```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA, ET AL.,  )
                                   )
          Plaintiffs,              )
                                   )    CV No. 20-3010
      vs.                          )    Washington, D.C.
                                   )    May 2, 2024
GOOGLE LLC,                        )    9:00 a.m.
                                   )
          Defendant.               )    Day 1
_____)    Morning Session


                    TRANSCRIPT OF
       BENCH TRIAL CLOSING ARGUMENT PROCEEDINGS
        BEFORE THE HONORABLE AMIT P. MEHTA
            UNITED STATES DISTRICT JUDGE


APPEARANCES:

For DOJ Plaintiffs:        Kenneth M. Dintzer
                           U.S. DEPARTMENT OF JUSTICE
                           1100 L Street, NW
                           Washington, D.C.
                           (202) 307-0340
                           Email:
                           kenneth.dintzer2@usdoj.gov
```

APPEARANCES CONTINUED:

For Plaintiff States:        Jonathan Bruce Sallet
                             COLORADO DEPARTMENT OF LAW
                             Consumer Protection Section,
                             Antitrust Unit
                             Ralph L. Carr
                             Colorado Judicial Center
                             1300 Broadway
                             Suite 7th Floor
                             Denver, CO 80203
                             (720) 508-6000
                             Email: jon.sallet@coag.gov

                             William F. Cavanaugh, Jr.
                             PATTERSON BELKNAP
                             WEBB & TYLER LLP
                             1133 Avenue of the Americas
                             Suite 2200
                             New York, NY 10036-6710
                             (212) 335-2793
                             Email: wfcavanaugh@pbwt.com

For the Defendant:           John E. Schmidtlein
                             WILLIAMS & CONNOLLY LLP
                             680 Maine Avenue, SW
                             Washington, D.C. 20024
                             (202) 434-5000
                             Email: jschmidtlein@wc.com

Court Reporter:              William P. Zaremba
                             Registered Merit Reporter
                             Certified Realtime Reporter
                             Official Court Reporter
                             E. Barrett Prettyman CH
                             333 Constitution Avenue, NW
                             Washington, D.C. 20001
                             (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                     P R O C E E D I N G S

 2              COURTROOM DEPUTY:  This Court is now in session;

 3     the Honorable Amit P. Mehta is presiding.

 4              THE COURT:  Good morning, everyone.

 5              COURTROOM DEPUTY:  Good morning, Your Honor.

 6     This is Civil Action 20-3010, United States of America,

 7     et al., versus Google LLC.

 8              Kenneth Dintzer for the DOJ.

 9              Jonathan Sallet and William Cavanaugh for

10     Plaintiff States.

11              John Schmidtlein on behalf of Google.

12              THE COURT:  Okay.  Good morning, everyone.

13     Welcome back.

14              Good morning to all the fans who've arrived in the

15     audience.

16              Okay.  So we're here this morning for closings.

17     Anything anybody would like to discuss before we get

18     started?

19              MR. DINTZER:  Not for the DOJ Plaintiffs,

20     Your Honor.

21              MR. CAVANAUGH:  No, Your Honor.

22              MR. SCHMIDTLEIN:  No, Your Honor.

23              THE COURT:  Okay.

24              Let me just say one quick thing in terms of

25     timing.
```

1          Obviously I did issue this order a couple weeks

2  ago in terms of the structure of the arguments over today

3  and then tomorrow.  You know, it was written and done at a

4  time -- let's just say it was two weeks ago, and so all of

5  this may not line up with actually the amount of time that

6  may be necessary for each of these topics; some may require

7  more; some may require less.  So in particular when we talk

8  about -- get to prima facie case and anti-competitive

9  effects, if that has to bleed over into after lunch, that is

10  perfectly fine, okay?

11          All right.  With that, Mr. Dintzer.

12          MR. DINTZER:  Thank you, Your Honor.

13          May I approach?

14          THE COURT:  You may.

15          Oh, and thank you, everybody, for getting

16  everything filed on Tuesday.  I noticed as all the filings

17  were coming in late at night, so thank you very much.

18          MR. DINTZER:  So, Your Honor, we'll be handing up

19  different binders for each of the different presentations.

20          May it please the Court.

21          Google has wielded monopoly power in general

22  search for more than a decade.  Its high market share and

23  enormous barriers to entry give it control of a market that

24  touches all of our lives.

25          Google's power has enabled it to freeze the search

1    ecosystem, making it impervious to change.

2         Google's power has allowed it to stall or strangle

3    new entrants that might weaken Google's hold, and Google's

4    power permits it to make unilateral decisions about a

5    product that all of us use every day.  These decisions harm

6    users, and these decisions ignore rivals.  An example of

7    this power is Google's refusal to give users tools needed to

8    protect their privacy.

9         The Court heard from Mr. Ramaswamy, an executive

10   first at Google and then at Neeva, that, surveys showed,

11   that most Americans were concerned about online privacy.

12        We tell Google our secrets.  We type in queries

13   into Google about our health, our sexuality and our politics

14   that are subjects that we would not share with our friends

15   and family, and then Google monetizes our secrets because it

16   can, because it has the power to ignore concerns and

17   preferences.

18        Every American should be able to search the

19   Internet without surrendering personal privacy.  We should

20   have tools that are easy to use and easy to understand and

21   that give us control over how Google stores and uses our

22   information and to protect our children and their

23   information from Google's advertising machinery.

24        Google's employees have recognized these concerns.

25   They repeatedly propose that Google adopt more powerful,

1    simpler privacy tools to empower the company's users, but

2    Google refused.

3            In 2019, search executives proposed an incognito

4    mode for Google search, and we asked Dr. Raghavan, Google's

5    Senior Vice President, about this proposal.

6            "Question:  And that proposal, had it been

7    enacted, would have offered users an option for searching,

8    where Google would anonymize the user's data and never log

9    it, right?

10           "Correct.

11           "And Google never adopted that proposal, correct?

12           "Answer:  Correct.

13           "And one of the concerns was if Google adopted

14   that proposal, users would pick it and Google would lose

15   billions of dollars in revenue, correct?

16           "That was only one of the concerns, yes."

17           Google was afraid to offer a privacy product not

18   because it would fail but it would succeed.  This is a

19   monopolist's way of thinking.

20           In the email rejecting incognito mode,

21   Dr. Raghavan wrote, "I disagree with the methodology that

22   consists of conflating 'people care increasingly about

23   privacy' and then concluding that this needs a product

24   change," even though he acknowledged that concern was valid.

25           He explained that Google was not losing queries to

```
 1   DuckDuckGo.  He called them ankle biters.  And so costly
 2   investments in privacy were not worth making.
 3           Google could do this because it's a monopolist.
 4   This is a monopolist flexing its monopoly power.  This
 5   decision made it more difficult for each and every one of us
 6   to protect our information, and it's just one example of
 7   Google ignoring privacy preferences.
 8           Now, the Court doesn't have to believe us that
 9   Google ignores privacy concerns.  Apple is Google's biggest
10   search partner and it reached the same conclusion.
11           In 2019, an Apple executive was discussing the
12   possibility of defaulting some search to DuckDuckGo, which
13   is privacy focused.  And this executive wrote,
14   "The implication of recommending DuckDuckGo when customers
15   choose private browsing is that Google does not respect your
16   privacy, which, while true, would certainly be a public slap
17   in the face."
18           Your Honor, Google did not respect the privacy of
19   Apple users.  But Apple did not adopt DuckDuckGo as the
20   default in its privacy setting because you don't slap a
21   monopolist in the face.  Apple made Google the default in
22   private browsing and it kept cashing Google's checks.
23   Google does not respect your privacy or my privacy because
24   it doesn't have to because it has monopoly power.  The
25   market cannot police Google, so this Court must.
```

1          At heart, the Sherman Act is making sure

2    competition exists so corporations have to respect their

3    customers' privacy, their customers' choices.

4          Every American should feel that their privacy is

5    respected when searching for important information, but we

6    can't because Google has decided we can't, and that is the

7    danger of a monopolist.

8          Now, Google has spent hundreds of pages in their

9    briefing discussing their noble rise to dominance in the

10   search market.  None of that is relevant.  We are not

11   challenging how Google gathered its monopolies.  This is a

12   monopoly maintenance case.  We challenge Google's conduct in

13   maintaining those monopolies.  We challenge Google's conduct

14   in freezing the ecosystem.

15         Now, as promised in our opening, we've shown what

16   Google did, and we relied on testimony presented at trial.

17         But we also relied on Google's documents, a lot of

18   documents, and they showed what Google thought and what

19   Google did at the time.

20         When questioning their own employees, Google often

21   used demonstratives, while we used the employees' own

22   contemporaneous words.

23         Google spent decades hiding and destroying

24   documents because their documents paint a clear record of

25   Google's efforts to protect its monopolies and freeze the

1  ecosystem.

2          In this morning's presentation, Your Honor, I'll

3  discuss the evidence demonstrating Google has monopoly power

4  in the U.S. general search servicing market.

5          First I'll focus on Google's ability to exercise

6  monopoly power in search, which I've already started, and

7  then I'll turn to the evidence demonstrating that general

8  search is, in fact, a relevant market.

9          So returning to the question of monopoly power --

10          THE COURT:  Can I ask you --

11          MR. DINTZER:  -- the cases say we can show --

12          THE COURT:  I'm sorry, Mr. Dintzer, if I could

13  just interrupt you, and this will happen from time to time.

14          MR. DINTZER:  Sure.

15          THE COURT:  Isn't the approach backwards?

16          In other words, shouldn't you be defining the

17  market and then, within that market, that where -- it's

18  within that market you need to establish monopoly power?

19          MR. DINTZER:  Your Honor, as far as we're

20  concerned, they are -- there are two parts that ultimately

21  we have to demonstrate, and we feel that showing the

22  monopoly power, the ability to exercise monopoly power,

23  allows the Court to infer that there is a market that

24  they're exercising it in.

25          But we have a complete presentation on market

1    definition.  If the Court would prefer us to go to that

2    first, we'd be happy to.

3            THE COURT:  I mean, it's your opening, I just --

4    I'm surprised that we're starting here.  But either way.

5            MR. DINTZER:  Okay.

6            And -- so we will do them in turn, and hopefully

7    we'll answer all the Court's questions.

8            Monopoly power is shown when a firm sets prices

9    without considering their rivals' prices.  And we have

10   evidence of that on the ad side, which Mr. Dahlquist

11   tomorrow will be addressing.

12           But for search, the price is free.  And for this,

13   we have evidence regarding Google's quality, which is agreed

14   can be a marker.

15           And what the Court said in *Microsoft*, what the

16   D.C. Circuit said was that, the company -- that "A company

17   that can set the price of windows without considering a

18   rival's price, that's something a firm without a monopoly

19   would have been unable to do."

20           And so in a 30(b)(6), Google said, Google admitted

21   the following:  "Google does not, however, consider whether

22   users will go to other specific search providers (general or

23   otherwise) if it introduces a change to its search product."

24           So they acknowledged that they can make or modify

25   their product, or choose not to, without worrying that they

1    might lose a user to a specific product, like the decision

2    to not do Incognito mode.  That's direct evidence of

3    monopoly power.

4            When discussing Google's efforts to model the

5    rev share payments that they paid to their partners --

6            THE COURT:  I'm sorry to interrupt.

7            MR. DINTZER:  Please.

8            THE COURT:  But this is one of the issues I want

9    to discuss, because I know one of the plaintiffs' themes has

10   been that some combination of Google hasn't innovated

11   sufficiently, it doesn't consider its rivals in terms of its

12   product development.

13           I mean, look, I think the record firmly, in a

14   sense, does establish -- I don't think anybody would dispute

15   that, that search today looks a lot different than it did 10

16   to 15 years ago.

17           MR. DINTZER:  Yes, Your Honor.

18           THE COURT:  And much of that -- or some of that is

19   attributable to Google and its continuing efforts to

20   innovate search.

21           Would you agree with that?

22           MR. DINTZER:  There are definite innovations that

23   have come through Google, some of them they take credit for,

24   that actually began elsewhere.

25           But there's no question, Your Honor, that even

1    monopolists have an incentive to invest, and -- I mean, the

2    *Microsoft* Court said that.

3              THE COURT:  No, I know *Microsoft* said that.

4              But just -- it's not that it's inconsistent with

5    monopolistic behavior, it's that it seems to me to be a hard

6    row for you to -- hard row for you to go down for me to

7    conclude that Google hasn't innovated enough.

8              I mean, how do I make that determination?  You

9    know, against what baseline should I be making that

10   comparison to say, you know what, Google, you've left too

11   much on the shelf over the years.  If you had competition,

12   it would have improved at a faster pace.

13             And how do I make that determination on this

14   record?

15             MR. DINTZER:  Your Honor, that's not a

16   determination the Court has to make.

17             We have shown and can show that Google has both

18   direct and indirect evidence of monopoly power.

19             And so if the Court is asking, does it need to

20   make a conclusion that Google hasn't innovated enough?

21   That's an effect of the fact that they have a monopoly, that

22   they've exercised monopoly power, and that they have hobbled

23   their competitors.

24             And then the Court infers that -- I mean, the

25   Court knows that the causation standard is toothless here,

```
 1   and the reason is because we can't prove the but-for world

 2   of how much they would have innovated if, for the past

 3   12 years, they had had a rival chomping at their feet.

 4              THE COURT:  Right.

 5              I mean, we'll clearly talk about but-for world

 6   issues maybe -- certainly a fair amount either today or --

 7   certainly today.

 8              But I mean, again, look, I thought one of your

 9   positions was that, when establishing monopoly power, you've

10   got direct evidence and indirect evidence.  We'll get to

11   indirect evidence in a moment.  But the direct evidence

12   needs to, at least in this type of case, show one of two

13   things; either, it seems to me, a lack of innovation or

14   product quality degradation, which, perhaps, is just the

15   other side of the same coin.

16              And I'm struggling to see how I could reach

17   findings of fact that would say, you know, Google has not

18   done enough or that Google's product has worsened over the

19   course of ten years in such a way that I could say it's

20   because of lack of competition.

21              How do I make that determination on this record?

22              MR. DINTZER:  What Microsoft says in the slide,

23   Your Honor, is that if it's setting in this case its -- if

24   it's making quality decisions without considering rivals,

25   that's something a monopolist wouldn't do.
```

1          THE COURT:  Is it enough that Google -- I mean,

2    we've heard evidence that it does regularly do quality

3    side-by-side comparisons with Bing, maybe not DuckDuckGo,

4    but with, certainly, Bing, who is the biggest rival.

5    I mean, they do periodically make -- check-in, and, in fact,

6    came to the conclusion at one point that Bing was sort of on

7    par in terms of quality on Desktop.

8          MR. DINTZER:  Yes, Your Honor.

9          THE COURT:  So isn't that contrary to the notion

10    that they're not checking in on their rivals?

11          MR. DINTZER:  I think we have specific elements,

12    such as the evidence we just showed, where you have a

13    decision being made -- I mean, the case law says,

14    direct evidence is often not available and it's not

15    necessary.  But we have specific instances where we have,

16    such as Dr. Raghavan, making a decision about privacy

17    because -- expressly because they're not losing searches to

18    a privacy-based search engine.

19          Or, Your Honor, for example -- a second example,

20    where Professor Murphy was talking about how Google, when

21    they're estimating how much to offer for rev share, he's

22    like, they don't have to be super precise because there's a

23    lot of headroom between the numbers that they're offering

24    and the deal that they're doing.

25          And, in fact, we heard that there's a lot of

```
 1    profit from these rev share agreements.  They -- Google
 2    takes a lot of profit.  If there was competition for these
 3    agreements, Google would have to compete more of its profit
 4    away to get to secure these defaults, if there was
 5    competition for the distribution, but there isn't.
 6              And, in fact, another example of Google ignoring
 7    privacy preferences, Your Honor.  Google did some research,
 8    they did a survey:  How long do you want Google to store
 9    your data?  Okay.  About 50 percent said a month or less,
10    and about 74 percent said no more than a year.
11              And so what Google decided was they would store --
12    the default would be 18 months, and the default is not
13    really easy to hunt down and change if you want, the default
14    is 18 months.  And when Ms. Fitzpatrick was testifying about
15    it, she explained that they sort of reached 18 months just
16    because it felt good.
17              THE COURT:  Can we talk -- I mean, here's my
18    challenge with privacy and the issue of privacy.
19              I don't think there's any dispute that the
20    evidence has shown that users have a concern about privacy,
21    right?  I mean Google -- I assume Mr. Schmidtlein will
22    concede to that.
23              The challenge I have is not dissimilar than what
24    you just discussed when I talk about innovation, which is,
25    how do I measure whether they've done enough?  Whether it's
```

1  good enough?

2        And, okay, sure, they haven't gone as far as

3  DuckDuckGo, fine; but why isn't that just a simple business

4  decision?  Because there are tradeoffs to be made -- I think

5  you'd agree there are tradeoffs to be made between privacy

6  and potentially the effectiveness of a search engine.

7        For example, Google has made the decision that as

8  part of the search experience, we want to be in a position

9  to deliver ad products to you or ads to you that will meet

10 your declared intent.  And to do that, we've got to know

11 your IP address, for example.  We've got to know perhaps

12 where you were yesterday or the day before in terms of your

13 search so that we can provide you with a better quality

14 SERP.

15        How can I sit here as a federal judge, Article III

16 Judge, and say, you know, Google, the tradeoff you've made

17 is wrong?

18        MR. DINTZER:  We are not asking the Court to make

19 that finding.

20        What we have in front of the Court right now is

21 Google asking their consumers, their customers something,

22 and then, admittedly, not only ignoring them but setting the

23 default --

24        THE COURT:  But it can't be an indication of a

25 monopoly power every time a company makes a determination

1   that's odd -- that may be at odds with its consumers'

2   desires, because it's a complicated question.

3          Would you agree this sort of balance of privacy

4   versus search quality, there is a tradeoff there?  Would you

5   agree with that?

6          MR. DINTZER:  I think that there's tradeoff to

7   some extent, Your Honor, yes.

8          I mean, obviously we believe that scale has a

9   significant effect on quality.

10         We know that Google uses 13 months to train its

11  elements and it, itself, acknowledges that it has a lot more

12  scale than its competitors.

13         It sets the default at 18 months.  I mean, the

14  explanation is not to save money, to do this, to do that.

15  The explanation is, just because we felt like it.  So when

16  you ignore your users' expressed statements because you feel

17  like it, that doesn't feel like a business decision, that

18  feels like a monopolist exercising its power.

19         THE COURT:  Say hypothetically they set

20  12 months --

21         MR. DINTZER:  They --

22         THE COURT:  -- they set 12 months.

23         MR. DINTZER:  As the default?

24         THE COURT:  Right.

25         MR. DINTZER:  That would be more consistent

```
1    with -- and if they explained they need 12 months or

2    13 months to --

3              THE COURT:  That still means 49 percent of users

4    believe that's too much data.

5              MR. DINTZER:  But that's a tradeoff that they

6    could explain.

7              They didn't -- there's no explanation for what

8    they said, except for that they could and that their users

9    don't have an ability to go anyplace else.

10             But, Your Honor, as the Court knows, we don't need

11   direct evidence to establish monopoly power.  We can

12   establish monopoly power through indirect evidence, and the

13   evidence is very clear about that.

14             Professor Whinston, and this is not challenged,

15   did a market share analysis, showed Google has 89.2 percent

16   of the market.

17             We look at StatCaster, [sic] this is a third party

18   that gathers market information about the general search

19   market.  And it shows that since 2009 and before, Google's

20   market share has been well over 70 percent and has been

21   rising over the time.  So the market share has been durable

22   for the last 14 years, this dominance.

23             Google's own analysis shows 98 percent of queries

24   share on mobile, 84 on Desktop, which equals 93 percent.

25   So there's no question that about market share.
```

1          As far as barriers to entry, the *Surescript* court

2    offered the useful definition:  "Any market condition that

3    makes entry more costly, time-consuming and thus reduces the

4    effectiveness of potential competition."

5          And Mr. Giannandrea testified about why venture

6    capital will not -- could not come in and make -- fund a new

7    search engine.  And he said, the reason a better search

8    engine has not appeared is that it's not a VC fundable

9    proposition, and he said that he still agreed with that

10   today.

11         In fact --

12         THE COURT:  So let me tell you what

13   Mr. Schmidtlein is going to get up and say.  He's going to

14   say, look at what Neeva did.  That is an example of why the

15   barriers of entry are not as high as the plaintiffs are

16   claiming.

17         Within three years, what Dr. Ramaswamy said what

18   they were able to do was build an index that he believes is

19   comparable to Google's, develop a ranking system that he

20   believes was comparable to Google's, and put on top of that

21   an AI search functionality or an AI answer functionality

22   that he thought was outstanding.

23         That was done in three years at the cost of --

24   I can't remember what their capital rate was, but let's say

25   less than half a billion dollars.  I'm not saying that's

```
 1    chump change, but in the world of search, that's not as much
 2    as the billions and billions of dollars Mr. Giannandrea was
 3    talking about.
 4              So why is that not an example of a case where,
 5    yes, they didn't succeed, but when we're just talking about
 6    barriers of entry, that that is an example of there aren't
 7    barriers of entry or they're not as high as you would say
 8    they are.
 9              MR. DINTZER:  Actually, what Mr. Ramaswamy
10    testified was that if he couldn't do it with all of his
11    experience and all the VC backing, then no one could do it.
12              So his actual testimony was that no one could do
13    it.  He --
14              THE COURT:  Well, that may be helpful in terms of
15    demonstrating the importance of distribution.  And we'll
16    obviously talk about that.  But they were certainly able to
17    enter the market.
18              I mean -- and, again, we can have a discussion
19    about whether they effectively entered the market.  But they
20    entered the market, they developed a search engine, they
21    developed a high-quality search engine relying not so much
22    on user data but on tech, on developments in AI and other
23    engineering prowess.
24              So if they could do it, why not somebody else?
25              MR. DINTZER:  Okay, so there's two answers to
```

1   that.

2          The first answer is that those barriers to

3   distribution are barriers to entry, and the *Kodak* case says

4   that, the *Surescript* case says that.

5          But, second, Neeva never stopped using Bing as --

6   to answer a lot of their questions.  So this was not a new

7   entrant into the market.  This was, to a large extent --

8   I mean, he did enter and they were answering some of the

9   questions themselves, I don't want to, again, say -- he said

10  that they had particular quality on certain types of

11  queries.  But for a lot of their queries, they had Bing

12  answering their queries.

13         THE COURT:  Was that true still at the end?

14         I thought Dr. Ramaswamy said they basically

15  shelved Bing at some point -- hang on -- when they

16  determined that Bing's quality just wasn't up to par.  And

17  they said, Look, that's -- I know that's when we decided --

18  but that was certainly a motivating factor in deciding,

19  we're going to build our own index, we're going to figure

20  out how to rank our searches -- oh, and then in 2002,

21  I think he said, or 2001, 2002, you know, the AI

22  functionality, we were able to put that on top of what we

23  had already built.

24         MR. DINTZER:  So Mr. Ramaswamy said that Neeva

25  failed, because in this market environment with these

1    interest rates, he couldn't get funding to continue on.  So

2    that is the market environment that we are in right now.

3              The second, I believe that the testimony is,

4    Your Honor, that while there were certain types of queries,

5    that they stopped falling back to Bing, that they always had

6    Bing.

7              And the existence of Bing as the option, to that

8    extent, they were a syndicator.  As is DuckDuckGo, they are

9    a syndicator of Bing.  They never moved the needle

10   competitively against Google.  I mean, they never forced

11   Google to change.  Whatever behaviors Google has, there's no

12   evidence.

13             And this is what barriers to entry is about.

14   There's no evidence that they changed Google's behavior.

15   And, in fact, the entry, actual entry doesn't prove no

16   barriers to entry.  That's what the *Surescript* case said.

17   That's exactly what -- he entered.  They gave it their best

18   shot.

19             Do we think there's going to be another Neeva

20   after they were unable to get distribution, unable to

21   succeed?  There's no evidence about that, and so that's why

22   Mr. Giannandrea calls it, and Mr. Nadella, I believe,

23   actually used the term of D.C. no-fly zone.

24             THE COURT:  Are you all -- just a related

25   question:  Are you all, plaintiffs, are you taking a

 1    position on Neeva's quality relative to Google's?

 2              MR. DINTZER:  No, Your Honor, no.  I mean, the

 3    Court doesn't need to make any factual findings about

 4    Neeva's quality.

 5              Neeva was in the market, they gave it a shot, they

 6    did not succeed.  There's no evidence that they created any

 7    kind of pressure on Google to create competition.

 8              THE COURT:  I mean, here's why I ask, because,

 9    I mean, certainly, Dr. Ramaswamy believes, and I understand

10    why he would, that he created a pretty good search engine.

11    You know, one of your -- the pillars of your argument is

12    that you can't create a world-class search engine without

13    sufficient user data.

14              If the evidence were to show that Neeva's quality

15    was comparable to Google's, maybe not as good, maybe not

16    100 percent, but, you know, within the ballpark, wouldn't

17    that sort of undermine your argument that it really takes a

18    lot of user-side data to build a world-class search engine?

19              MR. DINTZER:  The fact that they relied on Bing to

20    answer their questions shows that they couldn't get --

21    I mean, maybe there was some that they did, but -- and

22    I'm going off memory.  I believe what Mr. Ramaswamy said was

23    that for something like 60 percent of the queries, he felt

24    that they were as good as Google, it was something like

25    that.

1           But what will show when we're talking about scale

2    is that for the head queries, for the most popular queries,

3    I mean, if the query is about Taylor Swift, seeing it for

4    the millionth and one time doesn't add that much.  It adds

5    something, but it doesn't add that much.

6           THE COURT:  That depends on how big of a fan you

7    are.

8           Anyway.

9           MR. DINTZER:  If you want to find that extra site.

10          But what -- the tail is where the scale really

11   helps.

12          When you want to find that person who, you know,

13   was your roommate in college and you put in a name, the

14   ability to crawl the entire Internet and create an index,

15   that's where the rubber hits the road, and that's where

16   Google's scale is special when we get to scale.

17          THE COURT:  But I thought that's what he had done.

18          In other words, we don't need to -- but he said he

19   had built an index.  And the building of an index, as

20   I understand it, and correct me if I am wrong, that's not

21   user-data dependent, right?  Building an index is just

22   pulling out, crawling the web, building as big of an index

23   as you can such that when somebody puts in a query, that

24   improves the likelihood that you're going to get something

25   that is out there and relevant.

1          Now, of course, the other side of the equation is

2     that you have to have the ability to rank, and ranking

3     certainly does depend, or sort of historically has depended

4     on user data.

5          But at least as I heard his testimony, again, this

6     is why I'm asking whether you're taking a position on

7     quality, is that we had sort of figured out how to build a

8     search engine that was as good without user data.

9          MR. DINTZER:  There's no evidence of that,

10    Your Honor; there simply isn't.

11         What the evidence showed first is that -- I mean,

12    that user data is vital for the index.  It's vital in every

13    single step.

14         For the index, it tells the search engine how to

15    order the index, how to put the stuff that's going to be

16    seen more frequently up top.  It's vital for crawling in two

17    ways.  It tells you where to crawl more often and less

18    often.

19         And also, if you're a small search engine like

20    Neeva, a lot of websites won't even let you crawl because

21    there's a cost to the website.  So scale, it permeates all

22    of this.

23         And I don't -- I did not hear Mr. Ramaswamy ever

24    say, and I don't believe he said that even in his opinion,

25    they were as good as Google.  But even if he did reach that

1    conclusion, without -- we didn't see any metrics, any

2    IS testing, anything like that that indicated that they did

3    side-by-side testing to show that they mean in the bubble --

4              THE COURT:  Right.  I agree with that.

5              I was just curious whether you've taken a position

6    or you are taking a position about that question.

7              MR. DINTZER:  Our position is that Mr. Ramaswamy

8    is very knowledgeable about the search industry and some of

9    the things that he said are -- we agree with, and that the

10   quality of his search engine, we've never seen any data, so

11   we don't have an opinion on it.  I don't believe that

12   there's any basis for the Court to make a factual finding

13   about it.

14             What we do have is all this testimony,

15   Mr. Giannandrea, Mr. Ramaswamy calling it a Herculean

16   problem; Mr. Israel acknowledging costs billions of dollars

17   to create a search engine.  We know it requires all these

18   steps; one of is brand recognition and consumer loyalty; one

19   of which is ability to get access points.

20             So the Court should point that there are barriers

21   to entry, billions of dollars in costs; that if it didn't

22   cost billions of dollars to run a search engine like Google,

23   Google wouldn't pay billions of dollars to run its search

24   engine.

25             And Bing wouldn't pay billions of dollars and has

1    invested billions and billions of dollars to run its search

2    engine.  They would both, like, send it away and just invest

3    $50 million like, as Google says, Mr. Ramaswamy did.

4           So turning now to the question of relevant market,

5    general search engine is a tool that you use to search the

6    worldwide web.  And the reason that's relevant is because

7    Google keeps wanting to suggest that SVPs are in the market

8    but they generally don't search the worldwide web.  They

9    don't crawl, they didn't index, and they don't provide

10   information from the Internet.

11          Google's ordinary course analysis shows that SVPs

12   are not in the market.  We know that they're going to go

13   there, we know Dr. Israel talked about it, we want to make

14   sure we have a chance to talk about this.

15          This is Project Charlotte.  And what Google found

16   in a very comprehensive study was, we have found no evidence

17   of short-term negative per-user revenue impact resulting

18   from a user becoming an online retail loyalty program member

19   or being active on large online retailers.

20          That means somebody signs up for Prime and they're

21   going to be using it a lot.  If they were competitors, one

22   would expect that would rob Google of revenue, of queries;

23   in fact, they search more.  That's what the evidence shows.

24   The query count isn't going down, the revenue isn't going

25   down, this is not a competitor.

1            And we asked Dr. Raghavan about that:

2            "So loyalty to members, Amazon Prime members, tend

3    to do more searches, not fewer?

4            "Correct."

5            And that's not just Amazon Prime.  That's for all

6    online marketplaces.  That's what it says here.

7            We showed this to Dr. Israel.  He didn't remember

8    the study.  It turns out, it wasn't part of his documents

9    considered.

10           And it's not just on browsers.  Google did, as

11   part of a Project Charlotte, they looked at apps and did

12   apps for Amazon.  Did those harm Google?  Turns out they're

13   correlated with increased revenue and increased queries.

14   They searched more.

15           And so Dr. Israel had to admit, I would say that

16   at that sort of broad level of everything and Amazon and

17   Google do, there are elements of complementary between them,

18   and the existence of the app might help Google.  They like

19   that shopping apps are there.

20           Okay.  Your Honor, that is complements.  The case

21   law is very clear that a complement is not in the same

22   market.  It's like peanut butter and jelly.  If you use them

23   together, but if you're shopping for peanut butter, jelly is

24   not a replacement.  This is a fundamental mistake that the

25   defendants ask the Court to make.

1          And, in fact, Dr. Israel did not rely on documents

2     that support his conclusion.  We showed the Court documents.

3     We said, there's no documents from Google that validate this

4     analysis, right?  And he said, this is not based on a Google

5     document, it's based on my analysis of the data.

6          And so much of what he did was chop the data up in

7     ways that Google doesn't and pull out certain pieces of the

8     data in ways that Google doesn't and reaches conclusion that

9     Google has never reached and never even considered and tells

10    the Court, well, this is who Google really competes against.

11    There's no evidence for that.

12         And then he says, well, Amazon and Expedia,

13    they're taking some queries, some.  And what this Court,

14    in *H&R Block* said, is "While providers of all tax

15    preparation methods may compete at some level," may, "this

16    does not necessarily require that they be included in the

17    relevant product market for antitrust purposes."  And that's

18    important because the fact that one query, one query may

19    find its way to Amazon instead of Google does not mean that

20    users view them as substitutes, as reasonable substitutes.

21         I don't want to step on the States' time, so I'm

22    happy to, if the Court will indulge a couple more minutes on

23    this, or I'd be happy to pass the time.  I'm not quite sure

24    how lines are drawn, so I don't want to step on the Court's

25    time.

1          THE COURT:  That's okay.

2          MR. DINTZER:  If I could go through the *Brown Shoe*

3    factors in just a couple minutes, or I surrender the podium;

4    I don't want to overstay my welcome.

5          THE COURT:  No, no, we're here for a couple days,

6    there's no way you can overstay your welcome.

7          MR. DINTZER:  I appreciate that, Your Honor.

8          THE COURT:  Let me just ask, and as I said, the

9    time here is going to be a little fluid, 45 minutes moves

10   very quickly.

11         Look, I think the crux of the question is as

12   follows:  I think we all agree that there is some

13   substitution that happens between Google and SVPs, correct?

14         MR. DINTZER:  No, Your Honor.

15         THE COURT:  Well, let me put it differently.

16   There are some queries for which SVPs are used and not

17   Google, correct?

18         MR. DINTZER:  People type in queries into SVPs,

19   certainly.

20         THE COURT:  Right.

21         In other words, if I want to book a flight to

22   San Francisco, I can go directly to an SVP or I can do -- or

23   I can't book the flight through Google, but I can at least

24   find out what the flight times and the options are, and that

25   will then take me to United or some other airline's service.

 1          I think the question is as follows, and this gets

 2    to the heart of what Dr. Israel's analysis is, which is,

 3    you know, the question here ultimately is:  Is there a

 4    significant substitution?  And is the substitution

 5    sufficiently significant that, in a hypothetical world, if

 6    Google actually started charging for its searches, that

 7    Google would lose enough users in a way that would actually

 8    constrain any price that it might wish to impose, right?

 9          And if the answer is, yes, enough people would

10    substitute out, enough of the searches would be substituted

11    out such that Google thought to itself, well, you know what,

12    maybe we shouldn't charge a price at all, that's probably a

13    bad idea, that's not a good idea for our bottom line, that

14    would constrain Google, right?  That constrains Google's

15    monopoly power in theory.

16          So why isn't it the case that even if it's not one

17    SVP, that the collection of SVPs -- and arguably, you know,

18    the collection of SVPs is sufficient to constrain Google.

19    And so because it's constraining Google and has the effect

20    of constraining Google, because certainly the evidence shows

21    that Google compares itself to these SVPs, that they

22    shouldn't be included in the same marketplace?

23          MR. DINTZER:  Sure.

24          So I have three parts to the answer.

25          The first part is Google compares itself to the

1    SVPs for search ads because -- which we acknowledge.  They

2    do not do latency testing against the SVPs.  They don't do

3    IS testing against the SVPs.  They don't compare themselves

4    in that way.  That's the first one.

5         The second one, Your Honor, is, we can look at

6    what Google did -- does on Android.  It tells -- and this is

7    me asking Dr. Israel about this.  It tells the OEMs that

8    they can put TikTok, Amazon, and Facebook apps on Android,

9    they're okay with that, okay.  Google would not do that if

10   they thought they were losing queries.

11        Who are the OEMs not allowed to put on?  Bing,

12   DuckDuckGo, Ecosia.  Think about it.  You can't put Ecosia

13   on it, even though it's this big, but you can put the Amazon

14   app on it, you can put TikTok.  That's Google telling the

15   Court, telling everyone, these are not my competitors,

16   go ahead and put their apps on the phone.  And that's what

17   Dr. Israel is saying there.  So we have Google telling us

18   that they don't compete against these people.

19        And Project Charlotte was another version of that.

20   In fact, all the way back to 2010, Dr. Varian sent an email,

21   this is at page 171 of the transcript.  He was being asked

22   by his boss, "Should we worry about this Facebook thing?

23   Are they taking people from us?"  And Dr. Varian said, "No,

24   no.  We've looked.  We've looked at Amazon, we've looked at

25   Facebook," more -- "the more use of the Internet means more

```
 1    queries to us."  So from 2010 onward, they have not seen
 2    these people as rivals who would constrain them.
 3            When Dr. Raghavan was considering privacy
 4    concerns, he didn't say, well, let's think about Amazon;
 5    well, let's think about, you know, how does Expedia deal
 6    with privacy?  The only one he mentioned was DuckDuckGo,
 7    another general search engine.
 8            So, Your Honor, they don't consider these other
 9    entities when they're making decisions about quality or,
10    I mean, they've never tried to charge a price, but on
11    quality decisions.
12            I don't want to take the States' time.  So if I've
13    answered the Court's question.
14            THE COURT:  Yeah, you'll have some time in
15    rebuttal, too.
16            MR. DINTZER:  Okay, I appreciate that.
17            THE COURT:  But why don't we give Mr. Cavanaugh
18    the floor for a few minutes.
19            Again, I've also left time at the end of the day,
20    recognizing that this exact thing would happen.
21            MR. DINTZER:  Okay.  I appreciate that,
22    Your Honor.
23            MR. CAVANAUGH:  Your Honor, may I approach?
24            THE COURT:  Sure.
25            MR. CAVANAUGH:  Your Honor, I'll be brief; I won't
```

```
 1   go through all the slides I proposed using.

 2          Peter -- let me answer the Court's question about

 3   the substitutability of SVPs, and I'll start at the extreme,

 4   start at Slide 8.

 5          The Court will recall Dr. Israel, in an effort to

 6   suggest how expansive his potential market is, identified

 7   this Court's website as potentially taking queries away from

 8   Google.  Certainly nothing this Court has done to date has

 9   restrained Google; we're hoping it will hereafter.

10          But what's really problematic about his answer is

11   that it isn't the query that defines the market, it is the

12   product, it's the answer to the query.

13          If we go to Slide 9.

14          Because on cross-examination, he said,

15   "The product is the answer to a query.  And the answers you

16   get from an SVP and the answers you get from Google are

17   fundamentally different."

18          The SVP is working within the limited information

19   it has within its inventory.

20          Google, if I put in "Travel to Boston," I'm going

21   to get newspaper articles about the safety of air travel,

22   I'll get information on the Revolutionary Trail through

23   north Boston.

24          THE COURT:  Do you agree with Dr. Israel that the

25   product is the answer to a query?
```

1          MR. CAVANAUGH:  Yes.

2          THE COURT:  Okay.

3          MR. CAVANAUGH:  Yes, we do.  That's why I asked

4     that question on cross-examination, to make that point.

5          And if we go to Slide 3.

6          This is an analysis Dr. Baker did looking at, when

7     you do a search on Google, the information you get that is

8     outside of Google's segment, and that just -- it shows you

9     the breadth of the information that you get no matter what

10    the segment is.  And on average, it's -- more than half of

11    the information you get is outside the segment, which the

12    query itself was classified by Google.  It's just

13    fundamentally different.

14         If we go to Slide 2.

15         And this is the point Mr. Dintzer was making.

16    Dr. Raghavan admitted that research is one of the things

17    used during consumers mode, and they do a lot on Google.

18         Amazon Prime members, the people who are most

19    loyal, most committed to Amazon, that they're willing to pay

20    them whatever Mrs. Cavanaugh pays to be an Amazon Prime

21    user, they go to Google to do their research.  That's where

22    they start.

23         And 69 percent of people start with Google.  They

24    do it out of habit, they do it because it's a broad source

25    of information.  That's why SVPs are complements and not

```
 1   substitutes.
 2              THE COURT:  So --
 3              MR. CAVANAUGH:  Go ahead, Your Honor.
 4              THE COURT:  I'm sorry.
 5              So to bring this to a case that's sort of near and
 6   dear to my heart, in Sysco, there was a similar fact
 7   pattern, I would submit, which is that the broad-line
 8   distributors did everything, full complement of goods and
 9   services.
10              There were, in the industry, smaller, more niche
11   suppliers of varying size and abilities; and I held in that
12   case, as you know, they weren't in the market.
13              MR. CAVANAUGH:  Right.
14              THE COURT:  Because -- for a variety of reasons.
15              I think the question in my mind here is, we're not
16   talking about sort of smaller niche providers.
17              SVPs are Amazon, they're Expedia, they are large
18   multibillion-dollar corporations.  And so, you know, it's
19   not like a small food distributor that just provides Italian
20   food, as was the case in Sysco.  So it seems to me to be a
21   little bit different in that regard.
22              And so why shouldn't these larger companies be
23   considered direct competitors of Google in Search?
24              Let's not talk about general search.  In Search.
25              MR. CAVANAUGH:  Because, Your Honor, they spend
```

1    billions of dollars each year.  Those large companies you

2    just referenced, they spend billions of dollars a year to

3    advertise on Google.

4         Google doesn't advertise on them to any meaningful

5    degree.  Why?  Because the product produced by each is

6    different.

7         Amazon, Tripadvisor, Bookings, they go to Google

8    because that's where the new customers are, and they need

9    that to function.

10         The converse isn't true.  That's why they're in

11    different markets.  They have fundamentally different

12    purposes.

13         I mean, you know, I have a slide that talks about

14    they have different algorithms, they have different

15    purposes -- they just function very differently.

16         THE COURT:  I mean, the ultimate test here is, the

17    market is defined by the area in which significant

18    substitution occurs.

19         MR. CAVANAUGH:  Yes.

20         THE COURT:  So does the evidence establish that

21    significant substitution is not occurring with SVPs?

22         MR. CAVANAUGH:  The fact that 69 percent of people

23    start with Google.  And Amazon Prime members, Amazon's most

24    important customers, 70 percent of the time they're doing

25    their research on Google.  That's why they're complements

1    and not substitutes.

2           We're not seeing sufficient substitution to

3    warrant putting them in the same market, whether -- when

4    Your Honor talks about the practical indicia for a market,

5    when you look at that practical indicia, how they function,

6    how they operate, where they spend their advertising

7    dollars, that tells you that the practical indicia suggested

8    they are not in the same market.

9           Your Honor, one short point.  You raised the issue

10   of quality, which I was going to talk about a bit in the --

11   when we get to procompetitive effects.  But I would remind

12   the Court that the Supreme Court, in *Society of Professional*

13   *Engineers*, said that you can't eliminate competition in a

14   quest for quality.  It's not even a procompetitive effect at

15   that point.  It can't be.  Because it springs from

16   anti-competitive conduct.

17          And the point the Supreme Court made in that case

18   is that the Sherman Act is premised on a very fundamental

19   proposition.  Competition will produce greater innovation

20   and greater quality.  You don't fix prices or eliminate

21   price competition and say, well, that's going to produce

22   greater quality.  No, that's antithetical to the

23   Sherman Act.  And that's what's happened here.

24          And what Google does on the issue of quality is

25   it -- they do a comparative analysis.  They say, We're

```
 1    better than Bing.  Well, the theory of our case, plaintiffs'

 2    case, is that they've achieved that through scale, and they

 3    achieve that scale through exclusionary conduct which has

 4    produced the anti-competitive effects.

 5            You can't come back and say, well, look, yes, we

 6    eliminated some competition through our distribution

 7    contracts but, look, we got all this -- we have so much

 8    better quality than Bing.  That's not an appropriate

 9    analysis under the Sherman Act.

10            Thank you, Your Honor.

11            THE COURT:  All right.  Thank you, Mr. Cavanaugh.

12            All right.  Mr. Schmidtlein.

13            MR. SCHMIDTLEIN:  May I approach, Your Honor?

14            THE COURT:  You may.

15            MR. SCHMIDTLEIN:  All right.  May it please the

16    Court.

17            Your Honor, I will also address a couple of the

18    points that the plaintiffs have raised here.

19            I think during our discussion of anti-competitive

20    effects, I have a very different reading of *National Society*

21    *of Engineers* than Mr. Cavanaugh does and what it says about

22    product quality.

23            The *Engineers'* case obviously involved a situation

24    where the defense of sort of a blatant sort of boycott type

25    of situation was safety for the product, we have to -- we
```

1    can't compete because we have to make it safer, and that is

2    very, very, very different than what you see here.

3              A couple of points I just want to respond to to

4    some questions Your Honor raised in your conversation with

5    Mr. Dintzer.

6              Our Findings of Fact 614 and 615, I think, may

7    well be the portions of the record that you were referring

8    to with respect to Neeva.

9              I believe Mr. Ramaswamy testified that by 2022, it

10   was in the position to use its own index and ranking

11   infrastructure to respond to the vast majority of user

12   queries it received.

13             So you're absolutely correct that by at least that

14   time period, they were well on their way to weaning

15   themselves, if not entirely by that point, that was their

16   goal and they were moving towards it.

17             And the reason they were moving towards it was his

18   testimony that they believed that their search quality was

19   actually better than Bing's by that point, and it was very

20   comparable to Google in various verticals.  So sort of the

21   substantive categories.  So they were comparable to Google,

22   they believed in important verticals, and they were better

23   than Bing by that time period.

24             So today, obviously, we're going to talk about

25   general search; tomorrow -- and this is the general search

1    services market that I think both the plaintiff groups are

2    sort of consistent.  There's some differences, as you know,

3    with respect to the ads market.  We will obviously get to

4    those tomorrow.

5            So when we're talking about online search

6    competition, I think Your Honor made some reference to this,

7    we really are talking about what's the effective area of

8    competition.  You have to look at the user side of the

9    market on the general search side of things.  That's the

10   focus of their claim.  They like to sort of suggest, when

11   they get in a bind, they'll sort of try to distract you by

12   saying, oh, no, but look at how browsers, you know, what

13   they use for default or look at Google's contracts, they

14   focus on general search engines.  That's not what is

15   determinative here.  What's determinative here is where do

16   users look and where can users substitute?

17           They have not established what -- they refer to

18   repeatedly, and they didn't talk about it this morning

19   because I don't think they like the data, one-stop shopping.

20   That is the crux of their case, because, as I think

21   Your Honor has recognized, as the evidence at trial

22   established, there is unquestionably competition and

23   substitution across these different verticals.  And so we

24   are in a one-stop shop situation here, which is, I think you

25   were absolutely right, is somewhat similar to what you were

1    dealing with in *Sysco*.  It was a different sort of shop, if

2    you will, it wasn't sort of at the actual grocery store

3    level, it was at the distribution level and where they were

4    going to go to get their distribution needs.

5            And what the law and the economics tells us is

6    that if you're going to get this -- if you have to establish

7    this one-stop shop, you need to see very, very substantial

8    demand for that cluster, you know, for that group of

9    products that are being sold together, and that's what

10   Your Honor saw that was important.

11           But -- or do you see enough competition from sort

12   of the individual component sellers that will discipline the

13   seller of the cluster, and do you see different types of

14   competition for those clusters?  And I think the evidence

15   here is, absolutely that's the case.  There's different

16   clusters of competition for different vertical categories of

17   search queries.

18           THE COURT:  You've mentioned clusters,

19   Mr. Schmidtlein.  And I meant to ask the plaintiffs this and

20   I'll ask them to address this on rebuttal, which is,

21   do you understand -- how do you understand the case law with

22   respect to cluster markets?

23           As I understand it, a cluster market is different

24   than a product market in the sense that a cluster market is

25   almost one that's defined by users.

1          That's sort of how it was defined in *Whole Foods*

2    by the Circuit; that is, there's a core group of users who

3    require a certain -- or who demand a certain -- in that

4    case, certain type of food, have a certain focus on what

5    they are interested in.  And that's what creates a cluster

6    market, not just simply the fact that there's a service that

7    offers multiple types of different products.

8          Do you have a different understanding of that?

9          MR. SCHMIDTLEIN:  No, I think that's generally

10   correct.

11         THE COURT:  Because if that's the definition of a

12   cluster market, I'm not sure how there is a sort of core

13   group of Google users who are creating this cluster market.

14         MR. SCHMIDTLEIN:  We agree.

15         THE COURT:  Everybody uses Google.

16         MR. SCHMIDTLEIN:  No, but what you -- what the

17   plaintiffs have alleged is that the fact that Google tries

18   to answer all queries makes it so unique, and that there's

19   such a unique consumer demand for that that Google can't be

20   replaced.

21         I can only -- you know, there's a large enough

22   group of consumers who won't substitute using the individual

23   vertical categories, that they only really go to Google

24   because that's just sort of what they do, I guess, it's --

25   they claim it's their habit, such that the fact that we have

1  individual sellers involving kind of the individual

2  components that go into general search, that doesn't

3  discipline Google.

4          And so I agree with you that in order for them to

5  sustain a cluster market, they need to demonstrate

6  substantial demand, consumer demand for the cluster.  If

7  they don't establish that, then I think their market falls

8  apart, because necessarily you do have to sweep in, well,

9  what are the competitive effects, what's the substitution

10 that we see from these individual vertical suppliers, the

11 Amazons, the Expedias, all these other people who have

12 decided, you know what, we can compete really effectively

13 with Google by specializing just on a narrow set of queries.

14 We actually think that's an advantage.

15         You heard Mr. Cavanaugh talk about, well, look at

16 this study that shows that Google shows lots of different

17 types of information, you know, in response to types of

18 queries.  That might be an advantage to Google for some

19 users, but for other users that's actually a disadvantage,

20 because Google doesn't necessarily have the same intent

21 signals that somebody who is searching on an Amazon.

22         If I'm going to Amazon, Amazon knows you're here

23 to shop.  If I'm going to Expedia, I know you're here and

24 you're looking for a hotel or a flight.  But if you type in

25 Paris, France, to Google, you -- Google is not sure what it

is exactly you're looking for.

And so what they claim is sort of evidence that sort of establishes the market, we would actually say that actually allows these verticals to search better.

And the fact that Google only shows ads in response to roughly 20 percent of queries, and we know there is very fierce competition around those commercial queries, I think the record in the case established that, that really makes Google compete particularly hard for those verticals, those most commercial queries. But we also know, and the testimony was consistent on this, if Google does a really, really bad job answering the noncommercial queries, people won't come back.

In some ways, Mr. Brin and Mr. Page's great dream and the mission that Google still has 25 years later, to organize the world's information and make it universally accessible and useable, that actually is a bigger burden on Google, and Google accepts that mission and they embrace it and they innovate like crazy to satisfy everybody's needs, because if they do a bad job on some, they're not going to be -- they're not going to retain loyal customers where they make their money.

And I think, you know, even Professor -- Professor Whinston agreed if they fail to establish this general search engine market, their case falls apart, they

 1    haven't shown monopoly power.

 2            And you're absolutely right, Your Honor, which is

 3    why we've kind of flipped ours.  You have to establish the

 4    relevant market first.  If you don't establish the relevant

 5    market, you can't establish monopoly power.  You need both,

 6    and the case law is consistent on that.

 7            So I want to focus a little bit on this concept of

 8    one-stop shopping, because it really is the keystone to

 9    their whole case of general search services are the markets.

10            So what was the -- you know, what was the

11    information we heard?  Well, I think the evidence was pretty

12    much uncontradicted at trial.

13            Users find information on many different places

14    online, and they substitute these other websites and apps

15    for general search engines for online searching.

16            We know, listen very carefully, they said, people

17    research, Amazon Prime users research on Google.  Well,

18    you've seen evidence in this case that the majority of

19    users, when they start online searching, they start on

20    Amazon.  A much smaller percentage of users start on Google.

21    So it's interesting about research.  But when it comes to

22    actually searching for products, shopping queries, the

23    majority of people go to Amazon.  So don't be misled by this

24    research question.

25            And if -- by the way, if Google does a lousy job

1    on research, they'll stop going to Google and they're going

2    to find theirselves going to Amazon probably for those

3    queries as well.

4              There's also no material switching costs here.

5    I mean, people can easily navigate on a desktop computer to

6    one of these SVPs and they've got apps on all of their

7    phones for these SVPs and other social media and everything

8    else.  They're ubiquitous.

9              This isn't a case where, if I walk into, you know,

10    a shopping center and there's a certain convenience going to

11    the department store, because I can kind of buy everything,

12    or try to buy everything there, but I have to -- I may have

13    to walk all the way across the shopping center to get to an

14    individual shoe store, let's say.  It's not the case on the

15    Internet.  It's just as easy for somebody to start a search

16    on an SVP or a social media site as it is on Google.

17              So we've cited this in our papers, I won't belabor

18    it here.  Professor Baker, in one of his articles, you know,

19    picks up on this exact point of, if you're only looking at

20    sort of the bundle, I use "bundle" and "cluster" sort of

21    interchangeably here, you're not going to get or capture or

22    understand the competitive effects if you limit it to the

23    bundle if there are lots of people who are offering the

24    components, not just the suites.

25              So where was the evidence?

1          THE COURT:  Can I -- if I can interrupt you,

2     Mr. Schmidtlein.

3          So I'll ask you to put a pause on this one-stop

4     shop issue, because I could share my thoughts about one-stop

5     shop if you'd like.

6          But, you know, look, this is not a case where, at

7     least in this market, we've got any sort of econometric

8     evidence, right.  So I'm going to have to apply an

9     econometric evidence in a sense of a SSNIP test because we

10    have no price, at least when it comes to general search.

11         So, you know, what's then left?  It's *Brown Shoe*

12    factors, right?  So doesn't Google lose on the *Brown Shoe*

13    factors?  And, you know, for example, we have talked about,

14    you know, one of the key things to look at in terms of

15    *Brown Shoe* factors is, what's the product?  You know, is it

16    a product that seems differentiated in the market?

17    Certainly I don't think the average person would say, yeah,

18    Google and Amazon are the same thing.

19         You know, Google's business model is different

20    than Amazon's model.  Google's model is, we are going to

21    monetize advertising as our revenue source, and in doing so,

22    we're going to actually enable people to answer any query

23    they want, and that's what's going to attract them to our

24    site.

25         Yes, if you want to go shop, you can do it at

```
 1   Amazon too.  But to go to Google, Google is the one place
 2   you can go to get any answer you need for any query across
 3   the board.
 4        Amazon and other SVPs, their model is very
 5   different, very niche, very specific, and we're going to
 6   monetize based upon buying and selling on our site and some
 7   advertising, but mainly buying and selling on our site.
 8        So if I start lining up those kind of sort of
 9   qualitative descriptors of these products, how is Google in
10   the same market as an SVP?  I mean, it seems to me they just
11   can't be.  I mean, by definition, by sort of just basically
12   the very business propositions are very different.
13        MR. SCHMIDTLEIN:  Your Honor, I would not say that
14   they're very different in the sense that on the commercial
15   side of things, they're trying to do very sort of similar
16   things.
17        THE COURT:  Agreed.
18        MR. SCHMIDTLEIN:  They're trying to --
19        THE COURT:  But I've got to look at the broader
20   product, right.
21        And we can't -- I mean, you know, I think the
22   number is 80 percent of the searches on Google are
23   non-commercial searches, right?
24        We can't say anything close to that on any of
25   these SVPs.  Nobody would go do an SVP to find out who the
```

1    starting short stop was on a 1983 Orioles, right?  You and

2    I know that, we don't have to go to Google.  But you can't

3    go to Amazon to find that answer.

4           MR. SCHMIDTLEIN:  I don't need to go to Google to

5    get that answer, Your Honor.

6           THE COURT:  Right.

7           MR. SCHMIDTLEIN:  No, but the point is, and

8    I think the purpose of the *Brown Shoe* factors and the case

9    law, I think, is sort of clear on this, is, you can have

10   differentiated products that offer sort of different

11   characteristics, different product qualities.  That -- in

12   many ways that's sort of the -- that's evidence of

13   competition.

14          The fact that I'm not offering the exact same

15   product doesn't mean that I don't have a competitive

16   constraint on the alleged monopolist, because I think the

17   purpose of the *Brown Shoe* factors, I mean the purpose of all

18   of this, to up level this is, does Google face competition

19   from people other than Bing, Yahoo!, DuckDuckGo, to

20   constrain their -- sort of their product.

21          THE COURT:  I don't even think plaintiffs would

22   suggest that Google doesn't face some constraints from the

23   SVPs.  Obviously Google has done a lot over the years to

24   compete with SVPs, right?  You know, the travel verticals

25   probably being the best examples.  They didn't exist

1    15 years ago.

2            But *Microsoft* seems to define this in a way that,

3    I think, is at odds with what you're thinking, which is

4    that, you know, the product needs to be reasonably

5    interchangeable by consumers for the same purposes.  And the

6    general search engine is -- offers -- it can't be

7    substituted for the same purposes as an SVP; in other

8    words -- would you agree with that?

9            MR. SCHMIDTLEIN:  Only where -- this is where the

10   one-stop shop is the critical point in this case.  On a

11   query-by-query, category-by-category basis, they can be

12   substituted.

13           That's why their experts -- and this slide here

14   talks about what Professor Baker tried to do.  And then

15   we've got Professor Whinston doing his Comscore analysis,

16   where both sides are looking at, well, what are users doing

17   when they go on Google?

18           Are they only sort of looking at -- you know, on a

19   visit-by-visit basis, are they looking at sort of one

20   category?  Are they searching for sort of discrete topics,

21   which suggests and demonstrates that people are not going to

22   Google?  Because, oh, I'm going to sit down and search for

23   all the various different things that Google can answer.

24   They're --

25           THE COURT:  That's why I actually, for what it's

```
 1    worth, I don't think the one-stop shop analogy is perfect.
 2    In other words --
 3             MR. SCHMIDTLEIN:  That's --
 4             THE COURT:  I know.
 5             In other words, I think of one-stop-shop
 6    analogies, if we bring it into the physical world, which is,
 7    I go to a mall or a grocery store, I can get what I need
 8    there.  That doesn't mean there aren't specialty stores.
 9             But there's the benefit of a one-stop shop.  And
10    so in that sense, Google is not a "one-stop shop."  But it
11    is a one-stop shop in the sense that it is a frictionless
12    place that you can go, even if you go somewhere else, unlike
13    if I go to a grocery store and then I go to a special store,
14    in order for me to go back to the grocery store, that's
15    going to require some cost and effort on my part.  Not so
16    for Google.  I can go to Google, I can go to Amazon and
17    bounce back to Google, even if it's for a very different
18    purpose, completely different purpose.
19             And so that's why I think this one-stop-shop
20    analogy breaks down, but it doesn't alter the basic
21    fundamental point, which is that Google is the one site
22    where, for all purposes, a user can go for any answer and to
23    accomplish not everything but quite a bit.  And you can't
24    buy an airline ticket on Google, I get it, but you can do
25    just about almost everything else right there.
```

53

1          MR. SCHMIDTLEIN:  But in order for you to conclude

2   that that is the factor that concludes or sort of answers

3   the relevant market question, you have to conclude that when

4   people search, they are in this one-stop-shop mode.

5          The fact that Google offers a broader ability to

6   answer queries doesn't answer the question, is Google

7   competitively constrained?

8          And the answer to that question and the evidence

9   in this case is a resounding, "yes," they are constrained by

10  all of the different vertical search providers who are

11  competing for the most commercial monetizable queries and

12  the --

13         THE COURT:  So let me ask you this:  Was it

14  *Microsoft* -- which is a case I think I've probably read more

15  than any other case I've read as a judge.

16         You'll recall that in terms of market definition,

17  there were these information appliances which, I think the

18  only example they gave was sort of mobile phones at the

19  time.  And obviously a very different marketplace than we

20  have today.

21         But what the Circuit said there is, look, the

22  information appliances don't belong in the same market as

23  the operating system, because they don't perform all of the

24  functions of a PC, and it was all of the functions of a PC,

25  and that these information appliances were only a

54

1    supplement.

2         So why doesn't that analysis lay on perfectly

3    here?  No SVP can perform all the functions of Google, but

4    they are supplements.

5         MR. SCHMIDTLEIN:  Because those other devices

6    don't -- couldn't competitively constrain Microsoft in how

7    it actually developed, priced, and sold the Windows

8    operating system to OEMs.

9         There was evidence in that case of pricing

10   behavior, of other factors that showed, for the OEMs buying

11   those Windows licenses, they didn't have an alternative.

12   And there was no evidence in that case that a user would

13   substitute a phone or, back then, the early, early days --

14        THE COURT:  Right.

15        MR. SCHMIDTLEIN:  -- mobile devices.

16        You didn't see the type of competition and

17   substitution.

18        And you certainly didn't see the type of evidence

19   in the record in that case that Microsoft believed it was

20   constrained by the competition from those devices.  You

21   don't see the substitution that you see for the monetizable

22   queries in this case.

23        When you see a large majority of users starting

24   their searches on Amazon or, you know, travel sites or other

25   types of verticals and you see Google internally studying

1    those, analyzing those and then making substantial

2    investments to improve its own vertical search capabilities,

3    that's very, very different than what you see in *Microsoft*.

4           THE COURT:  So would you agree with the principle

5    that's been stated in many, many cases, that the fact that a

6    company may compete in particular product markets with

7    various different types of competitors, that doesn't mean

8    that those other competitors are in the same product market,

9    right?

10          In other words, yes, you can have the specialty

11   providers that with which Google does compete, in the same

12   way that broad liners competed with those specialty

13   providers, but that doesn't bring those specialty providers

14   into the marketplace.

15          And so why even -- why is that not squarely

16   applicable here?

17          MR. SCHMIDTLEIN:  Again, I think it -- it's going

18   to be a case-by-case determination.

19          I mean, we've cited to you several cases,

20   including the *Thurman Industries* case.  This was the home

21   retail center case where, you know, the case there, the

22   plaintiff alleged, I provide sort of the entire array of

23   sort of products, supplies, services to people who are

24   engaging in sort of house renovations and home supplies,

25   things like that, and they claimed that was the relevant

1    market.  You couldn't consider hardware stores or you

2    couldn't consider, you know, all of the other individual

3    places where you might get components.  And the Court said,

4    that's not right, that's not right.

5            We see evidence in the case that users are

6    prepared to substitute.  If the pricing in one gets out of

7    whack, they will substitute to another one and so you can't

8    exclude all of those individual component suppliers even

9    though they clearly don't compete in terms of offering the

10   overall bundle.

11           The *Green Country Food* case, the *Emigra Group*

12   case.  We've cited several cases where you've got courts

13   considering this question of, you know, whether you call it

14   bundles or clusters or what have you, people are trying to

15   apply -- or trying to supply a broad array of products, and

16   the question is, is that array, that bundle, cluster,

17   whatever you want to call it, is that the subject of such

18   substantial consumer demand that these other alternative

19   sort of individual component suppliers can't impose a

20   competitive restraint?

21           And I think what we would submit to Your Honor is,

22   and the evidence in this case, these critical individual

23   component suppliers, that's where all the money is.  And if

24   Google doesn't compete well with them, they are absolutely

25   constrained in terms of their ability to degrade the product

 1    or, you know, offer a poor product -- you've seen the

 2    evidence as to how Google has innovated and invested on

 3    those.

 4              And I think the evidence is also clear, if Google

 5    does a lousy job of answering non-commercial queries, and

 6    this is consistent with all the innovation Google has made

 7    to improve search for non-commercial queries.

 8              THE COURT:  But say Google's quality degraded on

 9    commercial verticals, people -- there's nowhere else to

10    substitute for the non-commercial queries, right?

11              In other words, sure, if you've degraded your

12    airline's vertical or your hotel's vertical, your shopping,

13    your PLA ads aren't terribly helpful as they used to be,

14    people will start substituting to the SVPs on individual

15    verticals.  I think that's probably a fair inference to

16    draw.

17              But they're not going to on the non-commercial.

18    You can't substitute away from Google on the non-commercial

19    queries, and that's 80 percent of what you do.

20              MR. SCHMIDTLEIN:  Well, I would -- respectfully,

21    I think you can -- there are plenty of places you can go to

22    search for non-commercial information.

23              If I'm looking for, unfortunately, the score of

24    the Orioles-Yankee's game last night, I can go to ESPN,

25    I can go to lots of places depending -- if I'm looking for

58

```
 1   the weather tomorrow, there's an app for that.
 2            THE COURT:  Right.
 3            MR. SCHMIDTLEIN:  There's all sorts of places
 4   people go for non-commercial information.
 5            THE COURT:  Yeah, but, again, it's being
 6   constrained by sort of niche informational locations.  It's
 7   not being constrained by some other site or some other
 8   product that can answer any query that -- non-commercial
 9   query that comes to mind.
10            MR. SCHMIDTLEIN:  But I think the -- well, the
11   point is, I think --
12            THE COURT:  Nobody put ESPN in the same market as
13   Google or put a weather app in the same market as Google.
14            MR. SCHMIDTLEIN:  For people who are searching for
15   that category of information, they absolutely are.
16            Google absolutely views that it's essential for
17   them.  They go out and they license the data.  They spend
18   lots of time and effort to get that data.
19            So if you type in to Google, you know,
20   Orioles-Yankees score, you will get that information.
21            And you've probably seen knowledge panels.  If I
22   type in Eiffel Tower, or I type in, you know, how tall is
23   the Eiffel Tower, it's not going to make any money on that,
24   but they've spent an enormous amount of money and innovation
25   to develop knowledge panels and all sorts of other search
```

1    innovations to get you that answer, because they understand

2    if over time Bing or other areas, if people are doing a

3    bad -- or if Google is doing a bad job on those queries,

4    they're going to stop coming to them for the commercial

5    queries.  The commercial queries absolutely constrain

6    Google's ability.

7            And I think that's the question.  It's not

8    whether, well, are there sufficient other alternatives for

9    the informational queries?  The question is, is Google's

10   competitive behavior for those constrained by the commercial

11   queries?  And I think everybody at Google who testified said

12   that was absolutely the case; that there was no evidence in

13   this case, Your Honor, that Google only innovated on

14   commercial and they did a lousy job innovating on

15   non-commercial.  The plaintiffs have never made that claim.

16           THE COURT:  Yeah, you've got about ten minutes or

17   so.  And I'll want you to talk about barriers to entry.

18           MR. SCHMIDTLEIN:  Well, I think Your Honor has

19   picked up on some of the key points on barriers to entry.

20   I think two points I would make there.

21           You did correctly predict that certainly the case

22   of Neeva, and there are other sort of new general search

23   engines that have come into the market, but certainly the

24   case of Neeva is a telling one.  He was able to -- or

25   Mr. Ramaswamy was able to build and develop a search engine

1    in a relatively short period of time that he believed

2    rivaled Bing and Google with a much smaller venture capital

3    funding.

4              DuckDuckGo exists and, you know, they believe they

5    compete in the market.

6              THE COURT:  But doesn't that, in a sense, undercut

7    your argument?

8              In other words, we all understand Google's profit

9    margins, its incredible revenues.  One would think in that

10   kind of marketplace there would be lots of businesses trying

11   to come in and take some of those profits away.  Billions of

12   dollars, billions of dollars, right.  I can't think of an

13   industry where there are billions and billions of dollars of

14   profits available, competitors aren't going to be pouring in

15   to trying to get a piece of the pie.

16             You've got two, two in the last ten-plus year.

17   Doesn't that tell us all we need to know in terms of

18   barriers of entry?  There's been two.

19             MR. SCHMIDTLEIN:  There are more than two.

20             THE COURT:  One of which failed.

21             MR. SCHMIDTLEIN:  There are more than two.  But I

22   take your point.

23             But, again, this goes back to the cluster.  People

24   have decided, I don't need to answer all the queries to

25   compete with Google.

1          We've seen countless, countless specialized SVPs.

2     There's clearly no barriers -- or very low barriers to entry

3     there.

4          THE COURT:  Fair enough.

5          I get your point in terms of -- I guess where I am

6     now, at least in just sort of logical progression is, say I

7     disagree with you, that Google, in fact -- the general

8     search is, in fact, a market.  The question then becomes,

9     well, do you have monopoly power in that market?  And the

10    big question is:  Are there barriers to entry, right?

11         So that's why I'm asking the question I am, which

12    is that, if we assume that there's a general search market,

13    how are there not barriers of entry -- how can I conclude

14    that there are not barriers of entry when we've only seen

15    two substantial competitors, if you want to call them that,

16    to have entered this market in the last ten years?

17         MR. SCHMIDTLEIN:  Well, we know that there is

18    massive investment going on in AI, machine learning, and all

19    of the technologies that are changing and shifting the way

20    that people are sort of interacting with various websites.

21    So we see massive investment there that is going to have

22    impacts on how people interact and look for --

23         THE COURT:  Nobody said that an AI, a purely AI

24    driven search engine could succeed tomorrow, right.  I mean,

25    my determination here is about today.

1          And a similar argument was made in *Microsoft* that,

2    you know, the middleware may at some point become extremely

3    effective and pose competitive threats to the operating

4    systems.

5          And the Court said, maybe, but not today; at least

6    the District Court did and the Circuit agreed.  And that

7    seems to be the same situation with AI, which is, maybe

8    someday but not today.

9          MR. SCHMIDTLEIN:  But, again, I think the

10   question, all of these subsidiary questions are designed to

11   answer the overarching question, which is, is there monopoly

12   power?  Is there constraint on competition?  There are low

13   barriers to entry for the most monetizable queries.

14         People, I think, have figured out, we don't

15   need -- we don't need to take on Google for the whole bundle

16   in order to make money.  Why -- we don't need to do that.

17         Can there be or is there evidence that people can

18   do it?  I think Neeva is the best example, that they failed

19   is not evidence that there are barriers to entry.

20         THE COURT:  Right, I agree, the failure is a

21   different issue.

22         MR. SCHMIDTLEIN:  Right, is a completely different

23   issue.

24         And the fact that DuckDuckGo is able to exert

25   competitive pressure with very, very modest funding.

1    And you heard the testimony.

2            THE COURT:  Do you really think DuckDuckGo is

3    creating competitive pressure for Google?

4            MR. SCHMIDTLEIN:  Absolutely.

5            THE COURT:  What's the evidence for that?

6            MR. SCHMIDTLEIN:  Well, on -- precisely the issue.

7            THE COURT:  On privacy?

8            MR. SCHMIDTLEIN:  On privacy.

9            They've decided that's going to be our focus.

10           THE COURT:  Right.

11           MR. SCHMIDTLEIN:  That's going to be the part of

12   the market that we're going to focus on.  And absolutely

13   there is evidence of that.

14           And we completely disagree.  And we can get to

15   Mr. Dintzer's completely inaccurate characterization of

16   Mr. Raghavan's testimony and how Google responded in 2019.

17           In 2019, that document arose at a time after

18   Cambridge Analytica, when there was an uproar in general

19   about --

20           THE COURT:  Right, I know what Google's response

21   is.

22           Dr. Raghavan was doing what a businessperson would

23   do, which is, let's kick the tires on the business case and,

24   even after that -- I can't remember the name of the witness,

25   unfortunately.

1          MR. SCHMIDTLEIN:  Jenn Fitzpatrick.

2          THE COURT:  Ms. Fitzpatrick came in and said,

3    these are all the things that we've done.

4          MR. SCHMIDTLEIN:  Correct.

5          And part of that was -- absolutely, part of it was

6    in response to a more generalized consumer reaction and

7    awareness of sort of online privacy, really security issues,

8    because Cambridge Analytica was, in part, a security issue.

9          But part of that was then DuckDuckGo sort of

10   responded to that and began sort of aggressively trying to

11   make the case that it was more privacy focused.  There was

12   testimony going back and forth about, you know, the merits

13   of that.

14         But the purpose -- the point here is, Google

15   absolutely responded to it.  Google absolutely over time has

16   made innovations and improvement in privacy.

17         And you are absolutely right that there is a

18   tradeoff between quality and privacy; that using some user

19   data helps improve search results.  Everybody understood and

20   agreed with that.

21         And one point I do want to leave you with is,

22   there's no evidence -- it's interesting.  There's no

23   evidence in the record that Microsoft was more private than

24   Google, Yahoo! was more private than Google.  If they

25   thought that there was a way to greatly improve their

```
 1    product to compete better on quality while making it more

 2    private and competing on privacy, why haven't we seen that

 3    from Microsoft or Yahoo!?

 4             They've made, I think, roughly the same

 5    calculation of Google.  There are a portion of users who are

 6    very concerned about that, that Google responds to that.

 7    But they're trying to make that product quality-privacy

 8    tradeoff.

 9             THE COURT:  Can I ask you two more questions

10    before you conclude.

11             First is, do you agree with the proposition that

12    it's not the exercise of monopoly power that defines whether

13    a company has it?  It's the potential to do so.

14             MR. SCHMIDTLEIN:  I think the question is, given

15    the competitive landscape and looking at the various

16    competitive constraints, is the firm -- does the firm face

17    enough competitive constraints that we would not expect them

18    to be able to successfully raise prices, reduce output, or

19    somehow constrain quality.

20             You would expect, however, though, I think most

21    economists would tell you, if a firm has monopoly power,

22    they're going to -- it would be rational for them, and,

23    indeed, it's completely lawful for a firm that possesses

24    monopoly power to exercise it.

25             THE COURT:  Right.
```

1          MR. SCHMIDTLEIN:  That would be economically

2     rational.

3          Indeed, somebody -- some people might say Google

4     would be duty-bound to do it because of their shareholders.

5          THE COURT:  So the reason I ask the question is

6     because of this:  You already recall the quality degradation

7     experiment that Google conducted in 2020, and I think the

8     facts are that they sort of decreased the quality by one IS

9     point for six weeks, and the results were that very few, if

10    any, people noticed a difference.

11         Now, I'm not suggesting that Google has

12    intentionally degraded its quality, don't get me wrong, but

13    is that not evidence of monopoly power that they have the

14    ability to do so?  Even if they haven't exercised it,

15    doesn't this experiment show that Google has the ability to

16    degrade its own quality without losing users?

17         MR. SCHMIDTLEIN:  Absolutely not.

18         That single test showing a very short-term, small

19    degradation of quality absolutely doesn't demonstrate that

20    Google could sort of perpetually do that and not lose users.

21    Absolutely not.  You can't rely on just that single

22    incident.

23         THE COURT:  I guess -- well, let's say that it

24    involved pricing.

25         I mean, say Google ran an experiment about

 1    pricing, I guess we'll get to some of this with the ads

 2    tomorrow, but in which it did the same thing, not just

 3    degrade quality but increase price over six weeks, and it

 4    didn't lose any advertisers.

 5            Now, I'm not saying that Google has done that, but

 6    isn't it to demonstrate that they have the potential to do

 7    that without losing users or advertisers?

 8            MR. SCHMIDTLEIN:  I think you would need to

 9    establish that they could persistently increase prices or

10    degrade quality in a way that was perceptible and

11    recognizable by whatever the constituent user base was.  And

12    if they did that and you did not see substitution, then that

13    would be -- that would be a potential basis to conclude

14    monopoly power.

15            I will point out, Your Honor, though, there are

16    lots of firms that have some degree of pricing power that is

17    sort of monopoly power.  We see it all the time.  I mean, in

18    markets that are highly competitive, somebody might raise

19    their price for a short period, sometimes it's to explore a

20    price point or what have you.  Some people might do it

21    because they've raised quality.  You have to look at quality

22    adjusted, and we're going to talk about that, I'm sure,

23    tomorrow.

24            THE COURT:  We'll talk about that tomorrow.

25    Big conversation piece.

1          MR. SCHMIDTLEIN:  So I think absolutely it could,

2     I think, is the answer.

3          But I think you have to know the facts very, very

4     carefully.  And just because you see some firm in the market

5     raise its price, there are a lot of lawyers in the audience

6     today from lots of different law firms, I imagine.  Last

7     time I checked, law firm rates usually tick up.  I don't

8     think people would suggest that we don't have enough output

9     of lawyers in the country in terms of does some firm have

10    monopoly power to raise prices.  The fact that you see a

11    price increase alone doesn't tell you --

12          THE COURT:  So Williams & Connolly doesn't have

13    that power?

14          MR. SCHMIDTLEIN:  I wish we did, Your Honor.

15    We do not.

16          THE COURT:  Last question.

17          Assume for a moment, if you will, that I were to

18    conclude there's a general search services market as the

19    plaintiffs have defined it.  Are you in agreement that

20    Google has 89 percent of that market as of 2020, and that,

21    if it does, it would be considered the dominant firm in that

22    market?

23          MR. SCHMIDTLEIN:  I don't think that we have sort

24    of disputed or we've not offered disputes about the math --

25          THE COURT:  Right.

```
1              MR. SCHMIDTLEIN:  -- that the plaintiffs --

2              THE COURT:  I just want to make sure --

3              MR. SCHMIDTLEIN:  Yeah.

4              THE COURT:  -- that there's no dispute about that.

5              MR. SCHMIDTLEIN:  No, we're not disputing the

6    math.

7              We are not saying that if you narrow it to just

8    that small circle, that the math is somehow different.

9              THE COURT:  Okay.

10             MR. SCHMIDTLEIN:  I would obviously dispute --

11             THE COURT:  Understood.

12             MR. SCHMIDTLEIN:  -- the notion of "dominant" and

13   that even if you sort of concluded, you would still have to

14   make -- that's a circumstantial piece, I think you'd still

15   have to make the assessment about whether Google, in fact,

16   has monopoly power, because market shares are not

17   determinative.

18             THE COURT:  Here's one more question, and maybe

19   the answer is there's no evidence.

20             But say I were to agree with your conception of

21   the marketplace, which is, on a query-by-query basis, that's

22   the market.  Is there any evidence in the record of what

23   Google's share percentage would be in that instance?

24             MR. SCHMIDTLEIN:  No, they have not -- they

25   have -- you know, they didn't come in here and try to say,
```

```
1    in some narrow category -- we're going to talk tomorrow,

2    I assume, about the IQVIA case, which, you know, had a very,

3    very narrow, very narrow sort of specialized advertising

4    market.

5              THE COURT:  Right.

6              And I'm not talking about a narrow -- I'm talking

7    about your market, the market that you have put forward,

8    which is a query-by-query market in which Google competes

9    not only with Amazon and -- you know, any -- it competes

10   with Wikipedia --

11             MR. SCHMIDTLEIN:  Right.

12             THE COURT:  -- in your conception of the market.

13             So is there evidence as to Google's share

14   percentage in that broader market as you would conceive it

15   to be?

16             MR. SCHMIDTLEIN:  No, Your Honor.

17             THE COURT:  It wouldn't be 90 percent, but would

18   it not be above 50?

19             MR. SCHMIDTLEIN:  I think it would depend, and

20   I'm going to see if I can find a slide here.

21             So this is an example, Your Honor, of some data

22   that Dr. Israel looked at, where he looked at sort of usage

23   patterns sort of by different types of sort of verticals.

24             And what he found was, you know, for example,

25   flights and shopping-type queries, there's a substantial
```

 1    number of users who are actually searching on those, maybe

 2    even -- more than Google.

 3            For autos, you know, people are out there looking

 4    for new cars, whatever, a lot of times people will start

 5    those type of searches on Google.  It really -- I think the

 6    short answer is you're right, there's no evidence on it on

 7    the record.

 8            THE COURT:  Right.

 9            MR. SCHMIDTLEIN:  But we have reason -- I think we

10    do have some evidence that would indicate that in different

11    types of verticals, you're going to get very, very different

12    answers, and there are absolutely, shopping being probably

13    the most obvious one, where we have data that would suggest

14    that, in fact, Google does not have even 50 percent,

15    it would be much lower than that, and I think that would be

16    the case in other verticals as well.

17            THE COURT:  Okay.  Thank you, Mr. Schmidtlein.

18            Mr. Dintzer.

19            MR. DINTZER:  I was going to say that my paralegal

20    told me that Cal Ripken was the short stop, but I was afraid

21    that Mr. Schmidtlein would put him in the Google market.

22            Everybody who gives an answer is not in that

23    market, Your Honor.  But I should have remembered that it's

24    Cal Ripken.

25            Nav queries, Google is the only one that does nav

1    queries.

2           THE COURT:  I'm sorry, what queries?

3           MR. DINTZER:  General search engines are the only

4    ones who do navigational queries, SVPs never do them.

5           THE COURT:  Navigation.

6           MR. DINTZER:  I'm just going to hit a few points

7    and then I'd like to talk about *Brown Shoe*, which is

8    something that Mr. Schmidtlein never even raised until the

9    Court asked him.  The Court's analysis, of course, should go

10   through *Brown Shoe*.

11          One-stop shopping is one piece of one factor, but

12   it's certainly not determinative of the government's case.

13          I do want to say, Mr. Ramaswamy, he said that they

14   peaked at 60 percent of all queries.  This is at 3776 of the

15   transcript.  They were hoping to get higher.  But, of

16   course, peaking at the most common ones and then trying to

17   get higher in the more remote ones is more difficult.

18   He said that they challenged Google in quality on certain

19   narrow areas, but he did not make the claim across all of

20   them.

21          THE COURT:  And, I'm sorry, the 60 percent figure

22   is what, is that they --

23          MR. DINTZER:  That they tried to answer 60 percent

24   of the queries themselves.

25          THE COURT:  I see.  Okay.

1              MR. DINTZER:  And that's at 3 --

2              THE COURT:  Is the testimony is that they,

3    in fact, achieved that result or that they tried to achieve

4    the result?

5              MR. DINTZER:  I believe they achieved 60, and that

6    they were shooting for more but they never got there.

7              THE COURT:  Got you.

8              MR. DINTZER:  That it was very -- the way he

9    described it, of course, the Court can look at the

10   testimony, it was very narrow areas that they achieved

11   equality with Google, and some areas that they believed that

12   they were better than Bing, but he didn't make any broad

13   statements.  In fact, he testified that scale was vital to

14   the quality of a search engine.

15             Let's see.  The study that the Court asked my

16   colleague at the Bar about, it lasted for two to three

17   months but they projected results out for a full year.  And

18   so they were substantial and they actually -- I mean, they

19   actually showed that people don't have a choice.  If your

20   quality goes down, you're still stuck with a general search

21   engine.

22             And with that, I would like to go to the

23   *Brown Shoe* factors, because we believe that they are

24   significant.

25             If we go to page 38.

1          THE COURT:  Before you do that, I'm sorry, can you

2     answer my question about cluster markets and your theory as

3     to how that fits into your theory of market definition here?

4          MR. DINTZER:  Sure.

5          So to take a step back, there are cluster markets

6     and bundle markets, and we believe that this is a bundle

7     market where, by putting everything together, you're getting

8     a new product, which is a version of one-stop shop, which is

9     sort of -- you give -- and when Dr. Varian talks about, we

10    answer the ones that we don't get paid for so that you'll

11    come back to us for the ones we do get paid for, that's sort

12    of like the market saying, you know, we're going to sell the

13    peas at a lower price so you'll come back and buy your

14    proteins here, something like that.  The fact that there's a

15    specialty shop down the street, it's not a perfect match,

16    but it is a one-stop shop for the ideas that we have.  And

17    so we believe that it is a bundle market.

18         A cluster market is a little different.  A cluster

19    market is identifiably different products that are grouped

20    together for the analytic convenience, as I understand it.

21    But it is not necessary for our analysis.

22         We believe it simplifies the *Brown Shoe* analysis,

23    and we do believe it is a market along the lines of what's

24    found in Staples and Whole Foods and every grocery store,

25    which is, there's a convenience to walking in and having it

1    all there.

2              THE COURT:  So just to be clear, because I want to

3    make sure I have this analytically right, which is, one --

4    let's just say that the cluster market is one you are

5    putting forward as an alternative to some extent.

6              MR. DINTZER:  The bundle.

7              It is -- I just don't to say the wrong thing and

8    have the economist get mad at me.

9              THE COURT:  I understand you to say the bundle

10   market is your primary definition.

11             MR. DINTZER:  Yes.

12             THE COURT:  And that a cluster market is an

13   alternative.

14             MR. DINTZER:  Even if the Court doesn't do the

15   grouping as it did in *Sysco* and say that there's a unique

16   product that you're getting here, which we totally believe

17   that there is, even if the Court doesn't do that, the fact

18   is that there is nothing out there like a general search

19   engine SERP.

20             And so whether the Court wants to call it a

21   one-stop shop, as Mr. Ramaswamy did in his testimony, if

22   whether the Court doesn't under -- we know that a SERP has

23   information from all over the Internet that includes

24   information that was crawled an indexed and that that

25   product, that thing is not available anyplace else.

1          And when you put in, as we did, AirTags and you

2     get a SERP from Google, it will have someplace, some people

3     who are selling AirTags, it will have a Wikipedia discussion

4     of AirTags, and it will have a newspaper article about

5     whether they're worth buying.

6          That group of information, whether you call it

7     one-stop shopping or not, that group of information

8     satisfies the second *Brown Shoe* factor.  And as far as

9     unique product, it is something different than what anybody

10    else has, peculiar characteristics and uses.

11         On the first one what we see here -- on the first

12    factor what we see here, we see Google themselves, when they

13    measure their own market share, they're measuring it against

14    other general search engines, even though they have the

15    technology to measure it against Amazon and the like.  For

16    years dating back, the first one is from 2014, we have them

17    all the way back to 2009, this one is 2019, we see them

18    doing their market shares by this, we see third parties

19    doing their market share by this.

20         So this is IPG doing, estimating the measure of

21    the general search market, and only putting in -- they're

22    putting in very remote ones like Yandex and Ecosia, they're

23    not putting in Amazon because they're not in this market.

24    This is something different.

25         This is Mr. Ramaswamy.  He himself used the term

1    "one-stop shopping for all needs."

2              I want to get to, if we can -- I'm having a little

3    trouble with the clicker, but I did want to show the Court

4    Slide Number 48 in your deck.

5              This is important, Your Honor.  This is --

6    Mr. Varian was talking about -- and this is 2021.  He was

7    talking about what makes general search unique.  And he

8    wrote, "With respect to the value of our products

9    specifically search, if Google were to disappear, people

10   would just switch to Bing.  If all search engines were to

11   disappear, we look like Borge's Universal Library but with

12   no card catalog."  In his testimony, he acknowledged he was

13   referring to general search.  What he's talking about is the

14   next best choice of Google.

15             THE COURT:  When did he make that statement?

16             MR. DINTZER:  I'm sorry, what?

17             THE COURT:  When was he quoted as --

18             MR. DINTZER:  The document you remember was from

19   2001.

20             He testified at trial that he was referring to

21   general search and not including SVPs.

22             THE COURT:  I thought his universal library quote

23   was from 2013 or 2014, not more recent.  Maybe I'm wrong

24   about that.

25             MR. DINTZER:  The document here says 2021.  I know

1  we tried to vet these.

2          THE COURT:  No, no, it's probably right.  I just

3  thought it was earlier.

4          MR. DINTZER:  He's telling us what the market is.

5  The market is, if you can't use Google, you go to Bing.  He

6  doesn't mention SVPs and they'll fill in the gaps and

7  everything.  He says, you wander around trying to find

8  information on your own because there's no other place to

9  go.  That's fundamentally a distinction.  And that's

10 Google's own people talking.

11         I'll note, Mr. Schmidtlein didn't cite a single

12 document from Google.  He didn't show the Court a single

13 document to underline what he's trying to show.

14         Let's go to the next slide, please.

15         Specialized vendors.  We know that there are

16 specialized vendors who distribute general search.  We know

17 browsers distribute general search.

18         THE COURT:  Mr. Dintzer, I'm going to ask you to

19 wrap up because I want to try and -- I'm already 10 minutes

20 behind, which is fine, but I want to just try to stay on

21 schedule as much as I can.  So if Mr. Cavanaugh has a

22 rebuttal, I'll give you a couple minutes.

23         MR. DINTZER:  Of course.  Thank you, Your Honor.

24         THE COURT:  Look, you can be certain that we'll go

25 back and look at these slides, and even if they weren't

1     presented to me, I'll take a look at them obviously.

2               MR. DINTZER:  We appreciate that, Your Honor.

3               MR. CAVANAUGH:  Just one quick point on barriers

4     to entry, Your Honor.

5               That concept includes the inability of a new

6     entrant to expand.

7               I would ask the Court to look at the

8     Eleventh Circuit's decision in *McWane*.  In that case, it was

9     an FTC case, the new entrant had gained 5 to 10 percent --

10              THE COURT:  Right.

11              MR. CAVANAUGH:  -- and they still found

12    significant barriers to entry.

13              I was struck by the Court's --

14              THE COURT:  Because they couldn't build a factory,

15    if memory serves.

16              MR. CAVANAUGH:  Yes.  It requires significant

17    capital outlays.

18              But I was struck by the Court's reliance on a

19    Ninth Circuit decision from '95, *Rebel Oil*.  "The fact that

20    entry has occurred does not necessarily preclude the

21    existence of significant entry barriers if the output or

22    capacity of the new entrant is insufficient to take

23    significant business away from the predator, they're

24    unlikely to represent a challenge to the predator's market

25    power."

1              That's Neeva.  That's DuckDuckGo, Your Honor.

2     They have not been able to pose a challenge to Google.  Why?

3     Because of Google's distribution contracts.

4              Thank you, Your Honor.

5              THE COURT:  All right.  Thank you, Mr. Cavanaugh.

6              All right.  Thank you, everyone.  Let's take our

7     morning break.  Let's resume at 11:00 with plaintiffs' prima

8     facie case.  Thank you, everyone.

9              COURTROOM DEPUTY:  All rise.  This Court stands in

10    recess.

11             (Recess from 10:48 a.m. to 11:02 a.m.)

12             COURTROOM DEPUTY:  All rise.  This Court is in

13    session; the Honorable Amit P. Mehta presiding.

14             THE COURT:  Please be seated, everyone.

15             Okay.  So let's move on to the next phase of our

16    opening.

17             Mr. Dintzer.

18             MR. DINTZER:  Thank you, Your Honor.

19             If I may approach?

20             THE COURT:  You may.

21             MR. DINTZER:  Your Honor, turning to the second

22    step of the monopolization analysis, the evidence showed

23    that Google's anti-competitive conduct harms competition and

24    is self-perpetuating.

25             As the Court knows, it did demonstrate the

1    exclusionary conduct.  All we have to do is make a

2    prima facie showing as required by the D.C. Circuit, and

3    then absent cognizable justification, then that proves our

4    violation of the Sherman Act.

5           We showed this feedback loop in the opening.  And

6    the evidence bore this out.  The evidence showed that the

7    defaults were extremely valuable for every -- for every step

8    of general search; that defaults created more searches and

9    were valuable enough that Google was willing to invest

10   billions of dollars in them.  The defaults led to the

11   searches, which led to data, and which led to an enormous

12   scale advantage for Google.

13          And the Court mentioned the 60 percent on the

14   queries.  I wanted to refine that.  That would be 60 percent

15   of the queries that a company the size of Neeva got, which,

16   if you look at sort of the curve, the bigger the search

17   engine, the more esoteric queries it could get at the tail,

18   so the more likely it was going to get queries that were

19   less frequent.  That turns to quality, and the testimony was

20   that scale drove quality in all areas.

21          Mr. Dahlquist tomorrow will talk about money and

22   how Google monetizes its monopoly in search but also its

23   monopolies in search advertising and text -- general --

24   search text advertising, which gives it the money to

25   continue to buy defaults.  So we're going to go all through

1    these, but we never want to lose track of the fact that

2    they're interrelated and this has been continuing on for

3    quite some time.

4            The next one was going to quote *Microsoft*, but

5    since the Court said that the Court's been reading

6    *Microsoft*, just make a note that engaging in a variety of

7    the exclusionary acts can prevent rivals from distributing

8    and then that can maintain its monopoly.

9            So there's three parts that we wanted to discuss.

10           THE COURT:  Mr. Dintzer, can I ask you a question,

11   which is:

12           How is it that you want me to think about the

13   exclusionary conduct?

14           In other words, let's take a contract.  You've

15   identified, for example, in the Google-Apple agreement not

16   only the default provision but a handful of others, the

17   alternate search provision, the sort of 2016 provision on --

18   with respect to searches.

19           Is it the plaintiffs' position that I should

20   consider each of those individually and determine whether

21   they have some anti-competitive effect?  Or is that a

22   collective determination I should just make; in other words,

23   that the contract, the agreement is what's anti-competitive?

24           MR. DINTZER:  The terms of the agreement are

25   exclusionary by a number of counts.

1              One is by keeping rivals from getting access to

2      defaults.

3              The effects of the contracts, we've listed six of

4      them.

5              And if we could go ahead to slide --

6              THE COURT:  I'll jump ahead.

7              My question is slightly different, and that is:

8      Is it that I should be looking at these contracts on a

9      provision-by-provision basis and making a determination

10     whether that provision has anti-competitive effects?  Or are

11     you just saying, Judge, look at the whole contract in its

12     entirety and judge whether the contract in its entirety has

13     anti-competitive effects?

14             MR. DINTZER:  We have identified certain terms in

15     those contracts, the MADA, the RSAs, the ISA, and then the

16     third-party distribution with browsers, terms in those

17     contracts, which have anti-competitive effects on the

18     market.

19             The way the Court should view them is,

20     collectively, they are exclusionary and they satisfy our

21     prima facie case that we have shown an anti-competitive

22     effect -- an effect to competition.  Obviously we don't have

23     to show an effect on any specific competitor but that these

24     terms have harmed competition, and that satisfies our prima

25     facie showing.

1          THE COURT:  Okay.

2          MR. DINTZER:  So we start with the defaults.  They

3    are clearly valuable.  I think Google's finally admitted

4    that they're valuable.  They are a powerful way to drive

5    searches; otherwise, Google wouldn't pay billions of dollars

6    for them.

7          We have testimony from a number of people that

8    back up the fact that Google itself is paying for them,

9    saying that defaults are unique.

10          Mr. Nadella explained those defaults, the only

11    thing that matters in terms of changing search behavior.

12          So the centerpiece of a lot of their exclusionary

13    behavior, but not all of it, was in capturing the defaults

14    and preventing the rivals from getting access to those

15    defaults.  Dr. Murphy and Google finally acknowledged that

16    those defaults do drive search traffic; there is an actual

17    benefit to Google capturing them all.

18          And we go back to 2007 where they not only

19    identified the value of them but identified them as a

20    powerful strategic weapon not only in growing and defending

21    market share but as an Achilles' heel for the rivals that

22    defaults were fundamentally important to keep the rivals

23    from capturing the defaults.

24          THE COURT:  So if I could just ask you to take the

25    opportunity now to hear what -- to respond to what we're

1    going to hear from Google, which is, okay, defaults can be

2    sticky except for when people want to switch to Google.

3         And they're not so sticky that people, when they

4    are confronted with the choice of an inferior search engine,

5    for example, the Mozilla example, people know how to switch,

6    and do switch.  The fact that they aren't switching from

7    Google isn't indicative of a sticky default, it's indicative

8    of people not moving to a sub -- an inferior rival.

9         MR. DINTZER:  Sure.

10        THE COURT:  So why is that wrong?

11        MR. DINTZER:  Okay.

12        So let's start with the point that *Microsoft* made,

13   which is that defaults can be exclusive, they're the proper

14   subject for an exclusionary analysis.

15        Second, we know that mobile defaults are stickier.

16   We have testimony -- in fact, I've got it right here, we

17   have testimony that mobile defaults are more sticky than

18   Desktop.  So they're fundamentally two separate things.

19        As Dr. Rangel explained, small screen, it makes it

20   fundamentally different.  The testimony -- we put documents

21   into evidence that the small screens, mobile screens are

22   fundamentally different than Desktop.

23        Then we look at Desktop.  It is true that Google

24   has a significant amount of Desktop even though they don't

25   have the default.

1          The missing piece there is that most of that, most

2    of the searches done on Desktop are done on Firefox and done

3    on Chrome, which means that people aren't -- what they're

4    talking about --

5          THE COURT:  I don't -- let's go back to answer my

6    question, which is, let's take the Mozilla example.  You had

7    a different default on Mozilla for a period of time --

8          MR. DINTZER:  Yes, sir.

9          THE COURT:  -- and people dropped off of that

10   default.

11         And in particular, what's interesting, it seems to

12   me, is that I suppose -- that wasn't a -- let's download

13   Chrome and search, it's this is what the searching was on

14   Firefox.

15         MR. DINTZER:  Yes, Your Honor.

16         THE COURT:  And Firefox users, Mozilla users made

17   the decision to switch.  The default apparently was not an

18   impediment, at least for them.

19         So, again, help me understand why that is not

20   indicative of their theme, which is people switch to Google,

21   and it's not the stickiness of this default, it's that they

22   like Google and Google is the best.  I mean, that's their

23   whole ball of wax in why that Mozilla example doesn't

24   support them, I think is a real issue.

25         MR. DINTZER:  Sure, Your Honor.

1          So we know one thing that they can't deny, which

2     is, after Mozilla wanted to switch, Google went back to

3     giving them rev share.  And the reason is because, I mean,

4     if everybody -- if everybody just switched, there would be

5     no reason for Google to give them rev share.

6          And what happened was everybody didn't switch.

7     A significant percentage of people chose not to switch,

8     stayed with the Yahoo! default, and so Yahoo!'s usage share

9     went up.  Google lost significant money on the loss of those

10    defaults.

11         So in answer to Your Honor's question, one, most

12    of those defaults were Desktop; two, yes, some people did

13    change, because the quality of what was there was

14    significantly inferior, and that's because what Google has

15    been doing to this market; but, three, even with that, so

16    many people didn't change their default, that when Mozilla

17    moved back to Google, Google raised its rev share from what

18    it was before.

19         THE COURT:  What was the final number on which

20    Mozilla settled?  I can't remember.

21         After some period of time, there was an initial

22    drop and then there was a bigger drop, if memory serves.

23    I mean, didn't they -- didn't almost two-thirds of the users

24    switch?

25         MR. DINTZER:  When you say "switch," do you mean

1   switched back to Google when --

2           THE COURT:  Right.

3           MR. DINTZER:  -- when Firefox --

4           THE COURT:  No, went from Yahoo! to Google.

5           MR. DINTZER:  I don't believe it was that high,

6   Your Honor.  But I don't have that number at hand; we will

7   get that.

8           THE COURT:  Okay.  All right.  I thought it was

9   something in that neighborhood.

10          MR. DINTZER:  I believe it was lower.

11          Whatever it was, the ones who didn't switch, the

12  ones who moved with the default were significant enough that

13  Google went back to paying a lot of money for the default so

14  that it could have the people who -- I mean, Google's theory

15  doesn't make sense, which is, everybody loves us and

16  defaults are easy to switch.

17          Those two things don't add up to paying billions

18  of dollars for default.  Why pay Apple for any default?  If

19  they were so easy to switch, they just tell Apple, put on

20  who you want, they're going to come to us anyway.  So that's

21  a fundamental flaw in their calculus.

22          And as I said, the documents show that on mobile,

23  they are much stickier.  So, for example, people are much

24  less likely to change default search engines on mobile.

25  I mean, that's Google's own document speaking there.

1           And so turning now, Your Honor -- and this -- to

2     the overall effect of the -- of Google's contracts, and this

3     was Mr. Ramaswamy testifying.  And he said, "So that's the

4     net effect of the payments.  They basically freeze the

5     ecosystem in place effectively."

6           And that's -- fundamentally, that's monopoly

7     maintenance.  That's having a monopoly big enough so that

8     you can freeze the ecosystem and then putting out these

9     contracts and that was the terms and that was the

10    complexity.  And that was his take on the impact from the

11    agreements that, when he was on the business council of

12    Google, he approved those contracts.

13           THE COURT:  Let me ask you a question, and maybe

14    you're going to get to this.

15           It seems to me you've skipped a step.  And what

16    I mean by that is, this case is about exclusive contracts --

17           MR. DINTZER:  Yes, Your Honor.

18           THE COURT:  -- or what you claim are exclusive

19    contracts.

20           And at least *Microsoft*, as I understand it, tells

21    me the first step in the analysis when it comes to exclusive

22    contracts, even before we get to any questions about market

23    effects, is foreclosure.

24           And the reason foreclosure is the first step is

25    because it acts, and *Microsoft* uses this term, it's a

1    screening function.  This Court says, "Not all exclusive

2    contracts are anti-competitive."

3            So we want to use a screening function,

4    foreclosure is that screening function, and then we'll

5    consider whether there are sort of real-world

6    anti-competitive effects that flow from that.

7            So are you going to get to foreclosure?

8            MR. DINTZER:  I am, Your Honor.  It's sort of in a

9    different way.

10           So I'm going to go after your question right here

11   so that I can try to put it into framework.

12           THE COURT:  Okay.

13           MR. DINTZER:  Our take is, Your Honor, that in an

14   exclusive dealing analysis, the two elements of exclusive

15   dealing are exclusivity and foreclosure, and foreclosure

16   does give a screening:  Is there enough foreclosed that --

17   the term that *Microsoft* uses is substantial foreclosure, but

18   of a certain percentage.

19           We believe that the better analysis for this, and

20   we have pled that, but we've also pled a broader analysis of

21   exclusion that's all under the general test of Section 2.

22           And the reason that it's important here,

23   Your Honor, is this:  Some of their conduct is beyond just

24   exclusive dealing with the defaults.  That's bad; that's

25   enough for a violation.  But we also have what they did with

1  Branch and what they did with Suggestions.  And those --

2              THE COURT:  I don't understand that, because all

3  of that flows from the contracts --

4              MR. DINTZER:  The contracts --

5              THE COURT:  -- which is why I asked you whether

6  I should be viewing the contract as a whole or sort of

7  looking at individual provisions of the contract.

8              I mean, look, I will just confess, I was surprised

9  to read the position you took, which is that this is not

10  only about -- or that -- this case is not so much about

11  exclusive dealing as it is about -- excuse me, exclusive

12  contracts as it is about sort of exclusion writ large, sure.

13              But this is the species of anti-competitive

14  conduct that you've ridden your horse on the whole time.

15  It's about these are exclusive agreements.

16              MR. DINTZER:  They are, Your Honor.

17              THE COURT:  So if we're not there -- I mean, if

18  you can't establish sufficient foreclosure, it seems to me

19  under *Microsoft*, you lose.

20              MR. DINTZER:  And we can.

21              And so under --

22              THE COURT:  Right, but let me ask you:  If you

23  can't -- say I were to find that you can't establish

24  sufficient market foreclosure, do you agree with me you

25  lose?

1          MR. DINTZER:  No, Your Honor, respectfully.

2          THE COURT:  Okay.

3          So what's the other conduct then?

4          We've got SA360, but that would then turn the tail

5   wagging the dog here.  So that can't be it.

6          What else are we talking about?

7          MR. DINTZER:  So the exclusivity clauses are the

8   clauses that tie up the defaults.  They're the clauses that

9   Professor Whinston calculated 50 percent foreclosure.  So we

10  do satisfy *Microsoft's* foreclosure.  And so those are

11  exclusive terms.

12         But there are other terms, such as the term

13  that -- such as the efforts to block Branch from being on

14  devices, such as rewriting a term for Apple so that they're

15  not allowed to expand Safari Suggestions.  Those are not

16  about the exclusivity on defaults that is in that

17  50 percent.  That is beyond it.

18         So what we want to make sure, Your Honor, is that

19  we have an analysis that not only recognizes -- I mean --

20  that recognizes the exclusivity elements to the contract,

21  but also the broader range of conduct that --

22         THE COURT:  So I do hear you telling me that you

23  do want me to sort of strip the contract apart into its

24  component parts and make determinations about whether each

25  component part is anti-competitive or has anti-competitive

1    effects?  Because what I hear you saying is that the

2    exclusive default provision, that first step is foreclosure.

3              MR. DINTZER:  Yes, Your Honor.

4              THE COURT:  I think *Microsoft* is clear about that,

5    right?

6              But then for some of these other provisions, like

7    no alternative search, although I guess that's really

8    related, or the 2016 provision in the Apple RSA, you want me

9    to look at that through a different lens?

10             MR. DINTZER:  That, Your Honor, is basically

11   exclusionary conduct under Section 2.

12             And so that combined with the other conduct is --

13   we would not want -- I mean, we believe we satisfy exclusive

14   dealing, Your Honor, and we have the foreclosure, but we

15   wouldn't want the Court to miss other conduct that is --

16   that is anti-competitive, that harms the competitive

17   process.

18             THE COURT:  Let me assure you I've missed no

19   conduct.  So I just want to know how to evaluate it from

20   your perspective.

21             MR. DINTZER:  So we believe that a broader

22   analysis, under Section 2, is warranted that would take into

23   account Safari Suggests and the treatment of Branch.

24             But if the Court was -- decided to focus on an

25   exclusive dealing, we have clearly made out the elements of

1    that.

2         THE COURT:  Let me tell you how I view this, and

3    you tell me if you think this is not the right analytical

4    framework, which is:  This is about exclusive agreements and

5    exclusivity.  You've got to establish foreclosure.  But

6    foreclosure is not enough by itself.  *Microsoft* clearly says

7    foreclosure is simply a screening device to make sure we've

8    actually got contracts that are potentially

9    anti-competitive.

10        You then need to show something more, actual

11   anti-competitive effects, in addition to foreclosure.  And

12   those can include, for example, the Branch example, or the

13   Apple Suggestions example, and many others -- you've

14   identified a whole bunch of other things.

15        But that's how I see this, which is that you've

16   got to establish foreclosure first.  And if you can't, you

17   lose.  And all the rest of this stuff doesn't matter,

18   because what *Microsoft* says is, if you can't establish

19   sufficient foreclosure, we are going to assume that there's

20   more of the market out there that people can compete for.

21        MR. DINTZER:  So for the -- in *U.S. v. Microsoft*,

22   Your Honor, the OEM analysis, the analysis of the OEM

23   agreements was that there was no foreclosure.

24        THE COURT:  Right, but that was because that was

25   an agreement about intellectual property, right?  That was

 1    not about -- you're right, but it was a different

 2    contractual provision.

 3                MR. DINTZER:  As is this.

 4                THE COURT:  If I go back to asking you, do you

 5    want me to evaluate these contractual provisions as

 6    *Microsoft* did, although it had to do with a different

 7    contract with the OEM, you know, there was sort of an

 8    intellectual property issue there with respect to the OEMs.

 9                Yes, the Court ultimately concluded there were

10    anti-competitive effects, but I'm not sure that changes the

11    analysis in terms of the exclusivity that has been at the

12    center of the case.

13                MR. DINTZER:  Your Honor, if the Court does an --

14    a foreclosure analysis and an exclusive dealing analysis,

15    the only two elements that we have to show are exclusivity

16    and sufficient foreclosure.  Those two -- those two satisfy

17    the prima facie case.

18                If the Court is going to do -- I mean, we have

19    shown anti-competitive effects, and I can walk the Court

20    through the anti-competitive effects, which is the harm to

21    competition, we don't have to show harm to any entity.

22                THE COURT:  *Microsoft* says, "Because its exclusive

23    deal affecting a small fraction of the market clearly cannot

24    have the requisite harm effect upon competition, the

25    requirement of a significant degree of foreclosure serves as

1   a useful screening function."

2           It's not the end of the analysis.

3           MR. DINTZER:  We -- I mean, once it has been

4   screened, you have exclusivity and you have foreclosure.

5           Maybe the Court's putting those in a separate --

6   in the reverse order.  If you do foreclosure first, then

7   exclusivity, but if you have those two elements under

8   exclusive dealing, you've checked the two boxes.

9           THE COURT:  So let me ask you this:  Is it your

10  position that -- say I agree with you that you've

11  established a 50 percent foreclosure number, okay?

12          MR. DINTZER:  Yes, Your Honor.

13          THE COURT:  Say I agree with that.

14          Is it your view that you need to prove nothing

15  more to meet your prima facie burden?

16          MR. DINTZER:  And the exclusivity, the 50 percent

17  represents exclusivity?

18          THE COURT:  Correct, that's the foreclosure

19  analysis.

20          So your view is, I do the foreclosure analysis, if

21  I agree at 50 percent, you've met your prima facie case

22  burden, then the burden shifts.  Is that how you view the --

23          MR. DINTZER:  If the Court is going to do the

24  exclusive dealing analysis as opposed to the broader

25  Section 2 general exclusionary analysis, yes.

 1          Those two pieces tell us -- what do they tell us?

 2   They tell us that there are terms that are in contracts that

 3   make those -- that makes those contracts unavailable to the

 4   monopolists' rivals, that they cover 50 percent of the

 5   market so that a potential rival who is thinking about

 6   investing in the marketing coming into the market looks at

 7   that and says, half the market is covered by these, that --

 8   the Court can infer --

 9          THE COURT:  So your view is that if the

10   foreclosure is established, we can simply then infer

11   anti-competitive effects of the kind that you just described

12   without looking for real-world examples?

13          MR. DINTZER:  Once 50 -- if 50 percent of all

14   contracts -- what Professor Whinston testified was,

15   50 percent of all U.S. queries go through defaults that

16   Google has purchased and are exclusive, and so not -- just

17   so we're clear, not defaults where if somebody downloads

18   Chrome and Google has the default, we don't count that, of

19   course.  So through -- that means the way it looks to a

20   rival or entrant is 50 percent is off limits, 50 percent

21   is -- and that will reduce not only the rivals' investment

22   but what we saw was that it will reduce Google's investment.

23          Google, when they faced a choice screen in Europe,

24   they immediately invested more.  Even -- and Mr. Schmidtlein

25   is going to say, well, the numbers didn't change.  And the

1    numbers don't have to change.  The fact that Google was

2    willing to invest more money in that market once it faced

3    competition tells us everything we need to know about what

4    it thought about that market before it actually faced a

5    choice screen.

6         THE COURT:  I think Mr. Schmidtlein is going to

7    get up and say that most of the money that was been spent,

8    maybe I'm wrong, went to marketing.

9         MR. DINTZER:  I'm sorry?

10        THE COURT:  Went to marketing.

11        MR. DINTZER:  Whether the money was invested in

12   marketing, it also went, I believe, to sports scores --

13        THE COURT:  Right.

14        MR. DINTZER:  -- and to features that were added.

15        But the point is, Google felt it had to act and it

16   invested money.  That is how it spent the money.

17        The Court doesn't need to make that decision, we

18   don't need to make it, competition will make that decision.

19   And what competition -- it was -- it was just a little, it

20   was just a -- it didn't cure all of these other harms.

21        But the evidence shows, and what Dr. Whinston

22   testified was, was that the contracts that we're talking

23   about affect competition in two ways; that it makes it -- it

24   makes potential investment less likely because the return is

25   less likely, and we had testimony from Microsoft saying

```
 1    that, how can you invest more if you're not going to get a
 2    payoff.
 3              But also because Google hoards all the default and
 4    all the data, it makes it much harder for rivals to do the
 5    experiments that get better.
 6              And we had testimony from a number of sources that
 7    expressly said that the more data you have, I think
 8    DuckDuckGo's CEO said this, the more data you have, the more
 9    experiments you can do, and more reliable.
10              THE COURT:  So let's take the Apple RSA, for
11    example.  And I want to talk about but-for world in a
12    moment, but let's take the Apple RSA for example.
13              We know that, I think it's 62 and a half percent
14    of queries go through Safari and the Google default.
15    I think that's the number.
16              MR. DINTZER:  I believe that that's right.
17              THE COURT:  I think it's 62 and a half, at least
18    according to Professor Whinston.
19              Is it your view that the remaining 38.5 percent,
20    that's available to the market, correct?
21              MR. DINTZER:  That is not part of the coverage
22    number.
23              THE COURT:  Right, not part of the coverage
24    number.
25              MR. DINTZER:  That's how I would say it, yes.
```

1          THE COURT:  So if say SuperDuck arrived and was

2  able to compete, is it your view that they would not be able

3  to develop enough scale if they were to be successful in

4  winning the other 38.5 percent?

5          MR. DINTZER:  Okay.  So you switched it up on me,

6  because now we're at scale.

7          THE COURT:  Same concept.

8          I mean, in other words -- and you're going to tell

9  me it's a chicken and egg problem, I get it.

10          But your point is that, well, Google, by virtue of

11  those contracts, they get a lot of scale.

12          MR. DINTZER:  They do.

13          THE COURT:  Right.

14          But what I've just said is on the Apple mobile

15  agreement, 38.5 percent of the queries are up for grabs.

16          MR. DINTZER:  They're not part of the coverage

17  number, yes.

18          THE COURT:  Right.  They're up for grabs; they can

19  be competed for; they're not part of the exclusive default.

20          MR. DINTZER:  Yes, Your Honor.

21          THE COURT:  Is it your view that if some other

22  competitor were able to get some percentage, a decent

23  percentage of that, they could not improve their search

24  quality and compete?

25          MR. DINTZER:  If they got -- so Safari numbers

1    include both Desktop and mobile.

2            If it was Bing and Bing got some of the mobile,

3    more of the mobile, then it would have more scale and

4    presumably would -- I don't have the curve but the scale

5    would have value to it, yes.  Could it compete with Google

6    that has 98 percent market share in mobile?  No.  I mean,

7    Google has an astronomical amount of scale, and this is a

8    comparison industry.

9            THE COURT:  I'm just trying to get -- trying to

10   understand today, how much scale continues to matter.

11           Look, I don't think even Google could get up here

12   and say that back in 2015, scale was not a more substantial

13   consideration than it is today.  It was.  You know, but

14   since then, there have been a number of developments that

15   are -- some not scale related, some that are scale related

16   but less data, that Google uses to produce its results.

17           And so, you know, we don't even need to get into

18   the DRE, but the question is, is there are not enough data

19   in Bing's possession, for example, to compete?  I mean, the

20   fact they haven't may be attributable to other reasons,

21   so it's not necessarily because of scale.

22           MR. DINTZER:  So on Desktop, Microsoft has a

23   certain access to a certain amount of data and we know that

24   its quality is comparable to Google's.

25           THE COURT:  Because they have scale.

1          MR. DINTZER:  Because they have scale; because

2     they have invested.

3          And they can't get the defaults for Chrome, and

4     they can't get the defaults for Firefox.  So when those are

5     downloaded, that impacts their market share, regardless of

6     the fact that they're as good, but they do have some scale.

7          That shows in contrast to the fact that they're

8     not on mobile, they don't have scale on mobile.  And for

9     them to invest -- Google's position is, well, they haven't

10    invested enough.  If you don't have access to distribution,

11    you don't have access to scale, you can't justify investing

12    if the market share is 98 percent and the coverage is

13    50 percent, that fundamentally affects the investment.

14          And so what we have here is testimony, including

15    from Mr. Ramaswamy, scale here is fundamentally important.

16    And it's specifically important on mobile.  Mobile scale.

17    Scale here refers to how much query click information one is

18    able to collect.  If you get it on mobile, it is

19    fundamentally different than if you get it on Desktop.

20          And so what he said was, it's one of the biggest

21    signals, the more click behavior you've observed over time,

22    the more effective you can be in creating a higher quality

23    search engine.  He was talking about now; he wasn't talking

24    about in the past.

25          And we have documents from Google throughout the

 1    time; this is the source of Google's magic.  So there's

 2    really no question about the import of scale.  The only

 3    person who testified scale doesn't matter was Mr. Fox --

 4    Dr. Fox, and we believe he made that testimony based on a

 5    flawed analysis which even --

 6            THE COURT:  Well, he didn't say scale didn't

 7    matter.  He said scale diminishes in its return and that the

 8    scale that Bing currently has is sufficient to compete and

 9    that Google's additional scale comprises, I think -- I can't

10    remember -- a very low percentage of the reason why its

11    quality is better.  I mean, he didn't say that scale doesn't

12    matter.

13            MR. DINTZER:  He came pretty close to saying scale

14    doesn't matter to Bing.

15            We have testimony that scale affects crawling,

16    indexing, query refinement, retrieval, ranking, whole-page

17    ranking, search features, and, as I was noting, development,

18    the ability to create a better search engine and make it

19    better over time.

20            And AI, as Dr. Nayak said, is too expensive to run

21    on hundreds or thousands of results, and it creates -- and

22    it creates latency that it's not -- as the Court said to

23    defense counsel, it's not now.  And whatever it is someday,

24    that's not the basis of this decision.

25            THE COURT:  Let me ask you this:  If I were to

1    conclude that -- say I embraced and agreed with Dr. Fox that

2    at least Bing has hit the point of diminishing returns,

3    they've got enough scale over there to compete and produce a

4    quality search engine; in fact, they do on mobile -- excuse

5    me, on Desktop.

6            If I conclude that the sort of marginal scale

7    Google is getting from the defaults isn't dispositive in

8    terms of competition, did the plaintiffs fail to make out

9    their case?

10           MR. DINTZER:  No, Your Honor, that is one of the

11   effects that we've talked about.

12           But I would point the Court to Professor Murphy's

13   testimony on the slide where he says, there's pretty much

14   always diminishing returns, but that doesn't mean they're

15   not valuable even after some diminishing returns have set

16   in.

17           So even if we're at the point where Dr. Fox says

18   that there's diminishing returns, that doesn't mean that it

19   is not an enormous benefit to Google, especially on mobile.

20   And it doesn't explain why Google pays so much to store the

21   data, because Google's -- I mean, the testimony was that

22   they weren't aware of them ever getting rid of data, they

23   just anonymized some of it after a certain amount of time,

24   and that means it has value.

25           And the testimony was uniform.  I think

1    Mr. Giannandrea explained, having mobile queries at scale is

2    important in answering mobile queries.  He agreed with that.

3            There is no way that -- there's no factual basis

4    to find that Bing has, or anybody else, and this case is not

5    about Microsoft, it is about -- it is about the search

6    industry and the harm to the industry.

7            So even if Bing was able to make out enough scale,

8    that doesn't tell us that entrants would be able to get

9    some.

10            THE COURT:  So as I understand it, and you'll let

11    me know if you disagree, what you have to prove is that the

12    exclusionary conduct causes the anti-competitive effect,

13    right?

14            MR. DINTZER:  That -- yes.

15            THE COURT:  There's got to be a link, there's got

16    to be a causal link between the conduct and the effect.

17            MR. DINTZER:  The effect on competition.

18            THE COURT:  Correct.  Okay.

19            MR. DINTZER:  Yes.

20            THE COURT:  So the question then becomes, have you

21    proven that the fact that Google has these exclusive

22    defaults across both types of mobile devices, Android and

23    iOS, that that is what continues to allow them to gain scale

24    and creates an anti-competitive marketplace?  I mean, have

25    you made that connection?

1          MR. DINTZER:  Well, every query creates data,

2    and there is -- 98 percent of the queries are done on

3    Google --

4          THE COURT:  I get that.

5          MR. DINTZER:  -- with 50 percent coverage.

6          THE COURT:  I get that.

7          But work with me here, because not all 98 percent

8    are coming through the default, right?

9          MR. DINTZER:  Right.

10         THE COURT:  They're coming through a variety of

11   means, including through Chrome, which has not been alleged

12   to be anti-competitive conduct.

13         MR. DINTZER:  On Android, just so we're clear,

14   just so that -- Chrome when it's downloaded, we're not

15   challenging.  Chrome when it's on Android, it does default.

16   I just want to make sure.

17         THE COURT:  No.  I get that.  I'm talking about

18   Chrome when it's -- anyway, we're on the same page.

19         Again, it seems to me that plaintiffs have to

20   prove that it is the continued possession of the defaults

21   that generates enough traffic, enough scale that prevents

22   competitors from competing.

23         Now, it seems to me your argument, I'll tell you,

24   is better when it comes to nascent competition, somebody

25   who's looking to enter the market, right.  I think you've

1   got a probably stronger case there.

2          But then how do you sort of square that with

3   Microsoft, which, at the end of the day, even its CEO came

4   in here and admitted fully, because it's in the papers, they

5   didn't invest enough, they did not invest enough.  They made

6   a decision.  The train was leaving the station on mobile,

7   and they decided it's not a train we want to get on.  And

8   it's only more recently they wanted to get on the train,

9   because they realized it was a pretty lucrative trip.

10  That's not anti-competitive, the fact that Google was smart

11  enough to get on the mobile band wagon before Microsoft.

12          MR. DINTZER:  So I agree.

13          But the decision by one rival, a mistake by one

14  rival doesn't mean that Google gets to monopolize this

15  market forever.

16          We have listed, and I put them on the screen, six

17  different, separate anti-competitive effects from the

18  Google -- the distribution contracts.  Scale is one.

19          But a reduced incentive to invest is a completely

20  separate one.  That's the one that says that by locking up

21  all of these defaults, the rivals and Google all have a

22  reduced incentive to invest, and because of that,

23  competition is harmed separate from scale.

24          We believe in scale, but separate from scale, the

25  reduced incentive.  And that's what --

1            THE COURT:  Do you believe it is irrelevant to the

2    Section 2 analysis that Google's counter-parties, whether

3    it's Apple, you know, Samsung, et cetera, have continued to

4    elect to partner with Google?

5            We know the evidence is that Apple, at least from

6    time to time, has taken a sneak peek at Bing and its

7    quality; certainly Mozilla has done so in a more formal way.

8            Do you think it's at all relevant that Google has

9    won these contracts, and they've won them from

10   multibillion-dollar companies and consistently done so based

11   upon quality, or at least according to everybody that came

12   in here and testified, it was based on quality?

13           MR. DINTZER:  The fact that one of the

14   anti-competitive effects is that they reduced their rivals'

15   incentive to invest means that you can't -- that the Court

16   can't look and say, oh, people are happy with the

17   monopolist.  Well, of course everybody was happy with

18   Standard Oil and AT&T because they didn't have any rivals

19   because all of their rivals had been diminished by

20   anti-competitive conduct.  That can't be the measure.

21           Even if at one time at some point they made that

22   decision in a competitive market, we showed the Court Google

23   had more than 70 percent as far as back as we can measure.

24           But even if they made it in a competitive market,

25   the fact is that right now today the rivals can't get access

1    to scale, don't have the incentives to invest.  And whenever

2    somebody tries to sneak in, whether it's Branch or whether

3    it's Apple, Google uses its hold on the industry and keeps

4    them out.

5           So, no, Your Honor, the fact that they may be

6    happy cashing Google's checks doesn't really tell us

7    anything about Google's conduct.

8           THE COURT:  So your position is, when it all comes

9    down to it, again, this goes back to foreclosure, which is,

10   Google's locked up 50 percent of the market by virtue of

11   these contracts.  Because of that lockup, competitors are

12   not going to invest.  Nascent companies aren't going to try

13   and come into this marketplace and compete with Google just

14   based upon having 50 percent of the locked-up market.

15          MR. DINTZER:  That is one of the effects.

16          But other effects that we saw were that Apple

17   wanted to bring out -- Apple went into Safari; Google did

18   their best to stop them.

19          And what we saw with that was, Apple -- the

20   testimony from Mr. Giannandrea was they believed that Safari

21   Suggests was a better product than Google; that this was

22   good for the users.  Google sent them a term sheet that

23   said, we're going to stop this completely, you're not going

24   to do this at all.  They ultimately decided on language that

25   I know the Court's familiar with, that says, you can't grow.

1          Now, Ms. Braddi testified -- I mean, Ms. Braddi's

2    document from 2016 --

3          THE COURT:  Right.  I know the email in which she

4    describes the purpose of that.

5          MR. DINTZER:  She expressly said, and I can show

6    on -- but I know the Court knows it.  She expressly

7    describes it, they were bleeding off queries from us, so we

8    put an end to it.

9          THE COURT:  So you don't need to prove coercion

10   under Section 2, I get it.

11         MR. DINTZER:  That is correct.  There was no proof

12   of coercion in *Microsoft* for most of the conduct.

13         THE COURT:  At least none that they talked about.

14         But isn't this very different than *Microsoft* in

15   the following sense:  I don't know how big any one of those

16   ISAs, Internet service providers, got.  Maybe AOL was the

17   biggest, I don't remember.

18         But I don't think, maybe I'm wrong, AOL was on the

19   sort of scale of Microsoft even then in terms of market

20   power.  And I mean that broadly.  I don't mean that in terms

21   of narrowly defined markets.

22         You're asking me to conclude that Apple is

23   agreeing to terms in this RSA, Apple, Apple.

24         MR. DINTZER:  Apple.

25         THE COURT:  Multitrillion-dollar market cap

1   company is agreeing to terms that, in your view, are not in

2   its best interest.

3        MR. DINTZER:  Oh, they may have been in its best

4   interest, they were not in the users' best interest.

5        THE COURT:  I'm saying they were not in their best

6   interest.

7        MR. DINTZER:  Right.

8        If the risk to their Google payments was

9   significant that they saw -- so what we saw is -- here, we

10  see Mr. Giannandrea saying, for the user, it's a better

11  experience.  And then we see Google saying, this is the

12  proposed term sheet.  Apple will not direct -- I mean, by

13  using Apple's Suggestions algorithm in connection with

14  search queries, it wanted to stop it completely.  We know

15  that they stopped it mostly; they stopped it from growing.

16       It doesn't -- Apple decided, for whatever reason,

17  it was in its best interest to accept this limit.  But it

18  wasn't in the best interest of competition, it wasn't in the

19  best interest of users to accept this limit.

20       And the reality is that browsers and distributors

21  have different interests than users.  Ultimately the

22  browsers and distributors, they may make decisions -- and we

23  have testimony about this from Professor Murphy.  They may

24  make decisions that are in their best interest and their

25  shareholders' best interests but that are not for the users.

1            When Apple agreed to limit the growth of

2    Suggestions, that wasn't in the best interest of

3    competition.  They were agreeing with the monopolist that

4    they wouldn't grow a product that they believed themselves

5    was better for users.  That can't have been good for users,

6    but it was good for Google.  And Apple thought it was good

7    enough because they didn't want to put their payments at

8    risk.

9            That's where Section 2 steps in.  And it says,

10   we're not going to let Apple decide what's good for

11   everybody.  Competition should decide what's good for

12   everybody.

13           So Google says, look, the ISA limitation, they

14   accept that it's a limitation.  They say it only applies to

15   sending things to third-party verticals.  The first thing

16   is, that's not in the contract language at all.  It's a

17   complete prohibition on certain types of growth for Apple's

18   Suggestions, which is why, when Ms. Braddi discussed it, she

19   didn't mention any exceptions or anything, she said they

20   were bleeding off queries, we didn't want them to do it, so

21   we put a stop to it.  That's what she wrote in her letter.

22           But the second thing is this:  Even if Google's

23   right and it was only directed at Apple deciding to send

24   queries to third-party verticals, that's still an admission

25   that Apple was not making the design decisions.

1          Google's whole theory is, well, Apple is making

2     all these design decisions.  Apple hasn't made design

3     decisions.  Google's made the design decisions.  Google has

4     told Apple, you can't grow this in a certain way because

5     then we won't pay you.

6          And, Your Honor, in 2012 -- and this is really

7     vital.  In 2012, Apple went to Google and said -- this

8     wasn't the first time they asked it, said, we want the

9     option but not the obligation to put Google on our -- in the

10    default.  Option but not the obligation.  And Google, as it

11    had before said, no, no.  If we don't get the default, if we

12    don't know we're going to get the default, then we're not

13    going to pay you.

14         So Apple wanted the ability to design itself.  It

15    had ideas about how it could divide up the market and have,

16    maybe in different regions or different distributors,

17    different ways of distributing.  It could choose different

18    people in the default; option but not the obligation.

19         And when Google said no --

20         THE COURT:  And even if that's true, and say that

21    that is an accurate recitation of the history, it's not the

22    reality today.

23         And both Mr. Cue and Mr. Giannandrea came in and

24    said, look, we don't think it's in Apple's best interest to

25    change search engines, develop our own search engine, nor

1  did they come in and say, we think it's in our interest to

2  grow Suggestions.

3         Why are they not making reasonable and rational

4  business judgments that can be explained just as that,

5  reasonable and rational business decisions, and not -- and

6  not -- and not being essentially participating in

7  anti-competitive agreements?

8         MR. DINTZER:  I don't know if those two are

9  exclusive, Your Honor.

10        But this case is not about Apple and their

11  decisions and their conduct.  They have a contractual

12  provision with Google that they have to defend this

13  agreement.  So I mean, they wrote that into the agreement,

14  they committed to defending it.  But there is no other

15  option, except for entry themselves, there is no rival that

16  they could go to.

17        So, again, the Court is taking the world as it is

18  now, after Google has maintained a monopoly for 12 years,

19  and is saying, well, there's no better option.  Well, of

20  course there's not, because Google has made sure Branch is

21  not an option, has made sure Apple Suggestions is not an

22  option, at least not a growing option, and has

23  systematically deprived its rivals of scale in the interest

24  of investing, so right now there is no other option.

25        So when Mozilla says, you know, we would have

```
1   liked to have an option but there isn't one, they tried,
2   they tried it with Yahoo! and they found that you really
3   can't go against Google.  That was the last time that
4   anybody had any chance -- that anybody got a mobile default,
5   and it was in 2014 to 2016.
6          THE COURT:  So I take it you, if you were writing
7   an opinion, you would have me find that there's no real
8   genuine competition?
9          MR. DINTZER:  There is no real genuine
10  competition, Your Honor.
11         THE COURT:  And that Microsoft coming in and
12  trying to win the default from Apple and arguably driving up
13  the cost of the rev share percentage, that's not
14  competition?
15         MR. DINTZER:  Apple was good enough to get the
16  meeting to talk to them, as was DuckDuckGo.  They were not
17  good enough -- and the testimony was from Mr. Cue that
18  realistically Microsoft -- Bing didn't have any chance, that
19  there was no other option other than Google.
20         And so they exist in the marketplace, they have
21  some small amount.  They do not do what the competitive
22  market would do, which is to challenge Google, make it
23  improve its product, make it go big in the U.S. and spend
24  that money, whether it's on marketing or getting us more
25  sports scores or whatever, they are not able to do that, and
```

```
1    no one has been able to do that significantly in the market
2    for a very long time.
3              THE COURT:  So let's go back to the foreclosure
4    analysis, and Google's position is that what I should be
5    looking at is a but-for world; that is, say I think one of
6    two options they've suggested, which is either, say these
7    contracts were to go away tomorrow, what would the market
8    look like?  And I think to some extent, they've also
9    suggested that even if Google didn't have these contracts,
10   you have to determine what the market would look like.
11             You know, Microsoft talks about this, and it talks
12   about this in the context of the causation inquiry, not in
13   terms of the foreclosure inquiry.  So why -- do you read
14   Microsoft to say something different; that is, the
15   foreclosure inquiry actually requires no inquiry into the
16   but-for world, it's only when it concerns causation?
17             MR. DINTZER:  No, Your Honor.
18             And I want to be respectful of the States' time,
19   but I do -- this is a really important question; I want to
20   make sure the Court gets our answer.
21             So what Microsoft said, and I'm quoting, Section 2
22   liability, that no part of section -- Section 2 liability
23   should not turn on a plaintiff's ability or inability to
24   reconstruct the hypothetical marketplace absent a
25   defendant's anti-competitive conduct.
```

1          So the fact that it was talking about causation,

2     it wouldn't make any sense at all to say, ah, but you have

3     to do it in this other part.

4          I mean -- and they recognized that putting

5     together a but-for world of Google's lack of monopolization

6     over 12 years would fundamentally be impossible.

7          So there's no way to say, oh, they just meant over

8     here, they didn't mean over here.  There's no way that

9     *Microsoft* could be read for that.

10         But the second thing is this.  They showed -- they

11    talked about the 40 to 50 percent foreclosure.  That is a

12    coverage number.  That number, for the Court to have a

13    number that can be compared to other cases, right, other --

14    you know, *Mittenger* said 8.6 percent, *Simon* case said

15    24 percent, *Microsoft* said 40 to 50.  It doesn't have to be

16    that high because of Section 2.  For the number the Court

17    uses to be comparable to these other cases, the methodology

18    has to be the same.  None of these other cases used a

19    but-for methodology, they used a coverage methodology.

20         THE COURT:  So I think Google will say the

21    following.  Let's leave the but-for world aside for a

22    moment.  They'll say:  Look, you're right.  In *Microsoft*, it

23    was really about coverage.  But there's a reason it was

24    about coverage in *Microsoft*.  It's because you couldn't

25    switch out from the -- you couldn't slide a new browser in,

1    right?  The deal was exclusive.  You couldn't put another

2    browser in under the agreement.

3                This case is different.  The product is set up in

4    such a way and the contract is structured in such a way that

5    the -- one, a user can change the default; and, two, the

6    user can go to other search entry points to gain access.

7                So while the coverage number made sense in

8    *Microsoft*, it was a different product that doesn't allow for

9    substitution, whereas this contract and this product does.

10               MR. DINTZER:  So the testimony was that having

11   your app in The App Store was no substitute.  Being able --

12   getting your name on the default list, should somebody go

13   looking for it, was no substitute.

14               And we know this because if there were

15   substitutes, if they were a genuine substitute -- if they

16   were a genuine substitute, then Google wouldn't pay billions

17   for them.  The fact that they are -- the fact that the

18   testimony said these defaults, out-of-the-box defaults,

19   default preinstallation is fundamentally different than any

20   other method of distribution.  And Google has known this

21   since 2007 means that coverage really does matter.

22               In the same way that exclusivity in -- if Pepsi

23   has an exclusive agreement with a supermarket, it may be

24   that you could go down the street and get a Coke, but that

25   doesn't mean that the exclusivity in that supermarket

1    doesn't count.

2          There will always -- unless you have 100 percent,

3    and the case law is clear that you don't have to have 100

4    percent, there will always be these other options.

5          That's what the foreclosure numbers tell us.  What

6    percentage are covered by this exclusive agreement, and, you

7    know, is it a high enough number that it would discourage

8    entry and investment by rivals.

9          THE COURT:  Okay.  We're approaching 60 minutes.

10   I didn't appreciate that I should have probably flagged you

11   earlier to make sure we get Mr. Cavanaugh up if he wants to.

12         MR. DINTZER:  I apologize, Your Honor.

13         THE COURT:  That's okay.

14         MR. DINTZER:  I do not want to take his time.

15         THE COURT:  And as I said, we can continue this

16   conversation after lunch; we'll have plenty of time.

17         MR. CAVANAUGH:  May I approach, Your Honor?

18         THE COURT:  Sure.

19         MR. CAVANAUGH:  Your Honor, I think I can do this

20   in five minutes.

21         I just want to briefly address another

22   anti-competitive effect that the Plaintiff States pled and

23   proved.  It's the one you noted in your summary judgment

24   decision with respect to the extent to which rivals have

25   been inhibited and had their costs raised in acquiring

1    content from SVPs and from suppliers of content, and that

2    has inhibited their ability to better compete against Google

3    by going out and getting content.

4              Now, there's no dispute --

5              Peter, if we could go to Slide 3.

6              THE COURT:  I'm sorry, it's harmed rival search

7    engines?

8              MR. CAVANAUGH:  Yes.

9              THE COURT:  Right.

10             I mean, I understood the theory to be that rival

11   search engines are harmed because there are less attractive

12   partner candidates with SVPs, and that, therefore, harms

13   competition in search because less people will come to, say,

14   Bing because there are fewer such partnerships.

15             MR. CAVANAUGH:  That's correct, Your Honor.

16             And so we start with the basic premise that SVPs

17   have limited interest in Google's search engines rivals to

18   Google.  Mr. Dijk testified about it, Mr. Hurst testified

19   about it.  You know, Mr. Hurst said, how much time do I

20   spend talking to Bing?  Zero.

21             Now, SVPs wear two hats.  They wear their

22   advertiser hat, but they also can sell content, they have

23   content that they can provide.

24             Now, for Bing or any other rival search engine,

25   they can -- if they have sufficient traffic, they can trade

 1    that for content.  But here, because rival search engines

 2    have been starved of traffic, it costs them more to go out,

 3    they have to buy content, and that has raised their costs.

 4    And this is particularly pronounced -- if we could go to

 5    Slide 6.

 6             THE COURT:  So hang on for a second.

 7             MR. CAVANAUGH:  Sure.

 8             THE COURT:  Because maybe I'm not quite

 9    appreciating how raised costs for SVPs plays into this,

10    because I thought that was sort of the original theory.

11             MR. CAVANAUGH:  No, it's raising the costs of the

12    general search engines.

13             THE COURT:  Okay.  Fine.

14             MR. CAVANAUGH:  And buying content.

15             THE COURT:  Okay, great.  So we're on the same

16    page then.

17             So the evidence shows as follows, as far as I can

18    tell:  That Microsoft has entered into, I don't know, two

19    dozen or so agreements with SVPs.  I think there were two

20    examples of instances where Microsoft has lost its contract,

21    I think it was the Yahoo! deal -- excuse me, not Yahoo!,

22    Yelp, and they identified another circumstance where their

23    ability to invest has been limited in a particular vertical

24    because of limited funding.

25             MR. CAVANAUGH:  We also have evidence that for,

1    I believe it was Tripadvisor, that Google -- Microsoft has

2    to pay for the data instead of having traffic.  And that's

3    really the harm, Your Honor.

4             THE COURT:  Right.

5             MR. CAVANAUGH:  It's having to go out and spend

6    millions buying content that, in a but-for, a more

7    competitive world, they would simply be able to trade

8    traffic.

9             And this is most pronounced, as Mr. Dintzer was

10   talking about, in mobile, where Microsoft, because they're

11   limited traffic, they don't have -- they don't gather much

12   information from users, and so they have to -- they would

13   have to go out and buy the content in local travel mapping.

14            THE COURT:  But I gather they've done that.

15   In other words, I mean, it goes back to the testimony we

16   heard, which is that they have entered into agreements for

17   structured data with 20-some odd or some variety of that,

18   it's 20-some odd SVPs.  They have been able to enter into

19   those kind of agreements to attract users.

20            MR. CAVANAUGH:  Sure, but it's cost them more to

21   do it, Your Honor, because they don't have the traffic to

22   trade.  It costs nothing to them to have traffic to trade.

23   When they have to buy it, it costs them more, and we could

24   just go to --

25            THE COURT:  So let me ask you this so

```
1    I understand:  Is it your belief that Microsoft has to

2    actually pay for it, some dollar amount?

3              MR. CAVANAUGH:  Yes.

4              THE COURT:  But Google's SVP agreements doesn't

5    require it to pay anything for the structure data?

6              MR. CAVANAUGH:  I'm trying to recall the full

7    state of the record, but I know Google certainly has the

8    traffic to be able to trade for that.

9              But they also have the data, so they have less

10   need for content.

11             THE COURT:  Right.

12             MR. CAVANAUGH:  Because they have so much data,

13   they have so much scale.

14             And I had mentioned --

15             THE COURT:  I'm not -- I mean, is that true when

16   it comes to SVPs?

17             In other words, I understand they've got scale,

18   data, et cetera --

19             MR. CAVANAUGH:  Sure.

20             THE COURT:  -- but the sort of whole purpose is

21   SVPs is they're niche and they're current.

22             It doesn't do you any good to have data about

23   airline prices last week or what the price was of a baseball

24   mitt two weeks ago from Amazon.  You need the current data.

25             MR. CAVANAUGH:  But ESPN and others also know
```

1    that, to the extent they are appearing on the SERP, to the

2    extent they're getting credit for that, that's traffic, and

3    that's visibility for them, and that traffic has value to

4    them.

5           The problem Bing faces is they don't have the

6    traffic to be able to entice content providers, and that's

7    raising their costs.

8           And if you just go to Slide 10.

9           That's the -- you know, in *McWane,* they recognized

10   that raising rivals' costs by a monopolist can prevent

11   growth and suppress competition, and that's what's happened

12   here.

13          THE COURT:  So tell me one more time what the

14   evidence is of increased costs to Microsoft.

15          MR. CAVANAUGH:  Well, there was -- they were

16   paying substantial money to Yelp, and that agreement ended

17   because they couldn't even provide them sufficient traffic.

18          THE COURT:  Right.

19          MR. CAVANAUGH:  Then if we go to, they're paying

20   Tripadvisor.  And in the vertical, the Court mentioned --

21   this is on Slide 8, Your Honor.  They've been limited in

22   their ability to grow beyond in that vertical.

23          THE COURT:  Okay.

24          MR. CAVANAUGH:  But I would say, Your Honor, it

25   rests on the fundamental premise that buying content is more

expensive than simply offering traffic, and that's the essence of our theory.

THE COURT: In other words, your view that the evidence shows that there's essentially -- it's either you're paying for structured data or you can send traffic?

MR. CAVANAUGH: Yes.

THE COURT: And the evidence, in your estimation, shows that Google is not having to pay for the data, it's simply in a position to say, we're going to drive more traffic?

MR. CAVANAUGH: Your Honor, I can't say that they've never paid for data, but I know that they -- it's unquestionably that they are in a position to offer enormous amounts of traffic that Microsoft and others are not in a position to offer, particularly in mobile.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Cavanaugh.

All right. Mr. Schmidtlein.

So what we'll do is we'll go --

Let's take five minutes before you start. So we'll start in just about 5 minutes. I want to make sure Bill gets a brief respite, and then we'll go for 60 minutes, and then we'll take lunch, okay?

Thank you, everyone.

COURTROOM DEPUTY: All rise.

1          This Court stands in recess.

2          (Recess from 12:07 p.m. to 12:14 p.m.)

3          THE COURT:  Mr. Schmidtlein, when you are ready.

4          MR. SCHMIDTLEIN:  May I approach, Your Honor?

5          THE COURT:  Sure.

6          You all don't need to ask anymore, just hand them

7    up.  Thank you.

8          MR. SCHMIDTLEIN:  Very quickly, Your Honor,

9    I would like to first just pick up very, very quickly where

10   we left off, and that was Mr. Cavanaugh and the States'

11   theory about some sort of disruption or increased cost of

12   Microsoft, and it's only Microsoft, is the only one they

13   even tried to make an allegation about, somehow was limited

14   in its ability to do deals with SVPs and, therefore, that

15   somehow reduced their ability to compete in the market.

16         The evidence on this issue is absolutely barren

17   for the plaintiffs.  They came up with two companies that

18   were referenced at trial, a firm I will confess I'd never

19   heard of, called Hopper, that had something to do with

20   rental car companies, and Yelp.

21         They have hundreds, the record will reflect

22   paragraph 1739 of our findings of fact, they have,

23   I believe, over 300 agreements with various SVPs,

24   third-party providers of data.  There is no evidence in this

25   case that their failure to have a deal with Hopper has

1    impacted their ability to compete against Google.

2            The evidence will also -- in this case is, they

3    had a dispute with Yelp over the manner in which Microsoft

4    was using their data, and that data terminated because they

5    couldn't reach terms.  That couldn't be harming their

6    ability to compete against Google because Google doesn't

7    have a deal with Yelp either.

8            So the notion that somehow Microsoft has failed to

9    compete because it can't get access to data, the record is

10    absolutely -- it doesn't support that claim at all, and

11    Microsoft has more than enough money to go out and acquire

12    data.

13            Your Honor, I think, made a question:  Google

14    spends money to acquire data as well.  There's lots of

15    third-party data sources that they have to acquire, depends

16    on the nature of the data, it depends on the nature of the

17    trade, but there's no evidence in this case that a reduction

18    in deals with SVPs has hindered Microsoft at all.

19            I want to now skip over and talk a little bit

20    about the prima facia case and talk a little bit about the

21    framework and the questions and some of these Your Honor

22    touched on.

23            I think Your Honor at summary judgment framed this

24    as looking at, do the agreements harm the competitive

25    process and thereby harm consumers as opposed to simply

1  harming a competitor, and you were quoting *U.S. v Microsoft*

2  and sort of discussing that concept.

3        And I think there are -- as part of that

4  conversation, there's a couple of different inquiries, and,

5  again, you've touched on some of them.

6        One is, is the agreement actually -- are we

7  dealing with an exclusive agreement here?  And that

8  obviously has its own legal test.

9        I will confess, and we'll get to it in a little

10 bit, I was shocked at how much Mr. Dintzer, when you pressed

11 him on this foreclosure and these questions about what's the

12 test, he began talking about the 2016 Apple ISA and the

13 substantially foreclosed -- the substantially similar

14 product language.

15       Your Honor, I know we made this argument but it is

16 worth repeating:  That claim, that allegation was never,

17 ever referenced in the complaint in this case, in the

18 contention interrogatories in this case.  And you may

19 remember when Professor Whinston tried to give some very

20 conclusory testimony about it, I asked him on

21 cross-examination:  Did you reference this anywhere in your

22 expert reports?  And his answer was:  No.

23       It's not because they didn't have the agreement,

24 Your Honor.  They've had the agreement since well before the

25 lawsuit was filed.  No expert evidence, no analysis

1   whatsoever of that clause and its actual effect on the

2   market.  They asked witnesses at trial about it, and all of

3   them said, it had nothing to do with limiting Apple's

4   ability to answer its own queries.

5          You'll see there's a provision in there that

6   allows Apple to make changes to improve its own product, and

7   Mr. Giannandrea testified, and I believe Ms. Braddi

8   testified, I may have this wrong, that we observed, they,

9   in fact, did increase the volume of queries Apple was

10  actually answering in response to Suggestions.  So the

11  notion that that is the anti-competitive effect that could

12  somehow save their case is absurd.  It was never pled.

13  It was made up at trial.

14         So let's talk a little bit about the browser

15  agreements, because I think you were absolutely right as you

16  did in summary judgment, I think we have to look at these

17  separately, and I think you do have to look at the

18  provisions separately, because these other subsidiary

19  provisions have nothing to do with exclusive dealing.

20         So as to the browser agreements, I want to talk a

21  little bit -- I want to sort of go back and talk a little

22  bit, because there was a conversation, I think you had

23  before, about coercion and, you know, how does that factor

24  into the analysis here.  And the reason why it's relevant,

25  Your Honor, is it goes to this question of, does the conduct

 1    harm the competitive process or does it just harm a

 2    competitor?

 3            Because Google winning agreements because it has a

 4    better product is not a harm to the competitive process.

 5    Even if it gives its scale to improve its product, even if

 6    it gives it other advantages, merely getting advantages by

 7    winning on quality, that may have an effect on a rival, but

 8    the question is, does it have an anti-competitive effect?

 9            Because there are all sorts of things that happen

10    in the marketplace.  Every time one company wins, you know,

11    a competition over another, does it affect the other

12    company?  Absolutely it does.  Might it affect their ability

13    to compete more effectively in the future?  Sure.  Is it an

14    anti-competitive effect?  Absolutely not.  That doesn't

15    answer the question.

16            And what the plaintiffs in this case -- they want

17    you to just to skip to the result which is, oh, well, this

18    has some effect.  Google's won these contracts; they've had

19    an effect.  That's not the question; that's not the test in

20    *Microsoft*.

21            Microsoft used a couple -- and I'll talk about a

22    couple of the different types of agreements, but they used

23    the Windows operating system monopoly to coerce the OEMs

24    into giving them all of the advantages.  And what the Court

25    agreed was effective preload exclusivity, because, for

1  various reasons that existed with respect to PCs back in the

2  1990s, it just wasn't -- it wasn't feasible for the OEMs to

3  preload a rival once they had chosen Internet Explorer.

4       They won the browser competition and harmed the

5  competitive process not because they had a better browser

6  but because they had the Windows monopoly.  They didn't win

7  that, they harm the competitive process.

8       And how do we know that?  Well, the Court made

9  extensive findings of fact.  Netscape Navigator was the

10  number one browser before that.  It was the highest quality.

11  It was distributed by the OEMs.  It was preferred by

12  consumers.

13       And all of these things -- they flipped the

14  market.  They completely coerced the OEMs to engage in

15  conduct that they previously had not engaged in.

16       And these prohibitions and restrictions that they

17  placed on them, the Court found, had a substantial effect.

18  And the reason why it had a substantial effect was, it

19  actually reduced the level of Navigator usage.

20       So this wasn't just a hypothetical effect.  We

21  talked a little bit -- and this kind of bleeds a little bit

22  into what we're going to get to on the but-for world

23  question.  Let's make no doubt, *Microsoft* court found

24  but-for effects.

25       Mr. Dintzer tries to say, oh, well, that talked

1    about causation at the end, it wouldn't make sense to talk

2    about that, but then require it earlier in the case.  That's

3    absolutely wrong.

4        What the Court found in the case was there was a

5    substantial effect on Navigator, a real-world, but-for

6    world, whatever you want to call it, effect.  And we know

7    this again from various -- from various provisions and

8    various findings of fact in the case.

9        Before 1996, Navigator enjoyed a substantial and

10   growing presence on desktops of new PCs.  Over the next two

11   years, however, they forced the number of copies of

12   Navigator distributed through the OEM channel to an exegesis

13   fraction of what it had been.  That is but-for actual

14   real-world effects.

15       What Microsoft later argued was, well, yeah, maybe

16   you found an actual effect on browsers, but you didn't prove

17   that absent these -- the browsers actually -- the middleware

18   threat actually would have come to fruition.

19       And that's where the Court said, no, that's --

20   they don't need to go that far, because what they did show

21   was this conduct had the anti-competitive effect of

22   increasing the, you know, applications barrier to entry by

23   making this distribution of cross-platform middleware much

24   reduced.

25       So there is an actual effect that they found on

1     the OEM deals.  And they also had the exact same conclusion

2     with respect to the Internet access provider deals, and

3     that's where AOL comes into the discussion.

4          THE COURT:  But I thought, maybe I'm

5     misrecollecting, I mean, I think your point is that there

6     was -- in *Microsoft*, there was real-world evidence of

7     competitive harm in the browser market, right.  Navigator's

8     distribution went down and you can plot it, but ultimately

9     the question still remains, was there anti-competitive

10    effect in the operating system market.

11         And I thought it was as to that issue, that

12    question, that the *Microsoft* Court said, you don't need to

13    reconstruct a but-for world; that you don't have to show

14    what the world would have looked like in this market, in the

15    iOS -- excuse me, in the operating system market in order to

16    make out your Section 2 case.

17         MR. SCHMIDTLEIN:  The analogous argument in this

18    case, which we are not making, Your Honor, is if we were in

19    here arguing absent the agreements, even under their

20    world -- let's just assume their relevant market because

21    we're really -- we're talking about the exclusionary

22    conduct, we're not talking about relevant market in this

23    phase, we're not talking about a monopoly power.

24         If you assume Google has a monopoly in general

25    search engines, if I was in here arguing, Judge, they

1    haven't shown that, absent the agreements, Microsoft would

2    have toppled Google -- that's what Microsoft argued.

3    Microsoft argued, absent our restrictions that flipped the

4    browser market, would this have actually reduced

5    Microsoft's, you know -- or dethroned Microsoft from the

6    monopoly position?  That's not what we're arguing in this

7    case; we're not arguing they have to show that.

8              But in order to show actual foreclosure and

9    anti-competitive effects, they do actually have to look at

10   the but-for world, because the law is not, is not, even

11   under Section 2, and *Microsoft* obviously says this, the law

12   is not, if you're a monopolist and you enter into an

13   exclusive agreement, no matter how big or how small or what

14   the effect is, it's per se illegal.  That's not the law.

15             THE COURT:  I recognize where the discussion comes

16   into *Microsoft* about the but-for world analysis, but I mean,

17   isn't it the case that the bridge between market power and

18   monopoly power and the conduct, the bridge between that and

19   anti-competitive effects is causation, right?

20             The anti-competitive conduct has to cause

21   anti-competitive effects.  And if the causation standard is

22   you don't have to show a but-for world, then why is it that

23   you believe the plaintiffs need to make a showing that, but

24   for these agreements, the world would look differently?

25   That is, some other competitor, whether it's Bing or

1    somebody else, would have a greater share.  I'm not sure

2    I understand why that follows if causation is the link

3    between the conduct and the effects.

4            MR. SCHMIDTLEIN:  In order to show -- and I think

5    you were right in some of your questions.  It's not just

6    foreclosure, it's foreclosure plus anti-competitive effects.

7    So we have to have some sort of understanding about what the

8    effects are.

9            And if I have foreclosed -- and we'll get to

10   Branch.  Branch isn't a general search engine.  Your *Fotobom*

11   decision resolved Branch's situation.

12           Branch is not a general search engine, it's not a

13   replacement for Google.  And under their market, it can't

14   have an anti -- getting rid of them, if that's what the

15   evidence shows, and it doesn't show that, but if it did,

16   there will be no anti-competitive effects.

17           THE COURT:  But I don't disagree with you in that

18   what you've just said, which is that -- that they've got to

19   show more than -- I think *Microsoft* says they've got to show

20   more than foreclosure.

21           Foreclosure is a screen.  I guess maybe -- I don't

22   know.  I suppose it's a question of whether there is more of

23   an evidentiary -- whether they've got to show something more

24   than foreclosure and that the screen is simply to screen out

25   the stuff that is not foreclosing.  But if they hit their

1    foreclosure number, they don't need to show anything else.

2         Would you agree with that?

3         MR. SCHMIDTLEIN:  No.

4         If they hit the foreclosure number, you still have

5    to look at the other factors, and I think Your Honor was on

6    to some of those in your questions to Mr. Dintzer.

7         If you have 50 percent, which, again, is, in our

8    view, an inaccurate number, if it's 50 percent but the

9    contracts aren't exclusive, then the 50 percent number is

10   meaningless.

11        THE COURT:  Right.

12        No, you've got to obviously show that the

13   exclusivity is sort of either de facto exclusive or in fact

14   exclusive.

15        I think the question is, at least as I've just

16   understood it, is that *Microsoft* doesn't demand a but-for

17   world causation proof standard in discussing the bridge

18   between the conduct and the effect.

19        Now, that does not mean that a plaintiff can't

20   come into a case with real-world effects, as these

21   plaintiffs have, and tried to essentially buttress the fact

22   that this foreclosure number actually has real-world

23   effects.

24        So they are making some but-for or consequential

25   arguments, but it's not clear to me that what you're

1    positing which is that they need to come in and show that,

2    in a but-for world, Bing, instead of having 5 and a half

3    percent, would have 15 percent or 25 percent, or that, you

4    know, a choice screen actually would result in a big shift,

5    I don't know that they have to show that.

6          MR. SCHMIDTLEIN:  They have to show that -- they

7    have to show, in regards to something, and I submit that

8    there are courts out there that have looked at this from a

9    but-for world type of scenario, they have to show an actual

10   effect.

11         And if the foreclosure -- the way that *Microsoft*

12   court met the foreclosure, and this is just some of the

13   findings of fact that were relied upon, the percentage of

14   AOL subscribers using a version of the client that included

15   Internet Explorer climbed steeply.  By 1998, 92 percent of

16   the subscribers were using it.  A year earlier, the same

17   data showed that only 34 percent of them used it.

18         There has to be an actual effect.  It can't just

19   be that we have an agreement and it covers.

20         THE COURT:  But when the Court analyzed the IAP

21   agreements, it simply, at least as I read it and understand

22   it, they went through and said, look, there's two primary,

23   you know, channels of distribution, there's the OEMs and

24   there's the IAPs.

25         And when it got to the exclusive agreement with

1    the IAPs, it simply said, look, Microsoft has agreements

2    with, I think it's 13 of the 14 largest IAPs or it was 14

3    out of 15 or whatever the case may be, more or less all of

4    them, and they said, that's anti-competitive.  They didn't

5    have to show -- and that was the harm.

6            In other words, they had foreclosed a channel of

7    distribution, which, if otherwise had been available, would

8    foster competition.  They didn't have to show that, well,

9    you know, Netscape, in fact, would have gained greater

10   distribution through the IAPs but for the -- but for the

11   agreements.  That wasn't the analysis.

12           MR. SCHMIDTLEIN:  I think the Court said -- and

13   I've got it right here.

14           THE COURT:  Hang on.

15           MR. SCHMIDTLEIN:  "By ensuring that the majority

16   of all IAP subscribers are offered; i.e., either as the

17   default or as the only browser, Microsoft's deals with the

18   IAPs clearly have a significant effect in preserving its

19   monopoly.  They help keep usage of Navigator below the

20   critical level necessary for Navigator or any other rival to

21   pose a real threat to Microsoft's monopoly."

22           THE COURT:  But isn't that their argument, too?

23           MR. SCHMIDTLEIN:  No.

24           THE COURT:  In other words -- I thought that

25   mean -- isn't that what the plaintiffs are saying, which is

```
 1    that these agreements foreclose so much of the market that
 2    it does prevent a rival from the sufficient -- they did
 3    say -- a sufficient amount of scale to compete; that because
 4    so much of the market is tied up in these agreements, that
 5    you wouldn't expect a rival to come in and invest or a
 6    nascent player to come in and try and overtake Google?
 7               MR. SCHMIDTLEIN:  Winning agreements lawfully on
 8    quality, it might disincentivize somebody from coming into
 9    the market, but that's not an anti-competitive effect.
10    That's what we have here.  We have Google winning agreements
11    on quality, on better monetization, on the merits.
12               THE COURT:  So let me ask you this:  Is there a
13    world in which a nascent competitor could dislodge Google
14    from the Apple ISA?
15               MR. SCHMIDTLEIN:  Well, Your Honor, you've
16    answered that question.  40 percent -- almost 40 percent of
17    the queries on those devices are up for grabs, absolutely.
18               THE COURT:  Hang on.
19               But here's what it would take, right?  It would
20    take someone to come in and develop a search engine that's
21    equal in quality to Google, right?  One.  Two, it would
22    require -- and do so without user data.  That's one.
23               Two, it would require that company to come in and
24    have the capital to actually build something like this,
25    which is incredibly intense.
```

1          And then it would have to hold Apple harmless,

2     which even Microsoft couldn't do.

3          MR. SCHMIDTLEIN:  No, they wouldn't do.

4          THE COURT:  Well --

5          MR. SCHMIDTLEIN:  They could.

6          THE COURT:  I suppose.

7          But I mean, if that's what it takes for somebody

8     to dislodge Google as the default search engine, I mean,

9     wouldn't the folks who wrote the Sherman Act be concerned

10    about that?  That it would take not only billions of dollars

11    to build but then also billions of dollars to ensure that

12    Apple doesn't lose revenue just to get that contract?

13         I can't conceive of a world in which some other

14    competitor, particularly a new competitor, could do that if

15    Microsoft couldn't do it.

16         MR. SCHMIDTLEIN:  Absolutely not.  Absolutely not.

17         If you have the best product and you're winning on

18    the merits, the Sherman Act is designed to protect

19    competition, not competitors.

20         And the D.C. Circuit in *Microsoft* talked about

21    harm to the competitive process, not harm to individual

22    competitors.

23         THE COURT:  Agreed.

24         MR. SCHMIDTLEIN:  Google is not, under the law,

25    obligated to say, we'll step back and we'll let you win the

```
 1    deal.
 2              THE COURT:  No, no, of course they aren't.
 3              But I think the question is slightly different,
 4    which is, again, I'm asking you to assume a world in which a
 5    competitor somehow manages to have equal quality as Google.
 6    That competitor would also have to spend billions and
 7    billions of dollars to make Apple whole, relative to the
 8    current Google ISA, one; and, two, would have to be willing
 9    to take the reputational hit from -- to go to another
10    browser -- excuse me, to another general search engine.
11              That seems to me to be very, very unlikely, if not
12    impossible under the current market conditions.
13              MR. SCHMIDTLEIN:  And that is competition on the
14    merits.
15              Google is winning because it's better, because
16    Apple is deciding Google is better for its users.
17              Apple could change that decision.  Mozilla changed
18    that decision.
19              THE COURT:  So say hypothetically Apple thought
20    the following, which is, you know what, Google's -- I mean,
21    Bing is as good as Google on Desktop, so we'd like to have
22    Google be the default on Mac computers, and, you know, we'll
23    pay Google -- we'll pay Apple some amount of money to make
24    them whole from whatever dropoff there is, because there's
25    going to be some.
```

```
1              That can't happen today.

2              That can't happen today, right?

3              MR. SCHMIDTLEIN:  There is no evidence in this

4    case that Apple wanted that.

5              There is evidence in this case that Apple demanded

6    and got exclusions in the contract for markets outside the

7    U.S. where it believed that there were other search engines

8    that were better than Google.

9              If Apple believed there were better search engines

10   in the United States, to give your example --

11             THE COURT:  Right.

12             MR. SCHMIDTLEIN:  -- presumably they would have

13   asked for that.

14             They didn't believe that.  They didn't believe

15   that.  That hypothetical never occurred.

16             THE COURT:  No, but I guess the question is, if we

17   all agree that, with respect to Apple, that it is getting,

18   you know, billions of dollars of revenue from Google.  And

19   if we all agree that a new search engine comes in and

20   there's going to be some drop-off in that revenue, even if

21   the new search engine can monetize as good as Google, it

22   would not only have to be as good a search engine as Google,

23   it would also have to be as good an ad platform as Google,

24   right?  So not just search engine but monetizing.

25             But even if they can meet on that battlefield,
```

1    they're still going to lose some amount of search just by

2    virtue of Google having been the dominant player.  People

3    will move over to Google.

4            They would then have to spend billions more to

5    make Apple whole.  And I guess I'm just wondering how

6    anybody would be able to spend billions and billions and

7    billions of dollars as a new entrant to possibly dislodge

8    Google as the default search engine from the Safari browser.

9            MR. SCHMIDTLEIN:  The antitrust laws are not

10   designed to ensure competitive -- sort of competitive

11   markets, they're designed to ensure a competitive process.

12           If a new search engine can't come along and beat

13   Google and win these contracts, you, as a federal judge

14   enforcing this law, you can't say, I'm going to rewrite how

15   this market works, because I'm going to hope that if I force

16   a worse result today for users -- and this is the basis of

17   their case -- we're going to force a worse result for users

18   in the short run, in the hopes, in the hopes that Microsoft,

19   a company that at every single turn failed.

20           THE COURT:  I guess the issue is not forcing a

21   different result for users.  The question, it seems to me,

22   is, if Google didn't have the exclusive out-of-the-box

23   default in exchange for massive revenue share payments,

24   could someone else come along and possibly compete?

25           MR. SCHMIDTLEIN:  But then you're basically now

1    ordering Apple to redesign its product.

2            THE COURT:  No, I'm not asking anybody to do

3    anything.

4            And I recognize that I cannot ask Apple or any OEM

5    to design their product differently, I recognize that.

6            But it just seems odd me to that you've got this

7    marketplace where Google is making billions of dollars in

8    profit, it's got a profit margin that is significant, nobody

9    is entering into the market to try and cut into that profit.

10            And even Microsoft has not been able to win.

11    Nobody has won in the last 10 to 15 years.  No one.

12            MR. SCHMIDTLEIN:  Microsoft has won on all Windows

13    desktop computers, Your Honor.

14            THE COURT:  Right, because they have their own

15    exclusive agreements.

16            MR. SCHMIDTLEIN:  Correct.  Correct.  They're

17    losing the Windows monopoly over there to their advantage.

18            THE COURT:  I know.

19            MR. SCHMIDTLEIN:  If they can't win on the merits

20    with Apple and Mozilla, the Sherman Act cannot come in and

21    say, well, we're going to elevate you even though your

22    product is inferior.  We're going to find, Google, you're

23    not allowed to compete.

24            When Apple goes out and says and when Mozilla goes

25    out and says and when the Android people go out and say,

1    we're having a competition, you're basically saying, sorry,

2    Google, you can't compete for that -- for those places.

3              Apple -- one of the most valuable platforms to

4    have your products available, Google, you're not allowed to

5    participate there.

6              You've got the evidence from Mozilla, what Mozilla

7    thinks would happen to it and the Firefox browser.  They've

8    said if Google is not allowed to compete for the default,

9    we're probably going to go out of the market.

10             THE COURT:  So what's the answer then to the

11   question that the plaintiffs have posed from the outset,

12   which is:  If it's all about quality, then why pay billions

13   in rev share?

14             MR. SCHMIDTLEIN:  There's absolutely -- you will

15   get some incremental usage.  Absolutely you get incremental

16   usage.

17             THE COURT:  Right.  But billions of dollars'

18   worth?

19             MR. SCHMIDTLEIN:  Absolutely.

20             THE COURT:  And has Google made a determination

21   that the incremental use it will get or incremental usage or

22   users it will get, searches and queries that it will get is

23   worth that much?

24             MR. SCHMIDTLEIN:  If Apple tomorrow announced to

25   the world they were switching to Bing because they thought

1    Bing's quality was better than Google's, that would be the

2    greatest day in Microsoft -- in Bing's history.  That would

3    cause all sorts of ripple effects amongst users.

4         And they haven't been able to win that.  They

5    haven't been able to get the endorsement.  They haven't been

6    able to persuade people, even on their own platform, that

7    their product is better.  So how is it procompetitive to

8    force users to pick a -- or to force Apple to pick an

9    inferior default?  That's not what the antitrust laws were

10   designed for.

11        And, Your Honor, look at some of the other conduct

12   that the D.C. Circuit looked at.  As you will recall, the

13   D.C. Circuit reversed --

14        THE COURT:  I guess the question isn't whether

15   you're compelling someone to pick a different user.  The

16   question is:  Is there any real competition for that slot?

17        MR. SCHMIDTLEIN:  Absolutely there is.

18        You referenced it earlier today.

19        I mean --

20        THE COURT:  For the default slot, for the

21   out-of-the-box default slot, is there any real competition

22   for it?

23        MR. SCHMIDTLEIN:  Well --

24        THE COURT:  Other than the -- you know, the sort

25   of dalliance with Microsoft, there's no example of any

```
1    instance in which any one of these providers has seriously
2    considered anyone other than Google in the last 10 to 15
3    years.
4             MR. SCHMIDTLEIN:  I think --
5             THE COURT:  And -- hang on.
6             And in the one instance where Microsoft thought
7    they were making some headway, we heard Mr. Cue say, there's
8    no price they could have offered us.
9             I mean, how is that a competitive marketplace?
10            MR. SCHMIDTLEIN:  Well, I will suggest to you,
11   both Mr. Nadella and Mr. Tinter said, our conduct did have
12   procompetitive effects because it drove up the competition.
13   That's absolutely the case.
14            Yahoo! being picked by Mozilla absolutely enhanced
15   competition by them doing that.  They were able to compete.
16            The fact that --
17            THE COURT:  But that's just one example.
18            I mean, that's the one example in the last
19   15 years where somebody has dislodged Google.
20            MR. SCHMIDTLEIN:  But the record in this case, and
21   Your Honor has the documents, as recently as 2021, I mean --
22   and obviously our discovery cut-off ended --
23            THE COURT:  Right.
24            MR. SCHMIDTLEIN:  -- a little while back now,
25   Mozilla was doing analyses.  They did internal user
```

1  analyses.  They switched a percentage of their users to Bing

2  and they observed what happened.  They did that because they

3  were evaluating, and they would be prepared and willing to

4  switch.

5          Microsoft and Apple had the same conversations.

6  Apple evaluated.  You heard the testimony from Mr. Cue and

7  Mr. Giannandrea, they evaluated the quality of Bing versus

8  Google, and they chose Google.

9          They are continually doing that, and they will

10 continue to do it.  So --

11         THE COURT:  Why, for example, then -- and let's

12 leave aside what Mr. Cue said, there's no price that they

13 could have offered.

14         I mean, is it in Apple's interest to have signed a

15 contract with Google that extends up to potentially ten

16 years for the default from 2021 if there's some genuine

17 prospect of somebody better coming along?

18         MR. SCHMIDTLEIN:  It wasn't a ten-year agreement.

19         THE COURT:  I know.  It's five and then it's got

20 some options.

21         MR. SCHMIDTLEIN:  There's a couple years and

22 options to renew.

23         THE COURT:  Google's got an option and I think

24 Apple's got options.  It adds up to potentially 10 years is

25 my recollection.  And that would seem to be the opposite of

1    a belief that there could be competition in the future.

2            And Apple says, nobody is going to come along to

3    possibly dislodge Google, so let's enter into this long-term

4    agreement.  Even we're not going to try and do more search,

5    because, why should we?

6            MR. SCHMIDTLEIN:  Well, they have enormous -- if

7    Apple, again, at the intervals of where they have options,

8    and they're the ones who have the repeated options, I think

9    there's some years where it's a mutual.

10            THE COURT:  Right.

11            MR. SCHMIDTLEIN:  But they're the ones who have

12    the option to get out.

13            THE COURT:  Right.

14            MR. SCHMIDTLEIN:  That is absolutely sufficient to

15    keep Google on its toes and to keep Google competing.

16            The fact that Google has repeatedly won the Apple

17    agreement is not evidence of an anti-competitive market,

18    it's evidence that Google is continuing to win.

19            And whether you think -- again, whether you think

20    Google is a monopolist because it has the best price --

21    remember, a company could be a monopolist just because it

22    has the highest quality.  That's *Grinnell*.  Superior

23    quality, skill, business acumen, all of those things.

24            THE COURT:  Right.

25            MR. SCHMIDTLEIN:  Doesn't make the fact that they

1    go and they compete in the market exclusionary.  They have

2    to be allowed.

3          But the monopolist is allowed to compete just as

4    hard as everybody else is.  And that's what we've seen here.

5    Apple has every incentive to make sure there's competition

6    in the market and to make sure they are putting the highest

7    quality product.

8          The D.C. Circuit, when it reversed *Microsoft's* --

9    the liability findings on Microsoft offering inducements to

10   IAPs to promote Internet Explorer, offering it for free,

11   offering an Internet access kit, developing an incompatible

12   Java development machine, even though that had an effect, it

13   wasn't anti-competitive because it was a product

14   improvement.  All of these categories of conduct, the

15   D.C. Circuit was very careful to say were not

16   anti-competitive even though each of those categories harmed

17   the rival.  It had an effect.  It just didn't have an

18   anti-competitive effect.

19         And the Sherman Act is not worried about

20   correcting markets that don't have enough competition.  It

21   is concerned with the competitive process, the process.  Not

22   the result, with the process.  And the process here has

23   shown repeatedly that Google has the best product.

24         And, Your Honor, we went through, and, really --

25   and, again, there's a real distinction in the D.C. Circuit

opinion between procompetitive and exclusionary conduct, and

this is at the prima facie case.

        But here's what Google didn't do, which is

different from Microsoft.  Google didn't go in to say to

Apple, if you don't make us the default, no Google Search on

Apple devices at all.  That might present some interesting

coercion.  Of course, that would be -- that would be suicide

for Google.

        But the idea, no, users can't use Google at all on

your devices.  That's not what happened.  That's what

Microsoft did with Windows.  If you want the Windows

license, you have to agree to all of these restrictions.

That's the type of coercion that -- and the infecting the

competitive process that Microsoft was concerned about.  In

each of these situations, obviously Google won because it

was superior.

        This piece of testimony has been cited by the

plaintiffs, but I want to highlight it for you.

        Mr. Parakhin -- this is extraordinary.  "It is the

case Microsoft told Apple that it could invest more in

mobile but it would not do so unless Apple gave it further

distribution in mobile.

        "It's uneconomical for us right now to invest more

in mobile because even, like, it's our belief that no amount

of investment without securing some way to do distribution

1    in mobile will result in any share gain."

2              He has it completely backwards.

3              THE COURT:  So Mr. Dintzer will stand up and say,

4    potentially, Mr. Cavanaugh, that that's actually exactly

5    what we're talking about -- hang on -- that this is actually

6    evidence of the disincentive to invest.

7              And there's a chicken-and-egg quality to this that

8    was a little bit like the chicken-and-egg quality they

9    talked about in *Microsoft*, which is, you know, the

10   investment without some -- you can't build a better search

11   engine unless you're assured -- you can't build a better

12   search engine unless there's going to be -- that there are

13   going to be users, right.  Your search engine quality is as

14   good as the number of users you have, or at least there's

15   some relationship to it.

16             And if a company can't get enough users in part

17   because of the agreement, I'm not saying it's all -- that's

18   the only reason.  It doesn't have to be.  But that's not the

19   only reason.  I mean, isn't this evidence of a disincentive

20   to invest?

21             MR. SCHMIDTLEIN:  Your Honor, there is an entire

22   venture capital world out there of companies investing and

23   new startups cropping up every day.  None of them are

24   guaranteed anything.

25             The notion that -- I mean, I can't even imagine

1    what the American economy would look like if everybody lived

2    by this.  I'm sorry, I'm not going to enter the market,

3    I'm not going to build my product, I'm not going to try to

4    improve my product unless you give my inferior product

5    business today.  And if you do that, I promise I'll improve

6    it.

7            That's what Microsoft told Apple, and that's what

8    Mr. Cue said was ridiculous.  And he didn't believe them.

9    He didn't believe them because they'd had the advantage on

10   their own desktop and they couldn't win there.  He didn't

11   believe that they could build a better search engine.

12           So the notion that Mr. Parakhin can glibly walk in

13   here and say, well, gee, we can't compete because they won't

14   give us the deal first and then we'll make our product good

15   enough to beat Google, he has it absolutely backwards, and

16   that's not what the -- this is not what the Sherman Act is

17   designed to protect.

18           Now, as you've referenced, everybody who marched

19   into this courtroom said Google was better.  Everybody did.

20   That's not what happened in *Microsoft*.

21           THE COURT:  Can I ask you a question?

22           Just to go back to our foreclosure discussion.

23           Is it your view that if -- say I were to agree

24   that the market foreclosure is at 50 percent, do you think

25   that's enough to satisfy their prima facie burden and then

1   shift it into your camp?

2          And if the answer is "no," what more do they have

3   to show in your view to make out the prima facie case?

4          MR. SCHMIDTLEIN:  I think under *Tampa Electric* and

5   all the subsequent cases, they made very, very clear we're

6   talking about, we are no longer in a quantitative

7   foreclosure world, we're in a qualitative foreclosure world.

8          You have to examine all of the other different

9   factors to determine whether there is effective room to

10  compete if I had a better product.

11         THE COURT:  Right.

12         So in your view, that would have to be real-world

13  manifestations of the absence of competition --

14         MR. SCHMIDTLEIN:  Not only that.

15         THE COURT:  -- in addition to the foreclosure?

16         MR. SCHMIDTLEIN:  Not only that.

17         And part of that would go with a couple different

18  directions.  One would be to go back to the question of

19  exclusivity, sort of, are these exclusive or de facto

20  exclusive.

21         I mean, you heard testimony in the case.  I asked

22  Mr. Nadella about all of the early agreements.

23         Remember, Your Honor, in the early mobile days,

24  Microsoft had lots of distribution agreements.  They had

25  Windows Mobile phones.  They had Nokia agreements.  They had

 1   BlackBerry RIM agreements.  They were the default on lots of

 2   different -- you'll remember this document.

 3          Windows phones.  This is 2010.  So several years

 4   after the introduction of Android and iPhone, you'll see

 5   from this internal Microsoft document, more Windows Mobile

 6   phones than Android phones.  Bing was the default.

 7          Google got 90 percent of the queries on that, on

 8   those devices.

 9          This is based on Microsoft's own internal data.

10          BlackBerry.

11          Again, going back to the prior document during

12   this time period, BlackBerry had the same number of devices

13   in the market that the iPhone had.  BlackBerry devices.

14          Well, they did agreements with the various

15   carriers.  You've heard testimony the carriers can impact

16   who gets to be the default.  On these devices, different

17   carriers had different search engines as the default.

18   Google was able to successfully compete against the default

19   in all of them.

20          THE COURT:  Can I -- if I could interrupt you,

21   Mr. Schmidtlein.

22          And I'll just note there's a couple minutes, but,

23   again, we can continue the conversation in the afternoon.

24          But would you agree that defaults are the most

25   efficient channel of distribution for search?

1          MR. SCHMIDTLEIN:  For -- on a browser agreement,

2    it's obviously an efficient agreement.

3          I mean, as we talked about, Safari -- for

4    Safari -- and, again, if this part of this goes into the

5    quality of the browser and the quality of the device,

6    60 percent queries through the default, roughly 60/40 split

7    there, it's certainly one of the primary methods, absolutely

8    it's an important method of distribution.  Absolutely.

9          And it not only allows for a convenient use by

10   your users, but if it's a good browser, you'll get increased

11   usage.  I mean, that's what --

12         THE COURT:  Right.

13         MR. SCHMIDTLEIN:  You've seen evidence,

14   Your Honor.

15         THE COURT:  No, that's what's happened on Desktop.

16         MR. SCHMIDTLEIN:  Google built Chrome.  Chrome's

17   free.

18         Why did Google build Chrome?  Why did Google

19   invest and innovate on Chrome?  Because Google understood a

20   really, really good browser will increase your searching.

21         Why did Google develop Android?  It gives it away

22   for free.

23         Why does Google -- why did Google do that?  Google

24   wanted to inject competition into smartphones.  We'll talk

25   about this on anti-competitive effect.

1          All of these things are procompetitive and they

2     allow for more search usage.  So absolutely the defaults are

3     important.

4          But, as we've seen on Windows, and here's the --

5     you know, here's the data.  This goes back to long before --

6     you know, in early, early time periods here, back when Bing

7     had all of the defaults, when Internet Explorer had all the

8     defaults.  There was no Chrome, and to Mr. Dintzer's point,

9     and this -- by the way, this is back when there was

10    virtually no mobile.

11          THE COURT:  What would you say to the response

12    that the reason there's so much greater search on Google and

13    Bing on PCs has less to do with Google and more to do with

14    Chrome; and that is, you know, people download Chrome,

15    whether it's individually or through their, you know --

16    whoever their IT person is, and that they're not really

17    making the selection in the way they would if somebody who's

18    actually switching the default.

19          MR. SCHMIDTLEIN:  I'd ask Your Honor to take a

20    look here at this next slide.

21          So this slide, which Professor Murphy presented,

22    not contradicted by the plaintiffs, I believe, at trial,

23    shows, going back -- Chrome, I believe, was introduced in

24    2008, in the fall of 2008.  So we have here Chrome's usage,

25    Internet Explorer or Edge, Internet Explorer.

1          THE COURT:  Right.

2          In other words, Google's usage was predominant

3     even before Chrome arrived.

4          MR. SCHMIDTLEIN:  There is no material difference

5     in Google's search usage on Windows devices before and

6     after, you know, while Chrome gained -- and, by the way,

7     Chrome also overcame defaults.  Chrome wasn't preloaded on

8     any Windows devices either.  So this is a double whammy for

9     the plaintiffs.

10         THE COURT:  One more question, because we're

11    approaching your 60 minutes, on the issue of defaults and

12    the stickiness of defaults.

13         As I understand it, the evidence shows that

14    80 percent of Desktop users who use Edge use Bing.  I think

15    that was one of Mr. -- I mean, Professor Whinston's slides.

16    It showed that 80 percent of Edge users search through Bing.

17         Is that not evidence of the stickiness of a

18    default that only 20 percent, I'm assuming they've switched

19    over to Google, but that only 20 percent have switched over

20    to Google from the Edge browser -- in the Edge browser?

21         MR. SCHMIDTLEIN:  I think that's probably --

22    I think you heard evidence in the case, and I think --

23    I crossed Professor Rangel on this issue of, isn't it true

24    Microsoft makes changing the default more difficult than

25    Apple and Google, too?

1          THE COURT:  Right.

2          MR. SCHMIDTLEIN:  Microsoft has for years -- and

3    I believe Mr. Pichai talked about it.  Microsoft has for

4    years made it more difficult to change defaults precisely

5    because they know that people do it.  So they have

6    obstructed the way to do it.

7          The other thing I would suggest to you is,

8    people -- the people -- the cohort of people who are using

9    Edge are loyal Microsoft customers.  I mean, they understand

10   that that's part of the experience, and I think you would

11   expect there to be some over-index --

12         THE COURT:  Right.

13         MR. SCHMIDTLEIN:  -- of those users.

14         So I don't believe that that is proof that somehow

15   we have a cohort of users who are sort of trapped within

16   Edge who don't know how to get to -- who don't know how to

17   get to Google.

18         THE COURT:  All right.  Mr. Schmidtlein,

19   thank you.

20         All right.  Why don't we take --

21         Bill, are you okay?

22         Why don't we take 15 minutes for a rebuttal and

23   then we'll take lunch and then we can go forward from there

24   in the afternoon.

25         MR. DINTZER:  Thank you, Your Honor.

1          I'm going to ask the Court --

2          Actually, before we switch over, could I ask you

3    to put up Slide 27 that you just had, please.

4          Thank you, sir.  I appreciate it.

5          So this slide would be more informative,

6    Your Honor, if it had Firefox, because Firefox was

7    downloadable, Firefox defaulted to Google.

8          So it is true, Google stayed that way.  And it is

9    true, Chrome went up.  But what it doesn't show is Firefox

10   was an avenue of distribution for Google before Chrome got

11   there.  And so this thing -- leaving out Firefox means that

12   this doesn't represent what happened in the market.  So I'll

13   just start with that.

14         Let's see.

15         Mr. Parakhin's statement about more investment in

16   mobile, that's on top of the $100 billion that we already

17   heard about from Microsoft that they invest, and they invest

18   enough so that their Desktop product is good.

19         Google's slam is, oh, they won't invest, they

20   don't care, and all this.

21         But what we've seen is there's a direct

22   relationship.  They have scale, they have distribution, they

23   invest, and they have some success.  And what we see is that

24   on mobile and on Apple, they're blocked out.

25         And so Mr. Parakhin's statement makes perfect

1  sense.  Why would you invest in an area that the incentives

2  to invest are, at best, significantly diminished or

3  disappear altogether?

4           THE COURT:  Could I ask you to answer two

5  questions and not to foreclose you from answering others?

6           MR. DINTZER:  Of course.

7           THE COURT:  One is, I think a question I asked you

8  at summary judgment, and I'm not sure I got an answer then

9  and I'm curious if you have an answer now, which is:

10  What should Google have done to remain outside of the

11  crosshairs of the Department of Justice and in line with

12  Section 2?  What should they have done?  Should they have

13  not competed?  Should they have sat on the sidelines?

14  Should they have lowered their rev share offer?  What should

15  they have done to avoid what we've been all enjoying for the

16  last three years?

17           MR. DINTZER:  Okay.

18           And so let's go to Slide 27, please.

19           So let's talk about Apple for a minute.

20           So we know that Google's interaction with Apple

21  begins in 2007.  And when Apple asks for choice screen and

22  Google says no rev share, no default, we know that Apple

23  wants the power -- we know that Google tells Apple in 2007,

24  you can't have Safari at the home page.  Apple showed --

25  I mean, you can't have Yahoo! at the home page.  Apple

    1    showed Yahoo! in a demo and Google said, no, no, no, no, we

    2    want language.  From now on, the home page default is also

    3    ours.

    4            Apple said, look, we might want different,

    5    multiple defaults so that if somebody downloads a copy of

    6    ours from Yahoo! on Windows, we'd like Yahoo! to be able to

    7    put the default.  It's to encourage them.  Google said, we

    8    won't pay for that; you're not allowed to do that.

    9            2009, this is really vital.  Apple seeks the

   10    option, not the obligation.  So this is Apple saying, we

   11    know what's best, okay?  You tell -- we're going to do it

   12    probably, but you let us choose the option but not the

   13    obligation.  And Google said, no, we won't pay you for that.

   14            And so this is fundamentally what they should have

   15    done.  They should have said, oh, well, we know we've got

   16    enormous market share, and we know that there are antitrust

   17    laws because we've been hiding documents and destroying

   18    documents because we're concerned about the antitrust laws.

   19    But instead they said no.

   20            And in 2012 -- 2012, this is Dr. Murphy.  But the

   21    ability for Apple to choose but not be obligated to put

   22    Google in the default spot, that was something that Apple

   23    was again seeking in 2012.  And he said, well, this is part

   24    of that negotiations.  Yeah, you can ask for things in

   25    negotiations.  Apple was asking for that.

1          What should Google have done?  They should have

2     recognized that by demanding, locking down every default,

3     that they were opening themselves up to a challenge on their

4     conduct because they were intentionally excluding people.

5          And this was to a playbook that was written in

6     2007 when they said, defaults can be a powerful, strategic

7     weapon.

8          THE COURT:  So let me ask you:  If Google had done

9     just that, that is they said, okay, look, Apple, you can --

10    we're not going to obligate you to set us as the default out

11    of the box.  In exchange for rev share, we will pay you

12    rev share, maybe it will be a little bit less, but we'll pay

13    you a little bit, continue to pay for rev share, and Google

14    did that across the board, allowed carriers to make -- or

15    OEMs and Apple and carriers to make that decision, would

16    they be -- and the decision was still made to carry Google

17    as the default?

18         MR. DINTZER:  So we haven't even spoken about

19    Android.  And so -- and I don't want to dodge the Court's

20    question.

21         It would depend.  It would certainly be less

22    restrictive than saying, we get every default and no one

23    else can have it.  But it would still -- depending on how it

24    was implemented, it could still be problematic.  And we

25    haven't even talked about Android.

1          So in the Android system, which Google talked

2     about how Microsoft -- in the *Microsoft* case, how it

3     leveraged its control over something, well, we know, we

4     heard testimony, that Google leverages its control over the

5     Play Store and that the progression is pretty standard.  The

6     progression is you start -- you need the Play Store, you

7     have to take the MADA, you get the MADA, you get a search

8     widget that provides something like 40 percent of the

9     queries and 50 to 60 percent of the payments, you have to

10    have a search widget.

11          THE COURT:  Why isn't the way the RSA is presently

12    set up, which is on a device-by-device basis, precisely what

13    you're talking about?

14          In other words, any carrier or OEM can say, we'd

15    like the choice to decide who the default is going to be.

16    We recognize that won't -- you know, that'll result in a

17    lower rev share because the default requires that, but why

18    aren't they able to make that -- why aren't they in the

19    exact same position that you've suggested that Google should

20    have taken with Apple, which is, let them choose who the

21    default is?  You're certainly not suggesting that Google had

22    to pay the same rev share regardless.

23          MR. DINTZER:  No.

24          But to talk about device by device, first of all,

25    we know that a number of their contracts are not device by

1    device.  They're platform.

2              But let's talk about the device by device.

3              Before the day that an RSA is put in front of

4    somebody and somebody says, what are you going to do -- and

5    this is what's in Professor Murphy's testimony right here.

6              Now, an OEM can't sign an RSA unless they've

7    already signed the MADA, right?  That's the way it works.

8              And OEMs would consider the add-on benefits in

9    signing the RSA when they sign the MADA, these two documents

10   work together.

11             In fact, we asked them the flip side, too:

12             "When Google sets the RSA payments, it is taking

13   into account the prior agreement?

14             "Right."

15             So the fact that the MADA has already been signed

16   already provides for exclusivity on the widget, already

17   means that Google is going to be on the device, already has

18   Chrome on the device.  Then and only then is the RSA put in

19   front of somebody.

20             At that point, the idea --

21             THE COURT:  Hang on for a second.

22             MR. DINTZER:  No, please.

23             THE COURT:  That's okay.

24             But under *Microsoft*, giving those away, is it your

25   contention that the MADA is anti-competitive?

1          MR. DINTZER:  Yes, Your Honor.

2          THE COURT:  Let's leave the RSA alone for a

3    moment.

4          *Microsoft* said, Look, you can give the stuff away

5    for free, that's fine, that's entirely procompetitive.  When

6    the District Court held otherwise, that was reversed, as

7    Mr. Schmidtlein just said.

8          In your view what makes the MADA unlawful is not

9    the fact that it's free, that the apps are given over for

10   free, it's that in exchange for those free apps, Google asks

11   for two things that matter:  Search widget being placed on

12   the home screen and Chrome being preloaded.

13         MR. DINTZER:  It asks for -- we've got the list

14   there.

15         It also gets YouTube, it also gets others.

16         THE COURT:  No, I know it gets all that free.

17   YouTube has nothing to do with search.

18         MR. DINTZER:  But they do get Chrome, they get the

19   Google Search app, and they get the widget, yes.

20         And the widget is placed in a position where

21   Google's own documents recognize that nobody is ever going

22   to ask for another widget.

23         THE COURT:  So let me ask you:  What should Google

24   do in your view, which is just, as far as I hear, all these

25   apps for free, zero cost license, and we're not going to ask

1  you for anything, we're not going to ask you for placement.

2  In fact, that's really the only thing.  I mean, Chrome gets

3  put on there, I suppose you could say, we're not going to

4  ask -- you can't require that Chrome have Google as the

5  default but that happens with the RSA, I think, maybe not

6  with the MADA.  What are they supposed to do?

7          MR. DINTZER:  So let's back up.

8          The Play Store makes billions of dollars.

9          THE COURT:  Right.

10          MR. DINTZER:  So when somebody wants the Play

11  Store, the fact that Google says "no" unless you sign the

12  MADA is kind of surprising given how much money it makes.

13          But, of course, they know people need the Play

14  Store.  And that was the testimony from Microsoft.  The Play

15  Store is the stick.

16          Even Microsoft had to sign.  This is enormously

17  telling.  Google's rival in search had to sign a MADA.  They

18  didn't want to.  They had to sign it.

19          THE COURT:  You haven't brought a tying claim.

20  I mean, this sounds a lot like a tying claim, which is that

21  nobody -- you don't have a choice.  Google says, Look, this

22  is free, but here are all these other things you've got to

23  take as well if you want the Play Store for free.  I mean,

24  that's a tying claim that you have not brought?

25          MR. DINTZER:  We have not brought -- we don't need

1  a tying claim.  All we need to do is show that Google has

2  put its default on the -- it has used its control of the

3  Android system to put its default widget and that it's

4  exclusive.  The point is, it is exclusive, there's not

5  another phone -- no phone is sold in this country with two

6  widgets.

7          So the widget is an exclusive default for Google

8  and it's done through the MADA.  The fact that --

9          THE COURT:  Even though the MADA doesn't bar

10  anybody from putting a second widget on.  It doesn't --

11  I don't know if it bars anybody from sort of encouraging use

12  of a -- or how to get rid of the widget, but I mean, it

13  doesn't prevent anybody from loading a second widget on

14  there.

15          MR. DINTZER:  So this is the testimony and the

16  documents that we cite about that.

17          A second search widget, according to Google's own

18  people, is allowed but not likely.

19          THE COURT:  Right.

20          MR. DINTZER:  Additional search widget allowed but

21  unlikely.  So in theory it's allowed.

22          But this is what de facto exclusivity is meant

23  for, when a monopolist comes up with an allow but not

24  likely, that is exclusive.  And that's 40 percent of the

25  searches.

1          So that -- the MADA is exclusionary, it has an

2    exclusivity element, and it -- to talk about the RSA and

3    what it does cannot be separated from what's already on the

4    phone, what's already been signed, because, among other

5    things, the one thing that we know no one can do is no one

6    can get exclusivity on Android through the RSA, because

7    Google has already got the MADA -- I mean, the widget there.

8          And so to say device by device, no one takes

9    Google up on that, because at that point, it wouldn't make

10   any sense.

11         And Google's own documents say they can price the

12   RSA in a way that their rivals really can't match because of

13   the territory that Google already owns.

14         So those are exclusive, de facto, if not express.

15   And, in fact, we have Google's employees, Mr. Pichai, and,

16   actually, Professor Murphy testified that there was

17   exclusivity on that phone.

18         THE COURT:  All right.  I'm going to ask you to

19   pause there.

20         MR. DINTZER:  Of course.

21         THE COURT:  And, if -- Mr. Cavanaugh, do you want

22   a couple minutes or a minute or so?

23         MR. CAVANAUGH:  Minute or two.

24         THE COURT:  Sure.

25         MR. CAVANAUGH:  Two very quick points, Your Honor.

1          First, the whole discussion about the *Microsoft*

2     decision and causation.

3          What the *Microsoft* Court said on page 79,

4     "The question is not whether Java or Navigator would have

5     actually developed into a viable platform.  The test is

6     whether the exclusionary conduct was reasonably capable of

7     contributing significantly to defendant's continued monopoly

8     power."

9          Our theory is that that exclusionary contract has

10    allowed them to maintain an enormous scale advantage, and

11    that's what's given them the quality that we keep hearing

12    about.  It all flows back to scale, which flows back to the

13    contracts.  That's the test for causation.

14         We also need to demonstrate that our nascent --

15    back in *Microsoft*, the nascent threats were reasonably

16    constituted potential threats, potential, and they found

17    that was all that was necessary.

18         The second point, Your Honor, is that you asked

19    the question:  What should Google have done?  That's the

20    right question.  Not what should happen today.  But what

21    should they have done ten years ago when there was a

22    recognition, hey, we're monopolists, we have substantial

23    control in markets.  How should we -- how should we proceed

24    with our contracting in light of that?  That's the question

25    that they answered, but they answered it the wrong way.

1            Thank you, Your Honor.

2            THE COURT:  All right, Mr. Cavanaugh, thank you.

3            All right, everyone.  So it's 1:20 now, a little

4    bit before.  Let's resume at 2:20.

5            And, again, if there's more to be said on

6    anti-competitive effects and the prima facie case, do not --

7    you can certainly discuss that this afternoon as well, okay?

8    Thank you, everyone.

9            COURTROOM DEPUTY:  All rise.  This Court stands in

10   recess.

11           (Recess from 1:18 p.m. to 2:20 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__May 2, 2024_____          _____

                                      William P. Zaremba, RMR, CRR

**COURTROOM DEPUTY: [6]** 3/2 3/5 80/9 80/12 125/25 171/9

**MR. CAVANAUGH: [35]** 3/21 33/23 33/25 35/1 35/3 36/3 36/13 36/25 37/19 37/22 79/3 79/11 79/16 119/17 119/19 120/8 120/15 121/7 121/11 121/14 121/25 122/5 122/20 123/3 123/6 123/12 123/19 123/25 124/15 124/19 124/24 125/6 125/11 169/23 169/25

**MR. DINTZER: [137]** 3/19 4/12 4/18 9/11 9/14 9/19 10/5 11/7 11/17 11/22 12/15 13/22 14/8 14/11 16/18 17/6 17/21 17/23 17/25 18/5 20/9 20/25 21/24 23/2 23/19 24/9 25/9 26/7 30/2 30/7 30/14 30/18 31/23 33/16 33/21 71/19 72/3 72/6 72/23 73/1 73/5 73/8 74/4 75/6 75/11 75/14 77/16 77/18 77/25 78/4 78/23 79/2 80/18 80/21 82/24 83/14 84/2 85/9 85/11 86/8 86/15 86/25 87/25 88/3 88/5 88/10 89/17 90/8 90/13 91/4 91/16 91/20 92/1 92/7 93/3 93/10 93/21 94/21 95/3 95/13 96/3 96/12 96/16 96/23 97/13 98/9 98/11 98/14 99/16 99/21 99/25 100/5 100/12 100/16 100/20 100/25 101/22 102/1 103/13 104/10 105/14 105/17 105/19 106/1 106/5 106/9 106/13 107/12 108/13 109/15 110/5 110/11 110/24 111/3 111/7 114/8 115/9 115/15 116/17 118/10 119/12 119/14 159/25 161/6 161/17 163/18 164/23 165/22 166/1 166/13 166/18 167/7 167/10 167/25 168/15 168/20 169/20

**MR. SCHMIDTLEIN: [99]** 3/22 39/13 39/15 43/9 43/14 43/16 49/13 49/18 50/4 50/7 51/9 52/3 53/1 54/5 54/15 55/17 57/20 58/3 58/10 58/14 59/18 60/19 60/21 61/17 62/9 62/22 63/4 63/6 63/8 63/11 64/1 64/4 65/14 66/1 66/17 67/8 68/1 68/14

69/10 69/12 69/24 70/11 70/16 70/19 71/9 126/4 126/8 133/17 135/4 136/3 137/6 138/12 138/15 138/23 139/7 139/15 140/3 140/5 140/16 140/24 141/13 142/3 142/12 143/9 143/25 144/12 144/16 144/19 145/14 145/19 145/24 146/17 146/23 147/4 147/10 147/20 147/24 148/18 148/21 149/6 149/11 149/14 149/25 152/21 154/4 154/14 154/16 156/1 156/13 156/16 157/19 158/4 158/21 159/2 159/13

**THE COURT: [271]**

**$**

**$100 [1]** 160/16
**$50 [1]** 27/3

**'**

**'95 [1]** 79/19
**'people [1]** 6/22
**'s [1]** 87/8

**0**

**0340 [1]** 1/15

**1**

**10 [6]** 11/15 78/19 124/8 144/11 147/2 148/24
**10 percent [1]** 79/9
**100 [2]** 119/2 119/3
**100 percent [1]** 23/16
**10036-6710 [1]** 2/10
**10:48 [1]** 80/11
**1100 [1]** 1/14
**1133 [1]** 2/9
**11:00 [1]** 80/7
**11:02 [1]** 80/11
**12 [4]** 17/22 18/1 114/18 117/6
**12 months [1]** 17/20
**12 years [1]** 13/3
**12:07 [1]** 126/2
**12:14 [1]** 126/2
**13 [2]** 17/10 138/2
**13 months [1]** 18/2
**1300 [1]** 2/5
**14 [3]** 18/22 138/2 138/2
**15 [5]** 11/16 138/3 144/11 147/2 159/22
**15 percent [1]** 137/3
**15 years [2]** 51/1 147/19
**171 [1]** 32/21
**1739 [1]** 126/22
**18 [4]** 15/12 15/14 15/15 17/13
**1983 [1]** 50/1
**1990s [1]** 131/2

**1998 [1]** 137/15
**1:18 [1]** 171/11
**1:20 [1]** 171/3

**2**

**20 percent [3]** 45/6 158/18 158/19
**20-3010 [2]** 1/4 3/6
**20-some [2]** 122/17 122/18
**20001 [1]** 2/19
**2001 [2]** 21/21 77/19
**2002 [2]** 21/20 21/21
**20024 [1]** 2/14
**2007 [5]** 84/18 118/21 161/21 161/23 163/6
**2008 [2]** 157/24 157/24
**2009 [3]** 18/19 76/17 162/9
**2010 [3]** 32/20 33/1 155/3
**2012 [5]** 113/6 113/7 162/20 162/20 162/23
**2013 [1]** 77/23
**2014 [3]** 76/16 77/23 115/5
**2015 [1]** 101/12
**2016 [5]** 82/17 93/8 110/2 115/5 128/12
**2019 [5]** 6/3 7/11 63/16 63/17 76/17
**202 [3]** 1/15 2/14 2/19
**2020 [2]** 66/7 68/20
**2021 [4]** 77/6 77/25 147/21 148/16
**2022 [1]** 40/9
**2024 [2]** 1/5 172/7
**212 [1]** 2/11
**2200 [1]** 2/10
**24 percent [1]** 117/15
**25 [1]** 45/15
**25 percent [1]** 137/3
**27 [2]** 160/3 161/18
**2793 [1]** 2/11
**2:20 [2]** 171/4 171/11

**3**

**30 [1]** 10/20
**300 [1]** 126/23
**3010 [2]** 1/4 3/6
**307-0340 [1]** 1/15
**3249 [1]** 2/19
**333 [1]** 2/18
**335-2793 [1]** 2/11
**34 [1]** 137/17
**354-3249 [1]** 2/19
**3776 [1]** 72/14
**38 [1]** 73/25
**38.5 percent [3]** 99/19 100/4 100/15

**4**

**40 [4]** 117/11 117/15 156/6 168/24
**40 percent [3]** 139/16 139/16 164/8
**434-5000 [1]** 2/14

**48 [1]** 77/4
**49 [1]** 18/3

**5**

**50 [6]** 70/18 97/13 109/10 117/15 153/24 164/9
**50 percent [19]** 15/9 71/14 92/9 92/17 96/11 96/16 96/21 97/4 97/13 97/15 97/20 97/20 102/13 106/5 109/14 117/11 136/7 136/8 136/9
**5000 [1]** 2/14
**508-6000 [1]** 2/6

**6**

**60 [6]** 23/23 73/5 119/9 125/22 158/11 164/9
**60 percent [6]** 72/14 72/21 72/23 81/13 81/14 156/6
**60/40 [1]** 156/6
**6000 [1]** 2/6
**614 [1]** 40/6
**615 [1]** 40/6
**62 [2]** 99/13 99/17
**6710 [1]** 2/10
**680 [1]** 2/13
**69 [2]** 35/23 37/22

**7**

**70 [2]** 37/24 108/23
**70 percent [1]** 18/20
**720 [1]** 2/6
**74 [1]** 15/10
**79 [1]** 170/3
**7th [1]** 2/5

**8**

**8.6 [1]** 117/14
**80 percent [4]** 49/22 57/19 158/14 158/16
**80203 [1]** 2/6
**84 [1]** 18/24
**89 percent [1]** 68/20
**89.2 [1]** 18/15

**9**

**90 percent [2]** 70/17 155/7
**92 [1]** 137/15
**93 [1]** 18/24
**98 [5]** 18/23 101/6 102/12 106/2 106/7
**9:00 [1]** 1/6

**A**

**a.m [3]** 1/6 80/11 80/11
**abilities [1]** 36/11
**ability [24]** 9/5 9/22 18/9 24/14 25/2 26/19 53/5 56/25 59/6 66/14 66/15 103/18 113/14 116/23 120/2 121/23 124/22 126/14 126/15 127/1 127/6 129/4

**able [31]** 5/18 19/18 20/16 21/22 59/24 59/25 62/24 65/18 80/2 100/2 100/2 100/22 102/18 105/7 105/8 115/25 116/1 118/11 122/7 122/18 123/8 124/6 143/6 144/10 146/4 146/5 146/6 147/15 155/18 162/6 164/18

**about [172]** 4/8 5/4 5/11 5/13 6/5 6/22 13/5 14/16 14/20 15/9 15/10 15/14 15/20 15/24 18/13 18/18 18/25 19/5 20/3 20/5 20/16 20/19 22/13 22/21 23/3 24/1 24/3 26/6 26/8 26/13 27/13 27/14 28/1 32/7 32/12 32/22 33/4 33/5 33/9 34/2 34/10 34/21 36/16 36/24 37/13 38/4 38/10 39/21 40/24 41/5 41/7 41/18 44/15 46/21 48/4 48/13 51/14 52/25 59/16 59/17 61/25 63/19 64/12 65/6 66/25 67/22 67/24 68/24 69/4 69/15 70/2 70/6 70/7 72/7 73/16 74/2 74/9 76/4 77/6 77/7 77/13 77/24 81/21 82/12 86/4 89/16 89/22 91/10 91/10 91/11 91/12 91/15 92/6 92/16 92/24 93/4 94/4 94/25 95/1 97/5 98/3 98/4 98/23 99/11 102/23 102/24 103/2 104/11 105/5 105/5 105/5 106/17 109/7 110/13 111/23 113/15 114/10 116/11 116/12 117/1 117/11 117/23 117/24 120/18 120/19 122/10 123/22 125/21 126/11 126/13 127/20 127/20 128/11 128/12 128/20 129/2 129/14 129/23 130/21 132/1 132/2 133/21 133/22 133/23 134/16 135/7 140/10 140/20 145/12 150/19 151/14 152/5 152/9 154/6 154/22 156/3 156/25 159/3 160/15 160/17 161/19 162/18 163/18 163/25 164/2 164/13 164/24 165/2 168/16 169/2 170/1 170/12

**above [2]** 70/18 172/4
**above-titled [1]** 172/4
**absence [1]** 154/13
**absent [6]** 81/3 116/24 132/17 133/19 134/1 134/3

**absolutely [40]** 40/13 41/25 42/15 46/2 56/24 58/15 58/16 59/5 59/12 63/4 63/12 64/5 64/15 64/15 64/17 66/17 66/19 66/21 68/1 71/12 126/16 127/10 129/15 130/12 130/14 132/3 139/17 140/16 140/16 145/14 145/15 145/19 146/17 147/13 147/14 149/14 153/15 156/7 156/8 157/2
**absurd [1]** 129/12
**accept [3]** 111/17 111/19 112/14
**accepts [1]** 45/18
**access [11]** 26/19 83/1 84/14 101/23 102/10 102/11 108/25 118/6 127/9 133/2 150/11
**accessible [1]** 45/17
**accomplish [1]** 52/23
**according [3]** 99/18 108/11 168/17
**account [2]** 93/23 165/13
**accurate [1]** 113/21
**achieve [2]** 39/3 73/3
**achieved [4]** 39/2 73/3 73/5 73/10
**Achilles' [1]** 84/21
**acknowledge [1]** 32/1
**acknowledged [4]** 6/24 10/24 77/12 84/15
**acknowledges [1]** 17/11
**acknowledging [1]** 26/16
**acquire [3]** 127/11 127/14 127/15
**acquiring [1]** 119/25
**across [6]** 41/23 47/13 49/2 72/19 105/22 163/14
**act [11]** 8/1 38/18 38/23 39/9 81/4 98/15 140/9 140/18 144/20 150/19 153/16
**Action [1]** 3/6
**active [1]** 27/19
**acts [2]** 82/7 89/25
**actual [12]** 20/12 22/15 42/2 84/16 94/10 129/1 132/13 132/16 132/25 134/8 137/9 137/18
**actually [39]** 4/5 11/24 20/9 22/23 31/6 31/7 40/19 44/14 44/19 45/3 45/4 45/17 46/22 48/22 51/25 54/7 71/1 73/18 73/19 94/8 98/4 116/15 123/2 128/6 129/10 131/19 132/17 132/18 134/4 134/9 136/22 137/4 139/24 152/4 152/5 157/18 160/2

**acumen [1]** 149/23
**ad [3]** 10/10 16/9 142/23
**add [4]** 24/4 24/5 88/17 165/8
**add-on [1]** 165/8
**added [1]** 98/14
**addition [2]** 94/11 154/15
**additional [2]** 103/9 168/20
**address [4]** 16/11 39/17 42/20 119/21
**addressing [1]** 10/11
**adds [2]** 24/4 148/24
**adjusted [1]** 67/22
**admission [1]** 112/24
**admit [1]** 28/15
**admitted [4]** 10/20 35/16 84/3 107/4
**admittedly [1]** 16/22
**adopt [2]** 5/25 7/19
**adopted [2]** 6/11 6/13
**ads [6]** 16/9 32/1 41/3 45/5 57/13 67/1
**advantage [6]** 44/14 44/18 81/12 144/17 153/9 170/10
**advantages [3]** 130/6 130/6 130/24
**advertise [2]** 37/3 37/4
**advertiser [1]** 120/22
**advertisers [2]** 67/4 67/7
**advertising [7]** 5/23 38/6 48/21 49/7 70/3 81/23 81/24
**affect [3]** 98/23 130/11 130/12
**affecting [1]** 95/23
**affects [2]** 102/13 103/15
**afraid [2]** 6/17 71/20
**after [13]** 4/9 22/20 63/17 63/24 87/2 87/21 90/10 104/15 104/23 114/18 119/16 155/4 158/6
**afternoon [3]** 155/23 159/24 171/7
**again [25]** 13/8 20/18 21/9 25/5 33/19 55/17 58/5 60/23 62/9 86/19 106/19 109/9 114/17 128/5 132/7 136/7 141/4 149/7 149/19 150/25 155/11 155/23 156/4 162/23 171/5
**against [13]** 12/9 22/10 29/10 32/2 32/3 32/18 76/13 76/15 115/3 120/2 127/1 127/6 155/18
**aggressively [1]** 64/10
**ago [6]** 4/2 4/4 11/16 51/1 123/24 170/21
**agree [26]** 11/21 16/5

**30/12 34/24 43/14 44/4 51/8 55/4 62/20 65/11 69/20 91/24 96/10 96/13 96/21 107/12 136/2 142/17 142/19 151/12 153/23 155/24**
**agreed [11]** 10/13 19/19 45/24 49/17 62/6 64/20 104/1 105/2 112/1 130/25 140/23
**agreeing [3]** 110/23 111/1 112/3
**agreement [26]** 68/19 82/15 82/23 82/24 94/25 100/15 114/13 114/13 118/2 118/23 119/6 124/16 128/6 128/7 128/23 128/24 134/13 137/19 137/25 148/18 149/4 149/17 152/17 156/1 156/2 165/13
**agreements [33]** 15/1 15/3 89/11 91/15 94/4 94/23 114/7 121/19 122/16 122/19 123/4 126/23 127/24 129/15 129/20 130/3 130/22 133/19 134/1 134/24 137/21 138/1 138/11 139/1 139/4 139/7 139/10 144/15 154/22 154/24 154/25 155/1 155/14
**ah [1]** 117/2
**ahead [4]** 32/16 36/3 83/5 83/6
**AI [9]** 19/21 19/21 20/22 21/21 61/18 61/23 61/23 62/7 103/20
**aided [1]** 2/21
**air [1]** 34/21
**airline [2]** 52/24 123/23
**airline's [2]** 30/25 57/12
**AirTags [3]** 76/1 76/3 76/4
**al [2]** 1/3 3/7
**algorithm [1]** 111/13
**algorithms [1]** 37/14
**all [128]** 3/14 4/4 4/11 4/16 4/24 5/5 10/7 20/10 20/11 22/24 22/25 25/21 26/14 26/17 28/5 29/14 30/12 31/12 32/20 34/1 39/7 39/11 39/12 39/15 43/18 44/11 47/6 47/13 50/17 51/23 52/22 53/10 53/23 53/24 54/3 56/2 56/8 56/23 57/6 58/3 58/25 60/8 60/17 60/24 61/18 62/10 64/3 67/17 72/14 72/19 75/1 75/23 76/17 77/1 77/10 80/5 80/6 80/9 80/12**

**84/17 88/8 90/21 91/2 94/17 97/13 97/15 98/20 99/3 99/4 106/7 107/21 107/21 108/8 108/19 109/8 109/24 112/16 113/2 117/2 125/18 125/25 126/6 127/10 127/18 129/2 130/9 130/24 131/13 138/3 138/16 142/17 142/19 144/12 145/12 146/3 149/23 150/14 151/6 151/9 151/12 152/17 154/5 154/8 154/22 155/19 157/1 157/7 157/7 159/18 159/20 160/20 161/15 164/24 166/16 166/24 167/22 168/1 169/18 170/12 170/17 171/2 171/3 171/9**
**All right [1]** 171/3
**allegation [1]** 126/13 128/16
**alleged [4]** 43/17 50/16 55/22 106/11
**allow [4]** 105/23 118/8 157/2 168/23
**allowed [14]** 5/2 32/11 92/15 144/23 145/4 145/8 150/2 150/3 162/8 163/14 168/18 168/20 168/21 170/10
**allows [4]** 9/23 45/4 129/6 156/9
**almost [4]** 42/25 52/25 87/23 139/16
**alone [2]** 68/11 166/2
**along [5]** 74/23 143/12 143/24 148/17 149/2
**already [14]** 9/6 21/23 66/6 78/19 160/16 165/7 165/15 165/16 165/16 165/17 169/3 169/4 169/7 169/9
**also [28]** 8/17 25/19 33/19 39/17 45/10 47/4 57/4 81/22 90/20 90/25 92/21 98/12 99/3 116/8 120/22 121/25 123/9 123/25 127/2 133/1 140/11 141/6 142/23 158/7 162/2 166/15 166/15 170/14
**alter [1]** 52/20
**alternate [1]** 82/17
**alternative [5]** 54/11 56/18 75/5 75/13 93/7
**alternatives [1]** 59/8
**although [2]** 93/7 95/6
**altogether [1]** 161/3
**always [4]** 22/5 104/14 119/2 119/4
**am [24]** 24/20 61/5 61/11 90/8
**Amazon [33]** 28/2 28/5 28/12 28/16 29/12

**33/4 35/18 35/19 35/20 36/17 37/7 37/23 44/21 44/22 44/22 46/17 46/20 46/23 47/2 48/18 49/1 49/4 50/3 52/16 54/24 70/9 76/15 76/23 123/24**
**Amazon's [2]** 37/23 48/20
**Amazons [1]** 44/11
**AMERICA [2]** 1/3 3/6
**American [2]** 5/18 8/4 153/1
**Americans [1]** 5/11
**Americas [1]** 2/9
**AMIT [3]** 1/10 3/3 80/13
**Amit P [1]** 80/13
**among [1]** 169/4
**amongst [1]** 146/3
**amount [12]** 4/5 13/6 58/24 85/24 101/7 101/23 104/23 115/21 123/2 139/3 141/23 143/1 151/24
**amounts [1]** 125/14
**analogies [1]** 52/6
**analogous [1]** 133/17
**analogy [2]** 52/1 52/20
**analyses [2]** 147/25 148/1
**analysis [39]** 18/15 18/23 27/11 29/4 29/5 31/2 35/6 38/25 39/9 51/15 54/2 72/9 74/21 74/22 80/22 85/14 89/21 90/14 90/19 90/20 92/19 93/22 94/22 94/22 95/11 95/14 95/14 96/2 96/19 96/20 96/24 96/25 103/5 108/2 116/4 128/25 129/24 134/16 138/11
**analytic [1]** 74/20
**Analytica [2]** 63/18 64/8
**analytical [1]** 94/3
**analytically [1]** 75/3
**analyzed [1]** 137/20
**analyzing [1]** 51/1
**Android [14]** 32/6 32/8 105/22 106/13 106/15 144/25 155/4 155/6 156/21 163/19 163/25 164/1 168/3 169/6
**ankle [1]** 7/1
**announced [1]** 145/24
**anonymize [1]** 6/8
**anonymized [1]** 104/23
**another [13]** 15/6 22/19 32/19 33/7 56/7 118/1 119/21 121/22 130/11 141/9 141/10 166/22 168/5
**answer [45]** 6/12 10/7 19/21 21/2 21/6 23/20 31/9 31/24 34/2 34/10

175

**A**

answer... [35] 34/12
34/15 34/25 43/18
48/22 49/2 50/3 50/5
51/23 52/22 53/6 53/6
53/8 58/8 59/1 60/24
62/11 68/2 69/19 71/6
71/22 72/23 74/2 74/10
86/5 87/11 116/20
128/22 129/4 130/15
145/10 154/2 161/4
161/8 161/9
**answered [4]** 33/13
139/16 170/25 170/25
**answering [7]** 21/8
21/12 45/12 57/5 105/2
129/10 161/5
**answers [5]** 20/25
34/15 34/16 53/2 71/12
**anti [54]** 4/8 38/16 39/4
39/19 80/23 82/21
82/23 83/10 83/13
83/17 83/21 90/2 90/6
91/13 92/25 92/25
93/16 94/9 94/11 95/10
95/19 95/20 97/11
105/12 105/24 106/12
107/10 107/17 108/14
108/20 114/7 116/25
119/22 129/11 130/8
130/14 132/21 133/9
134/9 134/19 134/20
134/21 135/6 135/14
135/16 138/4 139/9
149/17 150/13 150/16
150/18 156/25 165/25
171/6
**anti-competitive [53]**
4/8 38/16 39/4 39/19
80/23 82/21 82/23
83/10 83/13 83/17
83/21 90/2 90/6 91/13
92/25 92/25 93/16 94/9
94/11 95/10 95/19
95/20 97/11 105/12
105/24 106/12 107/10
107/17 108/14 108/20
114/7 116/25 119/22
129/11 130/8 130/14
132/21 133/9 134/9
134/19 134/20 134/21
135/6 135/16 138/4
139/9 149/17 150/13
150/16 150/18 156/25
165/25 171/6
**antithetical [1]** 38/22
**antitrust [6]** 2/3 29/17
143/9 146/9 162/16
162/18
**any [47]** 15/19 19/2
23/3 23/6 26/1 26/1
26/10 26/12 31/8 37/4
48/7 48/22 49/2 49/2
49/24 52/22 53/15 58/8
58/23 66/10 67/4 69/22
70/9 73/12 83/23 88/18
89/22 95/21 108/18
110/15 112/19 115/4

---

115/APM [7] 2/11
120/24 123/22 138/20
144/4 146/16 146/21
146/25 147/1 152/1
158/8 164/14 169/10
**anybody [11]** 3/17
11/14 76/9 105/4 115/4
115/4 143/6 144/2
168/10 168/11 168/13
**anymore [1]** 126/6
**anyone [1]** 147/2
**anyplace [2]** 18/9
75/25
**anything [10]** 3/17
26/2 49/24 109/7
112/19 123/5 136/1
144/3 152/24 167/1
**anyway [3]** 24/8 88/20
106/18
**anywhere [1]** 128/21
**AOL [4]** 110/16 110/18
133/3 137/14
**apart [3]** 44/8 45/25
92/23
**apologize [1]** 119/12
**app [7]** 28/18 32/14
58/1 58/13 118/11
118/11 166/19
**apparently [1]** 86/17
**APPEARANCES [2]**
1/12 1/16
**appeared [1]** 19/8
**appearing [1]** 124/1
**Apple [92]** 7/9 7/11
7/19 7/19 7/20 82/15
88/18 88/19 92/24 93/8
94/13 99/10 99/12
100/14 108/3 108/5
109/3 109/16 109/17
109/19 110/22 110/23
110/23 110/24 111/12
111/16 112/1 112/6
112/10 112/23 112/25
113/1 113/2 113/4
113/7 113/14 114/10
114/21 115/12 115/15
128/12 129/6 129/9
139/14 140/1 140/12
141/7 141/16 141/17
141/19 141/23 142/4
142/5 142/9 142/17
143/5 144/1 144/4
144/20 144/24 145/3
145/24 146/8 148/5
148/6 149/2 149/7
149/16 150/5 151/5
151/6 151/20 151/21
153/7 158/25 160/24
161/19 161/20 161/21
161/22 161/23 161/24
161/25 162/4 162/9
162/10 162/21 162/22
162/25 163/9 163/15
164/20
**Apple's [6]** 111/13
112/17 113/24 129/3
148/14 148/24
**appliances [3]** 53/17

---

**applicable [1]** 55/16
**applications [1]**
132/22
**applies [1]** 112/14
**apply [2]** 48/8 56/15
**appreciate [6]** 30/7
33/16 33/21 79/2
119/10 160/4
**appreciating [1]** 121/9
**approach [7]** 4/13 9/15
33/23 39/13 80/19
119/17 126/4
**approaching [2]** 119/9
158/11
**appropriate [1]** 39/8
**approved [1]** 89/12
**apps [10]** 28/11 28/12
28/19 32/8 32/16 46/14
47/6 166/9 166/10
166/25
**are [195]**
**area [3]** 37/17 41/7
161/1
**areas [5]** 59/2 72/19
73/10 73/11 81/20
**aren't [11]** 20/6 52/8
57/13 60/14 85/6 86/3
109/12 136/9 141/2
164/18 164/18
**arguably [2]** 31/17
115/12
**argued [3]** 132/15
134/2 134/3
**arguing [4]** 133/19
133/25 134/6 134/7
**argument [9]** 1/9 23/11
23/17 60/7 62/1 106/23
128/15 133/17 138/22
**arguments [2]** 4/2
136/25
**arose [1]** 63/17
**around [2]** 45/7 78/7
**array [3]** 55/22 56/15
56/16
**arrived [3]** 3/14 100/1
158/3
**article [2]** 16/15 76/4
**articles [2]** 34/21 47/18
**as [156]** 4/16 7/19 8/15
9/19 9/19 14/12 14/16
16/2 16/2 16/7 16/15
17/23 18/10 19/1 19/1
19/15 19/15 20/1 20/2
20/7 20/7 21/5 22/7
22/8 23/15 23/24 23/24
24/19 24/22 24/23 25/5
25/8 25/25 25/25 27/3
28/10 29/20 29/20 30/8
30/11 31/1 33/2 34/7
36/12 36/20 41/2 41/20
41/21 42/23 47/3 47/15
47/16 48/21 49/10 51/7
53/15 53/22 57/2 57/13
58/12 58/13 68/18
68/20 70/13 70/14
71/16 74/2 74/20 75/5
75/15 75/21 76/1 76/8

---

80/25 81/2 84/19 84/21
85/19 88/22 89/20 91/6
91/11 91/12 92/12
92/13 92/14 95/3 95/5
95/25 96/24 102/6
103/7 103/20 103/22
105/10 108/23 108/23
108/23 113/10 114/4
114/17 115/16 119/15
121/17 121/17 121/17
122/9 127/14 127/24
127/25 128/3 129/15
129/20 133/11 136/15
136/20 137/21 138/16
138/17 140/8 141/5
141/21 141/21 142/21
142/21 142/22 142/22
142/23 142/23 143/7
143/8 143/13 146/12
147/21 147/21 150/3
150/4 152/13 152/14
153/18 155/17 156/3
157/4 158/13 163/10
163/17 166/6 166/24
166/24 167/4 167/23
171/7
**aside [2]** 117/21
148/12
**ask [35]** 9/10 23/8
28/25 30/8 42/19 42/20
48/3 53/13 65/9 66/5
78/18 79/7 82/10 84/24
89/13 91/22 96/9
103/25 122/25 126/6
139/12 144/4 153/21
157/19 160/1 160/2
161/4 162/24 163/8
166/22 166/23 166/25
167/1 167/4 169/18
**asked [15]** 6/4 28/1
32/21 35/3 72/9 73/15
91/5 113/8 128/20
129/2 142/13 154/21
161/7 165/11 170/18
**asking [11]** 12/19
16/18 16/21 25/6 32/7
61/11 95/4 110/22
141/4 144/2 162/25
**asks [3]** 161/21 166/10
166/13
**assessment [1]** 69/15
**assume [8]** 15/21
61/12 68/17 70/2 94/19
133/20 133/24 141/4
**assuming [1]** 158/18
**assure [1]** 93/18
**assured [1]** 152/11
**astronomical [1]** 101/7
**attract [2]** 48/23
122/19
**attractive [1]** 120/11
**attributable [2]** 11/19
101/20
**audience [2]** 3/15 68/5
**autos [1]** 71/3
**available [6]** 14/14
60/14 75/25 99/20

---

07/16/24 45/4

**avenue [4]** 2/9 2/13
2/18 160/10
**average [2]** 35/10
48/17
**avoid [1]** 161/15
**aware [2]** 104/22
**awareness [1]** 64/7
**away [10]** 15/4 27/2
34/7 57/18 60/11 79/23
116/7 156/21 165/24
166/4

**B**

**back [44]** 3/13 22/5
32/20 39/5 45/13 52/14
52/17 54/13 60/23
64/12 74/5 74/11 74/13
76/16 76/17 78/25 84/8
84/18 86/5 87/2 87/17
88/1 88/13 95/4 101/12
108/23 109/9 116/3
122/15 129/21 131/1
140/25 147/24 153/22
154/18 155/11 157/5
157/6 157/9 157/23
167/7 170/12 170/12
170/15
**backing [1]** 20/11
**backwards [3]** 9/15
152/2 153/15
**bad [6]** 31/13 45/12
45/20 59/3 59/3 90/24
**Baker [3]** 35/6 47/18
51/14
**balance [1]** 17/3
**ball [1]** 86/23
**ballpark [1]** 23/16
**band [1]** 107/11
**bar [2]** 73/16 168/9
**barren [1]** 126/16
**Barrett [1]** 2/18
**barrier [1]** 132/22
**barriers [23]** 4/23 19/1
19/15 20/6 20/7 21/2
21/3 22/13 22/16 26/20
59/17 59/19 60/18 61/2
61/2 61/10 61/13 61/14
62/13 62/19 79/3 79/12
79/21
**bars [1]** 168/11
**base [1]** 67/11
**baseball [1]** 123/23
**based [9]** 14/18 29/4
29/5 49/6 103/4 108/10
108/12 109/14 155/9
**baseline [1]** 12/9
**basic [2]** 52/20 120/16
**basically [6]** 21/14
49/11 89/4 93/10
143/25 145/1
**basis [10]** 26/12 51/11
51/19 67/13 69/21 83/9
103/24 105/3 143/16
164/12
**battlefield [1]** 142/25
**be [139]** 4/6 4/18 5/18
7/16 9/16 10/2 10/11

**B**

**be... [132]** 10/14 12/5 12/9 14/22 15/12 16/4 16/5 16/8 16/24 17/1 17/25 20/14 22/19 25/15 27/21 29/16 29/23 30/9 31/10 31/22 33/25 35/20 36/20 36/22 38/15 40/7 43/19 44/18 45/21 46/23 49/11 51/4 51/6 51/11 55/18 57/13 60/10 60/14 62/7 62/17 63/9 63/11 65/18 65/22 66/1 66/4 67/13 67/13 68/21 69/23 70/15 70/17 70/18 71/15 71/15 75/2 78/24 80/14 81/14 83/8 85/1 85/13 87/4 91/6 92/5 100/2 100/3 100/19 101/20 102/22 105/8 105/15 105/16 106/12 108/20 109/5 114/4 116/4 116/18 117/6 117/9 117/13 117/15 117/17 117/18 118/23 119/4 120/10 122/7 123/8 124/6 127/5 135/16 137/18 137/19 138/3 140/9 141/8 141/11 141/22 141/25 142/20 142/22 142/23 143/6 146/1 148/3 148/25 149/1 149/21 150/2 151/7 151/7 152/12 152/13 152/18 154/12 154/18 155/16 159/11 160/5 162/6 162/21 163/6 163/12 163/16 163/21 163/24 164/15 165/17 169/3 171/5
**beat [2]** 143/12 153/15
**because [152]** 5/15 5/16 6/18 7/3 7/20 7/23 7/24 8/6 8/24 11/9 13/1 13/20 14/17 14/17 14/22 15/16 16/4 17/2 17/15 17/16 21/25 23/8 25/20 27/6 29/18 31/19 31/20 32/1 34/14 35/24 36/14 36/25 37/5 37/8 38/15 40/1 41/19 41/20 45/20 46/8 47/11 48/4 48/9 50/16 51/22 53/23 54/5 59/1 64/8 66/4 66/6 67/21 68/4 69/16 73/23 75/2 76/23 78/8 78/19 79/14 80/3 87/3 87/13 87/14 89/25 91/2 93/1 94/18 94/24 95/22 98/24 99/3 100/6 101/21 101/25 102/1 102/1 104/21 106/7 107/4 107/9 107/22 108/18 108/19 109/11 112/7 113/4 114/20

120/11 120/13 120/14 121/1 121/8 121/10 121/24 122/10 122/21 123/12 124/17 127/4 127/6 127/9 128/23 129/15 129/18 129/22 130/3 130/3 130/9 130/25 131/5 131/6 132/20 133/20 134/10 139/3 141/15 141/15 141/24 143/15 144/14 145/25 147/12 148/2 149/5 149/20 149/21 150/13 151/15 151/24 152/17 153/9 153/13 156/19 158/10 159/5 160/6 162/17 162/18 163/4 164/17 169/4 169/6 169/9 169/12
**become [1]** 62/2
**becomes [2]** 61/8 105/20
**becoming [1]** 27/18
**been [38]** 6/6 10/19 11/10 18/20 18/20 18/21 55/5 60/18 80/2 82/2 82/5 87/15 95/11 96/3 98/7 101/14 106/11 108/19 111/3 112/5 116/1 119/25 121/2 121/23 122/18 124/21 132/13 138/7 143/2 144/10 146/4 146/5 146/5 151/17 161/15 162/17 165/15 169/4
**before [23]** 1/10 3/17 16/12 18/19 65/10 74/1 87/18 89/22 98/4 107/11 113/11 125/20 128/24 129/23 131/10 132/9 157/5 158/3 158/5 160/2 160/10 165/3 171/4
**began [3]** 11/24 64/10 128/12
**begins [1]** 161/21
**behalf [1]** 3/11
**behavior [7]** 12/5 22/14 54/10 59/10 84/11 84/13 102/21
**behaviors [1]** 22/11
**behind [1]** 78/20
**being [14]** 14/13 27/19 32/21 42/9 50/25 58/5 58/7 71/12 92/13 114/6 118/11 147/14 166/11 166/12
**belabor [1]** 47/17
**belief [3]** 123/1 149/1 151/24
**believe [40]** 7/8 17/8 18/4 22/3 22/22 23/22 25/24 26/11 40/9 60/4 73/5 73/23 74/6 74/17 74/22 74/23 75/16 88/5 88/10 90/19 93/13

103/4 107/24 108/1 122/1 126/23 129/7 134/23 142/14 142/14 153/8 153/9 153/11 157/22 157/23 159/3 159/14
**believed [9]** 40/18 40/22 54/19 60/1 73/11 109/20 112/4 142/7 142/9
**believes [3]** 19/18 19/20 23/9
**BELKNAP [1]** 2/8
**belong [1]** 53/22
**below [1]** 138/19
**BENCH [1]** 1/9
**benefit [3]** 52/9 84/17 104/19
**benefits [1]** 165/8
**best [22]** 22/17 50/25 62/18 77/14 86/22 109/18 111/2 111/3 111/4 111/5 111/17 111/18 111/19 111/24 111/25 112/2 113/24 140/17 149/20 150/23 161/2 162/11
**better [35]** 16/13 19/7 39/1 39/8 40/19 40/22 45/4 65/1 73/12 90/19 99/5 103/11 103/18 103/19 106/24 109/21 111/10 112/5 114/19 120/2 130/4 131/5 139/11 141/15 141/16 142/8 142/9 146/1 146/7 148/17 152/10 152/11 153/11 153/19 154/10
**between [11]** 14/23 16/5 28/17 30/13 64/18 105/16 134/17 134/18 135/3 136/18 151/1
**beyond [3]** 90/23 92/17 124/22
**big [10]** 24/6 24/22 32/13 61/10 67/25 89/7 110/15 115/23 134/13 137/4
**Big conversation [1]** 67/25
**bigger [3]** 45/17 81/16 87/22
**biggest [4]** 7/9 14/4 102/20 110/17
**Bill [2]** 125/22 159/21
**billion [2]** 19/25 160/16
**billions [33]** 6/15 20/2 20/2 26/16 26/21 26/22 26/23 26/25 27/1 27/1 37/1 37/2 60/11 60/12 60/13 60/13 81/10 84/5 88/17 118/16 140/10 140/11 141/6 141/7 142/18 143/4 143/6 143/6 143/7 144/7 145/12 145/17 167/8

**binders [1]** 4/19
**Bing [46]** 14/3 14/4 14/6 21/5 21/11 21/15 22/5 22/6 22/7 22/9 23/19 26/25 32/11 39/1 39/8 40/23 50/19 59/2 60/2 73/12 77/10 78/5 101/2 101/2 103/8 103/14 104/2 105/4 105/7 108/6 115/18 120/14 120/20 120/24 124/5 134/25 137/2 141/21 145/25 148/1 148/7 155/6 157/6 157/13 158/14 158/16
**Bing's [5]** 21/16 40/19 101/19 146/1 146/2
**bit [16]** 36/21 38/10 46/7 52/23 127/19 127/20 128/10 129/14 129/21 129/22 131/21 131/21 152/8 163/12 163/13 171/4
**biters [1]** 7/1
**BlackBerry [4]** 155/1 155/10 155/12 155/13
**blatant [1]** 39/24
**bleed [1]** 4/9
**bleeding [2]** 110/7 112/20
**bleeds [1]** 131/21
**block [2]** 29/14 92/13
**blocked [1]** 160/24
**board [2]** 49/3 163/14
**book [2]** 30/21 30/23
**Bookings [1]** 37/7
**bore [1]** 81/6
**Borge's [1]** 77/11
**boss [1]** 32/22
**Boston [2]** 34/20 34/23
**both [9]** 12/17 27/2 41/1 46/5 51/16 101/1 105/22 113/23 147/11
**bottom [1]** 31/13
**bounce [1]** 52/17
**bound [1]** 66/4
**box [4]** 118/18 143/22 146/21 163/11
**boxes [1]** 96/8
**boycott [1]** 39/24
**Braddi [1]** 110/1 112/18 129/7
**Braddi's [1]** 110/1
**Branch [9]** 91/1 92/13 93/23 94/12 109/2 114/20 135/10 135/10 135/12
**Branch's [1]** 135/11
**brand [1]** 26/18
**breadth [1]** 35/9
**break [1]** 80/7
**breaks [1]** 52/20
**bridge [3]** 134/17 134/18 136/17
**brief [2]** 33/25 125/22
**briefing [1]** 8/9
**briefly [1]** 119/21

**bring [4]** 36/5 52/6 55/13 109/17
**broad [6]** 28/16 35/24 36/7 55/12 56/15 73/12
**broad-line [1]** 36/7
**broader [7]** 49/19 53/5 70/14 90/20 92/21 93/21 96/24
**broadly [1]** 110/20
**Broadway [1]** 2/5
**brought [3]** 167/19 167/24 167/25
**Brown [11]** 30/2 48/11 48/12 48/15 50/8 50/17 72/7 72/10 73/23 74/22 76/8
**Brown Shoe [2]** 48/15 73/23
**browser [19]** 117/25 118/2 129/14 129/20 131/4 131/5 131/10 133/7 134/4 138/17 141/10 143/8 145/7 156/1 156/5 156/10 156/20 158/20 158/20
**browsers [8]** 28/10 41/12 78/17 83/16 111/20 111/22 132/16 132/17
**browsing [2]** 7/15 7/22
**Bruce [1]** 2/2
**bubble [1]** 26/3
**build [13]** 19/18 21/19 23/18 25/7 59/25 79/14 139/24 140/11 152/10 152/11 153/3 153/11 156/18
**building [3]** 24/19 24/21 24/22
**built [3]** 21/23 24/19 156/16
**bunch [1]** 94/14
**bundle [11]** 47/20 47/20 47/23 56/10 56/16 62/15 74/6 74/6 74/17 75/6 75/9
**bundles [1]** 56/14
**burden [5]** 45/17 96/15 96/22 96/22 153/25
**business [11]** 16/3 17/17 48/19 49/12 63/23 79/23 89/11 114/4 114/5 149/23 153/5
**businesses [1]** 60/10
**businessperson [1]** 63/22
**butter [2]** 28/22 28/23
**buttress [1]** 136/21
**buy [8]** 47/11 47/12 52/24 74/13 81/25 121/3 122/13 122/23
**buying [7]** 49/6 49/7 54/10 76/5 121/14 122/6 124/25

Case 1:20-cv-03010-APM   Document 1012-16   Filed 07/14/24   Page 177 of 199

**C**

**calculated** [1] 92/9
**calculation** [1] 65/5
**calculus** [1] 88/21
**call** [6] 56/13 56/17
61/15 75/20 76/6 132/6
**called** [2] 7/1 126/19
**calling** [1] 26/15
**calls** [1] 22/22
**Cambridge** [2] 63/18
64/8
**came** [7] 14/6 64/2
103/13 107/3 108/11
113/23 126/17
**camp** [1] 154/1
**can** [108] 5/16 9/10
9/11 10/14 10/17 10/24
12/17 15/17 16/13
16/15 18/11 20/18
24/23 30/6 30/22 30/22
30/23 32/5 32/8 32/13
32/14 41/16 43/21
44/12 47/5 47/11 48/1
48/1 48/25 49/2 50/9
51/11 51/23 52/7 52/12
52/16 52/16 52/22
52/24 54/3 55/10 57/21
57/21 57/24 57/25 58/8
61/13 62/17 62/17
63/14 65/9 70/20 73/9
74/1 77/2 78/21 78/24
82/7 82/8 82/10 85/1
85/13 89/8 90/11 91/20
94/12 94/20 95/19 97/8
97/10 99/1 99/9 100/18
102/22 108/23 110/5
114/4 117/13 118/5
118/6 119/15 119/19
120/22 120/23 120/25
120/25 121/17 124/10
125/5 133/8 142/21
142/25 153/12 153/21
155/15 155/20 155/23
159/23 162/24 163/6
163/9 163/23 164/14
166/4 169/5 169/6
169/11 171/7
**can't** [70] 8/6 8/6 13/1
16/24 19/24 23/12
30/23 32/12 38/13
38/15 39/5 40/1 43/19
46/5 49/11 49/21 49/24
50/2 51/6 52/23 56/7
56/19 57/18 60/12
63/24 66/21 78/5 87/1
87/20 91/18 91/23
91/23 92/5 94/16 94/18
102/3 102/4 102/11
103/9 108/15 108/16
108/20 108/25 109/25
112/5 113/4 115/3
125/11 127/9 135/13
136/19 137/18 140/13
142/1 142/2 143/12
143/14 144/19 145/2
151/9 152/10 152/11
152/16 152/25 153/13
161/24 161/25 165/6

**candidates** [1] 120/12
**cannot** [5] 7/25 95/23
144/4 144/20 169/3
**cap** [1] 110/25
**capabilities** [1] 55/2
**capable** [1] 170/6
**capacity** [1] 79/22
**capital** [6] 19/6 19/24
60/2 79/17 139/24
152/22
**capture** [1] 47/21
**capturing** [3] 84/13
84/17 84/23
**car** [1] 126/20
**card** [1] 77/12
**care** [2] 6/22 160/20
**careful** [1] 150/15
**carefully** [2] 46/16 68/4
**Carr** [1] 2/4
**carrier** [1] 164/14
**carriers** [5] 155/15
155/15 155/17 163/14
163/15
**carry** [1] 163/16
**cars** [1] 71/4
**case** [102] 4/8 8/12
13/12 13/23 14/13 20/4
21/3 21/4 22/16 28/20
31/16 36/5 36/12 36/20
38/17 39/1 39/2 39/23
41/20 42/15 42/21 43/4
45/8 45/25 46/6 46/9
46/18 47/9 47/14 48/6
50/8 51/10 53/9 53/14
53/15 54/9 54/12 54/19
54/22 55/18 55/18
55/20 55/21 55/21 56/5
56/11 56/12 56/22
59/12 59/13 59/21
59/24 63/23 64/11 70/2
71/16 72/12 79/8 79/9
80/8 83/21 89/16 91/10
95/12 95/17 96/21
104/9 105/4 107/1
114/10 117/14 118/3
119/3 126/25 127/2
127/17 127/20 128/17
128/18 129/12 130/16
132/2 132/4 132/8
133/16 133/18 134/7
134/17 136/20 138/3
142/4 142/5 143/17
147/13 147/20 151/2
151/20 154/3 154/21
158/22 164/2 171/6
**cases** [8] 9/11 55/5
55/19 56/12 117/13
117/17 117/18 154/5
**cashing** [1] 7/22 109/6
**catalog** [1] 77/12
**categories** [5] 40/21
42/16 43/23 150/14
150/16
**category** [5] 51/11
51/11 51/20 58/15 70/1
**causal** [1] 105/16
**causation** [11] 12/25

**cause** [2] 134/20 146/3
**causes** [1] 105/12
**Cavanaugh** [15] 2/8
3/9 33/17 35/20 39/11
39/21 44/15 78/21 80/5
119/11 125/17 126/10
152/4 169/21 171/2
**center** [5] 2/4 47/10
47/13 55/21 95/12
**centerpiece** [1] 84/12
**CEO** [2] 99/8 107/3
**certain** [17] 21/10 22/4
29/7 43/3 43/3 43/4
43/4 47/10 72/18 78/24
83/14 90/18 101/23
101/23 104/23 112/17
113/4
**certainly** [22] 7/16 13/6
13/7 14/4 20/16 21/18
23/9 25/3 30/19 31/20
34/8 48/17 54/18 59/21
59/23 72/12 108/7
123/7 156/7 163/21
164/21 171/7
**Certified** [1] 2/17
**certify** [1] 172/2
**cetera** [2] 108/3 123/18
**CH** [1] 2/18
**challenge** [8] 8/12 8/13
15/18 15/23 79/24 80/2
115/22 163/3
**challenged** [2] 18/14
72/18
**challenging** [2] 8/11
106/15
**chance** [3] 27/14 115/4
115/18
**change** [15] 5/1 6/24
10/23 15/13 20/1 22/11
87/13 87/16 88/24
97/25 98/1 113/25
118/5 141/17 159/4
**changed** [2] 22/14
141/17
**changes** [2] 95/10
129/6
**changing** [3] 61/19
84/11 158/24
**channel** [3] 132/12
138/6 155/25
**channels** [1] 137/23
**characteristics** [2]
50/11 76/10
**characterization** [1]
63/15
**charge** [2] 31/12 33/10
**charging** [1] 31/6
**Charlotte** [3] 27/15
28/11 32/19
**check** [1] 14/5
**check-in** [1] 14/5
**checked** [2] 68/7 96/8
**checking** [1] 14/10
**checks** [2] 7/22 109/6

**children** [3]
152/7 152/8
**children** [1] 5/22
**choice** [9] 73/19 77/14
85/4 97/23 98/5 137/4
161/21 164/15 167/21
**choices** [1] 8/3
**chomping** [1] 13/3
**choose** [6] 7/15 10/25
113/17 162/12 162/21
164/20
**chop** [1] 29/6
**chose** [2] 87/7 148/8
**chosen** [1] 131/3
**Chrome** [26] 86/3
86/13 97/18 102/3
106/11 106/14 106/15
106/18 156/16 156/18
156/19 157/8 157/14
157/14 157/23 158/3
158/6 158/7 158/7
160/9 160/10 165/18
166/12 166/18 167/2
167/4
**Chrome's** [2] 156/16
157/24
**chump** [1] 20/1
**circle** [1] 69/8
**Circuit** [12] 10/16 43/2
53/21 62/6 79/19 81/2
140/20 146/12 146/13
150/8 150/15 150/25
**Circuit's** [1] 79/8
**circumstance** [1]
121/22
**circumstantial** [1]
69/14
**cite** [2] 78/11 168/16
**cited** [4] 47/17 55/19
56/12 151/17
**Civil** [1] 3/6
**claim** [12] 41/10 43/25
45/2 59/15 72/19 89/18
127/10 128/16 167/19
167/20 167/24 168/1
**claimed** [1] 55/25
**claiming** [1] 19/16
**class** [2] 23/12 23/18
**classified** [1] 35/12
**clause** [1] 129/1
**clauses** [3] 92/7 92/8
92/8
**clear** [12] 8/24 18/13
28/21 50/9 57/4 75/2
93/4 97/17 106/13
119/3 136/25 154/5
**clearly** [8] 13/5 56/9
61/2 84/3 93/25 94/6
95/23 138/17
**click** [2] 102/17 102/21
**clicker** [1] 77/3
**client** [1] 137/14
**climbed** [1] 137/15
**close** [2] 49/24 103/13
**CLOSING** [1] 1/9
**closings** [1] 3/16
**cluster** [19] 42/8 42/13
42/22 42/23 42/24 43/5

43/13 44/5 44/6
47/20 56/16 60/23 74/2
74/5 74/18 74/18 75/4
75/12
**clusters** [4] 42/14
42/16 42/18 56/14
**CO** [1] 2/6
**coag.gov** [1] 2/7
**coerce** [1] 130/23
**coerced** [1] 131/14
**coercion** [5] 110/9
110/12 129/23 151/7
151/13
**cognizable** [1] 81/3
**cohort** [2] 159/8
159/15
**coin** [1] 13/15
**Coke** [1] 118/24
**colleague** [1] 73/16
**collect** [1] 102/18
**collection** [2] 31/17
31/18
**collective** [1] 82/22
**collectively** [1] 83/20
**college** [1] 24/13
**COLORADO** [2] 2/2
2/4
**COLUMBIA** [1] 1/1
**combination** [1] 11/10
**combined** [1] 93/12
**come** [24] 11/23 19/6
39/5 45/13 59/23 60/11
69/25 74/11 74/13
88/20 109/13 114/1
120/13 132/18 136/20
137/1 139/5 139/6
139/20 139/23 143/12
143/24 144/20 149/2
**comes** [11] 46/21
48/10 58/9 89/21
106/24 109/8 123/16
133/3 134/15 142/19
168/23
**coming** [8] 4/17 59/4
97/6 106/8 106/10
115/11 139/8 148/17
**commercial** [19] 45/7
45/10 49/14 49/23
53/11 57/5 57/7 57/9
57/10 57/17 57/18
57/22 58/4 58/8 59/4
59/5 59/10 59/14 59/15
**committed** [2] 35/19
114/14
**common** [1] 72/16
**companies** [7] 36/22
37/1 108/10 109/12
126/17 126/20 152/22
**company** [13] 10/16
10/16 16/25 55/6 65/13
81/15 111/1 130/10
130/12 139/23 143/19
149/21 152/16
**company's** [1] 6/1
**comparable** [7] 19/19
19/20 23/15 40/20
40/21 101/24 117/17
**comparative** [1] 38/25

**C**

compare [1] 32/3
compared [1] 117/10
compares [2] 31/21
31/25
comparison [2] 12/10
101/8
comparisons [1] 14/3
compelling [1] 146/15
compete [39] 15/3
29/15 32/18 40/1 44/12
45/9 50/24 55/6 55/11
56/9 56/24 60/5 60/25
65/1 94/20 100/2
100/24 101/5 101/19
103/8 104/3 109/13
120/2 126/15 127/1
127/6 127/9 130/13
139/3 143/24 144/23
145/2 145/8 147/15
150/1 150/3 153/13
154/10 155/18
competed [3] 55/12
100/19 161/13
competes [3] 29/10
70/8 70/9
competing [4] 53/11
65/2 106/22 149/15
competition [59] 8/2
12/11 13/20 15/2 15/5
19/4 23/7 38/13 38/19
38/21 39/6 41/6 41/8
41/22 42/11 42/14
42/16 45/7 50/13 50/18
54/16 54/20 62/12
80/23 83/22 83/24
95/21 95/24 98/3 98/18
98/19 98/23 104/8
105/17 106/24 107/23
111/18 112/3 112/11
115/8 115/10 115/14
120/13 124/11 130/11
131/4 138/8 140/19
141/13 145/1 146/16
146/21 147/12 147/15
149/1 150/5 150/20
154/13 156/24
competitive [83] 4/8
38/16 39/4 39/19 44/9
47/22 50/15 56/20
59/10 62/3 62/25 63/3
65/15 65/16 65/17
67/18 80/23 82/21
82/23 83/10 83/13
83/17 83/21 90/2 90/6
91/13 92/25 92/25
93/16 93/16 94/9 94/11
95/10 95/19 95/20
97/11 105/12 105/24
106/12 107/10 107/17
108/14 108/20 108/22
108/24 114/7 115/21
116/25 119/22 122/7
127/24 129/11 130/1
130/4 130/8 130/14
131/5 131/7 132/21
133/7 133/9 134/9
134/19 134/20 134/21

conduct [1] 13/11
conclusion [7] 7/10
12/20 14/6 26/1 29/2
29/8 133/1
conclusory [1] 128/20
condition [1] 19/2
conditions [1] 141/12
conduct [37] 8/12 8/13
38/16 39/3 80/23 81/1
82/13 90/23 91/14 92/3
92/21 93/11 93/12
93/15 93/19 105/12
105/16 106/12 108/20
109/7 110/12 114/11
116/25 129/25 131/15
132/21 133/22 134/18
134/20 135/3 136/18
146/11 147/11 150/14
151/1 163/4 170/6
conducted [1] 66/7
confess [3] 91/8
126/18 128/9
conflating [1] 6/22
confronted [1] 85/4
connection [2] 105/25
111/13
CONNOLLY [2] 2/13
68/12
consequential [1]
136/24
consider [8] 10/21
11/11 33/8 56/1 56/2
82/20 90/5 165/8
consideration [1]
101/13
considered [5] 28/9
29/9 36/23 68/21 147/2
considering [5] 10/9
10/17 13/24 33/3 56/13
consistent [5] 17/25
41/2 45/11 46/6 57/6
consistently [1]
108/10
consists [1] 6/22
constituent [1] 67/11
constituted [1] 170/16
Constitution [1] 2/18
constrain [8] 31/8
31/14 31/18 33/2 50/20
54/6 59/5 65/19
constrained [7] 53/7
53/9 54/20 56/25 58/6
58/7 59/10
constraining [2] 31/19
31/20
constrains [1] 31/14
constraint [2] 50/16
62/12
constraints [3] 50/22
65/16 65/17
consumer [6] 2/3
26/18 43/19 44/6 56/18
64/6
consumers [6] 16/21
35/17 43/22 51/5
127/25 131/12
consumers' [1] 17/1
consuming [1] 19/3

contemporaneous [1]
8/22
content [13] 120/1
120/1 120/3 120/22
120/23 121/1 121/3
121/14 122/6 122/12
123/10 124/6 124/25
contention [2] 128/18
165/25
context [1] 116/12
continually [1] 148/9
continue [6] 22/1
81/25 119/15 148/10
155/23 163/13
continued [4] 2/1
106/20 108/3 170/7
continues [2] 101/10
105/23
continuing [3] 11/19
82/2 149/18
contract [17] 82/14
82/23 83/11 83/12 91/6
91/7 92/20 92/23 95/7
112/16 118/4 118/9
121/20 140/12 142/6
148/15 170/9
contracting [1] 170/24
contracts [33] 39/7
41/13 80/3 83/3 83/8
83/15 83/17 89/2 89/9
89/12 89/16 89/19
89/22 90/2 91/3 91/4
91/12 94/8 97/2 97/3
97/14 98/22 100/11
107/18 108/9 109/11
116/7 116/9 130/18
136/9 143/13 164/25
170/13
contractual [3] 95/2
95/5 114/11
contradicted [1]
157/22
contrary [1] 14/9
contrast [1] 102/7
contributing [1] 170/7
control [6] 4/23 5/21
164/3 164/4 168/2
170/23
convenience [3] 47/10
74/20 74/25
convenient [1] 156/9
conversation [6] 40/4
67/25 119/16 128/4
129/22 155/23
conversations [1]
148/5
converse [1] 37/10
copies [1] 132/11
copy [1] 162/5
core [2] 43/2 43/12
corporations [2] 8/2
36/18
correct [19] 6/10 6/11
6/12 6/15 24/20 28/4
30/13 30/17 40/13
43/10 64/4 96/18 99/20
105/18 110/11 120/15
144/16 144/16 172/3

correcting [1] 150/20
correctly [1] 59/21
correlated [1] 28/13
cost [8] 19/23 25/21
26/22 52/15 115/13
122/20 126/11 166/25
costly [2] 7/1 19/3
costs [8] 26/16 26/21
47/4 119/25 121/2
121/3 121/9 121/11
122/22 122/23 124/7
124/10 124/14
could [48] 7/3 9/12
13/16 13/19 18/6 18/8
19/6 20/11 20/12 20/24
30/2 48/4 61/24 66/20
67/9 68/1 81/17 83/5
84/24 88/14 100/23
101/5 101/11 113/15
113/17 114/16 117/9
118/24 120/5 121/4
122/23 129/11 139/13
140/5 140/14 141/17
143/24 147/8 148/13
149/1 149/21 151/20
153/11 155/20 160/2
161/4 163/24 167/3
couldn't [16] 20/10
22/1 23/20 54/6 56/1
56/2 79/14 117/24
117/25 118/1 124/17
127/5 127/5 140/2
140/15 153/10
council [1] 89/11
counsel [1] 103/23
count [3] 27/24 97/18
119/1
counter [1] 108/2
counter-parties [1]
108/2
countless [1] 61/1 61/1
country [3] 56/11 69/9
168/5
counts [1] 82/25
couple [14] 4/1 29/22
30/3 30/5 39/17 40/3
78/22 128/4 130/21
130/22 148/21 154/17
155/22 169/22
course [15] 13/19 25/1
27/11 72/9 72/16 73/9
78/23 97/19 108/17
114/20 141/2 151/7
161/6 167/13 169/20
court [89] 1/1 2/16
2/17 3/2 4/20 5/9 7/8
7/25 9/23 10/1 10/15
12/2 12/16 12/19 12/24
12/25 16/18 16/20
18/10 19/1 23/3 26/12
26/20 28/25 29/2 29/10
29/13 29/22 32/15 34/5
34/8 38/12 38/12 38/17
39/16 56/3 62/5 62/6
72/9 73/9 73/15 75/14
75/17 75/20 75/22 77/3
78/12 79/7 80/9 80/12
80/25 81/13 82/5 83/19

**court... [35]** 90/1 93/15
93/24 95/9 95/13 95/18
95/19 96/23 97/8 98/17
103/22 104/12 108/15
108/22 110/6 114/17
116/20 117/12 117/16
124/20 126/1 130/24
131/8 131/17 131/23
132/4 132/19 133/12
137/12 137/20 138/12
160/1 166/6 170/3
171/9
**Court's [12]** 10/7 29/24
33/13 34/2 34/7 72/9
79/13 79/18 82/5 96/5
109/25 163/19
**courtroom [1]** 153/19
**courts [2]** 56/12 137/8
**cover [1]** 97/4
**coverage [11]** 99/21
99/23 100/16 102/12
106/5 117/12 117/19
117/23 117/24 118/7
118/21
**covered [2]** 97/7 119/6
**covers [1]** 137/19
**crawl [4]** 24/14 25/17
25/20 27/9
**crawled [1]** 75/24
**crawling [3]** 24/22
25/16 103/15
**crazy [1]** 45/19
**create [5]** 23/7 23/12
24/14 26/17 103/18
**created [3]** 23/6 23/10
81/8
**creates [5]** 43/5 103/21
103/22 105/24 106/1
**creating [1]** 43/13 63/3
102/22
**credit [2]** 11/23 124/2
**critical [3]** 51/10 56/22
138/20
**cropping [1]** 152/23
**cross [4]** 34/14 35/4
128/21 132/23
**cross-examination [3]**
34/14 35/4 128/21
**cross-platform [1]**
132/23
**crossed [1]** 158/23
**crosshairs [1]** 161/11
**CRR [2]** 172/2 172/8
**crux [2]** 30/11 41/20
**Cue [6]** 113/23 115/17
147/7 148/6 148/12
153/8
**cure [1]** 98/20
**curious [2]** 26/5 161/9
**current [4]** 123/21
123/24 141/8 141/12
**currently [1]** 103/8
**curve [2]** 81/16 101/4
**customers [6]** 7/14
16/21 37/8 37/24 45/21
159/9
**customers' [2]** 8/3 8/3

**cut-off [1]** 147/22
**CV [1]** 1/4

**D**

**D.C [5]** 1/5 1/14 2/14
2/19 22/23
**D.C. [8]** 10/16 81/2
140/20 146/12 146/13
150/8 150/15 150/25
**D.C. Circuit [8]** 10/16
81/2 140/20 146/12
146/13 150/8 150/15
150/25
**Dahlquist [2]** 10/10
81/21
**dalliance [1]** 146/25
**danger [1]** 8/7
**data [53]** 6/8 15/9 18/4
20/22 23/13 23/18
24/21 25/4 25/8 25/12
26/10 29/5 29/6 29/8
41/19 58/17 58/18
64/19 70/21 71/13
81/11 99/4 99/7 99/8
101/16 101/18 101/23
104/21 104/22 106/1
122/2 122/17 123/5
123/9 123/12 123/18
123/22 123/24 125/5
125/8 125/12 126/24
127/4 127/4 127/9
127/12 127/14 127/15
127/16 137/17 139/22
155/9 157/5
**date [2]** 34/8 172/7
**dating [1]** 76/16
**day [8]** 1/7 5/5 16/12
33/19 107/3 146/2
152/23 165/3
**days [3]** 30/5 54/13
154/23
**de [4]** 136/13 154/19
168/22 169/14
**de facto [3]** 154/19
168/22 169/14
**deal [9]** 14/24 33/5
95/23 118/1 121/21
126/25 127/7 141/1
153/14
**dealing [12]** 42/1 90/14
90/15 90/24 91/11
93/14 93/25 95/14 96/8
96/24 128/7 129/19
**deals [5]** 126/14
127/18 133/1 133/2
138/17
**dear [1]** 36/6
**decade [1]** 4/22
**decades [1]** 8/23
**decent [1]** 100/22
**decide [3]** 112/10
112/11 164/15
**decided [10]** 8/6 15/11
21/17 44/12 60/24 63/9
93/24 107/7 109/24
111/16
**deciding [3]** 21/18

**decision [23]** 7/5 11/1
14/13 14/16 16/14 16/7
17/17 79/8 79/19 86/17
98/17 98/18 103/24
107/6 107/13 108/22
119/24 135/11 141/17
141/18 163/15 163/16
170/2
**decisions [14]** 5/4 5/5
5/6 13/24 33/9 33/11
111/22 111/24 112/25
113/2 113/3 113/3
114/5 114/11
**deck [1]** 77/4
**declared [1]** 16/10
**decreased [1]** 66/8
**default [74]** 7/20 7/21
15/12 15/12 15/13
16/23 17/13 17/23
41/13 82/16 85/7 85/25
86/7 86/10 86/17 86/21
87/8 87/16 88/12 88/13
88/18 88/18 88/24 93/2
97/18 99/3 99/14
100/19 106/8 106/15
113/10 113/11 113/12
113/18 115/4 115/12
118/5 118/12 118/19
138/17 140/8 141/22
143/8 143/23 145/8
146/9 146/20 146/21
148/16 151/5 155/1
155/6 155/16 155/17
155/18 156/6 157/18
158/18 158/24 161/22
162/2 162/7 162/22
163/2 163/10 163/17
163/22 164/15 164/17
164/21 167/5 168/2
168/3 168/7
**defaulted [1]** 160/7
**defaulting [1]** 7/12
**defaults [44]** 15/4 81/7
81/8 81/10 81/25 83/2
84/2 84/9 84/10 84/13
84/15 84/16 84/22
84/23 85/1 85/13 85/15
85/17 87/10 87/12
88/16 90/24 92/8 92/16
97/15 97/17 102/3
102/4 104/7 105/22
106/20 107/21 118/18
118/18 155/24 157/2
157/7 157/8 158/7
158/11 158/12 159/4
162/5 163/6
**defend [1]** 114/12
**Defendant [2]** 1/7 2/12
**defendant's [2]** 116/25
170/7
**defendants [1]** 28/25
**defending [2]** 84/20
114/14
**defense [2]** 39/24
103/23
**define [1]** 51/2
**defined [5]** 37/17 42/25

**defines [2]** 34/11 65/12
**defining [1]** 9/16
**definite [1]** 11/22
**definition [7]** 10/1 19/2
43/11 49/11 53/16 74/3
75/10
**degradation [3]** 13/14
66/6 66/19
**degrade [4]** 56/25
66/16 67/3 67/10
**degraded [3]** 57/8
57/11 66/12
**degree [3]** 37/5 67/16
95/25
**deliver [1]** 16/9
**demand [7]** 42/8 43/3
43/19 44/6 44/6 56/18
136/16
**demanded [1]** 142/5
**demanding [1]** 163/2
**demo [1]** 162/1
**demonstrate [6]** 9/21
44/5 66/19 67/6 80/25
170/14
**demonstrates [1]**
51/21
**demonstrating [3]** 9/3
9/7 20/15
**demonstratives [1]**
8/21
**Denver [1]** 2/6
**deny [1]** 87/1
**department [4]** 1/13
2/2 47/11 161/11
**depend [3]** 25/3 70/19
163/21
**depended [1]** 25/3
**dependent [1]** 24/21
**depending [2]** 57/25
163/23
**depends [3]** 24/6
127/15 127/16
**deprived [1]** 114/23
**described [2]** 73/9
97/11
**describes [2]** 110/4
110/7
**descriptors [1]** 49/9
**design [6]** 112/25
113/2 113/2 113/3
113/14 144/5
**designed [6]** 62/10
140/18 143/10 143/11
146/10 153/17
**desires [1]** 1/7
**desktop [19]** 14/7
18/24 47/5 85/18 85/22
85/23 85/24 86/2 87/12
101/1 101/22 102/19
104/5 141/21 144/13
153/10 156/15 158/14
160/18
**desktops [1]** 132/10
**destroying [2]** 8/23
162/17
**determination [10]**
12/8 12/13 12/16 13/21

15/18 61/23 61/25
82/22 83/9 145/20
**determinations [1]**
92/24
**determinative [4]**
41/15 41/15 69/17
72/12
**determine [2]** 82/20
116/10 154/9
**determined [1]** 21/16
**dethroned [1]** 134/5
**develop [7]** 19/19
58/25 59/25 100/3
113/25 139/20 156/21
**developed [4]** 20/20
20/21 54/7 170/5
**developing [1]** 150/11
**development [3]** 11/12
103/17 150/12
**developments [2]**
20/22 101/14
**device [14]** 94/7 156/5
164/12 164/12 164/24
164/24 164/25 165/1
165/2 165/2 165/17
165/18 169/8 169/8
**devices [14]** 54/5
54/15 54/20 92/14
105/22 139/17 151/6
151/10 151/8 155/12
155/13 155/16 158/5
158/8
**did [64]** 4/1 7/18 7/19
8/16 8/19 11/15 15/7
15/8 18/15 19/14 21/8
23/6 23/21 25/23 25/25
26/2 27/3 28/10 28/11
28/12 29/1 29/6 32/6
35/6 36/8 59/14 59/21
62/6 67/2 67/12 67/12
68/14 72/19 75/15
75/21 76/1 77/3 77/15
80/25 87/12 90/25 91/1
95/6 104/8 107/5
109/17 114/1 128/21
129/9 129/16 132/20
135/15 139/2 147/11
147/25 148/2 151/11
153/19 155/14 156/18
156/18 156/21 156/23
163/14
**Did you [1]** 128/21
**didn't [51]** 18/7 20/5
26/1 26/21 27/9 28/7
33/4 41/18 50/25 54/11
54/16 54/18 67/4 69/25
73/12 78/11 78/12 87/6
87/16 87/23 87/23
88/11 97/25 98/20
103/6 103/6 103/11
107/5 108/18 112/7
112/19 112/20 115/18
116/9 117/8 119/10
128/23 131/6 132/16
138/4 138/8 142/14
142/14 143/22 150/17
151/3 151/4 153/8
153/9 153/10 167/18

**difference [2]** 66/10 158/4
**differences [1]** 41/2
**different [79]** 4/19 4/19 11/15 34/17 35/13 36/21 37/6 37/11 37/11 37/14 37/14 39/20 40/2 41/23 42/1 42/13 42/15 42/16 42/23 43/7 43/8 44/16 46/13 48/19 49/5 49/12 49/14 50/10 50/11 51/23 52/17 52/18 53/10 53/19 55/3 55/7 62/21 62/22 68/6 69/8 70/23 71/10 71/11 74/18 74/19 76/9 76/24 83/7 85/20 85/22 86/7 90/9 93/9 95/1 95/6 102/19 107/17 110/14 111/21 113/16 113/16 113/17 113/17 116/14 118/3 118/8 118/19 128/4 130/22 141/3 143/21 146/15 151/4 154/8 154/17 155/2 155/16 155/17 162/6
**differentiated [2]** 48/16 50/10
**differently [4]** 30/15 37/15 134/24 144/5
**difficult [4]** 7/5 72/17 158/24 159/4
**Dijk [1]** 120/18
**diminished [2]** 108/19 161/2
**diminishes [1]** 103/7
**diminishing [4]** 104/2 104/14 104/15 104/18
**Dintzer [15]** 1/13 3/8 4/11 9/12 35/15 40/5 71/18 78/18 80/17 82/10 122/9 128/10 131/25 136/6 152/3
**Dintzer's [2]** 63/15 157/8
**direct [9]** 11/2 12/18 13/10 13/11 14/14 18/11 36/23 111/12 160/21
**direct evidence [5]** 11/2 13/10 13/11 14/14 18/11
**directed [1]** 112/23
**directions [1]** 154/18
**directly [1]** 30/22
**disadvantage [1]** 44/19
**disagree [5]** 6/21 61/7 63/14 105/11 135/17
**disappear [3]** 77/9 77/11 161/3
**discipline [2]** 42/12 44/3
**discourage [1]** 119/7
**discovery [1]** 147/22
**discrete [1]** 51/20
**discuss [5]** 3/17 9/3

**discussed [2]** 15/24 112/18
**discussing [5]** 7/11 8/9 11/4 128/2 136/17
**discussion [7]** 20/18 39/19 76/3 133/3 134/15 153/22 170/1
**disincentive [2]** 152/6 152/19
**disincentivize [1]** 139/8
**dislodge [4]** 139/13 140/8 143/7 149/3
**dislodged [1]** 147/19
**dispositive [1]** 104/7
**dispute [6]** 11/14 15/19 69/4 69/10 120/4 127/3
**disputed [1]** 68/24
**disputes [1]** 68/24
**disputing [1]** 69/5
**disruption [1]** 126/11
**dissimilar [1]** 15/23
**distinction [2]** 78/9 150/25
**distract [1]** 41/11
**distribute [2]** 78/16 78/17
**distributed [2]** 131/11 132/12
**distributing [1]** 82/7 113/17
**distribution [24]** 15/5 20/15 21/3 22/20 36/9 42/3 42/4 80/3 83/16 102/10 107/18 118/20 132/23 133/8 137/23 138/7 138/10 151/22 151/25 154/24 155/25 156/8 160/10 160/22
**distributor [1]** 36/19
**distributors [4]** 36/8 111/20 111/22 113/16
**DISTRICT [5]** 1/1 1/1 1/10 62/6 166/6
**divide [1]** 113/15
**do [152]** 7/3 10/6 10/19 11/2 12/8 12/13 13/21 13/25 14/2 14/5 15/8 15/25 16/10 17/14 17/14 19/18 20/10 20/11 20/24 20/24 22/19 26/14 28/3 28/17 30/22 32/2 32/2 32/22 32/9 34/24 35/3 35/7 35/17 35/21 35/24 35/24 38/25 41/15 42/11 42/13 42/21 42/21 43/8 43/24 44/8 45/20 48/25 49/15 49/25 51/14 52/24 57/19 61/9 62/16 62/18 63/2 63/23 64/21 65/11 65/13 66/4 66/14 66/20 67/6 67/20 68/15 71/10 72/4 72/4 72/13 74/1 74/11 74/23 75/14 75/17 81/1 84/16 85/6

92/22 92/23 95/4 95/6 95/18 96/6 96/20 96/23 97/1 99/4 99/9 100/12 102/6 104/4 107/2 108/1 108/8 109/24 112/20 115/21 115/21 115/22 115/25 116/1 116/13 116/19 117/3 119/14 119/19 120/19 122/21 123/22 125/19 126/14 126/19 127/24 129/3 129/17 129/19 131/8 134/9 139/22 140/2 140/3 140/14 140/5 144/2 148/10 149/4 151/3 151/21 151/25 153/5 153/24 154/2 156/23 157/13 157/13 159/5 159/6 162/8 162/11 165/4 166/17 166/18 166/24 167/6 168/1 169/5 169/21 171/6
**do you [6]** 34/24 63/2 65/11 107/2 116/13 123/22
**Do you believe [1]** 108/1
**do you have [2]** 43/8 61/9
**do you see [2]** 42/11 42/13
**do you understand [2]** 42/21 42/21
**document [11]** 29/5 63/17 77/18 77/25 78/12 78/13 88/25 110/2 155/2 155/5 155/11
**documents [18]** 8/17 8/18 8/24 8/24 28/8 29/1 29/2 29/3 85/20 88/22 102/25 147/21 162/17 162/18 165/9 166/21 168/16 169/11
**dodge [1]** 163/19
**does [40]** 7/15 7/23 10/21 11/14 12/19 14/2 25/3 29/16 29/19 32/6 33/5 37/20 38/24 39/21 45/11 46/25 50/18 55/11 57/5 65/16 68/9 68/21 71/14 71/25 79/20 90/16 95/13 106/15 118/9 118/21 129/23 129/25 130/1 130/8 130/11 130/12 136/19 139/2 156/23 169/3
**doesn't [66]** 7/8 7/24 11/11 17/17 22/15 23/3 24/4 24/5 29/7 29/8 37/4 44/2 44/20 48/12 50/15 50/22 52/8 52/20 53/6 54/2 55/7 55/13 56/24 60/6 60/17 66/15 66/19 68/11 68/12

86/23 88/15 94/17 98/17 103/3 103/11 103/14 104/14 104/18 104/20 105/8 107/14 109/6 111/16 117/15 118/8 118/25 119/1 123/4 123/22 127/6 127/10 130/14 135/15 136/16 140/12 149/25 152/18 160/9 160/12 168/9 168/10 168/13
**dog [1]** 92/5
**doing [15]** 14/24 37/24 48/21 51/15 51/16 59/2 59/3 63/22 76/18 76/19 76/20 87/15 147/15 124/18 148/9
**DOJ [3]** 1/13 3/8 3/19
**dollar [4]** 36/18 108/10 110/25 123/2
**dollars [25]** 6/15 19/25 20/2 26/16 26/21 26/22 26/23 26/25 27/1 37/1 37/2 38/7 60/12 60/12 60/13 81/10 84/5 88/18 140/10 140/11 141/7 142/18 143/7 144/7 167/8
**dollars' [1]** 145/7
**dominance [2]** 8/9 18/22
**dominant [3]** 68/21 69/12 143/2
**don't [105]** 7/20 11/14 14/22 15/19 18/9 18/10 21/9 24/18 25/23 25/24 26/11 26/11 27/8 27/9 27/9 29/21 29/24 30/4 32/2 32/3 32/8 33/8 33/12 33/17 38/20 41/19 44/7 46/4 46/23 48/17 50/2 50/4 50/15 50/21 52/1 53/22 53/23 54/6 54/21 56/9 60/24 62/14 62/15 62/16 66/12 68/7 68/8 68/23 73/19 74/10 75/7 83/22 85/24 86/5 88/5 88/6 88/17 91/2 95/21 97/18 98/1 98/18 101/4 101/11 101/17 102/8 102/10 102/11 109/1 110/9 110/15 110/17 110/18 110/20 113/11 113/12 113/24 114/8 119/3 121/18 122/11 122/11 122/21 124/5 126/6 132/20 133/12 133/13 134/22 135/17 135/21 136/1 137/5 150/20 151/5 159/14 159/16 159/20 159/22 160/20 163/19 167/21 167/25 168/11
**done [25]** 4/3 13/18 15/25 19/23 24/17 34/8 50/23 64/3 67/5 86/2

106/2 106/2 106/7 108/10 122/14 161/10 161/12 161/15 162/15 163/1 163/8 168/8 170/19 170/21
**double [1]** 158/8
**doubt [1]** 131/23
**down [12]** 12/6 15/13 27/24 27/25 51/22 52/20 73/20 74/15 109/9 118/24 133/8 163/2
**download [2]** 86/12 157/14
**downloadable [1]** 160/7
**downloaded [2]** 102/5 106/14
**downloads [2]** 97/17 162/5
**dozen [1]** 121/19
**Dr [1]** 27/13
**Dr. [31]** 6/4 6/21 14/16 19/17 21/14 23/9 28/1 28/7 28/15 29/1 31/2 32/7 32/17 32/20 32/23 33/3 34/5 34/24 35/6 35/16 63/22 70/22 74/9 84/15 85/19 98/21 103/4 103/20 104/1 104/17 162/20
**Dr. Baker [1]** 35/6
**Dr. Fox [3]** 103/4 104/1 104/17
**Dr. Israel [8]** 28/7 28/15 29/1 32/7 32/17 34/5 34/24 70/22
**Dr. Israel's [1]** 31/2
**Dr. Murphy [2]** 84/15 162/20
**Dr. Nayak [1]** 103/20
**Dr. Raghavan [7]** 6/4 6/21 14/16 28/1 33/3 35/16 63/22
**Dr. Ramaswamy [3]** 19/17 21/14 23/9
**Dr. Rangel [1]** 85/19
**Dr. Varian [3]** 32/20 32/23 74/9
**Dr. Whinston [1]** 98/21
**draw [1]** 57/16
**drawn [1]** 29/24
**DRE [1]** 101/18
**dream [1]** 45/14
**drive [3]** 84/4 84/16 125/9
**driven [1]** 61/24
**driving [1]** 115/12
**drop [3]** 87/22 87/22 142/20
**drop-off [1]** 142/20
**dropoff [1]** 141/24
**dropped [1]** 86/9
**drove [2]** 81/20 147/12
**DuckDuckGo [16]** 7/1 7/12 7/14 7/19 14/3 16/3 22/8 32/12 33/6 50/19 60/4 62/24 63/2

**DuckDuckGo... [3]** 64/9 80/1 115/16
**DuckDuckGo's [1]** 99/8
**durable [1]** 18/21
**during [3]** 35/17 39/19 155/11
**duty [1]** 66/4
**duty-bound [1]** 66/4

# E

**each [9]** 4/6 4/19 7/5 37/1 37/5 82/20 92/24 150/16 151/15
**earlier [5]** 78/3 119/11 132/2 137/16 146/18
**early [6]** 54/13 54/13 154/22 154/23 157/6 157/6
**easily [1]** 47/5
**easy [6]** 5/20 5/20 15/13 47/15 88/16 88/19
**econometric [2]** 48/7 48/9
**economically [1]** 66/1
**economics [1]** 42/5
**economist [1]** 75/8
**economists [1]** 65/21
**economy [1]** 153/1
**Ecosia [3]** 32/12 32/12 76/22
**ecosystem [5]** 5/1 8/14 9/1 89/5 89/8
**Edge [7]** 157/25 158/14 158/16 158/20 158/20 159/9 159/16
**effect [41]** 12/21 17/9 31/19 38/14 82/21 83/22 83/22 83/23 89/2 89/4 95/24 105/12 105/16 105/17 119/22 129/1 129/11 130/7 130/8 130/14 130/18 130/19 131/17 131/18 131/20 132/5 132/6 132/16 132/21 132/25 133/10 134/14 136/18 137/10 137/18 138/18 139/9 150/12 150/17 150/18 156/25
**effective [5]** 41/7 62/3 102/22 130/25 154/9
**effectively [4]** 20/19 44/12 89/5 130/13
**effectiveness [2]** 16/6 19/4
**effects [37]** 4/9 38/11 39/4 39/20 44/9 47/22 83/3 83/10 83/13 83/17 89/23 90/6 93/1 94/11 95/10 95/19 95/20 97/11 104/11 107/17 108/14 109/15 109/16 131/24 132/14 134/9 134/19 134/21 135/3 135/6 135/8 135/16

147/12 171/6
**efficient [2]** 155/25 156/2
**effort [3]** 34/5 52/15 58/18
**efforts [4]** 8/25 11/4 11/19 92/13
**egg [3]** 100/9 152/7 152/8
**Eiffel [2]** 58/22 58/23
**either [9]** 10/4 13/6 13/13 116/6 125/4 127/7 136/13 138/16 158/8
**elect [1]** 108/4
**Electric [1]** 154/4
**element [1]** 169/2
**elements [8]** 14/11 17/11 28/17 90/14 92/20 93/25 95/15 96/7
**elevate [1]** 144/21
**Eleventh [1]** 79/8
**Eleventh Circuit's [1]** 79/8
**eliminate [2]** 38/13 38/20
**eliminated [1]** 39/6
**else [15]** 18/9 20/24 47/8 52/12 52/25 57/9 75/25 76/10 92/6 105/4 135/1 136/1 143/24 150/4 163/23
**elsewhere [1]** 11/24
**email [7]** 1/15 2/7 2/11 2/15 6/20 32/20 110/3
**embrace [1]** 45/18
**embraced [1]** 104/1
**Emigra [1]** 56/11
**employees [3]** 5/24 8/20 169/15
**employees' [1]** 8/21
**empower [1]** 6/1
**enable [1]** 48/22
**enabled [1]** 4/25
**enacted [1]** 6/7
**encourage [1]** 162/7
**encouraging [1]** 168/11
**end [6]** 21/13 33/19 96/2 107/3 110/8 132/1
**ended [2]** 124/16 147/22
**endorsement [1]** 146/5
**enforcing [1]** 143/14
**engage [1]** 131/14
**engaged [1]** 131/15
**engaging [2]** 55/24 82/6
**engine [48]** 14/18 16/6 19/7 19/8 20/20 20/21 23/10 23/12 23/18 25/8 25/14 25/19 26/10 26/17 26/22 26/24 27/2 27/5 33/7 45/25 51/6 59/25 61/24 73/14 73/21 75/19 81/17 85/4 102/23 103/18 104/4

135/12 139/20 140/8 141/10 142/19 142/21 142/22 142/24 143/8 143/12 152/11 152/12 152/13 153/11
**engineering [1]** 20/23
**Engineers [2]** 38/13 39/21
**Engineers' [1]** 39/23
**engines [17]** 41/14 46/15 59/23 72/3 76/14 77/10 88/24 113/25 120/7 120/11 120/17 121/1 121/12 133/25 142/7 142/9 155/17
**enhanced [1]** 147/14
**enjoyed [1]** 132/9
**enjoying [1]** 161/15
**enormous [8]** 4/23 58/24 81/11 104/19 125/13 149/6 162/16 170/10
**enormously [1]** 167/16
**enough [40]** 12/7 12/20 13/18 14/1 15/25 16/1 31/7 31/9 31/10 42/11 43/21 61/4 65/17 68/8 81/9 88/12 89/7 90/16 90/25 94/6 100/3 101/18 102/10 104/3 105/7 106/21 106/21 107/5 107/5 107/11 117/7 115/15 115/17 119/7 127/11 150/20 152/16 153/15 153/25 160/18
**ensure [3]** 140/11 143/10 143/11
**ensuring [1]** 138/15
**enter [7]** 20/17 21/8 106/25 122/18 134/12 149/3 153/2
**entered [6]** 20/19 20/20 22/17 61/16 121/18 122/16
**entering [1]** 144/9
**entice [1]** 124/6
**entire [3]** 24/14 55/22 152/21
**entirely [2]** 40/15 166/5
**entirety [2]** 83/12 83/12
**entities [1]** 33/9
**entity [1]** 95/21
**entrant [6]** 21/7 79/6 79/9 79/22 97/20 143/7
**entrants [2]** 5/3 105/8
**entry [29]** 4/23 19/1 19/3 19/15 20/6 20/7 21/3 22/13 22/15 22/15 22/16 26/21 59/17 59/19 60/18 61/2 61/10 61/13 61/14 62/13 62/19 79/4 79/12 79/20 79/21 114/15 118/6 119/8 132/22
**environment [2]** 21/25

equal [2] 139/21 141/5
**equality [1]** 73/11
**equals [1]** 18/24
**equation [2]** 25/1
**esoteric [1]** 81/17
**especially [1]** 104/19
**ESPN [3]** 57/24 58/12 123/25
**essence [1]** 125/2
**essential [1]** 58/16
**essentially [3]** 114/6 125/4 136/21
**establish [17]** 9/18 11/14 18/11 18/12 37/20 42/6 44/7 45/24 46/3 46/4 46/5 67/9 91/18 91/23 94/5 94/16 94/18
**established [5]** 41/17 41/22 45/8 96/11 97/10
**establishes [1]** 45/3
**establishing [1]** 13/9
**estimating [1]** 14/21 76/20
**estimation [1]** 125/7
**et [4]** 1/3 3/7 108/3 123/18
**et al [1]** 3/7
**et cetera [1]** 108/3
**Europe [1]** 97/23
**evaluate [2]** 93/19 95/5
**evaluated [2]** 148/6 148/7
**evaluating [1]** 148/3
**even [64]** 6/24 11/25 25/20 25/24 25/25 29/9 31/16 32/13 38/14 45/23 50/21 52/12 52/17 55/15 56/8 63/24 66/14 69/13 71/2 71/14 72/8 75/14 75/17 76/14 78/25 85/24 87/15 89/22 97/24 101/11 101/17 103/5 104/15 104/17 105/7 107/3 108/21 108/24 110/19 112/22 113/20 116/9 124/17 126/13 130/5 130/5 133/19 134/10 140/2 142/20 142/25 144/10 144/21 146/6 149/4 150/12 150/16 151/24 152/25 158/3 163/18 163/25 167/16 168/9
**ever [4]** 25/23 104/22 128/17 166/21
**every [16]** 5/5 5/18 7/5 8/4 16/25 25/12 74/24 81/7 81/7 106/1 130/10 143/19 150/5 152/23 163/2 163/22
**everybody [17]** 4/15 43/15 59/11 64/19 71/22 87/4 87/4 87/6 88/15 108/11 108/17 112/11 112/12 150/4

everybody's [1] 45/19
**everyone [9]** 3/4 3/12 32/15 80/6 80/8 80/14 125/24 171/3 171/8
**everything [11]** 4/16 28/16 36/8 47/7 47/11 47/12 52/23 52/25 74/7 78/7 98/3
**evidence [88]** 9/3 9/7 10/10 10/13 11/2 12/18 13/10 13/10 13/11 13/11 14/2 14/12 14/14 15/20 18/11 18/12 22/21 23/6 23/14 25/9 25/11 27/16 27/23 29/11 31/20 37/20 41/21 42/14 45/2 46/11 46/18 47/25 48/8 48/9 50/12 53/8 54/9 54/12 54/18 56/5 56/22 57/2 57/4 59/12 62/17 62/19 63/5 63/13 64/22 64/23 66/13 69/19 69/22 70/13 71/6 71/10 80/22 81/6 81/6 85/21 98/21 108/5 121/17 121/25 124/14 125/4 125/7 126/16 126/24 127/2 127/17 128/25 133/6 135/15 142/3 142/5 145/6 149/17 149/18 152/6 152/19 156/13 158/13 158/17 158/22
**evidentiary [1]** 135/23
**exact [5]** 33/20 47/19 50/14 133/1 164/19
**exactly [3]** 22/17 45/1 154/4
**examination [3]** 34/14 35/4 128/21
**examine [1]** 154/8
**example [32]** 5/6 7/6 14/19 14/19 15/6 16/7 16/11 19/14 20/4 20/6 48/13 53/18 62/18 70/21 70/24 82/15 85/5 85/5 86/6 86/23 88/23 94/12 94/12 94/13 99/11 99/12 101/19 142/10 146/25 147/17 147/18 148/11
**examples [3]** 50/25 97/12 121/20
**except [3]** 18/8 85/2 114/15
**exceptions [1]** 112/19
**exchange [3]** 143/23 163/11 166/10
**exclude [1]** 56/8
**excluding [1]** 163/4
**exclusion [2]** 90/21 91/12
**exclusionary [17]** 39/3 81/1 82/7 82/13 82/25 83/20 84/12 85/14 93/11 96/25 105/12

**E**

explore [1] 67/20

exclusionary... [6] 133/21 150/1 151/1 169/1 170/6 170/9
exclusions [1] 142/6
exclusive [43] 85/13 89/16 89/18 89/21 90/1 90/14 90/14 90/24 91/11 91/11 91/15 92/11 93/2 93/13 93/25 94/4 95/14 95/22 96/8 96/24 97/16 100/19 105/21 114/9 118/1 118/23 119/6 128/7 129/19 134/13 136/9 136/13 136/14 137/25 143/22 144/15 154/19 154/20 168/4 168/4 168/7 168/24 169/14
exclusivity [21] 90/15 92/7 92/16 92/20 94/5 95/11 95/15 96/4 96/7 96/16 96/17 118/22 118/25 130/25 136/13 154/19 165/16 168/22 169/2 169/6 169/17
excuse [5] 91/1 104/4 121/21 133/15 141/10
executive [3] 5/9 7/11 7/13
executives [1] 6/3
exegesis [1] 132/12
exercise [4] 9/5 9/22 65/12 65/24
exercised [2] 12/22 66/14
exercising [2] 9/24 17/18
exert [1] 62/24
exist [2] 50/25 115/20
existed [1] 131/1
existence [3] 22/7 28/18 79/21
exists [2] 8/2 60/4
expand [2] 79/6 92/15
expansive [1] 34/6
expect [5] 27/22 65/17 65/20 139/5 159/11
Expedia [4] 29/12 33/5 36/17 44/23
Expedias [1] 44/11
expensive [2] 103/20 125/1
experience [4] 16/8 20/11 111/11 159/10
experiment [3] 66/7 66/15 66/25
experiments [2] 99/5 99/9
expert [2] 128/22 128/25
experts [1] 51/13
explain [2] 18/6 104/20
explained [7] 6/25 15/15 18/1 84/10 85/19 105/1 114/4
explanation [3] 17/14 17/15 18/7

Explorer [6] 131/3 137/15 150/10 157/7 157/25 157/25
express [1] 169/14
expressed [1] 17/16
expressly [4] 14/17 99/7 110/5 110/6
extends [1] 148/15
extensive [1] 131/9
extent [8] 17/7 21/7 22/8 75/5 116/8 119/24 124/1 124/2
extra [1] 24/9
extraordinary [1] 151/19
extreme [1] 34/3
extremely [2] 62/2 81/7

**F**

face [5] 7/17 7/21 50/18 50/22 65/16 65/16
Facebook [3] 32/8 32/22 32/25
faced [3] 97/23 98/2 98/4
faces [1] 124/5
facia [1] 127/20
facie [12] 4/8 80/8 81/2 83/21 83/25 95/17 96/15 96/21 151/2 153/25 154/3 171/6
fact [69] 9/8 12/21 13/17 14/5 14/25 15/6 19/11 22/15 23/19 27/23 29/1 29/18 32/20 36/6 37/22 40/6 43/6 43/17 43/25 45/5 50/14 53/5 55/5 61/7 61/8 62/24 68/10 69/15 71/14 73/3 73/13 74/14 75/17 79/19 82/1 84/8 85/6 85/16 98/1 101/20 102/6 102/7 104/4 105/21 107/10 108/13 108/25 109/5 117/1 118/17 118/17 126/22 129/9 131/9 132/8 136/13 136/21 137/13 138/9 147/16 149/16 149/25 165/11 165/15 166/9 167/2 167/11 168/8 169/15
facto [4] 136/13 154/19 168/22 169/14
factor [6] 21/18 53/2 72/11 76/8 76/12 129/23
factors [10] 30/3 48/12 48/13 48/15 50/8 50/17 54/10 73/23 136/5 154/9
factory [1] 79/14
facts [2] 66/8 68/3
factual [1] 23/3 26/12 105/3
fail [3] 6/18 45/24 104/8

explore [M] 67/20
failed [1] 62/18 127/8 143/19
failure [2] 62/20 126/25
fair [3] 13/6 57/15 61/4
fall [1] 157/24
falling [1] 22/5
falls [2] 44/7 45/25
familiar [1] 109/25
family [1] 5/15
fan [1] 24/6
fans [1] 3/14
far [8] 9/19 16/2 19/1 76/8 108/23 121/17 132/20 166/24
faster [1] 12/12
feasible [1] 131/2
features [2] 98/14 103/17
federal [2] 16/15 143/13
feedback [1] 81/5
feel [4] 8/4 9/21 17/16 17/17
feels [1] 17/18
feet [1] 13/3
felt [2] 15/16 17/15 23/23 98/15
few [3] 33/18 66/9 72/6
fewer [2] 28/3 120/14
fierce [1] 45/7
figure [2] 21/19 72/21
figured [1] 25/7 62/14
filed [2] 4/16 128/25
filings [1] 4/16
fill [1] 78/6
final [1] 87/19
finally [2] 84/3 84/15
find [14] 24/9 24/12 29/19 30/24 46/13 47/2 49/25 50/3 70/20 78/7 91/23 105/4 115/7 144/22
finding [2] 16/19 26/12
findings [8] 13/17 23/3 40/6 126/22 131/9 132/8 137/13 150/9
fine [5] 4/10 16/3 78/20 121/13 166/5
Firefox [11] 86/2 86/14 86/16 88/3 102/4 145/7 160/6 160/6 160/7 160/9 160/11
firm [11] 10/8 10/18 65/16 65/16 65/21 65/23 68/4 68/7 68/9 68/21 126/18
firmly [1] 11/13
firms [2] 67/16 68/6
first [23] 5/10 9/5 10/2 21/2 25/11 31/25 32/4 46/4 65/11 76/11 76/11 76/16 89/21 89/24 93/2 94/16 96/6 112/15 113/8 126/9 153/14 164/24 170/1
fits [1] 74/3
Fitzpatrick [3] 15/14 64/1 64/2

live [M] 119/8
148/19
fix [1] 38/20
flagged [1] 119/10
flaw [1] 88/21
flawed [1] 103/5
flexing [1] 7/4
flight [4] 30/21 30/23 30/24 44/24
flights [1] 70/25
flip [1] 165/11
flipped [3] 46/3 131/13 134/3
floor [2] 2/5 33/18
flow [1] 90/6
flows [3] 91/3 170/12 170/12
fluid [1] 30/9
fly [1] 22/23
focus [8] 9/5 41/10 41/14 43/4 46/7 63/9 63/12 93/24
focused [2] 7/13 64/11
folks [1] 140/9
following [4] 10/21 110/15 117/21 141/20
follows [4] 30/12 31/1 121/17 135/2
food [4] 36/19 36/20 43/4 56/11
Foods [2] 43/1 74/24
force [4] 143/15 143/17 146/8 146/8
forced [2] 22/10 132/11
forcing [1] 143/20
foreclose [2] 139/1 161/5
foreclosed [4] 90/16 128/13 135/9 138/6
foreclosing [1] 135/25
foreclosure [52] 89/23 89/24 90/4 90/7 90/15 90/15 90/17 91/18 91/24 92/9 92/10 93/2 93/14 94/5 94/6 94/7 94/11 94/16 94/19 94/23 95/14 95/16 95/25 96/4 96/6 96/11 96/18 96/20 97/10 109/9 116/3 116/13 116/15 117/11 119/5 128/11 134/8 135/6 135/6 135/20 135/21 135/24 136/1 136/4 136/22 137/11 137/12 153/22 153/24 154/7 154/7 154/15
foregoing [1] 172/3
forever [1] 107/15
formal [1] 108/7
forth [1] 64/12
forward [3] 70/7 75/5 159/23
foster [1] 138/8
Fotobom [1] 135/10
found [12] 27/15 27/16 70/24 74/24 79/11

five [M] 119/22
131/17 131/23 132/4 132/16 132/25 170/16
Fox [4] 103/3 103/4 104/1 104/17
fraction [2] 95/23 132/13
framed [1] 127/23
framework [3] 90/11 94/4 127/21
France [1] 44/25
Francisco [1] 30/22
free [12] 10/12 150/10 156/17 156/22 166/5 166/9 166/10 166/10 166/16 166/25 167/22 167/23
freeze [4] 4/25 8/25 89/4 89/8
freezing [1] 8/14
frequent [1] 81/19
frequently [1] 25/16
frictionless [1] 52/11
friends [1] 5/14
front [3] 16/20 165/3 165/19
fruition [1] 132/18
FTC [1] 79/9
full [3] 36/8 73/17 123/6
fully [1] 107/4
function [7] 37/9 37/15 38/5 90/1 90/3 90/4 96/1
functionality [3] 19/21 19/21 21/22
functions [3] 53/24 53/24 54/3
fund [1] 19/6
fundable [1] 19/8
fundamental [5] 28/24 38/18 52/21 88/21 124/25
fundamentally [15] 34/17 35/13 37/11 78/9 84/22 85/18 85/20 85/22 89/6 102/13 102/15 102/19 117/6 118/19 124/6
funding [4] 22/1 60/3 62/25 121/24
further [1] 151/21
future [2] 130/13 149/1

**G**

gain [3] 105/23 118/6 152/1
gained [3] 79/9 138/9 158/6
game [1] 57/24
gaps [1] 78/6
gather [2] 122/11 122/14
gathered [1] 8/11
gathers [1] 18/18
gave [4] 22/17 23/5 53/18 151/21
gee [1] 153/13

G Case 1:20-cv-03010-APM Document 713-20 Filed 07/24 Page 183 of 199

**general [42]** 4/21 9/4 9/7 10/22 18/18 27/5 33/7 36/24 40/25 40/25 41/9 41/14 44/2 45/25 46/9 46/15 48/10 51/6 59/22 61/7 61/12 63/18 68/18 72/3 73/20 75/18 76/14 76/21 77/7 77/13 77/21 78/16 78/17 81/8 81/23 90/21 96/25 121/12 133/24 135/10 135/12 141/10
**generalized [1]** 64/6
**generally [2]** 27/8 43/9
**generates [1]** 106/21
**genuine [5]** 115/8 115/9 118/15 118/16 148/16
**get [103]** 3/17 4/8 13/10 15/4 19/13 22/1 22/20 23/20 24/16 24/24 26/19 34/16 34/16 34/21 34/22 35/7 35/9 35/11 38/11 41/3 47/21 49/2 50/5 52/7 52/24 56/3 58/18 58/20 59/1 60/15 61/5 63/14 66/12 67/1 71/11 72/15 72/17 74/10 74/11 75/8 76/2 77/2 81/17 81/18 88/7 89/14 89/22 90/7 98/7 99/1 99/5 100/9 100/11 100/22 101/9 102/4 102/18 102/19 105/8 106/4 106/6 106/17 107/7 107/8 107/11 108/25 110/10 113/11 113/12 115/15 118/24 119/11 127/9 128/9 131/22 135/9 140/12 145/15 145/15 145/21 145/22 145/22 146/5 149/12 152/16 156/10 159/16 159/17 163/22 164/7 164/7 166/18 166/18 166/19 168/12 169/6
**gets [10]** 31/1 56/6 107/14 116/20 125/22 155/16 166/15 166/15 166/16 167/2
**getting [14]** 4/15 74/7 75/16 83/1 84/14 104/7 104/22 115/24 118/12 120/3 124/2 130/6 135/14 142/17
**Giannandrea [10]** 19/5 20/2 22/22 26/15 105/1 109/20 111/10 113/23 129/7 148/7
**give [13]** 4/23 5/7 5/21 33/17 74/9 78/22 87/5 90/16 128/19 142/10 153/4 153/14 166/4
**given [4]** 65/14 166/9

**gives [5]** 71/22 81/24 130/5 130/6 156/21
**giving [3]** 87/3 130/24 165/24
**glibly [1]** 153/12
**go [87]** 10/1 10/22 12/6 18/9 27/12 30/2 30/22 32/16 34/1 34/13 35/5 35/14 35/21 36/3 37/7 42/4 43/23 44/2 46/23 48/25 49/1 49/2 49/25 50/2 50/3 50/4 51/17 52/7 52/12 52/12 52/13 52/13 52/14 52/16 52/16 52/22 57/21 57/24 57/25 58/4 58/17 72/9 73/22 73/25 78/5 78/9 78/14 78/24 81/25 83/5 84/18 86/5 90/10 95/4 97/15 99/14 114/16 115/3 115/23 116/3 116/7 118/6 118/12 118/24 120/5 121/2 121/4 122/5 122/13 122/24 124/8 124/19 125/19 125/22 127/11 129/21 132/20 141/9 144/25 145/9 150/1 151/4 153/22 154/17 154/18 159/23 161/18
**go ahead [3]** 32/16 36/3 83/5
**goal [1]** 40/16
**goes [9]** 60/23 73/20 109/9 122/15 129/25 144/24 144/24 156/4 157/5
**going [110]** 19/13 19/13 21/19 21/19 22/19 23/22 24/24 25/15 27/12 27/21 27/24 27/24 30/9 34/20 38/10 38/21 40/24 42/4 42/6 44/22 44/23 45/20 45/21 47/1 47/1 47/2 47/10 47/21 48/8 48/20 48/22 48/23 49/5 51/21 51/22 52/15 55/17 57/17 58/23 59/4 60/14 61/18 61/21 63/9 63/11 63/12 64/12 65/22 67/22 70/1 70/20 71/11 71/19 72/6 74/12 78/18 81/18 81/25 82/4 85/1 88/20 89/14 90/7 90/10 94/19 95/18 96/23 97/25 98/6 99/1 100/8 109/12 109/12 109/23 109/23 112/10 113/12 113/13 120/3 125/9 131/22 141/25 142/20 143/1 143/14 143/15 143/17 144/21 144/22 145/9 149/2 149/4 152/12 152/13 153/2 153/3 153/15 155/11

**good [31]** 3/4 3/5 3/12 3/14 15/16 16/1 23/10 23/15 23/24 25/8 25/25 31/13 102/6 109/22 112/5 112/6 112/6 112/10 112/11 115/15 115/17 123/22 141/21 142/21 142/22 142/23 152/14 153/14 156/10 156/20 160/18
**Good morning [1]** 3/12
**goods [1]** 36/8
**GOOGLE [397]**
**Google LLC [1]** 3/7
**Google's [76]** 4/25 5/2 5/3 5/3 5/7 5/23 5/24 6/4 7/9 7/22 8/12 8/13 8/17 8/25 9/5 10/13 11/4 13/18 18/19 18/23 19/19 19/20 22/14 23/1 23/15 24/16 27/11 31/14 35/8 41/13 48/19 48/20 57/8 59/6 59/9 60/8 63/20 69/23 70/13 78/10 80/3 80/23 84/3 88/14 88/25 89/2 97/22 101/24 102/9 103/1 103/9 104/21 108/2 109/6 109/7 109/10 112/22 113/1 113/3 116/4 117/5 120/17 123/4 130/18 141/20 146/1 148/23 158/2 158/5 160/19 161/20 166/21 167/17 168/17 169/11 169/15
**Google-Apple [1]** 82/15
**got [48]** 13/10 16/10 16/11 39/7 47/6 48/7 49/19 51/15 56/12 59/16 60/16 73/6 73/7 81/15 85/16 92/4 94/5 94/8 94/16 100/25 101/2 104/3 105/15 105/15 107/1 110/16 115/4 123/17 135/18 135/19 135/23 136/12 137/25 138/13 142/6 146/6 144/8 145/6 148/19 148/23 148/24 155/7 160/10 161/8 162/15 166/13 167/22 169/7
**government's [1]** 72/12
**grabs [3]** 100/15 100/18 139/17
**great [2]** 45/14 121/15
**greater [6]** 38/19 38/20 38/22 135/1 138/9 157/12

**greatest [1]** 96/12
**greatly [1]** 64/25
**Green [1]** 56/11
**Grinnell [1]** 149/22
**grocery [5]** 42/2 52/7 52/13 52/14 74/24
**group [7]** 42/8 43/2 43/13 43/22 56/11 76/6 76/7
**grouped [1]** 74/19
**grouping [1]** 75/15
**groups [1]** 41/1
**grow [5]** 109/25 112/4 113/4 114/2 124/22
**growing [4]** 84/20 111/15 114/22 132/10
**growth [3]** 112/1 112/17 124/11
**guaranteed [1]** 152/24
**guess [10]** 43/24 61/5 66/23 67/1 93/7 135/21 142/16 143/5 143/20 146/14

**H**

**habit [2]** 35/24 43/25
**had [64]** 6/6 12/11 13/3 13/3 21/10 21/11 21/23 22/5 24/17 24/19 25/7 28/15 70/2 79/9 86/6 95/6 98/15 98/25 99/6 108/19 108/23 113/11 113/15 115/4 119/25 123/14 126/19 127/3 128/24 129/3 129/22 130/18 131/3 131/5 131/6 131/17 131/17 131/18 132/13 132/21 133/1 138/6 138/7 148/5 150/12 150/17 153/9 154/10 154/24 154/24 154/25 154/25 155/12 155/13 155/17 157/7 157/7 160/3 160/6 163/8 164/21 167/16 167/17 167/18
**half [6]** 19/25 35/10 97/7 99/13 99/17 137/2
**hand [2]** 88/6 126/6
**handful [1]** 82/16
**handing [1]** 4/18
**hang [7]** 21/15 121/6 138/14 139/18 147/5 152/5 165/21
**happen [7]** 9/13 33/20 130/9 142/1 142/2 145/7 170/20
**happened [8]** 38/23 87/6 124/11 148/2 151/10 153/20 156/15 160/12
**happens [2]** 30/13 167/5
**happy [6]** 10/2 29/22 29/23 108/16 108/17 109/6
**hard [4]** 12/5 12/6 45/9 150/4

**hardest [1]** 99/4
**hardware [1]** 56/1
**harm [17]** 5/5 28/12 95/20 95/21 95/24 105/6 122/3 127/24 127/25 130/1 130/1 130/4 131/7 133/7 138/5 140/21 140/21
**harmed [6]** 83/24 107/23 120/6 120/11 131/4 150/16
**harming [2]** 127/5 128/1
**harmless [1]** 140/1
**harms [4]** 80/23 93/16 98/20 120/12
**has [129]** 4/9 4/21 4/25 5/2 5/16 7/24 8/6 8/8 9/3 11/9 12/16 12/17 13/17 13/18 15/20 16/7 17/8 17/11 18/15 18/20 18/20 18/21 19/8 22/11 25/3 26/25 29/9 31/19 34/8 34/8 34/19 39/3 57/6 59/18 64/15 65/13 65/21 66/11 66/15 67/5 68/20 69/16 75/22 76/10 78/21 79/20 82/2 83/10 83/12 85/24 87/14 92/25 95/11 96/3 97/16 97/18 101/6 101/7 101/22 103/8 104/2 104/24 105/4 105/21 106/11 108/6 108/7 108/8 113/3 114/18 114/20 114/21 114/22 116/1 117/18 118/20 118/23 120/2 121/3 121/18 121/20 121/23 122/1 123/1 123/7 124/3 126/25 127/8 127/11 127/18 128/8 130/3 130/18 133/24 134/20 136/22 137/18 138/1 144/10 144/11 144/12 145/20 147/1 147/19 147/21 149/16 149/20 149/22 150/5 150/22 150/23 151/17 152/2 153/15 157/13 159/2 159/3 165/15 165/17 166/17 168/1 168/2 169/1 169/7 170/9
**hasn't [4]** 11/10 12/7 12/20 113/2
**hat [1]** 120/22
**hats [1]** 120/21
**have [312]**
**haven't [13]** 16/2 46/1 65/2 66/14 101/20 102/9 134/1 146/4 146/5 146/5 163/18 163/25 167/19
**having [12]** 74/25 77/2 89/7 105/1 109/14 118/10 122/2 122/5

**having ... [4]** 125/8
137/2 143/2 145/1
**he [76]** 6/24 6/25 7/1
19/7 19/9 19/9 19/18
19/19 19/22 20/10
20/13 21/8 21/9 21/21
22/1 22/17 23/10 23/10
23/23 24/17 24/18
24/18 25/24 25/25 26/9
28/7 29/4 29/6 29/12
32/21 33/4 33/6 34/14
59/24 60/1 70/22 70/24
72/13 72/18 72/19 73/8
73/12 73/13 76/25 77/6
77/7 77/12 77/12 77/15
77/17 77/20 77/20 78/5
78/7 78/12 89/3 89/11
89/12 102/20 102/23
102/23 103/4 103/6
103/7 103/11 103/13
104/13 105/2 119/11
128/12 152/2 153/8
153/9 153/10 153/15
162/23
**he didn't [6]** 33/4
73/12 78/12 103/6
103/11 153/8
**he said [14]** 19/7 21/9
21/21 24/18 25/24 26/9
29/4 34/14 72/13 72/18
89/3 102/20 103/7
162/23
**he's [5]** 14/21 19/13
77/13 78/4 78/13
**head [1]** 24/2
**headroom [1]** 14/23
**headway [1]** 147/7
**health [1]** 5/13
**hear [6]** 25/23 84/25
85/1 92/22 93/1 166/24
**heard [16]** 5/9 14/2
14/25 25/5 44/15 46/11
63/1 122/16 126/19
147/7 148/6 154/21
155/15 158/22 160/17
164/4
**hearing [1]** 170/11
**heart [3]** 8/1 31/2 36/6
**heel [1]** 84/21
**held [2]** 36/11 166/6
**help [3]** 28/18 86/19
138/19
**helpful [2]** 20/14 57/13
**helps [2]** 24/11 64/19
**her [1]** 112/21
**Herculean [1]** 26/15
**here [65]** 3/16 10/4
12/25 16/15 28/6 30/5
30/9 31/3 36/15 37/16
38/23 39/18 40/2 41/15
41/15 41/24 42/15
44/22 44/23 47/4 47/18
47/21 51/13 54/3 55/16
61/25 64/14 69/25
70/20 74/3 74/14 75/16
76/11 76/12 77/25
85/16 90/10 90/22 92/5

102/17 106/7 107/4
108/12 111/9 117/8
117/8 121/1 124/12
128/7 129/24 133/19
133/25 138/13 139/10
150/4 150/22 153/13
157/6 157/20 157/24
165/5 167/22
**here's [7]** 15/17 23/8
69/18 139/19 151/3
157/4 157/5
**hereafter [1]** 34/9
**hey [1]** 170/22
**hiding [2]** 8/23 162/17
**high [7]** 4/22 19/15
20/7 20/21 88/5 117/16
119/7
**high-quality [1]** 20/21
**higher [3]** 72/15 72/17
102/22
**highest [3]** 131/10
149/22 150/6
**highlight [1]** 151/18
**highly [1]** 67/18
**him [4]** 71/21 72/9
128/11 128/20
**himself [1]** 76/25
**hindered [1]** 127/18
**his [19]** 20/10 20/12
25/5 25/24 26/10 28/8
29/2 32/22 34/6 34/10
40/17 47/18 51/15
75/21 77/12 77/22
89/10 119/14 128/22
**historically [1]** 25/3
**history [2]** 113/21
146/2
**hit [5]** 72/6 104/2
135/25 136/4 141/9
**hits [1]** 24/15
**hoards [1]** 99/3
**hobbled [1]** 12/22
**hold [5]** 5/3 109/3
140/1
**home [6]** 55/20 55/24
161/24 161/25 162/2
166/12
**Honor [118]** 3/5 3/20
3/21 3/22 4/12 4/18
7/18 9/2 9/19 11/17
11/25 12/15 13/23 14/8
14/19 15/7 17/7 18/10
22/4 23/2 25/10 28/20
30/7 30/14 32/5 33/8
33/22 33/23 33/25 36/3
36/25 38/4 38/9 39/10
39/13 39/17 40/4 41/6
41/21 42/10 46/2 49/15
50/5 56/21 59/13 59/18
67/15 68/14 70/16
70/21 71/23 77/5 78/23
79/2 79/4 80/1 80/4
80/18 80/21 86/15
86/25 88/6 89/1 89/17
90/8 90/13 90/23 91/16
92/1 92/18 93/3 93/10
93/14 94/22 95/13

109/5 113/6 114/9
115/10 116/17 119/12
119/17 119/19 120/15
122/3 122/21 124/21
124/24 125/11 125/16
126/4 126/8 127/13
127/21 127/23 128/15
128/24 129/25 133/18
136/5 139/15 144/13
146/11 147/21 150/24
152/21 154/23 156/14
157/19 159/25 160/6
166/1 169/25 170/18
171/1
**Honor's [1]** 87/11
**HONORABLE [3]** 1/10
3/3 80/13
**hope [1]** 143/15
**hopefully [1]** 10/6
**hopes [2]** 143/18
143/18
**hoping [2]** 34/9 72/15
**Hopper [2]** 126/19
126/25
**horse [1]** 91/14
**hotel [1]** 44/24
**hotel's [1]** 57/12
**house [1]** 55/24
**how [70]** 5/21 8/11
12/8 12/13 13/2 13/16
13/21 14/20 14/21 15/8
15/25 16/15 21/20 24/6
25/7 25/14 25/15 29/24
33/5 34/6 38/5 38/6
41/12 42/21 43/1 43/12
49/9 54/6 57/2 58/22
61/13 61/13 61/22
63/16 74/3 81/22 82/12
85/5 93/19 94/2 94/15
96/22 98/16 99/1 99/25
101/10 102/17 107/2
110/15 113/15 120/19
121/9 128/10 129/23
131/8 134/13 134/13
143/5 143/14 146/7
147/9 159/16 159/16
163/23 164/2 164/2
167/12 168/12 170/23
170/23
**however [3]** 10/21
65/20 132/11
**hundreds [3]** 8/8
103/21 126/21
**hunt [1]** 15/13
**Hurst [2]** 120/18
120/19
**hypothetical [4]** 31/5
116/24 131/20 142/15
**hypothetically [2]**
17/19 141/19

**I**

**I am [3]** 61/5 61/11
90/8
**I assume [2]** 15/21
70/2
**I believe [13]** 22/3

98/12 99/16 122/1
126/23 129/7 157/22
157/23 159/3
**I can [14]** 30/22 30/22
30/23 43/21 47/11 52/7
52/16 52/16 57/24
57/25 78/21 90/11
95/19 121/17
**I can't [4]** 19/24 30/23
140/13 152/25
**I cannot [1]** 144/4
**I crossed [1]** 158/23
**I did [3]** 4/1 25/23 77/3
**I didn't [1]** 119/10
**I don't [25]** 11/14 15/19
25/23 25/24 26/11
41/19 48/17 50/4 50/21
52/1 60/24 68/7 68/23
88/5 101/11 110/15
110/17 110/18 114/8
121/18 135/17 135/21
137/5 159/14 168/11
**I don't have [3]** 50/15
88/6 101/4
**I guess [7]** 43/24 61/5
66/23 93/7 135/21
142/16 143/20
**I have [6]** 15/23 31/24
37/13 39/20 47/12 75/3
**I just [7]** 10/3 40/3 69/2
78/2 93/19 106/16
119/21
**I know [16]** 11/9 12/3
21/17 44/23 50/2 52/4
63/20 109/25 110/3
110/6 123/7 125/12
128/15 144/18 148/19
166/16
**I mean [74]** 10/3 11/13
12/1 12/8 12/24 13/8
14/5 14/13 15/17 15/21
17/13 20/18 21/8 22/10
23/2 23/8 23/9 23/21
24/3 25/11 33/10 37/13
37/16 47/5 49/10 49/11
49/21 61/24 66/25
67/17 73/18 86/22 87/3
87/23 88/14 88/25
89/16 91/8 91/17 92/19
93/13 96/3 100/8 101/6
103/11 110/20 111/12
114/13 120/10 122/15
123/15 133/5 134/16
140/7 140/8 141/20
146/19 147/9 147/18
147/21 148/14 152/19
152/25 154/21 156/3
156/11 158/15 159/9
161/25 167/2 167/20
167/23 168/12 169/7
**I should [7]** 71/23
82/19 82/22 83/8 91/6
116/4 119/10
**I think [95]** 11/13 14/11
16/4 17/6 21/21 30/11
30/12 31/1 36/15 39/19
40/6 41/1 41/6 41/20

98/13 99/18 122/1
126/23 129/7 157/22
157/23 159/3
**I can [14]** 30/22 30/22
30/23 43/21 47/11 52/7
52/16 52/16 57/24
57/25 78/21 90/11
95/19 121/17
**I can't [4]** 19/24 30/23
140/13 152/25
**I cannot [1]** 144/4
**I crossed [1]** 158/23
**I did [3]** 4/1 25/23 77/3
**I didn't [1]** 119/10
**I don't [25]** 11/14 15/19
25/23 25/24 26/11
41/19 48/17 50/4 50/21
52/1 60/24 68/7 68/23
88/5 101/11 110/15
110/17 110/18 114/8
121/18 135/17 135/21
137/5 159/14 168/11
**I don't have [3]** 50/15
88/6 101/4
**I guess [7]** 43/24 61/5
66/23 93/7 135/21
142/16 143/20
**I have [6]** 15/23 31/24
37/13 39/20 47/12 75/3
**I just [7]** 10/3 40/3 69/2
78/2 93/19 106/16
119/21
**I know [16]** 11/9 12/3
21/17 44/23 50/2 52/4
63/20 109/25 110/3
110/6 123/7 125/12
128/15 144/18 148/19
166/16
**I mean [74]** 10/3 11/13
12/1 12/8 12/24 13/8
14/5 14/13 15/17 15/21
17/13 20/18 21/8 22/10
23/2 23/8 23/9 23/21
24/3 25/11 33/10 37/13
37/16 47/5 49/10 49/11
49/21 61/24 66/25
67/17 73/18 86/22 87/3
87/23 88/14 88/25
89/16 91/8 91/17 92/19
93/13 96/3 100/8 101/6
103/11 110/20 111/12
114/13 120/10 122/15
123/15 133/5 134/16
140/7 140/8 141/20
146/19 147/9 147/18
147/21 148/14 152/19
152/25 154/21 156/3
156/11 158/15 159/9
161/25 167/2 167/20
167/23 168/12 169/7
**I should [7]** 71/23
82/19 82/22 83/8 91/6
116/4 119/10
**I think [95]** 11/13 14/11
16/4 17/6 21/21 30/11
30/12 31/1 36/15 39/19
40/6 41/1 41/6 41/20

45/23 43/9 44/7 45/8
45/23 46/11 49/21 50/8
50/9 50/16 51/3 52/5
52/19 53/14 53/17
55/17 56/21 57/4 57/15
57/21 58/10 58/11 59/7
59/11 59/18 59/20 62/9
62/14 62/18 65/4 65/14
65/20 66/7 67/8 68/2
68/3 69/14 70/19 71/5
71/9 71/15 84/3 86/24
93/4 98/6 99/7 99/13
99/15 103/9 104/25
106/25 116/5 116/8
117/20 119/19 121/19
127/13 127/23 128/3
129/15 129/16 129/17
129/22 133/5 135/4
135/19 136/5 136/15
138/2 138/12 141/3
147/4 149/8 154/4
158/14 158/21 158/22
158/22 159/10 161/7
167/5
**I thought [9]** 13/8
21/14 24/17 77/22 88/8
121/10 133/4 133/11
138/24
**I understand [10]** 23/9
24/20 42/23 74/20
89/20 105/10 123/1
123/17 135/2 158/13
**I want [12]** 11/8 46/7
75/2 77/2 78/19 78/20
99/11 116/19 125/21
127/19 129/21 151/18
**I wanted [1]** 81/14
**I was [6]** 26/5 38/10
71/19 71/20 79/13 91/8
**I will [6]** 39/17 67/15
91/8 126/18 128/9
147/10
**I would [1]** 126/9
**I'd [4]** 29/23 72/7
126/18 157/19
**I'll [18]** 9/2 9/5 9/7
33/25 34/3 34/22 42/20
48/3 59/17 78/11 78/22
79/1 83/6 106/23
130/21 153/5 155/22
160/12
**I'm [65]** 9/12 10/4 11/6
13/16 19/25 23/22 25/6
29/21 29/23 34/20 36/4
43/12 44/22 44/23 48/8
50/14 51/22 57/23
57/25 61/11 66/11 67/5
67/22 70/6 70/6 70/20
72/2 72/6 72/21 74/1
77/2 77/16 77/23 78/18
78/19 90/10 95/10 98/8
98/9 101/9 106/17
110/18 111/5 116/21
120/6 121/8 123/6
123/15 133/4 135/1
141/4 143/5 143/14
143/15 144/2 152/17
153/2 153/2 153/3

**I'm... [6]** 153/3 158/18 160/1 161/8 161/9 169/18
**I'm going [13]** 23/22 34/20 44/22 44/23 48/8 51/22 70/20 78/18 90/10 143/14 143/15 160/1 169/18
**I'm just [2]** 72/6 101/9
**I'm not [11]** 19/25 29/23 50/14 66/11 67/5 70/6 121/8 152/17 153/2 153/3 153/3
**I'm not sure [3]** 43/12 135/1 161/8
**I'm sorry [7]** 9/12 36/14 72/21 74/1 77/16 120/6 153/2
**I've [11]** 9/6 33/12 33/19 49/19 53/14 53/15 85/16 93/18 100/14 136/15 138/13
**i.e [1]** 138/16
**IAP [2]** 137/20 138/16
**IAPs [6]** 137/24 138/1 138/2 138/10 138/18 150/10
**idea [4]** 31/13 31/13 151/9 165/20
**ideas [2]** 74/16 113/15
**identifiably [1]** 74/19
**identified [7]** 34/6 82/15 83/14 84/19 84/19 94/14 121/22
**ignore [3]** 5/6 5/16 17/16
**ignores [1]** 7/9
**ignoring [3]** 7/7 15/6 16/22
**III [1]** 16/15
**illegal [1]** 134/14
**imagine [2]** 68/6 152/25
**immediately [1]** 97/24
**impact [3]** 27/17 89/10 155/15
**impacted [1]** 127/1
**impacts [2]** 61/22 102/5
**impediment [1]** 86/14
**impervious [1]** 5/1
**implemented [1]** 163/24
**implication [1]** 7/14
**import [1]** 103/2
**importance [1]** 20/15
**important [14]** 8/5 29/18 37/24 40/22 42/10 77/5 84/22 90/22 102/15 102/16 105/2 116/19 156/8 157/3
**impose [2]** 31/8 56/19
**impossible [2]** 117/6 141/12
**improve [10]** 55/2 57/7 64/19 64/25 100/23 115/23 129/6 130/5

**improved [1]** 12/12
**improvement [2]** 64/16 150/14
**improves [1]** 24/24
**inability [2]** 79/5 116/23
**inaccurate [2]** 63/15 136/8
**incentive [6]** 12/1 107/19 107/22 107/25 108/15 150/5
**incentives [2]** 109/1 161/1
**incident [1]** 66/22
**include [2]** 94/12 101/1
**included [3]** 29/16 31/22 137/14
**includes [2]** 75/23 79/5
**including [4]** 55/20 77/21 102/14 106/11
**incognito [1]** 6/3 6/20 11/2
**incompatible [1]** 150/11
**inconsistent [1]** 12/4
**increase [5]** 67/3 67/9 68/11 129/9 156/20
**increased [5]** 28/13 28/13 124/14 126/11 156/10
**increasing [1]** 132/22
**increasingly [1]** 6/22
**incredible [1]** 60/9
**incredibly [1]** 139/25
**incremental [4]** 145/15 145/15 145/21 145/21
**indeed [2]** 65/23 66/3
**index [13]** 19/18 21/19 24/14 24/19 24/19 24/21 24/22 25/12 25/14 25/15 27/9 40/10 159/11
**indexed [1]** 75/24
**indexing [1]** 103/16
**indicate [1]** 71/10
**indicated [1]** 26/2
**indication [1]** 16/24
**indicative [3]** 85/7 85/7 86/20
**indicia [3]** 38/4 38/5 38/7
**indirect [4]** 12/18 13/10 13/11 18/12
**indirect evidence [1]** 18/12
**individual [13]** 42/12 43/22 44/1 44/1 44/10 47/14 56/2 56/8 56/19 56/22 57/14 91/7 140/21
**individually [2]** 82/20 157/15
**inducements [1]** 150/9
**indulge [1]** 29/22
**Industries [1]** 55/20
**industry [7]** 26/8 36/10 60/13 101/8 105/6

**infecting [1]** 151/13
**infer [3]** 9/23 97/8 97/10
**inference [1]** 57/15
**inferior [6]** 85/4 85/8 87/14 144/22 146/9 153/4
**infers [1]** 12/24
**information [30]** 5/22 5/23 7/6 8/5 18/18 27/10 34/18 34/22 35/7 35/9 35/11 35/25 44/17 45/16 46/11 46/13 53/17 53/22 53/25 57/22 58/4 58/15 58/20 75/23 75/24 76/6 76/7 78/8 102/17 122/12
**informational [2]** 58/6 59/9
**informative [1]** 160/5
**infrastructure [1]** 40/11
**inhibited [2]** 119/25 120/2
**initial [1]** 87/21
**inject [1]** 156/24
**innovate [3]** 11/20 45/19 156/19
**innovated [6]** 11/10 12/7 12/20 13/2 57/2 59/13
**innovating [1]** 59/14
**innovation [5]** 13/13 15/24 38/19 57/6 58/24
**innovations [3]** 11/22 59/1 64/16
**inquiries [1]** 128/4
**inquiry [4]** 116/12 116/13 116/15 116/15
**instance [3]** 69/23 147/1 147/6
**instances [2]** 14/15 121/20
**instead [4]** 29/19 122/2 137/2 162/19
**insufficient [1]** 79/22
**intellectual [2]** 94/25 95/8
**intense [1]** 139/25
**intent [2]** 16/10 44/20
**intentionally [2]** 66/12 163/4
**interact [1]** 61/22
**interacting [1]** 61/20
**interaction [1]** 161/20
**interchangeable [1]** 51/5
**interchangeably [1]** 47/21
**interest [15]** 22/1 111/2 111/4 111/4 111/6 111/17 111/18 111/19 111/24 112/2 113/24 114/1 114/23 120/17 148/14
**interested [1]** 43/5
**interesting [4]** 46/21

**interests [2]** 111/21 111/25
**internal [3]** 147/25 155/5 155/9
**internally [1]** 54/25
**Internet [15]** 5/19 24/14 27/10 32/25 47/15 75/23 110/16 131/3 133/2 137/15 150/10 150/11 157/7 157/25 157/25
**interrelated [1]** 82/2
**interrogatories [1]** 128/18
**interrupt [4]** 9/13 11/6 48/1 155/20
**intervals [1]** 149/7
**introduced [1]** 157/23
**introduces [1]** 10/23
**introduction [1]** 155/4
**inventory [1]** 34/19
**invest [26]** 12/1 27/2 81/9 98/2 99/1 102/9 107/5 107/5 107/19 107/22 108/15 109/1 109/12 121/23 139/5 151/20 151/23 152/6 152/20 156/19 160/17 160/17 160/19 160/23 161/1 161/2
**invested [7]** 27/1 57/2 97/24 98/11 98/16 102/2 102/10
**investing [4]** 97/6 102/11 114/24 152/22
**investment [10]** 61/18 61/21 97/21 97/22 98/24 102/13 119/8 151/25 152/10 160/15
**investments [2]** 7/2 55/2
**involved [2]** 39/23 66/24
**involving [1]** 44/1
**iOS [2]** 105/23 133/15
**IP [1]** 66/11
**IPG [1]** 76/20
**iPhone [2]** 155/4 155/13
**IQVIA [1]** 70/2
**irrelevant [1]** 108/1
**is [628]**
**IS testing [1]** 26/2
**is there [10]** 31/3 62/11 62/12 62/17 69/22 70/13 90/16 139/12 146/16 146/21
**ISA [5]** 83/15 112/13 128/12 139/14 141/8
**ISAs [1]** 110/16
**isn't [24]** 9/15 14/9 15/5 16/3 25/10 27/24 27/24 31/16 34/11 37/10 47/9 67/6 85/7 104/7 110/14 115/1 134/17 135/10 138/22 138/25 146/14 152/19

**Israel [10]** 26/16 27/13 28/7 28/15 29/1 32/7 32/17 34/5 34/24 70/22 72/21
**Israel's [1]** 31/2
**issue [16]** 4/1 15/18 38/9 38/24 48/4 62/21 62/23 63/6 64/8 86/24 95/8 126/16 133/11 143/20 158/11 158/23
**issues [3]** 11/8 13/6 64/7
**it [476]**
**it wanted [1]** 111/14
**It was [1]** 129/13
**it would be [3]** 65/22 68/21 71/15
**it's [130]** 7/3 7/6 9/17 10/3 12/4 12/4 12/5 13/19 13/23 13/24 14/14 15/25 17/2 19/8 25/12 25/16 28/10 28/22 29/5 31/16 31/19 32/13 34/12 35/10 35/12 35/24 36/18 38/14 43/24 43/25 46/21 47/14 47/15 48/11 51/25 52/17 55/17 58/5 58/6 58/16 58/23 59/7 64/22 65/12 65/13 65/23 67/19 71/23 72/12 74/15 78/2 85/7 86/13 86/21 86/21 89/25 90/8 90/22 91/15 96/2 99/13 99/17 100/9 101/21 102/16 102/20 103/22 103/23 106/14 106/15 106/18 107/4 107/7 107/8 108/3 108/8 109/2 109/3 110/10 112/14 112/16 112/21 113/24 114/1 115/24 116/16 117/24 119/23 120/6 121/11 122/5 122/18 122/20 125/4 125/8 125/12 126/12 128/23 129/24 134/14 134/25 135/5 135/6 135/12 135/22 136/8 136/25 138/2 141/15 144/8 145/12 148/19 148/19 149/9 149/18 151/23 151/24 152/17 156/2 156/7 156/8 156/10 157/15 162/7 166/9 166/10 168/3 168/8 168/21 171/3
**It's like [1]** 28/22
**Italian [1]** 36/19
**its [63]** 4/22 7/4 7/20 8/11 8/25 10/23 11/11 11/11 11/19 13/23 15/3 17/1 17/10 17/12 17/18 26/23 27/1 29/19 31/6 34/19 40/10 55/2 60/9 66/12 66/16 66/18 68/5 81/22 81/22 82/8 83/11 83/12

186

Case 1:20-cv-03010-APM   Document 1012   Filed 07/04/24   Page 186 of 199

**I**

its... [32] 87/17 92/23
95/22 101/16 101/24
103/7 103/10 107/3
108/6 109/3 111/2
111/3 111/17 114/23
115/23 121/20 126/14
128/8 129/1 129/4
129/6 130/5 130/5
138/18 141/16 144/1
149/15 164/3 164/4
168/2 168/2 168/3
**itself [8]** 17/11 31/11
31/21 31/25 35/12 84/8
94/6 113/14

**J**

Java [2] 150/12 170/4
jelly [2] 28/22 28/23
Jenn [1] 64/1
job [6] 45/12 45/20
46/25 57/5 59/3 59/14
John [2] 2/12 3/11
John Schmidtlein [1]
3/11
jon.sallet [1] 2/7
Jonathan [2] 2/3 3/9
Jr [1] 2/8
jschmidtlein [2] 2/15
judge [8] 1/10 16/15
16/16 53/15 83/11
83/12 133/25 143/13
judgment [4] 119/23
127/23 129/16 161/8
judgments [1] 114/4
Judicial [1] 2/4
jump [1] 83/6
just [104] 3/24 4/4 7/6
9/13 10/3 12/4 13/14
14/12 15/15 15/24 16/3
17/15 20/5 21/16 22/24
24/21 26/5 27/2 28/5
28/10 30/3 30/8 35/8
35/12 36/19 37/2 37/15
40/3 43/6 43/24 44/13
47/15 47/24 49/10
49/11 52/25 61/6 66/21
67/2 68/4 69/2 69/7
72/6 75/2 75/4 75/7
77/10 78/2 78/20 79/3
82/6 82/22 83/11 84/24
87/4 88/19 90/23 91/8
93/19 97/11 97/16
98/19 98/20 100/14
101/9 104/23 106/13
106/14 106/16 109/13
114/4 117/7 119/21
122/24 124/8 125/21
126/6 126/9 130/1
130/17 131/2 131/20
133/20 135/5 135/18
136/15 137/12 137/18
140/12 142/24 143/1
143/5 144/6 147/17
149/21 150/3 150/17
153/22 155/22 160/3
160/13 163/9 166/7
166/24

**Justice** [2] 1/4 1/5
161/11
justification [1] 81/3
justify [1] 102/11

**K**

keep [5] 84/22 138/19
149/15 149/15 170/11
keeping [1] 83/1
keeps [2] 27/7 109/3
Kenneth [2] 1/13 3/8
kenneth.dintzer2 [1]
1/16
kept [1] 7/22
key [2] 48/14 59/19
keystone [1] 46/8
kick [1] 63/23
kind [10] 23/7 44/1
46/3 47/11 49/8 60/10
97/11 122/19 131/21
167/12
kit [1] 150/11
know [146] 4/3 11/9
12/3 12/9 12/10 13/17
16/10 16/11 16/16
17/10 21/17 21/21
23/11 23/16 24/12
26/17 27/12 27/13 31/3
31/11 31/17 33/5 36/12
36/18 37/13 41/2 41/12
42/8 43/21 44/12 44/17
44/23 45/6 45/10 45/23
46/10 46/16 47/9 47/18
48/6 48/11 48/13 48/14
48/15 48/19 49/21 50/2
50/24 51/4 51/18 52/4
54/24 55/21 56/2 56/13
57/1 58/19 58/22 60/4
60/17 61/17 62/2 63/20
64/12 68/3 69/25 70/2
70/9 70/24 71/3 74/12
75/22 77/25 78/15
78/16 85/5 85/15 87/1
93/19 95/7 98/3 99/13
101/13 101/17 101/23
105/11 108/3 108/5
109/25 110/3 110/6
110/15 111/14 113/12
114/8 114/25 116/11
117/14 118/14 119/7
120/19 121/18 123/7
123/25 124/9 125/12
128/15 129/23 130/10
131/8 132/6 132/22
134/5 135/22 137/4
137/5 137/23 138/9
141/20 141/22 142/18
144/18 146/24 148/19
152/9 157/5 157/6
157/14 157/15 158/6
159/5 159/16 159/16
161/20 161/22 161/23
162/11 162/15 162/16
164/3 164/16 164/25
166/16 167/13 168/11
169/5
knowledge [2] 58/21
58/25

**knowledgeable** [1]
26/8
known [1] 118/20
knows [5] 12/25 18/10
44/22 80/25 110/6
Kodak [1] 21/3

**L**

lack [3] 13/13 13/20
117/5
landscape [1] 65/15
language [4] 109/24
112/16 128/14 162/2
large [7] 21/7 27/19
36/17 37/1 43/21 54/23
91/12
larger [1] 36/22
largest [1] 138/2
last [12] 18/22 57/24
60/16 61/16 68/6 68/16
115/3 123/23 144/11
147/2 147/18 161/16
lasted [1] 73/16
late [1] 4/17
latency [2] 32/2 103/22
later [2] 45/15 132/15
law [15] 2/2 14/13
28/21 42/5 42/21 46/6
50/9 68/6 68/7 119/3
134/10 134/11 134/14
140/24 143/14
lawful [1] 65/23
lawfully [1] 139/7
laws [4] 143/9 146/9
162/17 162/18
lawsuit [1] 128/25
lawyers [2] 68/5 68/9
lay [1] 54/2
learning [1] 61/18
least [19] 13/12 25/5
30/23 40/13 48/7 48/10
61/6 62/5 86/18 89/20
99/17 104/2 108/5
108/11 110/13 114/22
136/15 137/21 152/14
leave [4] 64/21 117/21
148/12 166/2
leaving [2] 107/6
160/11
led [3] 81/10 81/11
81/11
left [4] 12/10 33/19
48/11 126/10
legal [1] 128/8
lens [1] 93/9
less [16] 4/7 15/9
19/25 25/17 81/19
88/24 98/24 98/25
101/16 120/11 120/13
123/9 138/3 157/13
163/12 163/21
let [22] 3/24 19/12
25/20 30/8 30/15 34/2
53/13 89/13 91/22
93/18 94/2 96/9 103/25
105/10 112/10 122/25
139/12 140/25 162/12
163/8 164/20 166/21

**led's [4]** 4/4 9/2 12/6
33/4 33/5 36/24 47/14
63/23 66/23 73/15 75/4
78/14 80/6 80/7 80/15
82/14 85/12 86/5 86/6
86/12 99/10 99/12
116/3 117/21 125/20
129/14 131/23 133/20
148/11 149/3 160/14
161/18 161/19 165/2
166/2 167/7 171/4
Let's see [1] 160/14
letter [1] 112/21
level [7] 28/16 29/15
42/3 42/3 50/18 131/19
138/20
leveraged [1] 164/3
leverages [1] 164/4
liability [3] 116/22
116/22 150/9
library [1] 77/11 77/22
license [3] 58/17
151/12 166/25
licenses [1] 54/11
light [1] 170/24
like [45] 3/17 11/1
14/22 17/15 17/17
17/17 17/18 23/23
23/24 25/19 26/2 26/22
27/2 27/3 28/18 28/22
36/19 41/10 41/19
45/19 48/5 55/25 72/7
73/22 74/12 74/14
75/18 76/15 76/22
77/11 86/22 93/6 116/8
116/10 126/9 133/14
139/24 141/21 151/24
152/8 153/1 162/6
164/8 164/15 167/20
liked [1] 115/1
likelihood [1] 24/24
likely [6] 81/18 88/24
98/24 98/25 168/18
168/24
limit [4] 47/22 111/17
111/19 112/1
limitation [2] 112/13
112/14
limited [7] 34/18
120/17 121/23 121/24
122/11 124/21 126/13
limiting [1] 129/3
limits [1] 97/20
line [4] 4/5 31/13 36/7
161/11
liners [1] 55/12
lines [2] 29/24 74/23
lining [1] 49/8
link [3] 105/15 105/16
135/2
list [2] 118/12 166/13
listed [2] 83/3 107/16
listen [1] 46/16
little [19] 30/9 36/21
46/7 74/18 77/2 98/19
127/19 127/20 128/9
129/14 129/21 129/21
131/21 131/21 147/24

**lid's [2]** 63/12 163/13
171/3
lived [1] 153/1
lives [1] 4/24
LLC [2] 1/6 3/7
LLP [2] 2/9 2/13
loading [1] 168/13
local [1] 122/13
locations [1] 58/6
locked [2] 109/10
109/14
locked-up [1] 109/14
locking [2] 107/20
163/2
lockup [1] 109/11
log [1] 6/8
logical [1] 61/6
long [4] 15/8 116/2
149/3 157/5
long-term [1] 149/3
longer [1] 154/6
look [53] 11/13 13/8
18/17 19/14 21/17
30/11 32/5 38/5 39/5
39/7 41/8 41/12 41/13
41/16 44/15 48/6 48/14
49/19 53/21 61/22
67/21 73/9 77/11 78/24
78/25 79/1 79/7 81/16
83/11 85/23 91/8 93/9
101/11 108/16 112/13
113/24 116/8 116/10
117/22 129/16 129/17
134/9 134/24 136/5
137/22 138/1 146/11
153/1 157/20 162/4
163/9 166/4 167/21
looked [9] 28/11 32/24
32/24 32/24 70/22
70/22 133/14 137/8
146/12
looking [18] 35/6
44/24 45/1 47/19 51/16
51/18 51/19 57/23
57/25 65/15 71/3 83/8
91/7 97/12 106/25
116/5 118/13 127/24
looks [3] 11/15 97/6
97/19
loop [1] 81/5
lose [12] 6/14 11/1
31/7 48/12 66/20 67/4
82/1 91/19 91/25 94/17
140/12 143/1
losing [6] 6/25 14/17
32/10 66/16 67/7
144/17
loss [1] 87/9
lost [2] 87/9 121/20
lot [19] 8/17 11/15
14/23 14/25 15/2 17/11
21/6 21/11 23/18 25/20
27/21 35/17 50/23 68/5
71/4 84/12 88/13
100/11 167/20
lots [10] 44/16 47/23
57/25 58/18 60/10
67/16 68/6 127/14

**L**

**lots... [2]** 154/24 155/1

**lousy [3]** 46/25 57/5
59/14

**loves [1]** 88/15

**low [3]** 61/2 62/12
103/10

**lower [4]** 71/15 74/13
88/10 164/17

**lowered [1]** 161/14

**loyal [3]** 35/19 45/21
159/9

**loyalty [3]** 26/18 27/18
28/2

**lucrative [1]** 107/9

**lunch [4]** 4/9 119/16
125/23 159/23

**M**

**Mac [1]** 141/22

**machine [2]** 61/18
150/12

**machinery [1]** 5/23

**mad [1]** 75/8

**MADA [15]** 83/15 164/7
164/7 165/7 165/9
165/15 165/25 166/8
167/6 167/12 167/17
168/8 168/9 169/1
169/7

**made [35]** 7/5 7/21
14/13 16/4 16/5 16/7
16/16 38/17 41/6 57/6
59/15 62/1 64/16 65/4
85/12 86/16 93/25
103/4 105/25 107/5
108/21 108/24 113/2
113/3 114/20 114/21
118/7 127/13 128/15
129/13 131/8 145/20
154/5 159/4 163/16

**magic [1]** 103/1

**Maine [1]** 2/13

**mainly [1]** 49/7

**maintain [2]** 82/8
170/10

**maintained [1]** 114/18

**maintaining [1]** 8/13

**maintenance [2]** 8/12
89/7

**majority [5]** 40/11
46/18 46/23 54/23
138/15

**make [72]** 5/4 10/24
12/8 12/13 12/16 12/20
13/21 14/5 16/18 19/6
23/3 26/12 27/13 28/25
35/4 40/1 45/16 45/22
58/23 59/20 62/16
64/11 65/7 69/2 69/14
69/15 72/19 73/12 75/3
77/15 81/1 82/6 82/22
88/15 92/18 92/24 94/7
97/3 98/17 98/18 98/18
103/18 104/8 105/7
106/16 111/22 111/24
115/22 115/23 116/20
117/2 119/11 125/21

132/1 133/16 134/23
141/7 141/23 143/5
149/25 150/5 150/6
151/5 153/14 154/3
163/14 163/15 164/18
169/9

**makes [15]** 16/25 19/3
43/18 45/9 77/7 85/19
97/3 98/23 98/24 99/4
158/24 160/25 166/8
167/8 167/12

**making [20]** 5/1 7/2 8/1
12/9 13/24 14/16 33/9
35/15 55/1 65/1 83/9
112/25 113/1 114/3
132/23 133/18 136/24
144/7 147/7 157/17

**mall [1]** 52/7

**manages [1]** 141/5

**manifestations [1]**
154/13

**manner [1]** 127/3

**many [6]** 46/13 50/12
55/5 55/5 87/16 94/13

**mapping [1]** 122/13

**marched [1]** 153/18

**margin [1]** 144/8

**marginal [1]** 104/6

**margins [1]** 60/9

**marker [1]** 10/14

**market [158]** 4/22 4/23
7/25 8/10 9/4 9/8 9/17
9/17 9/18 9/23 9/25
18/15 18/16 18/18
18/19 18/20 18/21
18/25 19/2 20/17 20/19
20/20 21/7 21/25 22/2
23/5 27/4 27/7 27/12
28/22 29/17 34/6 34/11
36/12 37/17 38/3 38/4
38/8 41/1 41/3 41/9
42/23 42/24 42/24 43/6
43/12 43/13 44/5 44/7
45/3 45/25 46/4 46/5
48/7 48/16 49/10 53/3
53/16 53/22 55/8 56/1
58/12 58/13 59/23 60/5
61/8 61/9 61/12 61/16
63/12 68/4 68/18 68/20
68/22 69/16 69/22 70/4
70/7 70/7 70/8 70/12
70/14 71/21 71/23 74/3
74/7 74/12 74/17 74/18
74/19 74/23 75/4 75/10
75/12 76/13 76/18
76/19 76/21 76/23 78/4
78/5 79/24 83/18 84/21
87/15 89/22 91/24
94/20 95/23 97/5 97/6
97/7 98/2 98/4 99/20
97/8 102/5 102/12
106/25 107/15 108/22
108/24 109/10 109/14
110/19 110/25 113/15
115/22 116/1 116/7
116/10 126/15 129/2
131/14 133/7 133/10

133/22 134/4 134/17
135/13 139/11 139/12
139/9 141/12 143/15
144/9 145/9 149/17
150/1 150/6 153/2
153/24 155/13 160/12
162/16

**market share [1]** 18/25

**marketing [5]** 97/6
98/8 98/10 98/12
115/24

**marketplace [12]**
31/22 53/19 55/14
60/10 69/21 105/24
109/13 115/20 116/24
130/10 144/7 147/9

**marketplaces [1]** 28/6

**markets [13]** 37/11
42/22 46/9 55/6 67/18
74/2 74/5 74/6 110/21
142/6 143/11 150/20
170/23

**massive [3]** 61/18
61/21 143/23

**match [2]** 74/15 169/12

**material [2]** 47/4 158/4

**math [3]** 68/24 69/6
69/8

**matter [11]** 35/9 94/17
100/11 100/13 100/3/7
103/12 103/14 118/21
134/13 166/11 172/4

**matters [1]** 84/11

**may [36]** 1/5 4/5 4/6
4/6 4/7 4/13 4/14 4/20
17/1 20/14 29/15 29/15
29/18 33/23 39/13
39/14 39/15 40/6 47/12
55/6 62/2 80/19 80/20
101/20 109/5 111/3
111/22 111/23 118/23
119/17 126/4 128/18
129/8 130/7 138/3
172/7

**maybe [23]** 13/6 14/3
23/15 23/15 23/21
31/12 62/5 62/7 69/18
71/1 77/23 89/13 96/5
98/8 110/16 110/18
113/16 121/8 132/15
133/4 135/21 163/12
167/5

**McWane [2]** 79/8 124/9

**me [59]** 3/24 12/5 12/6
13/13 19/12 24/20 30/8
30/15 30/25 32/7 34/2
36/20 49/10 52/14
53/13 66/12 71/20 75/8
79/1 82/12 86/12 86/19
89/13 89/15 89/21
91/11 91/18 91/22
91/24 92/22 92/23 93/8
93/18 94/2 94/3 95/5
96/9 100/5 100/9
103/25 104/5 105/11
106/7 106/19 106/23
110/22 115/7 121/21

136/25 139/12 141/10
141/11 143/21 144/6
163/8 166/23

**mean [99]** 10/3 11/13
12/1 12/8 12/24 13/5
13/8 14/1 14/5 14/13
15/17 15/21 17/8 17/13
20/18 21/8 22/10 23/2
23/8 23/9 23/21 24/3
25/11 26/3 29/19 33/10
37/13 37/16 47/5 49/10
49/11 49/21 50/15
50/17 52/8 55/7 55/19
61/24 66/25 67/17
73/18 86/22 87/3 87/23
87/25 88/14 88/25
89/16 91/8 91/17 92/19
93/13 95/18 96/3 100/8
101/6 101/19 103/11
104/14 104/18 104/21
105/24 107/14 110/1
110/20 110/20 111/12
114/13 117/4 117/8
118/25 120/10 122/15
123/15 133/5 134/16
136/19 138/25 140/7
140/8 141/20 146/19
147/9 147/18 147/21
148/14 152/19 152/25
154/21 156/3 156/11
158/15 159/9 161/25
167/2 167/20 167/23
168/12 169/7

**meaningful [1]** 37/4

**meaningless [1]**
136/10

**means [11]** 18/3 27/20
32/25 86/3 97/19
104/24 106/11 108/15
118/21 160/11 165/17

**meant [3]** 42/19 117/7
168/22

**measure [6]** 15/25
76/13 76/15 76/20
108/20 108/23

**measuring [1]** 76/13

**mechanical [1]** 2/20

**media [2]** 47/7 47/16

**meet [3]** 16/9 96/15
142/25

**meeting [1]** 115/16

**MEHTA [3]** 1/10 3/3
80/13

**member [1]** 27/18

**members [4]** 28/2 28/2
35/18 37/23

**memory [3]** 23/22
79/15 87/22

**mention [2]** 78/6
112/19

**mentioned [5]** 33/6
42/18 81/13 123/14
124/20

**merely [1]** 130/6

**Merit [1]** 2/16

**merits [5]** 64/12 139/11
140/18 141/14 144/19

**method [2]** 118/20
156/8

**methodology [4]** 6/21
117/17 117/19 117/19

**methods [2]** 29/15
156/7

**metrics [1]** 26/1

**Microsoft [107]** 10/15
12/2 12/3 13/22 51/2
53/14 54/6 54/9 55/3
62/1 64/23 65/3 82/4
82/6 85/12 89/20 89/25
90/17 91/19 93/4 94/6
94/18 94/21 95/6 95/22
98/25 101/22 105/5
107/3 107/11 110/12
110/14 110/19 115/11
115/18 116/11 116/14
116/21 117/9 117/15
117/22 117/24 118/8
121/18 121/20 122/1
122/10 123/1 124/14
125/14 126/12 126/12
127/3 127/8 127/11
127/18 128/1 130/20
130/21 131/23 132/15
133/6 133/12 134/1
134/2 134/3 134/5
134/11 134/16 135/19
136/16 137/11 138/1
140/2 140/15 140/20
143/18 144/10 144/12
146/2 146/25 147/6
148/5 150/9 151/4
151/11 151/14 151/20
152/9 153/7 153/20
154/24 155/5 158/24
159/2 159/3 159/9
160/17 164/2 164/2
165/24 166/4 167/14
167/16 170/1 170/3
170/15

**Microsoft's [6]** 92/10
134/5 138/17 138/21
150/8 155/9

**middleware [3]** 62/2
132/17 132/23

**might [13]** 5/3 11/1
28/18 31/8 44/18 56/3
66/3 67/18 67/20
130/12 139/8 151/6
162/4

**million [1]** 27/3

**millions [1]** 122/6

**millionth [1]** 24/4

**mind [2]** 36/15 58/9

**minute [3]** 161/19
169/22 169/23

**minutes [16]** 29/22
30/3 30/9 33/18 59/16
78/19 78/22 119/9
119/20 125/20 125/21
125/22 155/22 158/11
159/22 169/22

**misled [1]** 46/23

**misrecollecting [1]**
133/5

**M**

**miss [1]** 93/15
**missed [1]** 93/18
**missing [1]** 86/1
**mission [2]** 45/15 45/18
**mistake [2]** 28/24 107/13
**mitt [1]** 123/24
**Mittenger [1]** 117/14
**mobile [38]** 18/24 53/18 54/15 85/15 85/17 85/21 88/22 88/24 100/14 101/1 101/2 101/3 101/6 102/8 102/8 102/16 102/16 102/18 104/4 104/19 105/1 105/2 105/22 107/6 107/11 115/4 122/10 125/15 151/21 151/22 151/24 152/1 154/23 154/25 155/5 157/10 160/16 160/24
**mode [5]** 6/4 6/20 11/2 35/17 53/4
**model [5]** 11/4 48/19 48/20 48/20 49/4
**modest [1]** 62/25
**modify [1]** 10/24
**moment [5]** 13/11 68/17 99/12 117/22 166/3
**monetizable [3]** 53/11 54/21 62/13
**monetization [1]** 139/11
**monetize [3]** 48/21 49/6 142/21
**monetizes [2]** 5/15 81/22
**monetizing [1]** 142/24
**money [21]** 17/14 45/22 56/23 58/23 58/24 62/16 81/21 81/24 87/9 88/13 98/2 98/7 98/11 98/16 98/16 115/24 124/16 127/11 127/14 141/23 167/12
**monopolies [4]** 8/11 8/13 8/25 81/23
**monopolist [15]** 7/3 7/4 7/21 8/7 13/25 17/18 50/16 108/17 112/3 124/10 134/12 149/20 149/21 150/3 168/23
**monopolist's [1]** 6/19
**monopolistic [1]** 12/5
**monopolists [2]** 12/1 170/22
**monopolists' [1]** 97/4
**monopolization [2]** 80/22 117/5
**monopolize [1]** 107/14
**monopoly [48]** 4/21 7/4 7/24 8/12 9/3 9/6 9/9 9/18 9/22 9/22 10/8

10/11 11/4 12/12 12/13 12/22 13/9 16/25 18/11 18/12 31/15 46/1 46/5 61/9 62/11 65/12 65/21 65/24 66/13 67/14 67/17 68/10 69/16 81/22 82/8 89/6 89/7 114/18 130/23 131/6 133/23 133/24 134/6 134/18 138/19 138/21 144/17 170/7
**month [1]** 15/9
**months [10]** 15/12 15/14 15/15 17/10 17/13 17/20 17/22 18/1 18/2 73/17
**more [86]** 4/7 4/22 5/25 7/5 15/3 15/10 17/11 17/25 19/3 25/16 25/17 27/23 28/3 28/14 29/22 32/25 32/25 32/25 35/10 36/10 53/14 60/19 60/21 64/6 64/11 64/23 64/24 65/1 65/9 69/18 71/2 72/17 72/17 73/6 77/23 81/8 81/17 81/18 85/17 94/10 94/20 96/15 97/24 98/2 99/1 99/7 99/8 99/8 99/9 101/3 101/3 101/12 102/21 102/22 107/8 108/7 108/23 115/24 121/2 122/6 122/20 122/23 124/13 124/25 125/9 127/11 130/13 135/19 135/20 135/22 135/23 138/3 143/4 149/4 151/20 151/23 154/2 155/5 157/2 157/13 158/10 158/24 159/4 160/5 160/15 171/5
**morning [8]** 1/7 3/4 3/5 3/12 3/14 3/16 41/18 80/7
**morning's [1]** 9/2
**most [19]** 5/11 24/2 35/18 35/19 37/23 45/10 53/11 62/13 65/20 71/13 72/16 86/1 86/1 87/11 98/7 110/12 122/9 145/3 155/24
**mostly [1]** 111/15
**motivating [1]** 21/18
**move [2]** 80/15 143/3
**moved [3]** 22/9 87/17 88/12
**moves [1]** 30/9
**moving [3]** 40/16 40/17 85/8
**Mozilla [17]** 85/5 86/6 86/7 86/16 86/23 87/2 87/16 87/20 108/7 114/25 141/17 144/20 144/24 145/6 145/6 147/14 147/25
**Mr [2]** 26/16 158/15
**Mr. [95]** 4/11 5/9 9/12

20/2 20/9 21/24 22/22 22/22 23/22 25/22 26/25 26/15 26/15 27/3 33/17 35/15 39/11 39/12 39/21 40/5 40/9 42/19 44/15 45/14 45/14 48/2 59/25 63/15 63/16 71/17 71/18 71/21 72/8 72/13 75/21 76/25 77/6 78/11 78/18 78/21 80/5 80/17 81/21 82/10 84/10 89/3 97/24 98/6 102/15 103/3 105/1 105/7 109/20 111/10 113/23 115/18 115/17 119/11 120/18 120/18 120/19 122/9 125/17 125/18 126/3 126/10 128/10 129/7 131/25 136/6 147/7 147/11 147/11 148/6 148/7 148/12 151/19 152/3 152/4 153/8 153/12 154/22 155/21 157/8 159/3 159/18 160/15 160/25 166/7 169/15 169/21 171/2
**Mr. Brin [1]** 45/14
**Mr. Cavanaugh [12]** 33/17 39/11 39/21 44/15 78/21 80/5 119/11 125/17 126/10 152/4 169/21 171/2
**Mr. Cue [6]** 113/23 115/17 147/7 148/6 148/12 153/8
**Mr. Dahlquist [2]** 10/10 81/21
**Mr. Dijk [1]** 120/18
**Mr. Dintzer [13]** 4/11 9/12 35/15 40/5 71/18 78/18 80/17 82/10 122/9 128/10 131/25 136/6 152/3
**Mr. Dintzer's [2]** 63/15 157/8
**Mr. Fox [1]** 103/3
**Mr. Giannandrea [10]** 19/5 20/2 22/22 26/15 105/1 109/20 111/10 113/23 129/7 148/7
**Mr. Hurst [2]** 120/18 120/19
**Mr. Nadella [4]** 22/22 84/10 147/11 154/22
**Mr. Page's [1]** 45/14
**Mr. Parakhin [2]** 151/19 153/12
**Mr. Parakhin's [2]** 160/15 160/25
**Mr. Pichai [2]** 159/3 169/15
**Mr. Raghavan's [1]** 63/16
**Mr. Ramaswamy [15]** 5/9 20/9 21/24 23/22 25/23 26/7 26/15 27/3

76/25 89/3 102/15
**Mr. Schmidtlein [16]** 15/21 19/13 39/12 42/19 48/2 71/17 71/21 72/8 78/11 97/24 98/6 125/18 126/3 155/21 159/18 166/7
**Mr. Tinter [1]** 147/11
**Mr. Varian [1]** 77/6
**Mrs. [1]** 35/20
**Mrs. Cavanaugh [1]** 35/20
**Ms. [6]** 15/14 64/2 110/1 110/1 112/18 129/7
**Ms. Braddi [3]** 110/1 112/18 129/7
**Ms. Braddi's [1]** 110/1
**Ms. Fitzpatrick [2]** 15/14 64/2
**much [36]** 4/17 11/18 12/11 13/2 14/21 18/4 20/1 20/21 24/4 24/5 29/6 39/7 46/12 46/20 60/2 71/15 78/21 88/23 88/23 91/10 99/4 101/10 102/17 104/13 104/20 120/19 122/11 123/12 123/13 128/10 132/23 139/1 139/4 145/23 157/12 167/12
**multibillion [2]** 36/18 108/10
**multibillion-dollar [2]** 36/18 108/10
**multiple [2]** 43/7 162/5
**Multitrillion [1]** 110/25
**Multitrillion-dollar [1]** 110/25
**Murphy [6]** 14/20 84/15 111/23 157/21 162/20 169/16
**Murphy's [2]** 104/12 165/5
**must [1]** 7/25
**mutual [1]** 149/9
**my [19]** 7/23 15/17 29/5 30/4 32/15 36/6 36/15 48/4 52/15 61/25 71/19 73/15 74/2 83/7 86/5 148/25 153/3 153/4 153/4

**N**

**Nadella [4]** 22/22 84/10 147/11 154/22
**name [3]** 24/13 63/24 118/12
**narrow [8]** 44/13 69/7 70/1 70/3 70/3 70/6 72/19 73/10
**narrowly [1]** 110/21
**nascent [6]** 106/24 109/12 139/6 139/13 170/14 170/15
**National [1]** 39/20
**nature [2]** 127/16

**nav [2]** 71/25 71/25
**navigate [1]** 47/5
**Navigation [1]** 72/5
**navigational [1]** 72/4
**Navigator [8]** 131/9 131/19 132/5 132/9 132/12 138/19 138/20 170/4
**Navigator's [1]** 133/7
**Nayak [1]** 103/20
**near [1]** 36/5
**necessarily [5]** 29/16 44/8 44/20 79/20 101/21
**necessary [5]** 4/6 14/15 74/21 138/20 170/17
**need [39]** 9/18 12/19 18/1 18/10 23/3 24/18 37/8 42/7 44/5 46/5 49/2 50/4 52/7 60/17 60/24 62/15 62/15 62/16 67/8 94/10 96/14 98/3 98/17 98/18 101/17 110/9 123/10 123/24 126/6 132/20 133/12 134/23 136/1 137/1 164/6 167/13 167/25 168/1 170/14
**needed [1]** 5/7
**needle [1]** 22/9
**needs [6]** 6/23 13/12 42/4 45/19 54/4 77/1
**Neeva [13]** 5/10 19/14 21/5 21/24 22/19 23/5 25/20 40/8 59/22 59/24 62/18 80/1 81/15
**Neeva's [3]** 23/1 23/4 23/14
**negative [1]** 27/17
**negotiations [2]** 162/24 162/25
**neighborhood [1]** 88/9
**net [1]** 89/4
**Netscape [2]** 131/9 138/9
**Netscape Navigator [1]** 131/9
**never [19]** 6/8 6/11 21/5 22/9 22/10 26/10 29/9 29/9 59/10 59/15 72/4 72/8 73/6 82/1 125/12 126/18 128/16 129/12 142/15
**new [19]** 1/10 5/3 19/6 21/6 37/8 59/22 71/4 74/8 79/5 79/9 79/22 117/25 132/10 140/14 142/19 142/21 143/7 143/12 152/23
**newspaper [2]** 34/21 76/4
**next [6]** 77/14 78/14 80/15 82/4 132/10 157/20
**niche [5]** 36/10 36/16 49/5 58/6 123/21

**N**

**night [2]** 4/17 57/24
**Ninth [1]** 79/19
**no [134]** 1/4 3/21 3/22
11/25 12/3 15/10 18/7
18/25 20/11 20/12
22/11 22/14 22/15
23/6 25/9 27/16 29/3
29/11 30/5 30/5 30/6
30/14 32/23 32/24 35/9
38/22 41/12 43/9 43/16
47/4 48/10 50/7 54/3
54/12 59/12 61/2 64/22
64/22 69/4 69/5 69/19
69/24 70/16 71/6 77/12
78/2 78/2 78/8 87/5
88/4 92/1 93/7 93/18
94/23 101/6 103/2
104/10 105/3 105/3
106/17 109/5 110/11
113/11 113/11 113/19
114/14 114/15 114/19
114/24 115/7 115/9
115/19 116/1 116/15
116/17 116/22 117/7
117/8 118/11 118/13
120/4 121/11 126/24
127/17 128/22 128/25
128/25 131/23 132/19
134/13 135/16 136/3
136/12 138/23 140/3
141/2 141/2 142/3
142/16 144/2 144/11
146/25 147/8 148/12
151/5 151/9 151/24
154/2 154/6 156/15
157/8 157/10 158/4
161/22 161/22 162/1
162/1 162/1 162/1
162/13 162/19 163/22
164/23 165/22 166/16
167/11 168/5 169/5
169/5 169/8
**no-fly [1]** 22/23
**noble [1]** 8/9
**nobody [8]** 49/25
58/12 61/23 144/8
144/11 149/2 166/21
167/21
**Nokia [1]** 154/25
**non [10]** 49/23 57/5
57/7 57/10 57/17 57/18
57/22 58/4 58/8 59/15
**non-commercial [10]**
49/23 57/5 57/7 57/10
57/17 57/18 57/22 58/4
58/8 59/15
**noncommercial [1]**
45/12
**none [4]** 8/10 110/13
117/18 152/23
**north [1]** 34/23
**not [310]**
**note [3]** 78/11 82/6
155/22
**noted [1]** 119/23
**nothing [7]** 34/8 75/18
129/19 166/17
**noticed [2]** 4/16 66/10
**noting [1]** 103/17
**notion [6]** 14/9 69/12
127/8 129/11 152/25
153/12
**now [34]** 3/2 7/8 8/8
8/15 16/20 22/2 25/1
27/4 61/6 66/11 67/5
84/25 89/1 100/6
102/23 103/23 106/23
108/25 110/1 114/18
114/24 120/4 120/21
120/24 127/19 136/19
143/25 147/24 151/23
153/18 161/9 162/2
165/6 171/3
**nowhere [1]** 57/9
**number [30]** 49/22
71/1 77/4 82/25 84/7
87/19 88/6 96/11 99/6
99/15 99/22 99/24
100/17 101/14 117/12
117/12 117/13 117/16
118/7 119/7 131/10
132/11 136/1 136/4
136/8 136/9 136/22
152/14 155/12 164/25
**numbers [5]** 14/23
97/25 98/1 100/25
119/5
**NW [2]** 1/14 2/18
**NY [1]** 2/10

**O**

**obligate [1]** 163/10
**obligated [2]** 140/25
162/21
**obligation [5]** 113/9
113/10 113/18 162/10
162/13
**observed [3]** 102/21
129/8 148/2
**obstructed [1]** 159/6
**obvious [1]** 71/13
**obviously [17]** 4/1 17/8
20/16 39/23 40/24 41/3
50/23 53/19 69/10 79/1
83/22 128/8 134/11
136/12 147/22 151/15
156/2
**occurred [2]** 79/20
142/15
**occurring [1]** 37/21
**occurs [1]** 37/18
**odd [4]** 17/1 122/17
122/18 144/6
**odds [2]** 17/1 51/3
**OEM [8]** 94/22 94/22
95/7 132/12 133/1
144/4 164/14 165/6
**OEMs [12]** 32/7 32/11
54/8 54/10 95/8 130/23
131/2 131/11 131/14
137/23 163/15 165/8
**off [8]** 23/22 86/9 97/20
110/7 112/20 126/10
**offer [7]** 6/17 14/21
50/10 57/1 125/13
125/15 161/14
**offered [6]** 6/7 19/2
68/24 138/16 147/8
148/13
**offering [8]** 14/23
47/23 50/14 56/9 125/1
150/9 150/10 150/11
**offers [3]** 43/7 51/6
53/5
**Official [1]** 2/17
**often [4]** 8/20 14/14
25/17 25/18
**oh [11]** 4/15 21/20
41/12 51/22 108/16
111/3 117/7 130/17
131/25 160/19 162/15
**Oil [2]** 79/19 108/18
**okay [40]** 3/12 3/16
3/23 4/10 10/5 15/9
16/2 20/25 28/20 30/1
32/9 32/9 33/16 33/21
35/2 69/9 71/17 72/25
80/15 84/1 85/1 85/11
88/8 90/12 92/2 96/11
100/5 105/18 119/9
119/13 121/13 121/15
124/23 125/23 159/21
161/17 162/11 163/9
165/23 171/7
**once [4]** 96/3 97/13
98/2 131/3
**one [115]** 3/24 6/13
6/16 7/5 7/6 11/8 11/9
13/8 13/12 14/6 20/11
20/12 23/11 24/4 26/18
26/18 27/21 29/18
29/18 31/16 32/4 32/5
33/6 35/16 38/9 41/19
41/24 42/7 42/25 46/8
47/6 47/18 48/3 48/4
48/14 49/1 51/10 51/19
52/1 52/5 52/9 52/10
54/6 56/7 59/24 60/9
60/20 64/21 66/8 69/18
71/13 71/25 72/11
72/11 72/11 74/8 74/16
75/3 75/4 75/21 76/7
76/11 76/16 76/17 77/1
79/3 82/4 83/1 87/1
87/11 102/17 102/20
104/10 107/13 107/13
107/18 107/20 107/20
108/13 108/21 109/15
110/15 115/1 116/1
116/5 118/5 119/23
124/13 126/12 128/6
130/10 131/10 139/21
139/22 141/8 144/11
145/3 147/1 147/6
147/17 147/18 154/18
156/7 158/10 158/15
161/7 163/22 169/5
169/5 169/5 169/8
**one-stop [17]** 41/19
48/4 51/10 52/1 52/9
52/10 52/11 72/11 74/8
74/16 75/21 76/7 77/1
**one-stop-shop [3]**
52/5 52/19 53/4
**ones [10]** 72/4 72/16
72/17 74/10 74/11
76/22 88/11 88/12
149/8 149/11
**online [9]** 5/11 27/18
27/19 28/6 41/5 46/14
46/15 46/19 64/17
**only [45]** 6/16 16/22
33/6 43/21 43/23 45/5
47/19 51/9 51/18 53/18
53/25 59/13 61/14 70/9
71/25 72/3 76/21 82/16
84/10 84/18 84/20
91/10 92/19 95/15
97/21 103/2 107/8
112/14 112/23 116/16
126/12 126/12 137/17
138/17 140/10 142/22
152/18 152/19 154/14
154/16 156/9 158/18
158/19 165/18 167/2
**onward [1]** 33/1
**opening [5]** 8/15 10/3
80/16 81/5 163/3
**operate [1]** 38/6
**operating [6]** 53/23
54/8 62/3 130/23
133/10 133/15
**opinion [4]** 25/24
26/11 115/7 151/1
**opportunity [1]** 84/25
**opposed [2]** 96/24
127/25
**opposite [1]** 148/25
**option [17]** 6/7 22/7
113/9 113/10 113/18
114/15 114/19 114/21
114/22 114/22 114/24
115/1 115/19 148/23
149/12 162/10 162/12
**options [8]** 30/24
116/6 119/4 148/20
148/22 148/24 149/7
149/8
**order [52]** 4/1 25/15
44/4 52/14 53/1 62/16
96/6 133/15 134/8
135/4
**ordering [1]** 144/1
**ordinary [1]** 27/11
**organize [1]** 45/16
**original [1]** 121/10
**Orioles [3]** 50/1 57/24
58/20
**Orioles-Yankee's [1]**
57/24
**Orioles-Yankees [1]**
58/20
**other [86]** 9/16 10/22
13/15 20/22 24/18 25/1
30/21 30/25 33/8 44/11
44/19 46/14 47/7 49/4
48/4 51/10 52/1 52/9
48/4 51/10 52/1 52/9
52/11 72/11 74/8 74/6
74/16 75/21 76/7 77/1
**one-stop-shop [3]**
52/5 52/19 53/4
**ones [10]** 72/4 72/16
72/17 74/10 74/11
76/22 88/11 88/12
149/8 149/11
**online [9]** 5/11 27/18
27/19 28/6 41/5 46/14
46/15 46/19 64/17
**only [45]** 6/16 16/22
33/6 43/21 43/23 45/5
47/19 51/9 51/18 53/18
53/25 59/13 61/14 70/9
71/25 72/3 76/21 82/16
84/10 84/18 84/20
91/10 92/19 95/15
97/21 103/2 107/8
112/14 112/23 116/16
126/12 126/12 137/17
138/17 140/10 142/22
152/18 152/19 154/14
154/16 156/9 158/18
158/19 165/18 167/2
**onward [1]** 33/1
**opening [5]** 8/15 10/3
80/16 81/5 163/3
**operate [1]** 38/6
**operating [6]** 53/23
54/8 62/3 130/23
133/10 133/15
**opinion [4]** 25/24
26/11 115/7 151/1
**opportunity [1]** 84/25
**opposed [2]** 96/24
127/25
**opposite [1]** 148/25
**option [17]** 6/7 22/7
113/9 113/10 113/18
114/15 114/19 114/21
114/22 114/22 114/24
115/1 115/19 148/23
149/12 162/10 162/12
**options [8]** 30/24
116/6 119/4 148/20
148/22 148/24 149/7
149/8
**order [52]** 4/1 25/15
44/4 52/14 53/1 62/16
96/6 133/15 134/8
135/4
**ordering [1]** 144/1
**ordinary [1]** 27/11
**organize [1]** 45/16
**original [1]** 121/10
**Orioles [3]** 50/1 57/24
58/20
**Orioles-Yankee's [1]**
57/24
**Orioles-Yankees [1]**
58/20
**other [86]** 9/16 10/22
13/15 20/22 24/18 25/1
30/21 30/25 33/8 44/11
44/19 46/14 47/7 49/4
53/15 54/5 54/10 54/24
55/8 55/10 56/2 56/18
57/11 58/7 58/7 58/25
59/2 59/8 59/22 60/8
71/16 76/14 78/8 82/14
82/22 92/3 92/12 93/6
93/12 93/15 94/14
98/20 100/4 100/8
100/21 101/20 109/16
114/14 114/24 115/19
115/19 117/3 117/13
117/13 117/17 117/18
118/6 118/20 119/4
120/24 122/15 123/17
125/3 129/18 130/6
130/11 134/25 136/5
138/6 138/20 138/24
140/13 142/7 146/11
146/24 147/2 154/8
158/2 159/7 164/14
167/22 169/4
**others [6]** 82/16 94/13
123/25 125/14 161/5
166/15
**otherwise [4]** 10/23
84/5 138/7 166/6
**our [49]** 4/24 5/12 5/13
5/13 5/13 5/14 5/15
5/21 5/22 7/6 8/15
21/19 21/20 26/7 31/13
39/1 39/6 39/19 40/6
47/17 48/21 48/23 49/6
49/7 63/9 74/21 77/8
80/6 80/15 81/3 83/20
83/24 90/13 113/9
113/25 114/1 116/20
125/2 126/22 134/3
136/7 147/11 147/22
151/24 153/14 153/22
170/9 170/14 170/24
**ours [7]** 46/3 162/3
162/6
**out [50]** 21/20 24/22
24/25 25/7 28/8 28/12
29/7 30/24 31/10 31/11
35/24 49/25 56/6 58/17
62/14 67/15 71/3 73/17
75/18 81/6 89/8 93/25
94/20 104/8 105/7
109/4 109/17 117/25
118/18 120/3 121/2
122/5 122/13 127/11
133/16 135/24 137/8
138/3 143/22 144/24
144/25 144/25 145/9
146/21 149/12 152/22
154/3 160/11 160/24
169/20
**outlays [1]** 79/17
**output [3]** 65/18 68/8
79/21
**outset [1]** 145/11
**outside [4]** 35/8 35/11
142/6 161/10
**outstanding [1]** 19/22
**over [32]** 4/2 4/9 5/21
12/11 13/18 18/20

**O**

over... [26] 18/21 50/23 59/2 64/15 67/3 75/23 102/21 103/19 104/3 117/6 117/7 117/8 126/23 127/3 127/19 130/11 132/10 143/3 144/17 158/19 158/19 159/11 160/2 164/3 164/4 166/9
over-index [1] 159/11
overall [2] 56/10 89/2
overarching [1] 62/11
overcame [1] 158/7
overstay [2] 30/4 30/6
overtake [1] 139/6
own [22] 8/20 8/21 18/23 21/19 40/10 55/2 66/16 76/13 78/8 78/10 88/25 113/25 128/8 129/4 129/6 144/14 146/6 153/10 155/9 166/21 168/17 169/11
owns [1] 169/13

**P**

p.m [4] 126/2 126/2 171/11 171/11
pace [1] 12/12
page [9] 32/21 73/25 103/16 106/18 121/16 161/24 161/25 162/2 170/3
page 171 [1] 32/21
Page's [1] 45/14
pages [1] 8/8
paid [4] 11/5 74/10 74/11 125/12
paint [1] 8/24
panels [2] 58/21 58/25
papers [2] 47/17 107/4
par [2] 14/7 21/16
paragraph [1] 126/22
Parakhin [1] 151/19 153/12
Parakhin's [2] 160/15 160/25
paralegal [1] 71/19
Paris [1] 44/25
part [23] 16/8 28/8 28/11 31/25 52/15 63/11 64/5 64/5 64/8 64/9 92/25 99/21 99/23 100/16 100/19 116/22 117/3 128/3 152/16 154/17 156/4 159/10 162/23
participate [1] 145/5
participating [1] 114/6
particular [5] 4/7 21/10 55/6 86/11 121/23
particularly [4] 45/9 121/4 125/15 140/14
parties [2] 76/18 108/2
partner [3] 7/10 108/4 120/12
partners [1] 11/5
partnerships [1]

parts [4] 9/20 31/24 82/9 92/24
party [6] 18/17 83/16 112/15 112/24 126/24 127/15
pass [1] 29/23
past [2] 13/2 102/24
pattern [1] 36/7
patterns [1] 70/23
PATTERSON [1] 2/8
pause [2] 48/3 169/19
pay [21] 26/23 26/25 35/19 84/5 88/18 113/5 113/13 118/16 122/2 123/2 123/5 125/8 141/23 141/23 145/12 162/8 162/13 163/11 163/12 163/13 164/22
paying [6] 84/8 88/13 88/17 124/16 124/19 125/5
payments [7] 11/5 89/4 111/8 112/7 143/23 164/9 165/12
payoff [1] 99/2
pays [2] 35/20 104/20
pbwt.com [1] 2/11
PC [2] 53/24 53/24
PCs [3] 131/1 132/10 157/13
peaked [1] 72/14
peaking [1] 72/16
peanut [2] 28/22 28/23
peas [1] 74/13
peculiar [1] 76/10
peek [1] 108/6
people [68] 30/18 31/9 32/18 32/23 33/2 35/18 35/23 37/22 44/11 45/12 46/16 46/23 47/5 47/23 48/22 50/19 51/21 53/4 55/23 56/14 57/9 57/14 58/4 58/14 59/2 60/23 61/20 61/22 62/14 62/17 66/3 66/10 67/20 68/8 71/3 71/4 73/19 76/2 77/9 78/10 84/7 85/2 85/3 85/5 85/8 86/3 86/9 86/20 87/7 87/12 87/16 88/14 88/23 94/20 108/16 113/18 120/13 143/2 144/25 146/6 157/14 159/5 159/8 159/8 159/8 163/4 167/13 168/18
Pepsi [1] 118/22
per [2] 27/17 134/14
per-user [1] 27/17
percent [72] 15/9 15/10 18/3 18/15 18/20 18/23 18/24 23/16 23/23 35/23 37/22 37/24 45/6 49/22 57/19 68/20 70/17 71/14 72/14 72/21 72/23 79/9 81/13 81/14 92/9 92/17

97/13 97/15 97/20 97/20 99/13 99/19 100/4 100/15 101/6 102/12 102/13 106/2 106/5 106/7 108/23 109/10 109/14 117/11 117/14 117/15 119/2 119/4 136/7 136/8 136/9 137/3 137/3 137/3 137/15 137/17 139/16 139/16 153/24 155/7 156/6 158/14 158/16 158/18 158/19 164/8 164/9 168/24
percentage [12] 46/20 69/23 70/14 87/7 90/18 100/22 100/23 103/10 115/13 119/6 137/13 148/1
perceptible [1] 67/10
perfect [3] 52/1 74/15 160/25
perfectly [2] 4/10 54/2
perform [2] 53/23 54/3
perhaps [2] 13/14 16/11
period [7] 40/14 40/23 60/1 67/19 86/7 87/21 155/12
periodically [1] 14/5
periods [1] 157/6
permeates [1] 25/21
permits [1] 5/4
perpetually [1] 66/20
perpetuating [1] 80/24
persistently [1] 67/9
person [4] 24/12 48/17 103/3 157/16
personal [1] 5/19
perspective [1] 93/20
persuade [1] 146/6
Peter [2] 34/2 120/5
phase [2] 80/15 133/23
phone [6] 32/16 54/13 168/5 168/5 169/4 169/17
phones [6] 47/7 53/18 154/25 155/3 155/6 155/6
physical [1] 52/6
Pichai [2] 159/3 169/15
pick [5] 6/14 126/9 146/8 146/8 146/15
picked [2] 59/19 147/14
picks [1] 47/19
pie [1] 60/15
piece [6] 60/15 67/25 69/14 72/11 86/1 151/17
pieces [2] 29/7 97/1
pillars [1] 23/11
PLA [1] 57/13
place [4] 49/1 52/12 78/8 89/5
placed [3] 131/17 166/11 166/20

places [6] 46/13 56/3 57/21 57/25 58/3 145/2
plaintiff [6] 2/3 3/10 41/1 55/22 119/22 136/19
plaintiff's [1] 116/23
plaintiffs [23] 1/4 1/13 3/19 19/15 22/25 39/18 42/19 43/17 50/21 59/15 68/19 69/1 104/8 106/19 126/17 130/16 134/23 136/21 138/25 145/11 151/18 157/22 158/9
plaintiffs' [4] 11/9 39/1 80/7 82/19
platform [5] 132/23 142/23 146/6 165/1 170/5
platforms [1] 145/3
Play [7] 164/5 164/6 167/8 167/10 167/13 167/14 167/23
playbook [1] 163/5
player [2] 139/6 143/2
plays [1] 121/9
please [8] 4/20 11/7 39/15 78/14 80/14 160/3 161/18 165/22
pled [4] 90/20 90/20 119/22 129/12
plenty [2] 57/21 119/16
plot [1] 133/8
plus [2] 60/16 135/6
podium [1] 30/3
point [37] 14/6 21/15 26/20 35/4 35/15 38/9 38/15 38/17 40/15 40/19 47/19 50/7 51/10 52/21 58/11 60/22 61/5 62/2 64/14 64/21 66/9 67/15 67/20 79/3 85/12 98/15 100/10 104/2 104/12 104/17 108/21 133/5 157/8 165/20 168/4 169/9 170/18
points [8] 26/19 39/18 40/3 59/19 59/20 72/6 118/6 169/25
police [1] 7/25
politics [1] 5/13
poor [1] 57/1
popular [1] 24/2
portion [1] 65/5
portions [1] 40/7
pose [3] 62/3 80/2 138/21
posed [1] 145/11
positing [1] 137/1
position [19] 16/8 23/1 25/6 26/5 26/6 26/7 40/10 82/19 91/9 96/10 102/9 109/8 116/4 125/9 125/13 125/15 134/6 164/19 166/20
positions [1] 13/9
possesses [1] 65/23

possession [2] 101/9 106/20
possibility [1] 7/12
possibly [3] 143/7 143/24 149/3
potential [9] 19/4 34/6 65/13 67/6 67/13 97/5 98/24 170/16 170/16
potentially [6] 16/6 34/7 94/8 148/15 148/24 152/4
pouring [1] 60/14
power [45] 4/21 4/25 5/2 5/4 5/7 5/16 7/4 7/24 9/3 9/6 9/9 9/18 9/22 9/22 10/8 11/3 12/18 12/22 13/9 16/25 17/18 18/11 18/12 31/15 46/1 46/5 61/9 62/12 65/12 65/21 65/24 66/13 67/14 67/16 67/17 68/10 68/13 69/16 79/25 110/20 133/23 134/17 134/18 161/23 170/8
powerful [4] 5/25 84/4 84/20 163/6
practical [3] 38/4 38/5 38/7
precise [1] 14/22
precisely [2] 63/6 159/4 164/12
preclude [1] 79/20
predator [1] 79/23
predator's [1] 79/24
predict [1] 59/21
predominant [1] 158/2
prefer [1] 10/1
preferences [3] 5/17 7/7 15/7
preferred [1] 131/11
preinstallation [1] 118/19
preload [2] 130/25 131/3
preloaded [2] 158/7 166/12
premise [2] 120/16 124/25
premised [1] 38/18
preparation [1] 29/15
prepared [2] 56/6 148/3
presence [1] 132/10
present [1] 151/6
presentation [2] 9/2 9/25
presentations [1] 4/19
presented [3] 8/16 79/1 157/21
presently [1] 164/11
preserving [1] 138/18
President [1] 6/5
presiding [2] 3/3 80/13
pressed [1] 128/10
pressure [3] 23/7 62/25 63/3
presumably [2] 101/4

**P**

presumably... [1]
142/12

pretty [6] 23/10 46/11
103/13 104/13 107/9
164/5

Prettyman [1] 2/18

prevent [4] 82/7
124/10 139/2 168/13

preventing [1] 84/14

prevents [1] 106/21

previously [1] 131/15

price [19] 10/12 10/17
10/18 31/8 31/12 33/10
38/21 48/10 67/3 67/19
67/20 68/5 68/11 74/13
123/23 147/8 148/12
149/20 169/11

priced [1] 54/7

prices [7] 10/8 10/9
38/20 65/18 67/9 68/10
123/23

pricing [5] 54/9 56/6
66/24 67/1 67/16

prima [13] 4/8 80/7
81/2 83/21 83/24 95/17
96/15 96/21 127/20
151/2 153/25 154/3
171/6

prima facie [3] 81/2
96/15 153/25

primary [3] 75/10
137/22 156/7

Prime [7] 27/20 28/2
28/5 35/18 35/20 37/23
46/17

principle [1] 55/4

prior [2] 155/11 165/13

privacy [34] 5/8 5/11
5/19 6/1 6/17 7/2 7/7
7/9 7/13 7/16 7/18 7/20
7/23 7/23 8/3 8/4 14/16
14/18 15/7 15/18 15/18
15/20 16/5 17/3 33/3
33/6 63/7 63/8 64/7
64/11 64/16 64/18 65/2
65/7

privacy' [1] 6/23

privacy-based [1]
14/18

private [5] 7/15 7/22
64/23 64/24 65/2

probably [13] 31/12
47/2 50/25 53/14 57/15
58/21 71/12 78/2 107/1
119/10 145/9 158/21
162/12

problem [3] 26/16
100/9 124/5

problematic [2] 34/10
163/24

proceed [1] 170/23

proceedings [1] 1/9
2/20 172/4

process [3] 93/17
127/25 130/1 130/4
131/5 131/7 140/21
143/11 150/21 150/21

procompetitive [7]
38/11 38/14 146/7
147/12 151/1 157/1
166/5

produce [4] 38/19
38/21 101/16 104/3

produced [3] 2/21 37/5
39/4

product [59] 5/5 6/17
6/23 10/23 10/25 11/1
11/12 13/14 13/18
29/17 34/12 34/15
34/25 37/5 39/22 39/25
42/24 48/15 48/16
49/20 50/11 50/15
50/20 51/4 55/6 55/8
56/25 57/1 58/8 65/1
65/7 74/8 75/16 75/25
76/9 109/21 112/4
115/23 118/3 118/8
118/9 128/14 129/6
130/4 130/5 140/17
144/1 144/5 144/22
146/7 150/7 150/13
150/23 153/3 153/4
153/4 153/14 154/10
160/18

products [11] 16/9
42/9 43/7 46/22 49/9
50/10 55/23 56/15
74/19 77/8 145/4

Professional [1] 38/12

Professor [18] 14/20
18/14 45/23 45/24
47/18 51/14 51/15 92/9
97/14 99/18 104/12
111/23 128/19 157/21
158/15 158/23 165/5
169/16

Professor Baker [1]
51/14

Professor Murphy [4]
14/20 111/23 157/21
169/16

Professor Murphy's [2]
104/12 165/5

Professor Rangel [1]
158/23

Professor Whinston
[6] 18/14 45/24 51/15
92/9 97/14 128/19

Professor Whinston's
[1] 158/15

profit [7] 15/1 15/2
15/3 60/8 144/8 144/8
144/9

profits [2] 60/11 60/14

program [1] 27/18

progression [3] 61/6
164/5 164/6

prohibition [1] 112/17

prohibitions [1]
131/16

Project [3] 27/15 28/11
32/19

projected [1] 73/17

promise [1] 153/5

promote [1] 150/10

pronounced [2] 121/4
122/9

proof [3] 110/11
136/17 159/14

proper [1] 85/13

property [2] 94/25 95/8

proposal [4] 6/5 6/6
6/11 6/14

propose [1] 5/25

proposed [3] 6/3 34/1
111/12

proposition [3] 19/9
38/19 65/11

propositions [1] 49/12

prospect [1] 148/17

protect [6] 5/8 5/22 7/6
8/25 140/18 153/17

Protection [1] 2/3

proteins [1] 74/14

prove [7] 13/1 22/15
96/14 105/11 106/20
110/9 132/16

proved [1] 119/23

proven [1] 105/21

proves [1] 81/3

provide [5] 16/13 27/9
55/22 120/23 124/17

provider [1] 133/2

providers [11] 10/22
29/14 36/16 53/10
55/11 55/13 55/13
110/16 124/6 126/24
147/1

provides [3] 36/19
164/8 165/16

provision [11] 82/16
82/17 82/17 83/9 83/9
83/10 93/2 93/8 95/2
114/12 129/5

provisions [6] 91/7
93/6 95/5 129/18
129/19 132/7

prowess [1] 20/23

public [1] 7/16

pull [1] 29/7

pulling [1] 24/22

purchased [1] 97/16

purely [1] 61/23

purpose [8] 50/8 50/17
50/17 52/18 52/18
64/14 110/4 123/20

purposes [6] 29/17
37/12 37/15 51/5 51/7
52/22

put [35] 19/20 21/22
24/13 25/15 30/15 32/8
32/11 32/12 32/13
32/14 32/16 34/20 48/3
58/12 58/13 70/7 71/21
76/1 85/20 88/19 90/11
107/16 110/8 112/7
112/21 113/9 118/1
160/3 162/7 162/21
165/3 165/18 167/3
168/2 168/3

puts [1] 24/23

putting [11] 27/20 43/3
75/5 76/21 76/22 76/23
89/8 96/5 117/4 150/6
168/10

**Q**

qualitative [2] 49/9
154/7

qualities [1] 50/11

quality [72] 10/13
13/14 13/24 14/2 14/7
16/13 17/4 17/9 20/21
21/10 21/16 23/1 23/4
23/14 25/7 26/10 33/9
33/11 38/10 38/14
38/20 38/22 38/24 39/8
39/22 40/18 57/8 64/18
65/1 65/7 65/19 66/6
66/8 66/12 66/16 66/19
67/3 67/10 67/21 67/21
72/18 73/14 73/20
81/19 81/20 87/13
100/24 101/24 102/22
103/11 104/4 108/7
108/11 108/12 130/7
131/10 139/8 139/11
139/21 141/5 145/12
146/1 148/7 149/22
149/23 150/7 152/7
152/8 152/13 156/5
155/5 170/11

quality-privacy [1]
65/7

quantitative [1] 154/6

queries [71] 5/12 6/25
18/23 21/11 21/11
21/12 22/4 23/23 24/2
24/2 27/22 28/13 29/13
30/16 30/18 32/10 33/1
34/7 40/12 42/17 43/18
44/13 44/18 45/6 45/7
45/10 45/12 46/22 47/3
53/6 53/11 54/22 57/5
57/7 57/10 57/19 59/3
59/5 59/5 59/9 59/11
60/24 62/13 70/25
71/25 72/1 72/2 72/4
72/14 72/24 81/14
81/15 81/17 81/18
97/15 99/14 100/15
105/1 105/2 106/2
110/7 111/14 112/20
112/24 129/4 129/9
139/17 145/22 155/7
156/6 164/9

query [23] 24/3 24/23
27/24 29/18 29/18
34/11 34/12 34/15
34/25 35/12 48/22 49/2
51/11 51/11 58/8 58/9
69/21 69/21 70/8 70/8
102/17 103/16 106/1

quest [1] 38/14

question [69] 6/6 9/9
11/25 17/2 18/25 22/25
26/6 27/4 30/11 31/1
31/3 33/13 34/2 35/4
36/15 46/24 53/3 53/6

63/16 73/13 56/16 59/7
59/9 61/8 61/10 61/11
62/10 62/11 65/14 66/5
68/16 69/18 74/2 82/10
83/7 86/6 87/11 89/13
90/10 101/18 103/2
105/20 116/19 127/13
129/25 130/8 130/15
130/19 131/23 133/9
133/12 135/22 136/15
139/16 141/3 142/16
143/21 145/11 146/14
146/16 153/21 154/18
158/10 161/7 163/20
170/4 170/19 170/20
170/24

questioning [1] 8/20

questions [10] 10/7
21/6 21/9 23/20 40/4
62/10 65/9 89/22
127/21 128/11 135/5
136/6 161/5

quick [3] 3/24 79/3
169/25

quickly [3] 30/10 126/8
126/9

quite [4] 29/23 52/23
82/3 121/8

quote [2] 77/22 82/4

quoted [1] 77/17

quoting [2] 116/21
128/1

**R**

Raghavan [7] 6/4 6/21
14/16 28/1 33/3 35/16
63/22

Raghavan's [1] 63/16

raise [4] 65/18 67/18
68/5 68/10

raised [9] 38/9 39/18
40/4 67/21 72/8 87/17
119/25 121/3 121/9

raising [3] 121/11
124/7 124/10

Ralph [1] 2/4

Ramaswamy [18] 5/9
19/17 20/9 21/14 21/24
23/9 23/22 25/23 26/7
26/15 27/3 40/9 59/25
72/13 75/21 76/25 89/3
102/15

ran [1] 66/25

range [1] 92/21

Rangel [2] 85/19
158/23

rank [2] 21/20 25/2

ranking [5] 19/19 25/2
40/10 103/16 103/17

rate [1] 19/24

rates [2] 22/1 68/7

rational [4] 65/22 66/2
114/3 114/5

reach [3] 13/16 25/25
127/5

reached [3] 7/10 15/15
29/9

reaches [1] 29/8

**R**

recognizing [1] 148/25
recollection [1] 148/25
recommending [1] 7/14
reconstruct [2] 116/24 133/13
record [15] 8/24 11/13 12/14 13/21 40/7 45/8 54/19 64/23 69/22 71/7 123/7 126/21 127/9 147/20 172/3
recorded [1] 2/20
redesign [1] 144/1
reduce [3] 65/18 97/21 97/22
reduced [8] 107/19 107/22 107/25 108/14 126/15 131/19 132/24 134/4
reduces [1] 19/3
reduction [1] 127/17
refer [1] 41/17
reference [2] 41/6 128/21
referenced [5] 37/2 126/18 128/17 146/18 153/18
referring [3] 40/7 77/13 77/20
refers [1] 102/17
refine [1] 81/14
refinement [1] 103/16
reflect [1] 126/21
refusal [1] 5/7
refused [1] 6/2
regard [1] 36/21
regarding [1] 10/13
regardless [2] 102/5 164/22
regards [1] 137/7
regions [1] 113/16
Registered [1] 2/16
regularly [1] 14/2
rejecting [1] 6/20
related [4] 22/24 93/8 101/15 101/15
relationship [2] 152/15 160/22
relative [2] 23/1 141/7
relatively [1] 60/1
relevant [14] 8/10 9/8 24/25 27/4 27/6 29/17 46/4 46/4 53/3 55/25 108/8 129/24 133/20 133/22
reliable [1] 99/9
reliance [1] 79/18
relied [4] 8/16 8/17 23/19 137/13
rely [2] 29/1 66/21
relying [1] 20/21
remain [1] 161/10
remaining [1] 99/19
remains [1] 133/9
remember [11] 19/24 28/7 63/24 77/18 87/20 103/10 110/17 128/19 149/21 154/23 155/2

reaction [1] 64/6
read [6] 53/14 53/15 91/9 116/13 117/9 137/21
reading [2] 39/20 82/5
ready [1] 126/3
real [15] 86/24 90/5 97/12 115/7 115/9 132/5 132/14 133/6 136/20 136/22 138/21 146/16 146/21 150/25 154/12
real-world [8] 90/5 97/12 132/5 132/14 133/6 136/20 136/22 154/12
realistically [1] 115/18
reality [2] 111/20 113/22
realized [1] 107/9
really [32] 15/13 23/17 24/10 29/10 34/10 41/7 43/23 44/12 45/8 45/11 45/12 46/8 63/2 64/7 71/5 93/7 103/2 109/6 113/6 115/2 116/19 117/23 118/21 122/3 133/21 150/24 156/20 156/20 157/16 162/9 167/2 169/12
Realtime [1] 2/17
reason [18] 13/1 19/7 27/6 40/17 66/5 71/9 87/3 87/5 89/24 90/22 103/10 111/16 117/23 129/24 131/18 152/18 152/19 157/12
reasonable [3] 29/20 114/3 114/5
reasonably [3] 51/4 170/6 170/15
reasons [3] 36/14 101/20 131/1
Rebel [1] 79/19
rebuttal [4] 33/15 42/20 78/22 159/22
recall [5] 34/5 53/16 66/6 123/6 146/12
received [1] 40/12
recent [1] 77/23
recently [2] 107/8 147/21
recess [6] 80/10 80/11 126/1 126/2 171/10 171/11
recitation [1] 113/21
recognition [2] 26/18 170/22
recognizable [1] 67/11
recognize [5] 134/15 144/4 144/5 164/16 166/21
recognized [5] 5/24 41/21 117/4 124/9 163/2
recognizes [2] 92/19 92/20

remind [1] 38/11
remote [2] 72/17 76/22
renew [1] 148/22
renovations [1] 55/24
rental [1] 126/20
repeated [1] 149/8
repeatedly [4] 5/25 41/18 149/16 150/23
repeating [1] 128/16
replaced [1] 43/20
replacement [2] 28/24 135/13
Reporter [4] 2/16 2/16 2/17 2/17
reports [1] 128/22
represent [2] 79/24 160/12
represents [1] 96/17
reputational [1] 141/9
require [10] 4/6 4/7 29/16 43/3 52/15 123/5 132/2 139/22 139/23 167/4
required [1] 81/2
requirement [1] 95/25
requires [4] 26/17 79/16 116/15 164/17
requisite [1] 95/24
research [9] 15/7 35/16 35/21 37/25 46/17 46/17 46/21 46/24 47/1
resolved [1] 135/11
resounding [1] 53/9
respect [15] 7/15 7/18 7/23 8/2 40/8 41/3 42/22 77/8 82/18 95/8 119/24 131/1 133/2 142/17
respected [1] 8/5
respectful [1] 116/18
respectfully [2] 57/20 92/1
respite [1] 125/22
respond [3] 40/3 40/11 84/25
responded [3] 63/16 64/10 64/15
responds [1] 65/6
response [6] 44/17 45/6 63/20 64/6 129/10 157/11
rest [1] 94/17
restrained [1] 34/9
restraint [1] 56/20
restrictions [3] 131/16 134/3 151/12
restrictive [1] 163/22
rests [1] 124/25
result [10] 73/3 73/4 130/17 137/4 143/16 143/17 143/21 150/22 152/1 164/16
resulting [1] 27/17
results [5] 64/19 66/9 73/17 101/16 103/21
resume [2] 80/7 171/4

retailers [1] 27/19
retain [1] 45/21
retrieval [1] 103/16
return [2] 98/24 103/7
returning [1] 9/9
returns [4] 104/2 104/14 104/15 104/18
rev [15] 11/5 14/21 15/1 87/3 87/5 87/17 115/13 145/13 161/14 161/22 163/11 163/22 163/13 164/17 164/22
rev share [15] 11/5 14/21 15/1 87/3 87/5 87/17 115/13 145/13 161/14 161/22 163/11 163/12 163/13 164/17 164/22
revenue [10] 6/15 27/17 27/22 27/24 28/13 48/21 140/12 142/18 142/20 143/23
revenues [1] 60/9
reverse [1] 96/6
reversed [3] 146/13 150/8 166/6
Revolutionary [1] 34/22
rewrite [1] 143/14
rewriting [1] 92/14
rid [3] 104/22 135/14 168/12
ridden [1] 91/14
ridiculous [1] 153/8
right [119] 4/11 6/9 13/4 15/21 16/20 17/24 22/2 24/21 26/4 29/4 30/20 31/8 31/14 36/13 39/11 39/12 39/15 41/25 46/2 48/8 48/12 49/20 49/23 50/1 50/6 50/24 52/25 54/14 55/9 56/4 56/4 57/10 58/2 60/12 61/10 61/24 62/20 62/22 63/10 63/20 64/17 65/25 68/25 70/5 70/11 71/6 71/8 75/3 78/2 79/10 80/5 80/6 85/16 88/2 88/8 90/10 91/22 93/5 94/3 94/24 94/25 95/1 98/13 99/16 99/23 100/13 100/18 105/13 106/8 106/9 106/25 108/25 110/3 111/7 112/23 114/24 117/13 117/22 118/1 120/9 122/4 123/11 124/18 125/18 129/15 133/7 134/19 135/5 136/11 138/13 139/19 139/21 142/2 142/11 142/24 144/14 145/17 147/23 149/10 149/13 149/24 151/23 152/13 154/11 156/12 158/1 159/1 159/12 159/18 159/20

retailers [1] 27/19 65/7 165/14
167/9 168/19 169/18 170/20 171/2 171/3
RIM [1] 155/1
Ripken [2] 71/20 71/24
ripple [1] 146/3
rise [5] 8/9 80/9 80/12 125/25 171/9
rising [1] 18/21
risk [2] 111/8 112/8
rival [19] 13/3 13/4 85/8 97/5 97/20 107/13 107/14 114/15 120/6 120/10 120/24 121/1 130/7 131/3 138/20 139/2 139/5 150/17 167/17
rival's [1] 10/18
rivaled [1] 60/2
rivals [21] 5/6 11/11 13/24 14/10 33/2 82/7 83/1 84/14 84/21 84/22 97/4 99/4 107/21 108/18 108/19 108/25 114/23 119/8 119/24 120/17 169/12
rivals' [4] 10/9 97/21 108/14 124/10
RMR [2] 172/2 172/8
road [2] 24/15
rob [1] 27/22
room [1] 154/9
roommate [1] 24/13
roughly [3] 45/6 65/4 156/6
row [2] 126 12/6
RSA [15] 93/8 99/10 99/12 110/23 164/11 165/3 165/6 165/9 165/12 165/18 166/2 167/5 169/2 169/6 169/12
RSAs [1] 83/15
rubber [1] 24/15
run [5] 26/22 26/23 27/1 103/20 143/18

**S**

SA360 [1] 92/4
Safari [10] 92/15 93/23 99/14 100/25 109/17 109/20 143/8 156/3 156/4 161/24
safer [1] 40/1
safety [2] 34/21 39/25
said [88] 10/15 10/16 10/20 12/22 13/5 15/10 18/8 19/7 19/9 19/17 21/9 21/14 21/17 21/21 21/24 22/16 23/22 24/18 25/24 26/9 29/3 29/4 29/14 30/8 32/23 34/14 38/13 46/16 53/21 56/3 59/11 61/23 62/5 64/2 72/13 72/18 82/5 88/22 89/3 99/7 99/8 100/14 102/20 103/7 103/20

**S**

said... [42] 103/22
109/23 110/5 112/19
113/7 113/8 113/11
113/19 113/24 116/21
117/14 117/14 117/15
118/18 119/15 120/19
129/3 132/19 133/12
135/18 137/22 138/1
138/4 138/12 145/8
147/11 148/12 153/8
153/19 162/1 162/4
162/7 162/13 162/15
162/19 162/23 163/6
163/9 166/4 166/7
170/3 171/5
Sallet [2]  2/2 3/9
same [31]  7/10 13/15
28/21 31/22 38/3 38/8
44/20 48/18 49/10
50/14 51/5 51/7 53/22
55/8 55/11 58/12 58/13
62/7 65/4 67/2 100/7
106/18 117/18 118/22
121/15 133/1 137/16
148/5 155/12 164/19
164/22
Samsung [1]  108/3
San [1]  30/22
San Francisco [1]
30/22
sat [1]  161/13
satisfies [2]  76/8 83/24
satisfy [6]  45/19 83/20
92/10 93/13 95/16
153/25
save [2]  17/14 129/12
saw [6]  42/10 97/22
109/16 109/19 111/9
111/9
say [82]  3/24 4/4 9/11
12/10 13/17 13/19
16/16 17/19 19/13
19/14 19/24 20/7 21/9
25/24 28/15 33/4 38/21
38/25 39/5 45/3 47/14
48/17 49/13 49/24 57/8
61/6 66/3 66/23 66/25
69/20 69/25 71/19
72/13 75/4 75/7 75/9
75/15 87/25 91/23
96/10 96/13 97/25 98/7
99/25 100/1 101/12
103/6 103/11 104/1
108/16 112/14 113/20
114/1 116/5 116/6
116/14 117/2 117/7
117/20 117/22 120/13
124/24 125/9 125/11
131/25 139/3 140/25
141/19 143/14 144/21
144/25 147/7 150/15
151/4 152/3 153/13
153/23 157/11 164/14
167/3 169/8 169/11
saying [20]  19/25
32/17 41/12 67/5 69/7
74/12 83/11 84/9 93/1

111/10 111/11 114/19
138/25 145/1 152/17
162/10 163/22
says [31]  13/22 14/19
21/3 21/4 27/3 28/6
29/12 39/21 77/25 78/7
90/1 94/6 94/18 95/22
97/7 104/13 104/17
107/20 109/25 112/9
112/13 114/25 134/11
135/19 144/24 144/25
149/2 161/22 165/4
167/11 167/21
scale [60]  17/8 17/12
24/1 24/10 24/16 24/16
25/21 39/2 39/3 73/13
81/12 81/20 100/3
100/6 100/11 101/3
101/4 101/7 101/10
101/12 101/15 101/15
101/21 101/25 102/1
102/6 102/8 102/11
102/15 102/16 102/17
103/2 103/3 103/6
103/7 103/8 103/9
103/11 103/13 103/15
104/3 104/6 105/1
105/7 105/23 106/21
107/18 107/23 107/24
107/24 109/1 110/19
114/23 123/13 123/17
130/5 139/3 160/22
170/10 170/12
scenario [1]  137/9
schedule [1]  78/21
Schmidtlein [18]  2/12
3/11 15/21 19/13 39/12
42/19 48/2 71/17 71/21
72/8 78/11 97/24 98/6
125/18 126/3 155/21
159/18 166/7
score [2]  57/23 58/20
scores [2]  98/12
115/25
screen [10]  85/19
97/23 98/5 107/16
135/21 135/24 135/24
137/4 161/21 166/12
screened [1]  96/4
screening [6]  90/1
90/3 90/4 90/16 94/7
96/1
screens [2]  85/21
85/21
se [1]  134/14
search [156]  4/22 4/25
5/18 6/3 6/4 7/10 7/12
8/10 9/4 9/6 9/8 10/12
10/22 10/23 11/15
11/20 14/18 16/6 16/8
16/13 17/4 18/18 19/7
19/7 19/21 20/1 20/20
20/21 23/10 23/12
23/18 25/8 25/14 25/19
26/8 26/10 26/17 26/22
26/23 27/1 27/5 27/5
27/8 27/23 32/1 33/7

40/18 40/25 40/25 41/5
41/9 41/14 42/17 44/2
45/4 45/25 46/9 46/15
47/15 48/10 51/6 51/22
53/4 53/10 55/2 57/7
57/22 58/25 59/22
59/25 61/8 61/12 61/24
64/19 68/18 72/3 73/14
73/20 75/18 76/14
76/21 77/7 77/9 77/10
77/13 77/21 78/16
78/17 81/8 81/16 81/22
81/23 81/24 82/17
84/11 84/16 85/4 86/13
88/24 93/7 100/23
102/23 103/17 103/18
104/4 105/5 111/14
113/25 113/25 118/6
120/6 120/11 120/13
120/17 120/24 121/1
121/12 133/25 135/10
135/12 139/20 140/8
141/10 142/7 142/9
142/19 142/21 142/22
142/24 143/1 143/8
143/12 149/4 151/5
152/10 152/12 152/13
153/11 155/17 155/25
157/2 157/12 158/5
158/16 164/7 164/10
166/11 166/17 166/19
167/17 168/17 168/20
searched [1]  28/14
searches [16]  14/17
21/20 28/3 31/6 31/10
49/22 49/23 54/24 71/5
81/8 81/11 82/18 84/5
86/2 145/22 168/25
searching [11]  6/7 8/5
44/21 46/15 46/19
46/22 51/20 58/14 71/1
86/13 156/20
seated [1]  80/14
second [15]  14/19 21/5
22/3 32/5 76/8 80/21
85/15 112/22 117/10
121/6 165/21 168/10
168/13 168/17 170/18
secrets [2]  5/12 5/15
section [15]  2/3 90/21
93/11 93/22 96/25
108/2 110/10 112/9
116/21 116/22 116/22
117/16 133/16 134/11
161/12
Section 2 [1]  96/25
secure [1]  15/4
securing [1]  151/25
security [2]  64/7 64/8
see [35]  13/16 26/1
40/2 42/7 42/11 42/13
44/10 54/16 54/18
54/21 54/21 54/23
54/25 55/3 56/5 61/21
67/12 67/17 68/4 68/10
70/20 72/25 73/15
76/11 76/12 76/12

110/11 110/11 129/5
155/4 160/14 160/23
seeing [2]  24/3 38/2
seeking [1]  162/23
seeks [1]  162/9
seem [1]  148/25
seems [15]  12/5 13/13
36/20 48/16 49/10 51/2
62/7 86/11 89/15 91/18
106/19 106/23 141/11
143/21 144/6
seen [13]  25/16 26/10
33/1 46/18 57/1 58/21
61/1 61/14 65/2 150/4
156/13 157/4 160/21
segment [3]  35/8 35/10
35/11
selection [1]  157/17
self [1]  80/24
self-perpetuating [1]
80/24
sell [2]  74/12 120/22
seller [2]  42/13
sellers [2]  42/12 44/1
selling [2]  49/6 49/7
76/3
send [3]  27/2 112/23
125/5
sending [1]  112/15
Senior [1]  6/5
sense [14]  11/14 42/24
48/9 49/14 52/10 52/11
60/6 88/15 110/15
117/2 118/7 132/1
161/1 169/10
sent [2]  32/20 109/22
separate [6]  85/18 96/5
107/17 107/20 107/23
107/24
separated [1]  169/3
separately [2]  129/17
129/18
seriously [1]  147/1
SERP [5]  16/14 75/19
75/22 76/2 124/1
serves [3]  79/15 87/22
95/25
service [3]  30/25 43/6
110/16
services [5]  36/9 41/1
46/9 55/23 68/18
servicing [1]  9/4
session [3]  1/7 3/2
80/13
set [8]  10/17 17/19
17/22 44/13 104/15
118/3 163/10 164/12
sets [3]  10/8 17/13
165/12
setting [3]  7/20 13/23
16/22
settled [1]  87/20
several [2]  55/19 56/12
155/3
sexuality [1]  5/13
share [36]  4/22 5/14
11/5 14/21 15/1 18/15

18/25 48/4 69/23 70/13
76/13 76/19 84/21 87/3
87/5 87/8 87/17 101/6
102/5 102/12 115/13
135/1 143/23 145/13
152/1 161/14 161/22
162/16 163/11 163/12
163/13 164/17 164/22
shareholders [1]  66/4
shareholders' [1]
111/25
shares [2]  69/16 76/18
she [7]  15/15 110/3
110/5 110/6 112/18
112/19 112/21
sheet [2]  109/22
111/12
shelf [1]  12/11
shelved [1]  21/15
Sherman [10]  8/1
38/18 38/23 39/9 81/4
140/9 140/18 144/20
150/19 153/16
Sherman Act [10]  8/1
38/18 38/23 39/9 81/4
140/9 140/18 144/20
150/19 153/16
shift [2]  137/4 154/1
shifting [1]  61/19
shifts [1]  96/22
shocked [1]  128/10
shoe [12]  30/2 47/14
48/11 48/12 48/15 50/8
50/17 72/7 72/10 73/23
74/22 76/8
shooting [1]  73/6
shop [19]  41/24 42/1
42/7 44/23 48/4 48/5
48/25 51/10 52/1 52/5
52/9 52/10 52/11 52/19
53/4 74/8 74/15 74/16
75/21
shopping [13]  28/19
28/23 41/19 46/8 46/22
47/10 47/13 57/12
70/25 71/12 72/11 76/7
77/1
shopping-type [1]
70/25
short [9]  27/17 38/9
50/1 60/1 66/18 67/19
71/6 71/20 143/18
short-term [2]  27/17
66/18
shot [2]  22/18 23/5
should [36]  5/18 5/19
8/4 12/9 26/20 32/22
71/23 72/9 82/19 82/22
83/8 83/19 91/6 112/11
116/4 116/23 118/12
119/10 149/5 161/10
161/12 161/12 161/13
161/14 161/14 162/14
162/15 163/1 163/1
164/19 166/23 170/19
170/20 170/21 170/23
170/23

**S**

**shouldn't [4]** 9/16 31/12 31/22 36/22
**show [38]** 9/11 12/17 13/12 12/3 14/24 24/1 26/3 66/15 77/3 78/12 78/13 83/23 88/22 94/10 95/15 95/21 110/5 132/20 133/13 134/7 134/8 134/22 135/4 135/15 135/19 135/19 135/23 136/1 136/12 137/1 137/5 137/6 137/7 137/9 138/5 138/8 154/3 160/9 168/1
**showed [18]** 5/10 8/18 14/12 18/15 25/11 28/7 29/2 54/10 73/19 80/22 81/5 81/6 108/22 117/10 137/17 158/16 161/24 162/1
**showing [5]** 9/21 66/18 81/2 83/25 134/23
**shown [9]** 8/15 10/8 12/17 15/20 46/1 83/21 95/19 134/1 150/23
**shows [18]** 18/19 18/23 23/20 27/11 27/23 31/20 35/8 44/16 44/16 45/5 98/21 102/7 121/17 125/4 125/8 135/15 157/23 158/13
**sic [1]** 18/17
**side [12]** 10/10 13/15 14/3 14/3 23/18 25/1 26/3 26/3 41/8 41/9 49/15 165/11
**sidelines [1]** 161/13
**sides [1]** 51/16
**sign [6]** 165/6 165/9 167/11 167/16 167/17 167/18
**signals [2]** 44/21 102/21
**signed [4]** 148/14 165/7 165/15 169/4
**significant [18]** 17/9 31/4 31/5 37/17 37/21 73/24 79/12 79/16 79/21 79/23 85/24 87/7 87/9 88/12 95/25 111/9 138/18 144/8
**significantly [4]** 87/14 116/1 161/2 170/7
**signing [1]** 165/9
**signs [1]** 27/20
**similar [5]** 36/6 41/25 49/15 62/1 128/13
**Simon [1]** 117/14
**simple [1]** 16/3
**simpler [1]** 6/1
**simplifies [1]** 74/22
**simply [11]** 25/10 43/6 94/7 97/10 122/7 125/1 125/9 127/25 135/24 137/21 138/1
**since [5]** 18/19 82/5

**single [6]** 25/13 66/18 66/21 78/11 78/12 143/19
**sir [2]** 86/8 160/4
**sit [2]** 16/15 51/22
**site [7]** 24/9 47/16 48/24 49/6 49/7 52/21 58/7
**sites [1]** 54/24
**situation [5]** 39/23 39/25 41/24 62/7 135/11
**situations [1]** 151/15
**six [4]** 66/9 67/3 83/3 107/16
**size [2]** 36/11 81/15
**skill [1]** 149/23
**skip [2]** 127/19 130/17
**skipped [1]** 89/15
**slam [1]** 160/19
**slap [2]** 7/16 7/20
**slide [22]** 13/22 34/4 34/13 35/5 35/14 37/13 51/13 70/20 77/4 78/14 83/5 104/13 117/25 120/5 121/5 124/8 124/21 157/20 157/21 160/3 160/5 161/18
**Slide 10 [1]** 124/8
**Slide 2 [1]** 35/14
**Slide 3 [1]** 35/5 120/5
**Slide 6 [1]** 121/5
**slides [3]** 34/1 78/25 158/15
**slightly [2]** 83/7 141/3
**slot [3]** 146/16 146/20 146/21
**small [9]** 25/19 36/19 66/18 69/8 85/19 85/21 95/23 115/21 134/13
**smaller [4]** 36/10 36/16 46/20 60/2
**smart [1]** 107/10
**smartphones [1]** 156/24
**sneak [2]** 108/6 109/2
**so [266]**
**So I think [1]** 68/1
**so it's [3]** 46/21 101/21 171/3
**So the [1]** 84/12
**So there's [1]** 18/25
**so this Court [1]** 7/25
**so this is [4]** 70/21 158/8 162/10 162/14
**So this slide [2]** 157/21 160/5
**so this thing [1]** 160/11
**social [2]** 47/7 47/16
**Society [2]** 38/12 39/20
**sold [3]** 42/9 54/7 168/5
**some [97]** 4/6 4/7 7/12 11/10 11/18 11/23 15/7 17/7 21/8 21/15 23/21 26/8 29/13 29/13 29/15

33/14 39/6 40/4 41/2 41/6 44/18 45/14 45/20 49/6 50/22 52/15 58/7 58/7 59/19 60/11 62/2 64/18 66/3 67/1 67/16 67/20 68/4 68/9 70/1 70/21 71/10 73/11 75/5 76/2 82/3 82/21 87/12 87/21 90/23 93/6 100/21 100/22 101/2 101/15 101/15 102/6 104/15 104/23 105/9 108/21 115/21 116/8 122/17 122/17 122/18 123/2 126/11 127/21 128/5 128/19 130/18 134/25 135/5 135/7 136/6 136/24 137/12 140/13 141/23 141/25 142/20 143/1 145/15 146/11 147/7 148/16 148/20 149/9 151/6 151/25 152/10 152/15 159/11 160/23
**somebody [22]** 20/24 24/23 27/20 44/21 47/15 66/3 67/18 97/17 106/24 109/2 118/12 135/1 139/8 140/7 147/19 148/17 157/17 162/5 165/4 165/4 165/19 167/10
**someday [2]** 62/8 103/23
**somehow [8]** 65/19 69/8 126/13 126/15 127/8 129/12 141/5 159/14
**someone [3]** 139/20 143/24 146/15
**someplace [1]** 76/2
**something [21]** 10/18 13/25 16/21 23/23 23/24 24/5 24/24 72/8 74/14 76/9 76/24 88/9 94/10 116/14 126/19 135/23 137/7 139/24 162/22 164/3 164/8
**sometimes [1]** 67/19
**somewhat [1]** 41/25
**somewhere [1]** 52/12
**sorry [11]** 9/12 11/6 36/4 72/2 72/21 74/1 77/16 98/9 120/6 145/1 153/2
**sort [83]** 14/6 15/15 17/3 23/17 25/3 25/7 28/16 36/5 36/16 39/24 39/24 40/20 41/2 41/10 41/11 42/1 42/2 42/11 43/1 43/12 43/24 45/2 45/3 47/20 47/20 48/7 49/8 49/11 49/15 50/6 50/10 50/12 50/20 51/18 51/19 51/20 53/2 53/18 55/22 55/25 55/24 56/19 58/6 59/22

64/10 66/8 66/20 67/17 68/23 69/13 70/3 70/22 70/23 70/23 74/9 74/11 81/16 82/17 90/5 90/8 91/6 91/12 92/23 95/7 104/6 107/2 110/19 121/10 123/20 126/11 128/2 129/21 135/7 136/13 143/10 146/24 154/19 159/15 168/11
**sorts [4]** 58/3 58/25 130/9 146/3
**sounds [1]** 167/20
**source [3]** 35/24 48/21 103/1
**sources [1]** 99/6 127/15
**speaking [1]** 88/25
**special [2]** 24/16 52/13
**specialized [4]** 61/1 70/3 78/15 78/16
**specializing [1]** 44/13
**specialty [5]** 52/8 55/10 55/12 55/13 74/15
**species [1]** 91/13
**specific [6]** 10/22 11/1 14/11 14/15 49/5 83/23
**specifically [2]** 77/9 102/16
**spend [10]** 36/25 37/2 38/6 58/17 115/23 120/20 122/5 141/6 143/4 143/6
**spends [1]** 127/14
**spent [5]** 8/8 8/23 58/24 98/7 98/16
**split [1]** 156/6
**spoken [1]** 163/18
**sports [2]** 98/12 115/25
**spot [1]** 162/22
**springs [1]** 38/15
**square [1]** 107/2
**squarely [1]** 55/15
**SSNIP [1]** 48/9
**stall [1]** 5/2
**stand [1]** 152/3
**standard [5]** 12/25 108/18 134/21 136/17 164/5
**stands [3]** 80/9 126/1 171/9
**Staples [1]** 74/24
**start [19]** 34/3 34/4 35/22 35/23 37/23 46/19 46/19 46/20 47/15 49/8 57/14 71/4 84/2 85/12 120/16 125/20 125/21 160/13 164/6
**started [3]** 3/18 9/6 31/6
**starting [1]** 10/4 50/1 54/23
**startups [1]** 152/23
**starved [1]** 121/2

**statcaster [1]** 18/17
**state [1]** 123/7
**stated [1]** 55/5
**statement [3]** 77/15 160/15 160/25
**statements [2]** 17/16 73/13
**STATES [8]** 1/1 1/3 1/10 2/2 3/6 3/10 119/22 142/10
**States' [4]** 29/21 33/12 116/18 126/10
**station [1]** 107/6
**stay [1]** 78/20
**stayed [2]** 87/8 160/8
**steeply [1]** 137/15
**stenography [1]** 2/20
**step [15]** 25/13 29/21 29/24 74/5 80/22 81/7 89/15 89/21 89/24 93/2 140/25
**steps [2]** 26/18 112/9
**stick [1]** 167/15
**stickier [2]** 85/15 88/23
**stickiness [3]** 86/21 158/12 158/17
**sticky [4]** 85/2 85/3 85/7 85/17
**still [15]** 18/3 19/9 21/13 45/15 69/13 69/14 73/20 79/11 112/24 133/9 136/4 143/1 163/16 163/23 163/24
**stop [28]** 41/19 41/24 42/7 46/8 47/1 48/3 48/4 50/1 51/10 52/1 52/5 52/9 52/10 52/11 52/19 53/4 59/4 71/20 72/11 74/8 74/16 75/21 76/7 77/1 109/18 109/23 111/14 112/21
**stopped [4]** 21/5 22/5 111/15 111/15
**store [19]** 15/8 15/11 42/2 47/11 47/14 52/7 52/13 52/13 52/14 74/24 104/20 118/11 164/5 164/6 167/8 167/11 167/14 167/15 167/23
**stores [3]** 5/21 52/8 56/1
**strangle [1]** 5/2
**strategic [2]** 84/20 163/6
**street [1]** 1/14 74/15 118/24
**strip [1]** 92/23
**stronger [1]** 107/1
**struck [2]** 79/13 79/18
**structure [2]** 4/2 123/5
**structured [1]** 118/4 122/17 125/5
**struggling [1]** 13/16
**stuck [1]** 73/20
**study [4]** 27/16 28/8 44/16 73/15

**studying [1]** 54/25
**stuff [4]** 25/15 94/17
135/25 166/4
**sub [1]** 85/8
**subject [2]** 56/17 85/14
**subjects [1]** 5/14
**submit [3]** 36/7 56/21
137/7
**subscribers [3]** 137/14
137/16 138/16
**subsequent [1]** 154/5
**subsidiary [2]** 62/10
129/18
**substantial [15]** 42/7
44/6 55/1 56/18 61/15
70/25 73/18 90/17
101/12 124/16 131/17
131/18 132/5 132/9
170/22
**substantially [2]**
128/13 128/13
**substantive [1]** 40/21
**substitutability [1]**
34/3
**substitute [13]** 31/10
41/16 43/22 46/14
54/13 56/6 56/7 57/10
57/18 118/11 118/13
118/15 118/16
**substituted [3]** 31/10
51/7 51/12
**substitutes [5]** 29/20
29/20 36/1 38/1 118/15
**substituting [1]** 57/14
**substitution [12]** 30/13
31/4 31/4 37/18 37/21
38/2 41/23 44/9 54/17
54/21 67/12 118/9
**succeed [5]** 6/18 20/5
22/21 23/6 61/24
**success [1]** 160/23
**successful [1]** 100/3
**successfully [2]** 65/18
155/18
**such [14]** 13/19 14/12
14/16 24/23 31/11
43/19 43/25 56/17
92/12 92/13 92/14
118/4 118/4 120/14
**sufficient [14]** 23/13
31/18 38/2 59/8 91/18
91/24 94/19 95/16
103/8 120/25 124/17
139/2 139/3 149/14
**sufficiently [2]** 11/11
31/5
**suggest [8]** 27/7 34/6
41/10 50/22 68/8 71/13
147/10 159/7
**suggested [4]** 38/7
116/6 116/9 164/19
**suggesting [2]** 66/11
164/21
**Suggestions [9]** 91/1
92/15 94/13 111/13
112/2 112/18 114/2
114/21 129/10

**suggests [3]** 5/3 11/22
93/23 109/21
**suicide [1]** 151/7
**Suite [2]** 2/5 2/10
**suites [1]** 47/24
**summary [4]** 119/23
127/23 129/16 161/8
**super [1]** 14/22
**SuperDuck [1]** 100/1
**superior [2]** 149/22
151/16
**supermarket [2]**
118/23 118/25
**supplement [1]** 54/1
**supplements [1]** 54/4
**suppliers [6]** 36/11
44/10 56/8 56/19 56/23
120/1
**supplies [2]** 55/23
55/24
**supply [1]** 56/15
**support [3]** 29/2 86/24
127/10
**suppose [4]** 86/12
135/22 140/6 167/3
**supposed [1]** 167/6
**suppress [1]** 124/11
**Supreme [2]** 38/12
38/17
**Supreme Court [2]**
38/12 38/17
**sure [37]** 8/1 9/14 16/2
27/14 29/23 31/23
33/24 43/12 44/25
57/11 67/22 69/2 74/4
75/3 85/9 86/25 91/12
92/18 94/7 95/10
106/16 114/20 114/21
116/20 119/11 119/18
121/7 122/20 123/19
125/21 126/5 130/13
135/1 150/5 150/6
161/8 169/24
**Surescript [3]** 19/1
21/4 22/16
**surprised [2]** 10/4 91/8
**surprising [1]** 167/12
**surrender [1]** 30/3
**surrendering [1]** 5/19
**survey [1]** 15/8
**surveys [1]** 5/10
**sustain [1]** 44/5
**SVP [10]** 30/22 31/17
34/16 34/18 47/16
49/10 49/25 51/7 54/3
123/4
**SVPs [38]** 27/7 27/11
30/13 30/16 30/18
31/17 31/18 31/21 32/1
32/2 32/3 34/3 35/25
36/17 37/21 47/6 47/7
49/4 49/25 50/23 50/24
57/14 61/1 72/4 77/21
78/6 120/1 120/12
120/16 120/21 121/9
121/19 122/18 123/16
123/21 126/14 126/23
127/18

**sweep [1]** 44/8
**Swift [1]** 24/3
**switch [17]** 77/10 85/2
85/5 85/6 86/17 86/20
87/2 87/6 87/7 87/24
87/25 88/11 88/16
88/19 117/25 148/4
160/2
**switched [6]** 87/4 88/1
100/5 148/1 158/18
158/19
**switching [4]** 47/4 85/6
145/25 157/18
**syndicator [2]** 22/8
22/9
**Sysco [4]** 36/6 36/20
42/1 75/15
**system [8]** 19/19 53/23
54/8 130/23 133/10
133/15 164/1 168/3
**systematically [1]**
114/23
**systems [1]** 62/4

**T**

**tail [3]** 24/10 81/17
92/4
**take [32]** 11/23 30/25
33/12 60/11 60/22
62/15 74/5 79/1 79/22
80/6 82/14 84/24 86/6
89/10 90/13 93/22
99/10 99/12 115/6
119/14 125/20 125/23
139/19 139/20 140/10
141/9 157/19 159/20
159/22 159/23 164/7
167/23
**taken [3]** 26/5 108/6
164/20
**takes [4]** 15/2 23/17
140/7 169/8
**taking [8]** 22/25 25/6
26/6 29/13 32/23 34/7
114/17 165/12
**talk [31]** 4/7 13/5 15/17
15/24 20/16 27/14
36/24 38/10 40/24
41/18 44/15 59/17
67/22 67/24 70/1 72/7
81/21 99/11 115/16
127/19 127/20 129/14
129/20 129/21 130/21
132/1 156/24 161/19
164/24 165/2 169/4
**talked [13]** 27/13 48/13
104/11 110/13 117/11
131/21 131/25 140/20
152/9 156/3 159/3
163/25 164/1
**talking [29]** 14/20 20/3
20/5 24/1 36/16 41/5
41/7 70/6 70/6 77/6
77/7 77/13 78/10 86/4
92/6 98/22 102/23
102/23 106/17 117/1
120/20 122/10 128/12

**talks [6]** 37/13 38/4
51/14 74/9 116/11
116/11
**tall [1]** 58/22
**Tampa [1]** 154/4
**tax [1]** 29/14
**Taylor [1]** 24/3
**tech [1]** 20/22
**technologies [1]** 61/19
**technology [1]** 76/15
**tell [9]** 5/12 19/12
60/17 65/21 68/11
88/19 94/2 94/3 97/1
97/1 97/2 100/8 105/8
106/23 109/6 119/5
121/18 124/13 162/11
**telling [7]** 32/14 32/15
32/17 59/24 78/4 92/22
167/17
**tells [10]** 25/14 25/17
29/9 32/6 32/7 38/7
42/5 89/20 98/3 161/23
**ten [7]** 13/19 59/16
60/16 61/16 148/15
148/18 170/21
**ten-plus [1]** 60/16
**ten-year [1]** 148/18
**tend [1]** 28/2
**term [11]** 22/23 27/17
66/18 76/25 89/25
90/17 92/12 92/14
109/22 111/12 149/3
**terminated [1]** 127/4
**terms [30]** 3/24 4/2
11/11 14/7 16/12 20/14
48/14 53/16 56/9 56/25
60/17 61/5 68/9 82/24
83/14 83/16 83/24
84/11 89/9 92/11 92/12
95/11 97/2 104/8
110/19 110/20 110/23
111/1 116/13 127/5
**terribly [1]** 57/13
**territory [1]** 164/13
**test [9]** 37/16 48/9
66/18 90/21 128/8
128/12 130/19 170/5
170/13
**testified [16]** 19/5
20/10 40/9 59/11 73/13
77/20 97/14 98/22
103/3 108/12 110/1
120/18 120/18 129/7
129/8 169/16
**testifying [2]** 15/14
89/3
**testimony [42]** 8/16
20/12 22/3 25/5 26/14
40/18 45/11 63/1 63/16
64/12 73/2 73/10 75/21
77/12 81/19 84/7 85/16
85/17 85/20 98/25 99/6
102/14 103/4 103/15
104/13 104/21 104/25
109/20 111/23 115/17
118/10 118/18 122/15

**152/5 154/6 164/13
154/21 155/15 164/4
165/5 167/14 168/15
testing [4]** 26/2 26/3
32/2 32/3
**text [2]** 81/23 81/24
**than [49]** 4/22 11/15
15/10 15/23 17/12
19/25 35/10 39/1 39/8
39/21 40/2 40/19 40/23
42/24 48/20 50/19
53/15 53/19 55/3 60/19
60/21 64/23 64/24 71/2
71/15 73/12 76/9 85/17
85/22 101/13 102/19
108/23 109/21 110/14
111/21 115/19 118/19
125/1 127/11 135/19
135/20 135/24 142/8
146/1 146/24 147/2
155/6 158/24 163/22
**thank [22]** 4/12 4/15
4/17 39/10 39/11 71/17
78/23 80/4 80/5 80/6
80/8 80/18 125/16
125/17 125/24 126/7
159/19 159/25 160/4
171/1 171/2 171/8
**thank you [16]** 4/12
39/10 39/11 71/17
78/23 80/5 80/6 80/18
125/16 125/17 126/7
159/19 159/25 160/4
171/1 171/2
**thank you very much
[1]** 4/17
**that [1152]**
**that'll [1]** 164/16
**that's [169]** 10/18 11/2
12/15 12/21 13/25 17/1
18/4 18/5 19/25 20/1
21/17 21/17 22/16
22/17 22/21 24/15
24/15 24/17 24/20
25/15 27/6 27/23 28/5
28/5 28/6 29/17 30/1
31/12 31/13 32/4 32/14
32/16 35/3 35/21 35/25
36/5 37/8 37/10 37/25
38/21 38/22 38/23 39/8
41/9 41/14 42/9 42/15
42/25 43/1 43/5 43/9
43/11 43/24 44/14
44/19 48/23 50/12
50/12 51/13 51/25 52/3
52/14 52/19 55/3 55/5
56/4 56/4 56/23 57/15
57/19 59/7 61/11 63/9
63/11 69/14 69/21 73/1
74/11 78/9 78/9 80/1
80/1 86/22 87/14 88/20
88/25 89/3 89/6 89/6
89/7 90/21 90/24 90/24
93/7 94/15 96/18 99/15
99/16 99/20 99/25
103/24 107/10 107/20
107/25 112/9 112/16
112/21 112/24 113/2**

**that's... [60]** 115/13
119/5 119/13 120/15
122/2 124/2 124/3
124/6 124/9 124/11
125/1 130/19 130/19
132/2 132/19 132/19
133/3 134/2 134/6
134/14 135/14 138/4
139/9 139/10 139/20
139/22 140/7 146/9
147/13 147/17 147/18
149/22 150/4 151/10
151/10 151/13 152/4
152/17 152/18 153/7
153/7 153/16 153/20
153/25 156/11 156/15
158/21 159/10 160/16
165/7 165/23 166/5
166/5 167/2 167/24
168/24 170/11 170/13
170/19 170/24
**theme [1]** 86/20
**themes [1]** 11/9
**themselves [8]** 21/9
32/3 40/15 72/24 76/12
112/4 114/15 163/3
**then [69]** 4/3 5/10 5/15
6/23 9/7 9/17 12/24
16/22 20/11 21/20
29/12 30/25 44/7 48/11
51/14 52/13 54/13 55/1
61/8 64/9 67/12 72/7
72/16 81/3 81/3 82/8
83/15 85/23 87/22 89/8
90/4 92/3 92/4 93/6
94/10 96/6 96/22 97/10
101/3 101/14 105/20
107/2 110/19 111/11
113/5 113/12 118/16
121/16 124/19 125/22
125/23 132/2 134/22
136/9 140/1 140/11
143/4 143/25 145/10
145/12 148/11 148/19
153/14 153/25 159/23
159/23 161/8 165/18
165/18
**theory [12]** 31/15 39/1
74/2 74/3 88/14 113/1
120/10 121/10 125/2
126/11 168/21 170/9
**there [162]** 9/20 9/23
11/22 15/2 15/4 15/5
16/4 16/5 17/4 17/4
20/6 22/4 23/21 24/25
25/10 26/20 27/13
28/17 28/19 30/12
30/16 31/3 32/17 36/6
36/10 41/22 43/12 45/6
47/12 47/23 52/8 52/8
52/25 53/17 53/21 54/9
54/12 55/21 57/21 59/8
59/12 59/20 59/22
60/10 60/13 60/19
60/21 61/3 61/10 61/13
61/14 61/17 61/21
62/11 62/12 62/12
62/17 62/17 62/19
63/13 63/18 64/11
64/17 64/25 65/5 67/15
68/5 69/22 70/13 71/3
71/12 73/6 74/5 75/1
75/17 75/18 75/18
78/15 84/16 86/1 87/4
87/18 87/22 88/25 89/8
88/25 90/5 90/16 91/17
92/12 94/20 94/23 95/7
95/8 95/9 97/2 101/14
101/18 104/3 105/3

**theirselves [1]** 47/2
**them [74]** 7/1 10/6
11/23 16/22 28/17
28/22 29/20 33/2 35/20
37/4 38/3 42/20 44/4
48/23 56/24 58/17 59/4
61/15 65/17 65/22 72/4
72/20 76/16 76/17 79/1
81/10 83/4 83/19 84/6
84/8 84/17 84/19 84/19
86/18 86/24 87/3 87/5
102/9 104/22 105/23
107/16 108/9 109/4
109/12 109/22 112/20

122/20 122/22 122/23
124/3 124/4 124/17
126/6 128/5 129/3
130/24 131/17 135/14
137/17 138/4 141/24
147/15 152/23 153/8
153/9 155/19 162/7
164/20 165/11 170/10
170/11
114/14 114/15 114/24
115/1 115/9 115/19
118/14 119/2 119/4
120/11 120/14 121/19
124/15 126/24 128/3
129/5 129/22 130/9
132/4 132/25 133/5
133/6 133/9 135/16
135/22 137/8 137/8
137/18 139/12 141/24
142/3 142/5 142/7
142/9 144/17 145/5
146/16 146/17 146/21
149/1 152/12 152/21
152/22 153/10 154/9
156/7 157/8 157/9
158/4 159/11 159/23
160/11 162/16 166/14
167/3 168/14 169/7
169/16 169/19 170/21
**there's [87]** 11/25
14/22 14/25 15/19 17/6
18/7 18/25 20/25 22/11
22/14 22/19 22/21 23/6
25/9 25/21 26/12 29/3
29/11 30/6 41/2 42/15
43/2 43/6 43/18 43/21
47/4 47/10 52/9 57/9
58/1 58/3 60/18 61/2
61/12 64/22 64/22
68/18 69/4 69/19 70/25
71/6 74/14 74/25 75/15
78/8 82/9 94/19 103/1
104/13 104/18 105/3
105/15 105/15 114/19
114/20 115/7 117/7
117/8 117/23 120/4
125/4 127/14 127/17
128/4 129/5 137/22
137/23 137/24 141/24
142/20 145/14 146/25
147/7 148/12 148/16
148/21 149/9 150/5
150/25 152/7 152/12
152/14 155/22 157/12
160/21 168/4 171/5
**thereby [1]** 127/25
**therefore [2]** 120/12
126/14
**these [75]** 4/6 5/5 5/6
5/24 15/1 15/2 15/4
21/25 26/17 31/21
32/15 32/18 33/2 33/8
36/22 41/23 44/10
44/11 45/4 46/14 47/6
47/7 49/9 49/25 53/17
53/25 56/18 56/22
62/10 64/3 78/1 78/25
82/1 83/8 83/23 89/8
91/15 93/6 95/5 97/7
98/20 105/21 107/21
108/9 109/11 113/2
116/6 116/9 117/17
117/18 118/18 119/4
127/21 128/11 129/16
129/18 130/18 131/13
131/16 132/17 134/24

143/13 147/1 150/14
151/12 151/15 154/19
155/16 157/1 165/9
166/24 167/22
**they [462]**
**they'd [1]** 153/9
**they'll [4]** 41/11 47/1
78/6 117/22
**they're [65]** 9/24 14/10
14/17 14/21 14/23
14/24 20/7 27/12 27/20
28/12 29/13 32/9 33/9
35/19 36/17 37/10
37/24 37/25 45/20
45/21 47/1 47/8 49/14
49/15 49/18 51/24
57/17 59/4 65/7 65/22
76/5 76/13 76/21 76/22
76/23 79/23 82/2 84/4
85/3 85/13 85/18 86/3
88/20 92/8 92/14
100/16 100/18 100/19
102/6 102/7 104/14
106/10 122/10 123/21
123/21 124/2 124/19
143/1 143/11 144/16
149/8 149/11 157/16
160/24 165/1
**they've [25]** 12/22
15/25 33/10 39/2 47/6
58/24 63/9 65/4 67/21
104/3 108/9 116/6
116/8 122/14 123/17
124/21 125/12 128/24
130/18 135/18 135/19
135/23 145/7 158/18
165/6
**thing [16]** 3/24 32/22
33/20 48/18 67/2 75/7
75/25 84/11 87/1
112/15 112/22 117/10
159/7 160/11 167/2
169/5
**things [22]** 13/13 26/9
35/16 41/9 48/14 49/15
49/16 51/23 55/25 64/3
85/18 88/17 94/14
112/15 130/9 131/13
149/23 157/1 162/24
166/11 167/22 169/5
**think [126]** 11/13 11/14
14/11 15/19 16/4 17/6
21/21 22/19 30/11
30/12 31/1 32/12 33/4
33/5 36/15 39/19 40/6
41/1 41/6 41/19 41/20
41/24 42/14 43/9 44/7
44/14 45/8 45/23 46/11
48/17 49/21 50/8 50/9
50/16 50/21 51/3 52/1
52/5 52/19 53/14 53/17
55/17 56/21 57/4 57/15
57/21 58/10 58/11 59/7
59/11 59/18 59/20 60/9
60/12 62/9 62/14 62/18
63/2 65/4 65/14 65/20
66/7 67/8 68/1 68/2

70/19 71/5 71/9 71/15
82/12 84/3 86/24 93/4
94/3 98/6 99/7 99/13
99/15 99/17 101/11
103/9 104/25 106/25
108/8 110/18 113/24
114/1 116/5 116/8
117/20 119/19 121/19
121/21 127/13 127/23
128/3 129/15 129/16
129/17 129/22 133/5
135/4 135/19 136/5
136/15 138/2 138/12
141/3 147/4 148/23
149/8 149/19 149/19
153/24 154/4 158/14
158/21 158/22 158/22
159/10 161/7 167/5
**thinking [3]** 6/19 51/3
97/5
**thinks [1]** 145/7
**third [7]** 18/17 76/18
83/16 112/15 112/24
126/24 127/15
**third-party [5]** 83/16
112/15 112/24 126/24
127/15
**thirds [1]** 87/23
**this [265]**
**This is Civil Action [1]**
3/6
**those [62]** 8/13 21/2
28/12 37/1 41/4 42/14
45/7 45/9 45/10 47/2
49/8 54/5 54/11 54/20
55/1 55/1 55/8 55/12
55/13 56/8 57/3 59/3
59/10 60/11 71/1 71/5
82/20 83/15 83/16
84/10 84/14 84/16 87/9
87/12 88/17 89/12 91/1
92/10 92/15 94/12
95/16 95/16 96/5 96/7
97/1 97/3 97/3 100/11
102/4 110/15 114/8
122/19 136/6 139/17
145/2 149/23 150/16
155/8 159/13 165/24
166/10 169/14
**though [11]** 6/24 32/13
56/9 65/20 67/15 76/14
85/24 144/21 150/12
150/16 168/9
**thought [20]** 8/18 13/8
19/22 21/14 24/17
31/11 32/10 64/25
77/22 78/3 88/8 98/4
112/6 121/10 133/4
133/11 138/24 141/19
145/25 147/6
**thoughts [1]** 48/4
**thousands [1]** 103/21
**threat [2]** 132/18
138/21
**threats [3]** 62/3 170/15
170/16
**three [7]** 19/17 19/23

**three... [5]** 31/24 73/16
82/9 87/15 161/16
**through [28]** 11/23
18/12 30/2 30/23 34/1
34/22 39/2 39/3 39/6
72/10 81/25 93/9 95/20
97/15 97/19 99/14
106/8 106/10 106/11
132/12 137/22 138/10
150/24 156/6 157/15
158/16 168/8 169/6
**throughout [1]** 102/25
**Thurman [1]** 55/20
**thus [1]** 19/3
**tick [1]** 68/7
**ticket [1]** 52/24
**tie [1]** 92/8
**tied [1]** 139/4
**TikTok [2]** 32/8 32/14
**time [49]** 4/4 4/5 8/19
9/13 9/13 16/24 18/21
19/3 24/4 29/21 29/23
29/25 30/9 33/12 33/14
33/19 37/24 40/14
40/23 53/19 58/18 59/2
60/1 63/17 64/15 67/17
68/7 82/3 86/7 87/21
91/14 102/21 103/1
103/19 104/23 108/6
108/6 108/21 113/8
115/3 116/2 116/18
119/14 119/16 120/19
124/13 130/10 155/12
157/6
**time-consuming [1]**
19/3
**times [2]** 30/24 71/4
**timing [1]** 3/25
**Tinter [1]** 147/11
**tires [1]** 63/23
**titled [1]** 172/4
**today [21]** 4/2 11/15
13/6 13/7 19/10 40/24
53/20 61/25 62/5 62/8
68/6 101/10 101/13
108/25 113/22 142/1
142/2 143/16 146/18
153/5 170/20
**toes [1]** 149/15
**together [6]** 28/23 42/9
74/7 74/20 117/5
165/10
**told [4]** 71/20 113/4
151/20 153/7
**tomorrow [13]** 4/3
10/11 40/25 41/4 58/1
61/24 67/2 67/23 67/24
70/1 81/21 116/7
145/24
**too [8]** 12/10 18/4
33/15 49/1 103/20
138/22 158/25 165/11
**took [1]** 91/9
**tool [1]** 27/5
**tools [3]** 5/7 5/20 6/1
**toothless [1]** 12/25
**top [4]** 19/20 21/22

**topics [2]** 4/6 51/20
**toppled [1]** 134/2
**totally [1]** 75/16
**touched [2]** 127/22
128/5
**touches [1]** 4/24
**towards [2]** 40/16
40/17
**Tower [2]** 58/22 58/23
**track [1]** 82/1
**trade [6]** 120/25 122/7
122/22 122/22 123/8
127/17
**tradeoff [6]** 16/16 17/4
17/6 18/5 64/18 65/8
**tradeoffs [2]** 16/4 16/5
**traffic [18]** 84/16
106/21 120/25 121/2
122/2 122/8 122/11
122/21 122/22 123/8
124/2 124/3 124/6
124/17 125/1 125/5
125/10 125/14
**Trail [1]** 34/22
**train [4]** 17/10 107/6
107/7 107/8
**transcript [5]** 1/9 2/20
32/21 72/15 172/3
**transcription [1]** 2/21
**trapped [1]** 159/15
**travel [5]** 34/20 34/21
50/24 54/24 122/13
**treatment [1]** 93/23
**trial [9]** 1/9 8/16 41/21
46/12 77/20 126/18
129/2 129/13 157/22
**tried [10]** 33/10 51/14
72/23 73/3 78/1 115/1
115/2 126/13 128/19
136/21
**tries [3]** 43/17 109/2
131/25
**trip [1]** 107/9
**Tripadvisor [3]** 37/7
122/1 124/20
**trouble [1]** 77/3
**true [9]** 7/16 21/13
37/10 85/23 113/20
123/15 158/23 160/8
160/9
**try [11]** 41/11 47/12
69/25 78/19 78/20
90/11 109/12 139/6
144/9 149/4 153/3
**trying [15]** 49/15 49/18
56/14 56/15 60/10
60/15 64/10 65/7 72/16
78/7 78/13 101/9 101/9
115/12 123/6
**Tuesday [1]** 4/16
**turn [5]** 9/7 10/6 92/4
116/23 143/19
**turning [3]** 27/4 80/21
89/1
**turns [3]** 28/8 28/12
81/19
**two [45]** 4/4 9/20 13/12

60/16 60/16 60/18
60/19 60/21 61/15 65/9
73/16 85/18 87/12
87/23 88/17 90/14
95/15 95/16 95/16 96/7
96/8 97/1 98/23 114/8
116/6 118/5 120/21
121/18 121/19 123/24
126/17 132/10 137/22
139/21 139/23 141/8
161/4 165/9 166/11
168/5 169/23 169/25
**two-thirds [1]** 87/23
**tying [4]** 167/19 167/20
167/24 168/1
**TYLER [1]** 2/9
**type [15]** 5/12 13/12
30/18 39/24 43/4 44/24
54/16 54/18 58/19
58/22 58/22 70/25 71/5
137/9 151/13
**types [13]** 21/10 22/4
42/13 43/7 44/17 44/17
54/25 55/7 70/23 71/11
105/22 112/17 130/22

### U

**U.S [7]** 1/13 9/4 94/21
97/15 115/23 128/1
142/7
**ubiquitous [1]** 47/8
**ultimate [1]** 37/16
**ultimately [6]** 9/20 31/3
95/9 109/24 111/21
133/8
**unable [3]** 10/19 22/20
22/20
**unavailable [1]** 97/3
**uncontradicted [1]**
46/12
**under [17]** 39/9 75/22
90/21 91/19 91/21
93/11 93/22 96/7
110/10 118/2 133/19
134/11 135/13 140/24
141/12 154/4 165/24
**undercut [1]** 60/6
**underline [1]** 78/13
**undermine [1]** 23/17
**understand [22]** 5/20
23/9 24/20 42/21 42/21
42/23 47/22 59/1 60/8
74/20 75/9 86/19 89/20
91/2 101/10 105/10
123/1 123/17 135/2
137/21 158/13 159/9
**understanding [2]**
43/8 135/7
**understood [5]** 64/19
69/11 120/10 136/16
156/19
**uneconomical [1]**
151/23
**unfortunately [2]**
57/23 63/25
**uniform [1]** 104/25
**unilateral [1]** 5/4

**unique [4]** 74/8 74/9
75/15 76/9 77/7 84/9
**Unit [1]** 2/3
**UNITED [6]** 1/1 1/3
1/10 3/6 30/25 142/10
**United States [1]**
142/10
**United States of [1]**
3/6
**universal [2]** 77/11
77/22
**universally [1]** 45/16
**unlawful [1]** 166/8
**unless [7]** 119/2
151/21 152/11 152/12
153/4 165/6 167/11
**unlike [1]** 52/12
**unlikely [3]** 79/24
141/11 168/21
**unquestionably [2]**
41/22 125/13
**until [1]** 72/8
**up [47]** 4/5 4/18 19/13
21/16 25/16 27/20 29/6
47/19 49/8 50/18 59/19
68/7 78/19 84/8 87/9
88/17 92/8 98/7 100/5
100/15 100/18 101/11
107/20 109/10 109/14
113/15 115/12 118/3
119/11 126/7 126/9
126/17 129/13 139/4
139/17 147/12 148/15
148/24 152/3 152/23
160/3 160/9 163/3
164/12 167/7 168/23
169/9
**upon [5]** 49/6 95/24
108/11 109/14 137/13
**uproar [1]** 63/18
**us [29]** 5/5 5/21 7/5 7/8
10/1 32/17 32/23 33/1
42/5 60/17 74/11 78/4
88/15 88/20 97/1 97/1
97/2 98/3 105/8 109/6
110/7 115/24 119/5
147/8 151/5 151/23
153/14 162/12 163/10
**usage [12]** 70/22 87/8
131/19 138/19 145/15
145/16 145/21 156/11
157/2 157/24 158/2
158/5
**usdoj.gov [1]** 1/16
**use [16]** 5/5 5/20 27/5
28/22 32/25 40/10
41/13 47/20 78/5 90/3
145/21 151/9 156/9
158/14 158/14 168/11
**useable [1]** 45/17
**used [13]** 8/21 8/21
22/23 30/16 35/17
57/13 76/25 117/18
117/19 130/21 130/22
137/17 168/2
**useful [2]** 19/2 96/1
**user [23]** 11/1 20/22
23/13 23/18 24/21 25/4

75/1 76/9 77/7 84/9
**user's [2]** 17/16 111/4
**user-data [1]** 24/21
**user-side [1]** 23/18
**users [59]** 5/6 5/7 6/1
6/7 6/14 7/19 10/22
15/20 18/3 18/8 29/20
31/7 41/16 41/16 42/25
43/2 43/13 44/19 44/19
46/13 46/17 46/19
46/20 51/16 54/23 56/5
65/5 66/16 66/20 67/7
71/1 86/16 86/16 87/23
109/22 111/19 111/21
111/25 112/5 112/5
122/12 122/19 141/16
143/16 143/17 143/21
145/22 146/3 146/8
148/1 151/9 152/13
152/14 152/16 156/10
158/14 158/16 159/13
159/13
**users' [2]** 17/16 111/4
**uses [9]** 5/21 17/10
43/15 76/10 89/25
90/17 101/16 109/3
117/17
**using [10]** 21/5 27/21
34/1 43/22 64/18
111/13 127/4 137/14
137/16 159/8
**usually [1]** 68/7

### V

**valid [1]** 6/24
**validate [1]** 29/3
**valuable [6]** 81/7 81/9
84/3 84/4 104/15 145/3
**value [5]** 77/8 84/19
101/5 104/24 124/3
**Varian [4]** 32/20 32/23
74/9 77/6
**variety [4]** 36/14 82/6
106/10 122/17
**various [1]** 40/20
51/23 55/7 61/20 65/15
126/23 131/1 132/7
132/7 132/8 155/14
**varying [1]** 36/11
**vast [1]** 40/11
**VC [2]** 19/8 20/11
**vendors [2]** 78/15
78/16
**venture [3]** 19/5 60/2
152/22
**version [3]** 32/19 74/8
137/14
**versus [3]** 3/7 17/4
148/7
**vertical [10]** 42/16
43/23 44/10 53/10 55/2
57/12 57/12 121/23
124/20 124/22
**verticals [14]** 40/20

Case 1:20-cv-03010-APM Document 1112-6 Filed 07/11/24 Page 198 of 199

**V**

verticals... [13] 40/22 41/23 45/4 45/9 50/24 54/25 57/9 57/15 70/23 71/11 71/16 112/15 112/24

very [57] 4/17 18/13 26/8 27/16 28/21 30/10 37/15 38/18 39/20 40/2 40/2 40/2 40/19 42/7 42/7 45/7 46/16 49/4 49/5 49/5 49/12 49/12 49/14 49/15 52/17 53/19 55/3 55/3 61/2 62/25 62/25 65/6 66/9 66/18 68/3 68/3 70/2 70/3 70/3 71/11 71/11 73/8 73/10 76/22 103/10 110/14 116/2 126/8 126/9 126/9 128/19 141/11 141/11 150/15 154/5 154/5 169/25

vet [1] 78/1

viable [1] 170/5

Vice [1] 6/5

Vice President [1] 6/5

view [18] 29/20 83/19 94/2 96/14 96/20 96/22 97/9 99/19 100/2 100/21 111/1 125/3 136/8 153/23 154/3 154/12 166/8 166/24

viewing [1] 91/6

views [1] 58/16

violation [2] 81/4 90/25

virtually [1] 157/10

virtue [3] 100/10 109/10 143/2

visibility [1] 124/3

visit [2] 51/19 51/19

vital [6] 25/12 25/12 25/16 73/13 113/7 162/9

volume [1] 129/9

vs [1] 1/5

**W**

wagging [1] 92/5

wagon [1] 107/11

walk [4] 47/9 47/13 95/19 153/12

walking [1] 74/25

wander [1] 78/7

want [64] 11/8 15/8 15/13 16/8 21/9 24/9 24/12 27/13 29/21 29/24 30/4 30/21 33/12 40/3 46/7 48/23 48/25 56/17 59/17 61/15 64/21 69/2 72/13 75/2 77/2 77/3 78/19 78/20 82/1 82/12 85/2 88/20 90/3 92/18 92/23 93/8 93/13 93/15 93/19 95/5 99/11 106/16 107/7 112/7 112/20 113/8 116/18 116/19 119/14

129/20 129/21 130/16 132/6 151/11 151/18 162/2 162/4 163/19 167/18 167/23 169/21

wanted [9] 81/14 82/9 87/2 107/8 109/17 111/14 113/14 142/4 156/24

wanting [1] 27/7

wants [4] 75/20 119/11 161/23 167/10

warrant [1] 38/3

warranted [1] 93/22

was [261]

Washington [4] 1/5 1/14 2/14 2/19

wasn't [16] 21/16 28/8 42/2 86/12 102/23 111/18 111/18 112/2 113/8 131/2 131/2 131/20 138/11 148/18 150/13 158/7

wax [1] 86/23

way [41] 6/19 10/4 13/19 29/19 30/6 31/7 32/4 32/20 40/14 46/25 47/13 51/2 55/12 61/19 64/25 67/10 73/8 76/17 83/19 84/4 90/9 97/19 105/3 108/7 113/4 117/7 117/8 118/4 118/4 118/22 137/11 151/25 157/9 157/17 158/6 159/6 160/8 164/11 165/7 169/12 170/25

ways [7] 25/17 29/7 29/8 45/14 50/12 98/23 113/17

wc.com [1] 2/15

we [298]

we believe [10] 17/8 73/23 74/6 74/17 74/22 90/19 93/13 93/21 103/4 107/24

We do [1] 68/15

we will [4] 10/6 41/3 88/6 163/11

we'd [4] 10/2 141/21 162/6 164/14

we'll [25] 4/18 10/7 13/5 13/10 20/15 67/1 67/24 78/24 90/4 119/16 125/19 125/19 125/21 125/22 125/23 128/9 135/9 140/25 140/25 141/22 141/23 153/14 156/24 159/23 163/12

we're [62] 3/16 9/19 10/4 20/5 21/19 21/19 24/1 30/5 34/9 36/15 38/2 38/25 40/24 41/5 48/22 49/5 63/12 67/22 69/5 70/1 74/12 81/25 84/25 91/17 97/17 98/22 100/6 104/17

109/23 112/10 113/12 113/12 119/9 121/15 125/19 131/22 133/21 133/23 134/6 134/7 143/17 144/21 144/22 145/1 145/9 149/4 152/5 154/5 154/7 158/10 162/11 162/18 163/10 166/25 167/1 167/3 170/22

we've [30] 8/15 14/2 16/10 16/11 26/10 32/24 32/24 32/24 46/3 47/17 48/7 51/15 55/19 56/12 61/1 61/14 64/3 68/24 83/3 90/20 92/4 94/7 104/11 150/4 157/4 160/21 161/15 162/15 162/17 166/13

weaken [1] 5/3

weaning [1] 40/14

weapon [2] 84/20 163/7

wear [2] 120/21 120/21

weather [2] 58/1 58/13

web [3] 24/22 27/6 27/8

WEBB [1] 2/9

website [2] 25/21 34/7

websites [3] 25/20 46/14 61/20

week [1] 123/23

weeks [5] 4/1 4/4 66/9 67/3 123/24

welcome [3] 3/13 30/4 30/6

well [59] 18/20 20/14 29/10 29/12 30/15 31/11 33/4 33/5 38/21 39/1 39/5 40/7 40/14 44/8 44/15 46/11 46/17 47/3 51/16 56/24 57/20 58/10 59/8 59/18 61/9 61/17 63/6 66/23 71/16 97/25 100/10 102/9 103/6 106/1 108/17 113/1 114/19 114/19 124/15 127/14 128/24 130/17 131/8 131/25 132/15 138/8 139/15 140/4 144/21 146/23 147/10 149/6 153/13 155/14 162/15 162/23 164/3 167/23 171/7

went [13] 87/2 87/9 88/4 88/13 98/8 98/10 98/12 109/17 113/7 133/8 137/22 150/24 160/9

were [85] 4/17 5/11 7/2 16/12 19/18 20/16 21/8 21/22 22/4 22/8 22/20 23/14 23/24 25/25 27/21 32/10 36/10 40/7 40/14 40/16 40/17 40/14 40/16 40/17 42/3 45/13 45/20

66/9 68/17 69/20 72/15 73/6 73/12 73/18 77/9 77/10 81/7 81/9 81/18 84/22 87/12 88/12 88/19 91/23 95/9 98/14 100/3 100/22 103/25 109/16 110/7 111/4 111/5 112/3 112/20 115/6 115/16 116/7 118/14 118/15 118/16 121/19 124/15 126/18 128/1 129/15 133/18 135/5 137/13 137/16 142/7 142/8 142/9 145/25 146/9 147/7 147/15 148/3 150/15 153/23 155/1 163/3 163/4 170/15

weren't [3] 36/12 78/25 104/22

wfcavanaugh [1] 2/11

whack [1] 56/7

whammy [1] 158/8

what [185]

What should [1] 161/10

what's [24] 34/10 38/23 41/7 41/15 44/9 48/11 48/15 48/23 63/5 74/23 82/23 86/11 92/3 112/10 112/11 124/11 128/11 145/10 156/15 162/11 165/5 169/3 169/4 170/11

whatever [12] 22/11 35/20 56/17 67/11 71/4 88/11 103/23 111/16 115/25 132/6 138/3 141/24

whatsoever [1] 129/1

when [81] 4/7 7/14 8/5 8/20 10/8 11/4 13/9 14/20 15/14 15/24 17/15 20/5 21/15 21/17 24/1 24/12 24/16 24/23 33/3 33/9 35/6 38/3 38/5 38/11 41/5 41/10 46/19 46/21 48/10 51/17 53/3 54/23 61/14 63/18 74/9 76/1 76/12 77/15 77/17 85/2 85/3 89/11 89/21 97/23 102/4 106/14 106/15 106/18 106/24 109/8 112/1 112/18 113/19 114/25 116/16 122/23 123/15 126/3 128/10 128/19 137/20 137/25 144/24 144/24 144/25 150/8 157/6 157/7 157/9 161/21 163/6 165/9 165/12 166/5 167/10 168/23 170/21

whenever [1] 109/1

where [54] 6/8 9/17 14/12 14/15 14/20

198/24 24/10 24/15 24/15 25/17 35/21 37/8 38/6 39/24 41/15 41/16 42/3 45/21 47/9 47/25 48/6 51/9 51/9 51/16 52/22 55/21 56/3 56/12 56/23 60/13 61/5 70/22 71/13 74/7 84/18 97/17 104/13 104/17 112/9 121/20 121/22 122/10 126/9 132/19 133/3 134/15 142/7 144/7 147/6 147/19 149/7 149/9 166/20

whereas [1] 118/9

whether [36] 10/21 15/25 15/25 20/19 25/6 26/5 38/3 56/13 59/8 65/12 69/15 75/20 75/22 76/5 76/6 82/20 83/10 83/12 90/5 91/5 92/24 98/11 108/2 109/2 109/2 115/24 134/25 135/22 135/23 146/14 149/19 149/19 154/9 157/15 170/4 170/6

which [100] 7/12 7/16 9/6 10/10 10/13 13/14 15/24 18/24 26/19 30/16 31/2 32/1 35/11 36/7 37/17 38/10 39/3 41/24 42/20 46/2 51/3 51/21 52/6 52/21 53/14 53/17 55/11 60/20 61/11 62/7 62/11 63/23 67/2 69/21 70/2 70/8 70/8 72/7 74/8 74/8 74/25 75/3 75/16 78/20 81/11 81/11 81/15 81/24 82/11 83/17 85/1 85/13 86/3 86/6 86/20 87/1 87/19 88/15 91/5 91/9 94/4 94/15 95/20 103/5 106/11 107/3 109/9 110/3 112/18 115/22 116/6 119/24 122/16 127/3 130/17 133/18 135/18 136/7 137/1 138/7 138/25 139/13 139/25 140/2 140/13 141/4 141/4 141/20 145/12 147/1 151/3 152/9 157/21 161/9 164/1 164/12 164/20 166/24 167/20 170/12

while [8] 7/16 8/21 22/4 29/14 65/1 118/7 147/24 158/6

Whinston [8] 18/14 45/24 51/15 92/9 97/14 98/21 99/18 128/19

Whinston's [1] 158/15

who [42] 14/4 24/12 29/10 32/11 33/2 35/18 43/2 43/3 43/13 43/22 44/11 44/21 47/23

**W**

**who...** [29] 49/25 53/10 55/23 58/14 59/11 65/5 71/1 71/22 72/4 76/3 78/16 88/11 88/12 88/14 88/20 97/5 103/3 140/9 149/8 149/11 153/18 155/16 158/14 159/8 159/15 159/16 159/16 164/15 164/20
**who's** [2] 106/25 157/17
**who've** [1] 3/14
**whoever** [1] 157/16
**whole** [16] 43/1 46/9 62/15 74/24 83/11 86/23 91/6 91/14 94/14 103/16 113/1 123/20 141/7 141/24 143/5 170/1
**Whole Foods** [2] 43/1 74/24
**whole-page** [1] 103/16
**why** [56] 16/3 19/5 19/14 20/4 20/24 22/21 23/8 23/10 25/6 31/16 33/17 35/3 35/25 36/22 37/5 37/10 37/25 46/3 51/13 51/25 52/19 54/2 55/15 55/15 61/11 62/16 65/2 80/2 85/10 86/19 86/23 88/18 91/5 103/10 104/20 112/18 114/3 116/13 129/24 131/18 134/22 135/2 145/12 148/11 149/5 156/18 156/18 156/21 156/23 156/23 159/20 159/22 161/1 164/11 164/17 164/18
**widget** [15] 164/8 164/10 165/16 166/11 166/19 166/20 166/22 168/3 168/7 168/10 168/12 168/13 168/17 168/20 169/7
**widgets** [1] 168/6
**wielded** [1] 4/21
**Wikipedia** [2] 70/10 76/3
**will** [55] 9/13 10/6 10/11 10/22 15/21 16/9 19/6 24/1 29/22 30/25 34/5 34/9 38/19 39/17 41/3 42/2 42/12 56/7 57/14 58/20 67/15 68/17 71/4 76/2 76/3 76/4 81/21 88/6 91/8 97/21 97/22 98/18 111/12 117/20 119/2 119/4 120/13 126/18 126/21 127/2 128/9 135/16 143/3 145/14 145/21 145/22 145/22 146/12 147/10 148/9 152/1 152/3 156/20 163/11 163/12
**William** [5] 2/8 2/16 3/9

**WILLIAMS** [2] 2/13 68/12
**willing** [5] 35/19 81/9 98/2 141/8 148/3
**win** [9] 115/12 131/6 140/25 143/13 144/10 144/19 146/4 149/18 153/10
**windows** [16] 10/17 54/7 54/11 130/23 131/6 144/12 144/17 151/11 151/11 154/25 155/3 155/5 157/4 158/5 158/8 162/6
**winning** [7] 100/4 130/3 130/7 139/7 139/10 140/17 141/15
**wins** [1] 130/10
**wish** [2] 31/8 68/14
**within** [7] 9/17 9/18 19/17 23/16 34/18 34/19 159/15
**without** [15] 5/19 10/9 10/17 10/18 10/25 13/24 23/12 25/8 26/1 66/16 67/7 97/12 139/22 151/25 152/10
**witness** [1] 63/24
**witnesses** [1] 129/2
**won** [8] 108/9 108/9 130/18 131/4 144/11 144/12 149/16 151/15
**won't** [11] 25/20 33/25 43/22 45/13 47/17 113/5 153/13 160/19 162/8 162/13 164/16
**wondering** [1] 143/5
**words** [20] 8/22 19/6 24/18 30/21 51/8 52/2 52/5 55/10 57/11 60/8 82/14 82/22 100/8 122/15 123/17 125/3 138/6 138/24 158/2 164/14
**work** [2] 106/7 165/10
**working** [1] 34/18
**works** [2] 143/15 165/7
**world** [41] 13/1 13/5 20/1 23/12 23/18 31/5 52/6 90/5 97/12 99/11 114/17 116/5 116/16 117/5 117/21 122/7 131/22 132/5 132/6 132/14 133/6 133/13 133/14 133/20 134/10 134/16 134/22 134/24 136/17 136/20 136/22 137/2 137/9 139/13 140/13 141/4 145/25 152/22 154/7 154/7 154/12
**world's** [1] 45/16
**world-class** [2] 23/12 23/18
**worldwide** [2] 27/6 27/8
**worried** [1] 150/19

**worrying** [1] 10/25
**worse** [2] 143/16 143/17
**worsened** [1] 13/18
**worth** [6] 7/2 52/1 76/5 128/16 145/18 145/23
**would** [149] 3/17 5/14 6/7 6/8 6/14 6/14 6/18 6/18 7/16 10/1 10/19 11/14 11/21 12/12 13/2 13/17 15/3 15/11 15/12 17/3 17/4 17/25 20/7 23/10 27/2 27/22 27/22 28/15 31/7 31/7 31/9 31/10 31/14 32/9 33/2 33/20 36/7 38/11 45/3 48/17 49/13 49/25 50/21 51/8 54/12 55/4 56/21 57/20 59/20 60/9 60/10 63/22 65/17 65/20 65/21 65/22 66/1 66/4 67/8 67/13 67/13 68/8 68/21 69/10 69/13 69/23 70/14 70/17 70/19 71/10 71/13 71/15 71/15 71/21 73/22 77/10 79/7 81/14 87/4 92/4 93/13 93/22 99/25 100/2 101/3 101/4 101/5 104/12 105/8 114/25 115/7 115/22 116/7 116/10 117/6 119/7 122/7 122/12 124/24 126/9 132/18 133/14 134/1 134/4 134/24 135/1 136/2 137/3 137/4 138/7 138/9 139/19 139/19 139/21 139/23 140/1 140/10 141/6 141/8 142/12 142/22 142/23 143/4 143/6 145/7 146/1 146/2 148/3 148/25 151/7 151/7 151/21 153/1 154/12 154/17 154/18 155/24 157/11 157/17 159/7 159/10 160/5 161/1 163/15 163/21 163/21 163/23 165/8 170/4
**wouldn't** [15] 13/25 23/16 26/23 26/25 70/17 84/5 93/15 112/4 117/2 118/16 132/1 139/5 140/3 140/9 169/9
**wrap** [1] 78/19
**writ** [1] 91/12
**writing** [1] 115/6
**written** [2] 4/3 163/5
**wrong** [11] 16/17 24/20 66/12 75/7 77/23 85/10 98/8 110/18 129/8 132/3 170/25
**wrote** [6] 6/21 7/13 77/8 112/21 114/13

**Y**

**Yahoo** [14] 50/19 64/24 65/3 87/8 87/8 88/4 115/2 121/21 121/21 147/14 161/25 162/1 162/6 162/6
**Yandex** [1] 76/22
**Yankee's** [1] 57/24
**Yankees** [1] 58/20
**yeah** [7] 33/14 48/17 58/5 59/16 69/3 132/15 162/24
**year** [7] 15/10 37/1 37/2 60/16 73/17 137/16 148/18
**years** [27] 11/16 12/11 13/3 13/19 18/22 19/17 19/23 45/15 50/23 51/1 61/16 76/16 114/18 117/6 132/11 144/11 147/3 147/19 148/16 148/21 148/24 149/9 155/3 159/2 159/4 161/16 170/21
**Yelp** [5] 121/22 124/16 126/20 127/3 127/7
**yes** [34] 6/16 11/17 14/8 17/7 20/5 31/9 35/1 35/3 37/19 39/5 48/25 53/9 55/10 75/11 79/16 86/8 86/15 87/12 89/17 93/3 95/9 96/12 96/25 99/25 100/17 100/20 101/5 105/14 105/19 120/8 123/3 125/6 166/1 166/19
**yesterday** [1] 16/12
**York** [1] 2/10
**you** [470]
**you know** [3] 31/3 45/23 138/9
**you'd** [3] 16/5 48/5 69/14
**you'll** [9] 33/14 53/16 74/10 74/13 105/10 129/5 155/2 155/4 156/10
**you're** [39] 24/24 25/6 25/19 28/23 40/13 42/6 44/22 44/23 44/24 45/1 46/2 47/19 47/21 51/3 71/6 71/11 73/20 74/7 75/16 89/14 95/1 99/1 100/8 109/23 110/22 117/22 125/5 134/12 136/25 140/17 143/25 144/22 145/1 145/4 146/15 152/11 162/8 164/13 164/21
**you've** [34] 12/10 13/9 16/16 26/5 42/18 46/18 56/12 57/1 57/11 58/21 59/16 60/16 82/14 89/15 91/14 94/5 94/13 94/15 96/8 96/10 96/21 102/21 106/25 128/5

**your** [194]
**Your Honor** [116] 3/5 3/20 3/21 3/22 4/12 4/18 7/18 9/2 9/19 11/17 11/25 12/15 13/23 14/8 14/19 15/7 18/10 22/4 23/2 25/10 28/20 30/7 30/14 32/5 33/8 33/22 33/23 33/25 36/3 36/25 38/4 38/9 39/10 39/13 39/17 40/4 41/6 41/21 42/10 46/2 49/13 50/5 56/21 59/13 59/18 67/15 68/14 70/16 70/21 71/23 77/5 78/23 79/2 79/4 80/1 80/4 80/18 80/21 86/25 88/6 89/1 89/17 90/8 90/13 90/23 91/16 92/1 92/18 93/3 93/10 93/14 94/22 95/13 96/12 100/20 104/10 109/5 113/6 114/9 115/10 116/17 119/12 119/17 119/19 120/15 122/3 122/21 124/21 124/24 125/11 125/16 126/4 126/8 127/13 127/21 127/23 128/15 128/24 129/25 133/18 136/5 139/15 144/13 146/11 147/21 150/24 152/21 154/23 156/14 157/19 159/25 160/6 166/1 169/25 170/18 171/1
**Your Honor's** [1] 87/11
**YouTube** [2] 166/15 166/17

**Z**

**Zaremba** [3] 2/16 172/2 172/8
**zero** [2] 120/20 166/25
**zone** [1] 22/23

144/6 145/6 153/18 155/15 156/13 164/19 167/22