```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
     United States of America,     )
 3   et al.,                       ) Civil Action
                                   ) No. 20-3010
 4                  Plaintiffs,    )
                                   ) CLOSING ARGUMENTS
 5          vs.                    )
                                   ) Washington, D.C.
 6   Google LLC,                   ) Day 1 - Afternoon
                                   )
 7                  Defendant. )    Date:  May 2, 2024
                                   ) Time:  2:00 p.m.
 8   _____

 9                  TRANSCRIPT OF BENCH TRIAL
                BEFORE THE HONORABLE AMIT P. MEHTA
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:
     For DOJ Plaintiffs:        Kenneth M. Dintzer
12                              U.S. DEPARTMENT OF JUSTICE
                                1100 L Street, NW
13                              Washington, D.C.
                                (202) 307-0340
14                              Email:  Kenneth.dintzer2@usdoj.gov
                                David E. Dahlquist
15                              U.S. Department of Justice
                                209 South LaSalle Street
16                              Suite 600
                                Chicago, IL  60604
17                              (202) 805-8563
                                Email:  David.dahlquist@usdoj.gov
18
     For Plaintiff
19     State of Colorado:       Jonathan Bruce Sallet
                                COLORADO DEPARTMENT OF LAW
20                              Consumer Protection Section,
                                Antitrust Unit
21                              Ralph L. Carr
                                Colorado Judicial Center
22                              1300 Broadway
                                Seventh Floor
23                              Denver, CO 80203
                                (720) 508-6000
24                              Email:  Jon.sallet@coag.gov

25
```

```
 1    For Plaintiff
        Cont.                    William J. Cavanaugh, Jr.
 2                               Patterson Belknap Webb & Tyler LLP
                                 1133 Avenue of the Americas
 3                               Suite 2200
                                 New York, NY 10036
 4                               (212) 335-2793
                                 Email:  Wfcavanaugh@pbwt.com
 5
      For Defendant Google:      John E. Schmidtlein
 6                               WILLIAMS & CONNOLLY LLP
                                 680 Maine Avenue SW
 7                               Washington, D.C. 20024
                                 (202) 434-5000
 8                               Email:  Jschmidtlein@wc.com
 9
      Court Reporter:            Janice E. Dickman, RMR, CRR, CRC
10                               Official Court Reporter
                                 United States Courthouse, Room 6523
11                               333 Constitution Avenue, NW
                                 Washington, DC  20001
12                               202-354-3267
                                      *   *   *
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2           THE COURT:  All right.  Okay.  Hope everybody had a

3      nice lunch hour.  So we're ready to resume.

4           Mr. Dintzer?

5           MR. DINTZER:  Just so that, Your Honor, are we going

6      to continue on with anticompetitive effects, or would the

7      Court -- if the Court has preference, now we go to

8      procompetitive justification?

9           THE COURT:  I will leave it to you.  If there is --

10     if there are things you wanted to talk about that we didn't

11     talk about prior to lunch, welcome to start there because I

12     think we're going to have -- we should, hopefully, have enough

13     time to talk about both.  But if you want to go straight to

14     procompetitive now, that's all right, too.

15          MR. DINTZER:  Thank you, Your Honor.  Just a few

16     brief comments on the competition issue, Your Honor, then I

17     would like to move to the procompetitive justification.

18          THE COURT:  Sure.

19          MR. DINTZER:  Let's see.  The idea that -- and this

20     is going to kind of tie into procompetitive justifications --

21     that Google can sign an exclusive agreement for five to ten

22     years with Apple and then -- and they say, well, it's okay

23     because the contract itself is competed for.  Putting that

24     aside because we'll get to that in procompetitive

25     justifications.  The idea that all of those queries for five to

1    ten years are off limits and there's no way competition can

2    compete for them, and then competition is going to spring back

3    at the end of the five- or ten-year period and have survived

4    this void of competition, that's just not realistic.  The

5    reality is that if they do not have these extensive, lengthy,

6    exclusive defaults, the ability to compete on a regular basis

7    for these defaults would incentivize more investment and more

8    competition.

9            The Court asked about foreclosure being a screening

10   function.  And it is.  It performs a screening function to

11   ensure that there's enough exclusivity to push us into the next

12   step, to satisfy the prima facie case and push us into the next

13   step, which is what we're about to discuss, which is the

14   justifications.

15           THE COURT:  I'm sorry to interrupt.

16           MR. DINTZER:  Please.

17           THE COURT:  Just back up.  See if I can get a clear

18   understanding from you.  Is -- do you think your prima facie

19   case is satisfied by establishing foreclosure, nothing more?

20   Here's the foreclosure number.  Is it your view that you then

21   establish your prima facie case?

22           MR. DINTZER:  So in the broader Section 2 analysis --

23   well, I would say with either the broader Section 2 or

24   exclusive dealing analysis, we have to show exclusivity.  So

25   foreclosure, the Court is using that, I believe, to include

1    exclusivity.  So I think of it as two steps.  That's the only

2    reason that we have to show that there's exclusivity in the

3    agreements and that enough has been foreclosed that it is --

4    has a substantial impact.

5         Once we've done those two things, what we've

6    established is there are some -- some queries that have been

7    put off and have been put out of reach and that there's

8    enough -- enough of them that have been put out of reach

9    that -- I want to make sure I get the language right --

10   substantial foreclosure have been put out of reach such that

11   rivals will look at it and say, I can't get these and it will

12   affect their investment.  It will affect their access to scale.

13   It will affect all these other things.  But the Court can

14   assume these other things because that's the natural function

15   of the exclusivity that --

16        THE COURT:  I guess that's my question, is that it

17   sounds like your position is the exclusionary conduct here are

18   the exclusive agreements.  Exclusive agreements, you have to

19   show foreclosure.  We've shown foreclosure.  We don't need to

20   then show any actual real world effects because the -- sort of

21   you can infer the effects, and once we've established

22   foreclosure, it becomes their burden to establish

23   procompetitive justifications.

24        MR. DINTZER:  Yes, Your Honor.  And just to give the

25   Court sort of an extreme example, let's say you have a

1    monopolist that has 100 percent and they have all these

2    exclusive agreements.  It would be impossible to show real

3    world effects, right, because there wouldn't be anybody to show

4    the real world effects against.

5         The idea is that you can't reward the monopolist, the

6    really successful monopolist by saying they have to show

7    effects as well.  The fact that a monopolist -- so we've

8    already proven monopoly power, et cetera -- the monopolist is

9    signing exclusive agreements and it covers a substantial amount

10    of the market, the Court can infer and assume that there will

11    be effects, and then we go to justifications to see if there's

12    anything to offset those effects because, otherwise, the test

13    would basically benefit the most successful monopolists who

14    have made it impossible to prove anything.

15         THE COURT:  You don't think I need to sort of descend

16    into particulars about any one of these episodes that we've

17    heard about, whether it's Apple, Microsoft, Branch?  None of

18    that necessarily needs to be part of your prima facie case?

19         MR. DINTZER:  It doesn't need to be.  We encourage

20    the Court to do an analysis that would take all of the impact

21    that we believe we've shown, so that not only that we can call

22    Google on what they've done and the opinion will properly

23    reflect the breadth of the conduct, but also so that the

24    conduct can be addressed.  And, so, it is not necessary, but,

25    you know, Branch, suggestions, those are -- along with the

1    scale and the impact on investment, those are real effects that

2    genuinely have -- impact the market and they should be gathered

3    up and recognized in the opinion.

4         THE COURT:  And on the suggestions issue,

5    Mr. Schmidtlein said that this came out of left field, only

6    arose at trial.  Do you contest that description?

7         MR. DINTZER:  We do, Your Honor.  I have some

8    citations that I would be happy to hand up if the Court -- if I

9    may.

10        THE COURT:  Do you have a copy for counsel?

11        MR. DINTZER:  I will, of course.

12        So we actually don't have a slide for this, but our

13   complaint addresses Google's maintaining its monopoly by

14   stunting innovation in new products.  The counter-statement of

15   material facts, and -- and along with these other items,

16   there's -- there can be no question that I addressed it in the

17   opening statement.  And there's no question that I -- that we

18   elicited testimony about it.

19        And as the Court knows, Federal Rule of Civil

20   Procedure 15 says that when an issue not raised in the

21   pleadings -- which we believe it was -- is tried by the

22   parties' express or implied consent, it must be treated in all

23   respects as if raised in the pleadings.

24        They didn't object.  If Mr. Schmidtlein genuinely

25   thought this is new, then the time to object was either during

1    or, respectfully, right after my opening, and say we're going

2    to object to this.  And then when we put on the evidence, we

3    asked Ms. Braddi about this stuff.  The time to object would

4    have been, Your Honor, they're putting in evidence that's not

5    relevant to the case.  When they let all that in, which we

6    thought was consistent with what we pled, they consented to

7    having these elements tried.  If they thought otherwise, they

8    clearly waived that.  And that's under 15(b)(2) for issues

9    tried by consent.

10          So, we -- I mean, we don't believe it was an issue.

11   We understand why they didn't object.  But if they believed it

12   was, they should have objected.

13          And I'm reminded, they also elicited testimony about

14   suggestions, so they didn't just, like, stay silent.  And the

15   idea that there's prejudice, I mean, we had a ten-week trial.

16   They could call anybody.  And, so, if they had evidence that

17   they wanted to put on, they controlled all the evidence in the

18   case.  If they had some documents that undermined our theory

19   which we laid out in the opening statement, they certainly had

20   every opportunity to put that on.

21          Let's see.  So with that, Your Honor, I would like to

22   turn to the procompetitive justifications, if that's okay with

23   the Court.

24          THE COURT:  Sure.

25          MR. DINTZER:  If I may approach, Your Honor.

1          THE COURT:  Sure.

2          MR. DINTZER:  So, Your Honor, once the plaintiff has

3    established our prima facie case, the burden shifts to Google.

4    And I understand that this is maybe contested, but they then

5    have the burden, which they have failed to carry, of proving

6    procompetitive benefits that outweigh the anticompetitive

7    effects.  And it's rightly their burden because they have

8    access to the information, as Judge Posner put it.

9          This is a defense.  This is them saying, We had a

10   good reason for doing this.  Let's hear it.  They can list

11   them, they can defend them and, of course, we can address their

12   defense, but they should have the burden of that and -- and may

13   proffer a procompetitive justification for its conduct.

14         The case law is clear in the circuit.  Monopolist has

15   the burden of proving procompetitive justification, and they

16   have not.  They've asserted two groups.  First they have

17   asserted competition for the contract.  And the second is the

18   idea of pass-through.  And we'll take these in turn.

19         The competition for the contract, this Court properly

20   said this was procompetitive -- it fell into this analysis.  So

21   they kind of float these concepts as they did in the prior

22   discussion about competitive harm.  They sort of floated, look,

23   there's competition.  There's competition.  The Court has

24   already said this analysis really belongs in the justifications

25   analysis.  And what they said in their opening statement about

1    this --

2            THE COURT:  Can I ask you --

3            MR. DINTZER:  Sure.

4            THE COURT:  -- do you agree with that?

5            MR. DINTZER:  Which --

6            THE COURT:  I know what I wrote in the summary

7    judgment, but I think Google takes some issue with it, which is

8    where this competition on the contact analysis gets placed.  I

9    think they would say, look, we think you ought to actually

10   place it before any burden shifts to us, and it ought to be

11   placed in, you know, either -- it ought to be placed in is this

12   exclusionary conduct?  Is there a prima facie case?

13           Do you view that otherwise?

14           MR. DINTZER:  We agree -- probably not surprisingly,

15   but we agree with the way the Court considered it.  In the

16   procompetitive justifications, they have a chance to pursue it

17   and explain why competition is so great in this market, which

18   we really don't believe that they can.  Our competition is so

19   great in this market that the Court really -- the way that

20   Google frames this, you don't have to worry about the contents

21   of the agreements.  They can't be problematic because there's

22   so much competition for the agreements that there's nothing to

23   worry about.  That is a justification that they're saying is

24   based on procompetitive nature of the market.  So we do believe

25   that this is the proper -- to the extent that it's to be

1    considered, this is the proper place.

2           What they said in the opening was that the Court

3    would hear from Mr. Cue and Mr. Giannandrea and Ms. Baker and

4    they will confirm that Google won these competitions on the

5    merits and the intense competition for browser defaults.

6    Intense competition.  And there wasn't that.  In fact, what the

7    evidence showed was no meaningful competition, and as the Court

8    has already referenced.  Mr. Cue said there wasn't a valid

9    alternative.  There wasn't a choice.

10          And, in fact, Google's own interior analysis

11   concludes that Bing -- to capture Apple, Bing would likely need

12   to offer Apple 122 percent revenue share, that even Bing --

13   forget about the -- the Court was asking about, you know, new

14   entrants, which we believe that is absolutely proper focus, but

15   even an existing one would have to pay more than it was going

16   to make.  It was going to have to lose money for an extended

17   period, billions of dollars, and Google itself found that so

18   fanciful that they called it Alice in Wonderland because it was

19   a fantasy.

20          So when Mr. Pichai was on the stand, he was asked

21   about whether the competition in Search, the lack of it

22   affected his willingness to pay Apple for its default.  And the

23   question was:  At any point in your discussions in 2016 with

24   Mr. Cook and Mr. Cue, did you communicate to them that they

25   didn't really have any leverage in negotiating a revenue share

1    percent because Google was the only viable option?

2           And he discussed it and he said, and by the way, yes,

3    I did take what you're saying into account, which was why we

4    didn't pay the share Apple wanted.

5           Okay.  That's an express acknowledgment that -- I

6    mean, obviously Apple got paid a lot, but he didn't pay what

7    they wanted because he recognized that they really didn't have

8    any place else to go.  And so, I mean, that's not competition

9    for the contract.  That's not competition forcing everybody to

10   run, especially Google, as fast as they possibly can.

11          THE COURT:  So Professor Murphy was, if I remember

12   correctly, sort of posed this question, and -- about

13   competition, and I think what he said was -- I think he

14   acknowledged what Mr. Cue said and acknowledged that perhaps

15   Microsoft really wasn't -- didn't have that great a chance to

16   prevail.  But his view was, look, that doesn't really matter,

17   what matters is Google's perception.  Does Google think there's

18   a competition ongoing?  Because that is what constrains the

19   monopolist, is that perception of competition.

20          And so why -- do you take issue with Professor

21   Murphy's opinion?

22          MR. DINTZER:  Well, I -- I do, Your Honor.  But even

23   if you take it at face value, this was Google's perception.

24   Google's perception in 2016, that Bing's idea was *Alice in*

25   *Wonderland* and it was Mr. Pichai testifying that he took into

1    account that they had no other option.  That was Google's

2    perception.

3            So, even Google -- even if you give Professor

4    Murphy -- and we take some challenge with that, it should be --

5    if anybody realizes that there's no competition in the market,

6    it will affect what Apple can ask for, it will affect -- affect

7    everybody, if they all recognize that there's no competition in

8    the market.  But, Google knows that there's no competition in

9    the market.

10           Ms. Baker, Google chose not to call her after saying

11   that they were going to call her.  Instead, they -- they

12   submitted her deposition.  So we didn't have a chance to ask

13   her specifically about what they were saying.

14           But she did testify that competition in the search

15   market would help them because then there would be more

16   options -- which is obvious -- and that there aren't many

17   alternatives, which is also obvious.  And Mozilla knows there's

18   not competition.  They tried the only other option they could,

19   Yahoo!, and it didn't go well and they went back to Google.

20   There's -- there's no competition there.

21           In fact, Google's own theory is that Firefox and

22   Mozilla would fail if Google didn't pay them.  And whether

23   that's true or not, if that's Google's theory, then they --

24   they don't view there being competition for the contract, if

25   they view that it's us or, you know, you're closing up shop.

 1    They didn't put in any documents, not a single Mozilla document

 2    to say that, but that is Google's arguing position.

 3            THE COURT:  So what explains Google's behavior

 4    that -- and, look, the record is clear, it does compare itself

 5    to others.  It compares itself to Bing, it regularly -- I think

 6    we talked about this.  It regularly runs comparisons.

 7            Why is that not proof that Google wants to at least

 8    keep an eye on somebody they think is a competitor, somebody

 9    who, if they improved sufficiently, could be a threat to

10    Google's market prominence?  Because otherwise you would think

11    this record would show Google not doing that ever.

12            I mean, why do we have -- why do we need to concern

13    ourselves with comparing ourselves to Bing if they're not

14    competition?

15            MR. DINTZER:  Well, they certainly don't compare

16    themselves to, like, DuckDuckGo and to the smaller ones.  They

17    do do occasional look at is Bing getting ahead of us?  And they

18    keep -- they keep an eye on it.  But they make their decisions

19    based on what's best for Google, not are they going to lose a

20    lot of queries to Bing in the market.  That's -- that's a

21    different standard, and the fact that they might occasionally

22    look to see if Bing is -- is getting anywhere close to them.  I

23    mean, Dr. Fox testified that -- you know, that he thought Bing

24    was, you know, four IS points away.

25            And so according to him, they weren't even in the

 1    neighborhood.  So -- so I don't disagree, sometimes they check

 2    about latency.  But one of the things about latency that is

 3    kind of funny is they acknowledge that Bing is faster than

 4    them, but they don't bother trying to catch up because they

 5    don't feel like they need to.

 6              THE COURT:  I thought Dr. Nayak said the opposite.

 7              MR. DINTZER:  He said eventually they have made some

 8    progress, but for years that they have behind.  And I believe

 9    that there was testimony -- maybe I'm wrong, there was

10    testimony they may not have ever caught up.

11              But regardless, it is clear that Bing is not making

12    them run.  Does it make them, you know, check -- check over

13    their shoulder?  Maybe occasionally.

14              Do they respond to that?  There is some evidence in

15    2009 of them saying, oh, we really have to move forward.

16              THE COURT:  So were you asking -- I think this is the

17    hard question when it comes to a Court -- for a Court, which

18    is:  Well, how do I make the determination of whether, one,

19    competition is authentic, and, two, is it enough?

20              MR. DINTZER:  I'm sorry.  And I didn't hear --

21              THE COURT:  The second question is:  Is it enough?

22              In other words, I think you're conceding that Bing

23    provides some degree of competition, at least enough to cause

24    Google to look over its shoulder, as you've said.

25              You're asking me to then conclude, well, the

1    competition isn't significant enough.  And so how do I make

2    that determination as a judge, as opposed to, you know, someone

3    else with some economic expertise in the market?

4         You know, is that not just sort of an arbitrary

5    determination to say there's enough competition or there isn't

6    enough competition?

7         MR. DINTZER:  Your Honor, the market will provide for

8    competition.  What Section 2 says is -- is do they have market

9    share?  Do they have monopoly power?  Do they have -- are there

10   barriers to entry?

11        There are specific guideposts.  There are the Brown

12   Shoe factors, is this a relevant market?  Are there exclusive

13   agreements?  Is there a certain amount of foreclosure?  Are

14   they blocking nascent entry?  Are they -- and together -- and

15   then basically looking at the market and seeing that line of

16   Google never changing and the line of Bing never changing, and

17   hearing Mr. Cue saying I wouldn't -- you know, they're not

18   really competing, and having Mr. Pichai saying we don't take

19   them into account, we know they don't have another option.

20   Those -- that's enough.

21        I mean, that is a monopolized market, and it has been

22   for years, which is why -- I mean, Google is a verb.  It's a

23   verb because there are such barriers to entry, there are --

24   there are so -- there are no other options, that we don't even

25   think of general search, we think of Google.  And so -- and

1    this is just on the browsers, as far as competition on the --

2    for the contract to cure things.

3         What we heard from Dr. Murphy is:  "In describing the

4    competition for Android, you intentionally do not use the word

5    'intensely competed,' right?

6         "Answer:  I don't think I had evidence for that."

7         And so even their expert didn't say that there was

8    intense competition on Android.  The truth is that the

9    structure Android, nobody competes for those defaults because

10   they're not -- nobody knows when they become available.  The

11   contracts are constantly being renegotiated at Google's request

12   and they're not really put out for anybody to have that

13   opportunity because of the structure that Google has adopted.

14        They don't have to adopt that structure.  I mean, the

15   Court asked, is this about a time with the MADA?  Just to be

16   clear, it's not about a time claim.  It's about the fact that

17   they're using the MADA as payment to get the exclusive widget

18   and to get Chrome, and that everybody needs that exclusive

19   payment if you're going to sell Android phone, and the

20   existence of the MADA makes -- ensures, even for Professor

21   Murphy, that there's no intense competition.  So --

22        THE COURT:  Can I ask -- I mean, if I recall the

23   record correctly, in Europe the MADA has been unbundled.

24        MR. DINTZER:  That is correct.

25        THE COURT:  And so Google can't do in Europe what --

1    what they have been doing here anymore.  But the consequence of

2    that has simply been licensing of Play Store and Chrome.  It's

3    not as if anybody said, yeah, you know what? we'll just license

4    the Play Store and we don't need Chrome.

5         So I'm not quite sure why -- the fact that they are

6    actually put in the same agreement, when it seems like the

7    market views them as complimentary products or products that

8    belong together, why bundling them into a single contract is a

9    problem?

10        MR. DINTZER:  Requiring the MADA for the Play Store.

11   If you want the Play Store, you have to take the MADA.  That's

12   what makes it a problem.

13        It's a bundle.  That's what Professor Murphy said,

14   it's a bundle.  So instead of handing them cash for -- for the

15   exclusive widget, which is basically what they do for Apple --

16   and, I mean, it's not the widget, but how they pay for their

17   exclusivity.  In the MADA they pay for it in the United States

18   by giving the Play Store and the Play -- as part of what

19   Professor Murphy calls the MADA bundle or the MADA barter.  The

20   fact that in Europe they have broken those two pieces to some

21   extent is, like we -- as we said earlier, there is a little bit

22   of light of competition there, which is why Google has felt it

23   needs to invest more.

24        We don't believe that that's a competitive -- that

25   they've reached a true state of competition and it's taken care

1    of the issues that they've had there, but that was certainly a

2    step in the right direction.  That is one element of it.

3          Here, we have the -- I mean, somebody -- even

4    Dr. Murphy realizes this is not a competitive market.  You have

5    the MADA connected to the RSA and -- and nobody is on Android

6    at all except for Google.

7          THE COURT:  And just to make sure I understand your

8    positioning.  Is your position that the MADA -- standing alone,

9    let's leave the RSA to the side and, frankly, let's leave aside

10   for a moment your position that once you sign the MADA, of

11   course you're going to sign the RSA and nobody has done that,

12   so essentially you should think of it as one transaction, if

13   you will.

14         MR. DINTZER:  Yes, Your Honor.

15         THE COURT:  But the MADA -- how do you distinguish

16   the MADA from Microsoft?  Because Microsoft says, Europe, give

17   your stuff away for free to encourage use.  That's perfectly

18   okay because Microsoft was giving some stuff away for free.

19   The District Court thought that was a problem and the Circuit

20   said no.  And is it because the widget?  Is that the reason.

21         MR. DINTZER:  The widget drives 40 percent of the

22   traffic.  So the widget is no small thing, Your Honor.  And

23   it's exclusive in the sense that nobody wants to have a second

24   widget.  But the idea of giving things away -- if Google said

25   to everybody, look, if you want the widget, if you want the

 1    Play Store, here's our website, download it.  That would be

 2    fundamentally different than what they're doing.  What they're

 3    doing is they're saying if you want the Play Store, then here's

 4    a series of apps that you have to load and that are not

 5    deletable, and that they have to appear -- and not only that,

 6    you're not allowed -- you're not allowed to tell people how

 7    they can change -- you can't help people out on how they can

 8    change the default.

 9            THE COURT:  Well, is that a term of the MADA or the

10    RSA?

11            MR. DINTZER:  I believe it is on the MADA.  The MADA

12    has a requirement that you can't instruct or assist your users

13    in OEM in -- in how to change the -- the default on the widget.

14    How to -- how to basically help the users override the default.

15            And Google's take is, well, that's because we pay for

16    it, so we should have it.  And it's like, well, I mean, I

17    guess, but that just enforces the -- the -- I mean, my

18    colleague at the bar was saying it's really hard to change the

19    default on Windows.

20            Well, Google requires its partners to not help people

21    change their defaults with the MADA.  So, the point is, is all

22    of that together makes the MADA itself exclusionary and

23    the defaults exclusivity.

24            And -- and another point on this, Your Honor, is

25    that -- we made this earlier -- the browsers are not always

 1    aligned with the users.  Sometimes they are.

 2          When they want to load a default search engine, they

 3    pick general search because they know that their users want

 4    that.  That helps define our market and it makes sense.  But

 5    sometimes they're not.  And Apple showed that when it took

 6    suggestions, when it took competition -- I mean, when it

 7    accepted Google's payments and stopped on the choice screen.

 8          Sometimes they are not aligned with the users, they

 9    think something would be better for the users, but they take

10    the money because that's better off for them and their

11    shareholders.

12          And so the competition for the defaults on the

13    browsers is not a proxy for competition for the users.  And

14    that's what Professor Murphy says in the slide, well, they're

15    not always aligned.  And that's -- that's the point, sometimes

16    they're not.

17          And with that, Your Honor, unless you have more

18    questions about competition for the contract, I'll turn to the

19    point of pass-through.  So pass-through is this idea that --

20    where Google alleges and argues that when it pays money to its

21    partners, that money in some form trickles down to the users

22    and benefits them to offset the anticompetitive conduct that --

23    and effect that we talked about in the prima facie case.

24          THE COURT:  Can I interrupt you for a moment?

25          MR. DINTZER:  Sure.

1          THE COURT:  Before we talk about pass-through,

2     because I think, at least as I understand the pass-through

3     question, it really is sort of a cross-market issue.

4          MR. DINTZER:  That is one.  Yes, Your Honor.

5          THE COURT:  Or Google even -- before you even get to

6     that, I think they argue that there is actually a

7     procompetitive benefit to the exclusivity on the default

8     because it -- it sort of essentially provides sort of vouching,

9     if you will, sort of a Good Housekeeping Seal of Approval from

10    Apple, Motorola -- excuse me -- Samsung, Motorola, whoever it

11    may be, and there's procompetitive benefit to that.  It

12    essentially is vouching for our product, and it vouches to

13    users that this is a product that you ought to use.

14         So, I think the case law has sort of recognized to

15    some extent that that's a procompetitive benefit.  Do you agree

16    with that?

17         MR. DINTZER:  The promotional aspect that they

18    discuss does not -- to the extent that there is any, and they

19    haven't proven it.  I mean, there's no documents about that.

20    And so it looks pretextual.

21         THE COURT:  There was testimony, I think, even from

22    the Apple witnesses who said words to that effect, you know, it

23    benefits us but also benefits Google because they've got sort

24    of Apple's imprimatur on being the default.

25         MR. DINTZER:  There's no Google documents that I'm

 1    aware of, Your Honor, where Google says, you know, what we're

 2    really trying to do is to get Apple to, you know, talk about

 3    how great we are.  In fact, Google's whole theory of this case,

 4    writ large, is that everybody already knows Google, everybody

 5    loves Google, everybody wants Google.  So the last thing, it

 6    sounds like, they need is -- I don't know -- it may be

 7    depriving their rivals of that kind of promotion by getting the

 8    default, but I think Google's solid position is that's the last

 9    thing they need from anybody because everybody already knows

10    them.

11           But even if there was, and even if it wasn't

12    pretextual -- which we haven't seen anything in the documents

13    to support this -- the simple thing is that it could be done in

14    other ways.  There's a lot of ways to do promotion.  So we're

15    dropping down to least restrictive alternatives, but they could

16    pay Apple for promotion without paying it for its default.

17    They could -- you know, and there's a lot of different means of

18    promotion other than asking and demanding the exclusive

19    default.  So --

20           THE COURT:  Where does this least restrictive issue

21    fit in in the analysis?  I mean, it was a little bit of news to

22    me as I read your papers that there was this notion of least

23    restrictive -- that that was an inquiry that courts seem to be

24    making, not necessarily always in the Section 2 context, but

25    certainly in the Section 1 context.  But how do you see this

1   fitting in in the overall analytical framework?  Is it an

2   element of proof?

3            MR. DINTZER:  It is an element of proof.  I put the

4   *Meta Platforms* case up here, Your Honor.  Substantively the

5   burden would be on the defendant to demonstrate that benefits

6   it claims resulted from its conduct could not have been

7   achieved absent the conduct.

8            So it has to be -- I mean, if they could have --

9   there's a simple one that's actually seen in some of their

10  conduct, which is they say, look, we -- as part of the RSA, we

11  ask for security updates -- which is true -- and there actually

12  is something in the documents that say the security updates are

13  important.  They ask for them as part of the RSAs.

14           But, for example, Mr. Pichai, when asked, "But Google

15  could provide a separate financial incentive for security

16  upgrades outside of the RSA, correct?

17           "Answer:  Sure, we could structure it that way."

18           So the fact that they've been doing it through the

19  RSA is not the least restrictive alternative, as far as

20  anticompetitive conduct.  And so that would mean that even the

21  security updates, they shouldn't count as procompetitive

22  justification because they have a completely different way of

23  doing it.  And, more broadly, Ms. McCallister explained that

24  they have these go-to-market agreements that do not require

25  carriers to pre-install Google Search.  And the purpose of

1    supporting those marketing activities was to support the sale

2    of Android devices.

3            So they have a means of funding Android, of improving

4    Android, of aligning their interest.  They can do all those

5    things without demanding exclusivity in the RSA.  So that means

6    that there's a least restrictive alternative.  So when they

7    want to say, oh, we need these defaults because of X, Y, and Z,

8    it's like, wait, wait, do you really need the defaults?  And

9    the answer is that they don't.

10           So usually this comes after the discussion of the

11   procompetitive justification, but there's no reason to wait on

12   it.  They say that they need the exclusivity because it aligns

13   their incentives with the browsers.

14           So this is -- if you make it through the default,

15   sort of, base on Apple, you get to this list, which these are

16   alternative search engines that you could set as the default.

17   What's interesting about this list, Your Honor, is that each

18   one of these search engines has agreed to pay revshare if it is

19   selected as the default.  So this is non-default revshare

20   payments.

21           Everybody else in the industry is relegated to

22   non-exclusivity payments.  They don't get to align their

23   incentives with the search engine, but they do it.  And, in

24   fact, the norm in the industry for everybody, except for

25   Google's demand for exclusivity, is this kind of thing where

1  people pay so that if they're chosen to be -- by the user to

2  substitute in for the default, Yahoo! will pay, Bing will pay.

3         In fact, in the Mozilla agreement with Yahoo!, it

4  gives Mozilla the right, but not the obligation, to include

5  them in the option.  So, everyone else, the basics in the

6  industry are not to have this exclusivity which aligns your

7  incentives.  The standard in the industry for everybody else

8  is, you know, you pay and you hope that you get some.  And so

9  that means that there is a less restrictive alternative without

10  this alignment that everybody else can live with, so Google

11  should be able to live with.

12         And, of course, Apple is saying option but not the

13  obligation.  That was a less restrictive alternative.  That was

14  them saying this works for us, give us the option, pay us the

15  revshare, we'll work it out.  Google is saying no.  And so,

16  this was the option but not the obligation that worked for

17  Apple, that they could design with, and Apple wasn't worried

18  about the government telling them how to design.  They were

19  worried about Google telling them how to design.  Google said

20  no, so Apple took it out.

21         So, that's the discussion of less restrictive

22  alternative.  I did want to talk about pass-through, if that

23  pleases the Court, if I could take a minute.

24         THE COURT:  Sure.  Can I just ask for a moment,

25  when -- I think what we have seen in the evidence is that when

1    Google proposes the kind of -- the agreement you're talking

2    about, which is revenue share but not default, it offers a

3    lower revenue share.  That's what these tiered -- I think

4    that's sort of analogous to the tiered structure of these

5    Android RSAs.

6         Is it your view that I should ignore that?  In other

7    words, that I shouldn't consider that Apple may earn less

8    money?  I mean, the Android -- the carriers in the OEMs would

9    earn less money potentially if you unbundled the agreement.

10         MR. DINTZER:  If Google is able to do that, it would

11    be a demonstration of monopoly power, that it basically can

12    call the shots and that there's nobody who's going to come and

13    take -- eat its lunch because if they thought -- and this is

14    what Professor Whinston testified -- if there was real

15    competition, increased competition for these defaults should

16    result in increased payments.

17         So we don't think that they've shown that there's

18    pass-through.  But if there is pass-through, it will go up in a

19    more competitive environment, just as Mr. Pichai said.  I mean,

20    if he had seen that Bing was a genuine threat, they would have,

21    of course, paid more.  And so to the extent that there was any

22    pass-through, that would have found its way to the users.

23         Google has not managed to prove any in-market,

24    non-precontextual pass-through.  But if they had, that would --

25    so competition is the solve there, it's not the problem.  And

1   the fact that Google can make that assertion, these other

2   companies, they pay revshare without the exclusivity.  So

3   Google is asking for something that nobody else can get.

4           To be cognizable, justifications have to be --

5   there's two.  They have to be in market.  That means the

6   ultimate procompetitive effect has to be in market.  They can't

7   be pretextual.  And using Google's term of pretextual, that

8   means it can't have been made up just as an excuse.  They have

9   to do it for that reason.  That's straight out of *Microsoft*.

10          THE COURT:  And what case do you think -- and this is

11  a threshold legal issue between the parties -- or,

12  disagreement, I should say, which is what case stands for the

13  proposition that in a Section 2 case, I cannot consider cross-

14  market competitive justifications?

15          MR. DINTZER:  Overarching, Your Honor.  It's the

16  language of Section 2.  It says that you can't monopolize any

17  part of any relevant market.  And, ultimately, Your Honor, to

18  try to break down and figure out how to balance, cross-balance,

19  basically would be asking you to trade markets or asking the

20  government -- Congress didn't set it up that way -- asking the

21  government to trade markets.  They would say, look, it's okay

22  if you monopolize search as long as you make it really, really

23  great for people who buy low-cost phones.  There's simply no

24  way to cross-balance the winners and the losers, and it's not

25  fair to ask the Court to do that which Congress did not do.

1        So we would go straight to the language -- there is

2   some language in some cases but, really, the most impressive

3   language is in Section 2 itself, which simply refuses to do

4   that, and it doesn't make any sense because there's no basis.

5   How could you do that?  How could you say that these are the

6   winners and these are the losers?

7        THE COURT:  Just in terms of timing, Mr. Dintzer, I

8   think you're probably about 10 minutes shy of 50 minutes, and

9   so I want to just be --

10       MR. DINTZER:  My colleague needs five, so I'm going

11  to take five.

12       THE COURT:  I want to be sensitive of Mr. Cavanaugh.

13       MR. DINTZER:  I appreciate that, Your Honor.

14       The second one, straight out of *Microsoft*, is it

15  can't be pretextual, which means they have to show it wasn't.

16       This is a 30(b)(6) answer that Google gave us in

17  2021.  We said, from 2005 to the present, show us Google's

18  tracking of whether its search distribution partners pass on

19  payments received by Google to consumers in any form.

20       And they wrote back:  Google has not located any

21  formal analysis, study, or survey previously conducted,

22  commissioned or relied on by Google regarding any impact or

23  correlation of payments made by Google to manufacturers or

24  wireless carriers on consumer prices for devices or wireless

25  services in the United States.

1      They don't track it.  There's nothing.  And so for

2   them to say this is really important, this is procompetitive,

3   there's nothing there.

4      We asked Professor Murphy:  Did you look at Google's

5   documents?  And he said:  No, I'm an economist.  He looks at

6   markets.  But he didn't see any documents.

7      And so, talking about pass-through for Android, we

8   asked vice president at Google, "You don't have any

9   understanding as to how the carriers or OEMs used the revenue

10   share payments that Google pays them?

11      "I don't."

12      There is no evidence that there is this pass-through

13   that they have been asserting.

14      We asked -- Google argues that it makes the Android

15   ecosystem better.  And the problem with that is that they also

16   paid money to Apple, who is Google's -- the Android system's

17   biggest rival, and we asked whether that was problematic to

18   Mr. Pichai.

19      "Do you think about Google Search separate from the

20   competition between Apple iOS and Android?

21      "That's correct, yeah."

22      So they don't even factor that in.  Ms. Braddi

23   reached the same conclusion.

24      "Question:  Google has determined that the benefits

25   to Google Search are worth the cost of propping up Android's

1    biggest rival?

2            "I don't think we have ever looked at it that way."

3            And so if they don't look at pass-through and how

4    they're helping out their biggest rival, then they're not

5    considering how it's helping out the Android system.

6            They say, look, it gives us more low-cost phones.  We

7    asked Professor Murphy, "You haven't seen any documents that

8    link the MADA bundle with low-cost phones?

9            "No.

10           "You haven't quantified?

11           "No.

12           "You haven't seen any data from Europe or Russia that

13   showed that low-end cell phone makers left the market after the

14   MADA bundle was disallowed?

15           "Well, I don't have that evidence, no."

16           There's no evidence on any of their pass-through.

17   This is one I absolutely wanted to get to, Your Honor.  This is

18   2017.  This is them requesting, employees requesting approval

19   of the Samsung RSA.  This is the biggest OEM RSA.  Samsung is

20   the biggest manufacturer of phones in the U.S.  And this goes

21   to the business council, the one that Mr. Ramaswamy is on, for

22   approval because it's so much money.  And there's actually a

23   line in there that says "Rationale in support of the proposal."

24           Well, it secures Google's access on Samsung devices,

25   including Google as the default search, exclusive search.  So

1    we got exclusivity.  And it mentions the security upgrades,

2    which I talked about.  It doesn't mention anything about any of

3    these other alleged pass-through benefits.  It doesn't mention

4    low-cost phones or aligning incentives or anything.  And

5    Professor Murphy acknowledged that.

6              And finally they said, well, it creates a consistent

7    user experience.  And we asked Mr. Rosenberg about that,

8    consistent, consistent user experience across all Android.

9              "Question:  And Android partners compete against one

10   another by differentiating their devices and device

11   experiences?

12             "That's one of the ways they compete.  Yes.

13             "And differentiation between Android devices can lead

14   to innovation, correct?

15             "Yes.  I mean, innovation is one of the ways they can

16   differentiate."

17             So by Google insisting on matchy-matchy across

18   Android, that's not necessarily a good thing.  There's no

19   evidence that that's a good thing.

20             Google likes to think it's a good thing because the

21   matchy-matchy-matchy is them being in the default in all

22   positions.  But for users and for -- for carriers who want to

23   sell these phones, there's no evidence that that -- that that

24   is a benefit to the experience.

25             And, in fact, having a choice screen is a consistent

 1    user experience.  It's having the choice screen that everybody

 2    can spend, you know, four or five seconds -- and

 3    Mr. Schmidtlein is going to make it sound like, you know,

 4    picking from a choice screen is this really burdensome thing,

 5    but it takes about three seconds, four seconds the first time

 6    your phone starts up and then you're done.  And we can leave it

 7    to the OEMs and the carriers to decide what the optimal

 8    experience is for their devices.

 9            And so with that, Your Honor, I do want to concede

10    the rest of the time to the States.  Thank you, Your Honor.

11            THE COURT:  Thank you.

12            Mr. Cavanaugh.

13            MR. CAVANAUGH:  Thank you, Your Honor.

14            Your Honor, I just want to focus on one of the

15    aspects of the procompetitive justifications competition for

16    the contract Google's argued.

17            And that is that it has -- it has secured many of its

18    contracts, Apple and Mozilla, because of their quality

19    advantage it has over its rivals, and it's been able to

20    maintain these through the default agreements and the

21    significant scale advantage that's provided.

22            So in their post-trial brief they say, page 55 --

23    it's even in the heading -- that Google provided a superior

24    quality product, producing better user experience.

25            Slide 5, Peter.

