```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
       United States of America,    )
 3     et al.,                      )
                                    )
 4                     Plaintiffs,  )
                                    ) CV No. 20-3010
 5                         vs. ) Washington, D.C.
                                    ) May 3, 2024 - Afternoon
 6     Google LLC,                  ) 1:35 p.m.
                                    )
 7                     Defendant.   )
       _____ )
 8

 9                 TRANSCRIPT OF BENCH TRIAL
              BEFORE THE HONORABLE AMIT P. MEHTA
10                UNITED STATES DISTRICT JUDGE

11     APPEARANCES:
       For DOJ Plaintiffs:      Kenneth M. Dintzer
12                              U.S. DEPARTMENT OF JUSTICE
                                1100 L Street, NW
13                              Washington, D.C.
                                (202) 307-0340
14                              Email:  Kenneth.dintzer2@usdoj.gov
                                David E. Dahlquist
15                              U.S. Department of Justice
                                209 South LaSalle Street
16                              Suite 600
                                Chicago, IL  60604
17                              (202) 805-8563
                                Email:  David.dahlquist@usdoj.gov
18     For Plaintiff
         States:               Jonathan Bruce Sallet
19                              COLORADO DEPARTMENT OF LAW
                                Consumer Protection Section
20                              Ralph L. Carr Colorado Judicial Center
                                1300 Broadway, Seventh Floor
21                              Denver, CO 80203
                                (720) 508-6000
22                              Email:  Jon.sallet@coag.gov
                                William J. Cavanaugh, Jr.
23                              Patterson Belknap Webb & Tyler LLP
                                1133 Avenue of the Americas
24                              Suite 2200
                                New York, NY 10036
25                              (212) 335-2793
                                Email:  Wfcavanaugh@pbwt.com
```

```
1    For Defendant Google:    John E. Schmidtlein
                              Colette Connor
2                            WILLIAMS & CONNOLLY LLP
                             680 Maine Avenue SW
3                            Washington, D.C. 20024
                             (202) 434-5000
4                            Email:  Jschmidtlein@wc.com
                             Email:  Cconnor@wc.com
5

6
     Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
7                            Official Court Reporter
                             United States Courthouse, Room 6523
8                            333 Constitution Avenue, NW
                             Washington, DC  20001
9                            202-354-3267
                                  *   *   *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *
```

2                THE COURT:  All right.  Mr. Dahlquist, just give me a

3      moment.

4                MR. DAHLQUIST:  No problem.

5                (Pause.)

6                THE COURT:  Okay.  Whenever you're ready.

7                MR. DAHLQUIST:  Thank you, Your Honor.

8                Your Honor, for the final session of the search ads

9      topic, I was designated to talk about procompetitive

10     justifications.  As we already explained a little bit, these

11     are not true procompetitive justifications to the contract.

12     These are -- we interpret these to be a little bit more

13     explanations for the advertiser harm for the price increases.

14     They were organizing this bucket for convenience, as well as

15     serving Google's briefing, this is the bucket they put them in

16     as well.

17                We are -- intend to talk about three.  They

18     identified three:  One, quality-adjusted pricing, which is a

19     topic we've been touching on a lot.  Two, match-type expansion.

20     And, three, the SQR reports are the three topics I was going to

21     cover here, and those are the search query reports.

22                We can go to the next slide.

23                I'm repeating a slide from Mr. Dintzer's presentation

24     yesterday which is more focused on actual procompetitive

25     justifications than these, but I think the analysis is the

1    same, that Google has the burden to bring forward evidence and

2    to prove any of these justifications, explanations or

3    alternative explanations for the price increases.  It's their

4    burden, we believe, under *Microsoft* to show and specifically

5    substantiate its claims.

6            Now, I know we've had lots of discussions about where

7    does quality-adjusted pricing -- and that's the first topic --

8    how does it fit in.  I guess I give the following couple

9    prefatory comments.  First, that under *American Tobacco*,

10   pricing, the power to raise prices equals monopoly power, full

11   stop.  And so, you know, we don't even have to show that they

12   did increase prices, but we think we did.  We showed that

13   Google then did testing to show proof to themselves that they

14   could implement price increases.

15           Third, they actually went forward and implemented

16   those price increases.  So while you could stop the analysis,

17   the first step, do they have power over pricing?  Do they have

18   monopoly power?  Answer:  Yes.  The evidence then showed they

19   exercised that monopoly power, and that's where this full

20   analysis could stop.  You maybe don't even have to get to the

21   question of quality-adjusted pricing, but it's there.

22           And I think the Court is understandably struggling or

23   asking me the question, what do I do with it where there's a

24   mixed record, perhaps, where there's some evidence of some

25   quality and some evidence of price increases?  We think the

1    price increase evidence trumps it, certainly, but --

2            THE COURT:  Mr. Dahlquist, you just said -- you

3    raised the question, asked earlier, which is in terms of the

4    market power and establishing monopoly power, based upon the

5    mere ability to raise price, do you think that your burden is

6    to just show the final price has increased or that a

7    noncompetitive price is something that they could impose?

8            In other words, the power -- it's not just the power

9    to price increase, but the question is to noncompetitively

10   price increase.  I suppose it's tied in a little built with

11   quality-adjusted price.

12           MR. DAHLQUIST:  I think it's maybe a flavor of it,

13   but maybe a little bit different.  I guess I would answer it

14   under *American Tobacco*, under *Brown Shoe*, it is -- so let me

15   take a step back.

16           The answer to the question is no.  I think that we

17   don't have to prove that it is a super competitive price.  We

18   don't have to prove that what -- the monopoly, that they

19   exercise that monopoly power -- I think that's reading from

20   *American Tobacco* -- just that they had it.  And to hark back to

21   IQVIA or other context in a merger context where we're trying

22   to predict the future, anticipate what will happen in the real

23   world.  We have real world evidence, and that way might hark

24   back more like *Staples* where they had pricing data.  They had

25   pricing information.

1          Here we have pricing data.  We have pricing

2    information.  We can show -- we don't have to put together a

3    really fancy econometric model with a whole bunch of data in

4    order to figure out what might happen or predict what might

5    happen.  We know what happened.  That's -- that is

6    Mr. Dischler's statement.  That is the pricing experiments that

7    they had.  That proved the market power.  And not only that, it

8    proved that they exercised that monopoly power.  That's enough.

9          I don't know if that fully answers Your Honor's

10   question.

11          THE COURT:  Bear with me for a moment.

12          MR. DAHLQUIST:  We can certainly come back to that.

13          THE COURT:  I'm sorry?

14          MR. DAHLQUIST:  We can certainly come back to that.

15          THE COURT:  Just let me take a quick look at

16   something.

17          MR. DAHLQUIST:  Sure.

18          THE COURT:  I mean, here's what *Microsoft* said in

19   terms of having to show market power.  Supreme Court -- this is

20   at page 51.  Supreme Court defines monopoly power as the power

21   to control prices or exclude competition.  More precisely, a

22   firm is a monopolist if it can profitably raise prices

23   substantially above the competitive level.

24          So, it's not just have prices gone up?  You need to

25   make a demonstration that prices have gone up -- well, sorry.

1    The ability to raise prices substantially above the

2    anticompetitive --

3              MR. DAHLQUIST:  Certainly.  And I think the case law

4    Section 7, Section 2 have adopted that.  What does above a

5    competitive level say?  And they generally accept 5 percent,

6    right?  That's the SSNIP test.  That is the test that's done.

7    A hypothetical monopolist test would ask that question.

8              So I think that's why, if Your Honor recalls, with

9    this testimony of Mr. Dischler, when I asked:  Yes, 5 percent?

10   Yes, it's profitable.  Yes, they may be selling less ads, but

11   it's still profitable.  And I asked Your Honor to take judicial

12   recognition, or add as an admission, that was the importance of

13   it.  That was the SSNIP test.  That is a real test that just

14   occurred.

15             So I think it ties directly into *Microsoft*.  It's

16   exactly that point.  A super competitive price increase there

17   was 5 percent, which they had, they had monopoly power, and

18   that can end the analysis.

19             But I appreciate that Your Honor is looking at a

20   record with at least some evidence related to quality and some

21   evidence related to value.  And just because a launch, a tuning

22   knob, may have had an increase of value does not mean that

23   monopoly power doesn't exist.  Right?  They might point to a

24   couple; this one increased in value, this one increased in

25   value.

1          What we have is perhaps that, but we also have

2     evidence where they increased prices without a corresponding

3     incremental in value.  That's monopoly power.  That is what --

4     how Google has exercised that monopoly power.

5          THE COURT:  Sorry to interrupt you one more time.

6     Just so I understand the analytical framework here -- and some

7     of this is probably by virtue of how I structured the day.  But

8     in terms of procompetitive benefits, what we really ought to be

9     asking -- and I'm not suggesting that you can't go along with

10    the presentation you plan to make -- is what are the

11    procompetitive justifications for the exclusive dealing to the

12    ad market?  Right?  That's the question that I should be

13    asking.  That's the burden Google bears, is how is the ad

14    market more procompetitive by virtue of these agreements?

15         MR. DAHLQUIST:  Right.  I agree.

16         THE COURT:  What you're about to try to answer or go

17    through doesn't really go to that, it's just explanations for

18    what -- Google's explanations for what you claim are

19    anticompetitive harms.

20         MR. DAHLQUIST:  I think Your Honor is correct.

21         THE COURT:  That even before the procompetitive

22    justifications that they bear the burden for, you're not trying

23    to pre-but them, so to speak.

24         MR. DAHLQUIST:  Correct, Your Honor.  Yesterday we

25    went through what were the procompetitive justifications in the

1    general search market.  Mr. Dintzer explained why those -- why

2    they carried their burden on those.

3          Here, as I said, are not pure procompetitive

4    justifications.  There's some justifications, if you will, I

5    guess, to use that word broadly.  What I would like to go

6    through is just why we think those fail.

7          I think Google still has the same burden.  But, I

8    agree with you, it doesn't pigeonhole into the effects analysis

9    or the conduct analysis precisely in that way.

10          THE COURT:  Okay.

11          MR. DAHLQUIST:  So let me take one final example.

12    Your Honor gave an example before about cars, an increase in

13    quality and an increased price.  But I think that also,

14    thinking about it over lunch, made an assumption in that an

15    increase in quality necessitates an increase in price.  In

16    fact, it doesn't.

17          Let's look at the examples of the television market.

18    TVs.  The TV that I have in my home today is far better than

19    the TV that I had ten, fifteen, five years, certainly five

20    years ago, and I paid a lot less for it.  We've improved the

21    quality, the product.  We no longer have diode TVs or tube TVs.

22    We're now LCD TVs.  That is a quality improvement, absolutely,

23    with a corresponding price decrease.  Because there's

24    competition in that marketplace, the price of that television

25    we're paying is significantly lower than we paid for it ten

1    years ago.

2            So to accept Google's idea that every value

3    proposition has a corresponding increase in price is flawed.  I

4    think we need to look at is what would competition bring?

5    Competition will bring more value, more quality, yes, as well

6    as lower prices.

7            So let's get into what did the evidence show at

8    trial?  And why our piece -- or, our argument is that Google's

9    prices are not based on quality and not based on competition.

10   But Google itself couldn't measure value, doesn't know how to

11   measure value.  Mr. Schmidtlein has basically said as much.

12   They have a hard time figuring out how much value is there.

13   What is this quality?

14           And if you ask me what the difference between quality

15   and value is in the Google documents, I don't know, perfectly

16   honest, Your Honor.  They use the same term a little bit

17   interchangeably.  You see one, you see another.

18           But here we do not have value.  And they state:

19   After years of reserve work, we still aren't able to say what

20   an advertiser's value is.  And this is in 2016.

21           2019, they're doing more of these questions.  A lot

22   of smart people are looking at these questions, and they ask

23   themselves, if we had good estimates of the following two

24   values, we could simplify the system and call it a day.

25   Blindness -- which is a completely different topic we don't

1    have to dive down -- but, advertiser value per click.  They

2    said we've been unsuccessful at actually measuring it, figuring

3    out what it is, or even coming up with a good estimate of it.

4            Instead -- we can go to the next slide.

5            Instead, we have Dr. Juda, who is writing -- and this

6    is in his 2018 memo -- where he's writing to his boss to boast

7    about all the great things he's done and ask for a raise, he

8    admits that we're likely showing more low quality ads that we

9    ought not be showing.

10           Now, this is a clear example of where Google has an

11   option to improve quality, and they choose revenue instead.  He

12   states, "There's more juice in getting prices right, or higher,

13   than in improving the allocation of ads."

14           And that's what the evidence shows.  The direct

15   evidence shows that they chose revenue, through revenue

16   launches, pricing, format pricing, squashing rGSP.  This is how

17   a monopolist talks.  There's more juice in getting prices

18   right, higher than in improving the allocation of our ads.

19           THE COURT:  Mr. Dahlquist, could I ask you a

20   question?  That doesn't relate to what's on the screen.  I

21   should have asked it earlier in the day.

22           MR. DAHLQUIST:  Sure.

23           THE COURT:  You mentioned Google's profit margin.

24   There's no evidence in the case presented comparing Google's

25   profit margin to other firms.  So what is it about the profit

1    margin that you think supports the inference that Google is a

2    monopolist?  Is it the consistency of the profit margin over

3    the course of years?  Or is it something else?

4            MR. DAHLQUIST:  Sure.  And we can go back to that

5    slide where we talked --

6            THE COURT:  You don't have to go back.

7            MR. DAHLQUIST:  That's okay.  The short answer is

8    yes, you're right.  It is the consistency of it.  And I guess

9    I'd say a couple things.  The fact is that Google has -- I

10   think, as the witnesses testified, about astronomical revenue,

11   or like the -- like the world has never seen before.  It's that

12   revenue number, but it's the corresponding profit number, the

13   profit margin number, those numbers have been consistent over

14   time.

15           And how it compares to others in the industry, I

16   don't know.  There's not a lot of evidence on that, as to

17   how -- what the record is.  And I'm sure that's what Google's

18   argument is:  Well, everybody makes a lot of money.

19           But that's not the question.  The question is what

20   would competition do?  They have a really high profit margin,

21   but if they had competition, that profit margin might be a lot

22   smaller, might be a lot less.  I think this is indirect

23   evidence.  In short, Your Honor, that's what it is.  If there's

24   direct evidence, and that's indirect evidence, the same as our

25   market shares, all that is indirect evidence of monopoly power.

1          THE COURT:  Is it sort of equivalent to -- equivalent

2     to, sort of, the durability of the market share?

3          MR. DAHLQUIST:  Yes, Your Honor.  Yes.  I would say

4     it's the same point.  The durability of high profit margins,

5     durability of high market share, durability of high revenue

6     numbers, those are all indirect evidence under the case law

7     that we can look at.

8          THE COURT:  Right.  You would say -- your argument is

9     that because you don't see the numbers fluctuating in any

10     really meaningful sense, it's indicative of a fairly stable

11     marketplace in which competition has not cut into Google's

12     profit margins.

13          MR. DAHLQUIST:  Exactly.  Correct, Your Honor.  And I

14     think, to put extra emphasis on the fact, it's that plus --

15     this is a market -- remarking to your comments yesterday --

16     where there's billions of dollars of revenue to be made and

17     nobody is entering.  Nobody is entering to challenge those

18     profit margins or challenge those revenue numbers.

19          THE COURT:  What do you make of -- and I know I'm

20     getting you off course here a little bit -- but is there

21     anything to be made of the fact that Google's revenues have

22     gone up, the component parts of search have -- with one

23     exception -- more or less stayed the same.  There's some

24     variation, couple have doubled, but not in big numbers.

25          But the TAC number has increased dramatically.

1      That's when you're sort of looking at how the margin ends up

2      being defined, it's because -- largely because of the TAC

3      number.  That's the biggest component of the cost.

4                  MR. DAHLQUIST:  Right.

5                  THE COURT:  What, if anything, is to be made of that?

6                  MR. DAHLQUIST:  I would say a couple things, and

7      that's -- if we can go to Slide 26, that has those numbers in

8      it.  I think a couple things I'd say.  First, that you're

9      right, the TAC number is the single largest cost, if you will,

10     that Google has to take against their revenue numbers.  So I

11     would say that in the first instance.

12                 And I'm sorry, Your Honor's question --

13                 THE COURT:  I'm just curious whether there's anything

14     to be made of the fact?  And it may just be, you know, look,

15     it's simply a reflection of greater volumes of search, right?

16     More search, more payment of TAC.  And I'm wondering if there's

17     anything more to it than that?  And I'm not trying to trick

18     you, I'm just asking a question.

19                 MR. DAHLQUIST:  I think -- no, I think I'd say that

20     despite -- that the margins stayed high despite these costs.

21     And those costs continue to go up and their margins still stay

22     up.  If you look at the TAC costs across time, have increased

23     and their margins are generally flat.  High, extremely high and

24     flat.

25                 And I know -- I guess the one other point I would

1    make, that we asked Dr. Raghavan about when this slide was on

2    the screen, is Google keeps talking about all the innovation

3    and investment they make.  They pay more in TAC than they do in

4    research and development.  So that, I think, is another piece

5    of evidence that can be taken from the TAC number.

6              THE COURT:  Okay.  Thank you.  Sorry to take you off

7    course.

8              MR. DAHLQUIST:  I think that sort of closed out where

9    I wanted to go on quality adjusted pricing.

10              I guess I can finalize, Slide 108.

11              This would be defendant's burden, if they were going

12    to put this forward.  And they didn't do an econometric

13    analysis or study.  So I think if the Court's question is what

14    should I make of it?  If there was analysis to be done, this

15    was to be proven, it's defendant's burden to do it and they

16    simply didn't put forward on that burden.

17              The second topic in our quasi justifications for

18    price increases would be keyword matching.  Keyword matching is

19    a process that applies to text ads.  It's something that they

20    launched, I guess -- let me take a step back.  Google's

21    argument is that this is added value for advertisers.  When

22    they first launched some of this process in 2012, they had

23    exact match and phrase match.  That's when they started to

24    broaden out from just the exact match.  And at that time in

25    2012, advertisers could opt out of the matching process.  Your

1    Honor made reference to this earlier, about 30 percent of

2    customers wanted to opt out of it.  And over time they've,

3    again, changed it so that advertisers don't have that option

4    anymore.  And this slide I think is just helpful to show as you

5    broaden out in these options within the text match, from exact

6    match to broad match -- Google's argument is on the vertical

7    axis -- that every broadening out gives you more impressions,

8    you get to enter more auctions, more users and queriers can see

9    your ad.

10        But they ignore the horizontal axis, which is in each

11    of those your control goes down.  Every time you're broadening

12    out, the advertiser ability to control what auctions you go

13    into is decreasing and diminishing.

14        THE COURT:  Mr. Schmidtlein, when he and I were

15    talking about this prior to the break, and I wasn't terribly

16    precise in some of my questions, but I took from what his

17    response was to say -- I understood him to say that this match

18    reduction was done to benefit small and medium sized companies,

19    because it then enabled them to join more auctions and,

20    therefore, win more auctions.  Do you agree with that?  Do you

21    have a different view?  If so, what's the evidence of that?

22        MR. DAHLQUIST:  Perhaps this is where the line

23    between value and market power may cross.  And that's Google's

24    explanation, is that this is adding a value.  But if it is

25    valuable then why force advertisers to do it?  Why not give

1    them the option to take out?  Why -- remove that option.  When

2    it was first launched in 2012, and now when the latest version

3    was launched in 2018, advertisers can no longer opt out of it.

4    If that is really your reason, because it's adding so much

5    value, then, one, why do 30 percent of your customers not want

6    to be part of it?  And, two, why are you forcing them into it?

7    And the answer to that is revenue.  The answer to that is more

8    money.  And I think that's what the record has shown here.

9          As Professor Jerath explained in a colloquy with the

10   Court on this very question, it's easier for advertisers to

11   enter auctions, yes, but it's also more difficult for them to

12   not enter, and that's the problem.  They're being pushed into

13   these auctions.  And I think the record is -- Mr. Schmidtlein

14   can correct me if I'm wrong -- but the record is undisputed

15   that thicker auctions create higher prices.  That by entering

16   these auctions prices are going up.  Mr. Dischler said that,

17   Mr. Lowcock said that, Dr. Israel said that, that on average a

18   thicker auction means that they lead to higher prices.  And

19   why?

20         Google provided us a very helpful example in one of

21   their documents.  Let me go back to this real quick.

22         Can we go back to Side 15, please.

23         This is directly from Google's launch of semantic

24   matching, at UPX1117.  They show an example here.  This is

25   their example of increased auction pressure.  The query --

1    they're not allowing us to show what the query is, but Your

2    Honor can see it.  The query is there, baseline.  That is the

3    non-expanded, that is the exact match, if you will, price that

4    the auction winner got, 23 cents for winning that auction.

5         Now they do a keyword expansion.  They expand the

6    number of keywords that apply to this auction.  That makes the

7    auction thicker, additional competition comes into this

8    auction.  And look at that price.  The same advertiser, with

9    the same ad, who paid 23 cents under the exact match is now

10   paying $5.81 under this expanded match program, with the

11   inability to opt out.

12        This is revenue driving, this is not quality

13   increasing.  Maybe it is, but this is increasing quality --

14   this is increasing revenue to Google.  If it was really a

15   quality increase, every advertiser would want to jump into

16   this.  But as it stands, the record shows that they want to opt

17   out of this.  Maybe some want to be in, but a significant

18   portion do not.

19        Google was very clear as to what this impact does.

20        THE COURT:  Can I ask, is there any record evidence

21   about how firms, advertisers determine what the negative

22   keywords are?  In other words, when you sort of expand the

23   match system to include phrase match, broad match, et cetera,

24   it's adding words.  So say I'm an advertiser who is in that 30

25   percent and I want to be put in the same position I was

 1    previously.  I take it there's no sort of transparency as to

 2    what keywords I would add as negative keywords in order to

 3    ensure that I was back to where I was previously.

 4              MR. DAHLQUIST:  I think the short answer is you can

 5    try, but that --

 6              THE COURT:  In other words, the advertiser doesn't

 7    know what the broadened terms are?

 8              MR. DAHLQUIST:  I would say correct.  The one piece

 9    of evidence that might lead them to are the SQR reports, the

10    search query reports, that might give them some information.

11    And that's the next topic that we'll hit.  But in short, yeah,

12    you have to reverse engineer it.  You have to reverse engineer

13    and figure it out.

14              Can we go to the next slide?

15              And this is, I think, what we asked Mr. Dischler

16    about, was how do you opt out?  He said, well, there is no

17    ability to opt out, but you can do it with negative keywords.

18    Those negative keywords then, and Professor Jerath and others

19    have testified to this, every advertiser has to sit down and

20    think, What are the thousands of permutations of semantic

21    matches that I need to put in as a negative keyword, come up

22    with all of these phrases that might trigger my ad and

23    affirmatively put them into the system to opt out.  That's a

24    lot of effort, time.  Maybe the largest advertisers can do it,

25    but certainly not smallest advertisers.  And it's imperfect.

528

1    It's still imperfect.

2            You don't know where -- if you opt out, you say,

3    Nope, don't enter me into the semantic match, don't enter me

4    into the broader auction, you don't have to go through that

5    process.

6            And this is exactly why -- next slide, please.

7            As I previewed in the opening, this advertiser,

8    Angie, in response to the same launch, the same launch where

9    they were expanding matching, they looked at it and said it's

10   like being in the ring with a sumo wrestler with the lights

11   turned off.  They now had to do exactly what Your Honor is

12   saying, sit down and think about all these negative keywords.

13   We just have to keep our heads down and work very hard to

14   innovate our way to the next level.

15           They didn't say let's take our ad spend and go over

16   to Facebook.  They said we're here, we're stuck here, we have

17   to keep working with Google in a ring with the lights turned

18   off.

19           So that, I think, speaks exactly to Your Honor's

20   question and how difficult it is for many advertisers.  But it

21   correlates directly to my last topic -- if we can advance one

22   more -- the search query reports, which is information that

23   Google has provided to its advertisers since the beginning and

24   gives them information about where their ad spend is going.

25   But in 2020, Google changed course.

1          Can we go to the next slide, please.

2          They instituted a massive decrease in core

3   visibility.  And this is a third-party report.  This is from an

4   ad agency called Tinuiti.  And they identify that Google

5   reduced the information in the query report, limiting the

6   visibility into specific queries.  They describe it as a

7   massive decrease.  And the chart there just shows the before

8   and after.

9          Blue line is the information that they made available

10  before.  Purple line is after.  And about a 20 percent

11  reduction in information that was available.

12          THE COURT:  What's the theory on how that benefits

13  Google?

14          MR. DAHLQUIST:  It keeps it a black box, Your Honor.

15  It keeps advertisers guessing.  It keeps advertisers like Angie

16  having to fight their way in the dark to figure out how to get

17  out of these actions.  It allows Google to make auctions

18  thicker and increase that price.  It gives them more revenue,

19  in short.

20          THE COURT:  Does an SQR report -- I know that one was

21  put into evidence, but does it provide information just about

22  the terms that you have sought -- that you've put in for your

23  keywords, or would it also show, for example, when you've won

24  an auction because you've been involved in an expanded keyword

25  match that maybe you otherwise didn't want to be a part of?

1          MR. DAHLQUIST:  Your Honor, my understanding and

2    based on looking at the search query reports, it gives you

3    information where your dollars were spent, what auctions you

4    won, what auctions you were entered into.  So I think, yes, you

5    would be able to see I won in an auction on a keyword I

6    actually have zero interest in, for whatever reason.  That's

7    the advertiser's choice.

8          And if we could go to Slide 125.

9          Professor Jerath helps to explain this in saying that

10   the advertisers are not even told what queries they're buying,

11   and it's like going into a supermarket, getting the bill, and

12   not even knowing what you bought.  And that, I think, is the

13   real statement of advertiser harm here.  Advertiser buying a

14   product, they don't even know what they bought.

15         THE COURT:  But this is just in reference to the sort

16   of truncated report.

17         MR. DAHLQUIST:  Correct, Your Honor.  Correct.

18   Correct.

19         The final point is that Google's explanation for why

20   they truncated the information in this report is based on

21   privacy.

22         If we can go to 122, please.

23         In the record are emails from Bank of America stating

24   that this information has always been anonymized and

25   aggregated, so they did not agree with the explanation and

 1    thought it was incorrect.

 2              Next Slide, 123.

 3              Amazon, Google's largest advertiser, also agreed and

 4    said that nobody had ever talked to them before about a concern

 5    about the search query report having privacy implications.

 6    Evidence, again, Your Honor, that we think shows that Google

 7    did not meet their burden in bringing forward this information.

 8              And I know my time is up on this.  Happy to answer

 9    any additional questions.

10              THE COURT:  Thank you, Mr. Dahlquist.

11              MR. DAHLQUIST:  Thank you, Your Honor.

12              THE COURT:  Mr. Cavanaugh.

13              MR. CAVANAUGH:  Your Honor, just one basic point to

14    make here:  We talked yesterday about the -- about Google's

15    quality advantage is essentially the fruit of the poisonous

16    tree.  That same concept applies to ads.  If you go to Slide 3,

17    I think there's -- I think these are my Day One slides.  But

18    the ones I've handed up are the ones.

19              Google makes the claim that they link their highest

20    quality, most popular search engine, with the highest general

21    search engine advertiser's monetization.  They link the two

22    together.  And on Slide 4, this again, in their posttrial

23    briefs, monetization comes from the search side of the market.

24    There's no dispute about that.

25              Now, when it comes to where is this quality coming

1    from?  And how does it play into ads?  You go to slide 5.

2    Mr. Giannandrea said it helps with ad targeting, knowing which

3    ads people want and which ones they click on is essential.

4    It's the ability to enhance the relevance.  And that comes from

5    the more data you have, the better you can be at this.  If you

6    go to -- Mr. Parakhin --

7            THE COURT:  Is that because Mr. Dahlquist's

8    equation -- Google's equation in terms how it calculates rank

9    for ads.  The more user side data, in your view, would provide

10    a more informed predicted click-through-rate score because

11    you've got information about number of clicks, how long

12    somebody has been on the website, come back, all of that

13    information that a rival would not have.

14            MR. CAVANAUGH:  Right.  And Mr. Parakhin made this

15    point:  If you have more data and more advertisers, that means

16    you can provide higher value.  You could serve more relevant

17    ads, so advertisers start favoring you, you get more revenue,

18    you can then reinvest that revenue.

19            So all of this comes back to what we were talking

20    about yesterday, Your Honor.  And it just -- the only point I

21    wanted to make is:  What we see on the user side, and the

22    quality arguments on the user side, essentially also apply on

23    the ad side.  And it all goes back to the exclusionary conduct.

24    And so it's not a procompetitive justification.

25            Your Honor said, you know, how is the exclusionary

1    conduct making the ad market more competitive?  It's not.  It's

2    benefitting Google, but it's not benefitting competition in the

3    market.  It's actually harming competition.

4         Thank you, Your Honor.

5         THE COURT:  Mr. Sallet, before you have a seat, I

6    just want to ask one thing in terms of in terms of establishing

7    your burden of establishing monopoly power, market power, we've

8    talked a lot today about pricing.  Is it essential to even

9    reach that conclusion and, instead, what was done yesterday,

10   or -- the analysis that we spent a lot of time yesterday on,

11   which is:  This is your market share and here are the barriers

12   in entry, to becoming somebody who can do ads online.  You

13   know, who can sort of deliver ads like Google does.  Because as

14   you said, the same barrier entries -- well it's not exactly

15   true.  Some of the same barriers of entry would apply that we

16   discussed yesterday.  Certainly for the general search markets.

17        MR. CAVANAUGH:  I think that's true.  And you couple

18   it with -- you know, our monopoly power argument is also based

19   on the testimony from the advertisers who said we don't have a

20   choice.  Your costs are going up at Google, but we don't have

21   an alternative.  That's further evidence of monopoly power.

22        THE COURT:  Would you agree with me that the barriers

23   of entry to the general search market would be lower than to

24   the general search ads or the general search text markets?

25        MR. CAVANAUGH:  I --

```
 1                    THE COURT:  And here's what I mean --
 2                    MR. CAVANAUGH:  I don't think I agree with that, Your
 3          Honor, but --
 4                    THE COURT:  Say, I am -- let's leave aside nascent
 5          competitors for a moment.  Let's talk about established
 6          companies with websites and retail --
 7                    MR. CAVANAUGH:  Sure.
 8                    THE COURT:  Walmart, for example, can become a search
 9          advertiser.
10                    MR. CAVANAUGH:  Right.
11                    THE COURT:  Target can become a search advertiser.
12          What they've got to do is build on top of their website the
13          capacity to track ads and sort of produce them in response to a
14          search.  It seems to me that that market, for that reason, has
15          lower barriers to entry than a market in which you would have
16          to build a general search engine first to get into it.
17                    MR. CAVANAUGH:  Well, they would face all the
18          challenges that SVPs have in that they're in the narrow
19          segment.  Walmart isn't going to be getting ads from Target,
20          they're not going to be getting ads from Amazon, they're not
21          going to be getting ads from Expedia and other places.
22                    THE COURT:  But they would be getting ads just as
23          Amazon does, from the, you know, vast trove of retail products
24          that they sell for companies that would like to have their
25          products put to the stop of a search result, just as Amazon
```

1    does.

2            MR. CAVANAUGH:  That's a fair point, Your Honor.  And

3    the barriers may be somewhat less daunting.  But I think the

4    SVPs is still have the limitation that they're fundamentally

5    different from a general search engine in that they're working

6    in a narrower space, with a narrow inventory, and a narrower

7    purpose.  And they're not creating -- their not -- by virtue of

8    that, they're not getting into the general search market.  To

9    get into the general search market they have to fundamentally

10   change their model and face all of the barriers Your Honor was

11   talking about yesterday.

12           They're not scraping the internet, they're not doing

13   the things that general search engines do.  And to take that

14   on, yes, Walmart is certainly, you know, a large sophisticated

15   company.  But they would be fundamentally changing their model.

16           THE COURT:  Okay.  Thank you.

17           MR. CAVANAUGH:  Thank you.

18           THE COURT:  Mr. Schmidtlein.

19           MR. SCHMIDTLEIN:  All right.  Your Honor, I'm going

20   to kind of jump around here a little bit to be responsive to

21   some of the things that have been raised, and then I will try

22   to get to some of the parts -- or, points that we have here on

23   our slides.  And if we don't, you obviously have them to

24   consult on your own.

25           On this question of profit margins that you asked

1    about and Mr. Dahlquist put up a slide on.  And it's

2    interesting, he sort of notes not a significant deviation of

3    margin over the years on that slide that he's shown you.  But

4    that's during sort of this same time period that they wanted

5    you to focus on the cost-per-click time period.

6          In other words, they would have you believe that over

7    that time period Google was raising prices by substantial

8    amounts.  If Google was really able to rise prices like that in

9    substantial amounts, you would also expect the margins to be

10   going up by substantial amounts.  And you don't see that.  So

11   that should, sort of -- I think that should make you pause and

12   sort of question that.

13         The second thing I'll note is they had an expert,

14   financial expert and they didn't call her.  You may remember we

15   had a *Daubert* motion on this expert.  And I think we do have in

16   the record, in various places, I think our responsive findings

17   of fact, paragraph 41, the profit margins for lots of other

18   large competitive platforms.  Advertising platforms are in

19   similar sort of ranges.

20         So I don't think that you can deduce anything either

21   with respect to monopoly power or anticompetitive effects or

22   anything else like that with respect to profit margins by

23   themselves.

24         Turning to this question of transparency.  Can we put

25   up Slide 14.  This is actually from the prior deck.  And again,

537

1    this is some of the testimony from Google's witnesses about the

2    reasons why they developed the keyword matching types, the fact

3    that it was to make it easier for advertisers to match all of

4    the searchs.  And in some of the documents you'll see that I

5    think we've cited what Google is trying to do is to make sure

6    that advertisers who are looking for a certain return on

7    investment on a particular keyword, are able to make that

8    return on investment across a variety of keywords.

9            In other words, at the end of the day the advertiser

10   controls how much they spend.  Typically the way they do this

11   is they sit down and having made, you know, through whatever

12   their calculations are on ROI channels, all the things you've

13   heard, they then sit down and say, okay, I'm going to spend X

14   on Google.  And how do I do that, or what keywords do I want to

15   look at?  And what I think Google is trying to do with this

16   semantic match program, particularly for smaller and medium-

17   size advertisers, is to get them exposure to a broader variety

18   of keywords that will actually get them to reach their ROI

19   goals.  They get to set all of these goals.  It's not as if

20   Google has now required them to spend more money across these.

21   So, that I think is part of the explanation.

22            THE COURT:  So what was Google's -- is there a reason

23   offered for why advertisers could no longer opt out, when they

24   could before?

25            MR. SCHMIDTLEIN:  Again, I think the testimony was

1   here from Mr. Dischler, simplifying.  In other words, not

2   having 12 different flavors or options or things like that was

3   done to simplify based on competition with Facebook because

4   Facebook had a very, very simplistic UI and we were actually

5   looking to try to get our advertisers that consistent ROI

6   across lots of different keywords that we thought were

7   equivalent.  In other words, that you would see and we would be

8   able to deliver to these advertisers a broader audience of

9   people.

10          In other words, if you and I are searching for very,

11  very similar types of information, that would suggest we're in

12  the same target audience, you know, we have the same intent.

13  The goal is let's get these advertisers as many of those people

14  as possible because Facebook is able to deliver something

15  similar.  I think that's what the testimony and that's what the

16  focus was and the most sophisticated advertisers can do the

17  negative keywords and can, you know, figure these things out.

18          THE COURT:  I think you've touched on what I was

19  going to ask, what the plaintiffs' response would be, is this

20  notion of simplifying is at least counterintuitive when it

21  comes to that 30 percent of advertisers who were opting out.

22  In other words, seems like it would be pretty simple to click

23  on something to opt out.  But now those same advertisers, in

24  order to minimize or not expose themselves to greater

25  participation at auctions, if that's what they want to do, have

 1    to now come up with a bunch of negative keywords to achieve the

 2    same result.  It seems like a much more complicated process.

 3            MR. SCHMIDTLEIN:  I think there are trade-offs being

 4    made here.  I think for -- to help deliver a better experience

 5    and not have our smaller advertisers, we are redesigning the

 6    products in a way that we think is beneficial for that.  We

 7    don't think it's that onerous for the other folks to do what

 8    they need to do.  And again, the notion here was Google has

 9    made determinations by looking at -- I mean, they're not

10    semantic matching.  There's no testimony in the case that

11    Google semantic matching --

12            THE COURT:  Car with horse.

13            MR. SCHMIDTLEIN:  Correct.  We're not jamming people

14    into auctions.

15            THE COURT:  You weren't sort of putting disparate

16    concepts or words together.

17            MR. SCHMIDTLEIN:  We weren't trying.  Completely

18    unrelated keywords.  There's no allegation or suggestion that

19    the semantic matching was not, in fact, trying to get at the

20    broader collection of keywords that were delivering on the same

21    latent intent and acting as a quality improvement.  And I think

22    Mr. Dischler and Mr. Juda and others at the company who, over

23    the years, deal with advertisers would probably tell you, if

24    they were asked, every advertiser has their own ideas and, you

25    know what I mean, they're all unique.  Some people want this

1    much.  Some people want this much.  (Indicating.)  Some people

2    want in between.  If we tried to cater to every last one of

3    them, we would be absolutely paralyzed.  We couldn't possibly

4    do that.  So we're trying to do this.

5           And, again, I think what they found was Facebook had

6    found some very, very simple, easy to use -- and for smaller

7    advertisers, that's really, really important to help drive

8    that, and that's what they were trying to optimize for.  But

9    absolutely there are trade-offs.  And, again, I don't think --

10   in the absence of some evidence that would suggest that the

11   semantic matching was somehow, you know, a bad experience in

12   the sense of we're just -- wildly unrelated queries and we're

13   forcing people into auctions that had nothing to do with what

14   they wanted, I think -- I don't think Your Honor is in a

15   position to make a finding that this was net-net, a quality

16   reducing event.

17          THE COURT:  In your view, this is a product design

18   issue?

19          MR. SCHMIDTLEIN:  Exactly.  In terms of search query

20   reports.  Again, I think this is -- this is another one of

21   these complicated topics that -- this comes up, again, I think,

22   in this -- I think the documents and the issues that have been

23   flagged here by the plaintiffs arise roughly in, I think, the

24   2020 time period, a little bit later.  This is not something

25   that's sort of early, early days.  We've had these search

1   inquiry reports for many, many years, and Google provides --

2   historically, has tried to provide lots and lots of

3   information.  I mean, reams of information to the advertisers.

4        But over time -- and this is where I think the

5   plaintiffs get it a little bit -- we get it coming and going.

6   They say privacy, we need to be careful about privacy.  Your

7   Honor heard some testimony about changes Apple made to privacy

8   and the impact that had on Facebook.  There's definitely some

9   tension between advertisers who want all the information, and

10  more, that you can provide about individuals on your platform

11  and sort of trying to strike the balance -- the right balance

12  between that and privacy.

13       And what you see here in this time period, I think,

14  is a heightened awareness and a heightened sense of

15  reevaluation of, you know, where do we fit into how much do we

16  give advertisers to help them versus how much do we protect

17  privacy?  And I think what the testimony in the case is, is

18  there's no evidence that Google does this radically differently

19  than other competing platforms.

20       THE COURT:  Can you help me understand the privacy

21  rationale?  I guess maybe, in part, because I've never seen

22  what a before-and-after SQR report looks like.

23       MR. SCHMIDTLEIN:  That's a good point.  There's no

24  evidence that this has somehow -- they've done a before-after

25  with our data to say, oh, after this prices went way up because

1    we were in the dark over what we were doing.

2            THE COURT:  What is it that is on the SQR report that

3    gives rise to a privacy concern?  I'm looking at Mr. Dischler's

4    testimony here and he talks about does not want an advertiser

5    to be able to singularly identify a user.

6            MR. SCHMIDTLEIN:  Right.

7            THE COURT:  Did the SQR reports -- how did it

8    identify users?

9            MR. SCHMIDTLEIN:  If the -- if the threshold for the

10   volume of queries gets sufficiently low, I think there is a

11   concern that they might be able to identify you individually,

12   as opposed to people more generally who share a certain -- who

13   share certain characteristics.

14           THE COURT:  What in the report -- I mean, if you

15   know, you know; if you don't, that's okay.  But what in the

16   report would say, all right, well, I actually clicked through

17   on an ad that only, you know, involved a semantic match one

18   time, or was a keyword that was only used one time.  What would

19   enable the advertiser to hone in and say it was Mehta over

20   there that decided to click through to this website.

21           MR. SCHMIDTLEIN:  It could be sort of personally

22   identifying information.  It could be family names, or it could

23   be, you know --

24           THE COURT:  On the SQR reports?

25           MR. SCHMIDTLEIN:  The SQR reports are reporting

1     queries.  So if people are typing in very personalized query

2     information, and it might be things about health-related issues

3     or other things, we're trying to mask or provide less

4     information.  Or what they tried to do in this instance, in the

5     question to Professor Jerath, we spread it out.  We sort of

6     only provide it over a 90-day period, which we think will help

7     mask some of that particular information.

8             Microsoft does it over 60 days, which we think is

9     probably a less privacy, sort of, centric.  But that's -- that

10    was the notion.  Google very much has -- has an interest in

11    providing, and they do provide a lot of tools and information.

12    You've heard about conversion tracking and various other

13    things, analytics, Google Analytics.  They provide lots and

14    lots of information because they do want the advertisers to be

15    able to understand and evaluate ROI because over time I think

16    what Google has found is -- and the reason, you know, when I

17    showed you the chart at the very, very beginning which shows

18    Google's total digital ad spend going down compared to

19    everybody else, Google's ads are -- total ads are going up

20    during that time.

21            What all of these companies have found is as they

22    have improved their technology, improved their matching,

23    they've improved the tools that allow advertisers to calculate

24    ROI.  And you're right.  I think you correctly have pointed out

25    that even in the last five years those have improved a lot, so

1    that 2015, '16, '17 documents aren't necessarily as good as

2    what we have today.

3         So what you see over this time period is Google

4    adding lots of information to advertisers.  That allows them to

5    actually move ad spend from -- I mean, historically TV, radio.

6    I mean, I think you raised a good question like buying ads on

7    television shows is, you know, sort of, that was -- that was a

8    prime place for -- all these digital advertisers are taking ads

9    away from because they're better able to predict and maybe the

10   advertisers understand the return.  So, Google has, absolutely,

11   incentives to try to help their advertisers.

12        I think this is an incident where the advertisers

13   just want more and more and more.  And there's no evidence in

14   this case that after this occurred, the advertisers were so

15   lost that they just sort of bid wildly and, you know,

16   everything went up.  There's no evidence that's what the cause

17   and effect of any of this was.

18        THE COURT:  No, it's just -- I was trying to

19   understand exactly what was being taken off the report and the

20   rationale for it and --

21        MR. SCHMIDTLEIN:  Understood.  Understood.  Let me

22   talk a little bit -- we've talked a little bit about -- and

23   Mr. Cavanaugh made a reference to scale.  They keep saying we

24   need data, we need data, we need data.  And I want to talk a

25   little bit about that.

1          Now, this is a slide, again, from the earlier deck

2    that we had shown you.  And I can -- it's Slide 18.  If you can

3    pull it up.

4          THE COURT:  Okay.  I'm with you.

5          MR. SCHMIDTLEIN:  Microsoft had designated this

6    confidential, but this is from back in 2008.  And this is a

7    statement from the Microsoft document, made by Susan Athey.

8    Back then she was Microsoft's chief economist.  Today she's the

9    Department of Justice's chief economist.  Here's what she said,

10   and you can read it:  "It absolutely doesn't support the notion

11   that somehow Microsoft didn't have enough scale or that

12   somehow, you know, scale trumps everything when it comes to

13   search advertising."

14         THE COURT:  Can I just ask -- it's already -- can

15   this be unredacted?  I was looking at this.  I'm not sure what

16   the confidentiality concerns are.

17         MR. SCHMIDTLEIN:  I agree, Your Honor, but we're in

18   this world --

19         THE COURT:  I know we didn't -- anyway.  Go ahead.

20         MR. SCHMIDTLEIN:  The next slide we have here, again,

21   the 2009 natural experiment of adding Yahoo!'s scale did not

22   improve Microsoft's RPM.  And that's, you know, revenue per

23   mil, per thousand impressions from their own documents.  We

24   added scale, but it did not grow revenue per search.

25         Microsoft has, over the years, recognized

1    consistently it has problems in ads that are unrelated to

2    scale.  Again, we've highlighted these in our briefs, but these

3    are a couple of internal documents, again, going all the way

4    back to '07, '09 about problems that Microsoft recognized it

5    had that had nothing to do with scale.

6        Now, notwithstanding that, Microsoft has grown its

7    RPM over the years.  Between 2011 and 2018, which is the

8    subject of this document, you can see how Microsoft's RPM in

9    the U.S. more than tripled.

10        Now, is that a non-monopolistic price increase?  I

11    mean, again, I think this is consistent with our view.  Over

12    this time period everybody was competing hard, everybody was

13    improving their technologies, was improving their ability to

14    match.  And just as Google's, you know, pricing was going up

15    and revenues per mil or whatever were going up, so were

16    Microsoft's.  This is what you would expect in competition.

17    This isn't a sign of lack of competition or, frankly, the sign

18    that Google has -- that Google has monopoly power.

19        I guess we weren't unable to unredact it, but we'll

20    make that available.

21        So when we talk about our Professor Whinston's -- you

22    know, are his requirements met for showing some impact on

23    scale?  Here's what the data we were able to gather in the case

24    shows on Slide 24.

25        The top 2 1/2 percent of advertisers on Google

1    account for over 90 percent of the spend.  The top 2 1/2.  The

2    top 7, 95; top 26, 99.

3            Testimony from Microsoft's witnesses in the case said

4    the vast majority of large advertisers advertise on Bing, which

5    means, you know, the vast majority of the total search ad spend

6    on Google, they're also advertising on Bing.  So the idea that

7    somehow Microsoft doesn't have enough advertisers or enough

8    scale to be able to compete for the overwhelming majority of

9    ads is just not borne out by the record.

10           And, again, this is another one of these area where I

11   think there's a failure of empirical proof by the plaintiffs.

12   They haven't shown some sort of disparate effect.  They haven't

13   shown an overall advertiser effect.  You asked that earlier.

14   There's no evidence in the record that, you know, but for

15   Google's conduct -- and let's remember, they got to tie this

16   back to the search contracts.

17           THE COURT:  Isn't their best argument -- what their

18   position is, is that each one of these advertisers came in and

19   basically said there's a ceiling of how much we're going to

20   invest and advertise with Bing.  And that's due to user ratio,

21   right?  Google has a 90-plus percent, give or take, of the

22   query market.  And that's why we're putting 90 percent of our

23   ad revenue in Search toward Google and we put about 10 percent

24   toward Microsoft, because that's kind of the ballpark that

25   they've got in terms of query as well.

1          And so, isn't that indicative of essentially a

2     freezing of the ecosystem, if you will, if only, say,

3     10 percent of the spend is going to Bing?  Because even with a

4     better ROI, they can't attract more money and cut into the ad

5     spend that is being devoted to Search.

6          MR. SCHMIDTLEIN:  This goes back to the conduct

7     discussion yesterday.  In other words, if they had a better

8     quality search engine, they would attract more eyeballs.

9     They're not losing eyeballs, or they're not losing any ads

10    market because somehow something that's happened there is

11    having some knock-on derivative effect on their ads scale or

12    their ads quality.  That's my point, Your Honor.  In other

13    words, people don't go on Google because of ads.

14          THE COURT:  I think your point is that it's -- your

15    point yesterday, which is -- I think you're making the same

16    point -- you can tell me if I'm wrong -- which is that things

17    got plenty of scale.  They got plenty of scale for developing

18    query results, which means, I guess, they've got plenty of

19    scale to deliver quality ad results.  And the delta between

20    Google and Bing is not because we've got the default, either

21    for queries or for ads, it's because we deliver a better

22    product.

23          MR. SCHMIDTLEIN:  Absolutely.  And what we've seen --

24          THE COURT:  Which extends to ads.

25          MR. SCHMIDTLEIN:  And if we can flip over to the

1    next -- the smaller binder I gave you, I handed up, what we see

2    here is, you know, tremendous growth in search queries benefits

3    advertisers.  And, you know, I'm not going to rerun

4    yesterday's -- all the arguments, but all of the same arguments

5    about why Google's agreements are procompetitive, why

6    competition on the merits is a procompetitive justification,

7    whether you consider it up -- you know, at the first step or

8    later, all of those same arguments to the extent that it's

9    growing Search, it's also growing Search advertising.

10           And we've also seen over this same time period, as

11   we've noted, higher ROI, better return for advertisers and more

12   opportunities for advertisers.  To the extent that --

13           THE COURT:  Can I ask you a quick question,

14   Mr. Schmidtlein?  It's a silly question maybe, but you've made

15   the point that there's been Search growth, consistent growth

16   over -- in Search.  That's inconsistent with Google being a

17   monopolist because, sort of, a typical feature or a feature of

18   a monopolist is the restriction of output.  I'm having a hard

19   time envisioning how Google could restrict output in Search.

20           MR. SCHMIDTLEIN:  Well, degrade quality.

21           THE COURT:  It would be a degradation of quality, not

22   fewer searches?

23           MR. SCHMIDTLEIN:  If Google really was a monopolist,

24   you could imagine a scenario where what they would do is either

25   hold their quality constant or --

1          THE COURT:  One second.  I just saw her laptop look

2     like it was going to go down.

3          (Pause.)

4          THE COURT:  Okay.

5          MR. SCHMIDTLEIN:  All right, what -- what you would

6     expect, I think, Your Honor, is you would expect to see sort of

7     what you saw with Microsoft and Internet Explorer, little or no

8     investment, no improvement in quality because over a long, long

9     period they could sustain that usage on Windows.

10          The monopoly was sort of cemented, although

11    eventually Google did topple that monopoly through its own

12    quality and its own innovation.  But what you would expect to

13    see, I think, is the following:  Google reduces quality or

14    holds it constant and it reduces the opportunities for

15    advertisers.  In other words, it would actually -- it could

16    actually restrict the volume of ads to --

17          THE COURT:  That I can see.  I mean, if anything,

18    format -- I guess, format pricing has increased the number of

19    ad opportunities.

20          MR. SCHMIDTLEIN:  Right.  We spent a lot more money.

21    We made it a lot more complicated for ourselves, and we've

22    delivered a higher quality product.  We wouldn't have to do

23    that.  We would stay constant, reduce output, reduce the number

24    of ads and have everybody just bid through the roof, and that's

25    what you would expect to see from a monopolist.

1          In fact, you've seen sort of just the opposite.  And

2     the digital advertising market, which is everybody -- I mean,

3     all of these companies are competing tooth and nail to deliver

4     increased ROI, you know, better returns, better experience.

5     And all of these companies have grown and they've succeeded and

6     that's not -- that's not an anticompetitive story.  It's a

7     procompetitive story.  Advertisers today are better off than

8     they've ever been in terms of the array of ads that they can

9     buy and the ROI and the quality of the ads that they can

10    connect to their users.

11         And, you know, Google has been part of that, as are

12    all these other companies in this digital space.  We think to

13    the extent of what's gone on here has increased search queries

14    and have improved the user experience through higher quality

15    search results, it's also offered Google the opportunity to

16    search Search Ads.

17         As I was about to say before, Your Honor, Google was

18    very, very proud of its -- the quality of its Search Ads.

19    They're trying to get the right experience.  Google's ad load

20    is actually a little bit less.  Microsoft shows more ads, but

21    Google is always -- in their internal documents, they're trying

22    to figure out, you know, what's the right number to show

23    without achieving ad blindness, or sort of overdoing it with

24    ads.  Because I think Google recognized -- people don't come to

25    Google -- at least their mental model isn't I want to go to

 1    Google because I really want to get a bunch of great ads.  We

 2    don't watch TV because we want the ads.

 3           The ads can be a positive side effect, and they can

 4    be effective and they can actually improve our ability to

 5    connect with advertisers, but I'm not typically -- maybe there

 6    might be people on Super Bowl Sunday interested in the ads.

 7    But aside from that, typically, I think, Search is not

 8    dissimilar.

 9           So Google has been trying to make that, and I think

10    over time the evidence suggests that they've done a good job of

11    it.  And going -- again, going back to Dr. Israel, 10 percent

12    click rate to 30 percent click rate is pretty, pretty dramatic

13    in terms of quality improvement and what you would expect to

14    see in a competitive market.

15           Mindful of when you're going to call the whistle

16    here.

17           THE COURT:  You got about five more minutes.  I've

18    moved things back a little bit.

19           MR. SCHMIDTLEIN:  The last point, Your Honor, is I

20    just wanted to circle back on a couple of the documents that

21    you had flagged that I had a chance to review just during the

22    lunch break.  And, you know, I think the Iron Pot was one of

23    the ones you had flagged, DX737.

24           Just real quick, when it talks about -- on that

25    document the first page, why this pricing gap, there's a

1    discussion there about -- you know, launches show that ads

2    quality through individual launches is building up negative

3    excess CPC.  Now, there was some testimony at trial about

4    negative excess CPC, but I'm not expecting you to remember it

5    or to even understand it because it's very counterintuitive.

6         But what negative excess value CPC is, quality up,

7    prices down.  In other words, negative excess value costs per

8    click.  So this is a classic example of Google recognizing that

9    over time they have introduced a number of ad launches that the

10   quality has gone up, and Google hasn't been able to capture any

11   of that.

12        What this means -- and this is later in this

13   document.  What this means is that the value created over that

14   period was left underpriced.  And that's what we've been

15   talking about.  I don't think there's, sort of, anything about

16   that.  I think Mr. -- Mr. Dahlquist may have looked at

17   butternut squash, which is 442.  Again, you know, they talk in

18   this about recovering lost revenue from launches which create

19   value for our users and advertisers.  So, you know, my point is

20   this:  I know that we have inundated you with more paper than

21   you would ever want to have, but I would commend you to read

22   these documents carefully.

23        The snippets that my colleagues back here like to

24   fire up do not always tell the whole story.  And what I think

25   you usually see in these documents, when people are talking

1    about the potential for price increases, it's in connection

2    with either prior or contemporaneous ad launches where you're

3    seeing this value increase.

4         And, again, I think Your Honor has it right, that the

5    fact that you see a price increase in connection with an

6    increase in value or quality of a product, I don't think that

7    standing alone tells you, aha, I have monopoly power or, aha, I

8    have some sort of anticompetitive conduct because even they

9    aren't claiming any of this anticompetitive conduct.

10        The last point -- or last two, UPX1045 was another

11   document, What is rGSP?  It explicitly talks right in there,

12   avoids winner-take-all problem.  It helps with discovering the

13   right performance.  Mr. Dahlquist then, I think, highlighted

14   "does not directly touch quality."  What he's talking about

15   there is, remember, rGSP is when the long-term values are very

16   close together.  You know, they're so similar that even Google

17   is not saying I can't be 100 percent sure I've got the right ad

18   in the right slot, so we may flip those in some instances.

19        What they're saying is it helps us discover the right

20   performance because now I can see how Number 2 performs on

21   Number 1, and it's not touching on quality because they're so

22   close.  In other words, it's not having a negative experience,

23   but it's allowing me to figure out, hey, is Number 2 going to

24   get clicked on enough?  Because if I know Number 2 is going to

25   get clicked on a lot, that's going to change the PCTR, and that

1    helps us potentially, in the long run, serve better ads that

2    are more useful to users.

3          And when it came to rGSP, DX3040, this is -- it's

4    cited in our papers.  It's called ad rank -- it's called --

5    about ad rank.  This is on a Google Help Center page.  So this

6    is available for all advertisers that they go to.  And it

7    doesn't call it rGSP because who would know what that

8    necessarily means in the public, but what they say is "The ad

9    rank thresholds.  To help ensure high quality ads, we set

10   minimum thresholds that an ad must achieve to show."

11         Then it goes on, "The competitiveness of an auction.

12   If two ads competing for the same position have similar ad

13   ranks, each will have a similar opportunity to win that

14   position.  As the gap in ad rank between two advertisers grows,

15   the higher ranking ad will be more likely to win, but may also

16   pay a higher cost per click for the benefit of the increased

17   certainty of winning."

18         Google is not hiding, you know, some of these types

19   of things, as the plaintiffs would suggest.

20         Thank you very much for your patience, Your Honor,

21   and for your attention.

22         THE COURT:  All right.  Mr. Schmidtlein, thank you.

23         Mr. Dahlquist?  Mr. Cavanaugh?  About ten minutes and

24   then we'll take our break.

25         MR. DAHLQUIST:  Great.  Thank you, Your Honor.  I'll

1    be brief and try to bounce around and address a couple points

2    that Mr. Schmidtlein addressed.

3            First of all, keyword matching.  Mr. Schmidtlein

4    showed you a slide.  His slide is 14.  We don't need to put it

5    up, but it says:  "Boasting about all the great reasons why

6    keyword matching is great for advertisers."  These are only

7    Google employees.  They didn't call any advertisers.  If it

8    were so great for advertisers, you would expect to see an

9    advertiser saying that on this slide.  It's simply not.

10            Instead, what you see, if we go to our Slide 115,

11    it's the example I showed Your Honor -- I'm sorry, one earlier,

12    please.  Thank you.

13            Instead, this advertiser here, for the same ad, so

14    quality didn't increase.  They didn't get turned into a new

15    auction.  Instead, they received a price increase, a

16    substantial price increase.

17            Mr. Schmidtlein talked about margins.  Let's go to

18    Slide 19, please.  This is the -- the price index search on

19    price index at Google, based on Google's own data and

20    information and put forward in -- Professor Whinston used in

21    his testimony.  And Mr. Schmidtlein asked the question:  If

22    prices are going up, how come our margins aren't going up?

23    Very simple.  TAC, traffic acquisition cost.  Their costs went

24    up at the same time.  Over this exact same time period, they

25    are paying more money for those default contracts.  They are

1    paying more money, and as a result they have to increase prices

2    in order to pay for those default contracts.  That's why their

3    margins are the same.

4            SQR reports.  If we could go to Slide 124, please.

5    Mr. Schmidtlein talked about queries somehow being PII.

6    Dr. Adam Juda in this document itself says no, they're not.  It

7    says queries are not PII.  This is why the privacy explanation

8    within the SQR reports we argue is pretextual.  At a minimum,

9    Google employees themselves don't agree about it.  And we --

10   Mr. Schmidtlein invited Your Honor to read the documents.  We

11   agree.  Read the documents.  This is a long explanation for it,

12   but the summary is Dr. Juda did not agree that this was a

13   privacy protection.

14           THE COURT:  Do we have in the record any examples of

15   an SQR report?  If I do for the --

16           MR. DAHLQUIST:  There's only a few.  There's

17   certainly one.  I can get you that cite.

18           THE COURT:  If you would just get that cite, that

19   would be helpful.

20           MR. DAHLQUIST:  There's certainly one in the record.

21           Turning to a very different topic, I think, on scale,

22   and scale specifically with regard to search ads.

23           Mr. Schmidtlein put up a slide.  We don't have to put

24   it up, but it's his Slide 21 which referenced that Microsoft

25   has grown its RPM without additional volume.

```
1                   Can we put up Slide 126?
2                   Your Honor, this is a slide from Mr. Dintzer's deck
3         yesterday.  So I'm borrowing his material.  It's redacted in
4         the public, but this shows -- the slide that Mr. Schmidtlein
5         showed was incorrect.  He says Microsoft has grown RPM without
6         additional volume.  False.
7                   This slide shows that RPM increased at Bing in the
8         same time period because it acquired the additional traffic
9         from Yahoo!.  The jump that you see there -- and I admit I
10        can't even read what year it's referencing -- but Dr. Whinston
11        said in 2013 and 2015 in his quote, "RPM suddenly shot up."
12        And that's a result of additional traffic, additional volume,
13        so much, in fact, that the entire curve, the entire sloping
14        curve leapt into an entirely new curve.
15                  This, Your Honor, is evidence -- direct evidence of
16        additional volume in the search ads context.  Additional scale
17        in the search ads context helps the RPM and helped Bing in this
18        instance.
19                  And I think where I'll conclude, Your Honor, if we
20        can go to Slide 134.  This also relates to the scale point --
21        I'm sorry.  Can we go back to the search ads?  Thank you,
22        Mr. Penado.  Slide 134.
23                  And Your Honor made a reference to, well, isn't it
24        the government's argument that advertisers are maxed out with
25        their use of Bing?  The answer:  Yes.
```

 1          And this is the testimony from Ms. Lim on that exact

 2  point that -- and I referenced it early in regard to ROI.  It

 3  sort of makes a little bit of the same point.  But at some

 4  point their spend maxes out and there's nowhere else to go.  So

 5  when she maxes out at Bing, that's the ultimate ceiling of her

 6  scale usage at Bing, and she has nowhere else to go.

 7          With that, I'm happy to answer any questions, Your

 8  Honor.

 9          THE COURT:  Thank you, Mr. Dahlquist.

10          Mr. Cavanaugh, anything?

11          MR. CAVANAUGH:  Nothing, Your Honor.

12          THE COURT:  Okay, Everyone, let's take our afternoon

13  break.  We will resume at 3:15 and we'll talk about SA360.

14  Thank you all.

15          (Recess.)

16          MR. DAHLQUIST:  Your Honor, before we begin, I want

17  to answer your question from the last session.  SQR report is

18  in evidence at UPX526.  And I understand the SQR reports are

19  massive Excel files.  This document is a Google document

20  summarizing and detailing what an SQR report is with excerpts

21  and significant pieces of an SQR report within it.

22          THE COURT:  Okay.  Thank you.

23          MR. DAHLQUIST:  Thank you.

24          THE COURT:  All right.  Mr. Cavanaugh.

25          MR. CAVANAUGH:  Thank you, Your Honor.  I know this

1    is the moment you've been waiting for.

2            THE COURT:  You're not wrong.  We're not talking

3    about evidence.

4            MR. CAVANAUGH:  No, I was being serious.  Your Honor,

5    with your permission, I'll address SA360.  Mr. Sallet will

6    address duty to deal.  He worked on that section of the brief

7    and also allowed me to watch the Knicks game last night.

8            Your Honor, our position is that Google has operated

9    SA360 to just further entrench its monopolies.  The very

10   purpose of an SEM tool is to provide advertisers with an

11   efficient means of managing across ad campaigns across multiple

12   general search engines.  And here in the United States, it is

13   not only Bing that goes through Microsoft advertising, it's

14   Yahoo! and DuckDuckGo as well.

15           And SEM tools are particularly for large advertisers

16   that use them to run hundreds of campaigns with thousands of

17   keywords.  The type of advertisers who, as Your Honor has

18   noted, give 90 percent of the business to Google.  And to the

19   extent, you know, they're going to use a second general search

20   engine, an SEM tool is a particularly efficient way to do that.

21           As Your Honor noted in the summary judgment opinion,

22   the issue is whether Google delayed the roll-out and that that

23   inhibited, dissuaded advertisers from placing ads, thereby

24   harming competition.  The evidence at trial demonstrated that

25   we more than met our burden on that.

1          Harm to competition can come a myriad of ways, and

2     the *Illumina* case noted, you know, late deliveries, subtly

3     reducing the level of support services.  And what we have here

4     is a not very subtle effort by Google on what their own

5     witnesses say is the most critical feature, auction-time

6     bidding, to unreasonably delay that.

7          We're now close to five years from when that request

8     was initially made.  Now, Google, when it acquired and when it

9     voluntarily decided to get into providing an SEM tool, it went

10    out and said this is going to be a neutral third-party, helping

11    you, the advertiser, achieve the highest return on investment,

12    regardless of the online channel.

13         Now, they said it again in 2020, and as Dr. Baker

14    showed in his analysis, Google's financial incentive to break

15    that promise is pretty evident.  They make a lot more money

16    with a Google ad that is purchased through SA360 and then

17    through Google Ads than for a Microsoft ad that is purchased

18    through SA360; there they just make the commission.

19         Now, why does their operation of SA360 matter so much

20    here?  Well, it's the point I made a moment ago.  You know,

21    they dominate your general search ad market.  92 percent of the

22    revenue goes to them.  And so, SEM tools provide a lifeline for

23    smaller general search engine providers, the small players.

24    We're seeing Bing, Yahoo!, DuckDuckGo.  It's a potential

25    lifeline for them.  And over the years, Google's dominance

1    within SA360 tools has grown.  They now -- by 2020 they were up

2    to 76 percent of the traffic that went through an SEM tool,

3    went through SA360.

4         Now, what Google has done, they've harmed rivals by

5    depriving advertisers and rivals of the benefit of auction-time

6    bidding.  Your Honor, there is no dispute in this case that

7    auction-time bidding does more than intraday.  Mr. Varian said

8    it's the most critical feature.

9         When Google developed their auction-time bidding and

10   then integrated it into SA360, they went out and told

11   advertisers, "In our beta testing, conversions went up 15 to 30

12   percent."  And Your Honor has talked today about, you know, the

13   importance of conversion, and that translates not only into

14   you're providing something valuable to your advertisers, which

15   will obviously produce a benefit to Google, Mr. Krueger tried

16   to characterize that, describe that.  He said, advertisers

17   spend can go up 20 percent, and he was estimating Google would

18   make billions.

19        Now, they try to diminish all of this, but the fact

20   that you're providing a valuable service to advertisers, it's

21   just common sense that it will provide value to the search

22   engine.  And look what happened, the value of auction-time

23   bidding to Google, by September 2020, 80 percent of their

24   customers had fully adopted auction-time bidding.

25        Now, Google says, well, but that's ours.  And when

1    Microsoft went to them in the fall of 2019, right after Google

2    had introduced auction-time bidding, integrated it into SA360,

3    what were advertisers telling Google?

4         November 2019, they like to say, oh, what happened --

5    we only learned about this late in the game.  This is -- when

6    they're initially discovering, considering doing a test,

7    advertisers were interested in it.  And then in May of 2020,

8    Google likes to suggest -- now, this was only in Japan, but the

9    document makes clear it was raised in the American customer

10   survey.  Again, auction-time bidding.

11        And then, two of Google's largest advertisers who

12   also advertise through Microsoft, they used auction-time

13   bidding on Microsoft, and what did they come up with?  What did

14   they -- instead of intraday, what did they find?  It was just

15   better performance, more conversions.

16        And what did Mr. Krueger say internally?  He said,

17   I'm not surprised it's performing better than intraday for the

18   same reason Google auction-time bidding does.

19        Your Honor, they knew that.  Again, February '21,

20   auction-time bidding for Microsoft is requested consistently

21   from sales and customers.  And here we are, May of 2024, almost

22   five years after the initial request, still no auction-time

23   bidding.

24        Now, we know Microsoft auction-time bidding benefits

25   advertisers because the three other SEM tool providers which

1       make up a small segment of the share, they all now have --

2       provide auction-time bidding through Microsoft Ads.  And Skai

3       produced -- sought the higher conversion that Google saw with

4       its own auction-time bidding feature.  It was a dramatically

5       improved performance.

6               Now, the importance of SA360 to Bing -- this is from

7       Dr. Israel's slide.  It shows a material amount of business, of

8       ad revenue to Microsoft comes from SA360.

9               That's the green -- it's the green line, Your Honor.

10              And it's an important piece of -- and even within SEM

11      tools, they get a significant amount, a high percentage of

12      their business from SA360, which isn't surprising.  They have

13      76 percent of the share among tool providers.  None of this

14      is -- none of this is surprising.

15              And so what's happened, Your Honor, is that Google

16      auction-time bidding was integrated into SA360.  It all worked

17      seamlessly; the conversion data, the Floodlight data.  You get

18      to use the bidding strategies.  It all worked seamlessly.

19              But, what happens if an advertiser wants to use

20      Microsoft's auction-time bidding?  They can't use it.  Now,

21      Google suggested, well, wait, there's a workaround here.  What

22      they can do is -- yes, auction-time bidding can't be used

23      through SA360, but the advertiser can take the conversion data

24      out of SA360, move it over to Microsoft Ads auction-time

25      bidding.  What's the problem?

```
 1            Well, the problem is you can't use the SA360 bidding

 2   strategies as part of this.  It's not a workaround.  You can't

 3   do the comparisons across campaigns and across search engines

 4   that SA360 allows you to do.

 5            Mr. Krueger admitted at trial on cross-examination

 6   that, no, you can't use those bidding strategies.  Again, it's

 7   intended to put Microsoft Ads at a disadvantage.  It's

 8   deliberate, it's ongoing, and it's completely unjustified.

 9            THE COURT:  Mr. Cavanaugh, can I ask you a question?

10            MR. CAVANAUGH:  Yes.

11            THE COURT:  Is it -- do you think you need to

12   demonstrate an intent --

13            MR. CAVANAUGH:  No.

14            THE COURT:  -- to exclude here?

15            MR. CAVANAUGH:  No.

16            THE COURT:  I just want to make sure.  The case law

17   sort of suggests that this may be an area in which intent is

18   more relevant than in other exclusionary types of conduct.

19            MR. CAVANAUGH:  Perhaps if it was an attempt to

20   monopolize here.  But this is a maintenance case.  And we're

21   simply asking you to apply Section 2 to a specific set of facts

22   that we believe show abuse of monopoly power that's harmed

23   competition.  That's all we need to show.

24            THE COURT:  So here's the next question.  I don't

25   know whether Mr. Sallet is the person to address this or not.
```

1    But, put it a different way, ask the question -- is it your

2    position that the Duty to Deal Doctrine does not apply, full

3    stop?

4            MR. CAVANAUGH:  Yes.

5            THE COURT:  Or is it that your view is that this is

6    an *Aspen Skiing* case?

7            MR. CAVANAUGH:  Your Honor --

8            THE COURT:  You asked -- or, the distinction -- my

9    question, I suppose, is a threshold question -- and, again,

10   maybe jumping ahead to Mr. Sallet because it really does

11   matter.

12           Let me ask this:  Do you think the case law requires

13   me to use a Duty to Deal paradigm any time, any time the

14   exclusionary conduct is between rivals?  And that's the

15   question.

16           MR. SALLET:  Your Honor, we do not.  We believe that

17   the Duty of Deal Doctrine, the Refusal to Deal Doctrine applies

18   only if there's been a refusal to deal.  In this case, there's

19   been no refusal.  Google has worked with Microsoft.  Google has

20   said it's working on the very feature that's at the heart of

21   the controversy.  Therefore, we believe as a preliminary

22   matter, finding that there has been no refusal to deal, the

23   Court proceeds to the *Microsoft* analysis of whether the conduct

24   is or is not anticompetitive, and one never gets to cases like

25   *Aspen*.

1              THE COURT:  I thought -- let me get my hands on this.

2         I thought in *Aspen* -- I'm sorry -- in *Novell* -- and

3    maybe I'm wrong -- that what Justice Gorsuch -- now Justice

4    Gorsuch -- wrote was that what you describe as a not refusal --

5    is a -- this is not a refusal to deal case.  It's just a matter

6    of semantics.  And that when you're talking about rivals, the

7    question is, is the rival obligated to do what the other rival

8    is asking?

9              And in *Novell* you had a set of circumstances, not

10   quite on par here, but not dissimilar in the sense that

11   Microsoft in this case actually offered its APIs, made them --

12   put them out into the public.  Novell began to rely on those

13   APIs and thinking, look, I can now build more perfect.  And

14   Microsoft said, you know what, we're not going to let you use

15   the APIs anymore because we would rather focus on making profit

16   for Windows -- I'm sorry -- for WordPerfect -- Microsoft Word,

17   you know, Microsoft Office Suite.  And the Tenth Circuit said,

18   this is still a duty to deal case.  Even though they offered it

19   up, it's still a duty to deal case.  So why is this different?

20             MR. SALLET:  Because Duty to Deal Doctrine, the

21   *Trinko* doctrine, has been only applied in cases that satisfy

22   one of three circumstances.  The dealing was mandated by

23   government.  That's *Trinko*.  Or the dealing ceased and there

24   was no ongoing dealing.  That's *Novell*.  Or there's a case we

25   cite --

```
1              THE COURT:  The second category is what, again?

2              MR. SALLET:  The dealing ceased and wasn't in effect.

3    That also came up in the D.C. Circuit, in the Meta Platforms

4    case.

5              And the third is if there was never any dealing.  And

6    we cite a less famous case called Mr. Furniture in our

7    pleadings.

8              Absent that, if there is dealing, then, in fact,

9    Trinko doesn't apply.  Now, it's very important, Your Honor, if

10   I might say this:  Trinko is a form of antitrust immunity.

11   It's an exception.  If it applies, this Court is not allowed to

12   consider the harmful effect of conduct.  Exceptions to the

13   normal antitrust laws are to be narrowly construed.  The logic

14   of Trinko doesn't apply here.

15             So -- and I can come back to Novell, if you indulge

16   me for a minute.  In Trinko the Court says -- talks about when

17   it's applying this exception to the normal antitrust laws.

18   Now, in Trinko, Your Honor, as you remember, Verizon never

19   wanted to deal with the other company, never wanted to.  FCC

20   regulation mandated that it do so.  And so, the Trinko court

21   said, well, that's a circumstance where the defendant's prior

22   conduct sheds no light upon the motivation of its refusal to

23   deal.

24             THE COURT:  Doesn't this all beg the question -- and

25   I'm not seeing this discussed in any one of these cases --
```

1          MR. SALLET:  Correct.

2          THE COURT:  -- about the scope of the duty to deal at

3     the outset.

4          MR. SALLET:  Yes.

5          THE COURT:  In other words, how am I supposed to make

6     the determination and put the cases in the different boxes that

7     you would like me to without a full understanding of what the

8     scope of the initial commitment was?

9          It was easy in *Aspen Skiing*.  Look, you know, we're

10    going to put a multiday -- or, multislope pass together and

11    *Aspen*, you know, I guess, Ski Co., whatever it was called,

12    said, no, we're withdrawing it.  That's easy.

13         MR. SALLET:  Correct.

14         THE COURT:  It's not clear to me it's as easy here

15    because I'm not quite sure what Google's commitment was to

16    Microsoft in terms of adding features to SA360 at the outset.

17         And so if, for example, there was an agreement in

18    place, that would define the scope of the duty.

19         MR. SALLET:  Yes.

20         THE COURT:  Now, that may not mean you have antitrust

21    remedy.  You may have a breach of contract remedy.  But that's

22    one of the things I'm struggling with because it just feels

23    like this is a duty to deal by another name.

24         MR. SALLET:  Your Honor, I think it isn't.  I think

25    it's delay.  And I would like to just put up Slide 45, if I

1    might.  This is what -- this is what Google says in this case

2    about the conduct.

3            It says:  "Google did not refuse to build the

4    Microsoft advertising features at issue."

5            It says:  "The evidence at trial" -- this is in his

6    post-trial filing -- "the evidence at trial showed that

7    Google's conduct, which was delayed dealing, not a refusal to

8    deal, was based," it says, "on legitimate decisions."

9            And then in its trial brief, on page 105, it says:

10   "It eventually decided to build and implement the feature, the

11   Microsoft AT bidding."

12           THE COURT:  So part of the duty to deal doctrine, as

13   I understand it, one of the features of it is that the Supreme

14   Court has said, look, Courts shouldn't be in the business of

15   figuring out --

16           MR. SALLET:  Yes.

17           THE COURT:  -- what parameters and scope ought to be

18   of conduct between rivals.  And the challenge I am grappling

19   with here -- and let me be clear, the evidence here is a little

20   bit tricky for Google.  Let's just put it that way.  Okay?

21           But how do I make a determination whether -- at what

22   point in time they committed an antitrust violation?  Was it at

23   12 months, 24 months, 26 months?  And it's not the question of

24   a court supervising or interceding and overseeing after the

25   fact.  It's does the monopolist -- can the monopolist know in

1    advance when their conduct has crossed the line?  Right?  We

2    want an antitrust law to have certainty in conduct.  We want to

3    make sure businesses know what's in bounds and what's out of

4    bounds.

5          And so in a case like this, how is Google supposed to

6    know at what point their duty to deal -- or as you put it,

7    refusal to deal or delay in dealing -- crossed over from it's

8    okay to Section 2 violation?

9          MR. SALLET:  Your Honor, if I could just address a

10    legal issue, then a factual issue in that regard.

11          Your Honor, the language, I think, is the language

12    that we're using here of doctrine.  A duty to deal is not used

13    in the law to indicate that a Court has to evaluate exactly

14    what a company should or should not do in all circumstances.

15    It's used -- and *Trinko* explains this -- to create -- to find a

16    circumstance where the antitrust law is not applied at all.

17          That is not the case.  Mr. Cavanaugh cited the

18    *Illumina versus Grail* case, that the case from this court in

19    *H&R Block* makes the same point; lack of support, delay, these

20    kinds of actions can give rise to anticompetitive harm.  The

21    fact question is -- and Your Honor had it correct -- how does

22    the Court assess when there's been an antitrust violation?

23    That, I submit, has nothing to do with whether a duty has been

24    violated.  It's whether, for example, in an exclusive contract,

25    the term has been put in that does or does not foreclose

1    competitors from reaching customers in a different kind of

2    case, a bundling case.  What's the practice been?

3              In this case, Your Honor, if I can look at Slide

4    32 -- 42, excuse me, of our deck, we have industry evidence

5    that we believe supports that certainly by now it is beyond a

6    period of time for which there is any procompetitive or

7    legitimate justification for Google's delay.  Skai has

8    supported both in some form since at least 2020.

9              And, importantly, Your Honor, you'll remember that

10   the Skai executive told you that it was faster to add Microsoft

11   once Google was on its platform, did it in about two years.

12   Adobe since at least 2022.  Marin since 2022.  SA360 still does

13   not.

14             We believe the record is clear, Your Honor, that at

15   this moment, coming into this trial, a year or so ago, Google's

16   conduct has no justification except, except to disadvantage

17   advertisers and rivals and that it states an antitrust

18   violation.

19             But, Your Honor, if I may just finish this.  In this

20   inquiry, when we are in this inquiry about how Google should

21   know, we're no longer in the world of *Trinko* and duty to deal.

22   We're in the world of *Microsoft*.  Is the conduct to be

23   considered exclusionary or not?

24             That's not applying immunity.  That's applying the

25   *Microsoft* test to assess anticompetitive effects.

1              THE COURT:  To shift the questioning for a moment,

2       and then we can come back to this.

3              Assume for me, if you will, that the duty to deal

4       paradigm does apply.  Okay?  Do you believe that there must be

5       a threshold showing that you bear the burden on -- to show that

6       Google's conduct was motivated to sacrifice short-term profits

7       for anticompetitive purposes?

8              MR. SALLET:  No, Your Honor.  We believe -- and this

9       is the passage I read from *Trinko* -- that one can look, for

10      example, to anticompetitive malice.  That's relevant.  You

11      asked Mr. Cavanaugh this question, so forgive me if I repeat

12      what he said.  The fifth principle in the pages you asked to

13      talk about in summary judgment, the two pages of the *Microsoft*

14      decision, the fifth principle that the *Microsoft* court uses is

15      anticompetitive evidence of the intent behind the conduct of a

16      monopolist can be relevant to understand the likely effect of

17      the monopolist conduct.

18             Mr. Cavanaugh, our briefing, can explain that when

19      one looks at the run of Google conduct, there is no plausible

20      justification for it, except a desire to delay a feature that

21      would serve advertisers, help competition, because it is in

22      Google's incentive to promote its own monopoly profits.

23             THE COURT:  I'm not sure I got an answer to the

24      question, Mr. Sallet.

25             MR. SALLET:  Sorry.

1          THE COURT:  May not have asked it right.

2          Look, I understand what *Novell* and, frankly, the D.C.

3     Circuit has said in a duty to deal paradigm.  I know you're

4     telling me you don't think it applies.  But if it does apply --

5          MR. SALLET:  Yes.

6          THE COURT:  -- that it's not just a showing of

7     anticompetitive effect that needs to be made.  You need to show

8     that the reason for the conduct, as was the case in *Aspen*

9     *Skiing*, is sacrificing short-term harm -- short-term profits to

10    inflict harm on a rival.  And if that is a requirement, I ask,

11    what's the evidence to support that Google sacrificed

12    short-term profits here to cause harm to Microsoft?

13         MR. SALLET:  Could I go back just one step, Your

14    Honor, to the question of what do we think is required, if a

15    duty to deal exists?  Because we don't believe that the

16    appropriate case law -- if, in a circumstance in which it

17    exists -- is that one must show predatory pricing.

18         We think that *Comcast versus Viamedia* case out of the

19    Seventh Circuit does the best job we've seen in any lower court

20    case of looking broadly at circumstances and saying that a

21    court should look to see whether in the circumstances available

22    it is appropriate to find that failure to engage in an action,

23    or delay in this circumstance, harms competition.  Predatory

24    pricing has been used in cases.  It's been used in this circuit

25    in cases.  But it is not the exclusive basis.  And we think

1    *Trinko* shows that.

2            When *Trinko* talks about other cases that might not

3    trigger refusal to deal, it does not state any requirement that

4    there be a showing of predatory pricing.  It talks about

5    different kinds of circumstances.

6            And so we think the question is whether a court is in

7    this circumstance in which it can fairly ascertain the nature

8    and effect of the conduct without having to deal with

9    circumstances, which, as *Trinko* says, shed no light on the

10   circumstances.

11           THE COURT:  What case would you say is most analogous

12   factually to this one in which the Court has said that dealing

13   between two rivals does not -- is not something that needs to

14   be evaluated in the duty to deal paradigm?  Is there any case

15   that stands for the proposition?

16           MR. SALLET:  We cite in our post-trial brief a series

17   of cases, including a decision from the Southern District of

18   New York in which the Court specifically distinguished *Trinko*

19   because there was a five-year cause of dealing.  That case is

20   *A.I.B Express, Inc. Versus Federal Express Corp.*  It's in

21   paragraph 41 of our post-trial brief, and the observation

22   appears at note 86 of the case.

23           THE COURT:  That begs the question -- you'll forgive

24   me, I don't remember the facts of the case.  But in that case

25   did the Court hold that the duty to deal doctrine did not

1    apply, or did it hold that this was one of the rare exceptions

2    where there is, in fact, a duty to deal between rivals that is

3    comparable to *Aspen Skiing?*

4         MR. SALLET:  I read it earlier today.  I don't have

5    it in front of me, Your Honor.  I read it to say *Trinko* does

6    not apply because there's been a five-year course of dealing,

7    which I think is our case except the dealing has gone on longer

8    here than five years.  And so we think this supports our view

9    that this specialized doctrine of immunity simply doesn't get

10   triggered unless there's a circumstance in which a company is

11   not dealing at all with another, and that's not our case.

12        THE COURT:  You started on this, I don't know why you

13   put Duty to Deal Doctrine in an immunity basket.  I mean, it

14   can have that feature.  I don't disagree.  If Congress compels

15   to competitors, rivals, to -- as was the case in *Trinko*, to

16   share their plumbing, I see what you're saying.  But in a case

17   like *Novell*, you know, that's not an immunity question.

18   Justice Gorsuch wasn't talking about immunity.  He was talking

19   about courts not getting involved in making decisions about

20   duties between -- or, how rivals ought to conduct themselves.

21   It was based on the principle that companies, firms can choose

22   who they want to deal with.

23        And the lone exception, and the one that Courts have

24   said you need to be reluctant or hesitant before you arrive

25   there is *Aspen Skiing*, where there is a clear -- not only a

1    clear course of duty, but a clear understanding of what the

2    duty was, and that's what I'm struggling with here.

3         MR. SALLET:  Your Honor, in the case law there is no

4    case -- and this goes to the question of dealing with rivals

5    that you correctly, you know, note as being discussed in

6    *Novell* -- there is no case that applies a Refusal to Deal

7    Doctrine where a monopolist operates a platform whose essential

8    function is to support its rivals.  SA360's essential function

9    as a cross-platform tool is to support both Google and its

10   rivals, and there's no case law that treats that as involving a

11   duty to deal.

12        THE COURT:  Google has said at the outset, you know

13   what, Microsoft, we're not playing ball with you.  We

14   understand SA360 is this wonderful platform.  It would benefit

15   your business, but we're not playing ball.

16        Could they have done that?

17        MR. SALLET:  If Google had established a tool for

18   advertisers to place ads only on Google, it would not have gone

19   to the market -- I'm sorry --

20        THE COURT:  This is an SEM tool, SA360.  Google has

21   acquired it.  They can place ads on -- it's not even clear to

22   me --

23        MR. SALLET:  Yes.

24        THE COURT:  -- but different platforms --

25        MR. SALLET:  Yes.

1          THE COURT:  -- which ones, Facebook, whatever else is

2     available through the SEM tool.

3          MR. SALLET:  Yes.

4          THE COURT:  Could Google have said, Mr. Nadella,

5     we're not playing ball with you.  We're not putting Microsoft

6     ads on this platform.

7          MR. SALLET:  If it had done that, there would have

8     been a refusal to deal, and then one would have considered

9     cases like *Aspen*.  It might or might not have met *Aspen* or any

10    case --

11         THE COURT:  So once, in your view, there's been some

12    commitment to deal by a rival, it takes us out of the duty do

13    deal framework?

14         MR. SALLET:  To be more specific, Your Honor, if

15    there is a voluntary, not government mandate, ongoing

16    relationship, then the Duty to Deal Doctrine does not apply.

17         THE COURT:  So why did it apply in *Novell*?

18         MR. SALLET:  Because in that case the APIs that were

19    being used by the Microsoft challenger were withdrawn from the

20    marketplace.  It was cut off.

21         THE COURT:  Right.

22         MR. SALLET:  So there was not an ongoing, commercial

23    relationship.  It has to be both voluntary and ongoing.  In

24    *Meta* -- in the *Meta Platforms* case --

25         THE COURT:  Would this case be different if Google

1    just said -- is the case different because Google here has

2    said, look, we're going to do this, but we're not going to do

3    it on your timeline?

4            But I seem to understand you to say, for example,

5    Google could have said in this case, We're not going to do it.

6    All right.  We made a promise to you that we put in -- you

7    know, the auction-time bidding, but now we've changed our mind

8    and we're not doing it.  We're not doing it, Microsoft.

9            MR. SALLET:  If Google had --

10           THE COURT:  Because that's what Microsoft did in

11   *Novell*.

12           MR. SALLET:  If Google had thrown Microsoft off the

13   platform completely such that there was no dealing, which were

14   the facts in *Novell* -- as you said, Microsoft throws the

15   competitor off the platform completely -- then we get to the

16   question, the kind of question that was presented in -- to the

17   D.C. Circuit in *Meta Platforms* of whether there is any duty to

18   continue dealing.

19           But in this case, the dealing has -- the dealing has

20   continued and it's voluntary and it's inherent to the SA360

21   search tool.

22           Now, Your Honor, I want to be clear, nothing I'm

23   saying -- although we believe it -- says the fact that duty to

24   deal didn't apply means there's necessarily anticompetitive

25   harm.  We're simply saying there is no case law that supports

1    the notion that a Court in this circumstance, Your Honor, need

2    not look at the question of competitive harm.  And in assessing

3    that, there's a lot of questions, of course, Your Honor has to

4    consider.

5          THE COURT:  You want me to take this out of a duty to

6    deal paradigm -- I get that -- and look at this through the

7    Microsoft lens.

8          MR. SALLET:  Yes.

9          THE COURT:  Let me ask a slightly different question.

10   If we do look at this through a Microsoft lens, anticompetitive

11   effects, have you met your burden of showing what those are,

12   other than -- I shouldn't say "other than."  You've certainly

13   demonstrated the following:  Auction-time bidding is important.

14         MR. SALLET:  Yes.

15         THE COURT:  It's -- has an uplift of 15 to 30

16   percent.

17         It's fair to presume that if Microsoft had gotten

18   auction-time bidding -- because I think it's been the case

19   where it's Microsoft Ads -- it, too, would have gotten an

20   uplift?

21         MR. SALLET:  Yes.

22         THE COURT:  All of that seems to me to be proof that

23   it benefits Microsoft.

24         Do you need to produce evidence to show that some

25   advertisers out there did not put ads on Microsoft?  Or to put

1    it differently, put ads on Google that they would have put on

2    Microsoft had the auction-time bidding been available?

3            MR. SALLET:  We do not, Your Honor.  Just as in

4    *Microsoft*, there was no requirement that a -- of identifying a

5    specific app developer who was discouraged from creating an ap

6    for Netscape because Netscape was diminished in size.

7            In this case we have evidence of both benefit and

8    harm, and they are two sides of the same coin, Your Honor.  The

9    benefits to Microsoft, yes, of course, but what you noted, it

10   shows benefits to the advertisers, 15 to 30 percent increase.

11   At a later time Google calculates 45 or 46 percent increase.

12   At a later time there was specific testimony about the increase

13   that the Microsoft ATB feature itself provides.

14           All of that accrued to the benefit of advertisers,

15   and advertisers are, during this period, deprived of the

16   benefit to have more efficient advertising campaigns by using

17   the best Microsoft feature available.  That is harm to the

18   advertisers of the kind that was found to be sufficient in the

19   *Microsoft* case.

20           THE COURT:  And that would be true even if there is,

21   as is the case, an alternative way to use auction-time bidding

22   on Microsoft.  You could use its native tool.  I understand it

23   would cost a little bit more.

24           MR. SALLET:  Yes.

25           THE COURT:  And I get that.  But is that what

 1    distinguishes this case from -- well, let me put it a different

 2    way.

 3         Is that the reason, the fact there is an alternative

 4    way to do exactly what you want advertisers to be able to do,

 5    is because it will cost them more?

 6         MR. SALLET:  It is -- that is an important factor,

 7    but as Mr. Cavanaugh explained, going directly to Microsoft Ads

 8    doesn't just cost them more because they have to take the data

 9    and move it, it costs them the ability to use cross-platform

10    bidding strategies.

11         THE COURT:  It's a less efficient way of advertising.

12         MR. SALLET:  That's correct.  It impairs their

13    ability to advertise.

14         THE COURT:  No, they can't -- they can't move the ROI

15    and do all that stuff in an individual platform.  Got it.

16         MR. SALLET:  In addition, Your Honor, what's

17    happening in this case is that Microsoft is in a situation

18    where -- well, advertisers are in a situation where it's very

19    difficult to leave SA360, difficult because Google has dominant

20    market share, monopoly share in both the advertising market

21    and, as Your Honor knows, as Mr. Cavanaugh said, 76 percent in

22    the SEM tool market.  That means -- and Google has said -- and

23    this came out at trial -- that it prioritizes its own features

24    on SA360.

25         Since Google Ads are a must-have for people buying

1    general search engine advertising, it makes it more difficult

2    to leave SA360.  It's sticky, in other words.  So the

3    difficulties for the advertisers are real, and it deprives them

4    of something that would be a benefit if they had it and harm

5    because they do not.

6             THE COURT:  Okay.  Let me turn this over to

7    Mr. Schmidtlein for a few minutes.  Then I'm sure we'll have

8    some further discussion on rebuttal.

9             MR. SCHMIDTLEIN:  Your Honor, with respect to the

10   Colorado plaintiff's claims for SA360, there is no exclusionary

11   conduct here because Google had no duty to deal in the first

12   place.  What I think I've heard Mr. Sallet say, or the

13   suggestion here is that if Google had -- if Google tomorrow

14   could cut them off, if they finish building the -- once they

15   finish building auction-time bidding, they could announce

16   tomorrow, because now we're no longer dealing on any of these

17   individual features, we could say, fine, we're done dealing

18   with you, we're kicking you off the tool, and that would be

19   fine.

20            That doesn't make any sense.  They -- you have asked

21   the right question about *Novell* and -- Justice Gorsuch had it

22   absolutely right.  In that case there was actually dealing on

23   the very, very specific feature, if you will.

24            THE COURT:  Right.

25            MR. SCHMIDTLEIN:  Here, there was never dealing with

1    Microsoft on the particular feature.  And, in fact, the

2    evidence at trial established that there was no industry-wide

3    practice and certainly no contractual obligation that Google

4    ever entered into that said we agree to build any feature you

5    ask for, and we agree to do it on any particular time period.

6         THE COURT:  So I guess what's different here, in a

7    sense, is the following:  It's not that Google controls a

8    platform that its rivals are on -- I mean, that's unique, I

9    suppose, in some sense -- but it's that Google made

10    declarations at the start that we are not going to,

11    essentially, play favorites with Google.  At least publicly

12    that's what they have said.

13         MR. SCHMIDTLEIN:  No.  They said that we're going to

14    build a cross-platform tool and we're going to make it

15    available for everybody to use.  But we never said, we never

16    said we're going to adopt every feature they want.

17         THE COURT:  I don't disagree with that.  I don't

18    think even they're suggesting that.  I don't think they're

19    saying there was a commitment to Microsoft and whoever that

20    we're going to build every feature you ask for and do so in a

21    timely manner.  I don't think there's any evidence of that.

22    But what there is evidence of is Google, at least public

23    facingly, said that we are not going to, essentially,

24    discriminate among platforms on SA360.

25         In other words, we're not going to use SA360 to favor

1    us, Google, over these other platforms.  Because you could see

2    why there's a huge conflict of interest.  Let's leave aside

3    what the dollar value is, but there's a clear conflict in terms

4    of running this platform.

5           Now, look, Google could have said from the outset,

6    we're not putting Microsoft on.  We don't want to put our rival

7    on and benefit them.  But that's not the choice they made.

8    They put Microsoft on the platform.  And while there is no

9    promise about particular features or a particular time in which

10   features are going to be done, there was this general notion of

11   equity, if you will, to some degree.

12          MR. SCHMIDTLEIN:  I don't see -- I don't see how this

13   Court -- what does that mean going forward?  That Google has to

14   do it on the same day?  Advertiser -- what Google did -- the

15   evidence at trial was Google looked for advertiser demand for

16   the features.

17          THE COURT:  Well, I think the evidence is a little

18   mixed in terms of how much demand they understood there was.

19   But I guess you're right.  I mean, that's what I said to the

20   plaintiffs, which is, well, how is Google supposed to know from

21   what point they've gone from -- to the other side of the

22   Sherman Act line.

23          I guess what's difficult for me to get my head around

24   in this case is we're now five years in.  You've stood up in

25   good faith multiple times and said, look, Google is developing

1   this product, alpha testing, beta testing, whatever the case

2   may be.  And, yet, it's still not online five years later and

3   that -- four and a half years later, excuse me.  I'm not

4   measuring from the time of the case, I'm measuring from the

5   time they asked.  I mean, how can that not be -- at least infer

6   to be anticompetitive when, when, when, when we all agree that

7   this particular feature is really important, perhaps more

8   important than any other ad feature.

9           MR. SCHMIDTLEIN:  The evidence at trial didn't

10  establish it was more important than any other ad feature.

11  That's absolutely not the record in the case.  But if that was

12  true, they introduced this feature in 2016 on their native

13  tool.  Why weren't they banging on the door in 2017, 2018,

14  2019, this is -- oh, my God, SA360 is the critical tool we

15  need; it's the lifeline.

16          THE COURT:  Isn't the answer that Google hadn't

17  introduced it for its own until that spring?

18          MR. SCHMIDTLEIN:  But if it's so critical for them

19  and SA360 is so critical for Microsoft, why weren't they

20  pushing for that feature to be added?  Is the rule -- so we're

21  allowed to incorporate it first for Google, but then they can

22  ask for it?  I mean, what are the rules here?

23          The demand for the tool and the spend, because

24  Google's ad platform is better and in higher demand than

25  Bing's, of course Google is going to, in many instances, see

1    more demand for its own tools, and it has to make business

2    judgments.  It doesn't have unlimited resources to decide when

3    am I going to integrate, how am I going to integrate.

4              And it's undoubtedly more difficult -- and I think

5    the witnesses testified to this -- to integrate a version --

6    and this is not cut-and-paste technology.  Their technology is

7    different from our technology.  And, Your Honor, you've heard

8    from them.  They haven't proven SA360 is a monopolist.  He said

9    it's dominant in a market.  They haven't established a SEM tool

10   market.

11             I asked Professor Baker that.  "Is there a market for

12   SEM tools?

13             "I haven't done that analysis."  They showed you the

14   trend lines on their chart.  The majority of their ad spend

15   goes to their native tool.

16             THE COURT:  Well, okay.  I mean, that's not the

17   allegation.  The allegation is different, which is that this is

18   exclusionary conduct that's affecting the competitive process

19   in the ads market.  So you're right.  There's no SA360 market

20   or SEM tool market.  But this is their theory.

21             What am I to make of Ms. Braddi 's testimony and some

22   of the statements that were made in her emails and her

23   communications to Microsoft, which seem to depart from what the

24   folks on the ground were saying?  In other words, you know, we

25   heard from Mr. Varian, we heard from Mr. Krueger that, yes, we

1    can push forward.  This was -- we can start the testing perhaps

2    as early as -- I think it was the spring of 2020.

3            And then Ms. Braddi, later that summer, says, well,

4    we didn't understand what you were even asking for, Microsoft.

5            MR. SCHMIDTLEIN:  Yeah.  There was a

6    misunderstanding.  There was a miscommunication or a

7    misunderstanding between what Google thought Microsoft was

8    asking for, which was sort of a different implementation, and

9    when they came back and said, no, no, no, no, and they recited

10   Microsoft documents where they said, oh, yeah, you know what,

11   we could have -- we kind of get why they misunderstood us.

12   There's an internal Microsoft document where they admit that.

13           And they come back and said, oh, no, no, no.  It's

14   not this version.  It's this much more complicated version that

15   we now want.  And the reaction to that was, well, we're not

16   seeing demand for that.  That's a much bigger ask with a much

17   larger commitment.

18           And I think you heard the testimony at the trial

19   about Project Amalgam, which at the time Google was doing this

20   massive code bid switch and their resources were really

21   stretched.  So at that point Google was supposed to

22   re-prioritize all of its development effort of the tool in

23   general to accommodate a request where we hadn't seen real

24   advertiser demand until the end of 2020, until after this

25   lawsuit was filed.

1          And, so, no, I don't think they've demonstrated that

2    Google has taken -- has improperly refused to deal here.  There

3    was no prior course of dealing with Microsoft on the particular

4    advertising feature at issue.  That is an absolute legal

5    requirement under the no-duty-to-deal case law.

6          This is an easier case than *Novell* where the refusal

7    to deal was on the same exact feature.  So, how they can stand

8    up here and say no duty to deal, *Trinko* doesn't apply, you

9    know, this case law, and the command from the Supreme Court

10   that the exception to the no-duty-to-deal is to be interpreted

11   very, very, very narrowly?  That just doesn't comply with all

12   of the decisions.  It doesn't comply with *Novell*.  It doesn't

13   comply with all of the case law that has come after.

14          And there's no evidence that the conduct here can

15   only be explained by exclusion of competition.  Google looked

16   for customer demand, as it does for all of these various

17   features.  During the same time period Google built other

18   features for Microsoft.

19          THE COURT:  Well, I think Mr. Cavanaugh put up in his

20   slide deck, and sort of gone back and looked at some of these

21   documents.  Certainly as early as November 2019, at least

22   there's some documents.  This is DX179.009, which lists sort of

23   top Microsoft features, and Bing RSA is the top bullet point.

24          Now, I think if you're going to look at this and be

25   fair about this, there's the next bullet point which says, "All

1    Engines, Full Top 20, Important Context.  None of the top 20

2    include the Microsoft features above."

3              MR. SCHMIDTLEIN:  Yes, yes.

4              THE COURT:  So --

5              MR. SCHMIDTLEIN:  That's exactly what I was going to

6    hand Your Honor.  That document doesn't help his case.  It

7    hurts his case.  This is actually them surveying and

8    specifically they're not finding -- none of the top 20 items

9    include the Microsoft features above.  That doesn't prove that

10   there's demand at this time for Microsoft's features.

11             THE COURT:  I mean, there's another document.  It's

12   DX195.003.  It's a slide deck titled 2020 H2, SA360 Sales

13   Priority Results.  I think this may be a draft of the roadmap

14   for 2020.  Look, it's not a top five priority, but it's Number

15   11, auction-time bidding for Yahoo!, Japan and Bing.

16             MR. SCHMIDTLEIN:  And, again, no demand for it in the

17   United States.  I don't think that's demonstrating what volume

18   or particular demand there is in the United States.  What

19   Google gets -- the evidence that Mr. Cavanaugh refers to, when

20   there were two specific advertisers in December of 2020 who say

21   we're seeing real uplift and real benefits for this, that's

22   when Google begins to engage and begins to decide to work on

23   this.

24             THE COURT:  Does the record show what Home Depot made

25   there?  I think Mr. Booth testified that he had made an

1    inquiry.  Do we know when that occurred?  Do we have a date?

2              MR. SCHMIDTLEIN:  I don't --

3              THE COURT:  I just remember in his testimony -- I

4    thought he said we went to Google and said we would like to

5    have the auction-time bidding, and I don't know if he specified

6    when that happened.  In any event --

7              MR. SCHMIDTLEIN:  The point here is, Your Honor,

8    there was no prior course of dealing on this particular

9    feature.  We had no obligation.  And this really does get

10   into -- this case is a classic case of the plaintiffs asking a

11   Court to act as central planner, to oversee Google's product

12   development.  And when is Google supposed to know when's

13   enough?  How are we going to second-guess Google as to how much

14   customer demand is enough when they actually admit --

15             THE COURT:  Could there have been -- let me ask you:

16   What -- is there a commitment that Google could have made, in

17   your view, that would have put it within the *Aspen Skiing*

18   exception?

19             Because I take it your position is anytime you're

20   talking about conduct between rivals, duty to deal applies.

21   And, therefore, the only exception to that is *Aspen Skiing*.  Is

22   there any -- like, what commitment would Google have had to

23   have made, in your mind, in order to fall within the *Aspen*

24   *Skiing* exception?

25             MR. SCHMIDTLEIN:  I think you would have to see a

1    fact pattern a lot closer to *Aspen Skiing*, which was a

2    long-term course of conduct on a particular type of conduct.

3    So let's say, you know, there was some feature that we've been

4    supporting for years and years and years and years, and then,

5    all of a sudden, we sort of pulled it from them but we kept

6    supporting other people in the market that we didn't view as

7    particularly competitive or, you know, in a market where -- I

8    think in *Aspen Skiing* the evidence was they continued to

9    participate in other areas where they had competition, but in

10   this area they pulled it.

11          THE COURT:  One of the things in this case, I think,

12   if memory serves me, one of the elements of *Aspen Skiing* that

13   the court found to be compelling is that the other ski company,

14   the plaintiff --

15          MR. SCHMIDTLEIN:  Got the tickets.

16          THE COURT:  -- yeah, they said, look, we'll come and

17   buy tickets and they said, no, we're not going to sell them to

18   you.

19          MR. SCHMIDTLEIN:  Exactly.

20          THE COURT:  Didn't Microsoft in this case essentially

21   pay for the build-out?

22          MR. SCHMIDTLEIN:  Yeah, we asked the witness about

23   that and basically they said, that was kind of a joke.  We just

24   kind of threw that out there.  That wasn't a really serious --

25   that wasn't a really serious --

1          THE COURT:  One of the witnesses that testified here

2     or in a deposition?

3          MR. SCHMIDTLEIN:  I think that was deposition.

4          UNIDENTIFIED SPEAKER:  That was here.

5          MR. SCHMIDTLEIN:  It was -- it was Tinter.

6          THE COURT:  Oh, it was Mr. Tinter.

7          MR. SCHMIDTLEIN:  Yeah, Mr. Tinter, when he was

8     pressed at trial on that, he didn't fully stand behind that was

9     a real -- that was a real commitment.  And we'll review that --

10          THE COURT:  I'll look in the testimony.

11          MR. SCHMIDTLEIN:  The point here was, there's -- and

12     I do think it's important, Mr. Sallet's concession, they

13     haven't -- they haven't come forward with a single advertiser.

14     They haven't come forward with a single advertiser who said, I

15     switched my spend, or, I left Microsoft and I went to Google.

16     That's really critically important here.  I mean, I think you

17     need to have -- not just satisfy the very, very stringent

18     requirement of *Trinko* and --

19          THE COURT:  Your point is, even if Mr. Sallet is

20     right on the duty to deal, they still haven't come forward with

21     sufficient proof of anticompetitive effects.

22          MR. SCHMIDTLEIN:  Correct.  And this does go to what

23     I referred to throughout the case as "The back of the napkin."

24     They have not come forward with any advertisers, not a one.

25     They haven't come forward with any analysis by Dr. Baker,

 1    they -- of anything in the market.

 2            THE COURT:  Do you think -- is it not sufficient for

 3    me to infer an anticompetitive effect in the sense that, you

 4    know, they've laid the factual foundation about uplift for

 5    Google using ATB?  Microsoft has had uplift using ATB on its

 6    own platform, that the same would have occurred here?  Is that

 7    not enough of an inference of anticompetitive effect?

 8            MR. SCHMIDTLEIN:  Absolutely not, Your Honor.  And I

 9    believe in summary judgment we -- we talked a little bit about

10    foreclosure in this -- and you, I think, pointed out, well,

11    this isn't an exclusive dealing allegation so there's not a

12    foreclosure requirement per se.  But I think, going back to our

13    earlier conversations about what's the point of foreclosure,

14    well, the point OF foreclosure is to put some sort of a screen

15    or some sort of a test of anticompetitive effects.  And so I

16    think they do have to come forward.

17            I don't -- just as foreclosure percentages might give

18    you some indication, you have to then go beyond that and show

19    anticompetitive effects.  They haven't shown any

20    anticompetitive effects, and the reason why is the complete

21    failure of these -- and, again, I want to talk about these

22    estimates, these internal estimates that turn up within

23    Microsoft.

24            And at summary judgment we made this very same

25    argument to you.  We said they haven't shown anticompetitive

1    effects, and I think your -- as I read the gist of your opinion

2    is, I want to hear more about this at trial.

3              THE COURT:  Right.

4              MR. SCHMIDTLEIN:  I want to see -- they've come

5    forward with these documents.  And at the summary judgment

6    phase I think that's sufficient, but I'm sure I'm going to hear

7    more about it at trial.  You didn't hear more about it at

8    trial.

9              We've submitted the deposition testimony, and here's

10   what the deposition testimony was.  We asked Mr. van der Kooi.

11   I think Brian Utter and Shirley Heath, I think they're the ones

12   who probably have more information on that.

13             We asked Mr. Utter at his deposition, what do you

14   know about this?  Tell us how these numbers were put together.

15   "I didn't run the specific analysis, so I don't know the

16   basis."  He said to ask Ms. Heath.  We then asked Ms. Heath.

17             "I don't recall the basis of, specific involvement in

18   the estimates."

19             So you put them on notice at summary judgment, I need

20   to hear the explanation for these numbers.  And when I asked

21   Dr. Baker, I said, "Dr. Baker, you've cited these numbers in

22   your report or your opinions.  How did you come up with them?

23             "I read the documents.

24             "Well, did you ask Microsoft for all the backup?

25             "No."

1          You'll remember I -- you may remember Mr. Baker

2    interviewed Mr. Parakhin for another part of his opinion.  So

3    it's not as if Mr. Sallet didn't know how to get in touch with

4    Microsoft to help get him information when he thought it was

5    useful.

6          I asked Dr. Baker, "Did you ask him for that

7    information?  Did you ask for all the backup data so you could

8    rerun it and validate it and do any of that?"  He did none of

9    that.  He just rubber-stamped it.

10         If this was a damages case, if this was a case

11   involving, you know, this, you would never let this evidence in

12   front of a jury.  Never.  So, again, and --

13         THE COURT:  Mr. Schmidtlein, I'm going to ask you to

14   make your last point and wrap up, just in terms of the interest

15   of time here.

16         MR. SCHMIDTLEIN:  The references here are -- they may

17   sound like big numbers, but in context they're very, very small

18   numbers in terms of -- and, again, I'm not saying foreclosure

19   applies apples to apples, but I do think you need to consider

20   that as part of is there really harm to competition?  Or is

21   this just a blip of a few advertising dollars that Microsoft

22   claims, without any backup, it would have been able to

23   generate?

24         And respectfully, these are tiny, tiny percentages.

25   We've got it in our -- we've got it in the slide deck and you

1    can see it.  But the numbers are tiny when you look at the

2    overall size of the market.

3              Under those circumstances they haven't shown any harm

4    to competition, no impact on pricing, no impact on output, no

5    impact on any advertisers' participation in any auctions.

6              Thank you, Your Honor.

7              THE COURT:  Thank you, Mr. Schmidtlein.

8              Mr. Cavanaugh.

9              MR. CAVANAUGH:  Your Honor, on the point that

10   Microsoft should have come to them in 2016, the Google ATB was

11   not integrated into SA360 until 2019.

12             THE COURT:  Right.

13             MR. CAVANAUGH:  And that's when Microsoft got

14   interested it in.  And I would also note that over that period

15   of time, 2016 to 2019, their share of the SEM tools grew from

16   40 percent to 74 percent.  So they became much more

17   important -- SA360 was just becoming more and more important.

18             Second point, Your Honor raised Ms. Braddi.

19             Can we go to Slide 39, please, Peter?

20             So what Ms. Braddi was doing, who testified she

21   didn't actually know anything about SA360, she just kept moving

22   the goalpost.  So, you know, first it was, well, maybe we'll do

23   it within two years but no other conditional features.  Don't

24   ask for anything else.  And then it's, well, oh, Floodlight

25   data, you want Floodlight data?  Oh, my God, we can't --

 1    couldn't possibly.  That's completely out of scope.

 2              Slide 40.

 3              Well, Ms. Weinstein says, well, this shouldn't be

 4    surprising.  They knew this all along.

 5              How did they know it all along?

 6              Slide 41, please.

 7              In October of -- when they're first discussing doing

 8    the testing, track by Searchlight Ad, 360/Floodlight tag with

 9    Microsoft Advertising.  They're talking about the Floodlight

10    data.  And Brian Krueger, on behalf of Search Ads 360 team, we

11    look forward to getting this test off the ground.

12              What happened was Ms. Braddi and Don Harrison got

13    together and said, you know, we just -- this isn't consistent

14    with what we want to do.  It had already gone through the

15    roadmap, through sales, through finance, through everything.

16    They just wanted to drag their feet.

17              On the issue of harm, Your Honor, we go to Slide 27.

18              Dr. Israel got on the stand and said, well, we don't

19    see much of a drop.  There really isn't any impact here.  So we

20    then looked at the data itself from September 2019, when they

21    introduced auction-time AT bidding to Google Ads, to March

22    2021.  Bing's share dropped 13 to 11 percent.  Google's share

23    increased.

24              Now, Dr. Israel's point was, well, you know, we're

25    only talking 2 percent here.  Well, for Google that might be

1    meaningless, but for Bing, that's a significant drop in

2    business.  Before and after.

3               Go to Slide 28.

4               So we took these numbers and prepared a chart.  Bing

5    is going down, but the decrease is five times greater after

6    auction-time bidding on Google Ads is integrated into SA360.

7               Your Honor, our only obligation here in order to

8    aggregate the harm here is we have to show some competitive --

9    adverse competitive effects here.  Your Honor's point about

10   inferring something based upon the ample evidence that SA360

11   was valid, that auction-time bidding was valuable to

12   advertisers is undisputed at this point.  Skai produced a

13   12 percent conversion lift.  There's a benefit to Microsoft.

14              Your Honor, I would ask you to look at Mr. Tinter's

15   testimony.  He testified he offered to pay for part of the

16   engineering.  Never got a response from Microsoft.

17              Finally, Your Honor, Google wants the best of both

18   worlds.  And this is the point Mr. Sallet was trying to make.

19   They want to continuously run an SEM tool and say to the world,

20   we have this neutral tool.  We're supporting Microsoft and

21   through that we're supporting DuckDuckGo and Yahoo!, but at the

22   same time, we want the benefit of that but we don't want the

23   rules of the game to apply to us; we can act unreasonably here.

24              That's why these -- that's why this case is so

25   fundamentally different from a refusal to deal case because in

1   those cases, *Novell*, *Meta*, they made the case, we're going to

2   stop dealing with -- they weren't talking about a specific

3   feature.  We're just not going to deal.

4        And with that, okay, then you can't tell the market

5   I'm dealing with everybody.  And that's the fundamental premise

6   of this tool.

7        And then just finally, Your Honor, you know, what

8   conduct can be anticompetitive?  Well, we cite in our brief,

9   our post-trial brief, on page 4, you know, in *Illumina*, late

10  deliveries, subtly reducing the level of support services.  In

11  *H&R Block*, limiting the functionality of rival's products,

12  reserving special features or innovations.

13       Your Honor, every case, every antitrust case turns on

14  their specific facts.  When you look at the specific facts of

15  this case, voluntary, ongoing, continuous interactions with

16  Microsoft Ads, but -- they want the benefit of that, but they

17  don't want to play by the rules of the game.

18       Thank you, Your Honor.

19       THE COURT:  Thank you, Mr. Cavanaugh.  Okay.

20       All right.  Let's turn to sanctions, and we'll -- who

21  would like to be heard on that topic?

22       MR. DINTZER:  Just going to move chairs, Your Honor,

23  just take a moment.

24       (Pause.)

25       MR. DINTZER:  May I approach, Your Honor?  If I may,

1    Your Honor.

2            THE COURT:  Um-hum.

3            MR. DINTZER:  May it please the Court.

4            The Court should find that Google's systemic

5    destruction of documents to avoid discovery demonstrates

6    anticompetitive intent and violates the federal rules and

7    warrants sanctions, Your Honor.

8            The evidence is unequivocal and, quite honestly,

9    breath-taking.  In 32 years of litigation, I've never seen

10   anything like this, and it starts with -- in 2008 with Google's

11   chief legal officer expressly adopting a document destruction

12   policy to avoid civil discovery.

13           It expressly says this, he writes:  "As you know,

14   Google continues to be in the midst of several significant

15   legal and regulatory matters."

16           So what comes next is, because of existing civil and

17   regulatory matters, he writes, "We're an email and instant

18   messaging culture.  We conduct much of our work online."

19           He recognizes that they email and chat about

20   everything and that, quite honestly, people are more honest and

21   direct on chat.

22           He writes:  "We believe that information is good, but

23   anything you write can become subject to review in legal

24   discovery."

25           This is about discovery, Your Honor.  Then he writes:

1    "To help avoid inadvertent retention" -- which is amazing to

2    think of Google using the term "inadvertent retention" -- but,

3    "to avoid inadvertent retention of instant messages, we have

4    decided to make 'off the record' the Google corporate default

5    setting for Google Talk."

6          So they're expressly going to destroy documents.  In

7    the same paragraph he says:  "To avoid discovery."

8          Next slide, please.

9          Google says they sent out a whole letter that

10   absolved them of all concerns about them destroying the

11   document.  Your Honor, that whole letter did not stand a chance

12   against the history of -- the "history off" policy.  We heard

13   from vice president, executive, Dr. Nayak.

14         "And from time to time you asked people to turn

15   history off before or during your chats?

16         "Well, I've certainly done that because at that time

17   there was a policy at Google to have history off.

18         "And you --

19         "And I just wanted to be compliant with that policy.

20         "Question:  You understood Google's policy was that

21   history off for chats amongst Google employees?

22         "Answer:  Yes."

23         They destroyed documents based on an existing policy

24   because of civil discovery.

25         Your Honor, there's no question executives such as

1    Dr. Nayak, Dr. Raghavan, they intentionally had extensive
2    conversations with history off knowing they would automatically
3    be deleted.  In fact, that's why they used it.
4         Mr. Pichai knew and permitted this policy to
5    continue, did not stop it, did not change it, knew they were in
6    litigation.  Further indicia of anticompetitive intent.
7         Court is well familiar with our Communicate With
8    Care, but I just want to make one point, Your Honor.  And that
9    is, the development of fake privilege claims was, among other
10   things, focused on Android agreements.  This is from 2016 when
11   they write -- this slide appeared four times in an 88-slide
12   deck.  Four times.
13        So, they count on their people remembering everything
14   else, but they really wanted them to make sure they remember
15   this.  They say:  "Additionally, any written communication
16   regarding revshare and MADA should include an attorney's
17   name" -- they give the specific ones -- "and request guidance,
18   mark content as 'Confidential, Attorney-Client Privileged' any
19   written communications about those documents."
20        This was an intent to hide documents regarding those
21   two.  It wasn't any contract.  It wasn't any -- any legal
22   thing.  It was about those two because they knew those two
23   asked for exclusivity and could be the basis of an antitrust
24   case.
25        THE COURT:  Can I ask a question?  Do you think you

1    have shown -- with perhaps the exception of Mr. Krueger, that

2    any chats -- and maybe even Mr. Varia, any chats that are

3    relevant to this litigation were not preserved.  I mean,

4    obviously you can't know.  But you did ask -- I can't remember

5    how many custodians, whether they use chat for substantive

6    business purposes.  The vast majority said no.  Heard from a

7    couple who, here, in fact, Mr. Krueger, perhaps being the

8    primary person who, in fact, said, yes, you know, product

9    decisions were possibly discussed on chat.

10           But other than him, and to some extent Mr. Varian, is

11   there anyone else, given that Mr. Pichai's text that was in the

12   chat that was shown wasn't relevant; email involving

13   Mr. Kolotouros, had to do with wearables, perhaps relevant at

14   the beginning, by the time we got to trial not so much.  I just

15   went through all the evidence that was shown.  Mr. Raghavan was

16   shown a 2019 email in which he referred to moving to history

17   off chat prior to the document hold in this case.

18           I mean, look, let me just be perfectly candid, which

19   is, Google's document retention policy leaves a lot to be

20   desired.  I mean, it's shocking to me, or surprising to me that

21   a company would leave it to its employees to decide when to

22   preserve documents, which is essentially what they were doing

23   here.  If an employee thought they were going to say something

24   relevant, then you turn your history on.  That's not exactly

25   the way it ought to be done.

1                But the question of prejudice and whether there's --

2        you think there's documentation that's been lost here, can you

3        help me get there, if that's what you think.

4                MR. DINTZER:  Sure.  Your Honor, let's start with

5        Mr. Nayak, Mr. Raghavan, Mr. Kolotouros, Mr. Rosenberg.  They

6        all indicated that there were communications that were not just

7        like, "Let's have lunch," that they had, during those

8        conversations, substantive conversations over the chat system.

9                The second thing is Mr. Nayak -- let's go back to

10       that Slide Number 4, please.

11               He expressly says that he's asked people to either

12       turn history off or to -- you know, knew that the history was

13       off because he would -- there was a policy at Google to do it.

14       So it wasn't just, oh, it was set.  He actually believed -- and

15       I assume he's speaking for others there, too, where they

16       believed there was a policy to turn it off and to have the

17       documents destroyed.  It can't be that the burden is on the

18       injured party to show that the routine, regular and enormous

19       destruction of documents throughout the investigative period,

20       throughout the litigative period and only stopping when we told

21       them we were coming to the court, it can't be that it's our

22       burden to show what they destroyed.  I mean, they were

23       thorough.  So we don't have little leads in and the like.

24               But also, Your Honor, we have intent in other ways,

25       which is why I'm showing the red slide, Your Honor.  The red

1    slide shows they had the intent to hide stuff specifically

2    related to this.  And that intent is not -- doesn't stay in its

3    lane.  The Court should look at that intent and say they had an

4    anticompetitive -- they had an intent to hide information.  And

5    certainly that carried over into their intent in destroying

6    documents.

7         But -- so I believe that we do check the boxes for

8    Rule 37(e)(1), which is prejudice.  We didn't get the

9    documents.  We didn't get -- I mean, we're talking about

10   potentially hundreds of thousands of chats just during the time

11   of the investigation and during the litigation.

12        But we'll never know.  And Google's intent, the fact

13   that they intended to do this, I mean, they -- when the policy

14   was adopted, it was to keep things from civil discovery.

15        THE COURT:  So what do you -- what are you requesting

16   in terms of a sanction?

17        MR. DINTZER:  So to start with -- and the Court

18   previewed this when we brought up Communicate With Care.  We

19   believe the Court, separate from the sanctions, should conclude

20   that Communicate With Care plus history off shows

21   anticompetitive intent.  There was an intent to hide

22   information because they knew they were violating the antitrust

23   laws and that intent supports the existence of the type of

24   conduct that we've described.  So that doesn't -- that's even

25   before we get to sanctions.  We believe that that shows

```
 1    anticompetitive intent.

 2              Then we get to the sanctions.

 3              Let's go to 8, please.

 4              Where -- this just checks the boxes, actually.  Let's

 5    go to 9.

 6              So this is wrong.  For the legal system to work,

 7    legal officers in major corporations can't orchestrate this,

 8    they can't supervise it, and the Court needs to say that it's

 9    wrong.  It's -- if the Court doesn't, Google's history --

10    they've never said -- they've never apologized.  They've never

11    said, oh, this was a mistake.  They've never once said we won't

12    do this again.  They've never said anything to suggest that

13    this is limited.

14              Google games out everything.  They *Moneyball*

15    everything.  And if they believe that the risk and cost of

16    doing this is less than the risk and cost of being caught doing

17    this, they will do it again.  And so the Court needs to

18    adopt -- it needs to sanction them, first and foremost.  And

19    then as far as -- we believe we've proven our case, and so in

20    that sense it may not be -- the sanctions we're asking for

21    beyond sanctioning them may not be necessary, but to the extent

22    that the Court finds that any part of our case remains

23    unproved, we are asking for the five -- really, four items

24    listed here:  Adverse inferences;

25              Presumption that deleted chats were unfavorable to
```

1    Google regarding the intent behind and effect of Google's

2    contracts;

3              Presumption that Google's proffered justifications

4    are pretextual.  I mean, they don't have documents for their

5    proffered justifications anyway.  Maybe they destroyed those,

6    too.  But, they don't have any documents to support them

7    anyway.  But, a presumption that any proffered ones are

8    pretextual;

9              Presumption that Google intended to maintain its

10   monopoly.  And a prohibition on argument by Google that the

11   absence of evidence is the evidence of its absence.

12             Your Honor, and then any other relief the Court finds

13   proper.

14             The -- a finding of adverse inferences like this is

15   the type of thing that makes it -- the cost benefit analysis so

16   bad that they won't do it again.

17             And Mr. Schmidtlein is going to get up here and,

18   whatever he says, I would be shocked if he apologizes for their

19   conduct -- because they haven't yet -- admits to their conduct,

20   owns up to it or anything like says it won't ever happen again

21   because this was wrong.  And that would be a start.  And we're

22   not going to see that, Your Honor.

23             So, we believe we've established all the elements of

24   sanctions, and we believe that the Court should give us the

25   adverse inferences.

```
 1                THE COURT:  Mr. Dintzer, thank you.

 2                MR. DINTZER:  Thank you, Your Honor.

 3                Mr. Schmidtlein?

 4                MR. CAVANAUGH:  Your Honor, could I just make one

 5     point?

 6                THE COURT:  Oh, yes.  I'm sorry.  I didn't mean to --

 7                MR. CAVANAUGH:  I would just note, Brian Krueger and

 8     Mr. Varian were involved in the testing -- in stopping the

 9     testing in January of 2020.  And I think the Court should take

10     that into consideration in evaluating their claims of good

11     faith and the fact that they were just following usual

12     protocol.  Thank you, Your Honor.

13                THE COURT:  Thank you.

14                MS. CONNOR:  Yes.  Colette Connor for Google.

15                Good afternoon, Your Honor.  Counsel for Google

16     expressly disclosed Google's chats policies to the very same

17     parties who are plaintiffs here; first to the Texas Attorney

18     General, which is a co-plaintiff of the Department of Justice

19     in this matter and who has been involved in the parties'

20     discovery, communications of this matter from the beginning,

21     and to the Department of Justice Antitrust Division.

22                If you could pull up Slide 6, please.

23                So this is the -- a February 2020 letter from the

24     Texas Attorney General to Google memorializing the parties'

25     conversation.  This is Texas' words.  This is in their
```

1    investigation.  And this is before this complaint was filed.

2              It says, and you can see here:  "These messages are

3    not retained in any way unless they're marked 'On the Record.'"

4              THE COURT:  Remind me.  Is this from this

5    investigation or the ad tech investigation?

6              MS. CONNOR:  Texas was involved in ad tech

7    investigation, but also in the parties' investigation here.

8              But it -- and it goes on from there, as you can see.

9    Google was explicit about this.  If the user doesn't mark the

10   chat as "On the Record," it's deleted immediately.

11             And then if you can go to the next slide, please.

12             And this is a letter a couple days later, back from

13   Google to Texas, where Google discloses to the Texas Attorney

14   General the default is off the record.  Off-the-record messages

15   are not retained.

16             Next slide, please.

17             The Google attorney who was handling both the

18   investigation in this case and initially the investigation that

19   sort of -- the ad tech investigation continued.  The Department

20   of Justice was investigating both Search and Ad Tech.  They

21   filed their Search lawsuit and the Ad Tech investigation

22   continued.  Two months after this lawsuit was filed, the Search

23   lawsuit, there was a meet-and-confer, where chats were

24   discussed again to the Department of Justice Antitrust

25   Division.  Google's counsel again explained this distinction

1    between on the record and off the record and that

2    off the record were not retained.

3              THE COURT:  Ms. Connor, can I ask the following:

4    Would you agree with me that, at a minimum, it was negligent of

5    Google to leave it to its employees to decide when to preserve

6    chats?

7              MS. CONNOR:  I would not agree, Your Honor, but

8    negligence does not --

9              THE COURT:  I get it.

10             MS. CONNOR:  -- cut it here.

11             THE COURT:  That's why I used the word "negligence."

12   Do you think it's the best practice, after the Department of

13   Justice and State's Attorneys Generals send subpoenas, CIDs,

14   litigation holds, for a company like Google to leave it to its

15   employees to determine when it's okay -- when they should

16   preserve records and not?

17             MS. CONNOR:  Given the typical use of chats, it was

18   reasonable, Your Honor.  And you now have declarations of over

19   20 Google witnesses of plaintiffs' choosing and the trial

20   testimony.  And those uniformly, with the one exception of a

21   witness who has misunderstood his obligation, speak to how --

22             THE COURT:  Google's changed its policy today?

23             MS. CONNOR:  That's correct, Your Honor.

24             THE COURT:  So it's not that unreasonable.

25             In other words, it wasn't that unreasonable to expect

1    that Google would have taken it from its employees from the

2    outset to make the decision and then ultimately leave it to

3    search terms and other types of ways of determining whether

4    documents are relevant or not.  I mean, it really is sort of --

5    and let me sort of be clear about my thinking about this in

6    some sense, which is I've read all of the submissions that

7    counsel has made making the disclosures, and I have no reason

8    to think that Google's counsel has been anything other than --

9    I don't think that Google's counsel has been deceptive.

10            But for the company policy to have been, look, folks,

11   you know, I'm going to make you guess in advance of getting on

12   a chat whether what you're about to say is relevant to the

13   following three, four, five, six investigations is simply not

14   realistic.  You cannot possibly expect somebody like

15   Mr. Krueger, in advance of getting on a chat, to think, well,

16   wait a minute, am I about to get on a chat that might create

17   responsive records to litigation?  Of course not.  Of course

18   not.

19            He, like many others, came in and said, look, I just

20   went with what the default was.  Right?  That's what they did.

21   They went with what the default was, and that's history off.

22   And to ask them to turn it on because they're about to make a

23   record that could be relevant and disclosable just seems to me

24   to be contrary to human nature.  And I don't need Dr. Rangel to

25   reach that conclusion.

1              MS. CONNOR:  Understood, Your Honor.  I think there's

2       certainly -- you know, companies have some latitude with

3       respect to their document retention policies, but the reason

4       these disclosures -- there's two reasons the disclosures

5       matter.  The first reason is if this policy was so unreasonable

6       that it constitutes sanctionable conduct, and not one single

7       attorney who we disclosed it to raised their hand and said,

8       "Wait, what?  These off-the-record chats are being deleted?

9       What are you guys talking about?  We think those chats have

10      important, relevant information to our case such that you are

11      destroying evidence."

12             Nobody -- nobody took that position, not a one

13      attorney.  And it was disclosed to multiple plaintiffs

14      investigating -- you know, investigating Google and litigating

15      against Google.  In the *Epic* case where this was litigated,

16      every state plaintiff who is a plaintiff here, 37 states

17      between the two cases, is a plaintiff in that case.  They did

18      not raise their hands.

19             So, I think there is -- there certainly is

20      discretion.  Reasonable minds can disagree, but to rise to the

21      level of sanctionable conduct -- and we disclosed expressly to

22      multiple groups of plaintiffs, including the Department of

23      Justice Antitrust Division, years ago and not one of them said,

24      Hold on, that's your practice?  That's not acceptable to us.

25      And we think not only is that unacceptable to us, but that is

1    sanctionable.

2            It just never happened until the plaintiffs in *Epic*

3    did move for sanctions and there were proceedings out there,

4    and that's when the Department of Justice first raised it to

5    us.

6            And, of course, the second reason, the disclosures

7    matter, is it forecloses any claim of intent.  We -- it just

8    cannot be consistent with intent to destroy evidence when

9    you're disclosing the policy, the company policy in this case.

10   On intent courts set a very high bar.  It's stringent.  It's

11   unlike -- with respect to Rule 37.  And it's just like any

12   other discovery standard.

13           So in terms of prejudice --

14           THE COURT:  Can I ask the question, at the end of the

15   day -- and we just don't know what we don't know, right?  Is we

16   don't know if there was a treasure trove of material that was

17   not saved.  And I don't want to use the word "destroyed"

18   because it's not like somebody is going and shredding

19   documents.  They weren't preserved.  They should have been

20   preserved.  We don't know.  No reason to know.  And also, to

21   expect the plaintiffs to come forward to show that they would

22   have been a treasure trove is sort of difficult.  Although we

23   did ask a lot of folks to what extent they remember using the

24   chats.

25           Shouldn't there be some consequence?  Even if it's

1    not -- rises to the level of intent under Rule 37, some

2    consequence for what, at a minimum, at a minimum, was far from

3    best practices?

4            MS. CONNOR:  So, separately from intent to issue a

5    sanction under Rule 37(e)(1), now I -- the sanctions that

6    they're asking for all fall under Rule 37(e)(2) and require you

7    to find intent.  Those all fall under Rule 37(e)(2) --

8            THE COURT:  Right.

9            MS. CONNOR:  -- and require intent finding.  But a

10   sanction under Rule 37(e)(1) requires prejudice, and it's

11   always the case when evidence is gone, right, that you can

12   never know what it would have been.

13           That's not enough.  If that were enough, anytime

14   evidence was lost, it would meet that test.  It's not enough.

15   There has to be reason to think, good reason to think that

16   there was some unique material information such that the

17   plaintiffs were actually prejudiced.  And here there's just no

18   basis to conclude that.  And there's a couple reasons why.

19           THE COURT:  What about Mr. Krueger?  I mean, he

20   expressly admitted -- this is going back and taking a look at

21   his testimony and declaration -- that he used Google chat to

22   discuss SA360, including possibly the roadmap and product

23   decisions.  And that -- I think in his declaration he said he

24   purposely turned the chats off.

25           Now, not everybody said as much, but he did.  So why

1     isn't that enough to show that odds are that Mr. Krueger said

2     something on those chats that would have been producible and

3     relevant and maybe favorable?

4          MS. CONNOR:  So with respect to Mr. Krueger

5     specifically, he was put on legal hold in October of 2021.  He

6     was never deposed in this case.  He was put on legal in October

7     of 2021 and he had the position, the relevant position within

8     SA360 only until December of 2021.  So you're talking about

9     three months' time.

10          And he also testified that, you know, no one reported

11    to him.  He didn't have sort of discretionary authority, and

12    any decision-making points would be reflect -- would have been

13    made by other people in the first instance, and also the

14    analyses would be reflected in other documents.

15          So there's just no reason to think that any

16    information material to resolution of the issues in this case

17    has been lost, and that is what is required to show prejudice.

18    It's more than just there could have been relevant information

19    that could have been lost because, again, that would be true

20    always, and the cases require more than that.

21          And beyond Mr. Krueger, there's a couple reasons why

22    there's just no reason to think that there's

23    anything material -- that would have changed any issue or the

24    Court's consideration in any material way.  The nature of the

25    claims here in the first instance -- I mean, we're talking

1    about contracts that have been in place for many, many years,

2    long predate the initiation of the legal hold in this case.

3            And the plaintiffs have never articulated any --

4    anything that is missing or any evidence that they think they

5    would have found in the chats that would have driven the

6    Court's decision because it really just isn't applicable in

7    this case.  And the witness declaration, the 20 witness

8    declarations in the trial testimony really confirm that the

9    relevant employees just don't use chat for substantive

10   discussions.

11           And in the atypical use, when maybe something crosses

12   into substance, the, you know, complex media analysis is going

13   to be reflected in other documents.  You have seen many of

14   those documents during the trial, of course, emails, slide

15   decks, and that's just a tiny fraction of what is produced.

16           If you could put up the second slide, please.  Excuse

17   me -- yeah, Slide 2.

18           THE COURT:  Couple more minutes, Ms. Connor.  That's

19   okay.  Just a couple more minutes, if you would, please.

20           MS. CONNOR:  Sure.  All right.

21           You can take that down.

22           You're well familiar with the scope of discovery in

23   this case.  I just want to --

24           THE COURT:  I can't recite the numbers, so -- a good

25   sense of it.

1          MS. CONNOR:  A ten-week trial, I'm sure you can't

2     recite.

3          So a couple last points, just to respond to some

4     things DoJ's counsel said.  The exhibit that he started with,

5     which was -- you don't have to put it up, but -- excuse me --

6     it was UPX1101.

7          What they didn't show you is where they specifically

8     say if you're on legal hold, then they go on to instruct

9     employees about their legal hold obligations.  So they're not

10    showing you that, Your Honor, that this was not trying to --

11         THE COURT:  I know what the legal hold said.  It

12    wasn't don't preserve it, it was turn the chat on.  I mean, it

13    was as I described it earlier.

14         MS. CONNOR:  And just generally, and then they also

15    showed us slides sort of on the attorney-client privilege

16    labeling issue, which we've argued, you know, two years ago

17    now, and Your Honor has already concluded that they've received

18    all of the discovery, notwithstanding any -- you know, without

19    regard to a privilege label.  So there's just nothing that has

20    been -- they cannot be prejudiced because they have received

21    all that discovery.

22         THE COURT:  So could it not being used as intent

23    evidence?  Let's leave aside sanction, adverse inferences, the

24    like.  But, I mean, it was interesting to me that Google has

25    been very deliberate and perhaps, you know, after seeing what

1    happened with Microsoft, being very deliberate in advising its

2    employees about what to say and what not to say, right?  I

3    mean, there was a slide that said "Don't use the term

4    'markets.'  Don't use the term 'share.'" I think it was

5    something like that.

6            Then we have this pattern in which employee after

7    employee after employee would slap the Privilege and

8    Confidential label on an email.  Not every employee necessarily

9    knows, but so much so that Google's outside counsel -- at least

10   until we realized otherwise -- thought that these were actually

11   truly privileged and confidential emails.  Just seems like a

12   practice that is meant to -- it could be interpreted as

13   intentional in terms of ensuring that there is not the kind of

14   seeds that are sometimes found in other cases that prosecutors

15   or plaintiffs can follow.

16           MS. CONNOR:  Your Honor, I think that interpreting

17   that weight would be a sanction under Rule 37(e).  In other

18   words, you would have find Rule 37(e)(2) met in order to use

19   the evidence in that way.  And often in the jury context, just

20   allowing the plaintiffs to put forward evidence, such as they

21   put forward, is the sanction.

22           So, no, we don't think it could be used as intent

23   evidence.  It's not relevant to the claims in this case.  And

24   if you were to do that, you would have to make the finding

25   under Rule 37(e)(2).

1        THE COURT:  Okay.  All right.  Anything further?

2        MS. CONNOR:  No.  Thank you, Your Honor.

3        THE COURT:  All right.  Thank you.

4        Mr. Dintzer, I'll give you 60 seconds.

5        MR. DINTZER:  60 seconds?  I can do that.  I don't

6    know about Madam Court Reporter.

7        So I was wrong about Mr. Schmidtlein coming up.  I

8    was right that they would be unapologetic.

9        Your Honor, it is not a sanction for the Court to use

10   all the information it has and find that there was

11   anticompetitive intent, which there clearly was.

12       The date that -- so they told Texas -- I mean, this

13   can't be proper disclosure.  They told Texas in April of --

14   April 4th, 2020.  Our CID went out to them in August of 2019.

15   So they didn't tell us.  They didn't stop destroying the

16   documents, and so this was not disclosure.  And the Court

17   should find that the decision to tell a state and not tell the

18   federal government about this, that that doesn't satisfy their

19   obligation.

20       Clearly, clearly if we knew they were destroying the

21   documents, we would have acted.  If the Court has learned

22   nothing else about this team of litigators, it's that we would

23   not have let them continue to destroy documents for years

24   without calling them on it, which we did immediately after we

25   found out.  They said that they told the ad tech team.  It's a

 1    different team.  But also, the telling of them was very -- was

 2    very convoluted -- a lot of it was convoluted and should not be

 3    considered real disclosure.

 4          Finally, just two last points, Your Honor.

 5    Mr. Raghavan, Dr. Raghavan said -- this is a quote -- "I gave

 6    him both barrels, 'history off.'"

 7          He didn't explain what history off was in that email.

 8    He said that because he knew that the person receiving it would

 9    understand, and that the person receiving it would understand

10    that, oh, this is the kind of thing that we wouldn't to be

11    produced, so that's why he did it.  This was uniformly used as

12    a way of communicating without creating discoverable

13    information.

14          Your Honor, it was wrong and they shouldn't have done

15    it and the Court should reflect that in its opinion, but with

16    finding anticompetitive intent and a sanction.

17          Unless the Court has any questions, thank you very

18    much.

19          THE COURT:  Thank you, Mr. Dintzer.

20          Okay, everyone.  I left some time to sum up.

21          If you would like to have it, I'll give it to you.

22    If you think you've said enough, we can call it a day.

23          MR. SCHMIDTLEIN:  It sounds like a leading question.

24          THE COURT:  Promise.  Won't get sanctioned either

25    way.

1           MR. DINTZER:  I would not use the amount that the
2   Court allocated.  There is -- I have a lot of things I would
3   like to say.
4           THE COURT:  Before we do that then, I would like to
5   give our court reporter a few minutes.
6           MR. DINTZER:  Of course.
7           THE COURT:  We've been going for a while.
8           MR. DINTZER:  If we all agree, five minutes or three
9   minutes a side.  I'll just take a couple minutes, just to show
10  the Court a couple things that would answer questions the Court
11  may have.
12          THE COURT:  Okay.  All right.  Well, as I said, she's
13  been going for quite a while, and I don't want to press my luck
14  and, you know -- so, let's just resume at 10 after 5:00, if
15  that's all right.  Then we can probably finish up by 5:30.
16  Thank you, everyone.
17          (Recess from 5:03 p.m. to 5:10 p.m.)
18          THE COURT:  All right.  Mr. Dintzer, you're on the
19  clock.
20          MR. DINTZER:  I'm on the clock.  I appreciate that,
21  Your Honor, and I appreciate the time.
22          Okay.  Let's go -- hand these out.
23          Five minutes.  And --
24          THE COURT:  I can't imagine what the Department of
25  Justice's binder budget has been.

1          MR. DINTZER:  We do recycle.

2          So, Your Honor, I'm not going to use all of the

3     slides in there.  I would like to put up Slide Number 3 because

4     the Court asked about foreclosure.  And Microsoft established

5     that exclusivity and substantial foreclosure is enough, and we

6     know that because the follow-on case, *New York v. Microsoft*, it

7     twice referred to the original appellate decision, and it

8     expressly said that based -- all that would -- needed to be

9     shown was substantial foreclosure and no -- for competitive

10    justification.  So that's the follow-on case.

11         And then *In Re:  Lorazepam* reached a similar

12    conclusion in 2006 when it sent the case to the jury.  So we

13    wanted to give the Court those citations of direct to --

14    foreclosure was enough on causation.

15         The reason for that is, Your Honor, foreclosure is

16    what causes the lost incentives.

17         The second thing we wanted to show is Slide 8.  And I

18    know the Court knows *Microsoft*.  We're not going to read

19    *Microsoft*.  But if you take *Microsoft* regarding the IAP and you

20    just insert what happened here, it reads perfectly because this

21    is exactly what they did.

22         By ensuring that all of Android, Apple, and Mozilla

23    users are offered Google either as the default general search

24    engine or as the only general search engine, Google deals with

25    Android partners, Apple and Mozilla, clearly have a significant

 1    effect in preserving its monopoly.  They help keep usage of

 2    Bing below the critical level necessary for Bing or any other

 3    rival to pose a real threat to Google's monopoly.  This reads

 4    on *Microsoft*, and *Microsoft* fits like a glove.

 5           Slide 14.  I'm not going to read this because

 6    Mr. Schmidtlein said this today.  But what he was talking about

 7    was ads.  But if the Court reads this, this expressly tracks

 8    what our experts said about the impact on investment due to

 9    the -- Google's anticompetitive actions.  If you take away the

10    chance to win, people won't invest.  If one side is always

11    winning, they won't invest.  This is anticompetitive impact as

12    acknowledged by the other side.

13           Slide 10.

14           The Court said -- made a comment about scale and

15    quality.  Google uses 13 months of scale to train its systems

16    now.  And it would take Google -- I mean, Bing 17 years to get

17    that much scale.  These are 2019 and 2020 documents that

18    reference how important scale is.  Scale today is just as

19    important as its ever been.  Navboost and Glue are just as

20    important for their systems.

21           And then the final slide, Your Honor.  And

22    Mr. Ramaswamy, as the Court knows, he signed off on a lot of

23    these agreements.  He then had to compete against them.  And

24    when he said they basically freeze the ecosystem in place

25    effectively, he was describing monopoly maintenance, that only

1    a monopolist could do, that only a monopolist would benefit

2    from.  Google says the market is fine.  There's nothing to see

3    here.  They ask the Court to do nothing.

4          If the Sherman Act can't thaw this ecosystem, Your

5    Honor, Google's monopolies will continue tomorrow and tomorrow

6    and tomorrow, and so today must be the day for this action.  We

7    ask the Court to find that Google has violated Section 2 of the

8    Sherman Act and allow the plaintiffs to proceed to the remedy

9    phase.

10         Thank you, Your Honor.

11         THE COURT:  Thank you.

12         Mr. Cavanaugh.

13         MR. CAVANAUGH:  Thank you, Your Honor.

14         Your Honor, the plaintiffs states' case derives

15   directly from the search distribution contracts.  Harm to the

16   user side.  It's harm to the advertising side.  Fewer users

17   mean fewer advertisers.

18         Our evidence, unlike Google's, come from the firms

19   who spend the money, the advertisers, and they made it clear

20   for them Google holds all the cards.

21         Your Honor, today Mr. Schmidtlein was noting that the

22   margins have stayed relatively the same.  And that's because

23   TAC has gone up, traffic acquisition costs, which takes us back

24   to the question Your Honor has asked many times.  Why?

25         2019, 2021, there was no -- it was no secret that

1    Google's search engine was really the only game in town.

2    Microsoft wasn't able to compete.  Dr. Giannandrea was --

3    Google's former head of search, was -- now at Apple.  Mr. Cue

4    testified to what he testified to.

5         So I asked Mr. Pichai:  When you have dinner with

6    Mr. Cook, do you say, hey, Tim, let's be honest, you don't have

7    any leverage here.  I can't justify to my shareholders giving

8    you, you know, 40 percent of the ad revenue that goes through

9    Apple under the contract.

10        But what did he do?  He still gave him 40 percent.

11   Why?  Two reasons:  They saw Apple might have the capacity to

12   enter and they wanted to freeze the ecosystem.  It worked for

13   them.  Doesn't work for competition, ultimately doesn't work

14   for users, advertisers, but it's worked for Google.

15        Thank you, Your Honor.

16        THE COURT:  Thank you.

17        Mr. Schmidtlein.

18        MR. SCHMIDTLEIN:  Your Honor, Mr. Dintzer says

19   Microsoft fits this case like a glove.  I don't know what

20   gloves Mr. Dintzer wears, but I can tell you this, and the

21   evidence has shown you this.  In Microsoft, as a result of the

22   restrictions that Microsoft placed on OEMs and on IAPs, they

23   coerced, they coerced third parties to do deals they otherwise

24   wouldn't do.  They coerced third parties to take inferior

25   products that historically they had distributed.  And they

1    imposed exclusivity, de facto or otherwise, on those parties

2    that led to a substantial foreclosure and significant

3    anticompetitive effects.

4         That is not this case.  The evidence you've heard in

5    this case established the following:  Search ads quality over

6    time increased significantly.  Search ad -- search engine

7    quality, search result quality and search ad quality all

8    increased significantly.  Search output increased

9    significantly.  Search ads output increased significantly.

10        In *Microsoft* they won with an inferior product.

11   Google has won with a superior product that, unlike *Microsoft*,

12   where the OEMs all testified or there was evidence OEMs

13   testifying this isn't what we want, every single third-party --

14   Apple, Mozilla, Samsung, Motorola, Verizon, AT&T, T-Mobile --

15   every single relevant partner who came before this Court said

16   we picked Google because it was the best, not because we had to

17   have Google.  Because it was the best.

18        This would be an unprecedented decision to punish a

19   company for winning on the merits.  There has not been any

20   interference with the competitive process, as *Microsoft*

21   requires.  The plaintiffs are unhappy with the results of the

22   process.  That's not the question.  The question is was the

23   process infected, or was it an unfair process?

24        In *Microsoft* it was because Microsoft was able to use

25   Windows to coerce.  Google never ever did that, and they failed

1    to show it.  To hear Mr. Cavanaugh and them talk about it, you

2    would think that they had brought a claim of some sort of

3    predatory bidding, that Google had bid too much, they'd

4    intentionally lost money to lock people out.  That's never been

5    their claim.  In fact, they say Google should have bid more.

6    There should have been more competition.  They should have bid

7    more.

8        So please don't be fooled by the notion of, oh, they

9    paid so much.  You know, what does this all mean?  Well, what

10   did they pay for?  Of course, they paid for incremental

11   promotion.  But as Your Honor noted, I think yesterday with

12   Mr. Dintzer, when the default is Google, people don't switch

13   very much.  When the default is somebody else, they switch a

14   lot.

15       And when Microsoft had the defaults, users didn't

16   like them and the people who used them suffered.  And so now

17   they -- and they have repeatedly chosen Google, not because

18   they had to.  They've tried Microsoft.  They chose Google

19   because Google has won based on quality.

20       One last point on SA360.  Mr. Cavanaugh said the

21   standard that you should apply is some adverse effect on

22   competition.  Those were his words.  That's not the standard.

23   It is a substantial adverse effect on competition.  And for the

24   SA360 claim, that has to be a substantial adverse effect on

25   competition in a -- what they claim is a search advertising

1    market.  The chart Mr. Cavanaugh showed you, showing that

2    decline in spend, that was the decline in SA360 spend, a

3    2 percent effect on SA360 spend.

4            That's not all the Microsoft spend.  We all know

5    SA360 makes up a minority of the spend in the total market.

6    They've absolutely not shown a substantial foreclosure on the

7    search side.  They haven't shown it on the ad side for the same

8    reasons.  Mr. Cavanaugh hasn't shown it on SA360, in addition

9    to not showing that there is a -- that we had a duty to deal

10   with them in the first place.

11           This is the last you'll hear from me.  Thank you very

12   much.

13           I would also just like to think -- I think I can

14   speak for everyone, all sides here -- we really want to extend

15   a very, very -- our gratitude and thanks to the Court and the

16   Court's staff who have been so patient and have done an amazing

17   job tolerating us throughout these -- all these years and these

18   proceedings.  I know we've inundated you with a lot, but we are

19   all very, very grateful for your attention and time here.  And

20   I think I speak for everybody here.

21           Thank you.

22           THE COURT:  Thank you, Mr. Schmidtlein.

23           Okay.  I hope everybody has a vacation planned

24   starting tomorrow.  Thank you.  It's been a long couple days,

25   but even longer time for the case.  And let me just express my

1    gratitude to everyone.  The importance and significance of this

2    case is not lost on me, not only for Google, but for the

3    public.  And I think what everyone should be able to walk away

4    from here, whatever the outcome, it was the result of excellent

5    lawyering and excellent representation.

6         Hopefully we'll instill confidence in the public in

7    whatever the result is.  But from my perspective, it -- I wish

8    we could have had law students here on a daily basis to see how

9    the trade is plied and done at the highest levels.  So you all

10   certainly have made it easier on us.  You've given us a lot to

11   think about, and so I guess you've passed the baton to us.

12        So thank you.  And if I didn't say this at the end of

13   the trial, please extend my thanks to your families.  I know

14   how burdensome this has been and challenging, not only for all

15   of you, but for your loved ones.  And hopefully you can --

16   maybe they'll be happy that you're back.  I don't know.

17        Thank you.  And do not wait for me, please.

18        THE COURTROOM DEPUTY:  This court stands adjourned.

19                          *   *   *

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4      foregoing constitutes a true and accurate transcript of my

5      stenographic notes and is a full, true and complete transcript

6      of the proceedings to the best of my ability.

7                          Dated this ^ day of ^

8

9

10                           _____

11                           Janice E. Dickman, CRR, CMR, CCR
                             Official Court Reporter
12                           Room 6523
                             333 Constitution Avenue, N.W.
13                           Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$5.81** [1] - 526:10

## '

**'07** [1] - 546:4
**'09** [1] - 546:4
**'16** [1] - 544:1
**'17** [1] - 544:1
**'21** [1] - 563:19
**'Confidential** [1] - 603:18
**'history** [1] - 621:6
**'markets** [1] - 619:4
**'off** [1] - 602:4
**'On** [1] - 610:3
**'share** [1] - 619:4

## 1

**1** [1] - 554:21
**1/2** [2] - 546:25, 547:1
**10** [5] - 547:23, 548:3, 552:11, 622:14, 624:13
**100** [1] - 554:17
**10036** [1] - 509:24
**105** [1] - 570:9
**108** [1] - 523:10
**11** [2] - 590:15, 598:22
**1100** [1] - 509:12
**1133** [1] - 509:23
**115** [1] - 556:10
**12** [3] - 538:2, 570:23, 599:13
**122** [1] - 530:22
**123** [1] - 531:2
**124** [1] - 557:4
**125** [1] - 530:8
**126** [1] - 558:1
**13** [2] - 598:22, 624:15
**1300** [1] - 509:20
**134** [2] - 558:20, 558:22
**14** [3] - 536:25, 556:4, 624:5
**15** [4] - 525:22, 562:11, 580:15, 581:10
**17** [1] - 624:16
**18** [1] - 545:2
**19** [1] - 556:18
**1:35** [1] - 509:6

## 2

**2** [12] - 515:4, 546:25, 547:1, 554:20, 554:23, 554:24, 565:21, 571:8, 598:25, 617:17, 625:7, 629:3

**20** [7] - 529:10, 562:17, 590:1, 590:8, 611:19, 617:7
**20-3010** [1] - 509:4
**20001** [2] - 510:8, 631:13
**20024** [1] - 510:3
**2006** [1] - 623:12
**2008** [2] - 545:6, 601:10
**2009** [1] - 545:21
**2011** [1] - 546:7
**2012** [3] - 523:22, 523:25, 525:2
**2013** [1] - 558:11
**2015** [2] - 544:1, 558:11
**2016** [5] - 518:20, 586:12, 597:10, 597:15, 603:10
**2017** [1] - 586:13
**2018** [4] - 519:6, 525:3, 546:7, 586:13
**2019** [12] - 518:21, 563:1, 563:4, 586:14, 589:21, 597:11, 597:15, 598:20, 604:16, 620:14, 624:17, 625:25
**202** [3] - 509:13, 509:17, 510:3
**202-354-3267** [1] - 510:9
**2020** [16] - 528:25, 540:24, 561:13, 562:1, 562:23, 563:7, 572:8, 588:2, 588:24, 590:12, 590:14, 590:20, 609:9, 609:23, 620:14, 624:17
**2021** [5] - 598:22, 616:5, 616:7, 616:8, 625:25
**2022** [2] - 572:12
**2024** [2] - 509:5, 563:21
**209** [1] - 509:15
**21** [1] - 557:24
**212** [1] - 509:25
**2200** [1] - 509:24
**23** [2] - 526:4, 526:9
**24** [2] - 546:24, 570:23
**26** [3] - 522:7, 547:2, 570:23
**27** [1] - 598:17
**28** [1] - 599:3

## 3

**3** [3] - 509:5, 531:16, 623:3

**30** [8] - 524:1, 525:5, 526:24, 538:21, 552:12, 562:11, 580:15, 581:10
**307-0340** [1] - 509:13
**32** [2] - 572:4, 601:9
**333** [2] - 510:8, 631:12
**335-2793** [1] - 509:25
**360** [1] - 598:10
**360/Floodlight** [1] - 598:8
**37** [3] - 613:16, 614:11, 615:1
**37(e)** [1] - 619:17
**37(e)(1** [3] - 606:8, 615:5, 615:10
**37(e)(2** [3] - 615:6, 615:7, 619:18
**37(e)(2)** [1] - 619:25
**39** [1] - 597:19
**3:15** [1] - 559:13

## 4

**4** [3] - 531:22, 600:9, 605:10
**40** [1] - 597:16, 598:2, 626:8, 626:10
**41** [3] - 536:17, 575:21, 598:6
**42** [1] - 572:4
**434-5000** [1] - 510:3
**442** [1] - 553:17
**45** [2] - 569:25, 581:11
**46** [1] - 581:11
**4th** [1] - 620:14

## 5

**5** [4] - 515:5, 515:9, 515:17, 532:1
**508-6000** [1] - 509:21
**51** [1] - 514:20
**5:00** [1] - 622:14
**5:03** [1] - 622:17
**5:10** [1] - 622:17
**5:30** [1] - 622:15

## 6

**6** [1] - 609:22
**60** [3] - 543:8, 620:4, 620:5
**600** [1] - 509:16
**60604** [1] - 509:16
**6523** [2] - 510:7, 631:12
**680** [1] - 510:2

## 7

**7** [2] - 515:4, 547:2
**720** [1] - 509:21
**74** [1] - 597:16
**76** [3] - 562:2, 564:13, 582:21

## 8

**8** [2] - 607:3, 623:17
**80** [1] - 562:23
**80203** [1] - 509:21
**805-8563** [1] - 509:17
**86** [1] - 575:22
**88-slide** [1] - 603:11

## 9

**9** [1] - 607:5
**90** [3] - 547:1, 547:22, 560:18
**90-day** [1] - 543:6
**90-plus** [1] - 547:21
**92** [1] - 561:21
**95** [1] - 547:2
**99** [1] - 547:2

## A

**A.I.B** [1] - 575:20
**ability** [10] - 513:5, 515:1, 524:12, 527:17, 532:4, 546:13, 552:4, 582:9, 582:13, 631:6
**able** [18] - 518:19, 530:5, 536:8, 537:7, 538:8, 538:14, 542:5, 542:11, 543:15, 544:9, 546:23, 547:8, 553:10, 582:4, 596:22, 626:2, 627:24, 630:3
**absence** [3] - 540:10, 608:11
**absent** [1] - 568:8
**absolute** [1] - 589:4
**absolutely** [10] - 517:22, 540:3, 540:9, 544:10, 545:10, 548:23, 583:22, 586:11, 594:8, 629:6
**absolved** [1] - 602:10
**abuse** [1] - 565:22
**accept** [2] - 515:5, 518:2
**acceptable** [1] - 613:24
**accommodate** [1] - 588:23
**account** [1] - 547:1

633

accrued [1] - 581:14
accurate [1] - 631:4
achieve [3] - 539:1,
555:10, 561:11
achieving [1] - 551:23
acknowledged [1] -
624:12
acquired [3] - 558:8,
561:8, 577:21
acquisition [2] -
556:23, 625:23
Act [3] - 585:22, 625:4,
625:8
act [2] - 591:11,
599:23
acted [1] - 620:21
acting [1] - 539:21
action [2] - 574:22,
625:6
actions [3] - 529:17,
571:20, 624:9
actual [1] - 511:24
ad [49] - 516:12,
516:13, 524:9, 526:9,
527:22, 528:15,
528:24, 529:4, 532:2,
532:23, 533:1, 542:17,
543:18, 544:5, 547:5,
547:23, 548:4, 548:19,
550:19, 551:19,
551:23, 553:9, 554:2,
554:17, 555:4, 555:5,
555:8, 555:10, 555:12,
555:14, 555:15,
556:13, 560:11,
561:16, 561:17,
561:21, 564:8, 586:8,
586:10, 586:24,
587:14, 610:5, 610:6,
610:19, 620:25, 626:8,
627:6, 627:7, 629:7
Ad [3] - 598:8, 610:20,
610:21
Adam [1] - 557:6
add [3] - 515:12,
527:2, 572:10
added [3] - 523:21,
545:24, 586:20
adding [6] - 524:24,
525:4, 526:24, 544:4,
545:21, 569:16
addition [2] - 582:16,
629:8
additional [9] - 526:7,
531:9, 557:25, 558:6,
558:8, 558:12, 558:16
additionally [1] -
603:15
address [5] - 556:1,
560:5, 560:6, 565:25,

571:9
addressed [1] - 556:2
adjourned [1] - 630:18
adjusted [5] - 511:18,
512:7, 512:21, 513:11,
523:9
admission [1] -
515:12
admit [3] - 558:9,
588:12, 591:14
admits [2] - 519:8,
608:19
admitted [2] - 565:5,
615:20
Adobe [1] - 572:12
adopt [2] - 584:16,
607:18
adopted [3] - 515:4,
562:24, 606:14
adopting [1] - 601:11
ads [59] - 511:8,
515:10, 519:8, 519:13,
519:18, 523:19,
531:16, 532:1, 532:3,
532:9, 532:17, 533:12,
533:13, 533:24,
534:13, 534:19,
534:20, 534:21,
534:22, 543:19, 544:6,
544:8, 546:1, 547:9,
548:9, 548:11, 548:12,
548:13, 548:21,
548:24, 550:16,
550:24, 551:8, 551:9,
551:20, 551:24, 552:1,
552:2, 552:3, 552:6,
553:1, 555:1, 555:9,
555:12, 557:22,
558:16, 558:17,
558:21, 560:23,
577:18, 577:21, 578:6,
580:25, 581:1, 587:19,
624:7, 627:5, 627:9
Ads [13] - 551:16,
551:18, 561:17, 564:2,
564:24, 565:7, 580:19,
582:7, 582:25, 598:10,
598:21, 599:6, 600:16
advance [4] - 528:21,
571:1, 612:11, 612:15
advantage [1] - 531:15
adverse [8] - 599:9,
607:24, 608:14,
608:25, 618:23,
628:21, 628:23, 628:24
advertise [4] - 547:4,
547:20, 563:12, 582:13
advertiser [29] -
511:13, 519:1, 524:12,
526:8, 526:15, 526:24,

527:6, 527:19, 528:7,
530:13, 531:3, 534:9,
534:11, 537:9, 539:24,
542:4, 542:19, 547:13,
556:9, 556:13, 561:11,
564:19, 564:23,
585:14, 585:15,
588:24, 593:13, 593:14
advertiser's [3] -
518:20, 530:7, 531:21
advertisers [88] -
523:21, 523:25, 524:3,
524:25, 525:3, 525:10,
526:21, 527:24,
527:25, 528:20,
528:23, 529:15,
530:10, 532:15,
532:17, 533:19, 537:3,
537:6, 537:17, 537:23,
538:5, 538:8, 538:13,
538:16, 538:21,
538:23, 539:5, 539:23,
540:7, 541:3, 541:9,
541:16, 543:14,
543:23, 544:4, 544:8,
544:10, 544:11,
544:12, 544:14,
546:25, 547:4, 547:7,
547:18, 549:3, 549:11,
549:12, 550:15, 551:7,
552:5, 553:19, 555:6,
555:14, 556:6, 556:7,
556:8, 558:24, 560:10,
560:15, 560:17,
560:23, 562:5, 562:11,
562:14, 562:16,
562:20, 563:3, 563:7,
563:11, 563:25,
572:17, 573:21,
577:18, 580:25,
581:10, 581:14,
581:15, 581:18, 582:4,
582:18, 583:3, 590:20,
593:24, 599:12,
625:17, 625:19, 626:14
advertisers' [1] -
597:5
advertising [15] -
536:18, 545:13, 547:6,
549:9, 551:2, 560:13,
570:4, 581:16, 582:11,
582:20, 583:1, 589:4,
596:21, 625:16, 628:25
Advertising [1] - 598:9
advising [1] - 619:1
affecting [1] - 587:18
affirmatively [1] -
527:23
afternoon [2] - 559:12,
609:15

Afternoon [1] - 509:5
agency [1] - 529:4
aggregate [1] - 599:8
aggregated [1] -
530:25
ago [6] - 517:20,
518:1, 561:20, 572:15,
613:23, 618:16
agree [16] - 516:15,
517:8, 524:20, 530:25,
533:22, 534:2, 545:17,
557:9, 557:11, 557:12,
584:4, 584:5, 586:6,
611:4, 611:7, 622:8
agreed [1] - 531:3
agreement [1] -
569:17
agreements [4] -
516:14, 549:5, 603:10,
624:23
aha [1] - 554:7
ahead [2] - 545:19,
566:10
al [1] - 509:3
allegation [4] -
539:18, 587:17, 594:11
allocated [1] - 622:2
allocation [2] -
519:13, 519:18
allow [2] - 543:23,
625:8
allowed [3] - 560:7,
568:11, 586:21
allowing [3] - 526:1,
554:23, 619:20
allows [3] - 529:17,
544:4, 565:4
almost [1] - 563:21
alone [1] - 554:7
alpha [1] - 586:1
alternative [4] - 512:3,
533:21, 581:21, 582:3
Amalgam [1] - 588:19
amazing [2] - 602:1,
629:16
Amazon [4] - 531:3,
534:20, 534:23, 534:25
America [2] - 509:2,
530:23
American [4] - 512:9,
513:14, 513:20, 563:9
Americas [1] - 509:23
AMIT [1] - 509:9
amount [3] - 564:7,
564:11, 622:1
amounts [3] - 536:8,
536:9, 536:10
ample [1] - 599:10
analogous [1] -
575:11

634

**analyses** [1] - 616:14
**analysis** [16] - 511:25,
512:16, 512:20,
515:18, 517:8, 517:9,
523:13, 523:14,
533:10, 561:14,
566:23, 587:13,
593:25, 595:15,
608:15, 617:12
**analytical** [1] - 516:6
**analytics** [1] - 543:13
**Analytics** [1] - 543:13
**Android** [3] - 603:10,
623:22, 623:25
**Angie** [2] - 528:8,
529:15
**announce** [1] - 583:15
**anonymized** [1] -
530:24
**answer** [16] - 512:18,
513:13, 513:16,
516:16, 520:7, 525:7,
527:4, 531:8, 558:25,
559:7, 559:17, 573:23,
586:16, 602:22, 622:10
**answers** [1] - 514:9
**anticipate** [1] - 513:22
**anticompetitive** [34] -
515:2, 516:19, 536:21,
551:6, 554:8, 554:9,
566:24, 571:20,
572:25, 573:7, 573:10,
573:15, 574:7, 579:24,
580:10, 586:6, 593:21,
594:3, 594:7, 594:15,
594:19, 594:20,
594:25, 600:8, 601:6,
603:6, 606:4, 606:21,
607:1, 620:11, 621:16,
624:9, 624:11, 627:3
**Antitrust** [3] - 609:21,
610:24, 613:23
**antitrust** [12] - 568:10,
568:13, 568:17,
569:20, 570:22, 571:2,
571:16, 571:22,
572:17, 600:13,
603:23, 606:22
**anytime** [2] - 591:19,
615:13
**anyway** [3] - 545:19,
608:5, 608:7
**ap** [1] - 581:5
**APIs** [4] - 567:11,
567:13, 567:15, 578:18
**apologized** [1] -
607:10
**apologizes** [1] -
608:18
**app** [1] - 581:5

**APPEARANCES** [1] -
509:11
**appeared** [1] - 603:11
**appellate** [1] - 623:7
**Apple** [7] - 541:7,
623:22, 623:25, 626:3,
626:9, 626:11, 627:14
**apples** [2] - 596:19
**applicable** [1] - 617:6
**applied** [2] - 567:21,
571:16
**applies** [8] - 523:19,
531:16, 566:17,
568:11, 574:4, 577:6,
591:20, 596:19
**apply** [17] - 526:6,
532:22, 533:15,
565:21, 566:2, 568:9,
568:14, 573:4, 574:4,
576:1, 576:6, 578:16,
578:17, 579:24, 589:8,
599:23, 628:21
**applying** [3] - 568:17,
572:24
**appreciate** [3] -
515:19, 622:20, 622:21
**approach** [1] - 600:25
**appropriate** [2] -
574:16, 574:22
**April** [2] - 620:13,
620:14
**area** [3] - 547:10,
565:17, 592:10
**areas** [1] - 592:9
**argue** [1] - 557:8
**argued** [1] - 618:16
**argument** [10] - 518:8,
520:18, 521:8, 523:21,
524:6, 533:18, 547:17,
558:24, 594:25, 608:10
**arguments** [4] -
532:22, 549:4, 549:8
**arise** [1] - 540:23
**array** [1] - 551:8
**arrive** [1] - 576:24
**articulated** [1] - 617:3
**ascertain** [1] - 575:7
**aside** [4] - 534:4,
552:7, 585:2, 618:23
**Aspen** [16] - 566:6,
566:25, 567:2, 569:9,
569:11, 574:8, 576:3,
576:25, 578:9, 591:17,
591:21, 591:23, 592:1,
592:8, 592:12
**assess** [2] - 571:22,
572:25
**assessing** [1] - 580:2
**assume** [2] - 573:3,
605:15

**assumption** [1] -
517:14
**astronomical** [1] -
520:10
**AT** [2] - 570:11, 598:21
**AT&T** [1] - 627:14
**ATB** [4] - 581:13,
594:5, 597:10
**Athey** [1] - 545:7
**attempt** [1] - 565:19
**attention** [2] - 555:21,
629:19
**attorney** [4] - 610:17,
613:7, 613:13, 618:15
**Attorney** [4] - 603:18,
609:17, 609:24, 610:13
**attorney's** [1] - 603:16
**attorney-client** [1] -
618:15
**Attorney-Client** [1] -
603:18
**Attorneys** [1] - 611:13
**attract** [2] - 548:4,
548:8
**atypical** [1] - 617:11
**auction** [42] - 525:18,
525:25, 526:4, 526:6,
526:7, 526:8, 528:4,
529:24, 530:5, 555:11,
556:15, 561:5, 562:5,
562:7, 562:9, 562:22,
562:24, 563:2, 563:10,
563:12, 563:18,
563:20, 563:22,
563:24, 564:2, 564:4,
564:16, 564:20,
564:22, 564:24, 579:7,
580:13, 580:18, 581:2,
581:21, 583:15,
590:15, 591:5, 598:21,
599:6, 599:11
**auction-time** [30] -
561:5, 562:5, 562:7,
562:9, 562:22, 562:24,
563:2, 563:10, 563:12,
563:18, 563:20,
563:22, 563:24, 564:2,
564:4, 564:16, 564:20,
564:22, 564:24, 579:7,
580:13, 580:18, 581:2,
581:21, 583:15,
590:15, 591:5, 598:21,
599:6, 599:11
**auctions** [15] - 524:8,
524:12, 524:19,
524:20, 525:11,
525:13, 525:15,
525:16, 529:17, 530:3,
530:4, 538:25, 539:14,
540:13, 597:5

**audience** [2] - 538:8,
538:12
**August** [1] - 620:14
**authority** [1] - 616:11
**automatically** [1] -
603:2
**available** [9] - 529:9,
529:11, 546:20, 555:6,
574:21, 578:2, 581:2,
581:17, 584:15
**Avenue** [4] - 509:23,
510:2, 510:8, 631:12
**average** [1] - 525:17
**avoid** [5] - 601:5,
601:12, 602:1, 602:3,
602:7
**avoids** [1] - 554:12
**awareness** [1] -
541:14
**axis** [2] - 524:7,
524:10

# B

**backup** [3] - 595:24,
596:7, 596:22
**bad** [2] - 540:11,
608:16
**Baker** [7] - 561:13,
587:11, 593:25,
595:21, 596:1, 596:6
**balance** [2] - 541:11
**ball** [3] - 577:13,
577:15, 578:5
**ballpark** [1] - 547:24
**banging** [1] - 586:13
**Bank** [1] - 530:23
**bar** [1] - 614:10
**barrels** [1] - 621:6
**barrier** [1] - 533:14
**barriers** [6] - 533:11,
533:15, 533:22,
534:15, 535:3, 535:10
**based** [14] - 513:4,
518:9, 530:2, 530:20,
533:18, 538:3, 556:19,
570:8, 576:21, 599:10,
602:23, 623:8, 628:19
**baseline** [1] - 526:2
**basic** [1] - 531:13
**basis** [6] - 574:25,
595:16, 595:17,
603:23, 615:18, 630:8
**basket** [1] - 576:13
**baton** [1] - 630:11
**bear** [3] - 514:11,
516:22, 573:5
**bears** [1] - 516:13
**became** [1] - 597:16
**become** [3] - 534:8,

534:11, 601:23
**becoming** [2] - 533:12, 597:17
**BEFORE** [1] - 509:9
**before-after** [1] - 541:24
**before-and-after** [1] - 541:22
**beg** [1] - 568:24
**began** [1] - 567:12
**begin** [1] - 559:16
**beginning** [4] - 528:23, 543:17, 604:14, 609:20
**begins** [2] - 590:22
**begs** [1] - 575:23
**behalf** [1] - 598:10
**behind** [3] - 573:15, 593:8, 608:1
**Belknap** [1] - 509:23
**below** [1] - 624:2
**BENCH** [1] - 509:9
**beneficial** [1] - 539:6
**benefit** [15] - 524:18, 555:16, 562:5, 562:15, 577:14, 581:7, 581:14, 581:16, 583:4, 585:7, 599:13, 599:22, 600:16, 608:15, 625:1
**benefits** [8] - 516:8, 529:12, 549:2, 563:24, 580:23, 581:9, 581:10, 590:21
**benefitting** [2] - 533:2
**best** [9] - 547:17, 574:19, 581:17, 599:17, 611:12, 615:3, 627:16, 627:17, 631:6
**beta** [2] - 562:11, 586:1
**better** [15] - 517:18, 532:5, 539:4, 544:9, 548:4, 548:7, 548:21, 549:11, 551:4, 551:7, 555:1, 563:15, 563:17, 586:24
**between** [17] - 518:14, 524:23, 540:2, 541:9, 541:12, 546:7, 548:19, 555:14, 566:14, 570:18, 575:13, 576:2, 576:20, 588:7, 591:20, 611:1, 613:17
**beyond** [4] - 572:5, 594:18, 607:21, 616:21
**bid** [6] - 544:15, 550:24, 588:20, 628:3, 628:5, 628:6
**bidding** [36] - 561:6, 562:6, 562:7, 562:9,

562:23, 562:24, 563:2, 563:10, 563:13, 563:18, 563:20, 563:23, 563:24, 564:2, 564:4, 564:16, 564:18, 564:20, 564:22, 564:25, 565:1, 565:6, 570:11, 579:7, 580:13, 580:18, 581:2, 581:21, 582:10, 583:15, 590:15, 591:5, 598:21, 599:6, 599:11, 628:3
**big** [2] - 521:24, 596:17
**bigger** [1] - 588:16
**biggest** [1] - 522:3
**bill** [1] - 530:11
**billions** [2] - 521:16, 562:18
**binder** [2] - 549:1, 622:25
**Bing** [20] - 547:4, 547:6, 547:20, 548:3, 548:20, 558:7, 558:17, 558:25, 559:5, 559:6, 560:13, 561:24, 564:6, 589:23, 590:15, 599:1, 599:4, 624:2, 624:16
**Bing's** [2] - 586:25, 598:22
**bit** [17] - 511:10, 511:12, 513:13, 518:16, 521:20, 535:20, 540:24, 541:5, 544:22, 544:25, 551:20, 552:18, 559:3, 570:20, 581:23, 594:9
**black** [1] - 529:14
**blindness** [2] - 518:25, 551:23
**blip** [1] - 596:21
**Block** [2] - 571:19, 600:11
**blue** [1] - 529:9
**boast** [1] - 519:6
**boasting** [1] - 556:5
**Booth** [1] - 590:25
**borne** [1] - 547:9
**borrowing** [1] - 558:3
**boss** [1] - 519:6
**bought** [2] - 530:12, 530:14
**bounce** [1] - 556:1
**bounds** [2] - 571:3, 571:4
**Bowl** [1] - 552:6
**box** [1] - 529:14
**boxes** [3] - 569:6, 606:7, 607:4
**Braddi** [5] - 587:21,

588:3, 597:18, 597:20, 598:12
**breach** [1] - 569:21
**break** [5] - 524:15, 552:22, 555:24, 559:13, 561:14
**breath** [1] - 601:9
**breath-taking** [1] - 601:9
**Brian** [3] - 595:11, 598:10, 609:7
**brief** [7] - 556:1, 560:6, 570:9, 575:16, 575:21, 600:8, 600:9
**briefing** [2] - 511:15, 573:18
**briefs** [2] - 531:23, 546:2
**bring** [3] - 512:1, 518:4, 518:5
**bringing** [1] - 531:7
**broad** [2] - 524:6, 526:23
**broaden** [2] - 523:24, 524:5
**broadened** [1] - 527:7
**broadening** [2] - 524:7, 524:11
**broader** [4] - 528:4, 537:17, 538:8, 539:20
**broadly** [2] - 517:5, 574:20
**Broadway** [1] - 509:20
**brought** [2] - 606:18, 628:2
**Brown** [1] - 513:14
**Bruce** [1] - 509:18
**bucket** [2] - 511:14, 511:15
**budget** [1] - 622:25
**build** [9] - 534:12, 534:16, 567:13, 570:3, 570:10, 584:4, 584:14, 584:20, 592:21
**build-out** [1] - 592:21
**building** [3] - 553:2, 583:14, 583:15
**built** [2] - 513:10, 589:17
**bullet** [2] - 589:23, 589:25
**bunch** [3] - 514:3, 539:1, 552:1
**bundling** [1] - 572:2
**burden** [17] - 512:1, 512:4, 513:5, 516:13, 516:22, 517:2, 517:7, 523:11, 523:15, 523:16, 531:7, 533:7, 560:25, 573:5, 580:11,

605:17, 605:22
**burdensome** [1] - 630:14
**business** [8] - 560:18, 564:7, 564:12, 570:14, 577:15, 587:1, 599:2, 604:6
**businesses** [1] - 571:3
**butternut** [1] - 553:17
**buy** [2] - 551:9, 592:17
**buying** [4] - 530:10, 530:13, 544:6, 582:25

## C

**calculate** [1] - 543:23
**calculates** [2] - 532:8, 581:11
**calculations** [1] - 537:12
**campaigns** [4] - 560:11, 560:16, 565:3, 581:16
**candid** [1] - 604:18
**cannot** [3] - 612:14, 614:8, 618:20
**capacity** [2] - 534:13, 626:11
**capture** [1] - 553:10
**car** [1] - 539:12
**cards** [1] - 625:20
**Care** [3] - 603:8, 606:18, 606:20
**careful** [1] - 541:6
**carefully** [1] - 553:22
**Carr** [1] - 509:20
**carried** [2] - 517:2, 606:5
**cars** [1] - 517:12
**case** [111] - 515:3, 519:24, 521:6, 539:10, 541:17, 544:14, 546:23, 547:3, 561:2, 562:6, 565:16, 565:20, 566:6, 566:12, 566:18, 567:5, 567:11, 567:18, 567:19, 567:24, 568:4, 568:6, 570:1, 571:5, 571:17, 571:18, 572:2, 572:3, 574:8, 574:16, 574:18, 574:20, 575:11, 575:14, 575:19, 575:22, 575:24, 576:7, 576:11, 576:15, 576:16, 577:3, 577:4, 577:6, 577:10, 578:10, 578:18, 578:24, 578:25, 579:1, 579:5, 579:19, 579:25, 580:18, 581:7, 581:19,

581:21, 582:1, 582:17, 583:22, 585:24, 586:1, 586:4, 586:11, 589:5, 589:6, 589:9, 589:13, 590:6, 590:7, 591:10, 592:11, 592:20, 593:23, 596:10, 599:24, 599:25, 600:1, 600:13, 600:15, 603:24, 604:17, 607:19, 607:22, 610:18, 613:10, 613:15, 613:17, 614:9, 615:11, 616:6, 616:16, 617:2, 617:7, 617:23, 619:23, 623:6, 623:10, 623:12, 625:14, 626:19, 627:4, 627:5, 629:25, 630:2
**cases** [13] - 566:24, 567:21, 568:25, 569:6, 574:24, 574:25, 575:2, 575:17, 578:9, 600:1, 613:17, 616:20, 619:14
**category** [1] - 568:1
**cater** [1] - 540:2
**caught** [1] - 607:16
**causation** [1] - 623:14
**causes** [1] - 623:16
**CAVANAUGH** [24] - 531:13, 532:14, 533:17, 533:25, 534:2, 534:7, 534:10, 534:17, 535:2, 535:17, 559:11, 559:25, 560:4, 565:10, 565:13, 565:15, 565:19, 566:4, 566:7, 597:9, 597:13, 609:4, 609:7, 625:13
**Cavanaugh** [21] - 509:22, 531:12, 544:23, 555:23, 559:10, 559:24, 565:9, 571:17, 573:11, 573:18, 582:7, 582:21, 589:19, 590:19, 597:8, 600:19, 625:12, 628:1, 628:20, 629:1, 629:8
**Cconnor@wc.com** [1] - 510:4
**CCR** [1] - 631:11
**ceased** [2] - 567:23, 568:2
**ceiling** [2] - 547:19, 559:5
**cemented** [1] - 550:10
**Center** [2] - 509:20, 555:5
**central** [1] - 591:11
**centric** [1] - 543:9

**cents** [2] - 526:4, 526:9
**certain** [3] - 537:6, 542:12, 542:13
**certainly** [19] - 513:1, 514:12, 514:14, 515:3, 517:19, 527:25, 533:16, 535:14, 557:17, 557:20, 572:5, 580:12, 584:3, 589:21, 602:16, 606:5, 613:2, 613:19, 630:10
**certainty** [2] - 555:17, 571:2
**CERTIFICATE** [1] - 631:1
**certify** [1] - 631:3
**cetera** [1] - 526:23
**chairs** [1] - 600:22
**challenge** [3] - 521:17, 521:18, 570:18
**challenger** [1] - 578:19
**challenges** [1] - 534:18
**challenging** [1] - 630:14
**chance** [3] - 552:21, 602:11, 624:10
**change** [3] - 535:10, 554:25, 603:5
**changed** [5] - 524:3, 528:25, 579:7, 611:22, 616:23
**changes** [1] - 541:7
**changing** [1] - 535:15
**channel** [1] - 561:12
**channels** [1] - 537:12
**characteristics** [1] - 542:13
**characterize** [1] - 562:16
**chart** [5] - 529:7, 543:17, 587:14, 599:4, 629:1
**chat** [14] - 601:19, 601:21, 604:5, 604:9, 604:12, 604:17, 605:8, 610:10, 612:12, 612:15, 612:16, 615:21, 617:9, 618:12
**chats** [16] - 602:15, 602:21, 604:2, 606:10, 607:25, 609:16, 610:23, 611:6, 611:17, 613:8, 613:9, 614:24, 615:24, 616:2, 617:5
**check** [1] - 606:7
**checks** [1] - 607:4
**Chicago** [1] - 509:16

**chief** [3] - 545:8, 545:9, 601:11
**choice** [3] - 530:7, 533:20, 585:7
**choose** [2] - 519:11, 576:21
**choosing** [1] - 611:19
**chose** [2] - 519:15, 628:18
**chosen** [1] - 628:17
**CID** [1] - 620:14
**CIDs** [1] - 611:13
**circle** [1] - 552:20
**Circuit** [5] - 567:17, 568:3, 574:3, 574:19, 579:17
**circuit** [1] - 574:24
**circumstance** [7] - 568:21, 571:16, 574:16, 574:23, 575:7, 576:10, 580:1
**circumstances** [9] - 567:9, 567:22, 571:14, 574:20, 574:21, 575:5, 575:9, 575:10, 597:3
**citations** [1] - 623:13
**cite** [6] - 557:17, 557:18, 567:25, 568:6, 575:16, 600:8
**cited** [4] - 537:5, 555:4, 571:17, 595:21
**civil** [4] - 601:12, 601:16, 602:24, 606:14
**claim** [7] - 516:18, 531:19, 614:7, 628:2, 628:5, 628:24, 628:25
**claiming** [1] - 554:9
**claims** [7] - 512:5, 583:10, 596:22, 603:9, 609:10, 616:25, 619:23
**classic** [2] - 553:8, 591:10
**clear** [14] - 519:10, 526:19, 563:9, 569:14, 570:19, 572:14, 576:25, 577:1, 577:21, 579:22, 585:3, 612:5, 625:19
**clearly** [4] - 620:11, 620:20, 623:25
**click** [10] - 519:1, 532:3, 532:10, 536:5, 538:22, 542:20, 552:12, 553:8, 555:16
**click-through-rate** [1] - 532:10
**clicked** [3] - 542:16, 554:24, 554:25
**clicks** [1] - 532:11
**client** [1] - 618:15

**Client** [1] - 603:18
**clock** [2] - 622:19, 622:20
**close** [3] - 554:16, 554:22, 561:7
**closed** [1] - 523:8
**closer** [1] - 592:1
**CMR** [1] - 631:11
**co** [1] - 609:18
**Co** [1] - 569:11
**CO** [1] - 509:21
**co-plaintiff** [1] - 609:18
**code** [1] - 588:20
**coerce** [1] - 627:25
**coerced** [3] - 626:23, 626:24
**coin** [1] - 581:8
**Colette** [2] - 510:1, 609:14
**colleagues** [1] - 553:23
**collection** [1] - 539:20
**colloquy** [1] - 525:9
**COLORADO** [1] - 509:19
**Colorado** [2] - 509:20, 583:10
**COLUMBIA** [1] - 509:1
**Comcast** [1] - 574:18
**coming** [6] - 519:3, 531:25, 541:5, 572:15, 605:21, 620:7
**command** [1] - 589:9
**commend** [1] - 553:21
**comment** [1] - 624:14
**comments** [2] - 512:9, 521:15
**commercial** [1] - 578:22
**commission** [1] - 561:18
**commitment** [8] - 569:8, 569:15, 578:12, 584:19, 588:17, 591:16, 591:22, 593:9
**committed** [1] - 570:22
**common** [1] - 562:21
**Communicate** [3] - 603:7, 606:18, 606:20
**communicating** [1] - 621:12
**communication** [1] - 603:15
**communications** [4] - 587:23, 603:19, 605:6, 609:20
**companies** [9] - 524:18, 534:6, 534:24,

543:21, 551:3, 551:5,
551:12, 576:21, 613:2
**company** [11] -
535:15, 539:22,
568:19, 571:14,
576:10, 592:13,
604:21, 611:14,
612:10, 614:9, 627:19
**comparable** [1] -
576:3
**compared** [1] - 543:18
**compares** [1] - 520:15
**comparing** [1] -
519:24
**comparisons** [1] -
565:3
**compelling** [1] -
592:13
**compels** [1] - 576:14
**compete** [3] - 547:8,
624:23, 626:2
**competing** [4] -
541:19, 546:12, 551:3,
555:12
**competition** [29] -
514:21, 517:24, 518:4,
518:5, 518:9, 520:20,
520:21, 521:11, 526:7,
533:2, 533:3, 538:3,
546:16, 546:17, 549:6,
560:24, 561:1, 565:23,
573:21, 574:23,
589:15, 592:9, 596:20,
597:4, 626:13, 628:6,
628:22, 628:23, 628:25
**competitive** [14] -
513:17, 514:23, 515:5,
515:16, 533:1, 536:18,
552:14, 580:2, 587:18,
592:7, 599:8, 599:9,
623:9, 627:20
**competitiveness** [1] -
555:11
**competitor** [1] -
579:15
**competitors** [3] -
534:5, 572:1, 576:15
**complaint** [1] - 610:1
**complete** [2] - 594:20,
631:5
**completely** [6] -
518:25, 539:17, 565:8,
579:13, 579:15, 598:1
**complex** [1] - 617:12
**compliant** [1] - 602:19
**complicated** [4] -
539:2, 540:21, 550:21,
588:14
**comply** [3] - 589:11,
589:12, 589:13

**component** [2] -
521:22, 522:3
**concept** [1] - 531:16
**concepts** [1] - 539:16
**concern** [3] - 531:4,
542:3, 542:11
**concerns** [2] - 545:16,
602:10
**concession** [1] -
593:12
**conclude** [3] - 558:19,
606:19, 615:18
**concluded** [1] -
618:17
**conclusion** [3] -
533:9, 612:25, 623:12
**conditional** [1] -
597:23
**conduct** [39] - 517:9,
532:23, 533:1, 547:15,
548:6, 554:8, 554:9,
565:18, 566:14,
566:23, 568:12,
568:22, 570:2, 570:7,
570:18, 571:1, 571:2,
572:16, 572:22, 573:6,
573:15, 573:17,
573:19, 574:8, 575:8,
576:20, 583:11,
587:18, 589:14,
591:20, 592:2, 600:8,
601:18, 606:24,
608:19, 613:6, 613:21
**confer** [1] - 610:23
**confidence** [1] - 630:6
**confidential** [2] -
545:6, 619:11
**Confidential** [1] -
619:8
**confidentiality** [1] -
545:16
**confirm** [1] - 617:8
**conflict** [2] - 585:2,
585:3
**Congress** [1] - 576:14
**connect** [2] - 551:10,
552:5
**connection** [2] -
554:1, 554:5
**CONNOLLY** [1] -
510:2
**CONNOR** [15] -
609:14, 610:6, 611:7,
611:10, 611:17,
611:23, 613:1, 615:4,
615:9, 616:4, 617:20,
618:1, 618:14, 619:16,
620:2
**Connor** [4] - 510:1,
609:14, 611:3, 617:18

**consequence** [2] -
614:25, 615:2
**consider** [4] - 549:7,
568:12, 580:4, 596:19
**consideration** [2] -
609:10, 616:24
**considered** [3] -
572:23, 578:8, 621:3
**considering** [1] -
563:6
**consistency** [2] -
520:2, 520:8
**consistent** [6] -
520:13, 538:5, 546:11,
549:15, 598:13, 614:8
**consistently** [2] -
546:1, 563:20
**constant** [3] - 549:25,
550:14, 550:23
**constitutes** [2] -
613:6, 631:4
**Constitution** [2] -
510:8, 631:12
**construed** [1] - 568:13
**consult** [1] - 535:24
**Consumer** [1] -
509:19
**contemporaneous** [1]
- 554:2
**content** [1] - 603:18
**Context** [1] - 590:1
**context** [6] - 513:21,
558:16, 558:17,
596:17, 619:19
**continue** [5] - 522:21,
579:18, 603:5, 620:23,
625:5
**continued** [4] -
579:20, 592:8, 610:19,
610:22
**continues** [1] - 601:14
**continuous** [1] -
600:15
**continuously** [1] -
599:19
**contract** [5] - 511:11,
569:21, 571:24,
603:21, 626:9
**contracts** [6] - 547:16,
556:25, 557:2, 608:2,
617:1, 625:15
**contractual** [1] - 584:3
**contrary** [1] - 612:24
**control** [3] - 514:21,
524:11, 524:12
**controls** [2] - 537:10,
584:7
**controversy** [1] -
566:21
**convenience** [1] -

511:14
**conversation** [1] -
609:25
**conversations** [4] -
594:13, 603:2, 605:8
**conversion** [6] -
543:12, 562:13, 564:3,
564:17, 564:23, 599:13
**conversions** [2] -
562:11, 563:15
**convoluted** [2] - 621:2
**cook** [1] - 626:6
**core** [1] - 529:2
**Corp** [1] - 575:20
**corporate** [1] - 602:4
**corporations** [1] -
607:7
**correct** [15] - 516:20,
516:24, 521:13,
525:14, 527:8, 530:17,
530:18, 539:13, 569:1,
569:13, 571:21,
582:12, 593:22, 611:23
**correctly** [2] - 543:24,
577:5
**correlates** [1] - 528:21
**corresponding** [4] -
516:2, 517:23, 518:3,
520:12
**cost** [11] - 522:3,
522:9, 536:5, 555:16,
556:23, 581:23, 582:5,
582:8, 607:15, 607:16,
608:15
**cost-per-click** [1] -
536:5
**costs** [8] - 522:20,
522:21, 522:22,
533:20, 553:7, 556:23,
582:9, 625:23
**counsel** [7] - 609:15,
610:25, 612:7, 612:8,
612:9, 618:4, 619:9
**count** [1] - 603:13
**counterintuitive** [2] -
538:20, 553:5
**couple** [20] - 512:8,
515:24, 520:9, 521:24,
522:6, 522:8, 533:17,
546:3, 552:20, 556:1,
604:7, 610:12, 615:18,
616:21, 617:18,
617:19, 618:3, 622:9,
622:10, 629:24
**course** [18] - 520:3,
521:20, 523:7, 528:25,
576:6, 577:1, 580:3,
581:9, 586:25, 589:3,
591:8, 592:2, 612:17,
614:6, 617:14, 622:6,

628:10
  **court** [12] - 568:20,
570:24, 571:18,
573:14, 574:19,
574:21, 575:6, 592:13,
603:7, 605:21, 622:5,
630:18
  **COURT** [169] - 509:1,
511:2, 511:6, 513:2,
514:11, 514:13,
514:15, 514:18, 516:5,
516:16, 516:21,
517:10, 519:19,
519:23, 520:6, 521:1,
521:8, 521:19, 522:5,
522:13, 523:6, 524:14,
526:20, 527:6, 529:12,
529:20, 530:15,
531:10, 531:12, 532:7,
533:5, 533:22, 534:1,
534:4, 534:8, 534:11,
534:22, 535:16,
535:18, 537:22,
538:18, 539:12,
539:15, 540:17,
541:20, 542:2, 542:7,
542:14, 542:24,
544:18, 545:4, 545:14,
545:19, 547:17,
548:14, 548:24,
549:13, 549:21, 550:1,
550:4, 550:17, 552:17,
555:22, 557:14,
557:18, 559:9, 559:12,
559:22, 559:24, 560:2,
565:9, 565:11, 565:14,
565:16, 565:24, 566:5,
566:8, 567:1, 568:1,
568:24, 569:2, 569:5,
569:14, 569:20,
570:12, 570:17, 573:1,
573:23, 574:1, 574:6,
575:11, 575:23,
576:12, 577:12,
577:20, 577:24, 578:1,
578:4, 578:11, 578:17,
578:21, 578:25,
579:10, 580:5, 580:9,
580:15, 580:22,
581:20, 581:25,
582:11, 582:14, 583:6,
583:24, 584:6, 584:17,
585:17, 586:16,
587:16, 589:19, 590:4,
590:11, 590:24, 591:3,
591:15, 592:11,
592:16, 592:20, 593:1,
593:6, 593:10, 593:19,
594:2, 595:3, 596:13,
597:7, 597:12, 600:19,
601:2, 603:25, 606:15,

609:1, 609:6, 609:13,
610:4, 611:3, 611:9,
611:11, 611:22,
611:24, 614:14, 615:8,
615:19, 617:18,
617:24, 618:11,
618:22, 620:1, 620:3,
621:19, 621:24, 622:4,
622:7, 622:12, 622:18,
622:24, 625:11,
626:16, 629:22, 631:1
  **Court** [51] - 510:6,
510:7, 512:22, 514:19,
514:20, 525:10,
566:23, 568:11,
568:16, 570:14,
571:13, 577:22,
575:12, 575:18,
575:25, 580:1, 585:13,
589:9, 591:11, 601:3,
601:4, 606:3, 606:17,
606:19, 607:8, 607:9,
607:17, 607:22,
608:12, 608:24, 609:9,
620:6, 620:9, 620:16,
620:21, 621:15,
621:17, 622:2, 622:10,
623:4, 623:13, 623:18,
624:7, 624:14, 624:22,
625:3, 625:7, 627:15,
629:15, 631:11
  **Court's** [4] - 523:13,
616:24, 617:6, 629:16
  **Courthouse** [1] -
510:7
  **COURTROOM** [1] -
630:18
  **courts** [2] - 576:19,
614:10
  **Courts** [2] - 570:14,
576:23
  **cover** [1] - 511:21
  **CPC** [1] - 553:3, 553:4,
553:6
  **CRC** [1] - 510:6
  **create** [4] - 525:15,
553:18, 571:15, 612:16
  **created** [1] - 553:13
  **creating** [3] - 535:7,
581:5, 621:12
  **critical** [6] - 561:5,
562:8, 586:14, 586:18,
586:19, 624:2
  **critically** [1] - 593:16
  **cross** [5] - 524:23,
565:5, 577:9, 582:9,
584:14
  **cross-examination** [1]
- 565:5
  **cross-platform** [3] -

577:9, 582:9, 584:14
  **crossed** [2] - 571:1,
571:7
  **crosses** [1] - 617:11
  **CRR** [2] - 510:6,
631:11
  **Cue** [1] - 626:3
  **culture** [1] - 601:18
  **curious** [1] - 522:13
  **curve** [3] - 558:13,
558:14
  **custodians** [1] - 604:5
  **customer** [3] - 563:9,
589:16, 591:14
  **customers** [5] - 524:2,
525:5, 562:24, 563:21,
572:1
  **cut** [6] - 521:11, 548:4,
578:20, 583:14, 587:6,
611:10
  **cut-and-paste** [1] -
587:6
  **CV** [1] - 509:4

# D

  **D.C** [7] - 509:5,
509:13, 510:3, 568:3,
574:2, 579:17, 631:13
  **DAHLQUIST** [32] -
511:4, 511:7, 513:12,
514:12, 514:14,
514:17, 515:3, 516:15,
516:20, 516:24,
517:11, 519:22, 520:4,
520:7, 521:3, 521:13,
522:4, 522:6, 522:19,
523:8, 524:22, 527:4,
527:8, 529:14, 530:1,
530:17, 531:11,
555:25, 557:16,
557:20, 559:16, 559:23
  **Dahlquist** [10] -
509:14, 511:2, 513:2,
519:19, 531:10, 536:1,
553:16, 554:13,
555:23, 559:9
  **Dahlquist's** [1] - 532:7
  **daily** [1] - 630:8
  **damages** [1] - 596:10
  **dark** [2] - 529:16,
542:1
  **data** [21] - 513:24,
514:1, 514:3, 532:5,
532:9, 532:15, 541:25,
544:24, 546:23,
556:19, 564:17,
564:23, 582:8, 596:7,
597:25, 598:10, 598:20
  **date** [2] - 591:1,

620:12
  **Dated** [1] - 631:7
  **Daubert** [1] - 536:15
  **daunting** [1] - 535:3
  **David** [1] - 509:14
  **David.dahlquist@**
**usdoj.gov** [1] - 509:17
  **days** [4] - 540:25,
543:8, 610:12, 629:24
  **DC** [1] - 510:8
  **de** [1] - 627:1
  **deal** [43] - 539:23,
560:6, 566:18, 566:22,
567:5, 567:18, 567:19,
568:19, 568:23, 569:2,
569:23, 570:8, 570:12,
571:6, 571:7, 571:12,
572:21, 573:3, 574:3,
574:15, 575:3, 575:8,
575:14, 575:25, 576:2,
576:22, 577:11, 578:8,
578:12, 578:13,
579:24, 580:6, 583:11,
589:2, 589:5, 589:7,
589:8, 589:10, 591:20,
593:20, 599:25, 600:3,
629:9
  **Deal** [8] - 566:2,
566:13, 566:17,
567:20, 576:13, 577:6,
578:16
  **dealing** [28] - 516:11,
567:22, 567:23,
567:24, 568:2, 568:5,
568:8, 570:7, 571:7,
575:12, 575:19, 576:6,
576:7, 576:11, 577:4,
579:13, 579:18,
579:19, 583:16,
583:17, 583:22,
583:25, 589:3, 591:8,
594:11, 600:2, 600:5
  **deals** [2] - 623:24,
626:23
  **December** [2] -
590:20, 616:8
  **deceptive** [1] - 612:9
  **decide** [4] - 587:2,
590:22, 604:21, 611:5
  **decided** [4] - 542:20,
561:9, 570:10, 602:4
  **decision** [8] - 573:14,
575:17, 612:2, 616:12,
617:6, 620:17, 623:7,
627:18
  **decision-making** [1] -
616:12
  **decisions** [5] - 570:8,
576:19, 589:12, 604:9,
615:23

**deck** [8] - 536:25, 545:1, 558:2, 572:4, 589:20, 590:12, 596:25, 603:12

**decks** [1] - 617:15

**declaration** [3] - 615:21, 615:23, 617:7

**declarations** [3] - 584:10, 611:18, 617:8

**decline** [2] - 629:2

**decrease** [4] - 517:23, 529:2, 529:7, 599:5

**decreasing** [1] - 524:13

**deduce** [1] - 536:20

**default** [10] - 548:20, 556:25, 557:2, 602:4, 610:14, 612:20, 612:21, 623:23, 628:12, 628:13

**defaults** [1] - 628:15

**Defendant** [2] - 509:7, 510:1

**defendant's** [3] - 523:11, 523:15, 568:21

**define** [1] - 569:18

**defined** [1] - 522:2

**defines** [1] - 514:20

**definitely** [1] - 541:8

**degradation** [1] - 549:21

**degrade** [1] - 549:20

**degree** [1] - 585:11

**delay** [7] - 561:6, 569:25, 571:7, 571:19, 572:7, 573:20, 574:23

**delayed** [2] - 560:22, 570:7

**deleted** [4] - 603:3, 607:25, 610:10, 613:8

**deliberate** [3] - 565:8, 618:25, 619:1

**deliver** [7] - 533:13, 538:8, 538:14, 539:4, 548:19, 548:21, 551:3

**delivered** [1] - 550:22

**deliveries** [2] - 561:2, 600:10

**delivering** [1] - 539:20

**delta** [1] - 548:19

**demand** [12] - 585:15, 585:18, 586:23, 586:24, 587:1, 588:16, 588:24, 589:16, 590:10, 590:16, 590:18, 591:14

**demonstrate** [1] - 565:12

**demonstrated** [3] - 560:24, 580:13, 589:1

**demonstrates** [1] - 601:5

**demonstrating** [1] - 590:17

**demonstration** [1] - 514:25

**Denver** [1] - 509:21

**depart** [1] - 587:23

**DEPARTMENT** [2] - 509:12, 509:19

**Department** [10] - 509:15, 545:9, 609:18, 609:21, 610:19, 610:24, 611:12, 613:22, 614:4, 622:24

**deposed** [1] - 616:6

**deposition** [5] - 593:2, 593:3, 595:9, 595:10, 595:13

**Depot** [1] - 590:24

**deprived** [1] - 581:15

**deprives** [1] - 583:3

**depriving** [1] - 562:5

**DEPUTY** [1] - 630:18

**der** [1] - 595:10

**derivative** [1] - 548:11

**derives** [1] - 625:14

**describe** [3] - 529:6, 562:16, 567:4

**described** [2] - 606:24, 618:13

**describing** [1] - 624:25

**design** [1] - 540:17

**designated** [2] - 511:9, 545:5

**desire** [1] - 573:20

**desired** [1] - 604:20

**despite** [2] - 522:20

**destroy** [2] - 602:6, 614:8, 620:23

**destroyed** [5] - 602:23, 605:17, 605:22, 608:5, 614:17

**destroying** [5] - 602:10, 606:5, 613:11, 620:15, 620:20

**destruction** [3] - 601:5, 601:11, 605:19

**detailing** [1] - 559:20

**determination** [2] - 569:6, 570:21

**determinations** [1] - 539:9

**determine** [2] - 526:21, 611:15

**determining** [1] - 612:3

**developed** [2] - 537:2, 562:9

**developer** [1] - 581:5

**developing** [2] - 548:17, 585:25

**development** [4] - 523:4, 588:22, 591:12, 603:9

**deviation** [1] - 536:2

**devoted** [1] - 548:5

**Dickman** [2] - 510:6, 631:11

**DICKMAN** [1] - 631:3

**difference** [1] - 518:14

**different** [23] - 513:13, 518:25, 524:21, 535:5, 538:2, 538:6, 557:21, 566:1, 567:19, 569:6, 572:1, 575:5, 577:24, 578:25, 579:1, 580:9, 582:1, 584:6, 587:7, 587:17, 588:8, 599:25, 621:1

**differently** [2] - 541:18, 581:1

**difficult** [8] - 525:11, 528:20, 582:19, 583:1, 585:23, 587:4, 614:22

**difficulties** [1] - 583:3

**digital** [4] - 543:18, 544:8, 551:2, 551:12

**diminish** [1] - 562:19

**diminished** [1] - 581:6

**diminishing** [1] - 524:13

**dinner** [1] - 626:5

**Dintzer** [9] - 509:11, 517:1, 609:1, 620:4, 621:19, 622:18, 626:18, 626:20, 628:12

**DINTZER** [12] - 600:22, 600:25, 601:3, 605:4, 606:17, 609:2, 620:5, 622:1, 622:6, 622:8, 622:20, 623:1

**Dintzer's** [2] - 511:23, 558:2

**diode** [1] - 517:21

**direct** [5] - 519:14, 520:24, 558:15, 601:21, 623:13

**directly** [6] - 515:15, 525:23, 528:21, 554:14, 582:7, 625:15

**disadvantage** [2] - 565:7, 572:16

**disagree** [3] - 576:14, 584:17, 613:20

**Dischler** [5] - 515:9, 525:16, 527:15, 538:1, 539:22

**Dischler's** [2] - 514:6,

**developer** [1] - 581:5

**disclosable** [1] - 612:23

**disclosed** [4] - 609:16, 613:7, 613:13, 613:21

**discloses** [1] - 610:13

**disclosing** [1] - 614:9

**disclosure** [3] - 620:13, 620:16, 621:3

**disclosures** [4] - 612:7, 613:4, 614:6

**discouraged** [1] - 581:5

**discover** [1] - 554:19

**discoverable** [1] - 621:12

**discovering** [2] - 554:12, 563:6

**discovery** [12] - 601:5, 601:12, 601:24, 601:25, 602:7, 602:24, 606:14, 609:20, 614:12, 617:22, 618:18, 618:21

**discretion** [1] - 613:20

**discretionary** [1] - 616:11

**discriminate** [1] - 584:24

**discuss** [1] - 615:22

**discussed** [5] - 533:16, 568:25, 577:5, 604:9, 610:24

**discussing** [1] - 598:7

**discussion** [3] - 548:7, 553:1, 583:8

**discussions** [2] - 512:6, 617:10

**disparate** [2] - 539:15, 547:12

**dispute** [2] - 531:24, 562:6

**dissimilar** [2] - 552:8, 567:10

**dissuaded** [1] - 560:23

**distinction** [2] - 566:8, 610:25

**distinguished** [1] - 575:18

**distinguishes** [1] - 582:1

**distributed** [1] - 626:25

**distribution** [1] - 625:15

**DISTRICT** [3] - 509:1, 509:1, 509:10

**District** [1] - 575:17

**dive** [1] - 519:1

**Division** [3] - 609:21, 610:25, 613:23
**Doctrine** [7] - 566:2, 566:17, 567:20, 576:13, 577:7, 578:16
**doctrine** [5] - 567:21, 570:12, 571:12, 575:25, 576:9
**document** [17] - 545:7, 546:8, 552:25, 553:13, 554:11, 557:6, 559:19, 563:9, 588:12, 590:6, 590:11, 601:11, 602:11, 604:17, 604:19, 613:3
**documentation** [1] - 605:2
**documents** [39] - 518:15, 525:21, 537:4, 540:22, 544:1, 545:23, 546:3, 551:21, 552:20, 553:22, 553:25, 557:10, 557:11, 588:10, 589:21, 589:22, 595:5, 595:23, 601:5, 602:6, 602:23, 603:19, 603:20, 604:22, 605:17, 605:19, 606:6, 606:9, 608:4, 608:6, 612:4, 614:19, 616:14, 617:13, 617:14, 620:16, 620:21, 620:23, 624:17
**DOJ** [1] - 509:11
**DoJ's** [1] - 618:4
**dollar** [1] - 585:3
**dollars** [3] - 521:16, 530:3, 596:21
**dominance** [1] - 561:25
**dominant** [2] - 582:19, 587:9
**dominate** [1] - 561:21
**Don** [1] - 598:12
**done** [19] - 515:6, 519:7, 523:14, 524:18, 533:9, 538:3, 541:24, 552:10, 562:4, 577:16, 578:7, 583:17, 585:10, 587:13, 602:16, 604:25, 621:14, 629:16, 630:9
**door** [1] - 586:13
**doubled** [1] - 521:24
**down** [12] - 519:1, 524:11, 527:19, 528:12, 528:13, 537:11, 537:13, 543:18, 550:2, 553:7,

599:5, 617:21
**Dr** [21] - 519:5, 523:1, 525:17, 552:11, 557:6, 557:12, 558:10, 561:13, 564:7, 593:25, 595:21, 596:6, 598:18, 598:24, 602:13, 603:1, 612:24, 621:5, 626:2
**draft** [1] - 590:13
**drag** [1] - 598:16
**dramatic** [1] - 552:12
**dramatically** [2] - 521:25, 564:4
**drive** [1] - 540:7
**driven** [1] - 617:5
**driving** [1] - 526:12
**drop** [2] - 598:19, 599:1
**dropped** [1] - 598:22
**DuckDuckGo** [3] - 560:14, 561:24, 599:21
**due** [2] - 547:20, 624:8
**durability** [4] - 521:2, 521:4, 521:5
**during** [10] - 536:4, 543:20, 552:21, 581:15, 589:17, 602:15, 605:7, 606:10, 606:11, 617:14
**duties** [1] - 576:20
**duty** [31] - 560:6, 567:18, 567:19, 569:2, 569:18, 569:23, 570:12, 571:6, 571:12, 571:23, 572:21, 573:3, 574:3, 574:15, 575:14, 575:25, 576:2, 577:1, 577:2, 577:11, 578:12, 579:17, 579:23, 580:5, 583:11, 589:5, 589:8, 589:10, 591:20, 593:20, 629:9
**Duty** [6] - 566:2, 566:13, 566:17, 567:20, 576:13, 578:16
**DX179.009** [1] - 589:22
**DX195.003** [1] - 590:12
**DX3040** [1] - 555:3
**DX737** [1] - 552:23

**E**

**early** [5] - 540:25, 559:2, 588:2, 589:21
**easier** [4] - 525:10, 537:3, 589:6, 630:10
**easy** [4] - 540:6, 569:9, 569:12, 569:14

**econometric** [2] - 514:3, 523:12
**economist** [2] - 545:8, 545:9
**ecosystem** [4] - 548:2, 624:24, 625:4, 626:12
**effect** [18] - 544:17, 547:12, 547:13, 548:11, 552:3, 568:2, 568:12, 573:16, 574:7, 575:8, 594:3, 594:7, 608:1, 624:1, 628:21, 628:23, 628:24, 629:3
**effective** [1] - 552:4
**effectively** [1] - 624:25
**effects** [11] - 517:8, 536:21, 572:25, 580:11, 593:21, 594:15, 594:19, 594:20, 595:1, 599:9, 627:3
**efficient** [4] - 560:11, 560:20, 581:16, 582:11
**effort** [3] - 527:24, 561:4, 588:22
**either** [7] - 536:20, 548:20, 549:24, 554:2, 605:11, 621:24, 623:23
**elements** [2] - 592:12, 608:23
**Email** [5] - 509:14, 509:17, 509:22, 510:4, 510:4
**email** [7] - 509:25, 601:17, 601:19, 604:12, 604:16, 619:8, 621:7
**emails** [4] - 530:23, 587:22, 617:14, 619:11
**emphasis** [1] - 521:14
**empirical** [1] - 547:11
**employee** [5] - 604:23, 619:6, 619:7, 619:8
**employees** [10] - 556:7, 557:9, 602:21, 604:21, 611:5, 611:15, 612:1, 617:9, 618:9, 619:2
**enable** [1] - 542:19
**enabled** [1] - 524:19
**end** [5] - 515:18, 537:9, 588:24, 614:14, 630:12
**ends** [1] - 522:1
**engage** [2] - 574:22, 590:22
**engine** [13] - 531:20, 531:21, 534:16, 535:5, 548:8, 560:20, 561:23, 562:22, 583:1, 623:24,

626:1, 627:6
**engineer** [2] - 527:12
**engineering** [1] - 599:16
**Engines** [1] - 590:1
**engines** [3] - 535:13, 560:12, 565:3
**enhance** [1] - 532:4
**enormous** [1] - 605:18
**ensure** [2] - 527:3, 555:9
**ensuring** [2] - 619:13, 623:22
**enter** [6] - 524:8, 525:11, 525:12, 528:3, 626:12
**entered** [2] - 530:4, 584:4
**entering** [3] - 521:17, 525:15
**entire** [2] - 558:13
**entirely** [1] - 558:14
**entrench** [1] - 560:9
**entries** [1] - 533:14
**entry** [4] - 533:12, 533:15, 533:23, 534:15
**envisioning** [1] - 549:19
**Epic** [2] - 613:15, 614:2
**equals** [1] - 512:10
**equation** [2] - 532:8
**equity** [1] - 585:11
**equivalent** [3] - 521:1, 538:7
**essential** [4] - 532:3, 533:8, 577:7, 577:8
**essentially** [7] - 531:15, 532:22, 548:1, 584:11, 584:23, 592:20, 604:22
**establish** [1] - 586:10
**established** [7] - 534:5, 577:17, 584:2, 587:9, 608:23, 623:4, 627:5
**establishing** [3] - 513:4, 533:6, 533:7
**estimate** [1] - 519:3
**estimates** [4] - 518:23, 594:22, 595:18
**estimating** [1] - 562:17
**et** [2] - 509:3, 526:23
**evaluate** [2] - 543:15, 571:13
**evaluated** [1] - 575:14
**evaluating** [1] - 609:10
**event** [2] - 540:16,

591:6
**eventually** [2] - 550:11, 570:10
**evidence** [74] - 512:1, 512:18, 512:24, 512:25, 513:1, 513:23, 515:20, 515:21, 516:2, 518:7, 519:14, 519:15, 519:24, 520:16, 520:23, 520:24, 520:25, 521:6, 523:5, 524:21, 526:20, 527:9, 529:21, 531:6, 533:21, 540:10, 541:18, 541:24, 544:13, 544:16, 547:14, 552:10, 558:15, 559:18, 560:3, 560:24, 570:5, 570:6, 570:19, 572:4, 573:15, 574:11, 580:24, 581:7, 584:2, 584:21, 584:22, 585:15, 585:17, 586:9, 589:14, 590:19, 592:8, 596:11, 599:10, 601:8, 604:15, 608:11, 613:11, 614:8, 615:11, 615:14, 617:4, 618:23, 619:19, 619:20, 619:23, 625:18, 626:21, 627:4, 627:12
**evident** [1] - 561:15
**exact** [8] - 523:23, 523:24, 524:5, 526:3, 526:9, 556:24, 559:1, 589:7
**exactly** [14] - 515:16, 521:13, 528:6, 528:11, 528:19, 533:14, 540:19, 544:19, 571:13, 582:4, 590:5, 592:19, 604:24, 623:21
**examination** [1] - 565:5
**example** [14] - 517:11, 517:12, 519:10, 525:20, 525:24, 525:25, 529:23, 534:8, 553:8, 556:11, 569:17, 571:24, 573:10, 579:4
**examples** [2] - 517:17, 557:14
**Excel** [1] - 559:19
**excellent** [2] - 630:4, 630:5
**except** [4] - 572:16, 573:20, 576:7
**exception** [10] - 521:23, 568:11, 568:17, 576:23, 589:10, 591:18, 591:21, 591:24, 604:1, 611:20
**exceptions** [2] - 568:12, 576:1
**excerpts** [1] - 559:20
**excess** [4] - 553:3, 553:4, 553:6, 553:7
**exclude** [2] - 514:21, 565:14
**exclusion** [1] - 589:15
**exclusionary** [7] - 532:23, 532:25, 565:18, 566:14, 572:23, 583:10, 587:18
**exclusive** [4] - 516:11, 571:24, 574:25, 594:11
**exclusivity** [3] - 603:23, 623:5, 627:1
**excuse** [4] - 572:4, 586:3, 617:16, 618:5
**executive** [2] - 572:10, 602:13
**executives** [1] - 602:25
**exercise** [1] - 513:19
**exercised** [3] - 512:19, 514:8, 516:4
**exhibit** [1] - 618:4
**exist** [1] - 515:23
**existence** [1] - 606:23
**existing** [2] - 601:16, 602:23
**exists** [2] - 574:15, 574:17
**expand** [2] - 526:5, 526:22
**expanded** [3] - 526:3, 526:10, 529:24
**expanding** [1] - 528:9
**expansion** [2] - 511:19, 526:5
**expect** [11] - 536:9, 546:16, 550:6, 550:12, 550:25, 552:13, 556:8, 611:25, 612:14, 614:21
**expecting** [1] - 553:4
**Expedia** [1] - 534:21
**experience** [6] - 539:4, 540:11, 551:4, 551:14, 551:19, 554:22
**experiment** [1] - 545:21
**experiments** [1] - 514:6
**expert** [3] - 536:13, 536:14, 536:15
**experts** [1] - 624:8
**explain** [3] - 530:9, 573:18, 621:7
**explained** [6] - 511:10, 517:1, 525:9, 582:7, 589:15, 610:25
**explains** [1] - 571:15
**explanation** [7] - 524:24, 530:19, 530:25, 537:21, 557:7, 557:11, 595:20
**explanations** [5] - 511:13, 512:2, 512:3, 516:17, 516:18
**explicit** [1] - 610:9
**explicitly** [1] - 554:11
**Explorer** [1] - 550:7
**expose** [1] - 538:24
**exposure** [1] - 537:17
**Express** [2] - 575:20
**express** [1] - 629:25
**expressly** [9] - 601:11, 601:13, 602:6, 605:11, 609:16, 613:21, 615:20, 623:8, 624:7
**extend** [2] - 629:14, 630:13
**extends** [1] - 548:24
**extensive** [1] - 603:1
**extent** [7] - 549:8, 549:12, 551:13, 560:19, 604:10, 607:21, 614:23
**extra** [1] - 521:14
**extremely** [1] - 522:23
**eyeballs** [2] - 548:8, 548:9

## F

**face** [2] - 534:17, 535:10
**Facebook** [7] - 528:16, 538:3, 538:4, 538:14, 540:5, 541:8, 578:1
**facingly** [1] - 584:23
**fact** [26] - 517:16, 520:9, 521:14, 521:21, 522:14, 536:17, 537:2, 539:19, 551:1, 554:5, 558:13, 562:19, 568:8, 570:25, 571:21, 576:2, 579:23, 582:3, 584:1, 592:1, 603:3, 604:7, 604:8, 606:12, 609:11, 628:5
**facto** [1] - 627:1
**factor** [1] - 582:6
**facts** [5] - 565:21, 575:24, 579:14, 600:14
**factual** [2] - 571:10, 594:4
**factually** [1] - 575:12
**fail** [1] - 517:6
**failed** [1] - 627:25
**failure** [3] - 547:11, 574:22, 594:21
**fair** [3] - 535:2, 580:17, 589:25
**fairly** [2] - 521:10, 575:7
**faith** [2] - 585:25, 609:11
**fake** [1] - 603:9
**fall** [4] - 563:1, 591:23, 615:6, 615:7
**false** [1] - 558:6
**familiar** [2] - 603:7, 617:22
**families** [1] - 630:13
**family** [1] - 542:22
**famous** [1] - 568:6
**fancy** [1] - 514:3
**far** [3] - 517:18, 607:19, 615:2
**faster** [1] - 572:10
**favor** [1] - 584:25
**favorable** [1] - 616:3
**favoring** [1] - 532:17
**favorites** [1] - 584:11
**FCC** [1] - 568:19
**feature** [26] - 549:17, 561:5, 562:8, 564:4, 566:20, 570:10, 573:20, 576:14, 581:13, 581:17, 583:23, 584:1, 584:4, 584:16, 584:20, 586:7, 586:8, 586:10, 586:12, 586:20, 589:4, 589:7, 591:9, 592:3, 600:3
**features** [16] - 569:16, 570:4, 570:13, 582:23, 583:17, 585:9, 585:10, 585:16, 589:17, 589:18, 589:23, 590:2, 590:9, 590:10, 597:23, 600:12
**February** [2] - 563:19, 609:23
**Federal** [1] - 575:20
**federal** [2] - 601:6, 620:18
**feet** [1] - 598:16
**few** [4] - 557:16, 583:7, 596:21, 622:5
**fewer** [3] - 549:22, 625:16, 625:17
**fifteen** [1] - 517:19
**fifth** [2] - 573:12, 573:14
**fight** [1] - 529:16

**figure** [6] - 514:4, 527:13, 529:16, 538:17, 551:22, 554:23
**figuring** [3] - 518:12, 519:2, 570:15
**filed** [4] - 588:25, 610:1, 610:21, 610:22
**files** [1] - 559:19
**filing** [1] - 570:6
**final** [5] - 511:8, 513:6, 517:11, 530:19, 624:21
**finalize** [1] - 523:10
**finally** [3] - 599:17, 600:7, 621:4
**finance** [1] - 598:15
**financial** [2] - 536:14, 561:14
**findings** [1] - 536:16
**fine** [3] - 583:17, 583:19, 625:2
**finish** [4] - 572:19, 583:14, 583:15, 622:15
**fire** [1] - 553:24
**firm** [1] - 514:22
**firms** [4] - 519:25, 526:21, 576:21, 625:18
**first** [22] - 512:7, 512:9, 512:17, 522:8, 522:11, 523:22, 525:2, 534:16, 549:7, 552:25, 556:3, 583:11, 586:21, 597:22, 598:7, 607:18, 609:17, 613:5, 614:4, 616:13, 616:25, 629:10
**fit** [2] - 512:8, 541:15
**fits** [2] - 624:4, 626:19
**five** [17] - 517:19, 543:25, 552:17, 561:7, 563:22, 575:19, 576:6, 576:8, 585:24, 586:2, 590:14, 599:5, 607:23, 612:13, 622:8, 622:23
**five-year** [2] - 575:19, 576:6
**flagged** [3] - 540:23, 552:21, 552:23
**flat** [2] - 522:23, 522:24
**flavor** [1] - 513:12
**flavors** [1] - 538:2
**flawed** [1] - 518:3
**flip** [2] - 548:25, 554:18
**Floodlight** [4] - 564:17, 597:24, 597:25, 598:9
**Floor** [1] - 509:20
**fluctuating** [1] - 521:9
**focus** [3] - 536:5, 538:16, 567:15

**focused** [2] - 511:24, 603:10
**folks** [4] - 539:7, 587:24, 612:10, 614:23
**follow** [3] - 619:15, 623:6, 623:10
**follow-on** [2] - 623:6, 623:10
**following** [9] - 512:8, 518:23, 550:13, 580:13, 584:7, 609:11, 611:3, 612:13, 627:5
**fooled** [1] - 628:8
**FOR** [1] - 509:1
**force** [1] - 524:25
**forcing** [2] - 525:6, 540:13
**foreclose** [1] - 571:25
**forecloses** [1] - 614:7
**foreclosure** [13] - 594:10, 594:12, 594:13, 594:14, 594:17, 596:18, 623:4, 623:5, 623:9, 623:14, 623:15, 627:2, 629:6
**foregoing** [1] - 631:4
**foremost** [1] - 607:18
**forgive** [2] - 573:11, 575:23
**form** [2] - 568:10, 572:8
**format** [3] - 519:16, 550:18
**former** [1] - 626:3
**forward** [19] - 512:1, 512:15, 523:12, 523:16, 531:7, 556:20, 585:13, 588:1, 593:13, 593:14, 593:20, 593:24, 593:25, 594:16, 595:5, 598:11, 614:21, 619:20, 619:21
**foundation** [1] - 594:4
**four** [5] - 586:3, 603:11, 603:12, 607:23, 612:13
**fraction** [1] - 617:15
**framework** [2] - 516:6, 578:13
**frankly** [2] - 546:17, 574:2
**freeze** [2] - 624:24, 626:12
**freezing** [1] - 548:2
**front** [2] - 576:5, 596:12
**fruit** [1] - 531:15
**full** [5] - 512:10, 512:19, 566:2, 569:7, 631:5

**Full** [1] - 590:1
**fully** [3] - 514:9, 562:24, 593:8
**function** [2] - 577:8
**functionality** [1] - 600:11
**fundamental** [1] - 600:5
**fundamentally** [4] - 535:4, 535:9, 535:15, 599:25
**furniture** [1] - 568:6
**future** [1] - 513:22

## G

**game** [5] - 560:7, 563:5, 599:23, 600:17, 626:1
**games** [1] - 607:14
**gap** [2] - 552:25, 555:14
**gather** [1] - 546:23
**General** [3] - 609:18, 609:24, 610:14
**general** [20] - 517:1, 531:20, 533:16, 533:23, 533:24, 534:16, 535:5, 535:8, 535:9, 535:13, 560:12, 560:19, 561:21, 561:23, 583:1, 585:10, 588:23, 623:23, 623:24
**generally** [4] - 515:5, 522:23, 542:12, 618:14
**Generals** [1] - 611:13
**generate** [1] - 596:23
**Giannandrea** [2] - 532:2, 626:2
**gist** [1] - 595:1
**given** [3] - 604:11, 611:17, 630:10
**glove** [2] - 624:4, 626:19
**gloves** [1] - 626:20
**Glue** [1] - 624:19
**goal** [1] - 538:13
**goalpost** [1] - 597:22
**goals** [2] - 537:19
**God** [2] - 586:14, 597:25
**google** [1] - 509:6
**Google** [202] - 510:1, 512:1, 512:13, 516:4, 516:13, 517:7, 518:10, 518:15, 519:10, 520:1, 520:9, 522:10, 523:2, 525:20, 526:14, 526:19, 528:17, 528:23, 528:25, 529:4,

529:13, 529:17, 531:6, 531:19, 533:2, 533:13, 533:20, 536:7, 536:8, 537:5, 537:14, 537:15, 537:20, 539:8, 539:11, 541:1, 541:18, 543:10, 543:13, 543:16, 544:3, 544:10, 546:18, 546:25, 547:6, 547:21, 547:23, 548:13, 548:20, 549:16, 549:19, 549:23, 550:11, 550:13, 551:11, 551:15, 551:17, 551:21, 551:24, 551:25, 552:1, 552:9, 553:8, 553:10, 554:16, 555:5, 555:18, 556:7, 556:19, 557:9, 559:19, 560:8, 560:18, 560:22, 561:4, 561:8, 561:16, 561:17, 562:4, 562:9, 562:15, 562:17, 562:23, 562:25, 563:1, 563:3, 563:8, 563:18, 564:3, 564:15, 564:21, 566:19, 570:1, 570:3, 570:20, 571:5, 572:11, 572:20, 573:19, 574:11, 577:9, 577:12, 577:17, 577:18, 577:20, 578:4, 578:25, 579:1, 579:5, 579:9, 579:12, 581:1, 581:11, 582:19, 582:22, 582:25, 583:11, 583:13, 584:3, 584:7, 584:9, 584:11, 584:22, 585:1, 585:5, 585:13, 585:14, 585:15, 585:20, 585:25, 586:16, 586:21, 586:25, 588:7, 588:19, 588:21, 589:2, 589:15, 589:17, 590:19, 590:22, 591:4, 591:12, 591:13, 591:16, 591:22, 593:15, 594:5, 597:10, 598:21, 598:25, 599:6, 599:17, 601:14, 602:2, 602:4, 602:5, 602:9, 602:17, 602:21, 605:13, 607:14, 608:1, 608:9, 608:10, 609:14, 609:15, 609:24, 610:9, 610:13, 610:17, 611:5, 611:14, 611:19, 612:1, 613:14, 613:15, 615:21, 618:24, 623:23, 623:24,

643

624:15, 624:16, 625:2,
625:7, 625:20, 626:14,
627:11, 627:16,
627:17, 627:25, 628:3,
628:5, 628:12, 628:17,
628:18, 628:19, 630:2
**Google's** [58] -
511:15, 516:18, 518:2,
518:8, 519:23, 519:24,
520:17, 521:11,
521:21, 523:20, 524:6,
524:23, 525:23,
530:19, 531:3, 531:14,
532:8, 537:1, 537:22,
543:18, 543:19,
546:14, 547:15, 549:5,
551:19, 556:19,
561:14, 561:25,
563:11, 569:15, 570:7,
572:7, 572:15, 573:6,
573:22, 586:24,
591:11, 598:22, 601:4,
601:10, 602:20,
604:19, 606:12, 607:9,
608:1, 608:3, 609:16,
610:25, 611:22, 612:8,
612:9, 619:9, 624:3,
624:9, 625:5, 625:18,
626:1, 626:3
**Gorsuch** [4] - 567:3,
567:4, 576:18, 583:21
**government** [3] -
567:23, 578:15, 620:18
**government's** [1] -
558:24
**Grail** [1] - 571:18
**grappling** [1] - 570:18
**grateful** [1] - 629:19
**gratitude** [2] - 629:15,
630:1
**great** [6] - 519:7,
552:1, 555:25, 556:5,
556:6, 556:8
**greater** [3] - 522:15,
538:24, 599:5
**green** [2] - 564:9
**grew** [1] - 597:15
**ground** [2] - 587:24,
598:11
**groups** [1] - 613:22
**grow** [1] - 545:24
**growing** [2] - 549:9
**grown** [5] - 546:6,
551:5, 557:25, 558:5,
562:1
**grows** [1] - 555:14
**growth** [3] - 549:2,
549:15
**guess** [18] - 512:8,
513:13, 517:5, 520:8,

522:25, 523:10,
523:20, 541:21,
546:19, 548:18,
550:18, 569:11, 584:6,
585:19, 585:23,
591:13, 612:11, 630:11
**guessing** [1] - 529:15
**guidance** [1] - 603:17
**guys** [1] - 613:9

# H

**H&R** [2] - 571:19,
600:11
**H2** [1] - 590:12
**half** [1] - 586:3
**hand** [3] - 590:6,
613:7, 622:22
**handed** [2] - 531:18,
549:1
**handling** [1] - 610:17
**hands** [2] - 567:1,
613:18
**happy** [2] - 559:7,
630:16
**Happy** [1] - 531:8
**hard** [4] - 518:12,
528:13, 546:12, 549:18
**hark** [2] - 513:20,
513:23
**harm** [18] - 511:13,
530:13, 561:1, 571:20,
574:9, 574:10, 574:12,
579:25, 580:2, 581:8,
581:17, 583:4, 596:20,
597:3, 598:17, 599:8,
625:15, 625:16
**harmed** [2] - 562:4,
565:22
**harmful** [1] - 568:12
**harming** [2] - 533:3,
560:24
**harms** [2] - 516:19,
574:23
**Harrison** [1] - 598:12
**head** [2] - 585:23,
626:3
**heads** [1] - 528:13
**health** [1] - 543:2
**health-related** [1] -
543:2
**hear** [6] - 595:2, 595:6,
595:7, 595:20, 628:1,
629:11
**heard** [12] - 537:13,
541:7, 543:12, 583:12,
587:7, 587:25, 588:18,
600:21, 602:12, 604:6,
627:4
**heart** [1] - 566:20

**Heath** [3] - 595:11,
595:16
**heightened** [2] -
541:14
**Help** [1] - 555:5
**help** [13] - 539:4,
540:7, 541:16, 541:20,
543:6, 544:11, 555:9,
573:21, 590:6, 596:4,
602:1, 605:3, 624:1
**helped** [1] - 558:17
**helpful** [3] - 524:4,
525:20, 557:19
**helping** [1] - 561:10
**helps** [6] - 530:9,
532:2, 554:12, 554:19,
555:1, 558:17
**hereby** [1] - 631:3
**hesitant** [1] - 576:24
**hide** [4] - 603:20,
606:1, 606:4, 606:21
**hiding** [1] - 555:18
**high** [10] - 520:20,
521:4, 521:5, 522:20,
522:23, 555:9, 564:11,
614:10
**higher** [12] - 519:12,
519:18, 525:15,
525:18, 532:16,
549:11, 550:22,
551:14, 555:15,
555:16, 564:3, 586:24
**highest** [4] - 531:19,
531:20, 561:11, 630:9
**highlighted** [2] -
546:2, 554:13
**historically** [3] -
541:2, 544:5, 626:25
**history** [14] - 602:12,
602:15, 602:17,
602:21, 603:2, 604:16,
604:24, 605:12,
606:20, 607:9, 612:21,
621:7
**hit** [1] - 527:11
**Hold** [1] - 613:24
**hold** [9] - 549:25,
575:25, 576:1, 604:17,
616:5, 617:2, 618:8,
618:9, 618:11
**holds** [3] - 550:14,
611:14, 625:20
**Home** [1] - 590:24
**home** [1] - 517:18
**hone** [1] - 542:19
**honest** [3] - 518:16,
601:20, 626:6
**honestly** [2] - 601:8,
601:20
**Honor** [137] - 511:7,

511:8, 515:8, 515:11,
515:19, 516:20,
516:24, 517:12,
518:16, 520:23, 521:3,
521:13, 524:1, 526:2,
528:11, 529:14, 530:1,
530:17, 531:6, 531:11,
531:13, 532:20,
532:25, 533:4, 534:3,
535:2, 535:10, 535:19,
540:14, 541:7, 545:17,
548:12, 550:6, 551:17,
552:19, 554:4, 555:20,
555:25, 556:11,
557:10, 558:2, 558:15,
558:19, 558:23, 559:8,
559:11, 559:16,
559:25, 560:4, 560:8,
560:17, 560:21, 562:6,
562:12, 563:19, 564:9,
564:15, 566:7, 566:16,
568:9, 568:18, 569:24,
571:9, 571:11, 571:21,
572:3, 572:9, 572:14,
572:19, 573:8, 574:14,
576:5, 577:3, 578:14,
579:22, 580:1, 580:3,
581:3, 581:8, 582:16,
582:21, 583:9, 587:7,
590:6, 591:7, 594:8,
597:6, 597:9, 597:18,
598:17, 599:7, 599:14,
599:17, 600:7, 600:13,
600:18, 600:22,
600:25, 601:1, 601:7,
601:25, 602:11,
602:25, 603:8, 605:4,
605:24, 605:25,
608:12, 608:22, 609:2,
609:4, 609:12, 609:15,
611:7, 611:18, 611:23,
613:1, 618:10, 618:17,
619:16, 620:2, 620:9,
621:4, 621:14, 622:21,
623:2, 623:15, 624:21,
625:5, 625:10, 625:13,
625:14, 625:21,
625:24, 626:15,
626:18, 628:11
**Honor's** [4] - 514:9,
522:12, 528:19, 599:9
**HONORABLE** [1] -
509:9
**hope** [1] - 629:23
**hopefully** [2] - 630:6,
630:15
**horizontal** [1] - 524:10
**horse** [1] - 539:12
**huge** [1] - 585:2
**hum** [1] - 601:2

644

**human** [1] - 612:24
**hundreds** [2] - 560:16, 606:10
**hurts** [1] - 590:7
**hypothetical** [1] - 515:7

**I**

**IAP** [1] - 623:19
**IAPs** [1] - 626:22
**idea** [2] - 518:2, 547:6
**ideas** [1] - 539:24
**identified** [1] - 511:18
**identify** [4] - 529:4, 542:5, 542:8, 542:11
**identifying** [2] - 542:22, 581:4
**ignore** [1] - 524:10
**IL** [1] - 509:16
**Illumina** [3] - 561:2, 571:18, 600:9
**imagine** [2] - 549:24, 622:24
**immediately** [2] - 610:10, 620:24
**immunity** [6] - 568:10, 572:24, 576:9, 576:13, 576:17, 576:18
**impact** [9] - 526:19, 541:8, 546:22, 597:4, 597:5, 598:19, 624:8, 624:11
**impairs** [1] - 582:12
**imperfect** [2] - 527:25, 528:1
**implement** [2] - 512:14, 570:10
**implementation** [1] - 588:8
**implemented** [1] - 512:15
**implications** [1] - 531:5
**importance** [4] - 515:12, 562:13, 564:6, 630:1
**Important** [1] - 590:1
**important** [16] - 540:7, 564:10, 568:9, 580:13, 582:6, 586:7, 586:8, 586:10, 593:12, 593:16, 597:17, 613:10, 624:18, 624:19, 624:20
**importantly** [1] - 572:9
**impose** [1] - 513:7
**imposed** [1] - 627:1
**impressions** [2] - 524:7, 545:23

**improperly** [1] - 589:2
**improve** [3] - 519:11, 545:22, 552:4
**improved** [7] - 517:20, 543:22, 543:23, 543:25, 551:14, 564:5
**improvement** [4] - 517:22, 539:21, 550:8, 552:13
**improving** [4] - 519:13, 519:18, 546:13
**IN** [1] - 509:1
**inability** [1] - 526:11
**inadvertent** [3] - 602:1, 602:2, 602:3
**Inc** [1] - 575:20
**incentive** [2] - 561:14, 573:22
**incentives** [2] - 544:11, 623:16
**incident** [1] - 544:12
**include** [4] - 526:23, 590:2, 590:9, 603:16
**including** [3] - 575:17, 613:22, 615:22
**inconsistent** [1] - 549:16
**incorporate** [1] - 586:21
**incorrect** [2] - 531:1, 558:5
**increase** [23] - 512:12, 513:1, 513:9, 513:10, 515:16, 515:22, 517:12, 517:15, 518:3, 526:15, 529:18, 546:10, 554:3, 554:5, 554:6, 556:14, 556:15, 556:16, 557:1, 581:10, 581:11, 581:12
**increased** [18] - 513:6, 515:24, 516:2, 517:13, 521:25, 522:22, 525:25, 550:18, 551:4, 551:13, 555:16, 558:7, 598:23, 627:6, 627:8, 627:9
**increases** [7] - 511:13, 512:3, 512:14, 512:16, 512:25, 523:18, 554:1
**increasing** [3] - 526:13, 526:14
**incremental** [2] - 516:3, 628:10
**index** [2] - 556:18, 556:19
**indicate** [1] - 571:13
**indicated** [1] - 605:2
**indicating** [1] - 540:1
**indication** [1] - 594:18

**indicative** [2] - 521:10, 548:1
**indicia** [1] - 603:6
**indirect** [4] - 520:22, 520:24, 520:25, 521:6
**individual** [3] - 553:2, 582:15, 583:17
**individually** [1] - 542:11
**individuals** [1] - 541:10
**indulge** [1] - 568:15
**industry** [3] - 520:15, 572:4, 584:2
**industry-wide** [1] - 584:2
**infected** [1] - 627:23
**infer** [2] - 586:5, 594:3
**inference** [2] - 520:1, 594:7
**inferences** [4] - 607:24, 608:14, 608:25, 618:23
**inferior** [2] - 626:24, 627:10
**inferring** [1] - 599:10
**inflict** [1] - 574:10
**information** [39] - 513:25, 514:2, 527:10, 528:22, 528:24, 529:5, 529:9, 529:11, 529:21, 530:3, 530:20, 530:24, 531:7, 532:11, 532:13, 538:11, 541:3, 541:9, 542:22, 543:2, 543:4, 543:7, 543:11, 543:14, 544:4, 556:20, 595:12, 596:4, 596:7, 601:22, 606:4, 606:22, 613:10, 615:16, 616:16, 616:18, 620:10, 621:13
**informed** [1] - 532:10
**inherent** [1] - 579:20
**inhibited** [1] - 560:23
**initial** [2] - 563:22, 596:8
**initiation** [1] - 617:2
**injured** [1] - 605:18
**innovate** [1] - 528:14
**innovation** [2] - 523:2, 550:12
**innovations** [1] - 600:12
**inquiry** [4] - 541:1, 572:20, 591:1
**insert** [1] - 623:20
**instance** [5] - 522:11, 543:4, 558:18, 616:13, 616:25
**instances** [2] - 554:18,

586:25
**instant** [2] - 601:17, 602:3
**instead** [8] - 519:4, 519:5, 519:11, 533:9, 556:10, 556:13, 556:15, 563:14
**instill** [1] - 630:6
**instituted** [1] - 529:2
**instruct** [1] - 618:8
**integrate** [3] - 587:3, 587:5
**integrated** [5] - 562:10, 563:2, 564:16, 597:11, 599:6
**intend** [1] - 511:17
**intended** [3] - 565:7, 606:13, 608:9
**intent** [31] - 538:12, 539:21, 565:12, 565:17, 573:15, 601:6, 603:6, 603:20, 605:24, 606:1, 606:2, 606:3, 606:4, 606:5, 606:12, 606:21, 606:23, 607:1, 608:1, 614:7, 614:8, 614:10, 615:1, 615:4, 615:7, 615:9, 618:22, 619:22, 620:11, 621:16
**intentional** [1] - 619:13
**intentionally** [2] - 603:1, 628:4
**interactions** [1] - 600:15
**interceding** [1] - 570:24
**interchangeably** [1] - 518:17
**interest** [4] - 530:6, 543:10, 585:2, 596:14
**interested** [3] - 552:6, 563:7, 597:14
**interesting** [2] - 536:2, 618:24
**interference** [1] - 627:20
**internal** [4] - 546:3, 551:21, 588:12, 594:22
**internally** [1] - 563:16
**Internet** [1] - 550:7
**internet** [1] - 535:12
**interpret** [1] - 511:12
**interpreted** [2] - 589:10, 619:12
**interpreting** [1] - 619:16
**interrupt** [1] - 516:5
**interviewed** [1] - 596:2

645

**intraday** [3] - 562:7, 563:14, 563:17
**introduced** [5] - 553:9, 563:2, 586:12, 586:17, 598:21
**inundated** [2] - 553:20, 629:18
**inventory** [1] - 535:6
**invest** [3] - 547:20, 624:10, 624:11
**investigating** [1] - 610:20, 613:14
**investigation** [10] - 606:11, 610:1, 610:5, 610:7, 610:18, 610:19, 610:21
**investigations** [1] - 612:13
**investigative** [1] - 605:19
**investment** [6] - 523:3, 537:7, 537:8, 550:8, 561:11, 624:8
**invited** [1] - 557:10
**involved** [6] - 529:24, 542:17, 576:19, 609:8, 609:19, 610:6
**involvement** [1] - 595:17
**involving** [3] - 577:10, 596:11, 604:12
**IQVIA** [1] - 513:21
**Iron** [1] - 552:22
**Israel** [3] - 525:17, 552:11, 598:18
**Israel's** [2] - 564:7, 598:24
**issue** [10] - 540:18, 560:22, 570:4, 571:10, 589:4, 598:17, 615:4, 616:23, 618:16
**issues** [3] - 540:22, 543:2, 616:16
**items** [2] - 590:8, 607:23
**itself** [4] - 518:10, 557:6, 581:13, 598:20

### J

**jamming** [1] - 539:13
**Janice** [2] - 510:6, 631:11
**JANICE** [1] - 631:3
**January** [1] - 609:9
**Japan** [2] - 563:8, 590:15
**Jerath** [4] - 525:9, 527:18, 530:9, 543:5
**job** [3] - 552:10,

574:19, 629:17
**John** [1] - 510:1
**join** [1] - 524:19
**joke** [1] - 592:23
**jon.sallet@coag.gov** [1] - 509:22
**Jonathan** [1] - 509:18
**Jr** [1] - 509:22
**jschmidtlein@wc. com** [1] - 510:4
**Juda** [4] - 519:5, 539:22, 557:6, 557:12
**JUDGE** [1] - 509:10
**judgment** [6] - 560:21, 573:13, 594:9, 594:24, 595:5, 595:19
**judgments** [1] - 587:2
**Judicial** [1] - 509:20
**judicial** [1] - 515:11
**juice** [2] - 519:12, 519:17
**jump** [3] - 526:15, 535:20, 558:9
**jumping** [1] - 566:10
**jury** [3] - 596:12, 619:19, 623:12
**JUSTICE** [1] - 509:12
**justice** [1] - 576:18
**Justice** [11] - 509:15, 567:3, 583:21, 609:18, 609:21, 610:20, 610:24, 611:13, 613:23, 614:4
**Justice's** [2] - 545:9, 622:25
**justification** [6] - 532:24, 549:6, 572:7, 572:16, 573:20, 623:10
**justifications** [12] - 511:10, 511:11, 511:25, 512:2, 516:11, 516:22, 516:25, 517:4, 523:17, 608:3, 608:5
**justify** [1] - 626:7

### K

**keep** [5] - 528:13, 528:17, 544:23, 606:14, 624:1
**keeps** [4] - 523:2, 529:14, 529:15
**Kenneth** [1] - 509:11
**kenneth.dintzer2@ usdoj.gov** [1] - 509:14
**kept** [2] - 592:5, 597:21
**keyword** [11] - 523:18, 526:5, 527:21, 529:24, 530:5, 537:2, 537:7,

542:18, 556:3, 556:6
**keywords** [17] - 526:6, 526:22, 527:2, 527:17, 527:18, 528:12, 529:23, 537:8, 537:14, 537:18, 538:6, 538:17, 539:1, 539:18, 539:20, 560:17
**kicking** [1] - 583:18
**kind** [10] - 535:20, 547:24, 572:1, 579:16, 581:18, 588:11, 592:23, 592:24, 619:13, 621:10
**kinds** [2] - 571:20, 575:5
**Knicks** [1] - 560:7
**knob** [1] - 515:22
**knock** [1] - 548:11
**knock-on** [1] - 548:11
**knowing** [3] - 530:12, 532:2, 603:2
**knows** [4] - 582:21, 619:9, 623:18, 624:22
**Kolotouros** [2] - 604:13, 605:5
**Kooi** [1] - 595:10
**Krueger** [13] - 562:15, 563:16, 565:5, 587:25, 598:10, 604:1, 604:7, 609:7, 612:15, 615:19, 616:1, 616:4, 616:21

### L

**label** [2] - 618:19, 619:8
**labeling** [1] - 618:16
**lack** [2] - 546:17, 571:19
**laid** [1] - 594:4
**lane** [1] - 606:3
**language** [2] - 571:11
**laptop** [1] - 550:1
**large** [4] - 535:14, 536:18, 547:4, 560:15
**largely** [1] - 522:2
**larger** [1] - 588:17
**largest** [4] - 522:9, 527:24, 531:3, 563:11
**LaSalle** [1] - 509:15
**last** [13] - 528:21, 540:2, 543:25, 552:19, 554:10, 559:17, 560:7, 596:14, 618:3, 621:4, 628:20, 629:11
**late** [3] - 561:2, 563:5, 600:9
**latent** [1] - 539:21
**latest** [1] - 525:2

**latitude** [1] - 613:2
**launch** [4] - 515:21, 525:23, 528:8
**launched** [4] - 523:20, 523:22, 525:2, 525:3
**launches** [6] - 519:16, 553:1, 553:2, 553:9, 553:18, 554:2
**LAW** [1] - 509:19
**law** [15] - 515:3, 521:6, 565:16, 566:12, 571:2, 571:13, 571:16, 574:16, 577:3, 577:10, 579:25, 589:5, 589:9, 589:13, 630:8
**laws** [3] - 568:13, 568:17, 606:23
**lawsuit** [4] - 588:25, 610:21, 610:22, 610:23
**lawyering** [1] - 630:5
**LCD** [1] - 517:22
**lead** [2] - 525:18, 527:9
**leading** [1] - 621:23
**leads** [1] - 605:23
**leapt** [1] - 558:14
**learned** [2] - 563:5, 620:21
**least** [10] - 515:20, 538:20, 551:25, 572:8, 572:12, 584:11, 584:22, 586:5, 589:21, 619:9
**leave** [9] - 534:4, 582:19, 583:2, 585:2, 604:21, 611:5, 611:14, 612:2, 618:23
**leaves** [1] - 604:19
**led** [1] - 627:2
**left** [3] - 553:14, 593:15, 621:20
**legal** [14] - 571:10, 589:4, 601:11, 601:15, 601:23, 603:21, 607:6, 607:7, 616:5, 616:6, 617:2, 618:8, 618:9, 618:11
**legitimate** [2] - 570:8, 572:7
**lens** [2] - 580:7, 580:10
**less** [11] - 515:10, 517:20, 520:22, 521:23, 535:3, 543:3, 543:9, 551:20, 568:6, 582:11, 607:16
**letter** [4] - 602:9, 602:11, 609:23, 610:12
**level** [8] - 514:23, 515:5, 528:14, 561:3,

600:10, 613:21, 615:1, 624:2
**levels** [1] - 630:9
**leverage** [1] - 626:7
**lifeline** [3] - 561:22, 561:25, 586:15
**lift** [1] - 599:13
**light** [2] - 568:22, 575:9
**lights** [2] - 528:10, 528:17
**likely** [3] - 519:8, 555:15, 573:16
**Lim** [1] - 559:1
**limitation** [1] - 535:4
**limited** [1] - 607:13
**limiting** [2] - 529:5, 600:11
**line** [6] - 524:22, 529:9, 529:10, 564:9, 571:1, 585:22
**lines** [1] - 587:14
**link** [2] - 531:19, 531:21
**listed** [1] - 607:24
**lists** [1] - 589:22
**litigated** [1] - 613:15
**litigating** [1] - 613:14
**litigation** [6] - 601:9, 603:6, 604:3, 606:11, 611:14, 612:17
**litigative** [1] - 605:20
**litigators** [1] - 620:22
**LLC** [1] - 509:6
**LLP** [2] - 509:23, 510:2
**load** [1] - 551:19
**lock** [1] - 628:4
**logic** [1] - 568:13
**lone** [1] - 576:23
**long-term** [2] - 554:15, 592:2
**look** [36] - 514:15, 517:17, 518:4, 521:7, 522:14, 522:22, 526:8, 537:15, 550:1, 562:22, 567:13, 569:9, 570:14, 572:3, 573:9, 574:2, 574:21, 579:2, 580:2, 580:6, 580:10, 585:5, 585:25, 589:24, 590:14, 592:16, 593:10, 597:1, 598:11, 599:14, 600:14, 604:18, 606:3, 612:10, 612:19, 615:20
**looked** [6] - 528:9, 553:16, 585:15, 589:15, 589:20, 598:20
**looking** [10] - 515:19,

518:22, 522:1, 530:2, 537:6, 538:5, 539:9, 542:3, 545:15, 574:20
**looks** [2] - 541:12, 573:19
**Lorazepam** [1] - 623:11
**losing** [2] - 548:9
**lost** [9] - 544:15, 553:18, 605:2, 615:14, 616:17, 616:19, 623:16, 628:4, 630:2
**loved** [1] - 630:15
**low** [2] - 519:8, 542:10
**Lowcock** [1] - 525:17
**lower** [5] - 517:25, 518:6, 533:23, 534:15, 574:19
**luck** [1] - 622:13
**lunch** [3] - 517:14, 552:22, 605:7

# M

**MADA** [1] - 603:16
**Madam** [1] - 620:6
**Maine** [1] - 510:2
**maintain** [1] - 608:9
**maintenance** [2] - 565:20, 624:25
**major** [1] - 607:7
**majority** [5] - 547:4, 547:5, 547:8, 587:14, 604:6
**malice** [1] - 573:10
**managing** [1] - 560:11
**mandate** [1] - 578:15
**mandated** [1] - 567:22, 568:20
**manner** [1] - 584:21
**March** [1] - 598:21
**margin** [9] - 519:23, 519:25, 520:1, 520:2, 520:13, 520:20, 520:21, 522:1, 536:3
**margins** [14] - 521:4, 521:12, 521:18, 522:20, 522:21, 522:23, 535:25, 536:9, 536:17, 536:22, 556:17, 556:22, 557:3, 625:22
**Marin** [1] - 572:12
**mark** [2] - 603:18, 610:9
**marked** [1] - 610:3
**market** [45] - 513:4, 514:7, 514:19, 516:12, 516:14, 517:1, 517:17, 520:25, 521:2, 521:5,

521:15, 524:23, 531:23, 533:1, 533:3, 533:7, 533:11, 533:23, 534:14, 534:15, 535:8, 535:9, 547:22, 548:10, 551:2, 552:14, 561:21, 577:19, 582:20, 582:22, 587:9, 587:10, 587:11, 587:19, 587:20, 592:6, 592:7, 594:1, 597:2, 600:4, 625:2, 629:1, 629:5
**marketplace** [3] - 517:24, 521:11, 578:20
**markets** [2] - 533:16, 533:24
**mask** [2] - 543:3, 543:7
**massive** [4] - 529:2, 529:7, 559:19, 588:20
**match** [20] - 511:19, 523:23, 523:24, 524:5, 524:6, 524:17, 526:3, 526:9, 526:10, 526:23, 528:3, 529:25, 537:3, 537:16, 542:17, 546:14
**match-type** [1] - 511:19
**matches** [1] - 527:21
**matching** [13] - 523:18, 523:25, 525:24, 528:9, 537:2, 539:10, 539:11, 539:19, 540:11, 543:22, 556:3, 556:6
**material** [7] - 558:3, 564:7, 614:16, 615:16, 616:16, 616:23, 616:24
**matter** [8] - 561:19, 566:11, 566:22, 567:5, 609:19, 609:20, 613:5, 614:7
**matters** [2] - 601:15, 601:17
**maxed** [1] - 558:24
**maxes** [2] - 559:4, 559:5
**mean** [40] - 514:18, 515:22, 534:1, 539:9, 539:25, 541:3, 542:14, 544:5, 544:6, 546:11, 550:17, 551:2, 569:20, 576:13, 584:8, 585:13, 585:19, 586:5, 586:22, 587:16, 590:11, 593:16, 604:3, 604:18, 604:20, 605:22, 606:9, 606:13, 608:4, 609:6, 612:4, 615:19, 616:25, 618:12, 618:24, 619:3,

620:12, 624:16, 625:17, 628:9
**meaningful** [1] - 521:10
**meaningless** [1] - 599:1
**means** [10] - 525:18, 532:15, 547:5, 548:18, 553:12, 553:13, 555:8, 560:11, 579:24, 582:22
**meant** [1] - 619:12
**measure** [2] - 518:10, 518:11
**measuring** [3] - 519:2, 586:4
**media** [1] - 617:12
**medium** [2] - 524:18, 537:16
**meet** [3] - 531:7, 610:23, 615:14
**meet-and-confer** [1] - 610:23
**Mehta** [1] - 542:19
**MEHTA** [1] - 509:9
**memo** [1] - 519:6
**memorializing** [1] - 609:24
**memory** [1] - 592:12
**mental** [1] - 551:25
**mentioned** [1] - 519:23
**mere** [1] - 513:5
**merger** [1] - 513:21
**merits** [2] - 549:6, 627:19
**messages** [3] - 602:3, 610:2, 610:14
**messaging** [1] - 601:18
**met** [5] - 546:22, 560:25, 578:9, 580:11, 619:18
**Meta** [5] - 568:3, 578:24, 579:17, 600:1
**Microsoft** [113] - 512:4, 514:18, 515:15, 543:8, 545:5, 545:7, 545:11, 545:25, 546:4, 546:6, 547:7, 547:24, 550:7, 551:20, 557:24, 558:5, 560:13, 561:17, 563:1, 563:12, 563:13, 563:20, 563:24, 564:2, 564:8, 564:24, 565:7, 566:19, 566:23, 567:11, 567:14, 567:16, 567:17, 569:16, 570:4, 570:11, 572:10, 572:22, 572:25, 573:13,

573:14, 574:12, 577:13, 578:5, 578:19, 579:8, 579:10, 579:12, 579:14, 580:7, 580:10, 580:17, 580:19, 580:23, 580:25, 581:2, 581:4, 581:9, 581:13, 581:17, 581:19, 581:22, 582:7, 582:17, 584:1, 584:19, 585:6, 585:8, 586:19, 587:23, 588:4, 588:7, 588:10, 588:12, 589:3, 589:18, 589:23, 590:2, 590:9, 592:20, 593:15, 594:5, 594:23, 595:24, 596:4, 596:21, 597:10, 597:13, 598:9, 599:13, 599:16, 599:20, 600:16, 619:1, 623:4, 623:6, 623:18, 623:19, 624:4, 626:2, 626:19, 626:21, 626:22, 627:10, 627:11, 627:20, 627:24, 628:15, 628:18, 629:4
  **Microsoft's** [7] - 545:8, 545:22, 546:8, 546:16, 547:3, 564:20, 590:10
  **midst** [1] - 601:14
  **might** [21] - 513:23, 514:4, 515:23, 520:21, 520:22, 527:9, 527:10, 527:22, 542:11, 543:2, 552:6, 568:10, 570:1, 575:2, 578:9, 594:17, 598:25, 612:16, 626:11
  **mil** [2] - 545:23, 546:15
  **mind** [2] - 579:7, 591:23
  **mindful** [1] - 552:15
  **minds** [1] - 613:20
  **minimize** [1] - 538:24
  **minimum** [5] - 555:10, 557:8, 611:4, 615:2
  **minority** [1] - 629:5
  **minute** [2] - 568:16, 612:16
  **minutes** [10] - 552:17, 555:23, 583:7, 617:18, 617:19, 622:5, 622:8, 622:9, 622:23
  **miscommunication** [1] - 588:6
  **missing** [1] - 617:4
  **mistake** [1] - 607:11
  **misunderstanding** [2] - 588:6, 588:7

  **misunderstood** [2] - 588:11, 611:21
  **mixed** [2] - 512:24, 585:18
  **Mobile** [1] - 627:14
  **model** [4] - 514:3, 535:10, 535:15, 551:25
  **moment** [8] - 511:3, 514:11, 534:5, 560:1, 561:20, 572:15, 573:1, 600:23
  **monetization** [2] - 531:21, 531:23
  **money** [10] - 520:18, 525:8, 537:20, 548:4, 550:20, 556:25, 557:1, 561:15, 625:19, 628:4
  **Moneyball** [1] - 607:14
  **monopolies** [2] - 560:9, 625:5
  **monopolist** [16] - 514:22, 515:7, 519:17, 520:2, 549:17, 549:18, 549:23, 550:25, 570:25, 573:16, 573:17, 577:7, 587:8, 625:1
  **monopolistic** [1] - 546:10
  **monopolize** [1] - 565:20
  **monopoly** [28] - 512:10, 512:18, 512:19, 513:4, 513:18, 513:19, 514:8, 514:20, 515:17, 515:23, 516:3, 516:4, 520:25, 533:7, 533:18, 533:21, 536:21, 546:18, 550:10, 550:11, 554:7, 565:22, 573:22, 582:20, 608:10, 624:1, 624:3, 624:25
  **months** [5] - 570:23, 610:22, 624:15
  **months'** [1] - 616:9
  **most** [5] - 531:20, 538:16, 561:5, 562:8, 575:11
  **motion** [1] - 536:15
  **motivated** [1] - 573:6
  **motivation** [1] - 568:22
  **Motorola** [1] - 627:14
  **move** [6] - 544:5, 564:24, 582:9, 582:14, 600:22, 614:3
  **moved** [1] - 552:18
  **moving** [2] - 597:21, 604:16

  **Mozilla** [3] - 623:22, 623:25, 627:14
  **MR** [152] - 511:4, 511:7, 513:12, 514:12, 514:14, 514:17, 515:3, 516:15, 516:20, 516:24, 517:11, 519:22, 520:4, 520:7, 521:3, 521:13, 522:4, 522:6, 522:19, 523:8, 524:22, 527:4, 527:8, 529:14, 530:1, 530:17, 531:11, 531:13, 532:14, 533:17, 533:25, 534:2, 534:7, 534:10, 534:17, 535:2, 535:17, 535:19, 537:25, 539:3, 539:13, 539:17, 540:19, 541:23, 542:6, 542:9, 542:21, 542:25, 544:21, 544:5, 545:17, 545:20, 548:4, 548:23, 548:25, 549:20, 549:23, 550:5, 550:20, 552:19, 555:25, 557:16, 557:20, 559:11, 559:16, 559:23, 559:25, 560:4, 565:10, 565:13, 565:15, 565:19, 566:4, 566:7, 566:16, 567:20, 568:2, 569:1, 569:4, 569:13, 569:19, 569:24, 570:16, 571:9, 573:8, 573:25, 574:5, 574:13, 575:16, 576:4, 577:3, 577:17, 577:23, 577:25, 578:3, 578:7, 578:14, 578:18, 578:22, 579:9, 579:12, 580:8, 580:14, 580:21, 581:3, 581:24, 582:6, 582:12, 582:16, 583:9, 583:25, 584:13, 585:12, 586:9, 586:18, 588:5, 590:3, 590:5, 590:16, 591:2, 591:7, 591:25, 592:15, 592:19, 592:22, 593:3, 593:5, 593:7, 593:11, 593:22, 594:8, 595:4, 596:16, 597:9, 597:13, 600:22, 600:25, 601:3, 605:4, 606:17, 609:2, 609:4, 609:7, 620:5, 621:23, 622:1, 622:6, 622:8, 622:20, 623:1, 625:13, 626:18
  **MS** [15] - 609:14, 610:6, 611:7, 611:10,

611:17, 611:23, 613:1, 615:4, 615:9, 616:4, 617:20, 618:1, 618:14, 619:16, 620:2
  **multiday** [1] - 569:10
  **multiple** [4] - 560:11, 585:25, 613:13, 613:22
  **multislope** [1] - 569:10
  **must** [5] - 555:10, 573:4, 574:17, 582:25, 625:6
  **must-have** [1] - 582:25
  **myriad** [1] - 561:1

## N

  **N.W** [1] - 631:12
  **Nadella** [1] - 578:4
  **nail** [1] - 551:3
  **name** [2] - 569:23, 603:17
  **names** [1] - 542:22
  **napkin** [1] - 593:23
  **narrow** [2] - 534:18, 535:6
  **narrower** [2] - 535:6
  **narrowly** [2] - 568:13, 589:11
  **nascent** [1] - 534:4
  **native** [3] - 581:22, 586:12, 587:15
  **natural** [1] - 545:21
  **nature** [3] - 575:7, 612:24, 616:24
  **navboost** [1] - 624:19
  **Nayak** [4] - 602:13, 603:1, 605:5, 605:9
  **necessarily** [4] - 544:1, 555:8, 579:24, 619:8
  **necessary** [2] - 607:21, 624:2
  **necessitates** [1] - 517:15
  **need** [20] - 514:24, 518:4, 527:21, 539:8, 541:6, 544:24, 556:4, 565:11, 565:23, 574:7, 576:24, 580:1, 580:24, 586:15, 593:17, 595:19, 596:19, 612:24
  **needed** [1] - 623:8
  **needs** [5] - 574:7, 575:13, 607:8, 607:17, 607:18
  **negative** [13] - 526:21, 527:2, 527:17, 527:18, 527:21, 528:12,

648

538:17, 539:1, 553:2,
553:4, 553:6, 553:7,
554:22
**negligence** [2] -
611:8, 611:11
**negligent** [1] - 611:4
**net** [2] - 540:15
**net-net** [1] - 540:15
**Netscape** [2] - 581:6
**neutral** [2] - 561:10,
599:20
**never** [25] - 520:11,
541:21, 566:24, 568:5,
568:18, 568:19,
583:25, 584:15,
596:11, 596:12,
599:16, 601:9, 606:12,
607:10, 607:11,
607:12, 614:2, 615:12,
616:6, 617:3, 627:25,
628:4
**new** [2] - 556:14,
558:14
**New** [3] - 509:24,
575:18, 623:6
**next** [16] - 511:22,
519:4, 527:11, 527:14,
528:6, 528:14, 529:1,
531:2, 545:20, 549:1,
565:24, 589:25,
601:16, 602:8, 610:11,
610:16
**night** [1] - 560:7
**no-duty-to-deal** [2] -
589:5, 589:10
**nobody** [5] - 521:17,
531:4, 613:12
**non** [2] - 526:3, 546:10
**non-expanded** [1] -
526:3
**non-monopolistic** [1]
- 546:10
**noncompetitive** [1] -
513:7
**noncompetitively** [1] -
513:9
**none** [5] - 564:13,
564:14, 590:1, 590:8,
596:8
**normal** [2] - 568:13,
568:17
**note** [5] - 536:13,
575:22, 577:5, 597:14,
609:7
**noted** [6] - 549:11,
560:18, 560:21, 561:2,
581:9, 628:11
**notes** [2] - 536:2,
631:5
**nothing** [9] - 540:13,

546:5, 559:11, 571:23,
579:22, 618:19,
620:22, 625:2, 625:3
**notice** [1] - 595:19
**noting** [1] - 625:21
**notion** [7] - 538:20,
539:8, 543:10, 545:10,
580:1, 585:10, 628:8
**notwithstanding** [2] -
546:6, 618:18
**Novell** [15] - 567:2,
567:9, 567:12, 567:24,
568:15, 574:2, 576:17,
577:6, 578:17, 579:11,
579:14, 583:21, 589:6,
589:12, 600:1
**November** [2] - 563:4,
589:21
**nowhere** [2] - 559:4,
559:6
**number** [13] - 520:12,
520:13, 521:25, 522:3,
522:9, 523:5, 526:6,
532:11, 550:18,
550:23, 551:22, 553:9
**Number** [7] - 554:20,
554:21, 554:23,
554:24, 590:14,
605:10, 623:3
**numbers** [15] - 520:13,
521:6, 521:9, 521:18,
521:24, 522:7, 522:10,
595:14, 595:20,
595:21, 596:17,
596:18, 597:1, 599:4,
617:24
**NW** [2] - 509:12, 510:8
**NY** [1] - 509:24

**O**

**obligated** [1] - 567:7
**obligation** [5] - 584:3,
591:9, 599:7, 611:21,
620:19
**obligations** [1] - 618:9
**observation** [1] -
575:21
**obviously** [3] - 535:23,
562:15, 604:4
**occurred** [4] - 515:14,
544:14, 591:1, 594:6
**October** [3] - 598:7,
616:5, 616:6
**odds** [1] - 616:1
**OEMs** [3] - 626:22,
627:12
**OF** [6] - 509:1, 509:9,
509:12, 509:19,
594:14, 631:1

**off-the-record** [2] -
610:14, 613:8
**offered** [6] - 537:23,
551:15, 567:11,
567:18, 599:15, 623:23
**Office** [1] - 567:17
**officer** [1] - 601:11
**officers** [1] - 607:7
**Official** [2] - 510:7,
631:11
**OFFICIAL** [1] - 631:1
**offs** [2] - 539:3, 540:9
**often** [1] - 619:19
**once** [4] - 572:11,
578:11, 583:14, 607:11
**One** [2] - 531:17,
550:1
**one** [51] - 511:18,
515:24, 516:5, 517:11,
518:17, 521:22,
522:25, 525:5, 525:20,
527:8, 528:21, 529:20,
531:13, 533:6, 540:2,
540:20, 542:17,
542:18, 547:10,
547:18, 552:22,
556:11, 557:17,
557:20, 566:24,
567:22, 568:25,
569:22, 570:13, 573:9,
573:19, 574:13,
574:17, 575:12, 576:1,
576:23, 578:8, 592:11,
592:12, 593:1, 593:24,
603:8, 609:4, 611:20,
613:6, 613:12, 613:23,
616:10, 624:10, 628:20
**onerous** [1] - 539:7
**ones** [5] - 531:18,
532:3, 552:23, 578:1,
595:11, 603:17, 608:7,
630:15
**ongoing** [6] - 565:8,
567:24, 578:15,
578:22, 578:23, 600:15
**online** [4] - 533:12,
561:12, 586:2, 601:18
**opening** [1] - 528:7
**operated** [1] - 560:8
**operates** [1] - 577:7
**operation** [1] - 561:19
**opinion** [4] - 560:21,
595:1, 596:2, 621:15
**opinions** [1] - 595:22
**opportunities** [3] -
549:12, 550:14, 550:19
**opportunity** [2] -
551:15, 555:13
**opposed** [1] - 542:12
**opposite** [1] - 551:1

**opt** [11] - 523:25,
524:2, 525:3, 526:11,
526:16, 527:16,
527:17, 527:23, 528:2,
537:23, 538:23
**optimize** [1] - 540:8
**opting** [1] - 538:21
**option** [4] - 519:11,
524:3, 525:1
**options** [2] - 524:5,
538:2
**orchestrate** [1] - 607:7
**order** [7] - 514:4,
527:2, 538:24, 557:2,
591:23, 599:7, 619:18
**organizing** [1] -
511:14
**original** [1] - 623:7
**otherwise** [4] -
529:25, 619:10,
626:23, 627:1
**ought** [5] - 516:8,
519:9, 570:17, 576:20,
604:25
**ourselves** [1] - 550:21
**outcome** [1] - 630:4
**output** [6] - 549:18,
549:19, 550:23, 597:4,
627:8, 627:9
**outset** [5] - 569:3,
569:16, 577:12, 585:5,
612:2
**outside** [1] - 619:9
**overall** [2] - 547:13,
597:2
**overdoing** [1] - 551:23
**oversee** [1] - 591:11
**overseeing** [1] -
570:24
**overwhelming** [1] -
547:8
**own** [13] - 535:24,
539:24, 545:23,
550:11, 550:12,
556:19, 561:4, 564:4,
573:22, 582:23,
586:17, 587:1, 594:6
**owns** [1] - 608:20

**P**

**p.m** [3] - 509:6, 622:17
**page** [5] - 514:20,
552:25, 555:5, 570:9,
600:9
**pages** [2] - 573:12,
573:13
**paid** [5] - 517:20,
517:25, 526:9, 628:9,
628:10

**paper** [1] - 553:20
**papers** [1] - 555:4
**par** [1] - 567:10
**paradigm** [5] - 566:13, 573:4, 574:3, 575:14, 580:6
**paragraph** [3] - 536:17, 575:21, 602:7
**Parakhin** [3] - 532:6, 532:14, 596:2
**paralyzed** [1] - 540:3
**parameters** [1] - 570:17
**part** [11] - 525:6, 529:25, 537:21, 541:21, 551:11, 565:2, 570:12, 596:2, 596:20, 599:15, 607:22
**participate** [1] - 592:9
**participation** [2] - 538:25, 597:5
**particular** [11] - 537:7, 543:7, 584:1, 584:5, 585:9, 586:7, 589:3, 590:18, 591:8, 592:2
**particularly** [4] - 537:16, 560:15, 560:20, 592:7
**parties** [4] - 609:17, 626:23, 626:24, 627:1
**parties'** [3] - 609:19, 609:24, 610:7
**partner** [1] - 627:15
**partners** [1] - 623:25
**parts** [2] - 521:22, 535:22
**party** [4] - 529:3, 561:10, 605:18, 627:13
**pass** [1] - 569:10
**passage** [1] - 573:9
**passed** [1] - 630:11
**paste** [1] - 587:6
**patience** [1] - 555:20
**patient** [1] - 629:16
**pattern** [2] - 592:1, 619:6
**Patterson** [1] - 509:23
**pause** [4] - 511:5, 536:11, 550:3, 600:24
**pay** [6] - 523:3, 555:16, 557:2, 592:21, 599:15, 628:10
**paying** [4] - 517:25, 526:10, 556:25, 557:1
**payment** [1] - 522:16
**PCTR** [1] - 554:25
**Penado** [1] - 558:22
**people** [26] - 518:22, 532:3, 538:9, 538:13, 539:13, 539:25, 540:1,

540:13, 542:12, 543:1, 548:13, 551:24, 552:6, 553:25, 582:25, 592:6, 601:20, 602:14, 603:13, 605:11, 616:13, 624:10, 628:4, 628:12, 628:16
**per** [9] - 519:1, 536:5, 545:22, 545:23, 545:24, 546:15, 553:7, 555:16, 594:12
**percent** [36] - 515:5, 515:9, 515:17, 524:1, 525:5, 526:25, 529:10, 538:21, 546:25, 547:1, 547:21, 547:22, 547:23, 548:3, 552:11, 552:12, 554:17, 560:18, 561:21, 562:2, 562:12, 562:17, 562:23, 564:13, 580:16, 581:10, 581:11, 582:21, 597:16, 598:22, 598:25, 599:13, 626:8, 626:10, 629:3
**percentage** [1] - 564:11
**percentages** [2] - 594:17, 596:24
**perfect** [1] - 567:13
**perfectly** [3] - 518:15, 604:18, 623:20
**performance** [4] - 554:13, 554:20, 563:15, 564:5
**performing** [1] - 563:17
**performs** [1] - 554:20
**perhaps** [10] - 512:24, 516:1, 524:22, 565:19, 586:7, 588:1, 604:1, 604:7, 604:13, 618:25
**period** [20] - 536:4, 536:5, 536:7, 540:24, 541:13, 543:6, 544:3, 546:12, 549:10, 550:9, 553:14, 556:24, 558:8, 572:6, 581:15, 584:5, 589:17, 597:14, 605:19, 605:20
**permission** [1] - 560:5
**permitted** [1] - 603:4
**permutations** [1] - 527:20
**person** [4] - 565:25, 604:8, 621:8, 621:9
**personalized** [1] - 543:1
**personally** [1] -

542:21
**perspective** [1] - 630:7
**Peter** [1] - 597:19
**phase** [2] - 595:6, 625:9
**phrase** [2] - 523:23, 526:23
**phrases** [1] - 527:22
**Pichai** [2] - 603:4, 626:5
**Pichai's** [1] - 604:11
**picked** [1] - 627:16
**piece** [4] - 518:8, 523:4, 527:8, 564:10
**pieces** [1] - 559:21
**pigeonhole** [1] - 517:8
**PII** [2] - 557:5, 557:7
**place** [8] - 544:8, 569:18, 577:18, 577:21, 583:12, 617:1, 624:24, 629:10
**placed** [1] - 626:22
**places** [2] - 534:21, 536:16
**placing** [1] - 560:23
**plaintiff** [5] - 592:14, 609:18, 613:16, 613:17
**Plaintiff** [1] - 509:18
**plaintiff's** [1] - 583:10
**plaintiffs** [18] - 540:23, 541:5, 547:11, 555:19, 585:20, 591:10, 609:17, 613:13, 613:22, 614:2, 614:21, 615:17, 617:3, 619:15, 619:20, 625:8, 625:14, 627:21
**Plaintiffs** [2] - 509:4, 509:11
**plaintiffs'** [2] - 538:19, 611:19
**plan** [1] - 516:10
**planned** [1] - 629:23
**planner** [1] - 591:11
**platform** [16] - 541:10, 572:11, 577:7, 577:9, 577:14, 578:6, 579:13, 579:15, 582:9, 582:15, 584:8, 584:14, 585:4, 585:8, 586:24, 594:6
**Platforms** [3] - 568:3, 578:24, 579:17
**platforms** [6] - 536:18, 541:19, 577:24, 584:24, 585:1
**plausible** [1] - 573:19
**play** [3] - 532:1, 584:11, 600:17
**players** [1] - 561:23

**playing** [3] - 577:13, 577:15, 578:5
**pleadings** [1] - 568:7
**plenty** [1] - 548:17, 548:18
**plied** [1] - 630:9
**plumbing** [1] - 576:16
**plus** [2] - 521:14, 606:20
**point** [45] - 515:16, 515:23, 521:4, 522:25, 530:19, 531:13, 532:15, 532:20, 535:2, 541:23, 548:12, 548:14, 548:15, 548:16, 549:15, 552:19, 553:19, 554:10, 558:20, 559:2, 559:3, 559:4, 561:20, 570:22, 571:6, 571:19, 585:21, 588:21, 589:23, 589:25, 591:7, 593:11, 593:19, 594:13, 594:14, 596:14, 597:9, 597:18, 598:24, 599:9, 599:12, 599:18, 603:8, 609:5, 628:20
**pointed** [2] - 543:24, 594:10
**points** [2] - 535:22, 556:1, 616:12, 618:3, 621:4
**poisonous** [1] - 531:15
**policies** [2] - 609:16, 613:3
**policy** [16] - 601:12, 602:12, 602:17, 602:19, 602:20, 602:23, 603:4, 604:19, 605:13, 605:16, 606:13, 611:22, 612:10, 613:5, 614:9
**popular** [1] - 531:20
**portion** [1] - 526:18
**pose** [1] - 624:3
**position** [11] - 526:25, 540:15, 547:18, 555:12, 555:14, 560:8, 566:2, 591:19, 613:12, 616:7
**positive** [1] - 552:3
**possible** [1] - 538:14
**possibly** [5] - 540:3, 598:1, 604:9, 612:14, 615:22
**post** [4] - 570:6, 575:16, 575:21, 600:9
**post-trial** [4] - 570:6,

575:16, 575:21, 600:9

**posttrial** [1] - 531:22

**Pot** [1] - 552:22

**potential** [2] - 554:1, 561:24

**potentially** [2] - 555:1, 606:10

**power** [29] - 512:10, 512:17, 512:18, 512:19, 513:4, 513:8, 513:19, 514:7, 514:8, 514:19, 514:20, 515:17, 515:23, 516:3, 516:4, 520:25, 524:23, 533:7, 533:18, 533:21, 536:21, 546:18, 554:7, 565:22

**practice** [5] - 572:2, 584:3, 611:12, 613:24, 619:12

**practices** [1] - 615:3

**pre** [1] - 516:23

**pre-but** [1] - 516:23

**precise** [1] - 524:16

**precisely** [2] - 514:21, 517:9

**predate** [1] - 617:2

**predatory** [4] - 574:17, 574:23, 575:4, 628:3

**predict** [3] - 513:22, 514:4, 544:9

**predicted** [1] - 532:10

**prefatory** [1] - 512:9

**prejudice** [5] - 605:1, 606:8, 614:13, 615:10, 616:17

**prejudiced** [2] - 615:17, 618:20

**preliminary** [1] - 566:21

**premise** [1] - 600:5

**prepared** [1] - 599:4

**presentation** [2] - 511:23, 516:10

**presented** [2] - 519:24, 579:16

**preserve** [4] - 604:22, 611:5, 611:16, 618:12

**preserved** [3] - 604:3, 614:19, 614:20

**preserving** [1] - 624:1

**president** [1] - 602:13

**press** [1] - 622:13

**pressed** [1] - 593:8

**pressure** [1] - 525:25

**presume** [1] - 580:17

**presumption** [4] - 607:25, 608:3, 608:7, 608:9

**pretextual** [3] - 557:8,

608:4, 608:8

**pretty** [4] - 538:22, 552:12, 561:15

**previewed** [2] - 528:7, 606:18

**previously** [2] - 527:1, 527:3

**price** [30] - 511:13, 512:3, 512:14, 512:16, 512:25, 513:1, 513:5, 513:6, 513:7, 513:9, 513:10, 513:11, 513:17, 515:16, 517:13, 517:15, 517:23, 517:24, 518:3, 523:18, 526:3, 526:8, 529:18, 546:10, 554:1, 554:5, 556:15, 556:16, 556:18, 556:19

**prices** [21] - 512:10, 512:12, 514:21, 514:22, 514:24, 514:25, 515:1, 516:2, 518:6, 518:9, 519:12, 519:17, 525:15, 525:16, 525:18, 536:7, 536:8, 541:25, 553:7, 556:22, 557:1

**pricing** [21] - 511:18, 512:7, 512:10, 512:17, 512:21, 513:24, 513:25, 514:1, 514:6, 519:16, 523:9, 533:8, 546:14, 550:18, 552:25, 574:17, 574:24, 575:4, 597:4

**primary** [1] - 604:8

**prime** [1] - 544:8

**principle** [3] - 573:12, 573:14, 576:21

**prioritize** [1] - 588:22

**prioritizes** [1] - 582:23

**Priority** [1] - 590:13

**priority** [1] - 590:14

**privacy** [12] - 530:21, 531:5, 541:6, 541:7, 541:12, 541:17, 541:20, 542:3, 543:9, 557:7, 557:13

**Privilege** [1] - 619:7

**privilege** [3] - 603:9, 618:15, 618:19

**privileged** [1] - 619:11

**Privileged'** [1] - 603:18

**problem** [5] - 511:4, 525:12, 554:12, 564:25, 565:1

**problems** [2] - 546:1, 546:4

**proceed** [1] - 625:8

**proceedings** [3] - 614:3, 629:18, 631:6

**proceeds** [1] - 566:23

**process** [10] - 523:19, 523:22, 523:25, 528:5, 539:2, 587:18, 627:20, 627:22, 627:23

**procompetitive** [14] - 511:9, 511:11, 511:24, 516:8, 516:11, 516:14, 516:21, 516:25, 517:3, 532:24, 549:5, 549:6, 551:7, 572:6

**produce** [3] - 534:13, 562:15, 580:24

**produced** [4] - 564:3, 599:12, 617:15, 621:11

**producible** [1] - 616:2

**product** [12] - 517:21, 530:14, 540:17, 548:22, 550:22, 554:6, 586:1, 591:11, 604:8, 615:22, 627:10, 627:11

**products** [5] - 534:23, 534:25, 539:6, 600:11, 626:25

**Professor** [7] - 525:9, 527:18, 530:9, 543:5, 546:21, 556:20, 587:11

**proffered** [3] - 608:3, 608:5, 608:7

**profit** [15] - 519:23, 519:25, 520:2, 520:12, 520:13, 520:20, 520:21, 521:4, 521:12, 521:18, 535:25, 536:17, 536:22, 567:15

**profitable** [2] - 515:10, 515:11

**profitably** [1] - 514:22

**profits** [4] - 573:6, 573:22, 574:9, 574:12

**program** [2] - 526:10, 537:16

**prohibition** [1] - 608:10

**Project** [1] - 588:19

**promise** [4] - 561:15, 579:6, 585:9, 621:24

**promote** [1] - 573:22

**promotion** [1] - 628:11

**proof** [4] - 512:13, 547:11, 580:22, 593:21

**proper** [2] - 608:13, 620:13

**proposition** [2] - 518:3, 575:15

**prosecutors** [1] -

619:14

**protect** [1] - 541:16

**protection** [1] - 557:13

**Protection** [1] - 509:19

**protocol** [1] - 609:12

**proud** [1] - 551:18

**prove** [4] - 512:2, 513:17, 513:18, 590:9

**proved** [2] - 514:7, 514:8

**proven** [3] - 523:15, 587:8, 607:19

**provide** [13] - 529:21, 532:9, 532:16, 541:2, 541:10, 543:3, 543:6, 543:11, 543:13, 560:10, 561:22, 562:21, 564:2

**provided** [2] - 525:20, 528:23

**providers** [3] - 561:23, 563:25, 564:13

**provides** [2] - 541:1, 581:13

**providing** [4] - 543:11, 561:9, 562:14, 562:20

**public** [6] - 555:8, 558:4, 567:12, 584:22, 630:3, 630:6

**publicly** [1] - 584:11

**pull** [2] - 545:3, 609:22

**pulled** [2] - 592:5, 592:10

**punish** [1] - 627:18

**purchased** [2] - 561:16, 561:17

**pure** [1] - 517:3

**purple** [1] - 529:10

**purpose** [2] - 535:7, 560:10

**purposely** [1] - 615:24

**purposes** [2] - 573:7, 604:6

**push** [1] - 588:1

**pushed** [1] - 525:12

**pushing** [1] - 586:20

**put** [49] - 511:15, 514:2, 521:14, 523:12, 523:16, 526:25, 527:21, 527:23, 529:21, 529:22, 534:25, 536:1, 536:24, 547:23, 556:4, 556:20, 557:23, 558:1, 565:7, 566:1, 567:12, 569:6, 569:10, 569:25, 570:20, 571:6, 571:25, 576:13, 579:6, 580:25, 581:1, 582:1, 585:6,

585:8, 589:19, 591:17, 594:14, 595:14, 595:19, 616:5, 616:6, 617:16, 618:5, 619:20, 619:21, 623:3
**putting** [4] - 539:15, 547:22, 578:5, 585:6

## Q

**quality** [54] - 511:18, 512:7, 512:21, 512:25, 513:11, 515:20, 517:13, 517:15, 517:21, 517:22, 518:5, 518:9, 518:13, 518:14, 519:8, 519:11, 523:9, 526:12, 526:13, 526:15, 531:15, 531:20, 531:25, 532:22, 539:21, 540:15, 548:8, 548:12, 548:19, 549:20, 549:21, 549:25, 550:8, 550:12, 550:13, 550:22, 551:9, 551:14, 551:18, 552:13, 553:2, 553:6, 553:10, 554:6, 554:14, 554:21, 555:9, 556:14, 624:15, 627:5, 627:7, 628:19
**quality-adjusted** [4] - 511:18, 512:7, 512:21, 513:11
**quasi** [1] - 523:17
**queriers** [1] - 524:8
**queries** [10] - 529:6, 530:10, 540:12, 542:10, 543:1, 548:21, 549:2, 551:13, 557:5, 557:7
**query** [14] - 511:21, 525:25, 526:1, 526:2, 527:10, 528:22, 529:5, 530:2, 531:5, 540:19, 543:1, 547:22, 547:25, 548:18
**questioning** [1] - 573:1
**questions** [8] - 518:21, 518:22, 524:16, 531:9, 559:7, 580:3, 621:17, 622:10
**quick** [4] - 514:15, 525:21, 549:13, 552:24
**quite** [5] - 567:10, 569:15, 601:8, 601:20, 622:13
**quote** [2] - 558:11, 621:5

## R

**radically** [1] - 541:18
**radio** [1] - 544:5
**Raghavan** [6] - 523:1, 603:1, 604:15, 605:5, 621:5
**raise** [6] - 512:10, 513:5, 514:22, 515:1, 519:7, 613:18
**raised** [7] - 513:3, 535:21, 544:6, 563:9, 597:18, 613:7, 614:4
**raising** [1] - 536:7
**Ralph** [1] - 509:20
**Ramaswamy** [1] - 624:22
**Rangel** [1] - 612:24
**ranges** [1] - 536:19
**rank** [5] - 532:8, 555:4, 555:5, 555:9, 555:14
**ranking** [1] - 555:15
**ranks** [1] - 555:13
**rare** [1] - 576:1
**rate** [3] - 532:10, 552:12
**rather** [1] - 567:15
**ratio** [1] - 547:20
**rationale** [2] - 541:21, 544:20
**re** [1] - 588:22
**Re** [1] - 623:11
**re-prioritize** [1] - 588:22
**reach** [3] - 533:9, 537:18, 612:25
**reached** [1] - 623:11
**reaching** [1] - 572:1
**reaction** [1] - 588:15
**read** [13] - 545:10, 553:21, 557:10, 557:11, 558:10, 573:9, 576:4, 576:5, 595:1, 595:23, 612:6, 623:18, 624:5
**reading** [1] - 513:19
**reads** [3] - 623:20, 624:3, 624:7
**ready** [1] - 511:6
**real** [14] - 513:22, 513:23, 515:13, 525:21, 530:13, 552:24, 583:3, 588:23, 590:21, 593:9, 621:3, 624:3
**realistic** [1] - 612:14
**realized** [1] - 619:10
**really** [28] - 514:3, 516:8, 516:17, 520:20, 521:10, 525:4, 526:14,

536:8, 540:7, 549:23, 552:1, 566:10, 586:7, 588:20, 591:9, 592:24, 592:25, 593:16, 596:20, 598:19, 603:14, 607:23, 612:4, 617:6, 617:8, 626:1, 629:14
**reams** [1] - 541:3
**reason** [19] - 525:4, 530:6, 534:14, 537:22, 543:16, 563:18, 574:8, 582:3, 594:20, 612:7, 613:3, 613:5, 614:6, 614:20, 615:15, 616:15, 616:22, 623:15
**reasonable** [2] - 611:18, 613:20
**reasons** [7] - 537:2, 556:5, 613:4, 615:18, 616:21, 626:11, 629:8
**rebuttal** [1] - 583:8
**received** [3] - 556:15, 618:17, 618:20
**receiving** [2] - 621:8, 621:9
**recess** [2] - 559:15, 622:17
**recite** [2] - 617:24, 618:2
**recited** [1] - 588:9
**recognition** [1] - 515:12
**recognized** [3] - 545:25, 546:4, 551:24
**recognizes** [1] - 601:19
**recognizing** [1] - 553:8
**record** [24] - 512:24, 515:20, 520:17, 525:8, 525:13, 525:14, 526:16, 526:20, 530:23, 536:16, 547:9, 547:14, 557:14, 557:20, 572:14, 586:11, 590:24, 610:14, 611:1, 611:2, 612:23, 613:8
**Record** [2] - 610:3, 610:10
**record'** [1] - 602:4
**records** [2] - 611:16, 612:17
**recovering** [1] - 553:18
**recycle** [1] - 623:1
**red** [2] - 605:25
**redacted** [1] - 558:3
**redesigning** [1] -

539:5
**reduce** [2] - 550:23
**reduced** [1] - 529:5
**reduces** [2] - 550:13, 550:14
**reducing** [3] - 540:16, 561:3, 600:10
**reduction** [2] - 524:18, 529:11
**reevaluation** [1] - 541:15
**reference** [5] - 524:1, 530:15, 544:23, 558:23, 624:18
**referenced** [2] - 557:24, 559:2
**references** [1] - 596:16
**referencing** [1] - 558:10
**referred** [3] - 593:23, 604:16, 623:7
**refers** [1] - 590:19
**reflect** [2] - 616:12, 621:15
**reflected** [2] - 616:14, 617:13
**reflection** [1] - 522:15
**Refusal** [2] - 566:17, 577:6
**refusal** [12] - 566:18, 566:19, 566:22, 567:4, 567:5, 568:22, 570:7, 571:7, 575:3, 578:8, 589:6, 599:25
**refuse** [1] - 570:3
**refused** [1] - 589:2
**regard** [4] - 557:22, 559:2, 571:10, 618:19
**regarding** [4] - 603:16, 603:20, 608:1, 623:19
**regardless** [1] - 561:12
**regular** [1] - 605:18
**regulation** [1] - 568:20
**regulatory** [2] - 601:15, 601:17
**reinvest** [1] - 532:18
**relate** [1] - 519:20
**related** [4] - 515:20, 515:21, 543:2, 606:2
**relates** [1] - 558:20
**relationship** [2] - 578:16, 578:23
**relatively** [1] - 625:22
**relevance** [1] - 532:4
**relevant** [18] - 532:16, 565:18, 573:10, 573:16, 604:3, 604:12, 604:13, 604:24, 612:4,

612:12, 612:23,
613:10, 616:3, 616:7,
616:18, 617:9, 619:23,
627:15
  **relief** [1] - 608:12
  **reluctant** [1] - 576:24
  **rely** [1] - 567:12
  **remains** [1] - 607:22
  **remarking** [1] - 521:15
  **remedy** [3] - 569:21,
625:8
  **remember** [13] -
536:14, 547:15, 553:4,
554:15, 568:18, 572:9,
575:24, 591:3, 596:1,
603:14, 604:4, 614:23
  **remembering** [1] -
603:13
  **remind** [1] - 610:4
  **remove** [1] - 525:1
  **repeat** [1] - 573:11
  **repeatedly** [1] -
628:17
  **repeating** [1] - 511:23
  **report** [16] - 529:3,
529:5, 529:20, 530:16,
530:20, 531:5, 541:22,
542:2, 542:14, 542:16,
544:19, 557:15,
559:17, 559:20,
559:21, 595:22
  **reported** [1] - 616:10
  **reporter** [1] - 622:5
  **Reporter** [4] - 510:6,
510:7, 620:6, 631:11
  **REPORTER** [1] -
631:1
  **reporting** [1] - 542:25
  **reports** [14] - 511:20,
511:21, 527:9, 527:10,
528:22, 530:2, 540:20,
541:1, 542:7, 542:24,
542:25, 557:4, 557:8,
559:18
  **representation** [1] -
630:5
  **request** [4] - 561:7,
563:22, 588:23, 603:17
  **requested** [1] - 563:20
  **requesting** [1] -
606:15
  **require** [3] - 615:6,
615:9, 616:20
  **required** [3] - 537:20,
574:14, 616:17
  **requirement** [6] -
574:10, 575:3, 581:4,
589:5, 593:18, 594:12
  **requirements** [1] -
546:22

  **requires** [3] - 566:12,
615:10, 627:21
  **rerun** [2] - 549:3,
596:8
  **research** [1] - 523:4
  **reserve** [1] - 518:19
  **reserving** [1] - 600:12
  **resolution** [1] - 616:16
  **resources** [2] - 587:2,
588:20
  **respect** [6] - 536:21,
536:22, 583:9, 613:3,
614:11, 616:4
  **respectfully** [1] -
596:24
  **respond** [1] - 618:3
  **response** [5] - 524:17,
528:8, 534:13, 538:19,
599:16
  **responsive** [3] -
535:20, 536:16, 612:17
  **restrict** [2] - 549:19,
550:16
  **restriction** [1] - 549:18
  **restrictions** [1] -
626:22
  **result** [8] - 534:25,
539:2, 557:1, 558:12,
626:21, 627:7, 630:4,
630:7
  **results** [4] - 548:18,
548:19, 551:15, 627:21
  **Results** [1] - 590:13
  **resume** [1] - 559:13,
622:14
  **retail** [2] - 534:6,
534:23
  **retained** [3] - 610:3,
610:15, 611:2
  **retention** [5] - 602:1,
602:2, 602:3, 604:19,
613:3
  **return** [1] - 537:6,
537:8, 544:10, 549:11,
561:11
  **returns** [1] - 551:4
  **revenue** [22] - 519:11,
519:15, 520:10,
520:12, 521:5, 521:16,
521:18, 522:10, 525:7,
526:12, 526:14,
529:18, 532:17,
532:18, 545:22,
545:24, 547:23,
553:18, 561:22, 564:8,
626:8
  **revenues** [2] - 521:21,
546:15
  **reverse** [1] - 527:12
  **review** [3] - 552:21,

593:9, 601:23
  **revshare** [1] - 603:16
  **rGSP** [5] - 519:16,
554:11, 554:15, 555:3,
555:7
  **ring** [2] - 528:10,
528:17
  **rise** [4] - 536:8, 542:3,
571:20, 613:20
  **rises** [1] - 615:1
  **risk** [2] - 607:15,
607:16
  **rival** [7] - 532:13,
567:7, 574:10, 578:12,
585:6, 624:3
  **rival's** [1] - 600:11
  **rivals** [15] - 562:4,
562:5, 566:14, 567:6,
570:18, 572:17,
575:13, 576:2, 576:15,
576:20, 577:4, 577:8,
577:10, 584:8, 591:20
  **RMR** [1] - 510:6
  **roadmap** [3] - 590:13,
598:15, 615:22
  **ROI** [11] - 537:12,
537:18, 538:5, 543:15,
543:24, 548:4, 549:11,
551:4, 551:9, 559:2,
582:14
  **roll** [1] - 560:22
  **roll-out** [1] - 560:22
  **roof** [1] - 550:24
  **Room** [2] - 510:7,
631:12
  **Rosenberg** [1] - 605:5
  **roughly** [1] - 540:23
  **routine** [1] - 605:18
  **RPM** [8] - 545:22,
546:7, 546:8, 557:25,
558:5, 558:7, 558:11,
558:17
  **RSA** [1] - 589:23
  **rubber** [1] - 596:9
  **rubber-stamped** [1] -
596:9
  **Rule** [10] - 606:8,
614:11, 615:1, 615:5,
615:6, 615:7, 615:10,
619:17, 619:18, 619:25
  **rule** [1] - 586:20
  **rules** [4] - 586:22,
599:23, 600:17, 601:6
  **run** [5] - 555:1,
560:16, 573:19,
595:15, 599:19
  **running** [1] - 585:4

## S

  **SA360** [47] - 559:13,
560:5, 560:9, 561:16,
561:18, 561:19, 562:1,
562:3, 562:10, 563:2,
564:6, 564:8, 564:12,
564:16, 564:23,
564:24, 565:1, 565:4,
569:16, 572:12,
577:14, 577:20,
579:20, 582:19,
582:24, 583:2, 583:10,
584:24, 584:25,
586:14, 586:19, 587:8,
587:19, 590:12,
597:11, 597:17,
597:21, 599:6, 599:10,
615:22, 616:8, 628:20,
628:24, 629:2, 629:3,
629:5, 629:8
  **SA360's** [1] - 577:8
  **sacrifice** [1] - 573:6
  **sacrificed** [1] - 574:11
  **sacrificing** [1] - 574:9
  **sales** [2] - 563:21,
598:15
  **Sales** [1] - 590:12
  **SALLET** [35] - 566:16,
567:20, 568:2, 569:1,
569:4, 569:13, 569:19,
569:24, 570:16, 571:9,
573:8, 573:25, 574:5,
574:13, 575:16, 576:4,
577:3, 577:17, 577:23,
577:25, 578:3, 578:7,
578:14, 578:18,
578:22, 579:9, 579:12,
580:8, 580:14, 580:21,
581:3, 581:24, 582:6,
582:12, 582:16
  **sallet** [1] - 560:5
  **Sallet** [9] - 509:18,
533:5, 565:25, 566:10,
573:24, 583:12,
593:19, 596:3, 599:18
  **Sallet's** [1] - 593:12
  **Samsung** [1] - 627:14
  **sanction** [9] - 606:16,
607:18, 615:5, 615:10,
618:23, 619:17,
619:21, 620:9, 621:16
  **sanctionable** [3] -
613:6, 613:21, 614:1
  **sanctioned** [1] -
621:24
  **sanctioning** [1] -
607:21
  **sanctions** [9] -
600:20, 601:7, 606:19,

606:25, 607:2, 607:20, 608:24, 614:3, 615:5
**satisfy** [3] - 567:21, 593:17, 620:18
**saved** [1] - 614:17
**saw** [4] - 550:1, 550:7, 564:3, 626:11
**scale** [23] - 544:23, 545:11, 545:12, 545:21, 545:24, 546:2, 546:5, 546:23, 547:8, 548:11, 548:17, 548:19, 557:21, 557:22, 558:16, 558:20, 559:6, 624:14, 624:15, 624:17, 624:18
**scenario** [1] - 549:24
**SCHMIDTLEIN** [49] - 535:19, 537:25, 539:3, 539:13, 539:17, 540:19, 541:23, 542:6, 542:9, 542:21, 542:25, 544:21, 545:5, 545:17, 545:20, 548:6, 548:23, 548:25, 549:20, 549:23, 550:5, 550:20, 552:19, 583:9, 583:25, 584:13, 585:12, 586:9, 586:18, 588:5, 590:3, 590:5, 590:16, 591:2, 591:7, 591:25, 592:15, 592:19, 592:22, 593:3, 593:5, 593:7, 593:11, 593:22, 594:8, 595:4, 596:16, 621:23, 626:18
**Schmidtlein** [25] - 510:1, 518:11, 524:14, 525:13, 535:18, 549:14, 555:22, 556:2, 556:3, 556:17, 556:21, 557:5, 557:10, 557:23, 558:4, 583:7, 596:13, 597:7, 608:17, 609:3, 620:7, 624:6, 625:21, 626:17, 629:22
**scope** [6] - 569:2, 569:8, 569:18, 570:17, 598:1, 617:22
**score** [1] - 532:10
**scraping** [1] - 535:12
**screen** [3] - 519:20, 523:2, 594:14
**se** [1] - 594:12
**seamlessly** [2] - 564:17, 564:18
**search** [65] - 511:8, 511:21, 517:1, 521:22, 522:15, 522:16, 527:10, 528:22, 530:2, 531:5, 531:20, 531:21,

531:23, 533:16, 533:23, 533:24, 534:8, 534:11, 534:14, 534:16, 534:25, 535:5, 535:8, 535:9, 535:13, 540:19, 540:25, 545:13, 545:24, 547:5, 547:16, 548:8, 549:2, 551:13, 551:15, 551:16, 556:18, 557:22, 558:16, 558:17, 558:21, 560:12, 560:19, 561:21, 561:23, 562:21, 565:3, 579:21, 583:1, 612:3, 623:23, 623:24, 625:15, 626:1, 626:3, 627:5, 627:6, 627:7, 627:8, 627:9, 628:25, 629:7
**Search** [14] - 547:23, 548:5, 549:9, 549:15, 549:16, 549:19, 551:16, 551:18, 552:7, 598:10, 610:20, 610:21, 610:22
**searches** [1] - 549:22
**searching** [1] - 538:10
**Searchlight** [1] - 598:8
**searchs** [1] - 537:4
**seat** [1] - 533:5
**second** [11] - 523:17, 536:13, 550:1, 560:19, 568:1, 591:13, 597:18, 605:9, 614:6, 617:16, 623:17
**second-guess** [1] - 591:13
**seconds** [2] - 620:4, 620:5
**secret** [1] - 625:25
**Section** [6] - 509:19, 515:4, 565:21, 571:8, 625:7
**section** [1] - 560:6
**see** [40] - 518:17, 521:9, 524:8, 526:2, 530:5, 532:21, 536:10, 537:4, 538:7, 541:13, 544:3, 546:8, 549:1, 550:6, 550:13, 550:17, 550:25, 552:14, 553:25, 554:5, 554:20, 556:8, 556:10, 558:9, 574:21, 576:16, 585:1, 585:12, 586:25, 591:25, 595:4, 597:1, 598:19, 608:22, 610:2, 610:8, 625:2, 630:8
**seeds** [1] - 619:14

**seeing** [6] - 554:3, 561:24, 568:25, 588:16, 590:21, 618:25
**seem** [2] - 579:4, 587:23
**segment** [2] - 534:19, 564:1
**sell** [2] - 534:24, 592:17
**selling** [1] - 515:10
**SEM** [16] - 560:10, 560:15, 560:20, 561:9, 561:22, 562:2, 563:25, 564:10, 577:20, 578:2, 582:22, 587:9, 587:12, 587:20, 597:15, 599:19
**semantic** [9] - 525:23, 527:20, 528:3, 537:16, 539:10, 539:11, 539:19, 540:11, 542:17
**semantics** [1] - 567:6
**send** [1] - 611:13
**sense** [12] - 521:10, 540:12, 541:14, 562:21, 567:10, 583:20, 584:7, 584:9, 594:3, 607:20, 612:6, 617:25
**sent** [2] - 602:9, 623:12
**separate** [1] - 606:19
**separately** [1] - 615:4
**September** [2] - 562:23, 598:20
**series** [1] - 575:16
**serious** [3] - 560:4, 592:24, 592:25
**serve** [3] - 532:16, 555:1, 573:21
**serves** [1] - 592:12
**service** [1] - 562:20
**services** [2] - 561:3, 600:10
**serving** [1] - 511:15
**session** [2] - 511:8, 559:17
**set** [6] - 537:19, 555:9, 565:21, 567:9, 605:14, 614:10
**setting** [1] - 602:5
**Seventh** [2] - 509:20, 574:19
**several** [1] - 601:14
**share** [13] - 521:2, 521:5, 533:11, 542:12, 542:13, 564:1, 564:13, 576:16, 582:20, 597:15, 598:22
**shareholders** [1] - 626:7

**shares** [1] - 520:25
**shed** [1] - 575:9
**sheds** [1] - 568:22
**Sherman** [3] - 585:22, 625:4, 625:8
**shift** [1] - 573:1
**Shirley** [1] - 595:11
**shocked** [1] - 608:18
**shocking** [1] - 604:20
**Shoe** [1] - 513:14
**short** [9] - 520:7, 520:23, 527:4, 527:11, 529:19, 573:6, 574:9, 574:12
**short-term** [4] - 573:6, 574:9, 574:12
**shot** [1] - 558:11
**show** [32] - 512:4, 512:11, 512:13, 513:6, 514:2, 514:19, 518:7, 524:4, 525:24, 526:1, 529:23, 551:22, 553:1, 555:10, 565:22, 565:23, 573:5, 574:7, 574:17, 580:24, 590:24, 594:18, 599:8, 605:18, 605:22, 614:21, 616:1, 616:17, 618:7, 622:9, 623:17, 628:1
**showed** [11] - 512:12, 512:18, 543:17, 556:4, 556:11, 558:5, 561:14, 570:6, 587:13, 618:15, 629:1
**showing** [11] - 519:8, 519:9, 546:22, 573:5, 574:6, 575:4, 580:11, 605:25, 618:10, 629:1, 629:9
**shown** [17] - 525:8, 536:3, 545:2, 547:12, 547:13, 594:19, 594:25, 597:3, 604:1, 604:12, 604:15, 604:16, 623:9, 626:21, 629:6, 629:7, 629:8
**shows** [17] - 519:14, 519:15, 526:16, 529:7, 531:6, 543:17, 544:7, 546:24, 551:20, 558:4, 558:7, 564:7, 575:1, 581:10, 606:1, 606:20, 606:25
**shredding** [1] - 614:18
**Side** [1] - 525:22
**side** [14] - 531:23, 532:9, 532:21, 532:22, 532:23, 552:3, 585:21, 622:9, 624:10, 624:12,

654

625:16, 629:7
**sides** [2] - 581:8, 629:14
**sign** [2] - 546:17
**signed** [1] - 624:22
**significance** [1] - 630:1
**significant** [8] - 526:17, 536:2, 559:21, 564:11, 599:1, 601:14, 623:25, 627:2
**significantly** [5] - 517:25, 627:6, 627:8, 627:9
**silly** [1] - 549:14
**similar** [7] - 536:19, 538:11, 538:15, 554:16, 555:12, 555:13, 623:11
**simple** [3] - 538:22, 540:6, 556:23
**simplify** [2] - 518:24, 538:3
**simplifying** [2] - 538:1, 538:20
**simplistic** [1] - 538:4
**simply** [7] - 522:15, 523:16, 556:9, 565:21, 576:9, 579:25, 612:13
**single** [6] - 522:9, 593:13, 593:14, 613:6, 627:13, 627:15
**singularly** [1] - 542:5
**sit** [4] - 527:19, 528:12, 537:11, 537:13
**situation** [2] - 582:17, 582:18
**six** [1] - 612:13
**size** [3] - 537:17, 581:6, 597:2
**sized** [1] - 524:18
**Skai** [4] - 564:2, 572:7, 572:10, 599:12
**Ski** [1] - 569:11
**ski** [1] - 592:13
**Skiing** [11] - 566:6, 569:9, 574:9, 576:3, 576:25, 591:17, 591:21, 591:24, 592:1, 592:8, 592:12
**slap** [1] - 619:7
**Slide** [25] - 522:7, 523:10, 530:8, 531:2, 531:16, 531:22, 536:25, 545:2, 546:24, 556:10, 556:18, 557:4, 557:24, 558:1, 558:20, 569:25, 572:3, 597:19, 598:17, 599:3, 605:10, 609:22, 617:17, 623:3,
623:17
**slide** [40] - 511:22, 511:23, 519:4, 520:5, 523:1, 524:4, 527:14, 528:6, 529:1, 532:1, 536:1, 536:3, 545:1, 545:20, 556:4, 556:9, 557:23, 558:2, 558:4, 558:7, 558:22, 564:7, 589:20, 590:12, 596:25, 598:2, 598:6, 602:8, 603:11, 605:25, 606:1, 610:11, 610:16, 617:14, 617:16, 619:3, 624:5, 624:13, 624:21
**slides** [4] - 531:17, 535:23, 618:15, 623:3
**slightly** [1] - 580:9
**sloping** [1] - 558:13
**slot** [1] - 554:18
**small** [4] - 524:18, 561:23, 564:1, 596:17
**smaller** [6] - 520:22, 537:16, 539:5, 540:6, 549:1, 561:23
**smallest** [1] - 527:25
**smart** [1] - 518:22
**snippets** [1] - 553:23
**sometimes** [1] - 619:14
**somewhat** [1] - 535:3
**sophisticated** [2] - 535:14, 538:16
**sorry** [12] - 514:13, 514:25, 516:5, 522:12, 523:6, 556:11, 556:21, 567:2, 567:16, 573:25, 577:19, 609:6
**sort** [45] - 521:1, 521:2, 522:1, 523:8, 526:22, 527:1, 530:15, 533:13, 534:13, 536:2, 536:4, 536:11, 536:12, 536:19, 539:15, 540:25, 541:11, 542:21, 543:5, 543:9, 544:7, 544:15, 547:12, 549:17, 550:6, 550:10, 551:1, 551:23, 553:15, 554:8, 559:3, 565:17, 588:8, 589:20, 589:22, 592:5, 594:14, 594:15, 610:19, 612:4, 612:5, 614:22, 616:11, 618:15, 628:2
**sought** [2] - 529:22, 564:3
**sound** [1] - 596:17
**sounds** [1] - 621:23
**South** [1] - 509:15
**Southern** [1] - 575:17
**space** [2] - 535:6, 551:12
**SPEAKER** [1] - 593:4
**speaking** [1] - 605:15
**speaks** [1] - 528:19
**special** [1] - 600:12
**specialized** [1] - 576:9
**specific** [13] - 529:6, 565:21, 578:14, 581:5, 581:12, 583:23, 590:20, 595:15, 595:17, 600:2, 600:14, 603:17
**specifically** [7] - 512:4, 557:22, 575:18, 590:8, 606:1, 616:5, 618:7
**specified** [1] - 591:5
**spend** [22] - 528:15, 528:24, 537:10, 537:13, 537:20, 543:18, 544:5, 547:1, 547:5, 548:3, 548:5, 559:4, 562:17, 586:23, 587:14, 593:15, 625:19, 629:2, 629:3, 629:4, 629:5
**spent** [3] - 530:3, 533:10, 550:20
**spread** [1] - 543:5
**spring** [2] - 586:17, 588:2
**SQR** [15] - 511:20, 527:9, 529:20, 541:22, 542:2, 542:7, 542:24, 542:25, 557:4, 557:8, 557:15, 559:17, 559:18, 559:20, 559:21
**squash** [1] - 553:17
**squashing** [1] - 519:16
**SSNIP** [2] - 515:6, 515:13
**stable** [1] - 521:10
**staff** [1] - 629:16
**stamped** [1] - 596:9
**stand** [4] - 589:7, 593:8, 598:18, 602:11
**standard** [3] - 614:12, 628:21, 628:22
**standing** [1] - 554:7
**stands** [3] - 526:16, 575:15, 630:18
**Staples** [1] - 513:24
**start** [6] - 532:17, 584:10, 588:1, 605:4, 606:17, 608:21
**started** [3] - 523:23, 576:12, 618:4
**starting** [1] - 629:24
**starts** [1] - 601:10
**state** [4] - 518:18, 575:3, 613:16, 620:17
**State's** [1] - 611:13
**statement** [3] - 514:6, 530:13, 545:7
**statements** [1] - 587:22
**states** [3] - 519:12, 572:17, 613:16
**STATES** [2] - 509:1, 509:10
**States** [6] - 509:2, 509:18, 510:7, 560:12, 590:17, 590:18
**states'** [1] - 625:14
**stating** [1] - 530:23
**stay** [3] - 522:21, 550:23, 606:2
**stayed** [3] - 521:23, 522:20, 625:22
**stenographic** [1] - 631:5
**step** [5] - 512:17, 513:15, 523:20, 549:7, 574:13
**sticky** [1] - 583:2
**still** [13] - 515:11, 517:7, 518:19, 522:21, 528:1, 535:4, 563:22, 567:18, 567:19, 572:12, 586:2, 593:20, 626:10
**stood** [1] - 585:24
**stop** [8] - 512:11, 512:16, 512:20, 534:25, 566:3, 600:2, 603:5, 620:15
**stopping** [1] - 605:20, 609:8
**story** [3] - 551:6, 551:7, 553:24
**strategies** [4] - 564:18, 565:2, 565:6, 582:10
**Street** [2] - 509:12, 509:15
**stretched** [1] - 588:21
**strike** [1] - 541:11
**stringent** [2] - 593:17, 614:10
**structured** [1] - 516:7
**struggling** [3] - 512:22, 569:22, 577:2
**stuck** [1] - 528:16
**students** [1] - 630:8
**study** [1] - 523:13
**stuff** [2] - 582:15, 606:1

**subject** [2] - 546:8, 601:23
**submissions** [1] - 612:6
**submit** [1] - 571:23
**submitted** [1] - 595:9
**subpoenas** [1] - 611:13
**substance** [1] - 617:12
**substantial** [10] - 536:7, 536:9, 536:10, 556:16, 623:5, 623:9, 627:2, 628:23, 628:24, 629:6
**substantially** [2] - 514:23, 515:1
**substantiate** [1] - 512:5
**substantive** [3] - 604:5, 605:8, 617:9
**subtle** [1] - 561:4
**subtly** [2] - 561:2, 600:10
**succeeded** [1] - 551:5
**sudden** [1] - 592:5
**suddenly** [1] - 558:11
**suffered** [1] - 628:16
**sufficient** [4] - 581:18, 593:21, 594:2, 595:6
**sufficiently** [1] - 542:10
**suggest** [5] - 538:11, 540:10, 555:19, 563:8, 607:12
**suggested** [1] - 564:21
**suggesting** [2] - 516:9, 584:18
**suggestion** [2] - 539:18, 583:13
**suggests** [2] - 552:10, 565:17
**Suite** [3] - 509:16, 509:24, 567:17
**sum** [1] - 621:20
**summarizing** [1] - 559:20
**summary** [7] - 557:12, 560:21, 573:13, 594:9, 594:24, 595:5, 595:19
**summer** [1] - 588:3
**sumo** [1] - 528:10
**Sunday** [1] - 552:6
**super** [2] - 513:17, 515:16
**Super** [1] - 552:6
**superior** [1] - 627:11
**supermarket** [1] - 530:11

**supervise** [1] - 607:8
**supervising** [1] - 570:24
**support** [8] - 545:10, 561:3, 571:19, 574:11, 577:8, 577:9, 600:10, 608:6
**supported** [1] - 572:8
**supporting** [4] - 592:4, 592:6, 599:20, 599:21
**supports** [5] - 520:1, 572:5, 576:8, 579:25, 606:23
**suppose** [3] - 513:10, 566:9, 584:9
**supposed** [5] - 569:5, 571:5, 585:20, 588:21, 591:12
**Supreme** [4] - 514:19, 514:20, 570:13, 589:9
**surprised** [1] - 563:17
**surprising** [4] - 564:12, 564:14, 598:4, 604:20
**survey** [1] - 563:10
**surveying** [1] - 590:7
**Susan** [1] - 545:7
**sustain** [1] - 550:9
**SVPs** [2] - 534:18, 535:4
**SW** [1] - 510:2
**switch** [3] - 588:20, 628:12, 628:13
**switched** [1] - 593:15
**system** [5] - 518:24, 526:23, 527:23, 605:8, 607:6
**systemic** [1] - 601:4
**systems** [2] - 624:15, 624:20

**T**

**T-Mobile** [1] - 627:14
**TAC** [9] - 521:25, 522:2, 522:9, 522:16, 522:22, 523:3, 523:5, 556:23, 625:23
**tag** [1] - 598:8
**talks** [7] - 519:17, 542:4, 552:24, 554:11, 568:16, 575:2, 575:4
**Target** [1] - 534:19
**target** [2] - 534:11, 538:12
**targeting** [1] - 532:2
**team** [4] - 598:10, 620:22, 620:25, 621:1
**tech** [4] - 610:5, 610:6,

610:19, 620:25
**Tech** [2] - 610:20, 610:21
**technologies** [1] - 546:13
**technology** [4] - 543:22, 587:6, 587:7
**television** [3] - 517:17, 517:24, 544:7
**ten** [4] - 517:19, 517:25, 555:23, 618:1
**ten-week** [1] - 618:1
**tension** [1] - 541:9
**Tenth** [1] - 567:17
**term** [11] - 518:16, 554:15, 571:25, 573:6, 574:9, 574:12, 592:2, 602:2, 619:3, 619:4
**terms** [21] - 513:3, 514:19, 516:8, 527:7, 529:22, 532:8, 533:6, 540:19, 547:25, 551:8, 552:13, 569:16, 585:3, 585:18, 596:14, 596:18, 606:16, 612:3, 614:13, 619:13
**terribly** [1] - 524:15
**test** [10] - 515:6, 515:7, 515:13, 563:6, 572:25, 594:15, 598:11, 615:14
**testified** [11] - 520:10, 527:19, 587:5, 590:25, 593:1, 597:20, 599:15, 616:10, 626:4, 627:12
**testifying** [1] - 627:13
**testimony** [24] - 515:9, 533:19, 537:1, 537:25, 538:15, 539:10, 541:7, 541:17, 542:4, 547:3, 553:3, 556:21, 559:1, 581:12, 587:21, 588:18, 591:3, 593:10, 595:9, 595:10, 599:15, 611:20, 615:21, 617:8
**testing** [8] - 512:13, 562:11, 586:1, 588:1, 598:8, 609:8, 609:9
**Texas** [7] - 609:17, 609:24, 610:6, 610:13, 620:12, 620:13
**Texas'** [1] - 609:25
**text** [4] - 523:19, 524:5, 533:24, 604:11
**thaw** [1] - 625:4
**THE** [171] - 509:1, 509:1, 509:9, 511:2, 511:6, 513:2, 514:11, 514:13, 514:15, 514:18, 516:5, 516:16,

516:21, 517:10, 519:19, 519:23, 520:6, 521:1, 521:8, 521:19, 522:5, 522:13, 523:6, 524:14, 526:20, 527:6, 529:12, 529:20, 530:15, 531:10, 531:12, 532:7, 533:5, 533:22, 534:1, 534:4, 534:8, 534:11, 534:22, 535:16, 535:18, 537:22, 538:18, 539:12, 539:15, 540:17, 541:20, 542:2, 542:7, 542:14, 542:24, 544:18, 545:4, 545:14, 545:19, 547:17, 548:14, 548:24, 549:13, 549:21, 550:1, 550:4, 550:17, 552:17, 555:22, 557:14, 557:18, 559:9, 559:12, 559:22, 559:24, 560:2, 565:9, 565:11, 565:14, 565:16, 565:24, 566:5, 566:8, 567:1, 568:1, 568:24, 569:2, 569:5, 569:14, 569:20, 570:12, 570:17, 573:1, 573:23, 574:1, 574:6, 575:11, 575:23, 576:12, 577:12, 577:20, 577:24, 578:1, 578:4, 578:11, 578:17, 578:21, 578:25, 579:10, 580:5, 580:9, 580:15, 580:22, 581:20, 581:25, 582:11, 582:14, 583:6, 583:24, 584:6, 584:17, 585:17, 586:16, 587:16, 589:19, 590:4, 590:11, 590:24, 591:3, 591:15, 592:11, 592:16, 592:20, 593:1, 593:6, 593:10, 593:19, 594:2, 595:3, 596:13, 597:7, 597:12, 600:19, 601:2, 603:25, 606:15, 609:1, 609:6, 609:13, 610:4, 611:3, 611:9, 611:11, 611:22, 611:24, 614:14, 615:8, 615:19, 617:18, 617:24, 618:11, 618:22, 620:1, 620:3, 621:19, 621:24, 622:4, 622:7, 622:12, 622:18, 622:24, 625:11, 626:16, 629:22, 630:18
**themselves** [6] -

512:13, 518:23,
536:23, 538:24, 557:9,
576:20
**theory** [2] - 529:12,
587:20
**thereby** [1] - 560:23
**therefore** [3] - 524:20,
566:21, 591:21
**they've** [22] - 524:2,
534:12, 541:24,
543:23, 547:25,
548:18, 551:5, 551:8,
552:10, 562:4, 585:21,
589:1, 594:4, 595:4,
607:10, 607:11,
607:12, 618:17,
628:18, 629:6
**thicker** [4] - 525:15,
525:18, 526:7, 529:18
**thinking** [3] - 517:14,
567:13, 612:5
**third** [7] - 512:15,
529:3, 561:10, 568:5,
626:23, 626:24, 627:13
**third-party** [3] - 529:3,
561:10, 627:13
**thorough** [1] - 605:23
**thousand** [1] - 545:23
**thousands** [3] -
527:20, 560:16, 606:10
**threat** [1] - 624:3
**three** [9] - 511:17,
511:18, 511:20,
563:25, 567:22,
612:13, 616:9, 622:8
**threshold** [3] - 542:9,
566:9, 573:5
**thresholds** [2] - 555:9,
555:10
**threw** [1] - 592:24
**throughout** [4] -
593:23, 605:19,
605:20, 629:17
**thrown** [1] - 579:12
**throws** [1] - 579:14
**tickets** [2] - 592:15,
592:17
**tie** [1] - 547:15
**tied** [1] - 513:10
**ties** [1] - 515:15
**Tim** [1] - 626:6
**timeline** [1] - 579:3
**timely** [1] - 584:21
**Tinter** [3] - 593:5,
593:6, 593:7
**Tinter's** [1] - 599:14
**Tinuiti** [1] - 529:4
**tiny** [4] - 596:24,
597:1, 617:15
**titled** [1] - 590:12

**Tobacco** [3] - 512:9,
513:14, 513:20
**today** [12] - 517:18,
533:8, 544:2, 545:8,
551:7, 562:12, 576:4,
611:22, 624:6, 624:18,
625:6, 625:21
**together** [7] - 514:2,
531:22, 539:16,
554:16, 569:10,
595:14, 598:13
**tolerating** [1] - 629:17
**tomorrow** [6] - 583:13,
583:16, 625:5, 625:6,
629:24
**took** [3] - 524:16,
599:4, 613:12
**tool** [25] - 560:10,
560:20, 561:9, 562:2,
563:25, 564:13, 577:9,
577:17, 577:20, 578:2,
579:21, 581:22,
582:22, 583:18,
584:14, 586:13,
586:14, 586:23, 587:9,
587:15, 587:20,
588:22, 599:19,
599:20, 600:6
**tools** [9] - 543:11,
543:23, 560:15,
561:22, 562:1, 564:11,
587:1, 587:12, 597:15
**tooth** [1] - 551:3
**Top** [1] - 590:1
**top** [10] - 534:12,
546:25, 547:1, 547:2,
589:23, 590:1, 590:8,
590:14
**topic** [9] - 511:9,
511:19, 512:7, 518:25,
523:17, 527:11,
528:21, 557:21, 600:21
**topics** [2] - 511:20,
540:21
**topple** [1] - 550:11
**total** [4] - 543:18,
543:19, 547:5, 629:5
**touch** [2] - 554:14,
596:3
**touched** [1] - 538:18
**touching** [2] - 511:19,
554:21
**toward** [2] - 547:23,
547:24
**town** [1] - 626:1
**track** [2] - 534:13,
598:8
**tracking** [1] - 543:12
**tracks** [1] - 624:7
**trade** [3] - 539:3,

540:9, 630:9
**trade-offs** [2] - 539:3,
540:9
**traffic** [5] - 556:23,
558:8, 558:12, 562:2,
625:23
**train** [1] - 624:15
**transcript** [2] - 631:4,
631:5
**TRANSCRIPT** [1] -
509:9
**translates** [1] - 562:13
**transparency** [2] -
527:1, 536:24
**treasure** [2] - 614:16,
614:22
**treats** [1] - 577:10
**tree** [1] - 531:16
**tremendous** [1] -
549:2
**trend** [1] - 587:14
**trial** [27] - 518:8,
553:3, 560:24, 565:5,
570:5, 570:6, 570:9,
572:15, 575:16,
575:21, 582:23, 584:2,
585:15, 586:9, 588:18,
593:8, 595:2, 595:7,
595:8, 600:9, 604:14,
611:19, 617:8, 617:14,
618:1, 630:13
**TRIAL** [1] - 509:9
**trick** [1] - 522:17
**tricky** [1] - 570:20
**tried** [5] - 540:2,
541:2, 543:4, 562:15,
628:18
**trigger** [2] - 527:22,
575:3
**triggered** [1] - 576:10
**Trinko** [19] - 567:21,
567:23, 568:9, 568:10,
568:14, 568:16,
568:18, 568:20,
571:15, 572:21, 573:9,
575:1, 575:2, 575:9,
575:18, 576:5, 576:15,
589:8, 593:18
**tripled** [1] - 546:9
**trove** [3] - 534:23,
614:16, 614:22
**true** [8] - 511:11,
533:15, 533:17,
581:20, 586:12,
616:19, 631:4, 631:5
**truly** [1] - 619:11
**trumps** [2] - 513:1,
545:12
**truncated** [2] - 530:16,
530:20

**try** [7] - 516:16, 527:5,
535:21, 538:5, 544:11,
556:1, 562:19
**trying** [17] - 513:21,
516:22, 522:17, 537:5,
537:15, 539:17,
539:19, 540:4, 540:8,
541:11, 543:3, 544:18,
551:19, 551:21, 552:9,
599:18, 618:10
**tube** [1] - 517:21
**tuning** [1] - 515:21
**turn** [9] - 583:6,
594:22, 600:20,
602:14, 604:24,
605:12, 605:16,
612:22, 618:12
**turned** [4] - 528:11,
528:17, 556:14, 615:24
**turning** [2] - 536:24,
557:21
**turns** [1] - 600:13
**TV** [4] - 517:18,
517:19, 544:5, 552:2
**TVs** [4] - 517:18,
517:21, 517:22
**twice** [1] - 623:7
**two** [23] - 511:19,
518:23, 525:6, 531:21,
554:10, 555:12,
554:14, 563:11,
572:11, 573:13,
575:13, 581:8, 590:20,
597:23, 603:21,
603:22, 610:22, 613:4,
613:17, 618:16, 621:4,
626:11
**Tyler** [1] - 509:23
**type** [5] - 511:19,
560:17, 592:2, 606:23,
608:15
**types** [5] - 537:2,
538:11, 555:18,
565:18, 612:3
**typical** [2] - 549:17,
611:17
**typically** [3] - 537:10,
552:5, 552:7
**typing** [1] - 543:1

## U

**U.S** [3] - 509:12,
509:15, 546:9
**UI** [1] - 538:4
**ultimate** [1] - 559:5
**ultimately** [2] - 612:2,
626:13
**um-hum** [1] - 601:2
**unable** [1] - 546:19

**unacceptable** [1] - 613:25
**unapologetic** [1] - 620:8
**under** [17] - 512:4, 512:9, 513:14, 521:6, 526:9, 526:10, 589:5, 597:3, 615:1, 615:5, 615:6, 615:7, 615:10, 619:17, 619:25, 626:9
**underpriced** [1] - 553:14
**understandably** [1] - 512:22
**understood** [6] - 524:17, 544:21, 585:18, 602:20, 613:1
**undisputed** [2] - 525:14, 599:12
**undoubtedly** [1] - 587:4
**unequivocal** [1] - 601:8
**unfair** [1] - 627:23
**unfavorable** [1] - 607:25
**unhappy** [1] - 627:21
**UNIDENTIFIED** [1] - 593:4
**uniformly** [2] - 611:20, 621:11
**unique** [3] - 539:25, 584:8, 615:16
**United** [4] - 510:7, 560:12, 590:17, 590:18
**UNITED** [2] - 509:1, 509:10
**united** [1] - 509:2
**unjustified** [1] - 565:8
**unless** [3] - 576:10, 610:3, 621:17
**unlike** [3] - 614:11, 625:18, 627:11
**unlimited** [1] - 587:2
**unprecedented** [1] - 627:18
**unproved** [1] - 607:23
**unreasonable** [3] - 611:24, 611:25, 613:5
**unreasonably** [2] - 561:6, 599:23
**unredact** [1] - 546:19
**unredacted** [1] - 545:15
**unrelated** [3] - 539:18, 540:12, 546:1
**unsuccessful** [1] - 519:2
**up** [63] - 514:24, 514:25, 519:3, 521:22,

522:1, 522:21, 522:22, 525:16, 527:21, 531:8, 531:18, 533:20, 536:1, 536:10, 536:25, 539:1, 540:21, 541:25, 543:19, 544:16, 545:3, 546:14, 546:15, 549:1, 549:7, 553:2, 553:6, 553:10, 553:24, 556:5, 556:22, 556:24, 557:23, 557:24, 558:1, 558:11, 562:1, 562:11, 562:17, 563:13, 564:1, 567:19, 568:3, 569:25, 585:24, 589:8, 589:19, 594:22, 595:22, 596:14, 606:18, 608:17, 608:20, 609:22, 617:16, 618:5, 620:7, 621:20, 622:15, 623:3, 625:23, 629:5
**uplift** [5] - 580:15, 580:20, 590:21, 594:4, 594:5
**UPX1045** [1] - 554:10
**UPX1101** [1] - 618:6
**UPX1117** [1] - 525:24
**UPX526** [1] - 559:18
**usage** [3] - 550:9, 559:6, 624:1
**useful** [2] - 555:2, 596:5
**user** [8] - 532:9, 532:21, 532:22, 542:5, 547:20, 551:14, 610:9, 625:16
**users** [9] - 524:8, 542:8, 551:10, 553:19, 555:2, 623:23, 625:16, 626:14, 628:15
**uses** [2] - 573:14, 624:15
**usual** [1] - 609:11
**Utter** [1] - 595:11
**utter** [1] - 595:13

---

# V

**vacation** [1] - 629:23
**valid** [1] - 599:11
**validate** [1] - 596:8
**valuable** [4] - 524:25, 562:14, 562:20, 599:11
**value** [28] - 515:21, 515:22, 515:24, 515:25, 516:3, 518:2, 518:5, 518:10, 518:11, 518:12, 518:15, 518:18, 518:20, 519:1, 523:21, 524:23,

524:24, 525:5, 532:16, 553:6, 553:7, 553:13, 553:19, 554:3, 554:6, 562:21, 562:22, 585:3
**values** [2] - 518:24, 554:15
**van** [1] - 595:10
**Varia** [1] - 604:2
**Varian** [4] - 562:7, 587:25, 604:10, 609:8
**variation** [1] - 521:24
**variety** [2] - 537:8, 537:17
**various** [3] - 536:16, 543:12, 589:16
**vast** [4] - 534:23, 547:4, 547:5, 604:6
**Verizon** [2] - 568:18, 627:14
**version** [4] - 525:2, 587:5, 588:14
**versus** [4] - 541:16, 571:18, 574:18, 575:20
**vertical** [1] - 524:6
**Viamedia** [1] - 574:18
**vice** [1] - 602:13
**view** [9] - 524:21, 532:9, 540:17, 546:11, 566:5, 576:8, 578:11, 591:17, 592:6
**violated** [2] - 571:24, 625:7
**violates** [1] - 601:6
**violating** [1] - 606:22
**violation** [4] - 570:22, 571:8, 571:22, 572:18
**virtue** [3] - 516:7, 516:14, 535:7
**visibility** [2] - 529:3, 529:6
**volume** [7] - 542:10, 550:16, 557:25, 558:6, 558:12, 558:16, 590:17
**volumes** [1] - 522:15
**voluntarily** [1] - 561:9
**voluntary** [4] - 578:15, 578:23, 579:20, 600:15
**vs** [1] - 509:5

---

# W

**wait** [3] - 564:21, 612:16, 630:17
**Wait** [1] - 613:8
**waiting** [1] - 560:1
**walk** [1] - 630:3
**Walmart** [3] - 534:8, 534:19, 535:14
**wants** [2] - 564:19, 599:17

**warrants** [1] - 601:7
**Washington** [5] - 509:5, 509:13, 510:3, 510:8, 631:13
**watch** [2] - 552:2, 560:7
**ways** [3] - 561:1, 605:24, 612:3
**wearables** [1] - 604:13
**wears** [1] - 626:20
**Webb** [1] - 509:23
**website** [3] - 532:12, 534:12, 542:20
**websites** [1] - 534:6
**week** [1] - 618:1
**weight** [1] - 619:17
**Weinstein** [1] - 598:3
**Wfcavanaugh@pbwt .com** [1] - 509:25
**Whinston** [2] - 556:20, 558:10
**Whinston's** [1] - 546:21
**whistle** [1] - 552:15
**whole** [4] - 514:3, 553:24, 602:9, 602:11
**wide** [1] - 584:2
**wildly** [2] - 540:12, 544:15
**William** [1] - 509:22
**WILLIAMS** [1] - 510:2
**win** [4] - 524:20, 555:13, 555:15, 624:10
**Windows** [3] - 550:9, 567:16, 627:25
**winner** [2] - 526:4, 554:12
**winner-take-all** [1] - 554:12
**winning** [4] - 526:4, 555:17, 624:11, 627:19
**wish** [1] - 630:7
**withdrawing** [1] - 569:12
**withdrawn** [1] - 578:19
**witness** [4] - 592:22, 611:21, 617:7
**witnesses** [7] - 520:10, 537:1, 547:3, 561:5, 587:5, 593:1, 611:19
**won** [6] - 529:23, 530:4, 530:5, 627:10, 627:11, 628:19
**wonderful** [1] - 577:14
**wondering** [1] - 522:16
**Word** [1] - 567:16
**word** [3] - 517:5,

611:11, 614:17
**WordPerfect** [1] - 567:16
**words** [24] - 513:8, 526:22, 526:24, 527:6, 536:6, 537:9, 538:1, 538:7, 538:10, 538:22, 539:16, 548:7, 548:13, 550:15, 553:7, 554:22, 569:5, 583:2, 584:25, 587:24, 609:25, 611:25, 619:18, 628:22
**workaround** [2] - 564:21, 565:2
**world** [7] - 513:23, 520:11, 545:18, 572:21, 572:22, 599:19
**worlds** [1] - 599:18
**wrap** [1] - 596:14
**wrestler** [1] - 528:10
**write** [2] - 601:23, 603:11
**writes** [4] - 601:13, 601:17, 601:22, 601:25
**writing** [2] - 519:5, 519:6
**written** [2] - 603:15, 603:19
**wrote** [1] - 567:4

## Y

**Yahoo** [4] - 560:14, 561:24, 590:15, 599:21
**Yahoo!** [1] - 558:9
**Yahoo!'s** [1] - 545:21
**year** [4] - 558:10, 572:15, 575:19, 576:6
**years** [31] - 517:19, 517:20, 518:1, 518:19, 520:3, 536:3, 539:23, 541:1, 543:25, 545:25, 546:7, 561:7, 561:25, 563:22, 572:11, 576:8, 585:24, 586:2, 586:3, 592:4, 597:23, 601:9, 613:23, 617:1, 618:16, 620:23, 624:16, 629:17
**yesterday** [13] - 511:24, 516:24, 521:15, 531:14, 532:20, 533:9, 533:10, 533:16, 535:11, 548:7, 548:15, 558:3, 628:11
**yesterday's** [1] - 549:4
**York** [3] - 509:24, 575:18, 623:6

## Z

**zero** [1] - 530:6