## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | |
| | Case No. 1:20-cv-03010-APM |
| v. | |
| | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | |
| | Case No. 1:20-cv-03715-APM |
| v. | |
| | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |

## PLAINTIFFS' INITIAL PROPOSED FINAL JUDGMENT

WHEREAS, Plaintiffs United States of America, and the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, by and through their respective Attorneys General ("Co-Plaintiff States"), filed their Complaint on October 20, 2020, and their Amended Complaint on January 15, 2021;

AND WHEREAS, Plaintiffs Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico,

Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming (together "Colorado Plaintiff States") filed their Complaint on December 17, 2020;

AND WHEREAS, the Court conducted a trial and entered Findings of Fact and Conclusions of Law in both actions on August 5, 2024;

AND WHEREAS, the Court entered judgment finding Google liable for violating Section 2 of the Sherman Act by unlawfully maintaining its monopolies in the general search services and general search text advertising markets;

NOW THEREFORE, upon the record at trial and all prior and subsequent proceedings, it is hereby ORDERED, ADJUDGED, AND DECREED:

## I.      JURISDICTION

The Court has jurisdiction over the subject matter of this action and over Google.

## II.     APPLICABILITY

This Final Judgment applies to Google, as defined below, and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise.

## III.    DEFINITIONS

As used in this Final Judgment:

A.      "Ads Data" means data related to Google's selection, ranking, and placement of, Search Text Ads in response to queries, including any User-side Data used in that process.

B.      "AI Product" means any application, service, feature, tool, or functionality that involves artificial intelligence capabilities.

C.      "Android" means all code, software, applications, application programming interfaces (APIs), and other products and services provided by Google through the Android Open

Source Project (AOSP), including the open-source application framework, libraries, runtime, and kernel, which are published at http://source.android.com (or successor sites), and any software development kits made available at http://developer.android.com (or successor sites) and all code, software, applications, APIs, and other products and services provided by Google that are critical, in the determination of the Technical Committee, to the full and proper functioning of an Android Device. For the purposes of this Final Judgment, Android also includes (1) the Google Play Store and Google Play Services; (2) all other code, software, applications, APIs, and products and services provided by Google that are critical, in the determination of the Technical Committee, to the full and proper functioning of the Google Play Store and Google Play Services; and (3) all code, software, applications, APIs, and other products and services that Google adds to open-source Android to implement the operating system on Pixel Devices.

D.    "API" or "application programming interface" means a mechanism that allows different software components to communicate with each other.

E.    "Apple" means Apple Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

F.    "Choice Screen" means a selection menu for either a Search Access Point or a GSE default on a Search Access Point, which Plaintiffs approve.

G.    "Chrome" means all code, software, applications, APIs, and other products and services included in Google's Chromium or the Chrome browser, including the open-source application framework, libraries, runtime, and kernel which are published at http://www.chromium.org (or successor sites), and all code, software, applications, APIs, and

other products and services provided by Google that are critical, in the determination of the Technical Committee, to the full and proper functioning of Chromium or the Chrome browser.

H.    "Competitor" means any provider of, or potential entrant in the provision of, a General Search Engine (GSE) or of Search Text Ads in the United States.

I.    "Device" means any smartphone, tablet, laptop, desktop, or other device that allows a user to access general search functionality.

J.    "Distributor" is any Person that contracts with Google to display, load, or otherwise provide access to a Google product.

K.    "Google" means Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California, its parent Alphabet Inc., their successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

L.    "Google Browser" means any web browser owned by Google, including Chrome until divested.

M.    "Google Device" means any Device manufactured or refurbished by Google, including Pixel phones and tablets.

N.    "Google Grounding API" means a method for connecting foundation model output to Google Search results through API.

O.    "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query. "General Search Engine" or "GSE" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 8.

P.      The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided.

Q.      "Person" or "person" means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

R.      "Publisher" means any Person who controls the legal right to any information published or otherwise made available on any website or through any mobile app.

S.      "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards set by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee.

T.      "Ranking Signals" means variables that affect how all items on a Search Engine Results Page (SERP) are positioned and ranked.

U.      "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query and receive (or be directed to a place to receive) a response that includes information from a GSE. Search Access Points include OS-level Search Access Points (e.g., widgets), browsers (including Search Access Points within browsers such as browser address bars), and search apps as well as their widgets.

V.      "Search Feature" in Google Search means any content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches.

W.      "Search Index" means any databases that store and organize information about websites and their content that is crawled from the web, gathered from data feeds, or collected via partnerships, from which Google selects information to provide results to users in response to general search queries.

X.      "Search Text Ad" means a general search text advertisement, which is an ad that

resembles an organic link on a SERP. "Search Text Ad" also has the meaning defined and used

in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 60, and includes Search

Text Ads appearing in or in connection with Google AI Overviews.

Y.      "SERP" or "Search Engine Results Page" means the results provided by a search

engine, in response to a user query, including links and other features and content, including

from a broad index of the web. "SERP" or "Search Engine Results Page" also has the meaning

defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 19.

Z.      "Technical Committee" or "TC" means the five-person committee of experts

appointed by the Court pursuant to Section X.A.

