**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*,<br><br>                        Plaintiffs,<br><br>  v.<br><br>Google LLC,<br><br>                        Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |
| State of Colorado, *et al.*,<br><br>                        Plaintiffs,<br><br>  v.<br><br>Google LLC,<br><br>                        Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

**EXECUTIVE SUMMARY OF DEFENDANT GOOGLE LLC'S**
**<u>PROPOSED FINAL JUDGMENT</u>**

Google today submits its Proposed Final Judgment ("PFJ") pursuant to the Court's Scheduling Order (ECF 1043) and in connection with the Court's August 5, 2024 Opinion holding that certain search distribution and browser default agreements violated Section 2 of the Sherman Act.

It is axiomatic that courts "must be careful to avoid constructions of § 2 which might chill competition, rather than foster it." *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 136 (D.D.C. 2002) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)). "[A]ny dampening of technological innovation," the D.C. Circuit has warned, "would be at cross-purposes with antitrust law." *Id*. at 158 (quoting *United States v. Microsoft Corp*., 147 F.3d 935, 948 (D.C. Cir. 1998)). Accordingly, "[w]hen it comes to fashioning an antitrust remedy, . . . caution is key," as "markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare." *NCAA v. Alston*, 594 U.S. 69, 106 (2021). That could not be more true than here, where consumers and advertisers have benefited for decades from extraordinary innovations and product improvements to Google's search engine and search advertising auction technologies. Or in an environment where remarkable artificial intelligence innovations are rapidly changing how people interact with many online products and services, including search engines.

This Court has recognized that Google's investments and innovations have benefited consumers of its services. The Court found that "Google is widely recognized as the best [general search engine] available in the United States," Op. at 46 (FOF ¶ 126); it "has long been the best search engine, particularly on mobile devices," where the contracts at issue in the case applied, Op. at 199 (citing FOF ¶¶ 126-27); and "Google's partners value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries,"

1

Op. at 199 (citing FOF ¶¶ 126, 133). The Court did *not* find that Google acquired a monopoly in any market through anticompetitive conduct. (Indeed, Plaintiffs never asserted such a claim.) And the Court recognized that Google has "built brand loyalty and recognition by offering a high quality product," Op. at 47 (FOF ¶ 130); and that "[s]earch has changed dramatically over the last 15 years, largely because" of Google's continuing innovations, Op. at 247 (citing FOF ¶ 128).

The D.C. Circuit has recognized that where, as here, Plaintiffs seek sweeping relief, courts "require[] a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of market power." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1230 (D.C. Cir. 2004) (emphasis in original) (citation omitted). And "[a]bsent such causation, the antitrust defendant's unlawful behavior should be remedied by an injunction against continuation of that conduct." *United States v. Microsoft Corp.*, 253 F.3d 34, 106 (D.C. Cir. 2001) (citation omitted). But Plaintiffs and their experts never even attempted to show that, but for Google's allegedly anticompetitive conduct, Google would have lost a single percentage point of market share, much less that Google would not have maintained its market-leading position. A mere inference of causation cannot support the imposition of drastic remedies expressly designed to intervene in the market and prevent Google from competing on the merits for a decade—and eliminate incentives for Google (and its rivals) to innovate and improve search and search ads technologies during the term of any final judgment. *See id*. at 106-07.

In addition to the stringent requirement of causation, this Circuit has imposed other important limitations on the scope of relief that may be ordered to remedy an antitrust violation. Even in the consent decree context, the D.C. Circuit observed that "remedies must be of the 'same type or class' as the violations." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132-33 (1969)). The

D.C. Circuit has also stated that Sherman Act remedies must not be "so expansive as to be unduly regulatory or provide a blanket prohibition on all future anticompetitive conduct." *Massachusetts*, 373 F.3d at 1215-16. After all, "a finding of an offense under the antitrust laws does not invest a court with a license to embark upon a general program of comprehensive control of the defendants' business." *United States v. Nat'l City Lines*, 134 F. Supp. 350, 355 (N.D. Ill. 1955). And the Supreme Court has urged caution in the crafting of antitrust remedies, lest courts inadvertently undercut the core purpose of antitrust law—promoting competition that ultimately enhances the welfare of consumers. *Supra* p. 1.

