**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

## <u>JOINT STATUS REPORT</u>

Pursuant to the Court's Order, ECF No. 1043, as amended by ECF No. 1173, the Parties

submit the following Joint Status Report.

## I.    **Joint Status Update**

The Parties provide the Court with the following joint update on the status of discovery

and request the Court's assistance with the three disputes identified below in the Parties' Position

Statements.

<u>Document Discovery Status</u>

On January 27, 2025, Plaintiffs served Google with their Third Joint Requests for

Production. On February 10, Google provided to Plaintiffs its responses and objections.

On February 13 and 27, the Parties met and conferred but reached impasse and respectfully request the Court's guidance on a dispute related to Plaintiffs' Third Set of Requests for Production. The Parties include position statements regarding this dispute below.

Interrogatories Status

Pursuant to the Court's January 20, 2025 Order, ECF No. 1144, on February 4, Google issued its Third Set of Interrogatories to Plaintiffs. On February 18, Plaintiffs provided to Google their responses and objections. The Parties met and conferred on February 27. The Parties have reached impasse and respectfully request the Court's guidance, and the Parties include position statements regarding this dispute below.

On February 14, Plaintiffs served Google with their Second Set of Joint Interrogatories.

Fact Deposition Status

The Parties will have completed all 40 fact depositions by the end of today.

Expert Discovery Status

Consistent with the Court's scheduling orders, the Parties are working towards exchanging proponent expert reports as scheduled by March 14.

## II.    Plaintiffs' Position Statement Regarding Plaintiffs' Third RFPs, Nos. 7 and 8

As part of the PFJ, Plaintiffs have proposed data sharing remedies that are intended to prevent Google from using its sizable scale and data advantages to keep rivals from competing in the relevant markets. In order to tailor its remedies package to the needs of competition, Plaintiffs seek a list of data fields with a corresponding data dictionary[1] from Google for three categories of user-side data:

---

[1] Plaintiffs seek how each field is defined and used. Per Plaintiffs' request, the "data dictionary should at least: (1) provide field names and descriptions; (2) specify the data types; (3) outline permissible or expected value ranges and formats; (4) describe the purpose or function of each

1. Data used to build the GLUE statistical model(s);

2. Data used to train the RankEmbed model(s); and

3. Data used as training data for GenAI Models used in Search or any GenAI
   Product that can be used to access search.

These data access remedies are critical to address how Google's monopolization of search engines has denied rivals essential data derived from users necessary to improve and innovate products. Plaintiffs' requests, as narrowed, address these data access remedies, and aim to facilitate an efficient presentation to the Court of technical information by providing both parties a base-level understanding of which data fields exist in the datasets at issue.

Defendant's initial proposed final judgment does not include any data sharing remedies, even though this Court found that Google's monopolies benefited from its significant data advantages. As a result, Plaintiffs requested detailed information about Google's data collection that will allow Plaintiffs to more efficiently address Google's defenses. That is, Google has previewed that it will claim that sharing some data is impossible due to privacy concerns. Understanding precisely what data fields Google believes fit into this claim and what they are will be useful for Plaintiffs to focus on for the benefit of the Court in consideration of the appropriate remedy in this case. Indeed, Plaintiffs have asked Google whether it intends to use data field-level critiques of Plaintiffs' data access remedies in its defense of potential data access remedies in this case; Google has refused to answer. Thus, absent relief from the Court, Google

---

field in the model or training process; and (5) identify any transformations, preprocessing, or aggregations that are performed." Exhibit A, Plaintiffs' Third Joint Request for Production of Documents (Jan. 27, 2025).

seeks to wield this information as both a sword and a shield by refusing to provide access to data but also refusing to commit to not using such data in its defense.

Google claims that it is too burdensome to merely identify what user data it collects and uses in three processes. Plaintiffs disagree.

For context, Google collects—per its attorneys' characterization—an "extraordinary" amount of information from users that initially totals "over 100,000 fields" of data. Exhibit B, Google LLC's Responses & Objections to Plaintiffs' Third Joint Request for Production of Documents at 6 (Feb. 10, 2025); Exhibit C, Ltr. From Gloria K. Maier to K. Herrmann at 1 (Feb. 27, 2025). Plaintiffs asked Google, roughly, how many fields these requests would constitute, and Google explained that, for Plaintiffs' request relating to Glue, it would be "several hundred fields," and for RankEmbedBert, it would be "twenty" fields.[2] Plaintiffs have worked diligently to narrow the scope of this request to a very low burden. Google is well capable of providing a list of several hundred data fields, especially in the context of determining how access to those data fields will help enable rivals to overcome Google's years of monopolization.

