IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*,<br><br>                      Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>                      Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |
| State of Colorado, *et al.*,<br><br>                      Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>                      Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

**DEFENDANT'S PRE-HEARING BRIEF**

**TABLE OF CONTENTS**

I. PLAINTIFFS' PROPOSED REMEDIES ARE BASED ON AN ERRONEOUS ASSUMPTION ABOUT THE APPROPRIATE OBJECTIVE IN THIS CASE. ................3

II. DIVESTITURE OF CHROME OR CONTINGENT DIVESTITURE OF ANDROID WOULD BE UNPRECEDENTED AND CARRY DEVASTATING CONSEQUENCES. .........................................................................................................5

III. COMPULSORY DATA SHARING AND SYNDICATION FLOUT PRECEDENT, DAMPEN INNOVATION, AND EXPROPRIATE GOOGLE'S TRADE SECRETS. ........................................................................................................7

IV. PLAINTIFFS' ARTIFICIAL INTELLIGENCE AND SELF-PREFERENCING REMEDIES ARE INCOMPATIBLE WITH PRECEDENT AND WOULD THWART INNOVATION. ......................................................................................11

V. THE PROPOSED RESTRICTIONS ON PROMOTIONAL AGREEMENTS WOULD BAR PROCOMPETITIVE AND LAWFUL BUSINESS PRACTICES. .........13

VI. PLAINTIFFS' PROPOSED FINAL JUDGMENT VIOLATES THE DUE PROCESS CLAUSE AND ARTICLE III OF THE U.S. CONSTITUTION. ....................14

Plaintiffs' unprecedented array of proposed remedies would harm consumers and innovation, as well as future competition in search and search ads in addition to numerous other adjacent markets. They bear little or no relationship to the conduct found anticompetitive, and are contrary to the law on antitrust remedies as expounded by the D.C. Circuit in the *Microsoft* cases two decades ago. Their result-oriented purpose is to force consumers, browser developers, and sellers of Android mobile devices to use rival search engines—even though rivals are demonstrably inferior to Google and consumers overwhelmingly prefer Google. This extraordinary market intervention, supposedly necessary to restore user-data scale that rivals were denied by exclusive agreements, is based on a false premise: that Plaintiffs have adduced evidence that any party to a Google distribution agreement wanted to preload a rival or set a rival as a default but did not as a result of an agreement with Google.

The breadth and depth of the proposed remedies risks doing significant damage to a complex ecosystem. Some of the proposed remedies would imperil browser developers and jeopardize the digital security of millions of consumers. Others would impede innovation (and affirmatively harm competition) by expropriating Google's trade secrets through compelled "data sharing"—but Plaintiffs decline to provide the critical details of how this would work, and instead leave themselves (and a "technical committee") to determine the implementation. Other remedies would inhibit Google's pioneering work in generative artificial intelligence (AI) and Google's ability to enter into non-exclusive procompetitive distribution agreements that allow consumers the benefits of these extraordinary AI innovations. Finally, notwithstanding the clear admonition by the D.C. Circuit regarding the proof of causation needed to support antitrust remedies, Plaintiffs nonetheless propose the divestiture of Google Chrome and the potential divestiture of the Android mobile operating system—even though the ownership and design of

these products and technologies (used by billions of users around the world) formed no part of the conduct at issue in this case and their divestiture would raise national security implications given Google's use of these platforms to detect foreign threat activity and malware. In sum, Plaintiffs' proposals—which they seek to impose for 10 years—exceed the bounds of an appropriate decree.

Google's proposed remedies, by contrast, squarely and directly address the Court's findings regarding Google's distribution agreements. These remedies ensure that Android smartphone manufacturers and wireless carriers have unprecedented flexibility in deciding when and how to preload or set a search engine as default across any and all search access points—flexibility that goes far beyond what any court would find necessary to qualify an agreement as non-exclusive. Google's browser remedies address the attributes that, the Court held, made those deals exclusive and ensure that browser access points are contestable on at least an annual basis. Courts regularly conclude that even exclusive distribution agreements lasting only a year do not substantially foreclose competition. Here, Google's proposed remedy ensures that even unquestionably non-exclusive agreements are open for competition annually.

