# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |

## PLAINTIFFS' REMEDIES PRE-TRIAL BRIEF

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

I.      Remedies Should Pry Open The Markets That Google Unlawfully Monopolized ......2

II.     The Evidence Will Demonstrate That Plaintiffs' Remedies Are Necessary To Satisfy
        *Microsoft*'s Four Objectives ........................................................................................3

        A.      Distribution Remedies ........................................................................ 4

        B.      Structural Remedies ............................................................................ 8

        C.      Data Sharing and Syndication Remedies ......................................... 10

        D.      Advertising Remedies ....................................................................... 13

        E.      The Colorado Plaintiffs' Public Education Fund Remedy ................. 13

        F.      Administration, Anti-circumvention, And Anti-Retaliation Remedies ............... 14

III.    Plaintiffs' Remedies Are Supported By Causation .......................................................14

CONCLUSION ...................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*,
   331 F.3d 918 (D.C. Cir. 2003) ................................................................ 10
*Ford Motor Co. v. United States*,
   405 U.S. 562 (1972) .................................................................... 1, 2, 4, 9
*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
   958 F.3d 1239 (9th Cir. 2020) .................................................................. 4
*Int'l Boxing Club of N. Y., Inc. v. United States*,
   358 U.S. 242 (1959) ................................................................................. 8
*Int'l Salt Co. v. United States*,
   332 U.S. 392 (1947) ................................................................................. 3
*\*Massachusetts v. Microsoft Corp.*,
   373 F.3d 1199 (D.C. Cir. 2004) ....................................................... passim
*N.L.R.B. v. Express Publishing Co.*,
   312 U.S. 426 (1941) ................................................................................. 4
*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978) ................................................................................. 3
*New York v. Microsoft Corp.*,
   531 F. Supp. 2d 141 (D.D.C. 2008) ........................................................ 3
*United States v. E. I. du Pont de Nemours & Co.*,
   366 U.S. 316 (1961) ....................................................................... 2, 8, 10
*Standard Oil Co. of Cal. v. United States*,
   337 U.S. 293 (1949) ............................................................................... 15
*United States v. Am. Tel. & Tel. Co.*,
   552 F. Supp. 131 (D.D.C. 1982) ........................................................... 10
*United States v. Google LLC*,
   2025 WL 880552 (D.C. Cir. Mar. 21, 2025) ......................................... 15
*\*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ........................................................... passim
*United States v. U.S. Gypsum Co.*,
   340 U.S. 76 (1950) ................................................................................... 2
*United States v. United Shoe Mach. Corp.*,
   391 U.S. 244 (1968) ............................................................................. 1, 2
*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   395 U.S. 100 (1969) ................................................................................. 4

**Statutes**

15 U.S.C. § 4 ................................................................................................ 2

## INTRODUCTION

For more than a decade, Google unlawfully froze the general search and general search text advertising ecosystem through anticompetitive exclusive distribution agreements that maintained two monopolies. Google paid carriers, device manufacturers, and independent browsers billions to default their search access points to Google Search, to preinstall and prominently display Google's search access points, and to exclude competitors. Competition in both markets suffered substantially. Google foreclosed the competitive process, deprived rivals of the scale and revenue needed to compete, discouraged rival innovation and entry, and charged text advertisers supracompetitive rates for lower quality products. The breadth, duration, and severity of these harms demand a robust remedy.

The Court is now "charged with inescapable responsibility" to remedy the violation. *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968). The remedy "must" aim to serve four distinct (though overlapping) objectives: "'[1] unfetter [the relevant] market[s] from anticompetitive conduct,' . . . '[2] terminate the illegal monopoly, [3] deny to the defendant the fruits of its statutory violation, and [4] ensure that there remain no practices likely to result in monopolization in the future.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972), and *United Shoe*, 391 U.S. at 250) (citation omitted)).

Plaintiffs' proposed remedies satisfy *Microsoft*'s objectives. The proposed remedies— developed after receiving input from market participants as well as fact and expert discovery— prohibit the anticompetitive distribution agreements and payments. They prohibit similar conduct and likely means of future monopolization (e.g., self-preferencing, retaliation). And they aim to reduce barriers to entry, thereby curbing Google's monopoly power and denying Google the

fruits of its statutory violations. Remedies accomplishing these objectives include, among other things, provisions that open important distribution channels and establish critical data sharing and syndication services.

