# ATTACHMENT 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>GOOGLE LLC, )<br>)<br>Defendant. )<br>) | Case No. 20-cv-3010 (APM) |
| STATE OF COLORADO et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>GOOGLE LLC, )<br>)<br>Defendant. )<br>) | Case No. 20-cv-3715 (APM) |

**[PROPOSED] AMICUS CURIAE BRIEF
IN SUPPORT OF NO PARTY**

Dated: April 22, 2025

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Email:  jmalioto@aliotolaw.com
  twallace@aliotolaw.com

[Additional Counsel Listed on Last Page]

Counsel for Amici Curiae

1

**CORPORATE AND FINANCIAL DISCLOSURE STATEMENT**

I, the undersigned, counsel of record for amici curiae, Plaintiffs *in California Crane School v. Google, et al.,* Case No. 21-cv-10001 (N.D. Cal.), on Appeal Case No. 24-4604 (9th Cir.), and *Mary Katherine Arcell, et al. v. Google, LLC, et al*., Case No. 22-cv-02499 (N.D. Cal.) ("Amici Plaintiffs"), pursuant to D.C. District Court Local Rule 7(o)(5) and Fed. R. App. P. 26.1, certify that Amici Plaintiffs have no parent corporation and there is no publicly held corporation that owns 10% or more of their stock.

**STATEMENT OF COUNSEL**

In accordance with Local Rule 7(o) and Fed. R. App. P. 29(a)(4)(E), the Amici Plaintiffs certify that (1) this brief was authored entirely by its counsel and not by counsel for any party in the above-captioned dispute, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from amicus curiae and its counsel, no other person contributed money to fund preparing or submitting this brief.

# TABLE OF CONTENTS

**CORPORATE AND FINANCIAL DISCLOSURE STATEMENT** ......................................................... i
**STATEMENT OF COUNSEL** ................................................................................................................. i
**TABLE OF AUTHORITIES** ................................................................................................................ iii
**INTRODUCTION** .................................................................................................................................. 1
**IDENTITY AND INTEREST OF AMICI CURIAE** ............................................................................ 1
**STATEMENT OF AMICI CURIAE** ..................................................................................................... 3
   **Proposed Remedy** .............................................................................................................................. 6
      *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911) ................................................... 6
      *United States v. AT&T*, 552 F. Supp. 131 (1982) ................................................................................ 8
**CONCLUSION** ....................................................................................................................................... 9

## TABLE OF AUTHORITIES

**Cases**

*Citizen Publishing v. United States*,
  394 U.S. 131 (1969) ............................................................................................................... 5

*Dist. of Columbia v. Potomac Elec. Power Co.*,
  826 F. Supp. 2d 227, 237 (D.D.C. 2011) ............................................................................... 3

*Jin v. Ministry of State Sec.*,
  557 F. Supp. 2d 131 (D.D.C. 2008). ................................................................................. 3, 4

*Palmer v. BR of Georgia*,
  498 U.S. 46 (1990) ................................................................................................................. 5

*Standard Oil Co. of New Jersey v. United States*,
  221 U.S. 1 (1911) ............................................................................................................... 6, 7

*Swift v. United States*,
  196 U. S. 375 (1905) .............................................................................................................. 8

*United States v. AT&T*,
  552 F. Supp. 131 (1982) ........................................................................................................ 9

**Statutes**

Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. Sections 1, 2 ........................................ 4

Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. Sections 15, 26 ................................... 4

iv

## INTRODUCTION

Plaintiffs in *California Crane School v. Google, et al.*, Case No. 21-cv-10001 (N.D. Cal.), on Appeal Case No. 24-4604 (9th Cir.), and *Mary Katherine Arcell, et al. v. Google, LLC, et al.*, Case No. 22-cv-02499 (N.D. Cal.) ("Amici Plaintiffs") respectfully submit this brief in support of no party to assist the Court by providing the perspectives of consumers who paid Google for advertising and users of Google's general search services with regard to this Court's consideration of the appropriate remedy in light of the circumstances of this case.

## IDENTITY AND INTEREST OF AMICI CURIAE

Amici Plaintiffs are:

1. All consumers and businesses who paid Google to place advertising on Google search in the United States since January 1, 2005. (*See California Crane School v. Google, et al.*, Case No. 21-cv-10001 (N.D. Cal.), Dkt. 112, ¶ 213   They directly paid Google for the placement of search advertising on Google search and paid more than they would have paid in a competitive market.

