# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., <br><br>Plaintiffs <br><br>v. <br><br>GOOGLE LLC, <br><br>Defendant | Case No. 20-cv-3010 (APM) <br><br>Hon. Amit P. Mehta |
| STATE OF COLORADO, et al., <br><br>Plaintiffs <br><br>v. <br><br>GOOGLE LLC, <br><br>Defendant | Case No. 20-cv-3715 (APM) <br><br>Hon. Amit P. Mehta |

# BRIEF OF *AMICUS CURIAE*
# GREGORY J. WERDEN
# IN SUPPORT OF GOOGLE LLC

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTEREST OF *AMICI CURIAE* ........................................................................................ 1

INTRODUCTION ............................................................................................................... 2

I.   The Remedy Should Not Be Designed to Terminate Monopoly ................................ 3

    A.  Plaintiffs Should Not Be Permitted to Seek a Drastic Remedy ............................ 3

    B.  Plaintiffs Made a Weak Causation Showing ............................................................ 4

    C.  The Findings Do Not Satisfy the Dentulous Causation Test .................................. 6

    D.  No Court Has a Duty to Terminate Monopoly ......................................................... 7

II.  Plaintiffs Have Not Proposed an Appropriate Remedy ............................................... 9

    A.  The Court Should Learn from History ..................................................................... 9

    B.  The Court Should Avoid a Remedy that Fetters Competition .............................. 10

    C.  Plaintiffs' Proposal Would Fetter Competition ....................................................... 11

    D.  Plaintiffs Would Punish Google and Reward Microsoft ....................................... 12

    E.  The Court Should Impose Narrow Conduct Remedies ......................................... 14

CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

Cases                                                                                                               Page

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) .................................................................. 2

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983) ............ 10

*Guaranty Trust Co. v. York*, 326 U.S. 99 (1945) ............................................................... 13

*Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) ........................................................... 8

*Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168 (D.C. Cir. 1987) (en banc) ....... 11

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ....................... 10

*Mass. v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc) ................ 3, 10, 14–15

*NCAA v. Alston*, 594 U.S. 69 (2021) ..................................................................................... 2

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958) ......................................................... 10

*Standard Oil Co. of N.J. v. United States*, 221 U.S. 1 (1911) ............................................ 7

*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945) ................................ 8

*United States v. Am. Tobacco Co.*, 221 U.S. 106 (1911) ..................................................... 9

*United States v. Am. Tobacco Co.*, 191 F. 371 (S.D.N.Y. 1911) .......................................... 9

*United States v. Ford Motor Co.*, 286 F. Supp. 407 (E.D. Mich. 1968) ............................. 2

*United States v. Glaxo Group Ltd.*, 410 U.S. 52 (1973) ...................................................... 4

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) ........................... 13

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C.C. 1995) (per curiam) ................... 14

*\*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) ........ 3, 6–8, 14

*United States v. United Shoe Mach. Corp.*, 391 U.S. 244 (1968) ................................ 8, 14

*United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295 (D. Mass. 1953) ................ 8

*Verizon Commc'ns Inc. v. Law Offices of
   Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ........................................................ 8, 11

| Cases | Page |
|---|---|

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969)..................................14

Miscellaneous

Todd Blanche, Deputy Attorney General, Remarks Before Opening Arguments in Google Search Remedies Trial, Apr. 21, 2025, https://www.justice.gov/opa/speech/deputy-attorney-general-todd-blanche-delivers-remarks-opening-arguments-google-search............................................................................13

Albert Charles Muhse, *The Disintegration of the Tobacco Combination*, 28 Pol. Sci. Q. 249 (1913).......................................................................................... 9

Gregory J. Werden, *Remedies for Exclusionary Conduct Should Protect and Preserve the Competitive Process*, 76 Antitrust L.J. 65 (2009)................................. 10

## INTEREST OF *AMICI CURIAE*

Gregory J. Werden has devoted his professional life to the application of antitrust law. From 1977 to 2019, he served in the Antitrust Division of the U.S. Department of Justice. He is a law and economics scholar, and his writings have been cited in more than 20 antitrust decisions of U.S. federal courts and in more than 1000 law review articles.

