# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 1:20-cv-03010-APM <br><br> HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 1:20-cv-03715-APM <br><br> HON. AMIT P. MEHTA |

**BRIEF OF ANTHROPIC PBC,
ENGINE ADVOCACY, AND TECHNET AS *AMICI CURIAE***

**DISCLOSURE STATEMENT**

Pursuant to Local Rule 7(o)(5) of this Court and Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amici curiae* provide the following disclosures:

Anthropic PBC is a public benefit corporation that has no parent company. Google LLC (a wholly owned subsidiary of Alphabet, Inc., a publicly traded corporation) and Amazon Web Services, Inc. (a subsidiary of Amazon.com, Inc., a publicly-traded corporation) have ownership interests of 10% or more in Anthropic PBC.

Engine Advocacy receives funding from Google but operates independently of its funders, and its policy work is guided by ongoing conversations with startups in the network. Neither Engine Advocacy nor TechNet has a parent corporation, and no publicly traded corporation owns 10% or more of their stock.

**TABLE OF CONTENTS**

DISCLOSURE STATEMENT ................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................................................ 1

INTRODUCTION ...................................................................................................................... 3

ARGUMENT .............................................................................................................................. 5

I.      The Nascent AI Ecosystem Is Highly Competitive. ........................................................ 5

          A.      Firms across the globe provide a variety of AI products and services. .................. 5

          B.      Partnerships between small and large companies benefit AI competition. ............ 6

II.     Sections IV.H–I of Plaintiffs' RPFJ Would Suppress Competition and Innovation. ......... 8

CONCLUSION ........................................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*Common Cause v. Nuclear Regul. Comm'n*,
  674 F.2d 921 (D.C. Cir. 1982) .................................................................................................. 12

*NCAA v. Alston*,
  594 U.S. 69 (2021) ................................................................................................................ 4, 14

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) .................................................................................................................. 12

*United States v. Addyston Pipe & Steel Co.*,
  85 F. 271 (6th Cir. 1898) .......................................................................................................... 14

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................................................... 4, 10, 11, 14

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  395 U.S. 100 (1969) .................................................................................................................. 10

**Statutes, Regulations, & Rules**

15 U.S.C. § 18a .............................................................................................................................. 9

16 C.F.R. § 801.1 ........................................................................................................................... 9

Fed. R. Civ. P. 65 ......................................................................................................................... 12

**Other Authorities**

Anthropic,
  *Build with Claude* (2025), https://www.anthropic.com/customers ............................................ 5

Chui, Michael, et al.,
  McKinsey & Co., The Economic Potential of Generative AI: The Nnext Productivity
  Frontier 5 (June 2023), *available at* https://www.mckinsey.com/capabilities/mckinsey-
  digital/our-insights/the-economic-potential-of-generative-ai-the-next-productivity-
  frontier ........................................................................................................................................ 5

Complaint,
  *United States v. Bayer AG*,
  No. 1:18-cv-1241 (D.D.C. May 29, 2018), ECF No. 1 ............................................................ 11

Complaint,
  *United States v. Smiths Grp. PLC*,
  No. 1:17-cv-580 (D.D.C. Mar. 30, 2017), ECF No. 1 .............................................................. 11

Dastin, Jeffrey
   *Google begins opening access to its ChatGPT competitor Bard*,
   Reuters (Mar. 21, 2023), https://www.reuters.com/technology/google-begins-opening-access-its-chatgpt-competitor-bard-2023-03-21 ........................................................................ 5

Google Ventures,
   *Portfolio: AI*, https://www.gv.com/portfolio?sector=ai ............................................................. 8

Interview with Sarah Friar, CFO, OpenAI,
   *OpenAI's Friar: Strong AI Competition Coming from China*,
   Bloomberg TV (Jan. 21, 2025), https://www.bloomberg.com/news/videos/2025-01-21/openai-s-friar-strong-ai-competition-coming-from-china-video-m66jm2q3 ........................ 6

Mak, Robyn
   *China tech giants dig pricey trench for AI war*,
   Reuters, (Mar. 20, 2025), https://www.reuters.com/breakingviews/china-tech-giants-dig-pricey-trench-ai-war-2025-03-20/ ................................... 6

