# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

United States of America, et al.,

                                   Plaintiffs,

   v.

Google LLC,

                                   Defendant.

Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

State of Colorado, et al.,

                                   Plaintiffs,

   v.

Google LLC,

                                   Defendant.

Case No. 1:20-cv-03715-APM

HON. AMIT P. MEHTA

## BRIEF OF *AMICUS CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT IN SUPPORT OF PLAINTIFFS

## Table of Contents

INTEREST OF *AMICUS*……………….………………………………………………………1

I.    Introduction ......................................................................................................... 1

II.    Under Long-Established Supreme Court Authority, the Decree *Must* (A) Break Up the Illegal Monopoly, (B) Deny the Fruits of the Monopolization, and (C) Put an End to the Monopolizing Conduct ...................................................................................... 3

    A.    The Court Must Break Up or Render Impotent the Monopoly Power ............................. 4

    B.    The Court Must Deny the Fruits of the Monopolization .................................... 5

    C.    The Court Must Put an End to and Prevent Future Monopolizing Conduct...................... 6

    D.    The Government's Proposed Remedies Are Necessary to Accomplish the Supreme Court-Mandated Objectives of a Monopolization Remedies Decree ......................................... 8

III.    Google's Proposed Standards and Requirements for Equitable Relief Have No Support in the Law.................................................................................................................... 10

    A.    There Is No Requirement that the Remedies Imposed Be of the Same "Type or Class" as the Conduct Adjudged Anticompetitive ................................................................. 10

        1.    Structural Relief Is the Default and Preferred Remedy, Including in Non-Merger Cases 11

        2.    The Court Has Broad Discretion to Enjoin Conduct of a Different "Type or Class" from the Conduct Found to Violate Section 2 ..................................................... 14

    B.    Supreme Court Precedent Does Not Permit Google's Proposed Heightened "Causal Connection" Requirement.................................................................................. 17

    C.    Whether the Defendant's Unlawful Conduct Allowed It to Acquire or Maintain Its Monopoly Has No Bearing on the Appropriate Remedy....................................... 21

IV.    Conclusion ......................................................................................................... 24

## Table of Authorities

**Cases**

*Am. Tobacco Co. v. United States*,
   328 U.S. 781 (1946)……………………………...……………………………………14

*Associated Press v. United States*,
   326 U.S. 1 (1945)……………………………………………………………………...…20

*Barry Wright Corp. v. ITT Grinnell Corp.*,
   724 F.2d 227 (1st Cir. 1983)……………………………………………...…………19

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979)………………………………………………………………5

*Besser Mfg. Co. v. United States*,
   343 U.S. 444 (1952)………………………………………………………….…5

*Fed. Trade Comm'n v. Nat'l Lead Co.*,
   352 U.S. 419 (1957)………………………………………………………….…6

*Ford Motor Co. v. United States*,
   405 U.S. 562 (1972)………………………………………………………….4, 5, 6

*Ginsburg v. InBev NV/SA*,
   623 F.3d 1229 (8th Cir. 2010)………………………………………………...…16

*Hartford-Empire Co. v. United States*,
   323 U.S. 386 (1945)…………………………………………...………6, 13, 15, 21

*Hughes v. United States*,
   342 U.S. 353 (1952)………………………………………………...……….21

*Int'l Boxing Club of N. Y., Inc. v. United States*,
   358 U.S. 242 (1959)……………………………………...…………1, 2, 4, 7, 12

*Int'l Salt Co. v. United States*,
   332 U.S. 392 (1947)………………………………….…………………….3, 4

*Massachusetts v. Microsoft Corp.*,
   373 F.3d 1199 (D.C. Cir. 2004)…………………………………………….15, 17, 18

*Morgan v. Ponder*,
   892 F.2d 1355 (8th Cir. 1989)………………………………………….…….…..19

*New York v. Microsoft Corp.*,
　　224 F. Supp. 2d 76 (D.D.C. 2002),
　　*aff'd*, 373 F.3d 1199 (D.C. Cir. 2004)……………………………………...10, 11, 14, 18, 22

*NLRB v. Express Publishing Co.*,
　　312 U.S. 426 (1941)……………………………………………………….……..15

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
　　20 F.4th 466 (9th Cir. 2021)……………………………………………..……………4, 21

*Schine Chain Theatres v. United States*,
　　334 U.S. 110 (1948)……………………………………………...…………….passim

*Trabert & Hoeffer, Inc. v. Piaget Watch Co*.,
　　633 F.2d 477 (7th Cir. 1980)……………………………………………………….6, 13

*United States v. Am. Tobacco Co.*,
　　221 U.S. 106 (1911)……………………………………………………....…..14, 16

*United States v. Am. Tobacco Co.*,
　　191 F. 371 (S.D.N.Y. 1911)…………………………………….………………….14

*United States v. Crescent Amusement Co.*,
　　323 U.S. 173 (1944)……………………………………………………….5, 6, 7, 13

*United States v. E. I. du Pont de Nemours & Co.*,
　　366 U.S. 316 (1961)……………………………………………...2, 4, 6, 11, 16, 19

*United States v. Greater Buffalo Press, Inc.*,
　　402 U.S. 549 (1971)………………………………………………………………...5, 11

*United States v. Griffith*,
　　334 U.S. 100 (1948)……………………………………………………………….6

*United States v. Grinnell Corp.*,
　　384 U.S. 563 (1966)…………………………………………….……………3, 4, 5

*United States v. Microsoft Corp.*,
　　56 F.3d 1448 (D.C. Cir. 1995)…………………………………………………….10, 15

*United States v. Microsoft Corp.*,
　　253 F.3d 34 (D.C. Cir. 2001)……………………………………..………………passim

*United States v. Paramount Pictures, Inc*.,
　　334 U.S. 131 (1948)………………………………………………………...5, 21

iii

*United States v. United Shoe Mach. Corp.*,
    110 F. Supp. 295 (D. Mass. 1953), *aff'd*, 347 U.S. 521 (1954)……………..…….12, 23

*United States v. United Shoe Mach. Corp.*,
    266 F. Supp. 328 (D. Mass. 1967), *rev'd*, 391 U.S. 244 (1968)………………………..3

