# **<u>Exhibit A</u>**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | |
| GOOGLE LLC, | HON. AMIT P. MEHTA |
| Defendant. | |

| | |
|---|---|
| STATE COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | |
| GOOGLE LLC, | HON. AMIT P. MEHTA |
| Defendant. | |

**BRIEF OF CHAMBER OF PROGRESS AND COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION AS AMICUS CURIAE
SUPPORTING GOOGLE LLC**

## TABLE OF CONTENTS

**Page**

LCVR 7(O)(5) & FRAP 29(A)(4)(E) STATEMENT ..................................................... 1

STATEMENT OF INTEREST OF AMICUS CURIAE ............................................... 2

INTRODUCTION ........................................................................................................ 4

ARGUMENT ............................................................................................................... 6

    A.    A Ban On Non-Exclusive Distribution Payments Would Stifle
Competition, Hobbling Innovation, Raising Prices, and Shrinking
Consumer Choice. ........................................................................................... 6

        1.    A Ban On Non-Exclusive Distribution Payments Could Lead To A
Lower Quality Browsing Experience. ........................................................ 7

        2.    A Ban On Non-Exclusive Distribution Payments Could Stifle
Future Technological Innovation And Reduce Consumer Choice. ........... 8

        3.    A Ban On Non-Exclusive Distribution Payments Could Degrade
User Browsing Experience. ..................................................................... 10

    B.    Requiring Google To Provide Advance Notice of Partnerships Related To
Generative AI Could Chill Nascent Competition and Innovation. ...................... 11

    C.    Imposing Plaintiffs' Version of A Technical Committee To Oversee
Google's Compliance With the Final Judgment Will Likely Further
Impede the Development and Deployment of New Technologies. ...................... 14

CONCLUSION .......................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) ............................................................... 14

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ............................................................... 13

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
   833 F.3d 172 (2d Cir. 2016) ............................................................... 10

*NCAA v. Alston*,
   594 U.S. 69 (2021) ........................................................................ 4, 7

*New York v. Microsoft Corp.*,
   224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*,
   373 F.3d 1199 (D.C. Cir. 2004) ............................................................ 4

*United States v. Microsoft*,
   No. 1:98-cv-01232-CKK (D.D.C. Nov. 12, 2002) ................................... 14

*United States v. Microsoft Corp.*,
   147 F.3d 935 (D.C. Cir. 1998) ............................................................ 14

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ......................................................... 15, 16

*United States v. Microsoft Corp.*,
   56 F.3d 1448 (D.C. Cir. 1995) ............................................................ 16

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) ............................................................ 10

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ........................................................................ 13

**Other Authorities**

Corporate Transactions and Merger Control:  Overview, Practical Law Practice Note,
   Practical Law Antitrust ..................................................................... 11

*Cradle: Revolutionizing Protein Engineering with a secure AI platform built on Google
   Cloud*, Google Cloud, https://cloud.google.com/customers/cradlebio. ................... 13

Diana Moss, *Antitrust Remedies and* U.S. v. Google*: Putting the Consumer Back Into the
   "Fix"*, Progressive Policy Institute (Apr. 9, 2025),
   https://www.progressivepolicy.org/wp-content/uploads/2025/04/PPI_Antitrust-
   Remedies-in-Google-Search.pdf. ........................................................... 5

## TABLE OF AUTHORITIES
### (continued)

Emily Vogels, *Digital divide persists even as Americans with lower incomes make gains in tech adoption*, Pew Rsch. Ctr. (June 22, 2201), https://www.pewresearch.org/short-reads/2021/06/22/digital-divide-persists-even-as-americans-with-lower-incomes-make-gains-in-tech-adoption/ ................................................................................................ 8

Google for Startups, https://startup.google.com/. .......................................................... 12

Hunt Allcott, et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment*, Nat'l Bureau of Econ. Rsch. (Jan. 17, 2025), https://www.researchgate.net/publication/388699119_Sources_of_Market_Power_in_Web_Search_Evidence_from_a_Field_Experiment ......................................... 10

Haroun Adamu, *Samsung Internet: Everything you need to know*, Android Police (updated Feb. 22, 2024), https://www.androidpolice.com/samsung-internet-explainer-in-depth-guide. ................................................................................................................ 9

Hart-Scott-Rodino Annual Report: Fiscal Year 2023, https://www.ftc.gov/system/files/ftc_gov/pdf/fy2023hsrreport.pdf .......................... 12

Hasan Cavusoglu, et al., *Bloatware and Jailbreaking: How Consumer-Initiated Modification Interacts with Product Pricing*, https://www.teis-workshop.org/papers/2016/TEIS_2016_6_Geng.pdf ................................................. 7

