# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br>　　　　　　　　　　*Plaintiffs*,<br><br>v.<br><br>GOOGLE LLC,<br>　　　　　　　　　　*Defendant*. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*,<br>　　　　　　　　　　*Plaintiffs*,<br><br>v.<br><br>GOOGLE LLC,<br>　　　　　　　　　　*Defendant*. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

### BRIEF OF *AMICUS CURIAE* THE CENTER FOR CYBERSECURITY POLICY AND LAW

**VENABLE LLP**
Elizabeth C. Rinehart (Bar No. 1617790)
Jennifer C. Daskal (*pro hac vice*)
Matthew D. Field (*pro hac vice*)
600 Massachusetts Ave, NW
Washington, DC 20001
(202) 344-4000 (Tel.)
(202) 344-8300 (Fax)
ecrinehart@venable.com
jdaskal@venable.com
mfield@venable.com
*Counsel for Amicus Curiae*
*The Center for Cybersecurity Policy and Law*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, counsel for the Center for Cybersecurity Policy and Law (the "Center") states:

*Amicus curiae* the Center is a section 501(c)(6) nonprofit organization. It has no parent corporations, and no publicly held corporation has a 10 percent or greater ownership interest in it.

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **I.** | **STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE** ..................... | 1 |
| **II.** | **INTRODUCTION**................................................................................................................ | 1 |
| **III.** | **ARGUMENT**........................................................................................................................ | 2 |
| A. | Cybersecurity, Privacy, and National Security Should Be Core Considerations in the Implementation of Any Remedy in this Case................................................... | 2 |
| B. | Required Data Sharing With "Qualified Competitors" Creates Privacy and Security Concerns ........................................................................................................... | 6 |
| C. | The Proposed Divestiture of Chrome Also Raises Security Considerations........... | 10 |
| D. | Role of Technical Committee ..................................................................................... | 12 |
| **IV.** | **CONCLUSION** ...................................................................................................................... | 13 |

# TABLE OF AUTHORITIES

**Page(s)**

**Rules**

Fed. R. App. P. 29(a)(4)(E)..................................................................................................1

**Regulations**

Preventing Access to U.S. Sensitive Personal Data and Government-Related Data by Countries of Concern or Covered Persons, 90 Fed. Reg. 1636, 1637-38 (Jan. 8, 2025)..................................................................................................................5

**Other Authorities**

Ani Petrosyan, *Estimated Cost of Cybercrime Worldwide 2018-2029*, Statista (Jul. 9, 2024), https://www.statista.com/forecasts/1280009/cost-cybercrime-worldwide ........................................................................................................................4

Brian Dean, *Google Chrome Statistics*, Backlinko (Mar. 14, 2024), https://backlinko.com/chrome-users ................................................................................2

Casey Charrier, James Sadowski, Clement Lecigne, Vlad Stolyarov, *Hello 0-Days, My Old Friend: A 2024 Zero-Day Exploitation Analysis*, Google Cloud (Apr. 29, 2025), https://cloud.google.com/blog/topics/threat-intelligence/2024-zero-day-trends .......................................................................................12

Chris Jaikaran, Cong. Rsch. Serv., IF12798, *Salt Typhoon Hacks of Telecommunications Companies and Federal Response Implications* (Jan. 23, 2025), https://crsreports.congress.gov/product/pdf/IF/IF12798 .......................................3

Council on Foreign Relations, *Operation Aurora* (Jan. 2010), https://www.cfr.org/cyber-operations/operation-aurora .....................................................3

Dep't of Justice & Cybersecurity and Infrastructure Sec. Agency, *Compromise of Microsoft Exchange Server* (Mar. 10, 2021), https://www.ic3.gov/CSA/2021/210310.pdf .....................................................................3

Department of Justice, *Data Security Program: Implementation and Enforcement Policy Through July 8, 2025* (Apr. 11, 2025), https://www.justice.gov/opa/media/1396346/dl?inline .....................................................5

