# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:20-cv-03010-APM |
| GOOGLE LLC, | HON. AMIT P. MEHTA |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:20-cv-03715-APM |
| GOOGLE LLC, | HON. AMIT P. MEHTA |
| Defendant. | |

## BRIEF OF *AMICI CURIAE*
## ALPHABET WORKERS UNION-CWA[1]

---

[1] Alphabet Workers Union-CWA filed its Motion for Leave to File an *Amicus* Brief on April 25, 2025 as ECF No. 1230.  No Party has opposed the Motion.  The Motion is still pending before the Court. Alphabet Workers Union-CWA files this Brief to meet the Court's May 9, 2025 deadline for the filing of *amicus* briefs.  *See* ECF No. 1201.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LCvR 7(o)(5) and Fed. R. App. P. 29(a)4)(A) and 26.1(a), the Alphabet Workers Union-CWA ("AWU-CWA") is a local union of the Communications Workers of America ("CWA").  Both AWU-CWA and CWA are unincorporated associations and a labor organizations.  They have no stock, and therefore no publicly held company owns 10% or more of their stock.

Dated: May 9, 2025                                   /s/ *Allen Grunes*
                                                     Allen Grunes (D.C. Bar No. 989298)

                                                     *Counsel to Alphabet Workers Union-CWA*

## TABLE OF CONTENTS

Page

STATEMENT OF INTEREST OF AMICUS CURIAE ................................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................................................... 2

ARGUMENT ............................................................................................................................... 3

I.   Anti-Retaliation Protections for Google's Workers Are Critical to the Final Judgment's Implementation. ................................................................................................................. 3

   a.   Google's Shift from a Culture That Encouraged Employees To Speak Up To One of Speech Suppression. ..................................................................................................... 3

   b.   Robust Anti-Retaliation Provisions Are Critical to Ensuring Companies Promote a Culture of Compliance and Comply with U.S. Antitrust Laws and Antitrust Judgments. ................................................................................................................... 8

   c.   The Parties' Proposed Remedies Are Insufficient. ...................................................... 12

   d.   The Final Judgment Should Include Robust Anti-Retaliation Provisions that Protect All of Google's Workers. ................................................................................................... 13

II.   With the Protection of Robust Anti-Relation Provisions, AWU-CWA and Its Members Can Be a Vital Resource In Effectuating the Relief In the Final Judgment and Restoring a Culture of Compliance at Google. ......................................................................................... 15

III. Any Court-Ordered Divestiture Should Include Worker Protections. ................................. 18

CONCLUSION .......................................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Fed. Trade Comm'n v. Nat'l Lead Co.*,
  352 U.S. 419 (1957)................................................................................14

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944)................................................................................13

*In re Accenture d/b/a AccentureFlex; Google, LLC/Alphabet, Inc. (as joint employers)*,
  Case No. 20-RC-319743, Decision and Direction of Election (Sep. 21, 2023) ......................8

*In re Cognizant Tech. Solutions U.S. Corporation and Google, LLC, Joint Employers*,
   Case No. 16-CA-326027, Board Decision (Jan. 1, 2024)........................................8

*In re Google*, Case No. 32-CA-348577, Conformed Settlement Agreement Bilateral
  (May 24, 2025)........................................................................................5

*Int'l Salt Co. v. United States*,
  332 U.S. 392 (1947)................................................................................13

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2024) ...............................................................4

*United States v. Live Nation Ent., Inc.*,
  Case No. 1:24-cv-03973 (S.D.N.Y.)....................................................11, 12, 13, 14

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ....................................................................15

*United States v. Ticketmaster Ent., Inc.*,
  No. 1:10-CV-00139-RMC, 2020 WL 1061445 (D.D.C. Jan. 28, 2020) ................................11

*United States v. Ticketmaster Ent., Inc.*,
  1:10-CV-00139, 2010 WL 5699134 (D.D.C. July 30, 2010) ...................................11

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969)................................................................................13

**Other Authorities**

Adam Dean, et al., *Iowa School Districts Were More Likely To Adopt COVID-19 Mask
  Mandates Where Teachers Were Unionized*, 40 HEALTH AFFAIRS 1270 (Aug. 2021)............17

Adam Dean, et al., *Resident Mortality And Worker Infection Rates From COVID-19 Lower In Union Than Nonunion US Nursing Homes, 2020-21*, 41 HEALTH AFFAIRS 751 (May 2022) ............................................................................................17

Alisha Haridasani Gupta & Ruchika Tulshyan,*'You're the Problem': When They Spoke Up About Misconduct, They Were Offered Mental Health Services*, (Jul. 29, 2021) ...............6

Brent Snyder, Deputy Assistant Att'y Gen., U.S. Dep't Justice, Antitrust Div., *Compliance is a Culture, Not Just a Policy* (Sep. 9, 2014) ..................................................9, 10

Brian Callaci & Sandeep Vaheesan, *Workers Are an Untapped Resource for Antitrust Enforcers*, The Sling (Oct.24, 2023) ......................................................................................16

Cade Metz & Daisuke Wakabayashi, *Google Researcher Says She Was Fired Over Paper Highlighting Bias in A.I.*, New York Times (Dec. 3, 2020) ..........................................7

Clare Duffy, *Former Google workers fired for protesting Israel deal file complaint claiming protected speech*, CNN (May 1, 2024) ......................................................................7

Daisuke Wakabayashi, *Google's Shadow Work Force: Temps Who Outnumber Full-Time Employees*, New York Times (May 28, 2019) ..................................................................8

Dave Lee, *'Thanksgiving Four' say Google is punishing them*, BBC (Nov. 25, 2019) ..................7

David Weil, *Enforcing OSHA: The Role of Labor Union*s, 30 INDUSTRIAL RELATIONS 20 (Winter 1991) ........................................................................................................................17

Debbie Goldman, *Disconnected: Call Center Workers Fight for Good Jobs in the Digital Age*, University of Illinois Press (2024) ......................................................................19

Efraim Benmelech, et al., *Strong Employers and Weak Employees How Does Employer Concentration Affect Wages?*, 57 J. OF HUMAN RESOURCES S201 (Apr. 2022) .....................17

Google Code of Conduct (Feb. 1, 2008) ..........................................................................................4

Grace Dean, *Google reached a private settlement with a former employee who said he was fired over workplace activism, a report say*, Business Insider (Sep. 9, 2021) ..................7

