# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |

## BRIEF OF Y COMBINATOR, LLC AS *AMICUS CURIAE*
## IN SUPPORT OF PLAINTIFFS

Brandon Kressin
KRESSIN POWERS LLC
*Counsel for Amicus Curiae Y Combinator*

John M. Newman
University of Miami School of Law
*On the Brief*

Dated: May 9, 2025

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................................ v

STATEMENT OF AUTHORSHIP AND CONSENT ............................................................. v

ARGUMENT ............................................................................................................................ 1

INTRODUCTION .................................................................................................................... 1

I.     Y COMBINATOR'S EXTENSIVE FRONTLINE EXPERIENCE FUNDING AND ACCELERATING TECHNOLOGY STARTUPS INFORMS OUR UNIQUE PERSPECTIVE ................................................................................................................ 1

II.    OPEN COMPETITION IN FREE MARKETS IS ESSENTIAL FOR A HEALTHY INNOVATION ECOSYSTEM. .................................................................................... 2

    A.    Google's Conduct Has Limited Startup Founding and Funding Opportunities ...... 3

    B.    Effective Antitrust Enforcement Is Especially Important During Technological Inflection Points Like the Ongoing AI Revolution. ................................................. 4

    C.    Robust Antitrust Remedies in This Case Can Help Clear a Path for the Next Generation of Startups. .............................................................................................. 5

III.   TO BE EFFECTIVE, THE REMEDY ORDER SHOULD INCLUDE FORWARD-LOOKING COMPONENTS. ...................................................................................... 8

    A.    The Remedy Should Open Access to Google's Datasets and Search Index. .......... 9

    B.    The Remedy Should Prevent Google from Extending Its Monopolies into Query-Based AI Tools. .................................................................................................... 10

    C.    The Remedy Should Prevent Google From Entering Pay-to-Play Arrangements with Distributors. ..................................................................................................... 11

    D.    The Remedy Order Should Deter Circumvention and Retaliation. ...................... 12

CONCLUSION ....................................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Am. Tobacco Co. v. United States*,
    328 U.S. 781 (1946) .................................................................................................... 3

*Besser Mfg. Co. v. United States*,
    343 U.S. 444 (1953) .................................................................................................. 10

*FTC v. Meta Platforms, Inc.*,
    No. CV 20-3590 (JEB), 2024 WL 4772423 (D.D.C. Nov. 13, 2024) ........................ 4

*Int'l Boxing Club v. United States*,
    358 U.S. 242 (1959) ............................................................................................. 7, 10

*Omni Healthcare Inc. v. Health First, Inc.*,
    No. 6:13-cv-1509-Orl-37 (M.D. Fla. Aug. 13, 2016) ........................................... 7, 12

*Schine Chain Theatres v. United States*,
    334 U.S. 110 (1948) ................................................................................................. 11

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) ..................................................................... passim

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ...................................................................... 4, 7, 9, 12

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) .................................................................................................... 1

**Other Authorities**

*About Y Combinator*, Y COMBINATOR ................................................................................ 2

*An Interview with Arm CEO Rene Haas*, STRATECHERY, Jan. 11, 2024 ........................... 6

ANDREW S. GROVE, ONLY THE PARANOID SURVIVE (1996) ............................................... 4

*ARM Holdings PLC ADR*, MORNINGSTAR ........................................................................ 6

ARM, FYE25 – Q1 SHAREHOLDER LETTER (2024) ............................................................ 8

Asher Schecter, *Google and Facebook's "Kill Zone,"* PROMARKET, May 25, 2018 .................... 3

Daisy Wang, Dancing with the Giants: CVC Investments and Startup Outcomes (Nov. 8, 2024) .................................................................................................................. 3

Erin Griffith & Don Clark, *Arm Soars 25% in the Year's Biggest Initial Public Offering*, N.Y. TIMES, Sept. 14, 2023 ........................................................................................ 6

Jesús Fernández-Villaverde, *Defensive Hiring and Creative Destruction* (Nat'l Bureau of Econ. Research, Working Paper No. 33588, 2025) .................................................. 3

Mark A. Lemley & Matthew T. Wansley, *Coopting Disruption*, 105 B.U. L. REV. 457 (2025) ............................................................................................................... 4, 8

