**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                     Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>                     Defendant, | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*,<br><br>                     Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>                     Defendant, | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

**<u>APPLE INC.'S AMICUS BRIEF</u>**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(A), amicus curiae Apple Inc. ("Apple") certifies that Apple does not have a parent company, and no publicly held corporation owns 10% or more of Apple's stock.


*/s/ Sarah M. Ray*
Sarah M. Ray (*pro hac vice*)

*Counsel for Amicus Curiae Apple Inc.*

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION AND INTEREST OF AMICUS CURIAE ......................................... 1

II.     ARGUMENT ................................................................................................................. 3

        A.      Legal Framework ................................................................................................ 3

        B.      Plaintiffs' Search Distribution Remedy Is Untenable And Would
                Backfire ............................................................................................................... 4

                1.      Plaintiffs Target Apple With A Remedy Barring Any And
                        All Payments For Search Distribution ....................................................... 5

                2.      A Total Prohibition On Search Distribution Payments
                        Would Benefit Google And Harm Competition ......................................... 6

                3.      Plaintiffs Have No Justification For Targeting Apple ............................ 10

                4.      Plaintiffs' Remedy Unlawfully Exceeds The Scope Of The
                        Liability Ruling ...................................................................................... 15

        C.      If This Court Implements A Choice Screen Remedy, It Should
                Ensure It Is A Fair Choice Screen In Which Google Can Pay For
                Distribution ..................................................................................................... 17

III.    CONCLUSION ........................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. EPA,*
 72 F.4th 284 (D.C. Cir. 2023).....................................................................................3

*\*Gulf Oil Corp. v. Brock,*
 778 F.2d 834 (D.C. Cir. 1985)................................................................................3, 16

*Hartford-Empire Co. v. United States,*
 323 U.S. 386 (1945)...................................................................................................14

*Hecht Co. v. Bowles,*
 321 U.S. 321 (1944).....................................................................................................3

*Int'l Salt Co. v. United States,*
 332 U.S. 392 (1947)...................................................................................................14

*Madsen v. Women's Health Ctr., Inc.,*
 512 U.S. 753 (1994)...............................................................................................3, 16

*\*Nat'l Collegiate Athletic Ass'n v. Alston,*
 594 U.S. 69 (2021).................................................................................................3, 17

*\*New York v. Microsoft Corp.,*
 224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004)..............3

*Population Inst. v. McPherson,*
 797 F.2d 1062 (D.C. Cir. 1986).........................................................................4, 14, 16

*Rebel Oil Co. v. Atl. Richfield Co.,*
 51 F.3d 1421 (9th Cir. 1995) .......................................................................................9

*SEC v. Gentile,*
 939 F.3d 549 (3d Cir. 2019)..........................................................................................3

*Spectrum Sports, Inc. v. McQuillan,*
 506 U.S. 447 (1993).......................................................................................................4

*Systemation, Inc. v. Engel Indus., Inc.,*
 194 F.3d 1331 (Fed. Cir. Mar. 10, 1999)....................................................................4

*United States v. Brown Univ.,*
 5 F.3d 658 (3d Cir. 1993) .............................................................................................9

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ............................................................................ *passim*

*Verizon Commc'ns Inc. v. L. Offs. of Curtis v. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................................................15

## OTHER AUTHORITIES

Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a
    Field Experiment* (Nat'l Bureau of Econ. Rsch, Working Paper No. 33410,
    2025) .....................................................................................................................9

## I.    INTRODUCTION AND INTEREST OF AMICUS CURIAE[1]

Much has changed since the liability trial.  For the first time, Apple has recently seen a decline in the number of queries year-over-year to Google from the Safari web browser.  Apple believes this is driven by consumers increasingly shifting toward new entrants—products like ChatGPT, Claude, and Perplexity, among others—to search for and access information online.  Apple is excited about this rapid revolution and is eager to offer consumers more choices on Apple devices.  ChatGPT is now available to Apple users through its Apple Intelligence experience, and Apple anticipates that generative AI products will also be added as search options in Safari.  With new innovations, search is changing for the first time in years, and "faster than most anybody [] thought" was possible.  Remedies Transcript ("R. Tr.") (Cue) 3863:15-16.

Apple appreciates the opportunity to participate as an amicus and hopes this brief can help the Court chart a procompetitive course that avoids harming consumers and other third parties.  There are provisions in Plaintiffs' Revised Proposed Final Judgment ("RPFJ") that would help bolster competition and accelerate exciting changes in the search market.  For example, sharing Google Search index data with new AI companies would—taken in conjunction with their revolutionary large language models ("LLMs")—help accelerate their ability to compete.

