# Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:20-CV-03010-APM |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:20-CV-03715-APM |
| GOOGLE LLC, | |
| Defendant. | |

**BRIEF OF *AMICUS CURIAE* BRAVE SOFTWARE, INC.
IN SUPPORT OF NEITHER PARTY**

**CRAVATH, SWAINE &
MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
Yonatan Even (*pro hac vice*)
Andrew C. Finch (*pro hac vice*)

375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
gbornstein@cravath.com
yeven@cravath.com
afinch@cravath.com

*Counsel for Proposed Amicus
Curiae Brave Software, Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Local Rule 7(o)(5) and FRAP 29(a)(4) and 26.1, Brave Software, Inc. states that it has no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

## STATEMENT OF *AMICUS CURIAE* INDEPENDENCE

Pursuant to Local Rule 7(o)(5) and FRAP 29(a)(4)(e), Brave Software, Inc. states that:

(i) no party's counsel authored the brief in whole or in part;

(ii) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

(iii) no person—other than the *amicus curiae*, its members or its counsel—contributed money that was intended to fund preparing or submitting the brief.

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* .............................................1

ARGUMENT .........................................................................................................................4

    I.    As Drafted, Section VII.A-C of Plaintiffs' RPFJ Would Consolidate Google's Monopoly over All Organic Search Results. ................................................4

        A.    Section VII.A-C Would Discourage Investment in the Development of New, Independent GSEs. ................................................................5

        B.    Section VII.A-C Would Render Independent GSEs Unable to Compete with Google in the Generation of Search Results. ..........................9

        C.    Entrenching Google's Monopoly in Search Result Generation Would Be Harmful to Consumers. .................................................................12

        D.    Plaintiffs' Proposed Limits on Access to Google's Search Results Are Insufficient Safeguards to Protect Search Result Competition. ......14

    II.    Section VII.A-C Can Be Refined to Promote Competition Across the GSE Market Without Harming Competition Among Independent Search Engines. ......18

        A.    Section VII Should Require Google to Provide Responses Only to "Long-Tail" Search Queries. ....................................................................19

        B.    The Percentage Cap on Search Queries Should Decrease at Set Intervals over the Term of the Syndication License. ....................................23

        C.    Google Should Be Prohibited from Offering Access to Its Search Results on Any Other Terms. ....................................................................25

CONCLUSION......................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Other Authorities**

*Brave releases its Search API, bringing independence and competition to the search landscape*, BRAVE (May 30, 2023), *available at* https://brave.com/blog/search-api-launch/.................................................................................................................................22

*Brave Search removes last remnant of Bing from search results page, achieving 100% independence and providing real alternative to Big Tech search*, BRAVE (Apr. 27, 2023), *available at* https://brave.com/blog/search-independence/ .........................................21

iv

## <u>INTRODUCTION AND INTEREST OF *AMICUS CURIAE*</u>

Brave Software, Inc. ("Brave") is a private company that operates its own web browser and search engine.  Brave competes in the market for general search services through its general search engine, Brave Search.  Brave Search offers users a privacy-focused alternative to competitors like Google and Microsoft's Bing.  That is, Brave does not collect, and therefore does not monetize, its users' personal data.

Brave is one of only three general search engines ("GSEs") in the United States (alongside Google and Bing) that has built the technology to crawl the web and construct a search index capable of generating all of its own search results.  When a user enters a query on Brave Search, 100% of the results are generated by Brave from its own, built-from-scratch index. Brave's status as an "independent GSE" differentiates it from nearly all other GSEs in the United States, which obtain most or all of their search results from another GSE and repackage those results for display to their users.  Such "white-label GSEs" (like Yahoo! and DuckDuckGo) compete for search users, but they do not compete in the generation of organic search results.

In addition to producing organic search results for users who access Brave Search directly, Brave syndicates its search results for use by third parties through its Brave Search API. These customers include white-label GSEs, as well as generative artificial intelligence ("GenAI") companies that rely in part on search results to train their models and power their responses through retrieval-augmented generation and grounding.  Today, the vast majority of Brave's revenue is derived from the syndication of its organic results by selling access to the Brave Search API.  This revenue has grown rapidly over the past 12 months specifically due to the largest GenAI companies using the Brave Search API to augment and ground their results. Without the opportunity to sell its search results at a competitive rate, Brave's incentive to invest and innovate in its search index would plummet, as would its ability to compete as a GSE.

This Court has found that building a GSE that is capable of generating search results independent of any other GSE—as Brave has done—"is an extremely capital- and human-resource intensive endeavor," and that "[d]eveloping just the technical infrastructure alone requires billions of dollars."  (Aug. 5, 2024 Mem. Op. ("Op.") 21-22.)  Brave is the only company (other than Microsoft) that, despite Google's monopolistic conduct, took on this challenge successfully.  Today, Brave generates responses to more than 16 billion queries annually through Brave Search—more than Yahoo!, for example (Day 4 PM Tr. 1245:10-12 (Provost) (testifying that Yahoo! processes fewer than 10 billion queries per year).)  In addition, Brave generates responses to tens of billions of queries annually via the Brave Search API, including for leading players in artificial intelligence.

But part of Plaintiffs' remedy proposal, as currently drafted, threatens Brave's success and risks further consolidating Google's monopoly in the generation of search results. Specifically, Section VII.A-C of Plaintiffs' Revised Proposed Final Judgment ("RPFJ") would require Google, for ten years, to provide its real-time search results to all "Qualified Competitors" at no more than Google's marginal cost.  (RPFJ 18.)  These provisions were designed with the well-intentioned goal of facilitating immediate entry by GSE competitors, providing them with a stop-gap measure as they develop the ability to self-supply search results. (*Id.*)  However, as drafted, they risk serious competitive harms that will be counterproductive to that goal and instead help perpetuate a Google monopoly.  That is for two reasons.

