**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | |
| | Case No. 1:20-cv-03010-APM |
| v. | |
| | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | |
| | Case No. 1:20-cv-03715-APM |
| v. | |
| | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |

**[PROPOSED] BRIEF OF *AMICUS CURIAE* MOTOROLA MOBILITY, LLC**

## TABLE OF CONTENTS

I.    Introduction.................................................................................................................1

II.   Motorola and Its Relationship with Google.............................................................2

III.  Precedent Requires that Remedies for Monopolization Should Address the Underlying
      Anticompetitive Conduct Without Otherwise Harming Competition. ...............................4

IV.   The Parties' Proposed Remedies. ............................................................................6

      A.    Plaintiffs' Proposed Remedies Affecting Motorola............................................6

      B.    Google's Proposed Remedies Relevant to Motorola. ........................................7

V.    The Court Should Not Grant Plaintiffs' Proposed Remedies Affecting Motorola and
      Should Grant Google's Proposed Remedies.............................................................8

      A.    The Court Should Not Grant Plaintiffs' Proposed Remedy
            Eliminating Payments Based on Search. ...........................................................8

      B.    If the Court Decides to Grant Plaintiffs' Remedy Eliminating
            Search Revenue Payments, the Court Should Still Allow
            Search Payments to Smaller OEMs Like Motorola.........................................13

      C.    The Court Should Not Grant Plaintiffs' Requested Choice
            Screen Remedy. ...............................................................................................16

      D.    The Court Should Not Grant Plaintiffs' Requested Divestiture
            Remedies as Stated. .........................................................................................17

      E.    The Court Should Grant Google's Decoupling and No Self-
            Preferencing Remedies. ...................................................................................18

VI.   Conclusion ...............................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209 (D.D.C. 2022) ...................14, 15

*Connecticut Ironworkers Emps.' Assoc. v. New England Reg'l Council of Carpenters*,
    324 F. Supp. 3d 293 (D. Conn. 2018) .......................................................................15

Stipulated Order for Permanent Injunction and Equitable Relief, *Fed. Trade Comm'n v. Surescripts, LLC*,
    No. 1:19-cv-01080 (D.D.C. Aug. 9, 2023) .....................................................5, 8, 9

*Kuck v. Bensen*,
    647 F. Supp. 743 (D. Me. 1986) ..............................................................................14

*Maxon Hyundai Mazda v. Carfax, Inc.*,
    No. 13-cv-2680 (AJN), 2016 U.S. Dist. LEXIS 171418 (S.D.N.Y. Sep. 30, 2016) .....................................................................................................................14

*New York v. Microsoft Corp.*,
    224 F. Supp. 2d 76 (D.D.C. 2002) ...........................................................................5

*Servicetrends v. Siemens Med. Sys.*,
    870 F. Supp. 1042 (N.D. Ga. 1994) .........................................................................14

*Sewell Plastics, Inc. v. Coca-Cola Co.*,
    720 F. Supp. 1196 (W.D. N.C. 1989) .......................................................................14

*Sterling Merch., Inc. v. Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011) ....................................................................................14

*Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*,
    875 F. Supp. 8 (D. Me. 1994) ..................................................................................14

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..............................................................................4, 5

*United States v. Microsoft Corp.*,
    87 F. Supp. 2d 30 (D.D.C. 2000) ............................................................................14

*United States v. Microsoft Corp.*,
    97 F. Supp. 2d 59 (D.D.C. 2000) .........................................................................5, 8

*United States v. Google LLC*,
    No. 1:23-CV-108 (LMB/JFA), 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ...................11

*Woman's Clinic, Inc. v. St. John's Health Sys., Inc.*,
  252 F. Supp. 2d 857 (W.D. Mo. 2002) .................................................................................14

## I.     Introduction.

Motorola Mobility LLC ("Motorola") submits this Brief of Proposed *Amicus Curiae* to demonstrate the significant harm to Motorola if the Court were to implement certain provisions of the United States Department of Justice's and the Plaintiff States' (collectively, "Plaintiffs") Proposed Final Judgment (ECF No. 1184-1). The Plaintiffs' Proposed Remedies arguably impact Motorola more significantly than any other non-party to this litigation, yet Motorola was not part of the proceedings. This is Motorola's one and only opportunity to voice its concerns to the Court.

The Plaintiffs' Proposed Remedies, in particular, threaten Motorola's receipt of critical income from Google related to search, which is essential to Motorola's ability to compete against larger smartphone manufacturers. Eliminating search-related payments to Motorola risks creating a competitive shift in the U.S. smartphone market that would result in less competition, not more. Motorola uses payments from Google to fund directly manufacturing, research and development ("R&D"), marketing, and other costs to reduce prices for United States carriers and consumers for Motorola's smartphones, as set forth in the February 20, 2025, deposition testimony of Motorola's Global Chief Strategy & Marketing Officer, Francois Laflamme, and documents produced by Motorola in this case.

Throughout the proceedings, Motorola's testimony and documents were frequently cited and used by the parties to advocate for their positions, but none got it correct. Motorola's proposed brief of *amicus curiae* is, therefore, crucial because it presents the full picture of the potential unintended consequences of the Proposed Remedies to the United States' smartphone market and is not likely to come from the Parties' briefing.

