# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | |
| GOOGLE LLC, | HON. AMIT P. MEHTA |
| Defendant. | |

| | |
|---|---|
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | |
| GOOGLE LLC, | HON. AMIT P. MEHTA |
| Defendant. | |

## BRIEF OF BIPARTISAN FORMER ANTITRUST ENFORCERS AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY

STATEMENT OF INTEREST OF *AMICUS CURIAE* ................................................................ 1

INTRODUCTION .................................................................................................................... 2

RELEVANT BACKGROUND .................................................................................................. 3

ARGUMENT ......................................................................................................................... 5

    I.     There Are Well-Established Requirements and Principles that Govern Section 2 Remedies In A Monopoly Maintenance Case ...................................................... 5

    II.    Plaintiffs Must Satisfy the Applicable But-For Causation and Proportionality Requirements in Order To Justify "Extensive Equitable Relief." ......................... 8

          A.    Plaintiffs Must Establish a "Significant Causal Connection" Between Google's Anticompetitive Conduct and Its Maintenance of Monopoly Power. ..................................................................................................... 8

          B.    Plaintiffs Must Demonstrate That Each of the Proposed Remedies, Including Proposed Divestiture Remedies, Is Reasonable and Proportional to the Competitive Harm Actually Proven in this Case. ....... 11

    CONCLUSION .................................................................................................................. 13

## Cases

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ............................................................................... 11

*Brown v. Plata*,
563 U.S. 493 (2011) .................................................................................. 6

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) .............................................................................. 5, 6

*Ginsburg v. InBev NV/SA*,
623 F.3d 1229 (8th Cir. 2010) .............................................................. 2, 6

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004) ........................................................... 6, 11

*New York v. Microsoft Corp.*,
224 F. Supp. 2d 76 (D.D.C. 2002) .......................................................... 12

*Ragsdale v. Wolverine World Wide, Inc.*,
535 U.S. 81 (2002) .................................................................................... 6

*Salazar v. Buono*,
559 U.S. 700 (2010) .................................................................................. 7

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) .................................................... passim

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .......................................................... passim

## Other Authorities

3 Phillip Areeda & Herbert Hovenkamp, Antitrust Law (2d ed. 2002) ................................. passim

A. Douglas Melamed, *Afterword: The Purposes of Antitrust Remedies*, 76 Antitrust L.J.
359 (2009) ................................................................................................. 4

Charles A. James, *The Real Microsoft Case and Settlement*, Antitrust, Fall 2001 ....................... 5

E. Thomas Sullivan, *The Jurisprudence of Antitrust Divestiture: The Path Less Traveled*,
86 Minn. L. Rev. 565 (2002) ..................................................................... 6

Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L. J. 1952 (2021) ................. 11

John E. Lopatka & William H. Page, *A (Cautionary) Note on Remedies in the* Microsoft
*Case*, Antitrust, Summer 1999 ..................................................................... 4

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

As a bipartisan group of former federal antitrust enforcers who have worked in the United States Department of Justice Antitrust Division and the Federal Trade Commission Bureau of Competition, *Amici* have an interest in ensuring the antitrust laws are enforced in furtherance of their intended purposes.[1]  This interest is particularly acute in dynamic technology markets.

The antitrust laws prohibit anticompetitive conduct that harms competition.  Antitrust remedies in a monopoly maintenance case are intended to terminate the unlawful conduct and prevent its recurrence, and remediate proven harm to competition caused by the illegal conduct. Antitrust remedies that go further than that or that are not narrowly designed to achieve those goals can undermine the purpose of the antitrust laws by inhibiting the very robust competition that those laws are intended to promote.

*Amici* include high-level Department of Justice and Federal Trade Commission officials from the Nixon, Ford, Carter, Reagan, George H.W. Bush, Clinton, George W. Bush, Obama, and Trump Administrations with decades of experience in antitrust enforcement.  Four movants served under Republican administrations and seven served under Democratic administrations (and certain individuals worked under both parties' administrations).  The *Amici*'s names, current titles, and former government titles are set forth in the accompanying motion for leave to file this brief.

