# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 25-5016**                                  **September Term, 2024**

FILED ON: MARCH 21, 2025

UNITED STATES OF AMERICA, ET AL.,
        APPELLEES

v.

GOOGLE LLC,
        APPELLEE

APPLE INC.,
        APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-03010)

Before: CHILDS, PAN, and GARCIA, *Circuit Judges*

### **JUDGMENT**

This appeal was considered on the record from the United States District Court for the District of Columbia and the briefs of the parties. *See* D.C. CIR. R. 34(j). The Court has afforded the issues full consideration and determined that they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). For the reasons stated below, it is

**ORDERED** and **ADJUDGED** that the district court's order be **AFFIRMED.**

\* \* \*

On December 23, 2024, Apple moved to intervene in this antitrust action against Google. The sole question on appeal is whether the district court abused its discretion in denying that motion as untimely. It did not. The most important timeliness consideration is whether Apple moved "to intervene as soon as it became clear that its interests would no longer be protected by the parties in the case." *Campaign Legal Ctr. v. FEC*, 68 F.4th 607, 610 (D.C. Cir. 2023) (internal quotation marks omitted) (quoting *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 279–80 (2022)). As the district court found, it was clear that Google would no longer protect Apple's interests at least by the time plaintiffs filed their proposed remedy framework on October

8. Yet Apple waited another seventy-six days to intervene. The district court also reasonably found that the other timeliness factors disfavor Apple. We therefore affirm.

# I

In 2020, the federal government and forty-nine states sued Google under the Sherman Act, alleging that Google had violated Section 2 of the Act by "us[ing] anticompetitive tactics to maintain and extend its monopolies in the markets for general search services, search advertising, and general search text advertising." A. 256 ¶ 1. Plaintiffs claimed that Google's anticompetitive tactics included "enter[ing] into exclusionary agreements" with "distributors—including popular-device manufacturers such as Apple"—"to secure default status for its general search engine." A. 256–57 ¶ 4. The complaint particularly described Google's distribution agreement with Apple, the Internet Services Agreement (ISA). *See, e.g.*, A. 280–81 ¶¶ 85–86; A. 290–92 ¶¶ 118–22; *see also* A. 435 ¶ 290. Under that agreement, Apple preloads Google as the default search engine on Apple devices in exchange for a portion of the advertising revenue Google generates from searches on those devices (a practice known as "revenue sharing"). *See* A. 280–81 ¶ 86; A. 336–37; A. 538. Plaintiffs alleged that through its ISA with Apple, Google "substantially forecloses [its] search rivals from an important distribution channel," and that "[b]y paying Apple a portion of the monopoly rents extracted from advertisers, Google has aligned Apple's financial incentives with its own." A. 291 ¶¶ 121–22.

Given the centrality of Apple's ISA to the litigation, Apple closely monitored these proceedings from the start. It participated in discovery. *See* A. 319. And two Apple executives testified about the ISA at trial. *See* A. 612; A. 435–36 ¶¶ 291–95.

After four years of litigation and a forty-four-day bench trial, on August 5, 2024, the district court found that Google "is a monopolist" and "has violated Section 2 of the Sherman Act." A. 338. Google has "achieved market dominance," the court explained, in part "through [its] distribution contracts." A. 336–37. The court found that those "agreements are exclusive and have anticompetitive effects." A. 338. And it specifically discussed Google's ISA with Apple, noting that Google's revenue-share payments to Apple—$20 billion in 2022 alone—disincentivized Apple from developing a competing search engine. *See* A. 575–76; A. 550.

Following its liability decision, the district court in mid-September set a timeline for the remedies phase of the trial. It scheduled discovery to begin in late September and calendared a multi-week remedies hearing (essentially a second bench trial) for April 2025. In the lead-up to the remedies hearing, on October 8, 2024, plaintiffs submitted a proposed remedy framework outlining the remedies they planned to request. On November 20, plaintiffs filed a more detailed proposed final judgment. And on December 20, Google submitted its own proposed final judgment.

