# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

                            Plaintiffs,

v.

GOOGLE LLC,

                            Defendant.

Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

STATE OF COLORADO, *et al.*,

                            Plaintiffs,

v.

GOOGLE LLC,

                            Defendant.

Case No. 1:20-cv-03715 -APM

HON. AMIT P. MEHTA

## MEMORANDUM OF LAW IN SUPPORT OF NEWS/MEDIA ALLIANCE'S MOTION FOR LEAVE TO PARTICIPATE AS *AMICUS CURAIE*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

CORPORATE AND FINANCIAL DISCLOSURE STATEMENT ................................. iii

STATEMENT OF COUNSEL ......................................................................................... iii

I.     Identity and Interest of Amicus Curiae ................................................................ 1

II.    Argument ............................................................................................................... 4

    A.    Summary of Argument ................................................................................... 4

    B.    Google's Use of Publisher Content ............................................................... 6

        1.    *Search Indexing* .................................................................................... 7

        2.    *Model Training (Including Pretraining and Fine-Tuning).* ................. 8

        3.    *Generative AI Search Results: Grounding with Retrieval Augmented Generation (RAG)* ............................................................................... 8

    C.    Liability Decision Highlights AI as Next Phase of Search Competition .......................... 11

    D.    Google's Unlawful Monopoly Gives It an Unfair Advantage as Search Goes AI ............ 11

    E.    Legal Standard for Antitrust Remedies ....................................................... 14

    F.    The Final Judgment Should Clarify That Publishers Can Selectively Opt Out of RAG Without Penalty ......................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972).................................................................................................. 14

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947).................................................................................................. 15

*United States v. E. I. du Pont de Nemours & Co.,*
    366 U.S. 316 (1961).................................................................................................. 15

*United States v. U.S. Gypsum Co.*,
    340 U.S. 76 (1950).................................................................................................... 15

*United States v. United Shoe Mach. Corp.*,
    391 U.S. 244 (1968)............................................................................................ 14, 15

**Treatises**

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2011) ................................... 15, 16

## CORPORATE AND FINANCIAL DISCLOSURE STATEMENT

I, the undersigned, counsel of record for amicus curiae, News/Media Alliance, pursuant to D.C. District Court Local Rule 7(o)(5) and Fed. R. App. P. 29(a)(4)(A) and 26.1, certify that News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the Commonwealth of Virginia. It has no parent corporation.

## STATEMENT OF COUNSEL

In accordance with D.C. District Court Local Rule 7(o)(5) and Fed. R. App. P. 29(a)(4)(E), News/Media Alliance certifies that (1) this brief was authored entirely by its counsel and not by counsel for any party in the above-captioned dispute, in whole or in part; (2) no party or counsel for any party contributed money that was intended to fund preparing or submitting this brief; and (3) other than News/Media Alliance and its counsel, no other person contributed money that was intended to fund preparing or submitting this brief.

News/Media Alliance respectfully submits this brief in support of no party to assist the Court by providing the perspectives of its member publishers who rely on Google's search engine to reach their intended audience. Specifically, this brief seeks to aid the Court's consideration of an appropriate and effective remedy as generative artificial intelligence has and will continue to transform competition in search.

## I.    Identity and Interest of Amicus Curiae

The News/Media Alliance ("N/MA") is a nonprofit trade association headquartered in the Washington, D.C. area that represents over 2,200 news, magazine, and digital media publishers in the United States and globally. N/MA members range from national news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to publishers who have printed news since before the Constitutional Convention. All are committed to producing original, trusted, and quality journalism.

N/MA has a direct and compelling interest in the remedy being crafted by the Court. Trusted digital publishers are often the very source of the information delivered on the search engine results pages ("SERP") in response to users' search queries. Traditionally, users seeking answers to their queries would click on results on the SERP and visit publishers' websites, so-called "search referral traffic." As the monopoly general search engine ("GSE")—and therefore the monopoly provider of search referral traffic—Google's GSE is critical to N/MA's member publishers who depend on Google for discovery. While the business models for individual N/MA members may vary, as a general matter, monetizing the search referral traffic to their respective websites through advertising and subscriptions is the lifeblood that allows them to provide original, trusted, and quality content to their readers. Google's search referral traffic is therefore often existential for N/MA members.

