# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>       Plaintiffs,<br>v.<br>GOOGLE LLC,<br><br>       Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT. P. MEHTA |
| STATE OF COLORADO, *et al.*,<br><br>       Plaintiffs,<br>v.<br>GOOGLE LLC,<br><br>       Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

## BRIEF OF AMICI CURIAE
## DRS. JAMES COOPER AND ANDREW STIVERS

Miriam H. Wugmeister *
Jonathan Louis Newmark *
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 468-8000
MWugmeister@mofo.com
JNewmark@mofo.com

* Admitted *pro hac vice*

*Counsel for Amici Curiae*

Lisa M. Phelan (Bar No. 1617073)
Joseph Charles Folio III (Bar No. 1764923)
Megan E. Gerking (Bar No. 1027190)
Whitney A. Lee *
Jasmine Arooni *
MORRISON & FOERSTER LLP
2100 L Street, NW
Washington, DC 20037
Telephone: (202) 887-1500
LPhelan@mofo.com
JFolio@mofo.com
MGerking@mofo.com
JArooni@mofo.com
WLee@mofo.com

## TABLE OF CONTENTS

I.      STATEMENT OF INTEREST ........................................................................ 1

II.     INTRODUCTION ....................................................................................... 1

III.    BACKGROUND ....................................................................................... 4

IV.     ARGUMENT ........................................................................................... 5

     A.     The compelled disclosure of data from a company with a robust and well-
     established privacy protection regime to an unspecified third-party (a
     "Qualified Competitor") has inherent risks for user privacy. ............................ 6

        1.     Users have entrusted their personal data with Google with an
        understanding that the company has a data protection program
        designed to safeguard privacy and protect data. ....................................... 6

        2.     The forced wholesale transfer of data to a third party fails to
        account for consumer expectations. ....................................................... 7

        3.     The privacy-protective measures included in the Proposed Final
        Judgment may be insufficient to mitigate the risks associated with
        the compelled transfer of users' data. .................................................... 10

        4.     The forced, wholesale transfer of user data to third parties is likely
        to introduce structural vulnerabilities and heightens the risk of
        fraud or compromise. ....................................................................... 13

     B.     The compelled disclosure of data is in tension with longstanding FTC
     principles regarding material changes in privacy practices and Google's
     commitments under U.S. and global data protection laws................................. 15

V.      CONCLUSION ........................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd in part, rev'd in part and
    remanded by* 67 F.4th 946 (9th Cir. 2023) ............................................................1

*Epic Games, Inc. v. Apple Inc.*,
    67 F.4th 946 (9th Cir. 2023) ...........................................................................1, 2

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ...............................................................................3

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)...............................................................................................3

**Other Authorities**

28 CFR § 202.206 ...............................................................................................12

87 Fed. Reg. 51273 (Aug. 22, 2022).....................................................................8

90 Fed. Reg. 1,636 (Jan. 8, 2025) .......................................................................12

Cal. Code Regs. Tit. 11, § 7002(e) ......................................................................17

**Other Sources**

Alessandro Acquisti, Curtis Taylor & Liad Wagman, *The Economics of Privacy*,
    54 J. ECON. LITERATURE 442 (2016)..............................................................2, 9

Alex Matthews & Catherine Tucker, *The Impact of Online Surveillance on
    Behavior*, The Cambridge Handbook of Surveillance Law (June 2017).................9

Arvind Narayanan & Vitaly Shmatikov, *Robust De-anonymization of Large
    Sparse Datasets*, 2008 IEEE SYMP. ON SEC. & PRIVACY 111-125 (2008) .....................12

Center for Information Policy Leadership, *When the Dust Settles: Remaining
    Questions of Privacy vs. Utility under the DMA*, EURACTIV (Apr. 30, 2024),
    https://www.euractiv.com/section/tech/opinion/when-the-dust-settles-
    remaining-questions-of-privacy-vs-utility-under-the-dma/ ...................................11

Colleen McClain *et al.*, *Views of Data Privacy Risks, Personal Data and Digital
    Privacy Laws*, Pew Research Center (Oct. 18,2023) ..........................................2, 9

Fed. Trade Comm'n, *A Look at What ISPs Know About You: Examining the Privacy Practices of Six Major Internet Service Providers* (Oct. 21, 2021), https://www.ftc.gov/system/files/documents/reports/look-what-isps-know-about-you-examining-privacy-practices-six-major-internet-service-providers/p195402_isp_6b_staff_report.pdf ........................................................... 8

Fed. Trade Comm'n, *FTC Issues Final Commission Report on Protecting Consumer Privacy* (Mar. 26, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/03/ftc-issues-final-commission-report-protecting-consumer-privacy ........................................................... 6

Fed. Trade Comm'n, *How to Recognize and Avoid Phishing Scams* (Sept. 2022), https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams ......................... 15

Fed. Trade Comm'n, *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers* (Mar. 2012), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf; ............................ 8, 9, 15, 16

Fed. Trade Comm'n, *Self-Regulatory Principles for Online Behavioral Advertising* (Feb. 2009), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-staff-report-self-regulatory-principles-online-behavioral-advertising/p085400behavadreport.pdf ........................................................... 7

Google, *Google Activity Controls*, https://support.google.com/accounts/topic/7188674 ............................................... 7

Google, *Privacy Controls*, https://safety.google/privacy/privacy-controls/ .................................. 7

Google, *Privacy Policy*, https://policies.google.com/privacy ...................................................... 6, 7

Google, *Security*, https://publicpolicy.google/security/ ...................................................... 6

