# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *et al.*, <br><br>    Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br>    Defendant. | Case No. 1:20-cv-03010-APM <br><br> HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*, <br><br>    Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br>    Defendant. | Case No. 1:20-cv-03010-APM <br><br> HON. AMIT P. MEHTA |

### *AMICUS CURIAE* BRIEF OF ACT | THE APP ASSOCIATION <u>IN SUPPORT OF DEFENDANT</u>

## **CORPORATE AND FINANCIAL DISCLOSURE STATEMENT**

I, the undersigned, counsel of record for *amicus curiae*, ACT | The App Association pursuant to D.C. District Court Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 26.1, certify that ACT | The App Association is a non-profit entity, has no corporate parent company, and has no corporate stock.

## **STATEMENT OF COUNSEL**

In accordance with Local Rule 7(o) and Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* certifies that (1) this brief was authored entirely by its counsel and not by counsel for any party in the above-captioned dispute, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from *amicus curiae* and its counsel, no other person contributed money to fund preparing or submitting this brief.

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICUS CURIAE* ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................ 2

    I.    Plaintiffs' Proposed Remedies Will Create Uncertainty for App Developers and Disrupt Ongoing Business Relationships. ....................................................................... 4

    II.   Plaintiffs' Proposed Notification Requirements Stifle Innovation in Emerging Technology Markets and Impede Acquisitions of Small App Developers. ................................. 11

CONCLUSION ................................................................................................................ 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .................................................................................... 1, 2

**Statutes**

Hart-Scott-Rodino Act, 15 U.S.C. § 18a (2021) ................................................................. 5, 11, 12

Stored Communications Act, 18 U.S.C. §§ 2701–2712 (2021) ....................................................... 8

**Other Authorities**

*Announcing Supporters of Chromium-based Browsers*, CHROMIUM BLOG (Jan. 9, 2025), https://blog.chromium.org/2025/01/announcing-supporters-of-chromium-based.html .................................................................................... 13

*Google Play Statistics and Trends 2025*, 42 MATTERS, https://42matters.com/google-play-statistics-and-trends (last visited May 9, 2025) .................................................................................... 5

Jacob Hellman, *Big Tech's 'Voracious Appetite,' or Entrepreneurs Who Dream of Acquisition? Regulation and the Interpenetration of Corporate Scales*, 31 SCIENCE AS CULTURE 149, 149 (2021) *available at* https://doi.org/10.1080/09505431.2021.2000597 .................................................................................... 12, 13

*How Android and Google Play drive global growth*, THE GOOGLE BLOG (Apr. 10, 2024), https://blog.google/outreach-initiatives/public-policy/how-android-and-google-play-drive-global-growth/ .................................................................................... 10

Alex Nguyen, *List of Chromium and Non-Chromium Based Browsers*, COMPUTER CITY (Oct. 14, 2024), https://computercity.com/software/browsers/list-of-chromium-and-non-chromium-based-browsers .................................................................................... 12

*Powering the Global App Economy: Android and Google Play's Contributions*, ACCESS PARTNERSHIP (Apr. 9, 2024), https://accesspartnership.com/powering-the-global-app-economy-android-and-google-plays-contributions/# .................................................................................... 10

*Using Chromium for Building Apps (2025)*, VIGNATTI BLOG (December 4, 2024), https://vignatti.com/posts/chromium-for-building-apps/ .................................................................................... 10

*State of the App Economy*, ACT | THE APP ASSOCIATION (2023), https://actonline.org/wp-content/uploads/APP-EconomyReport-FINAL-1.pdf .................................................................................... 1

Davey Winder, *Google Debuts New Chrome Browser Security Features to Block Threats*, FORBES (Sept. 12, 2024), https://www.forbes.com/sites/daveywinder/2024/09/12/google-debuts-outstanding-new-chrome-browser-security-features/ ..............................................................5

**IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]**

ACT | The App Association (the "App Association") is a not-for-profit advocacy and education organization founded in 1998. It represents the small business developer, innovator, and entrepreneur community that creates countless software applications used on mobile devices and in enterprise systems. The software application economy represented by the App Association is valued at approximately $1.8 trillion and is responsible for 6.1 million U.S. jobs.[2]

The App Association represents small business technology developers who have mutually beneficial business relationships with Google LLC ("Google") and other large technology firms. The App Association is committed to efforts to promote innovation in the technology industry. Its members, typically small-to-medium app developers and technology companies, will be affected by the outcome of the upcoming remedies hearing where broad changes to the current online and mobile ecosystem have been proposed. The App Association files this *amicus* brief to raise its concerns about the breadth and content of Plaintiff's proposed remedies.

The App Association has a strong interest in ensuring the antitrust laws are properly applied to these technologies to promote competition and increase output. This interest is longstanding. In fact, one of the first *amicus* briefs the App Association ever filed was in *United States v. Microsoft Corp.*, where the Department of Justice sought to break up Microsoft and the court discussed Microsoft's "platform[] for software applications."

---

[1] No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person, other than the *amicus*, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief. ACT receives financial support from a large number of donors, including general support from Google. Baker McKenzie represents Google in other matters unconnected to this brief.

[2] *State of the App Economy*, ACT | THE APP ASSOCIATION (2023), https://actonline.org/wp-content/uploads/APP-EconomyReport-FINAL-1.pdf.

253 F.3d 34, 53 (D.C. Cir. 2001) (en banc).  More recently, the App Association closely followed Epic's litigations against both Apple and Google and filed *amicus* briefs in each of those matters that explained the ways in which the Apple App Store and the Google Play Store are important to developers and end-users.

The App Association submits this *amicus* brief to highlight the symbiotic relationship between its member developers and Google and to explain its understanding of how Plaintiffs' proposed final remedies would affect the small- and medium-sized app developers who use Google products to reach billions of users.

## INTRODUCTION AND SUMMARY OF ARGUMENT

ACT | The App Association, which represents thousands of small business developers in the digital economy, drafts this *amicus* to ensure that the voice of all its member developers and innovators is clearly heard before this Court imposes remedies that may have unexpected and deleterious outcomes on their business practices.

The remedies proposed by the Plaintiffs in the upcoming hearing deeply concern small app developers.  These remedies, if implemented, would significantly alter the current online and mobile ecosystem, affecting the technical and commercial relationships between thousands of small app developers and Google.  The proposed remedies include the divestiture of core Google products such as Chrome and Android, injecting uncertainty into the livelihoods of thousands of small app developers who have chosen to partner or work with Google as a means of digital content distribution.

Members of the App Association have a symbiotic relationship with Google.  Google provides easy-to-use, developer-friendly technologies with competitive and transparent pricing terms, and built-in data security guarantees.  The App Association's members develop apps to be used with Google services that benefit consumers and businesses and drive the digital economy.

If these Google services are divested to a new owner, this balance will be upset. The services, and the underlying business relationships with Google create immense value for app developers and end-users. Before mobile platforms, app developers engaged in time-consuming marketing campaigns to reach users. These costs imposed formidable barriers to entry, resulting in higher prices, less adoption, and fewer apps being developed. Now, mobile software systems provide one-stop shops where developers and end-users transact directly. Many of Google's products, including Chrome, Android, and the Google Play Store, would undergo significant changes if the current proposed remedies were implemented. The App Association believes that these changes would stifle innovation in the online and mobile marketplaces. Specifically, the implementation of the Plaintiffs' proposed remedies will inject a yet-to-be-determined purchaser into these relationships. The app development industry has thrived through disintermediation and constant improvement of integrated marketplaces and marketplace services. Injecting new and additional stakeholders into this system is regressive and harmful and will increase friction. The sale of Chrome also eliminates Google's incentive to continue investing in Chromium—currently an open-source browser project used to develop advanced web applications and a number of competitor browsers. The loss of Google's investments in Chromium will impose substantial costs on app developers and depress future innovation. Among other concerns, the App Association believes the proposed remedies are far-reaching, disproportionate to the alleged harms identified by the Court, and raise numerous unanswered questions about—among other things—the future handling of data protection and user privacy.

