**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                     Plaintiffs,<br><br>            v.<br><br>GOOGLE LLC,<br>                     Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*,<br><br>                     Plaintiffs,<br><br>            v.<br><br>GOOGLE LLC,<br>                     Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA |

**BRIEF OF AMICUS CURIAE SAMSUNG ELECTRONICS CO., LTD. IN
<u>SUPPORT OF DEFENDANT'S OPPOSITION TO CERTAIN PROPOSED REMEDIES</u>**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(A), *amicus curiae* Samsung Electronics Co., Ltd. ("Samsung") certifies that Samsung is a publicly held corporation organized under the laws of the Republic of Korea. Samsung has no parent corporation and no publicly held corporation owns 10% or more of Samsung's stock.

## STATEMENT OF INTEREST

As detailed in its motion seeking leave to file the instant *amicus* brief, Samsung has a strong interest in this litigation because the remedies ordered by this Court could have a profound impact on Samsung's global business and ability to compete in U.S. smartphone and browser markets. Samsung's interest in filing an amicus brief is particularly strong because neither party called a live Samsung witness to testify about Samsung's contracts and negotiations with Defendant Google LLC ("Google") and Google's competitors.

## STATEMENT OF *AMICUS CURIAE* INDEPENDENCE

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)((4)(E), Samsung certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person—other than the *amicus*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

i

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

RELEVANT FACTUAL BACKGROUND..........................................................................5

      A.      Samsung's Pro-Competitive Smartphone Business Model ..................................5

      B.      The Google Partnership Helps Samsung Compete By Providing
                 Royalty-Free Access To A Best-In-Class Mobile Operating System
                 And App Store ......................................................................................................7

      C.      The Search RSA Promotes Smartphone Competition And
                 Innovation ............................................................................................................8

      D.      Samsung's Gemini Contract Promotes Smartphone Competition
                 And Innovation ...................................................................................................10

ARGUMENT..........................................................................................................................12

I.       PLAINTIFFS' DISTRIBUTION REMEDIES WILL HARM
         SMARTPHONE COMPETITION AND INNOVATION .............................................13

II.      PLAINTIFFS' DISTRIBUTION REMEDIES WILL NOT HELP
         SAMSUNG BETTER COMPETE WITH APPLE.........................................................18

CONCLUSION......................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986)................................................................................................13

*Massachusetts v. Microsoft Corp*,
    373 F.3d 1199 (D.C. Cir. 2004) .....................................................................12, 13

*NCAA v. Alston*,
    594 U.S. 69 (2021).................................................................................................12

*United States v. Google LLC*,
    747 F. Supp.3d 1 (D.D.C. 2024) ...........................................................................8

**Other Authorities**

*U.S. et al. v. Apple Inc.*,
    No. 2:24-cv-04055, ECF #1 (D.N.J.)..............................4, 5, 6, 7, 14, 15, 16, 18, 20

## PRELIMINARY STATEMENT

"I think [smartphone manufacturers] should have the freedom to build the best possible product experience for their users."[1]  Tr. at 792:19-20.  That is what this Court heard from Perplexity's Chief Business Officer, a Google competitor called by Plaintiffs to support their case in chief.  Samsung agrees wholeheartedly with this testimony.  This is why Samsung rigorously tests and only preloads and sets as defaults products and services it determines on the merits are best-in-class while ensuring that its distribution agreements provide the freedom needed to reassess these determinations as market conditions change in the highly dynamic technology industry.

However, Plaintiffs' Distribution Remedies will deprive Samsung of the freedom to offer the best user experience by preventing Samsung from receiving any compensation for an entire decade if it preloads and/or sets as an access point default Google's general search engine, Google Search, which, as Plaintiffs' industrial organization expert (Dr. Tasneem Chipty) testified, has been "the best search engine" for "the last 20 years[.]"  *Id.* at 2309:19-22.  Similarly, Plaintiffs' Distribution Remedies will deprive Samsung of the freedom to offer the best user experience by preventing Samsung from receiving any compensation for an entire decade if it preloads and/or sets as an access point default Google's AI service, Gemini, which is a leading service in the nascent and highly competitive AI market.  If adopted, Plaintiffs' Distribution Remedies would place Samsung in a catch 22 situation of having to choose between offering the best user experience or preloading and setting as defaults lower quality services to receive revenue (albeit lesser revenue) that is critically important to the company's ability to compete and innovate.

The evidence before this Court does not support such drastic remedies.  Plaintiffs'

---

[1] All exhibit citations are to the exhibits attached to the accompanying Declaration of Juan A. Arteaga, dated May 9, 2025.  The term "Distribution Remedies" means Plaintiffs' proposal to bar Google from compensating distributors of Google's general search engine and/or generative artificial intelligence ("AI") products and services for 10 years.

Distribution Remedies would not only improperly override Samsung's business judgment regarding the best user experience for its customers but would also harm smartphone competition while failing to increase search competition.

As Samsung's Head of Mobile Customer Experience, Jay Kim, testified during his deposition, Samsung has consistently selected Google Search as the default for access points on Android devices because "Google has the best service," both in the U.S. and abroad.  Ex. A at 30:13-14, 41:9-12.  Notably, Samsung has reached this determination even as companies have begun integrating AI features into their search engines.  For example, in 2023, Samsung considered Microsoft's "New Bing," which included certain AI features, but concluded that "New Bing" was not "a compelling product . . . to bring to Samsung users[.]"  *Id.* at 39:23-40:16.

