# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ████████████ |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ████████████ |
| Defendant. | |

## DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

## TABLE OF CONTENTS

I.    THE LEGAL STANDARDS APPLICABLE TO THIS CASE. ..........................................4

  A.    The Appropriate Remedial Objective Is Terminating the Exclusionary
        Conduct, Not Terminating the Monopoly. ................................................................4

  B.    The Remedy Must Be Tailored to the Exclusive Dealing Conduct
        Identified in the Liability Opinion. ........................................................................7

  C.    Principles of Equitable Relief in Antitrust Cases Bar Remedies That Stifle
        Innovation or Undermine Competition. ..................................................................8

  D.    Remedies Should Respect the Limits of the Judicial Role and Should Not
        Substitute Regulation for Competition. .................................................................10

  E.    The Decree Must Provide Explicit Notice of Precisely What Conduct Is
        Required or Prohibited. .........................................................................................11

II.   GOOGLE'S PROPOSED REMEDIES SATISIFY THE APPLICABLE LEGAL
      STANDARDS. ...............................................................................................................11

  A.    Google's Proposal Terminates the Provisions of the MADAs Deemed
        Exclusive. ..............................................................................................................12

  B.    Google's Proposal Terminates the Provisions of the Android RSAs
        Deemed Exclusive. ................................................................................................13

  C.    Google's Proposal Is Forward Looking and Enjoins Other Conduct of the
        Same Type or Class Invalidated by the Court. ......................................................14

  D.    Google's Proposal Terminates the Provisions of the Browser Agreements
        Deemed Exclusive. ................................................................................................15

III.  PLAINTIFFS' PROPOSED REMEDIES ARE CONTRARY TO LAW. .......................16

  A.    Plaintiffs Have Not Established the Causal Connection Necessary to
        Support Their Proposed Remedies. ........................................................................17

        1.    The Court's Liability Opinion Neither Applied the More Stringent
              Standard for Causation Necessary for Plaintiffs' Proposed Remedies Nor
              Made Findings That Support Those Proposals. ........................................... 18

        2.    No Record Evidence Supports Relief Beyond Enjoining the Exclusionary
              Conduct Identified in the Opinion. ............................................................. 19

  B.    The Court Should Reject the Proposed Divestiture of Chrome and
        Chromium (Plaintiffs' RPFJ § V.A). .....................................................................24

        1.    Plaintiffs Have Not Demonstrated the Significant Causal Connection
              Required for Chrome Divestiture. ............................................................... 24

        2.    Chrome Divestiture Would Be Wholly Inappropriate in This Monopoly
              Maintenance Case. ....................................................................................... 25

        3.    The Chrome Divestiture Proposal Is Not Tailored to the Invalidated
              Conduct. ....................................................................................................... 26

4.      Chrome Divestiture Would Benefit a Specific Competitor at the Expense of Consumers and Competition. .................................................... 28

5.      Chrome Divestiture Would Be Technologically Complex and Value Destructive ............................................................................... 29

6.      The Chrome Divestiture Provision Is Impermissibly Vague. ................... 30

C.      The Court Should Reject the Proposed Contingent Divestiture of Android and Google Play (Plaintiffs' RPFJ § V.C). ...........................................31

1.      The Arguments Against the Divestiture of Chrome Apply with Equal Force to Android Divestiture. .................................................... 31

2.      Android Divestiture is Technically Unworkable and Would Cause Tremendous Harm. ................................................................ 32

3.      The Prospect of Contingent Relief Is Improper and Based on an Undefined Standard. ............................................................................. 33

D.      The Court Should Reject the Forced Data Sharing Proposals (Plaintiffs' RPFJ §§ VI.A, VI.C-G, VII.E). ......................................................33

1.      Plaintiffs Have Not Demonstrated the Significant Causal Connection Required for Forced Disclosure of Proprietary Assets. ......................... 35

2.      The Forced Data Disclosure Proposals Are Not Tailored to the Exclusionary Conduct Identified in the Opinion. ..................................... 38

3.      Forced Disclosure Eviscerates Google's Intellectual Property Rights and Harms Innovation by Cloning Its Proprietary Assets. ............................ 39

4.      The Forced Data Sharing Provisions Are Impermissibly Vague. ............. 43

5.      The Forced Data Disclosure Proposals Amount to Impermissible Regulation. ........................................................................ 44

E.      The Court Should Reject the Compelled Syndication Remedies (Plaintiffs' RPFJ §§ VII.A-D, VII.E-H, VIII.E-G). ................................................46

1.      Plaintiffs Have Not Demonstrated the Significant Causal Connection Required for Compelled Syndication. ............................................ 47

2.      The Compelled Syndication Proposals Are Not Tailored to the Exclusionary Conduct Identified in the Opinion. ..................................... 48

3.      Compelled Syndication Eviscerates Google's Intellectual Property Rights by Cloning Its Proprietary Assets. ............................................... 49

4.      The Compelled Syndication Provisions Would Require Extensive Central Planning. ......................................................................... 51

F.      The Court Should Reject the Payment Bans and Related Restrictions on Distribution (Plaintiffs' RPFJ §§ IV.A-B, D-E). ..................................52

1.      The Proposed Payment Bans Are Predicated on an Improper Remedial Objective. ......................................................................... 53

2.     The Proposed Payment Bans Are Not Tailored to the Exclusionary
       Conduct Identified in the Opinion. ...................................................... 54

3.     The Payment Bans Would Harm Competition and Consumers............... 55

G.     The Court Should Reject the Proposed Choice Screens Remedies
       (Plaintiffs' RPFJ §§ IX.A-D). ........................................................................56

       1.     The Proposals for Choice Screens on Google Devices and Google
              Browsers Are Not Tailored to the Invalidated Conduct. ......................... 56

       2.     The Proposal for Choice Screens on Existing Third-Party Devices Is
              Unwarranted and an Impermissible Monetary Penalty............................. 57

H.     The Court Should Reject the Artificial Intelligence Proposals (Including
       but Not Limited to Plaintiffs' RPFJ §§ III.V, V.B, VI.C, VII, and VIII.E)...........58

       1.     The Artificial Intelligence Proposals Are Not Tailored to the Exclusionary
              Conduct Identified in the Opinion. ........................................................ 59

       2.     Plaintiffs' Artificial Intelligence Proposals Would Stifle Innovation and
              Chill Competition.................................................................................. 62

I.     The Court Should Reject the Self-Preferencing Proposals (Plaintiffs' RPFJ
       §§ IV.D, V.B)................................................................................................63

       1.     The Self-Preferencing Proposals Are Not Tailored to the Exclusionary
              Conduct Identified in the Opinion. ........................................................ 64

       2.     The Self-Preferencing Provisions Are Impermissibly Vague and Would
              Chill Competition and Innovation. ........................................................ 65

J.     The Court Should Reject the Ads Transparency Proposals (Plaintiffs'
       RPFJ §§ VIII.A-D)........................................................................................66

       1.     The Ads Transparency Remedies Are Not Tailored to the Exclusionary
              Conduct Identified in the Opinion. ........................................................ 67

       2.     The Ads Transparency Proposals Are Unduly Regulatory, Vague, and
              Harmful to Users................................................................................... 68

K.     The Court Should Reject the Investment Reporting Remedies (Plaintiffs'
       RPFJ §§ IV.H, I). ..........................................................................................69

L.     The Court Should Reject the Prohibition on Certain Agreements with
       Publishers (Plaintiffs' RPFJ § IV.C).................................................................70

M.     The Court Should Reject the Publisher Opt-Out Remedy (Plaintiffs' RPFJ
       § VI.B). .......................................................................................................70

N.     The Colorado Plaintiffs' Unprecedented Public Education Fund is
       Unauthorized by Law, Inapt, and Overly Vague (Plaintiffs' RPFJ § VI.E). .........70

O.     The Anti-Retaliation and Anti-Circumvention Provisions Have No Basis
       in the Record and Fail to Satisfy Rule 65(d) (Including but Not Limited to
       Plaintiffs' RPFJ §§ X.E, F). ............................................................................71

P.     The Court Should Reject the Proposed Technical Committee (Including but Not Limited to Plaintiffs' RPFJ § X.A). .............................................72

Q.     The Decree Should Be Limited to the United States. ..............................................74

R.     The Duration of The Decree Should Not Exceed Three Years. .............................74

IV.    CONCLUSION.........................................................................................................75

# TABLE OF AUTHORITIES

## CASES

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ...................................46

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).....................20

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)...........9

*Brown v. Plata*, 563 U.S. 493 (2011)..............................................................................7

*Common Cause v. Nuclear Reg. Comm'n*, 674 F.2d 921 (D.C. Cir. 1982)...................72

*Concord Boat v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000)...............................22

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)................................................26

*Hartford Fire Ins. v. California*, 509 U.S. 764 (1993) ................................................74

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022) ..............16

*In re Zynga Priv. Litig.*, 750 F.3d 1098 (9th Cir. 2014) .............................................46

*Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959) .......................26

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64 (1967)..........................................................................................11, 43, 73

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................46

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc) .................... *passim*

*Microsoft Corp. v. Does 1-18*, 2014 WL 1338677 (E.D. Va. Apr. 2, 2014) ................46

*NCAA v. Alston*, 141 S. Ct. 2141 (2021)................................................................ *passim*

*New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002)........................ *passim*

*New York v. Microsoft Corp.*, 231 F. Supp. 2d 203 (D.D.C. 2002)..............................74

*New York v. Microsoft Corp.*, 297 F. Supp. 2d 15 (D.D.C. 2003)...............................75

*Sargent-Welch Sci. Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1977) ....................21

*Standard Oil Co. of Cal. v. United States*, 337 U.S. 293 (1949) ...................................6

*United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982) ...............................25, 71

*United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707 (1944)...................7, 52, 57, 60

*United States v. Dentsply Int'l, Inc.*, 2006 WL 2612167 (D. Del. Apr. 26, 2006) .......12

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) .......................25

*United States v. Google LLC*, 687 F. Supp. 3d 48 (D.D.C. 2023)...................14, 32, 60

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024)......................... *passim*

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995)....................... *passim*

*United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998).............8, 28, 39, 66

v

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) ................................................27

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) .......................... *passim*

*United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 196-97 (D.D.C. 2002) ...........................73

*United States v. Nat'l City Lines*, 134 F. Supp. 350 (N.D. Ill. 1955) .............................................8

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) .....................11, 44, 65

*United States v. United Reg'l Health Care Sys.*, No. 7:11-cv-00030 (N.D. Tex. Sept. 29, 2011) ........................................................................................................................................12

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) .........10, 41 44, 52

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) .................................................................................9

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969) .................................................7

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) .....................................................14

## STATUTES AND RULES

Clayton Act Section 3, 15 U.S.C. § 14 .........................................................................................6

Clayton Act Section 4a, 15 U.S.C. § 15a .....................................................................................58

Fed. R. Civ. P. 65 .................................................................................................................. *passim*

Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a .......................................................74

Sherman Act Section 2, 15 U.S.C. § 2 ....................................................................................... *passim*

Stored Communications Act, 18 U.S.C. § 2702 ..........................................................................46

## **ABBREVIATIONS**

| CITATION | CORRESPONDING FILING OR TRANSCRIPT |
|---|---|
| FOF | Google's Proposed Findings of Fact (Remedies Phase) Dated May 16, 2025. |
| Google's PFJ | Google's Proposed Final Judgment Dated March 7, 2025 (ECF 1185). |
| Pls.' RPFJ | Plaintiffs' Revised Proposed Final Judgment Dated March 7, 2025 (ECF 1184-1). |
| Tr. | Transcript of the Evidentiary Hearing on Remedies Conducted from April 21 to May 9, 2025. |
| Pls.' Pre-Hr'g Br. | Plaintiffs' Remedies Pre-Trial Brief Dated April 14, 2025 (ECF 1216). |
| Former Enforcers' Amicus Br. | Brief of Bipartisan Former Antitrust Enforcers as *Amicus Curiae* in Support of Neither Party Dated May 13, 2025 (ECF 1315-2). |
| Pls.' Liability PCOL | Plaintiffs' Proposed Conclusions of Law (Liability Phase) Dated February 9, 2024 (ECF 821). |
| Pls.' Liability PFOF | Plaintiffs' Corrected Proposed Findings of Fact (Liability Phase) Dated April 30, 2024 (ECF 897). |

Google has revolutionized how people find information.  The company has driven 25 years of extraordinary innovation and scientific progress across countless technologies.  And it has demonstrated an unrivaled commitment to improving the quality of online search, creating and developing various sources of online information, including its Search Index, Local Search unit, and Knowledge Graph.  Google also has invented and brought to market other world-famous products like Google Chrome and Android—making the Internet faster, safer, and more accessible for billions of users all over the world.  No search engine rival has ever approached Google Search's innovations, quality, or popularity with consumers—before and after the conduct at issue in this case.

Against this backdrop of success on the merits in the marketplace, Plaintiffs have submitted an unprecedented Revised Proposed Final Judgment (RPFJ) that does not seek to restore competition by returning markets to where they would have been absent the conduct at issue—the proper standard for evaluating an antitrust remedy that Plaintiffs' own expert economist endorsed but that Plaintiffs never even attempted to meet with admissible evidence. Instead, Plaintiffs propose what amounts to legislation overtly regulating and forcibly restructuring the marketplace.  That approach is not authorized by antitrust law or the Constitution of the United States, and would harm consumers and businesses.  And as discussed below, Plaintiffs seek to paper over manifest failures of proof to support their proposals, and the vagueness of many of their provisions, by giving themselves the right to adjudicate wide-ranging critical and substantive details of their RPFJ under the guise of working with a so-called "Technical Committee."  Plaintiffs' delegation to themselves to determine substantive aspects of their RPFJ would violate Google's Due Process rights and stands in stark contrast to the

1

technical committee created by the *United States v. Microsoft* Final Judgment, that provided only for assistance in the enforcement of that decree.

Plaintiffs' express divestiture proposals covering Chrome and Android plainly do not meet the significant and heightened causation standard required by the D.C. Circuit in *Microsoft*. Indeed, they are so legally unjustified as to appear to be throwaways to create the illusion that other provisions are somehow reasonable and justified, even though those too are appropriately characterized as structural relief subject to a heightened causation standard.

Plaintiffs' forced data disclosure and syndication proposals would require divestiture of substantial Google assets, resulting in the largest forcible transfer of intellectual property in the history of U.S. antitrust law. Courts have treated such compelled asset divestitures as structural remedies subject to the heightened standard of proof not met here. Moreover, these proposals are riddled with unresolved privacy risks that even Plaintiffs' privacy expert offered no solution for—instead suggesting that Plaintiffs could resolve this later with the help of a Technical Committee. The unrebutted testimony of numerous Google executives and the only expert whose field covers search engines (Professor James Allan) confirms that Plaintiffs' data sharing and syndication proposals would let rivals reverse engineer priceless Google technologies and intellectual know-how gained over many years—an approach rejected by legal precedent.

And Plaintiffs' proposed ban on payments for any type of distribution of Google Search, Chrome, or any Generative AI product bears no relationship to the factual record in this case. No browser developer, Android OEM, or wireless carrier expressed any preference for preloading or setting as a default a rival search engine instead of Google Search. Given that Google already had and would have continued to have widespread consumer usage and lawful non-exclusive distribution in a but-for world, there is no justification for a remedial world where

Google is prevented from competing for distribution.  No exclusive dealing case in the history of U.S. antitrust law has imposed such a remedy.

Finally, Plaintiffs' RPFJ seeks to interfere in a myriad of other products and industry dealings: Generative AI products that Plaintiffs never claimed were in the relevant markets, data reports that Google provides to advertisers, and requirements to allow publishers to opt their content out of individual AI models—none of which have any bearing on competition among general search engines or relationship to the conduct at issue in the case.  Many of Plaintiffs' proposals would also violate fundamental requirements of Due Process and Federal Rule of Civil Procedure 65(d), as they fail to provide "explicit notice of precisely what conduct is outlawed" or required but instead give almost unfettered discretion to Plaintiffs and their proposed Technical Committee to define the parameters of the decree.

Google's PFJ, by contrast, directly addresses the issues the Court identified in its liability opinion.  It ensures that partners and consumers get the benefit of competition, while prohibiting the forms of contractual provisions the Court deemed exclusive.  Further, Google's PFJ ensures that browser defaults are contestable every year and across numerous default dimensions, and that competition for distribution on Android devices occurs on an access point by access point basis.  These provisions go above and beyond what is needed to ensure future contracts are non-exclusive and readily contestable by rivals.  Rivals will of course have to compete to persuade partners that their products provide high-quality results and efficient monetization—but that is precisely the purpose of antitrust law.  Further, Google's PFJ confirms that Google will not use the same or similar commercial practices to influence the distribution of its Gemini app. Although Generative AI products were not deemed to be included in the relevant markets in this case, Google's PFJ assures that the robust competition that has taken place to date among many

growing well-funded rivals will continue.  Finally, Google's PFJ, including the appointment of a Monitor to ensure compliance, is imminently administrable and will not require this Court to act as a *de facto* regulator across multiple markets that are evolving in unprecedented ways.

## I.    THE LEGAL STANDARDS APPLICABLE TO THIS CASE.

### A.    The Appropriate Remedial Objective Is Terminating the Exclusionary Conduct, Not Terminating the Monopoly.

"[T]he proper objective of the remedy in this case is termination of the exclusionary acts and practices related thereto which served to illegally maintain the monopoly."  *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 101 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc).  It is ***not*** "a valid objective for the remedy in this case to actually 'terminate' [the] monopoly" because (1) "the monopoly in this case was not found to have been illegally acquired but only to have been illegally maintained," and (2) the Court "did not adopt the position that [Google] would have lost its position in the [relevant markets] but for its anticompetitive behavior."  *Id.* at 100-01 (citations omitted).

