# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |

| | |
|---|---|
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ███████████████ |
| Defendant. | |

## PLAINTIFFS' REMEDIES RESPONSIVE POST-TRIAL BRIEF

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.    Google Misstates The Law And Objectives Of Plaintiffs' Proposed Remedies .......... 2

II.   Scope Of Permissible Remedies ................................................................................ 3

    A.    Remedies Can Exceed Narrow Injunctions Against The Same "Type" Of Conduct Found Unlawful ...................................................................................... 3

    B.    Plaintiffs' Detailed Remedy Provisions Are Not Vague ............................................ 4

    C.    Plaintiffs' Remedies Are Not "Central Planning" ..................................................... 6

    D.    Plaintiffs' Remedies Are Well Supported By Sufficient Causation ........................... 7

        1.    Google Misunderstands Section 2's Causal Inquiry ............................................ 7

        2.    *New York I* And *Microsoft III* Both Reject But-For Causation ........................... 8

        3.    *Massachusetts* Rejects But-For Causation ....................................................... 10

III.  The Distribution Remedies Are Tailored To Address The Anticompetitive Effects Of Google's Unlawful Conduct ....................................................................... 11

    A.    Payment Bans Will Reduce Barriers And Prevent Foreclosure ............................... 11

    B.    Payment Bans Would Create Competition ............................................................. 15

    C.    Choice Screens On Existing Android Devices And Google Devices And Browsers Will Work With Other Remedies To Help Restore Competition ............................... 17

IV.   Google Mischaracterizes The Data Sharing And Syndication Remedies ................. 18

    A.    Plaintiffs' Data Sharing And Syndication Remedies Are Not Structural ................. 18

    B.    Plaintiffs' Data Sharing And Syndication Remedies Will Accelerate A Return To Competition ....................................................................................................... 19

V.    Chrome's Divestiture Benefits Competition And Consumers .................................. 21

VI.   Plaintiffs' Remedy Is Tailored To The Connections Between Search And GenAI .. 24

VII.  The Colorado Plaintiffs' Public Education Remedy Helps Restore Competition .... 25

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Other Authorities**

*Ball v. Paramount Pictures*,
176 F.2d 426 (3d Cir. 1949)...................................................................................22

*Common Cause v. Nuclear Regul. Comm'n*,
674 F.2d 921 (D.C. Cir. 1982)...................................................................................5

*Eli Lilly & Co. v. Arla Foods, Inc.*,
893 F.3d 375 (7th Cir. 2018)...................................................................................5

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972).............................................................................................7, 12

*Fortyune v. Am. Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004)...................................................................................5

*Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*,
389 U.S. 64 (1967)...................................................................................................5

*\*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004)........................................................................ *passim*

*N. Tex. Specialty Physicians v. FTC*,
528 F.3d 346 (5th Cir. 2008)...................................................................................5

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021)..............................................................................................6, 23

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978)..................................................................................17, 19, 21

*New York v. Microsoft Corp.*,
224 F. Supp. 2d 76 (D.D.C 2002)....................................................................... *passim*

*Optronic Tech., Inc. v. Ningbo Sunny Elec. Co.*,
20 F.4th 466 (9th Cir. 2021)...................................................................................7

*United States v. Am. Tobacco Co.*,
221 U.S. 106 (1911).................................................................................................24

*United States v. AT&T*,
552 F. Supp. 131 (D.D.C. 1982)...............................................................................25

*United States v. Crescent Amusement*,
323 U.S. 173 (1944)...................................................................................................4

*United States v. E. I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)...................................................................................................3

*United States v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961)....................................................................................22, 23, 24

*United States v. Glaxo Grp. Ltd.*,
  410 U.S. 52 (1973)..................................................................................... 7

*United States v. Google LLC*,
  No. 25-5016, 2025 WL 880552 (D.C. Cir. Mar. 21, 2025)................................... 12

\*United States v. Microsoft Corp*.,
  253 F.3d 34 (D.C. Cir. 2001) (en banc)......................................................... *passim*

*United States v. Microsoft Corp.*,
  56 F.3d 1448 (D.C. Cir. 1995)....................................................................... 4

*United States v. Paramount Pictures*,
  334 U.S. 131 (1948)..................................................................................... 22

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009)................................................................... 5, 25

*United States v. United Shoe Mach. Corp.*,
  110 F. Supp. 295 (D. Mass. 1953) ................................................................. 3

*United States v. United Shoe Mach. Corp.*,
  391 U.S. 244 (1968)................................................................................... 2, 3

*United States v. United Tote, Inc.*,
  768 F. Supp. 1064 (D. Del. 1991)................................................................. 24

*Verizon Commc'ns Inc. v. Law Office of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)..................................................................................... 6

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969)..................................................................................... 4

**Statutes**

18 U.S.C. § 2510............................................................................................. 6

18 U.S.C. § 2703............................................................................................. 6

18 U.S.C. § 2711............................................................................................. 6

**Rules**

Fed. R. Civ. P. 65 ........................................................................................... 5

**Other Authorities**

Orin S. Kerr, *The Next Generation Communications Privacy Act*, 162 U. Pa. L. Rev. 373 (2014)6

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ............................... 8, 11, 23

**ABBREVIATIONS**

| GenAI | Generative Artificial Intelligence |
|-------|-----------------------------------|
| GSE | General Search Engine |
| IE | Internet Explorer |
| ISA | Information Services Agreement (for Apple) |
| LLM | Large-Language Model |
| OEM | Original Equipment Manufacturer |
| PFOF | Proposed Findings Of Fact |
| SCA | Stored Communications Act |

## INTRODUCTION

Google—like any monopolist—is content with the status quo and benefits from continuing its market dominance. To that end, Google's proposed remedies are intended to keep the world largely as it exists today. If Google can maintain the status quo during the remedies period, with only minimal restrictions to its contracting practices, then it will be able to maintain its accrued monopoly power both during and after the remedial period. Google's flawed approach to remedies is: If we pretend nothing is wrong, we don't need to fix it.

Plaintiffs, on the other hand, have proven that Google's illegal conduct has broken the general search and general search text ads markets. Unfreezing the ecosystem and restoring competition is not going to happen overnight, but the longer it takes, the greater rewards Google will continue to reap. During the remedies trial, Plaintiffs demonstrated that comprehensive remedies working together are needed to address Google's unlawful monopoly maintenance in the affected markets, which denied rivals distribution and scale, harming the competitive process. And remedies must account for Google's incentive and ability to circumvent them. In their post-trial filings, Plaintiffs explained—based on the record evidence—how Google would likely aim to circumvent any final remedy by, for example, extending its unlawful distribution practices to new search access points such as GenAI products, *see, e.g.*, Pls. Br. Arg. § I.A.3.

Google refuses to grapple with the trial facts or the Court's prior findings that point to the need for strong remedies. Instead, Google contorts the law and market realities to fit its desired outcome—the status quo. Precedent does not support Google's tortured reading of causation and "but-for" worlds for Section 2 remedies. Plaintiffs' proposed remedies, by contrast, target the harm the Court found, seeking to unfetter the monopolized markets, deny Google the fruits of its violation, and ensure that there remain no practices likely to result in future monopolization.

# ARGUMENT[1]

## I.    Google Misstates The Law And Objectives Of Plaintiffs' Proposed Remedies

There are four objectives in a remedies decree: to "unfetter a market from anticompetitive conduct," "terminate the monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (*Microsoft III*) (citations omitted). The Court should enter all of Plaintiffs' proposed remedies because they work together to achieve these ends as applied to the circumstances of this case.

