# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████ |
| Defendant. | |

|  |  |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████ |
| Defendant. | |

## DEFENDANT'S RESPONSIVE PROPOSED FINDINGS OF FACT

**TABLE OF CONTENTS**

I.  INTRODUCTION. ...........................................................................................................1

II. PLAINTIFFS' DESCRIPTION OF GENAI IS MATERIALLY DEFICIENT. .................1

    A.  Plaintiffs Mischaracterize the Significance of Web Search as an Input into GenAI. ..............................................................................................................1

    B.  Plaintiffs Mischaracterize the Role of Retrieval-Augmented Generation. ..............4

    C.  Search Technologies Use Search Data (Even If They Also Use GenAI). ...............6

    D.  The GenAI Space Is Highly Competitive. ...............................................................7

III. PLAINTIFFS' ECONOMIC PRINCIPLES FOR REMEDIES REINFORCE THEIR FAILURE TO PROVE CAUSATION. ....................................................................8

IV. PLAINTIFFS' PROPOSALS WORK TOGETHER TO HARM, NOT HELP, COMPETITION. ..........................................................................................................10

V.  PLAINTIFFS FAIL TO JUSTIFY THEIR PAYMENT BANS. .....................................11

    A.  The Gemini App Is Not a Search Access Point. ...................................................11

    B.  Circle to Search Reflects Innovation at Work. .....................................................12

    C.  Plaintiffs' Payment Bans Would Harm Android Partners and Independent Browsers. ...............................................................................................................13

        1.  To Justify Payment Bans, Plaintiffs Flip-Flop on What Is "Exclusionary." ................................................................................................13

        2.  Google Has Not Stifled GenAI Competition. ..............................................14

        3.  Payment Prohibitions Would Harm Competition. .......................................19

    D.  A Ban on Payments to Apple Would Harm Competition and Consumers. ...........22

    E.  Plaintiffs Cannot Justify Their Proposal on Content Licenses. .............................25

    F.  Plaintiffs Fail to Support Their Conditional Access or Retaliation Proposals. ..............................................................................................................25

    G.  Plaintiffs Ignore Their Theory of the Case in Seeking to Prevent Google From Paying *Any* Revenue Share. .......................................................................26

    H.  Plaintiffs Do Not Leave Adequate Other Means for Google to Compete. ...........27

    I.  Plaintiffs Fail to Justify Their Proposed Restrictions on Google's Ability to Make Investments Without Prior Notice. ..........................................................28

VI. PLAINTIFFS' DIVESTITURE AND SELF-PREFERENCING PROPOSALS SHOULD BE REJECTED...............................................................................................28

    A.  Chrome Divestiture Would Harm Billions of Users Worldwide Without Materially Shifting Search Share. ..........................................................................29

    B.  Plaintiffs Oversimply the Prospect of Chrome Divestiture. .................................32

C.      No "Self-Preferencing" Remedies Are Warranted. ..................................34

VII.    PLAINTIFFS' "DATA-SHARING" PROVISIONS REACH FAR BEYOND
        "SCALE-DEPENDENT DATA" TO REQUIRE THE WHOLESALE
        TRANSFER OF GOOGLE'S PROPRIETARY ASSETS AND
        TECHNOLOGIES. ...........................................................................................37

        A.      Plaintiffs' Index-Data Disclosures Are Unfounded and Overbroad. .....................37

                1.      Plaintiffs' Web Index Provisions Go Far Beyond Correcting for
                        Any Claimed Advantage Resulting from Google's Click-and-
                        Query Scale. ...........................................................................................37

                2.      There Is No Evidence That Any Click-and-Query Scale Advantage
                        Contributed to Google's Knowledge Graph. ..............................................39

                3.      Index Disclosures Are Unnecessary for Competition and Would
                        Depress Innovation. ..................................................................................40

        B.      Plaintiffs Have Failed to Put Forth Any Basis for Their Proposed
                Remedies Regulating Agreements with Publishers. ...........................................41

        C.      Plaintiffs' User-Side Data Proposal Exposes Google's Intellectual
                Property and Risks User Privacy While Not Solving for Tail Queries.................43

                1.      The Quality Gaps Identified at the Remedies Hearing Have No
                        Connection to Click-and-Query Data. .......................................................44

                2.      Plaintiffs Ignore the Many Factors Driving Google's Best-in-Class
                        Technologies. ............................................................................................45

                3.      Plaintiffs' Data Proposal Would Give Away Google's Hard-
                        Earned Intellectual Property and Facilitate Reverse Engineering
                        While Not Providing the "Longtail" Data Rivals Claim to Need..............46

        D.      The Feasibility of Plaintiffs' Data-Sharing Remedies Turns on a Number
                of Yet-to-Be-Made Determinations That Plaintiffs Reserve for
                Themselves. ......................................................................................................47

        E.      Plaintiffs Offer No Proposal That Both Preserves User Privacy and Gives
                Rivals the "Longtail" Data They Seek.................................................................48

        F.      Plaintiffs Present No Evidence That the Ads Data Is Necessary to
                Compete in the Relevant Market. ......................................................................50

VIII.   PLAINTIFFS FAIL TO DEFEND THEIR SWEEPING, UNPRECEDENTED
        SYNDICATION PROPOSALS.........................................................................52

        A.      Plaintiffs' Search Syndication Proposals Demand Blueprints, Not
                "Bridges.".........................................................................................................52

        B.      Plaintiffs Offer No Sound Basis for Their Synthetic Queries Proposal................54

        C.      Plaintiffs Ignore the Many Material Differences Between Their
                Syndication Proposals and Google's Existing Syndication Agreements..............54

D.  Plaintiffs Identify No Technical Precedent for Their Syndication Proposals.................................................................................................56

E.  Plaintiffs' Ads Syndication Proposals Would Hurt Advertisers and Implicate a Market Outside of the Court's Liability Holding................................57

    1.  Plaintiffs' RPFJ Forces Google to Syndicate Ads Under Terms That Would Harm Advertisers.................................................57

    2.  Plaintiffs Rely on Testimony That Is Not from Qualified Competitors.................................................................58

IX.  PLAINTIFFS PROVIDE NO BASIS TO FORCE GOOGLE TO PROVIDE SEARCH GROUNDING TO RIVALS.................................................................60

X.  PLAINTIFFS IGNORE THAT THEIR PROPOSALS WOULD DELIVER GOOGLE'S PROPRIETARY ASSETS AND INTELLECTUAL PROPERTY TO RIVALS AND INSTEAD ADDRESS A RED HERRING. ......................................61

XI.  PLAINTIFFS' COMPELLED DATA DISCLOSURES AND SYNDICATION ENABLE FREE RIDING FOR ALL OF THE IMPLICATED ASSETS AND TECHNOLOGIES, DIMINISHING GOOGLE'S AND RIVALS' INVESTMENT INCENTIVES ACROSS THE SEARCH AND ADS STACKS. .....................................62

XII.  PLAINTIFFS DO NOT DISPUTE THAT THEIR ADS TRANSPARENCY PROPOSALS WOULD REPLACE COMPETITION WITH REGULATION AND EXPOSE SENSITIVE USER DATA. ...........................................................64

A.  Plaintiffs' SQR Proposal Far Exceeds the Scope of the Liability Opinion and Provides No Guidance on Privacy or Which Metrics Would Be Provided. ........................................................................................65

B.  Plaintiffs' Access to Data Reports Proposal Is Unconnected to Any Finding of Liability and Fails to Protect User Privacy. .........................................65

C.  Plaintiffs' Keyword Matching Proposal Is Unnecessary, Especially Given the Increased Prevalence of Autobidding. ..............................................66

D.  Plaintiffs' Auction Changes Proposal Does Not Change How Advertisers Set Bids and Would Cover Thousands of Launches.............................................67

XIII.  PLAINTIFFS FAIL TO JUSTIFY THE IMPOSITION OF CHOICE SCREENS. ..........67

A.  Choice Screens Cause Clear Harms and Offer No Material Benefit. ...................67

B.  Plaintiffs' Proposals Are Not Genuinely Interested in Consumer Choice............68

XIV.  PLAINTIFFS' PROPOSALS HARM INNOVATION AND INVESTMENT INCENTIVES. ....................................................................................................69

XV.  PLAINTIFFS' PROPOSED TERM IS UNSUPPORTED BY THE EVIDENCE............71

XVI.  PLAINTIFFS FAIL TO JUSTIFY THE SUBSTANTIVE AUTHORITY PROVIDED TO PLAINTIFFS AND THE TECHNICAL COMMITTEE. ......................72

XVII.  COLORADO PLAINTIFFS FAIL TO SUPPORT THEIR REQUESTED MONETARY AWARD TO FUND A PUBLIC EDUCATION CAMPAIGN.................74

## **ABBREVIATIONS**

| CITATION | CORRESPONDING FILING OR TRANSCRIPT |
|---|---|
| GCOL | Google's Proposed Conclusions of Law (Remedies Phase) Dated May 16, 2025 (ECF No. 1347) |
| PCOL | Plaintiffs' Remedies Post-Trial Brief Dated May 16, 2025 (ECF No. 1348). |
| GFOF | Google's Proposed Findings of Fact (Remedies Phase) Dated May 16, 2025 (ECF No. 1346). |
| PFOF | Plaintiffs' Remedies Proposed Findings of Fact Dated May 16, 2025 (ECF No. 1349). |
| Pls.' RPFJ | Plaintiffs' Revised Proposed Final Judgment Dated March 7, 2025 (ECF No. 1184-1). |
| Tr. | Transcript of the Evidentiary Hearing on Remedies Conducted from April 21 to May 9, 2025. |

I.     INTRODUCTION.

1.      For ease of reference, Google follows the structure of Plaintiffs' proposed findings.  Google addresses the third parties in the substantive sections that follow.  Google has addressed herein those proposed findings of most significance to the Court's resolution of the case.  Identifying each error in Plaintiffs' Proposed Findings of Fact would have exceeded by many multiples the pages allotted for responsive briefing.  The Court should not infer that Google's silence on a particular paragraph or citation means that Plaintiffs' proposed finding is supported by evidence.

II.     PLAINTIFFS' DESCRIPTION OF GENAI IS MATERIALLY DEFICIENT.

2.      Under the guise of a section entitled simply "GenAI," Plaintiffs offer a rendition of the state of GenAI that is both misleading and incomplete: (i) mischaracterizing the data used to train GenAI foundation models ("FMs"), (ii) supposing a need for a Google Search product for any grounding; (iii) ascribing significance to the unremarkable fact that Google Search features that use GenAI also use Search data; and (iv) generally failing to recognize the high degree of competition in the field.

A.      Plaintiffs Mischaracterize the Significance of Web Search as an Input into GenAI.

3.      GenAI FMs are trained through a process that involves exposing the model to very large amounts of data.  GFOF ¶ 982.

4.      Plaintiffs' Proposed Findings of Fact suggest that Google has the upper hand in any such training due to its ownership of the highest-quality general search engine.  That assertion is refuted by the evidence: Despite Google's scale advantage in web search, there is *no* evidence that Google's GenAI FMs or chatbot has a commensurate quality advantage over its rivals.  GFOF ¶ 1031.

5.      The record reflects, and indeed Plaintiffs' economic expert concedes, that the GenAI space is, instead, very competitive.  GFOF ¶ 1026.  Plaintiffs offered no fact or expert witness who testified to the contrary.

6.      That Google's advantages as a general search engine do not translate into a GenAI model quality advantage is unsurprising because (among other reasons) click-and-query data is not used to train GenAI FMs, at Google or elsewhere.  GFOF ¶ 985.

7.      To try to manufacture such a connection, Plaintiffs point to Gemini's use of the Google Common Corpus (the "GCC") to argue that Google trains its Gemini FM with search data.  PFOF ¶¶ 70, 119, 153.  But the GCC does *not* contain proprietary search data, and other companies can replicate it if they choose.  GFOF ¶¶ 983-84.

8.      Plaintiffs also reference the "filtering" of data before it is used to train an LLM. PFOF ¶¶ 75-79.  But Plaintiffs have adduced no evidence whatsoever that Google somehow uses signals derived from its search engine click-and-query data to filter data for training Gemini models, and, again, Google has not found click-and-query data useful for model training.  *See* Tr. 3342:1-8 (Collins).

9.      Nor does Google's use of a dataset called "DocJoins" indicate that Google uses click-and-query derived ranking signals to filter content for inclusion in the Gemini FM training data.  To the contrary, popularity signals used for ranking Google's search results are *not* used to filter data for training Gemini.  Parakh Dep. Tr. 54:7-13.

10.     Finally, Plaintiffs point to a dataset called "Search Augmented QA" derived from a data repository called Aquarium.  PFOF ¶¶ 71, 120.  As Google's Eli Collins explained at trial, Search Augmented QA is a dataset that includes web documents as well as prompts or queries that might be relevant to those documents.  Tr. 3342:11-14 (Collins).  The purpose of Search

Augmented QA is not to cause the model to memorize question and answer pairs; rather, the purpose is to strengthen the model's generalized ability to recognize how to answer questions. Tr. 3342:19-25, 3344:7-10 (Collins).  Consistent with that purpose, Google uses less than 1% of the Aquarium dataset to train the Gemini FM.  *See* Tr. 3343:1-3 (Collins).

11.    Despite being repeatedly informed that PXR0227 was not a data card actually used for the training of any model, Plaintiffs continue to cite it and assert that "Google has explored using user-side data and quality signals from Search to pre-train Gemini models used outside of Search."  PFOF ¶ 122 (citing PXR0227, PXR0184, PXR0016).

12.    Plaintiffs' characterization of PXR0227 as a "data card" prepared in connection with the "Gemini v3 foundation model" is wholly unsubstantiated.  In contrast with the actual Gemini v3 data card, which lists over 50 pages' worth of data sources and was authored by over a dozen engineers, PXR0227 is a five-page document whose single author did not testify in this litigation.  *Compare* PXR0227, *with* PXR0123 (Gemini v3 Pre-Training Data Card).

13.    The only testimony regarding PXR0227 came from Phiroze Parakh, who testified in deposition that he was unfamiliar with the document but could tell (based on its unexecuted "LGTM" fields) that it had not been approved.  *See* Parakh Dep. Tr. 149:18-22.

14.    Plaintiffs' reliance on PXR0184 and PXR0016 is likewise misplaced.  While Plaintiffs fixate on the phrase "query based removals," the context makes clear that does *not* mean search query as the document's examples of "query based removals" include "Court Order QBR" and "Unwanted association with porn," PXR0184 at -113, suggesting that the document has more to do with removing content flagged as objectionable than it does leveraging Google's data scale to some competitive advantage.  PXR0016 is an email that discusses approvals, rather than actual use.  The data card for the Gemini V3 model shows no such use.  PXR0123.

15.     Finally, the best evidence on the topic is the testimony regarding Google's investigation of whether to incorporate search data as part of pre-training a FM for Search.  What Google discovered was that it was not worth the cost.  GFOF ¶ 986; *see also* Parakh Dep. Tr. 27:12-28:4 (Google shut down the KITE program that had used Search data to build a FM for use within Search because there was not a sufficient quality reason to do it).  Plaintiffs' incorrect assertion that "Gemini pretrains on Search data" is based on Plaintiffs' misplaced reliance on such exploratory KITE documents.  PFOF ¶ 119 (citing PXR0178*, PXR0014*).

**B.    Plaintiffs Mischaracterize the Role of Retrieval-Augmented Generation.**

16.     Plaintiffs discuss retrieval-augmented generation or "grounding" throughout, with the suggestion that Google Search has given Google's GenAI products a comparative advantage.  The evidence is to the contrary:  (i) The Gemini app does not have a material quality or factuality advantage over rival chatbots that do not ground in Google Search; (ii) the Gemini app calls on Google Search for grounding infrequently; and (iii) at the time of ChatGPT's rise, it did not ground in any search engine for the majority of users.  GFOF ¶¶ 1013-25.

17.     Plaintiffs repeatedly assert that "[f]or GenAI Products, a lack of good search APIs is an 'innovation killer,'" quoting PXR0025.  PFOF ¶¶ 94, 817, 838.  But that document was not discussing "search APIs," but rather "local/maps" APIs, *see* PXR0025 at -481, and, in any event, was focused on the technological challenges of incorporating APIs into a model, not on the importance or potential utility of any particular API, Parakh Dep. Tr. 183:3-84:13.

18.     Commercial queries may well become a more significant chatbot use case in the future.  PFOF ¶¶ 97, 100-04.  But Plaintiffs' suggestion that, to satisfy them, "[a]ccess to the web will be crucial," PFOF ¶ 105, is misguided.  To address such prompts, web data is not needed.  Instead, the issue is "what are the current products available for sale and what are their prices," which are supplied via a retailer feed.  Tr. 659:16-61:13 (Hsiao); *see also* Liability Tr. 8224:2-

25:6 (Reid) (often information is not on a web page, giving the example of data from merchants).

19.     In both their general discussion of GenAI and grounding, Plaintiffs assert that "Google CEO Sundar Pichai believes the Gemini App will expand overall Search use."  PFOF ¶¶ 98, 174.  In fact, Mr. Pichai explained that the Gemini App will expand Google's ability to serve users' information needs, whether or not they fall within "search."  Tr. 2492:22-93:10 (Pichai) ("Q. In your view over time, the Gemini app will allow Google to answer a wider variety of queries? A. To be very clear, I think the Gemini app will overall expand our ability to serve users' information needs. There will be some overlap with Search, there will be some things which won't have anything to do with what we call as -- or think of as Search today; but overall, I think it will expand in a user's information needs.").

20.     Plaintiffs also cite PXR0027* to assert that "Google believes that leveraging its other products in Gemini, for example by providing up-to-date information from Google Maps and Google Flights, can differentiate Gemini from other GenAI products."  PFOF ¶ 90.  Far from demonstrating an advantage, PXR0027* is a study of users who "[c]hurned" off of Gemini, reflecting the success of Google's rivals.

21.     Plaintiffs refer to a series of "integrat[ions] [of] Gemini into Search" set forth in PXR0109 that Google considered, as if to suggest that Google was successfully using Search to advantage Gemini.  *See* PFOF ¶ 124; PXR0109 at -812-813, -817, -819).  In reality, as Ms. Reid testified, Google generally chose not to pursue the integrations described in PXR0109.  *See* Tr. 3652:3-6 (Reid) ("Q. And if they could move some of those users over to the Gemini app that would be good for Google. Correct? A. Well, only if it's good for users. But we did not end up doing most of the explorations in this deck.").

22.     Finally, and most remarkably, Plaintiffs prognosticate that "Google will be able to

translate its superior search index into winning the AI battle," citing nothing more than the soothsaying of DuckDuckGo's Gabriel Weinberg.  PFOF ¶ 153.  Mr. Weinberg is hardly on the forefront of AI.  Tr. 753:1-5 (Shevelenko) (describing DuckDuckGo as merely a "Bing wrapper").  Notably, Plaintiffs' experts (both computer science and economics) do not claim that Google has won or will win the contest.  GFOF ¶ 1031.  And when it comes to rivals who actually participate in the AI field, OpenAI declares instead that OpenAI "ha[s] what we need to win."  RDX0355 at .005.  Most importantly, there can be no question that OpenAI and other of Google's GenAI rivals have the tools to compete.  GFOF §§ VII.F-G.

