**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　v.<br><br>Google LLC,<br><br>　　　　　　　　Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA<br><br>██████████ |

| | |
|---|---|
| State of Colorado, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　v.<br><br>Google LLC,<br><br>　　　　　　　　Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA<br><br>██████████ |

**DEFENDANT'S RESPONSIVE PROPOSED CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

I.  PLAINTIFFS' RPFJ IS PREMISED ON A SERIES OF LEGAL ERRORS. ....................1

    A.  Plaintiffs Have Not Established the Causal Connection Required for Their Overreaching Proposals. ....................................................................................1

        1.  Plaintiffs Offer No Evidence of the Causal Connection Necessary to Support Their Remedy Proposals. ............................................................ 1

        2.  Plaintiffs Attempt to Distinguish *Microsoft*, But Their Arguments Support Google's Position. ...................................................................... 2

        3.  The Causation Requirement Is Not Limited to Structural Relief. .............. 3

        4.  Plaintiffs Misconstrue Google's Position and Fail to Apply Their Own Standard. ...................................................................................... 5

        5.  Plaintiffs Concede They Cannot Support the Notion That the Court Should Seek to "Terminate the Monopoly." ...................................... 6

    B.  Plaintiffs Have Failed to Identify or Quantify the "Fruits" of the Violation ...........6

    C.  Plaintiffs' "Remedy Package" Seeks Forced Parity That Is Contrary to Law and Not Even Supported by Their Own Expert Economist. ...........................8

    D.  Plaintiffs' Other Principles Do Not Support Their RPFJ or Are Misstated. ...........9

II.  PLAINTIFFS' PROPOSED REMEDIES ARE CONTRARY TO LAW. ........................10

    A.  The Proposed Payment Bans Are Based on Theories That Were Rejected or Disclaimed and Would Harm Consumers. ........................................................10

    B.  A Chrome Divestiture Would Be Unprecedented in Its Harmful Effects on Consumers and Unprecedented as a Legal Matter. ................................................11

    C.  The Compelled Data Disclosure and Syndication Remedies Would Divest Google of Its Intellectual Property and Clone Its Valuable Assets. ......................14

    D.  Plaintiffs' Arguments Regarding GenAI Confirm That Their Proposed Remedies Are Unjustified and Would Stifle Innovation. ......................................17

    E.  Plaintiffs' "Additional" Remedies Should Also Be Rejected. ...............................18

    F.  Plaintiffs' Proposed Technical Committee Is Unlawful and Their RPFJ Is Incompatible with Precedent, Rule 65, and the Constitution. ................................23

    G.  The Duration of the Decree Should Be Three Years. ...........................................25

## TABLE OF AUTHORITIES

### CASES

*Epic Games, Inc. v. Google LLC*, Nos. 24-6256, 24-6274 (9th Cir.) ............................................25

*In re Google Play Store Antitrust Litig.*, No. 21-md-0298, (N.D. Cal. Oct. 7, 2024) ..................25

*Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242 (1959) ...........................................7

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc) .................... *passim*

*M.G. through Garcia v. Armijo*, 117 F.4th 1230 (10th Cir. 2024) .................................................24

*M.G. through Garcia v. Scarse*, 2023 WL 3686751 (D. N.M. May 26, 2023) ............................25

*NCAA v. Alston*, 141 S. Ct. 2141 (2021) .................................................................................18, 19

*New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002) ........................................ *passim*

*Schine Chain Theaters v. United States*, 334 U.S. 110 (1948) .......................................................7

*United States v. Apple, Inc.*, 2013 WL 4774755 (S.D.N.Y. Sept. 5, 2013) ...................................25

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) ...........................................................25

*United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982) .......................................................12

*United States v. Crescent Amusement Co.*, 323 U.S. 173 (1944) .................................................12

*United States v. Google LLC*, 687 F. Supp. 3d 48 (D.D.C. 2023) .................................................13

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) .......................................... *passim*

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) .................................................10

*United States v. Microsoft Corp.*, 147 F.3d 935 (D.C. Cir. 1998) ...........................................22, 24

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000) .............................................11

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) .......................... *passim*

*United States v. Microsoft Corp.*, 231 F. Supp. 2d 144 (D.D.C. 2002) ........................................23

*United States v. United Shoe Machinery Corp.*, 391 U.S. 244 (1968) .........................................12

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ...........8, 14

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969) .................................................9

### STATUTES, RULES, AND OTHER AUTHORITIES

Fed. R. Civ. P. 65 ....................................................................................................19, 21, 23, 24

Sherman Act Section 2, 15 U.S.C. § 2 .............................................................................. *passim*

3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (1996) ......................................................4

Robert W. Crandall, *The Failure of Structural Remedies in Sherman Act Monopolization
Cases*, 80 Ore. L. Rev. 109 (2001) ........................................................................................12

**ABBREVIATIONS**

| CITATION | CORRESPONDING FILING OR TRANSCRIPT |
|---|---|
| COL | Google's Proposed Conclusions of Law (Remedies Phase) Dated May 16, 2025 (ECF 1347). |
| PCOL | Plaintiffs' Remedies Post-Trial Brief Dated May 16, 2025 (ECF 1348). |
| FOF | Google's Proposed Findings of Fact (Remedies Phase) Dated May 16, 2025 (ECF 1346). |
| RFOF | Google's Responsive Proposed Findings of Fact (Remedies Phase) Dated May 23, 2025. |
| PFOF | Plaintiffs' Remedies Proposed Findings of Fact Dated May 16, 2025 (ECF 1349). |
| Pls.' RPFJ Summary | Executive Summary of Plaintiffs' Revised Proposed Final Judgment Dated March 7, 2025 (ECF 1184). |
| Pls.' RPFJ | Plaintiffs' Revised Proposed Final Judgment Dated March 7, 2025 (ECF 1184-1). |
| Tr. | Transcript of the Evidentiary Hearing on Remedies Conducted from April 21 to May 9, 2025. |
| Motorola Amicus Br. | Brief of Amicus Curiae Motorola Mobility, LLC Dated May 9, 2025 (ECF 1335). |

## I.    PLAINTIFFS' RPFJ IS PREMISED ON A SERIES OF LEGAL ERRORS.

### A.    Plaintiffs Have Not Established the Causal Connection Required for Their Overreaching Proposals.

A threshold issue that cuts across Plaintiffs' proposals is their failure to establish "a clearer indication of a ***significant causal connection*** between" the specific conduct the Court deemed unlawful and the "maintenance of the market power" in the two relevant markets. *United States v. Microsoft Corp.*, 253 F.3d 34, 106 (D.C. Cir. 2001) (en banc). Plaintiffs' only arguments on this point misconstrue precedent and the Court's liability opinion. And perhaps most telling, Plaintiffs have retreated from their prior reliance on case law discussing circumstances where a plaintiff may seek remedies to "terminate" a defendant's monopoly status, now asserting the Court "need not resolve this issue" because their radical proposals are nonetheless otherwise justified. PCOL at 6. But Plaintiffs' proposals have always been about terminating Google's monopoly status through forcibly shifting share to rivals, and their latest effort to justify them (*e.g.*, by denying the supposed "fruits" of the conduct) lacks any legal basis.

