IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     ) CIVIL NO.:
et al.,                        ) 20-3010-APM
          Plaintiff,           )
     vs.                       )
                               )
GOOGLE, LLC,                   )
                               ) April 22, 2025
          Defendant.           ) Washington, D.C.
_____) Day 2 - Afternoon Session


Transcript of Remedies Hearing Proceedings
Before the Honorable Amit P. Mehta
United States District Judge


APPEARANCES:

For the Plaintiff:   David E. Dahlquist, Esquire
                     United States Department of Justice
                     Antitrust Division
                     209 South LaSalle Street
                     Suite 600
                     Chicago, IL 60604

                     Diana Arlen Aguilar Aldape, Esquire
                     U.S. Department of Justice
                     450 Golden Gate Avenue
                     Room 10-101
                     San Francisco, CA 94102

                     Adam T. Severt, Esquire
                     DOJ-ATR
                     Antitrust Division
                     450 Fifth Street, NW
                     Suite 7100
                     Washington, DC 20530

                     Sarah Bartels, Esquire
                     U.S. Department of Justice
                     Antitrust Division
                     450 Fifth Street, NW
                     Washington, DC 20530


Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

458

APPEARANCES: (Cont'd)


For the Plaintiff:  Veronica N. Onyema, Esquire
                    DOJ-CIV
                    450 E Street NW
                    Suite 8714
                    Washington, DC 20530

                    Jonathan Bruce Sallet, Esquire
                    Colorado Department of Law
                    Consumer Protection Section,
              Antitrust Unit
                    Ralph L. Carr Colorado Judicial
              Center
                    1300 Broadway
                    Suite 7th Floor
                    Denver, CO 80203

                    Austin Ostiguy, Esquire
                    Tennessee Attorney General's Office
                    Consumer Protection Division
                    P.O. Box 20207
                    Nashville, TN 37202

For the Defendant:  John E. Schmidtlein, Esquire
                    Graham Safty, Esquire
                    Kenneth C. Smurzynski, Esquire
                    Williams & Connolly LLP
                    680 Maine Avenue, S.W.
                    Washington, DC 20024

                    Matthew L. McGinnis, Esquire
                    Ropes & Gray LLP
                    Prudential Tower
                    800 Boylston Street
                    Boston, MA 02199


Reported by:    Christine T. Asif, RPR, FCRR
                  Federal Official Court Reporter
                333 Constitution Avenue, NW
                Washington, D.C. 20001
                (202) 354-3247


Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription


Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

INDEX

Witness Name                                                    Page

Nicholas Turley

    Continued Direct Examination by Ms. Aquilar ...... 4

    Direct Examination by Mr. Ostiguy ................. 21

    Cross-examination by Mr. Smurzynski ............... 24

    Redirect Examination by Ms. Aquilar .............. 71

Professor Antonio Rangel

    Direct Examination by Ms. Bartels ................ 79

    Cross-examination by Mr. Safty ................... 116

    Redirect Examination by Ms. Bartels ............. 141

<u>EXHIBITS</u>

Exhibit        Description                                      Page

RDX 149        Post by Mr. Altman dated 3-31-2025        30

RDX 0355       ChatGPT:  H1 2025 strategy                32

RDX 352        August 2024 board meeting discussion      42
               agenda

RDX 143        Blog post dated 3-31-2025                 45

RDX 148        OpenAI post December 2024                 47

RDX 150        Thread published by Mark Zuckerberg       54

RDX 151        About Facebook.com website                58

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

P R O C E E D I N G S

THE COURT:  All right.  Welcome back, everybody.

Ms. Aquilar, whenever you're ready.

DIRECT EXAMINATION (Cont'd)

BY MS. AQUILAR:

Q.  Mr. Turley, I wanted to ask a clarifying question.
Earlier today we spoke about OpenAi's project to build its own
index technology, and I wanted to clarify, when you talk about
an index technology, do you just mean like a repository of
documents, or do you mean something that is capable of more
than that?

A.  I describe a entire system that, if you imagine like a
black box, it eventually returns a list of links that are
ranked.  Now, behind the scenes, you need the content
repository, but you also need the knowledge of how to rank
information in that in that repository.  So it's a complex
system, but it's certainly more than just the content.

Q.  And so just to be clear, when we talk about the index
technology that OpenAI is building, it's both what is
traditionally thought of as an index and that sort of
retrieval and ranking mechanisms of a retrieval system?

A.  That's right.  The only thing that we already do on top of
that is to consume a list of links and information and to show
it to the large language model so it can take it into
consideration in its answer.  But everything else is exactly

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

as you described it.

Q.   And Mr. Turley, we talked earlier about OpenAI's access to YouTube for display rights.  Is that something that OpenAI currently has?

A.   We display all the publicly available information that we can.

Q.   Do you have an agreement with Google?

A.   We do not.

Q.   Have you tried to enter an agreement with Google?

A.   As discussed earlier, we have tried to enter an agreement with Google to become customers of their syndicated search APR, yes.  So we've tried to enter an agreement but do not have an agreement.

Q.   And, Mr. Turley, do you -- do you think Google affects OpenAI's ability to enter into agreements with third-party publishers?

A.   Would you mind repeating the question?  Sorry.  I didn't hear all of it.

Q.   Sure.

     Do you believe Google affects OpenAI's ability to enter into agreements with third-party publishers?

A.   You said "affects"?

Q.   Yes.

A.   Yes, I do.

Q.   How?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.   There's a few different ways.  In general, I described earlier that the -- most content providers have an incentive to stay opted in to Google's crawling because they depend on the traffic, and we don't have the same amount of leverage over the ecosystem because we provide less traffic.

In addition, in instances where we or Google make commercial arrangements with publishers, Google's offered to -- is able to pay a lot of money, oftentimes more money than us.  They are also able to structure contracts that would preclude us from getting better terms than they have, effectively pressing us out of many agreements.

So given the sort of competitive nature -- sorry, given the lack of competitive nature here, the fact that Google is the only option and has a lot of leverage for these ecosystem system players, they certainly do impact our ability to have great relationships with content providers as well.

Q.   And, Mr. Turley, I'd like to pivot a bit.  As part of your role as head of ChatGPT, do you have any responsibility for distribution of ChatGPT?

A.   It of course depends how you define responsibility, because, as mentioned I think in another answer earlier, I direct these discussions at a high level, but I'm not part of every single one of them.  Oftentimes, I have business development people or legal people executing on these agreements or negotiating them.

But that said, I'm the person who would be most vocal about saying which agreements we want and why and pushing for it to happen internally.

Q.   And so would it be fair to say that you're involved with the strategy for ChatGPT's distribution?

A.   Yes, absolutely.  So that's responsible.

Q.   As part of that work, do you keep up with how your competitors distribute their products?

A.   I try to.  I only have the information that is publicly available as a user.  I described my own experience using Meta's AI products earlier, for example, or the information that has been shared publicly by executives of these companies or the media.

Q.   Mr. Turley, why is distribution important to OpenAI?

A.   When you think about building the best product, it's not just about the user experience of -- that you find once you get there, but also how you can access that system in the first place.

To put that in more complete terms, if we're setting out to build a super system that could aid you in your daily life, whether or not it's a quick search for an answer or something more substantial, the amount of friction that you have in getting to that product is very, very important, and I consider it a core part of the product.

Put another way, we could have the best offering in

theory, but if people can't discover it or if people can't find it even after they've discovered it or if there are significant hurdles in getting to the product, we don't have the best product.  And that's why, at a high level, distribution matters for us.

The inverse is also true.  If we don't have distribution or if other products have distribution and not us, they may -- consumers may perceive that that is the only product available to them.  So this is very critical, and I think I've argued to our teams internally on numerous times that it is, in fact, existential.

Q.   And, Mr. Turley, are you familiar with the concept of a data flywheel?

A.   Yes.

Q.   And does distribution play into a data flywheel?

THE COURT:  I'm sorry, what's the word you're using, data?

MS. AQUILAR:  Flywheel.

THE COURT:  Oh, data flywheel.  Gotcha.

A.   I use this term in a number of different contexts, including in the context of distribution.

In the context of distribution, I mentioned earlier how it's important to users to be able to find and access the products that we serve.  And it's also important -- and the more users find us, the more data we get back on what people

like about the product.

This is true in general, for example, we try to improve our models based on user data.  But it's also particularly true for the search component that we spoke about earlier, because the more people use our product, especially for niche things, the more we're able to improve how real-time information in ChatGPT works.

So you could describe that as a reinforcing flywheel, because the more people use it, the more data we get back. The more data we get back, the better the product is.  And the better the product is, the more people want to use it.

That is a flywheel, but we have a number of such flywheels, so it would depend on the context that you're asking.

Q.   And, Mr. Turley, you mentioned that user feedback can help improve your models.  Can you tell us, generally, about how that works?

A.   Yes.  We use both implicit and explicit forms of user feedback.

On the explicit kind, occasionally users will see a dialogue where they can compare two possible answers from ChatGPT.  They pick one, and we use that as an input to improve our technology.

Users can also go and downvote an answer and say why they didn't like the answer.  Maybe it wasn't factual enough or

maybe it wasn't comprehensive enough, or maybe it wasn't formatted in the way that they found pleasing.  Those are all forms of explicit user feedback.

We also collect implicit user feedback.  One of the ways is by running classifiers on the overall conversation.  Another mechanism is to just see what users clicked on, what links did they click through on, what links did they not click through on, did they follow up on the conversation, did they abandon it.

So there are a number of ways that we might collect feedback.  Happy to go into more depth, but this is sort of an overview.

THE COURT:  You used the word "classifiers."  What do you mean by that?

THE WITNESS:  Classifier would describe a small model, not of the large kind, that we serve in a ChatGPT, but potentially a smaller kind that can tell us, for example, what was the topic that the user was talking about in a privacy-preserving way.

So at the end we might see, okay, we have, you know, "X" percent of users coming to us for how-to advice or "Y" percent of users coming to us for writing help or something like that.

So we're able to use classifiers to determine, in aggregate, what people are doing.  We're also able to use them

to determine whether or not a user was happy with a conversation.

In other words, because we don't optimize for time spent, we have no incentive to do that, what we look at instead is, was the user satisfied, or did they end up saying, hey, no, that's not what I wanted, can you look at this instead.  And the classifier can help us determine whether or not the overall conversation was to the user's satisfaction or not.

Q.   (BY MS. AQUILAR)  Mr. Turley, today how does OpenAI distribute ChatGPT?

A.   Today the vast majority of our distribution comes from our own owned surfaces.  That includes ChatGPT.com, the website, our IOS mobile app, our Android mobile app, our Windows app, our Mac OS app.  We also have begun to integrate ChatGPT into third-party services.  The most -- most prominent, and I think only example to date, is our integration with Siri in IOS.

Q.   Mr. Turley, is the partnership with Apple an exclusive integration?

A.   The exact terms of our partnership are confidential.  I'm happy to talk about it in a closed courtroom if required.

Q.   We have designated parts of your 30(b)(6) deposition that I think cover that subject, so we can -- we can move on.

A.   Okay.  Thank you.

Q.   Mr. Turley --

Direct Examination - Turley

THE COURT:  Can you just describe, at a high level or whatever level -- whatever detail you think is appropriate, what the integration is with Siri and how ChatGPT supports search or other functionality through Siri?

THE WITNESS:  Yes.  At a high level, and this is the element that I can talk about because we've shared it publicly, our -- we have a deep partnership with Apple.  That includes making our technology available to them to power IOS features that are independent of ChatGPT but also the integration of ChatGPT.  So I'll focus on the ChatGPT part here.

For ChatGPT, you can sort of -- you can think of the integration as an overflow.  Siri tries to answer the question itself but when it cannot, it can kick the user into ChatGPT to answer the question instead.  So if you ask a question that might be too complex or sophisticated for Siri to answer on its own, it may ask the user would you like to use ChatGPT instead and then remember that preference.

Q.  (BY MS. AQUILAR)  Mr. Turley, I'd like you to take a look at another document --

THE COURT:  Actually, one other question.

MS. AQUILAR:  Yes, Your Honor.

THE COURT:  I'm not asking for specific terms, but how is that relationship monetized for ChatGPT?

THE WITNESS:  At a high level, we offer a share of

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

our revenue.  I could go into specifics but probably not in this setting.

THE COURT:  Okay.  A share of your revenue based upon what?  In other words, what's the revenue-generating source of which the share's derived?

THE WITNESS:  It's any revenue on eligible IOS or Mac IOS devices.

THE COURT:  Okay.  I think I understand.  Thank you.

Q.  (BY MS. AQUILAR)  Mr. Turley, if you take a look at a document.  If you could turn to the third tab in your binder, it's exhibit labeled PXR 0182.

MS. AQUILAR:  Your Honor, this document has been admitted into evidence.

Q.  (BY MS. AQUILAR)  Mr. Turley, I want to note that this exhibit has a lot of confidentiality redactions, and the way they show up is by having a red box outlining the material that cannot be discussed.

Mr. Turley, could you please turn to page 10 in this exhibit, and it ends in Bates number 762.

A.  I've got the page.

Q.  And, Mr. Turley, this document contains a number of red boxes.  I believe on your screen you can see what is being shown to the public and what is not.

Mr. Turley, there are some bar graphs on this slide. Could you explain what these bar graphs, the individual bar

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

graphs represent?

**A.**  Yes, one moment, please.

Okay.  Just to contextualize what this slide is in context of the broader deck, this is a deck created by a report of mine, product research that outlines our vision for search in 2025 as well as the strategy that we're going to take.  The context you have to remember is that this is geared towards the internal team.  It's designed to motivate them about why 2025 is going to be awesome but also be transparent about our largest obstacles.  So that's the broader context in which you'll find the slide.

As to your question of these specific bar graphs, these graphs are plotting the number of daily search messages on various products ranging from perplexity on the left, which is one of our competitors in the AI chatbot space specifically, the ChatGPT search in the middle, and then AI Overviews, which is a feature within Google on the right.

I believe that the data, to the extent that it's third-party data, is from publicly available sources and/or competitive intelligence that we had.  And then the data in the middle comes from our own data.

**Q.**  And do you have an understanding if the numbers on this slide are global or local or to a specific region?

**A.**  These slides -- this slide would show numbers for the United States -- sorry, for global, we always use global stats

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

in all of our decks.  And generally, we track.  So, for example, if you wanted to cut for the United States, it would be far smaller than what you see here.

The third-party data, I'm not certain whether or not that's global or U.S.  But I would imagine that's global as well.  I'm not sure.  But our data is for sure global.

Q.   And, Mr. Turley, directionally, can you describe -- can you compare the ChatGPT search bar to AI Overviews?

A.   Yes.  It is a very small fraction.  So if you were to look at -- again, we're open to obfuscate the exact numbers here because they're not numbers that we have shared publicly yet, but you can imagine that our daily search volume is a very small fraction of the yellow bar on the right.

Q.   And do you know what this bar graph would look like if you were comparing to Google Search generally, not just the AI Overview features?

A.   It would be much larger.  As you can see in the footnote here, we have reports that AI Overviews may be as high as 14 percent of Google CraZe.  That means, you know, that there would be 86 percent that are -- of Google searches that don't trigger an IA Overview yet.

I don't know if that's changed or not.  It's possible that since creation of this slide, Google has expanded AI Overviews.  But it's safe to say that the total number of daily searches would be, again, far higher than even the

yellow bar here, which is far larger than the ChatGPT search daily volume.

Q.   And, Mr. Turley, what do you think is causing the difference between the ChatGPT search bar and the AI Overviews bar that is depicted in the slide?

A.   Distribution.  It's -- on your Google.com, like if you just simply type into your Chrome bar without thinking, you go to Google.com.  You type into your Safari without thinking, you go to Google.com.  If you follow your own muscle memory, you will go to Google.com.  In all cases, you may just encounter an AI Overview without ever asking for it or ever trying.

So certainly, the volume is, in large part, due to the number of eyeballs that see the AI Overviews product in the first place.

Q.   Mr. Turley, today, is the ChatGPT app preloaded onto any mobile devices in the United States?

A.   I do not believe so.

Q.   And I want to focus on Android phone manufacturers, setting aside Apple for a second.

Has OpenAI been able to gain any distribution through partnerships with Android phone manufacturers?

A.   No.

Q.   And to what do you attribute that, the current state -- that current state?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.   It was not a lack of trying.  So beyond that, I'm not certain because we've never, unfortunately, got to a point where we could discuss concrete terms with such a provider.  I pushed quite hard internally, as did the teams responsible for that -- those relationships.

It is my understanding that these third parties were under the impression that we would never pay as much money as they would get from Google.  The conversations have stalled, and we were put under the impression that, you know, we should come back if we had, you know, significant more -- significantly more money to offer and that we couldn't compete on any other grounds.

My hope was always that we could compete on nonmonetary grounds and offer superior technology, but we never even got to that conversation.

Q.   And when you say you never got to a conversation about the quality of your product, would that have involved discussions about integrating with Samsung's hardware?

A.   There's limited information that I can share in an open court about our conversations, but again, we very much would have been interested in a distribution partnership.  We don't think we can afford the terms.

Q.   And has OpenAI been able to gain -- to reach any distribution agreement with telecommunication providers?

A.   This is another thing that I am highly interested in,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

because again, and I've told the team this over and over, I think, our ability to get distribution where our users are is quite existential to our product vision of building a super assistant.

I think we are early on in these conversations, so none of them have -- I don't think we have any signed agreements yet, at least not that I'm aware of.  But I know that the team is engaging, and I'm hoping they will be fruitful conversations.

Q.  And, Mr. Turley, do you believe Google has affected OpenAI's ability to distribute on mobile devices?

A.  Certainly, it is -- the media has reported on the fact that Samsung is going with Google as the default for a large amount of money.  So it's hard to argue that Google has not accepted -- sorry, affected our ability to have that deal given that they got the deal and we didn't get far enough to even be at the table.

Q.  And, Mr. Turley, aside from revenue share, are there other ways Google has affected OpenAI's ability to distribute?

A.  I would have to guess, I think, because Google would approach generally interested in approaching all the same partners we would.  They would always have more leverage over those players on things like revenue or other tie-ins to the Google ecosystem.  But again, I don't know for sure so I would have to speculate.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.   When you say "tie-ins to the Google ecosystem," what do you mean?

A.   Google offers many things, including an operating system, the place store, search, and someone may want to be a customer of some of those things but not others.

Q.   Mr. Turley, we've discussed a few things today, and I want to talk about taking the remedies we've talked about today as a whole.  How would those remedies impact OpenAI?

A.   They fall into different categories.  Some of the remedies, like the API access that we spoke about earlier, or the technology that would enable us to build an incredible index system, those would offer -- allow us to build a better product faster, both directly by improving the quality of real-time information in the product in those use cases that I talked about earlier, and indirectly by accelerating our own research and development so that we can focus on other parts.

     Some of the other remedies in discussion would allow more users to discover our product so that we can offer people a real choice versus, you know, the world which we have today where many people will encounter -- won't ever encounter or product or may encounter it but won't find it again.

     So some of the -- so the second category of remedies will help us offer a real choice to people while the first allows us to build a better product faster.

          MS. AQUILAR:  I have no further questions,

Your Honor.  I note that we also designated portions of Mr. Turley's 30(b)(6) deposition to round out his testimony for this phase of trial.  And I pass the witness.

THE COURT:  Okay.  Thank you.

MR. SALLET:  Your Honor, Mr. Ostiguy will conduct a short direct examination.

THE COURT:  Okay.  And, I'm sorry, the name again, Ostigy?

MR. OSTIGUY:  Ostiguy.

THE COURT:  Ostiguy.

MR. SALLET:  My Massachusetts accent.

MR. OSTIGUY:  Good afternoon, Your Honor.  Austin Ostiguy, from the state of Tennessee, on behalf of the Colorado plaintiffs.

DIRECT EXAMINATION

BY MR. OSTIGUY:

Q.  Mr. Turley, good afternoon.  Thank you for being here today.

Mr. Turley, are you aware that plaintiffs are proposing that Google divest Chrome as part of the remedy package in this matter?

A.  I'm aware.

Q.  And you testified earlier that distribution is a core part of OpenAI's product.  In your view, if OpenAI were to reach a distribution agreement with an independent Chrome in the

United States, would that relationship provide value to OpenAI and its customers?

**A.**  Absolutely.

**Q.**  In what way?

**A.**  I mentioned earlier about how most people don't even think about what search engine to use or how to get their real-time information; they will just type into their browser bar, which, for most people, is Chrome.  And having a distribution agreement that allows those people to discover our product would ensure that people encounter it and can select it and can have a very frictionless way of interacting with ChatGPT today and their super assistant tomorrow.

**Q.**  And in your view, would such a relationship provide value to Chrome and Chrome's users?

**A.**  I believe so, because they would be able to offer an AI native experience end-to-end to their users.  So yes, I do.

**Q.**  Mr. Turley, could you please, from your perspective, talk a little bit about what you think this distribution arrangement would look like.

**A.**  It's hard to say exactly, because this possibility has felt so remote to us that we, frankly, never been able to consider it deeply.  As you know, you can technically set a different search engine in Chrome today if you go deep into your settings, but most people don't know that exists.

So it's difficult to imagine how exactly it would work,

only because we haven't been able to entertain the possibility.  But I would imagine that you could offer a really incredible experience where either the user chooses or better, we have an opportunity to introduce people into what an AI first experience looks like when they type into Chrome. Over time, I think that a super assistant can actually do many of the things that people would manually browse previously, and I think this would offer Chrome the ability to onramp users onto a future like that.

So imagine just typing in, for example, you know, just to use the same example from earlier, I'm looking for shoes, and it just actually takes you straight to the check-out screen based on what it's learned about you previously.  That's an amazing feature.  And by being where users are, you could imagine very, very deep integrations like that over time.  So I think this is useful now and useful later.

As for the commercial aspect of what this arrangement would look like, I have not spent enough time, and I think it would come down to the specifics of how independent Chrome is incentivised.  For example, if independent Chrome could continue to partner with Google, either in the U.S. or internationally, then we may be in a similar situation that we were with Samsung where, you know, we could be outspent dramatically.

In a world where they cannot, I think it would be a

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

matter of -- it would be a question of, okay, what is the incentive structure then and would we be competitive.  But again, I would love the opportunity to introduce more Chrome users to ChatGPT.

Q.  Mr. Turley, if the Court were to order Chrome to be divested, would OpenAI be interested in purchasing Chrome?

A.  Yes, we would as would many other parties, I'm sure.

MR. OSTIGUY:  Thank you, no further questions, Your Honor.

THE COURT:  All right.  Thank you, Counsel.

All right.  Mr. Smurzynski.

MR. SMURZYNSKI:  Yes.  If I can approach, I have some exhibits for the witness.

CROSS-EXAMINATION

BY MR. SMURZYNSKI:

Q.  Good afternoon, Mr. Turley.

A.  Good afternoon.

Q.  Do you agree that OpenAI is known as the market leader in AI?

A.  One could describe it that way, depending on the context.

Q.  And do you agree that to many people, OpenAI is AI?

A.  For many consumers, I could imagine that being the case.

Q.  And ChatGPT today is a consumer AI chatbot; correct?

A.  It depends.

Q.   You talked about the super assistant on direct, but your product's not there yet; correct?

A.   That's right.

Q.   It's something else, and is that something else generally described as a consumer AI chatbot?

A.   It depends on the context.

Q.   Well, let's get past that nomenclature.  The product that is currently known as ChatGPT has many use cases; correct?

A.   Yes.

Q.   You can use it to compose texts; correct?

A.   Yes.

Q.   You can use it to code?

A.   It can give answers that help you code, yes.

Q.   Can it generate code for you?

A.   Yes.

Q.   And we talked about question answering, and I'm going to come back to that.  But some of the other things that ChatGPT can do is it can serve as an expert for you?

A.   It's knowledgeable on many topics.

Q.   Can serve as a tutor?

A.   Part of the tutoring job can be done by ChatGPT, not all of them.

Q.   It can serve as a muse?

A.   Excuse me, a what?

Q.   A muse?

A.   Certainly.

Q.   It can serve as an entertainer?

A.   For some users, yes.  But it's mostly a transactional product today.

Q.   And we talked about information seeking is one of those uses, but not the main one, correct, for ChatGPT?

A.   I wouldn't quite put it that way.

Q.   All right.  We were looking at PXR 182, which is also in your binder there, RDX 356.  And I'm going to use the version that's in that black binder that you have.  Can you get that out in front of you?

A.   356?

Q.   356.

A.   Okay.  Thank you.

Q.   And you recall, this is the Search 2025 document that you looked at just a little bit ago?

A.   Yes, that's right.

Q.   Okay.  And we were looking at the page that ended in 762 together when you were on direct.  And I just direct your attention to the next page, sort of two -- the two numbering systems here, I apologize, one is .011.  Do you have that in front --

A.   I see it, uh-huh.

Q.   And there's certain figures that are redacted on this page, and I'm not going to ask you about the redacted

portions.  But we were talking about context before.  And in this slide, that's part of Search 2025 - Product Vision and Strategy, is "describe the percentage of searches" -- excuse me, it's hard with all the redactions.  "The percentage of ChatGPT user messages that are searched"; correct?

A.   Yes.  Note that's different from the percentage that could benefit from real-time information.

Q.   But those are the percentages that, when you're talking to your team about Search 2025 - Product Vision and Strategy, that you were contextualizing, were the percentage that were being treated as daily searches; correct?

A.   Yes, we're still early.

        THE COURT:  Can I just ask a clarifying question.

        MR. SMURZYNSKI:  Certainly, Your Honor.

        THE COURT:  The percentage that's attributed to Search, by that, do you mean queries that do require the search functionality that we've been talking about?  Because presumably, the model can answer queries too depending upon the nature of it.

        THE WITNESS:  That's a great question.  So there's a much larger percentage of queries that are informational.  What this refers to is the percentage of queries for which we trigger search mechanism.  We have what is called a decision boundary, that is part of the overall model, where the model will determine whether or not pulling in real-time information

and showing links, et cetera, will be accretive to the user experience.

For example, if you're just asking why is the sky blue, that information never really changes, so it might not actually require a search against our real-time information source.

Put another way, this decision boundary is a function of how good the Search experience is, because as it gets better, we would want to trigger it in more cases.  At the limit, you could imagine that all ChatGPT interactions should be grounded in real-time truth, because if you want to avoid hallucinations even for something like coding, you would want to make sure that it has some ground truth to compare against.  Otherwise, there's no way to solve the problem.

THE COURT:  Thank you.

Q.  (BY MR. SMURZYNSKI)  As of December 31, 2024, though, the number we saw on that screen is the number that would actually trigger that search function that you've described; correct?

A.  That's correct.

Q.  Okay.  I want to talk about ChatGPT's usage.

ChatGPT launched in November of 2022, I believe you testified; correct?

A.  November 30th, 2022, yes.

Q.  And it was a crazy viral success, wasn't it?

A.  You could put it that way, yes.

Q.   Is Mr. Altman the CEO of OpenAI?

A.   Yes.

MR. SMURZYNSKI:  And let's put up RDX 149, please.

Q.   (BY MR SMURZYNSKI)  And do you recognize this as a post of Mr. Altman's that was made recently in 2025?

A.   I do.

MR. SMURZYNSKI:  And, Your Honor, we would move the admission of RDX 149.

MS. AQUILAR:  Objection, Your Honor.  It can come in as a demonstrative but not as evidence.

THE COURT:  I don't know that it can be a demonstrative, but -- I'll allow it.  I recognize what some of the evidentiary limitations are in theory, but it's fine. It's good.

(Exhibit RDX 149 received.)

MR. SMURZYNSKI:  Thank you, Your Honor.

THE COURT:  Let's just put it this way, there are a lot of downvotes.  I get it.

Q.   (BY MR. SMURZYNSKI)  And in this post from March 31, 2025, Mr. Altman describes, "The ChatGPT launch 26 months ago is one of the craziest viral moments I'd ever seen, and we added one million users in five days."

Does that sound about right for the number of users that had downloaded ChatGPT in its first five days of use?

A.   Almost.

Q.   Too low, too high?

A.   You couldn't download it, it was only a website, and it would go down all the time.  But I can believe that that many people tried to access it in the first five days, certainly.

Q.   I appreciate the qualification.

Mr. Altman was talking about users that were added in the first five days?

A.   Yes.  Sorry, you had said download.  I agree with Mr. Altman's statement.

Q.   Okay.  Thank you.

And then he says, "And that was five days, and that was crazy and viral, in March 31 of 2025, that ChatGPT added one million users in an hour."

What happened to have ChatGPT add a million users in an hour in March 31, 2025?

A.   I believe in that week we were having a viral moment as part of our image-generation technology, which became a part of ChatGPT.  This was novel to many people around the world. So we had a lot of people trying us for the first time.

Q.   Now, ChatGPT tracks its market share; correct?

A.   Yes, we rely on third-party data.

Q.   If you'll turn to the document in your binder that is at RDX 355, and it's entitled, "ChatGPT:  H1 2025 strategy."

Do you see that?

A.   Yes.

Q.   And this is a document that you contributed to?

A.   Yes.

          MR. SMURZYNSKI:  And, Your Honor, I'd move the admission of RDX 0355.  I'd note there's been no objection from the government.

          THE COURT:  Okay.  It will be admitted, 0355 -- RDX 0355 will be admitted.

          (Exhibit RDX 0355 received.)

Q.   (BY MR. SMURZYNSKI)  And, Mr. Turley, if you'd turn to the page that ends in .029, this is a page that -- and I just caution you, everything in the red box -- I'll let you get there.  Everything in the red box has been -- are you there?

A.   Sorry, I keep --

Q.   So in the middle of the page you'll see some numbers that go, dot, something, and then ends in, dot, 029.

A.   Yup.  I see it now.  Thank you.

Q.   And this is -- this is ChatGPT's analysis of market share by country; correct?

A.   It depends on the context of which market.

Q.   So this refers to ChatGPT web market share?

A.   You can see the specific competitors that this is tracking at the top.

Q.   Okay.  So this is tracking ChatGPT versus Claude versus Perplexity versus Co-Pilot for Microsoft and Gemini from Google; correct?

**A.** Correct.

**Q.** And those are other consumer AI chatbots?

**A.** Colloquially, yes, chatbots.

**Q.** And those are the leading consumer AI chatbots in terms of usage in the United States; correct?

**A.** I wouldn't put it that way, because it's been fast evolving. DeepSeek, for example, was not around when -- which they have a lot of usage in the United States, and I don't think they were around when this graph was created.

**Q.** Okay. And this graph is created in December of 2024; is that right?

**A.** I'm not certain, but that sounds about right. Maybe slightly earlier.

**Q.** Okay.

MR. SMURZYNSKI: And, Your Honor, I just want to make sure that you can read the number in the United States for ChatGPT.

THE COURT: I cannot. I was going to ask you to -- if you've got a copy that's more legible for me.

MR. SMURZYNSKI: We will -- we will come up with one. Though, obviously, I can't say the number in open court, so if we get it to you later?

THE COURT: Although the witness did say this was based on public information, so if that's the case, it's not clear to me why this would need to be --

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

MR. SMURZYNSKI:  I'm not seeking its redaction.  I know counsel for --

THE WITNESS:  Just to clarify, we may have also acquired this from a third party that tracks this, so it could be public or third-party information.

THE COURT:  Okay.  Well, I -- I think in the past I have not had market share estimates to be deemed confidential.  So I think consistent with the rulings I've made in the liability phase, if you want to limit any questioning you have to U.S. market based upon whatever these numbers are, I can't read them.

It would also be helpful to get some clarification about what web market share means.  In other words, does that encompass just queries that are done on ChatGPT.com versus Claude.com, Perplexity.com, or does that include queries on any app, chatbot app.

THE WITNESS:  This is only ChatGPT.com and equivalent, and then there's a footnote that I think is eligible in the below that caveats the data.  "Nonchat competitive products such as Meta's integration; e.g., Facebook, WhatsApp, et cetera, and Microsoft and Google integrations into existing products may be significantly larger than we have visibility into from competitive web data."

So to answer your direct question, it's web only,

not mobile, and this caveat, I think, is appropriate as well.

Q. (BY MR. SMURZYNSKI) But in this deck, Mr. Turley, that has ChatGPT's H1 2025 Strategy, this is the only market share comparison that ChatGPT has put in this deck; correct?

A. Would you mind if I flip through it? It's a pretty long deck with a lot of data in the appendix and I don't remember.

Q. If you need to review it do so, I will represent to you this is the only --

THE COURT: Why don't we move on. I'll assume that to be the case. If it's not, then --

MR. SMURZYNSKI: Okay.

THE COURT: I'm sure there can be some redirect about it, but let's not waste time in having him go through.

MR. SMURZYNSKI: Okay, Your Honor. Thank you.

And so Your Honor is okay with me staying public.

Q. (BY MR. SMURZYNSKI) So, Mr. Turley, is it correct that --

THE COURT: I don't know if he can read it because at least.

MR. SMURZYNSKI: I'll ask him the question and see -- Your Honor, I can read it.

Q. (BY MR. SMURZYNSKI) Mr. Turley, is it correct that using this measure of market share, ChatGPT's market share in the United States, was 85 percent?

**A.**   I would really prefer not to read these numbers out loud because it's not information we've shared publicly.  I would be happy to get into it in a private court.

THE COURT:  Well, Mr. Turley, you'll forgive me, but I've got to make these decisions about what can be made publicly available.  In the past I've had these market shares, for example.  They've been made available publicly even if they're rough estimates.  So I'll abide or continue that ruling, and I'll ask you to please identify the numbers, at least for the United States.  I'm not sure the rest of the countries are relevant.

THE WITNESS:  Understood, Your Honor.

Let me give a shot at reading it.  It looks like an 85 to me, but it's extremely hard to read in this copy.

MR. SMURZYNSKI:  Your Honor, we'll get a cleaner copy for you, and we can move on from that chart.

THE COURT:  Okay.  Thank you.

**Q.**   (BY MR. SMURZYNSKI)  As part of your job, do you track weekly average users of ChatGPT?

**A.**   I do.

**Q.**   And if you'll turn in your binder to RDX 354.

MR. SMURZYNSKI:  And, Your Honor, this is already in evidence as PXR 72, but we'll use the version with the defense stamp, if that's okay.

**Q.**   (BY MR. SMURZYNSKI)  Mr. Turley, this is a document

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

entitled, "OpenAI 2025 Strategy."

Do you see that?

A.  I do.

Q.  And this is a document that you took from another document and then you created it as a fork, if you will, to share with your team; correct?

A.  Yeah, it looks like a draft that I shared with my team for comment.  You can see comments on the right, though it's hard to see who left what comment.

Q.  Okay.  And the top statistic, or metric rather, that's listed on this OpenAI 2025 Strategy, that's referring to usage, is ChatGPT WAU, and that's weekly average users?

A.  Weekly active users.

Q.  Active.  I'm sorry, active.  Thank you.  My mistake.

And without reading the numbers aloud, at the start of 2024, we see the first number, and then we see a current number in the next column.

Do you have that?