```
1              And when Apple sought Microsoft they said, look, in

2       mobile and long-tail inquiries, you're at a significant

3       disadvantage in terms of quality.

4              Now, there is no dispute that quality derives from

5       scale.

6              Slide 6, please, Peter.

7              Google itself, in a moment of utmost candor, said,

8       Most of the knowledge that powers Google, that makes it

9       magical, originates in the minds of users.  Users are the fount

10      of knowledge, not us.

11             We don't have better algorithms than anyone else.  We

12      just have more data.  That is scale.  And why this matters,

13      Your Honor --

14             THE COURT:  So if I could --

15             MR. CAVANAUGH:  Yeah.

16             THE COURT:  My recollection is that's a document from

17      2014, I think.  I think it's a data document, you can tell it

18      just the way the figures are drawn.  I think the question is,

19      is that true today?

20             And I asked Mr. Dintzer this question, is that still

21      true today?  And -- and things have changed, I think Google --

22      again, I think Google would have to admit that back in 2014

23      user scale -- I mean, user side data was -- was quite critical

24      to the quality of search.  And their view is, today, not so

25      much, and then you don't need as much data -- user-side data to
```

 1    create the better search engine.

 2          MR. CAVANAUGH:  Your Honor, there's no doubt that in

 3    terms of data in mobile they have 98 percent of the queries.

 4    That provides a significant scale advantage to them.

 5          Mr. Parakhin testified about that, that once you get

 6    over 70 -- once you get over 70 percent, you don't have -- your

 7    incremental improvements are not that great.  But when you're

 8    down at, as they are, 2, 10 percent, getting more scale is

 9    critical.

10          It's Slide 8, actually.

11          They've made the point that you get incremental

12    improvements, but it's when you are as low as Microsoft,

13    DuckDuckGo and others are that they are at a significant

14    disadvantage.

15          Look, AI might change -- might change things.  But

16    as -- Your Honor, I recall asking a question -- and I can't

17    remember who it was up -- well, when?  And even a Microsoft

18    witness, as I recall, said, well, we're looking five years,

19    we're looking -- no one knows.

20          Your Honor, it's similar to what Google was telling

21    the FTC back in 2012.  Mobile, mobile is going to change

22    everything.  Well, yeah, mobile changed -- mobile didn't change

23    much, except give them a greater advantage.  It's the same

24    thing.  It's always something else that's going to create

25    greater competition.  But when we look at things today, there

1    is still an enormous scale advantage.  And what they had in

2    2014, they have even greater scale advantage today.

3              And that raises the legal question, Your Honor.

4              If you go to Slide 2.

5              This is a case -- and I should hand up the case,

6    Your Honor, because it's not cited in our brief.  I did -- we

7    did notify Google two days ago that we would be -- that I would

8    be discussing it.

9              It's the Ninth Circuit decision in *PLS*.  That

10   involved a National Association of Retailers rule that

11   basically required all listings -- if you were going to list on

12   a non-MLS website, you had to make sure it was also on an MLS

13   website.  And their big argument was quality.  It's all about

14   quality.  It ensures that there's one website that everyone can

15   go to and it's reliable and it produces that great quality.

16             Well, what the Ninth Circuit said, again, citing

17   *National Society of Professional Engineers*:  Justifying a

18   restraint on competition based on an assumption it will improve

19   a product's quality is nothing less than a frontal assault to

20   the basic policy of the Sherman Act.

21             And so it's -- it's not a procompetitive

22   justification.  Quality can't be a procompetitive justification

23   here because it arises from the scale advantage, which arises

24   from the exclusionary conduct.  And we cite the *Anthem* case,

25   Judge Millett in a concurring opinion made the point very

1    simply:  A proffered efficiency can arise from procompetitive

2    effects.

3              And this all stems back to -- go to Slide 10, please.

4              THE COURT:  Before you go forward, can I just ask

5    this:  Do you have to prove -- I should say, government have to

6    prove, if this is sort of the key feature of your argument, the

7    scale issue, we all agree -- I shouldn't say we all agree.

8              Your contention is that Google has foreclosed

9    50 percent of the market by virtue of these agreements.

10             MR. CAVANAUGH:  Yes.

11             THE COURT:  Don't you have to show that a competitor

12   could not compete in a way for the remaining 50 percent that

13   would have enabled them to get scale?

14             Because, again, remember the anticompetitive -- the

15   question here is are the agreements responsible for maintaining

16   the monopoly?  And it's the agreements that, at least in part,

17   you've said provide scale.

18             MR. CAVANAUGH:  Your Honor, I think the answer to

19   that comes from *Microsoft*.  *Microsoft* says:  Reasonably capable

20   of significantly contributing to the retention of monopoly

21   power.

22             It doesn't have to be the sole exclusive reason, but

23   with a 50 percent share, 50 percent foreclosure, 90 percent of

24   queries overall, 98 percent in mobile, the question is:  Are

25   those defaults significantly contributing?  And the answer is

1       of course they are because one leads to the other.  Their power

2       through the defaults gives them power throughout the market and

3       particularly in mobile where there is no competition.

4              And so the point that was made in *National*

5       *Association of Professional Engineers* is that, look, the

6       Sherman Act -- you can't say, well, look, we're going to have

7       an anticompetitive effect here but it's really going to help on

8       quality.  Yeah.  It might give Google better quality, but it's

9       not giving the market better quality.  What gives the market is

10      the point that the Court made in this case.

11             It's the legislative judgment, ultimately competition

12      will produce not only lower prices, but also better goods and

13      services.  At the end of the day, competition is what is going

14      to provide greater quality here.  Not simply Google having the

15      quality advantage, but the overall market having a quality

16      advantage.

17             And so, Your Honor, we don't think quality is an

18      appropriate procompetitive justification.  But even if the

19      Court was going to say, well, look, still -- I'll look at it in

20      the context of a balancing test.  You still need to look at --

21      if you don't accept our argument that it's fruit of the

22      poisonous tree, which we think it is, to borrow criminal

23      analogy.  Even if you say, well, I will consider it, you still

24      have to look, what does it come from?  What does this quality

25      come to?  Is this a true, meaningful, procompetitive

1    justification for the market?  And the answer to that is no.

2              Thank you, Your Honor.

3              THE COURT:  Mr. Cavanaugh, thank you.

4              Let's do this, let's just take five minutes before --

5    so our court reporter can have a moment before we go for

6    another 50 or so.

7              So if we all can just resume in five minutes or so,

8    that would be great.

9              (Recess from 3:20 p.m. to 3:25 p.m.)

10             THE COURT:  Please be seated.  Thank you.

11             MR. SCHMIDTLEIN:  Excuse me, Your Honor.  One second.

12             (Pause.)

13             MR. SCHMIDTLEIN:  All right.  Good afternoon,

14   Your Honor.

15             I want to move right into procompetitive benefits and

16   balancing.  And I may come back to some of the other points

17   from our earlier discussion during -- during the summations.

18             A couple of just, sort of, high-level things from a

19   legal perspective to remind the Court of here.

20             The plaintiffs, I think, bear the burden on this

21   less-restrictive alternatives piece of this.  Only after, you

22   know, we've come forward with procompetitive justifications,

23   procompetitive benefits, you know, they -- at that point,

24   they're the ones who then have the burden of doing -- of

25   showing the balancing.  In other words, we don't have to show

1    the balancing.  We come forward with non-pretextual

2    procompetitive benefits, then they -- it's just back to them to

3    sort of show how the balancing turns out.  And -- excuse me.

4            And then as part of that, if -- they can try,

5    although I think you're right, Your Honor, that in this

6    question of where do the less restrictive alternatives fit in,

7    particularly in Section 2 cases, it's not a -- it's not a model

8    of clarity, but I would direct your Court -- the Court's

9    attention to the *Alston versus NCAA* case, which makes clear

10   that Google doesn't have to -- you know, they basically make

11   the point the defendant doesn't have to, sort of, sitting there

12   in realtime, try to imagine every single conceivable way in

13   which they might reorganize the market to try to help other

14   competitors.  This less-restrictive alternatives piece is a

15   pretty high burden, and it's on the plaintiffs at the end of

16   the day.

17           THE COURT:  I'm sorry to interrupt.

18           At least our reading of it -- and let me get your

19   reaction -- is that the least-restrictive alternatives issue

20   slots in on the question of pretext.  In other words, it --

21   once you -- and maybe this is what you're saying, which is if

22   the plaintiffs can show that there are less restrictive ways to

23   support your procompetitive justifications, then that is proof

24   of pretext.

25           MR. SCHMIDTLEIN:  I think that's -- I don't think

1   that's correct, Your Honor.

2              THE COURT:  You don't think that's right?

3              MR. SCHMIDTLEIN:  I think you're right in the sense

4   of once we've come forward with procompetitive benefits, then

5   it flips back to them to do potentially a number of different

6   things.  One may be for them to try to show that they are

7   pretextual.  But I don't believe that showing that there is a

8   theoretical less-restrictive alternative -- and, again, this is

9   where I would recommend that you take a look, again, at the

10  *Alston* case.

11             I think that that analysis or the fact that they

12  might be able to identify a less-restrictive alternative does

13  not make the procompetitive benefit pretextual.  And whether it

14  sort of adds into or fits into how you do this balancing, the

15  truth of the matter is, Your Honor, in most of these cases, and

16  as you've -- I think we both have probably read *Microsoft* --

17  *U.S. v. Microsoft* more than any case we've both probably read

18  in our careers.

19             In almost all of these types of cases, when the

20  defendant comes forward with a procompetitive justification,

21  there's not -- that usually wins the day.  You know, this idea

22  of now we're going to balance out, you know, somewhere else,

23  most of the time in *Microsoft* the conduct that was found

24  affirmed on liability, there were no -- there were no

25  procompetitive justifications.  However, there were

1    procompetitive justifications proffered.  The government

2    doesn't have a whole lot of success trying to win on the

3    balancing side.

4            So I think you are correct that it comes in sequence

5    afterwards, but I don't think the identification of it sort of

6    nullifies the procompetitive benefit.

7            THE COURT:  So even to take a step further back, is

8    it -- and I guess maybe I don't even need to ask you this,

9    since the plaintiffs have conceded it.

10           But, you know, most of the cases in which this

11   inquiry arises, this alternative lesser means, in all Section 1

12   cases.

13           MR. SCHMIDTLEIN:  All Section 1 cases.  Yep, right.

14           THE COURT:  In all Section 1 cases.  Is it your

15   view that -- and Section 1 cases, they, you know, arise in sort

16   of the rule-of-reason setting.

17           MR. SCHMIDTLEIN:  Correct.

18           THE COURT:  And I guess this is -- you know,

19   Section 2 balancing is a little bit of a rule of reason, but

20   not exactly either.  I don't think it's quite as loose.

21           And so, I'm wondering if there's even any inquiry

22   required of less restrictive ways, if for no other reason than

23   what we're really concerned about here is monopolistic

24   behavior, why we would sort of ask, well, could the monopolist

25   do it in a different way?

1          MR. SCHMIDTLEIN:  Right.  I mean -- and I think this

2     goes a little bit back to the question of if the conduct is

3     competition on the merits, our position is -- and we've won on

4     competition on the merits -- there is no balancing to conduct.

5     In other words, if I've won because I have a better price and I

6     have better quality, then the fact that there are effects

7     doesn't mean they're anticompetitive.  We don't want to get

8     into all this balancing.

9          THE COURT:  You would have me revisit kind of where I

10    put your competition on the contract defense and not, sort of,

11    put it in this procompetitive basket?  But, rather, ask the

12    threshold question, or the antecedent question, and that is, is

13    this an exclusionary conduct to begin with?

14         MR. SCHMIDTLEIN:  I think that goes to what

15    *Microsoft* -- and I think what Your Honor was grappling with was

16    this:  Does the conduct harm the competitive process, as

17    opposed to does the fact that you have won potentially have a

18    negative effect?  We obviously have a disagreement with them

19    about the scale.  And I'm probably going to talk to you a

20    little bit more about that in the summation, if that's okay

21    with you.

22         But even if they're right about that, if -- and,

23    remember, they haven't said that Google acquired its monopoly

24    in an unlawful way.  They've conceded.  For purposes of this

25    case, Google lawfully acquired what they claim is monopoly

1    power, and with that, presumably, according to them, came scale

2    advantages.

3            That's not unlawful.  That's not exclusionary.

4    Continuing to win contracts because we had that advantage,

5    lawfully obtained, does not mean we have an anticompetitive

6    effect, and it doesn't mean the conduct is exclusionary.  And

7    you shouldn't even get into balancing because once we've got

8    lawful, nonexclusionary conduct, I don't think the Sherman Act

9    commands you then to sort of balance that because the conduct

10    is nonexclusionary in the first instance.

11            I want to talk a little bit about the various types

12    of agreements here and talk a little bit about the balancing

13    effect, if that's okay.

14            First, as to the benefits --

15            THE COURT:  Sorry, could I just get your reaction to

16    the following:  It follows on, I think, with what you've just

17    described, and a similar sort of argument was made in *Microsoft*

18    in connection with the market power inquiry.  And the Court

19    described it this way:  "Microsoft next argues that the

20    applications barrier to entry is not an entry barrier at all

21    but a reflection of Windows popularity.  It's certainly true

22    that Windows may have gained its initial dominance in the

23    operating system market competitively through superior

24    foresight or quality, but this case is not about Microsoft's

25    initial acquisition of monopoly power.  It's about Microsoft's

1    efforts to maintain this position through means other than

2    competition on the merits."

3              Then they go on to say that the applications barrier

4    continues to remain.  And so it's in a slightly different

5    context, but I wonder whether what you just said runs up

6    against what the Court said in *Microsoft*, which is, okay, you

7    may have earned your monopoly position lawfully, but because

8    you're now a monopolist, that same conduct can now be unlawful

9    because you are a monopolist.

10             One or two, what Mr. Cavanaugh suggested is that, you

11   know, sort of propagating benefits from monopoly conduct can't

12   inure to the benefit of the monopolist.

13             MR. SCHMIDTLEIN:  The difference, again, between

14   *Microsoft* and the present case is in *Microsoft* they achieved

15   their monopoly through -- at least for purposes of the record

16   in that case -- through lawful means.  In other words, they

17   built the best PC operating system and they won that and they

18   got whatever advantages, including the applications barrier to

19   entry.

20             What was different, what changed was they weren't

21   prosecuted in that case for continuing to do the same conduct

22   that got them the applications barrier to entry.  In other

23   words, continuing to be very popular, continuing to have lots

24   and lots of users buy Microsoft computers, and then also all of

25   the software that goes with that and all the investment, back

1    in those days when we all bought discs and we all loaded our

2    computers with all that software.

3          What changed was they began engaging in different

4    conduct.  And that different conduct was all of the

5    exclusionary conduct directed at browsers because Microsoft's

6    internal documents and their -- you know, the evidence in the

7    case was they thought Netscape Navigator was a threat to erode

8    that applications barrier to entry.  So if Microsoft had just

9    gone on winning on the merits, I don't believe there would have

10   been a prosecution.

11         And, indeed, even as to the browser conduct -- I

12   think I talked a little bit before on one of my slides, even as

13   to the browser conduct, conduct that was competition on the

14   merits or conduct, like the free Internet Explorer and the IEK

15   and all of those things that the Court found not to be

16   impairing the competitive process, the Court said, step one,

17   lawful.  Don't get into balancing.

18         I recognize that conduct probably does also

19   contribute to increasing the applications barrier to entry

20   because it does help you sell Internet Explorer in competition,

21   but that's not -- you're not liable for that conduct.  So, I

22   think that's the difference.

23         THE COURT:  So, I'm sort of curious of plaintiffs'

24   position on this, which is is there a case or do you view

25   Sherman Act Section 2 law to essentially say if the same

1    conduct is the subject -- if the conduct that caused the

2    monopolist, or allowed a company, a firm to become a

3    monopolist, is also the same conduct that then gets alleged to

4    be containing the monopoly, that that is not a viable Section 2

5    claim?

6         MR. SCHMIDTLEIN:  By economic logic it can't be

7    because if I engaged in the conduct at a time when I didn't

8    have market power or monopoly power, then almost by definition

9    if it's successful, it's presumably because I'm doing something

10   procompetitive.  Right?  I mean, if I was engaging in -- if I

11   tried to engage in exclusionary conduct, but I don't have the

12   market power to pull it off, it's going to fail.

13        THE COURT:  Right.  I mean, prior to some year, the

14   foreclosure analysis would look very different when you were

15   entering into your initial agreements.  And so, yes, that would

16   not have been anticompetitive.

17        MR. SCHMIDTLEIN:  As to foreclosure.  But, again,

18   back to step one, is it exclusionary.  It's the same

19   procompetitive, competition on the merits conduct.  And I think

20   there is a very, very large difference between conduct like

21   that and then, sort of, conduct, as I said, in *Microsoft*, which

22   is:  Okay, now I'm going to engage in something very, very

23   different and I'm going to win on browsers through harming the

24   competitive process.  I'm going to cause them to use Internet

25   Explorer even though it's a lesser product.  And that is a

 1    very, very different situation than what we have -- what we had

 2    in this case.  I hope that was responsive, Your Honor.

 3         I would like to first talk about why we submit the

 4    procompetitive benefits outweigh any anticompetitive effects.

 5    And, obviously, our view is there were no anticompetitive

 6    effects in the first place.

 7         And I'll take a look at the browser agreements.  And

 8    those really were -- again, I want to follow a little bit in

 9    your judge's summary judgment opinion -- if you're going to

10    consider them here -- and I think a version of this you can

11    consider earlier, but if you're going to consider them here,

12    then absolutely competition on the merits is a procompetitive

13    benefit.

14         And this is not -- this is not *National Society of*

15    *Engineers*, as my friend, Mr. Cavanaugh, suggests, or the new

16    case that he handed up that they didn't cite in their brief,

17    which are horizontal conspiracy cases, sort of -- *Society of*

18    *Engineers* was kind of like a price-fixing boycott case and sort

19    of similar horizontal conduct, almost like a -- either a tie or

20    a sort of a forcing -- I'm using my monopoly power in a

21    horizontal sense to block competition, and the excuse was, in

22    *Society of Engineers*, it was, well, we sort of need to kind of

23    fix prices to prop up our bids because if competition drives

24    our bids down too low, we're going to design really, really

25    unsafe buildings.  And that's sort of bad for competition.

1          And the Court, I think, correctly said, listen,

2     whether you can stay in the market and whether you can afford

3     to build buildings in a safe way, that's a different question.

4     The Sherman Act doesn't get involved in, sort of, arbitrating

5     those sorts of things.  All we're here to do is think and talk

6     about competition.

7          That's a very, very different situation than what we

8     have in the present case because what we have here is we have a

9     long-standing -- on the browser side we have a long-standing

10    product design.  I know you've seen these documents before from

11    the very, very beginning.  When Apple first unveiled Safari,

12    they came up with an integrated sort of search feature.  And,

13    you know, whether we talk about these products as being

14    complements or however you want to describe them in economic

15    fashion, the truth of the matter is -- and I think the

16    testimony in the case was uncontradicted -- that everybody

17    views the quality of the default search engine in a browser as

18    affecting the utility of the product and consumers' perception

19    of the product.

20         You will remember the evidence from, I think,

21    Ms. Baker at Firefox, when they switched to Yahoo!, not only

22    did they find a lot of people leaving -- or, I should say,

23    switching the default, finding their way back to Google, they

24    also found people leaving Firefox altogether and starting to

25    use other browsers.  And I think everybody sort of understood

1     that.

2         And I also cross-examined Mr. Nadella on this, and he

3     admitted -- he admitted, because you also heard evidence about

4     how Internet Explorer and the government sort of concedes this,

5     they sort of tried this as part of their Chrome story --

6     Microsoft stopped innovating on Internet Explorer.  They

7     flipped the market, got their monopoly through their unlawful

8     conduct, and then they sat on it because they didn't think they

9     had any competitive pressure on it.  That's Point 1.

10        Point 2 is they missed the boat.  They didn't

11    understand that you needed to be designing a browser to work

12    well with the search engine.  Whereas, Google has been doing

13    that and working for that and finding ways to make those

14    products work really well together.  Microsoft missed the boat,

15    and Mr. Nadella admitted that.  We have a situation where --

16        THE COURT:  Sorry, for a second.  This issue of --

17    I'll just simplify, so forgive me, just in terms of Google's

18    benefit to browsers, just think what you're arguing, you know,

19    a Google Search engine in Firefox makes Firefox a better

20    browser.  It's pretty unique in the sense that there isn't, I

21    would say -- dare say, there isn't a lot of -- I think most

22    people don't distinguish between the two.  It's sort of

23    established at trial that browsers, general search engines, I'm

24    not sure if there's a popular understanding of the difference

25    between the two.

1          Do you think what you just talked about is a cross-

2     market justification, procompetitive justification, or is it in

3     market because these are complementary products?

4          MR. SCHMIDTLEIN:  It's both.  It's both.  But it is

5     definitely a cross-market sort of complementary product

6     because -- I'm sorry -- it's an in market because what we see

7     is, to the extent that what -- that users are getting the best

8     search engine as the default, they search more, they have a

9     better experience, and that's why -- that's, frankly, why

10    they're choosing Google.  They want their customers to have the

11    best experience, and that experience, it benefits the browsers,

12    and I think it enhances, sort of, competition between the

13    browsers, but it also benefits search.  It lifts Search output.

14         As I said, when Firefox switched, it not only found,

15    sort of, people dissatisfied with the search aspect, and so

16    they were switching back, but they also found people switching

17    away from Firefox altogether.  And so browser developers are

18    making this decision both because it's good for the browser but

19    also because it's good for Search.  And it's obviously, by

20    paying a revshare, it's incentivizing the browser to be really

21    good and to integrate well and to work well with Search because

22    they'll benefit from that.

23         THE COURT:  Is the increase in Search or growth in

24    Search that you say is related to Google's default position in

25    the browsers, is that a procompetitive effect?  I mean, yes, it

1    arguably benefits users, but is it procompetitive?  In other

2    words, does it enhance competition?  Or is it just sort of

3    enhancing Google's position in the market?

4        MR. SCHMIDTLEIN:  It's doing both.  It's doing both.

5    The competition for these defaults does both because it does --

6    it incentivizes everybody to compete hard, improve their

7    products to win those defaults.  It's absolutely both.  And,

8    you know, the plaintiffs like to say, oh, well, you know,

9    Google didn't face any competition.  Mr. Dintzer cites a very,

10   very misleading quote from Professor Murphy about Android.  You

11   know, these weren't contestable.

12        It's not that they weren't contestable, somehow that

13   the Android contracts were hidden.  Nobody knows when they're

14   up.  We cited the testimony to you.  People -- carriers talked

15   to Microsoft.  They asked them, would you make a bid?  They

16   never came back to them.  In other words, the notion that

17   Microsoft doesn't know how to find their way to talk to

18   Samsung -- Microsoft has deals with Samsung.  It's ridiculous.

19   Microsoft knows how to find deals with its OEMs.

20        So these are absolutely procompetitive in the sense

21   they both grow search, they improve the browsers.  And with

22   respect to Mozilla in particular, we've submitted to you the

23   evidence that they provided in the case that if Google was

24   prevented from competing, they might go out of business because

25   then there won't be competition, there won't be this

1    competition for the default, it will only be Microsoft left,

2    and the revshare payments will go way, way down.

3            And that is what we cited, the percent -- and it's

4    our slide deck, the percentage of revenue that they get, their

5    total company revenue that comes from these is the overwhelming

6    majority of the revenue.  This is their lifeblood.

7            So if you take this away, then these independent

8    browsers are absolutely going to suffer.  And without the

9    competitive pressure they bring to bear, it's absolutely the

10    case.

11            And, again, I will -- I'll just go back to Google,

12    Google doesn't make any money on Chrome per se because it

13    doesn't license Chrome.  Most browsers don't.  I think most

14    people would probably say this was another consequence of the

15    Internet Explorer monopolization.  They bundled it with

16    Windows, nobody could sell it anymore; now it was a free

17    product.

18            So as a result of that evolution, what's left for

19    browsers?  Making money on default search.  That's where they

20    make their money if they're not already a platform provider,

21    and so it is absolutely critical.  And I think what we've seen

22    over time is Google has injected competition into the browser

23    space and it absolutely impacts search.

24            Ironically, Microsoft Edge browser is built on

25    Chromium.  They finally ditched Internet Explorer, which was

1    built on different technology because it was so bad and

2    Google's open source.

3            Why doesn't Google make Chromium open source?

4    Because Google understands better browsers -- they'll put it

5    out there for anybody to use.  Lots of companies use Chromium

6    now.

7            Why does Google do that?  Because Google understands

8    better browsing technology for free, open source, will increase

9    the use of the internet, more people use internet, better

10   experience on internet, more searching.  It couldn't be more

11   obvious.

12           Mr. Dintzer says, well, I don't see the document side

13   of Google.  I don't know how much more obvious it could be.  It

14   is the logical and clear explanation.

15           And the same is true of Android.  The Android

16   operating system is licensed for free.  Why does Google do

17   that?  Because it understands having really, really good

18   smartphones, having good mobile devices, and having that

19   competition improves.  And I'll talk a little bit about some of

20   that competition because, again, I think it's the same -- it's

21   a little bit of the same question on browsers.  It's -- it's a

22   benefit in both.

23           I think they all do come back to Search, but they

24   also do promote competition in these other markets and, you

25   know, we've submitted to you the cases that we say you can

 1    consider, the procompetitive benefits in those other markets.

 2    There are certainly cases out there.  Mr. Dintzer -- I think he

 3    didn't say that there are no cases out there that say you can't

 4    consider them in other markets.  And he said, I think in

 5    response to your question, well, it's the language of Section

 6    2.

 7          Well, I would commend you to read *Kodak*, the --

 8    obviously the *Epic Games* case.  There's a variety of cases --

 9    *NCAA versus Board of Regents*, which was the monopolization --

10    or, the Section 1 and monopolization case involving college

11    football, all, I think, confront this issue.

12          And even Microsoft to some extent -- you'll remember

13    one of the OEM restrictions in Microsoft --

14          THE COURT:  How do you -- what's -- is it

15    *Philadelphia Bank* or --

16          MR. SCHMIDTLEIN:  Yeah.  That was a Section 7 merger

17    case.

18          THE COURT:  Right.

19          MR. SCHMIDTLEIN:  And our position is the language of

20    Section 7 and the language of Section 2 are different.  And I

21    think there are cases and there is sort of commentary out there

22    that recognize that.

23          But even in *Microsoft*, you'll remember that one of

24    the restrictions -- I think I got this right.  One of the

25    restrictions in *Microsoft* was -- that the Court found that was

1    legitimate, was when -- they overrode -- Windows overrode

2    somebody who chose another default browser, and they did that

3    in circumstances where if that browser tried to call certain

4    functionality to the Windows operating system, but they didn't

5    work together.  Only IE worked with it.  What the Court in

6    *Microsoft* said was that's a procompetitive benefit that inures

7    to the operating system market, even though there's an

8    anticompetitive effect in the browser side.

9            And I think this was part of the tying case and they

10   said, on remand, you can consider a measure effects in one

11   versus procompetitive in the other.  On remand, of course, the

12   government dropped the tying claim and it never -- it never

13   sort of percolated beyond that.  But the D.C. Circuit did say

14   that.

15           THE COURT:  I think the thing that I'm struggling

16   with on this question is, one, it doesn't seem to have come up

17   squarely in a Section 2 case in a very clean way.

18           But, two, what is seemingly at the heart of this

19   notion that courts shouldn't be engaging in cross market

20   balancing is -- is this notion of courts ought not to be in

21   that business.

22           In other words, it's very difficult for a court to

23   balance the competitive -- procompetitive benefits in Search

24   against procompetitive benefits in the mobile phone market.

25   And, the sense I get, at least from -- is that -- that is not

 1    something that courts should be doing.  And court --

 2             MR. SCHMIDTLEIN:  Courts have -- courts have ruled

 3    that it is appropriate, but you don't -- we don't need you to

 4    do that in this case.

 5             THE COURT:  Right.  I know you don't think I need to

 6    get there, but...

 7             MR. SCHMIDTLEIN:  Exactly.  And I think that -- it's

 8    a fair question to raise because, candidly, how you do it, even

 9    in market --

10             THE COURT:  Right, I think --

11             MR. SCHMIDTLEIN:  -- is tricky enough.

12             THE COURT:  Right.

13             MR. SCHMIDTLEIN:  And most of the cases resolve, as

14    *Microsoft* did, once you got procompetitive justifications.

15             And I would say, particularly if it's competition for

16    the contract, it's going to be near -- near impossible to show

17    the anticompetitive effects outweigh that because we want to

18    encourage procompetitive behavior.  So I hear what Your Honor

19    is saying.  I think you can do it, but you don't need to do it,

20    is our position here.

21             In terms of this question of the choice screen.

22    Mr. Dintzer has, you know, put up his timeline, back in the

23    annals of history when Microsoft was -- or, Apple was thinking

24    about launching a version of Safari for Windows and they were

25    thinking about possibly having different defaults because it

1    might relate to where they got downloaded and things like that.

2    And I believe Mr. Cue testified, yeah, that was something we

3    kicked around but we never -- we never did it.

4          And Mr. Cue, I think, has testified clearly, this

5    notion of a choice screen on -- for Safari is not something

6    they thought was the -- was the best user experience.  And, so,

7    the idea that this is a less restrictive alternative --

8          THE COURT:  Can I even consider that as a less

9    restrictive alternative with respect to the ISA?  I mean, with

10   Android maybe.

11         MR. SCHMIDTLEIN:  No, because it's not something

12   that's ever been out there in the wild and --

13         THE COURT:  Well, I was thinking slightly different,

14   which is that -- would the choice screen functionality -- who

15   would control that?  In other words, is that something that

16   could be built into a search engine?

17         That's the thing I don't quite understand.  It makes

18   sense to me that Safari, when you opened up an Apple phone,

19   that there would be some functionality through Apple, whether

20   it's Safari or some other mechanism, that the phone provides a

21   choice screen.  I don't know how the search engine could

22   provide a choice screen.

23         MR. SCHMIDTLEIN:  It's a good question.  I mean, as I

24   said -- and the reason why is we've never seen a browser do

25   this.

1              THE COURT:  The reason I -- tell me if I'm wrong.

2     The reason, I thought, in Europe they could mandate a choice

3     screen only on Android is because Google controls Android.  But

4     there's no choice screen mandated on iOS.

5              MR. SCHMIDTLEIN:  No.  No.  There's never been a

6     challenge to the iOS agreement.

7              THE COURT:  Right.

8              MR. SCHMIDTLEIN:  So that -- so it's a very

9     complicated -- and I'm not the expert on the -- the engineering

10    complication for, sort of, how Google -- and the things that

11    Google had to do to execute on, sort of, having this choice

12    screen.

13             Mr. Dintzer likes to say that -- you know, talks

14    about the widget and things like that, as if the widget -- as

15    if the Google widget has a default.  The Google widget is

16    Google Search.  There's no default on the search widget on

17    Android.  The only thing there's a default on is Chrome.

18             And so they actually forced Google to sort of build

19    something different over there to -- that would allow some sort

20    of choice screen widget sort of circumstance that was

21    completely non-existent beforehand.

22             So we are in a very, very different situation,

23    certainly with an Apple or a Mozilla.  But, the facts of this

24    case are Apple believed that a choice screen was not the right

25    thing for users, it wasn't the best user experience.  And for

1    that reason alone, I don't think this Court has a record, a

2    factual basis to be able to say this is a less restrictive

3    alternative, that this is a procompetitive outcome, or there

4    would be some sort of -- it would not be an anticompetitive one

5    to cause a redesign of a product that has been wildly -- that

6    is wildly popular.

7            And as I said, the testimony in this case has been

8    consistent, Mozilla is actually the exact same.  Ms. Baker

9    testified about they want the browser to work right out of the

10    box.  And, you know, their experience was they've never wanted

11    to have a choice screen, but they've designed the product, just

12    as Apple did, to make switching very, very simple.  They don't

13    view this as an exclusive default.  That's not their testimony.

14    And obviously the 60-40 Apple, you know, data that we've talked

15    about sort of confirms that.

16            They chose Google based on quality, just as Apple

17    did, and that is competition on the merits that absolutely is a

18    procompetitive benefit that you can consider.

19            Now, these agreements enhance search and browser

20    competition.  And this is the commentary point we've talked

21    about.  It definitely comes back and benefits search.  So it

22    absolutely benefits -- it benefits browsers, too, but it

23    absolutely comes back and benefits search.  And, you know,

24    even -- even Professor Rangel and -- you know, Professor Rangel

25    was very, very clear about what he was not testifying to.

1      Professor Rangel, you know, came in here and gave us

2   his exegesis on defaults and behavioral economics.  He never

3   sat up there and said, you know, I think it would be better if

4   Apple had a choice screen.  He never second-guessed anybody and

5   he recognized and admitted that there are, obviously, certainly

6   circumstances where having a default is the right design for

7   the product and is good for users, and he talked about various

8   other factors that would go into it.  I would suggest to you

9   those are the same factor that Mozilla and Apple have

10  considered.

11      But he -- even he admitted defaults are interpreted

12  by decision-makers, by consumers, as an implicit

13  recommendation.  Well, that's valuable.  That's absolutely

14  procompetitive.  Particularly when confronted with all of the

15  evidence in this case of users -- I think Your Honor -- Your

16  Honor nailed it, people don't switch the default very often

17  when it's Google.  People do know how to switch the default

18  when it's somebody else.

19      And so getting that recommendation is absolutely

20  valuable and it -- and when Google is the best, why wouldn't

21  Mozilla, why wouldn't Apple want their consumers to have the

22  best product working in compliment with their browsers?

23      So it provides a convenient access to a search engine

24  out-of-the-box that increases usage and it provides a

25  recommendation to users, which are valuable because even though

 1    Mr. Dintzer likes to say that, well, browsers aren't aligned

 2    with consumer's best interests, well, I would suggest that

 3    Apple has way more at stake than I do individually as to

 4    picking the best default search engine.  They've got way more

 5    at stake in terms of the broader portfolio of their products,

 6    their reputation, everything that they have -- that they stand

 7    behind than I do picking an individual browser at any point in

 8    time.

 9         Defaults also offer the option for price competition,

10    that price competition between browsers is a good thing.  It

11    sort of -- it's -- you know, gets a little bit lost in this

12    because browsers are free and search engine are free.  But it

13    does generate a notion of price competition, which does benefit

14    the browsers.

15         THE COURT:  I'm sorry.  What do you mean by price --

16    you mean in terms of the revenue share?

17         MR. SCHMIDTLEIN:  Correct.

18         THE COURT:  That's what you mean by price

19    competition?

20         MR. SCHMIDTLEIN:  Correct.

21         And to a point Mr. Dintzer said, he tried to suggest

22    to you that Mr. Pichai -- Mr. Pichai said, in 2016, oh, I

23    didn't really feel any competition, so that's why I didn't give

24    Apple exactly what they wanted in terms of their demand for

25    revshare.

1          I commend Your Honor's attention to the findings of

2     fact on this because you'll be reminded that in 2016, Google's

3     revenue share went up.  They wanted -- Apple wanted it even

4     higher and they compromised in between.

5          The idea that Mr. Pichai walked into Mr. Cue and

6     said, no, you'll take a price cut, it's not what the facts

7     indicated in this case at all.  There was price competition in

8     2016 and there's always been price competition.

9          THE COURT:  Do you need to show on the price

10    competition issue that, in fact, the revenue share is going

11    toward the particular product that's not the search engine?

12         In other words, we saw a lot of testimony from

13    various folks, AT&T, Motorola, et cetera, none of them said,

14    no, the amount we make in revshare really -- we don't really

15    think about that when we price our phones, for example.

16         Don't you have to make some showing that there is a

17    connection between the two, more than just, well, it's simple

18    economics and money is fungible.  I mean, it's got to be more

19    than that.

20         MR. SCHMIDTLEIN:  Understood.  But I guess I would

21    suggest they can't have it both ways.  They can't sit up here

22    and do this dance of billions of dollars, billions of dollars,

23    look how much money it is.  And then say, oh, it doesn't

24    matter.  It doesn't matter to the OEMs.  It doesn't matter to

25    Apple.  It doesn't matter to the carriers.  They haven't proven

 1    that it has any effect on their revenue.  I think we did --

 2              THE COURT:  I think -- clearly it is the revenue,

 3    right?

 4              MR. SCHMIDTLEIN:  I mean, their operations.  And I

 5    think we do have testimony -- obviously the slide I've got up

 6    here, it's redacted because this is still, I think,

 7    confidential information that Your Honor has -- about Apple

 8    margins and things like that that we've looked at.

 9              THE COURT:  Right.

10              MR. SCHMIDTLEIN:  But, you know, what Professor

11    Murphy did try to look at was, you know, relationships between

12    margins, revenue share payments, services, payments and things

13    like that, and he -- obviously he does see a correlation.

14              Now, you know, is there a dollar-for-dollar sort of

15    translation?  No, we don't have that.  But I think we have

16    established -- and I think there is enough economic theory here

17    that would suggest that when you're talking about payments of

18    the magnitudes that we have here, you absolutely would expect

19    those dollars to translate into advantages.  And one of the

20    reasons -- and I think the testimony on this was pretty

21    consistent from Google.  They absolutely understood and

22    expected and wanted the revenue share payments to help their

23    Android partners, that this was a way -- and, again, just a

24    reminder, particularly on the carrier side --

25              THE COURT:  Can I ask why that is so -- at least if

1    I'm understanding, if that was Google's understanding that you

2    then now have these go-to-market agreements that are

3    specifically -- say, some percent of the revshare needs to go

4    toward promotion of Android --

5          MR. SCHMIDTLEIN:  I think there's two different

6    things going on here.  One of them is we're going to share, or

7    we're going to provide certain dollars that are specifically

8    for promotional.  In other words, marketing types of

9    incentives.  The others, really the dollars are -- if we are

10    trying to incentivize you to provide for us incremental

11    promotion of Google Search and the setup of your device in a

12    way that we think will help Android sell better and we will

13    also give you certain -- we'll pay you revenue share that we

14    think will help your bottom line.

15          And for OEMs it will do a couple things.  It will --

16    obviously, it allows them to innovate more.  And these folks

17    are on tight margins.  It's a -- they're obviously in a

18    competitive industry.  It will allow them to build out and to

19    continue to hopefully come up with the new technologies.

20          You've probably seen some of the -- every time

21    there's a new advertising campaign, you're seeing new types of

22    functionality that's focused on.  That all costs money.  So

23    Google is absolutely trying to help those folks innovate.  And

24    on the carrier side, we're trying to give them money that will

25    help them be profitable so they can sell against Microsoft.

1          Yes.  We're going to try to work with them and give

2     them monies to do campaigns or, you know, help promote Google

3     in that way, but we also need them to make money on those

4     phones because the carriers are selling iPhones on aisle A, and

5     they're selling Android phones on aisle B, and we need them to

6     have skin in the Android game so that they are pushing those

7     phones just like they're pushing the iPhones because,

8     otherwise, it will just be too easy for them to sell more

9     iPhones.

10         So we're trying to make sure that there is a profit

11    incentive there.  And Google funds that through revenue shares

12    from Google Search, absolutely.

13         But we -- you know, again, we did do an analysis on

14    Apple.  The percentage of revenue that, obviously, goes to

15    Mozilla is enormous.

16         And, you know, I won't go through all of the --

17    you've seen this document before and you've seen the evidence

18    relating to Mozilla.  We do believe Apple has, you know, very,

19    very significant incentives to support competition.  Their

20    devices have more search on them than any other devices.  And

21    so that's -- it's -- fostering competition is important for

22    them.

23         And, you know, they have regularly -- we absolutely

24    dispute the notion that the record in this case shows, oh,

25    there's really no competition at all.  There absolutely was

1    competition, and Apple has regularly evaluated these, and even

2    Microsoft witnesses recognized that there was competition.

3         I want to talk quickly about the less restrictive

4    alternatives that they've proffered here, and there's really

5    two of them.  There's the unconditional revenue share, which

6    Mr. Dintzer talked about, and then there's also the choice

7    screen that we've talked a little bit about.  Neither of these

8    reflect competitive market-driven outcomes.

9         Now, again, they keep making it out as if there's

10   something nefarious about, well, Google -- you know, Google

11   won't pay unless they're made the default.  Well, that is --

12   that has absolutely been true.  That's the incremental

13   promotion that Google is paying for.  And the notion that

14   Google would pay -- and I think this is what Professor Whinston

15   has sort of imagined, the idea of -- and I'm just not aware of

16   this in this sort of setting; I want you to pay me premium

17   promotional dollars to be -- for this default, but I may or may

18   not use you.

19        Nobody would enter into that deal.  Absolutely nobody

20   would enter into that deal.  And even all of Google's rivals,

21   if you look at every single device where another rival search

22   engine is the default, they all specify -- nobody has entered

23   into an unconditional revenue share to be set as the

24   out-of-the-box default.  Nobody has done that.  They claim

25   that -- and we've got -- we've obviously got Yahoo!, and we've

 1    got the Microsoft Jumpstart.  So these agreements are

 2    absolutely the benchmark.

 3           THE COURT:  I think the question is, at least as I

 4    understand what the plaintiffs are saying, is that there are

 5    unconditional revenue share agreements in the sense that there

 6    are revenue share agreements with other general search engines

 7    that are mainly with Bing that are not linked to the default.

 8           MR. SCHMIDTLEIN:  Right.

 9           THE COURT:  And Google's is linked to the default.

10    And I think what they're saying -- and correct me if I'm

11    wrong -- which is that they're not saying Google can't pay

12    revshare, I think.  But it's just that they can't pay revshare

13    in exchange to be the out-of-the-box default.  And as long as

14    that decision, that choice is being made by Apple or someone

15    else, then that would be okay.

16           MR. SCHMIDTLEIN:  There is little or no evidence that

17    that is the way the market operates.  Every other agreement

18    we've ever looked at, nobody has ever entered into an agreement

19    to be set as the default -- I'm sorry, to be set as a default

20    in an unconditional way.  The others have paid for secondary

21    placement, but they're paying for if the user switches the

22    default.  In other words, they're getting the drop-down menu.

23           THE COURT:  I guess the question is -- well, is the

24    reason we aren't seeing those kinds of agreements is that

25    Google has got the default?

1            MR. SCHMIDTLEIN:  No.

2            THE COURT:  In other words, nobody else would enter

3     into an unconditional default because there's no default to

4     get.

5            MR. SCHMIDTLEIN:  That's the competition that all of

6     these -- whether it's a PC OEM, whether it's Apple, or Mozilla,

7     or anybody else, that's the competition they've designed.  They

8     want to set a single default.  The only evidence they have --

9     they have the Safari for Windows anomaly and they have -- I

10    think he pointed to one initial term sheet from 12 years ago.

11    And Google's response to that was, yeah, no, we're not

12    paying -- we're not going to pay you for that.  If you want

13    that premium revshare, we want to be the default.  But, you

14    know, if you want to set somebody else, then obviously they

15    could do that, but we're not paying the default for that.  And

16    that's the way all of these other search engines have operated.

17            Mr. Nadella, when he was trying to win the default,

18    and Mr. Tinder was trying to win the default from Apple, they

19    didn't go in and say, hey, listen, we have a great idea for

20    you; we're willing to do unconditional revenue share.  That

21    wasn't the deal they were proposing.  That's never been the

22    deal they've ever proposed for any of the deals where they got

23    exclusive defaults.

24            THE COURT:  I'm going to ask you to just -- give you

25    another minute and then do a rebuttal and then move forward.

1        MR. SCHMIDTLEIN:  Okay.  We've talked a little bit

2   about the choice screen and why the choice screen is not an

3   economically valid sort of but-for world or less restrictive

4   alternative.  And it's important -- even Professor Whinston

5   acknowledged that choice screens are not -- he didn't view

6   choice screens as a but-for world.  This was part of the

7   foreclosure back and forth.  He sort of talked about this as

8   his thought experiment or his thought --

9        THE COURT:  Right.  I've had nightmares about Super

10  Duck ever since.

11       MR. SCHMIDTLEIN:  I'm probably going to give you one

12  more before we're done today.  And then, last, I'll just

13  quickly say here, the same types of considerations occurred on

14  Android.  Again, it was competition on the merits.  There were

15  benefits to users, benefits to OEMs, benefits to carriers.  We

16  see, you know, substantial increased mobile search during this

17  period.  We know that the -- sort of the fact that Google was

18  making the Android license -- the operating system license for

19  free was an important part of why it was successful and was an

20  efficient -- I think Professor Murphy describes as an efficient

21  barter.  We've got the evidence as to how Android phones are

22  less expensive and have provided real competition.

23       That price competition and those lower price devices

24  have grown over all smartphone -- that's absolutely a

25  procompetitive benefit within smartphones, but it also

1    increases search.  So it's procompetitive search.  And that's
2    one that I think counts in both.

3            And, you know, again, you can sort of study these
4    more.  They're obviously in our findings of fact.  But we do
5    have witnesses who have talked about how the money is
6    beneficial to helping them in their business operations.

7            And then back to your question about Europe.  In
8    Europe when all of this has been unbundled and we've had to do
9    these very complicated charging people money one way, paying
10   people money back the other way, what's been the result?
11   Everybody still is licensing Google.  There's been no impact on
12   competition in the sense of we've seen Microsoft investing more
13   or we've seen different people investing more.

14           Even DuckDuckGo, they haven't claimed that there's
15   more investment over there.  And Mr. Dintzer earlier said to
16   you, talked to you about the Microsoft and how, gee, you know,
17   the Surface Duo, they were forced to take Google, and even they
18   couldn't resist the MADA.

19           In Europe, for the exact same device, they licensed
20   Google.  They voluntarily licensed Google in Europe for the
21   Surface Duo, even though it was unbundled.  So for all of those
22   reasons, the Android RSAs promote competition, both devices and
23   search, and for that reason, any anticompetitive benefits are
24   substantially outweighed by the procompetitive benefits.

25           Thank you.