AA.    "User-side Data" means all data that can be obtained from users in the United

States, directly through a search engine's interaction with the user's Device, including software

running on that Device, by automated means. User-side Data includes information Google

collects when answering commercial, tail, and local queries. User-side Data may also include

data sets used to train or fine-tune Google's ranking and retrieval components, as well as

artificial intelligence models used for Google's AI Product.

## IV.    PROHIBITION ON FORECLOSING OR OTHERWISE EXCLUDING COMPETITORS THROUGH CONTRACTS WITH THIRD PARTIES THAT MAINTAIN GOOGLE'S MONOPOLIES

The purposes of the following remedies are to unfetter the monopolized markets from

Google's exclusionary practices, pry open the monopolized markets to competition, remove

barriers to entry, and ensure there remain no practices likely to result in unlawful monopolization

of these markets and related markets in the future by prohibiting contracts that foreclose or

otherwise exclude Competitors, including by raising their costs, discouraging their distribution, or depriving them of competitive access to inputs.

      A.   <u>Preferential Treatment and Payments Prohibited</u>: Google must not offer or provide something of value to a third party, including payments or other commercial terms that create an economic disincentive to compete in or enter the GSE or Search Text Ad market(s), for (1) preferential treatment of a General Search Engine (GSE) or Search Access Point relative to Competitors; (2) making or maintaining any GSE as a default within a new or existing Search Access Point or for undermining, frustrating, interfering with, or in any way discouraging the use of any GSE Competitor; or (3) preinstallation, placement, or default status of any Search Access Point. This prohibition includes preferential treatment of GSE distribution or inputs that would have the effect of disadvantaging any GSE Competitor.

      B.   <u>Apple Search Access Points And Devices</u>: Google must not offer or provide anything of value to Apple—or offer any commercial terms—that in any way creates an economic disincentive for Apple to compete in or enter the GSE or Search Text Ad markets.

      C.   <u>Exclusionary Agreements with Publishers Prohibited</u>: Google must not enter into a contract or other agreement with any Publisher to license data from any Publisher, website, or content creator, which provides Google exclusivity or otherwise restricts the Publisher's ability to license or otherwise make available the data to any other GSE or AI Product developer. This includes, for example, any agreement with a "most favored nation" or any similar provision that would require the Publisher to give Google the best terms it makes available to any other buyer or licensee.

      D.   <u>Conditional Access Prohibited</u>: Google must not condition access or terms of access to the Play Store or any other Google product on a distribution agreement for a GSE,

Search Access Point, or Choice Screen; or an agreement not to distribute a Competitor's product or service. Google must not bundle, tie, comingle, or otherwise condition, a GSE or Search Access Point with any other Google product, for example, by licensing a product to a Distributor and including a GSE or Search Access Point for free.

E.  <u>Revenue Share Payments Prohibited</u>: Google must not offer or provide to any Distributor anything of variable value that is determined or calculated based on the usage of, revenue generated by—or any similar factor for—any particular GSE (e.g., Google queries, Google Search Text Ad clicks, Google selections on a Choice Screen).

F.  <u>Prohibited Investments</u>: Within thirty (30) days of entry of this Final Judgment, Google must notify Plaintiffs of any investment, holding, or interest in any Competitor, any company that controls a Search Access Point or an AI Product, or in any technologies, such as AI Products, that are potential entrants into the GSE or Search Text Ads markets or reasonably anticipated competitive threats to GSEs. Within six (6) months, Google must divest any such interest and immediately refrain from taking any action that could discourage or disincentivize that company from developing products or services that compete with, disrupt, or disintermediate Google's GSE or Search Text Ads.

G.  <u>Prohibited Acquisitions</u>: Google must not, without the prior written consent of the United States, acquire any interest in, or part of, any company; enter into a new joint venture, partnership, or collaboration, including any marketing or sales agreement; or expand the scope of an existing joint venture, partnership, or collaboration, with any company that competes with Google in the GSE or Search Text Ads markets or any company that controls a Search Access Point or query-based AI Product. The decision whether to consent is within the sole discretion of the United States, after consultation with the Co-Plaintiff States and the Colorado Plaintiff

States. Nothing in this provision prevents any State from separately investigating or challenging the legality of an acquisition, joint venture, partnership, or collaboration under applicable state or federal law.

H.    No Circumvention of This Section's Purposes: Google may not undertake any action or omission with the purpose or effect of circumventing these provisions or frustrating the purposes of this Section. Complaints regarding non-compliance with this provision will be reviewed in the first instance by the TC in accordance with Paragraph X.C.3 below.

V.    **PROHIBITION ON FORECLOSING OR OTHERWISE EXCLUDING GSE AND SEARCH TEXT AD COMPETITORS THROUGH OWNERSHIP OR CONTROL OF RELATED PRODUCTS**

The purposes of the following remedies are to unfetter the monopolized markets from Google's exclusionary practices, pry open the monopolized markets to competition, remove barriers to entry, and ensure there remain no practices likely to result in unlawful monopolization of these markets and related markets in the future by requiring Google to divest its browser Chrome and prohibiting Google from providing its search products preferential access to related products or services that it owns or controls such as its mobile operating system (e.g., Android).

A.    Chrome Divestiture: Google must promptly and fully divest Chrome, to a buyer approved by the Plaintiffs in their sole discretion, subject to terms that the Court and Plaintiffs approve. Google may not release any other Google Browser during the term of this Final Judgment absent approval by the Court.