I.      **Google's Proposed Final Judgment.**

While Google respectfully disagrees with the Court's liability determination, Google's PFJ provides appropriate relief for the Court's holding that certain of Google's contracts are exclusive and violate Section 2 of the Sherman Act. The Court's liability determination covered Google's search engine distribution and promotion agreements with Android mobile device manufacturers and wireless carriers and Google's default search engine agreements with browser developers Apple and Mozilla. The Court concluded that these agreements were exclusive and substantially foreclosed competition in two markets (for general search engines and general search text ads) based on its assessment of the "coverage" of these agreements. The Court did not find that Google's payment for non-exclusive distribution or promotion of Google Search would have been anticompetitive or otherwise unlawful.

Google's PFJ addresses the conduct at issue while still allowing Google and its rivals to compete on the merits, thereby generating benefits for Android partners and browser developers and the consumers that enjoy their products. The PFJ provides that Google could not condition the licensing of the Google Play store or other Google applications on the licensing of its mobile

Search application (or Chrome application even though Chrome was not the subject of any claim in this case). Thus, Android partners would not need to license Google Search (or Chrome) in order to preload Google Play or other Google applications on Android devices, addressing the Court's concerns about device manufacturers' options to preload a rival search engine, including on an exclusive basis. Google's PFJ thereby gives Android partners additional licensing flexibility, while still allowing Google to compete for preinstallation of Google Search on Android devices.

Google's PFJ also prohibits Google from conditioning licensing, payment, or any other form of consideration on an Android partner agreeing not to preload or place rival general search engines or third-party browsers on mobile devices. These provisions directly address the Court's core concerns regarding search engine exclusivity in preload distribution on Android devices; and they go beyond the conduct the Court invalidated—for example, the PFJ also prohibits the exclusive licensing of Chrome, a practice not at issue in the liability phase of the case.

Google's proposal also includes specific provisions addressing generative artificial intelligence chatbot products, in order to allay any concern that Google could employ exclusive distribution agreements to obtain preload of its Gemini Assistant chatbot mobile application (formerly known as Bard). Specifically, Google's PFJ provides that Android partners can license Google Play, Search, and/or Chrome without also licensing Google's Gemini Assistant mobile application. Google's PFJ further prohibits it from conditioning consideration on a partner refraining from the preload of rival generative AI assistive chatbot services. These provisions address the potential for generative artificial intelligence chatbots to become substitutes for general search engines.

With respect to agreements with browser developers, Google's PFJ gives these developers greater flexibility to set rivals as defaults and guarantees annual contestability where a developer chooses to set Google as the default search engine for a particular operating system version of its browser or browsing mode. Specifically, any agreement that results in a browser developer choosing to set Google as the default on any browser built for a particular operating system or for any browsing mode within a browser must be terminable on an annual basis, and browser developers may set different search engines as the default across different browser operating system versions and different browsing modes. These provisions ensure that any browser default agreements are non-exclusive (per the Court's exclusivity determination) and contestable on a regular basis.[1]

Lastly, Google's PFJ has a term of three years rather than the ten-year term proposed by Plaintiffs. The pace of innovation in search has been extraordinary and there is every reason to believe that will continue as developments in artificial intelligence rapidly change online computing products and services. Regulating a fast-changing industry like search with an invasive decree like the one proposed by Plaintiffs would harm competition, innovation, and consumers.

## II. Google's Proposed Final Judgment Complies with Core Principles of Remedies Case Law.

### A. The D.C. Circuit Requires Strict Proof of Causation for Remedies Exceeding the Conduct Adjudged Anticompetitive.

The D.C. Circuit has explained that when extraordinary remedies, including structural relief, are at issue, a significant causal connection is required. *See Microsoft Corp.*, 253 F.3d at 106-07. In particular, when plaintiffs request structural relief, they must provide "a clearer

---

[1] Consistent with this Court's conclusions (Op. at 135) and the relevant geographic market alleged by Plaintiffs, these remedies apply to agreements covering mobile devices and browsers distributed in the United States.

indication of a *significant causal connection* between the conduct and creation or maintenance of the market power." *Massachusetts*, 373 F.3d at 1230 (emphasis in original) (citation omitted). "Absent such causation, the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'" *Microsoft Corp.*, 253 F.3d at 106 (citation omitted).