Finally, Google has argued to Plaintiffs that these requests are somehow both belated yet also duplicative to those made during liability and earlier in the remedies phase. They are not. To be clear, it is well-established that Google does use user-side data to power these search processes, and it is well-established that these are important processes for Google. While Google has produced some documents that describe the use of user-side data in these processes generally, they do not show a definitive and comprehensive list of which user-side data fields are used to power these search processes.

---

[2]    Ex. C at 1. Google has not provided this information for the data used to train and fine-tune Google's various search-related AI models.

For these reasons, Plaintiffs respectfully request that the Court order Google to produce a list of the data fields requested and a corresponding data dictionary.

## III.    Google's Position Statement Regarding Plaintiffs' Third RFPs, Nos. 7 and 8

Plaintiffs seek an order compelling Google to create and produce technical documents regarding training data used for the Glue statistical model (RFP 7(b)), the RankEmbedBERT model (RFP 7(g)), and Google's AI models used for AI Overviews, Circle-to-Search, and the Gemini chatbot (RFP 8).  With the exception of the request related to the Gemini chatbot (RFP 8(d)), Plaintiffs demand data dictionaries detailing the available fields.  In the liability phase, Google provided Plaintiffs an enormous amount of information regarding the Glue statistical model and the RankEmbedBERT model, and in the remedies phase, Google has likewise produced an enormous amount of information regarding the data used to train Google's AI Overviews and the Gemini chatbot.  Plaintiffs' request for still more documentation at this late stage—including the creation of detailed data dictionaries that Google does not maintain in the ordinary course of business—is unreasonable and unduly burdensome.

**Request No. 7:** Request No. 7 seeks a "spreadsheet or similar document sufficient to show all the available fields used for the data used to train or create [certain listed] Google systems," including Glue and RankEmbedBERT, along with a "data dictionary that explains how each field is defined and used."  *See* Ex. A at 3-4.[3]  "This data dictionary should at least: (1) provide field names and descriptions, (2) specify the data types, (3) outline permissible or expected value ranges and formats, (4) describe the purpose or function of each field in the model or training process, and (5) identify any transformations, preprocessing, or aggregations

---

[3] In a February 24, 2025 email from Karl Herrmann, Plaintiffs agreed in written correspondence to narrow the scope of the request to parts (b) and (g), Glue and RankEmbedBERT.

that are performed on the data including any sampling methodology employed to obtain the data set." *Id.*

As Google has previously informed Plaintiffs, Google does not maintain such a document in the ordinary course of business.[4]  Here, the preparation of the spreadsheet requested by Plaintiffs would require Google's ranking engineers to extract the data and then to annotate and explain it in the manner requested by Plaintiffs.  Plaintiffs have provided no justification for this request—particularly at this late stage of discovery and in light of all of the discovery they have already obtained regarding the Glue and RankEmbedBERT systems.

**Request No. 8:** Request No. 8 seeks "technical documentation sufficient to show which User-Side Data is used, any considerations of privacy or privacy-protection mechanisms for this use, and how often this data is refreshed, to (a) train and (b) fine tune" certain models that (in general terms) relate to Google's AI Overview, Circle-to-Search, and Gemini chatbot offerings.  Ex. A at 4-5.  Although Google has produced dozens of technical documents relating to these models, Plaintiffs now take the position that Google's production is insufficient without a list of data fields, accompanied by a data dictionary.  As with Request No. 7, Google does not maintain such a data dictionary, and thus would have to create it.

Plaintiffs have separately served an interrogatory on Google that seeks substantially the same information; specifically, Interrogatory 15 of Plaintiffs' Second Set of Interrogatories requests that Google "[i]dentify what types of search data have been used as training data for" certain models relating to Gemini and AI Overviews.  The Interrogatory further requests that

---

[4] "Rule 34 only requires a party to produce documents that are already in existence," *Alexander v. F.B.I.*, 194 F.R.D. 305, 310 (D.D.C. 2000), the fact that the requested documents  "do[] not presently exist and would have to be created for the purpose of responding to Plaintiff[s'] RFP . . . dooms Plaintiff[s'] RFP," *Wall v. Reliance Standard Life Ins. Co.*, 341 F.R.D. 1, 4 n.2 (D.D.C. 2022).

Google "describe what the dataset consists of including any sampling methodology used to create the dataset and if any anonymization technique was applied," *i.e.*, methodologies that relate to the privacy protections referenced in Request No. 8.[5]  As Google has told Plaintiffs, Google will respond to that interrogatory when it is due on March 17.  Google sees no reason why, on top of that information, Plaintiffs would <u>separately</u> require a data dictionary describing the fields containing any "User-side Data"[6] used for training Google's AI-related models—particularly when the requested information is not maintained in the ordinary course.