Google's proposed remedies also apply to its distribution of the Gemini app even though Plaintiffs were at pains to argue at trial that generative AI applications were not in the same relevant market as general search engines and irrelevant to any assessment of Google's market power. Regardless, Google has agreed to distribution restrictions on its Gemini application even though none of Plaintiffs' experts suggests that the Gemini app has market power in any market—which is hardly surprising given the significant and expanding competition and innovation that has occurred and continues to flourish in a world ***without any remedies***. In sum, Google's proposed remedies address much more than the specific conduct the Court found to be

anticompetitive in the liability phase of this case and provide rivals the opportunity to innovate and compete on the merits in the future while preserving Google's innovation incentives.

**I.    PLAINTIFFS' PROPOSED REMEDIES ARE BASED ON AN ERRONEOUS ASSUMPTION ABOUT THE APPROPRIATE OBJECTIVE IN THIS CASE.**

Plaintiffs' proposed remedies are based on the incorrect legal premise that because the Court "found that Google unlawfully monopolized the general search services and general search text advertising markets, 'it is the duty of the court to prescribe relief' ***terminating those monopolies*** and preventing their recurrence." ECF 1184 at 4 (emphasis added). That is not a proper remedial objective where, as here, the Court found that (1) a monopoly was unlawfully ***maintained*** instead of unlawfully acquired and (2) "the 'causal connection between [the] exclusionary conduct and [the defendant's] continuing position in the [relevant] market' was established 'only through inference.'" *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 100-01 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc). "Given these circumstances," it is ***not*** "a valid objective for the remedy in this case to actually 'terminate' [the] monopoly." *Id.* at 101. "Rather, the proper objective of the remedy in this case is termination of the exclusionary acts and practices related thereto which served to illegally maintain the monopoly." *Id.*

With respect to the first point, Plaintiffs never alleged that Google unlawfully acquired a monopoly in any market. *E.g.*, ECF 94 § VII; *United States v. Google LLC*, 747 F. Supp. 3d 1, 32 (D.D.C. 2024). Indeed, Plaintiffs and their experts repeatedly disclaimed any argument that Google's monopoly status was achieved through the conduct at issue—which is unsurprising given that the Federal Trade Commission examined the very same Google search distribution practices and closed its investigation without taking any action in 2013.

3

And as to the second point, for liability, the Court applied the more "relaxed" standard for causation, whereby "[c]ourts may infer causation from the fact that a defendant has engaged in anticompetitive conduct that reasonably appears capable of making a significant contribution to maintaining monopoly power." *Google*, 747 F. Supp. 3d at 152-53 (cleaned up) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc)).  Plaintiffs did not establish, and the Court did not find, the "clearer indication of a ***significant causal connection*** between the conduct and creation or maintenance of the market power" required for relief "designed to eliminate the monopoly altogether." *Microsoft*, 253 F.3d at 106 (emphasis in original).  Instead, the Court found that in 2009—***before*** Plaintiffs allege that Google unlawfully maintained a monopoly—"80% of all search queries in the United States already went through Google." *Google*, 747 F. Supp. 3d at 31.  The Court further concluded that Google "has long been the best search engine, particularly on mobile devices"; that "it has continued to innovate in search"; and that its "partners value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries." *Id.* at 144.

Against this backdrop, Plaintiffs never established (or even attempted to establish) how much "scale" other general search engines purportedly would have needed to reverse the lead that Google lawfully achieved prior to the monopoly-maintenance period, let alone that any rival would have obtained that hypothetical additional scale if Google had entered into non-exclusive agreements rather than exclusive ones.  Nor did Plaintiffs prove a but-for world as to what Google's market share might have been absent the conduct at issue.  "Absent such causation, the antitrust defendant's unlawful behavior should be remedied by '***an injunction against continuation of that conduct***,'" not through relief "designed to eliminate the monopoly altogether." *Microsoft*, 253 F.3d at 106 (emphasis added).