Google's proposed final judgment, by contrast, falls woefully short of meeting the objectives that the D.C. Circuit identified in *Microsoft*. Google would permit unlawful payments to continue, permit new agreements similar to those that have harmed competition, ensure Google retains the fruits of its violations, and leave open practices likely to result in future monopolization. Underlying Google's anemic proposal is the erroneous theory already rejected by this Court that Google dispensed billions in cash to distributors each year—including to one of its largest potential rivals, Apple—without negatively affecting competition. The evidence has already shown and will continue to show that this theory is meritless.

## I.  Remedies Should Pry Open The Markets That Google Unlawfully Monopolized

Plaintiffs have the "duty" to institute proceedings in equity to "prevent and restrain" Sherman Act violations, including monopolization. 15 U.S.C. § 4. Now that this Court has found that Google's actions "'clearly have a significant effect in preserving [Google's] monopoly,'" Mem. Op. at 216 (quoting *Microsoft*, 253 F.3d at 71), this Court has a duty to "enter that relief it calculates will best remedy the conduct it has found to be unlawful." *Microsoft*, 253 F.3d at 105; *see United Shoe*, 391 U.S. at 250; *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950) (the court has the "duty" to impose a remedy to "cure the ill effects of the illegal conduct, and assure the public freedom from its continuance"). The Court has "broad discretion" to craft an appropriate remedy, *Microsoft*, 253 F.3d at 105, and now that "'the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor.'" *Ford Motor*, 405 U.S. at 575 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961)).

A decree that merely "end[s] specific illegal practices," *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947), without "eliminating the *consequences* of the illegal conduct," *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 698 (1978) (emphasis added), will leave Plaintiffs with having "won a lawsuit and lost a cause," *Int'l Salt*, 322 U.S. at 401. Thus, the Court must order a "comprehensive" and "unitary framework" of remedies with "provisions intended to complement and reinforce each other." *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 170 (D.D.C. 2008).

The proper remedy can and should "go[] beyond a simple proscription against the precise conduct previously pursued." *Prof'l Eng'rs*, 435 U.S. at 698. Indeed, the Court may order "forward-looking provisions" that require or prevent conduct that "played no role in [the] holding [that the defendant] violated the antitrust laws." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1215 (D.C. Cir. 2004).

## II.     The Evidence Will Demonstrate That Plaintiffs' Remedies Are Necessary To Satisfy *Microsoft*'s Four Objectives

Plaintiffs' comprehensive remedies proposal consists of six categories of mutually reinforcing remedies. *See generally* ECF Nos. 1184 and 1184-1. *First*, Plaintiffs propose contractual remedies prohibiting Google from locking up the most efficient forms of distribution on third-party devices and applications. *Second*, to open additional distribution means and to deprive Google of unlawful gains, the proposed remedies require Google to divest Chrome and reserve the right for the Court to require further structural relief, including the divestiture of Android, at a later date if certain conditions are triggered. *Third*, the remedies require Google to share certain search and ads data, and syndicate some search and ads products on terms that will erode Google's unlawfully gained scale advantage and lower barriers to entry. *Fourth*, the remedies aim to restore advertisers' transparency into and control over their ad spend to lower

their switching costs. *Fifth*, the Colorado Plaintiffs propose that the Court require Google to fund a nationwide advertising and education program designed to inform user choices. *Finally*, Plaintiffs propose a Compliance Monitor and Technical Committee (as was done in *Microsoft*) to ensure the proper administration of the Court's final judgment, as well as other remedies aimed at safeguarding against circumvention and retaliation.

These remedies will work together to stop Google's unlawful conduct, deny Google the fruits of its past conduct, prevent recurrence, and restore competition. *See Microsoft*, 253 F.3d at 103. Merely enjoining Google's unlawful conduct without affirmatively restoring the competitive ecosystem and "opening the channels of distribution for rival[s]," *Massachusetts*, 373 F.3d at 1233, would perpetuate Google's unlawfully maintained monopoly. Plaintiffs' trial presentation in support of each remedy is previewed below.