    > By reason of Google's dominant monopolistic position in the general search
    
    market and its resulting dominant and monopolistic position in the text search advertising market, Google is able to charge monopolistic prices for its search advertising, Plaintiff and the putative class have paid more to Defendant Google to place their ads on Google's search engine than they would have paid in a competitive text search advertising market within the United States, especially if Apple had entered the search business as it had originally intended and competed with Google in the text search advertising business.  (*Id.* ¶ 87)

2. End Users who have used Google's general search services from which Google collects search inquiries and information derived from End Users of its search engines for no compensation to End Users, which End User inquiries and information Google then sells to advertisers who collectively pay billions annually to Google in the United States. (*Mary

1

*Katherine Arcell, et al. v. Google, LLC, et al.,* Dkt. 124 ¶ 37 Case No. 22-cv-02499 (N.D. Cal.)

> Google uses End User search inquiries and consumer information derived from End Users of its search engines without compensation to End Users in order to sell advertising to advertisers, who pay at least $50 billion annually in the United States to place advertising on Google's search engine results page ("SERP"), which is subject to the Google-Apple agreements under which Google annually makes payments of billions of dollars of its search advertising revenues to Apple in return for Apple's agreement. *Id.* ¶ 4.

Because Amici Plaintiffs are users of the services provided by internet search engines, and because they have used Google search on an almost daily basis, they have been harmed and continue to be threatened with harm and damage in that they have been deprived of the quality, service and privacy that they otherwise would have enjoyed but for Google's monopoly and its conduct to maintain and in furtherance of the monopoly. They have also been injured by prejudicial steering by Google based upon the annoying and damaging distortion of Google's search results from Google in favor of Google's preferred advertisers and by higher prices paid by advertisers. In addition, Amici Plaintiffs have been damaged and continue to be threatened with damage because they have used Google search in their businesses and have, as a result, been forced to bear the added expense that results from distorted and steered search results. Further, Google has stunted innovation in new products that could serve as alternative search access points or disruptors to the traditional Google search model. Finally, Amici Plaintiffs have been deprived of the income to which they otherwise would be entitled from the appropriation by Google of their personal consumer data and personal information and search habits which are sold by Google to advertisers and others. By restricting competition in general search services, Google's conduct has also harmed users by reducing the quality of general search services with regard to privacy, data protection, and the use of consumer data, and by lessening choice in general search services, and by impeding innovation. *Id.* ¶ 4.

Given Amici Plaintiffs' strong direct interest in the Defendant Google's online search engine at issue in this case, Amici Plaintiffs have "relevant expertise and a stated concern for the issues at stake," and their amicus curiae brief may provide "unique perspective" that may assist the court in the disposition of the final judgment. *Dist. of Columbia v. Potomac Elec. Power Co.*, 826 F. Supp. 2d 227, 237 (D.D.C. 2011); *Jin v. Ministry of State Sec.,* 557 F. Supp. 2d 131, 136 (D.D.C. 2008).

## STATEMENT OF AMICI CURIAE

Amici Plaintiffs charged Google and Apple, two of the largest companies in the world, with combining to restrain and monopolize the general search market, the largest market on the internet, by allocating the market between themselves, sharing the profits, and by engaging in exclusionary practices and conduct giving them the power to fix prices and exclude competition, which they in fact did. They alleged that Google and Apple agreed that Google would share its profits and pay billions of dollars a year to Apple ($23 billion in 2023) in exchange for Apple's agreement not to compete against Google in the general search market and the general search text advertising market, even though Apple was ready, willing and able to do so. To enhance the profits for both of them and to exclude any potential competition, Apple and Google agreed that Google would get preferential treatment on all Apple devices which automatically referred all searches on Apple devices to Google. (Over 60% of all searches on Google go through Apple.) The more money Google made, the more Apple made. In addition, and in accordance with the written agreement between Apple and Google, the chief executive officers clandestinely met each year to confirm and police each other's adherence and observance to their agreement.

Pursuant to Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. Sections 15, 26, Amici Plaintiffs charged that this conduct violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. Sections 1, 2,[1] that they were damaged and injured by paying non-competitive prices for advertising on search, receiving less quality and less information that they would otherwise have had in a competitive market, and less access to consumers. By restricting competition in general search services, Google's conduct has also harmed users of the services provided by Google by reducing the quality of general search services related to privacy, data protection, and the use of consumer data, and by lessening choice in general search services, and by impeding innovation. By reason of these monopolistic prices and agreements, Google has achieved a 90% share of the general search market, the largest tech market by far, successfully suppressing any potential growth of any potential competitor, including that of Microsoft, one of the largest companies in the world, which offered multibillion dollar payments to Apple to get into the market and was turned down.

On August 5, 2024, this Court, after a two-month trial, ruled that Google violated Section 2 of the Sherman Act by maintaining monopoly power in the general search services and general search text ads markets by imposing exclusivity agreements that have anticompetitive effects. (Dkt. No. 1033).