The views expressed in this brief are solely those of Gregory J. Werden. No party's counsel authored any part of the brief, and no party, counsel, or any other person contributed funds for the preparation of the brief. Gregory J. Werden has neither accepted anything of value from Google, nor done any paid work done on Google's behalf.

## INTRODUCTION

"When it comes to fashioning an antitrust remedy," the Supreme Court now teaches that "caution is key. Judges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. Judges must be mindful, too, of their limitations—as generalists, as lawyers, and as outsiders trying to understand intricate business relationships. Judges must remain aware that markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare." *NCAA v. Alston*, 594 U.S. 69, 106 (2021).

A case that Plaintiffs cite illustrates how incautious remedies can harm competition: *Ford Motor Co. v. United States*, 405 U.S. 562 (1972), was a merger case under Section 7 of the Clayton Act. On direct appeal, the Supreme Court affirmed the judgment.

Electric Autolite Co.'s Fostoria, Ohio plant supplied spark plugs to Chrysler, and the plant's survival was threatened by Chrysler's decision to make its own spark plugs. Ford saved the plant by acquiring it along with the Autolite brand. Spark plugs typically were changed annually, and Ford was motivated by projected profits from selling replacement spark plugs. *United States v. Ford Motor Co.*, 286 F. Supp. 407, 409–11, 433–37 (E.D. Mich. 1968).

Upon finding the consummated acquisition unlawful, the court did not merely order divestiture. It sought to prevent the Fostoria plant's closure. The decree required Ford to source at least half of its spark plugs from the plant (for five years), barred Ford from placing its trademarks on sourced spark plugs (for five years), and barred Ford from making spark plugs (for ten years). *See Ford Motor*, 405 U.S. at 572. The decree harmed competition more than the merger had. It eliminated Ford as a competitor in replacement spark plugs but did not fully restore competition to supply Ford.

2

## I. The Remedy Should Not Be Designed to Terminate Monopoly

### A. Plaintiffs Should Not Be Permitted to Seek a Drastic Remedy

The D.C. Circuit held that a "rather edentulous test for causation" applies in Sherman Act Section 2 "actions seeking injunctive relief." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc). Plaintiffs invoked the "edentulous test" by arguing that they "need only show that [Google's] conduct 'reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power.'" Pls' Proposed Conclusions of Law, *United States v. Google LLC*, 20-cv-3010 (APM), ECF No. 838, at 11 (quoting *Microsoft*, 352 F.3d at 79). Noting that Plaintiffs sought "only injunctive relief," this Court applied the "relaxed" causation standard that Plaintiffs urged. Mem. Op., *United States v. Google LLC*, 20-cv-3010 (APM), ECF No. 1033, at 215 (Mem. Op.).

The D.C. Circuit further explained that "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition. Rather, structural relief, which is designed to eliminate the monopoly altogether requires a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power." *Microsoft*, 253 F.3d at 106 (cleaned up) (citations omitted). Without such a showing, the appropriate remedy is just "an injunction against continuation" of the illegal conduct. *Id.*

The D.C. Circuit, thus, prescribed an edentulous causation test for remedies that merely prohibit conduct of the sort found to be illegal, and it prescribed a dentulous causation test for remedies "designed to eliminate the monopoly" by directly altering market structure. Moreover, the court later held that sharing browser source code was a structural remedy subject to the dentulous causation test, as was any other "drastic remedy." *Mass. v. Microsoft Corp.*, 373 F.3d 1199, 1230–31 (D.C. Cir. 2004) (en banc).

3

Plaintiffs propose drastic remedies designed to terminate monopoly by altering market structure. *See* Pls' Remedies Pre-Trial Br., *United States v. Google LLC*, 20-cv-3010 (APM), ECF No. 1218 (Pls' Rem. Pre-Trial Br.). Plaintiffs argue that the data remedies are "behavioral" rather than "structural." Tr. of Rem. Hr. Proc., 4/21/2025 a.m. at 30, 36. But these remedies would not constrain Google's behavior; they would endow Google's GSE rivals with valuable assets, which makes the remedies structural. Plaintiffs do not deny that the data remedies are drastic, and they are more drastic than the break up of Standard Oil, which remains an archetype for drastic Section 2 structural remedies.