McIlwain, Matt
   *Big Tech's AI Spend: Fuel for the Startups That Will Shape the Future*,

Madrona (Sept. 10, 2024), https://www.madrona.com/thank-you-big-tech/ ................................. 7

Peters, Emma
   *#Startupseverywhere: St. Louis, Mo.*, Engine (Aug. 23, 2024),
   https://www.engine.is/news/startupseverywhere-st-louis-mo-hirehenry ................................. 8

Prado, Tiago S.
   Dep't of Media & Info., Mich. State Univ.,
   Kill Zones? Effects of Big Tech Start-up Acquisitions on Innovation
   (Int'l Telecomms. Soc'y, Conference Paper, June 11, 2021),
   *available at* https://www.econstor.eu/handle/10419/238049 ..................................................... 13

Rutledge, Ian
   *#Startupseverywhere: Brooklyn, N.Y.*, Engine (Oct. 21, 2022),
   https://www.engine.is/news/startupseverywhere-brooklyn-ny-carefully .................................. 8

Rutledge, Ian
   *#Startupseverywhere: New York City, N.Y.*, Engine (Sept. 30, 2022),
   https://www.engine.is/news/startupseverywhere-newyorkcity-ny-airpals ................................. 8

Subin, Samantha Subin
   *Tech megacaps plan to spend more than $300 billion in 2025 as AI race intensifies*,
   CNBC (Feb. 8, 2025), https://www.cnbc.com/2025/02/08/tech-megacaps-to-spend-more-than-300-billion-in-2025-to-win-in-ai.html ........................................................... 6

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Anthropic is a public benefit corporation dedicated to the responsible development of advanced artificial intelligence ("AI") systems for the long-term benefit of humanity. The company's work sits at the frontier of AI research, and the company develops generative AI models, particularly large language models, that are used across a range of applications, from enterprise software to consumer products. Anthropic is the smallest and most independent of the frontier AI labs, and its competitive success has required talent, dedication, and collaboration with a variety of other actors—including Google.

Engine Advocacy ("Engine") is a non-profit technology policy, research, and advocacy organization dedicated to bridging the gap between startups and policymakers. Engine works with government officials and a community of thousands of high-technology, growth-oriented startups across the nation to support innovation and entrepreneurship through research, policy analysis, and advocacy. Engine's community of startups includes companies developing and deploying AI across all industries and sectors. Many have benefited directly and indirectly from Google's participation in the AI ecosystem, including by using Google AI tools, building on AI tools supported by Google investments, and participating in Google's accelerator programs.

TechNet is a national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes 100 dynamic American companies ranging from startups to the most iconic companies on the planet. Those companies represent more than 5 million employees and countless customers in the fields of information technology, AI, e-commerce, the sharing and gig economies, advanced energy, cybersecurity,

---

[1] No party's counsel authored this brief in whole or in part, and no one other than *amici* and their counsel contributed money to fund the brief's preparation.

venture capital, and finance. TechNet's members are at the forefront of developing new technologies, including AI, and TechNet has unique expertise regarding the effects of public policy on innovation and competition in the technology industry. While TechNet is a membership-based association, its positions as *amicus curiae* represent only its own views and not necessarily the views of any of its individual members.

*Amici* submit this brief because certain provisions in Plaintiffs' Revised Proposed Final Judgment ("RPFJ"), ECF No. 1184-1, would negatively affect the competitive environment in which emerging AI companies operate. Sections IV.H and IV.I of the RPFJ, in particular, impose burdensome notice requirements that would impede Google from making future investments in AI companies, like Anthropic, or even collaborating with other companies with generative AI products in the context of a trade association like TechNet or a community organization like Engine. These provisions are far afield from the antitrust violations found by the Court and risk chilling the investments and collaborations that are critical to enabling innovation and competition in the nascent AI space. Anthropic has benefited from Google's investments in the past and wishes to be able to do so in the future; TechNet has benefited from Google's collaboration and involvement in its advocacy efforts and wishes to be able to do so in the future; and many of the startups in Engine's network have benefited directly and indirectly from Google's participation in the AI ecosystem. The interests of *amici* are thus directly implicated, and *amici* are well positioned to explain the impact of Plaintiffs' proposed remedy.

*Amici* take no position on the rest of the RPFJ or on the Court's liability finding.