*United States v. United Shoe Mach. Corp.*,
    391 U.S. 244 (1968)……………………………………………………...…….passim

*United States v. U.S. Gypsum Co.*,
    340 U.S. 76 (1950)……………………………………………...…4, 6, 7, 15, 21

*United States v. Ward Baking Co*.,
    376 U.S. 327 (1964)………………………………………………...………21

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969)…………………………………………….…………10, 15

**Statutes**

15 U.S.C. § 2……………………………………………...………………...……….passim

**Other Authorities**

Areeda & Hovenkamp, Antitrust Law ¶ 653b (5th ed. 2024)…………………..…………18, 22

E. Thomas Sullivan, *The Jurisprudence of Antitrust Divestiture: The Path Less Traveled*,
    86 Minn. L. Rev. 565 (2002)……………………………………………………16

## CORPORATE AND FINANCIAL DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5), *amicus* states as follows:

The American Economic Liberties Project is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

## CERTIFICATION OF COUNSEL

In accordance with Local Civil Rule 7(o)(5), *amicus* certifies that (1) this brief was authored entirely by its counsel and not by counsel for any party in the above-captioned actions, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from *amicus curiae* and its counsel, no other person contributed money to fund preparing or submitting this brief.

## INTEREST OF *AMICUS*

American Economic Liberties Project ("AELP") is a nonpartisan, nonprofit research and advocacy organization that supports fair and consistent enforcement of the antitrust laws. AELP's interest stems from its core mission of supporting the fair and consistent enforcement of the antitrust laws, and from its studious observation of the instant case. AELP was founded in February 2020 to help translate developments in antitrust law and policy to the broader public, while ensuring that lawmakers, agency officials, enforcement personnel, and courts apply the rich history of antitrust law to contemporary market realities. AELP's advocacy includes frequent submission of *amicus* briefs in antitrust cases.

AELP has studied this case since the date of its filing. AELP attended every day of the liability phase of trial and published near-daily trial updates for public consumption. AELP's inquiry into the broader circumstances of the case has taken the form of technological research, proactively seeking out the perspectives of nonparties who stand to be affected by the resolution of this case, and participation in legal and academic forums in which the case was a centerpiece of discussion. Since this Court's August 5, 2024 finding of liability, AELP has published a study of potential remedies in this matter and has been acknowledged for its contributions to another published study.

## I.    Introduction

This Court found that Google unlawfully monopolized the general search services and general search text advertising markets. In the words of the U.S. Supreme Court, "the Government in its effort to free [these markets] of monopoly and unreasonable restraints … ha[s] won the battle." *Int'l Boxing Club of N. Y., Inc. v. United States*, 358 U.S. 242, 259 (1959). It is now the "inescapable responsibility" and "duty" of this Court to "prescribe relief which will terminate the illegal monopoly, deny [Google] the fruits of its statutory violation, and ensure that

there remain no practices likely to result in monopolization in the future." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968). In so doing, and because "the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961). If this Court, at Google's urging, and relying virtually exclusively on statements in a set of D.C. Circuit and district court opinions in a *single* case (*Microsoft*), stops short of achieving these U.S. Supreme Court-mandated objectives, the American public, who has been waiting far too long for a vibrant, competitive market, will have "won the battle but lost the war." *Int'l Boxing Club*, 358 U.S. at 259.

Google offers three reasons why this Court should stop short of fully achieving the remedial objectives required by the U.S. Supreme Court. First, Google argues—relying on dicta from the *Microsoft* case—that the Court's remedy must be of the same "type or class" as the conduct the Court found anticompetitive. Second, Google argues—again relying not on U.S. Supreme Court precedent but on *Microsoft* dicta—that the Government must prove a "significant causal connection between the conduct and creation or maintenance of the market power" for the Court to order structural relief. Third, Google argues that structural relief is not available in a case where the defendant "merely" unlawfully *maintains*—as opposed to acquires—monopoly power.

All of Google's arguments fail under longstanding U.S. Supreme Court precedent, which provides that upon a finding of a violation of Section 2, the court *must* do more than simply enjoin future violations; it must put an end to the monopolizing conduct, "assure the complete extirpation of the illegal monopoly," and deprive the defendant of the fruits of its unlawful restraints. *United Shoe*, 391 U.S. at 247.

This Court has recently expressed concerns that the remedies under discussion in this case may not go nearly far enough—that they may merely turn Google's monopoly into a duopoly of Google and Microsoft, the only other corporation with a war chest big enough to meaningfully vie for default or exclusive positioning.  The Court is right to be concerned.  We must avoid another *United Shoe*, in which the defendant, arguing—like Google does—that it "owed much of its position to superior products and services," convinced the trial court to refrain from ordering meaningful relief, including divestiture.  *United States v. United Shoe Mach. Corp.*, 266 F. Supp. 328, 330 (D. Mass. 1967), *rev'd*, 391 U.S. 244 (1968).  *Ten years later*, the defendant "continued to dominate the shoe machinery market" and "workable competition had not been established," requiring a stern intervention by the Supreme Court that finally led to a breakup of the company.  *United Shoe*, 391 U.S. at 247.  The American public cannot afford a similar mistake here.

II.    **Under Long-Established Supreme Court Authority, the Decree *Must* (A) Break Up the Illegal Monopoly, (B) Deny the Fruits of the Monopolization, and (C) Put an End to the Monopolizing Conduct**

The trial court is clothed with a broad mandate to determine the appropriate remedy in an antitrust case.  *See generally Int'l Salt Co. v. United States*, 332 U.S. 392, 400–01 (1947).  This broad mandate is nonetheless governed by preordained and well-defined guardrails.  *See United States v. Grinnell Corp.*, 384 U.S. 563, 577 (1966).  The Supreme Court has long held that a remedy decree in a monopolization case must be designed to achieve three distinct "functions" or objectives.  *Schine Chain Theatres v. United States*, 334 U.S. 110, 128-129 (1948).  These three objectives are (1) the termination of the illegal monopoly, (2) denial of the fruits of monopolization, and (3) ending the unlawful conduct and preventing practices likely to result in future monopolization.  *United Shoe*, 391 U.S. at 250; *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001).