Jack Wallen, *Opera Workspaces is tab management perfection*, ZDNet (Oct. 19, 2022), https://www.zdnet.com/home-and-office/work-life/opera-workspaces-is-tab-management-perfection. ................................................................................................ 9

James Andrew Lewis, *Tech Regulation Can Harm National Security*, Ctr. for Strategic & Int'l Studies (Nov. 28, 2022), https://www.csis.org/analysis/tech-regulation-can-harm-national-security ................................................................................................ 14

Joshua S. Gans, *Three Things About Mobile App Commissions*, NBER Working Paper No. 32339, https://www.nber.org/papers/w32339 ...................................................... 8

National Venture Capital Association's Comment to the Federal Trade Comm'n's Notice of Proposed Rulemaking (Sept. 27, 2023), https://nvca.org/wp-content/uploads/2023/09/NVCA-Comments-to-FTC-HSR-927.23.pdf. ................................. 12

Nick Barney, *What is Firefox?*, TechTarget (Dec. 2022), https://www.techtarget.com/whatis/definition/Firefox ............................................. 9

Noé Lutz, *Cradle partners with Google Cloud on security for protein engineering*, Cradle (June 2024), https://www.cradle.bio/blog/cradle-partners-with-google-cloud-on-security-for-protein-engineering. ............................................................................ 12

Peter Boberg and Andrew Dick, *Findings from the Second Request Compliance Burden Survey*, ABA Antitrust Law Section (Summer 2014), https://media.crai.com/wp-content/uploads/2020/09/16164357/Threshold-Summer-2014-Issue.pdf .............................. 11

Philippe Aghion, et al., *The Impact of Regulation on Innovation*, Nat'l Bureau of Econ. Rsch. (Jan. 2021), https://www.nber.org/papers/w28381 .................................. 14, 15

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

Premerger Notification: Reporting and Waiting Period Requirements, 89 Fed. Reg.
  89,216, 89,332 (Nov. 12, 2024) ................................................................................... 11

*UC Browser vs Google Chrome:  A Comprehensive Browser Comparison*, SigmaOS,
  https://sigmaos.com/tips/browsers/uc-browser-vs-google-chrome-a-comprehensive-
  browser-comparison .................................................................................................... 9

Vlad Savov, *Why Do Profit-Seeking Companies Keep Making Profitless Android
  Phones?*, The Verge, (Feb. 3, 2016),
  https://www.theverge.com/2016/2/3/10894200/android-smartphoneoem-profit (noting
  that most device manufacturers barely break even) ..................................................... 9

## LCVR 7(O)(5) & FRAP 29(A)(4)(E) STATEMENT

Pursuant to LCvR 7(o)(5), amicus curiae Chamber of Progress hereby certifies that it is a not-for-profit corporation.  It has no parent corporation and no publicly held corporation owns 10% or more of its stock.  Amicus curiae Computer & Communications Industry Association certifies that it is a not-for-profit corporation organized under Section 501(c)(6) of the Internal Revenue Code, that it has no parent corporation, and that no publicly held company owns 10% or more of its stock.

Counsel for amici curiae certify that no counsel for a party authored any part of this brief. No entity or person, other than amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  *Amici* receive financial support from a large number of donors, including general support from Google.  O'Melveny & Myers LLP represents Google in other matters unconnected to this brief.

## STATEMENT OF INTEREST OF AMICUS CURIAE

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate.  Chamber of Progress backs public policies that will build a more fair and inclusive country in which the tech industry operates responsibly, and in which all people benefit from technological leaps.  Chamber of Progress seeks to protect Internet freedom and free speech, to promote innovation and economic growth, and to empower technology customers and users.  It has a direct interest in ensuring that antitrust remedies in the technology sector promote rather than inhibit innovation and that such remedies do not inadvertently harm consumer welfare by imposing overly restrictive obligations on digital platforms.  Chamber of Progress attended the liability and remedies trials, publishing daily summaries and resources for the public regarding the proceedings.

Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on or veto power over its positions.  Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

The Computer & Communications Industry Association ("CCIA") is an international, not-for-profit trade association representing a broad cross-section of communications, technology, and Internet-industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy.  For more than 50 years, CCIA has promoted open markets, open systems, and open networks.  CCIA believes that open, competitive markets are the best guarantors of consumer welfare and vibrant innovation.  The issues presented in this case are of particular importance to CCIA because they directly affect the ability of technology companies to design, develop, and operate their platforms in ways that best serve consumers while

maintaining security, privacy, and quality standards.  The list of CCIA's members can be found at www.ccianet.org/members.