Edith Ramirez, *Protecting Consumer Privacy in the Digital Age: Reaffirming the Role of Consumer Control* (Aug. 22, 2016), https://www.ftc.gov/system/files/documents/public_statements/980623/ramirez_-_protecting_consumer_privacy_in_digital_age_aspen_8-22-16.pdf ....................9

Emily Tabatabi & Shea Leitch, *States Continue to Expand Definition of Personal Information* (Feb. 27, 2017), https://iapp.org/news/a/states-continue-to-expand-definition-of-personal-information ....................................................................................... 9

Fed. Bureau of Investigation, *Internet Crime Report 2024* at 15 (Apr. 23, 2025), https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf ........................................... 4

Google Threat Analysis Group, *Iranian Backed Group Steps Up Phishing Campaigns Against Israel, U.S.*, Google Blog (Aug. 14, 2024), https://blog.google/threat-analysis-group/iranian-backed-group-steps-up-phishing-campaigns-against-israel-us/ .............................................................................. 12

Jim Finkle, *Hacker Group in China Linked to Big Cyber Attacks: Symantec*, Reuters (Sept. 17, 2013) .............................................................................................. 3

Kent Walker, *Transparency in the Shadowy World of Cyberattacks*, Google Blog (Jul. 19, 2022), https://blog.google/outreach-initiatives/public-policy/transparency-in-the-shadowy-world-of-cyberattacks/ ....................................... 4

Matt Liebowitz, *Morgan Stanley Was Hit by Chinese "Aurora" Hackers*, NBC News (Mar. 1, 2011), https://www.nbcnews.com/id/wbna41850361 ....................................... 4

Off. of the Austl. Info. Comm'r, *Publication of MBS/PBS Data* (Mar. 23, 2018), https://www.oaic.gov.au/privacy/privacy-assessments-and-decisions/privacy-decisions/investigation-reports/mbspbs-data-publication ........................................... 9

Office of the Director of National Intelligence, *National Counterintelligence Strategy 2024* at 11 (July 30, 2024) ............................................................................. 3

Office of the Nat'l Cyber Director, *2024 Report on the Cybersecurity Posture of the United States* at 5 (May 2024), https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/05/2024-Report-on-the-Cybersecurity-Posture-of-the-United-States.pdf ............................................................................................ 4

Privacy Forum, *The Curse of Dimensionality: De-Identification Challenges in the Sharing of Highly Dimensional Datasets* (May 5, 2025) https://fpf.org/blog/the-curse-of-dimensionality-de-identification-challenges-in-the-sharing-of-highly-dimensional-datasets/; ............................................................. 9

U.S. Dep't of Justice, *Three IRGC Cyber Actors Indicted for 'Hack-and-Leak' Operation Designed to Influence the 2024 U.S. Presidential Election* (Sept. 27, 2024), https://www.justice.gov/archives/opa/pr/three-irgc-cyber-actors-indicted-hack-and-leak-operation-designed-influence-2024-us ............................................. 12

U.S. Gov't Accountability Office, *SolarWinds Cyberattack Demands Significant Federal and Private-Sector Response* (Apr. 22, 2021), https://www.gao.gov/blog/solarwinds-cyberattack-demands-significant-federal-and-private-sector-response-infographic ............................................................... 5

UK National Cyber Security Centre, *Cloud Security Guidance, Principle 1: Data in Transit Protection* (Nov. 17, 2018), https://www.ncsc.gov.uk/collection/cloud/the-cloud-security-principles/principle-1-data-in-transit-protection ........................................................................ 7

UK National Cyber Security Centre, *MOVEit Vulnerability and Data Extortion Incident*, https://www.ncsc.gov.uk/information/moveit-vulnerability ........................................ 7

## I.    STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE[1]

The Center for Cybersecurity Policy and Law ("Center") is a nonprofit organization that develops, advances, and promotes best practices and educational opportunities among cybersecurity professionals. Its interest in this case is to address security and public safety considerations arising from some of the Department of Justice's ("DOJ") proposed remedies in the recent antitrust case against Google LLC ("Google"). As a nonprofit organization dedicated to advancing cybersecurity best practices among cybersecurity professionals and the industry, with the aim of better protecting public safety and national security, the Center is uniquely positioned to offer insights into the potential security risks associated with the proposed remedies in this case.[2]