Harry C. Katz, et al., *The Revitalization of the CWA: Integrating Collective Bargaining, Political Action, and Organizing*, 56 INDUS. & LAB. RELS. REV. 573, 575-76 (2003).........................................................................................................................19

Hiba Hafiz, *Rethinking Breakups*, 71 DUKE L.J. 1491, 1507 (2022).......................................18, 19

Hiba Hafiz, *Structural Labor Rights*, 119 MICH. L. REV. 651, 664 (2021) ............................18, 19

Hugh Langley, *Leaked email shows Google's top lawyer telling employees to 'refrain from speculating or commenting' on its blockbuster antitrust trial*, Business Insider (Sep. 12, 2023) ....................................................................................................................4

iv

Ihsaan Bassier, *Collective bargaining and spillovers in local labor markets*, Centre for Economic Performance, No. 1895 (Dec. 2022) ..................................................................18

Jeffrey Keefe and Karen Boroff, *Telecommunications Labor-Management Relations After Divestiture* (in *Contemporary collective bargaining in the private sector*), Industrial Relations Research Association series, (Dec. 1994) ............................................20

Jennifer Elias, *Google reverses policy telling workers not to discuss DOJ antitrust case* (Apr. 9, 2025)........................................................................................................................5

Kate Bahn & Carmen Sanchez Cumming, *Unions and the Enforcement of Labor Rights: How Organized Labor Protects U.S. Workers Against Unfair and Illegal Employment Practices*, Washington Center for Equitable Growth (Apr. 29, 2022) ...15, 16, 17

Lee Hepner & Laurel Kilgour, *Google Broke Internet Search. It's Time to Break up Google. Remedies to Jump-Start Competition in the Google Search Antitrust Litigation*, American Economics Liberties Project, 19-20 (Nov. 2024)........................6, 13, 14

Lorenzo Franceschi-Bicchierai & Jason Koebler, *Google Employee Alleges Discrimination Against Pregnant Women in Viral Memo*, Vice (Aug. 5, 2019)......................6

Marc Doussard & Ahmad Gamal, *The Rise of Wage Theft Laws: Can Community-Labor Coalitions Win Victories in State Houses?*, 52 URBAN AFFAIRS REVIEW 780 (Sep. 2016) ......................................................................................................................17

Nico Grant, *Google Says Employees Can Discuss Antitrust Case*, New York Times (Apr. 7, 2025)......................................................................................................................4

Nitasha Tiku, *Most of the Google Walkout Organizers Have Left the Company Most of the Google Walkout Organizers Have Left the Company*, Wired (Jul. 16, 2019) ................6

Office of the Whistleblower, SEC, Annual Report to Congress for Fiscal Year 2024 (Nov. 15, 2024) ..................................................................................................................9

Office of the Whistleblower, SEC, Securities Whistleblower Incentives and Protections (May 4, 2025)..................................................................................................9

Samuel Dodini, et al., *The Dynamics of Power in Labor Markets: Monopolistic Unions Versus Monopsonistic Employers*, CESifo Working Paper No. 9495 (2021)..................................................................................................................................17

Sarah Milow, *Gags and Grievance: The Labor Origins of Whistleblowing*, Knight First Amendment Center at Columbia University (Oct. 28, 2024).........................................16

Shirin Ghaffary, *Google is cracking down on its employees' political speech at work*, Vox (Aug. 23, 2019) ..............................................................................................................4

Steve Dent, *Google contract workers accuse Alphabet and Accenture of violating labor laws*, Engadget (Aug. 4, 2023) .............................................................................8

U.S. Department of Justice, Antitrust Division, *Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations* (Nov. 2024) .................................................10

*Union Victory Against Google's Antitrust Gag Order*, Alphabet Workers Union (Apr. 7, 2025) .............................................................................................................................5

Vlad Savov & Dina Bass, *Google Reaches Undisclosed Settlement in Discrimination Suit*, Bloomberg (Feb. 20, 2022)......................................................................................6

## STATEMENT OF INTEREST OF AMICUS CURIAE

Alphabet Workers Union-CWA ("AWU-CWA")[2] is a minority union[3] engaged in organizing workers at Alphabet Inc. ("Alphabet"), its subsidiaries including Defendant Google LLC ("Google"), and vendors providing contract labor to the company. AWU-CWA is a local union of Communications Workers of America ("CWA"), the largest communications and media labor union in the United States. AWU-CWA seeks to advocate on behalf of workers at Alphabet and, where possible, represent workers as their exclusive collective bargaining agent.

AWU-CWA membership includes over 1,000 full-time Google employees, temporary Google employees, individuals employed by Google vendors such as Accenture, and independent contractors in the United States. These individuals hold a wide variety of roles at Google and its subcontractors, including software engineers, data labelers, data center technicians, graphic designers, and salespeople. AWU-CWA members engage in workplace activism, education, organizing, and other forms of advocacy to improve working conditions, encourage freedom of expression, and enhance job security for all Google employees.

AWU-CWA has successfully advocated for its members since its founding in 2021. Its victories include the following: (1) three groups of workers at Google vendors filed for and won union elections, with one of those achieving a first collective contract with Google vendor Accenture in 2024; (2) workers at Google vendor Appen won a raise through an AWU-CWA petition campaign; and (3) an AWU-CWA campaign for job security successfully sought voluntary buyouts before layoffs, which have been offered to over 30,000 Google workers this year.

---

[2] No party, or counsel for a party, authored this brief in whole or in part, and no person or entity other than AWU-CWA, CWA, its counsel, or its members made a monetary contribution intended to fund the brief's preparation or submission.

[3] A minority union is a labor organization that has not yet won exclusive representation or collectively bargained contracts for much of the workforce.

Additionally, and of particular relevance here, after Google sent a company-wide email directing Google employees to refrain from commenting on this antitrust litigation, AWU-CWA filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") and obtained a negotiated agreement in which Google rescinded what amounted to a gag order on its employees.

AWU-CWA respectfully requests the Court to include robust protections in the Final Judgment both to prevent retaliation against workers and to protect worker concerted activity. The union made recommendations on worker protections to the U.S. Department of Justice ("DOJ") as to the government's proposed remedies and has publicly invited Google to engage with its members concerning effective antitrust remedies. AWU-CWA is concerned that Google may use the Final Judgment in this case to weaken worker bargaining power and as cover for anti-union action. It files this *Amicus* brief to provide the Court with insight into how the potential remedies in this case may impact its membership, and labor in general, in hopes that it will assist the Court in crafting remedies that adequately consider Google workers and create a culture of compliance.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

More than 1,000 AWU-CWA members earn their livelihoods through their work for Google. The Final Judgment in this action, which may include divestitures, the termination of distribution contracts, and the syndication of search data, could considerably impact member jobs.