Martin Watzinger et al., *How Antitrust Enforcement Can Spur Innovation: Bell Labs and the 1956 Consent Decree*, 12 AM. ECON. J. ECON. POL'Y 328 (2020) ..................... 5, 6

Press Release, NVIDIA, NVIDIA Announces Financial Results for First Quarter Fiscal 2025 (May 22, 2024) ........................................................................................... 6

Press Release, NVIDIA, NVIDIA Announces Financial Results for Second Quarter Fiscal 2022 (Aug. 18, 2021) .......................................................................................... 6

*Quotes*, Y COMBINATOR .............................................................................................. 2

Sai Krishna Kamepalli et al., *Kill Zone* (Nat'l Bureau of Econ. Research, Working Paper No. 27146, 2022) .................................................................................................... 3

*Stripe Announces Tender Offer to Provide Liquidity to Current and Former Employees*, STRIPE, Feb. 27, 2025 .............................................................................................. 2

*Tan on AI*, WASH. POST, Oct. 2, 2024 ............................................................................ 5

Taylor Cromwell, *Y Combinator: The Inside Story of Tech's Most Influential Startup Accelerator*, JUST GO GRIND, Apr. 6, 2025 ............................................................... 1

*Big Fixes for Big Tech: Hearing Before the Subcomm. on Antitrust, Competition Pol'y, and Consumer Rights of the S. Comm. on the Judiciary*, 119th Cong. (2025) (testimony of Garry Tan, Pres. & CEO of Y Combinator) .............................. 6, 10, 13

**IDENTITY AND INTEREST OF AMICUS CURIAE**

Y Combinator ("YC") is a startup accelerator and venture capital firm launched in 2005 and headquartered in San Francisco. YC is independent; we have no parent corporation, and no publicly held corporation owns 10% or more of our stock. Since YC's founding, we have selected, funded, and fostered more than 5,000 startups and entrepreneurs. Our experience has been that entrenched monopoly power often deters new entry and chills investment in disruptive innovation. YC is constantly seeking to identify and accelerate innovative new entrants in a wide range of markets, including digital technology markets. As a result, YC has an interest in ensuring that U.S. technology markets are free from anticompetitive barriers to entry and expansion. And because antitrust law has a crucial role to play in ensuring open, free competition, we have a unique interest in ensuring that antitrust remedies are robust enough to be effective.

**STATEMENT OF AUTHORSHIP AND CONSENT**

YC declares that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than YC or its counsel contributed money that was intended to fund preparing or submitting this brief.

## ARGUMENT

## INTRODUCTION

The remedies stage of this case has important implications for technology startup founding and funding. We respectfully submit this brief to share our view, based on two decades of frontline experience, that robust antitrust enforcement here can help to foster a healthier, more resilient, and more vibrant U.S. innovation ecosystem. The startups we work with every day should be able to exercise their "vigor, imagination, devotion, and ingenuity," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972), in markets that are free from restrictive conduct and illegally maintained monopoly power. YC supports Plaintiffs' proposed remedy package as a whole. To aid the Court's analysis, we also highlight below particular components of the proposed remedy as to which we believe our first-hand experience has given us unique insight and perspective.

## I. Y COMBINATOR'S EXTENSIVE FRONTLINE EXPERIENCE FUNDING AND ACCELERATING TECHNOLOGY STARTUPS INFORMS OUR UNIQUE PERSPECTIVE.

YC is widely recognized as the world's leading technology startup accelerator and seed-stage investor. For two decades, YC has been "the best program for creating top-end entrepreneurs that has ever existed." Taylor Cromwell, *Y Combinator: The Inside Story of Tech's Most Influential Startup Accelerator*, JUST GO GRIND, Apr. 6, 2025, https://bit.ly/4lJ4UiW (quoting Marc Andreessen) (internal quotation marks omitted). We have funded and incubated thousands of startups, including Airbnb, Boom Technology, Coinbase, DoorDash, Dropbox, Instacart, Reddit, Stripe, and more. Many of them are disruptive innovators who challenged—and ultimately changed—the status quo.