But other provisions in Plaintiffs' RPFJ would hamper progress and entrench Google's position.  Apple is particularly concerned about Plaintiffs' total prohibition on Apple's ability to receive compensation for non-exclusive distribution of Google Search.  Apple understands that this Court is considering whether to prohibit Google from contracting for out-of-the-box default status.  But the RPFJ goes far beyond that approach, instead prohibiting Apple from receiving

---

[1] No party's counsel authored this brief in whole or in part, and no one other than amicus and its counsel contributed money to fund the brief's preparation.  This Court granted Apple leave to file this brief as amicus curiae.  Dkt. No. 1153 at 2.

"anything of value" for distributing Google Search, whether as the default or, for instance, via a choice screen where Google is presented alongside its competitors on an equal basis. This would constrain Apple in a way that would undoubtedly harm competition. Under Plaintiffs' RPFJ, if implemented as written, Apple could either distribute Google for free (as the default or otherwise), or try to eliminate Google as a choice on Apple's search access points. The first option would entrench Google's market position by offering it free distribution, giving Google a significant *advantage* over its competitors. The second option is hardly an option at all because Apple cannot harm its own users by prohibiting them from choosing the world's current leading search engine. Moreover, as Mr. Cue testified, users would find a way to access Google.

Plaintiffs offer no convincing rationale for such a sweeping remedy. After three weeks of trial, the only conceivable justification they have put forward is that Apple will develop its own general search engine. That high-risk assumption is wrong: As both John Giannandrea and Eddy Cue explained, Apple does not intend to build its own general search engine—it has other competing concerns, and developing and monetizing a search engine is beyond Apple's business priorities. This Court likewise recognized during the liability phase that Apple has good reasons not to devote time and resources to building a competing search engine. Moreover, any prohibition on Apple receiving compensation from Google would affect Apple's pace of innovation, by eliminating a large revenue source that provides Apple greater confidence in making several long term investment decisions for innovative and disruptive technologies (including those that promote access to Google's AI competitors), which will benefit users.

This Court can order targeted, effective remedies that avoid needlessly harming third-parties like Apple's users and Apple itself. By allowing Google to pay and compete for non-exclusive distribution of Google Search—even if it is prohibited from contracting for

out-of-the-box default status—this Court can both avoid affording Google a significant financial benefit and allow Apple to receive value for providing a significant service. In combination with other contemplated remedies and the rapid development of the search landscape, this would accelerate a future in which consumers have a bona fide choice for general search.

## II.    ARGUMENT

### A.    Legal Framework

It is blackletter law that "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see also Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985) ("[A]n injunction must be narrowly tailored to remedy the harm shown."); *Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) (recognizing that judicial rulings should be tailored and that remedies are meant to operate on specific parties). That is because "[t]he historic injunctive process was designed to deter, not to punish." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). And that goal "would be dishonored if courts aimed to inflict hardship instead of tailoring injunctions to minimize it." *SEC v. Gentile*, 939 F.3d 549, 559-60 (3d Cir. 2019).

These anchoring principles equally govern antitrust decrees. "When it comes to fashioning an antitrust remedy," the Supreme Court recently admonished, "caution is key." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106 (2021). As a result, "[e]quitable relief in an antitrust case should not 'embody harsh measures when less severe ones will do.'" *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 100 (D.D.C. 2002) (citation omitted), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004)). And the "relief" ordered in an antitrust context "should be tailored to fit the wrong creating the occasion for the remedy." *United States v. Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001). Above all, courts must ensure that any relief ordered does not harm consumers. After all, the "purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to

protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  Given that animating rationale, courts take care "to avoid constructions" of the Act "which might chill competition, rather than foster it." *Id.*

Critical to avoiding undue interference with market forces and protecting consumers is the relevant causation standard in ordering relief.  As the D.C. Circuit has explained, in the "context" of a court ordering "equitable relief," a "court … must base its relief on some clear indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended." *Microsoft*, 253 F.3d at 105 (quotations and citation omitted).  And courts must likewise ensure that injunctions do not cause "third parties" to "suffer undue harm." *Population Inst. v. McPherson*, 797 F.2d 1062, 1067 (D.C. Cir. 1986); *see also Systemation, Inc. v. Engel Indus., Inc.*, 194 F.3d 1331, at *2 (Fed. Cir. Mar. 10, 1999) (similar).

## B. Plaintiffs' Search Distribution Remedy Is Untenable And Would Backfire

The Court concluded that Google violated Section 2 by "maintaining its monopoly … through its exclusive distribution agreements" and that "Google's browser agreements are exclusive *insofar as they establish Google as the out-of-the-box default search engine*." Dkt. No. 1033 at 276, 204 (emphasis added).  In light of these findings, Apple understands that the Court is considering whether to prohibit Google from entering into distribution agreements that make Google the out-of-the-box default search engine. *See Microsoft Corp.*, 253 F.3d at 107.