*First*, while Section VII's syndication remedy could facilitate entry by white-label GSEs in the short term, it will delay and disincentivize the investment necessary for GSEs to generate their own organic search results for the long term.  Section VII will make available a decade-long license to use Google's search results for no more than Google's marginal cost

(which, as this Court has recognized, is near zero (Op. 164)). With a free supply of Google search results in response to *all* user queries, entrants will have no incentive to invest in independent search index capability. Even an entrant with a plan ultimately to generate search results independently would delay the requisite investments for as long as possible, and instead direct its resources towards white-label differentiators that would help it better compete against other white-label GSEs. (*See* Day 2 AM Tr. 410:15-22 (Turley) (testifying that Plaintiffs' search syndication remedy would permit OpenAI to "re-allocate some of [its R&D] resources towards the differentiation of the product in a very competitive space" rather than "on the creation of [its] own index").) In other words, Section VII may help spur entry by companies that simply repackage and re-sell the syndicated Google search results, but it will impede competition in the independent generation of search results.

*Second*, at the same time, Section VII.A-C will cement Google's monopoly position by making it impossible for existing competitors like Brave to continue supplying Qualified Competitors with search results. As drafted, these provisions would require Google to supply the results for 100% of Qualified Competitors' search queries at Google's marginal cost. Because Google's exclusionary practices have given it significantly greater scale than its competitors, Google has a much lower marginal cost for responding to search queries than any competitors do. (*See* Day 1 AM Tr. 86:8-15 (Google Opening Statement); Op. 226-27.) That means neither Brave nor any other provider of search results could undercut the near-zero price at which Google would provide its search results to Qualified Competitors under Section VII; and no rational third party would choose to buy from Brave at a competitive rate what it can get from Google essentially for free. In short, the syndication license that Plaintiffs propose, as

written, would squeeze out alternative providers of search results, thereby entrenching (rather than undoing) Google's monopoly in search result generation.

The resulting lack of competition in search result generation would be devastating for consumers. Even if a wealth of white-label GSEs emerge, if all those GSEs provide users with the same search results (Google's), consumers would have even *less* choice than they do today with respect to the core product that these GSEs are supposed to be offering: responses to their search queries. Google would have even greater control over the flow of information to consumers, both for traditional search and for GenAI models' retrieval-augmented generation. Further, in the absence of meaningful competition, Google would have the ability to exercise its monopoly power over search result generation after the remedy expires.

For these reasons, Brave proposes certain refinements to Section VII.A-C that will achieve Plaintiffs' goal of permitting competitors to rapidly enter the GSE market with a competitive product while preserving incentives to compete in the generation of organic search results. Specifically, Brave proposes: (1) capping the percentage of search queries that Google may provide, so that Qualified Competitors continue to get the benefit of the "long-tail queries" that they need to offer a competitive product but retain the incentive to invest in developing their own search indices; and (2) predictably decreasing this cap to encourage early investment and development in a search index, such that Qualified Competitors are capable of responding to 100% of search queries without Google by the time the remedy expires.

## ARGUMENT

### I.    As Drafted, Section VII.A-C of Plaintiffs' RPFJ Would Consolidate Google's Monopoly over All Organic Search Results.

There are only three independent GSEs operating in the U.S. general search services market today. Section VII of Plaintiffs' proposed remedy creates the intolerable risk

that, upon expiration of the remedy, only one will still be actively competing in, and therefore dominating, search result generation:  Google.  That is for two reasons.  *First*, Section VII would discourage near-term investment in proprietary search indices, instead encouraging new entrants to participate as white-label GSEs that simply repackage Google's search results to their users. *Second*, Section VII would make it impossible for existing alternative providers of syndicated search results like Brave to win customers, when Google's search results will be available at Google's very low marginal cost, thereby squeezing these other independent GSEs out of the market.  The effect on consumers will be devastating:  consumers will face even less choice over what company generates responses to their search queries, and at the end of the license term Google will be able to exert its now-strengthened monopoly power to control access to syndicated search results—unless and until another competitor can emerge.  In short, Section VII would sacrifice the proverbial bird in the hand—not for birds in the bush, but for birds that have not yet hatched and have no prospect of hatching any time soon.

### A.     Section VII.A-C Would Discourage Investment in the Development of New, Independent GSEs.

Plaintiffs' proposed Section VII is intended to help GSEs immediately enter the market for general search services and do so with a competitive product by granting them low- or no-cost access to Google's own search results.  (*See* RPFJ 18; Day 1 AM Tr. 34:15-16 (U.S. Opening Statement) (noting that with the syndication remedy "[r]ivals can syndicate search results from Google and provide a high-quality product today").)  But, as drafted, this provision inadvertently incentivizes entry by white-label GSEs while *dis*incentivizing entry and expansion by independent GSEs capable of generating their own search results.  Therefore, although Section VII may succeed in drawing new competitors to the overall market for general search services, it will affirmatively discourage the investments needed to obtain search independence.

It risks creating a market in which a variety of white-label GSEs all provide users the exact same search results:  Google's.  This would mean decreased competition in general search services and in the market for ideas.