Motorola is unique. Not only is it a competitor of Google's, but it is also a customer. Motorola is also substantially smaller than the two leading smartphone manufacturers in the

1

United States whose parent companies both have tremendously large annual revenues affording them different options if the Proposed Remedies are implemented.  The Court's remedy should, therefore, be carefully crafted so as not to harm smaller manufacturers like Motorola. The Court should permit search payments, especially to entities that represent a small percentage of the smartphone market, as Motorola proposes. Doing so is not only supported by precedent, but also will ensure that these proceedings do not unintentionally cause less competition rather than more in the smartphone market.

Plaintiffs' Proposed Remedies harm Motorola and overall competition for smartphones and should not be implemented by the Court unless altered to prevent  undue harm to smaller OEMs like Motorola. Google's Proposed Remedies that may affect Motorola, however, generally align with Motorola's interest in remaining competitive and, therefore, should be granted

## II.    Motorola and Its Relationship with Google.

Motorola is a consumer electronics and telecommunications company and original equipment manufacturer ("OEM") that offers a variety of smartphones catering to different segments: 1) flagship smartphones, or high-end devices with advanced features and specifications; 2) mid-range smartphones, which balance performance and price, and offer standard features suitable for most users; 3) budget or affordable smartphones with mainstream specifications for cost-conscious consumers; 4) specialty smartphones, with unique functionality and features; and 5) entry-level or low-end smartphones designed for basic users who seek essential features at a low cost.

Motorola is a party to multiple contracts with Google through which Motorola receives significant payments or licenses Google's proprietary mobile applications developed for the Android operating system. *See* Ex. A, Feb. 20, 2025, Deposition Transcript of Francois

Laflamme ("Laflamme Dep.") 33:15-34:16, 41:2-45:4, 64:5-9, 168:3-170:15; *see also* PXR0541 (Laflamme Dep. Ex. 3 – Amendment 10 to Google Mobile Incentive Agreement); PXR0253 (Laflamme Dep. Ex. 1 – Marketing Agreement); PXR0542 (Laflamme Dep. Ex. 8 – General Go-To-Market Agreement); RDX0444 (Laflamme Dep. Ex. 9 – Gemini Go-To-Market Agreement). Motorola, therefore, wears many hats. It is a customer of Google's Android operating system, a distributor of and access point for Google Search, and a competitor of Google in the smartphone market. As a customer, Motorola implements a "pure" Android system for its smartphones, capitalizing on Android's open-source nature. Pure Android refers to an unaltered version of Android as envisioned by Google, without "bloatware" or unwanted "skins" or apps installed by certain manufacturers that may slow down Android's performance. As a distributor, Motorola pre-installs Google services (e.g., Search, Maps, and the Play Store) on its devices, acting as a critical access point for Google's ecosystem. This integration drives user engagement with Google's products. In addition to this partnership, Motorola also competes directly with Google's smartphones in the mid-range and budget segments.

Motorola receives: 1) revenue share payments from Google under its Revenue Share Agreement ("RSA")/Mobile Incentive Agreement ("MIA"); and 2) go-to-market funds under a general Go-To-Market Marketing Agreement ("Marketing Agreement") with Google. *See* PXR0541 (Laflamme Dep. Ex. 3 – Amendment 10 to Google Mobile Incentive Agreement); PXR0253 (Laflamme Dep. Ex. 1 – Marketing Agreement); PXR0542 (Laflamme Dep. Ex. 8 – General Go-To-Market Agreement). Motorola is also eligible to receive go-to-market funds specifically related to the promotion of Gemini under a separate Gemini Go-To-Market Agreement ("Gemini Marketing Agreement"). *See* RDX0444 (Laflamme Dep. Ex. 9 – Gemini Go-To-Market Agreement).

The RSA payments are largely unrestricted; therefore, Motorola broadly uses them to directly fund manufacturing, R&D, and other costs, which reduces prices of Motorola's smartphones to U.S. carriers and consumers, while maintaining their quality and innovation. *See, e.g.,* Laflamme Dep. 49:11-50:22; *see also* Ex. B, Dec. 21, 2021, Deposition Transcript of Eric Christensen ("Christensen Dep.") 70:22-71:3, 90:17-91:12. Without the RSA payments from Google that help fund Motorola's innovation efforts, Motorola could not compete as effectively against Apple, Samsung, and Google in the smartphone market. *See, e.g.,* Laflamme Dep. 100:19-101:6.

Conversely, Motorola must use the go-to-market funds according to Google's instructions. *See* Laflamme Dep 73:7-74:6. While the go-to-market funds are important and appreciated, they do not replace RSA payments. Laflamme Dep. 41:2-22; *see also id.* 79:14-80:21 ("The spirit of go-to-market, in [Laflamme's] view, is additional dollars to be spent very specifically to amplify the message of what [Motorola is] doing jointly and/or whatever platform that Google or other partners would want to amplify."). For example, the most recent Marketing Agreement includes a list of products eligible for marketing dollars, and states that a Google committee will approve Motorola's marketing plans for those products. *See* PXR0542. And the Gemini Marketing Agreement states that the funds will be used to promote Gemini apps and services. PXR0253, Attachment A.