*Amici* respectfully submit this brief in support of neither party, to clarify the legal standard that governs antitrust remedies—a standard based on the findings of the Court as to the

---

[1] The *Amici* are listed in the Addendum following this brief.

ways in which the challenged conduct was unlawful and was shown to have harmed competition in the market as whole.[2]

## INTRODUCTION

In *United States v. Microsoft Corp.*, the U.S. Court of Appeals for the D.C. Circuit stated that "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition."  253 F.3d 34, 106 (D.C. Cir. 2001) (en banc) (quoting 3 Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 650a, at 67 (2d ed. 2002)). The D.C. Circuit noted that, as a baseline, "the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'"  *Id.* at 106 (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 650a, at 67).  By contrast, "more extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether, . . . require a clearer indication of significant causal connection between the conduct and creation or maintenance of the market power."  *Id.* (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 653b, at 91–92).  "Absent such causation, the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'" *Id.* (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 650a, at 67).

Having adopted this heightened causation standard for structural or other remedial relief, the D.C. Circuit in *Microsoft* reversed the district court's decision granting structural relief, noting, among other things, that the court "expressly did not adopt the position that Microsoft

---

[2] No party, or counsel for a party, authored this brief in whole or in part.  No one other than *Amici* and their counsel contributed money to fund this brief.  O'Melveny & Myers LLP represents Google in other matters unconnected to this brief.  The affiliations of each individual *Amici* are listed for identification only as the views expressed in this brief are those of the individual *Amici* only and do not represent the views of each *Amicus*'s firms or their firms' clients or their affiliations.

would have lost its position in the OS market but for its anticompetitive behavior." *Id.* (quoting Findings of Fact ¶ 411 ("There is insufficient evidence to find that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the market for Intel-compatible PC operating systems.")). It added that "[i]f the court on remand is unconvinced of the causal connection between Microsoft's exclusionary conduct and the company's position in the OS market, it may well conclude that divestiture is not an appropriate remedy." *Id.*

As described in greater detail below, we believe the best reading of *Microsoft*'s heightened causation standard for structural or other remedial relief that goes beyond enjoining the anticompetitive conduct in question is that the plaintiff must show, and the Court must find, that the defendant's monopoly power would not have been maintained but for the illegal conduct, or that the remedy is reasonably calculated to restore competitive conditions that would have existed but for that conduct. Applying this test requires examining the counterfactual of what would have happened absent that conduct, just as courts regularly do in other contexts such as measuring damages in antitrust cases.

This but-for causation standard is particularly important in antitrust cases because of the danger that structural relief or other behavioral relief poses where that relief goes beyond enjoining the anticompetitive conduct in question and causes harm to competition. "Fashioning appropriate equitable antitrust relief requires that courts balance the benefit to competition against the hardship or competitive disadvantage the remedy may cause." *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010).

## RELEVANT BACKGROUND

After a 10-week trial, in August 2024, this Court issued its findings of fact and conclusions of law. *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024). The Court found that, through exclusive distribution agreements, Google unlawfully maintained

monopolies in two product markets in the United States—general search services and general text advertising.  Although the Court found Google to be a monopolist in both markets, it did not find that Google unlawfully acquired that monopoly power.  Rather it found that Google unlawfully maintained its monopoly power through exclusive distribution agreements, specifically (i) agreements with companies like Apple and Mozilla to make Google their default search engine; and (ii) agreements with Android manufacturers—such as Motorola, Samsung, and Sony—to make Google the preloaded general search engine on their devices.

The Court found that Google's superior search quality and advertising platform predated the period in which plaintiffs allege Google began its unlawful maintenance.  *Google*, 747 F. Supp. 3d at 144–45.  For example, the Court found that Windows users overwhelmingly prefer Google search even though Google has no preload or default distribution provisions with Microsoft.  *Id.* at 48–49.  The Court also found that Google has continued to innovate, leading its partners to continue to value the quality of Google search and its superior ability to monetize queries.  *Id.* at 144.  The Court found that Microsoft—which owns the second-place search engine—evinced a chronic "underinvestment in search" and indeed "missed" the mobile revolution at the outset.  *Id.* at 165–66.