Apple moved to intervene as of right on December 23—140 days after the district court issued its liability decision, 76 days after plaintiffs first outlined the remedies they would seek, and 33 days after plaintiffs submitted their proposed final judgment. The district court denied Apple's intervention motion as untimely, finding that Apple's asserted need to intervene had become clear by the time plaintiffs filed their proposed remedy framework on October 8. The court did, however, permit Apple to participate as amicus and to file up to two fact-witness affidavits and a

2

post-hearing brief. Apple appealed and moved for a stay of the district court's denial pending appeal. The district court and our court denied Apple's stay motion.

## II

We review the district court's denial of a motion to intervene as of right for abuse of discretion. *See Campaign Legal Ctr.*, 68 F.4th at 610. An abuse of discretion occurs if the district court makes a legal error or relies on clearly erroneous factual findings. *Id.* Whether a motion to intervene is timely must be "judged in consideration of all the circumstances." *Id.* (cleaned up). "The most important circumstance," however, "is whether a party sought to intervene as soon as it became clear that its interests would no longer be protected by the parties in the case." *Id.* (cleaned up).

### A

To explain why Google can no longer defend its interests, Apple points to two ways in which its and Google's interests have diverged. Apple's argument on appeal hinges on the proposition that this divergence was not clear until November 20. The district court appropriately found, however, that it was apparent by October 8.

First, Apple contends that the companies' interests diverged once it became clear that plaintiffs aimed to end not only the ISA's guarantee of default status for Google but also its guarantee of revenue-sharing payments to Apple. As Apple sees it, the companies have "vastly different priorities in defending default status versus revenue share." Appellant's Brief 29. Google would prioritize defending its ability to contract for default status over defending its ability to share search revenue with Apple. And Google would defend the revenue-sharing arrangement only so long as its search engine retained default status; "if, or once, the district court takes default status off the table . . . , Google will then have little incentive to protect Apple's interest in revenue share." Appellant's Brief 30. Apple, by contrast, would argue that revenue sharing should be permitted even if it could not make Google the default search option on its devices. Indeed, Apple has long (unsuccessfully) sought the flexibility to collect revenue-sharing payments from Google irrespective of Google's default status. *See* Appellant's Brief 17, 27, 29–30; *see also* A. 444–45 ¶¶ 319–20.

The question, then, is when it became clear that plaintiffs would seek to end revenue-sharing payments. Apple says that goal became clear only once plaintiffs filed their proposed final judgment on November 20, because plaintiffs there proposed to prohibit Google from "offer[ing] or provid[ing] anything of value to Apple . . . that in any way creates an economic disincentive for Apple to compete in or enter the [general search engine] or Search Text Ad markets." A. 682. The district court reasonably rejected that view.

The August liability opinion arguably made clear that plaintiffs would pursue an end to revenue sharing. In that opinion, the district court found it "unquestionabl[e]" that revenue-sharing payments from Google to Apple "significantly contribut[e] to keeping Apple on the sidelines of search, thus allowing Google to maintain its monopoly." A. 576. The court acknowledged other reasons Apple might be disinclined to build a competitor search engine. A. 575–76. The court nonetheless concluded that the "prospect of losing tens of billions in guaranteed revenue from

3

Google" at least "disincentive[d] Apple from launching its own search engine when it otherwise has built the capacity to do so"; and the court found that this factor alone was sufficient "to constitute an anticompetitive effect." A. 576. Apple conspicuously fails to address the liability opinion's discussion of the anticompetitive effects of revenue sharing, even though plaintiffs repeatedly emphasize those findings in their brief. *Compare* Appellees' Brief 2, 10, 32 (emphasizing the discussion at A. 576), *with* Reply Brief 11 (ignoring that portion of the district court's decision).