1

Google, however, does not provide search referral traffic for free. One of the basic (and foundational) bargains of the internet is that publishers, including N/MA members, allow GSEs like Google to crawl their websites to develop their respective search indexes (used to provide search results) in exchange for the search referral traffic the GSEs generate. But as Google's monopoly has grown, this quid pro quo has eroded, as Google has exploited its dominant status to extract concessions from publishers that are unavailable to Google's competitors.

The advent of generative AI-powered search poses the latest, and potentially most serious, encroachment by Google. GSEs now use publisher content, including N/MA members' content, on a "real-time" basis to ground their generative AI models and generate summary responses to user queries, typically using a process called retrieval-augmented-generation ("RAG"). These exploitations of publisher content by Google through features like "AI Overviews" or the newer, more dangerous "AI Mode," threatens to eviscerate the vital search referral traffic on which publishers depend. For example, a recent study by Bain & Company on the impact of AI summaries reports that (i) generative AI-powered search reduces search referral traffic by 15% to 25%, and (ii) "60% of searches now terminate without the users clicking through to another website."[1] Others have found that Google's AI Overviews in particular reduce click-through rates for publishers by as much as 34.5% for the top organic search result.[2] Meanwhile, Google is preparing to move its "AI Mode" from its beta Labs into Google Search,

---

[1] Press Release, Bain & Company, Consumer reliance on AI search results signals new era of marketing (Feb. 19, 2025) (available at https://www.bain.com/about/media-center/press-releases/20252/consumer-reliance-on-ai-search-results-signals-new-era-of-marketing--bain--company-about-80-of-search-users-rely-on-ai-summaries-at-least-40-of-the-time-on-traditional-search-engines-about-60-of-searches-now-end-without-the-user-progressing-to-a/).
[2] Search Engine Roundtable, More Studies Show AI Overviews Harm Google Click Through Rates (Apr. 23, 2025) (available at https://www.seroundtable.com/ai-overviews-hurt-google-click-through-rates-39282.html).

to provide a more fuller narrative experience that expands Google's capture of user interest at the expense of the journalism that powers Google's results.[3]

The ability of publishers to determine whether and on what terms they wish to permit RAG is critically important to N/MA members and is the gravamen of this *amicus curiae* brief. As this brief argues, without a comprehensive remedy that addresses generative AI search by specifically enabling publishers to freely and separately opt out of RAG (and other forms of grounding), Google can continue to extend and maintain its unlawfully obtained monopoly power in search. Absent such a remedy, Google's generative AI search products will continue to have an unfair advantage, and Google will retain its unlawfully acquired monopoly in the age of generative AI search, conferring to itself the benefit of unfettered access to publisher content that its would-be rivals do not have.

Accordingly, N/MA has a direct and compelling interest in ensuring that, when crafting its remedy, the Court carefully considers the next phase of competition in search. Generative AI search uses publishers' content to answer user queries directly on the SERP, obviating the need for users to click through to the publishers' websites from which Google sourced the generative AI search answer. This deprives publishers of referral traffic, and therefore of the ability to serve advertisements, secure subscriptions, and generate revenue. As a result, publishers are taking steps to prevent Google's would-be rivals in AI Search from crawling their sites and collecting data, forcing several to negotiate for access to their content—negotiations that Google refuses to

---

[3] Jess Weatherbed, *Google is putting AI Mode right in Search*, THE VERGE (May 1, 2025) (available at https://www.theverge.com/news/659448/google-ai-mode-search-public-test-us).

entertain. Google's coercive use of publishers' content for its AI products not only threatens publishers' viability, but also gives Google an unfair advantage over potential competitors.[4]