*Google, Security & Privacy*, https://safety.google/security-privacy/ ............................................ 6

James C. Cooper, *Anonymity and Online Search: Measuring the Privacy Impact of Google's 2012 Privacy Policy Change*, 19 Rev. L. & Econ. 393 (Nov. 2023) ............................................................................................................. 9

Jeffrey T. Prince & Scott Wallsten, *How Much is Privacy Worth Around the World and Across Platforms?*, 31 J. ECON. MGMT. & STRATEGY 841 (Mar. 2022) ..................................................................................................... 2-3

Jessica L. Rich, Director, Bureau of Consumer Protection, Fed. Trade Comm'n,
    Letter to Erin Egan, Chief Privacy Officer, Facebook, Inc., and Anne Hoge,
    General Counsel, WhatsApp Inc. (Apr. 10, 2014), https://www.ftc.gov/legal-
    library/browse/cases-proceedings/staff-letters/letter-jessica-l-rich-director-
    federal-trade-commission-bureau-consumer-protection-erin-egan-chief;
    Decision and Order .......................................................................................................15

Jules Polonetsky, *The Curse of Dimensionality: De-identification Challenges in
    the Sharing of Highly Dimensional Datasets*, FUTURE OF PRIVACY
    FORUM, https://fpf.org/blog/the-curse-of-dimensionality-de-identification-
    challenges-in-the-sharing-of-highly-dimensional-datasets/;.......................................10, 11, 13

Latanya Sweeney, *Simple Demographics Often Identify People Uniquely*,
    Carnegie Mellon Univ., Data Privacy Working Paper at 2 (2000),
    https://dataprivacylab.org/projects/identifiability/paper1.pdf.................................................11

Letter from Jessica L. Rich, Dir., Bureau of Consumer Prot., Fed. Trade Comm'n,
    to Erin Egan, Chief Privacy Officer, Facebook, Inc., & Anne Hoge, Gen.
    Couns., WhatsApp Inc., https://www.ftc.gov/legal-library/browse/cases-
    proceedings/staff-letters/letter-jessica-l-rich-director-federal-trade-
    commission-bureau-consumer-protection-erin-egan-chief.................................................15, 16

Michael Barbaro & Tom Zeller Jr., *A Face Is Exposed for AOL Searcher No.
    4417749*, N.Y. Times (Aug. 9, 2006),
    https://www.nytimes.com/2006/08/09/technology/09aol.html.................................................12

Nicholas Confessore, *Cambridge Analytica and Facebook: The Scandal and the
    Fallout So Far*, N.Y. Times (Apr. 4, 2018),
    https://www.nytimes.com/2018/04/04/us/politics/cambridge-analytica-
    scandal-fallout.html ...............................................................................................................13

OECD, *Data Portability, Interoperability and Digital Platform Competition* (Oct.
    31, 2021), https://www.oecd.org/en/publications/data-portability-
    interoperability-and-competition_73a083a9-en.html ............................................................14

Peter Swire & Yianni Lagos, *Why the Right to Data Portability Likely Reduces
    Consumer Welfare: Antitrust and Privacy Critique* (May 31, 2013),
    http://ssrn.com/abstract=2159157 .........................................................................................14

Tesary Lin, *Valuing Intrinsic and Instrumental Preferences for Privacy*, 41
    MKTG. SCI. 663 (Aug. 26, 2021) ............................................................................................2

Timothy Morey, Theodore Forbath & Allison Schoop, *Customer Data: Designing
    for Transparency and Trust,* Harv. Bus. Rev. (May 2015),
    https://hbr.org/2015/05/customer-data-designing-for-transparency-and-trust.....................7, 9

Urs Gasser, *Interoperability in the Digital Ecosystem* (July 6, 2015),
    http://ssrn.com/abstract=2639210 .........................................................................................14

Wolfgang Kerber & Heike Schweitzer, *Interoperability in the Digital Economy*
(Jan. 31, 2017), https://ssrn.com/abstract=2922515 ..............................................................14

## I.    STATEMENT OF INTEREST[1]

*Amici Curiae* are Dr. James Cooper and Dr. Andrew Stivers,[2] two consumer protection and privacy experts who previously served as senior officials in the Federal Trade Commission (FTC). *Amici's* interest in this matter stems from having dedicated their careers to the law and economics of privacy and consumer protection.

*Amici's* experience at the FTC and expertise in privacy and consumer protection presents a unique perspective in this case. *Amici* have dedicated their careers to researching, analyzing, developing policy, and discussing impacts of competition policy regulation on consumers. Such insight will assist the Court in its analysis and consideration of the remedies in the Proposed Final Judgment that would require information sharing.

## II.    INTRODUCTION

Courts have long recognized that competition and privacy, both critical to consumer welfare, may at times be in tension. *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1006 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded by* 67 F.4th 946 (9th Cir. 2023) ("[P]rivacy concerns may be more at risk with loosened app distribution restrictions.… Accordingly, privacy, more than other issues, likely benefits from some app distribution restrictions."). Structural remedies intended to promote competition, such as compelled data disclosure, can pose substantial privacy risks, particularly when they involve the transfer of sensitive personal data to third parties that lack the data governance infrastructure and

---

[1] No party opposes the filing of this amicus curiae brief. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of the brief. No person other than *amici curiae* or their counsel made a monetary contribution to the preparation or submission of this brief.