Further, the proposed remedies that impose notice terms for future Google investments in small technology companies, including Generative AI companies, represent a new barrier to acquisitions that will diminish investment and innovation in the industry. Small app developers

are often the ones creating true, independent value in the development of new AI technologies and applications. Often, these innovators desire to be recognized, sought out, and eventually acquired by larger technology companies. The motivation of acquisition drives many of the innovations in the technology space by providing monetization for meaningful technology or content development. Imposing the Plaintiffs' requested notification remedy (through the new Hart-Scott Rodino ("HSR") form) adds significant costs, delays, and disincentives to these acquisitions. This is likely to impose further burdens on small app developers and technology startups, thus stifling innovation in this critical space.

Given the significant impact these proposed remedies would have on small app developers, the App Association has filed this *amicus* brief to bring their concerns to the attention of the Court. The App Association's members also rely on Google's services for distribution and are concerned by the uncertainty created by the proposed remedies. These proposed remedies will degrade the quality of the underlying products when they end up in the hands of a new owner who lacks the technical know-how, resources, or economic incentives to continue maintaining and innovating these products. The new owner of these Google products will reduce disintermediation in the market and disrupt the commercial relationships on which members of the App Association rely. Therefore, it is crucial for the Court to consider the perspectives and concerns of small app developers to ensure that the antitrust laws are properly applied to promote competition and innovation in the technology industry.

I. **Plaintiffs' Proposed Remedies Will Create Uncertainty for App Developers and Disrupt Ongoing Business Relationships.**

If Plaintiffs' proposed remedies are adopted, app developers will be overcome by uncertainty. At least tens of thousands of small app developers have ongoing business relationships

4

with Google.[3]  These include distribution agreements for apps or games available on mobile or online through the Google Play Store, the Chrome Web Store, or other Google products.  App developers have partnered with Google precisely because (1) it provides high-quality distribution networks and tools that reduce overhead on reliable and proven technologies; (2) those services reach millions of users; (3) Google has a proven track-record of investing in safety and security[4]; and (4) Google consistently invests in innovations in its own products.[5]

Plaintiffs identify a wide range of proposed remedies for Google that are not closely moored to the identified anti-competitive behavior in this Court's liability opinion.  That opinion focused on payments from Google to browser and device manufacturers for default positions for Search.  *See Memorandum Opinion* §§ V–VI, ECF No. 1033 (focused on Google's "exclusive agreements").  Here, the proposed remedy is in no way proportional to the identified conduct. Plaintiffs identify a wide range of proposed remedies for Google that will change the nature of its existing products.  Plaintiffs seek, among other remedies: (1) the divestiture of core Google products, including Chrome and potentially Android (after a certain time period); (2) required advance notification (via the HSR Act) of *any* investments in search and AI companies—no matter how small; (3) various conduct remedies limiting self-preferencing; and

---

[3] *See Google Play Statistics and Trends 2025*, 42 MATTERS, https://42matters.com/google-play-statistics-and-trends (last visited May 9, 2025) (reporting that 578,662 publishers have released apps on Google Play).

[4] Google is very adept at quickly identifying and patching security vulnerabilities in Google Chrome and Android and is constantly rolling out updated security features.  *See* Davey Winder, *Google Debuts New Chrome Browser Security Features to Block Threats*, FORBES (Sept. 12, 2024), https://www.forbes.com/sites/daveywinder/2024/09/12/google-debuts-outstanding-new-chrome-browser-security-features/.