While viewing Google Search as the "best" search engine, Samsung nonetheless ensured that its most recent search revenue share agreement with Google ("Search RSA") contains an express non-exclusivity provision while continuing to include a device-by-device election provision, which allows Samsung to set a non-Google search engine as the default for access points on any device line without forfeiting revenue under device lines where Google Search is the default.  The most recent Search RSA also added an access point-by-access point election provision, which grants Samsung the option to set a non-Google search engine as the default for certain access points on any device without losing revenue for other access points on the same device where Google Search is the default.

These non-exclusivity provisions irrefutably establish that Samsung's Search RSA is not the sort of anticompetitive exclusive agreement this Court found supported its monopolization rulings.  The non-exclusive nature of the Search RSA would be further enhanced by Google's proposed remedies, which expressly prohibit Google from conditioning any search payments on a

2

smartphone manufacturer's integration, placement and/or promotion of a rival's products.

As Mr. Kim also testified, Samsung had discussions with Google, OpenAI and Microsoft about integrating their AI services on Samsung's Galaxy S25 series, which launched in February 2025, as Samsung sought to promptly respond to Apple's earlier integration of OpenAI's ChatGPT on iPhones. Ultimately, Samsung selected Google's Gemini because it offered the "best" AI services that could be deeply integrated with the S25 devices' technology within the strict launch schedule. As detailed below, Samsung's decision to only integrate Gemini was in no way due to the Search RSA. In addition, the indisputable evidence confirms that Samsung did not demand "luxurious" preload or promotion payments as suggested by certain Google competitors. Indeed, Samsung made clear to these competitors that neither the Search RSA nor Samsung's relationship with Google would preclude their AI services from being integrated in Samsung smartphones. Samsung also made clear that it fully intended to work with multiple AI partners and that no company, including Google, would receive any type of exclusivity on Samsung devices.

Consistent with these discussions, Samsung ensured that the Gemini contract did not restrict its ability to partner with OpenAI, Microsoft or any other AI provider by securing an express non-exclusivity provision, a device-by-device election provision, and the right to terminate the contract for convenience. As with the Search RSA, these provisions make clear that the Gemini contract is not the type of exclusive agreement that this Court found anticompetitive, especially when considered along with the additional flexibility provided by Google's proposed remedies. Since entering the Gemini contract, Samsung has continued discussing potential partnerships with both OpenAI and Microsoft, and has also begun similar discussions with other AI providers.

In addition to lacking any factual support, Plaintiffs' Distribution Remedies will have the unintended consequence of significantly harming U.S. smartphone competition. In a separate

lawsuit, Plaintiffs have accused Apple of unlawfully monopolizing U.S. smartphone markets, alleging that the case was necessary to free "smartphone markets from Apple's anticompetitive and exclusionary conduct and restoring competition to lower smartphone prices for consumers" and "preserving innovation for the future."[2]  However, the Distribution Remedies proposed in this case will have the exact opposite effect.  If adopted, these remedies would fortify Apple's monopoly by forcing Samsung to integrate default services that are not only of lower quality but that monetize at much lower rates—all while failing to increase search competition.

Without the ability to integrate the best default services, Samsung will be unable to offer a compelling out-of-the-box experience, which is necessary to overcome the user switching barriers that Apple has erected and the other structural advantages that Apple enjoys in U.S. smartphone markets.  Without the ability to secure the greatest search and AI revenue possible, Samsung will lack the financial resources needed to compete with Apple, which is able to annually spend "$30 billion on research and development" and "billions [more] on marketing and branding" because its $97 billion in "net income exceeds any other company in the Fortune 500[.]"  DOJ Apple Compl. ¶¶ 16, 19, 24.  Similarly, Samsung will lack the financial resources needed to continue offering consumers a broad range of devices with different price points because its device margins are already far lower than those of Apple, which focuses exclusively on higher priced premium smartphones.  *Id.* ¶¶ 5, 20, 188; Ex. A at 43:25-45:19.  This would harm all consumers.

When Samsung has previously advised Plaintiffs about these unintended consequences, Plaintiffs have suggested that (i) the Distribution Remedies will help Samsung compete with Apple because Apple will lose far greater Google search revenue, and (ii) Samsung can easily replace

---

[2] Compl. at 5, *U.S. et al. v. Apple Inc.*, No. 2:24-cv-04055, ECF #1 (D.N.J.) ("DOJ Apple Compl.").

any lost revenue because it is a large company with billions in revenue. The evidence in this case and Plaintiffs' own allegations in their monopolization lawsuit against Apple readily show that such suggestions lack merit. At bottom, these suggestions reflect a fundamental misunderstanding of how companies with multiple business units operate. Each business unit has its own profit and loss statement and must stand up on it own merits. Thus, Samsung cannot—and should not—be expected to subsidize its U.S. smartphone business with revenue from other business units.

Moreover, as Plaintiffs themselves have recognized, simply being a large technology company with billions in sales is not sufficient to effectively compete with Apple. The complaint in their monopolization lawsuit against Apple expressly notes that other "well-financed companies have tried and failed" to challenge Apple's monopoly, including "Amazon (which released its Fire mobile phone in 2014 but could not profitably sustain its business and exited the following year); Microsoft (which discontinued its mobile business in 2017); HTC (which exited the market by selling its smartphone business to Google in September 2017); and LG (which exited the smartphone market in 2021)." DOJ Apple Compl. ¶ 186. Rather than improve Samsung's competitive position, Plaintiffs' Distribution Remedies will place Samsung—Apple's closest competitor—on the road toward suffering the same fate.