Plaintiffs do not dispute that this is and always has been a monopoly ***maintenance*** case, where "80% of all search queries in the United States already went through Google" well before the alleged monopoly maintenance period even began.  *United States v. Google LLC*, 747 F. Supp. 3d 1, 31 (D.D.C. 2024).  Plaintiffs instead claim that remedies designed to "terminate the illegal monopoly" and "deny Google the fruits of its past conduct" are legally appropriate despite Plaintiffs' failure to introduce evidence that Google would have lost its pre-existing, lawful lead, including any scale advantages, if it had entered only non-exclusive search distribution agreements.  *E.g.*, Pls.' Pre-Hr'g Br. at 1, 4; *see id.* at 15 (asserting that "even for structural remedies, the causation standard is lower than the but-for standard").

*Microsoft* refutes that claim.  "In devising an appropriate remedy," the D.C. Circuit explained, a trial court must "consider whether plaintiffs have established a sufficient causal connection between [the defendant's] anticompetitive conduct and its dominant position in the [relevant] market."  *United States v. Microsoft Corp.*, 253 F.3d 34, 106 (D.C. Cir. 2001) (en banc).  That is because the "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition."  *Id.*  The D.C. Circuit compared (1) its finding of "a causal connection between Microsoft's exclusionary conduct and its continuing position in the [relevant] market only through inference" with (2) the absence of a finding that "Microsoft would have lost its position in the [relevant] market **but for** its anticompetitive behavior."  *Id.* at 106-07 (emphasis added).  In a monopoly maintenance case, then, a remedy designed to "terminate" the monopoly may be imposed only if the plaintiffs establish that the monopoly would have terminated if not for the exclusionary conduct.  The court held that: "***Absent such causation, the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.***'"  *Id.* at 106 (emphasis added); *see* Former Enforcers' Amicus Br. at 3, 5-7.

On remand, the district court in *Microsoft* applied the but-for causation standard in reiterating that "it does not seem to be a valid objective for the remedy in this case to actually 'terminate' Microsoft's monopoly."  *New York*, 224 F. Supp. 2d at 101.  In applying the D.C. Circuit's instructions for "crafting a remedy," the court explained that it "must assess the strength of the causation evidence that established liability and tailor the relief accordingly."  *Id.* at 102.  Specifically, that inquiry required evaluating "the strength of the evidence linking Defendant's anticompetitive behavior to its present position in the market."  *Id.* at 103.

After the district court applied this standard, an *en banc* D.C. Circuit unanimously "affirm[ed] the district court's remedial decree in its entirety." *Massachusetts*, 373 F.3d at 1204. In doing so, the D.C. Circuit evaluated an argument that "the district court erred in applying a 'stringent but-for test' of causation in determining whether 'advantages gained by Microsoft could be considered a fruit of Microsoft's illegality.'" *Id.* at 1233. The D.C. Circuit **rejected** that argument. *Id.* Moreover, both the district court and the circuit court repeatedly applied a but-for standard in refusing to implement structural and non-structural remedies that were animated by notions of "terminating the illegal monopoly" or denying Microsoft "the fruits of its statutory violation." For example, the district court rejected a proposed remedy that would have "place[d] the Java technology 'on equal footing' with Microsoft's technology" because "[t]here is no evidence that Java would today possess 'equal footing,' in terms of distribution, with Microsoft, **but for** Microsoft's anticompetitive conduct." *New York*, 224 F. Supp. 2d at 262 (emphasis added). The D.C. Circuit likewise applied a but-for standard in affirming the rejection of this proposed remedy and others, observing that "the fruits of a violation **must be identified** before they may be denied." *Massachusetts*, 373 F.3d at 1232 (emphasis added).

Plaintiffs cite cases that predate *Microsoft* and were considered in the opinions discussed above. For example, Plaintiffs go back 76 years to cite language in *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293 (1949), and even that is plainly distinguishable because it addresses liability rather than remedy and interprets a different statute (Section 3 of the Clayton Act). *Id.* at 307-10; *see* Pls.' Pre-Hr'g Br. at 15. The *Microsoft* opinions provide the standard for determining the remedy in a monopoly maintenance case, and they hold that even if "causation affords … no defense to liability," the issue of "causation ha[s] more purchase in connection with the appropriate remedy issue, *i.e.*, whether the court should impose a structural remedy or

6

merely enjoin the offensive conduct at issue." *Microsoft*, 253 F.3d at 80. Where, as here, a court "infer[s] causation from the fact that a defendant has engaged in anticompetitive conduct that reasonably appears capable of making a significant contribution to maintaining monopoly power," *Google*, 747 F. Supp. 3d at 153 (cleaned up), the "unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'" *Microsoft*, 253 F.3d at 106.

### B.     The Remedy Must Be Tailored to the Exclusive Dealing Conduct Identified in the Liability Opinion.

The remedy in this case must be "tailored to fit the wrong creating the occasion for the remedy." *Id.* at 107. As in any equitable proceeding, "[t]he scope of the remedy must be proportional to the scope of the violation," *Brown v. Plata*, 563 U.S. 493, 531 (2011), and "[e]quitable relief in an antitrust case should not 'embody harsh measures when less severe ones will do.'" *New York*, 224 F. Supp. 2d at 100. Thus, "a district court may ***not*** enjoin all future illegal conduct of the defendant, or even all future violations of the antitrust laws, however unrelated to the violation found by the court." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 133 (1969) (emphasis added). Rather, "where the government has proved antitrust violations at trial, the remedies must be of the 'same type or class' as the violations." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995). Under this standard, "clearly lawful practices" should not "be enjoined simply because they will weaken the antitrust violator's competitive position." *New York*, 224 F. Supp. 2d at 109; *see United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 728 (1944) (explaining that "remedies to enforce the antimonopoly statutes" must not "interfere with ordinary commercial practices"). By the same token, a court cannot enjoin conduct that was "ultimately not relied upon by the district court in conjunction with the imposition of liability" or is only "tenuously related to the liability findings." *New York*, 224 F. Supp. 2d at 138-39.

7

Furthermore, the remedy must be tailored to the "theory of liability in this case," as opposed to a theory that was not advanced or was "discounted during the liability phase." *Id.* at 185. And the remedy must be tailored to the "carefully defined market" identified at liability, *id.* at 235, as "[i]ntervention into a market outside of and unrelated to the monopoly market is not justified merely because [the defendant] has begun to compete in the new market and such competition is feared." *Id.* at 133. These limitations are important for several reasons. For one, a remedy that strays beyond the exclusive dealing that gave rise to liability may have unintended consequences that deprive consumers of the benefits of innovation and competition. When a court considers enjoining conduct that was not specifically deemed anticompetitive "by adopting a forward-looking provision, its discretion is necessarily less broad because, without liability findings to mark the way, it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Massachusetts*, 373 F.3d at 1224; *see NCAA v. Alston*, 594 U.S. 69, 106 (2021) ("[D]ecrees themselves may unintentionally suppress procompetitive innovation"). Remedies not directed to the conduct deemed exclusionary also give plaintiffs the benefit of claims they did not prove, while depriving the defendant of the opportunity to establish those claims would have failed. "[A] finding of an offense under the antitrust laws does not invest a court with a license to embark upon a general program of comprehensive control of the defendants' business," and "[t]o range far beyond the hard facts of the questions actually tried in the case is to invite the errors of a broad rule which proves unjust in the light of unforeseen circumstances." *United States v. Nat'l City Lines*, 134 F. Supp. 350, 355 (N.D. Ill. 1955).

### C. Principles of Equitable Relief in Antitrust Cases Bar Remedies That Stifle Innovation or Undermine Competition.

"[A]ny dampening of technological innovation would be at cross-purposes with antitrust law." *United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998). Thus, a court must

consider whether a proposed decree could "undermine [the defendant's] incentive to innovate," including by denying the defendant "the returns from its investment in innovation." *Massachusetts*, 373 F.3d at 1218-19. In *Massachusetts*, the D.C. Circuit affirmed the district court's rejection of a proposed remedy that "would allow [competitors] to 'mimic' the functionality of Microsoft's products" because "[t]he effect upon Microsoft's incentive to innovate would be substantial," and "not even the broad remedial discretion enjoyed by the district court extends to the adoption of provisions so likely to harm consumers." *Id.* at 1219.

Similarly, a court devising a remedy must be "careful to avoid constructions of § 2 which might chill competition, rather than foster it." *New York*, 224 F. Supp. 2d at 136. As the Supreme Court explained, "[w]hen it comes to fashioning an antitrust remedy … ***caution is key***" because "markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare." *Alston*, 594 U.S. at 106 (emphasis added). And as in any case involving "injunctive relief, preliminary or permanent," a court must assess the "adverse impact on the public interest" of the requested relief. *Winter v. NRDC, Inc.*, 555 U.S. 7, 24, 32 (2008).

Relatedly, it "is axiomatic that the antitrust laws were passed for the protection of ***competition***, not ***competitors***." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (cleaned up). A court therefore must "take[] careful note of those remedial proposals which advance the interests of particular competitors and take[] pains to ensure that the remedy … is not a vehicle by which such competitors can advance their own interests." *New York*, 224 F. Supp. 2d at 111. For example, in *Massachusetts* the D.C. Circuit held that even if a proposal to "open-source" Microsoft's Internet Explorer (IE) browser would "lower the applications barrier" to entry that Microsoft unlawfully raised, the trial court appropriately rejected that proposed remedy as an "IP grab" that "would help specific competitors but not the

9

process of competition."  373 F.3d at 1229-30; *see New York*, 224 F. Supp. 2d at 245

(characterizing the proposed "open-source of IE and the mandatory auction of [Microsoft] Office

licenses" as "a subsidy for competing operating systems," and rejecting those proposals

notwithstanding Microsoft's unlawful monopolization of an operating systems market).

Finally, as the example above indicates, "depriving an antitrust violator of the fruits of its

violation does not entail conferring a correlative benefit upon the particular competitor harmed

by the violation."  *Massachusetts*, 373 F.3d at 1243.  It also does not contemplate a divestiture or

the compelled sharing of assets that would let competitors free ride on a defendant's innovations.

*See id.* at 1233 (holding that "the fruit" of Microsoft's "violation was Microsoft's freedom from

the possibility rival middleware vendors would pose a threat to its monopoly" and that "[t]he

district court therefore reasonably identified opening the channels of distribution for rival

middleware as an appropriate goal for its remedy").

### D.    Remedies Should Respect the Limits of the Judicial Role and Should Not Substitute Regulation for Competition.

"[W]hen it comes to the remedy," courts "should never aspire to the role" of "central

planners" and "must be sensitive to the possibility that the 'continuing supervision of a highly

detailed decree' could wind up impairing rather than enhancing competition."  *Alston*, 594 U.S.

at 102-03 (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S.

398, 415 (2004)).  As this Court observed, imposing a duty to deal with rivals "would require the

court to act as a 'central planner' that endeavors to identify the proper 'terms of dealing,'" and

the "thorny questions" presented by such an obligation "foreshadow the challenges the court

would face in administering a remedy."  *Google*, 747 F. Supp. 3d at 183 (quoting *Trinko*, 540

U.S. at 408).  The Supreme Court's remedies jurisprudence therefore dictates that "[j]udges must

be wary … of the temptation to specify 'the proper price, quantity, and other terms of dealing'—

cognizant that they are neither economic nor industry experts." *Alston*, 594 U.S. at 102.

###### E. The Decree Must Provide Explicit Notice of Precisely What Conduct Is Required or Prohibited.

Every injunction must "state its terms specifically" and "describe in reasonable detail—

and not by referring to the complaint or other document—the act or acts restrained or required."

Fed. R. Civ. P. 65(d).  Failure to comply with this rule is "both serious and decisive" because a

court must "frame its orders so that those who must obey them will know what the court intends

to require and what it means to forbid." *Int'l Longshoremen's Ass'n, Local 1291 v. Phila.*

*Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).  Thus, a party subject to an injunction must

"receive *explicit* notice of *precisely* what conduct is outlawed" or required.  *United States v.*

*Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (emphasis added).

Antitrust cases are no exception, as the "remedial decree" must be "as specific as

possible, not only in the core of its relief, but in its outward limits."  *New York*, 224 F. Supp. 2d

at 191.  To illustrate: the *New York* court rejected a remedy where "compliance" would be tied to

"industry standards," which would be "difficult to determine" and involve "largely a subjective

undertaking."  *Id.*  The court also rejected a definition that was "vague and ambiguous, rendering

compliance with the terms of Plaintiffs' remedy which are reliant upon this definition to be

largely unenforceable."  *Id.* at 137; *see Alston*, 594 U.S. at 102-03 (holding a court must not

"impose a duty that it cannot explain or adequately and reasonably supervise" (cleaned up)).

## II. GOOGLE'S PROPOSED REMEDIES SATISIFY THE APPLICABLE LEGAL STANDARDS.

Google's Proposed Final Judgment (PFJ) comports with the above principles by

appropriately remedying the violations the Court found in the markets for general search services

and general search text advertising.

Given the mere inference of causation here, the appropriate relief is "an injunction against continuation of [the unlawful] conduct." *Microsoft*, 253 F.3d at 106. The "exclusionary conduct" the Court found involved "unlawful exclusive agreements" with browser developers, Android OEMs, and wireless carriers. *Google*, 747 F. Supp. 3d at 142. Plaintiffs stated expressly that they were not "challenging the concept of a search default or that distributors may recommend a search engine, set a search default, or preinstall search access points." *Id.* at 172 (distinguishing a "non-exclusive default" from agreements that "require[d] exclusivity"). Accordingly, the appropriate remedy is an injunction against exclusive dealing.

In response to interrogatories, Plaintiffs identified two cases brought by the United States since *Microsoft* in which the defendant engaged in exclusive dealing in violation of Section 2. In both cases, the final judgments prohibited the anti-competitive contracting practices—and did not impose anything resembling Plaintiffs' sweeping proposals. *United States v. United Reg'l Health Care Sys.*, No. 7:11-cv-00030, ECF 10 (N.D. Tex. Sept. 29, 2011); *United States v. Dentsply Int'l, Inc.*, 2006 WL 2612167 (D. Del. Apr. 26, 2006). Nevertheless, Google's PFJ not only enjoins the conduct deemed exclusionary, but also goes beyond the liability opinion to enjoin other conduct "of the 'same type or class' as the violations." *Microsoft*, 56 F.3d at 1460. As detailed below, Google's proposal ensures that it and "any number of competitors may flourish (or not) based upon the merits of their offerings." *Massachusetts*, 373 F.3d at 1231.

## A.    Google's Proposal Terminates the Provisions of the MADAs Deemed Exclusive.

The Court found that the "exclusivity" of Google's MADAs with Android OEMs "arises from" the requirements that "MADA signatories must: (1) feature the Google Search Widget in the center of the home screen and (2) place Chrome on the home screen with Google as the default GSE" (per requirements in RSAs) combined with the "market realities" that "the Google

12

Play Store is a must-have on all Android devices" and "the industry-wide practice is to avoid excessive preloading of applications."  *Google*, 747 F. Supp. 3d at 150.

Google's PFJ eliminates the provisions deemed exclusive.  Under Google's proposal, any OEM may license and preload the Play Store (or any other Google application) on any smartphone or tablet sold in the U.S. without having to place Google Search or Chrome anywhere on the device.  Google's PFJ §§ III.A, B.  For example, an OEM could license the Play Store for use on its smartphones while at the same time exclusively preinstalling a rival search widget and rival browser on those same phones.  *Id.* §§ III.A, B, E, F.

### B.     Google's Proposal Terminates the Provisions of the Android RSAs Deemed Exclusive.

The Court found "[t]he RSAs between Google and Android device distributors formalize the practical exclusivity of the MADAs" because they "contain an 'alternative search services' clause," which "prohibits Google's Android partners from preloading rival search engines." *Google*, 747 F. Supp. 3d at 151.

Google's PFJ eliminates the provisions deemed exclusive.  Google's PFJ §§ III.E, F. Because the proposed remedy eliminates any "all or nothing" aspect of the RSAs, the prohibition is broader than the RSAs the Court addressed in its liability opinion, whereby "a partner can on a device-by-device basis earn ***some*** revenue share on a non-exclusive deal."  *Google*, 747 F. Supp. 3d at 152.  Google's PFJ prohibits an exclusive RSA tier altogether, and it allows any Android OEM or carrier to refrain from loading Google Search or Chrome on any or all of its U.S. smartphones and tablets without sacrificing the ability to license other Google applications or earn revenue from Google through those applications.  Google's PFJ §§ III.E, F.  The PFJ also provides for access point by access point competition for promotion of Google Search and Chrome.  *Id.* §§ III.H, I.

Thus, an OEM or carrier could negotiate an agreement to preload the Chrome browser on certain access points on certain devices while also negotiating a deal with a rival to preload a different widget on those same devices. The proposed remedy accordingly terminates any semblance of what the Court considered an "exclusive dealing arrangement," *i.e.*, an "agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).

## C.   Google's Proposal Is Forward Looking and Enjoins Other Conduct of the Same Type or Class Invalidated by the Court.

Plaintiffs' claims regarding Google Assistant did not withstand summary judgment because Plaintiffs failed to adduce evidence of an anticompetitive effect in their alleged markets. *United States v. Google LLC*, 687 F. Supp. 3d 48, 86 (D.D.C. 2023). And Plaintiffs argued during the liability phase that "[g]enerative AI systems, like ChatGPT, are not a reasonable substitute for GSEs" because, among other things, "[u]sers have not replaced their use of traditional search with chatbot-based search tools, like Google's Bard or Microsoft's Bing Chat." Pls.' Liability PFOF ¶¶ 391, 395. Even at the Evidentiary Hearing, Plaintiffs argued that "GenAI … is not a replacement for Search today." Tr. 21:2-8 (Pls.' Opening Arg.); *see* Tr. 3541:15-43:18 (Reid) (explaining that the "use cases" for Search and chatbots "aren't exactly overlapping" and "[i]t's more of a Venn diagram"). Google's PFJ nevertheless addresses the Google Assistant Application and the Gemini Assistant Application.

First, under Google's proposal an OEM that licensed the Play Store (or any other Google application) would have no obligation to preload the Google Assistant or the Gemini app. Google's PFJ §§ III.C, D. An OEM or carrier could instead exclusively preinstall (or install alongside Assistant or Gemini) any other Generative AI (Gen AI) service, such as ChatGPT, Copilot, or Perplexity. *Id.* §§ III.C, D, G. Second, under Google's PFJ an OEM or carrier could

preinstall Google Search on a non-exclusive basis in order to collect revenue share from Google while at the same time preinstalling ChatGPT or any other Gen AI service as the sole Gen AI assistant on the device. *Id.* §§ III.H, I. The PFJ also includes a prohibition that runs in the other direction; consistent with this provision, an OEM or carrier could preload the Gemini app together with a rival browser and search widget without affecting any consideration it may receive from Google in connection with Gemini. *Id.* § III.J.