Google argues there can be only one remedial objective in this case: stopping "the exclusionary acts and practices related thereto which served to illegally maintain the monopoly." ECF No. 1347 (Def. Br.) at 4 (citing *New York v. Microsoft Corp.* (*New York I*), 224 F. Supp. 2d 76, 101 (D.D.C 2002)). Google's flawed view would, in effect, prevent courts from achieving any goals other than excising the exact exclusionary contract terms, despite the clear mandate that each of the remedial objectives be achieved to the extent appropriate in light of the facts. Def. Br. at 5 (citing *New York I*, 224 F. Supp. 2d at 101). Google attempts to reach this hollow result by reframing the goal of Plaintiffs' remedies as termination of the monopoly altogether. Def. Br. at 4–7, 53–54. Contrary to Google's assertion, Plaintiffs' proposed ban on distribution payments does not rest on the termination objective because it does not seek to "complete[ly] extirpat[e]" Google's monopoly, e.g., by breaking up Google Search into multiple competing companies. *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 251 (1968). Rather, it serves the independent objectives of unfettering the market from Google's conduct, denying

---

[1] Plaintiffs do not waive any arguments by failing to address them in this page-limited response and rely on the legal and factual statements contained in their initial post-trial brief and proposed findings of fact. ECF No. 1348 (Pls. Br.); *see also* ECF No. 1349 (Pls. PFOF).

Google the fruits of its unlawful conduct, and preventing a recurrence of the violation. *See* Pls. RPFJ § IV. Google's attempt to ascribe an incorrect purpose to Plaintiffs' remedies does not make it true.

More fundamentally, Google's argument stretches *New York I* beyond logic or reason. *New York I* does not categorically bar termination remedies in monopoly maintenance cases. The Court there simply concluded that termination "does not seem to be a valid objective" in "the[] circumstances" at issue. 224 F. Supp. 2d at 101–02. Most importantly, *New York I* did not—and could not—overturn *United Shoe*, which ordered the district court to consider a termination remedy in a monopoly maintenance case despite the absence of a showing of but-for causation. 391 U.S. at 251; *United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295, 307, 339–41, 344– 45 (D. Mass. 1953). If the Court wishes, it would be fully justified in terminating the aspects of Google's monopoly that the Court finds sufficiently causally connected to Google's anticompetitive conduct. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 393–94 (1956) (for the purposes of analysis under Section 2, equating "having a monopoly" with "having monopoly power"). But this rationale is not the basis for Plaintiffs' proposed remedies and, as a result, the Court need not consider Google's argument further.

## II.    Scope Of Permissible Remedies

### A.    Remedies Can Exceed Narrow Injunctions Against The Same "Type" Of Conduct Found Unlawful

Google baselessly challenges nearly every remedy Plaintiffs propose as violating guidance that remedies should be "tailored to fit the wrong creating the occasion for the remedy." Def. Br. at 7 (quoting *Microsoft III*, 253 F.3d at 107). Google interprets the "tailoring" requirement to permit no more than narrow injunctions against the same "type" of conduct found unlawful. But a remedy is properly tailored if it is a "reasonable means" of achieving a remedial

objective. *United States v. Crescent Amusement*, 323 U.S. 173, 188 (1944); *see also Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1216 (D.C. Cir. 2004) (relief "must represent a reasonable method of eliminating the consequences of the illegal conduct" (cleaned up)).  As Plaintiffs have explained, *Microsoft III*'s objectives support their proposed remedies, which are appropriately tailored to Google's conduct and the barriers erected to protect its monopolies. *See generally* Pls. Br. Arg. §§ I–IV.

Google's reliance on *Microsoft III* for its tailoring proposition is especially misplaced. In the subsequent *Massachusetts* appeal, the D.C. Circuit endorsed remedies requiring Microsoft to engage in affirmative conduct even though the prior non-performance of that conduct "played *no role* in [the] holding [that] Microsoft violated the antitrust laws." 373 F.3d at 1215 (emphasis added). For example, *Massachusetts* endorsed remedies that went "beyond the . . . decision on liability" because they were "'a reasonable method' of facilitating the entry of competitors into a market from which Microsoft's unlawful conduct previously excluded them." *Id.* at 1218; *accord* Pls. Br. Legal Framework § I.C. In this case, Plaintiffs' remedies are even more fitting because they facilitate entry directly into the monopolized markets.[2]

## B.    Plaintiffs' Detailed Remedy Provisions Are Not Vague

Google's scattershot assertions that various Plaintiffs' RPFJ provisions are vague miss the mark. As an initial matter, Plaintiffs' proposed remedies are not the final order and should be

---

[2] Google also claims that all remedies must be "of the 'same type or class' as the violations." *E.g.*, Def. Br. at 49 (quoting *United States v. Microsoft Corp.* (*Microsoft I*), 56 F.3d 1448, 1460 (D.C. Cir. 1995)). *Microsoft I* merely prohibits injunctions against forms of conduct that "bear no relationship" to the conduct found unlawful or ban "all future violations of the antitrust laws, however unrelated to violations found by the court." 56 F.3d at 1460 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132–33 (1969)). Plaintiffs' remedies, by contrast, all pertain to search-distribution agreements or the harms or fruits of Google's unlawful search-distribution agreements.

read together with the Court's final opinion on remedies. Rule 65(d) requires that *the Court* (not Plaintiffs) provide "reasonable" (not exhaustive) detail, Fed. R. Civ. P. 65(d), "especially when read in the context of the district court's legal conclusions and [] findings of fact." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (upholding injunction); *see also Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 385 (7th Cir. 2018) (remedy was "sufficiently definite, especially when considered in the context of the rest of the order").[3] The Court intends to issue a remedies opinion together with any final order, and—Plaintiffs submit—their proposed order is highly specific and detailed such that it could be readily adopted by this Court.

Google also complains that some technical requirements will be elaborated later with the help of the Technical Committee, Def. Br. at 1–3, 72–73, but that process will only *increase* the specificity of the injunction. It is both permissible and advisable for a technical committee to aid in filling in details about the "practical workings" of a decree. *Massachusetts*, 373 F.3d at 1244. Google also objects to the fact that certain provisions of Plaintiffs' RPFJ use standards to describe the acts required or prohibited. *See, e.g.*, Def. Br. at 43, 65–66, 72–73. But Plaintiffs "need not describe every combination of circumstances and behaviors that may or may not create a violation." *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 372 (5th Cir. 2008) (noting that the government "must be allowed effectively to close all roads to the prohibited goal"). Nor must the Court give Google "explicit instructions on the appropriate means to accomplish [its] directive[s]." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004).

---

[3] Tellingly, Google never discusses the facts of its vagueness authorities, all of which are far afield from this case. *See Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 74, 76 (1967) (Court's order to comply with an arbitral award containing no "operative command" "can only be described as unintelligible" and "defies comprehension"); *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 926 (D.C. Cir. 1982) (injunction against closing certain agency meetings did nothing, even read in context, to "identify the characteristics" of the covered meetings).