### C.    Search Technologies Use Search Data (Even If They Also Use GenAI).

23.    GenAI is a general-purpose technology with an almost limitless range of potential application, including self-driving cars, the science of protein folding, the generation of novel images and video, and many, many others.  GFOF ¶¶ 976-81, 1005.  Consistent with its broad application, one use of GenAI has been to apply it to GSEs.  GFOF ¶¶ 988-96.

24.    Plaintiffs describe a variety of Search technologies, including AI Overviews, the MAGIT model, the Tangram model, and AI Mode, that use GenAI.  PFOF ¶¶ 86, 123-49.

25.    These features and models are part of Google Search, not freestanding products like the Gemini chatbot.  *See, e.g.*, Tr. 3549:24-50:1 (Reid) ("Q. AI Overviews. And is that part of Search or something different? A. It's part of Search."); Tr. 3552:4-55:12 (Reid) (describing AI Mode as one of the "modes on Search that allow people to sort of dig deeper on some aspect of Search"); Tr. 3430:18-31:5, 3483:3-25 (Reid) (Tangram included in an "Overview of Google Search Technologies"); Parakh Dep. Tr. 61:11-13 ("Q. What are the models currently called that power AI Overviews? A. The MAGIT models are now where you are.").

26.    That these Search technologies use both GenAI and Search data hardly means that Search data is an important input to GenAI; to the contrary, it is unremarkable that a Search

6

product would use Search data (even if it also uses GenAI).  *See* Parakh Dep. Tr. 154:13-15.

**D.    The GenAI Space Is Highly Competitive.**

27.    Plaintiffs' description of the competition in the GenAI space for distribution, PFOF ¶¶ 176-88, understates the success of Google's rivals in securing distribution.  The record on the success of the rivals is discussed in GFOF ¶¶ 1045-57, and § V.C.2, *infra.*

28.    Plaintiffs' Proposed Findings of Fact also discuss a variety of instances in which Google provides, or considered providing, grounding services to third parties.  PFOF ¶¶ 189-94.  That recitation omits that Google's provision of grounding services has consistently been coupled with protections for Google's intellectual property.

29.    Thus, grounding through Vertex is designed to protect Google's intellectual property.  GFOF ¶ 871.  Other third parties who provide grounding likewise include intellectual property safeguards, confirming that this is an industry-standard practice.  GFOF ¶¶ 832-40 (Microsoft); *see also* Tr. 1072:10-13 (Schechter) (testifying that intellectual property protections are commonplace throughout Microsoft's agreements with third parties).

30.    Plaintiffs also refer to Google's pilot partnership with Meta to provide access to a Google Search API.  PFOF ¶ 194.  As with Vertex, Plaintiffs omit that the terms of Google's pilot agreement with Meta built in intellectual-property protections.  GFOF ¶ 871.

31.    Finally, Plaintiffs refer to documents considering potential partnerships with Snap and Anthropic.  PFOF ¶¶ 195-99.  As to Snap, no testimony was adduced at trial about the terms of any Snap partnership, nor Plaintiffs' cited document, PXR0099*.

32.    As to Anthropic, Plaintiffs attribute some nefarious motive to Google wishing to differentiate its product by declining to provide Anthropic with the same level of support given to the Gemini App.  PFOF ¶ 198.  But Plaintiffs cannot point to anything that requires Google to provide its services on equal terms to its rivals.  Nor is Google's position unusual.  The evidence

confirms this is standard commercial practice; companies providing grounding services routinely

offer a different suite of functionality to third parties than they use internally.  Tr. 514:24-15:5

(Turley) (acknowledging that the fact that OpenAI "compete[s] with [API Provider No. 1]" had

an impact on their refusal to offer more grounding to OpenAI).

## III.    PLAINTIFFS' ECONOMIC PRINCIPLES FOR REMEDIES REINFORCE THEIR FAILURE TO PROVE CAUSATION.

33.    Plaintiffs articulate the "goal[] in evaluating the proposed remedies" as

"restor[ing] competition to *where it would have been absent the anticompetitive conduct*."  PFOF

¶ 217 (emphasis added).  And Plaintiffs acknowledge that "[n]arrow remedies may be

appropriate" when there has not been "significant harm."  PFOF ¶ 226.[1]

34.    Plaintiffs do not deny that, in the but-for world, partners would have sought, and

Google would have paid for, *non-exclusive* default distribution.  GFOF ¶¶ 14-17.  Thus,

Plaintiffs must show that the provisions the Court found anti-competitive had "significant" anti-

competitive effects compared to a world in which Google paid for *non*-exclusive distribution of

search ("where it would have been absent the anticompetitive conduct").  PFOF ¶ 217.

35.    In their opening, Plaintiffs promised the Court additional evidence to support this

necessary causal finding, stating "that's the whole purpose" of the remedy proceeding.  Tr.

9:17-12:5 (DOJ Opening).  That promise went unfulfilled; Plaintiffs do not provide any such

factual findings of causation, instead relying solely on the Court's liability opinion.  PFOF

¶¶ 236-46.

36.    Plaintiffs argue it is "not possible" to predict the but-for world, because there "are

---

[1] Plaintiffs suggest that Dr. Chipty's testimony also supported a second "economic goal[]" "to deter future anticompetitive conduct," PFOF ¶ 217*, but she expressly stated that "I have not offered an opinion on [deterrence]."  Tr. 2286:20-87:2 (Chipty).

no suitable comparison markets." PFOF ¶¶ 242-43. Aside from an equally conclusory statement from Dr. Chipty, Plaintiffs offer no explanation why the evidence gathered from this case is insufficient, nor why European choice screen results are not a useful proxy. GFOF ¶¶ 32-38.

37.    In addition to the European Union choice screen proxy, there is ample evidence in the United States revealing that the provisions the Court found anti-competitive did not result in rivals getting significantly less share compared to a but-for world of Google paying for non-exclusive distribution. Despite years of discovery, hundreds of depositions, millions of documents produced by Google and its partners, Plaintiffs have presented no evidence that any browser, OEM, or carrier preferred to preload Google's rivals on any access point but failed to do so because of Google's agreements. GFOF ¶¶ 26-31.

38.    Plaintiffs cite Dr. Chipty's speculation that rivals might have "chipped away" at Google's market share. PFOF ¶ 232. But real-world evidence refutes this speculation that rivals would have won any additional access points, or that even had rivals received some additional access points, it would have resulted in significant changes to the competitive landscape. GFOF § I.E. And there certainly is no evidence that rivals would have received nearly 40% additional share, as Plaintiffs suggest could result from their distribution proposals alone. PFOF ¶ 352.

39.    Plaintiffs suggest that "[i]f rivals had no chance to challenge Google's monopoly, then Google would not have paid billions of dollars annually for exclusive distribution." PFOF ¶ 231. But Google would have paid significant amounts for *non-exclusive* distribution; thus, "the magnitude of the payments doesn't isolate what was paid for the exclusive component" of Google's agreements or that there was "a substantial effect of exclusivity." Tr. 4227:9-22 (Murphy). As Plaintiffs acknowledge, OpenAI is also spending ██████████ to be distributed on Apple devices today on a ██████████ basis. PFOF ¶ 332.

40.     Plaintiffs also suggest that "Google's conduct reinforced or protected . . . barriers to entry."  PFOF ¶ 222.  But the only evidence Plaintiffs cite for this is Dr. Chipty, who in turn relied solely on the Court's liability opinion and its inference of causation.  The Court did not consider the impact on barriers to entry against a but-for world removing only *exclusive* distribution, and Plaintiffs have not shown that the challenged provisions have significantly increased barriers to entry relative to Google paying for non-exclusive distribution.  GFOF § I.F.

## IV.    PLAINTIFFS' PROPOSALS WORK TOGETHER TO HARM, NOT HELP, COMPETITION.

41.     Plaintiffs suggest that their proposals "work together to restore competition." PFOF § IV.  In reality, Plaintiffs proposals work together to ensure that Google *cannot compete*, harming competition and consumers.

42.     Plaintiffs' proposed payment bans prevent Google from competing for *any* paid preinstallation, creating a Hobson's choice for partners to preload the best search engine without getting paid, or preload a lesser quality rival while still receiving less revenue.  GFOF § II.

43.     While Plaintiffs suggest that some of this harm will be offset by forcing syndication and data disclosure, PFOF ¶ 251, transforming Google into a public utility would rob it *and* its rivals of their incentives to innovate and would introduce further distortions to the competitive process, GFOF § V; Tr. 4254:18-55:21, 4259:22-60:7 (Murphy).

44.     Plaintiffs' proposed divestitures prevent Google from competing by offering complements, harming users of GSEs, browsers, mobile devices, and more.  GFOF §§ III, IV.

45.     Plaintiffs' proposal to force choice screens on Google devices and browsers prevents Google from competing with differentiated products, harming users and further cementing Apple's dominance in mobile device competition.  GFOF § VI.

46.     Plaintiffs' proposals regarding GenAI would stifle innovation and severely hinder

Google from competing in this highly competitive space.  GFOF §§ VII, IX.

47.    And Plaintiffs' advertiser and publisher proposals replace competition with regulation.  GFOF §§ VIII, X.

48.    While Plaintiffs suggest that the wide-ranging proposals "work to lower each of the barriers to entry that were raised by Google's unlawful conduct and that will persist as fruits of its violation," PFOF ¶ 254, Plaintiffs offered no evidence of the *extent* to which the challenged contractual provisions materially increased any barriers to entry, as compared against Google paying for non-exclusive distribution, GFOF § I.F.

## V.    PLAINTIFFS FAIL TO JUSTIFY THEIR PAYMENT BANS.

### A.    The Gemini App Is Not a Search Access Point.

49.    Plaintiffs' Proposed Findings of Fact would treat the Gemini App as a "search access point" akin to a browser or search widget, based on the notion that any internet-connected application from which one might find a web link or search engine access is one.  PFOF § V.A. That conception is hopelessly overbroad.  Were Plaintiffs correct, then not only is the Gemini App a "search access point," but so too are: ChatGPT, MetaAI, Claude, Perplexity, Grok, and so on.  If Plaintiffs' conception were accepted, Plaintiffs' perceived problem (an impact on the ability of third parties to distribute "search") would itself disappear given the robust competition amongst chatbot applications and the Gemini App's minority share of usage.  GFOF § VII.F.

50.    As explained in Google's Proposed Findings of Fact:  (i) Google does not promote the Gemini App as a Google Search access point; and (ii) users infrequently find their way from the Gemini App to Google Search.  GFOF ¶¶ 1006-12.  Thus, while Plaintiffs identify a means to get from the Gemini App to Google Search, PFOF ¶ 259, they ignore that the feature is used less than ▮▮▮% of the time, GFOF ¶ 1010.  Plaintiffs also distort Nick Fox's deposition testimony.  PFOF ¶ 260.  While Mr. Fox recognized that one could get from the Gemini App to

Search and thus it could be "technically" thought of as an access point, he made clear that as a practical matter, "I don't think of it that way." Fox Dep. Tr. 304:7-12. Ms. Reid and Ms. Hsiao cogently explained at trial why the Gemini App should not be thought of as a search access point. GFOF ¶¶ 1006-09.

51.     Indeed, for all of Plaintiffs' argument that the Gemini App is a "search access point," their own expert economist disagrees. Dr. Chipty acknowledged that the Gemini App is not, today, a "search access point." Tr. 2297:2-12, 4612:10-13:4 (Chipty). She instead describes it as a "forward-looking" "circumvention risk." Tr. 4625:14-20 (Chipty). But even as to that future, she concedes that the illustration she gave the Court of this supposed problem is "made up" and that she is "not offering an opinion on what Google will or will not actually do." Tr. 2295:15-97:1 (Chipty). She further confirmed that, *contra* PFOF ¶¶ 256-57, no evidence suggests Google plans to turn the Gemini App into a Search access point in the future. Tr. 4624:18-25:1 (Chipty).

52.     Plaintiffs' suggestion that because GenAI products can be distributed through the same "channels" as, e.g., a browser, they are search access points, PFOF § V.A.2, proves far too much. Any application, from TikTok to Instagram to Zoom, can be distributed in the same way. That does not make them search access points.

53.     Finally, Plaintiffs ignore that Google's proposed remedy places limits on the distribution of the Gemini App. Google's PFJ § III.C-D, G-J. Each of the instances in which some third party recounts (often as hearsay) the supposed impact of the then-existing RSA on distribution, PFOF ¶¶ 264-72, even if accurate, is addressed by Google's own proposal.

### B.     Circle to Search Reflects Innovation at Work.

54.     Circle to Search is one of the pro-competitive ways in which Google has innovated in Search to better meet users' needs. GFOF ¶¶ 416-18. It is an Android functionality

that allows users to search multimodally that can, but need not, invoke Google Search.  Tr. 3907:5-10:7 (Samat).  The Android operating system enables the circle-drawing functionality for any third-party service that invokes it, such that queries submitted via this function will be answered by whichever search engine the app chooses to invoke.  Indeed, Perplexity offers this functionality, using the technology Google created in Android.  Tr. 3909:18-10:7 (Samat).

### C. Plaintiffs' Payment Bans Would Harm Android Partners and Independent Browsers.

#### 1. To Justify Payment Bans, Plaintiffs Flip-Flop on What Is "Exclusionary."

55.    This Court previously rejected Plaintiffs' attempt to treat *all* of Google's default and distribution agreements as anti-competitive, regardless of whether they constitute exclusive dealing, by declining Plaintiffs' invitation to "eschew considering the agreements through the lens of exclusivity."  Liability Op. at 203.  Yet in seeking to prevent Google from paying for *any* preinstallation (regardless of exclusivity), Plaintiffs ignore the Court's ruling.  Despite recognizing that "Google has been updating its search distribution agreements to align with its proposal," PFOF ¶ 286, Plaintiffs claim all such agreements are "exclusionary," PFOF § V.C.1.

56.    The provisions Plaintiffs label "exclusionary" do not amount to exclusive dealing, but instead include "default and preinstallation," PFOF ¶ 284, "use of revenue share," PFOF ¶ 286, "pay[ing] for defaults on an access-point-by-access-point basis," *id.*, and paying to have "access points in favor of Google," PFOF ¶ 290.  At no point in discussing Google's recent agreements do Plaintiffs point to a provision requiring exclusive preloading of Search or Gemini.

57.    This is contrary to Plaintiffs' representations in liability that the Court accepted: "Plaintiffs are not challenging the concept of a search default or that distributors may recommend a search engine, set a search default, or preinstall search access points. Plaintiffs are challenging Google's exclusionary contracts that require counterparties to set Google as the

exclusive search default." Liability Op. at 249. And Plaintiffs' economic expert, Dr. Chipty, agreed that Google would have been able to pay for non-exclusive default distribution in the but-for world, and that she was not offering an opinion that Google's proposed remedies would have been anti-competitive in the but-for world. Tr. 2208:10-22, 2306:10-20 (Chipty).

58.     Having brought a case challenging *exclusivity*, Plaintiffs should not be permitted to eschew that framework in order to ban payment for non-exclusive distribution.

### 2.     Google Has Not Stifled GenAI Competition.

59.     Plaintiffs assert that Google has "stifle[d]" emerging GenAI competition, *see* PFOF § V.C.2, but the record shows otherwise. The GenAI space is manifestly competitive, including for distribution, as Dr. Chipty agrees. *See* GFOF § VII.F; Tr. 4626:19-27:3 (Chipty).

60.     Faced with a virtually one-sided record, Plaintiffs' Proposed Findings of Fact focus on distribution deals that never came to fruition, chiefly, the Android Commercial Incentive Agreement (the "ACIA"). *See* PFOF ¶¶ 296-99, 302; *see also* PFOF ¶ 303 (discussing correspondence about a potential Verizon deal). Although discussed internally, the ACIA framework was never shared with or proposed to any prospective or actual distribution partner, *see* Tr. 345:23-46:2 (Fitzgerald), nor would it be permitted under Google's proposed remedy.

61.     Plaintiffs refer to the fact that Google entered into standalone Gemini distribution agreements with Motorola and Samsung during the remedies discovery period, *see* PFOF ¶ 300, but those agreements are non-exclusive, short term, and permit the OEM to preload alternative GenAI services, *see* GFOF ¶¶ 1064-65. In fact, the Motorola agreement does not even cover all Motorola Android devices but, rather, is limited to a handful of device models and years. *See* PXR0535 at -067, § 2.2.1(1); *see also* Tr. 358:7-15 (Fitzgerald).

62.     Although Plaintiffs characterize the long-press power, hot words, and placement of the Gemini app as "'key levers'" in Gemini distribution negotiations, *see* PFOF ¶ 301, the

agreements (which are non-exclusive) do not reserve each of these access points for Gemini; to the contrary, OEMs can and do set multiple hot words, *see* GFOF ¶¶ 1106-07, determine which GenAI products to place on the home screen, *see* GFOF ¶ 1109, and enable other side-keys to activate other GenAI chatbots if they wish, *see* Tr. 352:1-13 (Fitzgerald); Tr. 3973:8-23 (Samat).

63.    Plaintiffs' characterization of the Google-Samsung Gemini Commercial Agreement, *see* PFOF ¶¶ 304-16 (citing PXR0571), is misleading at best.  For example, Plaintiffs characterize the deal as a "three-year agreement," *see* PFOF ¶ 305, when in fact, it is terminable on a yearly basis, *see* PXR0571 at -374-376; Tr. 350:8-12 (Fitzgerald).

64.    Plaintiffs also devote substantial attention to the terms of a Google-Motorola joint marketing agreement.  *See* PFOF ¶¶ 319-25.  The evidence indicates, however, that it was just that—a marketing agreement—rather than a Gemini distribution agreement.  Although the marketing agreement restricted Motorola from marketing third parties' assistive services, it did so only for a limited thirty-day window following device launch, *see* PXR0537* at -280, for the obvious reason that Google was agreeing to pay for non-exclusive marketing of its GenAI services, not the services of a competitor.  The agreement also explicitly carved out Motorola's ability to market under its brand (i.e., the Moto AI Assistant)*.  See* PXR0537* at -281.

65.    Although Plaintiffs note that the agreement prohibited Motorola from using Google's marketing funds "to market non-Google assistive services," PFOF ¶ 321, it is utterly unclear why any company would provide funds to market its competitors' products.  The provision in question bears no relation to those that the Court found exclusive in the liability phase and allows Motorola to preload and promote competing GenAI products.

66.    Plaintiffs postulate that Google somehow "leverage[d] other distribution deals, including Search, to . . . beat out other GenAI competitors" or otherwise "stifle[d] [their]

progress" securing distribution.  *See, e.g.*, PFOF ¶¶ 295, 304.  But the record shows that Google's rivals have consummated many distribution deals, including: (i) in the case of OpenAI, partnerships with Microsoft, Apple, T-Mobile, ███, and DuckDuckGo, *see* GFOF ¶¶ 1046-52; (ii) in the case of Perplexity, partnerships with Motorola and T-Mobile's parent company (Deutsche Telekom), ongoing negotiations with Apple, as well as possible deals with Samsung and Mozilla, *see* GFOF ¶¶ 1054-57; Tr. 746:10-47:1 (Shevelenko); Tr. 3853:7-25 (Cue); and, (iii) in the case of Microsoft, a partnership with Motorola and potentially also Samsung, *see* GFOF ¶¶ 1058-62.