#### 1.    Plaintiffs Offer No Evidence of the Causal Connection Necessary to Support Their Remedy Proposals.

Plaintiffs admit that "more severe remedies necessitate 'a clearer indication of a significant causal connection between the conduct and the creation or maintenance of market power.'" *Id.* at 11 (quoting *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 102 (D.D.C. 2002)). But instead of providing any such evidence, Plaintiffs double down on their claim that "the existing record from liability and this Court's findings already establish a significant causal connection between Google's conduct and its monopoly." PCOL at 10. This assertion ignores that Plaintiffs expressly argued during the liability phase that the Court should "infer causation," and the Court applied ***only*** that more "relaxed" standard. *United States v. Google LLC*, 747 F. Supp. 3d 1, 153 (D.D.C. 2024); *see* COL at 18-19.

1

Plaintiffs pledged in their opening statement that they would address causation "much more in [the] post-trial conclusions of law [and] post-trial findings of fact" and suggested the Court could "make additional findings" because Plaintiffs were "going to submit those to Your Honor." Tr. 9:17-11:17. Yet the pertinent section of Plaintiffs' brief cites *only two* proposed findings from the remedies phase. PCOL at 8-10. One of the cited findings asserts that "[i]t is not possible to predict precisely what the world would have looked like but-for Google's conduct," and the other avers (based on a single reference to expert testimony) that "Google's distribution partners requested more flexibility than Google offered." PFOF ¶¶ 242, 246. The 11 paragraphs of Plaintiffs' proposed findings addressing causation primarily cite to the Court's liability opinion, and they cite only a single snippet of fact witness testimony that is devoid of detail and adds nothing to the record. *Id.* ¶¶ 236-46. Plaintiffs' latest approach to causation is a complete retreat. They offer no evidence on this crucial point, and instead insist that the Court (1) disregard that Plaintiffs asked the Court to "infer causation" and (2) reinterpret its liability opinion using a standard that was not and could not possibly have been applied.

### 2.    Plaintiffs Attempt to Distinguish *Microsoft*, But Their Arguments Support Google's Position.

Plaintiffs' attempt to distinguish *Microsoft* in a footnote actually supports Google's position. First, Plaintiffs contend the *New York* court expressed concerns about the usefulness of Professor Murphy's causation opinions. PCOL at 10 n.1. His opinions here are different than in *New York*, but that is immaterial because the *New York* court **rejected** numerous remedies that required more than an inference of causation and were less extreme variations of Plaintiffs' RPFJ, including proposals for forced disclosure of assets and intellectual property, payment bans, regulation of emerging products outside the relevant markets, and other provisions not closely related to the exclusionary conduct. *E.g.*, COL at 27, 40, 55, 63, 65.

Second, Plaintiffs incorrectly assert "this Court's findings are stronger than" *Microsoft* "even when using similar wording" because the conduct in *Microsoft* "targeted out-of-market products where the potential to compete with the monopoly one day could be known only by inference," while this case involves "actual, in-market competition."  PCOL at 10 n.1.  Plaintiffs again ignore that they asked the Court to apply the "toothless" causation standard, and the Court applied ***only*** that standard.  COL at 18-19; *Google*, 747 F. Supp. 3d at 153 (stating "an inference" of causation "is appropriate when exclusionary conduct is aimed at producers of established substitutes" (cleaned up)).  The fact that *Microsoft* involved nascent out-of-market threats—where monopoly causation evidence may be more speculative—did not stop the court from requiring a ***"significant causal connection"*** for drastic remedies.  253 F.3d at 106.  Indeed, because the GSEs that were purportedly excluded in this case are not "nascent," Plaintiffs' failure to prove but-for causation is not due to "uncertainty" about future technological developments (*i.e.*, would a browser develop into a sufficient middleware platform threat to erode the applications barrier to entry and result in greater operating system competition). Plaintiffs' failure of proof follows extensive document and deposition discovery from every major browser developer (*e.g.*, Apple and Mozilla), Android OEM (Samsung and Motorola), and wireless carrier (AT&T, T-Mobile, and Verizon) in the U.S. about their product designs.  This record yielded no evidence that any third party wanted to preload or set as a default a rival search engine instead of Google (or wanted to preload or promote a rival in addition to Google).  And there is zero evidence that Apple would have developed its own GSE if Google had entered a non-exclusive default agreement for the Safari browser.  FOF §§ I, II.A.4; RFOF §§ III, V.D.

### 3.    The Causation Requirement Is Not Limited to Structural Relief.

Because there is no evidence of the "significant causal connection" required for Plaintiffs' proposals, they incorrectly suggest this standard only needs to be met for "structural

3

remedies." *See* PCOL at 11. Plaintiffs assert that Google is "pushing" *Microsoft* "to an illogical extreme" by pointing out "that the heightened causation standard applies to every remedy other than an injunction against the exclusionary conduct." *Id.* at 13. But that is precisely what the D.C. Circuit said in *Microsoft*: "Absent such causation, the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'" 253 F.3d at 106 (quoting 3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 650a, at 67 (1996)).

Plaintiffs contend this holding is taken "out of context" because it was "part of instructions for the district court to follow" in considering "whether the use of the structural remedy of divestiture is appropriate." PCOL at 13 (emphasis omitted). But Plaintiffs argued in their opening statement that the first sentence of the very same paragraph of *Microsoft* is "the piece that [Plaintiffs] think is controlling." Tr. 10:9-25; *see Microsoft*, 253 F.3d at 106. It takes a strained reading to suggest the first sentence of a paragraph is controlling while the final sentence—which refines and applies the same instruction—is inapposite.

In all events, the subsequent proceedings in *Microsoft* rebut Plaintiffs' claim that a "significant causal connection" is necessary to support only "a proposed structural remedy" and "is inapplicable when the Court analyzes proposed behavioral remedies." PCOL at 13-14. On remand the court confirmed it "must assess the strength of the causation evidence that established liability and tailor the relief accordingly." *New York*, 224 F. Supp. 2d at 102. The court then ***rejected*** numerous non-structural remedies, including by applying the "but for" reasoning that Plaintiffs resist. *E.g.*, *id.* at 262; *see Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1232 (D.C. Cir. 2004) (en banc).

Finally, Plaintiffs are incorrect that "*Massachusetts* suggests … that only certain structural remedies require a clearer indication of [a] significant causal connection." PCOL at

11.  In summarizing *Microsoft*, the *Massachusetts* court stated in open-ended fashion that "a drastic remedy, ***such as*** divestiture, would be inappropriate if Microsoft's dominant position in the operating system market could not be attributed to its unlawful conduct."  373 F.3d at 1231 (emphasis added).  And the court applied that heightened standard to a remedy that would "work a 'de facto divestiture.'"  *Id.* at 1228, 1233 (dismissing an argument that "the district court erred in applying a 'stringent but-for test' of causation" in analyzing a proposal to "open-source IE").