A.  Yes, I see it.

Q.  And that's a substantial increase over the course of 2024; correct?

A.  Yes.

Q.  And it, in fact, exceeded what had been your goal for 2024?

A.  That's right.  We ended up exceeding that goal.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.   All right.  And if we go to -- so that was 2024, if we go to --

THE COURT:  Mr. Smurzynski, sorry.

MR. SMURZYNSKI:  Absolutely.

THE COURT:  The term "active user," does the term "active" in that context have any special meaning?

THE WITNESS:  Yes, Your Honor.  The -- we expect the definition of active to evolve as the product evolves.  Today I believe to be counted as active you have to send a message.  So simply visiting ChatGPT.com and doing nothing wouldn't count.  But the minute you interact with the product and send a message, you would be counted as active.

Over time, you may imagine it evolving.  For example, as we build towards the product vision described earlier, you could imagine ChatGPT doing more things proactively on your behalf, in which case, we would have to evolve the definition.  But for now, the simple definition has worked well.

THE COURT:  All right.  Thank you.

Q.   (BY MR. SMURZYNSKI)  All right.  Now, if you move forward in that document to the page that ends in .013, you see some numbers for 2025 goals.  And in here, you've switched from a weekly active user metric to a daily active user metric.

Do you see that?

A.   I do see that.

Q.   And there's a number for the 2024 end.  And then there's a 2025 base case.

Do you see that?

A.   Yeah, there's a comment on that, I see.

Q.   And the comment simply is some math about -- and I don't want to read the percentages because they've been redacted, but some sort of assumption as to the ratio of daily active users to weekly active users; correct?

A.   No, the comment is about confusion about the term "base case" and what that actually means.

For context, normally, you would expect base case to assume the thing that happens if you do nothing, but that was not right per the comment.

Q.   Well, let me ask you this:  We're now in late April of 2025.  Is OpenAI on its way to achieving what's the base case number here for daily active users for 2025?

A.   We don't have road maps beyond a quarter, so I have to caveat it, but I'm very happy with our growth so far.  But it's competitive space and it's early so we'll see.

Q.   Is the answer to my question is yes, you're on track, but it's a competitive space?

A.   You could put it that way.

THE COURT:  Just one clarifying question.  These numbers, are these worldwide or U.S. numbers?

THE WITNESS:  These are worldwide numbers.  And in

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

general, in our materials, numbers would be worldwide unless described otherwise.

Q.   (BY MR. SMURZYNSKI)  Mr. Turley, you believe that ChatGPT has a great brand, yes?

A.   It depends on who you ask, but I would put it that way. I've, in fact, written that somewhere, I think.

Q.   I'm asking you.

A.   Yes.

Q.   All right.  Let's turn to the topic of revenue for a moment.  And let's go back to that document we had in front of us, RDX 354.  And if we start on the first page again.  And again, the numbers are blocked out here, but this has the 2024 expectations of revenue for -- is this all of OpenAI?

A.   One moment, please.  I believe so.

Q.   All right.  If we go back to the page that ends in .013, again, that chart we were looking at, there is here as well a revenue number for the end of 2024, and then the 2025 base case revenue number.

     Do you see that?  Again, it's the page that ends in .013.

A.   Yes.

Q.   And is OpenAI currently on track to achieve that base case revenue number that we see here for 2025?

A.   I don't know.

Q.   Okay.  So that's 2024/2025.

     OpenAI has large ambitions, is that fair to say?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.   Yes, we're very ambitious.

Q.   If you'll turn to the document that is RDX 352 in your binder.  And this is a document that is a slide deck, and it's the August 2024 board meeting discussion agenda.

Do you see that?  RDX 352.

A.   I see the title.  Would you like me to familiarize myself with the deck?  It's a long deck.

Q.   Sure, you can, but I'm going to direct you to a particular spot.

A.   Okay.

Q.   So rather than us taking the time for you the read all these slides, we'll get there.

MR. SMURZYNSKI:  But first, Your Honor, I move the admission of RDX 352.  I understand there's no objection from the government.

MS. AQUILAR:  I believe there's an objection to imbedded hearsay within the document, but it can otherwise be admitted.

THE COURT:  Okay.

(Exhibit RDX 352 received.)

MS. AQUILAR:  We can resolve those issues later.

MR. SMURZYNSKI:  Your Honor, I don't think what I'm going to elicit will raise any embedded hearsay issues, but I understand the government's objection.  I apologize for missing the embedded hearsay.  It didn't stick with me because

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

that's not how I'm using it.

Q.   (BY MR. SMURZYNSKI)  Mr. Turley, if you could turn to the page that ends in .012?

A.   I see it.

Q.   And this slide describes, "As part of our work on" -- and I think it's some code word.  I won't ask you to read it -- "OAI management has created a five-year long-range plan."

     Do you see that?

A.   Yes.

Q.   And in the two, four, fifth bullet, as part of OpenAI's ambitions, it states that, "The company expects to reach a certain figure," that I won't read, "in revenue in fiscal year '29."

     Do you see that?

A.   I see it.

Q.   And you understand that to be OpenAI's long-range plan for revenue through 2029, or as of 2029, I should say?

A.   It depends upon the context.

Q.   Well, if the context is a presentation to the board of OpenAI as to management's expectations about revenue, is that number correct?

A.   It's an aspiration.  The reason I said context is the final bullet on the slide.

Q.   Okay.  So that's the context, is that last bullet on the slide.

**A.**   That's part of the context.

**Q.**   And the other part of the context, among other things, is this is what OpenAI's board was told management's plan for 2029 revenue was; correct?

**A.**   Sir, I'm not in the board meetings, so I'm not familiar with the voiceover.  All I know is that we would heavily caveat such information.

**Q.**   Okay.  So here's some revenue projections and the like. Let me switch to OpenAI's ability to raise capital.

MR. SMURZYNSKI:  And if we could put on the screen RDX 143, and it's in your binder as well.

**Q.**   (BY MR. SMURZYNSKI)  And, Mr. Turley, this is a page that appears on OpenAI's website.  Do you recognize it as such?

**A.**   I do.

MR. SMURZYNSKI:  And, Your Honor, I move the admission of RDX 0143 as to which there's no objection as I understand it.

MS. AQUILAR:  Your Honor, we object.  This can be introduced as a demonstrative but not an exhibit.

THE COURT:  I think it's more appropriate as an exhibit since it's got some substantive information here that's not based on something else.  So assuming he can validate the whole thing, then yes, I'll admit it.

MR. SMURZYNSKI:  Your Honor, I just point out, he's identified it as something on OpenAI's website, its publicly

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

facing website.

THE COURT:  Oh, did he?

THE WITNESS:  Yes, it's a blog post.

THE COURT:  Okay.  Sorry, I missed the answer to that question.  So yes, we'll admit RDX 143.

MR. SMURZYNSKI:  Thank you, Your Honor.

(Exhibit RDX 143 received.)

Q.  (BY MR. SMURZYNSKI)  And so this is March 31, 2025, couple weeks ago.  And here, OpenAI is announcing that it has raised $40 billion in capital; correct?

A.  It appears so, yes.

Q.  And that funding operates on assumption that OpenAI itself is worth $300 billion; correct?

A.  I think that's right.

Q.  Now, we talked about some revenue numbers, some usage numbers, some market share numbers in 20- -- as of 2024 earlier.  Do you recall that?

A.  I do.

Q.  And OpenAI accomplished all of that without a distribution deal; correct?

A.  Sorry, I'm not sure what you mean by "without distribution."  We've generated our own distribution.

Q.  Distribution means different things to different people, so let me just clarify.  OpenAI accomplished all of that without signing any deal with a third party to give a

distribution on any particular platform?

**A.** That is correct.

**Q.** People downloaded the app, they navigated to your website, whatever it took, and they found ChatGPT and they used it, in those numbers that we saw on those redacted slides; correct?

**A.** Sorry, would you mind repeating the question?

**Q.** Sure.

Users found ChatGPT without ChatGPT -- in the volumes that we saw on those redacted slides, without ChatGPT having to enter into any third-party distribution deal?

**A.** These users did by definition, yes.

**Q.** Okay. Now, in December of 2024, the Apple integration went into effect; is that right?

**A.** I think it depends on when you count, but I think this is when it became more widely available.

**Q.** ChatGPT, the ChatGPT -- excuse me, the ChatGPT integration on Apple was publicly announced in December of 2024; correct? Strike that. It's a terrible question. Let me ask you a better question.

Users, at volume, were able to interact with ChatGPT via the Apple integration beginning in December of 2024?

**A.** I think that's right. To be honest, we had so many different milestones, and it continues to be an ongoing collaboration which is why I'm hesitating, but that sounds right and I believe if you say it.

Q.   All right.  So just so we get the dates straight.  If you turn in your binder to RDX 148.  And the sweaters will help us with the timing, if not the date on the document.

Mr. Turley, do you recognize this as a post that OpenAI did around December 2024?

A.   Yeah, this is a screenshot from the live stream.  And thank you for showing me this.  It aids my memory.  It sounds like this when we announced the general availability.

Q.   Okay.  And that's December 11 of 2024?

A.   That's what I see, yes.

Q.   Okay.

MR. SMURZYNSKI:  Your Honor, we move the admission of RDX 148.

MS. AQUILAR:  No objection.

THE COURT:  All right.  148 will be admitted.

(Exhibit RDX 148 received.)

Q.   (BY MR. SMURZYNSKI)  Now, ChatGPT did this deal with Apple even though it had the success it had prior to that; correct?

A.   Yes.

Q.   And you understand Google to have competed for the same deal that OpenAI ended up winning with Apple with respect to generative AI?

A.   Yes.

Q.   But OpenAI won that deal; correct?

A.   We worked very hard to win the deal.

Q.   And you won it, over Google?

A.   Can you define "win," because that implies some level of exclusivity.

Q.   Well, the only deal that Apple was offering with regard to generative AI went to ChatGPT instead of Google; correct?

A.   I don't know what other deals Apple is offering or will offer.  All I know is that we ended up with a deal, a commercial arrangement with Apple.

Q.   In 2024?

A.   Correct.

Q.   And you understand that Google did not obtain that same commercial deal with Apple?  Not going to get into the details of it, but Google did not get the same deal; correct?

A.   I genuinely don't know what deals Google has or had in 2024.  They have not announced a deal with Apple, and Apple, to the best of my knowledge, has not informed me that they have a deal with Google.  But I don't know if they would be obligated to, which is why I'm being careful.

Q.   But to the best of your knowledge, and you're head of product at ChatGPT and you've done this deal with Apple, Apple hasn't done an equivalent deal with Google, has it?

A.   I genuinely can't say, but I'm not aware of a deal.

Q.   Okay.  You're not aware of a deal.

     And just to be clear, in the United States, the majority

of mobile phones are Apple as compared to Android; correct?

A.   I don't have a stat on top of mind, but, anecdotally, that's true.

Q.   Now, ChatGPT became this great brand, got all this usage without grounding, correct, without grounding its model?

A.   Excuse me, sir, what do you mean by "grounding its model"?

Q.   It wasn't until 2024 that ChatGPT's results were grounded before they were provided to the user?

A.   That's not correct, sir.

Q.   ChatGPT did not call on an API to a third-party source in order to ground the results that came from ChatGPT to its regular users until 2024; correct?

A.   Sir, that's not correct.

Q.   In what way is that not correct?

A.   We had a predecessor through ChatGPT search called ChatGPT Browse that I believe we launched shortly after launching ChatGPT 4, which was our first ever attempt of offering real-time information in ChatGPT.  And that existed as early as 2023.  In fact, I think maybe spring 2023.

Q.   But that was not the majority use experience on ChatGPT. If someone went to ChatGPT.com and interacted with the model, you would not get ChatGPT Browse; correct?  You had to do something special and different to use ChatGPT Browse?

A.   No, I wouldn't put it that way.  It also had a decision boundary.  It was just slower and of inferior quality to what

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

we have today.

The thing that I could imagine, maybe you mean it this way, is that you had to be a paid user around that time, because we didn't actually launch search functionality to free users until fairly recently, end of last year.  But other than that, you didn't have to do anything special, and it was -- worked very similar to what we do today.

Q.   And the majority users were free users in this period; correct?

A.   This is -- was and is true, will always be true.

Q.   Okay.  So for the majority of users of ChatGPT, until 2024, the results they saw were not grounded; correct?

A.   Sir, by "grounded," do you mean connected to a real-time -- connected to real-time information?

Q.   Correct.

A.   The majority of the users would not have interacted with that experience, that's right.  Not for a lack of our desire, by the way.  We just couldn't scale the technology yet.

Q.   I'm just -- I'm just asking about when you grew to these numbers, did you do that with a majority of the users not having the benefit of a grounded model?  That's my only question.

A.   It's hard to attribute the growth, but we had growth without -- before we had search functionality, yes.

Q.   And let's talk about the generative AI space.  Let's sort

of switch -- sort of the same topic but a little different.

You consider that space to be very competitive; correct?

A.   Yes, absolutely.

Q.   And you consider there to be many participants in that market, yes?

A.   Not sure if I'd call the generative AI space a market. It's a technology for different types of products to use.  So it depends.

Q.   I'm not trying to use market in a sort of highly technical antitrust lawyer sense.  I just mean the space in which you're competing, you find to be very competitive and there being many entrants?

A.   It's very competitive.  The number of entrants depends on how you define the space.

Q.   All right.  Let's go back to RDX 355, which is already in evidence.  And it's the ChatGPT H1 2025 Strategy.  We've talked about that before.  If you could turn to the page that ends in .005.  And about a third of the way down the page, you see there's a heading, "Who are Our Competitors?"

Do you see that?

A.   Yes.

Q.   And you write, "We think about competition in two ways. First, there's the consumer AI chatbot space."

A.   Yes, that's one of the ways of defining it.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.  And we'll get to the other in a moment, but I want to focus on that because this is the first one that you list here.

A.  Yes.

Q.  ChatGPT competes in that space with Claude, Gemini, Co-Pilot, Meta AI, amongst others, yes?

A.  Yes, amongst others.

Q.  And we talked about some of the others before, but one of them you list there is Meta AI.

    Do you see that?

A.  I do.

        MR. SMURZYNSKI:  And if you could put up RDX 150.

Q.  (BY MR. SMURZYNSKI)  And RDX 150 is a thread.

    Do you see that?

A.  I do.

Q.  And here, you recognize this is a thread that's been published by Mark Zuckerberg, the CEO of Meta?

A.  I do.

Q.  And there, Mr. Zuckerberg states, "This will be a defining year for AI.  In 2025, I expect Meta AI will be the leading assistant, serving more than a billion people."

    Do you see that?

A.  I do.

Q.  And did you view that as a source of competition for ChatGPT?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.   Yes, Meta is one of our many competitors.

MR. SMURZYNSKI:  Your Honor, I would move the admission of RDX 150.

MS. AQUILAR:  Objection, Your Honor.  This document could come in as a demonstrative but definitely not an exhibit.

THE COURT:  Again, I'm not sure demonstrative is the right -- it's, you know, look, it's got its hearsay issues, I get it, but we'll just admit it.  I mean, it's a bench trial. We don't need to be so strict about these things.

(Exhibit RDX 150 received.)

THE COURT:  Can I ask a question, and this is for my own personal edification, as all my questions are.  But I have used a bunch of these and just tested them out, but I don't know what Meta AI does.  I have not used that.  Can you just give me a general description of how that product is used relative to a ChatGPT chatbot?

THE WITNESS:  Yeah, so if -- you actually refer to different things.  It could refer to a stand-alone offering that Meta has a Meta.AI.  That would be the one that I would be least concerned about from a competition perspective to date.

You could also refer -- and this is how I would refer to it typically internally when writing a document like this, you could imagine referring to the experience that you

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

find inside of WhatsApp or inside of Facebook.  My strong suspicion is that when Mark Zuckerberg is talking about one billion people, he's talking about bringing AI directly into the app that they already have that has a lot of distribution.

But I just want to recognize that the term is ambiguous because Meta has and plans -- presumably plans to launch a number of AI products.

THE COURT:  And in terms of its integration in WhatsApp and Facebook, what does that look like today?

THE WITNESS:  They've built the thing that I, you know, am worried Google Chrome or some other player might build, which is when you search in WhatsApp, it automatically kicks you into an IA search or conversation.  Instagram has this too.

Note that I've observed them experiment a lot with the different UI iterations.  So it's different oftentimes. But the experience that I've observed is that when you type in and are searching for, say, a conversation inside of WhatsApp, it automatically triggers an AI search.

And this is similar to some of the ideas that I was discussing that one might do with a Chrome or to AI Overviews, where you're taking one user intent and then effectively feeding them an AI product.

THE COURT:  And the output is what, if I've got -- if I do a search on WhatsApp, is it providing me an output

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

other than another conversation, or is it giving me --

THE WITNESS:  It starts a chat similar to ours. From there, the experience is intended to be very similar to ours.

THE COURT:  I see --

THE WITNESS:  So it will answer the question maybe and then you can follow up.

THE COURT:  I see.  So it starts a conversation much like a chatbot.

THE WITNESS:  That's right.  It's basically the way of sort of integrating a chatbot straight into the products that people are already using.

THE COURT:  Gotcha.  Thank you.

MR. SMURZYNSKI:  And if you could turn to RDX 5151, Your Honor, this will perhaps further answer your question. This is a document from the "About Facebook.com" website.

Q.   (BY MR. SMURZYNSKI)  And, Mr. Turley, does this describe -- let me just focus on the bit below, "Takeaways" -- I'm sorry, the next, sort of the bottom sentence there.

Mr. Turley, is this what you were describing in terms of Meta's integration into its products of these AI features?

A.   I think so.  I think in this blog post they're referring to Meta AI as kind of the overall thing and then saying you can use it in all these different surfaces.  So this seems consistent with what I just explained.

Q.   Okay.  And I won't go through all of the page, but the remainder of this, Mr. Turley, you would recognize as the thing that you know ChatGPT to be competing with that Meta AI offers?

A.   Sorry, would you mind saying that one more time?

Q.   Certainly.

If you take a moment and you scan through what's on the remainder of RDX 151, this is the functionality that Meta AI has that you were describing as competitive with ChatGPT's product?

A.   It doesn't really talk about the functionality, but it is talking about the ways in which you can access it.  But when I was referring to Meta AI, I was certainly referring to all these things in the document.

Q.   Thank you.

MR. SMURZYNSKI:  Your Honor, we move RDX 151 into evidence.

MS. AQUILAR:  Your Honor, we object.  The document is hearsay.

THE COURT:  Take it this is from Meta's website?

MR. SMURZYNSKI:  Yes, Your Honor.

THE COURT:  I think it's probably -- comes in as a business record.  So I'll admit under that exception.

(Exhibit RDX 151 received.)

MR. SMURZYNSKI:  All right.  Andrew, if you could go

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

back to RDX 355 at .005.

Q.   (BY MR. SMURZYNSKI) We looked at the first two sentences --

THE COURT:  Actually, Mr. Smurzynski, I'm sorry to interrupt you.  How much longer do you think you have?

MR. SMURZYNSKI:  Ten minutes.

THE COURT:  Okay.

(Discussion held off the record.)

THE COURT:  Let's try and finish and then take the break.

MR. SMURZYNSKI:  Thank you, Your Honor.

Q.   (BY MR. SMURZYNSKI)  Mr. Turley, we looked at the first two sentences here, "We think of competition in two ways. First there's the consumer AI chatbot space, Claude, Gemini, Co-Pilot, and Meta AI."

THE COURT:  Mr. Smurzynski, could you just put -- just place me back to where you are.

MR. SMURZYNSKI:  Certainly.  Your Honor, RDX 355.005.

THE COURT:  Okay.  I'm on it.  Thank you.

MR. SMURZYNSKI:  And in the middle of the page there's is a heading, "Who are Our Competitors?"

Q.   (BY MR. SMURZYNSKI)  And, Mr. Turley, earlier we talked about those first two sentences.  And then in the third sentence you conclude, "We are leading here, but we can't

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

rest."  Correct?

A.   I did write that.

Q.   "ChatGPT is leading here in the consumer AI chatbot space"; correct?

A.   This is true at the time.  I believe we've lost market share since then, but I meant it the way I wrote it.

Q.   Okay.  And then you say, "Looking ahead to 2025, another company," I'm not going to say the name, "poses the biggest threat due to their ability to embed equivalent functionality across their products; e.g.," and then I'm not going to read it, "without facing the business model cannibalization risks that Google does."

Google is not the number one competitive threat to ChatGPT, is it?  It's another company?

A.   I wouldn't characterize it that way.

Q.   But you did here, didn't you?

A.   It's -- there's a lot of extra context.  We talk about multiple different categories of competitors.  I'm happy to expand the context, but I'm also happy to move on.  It's up to you.

Q.   Well, let's go on in the document, because this is what you wrote at the end of 2024 with regard to ChatGPT's H1 2025 Strategy.  In the next paragraph --

MR. SMURZYNSKI:  And Andrew, if you could advance down to the next paragraph.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

**Q.** (BY MR. SMURZYNSKI) -- you refer to "a broader game, building a super-assistant and then something else."

You see that? I won't read the something else.

Correct?

**A.** That's correct.

**Q.** And you haven't built the super-assistant yet, and you haven't built that other thing either; correct?

**A.** That's right. They're both very ambitious.

**Q.** Okay. And then you go on to explain them a little more. And then in the third paragraph, after describing who are our competitors, first the consumer AI chatbot space, and then this other thing that you haven't done yet, you say, "We have what we need to win"; is that right?

**A.** Yes. You'd have to understand the context.

**Q.** I understand the context. It's a ChatGPT H1 2025 Strategy.

My question to you is: You wrote that not based on the government prevailing on some particular remedy in this case. You meant based on what ChatGPT had itself; correct?

**A.** I don't mention anything related to regulatory or government here, but I do mention it later in the document.

**Q.** Okay. And when you say, "We have what we need to win," you explain what you have, "one of the fastest-growing products of all time, a category-defining brand, a research lead in reasoning and multimodal, a compute lead, a

world-class research team," and you go on.

Those are all strengths that OpenAI had that give it what it needs to win; correct?

**A.** Yes, these are among our strengths.

**Q.** Now, let me switch topics to go back to grounding. We talked a little bit about it earlier, and you talked a little bit about it on direct. And if you could get out your Rosetta Stone and have PXR 0801 in front of you, so I don't stumble across anything here.

**A.** Sorry, do you mind saying the number one more time?

**Q.** Certainly. It's in the white binder. And I've confused you. And I apologize. So --

THE COURT: It's over your shoulder.

THE WITNESS: Oh, apologies.

**Q.** (BY MR. SMURZYNSKI) I should have -- I should have sent you to the right place. So if you go to PXR 0801, there's a document referred to as a Rosetta Stone that -- used on direct?

**A.** I see it.

**Q.** And one of the methods OpenAI has used to ground ChatGPT is what I'm going to call API provider No. 1; correct?

**A.** Correct.

**Q.** And on direct, you said that there were issues with quality and other issues with API provider No. 1; is that right?

A.   That's right.

Q.   And among those other issues was API provider No. 1 refused to ground the volume of queries that ChatGPT wished to have handled by their API?

A.   I wouldn't quite put it that way, but certainly scale was one of the considerations.

Q.   Well, did there come a time when ChatGPT wanted API provider No. 1 to ground more results, and API provider No. 1 refused to do so?

A.   Yes.

Q.   And you spoke to them about why they were doing that; correct?

A.   Yes, so the -- sorry, I prefer not to get too deep into relationship -- business relationships with these API providers in public court.

Q.   I'm just treading very lightly here and using a Rosetta Stone.

     Did they ever -- did API provider No. 1 ever tell you why they wouldn't ground more results from ChatGPT?

A.   They offered a variety of explanations.

Q.   Did they ever say one of the reasons was that they competed with you?

A.   No.

Q.   Did you come to the conclusion that one of the reasons why API provider No. 1 wouldn't ground more results from ChatGPT

was because they competed with you?

A.   We compete with this API provider.  And in the world where we would work together with Google, we would be competing with them as well.  I do imagine that that would have some impact on the relationship, but I can't say for certain.

Q.   Now, we talked today as well, you talked on direct about building an index, and OpenAI has started on the process of building its own index for grounding purposes; correct?

A.   Correct.

Q.   And you indicated that it would be hard to build an index of the same quality of Google's with "our R&D footprint."  Do you recall that?

A.   Where did I write this?  I generally agree.  I just don't recall exactly --

Q.   You didn't write.  You testified to it in open court.

A.   Oh, yeah.  Yeah.

Q.   Let me ask -- let me ask you a clearer question.

A.   Okay.

Q.   Whether you remember you said that or not, you agree that with OpenAI's current R&D footprint, it would be hard for it to build an index of the same quality as Google's?

A.   That's right.  We're trying anyway, but definitely hard.

Q.   What if OpenAI invested the same amount of money that Google had and the same number of engineers that Google had to build an index of the quality it built?  In that case, would

it be easier for OpenAI to be able to do that?

A.   Excuse me, funding aside, we have a very small team.  It's a fraction of the size.  I'm not sure how -- are you imagining a world where we hire all these people?

Q.   I'm imagining a world in which you use some of this $40 billion to hire as many engineers as Google has put out and invested as much to build its index.  In that world, could OpenAI achieve an index of the same quality as Google's?

A.   Sorry, this is very difficult to answer because I'm not sure how long it would take us to even onboard that many people even if they signed their offer today.  I think it would take years to even scale up the team.  So the answer is maybe, I don't know.

Q.   But you don't believe building an index the equivalent quality of Google's is beyond the capacity of OpenAI.  It would just take time and it would take engineers and it would take money; correct?

A.   I think I explained some of this earlier.  To add more context, time, engineers, and maybe money, though I don't think that's the primary consideration, all play a role.  But there's also uncertainty on whether or not we can get there at all beyond the 80 percent that I mentioned earlier.

Q.   All right.  We looked at RDX 356 before, I believe, which is the Search 2025 Product Vision and Strategy.  And if you could turn to the back of that to the page that has .033?

THE COURT:  I think we're back in the black binder.

MR. SMURZYNSKI:  Yes, thank you, Your Honor.

THE COURT:  And that's RDX what, again?

MR. SMURZYNSKI:  It is 356 at .033.

THE WITNESS:  Apologies.  Would you just tell me one more -- 06, you said?  03, thank you.  And then which page?

Q.  (BY MR. SMURZYNSKI)  33, .033.

A.  All right.

Q.  And this is ChatGPT's search vision for 2025; correct?

A.  Yes, this is the motivational deck I mentioned earlier.

Q.  Okay.  And in the section that's not redacted, you say, "Search will be built on a robust OAI-index, near-perfect reliability, and top-tier tooling."

That's what you told the team was the vision for 2025 within OpenAI; correct?

A.  You would have to understand the context.

Q.  And the context is you're trying to motivate a team, and you don't actually believe these things?

A.  The context that there's many things in this document that are not obtainable in 2025, and that the general rhetoric of the deck is motivational in nature.  I don't think it trades off against accuracy.

Q.  One of the reasons you want --

THE COURT:  I'm going to interrupt because if you've

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

still got a little more time, I do need --

MR. SMURZYNSKI:  That's fine, Your Honor.  I appreciate it.  I'm mindful of the court reporter as well.  I think I have like five or ten minutes -- or like five minutes, but i'm perfectly happy to take a break.  I apologize for messing up my time.

THE COURT:  No, no, no, it's fine.  Go ahead and collect your thoughts.  Let's take our 15 minutes.  We'll resume a little bit after -- just a few minutes after 3:30.

Thank you, everyone.

(A recess was taken from 3:15 p.m. to 3:35 p.m.)

THE COURT:  Mr. Smurzynski, you want to continue.

MR. SMURZYNSKI:  Thank you, Your Honor.

Q.  (BY MR. SMURZYNSKI)  Mr. Turley, on direct, do you recall being asked some questions about Chrome?

A.  Yes.

Q.  And OpenAI has explored building a browser based on Chromium; correct?

A.  You could describe it that way.

Q.  And Chromium is the open source code that Google makes available to browser manufacturers.  Edge is based on it, Chrome is based on it; correct?

A.  That's my understanding.

Q.  But OpenAI has not advanced that project of building its own browser based on Chromium because it's decided not to

devote the resources that would be required for that; correct?

A.   I wouldn't agree with that statement.  It is true that we've debated this project and many other projects and -- but I wouldn't agree with the statement as meant -- referenced.

Q.   You decided to focus on other things rather than bringing a browser to market at OpenAI; correct?

A.   We have not launched a browser to this date.

Q.   And had OpenAI decided it wanted to invest the resources, it could have launched a browser by today; correct?

A.   I wouldn't characterize it that way.

Q.   But what you would agree with is that OpenAI has not to date developed a commercial browser even though it's something that it has explored?

A.   We have not launched a browser to date.

Q.   You were also asked some questions about click-and-query data.  Do you recall that?

A.   I do.

Q.   And it's the case that OpenAI does not believe it would be valuable to chain -- excuse me, to train its models on click-and-query data; correct?

A.   I work on the product side.  I'm not an expert in training or models, but the reason that I was excited was to help build out our index system.

Q.   And aside from that index, you would agree that there are

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

no other uses of click-and-query data that OpenAI would find valuable, for example, training of models; correct?

A.   Sir, I can't agree with the statement because I'm not an expert on the training of our models, and I also don't know exactly what the data set contains.

MR. SMURZYNSKI:   Your Honor, if I could approach the witness and give him a copy of his deposition?

Q.   (BY MR. SMURZYNSKI)   Mr. Turley, do you recall being deposed in this matter on February 26th, 2025?

A.   This matter being this general matter?  Yes.

Q.   Yes.

And if you'll turn to page 123, line 8 through 11, do you have that in front of you?

And, Mr. Turley, do you recall being asked the following question and giving the following answer:

"Aside from building an index, are there other uses of click-and-query data that OpenAI finds valuable, for example, the training of models?

"Answer:  No."

Mr. Turley, let me ask you a new question.  It's also the case that it would not be valuable for fine-tuning the ChatGPT models; that is -- and by that, I mean click-and-query data. Do you agree?

A.   Give me a moment so I can familiarize myself with this part of the deposition.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

**Q.**   Well, actually, the question --

**A.**   I'm sorry, it was not about the -- I'm sorry.

**Q.**   You should put that aside.  I'm asking a question without the --

**A.**   Okay.  Sorry, I misunderstood.

**Q.**   No, no, it's fine.  This is a strange proceeding for someone who's not a lawyer.

THE COURT:  You can go ahead and close your deposition.  If there's a reason to open it up again, counsel will let you know.

THE WITNESS:  Great.

**Q.**   (BY MR. SMURZYNSKI)  So my question is -- let me just restate it so you have it in mind -- that do you agree that OpenAI would not find it valuable to fine-tune the ChatGPT models on click-and-query data either?

**A.**   I can't definitively rule it out simply -- and I think I said this in the deposition too, I hope I did.  I'm not an expert on the pretraining of our models.

Now, click-and-query data helps us build an index system, and that is very separate from making the 4o model.  It is theoretically possible that it could help make 4o better at using the index.  But that is, again, not why I would be excited about that data.  I would be excited about the data because it helps us build the index system, including the ranking over what's in the index.

MR. SMURZYNSKI:  Thank you.  I have no further questions.

THE COURT:  All right.

Ms. Aquilar, redirect?

MS. AQUILAR:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. AQUILAR:

Q.  Mr. Turley, if you could place the binder that we were looking at this morning -- it's the white binder -- in front of you.

A.  They're all white, sorry.  Oh, this one.  All right.

Q.  And, Mr. Turley, if you could turn to tab 4, which is RDX 0355.

A.  I have it.

MS. AQUILAR:  And, Your Honor, this document was admitted into evidence and discussed during Mr. Smurzynski's redirect.

Q.  (BY MS. AQUILAR)  Mr. Turley, could you please turn to the fifth page of the PDF with the Bates number ending in 211?

THE COURT:  It's the number in the lower right --

THE WITNESS:  Oh, on the right.  Right.  I got it. Thank you.

Q.  (BY MS. AQUILAR)  And if you could focus your attention, there is a heading in the middle of the document that says, "Who are Our Competitors?"

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Do you see that?

A.   I do.

Q.   And the first line in this -- underneath that reads, "We think about competition in two ways."

Do you see that?

A.   I do.

Q.   And you talked about the first method of competition with Mr. Smurzynski, but I want to focus on the second method of competition which is in the paragraph that starts, "Then there's the broader game, building super-assistant and link."

Do you see that?

A.   I do.

Q.   And the sentence after that reads, "Now, we're up against search engines, browsers, even interactions with real people."

Do you read that -- did I read that correctly?

A.   Yes.

Q.   And after that says, "This one isn't a head-on match"?

A.   Yes.

Q.   What did you mean by "this isn't a head-on match"?

A.   I meant to articulate a similar idea to the one in the diagram we discussed earlier this morning, where, over time, we're -- and we've begun already, we aim to build a product that can do what search engines can do, that can do what browsers can do, but in our own way.

What that means is that we might not call it a search

engine, we might not call it a browser, we would just call it ChatGPT. But over time, ChatGPT can do more and more of the things that you can do in these products, and we thus regard these products, whether or not it's the leading search engines like Google.com, the leading browsers like Chrome or Firefox, we would regard those as competitors as well in the second category.

Q. And in the third paragraph you wrote, "We have what we need to win."

And during Mr. Smurzynski's questioning you said that that sentence required more context. What context did it need?

A. Yes. Hold on, let me find it. Is it in the same section?

Q. Yes. It was the paragraph right below.

A. So I wrote this document myself, and I'm therefore familiar with the context under which it was written. This document is intended to inspire the team working on ChatGPT and the broader company as to why, despite much obstacle, we have a real chance. And I really do believe that. I really -- I wouldn't work on this problem, I wouldn't dedicate my life if I didn't think that there was a chance that we can win. But you should read this very much as this is far from certain, but we have what it takes, in the same way that you would speak to a team. That's one piece of the context. It's just what this document actually is and what it is not.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

The second piece of context, as it pertains to the conversation earlier when I said this needs more context is a section later on.  And when I expand on what we need to win, there's a whole section called "How to win out of product." And some of it, you can find this in Section 225, the number on the right.  In that section, it talks about all the things that are not pixels and technology that we need to win. There's sections on distribution and the criticality of that. There's also a section on the policy efforts required for ChatGPT to win.

If you go to page 28 -- 228 and look at paragraph 1 there, I write, "Real choice drives competition and benefits everyone.  Users should be able to pick their AI assistant. If you're on IOS, Android or Windows, you should be able to set ChatGPT as your default.  Apple, Google, Microsoft, Meta shouldn't push their own AIs without giving you fair alternatives.  The same goes for search engines.  Google, Apple, Microsoft should offer users a choice for their default search engine and make their underlying indexes accessible to AI assistants, including ChatGPT."

I won't read the rest, but I do want you to know that when I said this requires more context, you both have to understand the macro context of what this document is and the many other sections that go in depth onto the pieces that are required for us to be successful, ranging from distribution

partnerships to having a fair shot at being a viable competitor.

Q.   And I'd like to focus on that part of the document.  You were looking at on the bottom of the Bates number ending in 227.  You wrote, in the second senten- -- well, you wrote, "To introduce an AI super-assistant to the world, we need the right policy environment.  This work is critical to the product because the cards are stacked against us."