```
 1              THE COURT:  Thank you, Mr. Schmidtlein.

 2              Mr. Dintzer, give you a couple minutes, and then give

 3      Mr. Cavanaugh a few minutes as well.

 4              MR. CAVANAUGH:  Your Honor, I've ceded my time.

 5              MR. DINTZER:  Your Honor, I kept waiting for counsel

 6      to show you any documents from Google ever considering any of

 7      these benefits that we're talking about.  He showed you none.

 8      They are completely pretextual, and Microsoft expressly says

 9      that the procompetitive benefits that are asserted by the

10      defendant can't be pretextual.  It's not why they do these

11      things, and he couldn't show you a single document that shows

12      otherwise.

13              THE COURT:  Can I ask, is it the case, do you read

14      Microsoft to mean that the procompetitive benefit needs to be

15      contemporaneously spelled out?

16              In other words, I mean, that's what you suggested,

17      was the absence of documents suggests this pretextual.  Why

18      can't a defendant come into court and say, look, we agree that

19      there are no documents, but now that we're in litigation, here

20      are actually procompetitive benefits in these other markets?  I

21      mean, why is that not an acceptable litigation result, even if

22      there are no contemporaneous documents?

23              MR. DINTZER:  Well, so, Microsoft, Dentsply, Actavis,

24      they all say they have to be -- it has to be something they

25      consider.  Because I think at its root is the idea that -- that
```

 1    we want something to show that this is not an economist or not

 2    a made-for-litigation idea, that this is something that when

 3    they were actually considering this conduct, that we know from

 4    the documents that they -- that they hid it, they had an intent

 5    about it, that, hey, they were actually trying to create these

 6    benefits.  If they were all pretextual, if they were all made

 7    for litigation, then there is a deep likelihood that they

 8    really don't exist.

 9         THE COURT:  But your position is obviously, look, the

10    case law clearly states that it has to be something that is

11    supported with contemporaneous evidence, that that, in fact,

12    was -- the reason for a particular claimed exclusionary act

13    was, in fact, procompetitive benefits either within the market

14    or outside the market.

15         MR. DINTZER:  Within the market.  They can be outside

16    the market if they can make the bank shot and show that it

17    actually benefits inside the market.  But whatever it is,

18    they -- it can't pretextual.  And they have no documents.

19    They've shown no documents.  Everything that counsel said is

20    pretextual.

21         They talk about competition on the merits.  Oh, the

22    Apple contract comes up once every five years.  The idea

23    that -- so during that five years, there's no competition.  And

24    the idea that if they put the contract out once every five

25    years, that given the scale effects, given -- given all the

1  effects that some competition is going to arise is -- is just

2  not reasonable.

3           THE COURT:  I guess the question is:  Is that just

4  the reality of the product and does Google get held to account

5  because that's the reality of the product?

6           I mean, what you've just described is true with any

7  contract, right?  If I sign a contract to sell widgets to

8  somebody for some number of years, a requirements contract for

9  that period of time, no one else could compete for that supply,

10  right?

11          MR. DINTZER:  If it's a requirements contract,

12  absolutely, Your Honor.

13          THE COURT:  Right.  And, you know, I posed the

14  hypothetical with lawyers.  For example, lawyers represent

15  companies.  Okay, say the company puts, you know, it services

16  up to bid every couple years.  Well, the incumbent is always

17  going to have some advantage, right?  Because they've actually

18  acquired information and knowledge about the company that

19  they've represented for the last two years.

20          I guess the question is why the fact that there's no

21  ongoing competition -- that benefits the incumbent, for sure --

22  why that's anticompetitive?

23          MR. DINTZER:  Because when you're a monopolist, if

24  you insist on a requirements contract and you make sure that

25  none of your rivals can get that, the case law expressly says

1    that that can be an exclusive contract that blocks your rivals

2    and can be anticompetitive.

3           So if we go to Slide 38.

4           So I can't say the numbers here, Your Honor, but I

5    can -- the numbers speak for themselves.  What Google is

6    thinking about in 2016 is Apple's ask -- Apple is NYC, the Big

7    Apple.  NYC has asked for a certain amount and Google is trying

8    to decide whether to give them what they're asking for.

9           So what the Court can see in total TAC, that's the

10   delta, the number of billions of dollars extra if they gave

11   Apple what they wanted.  And they can see across the years.

12   And what's really telling here, Your Honor, is you go up to the

13   top line, Safari Default Search Revenue, this is how much they

14   think their revenue will go up if they pay Apple all of those

15   billions of dollars.  This would be pass-through.  This would

16   be saying, look, we're paying Apple more money and that number

17   will rise.  And the Court can see exactly how much their own

18   modeling in 2016, if they paid billions of dollars more, how

19   much pass-through would actually be affecting Search.  Google

20   doesn't believe in this.

21           THE COURT:  But you mean the pass-through to Google?

22           MR. DINTZER:  The pass-through -- it's not even just

23   to Google.  The increase in the amount of Search, this shows it

24   doesn't think that there's going to be any.  And, so, this is

25   them denying in their modeling the existence of pass-through in

 1    their biggest account.

 2         The --

 3         THE COURT:  Can I ask you to answer a question that I

 4    posed to Mr. Schmidtlein?  And I don't mean to prevent you from

 5    making your other points.

 6         But, would you agree with how I described this case,

 7    the way Mr. Schmidtlein described the history of Google's

 8    conduct here, which is that the very conduct that you all are

 9    now claiming is exclusionary and violates the Sherman Act is

10    the very same conduct that it engaged in to acquire the

11    monopoly?

12         Would you agree with that?

13         MR. DINTZER:  No, Your Honor.

14         And so I'm going to start with the law, which is

15    *Dentsply* and *LePage*, which both say that if you -- conduct that

16    you do when you're a monopolist -- I mean, if you're a

17    monopolist, there are things you can't do that you could do

18    otherwise.

19         But Google itself -- okay.  Google itself, we know

20    that since we've -- first of all, they had market share --

21    extreme market share before the 2010 start of our complaint.

22    But since that time, they've renewed and amended the RSA over

23    and over.  They've increased revshare.  They've modified the

24    RSAs.  They've modified MADAs.  They've switched terms from one

25    to the other.  They've enforced the terms.

1              What did we see with Branch?  We saw a term they were

2    enforcing against a potential entrant.  These are not like, oh,

3    we forgot we had this agreement and now we're being held

4    liable.  They consistently -- they renewed the RSAs every year

5    or two, which makes it particularly difficult in some ways

6    because they're constantly being renegotiated.

7              THE COURT:  What's the evidence that Google put the

8    kibosh on Branch?

9              I mean, I agree with you that there's some evidence

10   that Branch thought Google put the kibosh on Branch.  There's

11   evidence that your Samsung witness heard from somebody else

12   that it was Google and -- who was the other witness?  AT&T.

13             The guy from AT&T, same thing.  He sort of testified

14   and came up -- he didn't quite say that this was Google.  He

15   said, well, it may be an issue with the contract and we just

16   didn't want to press the issue.  I don't know that there's any

17   concrete evidence in the form of an email or testimony that

18   says Google concluded that installing Branch, even in some

19   original form -- let's forget about the sort of downgraded

20   form -- in it's original form, the reason nobody did that was

21   because they didn't want to run afoul of the RSA.

22             MR. DINTZER:  So this is in the second binder that I

23   gave you.  So I don't have access to the screens, but I will

24   explain the -- what the Court will see when it looks there.

25   And the Court will see it on the Slide 86, in the previous

1    deck.

2              But let me walk the Court through, if I may,

3    Your Honor.

4              First, we have AT&T reaching out to Google and

5    saying, can we have this technology?  Is this okay?  We have

6    Mrs. -- Ms. Kartasheva testifying she tried it out, she

7    determined that it wasn't okay.  She then got together with her

8    colleagues and they set up a plan where they would do two

9    things:  They would reach back to AT&T and tell them no and

10   they would reach out to Samsung and tell them no.

11             And so we then have the contact from AT&T that

12   took -- so this is -- they managed to get this up, so this is

13   on the screen.

14             So this is AT&T asking Samsung -- I mean Google -- is

15   it okay if we put this Branch technology on?

16             Let's go to the next one.

17             Mrs. Kartasheva testifying -- or, in the document she

18   concludes that it "conflicts with our definition of alternative

19   search," which is in the AT&T contract.

20             THE COURT:  Right.  But this -- to be clear, this is

21   not communication to AT&T.  This is an internal communication

22   within Google.

23             MR. DINTZER:  Absolutely.  But she says the next

24   steps are confirmed that other carriers have the language and

25   that gives us the ability to ask them to discontinue the

1    practice.  And with Samsung, confirm if they're doing it

2    globally and check what our alternative search definition wants

3    us to do.

4              Next one.

5              So then Google reaches back -- this is an email from

6    Google to AT&T saying, overall, we see some challenges with

7    this request and then they explain that it conflicts with the

8    alternative search service.  So this is -- this is the way that

9    a monopolist tells its partner we don't want you to do this

10   without actually threatening.

11             Next one.

12             And we know that because Mr. Ezell testified,

13   pointblank.  And the question comes from -- from Google's

14   lawyer where they're trying to say I think the alternate was

15   never definitively resolved one way or the other.  And

16   Mr. Ezell goes right after this, "Then one of my team members

17   floated the idea by Google to see what Google's opinion of it

18   was, and I didn't see the communication on that but I -- the

19   way it was reported back to me was that Google indicated they

20   felt that it was inconsistent with RSA.  Whether that's your

21   definition of definitively resolved or not, it was enough

22   uncertainty for me that I decided, as well as the device team

23   who would have been responsible for doing that, we just decided

24   it wasn't worth the uncertainty."

25             That's what Mr. Ramaswamy talked about when he said

1    about freezing the ecosystem.  You don't even have to threaten

2    anybody, all you have to do is make them feel like this.

3            THE COURT:  I have a question, I hate to bring up the

4    thorny Rules of Evidence.  The testimony was similar, Mr. Ezell

5    and the testimony from the gentleman from Samsung was similar,

6    that is, look, we never heard anything directly from Google.

7    We may have heard something -- we heard something from one

8    else, oftentimes the person was unnamed.  Is that admissible

9    evidence for the truth of the matter that Google in fact was

10   the one that told these companies that this would be a

11   violation of the RSA?

12           MR. DINTZER:  Sure, Your Honor.  We have the email

13   from Google, so we know that Google reached back to them and

14   said we have a problem.  And then we have testimony from

15   Mr. Ezell on how that email -- didn't have to be offered for

16   the truth -- how that affected his decision making.  So that's

17   not offered for the truth, he's actually testifying from

18   personal knowledge about why they decided not to do it.  And

19   his personal decision, as the head of that section, was we

20   decided because it wasn't worth the risk.

21           THE COURT:  Your case is less about Google, in fact,

22   told these companies that they would be violation the RSA, that

23   it is simply the mere chilling effect, if you will, to use some

24   First Amendment language, that these companies even had to

25   think about whether they were going to run afoul of the RSA

1    before they took steps to improve their product.

2         MR. DINTZER:  I think it's both, Your Honor.  There's

3    definitely a chilling effect.  I think that saying overall we

4    see some challenges and search results that pull from the

5    Internet content in a manner substantially similar to Google --

6    Google offers localized searches -- are an alternative search

7    service.  That's them telling them this is a violation.

8    They're nice enough not to say this is a violation.  That's

9    them telling them.  And that's, of course, what Mr. Ezell took

10   on the next.

11        But we have more than that.  Let's go to the next one

12   after that.

13        So Branch had been told as early as 2018 that the

14   Samsung -- Google-Samsung contract was the gating factor.  And

15   what we have from Ms. Kartasheva, in 2020, is:  We believe this

16   goes beyond the scope of what we originally allowed Samsung and

17   U.S. carriers and have started pushing back on them.  That's a

18   Google person saying that they're pushing back.  We know that

19   Google thinks that it's a violation, their pushing back.

20   That's enough evidence, Your Honor, to establish that Google

21   was telling Samsung you best not do this.

22        THE COURT:  Your response to Mr. Schmidtlein's point

23   that Branch is not in the search market?

24        MR. DINTZER:  It is closer to the search market than

25   Netscape was to the operative market.  It is outside of it, it

1    is a potential nascent threat competitor, which is exactly

2    why -- Google doesn't do this with Amazon, Google doesn't do

3    this with any of the other people they let on their phone.  But

4    they did it with Branch because they saw them as a threat.

5         THE COURT:  And it's a nascent competitor why?

6    Because -- I mean, because Branch never purported to say, look,

7    we have aspirations to be a general search engine.  Your theory

8    is they're a nascent competitor because they would divert

9    searches that otherwise would go to Google?

10        MR. DINTZER:  So Branch used this deep link

11   technology, where basically it would --

12        THE COURT:  Right.

13        MR. DINTZER:  So it had access -- if it had its full

14   range of technology, which is a lot of apps, it had access to

15   go through the apps and dig out information about maybe pizzas

16   near me or things that eventually could start -- using

17   Ms. Braddi's term -- bleeding off queries.

18        THE COURT:  No.  But that -- I mean, you beg my

19   point, which is you think it's competition, or at least

20   threatens Google because it would take search queries away from

21   Google that could be monetized.

22        MR. DINTZER:  Yes.  Yes.  And create -- and nascent,

23   it's nascent competition.

24        THE COURT:  Mr. -- let me ask you to pause because

25   we're now at 4:30, and I've still left some time for everybody

```
1      to sum up and --

2              MR. DINTZER:  Yes, Your Honor.

3              THE COURT:  -- address any issues you feel like you

4      weren't able to, but I want to give our court reporter a little

5      more than the five minutes I've given her already.  Let's plan

6      to go until about 5:30, if that's okay with everybody.  So

7      let's start up at 4:45 and then we'll take that last 45-minute

8      period for everybody to wrap up.

9              (Recess from 4:32 p.m. to 4:47 p.m.)

10             THE COURT:  Please have a seat.  Thank you,

11     everybody.  Let me just tell them now.

12             Before I forget, small bit of homework for tomorrow.

13             MR. DINTZER:  Yes, Your Honor.

14             THE COURT:  DXD29 at 129 is a chart that Dr. Israel

15     prepared.  That shows -- I think it was Dr. Israel, yeah --

16     showing price increases relative to quality of ads, I believe.

17     And I want to make sure I understand how to interpret that.

18     So -- anyway, that's all.

19             MR. DAHLQUIST:  Understood.

20             THE COURT:  Just before I forget.

21             MR. SCHMIDTLEIN:  Long notes.

22             THE COURT:  Long notes.

23             MR. DAHLQUIST:  I'll let them go first.

24             THE COURT:  Mr. Dintzer, go ahead.

25             MR. DINTZER:  Thank you, Your Honor.
```

1          May I proceed?

2          THE COURT:  Sure.

3          MR. DINTZER:  Okay.  So, Your Honor, I'm going to use

4     the summation to hit just a bunch of points we've talked about

5     and further them.

6          Google has asked -- said, you know, Apple doesn't

7     want a choice screen.  They -- you know, they want and this,

8     this.  Your Honor, if Apple had the option but not obligation,

9     then they could have chosen whether they wanted a choice

10    screen.  So option but not the obligation must have been a less

11    restrictive alternative that was not -- that would not mandate

12    a choice or mandate anything to them.

13         When Google talks about quality, every single time

14    they say "quality" they mean Google's quality after 12 years of

15    monopolizing and maintaining a monopoly and having all the

16    defaults and having all the scale that comes with them.

17         The Court asked about contestable scale.  And I want

18    to dig into this a little bit.  The idea that if 50 percent is

19    foreclosed, what about that other 50 percent?  So the first

20    thing is, is that 20 percent of the non-50 percent is

21    user-downloaded Chrome.  So there's no contest for those

22    defaults because Google is never going to let somebody else

23    have them.

24         We're not saying it's part of the foreclosed market,

25    but it is a market reality that the new entrant would have to

1    look at and say, well, am I going to have make my own

2    downloadable browsers to enter the browser market?  We know

3    that it's not an acceptable defense for a defendant to say,

4    well, if you enter two markets at once, then, you know, maybe

5    you can get some of the market.

6         They can't -- so, it's really not 50 percent that

7    is -- that's contestable.  It's closer to 30 percent that's

8    contestable.

9         The second point is, is that -- that while coverage

10   is 50 percent, that is the most efficient piece.  That's the

11   easiest way to put together and to -- which is why Google gets

12   it -- and to present your product to people.  The other 50

13   percent involves getting people to download your apps and do

14   other things.  It's harder to gain marginal scale.  And with

15   the agreements in place, people have a reduced incentive to

16   invest to begin with to try to get that.  So it hits them on

17   both ends.

18        The third point -- and this is significant, Your

19   Honor -- is that the entrants, a new entrant, somebody like

20   DuckDuckGo, they can't compete for just a piece.  Google has

21   made these all or nothing, which means that if you want the

22   Apple default, you have to be able to go in all these

23   countries.  You have to be able to -- you have to be able to

24   take on this enormous piece.  If they were not all or nothing,

25   if they were option but not the obligation, then when Apple

1    sets out with a privacy mode, DuckDuckGo can contest for this

2    little piece and hope to get some scale and move up.

3            But when Google insists that it's an all or nothing,

4    no revshare, no default sort of deal, that option is not

5    available for the smaller entities.

6            THE COURT:  So let me anticipate what Mr. Schmidtlein

7    is going to say, which is they do compete.  They did approach

8    Apple.  And we heard from Mr. Giannandrea and Mr. Cue that

9    they've got not only quality issues, but they've got some of

10   these other questions about -- got some other questions.

11           And by the way, it's not from lack of opportunity.

12   It's from lack of decision to invest.  I mean, they're still

13   relying on Bing, after all, for their searches.  They didn't

14   build their own index.  They haven't come up with their own

15   ranking system, at least not to the same extent that Google

16   has.  So, you can talk about competition, but the competitor

17   bears some responsibility for competing.

18           MR. DINTZER:  Which goes back to the -- Professor

19   Whinston's testimony about the lost incentives to invest when

20   portions of the market, large portions are set away.  And the

21   Court's -- the Court's observation that given the dollar values

22   in profits that Google gets, if this was a healthy market,

23   there would be constant entry.  There would be constantly new

24   entities seeking to ferret out pieces of it, and there simply

25   aren't.

1          Next the Court asked about *Philadelphia National Bank*

2     and the idea of -- that -- I'm sorry -- I lost my -- I lost --

3     too many sticky notes.

4          THE COURT:  This is the cross market.

5          MR. DINTZER:  Cross market.  Thank you, Your Honor.

6     And the defendants said, well, that's a Section 7 case.  And,

7     of course, *Grinnell* case said that the meaning of the terms in

8     Section 7 should parallel the meaning of the terms in Section

9     2, whereas the defendant keeps trying to cite Section 1 cases,

10    which Section 1 is missing the no-part language that Section 2

11    has that would -- that we believe completely prevents cross

12    market balancing.

13         Let's see.  I think this came up, the *NCAA v. Board*

14    *of Regents* case.  That is a Section 1 case, and that -- and if

15    we could go to Slide 37.

16         37 on the deck, please.  The -- I've already told

17    them.

18         So Professor Murphy did find pass-through.  This was

19    the only document we saw -- this wasn't a document.  This was

20    the only analysis that Professor Murphy performed on

21    pass-through.  And what he said was that Apple's device margins

22    have been declining, that means it's making more off -- less

23    off of its devices while its revenues have been increasing.

24    And he said because of these two movements, it might be because

25    of the pass-through, the money that Google is paying.  And to

1    his credit, he acknowledged, even before we started cross, that

2    this could be a coincidence.

3            And the fact that the one piece of evidence that they

4    have on pass-through is what their own expert said could be a

5    coincidence, that that's what they're citing, that's not enough

6    to meet any burden of proof, Your Honor.  And so the Court

7    should reject the testimony that these two lines moving apart

8    proves any sort of pass-through.  It simply doesn't.

9            THE COURT:  Can I ask you to address what I -- my

10   discussion with Mr. Schmidtlein about pretexts and, again,

11   where it fits into the analysis?  You know, I had suggested to

12   him that pretext can be used -- excuse me -- the least

13   restrictive -- less restrictive means.  That less restrictive

14   means is simply a way -- one way of proving pretext.  That is,

15   if there is evidence that there are less restrictive ways in

16   which the same procompetitive justification could be achieved,

17   it supports the notion that procompetitive justification is, in

18   fact, pretextual.

19           Do you have a view?  What's your view on that?

20           MR. DINTZER:  I think, Your Honor, that the best way

21   to structure this analysis is for the defendant -- the

22   defendant has the information.  The defendant knows what its

23   justifications are, to come forward with them, to offer

24   whatever proof of lack of pretext and -- that they actually

25   affect in market.

1          And then the other side -- and if the Court just

2     finds that that's completely unsatisfactory, as the Court did

3     in *Microsoft*, Microsoft came up with one procompetitive

4     justification about copyright and the Court just dismissed it

5     out of hand, without even asking the other side.

6          So the Court needs to look and see if there's any

7     evidence to support the procompetitive justification and to see

8     if it's completely pretextual because, if not, there's no

9     reason for the plaintiff to even have to respond.

10          And, in fact, that's how it's framed in *Microsoft*.

11    Procompetitive can be proffered -- you know, as long as they're

12    not -- I'm paraphrasing -- pretextual.  If they're not -- if

13    they're all pretextual, then the PCJ, the procompetitive

14    justification analysis is over.  There's no reason for us to

15    rebut it.

16          If they're not, if they're substantive and if the

17    Court finds that there's evidence behind them so that the

18    plaintiff has met their burden, then we would have the

19    opportunity to rebut them and to show that there is contrary

20    evidence and the like.  But the burden would stay where it --

21    the case law puts it, which is on the defense to prove these

22    justifications.

23          And, Your Honor, the reason is, is sort of if you

24    play this out to the extreme, if the burden fell on us, then

25    you have the defendant come out with 150 pages of

1    procompetitive justifications and they would say, go ahead,

2    plaintiff, prove the negative, prove these weren't, and -- and

3    which would be a borderline impossible task.  So the burden

4    should rest with the side that is asserting them, that is

5    claiming them and also has the burden of proving they're not

6    pretextual.

7             So after that, after -- if the Court finds that there

8    are procompetitive justifications that have been proven, then

9    the question is, well, okay, but could that have been

10   accomplished by a less restrictive alternative so that they

11   wouldn't have messed up the market?  And this doesn't require

12   bad faith.  It just requires a did you -- do you really need to

13   mess up this market to get these benefits?

14            And at that point, then, if there's a really easy way

15   that it could have done, like in this case, giving Apple the

16   option but not the obligation, then -- I mean, we don't think

17   that they've met any of their obligations under procompetitive

18   justifications, but if there were, if a simple one sat there,

19   then they would have to -- the burden would be on them to show

20   why that wasn't possible.  And we know that was possible

21   because that's what Apple asked for.  So I hope that answers

22   the Court's question.

23            THE COURT:  It does.  Thank you.

24            MR. DINTZER:  Google keeps wanting to make this case

25   about Microsoft and about Bing, but this case is about the

1    search industry and about the fact that it's been impervious to

2    any entrant coming and growing in a sufficient way to threaten

3    Google and Google's efforts, whether it's Safari Suggest,

4    whether it's Branch, whether it's gobbling up every single

5    piece of scale that it can and the defaults that makes it

6    impervious to that sort of entry.

7         Google cites Mozilla and says, look, Mozilla needs

8    Google, and, in fact, it makes a broader statement that the

9    browsers need Google.  The only document that Google cites is a

10   letter -- and they put it on the screen, a letter written by

11   Mozilla's outside counsel to DoJ when we were considering this

12   lawsuit.  Mozilla is an ally or potential -- you know, Google

13   says they're the benefactor.  They couldn't find a single

14   document from Mozilla internally that said, oh, we're going

15   to -- we're done, if Google stops paying us.

16        And so, if Google is going to assert sort of this

17   existential crisis for Mozilla, a single internal document as

18   opposed to a letter written after the fact by an outside

19   counsel, they would need to have some sort of evidence.  But

20   also, we know that if -- I mean, a lot of this is talking about

21   remedy, which obviously we're not at yet, but this letter talks

22   about, you know, the idea that if they were deprived of money

23   or if they were forced to match with Bing in a competitive

24   market, a company like Mozilla would have options.

25        THE COURT:  Just --

```
 1              MR. DINTZER:  Okay.