B.    Android Divestiture Option: In lieu of adhering to the requirements of this Section V with respect to Android, Google may elect to fully divest Android, to a buyer approved by the Plaintiffs in their sole discretion, subject to terms that the Court and Plaintiffs approve. If Google chooses to retain control of Android but fails to comply with the requirements of this Section V

as they apply to Android, or if compliance with or enforcement of this Final Judgment proves

unadministrable or ineffective, then Plaintiffs may petition the Court to order the divestiture of

Android.

   C. <u>Self-Preferencing Prohibited</u>: Except as permitted under Section IX, Google must

not use any Google-owned or operated asset (including any software, website, Device, service,

dataset, algorithm, or app) to preference Google's GSE, Search Text Ads, or AI Products;

undermine, frustrate, interfere with, or in any way lessen the ability of a user to discover a rival

GSE or of an advertiser to discover or shift its Search Text Ad spending to a rival Search Text

Ads provider; limit the competitive capabilities of a rival GSE or rival Search Text Ads provider;

or otherwise impede user discovery of products or services that are competitive threats in the

GSE or Search Text Ads markets. For example, Google must not use its ownership or control of

Android or any other product or service to disadvantage Competitors, including prompting a user

to switch the default GSE or to install or switch a Search Access Point. For the avoidance of

doubt, Google must not provide itself with preferential access to Android or Google-owned apps

or data as compared to the access it provides to all other GSEs and AI Products, and must not use

its ownership and control of Android, or any other Google product or service, to:

    1. make any Google GSE, Search Text Ads, or AI Product (including on-device AI) mandatory on Android Devices, for example, by preventing interoperability between Android AICore, or the Google Grounding API and Competitor products and services or competitive threats in the GSE or Search Text Ads markets;

    2. reduce, prevent, or otherwise interfere with the distribution of rival GSE, Search Text Ads, or AI Products on Android Devices;

    3. degrade any aspect of quality, including the features, functionality, or user experience, on rival GSE, Search Text Ads, or AI Products on Android Devices;

4.      explicitly or implicitly, directly or indirectly, prevent or discourage manufacturers or other Android partners (e.g., carriers) from working with Google's GSE, Search Text Ads, or AI Product rivals;

5.      explicitly or implicitly, directly or indirectly, punish or penalize manufacturers or other Android partners (e.g., carriers) that work with Google's GSE, Search Text Ads, or AI Product rivals; or

6.      otherwise use its ownership and control of Android to explicitly or implicitly, directly or indirectly, force or coerce manufacturers or other Android partners (e.g., carriers) to (i) work with Google's GSE, Search Text Ads, or AI Products or (ii) give Google's products and services any better treatment than given Google's rivals' products.

D.      <u>Contingent Structural Relief</u>: In the event the remedies in this Final Judgment prove insufficient to serve their intended purposes of restoring competition or if Google attempts to or is successful in, circumventing these remedies, then the Court may impose additional structural relief, including the divestiture of Android. Five (5) years after entry of this Final Judgment, if Plaintiffs demonstrate by a preponderance of the evidence that either or both monopolized markets have not experienced a substantial increase in competition, then Google shall divest Android unless Google can show by a preponderance of the evidence that its ownership or control of Android did not significantly contribute to the lack of a substantial increase in competition.

E.      <u>No Circumvention of This Section's Purposes</u>: Google may not undertake any action or omission with the purpose or effect of circumventing these provisions or frustrating the purposes of this Section. Complaints regarding non-compliance with this provision will be reviewed in the first instance by the TC in accordance with Paragraph X.C.3 below.

## VI.    REQUIRED DISCLOSURES OF SCALE-DEPENDENT DATA NECESSARY TO COMPETE WITH GOOGLE

The purposes of these remedies are to remove barriers to entry, pry open the monopolized markets to competition, and deprive Google of the fruits of its violations by providing

Competitors access to scale-dependent data inputs—for both search and ads—that would

otherwise provide Google an ongoing advantage from its exclusionary conduct. These remedies

are intended to make this data available in a way that provides suitable security and privacy

safeguards for the data that Google must share. Google is prohibited from using and retaining

data to which access cannot be provided to Qualified Competitors on the basis of privacy or

security concerns.

A.    Google's Search Index:

    1.    Google must provide, at marginal cost, ongoing access to its Search Index to Qualified Competitors such that it is equally available to Qualified Competitors and Google.

    2.    Google must make available, through the Search Index, all content from any Google-owned website, property, or other operated platform (e.g., all Google owned or operated properties such as YouTube) which Google uses in its own Search Index.

    3.    Google must provide the Search Index with latency and reliability functionally equivalent to how Google is able to access its Seach Index.

    4.    Nothing in this Section VI purports to transfer intellectual property rights of third parties to index users.

B.    Publisher Opt-Out: Google must provide online Publishers, websites, and content

creators an easily useable mechanism to selectively opt-out of having the content of their web

pages or domains used in search indexing; used to train or fine-tune AI models, or AI Products;

used in retrieval-augmented generation-based tools; or displayed as AI-generated content on its

SERP, and such opt-out must be applicable for Google as well as for users of the Search Index.

Google must provide for an opt-out specific to itself and each index user on a user-by-user basis

and must transmit all opt-outs to index users in a useable format. Google must offer content

creators on Google-owned sites (all Google owned or operated properties including YouTube)

the same opt-out provided to Publishers, websites, and content creators. Google must not

retaliate against any Publisher, website, or content creator who opts-out pursuant to this
provision.