To state the obvious, the "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." *Microsoft Corp.*, 253 F.3d at 106 (citation omitted). Instead, there must be "a proportionality between the strength of the evidence of the causal connection and the severity of the remedy." *New York*, 224 F. Supp. 2d at 102. Courts must "tailor the relief" in light of "the strength of the causation evidence that established liability." *Id.*; *Microsoft Corp.*, 253 F.3d at 107 (relief "should be tailored to fit the wrong creating the occasion for the remedy"); *see also id.* at 105 (requiring "a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended" (citation omitted)); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (same). This is particularly important in cases, like this one, that do not involve monopoly acquisition but rather monopoly maintenance. In such a case, it has been accepted that "the proper objective of the remedy . . . is termination of the exclusionary acts and practices related thereto which served to illegally maintain the monopoly," rather than market intervention whose purpose is termination of the monopoly itself. *New York*, 224 F. Supp. 2d at 101.

Consistent with these guiding lights, *New York v. Microsoft Corp.* repeatedly rejected remedies that were too far afield from the ultimate liability findings that were affirmed on appeal. The court refused to impose "open-sourcing of [Internet Explorer] or the mandatory auction of

6

Office licenses as remedies," *id.* at 186, and declared plaintiffs' request for broad technical disclosures (which would have enabled "cloning" of Microsoft software) to be an "unjustified divestiture of Microsoft's intellectual property." *Id*. at 177. The court also analogized the forced, royalty-free sharing with rivals of extensive technical information, *id.* at 177-78, open-sourcing of Internet Explorer, *id*. at 186, and mandatory auction of Microsoft Office, *id*., to divestiture, because those proposed remedies would have deprived Microsoft of valuable intellectual property—"one of Microsoft's primary assets," *id*. at 177. The D.C. Circuit affirmed these holdings, to the extent that they were challenged, and reiterated its "concern[] [that] a drastic remedy, such as divestiture, would be inappropriate if Microsoft's dominant position in the operating system market could not be attributed to its unlawful conduct." *Massachusetts*, 373 F.3d at 1231; *see also id*. at 1233.

In connection with the non-settling plaintiff states' request to compel an open-source license to Internet Explorer, the court applied a but-for causation test, holding that the states failed to "establish[] that the present success of [Internet Explorer] is attributable entirely, or even in predominant part, to Microsoft's illegal conduct." *New York*, 224 F. Supp. 2d at 185 n.81; *cf. id*. at 260-62 ("There is no evidence that Java would today possess 'equal footing,' in terms of distribution, with Microsoft, but for Microsoft's anticompetitive conduct."). The rejection of that remedy was upheld on appeal. *Massachusetts*, 373 F.3d at 1233.

Google's PFJ provides more than adequate relief to address this Court's holding of anticompetitive conduct in connection with Google's contracts. Op. at 4. In contrast, Plaintiffs ask this Court to impose unprecedented and sweeping remedies, purportedly to "deny Google the fruits of its statutory violations." ECF 1062 at 2. At the appropriate time, Google will respond in full to Plaintiffs' proposed remedies on factual and legal grounds. It is enough, for now, to note that "the fruits of a violation must be identified before they may be denied." *Massachusetts*, 373

7

F.3d at 1232.  This requires a clear showing of causation—one that Plaintiffs have failed to make. *Supra* pp. 5-8.

  **B.**  **Sherman Act Remedies Must be of the Same "Type or Class" as the Conduct Adjudged Anticompetitive.**

When (as here) a plaintiff seeks a remedy that exceeds the anticompetitive conduct found at trial, "the remedies must be of the 'same type or class' as the violations." *Microsoft Corp.*, 56 F.3d at 1460 (quoting *Zenith Radio Corp.*, 395 U.S. at 132-33); *New York*, 224 F. Supp. 2d at 136. Under this standard, a court may not enjoin "clearly lawful practices . . . simply because they will weaken the antitrust violator's competitive position." *New York*, 224 F. Supp. 2d at 109.  Google's PFJ adheres to these principles.

The *New York* court applied the "type or class" limitation to reject overreaching relief.  The court denied an attempt to broaden the definition of "middleware" to forms of technology not at issue in the liability phase, 224 F. Supp. 2d at 135-37, and refused to fashion remedies to address "'new' bad acts" where they were not of the same type or class as the conduct held to violate the Sherman Act, *id*. at 186.