Google, moreover, has already provided extensive discovery into the data (including any User-side Data) used to train its AI models.  For example, Google has retrieved and produced "data cards" and other technical summaries relating to the operation and characteristics of the models powering Google's AI functionality.[7]  Google's response to Request No. 8 refers back to

---

[5] The full text of Interrogatory 15 reads: "Identify what types of search data have been used as training data for Gemini V3 AI Pretrained models currently in experimentation and the MAGIT models, including but not limited to (1) Aquarium Magi data, (2) Aqua[r]ium WebAnswers data, (3) Search Sessions data, including QSessions data, and (4) Search Docjoin Metadata, and for each dataset describe what the dataset consists of including any sampling methodology used to create the dataset and if any anonymization technique was applied. For Search Docjoin Metadata data, please describe what constitutes a Docjoin and identify each item contained therein, including but not limited to a description of each metadata field that may appear in a Docjoin whether or not it was selected for training data in the Gemini V3 AI Pretrained or MAGIT models."

[6] Plaintiffs' Requests for Production define "User-Side Data" as a subset of search data.  Specifically, User-Side Data is defined to "mean[] all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. User-side Data may also include data sets used to train or fine-tune Google's ranking and retrieval components, as well as artificial intelligence models used for Google's AI Product."  *See also* ECF No. 1062-1 § III.AA (Plaintiffs' Proposed Final Judgment, containing the same definition).

[7] For example, Plaintiffs' Second Joint Requests for Production, Request No. 9 requests that Google: "Produce documents sufficient to show if and what search log or user-side data Google uses to train or fine-tune its foundation models for a specific application, how the search log or

those documents, *see* Ex. B, at 8, and Plaintiffs have never explained whether (or why) such discovery is somehow deficient.  To the contrary, Plaintiffs have used technical documentation that Google produced to question Google witnesses in deposition regarding the particulars of the extent to which User-side Data is used for training Google's AI technology.

In short, Google has provided substantial discovery into the topics covered by Request No. 8, and, in responding to Plaintiffs' Interrogatory No. 15, Google will provide still more.  There is no basis for compelling yet further discovery at this late stage.

## IV.    Plaintiffs' Position Statement Regarding Google's Third Set of Interrogatories

On February 4, 2025, Google served interrogatories regarding Plaintiffs' Initial Proposed Final Judgment. Although the Court limited it to 30 interrogatories, Google submitted 68 different inquiries, including all subparts. Despite this overreach, Plaintiffs answered all the interrogatories on February 18, 2025. Nine days later, on February 27, the parties met and conferred at which time Google raised concerns with a limited number of Plaintiffs' interrogatory answers. Following that meet and confer, Plaintiffs proposed on March 5—in the interest of efficiency—to refresh its answers to Google's sixty-eight interrogatories following our submission of a Revised Proposed Final Judgment just two days later. Google rejected this offer.

Rather than revise interrogatory answers about a previous version of Plaintiffs' Proposed Final Judgment, it better serves judicial economy to instead refresh the interrogatory answers as they apply to the Revised Proposed Final Judgment. This is especially true given the closeness in

---

user-side data improves or benefits a specific application, and the size, fields, and types of data used in the search log or user-side data sets. The specific applications include: (a) AI Overviews; (b) the Gemini Chatbot; (c) Circle to Search; and (d) the forthcoming 'AI mode,' referenced in Chris Miles' November 14, 2024, deposition."

time between the meet and confer and Plaintiffs' submission of its Revised Proposed Final Judgment. Google will not be prejudiced in any way—indeed their position will be enhanced, as they will receive discovery about the Proposed Final Judgment that Plaintiffs will argue in court.

Therefore, Plaintiffs propose providing a refresh of their interrogatory answers, as applied to the Revised Proposed Final Judgment, by Wednesday, March 12, 2025. This date is in advance of initial expert reports being due and allows time for the parties to have any follow-up meet and confer regarding Plaintiffs' answers.

## V. Google's Position Statement Regarding Google's Third Set of Interrogatories

On November 20, 2024, Plaintiffs served their initial Proposed Final Judgment ("PFJ"). As Google explained before the Court in January, that PFJ was not limited to the distribution of general search services or search text advertising, but instead reached several products and markets that were not the subject of discovery or evidence during the liability phase of this litigation. In addition to being wide-ranging, the PFJ contained vague and ambiguous language, making it impossible for Google and its experts to understand the full extent and intended implementation of Plaintiffs' proposals. To address this concern, Google served a Rule 30(b)(6) deposition notice on Plaintiffs in December. Plaintiffs refused to produce a witness, and at the January status conference, the Court ordered that in lieu of Google's noticed 30(b)(6) deposition, Plaintiffs were required to respond to interrogatories regarding the meaning of their PFJ.