4

Last, Plaintiffs' proposed remedy ignores the Supreme Court's admonition that in fashioning an antitrust remedy, "[j]udges must remain aware that markets are more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare." *NCAA v. Alston*, 594 U.S. 69, 106 (2021).  Plaintiffs' proposed remedies, designed to force consumers and market participants to adopt inferior products in the hope that this will enhance competition, turns upside-down the adage that antitrust law is designed to protect competition not competitors.

## II. DIVESTITURE OF CHROME OR CONTINGENT DIVESTITURE OF ANDROID WOULD BE UNPRECEDENTED AND CARRY DEVASTATING CONSEQUENCES.

In seeking the divestiture of Chrome and potential divestiture of Android, Plaintiffs ask this Court to take an unprecedented step.  A divestiture is a form of "structural relief" that cannot be imposed without "a ***significant causal connection*** between the conduct and creation or maintenance of the market power." *Microsoft*, 253 F.3d at 107.  As discussed, however, Plaintiffs did not establish any such connection, and the Court did not find one.  Plaintiffs' prior filings cite no ***monopoly maintenance*** case in which a court broke up a unitary company without a finding of but-for causation.  That is unsurprising because "divestiture is a remedy that is imposed only with great caution" and usually involves "the dissolution of entities formed by mergers and acquisitions" that were deemed unlawful. *Microsoft*, 253 F.3d at 80, 105.  Divestiture would be all the more remarkable here given that "Google developed Android" and "launched Chrome" many years before the alleged monopoly-maintenance period even began. *Google*, 747 F. Supp. 3d at 35.

Plaintiffs' proposed divestiture remedies are also legally impermissible for a number of other reasons.  For example, Plaintiffs seek the divestiture of Chrome—an unquestionably "drastic remedy," *Massachusetts*, 373 F.3d at 1231—despite never having attempted to establish that Google engaged in exclusionary conduct by developing Chrome or setting Google as the

5

default search engine in the browser. *E.g.*, *Google*, 747 F. Supp. 3d at 146 n.11. The same is true of Android, where Plaintiffs tried only claims asserting that two types of contracts—"the RSAs and MADAs"—are "exclusive" deals. *Id.* at 149. Plaintiffs never established that Google's development of Android (or its license of the Android open-source operating system) was exclusionary, and to the extent they advanced theories about compatibility agreements and Google's development of proprietary applications, this Court resolved those claims in Google's favor on summary judgment. *United States v. Google LLC*, 687 F. Supp. 3d 48, 86-88 (D.D.C. 2023). A divestiture would thus violate the cardinal principle that the relief "should be tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107; *see New York*, 224 F. Supp. 2d at 88 ("[T]he mandate of the appellate court requires this Court to fashion a remedy appropriately tailored to the revised liability findings."). Divestiture of a browser or operating system that Google successfully developed through billions of dollars of investments and millions of hours of engineering acumen would unjustifiably punish Google and "shield [its] competitors from the rigors of the marketplace." *New York*, 224 F. Supp. 2d at 185 (refusing to order the "divestiture of two of Microsoft's most valuable assets, IE and Microsoft Office," where "[t]he divestiture provisions serve to directly benefit non-Microsoft operating systems").

While it is sufficient to show that divestiture is legally unsupported, the evidence will also show that a forced sale of Chrome or Android would be extraordinarily destructive. The code base relied on by each of Chrome and Android is deeply intertwined with and dependent on Google's core infrastructure, and the quality and security of both Chrome and Android benefits from extensive interdependencies that Google has developed for nearly two decades. Like other "unitary companies," Google "cannot readily be dismembered of parts of its various operations without a marked loss of efficiency." *Microsoft*, 253 F.3d at 106. A divestiture of Chrome (and

the open-source Chromium project) or Android also raises national security concerns, and would wreak havoc for billions of consumers (who depend on Google's investments in ongoing quality improvements and security updates) and millions of developers (who have built businesses on top of Google's open and innovative browser engine and mobile operating system).