### A.    Distribution Remedies

The natural starting point in this case is a remedy to end the anticompetitive contracts found by the Court to be exclusionary. *Ford Motor*, 405 U.S. at 577–78; *see also In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1264 (9th Cir. 2020), *aff'd sub nom. NCAA v. Alston*, 594 U.S. 69 (2021). The Court further has "'broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed.'" *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969) (quoting *N.L.R.B. v. Express Publishing Co.*, 312 U.S. 426, 435 (1941)). Plaintiffs' proposed distribution remedies will help unfetter the market from Google's violations, reduce barriers to entry, and prevent future monopolization. *Microsoft*, 253 F.3d at 103.

As this Court explained, "Google has thwarted true competition by foreclosing its rivals from the most effective channels of search distribution." Mem. Op. at 202. The evidence will confirm that the distribution harms found by the Court remain insurmountable and that a

thorough response is required. Indeed, the Court will see documentary proof that Google's default and preinstallation contracts continue today and have even, in some instances, begun to cover the nascent potential threat of generative AI.[1]

Generative AI companies and others will explain firsthand how, despite their potential as a nascent future threat to Google Search, Google's agreements continue to insulate Google's monopoly. ████████████ and ████████████████ will detail the lack of distribution opportunities on Android stemming from not just Google's contracts but also its ability to self-preference Google services through the Android operating system. ████████████ will speak of his exhaustive yet fruitless attempts to convince Android distributors, who are beholden to Google, to distribute ████████. Testifying as a corporate representative for ████████ ████████ explains in designated testimony that, effectively blocked from distributing on Android, ██████████████████████████████████ ███████████████████████████████████████████ ███

Google's employees and distributors will tell a similar story. Google executive Peter Fitzgerald will explain that despite this Court's ruling, the 2024 ████████ RSA still requires Google defaults, preinstallations, and placements to earn a revenue share for each search access point. He will also confirm that the Gemini App, Google's generative AI product, now comes

---

[1] *E.g.*, ██████, at ████████ (extending the 2020 ████████ RSA to March 31, 2025); ████████, at -██, -██ (████████ with minimum placement, preinstallation, and default requirements); ████████, at ████████ (offering incentives for ████████ that decrease if ████████ does not preinstall and prominently feature all Google search access points); PXR0269 at -490 (Google document explaining that for generative AI, it "will be important to . . . pre-load[] on the homescreen to increase overall product utilization"); ████████, at -██, ██ (conditioning revenue on ████████ featuring Google's generative AI service in all common access points).

preinstalled on all U.S. ███████ devices. And Google's Neal Pancholi explains in designated

deposition testimony that in response to generative AI companies' attempts to distribute through

typical search access points, Google formulated its own Gemini distribution strategy. Pancholi

(Google) Dep. 96:17–98:19, 110:02–113:11 (discussing PXR0150); *accord* PXR0150, at -407,

-415–16.

     Plaintiffs' remedies also address the unique danger of Google's Mobile Application

Distribution Agreement (MADA). Under the MADA, Google conditioned its "must have" Play

Store on the exclusive distribution of the Google Search App, the Google Search Widget, and

Chrome. Mem. Op. at 210–212. Plaintiffs' proposed remedies prohibit Google from using these

same tactics going forward, including with new "must have" offerings and in response to cutting-

edge technologies. ███████ for example, will explain the need for these provisions to

ensure Google cannot use the Play Store to preempt distribution for third-party generative AI

products on Android. *See also* PXR0160 (showing Google's efforts to increase revenue by

bundling its own on-device generative AI model, Gemini Nano, with the Gemini App on

Android devices, and requiring the Nano model's preinstallation).

     Plaintiffs anticipate Google will mischaracterize Plaintiffs' distribution remedies as an

effort to "prop up" rivals at the expense of distributors, who will receive far less compensation

from Google, and consumers, who will be required to use new or different search engines. That

argument is wrong on all accounts: Plaintiffs' remedies will ignite competition among rivals,

which will benefit distributors and users. Plaintiffs' economics expert, Dr. Tasneem Chipty, will

explain, in accord with precedent, that "any number of competitors may flourish (or not) based

upon the merits of their offerings" under Plaintiffs' remedies. *Massachusetts*, 373 F.3d at 1231.