> "After having carefully considered and weighed the witness testimony and evidence, the court reaches the following conclusion: Google is a monopolist, and it has acted as one to maintain its monopoly. It has violated Section 2 of the Sherman Act.
>
> Specifically, the court holds that (1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those

---

[1] *See California Crane School v. Google, et al.*, Case No. 21-cv-10001 (N.D. Cal.), on Appeal Case No. 24-4604 (9th Cir.), and *Mary Katherine Arcell, et al. v. Google, LLC, et al.*, Case No. 22-cv-02499 (N.D. Cal.).

4

agreements. Importantly, the court also finds that Google has exercised its monopoly power by charging supra competitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits." *Id.* ¶ p. 4.

Amici Plaintiffs also claimed that Apple was a potential horizontal competitor and a threat to Google (*id.* at 241); Apple had the capacity and resources to enter the search market but was "disincentivized" by Google's billions of dollars in payments to Apple which "unquestionably" had the effect of Apple staying "on the sidelines of search" (*id.* at 242, 246). Amici further claimed that the allocation of the market was unlawful under the Supreme Court's decision in *Palmer v. BR of Georgia*, 498 U.S. 46 (1990); and that the sharing of revenues was unlawful under the Supreme Court's decision in *Citizen Publishing v. United States*, 394 U.S. 131 (1969).

At page 238 of the Court's decision (Dkt. No. 1033 at 242), this Court noted that "Plaintiffs offer other examples of how the distribution agreements disincentivize investment and innovation in general search: … (2) Apple, a fierce potential competitor, remains on the sidelines due to the large revenue share payments it receives from Google; …. Google lacks incentives to innovate. The court addresses each in turn."

Then, at page 242 of the opinion (Dkt. No. 1033 at 246), the Court found as follows:

"Still, the ultimate question is whether the ISA reasonably appears capable of significantly contributing to keeping Apple on the sidelines of search, thus allowing Google to maintain its monopoly. *See Microsoft*, 253 F.3d at 79. <u>The revenue share payments unquestionably have that effect.</u> The prospect of losing tens of billions in guaranteed revenue from Google—which presently come at little to no cost to Apple—<u>disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so</u>. The payments need not be Apple's sole reason for staying out of search to constitute an anticompetitive effect. Plaintiffs are not required to prove that Google's 'continued monopoly power is precisely attributable to' the ISA. *Id.*"

5

**Proposed Remedy**

Amici Plaintiffs respectfully submit that the remedy imposed in this case should be modeled after the remedies used in the Supreme Court's decision in *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 77 (1911), which was followed in *United States v. AT&T*, 552 F. Supp. 131 (1982); namely, that Google should be broken up into six or more regional Google companies. Standard Oil, AT&T, and Google have occupied more than 90% of the commodities and services they serve throughout the United States, and all have and have had immediate impact upon all of the people in the United States. The remedies applied in Standard Oil, and subsequently in AT&T, were considered necessary for the benefit of all, and not drastic or overreaching.

This remedy satisfies the interests of everyone: competition will be restored, stockholders of Google will be protected and become stockholders of numerous Google companies, consumers will benefit by consumer choice, advertisers will be protected by competition in price, service, quality, foreclosure of markets will be eliminated and the future of search will be based on competition rather than the foreclosure of markets, monopolization and exclusive dealings. The users and advertisers will have the benefit of competition in price and quality, service and privacy. Thus, in accordance with following decisions, the Google monopoly should be broken up into individual Google companies.

***Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911)**

In the landmark 1911 case *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911), the Supreme Court ruled that Standard Oil had violated the Sherman Antitrust Act by forming a monopoly, controlling more than 90 percent of the market, and ordered the company to

break up its holdings.² The Standard Oil case resulted in the dissolution of Standard Oil into 39 separate companies. Specifically, Standard Oil was dissolved into the following companies, among others: Exxon (Standard Oil of New Jersey), Mobil (Standard Oil of New York), Amoco (Standard Oil of Indiana), Sohio (Standard Oil of Ohio), Conoco (Standard Oil Company, Inc.) and Chevron (Standard Oil of California).³ Each of the new companies competed against each other under new management, and each had all of the intellectual property that existed in Standard Oil itself. From that point forward, all new companies were competitors of each other, including new management, generally taken from the management of the original company.

In *Standard Oil*, the Supreme court affirmed the decision by the District Court to dissolve Standard Oil.