This Court should not consider remedies designed to terminate monopoly because Plaintiffs refused to engage with the D.C. Circuit's dentulous causation test in the liability trial. Plaintiffs asked this Court to apply the edentulous test, and only that test. The Court applied the edentulous test, and only that test. The Court should decline Plaintiffs' suggestion that it create a foundation for drastic remedies by making additional findings predicated on the trial record. Tr. of Rem. Hr. Proc., 4/21/2025 a.m. at 11.

### B. Plaintiffs Made a Weak Causation Showing

"The purpose of relief in an antitrust case is so far as practicable, to cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 64 (1973) (cleaned up). The illegal conduct in this case is "exclusive dealing." Mem. Op. at 203–65. To get a clearer picture of the ill effects from Google's exclusive dealing, the Court can employ simple thought experiments based on its findings. The experiments reveal that the terms of Google's contracts with distribution partners did not alter the basic market forces that led browser developers to preference Google's GSE.

4

To appreciate that key aspects of browser design were not caused by illegal conduct, the Court can imagine the world before (or without) search advertising. Nothing in the Court's findings suggests that browsers would have been designed without default GSEs. And nothing in the Court's findings suggests that Google's GSE would not have been chosen by Apple and Mozilla as the default GSE. Google's "has long been the best search engine, particularly on mobile devices and "is the only real choice as the default GSE." Mem. Op. at 199, 201.

To appreciate that browser business models were not caused by illegal conduct, the Court can imagine how browser developers would have reacted to the advent of search advertising. Developers undoubtedly would have responded by structuring business models to capture a share of the search advertising revenue. Browsers would have been configured to preference one GSE over all others, and the preference would have been bartered for a share of the advertising revenue. Basic economics predicts that the preference would have gone to the GSE gaining the most from the preference.

To appreciate that the preferencing of Google's GSE was not caused by Google's illegal conduct, the Court can imagine a world with no possibility of contracts between GSE owners and potential distribution partners. But GSE owners still could have shared search advertising revenue with potential partners. A likely scenario is that GSE owners would have offered bounties for search queries. In a bounty-driven world, Google's GSE likely would have been set as a default to maximize bounty payments.

Google's real-world payments to partners surely mattered, but they were not held illegal. Nor does Section 2 of the Sherman Act ever condemn the mere payment for legitimate services rendered.

**C. The Findings Do Not Satisfy the Dentulous Causation Test**

This Court's findings establish only the remotest of possibilities that Google would have lost its dominant position but for conduct the Court found unlawful. The Court stressed the importance Google's scale advantage. Mem. Op. at 226, 230, 232–33, 335, 337. But Google enjoyed a massive scale advantage in 2009. Mem. Op. at 1, 13. Plaintiffs did not allege that any part of the 2009 scale advantage was due to unlawful conduct, nor did they allege Google's 2009 scale advantage ever came under threat.

This last point is in sharp contrast with *Microsoft*, which centered on threats to erode the applications barrier to entry and thereby erode Microsoft's monopoly. The *Microsoft* plaintiffs proved that the products and technologies Microsoft squelched "reasonably constituted nascent threats" to its monopoly, so squelching them was "reasonably capable of contributing significantly to the defendant's continued monopoly power." *Microsoft*, 253 F.3d at 79. Plaintiffs here made no similar showing of nascent threats.

In *Microsoft*, the D.C. Circuit rejected "more extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether," because "the District Court expressly did not adopt the position that Microsoft would have lost its position in the OS market but for its anticompetitive behavior." *Id.* at 107. Remedies always "should be tailored to fit the wrong creating the occasion for the remedy," *id.*, and remedies designed to terminate monopoly fit only those occasions in which, with reasonable probability, monopoly exists because of illegal conduct.

Plaintiffs contend that this Court's findings satisfy the D.C. Circuit's dentulous causation test because the Court found that Google's unlawful conduct "contributed significantly" to Google's continued monopoly. Pls' Rem. Pre-Trial Br. at 15 & n.4. But similar findings in *Microsoft* satisfied only the edentulous causation test:

6

The D.C. Circuit observed that the integration of the browser into the operating system had "the effect of significantly reducing the usage of rivals' products and hence protecting [Microsoft's] operating system monopoly." *Microsoft*, 253 F.3d at 65. "Microsoft's deals with [internet access providers] clearly have a significant effect in preserving its monopoly; they help keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly." *Id.* at 71. And "Microsoft's deals with the major [independent software vendors] had a significant effect upon [Java virtual machine] promotion." *Id.* at 75.