## INTRODUCTION

This case is not, and has never been, about Google's investments in AI companies. Plaintiffs did not allege, and the Court did not find, that Google engaged in any unlawful or anticompetitive conduct with respect to such investments. Yet Plaintiffs ask the Court to venture far beyond its liability findings and impose sweeping, burdensome notification and regulatory-review requirements on *all* future Google investments in—or even undefined "collaborations" with—AI startups, without regard to the nature of the counterparty, the size of the investments, whether they would give Google voting rights or other means of control, or whether they bear any indicia of harm to competition. The Court should decline to do so.

Plaintiffs' proposed remedy would harm, not benefit, AI competition. As explained in more detail below, AI is a nascent, developing, highly competitive space in which a host of companies—including Google, Meta, OpenAI, xAI, Deepseek, and Anthropic, among others—race to build the best models. Other companies use models to build and sell AI-based services like customer assistants, software development environments, and data analytics platforms. Of course, companies in a wide range of industries incorporate AI into their internal workflows. And millions of individual users rely on AI for brainstorming, document drafting, code writing, and other personal and professional tasks. In this context, larger firms like Google investing in, and collaborating with, startup AI companies is often procompetitive. Anthropic's relationship with Google demonstrates as much: Google's investments in Anthropic have not given Google any control over Anthropic or exclusive rights to Anthropic's products, and they have enabled Anthropic to independently develop its own AI products *that compete with Google's*, and to foster competition for semiconductors and cloud-computing services.

Plaintiffs would have the Court treat *any* Google relationship with *any* AI company as inherently suspect, no matter how far afield from Google's search product or its conduct that the

3

Court found violated the Sherman Act. In practice, this will likely deter Google from making such investments in the first place and ultimately reduce competition across a variety of markets. Tellingly, Plaintiffs came up with this proposed remedy only after acknowledging that their first, even more aggressive proposal would have caused "unintended consequences in the evolving AI space," ECF No. 1184 at 8—consequences laid bare by Anthropic's submissions in this case. Now they ask the Court to trust that their modified proposal is appropriately tailored. It is not.

This case arises at a pivotal moment for the trajectory of AI and technological innovation in the United States. The Court is being asked to evaluate remedial proposals that will shape capital flows, investment strategies, and competition in a space that barely existed when this case began and remains nascent and evolving today. Antitrust law has long recognized that in such dynamic, rapidly evolving markets, overbroad or misaligned remedies can distort incentives and harm innovation. That is why the Supreme Court has emphasized that "caution is key" when fashioning antitrust remedies, *NCAA v. Alston*, 594 U.S. 69, 106 (2021), and why the D.C. Circuit has instructed that remedies must be "tailored to fit" the specific antitrust violations that were adjudicated by the court, *United States v. Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001) (per curiam). Plaintiffs' proposal blows past those carefully constructed guardrails.

The Court should reject Plaintiffs' proposal and preserve competition by reinforcing a central antitrust principle: Remedies must be tied to the conduct found unlawful, and they must promote—not discourage—the conditions under which competition thrives.

**ARGUMENT**

I.      **The Nascent AI Ecosystem Is Highly Competitive.**

    A.      **Firms across the globe provide a variety of AI products and services.**

AI is a general-purpose technology deployed across a broad range of applications.[2] The AI ecosystem has expanded rapidly in recent years, propelled by technological advances and a surge in investment. Many of today's leading AI companies, including Anthropic, did not even exist when Plaintiffs filed this case five years ago.

No single company holds a dominant position in AI. Indeed, it makes little sense to think of dominating "AI," a field that encompasses countless different entities with diverse businesses. Companies like Google, Amazon, Microsoft, and NVIDIA provide hardware and other infrastructure. Multiple firms—including OpenAI, Google, Meta, xAi, and Anthropic—compete for these and other inputs to build different AI models that in turn compete on performance, cost, transparency, and security. Then thousands of companies and individuals build and deploy AI-based applications on top of the models, for themselves or for their own customers, to help with strategizing and brainstorming, drafting documents, writing code, handling customer support, and much more.[3] Some of these players rely on their own AI models; others enter into collaborations with other companies.[4]

---

[2] Michael Chui et al., McKinsey & Co., The Economic Potential of Generative AI: The Nnext Productivity Frontier 5 (June 2023), *available at* https://www.mckinsey.com/capabilities/mckinsey-digital/our-insights/the-economic-potential-of-generative-ai-the-next-productivity-frontier.