3

Accordingly, although the "determination of the scope of the decree to accomplish its purpose is peculiarly the responsibility of the trial court," the Supreme Court has "never treated that power as one of discretion, subject only to reversal for gross abuse." *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 90 (1950). And while the Supreme Court has accorded "due regard and respect to the conclusion of the District Court," it has also held that its own role is "to be sure that a decree is fashioned which will effectively redress proved violations of the antitrust laws." *E.I. du Pont de Nemours*, 366 U.S. at 323. The underlying rationale for this careful appellate scrutiny is straightforward and simple: the "proper disposition of antitrust cases is obviously of great public importance, and their remedial phase, more often than not, is crucial." *Id.* at 324; *see Int'l Salt*, 332 U.S. at 401 (if the decree accomplishes less than that, "the Government has won a lawsuit and lost a cause").

Consistent with this approach, the Supreme Court has found remand warranted when district court decrees failed to explicitly incorporate all three objectives into the analysis and the ultimate remedy ordered. *See, e.g.*, *Schine Theatres*, 334 U.S. at 129 (setting aside decree and remanding when remedy addressed only two of the three required objectives).

### A.    The Court Must Break Up or Render Impotent the Monopoly Power

First, this Court must ensure that the decree "break[s] up or render[s] impotent the monopoly power found to be in violation of the Act." *Grinnell*, 384 U.S. at 577; *see United Shoe*, 391 U.S. at 250 ("terminate the illegal monopoly"); *Microsoft*, 253 F.3d at 103; *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021). In practical terms, this means the court must fashion the decree as an "effective means" by which "competition in [the monopolized market] might be restored." *Int'l Boxing Club*, 358 U.S. at 258; *see United Shoe*, 391 U.S. at 252 ("restore workable competition in the market"). Such relief may "do more than return the market to the status quo ante" in order to accomplish the core purpose of rendering

omnipotent the defendant's monopoly power. *Ford Motor Co. v. United States*, 405 U.S. 562, 573 n.8 (1972).

The simplest, most straightforward way for the court to accomplish this core objective of "liquidation of the illegally acquired market power" is "[d]ivestiture." *United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 556 (1971). This can entail, for example, a "break[-]up" of the defendant company, or the liquidation of assets or ownership interests that confer monopoly power on the defendant. *Grinnell*, 384 U.S. at 577; *see also, e.g.*, *Besser Mfg. Co. v. United States*, 343 U.S. 444, 449 (1952) (affirming decree dismantling a monopoly in the concrete block-making machinery industry through compulsory licensing). Such "elimination" of the defendant's monopoly position can "lower[] a major barrier to entry" and thereby "bring about a deconcentrated market structure." *Ford Motor*, 405 U.S. at 578 ("the forces of competition must be nurtured").

### B.    The Court Must Deny the Fruits of the Monopolization

A remedy must do more than dissolve the illegally maintained monopoly power. It must also deny the monopolist the fruits of its violation. *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 171 (1948) (decree must deprive the defendant of any "reward from the conspiracy through retention of its fruits"); *Microsoft*, 253 F.3d at 103; *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979). This objective is rooted in common law and the long-established equitable principle that the defendant must "surrender" what it unlawfully obtained. *Schine Theatres*, 334 U.S. at 129. And as the Supreme Court has explained, this requirement is no "more punishment than the familiar remedy of restitution." *Paramount*, 334 U.S. at 171. In ordering this remedy, the court must first determine what "dividends" the monopolist obtained from the violation. *Schine Theatres*, 334 U.S. at 129. Finally, the court should give little weight to the monopolist's hardship in dispossessing these

5

"fruits." *United States v. Crescent Amusement Co.*, 323 U.S. 173, 189 (1944) ("[T]hose who

violate the Act may not reap the benefits of their violations and avoid an undoing of their

unlawful project on the plea of hardship or inconvenience."); *see also E. I. du Pont de Nemours*,

366 U.S. at 327.

### C.    The Court Must Put an End to and Prevent Future Monopolizing Conduct

Finally, the court must craft the decree to "ensure that there remain no practices likely to

result in monopolization in the future." *United Shoe*, 391 U.S. at 250; *see Schine Theatres*, 334

U.S. at 128 ("put[] an end to … the violation"); *U.S. Gypsum*, 340 U.S. at 88 (court has "duty to

compel action by the conspirators that will, so far as practicable, cure the ill effects of the illegal

conduct, and assure the public freedom from its continuance").

This type of prophylactic and prospective relief can encompass a prohibition on activities

or conduct that previously contributed to the maintenance of the monopoly. *See Crescent

Amusement*, 323 U.S. at 189-90 ("The proclivity in the past … for an unlawful end warrants

effective assurance that no such opportunity will be available in the future."); *see also United

States v. Griffith*, 334 U.S. 100, 109 (1948) (trial court decree must "undo as near as may be the

wrongs that were done and prevent their recurrence in the future").   But the court may also

prohibit the condemned monopolist from engaging in otherwise lawful conduct that in its view

may resurrect the monopoly. *See Hartford-Empire Co. v. United States*, 323 U.S. 386, 409

(1945) (court may "prohibit acts which in another setting would be unobjectionable"); *Ford

Motor*, 405 U.S. at 576.  As the Supreme Court explained in *Federal Trade Commission v.

National Lead Co.*, "those caught violating the Act must expect some fencing in" of future

commercial activities.  352 U.S. 419, 431 (1957); *see, e.g.*, *Trabert & Hoeffer, Inc. v. Piaget

Watch Co.*, 633 F.2d 477, 485 (7th Cir. 1980) (affirming decree requiring nondiscriminatory

dealing where merely enjoining the "proven violations" would not prevent defendants from covertly achieving their unlawful purpose).