  *Amici* have concurrently filed a motion for leave to file pursuant to Local Civil Rule 7(o) and the Court's March 11, 2025 order (*see* ECF No. 1186).

## INTRODUCTION

Antitrust remedies must be crafted carefully.  If not, they may "unintentionally suppress procompetitive innovation."  *NCAA v. Alston*, 594 U.S. 69, 102 (2021).  Accordingly, when the government proves antitrust violations at trial, the remedies must be "of the same type or class" as the violations.  *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 101, 109 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc) ("the proper objective of the remedy in this case is termination of the exclusionary acts and practices related thereto which served to illegally maintain the monopoly").  For good reason:  overbroad remedies may unintentionally harm consumers and adjacent markets.  Consider the parallel to medicine.  When doctors prescribe treatments, they bear in mind not just the end goal—getting rid of the sickness—but also how to achieve that goal with the least harmful side effects.  The same goes for antitrust remedies.  Just as doctors take care not to prescribe medications where the risk of side effects outweighs potential therapeutic benefits, so should courts exercise caution so as not to impose remedies where the risk of unintended consequences casts a shadow over the potential benefits.

Yet, Plaintiffs' Revised Proposed Final Judgment ("Plaintiffs' Proposed Remedy") (ECF No. 1184-1) asks the Court to cast caution aside.  Rather than simply prohibit the conduct the Court deemed anticompetitive—Google's exclusive agreements related to its search engine—Plaintiffs' Proposed Remedy defies fundamental principles of antitrust law by imposing broad remedies untethered to the liability finding.  From a doctrinal standpoint, Plaintiffs' Proposed Remedy thus dangerously exceeds the scope of established antitrust remedies—especially in

prescribing forward-looking relief. Here, though, *Amici* focus on the "indelible imprint"[1] on smaller companies, and in turn consumers, that will flow if the Court adopts three[2] of Plaintiffs' especially harmful proposals: (1) a ban on non-exclusive distribution payments between Google and browsers, device manufacturers, and wireless carriers;[3] (2) a requirement that Google notify the government of any proposed partnership with a generative AI company;[4] and (3) the creation of a vaguely defined "technical committee" that will monitor Google's compliance with the final judgment.[5]

As discussed below, though Plaintiffs' Proposed Remedy should create a pathway for additional competition between Google and other search engines to benefit consumers, its effect will be the opposite. If Google is prohibited from paying any compensation for non-exclusive distribution with browsers, device manufacturers, or wireless carriers, many companies that depend on those deals to stay afloat and invest in innovation will be forced to recoup money in ways that consumers do not like (i.e., more advertisements or selling consumer data). Even

---

[1] Diana Moss, *Antitrust Remedies and* U.S. v. Google*: Putting the Consumer Back Into the "Fix",* Progressive Policy Institute (Apr. 9, 2025), https://www.progressivepolicy.org/wp-content/uploads/2025/04/PPI_Antitrust-Remedies-in-Google-Search.pdf.

[2] *Amici* focus on three of Plaintiffs' proposed remedies, but Plaintiffs' other proposed remedies, including the forced divestiture of Chrome, also present the danger of unintended harmful consequences.

[3] *See* ECF No. 1184-1 at 9, Section IV(E): "Google must not offer or provide to any Distributor any payment that is determined or calculated based on the usage of or revenue generated by—or any similar factor for—any particular GSE or Search Access Point (e.g., Google queries, Google Search Text Ad clicks, Google selections on a Choice Screen)."

[4] *See id*. at 10, Section IV(H): "Google must not, without providing Prior Notification [as set forth in the HSR Act] to the United States and the Plaintiff States . . . enter into a new joint venture, partnership, or collaboration . . . with any company that competes with Google in the GSE or Search Text Ads markets or any company that controls a Search Access Point or GenAI Product."

[5] *See id*. at 31, Section X(A)(1): "Within thirty (30) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to assist in enforcement of and compliance with this Final Judgment."