## II.    INTRODUCTION

As the Court considers final remedies in this case, the Center urges careful evaluation of the security implications of DOJ's proposed measures. Our central concern is straightforward: some of the proposed structural and data-sharing remedies under consideration could increase risk to user privacy, national security, and the broader digital ecosystem. The Center is particularly concerned about remedies that may have the unintended consequences of exposing sensitive data and reducing the security of the digital ecosystem. The proposed remedies include provisions that would require sharing a significant amount of sensitive data relevant to security efforts—including

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus* certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person — other than the *amicus*, its members, or its counsel — contributed money that was intended to fund preparing or submitting this brief. All parties have either consented to or taken no position on the filing of this brief.

[2] Google has supported initiatives carried out by the Center but has not provided the Center General Support and has not provided funding for this brief.

1

user search queries and ad clicks—with not-yet identified "Qualified Competitors."[3]  As the government's expert testified, these proposed data sharing provisions include sensitive data that can expose personal health status, personal preferences, user activities, and physical location[4]— and that can be exploited by malicious foreign adversaries and criminal networks as a result. Required sharing of this data would create significant—and inherent—privacy and safety risks that cannot, as DOJ inaccurately suggests, be sufficiently remedied by limited protections for personally identifiable information or by the decisions of a yet-to-be created Technical Committee.

Of additional concern, the proposed divestiture of Chrome—which is currently downloaded on over three billion devices worldwide[5]—could undercut data security and public safety, particularly if future owners of Chrome (or other replacement browsers) offer reduced security and privacy protections compared to what is currently being provided or fail to innovate to meet the evolving cybersecurity threat faced by users and browsers online.

The Center outlines below the specific concerns in more detail to help the Court avoid these undesirable outcomes.

III.   **ARGUMENT**

   A.   **Cybersecurity, Privacy, and National Security Should Be Core Considerations in the Implementation of Any Remedy in this Case**

Remedies that neglect cybersecurity concerns risk undermining the very digital ecosystem they seek to make more competitive. This is a particular acute concern, as the number and

---

[3]   Plaintiffs' Revised Proposed Final Judgment at 15, *United States v. Google LLC*, No. 20-cv-03010 (D.D.C. Mar. 7, 2025).

[4]   Transcript of Remedies Hearing at 1137, *United States v. Google LLC*, No. 20-cv-03010 (D.D.C. Mar. 7, 2025) (testimony of David Evans).

[5]   Brian Dean, *Google Chrome Statistics*, Backlinko (Mar. 14, 2024), https://backlinko.com/chrome-users.

sophistication of cyberattacks and cyber intrusions has increased over time. Protection of sensitive data and of broader security infrastructure is core to public safety—and something that the Court should weigh heavily in the design of any remedy in this case.

*The Rising Sophistication of Malicious Cyber Actors*

Over the past decade, the number and sophistication of cyber-attacks and cyber intrusions has increased exponentially—highlighting the critical importance of strong digital security. Nation-state actors and their proxies are increasingly sophisticated in their ability to infiltrate private and public sector systems, leveraging cyber capabilities for misinformation, espionage, blackmail, and extortion, particularly amid rising geopolitical tensions.[6] Among the many recent examples of sophisticated targeted state-sponsored actions: the 2024 reported infiltration of United States telecommunications companies for espionage and disruption;[7] the 2021 Microsoft Exchange breach that compromised tens of thousands of systems in the U.S., granting attackers persistent access to enterprise networks;[8] and the 2009 Operation Aurora attack that targeted major companies, including Adobe, Dow Chemical, Morgan Stanley, and Google, stealing source code and other intellectual property and accessing personal information of users.[9]

---

[6] *See*, *e.g.*, Office of the Director of National Intelligence, *National Counterintelligence Strategy 2024* at 11 (July 30, 2024) ("Cyber threats from nation states and their surrogates remain acute. [Foreign actors] use the cyber domain to undertake their full range of activities, from collection of sensitive information to disruption and destruction of networks to malign foreign influence and monitoring of dissidents. They use technical—and often commercially available—tools to compromise computer networks and mobile and connected devices.").