No matter what remedies this Court ultimately orders, worker engagement will be essential to the effective implementation of, and compliance with, the Final Judgment. First, meaningful mechanisms for confidential reporting and anti-retaliation protections to supplement existing laws are needed to protect and encourage workers' participation and restore a culture of compliance at Google. Nothing evidences this more than the dramatic transformation that has happened within Google's internal culture—sliding from one that once celebrated employee voices to one marked by speech suppression, including the chilling effect of the company's response to this antitrust

2

litigation.  Second, AWU-CWA's members are uniquely positioned to play a vital role in the ongoing monitoring of Google's conduct.  The presence of a unionized workforce has historically increased compliance with existing laws and is often an untapped resource for antitrust compliance.  Collective action by Google workers should be protected and encouraged.  Third, although AWU-CWA takes no position on whether this Court should order any divestitures, a divestiture remedy should include worker protections.  Divestitures historically have enabled companies to cut jobs, reduce benefits, and decrease worker bargaining power.

Accordingly, the Court should incorporate strong worker protections into the Final Judgment—not only to ensure its successful implementation but also to restore a culture of accountability within Google.

## ARGUMENT

### I.  Anti-Retaliation Protections for Google's Workers Are Critical to the Final Judgment's Implementation.

AWU-CWA's members and their co-workers can, and should be, a resource for antitrust compliance.  But despite Google workers being uniquely positioned to help ensure corporate compliance with the antitrust laws, *see infra* § II, Google has repeatedly discouraged internal discourse related to this case and engaged in speech suppression.  Robust anti-retaliation provisions are therefore critical to a successful remedy.

### a.  Google's Shift from a Culture That Encouraged Employees To Speak Up To One of Speech Suppression.

Google has a track record of suppressing worker speech.  Discussion of some topics, like antitrust and unfair competition, have been explicitly prohibited.  In other areas, the company has retaliated against workers who raise concerns about the company's employment and business practices.  Both explicit and implied silencing contribute to a culture of concealment, evidenced by the company's potentially sanctionable conduct in this case of allegedly engaging in systematic

destruction of documents, misusing of attorney client privilege, and directing its employees to avoid "certain antitrust buzzwords." *United States v. Google LLC*, 747 F. Supp. 3d 1, 185–88 (D.D.C. 2024) (describing Plaintiffs' contentions that because of Google's chat-deletion policy, "years' worth of chats—likely full of relevant information—were destroyed").

Google's current reputation lies in stark contrast to its past ethos and how it originally treated its employees. In its early days, Google had a well-known motto, "Don't be evil." Its 2008 Code of Conduct stated this motto "generally appli[ed] to how we serve our users. But 'Don't be evil' is much more than that. . . . [I]t's also about doing the right thing more generally – following the law, acting honorably and treating each other with respect."[4] Based in part on this motto, Google's employees engaged in open discussions, even of controversial topics, during internal meetings and on online message boards.[5]

Despite the early intentions, Google has recently amassed a well-documented record of suppressing employee speech, including on three separate occasions by Kent Walker, Google's President of Global Affairs, on noteworthy dates associated with this case. On October 20, 2020, the same day the DOJ filed this lawsuit, Walker urged employees to "not [] get distracted by this process, including not speculating on legal issues internally or externally."[6] Walker then reiterated this directive as the trial commenced on September 12, 2023, advising employees to "refrain from speculating or commenting on this (or any legal case), internally or externally."[7] Finally, when

---

[4] Google Code of Conduct (Feb. 1, 2008), https://web.archive.org/web/20080228205246/http://investor.google.com/conduct.html.
[5] Shirin Ghaffary, *Google is cracking down on its employees' political speech at work*, Vox (Aug. 23, 2019, at 7:00 am MDT), https://www.vox.com/recode/2019/8/23/20829430/google-new-community-guidelines-employees-political-speech-internal-debate.
[6] Nico Grant, *Google Says Employees Can Discuss Antitrust Case*, New York Times (Apr. 7, 2025), https://www.nytimes.com/2025/04/07/technology/google-antitrust-union-settlement.html#.
[7] Hugh Langley, *Leaked email shows Google's top lawyer telling employees to 'refrain from*

this Court issued its August 5, 2024 Order, Walker once more instructed employees to "refrain from commenting on this case, both internally and externally."[8]

These directives from a Google executive not only infringed upon employees' protected rights to free speech but also reinforced that Google is unreceptive to employees raising concerns about Google's potentially unlawful activities.  In response, AWU-CWA filed an unfair labor practice charge with the NLRB, alleging that Walker's emails violated employees' Section 7 rights under the National Labor Relations Act ("NLRA").[9]  AWU-CWA contended that Google's broad prohibition on discussing the case, particularly regarding the potential impact of antitrust remedies, was unlawful because discussions pertaining to wages and working conditions are protected under the NLRA.[10]  Recognizing the merit of these allegations, Google settled on March 24, 2025, and agreed to email all employees and former employees employed as of August 5, 2024, a copy of the settlement agreement and a statement affirming that it would not restrict workers' rights to discuss how the antitrust suit may affect their terms and conditions of employment.[11]  The email sharing the notice to employees per the settlement was nonetheless cryptic, referring only to the NLRB case number and not directly referencing its antitrust content.  The delivery of this communication stands in stark contrast to Walker's direct emails.

---

*speculating or commenting' on its blockbuster antitrust trial*, Business Insider (Sep. 12, 2023, at 8:24 am MT), https://www.businessinsider.com/read-email-google-lawyer-sent-staff-about-antitrust-case-trial-2023-9.

[8] Jennifer Elias, *Google reverses policy telling workers not to discuss DOJ antitrust case* (Apr. 9, 2025, at 4:54 pm), https://www.nbcphiladelphia.com/news/business/money-report/google-reverses-policy-telling-workers-not-to-discuss-doj-antitrust-case/4156621/?os=roku...&ref=app.

[9] *Union Victory Against Google's Antitrust Gag Order*, Alphabet Workers Union (Apr. 7, 2025, at 6:00 am), https://www.alphabetworkersunion.org/press/union-victory-against-googles-antitrust-gag-order.