Today, YC alumni are worth over $800 billion combined, and more than 100 of our alumni firms are "unicorns," each valued at more than $1 billion. *About Y Combinator*, Y COMBINATOR, https://bit.ly/3YkikrH.  For example, Stripe launched out of our 2009 summer cohort, has grown to become the world's largest privately owned financial technology company, and is now valued at more than $90 billion. *Stripe Announces Tender Offer to Provide Liquidity to Current and Former Employees*, STRIPE, Feb. 27, 2025, https://bit.ly/3GuXr78.  Stripe's founder put it simply: "I doubt that Stripe would have worked without YC." *Quotes*, Y COMBINATOR, https://bit.ly/4lNP7j3.

In short, YC has unparalleled first-hand experience selecting, funding, and fostering some of the world's most creative disruptors and entrepreneurs.  We work with startups at all stages, from pre-launch to post-launch.  We also maintain a very active alumni community that keeps us in close contact with the generations of founders who graduate from our program.  The depth and breadth of our experience gives us unique insights into the U.S. technology ecosystem and the markets that Google's conduct has affected.

## II. OPEN COMPETITION IN FREE MARKETS IS ESSENTIAL FOR A HEALTHY INNOVATION ECOSYSTEM.

YC has selected, funded, and fostered disruptive entrants in many different sectors over the years.  But by foreclosing competition, Google has chilled independent firms like YC from funding and accelerating innovative startups that could otherwise have challenged Google's dominance.  The result is a landscape that has been artificially stunted and stagnant.  In our view, Plaintiffs' proposed remedy package would help to unlock a more dynamic, globally competitive U.S. technology startup ecosystem.

### A.  Google's Conduct Has Limited Startup Founding and Funding Opportunities.

This Court's liability ruling rightly underscores the harm that Google's monopolistic conduct has inflicted on innovation funding. *United States v. Google LLC*, 747 F. Supp. 3d 1, 165–71 (D.D.C. 2024) (concluding that Google's conduct "contributed significantly to the lack of new investment"). This finding aligns with our experience: independent venture-capital firms like YC often hesitate to fund startups in the "kill zone"—the area of deadened innovation around a monopolist like Google.[1] It also aligns with decades of established judicial wisdom. We agree with the U.S. Supreme Court that "immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 813 (1946) (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 427 (2d Cir. 1945) (Hand, J.)) (internal quotation marks omitted).

Emerging research confirms this common-sense proposition. Early-stage startups funded by independent firms like YC are more likely to engage in paradigm-shifting innovation. *See* Daisy Wang, Dancing with the Giants: CVC Investments and Startup Outcomes 4 (Nov. 8, 2024), https://bit.ly/4cZJkmA. When incumbents do engage in "research and development" spending, their activity is *negatively* correlated with creative disruption, new entry, and productivity in the affected sectors. Jesús Fernández-Villaverde, *Defensive Hiring and Creative Destruction* 3, 47 (Nat'l Bureau of Econ. Research, Working Paper No. 33588, 2025), https://bit.ly/4cSmxJj.

---

[1] Economic research on kill zones similarly aligns with YC's first-hand experience. *See, e.g.*, Sai Krishna Kamepalli et al., *Kill Zone* 35 & fig. 2a (Nat'l Bureau of Econ. Research, Working Paper No. 27146, 2022) (describing empirical finding that venture-capital investment in a given industry sector drops by 40% after Google or Facebook make a major acquisition in that sector); *see also* Asher Schecter, *Google and Facebook's "Kill Zone": "We've Taken the Focus Off of Rewarding Genius and Innovation to Rewarding Capital and Scale,"* ProMarket, May 25, 2018, https://bit.ly/4iFGEeO.

Unfortunately, "the general search services market has remained static for at least the last 15 years, with investments largely coming from established players." *Google*, 747 F. Supp. 3d at 165.

Dominant incumbents have a strong interest in maintaining the status quo. And Google's conduct has had that effect. YC currently sees a landscape that has been artificially stunted—"the antithesis of a competitive market," as this Court put it. *Id.* at 159. If implemented, Plaintiffs' proposed remedy package would help to attract a new wave of independent venture funding from a variety of sources, including YC.

### B. Effective Antitrust Enforcement Is Especially Important During Technological Inflection Points Like the Ongoing AI Revolution.