But Plaintiffs' search distribution remedy goes well beyond eliminating default status and proposes terms that would undermine, rather than advance, competition in search.  By prohibiting the exchange of "anything of value" between Apple and Google for ten years, Plaintiffs' proposal would harm consumers by either (1) providing Google free distribution or (2) denying users access to the highest quality product in the market currently.  Neither of these outcomes is procompetitive,

4

and only the first is realistic given the strength and desirability of Google Search today. Nor can Plaintiffs justify why their remedies target Apple specifically (and by name). The only conceivable justification for Plaintiffs' proposal is that Apple will respond by developing its own search engine, which at some unidentified future point may pose some unknown measure of competitive threat to Google Search. Uncontroverted testimony establishes that Apple has no plans to compete in general search. But there *are* remedies this Court can order that would promote competition in the search market, protect consumers, and avoid harm to third parties like Apple. *See infra* § 2(c). Apple urges the Court not to adopt a remedy that would do the opposite.

### 1.    Plaintiffs Target Apple With A Remedy Barring Any And All Payments For Search Distribution

The RPFJ singles out Apple by name with a remedial term of breathtaking scope. Plaintiffs' RPFJ states that Google "must not offer or provide anything of value to Apple, including payments," for (1) "preferential treatment," (2) "making or maintaining any [general search engine] as a default within a new or existing Search Access Point," or (3) "preinstallation, placement, or default status of any Search Access Point." RPFJ at 8. The RPFJ appears to prohibit Apple from receiving revenue share or any other kind of payment from Google for *any* kind of placement on Apple devices. It states that Google may not make any "payments for Choice Screens." *Id.* And the RPFJ broadly prohibits revenue share arrangements, including with respect to Apple: It provides that "Google must not offer or provide to any Distributor any payment that is determined or calculated based on the usage of or revenue generated by—or any similar factor for—any particular [general search engine] or Search Access Point." *Id.* at 9. The RPFJ thus specifically prohibits Google from compensating Apple for search distribution, even if Apple were to present Google as an option to its users on a non-exclusive basis.

With respect to *non*-Apple distributors, however, Plaintiffs have proposed allowing Google

5

to pay for distributing Google Search in at least some circumstances. Specifically, for "Non-Apple Third Parties," Plaintiffs' proposal provides that "Google must not offer or provide anything of value" for preferencing Google, making Google the default search engine or discouraging the use of a competitor, or "preinstallation, placement, or default status" for Google. RPFJ at 7-8. Although that prohibition extends to "payment for Choice Screens," it has an important caveat: For certain non-Apple distributors and third-party devices, Google is permitted to pay for search distribution under the requirements set forth in § IX of the RPFJ. *See id.* at 26-28. In this way, Plaintiffs have designed a remedy for non-Apple third parties that allows Google to pay for search distribution so long as it is distributed as part of a fair choice screen in which consumers are not steered toward any particular search engine provider. By contrast, Plaintiffs' proposed limitations as to Apple go far beyond prohibiting Google from contracting with Apple for out-of-the-box default status, as the current Information Services Agreement ("ISA") provides.

## 2. A Total Prohibition On Search Distribution Payments Would Benefit Google And Harm Competition

Plaintiffs' proposal would leave Apple with two options, each of which is bad—for consumers, for Apple, and for competition.

*Option 1: Windfall to Google and Entrenchment of Market Position.* First, Apple could continue setting Google as the out-of-the-box default on Apple devices, but it would have to distribute Google for free. As this Court recognized, Apple's "day one" incentive is "to maintain Google … as the default, regardless of whether the payments are going to be made, because [Apple] want[s] to deliver the best search engine experience to [its] customers, and on day one in the remedial world, that will remain Google." R. Tr. 2144:16, 2144:23-2145:3. Apple's Senior Vice President of Services, Eddy Cue, said much the same. "Google is still the best today." *Id.* 3819:3-4. And because Apple's "number one priority" is "to do what's best for the customer," *id.*

3829:16-17, that means making Google the out-of-the-box default even if "there was a remedy that prevented Google from paying Apple," *id.* 3829:7-8. Plaintiffs' own expert recognized that Apple's incentive is "to keep Google because Google is better and [Apple] may not want to disrupt the[] user experience." *Id.* 2145:21-23.

Distributing Google for free would harm consumer welfare and exacerbate, rather than cure, the anticompetitive effects this Court found in holding Google liable under Section 2. Under the current terms of the ISA, Google pays Apple for distribution because Apple expends enormous effort developing and maintaining a successful platform that can connect users with search engines—in other words, Google's payments for distribution "compensate[]" Apple "for the services that [it] render[s]." *Id.* (Cue) 3824:18. But under the RPFJ, Google would be able to free-ride on Apple's efforts, protected by an order of this Court *prohibiting* Google from offering Apple anything of value for distributing Google Search. *See* RPFJ at 8. If Google remains the out-of-the-box default, the only consequences of prohibiting Google from paying for distribution would be to provide an enormous financial benefit to Google while ensuring Google's continued market position in search. Far from bolstering consumer welfare, that would *harm* it by maintaining the status quo for Google while prohibiting Google from having to pay third-party platforms for distributing Google Search. *See Microsoft*, 253 F.3d at 103 (remedy "must seek to '*unfetter* a market from anticompetitive conduct'" and "'deny to the defendant the fruits of its statutory violation'" (emphasis added and citation omitted)). There is no surer way to undermine antitrust law's competitive goals than to issue a remedy providing free general search distribution to the defendant this Court determined to have "unlawfully maintain[ed] its monopoly in the market for general search." Dkt. 1033 at 258; *cf. id.* at 255 (rejecting argument that would "entrench[] Google as the default GSE of choice").