Building and maintaining a competitive search index is an incredibly expensive and complex endeavor.  (Op. 157; *see also* Day 2 AM Tr. 397:8-398:12 (Turley) (noting that even a well-resourced technology company like OpenAI may not be able to get "100 percent" of the way to developing an independent search engine "with [its] R&D footprint").)  That endeavor was made all the more challenging due to Google's years'-long anticompetitive conduct.  Consequently, in the United States, only Google, Bing and Brave operate independent GSEs with proprietary search indices capable of generating their own search results.  All other competitors operate as white-label GSEs that purchase an independent GSE's syndicated search results.  (*See, e.g.*, Day 3 PM Tr. 837:9-15 (Weinberg) (testifying that DuckDuckGo made a "business decision" to focus its investment in "privacy features or adjacent markets like our browser" and "syndicate [search results] from Microsoft instead who has bigger scale").)

Several aspects of Plaintiffs' proposed remedy have the potential to assist new entrants and existing white-label GSEs to develop independent search indices.  In particular, as witnesses have explained, data sharing (Section VI) and search text ads syndication (Section VIII) will help firms overcome barriers to entry and expansion.  (*See, e.g.*, Day 2 AM Tr. 409:11-21 (Turley) (testifying that access to Google's search index data under Section VI "would accelerate the development of [OpenAI's] own index"); Day 7 AM Tr. 2147:14-16 (Chipty) ("[I]f the Court adopts some version of the data and syndication remedies, that will give other firms a chance to actually be in the game.").)

By contrast, Section VII.A-C will not materially decrease the time or capital investment needed to build an independent search engine. A search API simply allows a white-label GSE to repackage an independent GSE's search results in response to user queries. (*See* Day 2 AM Tr. 400:17-21 (Turley) (explaining how a third-party search API works).) Consistent with this, witnesses in this proceeding have described Plaintiffs' proposed search syndication remedy *not* as a means to build one's own search index, but *instead* as a means to bridge the gap in handling long-tail queries until a GSE can offer a competitive independent product. For example, DuckDuckGo's Chief Executive Officer, Gabriel Weinberg, testified that syndication "makes sense" as a remedy to help "give search engines scale in the short term, so that when users are trying them out, they are not immediately souring on them"; but he recognized that, "[i]n the long term, as the remedies expire . . . we and others would need to build our own indexes at scale." (Day 3 PM Tr. 813:12-814:5.)

The Court recognized this point when it asked OpenAI's Head of Product for ChatGPT, Nicholas Turley, to distinguish between "the access to syndicated search results versus access to the user data." (Day 2 AM Tr. 424:18-23.) Mr. Turley testified in response:

> They are helpful on different timelines. The syndicated search results would be helpful now. . . . [I]t allows us to immediately improve the quality of the product on this dimension, the dimension of real-time information and currency, and allows us to focus on building out the parts on which we can most differentiate, which is, you know, increasingly helping our users perform tasks and many of the other long-term things that I described. . . . [The search index data under Section VI.A] aids us in the medium run, because it allows us to own our own destiny and not just partner for real-time information but build a great, high-quality index that is, you know, proprietary and that can serve our product over time.

(Day 2 AM Tr. 424:24-425:20.)

But as Section VII is currently drafted, its near-term entry-inducing effects come at a substantial cost. One cost is that it creates a heavy counterweight that will slow down the investments necessary to build an independent search index. As written, Section VII gives

Qualified Competitors nearly free access to Google's search results to satisfy 100% of their users' queries. With high-quality results available at such low cost, entrants will have little incentive to avail themselves of the other remedies and undertake the hard work and investment of building their own search indices. Plaintiffs' expert, Dr. Chipty, recognized this risk, testifying that Plaintiffs' syndication remedies would reduce competitors' "incentives to innovate in the future." (Day 7 AM Tr. 2165:18-19.) She further explained that "in the context of the evidence before the Court, there'll have to be some kind of consideration whether the incentive dampening effects o[n] innovation can actually be offset by any investment-enhancing effects of the remedies." (*Id.* at 2166:18-22.)

The "evidence before the Court" has shown they will not. Even with the panoply of Plaintiffs' remedies on the table, executives at GSEs and GenAI companies professed that their priority would *not* be the hard work of building a search index, but instead differentiating themselves on the front end. As Mr. Turley explained:

> I really don't see our index as the thing that differentiates ChatGPT; rather, it's a necessary requirement for its evolution. But I would love to spend both my time and the team's time on innovating on the core thing. . . . [W]e currently have to spend a lot of resources on the creation of our own index, and we would be able to re-allocate some of those resources towards the differentiation of the product in a very competitive space.

(Day 2 AM Tr. 409:11-410:22.) Similarly, Mr. Weinberg testified that, even if Section VII were to be ordered in its current form, in his "ideal world" DuckDuckGo would continue buying syndicated search results from Microsoft. (Day 4 AM Tr. 979:6-981:4.)

As a result, while Section VII could help white-label GSEs enter the market for search services quickly, it will not help those companies become independent. To the contrary, by providing the *entirety* of white-label GSEs' needs at a price close to zero, Section VII.A-C

will affirmatively deter those companies from making the investments needed to build their own search indices and compete in the generation of search results.

**B.     Section VII.A-C Would Render Independent GSEs Unable to Compete with Google in the Generation of Search Results.**

In addition to disincentivizing entrants from investing in their own proprietary search index, Section VII as drafted would severely penalize any GSE that *has* built this technical infrastructure by drying up a critical revenue stream:  syndication of its search results. That is because Section VII requires Google to make its search API available for *all* of a licensee's search queries at a lower price than any other competitor could profitably offer for the same (or sometimes even an inferior) service.  The resulting loss of this revenue would, at best, discourage continued investment in maintaining these competitors' search indices and related technology; and, at worst, drive these competitors out of the market altogether.  Thus, in pursuit of generating competition in the market for general search services, Section VII will inadvertently sacrifice the "bird in the hand"—existing GSEs offering independent indexing, like Brave—and consolidate Google's monopoly in generating organic search results.