## III.  Precedent Requires that Remedies for Monopolization Should Address the Underlying Anticompetitive Conduct Without Otherwise Harming Competition.

Remedies implemented to address anticompetitive conduct must do so without harming competition. In *United States v. Microsoft Corp.*, the D.C. Circuit emphasized this point. 253 F.3d 34 (D.C. Cir. 2001). Specifically, the court stated that remedies should be "tailored to fit the wrong creating the occasion for the remedy" and eschew "unacceptable and unjustified

4

burden[s]" on lawful competition. *Id.* at 70, 107; *see also New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 136 (D.D.C. 2002) (citing *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458 (1993)) (stating that courts "must be 'careful to avoid constructions of § 2 which might chill competition, rather than foster it'"); *id.* at 177 (if the Court finds there "is sufficient harm which flows from the [proposed remedies] which is not countermanded by competitive benefit," then "it is best not to require" the Parties to implement such proposed remedies). Of particular relevance to this case, the *United States v. Microsoft* Final Judgment did not prohibit Microsoft from offering discounts or incentives to OEMs for promoting or distributing Internet Explorer while still addressing and preventing specific types of Microsoft's practices that the Court considered anticompetitive. 97 F. Supp. 2d 59, 66 (D.D.C. 2000). The Final Judgment required that

> Microsoft shall not take or threaten any action adversely affecting any OEM . . . based directly or indirectly, in whole or in part, on any actual or contemplated action by that OEM: (1) to use, distribute, promote, license, develop, produce or sell any product or service that competes with any Microsoft product or service; or (2) to exercise any of the options or alternatives provided under this Final Judgment.

*Id.* An "action adversely affecting any OEM" was defined by the court as "giving or *withholding any consideration*" including but not limited to licensing terms, discounts, sales or marketing support, information about future plans, and developer tools or support, among other examples. *Id.* (emphasis added).

To protect competition and avoid harming a monopolist's contracting partners, courts have actually required that certain payments, which support competition, continue so as not to cause undue harm. For example, the Court in *Federal Trade Commission v. Surescripts, LLC* ordered that Surescripts both eliminate the exclusive agreements at issue and continue making the same level of payments to certain contracting partners. *See* Stipulated Order for Permanent

Inj. and Equitable Relief, No. 1:19-cv-01080, § II (D.D.C. Aug. 9, 2023). Thus, courts continue

to permit payments—and have found it imperative that payments continue—to avoid harming a

monopolist's partners and thereby detrimentally impacting innocent third parties.

## IV. The Parties' Proposed Remedies.

### A. Plaintiffs' Proposed Remedies Affecting Motorola.

Plaintiffs' Proposed Remedies would harm Motorola's business. First, Plaintiffs'

Proposed Remedies ban Google from offering or providing "to any Distributor any payment that

is determined or calculated based on the usage of or revenue generated by—or any similar factor

for—any particular GSE or Search Access Point (e.g., Google queries, Google Search Text Ad

clicks, Google selections on a Choice Screen)." Pls.' Revised Proposed Final J., §§ IV.D-E, ECF

No. 1184-1, Mar. 7, 2025. Motorola falls within the definition of a "Distributor" as a "Person

that contracts with Google to display, load, or otherwise provide access to a Google product" by

virtue of Motorola's agreements with Google. Through the RSA, Motorola shares in Google

Search revenue in exchange for certain placement requirements. Specifically, Motorola receives

fixed dollar amounts based on how many Motorola devices are enrolled in the premier tier

monthly incentive program, with Motorola receiving the highest amount of revenue share when

95% or more of its devices are enrolled. Currently, "the RSA payment is a fixed amount, and is

based on number of devices more than the actual revenue associated with a consumer accessing

Google properties." Laflamme Dep. 62:18-63:13.

Plaintiffs' Proposed Remedies also offer a choice screen solution that would

detrimentally impact Motorola. *See* Pls.' Revised Proposed Final J., § IX.A, ECF No. 1184-1

(Mar. 7, 2025). This proposal requires Motorola to include a choice screen on all its devices with

Google Search preloaded.

Plaintiffs' Proposed Remedies further include divestiture provisions for Chrome and Android that could negatively impact Motorola. Specifically, Plaintiffs' Proposed Remedies require that "Google must promptly and fully divest Chrome, along with any assets or services necessary to successfully complete the divestiture, to a buyer approved by the Plaintiffs in their sole discretion, subject to terms that the Court and Plaintiffs approve," and "[i]n the event the remedies in this Final Judgment prove insufficient to serve their intended purposes of restoring competition or if Google attempts to or is successful in circumventing these remedies, then the Court may impose additional structural relief, including the divestiture of Android." Pls.' Revised Proposed Final J., §§ V.A, V.C, ECF No. 1184-1, Mar. 7, 2025.