The Court here predicated its liability finding on what it called the "relaxed" standard of causation:

> Anticompetitive effects analysis involves establishing a "causal link."  The exclusionary conduct must cause the anticompetitive harm.  As here, when a regulator is seeking only injunctive relief, the standard is somewhat relaxed.  Courts may infer "causation" from the fact that a defendant has engaged in anticompetitive conduct that reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power. . . . Importantly, causation does not require but-for proof.

*Google*, 747 F. Supp. 3d at 152–53 (alteration in original) (internal quotation and citations omitted).

We do not purport to describe exhaustively the parties' respective remedy proposals, but we do note two sets of remedies in particular. *First*, Plaintiffs propose divestiture of Chrome, and the contingent divestiture of Android if the proposed remedies "prove insufficient." *Second*, Plaintiffs also propose mandated disclosures of search and search ads data and other restrictions on Google's conduct that go beyond enjoining the continuation or recurrence of conduct found to be unlawful.

## ARGUMENT

## I. There Are Well-Established Requirements and Principles that Govern Section 2 Remedies In A Monopoly Maintenance Case

As the en banc D.C. Circuit explained in *Microsoft*, the default remedy for an antitrust defendant's unlawful behavior is "an injunction against the continuation of that conduct." 253 F.3d at 106 (internal quotation omitted); *see also* John E. Lopatka & William H. Page, *A (Cautionary) Note on Remedies in the* Microsoft *Case*, Antitrust, Summer 1999, at 25, 26 ("The starting point . . . is an order prohibiting the defendant from engaging in the proven illegal conduct."). That tailored default remedy makes sense: "[R]emedies are hard to get right and, when suboptimal, can undermine antitrust objectives by interfering with markets and prohibiting or deterring procompetitive conduct." A. Douglas Melamed, *Afterword: The Purposes of Antitrust Remedies*, 76 Antitrust L.J. 359, 368 (2009). In a monopoly maintenance case, remedies appropriately focus on ending the behavior at the heart of the alleged Section 2 violation because "there is no unfairness or disincentive to meritorious competition in simply . . . ordering the monopolist to stop" the anticompetitive conduct. 3 Areeda & Hovenkamp, Antitrust Law ¶ 653b, at 98.

Remedies that go beyond preventing the continuation or recurrence of unlawful conduct raise more difficult issues. The D.C. Circuit emphasized that the "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." *Microsoft*, 253 F.3d at 106 (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 650a, at 67). The Court of Appeals went on to explain that "more extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether, . . . require a clearer indication of significant causal connection between the conduct and the creation or maintenance of the market power." *Id.* at 107 (quoting 3 Areeda & Hovenkamp, Antitrust Law ¶ 653(b), at 91–92).

That "clearer"—and heightened—causation requirement for equitable relief beyond the default injunction against proven anticompetitive conduct stands in marked contrast to the standard applied in the liability phase of a monopoly maintenance case, where "[c]ourts may 'infer "causation" from the fact that a defendant has engaged in anticompetitive conduct that reasonably appear[s] capable of making a significant contribution to . . . maintaining monopoly power.'" *Google*, 747 F. Supp. 3d at 153 (alteration in original). In the remedies context, establishing a "significant causal connection" requires establishing but-for causation between the proven anticompetitive conduct and competitive conditions allowing the monopolist to maintain its monopoly. *Microsoft*, 253 F.3d at 107. A structural remedy like divestiture or other remedy intended to restore competition to the relevant market therefore requires proof, not just that the illegal conduct was "reasonably capable" of harming competition, but also that the conduct actually harmed competition and either sustained or enhanced defendant's monopoly power, or damaged or destroyed some kind of market attribute—*e.g.*, an important supplier, resource, or distribution channel—that would have led to genuine competition. The purpose of these

remedies is the "[r]estoration" of "lost competition."  Charles A. James, *The Real Microsoft Case and Settlement*, Antitrust, Fall 2001, at 58, 61; *see also Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) ("The relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'").