Given the district court's discussion, it was quite likely that plaintiffs would pursue an order enjoining revenue sharing between Google and Apple (and not just such payments as they were tied to the ISA provisions protecting Google's default placement). As the district court reasonably concluded, the October proposed remedy framework removed any remaining doubt about plaintiffs' intentions. In that filing, plaintiffs stated that they were considering remedies that "limit or prohibit default agreements, preinstallation agreements, and other revenue-sharing arrangements related to search and search-related products." A. 627. They explained they were doing so in part "because Google's monopoly-funded revenue share payments disincentivize its partners from diverting queries to Google's rivals." A. 626. And they described that the remedies "should account for alternative and future forms of monopoly maintenance." A. 624; *see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132–33 (1969) (explaining that in designing remedies for anticompetitive conduct "it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed" (quoting *Int'l Salt Co. v. United Stat*es, 332 U.S. 392, 400 (1947)). As the district court put it, plaintiffs' proposed remedy framework "laid bare the very cleavage that Apple [now] claims is the reason Google can no longer adequately represent its interests." A. 977.

Apple's answer is unresponsive. Apple repeatedly notes the breadth of the specific remedy requested in plaintiffs' November proposed final judgment. Apple may be right that the broad remedy requested in November further emphasized the gap between Apple's interests and Google's interests, but that does not mean it caused the divergence or made it "clear" in the first instance. And Apple cannot persuasively explain how, after reviewing both the liability opinion and the proposed remedy framework, it still reasonably expected that plaintiffs would not pursue remedies targeted both at removing Google's default status and at ending Google's revenue-sharing payments to Apple. To the contrary, as the district court found, it was clear by at least October 8 that plaintiffs would pursue both of those remedies.

Second and alternatively, Apple contends that Google will now have less capacity and incentive to advocate for any version of the ISA, because Google will have to defend against other forms of relief that threaten major aspects of its business. *See* Appellant's Brief 28. The district court also reasonably concluded that this dynamic was present before plaintiffs filed their November proposed final judgment. The district court's August liability decision discussed multiple aspects of Google's business, including Google's control of its Chrome browser, Android operating system, and Pixel phones. *See, e.g.*, A. 271 ¶ 53; A. 453–55 ¶¶ 351–56; A. 492–93. Plaintiffs' October framework then stated that they anticipated seeking "a number of mutually reinforcing remedies" addressing "four categories of harm" that together generated Google's monopoly power. A. 625–26. For example, plaintiffs described that they were "considering behavioral and structural remedies that would prevent Google from using products such as

4

Chrome, Play, and Android to advantage Google search" and emphasized that "Google's longstanding control of the Chrome browser, with its preinstalled Google search default, significantly narrows the available channels of distribution and thus disincentivizes the emergence of new competition." A. 627 (internal quotation marks omitted). The framework also listed many other remedies relating to data disclosure, independent licensing or syndication of Google's ad feed, and limitations on development of Google's AI model. A. 627–29.

Apple counters that, before November 20, it was uncertain whether plaintiffs would seek to force Google to divest from Chrome. *See* Appellant's Brief 28–29, 32. Even if that were true, however, it is unclear why the divergence of the companies' interests would be triggered only once plaintiffs requested that specific remedy. Had plaintiffs never requested divestiture, Google would be faced with another version of the same problem; it would still need to defend against proposed remedies targeting a range of its business practices, meaning Apple's ISA would not be Google's sole or primary priority.