## II.    Argument

### A.    Summary of Argument

The Plaintiffs' Revised Proposed Final Judgment allows publishers to selectively opt out of Google using their content for (1) search indexing and (2) model training and fine tuning for Google's generative AI models and products (on a model-by-model basis). *See* Dkt. 1184, Exhibit A – Plaintiffs' Revised Proposed Final Judgment, at 16 ("RPFJ"). This critically important provision should be retained and clarified to ensure it achieves its intended outcome. The Court should clarify that the ability to opt out specifically includes publishers' ability to selectively opt out of allowing Google to use their content to ground its generative AI search results, such as by using RAG.[5] Using RAG, Google combines up-to-date publisher content on the web with the user's prompt to deliver more accurate and relevant responses, delivered as generative AI search answers on the SERP itself, through services including "AI Overviews" and the newer "AI Mode." The mutation of search engines into "answer engines" goes beyond the use of publisher content to provide information location services and instead is a system of republishing the underlying content in summarized form, which obviates the need to click through to the original site. To avoid Google extending and maintaining its unlawfully acquired search monopoly, as search transitions to incorporate generative AI-powered "answer engine"

---

[4] For the reasons discussed below, granting other generative AI-powered search companies access to publisher content via Google's index would not open up competition in generative AI-powered search.

[5] While RAG is currently the dominant method of grounding or other real-time access of content, N/MA encourages the Court to use inclusive language in the final judgment to encompass future technology iterations.

services, the Court should therefore make clear that publishers can separately opt out of generative AI search functions using RAG without being removed or penalized from traditional search results.

In an exercise of Google's unlawfully acquired monopoly power, Google takes what others must negotiate for. Google does not allow publishers to selectively opt out of real-time, RAG-powered AI search products like AI Overviews and AI Mode without negatively impacting the findability and display of the content in traditional search. Today, the only way publishers can prevent having their content summarized in Google's AI Overviews or AI Mode is also to block meaningful uses of their content in traditional search indexing and display. This makes their sites functionally undiscoverable in response to the user's query—pushing a publisher so far down the organic search results ranking that they effectively forego search distribution. Google itself estimates that such a change would reduce search traffic to news publishers by 45%.[6] In short, publishers cannot opt out of RAG without effectively forgoing search distribution, and as Google's internal documentation shows, when deciding not to offer a separate opt-out of RAG, Google was conscious that grounding was "evolving into a space for monetization."[7] Because Google is the monopoly provider of search referral traffic, this is not a realistic choice for publishers. Publishers, however, can and do implement blocking measures made available by other generative AI search companies for RAG. As a result, other generative AI search

---

[6] *See Now is the time to fix the EU copyright directive*, THE KEYWORD (February 7, 2019) (available at https://blog.google/around-the-globe/google-europe/now-time-fix-eu-copyright-directive/).

[7] See Ex. No. PXR0026, Search (incl SGE) Publishers Controls (updated Apr. 12, 2014), Bates No. GOOG-DOJ-33825264, at 5290, (available at https://www.justice.gov/atr/media/1399381/dl?inline ) (deciding to offer "no new controls" or public statement, but to "reposition publicly that no snippets impacts more than display" and recommending "not saying this opts them out of grounding" given the potential for monetizing grounding).

companies must negotiate (i.e., compete) to license publisher content specifically for this type of use.

As generative AI technologies continue to transform search, the Court's remedy should ensure that Google cannot continue to exercise its unlawfully acquired monopoly power by coercing publishers to provide content for both Google's search index and RAG-assisted generative AI tools together. Google should be required to compete for the use of publisher content for generative AI search like every other GSE, including Perplexity, OpenAI, ProRata, and others. Allowing publishers to specifically opt out of real-time uses like RAG will deny Google the benefits of its unlawfully acquired monopoly power and ensure a competitive playing field as search continues to evolve. As Assistant Attorney General for the Antitrust Division Gail Slater has said: "If Google's conduct is not remedied, it will control much of the internet for the next decade and not just in internet search, but in new technologies like artificial intelligence."[8]

**B.    Google's Use of Publisher Content**

GSEs, with Google at the forefront, have revolutionized how internet users find and access information on the web. To return the most relevant search results, including generative AI search answers to user queries, GSEs like Google must crawl and index content from digital publishers. They use publisher content in multiple ways: to build the search index, to train and fine-tune generative AI models, and to ground their generative AI models in current content on the web to provide fuller responses for users that reduces navigation away from the SERP.