[2] One of the *amici* is affiliated with a university academic center that has in the past received funding from Google unconnected to this brief. Morrison & Foerster represents Google in other matters unconnected to this brief.

capabilities of the original data collector. Conversely, remedies aimed at strengthening user privacy can reduce the value of data sets made available to competitor businesses. Importantly, courts and regulators recognize that protecting consumer privacy is a legitimate and procompetitive business goal. *See, e.g.*, *Epic Games*, 67 F.4th at 987 ("[T]hroughout the record, Apple makes clear that by improving security and privacy features, it is tapping into consumer demand and differentiating its products from those of its competitors—goals that are plainly procompetitive rationales.").

As personal data has become central to digital services and economic activity, public attention to privacy has grown significantly. Research shows that consumers value their privacy, and that privacy concerns among consumers have only increased over time.[3] Surveys have consistently found that internet users express significant and widespread privacy concerns.[4] Empirical studies show that many users assign measurable value to the protection of their personal data, including safeguards against secondary uses, misuse, and unauthorized access, and that many consumers are willing to pay to conceal specific types of data, such as browsing history, location, and communications.[5] Critically, research suggests that privacy preferences are deeply subjective and shaped by individual expectations, social norms, context, and perceived

---

[3] *See, e.g.*, Alessandro Acquisti, Curtis Taylor & Liad Wagman, *The Economics of Privacy*, 54 J. ECON. LITERATURE 442 (2016).
[4] *See, e.g.* Colleen McClain *et al.*, *Views of Data Privacy Risks, Personal Data and Digital Privacy Laws*, Pew Research Center (Oct. 18, 2023), https://www.pewresearch.org/internet/2023/10/18/views-of-data-privacy-risks-personal-data-and-digital-privacy-laws/.
[5] *See, e.g.*, Alessandro Acquisti, Curtis Taylor & Liad Wagman, *The Economics of Privacy*, 54 J. ECON. LITERATURE, at 478.

risks,[6] thereby making it nearly impossible to craft a data protection framework that addresses the concerns of all users.

Furthermore, the law does not treat privacy harms as theoretical or abstract. Rather, courts have repeatedly recognized that invasions of privacy, including unauthorized disclosures of personal data, constitute real and cognizable injuries under federal law. For example, in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), the Supreme Court affirmed that intangible harms such as privacy invasions can constitute concrete injuries to consumers.

Following *Spokeo*, numerous federal appellate courts have held that improper disclosures of personal data constitute sufficient injuries to sustain a claim, particularly when these disclosures violate express privacy commitments or individuals' expectations. For example, the Ninth Circuit has held that the unauthorized collection and use of personal data can undermine individuals' historically protected privacy interests and pose a material risk of harm—explaining that such practices leave users without "a meaningful opportunity to control or prevent the unauthorized exploration of their private lives." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020).

In evaluating the Proposed Final Judgment issued by the Department of Justice (DOJ), we therefore encourage the Court to consider the potentially substantial and lasting privacy risks any compelled disclosure remedy may pose for consumers. This amicus brief offers a legal and principles-based framework to support the Court's analysis of these risks.

---

[6] *See, e.g.*, *id*. at 445-46; *see also* Tesary Lin, *Valuing Intrinsic and Instrumental Preferences for Privacy*, 41 MKTG. SCI. 663 (Aug. 26, 2021); Jeffrey T. Prince & Scott Wallsten, *How Much is Privacy Worth Around the World and Across Platforms?*, 31 J. ECON. MGMT. & STRATEGY 841 (Mar. 2022).

## III.    BACKGROUND

In August 2024, the Court found that Google had unlawfully maintained monopolies in the markets for general search services and general text advertising through a series of exclusive distribution agreements. (Mem. Op. at 276, *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. Aug. 5, 2024), ECF No. 1033.) The DOJ now asks the Court to impose several remedies. (*See generally* Pls.' Revised Proposed Final Judgment, *United States v. Google LLC*, No. 1:20-cv-03010, (D.D.C. Mar. 7, 2024), ECF No. 1184-1.) These include both structural and behavioral requirements intended to "remove barriers to entry" and "pry open the monopolized markets to competition." (*Id*. at 7.)

Among these proposed requirements, the DOJ asks the Court to compel disclosure of several categories of data to Qualified Competitors, including Google's search index, "User-side Data," "Ads Data," responses to synthetic queries, and syndicated content. (*See generally id*. at 14-23.)

Google's search index includes not only underlying web content, but also key information such as associated ranking signals, quality scores, crawl frequency, and other metadata, which collectively reflect the structure and logic that underlie how Google organizes and evaluates information on the internet. (*Id*. at 14-16.)

"User-side Data" is defined in the Proposed Final Judgment as "all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's [d]evice, including software running on that [d]evice, by automated means." (*Id*. at 7.) This definition potentially encompasses a wide array of context-rich user data derived from user interactions with Google search, including query patterns, click behavior, location history, and engagement metrics.

The Proposed Final Judgment also contemplates compelled disclosure of other data. This includes responses to synthetic queries and "Ads Data," which means "data related to Google's selection, ranking, and placement of Search Text Ads in response to queries, including any User-side Data used in that process." (*Id*. at 2, 21.) In general, the value of this data is based in part on the extent to which it may provide granular behavioral insights reflecting a specific consumer's interests, and preferences. (*See* Mem. Op. at 167.)

The Proposed Final Judgment also acknowledges that certain privacy and security safeguards are necessary to mitigate privacy risks associated with large-scale data disclosure, but does not address those safeguards in detail. For example, the Proposed Final Judgment would require Google to apply "privacy-enhancing technique[s]," such as anonymization, to remove personally identifiable information from user data before transferring it to Qualified Competitors. (Pls.' Revised Proposed Final Judgment at 17.) It also relies on a Technical Committee to recommend data security standards and require data security and privacy audits. (*Id*. at 5.)