[5] Google's parent Alphabet reports over $45 billion in R&D for 2023 and $49 billion in 2024.  *See* Alphabet Inc., Annual Report (form 10-K) (Feb. 5, 2025) at 39.

5

(4) mandated data sharing. *See generally Executive Summary of Plaintiffs' Revised Proposed Final Judgment*, ECF No. 1184.

Additionally, the proposed remedies are far-reaching. They are aimed at the very heart of Google's core businesses and practices. If these core businesses are disrupted, the consequences are grave and unpredictable. Take for example the proposed divestiture of Chrome and Android. For the App Association, many questions remain outstanding: (1) Who will be the buyer of these products? (2) What will be their business model? (3) What level of investment and technical expertise will this buyer bring to the table? (4) Will the buyer display a similar level of focus on safeguarding data protection and user privacy? (5) Will the buyer share the current incentives of Google to maintain and improve the products that app developers heavily rely on? And (6), core to the App Association member's concerns, how will the buyer handle the thousands of existing business relationships between Google and the app developers who currently rely on Google products for distribution? The answers to these questions are likely to be highly devastating to the members of the App Association because they are likely to destroy long-standing business relationships, undermine product quality, and stifle continued innovation.

In particular, the divestment of Chrome and Android creates significant uncertainty and concern for these distribution systems. Chrome and Android link consumers to the primary product offerings of thousands of app developers—their digital content. App developers have a strong and ongoing relationship with Google. Their applications bring creativity and consumer interest to internet and mobile device users, adding substantial value to the consumer experience. Google provides dependable products used by millions of users every day. Google invests heavily in developing these digital content delivery methods. These investments include numerous features for these platform services that attract app developers because of their low overhead costs, standard

access procedures, reliable data security that safeguards the data of app developers and users, established intellectual property protections, as well as flexible marketing and pricing models. Google does not do this for altruistic purposes; rather, the apps available on Google's services are a key reason for the success of Google's overall products. In short, without app developers, there is no app ecosystem. App developers and Google, accordingly, have a mutually reinforcing relationship. This fosters development of new and increasingly innovative apps, thus benefiting consumers and competition.

      A primary concern from the proposed divestitures of Chrome and Android is the addition of new stakeholders in the process of app distribution. Disintermediation has been a major boon to the industry by lowering friction in app distribution. To date, Google has been a convenient one-stop shop for app developers—providing streamlined processes for multi-channel distribution. Plaintiffs' proposed remedies will have the unintended consequence of requiring thousands of app developers to partner with or, at minimum, deal with a new owner of Chrome or Android.[6] This development will both interfere with the existing business relationships with Google and effectively inject a new party into the process of application distribution. Members of the App Association have always had the right to choose where their app and app data are distributed and on what terms. Plaintiffs' proposed remedies add substantial friction on the business side of digital distribution that will impede the seamless integration of apps into the digital economy.

---

[6] The *Plaintiffs' Revised Proposed Final Judgment* ("RPFJ"), ECF No. 1184-1, purports to include as part of Android, all "applications," "application programing interfaces (APIs)," and "the Google Play Store and Google Play Services." RPFJ at 2–3. Further, The RPFJ includes as parts of Chrome all "software, and applications, APIs, and other products, and services included in Google's Chromium or the Chrome browser." RPFJ at 3. Certainly, these remedies *de facto* include the transfer of apps already on the Google Play Store and available through Android or Chrome.

In contrast to the established certainty of a relationship with Google, the purchaser of Chrome or Android remains a substantial unknown. There are very few (if any) companies who can commit to the level of investment and innovation that Google has historically made to these businesses. A new owner will likely lack the capital, technical know-how, and motivation, to match Google's past and expected future investments in these products.