Finally, in their opening statements, Plaintiffs claimed that their proposed remedies will serve as the antitrust "anti-freeze" needed to thaw out the U.S. search market. In reality, their Distribution Remedies will serve as the blizzard that places an everlasting deep freeze over U.S. smartphone markets while, as this Court suggested, simply leading to a "world [where we] just have a different [search engine] giant, and that's Microsoft[.]" Tr. at 820:7-13.

## **RELEVANT FACTUAL BACKGROUND**

### A.    **Samsung's Pro-Competitive Smartphone Business Model**

"Guided by the value of open collaboration, Samsung joined forces with [Google's]

Android [operating system in the late 2000s] to push the frontier of mobile technology[.]"[3]  In March 2010, this partnership resulted in the launch of Samsung's first Galaxy S series device, which was "[p]acked with best-in-class technology" and "created the blueprint for a mobile experience that enriches and simplifies everyday life."[4]  In the 15 years that have followed, Samsung has "cement[ed] [its] status as a pioneer in the smartphone industry" by, among other things, creating new device categories (*e.g.,* foldables; Galaxy Note with S Pen), introducing ultra-slim hardware designs with larger, brighter and curved screen displays, and being the first manufacturer to offer face recognition, 5G connectivity, water resistance, and a health software application.[5]  Most recently, Samsung has been leading the efforts to "fully unlock the benefits of AI technology" on smartphones through its market leading Galaxy AI service.[6]

　　To achieve these and many other innovative breakthroughs, Samsung has invested billions of dollars and millions of engineering hours into R&D.  For example, in 2024, Samsung invested approximately ▮▮▮▮▮▮▮ into R&D for its mobile business.

In addition to being an innovation leader, Samsung has broadened the pricing and product options available to consumers.  Unlike Apple, which exclusively focuses on "a more expensive [premium] segment of the [] smartphone market," DOJ Apple Compl. ¶ 22, Samsung offers consumers a broad array of devices that range from entry-level smartphones that cost about $150

---

[3] *A Journey of Mobile Innovation*, Samsung Newsroom (Jan. 11, 2019), https://news.samsung.com/global/a-journey-of-mobile-innovation.

[4] *Id.*

[5] *Id.*; *How Samsung Galaxy Has Rewritten Smartphone History in 10 Innovative Technologies* Samsung Newsroom (Feb. 9, 2022), https://news.samsung.com/global/how-samsung-galaxy-has-rewritten-smartphone-history-in-10-innovative-technologies.

[6] *Samsung Solidifies its Mobile AI Leadership at MWC 2025: From Galaxy AI to Software-Centric Networks*, Samsung Mobile Press (Mar. 2, 2025), https://www.samsungmobilepress.com/press-releases/samsung-solidifies-its-mobile-ai-leadership-at-mwc-2025-from-galaxy-ai-to-software-centric-networks.

to premium, business/enterprise-focused devices that cost close to $2,000.  Ex. A at 24:8-23.

This consumer-friendly business model, however, has resulted in Samsung having higher production costs than Apple because Samsung must purchase a "[v]ariety of chipset[s] and components" tailored to each device line's unique design and capabilities.  *Id.* at 24:24-25:8, 214:5-23.[7]  When coupled with Samsung's lower prices, these higher production costs have contributed to Samsung having "very thin" device margins.  *Id.*  For example, Samsung's device margins are ███████████████  *id.* at 44:7-8, whereas Apple's device margins are "more than "30 percent," which is "more than double those of others in the industry."  DOJ Apple Compl. ¶ 5.  Due to these "very thin" device margins, the revenue from Samsung's mobile partnerships has become increasingly important to its ability to compete and innovate.  Ex. A at 24:24-25:8.

### B.    The Google Partnership Helps Samsung Compete By Providing Royalty-Free Access To A Best-In-Class Mobile Operating System And App Store

"The most important software component [in] a smartphone[] [is the] operating system," which serves as "the foundational software that manages both the hardware and other software programs on the device."  DOJ Apple Compl. ¶ 158.  For example, software applications ("apps") "depend on a smartphone's operating system" to perform the requested tasks and "access various hardware components on the phone, such as the camera, microphone, and speaker."  *Id.*

Through its Google partnership, Samsung receives access to the Android mobile operating system, which enables Samsung devices to seamlessly deploy cutting-edge technology while offering consumers market leading security features.  Importantly, this partnership allows Samsung to build its smartphones on Android without paying any licensing fees, which, in turn,

---

[7] *See also id.* at 214:5-13 ("[W]e're playing at the premium segment, and Apple is all premium segment, and that's where the U.S. market is mainly residing. But we also . . . play in a lower [margin] segment to provide options for the U.S. customers . . . [which] increases the cost for us.").

permits Samsung to offer consumers lower prices and greater device features, as well as invest in R&D, by keeping Samsung's production costs down.[8]

In addition, the Google partnership provides Samsung access to the Play Store, which is "essential to the Android customer experience" because it "support[s] the functionality of all Android [apps]" and "'allow[s] customers to [easily] access the apps that they want to have [o]n their device[.]'" *United States v. Google LLC*, 747 F. Supp.3d 1, 98, 150 (D.D.C. 2024) (internal quotation marks and citation omitted).[9]  In the U.S., Samsung's partnership with Google permits Samsung to preload the Play Store without paying any licensing fees, *id.* at 98, which, in turn, allows Samsung to keep its costs down while still making a broad catalogue of high quality apps immediately available to users.