These provisions extend beyond the conduct deemed exclusionary to conduct "of the same type or class" by restricting how Google may distribute Assistant and Gemini even though the Court did not find that they were part of the relevant markets or that Google engaged in any exclusionary conduct with respect to those services. And the provisions are forward-looking in allowing Gen AI services to compete on the merits for distribution, regardless whether those services come to resemble general search engines (GSEs) or offer different functionality.

### D. Google's Proposal Terminates the Provisions of the Browser Agreements Deemed Exclusive.

Finally, the Court concluded that "[t]he Apple ISA requires that Google be preloaded as the exclusive default search engine on ***all*** Safari search access points" and that "[t]he Mozilla RSA has a similar effect" in providing that "Google is the default GSE on ***all*** Firefox search access points." *Google*, 747 F. Supp. 3d at 147 (emphasis added).

Google's PFJ addresses the Court's ruling by eliminating the provisions deemed exclusive. Google's PFJ § III.K. Under Google's proposal, a third-party browser developer such as Apple could, for example, set Google as the default in Safari on iPhones while setting a different search engine as the default in Safari on Mac computers, and it could promote other services in Safari on any or all devices. A browser developer could also set a different default search engine in standard browsing mode and private browsing mode. *Id.* A browser developer

15

that made this choice would not forgo "any payments attributable to an Operating System Version or Privacy Mode where Google Search remains set as the Default Search Engine." *Id.* Furthermore, any agreement to set Google as the default would need to be contestable at least once per year, which would dissipate any meaningful competitive concern. *E.g.*, *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022) ("It is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination.").

Although "an injunction against continuation of [the unlawful] conduct" is all that is required, *Microsoft*, 253 F.3d at 106, this aspect of Google's proposed remedy also addresses the future evolution of features and functionalities related to search. Google's PFJ § III.L. For example, Apple could set a non-Google default in Siri or Spotlight without sacrificing any revenue from any agreement it entered with Google, and it could continue to introduce new ways of searching on Apple devices and set a non-Google default for those services as well. *Id.*

## III. PLAINTIFFS' PROPOSED REMEDIES ARE CONTRARY TO LAW.

While Google's PFJ satisfies all applicable legal standards and fosters competition on the merits, Plaintiffs' proposal flagrantly disregards the *Microsoft* opinions and violates the cardinal rules for devising a remedy in a monopoly maintenance case. Plaintiffs' unprecedented attempt at overt market regulation would gravely injure not only consumers who benefit from the quality of Google Search, but also scores of businesses built on top of Chromium or Android, millions of users whose personal data would be passed around without their consent to unspecified "Qualified Competitors," and the pace of innovation in the rapidly changing world of Gen AI. Plaintiffs' proposals—many of which are still to be defined not by this Court but by Plaintiffs

themselves in consultation with a Technical Committee (TC)—would wreak havoc on multiple markets and should be rejected in their entirety.

A.    **Plaintiffs Have Not Established the Causal Connection Necessary to Support Their Proposed Remedies.**

All of Plaintiffs' proposed remedies entail far more than "an injunction against continuation of th[e] conduct" deemed exclusionary. *Microsoft*, 253 F.3d at 106. As explained in Section I.A, Plaintiffs must establish "a clearer indication of a ***significant causal connection*** between the conduct and … maintenance of the market power" to support going beyond a ban on the practices at issue. *Id.* They have not done so, at either the liability or the remedies phase.

Google's Pre-Hearing Brief highlighted the lack of evidence that any party to Google's search distribution agreements wanted to preload a rival search engine or set it as the default but did not do so because of its agreement with Google. Nor was there any evidence during the liability phase that any rival search engine proposed different or additional search access points than those memorialized in Google's distribution contracts, but those were rejected because of Google's distribution agreements. That remains the case after the three-week Evidentiary Hearing. Plaintiffs never established how much "scale" other GSEs purportedly would have needed to reverse (or even materially erode) the undisputed lead that Google lawfully acquired well before the monopoly maintenance period, let alone that any rival would have achieved that undetermined scale if Google had entered only non-exclusive agreements. The record remains devoid of any such evidence. The lack of supporting facts on these two critical issues leaves this Court without an evidentiary basis to conclude that Google's monopoly position would have been displaced in the absence of its search distribution agreements.[1]

---

[1] Although the approach taken by Plaintiffs' expert economist is flawed in numerous respects, even she acknowledged that "the goal" of a remedy should be "to allow competition to resume to where it would have been without the conduct," which requires "an understanding of the extent

Without evidence to support the causation standard necessary for Plaintiffs' radical proposals, Plaintiffs rely on the inaccurate assumption that the Court's liability opinion provides the "***significant causal connection***" necessary for their attempt to dismantle Google and impose a decade of regulatory control over various markets. *Microsoft*, 253 F.3d at 106; *see, e.g.*, Pls.' Pre-Hr'g Br. at 15; Tr. 2134:3-8 (Chipty). The liability opinion cannot bear that weight.

> **1.    The Court's Liability Opinion Neither Applied the More Stringent Standard for Causation Necessary for Plaintiffs' Proposed Remedies Nor Made Findings That Support Those Proposals.**

Plaintiffs expressly argued during the liability phase that they did not need to prove an actual causal connection between the exclusive terms of the agreements and the maintenance of the monopolies because "the causation standard is toothless." May 2, 2024 Closing Arg. Tr. 12:25. Plaintiffs' experts never offered any opinions regarding a but-for world, and Plaintiffs argued in post-trial briefing that "[t]he evidence need only show that the conduct 'reasonably appears capable of making a significant contribution to maintaining monopoly power.'" Pls.' Liability PCOL at 11 (quoting *Microsoft*, 253 F.3d at 79) (cleaned up).

Consistent with Plaintiffs' argument, the Court's liability opinion expressly applied only a more "relaxed" causation standard, *Google*, 747 F. Supp. 3d at 152-53, not the more stringent standard required for Plaintiffs' sweeping ***remedies***. In addressing causation, the opinion stated that "[t]he key question" is whether "Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power." *Id.* at 153. That is a word-for-word recitation of what it means "to infer 'causation.'" *Microsoft*, 253 F.3d at

---

to which competition was actually restricted." Tr. 2206:21-07:6 (Chipty); *see id.* 2232:24-33:4. Enabling "competition to resume to where it would have been without the conduct" inherently requires a comparison of the actual world with what it would have looked like if not for the conduct deemed anti-competitive, *i.e.*, the exclusive provisions of the distribution agreements.

79.  The liability opinion never referenced, let alone applied, the *remedial* standard that requires "a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power" before imposing relief beyond "an injunction against continuation of th[e] conduct." *Id.* at 106.  The Court's liability opinion cited *Microsoft* more than 60 times, and in every instance it pointed to the portions of *Microsoft* addressing *liability*, not the section concerning the causal connection necessary to impose more drastic *remedies*.

After benefitting from the "edentulous" causation standard, Plaintiffs now attempt to twist the Court's opinion to make it seem as if they proved a point on which they provided no evidence and the Court made no findings.  Specifically, Plaintiffs cite statements in the Court's opinion that the exclusive agreements "significantly contributed" to or had a "significant effect" in maintaining Google's monopolies.  Pls.' Pre-Hr'g Br. at 15 n.4.  Again, however, those passages are simply a restatement of the standard the D.C. Circuit applied in *Microsoft* regarding causation with respect to Section 2 *liability* in a case involving harm to nascent competition.  The *Microsoft* court used the very phrasing relied on by Plaintiffs as indicative of the court "hav[ing] found a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems market *only through inference*."  *Microsoft*, 253 F.3d at 106-07 (emphasis added).  Having argued at liability that a but-for causation standard was not necessary, Plaintiffs can hardly now claim that the Court's findings include such a but-for determination necessary to prove the significant causal connection required by the D.C. Circuit.

## 2.    No Record Evidence Supports Relief Beyond Enjoining the Exclusionary Conduct Identified in the Opinion.

Plaintiffs cannot support their dramatic interventions by scouring and repackaging the liability record, which lacks evidence of the "clearer indication of a *significant causal*

19

*connection* between the conduct and … maintenance of the market power" that Plaintiffs must establish to support their RPFJ.  *Microsoft*, 253 F.3d at 106.

It is undisputed that Google lawfully acquired a very substantial share of the two relevant markets identified by the Court.  "In 2009"—years before Plaintiffs contend that Google unlawfully maintained a monopoly—"80% of all search queries in the United States already went through Google."  *Google*, 747 F. Supp. 3d at 31.  At that time, all of the natural barriers to entry identified by the Court were already in place.  *Google*, 747 F. Supp. 3d at 119-22 (discussing "high capital costs," "brand recognition," "scale," and "key distribution channels"); *see* FOF § I.F.  Plaintiffs do not dispute that general search and general search text ads entailed "high capital costs" before Google engaged in the challenged conduct, Tr. 2224:17-24 (Chipty), and "Google" was just as much a verb 15 years ago as it is today.  In addition to lawfully acquiring a brand advantage by delivering a superior product, Google lawfully acquired a significant scale advantage well before Plaintiffs alleged (or the Court found) the company began violating Section 2.  Many of the documents and ranking techniques that Plaintiffs relied on to argue for the importance of user data to search quality come from the 2000s—when Google was lawfully obtaining far more queries (and therefore more user data) than any other search engine. *E.g.*, Pls.' Liability PFOF ¶¶ 182-84, 203-06.  Plaintiffs have not argued (and could not argue) that it was unlawful for Google to (1) acquire a significant scale advantage through lawful conduct prior to the monopoly maintenance period or (2) continue to use that preexisting scale advantage in ensuing years to improve its products, even as rivals fell behind.  *E.g.*, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir. 1979) (explaining that "[a] firm that has lawfully acquired a monopoly position is not barred from taking advantage of scale economies by constructing, for example, a large and efficient factory" because "[t]hese benefits

20

are a consequence of size and not an exercise of power over the market"); *Sargent-Welch Sci.*

*Co. v. Ventron Corp.*, 567 F.2d 701, 712 (7th Cir. 1977) ("[T]he possessor of lawfully acquired

monopoly power … is not forbidden from improving his efficiency in manufacturing or

marketing, even though the effect of doing so will be to maintain or improve his sales.").

      With respect to key distribution channels, there is again no dispute that Google offered

the highest quality search engine before the monopoly maintenance period, and therefore was in

the best position to obtain non-exclusive distribution.  Tr. 2220:24-21:12 (Chipty).  As Plaintiffs'

expert economist acknowledged, it would have been entirely consistent with a competitive

process for Google to pay for non-exclusive distribution during the monopoly maintenance

period.  Tr. 2208:10-24, 2209:12-25 (Chipty); FOF § I.B.  Professor Murphy's choice screen

analysis suggests that in a but-for world of payments for non-exclusive preinstallation, defaults,

or placement, Google's position would not have materially changed.  Tr. 4223:13-26:18

(Murphy); FOF § I.D.  In sum, the liability determination in this case, as in *Microsoft*, came in

the context of a finding of substantial, preexisting barriers to entry that protected a lawfully

acquired monopoly.  *See New York*, 224 F. Supp. 2d at 89.  Against this backdrop, there is no

evidence of the "clearer indication of a ***significant causal connection*** between the conduct"—

*i.e.*, the specific terms of the distribution agreements—and the "maintenance of the market

power" that Plaintiffs concede Google lawfully acquired.  *Microsoft*, 253 F.3d at 106.

      Plaintiffs offered no evidence on this point:  They did not attempt to identify the market

share that purportedly would have shifted to other search engines if Google had entered only

non-exclusive agreements, the amount of data that rivals purportedly would have needed to

improve their quality or monetization, or the scale that rivals supposedly would have obtained if

not for the exclusionary conduct.  Tr. 2212:2-6, 2227:11-14, 2228:17-20 (Chipty).  Likewise,

they provided no evidence that any distribution partner wanted to set a rival search engine as the default or preinstall it on a device but decided not to do so because of an exclusive deal with Google. *E.g.*, *id.* 2212:7-12. In fact, the Court heard overwhelming evidence to the contrary, as one company after another testified that it wanted to set Google as the default in its browser or preinstall Google Search on its devices. FOF § I.D. For example, Verizon had a non-exclusive agreement with Google during much of the monopoly maintenance period, but it never preloaded a rival search engine on its devices. FOF § I.E. And Mozilla switched away from setting Google as the default in the U.S. and then switched back to Google because using an inferior search engine significantly harmed the quality of the user experience. FOF § I.E.

Plaintiffs try to excuse their failure to meet the standard necessary for their extreme proposals by suggesting it is too difficult to compare what actually happened with what would have occurred absent the exclusionary conduct. That was not a valid excuse in *Microsoft*, and it is not one here. A but-for analysis is used to determine an appropriate remedy in all manner of cases, including antitrust actions for monetary relief, where the plaintiff likewise must "separate lawful from unlawful conduct." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055, 1057 (8th Cir. 2000) (excluding expert opinion in exclusive dealing case because "[n]otwithstanding the complex nature of the conduct at issue, [the expert] was required to construct a hypothetical market, a 'but for' market, free of the restraints and conduct alleged to be anticompetitive"). As the *Microsoft* court explained, the "reasoning" in damages cases "is instructive" in fashioning injunctive relief because "[a] court in both contexts must base its relief on some clear 'indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" 253 F.3d at 105; *see* Former Enforcers' Amicus Br. at 3 (applying "*Microsoft*'s heightened causation standard for

22

structural or other remedial relief that goes beyond enjoining the anticompetitive conduct in question … requires examining the counterfactual of what would have happened absent that conduct, just as courts regularly do in other contexts such as measuring damages in antitrust cases").  The but-for analysis in this case is more straightforward than in many cases because the exclusionary conduct is limited to specific terms of identifiable contracts.  However, because the record does not show that Google "would have lost its position in the [relevant] market[s] but for its anticompetitive behavior," *Microsoft*, 253 F.3d at 107, Plaintiffs have taken the unsupportable position that they need not adduce such evidence to obtain "radical structural relief."  *Id.* at 80.

As shown below, Plaintiffs' proposals are premised upon an untenable assumption that ***all or nearly all*** of Google's product-quality advantages flow from the specific terms of the distribution agreements, even though they have not proven that the disputed provisions in those agreements accounted for any dispositive part of Google's success sufficient to have resulted in different preload distribution or default settings.  Plaintiffs' position contradicts *New York*, where the court rejected a proposal to "open-source" IE because the record did not "establish[] that the present success of IE is attributable entirely, or even in predominant part, to Microsoft's illegal conduct."  224 F. Supp. 2d at 185 n.81; *see Massachusetts*, 373 F.3d at 1232.  Plaintiffs' approach also contradicts *Massachusetts*, where the court held that "it does not follow that, because a proposed requirement could reduce the applications barrier to entry, it must be adopted" given that the "applications barrier to entry arose only in part because of Microsoft's unlawful practices."  373 F.3d at 1226.

In short, Plaintiffs' proposed remedies should be rejected because Plaintiffs have not established the requisite causal connection between the exclusionary conduct and the maintenance of the monopolies.  "Absent such causation," the provisions deemed unlawful

"should be remedied by "an injunction against continuation of that conduct," not through any of Plaintiffs' extraordinary remedies.  *Microsoft*, 253 F.3d at 106.

**B.    The Court Should Reject the Proposed Divestiture of Chrome and Chromium (Plaintiffs' RPFJ § V.A).**

Plaintiffs seek "radical structural relief" through the divestiture of Chrome and Chromium—Google's proprietary web browser and an open-source browser ecosystem that Google has developed and improved for nearly two decades.  *Microsoft*, 253 F.3d at 80.  The proposal is unprecedented in numerous respects.  For one, no case law supports divestiture under these circumstances, and this District and the D.C. Circuit rejected a lesser proposal to force Microsoft to "open-source" IE even though Microsoft used the browser to unlawfully maintain its monopoly.  *New York*, 224 F. Supp. 2d at 240-45; *Massachusetts*, 373 F.3d at 1227-33.  For another, the proposed divestiture would present countless unsolved technical challenges because Google is a "unitary company" that built Chrome from the ground up and designed it to be deeply intertwined with the company's shared back-end infrastructure.  *Microsoft*, 253 F.3d at 105.  Plaintiffs' RPFJ also would cause unprecedented harm to everyone who depends on Chrome, including billions of users around the world who enjoy the browser, businesses and governments that rely on Google's experience with cybersecurity threats, and other browsers around the world built on the open-source Chromium project that Google created and maintains.

**1.    Plaintiffs Have Not Demonstrated the Significant Causal Connection Required for Chrome Divestiture.**

Divestiture is unquestionably a form of "structural relief, which is 'designed to eliminate the monopoly altogether'" and therefore "requires a clearer indication of a ***significant causal connection*** between the conduct and creation or maintenance of the market power."  *Microsoft*, 253 F.3d at 106 (cleaned up).  For all of the reasons discussed above, Plaintiffs have not

demonstrated that necessary connection between Google's distribution agreements and the maintenance of general search and general search text ad monopolies.

Google began developing the Chrome browser in 2006 and released it in 2008. Because Chrome was widely regarded as the highest-quality browser, it quickly gained share at the expense of IE, which was preloaded on Windows PCs, where a substantial majority of browsing and searching occurred at the time. By 2014—the earliest point any of Plaintiffs' experts opined that Google's distribution agreements were anti-competitive—Chrome was the most widely used browser in the U.S. FOF § III.A. Against this backdrop, it is remarkable that Plaintiffs even seek the divestiture of Chrome, and the imposition of such a remedy would be unprecedented.