### C.    Plaintiffs' Remedies Are Not "Central Planning"

Antitrust remedies are law enforcement, not regulation. Plaintiffs propose a comprehensive decree because Google committed extensive violations of the antitrust laws that harmed competition, requiring robust remedies to address Google's conduct and its effects. Having failed to show that Plaintiffs' proposed remedies are impermissibly vague, Google next argues the opposite: that Plaintiffs' remedies impose "extensive regulation" and "[e]xtensive [c]entral [p]lanning" through a "highly detailed decree." Def. Br. at 51, 67, 75. Google's argument is misplaced. Beyond one errant argument regarding the 1986 Stored Communications Act ("SCA"),[4] Google never explains why Plaintiffs' remedies "contemplate an exercise of regulatory power." Def. Br. at 44. This is because Google cannot. The decree does not dictate the price, quality, quantity, or other features of a GSE that a central planner would control—it restores competition to let the free market make those determinations. Rather than ask the Court to engage in "policymaking," Def. Br. at 46, Plaintiffs merely ask the Court to "enforc[e] a policy of competition" with which "Congress tasked courts" via the Sherman Act. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 73 (2021).

After critiquing Plaintiffs' remedies as a form of "central planning"[5] Google erroneously implies that *Verizon Commc'ns Inc. v. Law Office of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004),

---

[4] Not convinced by its own argument, Google speculates that the SCA "may" prohibit Plaintiffs' proposed data sharing remedies. Def. Br. at 46. The SCA applies only if Google Search is (1) an "electronic communication service" or (2) a "remote computing service" holding the relevant search and ads data "on behalf of" users and advertisers. 18 U.S.C. §§ 2510(15), 2711(1)–(2), 2703(a), 2703(b)(2). Google Search is neither an "electronic communication service" nor a "remote computing service." Orin S. Kerr, *The Next Generation Communications Privacy Act*, 162 U. Pa. L. Rev. 373, 396–97 (2014). Furthermore, Google keeps search and ads data for its own benefit, not as an agent or representative of each individual user and advertiser.

[5] Google's factual premise that the Court would need to be involved extensively in planning syndication agreements is also wrong. The Court need look no further than Google's agreement with Yahoo Japan. Plaintiffs' syndication and index-sharing provisions are patterned on this

bars Plaintiffs' data access and syndication remedies. Def. Br. at 44–45. But *Trinko* addresses antitrust liability and is not applicable here. Google identifies no authority holding that remedies are subject to the Section 2 liability standard for refusals to deal with rivals, because it cannot. To the contrary, courts often impose affirmative obligations as remedies for antitrust violations that might be considered duties to deal in other contexts. *See, e.g.*, *Optronic Tech., Inc. v. Ningbo Sunny Elec. Co.,* 20 F.4th 466, 486 (9th Cir. 2021); *Massachusetts*, 373 F.3d at 1215 (upholding an injunction requiring Microsoft to disclose APIs and communications protocols); *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 62 (1973) (requiring mandatory sales of antibiotic compound on non-discriminatory terms and mandatory licensing of patents to competing manufacturers at reasonable-royalty rates); *Ford Motor Co. v. United States*, 405 U.S. 562, 576–77 (1972) (requiring Ford to purchase half its spark plugs from divested company for five years).

### D. Plaintiffs' Remedies Are Well Supported By Sufficient Causation

Plaintiffs' remedies are all supported by this Court's finding of significant causation, which is enough for any remedy under any plausible causation standard. Pls. Br. Legal Framework § II. Google wrongly contends that but-for causation is required for any remedy other than a narrow injunction. Under Google's meritless and self-serving approach, the longer term the illegal conduct, the less susceptible it is to a remedy. This cannot be the case.

#### 1. Google Misunderstands Section 2's Causal Inquiry

Google sensationalizes this Court's reliance on "inference" in some parts of its liability opinion. Def. Br. at 7, 12, 18–19, 54. Causation can be proven through circumstantial evidence involving bare inference. But here, the Court found that Google's conduct "significantly contributed" to the maintenance of Google's monopoly power based in part on concrete evidence

---

agreement to syndicate search results, answer synthetic queries, and share information regarding Google's search index. Pls. PFOF ¶¶ 593–94; 752–53, 763–76.

of effects in the relevant market. Mem. Op. at 109–11 (FOF ¶¶ 313, 317, 319–20), 118 (FOF ¶ 347), 121–22 (FOF ¶ 359), 123 (FOF ¶ 365), 125–27 (FOF ¶¶ 369–74); Pls. Br. Legal Framework § II.A; Pls. PFOF ¶¶ 236–46. This Court thus did not rely on just *bare* inference—which is permitted in liability—that the conduct "'reasonably appears capable of making a significant contribution to . . . maintaining monopoly power,'" *Microsoft III*, 253 F.3d at 79 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651c (3d ed. 1996)), as Google claims. Indeed, this Court's findings establish a far clearer causal connection than in *Microsoft III*, where Microsoft's conduct was "aimed at producers of nascent competitive technologies" *outside* the operating-system market it monopolized. *Id.*; *accord* Pls. Br. at 10 n.1. Here, the Court found Google's conduct harmed competition *within* each of the relevant markets.

Even further, Google misreads *Microsoft III* to impose a "more stringent" causation standard for remedies than for liability. *E.g.*, Def. Br. § III.A.1. Whether assessing liability or remedies, causation always requires assessing the extent to which the evidence shows a "significant *contribution*" or, put differently, a "significant *causal connection*" between the challenged conduct and the maintenance or acquisition of the monopoly. *Microsoft III*, 253 F.3d at 79, 106 (emphasis altered). What can change is "the strength of the evidence" required to demonstrate significant causation. *New York I*, 224 F. Supp. 2d at 103. For liability, as well as some remedies, evidence that the conduct "reasonably appear[s] capable" of significant causation suffices; while other remedies require a "clearer indication" of significant causation. *Microsoft III*, 253 F.3d at 79, 106; Pls. Br. Legal Framework § II.B. Here, Plaintiffs have shown a clear indication of significant causation in support of all their proposed remedies. Pls. Br. Legal Framework § II.A; RPFOF ¶¶ 1010, 1019, 1024, 1027.

### 2. *New York I* And *Microsoft III* Both Reject But-For Causation

Google also claims that *Microsoft III* and *New York I* require but-for causation for any

remedies beyond a narrow injunction. Def. Br. at 5–6. Interpreting *Microsoft III*, *New York I*
directly rejects this argument. Most obviously, *New York I* confirms that a but-for requirement
conflicts with *Microsoft III* because it demands "precisely what the appellate court deemed to be
largely unattainable." *New York I*, 224 F. Supp. 2d at 147 (quoting *Microsoft III*, 253 F.3d at 79
("[N]either plaintiffs nor the court can confidently reconstruct a product's hypothetical
technological development in a world absent the defendant's exclusionary conduct.")). A but-for
causation requirement also conflicts with the clear implications of *Microsoft III*'s remand
instructions. Before *Microsoft III*, "the district court had already determined as a factual matter
that there was 'insufficient evidence to find [but-for causation].'" *Id.* at 147–48. The D.C. Circuit
"was well aware of this finding" yet remanded for further remedy proceedings without any
"indicat[ion] that Plaintiffs must overcome [that finding] in order to obtain a remedy exceeding a
mere proscription of the illegal conduct." *Id.* at 148 (citing *Microsoft III*, 253 F.3d at 107).[6]

     *New York I*'s subsequent analysis of specific remedies confirms that but-for causation is
not required, even for robust remedies. *New York I* explained that the plaintiffs had not proven
but-for causation during liability, *id.* at 101, and did "not offer additional evidence regarding a
causal link" at the remedy phase, *id.* at 244. Nonetheless, *New York I* imposed "generous"
remedies that (1) "exceed[ed] a mere proscription of the precise conduct found to be
anticompetitive," *id.* at 193–94; (2) were "forward-looking in the parameters of the relief
provided," *id.* at 193; (3) were "crafted to foster competition in the monopolized market," *id.*;
and (4) denied Microsoft the fruits of its conduct, *Massachusetts*, 373 F.3d at 1232–33.