67.    Plaintiffs err because they largely cite the testimony of Google's rivals, rather than the testimony of OEMs, carriers, and browsers, reflecting in several instances that they considered but simply rejected the rivals' proposals.  For example, Plaintiffs repeatedly refer to "Microsoft's understanding that Motorola sought permission from Google to enter into a Copilot distribution agreement with Microsoft but was told doing so would violate Google's RSA." PFOF ¶¶ 264, 284, 329-30, 359.  That hearsay "understanding" is unsupported by testimony from Motorola, which in fact made no such inquiry of Google; Motorola instead found "problems both with the experience and with the design of Copilot," and never received any proposal from Microsoft for Copilot.  Laflamme Dep. Tr. 152:16-20, 175:1-11, 175:13-178:3, 178:5-8, 181:5-182:3.  Other partners testified to similar problems with Copilot.  *E.g.*, ███ Dep. Tr. 42:13-18; Kim Dep. Tr. 86:19-87:19.

68.    Plaintiffs also cite a Microsoft document not used with any witness for the assertion that "Samsung said Copilot preinstallation would violate Google's RSA."  PFOF ¶ 331. No Samsung witness testified to any such communication.  Samsung's witness testified that, in July 2024, he offered Microsoft the opportunity to compete for placement of Copilot ███

████████████████████████████████████████████████████████████████

Kim Dep. Tr. 92:14-20, 94:14-95:19, 95:23-96:1, 98:20-23, 99:2-9.[2]

69.     Among the allegedly "stifled" GenAI transactions, Plaintiffs cite a plan to

promote Copilot through, among others, ███████, which Plaintiffs claim "fell through in part

due to Google's intervention."  PFOF ¶ 330.  Plaintiffs cite no evidence.  Instead, ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████.  Other partners were simply unclear on

what exactly the proposal was, or how it would monetize.  *E.g.*, ████ Dep. Tr. 38:10-16, 38:18-

40:5, 113:19-115:13.  There is no evidence that any Google agreement restricted the distribution

of the Microsoft Copilot application or any other GenAI product.

70.     Plaintiffs describe OpenAI as having been blocked from Samsung devices by

Google.  PFOF ¶ 331.  There is no basis in any cited Samsung document or testimony for that

accusation.  It was, in fact, Samsung that approached OpenAI, after OpenAI announced its deal

with Apple; Samsung confirmed that it was prepared to work with OpenAI but concluded that

OpenAI was ██████████████████████████████████ Kim Dep. Tr. 61:7-62:16,

64:23-25, 65:3-22, 91:1-92:2, 98:24-99:4, 99:10-13, 99:15.

71.     Plaintiffs urge the Court to credit the testimony of Perplexity's marketing

executive as to the reasons why, in Plaintiffs' view, Perplexity has not had sufficient "success."

---

[2] Samsung called out these "unsubstantiated claims of certain Google competitors" in its amicus
brief, and confirmed that "neither the Search RSA nor Samsung's relationship with Google has
prevented Google's AI competitors from fully and freely competing for distribution on Samsung
devices."  Samsung Amended Amicus Br. at 16 (ECF No. 1355); *id.* at 17 (explaining that
Samsung declined to exclusively preload any GenAI service, but that Microsoft and OpenAI's
services ██████████████████████████████).

*See* PFOF ¶ 339.  The record from Perplexity's prospective (or actual) OEM and wireless carrier partners is very different.  Samsung's Jay Kim explained that Samsung never "seriously considered Perplexity as our go-to generative AI service," including because it saw no indication that integrating it would "make[] our devices competitive."  Kim Dep. Tr. 102:11-103:2.[3]  ███ understood it had "a la carte optionality" to preload Perplexity, should it have so chosen, under the terms of its ███ renewal of its RSA, and had never requested the optionality to preload Perplexity under its prior agreement.  ███ Dep. Tr. 29:8-31:6, 31:9-14, 31:19-33:5, 47:3-48:11.  ███ witness likewise confirmed that its existing Google agreements would allow it to pursue a relationship with ███, and testified to no blockage from Google in that respect.  ███ Dep. Tr. 128:15-129:22.  Finally, as to Verizon, there is no evidence it considered Perplexity (much less that it was discouraged by any agreement with Google); rather, Verizon considered Gemini and Copilot, and chose Gemini.  Boulben Dep. Tr. 38:22-39:19, 39:24-40:6.

72.    As to Motorola, Perplexity has reached an agreement for distribution, but Plaintiffs say that "despite interest from both parties, Perplexity is merely preloaded as an application on the second screen and not set as the default assistant."  PFOF ¶ 342.  The claim lacks foundation.  If Plaintiffs are relying on Perplexity's witness for *Motorola's* position, that is hearsay.[4]  Motorola's witness did not testify to any such unrequited "interest," PFOF ¶ 342, but rather, that Motorola chose to preload Perplexity into its Moto AI feature, Laflamme Dep. Tr. 125:2-15.  And he was unaware of *any* conversation between Motorola and Perplexity about

---

[3] Consistent with Mr. Kim's testimony, Samsung's amicus brief explains that "[a]t no point . . . has Samsung ever taken the position that Perplexity must pay high fees to gain distribution on Samsung devices."  Samsung Amended Amicus Br. at 18 n.27 (ECF No. 1355).

[4] Plaintiffs describe the testimony of Mr. Shevelenko, who spoke of "guns to [the] head" and "mob boss[es]," as "vivid."  PCOL at 65 (first alteration in original).  To whatever extent he exaggerated for effect, or for publicity, that does not make hearsay admissible or reliable.

████████████████████████████████    Laflamme Dep. Tr. 190:17-22.  There is not a

single document, and no testimony from Motorola, to suggest that its decisions about the preload

or placement of Perplexity was attributable to Google.

73.    Mr. Shevelenko's testimony was also contradicted by other witnesses, including

Mr. Samat and Mr. Fitzgerald, who confirmed that no contractual prohibition precluded

assigning Perplexity a hot word or loading it on the default home screen.  *See* GFOF ¶¶ 1105-11.

### 3.    Payment Prohibitions Would Harm Competition.

74.    To support their claim that banning Google from paying for distribution would

somehow increase competition, Plaintiffs rely almost exclusively on the necessarily self-serving

testimony of the rivals to whom Plaintiffs seek to transfer market share.  PFOF ¶¶ 344-45, 350.

No doubt Microsoft, OpenAI, DuckDuckGo, and Perplexity would rather not have to compete

with Google for distribution, and no doubt each would rather pay less for promotion, but neither

of those truisms makes a ban on Google competing for paid distribution good for *competition* (or

consumers).  Indeed, it is telling that no OEM, wireless carrier, or browser partners share these

competitors' views about this payment prohibition that supposedly will benefit the partners.

75.    Nor does it follow that Google must be sidelined in order for rivals to attain

partnerships.  Even with Google competing, OpenAI competed for, and won placement on,

Apple devices, and Perplexity competed for, and won placement on, Motorola devices.  GFOF

¶¶ 1045-48, 1054-55.  Both Apple and Motorola—along with every other OEM, carrier, and

browser—benefited from that competition, as did their users.  GFOF ¶¶ 83-101, 122-30, 162-84.

76.    A payment ban surely will not incentivize rivals to improve the *quality* of their

products.  While Plaintiffs cite complaints from Microsoft and OpenAI about the burden of

competing with Google, and the need to "invest in . . . distribution," PFOF ¶ 345, those

complaints simply ignore that it is quality deficits and lack of engaging with distributors, not lack

of funds, that have frequently been why they failed to win default deals, GFOF ¶¶ 1053, 1060.

77.    Nor is sidelining Google to the detriment of partners and users required in order for competitors to "build the necessary userbase."  PFOF ¶ 345.  For example, in just a few years, OpenAI's ChatGPT product has built a user base generating enough queries to dwarf Gemini—it has done so competing with Google, not without it.  GFOF ¶¶ 1035-39.  Similarly, Perplexity has represented to investors in the course of reaching a ▮▮▮▮▮▮▮▮▮ valuation in just a few years that by 2027, it will have ▮▮▮▮▮ *daily* queries.  Tr. 733:7-34:15, 738:9-39:23 (Shevelenko); RDX0363A at .004.

78.    What Plaintiffs misguidedly aim for is competition *without Google*, i.e., what they describe as "competition among rivals for the defaults."  PFOF ¶¶ 347.  The evidence overwhelmingly established that such *reduced* "competition" harms OEMs, carriers, and browsers, who will receive less money, and in turn have less money to invest in their products and experiences.  *E.g.*, GFOF ¶¶ 93-100.  Plaintiffs freely concede that these partners will also be providing their users a worse experience.  PFOF ¶ 355 ("[T]here might be distributors who decide on day one to keep Google because Google is better and *they may not want to disrupt their user experience*." (emphasis added)).

79.    Plaintiffs speculate that a payment ban "may induce third parties like[] Apple, independent browsers, and OEMs to enter [the] GSE market."  PFOF ¶ 348.  But they cite only Mr. Weinberg's speculation that "I am not sure exactly what Apple would do, but I think that generally applies to Apple or the other browsers, OEMs."  Tr. 819:25-20:5 (Weinberg).

80.    Plaintiffs' effort to ground that speculation with actual evidence failed.  GFOF ¶ 119; *infra* ¶¶ 91-95.  And as to other browsers and OEMs, there is no evidence whatsoever that Samsung, which opposes the payment ban because of the razor-thin margins its smartphone

business already operates on, GFOF ¶¶ 93, 128; Kim Dep. Tr. 43:25-44:8, or Motorola or

Mozilla, who both oppose the payment ban ███████████████████████████████, GFOF

¶¶ 94-95, 97, would (or could) build their own general search engines under Plaintiffs' proposals.

81.    Moreover, no distribution partner testified that a payment ban would give it more

"flexibility" within the Android ecosystem, or otherwise.  Plaintiffs rely principally on testimony

from AT&T that they characterize as reflecting its preference to have "flexibility to work with

different AI service providers."  PFOF ¶ 358.  AT&T in fact testified that it already has the

flexibility to do so.  Ezell Dep. Tr. 31:19-33:5.  No AT&T testimony or document suggests that a

payment ban on Google would improve AT&T's "flexibility," much less that it would do so

more than Google's proposals already would.  GFOF ¶¶ 160-61.

82.    Nor did a single distribution partner testify that a payment ban would give it

"negotiating power."  PFOF ¶ 358.  Several partners testified precisely to the contrary, i.e., that

sidelining Google would not only eliminate the revenue sharing they receive from Google, but

would also reduce the revenue sharing they receive from Google's rivals.  GFOF ¶¶ 92-98.

83.    Plaintiffs say their payment ban would help Motorola gain "leverage to negotiate"

against Google.  PFOF ¶ 359; *see also* PFOF ¶¶ 360-65.  What Motorola's executive testified

was that he believes his company ████████████████████████████████████████████

████████████████████████████.  Laflamme Dep. Tr. 36:9-37:5 ████████████████████████

████████████████████████████████████████████; PFOF ¶ 363.

84.    At no point did he suggest that prohibiting Google from paying Motorola at all

would help Motorola, competition, or its "leverage to negotiate." ███████████████████████

██████████████████████████████████████████████████ Laflamme Dep.

Tr. 77:4-78:19 ████████████████████████████████████████████████

████████████████████████████

85.     To the extent Plaintiffs suggest that partners believe that competition in the short

term should be sacrificed for competition in the long term, partners such as Mozilla made clear

that "that's the kind of time that I'm worried that and feel strongly that we don't have if this

revenue source is cut off from us."  Tr. 3159:1-18 (Muhlheim); *see also* Kim Dep. Tr. 44:9-19

(without revenue share from Google, Samsung will "be structurally disadvantaged against Apple

and, you know, it will be a purely 100 percent Apple market eventually").

86.     In attacking Google's proposal to the extent "distributors will continue setting

Google Search as the default," and because "rivals would still have to compete with Google

being able to pay," PFOF ¶¶ 376-77, Plaintiffs again conflate Google winning non-exclusive

default placement with exclusionary conduct, *supra* ¶¶ 55-58.  Particularly where, as here,

"Google is better" and distributors "may not want to disrupt their user experience," PFOF ¶ 355,

prohibiting Google from being able to compete on price—conduct that was never challenged,

much less found to be anti-competitive conduct—would turn the competitive process on its head.

### D.    A Ban on Payments to Apple Would Harm Competition and Consumers.

87.     Plaintiffs characterize Apple as "continu[ing] to rely upon Google to prop up its

search products and capabilities."  PFOF ¶¶ 380-94.  That characterization misconstrues the

nature of Apple's partnerships with Google and other providers, including OpenAI.  Apple has

always understood its capabilities and has built a business based on partnering with companies in

areas it has not, or cannot, offer its users top-tier products alone.  GFOF ¶¶ 119-20.

88.     Plaintiffs acknowledge that Apple chose OpenAI—not Google—as its initial

partner to bring certain AI functionalities to users through Apple Intelligence.  PFOF ¶¶ 387-88;

GFOF ¶¶ 1046-48.  Just as with search, Apple evaluated the products available and picked the

one it thought best for its users.  *See* Tr. 3833:23-36:13, 3862:8-63:9 (Cue) ("[W]hat we want is

the best one. And if the best one isn't Google, then we'll provide whatever that best one is.").

89.     Plaintiffs highlight recent discussions between Google and Apple over integrating Gemini in Apple Intelligence.  PFOF ¶¶ 387-88.  But that would feature Gemini *in addition to others*, Tr. 2497:6-98:6 (Pichai), and therefore does not implicate the conduct found to be anti-competitive (*exclusive dealing*) or provide any support for Plaintiffs' proposals.

90.     And Plaintiffs' discussion of the Google Lens integration is similarly unpersuasive:  Google Lens is an innovative search feature which Apple users will benefit from, but which Plaintiffs' proposed remedies will prevent Apple from monetizing.  GFOF ¶ 165. Plaintiffs describe no benefits from such a prohibition, and there is no evidence that any rival even offered a similar product to Apple.  *See* PFOF ¶¶ 391-94.

91.     Plaintiffs argue that payment bans would incentivize Apple to offer a different product design or enter general search.  For this, Plaintiffs lean heavily on sources with no actual knowledge of Apple's decision-making, misconstrue Mr. Cue's testimony, and unabashedly acknowledge they are pursuing remedies in an attempt to force Apple—a third party—to dramatically alter its business strategy at the expense of its users.  PFOF ¶¶ 395-412.

92.     For example, Plaintiffs cite Mr. Weinberg's speculation that a payment ban might induce Apple to institute choice screens or make switching the search default easier.  PFOF ¶¶ 404-05.  Not only has Mr. Weinberg not spoken to Apple about search distribution in years, Tr. 893:5-11 (Weinberg), but those guesses as to Apple's behavior are inconsistent with Plaintiffs' proposed remedies, GFOF ¶ 933 (choice screen option only extends to "non-Apple" devices); GFOF ¶ 99 (partners would receive no payment when users switch to Google).

93.     Plaintiffs repeatedly quote Mr. Cue for the proposition that he couldn't say he disagreed that Google's payments "was a disincentive."  PFOF ¶¶ 395-97, 401.  But that is the

consequence of Apple receiving payments for distribution, not the consequence of exclusivity—the same would be true if, under Plaintiffs' proposed remedies, Apple began receiving payments from Microsoft in exchange for setting Bing as the default.  GFOF ¶ 121.

94.    Mr. Cue was pellucid:  In its "20-something years" of partnership with Google, Apple was "never interested in doing a search engine."  Tr. 3825:7-29:2 (Cue); GFOF ¶ 119.

95.    Instead, Plaintiffs' payment ban would force Apple either to forego payments for offering the highest-quality product or to offer its users an inferior product.  Either way, this "Hobson's choice" would harm Apple and its users.  GFOF ¶¶ 86-92, 102-07, 117-19, 162-65.

96.    Plaintiffs attempt to justify their payment ban by noting that Apple has been "actively looking at" new GenAI search services.  PFOF ¶¶ 402-03.  But they fail to explain why a payment ban is necessary for that outcome—Google's proposed remedies give Apple extra flexibility, under which Apple would *also* be able to change the Safari default away from Google to a GenAI search provider, if it thought that was best for its users.  GFOF ¶¶ 193-98.

97.    Plaintiffs also suggest that a payment ban would allow "rivals to earn defaults with Apple."  PFOF ¶ 402.  That conceptualization twists the word "earn" as it is based on removing competition.  Google's proposed remedies promote actual competition, incentivizing rivals to make a better product to actually "earn" the default.  GFOF ¶¶ 80-82, 193-98.

98.    Plaintiffs highlight that new GenAI companies ███████ "could not reach an agreement with Apple to be placed even as an *optional secondary* default on Safari."  PFOF ¶ 406 (emphasis added).  To the extent Plaintiffs are suggesting Google's conduct in any way caused that difficulty, they are making the same error here as they did with Neeva in the liability phase:  Nothing in Google's agreements with Apple prevents Apple from offering █████, Neeva, or anyone else as an "optional secondary default on Safari."  GFOF ¶ 68.

**E.    Plaintiffs Cannot Justify Their Proposal on Content Licenses.**

99.    The entirety of the support for Plaintiffs' RPFJ Section IV.C is six lines of testimony from Mr. Turley from OpenAI asserting that Google structures its content agreements with publishers such that OpenAI cannot get "better terms" than Google.  PFOF ¶ 413 (citing Tr. 462:6-11 (Turley)) (the remainder of PFOF ¶¶ 413-15 is directed to matters other than content agreements with publishers).  Beyond the vagueness of ███████ assertion, Plaintiffs ignore that ██████ itself regularly obtains MFNs with publishers, GFOF ¶ 1180, and regularly reaches agreements with the same publishers as Google, GFOF ¶ 1182, as do other industry participants. GFOF ¶¶ 1180, 1182.  Nor do Plaintiffs come forward with any expert testimony to refute Professor Hitt's opinion that, in the circumstances here, MFNs are pro-competitive.  GFOF ¶¶ 1183-86.  And Plaintiffs offer no evidence regarding any exclusive publisher agreements.

**F.    Plaintiffs Fail to Support Their Conditional Access or Retaliation Proposals.**

100.    Google's proposed remedies will "unbundle" the MADA, such that Google would not be able to license Play (or any other Google app) to OEMs conditioned on the distribution, preinstallation, or other promotion of Google Search or Chrome.  Google's PFJ §§ III.A-B; GFOF ¶ 187.  Plaintiffs' proposal appears to go further, adding vague language such as "comingle," that stifles innovation, Tr. 4262:5-63:12 (Murphy), for which Plaintiffs provide no justification (or even discussion).

101.    As to "retaliation," Plaintiffs point solely to Motorola testimony regarding a fear of the loss of marketing funding by Google.  PFOF ¶ 420.  But Motorola's witness confirmed he was unaware of a single instance in which marketing funding had been withheld, and Plaintiffs concededly do not seek to preclude Google from making marketing investments, provided they are not conditioned on search promotion.  Laflamme Dep. Tr. 172:20-173:5; RDX0705* at .008-.009, .011.  Motorola's concerns also predated, and were mooted by, the February 2025

amendment to Motorola's RSA, GFOF ¶¶ 155-58, as well as by Google's proposed remedies, which from Motorola's perspective "sufficiently address any concerns a party may have about retaliation," Motorola Amicus Br. at 19 (ECF No. 1306-1).