### 4.    Plaintiffs Misconstrue Google's Position and Fail to Apply Their Own Standard.

Plaintiffs misconstrue Google's position by suggesting they need not show "that the conduct was the cause of the monopoly altogether."  PCOL at 12.  The key point in this respect—which Plaintiffs do not rebut—is that the remedy in a monopoly maintenance case must reflect the extent to which the continuation of the monopoly was attributable to the exclusionary conduct, as opposed to lawfully obtained advantages that would have persisted if not for the conduct.  COL at 4-7, 19-24.  As Plaintiffs acknowledge, at a minimum there must be "a proportionality between the strength of the evidence of the causal connection and the severity of the remedy."  PCOL at 11 (quoting *New York*, 224 F. Supp. 2d at 102).

Although Plaintiffs concede this standard applies, ***none*** of their proposals reflects the requisite "proportionality."  Throughout their brief, Plaintiffs claim that Google should not be "able to maintain the advantages [it] has gained through illegal conduct."  *E.g.*, PCOL at 31.  But Plaintiffs have never distinguished any such "advantages" from the advantages that Google lawfully obtained before the monopoly maintenance period and indisputably would have lawfully continued to accrue, including through non-exclusive distribution.  COL at 19-24, 53-54.  Plaintiffs repeatedly propose draconian remedies prohibiting lawful conduct despite offering no evidence of the "causal connection" they admit is necessary.  PCOL at 11.

**5.    Plaintiffs Concede They Cannot Support the Notion That the Court Should Seek to "Terminate the Monopoly."**

Finally, because Plaintiffs have not shown that the lawfully acquired monopolies would have terminated if not for the exclusive dealing identified in the liability opinion, the Court should not impose remedies designed to do that.  COL at 4-7.  Plaintiffs assert for the first time that "[t]he Court need not resolve" whether "terminating the illegal monopoly is inappropriate in this matter."  PCOL at 6.  Plaintiffs' proposals, however, are very much based on that impermissible objective.  *E.g.*, Pls.' RPFJ Summary at 5 ("The remedy must . . . 'terminate the illegal monopol[ies].'").  If the objective is not to "terminate the monopoly" by reallocating market share, then there is no justification for many of Plaintiffs' proposals, including payment bans that allegedly "would shift roughly 31% of U.S. queries" to inferior rivals or a Chrome divestiture that "would likely result in at least a 7% share shift."  PCOL at 30, 35.

**B.    Plaintiffs Have Failed to Identify or Quantify the "Fruits" of the Violation.**

Because Plaintiffs cannot meet the causation standard necessary for their remedies, they attempt to justify the proposals by asserting that they are directed to "the fruits" of the "statutory violation."  PCOL at 5.  Plaintiffs' argument is just "termination of the monopoly" by another name, and, in any event, they still must establish causation.  "[T]he fruits of a violation ***must be identified*** before they may be denied," and the Court must peer "'into the record far enough to be confident' what had been identified as fruits were actually ***'the products of the unlawful practices*.'"  *Massachusetts*, 373 F.3d at 1232 (emphasis added).  Plaintiffs repeatedly argue the Court should "deprive" Google of "advantages … gained through its illegal monopoly maintenance."  *E.g.*, PCOL at 75.  But nowhere do Plaintiffs comply with D.C. Circuit law by identifying and quantifying the "advantages" purportedly gained from the exclusivity provisions identified in the liability opinion, as opposed to the substantial advantages in these same areas

that Google indisputably obtained through lawful means, including before the monopoly maintenance period even began. *Massachusetts*, 373 F.3d at 1226, 1232.

Plaintiffs also contend their proposals would "bring down the barriers that Google artificially raised for more than a decade." *E.g.*, PCOL at 31, 74. Again, however, Plaintiffs have not shown that any aspect of the "barriers" identified by the Court—such as "brand recognition" and "scale"—arose from the unlawful conduct, and it is beyond dispute that all of those natural "barriers" were in place and would have existed even without the exclusivity terms. COL at 19-24. As *Massachusetts* held: "it does not follow that, because a proposed requirement could reduce the applications barrier to entry, it must be adopted" because "the applications barrier to entry arose only in part because of Microsoft's unlawful practices." 373 F.3d at 1226.

Plaintiffs cite ancient cases discussing the "fruits" of illegal conspiracies that have no bearing here. *E.g.*, PCOL at 5. As *Massachusetts* explained, cases involving combinations or conspiracies were "not analogous to Microsoft's monopoly of the market for operating systems, which is due not only to the exclusionary practices [the court] found unlawful … but also to 'positive network effects.'" 373 F.3d at 1212. Plaintiffs again suffer a complete failure of proof, as their proposals do not reflect the extent to which Google's position in the Court's relevant markets is—or, more accurately, is not—attributable to the "exclusionary practices." *Id.*[1]

---

[1] Although cases involving unlawful conspiracies are inapposite in the monopoly maintenance context, even one of the cases Plaintiffs cite most frequently—*Schine Chain Theaters v. United States*, 334 U.S. 110 (1948)—illustrates why Plaintiffs' approach is contrary to law. In *Schine*, the Court reversed the divestiture of theaters because the trial court "did not determine what dividends Schine had obtained from the conspiracy"; in other words, its "findings" did not "reflect an inquiry to determine what theatres had been acquired by Schine through methods which violate the Act" and "which in whole or in part were lawfully acquired." *Id.* at 127-29. In the other case cited by Plaintiffs, the unlawful conduct included acquisitions and the use of ownership of certain boxing venues to further an unlawful conspiracy—conduct not at issue in the present case. *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 256-57 (1948).

In short, Plaintiffs' proposals defy *Massachusetts* by attempting to depict every drastic remedy—including Chrome divestiture, compelled syndication, and forced data disclosures—as targeting the "fruits" of the violations. The *Massachusetts* court rejected less invasive versions of those proposals and addressed the same failed arguments about "fruits." 373 F.3d at 1232-33; *see* COL at 6, 27, 38-39, 47-48. The D.C. Circuit concluded the trial court's analysis of the "fruits" of Microsoft's violations—which were clearly more wide-ranging than the violations at issue here—"properly focused … upon opening the channels of distribution to" the "makers of rival middleware." *Massachusetts*, 373 F.3d at 1229. Google's PFJ likewise focuses on the distribution channels related to the agreements identified in the Court's opinion. COL at 11-16.

## C.    Plaintiffs' "Remedy Package" Seeks Forced Parity That Is Contrary to Law and Not Even Supported by Their Own Expert Economist.