What did you mean by that?

A.   I expand on what I mean in the following sentences, "We're up against powerful incumbents who will leverage their distribution to advantage their own products.  We'll win by advocating for user choice, fast development, and protecting our user base and target markets."

So what I'm talking about here is the fact that we have powerful competitors who have large businesses to defend, who control the access points for how people discover products, including our product, because people discover our product on ChatGPT.com via a browser or via an app store.  And when I say the cards are stacked against us, I express, you know, deep worry that we might get shut out or that it might be more difficult for us to compete in the future.

Q.   And just to be clear, is one of those competitors Google?

A.   Google is one of the competitors that controls the access

point, yeah.

Q.   And, Mr. Turley, one final question.  Why was it important for you to be here today?

A.   I was asked to come here and speak the truth.

MS. AQUILAR:  Thank you, Your Honor.  No further questions.

THE COURT:  All right.  Mr. Turley, thank you for your time and testimony.

THE WITNESS:  Thank you very much, Your Honor.

THE COURT:  Oh, I'm sorry for a moment.  I forgot to ask plaintiff --

MS. ONYEMA:  No questions.

THE COURT:  Okay.  All right.  Thank you.

You're free to go, thanks.

THE WITNESS:  Thank you.

MR. MCGINNIS:  Your Honor, Matt McGinnis on behalf of Google.  Just one administrative item.  I omitted to move in on demonstratives RDXD-02.001 through .006 during my examination of Mr. Fitzgerald, so I move them in now.

MS. ONYEMA:  Your Honor, we just note the same objection as to using a demonstrative as evidence.

MR. McGinnis:  No issue.

THE COURT:  Okay.  Yeah, again, I've got the demonstrative.  As long as the underlying exhibits are in, we're all in good shape.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

If I could just ask counsel to grab the exhibits before Dr. Rangel comes on in.

They're not admitted.  They're just demonstratives.

Dr. Rangel.

THE WITNESS:  Your Honor.

THE COURT:  It's good to see you again.

THE WITNESS:  Thank you, sir.

PROFESSOR ANTONIO RANGEL, called as a witness, being first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you, sir.  Please be seated.

MS. BARTELS:  Good afternoon, Your Honor.  Sarah Bartels for the United States.

Your Honor, the United States calls Professor Antonio Rangel.  First we would just like to remind the Court that Professor Rangel testified in the liability phase and that the Court previously accepted Professor Rangel as an expert in behavioral economics.

May we proceed?

THE COURT:  You may.  And I don't know if you're intending to try and requalify him, but unless there's reason to, I would just as well get to the substance of his testimony.

MS. BARTELS:  Absolutely.

THE COURT:  But let me just confirm with defense counsel that that's acceptable to them.

MR. SAFTY:  Yes, Your Honor.

THE COURT:  Okay.  Very good.

All right.  Thank you.

DIRECT EXAMINATION

BY MS. BARTELS:

Q.  Good afternoon, Professor Rangel.  Please state and spell your name for the record.

A.  Antonio Rangel, A-n-t-o-n-i-o, R-a-n-g-e-l.

Q.  And, Professor, at a high level, what are you planning to testify about today?

A.  I plan to testify on a series of behavioral analysis on the impact of introducing a well-defined -- well-designed choice screens on reducing the persistent bias associated with Google Search.

Q.  And, Professor, have you prepared a slide presentation to assist with your testimony today?

A.  I have.

MS. BARTELS:  And, Your Honor, our intention is to do Professor Rangel's entire presentation in open court today. There are a few items in the presentation that will be redacted in the public version, and they're noted in the red boxes that Your Honor will have, and we will not state those figures publicly.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

THE COURT:  Thank you.

MS. BARTELS:  And as with the previous expert, at the conclusion of the examination, I'm going to enter the slide deck into evidence as a demonstrative as PXRD 004 to complete his testimony.

Your Honor, may we publish the slide presentation?

THE COURT:  Yes.

Q.  (BY MS. BARTELS)  So, Professor, I'd like to ask you about your assignment in this case.  Who hired you as an expert in this case?

A.  The United States Department of Justice.

Q.  And what was your assignment?

A.  I was given two assignments, Your Honor.  The first one is to offer an opinion from a behavioral economics perspective about what would be the impact of introducing well-defined -- well-designed choice screens in addressing or reducing the persistent bias associated with Google Search.

 And the second --

Slide 2, please.

The second assignment was to respond, again as a behavioral economist, to an opinion by Dr. Murphy, who is an economics expert for Google, who provides the opinion in his reports that allowing Google to maintain default installation agreements with some constraints will not cause bias in favor of Google.  And I want to address that.

Direct Examination - Rangel

Q.   How did you carry out your assignment?

A.   Your Honor, I used the same methodology that -- when I previously testified in front of the Court.  Importantly, I relied on over 20 years now of teaching and scholarship in behavioral economics.  And then I carried out my assignment in three parts.

First, I reviewed all the relevant materials in behavioral economics, publications related to the assignment, and I applied this body of knowledge to the facts of the case to make a prediction about the opinion of what would happen.

But I did not stop there.  Then I also reviewed a large number of case materials with the goal of seeing if the market participants are evaluating the issues in a way that is consistent with behavioral economics.  And as Your Honor would see, that is indeed the case.

And finally, there is -- as it was the case in defaults, or the case of choice of screens, there is -- there are some market events that allow us to see what are the effects of introducing this choice of screens and further point in the same direction.

Q.   Did you submit reports in this matter?

A.   I did.  I have submitted two reports and a summary report in this remedies phase, and I submitted three reports and a summary report in the liabilities phase.

Q.   So we're just going to discuss a few terms first.

First, what does bias mean in behavioral economics?

A.   Yes, Your Honor, bias is a fundamental term in behavioral economics.  It refers to changes in the decision context in the way the consumer encounters the decision that affect the consumer's decision but have no impact on the economic fundamentals, the cost and benefits of the options, the number of options that the consumer has, or the information that the consumer has about them.

Q.   And what is a choice screen?

A.   Yes.  Slide 3, please.

Your Honor, a choice screen is fundamentally a user interface that asks the consumer to make an explicit choice among a number of products.  And choice screens are everywhere.

Earlier in this trial I show you an example, Your Honor, which I encountered twice today already of these different interfaces.  That's a choice screen you need to complete to select something out to complete the transaction.

For the sake of the Court, I'm also providing here two other examples.  On the left is a choice screen associated with privacy in IOS.  It's called the app tracking transparency.  And I will talk about that later on.  It offers a binary choice.  On the right is an image of a European choice screen.

Q.   And what is choice architecture?

A.    Yeah, choice architecture refers to changes on how the information is presented to the consumer that don't affect economic fundamentals of decision, again, cost, benefits, information set of options, but can have a powerful effect on the decisions that are made.

Q.    What are some examples of choice architecture?

A.    Your Honor, we have already -- I've also in the past showed you examples of choice architecture.  So, for example, it's the older options.  Many elections, the candidates are randomized to avoid favoring the one that is listed first.  The number of clicks that have to be made to complete a decision is another example.  How accessible is the information out of the options that are being presented would be another example of choice architecture.

Q.    And what is choice friction?

A.    Choice friction, Your Honor, refers to the complexity and amount of effort that it takes to make the choice.

Q.    So now we're going to turn to a few of your conclusions.  Professor, what did you conclude about how choice screens affect consumer bias regarding search.

A.    Slide 4.

      My first conclusion, Your Honor, is that introducing choice screens would help reduce biases in consumer choice, both in search applications and search engines.

Q.    So you said choice screens help reduce consumer bias in

search.  Do you have any conclusions about the sufficiency of a choice screen to undo biases in search?

A.  Yes, I do.

Your Honor, despite the fact that choice screen will help, it is important to notice that they will not -- they will not be sufficient if introduced by themselves even if they're well designed -- and we will talk more about this later -- to fully undo the system that form biases.

Q.  Does the sufficiency of the choice screen to undo the bias depend on anything else?

A.  It does.

Your Honor, not all choice screens are created equal. And the performance of the choice screen will definitely depend on choice architecture.  If the choice architecture is appropriate, it will be more effective.

Q.  Did you review Google's expert's, Professor Murphy's, report?

A.  I did.  And I offer in my testimony to rebut those conclusions.

Q.  So your first rebuttal conclusion in response to Professor Murphy's conclusion that choice screens are an ineffective remedy, choice screens are untested in the marketplace, and their introduction would harm consumers?

A.  Yes.

Q.  What is your first rebuttal conclusion?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

**A.**   Slide 5, please.

Your Honor, my first rebuttal conclusion to Professor Murphy is that the introduction of choice screens, by themselves, on their own, is unlikely to harm consumer welfare.

Now, throughout my testimony, I would also talk about two other aspects of his opinion on choice screens.  One is the choice effectiveness.  My entire testimony talks about that.  And also his opinion that choice screens are untested in the marketplace.

**Q.**   And your second rebuttal conclusion in response to Professor Murphy's conclusion that Google's default and preinstallation agreements have not resulted in the bias of consumer choices towards Google?

**A.**   Yes.

**Q.**   What is your second rebuttal opinion?

**A.**   Your Honor, my second rebuttal opinion is that allowing Google to retain default installation agreements, even if it comes with some constraints about their distribution, would -- continues to generate consumer bias in its favor.

**Q.**   And we'll discuss each of those conclusions as we go.

Professor, today are you offering a qualitative or quantitative opinion?

**A.**   Your Honor, my testimony is qualitative.  I use the three-prong approach that I described to you before about

applying behavioral economics, looking at the case materials, and looking at market events, seeing if they provide concordant conclusions, and that allows me to provide qualitative opinions.  I am not providing a quantitative prediction about the size of these choice screens.

Q.   So let's turn to your first opinion that you identified earlier.  What do you conclude about the effectiveness of a choice screen to change user behavior regarding search?

A.   Slide 6, please.

Your Honor, just to remind the Court, I want to restate conclusion 1.  My first conclusion is that introducing choice screens will help to reduce the biases in consumer's choice, both in search and search applications, associated with previous defaults.

Q.   What is the basis for that conclusion?

A.   There is a large body of work in behavioral economics that informs this as well as some studies of market events.

Q.   What evidence is there from behavioral economics that supports this conclusion?

A.   Your Honor, earlier in the trial, I described to you a large literature in experimental economics -- apologize -- in behavioral and experimental economics that has looked at the impact of defaults in a large number of domains.

In a lot of those experiments and studies, the researchers compare a treatment condition in which one of the

options is chosen by default, with what happens in that control condition that has the same number of options, the same alternatives, but there is no default.  That control is a de facto choice screen.

And therefore, by comparing what happens in the default condition with the choice screen, we can see what is the impact of introducing a choice screen.  And the conclusion from that literature is that it would have a sizable reduction on the existing defaults on the existing default biases.

Q.   You also mentioned recent studies that are specific to Search.  Could you explain to the Court what that evidence shows?

A.   Of course.  Slide 7, please.

Your Honor, there is a recent published *Economics* article by Decarolis and several people in which they study the impact of introducing the choice of screens in Europe, and what they find is that the introduction of these choice screens early on decrease, on average, Google market share between half and 1.5 percentage points, depending exactly on how the estimation was done, which is consistent with a reduction of the default biases by that amount.

In addition, when the European choice screens were initially introduced, there was some problems with the choice architecture.  The -- our first estimate using a counterfactual analysis, that if some of them had been

resolved, and all of the individuals in Android in Europe had access to the choice screen, the effect would have been 3 percent instead of the other number.

And slide 8, please.

Q.   Are you aware of any other studies?

A.   One second, please.

There is another study, Your Honor, it's shown in slide 8, which also speaks to these issues.  In 2023, Mozilla ran a study with 12,000 subjects across three countries in Europe about the impact of introducing choice screens, this time for browsers, not search engines.  And they found that they had a sizable effect on consumer choices.  In particular, highlighted in yellow in the slide for you, 13 percent of -- consumers were 13 percent more likely to choose independent third-party browsers, defined as a browser older than Samsung, Chrome or Edge.  And this is in comparison to a condition where there was no choice screen, there was -- there were the defaults that came with the device.

THE COURT:  Sorry, could you restate the conclusion again.

THE WITNESS:  Of course.  This is a study that was to understand what happens in comparison to the defaults when you introduce a choice screen.  And what they find is that consumers are 13, one, three, percent more likely to choose independent browsers.

Q.   (BY MS. BARTELS)   Is there any other evidence of the choice screens in the software industry?

A.   I think there is, yes.   Slide 9.

So, Your Honor, the previous examples of the studies I have shown you are specific to Search.   But this is another example of a highly important choice screen in the software industry.

So this is the app, tracking transparency app that I mentioned before, which is a de facto choice screen.   It was introduced in 2021 by Apple and is activated every time a user encounters for the first time another application, and it asks specifically for that application, whether or not they want or not to do tracking.   Choice screen is specific for that. Through that many times.   And this has been extremely influential, effective or impactful, choice screen.

Prior to introduction, the default was that this application could track consumers, and the vast majority of them allowed it.   After its introduction, after a few months, over 80 percent of the consumers were opting out.

Q.   Are you aware that Google's economic expert, Professor Murphy, opines that choice screens are untested in the marketplace?

A.   I am.   And in my opinion, that specific opinion of Dr. Murphy is incorrect and inconsistent with the evidence.

Q.   And why is that opinion by Professor Murphy incorrect and

inconsistent with the evidence?

**A.**   Well, Your Honor, these choice screens are pervasive in software.  I just showed you, I still have up for you, slide No. 9.  This is a choice screen that is deployed by Apple constantly.  It has been there for four years and has had a big impact.

But it doesn't stop there.  Let me give you some other examples.

Slide 10.

Google itself, Your Honor, uses choice screens.  Let me give you the context for this slide.  IPhone users, your phone does not come installed with the Chrome browser, but you can go to the Apple store, download it and open it.  When you open it for the first time, before you can use it, you're asked to go through some choice screens that ask you a number of things.  And depending -- I've played with different paths, Your Honor.  Depending on the path that happens, you have to go to two or three choice screens before you can start using Chrome.

If you do the same thing for Firefox in the iPhone, if you try to download and start using Firefox, you have to go through five choice screens, for things that include a number of things, including customizing the color of your screen, just to give you a sense.

And there is also slide 11, some case documents,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Your Honor, that I have found that also consistent with the pervasive use and advocacy for choice screens in this space. Let me give you an example.  Each row in this table is quote from a case document by a different industry participant.  The first one is from a document that you have already seen in my previous presentation.

And the context, Your Honor, is 2005, Google is trying to compete with Microsoft in Internet Explorer where Microsoft is the default, and Google is basically advocating for choice screens.  They're asking, "We propose instead that users be prompted to select the default search provider," that's a choice screen, "because it eliminates any company's own self-interests and places control in the hands of the end user, where it belongs."

Mozilla, overall, well-designed choice screens have benefits, giving people an active choice that allows them to select their browsers more easily and increases contestability.

And to save the Court's time, I won't read the last part of the table, but the contest there, this is on an open letter by the CEOs of these three independent browsers -- independent search engines, I apologize -- in which they're advocating for choice screens.

Q.   We're now going to turn to your second conclusion. Professor, what is your second conclusion?

A.   Slide 12, please.

Your Honor, again, I want to contrast my first and my second conclusion.  My first conclusion is the introduction of choice screens, by themselves, would reduce bias.  My second conclusion is that they -- they are introduced by themselves, even if the choice architecture is well designed, it will be unlikely, unlikely that they are sufficient to fully undo the persistent Google default biases.

And at that time, what -- as to other question, would the effectiveness of the choice screen depends if they are not introduced by themselves, if there are other remedies there, and the second part of the opinion is that if all the remedy, if the Court decides to introduce other remedies that have the property of improving the quality and distribution of other engines, that would show up on the choice screens.  It will make them more effective.

Q.   What evidence is this conclusion based on?

A.   It's based on, again, the large body of behavioral economics on defaults as well as the empirical evidence from the studies that I just showed you.

Q.   Is there a difference between introducing and removing a default?

A.   I believe so, especially if the default that has been removed has been there for a long time and has resulted in a dominant position in the market.

Q.   And why is that?

A.   Slide 13, please.

     Your Honor, I presented to you evidence from behavioral economics in the liability phase of the trial and, by the way, it was very rewarding as a behavioral economist seeing the ChatGPT engineer providing yet another piece of evidence consistent with that, that when you have defaults, consumers end up engaging these search and search applications through strong defaults, that favor the defaults.  And because of this, they develop familiarity with those particular applications.  And those default applications, they build up a strong brand.

          And because of this, other things being equal, and that's important, other things being equal, when a consumer is put in an explicit situation to make a choice, it's more likely to choose the thing that is more familiar that has a stronger brand.

          And just to remind the Court, nobody on earth, as far as I know, says let's Bing what to have for dinner tonight.  People say let's Google what to have for dinner tonight.  Because of this, it leads to an advantage after the default is removed.

Q.   So in addition to the studies, are there case materials that support a similar finding?

A.   Yes.  Slide 14, please.

Your Honor, these are some case materials consistent with the role of this brand familiarity in this asymmetry.  The first document is from Google, and the context, Your Honor, is they are arguing, in this document internally, about whether or not -- it's a choice architecture argument inside Google whether or not it matters where the Google is listed within the choice screen that gets released.  And they are arguing back in the email that it's not so important in the case of Google because of their strong brand recognition.

Mozilla, when it has been discussing this choice screen for search applications, are emphasizing that it's likely to be ineffective due to Google's higher quality/strong brand recognition.

And the last quote here, Your Honor, is from the deposition of ADQ, who is a senior executive at Apple, and the context within the deposition is they're asking him about choice screens.  And he's basically saying they don't matter that much, because people pick the one that they know the most.  Again, familiarity.

Q.  Is there any other evidence that supports this conclusion?

A.  Yes, there's evidence from a academic study.  Slide 15.

Your Honor, we talked before about this DeCarolis study that analyzes the impact of introducing the European choice screens.  In that study, they leveraged the following:  Before

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

the choice screen is introduced in every of the different European countries, there is a little bit of variation about the market share of the competitors.  And that allows them to ask is the impact of the choice screen larger in contrast in which the competitors have a higher market share.  And the answer is yes.  That's what they find.

And there's another study.

Slide 16, please.

Your Honor, this is another study that -- from a group of economists in which they are comparing the impact of defaults with a number of choice screens.  And the study is complicated, I may get asked questions about it later, but here is the important part for the purpose of this conclusion: These researchers find -- they recruit people who have been using either Google or Bing, and they validate the study's been done, it's actually the case.  And then in a controlled condition with a basic choice screen, they ask Google users if they want to switch to Bing.  The percentage that do it is small, 1.1 percent, similar to the European data.

But this is the important part:  They also incentivize people in another control who are Google users to use Bing for two weeks in a way that they can monitor that they do.  And then at the end of the two weeks, they ask them -- they show them a second choice screen, and they ask them would you like to switch back to Google.  And what they find is that 33

percent of those who switch, who were -- accepted the payment to experiment for two weeks -- stayed -- chose explicitly to stay with Google.

I apologize, I'm misspeaking and it is important.  They offer the payment, a number of people who use Google agree to use Bing for two weeks.  At the end of the two weeks, they ask them do you want to switch back to Google, and 33 percent stay with Bing, even though they would not have chosen to do so without the incentives.  Which shows you that people are doing decisions in the choice screen, when shown by itself, based on this familiarity, but when they try the other product, maybe some of them, not all of them, discover that they like the other product, and they want to stay with it at least in the short-term.

Q.  Will the effectiveness of the choice screen change over time?

A.  Yeah, I believe so.

Especially, Your Honor, if it is a case that the market changes.  For example, if the remedies -- if the choice ends up being a package of remedies that include the quality and distribution of the competition.

Q.  How will other remedies interact with the choice screens?

A.  Well, if other remedies -- again, I'm repeating a little bit, but if other remedies improve the quality and

distribution of autosearch engines, that will make it more likely that when subjects -- subjects -- consumers encounter the choice screens will select them.

Q.   Do you have an opinion on which other remedies are necessary to make choice screens effective?

A.   Yes.

I want to be clear about this, Your Honor.  I'm not offering an opinion about difficult problem, which is which remedy should be introduced.  I'm making an analysis of choice screens.  And I am saying the impact of choice screens will depend on what else is happening.  And if the Court were to select other remedies that have the effect of improving quality and distribution, if the court did that and if they had that effect, that would make the choice screens more effective.

Q.   We're going to move to your third conclusion now.  What did you conclude about the role of choice architecture on choice screens?

A.   Slide 17.

Your Honor, to remind the Court, my third conclusion is that the performance of choice screens will depend on the choice architecture that is used to design them.  And the second part of this is that choice screen effectiveness could be improved in any remedy if they are -- if the choice screens are reviewed prior to deployment.

Q.   And who would they need to be reviewed by prior to deployment?

A.   Yes, thank you, Counselor.  It is important that they are reviewed by someone with behavioral expertise to be able to identify problems with the choice architectural that they are likely to generate biases and decrease the effectiveness.  And I will talk a little bit more about this in a moment.

Q.   Is the technology industry aware of the importance of choice architecture?

A.   Yes.  And they have used it repeatedly to induce consumers to make product selections that are consistent with their objectives, and the evidence that this is done is overwhelming.

Q.   Is there a term for that practice?

A.   Yeah.

     Your Honor, there is -- the term for this practice is a little colorful.  It's called "dark patterns."

Q.   Is there case evidence that supports the finding that Google has designed the choice architecture to increase use of its products, including Search?

A.   Slide 18.

     Yes, Your Honor, this is a short slide, out of respect for the Court's time, but throughout the case, and even in my previous presentation, I gave the Court multiple examples of how Google is able to play with the choice architecture to

improve usage of its products.

But in the concrete space of search, Google has tracked the amount of choice friction associated with changing search defaults and the amount of choice friction associated with privacy preferences.  And Google has also enforced contracts with third-party manufacturers to make sure that the degree of choice friction stays high enough that defaults are hard to change.

And just to give you an example.

Slide 19, please.

Your Honor, this is a document from -- the context is an email sent to Samsung.  Samsung has, in the Android devices, this thing called the S browser, and in the S browser, Google is the default.  And they wanted to make a change to the choice architecture that made it much easier to change the default, just with an app, with a dropdown menu, and Google send them this email that I said this cannot be done, it's in violation of our contracts, stop.  And this is an example of maintaining and enforcing a minimum degree of choice friction?

Q.   Would the elements of the choice architecture affect the performance of a choice screen?

A.   Yes, they would be fundamental.

Q.   What are some examples of elements of the choice architecture that would affect the performance of a choice

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

screen?

A.   Slide 20.

Your Honor, here's some examples of features of choice architecture that I believe behavioral economists, as a group, will believe are good features of a choice screen, in general, that is, unbiased and useful to consumers.

One is no option should be preselected as a default, for obvious reasons in this case.  Options should be listed in a random manner.  Consumers should have easily useful accessible information about the different options, not too much but enough -- enough that it's just right.  The application should avoid fear mingering -- I'm reverting to Spanish.  I apologize.  Fear messaging.  Your Honor, sometimes in choice screens, one encounters that if you press a button, you get a pop-up that says, "Are you sure you want to do this?"  This is fear messaging, but this should not be something like that.  Consumers should be required to scroll enough so that they see the full set of options before making a choice.  And the choice friction should be low.  This should minimize the number of required clicks.

Q.   Are there case documents that support these elements of an effective choice screen?

A.   Yes.  Slide 21, please.

Your Honor, it's always interesting, just as a behavioral economist, to check this understanding in the industry.  I

just told you that -- I gave you a list of things I think are consensual in my literature of these being good properties. This is an internal document for Mozilla in which they are discussing properties of a well-designed browser choice screen. And it's not exactly the same list, but as you can see, there's three bullet points. The first three bullet points are similar. The last one has do about when the choice screen is shown.

Q. Is there an extent to which choice screens that have released by tech companies in the past do not follow these best practices?

A. Yes.

Q. What are those?

A. Slide 22, please.

Your Honor, I encounter a number of case -- very recent case documents that have to do with problems in the choice architecture of the choice screens at Apple has released in Europe on its iPhones. And a number of companies, including Google and Mozilla, have submitted complaints to the European Union about this.

Let me give you some examples, because they illustrate the importance of choice architecture. So Google is complaining -- and to remind you, Google cares about this because they compete, Chrome versus Safari. A Apple choice screen introduces significant friction by forcing users to

take additional step of opening the app store.  It does not force all of the user to be all of the options.  These are violations of the list that I just gave you.

Mozilla says Apples's poor design means that -- I won't mention the name, it's private -- but a very large number of users don't complete the switch to Firefox because of choice friction, of how, after you want something, it's extra step that you need to do to implement them.  Third parties are listed in alphabetical order, but Safari is always listed first.  Again, a violation of what I just gave you.  Apple hides the browser default setting option when Safari is the default.  Introduce choice friction when it's advantageous to them.

And in a memo, the European Commission is summarizing a lot of this by saying Apple's design of the web choice screen may be preventing users from truly exercising their choice of services.

**Q.**  Are there other relevant case documents that support this conclusion?

**A.**  Yes, slide 23.

Your Honor, earlier I mentioned to you this letter from these three CEOs of independent search engines.  This letter makes a number of points.  One of them, which I am blowing up here for you, is about importance of choice architecture. They say, "Choice screen and switch mechanisms should

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

facilitate clear choice, and unfair attempts to reverse consumer choice, bad patterns, should be banned."

Interestingly, and this is the earlier highlight, they're also emphasizing the importance of pretesting before the choice screens are deployed.

Q.   And why do you conclude it would be useful to have behavioral experts review the choice screens?

A.   Because they will be able to spot some of the most obvious dark patterns before they are deployed.  And that will decrease the chances that they are taking to the marketplace and they are likely to improving do that, effectiveness of the choice screen.

Q.   Professor, now we're going to turn to your rebuttal conclusions in response to Professor Murphy's report.

THE COURT:  Let me back up for a moment, just to go back to the European choice screen and percentages that you identified of market change between, I think it was, half percent and 1.5 percent.  To a layperson, that doesn't sound like a big move in market change.  Do you view it differently, or would a behavioral economist view that differently?

THE WITNESS:  Your Honor, I think that number, in absolute terms, is small.  But that is consistent with the opinion, the two-part opinion that I'm giving you.

But that number needs to be taken in context in two different ways.  One is you will remember from the earlier

phase of the trial, Google starts with an enormous market share, which means that other search engines have a very small market share.  That means that .5 to 2 percentage points, looks like nothing to one part of the market, and it's enormous to another part of the market.  These other companies, I would imagine, would invest billions of dollars to try to gain that much.  So it's -- that's one thing I think I want to say.

The other thing is that I hope I'm communicating to the Court as a behavioral economist that we shouldn't think of the choice screen, the impact of a choice screen as a static number.  It depends on the context of what has happened before, how long were the defaults, how long is been since the choice screen has been deployed, and what else is happening in the market.  The impact of the choice screen will evolve with the market and with the remedies.

THE COURT:  What was it about the European choice screen that the authors of the report found to be lacking that, in their view, created this Delta between 3 percent and the lower actual percentage point movement?

THE WITNESS:  Of course, Your Honor, there are a couple of problems.  The first one is that for about a year, when the European choice screens were initially deployed, the list of competitors that were shown with Google was chosen in a very interesting way from the point of view architecture.

They were not, for example, search engines with highest market share.  Instead Google did something called pay-to-play options, in which they open an option in which companies, search engines, could bid for the right to be included.

But importantly, they didn't bid -- they didn't pay if they got selected to be included, they paid -- they bid how much they would pay after the subject click.  So in principle, I could tell you, if a subject clicks on me, I pay you a billion dollars.  I win the auction, I get included.  Nobody clicked on me in the choice screen, I don't have to pay.

So what happened as a result of that, Your Honor, is that the search engines that were introduced with Google, that were listed with Google in that initial choice screen, tended to be search engines that were not of the highest quality and were very consumer extractive.

THE COURT:  Thank you.

THE WITNESS:  The other problem that I should mention is that one should not think about the choice screens as every Android user having seen those choice screens.  There are problems with how they're introduced and when people see them that takes -- they take time to flow.

Q.   (BY MS. BARTELS)  So we will now turn to your rebuttal conclusions in response to Professor Murphy's report.

Professor, you mentioned earlier that in response to Professor Murphy, you have an opinion about any potential

negative impact on consumer welfare choice screens may present?

**A.**   I do.  Slide 24.  Sorry.

This is my conclusion, Your Honor, is that the introduction of the choice screens, by themselves, is a statement only about introducing the choice screens, is unlikely to harm consumer welfare.

**Q.**   And what is your expertise in analyzing consumer welfare?

**A.**   Your Honor, as part of my work as a behavioral economist, I have written some influential papers about methods to be used to think about consumer welfare in situations when consumers can make mistakes or can be biased, and therefore, one cannot take their choices as would be preference of one they like and one they don't like.

**Q.**   And based on your expertise in behavioral economics and consumer welfare, why would being presented with a choice screen not harm consumers?

**A.**   Slide 25, please.

Your Honor, to think about the overall impact on the welfare of consumers from the choice screen, we need to start by acknowledging or recognizing the heterogeneity in market. Not all consumers are identical.  And in my view, there are two important classes of consumers one need to take into account to think about this.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

First, there is going to be a sizable, quite sizable number of consumers based on the data that we have seen, that choose Google after the choice screen and were using Google before. Now, some of these consumers will have a history of usage in Google and a strong preference for Google, and that's why they're doing it. Without a doubt, those consumers are there. Some others will use Google before and Google after out of habits of familiarity and branding and confusion, but they still would use Google before and after.

So the only thing that has changed is they have to complete the choice screen. And in my view, that, at worst, is a negligible welfare effect, at worst. And to the extent that consumers like control of their own destiny, they could also derive activity from that. And there's some data that I will show you in a second about that.

Then -- that's one group of consumers, negligible impact. There is another group of consumers that will end up selecting another alternative search engine, not Google, whereas they were using Google before. And that they end up liking Google -- sorry, the nonGoogle search engine before. So they search away from Google, and they are better off because of that. Those consumers will be better off.

Now, I think it's important to recall the Mozilla study I just gave you, that there are consumers that they didn't know they liked it, they tried it, and they are better after that.

It has to be keep into account, when we think about this number of consumers, the total overall effect is going to be the sum of this.  It's hard to see how that number is not, at worst, negligible.

Q.   Are there studies that address this conclusion?

A.   Yes.  Slide 26.

So, Your Honor, I hinted about this a moment ago. There's some interesting aspect of the Mozilla browser choice study that speaks directly to this in which the study had a number of conditions.  So consumers make choices of browsers in different conditions, but all of them had to answer the following question:  Do you prefer a choice screen or a default?  And 97 to 98 percent of them, vast majority, prefer choice screen.

Q.   And what would happen if plaintiff's other remedies are successful?

A.   Well, I just spoke about that last category, Your Honor, of consumers that switch and end up liking the other search engine more.  If -- if other remedies are successful in increasing the quality and comp- -- distribution of competition, one would expect that group of consumers to grow, and therefore, would only make the welfare calculation of a choice screen more positive.

Q.   We're now going to turn to your second and final conclusion in response to Professor Murphy's report.

Are you familiar with Google's RPFJ?

A.   I am, especially to the extent that it relates to the behavioral analysis in the scope of my work.

Q.   And what is your second rebuttal conclusion?

A.   Slide 27, please.

Your Honor, my opinion, to remind the Court, is that allowing Google to retain this default on preinstallation agreements, even with some constraints, would continue to bias consumer choices in favor of Google.

Q.   What evidence supports this conclusion?

A.   Again, there is behavioral economics on a number of point of case evidence.

Q.   What studies support the conclusion that maintaining Google's ability to enter into default and preinstallation agreements with distribution partners, even with constraints, would continue to bias consumer behavior in its favor?

A.   Slide 28, please.

Your Honor, I thought it would be useful to show you a study to make the point out of the large body of economics, behavioral economic studies.

So in this slide, it's a slide you have seen before, I am showing you an example about shopping choice screen, in which a consumer needs to choose between two options, click one of them and add to cart.  Importantly, one of them is preselected as a default.  To choose the other one, you need to click the

other one.

Importantly, the other option is very prominently displayed.  It's right there in the screen, it takes only one click to go to it.  So it doesn't get -- the nondefault distribution doesn't get more prominent than in this example.  Despite this, studies like this show a sizable and robust default bias in favor of the default.

Now, compare this, in slide 29.

THE COURT:  Sorry, I am at 28.  The one on the left, that was the preselected default, the more expensive mango.

THE WITNESS:  Exactly, yes.

And they find -- they can comp- -- the researchers can compare what happens if the consumer see this choice screen, with the more expensive mango preselected, they will see exactly the same shopping chart, but there's no precheck.  And they find that the likelihood that the organic mango selected, in this particular study, Your Honor, just with this dinky intervention, is 13 percent.  So there's default of fact, with this very high product distribution, of 13 percent.

Now, if you go to slide 29, I want to compare for the Court this, with the kind of third-party distribution that we have seen in previous phases of the trial.  So to remind the Court, this is what happens if you are in an iPhone in Safari -- yeah, in Safari, and you want to change the default search engine, it's not shown in the main screen.  You have to

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

click several things.  There is a certain degree of choice friction.

What's the point of this, Your Honor?  We know that the impact of defaults increases with choice friction.  We know that there are already sizable and robust default effects, even with very prompt prominent distribution like the example I showed in the previous slide.  Therefore, one would expect that when there is third-party distribution but with much higher choice friction, the default effect would only be larger.

Q.  (BY MS. BARTELS)  Is there any market evidence consistent with this conclusion?

A.  Yes.  Page -- slide 30.

Your Honor -- one second, please.  During the liability phase of this case, I show you a number of market events involving -- a market data involving iPhones and Mozilla, the Waldo experiment where they changed the default, that situation where they went from Google to Yahoo and back.  In all of those cases, there was some third-party distribution.  And the data show that the default biases weren't there.

Just to remind the Court, for example, for the Apple events, this is how you reach this type of third-party distribution, through going through the screens that I show you.  So this shows that there is already data, that we've seen in court, in which there was third-party distribution,

but the default effects were still there.

Q.   Does this also apply to search applications?

A.   It does.

And the logic is very similar, Your Honor.  When we think about search applications, the same is going to be the case, that the impact of the defaults are going to be larger than in the studies than we think are more prominent and more easy to change.  So providing some sort of lower bound.

And if one goes to case materials, for example, and looks at the impact of defaults in search applications, you see that when you look at the Google -- at Google documents, in which they care deeply about competing with Safari for chrome, they say things like Safari lingering habits.  It's very challenging to change from a behavioral perspective.

Or in the earlier phase of the case, we discuss what was the impact of making Apple Maps a default in the iPhone, which led to -- I won't mention the number because it's confidential, but a very large decrease in the usage of Google Maps even after Google Maps introduced its own application.

Q.   And you were just speaking about slide 31.

Professor, does anything about Professor Murphy's report change your opinions or conclusions?