 2              THE COURT:  I've just got a few minutes in a, sort

 3      of, 20-minute block, and I want to make sure Mr. Cavanaugh --

 4              MR. DINTZER:  No, I absolutely want to make sure he

 5      has his time.

 6              Thank you, Your Honor.  Thank you for your time and

 7      attention.  We appreciate that today.

 8              THE COURT:  Like the Oprah show, slide decks for

 9      everyone.

10              MR. CAVANAUGH:  Your Honor, we've had a lot of smart

11      economists and some smart antitrust lawyers characterize this

12      case and the issues in this case.  But I think the comment

13      from -- just go next slide.

14              I think the comment by someone who is actually in the

15      market kind of made the point Your Honor was making today.

16      Mr. Ramaswamy said, Freeze the ecosystem.  That's what these

17      payments -- and Your Honor said earlier today, nothing's

18      happened.

19              And the reason nothing's happened is the feedback

20      loop that Mr. Dintzer talked about.  Contracts, restrictions,

21      made-to-scale advantage lead to the quality advantage, and it

22      just feeds back on and on, year after year, year after year.

23      And there's no sign that that's really changing.  Maybe machine

24      learning will help a bit on scale, maybe AI, but there's no

25      meaningful sign that any of this is going to change.
```

```
 1                    Can we go to the next slide, Peter.
 2                    Now, for Neeva.  It's not just Neeva, it's the
 3        marketplace that's being harmed by the freeze that Google has
 4        put on it.  Mr. Ramaswamy said it's -- it's our inability to be
 5        a default provider, or an alternative default provider.  And as
 6        he said -- I think Mr. Dintzer made this point today, he had a
 7        well -- he had a novel concept, well-funded, talented team and
 8        they're gone.  Not Microsoft, Neeva is gone.  They want to
 9        blame Microsoft for everything, but Neeva is gone.  DuckDuckGo
10        is going -- anywhere.  They're not creating competitive
11        challenges to Google.
12                    When Google does face competition --
13                    Next slide, please.
14                    -- for example, China, Russia, Czechoslovakia.  In
15        those countries Dr. Baker was talking about, quoting from
16        Google documents, when they face competition there's a greater
17        incentive to invest and innovate.  That's the point I made
18        earlier today about the Sherman Act.  Competition is what
19        creates greater -- greater quality overall in the market.
20                    THE COURT:  Can I ask you a question about the extent
21        to which I can rely on this other country evidence?
22                    From time to time throughout the trial we've alluded
23        to what the conditions are elsewhere.  I don't know that the
24        fact that the geographic market is the United States precludes
25        me from considering that.
```

1          I guess my concern is the following, which is I'm not

2     sure I quite understand the competitive conditions in all these

3     countries in the same way I do now.  I mean, I think there was

4     certainly an allusion that in Russia, for example, there may be

5     some regulatory reasons that Yandex is in a better position

6     than Bing is in today, and it may be true in other places.

7          And so I'm a little bit reluctant to draw too many

8     inferences from these foreign markets, unless you have a reason

9     to think that the record is clear.

10          MR. CAVANAUGH:  I think -- I think that it's a fair

11    point, Your Honor, as to there being regulatory differences,

12    different dynamics in different markets.  But I think there is

13    one basic fact you can rely on:  In all of those other

14    countries there are competitors with meaningful market share.

15    And Google itself recognized that that creates competition for

16    them and requires them to do more.  I don't think you need to

17    go much beyond that to simply recognize how fundamentally

18    different that is from what we have today.

19          And let me close, Your Honor, with questions and

20    testimony given by Mr. Hurst in response to Your Honor's

21    questions.  You asked him -- well, basically asked him a

22    hypothetical:  Let's assume we have a more equal competitive

23    market, what's going to happen?

24          Well, there will just be more competitive

25    opportunities; better ways to partner, for companies to be able

1    to differentiate, for different treatments.  You highlight

2    different parts of your value proposition when there's a more

3    competitive market.  That isn't happening.

4         Next slide, Peter.

5         And he analogized it to when you look into Meta space

6    and you have the Kayaks and Tripadvisors and Trivago and

7    others.  What happens?  Well, people start to differentiate.

8    They focus more on here's what I can do really well, here's

9    what someone else can do really well, and you get that consumer

10   differentiation and you get greater innovation.  That's what

11   competition produces.  And that's what the general search

12   services market lacks today, Your Honor.

13        Thank you.

14        THE COURT:  Thank you, Mr. Cavanaugh.

15        All right, Mr. Schmidtlein.

16        MR. SCHMIDTLEIN:  Thank you, Your Honor.

17        Just a couple of quick points here and then I'm going

18   to go back to some points that I wanted to talk about during

19   our second session.

20        The testimony from Mr. Ramaswamy, Mr. Ramaswamy never

21   testified that he believed he was entitled to be the default

22   search engine on any browser or any device.  To the extent he

23   was unhappy at one point, I believe he was unhappy that Apple

24   wouldn't put him on the drop-down menu.  That has nothing --

25   Google doesn't have any control over that.  That was Apple's

1    decision as to whether they were established enough, had they

2    shown enough quality, those type of issues.

3              Mr. Ramaswamy's failure in the market is not

4    connected to any of the agreements in this case and he did not

5    testify as such.

6              THE COURT:  So let me follow up on that because this

7    response was actually to a question that I asked, and it was a

8    question about why Google pays so much revenue share.  I asked

9    him, you know, you were at Google, now you're at Neeva, why

10   does Google pay as much revenue share?  And he gave an

11   explanation which ended with this sentence, which is,

12   "Basically freezes the ecosystem in place effectively."

13             So why is he wrong?

14             MR. SCHMIDTLEIN:  He is absolutely wrong because the

15   payments are the reflection of competition.  Google winning

16   repeatedly isn't freezing the ecosystem.  The Sherman Act isn't

17   designed to ensure the ecosystem gets jumbled or changed or

18   anything else.  It ensures competition, and Google is winning

19   those competitions.

20             Mr. Ramaswamy never came in and said, well, gee, you

21   know, we had a worse product but we won that competition

22   because we somehow coerced our way into winning that

23   competition.  That's not what happened.  And Mr. Dintzer --

24   again, I don't -- I'm not sure where he's getting the

25   suggestion that if Google would just have opened it up and

1    allowed Apple to do lots of different things in different

2    countries or whatever -- Apple did carve out countries where it

3    didn't want to use Google.  Apple absolutely had those options

4    and alternatives.  And if it wanted to do so, it could have

5    done so and there's no reason to think Google would have been

6    able to block them.

7           The -- the slides that Mr. Cavanaugh referenced about

8    foreign markets, these little snippets here and there, if he's

9    right, what he's suggesting is Google Search's quality is

10   higher in markets outside the U.S.  That's the implication of

11   what he's trying to suggest.  There is zero evidence of that.

12          There is no evidence that Google's search quality is

13   higher in Russia or higher in any other country.  In fact, the

14   testimony that -- I think Mr. Nayak and Mr. Raghavan, others,

15   Google innovates and rolls out all of its best new technologies

16   in the United States.  And when I asked Professor Baker,

17   Whinston:  Did you do any sort of comparative analysis?  Did

18   you study comparative search quality of these different

19   countries?

20          They did none of that.  They did nothing.  There is

21   no evidence in this case from which you could conclude, ah, I

22   see more competition outside of the United States and higher

23   search quality outside of the United States than I do inside

24   and it's attributable to Google's agreements in the

25   United States.

1          On this question of this -- this procompetitive

2     benefits question that we've been talking about, I would -- I

3     would point you to some language in *U.S. v. Microsoft*, it's

4     253 F.3d 67.

5               THE COURT:  Hang on one second.

6               What page?

7               MR. SCHMIDTLEIN:  67.

8               THE COURT:  Okay.

9               MR. SCHMIDTLEIN:  And it's at the bottom of the page

10    in the first column.  The last sentence, "The plaintiff bears

11    the burden of not only rebutting a proffered justification, but

12    also of demonstrating that the anticompetitive effect of the

13    challenged conduct outweighs it."

14          I think that addresses this question of sort of who

15    has got the burden of where.  And on this question of do you

16    need to document it and does it need to be sort of

17    contemporaneously documented, I would absolutely dispute the

18    notion that Google hasn't documented in the sense of there are

19    myriad documents that explain Google's efforts to improve

20    browsing technology.  Of course they understand the payments of

21    these are going to improve browsers.  Of course they're trying

22    to get their Search distributed.  But the notion that we've

23    basically just made up this idea that improved browser

24    technology is going to improve Search, I mean, the record is

25    replete with that.  You, of course, can find that.

1          It would be reversible for you to suggest, oh, I

2     didn't see a contemporaneous Google document that ties every

3     single revenue payment to all of these other knock-on effects.

4     That's absolutely not the law and I would commend you to our

5     brief, our responsive proposed conclusions of law, page 26,

6     where we point out, "For example, in *Microsoft*, the D.C.

7     Circuit credited *Microsoft's* copyright based justification for

8     preventing OEMs from automatically substituting a different

9     interface after initial boot-up, even though the District Court

10    condemned that restriction based on contemporaneous documents

11    indicating it was indicated to serve Microsoft's own goals."

12         So in other words, the lower court said I'm

13    discrediting that because I actually read your documents as

14    saying you did this for anticompetitive reasons.  The Court of

15    Appeals said, no, they had a copyright-based legitimate

16    justification for doing so.  That actually trumps and that

17    carries the day here.  That was a legitimate procompetitive

18    justification.

19         So I offer those for the Court's consideration on

20    those points.

21         If we can go to Slide 43.  And our -- this is in our

22    second binder, Your Honor.

23         And I want to go back and talk just a little bit

24    about foreclosure because it ties a little bit into this

25    question of scale that we've been -- we've been talking about.

1          I thought Your Honor -- you raised a really

2     interesting question earlier, which is when you pointed out to

3     Mr. Dintzer, I believe, you know, on these Apple devices

4     40 percent of the search queries are not -- are not actually

5     covered by the default.  Why isn't that enough for them to

6     compete to get the scale they need?

7          And I've -- I've heard over and over and over today

8     discussions of mobile search.  Oh, but they've got this share

9     of mobile search, they don't have enough scale in mobile

10    search.  There's no relevant market for mobile search pled in

11    this case, Your Honor.

12         They never pled a relevant market of mobile search.

13    Had they done so, we would have had some very other interesting

14    academic debates and some economic debates, but they never did

15    so.  They want to have their cake and eat it too on that and

16    they can't.  It's not -- it's not permissible.

17         But here's what -- here's what the evidence in the

18    case said, because if we're going to talk about foreclosure and

19    we're going to talk about, well, how much more volume would

20    they actually get?  And Professor Murphy did an analysis of

21    this using some of the choice screen data because, you know,

22    that's the -- that's the alternative world that they seem to be

23    suggesting.  It's not a but-for world in Professor Whinston's

24    world, but it's his thought experiment and it's -- it's the

25    less restrictive -- one of the less-restrictive alternatives

1    they keep telling us should exist.

2          If all the browser agreements in this case were

3    flipped from Google as the default to a choice screen and we --

4    we take the data and we take the learning that we have, what's

5    the incremental share shift? .9 percent is the answer.

6          Now, you'll also recall -- and we're not -- we're not

7    going to reargue -- try to reargue the *Daubert* motion on

8    Professor Fox here today.  But you understand the discussion

9    here, you understand the analysis he did.  It's very

10   interesting; scale, scale, scale.  Where was the computer

11   science expert on scale?  They didn't offer one in their

12   affirmative case.

13         Where -- where was the evidence and the testimony?

14   I've examined the industry and here is what the minimum viable

15   scale is that you need.  I've -- I've done the analysis, I've

16   looked over time, I've broken out, you know, the various

17   different factors.  Where is the computer science expert to

18   offer that testimony?

19         We brought in an expert who tried to do an analysis,

20   who tried to untangle this and offered an opinion.  They don't

21   like it, but they never offered an expert.  They offered an

22   expert to say our expert's opinion, you know, has these flaws

23   to it.  There's nobody on their side.  They brought in -- they

24   offer some breezy testimony by Mr. Parakhin based on nothing.

25   He just -- he just, in very breezy fashion, says, well, you

1    know, you probably need 70 percent -- or, 30 percent to

2    compete.  Based on what?  He never says.

3         So we have this continued reliance on scale as the

4    linchpin of this case and there is a total failure of proof on

5    it in terms of how much scale do you need?  Because your

6    question is right on the money.  Well, how much foreclosure

7    might tell me whether the scale thing is even in play?  And

8    they've offered no evidence on that at all.  This is the

9    evidence on browsers --

10         THE COURT:  Can I go back to this for a moment and

11    what -- I think what the response is going to be is that it's

12    not a terribly useful number in the sense that the shift --

13    this shift reflects the last decade and a half.  In other

14    words, this is -- if things were to change tomorrow, what would

15    be baked into the reaction -- I mean, to the response is

16    everything that's happened in the last 15 years, which they

17    will say is a function of monopolistic and exclusionary

18    conduct.

19         So we really can't look at what tomorrow would look

20    like as the sort of, you know, weathervane for determining

21    foreclosure.

22         MR. SCHMIDTLEIN:  Google's -- Google's share was

23    large before they claim the conduct occurred and it's large

24    after they claim the conduct occurred.

25         Again, this goes back to where were they?  What's the

1    issue that they -- what was Google supposed to do?  Stop

2    competing five years ago?

3            In 2013, the FTC had looked at these agreements,

4    didn't bring a case.  So now, ten years later, they say, oh,

5    you were violating the law 15 years ago, 10 years ago, 12 years

6    ago.  You should have known.  How?

7            How?  We've been out competing in the market.  We

8    can't be charged with, oh, well, maybe this number might have

9    been different if it was ten years ago.  How do we know that?

10   All I can go with is the data that we have today, and this is

11   what the data we have today is.

12           And this notion of a snowball effect, I think is what

13   Professor Whinston once tried.  I don't think he really got it

14   off the ground at trial.  There's no evidence of the snowball

15   effect.  We know from -- and we've got it in our -- our

16   post-trial findings.  We have two events that we put forward.

17   We said, all right, well, let's look at -- let's look at this

18   Microsoft claim.  If you give us more scale, we improve, we do

19   great, we improve, we get better in market.

20           2019, Yahoo! agreement, there's no scale-translate-

21   to-quality effect.

22           2014, Yahoo! gets the Mozilla deal.  Yahoo! sends all

23   their search queries to Microsoft.  They've come forward with

24   no evidence.  Oh, we had a huge bump in scale, huge bump in

25   quality.  No evidence of that.

 1              THE COURT:  So I thought Mr. Nadella's testimony was

 2     that the Yahoo!-Microsoft agreement, at least in his

 3     estimation -- let's leave aside the quality numbers -- was the

 4     reason, in his estimation, that Bing has been able to compete

 5     on desktop.  It provided them with additional scale and users

 6     to improve their search engine.

 7              Is he wrong about that?

 8              MR. SCHMIDTLEIN:  There's no evidence to back that up

 9     at all.  That is --

10              THE COURT:  I mean, he's the head of Microsoft, so, I

11     mean --

12              MR. SCHMIDTLEIN:  But he's -- there's no evidence of

13     what additional query volume did you get?  We know that --

14     people have turned off of Yahoo!  People -- I mean, where is

15     Yahoo! getting the scale?  How exactly has it translated?  We

16     looked very, very closely at the documents -- and we've

17     submitted these to you -- very closely at the documents when

18     Microsoft was trying to measure a scale effect on quality right

19     after that deal.  It's not there.  And we also know that after

20     the Mozilla deal that Your Honor pointed out, 70, 80, whatever

21     the percent was, people churned off.

22              So I would suggest that Mr. Nadella is overstating a

23     little bit the significance and the notion that that deal saved

24     them.  What saved them were their Jumpstart agreements, where

25     they've leveraged Windows and made it difficult on Windows to

1    try to compete, for -- say for others to try to compete.

2          And even without -- or, with all of those

3    restrictions, with all of those hurdles, Google has still

4    succeeded on Windows.  The idea that Yahoo! saved Microsoft,

5    there's just no evidence that somehow that resulted in some

6    huge Windows bump for them.

7          I want to jump forward here --

8          THE COURT:  Just a couple more minutes,

9    Mr. Schmidtlein.  Thank you.

10          MR. SCHMIDTLEIN:  Your Honor, on this question of

11    foreclosure on Android agreements, we've submitted to you the

12    case law around this.  Mr. Dintzer made passing reference to a

13    D.C. Circuit case called the *Mytinger* case, and in their

14    responsive brief they've suggested that 6. -- or, 8.6 or 6.8, I

15    can't remember which one it was -- foreclosure would be

16    sufficient.  That's absurd.  There is no way that the D.C.

17    Circuit today -- that was a 1960s case.  There's no way the

18    D.C. Circuit today, post-*Microsoft*, talking about 40 to 50

19    percent foreclosure, and maybe somewhat less in a Section 2

20    case, would allow a case to go forward with foreclosure of

21    6 percent and all of --

22          THE COURT:  Let me assure you, I haven't been

23    thinking about single digits --

24          MR. SCHMIDTLEIN:  That is absolutely -- that is not

25    the law.  And there's a whole variety of reasons why a

1    Section 3 Clayton Act case and why *U.S. versus Standard*

2    *Stations*, which was a Section 3 case, is not the law under

3    Section 2 today.

4         But the reason I point these out is Professor

5    Whinston talks about -- as you remember, he was trying to drive

6    this distinction between competitive effects and coverage and

7    what foreclosure -- and what it is.  And he admits that the

8    likely competitive effects have to be measured through a

9    but-for world.  He says that.  He admitted that, and then he

10   tries to back away and say, well, but that's different than --

11   that's different than foreclosure.

12        Well, here's what the D.C. Circuit said, and this is

13   what I think you've been quoting to us today.  "Because an

14   exclusive deal affecting a small fraction of a market clearly

15   cannot have the requisite harmful effect upon competition, the

16   requirement of a significant degree of foreclosure serves a

17   useful screening function."

18        The foreclosure is a proxy for anticompetitive

19   effects, and that's why we have to -- that's what we're trying

20   to get to.  And in an ideal situation, we want to know what the

21   but-for world is.  He hasn't done it.  He's offered these two

22   other, you know, sort of thought exercises.  We've calculated

23   the numbers for the thought exercise and they fail and they

24   haven't amounted to --

25             THE COURT:  Let me ask you --

1          MR. SCHMIDTLEIN:  -- something like foreclosure.

2          THE COURT:  -- this, I don't quite follow through

3     because I don't think the D.C. Circuit did a but-for analysis

4     when it looked at the IAP agreements, for example, or even the

5     OEM agreements.  You know, they didn't take the step that

6     you're asking me to take, which is, well, what would the world

7     have looked like if there weren't these exclusive agreements?

8     Wouldn't Netscape have, nevertheless, been able to break

9     through?  Although, I guess, the circumstances were slightly

10    different.  But that's not an analysis they performed.

11         MR. SCHMIDTLEIN:  No, but the finding of the

12    substantial anticompetitive effects that flow from the

13    foreclosure were the flipping of the market, and it was massive

14    market share flips.  The findings of fact that were relied upon

15    by the D.C. Circuit looked at what happened before and after.

16         THE COURT:  So you think that was the anticompetitive

17    effect they relied on --

18         MR. SCHMIDTLEIN:  Absolutely.

19         THE COURT:  -- as opposed to, at least as I read it,

20    the fact that there were two main efficient channels of

21    distribution?  Microsoft occupied them both exclusively and

22    that was the anticompetitive effect.  Netscape could not

23    distribute its browser through the two most efficient channels.

24         MR. SCHMIDTLEIN:  Right.  And the reason we know

25    these were the two most efficient channels and that there were