C.    <u>User-side Data</u>: For the term of this Final Judgment, Google must provide
Qualified Competitors, at no cost, with access to User-side Data on a non-discriminatory basis
while safeguarding personal privacy and security. Any User-side Data that Google collects and
uses as part of any of its products consistent with this Final Judgement can presumptively be
shared with Qualified Competitors consistent with personal privacy and security, as Google is
prohibited from using and retaining data to which access cannot be provided to Competitors on
the basis of privacy or security concerns. Google will have up to six (6) months from the date of
entry of this Final Judgment to implement the technology necessary to comply with this Section
VI, and time period will start once Plaintiffs, in consultation with the TC, determine that the
technology, including security and privacy safeguards, is fully functional. Qualified Competitors
may elect to receive real-time or daily access to the data via an API, data firehose, or data
transfer, or other suitable mechanism that Google makes available to or within its own GSE.

D.    <u>Synthetic Queries</u>: Google must permit, at no cost, Qualified Competitors to
submit synthetic or simulated queries and Google must provide results in the same format as the
results provided in the API required in the Section VII below. The Qualified Competitor will be
entitled to log and use (in any way) Google's results, including ads and anything else that would
appear on a Google SERP. The maximum number of allowable synthetic queries will be
determined by the Plaintiffs in consultation with the TC.

E.    <u>Ads Data</u>: For the term of this Final Judgment, Google must provide Qualified
Competitors, at no cost, with access to all Ads Data on a non-discriminatory basis while
safeguarding personal privacy and security. Any Ads Data that Google collects and uses as part

of any of its products consistent with this Final Judgement can presumptively be shared with

Qualified Competitors consistent with personal privacy and security, as Google is prohibited

from using and retaining data to which access cannot be provided to Competitors on the basis of

privacy or security concerns. Google will have up to six (6) months from the date of entry of this

Final Judgment to implement the technology necessary to comply with this Section VI, and the

time period will start once Plaintiffs, in consultation with the TC, determine that the technology,

including security and privacy safeguards, is fully functional. Qualified Competitors may elect to

receive real-time or daily access to the data via an API, data firehose, or other transfer, or other

suitable mechanism that Google makes available to or within its own GSE.

      F.    <u>No Circumvention of This Section's Purposes</u>: Google may not undertake any

action or omission with the purpose or effect of circumventing these provisions or frustrating the

purposes of this Section. Complaints regarding non-compliance with this provision will be

reviewed in the first instance by the TC in accordance with Paragraph X.C.3 below.

**VII.   REQUIRED TEMPORARY SYNDICATION OF SEARCH RESULTS AND ADS NECESSARY TO BUILD GSE QUALITY AND SCALE OF QUALIFIED COMPETITORS**

      The purposes of the following remedies are to remove barriers to entry, pry open the

monopolized markets to competition, and deprive Google of the fruits of its violations by

enabling Competitors to quickly erode Google's scale advantages, while also providing

incentives for those rivals and entrants to transition to independence. Google may not syndicate

its search results or Search Text Advertising except as allowed by this Section VII or otherwise

approved by Plaintiffs.

      A.    <u>Search Syndication License</u>: Google must take steps sufficient to make available

to any Qualified Competitor, at no more than the marginal cost of this syndication service, a

syndication license whose term will be ten (10) years from the date the license is signed and which makes available all non-advertising components of its GSE, including all organic results and all Search Features, Ranking Signals for those organic results and Search Features, and query understanding information such that a licensee is enabled to display a SERP, understand Google's ranking rationale, and how Google modified or refined the user's query. Google must provide the license on a non-discriminatory basis to any Qualified Competitor and may impose no restrictions on use, display, or interoperability with Search Access Points, including of AI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security. For example, licensees may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose. Google may not place any conditions on how any licensee may use syndicated content under this Paragraph VII.A, nor may Google retain, or use (in any way), syndicated queries or other information it obtains under this Paragraph VII.A for its own products and services. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States.

     1.   <u>Search Syndication License Terms</u>: The search syndication license must have the following additional features:

     a)   Google will make syndicated content available via an API that provides responses with latency and reliability functionally equivalent to what Google provides for its own SERP.

     b)   Syndication will start with significant access to the data required by Paragraph VII.A above and decline over the course of a 10-year period with an expectation that licensees will become independent of Google over time through investment in their own search capabilities. The scope of allowable syndication will be determined by the Plaintiffs in consultation with the TC.

c)      Google may not consent to licensees exceeding syndication limits set by Plaintiffs, and licensees must submit to the TC audits of syndication frequency.

B.    <u>Search Text Ads Syndication License</u>: Google must take steps sufficient to make available to any Qualified Competitor, at no more than the marginal cost of this syndication service, a syndication license whose term will be one (1) year from the date the license is signed and which makes available all components of its Search Text Ads product, including all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) appearing on Google's SERP or available through Google's AdSense for Search. Google must make the purchase of ads syndicated under this Section available to advertisers on a nondiscriminatory basis comparable to Google's other Search Text Ads. For each syndicated ad result, Google must provide to the Qualified Competitor all Ads Data related to the result, provide the license on a non-discriminatory basis, and may impose no restrictions on use, display, or interoperability with Search Access Points, including of AI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security. For example, licensees may elect, in their sole discretion, which queries (some or all) for which they will request syndicated Search Text Ads and which syndication components to display or use and may do so in any manner they choose. Google may not place any conditions on how any licensee may use syndicated content under this Paragraph VII.B. Google may not retain or use (in any way) syndicated queries or other information it obtains under this Paragraph VII.B for its own products and services. For the avoidance of doubt, Google must only provide syndication for queries that originate in the United States.