  **C.**  **The Sherman Act Bars Remedies That Chill Competition or Stifle Innovation.**

When crafting remedies, courts must be "careful to avoid constructions of § 2 which might chill competition, rather than foster it." *New York*, 224 F. Supp. 2d at 136 (quoting *Spectrum Sports, Inc.*, 506 U.S. at 458); *see also id*. at 111 ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." (quoting *Spectrum Sports, Inc.*, 506 U.S. at 458)).  Accordingly, remedies may not "impermissibly threaten[] to interfere with ordinary and legitimate commercial practices inherent" in the defendant's "participation in the . . . industry." *New York*, 224 F. Supp. 2d at 137 (citing

8

*Spectrum Sports, Inc.*, 506 U.S. at 458; *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 728 (1944)).

The Supreme Court has emphatically endorsed the notion that antitrust law should not chill competition or harm consumers. In *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, the Court noted that "[c]ompelling . . . firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest." 540 U.S. 398, 407-08 (2004); *accord Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.) ("Forcing firms to help one another would also risk reducing the incentive both sides have to innovate, invest, and expand."). Thus, "when it comes to the remedy," courts must take care to avoid decrees that "could wind up impairing rather than enhancing competition" and through detailed, court-imposed terms of dealing make judges, who "should never aspire to the role," "central planners." *Alston*, 594 U.S. at 102-03 (citing *Trinko*, 540 U.S. at 408, 415).

*Microsoft* again illustrates the application of these essential principles. There, the *New York* court rejected proposed relief that would have permitted "cloning" of Microsoft's valuable intellectual property, lest it "deny 'Microsoft the returns from its investment in innovation.'" *Massachusetts*, 373 F.3d at 1218-19 (quoting *New York*, 224 F. Supp. 2d at 176). The D.C. Circuit affirmed that determination. *Id*. at 1218-19, 1222. The *New York* court also refused to enter another remedy that would have provided a "windfall" or "subsidy" to Microsoft's competitors, 224 F. Supp. 2d at 244-45, and narrowly tailored a ban on contractual retaliation to avoid "unduly restrict[ing] legitimate business practices," *id*. at 163 (citation omitted); *see also Bausch & Lomb*, 321 U.S. at 728-29 (providing that Congress expressed no "intention to interfere with ordinary commercial practices"). Google's PFJ—by addressing the contract-related holding of the liability

9

phase—applies these well-established precepts, while still allowing Google to compete on the merits to the benefit of consumers.

### D. The Sherman Act Prohibits "Unduly Regulatory" Remedial Measures.

Google's PFJ complies with another maxim of D.C. Circuit case law: "the remedy [must] not [be] so expansive as to be unduly regulatory or provide a blanket prohibition on all future anticompetitive conduct." *Massachusetts*, 373 F.3d at 1215-16 (quoting *New York*, 224 F. Supp. 2d at 171); *see also New York*, 224 F. Supp. 2d at 100 (providing that antitrust relief should not "adopt overly regulatory requirements which involve the judiciary in the intricacies of business management"); *Zenith Radio Corp.*, 395 U.S. at 133. In this regard, the *New York* court warned against remedies that amount to "market engineering." 224 F. Supp. 2d at 261-62; *see also id.* at 189 ("The Court's role is . . . not to engineer a particular market outcome."); *accord Alston*, 594 U.S. at 106 (noting courts' "limitations—as generalists, as lawyers, and as outsiders trying to understand intricate business relationships"). The Supreme Court has shown special sensitivity to the prospect of "continuing supervision of a highly detailed decree." *Alston*, 594 U.S. at 102 (quoting *Trinko*, 540 U.S. at 415). In that circumstance, the Court has warned, "the decrees themselves may unintentionally suppress procompetitive innovation," not least because "[j]udges . . . are neither economic nor industry experts." *Id*. Google's PFJ avoids setting the Court down such a fraught path for years to come.

\*    \*    \*

Google reserves the right to add, remove, or modify provisions of its Proposed Final Judgment. Consistent with the Court's scheduling order governing remedy proceedings, Google will file a Revised Proposed Final Judgment on March 7, 2025. ECF 1043 at 2. Google reserves the right to appeal any final judgment, as well as the Court's underlying liability determination.

Dated: December 20, 2024

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice)*
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213) 2099 Pennsylvania Avenue, NW Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*