In accordance with the Court's order, Google served 30 interrogatories, and Plaintiffs served their responses and objections on February 18.[8] Plaintiffs' responses were deficient in

---

[8] Plaintiffs' objections and responses are Exhibit D to this JSR.

numerous ways.[9]  Google explained these deficiencies in a meet and confer on February 27, and

Plaintiffs committed to responding to Google early the following week.  Instead, on Wednesday,

March 5, Plaintiffs emailed to inform Google that they would not be providing responses this

week, but would submit revised interrogatory answers "shortly" after submitting their revised

PFJ.  In order to have sufficient time ahead of the expert disclosures due on March 14, Google

instead requested answers by Friday, March 7.  Plaintiffs refused.

Google now respectfully requests that the Court order Plaintiffs to respond in full to each

of the deficiencies addressed below by Monday, March 10 at 5 p.m. Eastern Time.  Plaintiffs

have already had weeks to respond to Google's interrogatories, and their self-help—purportedly

based on the upcoming revisions to their PFJ—was improper.

Plaintiffs' delay in providing complete answers to Google's interrogatories has already

been highly prejudicial to Google; the issues addressed by the interrogatories are critical to

expert reports due in just one week.  Whereas Plaintiffs' experts can simply ask Plaintiffs what is

meant by their vague and ambiguous provisions, Google and its experts have been left with

Plaintiffs' deficient and incomplete interrogatory responses.  Plaintiffs should provide complete

answers to Google's questions immediately so Google's experts can consider them in the few

days remaining before their reports are due next Friday, March 14.

**Interrogatory 5:**  Plaintiffs' claims in this action are limited to U.S. markets and U.S.

conduct.  *See* ECF No. 94 (Am. Compl.) ¶¶ 173-93.  Despite this, Plaintiffs' PFJ is ambiguous

regarding whether the broad prohibitions and requirements are intended to apply outside the

---

[9] On the meet and confer, Google raised additional issues with Plaintiffs' responses beyond those raised below.  Google has limited its requests in this submission to those for which Google needs a response immediately due to the upcoming expert deadline.  Google reserves the right to raise additional deficiencies with Plaintiffs interrogatory responses at a later time.

country.  While some of Plaintiffs' PFJ explicitly limit the requirements to the U.S., *see, e.g.*, Plaintiffs' PFJ Section VII.B ("For the avoidance of doubt, Google must only provide syndication for queries that originate in the United States."), most are silent as to extraterritorial application.  Most confusingly, Plaintiffs' PFJ includes a catch-all anti-circumvention provision that purports to be "worldwide in scope" and to apply "to Google's conduct or contracts regardless of where it occurred."  Plaintiffs' PFJ Section X.F.  That provision seeks to prohibit "any conduct substantially similar to conduct prohibited" by the PFJ or that has the "purpose or effect of evading or frustrating the purposes of" the PFJ.  *Id.*

Given this ambiguity, Interrogatory 5 asked "whether any prohibition or requirement in Sections IV, V, VI, VII, VIII, IX, or X of Plaintiffs' Proposed Final Judgment applies outside the United States (including but not limited to devices sold outside the United States)."  Plaintiffs responded that "None of the prohibitions in Sections IV-X would ***directly*** apply outside the United States, other than any divestiture provisions of Sections V.A or V.B, prohibited investments in Section IV.F, and ***the anti-circumvention provisions throughout the Proposed Final Judgment.***" Ex. D at 6 (emphasis added).

Plaintiffs' response does nothing to resolve the ambiguity, and provides Google no notice as to what conduct outside the United States would in fact be subject to the PFJ.  The stated exception for "anti-circumvention provisions" does not answer, for example, whether a contract with Apple related to Google Search solely on devices sold outside the United States would be "substantially similar to" or "frustrate the purpose of" the prohibition on providing Apple anything of value.  Google needs to know whether such a contract is prohibited by the PFJ so that it can prepare its legal, factual, and expert arguments against such a prohibition.  The same is true for all other prohibitions and requirements within the PFJ.  The Court should require

Plaintiffs to answer fully and completely what conduct outside the United States would be prohibited by their PFJ.

**Interrogatory 7(e) and (f):** Section IV.G of Plaintiffs' PFJ generally relates to "prohibited acquisitions." However, the language of the PFJ is much broader, prohibiting Google from, *inter alia*, "enter[ing] into . . . ***any marketing or sales agreement*** . . . with . . . any company that controls a Search Access Point or query-based AI Product" without prior consent of the United States. This could, by its terms, require pre-approval by the government for any number of marketing or sales agreements with Carrier or OEMs (in that they may "control[] a Search Access Point"), regardless of those agreements' connection to search. Google therefore served an interrogatory asking whether the following conduct would violate any provision of the PFJ:

> e. Google entering the Mobile Services Incentive Agreements with AT&T and T- Mobile, the Mobile Framework Service Agreement with Verizon, or a "Go to Market" Agreement with a third party that is based solely on the level of Android activations achieved through a third party's Android device sales;

> f. Google entering into a marketing agreement with a third party to promote and/or sell any type of Android device, including Google Pixel devices.