### III.  COMPULSORY DATA SHARING AND SYNDICATION FLOUT PRECEDENT, DAMPEN INNOVATION, AND EXPROPRIATE GOOGLE'S TRADE SECRETS.

Plaintiffs' compelled "data sharing" and "syndication" proposals would require Google to turn over to unspecified "Qualified Competitors" the trade secrets at the core of Google Search and search text ads that the company's employees have worked for decades to develop—that is, the effective divestiture of core elements of Google Search itself.  The proposals would appropriate the "numerous innovations" that the Court heard about at trial and referenced in its opinion, *Google*, 747 F. Supp. 3d at 56, and hand them (along with Google's future search innovations) to competitors for a 10-year period.  Plaintiffs do not cite a single case in which a court has compelled disclosure of such sensitive user or customer data, let alone such sweeping amounts of core intellectual property.

Under Plaintiffs' proposals, Google must make its Search Index available to an undefined set of "Qualified Competitors" at marginal cost—data that includes all ranking signals and quality scores "derived in any part from User-Side Data," how often Google crawls a particular website, and any other attributes or metadata associated with any document in Google's index that a technical committee decides is significant in ranking Google Search results.  ECF 1184-1 at 15.  This provision also requires Google to make available to competitors "databases consisting of information sufficient to recreate Google's Knowledge Graph"—a proprietary feature of Google Search consisting of a compilation of hundreds of billions of facts that Google has painstakingly assembled for over a decade.  *Id.*  But it does not stop there: Google must also

7

turn over all "User-side Data" and "Ads Data" that Google uses to build various models that Google uses to generate search and ads results. *Id.* at 16-17. The data required to be turned over includes a copy of the SERP Google returned in response to each user query, and thus would allow rivals to reverse engineer the algorithms and trade secrets that Google has invested many billions of dollars over decades to improve.

Plaintiffs' proposed search syndication remedy would require Google to license its search results and numerous search features for 10 years at "marginal cost" (making no allowance for the billions of dollars Google has invested in developing them) and to provide "[d]ata sufficient to understand the layout, display, slotting, and ranking of all items or modules on the SERP" (essentially Google's core intellectual property). *Id.* at 18. This would allow competitors to cut and paste Google Search results and call them their own. And it would allow competitors to free ride off Google's current and future trade secrets for purposes of building and improving competing search engines. *Id.* at 18-19; *see also id.* at 24-26. The proprietary methods Google has developed for ranking and displaying search results, as well as the assembly and layout of its vertical search units, are among its essential trade secrets, and "[a]bsent protection for intellectual property, there exists little reason to invest in developing software." *New York*, 224 F. Supp. 2d at 229. This "demand for extensive technical information … would provide an unearned windfall to [Google's] competitors and an unjustified divestiture of [its] intellectual property." *Id.* at 177.

The term "divestiture" is particularly apt here, as the compelled data sharing and syndication proposals "would work a 'de facto divestiture'" of Google's proprietary data and algorithms "and therefore should be analyzed as a structural remedy." *Massachusetts*, 373 F.3d at 1228; *see New York*, 224 F. Supp. 2d at 177-78 ("To require Microsoft to license intellectual

8

property in the absence of a reasonable royalty … constitutes a divestiture of one of [its] most valuable assets."). As discussed above, "structural relief" cannot be imposed without "a ***significant causal connection*** between the conduct and creation or maintenance of the market power," and there is no such connection in the record or the Court's opinion. *Microsoft*, 253 F.3d at 106-07. Notably, Plaintiffs' proposal would require Google to turn over entire categories of data, even absent evidence that another search engine would have received the same type or volume of data if not for the contractual provisions the Court deemed unlawful. This "is a far cry from 'facilitating entry,'" and instead is "nothing more than 'market engineering'" to create conditions that are unmoored from any competitive outcome. *New York*, 224 F. Supp. 2d at 262 (rejecting a "remedy proposal [that] places the Java technology 'on equal footing' with Microsoft's technology" and noting "[t]here is no evidence that Java would today possess 'equal footing,' in terms of distribution, with Microsoft, but for Microsoft's anticompetitive conduct").