To be sure, if Plaintiffs' remedies succeed, "a competitor identifiable *ex ante* may benefit but not

because it was singled out for favorable treatment." *Id.* at 1232. Further, with robust competition, distributors and consumers will *benefit*, even while the remedies prohibit Google from bidding for defaults and preinstallation. The evidence will show that Plaintiffs' distribution remedies—when analyzed together with the parallel data and syndication remedies (discussed further below)—will substantially improve rivals, the competitive process, and thus the welfare of distributors and consumers, all in short order. Google's criticism, by contrast, relies on a siloed analysis of Plaintiffs' distribution remedies.

Fact witnesses will corroborate this analysis. In designated testimony, ███████████ from █████ explains the need for at least two viable general-search competitors to enable ██████ to negotiate for more revenue. ███████████████████████████████ ████████████████████████████ Plaintiffs anticipate ████████████ ████████ will offer similar testimony, explaining that ████████ currently has few options, but if general search competition improved, ████████ would have the ability to secure revenue shares more reflective of the value the company provides.

Plaintiffs' behavioral economist, Prof. Antonio Rangel, will testify that one possible solution—choice screens—can help reduce biases in consumer choice in search, at least when evaluated by experts in behavioral science prior to deployment. Nonetheless, he and Dr. Chipty will explain that even well-designed choice screens by themselves are unlikely to be sufficient to undo the significant biases and brand recognition generated by Google's previous defaults.

Further, Dr. Chipty will explain how Plaintiffs' proposed remedies ensure Google retains many legitimate means of competing in general search services and related markets. Under Plaintiffs' proposed remedies, Google may, among other things, (1) pay users directly for general search activity, (2) distribute Google Search through the Google Search App, (3) advertise its

products, including the Google Search App, in app stores and elsewhere, and (4) invest in product quality to encourage users to seek out Google affirmatively and distributors to distribute Google without compensation.

B.    **Structural Remedies**

"[D]ivestiture is a common form of relief in successful antitrust prosecutions: it is indeed 'the most important of antitrust remedies.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 331 (1961)). A Chrome divestiture is amply warranted here as a means of reducing a "major barrier to entry," Mem. Op. at 159; denying Google the fruits of its statutory violation (e.g., a substantial Android Chrome user base obtained by MADAs and RSAs); and ensuring that there remain no practices likely to result in monopolization in the future.

The Court's liability findings already support a Chrome divestiture. Google's ownership of Chrome, in combination with the browser's popularity, has "only fortified [Google's] dominance." Mem. Op. ¶ 83. It "significantly narrows the available channels of distribution and thus disincentivizes the emergence of new competition." Mem. Op. at 159; *cf. Int'l Boxing Club of N. Y., Inc. v. United States*, 358 U.S. 242, 256–57 (1959) (upholding a divestiture in a monopolization case where the divested assets, though lawfully acquired, could be utilized to effectuate anticompetitive conduct). Plaintiffs intend to offer even more evidence during the remedies trial in support of its Chrome divestiture remedy.[2]

Plaintiffs will demonstrate that Chrome is valuable to Google Search and generates significant indirect revenue. Parisa Tabriz, Google's VP of Engineering and General Manager for

---

[2] The circumstances concerning the effect that Android can have on competition are also set forth in the Court's liability opinion. *See, e.g.*, Mem. Op. at 210–12.

Chrome, will confirm at trial that in 2023, Chrome generated $█ billion in indirect revenue, most of which is attributable to Search. PXR0215 at -257; PXR0162 at -901. Based on deposition testimony, Plaintiffs anticipate that Ms. Tabriz will confirm the importance that Google places on its browser. Internal Google documents will show that Chrome is the most widely used browser, with 4.1 billion monthly active users. PXR0216 at -707. Plaintiffs' divestiture expert, David Locala, will add to the evidence supporting Chrome divestiture. He will (1) testify that Chrome is an attractive asset to a divestiture buyer given Chrome's leading market position and immense usership, (2) identify potential revenue opportunities, and (3) explain why Chrome divestiture can be accomplished through established corporate practices. Opening this critical search distribution point will reinforce efforts to pry open the markets and restore competition. *See Ford Motor*, 405 U.S. at 577–78.