> "The remedy to be administered. It may be conceded that, ordinarily, where it was found that acts had been done in violation of the statute, adequate measure of relief would result from restraining the doing of such acts in the future. *Swift v. United States*, 196 U. S. 375 (1905). But in a case like this, where the condition which has been brought about in violation of the statute, in and of itself, is not only a continued attempt to monopolize, but also a monopolization, the duty to enforce the statute requires the application of broader and more controlling remedies. […], the application of remedies two-fold in character becomes essential: 1st. To forbid the doing in the future of acts like those which we have found to have been done in the past which would be violative of the statute. 2d. The exertion of such measure of relief as will effectually dissolve the combination found to exist in violation of the statute, and thus neutralize the extension and continually operating force which the possession of the power unlawfully obtained has brought and will continue to bring about." *Id.* at 77-78
>
> …
> Our conclusion is that the decree below was right and should be affirmed except as to the minor matters concerning which we have indicated the decree should be modified. Our order will therefore be one of affirmation, with directions, however, to modify the decree in accordance with this opinion. The court below to retain jurisdiction to the extent necessary to compel compliance in every respect with its decree." *Id.* at 81-82.

---

² Wikipedia, Standard Oil.
³ *Id.*

Therefore, the Amici suggest that the most appropriate remedy to preserve and protect competition without injury to the original company allows each company to begin with the same intellectual property held by Google, so that in effect multiple Google companies are created, with new management and in competition with each other. Using *Standard Oil* as a criterion, there should be at least six new Google companies. This remedy is a win-win for all parties. Like Standard Oil's Rockefeller, who after the break up held stock in all companies and was in fact made wealthier, so too any holder of stock in Google will have stock at least in six different Google companies, each would have the same intellectual property as the others and, most importantly, competition would now be achieved by the new companies competing against each other for the business of users and advertisers. In addition, middle management of Google would now in manty cases become top executive in the new companies, increasing jobs, quality, privacy, prices, production and service.

***United States v. AT&T*, 552 F. Supp. 131 (1982)**

*United States v. AT&T* (1982) was a ruling of the United States District Court for the District of Columbia, that led to the 1984 Bell System divestiture, and the breakup of the old AT&T natural monopoly into seven regional Bell operating companies and a much smaller new version of AT&T. After the ruling, the AT&T corporate structure was divested into seven regional companies that became known as Regional Bell Operating Companies, or colloquially as "Baby Bells", which inherited local landline telephone services for each region, while AT&T continued to exist as a long distance service provider at about 30% of its previous size.[4]

---

[4] *Id.*

The divestiture of AT&T was an act of deregulation (of a natural monopoly) that enabled more competition, which in turn enabled the development of firms that could serve multiple sectors of the marketplace such as phones, computer networks, and cable television, as well as the actions by courts and regulatory agencies to achieve it, and was the largest government action to reduce a corporation's market power in American history.[5]  The telecommunications and technology marketplace is again dominated by an oligopoly of large firms, and the judicial process that enabled the AT&T divestiture is another instructive historical example about possible divestures of the big tech firms that have gained market dominance.  Defendant Google should follow suit.

## CONCLUSION

Based on the foregoing, Amici Plaintiffs seek to hold Defendant Google accountable for its blatant disregard of antitrust laws of the United States and respectfully recommend that the Court adopt their proposed remedy, divest Google of its holdings and grant equitable relief consistent with this Court's decision.

Dated: April 22, 2025                                        Respectfully submitted,

*/s/ Joseph M. Alioto*

Joseph M. Alioto, Esq. (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone: (415) 434-8900
Email: jmalioto@aliotolaw.com

---

[5] *Id.*

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF
LAWRENCE G. PAPALE
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Email: lgpapale@papale.com

Josephine Alioto (SBN 282989)
THE VEEN FIRM
20 Haight Street
San Francisco, CA 94102
Telephone: (415) 673-4800
Email: j.alioto@veenfirm.com

Lingel H. Winters, Esq. (SBN 37759)
OFFICES OF LINGEL H. WINTERS
A Professional Corporation
2900 Shasta Rd.
Berkeley, California 94708
Telephone: (510) 845-5914
Email: sawmill2@aol.com

Robert J. Bonsignore
BONSIGNORE TRIAL LAWYERS, PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us

Christopher A. Nedeau (SBN 81297)
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

Jeffrey K. Perkins (SBN 57996)
LAW OFFICES OF JEFFREY K. PERKINS
1550-G Tiburon Boulevard, #344
Tiburon, California 94920
Telephone: (415) 302-1115
Email: jeffreykperkins@aol.com

**Counsel for Amici Curiae**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Amicus Curiae Brief with the Clerk of the U.S. District Court for the District of Columbia by using the CM/ECF system on March 26, 2025.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Dated: April 22, 2025                               Respectfully submitted,

                                                    */s/ Joseph M. Alioto*
                                                    Joseph M. Alioto (SBN 42680)
                                                    Tatiana V. Wallace (SBN 233939)
                                                    ALIOTO LAW FIRM
                                                    One Sansome Street, 35th Floor
                                                    San Francisco, CA 94104
                                                    Telephone: (415) 434-8900
                                                    Email: jmalioto@aliotolaw.com
                                                              twallace@aliotolaw.com

                                                    Counsel for Amici Curiae