In establishing liability, this Court excused Plaintiffs from having to identify the but for world. Mem. Op. at 216–19. But the Court relied on the portion of the *Microsoft* opinion setting out the edentulous causation test. Satisfying *Microsoft*'s dentulous causation test requires identifying a but for world without Google's unlawful conduct. Only in comparison to that world can a court make a clear "causal connection between the conduct and . . . maintenance of" monopoly.

Plaintiffs assert that a but for causation test is "nearly impossible to satisfy." Pls' Rem. Pre-Trial Br. at 15. But a drastic remedy should not be imposed without a compelling justification, and but for causation was shown in *Standard Oil* and *American Tobacco*. Plaintiffs cannot explain why it is either sensible or equitable to terminate a lawfully acquired monopoly that almost certainly would have continued to exist even if the monopolist had not engaged in unlawful exclusionary conduct.

**D. No Court Has a Duty to Terminate Monopoly**

In drafting the Sherman Act, Congress omitted "any direct prohibition against monopoly in the concrete." *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 62 (1911).

"The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

Plaintiffs' argue that "remedies should pry open the market that Google unlawfully monopolized." Pls' Rem. Pre-Trial Br. at 2. And they assert that "Comprehensive remedies are necessary to restore the competition lost by Google's unlawful durable monopolies in general search services and general search text ads." *Id.* at 15. But Google has not "unlawfully monopolized" and does not possess "unlawful . . . monopolies."

This Court found only unlawful maintenance of monopoly. Mem. Op. at 276. And the Court made no findings suggesting that Google would not possess a monopoly "***but for*** its anticompetitive behavior." *Microsoft*, 253 F.3d at 107 (emphasis added).

Had Google "unlawfully monopolized," or if it did possess "unlawful . . . monopolies," Plaintiffs still would not be correct to say that this Court "must" craft a remedy designed to "terminate the illegal monopoly." Pls' Rem. Pre-Trial Br. at 1 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (quoting *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968)). The district courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case." *Int'l Salt Co. v. United States*, 332 U.S. 392, 400–01 (1947).

The Court should look to what judges actually have done, and over the past century, few have ordered radical involuntary restructuring. The AT&T breakup was voluntary. Judge Hand decided not to break up Alcoa. *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 445–46 (2d Cir. 1945). And Judge Wyzanski decided not to break up United Shoe Machinery. *United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295, 347–48 (D. Mass. 1953).

8

## II. Plaintiffs Have Not Proposed an Appropriate Remedy

### A. The Court Should Learn from History

On May 29, 1911, the Supreme Court directed the district court to recreate "out of the elements" of American Tobacco "a new condition which shall be honestly in harmony with and not repugnant to the law." *United States v. Am. Tobacco Co.*, 221 U.S. 106, 187 (1911).

With American Tobacco taking the lead, a plan was drawn up and refined through conferences presided over by judges from the panel that originally decided the case. Final differences were resolved through a hearing in front of the full four-judge panel. Third parties participated, with Louis D. Brandeis represented two of them. *United States v. Am. Tobacco Co.*, 191 F. 371, 373–75 (S.D.N.Y. 1911).

The panel's November 16, 1911, decree prescribed the most comprehensive corporate reorganization that ever has followed a finding of Section 2 liability. The brands and manufacturing facilities associated with cigarettes and most other tobacco products were distributed among four successor companies—American Tobacco Co., Liggett & Myers Tobacco Co., P. Lorillard Co., and R.J. Reynolds Tobacco Co. The brands and manufacturing facilities for snuff and non-tobacco products were divided among ten additional companies. *See id.* at 390–97; Albert Charles Muhse, *The Disintegration of the Tobacco Combination*, 28 Pol. Sci. Q. 249 (1913).

The decree had injunctive provisions (e.g., prohibitions on common directors, common purchasing agents, and acquiring each others' stock), but the successor companies were unfettered in competing with each other and with smaller rivals. R.J. Reynolds was allocated no cigarette assets in the restructuring, but it then introduced the Camel brand of cigarettes at a price below the prices of its competitors.