[3] Anthropic, *Build with Claude* (2025), https://www.anthropic.com/customers.

[4] Jeffrey Dastin, *Google begins opening access to its ChatGPT competitor Bard*, Reuters (Mar. 21, 2023), https://www.reuters.com/technology/google-begins-opening-access-its-chatgpt-competitor-bard-2023-03-21.

This competitive landscape is global. U.S. companies, including Anthropic, compete directly with well-funded international counterparts, particularly those based in China. The Chinese government has made AI a strategic national priority, and major Chinese technology firms—including Baidu, Tencent, and Alibaba—have committed significant resources to developing and deploying large-scale AI models.[5] Tencent, for example, tripled its capital spending in 2023 to $10.7 billion, largely to expand its AI capabilities.[6] Alibaba has pledged approximately $53 billion toward cloud and AI-related investment over a three-year period.[7] These massive investments reflect not only commercial ambitions but also geopolitical competition.[8]

### B. Partnerships between small and large companies benefit AI competition.

In this dynamic environment, cross-firm investment and collaboration is necessary and typically procompetitive. Anthropic's relationship with Google is illustrative. State-of-the-art AI models like Anthropic's Claude demand extensive "compute" resources—the processing power, cloud and local memory, networking, and storage necessary to train AI models and serve them to customers. The costs of compute are massive: In 2025, the combined capital expenditures of Meta, Amazon, Alphabet, and Microsoft are projected to exceed $320 billion, much of it directed toward AI.[9] Those capital expenditures are not just for the benefit of those larger companies;

---

[5] Interview with Sarah Friar, CFO, OpenAI, *OpenAI's Friar: Strong AI Competition Coming from China*, at 18:00-22:00, Bloomberg TV (Jan. 21, 2025), https://www.bloomberg.com/news/videos/2025-01-21/openai-s-friar-strong-ai-competition-coming-from-china-video-m66jm2q3.

[6] Robyn Mak, *China tech giants dig pricey trench for AI war*, Reuters, (Mar. 20, 2025), https://www.reuters.com/breakingviews/china-tech-giants-dig-pricey-trench-ai-war-2025-03-20/.

[7] *Id.*

[8] *Id.*

[9] Samantha Subin, *Tech megacaps plan to spend more than $300 billion in 2025 as AI race intensifies*, CNBC (Feb. 8, 2025), https://www.cnbc.com/2025/02/08/tech-megacaps-to-spend-more-than-300-billion-in-2025-to-win-in-ai.html.

they create "unprecedented opportunities for emerging startups" by providing the cloud infrastructure and access to capital that AI startups generally cannot otherwise obtain.[10] Unlike the frontier labs run by large companies, startups building models, including Anthropic, do not have a well-capitalized corporate parent or affiliate that they can rely on to fund their compute needs. Instead, smaller companies often seek investment from larger companies. For example, Anthropic has sought investments from Google and others, including Amazon.[11]

Importantly, Google's investments in Anthropic have not given it any control over Anthropic or any exclusive rights to Anthropic's products. Just the opposite—Anthropic's Claude family of AI models competes directly with Google's Gemini, as well as with offerings from other leading developers. And Anthropic retains full control over its corporate governance: Google does not have voting shares or the right to appoint a member (or even observer) of Anthropic's board of directors.

Anthropic's partnership with Google also benefits the entire AI ecosystem. Google's investments have provided critical funding that has enabled Anthropic to develop and deploy its Claude models at scale, contributing to a competitive ecosystem in which Anthropic is the smallest and most independent provider of frontier-level foundation models. Without Google partnerships with and investments in companies like Anthropic, the AI frontier would be dominated by only the largest tech giants—including Google itself—giving application developers and end users fewer alternatives. And the benefits of the partnership extend upstream as well. While most AI companies depend on NVIDIA's GPU microchips, Anthropic has committed extensively to Google's TPU chips and Amazon's Trainium chips, which fosters

---

[10] Matt McIlwain, *Big Tech's AI Spend: Fuel for the Startups That Will Shape the Future*, Madrona (Sept. 10, 2024), https://www.madrona.com/thank-you-big-tech/.