Under the same rationale, the Supreme Court has sanctioned decrees that reached beyond the monopolized market and imposed restrictions on the defendant's conduct in those adjacent markets, even when they were not at the heart of the Government's underlying case. *See, e.g.*, *U.S. Gypsum*, 340 U.S. at 90. For example, in *International Boxing Club*, the Supreme Court observed that the district court's restrictions "went beyond the 'relevant market' which has been considered for purposes of determining the Sherman Act violations." 358 U.S. at 262. The Supreme Court nonetheless upheld the decree, reasoning that "until the effects of the conspiracy are fully dissipated," the district court can deploy "broader" relief to ensure that the defendant cannot continue to use its "decided advantage" against "the independent [competitor]." *Id.*

Finally, courts can and often do order structural relief, such as divestiture, to accomplish the core objective of preventing future monopolizing conduct. For example, in *International Boxing Club*, the Supreme Court affirmed a decree requiring divestiture of an asset that "was not the fruit of the conspiracy" and was "lawfully acquired," on the basis that it otherwise "may be utilized [in the future] as part of the conspiracy to effect [defendants' unlawful] ends." 358 U.S. at 256. As the Supreme Court explained in *Crescent Amusement*, if the defendant retains the "instruments" it used to make its monopolization scheme "effective," then "there will be [a] tempting opportunity for [it] to continue to [use them] against [its] independent[] [competitors]. The proclivity in the past to use that [instrument] for an unlawful end warrants effective assurance"—through divestiture—"that no such opportunity will be available in the future." 323 U.S. at 189-90.

**D.**  **The Government's Proposed Remedies Are Necessary to Accomplish the Supreme Court-Mandated Objectives of a Monopolization Remedies Decree**

The Government proposes "six categories of mutually reinforcing remedies" variously aimed at, *inter alia*, terminating Google's illegal monopoly in the relevant markets for general search services and general search text ads.  *See generally* ECF Nos. 1184 and 1184-1.  Among them, Google must not offer or provide anything of value to Apple or any non-Apple third party, including payments for preferential treatment of Google's General Search Engine (GSE), making or maintaining the GSE as a default within a new or existing Search Access Point, or pre-installation, placement, or default status of any Search Access Point.  Google must not enter into any agreement with a Publisher to license data which provides Google exclusivity or otherwise restricts a Publisher's ability to license or otherwise make available the data to any other GSE.  Google must not condition access to any Google Product on a distribution agreement for a GSE.  Structural remedies, including divestiture of Chrome and conditional divestiture of Android, are similarly aimed at terminating Google's illegal monopoly.  And data sharing, syndication remedies, and ad-specific transparency and control remedies are also designed to unfetter both markets from Google's monopoly grip.

This court has recognized that Google's default distribution agreements give Google a "major, largely unseen advantage over its rivals," in the form of "user queries, or scale, needed [for rivals] to effectively compete."  Mem. Op. at 2, 226, 233-234.  Such access to scale improves Google's ranking algorithm and improves search ads monetization by enabling ads algorithms to select higher quality, more relevant ads, thereby improving predicted and actual click-through rates and per-query and per-impression revenue.  Mem. Op. at 230.  Accordingly, the court suggested at the outset of these remedies proceedings that the antitrust remedy "should at least try to address" Google's significant data advantage.  Trial Tr. at 86:8-15 (April 21, 2025).

To deny Google the fruits of its illegal conduct, this court should adopt the Government's proposal to give competitors access to scale-dependent data inputs, for both search and ads, that would otherwise provide Google an ongoing advantage. *See* ECF No. 1184-1, 14-15. A Search Index is a "foundational element" of a GSE, and query data in particular is necessary to ensure that an index covers queries that are frequently entered. Mem. Op. ¶¶ 92, 301. Google "deploys user data to, among other things, crawl additional websites, expand the index, re-rank the Search Engine Results Page (SERP), and improve the 'freshness' of results." Mem. Op. at 229. To deprive Google of its "massive" scale advantage, the Court should adopt the Government's proposal to make available to rivals various data related to Google's Search Index. ECF No. 1184-1 at 14-15. Further, it should order Google to make certain user-side data and ads data available to rivals on a nondiscriminatory basis. *Id.* at 16-17.

The proposed divestiture of Chrome and conditional divestiture of Android further serve to deprive Google of the substantial Android-Chrome user base, which Google obtained through illegal Mobile Application Distribution Agreements (MADAs) with all Android original equipment manufacturers (OEMs), and Revenue Share Agreements (RSAs) with each major wireless carrier, browser, and OEM.

Finally, the Government's proposed remedies are designed to prevent the emergence of monopoly in related markets, including AI. Testifying in these proceedings, Google CEO Sundar Pichai acknowledged that "AI technology is going to deeply transform Google Search" and "will make Search evolve." Trial Tr. at 2458:1-5 (April 30, 2025). Indeed, the Gemini app is itself a search access point. Remedies that prevent the resurfacing of monopoly as "Search evolve[s]" must extend to Google's ongoing efforts to lock up distribution of competing generative AI models, including through the same search access points at issue in the Court's

underlying liability determination. *Id.* Google's Gemini app, which "relies on search for grounding," Trial Tr. at 18:4-6 (April 21, 2025), is now the subject of commercial distribution agreements which closely resemble the RSAs executed by Google to foreclose competition in the relevant markets at issue in the liability phase of these proceedings. In addition to the dissolution of Google's MADAs, RSAs, and the Apple Internet Services Agreement, the proposed data sharing and syndication remedies serve the added future-looking purpose of ensuring that Google will not control the next era of innovation in adjacent and related AI markets.

## III.    Google's Proposed Standards and Requirements for Equitable Relief Have No Support in the Law

By contrast, none of the core arguments Google makes for its proposed slap-on-the-wrist remedies squares with the controlling Supreme Court authority. That authority does not require that the remedies be of the same "type or class" as the unlawful conduct. It does not require a heightened "but-for" causation standard for structural relief. And it clearly authorizes structural relief in monopoly maintenance cases.