worse, some may be forced to exit the market completely.  That will leave consumers worse off with fewer alternatives—a result at odds with antitrust laws' goal of increasing inter-brand competition and consumer welfare.  So too for Plaintiffs' proposal that Google notify the government of any intended collaboration with a generative AI company.  If Google is forced to submit any potential partnership with a generative AI company to government scrutiny—a process that could delay progress in a rapidly shifting space and be unduly costly—many companies will not want (or be able) to work with Google at all.  And consumers will bear the costs:  if fewer companies have access to Google's investments, there will be less competition to develop new technologies and thus less innovation in a nascent industry.  Indeed, Plaintiffs recognized the potential for these "unintended consequences" when they walked back their original proposal forbidding Google from forming AI partnerships entirely.  *See* ECF No. 1184 (Executive Summary of Plaintiffs' Proposed Final Judgment) at 8.  And Plaintiffs' version of a "technical committee" to oversee Google's compliance with the Court's injunction is no less dangerous.  Such oversight would likely slow Google's ability to iterate on or launch new products, deterring other companies from collaborating with Google.  Yet again, consumers will lose out:  such regulatory restraints will suppress competition, hamper innovation, and deprive consumers of better technology.  The Court should, therefore, reject Plaintiffs' Proposed Remedy and adopt Google's instead.

## ARGUMENT

### A.  A Ban On Non-Exclusive Distribution Would Stifle Competition, Hobbling Innovation, Raising Prices, and Shrinking Consumer Choice.

Plaintiffs claim that their proposed ban on all payments for distribution of Google Search with browser developers, device manufacturers, and wireless carriers will increase competition.  ECF No. 1184 at 8.  The evidence shows the opposite: non-exclusive distribution payments fund

browser and device competition, device affordability, and product innovation. *See Alston*, 594 U.S. at 102 (warning that "continuing supervision of a highly detailed [antitrust] decree could wind up impairing rather than enhancing competition" (quotations omitted)).

### 1. A Ban On Non-Exclusive Distribution Payments Could Lead To A Lower Quality Browsing Experience.

*First*, a ban on non-exclusive distribution is likely to make the browsing experience worse for consumers. Independent browsers rely on this revenue stream. Some browsers, like Mozilla's Firefox, depend on these distribution agreements for up to 80% of their operating budgets. *See* ECF No. 1033 (Opinion) at 253. Browsers looking to replace such a significant source of revenue may be forced to consider adding more advertisements and usage fees, or selling user data—all things that most consumers do not like. That is exactly what happened when Mozilla switched the Firefox default search engine from Google to Yahoo in 2014: Yahoo increased the number of ads it placed on its search engine results page to meet its minimum payment guarantees to Mozilla, which upset Mozilla's users and ultimately contributed to Mozilla's decision to switch back to Google Search as the Firefox browser default just three years later. *Id.* at 116.

The same dynamics apply to device manufacturers and wireless carriers. Both derive significant funds from distributing Google Search on their devices. *Id.* at 210 (noting that "Samsung … derives 80% of its on-device search revenue through searches performed via the Google Search Widget and Chrome"). If third-party device manufacturers and wireless carriers can no longer enter any kind of distribution deal with Google, they are likely to try to recoup that lost revenue in other ways. They might, for example, add more bloatware or raise prices.[6] Or

---

[6] It is well known that device manufacturers sell their devices with bloatware to increase their revenues, and some depend on bloatware revenue to make a profit. *See* Hasan Cavusoglu, et al., *Bloatware and Jailbreaking: How Consumer-Initiated Modification Interacts with Product*

phone-makers may pull cheaper devices, which provide critical access to the internet for many consumers, out of the market entirely.  Trial Tr. 3894:3-6 (May 7, 2025).[7]  While intended to increase competition amongst search engines and benefit consumers, a ban on non-exclusive distribution payments would likely do the opposite:  consumers would end up with worse products—and might even pay more for them.  *See* ECF No. 1033 (Opinion) at 212 (noting that placing more bloatware on a device "would create a negative customer experience").

### 2.  A Ban On Non-Exclusive Distribution Payments Could Stifle Future Technological Innovation And Reduce Consumer Choice.

***Second***, not only could Plaintiffs' proposed ban force browsers and device manufacturers to try to make up for lost revenue through things like more ads and higher prices, but it could also stifle innovation.  That is for a simple reason:  innovation requires money.  Accordingly, if the Court blocks payments for non-exclusive distribution, the browsers and device manufacturers who depend on those agreements for significant portions of their operating budgets, will have significantly less ability to invest in their companies.  *See* Trial Tr. 3131:7-3132:18 (May 2, 2025) (testifying that Mozilla uses the revenue it receives from Google in developing new products, purchasing privacy preserving companies, and funding small companies that make AI more accessible to smaller developers); Trial Tr. 3893:18-21 (May 7, 2025) (testifying that

---

*Pricing*, https://www.teis-workshop.org/papers/2016/TEIS_2016_6_Geng.pdf ("In markets with shrinking margins like in smart phone and PC markets, the extra revenue from bloatware often makes a difference between profit and loss."); *see also* Joshua S. Gans, *Three Things About Mobile App Commissions*, NBER Working Paper No. 32339, https://www.nber.org/papers/w32339 ("eliminating app commissions will lead to higher device prices.").