[7] Chris Jaikaran, Cong. Rsch. Serv., IF12798, *Salt Typhoon Hacks of Telecommunications Companies and Federal Response Implications* at 1 (Jan. 23, 2025), https://crsreports.congress.gov/product/pdf/IF/IF12798.

[8] Dep't of Justice & Cybersecurity and Infrastructure Sec. Agency, *Compromise of Microsoft Exchange Server* at 2 (Mar. 10, 2021), https://www.ic3.gov/CSA/2021/210310.pdf.

[9] Council on Foreign Relations, *Operation Aurora* (Jan. 2010), https://www.cfr.org/cyber-operations/operation-aurora; Jim Finkle, *Hacker Group in China Linked to Big Cyber Attacks: Symantec*, Reuters (Sept. 17, 2013), https://www.reuters.com/article/technology/hacker-group-

3

Financially motivated criminals are also a growing threat, with ransomware actors increasing in scope and sophistication—aided in significant part by the ability to target identified victims. The estimated global cost of cybercrime is projected to rise by over $6.4 trillion between now and 2029, reaching a staggering $15.6 trillion over the next four years.[10] Attackers are adopting more aggressive tactics—including extortion schemes that combine threats to leak stolen information and doxxing (a form of digital abuse that exposes sensitive personal information).[11] Developments in the artificial intelligence landscape further enables cybercriminals, hacktivists, and others with limited resources and technical sophistication to conduct phishing campaigns, information operations, and other malicious cyber activity.[12]

The FBI's Internet Crime Complaint Center also reports year-over-year increases in advertising scams and business email compromise fraud, driven in part by the availability of behavioral data that enables highly targeted deception.[13] Threat actors frequently use spoofed domains and malicious advertising to mislead users into clicking on fraudulent links or disclosing personal information, techniques that benefit from understanding of the anti-fraud and security

---

in-china-linked-to-big-cyber-attacks-symantec-idUSBRE98G0M7; Matt Liebowitz, *Morgan Stanley Was Hit by Chinese "Aurora" Hackers*, NBC News (Mar. 1, 2011), https://www.nbcnews.com/id/wbna41850361; Kent Walker, *Transparency in the Shadowy World of Cyberattacks*, Google Blog (Jul. 19, 2022), https://blog.google/outreach-initiatives/public-policy/transparency-in-the-shadowy-world-of-cyberattacks/.

[10]    Ani Petrosyan, *Estimated Cost of Cybercrime Worldwide 2018-2029*, Statista (Jul. 9, 2024), https://www.statista.com/forecasts/1280009/cost-cybercrime-worldwide (*see* summary below chart).

[11]    Office of the Nat'l Cyber Director, *2024 Report on the Cybersecurity Posture of the United States* at 5 (May 2024), https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/05/2024-Report-on-the-Cybersecurity-Posture-of-the-United-States.pdf.

[12]    *Id*. at 7.

[13]    Fed. Bureau of Investigation, *Internet Crime Report 2024* at 15 (Apr. 23, 2025), https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

4

measures in place on digital platforms. These trends underscore the critical importance of cybersecurity to public safety, and the escalating financial, strategic, and human costs of insufficient protections.

*Single Vulnerabilities Can Lead to Propagating Surveillance*

Exacerbating the challenges, vulnerabilities in a single app or data transit point can provide an entry point into broad systems. Because applications and data pathways often serve as gateways to interconnected networks, a single flaw can cascade into widespread breaches. The 2020 SolarWinds cyberattack, perpetrated by the Russian Foreign Intelligence Service, exemplifies this risk: attackers compromised a routine software update from a trusted IT management platform, enabling them to infiltrate networks across multiple U.S. federal agencies and Fortune 500 companies.[14] Such a compromise, a single vulnerability in widely used software, can silently propagate through trusted systems, leading to far reaching exposures of data and ongoing surveillance.