[10] *Id.*

[11] *In re Google*, Case No. 32-CA-348577, Conformed Settlement Agreement Bilateral (May 24, 2025), https://www.nlrb.gov/case/32-CA-348577.

In addition to these directives, Google has repeatedly reshaped norms about speech by retaliating against employees who raise traditional employment concerns, such as anti-harassment and anti-discrimination. Although Google has often justified the alleged retaliation on narrow grounds related to the employees' specific situations, there is a cumulative chilling effect that discourages speaking up about employee rights and the company's business practices. For example, five workers who organized a nationwide Women's Walkout held on November 1, 2018, to highlight an internal culture that frequently rewarded and protected sexual harassers have since alleged being managed out by having the number of employees reporting to them cut in half or being disallowed to contribute to particular projects.[12] Similarly, Google worker Chelsea Glasson alleged pregnancy discrimination in an internal memorandum leaked to the press in August 2019.[13] She eventually settled,[14] but not before Google demanded her mental health records from employer-sponsored counseling sessions.[15] These allegations are even more concerning given Google's surveillance of worker communications.[16]

---

[12] Nitasha Tiku, *Most of the Google Walkout Organizers Have Left the Company Most of the Google Walkout Organizers Have Left the Company*, Wired (Jul. 16, 2019, at 4:22 pm), https://www.wired.com/story/most-google-walkout-organizers-left-company/.

[13] Lorenzo Franceschi-Bicchierai & Jason Koebler, *Google Employee Alleges Discrimination Against Pregnant Women in Viral Memo*, Vice (Aug. 5, 2019, at 11:34 am), https://www.vice.com/en/article/google-employee-alleges-discrimination-against-pregnant-women-in-viral-memo/.

[14] Vlad Savov & Dina Bass, *Google Reaches Undisclosed Settlement in Discrimination Suit*, Bloomberg (Feb. 20, 2022, at 9:26 pm MST), https://www.bloomberg.com/news/articles/2022-02-21/google-reaches-undisclosed-settlement-in-discrimination-suit.

[15] Alisha Haridasani Gupta & Ruchika Tulshyan, *'You're the Problem': When They Spoke Up About Misconduct, They Were Offered Mental Health Services*, (Jul. 29, 2021), https://www.nytimes.com/2021/07/28/us/google-workplace-complaints-counseling.html.

[16] *See* Lee Hepner & Laurel Kilgour, *Google Broke Internet Search. It's Time to Break up Google. Remedies to Jump-Start Competition in the Google Search Antitrust Litigation*, American Economics Liberties Project, 19–20 (citing several supporting sources, including an internal Google email "show[ing] that Google monitors the 'internal reaction' of its employees to antitrust-related issues") (Nov. 2024), https://www.economicliberties.us/wp-content/uploads/2024/11/AELP-Google-Remedies-Brief-111124-Clean.pdf.

Taking to heart the company's putative commitments to ethical corporate behavior, Google workers have also sought to raise concerns about company business practices, only to be later terminated. On November 25, 2019, Google fired four workers—the "Thanksgiving Four"—after they spoke out internally regarding Google's hiring of a union avoidance firm and Google's relationship with U.S. Customs and Border Patrol.[17] The NLRB subsequently accused Google of violating the NLRA by terminating the employees, and the case went to trial with at least one former employee settling with Google.[18] In late 2020, Google demanded Dr. Timnit Gebru remove herself and other Google employees as co-authors of a paper that was critical of Large Language Models because they learn by analyzing text that include biased and sometimes hateful language.[19] After she refused, Google terminated both her and her fellow team lead, Margaret Mitchell, who had internally alleged discrimination against Dr. Gebru.[20] And in April 2024, Google fired its employees who participated in a protest against the company's contracts with the Israeli government.[21] They subsequently filed a complaint under the NLRA.[22]

Google's reliance on subcontracting work to temporary employees, vendors, and contractors to conduct its business further erodes the culture. Of Alphabet's global workforce of

---

[17] Dave Lee, *'Thanksgiving Four' say Google is punishing them*, BBC (Nov. 25, 2019), https://www.bbc.com/news/technology-50554931.

[18] Grace Dean, *Google reached a private settlement with a former employee who said he was fired over workplace activism, a report say*, Business Insider (Sep. 9, 2021, at 6:04 am MT), https://www.businessinsider.com/google-settlement-laurence-berland-nlrb-calendar-union-workplace-activism-bloomberg-2021-9.

[19] Cade Metz & Daisuke Wakabayashi, *Google Researcher Says She Was Fired Over Paper Highlighting Bias in A.I.*, New York Times (Dec. 3, 2020), https://www.nytimes.com/2020/12/03/technology/google-researcher-timnit-gebru.html.

[20] *Id.*

[21] Clare Duffy, *Former Google workers fired for protesting Israel deal file complaint claiming protected speech*, CNN (May 1, 2024, at 1:01 pm EDT), https://www.cnn.com/2024/05/01/tech/google-workers-nlrb-complaint-israeli-palestinian-protest/index.html.

[22] *Id.*

more than 400,000 workers, over 50 percent have been subcontracted in some manner.[23]  This employment model allows it to extract greater profits through lower wages, and to flexibly cut or downsize contracts when facing unwanted speech or unionization efforts.  For example, AWU-CWA filed for and won union recognition elections for two units of subcontracted workers and had Google ruled a joint employer, only to see the workers' contracts eliminated or downsized.[24]

Google's multiple methods of speech suppression have caused workers to not feel safe raising concerns about anticompetitive behavior.  Given this backdrop, and as discussed in detail below, an effective Final Judgment should include robust worker protections that affirm, support, and encourage workers' abilities to act individually or collectively without fear of retaliation.

> ### b. Robust Anti-Retaliation Provisions Are Critical to Ensuring Companies Promote a Culture of Compliance and Comply with U.S. Antitrust Laws and Antitrust Judgments.

Google's workers occupy a unique vantage point within the company.  They often have access to internal operations and information, including information relevant to antitrust compliance, that is inaccessible to outsiders.  Such specialized knowledge can be effectively tapped only if there are mechanisms in place that both encourage and protect the right to speak up.  Robust anti-retaliation policies are necessary.  When workers feel secure in reporting violations or engaging in collective action, companies are more likely to adhere to antitrust laws and judgments.

Anti-retaliation provisions are not novel.  Several existing laws recognize the importance

---

[23] Daisuke Wakabayashi, *Google's Shadow Work Force: Temps Who Outnumber Full-Time Employees*, New York Times (May 28, 2019), https://www.nytimes.com/2019/05/28/technology/google-temp-workers.html.