Experience has taught us that technological inflection points are critical moments for competition and innovation. The rise of novel, transformative technology can create an opening for nimble startups to disrupt established incumbents. At an inflection point, "simply adopting new technology or fighting the competition as you used to may be insufficient." ANDREW S. GROVE, ONLY THE PARANOID SURVIVE 4 (1996). Dominant incumbents often respond by using exclusionary conduct to try to slow down or coopt the future. *See, e.g.*, Mark A. Lemley & Matthew T. Wansley, *Coopting Disruption*, 105 B.U. L. REV. 457, 460 (2025). For example, during the mid-1990s, Microsoft recognized the disruptive potential of web-based software applications and reacted by anticompetitively blocking rival internet browsers from reaching users. *United States v. Microsoft Corp.*, 253 F.3d 34, 60 (D.C. Cir. 2001). More recently, Facebook recognized the explosion in usage of mobile applications and reacted by acquiring mobile-native startups that it viewed as competitive threats. *See FTC v. Meta Platforms, Inc.*, No. CV 20-3590 (JEB), 2024 WL 4772423, at *29–30 (D.D.C. Nov. 13, 2024) ("[T]he case for buying Instagram focused heavily on neutralizing a competitive threat.").

4

In our view, the rise of generative artificial intelligence ("AI"), query-based AI, and agentic AI tools has the potential to be an especially significant inflection point. "We're at the dawn of a brand-new platform. When that occurs, we have to make sure that there is space for the little guy," as our president and CEO recently observed. *Tan on AI*, WASH. POST, Oct. 2, 2024, https://bit.ly/4j5GDBY. Just developing a new product is not enough to guarantee success. Founders also need to be able to get their products into the hands of users, free from restrictive dealing and self-preferencing that locks up important distribution channels. As things stand, Google has locked up the most critical distribution channels, freezing the general search and search text advertising markets into static competition for more than a decade. *Google*, 747 F. Supp. 3d at 165, 177. YC believes that this is a moment when dynamic competition could break out, but effective antitrust remedies in this case will be critical for the innovative startups currently trying to attract venture capital, reach users, and gain scale.

### C. Robust Antitrust Remedies in This Case Can Help Clear a Path for the Next Generation of Startups.

Antitrust remedies have a long track record of unlocking American dynamism and ingenuity. An antitrust consent decree in 1956, for example, required AT&T to provide open access to its patents and technical manufacturing information. That remedy order helped usher in the modern digital age, in large part because it enabled "young and small" firms—what we think of today as "little tech" companies—to compete. *See* Martin Watzinger et al., *How Antitrust Enforcement Can Spur Innovation: Bell Labs and the 1956 Consent Decree*, 12 AM. ECON. J. ECON. POL'Y 328, 330 (2020). A new generation was able to enter and expand in a multitude of markets, helping to vault the United States into position as the world's leader in technological innovation. *Id.* Economists have called the 1956 antitrust decree "one of the most unheralded

contributions to economic development" in history, and the co-founder of Intel called it "one of the most important developments for the commercial semiconductor industry." *Id.* at 332.

This tradition has continued in the modern era. In 2022, for example, the U.S. Federal Trade Commission blocked Nvidia Corp.'s proposed acquisition of Arm Ltd., a semiconductor technology firm. Arm's CEO later explained that the structural separation "helped us" focus on delivering better products at a time when "more applications [were] moving towards the cloud" and "AI [was] starting to raise its head." *An Interview with Arm CEO Rene Haas*, STRATECHERY, Jan. 11, 2024, https://bit.ly/449JZzk. Arm has since gone public on the Nasdaq stock exchange, delivered record revenues, and is now worth more than $100 billion. Erin Griffith & Don Clark, *Arm Soars 25% in the Year's Biggest Initial Public Offering*, N.Y. TIMES, Sept. 14, 2023; ARM, FYE25 – Q1 SHAREHOLDER LETTER (2024), https://bit.ly/4cVewmS; *ARM Holdings PLC ADR*, MORNINGSTAR, https://bit.ly/3ENmlOL. Meanwhile, Nvidia's earnings have nearly quintupled as its chips helped to fuel the rise of generative AI technology. *Compare* Press Release, NVIDIA, NVIDIA Announces Financial Results for Second Quarter Fiscal 2022 (Aug. 18, 2021), https://bit.ly/4lTQ2OU, *with* Press Release, NVIDIA, NVIDIA Announces Financial Results for First Quarter Fiscal 2025 (May 22, 2024), https://bit.ly/4iJHTd3.