Nor would it aid competition for Apple to distribute Google for free via a choice screen. Every search engine available on Apple's search access points pays for distribution. R. Tr. (Cue) 3819:9-12 (explaining that Apple has deals with "Microsoft, DuckDuckGo, Yahoo!, and Ecosia for non-default" distribution "on the Safari browser"). As a result, free distribution on a choice screen would give Google a significant leg up over its competitors. And because "most people would still pick the best product" (i.e., select Google), *id.* 3830:5, there would be little incentive for Apple to maintain a choice screen in which Google gets free distribution—it would be better for Apple's users to continue having Google as the out-of-the-box default. As a result, any choice screen in which Google gets free distribution is unlikely to be successful.

*Option 2: Ceasing Distribution of the Highest Quality Product.* Alternatively, Apple could in theory cease distributing Google, the highest quality product in the marketplace. But that is not a meaningful alternative. "At the end of the day, the customer will pick where they want to search," and "most customers would pick Google because it is the best search engine." R. Tr. (Cue) 3826:16-19. As this Court acknowledged in its liability ruling, "Google is widely recognized as the best [general search engine] available in the United States." Dkt. No. 1033 at 46.

Offering consumers access to the highest quality products is part of Apple's DNA. Apple prides itself on developing "products" that "are very simple"—"[t]hey're very clean" and "they work very, very well." R. Tr. (Cue) 3841:4-6. "These are critical components" to Apple, *id.*, with its longstanding "commitment to providing the best experience for [its] users," Declaration of John Giannandrea, Dkt. No. 1239, ¶ 8. Apple cannot adhere to that core principle while also providing its users an inferior default product, or by removing access to the strongest product altogether for users. As Mr. Cue stated, "[i]t would certainly be a bad thing for Apple to make a choice of not providing customers what the best choice is." R. Tr. 3829:22-24.

Nor would well-established antitrust principles support a remedy that would put an inferior product front and center for consumers. "Consumer welfare is maximized when . . . consumers are assured competitive price *and quality*." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (emphasis added); *see also United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993) ("deterioration in quality of goods or services" is "actual anticompetitive effect[]"). Notwithstanding this Court's conclusion that Google violated Section 2, witness after witness confirmed that Google offers the best search engine on the market today. It would not bolster consumer welfare to limit access to the highest quality product on the market. *See, e.g.*, Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment*, 5 (Nat'l Bureau of Econ. Rsch, Working Paper No. 33410, 2025) (distributing Bing as the default search engine instead of Google would "decrease consumer surplus by $70.92 per consumer per year").

Beyond these direct harms to consumer welfare, Plaintiffs' proposal would harm both Apple's users and Apple itself. Apple receives "a significant amount of money" via its revenue share agreement with Google. R. Tr. (Cue) 3831:5-6. Apple uses that revenue to develop "new products and new capabilities"—the kinds of things that serve Apple's users. *Id.* 3831:8-9; *see also* Liability Tr. 9709-15 (expert testimony explaining economic theory supporting pass-through benefits to consumers in terms of device prices resulting from search distribution revenue). If this Court orders a remedy that forecloses Apple from receiving "anything of value" from Google for the next decade, as Plaintiffs propose, that "just lets [Apple] do less." R. Tr. (Cue) 3831:19. Compensation for search distribution provides a stable revenue stream that enables Apple to have patience and confidence to invest in innovative and disruptive technologies. *Id.* 3831:5-9. Apple is, for instance, pioneering new AI technologies that enable users to more easily access and use their personal data—a product called Apple Intelligence. Giannandrea Decl. at ¶¶ 3-8. If this

9

Court implements a remedy that strips Apple of all compensation it receives for distributing Google, that would threaten the pace of innovation, including with respect to AI partnerships that enable more effective competition with Google. R. Tr. (Cue) 3831:20-22 ("doing less means less products, less engineers, less revenue" and it's a "significant impact"). It would also set a damaging precedent. Eliminating Apple's ability to seek a return on its investment for investing in a valuable product and strong platform for distribution, including for Google's competitors, would disincentivize innovation, chill competition, and harm consumers.[2]

In short, Plaintiffs' proposed search distribution remedy is a lose-lose-lose proposition. Competition in general search would be diminished, not promoted. Consumers of general search would be hurt, not benefitted. And Apple and its users would suffer needless harm.