As currently drafted, Section VII would allow—indeed, *require*—Google to undercut its few independent GSE competitors in the sale of syndicated search results. Section VII does not just require that Google provide access to its search API; it requires that Google do so for "no more than the marginal cost of [the] syndication service."  (RPFJ 18.)  This Court has already recognized that Google's "marginal cost of responding to one additional query is near zero."  (Op. 164.)  Google is able to offer its search results at "near zero" cost because the scale advantage it obtained through its years of monopolistic conduct.  Indeed, "Google receives nine times more queries each day than all of its rivals *combined* across all devices." (Op. 34 (emphasis in original).)  There is no GSE in the market even approaching Google's scale.

9

As a result, there is also no independent GSE that could sell its search results at or below Google's marginal cost and still cover its own costs, much less earn a profit.

The inability to meet or undercut Google on price will prevent any other independent GSE from earning revenue on the sale of its own search API.  No rational third party would pay a competitive rate to buy from Bing or Brave what they can obtain at virtually no cost from Google.  As Mr. Weinberg explained with respect to DuckDuckGo's relationship with Bing, "private syndication contracts just cost a lot more."  (Day 3 PM Tr. 829:22-830:2.)  The Court summarized this precise problem with respect to Plaintiffs' proposed search ads syndication license:  "I mean, you're essentially effectively removing any market for syndication of advertising if there's one source where it's essentially free—not free but at low cost."[1] (Day 10 AM Tr. 3208:7-9.)

For independent GSEs like Brave that rely on this revenue stream to justify their continued investment in search, the consequences would be severe.  The Court found that "[t]he cost of maintaining a fully integrated GSE once built runs into the billions of dollars."  (Op. 22.) Independent GSEs that are no longer able to profit from syndication will cease or decrease

---

[1] This problem is far more acute in the context of search results syndication (Section VII) than in the context of search text ads syndication (Section VIII).  Unlike Section VII, Plaintiffs' proposed Section VIII.E would not require Google to offer its search text ads syndication license at marginal cost; it would require only that the license be available to Qualified Competitors "on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products."  (RPFJ 24.)  Google can continue to choose the price at which it sells syndicated ads, and existing providers of search text ads syndication licenses, like Bing, can continue to compete with Google on price.  In short, both syndication remedies are designed to help GSEs compete effectively while they continue to build scale and improve their products. (Pls.' Remedies Pre-Hr'g Br. 12; RPFJ 18, 23.)  But only one of these remedies—Section VII's search syndication license—does so at an intolerably high cost to competition.

investment in maintaining (let alone improving) their search indices.[2]  Independent GSEs would also have less incentive to maintain their search indices even for their own search applications like Bing or Brave Search.  Instead, because any such GSE would likely be deemed a "Qualified Competitor" with "a plan to invest and compete in the GSE . . . market[]" (RPFJ 5), it could access Google's search API for less than its own marginal cost of generating search results.  At least for the duration of the syndication license, it would not make economic sense for a GSE to invest heavily in its own search result generation when it could repackage Google's search results for a fraction of the cost.  That will decrease competition in search result generation and decrease the diversity of search results delivered to users.  At best, existing independent GSEs will be unable to compete with Google in search result generation.  At worst, independent GSEs that can survive the loss of syndication revenue may compete less vigorously (or even cease competing for a time) in the broader general search services market altogether, relying instead (at least in part) on near-free syndicated results from Google.

At bottom, if Section VII is put in place as drafted, Google will face *less* competition in search result generation.  Existing independent GSEs like Brave, who took the enormous risk of investing in search result generation despite Google's anticompetitive conduct, will be deprived of their key revenue source and likely pushed out of the market.  Even the risk of this result warrants the refinements to the RPFJ proposed below.  In weighing the pros and cons of potential remedies, the Court should weigh very heavily the immediate and unavoidable adverse effect that Section VII.A-C would have on existing competition among independent

---

[2] This concern extends beyond existing competitors like Bing and Brave.  A new entrant trying to build its own GSE would have no hope of meaningfully competing with Google in the syndication of its search results for the ten years that Google's search API remains available.

GSEs to syndicate search results to others—and the long-term prospect of perpetuating Google's monopoly in search result generation.

C.     **Entrenching Google's Monopoly in Search Result Generation Would Be Harmful to Consumers.**

Strengthening Google's monopoly in search result generation will be devastating to consumers. *First*, even if Section VII encourages more white-label GSEs to enter the market, consumers will have *less* choice as to the source of their search results than they did before. That is because all such GSEs—as well as GenAI companies that rely on syndicated search results to power their responses—would simply be repackaging Google's search results. This would give Google even *greater* control over the flow of information to U.S. consumers. *Second*, during the term of the remedy, Google would have less incentive to innovate and improve upon its search results. *Third*, as the remedy expires, Google would be left in an advantageous position, able to exert its further-entrenched monopoly power to dictate prices for, and access to, syndicated search results. These outcomes are antithetical to Plaintiffs' stated goals of "pry[ing] open the monopolized markets to competition, and depriv[ing] Google of the fruits of its violations." (RPFJ 18.)