**B.    Google's Proposed Remedies Relevant to Motorola.**

Google's Proposed Remedies, conversely, give Motorola more of an "à la carte model" that maximizes flexibility while still permitting appropriate revenue sharing. *See* Laflamme Dep. 101:13-104:20. Google's Proposed Remedies restrict Google's business from bundling or tying Google apps as a condition for licensing Google Play or other apps. *See* Google's Proposed Final J., ECF No. 1185, Mar. 7, 2025. Google's Proposed Remedies also restrict Google from preventing manufacturers from preloading or supporting third-party search engines, browsers, or generative AI ("GenAI") assistants. *See id.* § III.A-J. Additionally, Google's payment to third parties for preloading a particular app, such as Google Search, cannot be conditioned on preloading other apps, such as Chrome or Gemini. *See id.*

Google's Proposed Remedies also prohibit Google from entering "into any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) permits the Browser Developer on an annual basis to set a different Default Search Engine in the United States for any Operating System Version . . . ." Google's Proposed Final J., § K, ECF No. 1185, Mar. 7,

2025. This proposed remedy would allow Motorola to preload competing search engines more easily, potentially increasing search engine competition and giving Motorola greater flexibility in negotiating with other providers besides Google.

**V.    The Court Should Not Grant Plaintiffs' Proposed Remedies Affecting Motorola and Should Grant Google's Proposed Remedies.**

The Court should not grant Plaintiffs' Proposed Remedies because they harm Motorola and overall competition for smartphones. Google's Proposed Remedies that are pertinent to Motorola, however, generally align with Motorola's interest in obtaining more flexibility and, therefore, should be granted.  *See* Google's Proposed Final J., § III.A-J, ECF No. 1185, Mar. 7, 2025.

**A.    The Court Should Not Grant Plaintiffs' Proposed Remedy Eliminating Payments Based on Search.**

*1.    Case law has allowed remedies that permit payments to certain partners to continue to avoid unnecessary harm to customers and competition.*

Third party customers and competition generally should not be harmed by remedies meant to curtail anticompetitive behavior of defendants. For example, the Final Judgment in *United States v. Microsoft* did not prevent Microsoft from offering discounts or incentives to manufacturers who promoted or distributed Internet Explorer, but instead prevented specific Microsoft conduct that the Court deemed anticompetitive. *See* 97 F. Supp. 2d at 66; *see also,* Hr'g Tr. 95:18-24, Apr. 21, 2025 ("[T]he *Microsoft* final judgment did not prohibit Microsoft from paying OEMs to promote or distribute Internet Explorer. It prevented and addressed the specific types of contracts that were at issue, but there was never a blanket prohibition on Microsoft providing discount or price competition going forward"). Additionally, the court in *FTC v. Surescripts* ordered that Surescripts not be prohibited from making payments to certain partners, including electronic health record vendors and other network participants and, in fact,

specifically mandated how Surescripts must handle existing payment structures and incentives, including maintaining certain payments. *See* Stipulated Order for Permanent Inj. and Equitable Relief, No. 1:19-cv-01080, § II (D.D.C. Aug. 9, 2023).

2.    *Plaintiffs' Proposed Remedies would harm Motorola.*

Plaintiffs' Proposed Remedies threaten Motorola's interest in receiving payments based on Google Search.[1] Plaintiffs generally seek to ban Google from paying smartphone manufacturers to set Google Search as the default, preload or preinstall Google Search, or give preferential treatment to Google Search over competitors. *See* Pls.' Revised Proposed Final J., § IV.A, ECF No. 1184-1, Mar. 7, 2025.

Plaintiffs' Proposed Remedies ignore commercial realities. If implemented, they would significantly reduce Motorola's income in the U.S. and, therefore, threaten its ability to remain competitive. Despite facially prohibiting only Google from paying for Search, Plaintiffs' Proposed Remedies also eliminate incentives for Google's competitors to pay. In fact, these same competitors, many with substantial funds (e.g., Amazon, Meta, and Microsoft), have had ample opportunities to pay for their products to be placed on Motorola's devices for years, yet none offered anything close to Google. *See* Laflamme Dep. 82:13-85:5; *see also* Christensen Dep. 108:8-111:2 (Amazon did not put forward sufficient dollars to compete to preload Alexa on Motorola devices).  Nothing prevented these third parties from entering into RSAs with Motorola like Google, but yet none did. *See e.g.,* Laflamme Dep. 135:18-136:6.

Google sets the "baseline" for other competitors. *See* Laflamme Dep. 82:13-85:5. Therefore, if the Court decides Google cannot pay OEMs, other competitors would be highly unlikely to step into Google's shoes. *See* Laflamme Dep. 66:18-69:14, 82:13-84:14, 149:19-

---

[1] It is also unclear whether Plaintiffs' Proposed Remedies, as written, also prohibit Google from continuing to provide Motorola with go-to-market funds.

155:22, 173:14-174:6 (speaking to lack of viable alternatives for receipt of comparable revenue share payments).As one example, while Motorola seriously considered placing Amazon's Alexa assistant on its devices several years ago, Google's offer to place Google Assistant on Motorola smartphones was ultimately "more compelling" because "the terms of the Google forward agreement were far simpler for [Motorola] to execute" compared to Amazon's "complex[]" agreement and "the bounty for the Google offer was far greater than . . . the combination of incentives that Amazon was willing to provide." Christensen Dep. 108:8-111:2. Google was consistently leaps and bounds ahead of its competitors in its willingness to share.