The Court of Appeals in *Microsoft* applied these principles.  The court took note of the District Court's finding that "[t]here is insufficient evidence that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the market for Intel-compatible PC operating systems." 253 F.3d at 107 (quoting Findings of Fact ¶ 411).  The court vacated the district court's divestiture remedy and remanded the case, stating that, "[i]f the court on remand is unconvinced of the causal connection between Microsoft's exclusionary conduct and the company's position in the OS market, it may well conclude that divestiture is not an appropriate remedy."  *Id.*

In addition, even if a plaintiff can satisfy the heightened causation threshold for more extensive equitable relief, the D.C. Circuit requires that any extensive relief "must represent[] a *reasonable* method of eliminating the consequences of the illegal conduct."  *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1216 (D.C. Cir. 2004) (alteration in original) (internal quotation omitted) (emphasis added).  "Fashioning appropriate equitable antitrust relief requires that courts balance the benefit to competition against the hardship or competitive disadvantage the remedy may cause."  *Ginsburg*, 623 F.3d at 1235; *see also* E. Thomas Sullivan, *The Jurisprudence of Antitrust Divestiture: The Path Less Traveled*, 86 Minn. L. Rev. 565, 613 (2002) ("Courts must exercise care to ensure that the cost of correcting the market failure does not exceed the anticompetitive injury visited on consumers.").  In other words, it is essential that courts "fit the decree" to the particulars of the case.  *Ford*, 405 U.S. at 573; *Microsoft*, 253 F.3d at 107 (relief

"should be tailored to fit the wrong creating the occasion for the remedy").

These principles informing the propriety and proportionality of equitable antitrust relief echo how courts have long thought about the function of remedies generally. The Supreme Court has made clear that that the "scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation." *Brown v. Plata*, 563 U.S. 493, 531 (2011); *see also Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 89 (2002) (stating that a remedy must be "tailored to the harm suffered"); *Salazar v. Buono*, 559 U.S. 700, 718 (2010) ("A court must find prospective relief that fits the remedy to the wrong or injury that has been established.").

## II.   Plaintiffs Must Satisfy the Applicable But-For Causation and Proportionality Requirements in Order To Justify "Extensive Equitable Relief."

### A.   Plaintiffs Must Establish a "Significant Causal Connection" Between Google's Anticompetitive Conduct and Its Maintenance of Monopoly Power.

Plaintiffs' proposed remedies qualify as "more extensive equitable relief" because they go well beyond an injunction against the continuation of the kind of distribution agreements that this Court found to be anticompetitive. The proposed remedies include divestiture of Chrome and the contingent divestiture of the Android mobile operating system; compulsory "data sharing" and "syndication" remedies; curtailing how Google develops and deploys GenAI—for example, by restricting Google's ability to integrate its GenAI products and services with other Google properties; and prohibiting Google from offering "anything of value" to any third party for "preferential treatment," "preinstallation, placement, or default status" of a general search engine or search access point. *See* Plaintiffs' Revised Proposed Final Judgment, at 730, ECF No. 1184-1.

As explained above, before the Court even considers relief beyond terminating the conduct that the Court held violated Section 2 and preventing its recurrence, Plaintiffs must

satisfy the "significant causal connection" requirement.  *See Microsoft*, 253 F.3d at 107 (internal

quotation omitted).  As we understand it, the Court did not find that, *but for* the unlawful

distribution agreements, Google's monopoly power in the "general search services" and "general

text advertising" product markets would have been eliminated or materially reduced or that the

unlawful agreements undermined market conditions that would have threatened Google's

monopoly.  Instead, as we understand it, the Court's analysis focused on answering the question:

"Do Google's exclusive distribution contracts reasonably appear capable of significantly

contributing to maintaining Google's monopoly power in the general search services market?"