Lastly, even if Apple were right that the divergence of its and Google's interests became clear only on November 20, Apple has never explained why it waited thirty-three additional days to intervene. In context, that delay seems difficult to justify; the remedies hearing was set for April 2025, and the district court repeatedly requested promptness given the case's gravity and complexity and the need to preserve institutional knowledge. *See* A. 978–79. Even if November 20 was the key date, then, the district court likely had discretion to deny the motion as untimely. *Cf., e.g.*, *NAACP v. New York*, 413 U.S. 345, 366–69 (1973) (finding motion untimely after seventeen days, in case affecting "rapidly approaching primary elections"); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) (finding that intervention was timely when party intervened within "less than thirty days"). *But cf., e.g.*, *Nat'l Wildlife Fed'n v. Burford*, 878 F.2d 422, 434 (D.C. Cir. 1989) (in slower administrative case, finding intervention timely after 73 days), *rev'd on other grounds sub nom. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).

**B**

The district court also did not abuse its discretion in addressing the three other factors that bear on timeliness—"the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *Campaign Legal Ctr.*, 68 F.4th at 610 (cleaned up).

To start, the district court thoroughly recounted why the existing parties would be prejudiced by Apple's belated intervention. Parties may be prejudiced by delays that stall the start of trial or shortchange their preparation time. *See, e.g.*, *United States v. Brit. Am. Tobacco Austl. Servs., Ltd.*, 437 F.3d 1235, 1238–39 (D.C. Cir. 2006); *Amador Cnty. v. Dep't of the Interior*, 772 F.3d 901, 905–06 (D.C. Cir. 2014). Here, as the district court explained, by the time it (promptly) resolved Apple's motion, only one month of fact discovery remained and there were just three months before the remedies hearing. A. 987. If Apple intervened, the parties would need to "request documents from and depose" Apple's additional witnesses, including "an (as-yet-unnamed) expert" witness to which the parties would "have to devote considerable time and resources." J.A. 986. The district court also explained that it could grant the intervention motion only by taking hearing time away from the existing parties or moving the trial—and either option would harm the existing parties. *See* A. 987–88. With little time left and less scheduling

flexibility, the court said, adding more days to the remedies hearing was no longer feasible; even when the existing parties requested fourteen additional days, the district court could add only five "without compromising" the decision deadline set months earlier. A. 987 & n.5. On abuse of discretion review, we decline Apple's invitation to question the district court's well-explained management of its own calendar. And we find, contrary to Apple's claims, that the district court's analysis was not "untethered to [Apple's] 76-day delay." Appellant's Brief 41. As the district court wrote, it was that long delay that reduced scheduling "flexibility" and cut into preparation time. A. 987–88.[1]

Finally, the district court reasonably concluded that Apple did not show that the purpose and need for party status favored intervention. Apple says that it must be permitted to intervene so that it can cross-examine witnesses and present live testimony. The district court disagreed, finding that Apple failed to demonstrate "that the information it wishes to present is any different than that the court already considered—and largely credited—during the liability phase." A. 982. And as the court emphasized, Apple will be permitted to submit fact-witness affidavits and a post-hearing brief. *See* A. 985.

Apple shows no abuse of discretion in those determinations. Apple argues in general terms that it would offer testimony addressing the dynamics presented by plaintiffs' proposed remedies and that its executives' earlier testimony was "historical" and needs updating. Appellant's Brief 37. The district court responded that it was unclear why "party status is necessary to present such evidence, especially when Google is likely to call [an Apple executive] as a witness" and noted that Apple will be able to submit affidavits for the court's consideration. A. 983; *see* A. 990. We find no error in the district court's analysis, much less one that would warrant reversal given the other, more important timeliness factors: Apple's delay in filing its motion and the prejudice to the parties that would result.

\* \* \*

For the foregoing reasons, we affirm the district court's denial of Apple's motion to intervene.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41(a)(1).

**Per Curiam**

---

[1] Apple also implies that it was an abuse of discretion for the district court to consider the potential for additional, follow-on third parties to intervene if Apple's motion were granted. But that consideration was not improper—and Apple does not offer a case suggesting it was. To the contrary, our court has endorsed that consideration as an aspect of the prejudice inquiry. *See Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 192 (D.C. Cir. 2013).

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:   /s/
Michael C. McGrail
Deputy Clerk