---

[8] U.S. Dep't of Justice, Assistant Attorney General Gail Slater Delivers Remarks Before Opening Arguments in Google Search Remedies Trial (Apr. 21, 2025) (available at https://www.justice.gov/opa/speech/assistant-attorney-general-gail-slater-delivers-remarks-opening-arguments-google-search).

1.    *Search Indexing*

Google generates search results based on data stored in its search index, a vast database containing information about web content and its location. Google uses algorithms to analyze this data and determine the most relevant content for users' queries. The effectiveness of Google's results depends on the breadth of its search index and the quality of its relevance algorithms. Google's "Googlebot" web crawler systematically crawls publicly available websites—including N/MA members' pages—to build and refresh its search index. The index forms the backbone of its GSE, enabling retrieval and ranking of content in response to user queries. *See also*, Dkt. 1033, Redacted Memorandum Opinion, at 14 et seq. (describing how GSEs work). The initial version of Google's GSE was a barebones reference tool, including ten blue links to help users identify relevant webpages. At that time, Google directed users to answers and monetization opportunities on publishers' sites, it did not provide the answers as it now does using generative AI search results. Now, Google provides narrative answers both as part of Google's AI Overviews product, as well as more recently its experimental "AI Mode," discussed further below.

Publishers allow Google to crawl their webpages and collect their content because inclusion in the search index is required for inclusion on the SERP page. This commercial exchange forms the backbone of the internet: Google exchanges search referral traffic for access to publisher content to build its search index.

2.     *Model Training (Including Pretraining and Fine-Tuning).*

Google also uses publishers' content to train its generative AI models.[9] AI companies like Google train their large language models (LLMs) by consuming vast amounts of text data, including original content from N/MA members' websites. This content forms the foundation for the model's learning process, enabling it to recognize linguistic patterns, relationships between words, and contextual meaning. The initial stage of ingestion is sometimes called pretraining.

Fine-tuning refers to the process of continuing to train a model on a more specific or specialized dataset to adapt it to a particular task, domain, or set of behaviors. Fine-tuning starts with a model that has already been trained on a broad, general-purpose dataset. While the general model may understand language well, it may not know specific jargon (e.g., medical, legal, technical), follow certain stylistic norms (e.g., for internal company communications), or perform optimally on a narrow task (e.g., summarizing court opinions, writing software documentation). Fine-tuning takes that general model and trains it more on new, domain-specific examples—without starting from scratch.

3.     *Generative AI Search Results: Grounding with Retrieval Augmented Generation (RAG)*

Over time, Google has increasingly incorporated generative AI search results on its SERP. *See* Dkt. 1033, Redacted Memorandum Opinion, at 41. It does so by grounding its model

---

[9] Google currently allows publishers to opt out of Google DeepMind's use of their content for some aspects of Google's generative AI model training, through what it calls "Google-Extended." *See An update on web publisher controls*, THE KEYWORD (Sep. 28, 2023) (available at https://blog.google/technology/ai/an-update-on-web-publisher-controls/) (last visited Apr. 24, 2025). However, notwithstanding a publishers' ability to opt out of Google DeepMind using their content for training, pretraining, and fine-tuning, Google may still use their content to pretrain or fine-tune the models it uses for search. *See* Remedies Hearing Proceedings Transcript at 3349, ln. 11 et seq. (Testimony of Eli Collins, Vice President of Product, Google DeepMind) (May 2, 2025) (Day 10, Afternoon Session).

using RAG to provide narrative responses that ultimately seek to answer user queries, rather than point them to third-party sources of information. Grounding refers to anchoring a model's output to a real, external source for, among other reasons, accuracy and relevance. RAG is a grounding technique that refers to the model retrieving external information (in this case publisher content on the live web) and combining it with a user's prompt to send to the model to generate a response. RAG enhances the accuracy and relevance of generative AI search responses by dynamically incorporating up-to-date content on the web at the time of the users' query, reducing the propensity for AI hallucination. Unlike model training, where the LLM generates text based solely on its pre-trained weights and inputs, generative AI search uses RAG to actively retrieve supplemental current content from the web.