## IV.    ARGUMENT

The breadth of remedies imposed by the Proposed Final Judgment aims to lower barriers of entry into search and advertising markets for competitors. (*Id*. at 14-18.) However, the Proposed Final Judgment implicates user data that is context-rich and reflective of sensitive individual behavior and preferences, which users shared with Google under specific privacy expectations and within a well-developed privacy framework. As discussed below, Google has a data governance program with established controls, technical safeguards, and compliance systems that is tailored to manage such data in accordance with applicable privacy obligations. Although the Proposed Final Judgment acknowledges the need for privacy and security safeguards, it does not include key implementation details, and research indicates that certain

data minimization techniques, such as de-identification, may not necessarily be sufficient to safeguard user privacy. Additionally, the Proposed Final Judgment is in tension with long-standing FTC guidance and obligations under U.S. and global data protection law. These are critically important issues that the Court should consider when evaluating the scope, feasibility, and potential risks of the compelled disclosures proposed in the DOJ's remedy.

A.   **The compelled disclosure of data from a company with a robust and well-established privacy protection regime to an unspecified third-party (a "Qualified Competitor") has inherent risks for user privacy. [7]**

1.   **Users have entrusted their personal data with Google with an understanding that the company has a data protection program designed to safeguard privacy and protect data.**

Like many other firms that ask consumers to entrust significant access to and control over their personal data, Google has built a data protection program governing the collection, use, and security of user data over nearly three decades.[8] By its very nature, this framework is tailored to integrate legal obligations, regulatory guidance, and industry standards. Like any complex ecosystem, it has evolved over time to account for the nature of the data collected, how the data is used within the Google environment, the risks of misuse or unauthorized disclosure of that data, the technical controls and other mechanisms instituted to mitigate those risks, and processes for addressing and remediating shortcomings.[9] Consumers have chosen to entrust their data with Google because of this investment.

---

[7] *Amici* would distinguish the compelled disclosure of consumer information to an unknown third-party from a voluntary data sharing agreement between parties.
[8] *See* Google, *Privacy Policy*, https://policies.google.com/privacy (last visited May 9, 2025); *see also* Google, *Security & Privacy*, https://safety.google/security-privacy/ (last visited May 9, 2025).
[9] *See* Google, *Security*, https://publicpolicy.google/security/ (last visited May 9, 2025); *see also* Google, *Security & Privacy*, https://safety.google/security-privacy/ (last visited May 9, 2025).

Consistent with the FTC's guidance about giving consumers choice over how their data is used, even after they share it,[10] Google provides users real-time control over their personal data, which includes the ability to, among other things, pause or delete web and app activity, manage location history, control advertising personalization, download or delete stored data, and adjust data-sharing and account security preferences.[11]

Users' long experience with Google and its data protection practices is likely to be a reason why they are willing to share sensitive personal data, including searches that could reveal health issues or other intimate information,[12] with a grounded expectation that this data would be protected and not shared indiscriminately with third parties.[13]

>    **2.    The forced wholesale transfer of data to a third party fails to account for consumer expectations.**

The forced disclosure of data from Google to Qualified Competitors may pose significant risks to consumer privacy and autonomy according to the federal government's own guidance about privacy and consumer expectations.[14] The FTC has repeatedly emphasized that privacy

---

[10] *See* Fed. Trade Comm'n, *FTC Issues Final Commission Report on Protecting Consumer Privacy* (Mar. 26, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/03/ftc-issues-final-commission-report-protecting-consumer-privacy.

[11] *See* Google, *Privacy Controls*, https://safety.google/privacy/privacy-controls/ (last visited May 6, 2025); *see also* Google, *Google Activity Controls*, https://support.google.com/accounts/topic/7188674 (last visited May 9, 2025).

[12] *See, e.g.,* Timothy Morey, Theodore Forbath & Allison Schoop, *Customer Data: Designing for Transparency and Trust,* Harv. Bus. Rev. (May 2015), https://hbr.org/2015/05/customer-data-designing-for-transparency-and-trust (explaining that consumer data sharing depends heavily on brand trust, with trusted firms gaining easier access and less trusted firms facing resistance despite offering equal value for data).

[13] *See* Google, *Privacy Policy*, https://policies.google.com/privacy (last visited May 9, 2025).

[14] *Amici* note that use of data beyond consumer expectations does not necessarily constitute a privacy harm. For example, the FTC requires companies to take steps to inform consumers before using their data in ways that are *materially* different from the promises the company made when it collected the data. *See, e.g.*, Fed. Trade Comm'n, *Self-Regulatory Principles for Online Behavioral Advertising*, at 47 (Feb. 2009),

expectations are shaped not only by the nature of any data used or shared with others, but also by the context in which the data was collected and used, as well as the relationship between the user and the data recipient.[15]

Mandating the transfer of user data to third parties with whom users have no established relationship does not account for the expectations users have developed over time regarding the privacy, security, and stewardship of their personal data. When users agreed to share their personal data with Google, many likely did so based on reasonable expectations about how Google would use, disclose, and protect their data.

Google's specific representations about user privacy can shape not only consumer expectations but also the normative framework governing data use. Compelling a transfer of user data to third parties without users' authorization disrupts this framework. It can sever the trust between the user and the original recipient, in this case, Google—trust which likely forms the foundation of many users' willingness to share personal data in the first place.[16] When users lose

---

https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-staff-report-self-regulatory-principles-online-behavioral-advertising/p085400behavadreport.pdf.