But the issue is deeper than that. Google's investments of billions of dollars to develop products like Chrome and Android, which they offer to the public for free, is economically viable because these products drive traffic to Search, allowing Google to recoup their investments in these complementary products. App developers are a strong beneficiary of these investments by Google. Google's investments provide app developers with functional and no-cost services for development, testing, and distribution. A future purchaser of Chrome or Android will either (1) lack the incentives to maintain, improve, and innovate these products or (2) will directly impose those investment costs on app developers and the public. The outcome here will devastate the current digital landscape—degrading product quality and raising the costs of operations for app developers (and in turn users) across the board. Small app developers have invested in the existing business relationship and Google ecosystem because it has offered app developers consistency, excellence, and reliability. Forcing the sale of these services would destroy the value of these investments.

A change in ownership also raises significant questions and uncertainty around the handling of app developer data, the data of users of those applications (which typically involves personally identifiable information), and future commitments to data safety and security. Further, any non-U.S. purchaser would also subject that personal data to transfer restrictions, such as those imposed by the Stored Communications Act, 18 U.S.C. §§ 2701–2712. The Plaintiffs' proposed

remedies pay little attention to these sensitive issues—outsourcing most of the details to a yet-to-be-named "Technical Committee" that will create "approved data security standards" at a yet-to-be-determined time. *See Plaintiffs' Revised Proposed Final Judgment* ("RPFJ"), ECF No. 1184-1 at 5, 35.[7] Basic questions regarding the handling and de-identification of user data remain unanswered. And these same concerns apply with equal force to the data of app developers.

This is not an empty concern. To meet developer needs, Google must safeguard this information and ensure products are viewed as trustworthy by the public. Even if Chrome and Android are purchased by established technology firms, the transfer of these products will create inherent security risks around the massive transfer of data and information, the adjustment period to a new owner, and uncertainty from the implementation of new data security standards. Immediate questions will arise around the new owner's means and experience to screen new apps for safety, security, and inappropriate content, and to safeguard users from efforts by hackers to steal sensitive information.

In short, the App Association has not seen sufficient commitment to the protection and safeguarding of its members' data (much of which is in the hands of the Google Play Store, Chrome, and Android) to provide any comfort in a blanket divestment or licensing of Google products or data. The assignment of the yet-to-be-named Technical Committee to oversee these proposed remedies does little to assuage these concerns.

The App Association fears other unintended consequences of the Plaintiffs' proposed remedies, as well. The Chromium browser project, developed by Google, is an open-source tool

---

[7] The RPFJ treats data security as an afterthought. The Technical Committee "will have the power to recommend reasonable data security standards," *id.* at 5, but nothing in the RPFJ actually requires the Technical Committee to set data security standards or specifies what these standards may be.

and resource that has been used to develop a number of products that compete with Google—including Microsoft's Edge browser, Opera, Brave, and DuckDuckGo—and allows advanced web applications to thrive.[8] Chromium also serves as a no-cost testing grounds for app developers who can test their web apps in a clean, open-source environment. Google has continued to invest in developing Chromium which continues to be a leading program. These investments come at no cost to small app developers and the improvements continue to make Chromium important and relevant for the new development of apps and related digital products. But the sale of Chrome would reduce or remove entirely the incentive for Google to continue making these investments in Chromium. The result of this change imposes a significant tax on small app developers who can no longer rely on Chromium as a state-of-the-art tool and will require an alternative testing product. Sources estimate that mobile device manufacturers saved "an estimated $33 billion to date in development and operating costs" from Google making Android open-source.[9] It is likely that Chromium resulted in similar sizable savings for app developers. Thus, the loss of Chromium would require small app developers to either license or purchase testing tools that would impose substantial costs and depress future innovations.

---

[8] Traditional apps are written with code that is unique to the platform (i.e. Kotlin for Android, Swift for iPhone, .NET for Windows). Web based apps enable small app developers to "write once, run everywhere" by writing their application using Chromium. Cross-platform application frameworks that depend on Chromium have been developed to support these web-based apps. *See* Tiago Vignatti, *Using Chromium for Building Apps (2025)*, VIGNATTI BLOG (December 4, 2024), https://vignatti.com/posts/chromium-for-building-apps/.