### C.    The Search RSA Promotes Smartphone Competition And Innovation

Since launching its first Galaxy S series device 15 years ago, Samsung has selected Google Search as the default on its Android device search access points because "Google has the best service," both in the U.S. and abroad.  Ex. A at 30:13-14, 41:9-12.  As Mr. Kim testified, Samsung needs to provide users the best out-of-the-box search experience because "one of the things that [consumers] do most [on their smartphones] is searching [the internet]."  *Id.* at 30:3-19.

Over the years, Samsung has considered setting Bing as the default for search access points on Android devices but has concluded each time that consumers view "Google Search [as] . . . a better product."  *Id.* at 32:8-11.  This conclusion has been supported by the fact that all Samsung personal computers built on Microsoft's Windows operating system have "Bing and Edge [set] as

---

[8] Samsung fully agrees with Dr. Chipty that Plaintiffs' proposed conditional Android divestiture "go[es] too far."  Tr. at 2201:1-8; *see also* Ex. A at 50:19-52:10 (divestiture would harm internet ecosystem because Android could become closed-sourced or a lower quality alternative to iOS, and Samsung could be forced raise prices or de-feature phones to help offset any licensing fees).

[9] *See also id.* at 98 ("The Play Store . . . contributes significantly to the user experience."); *id.* at 150 ("[W]ithout the Play Store, the 'phone is a brick.'" (citation omitted)).

"[the] default service," as required by Microsoft's Jumpstart program, but many "[consumers] still use Google Search as [their] primary search engine."[10]  *Id.* at 32:12-33:2.

Most recently, Samsung considered a potential search partnership with Microsoft in 2023, when Microsoft was promoting an AI-enhanced "New Bing."  Samsung ultimately determined that "New Bing" was not "a compelling product . . . to bring to Samsung users" because Microsoft was unable to clearly explain whether "New Bing" would function as an AI-powered search engine that competes with Google Search or an AI tool that competes with ChatGPT.  *Id.* at 36:3-37:10, 39:23-40:16.

Samsung has also selected Google Search as the default for Android device search access points because Google Search, as "the best search engine", "provides the best bet for monetizing [search] queries," *Google*, 747 F. Supp.3d at 144, which is critically important to Samsung's ability to compete in smartphone markets.  As Mr. Kim testified, Samsung uses its search revenue to help fund the billions of dollars that Samsung must invest each year in R&D and marketing "to keep up with the competition."  Ex. A at 21:23-22:19, 42:16-43:22.  As Mr. Kim also testified, Samsung's search revenue plays a critical role in its ability to offer consumers the lowest prices possible as well as cover the higher costs that come with producing a broad array of devices with different functionalities.  *Id.* at 23:22-25:13, 214:5-23.[11]

Moreover, Samsung's partnership with Google has provided it with the opportunity to develop innovative search functionalities for Samsung devices.  For example, as part of the Galaxy

---

[10] Plaintiffs' consumer behavior expert (Dr. Antonio Rangel) acknowledged this preference by citing studies showing that "when Google users were forced to make a choice between Google and Bing, 1.1 percent of Google users select Bing," whereas "when Bing users were forced to make a choice between Google and Bing, 16 percent selected Google[.]"  Tr. at 575:10-22.

[11] Under its Google partnership, Samsung receives payments that help cover the marketing costs associated with seeking to convert iPhone users to Android device users.  RDX0435 at -343-345.

S24 series, Samsung engineers worked with their Google counterparts to create "Circle to Search," which provides users the ability to conduct visual searches by circling an image without having to type any text. *Id.* at 149:13-20. This relatively new search service has already gained usage among approximately ▮ of Samsung devices enabled with this service. *Id.* at 93:11-21, 223:13-22.

Nonetheless, Samsung has preserved the freedom to work with other search providers by securing device-by-device election provisions in the Search RSAs. JX0071 at -399; PXR0608 at -046. Moreover, in the most recent Search RSA, Samsung secured an express non-exclusivity provision and an access point-by-access point election provision. PXR0608 at -049, -061-069.

### D.    Samsung's Gemini Contract Promotes Smartphone Competition And Innovation

Consistent with its longstanding commitment to open collaboration, Samsung adopted a "philosophical approach [of] openness" when it began considering integrating AI technology on its devices. *Id.* at 58:8-61:5.[12] Such an open approach, Samsung concluded, offers the best user experience and enhances the competitiveness of Samsung devices. *Id.* at 58:8-61:5, 78:6-83:1. Consequently, Samsung has invested significant financial and engineering resources toward ensuring that its devices can deeply integrate multiple AI services and thereafter allow for their maximum deployment when selected by users. *Id.* at 48:12-49:15, 58:8-64:19, 69:19-70:13.

In addition, Samsung has actively pursued partnerships with multiple leading AI providers. For instance, before entering its Gemini deal with Google in November 2024, Samsung had discussions with OpenAI and Microsoft about potential preload agreements for the then-forthcoming Galaxy S25 series and subsequent series. *Id.* at 61:17-63:7. During these discussions, Samsung made clear that its Google partnership was not an obstacle. Thus, when "OpenAI initially

---

[12] *See also* RDX0365 at -091 ("[W]ith respect to AI, it is necessary to take three approaches. 1. Cooperation with various partners such as Google/MS etc. Need to open all possibilities[.]").

thought that collaborating with Samsung [mobile] seemed unlikely due to its relationship with Google," "Samsung clarified that collaboration is possible" and that it was "targeting 2025" for a partnership.  RDX0366 at -291, -293.  Likewise, Samsung told Microsoft that it was pursuing "Multi-AI on Galaxy" and "[o]ther AI assistants can *co-exist with Gemini* thru Samsung's own access points such as side-key long-press, keyboard etc."  RDX0367 at -173.  Moreover, Samsung made clear to all potential partners, including Google, that there would be "[n]o exclusivity."  *Id.*

To help kickstart contract negotiations, Samsung provided term sheets to both OpenAI and Microsoft which left open for future discussion key financial terms.  Ex. A at 93:25-95:19, 98:9-99:15, 105:25-107:3; RDX0368 at -170-75. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

Ultimately, Samsung selected Gemini as the promoted AI service in the S25 series because it was the "best" product that met Samsung's product specifications and timing requirements as it sought to respond to Apple's earlier integration of ChatGPT on iPhones.  *Id.* at 57:13-23, 83:2-19.