## 2. Chrome Divestiture Would Be Wholly Inappropriate in This Monopoly Maintenance Case.

Plaintiffs' prior filings do not cite a single monopoly maintenance case where a court ordered, over the defendant's objection, the divestiture of a product or business line that the company developed rather than acquired.[2] As the D.C. Circuit explained, cases involving such structural relief largely "have involved the dissolution of entities formed by mergers and acquisitions." *Microsoft*, 253 F.3d at 105; *see id.* (explaining "that divestiture 'has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control,'" and "is particularly appropriate where asset or stock acquisitions violate the antitrust laws" (cleaned up)); Former Enforcers' Amicus Br. at 11-12.

In most of the opinions Plaintiffs previously cited, ***the acquisition itself*** was the unlawful conduct, and "an undoing of the acquisition is a natural remedy." *United States v. E.I. du Pont*

---

[2] Plaintiffs' position finds no support in cases where the defendant agreed to a divestiture as part of a voluntary consent decree. *E.g.*, *United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982). "[A] consent decree is, of course, a settlement," and the terms negotiated by the parties to resolve the matter do not indicate whether the same relief would have been entered if the case had been litigated to judgment. *Microsoft*, 56 F.3d at 1459.

*de Nemours & Co.*, 366 U.S. 316, 329 (1961); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 575 (1972) (concluding that "only divestiture would correct the condition **caused by the unlawful acquisition**" (emphasis added)).  Other cases Plaintiffs cite involved conspiracies that violated Section 1 of the Sherman Act, where the "great evil" was the agreement not to compete, such that the arrangement used "to effectuate" the conspiracy "ha[d] to be broken up." *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 244, 256-57 (1959).

These cases bear no resemblance to Chrome and Chromium, which Google developed organically to compete vigorously with other browsers (including Chromium-based browsers) and contribute to the quality of the browser ecosystem.  FOF § III.A.  A divestiture in this case would be squarely at odds with every remedial principle applicable to monopoly maintenance cases and would flout the D.C. Circuit's admonition that "divestiture is a remedy that is imposed only with great caution."  *Microsoft*, 253 F.3d at 80.

### 3.    The Chrome Divestiture Proposal Is Not Tailored to the Invalidated Conduct.

A divestiture of Chrome also would violate *Microsoft*'s holding that a remedy must "be tailored to fit the wrong creating the occasion for the remedy."  *Id.* at 107.  Plaintiffs never alleged, let alone proved, that there was anything unlawful about Google's development and maintenance of Chrome and Chromium.  Plaintiffs did not take the position that Chrome was illegal at its inception or that Google engaged in anti-competitive conduct by continuing to improve its browser during the monopoly maintenance period.  Plaintiffs did not even allege that it was anti-competitive for Google to design the browser with Google Search as the default—in the same way that Microsoft, DuckDuckGo, Brave, and other companies set their search engines as the default in their browsers.  *Google*, 747 F. Supp. 3d at 120 ("[T]he Chrome default is not alleged to be exclusionary conduct.").  The **only** conduct involving Chrome that the Court

deemed exclusionary was the contractual requirements of the MADAs and Android RSAs. *See id.* at 150-52. The remedy that is appropriately tailored to that conduct is a prohibition on those contracting practices, not "radical structural relief." *Microsoft*, 253 F.3d at 80.

Divestiture would not only violate the principles articulated in *Microsoft*, it would also be incompatible with the specific determinations in that case. The trial court and the D.C. Circuit rejected a proposal to "open-source" IE, which was "reasonably analogized … to a divestiture of Microsoft's assets." *Massachusetts*, 373 F.3d at 1230; *see New York*, 224 F. Supp. 2d at 240-45. Notably, the courts rejected the proposal to "open-source" IE ***even though*** Microsoft unlawfully maintained its monopoly through an array of conduct involving IE, including "commingling" IE's code with Windows to "deter[] OEMs from pre-installing rival browsers" and using "exclusive deals" to distribute IE that foreclosed the "major channels by which browsers can be distributed." *Microsoft*, 253 F.3d at 66, 70-71. And the courts reached this conclusion ***even though*** the record was replete with evidence of the effect of Microsoft's unlawful conduct. *E.g.*, *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 29, 69 (D.D.C. 1999) (finding Netscape's Navigator browser "enjoy[ed] dramatic acceptance by the public" and "a substantial and growing presence on the desktop of new PCs" until "Microsoft's actions forced the number of copies of Navigator distributed through the OEM channel down to an exiguous fraction of what it had been"). Even on this record, the courts ***rejected*** a proposed remedy that was tantamount to a divestiture of IE. *Massachusetts*, 373 F.3d at 1227-33; *New York*, 224 F. Supp. 2d at 240-45.

Chrome divestiture plainly is not "tailored to fit the wrong creating the occasion for the remedy," *Microsoft*, 253 F.3d at 107, and Plaintiffs' proposal is nothing more than an attempt to deprive Google of the benefit of having invested billions of dollars and millions of engineering hours in developing a popular product that consumers have embraced.

### 4. Chrome Divestiture Would Benefit a Specific Competitor at the Expense of Consumers and Competition.

Chrome divestiture would impermissibly aid a specific competitor (whichever firm were to acquire the assets) while harming consumers and competition "in opposition to the purpose of the antitrust laws." *Massachusetts*, 373 F.3d at 1230. The *New York* court found that proposals to force Microsoft to "open-source" IE and auction licenses to Microsoft Office would be "bad for competition" because, among other things, they would "discourage[] innovation by setting the bad precedent that the fruits of R & D and development investments can be expropriated." 224 F. Supp. 2d at 244 (cleaned up). The record here likewise confirms that divestiture would profoundly impair innovation and consumer welfare. FOF §§ III.D, III.E; *see Alston*, 594 U.S. at 102 (explaining that "when it comes to the remedy," courts "must be sensitive to the possibility that … the decrees themselves may unintentionally suppress procompetitive innovation").

Of particular note, Chrome is not the only browser built on Chromium—the open-source project that forms the foundation of more than two dozen browsers. Although anyone can contribute to the Chromium project, the vast majority of engineering and financial resources are provided by Google. FOF § III.A.2. No evidence indicates that any acquirer of Chrome would match Google's commitments, and a buyer may not even preserve the open-source project at all. In this respect, a divestiture could deal a major blow to search competition by undermining the foundation of browsers built on Chromium where rival search engines are the default, including Microsoft Edge, Amazon Silk, and Brave. And in all events, the "dampening of technological innovation" that would result from tearing apart a successful product and a vital open-source ecosystem "would be at cross-purposes with antitrust law." *Microsoft*, 147 F.3d at 948.

Divestiture would also harm consumers in a myriad of other ways, and all of these harms would be felt around the world, as more than 80% of Chrome users are outside the U.S. FOF §

28

III.A.  For instance, browser security is of paramount importance in containing malware and other threats to the security of user data, supports the proper functioning of businesses, and even supports cyber and national security.  Because Google has prioritized cybersecurity in its products, including Chrome, over the course of nearly two decades, Google has an unparalleled ability to address those threats through its shared infrastructure.  FOF §§ III.B.2, III.D.2.  An acquirer of Chrome would almost certainly lack the expertise and systems Google has developed for delivering a safe, high-quality experience on the web.

### 5. Chrome Divestiture Would Be Technologically Complex and Value Destructive

When considering a proposed remedy, "[t]he case law is unwavering in the admonition that it is not a proper task for the Court to undertake to redesign products."  *New York*, 224 F. Supp. 2d at 158.  Yet that is exactly what the Court would need to do in order to rip Chrome away from Google—"a unitary company" built on shared digital infrastructure, for which divestiture would present great "logistical difficulty."  *Microsoft*, 253 F.3d at 105-06.  Chrome does not fully function without access to an array of back-end Google services, and it would take years of planning and execution to attempt to break and rebuild those technological bonds.  FOF §§ III.B, III.C.  Even then, it is unlikely that Chrome would retain the reliability and functionality that has contributed to its success.  FOF §§ III.D.1, III.D.2.  It is even less likely that the browser would keep pace with innovation in the interim, as both Google and the acquirer would be immersed in untangling the dependencies that Google has built over nearly two decades of designing a browser to run on its proprietary systems.  FOF §§ III.C, III.D.1, III.E.

Furthermore, the shell of Chrome that would emerge from a divestiture would be a far less viable business than it is today.  Google's significant investments in Chrome are fueled by the company's dependence on a thriving open web, and there is no evidence that the browser

would have the same value to an acquirer, particularly where Google could not compete to be the default search provider.  FOF § III.E.  A court should not adopt a remedy that would have such "clearly negative economic consequences."  *New York*, 224 F. Supp. 2d at 230.

In the face of these tremendous harms, Plaintiffs have not even adduced evidence that divesting Chrome would shift a significant share of queries to a rival search engine—which of course is not a legitimate remedial objective for the reasons described above.  In particular, Plaintiffs' expert economist estimated—using a host of unrealistic assumptions—that if a new owner of Chrome set a non-Google search engine as the default on user-downloaded instances of Chrome, only 7% of search queries would shift to that search engine, with the majority of the shift occurring on desktop where no unlawful conduct occurred.  FOF § III.D.  Even if Plaintiffs' deeply flawed approach were legally valid, the effect of a divestiture would pale in comparison to the substantial harms to innovation and consumers.

**6.      The Chrome Divestiture Provision Is Impermissibly Vague.**

Finally, Plaintiffs' Chrome divestiture proposal fails to "describe in reasonable detail … the act or acts … required" under Plaintiffs' RPFJ.  Fed. R. Civ. P. 65(d).  The RPFJ devotes a single sentence to describing what Google must do, *i.e.*, "promptly and fully divest Chrome, along with any assets or services necessary to successfully complete the divestiture to a buyer approved by Plaintiffs in their sole discretion."  Pls.' RPFJ § V.A.  "Chrome" is expansively and vaguely defined, *id.* § III.F, with details left to the future and dependent on input of the TC.  FOF § III.F.  Regardless, the record is clear that the divestiture would present unprecedented technical challenges and raise substantial questions about which "assets or services are necessary" in view of the extensive dependencies on Google's shared infrastructure.  FOF §§ III.C, III.F.  "[W]hen it comes to the remedy" for an antitrust violation, courts "must have a healthy respect for the practical limits of judicial administration," and should never "impose a duty that [the court]

30

cannot explain or adequately and reasonably supervise." *Alston*, 594 U.S. at 102-03. The one-sentence directive in Plaintiffs' RPFJ provides little meaningful guidance to Google in determining what it must do or to the Court in understanding whether it has been done.

This failure of proof is entirely of Plaintiffs' own making. Plaintiffs brought their case more than four years ago, and the Court gave Plaintiffs the opportunity to conduct extensive discovery after issuing its liability opinion. If Plaintiffs believed it was feasible to separate a browser with billions of users around the world from the company that developed it from its inception, then Plaintiffs could have articulated "in reasonable detail" in their RPFJ what Google needed to do to carry out the divestiture. Fed. R. Civ. P. 65(d). They have not.

### C. The Court Should Reject the Proposed Contingent Divestiture of Android and Google Play (Plaintiffs' RPFJ § V.C).

Plaintiffs' proposed "contingent" divestiture of Android and Google Play extends so far beyond the law and facts that even Plaintiffs' own economist refused to offer an opinion in support of the proposal and agreed that it "seemed to go too far." Tr. 2200:19-01:7 (Chipty). There is no basis whatsoever for such a harmful remedy.

#### 1. The Arguments Against the Divestiture of Chrome Apply with Equal Force to Android Divestiture.

The arguments for why a divestiture of Chrome should be rejected apply with equal force here. Plaintiffs have not established the causal connection necessary for "structural relief." *Microsoft*, 253 F.3d at 106. Plaintiffs likewise cannot demonstrate that divestiture is an appropriate remedy in this monopoly maintenance case, where Google developed and launched the Android operating system well before the monopoly maintenance period even began. FOF §§ IV.A, IV.B. Nor have Plaintiffs established that a divestiture of Android and Google Play is "tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107. As discussed, the ***only*** exclusionary conduct identified by the Court was exclusive dealing through

specific contractual provisions. *See Google*, 747 F. Supp. 3d at 146-52. To the extent that Plaintiffs made broader allegations about Android Compatibility Commitments and the development of proprietary Android applications, those theories were abandoned or subject to judgment in Google's favor. *See Google*, 687 F. Supp. 3d at 86-88. Plaintiffs have not offered any justification for dismembering Android and Google Play under these circumstances.

### 2. Android Divestiture is Technically Unworkable and Would Cause Tremendous Harm.

Plaintiffs have not even tried to prove that an Android divestiture could be accomplished as a technical matter, and at best it would be incredibly complex and destructive. FOF §§ IV.B, IV.C. Likewise, Plaintiffs have not attempted to establish that Android would preserve its value to consumers and developers if divested, and the evidence shows it would not. FOF § IV.D.

A so-called "contingent" divestiture would immediately harm innovation, competition, and consumers. *See Alston*, 594 U.S. at 102. The extraordinary advances in Android-powered smartphones over the last 15 years have been fueled by investments across the ecosystem. That includes not only the tens of billions of dollars that Google has poured into Android and Google Play, but also the extensive commitments of device manufacturers and their suppliers, app developers, and consumers themselves. FOF § IV.A.3. Google's incentives to continue making long-term investments in Android would be diminished if all of its contributions might be stripped away in a few years. FOF § IV.D; *see New York*, 224 F. Supp. 2d at 191 (rejecting a far more modest proposal because it could "chill" Microsoft's "legitimate" behavior and "could, in contravention of the goals of antitrust law, stifle Microsoft's innovation and investment"). Furthermore, device manufacturers and component suppliers deciding whether to expand a factory or how to design next-generation devices would be deterred from investing by the prospect of Android potentially being broken up. Application developers similarly would have

less incentive to invest in writing software for an operating system that might be radically transformed by a judicial decree. And consumers shopping for a smartphone would be wary of purchasing a device that in the future might not receive reliable software and security updates that guarantee the longevity of the device and are crucial to fostering competition with Apple's iPhone. FOF § IV.D. The Court should reject this "broad and unjustified" provision that would "chill competition, rather than foster it." *New York*, 224 F. Supp. 2d at 136 (cleaned up).

### 3. The Prospect of Contingent Relief Is Improper and Based on an Undefined Standard.

Finally, this form of "contingent" relief is inappropriate in a monopoly maintenance case under any circumstances, and all the more so in a rapidly evolving technological environment where the contingent relief attempts to project several years in the future. Furthermore, the RPFJ incorporates an undefined standard that is not grounded in any applicable remedial principle or precedent. The RPFJ contemplates that Plaintiffs may trigger the divestiture of Android and Google Play by showing—in some unspecified future proceeding—"that either or both monopolized markets have not experienced a substantial increase in competition." Pls.' RPFJ § V.C. But the RPFJ is silent as to how the Court would apply such an ill-defined standard, and the "circumvention" trigger is equally undefined. *Id.* The deleterious effects on competition and consumers described above would be compounded by the fact that it would not even be clear what conditions might trigger such unprecedented relief. The Court should reject Plaintiffs' attempt to hang a Sword of Damocles over an entire ecosystem.

### D. The Court Should Reject the Forced Data Sharing Proposals (Plaintiffs' RPFJ §§ VI.A, VI.C-G, VII.E).

Plaintiffs' forced "data sharing" proposals are as unprecedented and unsupported as their proposed divestitures of Chrome and Android. Indeed, these proposals *are* divestitures, compelling Google to lose proprietary rights to the substantial intellectual property assets that

underpin Google Search, including its "Search Index," "User-Side Data," "Ads Data," and associated innovations. *Massachusetts*, 373 F.3d at 1230 (concluding the trial court "reasonably analogized" a proposal to "open-source" IE "to a divestiture of Microsoft's assets" even though "Microsoft could continue to use its intellectual property under the open-source IE proposal").

Google's proprietary search indexes and Knowledge Graph are among Google's core assets, built and refined through extensive investment and effort. FOF § V.B. Google's proprietary ranking signals are likewise core search assets, developed over decades by thousands of talented and dedicated engineers. FOF §§ V.B.2, V.C.1. Forcing Google to hand those assets over to rivals "inherently decreases both [Google's] incentive to innovate as well as the incentive for other [search engines] to innovate." *New York*, 224 F. Supp. 2d at 176. The law is clear that "not even the broad remedial discretion enjoyed by the district court extends to the adoption of provisions so likely to harm consumers." *Massachusetts*, 373 F.3d at 172.

Plaintiffs' forced data disclosure proposal also raises significant privacy risks that Plaintiffs and their privacy expert fail to grapple with—leaving this issue for Plaintiffs to unilaterally determine later after consulting with the TC. Unrebutted evidence shows that search queries can contain private information and allow for identification of the user. FOF § V.C.2. The Court should not adopt a proposal that does not address Google's legitimate interest in maintaining a trusted relationship with its users who trust it with often confidential and even intimate details of their lives. Plaintiffs' prior filings cite no case in which a court has ordered anything resembling the transfer of such extraordinary volumes of data, proprietary technologies, and intellectual property to an untold number of "Qualified Competitors" unilaterally determined by Plaintiffs. Moreover, Plaintiffs' RPFJ provides no meaningful guidance to Google or the Court on how to implement such a far-reaching, risky, and technologically complex scheme.

34

This Court should not "impose a duty that it cannot explain or adequately and reasonably supervise." *Alston*, 594 U.S. at 102-03 (cleaned up).

### 1. Plaintiffs Have Not Demonstrated the Significant Causal Connection Required for Forced Disclosure of Proprietary Assets.

Plaintiffs' "data sharing" proposals "would work a 'de facto divestiture' and therefore should be analyzed as a structural remedy," *Massachusetts*, 373 F.3d at 1228, which requires "a clearer indication of a ***significant causal connection*** between the conduct and creation or maintenance of the market power." *Microsoft*, 253 F.3d at 106.