     Google highlights the only instance where *New York I* discusses a remedy with reference

---

[6] Ironically, Google claims support from the fact that *Microsoft III* observed the lack of evidence
for but-for causation. Def. Br. at 4–5, 23 (quoting *Microsoft III*, 253 F.3d at 107). *New York I*
shows how Google's inference from that observation is exactly backward.

to what would have happened "but for" Microsoft's anticompetitive conduct—misleadingly referring to that instance as an "example." Def. Br. at 6, 38 (quoting *New York I*, 224 F. Supp. 2d at 262). The remedy under consideration would have required Microsoft to distribute a specific rival product, Java. *New York I*, 224 F. Supp. 2d at 260. Google's argument relies on the court's findings of fact about how Java would have fared but for Microsoft's conduct. Def. Br. at 6, 38 (quoting *New York I*, 224 F. Supp. 2d at 262). But as *Massachusetts* (unlike Google) accurately notes, *New York I*'s memorandum opinion rejected the remedy because it "'single[d] out [a] particular competitor[] and anoints [it] with special treatment not accorded to other competitors in the industry.'" 373 F.3d at 1231. That reasoning has nothing to do with causation and is inapplicable to Plaintiffs' remedies, which promote competition, not a particular competitor.[7]

### 3.    *Massachusetts* Rejects But-For Causation

Google supports its but-for demands by misconstruing the innocuous observation in *Massachusetts* that "the fruits of a violation must be identified before they may be denied." Def. Br. at 6 (quoting 373 F.3d at 1232). Plaintiffs and the Court have already identified the fruits of Google's unlawful conduct, which include scale, data, and suppressed competition and innovation in the marketplace that will sustain themselves for years unless remedied. *E.g.*, Pls. Br. at 3, 5, 20 n.4, 23–24, 28, 36, 51. Unsatisfied, Google demands Plaintiffs isolate the portion of those fruits Google would have lost but for its anticompetitive conduct. Def. Br. at 6, 37–39,

---

[7] Google also cites a footnote in *New York I* finding that IE was not a "fruit" because the evidence failed to "'establish[] that the present success of IE is attributable entirely, or even in predominant part, to Microsoft's illegal conduct.'" Def. Br. at 23, 39 (quoting *New York I*, 224 F. Supp. 2d at 185 n.81). But even in the context of this de facto divestiture, *New York I* looked only for attribution, not but-for causation, and assessed only whether the "present success of IE," not IE as a whole, was attributable to the illegal conduct. 224 F. Supp. 2d at 185 n.81; *see also id.* at 244 n.121 ("Plaintiffs did not offer any testimony in the remedy phase to establish that IE was the 'fruit' of the anticompetitive conduct affirmed by the appellate court.").

48–49. *Massachusetts* rejects this approach, explaining that the plaintiff need only show that "at least some" of the fruits disgorged are attributable to the defendant's conduct. 373 F.3d at 1232. To require more would flout the D.C. Circuit's instruction that "'the defendant [be] made to suffer the uncertain consequences of its own undesirable conduct.'" *Microsoft III*, 253 F.3d at 79 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651c (3d ed. 1996)).[8]

Finally, Google misreads a portion of *Massachusetts* affirming the (discretionary) denial of "web service" remedies, implying that *Massachusetts* affirmed that decision because web services had contributed to the applications barrier "only in part." Def. Br. at 23, 38 (quoting 373 F.3d at 1226). To the contrary, the web-service remedies were denied because both (1) the remedies were likely to "harm[] consumers" *and* (2) web services had played no role in raising a barrier to entry or even in contributing to liability more generally. *Massachusetts*, 373 F.3d at 1225–26. Meanwhile, *New York I* and *Massachusetts* each approved pro-competitive "server/network computing" remedies even though they (like web services) played no role in liability. *Id.* at 1222–26; *New York I*, 224 F. Supp. 2d at 129–30.

## III.  The Distribution Remedies Are Tailored To Address The Anticompetitive Effects Of Google's Unlawful Conduct

### A.  Payment Bans Will Reduce Barriers And Prevent Foreclosure

Plaintiffs' proposed payment bans are "a reasonable method of eliminating the consequences of [Google's] illegal conduct" and "facilitating the entry of competitors into [the relevant markets] from which [Google's] unlawful conduct previously excluded them."

---

[8] The latest update to the same treatise that *Microsoft III* cited continues to offer helpful guidance on how this Court should select remedies: "[A]t the least, equitable relief properly goes beyond merely 'undoing the act'; the proper relief is eradicating all the consequences of the act and providing deterrence against repetition; and any plausible doubts should be resolved against the monopolist." Areeda et al., *Antitrust Law* ¶ 653f (5th ed. 2022).

*Massachusetts*, 373 F.3d at 1216, 1218 (cleaned up); *Ford*, 405 U.S. at 578. Moreover, they prevent the likely recurrence of Google's monopolization through alternative contractual arrangements that allow Google to share a portion of its monopoly rents as a payoff to freeze the ecosystem. Absent the bans, Google can perpetuate its control over the most efficient channels of distribution by outbidding rivals for every significant search default. *See* Pls. Br. Arg. § I.A.1. Google misguidedly argues that the payment bans improperly "threaten to interfere with ordinary and legitimate commercial practices inherent in Google's participation in the industry." Def. Br. at 54 (quoting *New York I*, 224 F. Supp. 2d at 137) (cleaned up).

First, with respect to Apple, this Court concluded that, separate and apart from exclusivity, the billions of dollars that Apple received from Google under the ISA "unquestionably . . . disincentivize[d] Apple from launching its own search engine when it otherwise has built the capacity to do so." Mem. Op. at 242. Google ignores this portion of the Court's opinion, which in and of itself supports a complete ban on search-related payments to Apple. *See* Pls. PFOF § V.D.2. Section IV.B and IV.E directly address this anticompetitive conduct and its effects. *See United States v. Google LLC*, No. 25-5016, 2025 WL 880552, at *3 (D.C. Cir. Mar. 21, 2025) ("[I]t was quite likely that plaintiffs would pursue an order enjoining revenue sharing between Google and Apple (and not just such payments as were tied to the ISA provisions protecting Google's default placement).").

Second, and more broadly, Google's reliance on *New York I* is misplaced. Google relies on the *New York I* court's rejection of a sweeping ban on "adverse actions" supporting competing products, which would have prohibited Microsoft from compensating or giving discounts to distribution partners for promoting or distributing Microsoft products. Def. Br. at 54–55. Neither *New York I* nor *Massachusetts* supports Google's claim that payment bans should

12

be rejected in this case, because the payment bans are tailored to redress the specific harm and are narrower than the broad "adverse action" ban the states requested in *New York I*.

In *New York I* the district court permitted Microsoft to continue compensating OEMs for distribution of Microsoft products, including through discounting programs such as its Marketing Development Program (MDP), provided such payments were offered on uniform, non-discriminatory terms. 224 F. Supp. 2d at 164, 166. The court described these practices as "routine" and "procompetitive," observing that "the antitrust laws do not condemn even a monopolist for offering its product at an attractive price." *Id.* at 164–65 (quoting *Microsoft III*, 253 F.3d at 68). The court concluded that "so long as MDPs cannot be used to improperly influence OEM choices—for example, through discriminatory or retaliatory terms or enforcement—there remains little basis for objection to their use." *Id.* at 166 (cleaned up). On appeal, the D.C. Circuit found no abuse of discretion: "[w]ithout a clear indication that Microsoft can or will use its discounts in a fashion that . . . 'subverts' the other provisions of the remedy, we again refuse to condemn a practice that 'offers the customer an attractive deal.'" *Massachusetts*, 373 F.3d at 1227 (quoting *Microsoft III*, 253 F.3d at 68).