102.    Moreover, there is no record of Google conducting such "retaliation." To the contrary, for example, after Mozilla switched its U.S. default to Yahoo in 2014, Google continued to partner with Mozilla outside the U.S. DX2036 (Mozilla blog post) at .001, .004 (announcing Yahoo deal and stating that "Google will continue to be a pre-installed search option" globally and will "continue to power the Safe Browsing and Geolocation features of Firefox"); DX1016* (2016 Google-Mozilla Sponsorship Agreement) at .005. And more recently, Google reached agreements for non-exclusive promotion of Gemini with Samsung despite having been informed that Samsung would promote other GenAI services. Kim Dep. Tr. 189:7-15; GFOF ¶ 154. Finally, Google has continued to partner with T-Mobile despite its parent company, Deutsche Telekom, entering into a distribution agreement with Perplexity. Tr. 746:14-747:1 (Shevelenko); GFOF ¶ 1069.

**G.      Plaintiffs Ignore Their Theory of the Case in Seeking to Prevent Google From Paying *Any* Revenue Share.**

103.    In the liability phase, not even Plaintiffs' experts supported banning all payments for distribution. Professor Whinston testified that unconditional revenue share payments would create a "more equal playing field." Liability Tr. 5776:22-78:3 (Whinston).

104.    Now, however, Plaintiffs suggest that Google must be prevented from offering any revenue share (regardless of preinstallation, placement, or other requirements) because Google would win on that playing field as well. PFOF ¶¶ 426-43.

105.    Plaintiffs argue that, because of its quality and monetization advantage, a world in which Google pays for unconditional revenue share "will likely result in Google being set as the

default, *replicating the outcome in the actual world*." PFOF ¶ 430 (emphasis added). But that is precisely the problem with Plaintiffs' causation case—there is no evidence that Google's monetization and quality advantages would have been materially less in the but-for world and thus, under Plaintiffs' own telling, Google paying for non-exclusive distribution would have "replicat[ed] the outcome in the actual world." PFOF ¶ 430; GFOF § I.C-F.

106.    Plaintiffs argue that this is necessary to provide OEMs and carriers "a true choice." PFOF ¶¶ 432-43. But Plaintiffs ignore that, if Google is banned from paying for distribution, that "choice" is a "Hobson's choice" that no partner has asked for. GFOF § II.A.I.

107.    Unsurprisingly, as noted, in support of forcing partners into this predicament, Plaintiffs heavily rely on testimony from *rivals* (who prefer not to have to compete against Google) rather than from *partners* (who prefer to continue having the *choice* to preload Google and be paid). *Compare* PFOF ¶¶ 431-34 (citing Perplexity's and Microsoft's hearsay telling of partners' positions), *with* GFOF ¶¶ 86, 92-100, 128-30, 134-37 (partners' actual views).

108.    Finally, Plaintiffs' suggestion that GenAI rivals will be shut out of distribution if Google is permitted to compete, PFOF ¶ 431, is refuted by evidence showing that rivals are winning distribution deals even when Google is part of the competition. GFOF ¶¶ 1035-69.

**H.    Plaintiffs Do Not Leave Adequate Other Means for Google to Compete.**

109.    Plaintiffs seek to minimize the impact of their proposals on search competition by arguing that "Google can still compete" through marketing, "paying users directly for Search engagement, and by continuing to innovate Search." PFOF ¶ 439.

110.    But, again, Plaintiffs are flip-flopping. In liability, Plaintiffs said "[i]n contrast to defaults, app downloads and marketing *are ineffective methods* of distribution" and "[p]aid marketing for GSEs, browsers, and search apps is also an *ineffective distribution method*." Liability PFOF ¶¶ 880-81 (emphases added). And while Plaintiffs' remedies economic expert

now touts direct payments to users, PFOF ¶¶ 438-41, their liability expert argued that direct payments or rewards are not effective because they incentivize conduct such as fraudulent queries, Tr. 4244:21-46:1 (Murphy); RDXD-33.020 (citing Professor Whinston); GFOF ¶ 112.

111.    And Plaintiffs' proposals rob Google of its incentives to innovate.  *Infra* § XI.

**I.      Plaintiffs Fail to Justify Their Proposed Restrictions on Google's Ability to Make Investments Without Prior Notice.**

112.    In support of Plaintiffs' RPFJ Sections IV.H-I, Plaintiffs identify no connection to the conduct at issue in this case, or any evidence of the need to expand—for Google only—the HSR Act beyond the limits set by Congress.  Nor do Plaintiffs contest the attendant burden on start-up firms' ability to turn to Google for investments in, or collaboration with, other GenAI firms.  GFOF ¶ 1173.  Plaintiffs' entire factual discussion is limited to the notion that crippling Google's ability to invest in GenAI partnerships and collaborations would have limited impact on third parties because others might invest and investment is not the sole input for GenAI firms. PFOF ¶¶ 444-45.  As Google has explained, removing Google as a potential investor or partner would cause harm for all the reasons set forth at GFOF ¶¶ 1170-73; *see also* Anthropic PBC Amicus Br. § II (ECF No. 1279-1) (explaining harm from proposal to emerging firms).

**VI.    PLAINTIFFS' DIVESTITURE AND SELF-PREFERENCING PROPOSALS SHOULD BE REJECTED.**

113.    Chrome, and the related Chromium open-source project, are the result of Google's innovation and investment, unrelated to and starting well before any alleged anti-competitive conduct.  GFOF § III.A.  Forcing Google to divest these products would harm billions of users and competition among browsers, GFOF § III.D, be extraordinarily difficult to accomplish, GFOF § III.C, and result in the destruction of value that Google lawfully created, without Due Process, GFOF § III.E.  Plaintiffs' Proposed Findings of Fact (§ VI) provide insufficient support for their drastic Chrome divestiture and "self-preferencing" proposals, and

no facts at all to support their contingent Android divestiture proposal.

**A.    Chrome Divestiture Would Harm Billions of Users Worldwide Without Materially Shifting Search Share.**

114.    Plaintiffs concede that a divested Chrome will be altered, but argue that "there is no evidence to suggest that it will be *worse*."  PCOL at 39; GFOF ¶ 288.  To the contrary, the record contains significant evidence that a forced divestiture of Chrome to an unknown buyer will result in the degradation of not only Chrome, GFOF ¶¶ 288-95, but also ChromeOS, Chrome Enterprise, the Chrome Web Store, GFOF ¶¶ 315-27, as well as Chromium and competing browsers built on Chromium, GFOF ¶¶ 303-14.  The witnesses and third parties who know Chrome and Chromium best—those who built Chrome, manage Chrome, keep Chrome users secure, and rely on Chromium—testified that divesting Chrome would degrade it, and result in a "shadow of current Chrome."  GFOF ¶¶ 267, 290, 301, 313.  This would result in a significant risk of user attrition, as even Plaintiffs' expert concedes.  GFOF ¶ 336.

115.    As to Chromium, Plaintiffs argue that a "Chrome divestiture will not end industry support for open-source Chromium."  PFOF ¶ 523.  But the evidence shows that almost all Chromium support comes from Google; there is no evidence that a divested Chromium would receive anywhere near the same level of investment it does today.  GFOF ¶¶ 306-07, 312.

116.    As to ChromeOS, Plaintiffs ignore the impact that a Chrome divestiture will have on it, noting only that the Project Aluminium version of ChromeOS "will launch in 2026." PFOF ¶ 528.  This ignores all the evidence that a Chrome divestiture will have an ongoing and devastating impact on ChromeOS and millions of its users.  GFOF ¶¶ 315-21.

117.    Plaintiffs' contention that divesting Chrome would not harm cybersecurity because security "is driven significantly by the initial design . . . , which has already been completed for Chrome," PFOF ¶ 534, reflects their misunderstanding of the technologies at

issue. The world-class security infrastructure that keeps billions of users safe online across a variety of products would not transfer in a divestiture; a divested Chrome would by necessity be redesigned to operate on a third-party's technical infrastructure; and Chrome would no longer have access to the central security systems at Google, including those that identify threats from government actors and commercial surveillance vendors. GFOF ¶¶ 249, 263-71, 296-302.

118.    Plaintiffs incorrectly minimize the substantial cybersecurity impacts that will flow from a Chrome divestiture. PFOF ¶¶ 529-37. For example, the 2021 attack against Chrome is not evidence that Google is "not especially equipped to avoid security vulnerabilities and breaches." PFOF ¶ 535. Rather, it is evidence of Google's strong cybersecurity defenses that prevented a serious attack from having widespread impact. Tr. 2333:10-35:1 (H. Adkins). And, the fact that Google cannot control "the people, processes, and technologies" of other companies when it comes to cybersecurity, PFOF ¶ 531, is not evidence that the cybersecurity of those companies might be better than Google thinks; rather it explains Google's concerns about the inherent risks of disclosing sensitive Google user data. GFOF ¶¶ 722-23; *see* GFOF ¶¶ 297-98 (describing cybersecurity shortcomings of Microsoft and potential Chrome buyers).

119.    Ms. Adkins' testimony contradicts Plaintiffs' argument that "[a] Chrome divestiture will not raise national security concerns." PFOF ¶ 529; *see* GFOF ¶ 299; Tr. 2348:20-52:5 (H. Adkins) (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

120.    When it comes to the potential search share shift that may result on user-downloaded Chrome if Chrome is divested, Plaintiffs overstate Dr. Chipty's testimony—arguing that it "would likely result in at least a 7% share shift away from Google," and that "the vast

majority of this share shift would come from mobile devices."  PCOL at 35 (citing PFOF ¶¶ 352, 457).  But Dr. Chipty actually testified that more than half of the 7% share shift she estimated for user-downloaded Chrome would be *on desktop*, GFOF ¶ 286, and her 7% estimate was based on unrealistic assumptions that Chrome would maintain its popularity and Google would only claw back 20-40% of user-downloaded Chrome on mobile—a very low estimate given that Google Search previously clawed back closer to 70% when Mozilla switched its default search engine to Yahoo.  Tr. 2293:13-94:10 (Chipty); Liability Tr. 9761:23-64:1 (Murphy); DXD-37.055.

121.    Plaintiffs contend that "Chrome is hostile to Google's general search competitors when users try to switch defaults"—but Plaintiffs' assertions are based entirely on self-serving complaints by DuckDuckGo that have no evidentiary support.  PFOF ¶¶ 460-61.  Chrome users are easily able to change their default search engines.  Tr. 1659:21-23, 1660:14-16 (Tabriz).  The most common way that users change their default search engine is by going into Chrome settings in the "search engine" section, and selecting from a list of popular search engines.  Tr. 1659:24-1660:13 (Tabriz); RDXD-12.014-.015.  When users change their search engine through Chrome's settings, there are no pop-up dialog boxes.  Tr. 1660:10-19 (Tabriz).

122.    Plaintiffs' and DuckDuckGo's "dark pattern" accusations, PFOF ¶ 461, are in fact a Chrome Web Store policy designed to protect users from abusive practices by third-party developers.  If a user downloads an extension that makes multiple changes to a user's browser at once (like DuckDuckGo's extension does), Chrome will ask for user confirmation that they want all of those changes to be made.  Tr. 1660:20-61:25 (Tabriz).  This policy is in place to prevent third-parties from making undisclosed changes to a user's browser.  Tr. 1660:20-61:25 (Tabriz).

123.    Google's policy is in contrast to Microsoft's tactics referenced by Plaintiffs, PFOF ¶ 463, describing Microsoft's use of Windows 11 "to shift users from Chrome to Edge."

Plaintiffs elicited no trial testimony on this topic, and their lone exhibit shows Microsoft used its operating system to shift users away from third party browsers in many ways, including "Edge spoof[ing] as Chrome on multiple Google properties" and preventing Windows 11 users from setting a third-party browser as their default with one click.  PXR0216 at -717, -719.

### B.    Plaintiffs Oversimply the Prospect of Chrome Divestiture.

124.    Plaintiffs' assertions about the technical feasibility of divestiture, PFOF ¶¶ 484-509, turn a blind eye to Chrome's many dependencies on Google for features and functionality, including security, and the significant technical hurdles to Chrome divestiture. GFOF ¶¶ 247-327.  Plaintiffs' contentions are based almost exclusively on the testimony of their expert, Professor Mickens, who has little to no experience working on a commercially available browser, Tr. 1562:24-63:5 (Mickens), and they entirely ignore the testimony of Ms. Tabriz, the engineer who has managed Chrome for years.  Professor Mickens's opinion that a Chrome divestiture is technically feasible is based on his assumption that the scope of the divestiture will be limited to Chrome's client-side code (which would substantially degrade Chrome's features and performance).  PFOF ¶¶ 489-509; GFOF ¶¶ 288-95.  This assumption is unfounded—under Plaintiffs' proposal, Plaintiffs and the Technical Committee will define what the divestiture of Chrome entails, as even Professor Mickens conceded. GFOF ¶ 342; *see generally* GFOF § III.F. Professor Mickens also fails to grapple with the many complexities of Chrome that would complicate the divestiture process, result in product degradations, or both.  GFOF ¶¶ 252-302.

125.    Professor Mickens admitted that he did not examine Chrome's hundreds of APIs. GFOF ¶¶ 279-80.  No Google witness corroborates his evidence-free assertions about "simple, well-defined" APIs, or that Google "designed Chrome's client-side code to be easily decoupled from Google's back-end infrastructure."  PFOF ¶¶ 489, 491, 493-94.  To the contrary, the testimony from Google witnesses who have first-hand knowledge about Chrome's code

contradict Professor Mickens's analysis and confirm that Chrome depends extensively on shared Google infrastructure and services. GFOF ¶¶ 249-52.

126.    The proposal that a Chrome buyer could (i) maintain API connections to Google servers directly or by proxy, (ii) substitute existing API connections for new ones, or (iii) disable API functionality is oversimplified and deeply flawed. PFOF ¶¶ 499-509; GFOF ¶¶ 278-83.

127.    Plaintiffs are incorrect that "the new owner of Chrome would need only to acquire an API key from Google" to access Google backend services. PFOF ¶¶ 501-04. In reality, this would require creating new infrastructure, documentation, and licensing agreements; navigating "security, privacy, global compliance, and user consent concerns;" and employing software engineering staff to maintain and operate the backend systems and APIs—work currently done in large part by the Chrome team that would be divested. GFOF ¶¶ 279-85. Plaintiffs are also incorrect that "from a user's perspective the corresponding Chrome functionality would not change," PFOF ¶ 504, because the functionality would stagnate, GFOF ¶¶ 289-90.

128.    This "option" to maintain Google services would also turn the Court into a central planner, managing the provision of hundreds of APIs and forcing Google to become a software-as-a-service provider for Chrome browser APIs that it does not currently provide to third party Chromium-based browsers. PFOF ¶ 502; GFOF ¶ 279-80.

129.    Plaintiffs do not address that many Chrome features rely on Google's centralized user account infrastructure and the many challenges that would create—including migrating Google Account data for billions of Chrome users and navigating the thorny issues of user consent, security, privacy, and global compliance. *See* GFOF ¶¶ 277, 282.

130.    Plaintiffs' assertion that a Chrome buyer "could use a cloud provider" for its hardware and software infrastructure is misleading. PFOF ¶¶ 497-98. A hypothetical buyer

could rent data centers from a cloud provider, but would have to construct a (new) compatible software infrastructure.  Tr. 2547:22-51:16, 2646:3-47:19 (Nieh).

131.    Plaintiffs' assertion that a divestiture buyer could "substitute" API connections, PFOF ¶¶ 505-09, is purely academic:  There are no substitutes for many key Chrome features, and no record evidence that existing alternatives are comparable, much less better.  GFOF ¶ 291.

132.    Finally, Plaintiffs' proposal to "disable" Chrome APIs is a euphemism for billions of Chrome users losing features and functionality.  PFOF ¶¶ 499, 508; GFOF ¶ 292.

133.    As to "administrative feasibility," Chrome today may be "an attractive asset," PFOF ¶¶ 465-83, but Plaintiffs presented no evidence that the value of Chrome to a third party is equal, or anything close, to the value that Chrome provides to Google, *see* GFOF ¶¶ 329-39. Plaintiffs fail to define the scope of a Chrome divestiture, instead understating administrative difficulties and (again) ignoring Ms. Tabriz's testimony.  PFOF ¶¶ 510-22; GFOF ¶¶ 340-45.

### C.    No "Self-Preferencing" Remedies Are Warranted.

134.    Plaintiffs' contention that "Google is already self-preferencing its search access points" in Chrome and Android, PFOF § VI.D, is misconceived because it ignores how Google's Chrome and Android product designs improve functionality for the benefit of users, and that product integrations are typical in competing software products, GFOF ¶¶ 1113-30.

135.    ***Google Lens in Chrome.***  Plaintiffs' suggestion that Google's integration of Google Lens in Chrome is improper self-preferencing because "Chrome users can only access Google Lens if they set Google Search as their default search engine," PFOF ¶¶ 551-52, reflects Plaintiffs' misguided attitude towards Google's product design.  Plaintiffs do not contest that Google Lens is an innovative visual search feature that benefits Chrome users, or that other GSEs are able to feature their own visual search capabilities in Chrome if the user changes their default search engine.  Tr. 1658:9-25 (Tabriz); RDXD-12.020 (Bing's visual search capability is

offered in Chrome when Bing is set as default).

136.    ***Gemini Shortcut in Chrome Omnibox.***  Plaintiffs' contentions about "Gemini in the Chrome Omnibox," PFOF ¶¶ 553-55, are misleading and ignore unrebutted trial testimony from Ms. Tabriz.  As she explained, what Plaintiffs refer to as "Gemini in the Omnibox" is the ability to access the Gemini site using a "shortcut" in Chrome, by typing "@Gemini" in the omnibox before the query.  GFOF ¶ 1115; Tr. 1645:1-11 (Tabriz).  Plaintiffs describe this functionality as Gemini being "preloaded" as the "default GenAI product that can be accessed from the Chrome omnibox," PFOF ¶ 555, but in context this means that "@Gemini" is a pre-programmed shortcut in Chrome, RDX0141 at .057 (showing Chrome's preset shortcuts).

137.    This same functionality is available to third-party GenAI applications; for example, a user can create a shortcut for ChatGPT in the omnibox, which will open ChatGPT in a new browser window and run the user's query there.  GFOF ¶ 1115; Tr. 1645:4-46:25, 1654:23-55:17 (Tabriz); RDXD-12.015-.016.  There is no evidence of any invidious self-preferencing in the manner in which Chrome has been designed.

138.    ***Future Gemini Integrations in Chrome.***  Plaintiffs also seek to preemptively prevent future AI product integrations in Chrome, *see* PFOF ¶¶ 556-58, but this would prevent product improvements that benefit users and interfere with Chrome's ability to compete with established and forthcoming browsers like Microsoft Edge and Perplexity's Comet that provide deep GenAI integrations with their respective GenAI products, GFOF ¶¶ 245, 1113-30.

139.    There is no evidence that other companies that integrate GenAI applications into their products (e.g., Microsoft, Perplexity, or Meta) have designed their products to allow the replacement of their GenAI applications with rivals'—even though Google pro-competitively provides the Chrome Web Store to enable third-party developers like Perplexity to distribute

their extensions that provide equivalent functionality for "essentially free."  GFOF ¶ 325.