Plaintiffs' proposals ultimately are not grounded in the law or even their own economist's opinions, but rather in the unprecedented notion that the Court should create an artificial world where "all market participants will be poised to compete on a level playing field without restriction." PCOL at 22. This is an even more radical version of "terminating the monopoly"— an objective that indisputably cannot be pursued here. *See id.* at 6; COL at 4-7. In any market, one firm may develop lawful advantages over another because of more capital, better ideas, network effects, more efficient distribution, or countless other ways of "establishing an infrastructure that renders [it] uniquely suited to serve [its] customers." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). In this case, Google unquestionably obtained significant advantages—and substantial shares of Plaintiffs' relevant markets—through lawful means. COL at 19-24. There is *zero* evidence that "all market participants" would have been "on a level playing field" in any but-for world because that was not true before the monopoly maintenance period and it is not true of markets generally. The

cases Plaintiffs cite **rejected** forced parity as impermissible "market engineering" and endorsed "restoring conditions in which the competitive **process** is revived." *Massachusetts*, 373 F.3d at 1231-32 (emphasis added); *see, e.g.*, *New York*, 224 F. Supp. 2d at 261-62. Even Plaintiffs' expert economist agreed that "the goal" should be "to allow competition to **resume to where it would have been without the conduct**" deemed unlawful. Tr. 2206:16-24 (Chipty).

Plaintiffs' proposals bear no relation to reviving or resuming the competitive **process**. Instead, Plaintiffs seek to prevent Google from engaging in lawful competition for non-exclusive distribution in Search and GenAI, convert Google Search into a public utility for "Qualified Competitors" to draw from, and strip Google of the browser it built from the ground up in the hopes of shifting share to a rival search engine. There is no support in the law or the record for any of these extreme interventions, which are based on a deeply flawed objective that would not be appropriate under any circumstances and are especially inapt in a monopoly maintenance case where the only exclusionary conduct identified by the Court was exclusive dealing.

### D. Plaintiffs' Other Principles Do Not Support Their RPFJ or Are Misstated.

Plaintiffs' other principles neither support their RPFJ nor support broader relief than is found in Google's PFJ. The *Microsoft* courts pursued objectives including "unfettering" the markets "from anticompetitive conduct," "pry[ing] open" the markets "to competition," and "ensuring" there "remain no practices likely to result in monopolization." PCOL at 4-6; *see, e.g.*, *New York*, 224 F. Supp. 2d at 100, 108, 153. Sound application of those principles led the courts to **reject** less invasive versions of Plaintiffs' proposals. *E.g.*, COL at 27, 35-37, 54-55.

Plaintiffs are incorrect that "[a] remedy may not only prohibit 'acts which are of the same type or class as the unlawful acts.'" PCOL at 7 (cleaned up) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969)). The phrase "may not only" does not appear in *Zenith* or any other cited case. To the contrary, "[e]ven where the government has proved

antitrust violations at trial, the remedies *must* be of the 'same type or class' as the violations." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (emphasis added).

Finally, while Plaintiffs argue that the Court "has wide latitude in selecting remedies," PCOL at 3, they do not acknowledge the extent to which their proposals are foreclosed as a matter of law. Nor do they acknowledge the D.C. Circuit's rejection of analogous proposals, including under circumstances where the court made clear it would have been an abuse of discretion to adopt the remedy. *E.g.*, *Massachusetts*, 373 F.3d at 1219 (affirming rejection of a proposal that "would allow" rivals to "'mimic' the functionality of Microsoft's products" because "not even the broad remedial discretion enjoyed by the district court extends to the adoption of provisions so likely to harm consumers").

## II.    PLAINTIFFS' PROPOSED REMEDIES ARE CONTRARY TO LAW.

### A.    The Proposed Payment Bans Are Based on Theories That Were Rejected or Disclaimed and Would Harm Consumers.

Plaintiffs' brief highlights how their proposed payment bans "ignore[] the theory of liability in this case." *Id.* at 1228. By attempting to bar payments for non-exclusive distribution, Plaintiffs are relitigating their "dramatic post-trial shift," where they argued "[u]nexpectedly, for the first time post-trial, … that the court should eschew considering the agreements through the lens of exclusivity." *Google*, 747 F. Supp. 3d at 146 (cleaned up). The Court noted that "[f]rom the outset, Plaintiffs have framed this case as one about exclusive dealing" and concluded that "*Microsoft* compels application of the exclusive dealing framework." *Id.* Having brought a case challenging *exclusivity*, Plaintiffs cannot now seek to bar all payments for *non-exclusive* distribution, particularly given the lack of causation discussed above.

Plaintiffs' arguments only reinforce that the payment bans would "impermissibly threaten[] to interfere with ordinary and legitimate commercial practices inherent in [Google's]

10

participation in the … industry." *New York*, 224 F. Supp. 2d at 137. Every OEM, carrier, and browser developer in this case made clear it expects to be paid for distribution and promotion because their recommendations are valuable and they use the revenue to fuel innovation and deliver value to their customers. FOF §§ II.A.1, II.B, II.C; RFOF §§ V.C, V.D. It is thus no surprise that Apple insisted on compensation from OpenAI, PCOL at 25, just as Samsung did for non-exclusive promotion of Gemini, *id.* at 18. Banning Google from competing for non-exclusive distribution would harm consumers by restraining lawful, procompetitive conduct that Plaintiffs did not challenge. *E.g.*, *Google*, 747 F. Supp. 3d at 172 (distinguishing "a non-exclusive default" and confirming Plaintiffs are challenging only "contracts that require counterparties to set Google as the exclusive search default"); *see* FOF § I.B; RFOF § V.G.

The very first page of Plaintiffs' brief further underscores the absence of support for their proposed payment bans. Plaintiffs excerpt a statement that "Microsoft paid vast sums of money" to "help enhance Internet Explorer's share of browser usage," *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 44 (D.D.C. 2000), as if to suggest that stopping those payments somehow "pave[d] the way for new companies such as Google." PCOL at 1. Notably, however, the remedy in *Microsoft* did ***not*** prohibit it from paying OEMs to promote IE, and in fact the court held that a "complete ban" would be "absurd" because "it prohibits routine, procompetitive business practices." *New York*, 224 F. Supp. 2d at 216; *see Massachusetts*, 373 F.3d at 1226-27.

### B.    A Chrome Divestiture Would Be Unprecedented in Its Harmful Effects on Consumers and Unprecedented as a Legal Matter.

A Chrome divestiture would be unprecedented in its technical complexity and the magnitude of the harm inflicted on consumers. FOF §§ III.C, D, E; RFOF §§ VI.A, B. It would also be unprecedented as a legal matter. Plaintiffs rely almost entirely on cases involving the break-up of illegal conspiracies or unlawful acquisitions where ownership of the assets or

11

business to be divested was integral to the unlawful conduct.  *E.g.*, PCOL at 7-8.  As one of Plaintiffs' cases puts it, "[d]issolution of the combination will be ordered where the creation of the combination is itself the violation."  *United States v. Crescent Amusement Co.*, 323 U.S. 173, 189 (1944).  All of these cases are plainly inapposite.  *See Microsoft*, 253 F.3d at 105-06.