A.   No.

Q.   Professor, do you have any final comments to share with the Court?

**A.** Slide 32.

Just to remind the Court, the main point about choice -- my opinion about choice screens is that they will help to reduce bias. However, if introduced by themselves, even if they are well designed, they will not be sufficient to eliminate the full bias, and the choice architecture is critical. It will be helpful if it is reviewed prior to deployment.

MS. BARTELS: Thank you, Professor Rangel.

We are now going to move this slide deck into evidence as a demonstrative, PXR 004, to complete Professor Rangel's testimony.

THE COURT: Why don't we talk about it in a moment. We'll get started with the cross.

MS. BARTELS: Okay. We have no further questions at this time.

MR. SAFTY: Good afternoon, Your Honor. Graham Safty, of Williams and Connolly, on behalf of Google.

THE COURT: Mr. Safty.

CROSS-EXAMINATION

BY MR. SAFTY:

**Q.** Good afternoon, Professor. How are you today?

**A.** Hello.

**Q.** You're not offering an opinion in support of any of the remedies proposed by the plaintiffs in this case; right?

A.  Yeah, I'm providing an opinion about choice screens and the effect of maintaining defaults.  I'm not advocating or opining an opinion about what should be done.

Q.  Okay. And you're not offering an opinion about whether choice screens should be implemented on any particular device or browser; is that right?

A.  That is correct.

Q.  Plaintiff's counsel asked you to define biases as you understand the term, and your view is that biases affect every decision a consumer makes about which product or service to use; is that right?

A.  My view is -- my view -- the view of the body of work in behavioral economics that I'm trying to bring to court is that these behavioral mechanisms, under biases, are always there. Not important things, but sometimes they are negligible and sometimes are very large and very systematic.

Q.  You're not offering any opinion about whether reducing or eliminating any bias that you contend may exist in favor of Google is an appropriate objective in this case; correct?

A.  I am not beginning to presume to tell the Court what to do, including that.

Q.  You testified specifically about default biases.  And defaults are ubiquitous in consumer products; right?

A.  Yes.

Q.  And you haven't studied any web browser developer or

device manufacturers in this case that has implemented a search engine choice screen in the absence of a legal ruling or regulatory requirement; correct?

A. Just -- sorry, I missed the important objective in your sentence. Do you mind -- it's my bad, not yours.

Q. No problem. Thank you, Professor, for asking for the clarification.

You haven't studied any web browser developer or device manufacturer in this case that has implemented a search engine choice screen in the absence of a legal ruling or regulatory requirement?

A. That is correct. Thank you.

Q. In the United States, all of the devices and browsers you've studied, such as Microsoft Edge and Amazon Silk and the DuckDuckGo browser, all have default search engines; right?

A. Yes.

Q. You have not offered any opinions in which you attempt to quantify the default bias in favor of any search engine under any circumstances; correct?

A. I am not quantifying those default biases, no.

Q. And you are not offering any opinion concerning the percentage of Google queries in the U.S. that purportedly are attributable to default biases or any other factor; right?

A. Correct.

MR. SAFTY: May I approach, Your Honor.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

THE COURT:  Yes.

Q.  (BY MR. SAFTY)  Professor, I've handed you a copy of a demonstrative marked RDX D-03.  We can also go ahead and display that on the screen.

Professor, is this graphic consistent with your understanding of the search engine choice screens that have been implemented in Europe since 2020?

A.  Yes, roughly, yeah.

Q.  Is there anything you think is inaccurate about this graph?

A.  No, I do not.  I believe it's accurate.  I just -- you're testing episodic memories about a specific date, and that was just what I was referring to.

Q.  And your understanding is that the vast majority of users in Europe who have been shown each of the choice screens depicted here, have selected Google instead of another search engine; right?

A.  Yes.

Q.  You haven't formed any opinion about whether any search engine choice screen displayed in Europe since September 2021 was biased in favor of Google; correct?

A.  Clarification, please.  Starting in 2021?

Q.  Correct.

A.  I have not.

Q.  You're not offering any opinion in this case about the

extent to which the choice screens that have actually been implemented in Europe have reduced or eliminated any biases in favor of Google; right?

A.   I apologize, Counselor, again, do you mind repeating the question.

Q.   Sure.

You're not offering any opinion about the extent to which the choice screens that actually have been implemented in Europe have reduced or limited any biases in favor of Google; is that right?

A.   I may be misunderstanding you, but I am testifying -- I'm sorry.  You're asking me if I'm quantifying the outcomes in Europe, myself, and that's part of my testimony, no.  But I am using the data from Europe, as shown in the DeCarolis study, that shows the Google market share goes down by a half to 1.5 percent.  And that is consistent with decreasing the biases.

I'm using that study, I am not providing a new analysis, Your Honor.

I'm not quite sure what you're asking me.  That's why I want to clarify.

Q.   So you're not offering any opinion about how many users in Europe you think select Google from a choice screen because of the biases; is that fair?

A.   I am not quantifying that.

Q.   And you haven't studied how often users in Europe select a nonGoogle search engine from a choice screen and then, subsequently, switch back to using Google; is that right?

A.   Correct.

Q.   Plaintiff's counsel asked you some questions about brand strength and familiarity.  Do you generally recall that line of questioning?

A.   I do.

Q.   You're not offering any opinion about how many users may have selected Google from choice screens in Europe because of brand strength or familiarity; right?

A.   I am not providing an opinion specific to Europe; I'm certainly not quantifying that.  But I do, as highlighted in my testimony, believe that when consumers make choices out of a choice screen, after a default that has been successful is removed, brand familiarity play a big role.

Q.   You haven't studied the extent to which Google's brand familiarity or brand strength is attributable to the quality of Google Search; correct?

A.   I have not sought to quantify how brand versus quality versus familiarity versus other factors are playing a role.

Q.   Setting aside quantification, Professor, you haven't studied the attributes or factors of brand strength or familiarity at all; correct?

A.   Not explicitly, but all of these considerations are in the

line of behavioral economics.

Q.   You haven't studied whether Google's brand strength or familiarity among American consumers was equally substantial or more substantial in 2010 than it is today; correct?

A.   That is fair to say.

Q.   All else equal, you would expect a higher quality search engine to be selected more often from a choice screen; correct?

A.   Yes.

Q.   You're not offering any opinion about whether any portion or aspect of Google's brand strength is attributable to the contract provisions that the Court found to be anti-competitive in this case; right?

A.   Not directly, but I want to highlight that I have offered an opinion in this court that there are search engine defaults, and to the extent that these contracts are responsible for the defaults, there is a connection there. But not explicitly, no.

Q.   You haven't offered any opinion about the extent to which Google's brand strength or familiarity is a consequence of default placement, as opposed to any other number of other factors; correct?

A.   I have not quantified that, no.

Q.   And you haven't tried to determine how or why the brand strength or familiarity of a company like ChatGPT might have

changed over the last several years; correct?

A.   Fair.

Q.   Plaintiff's counsel asked you about how choice screen selections might change over time if other search engines improve their quality.  Do you remember that?

A.   Yes.

Q.   You're not offering any opinion about how any remedy proposed in this case might affect the quality of other search engines; correct?

A.   That is correct.  Just to be, again, crystal clear, I am testifying only on a conditional.  If the Court implements other remedies and they have that effect, they will show up in the choice screen.  They will make the choice screens more effective, that's all.

Q.   And you haven't conducted any analysis of whether or how search engine choice screen selections in Europe may have changed over the years, the choice screens have been in place there; correct?

A.   Correct.

Q.   Could you turn to slide 19 of the binder that you were handed earlier?

A.   My presentation?

Q.   Yes.

A.   Of course.  One second, please.  I'm there.

Q.   Did you review any testimony from the liability trial of a

Google employee about the event or email excerpted on this slide?

A.   I am sorry, I don't want to say no, because that is a very definitive thing, and I have seen so many documents, I have literally -- I have zero recollection of that.

Q.   You haven't studied the --

        THE COURT:   Doctor, what slide are you on?

        MR. SAFTY:   Slide 19.   I apologize, Your Honor.

        THE COURT:   Okay.   Thank you.

Q.   (BY MR. SAFTY)   Professor, you haven't studied the operation of the Samsung implementation referenced on this slide; correct?

A.   Could you repeat this.

Q.   Sure.

     You haven't studied the operation of the Samsung implementation referenced on this slide; right?

A.   I apologize, it's my Spanish ear, it's not you.   You're saying "operation"?

Q.   Correct.

A.   Oh, sorry.   Thank you.

     I have not.

Q.   You don't know why Google sent the message excerpted on slide 19; correct?

A.   I am providing no testimony about Google's motives.

Q.   You testified, in response to plaintiff's counsel's

questions, about economic studies where researchers compare a control group of consumers who are forced to make an explicit choice with a treatment group of consumers who are presented with a default.  Do you generally remember that testimony?

A.  I do.

Q.  In those studies, the estimate or measure of default bias in the particular study at issue is the difference between the outcome of the group forced to make a choice and the group presented with the default; right?

A.  There's a number of measures, but in the substance of the study that you are describing, that is correct.

Q.  And these behavioral economic studies that you describe in response to questions from plaintiff's counsel are very different than a scenario where users are exposed to a default and then subsequently exposed to a different default; correct?

A.  Yes, that's -- just to be crystal clear, Counselor, there --

Your Honor, are some studies in the literature that compare what happens when there's a default when there is no default.  That's what counselor was referring to before. There is another subset of the literature that compares what happens when one of the options is a default and when the other option is a default.  It's one default versus another default.  And in that particular case, the comparison is kind

of a double default, what is the effect of this default to nothing and from nothing to this other default.

Q.   And in the latter scenario that you're describing, if a researcher wanted to measure the default bias exerted by a particular default, ideally, the researcher would need to make a comparison to a third condition where there's a forced choice; correct?

A.   Yes.

Q.   You testified, in response to questions from plaintiff's counsel, about the introduction of Apple Maps in 2012.  And that's also an event you indicated you testified about at trial in 2023; is that right?

A.   Yes.

Q.   Do you know whether it's been possible at any point since 2012 to change the default mapping service on an iPhone from Apple Maps to Google Maps?

A.   I'm sorry, I have encountered that information.  I am not recalling it right now.

Q.   Google Maps is not preinstalled on any iPhone, to your knowledge; correct?

A.   To my knowledge.

Q.   Have you looked at any data from the last ten years regarding how widely used Google Maps is among iPhone owners?

A.   I have not.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.   Let's take a look at slide 31 of the binder that plaintiff's counsel gave you.  Let's look at the quote at the top.  Do you know when the document quoted there was created?

A.   Not from the top of my head, Counselor, but I'm sure you're about to tell me.

Q.   Do you know when it became possible to change the default browser on iPhones?

A.   I do not.

Q.   Do you know whether there was a period of time where it was not possible to change the default browser on iPhones?

A.   I do not.

Q.   So you don't know whether this document was created at a period of time when it was not possible to change the default browser on iPhones; correct?

A.   That is correct.

Q.   Plaintiff's counsel asked you about a study by Hunt Allcott and coauthors.  Do you remember that?

A.   I do.

         MR. SAFTY:  May I approach, Your Honor.

         THE COURT:  Sure.

Q.   (BY MR. SAFTY)  Professor, you had an excerpt from this paper on the slide that you looked at earlier.  I wanted to ask you whether this is -- what I've handed you is, in fact, the entirety of the study that you excerpted on your slide?

A.   It has a very long appendix, let me just check for a

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

second.  It looks like it.

Q.  Could you turn to page 3 of this study that you testified about earlier.

MR. SAFTY:  We can go ahead and put a call-out from this page on the screen as well, Andrew.

Q.  (BY MR. SAFTY)  You're familiar with page 3 of this study; right, Professor?

A.  I am very familiar with the study.  I haven't memorized page 3.

Q.  And you're aware that when the authors of this paper conducted this study, they found that when Google users were forced to make a choice between Google and Bing, 1.1 percent of Google users select Bing; is that correct?

A.  That is correct.

Q.  And conversely, according to the same paragraph here, when Bing users were forced to make a choice between Google and Bing, 16 percent selected Google; is that right?

A.  Yes.

Q.  The immediate effect of showing a search engine choice screen to Bing users in this study was that 16 percent switched to Google; right?

A.  That is literally the finding, yes.

Q.  And that effect persisted throughout the entire 56-day period the authors studied; right?

A.  In that particular -- yes, with the caveat that, remember,

there are several conditions.  You are describing one, which is just a basic choice screen, a subset of participants in that, and for those, it's true, not for others.

Q.   And in this condition -- thank you for pointing out that there are multiple conditions in this study.  In this particular condition, when users were -- when Bing users were simply shown a choice screen, 16 percent switched to Google, and 16 percent or more continued to use Google for 56 days; right?

A.   The numbers took turn a little bit, but yes, that's a fair description, qualitative description of the effect.

Q.   Now, you testified, in response to plaintiff's counsel's questions, about a different aspect of this study where a subset of Google users were offered $10 to switch to Bing for two weeks; is that right?

A.   Yes.

Q.   From a behavioral economics standpoint, offering users a payment as an incentive to make a choice will lead to different outcomes than presenting a choice screen; right?

A.   Yes, but let me be clear about one thing, just to put the study in context.

Your Honor, I think -- I feel that this is going to be a study you're going to hear a lot about in this case.

What this -- I believe, actually, that the authors say that explicitly in the paper.  What they really wanted to do

is be able to have people switch their default for a certain number of days and stick with it.  They couldn't enforce that because of constraints in the software that they used to run the experiment.  So they used the monetary incentive to this. I just wanted to provide the context.

But, please, let me respond to your question, Counselor. Yes, it is the case that as you change the experimental conditions, the behavior will change.  So if you pay me money, I will do things that I would not have done otherwise, for example.

Q.   Thank you, Professor.

I want to understand the numbers that you testified about in response to plaintiff's counsel's questions.  Your understanding of this study is that when Google users were offered $10 to switch to Bing for two weeks, 42 percent rejected the deal and stuck with Google, and 58 percent said I'll take the $10 and search with Bing; is that right?

A.   That is my recollection of the data, yes.

Q.   And then at the end of the two weeks, of those who accepted the payment and switched to Bing, 67 percent switched back to Google; right?

A.   That is correct.

Q.   So if we wanted to determine the percentage of Google users who accepted $10 to switch to Bing and continued using Bing two weeks later, we'd have to multiple the 58 percent by

the 33 percent; is that fair?

A.   It is.

Q.   And if we did the arithmetic in our heads, I've had the advantage of doing this on a calculator, the number's about 19 percent.  Does that sound right?

A.   Ballpark, yes.

Q.   That's around the same percentage of Bing users who switched to Google and continued using Google after simply being shown a choice screen without being paid; right?

A.   Yeah, but I think that you're not focusing on the important part of that condition in the study, Counselor.  The authors are crystal clear about this.

Your Honor, the important part, for the purpose of evaluating the scope of my work here, is not the number, it's not the 19 percent.  I mean, the 19 percent is not a trivial number.  What is important is that there were users who, if they have never been exposed to Bing, they would have still chosen Google out of the choice screen.  And they would have believed they were using the best product for them because those were their beliefs, because they have no exposure.

But after a mere two weeks of trying something else, they decide to stick with the number engine.  That's the important finding there.  That individuals seem to have be driving their choices at the point of the choice screen by mistaken beliefs about what they like and they don't like because they have

been using the default Google search engine.

Q.   Thank you, Professor, I appreciate that clarification.

And if you turn to page 20 of the study you have in front of you, there's a graph that will help us with this.

A.   Give me one second, Counselor -- oh, thank you.  Now I can see.

Q.   Professor, since you're familiar with this study and relied upon it in presenting your testimony today, you'll recall that this orange line in the middle of the other two lines reflects users who accepted the $10 to switch to Bing and kept searching with Bing; is that right?

A.   Correct.

Q.   And if we look at that orange line, we see that after the 14-day mark, it goes down, doesn't it?

A.   Just to be crystal clear, are you referring to -- there are two drops there.  The authors are plotting time in a way that is a little bit counterintuitive.  So if you look at this, there is an initial jump up in the orange line, then the orange line, then another big drop, and then a subsequent gradual drop, are you referring to the subsequent gradual drop?

Q.   I am referring to the drop between days 14 and 56.

A.   That's correct.  Yeah, it keeps going down gradually by a little bit.

Q.   So the more these users were exposed to Bing between days

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

14 and 56, the more they decided Bing wasn't for them; right?

A.    There is an assumption in your question that is not valid, which is that that is the causal force.  What we know, Counselor, is that as times go by --

One interesting feature of this study, Your Honor, is that -- I just want to explain why I'm saying this.  The researchers are able to install an extension in the browser being used by the individuals, by the subjects in the experiment, to see what they do over time.  In particular, from day zero to day 56.  So they can tell that some individuals are switching away from Google, which is what counselor is referring to.

Now, the reason why that is, they're implying it's because they were using Bing and they didn't like that.  I cannot tell you that was not the case, but there are other possibilities.  They may have decided they wanted to switch it and they may have forgotten or they may have been confused and suddenly they learned about this afterwards.  All that you can tell from this graph is that there is a gradual kind of exponential looking decline.

Q.    Right.  After the initial two weeks, if we look out for the full 56 days of the study, what we see is that the amount of Bing usage declines further and further; correct?

A.    Yes.

And also let me emphasize one other thing.  The term

"further and further" that you're using doesn't mean that it declines to zero. Okay. An exponential curve can decline to a positive amount and be always declining, which, by the way, when the authors feed the data, that's what they conclude is probably happening.

THE COURT: Mr. Safty, can I just ask you how much more time you have?

MR. SAFTY: I was just going to say, Your Honor, I recognize what time it is. I have five to ten more minutes.

THE COURT: Okay.

MR. SAFTY: Shall I proceed?

THE COURT: Please.

Q. (BY MR. SAFTY) Professor, plaintiff's counsel asked you some questions about the effects of Google continuing to be preinstalled on devices or set as default search engine. Do you remember that?

A. I do.

Q. And consumers sometimes interpret a default as a recommendation; correct?

A. Yes.

Q. If a device manufacturer or a browser developer sets a lower quality search engine as a default, some users will interpret that as recommending an inferior product; right?

A. Yes.

Q. You haven't evaluated how prohibiting Google from paying

to be the default in a browser would affect the quality or competitiveness of any browser; right?

A.   Correct.

Q.   You also haven't evaluated how prohibiting Google from paying for preinstallation of Google Search on a device would impact the quality or competitiveness of the device; right?

A.   Sorry, could you repeat that?  Lost you for a second.

Q.   Sure.

You haven't evaluated how prohibiting Google from paying to preinstall Google Search on a device would impact the quality or competitiveness of the device?

A.   Correct.

Q.   Your view is that there will be significant default biases in favor of whichever search engine is set as the default in a given browser or on a given device; right?

A.   Yes, with one small caveat, which the Court's opinion from the liability phase emphasizes, which is that the default effects depend on the quality and brand name of the option, so not all alternatives will have the same default advantage. But yes, there will always be a default advantage in this space.

Q.   And if a browser developer or device manufacturer replaces a default search engine that most users prefer with a different default search engine that most users don't prefer, that will certainly leave some users worse off, won't it?

A.   Let me -- I would say differently.  There are two parts to what you're saying.  I agree with one part, not with the rest.

Let me explain.  If the default manufacturer were to implement as a default an obviously lower quality search application or search engine -- I forgot which one of the two you were talking about.  I think it was a browser, right, in this particular example?

Q.   I was asking about a search default in a browser, yes.

A.   Thank you, Counselor.

If that were to be the case, there would be some individuals who, because the default effects are so strong, that will still use that.

Now, the experience of the quality of the search engine will not be ideal for those individuals, assuming, by the way, that when we define best, not only the search quality but preferences for privacy, advertisement.  It's really the best search engine.  I'm taking that as an implicit assumption.

But I also want to remind you that the implication for the welfare of the consumer that you're stating that worse off, doesn't necessarily follow.  Their experience from the browser and they maintain assumptions would be lower.  Now, no argument with that.

But there are consumers who value, who place utility on making their own choices.  If that second term is large enough, compare to the loss in experience from the browser,

the net effects still can be positive.

Q.   In the situation I'm asking you about, Professor, one default is replaced with another, so consumers aren't invited to make a choice.  Does that make sense?

A.   Yes.  I qualify my answer appropriately.  In that particular case, yes.

Q.   So in that scenario, where a default that most users prefer is replaced with a default that most users do not prefer, some users will certainly be worse off; right?

A.   Yes.

Q.   Plaintiff's counsel asked you some questions about the effect of search engine choice screens on consumer welfare. Do you remember that?

A.   I do.

Q.   You haven't studied what portion of consumers would prefer a search engine choice screen instead of a default; correct?

A.   I have not collected data on that.  I'm relying on the Mozilla study as well as the body of work in behavioral economics I'm familiar with.

Q.   And the study you're referring to was about browser choice screens, not search engine choice screens?

A.   Yes, but I think that still informs the space of choice screens for search engines.

Q.   You haven't done any testing in connection with your work on this case to evaluate whether search engine choice screens

impose costs on users; right?

A.   I have not collected any data specific to this case.

But I want to say to the Court that I have designed dozens to hundreds of user interfaces in my career.  I have a lot of familiarity with choice friction and method and what it takes.  And that I also rely, as mentioned in my reports -- I didn't mention in court, Your Honor -- on data from the Mozilla browser choice screen that shows that, in addition to 98 -- 97 to 98 percent of the users indicating they prefer choice screen, Mozilla also quantified how long it took those individuals to go through the choice screen, and it's in the order of 10 seconds.  So I'm relying on that.

Q.   Professor, have you reviewed plaintiff's proposed final judgment filed in this case?

A.   I have.

Q.   Are you aware that plaintiff's proposed final judgment would prohibit Google from paying a third party, such as Apple or Mozilla, to establish a search engine choice screen?

A.   Yes.

Q.   Do you have a view how that prohibition would affect consumer welfare?

A.   That's beyond the scope of my opinions.

Q.   You're not willing to offer any views on how that prohibition on payment to establish a search engine choice screen would affect consumer welfare; is that right?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.   You're asking me a question beyond the scope of my work, of my reports.

MR. SAFTY:  May I have just one moment, Your Honor.

MR. SAFTY:  No further questions.  And thank you for your time, Professor.

THE WITNESS:  Thank you, Counselor.

THE COURT:  Any redirect, Counsel?

REDIRECT EXAMINATION

BY MS. BARTELS:

Q.   Professor, you mentioned that it wasn't necessary for you to collect or analyze data to reach your conclusions.  Why is that?

A.   Okay.  I am a scientist, Your Honor, more data is always better.  But I feel very comfortable with my conclusions, especially since they are qualitative, because the three -- the body of economics, behavioral economics work is so robust and sizable, and then that and the case documents and the market events point in the same direction.  So I did not need that to make these conclusions that I'm offering.

Q.   And you talked with counsel a little bit ago about removing a default.  Do you remember that?

A.   Yes.

Q.   Does it matter how long a default has been in place?

A.   I think it will affect -- yes, the behavior.

So if you were -- just to give you an example, imagine,

Your Honor, that you are -- Google has been there for a long time, there will be a much likelihood -- a much higher likelihood that individuals are familiar with that search engine, brand familiarity.  If you were to be -- flip to, let's say, Bing or another search engine that has less brand familiarity, the likelihood of return to the other search engine, opting out of a default, would be higher.

I'm going back to the point of default effects are higher for -- more familiar, and options with a higher brand, and that the history of exposure to the other default will affect also that likelihood of switch.

Q.  And you just spoke with Google's counsel about the Allcott study.  Do you recall that?

A.  I do.

Q.  And he pointed you to one condition of the Allcott study. Did that change your conclusions in the matter?

A.  No, it does not.

It still shows, for the purposes that I'm using, that there's strong evidence in the Allcott study, Your Honor, that there are a sizable number of Google users who don't have well-formed preferences in the language of behavioral economics with alternative options because they have not been exposed to them.  They don't have enough experience.  And I was quite -- I find it quite striking that two weeks of exposure to Bing was sufficient to switch -- I'm taking the

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

math of the counselor in faith -- to 19 percent of them staying, staying with Bing afterwards, even though it dips after a while.

MS. BARTELS:  All right.  At this time we have no further questions.  And we would like to move the slide deck into evidence as a demonstrative, as PXRD 004, to complete Professor Rangel's testimony.

THE COURT:  Okay.  We'll talk about that in a moment.

MR. SAFTY:  Your Honor, if I may, I would note for the record that's subject to our standard objections about expert slides, including any objections --

THE COURT:  We'll talk about that in a second.

Professor Rangel, thank you very much.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Nice to see you again.

Look, the only issue I have -- well, there are two things.  One is, you know, again, I think consistent with the prior practice, we have not admitted demonstratives into evidence, and these slide decks that have been used with experts on both sides, we haven't admitted them as substantive evidence.  I've said so long as the underlying exhibits are there, it's the testimony plus the underlying exhibits, that's enough.

Now, look, to the extent there are a few things in

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

here that may not be formally in evidence, I'm happy to consider it.  For example, the study itself may not be in evidence, if you want the move that in.  But insofar as anything that he's relied on and talked about, it's already in the deck.  I'm not sure I see the need to move the deck in.  I mean, there's some illustrations in here, for example, that I can obviously take a look at still for demonstrative purposes, but I'm not sure there's anything substantively in here that adds to his testimony.

MS. BARTELS:  So he does have some testimony that references some figures that are red-boxed that we were not able to discuss.

THE COURT:  Oh, well, again, the red-box numbers come from some underlying document, presumptively, so that's in.  If that's your concern, then I wouldn't worry about that issue.

MS. BARTELS:  And we are not seeking to admit all of his, you know, underlying materials.  To the extent that he only relied upon them for his opinions, we're not seeking to admit those into evidence.  There are materials in there that are in evidence, but we would not be seeking to include any additional materials in there.

THE COURT:  You don't want to admit everything that's underlying his --

MS. BARTELS:  So we're admitting the deck as his

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

materials relied upon, but the individual documents, we would not necessarily be trying to get into evidence.

THE COURT:  Okay.

MR. SEVERT:  Your Honor, Adam Severt.  I just wanted to add, it's -- the red boxes are the concern.  It's not just what's in the document and it's confidential, but it's also things that the expert would have said in open court had he or she be able to.  That's the concern, is things that are red-boxed that the expert is unable to say because of the confidentiality.  We just want them to be able to be in evidence to the extent that they were things that the expert would have said.

THE COURT:  Look, if the concern is that the number, for example, slide 22, there's a number that's boxed out here, that wasn't formally put on the record.  I mean, that's certainly part of the record and even if you're not moving -- I guess if what you're concerned about is that you're not moving the underlying document in but you want to make sure that number is in the record, but it hasn't been put in the record testimony, I suppose we could make an exception for that limited purpose.  Or you could just simply put the document into evidence at no cost to you.  There's maybe a little bit of friction involved, but, you know, that would sort of tie up that issue.

MR. SEVERT:  Sure, I think our goal is for the

number, anything in a red box, to be the equivalent as if the expert actually said it, that's all.

THE COURT:  Okay.

MR. SCHMIDTLEIN:  The expert actually saying it doesn't make it -- make it evidence, if you understand.  Like there could be any number of things he's asked to assume or numbers.  That doesn't make it underlying, admissible evidence, as opposed to information he's relied on to form his opinions.  Because as Your Honor knows, expert can rely on all sorts of things that are not otherwise admissible.

THE COURT:  Right.

MR. SCHMIDTLEIN:  If the number that we're talking about is from a document that is otherwise admissible, then they can try to move that document into evidence.  But we do agree that this standing up and asking to move into evidence expert slides is not appropriate, and we're not going to ask for that either.

THE COURT:  Look, let's do the following, which is, I think just to do this properly -- and I do think Mr. Schmidtlein is right and as a strict matter, if there was a jury here, we would be a little bit more precise about this.  But let's just make sure that if there's a document that supports a number, just put the document in evidence.  I don't think they're going to object to it.  Maybe.  I mean, if -- my hope is there's not an objection.  If, for example, you're

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

592

relying on a Mozilla business record, I certainly hope nobody's going to stand on the absence of a certification at this point in the game to object. So let's do it that way, and I think that will alleviate -- address their concerns and take care of what you would like to make sure the record reflects.

MR. SCHMIDTLEIN: Sure.

THE COURT: Okay.

MR. SCHMIDTLEIN: And I think if there's an exception, we'll raise that. If it's a calculation, for example, that can't be said.

THE COURT: Okay. All right. All right. Thank you.

All right. So, Mr. Dahlquist, you want to just give me a quick preview of what we're expecting tomorrow.

MR. DAHLQUIST: Yes, Your Honor, thank you. We are slightly behind, probably about a half hour behind, I'd say. We did not get to Ms. Chow this evening. We will call her first thing tomorrow morning. Then we'll be followed by Mr. Shevelenko from Perplexity, then Mr. Weinberg from DuckDuckGo. We'll have our expert, Mr. Evans, standing by, he's the privacy expert, just in case we get there. There's a chance, I'd say not entirely certain, but that would be one summary if you wanted to review tonight, Professor Evans from privacy.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

THE COURT:  Which we have received; correct?

MR. DAHLQUIST:  For plaintiff's expert, yes, we should have that.

THE COURT:  All right.  Great.

MR. DAHLQUIST:  So that's our schedule for Wednesday.

THE COURT:  Okay.  Very good.

All right.  So anything on the Google, state side of things?

MR. SCHMIDTLEIN:  Nothing else from us, Your Honor.

MR. SCHWARTZ:  Nothing from us.

THE COURT:  Okay.  No other.

All right.  See everyone tomorrow morning.  Have a good evening, everyone.

(The proceedings were concluded at 5:17 p.m.)

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_____/s/_____
Christine T. Asif, Official Court Reporter

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

594

**< Dates >** .

**352 August 2024** 459:34 .

**APR,** 461:14 .

**April of 2025.** 496:4 .

**August 2024** 497:23 .

**December 11 of 2024** 503:13 .

**December 2024** 503:8 .

**December 2024 47** 459:39 .

**December 31, 2024,** 485:11 .

**December of 2024** 489:14, 502:18 .

**December of 2024** 502:22 .

**December of 2024,** 502:13 .

**February 26th, 2025** 525:15 .

**March 31 of 2025,** 487:11 .

**March 31, 2025** 487:14 .

**March 31, 2025,** 486:16, 501:7 .

**May** 534:18, 574:22, 584:4, 596:23 .

**November 30th, 2022,** 485:19 .

**November of 2022,** 485:17 .

**September 2021** 575:18 .

**$10** 586:4, 587:8, 587:10, 587:18, 589:9 .

**$300** 501:12 .

**$40** 501:9, 521:1 .

.

.

**< 0 >** .

**000** 545:3 .

**004** 536:3, 572:1, 599:7 .

**005** 508:13, 514:6 .

**006** 533:15 .

**011** 483:13 .

**012** 498:23 .

**013** 495:10, 497:9,

497:13 .

**0143** 500:15 .

**0182** 469:25 .

**02199** 458:38 .

**029** 488:11, 488:18 .

**03** 522:5 .

**033** 521:23, 522:3, 522:7 .

**0355** 459:32, 488:5, 488:7, 488:8, 488:9, 527:21 .

**06** 522:5 .

**0801** 517:19, 518:4 .

.

.

**< 1 >** .

**1** 457:13, 518:8, 518:12, 518:16, 518:21, 518:22, 519:6, 519:14, 531:4, 543:1 .

**1.1** 552:24, 584:24 .

**1.5** 544:13, 561:11, 576:13 .

**10** 470:7, 547:6, 596:5 .

**10-101** 457:33 .

**11** 525:19, 547:23 .

**116** 459:21 .

**12** 545:3, 548:25 .

**123** 525:18 .

**13** 545:8, 545:9, 545:19, 550:3, 569:3, 569:4 .

**1300** 458:17 .

**14** 472:15, 551:1, 589:22, 590:2 .

**14-day** 589:14 .

**141** 459:23 .

**143** 459:37, 500:9, 501:4, 501:6 .

**148** 459:39, 503:4, 503:17, 503:19, 503:20 .

**149** 459:30, 485:24, 486:5, 486:12 .

**15** 523:9, 523:13, 551:25 .

**150** 459:41, 509:8, 509:9, 509:25, 510:9 .

**151** 459:43, 513:13, 513:21, 514:4 .

**16** 552:12, 585:4, 585:8, 585:21, 585:22 .

**17** 555:1, 604:22 .

**18** 556:6 .

**182** 482:24 .

**19** 556:21, 579:22, 580:11, 581:1, 587:24, 588:10, 599:2 .

.

.

**< 2 >** .

**2** 536:19, 561:23 .

**20** 537:5, 557:13, 589:1 .

**20-** 501:15 .

**20-3010-APM** 457:6 .

**20001** 458:44 .

**20024** 458:32 .

**2005** 548:5 .

**2010** 578:4 .

**2012** 582:19, 582:23 .

**202** 458:45 .

**2020** 575:4 .

**20207** 458:24 .

**2021** 546:5, 575:19 .

**2023** 506:6, 506:7, 545:2, 582:20 .

**2024** 494:3, 494:8, 494:11, 494:13, 495:15, 497:5, 497:10, 501:16, 504:15, 504:22, 505:19, 505:24, 507:2, 516:3 .

**2024/2025** 497:18 .

**2025** 457:11, 459:32, 470:20, 470:23, 483:6, 483:18, 484:1, 486:2, 487:23, 491:8, 493:11, 493:21, 495:10, 495:16, 496:6, 497:11, 497:16, 508:11, 509:16, 515:13, 516:4, 516:24, 521:21, 522:9, 522:17, 522:22 .

**2029** 499:13, 500:1 .

**20530** 457:41, 457:47, 458:9 .

**209** 457:26 .

**21** 459:11, 558:11 .

**211** 528:3 .

**22** 559:3, 601:17 .

**225** 530:22 .

**227** 531:23 .

**228** 531:3 .

**23** 560:11 .

**24** 459:13, 564:2 .

**25** 564:19 .

**26** 486:17, 566:11 .

**27** 567:10 .

**28** 531:3, 567:24, 568:17 .

**29** 568:16, 569:5 .

**29.** 499:9 .

.

.

**< 3 >** .

**3** 523:11, 523:13, 538:16, 544:22, 562:14, 584:13, 584:17, 584:20 .

**3-31-2025** 459:30, 459:37 .

**30** 459:30, 523:11, 569:23 .

**30(b)(6** 468:7, 477:5 .

**31** 571:10, 583:9 .

**32** 459:32, 571:16 .

**33** 522:7, 553:6, 553:14, 587:20 .

**333** 458:43 .

**35** 523:13 .

**352** 497:21, 497:25, 498:9, 498:15 .

**354** 493:6, 497:3 .

**354-3247** 458:45 .

**355** 487:23, 508:10, 514:6 .

**355.005** 514:24 .

**356** 482:25, 483:3, 483:4, 521:20, 522:3 .

**37202** 458:25 .

.

.

**< 4 >** .

**4** 459:9, 506:4, 527:20, 540:5 .

**42** 459:34, 587:9 .

**45** 459:37 .

**450** 457:32, 457:39, 457:46, 458:7 .

**4o** 527:2, 527:3 .

.

.