```
1    substantial effects is because of the massive share shift that
2    was attributable to the agreements.  The world would -- I
3    submit to Your Honor the case might have looked a lot different
4    if, in the interim, Microsoft unveiled the world's greatest
5    browser and all the OEMs said, wow, that's a fabulous browser.
6    You have the best browser in the market.  I want that browser.
7    I'm happy to preload it exclusively.
8              That's not what happened in Microsoft.  There was
9    massive share shift and that is why they did find substantial
10   foreclosure in those cases.
11             THE COURT:  All right.
12             MR. SCHMIDTLEIN:  Thank you, Your Honor.
13             THE COURT:  Mr. Schmidtlein, thank you.
14             All right.  I'll give you the last word since it's
15   your burden, Mr. Dintzer and Mr. Cavanaugh, just a couple
16   minutes.
17             MR. DINTZER:  Yes, Your Honor.  Thank you.
18             There is no way that the Microsoft court said that we
19   don't have to do a but-for test and then said that we have to
20   do a but-for test.  There's no way to read that -- I mean, you
21   can parse the words, but that's not what the Court said.  With
22   respect to default payments, Google does not answer a critical
23   question regarding scale, which is why does Google use 13
24   months of data to train their algorithms if scale doesn't
25   matter?  And they do, and they still do.  And they said for the
```

1    foreseeable future they're going to continue.

2          They said we didn't bring our computer scientist.

3    Dr. Oard is a computer scientist.  He testified that based on

4    Dr. Fox's analysis, scale does matter.  It is vital.  It's

5    useful in almost every single part of the search process.

6          Mr. Parakhin said if you don't have 20 percent scale,

7    you really can't have a competitive device.  And the fact that

8    Microsoft has 20 percent scale, including what it got from

9    Yahoo! on desktop is what makes it competitive on desktop with

10   Google.

11         But I'll note, Your Honor, even though Google's own

12   analysis, Apple's own analysis shows that Microsoft is about as

13   good as Google on desktop, Microsoft doesn't have an enormous

14   share on desktop, and that is because of the stickiness of the

15   defaults for Firefox and for Chrome.  If this was really only

16   about quality, not about defaults, then we would expect that to

17   all, you know, balance out.  But Google has the defaults on

18   those two browsers, which are separate products, complementary

19   and -- complements, and they get downloaded onto the desktop

20   and people end up with those defaults to a search engine that's

21   about as good but has the defaults.

22         So, the story just -- that the defense is talking

23   about doesn't hold together as far as what happened with

24   Yahoo!, what happened with the defaults and what happened with

25   Microsoft's quality.

1          Browsers are not on the market and there's no

2    evidence, not a single document that -- I mean, Mr. Schmidtlein

3    can talk as much as he wants to about how so much evidence -- I

4    mean, we showed the evidence.  We -- I mean, maybe we had too

5    many slides, I'll grant you that.  But we really wanted to show

6    the Court the evidence.  We think that's really important

7    because there are Google documents that say what we say.

8          The Court asked about whether it had to judge proper

9    level of privacy or innovation, how does it judge those things?

10   Your Honor, the -- the case law is clear, the Court absolutely

11   does not have to judge those.  The market will take care of

12   that.

13         If it's a competitive market, the market will find

14   the right place for that.  But the goal is competition.  But

15   what the Court needs to do, and what we believe that we've

16   given it the evidence to do is reach the conclusion that

17   there's not enough competition in this market to set those

18   levels at the level that a competitive market would set.

19         And we believe that the evidence is there, and if --

20   I believe it's pronounced *Socony*.  It may be *Socony* -- *Socony*

21   *Vacuum* and *Maricopa* are two cases that underline this.

22         The slide -- the third slide, if we could pull it up.

23   This shows who has the burden.  *Microsoft* failed to meet its

24   burden of showing that its conduct serves a purpose other than

25   protecting its operating system and operant, Microsoft.  This

1    burden shifting has evolved based on which party has access to

2    the information.  It puts it to Google.

3            The government, having demonstrated how in the

4    competition, the burden shifts to *Dentsply*.  *Meta Platforms*,

5    which is just a year ago.  The burden is on Google.  They have

6    the evidence, if it exists, to show what they want it to show,

7    and their efforts to put it on us or to say they really don't

8    have to show anything or the Court should just assume because

9    everybody uses a browser with a search engine that they don't

10   have to prove anything, that's not the case.

11           And the last point I want to make, Your Honor, is

12   that the D.C. District Court in *Microsoft* said that Netscape

13   could be accessed by any PC user worldwide, could be

14   downloaded, could be mailed.  So there were other ways -- and

15   this is -- I'm quoting from page 53 of the District Court

16   opinion.  There were other ways to get it.  This was a default,

17   just like the defaults we have here where there were other ways

18   to change the default.  But because Google foreclosed the

19   primary channel, the best way to distribute it, that violated

20   the antitrust laws.

21           With that, Your Honor, unless the Court has any

22   question, we appreciate your time.  Thank you, Your Honor.

23           THE COURT:  Mr. Dintzer, thank you.

24           Mr. Cavanaugh, any last thoughts?

25           MR. CAVANAUGH:  Nothing further.

1        THE COURT:  Okay.  Thank you.

2        It's been an interesting and fulsome day.  We'll

3   continue tomorrow.  Can't wait to talk about ad pricing at

4   9 o'clock.  We'll see everybody in the morning.  Thank you.

5   Don't wait for me, please.

6                        *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 3rd day of May, 2024

_____

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C.  20001

**'** 

**'intensely** [1] - 216:5

## 1

**1** [11] - 200:6, 222:25, 241:11, 241:13, 241:14, 241:15, 249:9, 254:10, 286:9, 286:10, 286:14
**10** [4] - 228:8, 234:8, 236:3, 302:5
**100** [1] - 205:1
**10036** [1] - 201:3
**1100** [1] - 200:12
**1133** [1] - 201:2
**12** [3] - 268:10, 283:14, 302:5
**122** [1] - 210:12
**129** [1] - 282:14
**13** [1] - 307:23
**1300** [1] - 200:22
**15** [3] - 206:20, 301:16, 302:5
**15(b)(2** [1] - 207:8
**150** [1] - 288:25
**1960s** [1] - 304:17

## 2

**2** [21] - 203:22, 203:23, 215:8, 222:24, 227:13, 227:16, 228:3, 234:8, 235:4, 239:7, 241:19, 245:25, 246:4, 249:10, 254:6, 254:20, 255:17, 286:9, 286:10, 304:19, 305:3
**20** [3] - 283:20, 308:6, 308:8
**20-3010** [1] - 200:3
**20-minute** [1] - 291:3
**20001** [2] - 201:11, 312:13
**20024** [1] - 201:7
**2005** [1] - 228:17
**2009** [1] - 214:15
**2010** [1] - 275:21
**2012** [1] - 234:21
**2013** [1] - 302:3
**2014** [4] - 233:17, 233:22, 235:2, 302:22
**2016** [7] - 210:23, 211:24, 261:22, 262:2, 262:8, 274:6, 274:18
**2017** [1] - 230:18
**2018** [1] - 280:13
**2019** [1] - 302:20
**202** [3] - 200:13,

200:17, 201:7
**202-354-3267** [1] - 201:12
**2020** [1] - 280:15
**2021** [1] - 228:17
**2024** [2] - 200:7, 312:7
**209** [1] - 200:15
**212** [1] - 201:4
**2200** [1] - 201:3
**253** [1] - 297:4
**26** [1] - 298:5
**2:00** [1] - 200:7

## 3

**3** [3] - 200:7, 305:1, 305:2
**30** [2] - 284:7, 301:1
**30(b)(6** [1] - 228:16
**307-0340** [1] - 200:13
**333** [2] - 201:11, 312:12
**335-2793** [1] - 201:4
**37** [2] - 286:15, 286:16
**38** [1] - 274:3
**3:20** [1] - 238:9
**3:25** [1] - 238:9
**3rd** [1] - 312:7

## 4

**40** [3] - 218:21, 299:4, 304:18
**43** [1] - 298:21
**434-5000** [1] - 201:7
**45-minute** [1] - 282:7
**4:30** [1] - 281:25
**4:32** [1] - 282:9
**4:45** [1] - 282:7
**4:47** [1] - 282:9

## 5

**5** [1] - 232:25
**50** [12] - 228:8, 236:9, 236:12, 236:23, 238:6, 283:18, 283:19, 284:6, 284:10, 284:12, 304:18
**508-6000** [1] - 200:23
**53** [1] - 310:15
**55** [1] - 232:22
**5:30** [1] - 282:6

## 6

**6** [3] - 233:6, 304:14, 304:21
**6.8** [1] - 304:14
**60-40** [1] - 259:14
**600** [1] - 200:16

**60604** [1] - 200:16
**6523** [2] - 201:10, 312:12
**67** [2] - 297:4, 297:7
**680** [1] - 201:6

## 7

**7** [4] - 254:16, 254:20, 286:6, 286:8
**70** [4] - 234:6, 301:1, 303:20
**720** [1] - 200:23

## 8

**8** [1] - 234:10
**8.6** [1] - 304:14
**80** [1] - 303:20
**80203** [1] - 200:23
**805-8563** [1] - 200:17
**86** [1] - 276:25

## 9

**9** [2] - 300:5, 311:4
**90** [1] - 236:23
**98** [2] - 234:3, 236:24

## A

**ability** [3] - 203:6, 277:25, 312:6
**able** [13] - 225:11, 226:10, 232:19, 240:12, 259:2, 282:4, 284:22, 284:23, 293:25, 296:6, 303:4, 306:8
**absence** [1] - 271:17
**absent** [1] - 223:7
**absolutely** [34] - 210:14, 230:17, 247:12, 251:7, 251:20, 252:8, 252:9, 252:21, 252:23, 259:17, 259:22, 259:23, 260:13, 260:19, 263:18, 263:21, 264:23, 265:12, 265:23, 265:25, 266:12, 266:19, 267:2, 269:24, 273:12, 277:23, 291:4, 295:14, 296:3, 297:17, 298:4, 304:24, 306:18, 309:10
**absurd** [1] - 304:16
**academic** [1] - 299:14
**accept** [1] - 237:21
**acceptable** [2] -

271:21, 284:3
**accepted** [1] - 220:7
**access** [8] - 204:12, 208:8, 230:24, 260:23, 276:23, 281:13, 281:14, 310:1
**accessed** [1] - 310:13
**accomplished** [1] - 289:10
**according** [2] - 213:25, 243:1
**account** [5] - 211:3, 212:1, 215:19, 273:4, 275:1
**accurate** [1] - 312:4
**achieved** [3] - 223:7, 244:14, 287:16
**acknowledge** [1] - 214:3
**acknowledged** [5] - 211:14, 231:5, 269:5, 287:1
**acknowledgment** [1] - 211:5
**acquire** [1] - 275:10
**acquired** [3] - 242:23, 242:25, 273:18
**acquisition** [1] - 243:25
**act** [1] - 272:12
**Act** [9] - 235:20, 237:6, 243:8, 245:25, 248:4, 275:9, 292:18, 295:16, 305:1
**Actavis** [1] - 271:23
**Action** [1] - 200:3
**activities** [1] - 224:1
**actual** [1] - 204:20
**ad** [1] - 311:3
**additional** [2] - 303:5, 303:13
**address** [3] - 208:11, 282:3, 287:9
**addressed** [2] - 205:24, 206:16
**addresses** [2] - 206:13, 297:14
**adds** [1] - 240:14
**admissible** [1] - 279:8
**admit** [1] - 233:22
**admits** [1] - 305:7
**admitted** [6] - 249:3, 249:15, 260:5, 260:11, 305:9
**adopt** [1] - 216:14
**adopted** [1] - 216:13
**ads** [1] - 282:16
**advantage** [13] - 232:19, 232:21, 234:4, 234:23, 235:1, 235:2,

235:23, 237:15, 237:16, 243:4, 273:17, 291:21
**advantages** [3] - 243:2, 244:18, 263:19
**advertising** [1] - 264:21
**affect** [7] - 204:12, 204:13, 212:6, 287:25
**affected** [2] - 210:22, 279:16
**affecting** [3] - 248:18, 274:19, 305:14
**affirmed** [1] - 240:24
**afford** [1] - 248:2
**afoul** [2] - 276:21, 279:25
**Afternoon** [1] - 200:6
**afternoon** [1] - 238:13
**afterwards** [1] - 241:5
**ago** [8] - 235:7, 268:10, 302:2, 302:5, 302:6, 302:9, 310:5
**agree** [10] - 209:4, 209:14, 209:15, 221:15, 236:7, 271:18, 275:6, 275:12, 276:9
**agreed** [1] - 224:18
**agreement** [11] - 202:21, 217:6, 225:3, 226:1, 226:9, 258:6, 267:17, 267:18, 276:3, 302:20, 303:2
**agreements** [33] - 204:3, 204:18, 205:2, 205:9, 209:21, 209:22, 215:13, 223:24, 232:20, 236:9, 236:15, 236:16, 243:12, 246:15, 247:7, 259:19, 264:2, 267:1, 267:5, 267:6, 267:24, 284:15, 295:4, 296:24, 300:2, 302:3, 303:24, 304:11, 306:4, 306:5, 306:7, 307:2
**ahead** [3] - 213:17, 282:24, 289:1
**AI** [2] - 234:15, 291:24
**aisle** [2] - 265:4, 265:5
**al** [1] - 200:3
**algorithms** [2] - 233:11, 307:24
**Alice** [2] - 210:18, 211:24
**align** [1] - 224:22
**aligned** [4] - 220:1, 220:8, 220:15, 261:1
**aligning** [2] - 224:4, 231:4

**alignment** [1] - 225:10
**aligns** [2] - 224:12, 225:6
**alleged** [2] - 231:3, 246:3
**alleges** [1] - 220:20
**allow** [3] - 258:19, 264:18, 304:20
**allowed** [5] - 219:6, 246:2, 280:16, 296:1
**allows** [1] - 264:16
**alluded** [1] - 292:22
**allusion** [1] - 293:4
**ally** [1] - 290:12
**almost** [4] - 240:19, 246:8, 247:19, 308:5
**alone** [2] - 218:8, 259:1
**Alston** [2] - 239:9, 240:10
**alternate** [1] - 278:14
**alternative** [22] - 210:9, 223:19, 224:6, 224:16, 225:9, 225:13, 225:22, 240:8, 240:12, 241:11, 257:7, 257:9, 259:3, 269:4, 277:18, 278:2, 278:8, 280:6, 283:11, 289:10, 292:5, 299:22
**alternatives** [9] - 212:17, 222:15, 238:21, 239:6, 239:14, 239:19, 266:4, 296:4, 299:25
**altogether** [2] - 248:24, 250:17
**Amazon** [1] - 281:2
**amended** [1] - 275:22
**Amendment** [1] - 279:24
**America** [1] - 200:2
**Americas** [1] - 201:2
**AMIT** [1] - 200:9
**amount** [5] - 205:9, 215:13, 262:14, 274:7, 274:23
**amounted** [1] - 305:24
**analogized** [1] - 294:5
**analogous** [1] - 226:4
**analogy** [1] - 237:23
**analysis** [27] - 203:22, 203:24, 205:20, 208:20, 208:24, 208:25, 209:8, 210:10, 222:21, 228:21, 240:11, 246:14, 265:13, 286:20, 287:11, 287:21, 288:14, 296:17,

299:20, 300:9, 300:15, 300:19, 306:3, 306:10, 308:4, 308:12
**analytical** [1] - 223:1
**Android** [37] - 216:4, 216:8, 216:9, 216:19, 218:5, 224:2, 224:3, 224:4, 226:5, 226:8, 229:7, 229:14, 229:16, 229:20, 230:5, 231:8, 231:9, 231:13, 231:18, 251:10, 251:13, 253:15, 257:10, 258:3, 258:17, 263:23, 264:4, 264:12, 265:5, 265:6, 269:14, 269:18, 269:21, 270:22, 304:11
**Android's** [1] - 229:25
**annals** [1] - 256:23
**anomaly** [1] - 268:9
**answer** [10] - 216:6, 223:17, 224:9, 228:16, 236:18, 236:25, 238:1, 275:3, 300:5, 307:22
**answers** [1] - 289:21
**antecedent** [1] - 242:12
**Anthem** [1] - 235:24
**anticipate** [1] - 285:6
**anticompetitive** [23] - 202:6, 208:6, 220:22, 223:20, 236:14, 237:7, 242:7, 243:5, 246:16, 247:4, 247:5, 255:8, 256:17, 259:4, 270:23, 273:22, 274:2, 297:12, 298:14, 305:18, 306:12, 306:16, 306:22
**Antitrust** [1] - 200:20
**antitrust** [2] - 291:11, 310:20
**anyway** [1] - 282:18
**apart** [1] - 287:7
**Appeals** [1] - 298:15
**appear** [1] - 219:5
**APPEARANCES** [1] - 200:11
**Apple** [65] - 202:22, 205:17, 210:11, 210:12, 210:22, 211:4, 211:6, 212:6, 217:15, 220:5, 221:10, 221:22, 222:2, 222:16, 224:15, 225:12, 225:17, 225:20, 226:7, 229:16, 229:20, 232:18, 233:1, 248:11, 256:23, 257:18, 257:19, 258:23, 258:24, 259:12, 259:14,

259:16, 260:4, 260:9, 260:21, 261:3, 261:24, 262:3, 262:25, 263:7, 265:14, 265:18, 266:1, 267:14, 268:6, 268:18, 272:22, 274:6, 274:7, 274:11, 274:14, 274:16, 283:6, 283:8, 284:22, 284:25, 285:8, 289:15, 289:21, 294:23, 296:1, 296:2, 296:3, 299:3
**Apple's** [5] - 221:24, 274:6, 286:21, 294:25, 308:12
**applications** [6] - 243:20, 244:3, 244:18, 244:22, 245:8, 245:19
**appreciate** [3] - 228:13, 291:7, 310:22
**approach** [2] - 207:25, 285:7
**appropriate** [2] - 237:18, 256:3
**approval** [2] - 230:18, 230:22
**Approval** [1] - 221:9
**apps** [4] - 219:4, 281:14, 281:15, 284:13
**arbitrary** [1] - 215:4
**arbitrating** [1] - 248:4
**arguably** [1] - 251:1
**argue** [1] - 221:6
**argued** [1] - 232:16
**argues** [3] - 220:20, 229:14, 243:19
**arguing** [2] - 213:2, 249:18
**argument** [4] - 235:13, 236:6, 237:21, 243:17
**ARGUMENTS** [1] - 200:4
**arise** [3] - 236:1, 241:15, 273:1
**arises** [3] - 235:23, 241:11
**arose** [1] - 206:6
**aside** [3] - 202:24, 218:9, 303:3
**aspect** [2] - 221:17, 250:15
**aspects** [1] - 232:15
**aspirations** [1] - 281:7
**assault** [1] - 235:19
**assert** [1] - 290:16
**asserted** [3] - 208:16, 208:17, 277:9
**asserting** [2] - 229:13, 289:4
**assertion** [1] - 227:1

assist [1] - 219:12
Association [2] -
235:10, 237:5
assume [4] - 204:14,
205:10, 293:22, 310:8
assumption [1] -
235:18
assure [1] - 304:22
AT&T [10] - 262:13,
276:12, 276:13, 277:4,
277:9, 277:11, 277:14,
277:19, 277:21, 278:6
attention [3] - 239:9,
262:1, 291:7
attributable [2] -
296:24, 307:2
authentic [1] - 214:19
automatically [1] -
298:8
available [2] - 216:10,
285:5
Avenue [4] - 201:2,
201:6, 201:11, 312:12
aware [2] - 222:1,
266:15

**B**

bad [3] - 247:25,
253:1, 289:12
baked [1] - 301:15
Baker [6] - 210:3,
212:10, 248:21, 259:8,
292:15, 296:16
balance [7] - 227:18,
227:24, 240:22, 243:9,
255:23, 308:17
balancing [15] -
237:20, 238:16,
238:25, 239:1, 239:3,
240:14, 241:3, 241:19,
242:4, 242:8, 243:7,
243:12, 245:17,
255:20, 286:12
Bank [2] - 254:15,
286:1
bank [1] - 272:16
bar [1] - 219:18
barrier [7] - 243:20,
244:3, 244:18, 244:22,
245:8, 245:19
barriers [2] - 215:10,
215:23
barter [2] - 217:19,
269:21
base [1] - 224:15
based [11] - 209:24,
213:19, 235:18,
259:16, 298:7, 298:10,
298:15, 300:24, 301:2,

308:3, 310:1
basic [2] - 235:20,
293:13
basics [1] - 225:5
basis [3] - 203:6,
228:4, 259:2
basket [1] - 242:11
bear [2] - 238:20,
252:9
bears [2] - 285:17,
297:10
become - 216:10,
246:2
becomes [1] - 204:22
BEFORE [1] - 200:9
beforehand [1] -
258:21
beg [1] - 281:18
began [1] - 245:3
begin [2] - 242:13,
284:16
beginning [1] - 248:11
behavior [3] - 213:3,
241:24, 256:18
behavioral [1] - 260:2
behind [3] - 214:8,
261:7, 288:17
Belknap [1] - 201:2
belong [1] - 217:8
belongs [1] - 208:24
BENCH [1] - 200:9
benchmark [1] - 267:2
benefactor [1] -
290:13
beneficial [1] - 270:6
benefit [17] - 205:13,
221:7, 221:11, 221:15,
231:24, 240:13, 241:6,
244:12, 247:13,
249:18, 250:22,
253:22, 255:6, 259:18,
261:13, 269:25, 271:14
benefits [38] - 208:6,
220:22, 221:23, 223:5,
229:24, 231:3, 238:15,
238:23, 239:2, 240:4,
243:14, 244:11, 247:4,
250:11, 250:13, 251:1,
254:1, 255:23, 255:24,
259:21, 259:22,
259:23, 269:15,
270:23, 270:24, 271:7,
271:9, 271:20, 272:6,
272:13, 272:17,
273:21, 289:13, 297:2
best [16] - 213:19,
244:17, 250:7, 250:11,
257:6, 258:25, 260:20,
260:22, 261:2, 261:4,
280:21, 287:20,

296:15, 307:6, 310:19,
312:6
better [21] - 220:9,
220:10, 229:15,
232:24, 233:11, 234:1,
237:8, 237:9, 237:12,
242:5, 242:6, 249:19,
250:9, 253:4, 253:8,
253:9, 260:3, 264:12,
293:5, 293:25, 302:19
between [13] - 227:11,
229:20, 231:13,
244:13, 246:20,
249:22, 249:25,
250:12, 261:10, 262:4,
262:17, 263:11, 305:6
beyond [2] - 255:13,
280:16, 293:17
bid [2] - 251:15,
273:16
bids [2] - 247:23,
247:24
big [1] - 235:13
Big [1] - 274:6
biggest [6] - 229:17,
230:1, 230:4, 230:19,
230:20, 275:1
billions [6] - 210:17,
262:22, 274:10,
274:15, 274:18
binder [2] - 276:22,
298:22
Bing [21] - 210:11,
210:12, 213:5, 213:13,
213:17, 213:20,
213:22, 213:23, 214:3,
214:11, 214:22,
215:16, 225:2, 226:20,
267:7, 285:13, 289:25,
290:23, 293:6, 303:4
Bing's [1] - 211:24
bit [21] - 217:21,
222:21, 241:19, 242:2,
242:20, 243:11,
243:12, 245:12, 247:8,
253:19, 253:21,
261:11, 266:7, 269:1,
282:12, 283:18,
291:24, 293:7, 298:23,
298:24, 303:23
blame [1] - 292:9
bleeding [1] - 281:17
block [3] - 247:21,
291:3, 296:6
blocking [1] - 215:14
blocks [1] - 274:1
board [1] - 286:13
Board [1] - 254:9
boat [2] - 249:10,
249:14

boot [1] - 298:9
boot-up [1] - 298:9
borderline [1] - 289:3
borrow [1] - 237:22
bother [1] - 214:4
bottom [2] - 264:14,
297:9
bought [1] - 245:1
box [4] - 259:10,
260:24, 266:24, 267:13
boycott [1] - 247:18
Braddi [2] - 207:3,
229:22
Braddi's [1] - 281:17
Branch [14] - 205:17,
205:25, 276:1, 276:8,
276:10, 276:18,
277:15, 280:13,
280:23, 281:4, 281:6,
281:10, 290:4
breadth [1] - 205:23
break [2] - 227:18,
306:8
breezy [2] - 300:24,
300:25
brief [6] - 202:16,
232:22, 235:6, 247:16,
298:5, 304:14
bring [4] - 252:9,
279:3, 302:4, 308:2
broader [4] - 203:22,
203:23, 261:5, 290:8
broadly [1] - 223:23
Broadway [1] - 200:22
broken [2] - 217:20,
300:16
brought [2] - 300:19,
300:23
Brown [1] - 215:11
browser [30] - 210:5,
245:11, 245:13, 247:7,
248:9, 248:17, 249:11,
249:20, 250:17,
250:18, 250:20,
252:22, 252:24, 255:2,
255:3, 255:8, 257:24,
255:9, 259:19, 261:7,
284:2, 294:22, 297:23,
300:2, 306:23, 307:5,
307:6, 310:9
browsers [30] - 216:1,
219:25, 220:13,
224:13, 245:5, 246:23,
248:25, 249:18,
249:23, 250:11,
250:13, 250:25,
251:21, 252:8, 252:13,
252:19, 253:4, 253:21,
259:22, 260:22, 261:1,
261:10, 261:12,

261:14, 284:2, 290:9, 297:21, 301:9, 308:18, 309:1
**browsing** [2] - 253:8, 297:20
**Bruce** [1] - 200:19
**build** [4] - 248:3, 258:18, 264:18, 285:14
**buildings** [2] - 247:25, 248:3
**built** [4] - 244:17, 252:24, 253:1, 257:16
**bump** [3] - 302:24, 304:6
**bunch** [1] - 283:4
**bundle** [5] - 217:13, 217:14, 217:19, 230:8, 230:14
**bundled** [1] - 252:15
**bundling** [1] - 217:8
**burden** [26] - 204:22, 208:3, 208:5, 208:7, 208:12, 208:15, 209:10, 223:5, 238:20, 238:24, 239:15, 287:6, 288:18, 288:20, 288:24, 289:3, 289:5, 289:19, 297:11, 297:15, 307:15, 309:23, 309:24, 310:1, 310:4, 310:5
**burdensome** [1] - 232:4
**business** [4] - 230:21, 251:24, 255:21, 270:6
**but-for** [8] - 269:3, 269:6, 299:23, 305:9, 305:21, 306:3, 307:19, 307:20
**but..** [1] - 256:6
**buy** [2] - 227:23, 244:24

**C**

**cake** [1] - 299:15
**calculated** [1] - 305:22
**campaign** [1] - 264:21
**campaigns** [1] - 265:2
**candidly** [1] - 256:8
**candor** [1] - 233:7
**cannot** [2] - 227:13, 305:15
**capable** [1] - 236:19
**capture** [1] - 210:11
**care** [2] - 217:25, 309:11
**careers** [1] - 240:18
**Carr** [1] - 200:21
**carrier** [2] - 263:24,

264:24
**carriers** [12] - 223:25, 226:8, 228:24, 229:9, 231:22, 232:7, 251:14, 262:25, 265:4, 269:15, 277:24, 280:17
**carries** [1] - 298:17
**carry** [1] - 208:5
**carve** [1] - 296:2
**case** [82] - 203:12, 203:19, 203:21, 205:18, 207:5, 207:18, 208:3, 208:14, 209:12, 220:23, 221:14, 222:3, 223:4, 227:10, 227:12, 227:13, 235:5, 235:24, 237:10, 239:9, 240:10, 240:17, 242:25, 243:24, 244:14, 244:16, 244:21, 245:7, 245:24, 247:2, 247:16, 247:18, 248:8, 248:16, 251:23, 252:10, 254:8, 254:10, 254:17, 255:9, 255:17, 256:4, 258:24, 259:7, 260:15, 262:7, 265:24, 271:13, 272:10, 273:25, 275:6, 279:21, 286:6, 286:7, 286:14, 288:21, 289:15, 289:24, 289:25, 291:12, 295:4, 296:21, 299:11, 299:18, 300:2, 300:12, 301:4, 302:4, 304:12, 304:13, 304:17, 304:20, 305:1, 305:2, 307:3, 309:10, 310:10
**cases** [19] - 228:2, 239:7, 240:15, 240:19, 241:10, 241:12, 241:13, 241:14, 241:15, 247:17, 253:25, 254:2, 254:3, 254:8, 254:21, 256:13, 286:9, 307:10, 309:21
**cash** [1] - 217:14
**catch** [1] - 214:4
**caught** [1] - 214:10
**caused** [1] - 246:1
**Cavanaugh** [12] - 201:1, 228:12, 232:12, 238:3, 244:10, 247:15, 271:3, 291:3, 294:14, 296:7, 307:15, 310:24
**CAVANAUGH** [9] - 232:13, 233:15, 234:2, 236:10, 236:18, 271:4, 291:10, 293:10, 310:25
**CCR** [1] - 312:11

**ceded** [1] - 271:4
**cell** [1] - 230:13
**Center** [1] - 200:21
**certain** [5] - 215:13, 255:3, 264:7, 264:13, 274:7
**certainly** [9] - 207:19, 213:15, 218:1, 222:25, 243:21, 254:2, 258:23, 260:5, 293:4
**CERTIFICATE** [1] - 312:1
**certify** [1] - 312:3
**cetera** [2] - 205:8, 262:13
**challenge** [2] - 212:4, 258:6
**challenged** [1] - 297:13
**challenges** [3] - 278:6, 280:4, 292:11
**chance** [3] - 209:16, 211:15, 212:12
**change** [12] - 219:7, 219:8, 219:13, 219:18, 219:21, 234:15, 234:21, 234:22, 291:25, 301:14, 310:18
**changed** [5] - 233:21, 234:22, 244:20, 245:3, 295:17
**changing** [3] - 215:16, 291:23
**channel** [1] - 310:19
**channels** [3] - 306:20, 306:23, 306:25
**characterize** [1] - 291:11
**charged** [1] - 302:8
**charging** [1] - 270:9
**chart** [1] - 282:14
**check** [4] - 214:1, 214:12, 278:2
**Chicago** [1] - 200:16
**chilling** [2] - 279:23, 280:3
**China** [1] - 292:14
**choice** [28] - 210:9, 220:7, 231:25, 232:1, 232:4, 256:21, 257:5, 257:14, 257:21, 257:22, 258:2, 258:4, 258:11, 258:20, 258:24, 259:11, 260:4, 266:6, 267:14, 269:2, 269:5, 269:6, 283:7, 283:9, 283:12, 299:21, 300:3
**choosing** [1] - 250:10
**chose** [3] - 212:10,

255:2, 259:16
**chosen** [2] - 225:1, 283:9
**Chrome** [9] - 216:18, 217:2, 217:4, 249:5, 252:12, 252:13, 258:17, 283:21, 308:15
**Chromium** [3] - 252:25, 253:3, 253:5
**churned** [1] - 303:21
**Circuit** [11] - 218:19, 235:9, 235:16, 255:13, 298:7, 304:13, 304:17, 304:18, 305:12, 306:3, 306:15
**circuit** [1] - 208:14
**circumstance** [1] - 258:20
**circumstances** [3] - 255:3, 260:6, 306:9
**citations** [1] - 206:8
**cite** [3] - 235:24, 247:16, 286:9
**cited** [3] - 235:6, 251:14, 252:3
**cites** [3] - 251:9, 290:7, 290:9
**citing** [2] - 235:16, 287:5
**Civil** [2] - 200:3, 206:19
**claim** [8] - 216:16, 242:25, 246:5, 255:12, 266:24, 301:23, 301:24, 302:18
**claimed** [2] - 270:14, 272:12
**claiming** [2] - 275:9, 289:5
**claims** [1] - 223:6
**clarity** [1] - 239:8
**Clayton** [1] - 305:1
**clean** [1] - 255:17
**clear** [11] - 203:17, 208:14, 213:4, 214:11, 216:16, 239:9, 253:14, 259:25, 277:20, 293:9, 309:10
**clearly** [5] - 207:8, 257:4, 263:2, 272:10, 305:14
**close** [2] - 213:22, 293:19
**closely** [2] - 303:16, 303:17
**closer** [2] - 280:24, 284:7
**CLOSING** [1] - 200:4
**closing** [1] - 212:25
**CMR** [1] - 312:11

**CO** [1] - 200:23
**coerced** [1] - 295:22
**cognizable** [1] - 227:4
**coincidence** [2] - 287:2, 287:5
**colleague** [2] - 219:18, 228:10
**colleagues** [1] - 277:8
**college** [1] - 254:10
**Colorado** [2] - 200:19, 200:21
**COLORADO** [1] - 200:19
**COLUMBIA** [1] - 200:1
**column** [1] - 297:10
**coming** [1] - 290:2
**commands** [1] - 243:9
**commend** [3] - 254:7, 262:1, 298:4
**comment** [2] - 291:12, 291:14
**commentary** [2] - 254:21, 259:20
**comments** [1] - 202:16
**commissioned** [1] - 228:22
**communicate** [1] - 210:24
**communication** [3] - 277:21, 278:18
**companies** [7] - 227:2, 253:5, 273:15, 279:10, 279:22, 279:24, 293:25
**company** [5] - 246:2, 252:5, 273:15, 273:18, 290:24
**comparative** [2] - 296:17, 296:18
**compare** [2] - 213:4, 213:15
**compares** [1] - 213:5
**comparing** [1] - 213:13
**comparisons** [1] - 213:6
**compete** [14] - 203:2, 203:6, 231:9, 231:12, 236:12, 251:6, 273:9, 284:20, 285:7, 299:6, 301:2, 303:4, 304:1
**competed** [2] - 202:23, 216:5
**competes** [1] - 216:9
**competing** [5] - 215:18, 251:24, 285:17, 302:2, 302:7
**competition** [122] - 202:16, 203:1, 203:2,

203:4, 203:8, 208:17, 208:19, 208:23, 209:8, 209:17, 209:18, 209:22, 210:5, 210:6, 210:7, 210:21, 211:8, 211:9, 211:13, 211:18, 211:19, 212:5, 212:7, 212:8, 212:14, 212:18, 212:20, 212:24, 213:14, 214:19, 214:23, 215:1, 215:5, 215:6, 215:8, 216:1, 216:4, 216:8, 216:21, 217:22, 217:25, 220:6, 220:12, 220:13, 220:18, 226:15, 226:25, 229:20, 232:15, 234:25, 235:18, 237:3, 237:11, 237:13, 242:3, 242:4, 242:10, 244:2, 245:13, 245:20, 246:19, 247:12, 247:21, 247:23, 247:25, 248:6, 250:12, 251:2, 251:5, 251:9, 251:25, 252:1, 252:22, 253:19, 253:20, 253:24, 256:15, 259:17, 259:20, 261:9, 261:10, 261:13, 261:19, 261:23, 262:7, 262:8, 262:10, 265:19, 265:21, 265:25, 266:1, 266:2, 268:5, 268:7, 269:14, 269:22, 269:23, 270:12, 270:22, 272:21, 272:23, 273:1, 273:21, 281:19, 281:23, 285:16, 292:12, 292:16, 292:18, 293:15, 294:11, 295:15, 295:18, 295:21, 295:23, 296:22, 305:15, 309:14, 309:17, 310:4
**competitions** [2] - 210:4, 295:19
**competitive** [25] - 208:22, 217:24, 218:4, 226:19, 227:14, 242:16, 245:16, 246:24, 249:9, 252:9, 255:23, 264:18, 266:8, 290:23, 292:10, 293:2, 293:22, 293:24, 294:3, 305:6, 305:8, 308:7, 308:9, 309:13, 309:18
**competitively** [1] - 243:23

**competitor** [6] - 213:8, 236:11, 281:1, 281:5, 281:8, 285:16
**competitors** [2] - 239:14, 293:14
**complaint** [2] - 206:13, 275:21
**complementary** [3] - 250:3, 250:5, 308:18
**complements** [2] - 248:14, 308:19
**complete** [1] - 312:5
**completely** [6] - 223:22, 258:21, 271:8, 286:11, 288:2, 288:8
**complicated** [2] - 258:9, 270:9
**complication** [1] - 258:10
**compliment** [1] - 260:22
**complimentary** [1] - 217:7
**compromised** [1] - 262:4
**computer** [4] - 300:10, 300:17, 308:2, 308:3
**computers** [2] - 244:24, 245:2
**concede** [1] - 232:9
**conceded** [2] - 241:9, 242:24
**concedes** [1] - 249:4
**conceding** [1] - 214:22
**conceivable** [1] - 239:12
**concept** [1] - 292:7
**concepts** [1] - 208:21
**concern** [2] - 213:12, 293:1
**concerned** [1] - 241:23
**conclude** [2] - 214:25, 296:21
**concluded** [1] - 276:18
**concludes** [2] - 210:11, 277:18
**conclusion** [2] - 229:23, 309:16
**conclusions** [1] - 298:5
**concrete** [1] - 276:17
**concurring** [1] - 235:25
**condemned** [1] - 298:10
**conditions** [2] - 292:23, 293:2

**conduct** [51] - 204:17, 205:23, 205:24, 208:13, 209:12, 220:22, 223:6, 223:7, 223:10, 223:20, 235:24, 240:23, 242:2, 242:4, 242:13, 242:16, 243:6, 243:8, 243:9, 244:8, 244:11, 244:21, 245:4, 245:5, 245:11, 245:13, 245:14, 245:18, 245:21, 246:1, 246:3, 246:7, 246:11, 246:19, 246:20, 246:21, 247:19, 249:8, 272:3, 275:8, 275:10, 275:15, 297:13, 301:18, 301:23, 301:24, 309:24
**conducted** [1] - 228:21
**confidential** [1] - 263:7
**confirm** [2] - 210:4, 278:1
**confirmed** [1] - 277:24
**confirms** [1] - 259:15
**conflicts** [2] - 277:18, 278:7
**confront** [1] - 254:11
**confronted** [1] - 260:14
**Congress** [2] - 227:20, 227:25
**connected** [2] - 218:5, 295:4
**connection** [2] - 243:18, 262:17
**CONNOLLY** [1] - 201:6
**consent** [2] - 206:22, 207:9
**consented** [1] - 207:6
**consequence** [2] - 217:1, 252:14
**consider** [12] - 226:7, 227:13, 237:23, 247:10, 247:11, 254:1, 254:4, 255:10, 257:8, 259:18, 271:25
**consideration** [1] - 298:19
**considerations** [1] - 269:13
**considered** [3] - 209:15, 210:1, 260:10
**considering** [5] - 230:5, 271:6, 272:3, 290:11, 292:25
**consistent** [7] - 207:6,

318