1.    <u>Ads Syndication License Terms</u>: The ads syndication license must have the following additional features:

    a)    Google must make syndicated content available via an API that provides responses with latency and reliability functionally equivalent to what Google provides for Search Text Ads displayed on its own SERP.

    b)    Licensees may not request syndicated ads for more than 25% of the Search Text Ads they serve for queries originating in the United States. Google may not consent to requests exceeding these syndication limits, and licensees must submit to the TC audits of syndication frequency.

C.    The provisions of this Section VII will have no effect on any existing Google syndication agreements with third parties or on its ability to enter into syndication contracts with third parties other than Qualified Competitors, except that:

1.    Google must permit any entity with an existing syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VII.

2.    Google must comply with Paragraph VII.A for all existing syndication agreements between Google and third-party GSEs by the earlier of two (2) years from the Effective Date or the term of any existing syndication contract.

3.    For any existing or future Google agreements licensing or syndicating any search or search ads products to a Competitor, Google cannot:

    a)    Enforce any provisions restricting use, display, or interoperability with Search Access Points, including of AI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security. For example, licensees may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose.

    b)    Retain or use (in any way) syndicated queries or other information it obtains from Competitors for its own products and services.

D.    <u>No Circumvention of This Section's Purposes</u>: Google may not undertake any action or omission with the purpose or effect of circumventing these provisions or frustrating the purposes of this Section. Complaints regarding non-compliance with this provision will be reviewed in the first instance by the TC in accordance with Paragraph X.C.3 below.

## VIII.    SEARCH TEXT AD TRANSPARENCY AND REDUCTION OF SWITCHING COSTS

The purposes of the following remedies are to reduce entry barriers, afford advertisers better data to inform product choices, and pry open the monopolized markets to competition, including by providing advertisers with information and options providing visibility into the performance and cost of their Google Search Text Ads and by providing the necessary ability to optimize their advertising, including by purchasing Search Text Ads from Google Competitors.

A.    <u>Search Query Report</u>: For each Search Text Ad served or clicked, Google must make available to advertisers at the individual ad level for the preceding 18-month period, data showing the query, keyword trigger, match type, cost-per-click (CPC), SERP positioning, lifetime value (LTV), and any other metric necessary for the advertiser to evaluate its ad performance. This data must be made available through an API that permits advertisers to download raw data in real time, generate reports and summaries, and perform other analytical functions to assess ad spend, ad performance, and in-campaign optimization (including the ability to assess incremental clicks generated by Search Text Ads). This data must also be provided to advertisers through periodic (at least monthly) autogenerated summaries accessible through the Google ads system interface.

B.    <u>Keyword Matching</u>: Google must make available to advertisers a keyword matching option such that, when an advertiser chooses this matching option for a given keyword, the advertiser's ad will be eligible for the ad auction only when a query's content exactly

18

matches with no variation to the keyword selected by the advertiser. This same matching option must also be made available for use with negative keywords.

C.     <u>Access to Data Reports</u>: Google must not limit the ability of advertisers to export in real time (by downloading through an interface or API access) data or information relating to their entire portfolio of ads or advertising campaigns bid on, placed through, or purchased through Google, including data relating to placement or performance (i.e., conversion data).

D.     <u>Search Text Ads Auction Changes</u>: On a monthly basis, Google must provide the TC and Plaintiffs a report outlining all changes made to its Search Text Ads auction in the preceding month, provide (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary, and further identify each change which Google considers material. Plaintiffs have the right to challenge any disclosure they deem inadequate.

E.     <u>No Circumvention of This Section's Purposes</u>: Google may not undertake any action or omission with the purpose or effect of circumventing these provisions or frustrating the purposes of this Section. Complaints regarding non-compliance with this provision will be reviewed in the first instance by the TC in accordance with Paragraph X.C.3 below.

## IX.    LIMITATIONS ON DISTRIBUTION AGREEMENTS AND USER NOTIFICATION OF GSE CHOICES

The purposes of the following remedies are to unfetter the markets from Google's illegal monopolization and deprive it of the fruits of its violations by informing users, including the many users accustomed to Google's default status on their existing Devices and Google Devices, of their competitive choices for GSEs. These remedies are further intended to limit Google's ability to enter into or continue its anticompetitive distribution agreements.

A.     <u>Search Access Points On Non-Apple, Third-Party Devices</u>: Google must not offer or provide anything of value to any Distributor for any form of default, placement, or

preinstallation distribution (including Choice Screens) related to a GSE or Search Access Point on a non-Apple, third-party Device. Google must not take any action that would undermine, frustrate, interfere with, or in any way reduce the ability of the Device or any third-party or preinstalled Search Access Point to be configured to default to or otherwise interoperate with non-Google GSEs or other competitive entrants. For every Google Search Access Point that was preinstalled under a distribution agreement before the date of entry of this Final Judgment, Google must offer the Distributor the option to display a Choice Screen to any user who has Google as their default GSE on that Search Access Point, and for each Device displaying such Choice Screen, receive from Google a fixed monthly payment for the remaining life of the Device or one (1) year, whichever is shorter, equal to the average monthly amount that Google paid to the Distributor for that Device during the shorter of the 12-month period prior to the date of entry of this Final Judgment or the lifetime of the Device. For purposes of this Paragraph, Chrome is a Google Search Access Point until it is divested.