Plaintiffs responded "that hypotheticals (e) and (f) ***may*** not violate the Proposed Final Judgment, ***as long as any payments or other value provided are not 'related to a GSE or Search Access Point***.'" Ex. D at 8 (emphasis added). Plaintiffs' response, however, did not make reference to whether such agreements would still need the government's preapproval under Section IV.G. Google therefore asked Plaintiffs to confirm that Section IV.G of Plaintiffs' PFJ does not require preapproval by the government of marketing and sales agreements with Carriers and OEMs. Plaintiffs have not yet provided such confirmation.

**Interrogatory 8:** Section IV.B of the PFJ states that: "Google must not offer or provide anything of value to Apple—or offer any commercial terms—that in any way creates an economic disincentive for Apple to compete in or enter the GSE or Search Text Ad markets."  Similarly, Section IV.A prohibits Google from offering to a third party "payments or other commercial terms that create an economic disincentive to compete in or enter the GSE or Search Text Ad market(s)" in exchange for certain promotion of a GSE or search access point.  Because Plaintiffs did not explain how to determine whether something would "create an economic disincentive" to compete or enter these markets, Interrogatory 8 required Plaintiffs to "state the process and standards under which Google should assess" this question, including:

> a. What economic or other test should be used to determine whether this section is met;
>
> b. What information from actual or potential competitors should be used to determine whether such standard is met, and how will Google gain access to such information;
> c. What level of preparedness to enter the Search or Search Text Ads markets is contemplated of "third parties" or Apple that could experience an "economic disincentive to compete in or enter the GSE or Search Text Ads markets"; and
>
> d. Is there a "materiality" or other threshold for whether a payment creates an economic disincentive.

Plaintiffs' interrogatory response failed to answer any of these questions.  Instead, Plaintiffs' stated that the prohibition in Section IV.B "prohibits ***all*** monetary payments to or the exchange of anything of value with Apple ***for any purpose***"—despite the PFJ's clear text to the contrary (limiting "anything of value" to "creat[ing] an economic disincentive").  Ex. D at 9 (emphasis added).  During the meet and confer, Google pointed Plaintiffs to the text of the PFJ, and asked Plaintiffs to clarify whether this inconsistent reading of the PFJ was intended.  Google also explained that questions (a)-(d) should be answered regardless, because Plaintiffs' response makes clear that the phrase "create an economic disincentive to compete in or enter the GSE or Search Text Ad market" in the PFJ "is intended to modify the term 'other commercial

terms.'" Ex. D at 9. Therefore, Google still needs to know how one would determine whether "other commercial terms" violate this provision of the PFJ. There is no reason Plaintiffs cannot answer this question now, so that Google has fair notice before expert discovery and trial.

**Interrogatory 11:** Section IV.F of the PFJ requires, *inter alia*, Google to divest "any investment, holding, or interest" in "any company that controls a Search Access Point or an AI Product," and "in any technologies, such as AI Products, that are potential entrants into the GSE or Search Text Ads markets or reasonably anticipated competitive threats to GSEs." This provision is unclear as to what "Search Access Points" or "AI Products" currently exist that would be ordered divested and/or prohibited from investment. Google therefore asked Plaintiffs to at least disclose the "name of each entity that today qualifies as a company that controls a Search Access Point or an AI Product." Plaintiffs refused to respond or even provide examples, stating that "there are many companies that have developed AI technology, rendering it impossible for Plaintiffs to give a comprehensive list." Ex. D at 12. This many years into this litigation, that evasion is not tenable. If it is "impossible" for Plaintiffs to disclose such a list today, how could Google be expected to defend against the proposal, much less comply with it if it is ordered. Plaintiffs should provide a comprehensive list of all companies currently known to them that control what they define as a Search Access Point or an AI Product within the meaning of their PFJ.

Google also asked Plaintiffs to identify "each technology that today is a reasonably anticipated competitive threat to GSEs." Plaintiffs again refused to answer, stating that "while AI Products are not meaningful competitive constraints on Google search or search text ads today, various AI Products either in production or available today could become GSE competitors or control Search Access Points in the future." Again, this provides no notice of

which technologies are subject to this PFJ.  Plaintiffs should provide a comprehensive list of all technology, including AI products, that Plaintiffs contemplate by this provision of their PFJ.