Plaintiffs' data sharing and syndication remedies also would facilitate the "cloning" of Google's proprietary innovations, including its Search index and algorithmic models used for ranking search results and conducting ad auctions. These proposals would allow competitors "to 'mimic' the functionality of [Google's] products" and to "develop products that implement [Google's] technology at a far lower cost than [Google] itself since they would have access to all of [Google's] research and development investment." *Massachusetts*, 373 F.3d at 1219 (cleaned up). In addressing these kinds of incentive-warping remedies, the D.C. Circuit concluded that "not even the broad remedial discretion enjoyed by the district court extends to the adoption of provisions so likely to harm consumers." *Id.* The proposals undermine both Google's and rivals' innovation incentives and should therefore be rejected.

9

The perils of "cloning" recognized by the D.C. Circuit and this District apply not only to bit-for-bit copying, but also to the "creation of a piece of software that replicates the functions of another piece of software, even if the replication is accomplished by some means other than the literal repetition of the same source code." *New York*, 224 F. Supp. 2d at 176; *see id.* at 229. As in *New York*, "Plaintiffs seek the disclosure of vast amounts of technical information for purposes of enabling the creation of functional substitutes for various pieces of [Google's] products." *Id.* at 176. And, as in *New York*, Plaintiffs attempt to justify their extreme proposals by invoking "scale," "network effects," and "data feedback loops." ECF 1184-1 at 6; *see, e.g.*, *New York*, 224 F. Supp. 2d at 176. But, as in *New York*, "[t]he result Plaintiffs envision … is not a legitimate goal for the remedy in this case." 224 F. Supp. 2d at 176. Among other things, Plaintiffs' proposals would severely undermine "the protection of intellectual property rights" and thereby deny Google "the returns from its investment in innovation," which "inherently decreases both [Google's] incentive to innovate as well as the incentive for other software developers to innovate." *Id.*; *see Massachusetts*, 373 F.3d at 1230 (proposal that Microsoft be "required to license IE 'royalty-free' is 'on its face inequitable'" (cleaned up)).

The evidence also will show that Plaintiffs' "data sharing" proposals—which contemplate an unprecedented transfer of sensitive data—would imperil the privacy of millions of Americans who use Google Search and millions of businesses that advertise on it. And the record will reflect that Plaintiffs' ill-conceived "syndication" proposals would degrade the quality of Google Search and enable ad fraud. Plaintiffs' Proposed Final Judgment does not grapple with these realities, and "an antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations." *Verizon Commc'ns Inc. v. Law Offices of Curtis*

10

*V. Trinko, LLP*, 540 U.S. 398, 415 (2004); *see also Alston*, 594 U.S. at 102 ("[C]ourts must have a healthy respect for the practical limits of judicial administration.").

## IV. PLAINTIFFS' ARTIFICIAL INTELLIGENCE AND SELF-PREFERENCING REMEDIES ARE INCOMPATIBLE WITH PRECEDENT AND WOULD THWART INNOVATION.

The syndication of search results and ads is far from the only domain that Plaintiffs seek to regulate. Plaintiffs also envision curtailing how Google develops and distributes all manner of generative AI products, notwithstanding their earlier position that "Generative AI systems, like ChatGPT, are not a reasonable substitute for GSEs." ECF 906 ¶ 391. Plaintiffs' proposals to regulate the rapidly evolving field of generative AI for 10 years—including through their overbroad definition of "Search Access Point" and provisions governing "Self-Preferencing"— are contrary to precedent and would deprive consumers of the benefits of innovation.