The evidence will also show—from a technical perspective—that divesting Chrome is achievable. Prof. James Mickens will explain that Chrome and other mainstream browsers are not deeply integrated and can be separated. Chrome is a standalone piece of software that can operate as a browser without connecting to any cloud services. As a result, the divestiture buyer could decide, for each Google cloud service that Chrome currently uses, whether Chrome would (1) continue to use that service via API keys or proxies, (2) replace that service with an equivalent third-party service, or (3) disable the service entirely. To that end, any assertions by Google's expert Prof. Jason Nieh that Chrome relies on numerous bespoke Google dependencies are misplaced. The Court should also reject Prof. Nieh's assertion that a Chrome divestiture will take at least five years due to the need to remove Chrome's dependencies on Google's data center-side services. The number of dependencies alone do not demonstrate that those

connection points are technically daunting to identify, remove, or modify.[3] In short, this is not a case where structural relief poses "logistical difficulty" of splitting a "unitary compan[y]" in two. *Microsoft*, 253 F.3d at 106.

Finally, the Court should reject any eleventh-hour argument from Google that a divestiture (or any other remedy) will raise national security concerns. National security concerns are the purview of the Executive Branch of the United States, not of a self-interested, publicly traded, private entity, such as Google. *Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 926–27 (D.C. Cir. 2003) ("It is . . . well-established that the judiciary owes some measure of deference to the executive in cases implicating national security, a uniquely executive purview."). At most, such public policy concerns can come into play *only* when a court is "choosing between [multiple] effective remedies"; they are not a reason for rejecting a remedy that is necessary to restore competition, as divestiture is here. *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 150–51 (D.D.C. 1982); *see United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 327–28 (1961). Google's argument is no basis for opposing remedies that would restore competition. Indeed, just as the innovation that followed the breakup of AT&T demonstrated, competition will best secure the United States' national security.

### C.    Data Sharing and Syndication Remedies

Plaintiffs will also show that data sharing and syndication remedies are necessary. When executed well, remedies such as data sharing and syndication (more generally referred to as "pooling" and "interoperability") "can greatly increase the number of competing participants" in a relevant market by acting as a "substitute for scale economies." Phillip E. Areeda et al.,

---

[3] Google's five-year estimate for a potential Android divesture relies on the same unreliably applied and fundamentally flawed methodology.

*Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 653i2 (5th ed. 2022).

As this Court found, "Google's exclusive agreements . . . deny rivals access to user queries, or scale, needed to effectively compete" and, by doing so, "have substantially contributed to . . . anticompetitive market conditions." Mem. Op. at 226, 234. Plaintiffs' proposed data-sharing and syndication remedies are the best means of reducing this barrier to competition. *Massachusetts*, 373 F.3d at 1218 (upholding an API disclosure remedy as a means of "facilitating the entry of competitors"). And given Google's current scale advantage over any rival, which it enhanced through unlawful exclusionary conduct, these remedies are necessary to deny it the "fruits of its statutory violation." *Massachusetts*, 373 F.3d at 1232.

Scale is a "critical input" used "[a]t every stage of the search process" to "directly improve[] quality." Mem. Op. ¶ 90. From the outset, scale is used to understand both what to crawl and how to store that information in an index. Mem. Op. ¶¶ 91–92. Plaintiffs' proposed remedies address this scale harm by requiring Google to provide search index information (including information from Google's Knowledge Graph) without requiring Google to share a copy of or access to the Google index itself. Witnesses from ███████, ████████, and ████████████ will explain how this information is a necessary guide for crawling and indexing effectively.