9

**B. The Court Should Avoid a Remedy that Fetters Competition**

The Court should avoid any "remedy in opposition to the purpose of the antitrust laws." *Mass. v. Microsoft Corp.*, 373 F.3d 1199, 1230 (D.C. Cir. 2004) (en banc). "The purpose of the antitrust laws . . . is the protection of *competition*, not *competitors*." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 906 (2007). The antitrust laws were "aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).

My 2009 study found that many Section 2 decrees have been in opposition to the purpose of the antitrust laws. Gregory J. Werden, *Remedies for Exclusionary Conduct Should Protect and Preserve the Competitive Process*, 76 Antitrust L.J. 65 (2009). I proposed five "rules" for Section 2 cases in which the remedy is not designed to terminate an illegal monopoly:

1. Always consider a targeted structural remedy.
2. Do not prohibit competition on the merits.
3. Do not undermine the incentive to compete.
4. Frame all prohibitions in bright-line terms.
5. Do not substitute regulation for competition.

*Id.* at 78.

The thread running through all five rules is that antitrust remedies should protect the competitive process rather than supplant it. Conduct restrictions should be simple, limited in every feasible way, and dispensed with altogether if there is a good alternative. Hamstringing a lawful monopolist or robbing it of its incentive to compete turns antitrust law on its head. "A monopolist, no less than any other competitor, is permitted and indeed encouraged to compete aggressively on the merits . . . ." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544 (9th Cir. 1983).

**C. Plaintiffs' Proposal Would Fetter Competition**

Plaintiffs' proposal is extraordinary. Pls' Revised Proposed Final J., *United States v. Google LLC*, 20-cv-3010 (APM), ECF No. 1184-1 (PRPFJ). Its aims to deprive Google of every source of competitive advantage, no matter how legitimately acquired, and to deny Google of every important opportunity to compete on the merits.

PRPFJ §§ VI–VIII would grant Google's GSE rivals the full benefit of Google's GSE investments over decades, costing many billions of dollars, with the result that Google would be disabled in gaining users through superior search quality. PRPFJ § V.A would preclude Google from offering a browser, with the result that Google would be disabled in using the most efficient means of GSE distribution. And PRPFJ §§ IV.A, B & E would preclude Google from partnering with all other GSE distributors, with the result that Google would be disabled in using other highly effective GSE distribution channels.

PRPFJ §§ VI–VIII would compel Google to share all of the useful products of its GSE investments, even though compelling "firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–08 (2004).

In view of the Supreme Court's abhorrence of turning courts into price regulators, *see id.* at 408, Plaintiffs propose to price access at zero. Google would be allowed to recover only the incremental cost of sharing its property. PRPFJ §§ VI.A, C & E, VII.A, D & E. This is at odds with principles of public utility pricing. *See generally Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1189–93 (D.C. Cir. 1987) (en banc). And PRPFJ §§ VI–VIII, therefore, raise a significant constitutional question.

Plaintiffs ignore the Supreme Court's teaching that "caution is key." *See supra* p.2. Their proposal would distort competition by displacing normal incentives for a full decade. PRPFJ § XII. Plaintiffs' drastic remedy would create a world, bearing little resemblance to the but for world, in which the remedy likely would be the dominant consideration in formulating business models. Google's current GSE rivals might just repackage what Google gives them. AI-based rivals might just offer something similar but slightly better. And Google might pursue other opportunities.

The massive uncertainty created by Plaintiffs' proposed remedy is exacerbated by the fact it lacks certain bright lines. It does not specify what the divestiture of Chrome would entail. PRPFJ §§ III.F, V.A. It does not specify the interoperability requirements it imposes. PRPFJ §§ V.B, VII.B, D & G, VII.E. And the details of how Google would have to share its search index, user data, and ads data are left for a Technical Committee to work out. PRPFJ §§ VI.A, C, D & F.

### D. Plaintiffs' Would Punish Google and Reward Microsoft

Google launched Chrome in 2008 to promote usage of its GSE. Plaintiffs have never objected to Google's conduct with respect to Chrome. In particular, the "Chrome default [was] not alleged to be exclusionary conduct." Mem. Op. 159. But PRPFJ § V.A would require Google to divest Chrome "to a buyer approved by the Plaintiffs in their sole discretion, subject to terms that the Court and Plaintiffs approve."