[11] Amazon is Anthropic's primary training partner and primary cloud provider.

competition and helps ensure that Anthropic receives competitive pricing. Similarly, rather than buying cloud-computing services from a single provider, Anthropic partners with both Amazon and Google, which compete aggressively against Microsoft and other providers such as Oracle.

To be clear, though, Anthropic is far from the only company that has partnered with Google. Google Ventures, Google's venture-capital affiliate, currently invests in approximately 100 AI companies, and nearly 40% of its new investments in 2024 focused on AI.[12] And Google has several accelerator programs that provide needed resources, including non-dilutive financial investment, to startup founders. Several founders in Engine's network have benefited from these accelerator programs.[13] This level of cross-platform engagement reflects the underlying competitiveness in AI. Far from entrenching any single firm, these partnerships help diversify the market, reduce dependency on dominant players, and expand the range of choices available to consumers, developers (including AI developers), and infrastructure providers alike.

## II.     Sections IV.H–I of Plaintiffs' RPFJ Would Suppress Competition and Innovation.

Plaintiffs' proposed remedy reaches far beyond the conduct this Court found unlawful—conduct that had nothing to do with AI—and would disrupt capital flows and discourage procompetitive investments in AI firms. Specifically, Sections IV.H and IV.I of Plaintiffs' RPFJ would significantly impair Google's incentive to invest in Anthropic, and companies substantially smaller than Anthropic, even where those investments would not give Google any control over the recipient or otherwise impair competition. Although the RPFJ would not *directly*

---

[12] Google Ventures, *Portfolio: AI*, https://www.gv.com/portfolio?sector=ai.

[13] *See, e.g.*, Emma Peters, *#Startupseverywhere: St. Louis, Mo.*, Engine (Aug. 23, 2024), https://www.engine.is/news/startupseverywhere-st-louis-mo-hirehenry; Ian Rutledge, *#Startupseverywhere: Brooklyn, N.Y.*, Engine (Oct. 21, 2022), https://www.engine.is/news/startupseverywhere-brooklyn-ny-carefully; Ian Rutledge, *#Startupseverywhere: New York City, N.Y.*, Engine (Sept. 30, 2022), https://www.engine.is/news/startupseverywhere-newyorkcity-ny-airpals.

prohibit these investments, it would burden them with substantial, unjustified cost, delay, and uncertainty. Under Sections IV.H and IV.I of the RPFJ:

- Google would be prohibited from acquiring "any interest" in or entering into or expanding any "collaboration" with "any company that controls a … GenAI Product," including Anthropic, without providing Plaintiffs at least 30 days' advance notice. ECF No. 1184-1 at 10.

- As part of its notice, Google would need to disclose confidential business information, including "all management or strategic plans discussing the proposed transaction." *Id.* at 11.

- If Plaintiffs requested unspecified "additional information" during the 30-day period, the transaction would be further indefinitely delayed until Google submitted "all requested information," followed by an additional 30-day waiting period. *Id.*

These provisions of the RPFJ are materially broader than the existing statutory framework they invoke. Under the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act"), companies are already required to notify regulators before completing certain acquisitions. But in key respects, Congress designed the HSR Act to allow routine transactions to proceed without unnecessary delay. To trigger the Act's notification requirements, the acquisition must exceed a certain monetary threshold—$126.4 million as of 2025. Non-voting shares do not count towards this threshold. *See* 15 U.S.C. § 18a(a). And even where that threshold is exceeded, the Act exempts investors who acquire a 10-percent-or-less voting stake in a company "solely for the purpose of investment." *See* 15 U.S.C. § 18a; 16 C.F.R. § 801.1(*i*).

9

Not only does the RPFJ cast aside the triggers Congress identified—it eliminates *all* triggers. Plaintiffs' proposal would require burdensome advance notification and review for *any* investment by Google in an AI company, without regard to the size of the investment, the voting shares obtained, whether Google itself operates in a similar or adjacent market, or any factor that might indicate a threat to competition, and even when the transaction is structured to avoid control or influence. Plaintiffs treat every investment as suspect and refuse to distinguish between controlling acquisitions and passive investments, or between exclusionary conduct and procompetitive collaboration.