### A.    There Is No Requirement that the Remedies Imposed Be of the Same "Type or Class" as the Conduct Adjudged Anticompetitive

Google claims that the *entirety* of the remedies ordered by the Court "must be of the 'same type or class' as the violations." ECF No. 1108 at 8 (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (*quoting Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132-33 (1969))). In other words, Google suggests, the Court cannot order structural relief because Google's unlawful conduct did not involve acquisitions, and the remedies cannot implicate "forms of technology not at issue in the liability phase" and cannot "address '"new" bad acts' where they [a]re not of the same type or class as the conduct held to violate the Sherman Act." *Id.* (citing and quoting *New York v. Microsoft Corp.*, 224 F. Supp. 2d

76, 135-37, 186 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004)).  Binding Supreme Court

precedent makes clear that Google is wrong.

> **1.    Structural Relief Is the Default and Preferred Remedy, Including in Non-Merger Cases**

First, as to structural relief, while the district court "may, if circumstances warrant, accept

a formula for achieving the result by means less drastic," "immediate dissolution or divestiture"

is the presumptive and preferred method of achieving the required remedial objectives—

regardless of whether the defendant maintained that monopoly through mergers or through

conduct.  *United Shoe*, 391 U.S. at 250-51.  Indeed, the Supreme Court "start[s] from the premise

that an injunction against future violations is not adequate to protect the public interest," because

"[i]f all that was done was to forbid a repetition of the illegal conduct, those who had unlawfully

built their empires could preserve them intact" and "retain the full dividends of their

monopolistic practices and profit from the unlawful restraints of trade which they had inflicted

on competitors."  *Schine Theatres*, 334 U.S. at 128.  As the Supreme Court explained in *Greater*

*Buffalo Press*, "[d]ivestiture performs several functions, the foremost being the *liquidation of the*

*illegally acquired market power*."  402 U.S. at 556 (emphasis added).  Dissolution or divestiture

is preferred for the additional reason that it is "simple, relatively easy to administer, and sure."

*E. I. du Pont de Nemours*, 366 U.S. at 331.

"For these reasons divestiture or dissolution is an essential feature of these decrees,"

*Schine Theatres*, 334 U.S. at 128, and is "the most important of antitrust remedies."  *E. I. du*

*Pont de Nemours*, 366 U.S. at 331.  Google's suggestion that monopolization through means

other than mergers and acquisitions cannot be remedied with structural relief because it is of a

different "type or class" from the illegal conduct found to have created or maintained the

monopoly is flatly inconsistent with this and other Supreme Court authorities.

For example, in *United Shoe*, the district court found the defendant had monopolized the shoe machinery market through restrictive leasing and unlawful pricing practices. *See United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295, 340-41 (D. Mass. 1953), *aff'd*, 347 U.S. 521 (1954). The district court initially declined to order dissolution or divestiture, instead merely prohibiting or requiring certain leasing, sale, pricing, and contracting practices. *See* 391 U.S. at 245-46 & n.1 (describing major provisions of the decree). Ten years after the court's initial decree, the government reported that United "continued to dominate the shoe machinery market" and "workable competition had not been established," and accordingly requested that the court split United into two competing companies. *Id.* at 247. The district court denied the government's request to break up the company, but the Supreme Court reversed and remanded with instructions to the district court to fulfill its "duty," "implicit in the findings of violation of s[ection] 2 and in the decisions of this Court as to the type of remedy which must be prescribed," to "assure the *complete extirpation* of the illegal monopoly." *Id.* at 251 (emphasis added). In other words, the Supreme Court admonished the district court to seriously consider breaking up United, even though United was a so-called "unitary company," and even though it monopolized the market through leasing and pricing practices rather than through acquisitions.

As another example, in *International Boxing Club*, the Supreme Court affirmed a remedy decree requiring the defendants to divest their ownership interests in Madison Square Garden, even though "the stock … was not acquired pursuant to the conspiracy, was not the fruit of illegal activity and was not proven to be the lever by which Madison Square Garden was persuaded to join the conspiracy." 358 U.S. at 255–56. It was sufficient to justify the divestiture order that the defendants had, and may have otherwise continued to, "utilize[]" Madison Square Gardens "to effect [their ends]" to monopolize the relevant markets. *Id.* at 256.

Likewise, in *Crescent Amusement*, a number of movie theater chains that owned one another's stock were held to have conspired to monopolize movie exhibition in dozens of towns by leveraging their monopolies in "closed" towns to demand exclusive film rights in competitive downs, driving competing theaters out of business or to sell out to the defendants. 323 U.S. at 181. The Supreme Court affirmed the district court's decree that "require[d] each corporate exhibitor to divest itself of the ownership of any stock or other interest in any other corporate defendant." *Id.* at 188. This is despite the fact that the defendants' mutual ownership interests predated the conspiracy. Divestiture was appropriate—indeed, essential—because "[c]ommon control was one of the instruments in bringing about unity of purpose and unity of action and in making the conspiracy effective. If that affiliation continues, there will be tempting opportunity for these exhibitors to continue to act in combination against the independents." *Id.* at 189-90; *see also, e.g.*, *Hartford-Empire*, 323 U.S. at 428 (holding trade association that "has undoubtedly been an important instrument of restraint and monopoly," and "may be made such again," should be dissolved, even though dissolution "destroys its functioning, even as an innocent trade association for what have been held lawful ends").

The same logic applies here. Take, for example, the Government's proposed divestitures of Chrome and Android. True, Google did not unlawfully acquire Chrome and Android. But as with the interests ordered divested in *International Boxing Club*, *Crescent Amusement*, and *Hartford-Empire*, Chrome and Android were essential instruments in Google's monopolization scheme: Google made Search the default GSE in its Search Widget and in the Chrome browser, and then leveraged its control of Android to ensure that the Search Widget and Chrome were preloaded, out of the box, on hundreds of millions, if not billions, of Android devices. Google's control over Android and Chrome provided, "by far," "[t]he most efficient channel of GSE

distribution." Mem. Op. ¶ 59. If Google continues to own and control Chrome and Android, the ability and incentive to use these distribution channels to "covertly achieve their unlawful purposes" will remain. *Trabert*, 633 F.2d at 485. Moreover, ownership of Chrome "only fortifie[s] [Google's] dominance." Mem. Op. ¶ 83. A divestiture of Chrome and Android will thus immediately and significantly "extirpat[e]" Google's monopoly power in search, just as the eventual break-up of United Shoe accomplished in that case. *United Shoe*, 391 U.S. at 251.