[7] Emily Vogels, *Digital divide persists even as Americans with lower incomes make gains in tech adoption*, Pew Rsch. Ctr. (June 22, 2201), https://www.pewresearch.org/short-reads/2021/06/22/digital-divide-persists-even-as-americans-with-lower-incomes-make-gains-in-tech-adoption/ (noting that 27% of adults living in households earning less than $30,000 a year are smartphone-only internet users – meaning they own a smartphone but do not have broadband internet at home).

device manufacturers use revenue from Google distribution agreements for R&D); Trial Tr. 3831:20-22 (May 7, 2025) (testifying that less revenue from Google would mean "less products" and "less engineers").  This means consumers will see fewer innovations—like Mozilla Firefox's industry standard-setting bookmark tool and tabbed browsing[8]; Opera's customized tracking protection levels[9]; UC Browser's built-in compression technology that reduces page load times[10]; and Samsung Internet's built-in AI browsing assist that makes content on web pages easy to understand[11] —not to mention all the innovations that have not yet been invented.

Worse, an injunction prohibiting non-exclusive distribution payments could force browsers and device manufacturers out of the market entirely.  Browsers play a critical role in providing consumers with meaningful choices and drive technological innovation.  Firefox's underlying Gecko browser engine, for example, is the only player in the market held by a nonprofit.  Trial Tr. 3133:2-4 (May 2, 2025).  Yet, during the liability phase, Mozilla made it clear that depriving it of the Google distribution income stream would send it into a "death spiral."  ECF No. 757-2 (Designated Deposition Testimony of M. Baker) at 3, 16.  The risk is the same for those device manufacturers that operate on already razor-thin margins.[12]  Thus, contrary to Plaintiffs' goal of increasing competition, their Proposed Remedy might well do the opposite:

---

[8] Nick Barney, *What is Firefox?*, TechTarget (Dec. 2022), https://www.techtarget.com/whatis/definition/Firefox
[9] Jack Wallen, *Opera Workspaces is tab management perfection*, ZDNet (Oct. 19, 2022), https://www.zdnet.com/home-and-office/work-life/opera-workspaces-is-tab-management-perfection.
[10] *UC Browser vs Google Chrome:  A Comprehensive Browser Comparison*, SigmaOS, https://sigmaos.com/tips/browsers/uc-browser-vs-google-chrome-a-comprehensive-browser-comparison.
[11] Haroun Adamu, *Samsung Internet:  Everything you need to know*, Android Police (updated Feb. 22, 2024), https://www.androidpolice.com/samsung-internet-explainer-in-depth-guide.
[12] Vlad Savov, *Why Do Profit-Seeking Companies Keep Making Profitless Android Phones?*, The Verge, (Feb. 3, 2016), https://www.theverge.com/2016/2/3/10894200/android-smartphoneoem-profit (noting that most device manufacturers barely break even).

it may cause consumers to end up with fewer choices. And fewer choices, of course, is the antithesis of the goal of antitrust law. *See United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990) (antitrust law is designed to "assur[e] that competition reigns freely"); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) ("actions that reduce consumer choice are inherently anticompetitive").

### 3. A Ban On Non-Exclusive Distribution Payments Could Degrade User Browsing Experience.

***Third***, an injunction against non-exclusive distribution payments could make it more difficult for many consumers to access their preferred search product: Google. It is no secret that Google's search engine is widely regarded as the best. Indeed, this Court has acknowledged exactly that. *See* ECF No. 1033 (Opinion) at 199 (Google "has long been the best search engine"); *id.* (browsers "continue to select Google as the default because its search engine provides the best bet for monetizing queries"). Yet, Plaintiffs' proposed ban on non-exclusive distribution payments would make it more difficult for consumers to access Google; under Plaintiffs' proposal, while *Google* could no longer make non-exclusive distribution payments, *other* search engines could. To the extent, then, that browsers and device manufacturers would enter deals with Google's rivals, that would incentivize browsers and device manufacturers to push consumers toward non-Google search engines, making it more difficult for consumers to access their preferred search engine.[13] And these are just the easily foreseeable negative consequences of the proposed non-exclusive distribution payment ban. In a highly complex

---

[13] Hunt Allcott, et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment*, Nat'l Bureau of Econ. Rsch. (Jan. 17, 2025), https://www.researchgate.net/publication/388699119_Sources_of_Market_Power_in_Web_Search_Evidence_from_a_Field_Experiment (finding that increasing Bing's market share by 40 percentage points by preventing Google from bidding to be the default search engine would decrease consumer surplus by $70.92 per consumer per year because a large number of users will use Bing even though they strongly prefer Google).

ecosystem comprised of a large number of constituencies and interdependent payment flows, the

risk of unintended consequences is undoubtedly even higher than what *Amici* can now foresee.