With more entities holding sensitive data, it becomes easier for attackers to breach systems and weaponize data at scale. As detailed in *The Rule of Preventing Access to U.S. Sensitive Personal Data and Government-Related Data by Countries of Concern or Covered,* foreign adversaries can use access to bulk sensitive data to "engage in malicious cyber-enabled activities and malign foreign influence activities and to track and build profiles on U.S. individuals . . . for illicit purposes such as blackmail or espionage."[15] Given the risk and vulnerabilities, the Center

---

[14] U.S. Gov't Accountability Office, *SolarWinds Cyberattack Demands Significant Federal and Private-Sector Response* (Apr. 22, 2021), https://www.gao.gov/blog/solarwinds-cyberattack-demands-significant-federal-and-private-sector-response-infographic.

[15] *See* Preventing Access to U.S. Sensitive Personal Data and Government-Related Data by Countries of Concern or Covered Persons, 90 Fed. Reg. 1636, 1637-38 (Jan. 8, 2025); *see also* Department of Justice, *Data Security Program: Implementation and Enforcement Policy Through July 8, 2025* (Apr. 11, 2025), https://www.justice.gov/opa/media/1396346/dl?inline

urges the Court to heavily weigh core cybersecurity and related privacy considerations as it designs its remedy in this case, and to avoid remedies that undercut digital and user security.

### B. Required Data Sharing With "Qualified Competitors" Creates Privacy and Security Concerns

Required sharing of sensitive datasets to Qualified Competitors—even with controls significantly beyond those imagined in the proposed remedies—creates the risk of breach, misuse, and re-identification, especially in a threat environment where adversaries actively exploit such exposures. As demonstrated by the many breaches of reasonably secure enterprises and government actors discussed above, the underlying assumption that security and data utility can be balanced through "ordinary course" protections is not supported by technical or historical evidence.

Of concern, DOJ has proposed that Google be directed to share numerous datasets—including its search index and ranking signals, user-generated data and Ads Data—with a still-to-be determined set of "Qualified Competitors."[16] In short, DOJ is proposing that Google share user search queries and click information going back a year. This includes incredibly sensitive information about individuals' personal affiliations, interests, health status and location–creating valuable insights into user behavior, preferences, and patterns of activity.

The Government's expert, David Evans, acknowledged the sensitivity of this data:

> People submit queries to search engines that are often [ ] about medical symptoms, about their deepest, darkest secrets sometimes. It might accidentally include their Social Security number or their address intentionally. So there's a lot of information that, if it was revealed, and

---

(warning of the "urgent threat" posed by the "continued efforts of foreign adversaries to use commercial activities to access, exploit, and weaponize U.S. Government-related data and Americans' bulk sensitive personal data").

[16]   *See* Plaintiffs' Revised Proposed Judgment at 14.

especially if it could be linked to a particular user, would potentially cause harm.[17]

The sharing of this kind of sensitive data creates inherent vulnerabilities—even if the recipients of the data are entities that the Court or proposed Technical Committee trusts. Increasing the number of entities with access to this kind of sensitive data expands the potential attack surface that malicious actors and foreign adversaries can exploit. Even with safeguards in place, each additional point of access introduces new opportunities for unauthorized use, interception, tracking, or exploitation.

Data in transit—especially over public or long-distance networks—is particularly exposed to interception, manipulation, and unauthorized access, making secure transmission protocols essential to safeguarding sensitive information.[18] Attackers frequently exploit insecure transfer mechanisms to conduct man-in-the-middle attacks, to spoof recipient addresses, and to take other steps to acquire transiting data.[19] This risk escalates as more users, vendors, and third-party service providers gain access to sensitive data across distributed systems. Each new access point becomes a potential site of malicious exploitation. As data is copied and held by multiple parties, the attack surface increases as well. Malicious actors only need to identify the weakest link to access sought-after data.