[24] *In re Cognizant Tech. Solutions U.S. Corp. and Google, LLC, Joint Employers*,  Case No. 16-CA-326027, Board Decision (Jan. 1, 2024), https://www.nlrb.gov/case/16-CA-326027; *In re Accenture d/b/a AccentureFlex; Google, LLC/Alphabet, Inc. (as joint employers)*,  Case No. 20-RC-319743, Decision and Direction of Election (Sep. 21, 2023), https://www.nlrb.gov/case/20-RC-319743; Steve Dent, *Google contract workers accuse Alphabet and Accenture of violating labor laws*, Engadget (Aug. 4, 2023), https://www.engadget.com/google-contract-workers-accuse-alphabet-and-accenture-of-violating-labor-laws-085100869.html.

of offering protections and incentives to encourage would-be whistleblowers.  For instance, the Criminal Antitrust Anti-Retaliation Act ("CAARA"), which Congress passed in 2019, promotes whistleblowing by providing substantial protections to individuals who disclose violations.  15 U.S.C. § 7a-3.  CAARA safeguards employees from retaliation when they engage in protected activities, such as reporting violations of criminal antitrust laws and other criminal offenses linked to potential antitrust violations, or cooperating with the DOJ's investigation into possible criminal antitrust violations.  *Id.*  Similarly, the Securities and Exchange Act of 1934, as amended by the Dodd-Frank Act, encourages individuals with unique insight and knowledge into a company, such as its employees, to report securities violations by offering them confidential mechanisms to report, protections against retaliation, and large payouts.  15 U.S.C. §§ 78u-6(b),(h)(1), (h)(2).  As of 2023, the SEC has awarded nearly 400 whistleblowers payouts.[25]  Unsurprisingly, 62 percent of the whistleblowers who received awards from the SEC were insiders.[26]

Protecting whistleblowers and training employees, though necessary for compliance, are not sufficient.  Rather, there must be a *compliance culture* so that workers feel secure enough to raise concerns without being viewed as "whistleblowers."  As Brent Snyder, former Deputy Assistant Attorney General for the Antitrust Division, stated: "[T]rue compliance . . . is not optional, and is part of the company's culture."[27]  A compliance culture depends on the perception (and reality) that workers will be heard when they raise concerns.  Given Google's recent history of suppressing worker speech in multiple contexts, successful implementation of the remedies in

---

[25] Office of the Whistleblower, SEC, Securities Whistleblower Incentives and Protections, https://www.sec.gov/enforcement-litigation/whistleblower-program (last visited May 4, 2025).
[26] Office of the Whistleblower, SEC, Annual Report to Congress for Fiscal Year 2024 (Nov. 15, 2024) https://www.sec.gov/files/fy24-annual-whistleblower-report.pdf ("In FY 2024, of the whistleblowers who received awards, … approximately 62% were insiders.").
[27] Brent Snyder, Deputy Assistant Att'y Gen., U.S. Dep't Justice, Antitrust Div., *Compliance is a Culture, Not Just a Policy*, 9 (Sep. 9, 2014), https://www.justice.gov/atr/file/517796/download.

this case depends on reestablishing this culture.  Collective action by workers through a union can encourage workers to come forward, including those who are reluctant to be the only voice.[28]

Guidance from the DOJ's Antitrust Division regarding what constitutes an effective antitrust compliance program is particularly relevant.  U.S. Department of Justice, Antitrust Division, *Evaluation of Corporate Compliance Programs in Criminal Antitrust Investigations* (Nov. 2024), https://www.justice.gov/atr/media/1376686/dl?inline (hereinafter "the DOJ Guidance").[29]  The DOJ Guidance recognizes the importance of employee participation in antitrust compliance and that employee involvement can be encouraged through the appropriate corporate culture, proper training, confidential reporting mechanisms, and anti-retaliation protections.  *Id.* at 2 (noting that although the guidance is "focused on criminal risk, a well-designed antitrust compliance program should also minimize risk of civil antitrust violation").

The DOJ Guidance specifically highlights the important role of company culture.  It instructs that "[a]n effective compliance program will 'promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law,'" *id.* I.B.2 (quoting U.S.S.G. § 8B2.1(a)), which requires senior leadership to support the compliance program in such a way that "employees [are] 'convinced of the corporation's commitment to [the compliance program],'" *id.* (quoting JM § 9-28.800).  The compliance program should also be integrated into the company's business, accessible to its employees, and clearly address what an employee should do when they believe an activity is potentially unlawful.  *Id*. I.B.1, 5.

In addition to culture, an effective compliance program must include "reporting

---

[28] Steven Greenhouse, Creating a Stronger Voice for Workers, The Century Foundation (Mar. 27, 2024), https://tcf.org/content/commentary/creating-a-stronger-voice-for-workers/.
[29] *See also* Snyder, *supra* note 28, at 7 ("Effective compliance programs prevent antitrust violations.").

mechanisms that employees can use to report potential antitrust violations anonymously or confidentially and without fear of retaliation." *Id.* § I.B.7; *see also* U.S.S.G. § 8B2.1(b)(5)(C) (an effective compliance program will have in place a well-publicized "system, which may include mechanisms that allow for anonymity or confidentiality, whereby the organization's employees and agents may report or seek guidance regarding potential or actual criminal conduct without fear of retaliation"). To ensure that the entire company is committed, it must provide all of its workers with "the opportunity to report anonymously and seek guidance … without fear of retaliation."[30]

The history of the *Live Nation* antitrust litigation is particularly instructive. Although the DOJ obtained a consent decree in 2010 as part of Live Nation's acquisition of Ticketmaster that specifically prohibited retaliation against venue owners for not using the company's ticket services, *see United States v. Ticketmaster Ent., Inc.*, 1:10-CV-00139, 2010 WL 5699134 (D.D.C. July 30, 2010), Live Nation allegedly repeatedly violated this and other provisions. The court entered an amended final judgment in 2020, *see United States v. Ticketmaster Ent., Inc.*, No. 1:10-CV-00139-RMC, 2020 WL 1061445 (D.D.C. Jan. 28, 2020), which specifically required (1) monitoring of compliance via a court-appointed "Independent Monitoring Trustee" and an "Antitrust Compliance Officer" employed by defendants, *id.* § XVII.A–B; (2) training for employees, *id.* § XVII.B.3; (3) confirmation that employees may disclose violations without reprisal, *id.*; and (4) a whistleblower protection policy for antitrust violations, *id.* § XVII.D.1.d.