In fact, Google itself has benefited greatly from previous antitrust enforcement efforts. As our president and CEO recently pointed out, "Google and Chrome emerged precisely because Microsoft's monopoly was curtailed." *Big Fixes for Big Tech: Hearing Before the Subcomm. on Antitrust, Competition Pol'y, and Consumer Rights of the S. Comm. on the Judiciary*, 119th Cong. (2025) (testimony of Garry Tan, Pres. & CEO of Y Combinator) (hereinafter Testimony of Garry Tan). Unfortunately, after gaining sufficient scale for itself, Google pulled the ladder up behind it. *Google*, 747 F. Supp. 3d at 159 ("[N]ew entrants cannot hope to achieve a scale that

6

would allow them to compete with Google."). Like *Microsoft* and *AT&T*, this case offers an opportunity for antitrust remedies to pave the way for the next generation of technology startups and entrepreneurs.

Remedies to restore lost competition are important. But we believe that forward-looking provisions are also necessary to let independent startups take full advantage of this critical moment in technology history. A remedy order narrowly confined to the relevant markets that Google has already monopolized would carry a high risk of remedy failure.[2] Monopolists generally enjoy "myriad" ways to stifle competition. *Microsoft Corp.*, 253 F.3d at 58. And when its reach already extends into multiple markets, a monopolist has even more anticompetitive tools at its disposal. *See, e.g.*, *Omni Healthcare Inc. v. Health First, Inc.*, No. 6:13-cv-1509-Orl-37, 2016 WL 4272164, at *16 (M.D. Fla. Aug. 13, 2016) ("[Defendant]'s vertical integration, combined with its dominance in the [relevant] market . . . , allows it to impair competition in multiple markets through exclusionary tactics and facilitate the exercise of monopoly power in markets . . . where its market share appears relatively low when viewed in isolation . . . .").

YC is currently seeking to fund and accelerate startups developing query-based AI solutions and AI-based agentic tools that could transform how people interact with information across the internet. These tools have the potential to disrupt Google's decades-long monopoly in

---

[2] Our view that an effective remedy should go beyond the particular relevant markets that Google has already monopolized aligns with decades of judicial wisdom. In *International Boxing Club v. United States*, for example, the Supreme Court affirmed an order package with remedies that "went beyond the 'relevant market' which [was] considered for purposes of determining the Sherman Act violations." 358 U.S. 242, 256 (1959). And in that case, the defendants had engaged in illegal conduct for less than a decade, *id.* at 252 (calling that troublingly "long"), had voluntarily ceased much of their illegal conduct, and had seen their market share decline to 65% by the time judgment issued. Here, Google's conduct has continued for more than a decade, and its market shares remain nearly 90%. *Google*, 747 F. Supp. 3d at 119, 138.

general search. From our vantage point, we see a clear risk that, absent judicial protection, Google will use its current monopoly power to slow down or coopt the future of multiple markets, including query-based and agentic AI. *See generally* Lemley & Wansley, *supra*, at 497 ("It once seemed plausible that AI would be developed by a new generation of independent companies. Now it seems likely that the tech giants will shape the direction of AI development."). An effective remedy package should help to leverage the current moment by ensuring that the startups and inventors working on these next-generation tools can flourish free from anticompetitive exclusion or interference.

### III. TO BE EFFECTIVE, THE REMEDY ORDER SHOULD INCLUDE FORWARD-LOOKING COMPONENTS.

Free, open competition will be essential to harness the full potential of future innovation in and around the markets affected by Google's monopolistic conduct. That conduct helped Google maintain the status quo and its dominant market positions for more than a decade. *Google*, 747 F. Supp. 3d at 159. In our experience, entrenched power of this size and scope is not easy to dislodge. Disruptive innovation is the most likely source of true competition to Google. A remedy order that includes forward-looking components could enable this type of innovation to flourish, materially lowering the funding risks for independent sources of capital and expertise. By doing so, the remedy order could enable funders like YC to accelerate the next generation of disruptors. New ideas from new sources can help to displace Google's "static" monopolies with dynamic competition. *Id.* at 165. That competition would act as a free-market check on any attempts by Google to anticompetitively re-establish its monopoly power in the future.[3] Plaintiffs' proposed remedy package as a whole would effectively facilitate that type of

---

[3] Our perspective again aligns with decades of judicial experience and antitrust caselaw. As this Circuit has instructed, the remedy "must seek to unfetter a market from anticompetitive

competition.  In the discussion that follows, we highlight particular aspects of the proposed remedy as to which our first-hand experience has given us unique insight and perspective.