### 3.    Plaintiffs Have No Justification For Targeting Apple

The plain and indisputable harms to competition flowing from Plaintiffs' search distribution remedy raises a question: What possible justification could Plaintiffs have for forbidding Google from competing on an equal basis for distribution specifically on Apple devices? Throughout this case, the sole justification Plaintiffs have offered is that if Apple cannot receive compensation for distributing Google Search, Apple will develop its own competing search engine. That justification is unsupported by the record and cannot justify Plaintiffs' proposal.

At the outset, Apple notes that Plaintiffs have at times denied that their goal is to make Apple develop a search engine. In their attempt to defeat Apple's motion to intervene, Plaintiffs

---

[2] Plaintiffs have at times speculated that Google would not make revenue share payments to Apple in exchange for non-default placement. But Apple receives compensation from all other search providers available on Apple's search access points. And regardless, it should be up to the market (not the Court) to determine the extent to which Apple is compensated for providing a valuable service. Most of all, Google should have to compete on an equal playing field with competitors—not with the negotiating advantage that comes from a prohibition on Google paying Apple anything of value.

argued that the RPFJ does not seek "to force Apple to do anything"; "[w]hether Apple enters the search market is Apple's business and does not affect the 'success' of Plaintiffs Proposed Final Judgment."  Pls.' Resp. Br. 63, *United States v. Google, LLC*, No. 25-5016 (D.C. Cir. Feb. 26, 2025).  But if Plaintiffs do not care how Apple responds to their remedy, there could be no defensible justification for the remedy they propose.  Apple is the only third party targeted by name in the RPFJ.  And "non-Apple third parties" are expressly *allowed* to implement and receive compensation for distributing Google on a "choice screen" under certain circumstances.  RPFJ at 26-30 (outlining design of acceptable choice screens for "Search Access Points On Existing Non-Apple, Third-Party Devices"); *id.* at 7-8 (allowing Google to provide payments to "non-Apple third part[ies]" for choice screens that comply with § IX of the RPFJ).[3]  And elsewhere, Plaintiffs justify their Apple-specific remedy on the ground that Apple has "remain[ed] on the sidelines [of search] due to the large revenue share payments it receives from Google."  Exec. Summary of RPFJ at 13.

Plaintiffs' expert, Dr. Chipty, confirmed this rationale.  She stated "that the payment bans" proposed as part of the RPFJ "would increase the chance of entry into general search, especially by Apple."  R. Tr. 2141:13-15; *see also id.* 2188:12-14 (suggesting "that choice screen payments to Apple, in particular, would discourage either entry by Apple or Apple-sponsoring entry").  And Dr. Chipty's trial slides repeatedly singled out Apple, promoting remedial terms that would bar any payments "to Apple," Ex. No. PXRD012 (Chipty Trial Demonstrative) p. 48, ostensibly to prod Apple to enter the market for general search.

But Mr. Cue's uncontroverted testimony and the declaration Apple submitted by Mr.

---

[3] The RPFJ appears to also prohibit Mozilla from receiving revenue from Google in exchange for distribution via a choice screen.  Plaintiffs have not offered any apparent justification for that restriction.

Giannandrea confirm that Apple has no plan to build a general search engine. As Mr. Cue explained, Apple "understand[s]" this Court's conclusion that Google's payments for search distribution are a disincentive for Apple to develop its own general search engine. R. Tr. (Cue) 3825:19-20. But Apple and Google have long contracted for search distribution, and even when Google paid far less than it does today, Apple has "never" been "interested in doing a search engine." *Id.* 3825:24-25. "Google does an amazing job" and has a certain "skill set" and "competency" that Apple does not. *Id.* 3826:9-11.

Moreover, as the trial record made clear, there are significant costs associated with creating a search engine: "Developing just the technical infrastructure alone requires billions of dollars," and more billions still are required to "maintain[] a fully-integrated" search engine. Dkt. No. 1033 at 22. Apple would need to make "considerable investments in and expansions of Apple's data acquisition, engineering, and advertising efforts"—and "building the kind of advertising business necessary to monetize a general search engine would be an enormous, years-long undertaking" that is not a priority for Apple. Giannandrea Decl. ¶ 10; *see also* Dkt. No. 1111-1. And although "Apple maintains an internal search web index, … scaling [its] efforts to build a general search engine product would require considerable investments in and expansions of Apple's data acquisition, engineering, and advertising efforts." Giannandrea Decl. ¶ 10.