By definition, if Google has a monopoly over search result generation, then no matter how many white-label GSEs enter the market, users will still have less choice (perhaps even no choice) over the company that generates responses to their search queries. During the term of the remedy, all such GSEs would have strong incentives to source their search results from Google (*see* Arg. §§ I.A-B), making genuine choice among GSEs largely illusory, at least as to the search results that they provide. Perplexity AI, Inc.'s Chief Business Officer, Dmitry Shevelenko, put his finger directly on this problem. When asked by Google if he was aware whether a particular company had integrated other GSEs, like DuckDuckGo, as a secondary

default in its web browser, Mr. Shevelenko responded: "Well, DuckDuckGo is just Bing. . . . They're all Bing, right. It's basically—it's Google, it's Bing, it's a bunch of Bing wrappers and Ecosia. **So there's very limited consumer choice**." (Day 3 AM Tr. 752:25-753:5 (emphasis added).) Under Section VII, that choice would be further reduced: the market would likely consist of "Google and a bunch of Google wrappers."

      Not only will consumers have less choice over who generates their search results, but that lack of choice may also skew what information is presented to them. Even algorithms are not entirely free from bias. The websites Google serves for public consumption may not be the same as those served by Bing or Brave in response to any given query, even assuming no appreciable difference in the quality of their underlying search indices. Consolidating search result generation in Google's hands will necessarily (even if unintentionally) affect what viewpoints are promoted and what viewpoints are silenced. Such bias would likewise infect GenAI applications, which rely in part on syndicated search results to source their narrative responses. (*See* Day 2 AM Tr. 418:16-419:9 (Turley) (testifying that it is "critical" for OpenAI to have access to "high-quality search providers").) Ultimately, the information presented to U.S. search consumers would come from one monolithic source: Google.[3]

      A strengthened Google monopoly over search result generation would also mean that Google would have less incentive to invest in improving the efficacy of its search results, at least for the duration of the remedy. As this Court has recognized, monopoly power gives a company "the ability to degrade product quality without concern of losing consumers." (Op. 154-55.) Google has admitted that, under existing market conditions, it does not "consider

---

[3] To make matters worse, if there are a variety of white-label GSEs, consumers may not even realize that their search results all come from the same source. Consumers may believe there is competition even when there is not.

whether users will go to other specific search providers (general or otherwise) if it introduces a change to its Search product." (Op. 154 (internal quotation marks omitted).) That would be even more true if those other search providers were using *Google's own search results*.

In the longer term, as the remedies expire, Google would be able to use its monopoly power in search result generation to dictate the terms on which third parties can purchase syndicated search results. If Section VII squeezes alternative providers of syndicated search results out of the market, then customers like white-label GSEs and GenAI companies would be at Google's mercy as to whether and on what terms it makes its search results available. After the remedy expires, Google would be able to exercise its monopoly power to charge supra-competitive prices; to restrict access for particular customers and not others; or to stop making its search API available altogether.

In short, a world where the general search services market consists of many white-label GSEs and one monolithic independent GSE (Google)—even for a limited period of time—is not a desirable outcome for consumers.

### D. Plaintiffs' Proposed Limits on Access to Google's Search Results Are Insufficient Safeguards to Protect Search Result Competition.

Section VII contains two provisions designed to ensure that entrants would invest in building their own search indices and compete as independent GSEs during the license term: (1) the syndication license is limited to those entrants that Plaintiffs and the Technical Committee determine to be "Qualified Competitors," as defined in the RPFJ (RPFJ 5); and (2) Qualified Competitors' access to Google's syndication data will decline over the course of the ten-year license term (*id.* at 20). Although these provisions are aimed at the right problem, as drafted, they are insufficient to overcome the overwhelming incentives Section VII creates to delay the

investments needed to obtain search independence or to avoid squeezing out existing competition.

**Qualified Competitor.**  Section VII does not allow literally every potential entrant to obtain a search syndication license but instead restricts the license to "Qualified Competitors," which is defined as only those competitors "who make[] a sufficient showing . . . of a plan to invest and compete in the GSE and/or Search Text Ads markets." (RPFJ 5.)  This effort to limit the license to those who appear intent on making good use of it is insufficient to guard against the problems identified above.

*First*, the definition of "Qualified Competitor" does not require a plan to compete as an *independent* GSE.  It is sufficient under the definition that an entrant merely plans to compete "in the GSE . . . market[]," which includes white-label GSEs.  (RPFJ 5 (defining "GSE").)  As such, an entrant may obtain "Qualified Competitor" status, and therefore access to Google's search API, without ever demonstrating any interest in (let alone any plan for) building its own search index.  Indeed, the definition of "Qualified Competitor" would include even those competitors that openly admit they want to continue purchasing syndicated search results from other GSEs.  (*See* Day 4 AM Tr. 979:16-980:6 (Weinberg) (testifying that "in an ideal world," DuckDuckGo "could negotiate with Microsoft and make use of some of the remedies, while maintaining a Microsoft [Bing] syndication contract").)

*Second*, even if Section VII were limited to competitors with a viable plan to compete as independent GSEs, there is no means to enforce that limitation under the RPFJ.  The RPFJ does not require that syndication licensees actually implement their plans; and it does not provide any penalty for a Qualified Competitor that fails to do so.  A Qualified Competitor could

thus receive high-quality, low-cost search results from Google for up to a decade without ever taking meaningful steps towards building its own search index.