Additionally, competitors to Google have historically not been technically viable. *See* Laflamme Dep. 176:10-177:20. It will take time for competitors to offer sufficient alternatives to Google. While they attempt to catch up, OEMs such as Motorola will be harmed without access to revenue share payments. *See* Laflamme Dep. 175:9-178:8. Thus, even if we assume that third parties were incentivized to pay OEMs through Plaintiffs' Proposed Remedies (which they are not), the time needed to develop a realistic product alternative to Google Search is too great, which would result in unintended harm to Motorola.. *See* Hr'g Tr. 373:6-12, Apr. 22, 2025 (Nick Turley, OpenAI Head of Product for ChatGPT, stating, "It is my understanding that these third parties [such as Motorola] were under the impression that we would never pay as much money as they would get from Google. The conversations have stalled, and we were put under the impression that, you know, we should come back if we had, you know, significant more -- significantly more money to offer. . ."); *see also* Hr'g Tr. 726:19-727:4, Apr. 23, 2025 (Dmitry Shevelenko, Perplexity Chief Business Officer, stating that "it will take a long time for any challenger that has a better product for users to be able to directly replace, you know, dollar for dollar" the revenue share payments Google provides third parties.).

Plaintiffs' Proposed Remedies also would negatively impact Motorola's U.S. operations. Plaintiffs selectively cite Motorola for why the Court should ban payments for distribution. *See* Pls.' Pre-Trial Brief, Footnote 1 and page 7, ECF No. 1218, Apr. 16, 2025. However, Plaintiffs conveniently and somewhat disingenuously ignore Motorola's full testimony stressing the harm that will result to Motorola if that happens. *See* Laflamme Dep. 108:15-109:7 (cited by Plaintiffs in their opening statement). Importantly, Motorola testified that the payments received from Google help Motorola retain its U.S. employees, contribute directly toward payroll and real estate, and fund R&D, specifically in the US. *See, e.g.*, Laflamme Dep. 77:4-78:19.

Allowing payments unrelated to Search does not address the harm to Motorola. Google pays Motorola based on Search because Google derives revenue from Search ads. Advertisers pay Google to display ads, and Google then shares a portion of this ad revenue with partners who make Google the default search engine. Key to this arrangement is the existence of a revenue source from which to share. Google's competitors do not have the search ad revenue, so there is no competitor that could possibly place Motorola in a position similar to where it is today. Plaintiffs' proposed remedy fails to address this key point.[2]

### 3.    *Plaintiffs' Proposed Remedies would harm competition.*

Plaintiffs' Proposed Remedies would harm competition because they threaten to impair smaller OEMs' ability to compete in the smartphone market, potentially narrowing the competitive set or allowing larger competitors like Apple and Google to strengthen their position. *See* Laflamme Dep. 39:12-40:4, 77:6-85:6. Motorola agrees that, because the Court already found as anticompetitive certain aspects of Google's exclusive arrangements with OEMs

---

[2] Notably, the recent U.S. District Court for the Eastern District of Virginia decision against Google calls into question whether allowing payments unrelated to search would even be possible as an option going forward. *United States v. Google LLC*, No. 1:23-CV-108 (LMB/JFA), 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) .

to distribute Google Search and to serve as an access point for Google Search Ads, the Court should address those aspects. The Court should not, however, adopt remedies that unintentionally harm smaller OEMs like Motorola and the smartphone market because doing so would harm competition overall. Motorola and other companies of its size and revenue do not have the resources to develop their own operating systems, application stores, or search engines like the larger, vertically integrated OEMs. *See* Laflamme Dep. 100:18-101:6. In particular, if the Court were to impose remedies harming Motorola causing it to reduce its overall share in the U.S., then Apple, Samsung, and Google itself, would face less competition for smartphones, likely driving up prices. Plaintiffs' Proposed Remedies, therefore, favor large, vertically integrated phone manufacturers over OEMs like Motorola.

Contrary to Plaintiffs' stated remedial intent, eliminating Search revenue payments will allow Google to retain "monopolistic profits" to itself, potentially *enhancing* its alleged market power.[3] If Google were prohibited from making Search revenue payments to third-party partners, Google could use the same revenue to its own benefit. Rather than fostering a level playing field, the remedy would effectively reward Google by increasing its financial advantage over competitors, starving them of the resources needed to more thoroughly compete with Google's smartphones. In its Pre-Trial Brief, Plaintiffs argue banning "unlawful payments" will spur innovation by rivals and eliminate barriers to entry. *See* Pls.' Remedies Pre-Trial Br., ECF No. 1218, Apr. 16, 2025. This is unlikely to happen. Banning RSA payments essentially eliminates the opportunity for innovation from smartphone manufacturers such as Motorola, *see* Laflamme

---

[3] Google is not only a general search engine and search advertising provider but also a smartphone competitor; thus, if Motorola was forced to leave the smartphone market due to a lack of RSA payments, Google would likely pick up a significant portion of Motorola's share and further consolidate that market.