*Google*, 747 F. Supp. 3d at 153.  Thus the Court did not apply the heighted causation

requirement for extensive remedies but rather the "somewhat relaxed" causation standard in the

liability phase.

      If anything, the Court's findings suggest that Google's search and advertising products

have long beaten out the competition "through superior foresight or quality."  *Microsoft*, 253

F.3d at 56.  For instance:

- In 2009 "80% of all general search queries, whether entered on a desktop computer or mobile device, flowed through Google."  *Google*, 747 F. Supp. 3d at 38.  This was during a period before Google was alleged to have engaged in illegal monopoly maintenance.

- The Court found that Google "has long been the best search engine, particularly on mobile devices."  *Id.* at 144.

- The Court found that Google "has continued to innovate in search" despite its dominant market share.  *Id.*

- "Google's partners value its quality, and they continue to select Google as the default because its search engine provides the best bet for monetizing queries."  *Id.* Competitors "have not succeeded [in winning competitions for default placement] in part due to their inferior quality."  *Id.*

- "Google foresaw that the future of search was on mobile.  Microsoft acknowledges that it was slow to recognize the importance of developing a search product for

mobile, and it has been trying to catch up—unsuccessfully—ever since." *Id.*

In support of their view that they have satisfied the "significant causal connection"
requirement for what appears to be more intrusive equitable relief, Plaintiffs highlight the
following statements from the Court's liability decision:

- "The exclusive distribution agreements thus have significantly contributed to
  Google's ability to maintain its highly durable monopoly." *Id.* at 145.

- "The agreements 'clearly have a significant effect in preserving [Google's]
  monopoly.'" *Id.* at 153 (alteration in original).

- "The exclusive distribution agreements have substantially contributed to . . .
  anticompetitive market conditions." *Id.* at 163.

- The agreements have "contributed significantly to [a] lack of new investment." *Id.* at
  165.

- The agreements "substantially contribute to [Google] maintaining its monopoly in the
  general search text advertising market." *Id.* at 181.

These statements provide a predicate for terminating the unlawful agreements and preventing the
recurrence of agreements like them because those remedies would remove the unlawful
enhancement to "Google's ability to maintain its . . . monopoly." *Id.* at 145. But the statements
do not establish that, but for the unlawful agreements, Google's monopoly power would not have
been maintained or that "genuine competition" would have been "ignited" in the relevant
markets. *See Microsoft*, 253 F.3d at 107.

These distinctions are reflected in the *Microsoft* case. There, the Court of Appeals noted
that Microsoft's conduct had significantly harmed Navigator. "Microsoft's deals with [internet
service providers] clearly have a significant effect in preserving its monopoly; they kept usage of
the Navigator browser below the critical level necessary for Navigator or any other rival to pose
a real threat to Microsoft's monopoly." *Microsoft*, 253 F.3d at 66, 71. Yet, the court held that
those findings satisfied only the more relaxed standard for liability, explaining that it "ha[d]

found a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems market *only through inference*." *Id.* at 106–07 (emphasis added). The same appears true here where the Court found that the unlawful conduct was "reasonably capable" of harming competition, but it did not find that the conduct actually harmed competition in the market as a whole, much less set forth in any sense the metes and bounds or scope of the harm to the market as juxtaposed against a counterfactual.

**B.      Plaintiffs Must Demonstrate That Each of the Proposed Remedies, Including Proposed Divestiture Remedies, Is Reasonable and Proportional to the Competitive Harm Actually Proven in this Case.**

Even if Plaintiffs can satisfy *Microsoft*'s "significant causal connection" requirement, they must show that their proposed divestiture remedies are proportional to the proven harm to competition and do not risk doing more harm than good for consumers and competition.