Google uses publishers' content for RAG, and indeed RAG is now the most important use of news media publisher content to Google (and has the biggest impact on publishers) for delivering current, relevant generative AI-search results in response to user queries. As deployed by Google and others, RAG-enabled search offers users fuller narrative summaries that reduces the need for user to navigate to publisher websites compared to traditional search results. Make no mistake, this is a feature of RAG, not a bug. Google regularly touts its use of RAG in transforming its traditional search product. For example, in May 2024, Google introduced its "AI Overviews" as a way to "Let Google do the searching for you."[10] In March 2025, Google announced that it expanded AI Overviews to provide faster and higher quality responses and

---

[10] *Generative AI in Search: Let Google do the searching for you,* THE KEYWORD (May 14, 2024) (available at https://blog.google/products/search/generative-ai-google-search-may-2024/) (last visited Apr. 23, 2025).

show them more often, and introduced a new, experimental "AI Mode," which goes even further in answering user queries and further reducing any incentive to click-through.[11]

Generative AI is critical to the future of search competition. But unlike traditional search, where the key input was user data (search queries and clicks), the key input for generative AI search results is original publisher content, first to train the model, but importantly, also to be incorporated into the model's answer via RAG to deliver accurate, sufficiently comprehensive, timely, and relevant results. Google should not be permitted to extend its unlawfully obtained monopoly in general search services as it integrates generative AI technologies by exploiting its access to these key inputs where other search providers must bargain for publisher content.

Google collects publisher content for its search index and RAG together and does not currently offer the ability for publishers to opt out of Google using their content for RAG but remain in Google's search index without sacrificing their discoverability or otherwise being severely penalized. As discussed, Google currently allows publishers to opt out of only (1) search indexing, and (2) model training and fine-tuning, what it calls "Google-Extended."[12] For the reasons discussed below, it is important to specifically clarify in the final judgment that publishers may also selectively opt out of RAG to restore competition in search as generative AI search becomes more and more prevalent.

---

[11] *Expanding AI Overviews and introducing AI Mode*, THE KEYWORD (Mar. 5, 2025) ("With expanded AI Overviews… our custom Gemini model can take the legwork out of searching") (available at https://blog.google/products/search/ai-mode-search/) (last visited Apr. 23, 2025).
[12] *See An update on web publisher controls*, THE KEYWORD (Sep. 28, 2023) (available at https://blog.google/technology/ai/an-update-on-web-publisher-controls/) (last visited Apr. 24, 2025).

### C.    Liability Decision Highlights AI as Next Phase of Search Competition

As this Court made clear in its liability decision, generative AI search is transforming search: "[b]eginning in 2015, Google increasingly began to incorporate AI technologies into its search processes." Dkt. 1033, Redacted Memorandum Opinion, at 40. "The integration of generative AI is perhaps the clearest example of competition advancing search quality." *Id.* at 41. AI technologies "enable[] search engines to do things that are not really conceivable in a return-a-set-of-links model," offering fundamentally new paradigms of user interaction, such as direct answers, multimedia inputs, and conversational interfaces. *Id.* at 40.

Generative AI and LLMs already changed the SERP itself: "generative AI can supplement user data by offering different SERP functionality beyond organic links, such as an AI-Powered answer." *Id.* (internal quotations and citations omitted). Google and Microsoft raced to integrate their respective generative AI search products into their SERPs, including Google launching "its public piloting of Bard one day before Microsoft announced BingChat, the integration of ChatGPT's generative AI technology into Bing to deliver answers to queries." *Id.* Generative AI search is driving innovation and could level the playing field in search, but only if Google is denied the ability to extend and maintain its unlawfully acquired monopoly.