[15] *See* Fed. Trade Comm'n, *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers* (Mar. 2012), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf; Fed. Trade Comm'n, *A Look at What ISPs Know About You: Examining the Privacy Practices of Six Major Internet Service Providers* (Oct. 21, 2021), https://www.ftc.gov/system/files/documents/reports/look-what-isps-know-about-you-examining-privacy-practices-six-major-internet-service-providers/p195402_isp_6b_staff_report.pdf (emphasizing the role of context in shaping consumer privacy expectations); Fed. Trade Comm'n, *Trade Regulation Rule on Commercial Surveillance and Data Security, Advance Notice of Proposed Rulemaking*, 87 Fed. Reg. 51273 (Aug. 22, 2022), https://www.federalregister.gov/documents/2022/08/22/2022-17752/trade-regulation-rule-on-commercial-surveillance-and-data-security (noting that privacy expectations are shaped by context, trust, and the user–entity relationship).

[16] *See, e.g.*, Fed. Trade Comm'n, *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers*, at 12,

confidence that their data will be handled according to expectations about the terms and context in which it was originally provided, they may alter their behavior, limit their data sharing, or disengage from certain services altogether.[17] More fundamentally, the forced transfer may constitute a loss of control over personal information, which scholars and courts have recognized as an independent privacy harm.[18] Significantly, many consumers themselves have indicated that such loss of control is a harm.[19] Stripping users of reasonably expected control may weaken the trust-based architecture of digital platforms and erode public confidence in privacy governance altogether.[20]

---

https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf ("[B]asic privacy concepts like transparency about the nature of companies' data practices and meaningful consumer control are absent….[t]his absence erodes consumer trust.").

[17] Timothy Morey, Theodore Forbath & Allison Schoop, *Customer Data: Designing for Transparency and Trust,* Harv. Bus. Rev. (May 2015), https://hbr.org/2015/05/customer-data-designing-for-transparency-and-trust (explaining that consumer data sharing depends heavily on brand trust, with trusted firms gaining easier access and less trusted firms facing resistance despite offering equal value for data); *see also* Alex Matthews & Catherine Tucker, *The Impact of Online Surveillance on Behavior*, The Cambridge Handbook of Surveillance Law (June 2017); James C. Cooper, *Anonymity and Online Search:  Measuring the Privacy Impact of Google's 2012 Privacy Policy Change*, 19 Rev. L. & Econ. 393 (Nov. 2023).

[18] *See* Alessandro Acquisti, Curtis Taylor & Liad Wagman, *The Economics of Privacy*, 54 J. ECON. LITERATURE, at 445 ("Privacy is not the opposite of sharing—rather, it is control over sharing. For the individual, therefore, the potential benefits of strategically sharing certain data while protecting other data are quite apparent. So are the potential costs of having too much information disclosed to the wrong parties ….").

[19] Colleen McClain, Michelle Faverio, Monica Anderson & Eugenie Park, *Views of Data Privacy Risks, Personal Data, and Digital Privacy Laws in America*, PEW RSCH. CTR. (Oct. 18, 2023), https://www.pewresearch.org/internet/2023/10/18/views-of-data-privacy-risks-personal-data-and-digital-privacy-laws. ("A majority of Americans say they are concerned, lack control and have a limited understanding about how the data collected about them is used.").

[20] *See, e.g.*, Fed. Trade Comm'n, *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers*, at 12, https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf ("[B]asic privacy concepts like transparency about the nature of companies' data practices and meaningful consumer control are absent….[t]his absence erodes consumer trust.").

     3.     **The privacy-protective measures included in the Proposed Final Judgment may be insufficient to mitigate the risks associated with the compelled transfer of users' data.**

The Proposed Final Judgment would require Google to apply "privacy-enhancing technique[s]," such as anonymization, to remove personally identifiable information from user data before transferring it to Qualified Competitors. (ECF No. 1184-1 at 17.) While *amici* take no position as to the adequacy of any such technique, they note the ongoing debate about the efficacy of privacy-preserving measures—such as anonymization, pseudonymization, aggregation, and k-anonymity.

Although there is no technical consensus, respected digital privacy organizations and researchers have observed that rich datasets may be especially difficult to anonymize, and privacy-enhancing techniques are often inadequate to provide sufficient privacy protections in the face of evolving re-identification threats.[21] The widespread availability of large datasets potentially allows protected information to be correlated with other available data to allow recipients to re-identify individuals.[22] The ability to perform this analysis and link discrete sources of information appears to have expanded in recent years, which potentially allows the creation of detailed profiles about identifiable consumers based on disparate pieces of user

---

[21] *See* Jules Polonetsky, *The Curse of Dimensionality: De-identification Challenges in the Sharing of Highly Dimensional Datasets*, FUTURE OF PRIVACY FORUM (May 5, 2025), https://fpf.org/blog/the-curse-of-dimensionality-de-identification-challenges-in-the-sharing-of-highly-dimensional-datasets/ ("Decades of research and numerous real-world incidents have demonstrated that supposedly 'de-identified' or 'anonymized' data have been re-identified, sometimes with surprising ease. This re-identification potential stems from several factors: the residual information left in the data after processing, the increasing availability of external datasets (auxiliary information) that can be linked to the de-identified data, and the continuous development of sophisticated analytical techniques.").
[22] *Id.*

data.[23] According to certain experts in the field, even minimal data types, such as ZIP code, birth

date, and gender, may be sufficient to re-identify individuals in large datasets.[24]

Further, certain experts argue that sharing search query data in particular presents unique

privacy challenges even when companies rely on privacy-preserving techniques because the

richness that makes search data valuable also makes it particularly vulnerable to re-

identification.[25] As researchers have explained, "[g]iven that search histories encapsulate a …

rich and diverse set of user actions and interests over time, it is highly probable that many users

possess unique or near-unique search 'fingerprints' even after standard de-identification

techniques (like removing IP addresses and user IDs) are applied. This inherent uniqueness

makes search logs exceptionally vulnerable to re-identification, particularly through linkage

attacks that correlate the de-identified search patterns with other available data sources."[26]

---

[23] *See id.* ("Furthermore, the integration of search engines with advertising networks, user accounts, and other online services creates opportunities for linking search behavior with other extensive user profiles, amplifying the potential for privacy intrusions.").