[9] *How Android and Google Play drive global growth*, THE GOOGLE BLOG (Apr. 10, 2024), https://blog.google/outreach-initiatives/public-policy/how-android-and-google-play-drive-global-growth/ ("When device makers don't have to build their own operating system, they are able to devote their resources to innovative software and hardware features, bringing consumers a diverse range of devices. This has resulted in over 24,000 device models — including smartphones, wearables, TVs and more — at all price points."); *Powering the Global App Economy: Android and Google Play's Contributions*, ACCESS PARTNERSHIP (Apr. 9, 2024), https://accesspartnership.com/powering-the-global-app-economy-android-and-google-plays-contributions/#.

Together, many of the proposed remedies will have unintended consequences for app developers. Changes in ownership of Chrome and Android represent uncertainty that threatens the existing commercial relationships between Google and thousands of small app developers. Chrome and Android have, to date, been developed, maintained, and improved by Google. Divestment will result in under-investment, degradation of the quality of the underlying products, and reduced incentives to innovate—all to the detriment of many thousands of small app developers who rely on these products as part of their existing business models.

## II. Plaintiffs' Proposed Notification Requirements Stifle Innovation in Emerging Technology Markets and Impede Acquisitions of Small App Developers.

Plaintiffs, in their Initial Proposed Final Judgment, acknowledged a "risk" that prohibiting ownership "or acquiring any investment or interest in any search or search text ad rival, search distributor, or rival query-based AI product or ads technology could cause unintended consequences in the evolving AI space." *Executive Summary of Plaintiffs' Revised Proposed Final Judgment,* ECF No. 1184 at 8. Instead, Plaintiffs modified their requested remedy to require Google's notification of *all* of these transactions, even if under the applicable thresholds of the HSR Act. *See* RPFJ at 10. Plaintiffs' acknowledgment here of risk and unintended consequences in the developing AI-space mirrors the concerns of the App Association and its members. But even this revised remedy imposes substantial costs on small app developers and nascent technology startups who are innovating in the Gen AI field.

Plaintiffs' revised proposed remedy would inhibit technology deals, stifle the incentives for development by innovative companies, and impose significant costs on small app developers.[10]

---

[10] Google's investments are a major driver of technology developments and innovations. Google spent $92 billion in investing activities between 2022 and 2024. This includes $10 billion of spending in acquisitions. *See* Alphabet Inc., Annual Report (form 10-K) (Feb. 5, 2025) at 56.

11

The notification provisions of the RPFJ sweep broader than the existing statutory framework they invoke. Under the HSR Act, companies are already required to notify regulators before completing acquisitions over certain transaction size thresholds. But Congress, in passing the HSR Act, saw fit to impose a certain minimum threshold under which no notification is required. While the agencies can review non-reportable deals, the threshold is an acknowledgment that low-value acquisitions are less likely to result in any anticompetitive harm.

Plaintiffs' proposed remedy here discards that concern and instead imposes a sweeping, burdensome notification regime on *all* future Google investments to notify Plaintiffs (via an HSR filing) before participating in any investments, collaborations, or acquisitions of competitors in the general search services or general search text ads markets or in any emerging AI brands or developers. The Court should decline to adopt this proposal.

Adopting this notification remedy will negatively impact app developers who seek to create innovative products in the AI space. Startups spend and invest with the intent of being integrated into the current tech ecosystem. Many app developers "aim to compliment or enhance the offerings of established companies."[11] As noted above, many of Chrome's competitors are built on Chromium, including Edge, Opera, Brave, and DuckDuckGo.[12] The hundreds of projects that rely on Chromium, including projects that enable web-app development, depend on Google keeping the lights on by "having thousands of servers endlessly running millions of tests, responding to hundreds of incoming bugs per day, ensuring the important ones get fixed, and

---

[11] Jacob Hellman, *Big Tech's 'Voracious Appetite,' or Entrepreneurs Who Dream of Acquisition? Regulation and the Interpenetration of Corporate Scales*, 31 SCIENCE AS CULTURE 149, 149 (2021) *available at* https://doi.org/10.1080/09505431.2021.2000597.