However, to ensure that it could pursue its multi-AI partner strategy, Samsung secured an express non-exclusivity provision and device-by-device election provision, as well as the right to

---

[13] ████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

terminate the contract for convenience. RDX0432 at -368, -371, -375.[14] Since entering the Gemini contract, Samsung has continued discussing potential partnerships with various AI providers, including OpenAI, Microsoft, Meta AI and Perplexity. Ex. A at 60:24-61:5.

### ARGUMENT

A bedrock principle of antitrust law is that the remedies should "'do no harm.'"[15] This principle has long been embraced by leaders of the U.S. Department of Justice Antitrust Division as well as applied by the Supreme Court and D.C. Circuit in landmark antitrust cases.[16]

In *NCAA v. Alston*, the Supreme Court stressed that courts "must be sensitive to" entering remedies that "could wind up impairing rather than enhancing competition" by, for example, "unintentionally suppress[ing] innovation[.]" 594 U.S. 69, 102 (2021). The Supreme Court also stressed that "static judicial decrees in ever-evolving markets may themselves . . . frustrate entry and competition." *Id.* at 99. And, in the seminal case regarding appropriate antitrust remedies in monopolization cases involving technology markets, the D.C. Circuit applied this principle to reject several proposed remedies that were likely to harm consumers and competition. *Massachusetts v. Microsoft Corp*, 373 F.3d 1199, 1209-13 (D.C. Cir. 2004) (removing Microsoft's software code rejected because addressing entry barriers "in a manner likely to harm consumers is

---

[14] *See also* Ex. A at 70:22-25 ("[Under this non-exclusivity provision], Samsung has [the] option to work with any other generative AI companies for our devices[.]"); *id.* at 68:12-21 (Samsung has "option" to not preload Gemini on any device line).

[15] Former Assistant Att'y Gen. Thomas O. Barnett, U.S. Dep't of Just., Antitrust Div., *Section 2 Remedies: A Necessary Challenge* 4 (Sept. 28, 2007) ("AAG Barnett Speech"), https://www.justice.gov/archives/atr/file/519221/dl?inline=

[16] *See, e.g.*, AAG Barnett Speech at 4 ("In short, if the antitrust laws are intended to advance consumer welfare, then any remedy should, at the least, not harm such welfare."); Former Deputy Assistant Att'y Gen. Deborah Platt Majoras, U.S. Dep't of Just., Antitrust Div., *Antitrust Remedies in the United States: Adhering to Sound Principles in a Multi-Faceted Scheme* 7 (Oct. 4, 2002) (enforcers "must be mindful that the remedy may have unintended consequences in the marketplace . . . given our ultimate goal of protecting competitive markets for the benefit of consumers"), https://www.justice.gov/archives/atr/file/519721/dl.

not self-evidently an appropriate way to remedy an antitrust violation"); *id.* at 1219 (broader disclosure of Microsoft's future APIs rejected because it was "likely to harm consumers" by reducing Microsoft's and rivals' incentives to innovate).[17]

As detailed below, Plaintiffs' Distribution Remedies violate this central tenet of antitrust remedies law because they will cause grave harm to U.S. smartphone competition and consumers. Specifically, these remedies will prevent Samsung and other smartphone manufacturers from being able to challenge Apple's dominant market position by precluding them from integrating the search and AI services that they believe offer the best user experience, as well as by depriving them of the revenue needed to innovate and offer the most competitive prices possible.

In addition, Plaintiffs' Distribution Remedies are unlikely to achieve their stated objective because, as the Supreme Court has made clear, "'[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.'" *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) (citation omitted). Search competition will not be increased by reducing the number of players competing for default agreements for an entire decade. And sidelining the highest quality search engine from bidding for such agreements certainly will not lead to greater competition and innovation in the search market. Instead, as the Court suggested, Plaintiffs' Distribution Remedies will simply result in a "world [where we] just have a different [search] giant, and that's Microsoft[.]" Tr. 820:7-13.

## I.    PLAINTIFFS' DISTRIBUTION REMEDIES WILL HARM SMARTPHONE COMPETITION AND INNOVATION

In their monopolization lawsuit against Apple, Plaintiffs recognize that Samsung and other device manufacturers face significant barriers when competing with Apple in U.S. smartphone

---

[17] *See also id.* at 1226 (web services remedy rejected because "the court is not to risk harming consumers"); *id.* at 1226-27 (remedy barring discounts rejected because "we [] refuse to condemn a practice that 'offer[s the] customer an attractive deal'") (citation omitted).

markets and are seeking to eliminate certain of these barriers. However, their proposed 10-year bar on Google Search and Gemini distribution payments will simply solidify Apple's monopoly.