In *Microsoft*, the District Court and D.C. Circuit held that a proposed remedy that "would confiscate much of the value of Microsoft's investment" in an asset by allowing "others to use" it must be considered a "structural" remedy. *Massachusetts*, 373 F.3d at 1230. For example, "structural" remedies included proposals to compel Microsoft to "open-source" IE and to "auction" at least three "licenses to sell Office for use on Operating Systems other than Windows and Macintosh." *New York*, 224 F. Supp. 2d at 241. Notably, these provisions would ***not*** have restricted Microsoft's ability to "continue to use its intellectual property," *Massachusetts*, 373 F.3d at 1230, but rather would have made Microsoft's assets concurrently available to other operating system developers so they could "mount a more promising challenge to Microsoft's monopoly." *New York*, 224 F. Supp. 2d at 242. The relief nevertheless was "structural" because it involved "divesting Microsoft of much of the ***value*** of its intellectual property" in IE and Office, even though Microsoft could have continued developing these services alongside its competitors. *Massachusetts*, 373 F.3d at 1231 (emphasis added).

The compelled data disclosures here "would confiscate much of the value of [Google's] investment," *Massachusetts*, 373 F.3d at 1230, and thus Plaintiffs' "data sharing" proposals likewise must be evaluated as structural remedies. Google's CEO Sundar Pichai and Google's

Head of Search Elizabeth Reid testified to the tremendous loss of intellectual property that would result from these compelled disclosures, and Plaintiffs neither cross-examined those witnesses on those points nor submitted any contrary evidence. FOF § V.A.1. Google has invested many billions of dollars and the effort of thousands of employees in creating and maintaining world-class web indexes that it annotates with trade-secret signals and attributes, such as a quality score for each webpage in the index. FOF § V.B. The requested "user-side" data would reveal the search ***results*** Google has shown for every query received over the last 13 months—the output of Google's entire Search stack. FOF § V.C.1. Google makes these investments in its search technologies so that it can deliver the best possible results in response to every user query, and all of this "information constitutes valuable [Google] intellectual property," which is "one of [Google's] primary assets." *New York*, 224 F. Supp. 2d at 177; *see* FOF §§ V.A.2, V.B, V.C.

Forcing Google to make these assets available "at marginal cost" (without any return for the contributions from its substantial R&D and capital investments) would divest Google of the value of this intellectual property and deliver that value to "Qualified Competitors" determined by Plaintiffs. *See New York*, 224 F. Supp. 2d at 243 ("[I]f Red Hat purchases one of the auctioned Office licenses, as it plans, … Red Hat will benefit from Microsoft's twenty years of heavy investment in Microsoft Office."). In some respects, "this type of structural remedy" is "even more severe than a typical divestiture requirement" because Google could charge only marginal cost for assets that entail substantial fixed costs and are far more valuable than their marginal cost of ongoing production. *Id.* at 245. And Plaintiffs' proposal is an especially draconian form of divestiture because it would not be limited to a one-time, forced disgorgement

of the value of Google's presently existing intellectual property; rather, Plaintiffs propose that Google ***continuously*** turn over its newly developed assets and innovations for a full decade.[3]

For the reasons discussed, Plaintiffs cannot obtain structural relief because they have not established the requisite causal connection between the distribution agreements and Google's monopoly position in the relevant markets. *See* Section II.A. The D.C. Circuit made precisely this point in reiterating that "a drastic remedy, such as divestiture, would be inappropriate if Microsoft's dominant position in the operating system market could not be attributed to its unlawful conduct." *Massachusetts*, 373 F.3d at 1231. The court then affirmed the trial court's decision to "insist[] that an analogous form of structural relief—namely, divesting Microsoft of much of the value of its intellectual property—likewise meets the test of causation." *Id.*

With respect to the "data sharing" remedies in particular, Plaintiffs have not established (and cannot establish) that all of the data assets at issue are "scale-dependent data inputs" or how much scale (as opposed to non-scale factors) impacts their utility. Pls.' RPFJ § VI. For example, Google's "Search Index," including its Knowledge Graph, are divorced from the individual user queries Google receives, and are the product of vast amounts of innovation and effort. FOF § V.B. In all events, there would be no basis to force Google to turn over ***all*** of the data it receives, as Plaintiffs have not demonstrated that rival search engines would have received ***anything approaching Google's share*** of that data if not for the exclusionary contractual terms identified by the Court. FOF §§ I, V.A.3. Likewise, Plaintiffs have not shown that whatever natural barriers to entry exist as a consequence of user-data scale would have been eliminated, or even significantly diminished, if not for the conduct found to be exclusionary. *See*

---

[3] In addition to violating precedent concerning antitrust remedies, Plaintiffs' proposed expropriation of Google's trade secrets and other assets would implicate the Constitution's Takings Clause. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1020 (1984).

*New York*, 224 F. Supp. 2d at 89 (explaining that "Microsoft's lawfully-acquired monopoly" was "naturally protected by a 'structural barrier,' known as the 'applications barrier to entry,'" and rejecting structural remedies that would have lowered the barrier).

> ## 2. The Forced Data Disclosure Proposals Are Not Tailored to the Exclusionary Conduct Identified in the Opinion.

Even if Plaintiffs' "data sharing" proposals were not analyzed as a structural remedy, they should still be rejected on the basis that they are not "tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107. Consistent with the D.C. Circuit's mandate, the court in *Microsoft* considered the "proportionality between the strength of the evidence of the causal connection and the severity of the remedy" for both structural and non-structural remedies. *New York*, 224 F. Supp. 2d at 102. In applying this principle, the court refused to impose even non-structural remedies that would have placed rivals on "equal footing" with Microsoft because there was "no evidence that [they] would today possess 'equal footing' … but for Microsoft's anticompetitive conduct." *Id.* at 262. A proposal to create parity that would not have existed in the absence of the exclusionary conduct is "a far cry from 'facilitating entry,'" and instead is "nothing more than 'market engineering.'" *Id.* at 261-62; *see Massachusetts*, 373 F.3d at 1226 (holding that "[i]t does not follow that, because a proposed requirement could reduce the applications barrier to entry, it must be adopted" given that "the applications barrier to entry arose only in part because of Microsoft's unlawful practices").

Plaintiffs cannot avoid this standard by intimating that all of the data Google uses to improve its search engine represents the "fruits" of the challenged distribution agreements. "[T]he fruits of a violation must be identified before they may be denied," *Massachusetts*, 373 F.3d at 1232, and Plaintiffs have not shown that other search engines would have received ***any*** of the data encompassed by the RPFJ in the absence of the challenged agreements, let alone that

they would have received *all* of the data that Google receives today and for the next decade. FOF §§ I, V.A.3.  The *New York* court rejected the same argument Plaintiffs pursue here in evaluating a claim that IE should be "open-sourced" (*i.e.*, shared with rivals) "because it is the 'fruit' of Microsoft's illegal conduct."  224 F. Supp. 2d at 243.  The plaintiffs pointed to findings that "[t]he period since 1996 has witnessed a large increase in the usage of Microsoft's browsing technologies and a concomitant decline in Navigator's share," and "[t]he relative shares would not have changed nearly as much as they did … had Microsoft not devoted its monopoly power and monopoly profits to precisely that end."  *Id.* at 243-44.  But even with those findings (which are absent here), the court concluded that forcing Microsoft to make IE available to rivals was not "an appropriate remedy" because plaintiffs had not shown "that the present success of IE is attributable entirely, or even in predominant part, to Microsoft's illegal conduct."  *Id.* at 185 n.81.  The findings in this case likewise cannot support Plaintiffs' sweeping "data sharing" proposals because Plaintiffs have not demonstrated that the success of Google's ranking signals, index, and other proprietary search assets are "attributable entirely, or even in predominant part," *id.*, to Google's distribution agreements (much less the exclusive aspects of them) as opposed to its innovations, business acumen, and lawfully acquired scale advantage.

### 3.    Forced Disclosure Eviscerates Google's Intellectual Property Rights and Harms Innovation by Cloning Its Proprietary Assets.

Plaintiffs' compelled data disclosure proposal should also be rejected for the independent reason that it would undermine incentives to innovate, and "any dampening of technological innovation would be at cross-purposes with antitrust law."  *Microsoft*, 147 F.3d at 948.

Plaintiffs' RPFJ would allow "Qualified Competitors" to "clone" or "mimic" important components of Google Search and therefore cannot be reconciled with this Circuit's law. *Massachusetts*, 373 F.3d at 1219 (concluding that "not even the broad remedial discretion

enjoyed by the district court extend[ed] to the adoption of provisions" that would have given "rivals the ability to clone Microsoft's software" and "'mimic' the functionality of Microsoft's products"). In this context, cloning refers to "the creation of a piece of software which replicates the functions of another piece of software, even if the replication is accomplished by some means other than the literal repetition of the same source code." *New York*, 224 F. Supp. 2d at 176. Cloning "runs contrary to the theory of protection of intellectual property rights," which "encourages innovation by rewarding the innovator's investment in creating something new." *Id.* In this case, as in *New York*, cloning "sets this scheme askew by denying [Google] the returns from its investment in innovation," such that it "inherently decreases both [Google's] incentive to innovate as well as the incentive for other software developers to innovate, since they can simply create clones of [Google's] technology." *Id.*

Plaintiffs' RPFJ not only enables cloning, it requires it. For example, Google must provide "information sufficient to ***recreate*** Google's Knowledge Graph" and must divulge a wealth of proprietary data associated with each "document in the Google Search Index," including Google's quality signal for each indexed site and "any other specified signal the TC recommends to be treated as significant to ***the ranking of search results***." Pls.' RPFJ § VI.A (emphasis added). As discussed below, the evidence shows that the required disclosures would enable the reverse engineering of Google Search. But even if that were not the case, the RPFJ still could not be adopted under Circuit precedent because it expressly allows the cloning of key elements of Google's assets and intellectual property, including its proprietary "Search Index." While this District and the D.C. Circuit both condemned provisions that "could enable competitors to 'clone' Windows," *Massachusetts*, 373 F.3d at 1219, they were equally critical of proposals that would have cloned only ***portions*** of Microsoft's systems. For example, the

appellate court acknowledged evidence that "there would be 'substantial end user benefit'" if "Microsoft were to disclose the internal architecture of the Media Bar," *i.e.*, a proprietary media player embedded in IE.  *Id.* at 1228.  But the benefits of disclosing Microsoft's proprietary technology did not overcome the fact that even with respect to this single component of Microsoft's browser, the district court "was properly concerned with avoiding a disclosure requirement so broad it could lead to the cloning of Microsoft's products."  *Id.* at 1229.

The evidence in this case is even more compelling.  Google has made enormous investments in key components of its search engine, including its ranking signals, indexes, and Knowledge Graph.  FOF §§ V.A.2, V.B, V.C.  Other companies, including newcomers such as OpenAI and Perplexity, presently have an incentive to develop their own technologies and in fact are using the substantial capital available to them to build their own indexes and develop their own algorithms.  FOF § V.A.4.c.  While it would be cheaper for a company like OpenAI to take Google's indexes and Knowledge Graph at "marginal cost" and deploy its tens of billions in capital elsewhere, that would be exactly the kind of "unearned windfall" the law prohibits.  *New York*, 224 F. Supp. at 177; *see id.* at 111.  It is better for competition and consumers to preserve the incentive of new and existing firms to invest in their own technology.  FOF § V.A.4; *see* Tr. 4255:22-57:20 (Murphy) ("[F]rom a progress point of view, having the AI people there trying to do their own thing … is where the real value is going to come from."); *Trinko*, 540 U.S. at 407-08 (explaining that even when firms "acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers," compelling them to "share the source of their advantage … may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities").

41

Furthermore, the proposed data disclosures would facilitate even more extensive "cloning" than is apparent from the face of the RPFJ by enabling "Qualified Competitors" to reverse engineer how Google ranks and displays search results and search text ads.  FOF §§ V.C, V.D.  Using only the data that Google would need to disclose under Plaintiffs' RPFJ, a recipient could replicate Google's algorithms and the Google search results page itself, and thereby "mimic" the "functionality" of Google Search.  *Massachusetts*, 373 F.3d at 1219; *see* FOF § V.C.[4]  As Google's witnesses explained, this could be accomplished through either backing out the undisclosed signals or by using Google's results as training data for an LLM.  Either way, a "Qualified Competitor" could determine how Google ranks its results and replicate the search results page.  FOF § V.C.1.  It is immaterial that the recipient would not have every last proprietary detail because the hazards of cloning do not require bit-for-bit copying.  As the *New York* court explained, the negative effects of forced disclosure stem from the fact that "Plaintiffs seek the disclosure of vast amounts of technical information for purposes of enabling the creation of ***functional substitutes*** for various pieces of Microsoft's products."  224 F. Supp. 2d at 176 (emphasis added).  The data and signals encompassed by Plaintiffs' RPFJ would allow competitors to create "functional substitutes" for Google Search—eviscerating Google's intellectual property rights and violating the core tenets of antitrust law.  *Id.* at 177.  That outcome is "on its face … inequitable."  *Massachusetts*, 373 F.3d at 1230.  And that outcome would have all of the deleterious effects on innovation described above, but on an even grander scale.  FOF § V.A.4.  Even Plaintiffs' expert economist agreed that disclosing too much data can detract from Google's and rivals' incentives to invest, yet she did not "know what specific data"

---

[4] Allowing "Qualified Competitors" to submit "synthetic or simulated" queries would further facilitate the reverse engineering of Google Search, particularly when coupled with any of the other "data sharing" remedies.  Pls.' RPFJ § VII.E.

would need to be shared under the RPFJ and could not offer "an opinion on data disclosures and how to draw the line." Tr. 2234:18-36:12 (Chipty).

### 4.    The Forced Data Sharing Provisions Are Impermissibly Vague.

The forced data disclosure provisions also should be rejected because Plaintiffs' RPFJ does not specify with sufficient precision "what the court intends to require and what it means to forbid." *Int'l Longshoremen's Ass'n*, 389 U.S. at 76. For example, it is undisputed that the "User-Side Data" and "Ads Data" described in Plaintiffs' RPFJ contains a vast trove of highly sensitive user data, including individual user queries (which by themselves can be used to identify individual users) and associated metadata (which would make it even easier to determine who issued many queries). Even Plaintiffs' privacy expert agrees that extensive measures would need to be taken to anonymize the data before it could be disclosed. Yet none of the measures that Plaintiffs' expert described are referenced in Plaintiffs' RPFJ, nor could they be given that Plaintiffs have not performed the privacy-utility analysis that their expert conceded would have to occur before the details of the remedy could be determined. FOF §§ V.C.2, V.D.1. If the Court were to enter Plaintiffs' proposal, it would be impossible for Google or the Court to determine whether Google was providing the data required by the "User-Side Data" provision "while safeguarding personal privacy and security," since Plaintiffs have arrogated to themselves the unilateral power to decide what these terms actually mean at some future time. Pls.' RPFJ § VI.C. Harm to consumers must be weighed in determining whether a remedy can be adopted, *e.g.*, *Massachusetts*, 373 F.3d at 1211, and Plaintiffs have not included in their RPFJ any measures that would mitigate the harms that indisputably would result from their decree.

The failure to propose an enforceable remedy is not a result of a lack of information. Since 2019, Plaintiffs have obtained millions of documents from Google and conducted dozens

of depositions of its employees, including discovery into the specifics of the click-and-query data maintained by Google.  They had ample opportunity during the remedies discovery period to hone their proposed relief, including by analyzing the billions of queries and associated data fields that Google produced during the liability phase or seeking to inspect an updated sample of the data they insist should be disclosed to an unspecified array of companies.  But Plaintiffs abdicated their responsibility to formulate an enforceable decree that would provide Google with "explicit notice of precisely what conduct is outlawed" or required.  *Philip Morris*, 566 F.3d at 1137; *see New York*, 224 F. Supp. 2d at 248 (concluding that "vagueness renders" the provision of a proposed decree "unenforceable" to the extent that "there is no clear path for Microsoft to follow in order to comply with this aspect of Plaintiffs' proposed remedy").  It is telling that the only specific instruction in the RPFJ—that "Google must use ordinary course techniques to remove Personally Identifiable Information"—does not have the support of their own privacy expert, despite his being retained in November 2024 and having reviewed the RPFJ before it was filed.  FOF § V.C.2.a; *see* Tr. 1193:15-94:11, 1196:20-97:12 (Evans).

### 5.    The Forced Data Disclosure Proposals Amount to Impermissible Regulation.

Finally, even under a regime where Plaintiffs and their TC could work out the details *post hoc*, the data disclosure proposals are impermissible because they contemplate an exercise of regulatory power that is not susceptible to judicial oversight.  "Enforced sharing" not only skews incentives, but "also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited."  *Trinko*, 540 U.S. at 415; *see Alston*, 594 U.S. at 102.  In addressing the Colorado Plaintiffs' SA360 claim, this Court identified "a host of questions" about the terms of dealing between competitors that it "is ill-equipped to handle" and explained that "those thorny questions foreshadow the challenges

the court would face in administering a remedy." *Google*, 747 F. Supp. 3d at 183. The list of questions raised by Plaintiffs' "data sharing" proposals is much longer and far thornier.

Among other things, Plaintiffs' proposals require a determination of which signals may properly be regarded "as significant to the ranking of search results," how often the information and data referenced in each section must be provided, what it means to make the highly sensitive data available "while safeguarding personal privacy and security," and what "models" are encompassed by the "Ads Data" provision. Pls.' RPFJ § VI. Despite having ample time, extensive discovery into Google's operations, and unfettered access to experts and the third parties that lobbied for these provisions, Plaintiffs were unable to work through any of these issues to the extent necessary to submit an enforceable RPFJ. There is no basis to ask the Court as part of a post-judgment process to work out the terms of forced sharing, particularly given the Supreme Court's admonition that "judges make for poor 'central planners' and should never aspire to the role." *Alston*, 594 U.S. at 103.

Tellingly, the European Union's Digital Markets Act (DMA), which requires Google to provide a small fraction of what Plaintiffs have proposed, is a ***regulation*** enacted by the European Parliament and Council that took years to formulate and has taken years more to implement and reconcile with European privacy laws.[5] Plaintiffs have not cited a single instance of a ***court*** presiding over the forced disclosure of personal data and complex intellectual property that raises the extensive privacy and security concerns presented here, and such an outcome cannot be reconciled with precedent. *E.g.*, *Alston*, 594 U.S. at 102-03.

---

[5] The DMA, which was passed in 2022 after years of debate and went into substantive effect in March 2024, does not require Google to provide any of the data referenced in the RPFJ's "Search Index" or "Ads Data" provisions. The DMA also does not require any compelled syndication. While the DMA requires provision of a subset of the "User-Side Data" identified in the RPFJ, the data sets are narrower and are subject to important privacy protections.