Unlike in *New York I* and *Massachusetts*, the liability and remedies trial records here make clear that permitting Google to make any payments, not just for exclusivity, *can* and *will* subvert the remedy. In the general search and general search text ad markets, "[s]cale is the essential raw material" for improving a GSE's quality and per-query monetization. Mem. Op. at 139, 226; Pls. PFOF ¶¶ 712–13. Google's exclusive contracts with distributors raised the scale barrier by depriving rivals of scale and insulating Google from competition for queries, thereby expanding Google's scale-driven quality and monetization lead. *Id.* The facts underlying *New York I* are distinguishable. Critically, when OEMs preinstalled IE on Windows PCs because of

Microsoft's unlawful conduct, it did not make rival middleware products like Netscape worse or less monetizable through denial of scale. (It did, of course, deny Netscape access to a critical distribution channel.) *Microsoft III*, 253 F.3d at 60–62. Given the different characteristics of the general search market, namely the scale barrier, a payment ban in this case is both a reasonable and necessary means of restoring competition and promoting entry, even though the same may not have been true in *New York I.* Merely enjoining exclusivity while allowing Google to continue to pay for defaults will not close the gap between Google and rivals in any meaningful way on a reasonable timeline. *See* Pls. Br. Arg. §§ I.A.1, VI.

This problem will persist if the final judgment allows Google to make search payments to distributors, even if those payments are restricted. One such example would be allowing Google to make unconditional revenue share payments to distributors (i.e., where Google pays any time a Google search is issued from a third parties' search access point). Even Google's expert Prof. Murphy agrees that Google would still win those contests not only in the short term but also in the medium to long term. *See* Pls. Br. Arg. § I.A.1. Rivals would remain locked out, even if they improved their quality with the help of the data and syndication remedies.

Google laments that "Plaintiffs' RPFJ even goes so far as to preclude Google from paying to establish a search engine choice screen." Def. Br. at 53. As Plaintiffs' expert Dr. Chipty explained, if Google could pay for choice screens, it would be expected to outbid rivals, meaning rivals would again not win any significant defaults. Pls. RPFOF ¶ 1022. The choice screen would then fail to create a real contest between Google and rivals because Google would retain quality and brand advantages over rivals that are attributable to its anticompetitive

conduct.[9] *See* Pls. PFOF ¶¶ 912, 915; Pls. RPFOF ¶¶ 1022, 1024. In addition, for Apple, the payments for a choice screen would continue to disincentivize entry. Pls. RPFOF ¶¶ 1030, 1037.

Nowhere in its brief does Google answer the question the Court posed: If Google is allowed to pay for defaults, how can any rival possibly compete with Google in the remedial period? Google's silence is both deafening and telling. The answer is simple. Today, no one can compete for default payments in the face of Google's unlawful conduct and the improperly enhanced scale advantage and monopoly profits that conduct has conferred on Google.

### B.    Payment Bans Would Create Competition

Because of its anticompetitive conduct, Google has not faced a real competitive threat when bidding for search defaults over the years. *See, e.g.*, Mem. Op. at 200 ("There is no genuine 'competition for the contract.' Google has no true competitor."). Google ignores that its unlawful conduct has deprived distributors and consumers of the benefits of competition, instead arguing it is Plaintiffs' remedy proposal that will harm distributors and consumers.[10]

---

[9] Only a payment ban consistent with Plaintiffs' proposals can effectively eliminate the prospect that Google would retain these advantages, prevent recurrence of the violation, and restore competition to the relevant markets. For instance, there would be significant risk associated with a hybrid payment ban imposed in the initial years followed by choice screens paid for by Google in later stages of the remedial period because restoring competition requires competitors to have made significant quality improvements with the help of the data and syndication remedies and users to understand the realities of the new competitive landscape. In addition, any choice screen would have to comply with the conditions detailed in Section IX.D of Plaintiffs' RPFJ. In theory, such a scenario could be implemented by authorizing only choice screen payments calculated based on how many times the choice screen was displayed (instead of the number of searches sent to Google), which would help reduce distributors' incentives to design choice screens biased in favor of Google. However, if implemented too soon or before competitive opportunities have truly taken root, the early years of remedial progress would be erased, with Google regaining the ability to once again prevent rivals from competing. The risk of doing too little is that the remedy preserves the status quo and allows Google to continue to benefit from its past conduct and extend its effects into the future. Pls. PFOF ¶ 235.

[10] Google argues that there is no need for an anti-retaliation provision because it already had the opportunity to bully one market participant—Mozilla—and did not. Def. Br. at 71–72. Yet, the record reflects other companies who fear the very real possibility of retaliation. *See* Pls. Br. at

Google erroneously claims the payment bans present distributors with a "Hobson's choice" between setting Google as the default for no money or setting an inferior GSE as the default for low payments. Def. Br. at 55. Instead, syndication and data sharing will give rivals the inputs they need to improve quality in the short, medium, and long term. Pls. Br. Arg. § I.C. (The distribution remedies will still be necessary to unlock distribution channels.) As Dr. Chipty explained, although it is possible distributors will receive lower payments in the initial years of the remedy, unleashing competition in the long-frozen general search market could result in higher distribution payments in the long term. *See* Pls. PFOF ¶ 926; *see also* RPFOF ¶¶ 1051, 1057. Far from being a remedy with only "dubious benefits" that would "'likely'" harm consumers, the payment bans will ensure rivalry is born and consumers finally receive the benefits of competition. *Massachusetts*, 373 F.3d at 1211–12. Unlocking paths to entry and expansion that were foreclosed by unlawful conduct is far from a "dubious" benefit. *Id.* Google myopically focuses on outcomes when it should focus on the competitive process, which is only made stronger when more rivals can compete.

Even if search distribution payments declined for some period, Google overstates the potential impact of that reduction. First, Google has both the ability and incentive to continue providing monetary support to Android partners for reasons other than search defaults, such as its very profitable Play and YouTube apps. *See* Pls. RFPJ § IV.E; Pls. RPFOF ¶ 1044. In fact, today, Google has agreements with some Android partners under which Google makes

---

65–67. It should be taken as little comfort that Google has chosen not to retaliate against some distribution partners while this litigation and remedies trial were pending. The real question will be what Google does after the remedies take effect. Furthermore, the Court should reject Google's contention that Plaintiffs' anti-circumvention provisions are too broad and vague under FRCP 65(d). Def. Br. at 72. Plaintiffs' proposed remedies are supported by the factual record and provide sufficient detail that is consistent with case law. *See* Pls. Br. at 27–28, 65–67, 73.

significant payments to these partners without any search requirements. Pls. RPFOF ¶ 1044. Furthermore, Plaintiffs' remedy allows Android partners to continue earning payments from Google on existing devices for up to a year, which will give those partners time to adjust. Pls. RPFJ § IX.A.[11] Second, independent browsers other than Mozilla have generated many times more revenue through browser ads than search distribution agreements. Pls. RPFOF ¶ 1040.

Finally, Google cannot claim that the system is dependent on its monopoly rents to oppose a remedy. On the contrary, dependence underscores the need for a remedy. The law "foreclose[s] the argument that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 689 (1978).