140.    **Circle to Search.**  Plaintiffs' proposed finding that Google has "integrated Circle to Search into the Android operating system" and that "Samsung's implementation of Circle to Search defaults to Google" is misleading.  PFOF ¶¶ 560-61.  The Circle to Search feature requires two distinct steps to function:  First, the user must have the ability to draw on the screen and circle something; and second, the image selected by the user must be sent to a search engine.  Tr. 3908:23-11:6 (Samat).  The open-source Android operating system enables the circle-drawing user interface for third party services, entirely independent of whatever search engine the user has chosen.  Tr. 3908:23-10:1 (Samat).  As to the second step, "Samsung chose Google for the visual search capability."  Tr. 3908:23-09:16 (Samat).  Perplexity has already offered a competing product to Circle to Search; once a user sets Perplexity as the default assistant on their Android device, the user can circle to search with Perplexity.  Tr. 3907:14-08:22 (Samat).

141.    **AICore.**  Plaintiffs' assertion that "Android apps can only access a phone's AI [TPU/NPU] accelerators through the AICore system service" was shown at trial to be false.  PFOF ¶ 567.  Mr. Samat's testimony made clear that AICore is not part of the Android operating system.  GFOF ¶ 1098; Tr. 3960:7-61:11, 3966:6-11 (Samat).  Further, he explained that, contrary to Professor Mickens's uninformed opinions about how AICore actually operates, AICore does not prevent other on-device AI models from accessing the device's NPU, and is not the only way to access a device's NPU or other chips.  GFOF ¶¶ 1098-1100; RDXD-30.014.

142.    Although Plaintiffs assert that an OEM would not want to "build its own system service comparable to AICore," PFOF ¶ 573, the record reflects that Android devices do run multiple models on-device even though AICore presently operates only with Google's Gemini Nano model.  Model developers can work with OEMs and chip set providers to access a device's

accelerators; Samsung offers its Gauss model on-device, and Motorola recently announced that its newest device will have Meta's Llama model on-device.  GFOF ¶¶ 1095-98.

143.    Contrary to Plaintiffs' assertions, PFOF ¶¶ 209, 571, many Android devices have enough storage for multiple models.  GFOF ¶¶ 1096-97, 1100.  Mr. Collins's testimony was not to the contrary.  Collins (30(b)(6)) Dep. Tr. 48:18-49:10.  Mr. Samat confirmed that "there would be no problem on these premium devices having multiple models on storage. . . . [P]ractically speaking, . . . when you're using one, you have it in RAM, and then when you're not using it, you swap it out and you swap the other one in."  Tr. 3966:12-68:6 (Samat).

## VII.    PLAINTIFFS' "DATA-SHARING" PROVISIONS REACH FAR BEYOND "SCALE-DEPENDENT DATA" TO REQUIRE THE WHOLESALE TRANSFER OF GOOGLE'S PROPRIETARY ASSETS AND TECHNOLOGIES.

### A.    Plaintiffs' Index-Data Disclosures Are Unfounded and Overbroad.

#### 1.    Plaintiffs' Web Index Provisions Go Far Beyond Correcting for Any Claimed Advantage Resulting from Google's Click-and-Query Scale.

144.    Plaintiffs assert that "Google's conduct significantly contributed to data scale advantages that have helped it maintain its monopolies," PFOF ¶ 577, but fail to show that rival search engines would have achieved anything close to Google's scale absent the exclusionary contractual terms identified by the Court, GFOF §§ I, V.A.3.

145.    Even so, Plaintiffs seek sweeping disclosures of Google's web crawl index and related technologies, well beyond any plausible need to correct for any claimed advantage. Plaintiffs contend these will "allow rivals to overcome the scale barrier and quickly build their own competitive index."  PCOL at 44.  But Microsoft's Michael Schechter never testified that Bing needed Google's search index data to compete.  Tr. 1012:1-87:6 (Schechter).  And Plaintiffs' two fact witnesses who did testify to the index provision focused on Google's "longtail" or "less common" index sources—not Google's entire index plus proprietary ranking

signals and other data contained therein.  PFOF ¶¶ 579-80, 582; *see also* GFOF ¶¶ 463, 470-72.

146.    Contrary to Plaintiffs' claims that their index provisions will provide "scale-dependent inputs necessary to build a high-quality search engine," PCOL at 43, and that "[w]ithout scale it is impossible for rivals to build an index like Google's index," PFOF ¶ 579, the record shows that rivals lack competitive indexes due to underinvestment, not a lack of scale. As Perplexity's Dmitry Shevelenko explained, rivals can build competitive search engines, including underlying indexes, at a fraction of the time spent and cost incurred by Google.  GFOF ¶¶ 474-81.  DuckDuckGo built its web index much later (when ChatGPT launched), much smaller (a "really conscious decision"), and with far fewer employees than Google—choosing to pay out its shareholders rather than reinvest money in the company.  GFOF ¶¶ 459-62; Liability Tr. 2058:5-60:3 (Weinberg).  And Microsoft built a comprehensive index when it decided to do so—and was not prevented from doing so by Google's distribution agreements.  Liability Tr. 10422:6-14 (Oard); Liability Tr. 2756:3-57:1 (Parakhin); DX0538 at .003.

147.    Plaintiffs' sole rationale for seeking Google's proprietary index signals is that "signals will allow competitors to focus their efforts on crawling high quality, popular content first."  PCOL at 44.  But disclosing only Google's indexed URLs would tremendously reduce the pages rivals would need to crawl, and thus there is no need to also require disclosure of Google's proprietary signals.  RDXD-28.005; Tr. 3527:8-58:11 (Reid) (ranking signals are "a much higher level of our IP than simply these are the URLs we're using").  There is also no evidence that rivals cannot sufficiently crawl the web or create quality signals without user interaction data.

148.    Of the three index ranking signals Plaintiffs specify in their briefing (quality, popularity, and spam, PCOL at 43), the quality signal in particular reflects a tremendous amount of Google intellectual property.  Tr. 2800:15-02:18 (Allan).

149.    Notably, Plaintiffs do not defend their RPFJ provision requiring disclosure of Google's Navboost signals, presumably in recognition that those signals are tied to user queries, and thus present irreconcilable privacy harms—harms against which their index proposal provides no protections.  GFOF ¶ 625; *see also* GFOF § V.B.3.

150.    Plaintiffs also do not defend their "catch all" proposal permitting the Technical Committee to sweep in unlimited Google signals, including future innovations, and enable ongoing cloning of Google's signals.  GFOF ¶¶ 609-15.

### 2. There Is No Evidence That Any Click-and-Query Scale Advantage Contributed to Google's Knowledge Graph.

151.    As Google's fact and expert witnesses testified, the Knowledge Graph proposal ("databases consisting of information *sufficient to recreate* Google's Knowledge Graph," Pls.' RPFJ § VI.A.4 (emphasis added)), would reveal the Knowledge Graph's proprietary structure. Tr. 2806:19-07:8, 2843:18-44:4 (Allan); Tr. 3432:22-33:15, 3527:8-28:11 (Reid).  This structure results from extensive efforts to collect, restructure, and reconcile data into proprietary formats for inclusion in the Knowledge Graph—not what Plaintiffs describe as merely "import[ing]" data.  PFOF ¶¶ 583-87; GFOF § V.B.1.c; RDXD-28.013; *see generally* RDX0058*.

152.    Plaintiffs now seek the "databases *necessary* to construct" the Knowledge Graph. PFOF ¶ 591 (emphasis added).  If Plaintiffs are asking for raw, unstructured data *before* it is included in the Knowledge Graph, that is a different ask, albeit one that still discloses Google assets unrelated to scale and obtained at great cost.  GFOF ¶¶ 560-62; Tr. 3459:15-60:9 (Reid); RDXD-28.013 ("Data Feeds & Pipelines"); RDXD-28.014 ("Sources").

153.    Plaintiffs do not justify either version of their proposal.  For one, Plaintiffs' claim that "publishers permit Google to crawl web content not available to other web crawlers" is meritless.  PFOF ¶¶ 581, 586.  Mr. Turley never testified that any publishers had *in fact* blocked

OpenAI's crawlers.  Tr. 404:2-09:4 (Turley).  Moreover, any supposed crawling advantage is unrelated to the vast amounts of *non-crawled* data that Plaintiffs target.  GFOF § V.B.1.c.

154.    Plaintiffs' user-generated content arguments fare no better.  Google's user-generated content is not click-and-query data.  Plaintiffs also misread DX0208, which highlights many "UGC" contributions "to Google Maps"—a technology that has never been part of this case.  PFOF ¶¶ 589-90; DX0208 at .001-.002, .004.

155.    Plaintiffs also twist witness testimony regarding Google's "traffic" into a purported "scale advantage," arguing that Google should disclose its Geo and Knowledge Graph assets because Google is large.  PFOF ¶ 588 (citing Messrs. Schechter and Weinberg).  There is no legal or factual support for such an expansion of Plaintiffs' theory.

156.    Notably, Plaintiffs fail to address, let alone dispute, the testimony that Google's Knowledge Graph is not built with click-and-query data.  GFOF ¶ 587.

### 3.    Index Disclosures Are Unnecessary for Competition and Would Depress Innovation.

157.    Without citing a single expert in this case, Plaintiffs posit that their index proposal will "[a]ccelerate [i]nnovation and [c]ompetition."  PFOF § VII.A.3; PCOL at 44-45.

158.    Dr. Chipty's testimony that the data disclosure and syndication proposals generally would increase innovation incentives is conclusory, as Dr. Chipty fails to address any details of Plaintiffs' proposals or how competitors would use them.  PFOF ¶ 858; GFOF § V.A.5.  Moreover, because Dr. Chipty did not know whether Plaintiffs' RPFJ would allow rivals to reverse engineer Google technologies and innovations, she could offer no assurance that Plaintiffs' RPFJ would not undermine Google's incentives to innovate. GFOF ¶¶ 505, 508.

159.    By contrast, Google expert Professor Kevin Murphy explained that index "sharing" would "interfer[e] in the competitive process," refuting the fact testimony Plaintiffs

rely on.  Tr. 4210:6-13:2 (Murphy); PFOF ¶ 592.

160.    The historic version of the Yahoo Japan agreement Plaintiffs reference bears little

resemblance to their index proposal.  PFOF ¶ 593-94.  For instance, the agreement has always

prohibited Yahoo Japan from using Google's search results "to build its own search index" and

limited disclosure frequency and data retention.  GFOF ¶ 816.  Moreover, today, Google

provides only the specified fields for the particular web results that it returns.  GFOF ¶ 820.

161.    Plaintiffs argue that rivals "will still need to invest in significant *hardware* and

*infrastructure*" to build their indexes, effectively conceding that rivals will not compete and

innovate to develop high-quality content pipelines or their own technology for measuring high-

quality web content.  PFOF ¶¶ 595-97 (emphasis added); GFOF §§ V.A.4, B.1.a., B.2.

162.    And Plaintiffs concede that their proposals may create free riders.  PCOL at 49-50

("[A]ny free rider will perpetually lag behind Google's latest advancements[.]").

**B.      Plaintiffs Have Failed to Put Forth Any Basis for Their Proposed Remedies
          Regulating Agreements with Publishers.**

163.    The liability trial involved Google's conduct vis-à-vis its general search engine

competitors; no issue relating to content publishers was ever raised.  Nonetheless, Plaintiffs have

put forth a proposed remedy that would force Google to provide complex and technologically

infeasible content controls to publishers on a threadbare record.

164.    Despite the inclusion of two publishers on their initial witness list, Plaintiffs

neither deposed nor called at trial *any* publisher in support of their proposed publisher remedy.

Rather, Plaintiffs rely on the conjecture of a product manager at a GenAI company, OpenAI's

Nick Turley, who speculates about publisher incentives.  PFOF ¶¶ 212-14, 414-15, 611-13; Tr.

519:19-24 (Turley).  Mr. Turley could not identify a single publisher that opted out of OpenAI's

crawl, but not Google's, or that would be incentivized to permit OpenAI's crawl if only that

publisher had more opt-out options on Google.  *See* GFOF ¶¶ 537, 1189.

165.    Plaintiffs hint at an argument that the introduction of AI Overviews on Google's SERP somehow harms publishers, but offer no evidentiary support.  For exhibits, they cite only a 2019 document (PXR0001) about a different product, WebAnswers, written four years before AI Overviews launched, and PXR0158*, which (at -901) "find[s] that with AI Overviews, people use Search more, are more satisfied with their results, and are visiting a greater diversity of websites."  For testimony, they cite Phiroze Parakh who in fact testified to the benefits of AI Overviews to the ecosystem:  "[T]he point of Search is to serve its users and to produce the highest quality product for users. . . . [T]hat creates a total growth of Search traffic, and then that results in growth to third part[ies]."  Parakh Dep Tr. 195:16-96:13.

166.    Plaintiffs nowhere address the technological infeasibility of their proposal, instead implying that a thoughtful discussion of the difficulties of modifying any of these controls, PXR0026, somehow reflects a lack of transparency.  PFOF ¶ 604.  But Ms. Reid was crystal clear in her testimony to the Court:  Google provides publishers with a variety of mechanisms through which publishers can pick and choose the extent to which their content is used in various Google products and services, including providing publishers with the option to limit the use of their content in AI Overviews through "no snippet" and "max snippet."  GFOF ¶¶ 1190-93; Tr. 3536:6-37:22 (Reid).  And as Ms. Reid cogently testified, Plaintiffs' proposed opt-outs could not be feasibly implemented, including because it would be virtually impossible for Google to ensure that any selective Search opt-out had no side effects on publishers' appearance on the rest of the page.  GFOF ¶¶ 1194-97.

167.    Having failed to offer any publisher testimony at trial in support of their proposal on this issue, Plaintiffs, in a footnote, now seek to expand the provision of their RPFJ to that

42

"identified in the amicus brief submitted by the News Media Alliance."  PCOL at 44 n.11.  This

Court should disregard Plaintiffs' attempt to expand this requirement, as well as any effort to use

that amicus brief to inject hearsay as purported facts, after the close of evidence and as to which

Google's opportunity to present countervailing evidence has passed.  *Accord* PCOL at 25 n.6

("[T]he Court should not rely on self-serving advocacy that purports to dispute the evidentiary

record.").  Whatever the desires of publishers to change Google's product decisions regarding

how publishers can opt out, for the reasons explained by Ms. Reid, the amicus brief does not

answer the practical infeasibility of what Plaintiffs proposed on March 7, 2025, or what further

requirements they would now seek to impose.  GFOF ¶¶ 1194-98.

### C. Plaintiffs' User-Side Data Proposal Exposes Google's Intellectual Property and Risks User Privacy While Not Solving for Tail Queries.

168.    Without even attempting to quantify the portion of Google's data scale advantage

supposedly attributable to the exclusivity provisions in the challenged agreements, Plaintiffs

demand that Google disclose, to every Qualified Competitor, *all* (that is, *100%*) of its user-side

data and data received from its advertisers.  Wrapped up in the demand for Google's "user-side

data" is not just user queries and clicks, but all of Google's *search results* as well—and so rivals

would receive every URL and feature Google shows (and the order it shows them) in response to

every query it receives.  Given that there is no privacy-protective way for Google to disclose

longtail click-and-query data, *see infra* §§ VII.C.3, E, the data rivals would receive is Google's

ranked results for head and torso queries—thereby enabling free riding on Google's

technologies, notwithstanding that Plaintiffs never contended that rivals need head or torso data.

In short, Plaintiffs' request would transfer Google's intellectual property to rivals, enable free-

riding, and depress incentives to innovate—without any of Plaintiffs' hypothesized benefits to

competition.  The ads data presents even thornier questions of privacy and advertiser

confidentiality, to which Plaintiffs offer no response.

> 1. **The Quality Gaps Identified at the Remedies Hearing Have No Connection to Click-and-Query Data.**

169.    Plaintiffs rely on Microsoft witness testimony in support of their user-side data disclosure proposals, but Microsoft is not advocating for those proposals.  GFOF ¶ 493.

170.    Moreover, none of the areas identified by Microsoft's Mr. Schechter as quality gaps between Google and Bing are a function of click-and-query data; rather, any discrepancy results from Google out-investing Bing in acquiring data sources separate from the web crawl.

171.    Mr. Schechter provided an example of a fresh query that Bing struggled to answer: why flags were flying at half-mast in Washington, D.C.  Tr. 1016:20-17:15 (Schechter). While he tried to create the impression that failure was connected to Bing's smaller click-and-query scale, his testimony was conclusory.  Tr. 1017:16-25 (Schechter).  The reality is that Google deploys many different strategies to acquire fresh content for answering queries, including frequently crawling news sites, obtaining news feeds, and obtaining social media feeds such as from X, Instagram, and TikTok.  Tr. 3444:7-45:13 (Reid).  None of those relies on user search interaction data, let alone such data at any particular volume or scale, and Bing could have drawn from them to answer Mr. Schechter's question.

172.    Mr. Schechter also testified that incorrect business hours cause users to lose trust in a search engine, PFOF ¶ 616, but again, business hours are not data Google collects by crawling or derives from click-and-query data, GFOF ¶¶ 561, 563.

173.    And the claim that "[l]ocal businesses are more likely to share local data with search rivals who reach scale," PFOF ¶ 617 (citing Tr. 1018:17-19:3 (Schechter)), has nothing to do with click-and-query data.  Nor is there evidence that rivals have invested to the extent that Google has, GFOF ¶¶ 555-63, but nonetheless failed to obtain local business data.

174.    Microsoft's Mikhail Parakhin's testimony regarding the importance of "scale" is about a commerce site in *Turkey* that prohibited *Yandex* from crawling.  Liability Tr. 2666:21-67:12 (Parakhin) (cited in PFOF ¶ 618).  There is no evidence that a rival search engine has been blocked from crawling any site in the United States.  *See* GFOF ¶ 537; Tr. 3439:1-20 (Reid).

### 2.    Plaintiffs Ignore the Many Factors Driving Google's Best-in-Class Technologies.

175.    Plaintiffs dramatically oversimplify Google's ranking signals, ignoring the hundreds of top-level and sub-signals that Google engineers have carefully developed over many years to identify and rank the best sources across a range of different dimensions.  GFOF ¶¶ 597-601; Tr. 2795:16-99:22 (Allan); RDXD-20.020-.021.

176.    Nowhere do Plaintiffs address or dispute Professor Allan's conclusion that Plaintiffs' proposals directly disclose many of these signals and allow others to be "backed out" (i.e., reverse engineered).  GFOF ¶ 515; GFOF § V.B.2.

177.    As to Plaintiffs' scale claims, the only expert who has empirically studied any supposed scale dependencies is Google's computer science expert, Professor Edward Fox.  Liability GFOF § IV.D ("Data Reduction Experiment").  And when it comes to ranking *longtail* queries, language understanding, not clicks, is the crucial element.  Liability Tr. 6336:17-37:5 (Nayak); *see also* Liability GFOF ¶¶ 329-32 (explaining how Neeva developed its own search engine with licensed datasets and using AI models and large language models).