Although *United States v. United Shoe Machinery Corp.*, 391 U.S. 244 (1968), was a monopolization case, it provides no support for Plaintiffs' position.  As Plaintiffs' account indicates, the conduct there involved a host of "practices"—such as "patent acquisitions" and mergers—that were far more expansive than the distribution agreements at issue here.  PCOL at 37.  Crucially, the Court's express directive was "to assure the complete extirpation of the illegal monopoly," *United Shoe*, 391 U.S. at 251, which is an objective Plaintiffs concede cannot be pursued here.  *See* PCOL at 6; COL at 4-7.  The negotiated resolution in *United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982), also is hardly a model to follow.  While that "decree was in force," the district court "was essentially a … telecommunications sector regulator," and the "divestiture provisions in the AT&T decree … probably added to market concentration" rather than reducing it.  Robert W. Crandall, *The Failure of Structural Remedies in Sherman Act Monopolization Cases*, 80 Ore. L. Rev. 109, 184, 189 (2001).

Moreover, the factual distinctions between these cases and a Chrome divestiture could not be more stark.  Google built Chrome from the ground up, and it became the most popular browser in the U.S. before the monopoly maintenance period.  FOF § III.A.  It is remarkable that in a case where the only unlawful conduct is exclusive dealing, Plaintiffs highlight "Chrome's popularity … on the Windows operating system" (where Edge is exclusively preinstalled) and observe that it is "growing rapidly" on iOS (where Safari is exclusively preinstalled).  PCOL at 31-32.  A Chrome divestiture would be a drastic and impermissible punishment for building a

12

popular product from scratch, and it would "set[] the bad precedent that the fruits of R & D and development investments can be expropriated on the grounds that it would help competitors compete in a complementary product market." *New York*, 224 F. Supp. 2d at 244 (cleaned up).

Plaintiffs' arguments about the purported "centrality of Chrome to Google's monopolies" are badly misplaced, as they rest on lawful, unchallenged conduct. PCOL at 33. Setting Google Search as the default in Chrome was "not alleged to be exclusionary conduct," *Google*, 747 F. Supp. 3d at 120, and integrating Gemini into Chrome also has not been (and could not be) challenged because it is a product improvement of the same kind that other browser developers such as Microsoft are making by incorporating their AI services into their browsers. RFOF § VI.C. When Plaintiffs filed their complaints, they could have pursued a theory that Google was "using Chrome as a tool to unfairly advantage its search product," PCOL at 36, as Chrome was just as popular then and has always been a proprietary Google browser with Google Search as the default. If they had made such a claim, Google would have raised a raft of meritorious defenses, as it did in response to Plaintiffs' other claims that sounded in "self-preferencing" and that this Court rejected.[2] Especially when it comes to a drastic remedy such as divestiture, Plaintiffs should not receive the benefit of a claim they intentionally decided not to pursue and could not have proved. *See, e.g.*, *New York*, 224 F. Supp. 2d at 174 ("[A]llegations must be subjected to the rigorous four-part test outlined by the appellate court … before the Court can find that Microsoft's conduct violates antitrust law and demands a remedy.").

---

[2] *E.g.*, *Google*, 747 F. Supp. 3d at 181 (entering judgment for Google on claim that "Google has prioritized and advantaged its own ad platform, Google Ads, over Microsoft's ad platform on SA360"); *United States v. Google*, 687 F. Supp. 3d 48, 87 (D.D.C. 2023) (entering summary judgment on claim that "Google has chosen to include important features and functionality in Google's own ecosystem of proprietary apps").

Finally, Plaintiffs do not rebut the overwhelming evidence that a Chrome divestiture would harm users, businesses, governments, and other browser developers.  No citation supports their meek assertion that "there is no evidence to suggest that it will be *worse*," PCOL at 39, and in fact there is extensive evidence of the harms that would occur.  FOF § III.D; RFOF § VI.A.

### C.    The Compelled Data Disclosure and Syndication Remedies Would Divest Google of Its Intellectual Property and Clone Its Valuable Assets.

Plaintiffs' data disclosure and syndication proposals are the largest and most complex proposals for expropriation of assets, intellectual property, and user data in the history of U.S. antitrust law.  Yet Plaintiffs do not address any of the precedent explaining why compelled data disclosure or syndication stifles investment and innovation.  *E.g.*, *Trinko*, 540 U.S. at 407-08; *Massachusetts*, 373 F.3d at 1218-19.  Nor do they offer any reliable economic evidence, as their expert economist did not "know what specific data" would need to be disclosed and could not offer "an opinion on data disclosures and how to draw that line," despite admitting that disclosing too much data can impair innovation.  Tr. 2234:18-36:12 (Chipty).  And instead of addressing the enormous privacy implications of their RPFJ, Plaintiffs offer an abstract overview of what is "possible," without explaining what the Court actually should do.  PCOL at 47-48.

While any of these reasons would be sufficient to reject Plaintiffs' radical proposals, they should also be rejected because they are contrary to *Massachusetts*.  Plaintiffs attempt to distinguish this case by arguing that their forced data disclosure and syndication proposals are not "structural," but the only real distinction is that they would be ***more*** draconian.

First, Plaintiffs contend their proposal "does not permanently transfer any rights" because "the data sharing and syndication remedies proposed by Plaintiffs are limited to the period of the judgment."  PCOL at 50-51.  This flawed argument ignores that the data disclosure and syndication provisions require Google to divulge its trade secrets, thereby irrevocably giving the

recipients the same kind of "royalty-free, perpetual right" condemned in *New York* and *Massachusetts*. *Id.* at 50. Rivals would not "unlearn" all of Google's trade secrets when the decree ends. *See Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1185 (10th Cir. 2014) ("When someone steals a trade secret and discloses it to a competitor he effectively assumes for himself an unrestricted license in the trade secret…. After all, what value does a trade secret hold when it's no longer a secret from the trade?"). Plaintiffs' proposals are more severe than those rejected in *Massachusetts* because Google would not only be required to disclose its presently existing intellectual property but also many of its new innovations in areas such as indexing and ranking for many years to come. In this regard, Plaintiffs' RPFJ goes far beyond a one-time disclosure of the URLs for each webpage in Google's search index (without all of the proprietary signals specified in Plaintiffs' proposal)—a disclosure that would not raise nearly the same intellectual property challenges as Plaintiffs' demands for search ranking signals and the Knowledge Graph. RFOF § VII.A ¶¶ 147-50.

Plaintiffs also assert that their proposals "do not require disclosure of Google's raw intellectual property." PCOL at 51. Plaintiffs do not say what they mean by "raw" intellectual property, but their argument fails under any definition. It is difficult to conceive of clearer examples of intellectual property than proprietary "quality measures" Google assigns to webpages, "information sufficient to recreate Google's Knowledge Graph," or "[d]ata sufficient to understand the … ranking of all items or modules on the SERP." Pls.' RPFJ §§ VI.A, VII.A.