**< 5 >** .

**5** 541:12, 561:23, 604:22 .

**5151** 512:16 .

**54** 459:41 .

**56** 585:23, 589:23, 590:2, 590:12, 590:25 .

**56-day** 585:12 .
**58** 459:43, 587:10, 587:20 .

**< 6 > .**
**6** 542:24 .
**600** 457:27 .
**60604** 457:28 .
**67** 587:14 .
**680** 458:31 .

**< 7 > .**
**7** 544:6 .
**71** 459:15 .
**7100** 457:40 .
**72** 493:8 .
**762** 470:8, 483:10 .
**79** 459:19 .
**7th** 458:18 .

**< 8 > .**
**8** 525:18, 544:23, 545:2 .
**80** 521:18, 546:15 .
**800** 458:37 .
**80203** 458:19 .
**85** 492:8, 492:23 .
**86** 472:16 .
**8714** 458:8 .

**< 9 > .**
**9** 545:23, 547:1 .
**94102** 457:34 .
**97** 566:18, 596:1 .
**98** 566:18, 596:1 .
_____/s/_____
___ 604:27 .

**< A > .**
**A-n-t-o-n-i-o** 535:8 .
**abandon** 466:17 .
**abide** 492:17 .
**ability** 461:17, 461:22, 462:20, 474:24, 475:8, 475:13, 475:17, 479:16, 500:6, 515:15,

567:20 .
**able** 462:11, 462:12, 465:5, 465:13, 467:7, 467:8, 473:17, 474:20, 478:20, 479:3, 479:8, 502:21, 520:20, 531:5, 531:7, 555:13, 556:10, 560:25, 586:18, 590:9, 600:14, 601:11, 601:14 .
**above-entitled** 604:25 .
**absence** 573:22, 574:5, 603:8 .
**absolute** 561:16 .
**Absolutely** 463:11, 478:7, 494:16, 507:23, 534:23 .
**academic** 551:24 .
**accelerating** 476:17 .
**accent** 477:15 .
**acceptable** 534:25 .
**accepted** 475:13, 534:16, 553:7, 587:14, 587:18, 589:9 .
**access** 461:4, 463:23, 465:6, 476:11, 487:2, 513:17, 532:12, 532:22, 544:21 .
**accessible** 531:12, 539:20, 557:22 .
**accomplished** 501:18, 501:23 .
**according** 585:2 .
**account** 564:25, 566:6 .
**accretive** 484:21 .
**accuracy** 522:24 .
**accurate** 575:8 .
**achieve** 497:15, 521:3 .
**achieving** 496:4 .
**acknowledging** 564:22 .
**acquired** 490:8 .
**across** 515:16, 517:20, 545:3 .
**activated** 546:6 .
**Active** 493:24, 493:25, 494:17, 494:18, 494:20, 494:21, 494:25, 495:11, 495:12, 495:22, 496:5, 548:15 .
**activity** 565:16 .

**actual** 562:15 .
**Actually** 469:9, 479:14, 479:20, 484:24, 485:13, 495:24, 506:18, 510:16, 514:9, 522:20, 526:7, 530:16, 552:20, 575:24, 576:5, 586:16, 602:6, 602:8 .
**Adam** 457:36, 601:7 .
**add** 487:13, 521:15, 568:6, 601:8 .
**added** 486:19, 487:6, 487:12 .
**addition** 462:9, 544:16, 550:24, 596:1 .
**additional** 559:15, 600:24 .
**address** 536:25, 566:10, 603:10 .
**addressing** 536:16 .
**adds** 600:10 .
**administrative** 533:13 .
**admissible** 602:12, 602:15, 602:19 .
**admission** 486:5, 488:5, 498:9, 500:15, 503:17, 509:25 .
**admit** 500:22, 501:4, 510:6, 514:3, 600:19, 600:22, 601:1 .
**admitted** 470:2, 488:7, 488:8, 498:13, 503:19, 527:24, 533:25, 599:20, 599:23 .
**admitting** 601:3 .
**ADQ** 551:17 .
**advance** 516:6 .
**advanced** 524:2 .
**advantage** 532:6, 550:22, 587:23, 593:4, 593:5 .
**advantageous** 560:4 .
**advertisement** 594:3 .
**advice** 467:4 .
**advocacy** 547:25 .
**advocating** 532:7, 548:8, 548:22, 572:20 .
**affect** 538:10, 539:10, 540:4, 557:8, 557:11, 573:3, 579:10, 592:7, 596:15, 596:19, 597:22,

598:10 .
**affected** 475:8, 475:13, 475:17 .
**affects** 461:17, 461:22, 461:24 .
**afford** 474:19 .
**Afternoon** 457:13, 477:16, 477:21, 481:2, 481:3, 534:11, 535:6, 572:7, 572:13 .
**afterwards** 590:21, 599:3 .
**agenda** 459:35, 497:24 .
**aggregate** 467:8 .
**ago** 483:7, 486:18, 501:8, 566:13, 597:17 .
**agree** 481:4, 481:8, 487:7, 520:4, 520:12, 524:6, 524:8, 524:17, 525:5, 525:9, 526:4, 526:20, 553:12, 593:12, 602:20 .
**agreement** 461:8, 461:10, 461:13, 461:15, 474:21, 478:4, 478:13 .
**agreements** 461:17, 461:23, 462:15, 463:5, 463:7, 475:4, 536:24, 541:24, 542:5, 567:13, 567:21 .
**Aguilar** 457:30 .
**ahead** 515:13, 523:8, 526:14, 575:1, 584:15 .
**Al.** 514:20 .
**aid** 464:1 .
**aids** 503:10 .
**aim** 529:11 .
**Ais** 531:9 .
**al** 457:6 .
**Aldape** 457:30 .
**Allcott** 584:2, 598:12, 598:15, 598:19 .
**alleviate** 603:10 .
**allow** 476:13, 476:20, 486:9, 537:20 .
**allowed** 546:14 .
**allowing** 536:23, 542:4, 567:12 .
**allows** 477:2, 478:13, 542:16, 548:15, 552:7 .

**Almost** 486:23 .
**aloud** 494:2 .
**alphabetical** 559:24 .
**already** 460:23, 493:8, 508:11, 511:2, 512:13, 529:11, 538:22, 539:14, 548:4, 569:15, 570:11, 600:6 .
**alternative** 565:21, 598:22 .
**alternatives** 531:9, 543:20, 593:3 .
**Although** 490:2 .
**Altman** 459:30, 485:22, 486:2, 486:17, 487:5, 487:8 .
**amazing** 479:22 .
**Amazon** 574:10 .
**ambiguous** 511:5 .
**ambitions** 497:19, 499:7 .
**ambitious** 497:20, 516:15 .
**American** 578:3 .
**Amit P. Mehta** 457:17 .
**among** 499:24, 517:15, 518:15, 538:19, 578:3, 583:6 .
**amongst** 509:1, 509:2 .
**amount** 462:7, 464:3, 475:12, 520:17, 539:25, 544:15, 556:13, 556:14, 591:1, 591:7 .
**analysis** 488:20, 535:12, 544:19, 554:17, 567:8, 576:16, 579:17 .
**analyze** 597:7 .
**analyzes** 552:2 .
**analyzing** 564:7 .
**and/or** 471:11 .
**Andrew** 514:5, 516:5, 584:16 .
**Android** 467:22, 473:15, 473:18, 505:11, 531:6, 544:20, 556:24, 563:16 .
**anecdotally** 505:13 .
**announced** 502:18, 503:11, 504:22 .
**announcing** 501:8 .

**Answer** 461:1, 463:2, 464:3, 466:7, 466:8, 468:25, 469:2, 469:4, 484:12, 491:4, 496:11, 501:3, 512:7, 512:16, 521:5, 521:9, 525:21, 525:25, 552:10, 566:17, 594:19 .
**answering** 482:6 .
**answers** 466:5, 482:3 .
**anti-competitive** 578:14 .
**Antitrust** 457:25, 457:38, 457:45, 458:14, 508:5 .
**Antonio** 459:17, 534:6, 534:14, 535:8 .
**anyway** 520:15 .
**API** 476:11, 505:22, 518:8, 518:12, 518:15, 518:17, 518:21, 519:3, 519:6, 519:14, 519:16 .
**Apologies** 518:1, 522:4 .
**apologize** 483:12, 498:20, 517:24, 523:7, 543:13, 548:21, 553:10, 557:25, 576:1, 580:11, 580:20 .
**app** 467:22, 467:23, 473:12, 490:20, 502:2, 511:2, 532:15, 539:3, 546:3, 557:2, 559:15 .
**APPEARANCES** 457:21, 458:1 .
**appears** 500:11, 501:10 .
**appendix** 491:12, 584:11 .
**Apple** 468:2, 468:19, 473:16, 502:13, 502:18, 502:22, 503:22, 504:1, 504:9, 504:12, 504:14, 504:18, 504:22, 504:23, 505:4, 505:10, 531:8, 531:10, 546:5, 547:2, 547:10, 551:17, 559:6, 559:14, 560:1, 560:6, 570:8, 571:5, 582:18, 582:24, 596:11 .
**Apples** 559:19 .
**application** 546:7, 546:8,

546:13, 557:24, 571:9, 593:16 .
**applications** 540:8, 543:4, 550:10, 550:12, 550:13, 551:13, 570:14, 570:17, 570:24 .
**applied** 537:10 .
**apply** 570:14 .
**applying** 542:14 .
**appreciate** 487:4, 523:4, 588:24 .
**approach** 475:20, 480:23, 525:12, 542:13, 574:22, 584:4 .
**approaching** 475:20 .
**appropriate** 468:14, 491:6, 500:19, 541:1, 573:13, 602:22 .
**appropriately** 594:19 .
**April 22** 457:11 .
**Aquilar** 459:9, 459:15, 460:3, 498:16, 527:11 .
**architectural** 555:14 .
**architecture** 539:7, 539:8, 539:13, 539:15, 539:22, 540:25, 541:1, 544:18, 549:6, 551:7, 554:25, 555:4, 555:18, 556:4, 556:11, 557:1, 557:7, 557:11, 557:15, 559:6, 559:11, 560:16, 562:21, 571:22 .
**argue** 475:12 .
**argued** 464:17 .
**arguing** 551:5, 551:9 .
**argument** 551:7, 594:10 .
**arithmetic** 587:22 .
**Arlen** 457:30 .
**around** 487:18, 489:10, 489:12, 503:8, 506:17, 588:1 .
**arrangement** 478:25, 480:2, 504:14 .
**arrangements** 462:10 .
**article** 544:8 .
**articulate** 529:9 .
**Aside** 473:16, 475:16, 520:22, 525:5, 525:22, 526:9, 577:22 .

**Asif** 458:41, 604:23, 604:28 .
**asks** 538:18, 546:7 .
**aspect** 480:1, 566:13, 578:12, 586:3 .
**aspects** 541:18 .
**aspiration** 499:19 .
**assignment** 536:8, 536:11, 536:20, 537:2, 537:7, 537:10 .
**assignments** 536:12 .
**assist** 535:16 .
**assistant** 475:1, 478:17, 479:14, 481:15, 509:17, 531:6 .
**assistants** 531:13 .
**associated** 535:14, 536:16, 539:3, 543:4, 556:13, 556:15 .
**assume** 491:16, 496:1, 602:11 .
**assuming** 500:21, 594:1 .
**assumption** 495:21, 501:11, 590:4, 594:5 .
**assumptions** 594:10 .
**asymmetry** 551:4 .
**attempt** 506:5, 574:14 .
**attempts** 560:18 .
**attention** 483:11, 528:9 .
**Attorney** 458:22 .
**attributable** 574:19, 577:17, 578:13 .
**attribute** 473:20, 507:15 .
**attributed** 484:9 .
**attributes** 577:23 .
**auction** 563:5 .
**Austin** 458:21, 477:17 .
**authors** 562:13, 584:21, 585:12, 586:17, 588:7, 589:16, 591:8 .
**automatically** 511:12, 511:18 .
**autosearch** 554:8 .
**availability** 503:12 .
**available** 461:6, 463:15, 464:16, 468:20, 471:10, 492:15, 492:16, 502:16, 523:24 .

**Avenue** 457:32, 458:31, 458:43 .
**average** 493:4, 493:23, 544:12 .
**avoid** 485:6, 539:17, 557:24 .
**aware** 475:4, 477:23, 478:1, 505:6, 505:8, 544:24, 546:16, 555:17, 584:21, 596:9 .
**away** 565:24, 590:13 .
**awesome** 470:24 .

.

.

**< B >** .
**back** 460:2, 465:8, 465:17, 474:6, 482:7, 497:2, 497:8, 508:10, 514:6, 514:22, 517:16, 521:22, 521:24, 551:9, 553:5, 553:14, 561:8, 561:9, 570:4, 576:25, 587:15, 598:7 .
**bad** 560:19, 573:25 .
**Ballpark** 587:25 .
**banned.** 560:19 .
**bar** 470:13, 470:14, 470:15, 471:2, 472:2, 472:9, 472:10, 472:22, 472:25, 473:1, 473:3, 478:12 .
**BARTELS** 457:43, 459:19, 459:23, 534:12, 535:18, 536:7, 569:21 .
**base** 495:16, 495:24, 495:25, 496:5, 497:11, 497:16, 532:8 .
**based** 465:10, 469:16, 479:21, 490:3, 490:14, 500:21, 516:25, 517:2, 523:20, 523:24, 523:25, 524:3, 549:18, 549:19, 553:18, 564:16, 565:3 .
**basic** 552:22, 585:15 .
**basically** 512:11, 548:7, 551:19 .
**basis** 543:5 .
**Bates** 470:8, 528:2, 531:22 .
**became** 487:17, 502:16,

505:14, 583:15 .
**become** 461:13 .
**beginning** 502:22, 573:15 .
**begun** 467:24, 529:11 .
**behalf** 477:17, 495:4, 533:13, 572:8 .
**behavior** 542:22, 567:23, 587:1, 597:22 .
**behavioral** 534:17, 535:11, 536:13, 536:21, 537:6, 537:9, 537:16, 538:5, 538:8, 542:14, 543:6, 543:9, 543:13, 549:20, 550:5, 550:6, 555:12, 557:15, 558:13, 560:24, 561:13, 562:4, 564:9, 564:16, 567:8, 567:17, 568:2, 571:3, 573:6, 573:7, 578:1, 581:19, 586:7, 595:10, 597:12, 598:22 .
**behind** 460:14, 603:23 .
**beliefs** 588:15, 588:21 .
**believe** 461:22, 470:11, 471:9, 473:14, 475:7, 478:20, 485:17, 487:1, 487:15, 494:21, 496:19, 497:7, 498:11, 503:2, 506:3, 515:10, 521:10, 521:21, 522:20, 524:24, 530:10, 549:24, 553:24, 557:15, 557:16, 575:8, 577:12, 586:16 .
**believed** 588:14 .
**belongs.** 548:13 .
**below** 490:23, 512:20, 530:4 .
**bench** 510:7 .
**benefit** 483:24, 507:13 .
**benefits** 531:5, 538:12, 539:11, 548:15 .
**best** 463:21, 464:7, 464:11, 504:23, 505:2, 558:25, 588:15, 594:2, 594:4 .
**better** 462:13, 465:17, 465:18, 476:14, 477:2, 479:11, 485:3, 502:20, 527:3, 565:25, 566:1, 566:5, 597:10 .

**beyond** 473:22, 496:7, 521:11, 521:18, 596:16, 596:21 .
**bias** 535:14, 536:16, 536:25, 538:5, 538:7, 540:4, 540:11, 540:21, 541:25, 542:7, 549:4, 567:14, 567:22, 568:14, 571:19, 571:21, 573:12, 574:14, 581:12, 582:13 .
**biased** 564:13, 575:18 .
**biases** 540:7, 540:12, 540:19, 543:2, 544:2, 544:15, 549:8, 555:14, 570:6, 573:1, 573:2, 573:7, 573:17, 574:16, 574:19, 575:25, 576:6, 576:14, 576:21, 592:22 .
**bid** 562:25, 563:1, 563:3 .
**big** 547:3, 561:12, 577:15, 589:20 .
**biggest** 515:15 .
**billion** 501:9, 501:12, 509:17, 511:1, 521:1, 563:5 .
**billions** 562:1 .
**binary** 539:5 .
**binder** 469:25, 482:25, 483:1, 487:22, 493:6, 497:22, 500:9, 503:4, 517:23, 521:25, 527:15, 527:17, 579:22, 583:9 .
**Bing** 550:20, 552:19, 552:23, 553:2, 553:12, 553:14, 584:24, 585:3, 585:4, 585:8, 585:20, 586:5, 587:8, 587:11, 587:14, 587:18, 587:19, 588:1, 588:12, 589:10, 590:1, 590:2, 590:16, 591:1, 598:3, 598:25, 599:3 .
**bit** 462:22, 478:24, 483:7, 512:20, 517:17, 517:18, 523:10, 552:6, 554:7, 555:15, 585:24, 589:17, 589:25, 597:17, 602:1, 603:1 .
**black** 460:13, 483:1, 521:24 .
**blocked** 497:4 .
**Blog** 459:37, 501:2,

513:1 .
**blowing** 560:15 .
**blue** 484:23 .
**board** 459:34, 497:23, 499:17, 499:25, 500:2 .
**body** 537:10, 543:6, 549:19, 568:1, 573:5, 595:9, 597:12 .
**Boston** 458:38 .
**bottom** 512:21, 531:22 .
**bound** 570:21 .
**boundary** 484:18, 485:1, 506:14 .
**Box** 458:24, 460:13, 470:6, 488:13, 602:5 .
**boxed** 601:18 .
**boxes** 470:11, 535:22, 601:8 .
**Boylston** 458:37 .
**brand** 496:20, 505:14, 517:10, 550:13, 550:18, 551:3, 551:11, 551:15, 577:4, 577:9, 577:14, 577:17, 577:19, 577:23, 578:2, 578:12, 578:21, 579:1, 593:2, 598:2, 598:4, 598:9 .
**branding** 565:10 .
**break** 514:15, 523:6 .
**bring** 573:6 .
**bringing** 511:2, 524:11 .
**broader** 470:18, 470:25, 516:7, 528:20, 530:8 .
**Broadway** 458:17 .
**Browse** 479:15, 506:3, 506:10, 506:12 .
**browser** 478:12, 523:20, 523:24, 524:3, 524:11, 524:12, 524:14, 524:18, 524:20, 529:15, 532:14, 545:10, 547:10, 556:24, 556:25, 558:18, 560:2, 566:14, 572:24, 573:20, 574:3, 574:10, 583:16, 583:19, 583:24, 590:10, 592:1, 592:7, 592:8, 592:23, 593:6, 593:18, 593:20, 594:9, 594:14, 595:12, 595:25 .
**browsers** 528:25, 529:13,

529:20, 545:5, 545:10, 545:20, 548:16, 548:21, 566:16, 574:9 .
**Bruce** 458:11 .
**build** 460:8, 464:1, 476:12, 476:14, 477:2, 495:2, 511:11, 520:1, 520:13, 520:19, 521:2, 525:4, 526:25, 527:5, 529:12, 550:13 .
**building** 460:20, 463:21, 475:1, 516:8, 519:22, 519:23, 521:10, 523:20, 524:3, 525:22, 528:21 .
**built** 511:9, 516:13, 516:14, 520:19, 522:14 .
**bullet** 499:6, 499:20, 499:22, 558:20 .
**bunch** 510:12 .
**business** 463:4, 514:3, 515:18, 519:2, 603:7 .
**businesses** 532:11 .
**button** 558:2 .
.
.
**< C >** .
**C.** 457:12, 458:29, 458:44 .
**CA** 457:34 .
**calculation** 567:3, 603:16 .
**calculator** 587:23 .
**call** 505:22, 508:1, 518:8, 529:14, 529:15, 529:16, 603:25 .
**call-out** 584:15 .
**called** 484:18, 506:3, 530:20, 534:7, 539:3, 556:1, 556:24, 562:23 .
**calls** 534:13 .
**candidates** 539:17 .
**cannibalization** 515:18 .
**capable** 460:11 .
**capacity** 521:11 .
**capital** 500:7, 501:9 .
**cards** 532:2, 532:15 .
**care** 570:25, 603:11 .
**career** 595:22 .

**careful** 505:1 .
**cares** 559:12 .
**Carr** 458:15 .
**carried** 537:7 .
**carry** 537:2 .
**cart** 568:6 .
**cases** 473:7, 476:16, 481:23, 485:4, 570:4 .
**categories** 476:10, 515:24 .
**category** 476:25, 529:21, 566:22 .
**category-defining** 517:9 .
**causal** 590:5 .
**cause** 536:25 .
**causing** 472:24 .
**caution** 488:12 .
**caveat** 491:5, 496:8, 500:4, 585:13, 592:25 .
**caveats** 490:23 .
**Center** 458:16 .
**CEO** 485:22, 509:13 .
**Ceos** 548:20, 560:13 .
**certain** 471:22, 473:23, 483:15, 489:16, 499:8, 519:20, 530:13, 569:12, 586:19, 604:5 .
**Certainly** 460:17, 462:20, 473:9, 475:10, 482:16, 484:8, 487:3, 513:11, 513:18, 514:23, 517:23, 518:18, 577:11, 593:9, 594:23, 601:19, 603:7 .
**certification** 603:8 .
**certify** 604:23 .
**cetera** 484:21, 490:25 .
**chain** 524:25 .
**challenging** 571:2 .
**chance** 530:9, 530:12, 604:4 .
**chances** 561:2 .
**change** 542:22, 553:23, 556:19, 557:1, 557:2, 561:10, 561:12, 569:10, 570:20, 571:2, 571:12, 579:6, 582:23, 583:15, 583:19, 583:24, 586:25, 587:1, 598:15 .

**changed** 472:18, 565:12, 570:3, 579:2, 579:19 .
**changes** 484:23, 538:8, 539:8, 554:1 .
**changing** 556:14 .
**characterize** 515:21, 524:16 .
**chart** 493:1, 497:9, 568:25 .
**chat** 512:3 .
**chatbot** 471:6, 481:12, 481:19, 490:20, 508:19, 510:15, 512:10, 512:12, 514:19, 515:9, 516:19 .
**chatbots** 489:5, 489:6, 489:7 .
**Chatgpt.** 531:13 .
**Chatgpt.com** 467:22, 490:19, 490:21, 494:22, 506:9, 532:14 .
**check** 558:13, 584:11 .
**check-out** 479:21 .
**Chicago** 457:28 .
**choices** 541:25, 545:7, 564:13, 566:16, 567:14, 577:13, 588:20, 594:12 .
**choose** 545:9, 545:20, 550:17, 565:4, 568:5, 568:7 .
**chooses** 479:11 .
**chose** 553:8 .
**chosen** 543:18, 553:15, 562:20, 588:13 .
**Chow** 603:24 .
**Christine** 458:41, 604:23, 604:28 .
**Chrome** 473:3, 477:24, 478:5, 478:12, 478:19, 479:4, 479:13, 479:16, 480:4, 480:5, 480:13, 480:14, 480:16, 511:10, 511:21, 523:18, 523:25, 529:20, 545:11, 547:9, 547:17, 559:13, 571:1 .
**Chromium** 523:21, 523:23, 524:3 .
**circumstances** 574:15 .
**CIVIL** 457:5 .

**Clarification** 490:17, 574:2, 575:19, 588:25 .
**clarify** 460:9, 490:7, 501:23, 576:18 .
**clarifying** 460:6, 484:6, 496:14 .
**classes** 564:25 .
**Classifier** 466:23, 467:15 .
**classifiers** 466:13, 467:7 .
**classifiers.** 466:21 .
**Claude** 489:1, 508:25, 514:20 .
**Claude.com** 490:19 .
**cleaner** 492:25 .
**clear** 460:19, 490:4, 505:9, 532:19, 554:14, 560:17, 579:13, 581:24, 586:11, 588:7, 589:15 .
**clearer** 520:9 .
**CLERK** 534:10 .
**click** 466:15, 466:16, 563:3, 568:6, 568:8, 568:11, 569:11 .
**click-and-query** 524:22, 525:1, 525:6, 525:23, 526:4, 526:21, 526:25 .
**clicked** 466:15, 563:6 .
**clicks** 539:18, 558:8, 563:4 .
**close** 526:14 .
**closed** 468:5 .
**CO** 458:19 .
**Co-pilot** 489:2, 509:1, 514:20 .
**coauthors** 584:2 .
**code** 482:2, 482:3, 482:4, 499:1, 523:23 .
**coding** 485:7 .
**collaboration** 503:1 .
**collect** 466:12, 466:19, 523:9, 597:7 .
**collected** 595:8, 595:18 .
**Colloquially** 489:6 .
**color** 547:22 .
**Colorado** 458:12, 458:15, 477:18 .
**colorful** 556:1 .

COLUMBIA 457:2 .
column 494:4 .
com 473:4, 473:5, 473:6 .
comes 467:21, 471:12, 514:2, 533:24, 542:5 .
comfortable 597:10 .
coming 467:4, 467:5 .
comment 493:18, 493:19, 495:18, 495:19, 495:23, 496:2 .
comments 493:18, 571:14 .
commercial 462:10, 480:1, 504:14, 504:18, 524:18 .
Commission 560:5 .
communicating 562:3 .
comp- 566:25, 568:21 .
companies 463:18, 558:24, 559:8, 561:25, 562:24 .
company 499:7, 515:14, 515:20, 530:8, 548:11, 579:1 .
compare 466:4, 472:2, 485:8, 543:17, 568:16, 568:22, 569:5, 581:6, 582:2, 594:13 .
compared 505:10 .
compares 582:5 .
comparing 472:11, 543:22, 552:14 .
comparison 491:9, 545:11, 545:17, 582:8, 582:14 .
compete 474:8, 474:9, 519:16, 532:18, 548:6, 559:13 .
competed 503:25, 519:11, 519:15 .
competes 508:25 .
competing 508:6, 513:9, 519:18, 571:1 .
competition 508:18, 509:21, 510:19, 514:18, 528:14, 528:18, 528:19, 531:5, 554:3, 567:1 .
competitive 462:16, 462:17, 471:11, 480:12, 490:24, 491:2, 496:9, 496:12,

507:21, 508:7, 508:8, 513:14, 515:19 .
competitiveness 592:8, 592:12, 592:19 .
competitor 531:20 .
Competitors 463:13, 471:5, 488:24, 508:15, 509:23, 515:2, 515:24, 516:18, 528:10, 529:21, 532:11, 532:20, 532:21, 552:7, 552:9, 562:19 .
complaining 559:12 .
complaints 559:9 .
complete 463:25, 536:3, 538:24, 539:19, 559:21, 565:13, 572:1, 599:8 .
complex 460:17, 469:3 .
complexity 539:25 .
complicated 552:16 .
component 465:11 .
compose 481:25 .
comprehensive 466:9 .
compute 517:11 .
computer-aided 458:49 .
concept 464:20 .
concern 600:17, 601:8, 601:12, 601:16 .
concerned 510:19, 601:20 .
concerning 574:17 .
concerns 603:10 .
conclude 515:5, 540:3, 542:21, 554:24, 560:23, 591:9 .
concluded 604:22 .
conclusion 519:13, 536:1, 540:6, 541:6, 541:7, 541:11, 541:13, 541:22, 541:23, 543:1, 543:5, 543:10, 543:25, 545:15, 548:24, 549:2, 549:4, 549:18, 551:23, 552:18, 554:23, 555:3, 560:10, 564:3, 566:10, 567:5, 567:9, 567:16, 567:19, 569:22 .
conclusions 540:3, 540:11, 541:5, 542:8, 542:16, 561:6, 563:21, 571:12,

597:8, 597:11, 597:16, 598:15 .
concordant 542:16 .
concrete 473:24, 556:12 .
condition 543:17, 543:19, 543:23, 545:12, 552:21, 582:15, 585:18, 585:20, 588:6, 598:14 .
conditional 579:13 .
conditions 566:15, 566:16, 585:14, 585:19, 587:1 .
conduct 477:10 .
conducted 579:17, 584:22 .
confidential 468:5, 490:12, 571:7, 601:10 .
confidentiality 470:4, 601:13 .
confirm 534:24 .
confused 517:24, 590:20 .
confusion 495:23, 565:10 .
connected 507:4, 507:5 .
connection 578:19, 595:15 .
Connolly 458:30, 572:8 .
consensual 558:15 .
consequence 578:22 .
consider 464:5, 479:3, 507:21, 507:24, 600:3 .
consideration 461:1, 521:16 .
considerations 518:19, 577:25 .
consistent 490:12, 513:4, 537:16, 544:14, 547:24, 550:8, 551:3, 555:20, 561:16, 569:22, 575:2, 576:14, 599:19 .
constantly 547:2 .
Constitution 458:43 .
constraints 536:24, 542:5, 567:13, 567:22, 586:20 .
consume 460:24 .

Consumers 464:15, 481:10, 541:9, 545:8, 545:19, 546:13, 546:15, 550:9, 554:9, 555:20, 557:18, 557:21, 558:5, 564:12, 564:18, 564:21, 564:23, 564:25, 565:3, 565:5, 565:8, 565:15, 565:19, 565:20, 566:1, 566:3, 566:6, 566:15, 566:23, 567:2, 577:12, 578:3, 581:6, 581:8, 591:23, 594:11, 594:17, 595:5 .
Cont'd 458:1, 460:4 .
contains 470:10, 525:11 .
contend 573:12 .
content 460:15, 460:18, 462:4, 462:21 .
contest 548:19 .
contestability 548:17 .
contexts 465:3 .
contextualize 470:17 .
contextualizing 484:2 .
continue 480:5, 492:18, 523:15, 567:14, 567:22 .
Continued 459:9, 585:22, 587:19, 588:2 .
continues 502:25, 542:6 .
continuing 591:20 .
contract 578:13 .
contracts 462:13, 556:16, 557:5, 578:18 .
contrast 549:1, 552:8 .
contributed 488:2 .
control 532:12, 543:19, 543:21, 548:12, 553:1, 565:15, 581:6 .
controlled 552:21 .
controls 532:21 .
conversation 466:14, 466:17, 467:10, 467:16, 474:11, 474:12, 511:13, 511:18, 512:1, 512:9, 530:18 .
conversations 474:4, 474:17, 475:2, 475:6 .

conversely 585:2 .
copy 489:23, 492:24, 493:1,
    525:13, 574:25 .
core 464:5, 478:3 .
correctly 529:2 .
cost 538:11, 539:11,
    602:1 .
costs 595:17 .
Counsel 480:21, 490:6,
    526:16, 533:23, 534:25,
    573:1, 577:3, 579:5, 581:5,
    581:21, 582:18, 583:10,
    584:1, 586:3, 587:6,
    591:18, 595:1, 597:3,
    597:17, 598:11 .
Counselor 555:11, 576:1,
    581:25, 582:3, 583:13,
    586:25, 588:7, 589:4,
    590:6, 590:14, 593:21,
    597:2, 599:2 .
count 494:23, 502:15 .
counted 494:21,
    494:25 .
counterfactual 544:19 .
counterintuitive
    589:18 .
countries 492:20, 545:4,
    552:5 .
country 488:21 .
couple 501:8, 562:17 .
course 462:25, 494:8, 544:6,
    545:16, 562:16,
    580:1 .
courtroom 468:6 .
cover 468:8 .
crawling 462:5 .
Craze 472:15 .
craziest 486:18 .
crazy 485:20, 487:11 .
created 470:18, 489:13,
    489:14, 493:15, 499:2,
    540:23, 562:14, 583:12,
    583:23 .
creation 472:19 .
critical 464:17, 532:1,
    571:22 .
criticality 530:25 .
cross 572:4 .
CROSS-EXAMINATION
    459:13, 459:21, 480:25,

572:11 .
crystal 579:12, 581:24, 588:7,
    589:15 .
current 473:20, 473:21,
    494:4, 520:12 .
currently 461:5, 481:22,
    497:15 .
curve 591:6 .
customer 476:4 .
customers 461:13,
    478:6 .
customizing 547:21 .
cut 471:19 .

.

.
< D > .
D-03 574:25 .
DAHLQUIST 457:23, 603:20,
    603:22, 604:8,
    604:11 .
daily 464:2, 471:3, 472:8,
    472:21, 472:23, 484:3,
    495:12, 495:22,
    496:5 .
dark 556:1, 561:1 .
data. 491:3 .
date 468:1, 503:6, 510:20,
    524:12, 524:18, 524:20,
    575:10 .
dated 459:30, 459:37 .
dates 503:3 .
David 457:23 .
Day 457:13, 590:12 .
days 486:21, 487:3, 487:6,
    487:10, 585:23, 586:19,
    589:22, 590:2,
    590:25 .
days. 486:19 .
DC 457:41, 457:47, 458:9,
    458:32 .
de 543:21, 546:4 .
deal 475:14, 501:19, 501:24,
    502:11, 503:21, 504:1,
    504:4, 504:5, 504:9,
    504:14, 504:18, 504:20,
    504:22, 504:24, 505:3,
    505:4, 505:7, 505:8,
    587:9 .
deals 504:12, 504:21 .
debated 524:7 .

Decarolis 544:8, 552:2,
    576:12 .
decide 588:18 .
decided 524:4, 524:10,
    524:13, 590:2,
    590:18 .
decides 549:13 .
decision 484:18, 485:1,
    506:14, 538:9, 538:10,
    539:10, 539:19,
    573:3 .
decisions 492:14, 539:12,
    553:17 .
deck 470:18, 491:7, 491:10,
    491:12, 497:23, 498:2,
    522:11, 522:23, 536:2,
    571:25, 599:7, 600:6,
    600:7, 601:3 .
decks 471:18, 599:21 .
decline 590:23, 591:7 .
declines 591:1, 591:6 .
declining 591:7 .
decrease 544:11, 555:15,
    561:2, 571:7 .
decreasing 576:14 .
dedicate 530:11 .
deemed 490:11 .
deep 468:19, 479:5, 479:24,
    519:2, 532:16 .
deeply 479:3, 570:25 .
Deepseek 489:10 .
defaults 537:19, 543:4,
    543:14, 544:1, 545:13,
    545:18, 549:20, 550:9,
    550:10, 550:11, 552:15,
    556:14, 556:18, 562:7,
    569:14, 570:18, 570:23,
    572:19, 573:18, 578:17,
    578:18 .
defend 532:12 .
Defendant 457:12,
    458:27 .
defense 493:9, 534:24 .
define 462:25, 504:7, 508:9,
    573:1, 594:2 .
defined 545:10 .
defining 508:20,
    509:16 .
definitely 510:2, 520:16,
    540:25 .

definition 494:20, 495:5,
    495:6, 502:12 .
definitive 580:6 .
definitively 526:22 .
degree 556:17, 557:6,
    569:12 .
Delta 562:14 .
demonstrative 486:7, 486:9,
    500:18, 510:2, 510:4,
    533:18, 533:21, 536:2,
    572:1, 574:25, 599:7,
    600:9 .
demonstratives 533:14,
    534:1, 599:21 .
Denver 458:19 .
Department 457:24, 457:31,
    457:44, 458:12,
    536:10 .
depend 462:6, 465:21,
    540:21, 540:25, 554:18,
    555:4, 593:2 .
Depending 481:6, 484:13,
    544:13, 547:14,
    547:15 .
depends 462:25, 481:14,
    481:20, 488:22, 496:21,
    499:15, 502:15, 508:3,
    508:9, 549:10, 562:6 .
depicted 473:1, 575:13 .
deployed 547:2, 560:22,
    561:1, 562:8, 562:19 .
deployment 555:8, 555:10,
    571:23 .
deposed 525:15 .
deposition 468:8, 477:5,
    525:13, 526:6, 526:15,
    526:23, 551:17,
    551:18 .
depth 466:19, 531:17 .
derive 565:16 .
derived 469:18 .
describe 460:12, 465:15,
    466:23, 468:12, 472:2,
    481:6, 483:19, 512:20,
    523:22, 581:20 .
described 461:2, 462:4,
    463:15, 481:19, 485:14,
    495:2, 496:18, 542:13,
    543:11 .
describes 486:17,

498:25 .