231:6, 231:8, 231:25,
259:8, 263:21
**consistently** [1] -
276:4
**conspiracy** [1] -
247:17
**constant** [1] - 285:23
**constantly** [3] -
216:11, 276:6, 285:23
**constitutes** [1] - 312:4
**Constitution** [2] -
201:11, 312:12
**constrains** [1] -
211:18
**Consumer** [1] -
200:20
**consumer** [2] -
228:24, 294:9
**consumer's** [1] -
261:2
**consumers** [3] -
228:19, 260:12, 260:21
**consumers'** [1] -
248:18
**Cont** [1] - 201:1
**contact** [2] - 209:8,
277:11
**containing** [1] - 246:4
**contemporaneous** [4]
- 271:22, 272:11,
298:2, 298:10
**contemporaneously**
[2] - 271:15, 297:17
**content** [1] - 280:5
**contention** [1] - 236:8
**contents** [1] - 209:20
**contest** [3] - 206:6,
283:21, 285:1
**contestable** [5] -
251:11, 251:12,
283:17, 284:7, 284:8
**contested** [1] - 208:4
**context** [4] - 222:24,
222:25, 237:20, 244:5
**continue** [4] - 202:6,
264:19, 308:1, 311:3
**continued** [1] - 301:3
**continues** [1] - 244:4
**continuing** [4] - 243:4,
244:21, 244:23
**contract** [22] - 202:23,
208:17, 208:19, 211:9,
212:24, 216:2, 217:8,
220:18, 232:16,
242:10, 256:16,
272:22, 272:24, 273:7,
273:8, 273:11, 273:24,
274:1, 276:15, 277:19,
280:14
**contracts** [5] - 216:11,

232:18, 243:4, 251:13,
291:20
**contrary** [1] - 288:19
**contribute** [1] - 245:19
**contributing** [2] -
236:20, 236:25
**control** [2] - 257:15,
294:25
**controlled** [1] - 207:17
**controls** [1] - 258:3
**convenient** [1] -
260:23
**cook** [1] - 210:24
**copy** [1] - 206:10
**copyright** [3] - 288:4,
298:7, 298:15
**copyright-based** [1] -
298:15
**correct** [10] - 216:24,
223:16, 229:21,
231:14, 240:1, 241:4,
241:17, 261:17,
261:20, 267:10
**correctly** [3] - 211:12,
216:23, 248:1
**correlation** [2] -
228:23, 263:13
**cost** [5] - 227:23,
229:25, 230:6, 230:8,
231:4
**costs** [1] - 264:22
**council** [1] - 230:21
**counsel** [5] - 206:10,
271:5, 272:19, 290:11,
290:19
**count** [1] - 223:21
**counter** [1] - 206:14
**counter-statement** [1]
- 206:14
**countries** [7] - 284:23,
292:15, 293:3, 293:14,
296:2, 296:19
**country** [2] - 292:21,
296:13
**counts** [1] - 270:2
**couple** [7] - 238:18,
264:15, 271:2, 273:16,
294:17, 304:8, 307:15
**course** [12] - 206:11,
208:11, 218:11,
225:12, 226:21, 237:1,
255:11, 280:9, 286:7,
297:20, 297:21, 297:25
**Court** [64] - 201:9,
201:10, 202:7, 203:9,
203:25, 204:13,
204:25, 205:10,
205:20, 206:8, 206:19,
207:23, 208:19,
208:23, 209:15,

209:19, 210:2, 210:7,
210:13, 214:17,
216:15, 218:19,
225:23, 227:25,
237:10, 237:19,
238:19, 239:8, 243:18,
244:6, 245:15, 245:16,
248:1, 254:25, 255:5,
259:1, 274:9, 274:17,
276:24, 276:25, 277:2,
283:17, 286:1, 287:6,
288:1, 288:2, 288:4,
288:6, 288:17, 289:7,
298:9, 298:14, 307:21,
309:6, 309:8, 309:10,
309:15, 310:8, 310:12,
310:15, 310:21, 312:11
**COURT** [123] - 200:1,
202:2, 202:9, 202:18,
203:15, 203:17,
204:16, 205:15, 206:4,
206:10, 207:24, 208:1,
209:2, 209:4, 209:6,
211:11, 213:3, 214:6,
214:16, 214:21,
216:22, 216:25, 218:7,
218:15, 219:9, 220:24,
221:1, 221:5, 221:21,
222:20, 225:24,
227:10, 228:7, 228:12,
232:11, 233:14,
233:16, 236:4, 236:11,
238:3, 238:10, 239:17,
240:2, 241:7, 241:14,
241:18, 242:9, 243:15,
245:23, 246:13,
249:16, 250:23,
254:14, 254:18,
255:15, 256:5, 256:10,
256:12, 257:8, 257:13,
258:1, 258:7, 261:15,
261:18, 262:9, 263:2,
263:9, 263:25, 267:3,
267:9, 267:23, 268:2,
268:24, 269:9, 271:1,
271:13, 272:9, 273:3,
273:13, 274:21, 275:3,
276:7, 277:20, 279:3,
279:21, 280:22, 281:5,
281:12, 281:18,
281:24, 282:3, 282:10,
282:14, 282:20,
282:22, 282:24, 283:2,
285:6, 286:4, 287:9,
289:23, 290:25, 291:2,
291:8, 292:20, 294:14,
295:6, 297:5, 297:8,
301:10, 303:1, 303:10,
304:8, 304:22, 305:25,
306:2, 306:16, 306:19,
307:11, 307:13,

310:23, 311:1, 312:1
**court** [7] - 238:5,
255:22, 256:1, 271:18,
282:4, 298:12, 307:18
**Court's** [5] - 239:8,
285:21, 289:22, 298:19
**Courthouse** [1] -
201:10
**courts** [6] - 222:23,
255:19, 255:20, 256:1,
256:2
**coverage** [2] - 284:9,
305:6
**covered** [1] - 299:5
**covers** [1] - 205:9
**CRC** [1] - 201:9
**create** [4] - 234:1,
234:24, 272:5, 281:22
**creates** [3] - 231:6,
292:19, 293:15
**creating** [1] - 292:10
**credit** [1] - 287:1
**credited** [1] - 298:7
**criminal** [1] - 237:22
**crisis** [1] - 290:17
**critical** [4] - 233:23,
234:9, 252:21, 307:22
**cross** [2] - 221:3,
227:13, 227:18,
227:24, 249:2, 250:1,
250:5, 255:19, 286:4,
286:5, 286:11, 287:1
**cross-balance** [2] -
227:18, 227:24
**cross-examined** [1] -
249:2
**cross-market** [2] -
221:3, 250:5
**CRR** [2] - 201:9,
312:11
**Cue** [9] - 210:3, 210:8,
210:24, 211:14,
215:17, 257:2, 257:4,
262:5, 285:8
**cure** [1] - 216:2
**curious** [1] - 245:23
**customers** [1] -
250:10
**cut** [1] - 262:6
**Czechoslovakia** [1] -
292:14

---

**D**

---

**D.C** [13] - 200:5,
200:13, 201:7, 255:13,
298:6, 304:13, 304:16,
304:18, 305:12, 306:3,
306:15, 310:12, 312:13
**DAHLQUIST** [2] -

282:19, 282:23
**Dahlquist** [1] - 200:14
**dance** [1] - 262:22
**dare** [1] - 249:21
**data** [13] - 230:12, 233:12, 233:17, 233:23, 233:25, 234:3, 259:14, 299:21, 300:4, 302:10, 302:11, 307:24
**Date** [1] - 200:7
**Dated** [1] - 312:7
**Daubert** [1] - 300:7
**David** [1] - 200:14
**David.dahlquist@usdoj.gov** [1] - 200:17
**days** [2] - 235:7, 245:1
**DC** [1] - 201:11
**deal** [10] - 266:19, 266:20, 268:21, 268:22, 285:4, 302:22, 303:19, 303:20, 303:23, 305:14
**dealing** [1] - 203:24
**deals** [3] - 251:18, 251:19, 268:22
**debates** [2] - 299:14
**decade** [1] - 301:13
**decide** [2] - 232:7, 274:8
**decided** [4] - 278:22, 278:23, 279:18, 279:20
**decision** [8] - 235:9, 250:18, 260:12, 267:14, 279:16, 279:19, 285:12, 295:1
**decision-makers** [1] - 260:12
**decisions** [1] - 213:18
**deck** [3] - 252:4, 277:1, 286:16
**decks** [1] - 291:8
**declining** [1] - 286:22
**deep** [2] - 272:7, 281:10
**default** [63] - 210:22, 219:8, 219:13, 219:14, 219:19, 220:2, 221:7, 221:24, 222:8, 222:16, 222:19, 224:14, 224:16, 224:19, 225:2, 226:2, 230:25, 231:21, 232:20, 248:17, 248:23, 250:8, 250:24, 252:1, 252:19, 255:2, 258:15, 258:16, 258:17, 259:13, 260:6, 260:16, 260:17, 261:4, 266:11, 266:17, 266:22, 266:24, 267:7, 267:9, 267:13, 267:19,

267:22, 267:25, 268:3, 268:8, 268:13, 268:15, 268:17, 268:18, 284:22, 285:4, 292:5, 294:21, 299:5, 300:3, 307:22, 310:16, 310:18
**Default** [1] - 274:13
**defaults** [29] - 203:6, 203:7, 210:5, 216:9, 219:21, 219:23, 220:12, 224:7, 224:8, 226:15, 236:25, 237:2, 251:5, 251:7, 256:25, 260:2, 260:11, 261:9, 268:23, 283:16, 283:22, 290:5, 308:15, 308:16, 308:17, 308:19, 308:20, 308:21, 308:24, 310:17
**defend** [1] - 208:11
**defendant** [11] - 223:5, 239:11, 240:20, 271:10, 271:18, 284:3, 286:9, 287:21, 287:22, 288:25
**Defendant** [2] - 200:7, 201:5
**defendants** [1] - 286:6
**defense** [6] - 208:9, 208:12, 242:10, 284:3, 288:21, 308:22
**define** [1] - 220:4
**definitely** [3] - 250:5, 259:21, 280:3
**definition** [4] - 246:8, 277:18, 278:2, 278:21
**definitively** [2] - 278:15, 278:21
**degree** [2] - 214:23, 305:16
**deletable** [1] - 219:5
**delta** [1] - 274:10
**demand** [2] - 224:25, 261:24
**demanding** [2] - 222:18, 224:5
**demonstrate** [1] - 223:5
**demonstrated** [1] - 310:3
**demonstrating** [1] - 297:12
**demonstration** [1] - 226:11
**Dentsply** [3] - 271:23, 275:15, 310:4
**Denver** [1] - 200:23
**denying** [1] - 274:25
**DEPARTMENT** [2] - 200:12, 200:19

**Department** [1] - 200:15
**deposition** [1] - 212:12
**deprived** [1] - 290:22
**depriving** [1] - 222:7
**derives** [1] - 233:4
**descend** [1] - 205:15
**describe** [1] - 248:14
**described** [5] - 243:17, 243:19, 273:6, 275:6, 275:7
**describes** [1] - 269:20
**describing** [1] - 216:3
**description** [1] - 206:6
**design** [6] - 225:17, 225:18, 225:19, 247:24, 248:10, 260:6
**designed** [3] - 259:11, 268:7, 295:17
**designing** [1] - 249:11
**desktop** [6] - 303:5, 308:9, 308:13, 308:14, 308:19
**determination** [3] - 214:18, 215:2, 215:5
**determined** [2] - 229:24, 277:7
**determining** [1] - 301:20
**developers** [1] - 250:17
**device** [8] - 231:10, 264:11, 266:21, 270:19, 278:22, 286:21, 294:22, 308:7
**devices** [13] - 224:2, 228:24, 230:24, 231:10, 231:13, 232:8, 253:18, 265:20, 269:23, 270:22, 286:23, 299:3
**DICKMAN** [1] - 312:3
**Dickman** [2] - 201:9, 312:11
**difference** [4] - 244:13, 245:22, 246:20, 249:24
**differences** [1] - 293:11
**different** [38] - 213:21, 219:2, 222:17, 223:22, 240:5, 241:25, 244:4, 244:20, 245:3, 245:4, 246:14, 246:23, 247:1, 248:3, 248:7, 253:1, 254:20, 256:25, 257:13, 258:19, 258:22, 264:5, 270:13, 293:12, 293:18, 294:1,

294:2, 296:1, 296:18, 298:8, 300:17, 302:9, 305:10, 305:11, 306:10, 307:3
**differentiate** [3] - 231:16, 294:1, 294:7
**differentiating** [1] - 231:10
**differentiation** [2] - 231:13, 294:10
**difficult** [3] - 255:22, 276:5, 303:25
**dig** [2] - 281:15, 283:18
**digits** [1] - 304:23
**Dintzer** [22] - 200:11, 202:4, 228:7, 233:20, 251:9, 253:12, 254:2, 256:22, 258:13, 261:1, 261:21, 266:6, 270:15, 271:2, 282:24, 291:20, 292:6, 295:23, 299:3, 304:12, 307:15, 310:23
**DINTZER** [59] - 202:5, 202:15, 202:19, 203:16, 203:22, 204:24, 205:19, 206:7, 206:11, 207:25, 208:2, 209:3, 209:5, 209:14, 211:22, 213:15, 214:7, 214:20, 215:7, 216:24, 217:10, 218:14, 218:21, 219:11, 220:25, 221:4, 221:17, 221:25, 223:3, 226:10, 227:15, 228:10, 228:13, 271:5, 271:23, 272:15, 273:11, 273:23, 274:22, 275:13, 276:22, 277:23, 279:12, 280:2, 280:24, 281:10, 281:13, 281:22, 282:2, 282:13, 282:25, 283:3, 285:18, 286:5, 287:20, 289:24, 291:1, 291:4, 307:17
**direct** [1] - 239:8
**directed** [1] - 245:5
**direction** [1] - 218:2
**directly** [1] - 279:6
**disadvantage** [2] - 233:3, 234:14
**disagree** [1] - 214:1
**disagreement** [2] - 227:12, 242:18
**disallowed** [1] - 230:14
**discontinue** [1] - 277:25

discrediting [1] - 298:13
discs [1] - 245:1
discuss [2] - 203:13, 221:18
discussed [1] - 211:2
discussing [1] - 235:8
discussion [6] - 208:22, 224:10, 225:21, 238:17, 287:10, 300:8
discussions [2] - 210:23, 299:8
dismissed [1] - 288:4
dispute [3] - 233:4, 265:24, 297:17
dissatisfied [1] - 250:15
distinction [1] - 305:6
distinguish [2] - 218:15, 249:22
distribute [2] - 306:23, 310:19
distributed [1] - 297:22
distribution [2] - 228:18, 306:21
DISTRICT [3] - 200:1, 200:1, 200:10
District [4] - 218:19, 298:9, 310:12, 310:15
ditched [1] - 252:25
divert [1] - 281:8
document [15] - 213:1, 233:16, 233:17, 253:12, 265:17, 271:11, 277:17, 286:19, 290:9, 290:14, 290:17, 297:16, 298:2, 309:2
documented [2] - 297:17, 297:18
documents [25] - 207:18, 213:1, 221:19, 221:25, 222:12, 223:12, 229:5, 229:6, 230:7, 245:6, 248:10, 271:6, 271:17, 271:19, 271:22, 272:4, 272:18, 272:19, 292:16, 297:19, 298:10, 298:13, 303:16, 303:17, 309:7
DOJ [1] - 200:11
DoJ [1] - 290:11
dollar [3] - 263:14, 285:21
dollar-for-dollar [1] - 263:14
dollars [10] - 210:17,

262:22, 263:19, 264:7, 264:9, 266:17, 274:10, 274:15, 274:18
dominance [1] - 243:22
done [13] - 204:5, 205:22, 218:11, 222:13, 232:6, 266:24, 269:12, 289:15, 290:15, 296:5, 299:13, 300:15, 305:21
doubt [1] - 234:2
down [8] - 220:21, 222:15, 227:18, 234:8, 247:24, 252:2, 267:22, 294:24
downgraded [1] - 276:19
download [2] - 219:1, 284:13
downloadable [1] - 284:2
downloaded [4] - 257:1, 283:21, 308:19, 310:14
Dr [9] - 213:23, 214:6, 216:3, 218:4, 282:14, 282:15, 292:15, 308:3, 308:4
draw [1] - 293:7
drawn [1] - 233:18
drive [1] - 305:5
driven [1] - 266:8
drives [2] - 218:21, 247:23
drop [2] - 267:22, 294:24
drop-down [2] - 267:22, 294:24
dropped [1] - 255:12
dropping [1] - 222:15
Duck [1] - 269:10
DuckDuckGo [6] - 213:16, 234:13, 270:14, 284:20, 285:1, 292:9
Duo [2] - 270:17, 270:21
during [6] - 206:25, 238:17, 269:16, 272:23, 294:18
DXD29 [1] - 282:14
dynamics [1] - 293:12

E

early [1] - 280:13
earn [2] - 226:7, 226:9
earned [1] - 244:7
easiest [1] - 284:11

easy [2] - 265:8, 289:14
eat [2] - 226:13, 299:15
economic [5] - 215:3, 246:6, 248:14, 263:16, 299:14
economically [1] - 269:3
economics [2] - 260:2, 262:18
economist [2] - 229:5, 272:1
economists [1] - 291:11
ecosystem [6] - 229:15, 279:1, 291:16, 295:12, 295:16, 295:17
Edge [1] - 252:24
effect [20] - 220:23, 221:22, 227:6, 237:7, 242:18, 243:6, 243:13, 250:25, 255:8, 263:1, 279:23, 280:3, 297:12, 302:12, 302:15, 302:21, 303:18, 305:15, 306:17, 306:22
effectively [1] - 295:12
effects [24] - 202:6, 204:20, 204:21, 205:3, 205:4, 205:7, 205:11, 205:12, 206:1, 208:7, 236:2, 242:6, 247:4, 247:6, 255:10, 256:17, 272:25, 273:1, 298:3, 305:6, 305:8, 305:19, 306:12, 307:1
efficiency [1] - 236:1
efficient [6] - 269:20, 284:10, 306:20, 306:23, 306:25
efforts [4] - 244:1, 290:3, 297:19, 310:7
either [6] - 203:23, 206:25, 209:11, 241:20, 247:19, 272:13
element [3] - 218:2, 223:2, 223:3
elements [1] - 207:7
elicited [2] - 206:18, 207:13
elsewhere [1] - 292:23
Email [4] - 200:14, 200:17, 200:24, 201:8
email [5] - 201:4, 276:17, 278:5, 279:12, 279:15
employees [1] - 230:18
enabled [1] - 236:13

encourage [3] - 205:19, 218:17, 256:18
end [5] - 203:3, 230:13, 237:13, 239:15, 308:20
ended [1] - 295:11
ends [1] - 284:17
enforced [1] - 275:25
enforces [1] - 219:17
enforcing [1] - 276:2
engage [2] - 246:11, 246:22
engaged [2] - 246:7, 275:10
engaging [3] - 245:3, 246:10, 255:19
engine [19] - 220:2, 224:23, 234:1, 248:17, 249:12, 249:19, 250:8, 257:16, 257:21, 260:23, 261:4, 261:12, 262:11, 266:22, 281:7, 294:22, 303:6, 308:20, 310:9
engineering [1] - 258:9
Engineers [5] - 235:17, 237:5, 247:15, 247:18, 247:22
engines [5] - 224:16, 224:18, 249:23, 267:6, 268:16
enhance [2] - 251:2, 259:19
enhances [1] - 250:12
enhancing [1] - 251:3
enormous [4] - 235:1, 265:15, 284:24, 308:13
ensure [2] - 203:11, 295:17
ensures [3] - 216:20, 235:14, 295:18
enter [2] - 266:19, 266:20, 268:2, 284:2, 284:4
entered [2] - 266:22, 267:18
entering [1] - 246:15
entities [2] - 285:5, 285:24
entitled [1] - 294:21
entrant [4] - 276:2, 283:25, 284:19, 290:2
entrants [2] - 210:14, 284:19
entry [11] - 215:10, 215:14, 215:23, 243:20, 244:19, 244:22, 245:8, 245:19, 285:23, 290:6

**environment** [1] - 226:19

**Epic** [1] - 254:8

**episodes** [1] - 205:16

**equal** [1] - 293:22

**erode** [1] - 245:7

**especially** [1] - 211:10

**essentially** [4] - 218:12, 221:8, 221:12, 245:25

**establish** [3] - 203:21, 204:22, 280:20

**established** [6] - 204:6, 204:21, 208:3, 249:23, 263:16, 295:1

**establishing** [1] - 203:19

**estimation** [2] - 303:3, 303:4

**et** [3] - 200:3, 205:8, 262:13

**Europe** [10] - 216:23, 216:25, 217:20, 218:16, 230:12, 258:2, 270:7, 270:8, 270:19, 270:20

**evaluated** [1] - 266:1

**events** [1] - 302:16

**eventually** [2] - 214:7, 281:16

**Evidence** [1] - 279:4

**evidence** [58] - 207:2, 207:4, 207:16, 207:17, 210:7, 214:14, 216:6, 225:25, 229:12, 230:15, 230:16, 231:19, 231:23, 245:6, 248:20, 249:3, 251:23, 260:15, 265:17, 267:16, 268:8, 269:21, 272:11, 276:7, 276:9, 276:11, 276:17, 279:9, 280:20, 287:3, 287:15, 288:7, 288:17, 288:20, 290:19, 292:21, 296:11, 296:12, 296:21, 299:17, 300:13, 301:8, 301:9, 302:14, 302:24, 302:25, 303:8, 303:12, 304:5, 309:2, 309:3, 309:4, 309:6, 309:16, 309:19, 310:6

**evolution** [1] - 252:18

**evolved** [1] - 310:1

**exact** [2] - 259:8, 270:19

**exactly** [6] - 241:20, 256:7, 261:24, 274:17, 281:1, 303:15

**examined** [2] - 249:2, 300:14

**example** [8] - 204:25, 223:14, 262:15, 273:14, 292:14, 293:4, 298:6, 306:4

**except** [3] - 218:6, 224:24, 234:23

**exchange** [1] - 267:13

**exclusionary** [13] - 204:17, 209:12, 219:22, 235:24, 242:13, 243:3, 243:6, 245:5, 246:11, 246:18, 272:12, 275:9, 301:17

**exclusive** [20] - 202:21, 203:6, 203:24, 204:18, 205:2, 205:9, 215:12, 216:17, 216:18, 217:15, 218:23, 222:18, 230:25, 236:22, 259:13, 268:23, 274:1, 305:14, 306:7

**exclusively** [2] - 306:21, 307:7

**exclusivity** [15] - 203:11, 203:24, 204:1, 204:2, 204:15, 217:17, 219:23, 221:7, 224:5, 224:12, 224:22, 224:25, 225:6, 227:2, 231:1

**excuse** [6] - 221:10, 227:8, 238:11, 239:3, 247:21, 287:12

**execute** [1] - 258:11

**exegesis** [1] - 260:2

**exercise** [1] - 305:23

**exercises** [1] - 305:22

**exist** [2] - 272:8, 300:1

**existence** [2] - 216:20, 274:25

**existent** [1] - 258:21

**existential** [1] - 290:17

**existing** [1] - 210:15

**exists** [1] - 310:6

**expect** [2] - 263:18, 308:16

**expected** [1] - 263:22

**expensive** [1] - 269:22

**experience** [13] - 231:7, 231:8, 231:24, 232:1, 232:8, 232:24, 250:9, 250:11, 253:10, 257:6, 258:25, 259:10

**experiences** [1] - 231:11

**experiment** [2] - 269:8, 299:24

**expert** [8] - 216:7, 258:9, 287:4, 300:11, 300:17, 300:19, 300:21, 300:22

**expert's** [1] - 300:22

**expertise** [1] - 215:3

**explain** [4] - 209:17, 276:24, 278:7, 297:19

**explained** [1] - 223:23

**explains** [1] - 213:3

**explanation** [2] - 253:14, 295:11

**Explorer** [7] - 245:14, 245:20, 246:25, 249:4, 249:6, 252:15, 252:25

**express** [2] - 206:22, 211:5

**expressly** [2] - 271:8, 273:25

**extended** [1] - 210:16

**extensive** [1] - 203:5

**extent** [10] - 209:25, 217:21, 221:15, 221:18, 226:21, 250:7, 254:12, 285:15, 292:20, 294:22

**extra** [1] - 274:10

**extreme** [3] - 204:25, 275:21, 288:24

**eye** [2] - 213:8, 213:18

**Ezell** [5] - 278:12, 278:16, 279:4, 279:15, 280:9

## F

**F.3d** [1] - 297:4

**fabulous** [1] - 307:5

**face** [4] - 211:23, 251:9, 292:12, 292:16

**facie** [7] - 203:12, 203:18, 203:21, 205:18, 208:3, 209:12, 220:23

**fact** [38] - 205:7, 210:6, 210:10, 212:21, 213:21, 216:16, 217:5, 217:20, 222:3, 223:18, 224:24, 225:3, 227:1, 231:25, 240:11, 242:6, 242:17, 262:2, 262:10, 269:17, 270:4, 272:11, 272:13, 273:20, 279:9, 279:21, 287:3, 287:18, 288:10, 290:1, 290:8, 290:18, 292:24, 293:13, 296:13, 306:14, 306:20, 308:7

**factor** [3] - 229:22, 260:9, 280:14

**factors** [3] - 215:12, 260:8, 300:17

**facts** [3] - 206:15, 258:23, 262:6

**factual** [1] - 259:2

**fail** [2] - 212:22, 246:12, 305:23

**failed** [2] - 208:5, 309:23

**failure** [2] - 295:3, 301:4

**fair** [3] - 227:25, 256:8, 293:10

**faith** [1] - 289:12

**fanciful** [1] - 210:18

**fantasy** [1] - 210:19

**far** [3] - 216:1, 223:19, 308:23

**fashion** [2] - 248:15, 300:25

**fast** [1] - 211:10

**faster** [1] - 214:3

**feature** [2] - 236:6, 248:12

**Federal** [1] - 206:19

**feedback** [1] - 291:19

**feeds** [1] - 291:22

**fell** [2] - 208:20, 288:24

**felt** [2] - 217:22, 278:20

**ferret** [1] - 285:24

**few** [3] - 202:15, 271:3, 291:2

**field** [1] - 206:5

**figure** [1] - 227:18

**figures** [1] - 233:18

**finally** [2] - 231:6, 252:25

**financial** [1] - 223:15

**findings** [4] - 262:1, 270:4, 302:16, 306:14

**Firefox** [8] - 212:21, 248:21, 248:24, 249:19, 250:14, 250:17, 308:15

**firm** [1] - 246:2

**First** [1] - 279:24

**first** [12] - 208:16, 232:5, 243:10, 243:14, 247:3, 247:6, 248:11, 275:20, 277:4, 282:23, 283:19, 297:10

**fit** [2] - 222:21, 239:6

**fits** [2] - 240:14, 287:11

**fitting** [1] - 223:1

**five** [14] - 202:21, 202:25, 203:3, 228:10, 228:11, 232:2, 234:18,

238:4, 238:7, 272:22, 272:23, 272:24, 282:5, 302:2
**fix** [1] - 247:23
**fixing** [1] - 247:18
**flaws** [1] - 300:22
**flipped** [2] - 249:7, 300:3
**flipping** [1] - 306:13
**flips** [2] - 240:5, 306:14
**float** [1] - 208:21
**floated** [2] - 208:22, 278:17
**Floor** [1] - 200:22
**flow** [1] - 306:12
**focus** [3] - 210:14, 232:14, 294:8
**focused** [1] - 264:22
**folks** [3] - 262:13, 264:16, 264:23
**follow** [3] - 247:8, 295:6, 306:2
**following** [2] - 243:16, 293:1
**follows** [1] - 243:16
**football** [1] - 254:11
**FOR** [1] - 200:1
**forced** [3] - 258:18, 270:17, 290:23
**forcing** [2] - 211:9, 247:20
**foreclosed** [5] - 204:3, 236:8, 283:19, 283:24, 310:18
**foreclosure** [28] - 203:9, 203:19, 203:20, 203:25, 204:10, 204:19, 204:22, 215:13, 236:23, 246:14, 246:17, 269:7, 298:24, 299:18, 301:6, 301:21, 304:11, 304:15, 304:19, 304:20, 305:7, 305:11, 305:16, 305:18, 306:1, 306:13, 307:10
**foregoing** [1] - 312:4
**foreign** [2] - 293:8, 296:8
**foreseeable** [1] - 308:1
**foresight** [1] - 243:24
**forget** [4] - 210:13, 276:19, 282:12, 282:20
**forgive** [1] - 249:17
**forgot** [1] - 276:3
**form** [6] - 220:21, 228:19, 276:17, 276:19, 276:20

**formal** [1] - 228:21
**forth** [1] - 269:7
**forward** [12] - 214:15, 236:4, 238:22, 239:1, 240:4, 240:20, 268:25, 287:23, 302:16, 302:23, 304:7, 304:20
**fostering** [1] - 265:21
**fount** [1] - 233:9
**four** [3] - 213:24, 232:2, 232:5
**Fox** [2] - 213:23, 300:8
**fox's** [1] - 308:4
**fraction** [1] - 305:14
**framed** [1] - 288:10
**frames** [1] - 209:20
**framework** [1] - 223:1
**frankly** [2] - 218:9, 250:9
**free** [9] - 218:17, 218:18, 245:14, 252:16, 253:8, 253:16, 261:12, 269:19
**Freeze** [1] - 291:16
**freeze** [1] - 292:3
**freezes** [1] - 295:12
**freezing** [2] - 279:1, 295:16
**friend** [1] - 247:15
**frontal** [1] - 235:19
**fruit** [1] - 237:21
**FTC** [2] - 234:21, 302:3
**full** [2] - 281:13, 312:5
**fulsome** [1] - 311:2
**function** [5] - 203:10, 204:14, 301:17, 305:17
**functionality** [4] - 255:4, 257:14, 257:19, 264:22
**fundamentally** [2] - 219:2, 293:17
**funded** [1] - 292:7
**funding** [1] - 224:3
**funds** [1] - 265:11
**fungible** [1] - 262:18
**funny** [1] - 214:3
**future** [1] - 308:1

## G

**gain** [1] - 284:14
**gained** [1] - 243:22
**game** [1] - 265:6
**Games** [1] - 254:8
**gathered** [1] - 206:2
**gating** [1] - 280:14
**gee** [2] - 270:16, 295:20
**general** [6] - 215:25,

220:3, 249:23, 267:6, 281:7, 294:11
**generate** [1] - 261:13
**gentleman** [1] - 279:5
**genuine** [1] - 226:20
**genuinely** [2] - 206:2, 206:24
**geographic** [1] - 292:24
**Giannandrea** [2] - 210:3, 285:8
**given** [7] - 272:25, 282:5, 285:21, 293:20, 309:16
**globally** [1] - 278:2
**go-to-market** [2] - 223:24, 264:2
**goal** [1] - 309:14
**goals** [1] - 298:11
**gobbling** [1] - 290:4
**goods** [1] - 237:12
**google** [2] - 200:6, 275:19
**Google** [201] - 201:5, 202:21, 205:22, 208:3, 209:7, 209:20, 210:4, 210:17, 211:1, 211:10, 211:17, 212:3, 212:8, 212:10, 212:19, 212:22, 213:7, 213:11, 213:19, 214:24, 215:16, 215:22, 215:25, 216:13, 216:25, 217:22, 218:6, 218:24, 219:20, 220:20, 221:5, 221:23, 221:25, 222:1, 222:4, 222:5, 223:14, 223:25, 225:10, 225:15, 225:19, 226:1, 226:10, 226:23, 227:1, 227:3, 228:16, 228:19, 228:20, 228:22, 228:23, 229:8, 229:10, 229:14, 229:19, 229:24, 229:25, 230:25, 231:17, 231:20, 232:23, 233:7, 233:8, 233:21, 233:22, 234:20, 235:7, 236:8, 237:8, 237:14, 239:10, 242:23, 242:25, 248:23, 249:12, 249:19, 250:10, 251:9, 251:23, 252:11, 252:12, 252:22, 253:3, 253:4, 253:7, 253:13, 253:16, 258:3, 258:10, 258:11, 258:15, 258:16, 258:18,

259:16, 260:17, 260:20, 263:21, 264:11, 264:23, 265:2, 265:11, 265:12, 266:10, 266:13, 266:14, 267:11, 267:25, 269:17, 270:11, 270:17, 270:20, 271:6, 273:4, 274:5, 274:7, 274:19, 274:21, 274:23, 275:19, 276:7, 276:10, 276:12, 276:14, 276:18, 277:4, 277:14, 277:22, 278:5, 278:6, 278:17, 278:19, 279:6, 279:9, 279:13, 279:21, 280:5, 280:6, 280:14, 280:18, 280:19, 280:20, 281:2, 281:9, 281:20, 281:21, 283:6, 283:13, 283:22, 284:11, 284:20, 285:3, 285:15, 285:22, 286:25, 289:24, 290:3, 290:7, 290:8, 290:9, 290:12, 290:15, 290:16, 292:3, 292:11, 292:12, 292:16, 293:15, 294:25, 295:8, 295:9, 295:10, 295:15, 295:18, 295:25, 296:3, 296:5, 296:9, 296:15, 297:18, 298:2, 300:3, 302:1, 304:3, 307:22, 307:23, 308:10, 308:13, 308:17, 309:7, 310:2, 310:5, 310:18
**Google's** [43] - 206:13, 210:10, 211:17, 211:23, 211:24, 212:1, 212:21, 212:23, 213:2, 213:3, 213:10, 216:11, 219:15, 220:7, 222:3, 222:8, 224:25, 227:7, 228:17, 229:4, 229:16, 230:24, 232:16, 249:17, 250:24, 251:3, 253:2, 262:2, 264:1, 266:20, 267:9, 268:11, 275:7, 278:13, 278:17, 283:14, 290:3, 296:12, 296:24, 297:19, 301:22, 308:11
**Google-Samsung** [1] - 280:14
**government** [8] - 225:18, 227:20, 227:21, 236:5, 241:1, 249:4, 255:12, 310:3

323

**grant** [1] - 309:5
**grappling** [1] - 242:15
**great** [10] - 209:17, 209:19, 211:15, 222:3, 227:23, 234:7, 235:15, 238:8, 268:19, 302:19
**greater** [8] - 234:23, 234:25, 235:2, 237:14, 292:16, 292:19, 294:10
**greatest** [1] - 307:4
**Grinnell** [1] - 286:7
**ground** [1] - 302:14
**groups** [1] - 208:16
**grow** [1] - 251:21
**growing** [1] - 290:2
**grown** [1] - 269:24
**growth** [1] - 250:23
**guess** [10] - 204:16, 219:17, 241:8, 241:18, 262:20, 267:23, 273:3, 273:20, 293:1, 306:9
**guessed** [1] - 260:4
**guideposts** [1] - 215:11
**guy** [1] - 276:13

## H

**half** [1] - 301:13
**hand** [3] - 206:8, 235:5, 288:5
**handed** [1] - 247:16
**handing** [1] - 217:14
**hang** [1] - 297:5
**happy** [2] - 206:8, 307:7
**hard** [3] - 214:17, 219:18, 251:6
**harder** [1] - 284:14
**harm** [2] - 208:22, 242:16
**harmed** [1] - 292:3
**harmful** [1] - 305:15
**harming** [1] - 246:23
**hate** [1] - 279:3
**head** [2] - 279:19, 303:10
**heading** [1] - 232:23
**healthy** [1] - 285:22
**hear** [4] - 208:10, 210:3, 214:20, 256:18
**heard** [9] - 205:17, 216:3, 249:3, 276:11, 279:6, 279:7, 285:8, 299:7
**hearing** [1] - 215:17
**heart** [1] - 255:18
**held** [2] - 273:4, 276:3
**help** [14] - 212:15, 219:7, 219:14, 219:20,

237:7, 239:13, 245:20, 263:22, 264:12, 264:14, 264:23, 264:25, 265:2, 291:24
**helping** [3] - 230:4, 230:5, 270:6
**helps** [1] - 220:4
**hereby** [1] - 312:3
**hid** [1] - 272:4
**hidden** [1] - 251:13
**high** [2] - 238:18, 239:15
**high-level** [1] - 238:18
**higher** [5] - 262:4, 296:10, 296:13, 296:22
**highlight** [1] - 294:1
**history** [2] - 256:23, 275:7
**hit** [1] - 283:4
**hits** [1] - 284:16
**hold** [1] - 308:23
**homework** [1] - 282:12
**Honor** [88] - 202:5, 202:15, 202:16, 204:24, 206:7, 207:4, 207:21, 207:25, 208:2, 211:22, 215:7, 218:14, 218:22, 219:24, 220:17, 221:4, 222:1, 223:4, 224:17, 227:15, 227:17, 228:13, 230:17, 232:9, 232:10, 232:13, 232:14, 233:13, 234:2, 234:16, 234:20, 235:3, 235:6, 236:18, 237:17, 238:2, 238:11, 238:14, 239:5, 240:1, 240:15, 242:15, 247:2, 256:18, 260:15, 260:16, 263:7, 271:4, 271:5, 273:12, 274:4, 274:12, 275:13, 277:3, 279:12, 280:2, 280:20, 282:2, 282:13, 282:25, 283:3, 283:8, 284:19, 286:5, 287:6, 287:20, 288:23, 291:6, 291:10, 291:15, 291:17, 293:11, 293:19, 294:12, 294:16, 298:22, 299:1, 299:11, 303:20, 304:10, 307:3, 307:12, 307:17, 308:11, 309:10, 310:11, 310:21, 310:22
**Honor's** [2] - 262:1, 293:20
**HONORABLE** [1] - 200:9

**hope** [5] - 202:2, 225:8, 247:2, 285:2, 289:21
**hopefully** [2] - 202:12, 264:19
**horizontal** [3] - 247:17, 247:19, 247:21
**hour** [1] - 202:3
**Housekeeping** [1] - 221:9
**huge** [2] - 302:24, 304:6
**hurdles** [1] - 304:3
**Hurst** [1] - 293:20
**hypothetical** [2] - 273:14, 293:22

## I

**IAP** [1] - 306:4
**idea** [23] - 202:19, 202:25, 205:5, 207:15, 208:18, 211:24, 218:24, 220:19, 240:21, 257:7, 262:5, 266:15, 268:19, 271:25, 272:2, 272:22, 272:24, 278:17, 283:18, 286:2, 290:22, 297:23, 304:4
**ideal** [1] - 305:20
**identification** [1] - 241:5
**identify** [1] - 240:12
**IE** [1] - 255:5
**IEK** [1] - 245:14
**ignore** [1] - 226:6
**IL** [1] - 200:16
**imagine** [1] - 239:12
**imagined** [1] - 266:15
**impact** [6] - 204:4, 205:20, 206:1, 206:2, 228:22, 270:11
**impacts** [1] - 252:23
**impairing** [1] - 245:16
**impervious** [2] - 290:1, 290:6
**implication** [1] - 296:10
**implicit** [1] - 260:12
**implied** [1] - 206:22
**important** [6] - 223:13, 229:2, 265:21, 269:4, 269:19, 309:6
**impossible** [4] - 205:2, 205:14, 256:16, 289:3
**impressive** [1] - 228:2
**imprimatur** [1] - 221:24

**improve** [10] - 235:18, 251:6, 251:21, 280:1, 297:19, 297:21, 297:24, 302:18, 302:19, 303:6
**improved** [2] - 213:9, 297:23
**improvements** [2] - 234:7, 234:12
**improves** [1] - 253:19
**improving** [1] - 224:3
**IN** [1] - 200:1
**in-market** [1] - 226:23
**inability** [1] - 292:4
**incentive** [4] - 223:15, 265:11, 284:15, 292:17
**incentives** [7] - 224:13, 224:23, 225:7, 231:4, 264:9, 265:19, 285:19
**incentivize** [2] - 203:7, 264:10
**incentivizes** [1] - 251:6
**incentivizing** [1] - 250:20
**include** [2] - 203:25, 225:4
**including** [3] - 230:25, 244:18, 308:8
**inconsistent** [1] - 278:20
**increase** [3] - 250:23, 253:8, 274:23
**increased** [4] - 226:15, 226:16, 269:16, 275:23
**increases** [3] - 260:24, 270:1, 282:16
**increasing** [2] - 245:19, 286:23
**incremental** [5] - 234:7, 234:11, 264:10, 266:12, 300:5
**incumbent** [2] - 273:16, 273:21
**indeed** [1] - 245:11
**independent** [1] - 252:7
**index** [1] - 285:14
**indicated** [2] - 262:7, 278:19, 298:11
**indicating** [1] - 298:11
**individual** [1] - 261:7
**individually** [1] - 261:3
**industry** [7] - 224:21, 224:24, 225:6, 225:7, 264:18, 290:1, 300:14
**infer** [2] - 204:21,

205:10
**inferences** [1] - 293:8
**information** [6] -
208:8, 263:7, 273:18,