B.    <u>Default GSEs On Non-Apple, Third-Party Search Access Points</u>: Google must not offer or provide anything of value to any Distributor for any form of default, placement, or preinstallation distribution (including choice screens) related to making any GSE a default within a new or existing Search Access Point.

C.    <u>Search Access Points On Google Devices</u>: Google must not preinstall any Search Access Point on any new Google Device. Google must not take any action that would undermine, frustrate, interfere with, or in any way reduce the ability of the Device or any third-party or preinstalled Search Access Point to be configured to default to or otherwise interoperate with non-Google GSEs or other competitive entrants. On new Google Devices, Google may display Choice Screens with Search Access Points of the same type as options. If the user selects

the Google Search Access Point from the Choice Screen, a second Choice Screen must be displayed to determine the default GSE for that Google Search Access Point. For each Search Access Point preinstalled on an existing Google Device before the date of entry of this Final Judgment, Google must (a) implement, through a software update or otherwise, a Choice Screen or (b) cease providing responses from Google's GSE to queries from that Search Access Point. For purposes of this Paragraph, Chrome is a Google Search Access Point until it is divested.

      D.    <u>Google Browsers</u>: Google must display a Choice Screen on every new and existing instance of a Google Browser where the user has not previously affirmatively selected a default GSE for that Google Browser, including by changing the search default through the settings.

      E.    <u>Choice Screen Review By Plaintiffs And The TC</u>: Google must disclose each Choice Screen, the related distribution agreement, if relevant, and its plan for implementing that Choice Screen to Plaintiffs and the TC at least sixty (60) days in advance of the Choice Screen being displayed to any user. Each Choice Screen must provide users with a clear choice between competing products and be designed to not preference Google, to be accessible, to be easy to use, and to minimize choice friction, based on empirical evidence of user behavior. After consultation with a behavioral scientist, the TC will report to Plaintiffs whether each Choice Screen satisfies these requirements, and ultimately Plaintiffs must approve any Choice Screen offered pursuant to this Final Judgment. Plaintiffs, in consultation with the TC, may require modifications to any Choice Screen over time.

      F.    <u>[The following provisions in Paragraph IX.F are proposed solely by the Colorado State Plaintiffs. Plaintiff United States and its Co-Plaintiff States do not join in proposing these remedies.]</u> <u>Public Education Fund</u>: Google will fund a nationwide advertising and education

program designed to inform users of the outcome of this litigation and the remedies in this Final

Judgment relating to GSE choices and disclosures of data. In order to lower the barrier to entry

created by Google's brand recognition (ECF 1032 at 159–60) and to increase the effectiveness of

the Choice Screen remedy, that funding may include reasonable, short-term incentive payments

to users who voluntarily choose a non-Google default GSE on a Choice Screen. The Public

Education Fund's creation and expenditures will be based on predicted outcomes, retrospective

analyses, and testing, which Colorado Plaintiff States will approve after consultation with the

Technical Committee. Nothing in this program will limit the ability of users to change any

Search Access Point or a search default on a Search Access Point, at any time as they choose.

       G.      <u>No Circumvention of This Section's Purposes</u>: Google may not undertake any

action or omission with the purpose or effect of circumventing these provisions or frustrating the

purposes of this Section. Complaints regarding non-compliance with this provision will be

reviewed in the first instance by the TC in accordance with Paragraph X.C.3 below.

## X.     EFFICIENT, EFFECTIVE, AND ADMINISTRABLE MONITORING AND ENFORCEMENT

      The purposes of the following remedies are to ensure the efficient, effective, and

administrable monitoring and enforcement of this decree.

       A.      <u>Technical Committee</u>:

          1.     Within thirty (30) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to assist in enforcement of and compliance with this Final Judgment.

          2.     The TC members must be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, and behavioral science. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless Plaintiffs specifically consent, no TC member:

a)      may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC;

b)      may have been retained as a consulting or testifying expert by any party in this action; or

c)      may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC.

3.      Within seven (7) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google will each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee will serve as chair. The selection and approval process will be as follows:

a)      As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group will identify to Google the individuals they propose to select as their designees to the TC, and Google will identify to Plaintiffs the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Paragraph X.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of selection.

b)      The Plaintiffs will apply to the Court for appointment of the persons selected pursuant to Paragraph X.A.3.a)X.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Paragraph X.A.2 above.

c)      As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") will identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google must not object to these selections on any grounds other than failure to satisfy the requirements of Paragraph X.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of the selection and must be served on the other party as well as on the Standing Committee Members.

d)      The Plaintiffs will apply to the Court for appointment of the persons selected by the Standing Committee Members. If the

Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members will be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by the Standing Committee Members which the parties have failed to resolve among themselves will also be decided by the Court based solely on the requirements stated in Paragraph X.A.2 above.