**Interrogatory 12:** Interrogatory 12 relates to Plaintiffs' proposed divestiture of Chrome (Section V.A).  Google asked whether and how the proposed Chrome divestiture obligation applies to, *inter alia*, ChromiumOS and ChromeOS.  Plaintiffs responded (on February 18) that they "do not *believe* that the Chrome divestiture in Section V.A would *necessarily* apply to ChromiumOS or ChromeOS, but Plaintiffs *require additional information from remedies discovery* in order to provide a complete response."  Discovery is now over, and there is no reason for further delay.

**Interrogatory 15:** Section V.C of Plaintiffs' PFJ contains a broad prohibition on Google using any Google-owned or operated asset to "*preference* Google's GSE, Search Text Ads, or AI Products."  The PFJ does not define what it means to "preference" Google's GSE, Search Text Ads, or AI Products other than an example that "Google must not use its ownership or control of Android or any other product or service to *disadvantage* Competitors."  Plaintiffs' PFJ Section V.C.  Given the ambiguity regarding what it might mean to "preference" Google or "disadvantage" a competitor, Interrogatory 15 asked Plaintiffs to "[i]dentify with specificity any conduct that you claim Google has engaged in or is engaging in today that is prohibited by the provisions of Section V.C."  Plaintiffs' response listed just four categories of conduct: "Self-preferencing of the Google GSE on user-downloaded Chrome, Agreements to preinstall Google apps on Android phones, Agreements to preset default of Google apps on Android phones, and Gemini interoperability with only Google GSE, Android, and Chrome."

This response is not sufficient to provide Google notice of what current conduct would be prohibited by the "self-preferencing" provisions of Plaintiffs' PFJ.  Plaintiffs do not define "self-

preferencing." It is therefore entirely unclear what is meant by "self-preferencing" of the Google GSE on user-downloaded Chrome, or how preinstallation and default agreements with third parties on Android devices that Google does not own or control could possibly constitute "self-preferencing." Furthermore, their answer refers to "Gemini," a term that could refer to the Gemini application, the family of large language models, or other projects within Google that have at times been referred to as "Gemini." And Plaintiffs failed to explain what specific "Gemini interoperability" they believe violates their proposed prohibition on "self-preferencing." If Plaintiffs believe certain Google conduct today would violate this portion of the PFJ, they should state so clearly and with sufficient particularity to give Google notice of what conduct would be enjoined.

**Interrogatory 29:** Section IX.F of the PFJ—proposed solely by the Colorado State Plaintiffs—would require Google to "fund a nationwide advertising and education program designed to inform users of the outcome of this litigation and the remedies in this Final Judgment relating to GSE choices and disclosures of data." The Colorado State Plaintiffs proposed that this may include "reasonable, short-term incentive payments" to users that "choose a non-Google default GSE on a Choice Screen." That is, under this remedy, Google could be required to pay users who choose a rival. Plaintiffs did not explain how much money their proposal would require Google to pay these users. Therefore, Interrogatory 29 instructed the Colorado State Plaintiffs to specify in dollar amounts what payments were contemplated by this proposal.

The Colorado State Plaintiffs refused to provide a dollar amount, instead stating that they "anticipate [the payments] would be ***relatively small sums*** for a relatively short time period." This response is just as ambiguous as the PFJ's statement that the payments would be

16

"reasonable." The Colorado State Plaintiffs should answer what dollar amount (even if it is a range) they mean by "reasonable" and a "relatively small sum."

## VI.    Plaintiffs' Position Statement Regarding Google's Request to Limit Trial Exhibits

On March 5, 2025, Google indicated that, in its view, each side should be permitted to introduce no more than 200 exhibits in connection with the remedies evidentiary hearing, excluding deposition exhibits, executed contracts, and data files. In response, Plaintiffs indicated that discussing the appropriateness of a cap on exhibits was premature at this stage. That same day, the parties met and conferred but were unable to resolve this dispute.

The Court should decline Google's request to arbitrarily limit the evidence it receives at trial. As we did in liability, Plaintiffs intend to provide comprehensive evidence to aid the Court as it fashions a remedy to address Google's unlawful, persistent monopolies. As an initial matter, the Court did not cap the number of exhibits during liability. Indeed, the Court's extensive findings of fact contained in its 286-page liability opinion reveal the Court's detailed review of the nearly 5,000 exhibits that were admitted into evidence. Notably, while the parties used 652 exhibits at trial and cited to 1,267 exhibits in their proposed findings of fact, approximately 2,500 exhibits—excluding deposition exhibits, executed contracts, and data files—were entered into the evidentiary record. Plaintiffs similarly seek to provide the Court with a complete evidentiary record to aid it in remedying Google's unlawful violations. The number of exhibits required to make this showing to the Court remains to be seen at this time, given where the Parties are in the remedies schedule. We respectfully request that the Court not hamper our ability to do so with the artificially drawn restrictions that Google seeks to impose.