When a court is asked to adopt "a forward-looking provision, its discretion is necessarily less broad because, without liability findings to mark the way, it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Massachusetts*, 373 F.3d at 1224. The Court made very few findings about generative AI generally or applications such as chatbots and virtual assistants. For example, the Court's 286-page opinion does not mention OpenAI (a company now valued at $300 billion) and only twice references ChatGPT (which by some measures has been the fastest-growing app in history). That is not surprising because Plaintiffs characterized "Generative AI [as] a nascent technology" and argued that "[u]sers have not replaced their use of traditional search with chatbot-based search tools." ECF 906 ¶¶ 393-95. Plaintiffs' own arguments thus show why the Court should not adopt their vague decree, which would place the Court in the untenable position of regulating Google's AI innovations, and which lumps together GSEs as defined by the Court with "Gen AI Products that can retrieve and display information from a GSE." ECF 1184-1 at 6.

11

Plaintiffs' proposed remedies relating to generative AI also run afoul of the principle that "even where the government has proved antitrust violations at trial, the remedies must be of the 'same type or class' as the violations." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (cleaned up).  For example, Plaintiffs did not establish that Google engaged in unlawful "self-preferencing" or anticompetitive conduct that involved "preventing interoperability between" Google services (AI-related or otherwise) and competitors' services on Android devices.  ECF 1184-1 at 13.  And although Plaintiffs alleged in their Complaints that Google engaged in anticompetitive conduct regarding the promotion of Google Assistant, the Court entered summary judgment for Google "to the extent Plaintiffs' claims rest on conduct relating to Google Assistant."  *Google*, 687 F. Supp. 3d at 86; *see* ECF 1184-1 at 6 (defining "Search Access Point" to encompass the Gemini Assistant Application and unspecified other services and subjecting them to the same proposed prohibitions on promotion as Google Search).  Plaintiffs' proposed remedies are directed to services outside of their alleged relevant markets and theories of liability they abandoned or never pursued, and they should be rejected because they are not "crafted to foster competition in the monopolized market in a manner consistent with the theory of liability in this case."  *New York*, 224 F. Supp. 2d at 193; *see id.* at 146 ("[T]he Court is not at liberty to remedy new 'bad' conduct for which no liability has been ascribed.").[1]

---

[1] The various other remedies Plaintiffs have proposed—which range from regulating how publisher data may be used in AI training to which data must be disclosed to advertisers, *e.g.*, ECF 1184-1 at 16, 23-24—should also be rejected for this reason and others.  For example, Plaintiffs' proposed ads-side remedies are unjustified because, among other things, the only exclusionary conduct at issue occurred on the user side in the form of contract provisions deemed exclusive.

## V. THE PROPOSED RESTRICTIONS ON PROMOTIONAL AGREEMENTS WOULD BAR PROCOMPETITIVE AND LAWFUL BUSINESS PRACTICES.

Plaintiffs' proposed prohibitions on agreements to distribute and promote Google Search and "Search Access Points" also sweep too broadly. Plaintiffs acknowledged that their case was about agreements "that require counterparties to set Google as the *exclusive* search default," and that they were not challenging the notion "that distributors may recommend a search engine, set a search default, or preinstall search access points." *Google*, 747 F. Supp. 3d at 172 (emphasis added). Yet Plaintiffs' Proposed Final Judgment seeks to prohibit Google from engaging in all forms of *non-exclusive* distribution, and would thus impermissibly "interfere with ordinary commercial practices" regarding how search engines compete for users. *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 728 (1944).

Plaintiffs contend that the Court can issue a "remedy going beyond a proscription of the specific exclusionary conduct identified in th[e] Court's liability opinion." ECF 1184 at 6. Notably, however, "the related acts must also be 'unlawful' or of the 'same type or class' in order to warrant injunction," and "clearly lawful practices" *cannot* be "enjoined simply because they will weaken the antitrust violator's competitive position." *New York*, 224 F. Supp. 2d at 109 (cleaned up). Moreover, the cases cited by Plaintiffs for this proposition illustrate the point that where "the remedy imposed exceeded the specific anticompetitive conduct, the restrictions were closely related to the anticompetitive conduct." *Id.* at 110. For example, Plaintiffs rely on a case where the defendant unlawfully adopted a "canon of ethics prohibiting competitive bidding," and the court entered an injunction that extended beyond "the precise conduct previously pursued" by prohibiting the defendant "from adopting any official opinion, policy statement, or guideline stating or implying that competitive bidding is unethical." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 681, 697-98 (1978). That prohibition is far more