Another key component of a general search service is its ranking algorithm. Mem. Op. ¶¶ 93–106. User-side data at scale, including clicks, queries, and more, train and refine many of the signals that ranking algorithms use to identify high quality search results. Mem. Op. ¶¶ 87–89, 94, 98. Accordingly, Plaintiffs' proposed remedies require Google to share this user-side data with Qualified Competitors. Witnesses from ████████ and ████████████ will explain to the Court the importance of this remedy and how rivals can use this information to compete with Google.

Plaintiffs have proposed similar data-sharing remedies for the ads side of Google Search. As this Court recognized, scale "improves search ads monetization"—and thus the ability to compete—by enabling ads algorithms to select higher quality, more relevant ads, improving predicted and actual click-through rates and thus improving per-query and per-impression revenue. Mem. Op. at 230. Google's own witnesses and documents will corroborate these findings. *E.g.*, PXR0246 at -156, -164. Plaintiffs' proposed remedies will address these harms by requiring Google to share data inputs used to train Google's auction and prediction models.

Even the best data-sharing remedies will not improve competition overnight. Witnesses from ████ and ██████ will explain how using data to develop a high-quality service takes time—meaning that rivals need syndication services to enter the markets and meaningfully compete in the short run. *See* ██████ ███████████████████████ ███████████████████████████████████████ ███████████████████████████ Plaintiffs' remedies require these services on both the organic and ad sides, with variations designed to reflect inherent differences in those services. The evidence will show how, when implemented properly, organic and ad syndication can encourage competition and innovation. Evidence will show Japan as an example of a geography where a Google syndication product not offered in the United States has supported competition and innovation in both the advertising and search markets. *See, e.g.*, ██████ at -██, -██ (describing a ████████ syndication agreement with Google).

The evidence and testimony will also undermine Google's purported concern that the data and syndication remedies will discourage innovation by giving too much to rivals. First, the Court will hear how, even accepting Google's view of the facts, rivals will nonetheless have incentives to invest to differentiate themselves from each other and Google, and how Google will

retain the incentive to invest to avoid falling behind. *Antitrust Law* ¶ 653i2 (endorsing data-sharing remedies and explaining how, with those remedies, "[s]earch engines could continue to compete in search algorithms or other features"). Second, the Court will hear how the reverse engineering that underpins most of Google's concern is overstated and impractical. Third, the Court will hear how Plaintiffs' proposed remedies contain provisions safeguarding against these incentive concerns by requiring that any rival seeking data or syndication services demonstrate a "plan to invest and compete" in a relevant market; requiring rivals to achieve independence by tapering down the organic syndication services they use; and allowing Google to set any non-discriminatory price it wants for ad syndication services.

### D. Advertising Remedies

Plaintiffs' proposed remedies include additional ad-specific transparency and control remedies designed to unfetter the ad market from Google's conduct, reduce barriers for competition, and deny Google the fruits of its violations. In particular, these remedies will require Google to include important information in search query reports, ensure Google permits advertisers to export information for use in non-Google optimization systems, provide advertisers with additional control over the Google auctions they enter through keyword selections, and require disclosure of material auction launches relevant to advertisers' optimization strategies. Documents and testimony from both Google and third parties will show that these remedies will not only remediate the specific harms the Court identified, *see* Mem. Op. at 263–264 (SQRs, keyword matching, auction transparency), but also reduce advertiser switching costs and increase competition in the advertising market.

### E. The Colorado Plaintiffs' Public Education Fund Remedy

The Court found inertia, habit, and brand recognition insulate Google from competition. Mem. Op. at 26, 157. Colorado Plaintiffs propose a public education remedy to address these

barriers. Professor Michael Luca will explain how (i) a well-designed campaign would inform users about changes in the marketplace resulting from this case and how to best choose the general search engine best for them and (ii) short-term incentive payments can encourage users to test and experience other search engines, further advancing informed choice.

### F.    Administration, Anti-circumvention, And Anti-Retaliation Remedies

Finally, Plaintiffs will offer evidence that corroborates the need for a Technical Committee to help administer the remedies. For example, Prof. Evans will explain the importance of the Technical Committee to ensure that Google's data is shared with adequate privacy safeguards. Plaintiffs will also offer evidence demonstrating the need for anti-circumvention and anti-retaliation remedies to prevent Google from undermining the remedies by taking new routes of "monopolization in the future." *See Microsoft*, 253 F.3d at 103.