To vindicate the public interest in competition, equitable antitrust remedies restore lost competition. But Plaintiffs justify divesting Chrome on the basis that it "is valuable to Google Search." Pls' Rem. Pre-Trial Br. at 8–9; *see* PXRD001 at 29–31. Because Google cannot capture Chrome's full value in a sale price, the divestiture would be punitive.

12

"Equitable relief in a federal court . . . must be within the traditional scope of equity as historically evolved in the English Court of Chancery." *Guaranty Trust Co. v. York*, 326 U.S. 99, 105 (1945). "Courts are not authorized in civil proceedings to punish antitrust violators, and relief must not be punitive." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961).

The threatened divestiture of Android (PRPFJ § V.C) also would be punitive. Plaintiffs define Android to include the Play Store (PRPFJ § III.B), which is a major revenue source. And Plaintiffs explained that the purpose of the Android threat is "deterrence," which implies punishment. Tr. of Rem. Hr. Proc., 4/21/2025 a.m. at 54–55. Moreover, the punishment would be meted out for marketplace success, not bad behavior.

The Trump administration transparently seeks to punish Google for political reasons. At the outset of the present proceeding, Deputy Attorney General Todd Blanche declared: "Google has deplatformed conservative speech and has put its thumb on the scale politically for years. All of this behavior is downstream from Google's monopoly power over internet search." Remarks Before Opening Arguments in Google Search Remedies Trial, Apr. 21, 2025, https://www.justice.gov/opa/speech/deputy-attorney-general-todd-blanche-delivers-remarks-opening-arguments-google-search.

By disabling Google, Plaintiffs would concomitantly reward Microsoft. Microsoft would be freed of competition from Google in securing default status for Bing in Chrome, Firefox, Safari, and other browsers. And Microsoft would continue to distribute Bing as the default GSE in its Edge browser. If defaults are as powerful as Plaintiffs contended, Bing could achieve a durable position of dominance within a year. And Microsoft would pay distributors less than half of what Google has paid them.

13

**E. The Court Should Impose Narrow Conduct Remedies**

This Court held that Google "violated Section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States—general search services and general text advertising—through its exclusive distribution agreements." Mem. Op. at 276. As Plaintiffs observe, the Court should "enter that relief it calculates will best remedy the conduct it has found to be unlawful." Pls' Rem. Pre-Trial Br. at 2 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (en banc)). But the remedy must be "tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107.

The Court exercises "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969) (cleaned up). "Even where the government has proved antitrust violations at trial, the remedies must be of the 'same type or class' as the violations . . . ." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C.C. 1995) (per curiam) (quoting *Zenith*, 395 U.S. at 132).

The Supreme Court has said that the remedy should "deny the defendant the fruits of its statutory violation." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968). In *Microsoft*, the D.C. Circuit agreed with the United States that the "fruit" is the harm to competition, not the harm to competitors. *Mass. v. Microsoft Corp.*, 373 F.3d 1199, 1233 (D.C. Cir. 2004) (en banc) ("the fruit of its violation was Microsoft's freedom from the possibility rival middleware vendors would pose a threat to its monopoly"). The fruit of Google's exclusive dealing is that rival GSEs could not compete in some ways for certain users. That fruit is denied to Google by a narrow conduct remedy.

Plaintiffs mistakenly assert that the "fruits are the users, the data, the scale, the money." Tr. of Rem. Hr. Proc., 4/21/2025 a.m. at 8. And Plaintiffs mistakenly assert that boosting Google's GSE rivals is necessary to deny Google the fruits of its unlawful conduct. The D.C. Circuit, however, squarely held that "depriving an antitrust violator of the fruits of its violation does not entail conferring a correlative benefit upon the particular competitor harmed by the violation." *Microsoft*, 373 F.3d at 1243.

## CONCLUSION

The Court should reject Plaintiffs' incautious remedy proposal and use Google's proposal as a starting point. If the Court determines that Google's proposal requires significant revision, the Court should notify the parties of the deficiencies. The Court should then order the parties to confer and report back within 30 days with a mutually agreeable proposed decree or alternatives for the Court's final consideration.

May 7, 2025

Respectfully submitted,

Gregory J. Werden
1029 N. Stuart St. #310
Arlington, VA 22201
703-527-5128
gregwerden@gmail.com

15