The Court should reject these provisions of the RPFJ for several reasons:

***First***, they are completely untethered from the antitrust violations this Court found at the liability phase. Effective antitrust enforcement identifies unlawful, anticompetitive conduct and enjoins "continuation of *that conduct*" through relief that is carefully "tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 106-07 (emphasis added) (quotation marks omitted); *accord Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969) (antitrust remedies should restrain only "acts which are of the same type or class as unlawful acts which the court has found to have been committed").

Here, the Court did not find (nor had Plaintiffs alleged) that Google engaged in any anticompetitive conduct relating to its investments in AI. Instead, the Court's liability findings centered on exclusionary contracts and default placement agreements in general search, not investment or acquisition activity (and certainly not Google's minority, non-controlling investments in other firms). *See, e.g.*, ECF No. 1033 at 2-4. The Court's 277-page liability opinion mentions AI only briefly, and only to conclude that AI was *not relevant* to the Court's decision. *See* ECF No. 1033 at 163 (concluding that "[c]urrently, AI cannot replace the

fundamental building blocks of search"); *see also id.* at 41 (similar). Even during the remediation trial, investments have remained unexplored. While Plaintiffs have referenced AI in connection with search and Gemini, they have failed to elicit any evidence justifying relief that would extend to Google's minority investments in other AI companies, and did not even mention investments in their opening arguments.

Nothing in the cases Plaintiffs cite about the Court's "broad discretion," *see* ECF 1218 at 2-3 (quoting *Microsoft*, 253 F.3d at 105), endorses the kind of expansive remedial inquiry they now propose. The remedy for Google's antitrust violations should be tailored to the violations the Court found. It should not restrict investments that have never been found to be anticompetitive.[14]

*Second*, the RPFJ provisions at issue are so vague and overbroad as to be unworkable. Plaintiffs' proposal applies not only to relatively straightforward "acquisitions" but also to Google "enter[ing] into any . . . partnership[] or collaboration." This could be read to cover activity as benign as Google and Anthropic or TechNet (which is itself based on collaboration between companies, including ones developing AI products) jointly lobbying Congress or state legislatures to enact AI safety laws; hosting an AI research conference attended by startups in Engine's network; or sponsoring a community event promoting AI literacy. This vast—and ultimately unclear—sweep violates the requirement of specificity. *See* Fed. R. Civ.

---

[14] Plaintiffs have argued that "[c]ourts often include" similar notice requirements "in the context of consent decrees with the Antitrust Division." ECF No. 1190 at 2. But negotiated consent decrees entered without adversarial briefing shed no light on whether such a remedy is appropriate here. And Plaintiffs' examples come from cases where, unlike here, the conduct the government challenged as anticompetitive involved a merger or acquisition. *See* Complaint at 1, *United States v. Bayer AG*, No. 1:18-cv-1241 (D.D.C. May 29, 2018), ECF No. 1 (challenging Bayer's acquisition of Monsanto); Complaint at 1-2, *United States v. Smiths Grp. PLC*, No. 1:17-cv-580 (D.D.C. Mar. 30, 2017), ECF No. 1 (challenging Smiths' acquisition of Morpho).

P. 65(d)(1)(B)-(C); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (Rule 65's specificity requirement "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."); *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (holding that injunction that was not "sufficiently specific to notify the parties of the acts the court seeks to restrain" violated Rule 65). It also threatens to inundate the Court with administrative requests or secondary litigation regarding the scope of the injunction.

*Third*, the RPFJ provisions at issue would undermine, not enhance, competition in AI. These provisions would create a significant disincentive for Google to invest in smaller AI companies and are likely to deter such investments altogether, while encouraging Google to invest in its own AI instead. In fast-moving fields like AI, delay can be decisive. Startups operate on compressed timelines: Their ability to secure funding often depends on closing deals within weeks, not months. Injecting prolonged and uncertain regulatory delay into that process means that many potential deals will be abandoned—not because they are unlawful or anticompetitive, but because the procedural burden is too high and the timeline too uncertain.