### 2. The Court Has Broad Discretion to Enjoin Conduct of a Different "Type or Class" from the Conduct Found to Violate Section 2

As the foregoing cases make clear, Google's claim that "a court may not enjoin 'clearly lawful practices … simply because they will weaken the antitrust violator's competitive position'" (ECF No. 1108 at 9 (quoting *New York*, 224 F. Supp. 2d at 109)) is incorrect. In fact, the court can go further—the court can (and preferably should) go so far as to order divestiture or dissolution to eliminate the defendant's monopoly and prevent future acts of monopolization, even when that structural remedy is of an entirely different "type or class" from the defendant's conduct found to have violated Section 2. This principle is not "novel" or "radical," but rather is firmly established in Supreme Court precedent and has been deployed by the courts for more than a century. For example, in *United States v. American Tobacco Co.*, the Supreme Court found that American Tobacco violated Section 2 by monopolizing the market for tobacco products. 221 U.S. 106 (1911). The decree in that case went beyond mere divestiture and required the defendant to create out of whole cloth and stand up "Lorillard" and "Liggett & Myers," two brand-new companies that eventually became important competitors over the next several decades. *See United States v. Am. Tobacco Co.*, 191 F. 371, 375, 423-27 (S.D.N.Y. 1911); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 793 n.7 (1946) (discussing the decree). If the court can order divestiture or dissolution, or even the creation of brand-new

14

companies, of course it can order remedial measures that stop short of divestiture or dissolution, such as injunctive relief, that accomplish the same purposes, and such a "decree need [not] deal only with the exact type of acts found to have been committed." *Hartford-Empire*, 323 U.S. at 409.

It is true that the court must ensure that the enjoined acts are "related" to the acts the defendant committed in violation of the law. *Zenith Radio*, 395 U.S. at 133 (quoting *NLRB v. Express Publishing Co.*, 312 U.S. 426, 436 (1941)). But "related" acts are not limited to those "which are of the same type or class as unlawful acts which the court has found to have been committed." *Id.* at 132. As the same sentence in *Zenith Radio* (omitted by the *Microsoft* court when quoting *Zenith*, *see* 56 F.3d at 1460) explains, "related" acts also include acts "whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past.'" *Zenith*, 395 U.S. at 132 (quoting *NLRB v. Express Publishing*, 312 U.S. at 435).

The *Microsoft* court's selective invocation of the "same type or class" language from *Zenith* was superfluous dicta; it certainly did not, as Google would apparently have this court believe, upend decades of Supreme Court precedent establishing that the enjoined conduct must merely be "[]related to violations found by the court." *Microsoft*, 56 F.3d at 1460 (quoting *Zenith*, 395 U.S. at 132-22). The D.C. Circuit certainly did not find these dicta bound it only a few years later when it ordered Microsoft to license its communication protocols. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1215-16 (D.C. Cir. 2004) (recognizing that the remedy provision was "forward-looking" since "nondisclosure of this proprietary information had played no role in our holding Microsoft violated the antitrust laws"). As the Supreme Court explained in *U.S. Gypsum*, the trial court "has the duty to compel action" by the defendant that "is not limited to prohibition of the proven means by which the evil was accomplished, but may

range broadly through practices," so long as they are "connected with acts actually found to be illegal," because "relief, to be effective, must go beyond the narrow limits of the proven violation."  340 U.S. at 88-90.  The requirement is merely a connection or relation between the unlawful conduct and the conduct restrained—not that they be of the same "type or class."

Finally, there is no "require[ment] that courts balance the benefit to competition against the hardship or competitive disadvantage the remedy may cause," contrary to the brief of *amici curiae* "bipartisan former antitrust enforcers"—ostensibly in support of neither party but represented by Google's counsel in the Google Play Store litigation.  ECF No. 1243-1 at 7 (quoting *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010)).  The only authority the *Ginsburg* court cited for that proposition is a 2002 law review article expressing the policy view that "divestiture may be an unwise remedy in *Microsoft* and other e-commerce litigation."  E. Thomas Sullivan, *The Jurisprudence of Antitrust Divestiture: The Path Less Traveled*, 86 Minn. L. Rev. 565, 570 (2002) (cited by *Ginsburg*, 623 F.3d at 1235 n.4).  These *amici*'s proposed balancing test is squarely at odds with controlling Supreme Court precedent, not only because— as discussed—divestiture is the preferred, "most important" and "most effective … of antitrust remedies," but also because the Supreme Court has made clear that "courts are authorized, indeed required, to decree relief effective to redress the violations, *whatever the adverse effect of such a decree on private interests*."  *E. I. du Pont de Nemours*, 366 U.S. at 331, 326 (emphasis added).  "Economic hardship can influence choice only as among two or more effective remedies.  If the remedy chosen is not effective, it will not be saved because an effective remedy would entail harsh consequences."  *Id.* at 327 (emphasizing that "[t]his proposition is not novel; it is deeply rooted in antitrust law and has never been successfully challenged") (citing *Am. Tobacco*, 221 U.S. at 185 (1911)).  If this Court decides that divestiture is a more effective

remedy than less so-called "drastic" relief, it may not choose the latter in the interest of avoiding hardship to Google, a $2 trillion company that violated the antitrust laws.

### B.    Supreme Court Precedent Does Not Permit Google's Proposed Heightened "Causal Connection" Requirement

Google does not dispute the longstanding Supreme Court precedent establishing that the Court's remedy *must* extirpate the illegal monopoly, deny Google the fruits of its monopolizing conduct, and prevent likely future monopolizing conduct.  Yet Google advances a standard found nowhere in these Supreme Court cases: that "when plaintiffs request structural relief, they must provide 'a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power.' … 'Absent such causation, the antitrust defendant's unlawful behavior should be remedied by "an injunction against continuation of that conduct.""' ECF No. 1108 at 6-7 (quoting *Massachusetts*, 373 F.3d at 1230, and *Microsoft*, 253 F.3d at 106). Google relies exclusively on dicta from less than a handful of district and circuit court opinions, all from the *Microsoft* case, for this proposition.