The Court should reject Plaintiffs' Proposed Remedy.

**B. Requiring Google To Provide Advance Notice of Partnerships Related To Generative AI Could Chill Nascent Competition and Innovation.**

Plaintiffs' proposal that Google provide DOJ advance notice of any future transactions

involving generative AI likewise threatens harm to competition and consumers.  To be clear, the

remedy that Plaintiffs' request is not a quick heads-up.  Nor is it a simple written letter.  Rather,

Plaintiffs ask the Court to require Google and any potential generative AI partner to submit to the

same process that is typically reserved for "reportable transactions"—mergers worth $126.4

million or more.  *See* ECF No. 1184-1 at 11, Section IV(I)(2) ("Google must provide the

notification required by this Paragraph IV.I. in the same format as, and in accordance with the

instructions relating to, the Notification and Report Form set forth in the [HSR Act].").  That

process is burdensome: it can last months, involve intrusive investigations, and easily cost

millions of dollars.[14]

For these reasons, Plaintiffs' proposal threatens to chill partnerships between Google and

generative AI companies—partnerships that are vital for driving innovation and transformative

growth.  Right out of the gate, the obligation to collect, review, analyze, and prepare the detailed

information required by the notice process may deter Google and AI companies from even

---

[14] *See* Premerger Notification: Reporting and Waiting Period Requirements, 89 Fed. Reg. 89,216, 89,332 (Nov. 12, 2024) (premerger notification may take over 100 hours to compile); Peter Boberg and Andrew Dick, *Findings from the Second Request Compliance Burden Survey*, ABA Antitrust Law Section (Summer 2014), https://media.crai.com/wp-content/uploads/2020/09/16164357/Threshold-Summer-2014-Issue.pdf (noting that median estimated cost of compliance with a Second Request was $4.3 million, with a range of $2 million to $9 million); Corporate Transactions and Merger Control:  Overview, Practical Law Practice Note, Practical Law Antitrust ("Merger investigations can delay a transaction for months. … In 2023, an investigation that resulted in enforcement action took, on average, over 12 months").

contemplating working together.  Indeed, for early-stage growth companies, the prospect of delays might feel like an insurmountable hurdle:  "delays of even a day or two can cause significant issues,"; "delays of several weeks can result in a business failing."[15]  *See also* Trial Tr. 4074:7-10 (May 7, 2025) (Professor Hitt testifying that a 30-day waiting period could be significant in a market where seven new GenAI models have been introduced in the span of six weeks).  And even for companies that choose to move forward, the legal costs to navigate the regulatory system might prove to be too high, resulting in abandonment.[16]

The upshot?  Imposing a notice requirement is almost certain to result in fewer partnerships between Google and generative AI companies.  Fewer AI partnerships likely means less innovation, because many startups depend on collaboration and investment from companies like Google.  Indeed, Google is a pivotal player in nurturing startups, providing not just financial backing, but also access to a vast network of industry experts, technological resources, and market insights.[17]  This support has enabled numerous startups to scale new heights.  Take, for example, Google's partnership with Cradle, a biotechnology startup that uses AI to understand the molecular structure of proteins for use in a wide swath of industries.[18]  Cradle partnered with Google because of Google's expertise in protecting customers' sensitive data:  Google Cloud's "mature" and "time-tested" security services allowed Cradle to focus on scientific developments

---

[15] *See* National Venture Capital Association's Comment to the Federal Trade Comm'n's Notice of Proposed Rulemaking at 5 (Sept. 27, 2023), https://nvca.org/wp-content/uploads/2023/09/NVCA-Comments-to-FTC-HSR-927.23.pdf.
[16] *See* Hart-Scott-Rodino Annual Report:  Fiscal Year 2023, https://www.ftc.gov/system/files/ftc_gov/pdf/fy2023hsrreport.pdf (noting that more than 62 percent of deals in 2023 were voluntarily restructured or abandoned once the antitrust enforcement agencies signaled their concerns that the deal may have anticompetitive effects).
[17] Google for Startups, https://startup.google.com.
[18] Noé Lutz, *Cradle partners with Google Cloud on security for protein engineering*, Cradle (June 2024), https://www.cradle.bio/blog/cradle-partners-with-google-cloud-on-security-for-protein-engineering.

without worrying about data leaks.[19]  Barely two years after its launch, Cradle already has multiple renowned customers, including major drug manufacturers like Johnson & Johnson and Novozymes.[20]  Google's partnership helped enable those innovations.