---

[17] *See* Transcript of Remedies Hearing at 1137; *see also id.* at 1204 ("People submit queries with very personal information in it, and that would make the text that records that search query sensitive data"); *id.* at 1205 (acknowledging that search query data, if "exposed in the wrong way to the wrong people," have the potential to "cause financial, psychological, or reputational harm").

[18] UK National Cyber Security Centre, *Cloud Security Guidance, Principle 1: Data in Transit Protection* (Nov. 17, 2018), https://www.ncsc.gov.uk/collection/cloud/the-cloud-security-principles/principle-1-data-in-transit-protection.

[19] UK National Cyber Security Centre, *MOVEit Vulnerability and Data Extortion Incident*, https://www.ncsc.gov.uk/information/moveit-vulnerability.

Breaches risk compromising both user safety and broader security measures. Data subject to the proposed sharing requirements includes information integral to understanding Google's security measures, including its security and anti-fraud mechanisms. If malicious actors gain access to this data, they could reverse-engineer security protocols or manipulate the information to their advantage, thereby weakening the security defenses that currently protect users.

*Proposed Safeguards are Inadequate*

DOJ proposes to address these concerns by specifying that sharing should be conducted in a way that "provides suitable privacy and security safeguards."[20] The DOJ proposal would also require Google to "use ordinary course techniques to remove any Personally Identifiable Information."[21] The details of what are the right protections and approved means of implementing them are left to a yet-to-be established Technical Committee, with a DOJ appointed chair.[22]

But as the Government's own expert also highlighted, what constitutes "suitable" protections depends on multiple factors, including the properties of the data, the context in which the data is shared, and the intended use. There is a trade-off between privacy and the utility of the data. And the determination as to how many protections to put in place will depend on how one weighs those tradeoffs. As a result, there is also no "ordinary course" for removing personally identifiable information (PII) and no "universal agreement" on the appropriate weighting of these complicated factors.

Even the seemingly straightforward provisions that require Google to remove PII are subject to interpretation. Traditionally, PII encompassed only direct identifiers such as names,

---

[20] *See* Plaintiffs' Revised Proposed Judgment at 14.

[21] *Id.* at 17.

[22] *Id.* at 30.

email addresses, and physical addresses. However, many authorities, including the Federal Trade Commission (FTC), have since recognized that this definition is too narrow and adopted more expansive interpretations in order to better protect sensitive personal information that can identify the activity, behavior, and location of users.[23]

Moreover, even if the de-identification measures are applied, the risk of data re-identification remains a possibility. Multiple data points, taken together, can often be used to infer the identity of individuals or to track them across platforms and services, even if certain personal identifiers are not included in the underlying data. Over past decades, there are many examples of large datasets, theoretically de-identified, that are quickly reidentified through the use of additional information or datasets.[24] The rapid evolution of data analytics, artificial intelligence, and machine learning techniques heightens the risk of re-identification, as these technologies are increasingly capable of identifying patterns or links that may have been overlooked in traditional anonymization

---

[23]   The FTC, for instance, includes persistent identifiers such as device IDs, MAC addresses, static IP addresses, and retail loyalty card numbers within its definition of PII. *See* Keynote Address of FTC Chairwoman Edith Ramirez, *Protecting Consumer Privacy in the Digital Age: Reaffirming the Role of Consumer Control* at 4 (Aug. 22, 2016), https://www.ftc.gov/system/files/documents/public_statements/980623/ramirez_-_protecting_consumer_privacy_in_digital_age_aspen_8-22-16.pdf. Several states have mirrored this trend, enacting privacy laws that reflect a similarly broad understanding of what constitutes personally identifiable data. California, for example, through the California Consumer Privacy Act (CCPA) and its successor, the California Privacy Rights Act (CPRA), defines personal information to include not only traditional identifiers but also a wide range of indirect or inferred data. This includes online identifiers like IP addresses, precise geolocation data, biometric information, and even inferences drawn from consumer behavior used to create consumer profiles. *See* Emily Tabatabi & Shea Leitch, *States Continue to Expand Definition of Personal Information* (Feb. 27, 2017), https://iapp.org/news/a/states-continue-to-expand-definition-of-personal-information.