Nevertheless, according to the DOJ, even with the strengthened compliance program, the company's culture apparently did not change. The DOJ filed a separate complaint last year, seeking the break-up of Live Nation, in part because the amended judgement "failed to restrain Live Nation and Ticketmaster from violating . . . antitrust laws in increasingly serious ways."

---

[30] Snyder, *supra* note 26, at 5.

*United States v. Live Nation Ent., Inc.*, Case No. 1:24-cv-03973 (S.D.N.Y.).  *Live Nation* presents

a cautionary tale that reinforces the importance of a compliance culture in effectuating remedies.

### c.  The Parties' Proposed Remedies Are Insufficient.

The parties' Proposed Final Judgments lack the necessary anti-retaliation provisions for

worker collective action, particularly in light of Google's history of suppressing worker speech,

and are insufficient to create a compliance culture at Google.

Google's Proposed Final Judgment unsurprisingly would impose minimal constraints on

its operations.  *See generally* Def.'s Proposed Final Judgment, ECF No. 1108-1.  While it would

limit the conditions Google can include in agreements with certain third parties, mandate an

undefined annual compliance report, allow Plaintiffs to request an additional interim annual report,

and require Google to designate a compliance officer for third-party complaints regarding

compliance, *id.* §§ III, IV(A)–(C), it lacks any mechanism, anonymous or otherwise, for

employees, as opposed to third parties, to report compliance issues.  Further, although Google's

proposal would permit Plaintiffs to interview employees to confirm the compliance report's

accuracy, *see id.* § IV.A.3.c, it contains no anti-retaliation protections for those employees.

Plaintiffs' Revised Proposed Final Judgment, although it envisions more significant

protections, does not go far enough in protecting workers.  *See generally* ECF No. 1184-3.  Similar

to the addition to the *Live Nation* amended judgment, to assist with monitoring and enforcement

of the judgment, Plaintiffs' proposal would establish a "Technical Committee" and require Google

to appoint a compliance officer responsible for employee training.  *Id.* § X.  It also provides some

protections and confidential reporting mechanisms for Google's workers to raise potential

violations.  *See id* § X.B.4(g) (confidential avenue for reporting violations); *id.* § X.D (anti-

retaliation protections); *id.* § X.B.4(g) (annual reminders to workers).  While these protections

provide a good starting point, they fall short of cultivating the necessary compliance culture.

### d. The Final Judgment Should Include Robust Anti-Retaliation Provisions that Protect All of Google's Workers.

Given that the remedies this Court ultimately orders will necessarily require the active participation of Google's workers, AWU-CWA respectfully asks this Court to include robust anti-retaliation provisions, including provisions *explicitly* protecting worker collective action, to foster their participation in ensuring compliance. *See Int'l Salt Co. v. United States*, 332 U.S. 392, 400–01 (1947) ("[District courts] are invested with large discretion to model their judgments to fit the exigencies of the particular case"); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 131 (1969) (courts have authority to fashion remedies that are "flexible and capable of nice 'adjustment and reconciliation between the public interest and private needs as well as between competing private claims.'") (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944)).

*First*, the Final Judgment should at minimum include provisions to protect whistleblowers and provide training for Google workers so that they can monitor Google's compliance and raise concerns confidentially or anonymously. Specifically, the ordered remedies should:

- Compel Google to provide all workers with a copy of the Final Judgment and train them so that they understand it and relevant antitrust laws to assist with compliance;

- Require an express whistleblower policy, similar to the one ordered in *Live Nation*, that includes a confidential procedure for Google workers to report concerns[31]; and

- Mandate Google to otherwise establish confidential and/or anonymous reporting channels for its workers to submit complaints and raise concerns, including directly to any compliance officer or similar position.

*Second*, and critically, the Final Judgment should include robust anti-retaliation protections for Google workers so that their speech is not chilled, including:

- Provisions that protects workers who (i) voluntarily speak up, (ii) file a complaint, (iii) engage in concerted effort or union activity, or (iv) otherwise participate in

---

[31] *See* Hepner, *supra* note 15, at 20 (further arguing that "the Court should provide enforceable prohibitions against whistleblower retaliation" in the Final Judgment).

interviews or assist Plaintiffs in ensuring Google complies with the Final Judgment;

- Prohibitions on Google placing restrictions in employment agreement on workers' ability to report violations, speak publicly, or engage in concerted activity[32]; and

- Requirements that Google clearly and repeatedly communicate to its workers that they will not be retaliated against and may speak out regarding complaints and concerns without fear of reprisal.

These anti-retaliation protections will be less effective if they do not specifically prohibit retaliation against collective action by Google workers and union activity.

  *Third,* the Final Judgment should foster a culture of compliance at Google so that the *Live Nation* failure is not repeated by:

- Creating a compliance program as set forth in the DOJ Guidelines that requires senior leadership to support the compliance program and integrates the program in to the company's business;

- Obligating Google to inform all of its workers on at least an annual basis of the whistleblower policy, anti-retaliation provision in the Final Judgment, and the confidential reporting procedures; and

- Integrating the mechanisms that allow for anonymous or confidential reporting of violations without fear or retaliation into a well-publicized company system.

  Finally, these protections should apply to all Google workers, not just its full-time employees. Because over half of Alphabet's workforce consists of non-employees, it is critical that all workers are confident that their efforts to ensure Google's compliance will be met with support rather than punitive measures.

  This Court has the discretion to craft a Final Judgment that not only remedies Google's monopolization but also prevents recurrence. *See Fed. Trade Comm'n v. Nat'l Lead Co.*, 352 U.S. 419, 430 (1957) ("[T]he Court is obliged not only to suppress the unlawful practice but to take

---

[32] *See id.* (analyzing this lawsuit and arguing that "as a prophylactic measure, the Court should prohibit Google from imposing any term of employment that restricts workers from cooperating with law enforcement efforts or from speaking publicly about potential illegal conduct").

such reasonable action as is calculated to preclude the revival of the illegal practices."); *United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001) (the Court should fashion remedies "so as to prevent future violations and eradicate existing evils.").  By including provisions that help create an environment where all workers are encouraged to voice concerns and report potential violations without fear of reprisal, the Final Judgment can help restore Google's workplace ethos and promote long-term lawful and ethical conduct.