### A. The Remedy Should Open Access to Google's Datasets and Search Index.

We agree with Plaintiffs' proposal that the remedy package should create pathways for startups and innovators to access Google's monopoly-derived datasets and search index.  *See* Exec. Summ. Plaintiffs' Revised Proposed Final Judgment, at 10–11, ECF No. 1184 (hereinafter Plaintiffs' Exec. Summ. RPFJ).  Making Google's search index and datasets available with adequate privacy safeguards will help to enable the competitive development of innovative, user-friendly search and AI-driven query-based tools.

As things now stand, Google's conduct has given it "access to scale that its rivals cannot match."  *Google*, 747 F. Supp. 3d at 159.  And "Google has used that [same] scale to improve its search product."  *Id.*  That means "new entrants cannot hope to achieve a scale that would allow them to compete with Google."  *Id.*  The result is a static "vicious cycle."  *Id.* (quoting Nadella).

Access to Google's user datasets and search index offers a way out of this cycle.  Opening access would help to reinvigorate competition in online search and also accelerate the development and deployment of transformative query-based AI solutions, which depend on access to data inputs.  In other words, an access remedy component would help both to restore lost static competition and also to catalyze dynamic competition.

---

conduct, to terminate the illegal monopoly, [and] deny to the defendant the fruits of its statutory violation."  *Microsoft Corp.*, 253 F.3d at 103 (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972), and *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (internal quotation marks and citations omitted)).  But that is not all: the remedy "must [also] seek to . . . ensure that there remain no practices likely to result in monopolization in the future."  *Id.*

Access remedies have long been an important part of the antitrust remedy toolkit. *See, e.g.*, *Int'l Boxing*, 358 U.S. at 252 (affirming order that required access to critical asset on "fair and reasonable" terms to any "duly qualified" applicant); *Besser Mfg. Co. v. United* States, 343 U.S. 444, 447–48 (1953). More recently, "[t]he landmark *Microsoft* antitrust case exemplified how mandated open API access and prohibitions against exclusionary agreements unlocked competition." Testimony of Garry Tan, *supra*, at *3. Open access in this case would incentivize YC and similar independent venture-capital firms to identify and invest in markets that have remained too static for too long.

### B. The Remedy Should Prevent Google from Extending Its Monopolies into Query-Based AI Tools.

An effective remedy package should help to leverage the current moment by ensuring that next-generation search and query-based AI tools can reach users free from exclusion, interference, or cooption. We see a clear risk that, absent a robust remedy order in place, Google will extend its dominant position in online search into emerging markets for query-based AI tools. In our view, the remedy package should prevent Google from anticompetitive self-preferencing, and this prohibition should apply specifically to Google's use of its monopoly search product to boost its query-based AI tools or discriminate against rivals' tools. *See* Plaintiffs' Exec. Summ. RPFJ, at 9. The remedy order should also prevent Google from entering into exclusive agreements to access AI training data, which would foreclose startups and innovators from accessing this critical input. *See id.* at 8. These forward-looking provisions would help to give next-generation startups a more level playing field on which to enter and compete.

### C. The Remedy Should Prevent Google From Entering Pay-to-Play Arrangements with Distributors.

In YC's view, the remedy package should also limit Google's ability to enter pay-to-play arrangements with distributors. *See* Plaintiffs' Revised Proposed Final Judgment, Pt. IV, at 7–12, ECF No. 1184-1 (hereinafter Plaintiffs' RPFJ). For more than a decade, Google's restrictive agreements have locked up more than half of the independent distribution channels for general search. *Google*, 747 F. Supp. 3d at 154, 157 (finding that half of all U.S. search queries run through agreement-affected distribution channels, and that another 20% of queries run through user-downloaded Chrome). During that time, we have seen the emergence of multiple potentially paradigm-shifting backbone technologies, including generative AI. In the normal give-and-take of a healthy marketplace, potential profits should attract both new entry and transformative disruptors. Yet the markets monopolized by Google have remained both highly lucrative and competitively static. *Id.* at 165.