Developing a search engine is all the more risky in the current moment given the changing nature of how users access information online: ChatGPT, Claude, Gemini, Perplexity, and other AI-related search tools are promising to forever change the nature of the search market. *See id.* ¶¶ 13-14. These are "extremely well funded" companies who are "moving incredibly fast." R. Tr. (Cue) 3863:13-19. And with "billions of dollars" on hand, *id.* 3838:7, these companies have "already built large language models that are as good or better than most," *id.* 3846:6-8. Mr. Cue,

12

who has been at Apple for 36 years, explained that "for the first time," *id.* 3818:20, "we're seeing less searches … in Safari," *id.* 3847:1, as users are turning toward new, potentially "formidable competitors," *id.* 3819:3.  So, regardless of whether it ever made sense for Apple to consider investing in general search, it certainly does not make sense today.

Apple is invested elsewhere.  For example, it is pioneering Apple Intelligence, a product "grounded in on-device and private cloud AI processing and searching personal data." Giannandrea Decl. ¶ 6.  Apple Intelligence is about "using the data that exists on your phone," R. Tr. (Cue) 3832:16-17, "to process information . . . in order to simplify and accelerate everyday tasks," Giannandrea Decl. ¶ 6.  The engineers and product designers at Apple, in other words, have "spen[t] [their] time" and "energy" on the development of products that are focused on "personal knowledge."  R. Tr. (Cue) 3833:3-6.  It takes time, significant capital investments, and ingenuity to make new products, like Apple Intelligence, that can revolutionize the user experience.  And Apple is moving at an extraordinary pace to mobilize the human and technical resources needed to bring new AI experiences to its users.  Giannandrea Decl. ¶¶ 3-6.  Diverting "billions of dollars" and "valuable human resources … in pursuit of a general search engine product would require significant effort with minimal incremental value to users."  *Id.* ¶ 9.  Just consider that other companies with similar resources to Apple—like Microsoft—have tried to "out-Google Google" for decades.  R. Tr. (Cue) 3869:22.  But search "is hard."  *Id.* 3864:14.  "[I]t's a very, very difficult problem that no one has done successfully other than Google, … which shows you how hard it is, because there's so much money involved."  *Id.* 3864:19-22.

This Court has already recognized that Apple has good reasons not to build a general search engine.  As the Court explained in response to Plaintiffs' contention that revenue share payments have kept "Apple on the sidelines of search": "The evidence relating to Apple cannot be cast in

such absolute terms and calls for more nuance." Dkt. No. 1033 at 240. And while the only apparent justification for Plaintiffs' unique remedy targeting Apple is to force Apple to create its own search engine, this Court has already rejected that rationale in discussing what kind of remedy is appropriate in this case: "Whatever remedy is issued and whether Apple gets off the sideline or not, I don't really care. That's not my objective." Jan. 17, 2025 Status Hearing Tr. at 55:2-4. Plaintiffs have not come close to offering a causal connection, much less a "significant causal connection" between the conduct they seek to enjoin—here, allowing Google to pay for non-exclusive search distribution—and "the remedial goal intended." *Microsoft*, 253 F.3d at 105 (quotations and citation omitted).

The bottom line is this: Apple "can't do everything." R. Tr. (Cue) 3825:25-3826:1. Irrespective of whatever remedy this Court orders, Apple will not divert the significant resources that would be required to create a search product that competes head-to-head with Google. This Court acknowledged that it has no dog in the fight when it comes to whether Apple will create its own search engine. And Plaintiffs offer *no other reason* for targeting Apple with a unique remedy.

Plaintiffs' relentless effort to single out Apple—on terms expressly designed to force Apple to create a competing product in the market—is a transparent and unsupported effort to control the market. The case law is clear that the remedy must address the conduct this Court determined constituted monopolization and not penalize Apple, a non-party, based on claims Plaintiffs never brought. *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) (injunctions may not be used to "punish[]"), *see also Hartford-Empire Co. v. United States*, 323 U.S. 386, 409 (1945) ("[W]e may not impose penalties in the guise of preventing future violations."). For similar reasons, Plaintiffs' remedy flouts settled principles governing equitable relief as to third parties. *McPherson*, 797 F.2d at 1067 (discussing need to prevent harm to third parties when issuing injunctive relief). To

14

the extent Plaintiffs are trying to craft a remedy that is uniquely designed to force a particular third-party to develop a competing product, they attempt to have this court "act as [a] central planner[]." *Verizon Commc'ns Inc. v. L. Offs. of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2004). That is a fraught role in any context, but particularly when it comes to the technology industry, which "changes frequently, rapidly, and significantly."  R. Tr. (Cue) 3843:12-13.