History illustrates this risk.  In the past, GSE market entrants have professed their *intent* to build their own search indices.  But, when push came to shove, they chose to compete only on the front end, and invest their R&D resources elsewhere.  DuckDuckGo, for example, claims to have been trying to build a search index for over a decade.  (Day 4 AM Tr. 982:9-25 (Weinberg) (testifying that DuckDuckGo has "done lots of indexing and crawling over the years").)  Mr. Weinberg admitted, however, that DuckDuckGo made a "business decision" not to build out its search index and instead use syndicated search results from Microsoft, so that it could invest in "either privacy features or adjacent markets."  (Day 3 PM Tr. 837:5-15.)  And, as discussed above, *even with Plaintiffs' proposed remedies like data sharing and search text ads syndication in place*, DuckDuckGo would prefer to continue using syndicated search results from Bing.  (*See* Day 4 AM Tr. 979:16-980:6 (Weinberg).)

**<u>Tapering Access to the API.</u>**  Plaintiffs have also suggested that Section VII will encourage entrants "to transition to independence" by gradually decreasing the amount of data Qualified Competitors can access across the ten-year license term.  (RPFJ 18, 20.)  Brave agrees that such tapering is a necessary—indeed, crucial—component of any search syndication remedy.  But as drafted, Section VII's tapering provision is too open-ended and will allow Qualified Competitors to delay their investments in building their own search indices.

Even an entrant that wants eventually to compete as an independent GSE will be incentivized to put off the necessary (and sizable) capital investments for as long as possible. This is in part basic economics:  rational market actors are not incentivized to make sizable capital investments any earlier than they must.  But it is especially true here.  Section VII would

facilitate entry by firms that syndicate 100% of their search results from Google.  Because these firms all receive the same search results, they will want to differentiate themselves on the front end and will direct their research and development resources accordingly, as DuckDuckGo did. (Day 3 PM Tr. 837:5-15 (Weinberg).)  Competing as a white-label GSE will be their primary focus unless or until it becomes necessary to divert resources towards building a search index.

Section VII does not provide a Qualified Competitor with guidance on when during the ten-year license term it will need to be capable of generating its own search results, and to what degree.  Instead, Section VII leaves entirely to the discretion of Plaintiffs, in consultation with the Technical Committee, the details of how, when and at what rate data access would decline.  (RPFJ 20.)  This leaves market entrants unable to appropriately time these large capital expenditures and creates incentives for them to argue to Plaintiffs and the Technical Committee that tapering should be as slow and modest as possible.

The vagueness of Section VII's tapering provision is particularly problematic because experience has shown that entrants already have a tendency to underestimate the time necessary to achieve search independence.  Mr. Turley, for example, admitted that OpenAI's goal was to be able to respond to 80% of its users' queries with its own search index by end of 2025, but he already knows OpenAI will not meet that goal.  (Day 2 AM Tr. 397:18-24.)  When this Court asked Mr. Turley how long he would need *with* access to Plaintiffs' proposed remedies, Mr. Turley acknowledged:  "I have consistently underestimated how hard this problem is."  (*See* Day 2 AM Tr. 426:1-25.)  Companies like OpenAI may not even realize that they cannot achieve search independence before expiration of the license until it is too late.

* * *

Plaintiffs' inclusion of these terms in Section VII suggests that they, too, understand that the proposed search syndication remedy should be designed to facilitate investment rather than to be used as a crutch. As discussed below, Brave's proposed refinements to Section VII seek to build off of Plaintiffs' provisions to better preserve competition among independent GSEs.

## II.      Section VII.A-C Can Be Refined to Promote Competition Across the GSE Market Without Harming Competition Among Independent Search Engines.

Brave proposes two refinements to Section VII.A-C that will achieve Plaintiffs' twin goals of ensuring that GSEs can both rapidly enter the general search services market and have proper incentives to compete as independent GSEs, without destroying competition among existing independent GSEs. *First*, Section VII should be amended to add a limit on the percentage of a GSE's queries that Google must supply. This will alleviate the skewed incentives created by a near-free search syndication license covering the entirety of a GSE's needs, while preserving independent GSEs' ability to continue syndicating their search results and competing with Google in search result generation. *Second*, Section VII should be amended to clearly structure the decreased access to Google's syndicated search results over the license term. This will create needed predictability for investors and developers, minimizing the risk that they unduly delay their investments in search independence. These refinements are buttressed by the necessary provision in Section VII—with which Brave agrees—that prevents Google from making bespoke syndication agreements that circumvent the intent of the RPFJ and Brave's proposed refinements.

A.     **Section VII Should Require Google to Provide Responses Only to "Long-Tail" Search Queries.**

Brave's first, and most critical, refinement to Section VII is to focus the required syndication license on the search results that potential competitors truly need to facilitate entry and expansion:  the "long-tail" queries that take time and scale for GSEs to handle well.  The evidence shows that even prior to this Court's decision, GSEs were able to develop the capability to handle the more common search queries that they received, sometimes referred to in the record as the "head" or "torso" queries.  The remedies in Section VI (data sharing) and Section VIII (search text ads syndication) will greatly enhance competitors' ability and incentive to get up the curve.  Thus, to achieve Section VII's goal of enabling GSEs to enter with a commercially viable product from the outset, it need not provide GSEs with the *entirety* of Google's search results; it is sufficient to provide GSEs with the long-tail queries they could not otherwise handle well.  At the same time, this more tailored syndication license will better incentivize entrants to invest in building their own search indices while preserving the ability of existing independent GSEs to continue syndicating their results (outside the long tail) and continue competing with Google in search result generation.

In Brave's own experience, the long tail requiring the greatest degree of investment, experience and scale is approximately the last 10% of queries, and Brave believes that would be an appropriate cap for mandatory search result syndication.  The record evidence suggests the long tail may begin slightly earlier, constituting the last 20% of queries.  Either way, a long-tail search syndication license (rather than Section VII's license for 100% of queries) would still facilitate immediate entry into the market for general search services.  Qualified Competitors could develop their own search indices and/or syndicate at market rates from other GSEs to cover the majority of the queries they receive and then syndicate results from Google at

marginal cost for the long tail. Such competitors could enter promptly but would have a proper incentive to invest in becoming independent; in the meantime, existing independent GSEs could assist by syndicating their results up to the long tail that Google would provide.