Dep. 77:4-78:19, and instead allows Google to retain the revenue share payments for its own

benefit in the markets for general search, general search advertising, and smartphones.

Banning payments directly reduces Motorola's ability to innovate. As a smaller

manufacturer, Motorola experiments with new products and takes innovative risks in ways that

larger manufacturers with sizable market share to protect often are not. For example, Motorola

launched the world's first 5G-upgradable phone, which was developed in partnership with

Verizon.[4] Motorola is changing the marketplace and driving innovation, particularly in the U.S.,

and these efforts are significantly funded by Google's RSA payments.

**B.      If the Court Decides to Grant Plaintiffs' Remedy Eliminating Search Revenue Payments, the Court Should Still Allow Search Payments to Smaller OEMs Like Motorola.**

Precedent has upheld remedies that maintain payments to certain partners to avoid

unnecessary harm to competition. The Court should follow that precedent. If the Court

implements Plaintiffs' Proposed Remedies removing Google's ability to make revenue share

payments, the Court should permit Google to continue making payments to smaller OEMs, such

as Motorola, to avoid undue harm to smaller smartphone manufacturers.

*1.      If the Court were to allow Plaintiffs' proposed remedy, Motorola proposes an alternative remedy that avoids harming smaller OEMs and competition.*

If the Court prohibit revenue share payments, the Court should avoid harming smaller

competitors such as Motorola. Thus, Motorola proposes an alternative remedy, which addresses

the Court's liability ruling while preserving competition for OEMs. Motorola proposes

permitting Google to continue making revenue share payments to smartphone manufacturers that

---

[4] *See* Matt Swider, Moto Z3 is the world's first 5G-upgradable smartphone, say Motorola and Verizon, TechRadar (Aug. 2, 2018), https://www.techradar.com/news/moto-z3-is-the-worlds-first-5g-upgradable-smartphone-say-motorola-and-verizon.

collectively represent less than 30 percent of the U.S. market, measured by either units sold or revenue. This alternative remedy cures the alleged unlawful exclusive dealing in the markets for general search and general search advertising services, as found by the Court during the merits phase, but does not pose significant risk to Motorola and other smaller OEMs.

### 2.    *Case law supports Motorola's proposed alternative remedy.*

Case law supports Motorola's proposition that payments for search made to OEMs (comprising a smaller share of the smartphone market) addresses antitrust concerns arising from exclusive agreements, while avoiding unnecessary and unintended harm to smaller and mid-size competitors.

Although the D.C. Circuit does not have an established "threshold market share percentage that plaintiffs must meet to establish dangerous probability of success, other courts have" weighed in on such requisite thresholds. *American President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 233 (D.D.C. 2022) (citing *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 428 (D.C. Cir. 1986)) ("suggesting that a 'share of 30% or less presumptively disproves requisite power'"). [5] Case law in this Circuit, and other Circuits, generally supports the proposition that

---

[5] *See also Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 124 (1st Cir. 2011) (holding requisite foreclosure was unlikely when defendant's exclusive agreements foreclosed less than 30% of the market); *United States v. Microsoft Corp.*, 87 F. Supp. 2d at 52 ("[T]he case law suggests that, unless the evidence demonstrates that Microsoft's agreements excluded Netscape altogether from access to roughly forty percent of the browser market, the Court should decline to find such agreements in violation of § 1."); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 875 F. Supp. 8, 13 (D. Me. 1994) (holding that because defendant's exclusive agreements applied to only 30% of relevant market, they were reasonable, and noting that competitors had gained new accounts and customers were unharmed); *Woman's Clinic, Inc. v. St. John's Health Sys., Inc.*, 252 F. Supp. 2d 857, 867 (W.D. Mo. 2002) (finding insufficient market power for defendant to impair competition when defendant's exclusive contracts covered only 35% of the market and no evidence of actual anti-competitive effects was presented); *Servicetrends v. Siemens Med. Sys.*, 870 F. Supp. 1042, 1065–66 (N.D. Ga. 1994) (finding exclusive dealing arrangements reasonable in light of 38% market foreclosure and buyers' business needs); *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1212–14 (W.D. N.C. 1989) (market foreclosure of 40% was insufficient to prove unreasonableness); *Kuck v. Bensen*, 647 F. Supp. 743, 746 (D. Me. 1986) (upholding exclusive provider contract which did not "unreasonably enhance" hospital's market position over competitor, where defendant's market share was only 37%); *Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-cv-2680 (AJN), 2016 U.S. Dist. LEXIS 171418,

exclusive agreements do not foreclose competition so long as the agreements cover 30 percent or less share of the relevant market. *See also id.* at 228 (citing 11 Areeda & Hovenkamp, *Antitrust Law*, ¶ 1821(c) (4th ed. 2018)) ("[S]ingle-firm foreclosure percentages of less than 30 percent in a properly defined market would seem presumptively harmless to competition.")*.*

The *American President Lines* court held that "[t]o violate the Sherman Act, an exclusivity program must foreclose a 'substantial percentage' of the relevant market from competition, which has often been cited as about 40% of the relevant market." 633 F. Supp. 3d at 228 (citing *U.S. v. Microsoft*, 253 F.3d at 70-71). *American President Lines* further states, "[w]hen the defendant is a monopolist, . . . an even lower percentage may suffice." *Id.* (citing *U.S. v. Microsoft*, 253 F.3d at 70-71) ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation.").