At the outset, Plaintiffs cite *Microsoft* for the proposition that "divestiture is a common form of relief in successful antitrust prosecutions." ECF No. 1218 at 11 (quoting 253 F.3d at 105) (alteration omitted). But that quotation omits important context: Other than in merger cases, divestitures are "common" only in cases where the defendant unlawfully *acquired* monopoly power. And even in those cases, "divestiture is a remedy that is imposed only with great caution, in part because its long-term efficacy is rarely certain." *Microsoft*, 253 F.3d at 80. The leading antitrust treatise notes "many monopolists owe their size to significant economies of scale or scope, or else network effects, and breaking up the monopoly incorrectly can produce significant diseconomies." Areeda & Hovenkamp, Antitrust Law, ¶ 710b4 (2024).

As the Court acknowledges, "this case is not about Google's initial acquisition of monopoly power. It is about Google's efforts to maintain this position through means other than competition on the merits." *Google*, 747 F. Supp. 3d at 145 (internal quotation omitted) (alterations omitted). Because there is no unlawful acquisition of monopoly power to unwind

here, the Court should approach Plaintiffs' proposed divestiture remedies with caution.  As the *Microsoft* court explained, "One apparent reason why courts have not ordered the dissolution of unitary companies is logistical difficulty. . . . [A] 'corporation, designed to operate effectively as a single entity, cannot readily be dismembered of parts of its various operations without a marked loss of efficiency.'" *Microsoft*, 253 F.3d at 105–06.

Similarly, compulsory sharing obligations must be "tailored" to "directly address[] the fruit of [the] unlawful conduct." *Massachusetts*, 373 F.3d at 1233.  Proposed compulsory sharing obligations, like any antitrust remedy, "should be evaluated by its success in increasing output, decreasing prices, improving product quality, or spurring innovation—that is, by the same criteria that we generally adopt as goals for the antitrust laws."  Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L. J. 1952, 2006 (2021); *cf. Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962) (explaining that the Sherman Act protects "competition, not competitors").

The D.C. Circuit's opinion in *Massachusetts* controls on this point.  There, the States argued that the district court's imposed remedy—which required Microsoft to disclose application program interfaces ("APIs") that Microsoft used to interoperate with Windows—was inadequate because it limited the number and detail of the API disclosures.  *Massachusetts*, 373 F.3d at 1218.  The court scrutinized the "breadth" and "depth" of the States' proposed remedy, and then concluded that the district court "reasonably balanced its goal of enhanced interoperability with the need to avoid requiring overly broad disclosure, which it determined could have adverse economic and technological effects[.]"  *Id.* at 1218, 1222.  The court pointed in particular to the district court's findings that the States' preferred remedy "could undermine Microsoft's incentive to innovate," could allow rivals to "clone Microsoft's software and mimic

its functionality," and "would deny 'Microsoft the returns from its investment in innovation.'"

*Id.* at 1218–19.  In the D.C. Circuit's view, compulsory licensing "would work a 'de facto

divestiture.'"  *Massachusetts*, 373 F.3d at 1228; *see New York v. Microsoft Corp.*, 224 F. Supp.

2d 76, 177–78 (D.D.C. 2002) ("To require Microsoft to license intellectual property in the

absence of a reasonable royalty . . . constitutes a divestiture of one of [its] most valuable

assets."), *aff'd Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004).

For these reasons, the court should proceed cautiously before imposing any of Plaintiffs'

proposed forced-sharing remedies.  It should first have clearly in mind what harm to competition

the remedy is likely to correct and, then, weigh the possibility of that benefit against possible

harm from reducing Google's competitive efficiency and its incentives to continue to invest in

product improvements.

## CONCLUSION

For the foregoing reasons, this Court should faithfully apply the well-established

requirements and principles that govern Sherman Act Section 2 equitable relief in a monopoly

maintenance case.