### D.    Google's Unlawful Monopoly Gives It an Unfair Advantage as Search Goes AI

Google's unfair advantage in the transition to generative AI search stems directly from its unlawfully acquired search monopoly. As the dominant GSE, web publishers depend on search referral traffic from Google to monetize their websites and therefore allow Google to crawl their websites. But now, Google's unlawfully acquired search monopoly allows it to force publishers to give up their content for RAG-powered search as well, which Google uses to improve the

answers of its AI Overviews or AI Mode, and reduces traffic to publishers' websites. Currently, publishers' only option is a Hobson's choice – they cannot opt out of RAG without sacrificing their effective presence on the SERP as a whole.

The following graphic shows Google's placement of AI Overviews and publishers' current options in deciding whether to opt.



Google's new AI Mode will likely go further than AI Overviews in reducing traffic for publishers that opt out of Google's generative AI search summaries. According to reports, whereas AI Overviews are at the top of the SERP and above the search results, the AI Mode is accessed separately by tab at the top of the SERP. When users are in AI Mode, organic search results will no longer be displayed; publishers that opt out will not be visible at all.

No other search engine or GAI company has sufficient market power or monopoly power to compel this exchange. Other GSEs and AI-search companies must negotiate for access to publisher content to enable their RAG-based AI search. Google's actions, if allowed to continue, threaten not only to entrench its monopoly in search, but also to dilute or eviscerate the emerging value of publisher content for RAG.

To succeed in generative AI search (on the merits), generative AI search providers that can draw from the largest corpus of trusted content will be able to offer the highest quality search experience—this requires a partnership between generative AI companies and publishers, which is being born out in licensing deals. It is not surprising, therefore, that numerous N/MA members have entered into content licensing deals with, for example, OpenAI, Perplexity, and Prorata.ai. OpenAI has entered content licensing deals with publishers including Axel Springer, the Associated Press, Conde Nast, News Corp, The Atlantic, Vox Media, and Dotdash Meredith.[13] Perplexity has entered into deals with publishers including Time, Der Spiegel, Los Angeles

---

[13] *See* Angela Cullen & Jackie Davalos, *OpenAI to Pay Axel Springer Tens of Millions to Use News Content*, BLOOMBERG (Dec. 1, 2023) (available at https://www.bloomberg.com/news/articles/2023-12-13/openai-axel-springer-ink-deal-to-use-news-content-in-chatgpt); Matt O'Brien, *ChatGPT-maker OpenAI Signs Deal with AP to License News Stories*, AP NEWS (July 13, 2023) (available at https://apnews.com/article/openai-chatgpt-associated-press-ap-f86f84c5bcc2f3b98074b38521f5f75a); *OpenAI signs multi-year content partnership with Condé Nast*, THE GUARDIAN (Aug. 20, 2024) (available at https://www.theguardian.com/technology/article/2024/aug/20/conde-nast-open-ai-deal); Katie Robertson, *OpenAI Strikes a Deal to License News Corp Content*, THE NEW YORK TIMES (May 22, 2024) (available at https://www.nytimes.com/2024/05/22/business/media/openai-news-corp-content-deal.html); Sara Fischer, *Exclusive: The Atlantic, Vox Media ink licensing, product deals with OpenAI*, AXIOS (May 29, 2024) (available at https://www.axios.com/2024/05/29/atlantic-vox-media-openai-licensing-deal); Sara Fischer, *OpenAI inks licensing deal with Dotdash Meredith*, AXIOS (May 7, 2024) (available at https://www.axios.com/2024/05/07/openai-dotdash-meredith-licensing-deal).