[24] *See* Latanya Sweeney, *Simple Demographics Often Identify People Uniquely*, Carnegie Mellon Univ., Data Privacy Working Paper at 2 (2000), https://dataprivacylab.org/projects/identifiability/paper1.pdf. (showing that 87% of the U.S. population could be uniquely identified by the combination of ZIP code, birth date, and sex from 1990 US Census Summary Data).

[25] *See* Jules Polonetsky, *The Curse of Dimensionality: De-identification Challenges in the Sharing of Highly Dimensional Datasets*, FUTURE OF PRIVACY FORUM, https://fpf.org/blog/the-curse-of-dimensionality-de-identification-challenges-in-the-sharing-of-highly-dimensional-datasets/; *see also* Center for Information Policy Leadership, *When the Dust Settles: Remaining Questions of Privacy vs. Utility under the DMA*, EURACTIV (Apr. 30, 2024), https://www.euractiv.com/section/tech/opinion/when-the-dust-settles-remaining-questions-of-privacy-vs-utility-under-the-dma/ ("Anybody who has ever used a search engine would be aware of the potential for large amounts of personal data or even sensitive data to be included in any given search query.").

[26] Jules Polonetsky, *The Curse of Dimensionality: De-identification Challenges in the Sharing of Highly Dimensional Datasets*, FUTURE OF PRIVACY FORUM, https://fpf.org/blog/the-curse-of-dimensionality-de-identification-challenges-in-the-sharing-of-highly-dimensional-datasets/.

The DOJ itself recently acknowledged that anonymization and de-identification techniques may be inadequate safeguards to protect sensitive data. On December 28, 2024, the DOJ finalized regulations governing the transfer of bulk sensitive and government-related data. The final regulations and commentary specifically note that anonymization and de-identification are insufficient to thwart a determined adversary from re-identification.[27] Notably, the government's definition of sensitive data includes information regardless of whether it has been pseudonymized or anonymized, which underscores the point that the DOJ believes that those measures intended to protect sensitive personal data often fail.[28]

Several high-profile security events also illustrate the potential risks of reliance on privacy-enhancing techniques. In 2006, AOL inadvertently released a large excerpt of its web search query logs, which allowed individuals to be identified through their search terms alone.[29] This incident—with technology that is nearly 20 years old—demonstrates how search queries alone can function as identifiers. In 2008, researchers used Netflix's publicly available "anonymized" movie rating data to identify individual users by matching a few known ratings with their IMDb profiles.[30] In 2016, Cambridge Analytica acquired the personal data of millions

---

[27] 90 Fed. Reg. 1,636, 1,653 (Jan. 8, 2025) ("[A]dvances in technology, combined with access by countries of concern to large datasets, increasingly enable countries of concern that access this data to re-identify or de-anonymize data, allowing them to reveal exploitable sensitive personal information on U.S. persons. Accordingly, the Department declines to exempt from its prohibitions and restrictions … data that has been de-identified or pseudonymized.").

[28] 28 CFR § 202.206 (defining "*bulk U.S. sensitive personal data*" to be "a collection or set of sensitive personal data relating to U.S. persons, in any format, regardless of whether the data is anonymized, pseudonymized, de-identified, or encrypted, where such data meets or exceeds the applicable [bulk] threshold").

[29] Michael Barbaro & Tom Zeller Jr., *A Face Is Exposed for AOL Searcher No. 4417749*, N.Y. Times (Aug. 9, 2006), https://www.nytimes.com/2006/08/09/technology/09aol.html.

[30] Arvind Narayanan & Vitaly Shmatikov, *Robust De-anonymization of Large Sparse Datasets*, 2008 IEEE SYMP. ON SEC. & PRIVACY 111–125 (2008), https://www.cs.utexas.edu/~shmat/shmat_oak08netflix.pdf.

of Facebook users from a third-party application to build detailed profiles on individual users.

This incident highlights how personal traits, including political preferences, can be inferred from

behavioral data and easily manipulated despite having data controls.[31]

Importantly, there is an inherent tension between the value of a dataset and privacy-

enhancing measures. As datasets include more granular detail to satisfy commercial goals, they

also become more likely to allow re-identification.[32] On the other hand, more advanced privacy-

enhancing techniques, like differential privacy or synthetic data, often render the information less

valuable to would-be data recipients.[33]

4. **The forced, wholesale transfer of user data to third parties is likely to introduce structural vulnerabilities and heightens the risk of fraud or compromise.**

Regardless of the safeguards put in place by a Qualified Competitor, the wholesale

transfer of personal data from one ecosystem to another is likely to pose additional risks by

creating new opportunities for misuse and compromise, such as inadvertent or unauthorized

---

[31] Nicholas Confessore, *Cambridge Analytica and Facebook: The Scandal and the Fallout So Far*, N.Y. Times (Apr. 4, 2018), https://www.nytimes.com/2018/04/04/us/politics/cambridge-analytica-scandal-fallout.html.