[12] Alex Nguyen, *List of Chromium and Non-Chromium Based Browsers*, COMPUTER CITY (Oct. 14, 2024), https://computercity.com/software/browsers/list-of-chromium-and-non-chromium-based-browsers.

constantly investing in code health to keep the whole project maintainable" which represents "hundreds of millions of US dollars in annual investment just for maintenance costs."[13]

Acquisition is often a strong motivator for product development. The App Association has numerous members who are invested in the growth and development of the AI space, many of which are contributing independent value in the development of new AI technologies and applications. Acquisition by a larger, better capitalized company is often the relevant business model that motivates these developments.[14] For many, the goal is to create sufficient innovation to be recognized, sought out, and eventually acquired by larger AI developers like Google, Microsoft, Open AI, or other tech companies that invest in their relevant expertise. This dynamic is one of the primary drivers of innovation in the technology space—as many small app developers lack the infrastructure, startup capital, or personnel to rapidly expand and compete with more established products. This incentive structure will become more unpredictable should the Court adopt the notice provisions of the RPFJ. In these cases, acquisitions—particularly of small start-up companies—are marginal decisions. Such acquisitions will be substantially less attractive to Google if they are forced to incur the costs of filing an HSR Form, incurring extra delays, and drawing extra scrutiny from federal and state regulators.

Imposing these more arduous notice restrictions on acquisitions of small startups, app developer products, or other innovations in the AI space, will result in higher hurdles to these future acquisitions. Filing the new HSR Form alone is no small task. It is highly burdensome and

---

[13] *Announcing Supporters of Chromium-based Browsers*, CHROMIUM BLOG (Jan. 9, 2025), https://blog.chromium.org/2025/01/announcing-supporters-of-chromium-based.html.

[14] This phenomenon has been recognized in scholarly works. *See, e.g.*, Hellman, *supra*, at 149–161 (". . . Big Tech's tendency to acquire startups and absorb their intellectual property, workers, and user base . . . is also driven by the supply side, as it were, in that many founders of technology startups – and their investors – want to get acquired.").

resource intensive. Compounding the new HSR notification requirements with the notice requirements of the RPFJ will have significant and lasting negative consequences for the app development industry.

The required waiting period and review by federal agencies and multiple state regulators acts as a further disincentive to even low-value, non-competitively relevant acquisitions. The imposition of further costs, delays, and scrutiny by large regulators will assuredly reduce the incentive to continue innovating and acquiring companies like the App Association's members. This outcome will reduce the likelihood of acquisition, thereby depressing the incentive and ability of small app developers to monetize their innovations via acquisitions. Likely this change in incentives will result in a long-term reduction in innovation.

Accordingly, the Court should reject Plaintiffs' notification remedies for investments or acquisitions of search or generative AI products.

## CONCLUSION

For the foregoing reasons, the App Association respectfully requests that this Court take serious consideration of the consequences of Plaintiffs' proposed remedies and consider the views of its members—small app developers—as identified in this *amicus* brief to avoid imposing remedies that would significantly harm those members.

Dated: May 9, 2025

Respectfully submitted,

*/s/ Mark G. Weiss*
BAKER MCKENZIE LLP
Mark G. Weiss (*pro hac vice* pending)
Creighton J. Macy (*pro hac vice* pending)
Graham Cronogue (Bar No. 104436)
Kaitlyn E. Barry (*pro hac vice* pending)
815 Connecticut Ave., NW
Washington, DC 20006
Telephone: (202) 835-6260

Facsimile: (202) 416-6260
Mark.Weiss@bakermckenzie.com

*Counsel for Amicus Curiae*