As Mr. Kim testified, Samsung's competitive position is "weakest" in the U.S. because it needs to overcome various market structure disadvantages, which require Samsung "to [make] bigger investment[s]." Ex. A at 29:4-29:11, 151:8-19, 213:22-214:2. For instance:

- Samsung must invest heavily in marketing due to the user switching barriers and product quality misperceptions created by Apple practices that, among other things, severely restrict the interoperability between iPhones and Android devices. *Id.* at 28:2-29:3 (Apple limits functionality of iMessage, FaceTime and AirDrop—which are "very popular services in the U.S."—to iOS).

- Samsung must expend significant time and resources ensuring that device carriers and app developers do not provide better promotion and services to iPhones because carriers tend to give iPhones "a stronger presence in the retail front" and "app developer[s] tend to work on iOS more than [the] Android side" given that the "[U.S.] market is very skewed to iOS[.]" *Id.* at 19:24-20:12, 29:4-11.

- Samsung must make every effort to keep up with Apple's annual R&D spend of "$30 billion," DOJ App. Compl. ¶ 24, because high-end premium smartphones comprise a large segment of the U.S. market, which means Samsung must be able to offer consumers "the latest technology and [best] services[.]" *Id.* Ex. at 43:14-19.

- Samsung's "operation cost[s] [are] much higher [than] Apple" because it seeks "to provide [greater] options for [] U.S. customers" by offering a broader range of devices with varying capabilities and price points. *Id.* at 214:5-23.

- The structure of the U.S. smartphone market and the barriers erected by Apple have enabled Apple to secure device "margins of more than 30 percent," ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Thus, as Mr. Kim testified, Samsung is "fighting a pretty tough battle in the U.S." and its already "weak" position will be made "much weaker" without Google search payments:

> [W]e're making a lot of investment to make the latest technology come to our devices. And the revenue share that we [get] from Google is . . . a very . . . important part of . . . sustaining our business to reinvest and manage . . . the price point[s] that we're covering . . . and the customization we do for our customers[.]
>
> And if we're not getting paid from Google in the revenue share that we're getting currently, I think it will probably make our position much weaker to innovate and provide . . . the latest technology and better services to our customer. . . .[W]e might face [] a very difficult situation to continue our [U.S.] business.

Ex. A at 43:5-22. Importantly, Samsung would not be the only loser in such a scenario because

14

U.S. consumers will end up paying more, having less choice, and receiving lower quality devices:

> Q. If Samsung had to cover more of the costs without revenue share from Google on Search, could that impact the price of smartphones to end users?
>
> A. We can't sell a product in minus profit. So, basically, you know, some of [our] product[s] could end up increasing [in] prices or [we may need to] defeature our product[s] to manage the profit, which will make our position [even] weaker in the [U.S.] market. Then . . . we'll be [further] structurally disadvantaged against Apple and . . . it will be a purely 100 percent Apple market eventually.

*Id.* at 44:9-19.

For the same reasons, consumers and competition in smartphone markets will be harmed if Google cannot compensate Gemini distributors.  As Mr. Kim testified, the integration of AI services into smartphones is a complex process that requires significant investment:

> It's a very complicated process to integrate AI services on devices because we're not just preloading them as a[n] independent service. [The AI service] has to work closely with our hardware, our [One U1], which is our UX. And then [we] also [need to offer a] . . . very competitive [experience] . . . [with] meaningful feature[s] or services that [consumers] use every day. And it has to have a very easy access . . . and it has to be safe and private so [consumers] are . . . comfortable using it.
>
> So in order to make all these [things] happen, it requires a lot of engineering work . . . [and] aligning the philosophical approach [of Samsung and the AI provider]. So it's a massive . . . process that you have to go through to make this work. So it's not a couple of months of work. It's actually a long period of time to [get it to properly] work . . . [and] make it come to life.

*Id.* at 63:18-64:19.  As Mr. Kim also testified, Samsung needs to be compensated by AI services providers to help cover the large costs associated with deeply integrating their products into Samsung devices, which include developing "better chips to support the [service]," investing engineering resources, deploying marketing campaigns to promote the service, and training personnel about the service and how to communicate with consumers about it.  *Id.* at 48:7-49:15.

Moreover, there is absolutely zero evidentiary support for any assertion that Samsung's partnership with Google—including the Search RSA and Gemini contract—has foreclosed or will foreclose Google's rivals from competing for promotion and distribution on Samsung devices.

With respect to the Search RSA, Samsung has always had the contractual right to set

another search engine as the default on the search access points for any device line without losing revenue under device lines where Google Search is the default.  JX0071 at -399; PXR0608 at -046.  The most recent Search RSA contains an access point-by-access point provision, which grants Samsung the option to set a non-Google search engine as the default for certain access points on any device without losing revenue for other access points on the same device where Google Search serves as the default.  PXR0608 at -049, -061-069.  Moreover, the most recent Search RSA contains an express non-exclusivity provision.  *Id.* at -049.  These provisions irrefutably establish that the RSA is not exclusive in any manner.

Like the Search RSA, the Gemini contract provides Samsung the right to set another AI service as the default on any device line while continuing to receive revenue under device lines where Gemini is the default on certain specified access points.  RDX0432 at -368.[18]  In addition, Samsung has the freedom to set Gemini and a non-Google AI service as the defaults for different access points on the same device.[19]  And, like the Search RSA, the Gemini contract contains an express non-exclusivity provision while also granting Samsung the right to terminate the contract for convenience.  *Id.* at -371, -375.[20]  Thus, the Gemini contract is not exclusive in any way.

Contrary to the unsubstantiated claims of certain Google competitors, neither the Search RSA nor Samsung's relationship with Google has prevented Google's AI competitors from fully and freely competing for distribution on Samsung devices.