As a final illustration of how far Plaintiffs' proposals stray from prudence and precedent, the forced "data sharing" provisions exceed the Court's discretion because they appear to conflict with the 1986 Stored Communications Act ("SCA"), which generally provides that certain service providers may not disclose the contents of their customers' communications. 18 U.S.C. § 2702(a)(2)(A). Some cases indicate that a search engine may qualify as a provider of a service covered by the SCA. *E.g.*, *Microsoft Corp. v. Does 1-18*, 2014 WL 1338677, at *7 (E.D. Va. Apr. 2, 2014). And some cases indicate that the data encompassed by Plaintiffs' RPFJ may be covered by the SCA. *E.g.*, *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1108-09 (9th Cir. 2014). Insofar as the data identified in Plaintiffs' RPFJ is covered by the SCA, forcing Google to provide it to "Qualified Competitors" would violate the principle that "[c]ourts of equity" lack the power to "disregard statutory … requirements." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015). But even if the Court were to determine that all of the "User-Side Data" fell outside the SCA, it is telling that Congress has regulated the disclosure of the kinds of electronic communications implicated by the proposal and therefore views weighing the risks and benefits of data disclosure as an exercise of legislative power. Courts have long "assume[d] that Congress intends to leave policymaking to political actors," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024), and it would turn that principle on its head to suggest that the Sherman Act vests the courts (or a TC) with the power to modify data-disclosure laws.

### E. The Court Should Reject the Compelled Syndication Remedies (Plaintiffs' RPFJ §§ VII.A-D, VII.E-H, VIII.E-G).

Plaintiffs' compelled syndication remedies should be rejected for many of the same reasons as their forced data disclosure proposals, as well as for a number of other reasons specific to these deeply flawed provisions. To begin, the compelled syndication remedies, like the "data sharing" provisions, are again structural remedies under the D.C. Circuit's opinion in

*Massachusetts*.  They must be rejected because Plaintiffs have not satisfied the causation standard required for such drastic relief.

Compelled syndication also is contrary to precedent because it would smother innovation by allowing any "Qualified Competitor" to free ride on and republish Google's search results, features, and ads.  This would be an extreme form of "cloning" because Plaintiffs' RPFJ expressly requires Google to provide a bit-for-bit replica of whole swaths of the search results page that Google displays on its own site.  In addition to providing the proprietary output of Google Search (*i.e.*, the end result of Google's innovations and a key source of its value), Google would be required to turn over vast amounts of trade-secret information relating to the ranking of results, the assembly of its search results page, and the operation of its ads auction.

Finally, Plaintiffs seek to regulate the entire commercial domain of search and search ads syndication for a decade, without regard for the practices that have developed in a specialized area that was not the subject of liability findings.  This would have a disastrous effect on competition and innovation.

> **1.    Plaintiffs Have Not Demonstrated the Significant Causal Connection Required for Compelled Syndication.**

As discussed in connection with the data disclosure proposals, a remedy is structural when it "would confiscate much of the value of [Google's] investment," even though Google "could continue to use its intellectual property" alongside the "Qualified Competitors" identified by Plaintiffs.  *Massachusetts*, 373 F.3d at 1230.  The search results Google would be required to deliver at marginal cost under the proposed "syndication licenses" are Google's intellectual property and a tremendous source of value.  FOF §§ V.A, V.E, V.F.  Google "is the industry's highest quality search engine" and "has earned … the trust of hundreds of millions of daily users" because they value what they see on google.com.  *Google*, 747 F. Supp. 3d at 31.

Requiring Google to replicate much of that experience for "any Qualified Competitor, at no more than … marginal cost" is an expropriation of Google's assets.

It is immaterial that Google has syndicated some elements of its search results and ads, as those voluntary commercial agreements contain very different terms, including significant prohibitions on reverse engineering and other uses designed to protect Google's intellectual property that are absent here.  FOF §§ V.E, V.F.  The same facts were present in *Microsoft*, where the company had licensed IE and Office to Apple for years.  *Microsoft*, 253 F.3d at 73.  That did not stop the courts from concluding that the ***compelled*** "open-sourcing" of IE and auctioning of Office licenses were structural remedies.  These proposals were "a divestiture" because they deprived Microsoft of the value it derived from maintaining ***control*** of its "primary asset—intellectual property."  *New York*, 224 F. Supp. 2d at 186; *see Massachusetts*, 373 F.3d at 1231.  Plaintiffs' compelled syndication remedies are no different.

For all of the reasons described above, Plaintiffs have not provided "the clearer indication of a ***significant causal connection*** between" the exclusivity terms of Google's distribution agreements and the unlawful "maintenance of … market power" required for structural relief.  *Microsoft*, 253 F.3d at 106.  The compelled syndication proposals therefore must be rejected.

> **2.    The Compelled Syndication Proposals Are Not Tailored to the Exclusionary Conduct Identified in the Opinion.**

Even if the compelled syndication proposals were evaluated as a non-structural remedy, they still would not be "tailored to fit the wrong creating the occasion for the remedy." *Id.* at 107.  Among other things, there is no evidence that any "Qualified Competitor" would have built functionality equal in quality to what Google would be required to provide—including "query rewriting features," local units, maps, and knowledge panels—if not for the exclusionary conduct

identified by the Court.  As discussed in connection with Plaintiffs' "data sharing" proposals, *New York* and *Massachusetts* disapprove of engineering artificial parity through forced sharing.

Furthermore, the proposed remedies are not "of the 'same type or class' as the violations." *Microsoft*, 56 F.3d at 1460.  The Court's opinion addressed Google's ***distribution*** agreements; Plaintiffs never argued that any ***syndication*** practices were anti-competitive.  The passing references to syndication in the liability phase record confirm that it is and has been an option for new and existing search engines.  *E.g.*, *Google*, 747 F. Supp. 3d at 36.  Plaintiffs' proposal nevertheless eliminates all of the commercial terms of syndication—including a negotiated price, use limitations, intellectual property protections, and safeguards for users and advertisers—and contemplates forcing Google to enable any "Qualified Competitor" to replicate its services virtually without limitation.  FOF §§ V.E, V.F.  If Plaintiffs had challenged Google's syndication practices, Google could have presented all manner of evidence about competition to provide syndication services and the procompetitive justifications for placing limitations on the services provided.  Instead, Plaintiffs seek to wipe away commercial practices the Court never analyzed and replace them with an unprecedented dispersion of Google's assets.  Such a remedy is contrary to law.  *E.g.*, *New York*, 224 F. Supp. 2d at 173-74 (rejecting a request for "vast disclosures and royalty-free licensing of technical information" based on "allegations" not "subjected to the rigorous four-part test outlined by the appellate court" for imposing liability).

### 3. Compelled Syndication Eviscerates Google's Intellectual Property Rights by Cloning Its Proprietary Assets.

The proposed syndication remedies should also be rejected because they "will likely enable wholesale copying or cloning of" Google Search.  *Id.* at 175.  Plaintiffs' RPFJ compels Google to provide much of the Google search results page exactly as it appears on google.com.  Pls.' RPFJ §§ VII.A-D, VIII.E.  Any "Qualified Competitor" therefore could "'mimic' the

functionality of [Google's] products" by showing users what they would see on Google's site. *Massachusetts*, 373 F.3d at 1219. That is reason enough to reject the proposed remedy. *See id.* In addition, any "Qualified Competitor" could use Google's search results and ads to "develop products that implement" Google's content "at a far lower cost than [Google] itself since they would have access to" the output of Google's "research and development investment" in determining how to present the best possible search results page in response to each query. *Id.* (cleaned up). Again, *Massachusetts* condemns that outcome. *See id.*

Plaintiffs' proposal also requires Google to facilitate the reverse engineering of the proprietary techniques it uses to generate each search results page by providing, among other things, "[d]ata sufficient to understand the … ranking of all items or modules on the SERP" and all "Ads Data." Pls.' RPFJ §§ VII.A-D, VIII.E. In this way, the wholesale copying of Google Search would extend beyond syndicated results, features, and ads to the algorithms Google has developed for determining which content to display. For all of the reasons discussed above, "the creation of functional substitutes for various pieces of [Google's] products" in this manner is "not a legitimate goal for the remedy in this case." *New York*, 224 F. Supp. 2d at 176. Allowing rivals to take Google's intellectual property "would provide a windfall to [Google's] competitors," *id.*, who would not need to invest in developing the world-class infrastructure and algorithms Google has created over the last 25 years. And the negative effects on Google's "incentive to innovate would be substantial," *Massachusetts*, 373 F.3d at 1219, as many of Google's innovations would be irrevocably turned over to competitors on a continuous basis. FOF §§ V.A, V.E. V.F. The law prohibits the "adoption of provisions so likely to harm consumers." *Massachusetts*, 373 F.3d at 1219.

### 4.    The Compelled Syndication Provisions Would Require Extensive Central Planning.

Finally, the forced syndication provisions should be rejected because they would require the Court to specify "terms of dealing" and act as a "central planner," even though judges "should never aspire to the role." *Alston*, 594 U.S. at 102-03.  For example, Plaintiffs' RPFJ asks the Court to set a price for search and ads syndication that is essentially confiscatory because it neither accounts for the fixed costs of building Google Search nor places any value on the vast amount of intellectual property encompassed by the RPFJ.  No evidence indicates whether such a price is sustainable because there is no precedent for treating Google Search as a public good that any "Qualified Competitor" can take to the extent it wishes.  At a minimum, the proposal would decrease competition by rendering uneconomical the syndication services offered by other search engines such as Bing and Brave—a classic example of how a regulatory remedy can "wind up impairing rather than enhancing competition." *Id.* at 102.[6]

Plaintiffs' proposal goes far beyond the syndication APIs that Google offers in the ordinary course, and would require Google to build from scratch a series of new APIs that would require extensive coordination with the "Qualified Competitor" recipients.  FOF §§ V.E, V.F.  It is telling that a single syndication relationship—such as Google's deal with Yahoo! Japan or Microsoft's arrangement with DuckDuckGo—requires extensive coordination between the parties to build and maintain the technology necessary to provide the syndication services.  Not only would Plaintiffs' proposal mean replicating that dynamic for an untold number of

---

[6] Plaintiffs called only two GSEs that rely on syndication: DuckDuckGo and Yahoo!.  Both have agreements with Microsoft that preclude syndicating from Google.  FOF § V.A.4.  Moreover, the evidence shows that even if they were able to take advantage of the compelled syndication proposals, there would be less competition and innovation because they could republish most of Google's search results page on extremely favorable terms rather than having to create their own content or obtain it from the other companies (such as Microsoft, Yelp, TripAdvisor, and Apple) that currently create the content they license on market terms.  FOF § V.A.4.

"Qualified Competitors," but the required coordination would be multiplied by virtue of the requirement that Google make the syndicated features available as they appear on google.com. FOF §§ V.E, V.F.  Plaintiffs' novel and vague proposal also invites demands for customization, including because it would be "the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user."  Pls.' RPFJ §§ VII.A, VIII.E. All of these dynamics would be at cross-purposes with the antitrust laws, which disapprove of "compelling negotiation between competitors."  *Trinko*, 540 U.S. at 408.

Furthermore, Plaintiffs' proposal eliminates Google's ability to detect and prevent fraudulent, malicious, and unqualified traffic.  FOF § V.F.1.  And insofar as the proposed decree leaves any room for Google to protect its infrastructure and advertisers, the Court would need to determine whether a given restriction is a "reasonable step to protect" Google's "brand," "reputation," or "security."  Pls.' RPFJ §§ VII.B, VIII.E.  This market engineering is not within a court's usual ambit, as courts are "neither economic nor industry experts," and a court is "unlikely to be an effective day-to-day enforcer."  *Alston*, 594 U.S. at 102 (cleaned up).  In short, Plaintiffs' RPFJ replaces intellectual property rights with unprecedented forced sharing, substitutes competition with untested regulation, and provides unprecedented subsidies for any company Plaintiffs deem a "Qualified Competitor."  The Court should reject these proposals.

F.    **The Court Should Reject the Payment Bans and Related Restrictions on Distribution (Plaintiffs' RPFJ §§ IV.A-B, D-E).**

As discussed in Section II, Google's PFJ addresses the exclusionary conduct identified by the Court by enjoining the exclusivity terms of the search distribution agreements and other conduct "of the 'same type or class' as the violations."  *Microsoft*, 56 F.3d at 1460.  Plaintiffs' proposal also addresses these agreements, but it sweeps far beyond any conduct challenged in this case and "interfere[s] with ordinary commercial practices."  *Bausch & Lomb*, 321 U.S. at

728.  In particular, Plaintiffs seek to prohibit Google from offering "anything of value" for promotion of Google Search or a "Search Access Point," even if the promotion is indisputably non-exclusive.  *See* Pls.' RPFJ § IV.  Plaintiffs' RPFJ even goes so far as to preclude Google from paying to establish a search engine choice screen.  *Id.* §§ IV.A-B.

This overbroad proposal is based on an improper and unprecedented remedial objective—namely, that the Court may impose remedies intended to "terminate the monopoly" by shifting market share to inferior rivals.  Plaintiffs' proposal also is not grounded in the Court's liability opinion, which accepted Plaintiffs' representation that they were only challenging "contracts that require counterparties to set Google as the exclusive search default" and distinguished "non-exclusive default" deals.  *Google*, 747 F. Supp. 2d at 172.  Finally, the payment bans should be rejected because they would cause significant harm to competition and consumers by forcing OEMs, carriers, and browser developers to either forgo (or face significant cuts in) the revenue they use to fuel their innovations or degrade their products by replacing Google with a lower-quality option that the overwhelming majority of their users do not prefer.

### 1. The Proposed Payment Bans Are Predicated on an Improper Remedial Objective.

Plaintiffs' proposed payment bans are far more than "an injunction against continuation" of the unlawful conduct, *Microsoft*, 253 F.3d at 106, as Plaintiffs did not challenge the practice of paying for non-exclusive search distribution.  *E.g.*, *Google*, 747 F. Supp. 2d at 172.  The proposal also cannot be characterized as an attempt "to restore competition to where it would have been absent the anti-competitive conduct" because Google indisputably could have paid for distribution "in a competitive world, absent the anticompetitive conduct."  Tr. 2132:21-33:8, 2209:12-25 (Chipty).  Rather, the payment bans are an attempt to "terminate the monopoly" by preventing Google from engaging in lawful price competition for non-exclusive promotion in the

hope that inferior search engines will receive distribution instead of Google.  As discussed, however, it is not "a valid objective for the remedy in this case to actually 'terminate' [the] monopoly" because "the monopoly in this case was not found to have been illegally acquired" and the "causal connection between [Google's] exclusionary conduct and its continuing position in the [relevant] market" was established "only through inference."  *New York*, 224 F. Supp. 2d at 100-01; *see* Section I.A.  The Court should not enter an injunction that could only be justified under a higher standard of causation that Plaintiffs have not met.

### 2.    The Proposed Payment Bans Are Not Tailored to the Exclusionary Conduct Identified in the Opinion.

Plaintiffs' proposal should be rejected for the additional reason that it is not "tailored to fit the wrong creating the occasion for the remedy."  *Microsoft*, 253 F.3d at 107.  Crucially, Plaintiffs claimed that the challenged agreements were unlawful because they were ***exclusive***, not because they involved ***payments*** or other consideration.  The Court observed that "[f]rom the outset, Plaintiffs have framed this case as one about exclusive dealing" and concluded that "*Microsoft* compels application of the exclusive dealing framework."  *Google*, 747 F. Supp. 3d at 146.  Plaintiffs themselves made clear that they were "not challenging the concept of a search default or that distributors may recommend a search engine," but rather were challenging "contracts that require counterparties to set Google as the exclusive search default."  *Id.* at 172.

Plaintiffs' expert economist expert testified that Google would have been expected to compete for non-exclusive promotional opportunities—including defaults—if not for the provisions deemed unlawful.  FOF § I.B.  Thus, by seeking to ban essentially all payments for distribution, Plaintiffs "impermissibly threaten[] to interfere with ordinary and legitimate commercial practices inherent in [Google's] participation in the … industry."  *New York*, 224 F. Supp. 2d at 137.  Confirming the impropriety of the relief Plaintiffs seek, the *New York* court

held that even though Microsoft unlawfully maintained its monopoly through exclusive agreements with OEMs, it should "be permitted to provide compensation for OEM action which promotes or supports Microsoft products" because "there are often instances where compensation commensurate with the amount of support given to a particular product is not only a routine business practice, but it is 'obviously beneficial.'" *Id.* at 164. The *New York* court expressly ***rejected*** an argument that the decree should bar Microsoft from providing "consideration or price reductions to OEMs for carrying, supporting, or promoting the 'middleware' portions of Microsoft's operating system," *i.e.*, the portions Microsoft had used to unlawfully maintain its monopoly. *Id.* at 216. "[A] complete ban on the provision of compensation for support of Microsoft products" would be "absurd," the court explained, because "it prohibits routine, procompetitive business practices." *Id.*; *see Massachusetts*, 373 F.3d at 1226 (rejecting the argument "that the new freedoms provided to OEMs under the decree will be ineffectual because Microsoft has retained the ability to offer OEMs favorable discounts"). For these reasons, the Court should reject Plaintiffs' proposed payment ban here.

### 3. The Payment Bans Would Harm Competition and Consumers.

Plaintiffs' proposal should also be rejected because it is "likely to harm consumers." *Massachusetts*, 373 F.3d at 1211. The RPFJ presents OEMs, carriers, and browser developers with a Hobson's choice. On the one hand, these companies could preload or set as the default "the industry's highest quality search engine," *Google*, 747 F. Supp. 3d at 31, while forgoing the payments they count on to improve their products and deliver value to their users. FOF § II.A.1. On the other hand, they could enter an exclusive deal with a lower-quality search engine, leading to a worse user experience, less searching through their access points, and lower user retention. FOF §§ II.A.1, II.B, II.C. Either way, consumers would be worse off. FOF § II.A.2.