### C.    Choice Screens On Existing Android Devices And Google Devices And Browsers Will Work With Other Remedies To Help Restore Competition

Google incorrectly relies on *Microsoft III* and *New York I* to oppose Plaintiffs' choice screen remedies. Def. Br. § III.G.1. However, choice screens on Pixel and other Google-controlled technologies further several *Microsoft III* objectives, working together with Plaintiffs' other proposed remedies that improve quality and distribution for competing search engines to restore competition. Pls. Br. Arg. § I.A.4. Choice screens will help introduce some competition to search access points that would otherwise always default to Google, specifically on existing Android devices that were subject to the exclusionary contracts, on Google-controlled Pixel phones, and on Chrome (until divested). Pls. RPFJ § IX.A; Pls. PFOF ¶¶ 906, 908. Allowing users to take the simple step of selecting a general search provider from a properly designed choice screen is a reasonable means of further opening general search to competition, and it will

---

[11] Google offers only conclusory statements from Android partners that the price of Android smartphones would increase. *See, e.g.*, Def. PFOF ¶¶ 128, 140.

put the choice back in consumers' hands, where it belongs. RPFOF ¶¶ 1219, 1223.

Google's claim that the choice screens on existing Android devices are an "impermissible monetary penalty" is also wrong. Def. Br. § III.G.2. The payment would be for Android devices that have already shipped, so Google has already received the benefit of being the out-of-the-box default that it originally bargained for—a far cry from a so-called "penalty." Pls. RPFJ § IX.A. If a distributor accepts this option, which it is not required to do, the longest possible period for which Google would make such payments on the choice screens is one year. Pls. Br. Arg. § I.A.1; Pls. RPFJ § IX.A; RPFOF ¶ 1217.

## IV.    Google Mischaracterizes The Data Sharing And Syndication Remedies

### A.    Plaintiffs' Data Sharing And Syndication Remedies Are Not Structural

Google incorrectly argues that Plaintiffs' data sharing and syndication remedies are de facto structural remedies that confiscate "much of the value" of Google Search and therefore must satisfy a heightened causation standard. Def. Br. §§ III.D.1, III.E.1. Plaintiffs' initial brief already refuted this argument. Pls. Br. Arg. § I.C.5. Only one additional argument Google raises merits a response.

Google suggests that, for a Microsoft Office auction proposed in *New York I*, the Court there found the remedy to be structural because the expected purchaser, Red Hat, would "benefit from Microsoft's twenty years of heavy investment in Microsoft Office." Def. Br. at 36 (quoting 224 F. Supp. 2d at 243). Google's misleading quotation hides *New York I*'s actual concern: that the auction had been designed "specifically" for "the benefit of . . . Red Hat." 224 F. Supp. 2d at 243. In other words, Google repeats an earlier error, *see supra* § II.D.D, as the remedy was rejected because it impermissibly "singled out [a competitor] for favorable treatment." *Massachusetts*, 373 F.3d at 1232. Plaintiffs' remedies do no such thing.

### B.    Plaintiffs' Data Sharing And Syndication Remedies Will Accelerate A Return To Competition

Plaintiffs' data sharing and syndication remedies will accelerate rivals' competitiveness by removing scale barriers and giving rivals the inputs needed to improve their search and search advertising products. Google takes issue with the remedies, claiming that Plaintiffs' proposal impermissibly allows rivals to not only "clone" or "mimic" key elements of Google Search, but also "reverse engineer[] Google Search." Def. Br. at 39–43. Google's argument fails on both the law and the facts.

On the law, Google's claim that *Massachusetts* forecloses Plaintiffs' data sharing remedies ignores the baseline holding. Def. Br. at 39–42. There, the D.C. Circuit *affirmed* a remedy that required Microsoft to disclose its internal APIs—even APIs "beyond the functionality of the middleware at issue in . . . liability"—as a "'reasonable method' of facilitating . . . entry." *Massachusetts*, 373 F.3d at 1218, 1222 (quoting *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 698). The remaining issue was one of degree. The *New York I* plaintiffs had advanced a disclosure remedy that would have included *all* information needed to enable the interoperation of "essentially any two pieces of Microsoft software on a PC." *Id.* at 1219. That "perfect interchangeability," *New York I*, 224 F. Supp. 2d at 176, would have allowed the recreation of the "full features and functionality" of Microsoft's products. *Massachusetts*, 373 F.3d at 1219 n.10. It was access to "*all* of Microsoft's research and development investments" that the D.C. Circuit relied on in rejecting the states' proposal. *Id.* at 1219 (emphasis added).

As a factual matter, Plaintiffs' remedies fundamentally differ from those rejected by *New York I* and *Massachusetts* because they would not give rivals the full features and functionality of Google Search and Text Ads. Pls. RPFOF ¶ 1111, 1144, 1151–52, 1169, 1181. Instead, they are narrowly tailored to facilitate rapid entry over the scale barriers that Google unlawfully

raised, Pls. Br. Arg. § I.C, thereby representing a "reasonable method of facilitating the entry of competitors into a market from which [Google]'s unlawful conduct previously excluded them," *Massachusetts*, 373 F.3d at 1218 (internal quotation marks omitted). Plaintiffs' remedies do not require Google to share *any* source code or algorithms, or the technical structure Google uses to process queries. Rivals would receive user-side data and other information that would be useless without the extensive engineering work and competitive innovation required to identify how to use that data to improve a search or search advertising product and to implement complex systems to do so. *See, e.g.*, Pls. PFOF ¶¶ 596–97; Pls. RPFOF ¶¶ 1111, 1169, 1181.

Moreover, Plaintiffs' remedies are purposefully designed to prevent free riding or cloning. Pls. RPFOF ¶ 1111; Pls. PFOF ¶¶ 850–59. Plaintiffs' index-data sharing remedy, for example, narrowly requires Google to share information about the webpages contained in Google's index; not the content or "more than 2,500 proprietary annotations" associated with each webpage. Pls. PFOF ¶¶ 596–97; Pls. RPFOF ¶¶ 1143–44; Def. PFOF ¶ 538. To succeed, rivals will need to build out their own technology for crawling and retrieving web content, not to mention the hardware to store and serve that content to users. Pls. PFOF ¶¶ 596–97. Rivals also must convince webpages to allow rivals to crawl like they allow Google to because of its scale. Pls. PFOF ¶¶ 580–81; Pls. RPFOF ¶ 1111. Similarly, the user-data sharing remedy would only require Google to share the *user-side data* used to build two search components, not the complex ranking signals used to build those systems. RPFOF ¶¶ 1151–52. Nor would the systems' underlying technologies be disclosed pursuant to the remedies. Pls. RPFOF ¶ 1149; *see also* Pls. PFOF ¶ 591. Yet another example, search syndication does not require Google to syndicate most of its search features and rivals cannot syndicate all their queries from Google—and the amount of syndication must decrease over time. Pls. RPFJ at 18–21. Syndication licensees, thus, will still

need to invest considerable effort to have a marketable product that can compete with Google.

Finally, rivals will not be able to use the shared data to train an LLM to "reverse engineer" the "full features and functionality" of Google Search. Prof. Allan testified he did not think it possible to reverse engineer Google's "end-to-end" search stack, and any attempt would "be a long slog." RPFOF ¶ 1154.[12] Rather, he was clear that what he meant by "reverse engineer" was that rivals could train an LLM to "parrot" Google Search. Pls. RPFOF ¶ 1111. He did not opine that such a system would be the functional equivalent of Google Search. Pls. RPFOF ¶ 1154. Nor could he. The record shows an LLM would not create a functional substitute for Google Search. *See, e.g.*, Pls. PFOF ¶¶ 841–42.