178.    While it is a truism that today, "[t]he amount of data Google uses to build count-based systems is not available to its rivals," PFOF ¶ 640, that is not reason enough to force the disclosure of Google's intellectual property (which is based on more than just user data) and private user data.  If the Court concludes that, despite Plaintiffs' failure to show it is a valid remedial objective, rivals need a short-term "bridge" while they compete to obtain distribution,

syndicating limited web results for their longtail queries on commercial terms with enforceable protections against storage, analysis, and other forms of reverse engineering would suffice.

### 3. Plaintiffs' Data Proposal Would Give Away Google's Hard-Earned Intellectual Property and Facilitate Reverse Engineering While Not Providing the "Longtail" Data Rivals Claim to Need.

179.    Plaintiffs' claim that their data disclosure proposals would "accelerate innovation and competition" lacks evidentiary support.  PFOF §§ VII.A.3, C.3.  Plaintiffs had no information retrieval, search industry, or search ads expert who opined on what amount of data rivals need to compete, no privacy expert opining that the requisite data could actually be shared, and no economic expert opining that providing that specific data would accelerate rather than depress innovation and competition.

180.    Meanwhile, Plaintiffs characterize the anonymized user-side data available to rivals under the DMA as "useless."  PFOF ¶ 695 (quoting Tr. 870:4-17 (Weinberg)), ¶ 628; PCOL at 48.  But the record shows that any attempt to adequately anonymize click-and-query data would generate similar outcomes due to the nature of such datasets.  GFOF ¶¶ 687-88, 691 (citing RDX0375 at .007).  Incredibly, given the extensive discovery Google has made to Plaintiffs in the form of query samples during liability and DMA dataset details during remedies, Plaintiffs did not propose how search query data could be shared while ensuring users cannot be re-identified.  Notably, Plaintiffs refuse to even embrace a privacy standard that would specify that users should not be able to be re-identified—notwithstanding their own privacy expert's views, Tr. 1235:20-36:4 (Evans), as well as the FTC's in its amicus brief, ECF No. 1286-1 at 5, emphasizing the importance of such a standard.

181.    Plaintiffs' claims as to investment incentives ignore that the requested data would deliver Google's intellectual property to rivals, which would depress innovation and competition. Google's Glue and RankEmbed training data—which include (i) all web results returned and

their order, (ii) all search features returned and their order, and (iii) how users interacted with displayed content—are ample sources "for an LLM to reproduce essentially [Google's] IP," or all the data competitors would need to simply "plug it in[]" and mimic Google's technologies. GFOF ¶¶ 633-35, 646, 651-54, 660.

182.    Plaintiffs ignore the evidence that their user-side data proposal would directly disclose Google's intellectual property, and gloss over how competitors could use the data disclosed thereunder to reverse engineer Google technologies.  For example, Plaintiffs cite their own expert's concession that a competitor could "train a model to do the same thing" as Google's technologies, but in the same breath cast Google's "concerns regarding reverse engineering" as "overstated and impractical" because competitors could not reverse engineer "the entire process of Google Search," nor copy Google's "component structure."  PFOF ¶ 727 (citing Tr. 195:24-97:19 (Durrett)).  Plaintiffs then rely on that irrelevant distinction to make the unsupported claim that their index and user-side data proposals "provide enough data for rivals to improve their own products but too little data for rivals to reverse engineer Google's innovation."  PCOL at 49.  But they fail to rebut extensive fact and expert witness testimony explaining how competitors could do just that.  *See supra* § X; GFOF §§ V.A.1, C.1.

### D.    The Feasibility of Plaintiffs' Data-Sharing Remedies Turns on a Number of Yet-to-Be-Made Determinations That Plaintiffs Reserve for Themselves.

183.    The feasibility of the user-side and ads data-sharing proposals depends on determinations that Plaintiffs refuse to specify: what data is to be shared, by what means, and how often.

184.    Plaintiffs' expert Professor James Mickens offered only "sketches of various types of implementations that would comply with the RPFJ," even as he acknowledged that implementation depends on specifics "yet to be determined" by the Technical Committee (and

Plaintiffs).  Tr. 1593:7-94:3 (Mickens).  Plaintiffs' privacy expert similarly deferred to the Technical Committee (and Plaintiffs) on implementation.  Tr. 1198:13-99:1 (Evans).

185.    Plaintiffs' briefing is silent on particularly burdensome aspects of their proposals: (i) the extent to which Google must disclose vertical index data outside of the webcrawl (much of which is licensed and not mapped to a DocID), GFOF ¶¶ 512-13, 556, 565; (ii) the extent to which Google must disclose user-data-derived signals embedded within Google's Glue and RankEmbed models, GFOF ¶ 624; (iii) the extent to which Google must disclose query-reliant signals such as "Navboost/Glue," GFOF § V.B.3; (iv) whether disclosing "databases sufficient to recreate" Google's Knowledge Graph contemplates Google translating its structured Knowledge Graph data—designed to be used internally—into formats rivals can understand, Pls.' RPFJ § VI.A.4; and (v) whether Google must translate other internal signals into formats rivals can understand, Tr. 3440:12-41:5 (Reid).

**E.    Plaintiffs Offer No Proposal That Both Preserves User Privacy and Gives Rivals the "Longtail" Data They Seek.**

186.    Plaintiffs falsely claim that testimony from both parties' privacy experts established that the "data that is at issue in [Plaintiffs' RPFJ] can be safely shared by Google in a way that assures privacy while providing utility to Qualified Competitors."  PFOF ¶ 656.

187.    *First*, it is unclear what Plaintiffs mean by "the data that is at issue."  Plaintiffs' RPFJ encompasses *all* user-side data used to "build, create, or operate" multiple models, one of which has over ███ data fields.  GFOF ¶ 692.  At the hearing and in their submissions, Plaintiffs openly concede that it would not be possible to safely share *all* of the requested data, or even most of it.  PFOF ¶¶ 665, 681, 684, 957.  Rather, they maintain only that Google could safely share some generalized or reduced version of this data—not the raw data itself.  *See* PFOF ¶ 679.

188.    *Second*, Plaintiffs did not commission the empirical analysis that they claim is

required to determine whether the data, as modified by privacy-enhancing techniques, provides sufficient utility to rivals.  GFOF ¶¶ 708-09, 1247; PFOF ¶¶ 666, 957.  Plaintiffs had every ability to "understand[] both the properties of the data and the intended use cases for that data" such that they could have "[d]etermin[ed] the appropriate [Privacy Enhancing Techniques] to apply to a data release."  PFOF ¶ 666.  They chose instead to stick their heads in proverbial sand, while criticizing Google's DMA approach as providing both too little utility ("99% of queries removed") and too much utility (faulting Google for including granular data at the behest of rivals).  Tr. 868:16-70:17 (Weinberg); Tr. 1158:17-60:20 (Evans); PFOF ¶ 696 .  Plaintiffs simply ignore the inherent tension between generalizing or aggregating data to meet privacy thresholds and preserving data utility.  GFOF ¶¶ 698-700; Tr. 1064:10-65:20 (Schechter).

189.    Relying on inadmissible hearsay statements from a regulatory submission—rather than asking Mr. Schechter—Plaintiffs claim "Microsoft believes Google's proposal to comply with the DMA 'falls short of providing the minimum necessary click and query information to be useful to a search engine to 'optimise [sic] their services.'"  PFOF ¶ 628 (citing PXR0255* at -805).  While Plaintiffs did not elicit testimony from Mr. Schechter on this position, in response to a question from the Court, Mr. Schechter explained that it is simply not possible to threshold the data in a privacy-protective way while also disclosing longtail queries.  GFOF ¶ 715.

190.    And as to the k-threshold applied in Google's DMA Search Data Licensing Program, Plaintiffs are incorrect that "Google's approach to k-anonymity under the DMA resulted in the company removing 99 percent of *all* queries from its data release."  PFOF ¶ 695.  Rather, the vast majority of *distinct* queries are lost when any threshold is applied, but the large majority of *total* queries were in fact disclosed in a privacy protected manner.  GFOF ¶¶ 867-88.

191.    *Third*, Plaintiffs' claim that "looser" privacy protections are appropriate because the search data will not be released publicly, PFOF ¶ 658, misreads Dr. Culnane's testimony, who was clear that the same privacy standard is necessary here, *see* Tr. 3685:8-86:21 (Culnane) (competitors are most likely to have auxiliary data that could re-identify users); RDXD-29.008.

192.    *Fourth*, Plaintiffs wrongly assert that "Google has used differential privacy on several occasions to preserve user privacy when collecting and releasing *similar data* to the data at issue in this case." PFOF ¶ 687 (emphasis added). Dr. Evans identified no applications of differential privacy involving user queries. GFOF ¶ 701. In any event, there is no mechanism (and Plaintiffs have identified no such mechanism) for adding differentially private noise to open-text fields without also using frequency-based measures. GFOF ¶¶ 694-96.

193.    *Finally*, Plaintiffs' reference to what they call Google's past "privacy issues," PFOF ¶¶ 700-05, is irrelevant—it is *Plaintiffs* who seek to trade away user privacy in a manner inconsistent with Google's privacy policies and users' privacy expectations.

## F.    Plaintiffs Present No Evidence That the Ads Data Is Necessary to Compete in the Relevant Market.

194.    Plaintiffs and their experts offer no evidence as to whether rivals have sufficient scale to serve high-quality ads to users or whether the low percentage of queries that show ads are tail queries. *See* Tr. 4620:8-12, 4623:13-16 (Chipty). Instead, Plaintiffs rely on a handful of exhibits that establish only that Google's ads models train on click-and-query data—not the importance of this data relative to competitors' data, the extent to which user data explains Google's ad quality, or how much less data (if any) Google would have had but for the challenged agreements. PFOF ¶ 717, 721-22. As Dr. Muralidharan testified, while Google's ads models train on click-and-query data, his observation from fifteen years on the search ads team is that "most of [Google's] effort goes into actually getting the insights to design the system or

coming up with better algorithms." Tr. 4411:12-12:6, 4452:2-22 (Muralidharan).

195.    Plaintiffs rely solely on Adam Epstein—who holds a degree in law, not computer science, and works at adMarketplace, a company that does not participate in any relevant market—for the proposition that "the algorithms aren't really the tough part." PFOF ¶ 718; Tr. 1835:24-36:6 (Epstein); GFOF ¶ 495. Yet Google employs thousands of engineers to improve these algorithms and increase their accuracy. Tr. 4405:2-06:3 (Muralidharan).

196.    Plaintiffs' ads data proposal remains extraordinarily broad, yet Mr. Weinberg's complaints around DuckDuckGo's ad quality were limited to "long-tail queries where we are generally showing ads when we shouldn't be." Tr. 848:3-21, 845:25-46:25 (Weinberg). There is no evidence concerning what percentage of longtail queries triggers ads, much less whether click-and-query data is necessary to make those determinations. Tr. 4623:9-24:9 (Chipty).

197.    And although Plaintiffs often cite the testimony of Mr. Epstein, his interest was primarily in syndicating Google's Suggest API, *see infra* ¶ 225 & n.7, and increasing the relevancy of his firm's ads by accessing Google's larger advertiser inventory, again through syndication. Tr. 1791:18-92:11 (Epstein).

198.    Indeed, there is no evidence that the Ads Data in Section VI.E of Plaintiffs' RPFJ would prove valuable to an ads rival unless the recipient has the same advertiser inventory as Google and could serve the same ad, because even seemingly similar advertisers like Target and Walmart have very different marketing strategies. Tr. 4421:19-22:21 (Muralidharan).[5]

199.    There is ample record evidence, however, that disclosing this Ads Data would

---

[5] While Google's agreement with Yahoo Japan permits Yahoo Japan to submit a limited number of synthetic queries for the specific purpose of assessing quality and compliance with local law, PFOF ¶ 813; GFOF ¶ 818, all of the advertisers in this arrangement already belong to Yahoo Japan so there is no question of advertiser inventory, *see infra* ¶ 220.

expose advertisers' confidential business information, GFOF ¶¶ 749-59, and violate user privacy, GFOF ¶¶ 735-48. Plaintiffs ignore the issue of advertiser confidentiality. As to user privacy, while Plaintiffs suggest that the FLOGs ads database already "handle[s] privacy compliance" since it does not contain user identifiers, PFOF ¶ 732 (quoting PXR0247*), Google's internal policies warn that the longitudinal nature of that data and its extensive metadata pose risks that information may be linked back to a user, and further warn that once data is copied from FLOGs, Google cannot control or audit the data for privacy compliance, RDX0011*; GFOF ¶¶ 738, 740.

## VIII.   PLAINTIFFS FAIL TO DEFEND THEIR SWEEPING, UNPRECEDENTED SYNDICATION PROPOSALS.

### A.    Plaintiffs' Search Syndication Proposals Demand Blueprints, Not "Bridges."

200.    Plaintiffs define "search syndication" as "when a GSE's search *results* and other organic content is syndicated for display on a different search engine's website." PFOF ¶ 738 (emphasis added). They do not explain, much less support with evidence, their RPFJ's requirement that Google "syndicate" far more than its search results, including: (i) the proprietary query understanding information underlying those results; (ii) data sufficient for competitors to understand which Google features should be triggered in response to a given query and where they should appear on the SERP; (iii) what appears inside the Local, Maps, Video, Images, and Knowledge Panel features and the understanding of how the content is ranked; and (iv) information sufficient to understand content displayed after users click on those features. GFOF ¶¶ 783-801; Pls.' RPFJ §§ VII.A.1-5; RDX0706 at .003-.004; RDX0708 at .004.

201.    Similarly, Plaintiffs suggest that standard syndication arrangements could be used for "backfilling"—that is, allowing a competitor to call on Google to provide syndicated web results where the competitor "might not yet have great quality results." PFOF ¶¶ 741-43; Tr. 3025:9-20 (J. Adkins). And they observe that "[w]hen implemented properly," search

syndication "can encourage competition and innovation."  PFOF ¶ 740.  But they fail to explain how requiring Google to directly disclose its technologies like Tangram, which determines the layout and content of Google's SERP, or its back-end query understanding systems that interpret nuanced intent behind users queries, GFOF ¶¶ 784-86, 789-91, would be in any way akin to "backfilling" results for a subset of rivals' queries, nor why such forced disclosure of Google technologies would amount to a "proper" implementation of search syndication that would spur competition or innovation among recipients of Google's intellectual property.  In other words, Plaintiffs have no response to the ample evidence Google offered that Plaintiffs' syndication proposals would directly disclose Google's proprietary technologies, allow for extensive reverse engineering, and artificially prop up Google's rivals while diminishing incentives to innovate across the board.  GFOF §§ V.A.4, E.2.

202.    Plaintiffs claim that their RPFJ contains built-in protections against competitors who would free-ride off of disclosed Google technologies, citing their proposals' requirement that rivals demonstrate plans to invest and compete, that their proposals "all end eventually," and the limitation that rivals may syndicate only "a 'significant' proportion—not all—of their queries" from Google.  PCOL at 49.  None of these "protections" are specified; rather, they are all left to be determined by Plaintiffs and their Technical Committee.

203.    Plaintiffs, meanwhile, would prohibit Google's industry-standard restrictions on storage and analysis of its organic search results, Pls.' RPFJ § VII.B, and require Google to syndicate not only those results but also the back-end blueprints explaining *why* Google returned them, *where* it would have displayed them on its own SERP, *what* content Google's Local, Maps, Video, Images and Knowledge Panel features contained, and *how* Google would have ranked the content within those features, GFOF § V.E.

204.    Although Plaintiffs assert that their syndication proposals provide competitors with "important scale-dependent results and features," they narrowly focus on organic web results and FastSearch results, failing to mention much of the rest of their demands.  PCOL at 49.

205.    The syndication proposals would baselessly provide rivals with myriad Google technologies and assets, not the "bridge" to self-sufficiency Plaintiffs claim.  GFOF § V.E.2.

**B.    Plaintiffs Offer No Sound Basis for Their Synthetic Queries Proposal.**

206.    Plaintiffs do not justify the additional disclosures of Google's intellectual property that their synthetic queries proposal would force, nor the targeted reverse forms of engineering it would allow.  GFOF ¶¶ 878-80, 930-32 (explaining how competitors could use synthetic queries to methodically recreate Google's content databases and more efficiently mimic or reverse engineer its technologies).  Plaintiffs cite testimony from Mr. Weinberg that does not reference synthetic queries, PFOF ¶ 749 (citing Tr. 832:2-9 (Weinberg)), and rely on a single, "machine generated queries" provision in Google's Yahoo Japan agreement as purported precedent for their synthetic queries proposal, PFOF ¶¶ 750, 752-53; PXR0598 at -723 (§ 2.7(c)).

207.    This "machine generated queries" provision bears no resemblance to Plaintiffs' proposal.  GFOF ¶ 818; PXR0598 at -723 (§ 2.7(c)).  Yahoo Japan may submit a very limited number of synthetic queries in order for Yahoo Japan to evaluate the quality of *Google's* Japanese language results and to assess compliance with local laws.  GFOF ¶¶ 818-19.

**C.    Plaintiffs Ignore the Many Material Differences Between Their Syndication Proposals and Google's Existing Syndication Agreements.**

208.    Plaintiffs point to Google's "current organic syndicated search offerings" to try to justify their syndication proposals (PFOF § VII.C), but fail to account for the substantive differences between their proposals and Google's syndication offerings.  GFOF §§ V.E.1.a, c.

209.    For one, Plaintiffs' RPFJ would require Google to syndicate organic search results

and features "the same as if the Qualified Competitor's query had been submitted through

Google.com." Pls.' RPFJ § VII.A. Google's current syndication API returns limited data in

response to queries, focusing on the "ten blue links" and including only "a very small subset of

the features that appear on Google.com," whereas Plaintiffs' RPFJ sweeps in a much broader set

of features, and requires Google to provide page layout and display functionality for which

syndication partners are ordinarily responsible. GFOF ¶ 842 (quoting Tr. 2999:9-17 (J.

Adkins)); GFOF ¶¶ 811-14. Plaintiffs offer no evidentiary basis for that proposed requirement.

210.    Likewise, Google would be required to syndicate complete Search feature

experiences, including in-feature interactive content. GFOF ¶¶ 861-64. Plaintiffs' proposal

would require Google to provide competitors with enough information to re-display Google's

constantly evolving features, including their complex rendering needs. GFOF ¶ 862. Moreover,

the requirement that Google syndicate information sufficient to "produce what is shown to the

user once the user has clicked" on Google's Local, Maps, Video, Images, or Knowledge Panel

features would require Google to syndicate the full "Google.com" experience for these features,

including interactive sub-features, expansions, and filtering. GFOF ¶¶ 863-64.

211.    Google has never syndicated any such experience—not only to protect its

intellectual property but also for reasons of technical impracticality. GFOF ¶ 865; GFOF

§§ V.E.1.a, c. Thus, Plaintiffs' observations that Google today provides "syndicated search

results through an API" as well as "some of the features on Google.com," PFOF ¶¶ 755-56, are

beside the point. Plaintiffs ignore that those existing APIs do not offer the same functionality as

provided on Google.com, and Google does not syndicate the vast majority of its search features,

GFOF ¶¶ 812-13. Plaintiffs do not explain how or why Google should now be required to do so.

212.    Nor has Google ever syndicated the underlying query understanding and ranking

signals demanded by Plaintiffs' proposals.  GFOF §§ V.E.1-2.  Plaintiffs do not claim otherwise.