Plaintiffs next contend that "the data and the syndication are not 'free.'" PCOL at 51. But that was true of the proposal to require Microsoft to "auction" Microsoft Office licenses, which would have allowed Microsoft to earn revenue from the auction and to continue selling Office to its customers. *New York*, 224 F. Supp. 2d at 241. The courts nevertheless described it

as "impos[ing] a forced divestiture of assets" and treated it as a structural remedy subject to the heightened causation standard. *Id.* at 186, 241; *see Massachusetts*, 373 F.3d at 1232. Here again, Plaintiffs' proposals go far beyond what occurs in commercial syndication agreements— the provision of Google "blue link" organic search results with appropriate search query rate limits and express prohibitions on use for reverse engineering of Google's intellectual property, provided at negotiated commercial rates. RFOF § VIII.C.[3]

Plaintiffs also assert "that Qualified Competitors will not be able to reverse engineer and replicate or clone Google Search." PCOL at 52. This is incorrect as a factual matter, as demonstrated by the fact and expert witnesses who testified in the remedies hearing. FOF §§ V.C.1; V.E.2; RFOF §§ VII.C.3; VIII.B. But even if it were true that the proposal would not result in cloning Google Search, the RPFJ would require disclosure of key components of Google Search (such as the Knowledge Graph) and the provision of proprietary Google SERPs (through both forced sharing of the "Glue" data and syndication). *Massachusetts* and *New York* condemned even "partial" disclosures of Microsoft's proprietary assets. *E.g.*, *Massachusetts*, 373 F.3d at 1228 (rejecting a proposal that Microsoft "disclose the internal architecture of the Media Bar" so that competitors can "create their own versions" of this component of IE).

Finally, Plaintiffs' proposals are contrary to law even if they envision that recipients of these unprecedented handouts would "differentiate themselves from Google." PCOL at 52. *Massachusetts* condemned forced disclosures not only because they would allow rivals "to

---

[3] While syndication of search results raises significant IP concerns—which Google addresses in practice through express contractual and technical restrictions on the features, query volumes, storage, and reformatting rights it offers to its partners as well as the ability to select partners— such syndication does not inherently raise the privacy concerns discussed by various witnesses during the remedies trial because the queries and other private information (*i.e.*, location and click behavior) are those of people using the syndication partner's services, not Google's.

'mimic' the functionality of Microsoft's products," but also because rivals could "develop products that implement Microsoft's Windows technology at a far lower cost than Microsoft itself since they would have access to all of Microsoft's research and development investment." 373 F.3d at 1219 (cleaned up).  That is unquestionably what Plaintiffs propose, as they argue that "[r]equiring Google to offer text ads syndication 'would provide a built-in business model'" and "Search Index sharing remedies will accelerate the development of rival search indexes."  PCOL at 42, 45.  The fact that rivals would free ride on ongoing access to Google's proprietary innovations is not a virtue, it is a (fatal) vice.  "The effect upon [Google's] incentive to innovate would be substantial; not even the broad remedial discretion enjoyed by the district court extends to the adoption of provisions so likely to harm consumers."  *Massachusetts*, 373 F.3d at 1219.

### D.    Plaintiffs' Arguments Regarding GenAI Confirm That Their Proposed Remedies Are Unjustified and Would Stifle Innovation.

Plaintiffs' cross-cutting proposals regarding GenAI should be rejected because GenAI services were excluded from the relevant markets and were not the subject of any liability findings.  COL at 59-62.  Plaintiffs' brief omits this dispositive fact, even as Plaintiffs try to explain it away by asserting that "during the liability trial in this case" GenAI "was a glimmer of an idea that had yet to take hold of the American public."  PCOL at 2.

While Plaintiffs' depiction of the state of GenAI in late 2023 is questionable, if their argument is taken at face value, then what has occurred in less than two years is remarkable.  The transformation from "a glimmer of an idea" to a world where numerous GenAI apps have millions upon millions of users happened ***without*** any of Plaintiffs' proposals.  FOF § VII.F.  While Plaintiffs correctly credit Google for developing "the backbone of LLMs," PFOF ¶ 67, there is no doubt that a range of established firms and start-ups are driving breakthroughs in GenAI quality and efficiency.  FOF §§ VII.F.  "When it comes to fashioning an antitrust remedy

… caution is key," and nothing about GenAI suggests a decade-long regulatory decree would spur innovation.  *NCAA v. Alston*, 594 U.S. 69, 106 (2021) ("Judges must remain aware that markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare."); *see Massachusetts*, 373 F.3d at 1224 (holding that a court's "discretion is necessarily less broad" when considering "a forward-looking provision").

Plaintiffs' characterizations of this "next digital frontier" also disprove their assertion that "Google's proposed remedies … would maintain the status quo."  PCOL at 2-3.  Major companies such as Apple and Motorola have integrated rival GenAI services instead of or in addition to Google's Gemini, and these firms and others testified about their plans to work with rival GenAI providers in the near future.  FOF § VII.F.3.[4]  Although Gemini is not a GSE (or a search access point), Google's PFJ extends applicable distribution prohibitions to Gemini to ensure that OEMs, carriers, and browser developers can continue preinstalling multiple GenAI assistants (or exclusively preinstall a rival GenAI service if they prefer).  COL at 14-16.  But forcing Google to refrain from competing for non-exclusive distribution or to disclose its assets and intellectual property to GenAI services—who were not even arguably harmed by the conduct identified in the Court's opinion and have thrived without any remedies in place—would be contrary to the antitrust laws, which "were enacted for the protection of competition not competitors."  *New York*, 224 F. Supp. 2d at 153, 243 (cleaned up).

### E.    Plaintiffs' "Additional" Remedies Should Also Be Rejected.

<u>The "Ads Transparency" Proposals</u>.  Plaintiffs cite no law in support of their attempt to regulate the design of Google's ads tools and reports, which were never alleged to be part of the

---

[4] The fact that Motorola is preinstalling, and Apple is in negotiations over promoting, Perplexity—a service that did not even exist three years ago—confirms both the dynamism of GenAI and the utter baselessness of Plaintiffs' assertion that Motorola, Perplexity, or anyone else "feared retaliation."  PCOL at 25, 65; *see* RFOF §§ V.C.2, 3; V.F.

exclusive dealing conduct identified in the Court's opinion and do not relate to competition in the relevant markets. COL at 66-68. Plaintiffs' brief is notable, though, in observing for the first time that "Plaintiffs are supportive of adding appropriate privacy protections to this data set," without describing any such protections (which are not referenced in the RPFJ). PCOL at 56. Plaintiffs propose that the Court regulate the granular details of Google's ads tools and reports (along with numerous other aspects of its business) for a decade. But even after extensive discovery, a three-week hearing, and the assistance of a privacy expert (who pointedly did not opine on this section of the RPFJ), Plaintiffs cannot determine what that regulation should entail. The RPFJ would not notify Google whether it should or must disclose data to all of its advertiser customers that could be used to identify which person entered specific queries. FOF §§ VIII.C, D; RFOF §§ XII.A, B. This kind of defect is fatal, as "the specificity provisions of Rule 65(d)" and "basic fairness require[] that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). And this is only one example of a substantive issue, not a mere technicality, that Plaintiffs have known about for months but have not resolved. Under the RPFJ, vexing questions will arise each time advertisers seek "new metrics," PCOL at 55, or Google improves its tools, reports, or ads auctions. "Courts reviewing complex business arrangements should … be wary about invitations to set sail on a sea of doubt." *Alston*, 594 U.S. at 107 (cleaned up).