**describing** 512:23, 513:14, 516:18, 581:17, 582:12, 585:15 .

**Description** 459:28, 510:14, 585:25 .

**design** 555:4, 559:19, 560:6 .

**designated** 468:7, 477:4 .

**designed** 470:23, 540:17, 549:6, 556:4, 571:20, 595:21 .

**desire** 507:9 .

**Despite** 530:9, 540:14, 568:13 .

**destiny** 565:16 .

**detail** 468:13 .

**details** 504:19 .

**determine** 467:7, 467:9, 467:16, 484:19, 578:25, 587:17 .

**develop** 550:11 .

**developed** 524:18 .

**developer** 573:21, 574:3, 592:1, 593:6 .

**development** 463:4, 476:18, 532:8 .

**device** 545:13, 572:24, 573:21, 574:4, 592:1, 592:12, 592:13, 592:18, 592:19, 592:23, 593:6 .

**devices** 469:20, 473:13, 475:9, 556:24, 574:8, 591:20 .

**devote** 524:4 .

**diagram** 529:10 .

**dialogue** 466:4 .

**Diana** 457:30 .

**difference** 472:25, 549:22, 581:13 .

**different** 462:3, 465:2, 476:10, 479:4, 483:23, 501:22, 502:25, 506:11, 507:20, 508:2, 510:17, 511:15, 513:3, 515:24, 538:23, 547:14, 548:2, 552:5, 557:23, 561:19, 566:16, 581:21, 581:23,

586:3, 586:9, 593:8 .

**differently** 561:13, 561:14, 593:11 .

**difficult** 479:7, 521:5, 532:17, 554:15 .

**dinky** 569:2 .

**dinner** 550:20, 550:21 .

**dips** 599:3 .

**DIRECT** 459:9, 459:11, 459:19, 460:4, 463:2, 477:10, 477:19, 481:15, 483:10, 483:11, 491:4, 498:3, 517:18, 518:5, 518:11, 519:22, 523:17, 535:4 .

**direction** 537:22, 597:15 .

**directionally** 472:1 .

**directly** 476:14, 511:2, 566:14, 578:15 .

**discover** 464:8, 476:20, 478:14, 532:13, 532:14, 553:19 .

**discovered** 464:9 .

**discuss** 473:24, 538:3, 542:8, 571:4, 600:14 .

**discussed** 461:12, 470:6, 476:6, 527:24, 529:10 .

**discussing** 511:21, 551:12, 558:17 .

**Discussion** 459:34, 476:19, 497:23, 514:13 .

**discussions** 463:2, 474:14 .

**display** 461:4, 461:6, 575:1 .

**displayed** 568:10, 575:17 .

**distribute** 463:13, 467:19, 475:8, 475:18 .

**distribution.** 501:21 .

**District** 457:1, 457:2, 457:18 .

**divest** 477:24 .

**divested** 480:15 .

**Division** 457:25, 457:38, 457:45, 458:23 .

**Doctor** 580:10 .

**documents** 460:10, 547:23,

558:9, 559:5, 560:9, 570:25, 580:7, 597:14, 601:4 .

**does.** 515:18 .

**doing** 467:8, 494:23, 495:3, 518:24, 553:16, 565:7, 587:23 .

**DOJ-ATR** 457:37 .

**DOJ-CIV** 458:6 .

**dollars** 562:1, 563:5 .

**domains** 543:15 .

**dominant** 550:1 .

**done** 482:11, 490:19, 505:3, 505:4, 516:20, 544:14, 552:20, 555:21, 557:4, 572:21, 587:3, 595:15 .

**dot** 488:17 .

**double** 582:8 .

**doubt** 565:8 .

**down** 480:3, 487:1, 508:14, 516:6, 576:13, 589:14, 589:24 .

**download** 486:25, 487:7, 547:10, 547:19 .

**downloaded** 486:21, 502:2 .

**downvote** 466:7 .

**downvotes** 486:15 .

**dozens** 595:21 .

**draft** 493:17 .

**dramatically** 480:8 .

**drives** 531:4 .

**driving** 588:20 .

**drop** 589:20, 589:21, 589:22 .

**dropdown** 557:3 .

**drops** 589:16 .

**Duckduckgo** 574:10, 604:2 .

**due** 473:9, 515:15, 551:14 .

**duly** 534:7 .

**During** 527:24, 529:24, 533:15, 569:24 .

.

.

**< E > .**

**E.** 457:23, 458:27 .

**ear** 580:20 .

**Earlier** 460:7, 461:3, 461:12, 462:4, 463:2, 463:16, 465:5, 465:12, 476:12, 476:16, 478:2, 478:9, 479:19, 489:17, 495:3, 501:16, 515:3, 517:17, 521:14, 521:19, 522:12, 529:10, 530:18, 538:21, 542:21, 543:11, 560:12, 560:20, 561:20, 563:23, 571:4, 579:23, 584:7, 584:14 .

**early** 475:2, 484:5, 496:9, 506:6, 544:11 .

**earth** 550:19 .

**easier** 520:20, 557:2 .

**easily** 548:16, 557:22 .

**easy** 570:20 .

**economic** 538:11, 539:10, 546:16, 568:2, 581:5, 581:19 .

**Economics** 534:17, 536:14, 536:22, 537:6, 537:9, 537:16, 538:6, 538:8, 542:14, 543:7, 543:9, 543:12, 543:13, 544:8, 549:20, 550:5, 564:17, 567:17, 568:2, 573:6, 578:1, 586:7, 595:10, 597:12, 597:13, 598:22 .

**economist** 536:21, 550:7, 558:13, 561:13, 562:4, 564:10 .

**economists** 552:14, 557:15 .

**ecosystem** 462:7, 462:19, 475:23, 475:25 .

**Edge** 523:24, 545:11, 574:9 .

**edification** 510:11 .

**effect** 502:14, 539:12, 544:21, 545:6, 554:20, 554:21, 565:14, 566:7, 569:20, 572:19, 579:15, 582:9, 585:7, 585:11, 586:1, 595:2 .

**effective** 541:1, 546:11, 549:17, 554:12, 554:22, 558:10, 579:16 .

602

effectively 462:14,
  511:23 .
effectiveness 541:19,
  542:22, 549:10, 553:22,
  555:6, 555:15, 561:4 .
effects 537:21, 569:16,
  570:12, 591:19, 593:2,
  593:23, 594:14,
  598:7 .
effort 539:25 .
efforts 531:1 .
either 479:10, 480:6, 516:14,
  526:21, 552:19,
  602:22 .
elections 539:16 .
element 468:18 .
elements 557:7, 557:10,
  558:10 .
elicit 498:18 .
eligible 469:19, 490:23 .
eliminate 571:21 .
eliminated 575:25 .
eliminates 548:11 .
eliminating 573:12 .
else. 516:9 .
email 551:10, 556:23, 557:3,
  580:3 .
embed 515:15 .
embedded 498:18,
  498:20 .
emphasize 591:4 .
emphasizes 593:1 .
emphasizing 551:13,
  560:21 .
empirical 549:20 .
employee 580:3 .
enable 476:12 .
encompass 490:18 .
encounter 473:7, 476:22,
  476:23, 478:15, 554:10,
  559:4 .
encountered 538:22,
  582:25 .
encounters 538:9, 546:6,
  558:2 .
end 467:3, 467:13, 495:15,
  497:10, 506:19, 516:3,
  548:12, 550:9, 553:3,
  553:13, 565:21, 565:23,
  566:23, 587:13 .

end-to-end 478:21 .
ended 483:10, 494:12, 504:1,
  504:13 .
ending 528:3, 531:23 .
ends 470:8, 488:11, 488:17,
  495:9, 497:8, 497:12,
  498:23, 508:13,
  554:2 .
enforce 586:20 .
enforced 556:16 .
enforcing 557:6 .
engaging 475:5, 550:9 .
engine 478:10, 479:4, 529:15,
  531:12, 565:22, 565:24,
  566:24, 569:10, 573:22,
  574:5, 574:15, 575:3,
  575:14, 575:17, 576:24,
  578:8, 578:17, 579:18,
  585:7, 588:18, 588:23,
  591:21, 592:2, 592:22,
  593:7, 593:8, 593:16,
  594:1, 594:4, 595:2, 595:6,
  595:12, 595:16, 596:11,
  596:18, 598:2, 598:4,
  598:5 .
engineer 550:7 .
engineers 520:18, 521:1,
  521:13, 521:15 .
engines 528:25, 529:12,
  529:19, 531:10, 540:9,
  545:6, 548:21, 549:15,
  554:8, 560:14, 561:22,
  562:22, 562:24, 563:9,
  563:11, 574:11, 579:7,
  579:11, 595:14 .
enormous 561:21,
  561:24 .
enough 466:9, 475:15, 480:2,
  556:18, 557:23, 558:5,
  594:13, 598:24,
  599:25 .
ensure 478:14 .
enter 461:10, 461:12, 461:14,
  461:17, 461:23, 502:10,
  536:1, 567:20 .
entertain 479:9 .
entertainer 482:17 .
entire 460:12, 535:19, 541:19,
  585:11 .
entirely 604:5 .

entirety 584:9 .
entitled 487:23, 493:11 .
entrants 508:7, 508:8 .
environment 532:1 .
episodic 575:9 .
equal 540:24, 550:14, 550:15,
  578:7 .
equally 578:4 .
equivalent 490:22, 505:4,
  515:16, 521:11,
  602:5 .
Especially 465:13, 549:24,
  553:25, 567:7,
  597:11 .
Esquire 457:23, 457:30,
  457:36, 457:43, 458:5,
  458:11, 458:21, 458:27,
  458:28, 458:29,
  458:34 .
establish 596:11,
  596:18 .
estimate 544:18,
  581:11 .
estimates 490:11,
  492:17 .
estimation 544:14 .
et 457:6, 484:21, 490:25 .
Europe 544:10, 544:20,
  545:4, 559:7, 575:4,
  575:12, 575:17, 575:24,
  576:6, 576:10, 576:12,
  576:20, 576:24, 577:9,
  577:11, 579:19 .
European 539:6, 544:16,
  552:3, 552:5, 552:24,
  559:9, 560:5, 561:9,
  562:12, 562:18 .
evaluate 595:16 .
evaluated 592:6, 592:10,
  592:17 .
evaluating 537:15,
  588:9 .
Evans 604:3, 604:6 .
evening 603:24, 604:21 .
event 580:3, 582:19 .
events 537:20, 542:15, 543:8,
  570:1, 570:8, 597:14 .
eventually 460:13 .
everybody 460:2 .
everyone 523:12, 531:5,

604:20, 604:21 .
Everything 461:2, 488:12,
  488:13, 601:1 .
everywhere 538:20 .
evidentiary 486:10 .
evolve 494:20, 495:5,
  562:10 .
evolves 494:21 .
evolving 489:10, 495:1 .
exact 468:4, 472:6 .
Exactly 461:2, 479:1, 479:7,
  520:5, 525:11, 544:13,
  558:19, 568:20,
  568:24 .
EXAMINATION 459:9,
  459:11, 459:15, 459:19,
  459:23, 460:4, 477:10,
  477:19, 527:13, 533:15,
  535:4, 536:1, 597:4 .
examined 534:7 .
example 463:16, 465:9,
  467:1, 468:1, 471:19,
  479:18, 479:19, 480:4,
  484:22, 489:10, 492:16,
  495:2, 525:7, 525:24,
  538:21, 539:16, 539:19,
  539:21, 546:1, 548:1,
  554:1, 556:20, 557:5,
  562:21, 568:4, 568:13,
  569:17, 570:7, 570:22,
  587:3, 593:18, 597:23,
  600:3, 600:8, 601:17,
  603:6, 603:17 .
examples 539:2, 539:13,
  539:15, 545:24, 547:5,
  556:10, 557:10, 557:14,
  559:10 .
exceeded 494:10 .
exceeding 494:12 .
exception 514:3, 601:24,
  603:16 .
excerpt 584:6 .
excerpted 580:4, 581:1,
  584:10 .
excited 525:3, 527:4,
  527:5 .
exclusive 468:3 .
exclusivity 504:8 .
Excuse 482:14, 483:20,
  502:17, 505:17, 520:22,

524:25 .
**executing** 463:5 .
**executive** 551:17 .
**executives** 463:18 .
**exercising** 560:8 .
**exerted** 582:13 .
**Exhibit** 459:28, 469:25, 470:4, 470:8, 486:12, 488:9, 498:15, 500:18, 500:20, 501:6, 503:20, 510:3, 510:9, 514:4 .
**EXHIBITS** 459:26, 480:24, 533:21, 533:23, 599:24, 599:25 .
**exist** 573:13 .
**existed** 506:6 .
**existential** 464:18, 474:25 .
**existing** 491:1, 544:1, 544:2 .
**exists** 479:6 .
**expand** 515:25, 530:19, 532:4 .
**expanded** 472:20 .
**expect** 494:19, 495:25, 509:16, 567:1, 569:18, 578:7 .
**expectations** 497:5, 499:17 .
**expecting** 603:21 .
**expects** 499:7 .
**expensive** 568:19, 568:23 .
**experience** 463:16, 463:22, 478:21, 479:10, 479:12, 484:21, 485:2, 506:8, 507:8, 510:23, 511:16, 512:4, 593:25, 594:9, 594:13, 598:24 .
**experiment** 511:14, 553:8, 570:2, 586:21, 590:11 .
**experimental** 543:12, 543:13, 587:1 .
**experiments** 543:16 .
**expert** 482:8, 525:2, 525:10, 526:24, 534:17, 535:25, 536:9, 536:22, 541:2, 546:16, 599:13, 601:10, 601:12, 601:15, 602:6,

602:8, 602:14, 602:21, 604:2, 604:3, 604:8 .
**expertise** 555:12, 564:7, 564:16 .
**experts** 560:24, 599:22 .
**explain** 470:14, 516:16, 517:8, 544:4, 590:8, 593:14 .
**explained** 513:5, 521:14 .
**explanations** 519:9 .
**explicit** 466:1, 466:3, 466:11, 538:18, 550:16, 581:7 .
**explicitly** 553:8, 577:25, 578:19, 586:17 .
**explored** 523:20, 524:19 .
**Explorer** 548:6 .
**exponential** 590:22, 591:6 .
**exposed** 581:22, 588:12, 590:1, 598:23 .
**exposure** 588:16, 598:9, 598:25 .
**express** 532:16 .
**extension** 590:9 .
**extent** 471:9, 558:23, 565:15, 567:7, 575:23, 576:4, 577:16, 578:17, 578:20, 600:1, 600:21, 601:14 .
**extra** 515:23, 559:23 .
**extractive** 563:12 .
**extremely** 492:23, 546:10 .
**eyeballs** 473:10 .

.

.
**< F >** .
**Facebook** 490:25, 510:24, 511:8 .
**Facebook.com** 459:43, 512:18 .
**facilitate** 560:17 .
**facing** 500:25, 515:17 .
**fact** 462:18, 464:18, 475:11, 494:10, 496:22, 506:6, 532:10, 540:14, 569:3, 584:9 .

**facto** 543:21, 546:4 .
**factor** 574:20 .
**factors** 577:20, 577:23, 578:23 .
**facts** 537:11 .
**factual** 466:8 .
**Fair** 463:9, 497:19, 531:9, 531:20, 576:21, 578:6, 579:4, 585:25, 587:20 .
**fairly** 506:19 .
**faith** 599:2 .
**fall** 476:10 .
**familiar** 464:19, 500:3, 530:6, 550:18, 567:6, 584:17, 584:19, 589:6, 595:10, 598:1, 598:8 .
**familiarity** 550:12, 551:3, 551:21, 553:18, 565:10, 577:4, 577:9, 577:14, 577:17, 577:20, 577:24, 578:3, 578:21, 579:1, 595:22, 598:2, 598:4 .
**familiarize** 498:2, 526:5 .
**far** 471:20, 472:21, 472:22, 475:15, 496:9, 530:13, 550:20 .
**fast** 489:10, 532:7 .
**faster** 476:14, 477:2 .
**fastest-growing** 517:9 .
**favor** 536:25, 542:7, 550:11, 567:14, 567:23, 568:14, 573:13, 574:14, 575:18, 575:25, 576:7, 592:22 .
**favoring** 539:17 .
**FCRR** 458:41, 604:23 .
**Fear** 557:24, 558:1, 558:4 .
**feature** 471:7, 479:22, 590:7 .
**features** 468:21, 472:12, 512:25, 557:14, 557:16 .
**Federal** 458:42 .
**feed** 591:8 .
**feedback** 465:24, 466:2, 466:11, 466:12, 466:19 .

**feeding** 511:23 .
**feel** 586:13, 597:10 .
**felt** 479:2 .
**few** 462:3, 476:6, 523:10, 535:20, 538:3, 540:2, 546:14, 600:1 .
**Fifth** 457:39, 457:46, 499:6, 528:2 .
**figure** 499:8 .
**figures** 483:15, 535:23, 600:13 .
**filed** 596:7 .
**final** 499:20, 532:23, 567:4, 571:14, 596:7, 596:9 .
**finally** 537:18 .
**find** 463:23, 464:9, 465:5, 465:7, 471:1, 476:24, 508:6, 510:24, 525:7, 526:20, 530:2, 530:21, 544:10, 545:19, 552:10, 552:18, 553:6, 568:21, 568:25, 598:24 .
**finding** 550:25, 556:3, 585:10, 588:19 .
**finds** 525:23 .
**fine** 486:11, 523:3, 523:8, 526:12 .
**fine-tune** 526:20 .
**fine-tuning** 526:3 .
**finish** 514:14 .
**Firefox** 529:20, 547:18, 547:19, 559:22 .
**fiscal** 499:9 .
**Fitzgerald** 533:15 .
**five** 486:19, 486:21, 487:3, 487:6, 487:10, 523:5, 523:6, 547:20, 591:13 .
**five-year** 499:2 .
**flip** 491:11, 598:3 .
**Floor** 458:18 .
**flow** 563:19 .
**Flywheel** 464:20, 464:22, 464:25, 465:1, 465:16, 465:20 .
**flywheels** 465:21 .
**focus** 468:22, 473:15, 476:18, 508:22, 512:20, 524:10, 528:8, 528:18, 531:21 .

**focusing** 588:5 .
**follow** 466:16, 473:6, 512:8, 558:24, 594:8 .
**followed** 604:1 .
**following** 525:21, 532:4, 552:4, 566:17, 602:23 .
**follows** 534:8 .
**footnote** 472:14, 490:22 .
**footprint** 520:12 .
**footprint.** 520:3 .
**force** 559:16, 590:5 .
**forced** 581:7, 581:13, 582:15, 584:23, 585:3 .
**forcing** 559:15 .
**foregoing** 604:24 .
**forgive** 492:13 .
**forgot** 533:7, 593:16 .
**forgotten** 590:19 .
**fork** 493:15 .
**form** 540:19, 602:13 .
**formally** 600:2, 601:18 .
**formatted** 466:10 .
**formed** 575:16 .
**forms** 466:1, 466:11 .
**forward** 495:9 .
**found** 466:10, 502:3, 502:8, 545:6, 547:24, 562:13, 578:14, 584:22 .
**four** 499:6, 547:2 .
**fraction** 472:4, 472:8, 520:23 .
**Francisco** 457:34 .
**frankly** 479:2 .
**free** 506:19, 506:23, 533:10 .
**friction** 464:4, 539:23, 539:24, 556:13, 556:15, 556:18, 557:6, 558:7, 559:14, 559:22, 560:3, 569:12, 569:15, 569:20, 595:22, 602:2 .
**frictionless** 478:16 .
**front** 483:2, 483:13, 497:3, 517:20, 525:19, 527:17, 537:4, 589:2 .
**fruitful** 475:6 .
**full** 558:6, 571:21, 590:25 .

**fully** 540:18, 549:7 .
**function** 485:2, 485:13 .
**functionality** 468:15, 484:11, 506:19, 507:16, 513:13, 513:16, 515:16 .
**fundamental** 538:7, 557:9 .
**fundamentally** 538:17 .
**fundamentals** 538:11, 539:10 .
**funding** 501:11, 520:22 .
**future** 479:17, 532:18 .

.

.

**< G > .**
**g.** 490:24, 515:16 .
**gain** 473:17, 474:20, 562:1 .
**game** 516:8, 528:20, 603:9 .
**Gate** 457:32 .
**gave** 556:9, 558:14, 559:18, 560:1, 566:3, 583:10 .
**geared** 470:22 .
**Gemini** 489:3, 509:1, 514:20 .
**General** 458:22, 462:3, 465:9, 496:17, 503:11, 510:14, 522:23, 525:16, 557:17 .
**generally** 465:25, 471:18, 472:11, 475:20, 481:19, 520:4, 577:4, 581:9 .
**generate** 482:4, 542:6, 555:14 .
**generated** 501:21 .
**generative** 504:2, 504:10, 507:18, 508:1 .
**genuinely** 504:21, 505:6 .
**gets** 485:3, 551:9 .
**getting** 462:13, 464:4, 464:10 .
**Give** 482:3, 492:22, 501:25, 510:14, 517:14, 525:13, 526:5, 547:4, 547:8, 547:22, 548:1, 556:20, 559:10, 589:4, 597:23, 603:21 .
**given** 462:16, 462:17, 475:14,

536:12, 592:23 .
**giving** 512:2, 525:21, 531:9, 548:15, 561:17 .
**global** 471:14, 471:17, 471:18, 471:23, 471:24, 471:25 .
**goal** 494:11, 494:12, 537:14, 602:4 .
**goals** 495:10 .
**Golden** 457:32 .
**GOOGLE, LLC** 457:10 .
**Google.com** 473:2, 529:19 .
**Gotcha** 465:1, 512:14 .
**government** 488:6, 498:10, 498:19, 517:1, 517:5 .
**grab** 533:23 .
**gradual** 589:20, 589:21, 590:22 .
**gradually** 589:25 .
**Graham** 458:28, 572:8 .
**graph** 472:10, 489:13, 489:14, 575:7, 589:2, 590:21 .
**graphic** 575:2 .
**graphs** 470:13, 470:14, 470:15, 471:3 .
**Gray** 458:35 .
**Great** 462:20, 484:14, 496:20, 505:14, 526:17, 604:10 .
**grew** 507:11 .
**ground** 485:8, 505:23, 518:7, 518:16, 518:21, 519:7, 519:14 .
**grounded** 485:5, 505:20, 507:2, 507:4, 507:13 .
**grounding** 505:15, 505:17, 517:17, 519:23 .
**grounds** 474:8, 474:10 .
**group** 552:14, 557:16, 565:19, 565:20, 567:1, 581:6, 581:7, 581:13, 581:14 .
**grow** 567:2 .
**growth** 496:8, 507:15, 507:16 .
**guess** 475:19, 601:20 .

.

.

**< H > .**

**H1** 459:32, 487:23, 491:8, 508:11, 516:4, 516:24 .
**habits** 565:9, 571:2 .
**half** 544:12, 561:11, 576:13, 603:23 .
**hallucinations** 485:6 .
**handed** 574:24, 579:23, 584:8 .
**handled** 518:17 .
**hands** 548:12 .
**happen** 463:8, 537:12, 566:20 .
**happened** 487:13, 562:7, 563:8 .
**happening** 554:18, 562:9, 591:9 .
**happens** 496:1, 543:18, 543:22, 545:17, 547:15, 568:22, 569:8, 582:2, 582:5 .
**Happy** 466:19, 467:9, 468:5, 492:11, 496:8, 515:25, 523:6, 600:2 .
**hard** 473:25, 475:12, 479:1, 483:20, 492:23, 493:19, 504:5, 507:15, 520:1, 520:13, 520:16, 556:18, 566:8 .
**hardware** 474:15 .
**harm** 541:9, 541:15, 564:6, 564:18 .
**head** 462:23, 505:3, 583:13 .
**head-on** 529:4, 529:7 .
**heading** 508:14, 515:2, 528:9 .
**heads** 587:22 .
**hear** 461:20, 586:14 .
**hearsay** 498:12, 498:18, 498:20, 510:5, 513:24 .
**heavily** 500:4 .
**held** 514:13 .
**Hello** 572:14 .
**help** 465:24, 467:5, 467:15, 477:1, 482:3, 503:5, 525:4, 527:3, 540:7, 540:10, 540:15, 543:2, 571:19, 589:2 .

**helpful** 490:16, 571:22 .
**helps** 526:25, 527:5 .
**hereby** 604:23 .
**hesitating** 503:1 .
**heterogeneity** 564:23 .
**hides** 560:1 .
**high** 463:2, 464:12, 468:12,
        468:17, 469:13, 472:15,
        486:24, 535:9, 556:18,
        569:4 .
**higher** 472:22, 551:14, 552:9,
        569:19, 578:7, 598:1,
        598:6, 598:8, 598:9 .
**highest** 562:22, 563:12 .
**highlight** 560:21,
        578:15 .
**highlighted** 545:7,
        577:12 .
**highly** 474:22, 508:4,
        546:1 .
**hinted** 566:12 .
**hire** 520:24, 521:1 .
**hired** 536:8 .
**history** 565:6, 598:9 .
**Hold** 530:2 .
**honest** 502:24 .
**Honorable** 457:17 .
**hope** 474:9, 526:23, 562:3,
        603:5, 603:7 .
**hoping** 475:5 .
**hour** 487:14, 603:23 .
**hour.** 487:12 .
**how-to** 467:4 .
**hundreds** 595:21 .
**Hunt** 584:2 .
**hurdles** 464:10 .

        .

        .

**< I >** .
**IA** 472:17, 511:12 .
**idea** 529:9 .
**ideal** 594:1 .
**ideally** 582:13 .
**ideas** 511:20 .
**identical** 564:24 .
**identified** 500:24, 542:21,
        561:10 .
**identify** 492:19, 555:13 .
**IL** 457:28 .
**illustrate** 559:11 .

**illustrations** 600:7 .
**image** 539:5 .
**image-generation**
        487:16 .
**imagine** 460:12, 471:23,
        472:7, 479:7, 479:9,
        479:18, 479:23, 481:10,
        485:4, 495:1, 495:3,
        506:16, 510:23, 519:18,
        561:25, 597:24 .
**imagining** 520:24,
        520:25 .
**imbedded** 498:12 .
**immediate** 585:7 .
**impact** 462:20, 476:8, 519:19,
        535:12, 536:14, 538:11,
        543:14, 543:24, 544:9,
        545:4, 547:3, 552:2, 552:8,
        552:15, 554:17, 562:5,
        562:9, 563:25, 564:20,
        565:20, 569:14, 570:18,
        570:23, 571:5, 592:12,
        592:19 .
**impactful** 546:11 .
**implement** 559:24,
        593:15 .
**implementation** 580:14,
        580:19 .
**implemented** 572:23,
        573:22, 574:4, 575:4,
        575:24, 576:6 .
**implements** 579:14 .
**implication** 594:7 .
**implicit** 466:1, 466:12,
        594:5 .
**implies** 504:7 .
**implying** 590:15 .
**importance** 555:18, 559:11,
        560:16, 560:21 .
**important** 463:19, 464:5,
        465:5, 465:7, 532:24,
        540:15, 546:1, 550:15,
        551:10, 552:17, 552:25,
        553:11, 555:11, 564:24,
        566:2, 573:8, 573:24,
        588:6, 588:8, 588:11,
        588:19 .
**Importantly** 537:5, 563:1,
        568:6, 568:9 .
**impose** 595:17 .

**impression** 474:3,
        474:5 .
**improve** 465:10, 465:14,
        465:24, 466:6, 554:7,
        556:11, 579:7 .
**improved** 555:6 .
**improving** 476:15, 549:14,
        554:20, 561:3 .
**in.** 533:24, 600:4, 600:7,
        600:17 .
**inaccurate** 575:6 .
**incentive** 462:5, 467:12,
        480:11, 586:8,
        586:22 .
**incentives** 553:16 .
**incentivised** 480:4 .
**incentivize** 553:1 .
**include** 490:20, 547:21,
        554:2, 600:24 .
**included** 562:25, 563:2,
        563:6 .
**includes** 467:21,
        468:20 .
**including** 465:3, 476:2,
        527:6, 531:13, 532:13,
        547:21, 556:5, 559:8,
        573:16, 599:13 .
**inconsistent** 546:20,
        546:23 .
**incorrect** 546:20,
        546:23 .
**increase** 494:7, 556:5 .
**increases** 548:16,
        569:14 .
**increasing** 566:25 .
**incredible** 476:13,
        479:10 .
**incumbents** 532:5 .
**independent** 468:21, 478:5,
        480:4, 480:5, 545:9,
        545:20, 548:20, 548:21,
        560:13 .
**INDEX** 459:1, 460:8, 460:9,
        460:20, 460:21, 476:13,
        519:22, 519:23, 520:2,
        520:13, 520:19, 521:2,
        521:3, 521:10, 525:4,
        525:5, 525:22, 527:1,
        527:3, 527:6, 527:7 .
**indexes** 531:12 .

**indicated** 520:1,
        582:19 .
**indicating** 596:2 .
**indirectly** 476:17 .
**individual** 470:15,
        601:4 .
**individuals** 544:20, 588:19,
        590:10, 590:13, 593:23,
        594:1, 596:4, 598:1 .
**induce** 555:19 .
**industry** 545:22, 546:2,
        548:3, 555:17,
        558:14 .
**ineffective** 541:8,
        551:14 .
**inferior** 506:14, 592:3 .
**influential** 546:11,
        564:10 .
**information** 460:16, 460:25,
        461:7, 463:14, 463:17,
        465:14, 474:16, 476:15,
        478:11, 482:20, 483:24,
        484:20, 484:23, 484:25,
        490:3, 490:9, 492:10,
        500:4, 500:20, 506:5,
        507:5, 538:13, 539:9,
        539:11, 539:20, 557:22,
        582:25, 602:12 .
**informational** 484:16 .
**informed** 504:23 .
**informs** 543:7, 595:13 .
**initial** 563:10, 589:19,
        590:24 .
**initially** 544:17, 562:18 .
**input** 466:6 .
**inside** 510:24, 511:18,
        551:7 .
**insofar** 600:4 .
**inspire** 530:7 .
**Instagram** 511:13 .
**install** 590:9 .
**installation** 536:24,
        542:4 .
**installed** 547:9 .
**instances** 462:9 .
**Instead** 467:13, 467:15,
        469:2, 469:5, 504:10,
        544:22, 548:9, 562:22,
        575:13, 595:6 .
**integrate** 467:24 .

606

**integrating** 474:14, 512:12 .

**integration** 468:1, 468:3, 468:14, 468:22, 468:25, 490:24, 502:14, 502:18, 502:22, 511:7, 512:24 .

**integrations** 479:24, 491:1 .

**intelligence** 471:11 .

**intended** 512:4, 530:7 .

**intending** 534:20 .

**intent** 511:22 .

**intention** 535:18 .

**interact** 494:24, 502:21, 554:4 .

**interacted** 506:9, 507:8 .

**interacting** 478:16 .

**interactions** 485:5, 528:25 .

**interested** 474:18, 474:23, 475:20, 480:15 .

**interesting** 558:12, 562:20, 566:13, 590:7 .

**Interestingly** 560:20 .

**interface** 538:18 .

**interfaces** 538:23, 595:21 .

**internal** 470:22, 558:16 .

**internally** 463:8, 464:17, 473:25, 510:22, 551:6 .

**internationally** 480:6 .

**Internet** 548:6 .

**interpret** 591:23, 592:3 .

**interrupt** 514:10, 523:1 .

**intervention** 569:3 .

**Introduce** 479:12, 480:13, 531:24, 545:18, 549:13, 560:3 .

**introduced** 500:18, 540:16, 544:17, 546:5, 549:5, 549:11, 552:5, 554:16, 563:9, 563:17, 571:9, 571:19 .

**introduces** 559:14 .

**introducing** 535:12, 536:15, 537:21, 540:7, 543:2, 543:24, 544:9, 545:4, 549:22, 552:2, 564:5 .

**introduction** 541:9, 541:14, 544:11, 546:12, 546:14, 549:3, 564:4, 582:18 .

**inverse** 464:13 .

**invest** 524:13, 562:1 .

**invested** 520:17, 521:2 .

**invited** 594:17 .

**involved** 463:10, 474:14, 602:2 .

**involving** 570:1 .

**IOS** 467:22, 468:1, 468:21, 469:19, 469:20, 531:6, 539:3 .

**Iphone** 547:8, 547:19, 569:9, 571:6, 582:24, 583:2, 583:7 .

**iphones** 559:7, 570:2, 583:16, 583:20, 583:24 .

**issue** 533:19, 581:12, 599:18, 600:18, 602:3 .

**issues** 498:16, 498:19, 510:6, 518:11, 518:12, 518:15, 537:15, 545:2 .

**item** 533:13 .

**items** 535:20 .

**iterations** 511:15 .

**itself** 469:1, 501:12, 517:2, 547:7, 553:17, 600:3 .

.

.

**< J >.**

**job** 482:11, 493:3 .

**John** 458:27 .

**Jonathan** 458:11 .

**Judge** 457:18 .

**judgment** 596:7, 596:10 .

**Judicial** 458:15 .

**jump** 589:19 .

**jury** 603:1 .

**Justice** 457:24, 457:31, 457:44, 536:10 .

.

.

**< K >.**

**keep** 463:12, 488:15, 566:5 .

**keeps** 589:24 .

**Kenneth** 458:29 .

**kept** 589:10 .

**kick** 469:1 .

**kicks** 511:12 .

**kind** 466:3, 466:24, 466:25, 513:2, 569:6, 582:8, 590:22 .

**knowledge** 460:15, 504:23, 505:2, 537:10, 583:3, 583:4 .

**knowledgeable** 482:9 .

**known** 481:4, 481:22 .

**knows** 602:14 .

.

.

**< L >.**

**L.** 458:15, 458:34 .

**labeled** 469:25 .

**lack** 462:17, 473:22, 507:9 .

**lacking** 562:14 .

**language** 460:25, 598:21 .

**large** 460:25, 466:24, 473:9, 475:12, 497:19, 532:11, 537:14, 543:6, 543:12, 543:14, 549:19, 559:21, 568:1, 571:7, 573:9, 594:13 .