281:15, 287:22, 310:2
**initial** [5] - 243:22,
243:25, 246:15,
268:10, 298:9
**injected** [1] - 252:22
**innovate** [3] - 264:16,
264:23, 292:17
**innovates** [1] - 296:15
**innovating** [1] - 249:6
**innovation** [5] -
206:14, 231:14,
231:15, 294:10, 309:9
**inquiries** [1] - 233:2
**inquiry** [4] - 222:23,
241:11, 241:21, 243:18
**inside** [2] - 272:17,
296:23
**insist** [1] - 273:24
**insisting** [1] - 231:17
**insists** [1] - 285:3
**install** [1] - 223:25
**installing** [1] - 276:18
**instance** [1] - 243:10
**instead** [2] - 212:11,
217:14
**instruct** [1] - 219:12
**integrate** [1] - 250:21
**integrated** [1] - 248:12
**intense** [4] - 210:5,
210:6, 216:8, 216:21
**intent** [1] - 272:4
**intentionally** [1] -
216:4
**interest** [1] - 224:4
**interesting** [5] -
224:17, 299:2, 299:13,
300:10, 311:2
**interests** [1] - 261:2
**interface** [1] - 298:9
**interim** [1] - 307:4
**interior** [1] - 210:10
**internal** [3] - 245:6,
277:21, 290:17
**internally** [1] - 290:14
**internet** [3] - 253:9,
253:10
**Internet** [8] - 245:14,
245:20, 246:24, 249:4,
249:6, 252:15, 252:25,
280:5
**interpret** [1] - 282:17
**interpreted** [1] -
260:11
**interrupt** [1] - 203:15,
220:24, 239:17
**inure** [1] - 244:12

**inures** [1] - 255:6
**invest** [5] - 217:23,
284:16, 285:12,
285:19, 292:17
**investing** [2] - 270:12,
270:13
**investment** [5] -
203:7, 204:12, 206:1,
244:25, 270:15
**involved** [2] - 235:10,
248:4
**involves** [1] - 284:13
**involving** [1] - 254:10
**iOS** [3] - 229:20,
258:4, 258:6
**iPhones** [3] - 265:4,
265:7, 265:9
**ironically** [1] - 252:24
**IS** [1] - 213:24
**ISA** [1] - 257:9
**Israel** [2] - 282:14,
282:15
**issue** [17] - 202:16,
206:4, 206:20, 207:10,
209:7, 211:20, 221:3,
222:20, 227:11, 236:7,
239:19, 249:16,
254:11, 262:10,
276:15, 276:16, 302:1
**issues** [6] - 207:8,
218:1, 282:3, 285:9,
291:12, 295:2
**items** [1] - 206:15
**itself** [10] - 202:23,
210:17, 213:4, 213:5,
219:22, 228:3, 233:7,
275:19, 293:15

**J**

**JANICE** [1] - 312:3
**Janice** [2] - 201:9,
312:11
**John** [1] - 201:5
**jon.sallet@coag.gov**
[1] - 200:24
**Jonathan** [1] - 200:19
**Jr** [1] - 201:1
**jschmidtlein@wc.**
**com** [1] - 201:8
**Judge** [2] - 208:8,
235:25
**judge** [4] - 215:2,
309:8, 309:9, 309:11
**JUDGE** [1] - 200:10
**judge's** [1] - 247:9
**judgment** [3] - 209:7,
237:11, 247:9
**Judicial** [1] - 200:21
**jumbled** [1] - 295:17

**jump** [1] - 304:7
**Jumpstart** [2] - 267:1,
303:24
**JUSTICE** [1] - 200:12
**Justice** [1] - 200:15
**justification** [23] -
202:8, 202:17, 208:13,
208:15, 209:23,
223:22, 224:11,
235:22, 237:18, 238:1,
240:20, 250:2, 287:16,
287:17, 288:4, 288:7,
288:14, 297:11, 298:7,
298:16, 298:18
**justifications** [21] -
202:20, 202:25,
203:14, 204:23,
205:11, 207:22,
208:24, 209:16, 227:4,
227:14, 232:15,
238:22, 239:23,
240:25, 241:1, 256:14,
287:23, 288:22, 289:1,
289:8, 289:18
**justifying** [1] - 235:17

**K**

**Kartasheva** [3] -
277:6, 277:17, 280:15
**Kayaks** [1] - 294:6
**keep** [5] - 213:8,
213:18, 266:9, 300:1
**keeps** [2] - 286:9,
289:24
**Kenneth** [1] - 200:11
**kenneth.dintzer2@**
**usdoj.gov** [1] - 200:14
**kept** [1] - 271:5
**key** [1] - 236:6
**kibosh** [2] - 276:8,
276:10
**kicked** [1] - 257:3
**kind** [10] - 202:20,
208:21, 214:3, 222:7,
224:25, 226:1, 242:9,
247:18, 247:22, 291:15
**kinds** [1] - 267:24
**knock** [1] - 298:3
**knock-on** [1] - 298:3
**knowledge** [4] - 233:8,
233:10, 273:18, 279:18
**known** [1] - 302:6
**knows** [10] - 206:19,
212:8, 212:17, 216:10,
222:4, 222:9, 234:19,
251:13, 251:19, 287:22
**Kodak** [1] - 254:7

**L**

**lack** [4] - 210:21,
285:11, 285:12, 287:24
**lacks** [1] - 294:12
**laid** [1] - 207:19
**language** [12] - 204:9,
227:16, 228:1, 228:2,
228:3, 254:5, 254:19,
254:20, 277:24,
279:24, 286:10, 297:3
**large** [5] - 222:4,
246:20, 285:20, 301:23
**LaSalle** [1] - 200:15
**last** [11] - 222:5, 222:8,
269:12, 273:19, 282:7,
297:10, 301:13,
301:16, 307:14,
310:11, 310:24
**latency** [2] - 214:2
**launching** [1] - 256:24
**LAW** [1] - 200:19
**law** [14] - 208:14,
221:14, 245:25,
272:10, 273:25,
275:14, 288:21, 298:4,
298:5, 302:5, 304:12,
304:25, 305:2, 309:10
**lawful** [3] - 243:8,
244:16, 245:17
**lawfully** [3] - 242:25,
243:5, 244:7
**laws** [1] - 310:20
**lawsuit** [1] - 290:12
**lawyer** [1] - 278:14
**lawyers** [3] - 273:14,
291:11
**lead** [2] - 231:13,
291:21
**leads** [1] - 237:1
**learning** [2] - 291:24,
300:4
**least** [20] - 213:7,
214:23, 221:2, 222:15,
222:20, 222:22,
223:19, 224:6, 236:16,
239:18, 239:19,
244:15, 255:25,
263:25, 267:3, 281:19,
285:15, 287:12, 303:2,
306:19
**least-restrictive** [1] -
239:19
**leave** [5] - 202:9,
218:9, 232:6, 303:3
**leaving** [2] - 248:22,
248:24
**left** [5] - 206:5, 230:13,
252:1, 252:18, 281:25
**legal** [3] - 227:11,

235:3, 238:19
**legislative** [1] - 237:11
**legitimate** [3] - 255:1, 298:15, 298:17
**lengthy** [1] - 203:5
**LePage** [1] - 275:15
**less** [29] - 225:9, 225:13, 225:21, 226:7, 226:9, 235:19, 238:21, 239:6, 239:14, 239:22, 240:8, 240:12, 241:22, 257:7, 257:8, 259:2, 266:3, 269:3, 269:22, 279:21, 283:10, 286:22, 287:13, 287:15, 289:10, 299:25, 304:19
**less-restrictive** [5] - 238:21, 239:14, 240:8, 240:12, 299:25
**lesser** [2] - 241:11, 246:25
**letter** [4] - 290:10, 290:18, 290:21
**level** [3] - 238:18, 309:9, 309:18
**levels** [1] - 309:18
**leverage** [1] - 210:25
**leveraged** [1] - 303:25
**liability** [1] - 240:24
**liable** [2] - 245:21, 276:4
**license** [4] - 217:3, 252:13, 269:18
**licensed** [3] - 253:16, 270:19, 270:20
**licensing** [2] - 217:2, 270:11
**lifeblood** [1] - 252:6
**lifts** [1] - 250:13
**light** [1] - 217:22
**likelihood** [1] - 272:7
**likely** [2] - 210:11, 305:8
**limits** [1] - 203:1
**linchpin** [1] - 301:4
**line** [5] - 215:15, 215:16, 230:23, 264:14, 274:13
**lines** [1] - 287:7
**link** [2] - 230:8, 281:10
**linked** [2] - 267:7, 267:9
**list** [4] - 208:10, 224:15, 224:17, 235:11
**listen** [2] - 248:1, 268:19
**listings** [1] - 235:11
**litigation** [4] - 271:19, 271:21, 272:2, 272:7

**live** [2] - 225:10, 225:11
**LLC** [1] - 200:6
**LLP** [2] - 201:2, 201:6
**load** [2] - 219:4, 220:2
**loaded** [1] - 245:1
**localized** [1] - 280:6
**located** [1] - 228:20
**logic** [1] - 246:6
**logical** [1] - 253:14
**long-standing** [2] - 248:9
**long-tail** [1] - 233:2
**look** [42] - 204:11, 208:22, 209:9, 211:16, 213:4, 213:17, 213:22, 214:24, 218:25, 223:10, 227:21, 229:4, 230:3, 230:6, 233:1, 234:15, 234:25, 237:5, 237:6, 237:19, 237:20, 237:24, 240:9, 246:14, 247:7, 262:23, 263:11, 266:21, 271:18, 272:9, 274:16, 279:6, 281:6, 284:1, 288:6, 290:7, 294:5, 301:19, 302:17
**looked** [10] - 230:2, 263:8, 267:18, 300:16, 302:3, 303:16, 306:4, 306:7, 306:15, 307:3
**looking** [3] - 215:15, 234:18, 234:19
**looks** [3] - 221:20, 229:5, 276:24
**loop** [1] - 291:20
**loose** [1] - 241:20
**lose** [2] - 210:16, 213:19
**losers** [2] - 227:24, 228:6
**lost** [4] - 261:11, 285:19, 286:2
**loves** [1] - 222:5
**low** [7] - 227:23, 230:6, 230:8, 230:13, 231:4, 234:12, 247:24
**low-cost** [4] - 227:23, 230:6, 230:8, 231:4
**low-end** [1] - 230:13
**lower** [4] - 226:3, 237:12, 269:23, 298:12
**lunch** [3] - 202:3, 202:11, 226:13

---

## M

**machine** [1] - 291:23
**MADA** [22] - 216:15, 216:17, 216:20,

216:23, 217:10, 217:11, 217:17, 217:19, 218:5, 218:8, 218:10, 218:15, 218:16, 219:9, 219:11, 219:21, 219:22, 230:8, 230:14, 270:18
**MADAs** [1] - 275:24
**made-for-litigation** [1] - 272:2
**made-to-scale** [1] - 291:21
**magical** [1] - 233:9
**magnitudes** [1] - 263:18
**mailed** [1] - 310:14
**main** [1] - 306:20
**Maine** [1] - 201:6
**maintain** [2] - 232:20, 244:1
**maintaining** [3] - 206:13, 236:15, 283:15
**majority** [1] - 252:6
**makers** [2] - 230:13, 260:12
**managed** [2] - 226:23, 277:12
**mandate** [3] - 258:2, 283:11, 283:12
**mandated** [1] - 258:4
**manner** [1] - 280:5
**manufacturer** [1] - 230:20
**manufacturers** [1] - 228:23
**marginal** [1] - 284:14
**margins** [4] - 263:8, 263:12, 264:17, 286:21
**Maricopa** [1] - 309:21
**market** [98] - 205:10, 206:2, 209:17, 209:19, 209:24, 212:5, 212:8, 212:9, 212:15, 213:10, 213:20, 215:3, 215:7, 215:8, 215:12, 215:15, 215:21, 217:7, 218:4, 220:4, 221:3, 223:24, 226:23, 227:5, 227:6, 227:14, 227:17, 230:13, 236:9, 237:2, 237:9, 237:15, 238:1, 239:13, 243:18, 243:23, 246:8, 246:12, 248:2, 249:7, 250:2, 250:3, 250:5, 250:6, 251:3, 255:7, 255:19, 255:24, 256:9, 264:2, 266:8, 267:17, 272:13, 272:14, 272:15, 272:16, 272:17,

275:20, 275:21, 280:23, 280:24, 280:25, 283:24, 283:25, 284:2, 284:5, 285:20, 285:22, 286:4, 286:5, 286:12, 287:25, 289:11, 289:13, 290:24, 291:15, 292:19, 292:24, 293:14, 293:23, 294:3, 294:12, 295:3, 299:10, 299:12, 302:7, 302:19, 305:14, 306:13, 306:14, 307:6, 309:1, 309:11, 309:13, 309:17, 309:18
**market-driven** [1] - 266:8
**marketing** [2] - 224:1, 264:8
**marketplace** [1] - 292:3
**markets** [12] - 227:19, 227:21, 229:6, 253:24, 254:1, 254:4, 271:20, 284:4, 293:8, 293:12, 296:8, 296:10
**massive** [3] - 306:13, 307:1, 307:9
**match** [1] - 290:23
**matchy** [5] - 231:17, 231:21
**matchy-matchy** [1] - 231:17
**matchy-matchy-matchy** [1] - 231:21
**material** [1] - 206:15
**matter** [10] - 211:16, 240:15, 248:15, 262:24, 262:25, 279:9, 307:25, 308:4
**matters** [2] - 211:17, 233:12
**mcCallister** [1] - 223:23
**mean** [62] - 207:10, 207:15, 211:6, 211:8, 213:12, 213:23, 215:21, 215:22, 216:14, 216:22, 217:16, 218:3, 219:16, 219:17, 220:6, 221:19, 222:21, 223:8, 223:20, 226:8, 226:19, 231:15, 233:23, 242:1, 242:7, 243:5, 243:6, 246:10, 246:13, 250:25, 257:9, 257:23, 261:15, 261:16, 261:18, 262:18, 263:4, 271:14,

271:16, 271:21, 273:6,
274:21, 275:4, 275:16,
276:9, 277:14, 281:6,
281:18, 283:14,
285:12, 289:16,
290:20, 293:3, 297:24,
301:15, 303:10,
303:11, 303:14,
307:20, 309:2, 309:4

**meaning** [2] - 286:7,
286:8

**meaningful** [4] -
210:7, 237:25, 291:25,
293:14

**means** [14] - 222:17,
224:3, 224:5, 225:9,
227:5, 227:8, 228:15,
241:11, 244:1, 244:16,
284:21, 286:22,
287:13, 287:14

**measure** [2] - 255:10,
303:18

**measured** [1] - 305:8

**mechanism** [1] -
257:20

**meet** [2] - 287:6,
309:23

**MEHTA** [1] - 200:9

**members** [1] - 278:16

**mention** [2] - 231:2,
231:3

**mentions** [1] - 231:1

**menu** [2] - 267:22,
294:24

**mere** [1] - 279:23

**merger** [1] - 254:16

**merits** [11] - 210:5,
242:3, 242:4, 244:2,
245:9, 245:14, 246:19,
247:12, 259:17,
269:14, 272:21

**mess** [1] - 289:13

**messed** [1] - 289:11

**met** [2] - 288:18,
289:17

**Meta** [3] - 223:4,
294:5, 310:4

**Microsoft** [71] -
205:17, 211:15,
218:16, 218:18, 227:9,
228:14, 233:1, 234:12,
234:17, 236:19,
240:16, 240:17,
240:23, 242:15,
243:17, 243:19, 244:6,
244:14, 244:24, 245:8,
246:21, 249:6, 249:14,
251:15, 251:17,
251:18, 251:19, 252:1,
252:24, 254:12,

254:13, 254:23,
254:25, 255:6, 256:14,
256:23, 264:25, 266:2,
267:1, 270:12, 270:16,
271:8, 271:14, 271:23,
288:3, 288:10, 289:25,
292:8, 292:9, 297:3,
298:6, 302:18, 302:23,
303:10, 303:18, 304:4,
304:18, 306:21, 307:4,
307:8, 307:18, 308:8,
308:12, 308:13,
309:23, 309:25, 310:12

**Microsoft's** [6] -
243:24, 243:25, 245:5,
298:7, 298:11, 308:25

**might** [12] - 213:21,
234:15, 237:8, 239:13,
240:12, 251:24, 257:1,
286:24, 301:7, 302:8,
307:3

**Millett** [1] - 235:25

**minds** [1] - 233:9

**minimum** [1] - 300:14

**minute** [2] - 225:23,
268:25

**minutes** [10] - 228:8,
238:4, 238:7, 271:2,
271:3, 282:5, 291:2,
304:8, 307:16

**misleading** [1] -
251:10

**missed** [2] - 249:10,
249:14

**missing** [1] - 286:10

**MLS** [2] - 235:12

**mobile** [16] - 233:2,
234:3, 234:21, 234:22,
236:24, 237:3, 253:18,
255:24, 269:16, 299:8,
299:9, 299:10, 299:12

**mode** [1] - 285:1

**model** [1] - 239:7

**modeling** [2] - 274:18,
274:25

**modified** [2] - 275:23,
275:24

**moment** [6] - 218:10,
220:24, 225:24, 233:7,
238:5, 301:10

**monetized** [1] -
281:21

**money** [23] - 210:16,
220:10, 220:20,
220:21, 226:8, 226:9,
229:16, 230:22,
252:12, 252:19,
252:20, 262:18,
262:23, 264:22,
264:24, 265:3, 270:5,

270:9, 270:10, 274:16,
286:25, 290:22, 301:6

**monies** [1] - 265:2

**monopolist** [17] -
205:1, 205:5, 205:6,
205:7, 205:8, 208:14,
211:19, 241:24, 244:8,
244:9, 244:12, 246:2,
246:3, 273:23, 275:16,
275:17, 278:9

**monopolistic** [2] -
241:23, 301:17

**monopolists** [1] -
205:13

**monopolization** [3] -
252:15, 254:9, 254:10

**monopolize** [2] -
227:16, 227:22

**monopolized** [1] -
215:21

**monopolizing** [1] -
283:15

**monopoly** [18] - 205:8,
206:13, 215:9, 226:11,
236:16, 236:20,
242:23, 242:25,
243:25, 244:7, 244:11,
244:15, 246:4, 246:8,
247:20, 249:7, 275:11,
283:15

**months** [1] - 307:24

**morning** [1] - 311:4

**most** [12] - 205:13,
228:2, 240:15, 240:23,
241:10, 249:21,
252:13, 256:13,
284:10, 306:23, 306:25

**Most** [1] - 233:8

**motion** [1] - 300:7

**Motorola** [3] - 221:10,
262:13

**move** [5] - 202:17,
214:15, 238:15,
268:25, 285:2

**movements** [1] -
286:24

**moving** [1] - 287:7

**Mozilla** [22] - 212:17,
212:22, 213:1, 225:3,
225:4, 232:18, 251:22,
258:23, 259:8, 260:9,
260:21, 265:15,
265:18, 268:6, 290:7,
290:12, 290:14,
290:17, 290:24,
302:22, 303:20

**Mozilla's** [1] - 290:11

**MR** [120] - 202:5,
202:15, 202:19,
203:16, 203:22,

204:24, 205:19, 206:7,
206:11, 207:25, 208:2,
209:3, 209:5, 209:14,
211:22, 213:15, 214:7,
214:20, 215:7, 216:24,
217:10, 218:14,
218:21, 219:11,
220:25, 221:4, 221:17,
221:25, 223:3, 226:10,
227:15, 228:10,
228:13, 232:13,
233:15, 234:2, 236:10,
236:18, 238:11,
238:13, 239:25, 240:3,
241:13, 241:17, 242:1,
242:14, 244:13, 246:6,
246:17, 250:4, 251:4,
254:16, 254:19, 256:2,
256:7, 256:11, 256:13,
257:11, 257:23, 258:5,
258:8, 261:17, 261:20,
262:20, 263:4, 263:10,
264:5, 267:8, 267:16,
268:1, 268:5, 269:1,
269:11, 271:4, 271:5,
271:23, 272:15,
273:11, 273:23,
274:22, 275:13,
276:22, 277:23,
279:12, 280:2, 280:24,
281:10, 281:13,
281:22, 282:2, 282:13,
282:19, 282:21,
282:23, 282:25, 283:3,
285:18, 286:5, 287:20,
289:24, 291:1, 291:4,
291:10, 293:10,
294:16, 295:14, 297:7,
297:9, 301:22, 303:8,
303:12, 304:10,
304:24, 306:1, 306:11,
306:18, 306:24,
307:12, 307:17, 310:25

**Murphy** [17] - 211:11,
212:4, 216:3, 216:21,
217:13, 217:19, 218:4,
220:14, 229:4, 230:7,
231:5, 251:10, 263:11,
269:20, 286:18,
286:20, 299:20

**Murphy's** [1] - 211:21

**must** [2] - 206:22,
283:10

**myriad** [1] - 297:19

**Mytinger** [1] - 304:13

### N

**N.W** [1] - 312:12

**Nadella** [4] - 249:2,
249:15, 268:17, 303:22

**Nadella's** [1] - 303:1
**nailed** [1] - 260:16
**nascent** [6] - 215:14,
281:1, 281:5, 281:8,
281:22, 281:23
**National** [5] - 235:10,
235:17, 237:4, 247:14,
286:1
**natural** [1] - 204:14
**nature** [1] - 209:24
**Navigator** [1] - 245:7
**Nayak** [2] - 214:6,
296:14
**NCAA** [3] - 239:9,
254:9, 286:13
**near** [3] - 256:16,
281:16
**necessarily** [3] -
205:18, 222:24, 231:18
**necessary** [1] - 205:24
**need** [32] - 204:19,
205:15, 205:19,
210:11, 213:12, 214:5,
217:4, 222:6, 222:9,
224:7, 224:8, 224:12,
233:25, 237:20, 241:8,
247:22, 256:3, 256:5,
256:19, 262:9, 265:3,
265:5, 289:12, 290:9,
290:19, 293:16,
297:16, 299:6, 300:15,
301:1, 301:5
**needed** [1] - 249:11
**needs** [9] - 205:18,
216:18, 217:23,
228:10, 264:3, 271:14,
288:6, 290:7, 309:15
**Neeva** [5] - 292:2,
292:8, 292:9, 295:9
**nefarious** [1] - 266:10
**negative** [2] - 242:18,
289:2
**negotiating** [1] -
210:25
**neighborhood** [1] -
214:1
**Netscape** [5] - 245:7,
280:25, 306:8, 306:22,
310:12
**never** [23] - 215:16,
251:16, 255:12, 257:3,
257:24, 258:5, 259:10,
260:2, 260:4, 268:21,
278:15, 279:6, 281:6,
283:22, 294:20,
295:20, 299:12,
299:14, 300:21, 301:2
**nevertheless** [1] -
306:8
**new** [11] - 206:14,

206:25, 210:13,
247:15, 264:19,
264:21, 283:25,
284:19, 285:23, 296:15
**New** [1] - 201:3
**news** [1] - 222:21
**next** [14] - 203:11,
203:12, 243:19,
277:16, 277:23, 278:4,
278:11, 280:10,
280:11, 286:1, 291:13,
292:1, 292:13, 294:4
**nice** [2] - 202:3, 280:8
**nightmares** [1] - 269:9
**Ninth** [2] - 235:9,
235:16
**no-part** [1] - 286:10
**nobody** [17] - 216:9,
216:10, 218:5, 218:11,
218:23, 226:12, 227:3,
251:13, 252:16,
266:19, 266:22,
266:24, 267:18, 268:2,
276:20, 300:23
**non** [6] - 224:19,
224:22, 226:24,
235:12, 239:1, 258:21
**non-50** [1] - 283:20
**non-default** [1] -
224:19
**non-exclusivity** [1] -
224:22
**non-existent** [1] -
258:21
**non-MLS** [1] - 235:12
**non-precontextual** [1]
- 226:24
**non-pretextual** [1] -
239:1
**none** [5] - 205:17,
262:13, 271:7, 273:25,
296:20
**nonexclusionary** [2] -
243:8, 243:10
**norm** [1] - 224:24
**note** [1] - 308:11
**notes** [4] - 282:21,
282:22, 286:3, 312:5
**nothing** [12] - 203:19,
209:22, 229:1, 229:3,
235:19, 284:21,
284:24, 285:3, 294:24,
296:20, 300:24, 310:25
**nothing's** [2] - 291:17,
291:19
**notify** [1] - 235:7
**notion** [13] - 222:22,
251:16, 255:19,
255:20, 257:5, 261:13,
265:24, 266:13,

287:17, 297:18,
297:22, 302:12, 303:23
**novel** [1] - 292:7
**nullifies** [1] - 241:6
**number** [7] - 203:20,
240:5, 273:8, 274:10,
274:16, 301:12, 302:8
**numbers** [4] - 274:4,
274:5, 303:3, 305:23
**NW** [2] - 200:12,
201:11
**NY** [1] - 201:3
**NYC** [2] - 274:6, 274:7

## O

**o'clock** [1] - 311:4
**Oard** [1] - 308:3
**object** [5] - 206:24,
206:25, 207:2, 207:3,
207:11
**objected** [1] - 207:12
**obligation** [7] - 225:4,
225:13, 225:16, 283:8,
283:10, 284:25, 289:16
**obligations** [1] -
289:17
**observation** [1] -
285:21
**obtained** [1] - 243:5
**obvious** [4] - 212:16,
212:17, 253:11, 253:13
**obviously** [17] - 211:6,
242:18, 247:5, 250:19,
254:8, 259:14, 260:5,
263:5, 263:13, 264:16,
264:17, 265:14,
266:25, 268:14, 270:4,
272:9, 290:21
**occasional** [1] -
213:17
**occasionally** [2] -
213:21, 214:13
**occupied** [1] - 306:21
**occurred** [3] - 269:13,
301:23, 301:24
**OEM** [5] - 219:13,
230:19, 254:13, 268:6,
306:5
**OEMs** [9] - 226:8,
229:9, 232:7, 251:19,
262:24, 264:15,
269:15, 298:8, 307:5
**OF** [5] - 200:1, 200:9,
200:12, 200:19, 312:1
**offer** [7] - 210:12,
261:9, 287:23, 298:19,
300:11, 300:18, 300:24
**offered** [2] - 279:15,
279:17, 300:20,

300:21, 301:8, 305:21
**offers** [2] - 226:2,
280:6
**OFFICIAL** [1] - 312:1
**Official** [2] - 201:10,
312:11
**offset** [2] - 205:12,
220:22
**often** [1] - 260:16
**oftentimes** [1] - 279:8
**once** [14] - 204:5,
204:21, 208:2, 218:10,
234:5, 234:6, 239:21,
240:4, 243:7, 256:14,
272:22, 272:24, 284:4,
302:13
**one** [57] - 205:16,
210:15, 214:2, 214:18,
218:2, 218:12, 221:4,
223:9, 224:18, 228:14,
230:17, 230:21, 231:9,
231:12, 231:15,
232:14, 234:19,
235:14, 237:1, 238:11,
240:6, 244:10, 245:12,
245:16, 246:18,
254:13, 254:23,
254:24, 255:10,
255:16, 259:4, 263:19,
264:6, 268:10, 269:11,
270:2, 270:9, 273:9,
275:24, 277:16, 278:4,
278:11, 278:15,
278:16, 279:7, 279:10,
280:11, 287:3, 287:14,
288:3, 289:18, 293:13,
294:23, 297:5, 299:25,
300:11, 304:15
**ones** [2] - 213:16,
238:24
**ongoing** [2] - 211:18,
273:21
**open** [3] - 253:2,
253:3, 253:8
**opened** [2] - 257:18,
295:25
**opening** [5] - 206:17,
207:1, 207:19, 208:25,
210:2
**operant** [1] - 309:25
**operated** [1] - 268:16
**operates** [1] - 267:17
**operating** [7] - 243:23,
244:17, 253:16, 255:4,
255:7, 269:18, 309:25
**operations** [2] - 263:4,
270:6
**operative** [1] - 280:25
**opinion** [9] - 205:22,
206:3, 211:21, 235:25,

247:9, 278:17, 300:20, 300:22, 310:16
**opportunities** [1] - 293:25
**opportunity** [4] - 207:20, 216:13, 285:11, 288:19
**opposed** [4] - 215:2, 242:17, 290:18, 306:19
**opposite** [1] - 214:6
**Oprah** [1] - 291:8
**optimal** [1] - 232:7
**option** [14] - 211:1, 212:1, 212:18, 215:19, 225:5, 225:12, 225:14, 225:16, 261:9, 283:8, 283:10, 284:25, 285:4, 289:16
**options** [4] - 212:16, 215:24, 290:24, 296:3
**original** [2] - 276:19, 276:20
**originally** [1] - 280:16
**originates** [1] - 233:9
**otherwise** [8] - 205:12, 207:7, 209:13, 213:10, 265:8, 271:12, 275:18, 281:9
**ought** [5] - 209:9, 209:10, 209:11, 221:13, 255:20
**ourselves** [2] - 213:13
**out-of-the-box** [3] - 260:24, 266:24, 267:13
**outcome** [1] - 259:3
**outcomes** [1] - 266:8
**output** [1] - 250:13
**outside** [9] - 223:16, 272:14, 272:15, 280:25, 290:11, 290:18, 296:10, 296:22, 296:23
**outweigh** [3] - 208:6, 247:4, 256:17
**outweighed** [1] - 270:24
**outweighs** [1] - 297:13
**overall** [6] - 223:1, 236:24, 237:15, 278:6, 280:3, 292:19
**overarching** [1] - 227:15
**override** [1] - 219:14
**overrode** [2] - 255:1
**overstating** [1] - 303:22
**overwhelming** [1] - 252:5
**own** [10] - 210:10,

212:21, 274:17, 284:1, 285:14, 287:4, 298:11, 308:11, 308:12

## P

**p.m** [5] - 200:7, 238:9, 282:9
**page** [5] - 232:22, 297:6, 297:9, 298:5, 310:15
**pages** [1] - 288:25
**paid** [5] - 211:6, 226:21, 229:16, 267:20, 274:18
**papers** [1] - 222:22
**Parakhin** [3] - 234:5, 300:24, 308:6
**parallel** [1] - 286:8
**paraphrasing** [1] - 288:12
**parse** [1] - 307:21
**part** [14] - 205:18, 217:18, 223:10, 223:13, 227:17, 236:16, 239:4, 249:5, 255:9, 269:6, 269:19, 283:24, 286:10, 308:5
**particular** [3] - 251:22, 262:11, 272:12
**particularly** [6] - 237:3, 239:7, 256:15, 260:14, 263:24, 276:5
**particulars** [1] - 205:16
**parties** [1] - 227:11
**parties'** [1] - 206:22
**partner** [2] - 278:9, 293:25
**partners** [5] - 219:20, 220:21, 228:18, 231:9, 263:23
**parts** [1] - 294:2
**party** [1] - 310:1
**pass** [26] - 208:18, 220:19, 221:1, 221:2, 225:22, 226:18, 226:22, 226:24, 228:18, 229:7, 229:12, 230:3, 230:16, 231:3, 274:15, 274:19, 274:21, 274:22, 274:25, 286:18, 286:21, 286:25, 287:4, 287:8
**pass-through** [25] - 208:18, 220:19, 221:1, 221:2, 225:22, 226:18, 226:22, 226:24, 229:7, 229:12, 230:3, 230:16,

231:3, 274:15, 274:19, 274:21, 274:22, 274:25, 286:18, 286:21, 286:25, 287:4, 287:8
**passing** [1] - 304:12
**Patterson** [1] - 201:2
**pause** [2] - 238:12, 281:24
**pay** [25] - 210:15, 210:22, 211:4, 211:6, 212:22, 217:16, 217:17, 219:15, 222:16, 224:18, 225:1, 225:2, 225:8, 225:14, 227:2, 264:13, 266:11, 266:14, 266:16, 267:11, 267:12, 268:12, 274:14, 295:10
**paying** [10] - 222:16, 250:20, 266:13, 267:21, 268:12, 268:15, 270:9, 274:16, 286:25, 290:15
**payment** [3] - 216:17, 216:19, 298:3
**payments** [16] - 220:7, 224:20, 224:22, 226:16, 228:19, 228:23, 229:10, 252:2, 263:12, 263:17, 263:22, 291:17, 295:15, 297:20, 307:22
**pays** [3] - 220:20, 229:10, 295:8
**PC** [3] - 244:17, 268:6, 310:13
**PCJ** [1] - 288:13
**people** [27] - 219:6, 219:7, 219:20, 225:1, 227:23, 248:22, 248:24, 249:22, 250:15, 250:16, 251:14, 252:14, 253:9, 260:16, 260:17, 270:9, 270:10, 270:13, 281:3, 284:12, 284:13, 284:15, 294:7, 303:14, 303:21, 308:20
**per** [1] - 252:12
**percent** [32] - 205:1, 210:12, 211:1, 218:21, 234:3, 234:6, 234:8, 236:9, 236:12, 236:23, 236:24, 252:3, 264:3, 283:18, 283:19, 283:20, 284:6, 284:7, 284:10, 284:13, 299:4, 300:5, 301:1, 303:21, 304:19, 304:21, 308:6,

308:8
**percentage** [2] - 252:4, 265:14
**perception** [6] - 211:17, 211:19, 211:23, 211:24, 212:2, 248:18
**percolated** [1] - 255:13
**perfectly** [1] - 218:17
**performed** [2] - 286:20, 306:10
**performs** [1] - 203:10
**perhaps** [1] - 211:14
**period** [5] - 203:3, 210:17, 269:17, 273:9, 282:8
**permissible** [1] - 299:16
**person** [2] - 279:8, 280:18
**personal** [2] - 279:18, 279:19
**perspective** [1] - 238:19
**Peter** [4] - 232:25, 233:6, 292:1, 294:4
**Philadelphia** [2] - 254:15, 286:1
**phone** [7] - 216:19, 230:13, 232:6, 255:24, 257:18, 257:20, 281:3
**phones** [11] - 227:23, 230:6, 230:8, 230:20, 231:4, 231:23, 262:15, 265:4, 265:5, 265:7, 269:21
**Pichai** [9] - 210:20, 211:25, 215:18, 223:14, 226:19, 229:18, 261:22, 262:5
**pick** [1] - 220:3
**picking** [3] - 232:4, 261:4, 261:7
**piece** [8] - 238:21, 239:14, 284:10, 284:20, 284:24, 285:2, 287:3, 290:5
**pieces** [2] - 217:20, 285:24
**pizzas** [1] - 281:15
**place** [7] - 209:10, 210:1, 211:8, 247:6, 284:15, 295:12, 309:14
**placed** [3] - 209:8, 209:11
**placement** [1] - 267:21
**places** [1] - 293:6
**Plaintiff** [2] - 200:18,

201:1
plaintiff [5] - 208:2, 288:9, 288:18, 289:2, 297:10
Plaintiffs [2] - 200:4, 200:11
plaintiffs [6] - 238:20, 239:15, 239:22, 241:9, 251:8, 267:4
plaintiffs' [1] - 245:23
plan [2] - 277:8, 282:5
platform [1] - 252:20
Platforms [2] - 223:4, 310:4
play [2] - 288:24, 301:7
Play [8] - 217:2, 217:4, 217:10, 217:11, 217:18, 219:1, 219:3
pleadings [2] - 206:21, 206:23
pleases [1] - 225:23
pled [3] - 207:6, 299:10, 299:12
PLS [1] - 235:9
Point [1] - 249:9
point [29] - 210:23, 219:21, 219:24, 220:15, 220:19, 234:11, 235:25, 237:4, 237:10, 238:23, 239:11, 249:10, 259:20, 261:7, 261:21, 280:22, 281:19, 284:9, 284:18, 289:14, 291:15, 292:6, 292:17, 293:11, 294:23, 297:3, 298:6, 305:4, 310:11
pointblank [1] - 278:13
pointed [3] - 268:10, 299:2, 303:20
points [7] - 213:24, 238:16, 275:5, 283:4, 294:17, 294:18, 298:20
poisonous [1] - 237:22
policy [1] - 235:20
popular [3] - 244:23, 249:24, 259:6
popularity [1] - 243:21
portfolio [1] - 261:5
portions [2] - 285:20
posed [3] - 211:12, 273:13, 275:4
position [15] - 204:17, 213:2, 218:8, 218:10, 222:8, 242:3, 244:1, 244:7, 245:24, 250:24, 251:3, 254:19, 256:20,

272:9, 293:5
positioning [1] - 218:8
positions [1] - 231:22
Posner [1] - 208:8
possible [2] - 289:20
possibly [2] - 211:10, 256:25
post [3] - 232:22, 302:16, 304:18
post-Microsoft [1] - 304:18
post-trial [2] - 232:22, 302:16
potential [3] - 276:2, 281:1, 290:12
potentially [3] - 226:9, 240:5, 242:17
power [13] - 205:8, 215:9, 226:11, 236:21, 237:1, 237:2, 243:1, 243:18, 243:25, 246:8, 246:12, 247:20
powers [1] - 233:8
practice [1] - 278:1
pre [1] - 223:25
pre-install [1] - 223:25
precludes [1] - 292:24
precontextual [1] - 226:24
preference [1] - 202:7
prejudice [1] - 207:15
preload [1] - 307:7
premium [2] - 266:16, 268:13
prepared [1] - 282:15
present [4] - 228:17, 244:14, 248:8, 284:12
president [1] - 229:8
press [1] - 276:16
pressure [2] - 249:9, 252:9
presumably [2] - 243:1, 246:9
pretext [5] - 239:20, 239:24, 287:12, 287:14, 287:24
pretexts [1] - 287:10
pretextual [19] - 221:20, 222:12, 227:7, 228:15, 239:1, 240:7, 240:13, 271:8, 271:10, 271:17, 272:6, 272:18, 272:20, 287:18, 288:8, 288:12, 288:13, 289:6
pretty [3] - 239:15, 249:20, 263:20
prevail [1] - 211:16
prevent [1] - 275:4
prevented [1] - 251:24
preventing [1] - 298:8

prevents [1] - 286:11
previous [1] - 276:25
previously [1] - 228:21
price [15] - 242:5, 247:18, 261:9, 261:10, 261:13, 261:15, 261:18, 262:6, 262:7, 262:8, 262:9, 262:15, 269:23, 282:16
price-fixing [1] - 247:18
prices [3] - 228:24, 237:12, 247:23
pricing [1] - 311:3
prima [7] - 203:12, 203:18, 203:21, 205:18, 208:3, 209:12, 220:23
primary [1] - 310:19
privacy [2] - 285:1, 309:9
problem [6] - 217:9, 217:12, 218:19, 226:25, 229:15, 279:14
problematic [2] - 209:21, 229:17
Procedure [1] - 206:20
proceed [1] - 283:1
proceedings [1] - 312:6
process [4] - 242:16, 245:16, 246:24, 308:5
procompetitive [74] - 202:8, 202:14, 202:17, 202:20, 202:24, 204:23, 207:22, 208:6, 208:13, 208:15, 208:20, 209:16, 209:24, 221:7, 221:11, 221:15, 223:21, 224:11, 227:6, 229:2, 232:15, 235:21, 235:22, 236:1, 237:18, 237:25, 238:15, 238:22, 238:23, 239:2, 239:23, 240:4, 240:13, 240:20, 240:25, 241:1, 241:6, 242:11, 246:10, 246:19, 247:4, 247:12, 250:2, 250:25, 251:1, 251:20, 254:1, 255:6, 255:11, 255:23, 255:24, 256:14, 256:18, 259:3, 259:18, 260:14, 269:25, 270:1, 270:24, 271:9, 271:14, 272:10, 272:13, 287:16, 287:17, 288:3, 288:7, 288:11, 288:13,

289:1, 289:8, 289:17, 297:1, 298:17
produce [1] - 237:12
produces [2] - 235:15, 294:11
producing [1] - 232:24
product [19] - 221:12, 221:13, 232:24, 246:25, 248:10, 248:18, 248:19, 250:5, 252:17, 259:5, 259:11, 260:7, 260:22, 262:11, 273:4, 273:5, 280:1, 284:12, 295:21
product's [1] - 235:19
products [9] - 206:14, 217:7, 248:13, 249:14, 250:3, 251:7, 261:5, 308:18
Professional [2] - 235:17, 237:5
Professor [28] - 211:11, 211:20, 212:3, 216:20, 217:13, 217:19, 220:14, 226:14, 229:4, 230:7, 231:5, 251:10, 259:24, 260:1, 263:10, 266:14, 269:4, 269:20, 285:18, 286:18, 286:20, 296:16, 299:20, 299:23, 300:8, 302:13, 305:4
proffer [1] - 208:13
proffered [5] - 236:1, 241:1, 266:4, 288:11, 297:11
profit [1] - 265:10
profitable [1] - 264:25
profits [1] - 285:22
progress [1] - 214:8
prominence [1] - 213:10
promote [3] - 253:24, 265:2, 270:22
promotion [7] - 222:7, 222:14, 222:16, 222:18, 264:4, 264:11, 266:13
promotional [3] - 221:17, 264:8, 266:17
pronounced [1] - 309:20
proof [7] - 213:7, 223:2, 223:3, 239:23, 287:6, 287:24, 301:4
prop [1] - 247:23
propagating [1] - 244:11
proper [4] - 209:25,

210:1, 210:14, 309:8
**properly** [2] - 205:22, 208:19
**proposal** [1] - 230:23
**proposed** [2] - 268:22, 298:5
**proposes** [1] - 226:1
**proposing** [1] - 268:21
**proposition** [2] - 227:13, 294:2
**propping** [1] - 229:25
**prosecuted** [1] - 244:21
**prosecution** [1] - 245:10
**protecting** [1] - 309:25
**Protection** [1] - 200:20
**prove** [8] - 205:14, 226:23, 236:5, 236:6, 288:21, 289:2, 310:10
**proven** [4] - 205:8, 221:19, 262:25, 289:8
**proves** [1] - 287:8
**provide** [7] - 215:7, 223:15, 236:17, 237:14, 257:22, 264:7, 264:10
**provided** [5] - 232:21, 232:23, 251:23, 269:22, 303:5
**provider** [3] - 252:20, 292:5
**provides** [6] - 214:23, 221:8, 234:4, 257:20, 260:23, 260:24
**proving** [4] - 208:5, 208:15, 287:14, 289:5
**proxy** [2] - 220:13, 305:18
**pull** [3] - 246:12, 280:4, 309:22
**purported** [1] - 281:6
**purpose** [2] - 223:25, 309:24
**purposes** [2] - 242:24, 244:15
**pursue** [1] - 209:16
**push** [2] - 203:11, 203:12
**pushing** [5] - 265:6, 265:7, 280:17, 280:18, 280:19
**put** [26] - 204:7, 204:8, 204:10, 207:2, 207:17, 207:20, 208:8, 213:1, 216:12, 217:6, 223:3, 242:10, 242:11, 253:4, 256:22, 272:24, 276:7, 276:10, 277:15,

284:11, 290:10, 292:4, 294:24, 302:16, 310:7