4. The Standing Committee Members will serve for an initial term of thirty-six (36) months; the remaining members will serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Paragraph X.A.3 above. In the case of the fourth and fifth members of the TC, those members will be re-appointed or replaced in the manner provided in Paragraph X.A.3 above.

5. If Plaintiffs determine that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, or if a member of the TC resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member will select a replacement member in the same manner as provided for in Paragraph X.A.3 above.

6. Promptly after appointment of the TC by the Court, the Plaintiffs will enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google must indemnify each TC member and hold them harmless against any losses, claims, damages, liabilities or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements must include the following:

   a) The TC members will serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the Plaintiffs approve, including the payment of reasonable fees and expenses.

   b) The TC Services Agreement will provide that each member of the TC must comply with the limitations provided for in Paragraph X.A.2 above.

7.      The TC must have the following powers and duties:

a)      The TC will have the power and authority to monitor Google's compliance with its obligations under this Final Judgement.

b)      The TC will have the power to set reasonable data security standards applicable to Qualified Competitors, which will be approved by the Plaintiffs.

c)      The TC will have the power to evaluate Choice Screens and recommend to Plaintiffs whether they comply with this Final Judgment.

d)      The TC may, on reasonable notice to Google:

(1)      interview, either informally or on the record, any Google personnel, who may have counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google;

(2)      inspect and copy any document in the possession, custody, or control of Google personnel;

(3)      obtain reasonable access to any system or equipment to which Google personnel have access;

(4)      obtain access to, and inspect, any physical facility, building or other premises to which Google personnel have access; and

(5)      require Google personnel to provide compilations of documents, data and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct.

e)      The TC will have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Paragraph X.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties.

f)      The TC will receive complaints from Google's Compliance Officer (as described in Section X.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section X.C below.

g)      The TC must report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC.

h)      Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the goals of this Final Judgment, the TC must immediately notify the Plaintiffs in writing setting forth the relevant details.

i)      TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained.

j)      The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Section X.A.2.a-c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgement. The compensation of any person retained by the TC will be based on reasonable and customary terms commensurate with the individual's experience and responsibilities.

k)      The TC must account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs. Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, will constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. Google may, on application to the Court, object to the reasonableness of any such fees or other expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses. On any such application, (a) Google will bear the burden to demonstrate unreasonableness; (b) Google must establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members will be entitled to recover all costs incurred on such application

26

(including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification.

l)  [The following provision in Paragraph X.A.7.l is proposed solely by the Colorado State Plaintiffs. Plaintiff United States and its Co-Plaintiff States do not join in proposing this remedy.] The TC will have the power to implement the Public Education Fund as provided for in Paragraph IX.F above.

8.  Each TC member, and any consultants or staff hired by the TC, must sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC must be treated as Highly Confidential under the Protective Order in this case, and must not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities.

B.  Internal Compliance Officer:

1.  Google must designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment.

2.  Within seven (7) days of the Compliance Officer's appointment, Google must identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the Compliance Officer position, Google must appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the United States, in its sole discretion, after consultation with the Co-Plaintiff States and the Colorado Plaintiff States.

3.  The Compliance Officer must supervise the review of Google activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google.

4.     The Compliance Officer must be responsible for performing the following activities:

a)     within thirty (30) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and employees of Google;

b)     distributing a copy of this Final Judgment to any person who succeeds to a position described in Paragraph X.B.4.a above within thirty (30) days of the date the person starts that position;

c)     ensuring that those persons designated in Paragraph X.B.4.a above are annually trained on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws;

d)     obtaining from each person designated in Paragraph X.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has been advised and understands that his or her failure to comply with this Final Judgment may result in a finding of contempt of court;

e)     maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Paragraph X.B.4.d above has been obtained;

f)     ensuring that all employees, and all new employees, receive a copy of this Final Judgment and receive annual training on compliance with the antitrust laws (the Compliance Officer will be responsible for approving the content, schedule, and scope of delivery of compliance training within Google with respect to: compliance with the decree itself; substantive antitrust laws; and obligations to preserve and produce materials for use in investigations, litigations, or regulatory proceedings);

g)     annually communicating to all employees that they may disclose to the Compliance Officer, without reprisal for such disclosure, information concerning any violation or potential violation of this Final Judgment or the antitrust laws by Google, and establishing a confidential avenue for any employee to report potential violations;

h)     establishing and maintaining the website provided for in Paragraph X.C.2.a below;

      i)     receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section X.C below;

      j)     maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and

      k)     ensuring employees retain all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgement and all complaints received and or action taken by Google with respect to any complaint.

5.     Google must further appoint a senior business executive, who has visibility into any Google entity with obligations under this Final Judgment, who Google will make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered.

6.     Google will retain a licensed attorney in good standing in California to collect documents and interview employees and generally review Google's document retention practices and Google's compliance with its legal discovery obligations. This attorney will be retained for a term no shorter than eighteen (18) months. This attorney (and any team this attorney assembles) will present to the Audit and Compliance Committee (or any successor Board Committee) on the retention of documents and Google's compliance with its discovery obligations.

C.     <u>Voluntary Dispute Resolution</u>:

1.     Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer.