In the alternative, should the Court believe that a limitation on exhibits is appropriate, the details of any such cap is premature at this juncture. Fact depositions conclude today, and the

evidence gleaned during fact discovery will certainly affect Plaintiffs' litigation strategy as to what evidence to present to the Court and how best to present that information. Further, witness lists are not due until March 11, and expert discovery has yet to begin. Although, as Google argues, the number of trial days will limit the amount of exhibits that are used in Court, it should not impact our ability to push in exhibits like the parties did during liability. Those additional exhibits included more than deposition exhibits, executed contracts, and data files.

Ultimately, imposing any artificial restriction on the number of exhibits at this stage creates the unnecessary risk that Plaintiffs will be impaired in our ability to provide comprehensive information for the Court's consideration.

## VII. Google's Position Statement Regarding Google's Request to Limit Trial Exhibits

Google respectfully requests that the Court order that each side may introduce a maximum of 200 exhibits in connection with the upcoming evidentiary hearing, excluding exhibits introduced during a deposition that are introduced into evidence, executed contracts, and data files. A reasonable cap on the number of exhibits introduced by each side follows naturally from the limits that the Court has already established for the evidentiary hearing.

To begin, the Court has limited the parties to a total of 14 days of testimony. *See* ECF No. 1164. It is unlikely that more than 200 exhibits in total will be used within that amount of time, let alone more than the 200 exhibits *per side* that Google has proposed. *See, e.g.*, *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 187-89 (D.D.C. 2018) (noting that "[i]n total," the Court "admitted into evidence … over 120 exhibits" in a case where "there were 23 days of proceedings"). A cap of 200 exhibits per side—excluding exhibits introduced during a deposition that are entered into evidence, executed contracts, and data files—is eminently reasonable given the time allotted for the presentation of evidence. *See, e.g.*, *Brackens v. City & County of San Francisco*, 2023 WL 12035597, at *4-5 (N.D. Cal. July 6, 2023) (ordering the

18

parties "to submit a shortened list of no more than 100 exhibits each" in advance of "a bench trial"); *Sabre Int'l Sec. v. Torres Adv. Enter. Solutions, LLC*, 72 F. Supp. 3d 131, 151 (D.D.C. 2014) (limiting the parties to "100 exhibits").

Furthermore, the Court has ordered a single round of post-hearing submissions, which are due to be filed simultaneously a week after the conclusion of all testimony.  *See* ECF 1164.  As a consequence, the schedule does not currently provide Google with an opportunity to respond to any characterizations Plaintiffs may offer of exhibits that have not been used with a witness.  Capping the number of exhibits is a reasonable case management tool in any event, and it is all the more important under the present circumstances, where Google will have no chance to respond to narration based on a significant number of exhibits "pushed" into the record without a witness.  *See, e.g.*, *AT&T*, 310 F. Supp. 3d at 186-87 (explaining that the Court "generally instructed the parties to seek admission of documents through sponsoring witnesses" because, among other things, "[w]itnesses would be able to contextualize and explain the technical and lengthy documents at issue, which might otherwise be misunderstood or selectively cited in post-trial briefs"); Federal Judicial Center, *Civil Litigation Management Manual* at 101 (3d Ed. 2022) (explaining that courts may consider "controlling the volume of exhibits by limiting their number" and "having counsel redact voluminous exhibits").

Finally, Google is especially susceptible to unfair surprise due to the breadth of the remedies sought by Plaintiffs.  At Plaintiffs' urging, their Revised Proposed Final Judgment will not be filed until today (*i.e.*, fewer than seven weeks before trial and after the close of fact discovery).  And because of Plaintiffs' original projection for the amount of time needed to present their case, the evidentiary hearing will last 14 days, notwithstanding the extraordinary breadth of the remedies sought in Plaintiffs' Initial Proposed Final Judgment.  Against this

backdrop, it is crucial that Plaintiffs be required to make their case for any given remedy through witnesses subject to cross-examination, not through pushing into evidence a large number of exhibits so that they can pick-and-choose which ones to use for the first time in their post-trial submission without opportunity for proper contextualization or witness testimony. *Cf. United States ex rel. Morsell v. NortonLifeLock, Inc.*, 2022 WL 278773, at *4 (D.D.C. Jan. 31, 2022) ("Even a bench trial depends on the processes of the adversarial system."). By capping the number of exhibits at 200 per side, the Court can help ensure the focused presentation of evidence during this unusually compressed and highly consequential proceeding. *See, e.g.*, *AT&T*, 310 F. Supp. 3d at 186 (observing that the Court "did not have the luxury of blanketly admitting a mass of documentary evidence and sorting through it after trial" because "[t]he compressed timeline and novel, complicated nature of the case instead necessitated that [the Court] make individualized rulings on relevance and admissibility").