13

targeted than Plaintiffs' proposal and is more analogous to Google's Proposed Final Judgment, which addresses the "exclusive" aspects of the agreements at issue and also other acts of the same "type or class" that were not addressed by the Court.  Google's proposal thus satisfies "the proper objective of the remedy in this case," *i.e.*, the "termination of the exclusionary acts and practices related thereto which served to illegally maintain the monopoly."  *New York*, 224 F. Supp. 2d at 101.

The evidence will show that Plaintiffs' attempt to bar Google from competing for non-exclusive distribution opportunities would not just harm consumers but also have profound negative consequences for browser developers and smartphone manufacturers and distributors, who will be forced to deliver an inferior product to their customers at a higher price or forgo the payments that fuel their innovations.  Plaintiffs will not be able to salvage their flawed proposal by arguing that forcing Google to sit on the sidelines may benefit rivals, as that would place the "remedy in opposition to the purpose of the antitrust laws," which are "designed to protect 'competition, not competitors.'"  *Massachusetts*, 373 F.3d at 1230 (cleaned up).

## VI. PLAINTIFFS' PROPOSED FINAL JUDGMENT VIOLATES THE DUE PROCESS CLAUSE AND ARTICLE III OF THE U.S. CONSTITUTION.

Plaintiffs' Proposed Final Judgment should be rejected for the independent reason that it lacks specificity and vests excessive authority in Plaintiffs and their proposed technical committee, depriving Google of due process.  For example, Plaintiffs' proposal for the forced disclosure of "User-side Data" would benefit unspecified entities "who meet[] the Plaintiffs' approved data security standards as recommended by the Technical Committee [TC]" and would occur "on a periodic basis to be determined by Plaintiffs in consultation with the TC."  ECF 1184-1 at 7, 17.  Similarly, the *de facto* divestiture of Google's search index would encompass "any other specified signal the TC recommends to be treated as significant to the ranking of

14

search results," *id.* at 15, and the scope of compelled "syndication" of Google's search results and features "will be determined by the Plaintiffs in consultation with the TC." *Id.* at 20.

The Due Process Clause and Article III prohibit a technical committee (or Plaintiffs) from determining Google's obligations on an ongoing basis over Google's objection.  A district court "has no discretion to impose on parties against their will 'a surrogate judge.'" *United States v. Microsoft Corp.*, 147 F.3d 935, 956 (D.C. Cir. 1998).  Yet a "surrogate judge" is exactly what Plaintiffs propose by reserving for themselves and a technical committee the right to engage in "interpretation, not compliance" pursuant to provisions where "the parties' rights must be determined, not merely enforced." *Id.* at 954.  It is not enough to say that decisions made by a technical committee or Plaintiffs could be subject to the Court's review (though that is not contemplated by Plaintiffs' proposed remedy) because "even the temporary subjection of a party to a Potemkin jurisdiction so mocks the party's rights as to render end-of-the-line correction inadequate." *Id*.

The remedies proceeding is Plaintiffs' opportunity to prove they are entitled to each distinct remedy they seek.  But Plaintiffs' Proposed Final Judgment sidesteps the adversarial process through a vaguely defined framework that Plaintiffs promise to build out later.  The lack of specificity by itself is sufficient to reject many of Plaintiffs' proposed remedies. *E.g.*, *New York*, 224 F. Supp. 2d at 137, 191 (concluding a "vague and ambiguous" definition "is at odds with precedent on the subject of antitrust remedies" and "render[s] compliance with the terms of Plaintiffs' remedy which are reliant upon this definition to be largely unenforceable").  When the gaps and ambiguities in Plaintiffs' proposal are combined with a purported delegation of authority to a technical committee or Plaintiffs themselves, the result is unconstitutional.  "Trust us" is not a sound basis for a judicial decree.

Dated: April 14, 2025   Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice*)
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*