## III.    Plaintiffs' Remedies Are Supported By Causation

Recycling a failed tactic from the liability trial, Google likely will once again insist that Plaintiffs satisfy a but-for test—this time permitting nothing more than trivial remedies unless Plaintiffs show but-for causation by identifying a precise but-for world that differs substantially from today. And even then, Google would require that any remedies achieve no more than the but-for world. The law contains no such requirement. *Microsoft*, 253 F.3d at 79 ("[N]either plaintiffs nor the court can confidently reconstruct . . . a world absent the defendant's exclusionary conduct.").

Google's argument has two major flaws. First, Google wrongly demands this but-for causation standard for virtually all remedies, excepting only narrow prohibitions on conduct found unlawful. The D.C. Circuit, by contrast, has "singled out" only structural remedies (and their analogues) for this modified standard. *Massachusetts*, 373 F.3d at 1234; *see also id.* at

1207–34 (discussing many forms of relief, with reference to causation only while analyzing a remedy akin to structural relief).

Second, even for structural remedies, the causation standard is lower than the but-for standard Google demands. But-for requirements have been repeatedly rejected in antitrust matters because they are nearly impossible to satisfy. *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 309–10 (1949) (explaining that a but-for standard is, "if not virtually impossible to meet, at least most ill-suited for ascertainment by courts"). Rather, the heightened causation standard for structural remedies requires—relative to the liability causation standard—only a "'clearer indication of a significant causal connection'" between the anticompetitive conduct and the maintenance of monopoly. *Microsoft*, 253 F.3d at 106 (emphasis omitted). That is not but-for causation. And indeed, this Court's liability findings already satisfy this heightened standard.[4]

## CONCLUSION

Comprehensive remedies are necessary to restore the competition lost by Google's unlawful durable monopolies in general search services and general search text ads. Plaintiffs look forward to engaging with the Court on their proposed remedies at trial.

---

[4] *E.g.*, Mem. Op., *United States et al. v. Google LLC*, 20-cv-3010 (APM), ECF No. 1032 ("Mem. Op."), at 202 ("The exclusive distribution agreements thus have significantly contributed to Google's ability to maintain its highly durable monopoly."), 216 ("[Google's] agreements 'clearly have a significant effect in preserving [Google's] monopoly.'"), 234 ("The exclusive distribution agreements have substantially contributed to . . . anticompetitive market conditions."), 237 ("[Google's agreements have] contributed significantly to [a] lack of new investment."), 265 ("Google's exclusive distribution agreements substantially contribute to maintaining its monopoly in the general search text advertising market."); *see also United States v. Google LLC*, 2025 WL 880552, at *3 (D.C. Cir. Mar. 21, 2025) ("[T]he district court found it 'unquestionabl[e]' that revenue-sharing payments from Google to Apple 'significantly contribut[e] to keeping Apple on the sidelines of search, thus allowing Google to maintain its monopoly.'" (quoting Mem. Op. at 242)).

Dated: April 14, 2025

Respectfully submitted,

_/s/ Karl E. Herrmann_

Abigail A. Slater
Assistant Attorney General
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Roger P. Alford
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Mark H. Hamer
Deputy Assistant Attorney General
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

David E. Dahlquist
Adam T. Severt
R. Cameron Gower
Veronica N. Onyema (D.C. Bar #979040)
Diana A. Aguilar Aldape
Sarah M. Bartels (D.C. Bar #1029505)
Travis R. Chapman (D.C. Bar #90031151)
Grant Fergusson (D.C. Bar #90004882)
Kerrie J. Freeborn (D.C. Bar #503143)
Meagan M. Glynn (D.C. Bar #1738267)
Karl E. Herrmann (D.C. Bar #1022464)
John J. Hogan
Ian D. Hoffman
Elizabeth S. Jensen
Ryan T. Karr
Claire M. Maddox (D.C. Bar #498356)
Michael G. McLellan (D.C. Bar #489217)
Keane M. Nowlan (D.C. Bar #90028063)
Andrew R. Tisinger (D.C. Bar #90018455)
Sara Trent
Jennifer A. Wamsley (D.C. Bar #486540)
Catharine S. Wright (D.C. Bar #1019454)