Drying up this source of investment funding may have severe consequences for smaller players that have benefited from Google's investments. Take Anthropic, for instance. Developing large-scale AI models is an extraordinarily capital-intensive undertaking: As mentioned, the costs of training, testing, and deploying these systems routinely exceeds hundreds of millions of dollars, and few investors can provide that level of funding. Nor would the impact be limited to funding: Strategic partners like Google can contribute not only cash but also infrastructure, distribution, and technical talent that can help startups scale more quickly and

reach more users. Yet Plaintiffs' proposed remedy would impede not only Google's ability to invest in AI companies, but also its ability to "collaborate" with them in any way.

Making Google less viable as an investor would also make it harder for Anthropic and other, even smaller AI startups to negotiate favorable terms with other potential investors. Having multiple credible investors gives a startup leverage that allows it to resist exclusivity demands, preserve product independence, and retain flexibility. When the investor landscape becomes less competitive, the remaining funders can wield disproportionate influence. They may demand tighter integration and more control. The predictable result is that the market would become less competitive and startups' ability to challenge dominant players, including Google, would be diminished.

Empirical research supports these concerns. Studies show that the ability of large firms to invest in startups can foster innovation by validating business models, accelerating product development, and creating viable exit paths for early-stage investors. Restricting these transactions across the board—regardless of competitive effects—can have the opposite result: a contraction in venture activity, a drop in capital formation, and increased concentration among the few firms able to scale independently.[15]

\* \* \*

The evolution of Plaintiffs' proposed remedy with respect to AI investments underscores why the Court should decline to intervene in this nascent, developing space. Plaintiffs originally proposed an even more aggressive remedy: They sought to compel Google to divest all its existing investments in AI startups, including its minority, non-voting stake in Anthropic.

---

[15] *See* Tiago S. Prado, Dep't of Media & Info., Mich. State Univ., Kill Zones? Effects of Big Tech Start-up Acquisitions on Innovation (Int'l Telecomms. Soc'y, Conference Paper, June 11, 2021), *available at* https://www.econstor.eu/handle/10419/238049.

13

Anthropic was blindsided by this proposal given that Google's AI investments had never been part of this case, and it explained in prior filings that the divestment remedy would have had disastrous consequences. *See* ECF Nos. 1165, 1182. Plaintiffs then modified their proposal, dropping their divestiture demand and acknowledging that it could have caused "unintended consequences in the evolving AI space." ECF No. 1184 at 8.

Although Plaintiffs will likely point to this change as a reason why the Court should accept their modified proposal, it in fact shows the opposite. Plaintiffs' original request was misguided precisely because this case is not and has never been about AI, so Plaintiffs did not have the information necessary to craft a tailored remedial decree on that subject. Plaintiffs' modifications to their original proposal may be less extreme, but they too are ill-advised. This is not how antitrust remedies are supposed to work. An injunction in an antitrust case should reflect a fully developed and litigated factual record about the conduct and markets at issue. That is why antitrust remedies must be "tailored to fit" the particular antitrust violations that were adjudicated by the court. *Microsoft*, 253 F.3d at 107. "When it comes to fashioning an antitrust remedy," the Supreme Court has recognized, "caution is key." *NCAA*, 594 U.S. at 106. Plaintiffs' trial-and-error approach to crafting the AI portions of their proposed remedial decree is the antithesis of caution, and this Court should "be wary about [Plaintiffs'] invitations to 'set sail on a sea of doubt.'" *Id.* at 107 (quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 284 (6th Cir. 1898)).

## CONCLUSION

The Court should tailor its remedy to address the specific unlawful conduct at issue in this case and should decline to adopt Sections IV.H and IV.I of Plaintiffs' Revised Proposed Final Judgment.

Dated: May 9. 2025

Respectfully submitted,

*/s/ Paul Alessio Mezzina*
Veronica Moyé (*pro hac vice*)
Benjamin T. Lee (*pro hac vice*)
KING & SPALDING LLP
2601 Olive Street
Suite 2300
Dallas, TX 75201
(214) 764-4600
vmoye@kslaw.com
benjamin.lee@kslaw.com

Nema Milaninia
 DC Bar No. 984897
Paul Alessio Mezzina
 DC Bar No. 999325
Sumon Dantiki (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
nmilaninia@kslaw.com
pmezzina@kslaw.com
sdantiki@kslaw.com

*Counsel for Amici Curiae Anthropic PBC, Engine Advocacy, and TechNet*