Google's "significant causal connection" requirement cannot be, and is not, the law.  This language first appeared in the D.C. Circuit's *Microsoft* opinion reversing certain of the district court's liability findings and vacating the breakup remedy the district court had ordered without conducting an evidentiary hearing and based on questionable reasoning.  *See* 253 F.3d at 100 (discussing "four reasons" the district court identified "for its 'reluctant' conclusion that 'a structural remedy has become imperative'").  Clearly disturbed by the district court's "problematic" lack of process and findings, *id.* at 49, the court of appeals felt compelled to go beyond mere vacatur and proceeded to offer the district court guidance for its new remedy determination.  In the course of this dicta, the D.C. Circuit extensively—and exclusively— quoted Professors Areeda and Hovenkamp's treatise on antitrust law.  In that treatise, the

17

professors express some of their own policy views, including advocating for their proposed heightened "causal connection" requirement that Google has latched onto.  *See* Areeda & Hovenkamp, Antitrust Law ¶ 653b (5th ed. 2024); *Microsoft*, 253 F.3d at 106-07.  The D.C. Circuit then volunteered, in a fully advisory portion of its opinion, that "[i]f the court on remand is unconvinced of the causal connection between Microsoft's exclusionary conduct and the company's position in the OS market, it may well conclude that divestiture is not an appropriate remedy."  *Id.* at 107.  Subsequent opinions in the same case then parroted the treatise language from the advisory portion of the D.C. Circuit's opinion.  See *New York*, 224 F. Supp. 2d at 102; *Massachusetts*, 373 F.3d at 1230.

Google now seeks to recast these superfluous dicta as the law of the circuit.  But Professors Areeda and Hovenkamp's policy views as expressed in the treatise, no matter how attractive, cannot abrogate Supreme Court precedent and are not the law.  The Supreme Court has repeatedly admonished that the trial court must extinguish the defendant's monopoly power, order the surrender of the fruits of the unlawful conduct, and stop the monopolizing conduct, and that the default, preferred method of doing so is divestiture.  *See supra*, section III.A.1.  It has never made these remedial obligations contingent upon the existence of any heightened causal connection between the violative conduct and the maintenance of monopoly power.  Under controlling Supreme Court authority, it would be error for this Court to find divestiture or other structural relief an appropriate means of eliminating Google's monopoly and deterring its future unlawful exercise, but to nevertheless reject that remedy for lack of a "significant causal

connection"—above and beyond what the Court already found in the liability phase—between Google's unlawful conduct and its monopoly power.[1]

Indeed, Google's "significant causal connection" standard is flatly inconsistent with the lenient causation requirement applied in equitable enforcement actions. In such actions, as this Court explained, the plaintiff "need not 'present direct proof that a defendant's continued monopoly power is precisely attributable to anticompetitive conduct.'" Mem. Op. at 215 (quoting *Microsoft*, 253 F.3d at 79). Rather, "[c]ourts may infer causation from the fact that a defendant has engaged in anticompetitive conduct that reasonably appears capable of making a significant contribution to ... maintaining monopoly power." *Id.* (quotation marks omitted) (quoting *Microsoft*, 253 F.3d at 79, and collecting cases). The applicability of this "somewhat relaxed" causation standard, *id.*, is not limited to actions seeking only non-structural relief. Rather, the standard applies to "equitable enforcement action[s]," regardless of the remedy sought. *Microsoft*, 253 F.3d at 79; *see Morgan v. Ponder*, 892 F.2d 1355, 1363 (8th Cir. 1989); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir. 1983).

Courts have adopted this standard knowing full well that divestiture or dissolution is the default, preferred remedy in injunctive relief cases. It would be quite the about-face to apply this standard at the liability phase, only to retract it the minute the Government seeks the most predictable equitable remedy of all. Indeed, to do so would turn on its head the core principle that "once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *E.I. du Pont de*

---

[1] To the extent Plaintiffs' counsel conceded at the remedies hearing that "there's some heightened [causal connection] requirement," they were mistaken in doing so. Remedies Hearing Tr. at 31 (Apr. 21, 2025). That perhaps inadvertent concession was based entirely on the nonbinding *Microsoft* dicta discussed above.

*Nemours,* 366 U.S. at 334.  Google's "significant causal connection" standard invokes the opposite principle—that once the government has satisfied its burden of proof as to causation, the sufficiency of the causal link between the defendant's conduct and its monopoly power must be questioned and reestablished.  The remedies phase is not an opportunity for the defendant to compel an effective retrial on causation requiring the Government to meet an entirely new and substantially more burdensome test.

Google's proposed but-for causation standard is designed so that no plaintiff can ever meet it.  For example, *amici curiae* "bipartisan former antitrust enforcers" urge that the Court cannot impose "[a] structural remedy like divestiture or other remedy intended to restore competition to the relevant market" unless the Government proves "that the conduct actually harmed competition and either sustained or enhanced defendant's monopoly power, or damaged or destroyed some kind of market attribute—e.g., an important supplier, resource, or distribution channel—that would have led to genuine competition."  ECF No. 1243-1 at 6; *see id.* at 14 (urging the standard "but for the unlawful agreements, Google's monopoly power would not have been maintained").  There is a reason the D.C. Circuit rejected this test for purposes of establishing liability: it presents an "underlying proof problem" in that "neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct."  *Microsoft*, 253 F.3d at 79.  Google and its *amici* would now impose that impossible task on the Government and this Court, with little more for support than dicta from the *Microsoft* case and musings contained in a single treatise.