And so, again, the costs of Plaintiffs' Proposed Remedy will be borne by consumers. With fewer partnerships and collaborations between Google and generative AI companies, there will be fewer companies taking advantage of Google's resources and know-how to develop and commercialize innovative technology.  This means *less* competition in the generative AI space, not more.  Such lessened competition would not only undermine the goals of antitrust law, *see infra* Part B, but also beget particularly devastating practical consequences:  less competition could reduce the cross-pollination of ideas and thwart the development of nascent technologies. *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("safeguard[ing] the incentive to innovate . . . will not be found unlawful"); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 988 (9th Cir. 2020) ("Antitrust law . . . is aimed at encouraging innovation, industry and competition") (cleaned up).  Indeed, that is why the government has since retrenched from its original proposed remedies.  Recognizing that requiring Google to divest from its AI investments "could cause unintended consequences in the evolving AI space," the government backed away from its original proposal.  ECF No. 1184 (Executive Summary of Plaintiffs' Proposed Final Judgment) at 8.  But because the government's notice proposal will effectively function as a bar to so many partnerships, it risks just the same "unintended consequences."  The Court should reject it.

---

[19] *Cradle: Revolutionizing Protein Engineering with a secure AI platform built on Google Cloud*, Google Cloud, https://cloud.google.com/customers/cradlebio.
[20] *Id*.

### C.  Imposing Plaintiffs' Version of A Technical Committee To Oversee Google's Compliance With the Final Judgment Will Likely Further Impede the Development and Deployment of New Technologies.

If the Court establishes Plaintiffs' proposed technical committee to oversee Google's compliance with the final judgment, that remedy would likewise hamper, not promote, competition.  Consider the practical realities.  If the Court were to adopt Plaintiffs' vague request, Google would be subject to daily monitoring, interference, and compliance costs—and would likely have to expose its unique source code, algorithms, and other proprietary information along the way.  That scheme not only makes a hash of the long-established principles that courts should not appoint "surrogate judge[s]," *United States v. Microsoft Corp.*, 147 F.3d 935, 956 (D.C. Cir. 1998) (quotations omitted); *cf United States v. Microsoft*, No. 1:98-cv-01232-CKK, (D.D.C. Nov. 12, 2002), ECF No. 746 at 9-13 (technical committee by consent decree), or "oversee product design," *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010) (*quoting Microsoft Corp.*, 147 F.3d at 948), but also threatens to reduce competition and warp the market.

For one thing, appointing Plaintiffs' proposed committee to oversee Google's compliance would almost certainly slow Google's work with its current partners or deter future partners from wanting to work with it.  Bureaucracy—even when well-intentioned—causes delay in development, deployment, and time to market.[21]  Indeed, one study found that regulatory requirements have slowed innovation by 5.4%, representing a considerable detriment to

---

[21] James Andrew Lewis, *Tech Regulation Can Harm National Security*, Ctr. for Strategic & Int'l Studies (Nov. 28, 2022), https://www.csis.org/analysis/tech-regulation-can-harm-national-security ("Technological innovation does not flourish in an environment of risk-averse and burdensome regulation."); Philippe Aghion, et al., *The Impact of Regulation on Innovation*, Nat'l Bureau of Econ. Rsch. (Jan. 2021), https://www.nber.org/papers/w28381 (showing that companies are hesitant to invest in their operations when hiring more employees increases regulatory oversight).

consumers.[22]  Delay is *particularly* likely here, because Plaintiffs' Proposed Remedy does not offer any timetables or guidance for how the committee would handle its review and revisions. *See* ECF No. 1184-1 (Plaintiffs' Proposed Remedy) at 43.  Nor does Plaintiffs' proposal offer any specifics regarding how to resolve disputes between committee members, including about who is a "Qualified Competitor" and how sensitive data should be protected.[23]  That vagueness is likely to exacerbate delays, and the prospect for such delays might prevent Google from embarking on projects, which in turn, may deter others from seeking to partner with Google.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001) ("[b]y the time a court can assess liability, firms, products, and the marketplace are likely to have changed dramatically").  And in the event a project is successfully pursued, the compliance costs of committee oversight could distract from core business operations.  In all events, those realities would exacerbate the problems identified above:  if it is harder for Google to participate in the market, fewer companies will want to partner with it, leading to less collaboration and innovation.