[24]   *See, e.g.*, Future of Privacy Forum, *The Curse of Dimensionality: De-Identification Challenges in the Sharing of Highly Dimensional Datasets* at 3 (May 5, 2025) https://fpf.org/blog/the-curse-of-dimensionality-de-identification-challenges-in-the-sharing-of-highly-dimensional-datasets/; Off. of the Austl. Info. Comm'r, *Publication of MBS/PBS Data* (Mar. 23, 2018), https://www.oaic.gov.au/privacy/privacy-assessments-and-decisions/privacy-decisions/investigation-reports/mbspbs-data-publication.

methods. Additionally, the prevalence of large, sensitive, or personal data sets that can be purchased or may be separately collected by Qualified Competitors and others means that this reidentification will be significantly easier than it has in the past.

The kind of protections that would best address these concerns around the attack surface created by copying and distributing this kind of sensitive data—such as redaction of entire records, categories of data within data sets, or specific data fields; masking data values; generalization and aggregation of data; noise addition; swapping; hashing; and pseudonymization—run counter to what appears to be the purpose of the proposed remedy, which is to give competitors access to sufficiently granular data to be able to recreate much of what Google has built.[25] In other words, as the privacy protections increase, the utility of the data for the purpose that is motivating DOJ's data sharing proposals decreases. And this data, particularly when re-identified, can be exploited by malicious actors and foreign adversaries in ways that pose a significant threat.

Although DOJ appears to recognize some of these risks and uncertainties, its solution is to delegate the details of defining, overseeing, and protecting data and security to a Technical Committee with a DOJ-appointed chair. This solution is entirely inadequate. These risks of mishandling or unauthorized access are too significant to leave to a committee of yet-unidentified individuals, especially without clear guidance on how to balance data utility with privacy and security risks.

### C. The Proposed Divestiture of Chrome Also Raises Security Considerations

The proposed structural remedies, including the proposed divestiture of Chrome to a "buyer approved by Plaintiffs in their sole discretion," should be evaluated not only for their competitive

---

[25] *See* Plaintiffs' Revised Proposed Judgment at 14 (describing the goal as giving competitors "access to scale-dependent data inputs—for both search and ads—that would otherwise provide Google an ongoing advantage from its exclusionary conduct").

effects but also for their cybersecurity consequences.[26] In this regard, the Center urges the Court to consider Google's security infrastructure as a critical aspect of the value it provides–both to the billions of users that download Chrome on its devices and the broader digital ecosystem.

The security of Chrome impacts the security of anyone, or any organization, that downloads it. Any divestiture that results in an increase in vulnerabilities within Chrome—or even worse, malicious code being transmitted through browser updates—would have negative consequences for data security. Malicious code within Chrome could migrate across networks and systems, compromising enterprise environments, enabling credential theft, disrupting essential services, and potentially being leveraged in broader supply chain attacks. Given Chrome's global footprint, even a localized breach could scale rapidly, affecting users, organizations, and infrastructure across borders. Any potential buyer who cannot maintain the security of Chrome should be disqualified.

As the Court considers this issue, it is important that it asks the right questions. The question is not: Is Google's security impervious? The answer is no. That is an impossible standard, given the pervasiveness and sophistication of the threat. Instead, the key question is: Will the proposed divestiture make users more or less secure? That, of course, depends in significant part on the buyer–a matter that DOJ proposes be left to Plaintiffs sole discretion.

Assessing this core question requires consideration of multiple factors, including the buyer's security protocols and practices, its short-term and long-term investment in security, and its role in identifying and thus protecting against emergent threats. Chrome's integration with Google has supported cross-platform threat analysis that has supported the identification of a high

---

[26] *See id.* at 12.

number of zero-day vulnerabilities,[27] national security threats,[28] and frauds. Would a future buyer do this better or worse? At this point, we lack any specificity about how Plaintiffs would invest in security, what they would do to protect users, and how that compares to steps taken by Google. The Center urges the Court to heavily weigh the potential security risks in its consideration of the proposed divestiture remedy—particularly given the lack of information about what entity or entities would fill Chrome's place, their role in the digital ecosystem, and their security protocols and practices.