## II.    With the Protection of Robust Anti-Relation Provisions, AWU-CWA and Its Members Can Be a Vital Resource In Effectuating the Relief In the Final Judgment and Restoring a Culture of Compliance at Google.

Union workers have support from their coworkers to speak out regarding not only working conditions but also compliance and matters of public interest.  As detailed above, *see supra* § I.a, AWU-CWA and its members have already enforced workers' rights to freely discuss the impact of this case on their working conditions and obtained an important settlement after filing an NLRB charge.  Armed with strong anti-retaliation provisions, AWU-CWA's members are uniquely positioned to provide ongoing monitoring and help restore a culture of compliance at Google.

AWU-CWA's role in antitrust enforcement is no accident.  Unions have a rich history of playing a governance role by protecting workers' rights and supporting them as they speak out about working conditions and other important matters.[33]  For example, unions empower workers to address grievances and push for systemic changes that lead to a more just and equitable workplace by ensuring whistleblower protections are respected and enforced.  Indeed, the origins of modern whistleblower protections can be traced to union workers on the railroads in the early

---

[33] *See* Kate Bahn & Carmen Sanchez Cumming, *Unions and the Enforcement of Labor Rights: How Organized Labor Protects U.S. Workers Against Unfair and Illegal Employment Practices*, Washington Center for Equitable Growth (Apr. 29, 2022), https://equitablegrowth.org/unions-and-the-enforcement-of-labor-rights-how-organized-labor-protects-u-s-workers-against-unfair-and-illegal-employment-practices/.

20th century who exposed unsafe conditions that had caused workers' deaths and endangered the public.[34]  More recently, Wells Fargo bank workers, organizing with CWA, blew the whistle on management demands that frontline workers open fake customer accounts to meet metrics.[35]

Workers and their unions are thus an untapped resource for antitrust enforcement.[36]  While labor unions, such as AWU-CWA, have been "one of government enforcement agencies' most effective partners in fostering compliance with labor standards," "unions today can be effective partners in ensuring government institutions protect workers and, in turn, foster equitable economic growth."[37]  In particular, "unions emphasize the need to treat workers and their unions as the expert market participants they are, with an immense store of untapped knowledge and experience."[38]  Their workers "are most likely to know 'where the bodies are buried' in any given transaction, and thus represent a previously untapped source of rich qualitative and quantitative information on industrial and market conditions."[39]

A unionized workforce in particular can help ensure compliance with existing laws and push for better ones.[40]  Studies have shown that unionized workers are more likely to enforce the Occupational Safety and Health Act than nonunion workplaces because the presence of a union increases the probability that employees will call for a workplace inspection by the Occupational

---

[34] *See* Sarah Milow, *Gags and Grievance: The Labor Origins of Whistleblowing*, Knight First Amendment Center at Columbia University (Oct. 28, 2024), https://knightcolumbia.org/content/gags-and-grievance-the-labor-origins-of-whistleblowing.
[35] *See* Committee for Better Banks, *Campaign Backstory*, https://betterbanks.org/wfwu/campaign-backstory.
[36] Brian Callaci & Sandeep Vaheesan, Workers Are an Untapped Resource for Antitrust Enforcers, The Sling (Oct.24, 2023), https://www.thesling.org/workers-are-an-untapped-resource-for-antitrust-enforcers/.
[37] Bahn, *supra* note 32.
[38] Callaci, *supra* note 35 (quoting CWA's point that "workers' deep knowledge of their industry is an invaluable input into the review process").
[39] *Id.*
[40] Bahn, *supra* note 32.

Safety and Health Administration and that inspectors provide increased supervision of workplace conditions.[41]  Unionized workers likewise have been associated with greater adoption of mask mandates during the COVID-19 pandemic in schools[42] and nursing homes.[43]  And states with greater union membership rates are more likely to introduce and pass legislation against wage theft because unions provide advocates with the necessary political power.[44]

Moreover, economic analysis indicates that collective bargaining through unionization offers an important countervailing power to an employer with market power by structurally changing the labor market and enabling workers to increase their wages and improve their working conditions.[45]  "[U]nionization strengthens labor's bargaining position and may enable employees to diminish employers' monopsony power."[46]  Through a democratic process, collective bargaining provides workers a means to negotiate legally binding agreements covering a variety of topics, including wages; working conditions; guardrails for layoffs; and processes for workplace governance, such as grievance procedures or workplace health and safety committees.  Indeed, research shows evidence of meaningful spillovers from collectively bargained wages to non-union

---

[41] David Weil, *Enforcing OSHA: The Role of Labor Union*s, 30 INDUSTRIAL RELATIONS 20 (Winter 1991).

[42] Adam Dean, et al., *Iowa School Districts Were More Likely To Adopt COVID-19 Mask Mandates Where Teachers Were Unionized*, 40 HEALTH AFFAIRS 1270 (Aug. 2021).

[43] Adam Dean, et al., *Resident Mortality And Worker Infection Rates From COVID-19 Lower In Union Than Nonunion US Nursing Homes, 2020–21*, 41 HEALTH AFFAIRS 751 (May 2022).

[44] Marc Doussard & Ahmad Gamal, *The Rise of Wage Theft Laws: Can Community–Labor Coalitions Win Victories in State Houses?*, 52 URBAN AFFAIRS REVIEW 780 (Sep. 2016).

[45] *See* Bahn, *supra* note 32; *see also* Samuel Dodini, et al., *The Dynamics of Power in Labor Markets: Monopolistic Unions Versus Monopsonistic Employers*, CESifo Working Paper No. 9495 (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3998033.

[46] Efraim Benmelech, et al., *Strong Employers and Weak Employees How Does Employer Concentration Affect Wages?*, 57 J. OF HUMAN RESOURCES S201 (Apr. 2022).

workers[47] and that higher union density mitigates the negative effects monopsony has on wages.[48] "Modern labor-market regulation emerged from a congressional recognition that, to enable workers to lift their wages and secure a more equal share of their contributions to economic growth, it would need to restrain firms' ability to consolidate economic power under the antitrust laws while exempting and protecting workers' collective coordination under the [NLRA]."[49]

In short, AWU-CWA can assist in rebuilding and maintaining a compliance culture to effectuate the Final Judgment and also improve the working conditions for all Google workers.

### III.    Any Court-Ordered Divestiture Should Include Worker Protections.

AWU-CWA takes no position on what substantive remedies are appropriate in this case, including whether divestitures should be ordered. However, experience teaches that if a divestiture of Chrome or Android is ordered by the Court, there is significant need for worker protections. Divestitures or "break-ups" historically have been used by companies as an excuse to eliminate good jobs, reduce benefits, and reduce worker bargaining power.