New startups that would challenge Google's dominance—whether by offering novel general search options or next-generation query-based AI solutions—need to be able to reach users. But Google's conduct has made "the ecosystem exceptionally resistan[t] to change." *Id.* at 159 (quoting Ramaswamy). This is why, in our view, an effective remedy must prohibit both the particular exclusivity restrictions that Google has used before and also payments by Google for access to choice screens. *See* Plaintiffs' Exec. Summ. RPFJ, at 7–8; *see also Schine Chain Theatres v. United States*, 334 U.S. 110, 119 (1948) ("Even an otherwise lawful device may be used as a weapon . . . in an effort to monopolize a part of trade or commerce."). As part of the overall remedy package, this would immediately open distribution channels that could help YC-accelerated startups thrive.

11

## D. The Remedy Order Should Deter Circumvention and Retaliation.

An effective, forward-looking remedy order will also need to anticipate and prevent potential remedy circumvention. Monopoly power gives a monopolist myriad ways to exclude competition. *Microsoft*, 253 F.3d at 58. When a monopolist's reach extends across multiple markets, it has even more anticompetitive tactics at its disposal. *Omni Healthcare Inc.*, 2016 WL 4272164, at *16 (observing that "[defendant]'s vertical integration, combined with its dominance in the [relevant] market . . . , allows it to impair competition in multiple markets through exclusionary tactics and facilitate the exercise of monopoly power in markets . . . where its market share appears relatively low when viewed in isolation").

The remedy order will also need to anticipate and prevent any retaliation against startups that seek to compete on the merits. YC's experience has been that many startups are concerned about Google's ability to exclude, punish, or retaliate against them. Strong anti-circumvention and anti-retaliation provisions are both essential here to create a space in which founders can confidently innovate. The proposals laid out in Plaintiffs' RPFJ, Pt. X, at 31–48, including the establishment of a fully independent technical committee, would help to ensure an effective remedy in this case.

An effective remedy order should, in our view, also include Plaintiffs' proposed contingent-spinoff requirement for Google's Android platform. Plaintiffs' Exec. Summ. RPFJ, at 9. If triggered, a spinoff could help to restore Android's lost potential as a truly open mobile platform. And whether or not the spinoff requirement is actually trigged, its inclusion in the overall remedy package would help to create a strong incentive for Google to comply with both the letter and the spirit of this Court's order.

\*   \*   \*

12

## CONCLUSION

YC has spent the past two decades selecting, funding, and accelerating some of the world's most innovative startup companies. Our alumni have a remarkable track record of success in a wide range of markets. But from our vantage point, Google's conduct has caused a vitally important sector to remain stagnant for too long. "The unchecked concentration of power in big tech has severely limited innovation, harmed consumers, and undermined America's global competitiveness." Testimony of Garry Tan, *supra*, at *2. In YC's experience, free-market competition is the best recipe for a dynamic technology startup ecosystem. An effective remedy in this case would clear a path for independent sources of startup capital and expertise like YC to accelerate a new generation of founders, inventors, and entrepreneurs working to deliver world-changing innovations.

Dated:  May 9, 2025

Respectfully Submitted,

By:  /s/ Brandon Kressin
Brandon Kressin (D.C. Bar No. 1002008)
KRESSIN POWERS LLC
Brandon@kressinpowers.com
400 Seventh Street NW, Ste 300
Washington, DC 20004
202-464-2905

*Counsel for Amicus Curiae Y Combinator*

John M. Newman
University of Miami School of Law
*On the Brief*

13

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I electronically filed a true and correct copy of the foregoing BRIEF OF Y COMBINATOR, LLC AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS with the Clerk via the CM/ECF system which will send notification of such filing and service upon all counsel of record.

Dated: May 9, 2025

Respectfully Submitted,

By: /s/ Brandon Kressin
Brandon Kressin (D.C. Bar No. 1002008)
KRESSIN POWERS LLC
Brandon@kressinpowers.com
400 Seventh Street NW, Ste 300
Washington, DC 20004
202-464-2905

*Counsel for Amicus Curiae Y Combinator*