> 4.    **Plaintiffs' Remedy Unlawfully Exceeds The Scope Of The Liability Ruling**

The remedy proposed by Plaintiffs is also untethered from the conduct that this Court found to have violated the Sherman Act.  From the start of this litigation, Plaintiffs have framed this case around Google's use of *exclusive* arrangements in distributing search.  Their complaints "alleged that Google has violated Section 2 of the Sherman Act by unlawfully maintaining its monopoly … by entering into exclusive agreements to secure default distribution on nearly all desktop and mobile devices in the United States."  Dkt. No. 1033 at 5.  This Court analyzed the ISA through that lens, stating that "Google pays Apple a share of its search ads revenue in exchange for Apple preloading Google as the exclusive, out-of-the-box default [general search engine] on its mobile and desktop browser, Safari."  *Id.* at 101; *see also id.* at 108-10 (explaining that Google was not always "the exclusive default" on Safari).  This Court found that "Google has violated Section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States— general search services and general text advertising—through its *exclusive* distribution agreements."  *Id.* at 276 (emphasis added).

Plaintiffs could have developed a remedial proposal that targets Google's use of exclusive dealing arrangements.  They did not.  Instead, Plaintiffs have proposed a remedy that decouples revenue share from default status and attacks both.  That overbroad approach fails to grapple with the particular conduct this Court found unlawful.  Plaintiffs do not "narrowly tailor[]" their

proposal "to remedy the harm shown." *Gulf Oil*, 778 F.2d at 842. By prohibiting the exchange of *anything* of value between Apple and Google relating to search, the RPFJ imposes relief that is "more burdensome … than necessary." *Madsen*, 512 U.S. at 765. And Apple is a third-party that has not been found to have committed any wrongdoing. *See McPherson*, 797 F.2d at 1067 (warning that injunctions should not cause third parties to "suffer undue harm").

Plaintiffs' RPFJ is overbroad and unlawful in another respect, too. Plaintiffs not only propose prohibiting Apple and Google from exchanging "anything of value" for search distribution, they propose a similar prohibition on Apple's distribution of Google Gemini or any other Google AI related search tools. The RPFJ prohibits any payments related to the "placement" of a "Search Access Point." RPFJ at 8. And Plaintiffs define "Search Access Point" to include "any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive … a response that includes information from a GSE, including links to websites." RPFJ at 6. That definition would appear to sweep in applications, like Gemini or other generative AI tools, that provide narrative responses to user prompts based only in part on information from a general search engine. So, although Plaintiffs went to great lengths during the liability phase to treat AI as being outside the scope of the relevant market, Plaintiffs now propose a remedy that would treat AI tools the same as Apple's distribution of Google Search.

AI software is in its infancy, and consumers are just beginning to harness the power of these fast-evolving tools to search for and access content online. *See* R. Tr. (Cue) 3866:3-12; *see also id.* 3828:20-3829:2, 3827:17 ("[N]obody's quite there yet."). This is an area in which this Court should be particularly wary of implementing a remedy that might distort competition. When it comes to fast-evolving technology, courts are particularly ill-suited to predict future events and

understand the competitive dynamics that are likely to shape a market that has not even taken form. *See Microsoft*, 253 F.3d at 49 (explaining that "[r]apid technological change leads to markets in which firms compete through innovation for temporary market dominance, from which they may be displaced by the next wave of product advancements" (quotations and citation omitted)). "Judges must remain aware that markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare" and adjust "in light of changing market realities." *Alston*, 594 U.S. at 106-07.

### C.    If This Court Implements A Choice Screen Remedy, It Should Ensure It Is A Fair Choice Screen In Which Google Can Pay For Distribution

Apple recognizes that this Court is considering a range of potential remedies designed to address the conduct it found anticompetitive. During this Court's questioning of Plaintiffs' lead economic expert, the Court suggested that rather than outright prohibit Google for paying for distribution—a remedy that would *harm* competition, *see supra* at 6-10—"there's a middle ground, where Google could still pay a revenue share but not for default placement." R. Tr. 2149:2-4.

To the extent the Court is inclined to adopt a "middle ground" approach involving a choice screen, Apple emphasizes that fair compensation for search distribution is essential to ensuring a successful choice screen remedy. *See id.* 3827:6-12. Consider the incentives facing any distributor of various products for consumers. If the vast majority of consumers choose only one player, and if that most popular player is outright prohibited from paying to be included on the menu of options presented by the distributor, any choice screen would break down. Rather than include Google on such a screen, distributors like Apple would likely return to making Google the default. "At the end of the day, the customer will pick where they want to search," and Apple knows "that most customers would pick Google because it is the best search engine." *Id.* (Cue) 3826:16-19.

Payments for distribution—if conditioned on Google being presented on a no-more-than-equal-basis—can incentivize distributors to implement choice screens without preference for a particular search provider.

If this Court were to conclude that choice screens are the right approach, then, as Mr. Cue testified, "of course" Apple would implement one. *Id.* 3830:4. But any choice screen must be fair and procompetitive. Permitting Apple to continue receiving revenue for distributing Google via a choice screen would prevent the serious short-term harm to the market of Google receiving free distribution. *See supra* at 6-8.