   *First*, the record shows that market entrants are capable of building proprietary search indices that respond to at least 80% of their users' search queries, and such competitors are capable of doing so—as the United States said in its opening statement—"pretty quickly." (Day 1 AM Tr. 33:11-24 (U.S. Opening Statement); *see also* Day 3 PM Tr. 838:25-839:1 (Weinberg) (same); Day 3 PM Tr. 796:8-13 (Shevelenko) (agreeing that Perplexity's search index is already "approaching the point of diminishing returns" such that "increasing its size or coverage may help with quality [only] somewhat").) It is the last bit of queries—the "long tail"—for which market participants struggle to generate results. *That* is what prevents most entrants from competing effectively with Google in search result generation. (*See, e.g.*, Day 4 AM Tr. 989:19-20 (Weinberg) ("I think it's pretty clear that people leave DuckDuckGo for Google because of long tail searches."); Day 4 AM Tr. 1016:11-19 (Schechter) (testifying that Bing "still struggles" with respect to long-tail queries as compared to Google).)

   Witnesses have repeatedly affirmed that the search syndication remedy is valuable because it allows responses to these long-tail queries. For example, when asked whether "a search syndication license [could] help address the scale gap" between DuckDuckGo and Google, Mr. Weinberg testified: "Yes. . . . **[I]n these, you know, long-tail searches** where data is [sparse], especially on small players, it would, you know, give us data for those type of queries, like obscure articles, products, businesses, and, you know, help us understand how Google would lay out those pages." (Day 3 PM Tr. 827:3-10 (emphasis added).)

*Second*, to the extent that a Qualified Competitor needs more time to build a

search index capable of responding to its core search queries (*i.e.*, everything but the long tail),

or simply wants to compete only as a white-label GSE, there are market solutions currently

available to bridge that gap:  Bing's and Brave's search APIs.  (*Cf.* Day 12 PM Tr. 4031:17-

4032:9 (Hitt) (GenAI companies that do not want to build their own search indices can obtain

licenses to access Bing's or Brave's index).)  Certain witnesses have suggested that entrants need

*Google's* search API, specifically, to compete because of quality concerns.  (*See, e.g.*, Day 2 AM

Tr. 417:3-18 (Turley).)  That is incorrect.  There is no meaningful quality gap between Google,

Bing or Brave with respect to core search capabilities (*i.e.*, head and torso queries).  The Court

heard this directly from Michael Schechter, Vice President of Growth for Bing, who testified that

Bing is closing the quality gap with Google, and that, on several metrics, Bing is actually ahead

of Google.  (Day 4 AM Tr. 1052:17-1053:8.)  It is only for long tail queries that Bing professes

to have work to do across platforms.  Brave, for its part, scores 0.98 (if Google is 1.00) in

internal quality tests.

Indeed, Brave's existence is proof that a 10-20% cap (or even lower) will not

prevent market entry.  As of 2021, when Brave launched the current iteration of Brave Search, it

was able to provide high-quality search results for 87% of its users' search queries; it sourced the

remainder from Bing.  *Brave Search removes last remnant of Bing from search results page,*

*achieving 100% independence and providing real alternative to Big Tech search*, BRAVE

(Apr. 27, 2023), *available at* https://brave.com/blog/search-independence/ ("*Brave Search*

*Achieves 100% Independence*").  Brave was ultimately "very successful in building [its] own

[independent] search engine without a syndication deal from Google" or any other of Plaintiffs'

proposed remedies.  (Day 9 PM Tr. 3027:15-17 (Adkins).)  By April 2023, Brave had shifted

entirely to its own index.  *Brave Search Achieves 100% Independence*.  Brave released its Brave Search API shortly thereafter and began profiting from syndication of its search results.  *Brave releases its Search API, bringing independence and competition to the search landscape*, BRAVE (May 30, 2023), *available at* https://brave.com/blog/search-api-launch/.  Although Google's monopolistic conduct made it difficult for Brave to obtain meaningful market share, Brave Search became the fastest-growing search engine since Bing, with a search index that stands toe-to-toe with Google's for the vast majority of queries.

Under Plaintiffs' proposed remedies, Qualified Competitors would have it easier than Brave did because they would have access to Google's search index data and user-side data to assist in building and training their search indices and ranking technology.  There is no support for the position that a Qualified Competitor needs to source *the entirety* of its search results from Google's search API in order to compete in the market envisioned by the remedy.  The challenge arises only with respect to the long tail, so that is what the required search result syndication license should provide.  In effect, Brave's proposed refinement ensures that entrants who gain access to Google's syndicated search results are truly "Qualified Competitors" in the sense that the RPFJ intends.  Companies that are neither able to invest in their own search capability nor have the means to pay a competitive rate to syndicate core search results from an independent GSE are unlikely to be able to "invest and compete in the GSE . . . market[]."  (RPFJ 5.)

While Brave's proposed refinement will not interfere with Plaintiffs' goal of rapid market entry, it *will* prevent Section VII from inadvertently reducing competition in search result generation in two important ways.