With a 30 percent threshold, 70 percent of the smartphone market would be free of agreements with Google that might be used to foreclose another general search or general search advertising competitor from access to smartphone consumers. However, Google's continued ability to make some revenue share payments would maintain competition in the smartphone market. As noted, preserving revenue share payments will provide Motorola with the direct ability to continue competing in the smartphone market as Motorola uses such payments to fund its R&D, marketing, and support other costs. Importantly, preserving some ability by Google to

---

at *86–89 (S.D.N.Y. Sep. 30, 2016) (granting defendant's motion for summary judgment as plaintiffs did not show that defendant's exclusive agreements with used car websites foreclosed at least 30–40% of market for vehicle history reports); *Connecticut Ironworkers Emps.' Assoc. v. New England Reg'l Council of Carpenters*, 324 F. Supp. 3d 293, 311–12 (D. Conn. 2018) (noting requirement of 30–40% foreclosure and dismissing exclusive dealing claims at summary judgment stage on the basis of lack of evidence of market power).

offer payments—instead of a blanket prohibition—will not only remedy the underlying violation, but will also preserve competition in smartphones consistent with precedent.

C.      **The Court Should Not Grant Plaintiffs' Requested Choice Screen Remedy.**

Contrary to Plaintiffs' assertions, choice screens do not help reduce biases in consumer choices in search. *See* Pls.' Revised Proposed Final J., § IX.A, ECF No. 1184-1, Mar. 7, 2025. In fact, Plaintiffs' choice screen proposed remedy would certainly harm Motorola. Choice screens do not work and would lower payments to OEMs like Motorola, while Google retains more revenue.

As Motorola experienced in the European Union, choice screens fail because consumers continue to choose Google Search and Chrome regardless. *See* Laflamme Dep. 87:4-89:2; *see also* Ex. C at MOTO-DDC-00162956 (indicating Chrome usage remains unchanged following EU's implementation of choice screens in 2022); PXR0135 (stating requirement of choice screen "caused Google to change its monetization model where they share much less of the monetization with OEMs in Europe," and "[i]n Europe, they increased choice but then *started charging a fee for licenses and then provide a discount to pre-load their apps*") (emphasis added). Thus, although requiring choice screens "has not changed behavior in the consumer [because] they are still choosing Chrome, even once given the choice," choice screens further "reduce Google's incentive, or need, to pay OEMs like [Motorola] in terms of revenue share, because ultimately []Google[] is the consumer's choice." *See* Laflamme Dep. 87:4-89:2. Consequently, choice screens have had "very negative" consequences for Motorola. *See Id.*

Additionally, even though Plaintiffs' Proposed Remedies would require that OEMs receive from Google "a fixed monthly payment equal to the average monthly amount that Google paid to the Distributor for that Device during the shorter of the 12-month period prior to the date of entry of this Final Judgment or the lifetime of the Device," 12 months or less is not

enough time to make OEMs like Motorola whole. Pls.' Revised Proposed Final J., § IX.A, ECF No. 1184-1, Mar. 7, 2025. Using the European Union as an example, it has been years since choice screens were implemented and Motorola is significantly worse off. *See* Laflamme Dep. 87:4-89:2.

Because choice screens reduce Google's incentive to share revenue with partners, a choice screen would also likely reduce the incentive of Microsoft, Epic, Perplexity, and other competitors to offer any revenue share. If Google—whose search engine is largely consumers' preference even when choice screens are implemented—has less incentive to pay Motorola, competitors' incentives will diminish as well. *See Id.*

Motorola, therefore, opposes the requirement to implement choice screens in Plaintiffs' Revised Proposed Final Judgment. However, if the Court adopts choice screens, Motorola strongly believes that Google should be allowed to share revenue with OEMs when a consumer chooses Google Search via such a choice screen to prevent harm to competition in the smartphone market.

### D.    The Court Should Not Grant Plaintiffs' Requested Divestiture Remedies as Stated.

Plaintiffs' proposed divestitures of Chrome and Android fail to address Motorola's interests because they do not contemplate Motorola having any input on a potential buyer. One of Motorola's key differentiators is the pure Android experience. Thus, the Android operating system is crucial to Motorola's brand and success. If Motorola were to lose the ability to offer the Android operating system to its consumers because Android is sold to a competitor, for example, or purchased by an entity that does not want to contract with Motorola or permit Motorola to continue implementing the operating system for free, Motorola—and its customers—will be impacted significantly.

So long as Chrome and Android are not divested to an existing smartphone competitor, Motorola does not take a position on the Court implementing these Proposed Remedies. Nevertheless, should the Court implement Plaintiffs' proposed divestiture remedies, Motorola seeks to provide input regarding any proposed purchasers given the likely significant impact on Motorola's products and business and potential harm that Motorola would suffer based on the identity and incentives of the purchaser of Chrome or Android.