Dated:  May 13, 2025

Respectfully submitted,

/s/ Ian Simmons

Ian Simmons (D.C. Bar No. 439645)
Michael F. Rosenblatt (D.C. Bar No. 1656892)
(*pro hac vice* application pending)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006-4061
Telephone:     +1 202 383 5300
Facsimile:     +1 202 383 5414
isimmons@omm.com
mrosenblatt@omm.com

Peter Herrick (D.C. Bar No. 1029327) (*pro hac vice* application pending)
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
17th Floor
New York, NY 10019
Telephone:     +1 212 326 2000
Facsimile:     +1 212 326 2061
pherrick@omm.com

*and*

Andrew Ezekoye (*pro hac vice* application pending)
Joshua P. Cayetano (*pro hac vice* application pending)
O'MELVENY & MYERS LLP
Two Embarcadero Center
28th Floor
San Francisco, CA 94111-3823
Telephone:     +1 415 984 8700
Facsimile:     +1 415 984 8701
aezekoye@omm.com
jcayetano@omm.com

Attorneys for *Amicus Curiae* Bipartisan
Former Antitrust Enforcers

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2025, I electronically filed a true and correct copy of the foregoing BRIEF OF BIPARTISAN FORMER ANTITRUST ENFORCERS AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY with the Clerk via the CM/ECF system which will send notification of such filing and service upon all counsel of record.

<div style="margin-left:50%">

/s/ Ian Simmons
Ian Simmons
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006-4061
Telephone:     +1 202 383 5300
Facsimile:       +1 202 383 5414
isimmons@omm.com

*Counsel for Amicus Curiae*
*Bipartisan Former Antitrust*
*Enforcers*

</div>

15

## ADDENDUM

Stephen Calkins is a Professor of Law at Wayne State University Law School.  He served as General Counsel of the Federal Trade Commission from 1995 to 1997.

Terry Calvani served as a Commissioner of the Federal Trade Commission from 1983 to 1990.

William Kolasky is a Senior Counsel at Hughes Hubbard & Reed LLP.  He served as Deputy Assistant Attorney General in the Antitrust Division of the United States Department of Justice from 2001 to 2002.

Jon Leibowitz served on the Federal Trade Commission, first as a Commissioner from 2004 to 2009, then as the Chairman from 2009 to 2013.  He also served as Chief Counsel to the Antitrust, Competition Policy, and Consumer Rights Subcommittee of the Senate Judiciary Committee from 1997 to 2000.

Abbott (Tad) B. Lipsky, Jr. is an Adjunct Professor of Law at George Mason University Antonin Scalia School of Law.  He served as Deputy Assistant Attorney General in the Antitrust Division of the United States Department of Justice from 1981 to 1983.  He more recently served as co-chair of the Transition Team for the Federal Trade Commission following the election of President Donald Trump in 2016 and as Acting Director of the Federal Trade Commission Bureau of Competition in 2017.

Douglas Melamed is a Visiting Fellow at Stanford Law School.  He served in the Antitrust Division of the United States Department of Justice from 1996 to 2001, first as Principal Deputy Assistant Attorney General, then leading the division as Acting Assistant Attorney General.

Jon Nuechterlein is a Distinguished Scholar at George Washington University's Competition Law Center, an Adjunct Professor of Law at Georgetown Law School, and a Nonresident Senior Fellow at the Technology Policy Institute.  He served as General Counsel of the Federal Trade Commission from 2013 to 2016.

Richard Parker served as Senior Deputy Director and then as Director of the Bureau of Competition at the Federal Trade Commission from 1998 to 2001.

Joe Sims served as Deputy Assistant Attorney General in the Antitrust Division of the United States Department of Justice from 1975 to 1978.

Willard K. Tom served as General Counsel of the Federal Trade Commission from 2009 to 2012.  He also served as Deputy Director of the Bureau of Competition at the Federal Trade Commission from 1997 to 2000 and as Counsel to the Assistant Attorney General in the Antitrust Division of the United States Department of Justice from 1993 to 1995.

Mark Whitener is an Adjunct Professor at Georgetown University and a Senior Fellow at the Georgetown Center for Business & Public Policy.  He served as Deputy Director of the Bureau of Competition at the Federal Trade Commission from 1993 to 1997.