Times, Fortune, Entrepreneur, The Texas Tribune and Automattic.[14] And Prorata.ai has entered

into deals with scores of publishers, including McClatchy, MIT Technology Review, Lee

Enterprises, The Financial Times, Fortune, Axel Springer and The Atlantic.[15] These deals are

becoming more and more common.

Currently, however, Google faces no similar incentives or restraints. Its unlawfully

acquired search advantage allows it to force publishers to provide RAG-content for generative AI

search at no additional cost, giving it an unfair advantage and extending its unlawfully acquired

monopoly as search integrates more and more AI technologies.

### E.    Legal Standard for Antitrust Remedies

"The relief in an antitrust case must be effective to redress the violations and to restore

competition." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (internal citations and

quotations omitted). In a Section 2 case, "upon appropriate findings of violation, it is the duty of

the court to prescribe relief which will terminate the illegal monopoly, deny to the defendant the

fruits of its statutory violation, and ensure that there remain no practices likely to result in

monopolization in the future." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250

---

[14] Kayleigh Barber, *Perplexity's new rev-share publisher program is live, but not all pubs are sold*, DIGIDAY (Jul. 30, 2024) (available at https://digiday.com/media/perplexitys-new-rev-share-publisher-program-is-live-but-not-all-pubs-are-sold/); Kyle Wiggers, *Perplexity expands its publisher program*, TECHCRUNCH (Dec. 5, 2024) (available at https://techcrunch.com/2024/12/05/perplexity-expands-its-publisher-program/).
[15] News/Media Alliance, *News/Media Alliance Announces AI Licensing Partnership with ProRata* (Mar. 26, 2025) (available at https://www.newsmediaalliance.org/prorata-licensing-partnership/); *ProRata Announces Gist.ai, New AI Search Engine Based Entirely on High-Quality Licensed Content*, BUSINESSWIRE (Dec. 9, 2024) (available at https://www.businesswire.com/news/home/20241209071998/en/ProRata-Announces-Gist.ai-New-AI-Search-Engine-Based-Entirely-on-High-Quality-Licensed-Content); Charlotte Tobitt, *FT, Atlantic, Axel Springer and Fortune get behind AI start-up's per-use compensation plan,* PRESSGAZETTE (Aug. 7, 2024) (available at https://pressgazette.co.uk/news/prorata-ai-publisher-deals-financial-times-axel-springer-fortune-atlantic/).

(1968). Appropriate remedies are "not limited to prohibition of the proven means by which the evil was accomplished, but may range broadly through practices connected with acts actually found to be illegal. Acts entirely proper when viewed alone may be prohibited. The [monopolist] should, so far as practicable, be denied future benefits from [its] forbidden conduct." *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88–89 (1950) (internal citations omitted). Successful government suits should not "merely [] end specific illegal practices . . . [rather they should] effectively pry open to competition a market that has been closed by defendants' illegal restraints. If [the remedy] accomplishes less than that, the Government has won a lawsuit and lost a cause." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947), *abrogated by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). And "it is well settled that once the government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961).

As Areeda and Hovenkamp succinctly explain in their treatise, "equitable relief properly goes beyond merely 'undoing the act'; the proper relief is eradicating all the consequences of the act and providing deterrence against repetition; and any plausible doubts should be resolved against the monopolist." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 653f at 169. Indeed, more extensive remedies are especially appropriate in cases involving scale and network effects: "[A] 'network' monopoly such as the market for telecommunications or computer operating systems may have to be forced open by more aggressive means." *Id.*[16]

---

[16] This Court rightly recognized the network effects Google enjoys from its unlawful search monopoly: "The market for GSEs is thus characterized by a type of network effect. . . . Google's massive scale advantage thus is a key reason why Google is effectively the only genuine choice as a default general search engine." Dkt. 1033, Redacted Memorandum Opinion, at 231, 233.