[32] *See* Jules Polonetsky, *The Curse of Dimensionality: De-identification Challenges in the Sharing of Highly Dimensional Datasets*, FUTURE OF PRIVACY FORUM, https://fpf.org/blog/the-curse-of-dimensionality-de-identification-challenges-in-the-sharing-of-highly-dimensional-datasets/ ("The concept of true, irreversible anonymization, where re-identification is effectively impossible, represents a high standard that is particularly challenging to meet for rich behavioral datasets, especially when data is shared with additional parties or made public.").

[33] *See id.* ("Achieving a state where individuals genuinely cannot be reasonably identified is significantly harder, especially given the inherent trade-off between privacy protection and data utility: more aggressive de-identification techniques reduce re-identification risk but also diminish the data's value for analysis."); *see also* Tr. of Remedies Hearing Day 4 (Apr. 4, 2025) at 1212-14.

disclosures or exploitation by malicious actors.[34] Even well-intentioned recipients may

underestimate the complexity of securing transferred datasets, particularly when privacy

protections depend on context-specific safeguards, as explained above. Such situations expose

datasets to systems that may be un- or under-equipped to defend them.[35] As the number of

recipients proliferates, the risks compound and the potential attack surface expands.[36] As a result,

although data portability may appear to be neutral in theory, in practice it may degrade user

privacy.

Moreover, the process required to effectuate the data transfer, including providing notice

to users and seeking consent, would create additional risks. Because the compelled disclosure

would involve new entities with whom users likely have no prior relationship, any resulting

communications from those entities—such as consent requests or account notifications—are

---

[34] Peter Swire & Yianni Lagos, *Why the Right to Data Portability Likely Reduces Consumer Welfare: Antitrust and Privacy Critique*, at 366 (May 31, 2013), http://ssrn.com/abstract=2159157 ("[T]he proposed right [to data portability] raises serious risks for another principle of data protection law: protecting the security of an individual's personal data. In our world of weak authentication and rampant identity theft, moving all of a person's data to another system 'without hindrance' creates security risks that can outweigh the portability benefits."); Wolfgang Kerber & Heike Schweitzer, *Interoperability in the Digital Economy*, at 6 (Jan. 31, 2017), https://ssrn.com/abstract=2922515 ("Through a generally higher level of interconnectedness in a digital economy, more interoperability may lead to higher risks regarding reliability, security, and privacy."); Urs Gasser, *Interoperability in the Digital Ecosystem*, at 14 (July 6, 2015), http://ssrn.com/abstract=2639210 ("[T]he fact that multiple service providers have access to a user's online identity increases the risk of one of them misusing that data.").
[35] OECD, *Data Portability, Interoperability and Digital Platform Competition*, at 24 (Oct. 31, 2021), https://www.oecd.org/en/publications/data-portability-interoperability-and-competition_73a083a9-en.html ("[A] small third party does not have the same resources to protect against hacking as large platforms, and so interoperability measures requiring connections with these services may create vulnerabilities. Further, the damage of such security breaches could be compounded if they grant access to numerous platforms and services (Gal and Rubinfeld, 2019, p. 756).").
[36] Urs Gasser, *Interoperability in the Digital Ecosystem*, at 14, http://ssrn.com/abstract=2639210 ("[I]nteroperability encourages more complex ecosystems, with more participants, and thus creates more risk vectors.").

likely to appear unfamiliar. As noted by the FTC,[37] unexpected or unfamiliar communications can be exploited for phishing or fraud. When users receive requests from multiple, unfamiliar entities, they may have difficulty distinguishing between legitimate actors and malicious impersonation attempts. The fact that the proposed remedies are likely to be widely publicized does not solve the problem. Heightened awareness of the compelled disclosure by users could exacerbate the risk as bad actors see a potential opportunity to engage in fraud, and users, who are primed to anticipate data transfer notices, may be more likely to mistakenly engage with a phishing attempt disguised as a legitimate request.

> **B.    The compelled disclosure of data is in tension with longstanding FTC principles regarding material changes in privacy practices and Google's commitments under U.S. and global data protection laws.**

The compelled disclosure of user data to a broad and undefined class of Qualified Competitors is in tension with prior decisions by the FTC regarding material changes in privacy practices.[38] The FTC has long taken the position that user expectations at the time of data collection are paramount, and that companies must adhere to the privacy commitments in effect at the point of collection.[39]

---

[37] Fed. Trade Comm'n, *How to Recognize and Avoid Phishing Scams* (Sept. 2022), https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams.

[38] Complaint, *In re 1Health.io Inc.*, No. 1923170 (FTC June 16, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/1Health-Complaint.pdf; Decision and Order, In *re 1Health.io Inc.*, No. 1923170 (FTC Sept. 7, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/1Health-DecisionandOrder.pdf; Jessica L. Rich, Director, Bureau of Consumer Protection, Fed. Trade Comm'n, Letter to Erin Egan, Chief Privacy Officer, Facebook, Inc., and Anne Hoge, General Counsel, WhatsApp Inc. (Apr. 10, 2014), https://www.ftc.gov/legal-library/browse/cases-proceedings/staff-letters/letter-jessica-l-rich-director-federal-trade-commission-bureau-consumer-protection-erin-egan-chief; Decision and Order, *In re Google Inc.*, No. 1023136 (FTC Oct. 13, 2011), https://www.ftc.gov/sites/default/files/documents/cases/2011/10/111024googlebuzzdo.pdf.