For instance, while OpenAI's Head of Product for ChatGPT suggested that OpenAI—a

---

[18] *See also* Ex. A at 69:1-4 ("Q. Under this [device-by-device provision], could Samsung choose not to load Gemini on the S26? A. That's our option.").

[19] As Appendix A shows, Samsung's S25 devices have a minimum of 11 AI access points.  At least seven (and possibly many more) of these access points are readily available to promote other AI services.

[20] *See also* Ex. A at 63:11-13 ("Q. Did Samsung commit to making Gemini the only AI application on its phones? A. No.").

company valued at $300 billion that recently raised $40 billion in funding—has failed to gain

ChatGPT distribution on Samsung Android devices because "[w]e don't think we can afford the

terms[,]" Tr. at 473:21-22, the Court was not made aware that:

- Samsung, not OpenAI, initiated the companies' partnership discussions;[21]
- Samsung expressly told OpenAI that the Google partnership would not be an issue;[22]
- Samsung, not OpenAI, sought to kickstart contract negotiations by preparing a term sheet, which left open certain key financial terms for future discussion;[23]

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████ [24] and

- Samsung has continued to have discussions with OpenAI since entering the Gemini contract and ███████████████████████████████████████.[25]

████████████████████████████████████████████████████████
████████████████████████████████████████████████

    Had Plaintiffs called a witness from Microsoft's AI business, this Court would have been

told that Samsung took the same approach as it did with OpenAI but Microsoft ████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ [26]

---

[21] Ex. A at 61:19-24 ("[Samsung] approached [OpenAI] in July [2024], which was about one month [] after they had announc[ed] [their deal] with Apple. . . . I [] wanted to see if they [had the] appetite to work with us.").

[22] RDX0366 at -293; *see also* Ex. A at 91:8-14 ("[OpenAI] had a perception that we were tightly coupled with Google services, but we clarified that that's not the case and [] we can deeply integrate OpenAI services on our devices, and we are willing to discuss that.").

[23] RDX0368 at -170-75; Ex. A at 98:9-99:15, 105:25-107:3.

[24] RDX0369 at -664; *see also* Ex. A at 62:15-16 ████████████████████████████████
████ ); *id.* at 100:9-11 ████████████████████████████████████

[25] Ex. A at 60:24-25 ("[A]t the same time [that] we work [with] Gemini, . . . we [continue] discuss[ions] with OpenAI[.]").

[26] *See also* RDX0367 at -173; RDX0368 at -170-75; RDX0366 at -293.

Since signing the Gemini contract, Samsung has continued "discuss[ions] with OpenAI . . . [and] Microsoft" about preloading and promoting their AI services on Samsung devices, and has "start[ed] to discuss [similar partnerships] with Meta AI[.]" *Id.* at 60:24-61:5.[27]

## II.  PLAINTIFFS' DISTRIBUTION REMEDIES WILL NOT HELP SAMSUNG BETTER COMPETE WITH APPLE

Plaintiffs have suggested that their Distribution Remedies will help Samsung better compete with Apple in U.S. smartphone markets because Apple would lose significantly more search revenue.  This suggestion lacks merit for several reasons.[28]

*First*, as Plaintiffs allege in their monopolization lawsuit against Apple, Apple has erected numerous barriers that make it difficult for Samsung and other device manufacturers to convert iPhone users to Android device users.  *See, e.g.*, DOJ Apple Compl. ¶ 10.

*Second*, Apple strongly benefits from various structural advantages in U.S. smartphone markets.  For example, mobile device carriers play a critical role in smartphone sales because they purchase and resell devices to the public.  Given its dominant market position, Apple can exert significant power over this sales channel, as reflected by the fact that it controls carrier client ID's, "charges carriers considerably more . . . to buy and resell its smartphones," and "employs contract clauses that may impede the ability of carriers to promote rival smartphones[.]" *Id.* ¶ 188.[29]

---

[27] Initially, Perplexity's lack of a global platform caused Samsung to forego considering an AI partnership with Perplexity. Ex. A at 102:14-103:2.  However, at the end of 2024, Samsung began exploring partnership opportunities with Perplexity as part of its multi-AI partner strategy.  At no point during these discussions has Samsung ever taken the position that Perplexity must pay high fees to gain distribution on Samsung devices and Perplexity's Chief Business Officer conceded that there is no evidentiary support for any suggestion otherwise.  Tr. at 751:21-752:1 (testifying that "[w]e don't spend too much time creating documents" and that "we don't put that in writing").

[28] Plaintiffs' Distribution Remedies will also harm browser competition because they will deprive Samsung of the revenue needed to continue developing innovative features for Samsung's browser—which is based on Chromium—while also offering top security and privacy protections.

[29] Tr. at 3896:4-3897:2 (President of Google's Android ecosystem stating that, "[w]ithout [search

(continued…)

*Third*, Samsung's search and AI revenue is much more important to its ability to compete and innovate because Apple "generates extraordinary profits through subscription services (like Apple's proprietary music, gaming, cloud storage, and news services), [and] advertisements within the App Store[.]" *Id.* ¶ 55. In addition, Apple generally receives a 30% commission for App Store downloads and another 30% commission for in-app purchases. *Id.* ¶ 56. "In recent years, [this] Services [revenue]"—which Samsung does not have—has "accounted for an increasing share of Apple's revenue[.]" *Id.* ¶ 21; Ex. A at 22:12-19. Thus, it is not surprising that Apple's net income in 2024 was approximately ▮▮▮▮▮ that of Samsung's mobile business.