The harms would only grow over the course of Plaintiffs' proposed ten-year decree. For example, if Google could not compete on price for distribution, then other search engines would not need to make more competitive offers, and the funds available to OEMs, carriers, and browser developers to improve their products would dissipate. FOF §§ II.A.1, II.B, II.C. Businesses and product lines that rely on search revenue—such as independent browsers and low-cost smartphones—would be less viable and consumers would suffer. FOF §§ II.A.1, II.B, II.C. As with so many of Plaintiffs' other proposals, their attempt to engineer conditions that would never arise through a competitive process "could wind up impairing rather than enhancing competition" and therefore should be rejected. *Alston*, 594 U.S. at 102.

## G. The Court Should Reject the Proposed Choice Screens Remedies (Plaintiffs' RPFJ §§ IX.A-D).

### 1. The Proposals for Choice Screens on Google Devices and Google Browsers Are Not Tailored to the Invalidated Conduct.

Plaintiffs' RPFJ would require Google to display choice screens on "Google Devices" (such as Pixel smartphones and Google "Internet of Things" devices) and "Google Browsers" (a term that encompasses "Chrome until divested"). Pls.' RPFJ § IX.B-C. The proposal is not "tailored to fit the wrong creating the occasion for the remedy," *Microsoft*, 253 F.3d at 107, because Plaintiffs did not challenge Google's design of Pixel or other Google proprietary devices or its practice of setting Google Search as the default in Chrome. *E.g.*, *Google*, 747 F. Supp. 3d at 120, 172. Plaintiffs should not receive the benefit of a claim that they expressly disclaimed. *See New York*, 224 F. Supp. 2d at 174 (rejecting proposed remedies based on testimony that "Microsoft has implemented proprietary technology much to the consternation of its competitors" because "these allegations must be subjected to the rigorous four-part test" for Section 2 liability "before the Court can find that Microsoft's conduct violates antitrust law and demands a remedy").

56

Plaintiffs' proposals should also be rejected on the basis that "clearly lawful practices" cannot "be enjoined simply because they will weaken the antitrust violator's competitive position." *New York*, 224 F. Supp. 2d at 109. Setting a browser or search default is a product design decision that Google makes in order to offer the most compelling experience to its users. FOF §§ VI.A, VI.C. To the extent that Plaintiffs challenged Google's product design determinations—such as its development of proprietary Android applications or the display of specialized vertical providers on its search results page—the Court entered judgment in Google's favor. *Google*, 747 F. Supp. 3d at 34. The way that Google designs Chrome and its proprietary devices not only went unchallenged in this case, but also is consistent with ubiquitous practices in the industry. Plaintiffs have not identified any devices sold in the U.S. that ship with a browser or search engine choice screen, nor have they identified any browsers marketed in the U.S. that display a search engine choice screen. With respect to the U.S., the proposed remedy would be a novel regulatory intervention that imposes a design no market participant has adopted and overrides a common practice that has not been found unlawful. "[I]n no instance has" Congress "indicated an intention to interfere with ordinary commercial practices" in authorizing remedies for antitrust violations. *Bausch & Lomb*, 321 U.S. at 728.

Finally, the proposed choice screens would harm Google's ability to innovate, harm users, and impair competition between Apple and Android. FOF § VI.C. And extending choice screens to Gen AI services through Plaintiffs' overbroad definition of "Search Access Point" is unsupported by the Court's liability findings and would undermine innovation. FOF § VI.C.

### 2. The Proposal for Choice Screens on Existing Third-Party Devices Is Unwarranted and an Impermissible Monetary Penalty.

Plaintiffs' RPFJ includes a separate choice screen provision that applies to each "non-Apple, third-party Device under a distribution agreement." RPFJ § IX.A. Under this proposal,

Google must offer the "Distributor" of those devices "the option to display" a variety of choice screens in exchange for payments calculated based on the amount of revenue share payments made by Google for the device during the preceding year. *Id.* This is effectively the only option a Distributor has under the RPFJ, aside from preloading a rival instead of Google.

For the reasons explained above, there is no strong causal connection that would warrant finding that Google Search or Chrome would have had any different position on Android devices under ***non-exclusive*** distribution. There is thus no proven change in market outcomes that choice screens "restore." FOF § I.D. Moreover, search engine choice screens would hinder the ability of Android devices to compete against iPhones. FOF § II.B. And their extension to Gen AI services deemed "Search Access Points" would hinder innovation. FOF § VI.C.

Furthermore, because Google would be required to continue paying an Android OEM or carrier without receiving any incremental promotion or distribution, this provision in effect is a monetary penalty that could exceed a billion dollars. FOF § VI. The Sherman Act does not authorize Plaintiffs' proposal, as the statute expressly enumerates when monetary relief may be awarded. *E.g.*, 15 U.S.C. § 15a. Nor do the Court's equitable powers extend nearly this far, as the provision would require Google to pay third parties to implement a device configuration (*i.e.*, a choice screen) that would not have arisen through competition. FOF § VI.A. The proposal is an unlawful penalty that does not satisfy any valid remedial objective.

### H. The Court Should Reject the Artificial Intelligence Proposals (Including but Not Limited to Plaintiffs' RPFJ §§ III.V, V.B, VI.C, VII, and VIII.E).

Gen AI services are thriving, as part of a robust competition with deep scientific and geo-political implications. OpenAI's ChatGPT is arguably the fastest growing consumer product in history, having attracted an estimated 160 million daily active users within two-and-a-half years of its launch. FOF § VII.F. The company recently raised another $40 billion in capital and is the

58

sole third-party Gen AI service integrated into Apple's iPhone.  FOF § VII.F.  Its growth has

only accelerated: while ChatGPT added an estimated one million users within five days of

launching in November 2022, it added a million users in ***an hour*** in March 2025 when OpenAI's

"image generation technology … became part of ChatGPT."  Tr. 484:19-85:19 (Turley).  Meta

AI is distributed through Facebook, Instagram, and WhatsApp—products that collectively are

accessed by billions of users each day—and now includes a standalone app that can be

downloaded on mobile devices.  FOF § VII.F.  New companies continue to grab headlines, with

services such as DeepSeek and xAI's Grok rapidly attracting tens of millions of users.  FOF §

VII.F.  The technology for information retrieval, and the rise of new entrants, is evolving at

unprecedented speed, all without judicial intervention.

Plaintiffs' RPFJ seeks to regulate this fiercely competitive domain for a decade, even

though Gen AI services played no role in the Court's liability determination.  For example,

Plaintiffs propose extending payment bans and choice screens to any "GenAI Products that can

retrieve and display information from a GSE," Pls.' RPFJ § III.V, despite having secured their

preferred market definition by arguing that "Generative AI systems … are not a reasonable

substitute for GSEs."  Pls.' Liability PFOF ¶ 391.  And Plaintiffs seek unprecedented subsidies

for Gen AI rivals in the form of compelled "data sharing" and syndication, even though there

were no findings that Google's search distribution agreements foreclosed any distribution

opportunities for Gen AI services.  In addition to the reasons already discussed, several

additional reasons support rejecting Plaintiffs' Gen AI proposals.

### 1.    The Artificial Intelligence Proposals Are Not Tailored to the Exclusionary Conduct Identified in the Opinion.

The proposals relating to Gen AI "played no role" in the Court's "holding [Google]

violated the antitrust laws."  *Massachusetts*, 373 F.3d at 1215.  The Court did not define a

relevant market that included massively popular chatbots or virtual assistants such as ChatGPT or Meta AI and there was no evidence that any Google Search distribution agreements inhibited any Gen AI service. Nor is there any such evidence today, with ChatGPT having beaten out Google Gemini for a prized position in Apple Intelligence and Perplexity securing preinstallation on Android smartphones. FOF § VII.F. The Court's findings regarding scale likewise had no bearing on Gen AI models, which are not trained on the same data as GSEs and have achieved state-of-the-art quality without access to any of Google's user-side search data, Google's search index, or other proprietary databases like its Knowledge Graph. FOF § VII.B.

Under these circumstances, the Court's "discretion is necessarily less broad because, without liability findings to mark the way, it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Massachusetts*, 373 F.3d at 1223-24. Preventing Google from serving consumers is exactly what Plaintiffs are attempting to do by prohibiting all payments—including through non-exclusive agreements—to promote Gemini or other "GenAI products that can retrieve and display information from a GSE." Pls.' RPFJ § III.V. Under the market definition urged by Plaintiffs and adopted by the Court, the fact that a service "can retrieve and display information from a GSE" does not make it a GSE. For example, Google Assistant and Siri can retrieve information from a GSE, but Plaintiffs excluded them from their relevant markets and abandoned claims that Google engaged in anti-competitive conduct with respect to the Assistant. *Google*, 687 F. Supp. 3d at 86. A number of Gen AI companies, including market-leader OpenAI, pay for preinstallation and promotion. FOF § VII.F. By barring Google from engaging in the same type of price competition, Plaintiffs impermissibly seek to "interfere with ordinary commercial practices" in a domain where they have not even shown that Google has market power. *Bausch & Lomb*, 321 U.S. at 728.

There is also no basis for extending Plaintiffs' unlawful "data sharing" and forced syndication proposals to Gen AI services. The remedy must be "tied to [the finding of a] monopoly in a carefully defined market, rather than to some more general dominance in the broader … industry." *New York*, 224 F. Supp. 2d at 235. According to Plaintiffs' arguments and the Court's findings, chatbots and virtual assistants are not part of the relevant markets. *See Google*, 747 F. Supp. 3d at 37-38. The remedy must also be tied "to the theory of liability" advanced by Plaintiffs and adopted by the Court. *New York*, 224 F. Supp. 2d at 136. Insofar as Plaintiffs argued that Google's "distribution agreements prevent the emergence of innovative search-adjacent technologies" such as Branch Metrics, the Court rejected that theory. *Google*, 747 F. Supp. 3d at 169-70. If Plaintiffs had pursued a theory based on the emergence of Gen AI services, the evidence would have looked very different, including with respect to market definition and monopoly power. For example, the opinion credited the testimony of Microsoft's CEO that "venture funding of search [is] the 'biggest no fly zone,'" *Google*, 747 F. Supp. 3d at 43, even though Microsoft itself had poured billions into OpenAI and other Gen AI companies before those words were spoken. FOF § VII.F. Plaintiffs' RPFJ thus impermissibly seeks to regulate conduct outside of the relevant markets based on theories they did not pursue or failed to prove. *See New York*, 224 F. Supp. 2d at 131, 133 (rejecting argument "that handheld devices need some form of protection [in] the remedial decree" notwithstanding assertions that they "pose a 'platform threat to the Windows operating system'" because "[h]andheld devices did not play a role during the liability phase … beyond exclusion from the relevant market").

Finally, any argument that Gen AI services could become competitors in the relevant markets identified by the Court does not justify the expansive remedies proposed by Plaintiffs. ChatGPT, Perplexity, Copilot, Meta AI, and many other Gen AI services have experienced a

meteoric rise that their developers expect will continue even though they have not received any of the benefits from Google that Plaintiffs seek to bestow (such as Google's "Search Index," search results, and ads). FOF § VII.F. Although data from search engines can be used in training language models, OpenAI and others have already demonstrated that models trained on other data perform at least as well. FOF § VII.F. And to the extent that language models benefit from search "grounding," Gen AI companies have obtained these services on market terms and are developing their own capabilities. FOF § VII.E. That is the essence of competition, and it is happening without the unprecedented expropriation of Google's assets sought by Plaintiffs.

### 2. Plaintiffs' Artificial Intelligence Proposals Would Stifle Innovation and Chill Competition.

Plaintiffs' "forward-looking provision[s]" also must be rejected because they would "undermine [Google's] incentive to innovate." *Massachusetts*, 373 F.3d at 1218-19. In addition to the adverse effects of compelled data disclosure or syndication described above, the RPFJ would hinder Google's ability to deliver the best products to consumers. For example, users (and website publishers) benefit from Gemini being able to display "links to websites" in Gemini results, but including this functionality would trigger the draconian remedies applicable to "Search Access Points" under Plaintiffs' RPFJ. Pls.' RPFJ § III.V. Consumers and competition would suffer if Google were faced with the choice of either delivering an inferior experience or subjecting an array of products that are not GSEs to Plaintiffs' overbroad decree.

Plaintiffs' RPFJ would also have negative effects on the incentives of Gen AI firms to innovate. The tens of billions of dollars flowing into the industry represents an opportunity for Gen AI companies to build infrastructure for the future of information retrieval—including new web indexes, language models, and ad platforms. FOF § VII.F. The incentives for such investments would be diminished if firms could instead draw on Google's assets through

compelled data disclosure or syndication. *Massachusetts*, 373 F.3d at 1218-19. And innovation will suffer if Google cannot recoup its investments in this area because its innovations in indexing, ranking, and ad serving are funneled to competitors for 10 years. FOF §§ V.A, VII.C.

Instructively, the *New York* court did not include "handheld devices" in the key definitions in its decree notwithstanding arguments that those devices were "attracting more software developers and potentially beginning to replace the personal computer." 224 F. Supp. 2d at 132. The court rejected a broader decree even though Palm—which was "Microsoft's primary competitor in the handheld market"—would have benefitted substantially from "access to significant information regarding Microsoft's proprietary technologies." *Id.* at 133 n.54. The argument that Palm might pose a threat to Microsoft's monopoly was ***not*** a reason to require Microsoft to aid Palm through forced sharing. Rather, it was a reason to encourage Microsoft to ***compete*** with Palm. *Id.* at 133. The same principles apply here.

Finally, Plaintiffs' proposed remedies regarding Gen AI, like so many of their other proposals, reflect an unjustified confidence in the ability of Plaintiffs (or anyone else) to predict and effectively regulate the trajectory of innovative and rapidly evolving technologies over the next decade. *See Alston*, 594 U.S. at 102. Plaintiffs' willingness to impose sweeping forward-looking regulation stands in marked contrast to their refusal to assess what the past would have looked like if not for the exclusive provisions of the challenged agreements, even though such analyses are commonplace. *See* Section III.A.2.

## I.     The Court Should Reject the Self-Preferencing Proposals (Plaintiffs' RPFJ §§ IV.D, V.B).

Plaintiffs' proposed "self-preferencing" remedy (including the unexplained prohibition against "commingling" in RPFJ § IV.D) is a jumble of provisions unmoored from the exclusionary conduct identified by the Court and unsupported by the evidence. Some of these

ill-defined provisions are directed to services not addressed in the liability opinion at all (including "Android AICore" and a "Google Grounding API"), while others relate to vague notions that Plaintiffs abandoned or never pursued (*e.g.*, that Google would use its proprietary services to "degrade" a "Competitor's GSE, Search Access Point, or GenAI Products"). Pls.' RPFJ § V.B. "The broad ban proposed by Plaintiffs is not directly connected to any finding of liability" and should be rejected for that reason alone. *New York*, 224 F. Supp. 2d at 187.

The provisions also should be rejected because they are too vague to be enforced. Adopting such open-ended provisions that are unrelated to the exclusionary conduct at issue would require constant judicial management of Google's product design decisions. This is undesirable in its own right, and it would hinder innovation.

### 1.    The Self-Preferencing Proposals Are Not Tailored to the Exclusionary Conduct Identified in the Opinion.

The "self-preferencing" provisions would impair innovation by regulating ill-defined categories of conduct that formed no part of the Court's liability opinion. Among other things, there was no evidence that Google "use[d] its ownership and control of Android, or any other Google product or service" to "prevent[] interoperability," "punish or penalize" any "Android partners," or "degrade any aspect" of competitors' services. Pls.' RPFJ § V.B. The conduct evaluated in the liability opinion that most closely resembles this proposed remedy was the Colorado Plaintiffs' SA360 claim, which generally alleged that Google used "its ownership" of "a Google product" (SA360) to favor Google Search over Bing. But the Court rejected that claim, and the ***only*** conduct deemed exclusionary involved specific provisions of contracts that were reduced to writing. *Google*, 747 F. Supp. 3d at 146-52, 184-85. The Court's findings therefore cannot support prohibitions on any hypothetical "self-preferencing" conduct. *See New York*, 224 F. Supp. 2d at 144 (refusing to impose remedies that "more closely resemble conduct

for which the appellate court expressly rejected liability").  Moreover, even if Plaintiffs had presented evidence that Google engaged in some kind of "self-preferencing," the remedy still could not be adopted because any such conduct would not be "the same or similar to the illegal conduct identified" in the liability opinion.  *See New York*, 224 F. Supp. 2d at 258.

*New York* again proves instructive.  There, the court entered an "anti-retaliation provision" because the "liability findings … portray[ed] a practice by Microsoft of threatened and actual retaliation against software and hardware vendors for engaging in action which promotes or supports non-Microsoft middleware."  *Id.* at 212.  Despite those findings—which are absent here—the court rejected a broader proposal that was "likely to curtail a significant amount of conduct which is not truly retaliation" and "is not tailored to reflect the monopoly market."  *Id.* at 217.  Such conduct should not be prohibited, the court reasoned, because it "is likely to be legitimate business conduct."  *Id.*  The same is true of Plaintiffs' "self-preferencing" proposal, which fails to prohibit conduct "of the same type or class" deemed exclusionary and instead encompasses a wide range of lawful conduct.  *Microsoft*, 56 F.3d at 1460 (cleaned up).

##   2.    The Self-Preferencing Provisions Are Impermissibly Vague and Would Chill Competition and Innovation.

The "self-preferencing" provisions also should be rejected because they do not provide "explicit notice of precisely what conduct is outlawed."  *Philip Morris*, 566 F.3d at 1137.  A simple example illustrates the point: In the Google Docs word processing application, a user can ask Google Gemini to perform tasks such as summarizing a document or drafting text, but the same task could not be performed using a third-party virtual assistant, such as Microsoft's Copilot (which is similarly integrated into Microsoft Word).  Does Plaintiffs' RPFJ prohibit this design?  Through multiple rounds of interrogatory responses, Plaintiffs could say only that the design of Google Docs "may be prohibited" by their RPFJ.  RDX0703.016*.  After being

65

pressed again to answer, Plaintiffs responded that the design would be prohibited if "a Google GenAI product, outside of Google Docs" was able "to communicate or interoperate with the Google Docs application" because in that scenario "Google must provide a means … for non-Google GenAI products to communicate or interoperate with … Google Docs." RDX0707.005*.