Even after all that, it remains within the Court's discretion to adopt a remedy that "reasonably balance[s]" bringing down unlawfully raised barriers with any consequent "economic and technological effects." *Massachusetts*, 373 F.3d at 1222. Plaintiffs' proposal is an "expanded but not unlimited disclosure" that does just that. *Id.* at 1218 (citing *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 698); Pls. Br. Arg. §§ I.C.2, I.C.4.

## V.     Chrome's Divestiture Benefits Competition And Consumers

Plaintiffs' opening brief demonstrated the availability, feasibility, and necessity of Chrome's divestiture. Pls. Br. Arg. § I.B. Chrome's divestiture will open up a critical search access point sparking a new opportunity for competition, while also preventing Google from misusing its ownership of Chrome to circumvent this Court's final order or attempt to maintain practices likely to result in a recurrence of monopolization. Pls. PFOF ¶¶ 455–56, 460–64. And,

---

[12] Google's attempts to rely on *Massachusetts*' discussion of the IE Media Bar fare no better. The D.C. Circuit discounted that API disclosure because, by including the entirety of the software's "source code" and "internal architecture," it would have allowed for a competitor to copy Microsoft's product as its own. *Massachusetts*, 373 F.3d at 1227–29. Because Plaintiffs' proposal is not so expansive, the same concern does not arise here.

as explained above, none of Plaintiffs' remedies proposals are impermissibly vague. *See infra* § II.B. Google raises two further additional arguments against Chrome's divestiture.[13] Both fail.

First, Google provides no factual or legal support for its argument that Chrome's divestiture would impermissibly aid a specific competitor while harming competition and consumers. Def. Br. at 28–29. *Cf. Massachusetts*, 373 F.3d at 1229, 1231–32 ("[A] competitor identifiable *ex ante* may benefit but not because it was singled out for favorable treatment."). The unmoored principle that divestiture could not aid the buyer would cut directly against the Supreme Court's admonition that divestiture is "the most important of antitrust remedies." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 330–31 (1961). Here, competition will be the beneficiary. Pls. PFOF ¶¶ 352, 448–55, 930–32. Google next retreats to the solipsism of a monopolist—only Google can make Chrome and Chromium great. Def. Br. at 28. In support, Google principally relies on its share of contributions to the Chromium project relative to other browser developers. Def. Br. at 28. Google misses the point. Every major browser engine is open source. RPFOF ¶ 1064 (Apple's WebKit, on which Safari is built, and Mozilla's Gecko, on which Firefox is built, are open source). Google's assumption that a divestiture buyer of Chrome and Chromium would act differently contradicts the market reality.

---

[13] Google also makes several unpersuasive arguments against Plaintiffs' proposed contingent Android divestiture. First, Google claims that its reasons for why a Chrome divestiture should be rejected apply equally to Android. Def. Br. at 31. However, Plaintiff's proposed Chrome divestiture remedy is fundamentally different than a *contingent* Android divestiture. Second, Google posits that an Android divestiture is technically unworkable. *Id.* at 32. But there is no basis or need for the Court to consider market and technological conditions today for relief that might be sought years in the future, if at all. Third, Google argues that the contingent Android divestiture seeks to apply an "undefined standard." *Id.* at 33. This argument also fails. Section V.C of the Plaintiffs' proposed remedies specifies the preconditions that Plaintiffs must prove and describes a burden-shifting framework through which Google may seek to rebut Plaintiffs' showing. *See Ball v. Paramount Pictures*, 176 F.2d 426, 428–29 (3d Cir. 1949), *decree vacated on other grounds*, 176 F.2d 1023 (1949); *United States v. Paramount Pictures*, 334 U.S. 131, 148 (1948).

Pls. PFOF ¶ 523. Plaintiffs will review potential buyers and expect potential buyers will plan to keep Chromium open source.

Google's legal argument fares no better. Its reliance on *Alston* is particularly misguided, contorting the case's holding with cherry-picked quotations. *Compare* Def. Br. at 28, *with Alston*, 594 U.S. at 102–03. *Alston*'s concern was unnecessary judicial supervision of remedial decrees, especially when a court is not equipped with a sufficient factual record to craft the decree. 594 U.S. at 102–03, 107. This Court has a fully developed factual record that supports the feasibility and effectiveness of a divestiture in restoring competition. *See* Pls. PFOF § VI. It is the "surer, cleaner remedy." *du Pont*, 366 U.S. at 334. The factual record, legal analysis, and antitrust principles here counsel towards divestiture. *See Alston*, 594 U.S. at 107; *see also supra* note 6 (quoting Areeda et al., *Antitrust Law* ¶ 653f (5th ed. 2022)). Without a divestiture of Chrome, the behavioral interventions necessary to prevent the likely recurrence of monopolization through misuse of a Google-owned Chrome could require more ongoing and detailed judicial intervention. Pls. PFOF § VI.D.1.

Second, Google argues that divesting Chrome would be "technologically complex and value destructive." Def. Br. at 29–30. Plaintiffs have already demonstrated Chrome can be divested. Pls. Br. at 37–40. But Google contends that the Court should adopt no remedy that would have "clearly negative economic consequences." Def. Br. at 30 (quoting *New York I*, 224 F. Supp. 2d at 230). *New York I* establishes no such rule; the language that Google quotes is merely the introductory preface to a factual finding. 224 F. Supp. 2d at 230. Even if Chrome's divestiture deprives Google of some value, those costs are not the deciding consideration. Rather, as the Supreme Court explained: "Economic hardship can influence choice only as among two or more effective remedies. If the remedy chosen is not effective, it will not be saved because an

23

effective remedy would entail harsh consequences." *du Pont*, 366 U.S. at 327 (citing *United States v. Am. Tobacco Co.*, 221 U.S. 106, 185 (1911)). Google has failed to propose a remedy that would meaningfully address the ends that a monopolization case "must seek." *Microsoft III*, 253 F.3d at 103. Because Google fails to demonstrate its own remedy would effectively restore competition, the Court should reject any argument that the divestiture of Chrome should be rejected in favor of an ineffective alternative. *See United States v. United Tote, Inc.*, 768 F. Supp. 1064, 1086–87 (D. Del. 1991) (citing *du Pont*, 366 U.S. at 327) (applying *du Pont* and ordering a divestiture because the defendant failed to offer the court a "reasonable alternative").

## VI.    Plaintiffs' Remedy Is Tailored To The Connections Between Search And GenAI

It is uncontested that search and GenAI products interact in critical ways. Pls. PFOF § II.A.2.[14] Plaintiffs' remedies ensure that (1) GenAI firms, as potential entrants and nascent threats to search, can access the data and syndication remedies, and (2) Google GenAI products that are search access points are covered by the distribution remedies. Such measures are tailored to Google's unlawful conduct and reduce barriers to entry.