**D.  Plaintiffs Identify No Technical Precedent for Their Syndication Proposals.**

213.    Despite Plaintiffs' and their expert's bare assertions that "Google's Yahoo Japan syndication is very similar to the syndication proposed by Plaintiffs," such that Google can "feasibly satisfy" their syndication demands, PFOF ¶¶ 780-82 (citing Mickens), the Yahoo Japan agreement in fact differs significantly from Plaintiffs' proposals, with a variety of contractual restrictions and exceptions Plaintiffs simply ignore, GFOF ¶¶ 815-31.

214.    The fact that Google has "hardware and back-end software infrastructure" and can "isolate qualified competitors' data requests to prevent Google from seeing" them, PFOF ¶¶ 783-84, has no bearing on the technical feasibility of Google syndicating search features and sub-features that it has never syndicated, in a way that it has never syndicated any feature—that is, complete feature experiences on par with Google.com, including interactive content and information sufficient to understand Google's ranking.  GFOF ¶¶ 860-66.

215.    As to Yahoo Japan, Plaintiffs do not explain how this one-off partnership in a different market, subject to many contractual exceptions, and in which Google syndicates only its web search results, image thumbnails, and a small subset of Knowledge Panel data, GFOF ¶¶ 815-31, is a "template" for their sweeping, unprecedented proposals, PFOF ¶ 781, which Google must fulfill for all Qualified Competitors, at marginal cost, for ten years, GFOF § V.E.

216.    Finally, Plaintiffs ignore that forcing Google to syndicate "[d]ata sufficient to understand" Google's evolving ranking technologies and search features, GFOF ¶¶ 784-85, 792-93, would impose an ongoing obligation on Google to teach rivals about its technology, Tr. 3433:16-17:16, 3488:22-89:24, 3499:2-3500:2 (Reid).

E.    **Plaintiffs' Ads Syndication Proposals Would Hurt Advertisers and Implicate a Market Outside of the Court's Liability Holding.**

1.    **Plaintiffs' RPFJ Forces Google to Syndicate Ads Under Terms That Would Harm Advertisers.**

217.    Google presented extensive testimony detailing the resources it puts into ensuring that its syndicated ads are useful to users while offering value to advertisers.  GFOF §§ V.F.1-3.  Plaintiffs' RPFJ would eliminate all of those policies, and yet Plaintiffs do not even address the evidence presented by Google.

218.    Google does not provide advertiser identities or the costs-per-click paid by advertisers that show ads on syndicators' sites.[6]  PFOF ¶ 793.  Jesse Adkins explained that Google omits this information because, *first*, ads syndicators receive aggregated reporting on impressions, clicks, cost-per-click, and revenue.  Tr. 2969:8-71:8 (J. Adkins).  *Second*, this advertiser information—including queries advertisers bid on and how much they pay—"is extremely sensitive information" that advertisers entrust with Google, and which would expose advertisers' financial data.  Tr. 2969:8-71:8 (J. Adkins); GFOF ¶¶ 751-59, 906-08.

219.    Notwithstanding Mr. Epstein's belief that adMarketplace is entitled to this advertiser data, Tr. 1860:22-61:3 (Epstein), as Dr. Muralidharan explained, advertisers are "very protective" of their data and only provide it to Google to the extent Google provides sufficient value in return, GFOF ¶ 751.  And one way that Google competes for advertisers is by guaranteeing that their data is protected.  Tr. 3204:24-05:10 (Israel).

220.    Plaintiffs point to the fact that Yahoo Japan provides its own advertisers' data to Google.  PFOF ¶¶ 811-12.  But as Mr. Adkins testified, this data is "essential" for Google to

_____

[6] Plaintiffs' RPFJ Section VIII.E goes far beyond this data and extends to "all Ads Data" including Google's internal proprietary signals.  *See* GFOF § V.F.4 (explaining how Plaintiffs' proposal divulges Google's intellectual property).

provide Yahoo Japan with syndicated ads because Google provides the underlying data and reporting infrastructure for Yahoo Japan's advertisers. Tr. 3093:22-95:15 (Adkins). Mr. Adkins also explained that the Yahoo Japan partnership prohibits anyone in the Google Japan ads business from accessing Yahoo Japan's advertiser data. J. Adkins (30(b)(6)) Dep. Tr. 38:1-39:9. Yet Plaintiffs would compel Google to share its own advertisers' data with rivals for reasons unrelated to Google's ability to serve ads—rather, so that rivals can develop competing search ads businesses. Pls.' RPFJ § VIII.E.

221.    Plaintiffs ignore advertisers' vested interest in their data confidentiality, instead claiming that their RPFJ would "lower[] advertiser cost" by increasing competition. PFOF ¶ 793. In fact, Plaintiffs' proposals would reduce the value advertisers receive because Google would be unable to restrict how ads syndicators display or use ads, exposing advertisers to the ever-evolving schemes that mislead users into clicking ads so that syndicators may collect greater revenue, while advertisers are left with useless clicks and depleted budgets. GFOF ¶¶ 887-904; *see also* GFOF ¶ 905 (Plaintiffs' requirement of a minimum cost-per-click for syndicated ads only serves to squeeze advertisers for more revenue); GFOF ¶ 500. And under Plaintiffs' RPFJ, Google cannot accurately price the ads because the syndicator may reorder them—meaning that an advertiser who paid for the first ad slot on the SERP could arbitrarily be moved to the bottom of the page. PFOF ¶ 798; GFOF ¶ 891.

222.    Lifting these restrictions would harm advertisers and irreparably damage Google's relationship with its advertisers—as Mr. Epstein testified, "Google is going to be putting their advertiser relationships on the line." Tr. 1812:14-13:11 (Epstein).

### 2.    Plaintiffs Rely on Testimony That Is Not from Qualified Competitors.

223.    Section VIII.E.2 of Plaintiffs' PFOF overwhelmingly relies on testimony from Adam Epstein of adMarketplace. When Mr. Epstein described the "three cold start problems,"

he explained that "the first . . . and really the biggest one" is specific to adMarketplace's Suggest product. Tr. 1794:6-97:3 (Epstein). Yet adMarketplace was not identified as a Competitor in Plaintiffs' pretrial interrogatory responses. GFOF ¶ 495.

224.    AMP Suggest is adMarketplace's "showcase product." It automatically populates advertisements beneath the search box as the user enters her query and before entering a search results page, thereby "skipping the SERP" entirely. Tr. 1787:22-89:13, 1799:19-80:10 (Epstein).

225.    Mr. Epstein testified that "Google API for Suggest" (included under Plaintiffs' *search* syndication proposal at Section VII.A.2) would improve the AMP Suggest *advertising* product by improving AMP's ability to serve a relevant ad in response to a partial query before reaching a search results page. Tr. 1794:6-95:14, 1796:23-97:3 (Epstein); *see also* PFOF ¶ 803. Five times during his testimony, Mr. Epstein repeated adMarketplace's desire to access Google's Suggest API—all to improve AMP Suggest—a product that does not serve ads on SERPs and is outside the general search text advertising market defined by the Court.[7] Tr. 1794:6-95:14, 1796:23-97:3, 1800:11-18, 1803:7-15, 1843:1-20 (Epstein); Liability Op. at 185-89.

226.    Still, Plaintiffs insist that adMarketplace is a potential Qualified Competitor, PFOF ¶ 3, because "adMarketplace and other syndicators could help a new GSE entrant," PFOF ¶ 805. However, the ad syndication market is far outside the court's liability opinion, and Google should not be compelled to syndicate ads to self-described "intermediaries." Tr. 1844:1-12 (Epstein); *see, e.g.*, Tr. 3211:18-12:7, 3205:15-07:22 (Israel); Tr. 845:23-47:12, 853:13-54:3

---

[7] Although Plaintiffs attribute to Mr. Epstein the proposition that new GSE entrants have "a lack of access to scale, which impedes ad targeting and query understanding," (PFOF ¶ 800), Mr. Epstein went so far as to say that Google's Suggest API alone was "one little piece of technology…[that] would bridge like 80 percent of the data moat that [Google has] in terms of the query data." Tr. 1794:6-95:14 (Epstein). Despite this, he later testified in favor of Plaintiffs' ads data disclosure remedies in VI.E and VIII.E, even as he agreed that Plaintiffs' definition of "Ads Data" is "loose." Tr. 1807:15-23, 1814:20-15:11, 1858:19-24 (Epstein).

(Weinberg) (testifying that ads syndication can offer new *search* entrants—not ad syndication entrants—a business model) (cited in PFOF ¶¶ 806, 809).

## IX.    PLAINTIFFS PROVIDE NO BASIS TO FORCE GOOGLE TO PROVIDE SEARCH GROUNDING TO RIVALS.

227.    State-of-the-art LLMs (including GenAI models) have not *eliminated* the entire quality gap between Google and rival search engines (unsurprising given the role innovation and investment also play).  PFOF ¶¶ 816, 838-39.  Nonetheless, the record reveals that such technology has allowed Microsoft to reduce its search result quality gap with Google and achieve the single biggest relevance gain in the history of Bing.  GFOF ¶¶ 994-96.

228.    Plaintiffs point to the utility of Retrieval Augmented Generation ("RAG") or grounding for GenAI chatbots.  PFOF ¶¶ 817-27, 829-31.  To begin with, they ignore that most chatbot use cases have no need for search grounding and that ChatGPT became the most popular chatbot without it.  GFOF ¶¶ 1016-17, 1043.

229.    For those use cases where search grounding does have utility, whatever advantage Google might have in search grounding because of its highest-quality general search engine, PFOF ¶ 828, zero evidence was introduced that any such advantage has translated to an actual competitive advantage in the marketplace.  GFOF ¶ 1019.  Not only do rival GenAI products have far greater usage, GFOF ¶¶ 1035-44, the evidence is that rival GenAI products are neck-and-neck on measures of *factuality*, the dimension most associated with search grounding performance, notwithstanding rivals' lack of grounding in Google Search.  GFOF ¶ 1025.

230.    Likewise ignored by Plaintiffs is the ability of rivals to obtain grounding, either by innovating themselves or purchasing such services from third parties who sell it.  GFOF § VII.E.  That rivals would prefer to be handed Google's intellectual property at marginal cost, PFOF ¶ 837, is unsurprising, but hardly sufficient to justify such expropriation.

**X.    PLAINTIFFS IGNORE THAT THEIR PROPOSALS WOULD DELIVER GOOGLE'S PROPRIETARY ASSETS AND INTELLECTUAL PROPERTY TO RIVALS AND INSTEAD ADDRESS A RED HERRING.**

231.    What Plaintiffs call "unfounded claims that Plaintiffs' remedies would allow Qualified Competitors to expropriate Google's intellectual property and allow 'cloning' of its products," PCOL at 52, is in fact unrebutted evidence.  Plaintiffs' contrary arguments are merely that (i) the provisions do not reveal the source code itself, and (ii) elements of Google Search lie outside the remedies—primarily, the internal software architecture and hardware that supports Google Search and Search Ads.  PFOF ¶¶ 727, 848-49, 853.  Plaintiffs do not—and cannot— dispute that their proposals directly disclose wide swaths of Google's trade-secret technologies, and enable the cloning of many more.  GFOF §§ V.B.1-2, C, D.  As Professor Allan, Mr. Pichai, Ms. Reid, and Dr. Muralidharan all explained, the sum total of Plaintiffs' proposals reaches across every layer of Google's search and ads stack, exempting from expropriation only the system architecture and hardware itself.  GFOF § V.A.1.

232.    Plaintiffs' citations to Mr. Collins rely on obfuscation.  PFOF ¶¶ 842-45.  Mr. Collins merely agreed that search engines perform functions beyond the query understanding-ranking functions; they must, for example, retrieve the information from an index.  Tr. 3373:16-74:18 (Collins).  The query understanding-ranking function is critical to a search engine, and *that* function is what LLM embedding models replicate.  GFOF ¶¶ 637-39.  As Professor Allan explained, Plaintiffs' proposals would allow rivals to plug Google's search results—the output of myriad Google technologies developed by countless engineers—into LLMs that mimic Google's functions.  GFOF §§ V.C.1.a-b, E.2.  Mr. Collins' testimony in no way contradicts that fact.

233.    Professor Durrett concedes as much:  *He agrees that rivals can use Google's disclosed data to train LLMs to mimic Google's technologies*.  Tr. 195:25-97:19 (Durrett).

234.    None of Professor Durrett's rebuttal points undercut Professor Allan's

conclusions and the testimony of Google executives.  *First*, he testified that the scope of reverse engineering would be "specific pieces within[] the search engine, and not the ability to reverse engineer the entire process with a large language model."  Tr. 191:21-92:25 (Durrett).  But that says no more than Google Search is supported by architecture beyond the core query understanding and ranking functions, and rivals too would need their own architecture on which to run the reverse-engineering systems.  *Second*, he clarified that "training this mimicking system using a large language model does not reveal the component substructure of Google's system."  Tr. 193:25-94:10 (Durrett).  Given that rivals have the benefit of all of Google's technology, they do not need to understand the sub-components.  *Third*, he opined that "the mimicking system may not be as performant as the original system on whose data it was trained," that is, it "may return lower accuracy on new queries than the original system."  Tr. 194:5-10 (Durrett).  Notably, here, he says only that it "may not be"; he does not claim that rivals could not reach parity with Google—nor is perfect parity the standard for evaluating whether Google's trade secrets would be divulged.  *Fourth*, he agreed that RankEmbedBERT can be mimicked via the mechanism Professor Allan described, but added the unremarkable observation that rivals would not obtain other system architecture components, and "would still have to do their own engineering to figure out, for example, how to make the system fast."  Tr. 196:7-97:19 (Durrett).

## XI.    PLAINTIFFS' COMPELLED DATA DISCLOSURES AND SYNDICATION ENABLE FREE RIDING FOR ALL OF THE IMPLICATED ASSETS AND TECHNOLOGIES, DIMINISHING GOOGLE'S AND RIVALS' INVESTMENT INCENTIVES ACROSS THE SEARCH AND ADS STACKS.

235.    Plaintiffs' contention that "Google's concerns regarding reverse engineering are overstated and impractical" rests solely Mr. Weinberg's testimony.  PFOF ¶ 853.  He was asked only about the syndication, not the index and user-side data provisions.  And as to syndication, he is incorrect that rivals "are really just getting end-page layouts."  Tr. 836:5-37:6 (Weinberg).

Their RPFJ requires much more, *see supra* §§ VIII.A, C; Mr. Weinberg himself acknowledges that DuckDuckGo could "use the data that we're processing from the [compelled] syndication data and help us into index building for more longer term indexes." Tr. 828:20-29:9 (Weinberg). And as to what rivals can do with the ranked results and end-page-layout information they would receive from Google, Mr. Weinberg testified to "the benefits to DuckDuckGo *to learn how Google ranks* different types of information." Tr. 831:11-32:1 (Weinberg) (emphasis added). Plaintiffs notably did not ask him whether that information could be used to train an LLM to mimic Google's ranking; and, as above, Plaintiffs' own computer scientist expert readily acknowledges precisely that point. Finally, Mr. Weinberg has no experience in computer science or web result ranking, as DuckDuckGo has long licensed its organic web results—first from Yahoo, then from Bing. Liability Tr. 1938:20-39:23, 2159:12-17 (Weinberg).

236.    Mr. Weinberg's testimony regarding Startpage is a non sequitur. PFOF ¶ 853. Startpage displays Google syndicated results, pursuant to agreements that forbid storage and analysis—just as DuckDuckGo displays Bing's syndicated results pursuant to similar terms. GFOF ¶¶ 807, 835; *see also* GFOF ¶ 487.

237.    More fundamentally, Plaintiffs miss the point: The incentives of Google and rivals to innovate and improve with respect to directly disclosed assets and technologies (or those capable of being reverse engineered or mimicked) are inarguably diminished. GFOF § V.A.4. Plaintiffs say little on that point, instead focusing on other aspects of search that rivals (and Google) would still have incentives to improve. *See supra* § X; PFOF § XI. But that misses the forest for the trees, given that Plaintiffs' proposals sweep across Google's entire search stack. GFOF § V.A.1. Likewise, any "differentiation" would need to occur outside of the technologies and capabilities that Google was forced to turn over—reducing, not expanding, areas for

differentiation. GFOF § V.A.4.b.

## XII. PLAINTIFFS DO NOT DISPUTE THAT THEIR ADS TRANSPARENCY PROPOSALS WOULD REPLACE COMPETITION WITH REGULATION AND EXPOSE SENSITIVE USER DATA.

238.    There is no evidence contradicting Dr. Israel's testimony that as a matter of economics, the ads transparency proposals (i) are costly regulatory mandates on data reporting and product design, (ii) do not impact competition in the general search text ads market, (iii) are unnecessary because advertisers follow users, and (iv) extend beyond the concerns raised in the Court's liability opinion.  GFOF ¶¶ 1131, 1133-35, 1138, 1142.  Plaintiffs offered no evidence that Microsoft or any other company has tried to attract advertisers by offering any of the data reporting information encompassed by their proposals.  GFOF ¶ 1137.

239.    Plaintiffs offered no economic evidence that their "ads transparency" proposals would affect barriers to entry or competition.  They also did not present advertiser evidence that the unavailability of any data or information encompassed by the "ads transparency" proposals has affected advertisers' willingness or ability to purchase general search text ads from rivals.  Nor did they present any evidence that implementing the proposals would lower switching costs.  Plaintiffs assert that receiving more granular forms of certain data "would enable Skai 'to make more informed recommendations, and some of those could lead to budget shifting,'" PFOF ¶¶ 875-76, but the same witness admitted that receiving more data from Google could result in advertisers increasing their spend on Google relative to other sellers.  Tr. 1406:6-07:7 (Vallez).

240.    While Plaintiffs now belatedly "support" adding privacy protection to the ads transparency proposals and assert it is "feasible" to do so, they offer no specific proposal and present no evidence that user privacy could be protected while providing the extremely granular data contemplated by their RPFJ.  PCOL at 56; PFOF ¶ 877.

### A. Plaintiffs' SQR Proposal Far Exceeds the Scope of the Liability Opinion and Provides No Guidance on Privacy or Which Metrics Would Be Provided.

241.    Plaintiffs do not dispute that their SQR proposal goes far beyond the low-volume "tail" queries discussed in the Court's Opinion by requiring reporting on every unclicked ad *impression*, the proprietary LTV score, and "any other metric" requested—all in real-time (while today there is generally a 3-hour delay).  GFOF ¶¶ 1142-43; Tr. 4435:1-4 (Muralidharan).

242.    Although Plaintiffs argue that advertising witnesses rejected the privacy rationale for not including rare queries in SQRs, PCOL at 56, Paul Vallez of Skai agreed that only considering advertisers' interest in obtaining data does not balance users' privacy.  Tr. 1387:4-88:16 (Vallez).  And Plaintiffs' privacy expert agreed that user queries include sensitive information and can be used to re-identify a user.  GFOF ¶ 1146.

243.    Plaintiffs contend that the advertising industry generally agrees on the "key metrics" for ad performance, PFOF ¶ 865, but do not dispute that their proposal (i) provides no limitation on the requirement to provide "any other metric," including user information, and (ii) would result in burdensome disputes over the metrics to be provided.  GFOF ¶ 1148.

### B. Plaintiffs' Access to Data Reports Proposal Is Unconnected to Any Finding of Liability and Fails to Protect User Privacy.