The Colorado Plaintiffs' Public Education Fund. The Colorado Plaintiffs cite no precedent for ordering Google to pay hundreds of millions of dollars for a "public education fund" that could include paying consumers to use rival search engines. There is no such authority, and neither the Sherman Act nor principles of equity authorize this kind of monetary penalty. COL at 70-71. The Colorado Plaintiffs contend their fund would lower barriers to entry

by providing information to users, but they did not analyze the information already available or address the evidence that more information does not result in users switching away from Google. FOF § XI; RFOF § XVII.  The study they rely on to support forcing Google to pay consumers to use a rival search engine is no support at all, as it shows that users would be harmed by being induced to use a search engine they do not prefer.  FOF §§ II.A.2, XI.

The "Contingent" Remedies.  Plaintiffs' submissions do not say a word about the significant adverse effects on investment and innovation that would occur immediately if the Court were to cast doubt over Android's future with a "contingent" divestiture provision.  COL at 31-33; FOF § IV.D.  Plaintiffs' proposal would harm billions of Android users and countless businesses around the world now in furtherance of the vague and impermissible goal of "re-align[ing] Google's incentives" and "providing a deterrent effect."  PCOL at 64.  Plaintiffs submitted no evidence in support of these "contingent" proposals, and their economist had not even looked at them because she told Plaintiffs "that the Android divestiture seemed to go too far."  Tr. 2129:6-9, 2200:19-01:7 (Chipty).  The cases Plaintiffs cite did not approve such a sweeping and damaging provision that would upend an entire ecosystem, but rather placed the burden on the conspirator-defendants to provide information showing their compliance with the decree and to defend the legality of any future price-fixing terms of the kind invalidated.  *See Ball v. Paramount Pictures*, 176 F.2d 426, 428-29 (3d Cir. 1949).  And Plaintiffs' reference to a court's "authority to revisit and modify" a decree only illustrates why there is no justification for a predetermined, draconian provision that would cause immediate harm.  PCOL at 63.

The Anti-Circumvention and Anti-Retaliation Proposals.  Plaintiffs cite no precedent for their proposed "anti-circumvention" provisions, which are not based on the decrees in *Microsoft* or any other cited case.  PCOL at 65-67.  Courts have refused to enforce provisions that were

20

more targeted than Plaintiffs' sweeping proposals, which would prohibit, among other things, "any conduct substantially similar to conduct prohibited by" the decree.  Pls.' RPFJ § X.F; *see* COL at 72; *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 843 (D.C. Cir. 1985) (vacating injunction addressing "substantially similar" documents because it was "ambiguous" and "violated the specificity requirements of Rule 65(d)").  The "anti-circumvention" provisions are contrary to the law and the public interest, as they would leave Google to guess whether countless lawful business and product design determinations were covered by the decree and thereby "chill" legitimate, pro-competitive behavior.  *See, e.g.*, *New York*, 224 F. Supp. 2d at 137, 265.

Plaintiffs' "anti-retaliation" proposal is also baseless.  The *Microsoft* court entered targeted anti-retaliation provisions because the "liability findings … evidence[d] a practice by Microsoft of threatened and actual retaliation" that was itself a form of exclusionary conduct.  *New York*, 224 F. Supp. 2d at 166-67; *see Microsoft*, 253 F.3d at 78.  Even then, the court rejected broader anti-retaliation proposals and emphasized that the provisions "must be carefully drawn so as not to unduly restrict legitimate business practices" because "[s]uch restrictions can dampen competition."  *New York*, 224 F. Supp. 2d at 163-64.  There are no remotely comparable findings in this case, and the materials Plaintiffs now cite reflect only vague and groundless speculation, not threatened or actual retaliation.  PCOL at 65-66; *see* RFOF § V.F; Motorola Amicus Br. at 19 ("Motorola recently launched a new product line with multiple AI search engines included without fear of retaliation.").

The Investment Notification Requirement.  Plaintiffs' argument about the "investment notification" proposal underscores why the *Microsoft* court found a comparable provision was "so far removed from any liability in this case, it is difficult to understand the manner in which Plaintiffs believe such a provision will satisfy the objectives of an antitrust remedy."  *New York*,

224 F. Supp. 2d at 192.  Plaintiffs' authorities are consent decrees where the challenged conduct was a merger, and the "notification" requirement facilitated compliance with the conditions of the settlement that enabled the merger.  PCOL at 69.  There is no evidence that mergers or comparable deals had anything to do with the conduct in this case or that supplementing statutory law on reporting such transactions is warranted here.  RFOF § V.I.

The "Self-Preferencing" Proposals.  Plaintiffs' proposals are based on unproven allegations they never made during the liability phase and a "self-preferencing" theory the Court rejected when it was pursued by the Colorado Plaintiffs through their SA360 claim.  COL 63-65.  Moreover, their brief makes clear that they seek to impose sweeping regulation on the design of Google's products—including ones not even referenced in the Court's opinion—in order to inhibit Google from improving those products.  PCOL at 70-71.  As to the single example of AICore that Plaintiffs focus on, their "self-preferencing" claim was thoroughly debunked at the evidentiary hearing, and Plaintiffs still do not say how the Court should order Google to redesign its proprietary software that enables its proprietary on-device model (Gemini Nano) to communicate with a smartphone's processors.  FOF § VII.H.1; RFOF § VI.C.  Nor do they explain why any such Court-ordered redesign is justified given that Android smartphones indisputably can and do preload multiple on-device models that communicate with the device's processors.  FOF § VII.H.1.  Yet Plaintiffs would have the Court repeat this exercise innumerable times based on language in the RPFJ that provides no guidance and that Plaintiffs themselves cannot explain.  COL at 65-66.  Consumers benefit from the wide availability of Google's innovations, and Plaintiffs offer no basis for the Court to "oversee product design" by dictating when and how Google should make those innovations available in its proprietary products.  *United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998).