**larger** 472:13, 472:22, 484:15, 491:2, 552:8, 569:20, 570:19 .

**largest** 470:24 .

**Lasalle** 457:26 .

**last** 499:21, 506:20, 548:19, 551:16, 558:21, 566:22, 579:2, 583:5 .

**late** 496:3 .

**later** 479:25, 490:1, 498:16, 517:5, 530:19, 539:4, 540:18, 552:17, 587:19 .

**latter** 582:11 .

**launch** 486:17, 506:18, 511:6 .

**launched** 485:17, 506:3, 524:12, 524:14, 524:20 .

**launching** 506:4 .

**Law** 458:12 .

**lawyer** 508:5, 526:13 .

**layperson** 561:11 .

**lead** 517:10, 517:11, 586:9 .

**leader** 481:5 .

**leading** 489:7, 509:17, 515:5, 515:8, 529:19 .

**leads** 550:22 .

**learned** 479:22, 590:20 .

**least** 475:4, 492:3, 492:19, 510:19, 553:21 .

**leave** 593:9 .

**led** 571:6 .

**left** 471:5, 493:19, 539:2, 568:18 .

**legal** 463:4, 573:23, 574:5 .

**legible** 489:23 .

**less** 462:8, 598:4 .

**letter** 548:20, 560:13, 560:14 .

**level** 463:3, 464:12, 468:13, 468:17, 469:13, 504:8, 535:9 .

**leverage** 462:7, 462:19, 475:22, 532:6 .

**leveraged** 552:4 .

**liabilities** 538:1 .

**liability** 490:13, 534:15, 550:5, 569:25, 580:2, 593:1 .

**life** 464:2, 530:11 .

**lightly** 519:4 .

**likelihood** 569:1, 597:25, 598:1, 598:4, 598:10 .

**likely** 545:9, 545:20, 550:17, 551:14, 554:9, 555:14, 561:3 .

**liking** 565:23, 566:23 .

**limit** 485:4, 490:13 .

**limitations** 486:10 .

**limited** 474:16, 576:6, 601:24 .

**line** 525:18, 528:13, 577:5, 578:1, 589:8, 589:13, 589:19 .

**lines** 589:9 .

**lingering** 571:2 .

**link.** 528:21 .

**links** 460:13, 460:24, 466:15, 466:16, 484:20 .

**list** 460:13, 460:24, 508:23, 509:4, 558:14, 558:19, 559:17, 562:19 .
**listed** 493:21, 539:18, 551:8, 557:21, 559:24, 559:25, 563:10 .
**literally** 580:7, 585:10 .
**literature** 543:12, 543:25, 558:15, 582:1, 582:4 .
**little** 478:24, 483:7, 507:20, 516:17, 517:17, 517:18, 523:2, 523:10, 552:6, 554:7, 555:15, 556:1, 585:24, 589:17, 589:25, 597:17, 602:1, 603:1 .
**live** 503:9 .
**LLP** 458:30, 458:35 .
**local** 471:14 .
**logic** 570:16 .
**long** 491:12, 498:2, 521:6, 533:21, 549:25, 562:7, 584:11, 596:3, 597:20, 597:25, 599:23 .
**long-range** 499:3, 499:13 .
**longer** 514:10 .
**Look** 467:12, 467:14, 469:8, 469:23, 472:5, 472:10, 478:25, 480:2, 510:5, 511:8, 531:3, 570:24, 583:9, 583:10, 589:13, 589:18, 590:24, 599:18, 600:1, 600:8, 601:16, 602:23 .
**looked** 483:7, 514:7, 514:17, 521:20, 543:14, 583:5, 584:7 .
**Looking** 479:20, 482:24, 483:9, 497:9, 515:13, 527:16, 531:22, 542:14, 542:15, 590:22 .
**looks** 479:12, 492:22, 493:17, 561:23, 570:23, 584:12 .
**loss** 594:13 .
**Lost** 515:10, 592:14 .
**lot** 462:11, 462:18, 470:4, 486:15, 487:18, 489:11, 491:12, 511:3, 511:14, 515:23, 543:16, 560:6,

586:14, 595:22 .
**loud** 492:10 .
**love** 480:12 .
**low** 486:24, 558:7 .
**lower** 528:4, 562:15, 570:21, 592:2, 593:15, 594:10 .

. .

. .

**< M > .**
**MA** 458:38 .
**Mac** 467:23, 469:20 .
**machine** 458:48 .
**macro** 531:16 .
**main** 482:21, 569:11, 571:17 .
**Maine** 458:31 .
**maintain** 536:23, 594:9 .
**maintaining** 557:5, 567:20, 572:19 .
**majority** 467:20, 505:10, 506:8, 506:23, 507:1, 507:7, 507:12, 546:13, 566:19, 575:11 .
**management** 499:2, 499:17, 500:1 .
**mango** 568:19, 568:23, 569:1 .
**manner** 557:21 .
**manually** 479:15 .
**manufacturer** 574:4, 592:1, 593:7, 593:14 .
**manufacturers** 473:16, 473:18, 523:24, 556:17, 573:21 .
**mapping** 582:23 .
**Maps** 496:7, 571:5, 571:8, 582:18, 582:24, 583:2, 583:6 .
**Mark** 459:41, 509:13, 510:25, 589:14 .
**marked** 574:25 .
**market** 481:4, 487:20, 488:21, 488:22, 488:23, 490:11, 490:14, 490:17, 491:9, 492:7, 492:16, 501:15, 507:25, 508:2, 508:4, 515:11, 524:11, 537:15, 537:20, 542:15, 543:8, 544:12, 550:1, 552:6,

552:9, 554:1, 561:10, 561:12, 561:21, 561:22, 561:24, 561:25, 562:9, 562:10, 562:22, 564:23, 569:21, 570:1, 576:13, 597:14 .
**marketplace** 541:9, 541:21, 546:18, 561:3 .
**markets.** 532:9 .
**Massachusetts** 477:15 .
**match** 529:5, 529:8 .
**material** 470:6 .
**materials** 496:17, 537:8, 537:14, 542:15, 550:25, 551:2, 570:22, 600:20, 600:23, 600:24, 601:4 .
**math** 495:19, 599:1 .
**Matt** 533:12 .
**matter** 477:25, 480:10, 525:15, 525:16, 537:23, 551:20, 597:20, 598:16, 602:25, 604:26 .
**matters** 464:12, 551:8 .
**Matthew** 458:34 .
**Mcginnis** 458:34, 533:12, 533:19 .
**mean** 460:10, 466:22, 476:1, 484:10, 501:20, 505:17, 506:16, 507:4, 508:5, 510:6, 526:4, 529:7, 532:3, 532:4, 538:5, 588:10, 591:5, 600:7, 601:19, 603:5 .
**meaning** 494:18 .
**means** 472:15, 490:17, 495:24, 501:22, 529:14, 559:19, 561:21, 561:22 .
**meant** 515:11, 517:2, 524:9, 529:9 .
**measure** 492:7, 581:11, 582:12 .
**measures** 581:16 .
**mechanism** 466:14, 484:17 .
**mechanisms** 460:22, 560:17, 573:7 .
**media** 463:18, 475:10 .

**meeting** 459:34, 497:23 .
**meetings** 500:2 .
**memo** 560:5 .
**memories** 575:9 .
**memorized** 584:20 .
**memory** 473:6, 503:10 .
**mention** 517:4, 517:5, 559:20, 563:15, 571:6, 595:24 .
**mentioned** 463:1, 465:4, 465:23, 478:9, 521:19, 522:11, 544:3, 546:4, 560:12, 563:23, 595:24, 597:6 .
**menu** 557:3 .
**mere** 588:17 .
**message** 494:22, 494:24, 580:25 .
**messages** 471:4, 483:21 .
**messaging** 558:1, 558:4 .
**messing** 523:7 .
**Meta** 463:16, 490:24, 509:1, 509:4, 509:13, 509:16, 509:23, 510:13, 510:18, 511:5, 512:24, 513:2, 513:9, 513:14, 513:18, 513:25, 514:20, 531:8 .
**method** 528:17, 528:19, 595:23 .
**methodology** 537:3 .
**methods** 518:7, 564:11 .
**metric** 493:20, 495:11, 495:12 .
**Microsoft** 489:2, 490:25, 531:8, 531:10, 548:6, 548:7, 574:9 .
**middle** 471:7, 471:12, 488:16, 515:1, 528:9, 589:8 .
**milestones** 502:25 .
**million** 486:19, 487:12, 487:13 .
**mind** 461:19, 491:11, 502:6, 505:12, 513:10, 517:21, 526:19, 573:25, 576:1 .
**mindful** 523:4 .
**mine** 470:19 .

**mingering** 557:25 .
**minimize** 558:8 .
**minimum** 557:6 .
**minute** 494:23 .
**minutes** 514:11, 523:5, 523:6, 523:9, 523:10, 591:14 .
**missed** 501:3, 573:24 .
**missing** 498:20 .
**misspeaking** 553:10 .
**mistake** 494:1 .
**mistaken** 588:21 .
**mistakes** 564:12 .
**misunderstanding** 576:8 .
**misunderstood** 526:11 .
**mobile** 467:22, 467:23, 473:13, 475:8, 491:5, 505:10 .
**model** 460:25, 466:24, 484:12, 484:19, 505:16, 505:18, 506:10, 507:13, 515:18, 527:2 .
**models** 465:10, 465:24, 525:1, 525:3, 525:8, 525:10, 525:24, 526:3, 526:21, 526:24 .
**moment** 470:16, 487:16, 497:2, 497:7, 508:21, 513:12, 526:5, 533:6, 555:16, 561:8, 566:12, 572:4, 596:23, 599:10 .
**moments** 486:18 .
**monetary** 586:22 .
**monetized** 469:12 .
**money** 462:11, 462:12, 474:4, 474:7, 475:12, 520:17, 521:13, 521:15, 587:2 .
**monitor** 553:3 .
**months** 486:18, 546:15 .
**morning** 527:16, 529:10, 603:25, 604:20 .
**mostly** 482:18 .
**motivate** 470:23, 522:19 .
**motivational** 522:11, 522:23 .

**motives** 581:3 .
**move** 468:9, 486:4, 488:4, 491:16, 493:1, 495:9, 498:8, 500:14, 503:16, 509:24, 513:21, 515:25, 533:14, 533:15, 554:23, 561:12, 571:25, 599:6, 600:4, 600:6, 602:19, 602:21 .
**movement** 562:15 .
**moving** 601:20, 601:21 .
**Mozilla** 545:3, 548:14, 551:12, 558:17, 559:8, 559:19, 566:3, 566:13, 570:2, 595:9, 595:25, 596:3, 596:11, 603:6 .
**MR. SAFTY** 535:1, 572:12, 574:22, 574:24, 580:11, 580:13, 584:4, 584:6, 591:12, 591:16, 591:18, 596:23, 596:25, 599:11 .
**Ms** 459:9, 459:15, 459:19, 459:23, 460:3, 498:16, 527:11, 533:8, 533:17, 535:18, 536:7, 569:21, 603:24 .
**MS. AQUILAR** 460:5, 464:25, 467:18, 469:7, 469:10, 469:23, 470:1, 470:3, 477:3, 486:6, 498:11, 500:17, 503:18, 510:1, 513:23, 527:12, 527:14, 527:23, 528:1, 528:8, 533:1 .
**MS. BARTELS** 534:11, 534:23, 535:5, 535:25, 545:21, 563:20, 571:24, 572:5, 597:5, 599:5, 600:12, 600:19, 601:3 .
**multimodal** 517:10 .
**multiple** 515:24, 556:10, 585:19, 587:20 .
**Murphy** 536:21, 541:3, 541:7, 541:14, 541:23, 546:17, 546:20, 546:22, 561:6, 563:21, 563:24, 567:5, 571:12 .
**muscle** 473:6 .

**muse** 482:13, 482:15 .
**myself** 498:2, 526:5, 530:5, 576:10 .

.

.

**< N >** .
**N.** 458:5 .
**Name** 459:5, 477:11, 515:14, 535:7, 559:20, 593:3 .
**Nashville** 458:25 .
**native** 478:21 .
**nature** 462:16, 462:17, 484:13, 522:23 .
**navigated** 502:2 .
**near-perfect** 522:15 .
**necessarily** 594:8, 601:5 .
**necessary** 554:12, 597:7 .
**need** 460:14, 460:15, 490:4, 491:14, 510:7, 516:20, 517:7, 523:2, 529:23, 530:1, 530:20, 530:24, 531:25, 538:24, 555:9, 559:23, 564:21, 564:25, 568:8, 582:14, 597:15, 600:6 .
**needs** 517:14, 530:18, 561:18, 568:5 .
**negative** 563:25 .
**negligible** 565:14, 565:20, 566:9, 573:9 .
**negotiating** 463:5 .
**net** 594:14 .
**new** 526:1, 576:15 .
**next** 483:11, 494:4, 512:21, 516:4, 516:6 .
**Nice** 599:17 .
**niche** 465:13 .
**Nicholas** 459:7 .
**No.** 457:5, 518:8, 518:12, 518:16, 518:21, 518:22, 519:6, 519:14, 525:25, 547:1, 576:11 .
**Nobody** 550:19, 563:6, 603:7 .
**nomenclature** 481:21 .
**Nonchat** 490:23 .
**nondefault** 568:12 .
**none** 475:3 .

**nongoogle** 565:24, 576:24 .
**nonmonetary** 474:10 .
**normally** 495:25 .
**Note** 470:3, 477:4, 483:23, 488:5, 511:14, 533:17, 599:11 .
**noted** 535:22 .
**Nothing** 494:23, 496:1, 561:23, 582:9, 604:16, 604:18 .
**notice** 540:15 .
**novel** 487:17 .
**numbering** 483:12 .
**numbers** 471:13, 471:16, 472:6, 488:17, 490:15, 492:9, 492:19, 494:2, 495:10, 496:15, 496:16, 496:17, 497:4, 501:14, 501:15, 502:4, 507:12, 585:24, 587:5, 600:15, 602:11 .
**numerous** 464:18 .
**NW** 457:39, 457:46, 458:7, 458:43 .

.

.

**< O >** .
**O.** 458:24 .
**OAI** 499:2 .
**Oai-index** 522:14 .
**obfuscate** 472:5 .
**object** 500:17, 513:23, 603:4, 603:9 .
**Objection** 486:6, 488:6, 498:10, 498:11, 498:19, 500:15, 503:18, 510:1, 533:18, 603:6 .
**objections** 599:12, 599:13 .
**objective** 573:13, 573:24 .
**objectives** 555:21 .
**obligated** 504:25 .
**observed** 511:14, 511:16 .
**obstacle** 530:9 .
**obstacles** 470:25 .
**obtain** 504:17 .
**obtainable** 522:22 .

**obvious** 557:20, 561:1 .
**obviously** 489:25, 593:15, 600:8 .
**occasionally** 466:3 .
**offer** 469:13, 474:7, 474:10, 476:13, 476:21, 477:1, 478:21, 479:10, 479:16, 504:13, 521:7, 531:11, 536:13, 541:4, 553:11, 596:17 .
**offered** 462:11, 519:9, 574:13, 578:16, 578:20, 586:4, 587:8 .
**offering** 464:7, 504:9, 504:12, 506:5, 510:18, 542:10, 554:15, 572:15, 572:22, 573:11, 574:17, 575:22, 576:4, 576:19, 577:7, 578:11, 579:9, 586:7, 597:16 .
**offers** 476:2, 513:9, 539:5 .
**Office** 458:22 .
**Official** 458:42, 604:28 .
**often** 576:23, 578:8 .
**Oftentimes** 462:11, 463:4, 511:16 .
**older** 539:16, 545:10 .
**omitted** 533:14 .
**onboard** 521:6 .
**once** 463:23 .
**ongoing** 503:1 .
**onramp** 479:16 .
**ONYEMA** 458:5, 533:8, 533:17 .
**open** 472:5, 474:17, 489:25, 520:6, 523:23, 526:15, 535:19, 547:11, 548:20, 562:24, 601:11 .
**opening** 559:15 .
**operates** 501:11 .
**operating** 476:3 .
**operation** 580:14, 580:18, 580:21 .
**opines** 546:17 .
**opining** 572:20 .
**opinion** 536:13, 536:21, 536:22, 537:11, 541:18, 541:20, 542:2, 542:3, 542:11, 542:20, 546:19,

546:22, 549:12, 554:11, 554:15, 561:17, 563:24, 567:11, 571:18, 572:15, 572:18, 572:20, 572:22, 573:11, 574:17, 575:16, 575:22, 576:4, 576:19, 577:7, 577:10, 578:11, 578:16, 578:20, 579:9, 593:1 .
**opinions** 542:17, 571:12, 574:13, 596:16, 600:21, 602:13 .
**opportunity** 479:11, 480:12 .
**opposed** 578:22, 602:12 .
**opted** 462:5 .
**optimize** 467:11 .
**opting** 546:15, 598:5 .
**option** 462:18, 557:19, 560:2, 562:24, 568:9, 582:6, 593:3 .
**Options** 538:12, 539:11, 539:16, 539:20, 543:18, 543:20, 557:20, 557:23, 558:6, 559:17, 562:23, 568:6, 582:5, 598:8, 598:22 .
**orange** 589:8, 589:13, 589:19 .
**order** 480:14, 505:23, 559:25, 596:5 .
**organic** 569:1 .
**OS** 467:23 .
**OSTIGUY** 458:21, 459:11, 477:9, 477:13, 477:14, 477:16, 477:17, 477:20, 480:19 .
**Ostigy** 477:12 .
**others** 476:5, 509:1, 509:2, 509:3, 565:8, 585:17 .
**Otherwise** 485:8, 496:18, 498:13, 587:3, 602:15, 602:18 .
**outcome** 581:13 .
**outcomes** 576:10, 586:9 .
**outlines** 470:19 .
**outlining** 470:6 .
**output** 511:24, 512:1 .

**outspent** 480:8 .
**overall** 466:13, 467:16, 484:19, 513:2, 548:14, 564:20, 566:7 .
**overflow** 468:25 .
**Overview** 466:20, 472:12, 472:17, 473:7 .
**Overviews** 471:7, 472:3, 472:14, 472:20, 473:1, 473:10, 511:22 .
**overwhelming** 555:22 .
**own** 460:8, 463:15, 467:21, 469:4, 471:12, 473:6, 476:17, 501:21, 510:11, 519:23, 524:3, 529:13, 531:9, 532:6, 541:15, 548:11, 565:15, 571:9, 594:12 .
**owned** 467:21 .
**owners** 583:7 .

.

.

**< P >** .
**p.m.** 523:13, 604:22 .
**package** 477:25, 554:2 .
**Page** 459:5, 459:28, 470:7, 470:9, 483:9, 483:11, 483:16, 488:11, 488:16, 495:9, 497:4, 497:8, 497:12, 498:23, 500:11, 508:13, 508:14, 513:6, 515:1, 521:23, 522:6, 525:18, 528:2, 531:3, 569:23, 584:13, 584:16, 584:17, 584:20, 589:1 .
**paid** 506:17, 563:2, 588:3 .
**paper** 584:7, 584:22, 586:17 .
**papers** 564:10 .
**paragraph** 516:4, 516:6, 516:17, 528:20, 529:22, 530:4, 531:4, 585:2 .
**Part** 462:23, 463:3, 463:12, 464:5, 468:23, 473:9, 477:24, 478:3, 482:11, 483:18, 484:18, 487:16, 487:17, 493:3, 498:25, 499:6, 499:23, 499:24,

526:6, 531:21, 548:19, 549:12, 552:17, 552:25, 555:5, 561:23, 561:24, 564:9, 576:11, 588:6, 588:8, 593:12, 601:19 .
**participant** 548:3 .
**participants** 507:24, 537:15, 585:16 .
**particular** 498:4, 501:25, 517:1, 545:7, 550:12, 569:2, 572:24, 581:12, 582:7, 582:13, 585:13, 585:20, 590:12, 593:18, 594:20 .
**particularly** 465:11 .
**parties** 474:2, 480:17, 559:24 .
**partner** 480:5 .
**partners** 475:21, 567:21 .
**partnership** 468:2, 468:4, 468:19, 474:19 .
**partnerships** 473:18, 531:19 .
**parts** 468:7, 476:18, 537:7, 593:12 .
**party** 490:8, 501:24, 596:10 .
**pass** 477:6 .
**past** 481:21, 490:11, 492:15, 539:15, 558:24 .
**path** 547:15 .
**paths** 547:14 .
**patterns** 560:19, 561:1 .
**patterns.** 556:2 .
**pay** 462:11, 474:3, 563:2, 563:3, 563:5, 563:7, 587:2 .
**pay-to-play** 562:23 .
**paying** 592:7, 592:11, 592:18, 596:10 .
**payment** 553:7, 553:11, 586:8, 587:14, 596:18 .
**PDF** 528:2 .
**People** 463:4, 463:5, 464:8, 465:8, 465:12, 465:16, 465:19, 467:8, 476:21, 476:22, 477:1, 478:9,

478:12, 478:14, 479:5, 479:12, 479:15, 481:8, 487:2, 487:17, 487:18, 501:23, 502:2, 511:1, 512:13, 520:24, 521:7, 532:12, 532:13, 544:8, 548:15, 550:21, 551:20, 552:19, 553:1, 553:11, 553:16, 563:18, 586:18 .
**people.** 509:18, 529:1 .
**per** 496:2 .
**perceive** 464:15 .
**percent** 467:4, 467:5, 472:15, 472:16, 492:8, 521:18, 544:22, 545:8, 545:9, 545:19, 546:15, 552:24, 553:6, 553:14, 561:11, 562:15, 566:19, 569:3, 569:4, 576:13, 584:24, 585:4, 585:9, 585:21, 585:22, 587:9, 587:10, 587:14, 587:20, 587:24, 588:10, 596:2, 599:2 .
**percentage** 483:19, 483:21, 483:23, 484:3, 484:9, 484:15, 484:16, 544:13, 552:23, 561:23, 562:15, 574:18, 587:17, 588:1 .
**percentages** 483:25, 495:20, 561:9 .
**perfectly** 523:6 .
**performance** 540:24, 555:3, 557:8, 557:11 .
**perhaps** 512:16 .
**period** 506:24, 583:18, 583:23, 585:12 .
**Perplexity** 471:5, 489:2, 604:1 .
**Perplexity.com** 490:19 .
**persisted** 585:11 .
**persistent** 535:13, 536:16, 549:8 .
**person** 463:6 .
**personal** 510:11 .
**perspective** 478:24, 510:20, 536:14, 571:3 .
**pertains** 530:17 .
**pervasive** 546:25,

547:25 .
**phase** 477:6, 490:13, 534:16, 537:25, 538:2, 550:5, 561:20, 569:25, 571:4, 593:1 .
**phases** 569:7 .
**phone** 473:15, 473:18, 547:9 .
**phones** 505:10 .
**pick** 466:5, 531:6, 551:20 .
**piece** 530:15, 530:17, 550:8 .
**pieces** 531:18 .
**pivot** 462:22 .
**pixels** 530:24 .
**place** 463:24, 473:11, 476:3, 514:22, 518:3, 527:15, 579:20, 594:11, 597:21 .
**placement** 578:22 .
**places** 548:12 .
**Plaintiff** 457:7, 457:23, 458:5, 533:7, 566:20, 573:1, 577:3, 579:5, 581:4, 581:20, 582:18, 583:10, 584:1, 586:2, 587:6, 591:18, 595:1, 596:6, 596:9, 604:8 .
**plaintiffs** 477:18, 477:23, 572:16 .
**plan** 499:13, 500:1, 535:11 .
**plan.** 499:3 .
**planning** 535:10 .
**plans** 511:5 .
**platform** 501:25 .
**play** 464:22, 521:17, 556:10, 577:14 .
**played** 547:14 .
**player** 511:10 .
**players** 462:19, 475:22 .
**playing** 577:21 .
**Please** 470:7, 470:16, 478:23, 485:25, 492:18, 497:7, 528:1, 534:10, 535:6, 536:19, 538:16, 541:12, 542:24, 544:6, 544:23, 544:25, 548:25, 550:3, 551:1, 552:12, 556:21,

558:11, 559:3, 564:19, 567:10, 567:24, 569:24, 575:19, 580:1, 586:24, 591:17 .
**pleasing** 466:10 .
**plotting** 471:3, 589:17 .
**plus** 599:25 .
**point** 473:24, 500:23, 532:22, 537:22, 562:15, 562:21, 567:18, 568:1, 569:13, 571:17, 582:23, 588:20, 597:14, 598:7, 603:8 .
**pointed** 598:14 .
**pointing** 585:18 .
**points** 532:12, 544:13, 558:20, 560:14, 561:23 .
**policy** 531:1, 531:25 .
**poor** 559:19 .
**pop-up** 558:3 .
**portion** 578:12, 595:5 .
**portions** 477:4, 483:17 .
**poses** 515:14 .
**position** 550:1 .
**positive** 567:3, 591:7, 594:14 .
**possibilities** 590:18 .
**possibility** 479:2, 479:9 .
**possible** 466:4, 472:19, 527:2, 582:22, 583:15, 583:19, 583:23 .
**Post** 459:30, 459:37, 459:39, 486:2, 486:16, 501:2, 503:7, 513:1 .
**potential** 563:25 .
**potentially** 466:25 .
**power** 468:21 .
**powerful** 532:5, 532:11, 539:12 .
**practice** 555:23, 556:1, 599:20 .
**practices** 558:25 .
**precheck** 568:25 .
**precise** 603:1 .
**preclude** 462:13 .
**predecessor** 506:2 .
**prediction** 537:11, 542:18 .
**prefer** 492:9, 519:1, 566:18,

566:19, 593:8, 593:9, 594:22, 594:23, 595:6, 596:2 .
**preference** 469:6, 564:14, 565:7 .
**preferences** 556:15, 594:3, 598:21 .
**preinstall** 592:18 .
**preinstallation** 541:24, 567:13, 567:21, 592:11 .
**preinstalled** 583:2, 591:20 .
**preloaded** 473:12 .
**prepared** 535:15 .
**preselected** 557:19, 568:7, 568:18, 568:24 .
**present** 564:1 .
**presentation** 499:16, 535:16, 535:19, 535:20, 536:5, 548:4, 556:9, 579:24 .
**presented** 539:9, 539:21, 550:4, 564:17, 581:8, 581:14 .
**presenting** 586:9, 589:7 .
**press** 558:2 .
**pressing** 462:14 .
**presumably** 484:12, 511:5 .
**presume** 573:15 .
**presumptively** 600:16 .
**pretesting** 560:22 .
**pretraining** 526:24 .
**pretty** 491:12 .
**prevailing** 517:1 .
**preventing** 560:7 .
**preview** 603:21 .
**previous** 535:25, 543:4, 545:24, 548:4, 556:9, 569:7, 569:17 .
**previously** 479:15, 479:22, 534:16, 537:4 .
**primary** 521:16 .
**principle** 563:4 .
**Prior** 503:22, 546:12, 555:7, 555:9, 571:23, 599:20 .
**privacy** 539:3, 556:15, 594:3, 604:3, 604:6 .

**privacy-preserving**
467:2 .
**private** 492:11, 559:20 .
**proactively** 495:4 .
**probably** 469:14, 514:2,
591:9, 603:23 .
**problem** 485:9, 530:11,
554:15, 563:14,
574:1 .
**problems** 544:17, 555:13,
559:5, 562:17,
563:17 .
**proceed** 534:18,
591:16 .
**proceeding** 526:12 .
**Proceedings** 458:48, 604:22,
604:25 .
**process** 519:23 .
**produced** 458:49 .
**product.** 530:21 .
**products** 463:13, 463:16,
464:14, 465:6, 471:4,
490:24, 491:1, 508:3,
511:6, 512:13, 512:24,
515:16, 517:9, 529:17,
529:18, 532:7, 532:13,
538:19, 556:5, 556:11,
573:18 .
**prohibit** 596:10 .
**prohibiting** 592:6, 592:10,
592:17 .
**prohibition** 596:14,
596:18 .
**project** 460:7, 524:2,
524:7 .
**projections** 500:5 .
**projects** 524:8 .
**prominent** 467:25, 568:13,
569:16, 570:20 .
**prominently** 568:10 .
**prompt** 569:16 .
**prompted** 548:9 .
**properly** 602:24 .
**properties** 558:16,
558:17 .
**property** 549:14 .
**propose** 548:9 .
**proposed** 572:16, 579:10,
596:7, 596:9 .
**proposing** 477:24 .

**protecting** 532:8 .
**Protection** 458:13,
458:23 .
**provide** 462:8, 478:6, 478:19,
542:16, 542:17,
586:23 .
**provided** 505:20 .
**provider** 473:25, 518:8,
518:12, 518:15, 518:21,
518:22, 519:6, 519:14,
519:16, 548:10 .
**providers** 462:4, 462:21,
474:21, 519:3 .
**provides** 536:22 .
**providing** 511:25, 539:1,
542:17, 550:7, 570:20,
572:18, 576:15, 577:10,
581:2 .
**provisions** 578:13 .
**Prudential** 458:36 .
**public** 470:12, 490:3, 490:9,
491:24, 519:3,
535:21 .
**publications** 537:9 .
**publicly** 461:6, 463:15,
463:17, 468:19, 471:10,
472:7, 492:11, 492:15,
492:17, 500:25, 502:18,
535:23 .
**publish** 536:4 .
**published** 459:41, 509:13,
544:7 .
**publishers** 461:18, 461:23,
462:10 .
**pulling** 484:20 .
**purchasing** 480:15 .
**purportedly** 574:19 .
**purpose** 552:17, 588:8,
601:25 .
**purposes** 519:24, 598:18,
600:9 .
**push** 531:8 .
**pushed** 473:25 .
**pushing** 463:8 .
**Put** 463:25, 464:7, 474:5,
482:23, 485:1, 485:21,
485:24, 486:14, 489:9,
491:9, 496:13, 496:21,
500:8, 506:13, 509:7,
514:21, 518:18, 521:2,

526:9, 550:16, 584:15,
586:12, 601:18, 601:23,
601:25, 603:3 .
**PXR** 469:25, 482:24, 493:8,
517:19, 518:3, 572:1 .
**PXRD** 536:2, 599:7 .

.

.

**< Q > .**
**qualification** 487:4 .
**qualify** 594:19 .
**qualitative** 542:10, 542:12,
542:17, 585:25,
597:11 .
**quality** 474:13, 476:15,
506:15, 518:12, 520:2,
520:13, 520:19, 521:3,
521:11, 549:15, 554:3,
554:7, 554:20, 563:12,
566:25, 577:18, 577:20,
578:8, 579:7, 579:10,
592:2, 592:8, 592:12,
592:19, 593:2, 593:15,
593:25, 594:3 .
**quality/strong** 551:15 .
**quantification** 577:22 .
**quantified** 578:24,
596:3 .
**quantify** 574:14, 577:19 .
**quantifying** 574:16, 576:10,
576:22, 577:11 .
**quantitative** 542:11,
542:18 .
**quarter** 496:7 .
**queries** 484:10, 484:12,
484:15, 484:17, 490:18,
490:20, 518:16,
574:18 .
**question** 460:7, 461:19,
469:1, 469:2, 469:3, 469:9,
471:2, 480:10, 482:6,
484:7, 484:14, 491:4,
492:4, 496:11, 496:14,
501:4, 502:6, 502:20,
507:14, 510:10, 512:7,
512:17, 516:25, 520:9,
525:21, 526:1, 526:7,
526:10, 526:18, 532:23,
549:9, 566:17, 576:2,
586:24, 590:4,

596:21 .
**questioning** 490:14, 529:24,
577:5 .
**questions** 477:3, 480:19,
510:11, 523:18, 524:21,
527:9, 533:2, 533:8,
552:16, 572:6, 577:3,
581:5, 581:20, 582:17,
586:3, 587:7, 591:19,
595:1, 596:25, 599:6 .
**quick** 464:2, 603:21 .
**quite** 473:25, 474:25, 482:23,
518:18, 565:2, 576:17,
598:24 .
**quote** 548:2, 551:16,
583:10 .
**quoted** 583:11 .

.

.

**< R > .**
**R&D** 520:2, 520:12 .
**R-a-n-g-e-l** 535:8 .
**raise** 498:18, 500:6,
603:16 .
**raised** 501:9 .
**Ralph** 458:15 .
**ran** 545:3 .
**random** 557:21 .
**randomized** 539:17 .
**Rangel** 459:17, 533:24,
534:2, 534:6, 534:14,
534:15, 534:17, 535:6,
535:8, 535:19, 571:24,
572:2, 599:8, 599:15 .
**ranging** 471:4, 531:19 .
**rank** 460:16 .
**ranked** 460:14 .
**ranking** 460:22, 527:6 .
**rather** 493:20, 498:6,
524:10 .
**ratio** 495:21 .
**RDXD-02.001** 533:14 .
**reach** 474:20, 478:4, 499:8,
570:8, 597:7 .
**read** 489:20, 490:15, 492:2,
492:5, 492:9, 492:23,
495:20, 498:7, 499:2,
499:8, 515:17, 516:10,
529:2, 530:13, 531:14,
548:18 .

**reading** 492:22, 494:2 .
**reads** 528:14, 528:24 .
**ready** 460:3 .
**Real** 476:21, 477:1, 529:1,
   530:9, 531:4 .
**real-time** 465:14, 476:15,
   478:11, 483:24, 484:20,
   484:24, 485:5, 506:5,
   507:5 .
**really** 479:10, 484:23, 492:9,
   513:16, 530:10, 586:18,
   594:4 .
**reason** 499:19, 525:3, 526:15,
   534:21, 590:15 .
**reasoning** 517:10 .
**reasons** 519:10, 519:14,
   522:25, 557:20 .
**rebut** 541:4 .
**rebuttal** 541:6, 541:11,
   541:13, 541:22, 542:2,
   542:3, 561:6, 563:21,
   567:9 .
**recall** 483:6, 501:16, 520:3,
   520:5, 523:18, 524:22,
   525:14, 525:20, 566:2,
   577:5, 589:8, 598:12 .
**recalling** 583:1 .
**received** 604:7 .
**received.** 486:12, 488:9,
   498:15, 501:6, 503:20,
   510:9, 514:4 .
**recent** 544:3, 544:7,
   559:5 .
**recently** 486:2, 506:19 .
**recess** 523:13 .
**recognition** 551:11,
   551:15 .
**recognize** 486:1, 486:9,
   500:11, 503:7, 509:12,
   511:4, 513:8, 591:13 .
**recognizing** 564:22 .
**recollection** 580:7,
   587:12 .
**recommendation**
   591:24 .
**recommending** 592:3 .
**record** 514:3, 535:7, 599:12,
   601:18, 601:19, 601:23,
   603:7, 603:11,
   604:25 .