**puts** [3] - 273:15, 288:21, 310:2
**putting** [2] - 202:23, 207:4

## Q

**quality** [40] - 232:18, 232:24, 233:3, 233:4, 233:24, 235:13, 235:14, 235:15, 235:19, 235:22, 237:8, 237:9, 237:14, 237:15, 237:17, 237:24, 242:6, 243:24, 248:17, 259:16, 282:16, 283:13, 283:14, 285:9, 291:21, 292:19, 295:2, 296:9, 296:12, 296:18, 296:23, 302:21, 302:25, 303:3, 303:18, 308:16, 308:25
**quantified** [1] - 230:10
**queries** [9] - 202:25, 204:6, 213:20, 234:3, 236:24, 281:17, 281:20, 299:4, 302:23
**query** [1] - 303:13
**questions** [5] - 220:18, 285:10, 293:19, 293:21
**quick** [1] - 294:17
**quickly** [2] - 266:3, 269:13
**quite** [7] - 217:5, 233:23, 241:20, 257:17, 276:14, 293:2, 306:2
**quote** [1] - 251:10
**quoting** [3] - 292:15, 305:13, 310:15

## R

**raghavan** [1] - 296:14
**raise** [1] - 256:8
**raised** [3] - 206:20, 206:23, 299:1
**raises** [1] - 235:3
**Ralph** [1] - 200:21
**Ramaswamy** [7] - 230:21, 278:25, 291:16, 292:4, 294:20, 295:20
**Ramaswamy's** [1] - 295:3
**range** [1] - 281:14
**Rangel** [3] - 259:24,

260:1
**ranking** [1] - 285:15
**rather** [1] - 242:11
**Rationale** [1] - 230:23
**reach** [6] - 204:7, 204:8, 204:10, 277:9, 277:10, 309:16
**reached** [3] - 217:25, 229:23, 279:13
**reaches** [1] - 278:5
**reaching** [1] - 277:4
**reaction** [3] - 239:19, 243:15, 301:15
**read** [8] - 222:22, 240:16, 240:17, 254:7, 271:13, 298:13, 306:19, 307:20
**reading** [1] - 239:18
**ready** [1] - 202:3
**real** [6] - 204:20, 205:2, 205:4, 206:1, 226:14, 269:22
**realistic** [1] - 203:4
**reality** [4] - 203:5, 273:4, 273:5, 283:25
**realizes** [2] - 212:5, 218:4
**really** [51] - 205:6, 208:24, 209:18, 209:19, 210:25, 211:7, 211:15, 211:16, 214:15, 215:18, 216:12, 219:18, 221:3, 222:2, 224:8, 227:22, 228:2, 229:2, 232:4, 237:7, 241:23, 247:8, 247:24, 249:14, 250:20, 253:17, 261:23, 262:14, 264:9, 265:25, 266:4, 272:8, 274:12, 284:6, 289:12, 289:14, 291:23, 294:8, 294:9, 299:1, 301:19, 302:13, 308:7, 308:15, 309:5, 309:6, 310:7
**realtime** [1] - 239:12
**reargue** [2] - 300:7
**reason** [26] - 204:2, 208:10, 218:20, 224:11, 227:9, 236:22, 241:16, 241:19, 241:22, 257:24, 258:1, 258:2, 259:1, 267:24, 270:23, 272:12, 276:20, 288:9, 288:14, 288:23, 291:19, 293:8, 296:5, 303:4, 305:4, 306:24
**reasonable** [1] - 273:2
**reasonably** [1] -

236:19
**reasons** [5] - 263:20, 270:22, 293:5, 298:14, 304:25
**rebut** [2] - 288:15, 288:19
**rebuttal** [1] - 268:25
**rebutting** [1] - 297:11
**received** [1] - 228:19
**recess** [2] - 238:9, 282:9
**recognize** [4] - 212:7, 245:18, 254:22, 293:17
**recognized** [6] - 206:3, 211:7, 221:14, 260:5, 266:2, 293:15
**recollection** [1] - 233:16
**recommend** [1] - 240:9
**recommendation** [3] - 260:13, 260:19, 260:25
**record** [8] - 213:4, 213:11, 216:23, 244:15, 259:1, 265:24, 293:9, 297:24
**redacted** [1] - 263:6
**redesign** [1] - 259:5
**reduced** [1] - 284:15
**reference** [1] - 304:12
**referenced** [2] - 210:8, 296:7
**reflect** [2] - 205:23, 266:8
**reflection** [1] - 243:21, 295:15
**reflects** [1] - 301:13
**refuses** [1] - 228:3
**regarding** [2] - 228:22, 307:23
**regardless** [1] - 214:11
**Regents** [2] - 254:9, 286:14
**regular** [1] - 203:6
**regularly** [4] - 213:5, 213:6, 265:23, 266:1
**regulatory** [2] - 293:5, 293:11
**reject** [1] - 287:7
**relate** [1] - 257:1
**related** [1] - 250:24
**relating** [1] - 265:18
**relationships** [1] - 263:11
**relative** [1] - 282:16
**relegated** [1] - 224:21
**relevant** [5] - 207:5, 215:12, 227:17, 299:10, 299:12

**reliable** [1] - 235:15
**reliance** [1] - 301:3
**relied** [3] - 228:22, 306:14, 306:17
**reluctant** [1] - 293:7
**rely** [2] - 292:21, 293:13
**relying** [1] - 285:13
**remain** [1] - 244:4
**remaining** [1] - 236:12
**remand** [2] - 255:10, 255:11
**remedy** [1] - 290:21
**remember** [9] - 211:11, 234:17, 236:14, 242:23, 248:20, 254:12, 254:23, 304:15, 305:5
**remind** [1] - 238:19
**reminded** [2] - 207:13, 262:2
**reminder** [1] - 263:24
**renegotiated** [2] - 216:11, 276:6
**renewed** [2] - 275:22, 276:4
**reorganize** [1] - 239:13
**repeatedly** [1] - 295:16
**replete** [1] - 297:25
**reported** [1] - 278:19
**reporter** [2] - 238:5, 282:4
**Reporter** [3] - 201:9, 201:10, 312:11
**REPORTER** [1] - 312:1
**represent** [1] - 273:14
**represented** [1] - 273:19
**reputation** [1] - 261:6
**request** [2] - 216:11, 278:7
**requesting** [2] - 230:18
**require** [2] - 223:24, 289:11
**required** [2] - 235:11, 241:22
**requirement** [2] - 219:12, 305:16
**requirements** [3] - 273:8, 273:11, 273:24
**requires** [3] - 219:20, 289:12, 293:16
**requiring** [1] - 217:10
**requisite** [1] - 305:15
**resist** [1] - 270:18
**resolve** [1] - 256:13

**resolved** [2] - 278:15, 278:21
**respect** [3] - 251:22, 257:9, 307:22
**respectfully** [1] - 207:1
**respects** [1] - 206:23
**respond** [2] - 214:14, 288:9
**response** [7] - 254:5, 268:11, 280:22, 293:20, 295:7, 301:11, 301:15
**responsibility** [1] - 285:17
**responsible** [2] - 236:15, 278:23
**responsive** [3] - 247:2, 298:5, 304:14
**rest** [2] - 232:10, 289:4
**restraint** [1] - 235:18
**restriction** [1] - 298:10
**restrictions** [5] - 254:13, 254:24, 254:25, 291:20, 304:3
**restrictive** [29] - 222:15, 222:20, 222:23, 223:19, 224:6, 225:9, 225:13, 225:21, 238:21, 239:6, 239:14, 239:19, 239:22, 240:8, 240:12, 241:22, 257:7, 257:9, 259:2, 266:3, 269:3, 283:11, 287:13, 287:15, 289:10, 299:25
**result** [4] - 226:16, 252:18, 270:10, 271:21
**resulted** [2] - 223:6, 304:5
**results** [1] - 280:4
**resume** [2] - 202:3, 238:7
**Retailers** [1] - 235:10
**retention** [1] - 236:20
**Revenue** [1] - 274:13
**revenue** [27] - 210:12, 210:25, 226:2, 226:3, 229:9, 252:4, 252:5, 252:6, 261:16, 262:3, 262:10, 263:1, 263:2, 263:12, 263:22, 264:13, 265:11, 265:14, 266:5, 266:23, 267:5, 267:6, 268:20, 274:14, 295:8, 295:10, 298:3
**revenues** [1] - 286:23
**reversible** [1] - 298:1
**revisit** [1] - 242:9
**revshare** [14] - 224:18,

224:19, 225:15, 227:2, 250:20, 252:2, 261:25, 262:14, 264:3, 267:12, 268:13, 275:23, 285:4
**reward** [1] - 205:5
**ridiculous** [1] - 251:18
**rightly** [1] - 208:7
**rise** [1] - 274:17
**risk** [1] - 279:20
**rival** [4] - 229:17, 230:1, 230:4, 266:21
**rivals** [6] - 204:11, 222:7, 232:19, 266:20, 273:25, 274:1
**RMR** [1] - 201:9
**rolls** [1] - 296:15
**Room** [2] - 201:10, 312:12
**root** [1] - 271:25
**Rosenberg** [1] - 231:7
**RSA** [16] - 218:5, 218:9, 218:11, 219:10, 223:10, 223:16, 223:19, 224:5, 230:19, 275:22, 276:21, 278:20, 279:11, 279:22, 279:25
**RSAs** [5] - 223:13, 226:5, 270:22, 275:24, 276:4
**rule** [3] - 235:10, 241:16, 241:19
**Rule** [1] - 206:19
**rule-of-reason** [1] - 241:16
**ruled** [1] - 256:2
**Rules** [1] - 279:4
**run** [4] - 211:10, 214:12, 276:21, 279:25
**runs** [2] - 213:6, 244:5
**Russia** [4] - 230:12, 292:14, 293:4, 296:13

**S**

**Safari** [8] - 248:11, 256:24, 257:5, 257:18, 257:20, 268:9, 274:13, 290:3
**safe** [1] - 248:3
**sale** [1] - 224:1
**Sallet** [1] - 200:19
**Samsung** [15] - 221:10, 230:19, 230:24, 251:18, 276:11, 277:10, 277:14, 278:1, 279:5, 280:14, 280:16, 280:21
**sat** [3] - 249:8, 260:3, 289:18

**satisfied** [1] - 203:19
**satisfy** [1] - 203:12
**saved** [3] - 303:23, 303:24, 304:4
**saw** [4] - 262:12, 276:1, 281:4, 286:19
**scale** [46] - 204:12, 206:1, 232:21, 233:5, 233:12, 233:23, 234:4, 234:8, 235:1, 235:2, 235:23, 236:7, 236:13, 236:17, 242:19, 243:1, 272:25, 283:16, 283:17, 284:14, 285:2, 290:5, 291:21, 291:24, 298:25, 299:6, 299:9, 300:10, 300:11, 300:15, 301:3, 301:5, 301:7, 302:18, 302:20, 302:24, 303:5, 303:15, 303:18, 307:23, 307:24, 308:4, 308:6, 308:8
**scale-translate** [1] - 302:20
**SCHMIDTLEIN** [50] - 238:11, 238:13, 239:25, 240:3, 241:13, 241:17, 242:1, 242:14, 244:13, 246:6, 246:17, 250:4, 251:4, 254:16, 254:19, 256:2, 256:7, 256:11, 256:13, 257:11, 257:23, 258:5, 258:8, 261:17, 261:20, 262:20, 263:4, 263:10, 264:5, 267:8, 267:16, 268:1, 268:5, 269:1, 269:11, 282:21, 294:16, 295:14, 297:7, 297:9, 301:22, 303:8, 303:12, 304:10, 304:24, 306:1, 306:11, 306:18, 306:24, 307:12
**Schmidtlein** [13] - 201:5, 206:5, 206:24, 232:3, 271:1, 275:4, 275:7, 285:6, 287:10, 294:15, 304:9, 307:13, 309:2
**Schmidtlein's** [1] - 280:22
**science** [2] - 300:11, 300:17
**scientist** [2] - 308:2, 308:3
**scope** [1] - 280:16
**screen** [25] - 220:7, 231:25, 232:1, 232:4, 256:21, 257:5, 257:14,

257:21, 257:22, 258:3, 258:4, 258:12, 258:20, 258:24, 259:11, 260:4, 266:7, 269:2, 277:13, 283:7, 283:10, 290:10, 299:21, 300:3
**screening** [3] - 203:9, 203:10, 305:17
**screens** [3] - 269:5, 269:6, 276:23
**se** [1] - 252:12
**Seal** [1] - 221:9
**search** [68] - 212:14, 215:25, 220:2, 220:3, 224:16, 224:18, 224:23, 227:22, 228:18, 230:25, 233:24, 234:1, 248:12, 248:17, 249:12, 249:23, 250:8, 250:13, 250:15, 251:21, 252:19, 252:23, 257:16, 257:21, 258:16, 259:19, 259:21, 259:23, 260:23, 261:4, 261:12, 262:11, 265:20, 266:21, 267:6, 268:16, 269:16, 270:1, 270:23, 277:19, 278:2, 278:8, 280:4, 280:6, 280:23, 280:24, 281:7, 281:20, 290:1, 294:11, 294:22, 296:12, 296:18, 296:23, 299:4, 299:8, 299:9, 299:10, 299:12, 302:23, 303:6, 308:5, 308:20, 310:9
**Search** [20] - 210:21, 223:25, 229:19, 229:25, 249:19, 250:13, 250:19, 250:21, 250:23, 250:24, 253:23, 255:23, 258:16, 264:11, 265:12, 274:13, 274:19, 274:23, 297:22, 297:24
**Search's** [1] - 296:9
**searches** [3] - 280:6, 281:9, 285:13
**searching** [1] - 253:10
**seat** [1] - 282:10
**seated** [1] - 238:10
**second** [12] - 200:17, 214:21, 218:23, 228:14, 238:11, 249:16, 260:4, 276:22, 284:9, 294:19, 297:5, 298:22

**second-guessed** [1] - 260:4
**secondary** [1] - 267:20
**seconds** [3] - 232:2, 232:5
**Section** [34] - 200:20, 203:22, 203:23, 215:8, 222:24, 222:25, 227:13, 227:16, 228:3, 239:7, 241:11, 241:13, 241:14, 241:15, 241:19, 245:25, 246:4, 254:5, 254:10, 254:16, 254:20, 255:17, 286:6, 286:8, 286:9, 286:10, 286:14, 304:19, 305:1, 305:2, 305:3
**section** [1] - 279:19
**secured** [1] - 232:17
**secures** [1] - 230:24
**security** [5] - 223:11, 223:12, 223:15, 223:21, 231:1
**see** [27] - 202:19, 203:17, 205:11, 207:21, 213:22, 222:25, 229:6, 250:6, 253:12, 263:13, 269:16, 274:9, 274:11, 274:17, 276:1, 276:24, 276:25, 278:6, 278:17, 278:18, 280:4, 286:13, 288:6, 288:7, 296:22, 298:2, 311:4
**seeing** [3] - 215:15, 264:21, 267:24
**seeking** [1] - 285:24
**seem** [3] - 222:23, 255:16, 299:22
**seemingly** [1] - 255:18
**selected** [1] - 224:19
**sell** [8] - 216:19, 231:23, 245:20, 252:16, 264:12, 264:25, 265:8, 273:7
**selling** [2] - 265:4, 265:5
**sends** [1] - 302:22
**sense** [13] - 218:23, 220:4, 228:4, 240:3, 247:21, 249:20, 251:20, 255:25, 257:18, 267:5, 270:12, 297:18, 301:12
**sensitive** [1] - 228:12
**sentence** [2] - 295:11, 297:10
**separate** [3] - 223:15, 229:19, 308:18

**sequence** [1] - 241:4
**series** [1] - 219:4
**serve** [1] - 298:11
**serves** [2] - 305:16, 309:24
**service** [2] - 278:8, 280:7
**services** [5] - 228:25, 237:13, 263:12, 273:15, 294:12
**session** [1] - 294:19
**set** [11] - 224:16, 227:20, 266:23, 267:19, 268:8, 268:14, 277:8, 285:20, 309:17, 309:18
**sets** [1] - 285:1
**setting** [2] - 241:16, 266:16
**setup** [1] - 264:11
**Seventh** [1] - 200:22
**share** [32] - 210:12, 210:25, 211:4, 215:19, 226:2, 226:3, 229:10, 236:23, 261:16, 262:3, 262:10, 263:12, 263:22, 264:6, 264:13, 266:5, 266:23, 267:5, 267:6, 268:20, 275:20, 275:21, 293:14, 295:8, 295:10, 299:8, 300:5, 301:22, 306:14, 307:1, 307:9, 308:14
**shareholders** [1] - 220:11
**shares** [1] - 265:11
**sheet** [1] - 268:10
**Sherman** [8] - 235:20, 237:6, 243:8, 245:25, 248:4, 275:9, 292:18, 295:16
**shift** [5] - 300:5, 301:12, 301:13, 307:1, 307:9
**shifting** [1] - 310:1
**shifts** [3] - 208:3, 209:10, 310:4
**Shoe** [1] - 215:12
**shop** [1] - 212:25
**shot** [1] - 272:16
**shots** [1] - 226:12
**shoulder** [2] - 214:13, 214:24
**show** [28] - 203:24, 204:2, 204:19, 204:20, 205:2, 205:3, 205:6, 213:11, 228:15, 228:17, 236:11, 238:25, 239:3, 239:22, 240:6, 256:16, 262:9,

271:6, 271:11, 272:1, 272:16, 288:19, 289:19, 291:8, 309:5, 310:6, 310:8
**showed** [5] - 210:7, 220:5, 230:13, 271:7, 309:4
**showing** [5] - 238:25, 240:7, 262:16, 282:16, 309:24
**shown** [5] - 204:19, 205:21, 226:17, 272:19, 295:2
**shows** [6] - 265:24, 271:11, 274:23, 282:15, 308:12, 309:23
**shy** [1] - 228:8
**side** [13] - 218:9, 233:23, 233:25, 241:3, 248:9, 253:12, 255:8, 263:24, 264:24, 288:1, 288:5, 289:4, 300:23
**sign** [6] - 202:21, 218:10, 218:11, 273:7, 291:23, 291:25
**significance** [1] - 303:23
**significant** [8] - 215:1, 232:21, 233:2, 234:4, 234:13, 265:19, 284:18, 305:16
**significantly** [2] - 236:20, 236:25
**signing** [1] - 205:9
**silent** [1] - 207:14
**similar** [6] - 234:20, 243:17, 247:19, 279:4, 279:5, 280:5
**simple** [5] - 222:13, 223:9, 259:12, 262:17, 289:18
**simplify** [1] - 249:17
**simply** [10] - 217:2, 227:23, 228:3, 236:1, 237:14, 279:23, 285:24, 287:8, 287:14, 293:17
**single** [14] - 213:1, 217:8, 239:12, 266:21, 268:8, 271:11, 283:13, 290:4, 290:13, 290:17, 298:3, 304:23, 308:5, 309:2
**sit** [1] - 262:21
**sitting** [1] - 239:11
**situation** [5] - 247:1, 248:7, 249:15, 258:22, 305:20
**skin** [1] - 265:6
**Slide** [7] - 234:10,

235:4, 236:3, 274:3, 276:25, 286:15, 298:21
**slide** [13] - 206:12, 220:14, 232:25, 233:6, 252:4, 263:5, 291:8, 291:13, 292:1, 292:13, 294:4, 309:22
**slides** [3] - 245:12, 296:7, 309:5
**slightly** [3] - 244:4, 257:13, 306:9
**slots** [1] - 239:20
**small** [3] - 218:22, 282:12, 305:14
**smaller** [2] - 213:16, 285:5
**smart** [2] - 291:10, 291:11
**smartphone** [1] - 269:24
**smartphones** [2] - 253:18, 269:25
**snippets** [1] - 296:8
**snowball** [2] - 302:12, 302:14
**Society** [4] - 235:17, 247:14, 247:17, 247:22
**Socony** [1] - 309:20
**software** [2] - 244:25, 245:2
**sole** [1] - 236:22
**solid** [1] - 222:8
**solve** [1] - 226:25
**someone** [4] - 215:2, 267:14, 291:14, 294:9
**sometimes** [5] - 214:1, 220:1, 220:5, 220:8, 220:15
**somewhat** [1] - 304:19
**somewhere** [1] - 240:22
**sorry** [9] - 203:15, 214:20, 239:17, 243:15, 249:16, 250:6, 261:15, 267:19, 286:2
**sort** [74] - 204:20, 204:25, 205:15, 208:22, 211:12, 215:4, 221:3, 221:8, 221:9, 221:14, 221:23, 224:15, 226:4, 236:6, 238:18, 239:3, 239:11, 240:14, 241:5, 241:15, 241:24, 242:10, 243:9, 243:17, 244:11, 245:23, 246:21, 247:17, 247:18, 247:20, 247:22, 247:25, 248:4, 248:12, 248:25, 249:4, 249:5,

249:22, 250:5, 250:12, 250:15, 251:2, 254:21, 255:13, 258:10, 258:11, 258:18, 258:19, 258:20, 259:4, 259:15, 261:11, 263:14, 266:15, 266:16, 269:3, 269:7, 269:17, 270:3, 276:13, 276:19, 285:4, 287:8, 288:23, 290:6, 290:16, 290:19, 291:2, 296:17, 297:14, 297:16, 301:20, 305:22
**sorts** [1] - 248:5
**sought** [1] - 233:1
**sound** [1] - 232:3
**sounds** [2] - 204:17, 222:6
**source** [3] - 253:2, 253:3, 253:8
**South** [1] - 200:15
**space** [2] - 252:23, 294:5
**specific** [1] - 215:11
**specifically** [3] - 212:13, 264:3, 264:7
**specify** [1] - 266:22
**spelled** [1] - 271:15
**spend** [1] - 232:2
**spring** [1] - 203:2
**squarely** [1] - 255:17
**stake** [2] - 261:3, 261:5
**stand** [2] - 210:20, 261:6
**standard** [2] - 213:21, 225:7
**Standard** [1] - 305:1
**standing** [3] - 218:8, 248:9
**stands** [1] - 227:12
**start** [6] - 202:11, 275:14, 275:21, 281:16, 282:7, 294:7
**started** [2] - 280:17, 287:1
**starting** [1] - 248:24
**starts** [1] - 232:6
**State** [1] - 200:19
**state** [1] - 217:25
**statement** [5] - 206:14, 206:17, 207:19, 208:25, 290:8
**states** [1] - 272:10
**STATES** [2] - 200:1, 200:10
**States** [10] - 200:2, 201:10, 217:17, 228:25, 232:10,

292:24, 296:16, 296:22, 296:23, 296:25
**Stations** [1] - 305:2
**stay** [3] - 207:14, 248:2, 288:20
**stems** [1] - 236:3
**stenographic** [1] - 312:5
**step** [7] - 203:12, 203:13, 218:2, 241:7, 245:16, 246:18, 306:5
**steps** [3] - 204:1, 277:24, 280:1
**stickiness** [1] - 308:14
**sticky** [1] - 286:3
**still** [11] - 233:20, 235:1, 237:19, 237:20, 237:23, 263:6, 270:11, 281:25, 285:12, 304:3, 307:25
**stop** [1] - 302:1
**stopped** [2] - 220:7, 249:6
**stops** [1] - 290:15
**Store** [7] - 217:2, 217:4, 217:10, 217:11, 217:18, 219:1, 219:3
**story** [2] - 249:5, 308:22
**straight** [4] - 202:13, 227:9, 228:1, 228:14
**Street** [2] - 200:12, 200:15
**structure** [6] - 216:9, 216:13, 216:14, 223:17, 226:4, 287:21
**struggling** [1] - 255:15
**study** [3] - 228:21, 270:3, 296:18
**stuff** [3] - 207:3, 218:17, 218:18
**stunting** [1] - 206:14
**subject** [1] - 246:1
**submit** [2] - 247:3, 307:3
**submitted** [5] - 212:12, 251:22, 253:25, 303:17, 304:11
**substantial** [7] - 204:4, 204:10, 205:9, 269:16, 306:12, 307:1, 307:9
**substantially** [2] - 270:24, 280:5
**substantive** [1] - 288:16
**substantively** [1] - 223:4
**substitute** [1] - 225:2
**substituting** [1] -

298:8
**succeeded** [1] - 304:4
**success** [1] - 241:2
**successful** [4] - 205:6, 205:13, 246:9, 269:19
**suffer** [1] - 252:8
**sufficient** [2] - 290:2, 304:16
**sufficiently** [1] - 213:9
**suggest** [8] - 260:8, 261:2, 261:21, 262:21, 263:17, 296:11, 298:1, 303:22
**Suggest** [1] - 290:3
**suggested** [4] - 244:10, 271:16, 287:11, 304:14
**suggesting** [2] - 296:9, 299:23
**suggestion** [1] - 295:25
**suggestions** [4] - 205:25, 206:4, 207:14, 220:6
**suggests** [2] - 247:15, 271:17
**Suite** [2] - 200:16, 201:3
**sum** [1] - 282:1
**summary** [2] - 209:6, 247:9
**summation** [2] - 242:20, 283:4
**summations** [1] - 238:17
**Super** [1] - 269:9
**superior** [2] - 232:23, 243:23
**supply** [1] - 273:9
**support** [6] - 222:13, 224:1, 230:23, 239:23, 265:19, 288:7
**supported** [1] - 272:11
**supporting** [1] - 224:1
**supports** [1] - 287:17
**supposed** [1] - 302:1
**Surface** [2] - 270:17, 270:21
**surprisingly** [1] - 209:14
**survey** [1] - 228:21
**survived** [1] - 203:3
**SW** [1] - 201:6
**switch** [2] - 260:16, 260:17
**switched** [3] - 248:21, 250:14, 275:24
**switches** [1] - 267:21
**switching** [4] - 248:23, 250:16, 259:12

**system** [9] - 230:5,
243:23, 244:17,
253:16, 255:4, 255:7,
269:18, 285:15, 309:25
**system's** [1] - 229:16

# T

**TAC** [1] - 274:9
**tail** [1] - 233:2
**talented** [1] - 292:7
**talks** [4] - 258:13,
283:13, 290:21, 305:5
**task** [1] - 289:3
**team** [3] - 278:16,
278:22, 292:7
**technologies** [2] -
264:19, 296:15
**technology** [8] -
253:1, 253:8, 277:5,
277:15, 281:11,
281:14, 297:20, 297:24
**ten** [6] - 202:21, 203:1,
203:3, 207:15, 302:4,
302:9
**ten-week** [1] - 207:15
**ten-year** [1] - 203:3
**term** [5] - 219:9,
227:7, 268:10, 276:1,
281:17
**terms** [13] - 228:7,
233:3, 234:3, 249:17,
256:21, 261:5, 261:16,
261:24, 275:24,
275:25, 286:7, 286:8,
301:5
**terribly** [1] - 301:12
**test** [4] - 205:12,
237:20, 307:19, 307:20
**testified** [10] - 213:23,
226:14, 234:5, 257:2,
257:4, 259:9, 276:13,
278:12, 294:21, 308:3
**testify** [2] - 212:14,
295:5
**testifying** [5] - 211:25,
259:25, 277:6, 277:17,
279:17
**testimony** [25] -
206:18, 207:13, 214:9,
214:10, 221:21,
248:16, 251:14, 259:7,
259:13, 262:12, 263:5,
263:20, 276:17, 279:4,
279:5, 279:14, 285:19,
287:7, 293:20, 294:20,
296:14, 300:13,
300:18, 300:24, 303:1
**THE** [124] - 200:1,
200:1, 200:9, 202:2,

202:9, 202:18, 203:15,
203:17, 204:16,
205:15, 206:4, 206:10,
207:24, 208:1, 209:2,
209:4, 209:6, 211:11,
213:3, 214:6, 214:16,
214:21, 216:22,
216:25, 218:7, 218:15,
219:9, 220:24, 221:1,
221:5, 221:21, 222:20,
225:24, 227:10, 228:7,
228:12, 232:11,
233:14, 233:16, 236:4,
236:11, 238:3, 238:10,
239:17, 240:2, 241:7,
241:14, 241:18, 242:9,
243:15, 245:23,
246:13, 249:16,
250:23, 254:14,
254:18, 255:15, 256:5,
256:10, 256:12, 257:8,
257:13, 258:1, 258:7,
261:15, 261:18, 262:9,
263:2, 263:9, 263:25,
267:3, 267:9, 267:23,
268:2, 268:24, 269:9,
271:1, 271:13, 272:9,
273:3, 273:13, 274:21,
275:3, 276:7, 277:20,
279:3, 279:21, 280:22,
281:5, 281:12, 281:18,
281:24, 282:3, 282:10,
282:14, 282:20,
282:22, 282:24, 283:2,
285:6, 286:4, 287:9,
289:23, 290:25, 291:2,
291:8, 292:20, 294:14,
295:6, 297:5, 297:8,
301:10, 303:1, 303:10,
304:8, 304:22, 305:25,
306:2, 306:16, 306:19,
307:11, 307:13,
310:23, 311:1
**themselves** [2] -
213:16, 274:5
**theoretical** [1] - 240:8
**theory** [6] - 207:18,
212:21, 212:23, 222:3,
263:16, 281:7
**they've** [32] - 205:22,
208:16, 217:25, 218:1,
221:23, 223:18,
226:17, 234:11,
242:24, 259:10,
259:11, 261:4, 266:4,
268:7, 268:22, 272:19,
273:17, 273:19,
275:22, 275:23,
275:24, 275:25, 285:9,
289:17, 299:8, 301:8,
302:23, 303:25, 304:14

**thinking** [5] - 256:23,
256:25, 257:13, 274:6,
304:23
**thinks** [1] - 280:19
**third** [2] - 284:18,
309:22
**thorny** [1] - 279:4
**thoughts** [1] - 310:24
**threat** [5] - 213:9,
226:20, 245:7, 281:1,
281:4
**threaten** [2] - 279:1,
290:2
**threatening** [1] -
278:10
**threatens** [1] - 281:20
**three** [1] - 232:5
**threshold** [2] - 227:11,
242:12
**throughout** [2] -
237:2, 292:22
**tie** [2] - 202:20, 247:19
**tiered** [2] - 226:3,
226:4
**ties** [2] - 298:2, 298:24
**tight** [1] - 264:17
**timeline** [1] - 256:22
**timing** [1] - 228:7
**tinder** [1] - 268:18
**to-quality** [1] - 302:21
**today** [22] - 233:19,
233:21, 233:24,
234:25, 235:2, 269:12,
291:7, 291:15, 291:17,
292:6, 292:18, 293:6,
293:18, 294:12, 299:7,
300:8, 302:10, 302:11,
304:17, 304:18, 305:3,
305:13
**together** [8] - 215:14,
217:8, 219:22, 249:14,
255:5, 277:7, 284:11,
308:23
**tomorrow** [4] - 282:12,
301:14, 301:19, 311:3
**took** [7] - 211:25,
220:5, 220:6, 225:20,
277:12, 280:1, 280:9
**top** [1] - 274:13
**total** [3] - 252:5, 274:9,
301:4
**toward** [2] - 262:11,
264:4
**track** [1] - 229:1
**tracking** [1] - 228:18
**trade** [2] - 227:19,
227:21
**traffic** [1] - 218:22
**train** [1] - 307:24
**transaction** [1] -

218:12
**TRANSCRIPT** [1] -
200:9
**transcript** [2] - 312:4,
312:5
**translate** [2] - 263:19,
302:20
**translated** [1] - 303:15
**translation** [1] -
263:15
**treated** [1] - 206:22
**treatments** [1] - 294:1
**tree** [1] - 237:22
**TRIAL** [1] - 200:9
**trial** [7] - 206:6,
207:15, 232:22,
249:23, 292:22,
302:14, 302:16
**trickles** [1] - 220:21
**tricky** [1] - 256:11
**tried** [12] - 206:21,
207:7, 207:9, 212:18,
246:11, 249:5, 255:3,
261:21, 277:6, 300:19,
300:20, 302:13
**tries** [1] - 305:10
**Tripadvisors** [1] -
294:6
**Trivago** [1] - 294:6
**true** [13] - 212:23,
217:25, 233:11,
233:19, 233:21,
237:25, 243:21,
253:15, 266:12, 273:6,
293:6, 312:4, 312:5
**trumps** [1] - 298:16
**truth** [6] - 216:8,
240:15, 248:15, 279:9,
279:16, 279:17
**try** [11] - 227:18,
239:4, 239:12, 239:13,
240:6, 263:11, 265:1,
284:16, 300:7, 304:1
**trying** [18] - 214:4,
222:2, 241:2, 264:10,
264:23, 264:24,
265:10, 268:17,
268:18, 272:5, 274:7,
278:14, 286:9, 296:11,
297:21, 303:18, 305:5,
305:19
**turn** [3] - 207:22,
208:18, 220:18
**turned** [1] - 303:14
**turns** [1] - 239:3
**two** [27] - 204:1,
204:5, 208:16, 214:19,
217:20, 227:5, 235:7,
244:10, 249:22,
249:25, 255:18,

262:17, 264:5, 266:5, 273:19, 276:5, 277:8, 284:4, 286:24, 287:7, 302:16, 305:21, 306:20, 306:23, 306:25, 308:18, 309:21
**tying** [2] - 255:9, 255:12
**Tyler** [1] - 201:2
**type** [1] - 295:2
**types** [5] - 240:19, 243:11, 264:8, 264:21, 269:13

## U

**U.S** [8] - 200:12, 200:15, 230:20, 240:17, 280:17, 296:10, 297:3, 305:1
**ultimate** [1] - 227:6
**ultimately** [2] - 227:17, 237:11
**unbundled** [4] - 216:23, 226:9, 270:8, 270:21
**uncertainty** [2] - 278:22, 278:24
**unconditional** [6] - 266:5, 266:23, 267:5, 267:20, 268:3, 268:20
**uncontradicted** [1] - 248:16
**under** [3] - 207:8, 289:17, 305:2
**underline** [1] - 309:21
**undermined** [1] - 207:18
**understood** [4] - 248:25, 262:20, 263:21, 282:19
**unhappy** [2] - 294:23
**unique** [1] - 249:20
**Unit** [1] - 200:20
**United** [8] - 201:10, 217:17, 228:25, 292:24, 296:16, 296:22, 296:23, 296:25
**UNITED** [2] - 200:1, 200:10
**united** [1] - 200:2
**unlawful** [4] - 242:24, 243:3, 244:8, 249:7
**unless** [4] - 220:17, 266:11, 293:8, 310:21
**unnamed** [1] - 279:8
**unsafe** [1] - 247:25
**unsatisfactory** [1] - 288:2
**untangle** [1] - 300:20

**unveiled** [2] - 248:11, 307:4
**up** [52] - 203:17, 206:3, 206:8, 212:25, 214:4, 214:10, 223:4, 226:18, 227:8, 227:20, 229:25, 232:6, 234:17, 235:5, 244:5, 247:16, 247:23, 248:12, 251:14, 255:16, 256:22, 257:18, 260:3, 262:3, 262:21, 263:5, 264:19, 272:22, 273:16, 274:12, 274:14, 276:14, 277:8, 277:12, 279:3, 282:1, 282:7, 282:8, 285:2, 285:14, 286:13, 288:3, 289:11, 289:13, 290:4, 295:6, 295:25, 297:23, 298:9, 303:8, 308:20, 309:22
**updates** [3] - 223:11, 223:12, 223:21
**upgrades** [2] - 223:16, 231:1
**usage** [1] - 260:24
**useful** [3] - 301:12, 305:17, 308:5
**user** [13] - 225:1, 231:7, 231:8, 232:1, 232:24, 233:23, 233:25, 257:6, 258:25, 267:21, 283:21, 310:13
**user-downloaded** [1] - 283:21
**user-side** [1] - 233:25
**users** [22] - 219:12, 219:14, 220:1, 220:3, 220:8, 220:9, 220:13, 220:21, 221:13, 226:22, 231:22, 233:9, 244:24, 250:7, 251:1, 258:25, 260:7, 260:15, 260:25, 269:15, 303:5
**uses** [1] - 310:9
**utility** [1] - 248:18
**utmost** [1] - 233:7

## V

**Vacuum** [1] - 309:21
**valid** [2] - 210:8, 269:3
**valuable** [3] - 260:13, 260:20, 260:25
**value** [2] - 211:23, 294:2
**values** [1] - 285:21
**variety** [2] - 254:8, 304:25

**various** [4] - 243:11, 260:7, 262:13, 300:16
**verb** [2] - 215:22, 215:23
**version** [2] - 247:10, 256:24
**versus** [4] - 239:9, 254:9, 255:11, 305:1
**viable** [3] - 211:1, 246:4, 300:14
**vice** [1] - 229:8
**view** [14] - 203:20, 209:13, 211:16, 212:24, 212:25, 226:6, 233:24, 241:15, 245:24, 247:5, 259:13, 269:5, 287:19
**views** [2] - 217:7, 248:17
**violated** [1] - 310:19
**violates** [1] - 275:9
**violating** [1] - 302:5
**violation** [5] - 279:11, 279:22, 280:7, 280:8, 280:19
**virtue** [1] - 236:9
**vital** [1] - 308:4
**void** [1] - 203:4
**volume** [2] - 299:19, 303:13
**voluntarily** [1] - 270:20
**vouches** [1] - 221:12
**vouching** [2] - 221:8, 221:12
**vs** [1] - 200:5

## W

**wait** [5] - 224:8, 224:11, 311:3, 311:5
**waiting** [1] - 271:5
**waived** [1] - 207:8
**walk** [1] - 277:2
**walked** [1] - 262:5
**wants** [5] - 213:7, 218:23, 222:5, 278:2, 309:3
**Washington** [5] - 200:5, 200:13, 201:7, 201:11, 312:13
**ways** [14] - 222:14, 231:12, 231:15, 239:22, 241:22, 249:13, 262:21, 276:5, 287:15, 293:25, 310:14, 310:16, 310:17
**weathervane** [1] - 301:20
**Webb** [1] - 201:2

**website** [4] - 219:1, 235:12, 235:13, 235:14
**week** [1] - 207:15
**welcome** [1] - 202:11
**well-funded** [1] - 292:7
**Wfcavanaugh@pbwt .com** [1] - 201:4
**whereas** [2] - 249:12, 286:9
**Whinston** [6] - 226:14, 266:14, 269:4, 296:17, 302:13, 305:5
**Whinston's** [2] - 285:19, 299:23
**whole** [3] - 222:3, 241:2, 304:25
**widget** [15] - 216:17, 217:15, 217:16, 218:20, 218:21, 218:22, 218:24, 218:25, 219:13, 258:14, 258:15, 258:16, 258:20
**widgets** [1] - 273:7
**wild** [1] - 257:12
**wildly** [2] - 259:5, 259:6
**William** [1] - 201:1
**WILLIAMS** [1] - 201:6
**willing** [1] - 268:20
**willingness** [1] - 210:22
**win** [6] - 241:2, 243:4, 246:23, 251:7, 268:17, 268:18
**Windows** [12] - 219:19, 243:21, 243:22, 252:16, 255:1, 255:4, 256:24, 268:9, 303:25, 304:4, 304:6
**winners** [2] - 227:24, 228:6
**winning** [4] - 245:9, 295:15, 295:18, 295:22
**wins** [1] - 240:21
**wireless** [2] - 228:24
**witness** [3] - 234:18, 276:11, 276:12
**witnesses** [3] - 221:22, 266:2, 270:5
**won** [6] - 210:4, 242:3, 242:5, 242:17, 244:17, 295:21
**wonder** [1] - 244:5
**wondering** [1] - 241:21
**Wonderland** [2] - 210:18, 211:25
**word** [2] - 216:4,

307:14
   **words** [20] - 214:22,
221:22, 226:7, 238:25,
239:20, 242:5, 244:16,
244:23, 251:2, 251:16,
255:22, 257:15,
262:12, 264:8, 267:22,
268:2, 271:16, 298:12,
301:14, 307:21
   **works** [1] - 225:14
   **world** [12] - 204:20,
205:3, 205:4, 269:3,
269:6, 299:22, 299:23,
299:24, 305:9, 305:21,
306:6, 307:2
   **world's** [1] - 307:4
   **worldwide** [1] - 310:13
   **worried** [2] - 225:17,
225:19
   **worry** [2] - 209:20,
209:23
   **worse** [1] - 295:21
   **worth** [3] - 229:25,
278:24, 279:20
   **wow** [1] - 307:5
   **wrap** [1] - 282:8
   **writ** [1] - 222:4
   **written** [2] - 290:10,
290:18
   **wrote** [2] - 209:6,
228:20

## Y

   **Yahoo** [13] - 212:19,
225:2, 225:3, 248:21,
266:25, 302:20,
302:22, 303:14,
303:15, 304:4, 308:9,
308:24
   **Yahoo!-Microsoft** [1] -
303:2
   **Yandex** [1] - 293:5
   **year** [8] - 203:3,
246:13, 276:4, 291:22,
310:5
   **years** [21] - 202:22,
203:1, 214:8, 215:22,
234:18, 268:10,
272:22, 272:23,
272:25, 273:8, 273:16,
273:19, 274:11,
283:14, 301:16, 302:2,
302:4, 302:5, 302:9
   **York** [1] - 201:3

## Z

   **zero** [1] - 296:11