2.     Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment. Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest.

      a)     To facilitate the communication of complaints and inquiries by parties, the Compliance Officer must place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website must provide a mechanism for communicating complaints and inquiries to the Compliance Officer.

b)      Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it.

c)      Within thirty (30) days of receiving a complaint, the Compliance Officer must advise the TC of the nature of the complaint and its disposition. The TC may then take further actions consistent with this Final Judgment, including consulting with Plaintiffs regarding the complaint.

3.      The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment.

a)      The TC must investigate complaints it receives and will consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve complaints informally, the TC will meet with the Compliance Officer to allow Google to respond to the substance of the complaint and to determine whether the complaint can be resolved without further proceedings.

b)      If the TC concludes that a complaint is meritorious, it will advise Google and the Plaintiffs of its conclusion and its proposal for cure.

c)      Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but must not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC will be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment.

d)      The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion.

D.      Compliance Inspection:

1.      Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States will form a committee to coordinate their enforcement of this Final Judgment. Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee.

2.      For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google must permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff:

a)      to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and

b)      to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Google.

3.      Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Plaintiff States' enforcement committee), Google must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

E.      <u>Anti-Retaliation</u>: Google must not retaliate in any form against a person because it is known to Google that the person is or is contemplating:

1.      developing, distributing, promoting, syndicating, using, selling, offering, or licensing any product or service that competes with—or facilitates competition with—a Google-affiliated GSE or a Google-affiliated Search Text Ads product;

2.      filing a complaint related to Google's compliance with this Final Judgment;

31

3.      testifying, assisting, cooperating with, or participating in any manner in an investigation, proceeding, hearing, or litigation related to Google's compliance with this Final Judgment; or

4.      exercising any of the options or alternatives provided for under this Final Judgment.

F.      <u>Anti-Circumvention</u>: Google is enjoined from enforcing or complying with any provision in any existing or future contract, agreement, or understanding which is otherwise prohibited by this Final Judgment.

1.      Google must not (i) engage in any conduct designed to replicate the effect of any behavior found by the Court to violate the Sherman Act; (ii) engage in any conduct substantially similar to conduct prohibited by another Section of this Final Judgment or designed to evade any obligation imposed by this Final Judgment; or (iii) engage in any conduct with the purpose or effect of evading or frustrating the purposes of this Final Judgment, as stated throughout this Final Judgment.

2.      If Google is found liable in any federal court for a violation of the antitrust laws involving GSE or Search Text Ads, the Court may, upon judicial notice of the liability finding, automatically order the structural relief provided for in Paragraph V.D above.

3.      For the avoidance of doubt, the provisions in this Section X.F are worldwide in scope and are applicable to Google's conduct or contracts regardless of where it occurred or purports to apply.

G.      <u>No Circumvention of This Section's Purposes</u>: Google may not undertake any action or omission with the purpose or effect of circumventing these provisions or frustrating the purposes of this Section. Complaints regarding non-compliance with this provision will be reviewed in the first instance by the TC in accordance with Paragraph X.C.3 above.

## XI.    RETENTION OF JURISDICTION AND ENFORCEMENT OF FINAL JUDGMENT

A.      Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for

the modification of any of the provisions hereof (including an order divesting any relevant Google business), for the enforcement of compliance herewith, and for the punishment of any violation hereof. In any motion to modify this Final Judgment, Plaintiffs need not show any change in circumstances, but need only demonstrate that modification is necessary to achieve the ultimate goals of this Final Judgment to restore competition in the monopolized markets. In any action to enforce this Final Judgment, Google must show by a preponderance of the evidence that its actions are in compliance with this Final Judgment.

B.      The Court may act *sua sponte* to issue orders or directions for the construction or carrying out of this Final Judgment, for the enforcement of compliance therewith, and for the punishment of any violation thereof.

C.      This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore the competition the Court found was harmed by Google's illegal conduct.

D.      For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment.

E.      In connection with a successful effort by any Plaintiff to enforce this Final Judgment against Google, whether litigated or resolved before litigation, Plaintiff may request that the Court order Google to reimburse that Plaintiff for the fees and expenses of its attorneys,

as well as all other costs, including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation.

## XII.    EFFECTIVE DATE AND EXPIRATION OF FINAL JUDGMENT

This Final Judgment will take effect thirty (30) days after the date on which it is entered, and Plaintiffs must report the date on which Google has substantially implemented all provisions of this Final Judgment (the "Effective Date"). Unless the Court grants an extension or early termination is granted, this Final Judgment will expire ten (10) years from the Effective Date. This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets. Alternatively, if Google has substantially complied with all terms of this Final Judgment for at least the preceding five (5) years and if Google's Competitors' combined market share in U.S. GSEs, as measured by the six-month moving medians of two industry standards, agreed upon by Google and the Plaintiffs, is greater than 50% (excluding all syndicated queries), Google may petition the Court to terminate this Final Judgment on the grounds that competition in both relevant markets has increased so substantially that this Final Judgment is no longer needed.

## XIII.    THIRD-PARTY RIGHTS

Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever hereunder or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC.

**XIV.  FEES**

Plaintiffs are prevailing parties in this litigation. Google is ordered to pay Plaintiff United States' reasonable attorneys' fees and costs, the Co-Plaintiff States' reasonable attorneys' fees and costs, and the Colorado Plaintiff States' reasonable attorneys' fees and costs.


Date: _____


_____
Judge Amit Mehta
United States District Judge