Dated: March 7, 2025                    Respectfully submitted,

By: _/s/ Karl E. Herrmann_
David E. Dahlquist
Adam T. Severt
Travis R. Chapman
Karl E. Herrmann (D.C. Bar #1022464)
Keane M. Nowlan (D.C. Bar #90028063)
Veronica N. Onyema (D.C. Bar #979040)

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 805-8563
David.Dahlquist@usdoj.gov
Adam.Severt@usdoj.gov

_Counsel for Plaintiff_
_United States of America_

By: ___/s/ Christoper A. Knight___
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Lee Istrail, Assistant Attorney General
Christopher A. Knight, Assistant Attorney
General
Office of the Attorney General, State of
Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com
Christopher.Knight@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: ___/s/ Diamante Smith___
Ken Paxton, Attorney General
Brent Webster, First Assistant Attorney
General
Ralph Molina, Deputy First Assistant
Attorney General
James Lloyd, Deputy Attorney General for
Civil Litigation
Diamante Smith, Assistant Attorney
General, Antitrust Division
Office of the Attorney General, State of
Texas
300 West 15th Street
Austin, Texas 78701
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: ___/s/ Carolyn D. Jeffries___
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney
General
Michael Jorgenson, Supervising Deputy
Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney
General (DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice

455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Brian.Wang@doj.ca.gov
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

Matthew M. Ford
Arkansas Bar No. 2013180
Senior Assistant Attorney General
Office of the Arkansas Attorney General
Tim Griffin
323 Center Street, Suite 200
Little Rock, AR 72201
Matthew.Ford@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney General
Ronald J. Stay, Jr., Senior Assistant Attorney
General
Charles Thimmesch, Senior Assistant
Attorney General
Office of the Attorney General, State of
Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and
Director, Consumer Protection Division
Jesse Moore, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of
Indiana
Indiana Government Center South, Fifth
Floor
302 West Washington Street
Indianapolis, Indiana 46204
Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the
Office of Consumer Protection
Philip R. Heleringer, Executive Director of
the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive
Director of the Office of Consumer
Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of
Kentucky*

Liz Murrill, Attorney General
Patrick Voelker, Assistant Attorney General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
voelkerp@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

Michael Schwalbert
Missouri Bar No. 63229
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov

Phone: 314-340-7888
Fax: 314-340-7981

*Counsel for Plaintiff State of Missouri*

Lynn Fitch, Attorney General
Crystal Utley Secoy, Assistant Attorney
General
Lee Morris, Special Assistant Attorney
General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Crystal.Utley@ago.ms.gov
Lee.Morris@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

Anna Schneider
Special Assistant Attorney General, Senior
Counsel
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Office of the Attorney General, State of
South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549

mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

Joshua L. Kaul, Attorney General
Laura E. McFarlane, Assistant Attorney
General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
mcfarlanele@doj.state.wi.us

*Counsel for Plaintiff State of
Wisconsin*

PHILIP WEISER
Attorney General of Colorado

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney
General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

25

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Matthew Michaloski, Assistant Attorney General
Marie W.L. Martin, Deputy Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mmichaloski@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

TREGARRICK TAYLOR
Attorney General of Alaska

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Fred Nishihira
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324
E-Mail: fnishihira@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawai'i

Rodney I. Kimura
Department of the Attorney General, State
of Hawai'i
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail:  John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Gary Honick
Office of the Attorney General of
Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of
Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of
Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General

100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New
Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New
Hampshire*

MATTHEW PLATKIN
Attorney General of New Jersey

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (973) 648-7819
E-Mail: Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov

ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust
Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North
Dakota*

DAVID YOST
Attorney General of Ohio

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail:
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Robert J. Carlson
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-1014

E-Mail: Robert.carlson@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Cheryl Hiemstra, Special Assistant
Attorney General
Gina Ko, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.Hiemstra@doj.oregon.gov
Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of
Pennsylvania*

DOMINGO EMANUELLI
HERNANDEZ
Attorney General of Puerto Rico
Guarionex Diaz Martinez
Assistant Attorney General Antitrust
Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov
*Counsel for Plaintiff State of Vermont*

JASON S. MIYARES
Attorney General of Virginia

Tyler T. Henry

Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICK BROWN
Attorney General of Washington

Amy Hanson
Senior Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard
East Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

BRIDGET HILL
Attorney General of Wyoming

William T. Young
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*

WILLIAMS & CONNOLLY LLP

John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Susan A. Creighton (D.C. Bar No. 978486)
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
screighton@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*