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 805-8563
David.Dahlquist@usdoj.gov
Adam.Severt@usdoj.gov

_Counsel for Plaintiff_
_United States of America_

By:    /s/ Christoper A. Knight
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Lee Istrail, Assistant Attorney General
Christopher A. Knight, Assistant Attorney
General
Office of the Attorney General, State of
Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com
Christopher.Knight@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By:    /s/ Diamante Smith
Ken Paxton, Attorney General
Brent Webster, First Assistant Attorney
General
Ralph Molina, Deputy First Assistant
Attorney General
Austin Kinghorn, Deputy Attorney General
for Civil Litigation
Diamante Smith, Assistant Attorney
General, Antitrust Division
Office of the Attorney General, State of
Texas
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1162
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By:    /s/ Carolyn D. Jeffries
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney
General
Michael Jorgenson, Supervising Deputy
Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney
General (DC Bar No. 1600843)
Office of the Attorney General

California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

Matthew M. Ford
Arkansas Bar No. 2013180
Senior Assistant Attorney General
Office of the Arkansas Attorney General
Tim Griffin
323 Center Street, Suite 200
Little Rock, AR 72201
Matthew.Ford@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney General
Ronald J. Stay, Jr., Senior Assistant
Attorney General
Charles Thimmesch, Senior Assistant
Attorney General
Office of the Attorney General, State of
Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and
Director, Consumer Protection Division
Jesse Moore, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of
Indiana
Indiana Government Center South, Fifth
Floor
302 West Washington Street
Indianapolis, Indiana 46204
Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the
Office of Consumer Protection
Philip R. Heleringer, Executive Director of
the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive
Director of the Office of Consumer
Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of
Kentucky*

Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
nachabea@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

Michael Schwalbert
Missouri Bar No. 63229
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888

Fax: 314-340-7981

*Counsel for Plaintiff State of Missouri*

Lynn Fitch, Attorney General
Crystal Utley Secoy, Assistant Attorney
General
Lee Morris, Special Assistant Attorney
General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Crystal.Utley@ago.ms.gov
Lee.Morris@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

Anna Schneider
Special Assistant Attorney General, Senior
Counsel
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant
Deputy Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Office of the Attorney General, State of
South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

Joshua L. Kaul, Attorney General
Laura E. McFarlane, Assistant Attorney
General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
mcfarlanele@doj.state.wi.us

*Counsel for Plaintiff State of Wisconsin*

PHILIP WEISER
Attorney General of Colorado

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney
General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Matthew Michaloski, Assistant Attorney General
Marie W.L. Martin, Deputy Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mmichaloski@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

TREGARRICK TAYLOR
Attorney General of Alaska

Jeff Pickett
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5100
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Fred Nishihira
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324
E-Mail: fnishihira@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawai'i

Rodney I. Kimura
Department of the Attorney General, State
of Hawai'i
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail: John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Gary Honick
Office of the Attorney General of
Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
ghonick@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of
Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of
Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General

100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New
Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New
Hampshire*

MATTHEW PLATKIN
Attorney General of New Jersey

Isabella R. Pitt
Deputy Attorney General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (973) 648-7819
E-Mail: Isabella.Pitt@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov

ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust
Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North
Dakota*

DAVID YOST
Attorney General of Ohio

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail:
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Robert J. Carlson
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-1014

E-Mail: Robert.carlson@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Cheryl Hiemstra, Special Assistant
Attorney General
Gina Ko, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.Hiemstra@doj.oregon.gov
Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of
Pennsylvania*

DOMINGO EMANUELLI
HERNANDEZ
Attorney General of Puerto Rico
Guarionex Diaz Martinez
Assistant Attorney General Antitrust
Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902
Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov
*Counsel for Plaintiff State of Vermont*

JASON S. MIYARES
Attorney General of Virginia

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street

Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICK BROWN
Attorney General of Washington

Amy Hanson
Senior Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard
East Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

BRIDGET HILL
Attorney General of Wyoming

William T. Young
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*