But-for causation simply is not the standard at the remedies stage.  Instead, all that is generally required is a "full exploration of facts" and a causal link between the court's factual findings and the decree.  *Associated Press v. United States*, 326 U.S. 1, 22 (1945); *see Schine*

*Theatres*, 334 U.S. at 129.  For example, in *Schine Theatres*, the Court set aside the trial court's monopolization remedy because the findings of fact did not "reveal what the rewards of the conspiracy were," and therefore the trial court could not meaningfully "consider what would be the preferable way of causing [the monopolist] to surrender them."  *Id.*  The Supreme Court has similarly reversed remedial action by the lower courts, both for and against the government, when wanting in supporting findings.  *See, e.g.*, *Hartford-Empire*, 323 U.S. at 418; *Paramount Pictures*, 334 U.S. at 170-174; *Hughes v. United States*, 342 U.S. 353, 357-358 (1952).  Thus, to the extent that there is any sort of causal connection requirement in the remedy phase of monopolization cases, it mandates merely that the district court create a clear link between its factual findings and the decree's three objectives.  *See U.S. Gypsum*, 340 U.S. at 89; *United States v. Ward Baking Co.*, 376 U.S. 327, 333-34 (1964).  On appeal, "[t]he reviewing court only asks if 'the relief is a reasonable method of eliminating the consequences of the illegal conduct.'"  *Optronic Techs.*, 20 F.4th at 486 (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 698 (1978)).

### C.    Whether the Defendant's Unlawful Conduct Allowed It to Acquire or Maintain Its Monopoly Has No Bearing on the Appropriate Remedy

Finally, Google takes the extraordinary position, contrary to longstanding Supreme Court precedent and its own cited authorities, that "it is *not* a valid objective for the remedy in this case to actually terminate the monopoly" because Google's "monopoly was unlawfully *maintained* instead of unlawfully *acquired*."  ECF No. 1215 at 5 (quotation marks omitted; emphases in original).  The Supreme Court has never so qualified its blanket admonition that "upon appropriate findings of violation" "in a [Section] 2 case"—not just a Section 2 monopoly acquisition case, but *any* Section 2 case—the trial court holds the "inescapable responsibility" to "terminate the illegal monopoly" and "deny to the defendant the fruits of its statutory violation."

21

*United Shoe*, 391 U.S. at 250.  Indeed, the Supreme Court has taken pains to clarify that "[m]onopoly power is not condemned by the Act *only when it was unlawfully obtained*."  *Schine Theatres*, 334 U.S. at 130 (emphasis added).  The plain text of Sherman Act Section 2 makes it illegal to "monopolize … any part of … trade or commerce."  15 U.S.C. § 2.  It does not distinguish between gaining a monopoly position illegally and retaining a monopoly position illegally.

Even the handful of opinions—all from *Microsoft*—that Google relies on belie its argument that structural relief is not available in a monopoly maintenance case.  In the D.C. Circuit's dicta endorsing Professors Areeda and Hovenkamp's "significant causal connection" requirement, the court of appeals stated that "remedies such as divestiture … require a clearer indication of a significant causal connection between the conduct and creation *or maintenance* of the market power."  *Microsoft*, 253 F.3d at 80 (quoting Areeda & Hovenkamp, Antitrust Law ¶ 653b) (emphasis added).  In other words, Google's favorite authority, *Microsoft*, stands for the proposition that a structural remedy can be fully appropriate in a monopoly "maintenance" case.

Google's reliance on the subsequent district court remedies order in the *Microsoft* case is equally misplaced.  The district court did not *hold* that, in light of the fact that "the monopoly in this case was not found to have been illegally acquired, … but only to have been illegally maintained, … it does not seem to be a valid objective for the remedy in this case to actually 'terminate' Microsoft's monopoly."  *New York*, 224 F. Supp. 2d at 100-01.  Rather, both "parties concede[d]" this.  *Id.* at 101.  The district court's discussion on this point was thus, again, dicta. Back on appeal, the D.C. Circuit said nothing about the appropriateness of a structural remedy in a monopoly maintenance case.

Google claims it has monopoly power because its "continuing innovations" created "the best general search engine." ECF No. 1108 at 2-3. But the court found that Google violated the Sherman Act and that those violations—not Google's superiority—helped Google maintain its monopoly power. In other words, it does not matter that Google may have initially acquired monopoly power lawfully. It held onto that monopoly power by violating the antitrust laws. Therefore, today, it holds monopoly power, and enjoys the fruits of the unlawful exercise of that monopoly power, to which it is not entitled.

The same situation presented itself in *United Shoe*. Despite the fact that there were "three principal sources of United's [monopoly] power"—"the original constitution of the company, the superiority of United's products and services, and the [unlawful] leasing system"—and despite the fact that "[t]he first two of these [we]re plainly beyond reproach," 110 F. Supp. at 344, the Supreme Court still reversed the district court's denial of the government's request to break up the company. 391 U.S. 244. In other words, even though United Shoe "merely" maintained the monopoly power it already had by virtue of its original constitution and superior skills and abilities, a breakup of the company was still called for in order "to extirpate practices that have caused or may hereafter cause monopolization, and to restore workable competition in the market." *Id.* at 251-52.

As in *United Shoe*, here, the Court is required to devise a remedy that "terminate[s] the illegal monopoly, den[ies] to [Google] the fruits of its statutory violation, and ensure[s] that there remain no practices likely to result in monopolization in the future." *Id.* at 250. Structural relief is appropriate and well suited to accomplish those mandatory objectives, and Google does not and cannot cite a case that holds otherwise.

IV.    **Conclusion**

The Court should decline Google's invitation to deviate from U.S. Supreme Court

precedent governing remedies decrees in antitrust cases.  The Court should order a strong

remedy, including structural relief, that breaks up Google's monopoly power, denies Google the

fruits of its monopolizing conduct, and puts an end to its unlawful practices.


Dated: May 9, 2025                           Respectfully submitted,
                                             /s/ Lee A. Hepner
                                             Lee A. Hepner (admitted *pro hac vice*)
                                                *Senior Legal Counsel*
                                             Catherine S. Simonsen (admitted *pro hac vice*)
                                                *Senior Legal Fellow*
                                             AMERICAN ECONOMIC LIBERTIES PROJECT
                                             2001 Pennsylvania Ave NW, Suite 540
                                             Washington, DC 20006
                                             Telephone: (949) 412-7623
                                             lhepner@economicliberties.us
                                             csimonsen@economicliberties.us

                                             Attorneys for *Amicus Curiae* American Economic
                                             Liberties Project