What is more, requiring Google to share proprietary algorithms, data, and business strategies with the technical committee could risk the exposure of the trade secrets at the heart of Google Search.  Not only would such exposure allow competitors to cut and paste Google's work, effectively depriving Google of the competitive advantage it has worked for decades to achieve, but also deter third parties from wanting to partner with Google for fear of *their* trade secrets being exposed too.  Again, it is consumers who will bear the costs:  imposing Plaintiffs' version of a technical committee to oversee Google's compliance with the final judgment will reduce the incentive for other competitors to collaborate with Google, resulting in less

---

[22] Aghion, *supra*, n.21.
[23] ECF No. 1184-1 at 35 ("The TC will have the power to recommend reasonable data security standards applicable to Qualified Competitors").

innovation—a result directly at odds with the purpose of Plaintiffs' Proposed Remedy.

## CONCLUSION

It is well established that antitrust remedies must not sweep more broadly than what is necessary to fix the violation the court found.  *See Microsoft Corp.*, 253 F.3d at 107 (remedy "should be tailored to fit the wrong creating the occasion for the remedy").  That principle is especially salient where, as here, the plaintiff does not prove a causal connection between the exclusionary conduct and the maintenance of monopoly power:  "absent such causation, the antitrust defendant's unlawful behavior should be remedied by an injunction against continuation of that conduct."  *Id.* at 106 (quotations omitted).

Yet, Plaintiffs' Proposed Remedy sweeps beyond the "same type or class" of violations as the Court found—Google's exclusive revenue-sharing contracts—so it is legally impermissible.  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (quotations omitted).  Even worse, as *Amici* explain in detail above, Plaintiffs' Proposed Remedy will likely lead to dangerous, unintended consequences for competitors and consumers alike. Indeed, although Plaintiffs' Proposed Remedy may be intended to promote competition and benefit consumers, its practical effect will likely be to *reduce* competition and *harm* consumers. The Court should reject Plaintiffs' Proposed Remedy and adopt Google's.

Dated:  May 9, 2025                              Respectfully submitted,

                                                 */s/ Benjamin G. Bradshaw*
                                                 Benjamin G. Bradshaw (D.C. Bar No. 460539)
                                                 Sergei Zaslavsky (*pro hac vice* pending) (D.C.
                                                 Bar No. 1010425)
                                                 Monsura A. Sirajee (*pro hac vice* pending)
                                                 (D.C. Bar No. 90001359)
                                                 O'MELVENY & MYERS LLP
                                                 1625 Eye Street, NW
                                                 Washington, DC 20006-4061
                                                 Telephone:        +1 202 383 5300
                                                 Facsimile:        +1 202 383 5414
                                                 bbradshaw@omm.com
                                                 szaslavsky@omm.com
                                                 msirajee@omm.com

                                                 Anna T. Pletcher (*pro hac vice* pending)
                                                 Melissa C. Cassel-Walker (*pro hac vice*
                                                 pending)
                                                 O'MELVENY & MYERS LLP
                                                 Two Embarcadero Center
                                                 28th Floor
                                                 San Francisco, CA 94111-3823
                                                 Telephone:        +1 415 984 8700
                                                 Facsimile:        +1 415 984 8701
                                                 apletcher@omm.com
                                                 mcassel@omm.com

                                                 *and*

                                                 Enoch O. Ajayi (*pro hac vice* pending)
                                                 O'MELVENY & MYERS LLP
                                                 2765 Sand Hill Road
                                                 Menlo Park, CA 94025-7019
                                                 Telephone:        +1 650 473 2600
                                                 Facsimile:        +1 650 473 2601
                                                 eajayi@omm.com

                                                 *Attorneys for Amici Curiae Chamber of*
                                                 *Progress and Computer & Communications*
                                                 *Industry Association*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the filing complies with the Local Civil Rules relating to formatting and page limits, being double-spaced, prepared in 12-point font, and not exceeding the allotted page or word limits.

Dated:  May 9, 2025

*/s/ Benjamin G. Bradshaw*
Benjamin G. Bradshaw (D.C. Bar No. 460539)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4061
Telephone:    +1 202 383 5300
Facsimile:    +1 202 383 5414
bbradshaw@omm.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I filed this Brief with the United States District

Court for the District of Columbia using the CM/ECF system, which will cause it to be served on

all counsel of record.


Dated:  May 9, 2025

*/s/ Benjamin G. Bradshaw*
Benjamin G. Bradshaw (D.C. Bar No. 460539)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4061
Telephone:        +1 202 383 5300
Facsimile:        +1 202 383 5414
bbradshaw@omm.com