### D.   Role of Technical Committee

The proposal to delegate key security and privacy determinations to a Technical Committee is insufficient to ensure the protection of sensitive data and systems–and hence public safety. DOJ proposes that the yet-to-be-named Technical Committee would decide the specifics of what information is shared by Google, assess whether privacy and security safeguards are sufficient to support such sharing, and adjudicate compliance disputes.[29] But there is no clarity as to the

---

[27]   Google's Threat Intelligence Group (GTIG) reportedly identified 75 zero-day vulnerabilities – newly discovered software bugs that are used to hack into networks – that were actively being exploited in 2024 by leveraging a combination of open-source reporting and Chrome and Android telemetry to do so. *See* Casey Charrier, James Sadowski, Clement Lecigne, Vlad Stolyarov, *Hello 0-Days, My Old Friend: A 2024 Zero-Day Exploitation Analysis*, Google Cloud (Apr. 29, 2025), https://cloud.google.com/blog/topics/threat-intelligence/2024-zero-day-trends.

[28]   In 2024, for example, the Google Threat team was able to connect information across Search, Gmail, Chrome, Android and other products to identify and disrupt Iranian activity targeting the Trump presidential campaign. *See* Google Threat Analysis Group, *Iranian Backed Group Steps Up Phishing Campaigns Against Israel, U.S.*, Google Blog (Aug. 14, 2024), https://blog.google/threat-analysis-group/iranian-backed-group-steps-up-phishing-campaigns-against-israel-us/. The Department of Justice relied on this information to support its subsequent indictment of three IRGC cyber actors. *See* U.S. Dep't of Justice, *Three IRGC Cyber Actors Indicted for 'Hack-and-Leak' Operation Designed to Influence the 2024 U.S. Presidential Election* (Sept. 27, 2024), https://www.justice.gov/archives/opa/pr/three-irgc-cyber-actors-indicted-hack-and-leak-operation-designed-influence-2024-us.

[29]   *See* Plaintiffs' Revised Proposed Judgment at 31.

competence of those on the Committee and no guidance about the necessary safeguards to guarantee strong cybersecurity. For the reasons outlined above, the key security and privacy questions associated with the information-sharing proposal are simply too momentous to delegate to a committee, let alone one that has not yet been stood up.

DOJ proposes that the Parties choose future Committee Members, with the United States government given the role of selecting the Chair. And DOJ further proposes relevant qualifications: Members of the Technical Committee "must be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, and behavioral science."[30] Notably missing from this list is cybersecurity.

To the extent that a committee is established, it is essential that it be comprised of those with deep expertise in cybersecurity, secure system design, and the management of sensitive operational data, and that they are given a clear mandate to protect cybersecurity and privacy. These experts must have clear authority to take the necessary steps to assess the security and privacy implications of proposed technical changes, review access controls for sensitive data, and evaluate the potential for unintended exposure of sensitive data.

## IV.    CONCLUSION

As the Court considers potential remedies in this case, cybersecurity and privacy should not be viewed as peripheral concerns. They are essential to the integrity of the digital ecosystem, and thus public safety and national security, and should be central to the Court's analysis.

Respectfully submitted,

/s/ Elizabeth C. Rinehart

**VENABLE LLP**
Elizabeth C. Rinehart (Bar No. 1617790)

---

[30] *Id.*

                                      Jennifer C. Daskal (*pro hac vice*)
                                      Matthew D. Field (*pro hac vice*)
                                      600 Massachusetts Ave, NW
                                      Washington, DC 20001
                                      (202) 344-4000 (Tel.)
                                      (202) 344-8300 (Fax)
                                      ecrinehart@venable.com
                                      jdaskal@venable.com
                                      mfield@venable.com
                                      *Counsel for Amicus Curiae*
                                      *The Center for Cybersecurity Policy and Law*

Dated: May 9, 2025