In the context of merger enforcement, the government has not generally considered the impact on labor markets in crafting remedies.[50] This is a mistake. The effect a remedy may have on labor markets should be considered because Section 7 of the Clayton Act applies to any relevant market, including labor markets. Indeed, "even where mergers are successfully challenged in product markets under § 7, imposing any remedy for found violations would contravene the statute were it to result in substantially lessening competition in a labor market."[51] While parties may

---

[47] Ihsaan Bassier, *Collective bargaining and spillovers in local labor markets*, Centre for Economic Performance, No. 1895 (Dec. 2022), https://cep.lse.ac.uk/pubs/download/dp1895.pdf.
[48] Hiba Hafiz, *Structural Labor Rights*, 119 MICH. L. REV. 651, 664 (2021).
[49] *Id.*
[50] Hiba Hafiz, *Rethinking Breakups*, 71 DUKE L.J. 1491, 1507 (2022) (explaining that "effects on labor markets must also be considered in drafting remedies for mergers challenged as having anticompetitive effects in product markets").
[51] *Id.* at 1506–07.

claim that divestiture would reduce labor costs, lower labor costs also may reduce output resulting to harms in both labor and product markets.  Merger remedies should be crafted so that they do not lessen competition in labor markets and degrade unions or union activity.

In the context of enforcing Section 2 of the Sherman Act, the situation is the same.  The break up of the Bell System in the early 1980s provides an illustrative example.  At the time, CWA requested the court consider measures to preserve "continued national bargaining in telecommunications following the reorganization of AT&T."[52]  However, in its Tunney Act opinion, the court disregarded the need to address workers' interests and deemed CWA's comments not to be relevant to the divestiture's purposes.  The convention of prioritizing competition in consumer markets overrode CWA's three decade fight to establish pattern bargaining in the national telecommunications market.[53]

The result was both predictable and devastating.  In the decade following divestiture and decimation of union representation in the long distance market, 200,000 jobs were eliminated, with union density at AT&T falling from 62 to 25 percent from 1984 to 1995 as the company cut union jobs, moved many technical jobs out of the bargaining unit, and walled off acquisitions and new subsidiaries from union representation.[54]  An economic study that reviewed the effects of the divestitures "found that the breakup of the Bell System 'undermined the union's power, in terms of both membership levels and bargaining leverage' and increased the 'uncertainty facing the union.'"[55]  In 1993, Keefe and Boroff described the fallout from the Bell System divestiture:

---

[52] *Id.* at 1540.

[53] *Id.* at 1536, 1540–41.

[54] *See* Debbie Goldman, *Disconnected: Call Center Workers Fight for Good Jobs in the Digital Age*, University of Illinois Press (2024).

[55] Hafiz, *supra* note 49, 1541 (quoting Harry C. Katz, et al., *The Revitalization of the CWA: Integrating Collective Bargaining, Political Action, and Organizing*, 56 INDUS. & LAB. RELS. REV. 573, 575–76 (2003)).

From the standpoint of labor-management relations, this industrial restructuring is in jeopardy of severing the traditional link between high productivity growth through rapid technological change and increases in employee incomes and employment security. When compared to the decade prior to divestiture, post-divestiture productivity growth has fallen by one-half as networks are duplicated and many of the one million employees in the industry now face chronic insecurity, displacement, and stagnating incomes. Breaking the industry's social contract through this uncoupling may have serious long term consequences for productivity, service quality, and stable labor-management relations.[56]

Unless carefully structured, divestitures in this case may negatively impact workers and union activity. There is an understandable temptation by a company to use a divestiture remedy to its own advantage. If a divestiture is ordered here, there should be protections so it does not prevent concerted activity by Google workers or AWU-CWA from obtaining formal union recognition.

## CONCLUSION

The Final Judgment should strengthen, not weaken, the ability of Google's workers to engage in concerted action, enforce Google's compliance, and prevent future anticompetitive conduct. Accordingly, AWU-CWA respectfully requests that this Court issue a Final Judgment that: (1) includes provisions to protect whistleblowers and provide training for all Google workers, comprehensive anti-retaliation protections for all Google workers, and provisions that foster a compliance culture so that Google's workers can speak freely about working conditions, violations of the Final Judgment, and potential antitrust violations; (2) takes into account the benefits a union like AWU-CWA and its members may provide in the ongoing monitoring of Google's conduct so as to effectuate the relief in the Final Judgment and restore a culture of compliance at Google; and (3) provides worker protections in the event a divestiture is ordered so as to protect against the elimination of good jobs, reduction in benefits, and reduction in worker bargaining power.

---

[56] *See* Jeffrey Keefe and Karen Boroff, *Telecommunications Labor-Management Relations After Divestiture* (in *Contemporary collective bargaining in the private sector*), Industrial Relations Research Association series, (Dec. 1994).

Respectfully submitted,

*/s/ Allen Grunes*

ALLEN GRUNES (D.C. BAR NO. 989298)
BROWNSTEIN HYATT FARBER SCHRECK LLP
600 Massachusetts Avenue NW, Suite 400
Washington, DC 20001
(202) 296-7353
agrunes@bhfs.com

DAVID B. MESCHKE (D.C. BAR NO. CO0069)
BROWNSTEIN HYATT FARBER SCHRECK LLP
675 15th Street, Suite 2900
Denver, Colorado 80202-4287
(303) 223-1100
dmeschke@bhfs.com

*Counsel to Alphabet Workers Union-CWA*

Dated: May 9, 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document complies with LCvR 7(o)(4) because it does not exceed 25 pages and complies with the Court's March 28, 2025 Amended Order that amicus briefs shall be no more than 20 pages, double-spaced and shall be filed by May 9, 2025.  *See* ECF No. 1201.

*/s/ Allen Grunes*

Allen Grunes (D.C. Bar No. 989298)

*Counsel to Alphabet Workers Union-CWA*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2025, I electronically filed a true and correct copy of the foregoing document with the Clerk via the CM/ECF system which will send notification of such filing and service upon all counsel of record.

/s/ Kathleen M. Stehling
Kathleen M. Stehling, Paralegal
Brownstein Hyatt Farber Schreck, LLP
675 15th Street, Suite 2900
Denver, CO 80202
P: 303-223-1100
F: 303-223-1111

23