As Mr. Cue explained, however, a choice screen remedy standing on its own is unlikely to be "highly effective." R. Tr. 3830:3. Incumbent players have been trying to match Google for years, without much success. But search is changing and information access is at an inflection point. AI is a "revolutionary technolog[y]." *Id.* 3844:19, 3845:4-5. New products like Perplexity, Claude, and ChatGPT (among others) are changing how users search for and access information. *Id.* 3849:8-17. Just recently, and for the first time, "the number of Google Search queries that [Apple has] had in Safari went down." *Id.* 3818:24-3819:1. Apple believes that is because consumers are increasingly using generative AI models for search. *Id.* 3828:2-7. ChatGPT has "over 500 million users every week." *Id.* at 3828:6. And "[t]hat used to be zero two years ago." *Id.* 3828:7; *see also id.* 3827:20-22 ("[T]here's no question that people today are searching using those products now that was not the case before."). These new entrants are "changing the rules" of search by utilizing new technologies, like large language models, to provide "better search results" despite having smaller indexes. *Id.* 3871:14, 3871:19-20. "[A] smaller index … will be able to do things with LLMs" that would not otherwise be possible "with just a search index" alone. *Id.* 3871:14-16. As Mr. Cue explained, the future lies in combining a search index with

18

large language models to give users "way better results." *Id.* 3838:11-12.

Apple believes that consumers are better off when they have a choice—a *real* choice—between competing high-quality products. If new entrants to the market like OpenAI, Anthropic, Perplexity, and others, had access to the "Google Search Index" in some capacity, that would accelerate their ability to compete. *Id.* 3847:18-3848:1. Such a remedy would be good for Apple's users. *Id.* 3866:15-16. Apple expects that it "will add other choices" for consumers in its browser because new entrants keep "getting better and better." *Id.* 3835:6-10. A limited data sharing remedy focused on providing some form of access to the Google Search Index could bolster the competitive landscape and steer the market toward an environment in which consumers have a bona fide choice between high quality search providers.

True competition in the market is not far away. The new companies that are pairing generative AI capabilities with search have "money and resources," *id.* 3871:3, that will make them competitive by making "search significantly better," *id.* 3865:22. The question is when, not if. *See id.* 3871:4-6. And the current limitation facing burgeoning competitors is the need "to significantly increase their index in order to provide better search results." *Id.* 3865:5-7. A remedy that spurs such competition while protecting consumers' ability to choose the best product would promote competition, avoid entrenching Google, and protect Apple's users.

## III.    CONCLUSION

Search is changing. For the first time in decades, new entrants are challenging Google's market position by combining smaller search indexes with capable large language models—and that combination is revolutionizing how users search for, access, and process information online. Apple has always been focused on providing the best possible user experience, including when it comes to distributing search engine technology on Apple devices. And as the market has shifted, so has Apple. Apple is investing in new AI capabilities that will better connect users with their

own private data, and Apple is partnering with third-party AI products that are increasingly popular among consumers.  This is an exciting time for search, for consumers, and for the technology industry at large.

Critical aspects of Plaintiffs' proposed remedy threaten to impede this progress.  By eliminating any compensation to Apple for distributing Google, Plaintiffs' remedy would provide an immediate financial benefit to Google while undermining Apple's pace of innovation when it comes to new products.  Neither common sense nor bedrock antitrust principles support such an approach.  Whatever remedy this Court implements, it should ensure that Apple can be compensated for the valuable services it provides—both to search engine creators and to users.  If the Court is inclined to adopt a choice screen remedy, Apple will of course implement one.  But any choice screen must be fair and allow all high-quality search providers to compete equally.  A choice screen alone may do little at present to offer consumers real choice because today Google remains the best choice.  Apple believes, however, that if the Court were to order some form of data sharing such that new entrants can access Google's search index, it would accelerate changes that are beneficial to Apple's users.

The major players of today can become the relics of tomorrow, especially in Silicon Valley. That is why Apple is constantly innovating to provide its users the best possible experience, and it is why Apple has partnered with new market entrants who are revolutionizing access to the world's information.  These companies are providing users new search experiences that are already changing the market.  In short, change is coming to search, whatever remedy this Court orders. Apple respectfully requests that the Court carefully tailor its approach to bolster competition and avoid harming third parties—like Apple's users and Apple itself—along the way.

Dated:   May 9, 2025

LATHAM & WATKINS LLP


By  *s/ Sarah M. Ray*

Alfred C. Pfeiffer, Jr. (*pro hac vice*)
Sarah M. Ray (*pro hac vice*)
Aaron T. Chiu (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600
Fax: (415) 395-8095
Email: al.pfeiffer@lw.com
          sarah.ray@lw.com
          aaron.chiu@lw.com

Gregory G. Garre (D.C. Bar No. 440779)
Peter E. Davis (D.C. Bar No. 1686093)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: gregory.garre@lw.com
          peter.davis@lw.com

Ben Harris (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
Email: ben.harris@lw.com

*Counsel for Amicus Curiae Apple Inc.*