*First*, by requiring Qualified Competitors to build, or else pay a competitive rate for, their core search capability, Brave's refinement lightens Section VII's heavy thumb on the

scale in favor of entry as a white-label GSE.  At least with respect to core search capability, a Qualified Competitor would not be choosing between Google's search results for near-zero cost on the one hand and its own search results at a high cost on the other.  Instead, it would face a more market-driven decision:  whether to source the search queries not covered by Google's license—those outside the long tail—at market rates from another independent GSE or to invest in building its own search index.  The only "thumb on the scale" at that point would solve for the problem actually created by Google's conduct—the lack of scale that prevents competitors from offering a market solution for the "long tail" of queries.  For some Qualified Competitors, having to pay a competitive rate for syndicated search results for their core search queries, together with the data-sharing remedies under Section VI, may be enough to tip the scale towards building their own search indices and competing as an independent GSE.  This outcome would result in increased competition in the market and increased choice for consumers.

Second, limiting the percentage of queries covered by Section VII will ensure that existing independent GSEs, like Bing and Brave, have space in the market to continue competing against Google in search result generation.  The intention of Section VII is not—and the real-world result must not be—to reduce the number of competitors in search result generation from three to one.  Brave's refinement avoids this outcome by ensuring that Bing, Brave and any nascent independent GSE that has deployed the requisite investment will have the opportunity to compete with Google in search result generation during, and well beyond, the license term.

**B.      The Percentage Cap on Search Queries Should Decrease at Set Intervals over the Term of the Syndication License.**

Brave further suggests refining Section VII.A-C to include a defined schedule by which the percentage cap discussed in Section II.A, *supra*, gradually decreases over the term of the search syndication license.  As discussed in Section I.D, Brave supports Plaintiffs' proposal

to taper access to search results across the license term.  Brave's proposal adds structure to this provision to ensure that Qualified Competitors know exactly when, and by what amount, their search result generation capability must improve in order to remain competitive (or, for those Qualified Competitors that choose to compete as white-label GSEs, when and to what extent they need to enter into syndication deals with independent GSEs).  This structure should be built into the remedy itself for certainty, rather than left to the discretion of Plaintiffs or the Technical Committee.

The specifics of this tapering will depend in part on where the Court sets the starting query cap, as well as the determined length of the license period.  But a reasonable step-down schedule could involve a percentage-based reduction, such that the cap is reduced by one-third after five years and then by another third after three more years.  Alternatively, if the cap started at 10%, it could step down 1% per year over the ten-year license period.

Either schedule would provide ample time for Qualified Competitors to close the long-tail gap.  Indeed, the evidence suggests that these schedules provide even more runway than needed.[4]  For example, when the Court asked for how long OpenAI would need access to

---

[4] Google's expert, Dr. Mark Israel, opined that Plaintiffs' proposed syndication remedies should last for fewer than 10 years.  (Day 10 AM Tr. 3210:11-20.)  From Brave's perspective, limiting the percentage of search queries under the license is far more impactful than reducing the length of the license term.  *First*, even a two-year license would gravely harm existing GSEs, for all the reasons stated above, potentially driving them out of business or at least curtailing, rather than encouraging, their growth.  *Second,* a two-year license term with 100% access to Google's search results would still encourage a Qualified Competitor to enter as a white-label GSE and focus its two years of near-free Google search results on better competing against the other "Google wrappers."  As a result, at the end of two years, that same Qualified Competitor is likely to be right back in the same position it is in today:  with no independent search functionality and dependent on the purchase of syndicated search results from competitors.  Thus, while Brave has no objection to a shortened license term as another lever the Court may use to address some of the concerns Brave has raised, Brave would oppose doing so at the expense of the far more effective imposition of a cap on the number of queries that licensees may obtain from Google at sub-competitive prices.

Google's syndicated search results before it has a competitive search index, Mr. Turley testified: "[I]f five years from now we haven't built something that, you know, can stand on its own feet that we are proud of, that would be something that I'd want to re-evaluate about our strategy." (Day 2 AM Tr. 426:10-25; *see also* Day 3 PM Tr. 844:3-7 (Weinberg) (estimating that Plaintiffs' remedies would "probably accelerate by years the ability to create indexes at scale").

### C.    Google Should Be Prohibited from Offering Access to Its Search Results on Any Other Terms.

Finally, Brave supports Plaintiffs' proposed prohibition against Google providing third parties access to its search results "except as allowed by Section VII or otherwise approved by Plaintiffs." (RPFJ 18.) Google should not be permitted to voluntarily exceed the above limitations on access to its search results during the license term. Without this prohibition, Google could *choose* to undercut its independent GSE competitors in order to drive such competitors out of the market prior to the expiration of the remedy, securing for itself the very monopoly over search result generation that Brave's refinements are intended to avoid. To facilitate enforcement of this important restriction, Brave supports the creation of a template agreement with non-modifiable terms that Google would be required to use when offering access to its search API to any Qualified Competitor.

### <u>CONCLUSION</u>

For these reasons, Brave respectfully submits that the Court should adopt Plaintiffs' proposed search syndication remedy (Section VII.A-C) *only* with Brave's above-described refinements.

Dated:  May 9, 2025                    Respectfully submitted,

                                       By:    /s/ *Yonatan Even*

                                       **CRAVATH, SWAINE & MOORE LLP**

                                       Gary A. Bornstein (*pro hac vice*)
                                       Yonatan Even (*pro hac vice*)
                                       Andrew C. Finch (*pro hac vice*)

                                       375 Ninth Avenue
                                       New York, New York 10001
                                       Telephone:  (212) 474-1000
                                       Facsimile:  (212) 474-3700
                                       gbornstein@cravath.com
                                       yeven@cravath.com
                                       afinch@cravath.com

                                       *Counsel for Proposed Amicus Curiae Brave
                                       Software, Inc.*