### E.    The Court Should Grant Google's Decoupling and No Self-Preferencing Remedies.

Motorola and Google recently amended their RSA on February 7, 2025 to ensure flexibility to implement other third-party GenAI, search, and assistive services without reduction of its RSA payments. Although Google never expressly prohibited Motorola from implementing non-Google GenAI and assistive services, and Motorola never had a "discussion with Google where [Google] told [Motorola] that it put at risk the full suite of [revenue share] dollars if [Motorola had an] arrangement with" a third-party GenAI app, the language of the prior version of the RSA relating to such implementation was unclear to Motorola. *See* Laflamme Dep. 152:16-20. Therefore, at Google's suggestion, the parties renegotiated their RSA to explicitly permit Motorola to contract with other parties for GenAI and assistive services without running afoul of the  RSA terms. *See* Hr'g Tr. 355:25-356:3, Apr. 22, 2025 (regarding the new RSA, Peter Fitzgerald, Google VP – Global Partnerships, states, "[i]t also removes the search in Chrome placement obligations" and "[t]here's also no restrictions for GenAI services or alternative search services."); *see also id.* 356:15-24 (Fitzgerald further noting the new RSA clarifies that "any alternative search provider or alternative assistive service provider or GenAI service, like ChatGPT, CoPilot, Perplexity, [Motorola is] able to have agreements with them, [Motorola is] able to work with them" and Motorola can "still receive payments under this RSA

while having the other GenAI providers [he] identified installed on the same devices."); *id.* 357:3-11 (Fitzgerald discussing the recent letter Google sent to Motorola "in connection with its obligations under the current RSA," which "waives any Assistant requirements" and "clarifies [that there are] no restrictions on alternative assistive services"); *id.* 364:16-17 (noting "Perplexity and CoPilot and Gemini will all be offered side by side on the same [Motorola] device").

Google's proposed remedy eliminating bundling and self-preferencing, therefore, accomplishes what Motorola's new agreement does and mirrors the provisions that Motorola already negotiated with Google in relation to the RSA. In fact, Motorola is continuing to pursue partnerships with GenAI providers other than Google today, and nothing "in Google's current agreements with Motorola [] would prevent Motorola from doing that." *See* Hr'g Tr. 363:10-12, 364:1-23, Apr. 22, 2025.

Throughout the remedies phase of this trial, the Court has heard testimony from non-Motorola witnesses about Motorola's supposed view of Google. These statements were often misleading or inaccurate. Motorola has, from time to time, been concerned about Google's potential to retaliate against it should Motorola engage with other GenAI or assistive services providers. *See* PXR0139; *see also* Hr'g Tr. 38:10-23, Apr. 21, 2025. However, these concerns occurred *prior* to the companies amending their RSA terms in February 2025 to make it abundantly clear that no such retaliation would happen. Motorola recently launched a new product line with multiple AI search engines included without fear of retaliation. Therefore, Motorola believes Google's Proposed Remedies sufficiently address any concerns a party may have about retaliation. *See* Google's Proposed Final J., ECF No. 1185, § III.G, Mar. 7, 2025.

## VI.    Conclusion

Motorola respectfully requests that the Court deny Plaintiffs' Proposed Remedies or alter

certain provisions in a manner that would not result in harm to Motorola and competition at large, and grant Google's Proposed Remedies relevant to Motorola. *See id.* § III.A-J. Motorola takes no position on the other provisions of Google's Proposed Final Judgment.

Dated: May 9, 2025                         Respectfully submitted,

                                           */s/ Katharine O'Connor*
                                           Katharine O'Connor
                                           (*admitted pro hac vice*)
                                           Stephen Wu
                                           (*pro hac vice* application pending)
                                           McDermott Will & Emery LLP
                                           444 West Lake Street, Suite 4000,
                                           Chicago, IL 60606
                                           (312) 984-3627
                                           Swu@mwe.com
                                           Koconnor@mwe.com

                                           */s/ Marisa Poncia*
                                           Marisa Poncia
                                           McDermott Will & Emery LLP
                                           500 North Capitol Street NW
                                           Washington, DC 20001
                                           (202) 756 – 8928
                                           Rponcia@mwe.com

                                           *Counsel for Motorola Mobility LLC*

21

## STATEMENT OF COUNSEL

In accordance with Local Rule 7(o) and Fed. R. App. P. 29(a)(4)(E), Motorola Mobility LLC ("Motorola") certifies that (1) this brief was authored entirely by its counsel and not by counsel for any party in the above-captioned dispute, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from amicus curiae and its counsel, no other person contributed money to fund preparing or submitting this brief.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing *Amicus Curiae* Brief with the Clerk of the U.S. District Court for the District of Columbia by using the CM/ECF system on May 9, 2025. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Dated: May 9, 2025

Respectfully submitted,

*/s/ Katharine O'Connor*
Katharine O'Connor
(*admitted pro hac vice*)
Stephen Wu
(*pro hac vice* application pending)
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000,
Chicago, IL 60606
(312) 984-3627
Swu@mwe.com
Koconnor@mwe.com

*/s/ Marisa Poncia*
Marisa Poncia
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756 – 8928
Rponcia@mwe.com

*Counsel for Motorola Mobility LLC*