**F.    The Final Judgment Should Clarify That Publishers Can Selectively Opt Out of RAG Without Penalty**

Section VI.B of the Plaintiffs' RPFJ provides that:

> Google must provide online Publishers, websites, and content creators with an easily useable mechanism to selectively opt-out of having the content of their web pages or domains used in search indexing or used to train or fine-tune any of Google's GenAI models or GenAI Products (on a model-by-model basis). Google must enable online Publishers, websites, and content creators to opt-out of individual GenAI Products on a product-by-product basis without affecting the Publisher, website, or content creator's participation or inclusion in any other Google product or feature. Google must offer content creators on Google-owned sites (all Google owned or operated properties, including YouTube) the same opt-out provided to Publishers, websites, and content creators. Google must not retaliate against any Publisher, website, or content creator who opts-out pursuant to this Paragraph VI.B.

*See* Dkt. 1184, Exhibit A – Plaintiffs' RPFJ, at 16.

It is important that the Final Judgment clarify that this provision means publishers can also selectively opt out of RAG (or other grounding and real-time techniques) without that choice being coupled with search indexing, model training, or fine-tuning.[17] The RFPJ does not define "training," "fine-tuning," or "RAG" so the Court should clarify expressly that RAG, and other grounding or real-time taking of content for generative AI search answers, is in scope and can be opted out of separately. In addition, the Final Judgment should make clear that the opt-out applies to Google as well as other to other users or licensees of Google's search index or data that can be used for search indexing, model training or fine-tuning, RAG, grounding or other real-time taking of content for generative AI search answers.

---

[17] Plaintiffs' Initial Proposed Final Judgment, for example, allowed selective opt-outs for content used in "search indexing; used to train or fine-tune AI models, or AI Products; used in retrieval-augmented generation-based tools; or displayed as AI-generated content on its SERP, and such opt-out must be applicable for Google as well as for users of the Search Index." Dkt. 1062-1, Plaintiffs' Initial Proposed Final Judgment, at 12.

Some of Google's generative AI search competitors have suggested that access to Google's search index would allow them to build their own index faster and in turn compete more with Google.[18] While perhaps true, to avoid compounding Google's abusive tactics to publishers, this aspect of the remedy should be coupled with allowing publishers to separately opt out of RAG (both with respect to Google and any others who may obtain licenses to Google's search index or other publisher content data). Google's generative AI search competitors are not the only ones to have been harmed by Google's unlawful conduct. From the publishers' perspective, if the only remedy regarding RAG is that Google's competitors may now share in Google's ill-gotten monopoly power, that is cold comfort. Rather, as would occur in the absence of Google's unlawful exploitation of its monopoly power in search, Google and its generative AI search competitors should be required to compete for publisher content for use in RAG, which will only happen if publishers can selectively opt out of RAG.

Finally, to ensure the effectiveness of the remedy, the Court should clarify that "retaliate" in Section VI.B includes Google product design that would directly or indirectly harm publishers that choose to opt out of RAG, including by adversely impacting their findability in search. For example, assume the publisher occupying the top organic search link on the SERP opts out of RAG, but lower ranked publishers do not. If Google designs its AI Overview (or AI Mode) to include links to the lower ranked publishers in its generative AI summary at the top of the SERP, it allows them to leapfrog the top-ranked publisher, effectively pushing the top-ranked publisher further down the SERP. (AI Mode may omit links to the opt-out publishers entirely.) This harms the publishers that choose to opt out of RAG, creating a "race to the bottom" where publishers

---

[18] See, for example, Remedies Hearing Proceedings Transcript at 409, ln. 6 et seq. (Testimony of Nicholas Turley, Head of Product, OpenAI) (Apr. 22, 2025) (Day 2, Morning Session).

must opt-in or receive less search referral traffic. This would undermine the Court's remedy and allow Google to circumvent the opt-out provision.

The following graphic depicts one potential non-retaliatory or non-discriminatory solution if publishers A, B, and C opt out of the AI Overview.



Without these clarifications and protections, the status quo remains intact: publishers can opt out of model training and fine-tuning, but RAG and search indexing are still combined. Google will still be able to use its unlawfully acquired search monopoly to extract for free what its competitors must license and extend its search monopoly into the next phase of generative AI search.