[39] *See id.; see also* Fed. Trade Comm'n, *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers*, at 57,

As stated by the FTC, "at a minimum, sharing consumer information with third parties after committing at the time of collection not to share the data would constitute a material change."[40] When a material change has occurred, the FTC has found that the party that collected the data may have an obligation to obtain affirmative, express consent from users before their personal data will be used or disclosed in an unanticipated way.[41] Importantly, the FTC has repeatedly found that material changes in data use, such as disclosing information to third parties, cannot be justified post hoc through policy updates.[42]

Accordingly, the Proposed Final Judgment is in fundamental tension with the FTC's established principles—which the FTC has aggressively enforced—by mandating a remedy without contemplating whether, or how, the compelled disclosure would require a meaningful mechanism for obtaining affirmative, express user consent. The remedy also necessarily requires consideration of the consequences if a user refuses to provide consent.

Should the FTC require user consent, such consent likely would be difficult to obtain at scale and costly to secure in a consistent, meaningful way. The FTC requires affirmative express

---

https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf.
[40] *Id.* at 58.
[41] Complaint ¶¶ 15–21, *In re 1Health.io Inc.*, No. 1923170 (FTC June 16, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/1Health-Complaint.pdf; Decision and Order, *In re Gateway Learning Corp.*, No. 0423047 (FTC Sept. 10, 2004), https://www.ftc.gov/sites/default/files/documents/cases/2004/09/040917do0423047.pdf.
[42] Letter from Jessica L. Rich, Dir., Bureau of Consumer Prot., Fed. Trade Comm'n, to Erin Egan, Chief Privacy Officer, Facebook, Inc., & Anne Hoge, Gen. Couns., WhatsApp Inc., https://www.ftc.gov/legal-library/browse/cases-proceedings/staff-letters/letter-jessica-l-rich-director-federal-trade-commission-bureau-consumer-protection-erin-egan-chief.

consent to be specific, informed, and freely given;[43] and it may be difficult to meet this standard given the complexity, scale, and fluid nature of the data-sharing arrangement.

The forced data transfer in the Proposed Final Judgment similarly risks contravening state and international privacy principles with regard to users in those jurisdictions. For example, statutes in California, Virginia, Colorado, and other states require that consumers be informed of material changes in data practices and that affirmative consent be obtained before data is used or shared in new ways.[44]  Outside the United States, legal regimes such as the European Union's General Data Protection Regulation impose strict conditions on data transfers and require consent when data is repurposed or shared with new recipients. If Google is required to transfer user data to multiple competitors, it may become subject to a range of overlapping regulatory obligations that are difficult to harmonize and costly to implement. Tension or conflict between these obligations may lead to unexpected results, such as not allowing complete datasets to be transferred, or other issues as the company attempts to resolve conflicting requirements.

## V.    CONCLUSION

Although the DOJ's proposed remedy is intended to encourage competition, it raises serious issues about how to best safeguard the privacy interests of users whose data may be disclosed to third parties with unknown data protection capabilities, without these users' express consent.

---

[43] *See* Decision and Order, *In the Matter of X-Mode Social, Inc.*, No. 2123038 (FTC Jan. 9, 2024); *see also* Decision and Order, *In the Matter of X-Mode Social, Inc.*, No. 2123038 (FTC Apr. 11, 2024).
[44] *See, e.g.*, Cal. Code Regs. Tit. 11, § 7002(e) ("A business shall obtain the consumer's consent … before collecting or processing personal information for any purpose that does not meet" the purposes for which the personal information was collected.).

As this Court considers this proposed remedy, we respectfully submit that the data protection concerns merit close attention and consideration. The risks associated with the proposed compelled data disclosure are not hypothetical; they implicate longstanding legal principles, evolving technical realities, and the trust that users place in the entities with which they share their most sensitive data.

In light of these concerns, we encourage this Court to weigh the lasting impact that this remedy could have on individuals' privacy and the integrity of the commitments made to users at the time of data collection.

Dated: May 9, 2025                                    Respectfully submitted,

  _/s/ Miriam H. Wugmeister_                          _/s/ Lisa M. Phelan_
Miriam H. Wugmeister *                              Lisa M. Phelan (Bar No. 1617073)
Jonathan Louis Newmark *                            Joseph Charles Folio III (Bar No. 1764923)
MORRISON & FOERSTER LLP                             Megan E. Gerking (Bar No. 1027190)
250 West 55th Street                                Whitney A. Lee *
New York, NY 10019                                  Jasmine Arooni *
Telephone: (212) 468-8000                           MORRISON & FOERSTER LLP
MWugmeister@mofo.com                                 2100 L Street, NW
JNewmark@mofo.com                                    Washington, DC 20037
                                                    Telephone: (202) 887-1500
                                                    LPhelan@mofo.com
                                                    JFolio@mofo.com
                                                    MGerking@mofo.com
                                                    JArooni@mofo.com
                                                    WLee@mofo.com

                                                    * Admitted _pro hac vice_

                                                    _Counsel for Amici Curiae_

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2025, I filed this Motion with the United States District Court for the District of Columbia using the CM/ECF system, which will cause it to be served on all counsel of record.

Respectfully submitted,

_/s/ Lisa M. Phelan_
Lisa M. Phelan (Bar No. 1617073)
MORRISON & FOERSTER LLP
2100 L Street, NW
Washington, DC 20037
Telephone: (202) 887-1500
LPhelan@mofo.com

*Counsel for Amici Curiae*

19