*Fourth*, Samsung would have much greater difficulty replacing its lost search and AI revenue because its device margins, as a percentage of device prices, are almost ▮▮▮ lower than Apple's margins. DOJ Appl. Compl. ¶ 5; Ex. A at 44:7-8. Relatedly, Samsung's "operation cost[s are] much higher [when] compared to [] Apple" because it manufactures a broader range of devices, Ex. A at 214:5-23.

*Fifth*, Android-related remedies in other jurisdictions intended to help search competition, such as search choice screens and the unbundling of Google Search and Chrome from the Play Store in Europe,[30] have resulted in Samsung losing its search revenue while Apple has continued to receive search payments in these jurisdictions from Google.[31]

---

payments . . . [mobile] carriers would certainly have less Android in their portfolio" and "would sell less Android, they would sell more iPhone").

[30] Here, both parties have proposed unbundling Google Search and Chrome from the Play Store. When this was done in Europe, Android device manufacturers lost their search revenue while being required to begin paying licensing fees, which Google offset through bounties. If Google were to implement similar licensing fees in the U.S., Plaintiffs' Distribution Remedies would prevent Android device manufacturers from receiving (i) any search revenue and (ii) bounties to offset the licensing fees. This would further disadvantage Android device manufacturers like Samsung vis-à-vis Apple, which would not have to pay such licensing fees.

[31] Samsung agrees with Dr. Chipty that Plaintiffs' Android device choice screen remedies are unlikely to result in meaningful share shifts. Tr. at 2162:5-10, 2175:6-19, 2177:21-2178:16.

*Finally*, Plaintiffs' suggestion that Samsung can easily withstand the loss of its U.S. Google Search and Gemini revenue because it is a large multi-national company with billions in net profits wrongly expects Samsung to subsidize its U.S. smartphone business with revenue from other business units. This is not how corporations are operated. Each business unit has its own profit and loss statement and must stand up on its own merits. Here, Plaintiffs' Distribution Remedies would decrease the ███████ net profit of Samsung's U.S. smartphone business by ███████ ███████ Such a drastic cut in the profitability of Samsung's U.S. smartphone business—where Samsung is already "fighting a pretty tough battle" (Ex. A at 214:23)—will likely add Samsung to the long list of "well-financed companies" that "tried and failed" to challenge Apple's U.S. smartphone monopoly. DOJ Apple Compl. ¶ 186. A list that includes Amazon, Microsoft, HTC, LG, and Sony. As the President of Google's Android Ecosystem, Samer Samat, testified:

> The companies on this slide, JTC, Sony America, LG . . . are all very big companies who have a lot of different businesses, and mobile devices was one of them. But . . . HTC and LG chose to get out of the smartphone business entirely, and Sony decided to get out of the smartphone business in the U.S.

> As I mentioned, it's a very challenging business, which requires a lot of manufacturing capability, a lot of supply chain capability, a lot of marketing to build a brand and so forth. And being able to have a P&L that works, a profit and loss statement that works, is very challenging, and so we've seen a lot of these companies decide to exit.

Tr. at 3895:7-19.

## CONCLUSION

Accordingly, Samsung respectfully requests that this Court decline to adopt Plaintiffs' Distribution Remedies and proposed conditional divestiture of the Android operating system, as well as any other remedies that would harm smartphone and browser competition.

Dated: May 9, 2025

Respectfully submitted,

**CROWELL & MORING LLP**

By:  /s/ Juan A. Arteaga

　　　Juan A. Arteaga (*pro hac vice*)
　　　Rosa M. Morales (*proc hac vice*)
　　　Two Manhattan West
　　　375 Ninth Avenue
　　　New York, New York 10001
　　　(212) 223-4000
　　　jarteaga@crowell.com
　　　rmorales@crowell.com

　　　*Attorneys for Amicus Curiae*
　　　*Samsung Electronics Co., Ltd*

# APPENDIX A

# General entry points in US

**+1 Page (Screen)** — Swipe to Left

**Home Screen** — Swipe to up/down — Swipe to Right

**-1 Page (Screen)**

**App Tray**

Hot Seat

| No. | Entry Point | Default (US) | Remarks |
|---|---|---|---|
| 1 | Home Button Long Press | Circle to Search | Open for new devices with One UI 7.0 and above; User-changeable; Linked to the default assistant setting |
| 2 | Corner Swipe Gesture | Gemini (*Not applicable for One UI 7.0 and above) | Open for new devices with One UI 7.0 and above; User-changeable; Linked to the default assistant setting |
| 3 | Long Press Power (aka Side-key) | Gemini | User-changeable; Linked to the default assistant setting |
| 4 | App Icon in Home Screen | - | |
| 5 | '-1 Page' | Google Discover | User has an option to change it to the Samsung service ("Samsung Free"); Samsung has the freedom to incorporate 3rd party AI services in Samsung Free |
| 6 | App Icon in '+1 Page' | - | |
| 7 | App Icon in App Tray | - | |
| 8 | S-Finder | - | |
| 9 | Hot-word (voice) | Bixby Gemini | Additional Hot-words can be added |
| 10 | Hot Seat (Home Screen, +1 Page) | - | |
| 11 | Widget | Google Search | Additional widgets may be added, subject to user experience |

# In-app AI entry points in US (Example: Samsung 1ˢᵗ Party apps)



*There can be as many AI entry points as the number of apps installed on a smartphone to the extent AI queries can be input in any form - such as text, audio, image, video, etc.