Plaintiffs' answer is striking on many levels. For one, how Google Docs communicates with Gemini has nothing whatsoever to do with the Court's liability opinion, and there is no basis to regulate it. Furthermore, it is impossible to glean Plaintiffs' arbitrary rule from their RPFJ. The provision plainly does not provide the notice required by Rule 65(d), and such a vague regulatory regime would chill innovation. Google would have no way of knowing whether improving its services ran afoul of the judgment, and this kind of compelled product interoperability inherently stifles innovation, as a company cannot introduce a new feature until it has validated that it will work for other companies. Finally, the Court would need to engage in this arbitrary line-drawing each time Google made a change to "any … Google product or service" that implicated a "GSE, Search Access Point, or Gen AI Product." Pls.' RPFJ § V.B. That is plainly untenable, as "[a]ntitrust scholars have long recognized the undesirability of having courts oversee product design." *Microsoft*, 147 F.3d at 948.

**J.    The Court Should Reject the Ads Transparency Proposals (Plaintiffs' RPFJ §§ VIII.A-D).**

Plaintiffs' "ad transparency" proposals seek to regulate all manner of ad campaigns—including those outside the relevant markets—and to compel disclosure of vast amounts of private data that Google has never provided before and that Google does not have permission to disclose. The proposal is not grounded in the exclusionary conduct identified by the Court, not supported by Plaintiffs' expert economist, and not related to competition among GSEs, yet it would impose extensive judicial regulation of lawful business practices and would harm users.

66

### 1. The Ads Transparency Remedies Are Not Tailored to the Exclusionary Conduct Identified in the Opinion.

Plaintiffs' sweeping "ads transparency" proposals are not grounded in Plaintiffs' theory of liability or the Court's findings because ads reporting and product changes were never alleged to be exclusionary conduct that violated Section 2. "The district court's obligation in fashioning a remedial decree" concerns "the conduct it has found to be unlawful," *Massachusetts*, 373 F.3d at 1233, and "the remedies must be of the 'same type or class' as the violations." *Microsoft*, 56 F.3d at 1460 (cleaned up). The opinion's discussion of the removal of rare queries from search query reports (SQRs) and a 2014 change to keyword matching options are not (and were never alleged to be) anti-competitive conduct, and therefore are not the proper subject of the decree in this case. *Google*, 747 F. Supp. 3d at 180.

Even if these two changes were the proper subject of a remedy, Plaintiffs' RPFJ is not "tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107. For example, Plaintiffs propose extensive regulation of "data or information relating to [an advertiser's] entire portfolio of ads" purchased through Google, including display ads, YouTube ads, and other ad types that Plaintiffs excluded from their relevant markets. Pls.' RPFJ § VIII.C. And Plaintiffs would impose these requirements on a range of products that formed no part of the Court's liability opinion, such as "Ads Data Hub" and "Ads Data Manager." *Id.* Even the provision relating to SQRs bears scant resemblance to the Court's findings, as it encompasses vast amounts of information that Google has never provided to advertisers because it is not useful and in many cases would raise significant privacy concerns. FOF § VIII.C. For example, Plaintiffs propose disclosure of additional "SERP positioning" data, even though "there was very little advertiser testimony that" Google's change to these metrics "was harmful, and no evidence that it led to increased prices." *Google*, 747 F. Supp. 3d at 180 n.17.

67

The proposed remedies are not only disconnected from the contractual terms the Court invalidated, they are also unrelated to competition in the relevant markets.  The evidence indicates that advertisers follow users, and there is no indication they would spend more with another GSE if Google provided the data in Plaintiffs' RPFJ.  FOF § VIII.A.  If providing all that data would attract advertisers, then Microsoft would provide the data to its customers, but the evidence shows no disparity in the information that Google and Microsoft provide.  FOF §§ VIII.A, VIII.E.  Because Plaintiffs have not provided "a clearer connection to the imposition of liability or a clearer showing that a remedy … will benefit competition," the Court should reject the "ads transparency" proposals.  *New York*, 224 F. Supp. 2d at 153.

### 2. The Ads Transparency Proposals Are Unduly Regulatory, Vague, and Harmful to Users.

The advertiser-facing tools and reports that Plaintiffs seek to regulate involve complicated tradeoffs between several legitimate interests, including large advertisers' desire for more data, smaller advertisers' demand for systems that are less complex, all advertisers' desire to keep their campaigns confidential from rivals, users' privacy expectations, and Google's need to protect its intellectual property.  FOF § VIII.  Plaintiffs offer no basis to conclude that their novel framework—which is not based on the policies or product designs of any market participant—would somehow strike a better balance.  FOF § VIII.A.  For example, Plaintiffs' privacy expert refused to address the provision that Google share with advertisers every query leading to an ad impression because it squarely contradicts his opinion that disclosing raw queries violates privacy norms.  FOF § VIII.C.  Plaintiffs' "ads transparency" remedies are nothing more than arbitrary regulations of product designs and reporting policies that have not been deemed anti-competitive.  "The task … before the Court is not the redesign of [Google's]

products to conform to Plaintiffs' views regarding what product design would be best for consumers and competitors alike." *New York*, 224 F. Supp. 2d at 179.

Finally, the proposals should be rejected because they are too vague and defy judicial administration. For instance, the proposed decree would have Google disclose "any other metric necessary for the advertiser to evaluate its ad performance"—a subjective notion that invites perpetual disputes about whether Google can even generate the requested information or provide it consistent with privacy policies and regulations. Pls.' RPFJ § VIII.A. Plaintiffs' RPFJ also proposes monthly descriptions of "changes made to [Google's] Search Text Ads auctions," with Plaintiffs granting themselves "the right to challenge any disclosure they deem inadequate." *Id.* § VIII.D. But Google is constantly improving its ads auction and many of its changes are trade secrets, yet the RPFJ provides no standard for resolving the inevitable disputes. These proposals "may unintentionally suppress procompetitive innovation" and they push past the "practical limits of judicial administration." *Alston*, 594 U.S. at 102.

## K. The Court Should Reject the Investment Reporting Remedies (Plaintiffs' RPFJ §§ IV.H, I).

Plaintiffs propose that Google provide notice and undergo a waiting period prior to investing in, or even entering a "partnership or collaboration" with, a range of firms including "any company that controls a Search Access Point or GenAI Product." Pls.' RPFJ § IV.H. As the *New York* court put it in evaluating a comparable proposal, "[t]his suggested provision is so far removed from any liability in this case, it is difficult to understand the manner in which Plaintiffs believe such a provision will satisfy the objectives of an antitrust remedy." 224 F. Supp. 2d at 192. Plaintiffs offered no witness to support the provision, and it would harm competition by delaying investments in a fast-moving sector, chilling "ordinary and legitimate commercial practices inherent in [Google's] participation in the … industry." *Id.* at 137.

### L.    The Court Should Reject the Prohibition on Certain Agreements with Publishers (Plaintiffs' RPFJ § IV.C).

Another of Plaintiffs' overreaching provisions seeks to regulate how Google licenses data for AI training by barring certain agreements, including those with "a 'most favored nation' … provision." Pls.' RPFJ § IV.C.  Plaintiffs did not challenge any agreements between Google and a publisher, and the Court made no findings about them in its liability opinion.  The provision should be rejected because the proposed remedy is not "of the 'same type or class' as the violations." *Microsoft*, 56 F.3d at 1460.  The Court should also reject the proposal because Plaintiffs presented no witness to support it, and the evidence shows that publisher agreements with most-favored nation provisions are common and procompetitive.  FOF § VIII.X.A.

### M.    The Court Should Reject the Publisher Opt-Out Remedy (Plaintiffs' RPFJ § VI.B).

Through another provision that lacks any connection to the Court's liability opinion, Plaintiffs seek to regulate the options available to publishers to "opt-out" of having their data used in AI training.  Google gives publishers a range of controls over how their data is used, and Plaintiffs never alleged, let alone established, that its menu of options is anti-competitive or otherwise connected to the conduct deemed unlawful or to competition among GSEs.  FOF § X.B.  "[T]he remedies must be of the 'same type or class' as the violations," and this one does not qualify. *Microsoft*, 56 F.3d at 1460.  Plaintiffs presented no witness on this provision, and it would be harmful to innovation and contrary to industry practice.  FOF § X.B.

### N.    The Colorado Plaintiffs' Unprecedented Public Education Fund is Unauthorized by Law, Inapt, and Overly Vague (Plaintiffs' RPFJ § VI.E).

The Colorado Plaintiffs alone propose that Google "fund a nationwide advertising and education program," which may include "short-term incentive payments" to use rival search engines.  Pls.' RPFJ § IX.E.  This unprecedented proposal should be rejected for several reasons.

70

First, the proposal seeks monetary relief that is not authorized by the Sherman Act or other authority.  A consent decree involving AT&T provides no support for this proposal, as it merely required the inclusion of certain language on any joint bills to avoid consumer confusion resulting from the remedy itself.  *See AT&T*, 552 F. Supp. at 198-99.  The settlement did not require AT&T to fund a public education campaign, let alone to pay users to use rival long distance service providers.  FOF § XI.

Second, the proposal is impermissibly vague to the point that it does not even specify the requested relief.  The Colorado Plaintiffs instead propose that they will determine later "the design and funding level"—*i.e.*, the amount of the monetary penalty.  Pls.' RPFJ § IX.E.  This is the remedies phase of the case, and Plaintiffs are not entitled to another bite at the apple.  Their inability to specify the relief sought is an unjustifiable failure of proof, and courts may not enter a vague declaration of intent to be filled in later.  *See* Fed. R. Civ. P. 65(d).

Third, the proposal is not "tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107.  The Colorado Plaintiffs offered no evidence connecting the exclusive terms of the challenged agreements with awareness of the options available to users, particularly given that Google was a household name in search before the monopoly maintenance period and Plaintiffs were "not challenging the concept of a search default or that distributors may recommend a search engine."  *Google*, 747 F. Supp. 3d at 172; *see* FOF § XI.  And to the extent marketing or "financial incentives" could result in an uptick in rival usage, rivals had and have every opportunity and incentive to fund those themselves.  FOF § XI.

### O.     The Anti-Retaliation and Anti-Circumvention Provisions Have No Basis in the Record and Fail to Satisfy Rule 65(d) (Including but Not Limited to Plaintiffs' RPFJ §§ X.E, F).

The Court should reject Plaintiffs' "anti-retaliation" provision because there is no evidence that Google has retaliated against anyone, including a company like Mozilla that

71

switched the default in its browser.  This is in marked contrast to *Microsoft*, where retaliatory threats were among the exclusionary conduct that gave rise to liability.  *Microsoft*, 253 F.3d at 78.  Even then, the court enjoined only "conduct closely related to the retaliatory conduct for which Microsoft has been held liable" and rejected broader prohibitions because they would "dampen competition."  *New York*, 224 F. Supp. 2d at 130, 163-64 ("[C]onduct that is in some respect adverse to competitors is almost implicit in the concept of competition.").

Plaintiffs' proposed "anti-circumvention" provisions are similarly unsupported by any factual findings or evidence.  Moreover, these provisions are too broad and vague.  For example, Plaintiffs' RPFJ would prohibit "any conduct substantially similar to conduct prohibited by another Section of this Final Judgment."  Pls.' RPFJ § X.F.1.  Even when an injunction is directed to far narrower and more discernable subject matter, courts have refused to enter injunctions that are so imprecise because they "fail[] to satisfy the exacting requirements of Rule 65(d)."  *Common Cause v. Nuclear Reg. Comm'n*, 674 F.2d 921, 926-27 (D.C. Cir. 1982) (vacating an injunction prohibiting the Commission "from closing future meetings of a similar nature" to "the Commission's meeting of July 18, 1980" because the phrase "similar nature" "is susceptible to more than one interpretation" (cleaned up)).  The proposed "anti-circumvention" provisions would chill all manner of lawful and procompetitive conduct, and they should not be entered.  *E.g.*, *New York*, 224 F. Supp. 2d at 217.

**P.      The Court Should Reject the Proposed Technical Committee (Including but Not Limited to Plaintiffs' RPFJ § X.A).**

The Court should reject Plaintiffs' proposed decree because it improperly vests Plaintiffs and their proposed TC with excessive authority that violates Google's Due Process rights and Article III.  Among other things, the proposed decree would allow Plaintiffs and/or the TC to decide which Google assets are divested under the definitions of "Chrome" and "Android," who

may acquire Chrome and Android, which companies receive Google's intellectual property and other assets under the definition of "Qualified Competitor" and what privacy protections Google may employ, which Google assets must be "shared" (*i.e.*, divested) under the "data sharing" and syndication provisions, and how much money Google must pay the "public education fund." Pls.' RPFJ §§ III.B, F, U; IV.A, C; IX.E.

And Plaintiffs' TC would not be a neutral arbiter.  Although Google must finance the apparatus, Google would appoint only one of the five members, and the TC would have the power to "investigate complaints … and [] consult with the Plaintiffs regarding its investigation" and issue reports that "may be received into evidence by the Court."  *E.g.*, *id.* X.A.3, 7; X.C.3. In *Microsoft*, where the parties agreed to a three-person committee (with one member appointed by the Plaintiffs, one appointed by Microsoft, and a third agreed upon by the appointed members), the plaintiffs indicated that "the Technical Committee serves Plaintiffs" and "is answerable to the government."  *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 196-97 (D.D.C. 2002).  The envisioned TC would put the executive branch in position to make consequential determinations that impact Google's substantive rights.

Plaintiffs have yet to cite any authority for the proposition that a court can delegate to the executive branch—on its own or in conjunction with a committee—such vast powers to fill in the gaps of an impermissibly vague decree.  Nor have Plaintiffs identified any instance of a court delegating such authority to a party or its committee over the other party's objection.  As a matter of statutory law, Congress has "require[d] that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid."  *Int'l Longshoremen's Ass'n*, 389 U.S. at 76.  And as a matter of constitutional law, "it is the function of the district judge, in a non-jury civil case, to decide dispositive issues of fact and

law genuinely disputed by the parties." *In re Bituminous Coal Operators' Ass'n, Inc.*, 949 F.2d 1165, 1169 (D.C. Cir. 1991). The Court should not enter a decree that leaves it up to Plaintiffs, whether alone or with a TC, to determine Google's substantive rights as they see fit.

### Q.    The Decree Should Be Limited to the United States.

No provision of the decree should apply outside the U.S.—the only geographic market alleged in this case. *Google*, 747 F. Supp. 3d at 107. Insofar as portions of Plaintiffs' RPFJ implicitly or explicitly apply outside the U.S. (*e.g.*, Pls.' RPFJ §§ V.A, X.F), they are unsupported by the liability findings necessary for extraterritorial application. 15 U.S.C. § 6a. Moreover, comity precludes extraterritorial application, particularly given that other countries have expressed "an interest in regulating the activity" addressed in the Court's opinion and global application would "conflict with regulation" adopted by those states—none of which has imposed Plaintiffs' radical proposals. *Hartford Fire Ins. v. California*, 509 U.S. 764, 819 (1993).

### R.    The Duration of The Decree Should Not Exceed Three Years.

Finally, Plaintiffs' proposal for a 10-year decree is contrary to the law and the evidence. As the *New York* court explained, "it is beyond the capacity of this Court, counsel, or any witness, to craft a remedy" today for past violations that "will be appropriately tailored to the needs of a rapidly changing industry" in a decade. 224 F. Supp. 2d at 184. And as the United States acknowledged in that case, if a "ten-year term" were imposed "there exists a substantial risk that the decree will become highly regulatory in nature." *New York v. Microsoft Corp.*, 231 F. Supp. 2d 203, 253 (D.D.C. 2002).

Those considerations are particularly true given the unprecedented innovation and business dynamism in the sectors Plaintiffs seek to regulate. Plaintiffs presented testimony from Perplexity, a company that did not even exist three years ago but is now valued at more than $9 billion and has entered deals to be preloaded on Android smartphones. FOF §§ VII.I.1, 3.

Plaintiffs also presented testimony from OpenAI, which essentially did not have a consumer product three years ago but is now integrated with Apple Intelligence and valued at $300 billion. FOF §§ VII.I.1, 3.  The Court also heard about Google features that are transforming how users access information in ways that were inconceivable when these cases were filed.  FOF §§ VII.C, D, E, F, G.  Against this backdrop of tremendous innovation, Plaintiffs marshaled no support for such a lengthy decree and even described some of their own proposed remedies, particularly forced syndication, as at most a short-term bridge.  FOF § V.A; *see, e.g.*, Tr. 33:25-34:5 (Pls.' Opening Arg.).  Even Plaintiffs' expert economist refused to specifically endorse the 10-year term they propose.  Tr. 2202:16-03:3 (Chipty).

Google's proposed three-year decree reflects the evidence of rapid technological change and minimizes "the possibility that the 'continuing supervision of a highly detailed decree' could wind up impairing rather than enhancing competition."  *Alston*, 594 U.S. at 102.

## IV.    CONCLUSION

The Court should reject Plaintiffs' RPFJ and adopt Google's PFJ instead.[7]

Dated:  May 16, 2025                    Respectfully submitted,

                                        WILLIAMS & CONNOLLY LLP

                                        By:  */s/ John E. Schmidtlein*
                                        John E. Schmidtlein (D.C. Bar No. 441261)
                                        Benjamin M. Greenblum (D.C. Bar No. 979786)
                                        Colette T. Connor (D.C. Bar No. 991533)
                                        680 Maine Avenue, SW
                                        Washington, DC 20024
                                        Tel: 202-434-5000
                                        jschmidtlein@wc.com

---

[7] Google intends to appeal the Court's liability determination and reserves the right to propose a different final judgment based on the outcome of that appeal.  Google also reserves the right to object to any requests for "fees and costs" submitted by Plaintiffs, *see* Pls.' RPFJ § XIV, including fees and costs associated with unsuccessful claims and unsuccessful remedy proposals. *E.g.*, *New York v. Microsoft Corp.*, 297 F. Supp. 2d 15, 33-34, 37-38 (D.D.C. 2003).

bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice)*
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice)*
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*