Google makes much of *New York I*'s discussion of handheld devices, arguing that GenAI (like handheld devices) is neither connected to the relevant market nor the theory of liability. Def. Br. at 61 (citing 224 F. Supp. 2d at 136, 235). But applying *New York I*'s logic yields the opposite result. GenAI products have become search access points. Pls. PFOF § V.A–B. GenAI capabilities are now part of the barriers to entering search. Pls. PFOF § II.A.1–2. And search data

---

[14] The connection between GenAI and search justifies a standard prior-notification provision to apply to transactions that involve GSEs and general search text ads, and to companies that control a Search Access Point or GenAI product. Pls. PFOF ¶¶ 113–75. Google's citation to a proposed notification in *New York I*, Def. Br. at 69, is distinguishable because that provision went well beyond the technologies at issue in that case, encompassing virtually all possible investments by Microsoft, 224 F. Supp. 2d at 265.

has become a critical input into developing GenAI models and products. Pls. PFOF § II.A.1–2. In that way, GenAI now shares an existential nexus with search, including how consumers access the relevant market, how difficult it is to enter that market, and how valuable the fruits of monopolizing that market are to Google. Plaintiffs have shown the relationship between GenAI and search that requires that both be addressed in the remedy. Applying the same logic and finding that server operating systems should be addressed alongside Intel-compatible PC operating systems, the *New York I* court observed that "assistance is appropriate as it looks toward the new model of the 'platform threat' and seeks to ensure that the ill effects of Microsoft's conduct are not felt in this related area of the industry." 224 F. Supp. 2d at 129–30.

## VII. The Colorado Plaintiffs' Public Education Remedy Helps Restore Competition

The Court should also reject Google's arguments regarding the Colorado Plaintiffs' public education remedy. Contrary to Google's claim, Def. Br. at 70–71, the remedy is not "unprecedented," *see United States v. AT&T*, 552 F. Supp. 131, 198–99 (D.D.C. 1982); Pls. PFOF ¶ 971 (Prof. Luca describing other examples). Additionally, the remedy contains the requisite "reasonable detail" to satisfy Rule 65. *See supra* § II.B. Prof. Luca described the specific types of information and specific incentive payment amounts and duration required for the remedy. Pls. PFOF ¶¶ 972, 982–83. Further details about the "practical workings" of the remedy will be recommended by the Technical Committee for the Court's review and approval. *Massachusetts*, 373 F.3d at 1244; *Phillip Morris*, 566 F.3d at 1138 (affirming order describing the "topics" of informational disclosures even though "[t]he court will determine the precise content of the statements at a future date"). Finally, the remedy is properly connected to Google's unlawful conduct. Pls. PFOF ¶¶ 963–68; Mem. Op. at 35, 161, 226.

## CONCLUSION

The Court should reject Google's arguments and enter Plaintiffs' proposed remedies.

Dated: May 23, 2025

Abigail A. Slater
Assistant Attorney General
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Roger P. Alford
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Mark H. Hamer
Deputy Assistant Attorney General
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Respectfully submitted,

*/s/* Travis R. Chapman
David E. Dahlquist
Adam T. Severt
Sarah M. Bartels (D.C. Bar #1029505)
R. Cameron Gower
Ryan T. Karr
Karl E. Herrmann (D.C. Bar #1022464)
Veronica N. Onyema (D.C. Bar #979040)
Catharine S. Wright (D.C. Bar #1019454)
Diana A. Aguilar Aldape
Travis R. Chapman (D.C. Bar #90031151)
Grant Fergusson (D.C. Bar #90004882)
Kerrie J. Freeborn (D.C. Bar #503143)
Meagan M. Glynn (D.C. Bar #1738267)
Ian D. Hoffman
John J. Hogan
Elizabeth S. Jensen
Claire M. Maddox (D.C. Bar #498356)
Michael G. McLellan (D.C. Bar #489217)
Keane M. Nowlan (D.C. Bar #90028063)
Andrew R. Tisinger (D.C. Bar #90018455)
Sara Trent
Jennifer A. Wamsley (D.C. Bar #486540)

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 805-8563
David.Dahlquist@usdoj.gov
Adam.Severt@usdoj.gov

*Counsel for Plaintiff*
*United States of America*

By:    /s/ Christoper A. Knight
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Lee Istrail, Assistant Attorney General
Christopher A. Knight, Assistant Attorney
General
Office of the Attorney General, State of
Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com
Christopher.Knight@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By:    /s/ Diamante Smith
Ken Paxton, Attorney General
Brent Webster, First Assistant Attorney
General
Ralph Molina, Deputy First Assistant
Attorney General
Austin Kinghorn, Deputy Attorney General
for Civil Litigation
Diamante Smith, Assistant Attorney
General, Antitrust Division
Office of the Attorney General, State of
Texas
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1162
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By:    /s/ Carolyn D. Jeffries
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney
General
Michael Jorgenson, Supervising Deputy
Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney
General (DC Bar No. 1600843)
Office of the Attorney General

California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

Matthew M. Ford
Arkansas Bar No. 2013180
Senior Assistant Attorney General
Office of the Arkansas Attorney General
Tim Griffin
323 Center Street, Suite 200
Little Rock, AR 72201
Matthew.Ford@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney General
Ronald J. Stay, Jr., Senior Assistant
Attorney General
Charles Thimmesch, Senior Assistant
Attorney General
Office of the Attorney General, State of
Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and
Director, Consumer Protection Division
Jesse Moore, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of
Indiana
Indiana Government Center South, Fifth
Floor
302 West Washington Street
Indianapolis, Indiana 46204
Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the
Office of Consumer Protection
Philip R. Heleringer, Executive Director of
the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive
Director of the Office of Consumer
Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of
Kentucky*

Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
nachabea@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

Michael Schwalbert
Missouri Bar No. 63229
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888

Fax: 314-340-7981

*Counsel for Plaintiff State of Missouri*

Lynn Fitch, Attorney General
Crystal Utley Secoy, Assistant Attorney
General
Lee Morris, Special Assistant Attorney
General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Crystal.Utley@ago.ms.gov
Lee.Morris@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

Anna Schneider
Special Assistant Attorney General, Senior
Counsel
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant
Deputy Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Office of the Attorney General, State of
South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

Joshua L. Kaul, Attorney General
Laura E. McFarlane, Assistant Attorney
General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
mcfarlanele@doj.state.wi.us

*Counsel for Plaintiff State of Wisconsin*

PHILIP WEISER
Attorney General of Colorado

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney
General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Matthew Michaloski, Assistant Attorney General
Marie W.L. Martin, Deputy Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mmichaloski@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

TREG TAYLOR
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Fred Nishihira
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324
E-Mail: fnishihira@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawai'i

Rodney I. Kimura
Department of the Attorney General, State
of Hawai'i
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549

E-Mail: John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Lynette R. Bakker
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: Lynette.bakker@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Melissa English
Office of the Attorney General of
Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
menglish@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of
Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of
Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker

Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New
Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New
Hampshire*

MATTHEW PLATKIN
Attorney General of New Jersey

Yale A. Leber
Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (609) 376-2383
E-Mail: Yale.Leber@law.njoag.gov
Abiola.Miles@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.

Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust
Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North
Dakota*

DAVID YOST
Attorney General of Ohio

Jennifer Pratt
Beth Ann Finnerty
Mark Kittel
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail:
Jennifer.pratt@ohioattorneygeneral.gov
Beth.finnerty@ohioattorneygeneral.gov
Mark.kittel@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Malisa McPherson
Office of the Oklahoma Attorney General

313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-2297
E-Mail: Malisa.Mcpherson@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Cheryl Hiemstra, Special Assistant
Attorney General
Gina Ko, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.Hiemstra@doj.oregon.gov
Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of
Pennsylvania*

JANET PARRA MERCADO
Acting Attorney General of Puerto Rico

Guarionex Diaz Martinez
Assistant Attorney General
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902

Telephone: (787) 721-2900, Ext. 1201
E-Mail: gdiaz@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov
*Counsel for Plaintiff State of Vermont*

JASON S. MIYARES

Attorney General of Virginia

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

BRIDGET HILL
Attorney General of Wyoming

William T. Young
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building

Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*