244.    Plaintiffs contend that Google should allow the export of unaggregated impression-level data, noting that Skai in particular could improve its products.  PFOF ¶¶ 875-76.  However, they fail to connect this proposal to any liability finding, present any evidence that advertisers face switching costs that are attributable to the design of Google's tools or reporting, or show that allowing such exporting would increase competition or shift spend away from Google to rival ads platforms.  GFOF ¶¶ 1139-41, 1153.  And while Plaintiffs assert that access to data at the "keyword level" would help advertisers, PFOF ¶ 870, they ignore that Google already provides search text advertising reports at the keyword level, GFOF ¶¶ 1143, 1150.

245.    Plaintiffs claim that safely disclosing such granular data is "feasible" because third parties like Skai already go through an authorization process.  PFOF ¶ 877.  That process, however, applies only to the *aggregated* data Google provides today, PFOF ¶ 871, and Plaintiffs propose no privacy regime for a highly consequential increase in the granularity of data provided to advertisers—even though more granular data increases the risk that individual users may be linked to their search queries, GFOF ¶¶ 685, 1152.

246.    Plaintiffs cite two documents for the proposition that Google is making less data available to advertisers, PFOF ¶¶ 872, 874, but these documents concern deprecating certain conversion files to Skai, and one shows that Google suggested a workaround so Skai could still use some conversion data.  PXR0228* at -117.  Plaintiffs did not ask Mr. Vallez about these documents, and neither document indicates that Google stopped providing conversion data to the relevant party under the Court's Opinion—the *advertisers*.

### C.    Plaintiffs' Keyword Matching Proposal Is Unnecessary, Especially Given the Increased Prevalence of Autobidding.

247.    Plaintiffs dispute that autobidding makes their keyword-matching proposal less valuable to advertisers, claiming that autobidding and keywords "play different roles" and autobidding requires advertisers "to accept Google's estimate of the advertiser's bid."  PFOF ¶¶ 879-81.  Plaintiffs misunderstand how autobidding works—it automatically adjusts the bid to meet a goal that the advertiser specifies such as an average CPC or average conversion cost, which means that for "variations of the advertiser's keyword," PFOF ¶ 881, autobidding will adjust to meet the advertiser-set goal, without requiring the advertiser to manually enter every possible misspelling of a keyword with a unique bid (as Plaintiffs envision in their proposal), GFOF ¶ 1157; Tr. 4403:3-04:6, 4416:14-18:6, 4441:23-42:13 (Muralidharan).

**D.    Plaintiffs' Auction Changes Proposal Does Not Change How Advertisers Set Bids and Would Cover Thousands of Launches.**

248.    Plaintiffs contend their auction disclosure proposal will cause advertisers to change their "bidding choices" because they will "experiment differently" and for those that use autobidding, the "inputs can be different."  PFOF ¶¶ 888-89.  But Plaintiffs do not dispute that advertiser experimentation will lead to the same optimum bid regardless of auction disclosures, or that autobidding will optimize the bid to meet the objective specified by the advertiser while taking auction changes into account.  GFOF ¶ 1163.  Further, Plaintiffs did not offer any evidence from advertisers that additional disclosure of auction changes would be useful or cause them to shift ad spend to rival ad platforms.  GFOF ¶ 1163.

249.    Finally, Plaintiffs cite Jerry Dischler's testimony to diminish the proposal's burden, PFOF ¶ 891, but bug fixes and experiments are within the scope of the proposal according to Plaintiffs, RDX0705* at .025-.026.  Mr. Dischler and Dr. Muralidharan agree there are thousands of experiments, and this number balloons further when considering changes to the many upstream models that feed into the auction.  Tr. 4444:6-46:19 (Muralidharan).

## XIII.   PLAINTIFFS FAIL TO JUSTIFY THE IMPOSITION OF CHOICE SCREENS.

**A.    Choice Screens Cause Clear Harms and Offer No Material Benefit.**

250.    Plaintiffs agree that choice screens would not meaningfully shift market share for general search.  PFOF ¶¶ 907-13, 921, 939.  This is because, as Plaintiffs acknowledge and Apple found, "people still choose the best product, which today is Google."  PFOF ¶ 912.

251.    Plaintiffs repeatedly emphasize the importance of choice architecture in the design of choice screens.  PFOF ¶¶ 898-901, 958-59.  But Plaintiffs concede that even well-designed choice screens have minimal impact.  PFOF ¶ 902 (resolving issues results in 3% shift).

252.    Meanwhile, Plaintiffs ignore the negative impact of choice screens on the out-of-

the-box experience and innovation.  GFOF § VI.C.  Plaintiffs state that choice screens are "unlikely to harm consumer welfare," PFOF ¶ 906, but offer no evidence supporting that conclusory statement other than Dr. Rangel, who admitted that he did not study costs associated with choice screens, GFOF ¶ 954; Tr. 584:24-85:12 (Rangel).  And Plaintiffs do not discuss their proposal to impose these harms on a yearly basis.  GFOF ¶ 958.

253.    Plaintiffs also propose choice screens on "devices that have already shipped," PFOF ¶ 897, but these choice screens would be especially harmful.  GFOF ¶ 957.  While Plaintiffs argue this is necessary because Google "already locked up those search access points," PCOL at 28, Google's proposed remedy allows rivals to compete for those access points, *see* Google's PFJ § III.H-J; Tr. 4366:14-21 (Murphy).

254.    Plaintiffs cite Mozilla for browser choice screens, but they acknowledge that Mozilla is *opposed* to search engine choice screens, PFOF ¶ 919, and Plaintiffs identify no support for the proposed "choice screen within a choice screen," GFOF ¶ 938.

255.    Nor do Plaintiffs identify any facts to support placing choice screens on Google Pixel devices, which Plaintiffs did not challenge in this case.  GFOF ¶ 960.

256.    Plaintiffs accuse Google of making design choices aimed at increasing the use of its products.  PFOF ¶¶ 903-04.  But the evidence actually shows that Google products have much lower default choice friction than rivals.  Microsoft designs its products with "substantial" choice friction, and DuckDuckGo prevents users from switching at all.  GFOF ¶¶ 945-46.

### B.    Plaintiffs' Proposals Are Not Genuinely Interested in Consumer Choice.

257.    Plaintiffs stress that Google's status as the default creates bias in its favor.  PFOF ¶¶ 893-94, 907, 914.  But as Dr. Rangel agreed "there will be significant default biases in favor of whichever search engine is set as the default." Tr. 564:22-24, 582:13-21 (Rangel).

258.    While Plaintiffs suggest that default bias is *higher* with Google because of its

strong brand and prior default status, PFOF ¶¶ 914-15, the evidence shows just the opposite.  The Allcott study shows that default bias is 16 times higher when Bing is the default than when Google is the default.  Tr. 572:6-11, 575:10-22 (Rangel) (default bias is the "difference between the outcome of the group forced to make a choice and the group presented with the default").  And neither Plaintiffs nor Dr. Rangel have assessed the impact on consumers of Microsoft setting Bing as the exclusive default on Windows devices.  Liability Tr. 673:22-74:10 (Rangel).

259.    Plaintiffs purport to justify choice screens as a mechanism for decreasing default bias.  PFOF ¶¶ 897, 906, 908, 920.  Yet Plaintiffs' RPFJ would prohibit Google from making "payments for Choice Screens" for new Android devices and all Apple devices.  Pls.' RPFJ § IV.A-B.

260.    Therefore, it is clear that Plaintiffs' proposals are not concerned with decreasing default bias—rather, they seek to *leverage* default bias to increase share for rivals on new Android and Apple devices, by allowing other inferior rivals to bid for and win exclusive and default status without having to compete against Google.  *Supra* § V.  Plaintiffs only propose choice screens on products for which they have no way to influence rivals becoming the default.

261.    Ultimately, switching defaults from Google to rivals will harm consumers.  Tr. 584:2-10 (Rangel) ("where a default that most users prefer is replaced with a default that most users do not prefer, some users will certainly be worse off"); Liability Tr. 750:2-25 (Rangel).

## XIV.    PLAINTIFFS' PROPOSALS HARM INNOVATION AND INVESTMENT INCENTIVES.

262.    Plaintiffs' argument that reengineering the search market will lead to more innovation and investment fails on all fronts.  *First*, Plaintiffs suggest that the proposals will increase Apple's incentives to enter the search market.  PFOF ¶¶ 923, 933.  But Mr. Cue was clear that Apple will not enter regardless of Plaintiffs' proposal.  *Supra* ¶ 94.

263. *Second*, Plaintiffs suggest their proposals will incentivize rivals to innovate and "to invest in product differentiation." PFOF ¶¶ 924-32. In reality, Plaintiffs' syndication and data disclosure proposals will incentivize "Google-like" products, which will struggle to differentiate and compete. Tr. 4256:10-57:20 (Murphy) ("[B]y giving . . . AI competitors access to Google's existing way of doing things, you're tilting your investment in the Search side of the world toward being more Google-like . . . . "); Tr. 3861:10-62:7 (Cue) ("I think attacking the problem in the same way, it is very, very difficult to come up with something that's better.").

264. Plaintiffs cite Professor Murphy, PFOF ¶ 930, but they omit his full answer: "[a]nd making it easier to be like Google, I don't think enhances the incentive to be different from Google, because, you know, the more you make it easy to be like Google, the more people are going to tend to be like Google." Tr. 4257:21-59:5 (Murphy).

265. *Third*, Plaintiffs suggest their proposals "will likely increase Google's incentives to invest and innovate," PFOF ¶¶ 934-37, but completely ignore the disincentives caused by Google being forced to disclose its innovations to competitors, *infra* § XI.

266. Plaintiffs misquote Mr. Cue to suggest that "Search results have not gotten better in the last 20 years." PFOF ¶ 936. What Mr. Cue actually said is that there has not been a "technological shift" like AI in the last 20 years. Tr. 3861:10-62:7 (Cue); Tr. 3865:15-66:12 (Cue) (improvements in last 5-10 years have been "significant" but not "game changers" like AI). Plaintiffs' revision to Mr. Cue's testimony also does not withstand the Court's findings. Liability Op. at 199 ("Nor has Google sat still; it has continued to innovate in search.").

267. And it goes without saying that Mr. Weinberg has no personal knowledge to support Plaintiffs' citation to him for the proposition that "Google did not innovate on AI in search because it does not have competition." PFOF ¶ 934.

## XV.    PLAINTIFFS' PROPOSED TERM IS UNSUPPORTED BY THE EVIDENCE.

268.    The premise for Plaintiffs' RPFJ duration is that Google's success since the mid-2000s is evidence of anti-competitive conduct "[f]or 10 to 20 years." PFOF ¶ 938. But Google was successful long before any challenged agreement, and Plaintiffs did not even attempt to prove anti-competitive conduct prior to 2014. GFOF ¶¶ 18-25. Plaintiffs cannot overextend the remedies period because Google won on the merits prior to the challenged period.

269.    Plaintiffs aim to extend remedies until rivals "overcome the barriers to entry and expansion," PFOF ¶ 944, but they have not proven that, in a but-for world without the challenged contract provisions, those barriers would have been materially lower or that Google's rivals would have "overcome" them, GFOF ¶¶ 58-79. In fact, Plaintiffs acknowledge that Google would have still succeeded using "flexible default agreements that could be canceled . . . at any time"—that is, through what Plaintiffs concede are *non-exclusive* agreements. *See* PFOF ¶ 947.

270.    Plaintiffs argue that a "three-year remedy period is too short for rivals to compete," PFOF ¶ 954, providing a myriad of "practical considerations," including that "[e]ven after ten to fifteen years, it would be unlikely for a rival search engine to match Google's scale," PFOF ¶ 953. But again, Plaintiffs offer no evidence of any connection to advantages allegedly gained unlawfully. Google achieved its superior quality, scale, and brand advantages long before the challenged contracts. GFOF ¶¶ 18-25. Plaintiffs simply ignore the position that rival firms would be in absent *the challenged aspects* of such contracts. GFOF ¶¶ 58-79.

271.    Google's continued success in Europe after mandatory choice screens and data sharing also does not support Plaintiffs' overlong decree period. PFOF ¶ 939. Rather, it demonstrates the lack of any strong causal connection between *exclusivity* and Google's competitive position. GFOF ¶¶ 26-57, 947-52.

272.    Notably, neither Plaintiffs nor Dr. Chipty are willing to endorse the 10-year term

originally proposed in Plaintiffs' RPFJ.  Pls.' RPFJ § XII (proposing 10 years).  Instead, both

only go as far as to say that at least *five years* is necessary.  PFOF ¶¶ 954-56.

273.    Finally, Plaintiffs' characterization of GenAI products as a new frontier in search,

*see* PFOF ¶¶ 101-06, 111-12, undermines the case for a lengthy decree.  The "advent" of GenAI

confirms that Google's rivals do not need 10 years to develop traditional general search engines

in order to compete.  PFOF ¶ 80; Tr. 3870:19-72:1 (Cue) (AI competitors have "money and

resources" and can "leverage [AI and the LLM to] accelerate the search index" to provide quality

results with a "smaller search index"); Tr. 4234:19-36:2 (Murphy).

## XVI.    PLAINTIFFS FAIL TO JUSTIFY THE SUBSTANTIVE AUTHORITY PROVIDED TO PLAINTIFFS AND THE TECHNICAL COMMITTEE.

274.    Plaintiffs frame the TC as responsible for "administrative oversight," with

"monitoring and advisory authority," attempting to draw a parallel with the *Microsoft* technical

committee's limited compliance-focused role.  PCOL at 67; *see also* PFOF ¶¶ 957-62.  But in

reality, Plaintiffs would have the TC serve as a consultant to Plaintiffs for powers they arrogate

for themselves and sometimes determine the substantive parameters of their RPFJ.  GFOF § XII.

275.    Google will have no real ability to participate in the TC.  Far from being "a

neutral Technical Committee," PCOL at 73, Plaintiffs would pick four members, to Google's one

(who cannot possibly cover all topics). GFOF ¶¶ 1229-30.

276.    While Plaintiffs' briefing ignores several areas they have reserved for themselves

and/or the TC, *see* GFOF § XII, those they address demonstrate that Plaintiffs and the TC would

have substantive decision-making authority far beyond monitoring or compliance.

277.    As one example, the Plaintiffs would leave for themselves, with consultation from

the TC, "the privacy-utility tradeoff."  PFOF ¶¶ 666, 668, 957.  Balancing privacy against utility

is a core policy determination.  *See* GFOF ¶¶ 704-15; *supra* §§ VII.D, E.  Leaving that to

Plaintiffs (or even a TC) flies in the face of the Court's admonition, and Plaintiffs' promise, that these parameters would be determined at the remedies proceeding.  Jan. 17, 2025 Status Conf. Tr. 91:1-92:8 ("[I]t can't be the case that we're at trial and we still don't know. . . . Google has to have some opportunity to say, those terms are just not acceptable.").  The many other substantive decisions reserved to Plaintiffs, the TC, or both are set forth in GFOF § XII.

278.     Plaintiffs' attempt to draw a parallel to the *Microsoft* technical committee, *see* PFOF ¶ 961, is ill-founded.  That technical committee could "assist in enforcement of and compliance" of a narrow and specific set of remedies.  *See* Final Judgment (ECF No. 746), *United States v. Microsoft Corp.*, No. 98-1232 (D.D.C. Nov. 12, 2002).  The *Microsoft* Final Judgment did not reserve to *plaintiffs* critical substantive determinations affecting Microsoft's property rights and future business operations.  Plaintiffs' RPFJ does.  GFOF ¶¶ 1223-30.

279.     Last, Plaintiffs criticize the regulations implementing the DMA for supposedly lacking a technical committee.  PFOF ¶¶ 958-61 (citing Mr. Weinberg).  But Plaintiffs (and Mr. Weinberg) failed to look at the DMA itself, which creates a committee—the "the Digital Markets Advisory Committee"—comprising experts with "the relevant expertise for a specific issue presented."  Regulation (EU) 2022/1925 of the Eur. Parliament and Council at 265/25, 265/61.

280.     In a similar vein, Plaintiffs' implication (relying again on Mr. Weinberg) that competitors had no voice in the DMA's regulations, PFOF ¶¶ 959-60, is wrong.  As Mr. Weinberg acknowledged in testimony omitted by Plaintiffs, the DMA *did* allow input by competitors.  Tr. 869:8-23 (Weinberg); European Commission, Annual report on Regulation (EU) 2022/1925 (Mar. 6, 2024) at 1 (describing process under which European regulators implemented regulations pursuant to notice and comment).

281.     Perhaps most striking are the parallels between the DMA expert committee and

the role Plaintiffs envision for the TC, underscoring the regulatory nature of Plaintiffs' proposal.

## XVII. COLORADO PLAINTIFFS FAIL TO SUPPORT THEIR REQUESTED MONETARY AWARD TO FUND A PUBLIC EDUCATION CAMPAIGN.

282. Colorado Plaintiffs attempt to justify their requested public education fund by highlighting habit, inertia, and brand recognition as factors that may impact consumer search choices. But they offer no evidence of the extent to which, if at all, the conduct found to be anti-competitive (exclusive distribution agreements) contributed to those factors, when compared to Google paying for non-exclusive distribution. PFOF ¶¶ 963-68; GFOF ¶¶ 1210-11.

283. Colorado Plaintiffs also offer no evidence about the information already available to consumers about rival search engines despite Professor Luca's acknowledgement that this informs how effective any public education campaign would be. GFOF ¶ 1212. The information Colorado Plaintiffs assert might be added—the "distinct characteristics" of search engines, PFOF ¶ 973—is already readily available. GFOF ¶ 1213; RDX0176.

284. Colorado Plaintiffs argue that Google's conduct "[left] rivals limited incentive to invest in marketing today," citing Mr. Weinberg's testimony. PFOF ¶ 975. But as Professor Luca admits, rivals have an incentive to offer consumers the information the campaign would cover, including on how to switch the default. GFOF ¶ 1218. And with Google's conduct addressed by injunctive relief, rivals are incented to engage in the very marketing that they want to be funded by Google for them. That DuckDuckGo and Yahoo believe a Google-funded public education campaign would "help them . . . attract users" or "enable [DDG] to [market] at a bigger scale," PFOF ¶¶ 975-76, shows this proposal's true nature as a handout to competitors.

285. The Allcott study cannot bear the weight placed on it. The vast majority of users offered $10 to change their default to Bing refused, quickly switched back, or left Bing soon after the incentive ended. GFOF ¶ 1215. And of the small percentage that had not yet switched

back, *almost half* reported they did so because they were too lazy or forgot.  GFOF ¶ 1216.

286.    Finally, like many of Plaintiffs' proposals, the details are left to the TC, including the specific information in the campaign, the mechanism of dissemination, or the structure or amount of short-term financial incentives.  GFOF ¶¶ 1203-08; PFOF ¶¶ 986-90.

287.    Colorado Plaintiffs suggest funding "may be comparable to, or lower than, what Google currently spends to market"—around $700 million.  PCOL at 62; PFOF ¶ 990.  But this further undermines the United States' arguments that Google can "compete by continuing to market and advertise."  PFOF ¶ 439.  Colorado Plaintiffs suggest Google should spend *as much* on advertising for rivals as it spends on itself, neutralizing its ability to compete in this way.

Dated:  May 23, 2025

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice*)
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*