Choice Screens.  Plaintiffs barely mention their proposal to force Google to pay an amount that could exceed a billion dollars for Android OEMs and carriers to create choice screens, and they certainly do not provide any legal support for this provision, which would not have resulted from competition and would amount to an impermissible penalty.  COL at 57-58.  Nor do they cite any authority for compelling Google to create choice screens on its own proprietary devices such as Google Pixel—yet another example of Plaintiffs seeking to regulate lawful conduct they chose not to challenge.  *Id.*  Plaintiffs' justification is, however, telling.  *See* PCOL at 28.  They recognize that the RPFJ would destroy Google's incentive to invest in the Android ecosystem, not least because it might be divested in a few years.  But they fear that will drive Google to focus on proprietary Pixel devices instead, so they seek to make investing in those devices less attractive by saddling them with multiple choice screens.  *Id.*  Consumers would bear the brunt of the harm from this misguided attempt to create forced parity by lowering the ceiling on investment and innovation.  And all of this would harm competition between Android and Apple devices—an issue that none of Plaintiffs' experts considered.  FOF § II.B.

## F.    Plaintiffs' Proposed Technical Committee Is Unlawful and Their RPFJ Is Incompatible with Precedent, Rule 65, and the Constitution.

Plaintiffs' proposed Technical Committee (TC) bears no resemblance to the entity appointed in *Microsoft*, "which serve[d] to 'assist in *enforcement of and compliance with' the terms* of the consent decree."  *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 196 (D.D.C. 2002) (emphasis added).  Unlike in *Microsoft*, where the specific terms to be enforced and complied with appeared in the final judgment, Plaintiffs envision that Plaintiffs themselves and their TC will make up the terms as they go along.  *E.g.*, COL at 30, 43-44, 72-73.

Plaintiffs cite no law supporting their assertion that "[t]he Court can set … the parameters of the remedy and allow technical experts under its auspices and direction to implement them."

PCOL at 68.  Rule 65(d), the Due Process Clause, and Article III do not permit such an arrangement.  COL at 72-74.  Plaintiffs also do not cite their RPFJ to support that assertion because it is not what the RPFJ says.  The decree does not propose appointing technical experts to advise the Court; rather, it proposes that **Plaintiffs and a TC working at Plaintiffs' direction** would determine Google's substantive rights on matters as consequential as which assets would be divested, which proprietary ranking signals would be forcibly disclosed at marginal cost, and which privacy measures, if any, would be applied to highly sensitive user data.  *E.g.*, Pls.' RPFJ §§ III.B, F, U; VI.A, C.  The RPFJ does not provide for judicial oversight of these discretionary determinations, but even if that concept were introduced, it would be patently insufficient because "even the temporary subjection of a party to a Potemkin jurisdiction so mocks the party's rights as to render end-of-the-line correction inadequate."  *Microsoft*, 147 F.3d at 954.

Plaintiffs' unprecedented arrangement cannot be justified on the ground that "this case implicates extensive conduct."  PCOL at 67.  For one thing, the statement is inaccurate, as the only exclusionary conduct identified by the Court was exclusivity terms in a discrete number of written agreements.  For another, the plaintiffs in cases involving far more extensive conduct (such as *Microsoft*) were able to craft enforceable decrees without reserving for themselves or a TC the right to determine crucial details later.  Plaintiffs also cannot excuse their obligation to comply with precedent, Rule 65(d), and the Constitution by arguing that implementation "will require technical expertise that the parties and the Court lack."  PCOL at 73.  In the case Plaintiffs cite, the court noted "the injunction's preliminary nature," yet it still described what the defendants needed to do and enumerated steps they could take to comply with the obligation while giving **the defendants** discretion to take different steps based on what "had been successful or unsuccessful" for them in the past.  *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1250-51

(10th Cir. 2024); *see M.G. through Garcia v. Scarse*, 2023 WL 3686751, at \*22-23 (D.N.M. May 26, 2023).  Here, Plaintiffs conducted years of discovery and worked with scores of expert and third-party witnesses before submitting their RPFJ, yet they still seek to reserve vast discretion ***for themselves and their TC*** to dictate Google's obligations.  Every provision of the RPFJ that requires further determinations by Plaintiffs or the Technical Committee should be rejected.  *E.g.*, COL at 30-31, 43-46, 51-52, 72-73.

      **G.**    **The Duration of the Decree Should Be Three Years.**

      Plaintiffs advocate a ten-year term, but the only cases in the pertinent section of their brief entered five-year decrees, and another recent decision cited throughout their brief imposed a three-year injunction.  PCOL at 71-72.[5]  Moreover, Plaintiffs admit that some of their proposed remedies, particularly compelled syndication, are supposed to be "a bridge to help rivals and entrants … in the short term."  PCOL at 21.  Plaintiffs also concede that "GenAI is presently transforming all technology markets" despite arguing that less than two years ago it "was a glimmer of an idea that had yet to take hold of the American public."  PCOL at 2, 71.  Even five years is an eternity under these circumstances, and there is no chance that a decree "will be appropriately tailored to the needs of a rapidly changing industry" in ten years.  *New York*, 224 F. Supp. 2d at 184.  The Court should enter Google's PFJ, which provides for a three-year term.

---

[5] *New York*, 224 F. Supp. 2d at 184 (five years); *United States v. Apple, Inc.*, 2013 WL 4774755, at \*9 (S.D.N.Y. Sept. 5, 2013), *aff'd* 791 F.3d 290 (2d Cir. 2015) (five years); *In re Google Play Store Antitrust Litig.*, No. 21-md-0298, ECF No. 1017 at 1-3 (N.D. Cal. Oct. 7, 2024), *appeal pending sub nom. Epic Games, Inc. v. Google LLC*, Nos. 24-6256, 24-6274 (9th Cir.) (three years).

Dated:  May 23, 2025                    Respectfully submitted,

                                        WILLIAMS & CONNOLLY LLP

                                        By: */s/ John E. Schmidtlein*
                                        John E. Schmidtlein (D.C. Bar No. 441261)
                                        Benjamin M. Greenblum (D.C. Bar No. 979786)
                                        Colette T. Connor (D.C. Bar No. 991533)
                                        680 Maine Avenue, SW
                                        Washington, DC 20024
                                        Tel: 202-434-5000
                                        jschmidtlein@wc.com
                                        bgreenblum@wc.com
                                        cconnor@wc.com

                                        WILSON SONSINI GOODRICH & ROSATI P.C.
                                        Michael Sommer (admitted *pro hac vice*)
                                        Franklin M. Rubinstein (D.C. Bar No. 476674)
                                        1700 K Street, NW
                                        Washington, DC 20006
                                        Tel: 202-973-8800
                                        msommer@wsgr.com
                                        frubinstein@wsgr.com

                                        ROPES & GRAY LLP
                                        Mark S. Popofsky (D.C. Bar No. 454213)
                                        2099 Pennsylvania Avenue, NW
                                        Washington, DC 20006
                                        Tel: 202-508-4624
                                        Mark.Popofsky@ropesgray.com

                                        Matthew McGinnis (admitted *pro hac vice*)
                                        Prudential Tower
                                        800 Boylston Street
                                        Boston, MA 02199
                                        Tel: 617-951-7703
                                        Matthew.McGinnis@ropesgray.com

                                        *Counsel for Defendant Google LLC*

26