**record.** 514:13 .
**recorded** 458:48 .
**recruit** 552:19 .
**red** 470:5, 470:11, 488:12,
   488:13, 535:22, 601:8,
   602:5 .
**red-box** 600:15 .
**red-boxed** 600:13,
   601:12 .
**redacted** 483:15, 483:17,
   495:21, 502:5, 502:9,
   522:13, 535:21 .
**redaction** 490:5 .
**redactions** 470:5,
   483:21 .
**REDIRECT** 459:15, 459:23,
   491:19, 527:11, 527:13,
   527:25, 597:3, 597:4 .
**reduce** 540:7, 540:10, 543:2,
   549:4, 571:19 .
**reduced** 575:24, 576:6 .
**reducing** 535:13, 536:16,
   573:12 .
**reduction** 544:1,
   544:14 .
**refer** 510:16, 510:17, 510:21,
   510:22, 516:7 .
**referenced** 524:9, 580:14,
   580:19 .
**references** 600:13 .
**referred** 518:4 .
**referring** 493:22, 510:23,
   513:2, 513:18, 513:19,
   575:10, 582:3, 589:15,
   589:21, 589:22, 590:14,
   595:11 .
**refers** 484:16, 488:23, 538:8,
   539:8, 539:24 .
**reflects** 589:9, 603:12 .
**refused** 518:16, 518:22 .
**regard** 504:10, 516:3, 529:18,
   529:20 .
**regarding** 540:4, 542:23,
   583:6 .
**region** 471:15 .
**regular** 505:24 .
**regulatory** 517:4, 573:23,
   574:6 .
**reinforcing** 465:15 .
**rejected** 587:9 .

**related** 517:4, 537:9 .
**relates** 567:7 .
**relationship** 469:12, 478:6,
   478:18, 519:2,
   519:19 .
**relationships** 462:21, 474:1,
   519:2 .
**relative** 510:15 .
**released** 551:9, 558:24,
   559:7 .
**relevant** 492:20, 537:8,
   560:9 .
**reliability** 522:15 .
**relied** 537:5, 589:7, 600:5,
   600:21, 601:4,
   602:13 .
**rely** 487:21, 595:23,
   602:14 .
**relying** 595:8, 596:5,
   603:6 .
**remainder** 513:7,
   513:13 .
**remedies** 476:7, 476:8,
   476:11, 476:19, 477:1,
   537:25, 549:12, 549:14,
   554:1, 554:2, 554:4, 554:6,
   554:7, 554:11, 554:19,
   562:11, 566:21, 566:24,
   572:16, 579:14 .
**Remedies Hearing**
   **Proceedings**
   457:16 .
**remedy** 477:24, 517:1, 541:8,
   549:13, 554:16, 555:6,
   579:10 .
**remember** 469:5, 470:21,
   491:13, 520:11, 561:19,
   579:7, 581:9, 584:2,
   585:14, 591:21, 595:3,
   597:18 .
**remind** 534:14, 542:25,
   550:19, 555:2, 559:12,
   567:11, 569:8, 570:7,
   571:17, 594:6 .
**remote** 479:2 .
**removed** 549:25, 550:23,
   577:14 .
**removing** 549:23,
   597:18 .
**repeat** 580:16, 592:14 .

**repeatedly** 555:19 .
**repeating** 461:19, 502:6,
   554:6, 576:2 .
**replaced** 594:16,
   594:22 .
**replaces** 593:7 .
**report** 470:19, 537:25, 538:1,
   541:3, 561:7, 562:13,
   563:22, 567:5,
   571:12 .
**Reported** 458:41,
   475:10 .
**Reporter** 458:42, 523:4,
   604:28 .
**reports** 472:14, 536:23,
   537:23, 537:24, 538:1,
   595:24, 596:22 .
**repository** 460:10, 460:15,
   460:16 .
**represent** 470:15,
   491:14 .
**requalify** 534:20 .
**require** 484:10, 484:24 .
**required** 468:6, 524:5,
   529:25, 531:1, 531:18,
   558:5, 558:8 .
**requirement** 573:23,
   574:6 .
**requires** 531:15 .
**research** 470:19, 476:17,
   517:10, 517:11 .
**researcher** 582:12,
   582:14 .
**researchers** 543:17, 552:18,
   568:22, 581:6, 590:9 .
**resolve** 498:16 .
**resolved** 544:20 .
**resources** 524:4,
   524:14 .
**respect** 504:2, 556:8 .
**respond** 536:20,
   586:24 .
**response** 541:6, 541:22,
   561:6, 563:21, 563:24,
   567:5, 581:4, 581:20,
   582:17, 586:2, 587:6 .
**responsibility** 462:24,
   463:1 .
**responsible** 463:11, 474:1,
   578:18 .

**rest** 492:20, 531:14, 593:13 **.**
**rest.** 515:6 **.**
**restate** 526:19, 543:1, 545:14 **.**
**result** 563:8 **.**
**resulted** 541:24, 550:1 **.**
**results** 505:19, 505:23, 507:2, 518:21, 519:7, 519:15 **.**
**resume** 523:10 **.**
**retain** 542:4, 567:12 **.**
**retrieval** 460:22 **.**
**return** 598:5 **.**
**returns** 460:13 **.**
**revenue** 469:14, 469:16, 469:19, 475:16, 475:22, 497:1, 497:5, 497:10, 497:11, 497:16, 499:9, 499:13, 499:18, 500:1, 500:5, 501:14 **.**
**revenue-generating** 469:17 **.**
**reverse** 560:18 **.**
**reverting** 557:25 **.**
**review** 491:14, 541:2, 560:24, 580:2, 604:6 **.**
**reviewed** 537:8, 537:13, 555:7, 555:9, 555:12, 571:23, 596:6 **.**
**rewarding** 550:6 **.**
**rhetoric** 522:23 **.**
**rights** 461:4 **.**
**risks** 515:18 **.**
**road** 496:7 **.**
**robust** 522:14, 568:14, 569:16, 597:13 **.**
**role** 462:23, 521:17, 551:3, 554:24, 577:15, 577:21 **.**
**Room** 457:33 **.**
**Ropes** 458:35 **.**
**Rosetta** 517:19, 518:4, 519:5 **.**
**rough** 492:17 **.**
**roughly** 575:5 **.**
**round** 477:5 **.**
**row** 548:1 **.**
**RPFJ** 567:6 **.**
**RPR** 458:41, 604:23 **.**

**rule** 526:22 **.**
**ruling** 492:18, 573:23, 574:6 **.**
**rulings** 490:12 **.**
**run** 586:21 **.**
**running** 466:13 **.**
**.**
**.**
**< S > .**
**S.** 457:31, 457:44, 471:23, 480:6, 490:14, 496:15, 574:18 **.**
**Safari** 473:5, 559:13, 559:25, 560:2, 569:9, 571:1, 571:2 **.**
**safe** 472:20 **.**
**Safty** 458:28, 459:21, 572:7, 572:8, 572:10, 584:15, 584:17, 591:10 **.**
**sake** 539:1 **.**
**SALLET** 458:11, 477:9, 477:15 **.**
**Samsung** 474:14, 475:11, 480:7, 545:11, 556:23, 580:14, 580:18 **.**
**San** 457:34 **.**
**Sarah** 457:43, 534:11 **.**
**satisfaction** 467:17 **.**
**satisfied** 467:13 **.**
**save** 548:18 **.**
**saw** 485:12, 502:4, 502:9, 507:2 **.**
**saying** 463:7, 467:14, 513:3, 513:10, 517:21, 551:19, 554:17, 560:6, 580:21, 590:8, 593:12, 602:8 **.**
**says** 487:10, 528:10, 529:4, 550:20, 558:3, 559:19 **.**
**scale** 507:9, 518:19, 521:8 **.**
**scan** 513:12 **.**
**scenario** 581:21, 582:11, 594:21 **.**
**scenes** 460:14 **.**
**schedule** 604:11 **.**
**SCHMIDTLEIN** 458:27, 602:8, 602:17, 602:25, 603:13, 603:15, 604:16 **.**

**scholarship** 537:6 **.**
**SCHWARTZ** 604:18 **.**
**scientist** 597:9 **.**
**scope** 567:8, 588:9, 596:16, 596:21 **.**
**screenshot** 503:9 **.**
**scroll** 558:5 **.**
**searched** 483:22 **.**
**searches** 472:17, 472:21, 483:20, 484:3 **.**
**searching** 511:17, 589:10 **.**
**seated** 534:10 **.**
**second** 473:16, 476:25, 528:19, 529:21, 530:17, 531:23, 536:18, 536:20, 541:22, 542:2, 542:3, 544:25, 548:23, 548:24, 549:2, 549:4, 549:12, 553:4, 555:5, 565:17, 567:4, 567:9, 569:24, 580:1, 584:12, 589:4, 592:15, 594:12, 599:14 **.**
**seconds** 596:5 **.**
**Section** 458:13, 522:13, 530:3, 530:19, 530:20, 530:22, 530:23, 531:1 **.**
**sections** 530:25, 531:17 **.**
**seeing** 537:14, 542:15, 550:7 **.**
**seeking** 482:20, 490:5, 600:19, 600:22, 600:24 **.**
**seem** 588:20 **.**
**seems** 513:4 **.**
**seen** 486:19, 548:4, 563:16, 565:4, 568:3, 569:7, 570:11, 580:6 **.**
**select** 478:15, 538:24, 548:9, 548:16, 554:10, 554:19, 576:20, 576:24, 584:24 **.**
**selected** 563:2, 569:1, 575:13, 577:8, 578:8, 585:4 **.**
**selecting** 565:21 **.**
**selections** 555:20, 579:6,

579:18 **.**
**self-interests** 548:11 **.**
**send** 494:22, 494:24, 557:3 **.**
**senior** 551:17 **.**
**sense** 508:5, 547:22, 594:18 **.**
**sent** 518:3, 556:23, 580:25 **.**
**senten-** 531:24 **.**
**sentence** 512:22, 515:5, 528:24, 529:25, 573:25 **.**
**sentences** 514:8, 514:18, 515:4, 532:5 **.**
**separate** 527:1 **.**
**series** 535:11 **.**
**serve** 465:6, 466:24, 482:8, 482:10, 482:13, 482:17 **.**
**service** 573:4, 582:23 **.**
**services** 467:25, 560:8 **.**
**serving** 509:17 **.**
**Session** 457:13 **.**
**set** 479:4, 525:11, 531:7, 539:11, 558:6, 591:20, 592:22 **.**
**sets** 592:2 **.**
**Setting** 464:1, 469:15, 473:16, 560:2, 577:22 **.**
**settings** 479:5 **.**
**several** 544:8, 569:11, 579:2, 585:14 **.**
**SEVERT** 457:36, 601:7, 602:4 **.**
**Shall** 591:16 **.**
**shape** 533:22 **.**
**share** 469:13, 469:16, 469:18, 474:16, 475:16, 487:20, 488:21, 488:23, 490:11, 490:17, 491:9, 492:7, 492:8, 493:16, 501:15, 515:11, 544:12, 552:6, 552:9, 561:21, 561:22, 562:22, 571:15, 576:13 **.**
**shared** 463:17, 468:18, 472:7, 492:10, 493:17 **.**
**shares** 492:16 **.**

**Shevelenko** 604:1 .
**shoes** 479:20 .
**shopping** 568:4, 568:24 .
**short** 477:10, 556:7 .
**short-term** 553:21 .
**shorthand** 458:48 .
**shortly** 506:3 .
**shot** 492:22, 531:20 .
**shoulder** 517:25 .
**shouldn't** 531:8, 562:4 .
**show** 460:25, 470:5, 471:16, 538:21, 549:16, 553:4, 565:17, 567:25, 568:14, 569:25, 570:5, 570:10, 579:15 .
**showed** 539:15, 546:25, 549:21, 569:17 .
**showing** 484:20, 503:10, 568:4, 585:7 .
**shown** 470:12, 545:1, 545:25, 553:17, 558:22, 562:19, 569:11, 575:12, 576:12, 585:21, 588:3 .
**shows** 544:5, 553:16, 570:10, 576:12, 596:1, 598:18 .
**shut** 532:17 .
**side** 525:2, 604:15 .
**sides** 599:22 .
**signed** 475:3, 521:7 .
**significant** 464:10, 474:7, 559:14, 592:21 .
**significantly** 474:7, 491:1 .
**signing** 501:24 .
**Silk** 574:10 .
**similar** 480:7, 506:21, 511:20, 512:3, 512:4, 529:9, 550:25, 552:24, 558:21, 570:16 .
**simple** 495:5 .
**simply** 473:3, 494:22, 495:19, 526:22, 585:21, 588:3, 601:25 .
**single** 463:3 .
**Sir** 500:2, 505:17, 505:21, 505:25, 507:4, 525:9, 534:5, 534:10 .
**Siri** 468:1, 468:14, 468:16,

468:25, 469:4 .
**situation** 480:7, 550:16, 570:3, 594:15 .
**situations** 564:12 .
**sizable** 544:1, 545:6, 565:2, 565:3, 568:14, 569:15, 597:13, 598:20 .
**size** 520:23, 542:18 .
**sky** 484:23 .
**slides** 471:16, 498:7, 502:5, 502:9, 599:13, 602:21 .
**slightly** 489:17, 603:23 .
**slower** 506:14 .
**small** 466:23, 472:4, 472:8, 520:22, 552:23, 561:16, 561:22, 592:25 .
**smaller** 466:25, 471:20 .
**Smurzynski** 458:29, 459:13, 480:22, 481:1, 485:24, 486:1, 491:18, 494:15, 500:8, 500:10, 509:7, 509:9, 512:19, 514:7, 514:9, 514:21, 515:3, 516:5, 516:7, 523:14, 527:25, 528:18, 529:24 .
**software** 545:22, 546:2, 546:25, 586:21 .
**solve** 485:9 .
**someone** 476:3, 506:9, 526:13, 555:12 .
**sometimes** 558:1, 573:8, 573:9, 591:23 .
**somewhere** 496:22 .
**sophisticated** 469:3 .
**Sorry** 461:19, 462:17, 464:23, 471:17, 475:13, 477:11, 487:7, 488:15, 493:25, 494:15, 501:3, 501:20, 502:6, 512:21, 513:10, 514:9, 517:21, 519:1, 521:5, 526:8, 526:11, 527:18, 533:6, 545:14, 564:2, 565:23, 568:17, 573:24, 576:9, 580:5, 580:23, 582:25, 592:14 .
**sort** 460:21, 462:16, 466:20, 468:24, 483:11, 495:21,

507:19, 508:4, 512:12, 512:21, 570:21, 602:2 .
**sorts** 602:14 .
**sought** 577:19 .
**sound** 486:20, 561:12, 587:24 .
**sounds** 489:16, 503:2, 503:11 .
**source** 469:18, 484:25, 505:23, 509:21, 523:23 .
**sources** 471:10 .
**South** 457:26 .
**space** 471:6, 496:9, 496:12, 507:18, 507:21, 508:1, 508:5, 508:9, 508:25, 514:19, 515:9, 516:19, 548:1, 556:12, 593:5, 595:13 .
**space.** 508:19 .
**Spanish** 557:25, 580:20 .
**speaking** 571:10 .
**speaks** 545:2, 566:14 .
**special** 494:18, 506:11, 506:21 .
**specific** 469:11, 471:2, 471:14, 488:24, 544:4, 545:25, 546:9, 546:19, 575:9, 577:10, 595:18 .
**specifically** 471:6, 546:7, 573:17 .
**specifics** 469:14, 480:3 .
**speculate** 475:24 .
**spell** 535:7 .
**spent** 467:12, 480:2 .
**spoke** 460:7, 465:11, 476:11, 518:24, 566:22, 598:11 .
**spot** 498:4, 560:25 .
**spring** 506:7 .
**stacked** 532:2, 532:15 .
**stalled** 474:5 .
**stamp** 493:9 .
**stand** 603:7 .
**stand-alone** 510:17 .
**standard** 599:12 .
**standing** 602:20, 604:3 .

**standpoint** 586:7 .
**start** 494:3, 497:3, 547:16, 547:19, 564:22 .
**started** 519:22, 572:4 .
**Starting** 575:19 .
**starts** 512:3, 512:9, 528:20, 561:20 .
**stat** 505:12 .
**state** 473:21, 477:17, 535:6, 535:23, 604:14 .
**statement** 487:8, 524:6, 524:8, 525:9, 564:5 .
**States** 457:1, 457:18, 457:24, 471:17, 471:20, 473:13, 478:5, 489:8, 489:12, 489:21, 492:8, 492:19, 499:7, 505:9, 509:15, 534:12, 534:13, 536:10, 574:8 .
**static** 562:6 .
**stating** 594:8 .
**statistic** 493:20 .
**stats** 471:18 .
**stay** 462:5, 553:9, 553:14, 553:20 .
**stayed** 553:8 .
**staying** 491:23, 599:2, 599:3 .
**stays** 556:18 .
**stenographic** 604:25 .
**step** 559:15, 559:23 .
**stick** 498:21, 586:19, 588:18 .
**Stone** 517:19, 518:4, 519:5 .
**stop** 537:13, 547:4, 557:5 .
**store** 476:3, 532:15, 547:10, 559:16 .
**straight** 479:21, 503:4, 512:12 .
**strange** 526:12 .
**Strategy** 459:32, 463:10, 470:20, 483:19, 484:2, 491:8, 493:21, 508:12, 516:4, 516:24, 521:22 .
**Strategy.** 487:24, 493:11 .
**stream** 503:9 .

615

**Street** 457:26, 457:39, 457:46, 458:7, 458:37 .
**strength** 577:4, 577:9, 577:17, 577:24, 578:3, 578:12, 578:21, 579:1 .
**strengths** 517:13, 517:15 .
**strict** 510:7, 602:25 .
**Strike** 502:19 .
**striking** 598:25 .
**strong** 510:25, 550:10, 550:13, 551:11, 565:6, 593:24, 598:19 .
**stronger** 550:18 .
**structure** 462:12, 480:11 .
**stuck** 587:9 .
**studied** 573:20, 574:3, 574:9, 576:23, 577:16, 577:23, 578:2, 580:9, 580:13, 580:18, 585:12, 595:5 .
**studies** 543:7, 543:16, 544:3, 544:24, 545:25, 549:21, 550:24, 566:10, 567:19, 568:2, 568:13, 570:19, 581:5, 581:11, 581:19, 582:1 .
**stumble** 517:20 .
**subject** 468:8, 563:3, 563:4, 599:12 .
**subjects** 545:3, 554:9, 590:11 .
**submit** 537:23 .
**submitted** 537:24, 537:25, 559:8 .
**subsequent** 589:20, 589:21 .
**subsequently** 576:25, 581:22 .
**subset** 582:4, 585:16, 586:4 .
**substance** 534:21, 581:17 .
**substantial** 464:3, 494:7, 578:4 .
**substantive** 500:20, 599:23 .

**substantively** 600:10 .
**success** 485:20, 503:22 .
**successful** 531:19, 566:21, 566:25, 577:14 .
**suddenly** 590:20 .
**sufficiency** 540:12, 540:20 .
**sufficient** 540:16, 549:7, 571:21, 599:1 .
**Suite** 457:27, 457:40, 458:8, 458:18 .
**sum** 566:7 .
**summarizing** 560:6 .
**summary** 537:25, 538:1, 604:5 .
**super** 464:1, 475:1, 478:17, 479:14, 481:15 .
**super-assistant** 516:8, 516:13, 528:21, 531:25 .
**superior** 474:10 .
**support** 550:25, 558:9, 560:10, 567:19, 572:15 .
**supports** 468:15, 543:10, 551:22, 556:3, 567:16, 603:3 .
**suppose** 601:24 .
**surfaces** 467:21, 513:4 .
**suspicion** 510:25 .
**sweaters** 503:5 .
**switch** 500:6, 507:19, 517:16, 552:23, 553:5, 553:7, 553:13, 559:21, 560:17, 566:23, 576:25, 586:5, 586:18, 587:8, 587:18, 589:10, 590:19, 598:10, 599:1 .
**switched** 495:11, 585:9, 585:22, 587:14, 587:15, 588:2 .
**switching** 590:13 .
**sworn** 534:7 .
**syndicated** 461:14 .
**system** 460:12, 460:17, 460:22, 462:19, 463:24, 464:1, 476:3, 476:13, 525:4, 527:1, 527:6, 540:18 .

**systematic** 573:10 .
**systems** 483:12 .

.

.

**< T >** .
**T.** 457:36, 458:41, 604:28 .
**tab** 469:24, 527:20 .
**table** 475:15, 548:2, 548:19 .
**Takeaways** 512:21 .
**talked** 461:3, 476:7, 476:16, 481:15, 482:6, 482:20, 501:14, 508:12, 509:3, 515:4, 517:17, 517:18, 519:21, 528:17, 552:1, 597:17, 600:5 .
**talks** 530:23, 541:20 .
**target** 532:8 .
**teaching** 537:5 .
**team** 470:22, 474:23, 475:5, 484:1, 493:16, 493:18, 517:11, 520:23, 521:8, 522:16, 522:20, 530:7, 530:15 .
**teams** 464:17, 474:1 .
**tech** 558:24 .
**technical** 508:5 .
**technically** 479:4 .
**technology** 460:8, 460:9, 460:20, 466:6, 468:20, 474:10, 476:12, 487:16, 507:10, 508:2, 530:24, 555:17 .
**telecommunication** 474:21 .
**Ten** 514:11, 523:5, 583:5, 591:13 .
**tended** 563:11 .
**Tennessee** 458:22, 477:17 .
**term** 465:2, 494:17, 494:18, 495:24, 511:4, 538:7, 555:23, 555:25, 573:2, 591:5, 594:12 .
**terms** 462:14, 463:25, 468:4, 469:11, 473:24, 474:19, 489:8, 511:7, 512:24, 538:3, 561:16 .
**terrible** 502:19 .

**tested** 510:12 .
**testified** 478:2, 485:18, 520:6, 534:8, 534:15, 537:4, 573:17, 581:4, 582:17, 582:20, 584:14, 586:2, 587:6 .
**testify** 535:10, 535:11 .
**testifying** 576:9, 579:13 .
**testimony** 477:6, 533:4, 534:22, 535:16, 536:3, 541:4, 541:17, 541:19, 542:12, 572:2, 576:11, 577:12, 580:2, 581:2, 581:9, 589:7, 599:8, 599:24, 600:11, 600:12, 601:23 .
**testing** 575:9, 595:15 .
**texts** 481:25 .
**thanks** 533:10 .
**themselves** 540:17, 541:15, 549:3, 549:5, 549:11, 564:4, 571:20 .
**theoretically** 527:2 .
**theory** 464:8, 486:10 .
**They've** 464:9, 492:16, 495:20, 511:9 .
**thinking** 473:4, 473:5 .
**Third** 469:24, 474:2, 490:8, 501:24, 508:13, 515:5, 516:17, 529:22, 554:23, 555:2, 559:24, 582:14, 596:10 .
**third-party** 461:18, 461:23, 467:24, 471:10, 471:22, 487:21, 490:9, 502:10, 505:22, 545:10, 556:16, 569:6, 569:19, 570:5, 570:9, 570:12 .
**Though** 485:12, 489:25, 493:19, 503:22, 521:16, 524:18, 553:15, 599:3 .
**thoughts** 523:9 .
**Thread** 459:41, 509:9, 509:12 .
**threat** 515:15, 515:19 .
**three** 537:7, 538:1, 545:3, 545:19, 547:16, 548:20, 558:19, 558:20, 560:13,

597:12 .
**three-prong** 542:13 .
**throughout** 541:17, 556:8, 585:11 .
**tie** 602:3 .
**tie-ins** 475:23, 475:25 .
**timing** 503:5 .
**title** 498:1 .
**TN** 458:25 .
**Today** 460:7, 467:18, 467:20, 473:12, 476:6, 476:8, 476:22, 477:22, 478:16, 479:5, 481:12, 482:19, 494:21, 506:15, 506:22, 511:8, 519:21, 521:7, 524:14, 532:24, 535:10, 535:16, 535:20, 538:22, 542:10, 572:13, 578:5, 589:7 .
**together** 483:10, 519:17 .
**tomorrow** 478:17, 603:21, 603:25, 604:20 .
**tonight** 550:21, 550:22, 604:6 .
**took** 493:14, 502:3, 585:24, 596:3 .
**tooling.** 522:15 .
**top** 460:24, 488:25, 493:20, 505:12, 583:11, 583:13 .
**top-tier** 522:15 .
**topic** 467:1, 497:1, 507:19 .
**topics** 482:9, 517:16 .
**total** 472:21, 566:7 .
**towards** 470:22, 495:2, 541:25 .
**Tower** 458:36 .
**track** 471:19, 493:4, 496:12, 497:15, 546:13 .
**tracked** 556:13 .
**tracking** 488:25, 489:1, 539:4, 546:3, 546:9 .
**tracks** 487:20, 490:8 .
**trades** 522:24 .
**traditionally** 460:21 .
**traffic** 462:6, 462:8 .
**train** 524:25 .
**training** 525:3, 525:7, 525:10,

**525**:24 .
**transaction** 538:25 .
**transactional** 482:19 .
**Transcript** 457:16, 458:48, 604:24 .
**transcription** 458:49 .
**transparency** 539:4, 546:3 .
**transparent** 470:24 .
**treading** 519:4 .
**treated** 484:3 .
**treatment** 543:17, 581:7 .
**trial** 477:6, 510:7, 538:21, 543:11, 550:5, 561:20, 569:8, 580:3, 582:20 .
**tried** 461:10, 461:12, 461:14, 487:2, 566:4, 578:25 .
**tries** 468:25 .
**trigger** 472:17, 484:17, 485:3, 485:13 .
**triggers** 511:19 .
**trivial** 588:11 .
**true** 464:13, 465:9, 465:11, 505:13, 506:25, 515:10, 524:7, 585:16 .
**truly** 560:7 .
**truth** 485:5, 485:8, 532:25 .
**try** 463:14, 465:9, 514:14, 534:20, 547:19, 553:18, 562:1, 602:19 .
**trying** 473:8, 473:22, 487:18, 508:4, 520:15, 522:19, 548:6, 573:6, 588:17, 601:5 .
**turn** 469:24, 470:7, 487:22, 488:11, 493:6, 497:1, 497:21, 498:23, 503:4, 508:13, 512:15, 521:22, 525:18, 527:20, 528:2, 540:2, 542:20, 548:23, 561:5, 563:20, 567:4, 579:22, 584:13, 585:24, 589:1 .
**tutor** 482:10 .
**tutoring** 482:11 .
**twice** 538:22 .
**two** 466:4, 483:12, 499:6, 508:19, 514:7, 514:18,

514:19, 515:4, 528:14, 536:12, 537:24, 539:2, 541:18, 547:16, 553:2, 553:3, 553:8, 553:12, 553:13, 561:19, 564:24, 568:5, 586:5, 587:8, 587:13, 587:19, 588:17, 589:9, 589:16, 590:24, 593:12, 593:17, 598:25, 599:19 .
**two-part** 561:17 .
**type** 473:3, 473:4, 478:11, 479:13, 511:17, 570:8 .
**types** 508:2 .
**typically** 510:22 .
**typing** 479:18 .
.
.
**< U >** .
**ubiquitous** 573:18 .
**UI** 511:15 .
**unable** 601:13 .
**unbiased** 557:17 .
**uncertainty** 521:17 .
**underlying** 531:12, 533:21, 599:24, 599:25, 600:16, 600:20, 601:2, 601:21, 602:11 .
**underneath** 528:13 .
**understand** 469:21, 498:9, 498:19, 499:12, 500:16, 503:25, 504:17, 516:22, 516:23, 522:18, 531:16, 545:17, 573:2, 587:5, 602:9 .
**understanding** 471:13, 474:2, 524:1, 558:13, 575:3, 575:11, 587:7 .
**Understood** 492:21 .
**undo** 540:12, 540:18, 540:21, 549:7 .
**unfair** 560:18 .
**unfortunately** 473:23 .
**Union** 559:9 .
**Unit** 458:14 .
**United** 457:1, 457:18, 457:24, 471:17, 471:20, 473:13, 478:5, 489:8, 489:11, 489:20, 492:8, 492:19,

505:9, 534:12, 534:13, 536:10, 574:8 .
**UNITED STATES OF AMERICA** 457:5 .
**unless** 496:18, 534:20 .
**unlikely** 541:15, 549:6, 549:7, 564:6 .
**untested** 541:8, 541:21, 546:17 .
**until** 505:19, 505:24, 506:19, 507:2 .
**us.** 532:2 .
**usage** 485:16, 489:8, 489:11, 493:22, 501:15, 505:15, 556:11, 565:6, 571:8, 591:1 .
**useful** 479:25, 557:17, 557:22, 560:23, 567:25 .
**user** 463:15, 463:22, 465:10, 465:23, 466:2, 466:11, 466:12, 467:1, 467:9, 467:13, 467:17, 469:1, 469:4, 479:11, 483:21, 484:21, 494:17, 495:11, 495:12, 505:20, 506:17, 511:22, 532:7, 532:8, 538:18, 542:22, 546:6, 548:12, 559:16, 563:16, 595:21 .
**uses** 482:21, 525:6, 525:23, 547:7 .
**using** 463:16, 464:24, 492:7, 498:21, 512:13, 519:4, 527:3, 533:18, 544:18, 547:17, 547:19, 552:19, 565:5, 565:22, 576:11, 576:15, 576:25, 587:19, 588:2, 588:14, 588:22, 590:16, 591:5, 598:18 .
**utility** 594:12 .
.
.
**< V >** .
**valid** 590:5 .
**validate** 500:22, 552:20 .
**valuable** 524:25, 525:7, 525:23, 526:2, 526:20 .

**value** 478:6, 478:19, 594:11 .
**variation** 552:6 .
**variety** 519:9 .
**various** 471:4 .
**vast** 467:20, 546:13, 566:19, 575:11 .
**Veronica** 458:5 .
**version** 483:1, 493:8, 535:21 .
**versus** 476:21, 489:1, 489:2, 490:19, 559:13, 577:19, 577:20, 582:7 .
**via** 502:22, 532:14 .
**viable** 531:20 .
**view** 478:3, 478:18, 509:21, 561:13, 562:14, 562:21, 564:24, 565:13, 573:2, 573:5, 592:21, 596:14 .
**views** 596:17 .
**violation** 557:4, 560:1 .
**violations** 559:17 .
**viral** 485:20, 486:18, 487:11, 487:15 .
**visibility** 491:2 .
**Vision** 470:20, 475:1, 483:19, 484:1, 495:2, 521:21, 522:9, 522:16 .
**visiting** 494:22 .
**vocal** 463:7 .
**voiceover** 500:3 .
**volume** 472:8, 472:23, 473:9, 502:21, 518:16 .
**volumes** 502:9 .
**vs** 457:8 .

.
.

**< W >** .

**W.** 458:31 .
**Waldo** 570:2 .
**wanted** 460:6, 460:8, 467:14, 471:19, 518:20, 524:13, 556:25, 582:12, 584:8, 586:18, 586:22, 587:17, 590:19, 601:8, 604:6 .
**Washington** 457:12, 457:41, 457:47, 458:9, 458:32, 458:44 .
**waste** 491:20 .

**WAU** 493:22 .
**ways** 462:3, 466:13, 466:18, 475:17, 508:19, 508:20, 513:17, 514:19, 561:19 .
**ways.** 528:14 .
**web** 488:23, 490:17, 491:2, 491:4, 560:7, 573:20, 574:3 .
**website** 459:43, 467:22, 486:25, 500:11, 500:24, 500:25, 502:3, 512:18, 513:25 .
**Wednesday** 604:12 .
**week** 487:15 .
**Weekly** 493:4, 493:22, 493:24, 495:11, 495:22 .
**weeks** 501:8, 553:2, 553:4, 553:8, 553:12, 553:13, 586:5, 587:9, 587:13, 587:19, 588:17, 590:24, 598:25 .
**Weinberg** 604:2 .
**Welcome** 460:2 .
**welfare** 541:16, 563:25, 564:6, 564:8, 564:11, 564:17, 564:21, 565:14, 567:3, 594:7, 595:3, 596:15, 596:19 .
**well-defined** 535:12, 536:15 .
**well-designed** 535:13, 536:15, 548:14, 558:18 .
**well-formed** 598:21 .
**whatever** 468:13, 490:15, 502:3 .
**Whatsapp** 490:25, 510:24, 511:8, 511:11, 511:18, 511:25 .
**whenever** 460:3 .
**whereas** 565:22 .
**Whether** 464:2, 467:9, 467:16, 471:22, 484:19, 520:11, 521:17, 529:18, 546:8, 551:6, 551:7, 572:23, 573:11, 575:16, 578:2, 578:11, 579:18, 582:22, 583:18, 583:22,

584:8, 595:16 .
**whichever** 592:22 .
**white** 517:23, 527:16, 527:18 .
**whole** 476:8, 500:22, 530:20 .
**widely** 502:16, 583:6 .
**Williams** 458:30, 572:8 .
**willing** 596:17 .
**win** 504:5, 504:7, 516:20, 517:8, 517:14, 530:12, 530:20, 530:21, 530:24, 531:2, 532:7, 563:5 .
**win.** 529:23 .
**Windows** 467:23, 531:7 .
**winning** 504:1 .
**wished** 518:17 .
**within** 471:8, 498:12, 522:17, 551:8, 551:18 .
**Without** 473:3, 473:5, 473:8, 494:2, 501:18, 501:20, 501:24, 502:8, 502:9, 505:15, 507:16, 515:17, 526:10, 531:9, 553:15, 565:8, 588:3 .
**WITNESS** 459:5, 466:23, 468:17, 469:13, 469:19, 477:7, 480:24, 484:14, 490:2, 490:7, 490:21, 492:21, 494:19, 496:16, 501:2, 510:16, 511:9, 512:3, 512:7, 512:11, 518:1, 522:4, 525:13, 526:17, 528:6, 533:5, 533:11, 534:3, 534:5, 534:7, 534:9, 545:16, 561:15, 562:16, 563:14, 568:20, 597:2, 599:16 .
**won** 504:4, 504:6 .
**word** 464:23, 466:21, 499:1 .
**words** 467:11, 469:17, 490:18 .
**work** 463:12, 479:8, 498:25, 519:17, 525:2, 530:10, 532:1, 543:6, 564:9, 567:8, 573:6, 588:9, 595:9, 595:16, 596:22,

597:13 .
**worked** 495:6, 504:5, 506:21 .
**working** 530:8 .
**works** 465:14, 465:25 .
**world** 476:21, 480:9, 487:18, 519:17, 520:24, 520:25, 521:3, 531:25 .
**world-class** 517:11 .
**worldwide** 496:15, 496:16, 496:17 .
**worried** 511:10 .
**worry** 532:16, 600:17 .
**worse** 593:10, 594:8, 594:23 .
**worst** 565:14, 566:8 .
**worth** 501:12 .
**write** 508:18, 515:7, 520:4, 520:6, 531:4 .
**writing** 467:5, 510:22 .
**written** 496:22, 530:7, 564:10 .
**wrote** 515:11, 516:3, 516:25, 529:22, 530:5, 531:23, 531:24 .

.
.

**< Y >** .

**Yahoo** 570:4 .
**year** 499:9, 506:20, 509:16, 562:18 .
**years** 521:8, 537:5, 547:3, 579:2, 579:19, 583:6 .
**yellow** 472:9, 472:22, 545:8 .
**Youtube** 461:4 .
**Yup** 488:19 .

.
.

**< Z >** .

**zero** 580:7, 590:12, 591:6 .
**Zucerkburg** 459:41 .
**Zuckerberg** 509:13, 509:15, 510:25 .