2118

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, ET AL.,   )
                                    )
          Plaintiffs,               )
                                    )   CV No. 20-3010
      vs.                           )   Washington, D.C.
                                    )   April 29, 2025
GOOGLE LLC,                         )   9:15 a.m.
                                    )
          Defendant.                )   Day 7
_____  )   Morning Session


TRANSCRIPT OF REMEDIES HEARING PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

2119

APPEARANCES:

For DOJ Plaintiffs:          David E. Dahlquist
                             UNITED STATES
                             DEPARTMENT OF JUSTICE
                             Antitrust Division
                             209 South LaSalle Street
                             Suite 600
                             Chicago, IL 60604
                             (202) 805-8563
                             Email:
                             david.dahlquist@usdoj.gov


                             Richard Cameron Gower
                             U.S. DEPARTMENT OF JUSTICE
                             Antitrust Division
                             450 Fifth Street, NW
                             Suite 7100
                             Washington, D.C. 20530
                             (202) 286-0159
                             Email: richard.gower@usdoj.gov

2120

APPEARANCES CONTINUED:

For Plaintiff
State Colorado:                    Jonathan Bruce Sallet
                                   COLORADO DEPARTMENT OF LAW
                                   Consumer Protection Section,
                                   Antitrust Unit
                                   Ralph L. Carr Colorado
                                   Judicial Center
                                   1300 Broadway
                                   Suite 7th Floor
                                   Denver, CO 80203
                                   (720) 508-6000
                                   Email: jon.sallet@coag.gov


For Defendant Google:             John E. Schmidtlein
                                   WILLIAMS & CONNOLLY LLP
                                   680 Maine Avenue SW
                                   Washington, D.C. 20024
                                   (202) 434-5000
                                   Email: jschmidtlein@wc.com


Also Present:                     Khushita Vasant from MLex
                                   Bryan Koenig from Law360


Court Reporter:                   William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   E. Barrett Prettyman CH
                                   333 Constitution Avenue, NW
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

2121

- - -

WITNESS INDEX

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PLAINTIFFS': | | | | |
| TASNEEM CHIPTY | 2125 | 2196 | | |

2122

                              P R O C E E D I N G S

              COURTROOM DEPUTY:  All rise.

              THE COURT:  Good morning.  Please be seated,
everyone.

              COURTROOM DEPUTY:  Your Honor, we're now calling
for the record Civil Action 20-3010, United States of
America, et al., versus Google LLC.

              Jon Sallet and David Dahlquist for the plaintiffs.

              And John Schmidtlein for the defendant.

              THE COURT:  Okay.  Good morning, everyone.
It's good to see you all.

              Okay.  First things first, Google had indicated
yesterday that it may need -- may request or need sort of a
confidential session for its witness, Ms. Adkins.

              Is that still the case, Mr. Sallet -- excuse me,
Mr. Schmidtlein?

              MR. SCHMIDTLEIN:  Yes, Your Honor.

              THE COURT:  Okay.

              Is there any objection from anyone present or
anybody would like to be heard?

              Come on up.

              MS. VASANT:  Good morning, Your Honor.

              My name is Khushita Vasant.  I write for MLex.

              Bryan Koenig from Law360.

              MR. KOENIG:  Good morning.

THE COURT:  Good morning.

MS. VASANT:  I have a short statement I'd like to read out on behalf of other media organizations.

The press and the public have a constitutional right to attend judicial proceedings and may not be excluded unless the Court makes findings on the record that, one, closure is required to preserve a compelling constitutional interest; two, no adequate alternatives to closure exist; and, three, the closure ordered is narrowly tailored to protect the threatened interest effectively.

The public has a right to be informed of what transpires in this case and the positions being argued by the parties and the factual basis for rulings made by the Court.  The Court should avoid any impression that justice is being carried on in secret.

MLex, Law360, Bloomberg, *The New York Times*, and other media organizations object to any closure order. To the extent Your Honor finds closure is necessary, we respectfully request it be kept as short as possible given the heightened public interest in this case.

Thank you, Your Honor.

THE COURT:  All right, thank you, Counsel -- thank you.  Sorry, used to saying "counsel."

All right.  Thank you for your statement.

Mr. Koenig, did you want to add anything else?

MR. KOENIG:  No, sir, just here to back up Khushita on those arguments.

THE COURT:  Okay.  Thank you.

All right.  You all can have a seat.

So, look, I think I can make the necessary findings for a brief in-camera session with Google's cybersecurity chief.

It's been represented that the nature of the testimony is such that if it's publicly disclosed, it could create security concerns for Google.

I obviously need to be sensitive of any disclosure of public information that could cause Google to become vulnerable to cyberattacks or other kind of vulnerabilities or creative vulnerabilities from bad actors, and so I think that's a fairly compelling reason to keep that portion of the testimony closed.  It's been represented that the -- or I've required counsel to minimize the amount of time that that session will take, and I've said if it goes any longer than 20 minute, I will cut counsel off.

And then, finally, as we did in the liability phase, we will certainly review the transcript from that session very quickly and get out the transcript and the portions that can, in fact, be disclosed to the public as expeditiously as we can, and there's already a process in place for doing just that, okay?

All right.  So with that, why don't we move forward and we'll begin with Dr. Chipty.

MR. GOWER:  Good afternoon, Your Honor.  Cameron Gower for the United States.

Plaintiffs call Dr. Tasneem Chipty as their next witness.

COURTROOM DEPUTY:  Please raise your right hand.

(Witness is placed under oath.)

COURTROOM DEPUTY:  Thank you.  Please be seated.

THE COURT:  All right, Dr. Chipty, welcome.

THE WITNESS:  Thank you very much.

          - - -

TASNEEM CHIPTY, WITNESS FOR THE PLAINTIFFS, SWORN

                    DIRECT EXAMINATION

BY MR. GOWER:

Q    Good morning, Dr. Chipty.

Would you please state and spell your name for the record.

A    Good morning.

My name is Tasneem Chipty.

It's T-a-s-n-e-e-m, C-h-i-p-t-y.

Q    And would you start by giving the Court your educational background.

A    Sure.

I have an undergraduate degree in math and

2126

economics.

Excuse me.

Let me start it again.

I have undergraduate degree in math and economics from Wellesley college, and a Ph.D. in economics from MIT.

Q    And where do you currently work?

A    I work as an independent consultant through my firm, Chipty Economics.

Q    And what other positions have you held?

A    Well, for most of my career, I was either a partner at an economics consulting firm or a professor in academia.

Most recently, I was the co-head of the global economics practice at Alix Partners.

And before that, I ran my own firm called Matrix Economics.

Q    And where have you taught?

A    Well, I started my career on the faculty of The Ohio State University, and then over the years, I've taught at Brandeis University and also MIT.

Q    And what subjects have you taught?

A    Undergraduate and graduate, microeconomics, industrial organization, and econometrics.

Q    And what is industrial organization?

A    Well, at the highest level, I would say it's the study of how markets function, including the choices consumers make and the strategic interaction among firms.

Q    Have you written any published articles or contributed to any books in the areas in which you've taught?

A    Yes, both.

I've published about a dozen or so articles, as well as contributed to chapters of books.

Q    And on what subjects have you published?

A    Well, in various sort of topics and industrial organizations.

So, for example, I've written on the effects of horizontal integration and the importance of firm size and bargaining power.

I've written on vertical integration and the importance of self-preferencing.

More recently, I've written on competition through innovation, as well as incentive design.

Q    How many times have you testified as an expert in economics before a trier of fact?

A    About ten times.

Q    And have you been qualified as an expert in industrial organization and economics in prior matters?

A    I have.

Q    On whose behalf have you previously been engaged as an expert?

A    I've been engaged by both private parties, as well as government agencies, including the Department of Justice.

MR. GOWER:  Your Honor, at this time, plaintiffs move to qualify Dr. Chipty as an expert in industrial organization economics.

MR. SCHMIDTLEIN:  No objection.

THE COURT:  Okay.

All right.  The Court will recognize Dr. Chipty as an expert in industrial organization.

BY MR. GOWER:

Q    Dr. Chipty, have you prepared a slide deck for your testimony today?

A    I have.

MR. GOWER:  Your Honor, may I approach?

THE COURT:  You may.

MR. GOWER:  And, Your Honor, may we publish?

BY MR. GOWER:

Q    Dr. Chipty, please describe your assignment in this remedies proceeding.

A    Sure.

If we could go to Slide 2.

You know, I was asked to start by taking the Court's findings in liability as given.

And then in that context, I was asked how the proposed remedies would change economic incentives, and whether plaintiffs' remedies, as compared to Google's, would be capable of restoring competition in the markets for general search services and general search text advertising.

Q    And have you studied all the proposed remedies?

A    No, I have not.

For example, I haven't looked at the contingent Android divestiture or the transparency provisions.

Q    Have you opined on the technical details of plaintiffs' remedy proposal or its implementation?

A    No.

As I've said, my analysis focuses on the economic incentives.

Q    And can you give us an example of where you drew the line between economic incentives and technical details or implementation.

A    Sure.

Take, for example, the plaintiffs' data-sharing provisions.

I have an opinion at a high level on the role that type of provision would play in restoring competition, but I don't have an opinion on what specific data should be shared.

Q    And how did you go about completing your assignment?

A    If we go to the next slide, Slide 3.

So I essentially broke the problem down into the following steps.

As I said, I started with the Court's opinion to understand the problem that needs to be fixed.

I then went on to identify guiding economic principles.

I then evaluated how the remedies are likely to work given the different economic incentives facing the different market participants.

Along the way, I identified potential risks and benefits, as well as assumptions that might make some of the remedy proposals more successful under which they might be more successful.

And where possible, I tried to identify relevant evidence from the record that might shed light on some important questions in this remedies proceedings.

Q    And at a high level, what conclusions have you reached?

A    Well, if we could go to Slide 4.

Really, three conclusions at a high level.

The first, that plaintiffs' remedies are likely to change incentives in ways that introduce competitive

rivalry.

Second, Google's remedies are likely to preserve the status quo.

And, third, that plaintiffs' remedies are more likely than Google's to restore competition in the relevant markets.

Q    And we'll discuss these conclusions in more detail throughout your testimony, but drilling down just for a moment on the first conclusion, can you explain a little more on how plaintiffs' remedies introduce competitive rivalry?

A    Sure.

If we could go to Slide 5.

Really, here are some of the ways that I think the plaintiffs' remedies would introduce competitive rivalry.

First of all, distributors would have a greater incentive to set rivals as the default in the remedial period, so that's from the get-go.

Rivals would be able to compete for the default on Chrome, something that's not been historically possible.

With access to distribution as well as under the plaintiffs' data-sharing remedies, rivals would be able to invest and compete on quality in both relevant markets.

At the same time, Google would still be able to compete for users.

All of this would mean that users and advertisers would be the beneficiaries of greater competition.

Q    And focusing on your first bullet, can you explain how distributors having a greater incentive to set rivals as the default might introduce competitive rivalry.

A    Well, even in the remedial period, that would mean that the non-Google rivals would have to compete for defaults, which would lead to a series of investments and efforts to convince distributors to carry them over other non-Google rivals.

Q    So let's dive into your analysis in more detail.

Have you prepared a roadmap to take us through your opinions?

A    I have, if you go to Slide 6, please.

So I'll start with remedy goals, and then move to plaintiffs' distribution remedies, then plaintiffs' data and syndication remedies, talk a little about GenAI and how they relate to the remedies here, remedy duration, then turn to Google's remedies, as well as consideration of some alternative remedies.

Q    All right.

Let's start with remedy goals.

As an economist, what goals did you have in mind when evaluating the proposed remedies?

A    Well, if we could go to slide 8, please.

So really, from my perspective, there are two broad goals.

First, to restore competition to where it would have been absent the anti-competitive conduct; and the second, to deter future anticompetitive conduct by ensuring that a dominant firm doesn't continue to benefit from its past conduct.

Q    How is the goal of restoring competition different, if at all, when a firm has engaged in monopoly maintenance as opposed to monopoly acquisition?

A    From my perspective, I don't think there's any difference.

The goal in both cases is to restore the competitive rivalry that was diminished by the dominant firm's anticompetitive conduct.

Q    In this matter, how did you identify the harms to competition that the remedies should restore?

A    Well, if we could go to slide 9.

As I said, I started with the Court's opinion to identify the harms that the Court found in this case.

And my analysis focuses on three primary harms that were identified.

The first is that Google's conduct foreclosed rivals from distribution; the second, that it deprived

2134

rivals of scale; and, third, that it reduced rivals' incentives to invest.

Q    And how, if at all, have you quantified the harms caused by Google's conduct?

A    I have not quantified them, but I take the Court's opinion to mean that there's a significant difference between what actually happened and what would have happened absent the anticompetitive conduct.

Q    And what, if any, specific outcomes would have occurred absent Google's anticompetitive conduct?

A    Well, I think the Court does identify some specific outcomes that would have occurred but did not occur because of Google's anticompetitive conduct; but, beyond that, I cannot say.

Q    And so without knowing all the specific outcomes that would have occurred, absent Google's anticompetitive conduct, how can one design remedies to restore competition?

A    Well, antitrust remedies are not a precise tool. Even if we knew exactly what would have happened, we wouldn't be able to perfectly or painlessly engineer those outcomes after the fact.

That's why remedies focus on the competitive process and not the ultimate outcomes of that process.

Q    And how do you focus on the competitive process as opposed to outcomes?

A     Well, in this case, I think that requires focusing on the barriers to entry identified by the court.  These barriers are the gateway to competition and general search, and Google's conduct amplified them.

Q     And what are the barriers to competition in the general search services?

A     Well, if we go to slide 10, the Court identified four barriers:  Distribution, scale, brand, and capital costs.

Q     And how has Google's conduct reinforced or protected barriers to entry?

A     Well, it starts with distribution.  So Google's distribution agreements deprived rivals of scale.

Armed with its own scale advantage, Google was able to, over more than ten years, invest in scale-related search and monetization capabilities, which then further enforced its hold on search access points.

With distribution, scale, and the benefit of time to build quality, Google was able to reinforce its brand, habituate users into using Google.

You know, left with no path to market, rivals had diminished incentives to incur the high capital costs for entry and expansion.

Q     Are the barriers to entry best viewed individually or collectively?

2136

A    Well, I think in this case, they're best viewed collectively, because there's an important interaction term that I describe as the chicken-and-egg problem.

Q    And can you explain the chicken-and-egg problem.

A    Sure.

It starts with the fact that general search firms need scale to create a high-quality search product.

But users, distributors, and advertisers want a general search product that's already of high quality.

So how is a small rival general search firm supposed to get scale to build quality?  Therein lies the chicken-and-egg problem.

Q    Given that this is a monopoly maintenance case, does the chicken-and-egg problem imply that Google would have maintained its monopoly even without engaging in anticompetitive conduct?

A    No, I don't think so.

If --

THE COURT:  I'm sorry, can you repeat the question?

MR. GOWER:  I said, given that this is a monopoly maintenance case, does the chicken-and-egg problem imply that Google would have maintained its monopoly even without engaging in anticompetitive conduct.

THE WITNESS:  And I don't think so.

If really it was the case that rivals had no chance to challenge Google's monopoly, then Google wouldn't have paid billions of dollars annually for exclusive distribution.  Instead, I think the chicken-and-egg problem highlights the time it would take for rivals to challenge Google.

Now, given more than ten years and the significant technological advances over this period, I think it's reasonable to expect that one or more rivals would have slowly chipped away at Google's monopoly.  That's, again, implicit in Google's conduct.

Today, after the fact, I think that it would take even more time for rivals to challenge Google, because Google's conduct amplified the chicken-and-egg problem.

BY MR. GOWER:

Q    And before we leave remedy goals, can you explain whether, as a matter of economics, remedies need to target the specific conduct found to be anticompetitive.

A    No, I don't think they have to.

You know, it's possible that conduct that reinforced one barrier might be offset by a remedy that helps lower another barrier, a second barrier.

Now, that might be necessary sometimes because one can't target the first barrier or it might be more efficient

to target the second barrier, and perhaps it's even more efficient to target both barriers.

Q    Let's turn to your opinions on plaintiffs' remedies.

Which of plaintiffs' remedies have you focused on?

A    So if we go to the next slide.

So I look at distribution remedies, data-sharing remedies, and the search and ads syndication remedies.

Q    All right.

And starting with the distribution remedies, what are the distribution remedies that you've come to testify about?

A    We go to the next slide, 13.

So really payment bans and the Chrome divestiture.

Q    And we're going to discuss these individually; but before we do that, I'd like to get a perspective on the significance of these remedies.

Have you calculated how much market share these remedies might free up for rivals to compete over in the remedial period?

A    Yes, I have.

Q    And can you describe the methodology you used for that calculation.

A    Sure.

If we go to Slide 14.

You know, I started by identifying the queries that Google received through various search access points.

And then I assumed for the access points where Google was set as the default, I assumed that Google would lose its defaults under plaintiffs' distribution remedies, and that might be the case because Google couldn't pay for default under plaintiffs' remedies but rivals could.

And then I also assumed that Google could recover some of these lost queries based on historical recovery rates, what has been described in the record as clawback rates.

I then calculated queries that would likely shift from Google to rivals under these assumptions.

Q    All right.

And can you explain the results that you arrived at through your methodology.

A    Sure.

If we could go to Slide 15.

Now, let's start with what actually happened.

So this slide shows you Google's and rivals' shares in general search services in 2020 across all devices.  So rivals had 11 percent share, Google had 89 percent share.

So if we go to the next slide, please, 19.

You know, applying the methodology I just

described, so tracing those search access points and applying the recovery rates, I find that plaintiffs' remedies, the distribution remedies would shift share, and the share shift would be on the order of 38 percent to rivals; and under the same assumptions, Google would maintain on the order of 51 percent share.

Q    Now, looking at the 38 percent incremental post-remedy share, how would rivals get this additional 38 points of market share?

A    Well, rivals would compete to be set as the default, and the ultimate -- ultimately who would win and how much would depend on the outcome of that competitive process.

Q    How does this calculation account for the data and syndication remedies we previewed a moment ago?

A    It doesn't.  It focuses only on the distribution remedies.

Q    We'll return to this pie chart in a moment, but until then, let's discuss the distribution remedies individually.

And starting with the payment bans, what conclusions did you come to about the incentives created by the proposed payment bans?

A    So I concluded that the payment bans which -- would change behaviors in ways that are likely to stimulate

competition.

Q   And how would changes under the payment ban stimulate competition?

A   Well, if we go to the next slide, I concluded that the payment bans would -- well, first of all, create competition among rivals for the default in the remedial world.  That's the competition that gives rise to that share shift.

I also concluded that the payment bans would likely cause many distributors to shift their defaults away from Google, because, again, rivals could pay for defaults but Google couldn't.

And, thirdly, that the payment bans would increase the chance of entry into general search, especially by Apple.

Q   And how would rivals winning defaults stimulate competition?

A   Well, if rivals were to win defaults, they'd have access to scale.  And over time, they would be able to make the investments to improve search quality and create greater competitive rivalry against Google and also against each other.

Q   And looking to the third item here about entry, why would the payment bans affect entry prospects in the relevant markets?

A    Well, they would just increase the business case for entry.  Potential entrants would no longer have to also overcome the Google revenue share payments.

Q    So a moment ago, we saw the pie graph showing that distribution remedies collectively would enable rivals to compete for 38 percentage points of market share.  What portion of that number is attributable to the payment bans?

A    If we go to the next slide, 19.

So this slide shows you if we just look at the payment bans, the associated share shift is on the order of 31 percent from Google to rivals as a result of the payment bans alone.

Q    Can you explain how this 31 percentage points of market share breaks down.

A    Sure.

That's shown in the bullets on the right.

So if you trace out the search access points, it would be 18 percent from Apple, 13 percent from Android, and less than 1 percent from third-party browsers.

Q    Let's move to the plaintiffs' proposal for Chrome divestiture.

THE COURT:  I'm sorry, before you do that, can you help me understand where these numbers come from.

THE WITNESS:  Sure, sure.

So, you know, it starts with actual queries that

went to Google from the different search access points.

So starting with in 2020, which is when the record is the fullest, that's where I looked.

So in 2020, we know how many queries and what share of U.S. queries went to Google from Apple.

And what this calculation posits is that in the remedial world because Google couldn't pay Apple, under plaintiffs' remedies to set Google as the default, Apple would chose another distributor -- excuse me, another default search firm.  And when that happens, those -- the Apple share would switch to the rival.

So I assume that Apple would reset its default. And this is the first assumption I made that distributors would reset their defaults away from Google.  And then I recognize that Google being better than all of the other products today, Google would be able to recover some of the lost queries or share even if it wasn't the default.

So applying historical clawback rates by device type.  So on mobile devices, I used the evidence from the record that clawback rates would be lower on mobile, and then on desktop devices, I assume, using the evidence from the record, that clawback rates would be higher.

And so once you factor in the share that would shift to rivals and then the share that would be clawed back by Google, the net effect of all of that would mean that

18 percent of share would move from Google to rivals, accounting for sort of the back-and-forth of those -- the share shift.

And like that, the data allow us to trace every search access point.  So Apple desktop, Apple mobile, Android, third-party browsers as well will come to Chrome.  So user-downloaded Chrome.

So that's how that's calculated.

Does that answer?

THE COURT:  It does.

THE WITNESS:  Okay.

THE COURT:  Have you considered or can you help me understand what your view is about OEM and carriers and Apple's sort of what I would sort of call day-one incentives in what you've described as the remedial world.

On day one, Google still remains the best search engine compared to rivals.  You've assumed or believe that if Google can't pay the OEMs, carriers and Apple would switch to a different general search engine.

Have you considered the incentives or lack of incentives they would have for making that switch even if there were no payments for defaults by Google; in other words, they have an incentive to maintain Google in some sense, I suspect we're going to hear this, as the default, regardless of whether the payments are going to be made,

because they want to deliver the best search experience to their customers, and on day one in the remedial world, that will remain Google.

Have you considered that incentive, and, if so, how do you view that prospect?

THE WITNESS:  That's a great question.

And, yes, I have.

So let me try to -- there are many aspects to answering that question.

First of all, just in terms of the mechanical calculations, we have the bookends, right; we know what current rival Google shares are, let's say.  And I say current, but 2020, because that's the full record that we have.  So we have shares of 11, 89, 11 percent, 89 percent.

And the other bookend is something like this, which does, you're right, make the assumption that rivals would -- that distributors would reset defaults.  So we have now the bookends of what, under these assumptions, we get the range.

But you're right that there's -- I expect there might be distributors who decide on day one to keep Google because Google is better and they may not want to disrupt their user experience.

I think that's -- so on the one hand, that means Google can still compete through innovation and making sure

that their product is directly valued by consumers. So I think that's an important fact that Google can still compete even without defaults.

But it also -- this whole concern that on day one, and possibly day two and day three, Google will still be better because it's going to take time for rivals to catch up in terms of their ability to compete on quality, and that's where I think the data and syndication remedies really play an important role to allow rivals a better chance to get better faster, to really have that kind of impact.

So this is not meant to be the day-one prediction, but it does -- at least I found it useful to give me a sense of how capable are these remedies in the remedial world to shift share and what kind of share shift is even possible under the assumptions that one might make.

THE COURT:  Okay.

The other question I have is, again, in the day-one world, if Google isn't able to pay revenue share, there's another company that can and it can pay a lot of money, and that's Microsoft.

And so, you know, theoretically what we ought to be doing here, at least I ought to be thinking about again, is prying open the market to competition and not just creating conditions for duopoly.

2147

And how do you view that prospect and how the remedies might avoid that possibility?

THE WITNESS:  Yeah, no, that's a great question.

And, in fact, I have thought about that and actually have a slide on that when we come to it.

But at the high level, I think that, you know, yes, the concerns stem -- I understand exactly what you're saying, because today, Microsoft is Google's best competitor, the most obvious competitor.

But the point is, in the remedial world, if -- well, first of all, Google will still be able to compete, so it's not like Microsoft would be undisciplined by competition.

Second of all, if the Court adopts some version of the data and syndication remedies, that will give other firms a chance to actually be in the game, and so I think it's a timing issue.

Whether it's really a competition between Google and Microsoft, it might be in the near term, but if -- especially under syndication remedies, which I understand from industry testimony, that that would really accelerate rivals' ability to create consumer-facing products, and to the extent that is enabled through the remedy process, I think there's a good chance that, at least, maybe not day one, but soon thereafter, there would be some healthy

competition from other competitors.

THE COURT:  I'm just trying to formulate this question.

Well, why don't you keep going and I'll come back to it in a moment.

Go ahead.

MR. GOWER:  We have a few more questions dedicated to this topic after we get through the data and syndication remedies.

THE COURT:  Okay.

BY MR. GOWER:

Q   So let's move to the Chrome divestiture, the second distribution remedy you opined on.

And I want to start by discussing browsers generally.

How important are browsers as a search access point?

A   They're quite important.

If you go to the next slide, 21, please.

THE COURT:  I'm sorry, before you -- now it occurred to me what I wanted to say.

Does your analysis at this point contemplate Google being prevented from paying for defaults or -- only or making payments at all?

In other words, Google -- there's at least,

2149

I think, three possibilities.  There's no payments, period; Google wants to be able to pay for defaults.  Then there's a middle ground, where Google could still pay a revenue share but not for default placement.

And do you contemplate -- does your view of the remedies contemplate that Google would be able to make no payments or only not be able to pay for defaults?

THE WITNESS:  So my analysis here, and I'm going to come back to other kinds of payments, but my analysis for these share shifts focuses on Apple -- I'm sorry, Google not being able to pay for defaults --

THE COURT:  Okay.

THE WITNESS:  -- okay?

And under plaintiffs' sort of overall remedies package, I think they leave open the possibility that Google could still pay in another way.

So, for example, they could pay for promotion, they could pay directly to users to encourage them to use -- to search on google.com.

So these calculations assume that the only thing that Google couldn't do is pay for defaults.

THE COURT:  And when you say "pay for promotion," you mean non-default promotion?

THE WITNESS:  Non-default promotion, that is right.

So they couldn't pay, for example, to incentivize users to set Google as their default.

THE COURT:  When you say "non-default promotion," I understood that, at least my concept of that is with respect to the carriers and OEMs, for example.

You know, for example, right now, Microsoft pays for placement of Bing on -- you know, on a tab, for example, and I think maybe DuckDuckGo as well.

You're contemplating that Google could still do something like that but not for defaults at the search access points, the main search access points?

THE WITNESS:  That's correct.

In fact, when I actually, this -- the pie chart is just a simplification of the actual table in my report.

So when I actually trace it all out, there is a portion of -- there are queries that Google gets outside of default placement, and I assume that those queries remain with Google.

THE COURT:  All right.  Okay.

Thank you.

BY MR. GOWER:

Q    And where would those queries outside of default placement appear on the pie graph on Slide 19?

A    So those would be in that 51 percent.  Those would be queries that Google would continue to get at large from,

2151

you know, activity in general search.

Q    Back to the Chrome divestiture, and I believe we were on Slide 21, Ms. Young.

And so to remind you --

THE COURT:  Sorry, I'm going to interrupt you one more time.

The numbers that you've projected on Slide 19, that is exclusive of a Chrome divestiture or inclusive of a Chrome divestiture?

THE WITNESS:  Great question.

The 31 that's highlighted here, 31 percent market share, is exclusive of the Chrome divestiture.

And then in the start -- the first chart I showed you had a number of 38 percent, the delta.  So the 7 percent difference would be the -- at least from user-downloaded Chrome, the share shift that I've calculated under these assumptions.

THE COURT:  Okay.  Thank you.

BY MR. GOWER:

Q    We're about to talk about Chrome and how it might fit into this pie graph, but can you show where it would be on here for a moment.

And back on Slide 19?

A    Yeah.

So in Slide 19, I haven't labeled it yet --

2152

THE COURT:  Sorry, technology is the very complex nature of all of this.

But what you've just said "user-downloaded Chrome," do you contemplate then that Google would not be able to reach agreements to preload Chrome with Google as the default even without payments?

THE WITNESS:  So as I understand plaintiffs' proposed remedies, as I understand it, that would be precluded if they were to retain Chrome as an asset.

THE COURT:  So, in other words, the only way, under the plaintiffs' remedies, your understanding is, that a user could reach Google through Chrome would be to download it, because it would not preloaded on any device?

THE WITNESS:  That's how I understand their remedies.

And that's why I maintain those assumptions to really understand the import of them, if the Court were to adopt them, like what kind of movements and what are the different contributors based on the different aspects of plaintiffs' proposed remedies.

THE COURT:  Okay.  Thank you.

BY MR. GOWER:

Q    Dr. Chipty, we were on Slide 21, and I was asking you if you could explain how important browsers are as a search access point.

A    Sure.

As I think the record makes clear, browsers are an important access point.

Just to give you some numbers to ground how important, in 2024, 78 percent of Google's U.S. queries came from a browser.  35 percent -- so that 78 percent splits; 35 percent from Chrome, 43 percent from other browsers.

Also in 2024, 20 percent of Google's U.S. queries came from the default on user downloaded Chrome.

Q    And how significant is Chrome relative to other browsers as a search access point?

A    Well, if we go to Slide 22, Chrome has been the most widely used browser in the U.S. in the last ten years, according to StatCounter.

The top line there, the dark blue line is Chrome.

If we go to the next slide, this shows you on mobile, Chrome has accounted for about 40 percent of U.S. web traffic.

The Chrome line here is, again, that dark blue line.  It's the second highest line.  The light blue line is Safari.

Q    And discussing -- let's move to divestiture specifically.

How would the Chrome divestiture help restore competition in the relevant markets?

A    If we could go to slide 24.

The Chrome divestiture would further lower distribution barriers.

So being the default on a browser is an efficient form of distribution, and rivals have not been able to compete for defaults on widely distributed browsers, especially on mobile.

And so this divestiture would allow rivals to get default placement on Chrome, something that's not been historically possible.

Q    And have you studied how much general search market share might shift from Google to a rival as a result of the Chrome divestiture?

A    Yes.  I alluded to that number just a few minutes ago.

I calculated that under these assumptions, the Chrome divestiture would contribute 7 percent share shift from Google to rivals, from user downloaded Chrome.

Now, to the extent Chrome is able to be pre-installed on Android devices, the new owner of Chrome, who could pay for pre-installation, the new owner of Chrome might be able to get some of that Android 13 percent number I showed you on the previous chart.

Q    And to see them all in one place, do you have a pie chart showing all these share shift numbers we've been

discussing?

A    Yes, if we go to Slide 25.

So these are all of the numbers now in one view.

Q    Now, focusing just on the user downloaded component of Chrome, can you remind us where that is on the chart for a moment.

A    Yeah, that's the 7 percent slice.

Q    And can you expand on where the additional potential market share would come from that you were mentioning a moment ago.

A    I'm sorry, could you ask again.

Q    A moment ago, you mentioned additional market share beyond the 7 percent.  I believe you said -- can you explain that just in the context of this pie chart.

A    Sure.

What I said is that if Chrome -- you know, in the world where Chrome is divested and Chrome is able to get pre-installed on Android devices, the new owner of Chrome would be able to get that some of that 13 percent of Android.

Q    All right.

Now, focusing just on the 7 percent, setting aside any additional share that could come from a Chrome pre-installation deal, would you consider a 7 percent move in market share from Google to rivals to be a trivial move?

A    Well, I don't think so.

I think of it like this.

Without the remedies, rivals have about an 11 percent share.  This one change alone would add on the order of 7 percentage points, which would be a 65 percent increase for rivals.

Q    What portion of the 38 percent share on Slide 25 is from mobile queries?

A    Well, the Apple 18 percent is primarily mobile.

The Android 13 percent is mobile.

And as it happens, about half of the user downloaded Chrome, 7 percent is from mobile.

That means that the vast majority of this 38 percent share shift would come from shifting share on mobile from Google to rivals.

Q    Are there any other notable aspects of the pie chart you'd like to identify for the Court?

A    Well, I found two other things that were, I think, worth noting.

The first is, I mean, it's obvious from the chart, Google would still be able to compete.  Google would remain, even under plaintiffs' distribution remedies, the largest general search firm with 51 percent share.

The other, I think, notable aspect is that the share shift is relatively fragmented.  There's not one

source under these different sort of avenues through which share would shift that account for the lion's share of the 38 percent.

I mean, certainly Apple is the largest, then it would be Android, and then user downloaded Chrome in terms of relative contribution to share shift.

Q    Now, how surprising is it that even if Google were to lose the significant defaults covered by its current default and pre-installation agreements under plaintiffs' remedies, Google would still retain a market share greater than all rivals combined?

A    Well, I don't think it's that surprising.

As the Court found, Google's the -- probably the only general search firm who could retain a significant market share without defaults because of its brand and quality advantage.

Q    And what, if anything, does this pie graph suggest about what would have happened had Apple entered the general search market?

A    Well, presumably if Apple had entered general search, Apple would have served as the default on its own devices, and so this 18 percent Apple number would have gone to Apple.

And to the extent that Apple would have made its general search product available to third party browsers and

other distributors, then I think it would have perhaps been even more.

Q    All right.

So we focused on the distribution remedies from rivals' perspective.  Let's talk about it from Google's perspective.

How can users access Google if Google can't pay for defaults and pre-installation?

A    Well, there are ways users can still access Google.

If we could go to Slide 26.

So this slide shows the different ways that users would still be able to access Google Search.

So certainly, they could download the Google Search app from an App Store.  They could search on Google.com from any browser, and they could actually change the default.

Now, historically, about 20 percent of U.S. queries have gone to Google in these ways, even with Google defaults.

Q    And just for clarity, I asked how Google could compete even if it couldn't pay for defaults and pre-installation.

Let me ask if all of plaintiffs' remedies were entered, including that -- all plaintiffs' distribution

remedies is, frankly, what I meant to ask you, even with the Chrome divestiture, how would users be able to access Google and was your answer in response to that question or...

A    I'm sorry, could you repeat your question.

Q    Yeah.

Does this chart include -- account for a Chrome divestiture?

A    Yes, it does.

Q    And so if a Chrome divestiture were not ordered, what additional ways, if any, would Google have to compete for users?

A    If the Chrome divestiture were not ordered, then Google would be able to have an additional path to users, which is through its own browser and being set as the default in its own browser.

Q    And so we've discussed how users can access Google.

How can Google compete to encourage users to take those actions to access Google?

A    If we go to the next slide.

These are the types of actions that Google would be able to take even under plaintiffs' remedies.

So Google could encourage users to download the Google Search app in app stores.  It could promote and market to make that happen.  It could send promotional

reminders through other Google properties, like Gmail and YouTube, to encourage users to download the Google Search app.

Google could pay users directly for searching on Google.

And then, of course, Google could innovate further in product quality that would encourage users to proactively seek out Google, and it might even encourage distributors to set Google as the default even without compensation.

Q    I'm now focusing on the third bullet of Slide 27.

What precedent, if any, is there for paying users to run general search queries?

A    Well, even in general search today, Microsoft gives users incentives to search on Bing.

But the use of direct-to-consumer incentives or payments through things like rewards programs or loyalty programs are actually quite common, including in adjacent markets.  So, for example, firms like Amazon, Booking, and even outside of search, similarly situated firms use these types of strategies all the time.

Q    All right.

Now, focusing of your fourth bullet of Slide 27, how do you square your view that Google could innovate more under plaintiffs' remedies with the fact that Google has already been such an innovator?

2161

A     Well, there's no inconsistency.

Google has innovated.

Because even monopolies will innovate in response to increases in consumer demand or shift out of the technological frontier.

That's no different from, say, observing output increases in monopoly markets.

If plaintiffs -- if remedies are successful in this case, I would expect Google to innovate more because of greater competitive rivalry.

This motivation, it's the cornerstone of the competitive process, and it's been -- largely been non-existent in this marketplace for over ten years.

Q     Are there any historic examples of Google investing and innovating in more competitive markets?

A     Yes.

For example, the record shows that Google has innovated in vertical search capabilities in the broader market for search advertising that the Court found -- where the Court found Google does not have monopoly power.

There's also an example in the record of Google releasing its Generative AI chatbot specifically in response to competition from Microsoft.

Q     And let's turn back to Slide 25 for a moment, Ms. Young.

2162

So earlier, the Court asked you if the share-shift estimates on Slide 25 assumed that Google was prohibited from paying for defaults or whether Google would face other restrictions on what it could pay for.

And just for clarity, in the context of calculating the share shifts on this chart, can you explain whether Google would be permitted to pay distributors for, say, a choice screen.

A    So my calculations here assume they would not.

Q    All right.

Let's talk about plaintiffs' data sharing and syndication remedies.

Can you describe what you understand the data and syndication remedies to be.

A    Sure.

If we go to the next slide, 29.

So I understand that under plaintiffs' proposed remedies, qualified competitors would be eligible for search and ads data sharing, as well as search and ad syndication as part of the multipronged, more comprehensive set of measures.

Q    And let's start with search and ads data sharing.

How would the data-sharing remedies contribute to restoring competition?

2163

A     Well, if we go to Slide 31, the data-sharing remedies would directly work to lower the scale barrier.

So the record shows pretty clearly that scale is a significant barrier in the relevant markets, that there's a close link between scale and quality in both relevant markets, and that Google's agreements have, for years, deprived rivals of scale.  So it goes to the heart of that.

Q     Now, given that the distribution remedies, as you've identified in the pie chart, are likely to shift market shares to rivals, what, if any, need is there for data-sharing remedies in addition to the distribution remedies?

A     Well, look, rivals that win defaults will be able to access user data.

But collecting that data and working with it and learning from it is going to take time.

The shared data would accelerate their ability to develop their own capabilities.

But then there are rivals that won't win defaults, and there'll be potential entrants that don't have their own user data.  In that context, the shared data would encourage them and enable them to make early investments.

So bottom line is, data sharing would accelerate the time it would take to move from, you know, the actual world, the current situation, to a more competitive

situation.

Q    And let's discuss syndication.

What is the economic rationale for syndication remedies in addition to data remedies?

A    Well, I think the record makes clear that working with user data, whether it's organically collected or whether it's through the kind of data-sharing provisions plaintiffs have in mind will take time.

And, you know, those are medium and long-term solutions.  The syndication remedy is more of an immediate solution that would give rivals the ability to more rapidly create consumer-facing products that would help them down the path.

Q    And how do you know that making use of user data will take time?

A    Well, I think there's evidence in the record, even in the liability record, to that effect; that it's not just about having the data, it's about having the time to work with the data and to build the capabilities around the data.  But there's also been testimony in the remedies phase of the case.

If we could go to Slide 33, you know, I was in the court when OpenAI's Mr. Turley testified about this. He said that syndication would be helpful right now. These were his words.  And that working even with the data

through -- the data-sharing remedies would, he described it as a medium-term solution and that it would take years to really make use of those more granular data.

There was similar testimony, if you go to the next slide, from DuckDuckGo's Gabriel Weinberg.  He used different language, but I think the gist was the same, that syndication would help close the gap more quickly, and that working with the user data is just a much more time-consuming process.

Q   So we've discussed the benefits, the competitive benefits of data sharing and syndication remedies.

What, if any, risks are there to data sharing and syndication remedies?

A   So depending on data implementation, it's possible that these remedies give rise to something called a free-rider problem.

Q   And what is the free-rider problem?

A   Well, it's a concern about incentives to innovate in the future, right.

In this context, free-riding is something that would happen if one firm could, say, ride on the coattails of another firm's future innovation.

Q   And if a free-rider problem were to arise in the context of data sharing and syndication remedies, how would it manifest?

A     Well, I think in this case, there are two potential concerns.

One is, from Google's perspective, the question is, would the remedies dampen Google's incentives to innovate in the future if Google had to share the benefits of its innovations with its rivals.

And the second is from rivals' perspective.  The question is whether rivals would have incentives to innovate in the future if it could take advantage of Google's innovation.  So there are two halves, I think, two sides of the same coin.

Q     What, if any, insights from economics can help the Court evaluate the significance of any potential free-rider concern in this matter?

A     So just without getting into the data specifics, which I cannot, you know, as a general matter, free-riding isn't a zero one, there are degrees of free-riding.

And in the end, I think in the context of the evidence before the Court, there'll have to be some kind of consideration whether the incentive dampening effects of innovation can actually be offset by any investment-enhancing effects of the remedies.

Actually, I think if we go to the next slide, 35, you know, I think in this case, there are strong reasons to believe that rivals and Google would innovate more,

and I think that has to be factored into an overall assessment of incentives to innovate.

So, in this instance, I would say rivals would have a greater ability to innovate, because they'd have access to scale-dependent data that they didn't have before. They'd have an incentive to innovate because they have access to distribution that they didn't have before.

Rivals would also want to differentiate themselves from each other because they'll be competing to be the default provider.

And so the way to win is to provide a value proposition that someone else doesn't.  Rivals and Google would have to differentiate from each other to win users. And then in the end, Google would have to innovate in response to greater competitive rivalry.

So I think these are all the factors that should be weighed against any concerns of investment dampening effects.

Q    Now, Google's experts have said that plaintiffs' distribution remedies would cause harm to distributors and users.  Are you familiar with that criticism?

A    Yes, I am.

Q    And can you explain that criticism briefly for the Court so we have some context.

A     Sure.

I mean, I think it starts by observing that distributors have selected Google today because it's better and it pays more.

And that under plaintiffs' distribution remedies, the concern is distributors would be forced to choose another search product which is of lower quality and pays less.

So I think that's the essence of the concern.

Q     And what do you make of this criticism?

A     Well, I think it misses the point of the remedies.

It misses the first point that, under the distribution and the data and syndication remedies, rivals would have an opportunity to improve their product quality.

Of course, it misses -- also misses the long-term benefits to distributors and users from greater competition that would not otherwise come about.

Q     And how do the payment bans and the data and syndication remedies work together in the way that you're previewing there?

A     Well, if we could look at Slide 36.

So the payment bans unlock search access points, and the data and syndication accelerate rivals' ability to improve quality.

The first without the second would just take much

longer.  And the second without the first just wouldn't get off the ground because why would rivals invest without a path to market.

Q    When plaintiffs' distribution, data, and syndication remedies are viewed together, do you expect the distributors and users would be better or worse off?

A    I would expect they'd be better off, and they would be better off faster with the data and syndication remedies.

Q    Now, another concern raised is that, and I think we even heard a little bit of this earlier, we were discussing how there might be a chance that plaintiffs' remedies would trade one Google monopoly for a Microsoft monopoly.

What do you make of that concern?

A    Well, as I said earlier, I understand the source of the concern, because today Microsoft is Google's largest competitor and the competitor that's most positioned to perhaps take advantage of some of the remedies.

But I think that there are reasons to think that in this remedial world that plaintiffs' remedies are trying to create, Microsoft would face competition.

If we could go to Slide 37.

You know, the fact is that Google could still compete under plaintiffs' proposed remedies.  I showed you

2170

that even without defaults, Google would be a significant player in the marketplace.

And, second, with data and syndication, Microsoft's rivals would be able to develop competitive product.

So however this plays out in the remedial world, Microsoft would have to compete with high-quality search products.

Q   Now, let's talk about GenAI.

How are GenAI apps relevant to restoring competition?

A   So if we could go to Slide 39.

I think GenAI apps are relevant in two ways given the record in this case.

The first GenAI apps as a nascent threat to Google; and then, second, GenAI apps as a potential circumvention tool for Google.

Q   And let's take those one at a time.

What do you mean by GenAI's a nascent threat to Google?

A   Well, as I understand the record in this case, GenAI apps are developing general search capabilities; and these capabilities might, in the future, compete with traditional general search firms, and they might even replace them, depending on where technology goes.

Q    Now, assuming GenAI is a nascent threat to Google, what implications would that have for the proper remedies?

A    Well, I think there would be two implications; the first has to do with the distribution remedies.

So if GenAI apps are a nascent threat, then it would be important for the distribution remedies to extend to GenAI apps, because, without them, Google would be able to exclude them in future, so Google might be able to exclude GenAI-based general search rivals like it has historically excluded traditional general search rivals.

The second implication for remedies, I think, has to do with the data and syndication component.

So if GenAI apps are a nascent threat -- nascent threats to Google or potential future competitors, then I would think that GenAI apps should qualify for the data and ads sharing and syndication remedies so that they can make the investments necessary to compete.

Q    And on the second line here, you've listed GenAI as a potential circumvention tool for Google.

Can you explain that.

A    Sure.

If we go to Slide 40.

The issue here is that, you know, Gemini, or a future version of it, might be a search access point.

And I would expect that in the future when the

2172

remedies are adopted, whatever they might be, I would expect that Google look for alternative ways to protect its lucrative general search monopoly.

And if Gemini is a search access point, that would offer Google a path to circumvention.

Q   And how might that circumvention play out?

A   Well, you know, so if Gemini or a future version of it is a search access point, Google could distribute -- Google could use it to distribute Google Search.  So, for example -- and that's what this sort of slide with graphics tries to show.

If you could imagine, for example, that Google might pay distributors to pre-install, say, a Google Gemini widget on to the home screen of Android devices, kind of like it's done today with the Google Search widget.  And if something like that would be permissible, it's possible to expect that we would find ourselves in the same situation today even under a remedy.

Q   And how could the remedies safeguard against these circumvention risks?

A   Well, you know, the one way to do it is to make sure that GenAI apps are treated like other search access points.  And if that were the case, the remedies would prevent this kind of circumvention.

Q    Next, let's talk about the duration of the remedies.

In principle, how long should remedies last?

A    Well, in principal, as long as it takes to restore competition.

Q    And what factors determine how long it takes to restore competition?

A    Well, given the mechanism of harm here, I think it would largely depend on how long it might reasonably take for rivals to overcome the barriers to entry and expansion.

In this case, given how important those barriers are, I would expect it will take rivals some time.

Q    And how do you measure how long remedies should last in this matter?

A    Well, let's go to the next slide, 42.

I think there are some historical timelines that inform duration, none of them are perfect, but I think these are the insights from the record that might give us some guidance.

The first has to do with the history of entry in general search.

The second, efforts in Europe.

The third, the history of the conduct itself.

And the fourth, the inherent challenges in using the kind of data that we have in this marketplace.

Q    Okay.

So let's hear a little bit about each of these.

What timelines, from the history of entry, influence the proper duration of remedies?

A    Well, you know, as the Court's recognized, there's been no meaningful entry in general search in the last 15 years.  The only exceptions, and I think the only attempts are by DuckDuckGo and Neeva.

Q    And how does Neeva's experience inform the proper duration remedies?

A    I think Neeva is a good example of what it would take to imagine de novo entry, how long it would -- I think Neeva's a good example to give us a sense of how long de novo entry might take in general search because it's a relatively recent example.

You know, it's an example where we have -- we had a well-funded, highly experienced team trying to create a general search product from scratch.  So that's why it's a good example of de novo entry.

They entered in 2019 and they called it quits about four and a half years later.

Q    All right.

Looking at the second item, what efforts in Europe influence how long remedies should last in this matter?

A    So here, I have in mind, efforts in Europe to increase competition in general search from the use of broad choice screens, as well as some data sharing provisions.

Q    And in what ways do those efforts inform the proper duration of remedies?

A    Well, in Europe, choice screens were rolled out beginning about five years ago, maybe a little more than five years now.  And since then, Europe has expanded the use of its choice screens.  So it started just on Android and it's gone beyond.

And in addition to broadening choice screens, Europe has also added these data sharing provisions about two years ago.  And so it's been more than five years since efforts have been made.

It's not the same efforts as here, but still, it should give you a sense of how long it might take to overcome the different challenges.

Google's share in Europe still remains well over 90 percent.

Q    And focusing on the third timeline, how does the history of the conduct itself influence the proper duration of the remedies?

A    Well, look, Google has had default agreements with its top distributors for on the order of 20 years, and the Court found that for at least ten years, these agreements

had been anti-competitive.

But the fact is that, for anywhere between ten to 20 years, Google has been able to make investments and take the lead, and I think this kind of advantage is going to take a -- is going to take time to overcome.

Q   And lastly, how do the challenges in using data inform the proper duration of remedies?

A   I think there has been evidence in this case that using -- developing capabilities to work with these data are going to take time.

In fact, OpenAI's Mr. Turley explained that in his explanation for his company, if they were to get access to the kinds of -- the data sharing that's envisioned, it would take them on the order of five years, I believe was his testimony, to really make good use of the data.

Q   And so what do these various timelines say about the optimal length of remedies in this matter?

A   I don't think they say anything directly about the optimal timeline.

I think that these timelines suggest to me that restoring competition will take at least five years, maybe more.

I think these timelines suggest that three years is too short, and that, at best, I could infer that ten years is better than three.

Q    All right.

Let's turn to Google's proposed remedies.

THE COURT:  Before you do that, can I ask a question.

Do you see that there is a tension between the proposal to require choice screens on Android devices and the ability of rivals to pay for defaults?

THE WITNESS:  No, I don't, because at least -- you're asking about plaintiffs' use of choice screens and their proposal on Android?

THE COURT:  Correct.

THE WITNESS:  So as I understand the plaintiffs' proposal, they are asking for choice screens on pre-existing Android devices.  So these would be search access points that Google has already paid for defaults, right?

So on day one, Google would be the default on those, and the choice screens would give consumers a chance and rivals a chance.

But I think those would be relatively short lived. As phone devices change, those would no longer be operative.

THE COURT:  So the remedies don't contemplate -- maybe I misunderstood them -- don't contemplate a choice screen on new devices.

THE WITNESS:  That's my understanding.

For Android.

THE COURT:  Right.

I mean, Android would be the only devices that the Court could theoretically even impose that requirement on.

THE WITNESS:  Oh, I think plaintiffs are also asking for choice screens on new Pixel devices.

THE COURT:  Right.

Well, but those are Google-owned or Google-operated devices, right?

THE WITNESS:  Yeah, that's right.

THE COURT:  So we're just talking about more broadly on Android devices beyond Pixel.

THE WITNESS:  That's correct.  That's correct.

So I think that's why I think of the proposal on choice screens to be relatively narrow use of choice screens, because, at least on Android, they would be only on existing Android devices, not on new Android devices.

THE COURT:  Okay.  Thank you.

BY MR. GOWER:

Q    And can you briefly speak for a moment about choice screens in the context of Chrome and the proposed Chrome divestiture.

A    Right.

And so as I understand it, for as long as Google has Chrome, they would have to show a choice screen on Chrome as well.

Q    And can you explain what you think of that proposal in the context of the payment bans.

A    So, you know, with the Google-owned devices or browsers or search access points, more generally, Google doesn't pay for those defaults.

So payment bans and instances where Google doesn't pay for defaults will not be effective at opening up search access points, and I think that's the logic of showing choice screens in those instances.

Q    Let's return to Google's proposed remedies.

Which of Google's remedies have you focused on?

A    So if we go to the next slide, 44.

So I focused on these:

Google's proposal that it be allowed to enter into default agreements that give manufacturers and carriers greater flexibility to preload rival general search services, and also its proposal that it be allowed to enter one-year browser exclusive default agreements.

Q    How capable are Google's remedies as compared to plaintiffs' remedies restoring competition?

A    So in my view, they're not as capable.

If we go to the next slide, 45, I believe Google's remedies are likely to maintain the status quo, and that's because of the combination of features that I described here.

2180

So first, I believe the types of arrangements that I focused on will create ineffective distribution remedies, because, first, they all allow Google to pay for defaults, and I think that's a big short-term problem in getting rivals the ability to access users.

Google's -- under Google's proposals, they would still be able to pay Apple, and that would encourage entry by Apple or Apple sponsoring entry.

They would still permit some exclusives, and they provide no provisions to unlock search access points that Google had already secured through its historical exclusionary agreements.

And this relates to this point you just asked me about, about existing Android devices.

So that's on distribution.

Of course, Google's proposals have no data or syndication provisions.

And as I've already explained, in my view, their duration is too short.

Q   So we've covered some of these; I want to focus on a couple.

Looking at the first sub-bullet, what is the harm of Google continuing to pay for defaults?

A   Well, look, Google is better than its rivals today, and Google can pay more; it's got enormous

monetization advantages.  And so if Google can pay for defaults, it will win those defaults.

You know, with the greater flexibility under Google's -- especially the first of the two, the non-browser types of arrangements, I think it's possible that rivals might be able to, you know, win minor defaults, niche defaults, and that over time, that could promote competition, but that it would just take much longer, because rivals would still have to compete with Google being able to pay for defaults.

Q    Looking at the third bullet, the third sub-bullet, in what ways do Google's remedies permit Google to use exclusive agreements to exclude rivals from obtaining distribution?

A    So as I understand Google's proposal with respect to browsers, Google would, for example, be able to reach an agreement with Apple to set Google as the default on the standard Safari browser.

Q    And what scope of devices would be permitted under that agreement that you just referred to?

A    Well, that could, for example, mean that all iPhones in the United States are preset with the Google Search default on Safari which I showed you was the most widely distributed browser on mobile.

Q    Now, Google's proposal has a -- would allow Apple -- the remedies would allow Google to pay for defaults on Apple devices only if Apple could set a different default for privacy mode in Safari.

Does that provision solve the exclusivity concern that you have?

A    No.

I think for a couple of different reasons, the -- probably the bigger reason is that, under this exclusivity provision, take Apple again as the example, Apple wouldn't be able to -- at least as I understand Google's proposal, Apple wouldn't be able to set another general search product, say, a ChatGPT or -- some other general search product or rival from the future as the default on, say, certain devices or certain models of the iPhone.

Q    And how about the carve-out for privacy mode specifically, what do you make of that carve-out?

A    So there is a carve-out for privacy mode, and that's great.

But there are no other carve-outs for other potential modes that, in the future, consumers might find valuable or distributors might want to attempt.

And I think the fact that this carve-out is so narrow, suggests that it, you know, it will cut into distributors' incentives to innovate and potentially even

2183

experiment with other modes that consumers find useful or might find useful.

Q    And are you able, as an economist, to identify what those modes might be today?

A    No.  I -- how can I?

The point is, you know, innovation will take its path, and I think the job of incentive design is to make sure those doors are open when those ideas and features become available for consumers.

Q    And does Google's remedy provision limiting the exclusivity period in browser agreements to one year address the competition concern of the exclusive agreements?

A    I think as a practical matter, I don't think so.

Imagine what would happen in the first year of, say, Google's three years, right.  The first year, there would be a competition, perhaps, for who would win the default, say, on Apple, Safari, or some other search access point.  But given that, you know, Google's better and it can pay more, it's reasonable to expect that Google will win those defaults.

So that means that over the first year, rivals wouldn't have access to user data.  Even if they had some access from, you know, their existing businesses, they wouldn't have the same incentives to innovate and invest because of what would happen at the start of the second

year, the same thing.

And so just working backwards from year three, you know, it would happen in year three, it would happen in year two, chances are, under this one year, repeat over three years, rivals -- we'd be in the same place, rivals wouldn't have incentives to incur risky investments.

Q   So I want to modify that provision of Google's remedies and hear your opinion on that.

So let's assume Google's remedies permit all distributors to have maximum flexibility.

And to play that out, I want you to assume the only distribution or default agreements Google could enter are unilateral commitments to pay whenever the distributor sets that -- sets a search access point to default to Google and at any time the distributor could switch the default away from Google on any search access point on any device without losing revenue for any other search access point where Google remains the default.

Does that make sense?

A   I think so.

Q   All right.

So what would the effect of permitting those kinds of default agreements be?

A   So I think that means that Google would still win the majority of the defaults because Google is better and it

2185

can pay more today.

But given the flexibility, it's possible that rivals win some of the defaults.

But I think it would take a long time for rivals to be able to slowly accumulate the kind of scale they would need to challenge Google.

Q    And does your opinion there account for any risk of retaliation that distributors might fear?

A    No.  I mean, I'm not talking about retaliation.

But to the extent there is or even fear of retaliation, that would just increase the chances that distributors would set Google as the default.

THE COURT:  Can I ask you a question.

If the data and syndication remedies that the plaintiffs have proposed would be in place, were to be put in place, wouldn't that accelerate the competition for defaults on quality?

In other words, if, say, a rival were to be able to produce results through syndication of Google, they're able to produce a SERP or search results that arguably are on par because they're pulling them from Google, doesn't that argue in favor of a greater likelihood that there should be competition for defaults that would include Google and Google's ability to pay as opposed to keeping it shut out for a long period of time when rivals are able to use

Google's search results?

THE WITNESS:  So, yes, I think that the data and syndication remedies generally help on that front.

You know, I think that the -- I see two challenges, though.

So I should back up and say, I think greater flexibility is better than no flexibility, and I think with data and syndication is even better.

But the two problems I see is that because Google has a monetization advantage, it will still take time, more time than it would in the remedial world without, or at least, some period of time over which Google can't pay.

The second is that the syndication especially, I agree, would help in terms of immediate consumer-facing ability to compete for users.

But it's -- I don't think rivals could compete by just creating a copy of Google.  Why would users want a copy of Google when they can have Google?

So I think that for realistic chance for rivals to compete against Google, they will have to differentiate, which will take a little time.  It's not a, you know, immediate solution.

BY MR. GOWER:

Q    Dr. Chipty, I want to try another remedy variation, and this time I want you to suppose that Google

2187

can't pay for defaults but can pay for a choice screen.

Does that hypothetical remedy make sense to you?

A    Well, I understand it.

Q    Thank you.

That's what I was asking, do you understand.

And in this hypothetical remedy, would you expect Google to pay for a choice screen if it can't pay for a default?

A    Yes.

I think it's reasonable to expect that if Google could pay for choice screens but it couldn't pay for defaults, it would pay for the choice screens.

We know from Europe that when users are given a choice today, they will overwhelmingly choose Google.  That would give Google an incentive to pay for choice screens because then they have a direct path to users and the ability to monetize those users.

Q    So we talked about Google might pay for a choice screen.

What would you expect distributors -- how would you expect distributors to respond to Google's offer for a choice screen?

A    I think distributors would probably take that deal, because Google would be able to pay more presumably for choice screens than rivals would be able to pay for

defaults, at least, you know, initially.

Q   What, if any, problems have you identified with a broad choice screen remedy such as this?

A   Well, if we go to the next slide, I think these are the problems I see.

The first is that choice screens don't really create a contest between Google and rivals, because, like I said, users today have not experienced other search products.  Users today, you know, are habituated to Google, and Google's better, and they can pay more.  So I don't think it creates a real contest.

I also think that choice screen payments to Apple, in particular, would discourage either entry by Apple or Apple-sponsoring entry, and I think that's a consideration.

And then, ultimately, I think it would take more time, even if these choice screens were set up to be maximally flexible, so that distributors could perhaps show a choice screen on many devices or access points but not all, it's possible rivals win some defaults along the way, but, again, I think the benefits of competition would be delayed.

THE COURT:  I'm sorry, can you explain what you mean by "payment," by "Google paying for choice screens."  I'm not sure quite I understand the concept.

THE WITNESS:  Yeah.

So the idea is that Google could, for example, pay a distributor to show a choice screen and not set a rival as a default, like an out-of-the-box default.

THE COURT:  I see.  Okay.

THE WITNESS:  Yep.

BY MR. GOWER:

Q    If Google were allowed to pay for choice screens, are there any ways that you can imagine increasing the effectiveness of those choice screens?

A    Yeah, if we could go to Slide 48.

You know, here are some considerations that I thought about.

If one were to use broad choice screens instead of payment bans, what types of things might one want to think about.

The first is, in terms of the structure of the choice screen payments, I would imagine it would be helpful to keep those payments as flexible as possible or structure them so that distributors maintain their flexibility; in the sense that I just explained, that it's not all or nothing, that they might, without risking payments on some access points, they could still choose to set rivals as defaults on other search access points.  So I think that's one.

I think it's important to at least consider the

idea of prohibiting choice screens to Apple to promote the incentives to either enter or sponsor entry.

I think that there's evidence to suggest that choice screens by themselves may not be the best idea, but maybe choice screens in combination with other features.

So, for example, it may be useful to consider payment bans for some time and then delay choice screens.

And that would, for example, give users the chance to experience other search products.  It would give other search products a chance to develop capabilities.

And then the choice screens could, you know, give users a chance to sort of decide then what search product they want as their default.

And then the last consideration is to layer on data and syndication remedies, because I think whatever direction the Court goes, these remedies have an important role throughout.

Q    Have you seen any evidence on what the effect of a short-term payment ban followed by a choice screen might be?

A    Yeah.

There is actually a -- I have -- there's a relatively recent academic paper where a group of economists have considered different potential interventions that might help restore competition in general search; and they considered, as one of several different interventions, a mix

like this, where they had, you know, some change of default in the first instance, followed by delayed choice screens.

And what they found is that this mix of interventions was more successful at shifting share than immediate choice screens.

Q    And what did that study find for the effect on consumer welfare of a rival default's being followed by a choice screen?

A    Right.

So they found that if the mix of intervention like this was used in their study, they found that, in the short term, there would be what they describe as no change, they found a small increase, but essentially no change in consumer welfare without factoring in sort of future benefits of competition.

But they recognize that there are -- there would be future benefits of competition from the share shift, but they did not model those.

THE COURT:  I'm sorry, can you identify the study and the authors, its source?

THE WITNESS:  Yes.

So there are -- well, I can give you the --

THE COURT:  Or the legal --

THE WITNESS:  -- the first two authors -- it's a many-authored paper.

2192

Hunt Allcott is the lead author.

Juan Camilo is the second author.

After that, there are many authors.

And as I understand it, the paper is not yet published.  It's an NBER working paper, but it's been around for a while.

BY MR. GOWER:

Q    When you say "not published," you mean not formally -- I guess, is it available in its tentative form?

A    Yes, yes.

I meant published in the academic sense like in a journal.  I believe -- it will be published and it is just a relatively new paper so it's working through the publication process.

But it's available online, and I think everyone can access it readily.

THE COURT:  This is different than the Allcott study concerning payment -- incentive payments?

THE WITNESS:  This is the same Allcott study?

THE COURT:  It's the same.

THE WITNESS:  As I understand it, there's only one.

THE COURT:  Okay.

It's the same paper?

MR. GOWER:  Yes.

2193

THE COURT:  Okay.

BY MR. GOWER:

Q    Dr. Chipty, can you just explain briefly -- or was there only one remedy possibility evaluated by the Allcott paper or several?

A    I think they looked at several.

THE COURT:  Okay.

We've focused on one, so I don't remember the formal breadth of the markets.

THE WITNESS:  There's several.

And it's -- I think it's worth a read or skim, something, yeah.

THE COURT:  I'll skip over the math.

BY MR. GOWER:

Q    So we've discussed a few hypothetical remedies.

I want to return to comparing plaintiffs' and Google's remedies.

Early in this examination, we discussed the importance of barriers to entry to your analysis.

Can you briefly remind us of that.

A    Yes.

Well, I explained that the way to focus on the competitive process in this case was to really look at the barriers to entry, because the barriers are the gateway to competition, and Google's conduct reinforced them.

And so, yes, so that's why I looked at the different remedy proposals in light of those barriers.

Q   And how do plaintiffs' and Google's remedies compare overall in addressing the barriers to entry?

A   Well, if we just go to the next slide, it's just a little animation.

You know, the first barrier is distribution.

In my opinion, plaintiffs' remedies open up distribution in important ways.

Google's remedies, with small exceptions because of that greater flexibility, you know, but with small exceptions, don't.

With respect to scale, I think plaintiffs' data and ad syndication remedies directly go to the scale barrier.

You know, in conjunction with the distribution, it even amplifies the opening up of scale.

I think Google's remedies don't, they actually don't have any data or syndication provisions.

With respect to brand, I think between distribution and the data and ad syndication remedies, plaintiffs' remedies go a long way towards giving rivals a chance to build brand.  Google's remedies don't.

With respect to incentives to invest and innovate for rivals, I think plaintiffs' remedies give rivals a much

more important, significant path to market, and so will increase their incentives to incur the high capital costs of entry and expansion.  Google's remedies won't.

Q    And given this comparison, which set of remedies, plaintiffs' or Google's, is more likely to restore competition?

A    Well, I believe plaintiffs' remedies will have a better chance of restoring competition.  I think Google's remedies will tend to preserve Google's monopoly.

MR. GOWER:  Thank you, Dr. Chipty, for your testimony.

Your Honor, unless you have any further questions, I would move to admit Dr. Chipty's slide deck as demonstrative which is PXRD012.

THE COURT:  All right.  Terrific.

Okay.  So it's approaching the 11:00 hour. We will take our break now and we will resume at 11:15.

Dr. Chipty, I'll just ask you not to discuss your testimony during the break with anyone.  Thank you.

COURTROOM DEPUTY:  All rise.  This Court is now in recess.

(Recess from 10:57 a.m. to 11:16 a.m.)

COURTROOM DEPUTY:  All rise.  This Court is again in session.

THE COURT:  Please be seated.  Thank you, everyone.

All right.  Mr. Schmidtlein.

MR. SCHMIDTLEIN:  Thank you, Your Honor. John Schmidtlein for Google.

- - -

CROSS-EXAMINATION

BY MR. SCHMIDTLEIN:

Q   Good morning, Dr. Chipty.

A   Good morning.

Q   Now, Doctor, you described a little bit of your background, and I just want to touch on a couple of things.

You taught in academia for roughly six years; is that right?

A   About six and a half, seven years.

Q   Okay.

And you stopped teaching roughly around 2000; is that right?

A   2005.

Q   You started working for economic consulting firms, like the one you work at right now, in 1999, correct?

A   That's right.

And then I did take a leave of absence.

But, yes.

Q    You took a one-year leave of absence, right?

A    I did.

Q    But from 1999 until the present, roughly the last 25 years, you have been predominantly doing economic consulting work, right?

A    That's right.

Q    And litigation consulting work, correct?

A    Largely but not only, yeah.

Q    And you were retained by the plaintiffs in this case to offer expert testimony in the remedies phase in late January or early February; is that right?

A    It's around that time frame, right.

Q    Okay.

So roughly six weeks before the expert reports were due in this case, you were retained, right?

A    I think that's right, yeah.

It's possible that six weeks, yeah.

Q    And it was six months after the Court's liability opinion, right?

A    That's right.

Q    Now, prior to your retention in late January and early February of 2025, you'd been retained as a consulting expert by the Colorado Plaintiffs; is that right?

A    Yes.

Q   And in your role as a consulting expert for the Colorado Plaintiffs, you were the primary consulting economist who assisted Dr. Baker, right?

A   That's right.

Q   And with regards to the remedy proceedings here, you were not hired by either the Colorado Plaintiffs or the DOJ Plaintiffs to help them with deciding what remedies to include in their initial proposed final judgment that was filed in November 2024, right?

A   I think that's mostly right.

I mean, I -- I did have conversations with them about impressions, but ultimately, I did not have a say in those remedies, proposed remedies.

Q   And after you were retained in late January and early February of 2025, you were not the architect of the DOJ Plaintiffs' or the Colorado Plaintiffs' final proposed judgment in this case that was filed on March 7th, 2025, correct?

A   That's correct.

Q   Now, there are a number of remedies that you have not disclosed any opinions on in your expert reports, correct?

A   That's correct.

Q   And you touched on a couple of them in your direct testimony this morning, right?

A    I did.

MR. SCHMIDTLEIN:  May I approach, Your Honor?

BY MR. SCHMIDTLEIN:

Q    And, Dr. Chipty, I've handed you a demonstrative that we've marked as RDXD15.002.

And I've just -- we've put this together to hopefully facilitate a run-through here of some of the remedy provisions.

You're very familiar with the plaintiffs' proposed remedy, right?

A    Well, I'm familiar with it.

I would have to have a copy of it if we were going to talk about details.

Q    We'll get there.

I just want to run through several sections of it and see if I can get a confirmation as to whether or not you have disclosed any opinions relating to these sections.

So the first provision is Section IV.C that deals with prohibited agreements with publishers.  Am I correct that you're not offering any opinion about this remedy provision; is that right?

A    I think that's right specifically.

But it's possible some of my opinions, just in spirit, would apply to them, but I have not.

Q   Dr. Chipty, you know how this game works. You submit expert reports, you disclose your opinions in those reports so that we can examine you about those, right?

A   Right.

    And I'm just answering your question to the best of my ability.

Q   You didn't disclose in your expert reports, specifically in spirit or otherwise, any opinions related to Section IV.C with regards to prohibited agreements with publishers, correct?

A   No, that's right.

Q   All right.

    Sections IV.H and IV.I deal with provisions regarding the notification of acquisitions and investments.

    You did not disclose any opinions in your expert reports with regards to these provisions of plaintiffs' remedies, correct?

A   That's correct.

Q   Section V.C, this is the contingent structural relief provision, and this talks about the contingent divestiture of the Android operating system, right?

A   Right.

Q   You've offered no opinions in this case about that remedy, right?

A   No, I haven't.

Q    And I believe, when I took your deposition, you actually told me that you had told the plaintiffs that the Android divestiture seemed to go too far; isn't that right?

A    That's right.

That's right.

We didn't talk further about it, but it was -- yes, I said that, and, in part, I felt that.

Q    Okay.

Section VI.B of the plaintiffs' RPFJ deals with something called publisher opt-outs; isn't that right?

A    That's right.

Q    And you've not disclosed any opinions in your expert reports on this section of plaintiffs' remedy, correct?

A    That's right.

Q    Section VIII is an entire section dealing with search text ad transparency and reduction of switching costs.

Have you read that provision?

A    I have.

Q    And you have not disclosed any opinions in your expert reports with regards to that provision of plaintiffs' remedy, correct?

A    Correct.

Q    Section IX.E is a provision offered only by the Colorado Plaintiffs with respect to a public education fund; is that right?

A    That's right.

Q    And you've not offered any opinions in your expert reports in support of the public education fund provision, right?

A    I have not looked at that.

Q    Now, I want to talk a little bit about the term of the RPFJ.

You gave some testimony this morning about some of your thoughts and some of your -- some data points that the Court should consider when thinking about the term of any final judgment in this case, correct?

A    That's correct.

Q    In your expert report, you did not provide an opinion as to a specific term that should be applied to plaintiffs' proposed final judgment, correct?

A    No, I didn't pick a specific number.  I gave the same opinion I testified to earlier.

Q    Right.

And I believe what you testified to earlier was, you thought it should be at least five years but you didn't have an opinion beyond that?

A    I think it's hard to come up with a specific number, and my opinion was, it should be at least five years and possibly more.

Q    Can we pull up Slide 42 from Dr. Chipty's presentation.

Now, these are the historical timelines that you think the Court should take into consideration; is that right?

A    That's right.

Q    And you've talked about the history of entry; is that right?

A    Yes.

Q    And when you talked about the history of entry, I think you identified Neeva and DuckDuckGo; is that right?

A    That's right.

Q    And you said Neeva was in the market for about four and a half years before they got out of the market; is that right?

A    That's right.

That's my understanding of the record.

Q    You didn't do any analysis in this case as to the extent to which Neeva sought to obtain distribution agreements with either Android, OEMs, or Apple, or anyone else, did you?

A   No, I didn't specifically, but I did rely on the Court's opinion about the factors that contributed to Neeva's exit.

Q   You have not reached any opinion in this case that but for any of the Google agreements at issue, Neeva would have achieved any distribution, correct?

A   Correct, in as far as I've said I'm not here to predict outcomes of a very complex process.

Q   But when you looked at the -- you're familiar with the liability record in this case, right?

A   Yes, I'm familiar with it.

It's extensive, but, to the extent I am, I'm familiar with it.

Q   You didn't see any evidence of Neeva attempting to get a default setting or a preload agreement with any distributor, correct?

A   So I don't know specifically.

Q   Okay.

A   But I do know there's testimony in the case that Neeva did try to get distribution.

Q   Who did Neeva try to get distribution with?

A   I don't specifically know.

I'm relying -- I'm familiar with the testimony of Mr. Ramaswamy of Neeva.

Q    Mr. Ramaswamy testified that he went to Apple and he tried to get put on the drop-down default list; isn't that right?

A    I think that's right.

Q    And nothing in Google's agreement with Apple prevented Apple from adding Neeva to the drop-down list for Safari, correct?

A    I think that's right.

Q    Now, you also talked about efforts in Europe. That's one of your bullet points on Slide 42, right?

A    That's right.

Q    And you made reference to data sharing in Europe?

A    I did.

Q    And you're referring to certain Digital Market Act requirements in Europe; is that right?

A    That's right.

Q    When did the data sharing provisions for the DMA come into effect in Europe?

A    So I believe they were added about two years ago in rough numbers.  I'm not exactly -- I don't recall the exact date.

Q    Have you done any comparison or assessment of the data that is required to be disclosed and shared in Europe, the breadth and scope of that data with the breadth and scope of data that the plaintiffs in this case are seeking

to have disclosed under their Proposed Final Judgment?

A   No, I haven't done a comparison of that, but I did notice they required the same click and query -- what they call click-and-query data in their provisions.

But beyond that, I cannot say.

Q   The data that the plaintiffs in this case are seeking to have disclosed go way beyond any data that the Europeans are requiring under the DMA, correct?

A   Mr. Schmidtlein, I said I don't take a position on what data.

I'm not really here to testify on the scope and breadth of the data request, except that I think some form of data sharing that would enable rivals to compete faster, develop their capabilities more quickly would play a really important role in restoring competition.

Q   Now, you've talked this morning about the goal of the antitrust remedy in this case, at least from the perspective of an economist, is to restore competition; is that right?

A   That's right.

Q   And by "restore competition," you mean to allow competition to resume to where it would have been without the conduct, correct?

A   That's right.  That would be the goal.

Q    Now, in order to assess the appropriateness and the breadth of how you restore competition, you need to have an understanding of the extent to which competition was actually restricted, correct?

A    Yes.  I talked about sort of different ways of thinking about that in my direct testimony.

Q    Would you agree with me that with regards to restoring competition to where it would have been without the alleged unlawful conduct, you need to understand and assess the extent to which the conduct resulted in anticompetitive effects?

A    Yes.

And I take the Court's finding in this case to mean that there was a significant harming of competition.

Q    Assessing the competitive effects of behavior in the market is ideally examined relative to a but-for world, correct?

A    So I think I would agree with that, except I would say that the world absent Google's conduct would have been one where I would focus on the barriers to entry as opposed to the specific outcomes, because it's hard to know in this case given the complex nature and the duration.

Q    In order to understand or to conduct a but-for analysis in this case, you need to first look at the anticompetitive conduct, which here involved search

2208

distribution agreements with browsers and Android distributors, correct?

A    Correct.

Q    And then you would then need to construct what the world would have looked like in the absence of those specific distribution agreements, correct?

A    I think it's important to think about how the competitive process would have been different absent those agreements.

Q    Right.

And the competitive process would have involved Google being able to compete and pay distributors for nonexclusive distribution, correct?

A    Possibly that would have been one -- something Google might have pursued.

And as I explained, if they had done that, rivals would have had a chance to chip away at Google's monopoly.

Q    In the but-for world, you would have expected Google to have paid for nonexclusive distribution of Google Search to browser developers and Android device manufacturers and wireless carriers, correct?

A    I think that's one particular path, and had that happened over ten or more years ago, we might be in a different situation today.

2209

Q    We might be in a different situation today, but you can't say, correct?

A    I can't make a prediction about the specific outcomes, but I would say that the competitive process would have been different and there would have been greater competitive rivalry irrespective of the ultimate outcomes.

Q    The fact that Google paid for distribution by itself is not anticompetitive, correct?

A    Well, I think Google paying for distribution in the aftermath could promote and facilitate sort of Google to benefit from its past conduct.

Q    I'm not asking about in the aftermath.  We're in the but-for world right now.

In the but-for world, you would agree that the fact that Google would have paid for distribution is not anticompetitive, right?

A    No.

I think in a competitive world, absent the anticompetitive conduct, it's reasonable to expect Google or whoever to pay for some distribution.

Q    And you would agree that a browser developer or an Android OEM or a wireless carrier setting a search engine as a default on a search access point, that by itself is not anticompetitive, correct?

A    I would agree with that.

2210

Q    In fact, you would expect it in the but-for world, third parties would have set default search engines, right?

A    I would expect that, but it need not have been ubiquitously the one default.

Q    And you agree that many consumers prefer to have a default, correct?

A    I would agree with that.

But, again, the issue is not with the default, it's the ubiquitous nature given the incentives that were established.

Q    If an inferior search engine is set as the default and a large majority of users do not prefer it, you would agree that consumers are worse off, correct?

A    I think that consumers would be better off if they had had choices, even niche choices, which they didn't have.

Q    You're not offering an opinion in this case that in the but-for world, there would have been choice screens, right?

A    I'm not suggesting that.  That's not the way I use the word "choice."

Q    You've not done any analysis or offered any opinion in this case with regards to any third party, whether it was Apple or Samsung or a wireless carrier, what sort of preload distribution or default settings Google would have achieved in the but-for world, right?

A    Again, as I explained that Google's use of exclusive distribution agreements suggests that -- and the structure of those agreements suggests that distributors would have considered carving out certain devices, certain access points to select other defaults.

Q    You've not done any analysis in this case with regards to whether Bing or Yahoo! or DuckDuckGo would have achieved any browser default status different from what it achieved in the actual world, correct?

A    No, I think it's hard to know.  That competitive process never got to play out.

Q    Were you aware that Google's RSA agreement with Verizon from 2014 to 2022 did not have any exclusivity provisions?

A    Yes, but I believe in those cases and the Court's opinion recognized that there's a limit to what distributors might be willing to preload.

Q    I see.

So are you saying that in the but-for world, a distributor only would have preloaded a single search engine on a device?

A    No, that's not what I'm saying.

Q    You've not offered any opinion in this case about what rivals' market share would have been but for the challenged conduct?

2212

A    Would you repeat your question.

Q    You've not offered any opinion in this case about what rivals' market shares would have been but for the challenged conduct, correct?

A    No, I'm not offering an opinion of a specific market share distribution.

Q    You're not offering an opinion in this case that any rival search engine would have won any particular access point in the but-for world?

A    No.  It's hard to say.

But the point of the competitive process is to let outcomes play out.

Q    Now, I want to put up Table 1 from your rebuttal report.

MR. SCHMIDTLEIN:  May I approach, Your Honor?

THE COURT:  Of course.

BY MR. SCHMIDTLEIN:

Q    Dr. Chipty, I have handed you what we've marked as RDXD15.010.

Do you recognize this?

A    Yeah, this is the Table 1.

Q    Okay.

And this is, in some respects, another way in which you sort of depict some of the potential share shift to rivals under plaintiffs' proposed remedy, right?

2213

A    Right, in the remedial world.

Q    In the remedial world.

This is a more granular depiction of the pie chart that you were reviewing with plaintiffs' counsel earlier today, correct?

A    That's right.

Q    All right.

Now, what you've done in Table 1 is go through various access points, some of which were at issue in the distribution agreements in the liability phase in this case, correct?

A    That's correct.

Q    And what you've done here is describe the percentage, the actual Google share in the actual world.

So, for example, the 25 percent, that's 25 percent share points in the actual world that Google has from that access point, right?

A    That is correct.

Q    And then you do some clawback assumptions, and then you translate that into various potential Google shares in the remedial world, right?

A    That's right.

Q    And the share numbers here are all overall market share numbers, they're not percentages of the, like, the 25 percent.

2214

You're talking about 5, 8, and 10 percent for the first line there.  That would be an overall market share number; is that right?

A    That's right.

Or percentage points, if you will, yeah.

Q    Okay.

Now, do you have an understanding that the purpose of plaintiffs' remedy is to shift all of the market shares from Google to other search engines under these various distribution points here?

A    No, that's not how I describe it, not at all.

Q    The assumption behind table one is that Google doesn't get distribution in any of these access points, correct?

A    That's correct.

As I said, I assumed Google would lose the defaults for the purposes of these calculations.

Q    And the reason you've assumed that is because of plaintiffs' ban on Google making payments for distribution, correct?

A    That's correct.

As I explained, I thought it would be a reasonable assumption for this purpose given the different incentives.

Q    And I want to clear up some testimony from earlier today, because the Court asked you a question about what

types of payments or distribution would or would not be permitted under plaintiffs' proposed remedy, okay?

Now, Google cannot make any payment for default status on any device under plaintiffs' remedy, correct?

A     That's my understanding.

Q     Under plaintiffs' remedy, Google cannot pay for placement under any -- of its search icon under any circumstance, correct?

A     I think that's correct, but I'd have to look at the exact language.

My calculations here were focused on default placement.

Q     You understand that plaintiffs' proposed remedy would prevent Google from going to an Android OEM and saying, I'm willing to pay you either X revenue share or a bounty of a certain dollar amount to put a Google Search application icon or a widget anywhere you want on the device on any bases you like, nonexclusive, you can put it anywhere you want on the device, plaintiffs' remedy bans that, correct?

A     I think that's right, for the same reasons plaintiffs ban payments for defaults.

Q     Now, for purposes of your opinions in this case, have you come to any conclusions about whether or not, in the remedial world, all of these access points identified

in Table 1 will actually be shifted from Google to another search engine?

A    I think we're -- the default is switched.

It would switch to another general search product, and so I think the answer would have to be "yes."

Q    Are you assuming that in any of these scenarios here on your Table 1, Google gets any preload distribution on the device at all?

A    No.

For the purposes of this calculation, no.

And as I explained to the Court, it gives me the bookends somewhere in between -- it's possible a distributor would carry Google without compensation, especially in the early years.

So I think of these as the bookends of the "do nothing or lose all" the defaults.

Q    Would you expect, in the remedial world, under plaintiffs' proposed remedy that rivals will bid for exclusive defaults?

A    I think it's possible.

Q    You would fully expect in the but-for world that Microsoft will bid for exclusive defaults on all of these surfaces, correct?

A    Well, it's possible.

But I just want to make clear, if you're talking

2217

about this, what's on the slide, which is the sort of share shifts that we're talking about here, unless you're moved on from this, but this is about the remedial world.

Q    In the remedial world where Google cannot pay for any defaults, any distribution, nothing, you would expect Microsoft to bid to be the exclusive default on all of these, correct?

A    So it's possible.

I can't tell you they wouldn't, but whether or not they would be selected, I'm not sure.

And possibly.

But like I said, they would -- if plaintiffs did and syndication remedies are adopted, rivals would be able to compete even against Microsoft, especially on mobile, where Microsoft is still behind.

Q    Do you think Microsoft, given the resources it has, is likely to win all of those defaults against DuckDuckGo and Yahoo!?

A    Again, I can't make a prediction, but certainly Microsoft would be in a strong position to be selected, but I can't tell you whether they would be especially if rivals have a chance to catch up.

Q    Can we look at Slide 18 from Dr. Chipty's...

Now, you testified earlier that one of the benefits of the ban on Google being able to pay for any

2218

distribution would be that it would create competition among rivals for defaults; is that right?

A    That's right.

Q    And you've testified that you think it's likely to cause many distributors to shift their defaults away from Google, right?

A    I think it is, yes.

Q    Now, if you go to the next slide.

I just want to make sure I understand.

When you talk about the payment bans creating competition among rivals for defaults, is it your opinion in this case that -- let's talk about Apple first because that's the biggest chunk of your 31 percent; it's well over half, right?

A    Yes, it's 18 out of 31.

Q    So is it your testimony that in this case historically, there wasn't competition for the Apple default?

A    I think as a practical matter, there wasn't in the -- during the course of the last ten years or so.

Q    You didn't see any evidence in this case of what Microsoft tried to offer Apple in order to persuade Apple to set Bing as the default on Safari?

A    No.

I understand Microsoft tried to get Apple to

switch the default, but as the Court's opinion recognized, there wasn't really a contest for those defaults.

Q    There wasn't really a contest, because Google's quality was superior, correct?

A    So I do think that the quality, coupled with the hold on search access points, allowed Google to continue making itself even better.

Q    So when you talk about creating more competition for Apple, are you talking about a world where it's going to be more competitive for Bing to be competing against DuckDuckGo to be the default on Safari than Google competing against Bing?

A    I think it's the fact that with the -- again, comprehensively, with the data and syndication remedies and with -- and this is why you need time, there would be competition for the defaults among the non-Google rivals.

Q    In the remedial world, have you reached an opinion that all of these defaults are just going to switch from Google to some other rival?

A    Sorry, could you ask it again.

Q    Sure.

In the remedial world, is it your opinion that we're just going to see a new set of exclusive agreements with rivals?

2220

A    No, that's not my -- that's not my opinion. I haven't taken an opinion on that.

Q    Now, the 31 -- can we go to the -- well, sticking here, you talk about, there's going to be a 31 percent market share potential share shift in a world where there are no payments from Google.

In the but-for world where Google paid for nonexclusive distribution, you haven't come up with an opinion about what that percentage would be.

It would be a lot lower than 31 percent, wouldn't it?

A    So I don't know what that share would have been, but...

Q    You've not done that analysis?

A    Well, as I've explained, it is not possible for anyone to predict how that world would have played out, except for the fact that when rivals would have had more opportunities to compete, over the course of ten or more years, I believe the competitive dynamics would have been substantially different.

Q    You've talked about the chicken-and-the-egg problem.  You mentioned it again this morning, correct?

A    That's right.

Q    And the chicken-and-the-egg problem is, you need to have a high quality search engine to get distribution,

2221

right?

        A    That's correct.

        Q    And if you can't get distribution, it's a lot harder to get scale, right?

        A    Yes.

        Q    And in the period before the alleged unlawful conduct began here, Google had the highest quality search engine, right?

        A    Yes, it did.

        Q    And it had scale advantages prior to any alleged wrongdoing, right?

        A    Yes, I believe it did.

        Q    And the chicken-and-the-egg problem existed before any of the alleged an unlawful conduct, correct?

        A    Yes.

             And I testified to that, that the point isn't -- the point is, it would -- it was always going to take time, and it will take even more time now.

             But the point is, the structure of Google's agreements foreclose the opportunity for rivals to come in and start chipping away at niche defaults, at -- with sort of minor access points and so on and so forth in ways that would have accumulated.

        Q    Can you tell me, what are the minor access points on the Safari browser that rivals could have chipped away

2222

at?

A    Well, that's the whole point.

These all-or-nothing agreements precluded the possibility of alternative configurations on some models in certain ways that never came to market.

So I can't -- and I don't think anyone can, sitting here, go back and think about the different types of products that might have come to market.

Q    Have you reviewed the testimony from Apple's executives and Apple's internal documents to see whether there were any other types of these niche access points that were being considered at Apple but were shelved because of Google's agreements with Apple?

A    Well, there's certainly the discussion in the record about privacy mode.

Q    Right.

And Apple introduced a private browsing default feature in Safari, right?

A    It has now.

Q    Right.

And it introduced that notwithstanding the existence of Google's contracts, right?

A    Well, but as I understand it, it still features Google's privacy product, but it's Google's.

Q    Right.

But this is an example of another, what you, I think, have referred to as a niche access point that actually was developed notwithstanding Google's contracts, right?

A    Well, it was just very recently developed.

Q    Correct.  Correct.

September of 2023, it was developed, right?

A    Yes.

And that's the whole point.

Why would distributors invest in alternative things if ultimately they didn't have the flexibility to do with it what they wanted.

And so, yes, they did come to market.  That doesn't mean that they wouldn't have come sooner with that feature.

Q    Have you seen any evidence that that feature would have come sooner absent Google's contract?

A    Well, this is the thing:  We can't know now, can we?

Q    Yeah, but, Dr. Chipty, we had two senior executives from the Apple corporation sitting in that chair two years ago, and they were asked questions about the Safari browser and all of the access points.

Did you review the testimony of those executives?

A     I have.

Q     Did those executives say, Google's contracts have blocked us from coming up with different access points sooner?

A     I don't recall specifically, but I -- it wouldn't surprise me if they didn't say that.

Q     Are you saying that they perjured themselves?

A     No.  I'm saying that --

THE COURT:  I think we're sort of getting, one, argumentative; and, two, maybe trying to re-litigate the liability phase of this a little bit.

MR. SCHMIDTLEIN:  I'm trying to get an understanding of what the but-for world is here so we can assess how the remedies fit against that but-for world.

But I'll move forward.

BY MR. SCHMIDTLEIN:

Q     I want to talk about the barriers to entry that you've testified to.

High capital costs, those existed before Google's conduct in this case, right?

A     Yes.

Q     Search engine and search ad businesses have been high capital cost businesses for many, many years, correct?

A     That's my understanding.

Q    You've not tried to quantify what impact Google's distribution agreements have had on the capital costs of operating a search engine or a search ads business, correct?

A    No.

As I said, I think some of the barriers were exacerbated and others just became harder to overcome.

Q    You've not -- you have not done any economic analysis to quantify whether the capital costs of operating a search engine or a search ads business were materially impacted by Google's agreements, correct?

A    I have not done a quantification of that.

But as I said, the issue with capital costs from my perspective is that they became harder to overcome, not that they were exacerbated.

Q    Brand recognition.

Google had far and away the leading brand recognition long before the plaintiffs alleged Google engaged in any exclusionary conduct in this case, correct?

A    Sorry, could you repeat.

Q    Google had far and away the leading brand recognition long before plaintiffs alleged that Google engaged in any exclusionary conduct, correct?

A    Google had a strong brand from the beginning of the conduct period, that's certainly true.

But, again, the point is, if rivals had a path to

market, I'm not making a prediction about what would have happened specifically, but rivals would have at least had a chance to get in front of more users.

Q   You've not done any analysis in this case to assess whether Google's brand recognition would be any different relative to rivals in a but-for world, correct?

A   I've not got a prediction on how the but-for world would have evolved.

Q   Yahoo! had a well-known consumer brand in 2014 when it was made the default search engine in the Firefox browser, correct?

A   I haven't specifically studied the relative strength of Yahoo!'s brand, but I do know it was made the default at that time.

Q   Did you do any analysis of Bing's brand recognition in the 2010 to 2014 time period and how that compared to Google's?

A   No, I have not.

Q   I want to switch to user-side scale because that's another one of the barriers to entry that you testified about.

User-side scale is a natural barrier to entry in search in your view; is that right?

A   I think so.

Q   And user-side scale as a barrier to entry existed long before the time period Google is alleged to have engaged in any exclusionary conduct, right?

A   Well, it's a yes and no.

I certainly -- certainly Google had a high market share, like, something like 80 percent beginning around 2014, if memory serves.

But it's not just about having the user data. It's having the time to get ahead and invest and innovate in ways that it would take rivals longer to do now.

Q   You've not undertaken any analysis in this case of the minimum scale that would be needed to compete effectively in the search engine market, correct?

A   No, I haven't done an analysis of that.

But, you know, I have said Bing on desktop gives us a sense of how much scale might be necessary, at least for Bing, to compete.

But, again, it's not just about the scale, it's also about the time and the insulation, you know, without having to worry about others to start developing and maintaining and advancing those capabilities.

Q   You haven't done any analysis in this case of how much of Google's search quality advantage over rivals is attributed to search-query scale, correct?

2228

A    I haven't done my own analysis of that, but there's evidence in the record that there's a close relationship between scale and quality.

Q    You're not an expert in search engines, correct?

A    Oh, no, I'm not.

Q    You don't know how much of search quality is attributable to just query scale versus the development of all sorts of other features and innovations that are not related to scale, correct?

A    No, I don't have an independent view of that.

I'm just explaining in the liability record, I've seen evidence that there is a close relationship between the two.

Q    There's some relationship between the two, but you can't quantify it, correct?

A    No, I'm not offering a quantification of that.

Q    And you're certainly not offering an opinion in this case that in the but-for world, any Google rival would have achieved the same query scale as Google, correct?

A    No, I'm not offering an opinion on that.

Q    Do you have an understanding as to whether plaintiffs' data disclosure remedies all involve scale-dependent data inputs as opposed to outputs?

A    I don't have a view on that.

2229

MR. SCHMIDTLEIN:  Can we pull up Section VI of the plaintiffs' remedy.

BY MR. SCHMIDTLEIN:

Q    Dr. Chipty, this is Section VI, and I'm happy to give you a hard copy of the remedy if you'd like it.

So this is page 14 of the remedy.

And this is the -- I think what the plaintiffs refer to as the preamble.

And it says, "The purposes of the remedy set forth in this section are to remove barriers to entry, pry open the monopolized markets to competition, and deprive Google of the fruits of its violations by providing competitors access to scale-dependent data inputs both -- for both search and ads -- that would otherwise provide Google an ongoing advantage from its exclusionary conduct."

Do you see that?

A    I do.

Q    Have you done anything yourself to assess whether, in fact, the data that is required to be disclosed here is limited to scale-dependent inputs?

A    No, I've not made that assessment.

Q    Have you reached any conclusions or views as to whether, in fact, plaintiffs' proposed remedies would require Google to turn over outputs?

2230

A    So I think for me, again, I'm not offering a technical opinion.  I'm just not.

But -- and part of the reason -- one example of something I'm not sure about is what do you mean or what does one mean by an input versus an output.

In some sense, just the raw user data might be an input.  But -- and which might mean anything else is an output.

But I don't really know what that -- where that line between input and output really is.

Q    And am I correct -- did I hear you correctly this morning that you don't actually have an opinion about what data should or should not be disclosed under the remedy in this case?

A    Yes, I don't have a view on the specific data that should be shared, but I do think the nature of whatever the -- to be effective, the data sharing and syndication remedies have to be of a nature that would allow rivals to develop capabilities faster to sort of close the -- you know, to remove the persistent effect of Google's anticompetitive advantage.

Q    And as I think we have talked about before, in assessing these data remedies, you have not made a determination of what specific impact Google's distribution agreements had on relative scale?

2231

A    I have not provided a quantification, nor I don't think it's possible in this case.

But, like, I did take the Court's opinion to mean that there is a significant difference between how the world played out and how it would have played out.

Q    You believe the Court made a but-for determination in its opinion; is that right?

A    I think the Court made a directional finding of significant competitive harm.

Q    For purposes of your opinion in this case, did you assume that the Court had made a but-for world determination?

A    I think the Court -- well, the Court's right here.

I think the Court made the determination that competition was harmed in specific ways that were tied to the barriers to entry.

Q    If we can go over to the next page of the remedy --

A    Okay.

Q    -- the Section VI.

And in this section of the remedy, VI.A, it talks about Google's search index, right?

A    Yes, right.

Q    And as part of this, Google has to identify, for a qualified competitor, every single document in Google's

search index, correct?

A     Well, that's how I read item 1.

But I'm not really here to parse that language.

Q     This remedy requires, on top of Google identifying every single URL for every document in its index, a whole set of signals, attributes, and metadata associated with every single document in the index, correct?

A     I can't -- I don't know.

Q     Well, have you done any analysis to assess whether, in the but-for world, Google's rivals would have built a search index that is equivalent to Google's index in terms of size and quality?

A     So I have not made that determination, but that is not the purpose of the remedial actions.

Q     I'm just asking you -- just try to stick with my question, okay?

You've not made any analysis or judgment or opinion that in the but-for world, any rival, forget all of them, any rival would have ended up with Google's search index, correct?

A     I have not.

But, again, this is not about the but-for world, it's about a remedial world.

Q     Well, but you've talked about restoring competition in this case being about trying to put rivals

2233

back in the place they would have been absent the anticompetitive conduct, right?

A    Right.

That's the ultimate goal.

Q    And I'm trying to assess whether you have a belief whether to, in order to restore competition, we need to give all the competitors Google's entire search index?

A    So for sure, I don't read -- I don't know that that's what this is asking for.  I don't read it that way.

But in any case --

Q    You don't know what this section provides?

THE COURT:  Sorry, let's move on.

Let's not argue over the terms of this.  She doesn't really have the expertise to really say one way or another.

BY MR. SCHMIDTLEIN:

Q    There's a provision in here that requires Google to turn over databases consisting of information sufficient to recreate Google's knowledge graph, including local information.

Have you done any analysis in this case to assess whether the knowledge graph is built based on user data?

A    I can't answer that question.

Q    And you don't have an opinion in this case that, in the but-for world, all of Google's rivals would have

created a knowledge graph equivalent to Google's?

A    I don't have a view on the specific outcomes of the but-for world.

Q    Let's take a look at Subsection C, which is the section related to user-side data.

Do you have an understanding as to what data is required to be disclosed under this section of plaintiffs' remedy?

A    Not specifically.  Only at the vague level of reading what's in here.

Q    Okay.

Do you have an understanding that this provision of plaintiffs' proposed remedy requires Google to turn over every user search query and all user interaction data related to every search query?

A    Again, I can't answer that with any great confidence.

Q    You would agree that data disclosure remedies like these can have impacts on the incentives of both rivals and Googles to actually innovate, correct?

A    Yes, it's possible.

And I talked about that earlier today.

Q    And if you get the -- if you get it wrong in terms of disclosing too much data, that can detract from a rival's incentives to innovate and also detract from Google's

2235

incentives to innovate, correct?

A    Yes, I think, in principle, it's possible, and that's why I discussed the pushes and the pulls.

Q    Right.

But for purposes of your opinions in this case, you don't actually know what specific data is required to be disclosed, right?

A    No, I don't know what specific data.

But my point is, if there is an appropriately crafted data sharing and syndication provision, it will play an important role in restoring competition.

I can't say what specific data should be shared.

Q    And not only do you not know what data is supposed to be shared, you, therefore, can't offer an opinion as to whether the plaintiffs' proposed remedy goes too far in terms of reducing Google's and rivals' incentives to innovate going forward?

A    So I think I can in terms of describing the components of a multi-prong strategy that would be important, especially relative to a strategy that's likely to preserve the status quo.

Q    You've offered a very high level opinion, but you can't say definitively whether plaintiffs' proposed remedies go too far in terms of data disclosures, correct?

2236

A    I -- correct, I cannot give you an opinion on data disclosures and how to draw that line.  That's not my area of expertise.

Q    And in forming your opinions in this case, you didn't assess whether plaintiffs' remedies will allow rivals to reverse engineer Google search results, correct?

A    Well, generally that's yes.  But as I've explained, I'm not a technology person, so I'm not even sure what it means to "reverse engineer."

And then what?  Reverse engineer what is also a question I have.

But, again, it's not my area of expertise.

Q    In forming your opinions in this case, did you gain an understanding as to how plaintiffs' search syndication remedy works?

A    Yes, at a high level.

My understanding of syndication is that it gives more immediately useable information.

Q    The search syndication remedying -- I'm just talking about the search results, not search ads --
the search syndication remedy in this remedy would require Google to license all of its search results, all of its search features to rivals, correct?

A    I'm not -- I would -- we'd have to look.

Could we take a look at it.

Q    If you can look at page 18; Section A.

And it talks about, there, at the bottom: "To make the following information and data available in response to each query issued or submitted by a qualified competitor."

And it talks about data sufficient to understand the layout, display, slotting, ranking of all items or modules on the SERP, including mainline content, sidebar content, site links, snippets.

Number 2, ranked organic search results obtained from Google's database or index, regardless of whether the content was obtained by crawling the Internet or by other means.

Search features, it goes on, local, maps, videos, images, knowledge panel.

A    Again, what was your -- could you repeat your question.

Q    Sure.

The search syndication remedy in this case requires Google to provide its search results in response to any query a competitor issues, correct?

A    Well, it -- I'm -- I think it requires these. I don't know if that's all.

That's where I'm hesitating.  I can't tell you.

You know, I look at number 4 on this, and not all

2238

the features are listed.  So I can't specifically affirm that it would be all.

You know, AI Overviews is missing, the hotel and flights box information is missing.

I don't know enough to tell you that this is all...

Q    Do you know whether or not the disclosure of all of this information under the search syndication provision would allow rivals to reverse engineer or mimmick significant aspects of Google's innovations and search engine algorithms?

A    I'm sorry, could you say that -- ask that again.

Q    Sure.

Have you looked at or assessed whether Google having to provide all of this information under the search syndication provisions would allow rivals to reverse engineer or mimmick or recreate significant functionality from Google Search?

THE COURT:  Mr. Schmidtlein, I understand what you're getting at, but I don't know if she has the expertise and I'm sure we're going to hear from people who have that expertise.  So she doesn't have the expertise.

MR. SCHMIDTLEIN:  Well, we're at the end of their case.

THE COURT:  I understand, but she's not in a position to -- she can testify the way she can testify about it in the sense of --

MR. SCHMIDTLEIN:  Why don't we put up Slide 33 from your slide deck.

BY MR. SCHMIDTLEIN:

Q    Because you offered some testimony earlier this morning about syndication, didn't you?

A    That's right.

Q    And you cited Mr. Turley; is that right?

A    I did.

Q    You think OpenAI should get access to all the Google Search results and features that are part of plaintiffs' syndication remedy; is that right?

A    I think what I said is that, as a potential entrant, to the extent like a traditional potential entrant, they have a plan to compete and enter, which he testified that they are developing search capabilities.

I expressed an opinion that the remedies should consider extending to these types of potential rivals as well or entrants as well.

Q    OpenAI wasn't excluded by any of Google's search distribution agreements, were they?

A    The point is this is a forward-looking remedy.

So what matters is who are the potential entrants

2240

in the next sort of -- you know, the next generation of potential entrants, and that's, I think, what should be the focus of remedies.

Q    I see.

So have you made any assessment as to whether OpenAI has suffered as a result of any of Google's distribution agreements to date?

A    No, I have not made that determination.

Q    And Mr. Turley, his testimony here says, they'd be helpful now because it allows us to improve the quality of the product, it allows us to own our own destiny and not just partner from real-time information.

Mr. Turley is not looking to put Google's search results in OpenAI.  He's looking to get this data so he can reverse engineer or come up and learn Google's innovations and use them for OpenAI; isn't that right?

A    I'm not able to tell you that that's what he meant by this.

I understood him to be explaining the -- sort of the relative significance of information that would -- could be usable in the short run, versus information that would take more time to use.

Q    He wants to get access and understanding the signals.  He's not looking to reproduce Google's search results?

THE COURT: Let's not ask her to interpret his testimony.

I'll make the decisions about what he does or doesn't want, so let's not argue over what somebody else has said. She's identified this and we'll figure out what it all means.

BY MR. SCHMIDTLEIN:

Q   You would agree that it would be reasonable, as part of any search syndication remedy, to place conditions on a qualified competitor's ability to use the syndicated search results to reverse engineer Google Search results?

A   I think it would depend on what it means to reverse engineer.

I think that the point of the remedies is to allow rivals to make use of information that would accelerate the learning, and that beyond that, I mean, it would it depend, like I said, on what reverse engineering means.

But, yes, reverse engineer algorithms, possibly.

But, again, I'm not a technology expert and I can't really take a position on what reverse engineering is.

Q   You would agree that there are no provisions in the plaintiffs' proposed remedy that restrict in any way a qualified competitor's use of all of the information that is

2242

provided as part of search syndication?

A    So I don't take a view on how the data sharing provisions would be implemented.  I think that's an implementation question, and so, yes, I don't have a view on that and I can't describe that.

MR. SCHMIDTLEIN:  Your Honor, I'm going to move on to a different topic if now is a good time for a break.

THE COURT:  Let's go ahead and take our lunch break now.

Dr. Chipty, we'll resume at 1:30 and I'll just please ask you again not to discuss your testimony with anyone during the break and I'll just ask you to step outside.

MR. SALLET:  Your Honor, can I please address one brief housekeeping matter?

THE COURT:  Let's have Dr. Chipty step outside and then we can take care of whatever anybody else wants to raise.

Hang on.

Mr. Schmidtlein, can I get a sense from you of timing here?

MR. SCHMIDTLEIN:  I'll have a better sense once I look at my notes and kind of review this morning, but I've probably got somewhere between a half hour to 45 minutes.

2243

THE COURT:  Okay.

All right.  Look, I'm not -- I understand the purpose and the reasons for your questions.

Ultimately, I'll just be honest with you, it doesn't help me to ask her to interpret this thing. We're going to have a long conversation at the end of this about what it does and doesn't contain.

Obviously she can testify about her views on the impacts and market dynamics and the like, but in order just to avoid that kind of argument and of back and forth that she's really not in a position to testify about.

MR. SCHMIDTLEIN:  Understood, Your Honor.

But I know you appreciate --

THE COURT:  I --

MR. SCHMIDTLEIN:  -- I have a record to make.

THE COURT:  It's not just about making a record, I understand all of that.  It's also who's going to give me the information.

And ultimately we're going to have a long discussion about the extent of these remedies and what's appropriate and what isn't.  And for her to sit here and not tell us anything isn't terribly helpful to that because she's not in a position to.  So, I mean, she's an economist, she's not a technical person.

Okay.  Mr. Sallet?

2244

MR. SALLET:  Just briefly, Your Honor.

Yesterday when Mr. Locala testified, we marked as an exhibit his demonstratives PXRD011.  We have prepared an amended version of that that takes out the slide that Your Honor said we could not use, inserts a blank page. We'd like to move that into evidence as a demonstrative, and we's do so with Google's consent.

THE COURT:  Okay.

So we'll just switch that out and make sure we've got the correct demonstrative exhibit that was used with Mr. Locala yesterday.

All right.  Is there anything else, folks?

MR. DAHLQUIST:  No.

THE COURT:  Okay.

Let's plan to just resume then at 1:35.

We'll see everybody soon.  Thank you.

COURTROOM DEPUTY:  All rise.  The Court is now in recess.

(Recess from 12:31 p.m. to 1:35 p.m.)

2245

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__April 29, 2025_____    _____

William P. Zaremba, RMR, CRR

BY MR. GOWER: [14]
2125/15 2128/12
2128/19 2137/16
2148/11 2150/21
2151/19 2152/22
2178/18 2186/23
2189/7 2192/7 2193/2
2193/14
BY MR. SCHMIDTLEIN:
[8]   2196/10 2199/3
2212/17 2224/16
2229/3 2233/16
2239/6 2241/7
COURTROOM DEPUTY:
[7]   2122/2 2122/5
2125/7 2125/9
2195/20 2195/23
2244/17
MR. DAHLQUIST: [1]
2244/13
MR. GOWER: [8]
2125/3 2128/5
2128/16 2128/18
2136/21 2148/7
2192/25 2195/10
MR. KOENIG: [2]
2122/25 2124/1
MR. SALLET: [2]
2242/14 2244/1
MR. SCHMIDTLEIN:
[13]   2122/17 2128/8
2196/6 2199/2
2212/15 2224/12
2228/25 2238/23
2239/4 2242/6
2242/22 2243/12
2243/15
MS. VASANT: [2]
2122/22 2123/2
THE COURT: [59]
2122/3 2122/10
2122/18 2123/1
2123/22 2124/3
2125/10 2128/9
2128/17 2136/19
2142/22 2144/10
2144/12 2146/17
2148/2 2148/10
2148/20 2149/12
2149/22 2150/3
2150/19 2151/5
2151/18 2152/1
2152/10 2152/21
2177/3 2177/11
2177/21 2178/1
2178/6 2178/10
2178/17 2185/13
2188/22 2189/5
2191/19 2191/23
2192/17 2192/20
2192/23 2193/1
2193/7 2193/13
2195/15 2196/3
2212/16 2224/9

2233/12 2238/19
2238/25 2241/1
2242/8 2242/16
2242/25 2243/14
2243/16 2244/8
2244/14
THE WITNESS: [27]
2125/11 2136/25
2142/24 2144/11
2145/6 2147/3 2149/8
2149/13 2149/24
2150/12 2151/10
2152/7 2152/14
2177/8 2177/12
2177/24 2178/4
2178/9 2178/12
2186/2 2188/25
2189/6 2191/21
2191/24 2192/19
2192/21 2193/10

'

's [1]   2226/13

0

0159 [1]   2119/11

1

1 percent [1]
2142/19
10 [1]   2135/7
10 percent [1]
2214/1
10:57 [1]   2195/22
11 [1]   2145/14
11 percent [3]
2139/22 2145/14
2156/4
11:00 [1]   2195/16
11:15 [1]   2195/17
11:16 [1]   2195/22
12:31 [1]   2244/19
13 [1]   2138/13
13 percent [4]
2142/18 2154/22
2155/19 2156/10
1300 [1]   2120/5
14 [2]   2138/25
2229/6
15 [2]   2139/18
2174/6
18 [3]   2217/23
2218/15 2237/1
18 percent [3]
2142/18 2144/1
2156/9
19 [6]   2139/24
2142/8 2150/23
2151/7 2151/23
2151/25
1999 [2]   2196/23
2197/4
1:30 [1]   2242/10
1:35 [2]   2244/15
2244/19

2

20 [1]   2124/19
20 percent [2]
2153/8 2158/18
20 years [2]   2175/24
2176/3
20-3010 [2]   2118/4
2122/6
2000 [1]   2196/19
20001 [1]   2120/16
20024 [1]   2120/10
2005 [1]   2196/21
2010 [1]   2226/16
2014 [4]   2211/13
2226/9 2226/16
2227/7
2019 [1]   2174/20
202 [4]   2119/5
2119/11 2120/10
2120/17
2020 [4]   2139/21
2143/2 2143/4
2145/13
2022 [1]   2211/13
2023 [1]   2223/8
2024 [3]   2153/5
2153/8 2198/9
2025 [5]   2118/5
2197/23 2198/15
2198/17 2245/7
20530 [1]   2119/10
209 [1]   2119/4
21 [3]   2148/19
2151/3 2152/23
22 [1]   2153/12
24 [1]   2154/1
25 [5]   2155/2 2156/7
2161/24 2162/2
2213/15
25 percent [2]
2213/15 2213/25
25 years [1]   2197/5
26 [1]   2158/11
27 [2]   2160/10
2160/22
286-0159 [1]   2119/11
29 [3]   2118/5
2162/16 2245/7

3

3010 [2]   2118/4
2122/6
31 [10]   2142/11
2142/13 2151/11
2151/11 2163/1
2218/13 2218/15
2220/3 2220/4
2220/10
3249 [1]   2120/17
33 [2]   2164/22
2239/4
333 [1]   2120/16
35 [1]   2166/23
35 percent [2]
2153/6 2153/7

354-3249 [1]   2120/17
36 [1]   2168/21
37 [1]   2169/23
38 [7]   2140/4 2140/7
2142/6 2151/14
2156/7 2156/13
2157/3
38 points [1]   2140/9
39 [1]   2170/12

4

40 [1]   2171/22
40 percent [1]
2153/17
42 [3]   2173/15
2203/4 2205/10
43 [1]   2153/7
434-5000 [1]   2120/10
44 [1]   2179/12
45 [2]   2179/22
2242/24
450 [1]   2119/9
48 [1]   2189/11

5

5000 [1]   2120/10
508-6000 [1]   2120/7
51 [3]   2140/6
2150/24 2156/23

6

600 [1]   2119/4
6000 [1]   2120/7
60604 [1]   2119/5
65 percent [1]
2156/5
680 [1]   2120/9

7

7100 [1]   2119/10
720 [1]   2120/7
78 percent [2]
2153/5 2153/6
7th [2]   2120/6
2198/17

8

80 percent [1]
2227/6
80203 [1]   2120/6
805-8563 [1]   2119/5
8563 [1]   2119/5
89 [1]   2145/14
89 percent [2]
2139/23 2145/14

9

90 percent [1]
2175/19
9:15 [1]   2118/6

A

a.m [3]   2118/6
2195/22 2195/22
ability [13]   2146/7
2147/22 2163/17

**A**

**ability... [10]**
2164/11 2167/4
2168/23 2177/7
2180/5 2185/24
2186/15 2187/17
2200/6 2241/10
**able [47]**  2131/19
2131/22 2131/24
2134/20 2135/15
2135/19 2141/19
2143/16 2146/19
2147/11 2149/2
2149/6 2149/7
2149/11 2152/5
2154/5 2154/19
2154/22 2155/17
2155/19 2156/21
2158/13 2159/2
2159/13 2159/22
2163/13 2170/4
2171/8 2171/8 2176/3
2180/7 2181/6
2181/10 2181/16
2182/11 2182/12
2183/3 2185/5
2185/18 2185/20
2185/25 2187/24
2187/25 2208/12
2217/13 2217/25
2240/17
**about [110]**  2127/8
2127/22 2130/1
2132/17 2138/12
2140/22 2141/23
2144/13 2146/23
2147/4 2151/20
2151/20 2153/17
2156/3 2156/11
2157/18 2158/5
2158/18 2162/11
2164/18 2164/18
2164/23 2165/18
2168/17 2170/9
2173/1 2174/2
2174/21 2175/7
2175/12 2176/16
2176/18 2177/9
2178/10 2178/19
2180/14 2180/14
2182/16 2185/9
2187/18 2189/13
2189/16 2196/17
2198/12 2199/13
2199/20 2200/3
2200/20 2200/23
2201/6 2202/9
2202/11 2202/13
2203/10 2203/13
2203/16 2204/2
2205/9 2205/19
2206/16 2207/5
2207/6 2208/7 2209/3
2209/12 2211/23
2212/2 2214/1

2214/25 2215/24
2217/1 2217/2 2217/3
2218/10 2218/12
2219/8 2219/9 2220/4
2220/9 2220/21
2222/7 2222/15
2223/23 2224/17
2226/1 2226/21
2227/8 2227/18
2227/19 2227/20
2230/4 2230/12
2230/22 2231/22
2232/22 2232/23
2232/24 2232/25
2234/22 2236/20
2237/2 2237/6 2239/2
2239/8 2241/3 2243/7
2243/8 2243/11
2243/16 2243/20
**above [1]**  2245/4
**above-titled [1]**
2245/4
**absence [3]**  2196/25
2197/2 2208/5
**absent [9]**  2133/5
2134/8 2134/10
2134/16 2207/19
2208/8 2209/18
2223/18 2233/1
**academia [2]**  2126/12
2196/15
**academic [2]**  2190/22
2192/11
**accelerate [6]**
2147/21 2163/17
2163/23 2168/23
2185/16 2241/16
**access [62]**  2131/21
2135/17 2139/2
2139/3 2140/1
2141/19 2142/17
2143/1 2144/5
2148/16 2150/11
2150/11 2152/25
2153/3 2153/11
2158/7 2158/9
2158/13 2159/2
2159/16 2159/19
2163/14 2167/5
2167/7 2168/22
2171/24 2172/4
2172/8 2172/22
2176/12 2177/14
2179/4 2179/8 2180/5
2180/10 2183/17
2183/22 2183/23
2184/14 2184/16
2184/17 2188/18
2189/22 2189/24
2192/16 2209/23
2211/5 2212/8 2213/9
2213/17 2214/13
2215/25 2219/6
2221/22 2221/24
2222/11 2223/3

2223/24 2224/3
2229/13 2239/12
2240/23
**according [1]**
2153/14
**account [4]**  2140/14
2157/2 2159/6 2185/7
**accounted [1]**
2153/17
**accounting [1]**
2144/2
**accumulate [1]**
2185/5
**accumulated [1]**
2221/23
**achieved [5]**  2204/6
2210/25 2211/8
2211/9 2228/19
**acquisition [1]**
2133/11
**acquisitions [1]**
2200/14
**across [1]**  2139/21
**Act [1]**  2205/14
**Action [1]**  2122/6
**actions [3]**  2159/19
2159/21 2232/14
**activity [1]**  2151/1
**actors [1]**  2124/14
**actual [7]**  2142/25
2150/14 2163/24
2211/9 2213/14
2213/14 2213/16
**actually [19]**  2134/7
2139/19 2147/5
2147/16 2150/13
2150/15 2158/16
2160/17 2166/21
2166/23 2190/21
2194/18 2201/2
2207/4 2216/1 2223/4
2230/12 2234/20
2235/6
**ad [5]**  2162/19
2194/14 2194/21
2201/17 2224/22
**add [2]**  2123/25
2156/4
**added [2]**  2175/12
2205/19
**adding [1]**  2205/6
**addition [3]**  2163/11
2164/4 2175/11
**additional [6]**
2140/8 2155/8
2155/12 2155/23
2159/10 2159/13
**address [2]**  2183/11
2242/14
**addressing [1]**
2194/4
**adequate [1]**  2123/8
**adjacent [1]**  2160/17
**Adkins [1]**  2122/14
**admit [1]**  2195/13

**adopt [1]**  2152/18
**adopted [2]**  2172/1
2217/13
**adopts [1]**  2147/14
**ads [8]**  2138/8
2162/19 2162/22
2171/16 2225/3
2225/9 2229/14
2236/20
**advances [1]**  2137/9
**advancing [1]**
2227/21
**advantage [9]**
2135/14 2157/16
2166/9 2169/19
2176/4 2186/10
2227/23 2229/15
2230/21
**advantages [2]**
2181/1 2221/10
**advertisers [2]**
2132/1 2136/8
**advertising [2]**
2129/5 2161/19
**affect [1]**  2141/24
**affirm [1]**  2238/1
**after [6]**  2134/21
2137/13 2148/8
2192/3 2197/19
2198/14
**aftermath [2]**
2209/10 2209/12
**afternoon [1]**  2125/3
**again [26]**  2126/3
2137/11 2141/11
2146/18 2146/23
2153/19 2155/11
2182/10 2188/20
2196/1 2210/8 2211/1
2217/19 2219/13
2219/20 2220/22
2225/25 2227/18
2230/1 2232/22
2234/16 2236/12
2237/16 2238/12
2241/20 2242/11
**against [10]**  2141/21
2141/21 2167/17
2172/19 2186/20
2217/14 2217/17
2219/10 2219/12
2224/14
**agencies [1]**  2128/4
**ago [10]**  2140/15
2142/4 2154/15
2155/10 2155/12
2175/7 2175/13
2205/19 2208/23
2223/23
**agree [12]**  2186/14
2207/7 2207/18
2209/14 2209/21
2209/25 2210/5
2210/7 2210/13
2234/18 2241/8

**A**

**agree... [1]**   2241/23
**agreement [5]**
 2181/17 2181/20
 2204/15 2205/5
 2211/12
**agreements [33]**
 2135/13 2152/5
 2157/9 2163/6
 2175/23 2175/25
 2179/15 2179/18
 2180/12 2181/13
 2183/11 2183/12
 2184/12 2184/23
 2199/19 2200/9
 2203/23 2204/5
 2208/1 2208/6 2208/9
 2211/2 2211/3
 2213/10 2219/23
 2221/20 2222/3
 2222/13 2225/2
 2225/10 2230/25
 2239/23 2240/7
**ahead [3]**   2148/6
 2227/9 2242/8
**AI [2]**   2161/22
 2238/3
**aided [1]**   2120/18
**al [2]**   2118/3 2122/7
**algorithms [2]**
 2238/11 2241/19
**Alix [1]**   2126/14
**all [89]**   2122/2
 2122/11 2123/22
 2123/24 2124/4
 2124/4 2125/1
 2125/10 2128/10
 2129/6 2131/16
 2132/1 2132/21
 2133/10 2134/3
 2134/15 2138/9
 2139/14 2139/21
 2141/5 2143/15
 2143/25 2145/10
 2147/11 2147/14
 2148/24 2150/15
 2150/19 2152/2
 2154/24 2154/25
 2155/3 2155/21
 2157/11 2158/3
 2158/24 2158/25
 2160/20 2160/21
 2162/10 2167/16
 2174/22 2177/1
 2180/3 2181/21
 2184/9 2184/21
 2188/19 2189/21
 2195/15 2195/20
 2195/23 2196/5
 2200/12 2213/7
 2213/23 2214/8
 2214/11 2215/25
 2216/8 2216/16
 2216/22 2217/6
 2217/17 2219/18

 2222/3 2223/24
 2228/8 2228/22
 2232/18 2233/7
 2233/25 2234/14
 2236/22 2236/22
 2237/7 2237/23
 2237/25 2238/2
 2238/6 2238/7
 2238/15 2239/12
 2241/6 2241/25
 2243/2 2243/17
 2244/12 2244/17
**All right [3]**
 2128/10 2243/2
 2244/12
**Allcott [4]**   2192/1
 2192/17 2192/19
 2193/4
**alleged [7]**   2207/9
 2221/6 2221/10
 2221/14 2225/17
 2225/21 2227/2
**allow [12]**   2144/4
 2146/9 2154/8 2180/3
 2182/1 2182/2
 2206/21 2230/18
 2236/5 2238/9
 2238/16 2241/15
**allowed [4]**   2179/14
 2179/17 2189/8
 2219/6
**allows [2]**   2240/10
 2240/11
**alluded [1]**   2154/14
**alone [2]**   2142/12
 2156/4
**along [2]**   2130/13
 2188/19
**already [6]**   2124/24
 2136/9 2160/25
 2177/15 2180/11
 2180/18
**also [21]**   2120/12
 2126/20 2139/8
 2141/9 2141/21
 2142/2 2146/4 2153/8
 2161/21 2164/20
 2167/8 2168/15
 2175/12 2178/4
 2179/17 2188/12
 2205/9 2227/19
 2234/25 2236/10
 2243/17
**alternative [4]**
 2132/20 2172/2
 2222/4 2223/11
**alternatives [1]**
 2123/8
**always [1]**   2221/17
**am [4]**   2167/22
 2199/19 2204/12
 2230/11
**Amazon [1]**   2160/18
**amended [1]**   2244/4
**AMERICA [2]**   2118/3

 2122/7
**AMIT [1]**   2118/9
**among [5]**   2127/3
 2141/6 2218/1
 2218/11 2219/16
**amount [2]**   2124/17
 2215/16
**amplified [2]**   2135/4
 2137/15
**amplifies [1]**
 2194/17
**analysis [22]**
 2129/13 2132/11
 2133/22 2148/22
 2149/8 2149/9
 2193/19 2203/21
 2207/24 2210/21
 2211/6 2220/14
 2225/8 2226/4
 2226/15 2227/11
 2227/14 2227/22
 2228/1 2232/9
 2232/17 2233/21
**Android [28]**   2129/9
 2142/18 2144/6
 2154/20 2154/22
 2155/18 2155/20
 2156/10 2157/5
 2172/14 2175/9
 2177/6 2177/10
 2177/14 2177/25
 2178/2 2178/11
 2178/15 2178/16
 2178/16 2180/14
 2200/21 2201/3
 2203/23 2208/1
 2208/20 2209/22
 2215/14
**animation [1]**   2194/6
**annually [1]**   2137/4
**another [16]**   2137/23
 2143/9 2143/9
 2146/20 2149/16
 2165/22 2168/7
 2169/10 2182/12
 2186/24 2212/23
 2216/1 2216/4 2223/2
 2226/20 2233/15
**answer [5]**   2144/9
 2159/3 2216/5
 2233/23 2234/16
**answering [2]**   2145/9
 2200/5
**anti [2]**   2133/5
 2176/1
**anti-competitive [2]**
 2133/5 2176/1
**anticompetitive [17]**
 2133/6 2133/16
 2134/8 2134/10
 2134/13 2134/16
 2136/16 2136/24
 2137/19 2207/11
 2207/25 2209/8
 2209/16 2209/19

 2209/24 2230/21
 2233/2
**antitrust [5]**   2119/3
 2119/9 2120/4
 2134/18 2206/17
**any [100]**   2122/19
 2123/14 2123/17
 2124/11 2124/18
 2127/4 2127/5
 2133/12 2134/9
 2152/13 2155/23
 2156/16 2158/16
 2159/10 2160/11
 2161/14 2163/10
 2165/12 2166/12
 2166/13 2166/21
 2167/17 2184/15
 2184/16 2184/16
 2184/17 2185/7
 2188/2 2189/9
 2190/18 2194/19
 2195/12 2198/21
 2199/17 2199/20
 2200/8 2200/15
 2201/12 2201/21
 2202/5 2202/13
 2203/21 2204/4
 2204/5 2204/6
 2204/14 2204/15
 2205/22 2206/7
 2210/21 2210/21
 2210/22 2211/6
 2211/8 2211/13
 2211/23 2212/2
 2212/8 2212/8
 2214/13 2215/3
 2215/4 2215/7 2215/7
 2215/18 2215/24
 2216/6 2216/7 2217/5
 2217/5 2217/25
 2218/21 2221/10
 2221/14 2222/11
 2223/17 2225/7
 2225/18 2225/22
 2226/4 2226/5
 2226/15 2227/3
 2227/11 2227/22
 2228/18 2229/22
 2232/9 2232/17
 2232/18 2232/19
 2233/10 2233/21
 2234/16 2237/21
 2239/22 2240/5
 2240/6 2241/9
 2241/24
**anybody [2]**   2122/20
 2242/17
**anyone [6]**   2122/19
 2195/19 2203/23
 2220/16 2222/6
 2242/12
**anything [7]**   2123/25
 2157/17 2176/18
 2229/18 2230/7
 2243/22 2244/12

**A**

**anywhere [3]**   2176/2 2215/17 2215/18
**app [5]**   2158/15 2158/15 2159/24 2159/24 2160/3
**appear [1]**   2150/23
**APPEARANCES [2]**   2118/11 2119/12
**Apple [49]**   2141/15 2142/18 2143/5 2143/7 2143/8 2143/11 2143/12 2144/5 2144/5 2144/18 2149/10 2156/9 2157/4 2157/18 2157/20 2157/21 2157/22 2157/23 2157/24 2180/7 2180/8 2180/8 2181/17 2182/2 2182/3 2182/3 2182/10 2182/10 2182/12 2183/17 2188/12 2188/13 2188/14 2190/1 2203/23 2205/1 2205/5 2205/6 2210/23 2218/12 2218/17 2218/22 2218/22 2218/25 2219/9 2222/12 2222/13 2222/17 2223/22
**Apple's [3]**   2144/14 2222/9 2222/10
**Apple-sponsoring [1]**   2188/14
**application [1]**   2215/17
**applied [1]**   2202/17
**apply [1]**   2199/24
**applying [3]**   2139/25 2140/2 2143/18
**appreciate [1]**   2243/13
**approach [3]**   2128/16 2199/2 2212/15
**approaching [1]**   2195/16
**appropriate [1]**   2243/21
**appropriately [1]**   2235/9
**appropriateness [1]**   2207/1
**apps [10]**   2170/10 2170/13 2170/15 2170/16 2170/22 2171/5 2171/7 2171/13 2171/15 2172/22
**April [2]**   2118/5 2245/7
**architect [1]**

**are [98]**   2130/10 2130/24 2131/2 2131/4 2131/14 2133/2 2134/18 2135/3 2135/5 2135/24 2138/11 2140/25 2144/25 2145/8 2145/12 2146/14 2148/16 2150/16 2152/18 2152/24 2153/2 2155/3 2156/16 2158/9 2159/21 2160/17 2161/8 2161/14 2163/9 2163/19 2164/9 2165/12 2166/1 2166/10 2166/17 2166/24 2167/16 2167/21 2169/5 2169/20 2169/21 2170/10 2170/13 2170/22 2171/5 2171/13 2172/1 2172/22 2173/12 2173/16 2173/17 2173/18 2174/8 2176/9 2177/13 2178/4 2178/7 2179/19 2179/23 2181/22 2182/20 2183/3 2183/8 2184/4 2184/13 2185/20 2185/25 2187/13 2188/5 2188/9 2189/9 2189/12 2191/16 2191/22 2192/3 2193/24 2198/20 2203/6 2205/25 2206/6 2206/8 2210/13 2211/19 2213/23 2216/6 2217/13 2219/9 2219/18 2220/6 2221/24 2224/7 2228/8 2229/10 2238/1 2239/13 2239/18 2239/25 2241/23
**area [2]**   2236/2 2236/12
**areas [1]**   2127/5
**arguably [1]**   2185/20
**argue [3]**   2185/22 2233/13 2241/4
**argued [1]**   2123/12
**argument [1]**   2243/10
**argumentative [1]**   2224/10
**arguments [1]**   2124/2
**arise [1]**   2165/23
**Armed [1]**   2135/14
**around [5]**   2164/19 2192/5 2196/19

2198/15   2199/7 2224/6

**arrangements [2]**   2180/1 2181/5
**arrived [1]**   2139/15
**articles [2]**   2127/4 2127/8
**as [153]**
**as opposed [4]**   2133/11 2134/25 2207/20 2228/23
**as part [1]**   2241/9
**as well [1]**   2127/9
**as you've [1]**   2163/9
**aside [1]**   2155/22
**ask [12]**   2155/11 2158/24 2159/1 2177/3 2185/13 2195/18 2219/20 2238/12 2241/1 2242/11 2242/12 2243/5
**asked [7]**   2128/24 2129/1 2158/21 2162/1 2180/13 2214/25 2223/23
**asking [8]**   2152/23 2177/9 2177/13 2178/5 2187/5 2209/12 2232/15 2233/9
**aspect [1]**   2156/24
**aspects [4]**   2145/8 2152/19 2156/16 2238/10
**assess [9]**   2207/1 2207/10 2224/14 2226/5 2229/18 2232/9 2233/5 2233/21 2236/5
**assessed [1]**   2238/14
**assessing [2]**   2207/15 2230/23
**assessment [4]**   2167/2 2205/22 2229/21 2240/5
**asset [1]**   2152/9
**assignment [2]**   2128/20 2130/2
**assisted [1]**   2198/3
**associated [2]**   2142/10 2232/6
**assume [8]**   2143/12 2143/21 2149/20 2150/17 2162/9 2184/9 2184/11 2231/11
**assumed [7]**   2139/3 2139/4 2139/8 2144/17 2162/2 2214/16 2214/18
**assuming [2]**   2171/1 2216/6
**assumption [4]**   2143/13 2145/16 2214/12 2214/23

**assumptions [9]**   2130/14 2139/13 2140/5 2145/18 2146/16 2151/17 2152/16 2154/16 2213/19
**attempt [1]**   2182/22
**attempting [1]**   2204/14
**attempts [1]**   2174/7
**attend [1]**   2123/5
**attributable [2]**   2142/7 2228/7
**attributed [1]**   2227/24
**attributes [1]**   2232/6
**author [2]**   2192/1 2192/2
**authored [1]**   2191/25
**authors [3]**   2191/20 2191/24 2192/3
**available [5]**   2157/25 2183/9 2192/9 2192/15 2237/3
**Avenue [2]**   2120/9 2120/16
**avenues [1]**   2157/1
**avoid [3]**   2123/14 2147/2 2243/10
**aware [1]**   2211/12
**away [10]**   2137/11 2141/10 2143/14 2184/16 2208/17 2218/5 2221/21 2221/25 2225/16 2225/20

**B**

**back [12]**   2124/1 2143/24 2144/2 2148/4 2149/9 2151/2 2151/23 2161/24 2186/6 2222/7 2233/1 2243/10
**background [2]**   2125/23 2196/14
**backwards [1]**   2184/2
**bad [1]**   2124/14
**Baker [1]**   2198/3
**ban [5]**   2141/2 2190/19 2214/19 2215/22 2217/25
**bans [19]**   2138/14 2140/21 2140/23 2140/24 2141/5 2141/9 2141/13 2141/24 2142/7 2142/10 2142/12 2168/18 2168/22 2179/2 2179/6 2189/15 2190/7 2215/19 2218/10
**bargaining [1]**

**B**

**bargaining... [1]**
 2127/15
**Barrett [1]** 2120/15
**barrier [11]** 2137/22
 2137/23 2137/23
 2137/25 2138/1
 2163/2 2163/4 2194/7
 2194/15 2226/22
 2227/1
**barriers [21]** 2135/2
 2135/3 2135/5 2135/8
 2135/11 2135/24
 2138/2 2154/3
 2173/10 2173/11
 2193/19 2193/24
 2193/24 2194/2
 2194/4 2207/20
 2224/17 2225/5
 2226/20 2229/10
 2231/16
**based [4]** 2139/9
 2152/19 2171/9
 2233/22
**bases [1]** 2215/18
**basis [1]** 2123/13
**be [175]**
**became [2]** 2225/6
 2225/13
**because [49]** 2134/13
 2136/2 2137/14
 2137/24 2139/6
 2141/11 2143/7
 2145/1 2145/13
 2145/22 2146/6
 2147/8 2152/13
 2157/15 2161/3
 2161/9 2167/4 2167/6
 2167/9 2168/3 2169/2
 2169/17 2171/7
 2174/14 2177/8
 2178/15 2179/24
 2180/3 2181/9
 2183/25 2184/25
 2185/21 2186/9
 2187/16 2187/24
 2188/7 2190/15
 2193/24 2194/10
 2207/21 2214/18
 2214/25 2218/12
 2219/3 2222/12
 2226/19 2239/7
 2240/10 2243/22
**become [2]** 2124/12
 2183/9
**been [41]** 2124/8
 2124/16 2127/23
 2128/1 2128/3
 2131/20 2133/5
 2139/10 2153/12
 2154/5 2154/9
 2154/25 2158/1
 2160/25 2161/12
 2161/12 2164/20
 2174/6 2175/13

2175/14 2176/1
 2176/3 2176/8 2192/5
 2197/5 2197/23
 2206/22 2207/8
 2207/19 2208/8
 2208/14 2209/5
 2209/5 2210/3
 2210/17 2211/24
 2212/3 2220/12
 2220/20 2224/22
 2233/1
**before [20]** 2118/9
 2126/15 2127/21
 2137/17 2138/16
 2142/22 2148/20
 2166/19 2167/5
 2167/7 2177/3
 2197/15 2203/17
 2221/6 2221/13
 2224/19 2225/17
 2225/21 2227/2
 2230/22
**began [1]** 2221/7
**begin [1]** 2125/2
**beginning [3]** 2175/7
 2225/23 2227/6
**behalf [2]** 2123/3
 2128/1
**behavior [1]** 2207/15
**behaviors [1]**
 2140/25
**behind [2]** 2214/12
 2217/15
**being [13]** 2123/12
 2123/15 2143/15
 2148/23 2149/11
 2154/4 2159/14
 2181/9 2191/7
 2208/12 2217/25
 2222/12 2232/25
**belief [1]** 2233/5
**believe [16]** 2144/17
 2151/2 2155/13
 2166/25 2176/14
 2179/22 2180/1
 2192/12 2195/7
 2201/1 2202/22
 2205/19 2211/15
 2220/19 2221/12
 2231/6
**beneficiaries [1]**
 2132/2
**benefit [3]** 2133/7
 2135/18 2209/11
**benefits [9]** 2130/14
 2165/10 2165/11
 2166/5 2168/16
 2188/20 2191/15
 2191/17 2217/25
**best [8]** 2135/24
 2136/1 2144/16
 2145/1 2147/8
 2176/24 2190/4
 2200/5
**better [20]** 2143/15

2145/22 2146/6
 2146/9 2146/10
 2168/3 2169/6 2169/7
 2169/8 2176/25
 2180/24 2183/18
 2184/25 2186/7
 2186/8 2188/10
 2195/8 2210/14
 2219/7 2242/22
**between [15]** 2129/16
 2134/7 2147/18
 2163/5 2176/2 2177/5
 2188/7 2194/20
 2216/12 2228/3
 2228/12 2228/14
 2230/10 2231/4
 2242/24
**beyond [8]** 2134/13
 2155/13 2175/10
 2178/11 2202/24
 2206/5 2206/7
 2241/17
**bid [3]** 2216/18
 2216/22 2217/6
**big [1]** 2180/4
**bigger [1]** 2182/9
**biggest [1]** 2218/13
**billions [1]** 2137/4
**Bing [8]** 2150/7
 2160/14 2211/7
 2218/23 2219/10
 2219/12 2227/15
 2227/17
**Bing's [1]** 2226/15
**bit [5]** 2169/11
 2174/2 2196/13
 2202/9 2224/11
**blank [1]** 2244/5
**blocked [1]** 2224/3
**Bloomberg [1]**
 2123/16
**blue [3]** 2153/15
 2153/19 2153/20
**bookend [1]** 2145/15
**bookends [4]** 2145/11
 2145/18 2216/12
 2216/15
**Booking [1]** 2160/18
**books [2]** 2127/5
 2127/9
**both [9]** 2127/7
 2128/3 2131/23
 2133/14 2138/2
 2163/5 2229/13
 2229/13 2234/19
**bottom [2]** 2163/23
 2237/2
**bounty [1]** 2215/16
**box [2]** 2189/4
 2238/4
**brand [13]** 2135/8
 2135/19 2157/15
 2194/20 2194/23
 2225/15 2225/16
 2225/20 2225/23

2226/5 2226/9
 2226/13 2226/15
**Brandeis [1]** 2126/20
**breadth [5]** 2193/9
 2205/24 2205/24
 2206/12 2207/2
**break [5]** 2195/17
 2195/19 2242/7
 2242/9 2242/12
**breaks [1]** 2142/14
**brief [2]** 2124/6
 2242/15
**briefly [5]** 2167/23
 2178/19 2193/3
 2193/20 2244/1
**broad [4]** 2133/3
 2175/2 2188/3
 2189/14
**broadening [1]**
 2175/11
**broader [1]** 2161/18
**broadly [1]** 2178/11
**Broadway [1]** 2120/5
**broke [1]** 2130/4
**browser [17]** 2153/6
 2153/13 2154/4
 2158/16 2159/14
 2159/15 2179/18
 2181/4 2181/18
 2181/24 2183/11
 2208/20 2209/21
 2211/8 2221/25
 2223/24 2226/11
**browsers [13]**
 2142/19 2144/6
 2148/14 2148/16
 2152/24 2153/2
 2153/7 2153/11
 2154/6 2157/25
 2179/4 2181/16
 2208/1
**browsing [1]** 2222/17
**Bruce [1]** 2120/2
**Bryan [2]** 2120/12
 2122/24
**build [4]** 2135/19
 2136/11 2164/19
 2194/23
**built [2]** 2232/11
 2233/22
**bullet [7]** 2132/3
 2160/10 2160/22
 2180/22 2181/11
 2181/11 2205/10
**bullets [1]** 2142/16
**business [3]** 2142/1
 2225/3 2225/9
**businesses [3]**
 2183/23 2224/22
 2224/23

---

**C**

**C-h-i-p-t-y [1]**
 2125/21
**calculated [5]**

**C**

**calculated... [5]**
2138/18 2139/12
2144/8 2151/16
2154/16
**calculating [1]**
2162/6
**calculation [4]**
2138/23 2140/14
2143/6 2216/10
**calculations [5]**
2145/11 2149/20
2162/9 2214/17
2215/11
**call [3]**  2125/5
2144/14 2206/4
**called [4]**  2126/15
2165/15 2174/20
2201/10
**calling [1]**  2122/5
**came [3]**  2153/5
2153/9 2222/5
**camera [1]**  2124/6
**Cameron [2]**  2119/8
2125/4
**Cameron Gower [1]**
2125/4
**Camilo [1]**  2192/2
**can [77]**  2124/4
2124/5 2124/23
2124/24 2129/15
2131/9 2132/3
2134/17 2136/4
2136/19 2137/17
2138/22 2139/15
2142/13 2142/22
2144/12 2145/25
2146/2 2146/20
2146/20 2151/21
2155/5 2155/8
2155/13 2158/7
2158/9 2159/16
2159/18 2162/6
2162/13 2166/12
2166/21 2167/23
2171/16 2171/20
2177/3 2178/19
2179/1 2180/25
2181/1 2183/5
2183/18 2185/1
2185/13 2186/18
2187/1 2188/10
2188/22 2189/9
2191/19 2191/22
2192/16 2193/3
2193/20 2199/16
2200/3 2203/4
2215/18 2217/23
2220/3 2221/24
2222/6 2223/20
2224/13 2228/25
2231/17 2234/19
2234/24 2235/18
2237/1 2239/2 2239/2
2240/14 2242/14

2242/17 2242/20
2243/8
**can we [1]**  2223/20
**can't [25]**  2137/25
2144/18 2158/7
2186/12 2187/1
2187/7 2209/2 2209/3
2217/9 2217/19
2217/21 2221/3
2222/6 2223/19
2228/15 2232/8
2233/23 2234/16
2235/12 2235/14
2235/23 2237/24
2238/1 2241/21
2242/5
**cannot [7]**  2134/14
2166/16 2206/5
2215/3 2215/6 2217/4
2236/1
**capabilities [12]**
2135/16 2161/18
2163/18 2164/19
2170/22 2170/23
2176/9 2190/10
2206/14 2227/21
2230/19 2239/18
**capable [4]**  2129/4
2146/14 2179/19
2179/21
**capital [8]**  2135/8
2135/22 2195/2
2224/19 2224/23
2225/2 2225/8
2225/12
**care [1]**  2242/17
**career [2]**  2126/10
2126/18
**Carr [1]**  2120/4
**carried [1]**  2123/15
**carrier [2]**  2209/22
2210/23
**carriers [5]**  2144/13
2144/18 2150/5
2179/15 2208/21
**carry [2]**  2132/9
2216/13
**carve [5]**  2182/16
2182/17 2182/18
2182/20 2182/23
**carve-out [4]**
2182/16 2182/17
2182/18 2182/23
**carve-outs [1]**
2182/20
**carving [1]**  2211/4
**case [65]**  2122/15
2123/12 2123/20
2133/21 2135/1
2136/1 2136/13
2136/22 2137/2
2139/6 2142/1 2161/9
2164/21 2166/1
2166/24 2170/14
2170/21 2172/23

2173/11 2174/8
2193/23 2197/11
2197/16 2198/17
2200/23 2202/14
2203/21 2204/4
2204/10 2204/19
2205/25 2206/6
2206/17 2207/13
2207/22 2207/24
2210/16 2210/22
2211/6 2211/23
2212/2 2212/7
2213/10 2215/23
2218/12 2218/16
2218/21 2224/20
2225/18 2226/4
2227/11 2227/22
2228/18 2230/14
2231/2 2231/10
2232/25 2233/10
2233/21 2233/24
2235/5 2236/4
2236/13 2237/19
2238/24
**cases [2]**  2133/14
2211/15
**catch [2]**  2146/6
2217/22
**cause [4]**  2124/12
2141/10 2167/20
2218/5
**caused [1]**  2134/4
**Center [1]**  2120/5
**certain [7]**  2182/15
2182/15 2205/14
2211/4 2211/4
2215/16 2222/5
**certainly [9]**
2124/21 2157/4
2158/14 2217/19
2222/14 2225/24
2227/5 2227/5
2228/17
**Certified [1]**
2120/14
**certify [1]**  2245/2
**CH [1]**  2120/15
**chair [1]**  2223/22
**challenge [4]**  2137/3
2137/6 2137/14
2185/6
**challenged [2]**
2211/25 2212/4
**challenges [4]**
2173/24 2175/17
2176/6 2186/5
**chance [17]**  2137/3
2141/14 2146/10
2147/16 2147/24
2169/12 2177/17
2177/18 2186/19
2190/8 2190/10
2190/12 2194/23
2195/8 2208/17
2217/22 2226/3

**chances [2]**  2184/4
2185/11
**change [9]**  2129/2
2130/25 2140/25
2156/4 2158/16
2177/20 2191/1
2191/12 2191/13
**changes [1]**  2141/2
**chapters [1]**  2127/9
**chart [13]**  2140/18
2150/13 2151/13
2154/23 2154/25
2155/6 2155/14
2156/17 2156/20
2159/6 2162/6 2163/9
2213/3
**chatbot [1]**  2161/22
**ChatGPT [1]**  2182/13
**Chicago [1]**  2119/5
**chicken [10]**  2136/3
2136/4 2136/12
2136/14 2136/22
2137/5 2137/15
2220/21 2220/24
2221/13
**chief [1]**  2124/7
**chip [1]**  2208/17
**chipped [2]**  2137/11
2221/25
**chipping [1]**  2221/21
**Chipty [24]**  2125/2
2125/5 2125/10
2125/13 2125/16
2125/20 2126/8
2128/6 2128/10
2128/13 2128/20
2152/23 2186/24
2193/3 2195/10
2195/18 2196/11
2199/4 2199/25
2212/18 2223/21
2229/4 2242/10
2242/16
**Chipty's [3]**  2195/13
2203/4 2217/23
**choice [47]**  2162/8
2175/3 2175/6 2175/9
2175/11 2177/6
2177/9 2177/13
2177/17 2177/22
2178/5 2178/14
2178/14 2178/20
2178/24 2179/9
2187/1 2187/7
2187/11 2187/12
2187/14 2187/15
2187/18 2187/22
2187/25 2188/3
2188/6 2188/12
2188/16 2188/18
2188/23 2189/3
2189/8 2189/10
2189/14 2189/18
2190/1 2190/4 2190/5
2190/7 2190/11

**C**

**choice... [6]**
2190/19 2191/2
2191/5 2191/8
2210/17 2210/20
**choices [3]** 2127/2
2210/15 2210/15
**choose [3]** 2168/6
2187/14 2189/23
**chose [1]** 2143/9
**Chrome [48]** 2131/20
2138/14 2142/20
2144/6 2144/7
2148/12 2151/2
2151/8 2151/9
2151/12 2151/16
2151/20 2152/4
2152/5 2152/9
2152/12 2153/7
2153/9 2153/10
2153/12 2153/15
2153/17 2153/19
2153/24 2154/2
2154/9 2154/13
2154/17 2154/18
2154/19 2154/20
2154/21 2155/5
2155/16 2155/17
2155/17 2155/18
2155/23 2156/12
2157/5 2159/2 2159/6
2159/9 2159/12
2178/20 2178/21
2178/24 2178/25
**chunk [1]** 2218/13
**circumstance [1]**
2215/8
**circumvention [6]**
2170/17 2171/19
2172/5 2172/6
2172/20 2172/24
**cited [1]** 2239/10
**Civil [1]** 2122/6
**clarity [2]** 2158/21
2162/5
**clawback [5]** 2139/10
2143/18 2143/20
2143/22 2213/19
**clawed [1]** 2143/24
**clear [4]** 2153/2
2164/5 2214/24
2216/25
**clearly [1]** 2163/3
**click [2]** 2206/3
2206/4
**close [5]** 2163/5
2165/7 2228/2
2228/12 2230/19
**closed [1]** 2124/16
**closure [5]** 2123/7
2123/8 2123/9
2123/17 2123/18
**co [2]** 2120/6
2126/13
**co-head [1]** 2126/13

**coag.gov [1]** 2120/7
**coattails [1]**
2165/21
**coin [1]** 2166/11
**collected [1]** 2164/6
**collecting [1]**
2163/15
**collectively [3]**
2135/25 2136/2
2142/5
**college [1]** 2126/5
**Colorado [8]** 2120/2
2120/3 2120/4
2197/24 2198/2
2198/6 2198/16
2202/2
**COLUMBIA [1]** 2118/1
**combination [2]**
2179/24 2190/5
**combined [1]** 2157/11
**come [22]** 2122/21
2138/11 2140/22
2142/23 2144/6
2147/5 2148/4 2149/9
2155/9 2155/23
2156/14 2168/17
2203/1 2205/18
2215/24 2220/8
2221/20 2222/8
2223/14 2223/15
2223/18 2240/15
**coming [1]** 2224/3
**commitments [1]**
2184/13
**common [1]** 2160/17
**company [2]** 2146/20
2176/12
**compare [1]** 2194/4
**compared [4]** 2129/3
2144/17 2179/19
2226/17
**comparing [1]**
2193/16
**comparison [3]**
2195/4 2205/22
2206/2
**compelling [2]**
2123/7 2124/15
**compensation [2]**
2160/9 2216/13
**compete [31]** 2131/19
2131/23 2131/25
2132/7 2138/19
2140/10 2142/6
2145/25 2146/3
2146/7 2147/11
2154/6 2156/21
2158/22 2159/10
2159/18 2169/25
2170/7 2170/23
2171/17 2181/9
2186/15 2186/16
2186/20 2206/13
2208/12 2217/14
2220/18 2227/12

**competing [3]** 2167/9
2219/10 2219/11
**competition [61]**
2127/18 2129/4
2129/22 2131/5
2132/2 2133/4 2133/9
2133/18 2134/17
2135/3 2135/5 2141/1
2141/3 2141/6 2141/7
2141/17 2146/24
2147/13 2147/18
2148/1 2153/25
2161/23 2162/24
2168/16 2169/22
2170/11 2173/5
2173/7 2175/2
2176/21 2179/20
2181/8 2183/12
2183/16 2185/16
2185/23 2188/20
2190/24 2191/15
2191/17 2193/25
2195/6 2195/8
2206/15 2206/18
2206/21 2206/22
2207/2 2207/3 2207/8
2207/14 2218/1
2218/11 2218/17
2219/8 2219/16
2229/11 2231/15
2232/25 2233/6
2235/11
**competitive [30]**
2130/25 2131/10
2131/15 2132/5
2133/5 2133/15
2134/22 2134/24
2140/12 2141/21
2161/10 2161/12
2161/15 2163/25
2165/10 2167/15
2170/4 2176/1
2193/23 2207/15
2208/8 2208/11
2209/4 2209/6
2209/18 2211/10
2212/11 2219/10
2220/19 2231/9
**competitor [7]**
2147/9 2147/9
2169/18 2169/18
2231/25 2237/5
2237/21
**competitor's [2]**
2241/10 2241/25
**competitors [5]**
2148/1 2162/18
2171/14 2229/12
2233/7
**completing [1]**
2130/1
**complex [3]** 2152/1
2204/8 2207/22
**component [2]** 2155/5

**components [1]**
2235/19
**comprehensive [1]**
2162/20
**comprehensively [1]**
2219/14
**computer [1]** 2120/18
**computer-aided [1]**
2120/18
**concept [2]** 2150/4
2188/24
**concern [10]** 2146/4
2165/18 2166/14
2168/6 2168/9
2169/10 2169/15
2169/17 2182/5
2183/12
**concerning [1]**
2192/18
**concerns [4]** 2124/10
2147/7 2166/2
2167/17
**concluded [3]**
2140/24 2141/4
2141/9
**conclusion [1]**
2131/9
**conclusions [6]**
2130/20 2130/23
2131/7 2140/22
2215/24 2229/22
**conditions [2]**
2146/25 2241/10
**conduct [40]** 2133/5
2133/6 2133/8
2133/16 2133/24
2134/4 2134/8
2134/10 2134/13
2134/17 2135/4
2135/10 2136/16
2136/24 2137/12
2137/15 2137/19
2137/21 2173/23
2175/21 2193/25
2206/23 2207/9
2207/10 2207/19
2207/23 2207/25
2209/11 2209/19
2211/25 2212/4
2221/7 2221/14
2224/20 2225/18
2225/22 2225/24
2227/3 2229/15
2233/2
**confidence [1]**
2234/17
**confidential [1]**
2122/14
**configurations [1]**
2222/4
**confirmation [1]**
2199/16
**conjunction [1]**
2194/16

**C**

CONNOLLY [1]    2120/9
consent [1]    2244/7
consider [5]    2155/24
 2189/25 2190/6
 2202/13 2239/20
consideration [5]
 2132/19 2166/20
 2188/14 2190/14
 2203/7
considerations [1]
 2189/12
considered [7]
 2144/12 2144/20
 2145/4 2190/23
 2190/25 2211/4
 2222/12
consisting [1]
 2233/18
Constitution [1]
 2120/16
constitutional [2]
 2123/4 2123/7
construct [1]    2208/4
consultant [1]
 2126/7
consulting [7]
 2126/11 2196/22
 2197/6 2197/8
 2197/23 2198/1
 2198/2
consumer [9]    2120/3
 2147/22 2160/15
 2161/4 2164/12
 2186/14 2191/7
 2191/14 2226/9
consumer-facing [3]
 2147/22 2164/12
 2186/14
consumers [9]    2127/3
 2146/1 2177/17
 2182/21 2183/1
 2183/9 2210/5
 2210/13 2210/14
consuming [1]    2165/9
contain [1]    2243/7
contemplate [6]
 2148/22 2149/5
 2149/6 2152/4
 2177/21 2177/22
contemplating [1]
 2150/9
content [3]    2237/8
 2237/9 2237/12
contest [4]    2188/7
 2188/11 2219/2
 2219/3
context [10]    2129/1
 2155/14 2162/5
 2163/21 2165/20
 2165/24 2166/18
 2167/24 2178/20
 2179/2
contingent [3]
 2129/8 2200/19

2200/20
continue [3]    2133/7
 2150/25 2219/6
CONTINUED [1]    2120/1
continuing [1]
 2180/23
contract [1]    2223/18
contracts [3]
 2222/22 2223/4
 2224/2
contribute [2]
 2154/17 2162/23
contributed [3]
 2127/5 2127/9 2204/2
contribution [1]
 2157/6
contributors [1]
 2152/19
conversation [1]
 2243/6
conversations [1]
 2198/11
convince [1]    2132/9
copy [4]    2186/17
 2186/17 2199/12
 2229/5
cornerstone [1]
 2161/11
corporation [1]
 2223/22
correct [86]    2150/12
 2177/11 2178/12
 2178/12 2196/23
 2197/8 2198/18
 2198/19 2198/22
 2198/23 2199/19
 2200/10 2200/17
 2200/18 2201/14
 2201/23 2201/24
 2202/14 2202/15
 2202/18 2204/6
 2204/7 2204/16
 2205/7 2206/8
 2206/23 2207/4
 2207/17 2208/2
 2208/3 2208/6
 2208/13 2208/21
 2209/2 2209/8
 2209/24 2210/6
 2210/13 2211/9
 2212/4 2213/5
 2213/11 2213/12
 2213/18 2214/14
 2214/15 2214/20
 2214/21 2215/4
 2215/8 2215/9
 2215/20 2216/23
 2217/7 2219/4
 2220/22 2221/2
 2221/14 2223/7
 2223/7 2224/23
 2225/3 2225/10
 2225/18 2225/22
 2226/6 2226/11
 2227/13 2227/24

2228/4 2228/9
 2228/15 2228/19
 2230/11 2232/1
 2232/7 2232/20
 2234/20 2235/1
 2235/24 2236/1
 2236/6 2236/23
 2237/21 2244/10
 2245/3
correctly [1]
 2230/11
cost [1]    2224/23
costs [8]    2135/9
 2135/22 2195/2
 2201/18 2224/19
 2225/2 2225/8
 2225/12
could [70]    2124/9
 2124/12 2128/23
 2130/22 2131/13
 2133/1 2133/19
 2139/7 2139/8
 2139/18 2141/11
 2149/3 2149/16
 2149/17 2149/18
 2150/9 2152/12
 2152/24 2154/1
 2154/21 2155/11
 2155/23 2157/14
 2158/11 2158/14
 2158/15 2158/16
 2158/21 2159/4
 2159/23 2159/24
 2159/25 2160/4
 2160/6 2160/23
 2162/4 2164/22
 2165/21 2166/9
 2168/21 2169/23
 2169/24 2170/12
 2172/8 2172/9
 2172/12 2172/19
 2176/24 2178/3
 2181/7 2181/21
 2182/3 2184/12
 2184/15 2186/16
 2187/11 2188/17
 2189/2 2189/11
 2189/23 2190/11
 2209/10 2219/20
 2221/25 2225/19
 2236/25 2237/16
 2238/12 2240/20
 2244/5
couldn't [7]    2139/6
 2141/12 2143/7
 2149/21 2150/1
 2158/22 2187/11
counsel [5]    2123/22
 2123/23 2124/17
 2124/19 2213/4
couple [4]    2180/21
 2182/8 2196/14
 2198/24
coupled [1]    2219/5
course [6]    2160/6

2168/15 2180/16
 2212/16 2218/20
 2220/18
court [38]    2118/1
 2120/13 2120/15
 2123/6 2123/14
 2123/14 2125/22
 2128/10 2133/21
 2134/11 2135/2
 2135/7 2147/14
 2152/17 2156/17
 2157/13 2161/19
 2161/20 2162/1
 2164/23 2166/13
 2166/19 2167/24
 2175/25 2178/3
 2190/16 2195/20
 2196/1 2202/13
 2203/7 2214/25
 2216/11 2231/6
 2231/8 2231/11
 2231/13 2231/14
 2244/17
Court's [12]    2128/25
 2130/6 2133/20
 2134/5 2174/5
 2197/19 2204/2
 2207/13 2211/15
 2219/1 2231/3
 2231/13
covered [2]    2157/8
 2180/20
crafted [1]    2235/10
crawling [1]    2237/12
create [11]    2124/10
 2136/7 2141/5
 2141/20 2147/22
 2164/12 2169/22
 2174/17 2180/2
 2188/7 2218/1
created [2]    2140/22
 2234/1
creates [1]    2188/11
creating [4]    2146/25
 2186/17 2218/10
 2219/8
creative [1]    2124/14
criticism [3]
 2167/21 2167/23
 2168/10
CROSS [2]    2121/4
 2196/9
CROSS-EXAMINATION [1]
 2196/9
CRR [2]    2245/2
 2245/8
current [4]    2145/12
 2145/13 2157/8
 2163/25
currently [1]    2126/6
customers [1]    2145/2
cut [2]    2124/19
 2182/24
CV [1]    2118/4
cyberattacks [1]

**C**

**cyberattacks... [1]**
2124/13
**cybersecurity [1]**
2124/7

**D**

**D.C [4]**   2118/5
2119/10 2120/10
2120/16
**Dahlquist [2]**   2119/2
2122/8
**dampen [1]**   2166/4
**dampening [2]**
2166/20 2167/17
**dark [2]**   2153/15
2153/19
**data [104]**   2129/19
2129/23 2131/22
2132/16 2138/7
2140/14 2144/4
2146/8 2147/15
2148/8 2162/11
2162/13 2162/19
2162/22 2162/23
2163/1 2163/11
2163/14 2163/15
2163/17 2163/21
2163/21 2163/23
2164/4 2164/6 2164/7
2164/14 2164/18
2164/19 2164/20
2164/25 2165/1
2165/3 2165/8
2165/11 2165/12
2165/14 2165/24
2166/15 2167/5
2168/13 2168/18
2168/23 2169/4
2169/8 2170/3
2171/12 2171/15
2173/25 2175/3
2175/12 2176/6
2176/9 2176/13
2176/15 2180/16
2183/22 2185/14
2186/2 2186/8
2190/15 2194/13
2194/19 2194/21
2202/12 2205/12
2205/17 2205/23
2205/24 2205/25
2206/4 2206/6 2206/7
2206/10 2206/12
2206/13 2219/14
2227/8 2228/22
2228/23 2229/13
2229/19 2230/6
2230/13 2230/15
2230/17 2230/23
2233/22 2234/5
2234/6 2234/14
2234/18 2234/24
2235/6 2235/8
2235/10 2235/12

2235/15 2235/24
2236/1 2237/3 2237/6
2240/14 2242/2
**data-sharing [8]**
2129/19 2131/22
2138/7 2162/23
2163/1 2163/11
2164/7 2165/1
**database [1]**   2237/11
**databases [1]**
2233/18
**date [3]**   2205/21
2240/7 2245/7
**David [2]**   2119/2
2122/8
**david.dahlquist [1]**
2119/6
**day [12]**   2118/7
2144/14 2144/16
2145/2 2145/21
2146/4 2146/5 2146/5
2146/12 2146/19
2147/24 2177/16
**day-one [3]**   2144/14
2146/12 2146/19
**de [3]**   2174/12
2174/14 2174/19
**de novo [3]**   2174/12
2174/14 2174/19
**deal [3]**   2155/24
2187/24 2200/13
**dealing [1]**   2201/16
**deals [2]**   2199/18
2201/9
**decide [2]**   2145/21
2190/12
**deciding [1]**   2198/7
**decisions [1]**   2241/3
**deck [3]**   2128/13
2195/13 2239/5
**dedicated [1]**   2148/7
**default [70]**   2131/17
2131/19 2132/5
2139/4 2139/7
2140/11 2141/6
2143/8 2143/10
2143/12 2143/17
2144/24 2149/4
2149/23 2149/24
2150/2 2150/3
2150/17 2150/22
2152/6 2153/9 2154/4
2154/9 2157/9
2157/21 2158/17
2159/15 2160/9
2167/10 2175/23
2177/16 2179/15
2179/18 2181/17
2181/23 2182/3
2182/14 2183/17
2184/12 2184/14
2184/15 2184/18
2184/23 2185/12
2187/8 2189/4 2189/4
2190/13 2191/1

2204/15 2205/2
2209/23 2210/2
2210/4 2210/6 2210/8
2210/11 2210/24
2211/8 2215/3
2215/11 2216/3
2217/6 2218/18
2218/23 2219/1
2219/11 2222/17
2226/10 2226/14
**default's [1]**   2191/7
**defaults [63]**   2132/8
2139/5 2141/10
2141/11 2141/16
2141/18 2143/14
2144/22 2145/17
2146/3 2148/23
2149/2 2149/7
2149/11 2149/21
2150/10 2154/6
2157/8 2157/15
2158/8 2158/20
2158/22 2162/3
2163/13 2163/19
2170/1 2177/7
2177/15 2179/5
2179/7 2180/3
2180/23 2181/2
2181/2 2181/6 2181/7
2181/10 2182/2
2183/20 2184/25
2185/3 2185/17
2185/23 2187/1
2187/12 2188/1
2188/19 2189/23
2211/5 2214/17
2215/22 2216/16
2216/19 2216/22
2217/5 2217/17
2218/2 2218/5
2218/11 2219/2
2219/16 2219/18
2221/21
**defendant [3]**   2118/7
2120/8 2122/9
**definitively [1]**
2235/23
**degree [2]**   2125/25
2126/4
**degrees [1]**   2166/17
**delay [1]**   2190/7
**delayed [2]**   2188/21
2191/2
**deliver [1]**   2145/1
**delta [1]**   2151/14
**demand [1]**   2161/4
**demonstrative [4]**
2195/14 2199/4
2244/6 2244/10
**demonstratives [1]**
2244/3
**Denver [1]**   2120/6
**DEPARTMENT [4]**
2119/3 2119/8 2120/3
2128/4

**depend [4]**   2140/12
2173/9 2241/13
2241/17
**dependent [4]**   2167/5
2228/23 2229/13
2229/20
**depending [2]**
2165/14 2170/25
**depict [1]**   2212/24
**depiction [1]**   2213/3
**deposition [1]**
2201/1
**deprive [1]**   2229/11
**deprived [3]**   2133/25
2135/13 2163/7
**describe [8]**   2128/20
2136/3 2138/22
2162/13 2191/12
2213/13 2214/11
2242/5
**described [6]**
2139/10 2140/1
2144/15 2165/1
2179/24 2196/13
**describing [1]**
2235/18
**design [3]**   2127/19
2134/17 2183/7
**desktop [3]**   2143/21
2144/5 2227/15
**destiny [1]**   2240/11
**detail [2]**   2131/7
2132/11
**details [3]**   2129/10
2129/16 2199/13
**deter [1]**   2133/6
**determination [6]**
2230/24 2231/6
2231/12 2231/14
2232/13 2240/8
**determine [1]**   2173/6
**detract [2]**   2234/24
2234/25
**develop [5]**   2163/18
2170/4 2190/10
2206/14 2230/19
**developed [3]**   2223/4
2223/6 2223/8
**developer [1]**
2209/21
**developers [1]**
2208/20
**developing [4]**
2170/22 2176/9
2227/20 2239/18
**development [1]**
2228/7
**device [9]**   2143/18
2152/13 2184/16
2208/20 2211/21
2215/4 2215/17
2215/19 2216/8
**devices [24]**   2139/22
2143/19 2143/21
2154/20 2155/18

**D**

**devices... [19]**
2157/22 2172/14
2177/6 2177/14
2177/20 2177/23
2178/2 2178/5 2178/8
2178/11 2178/16
2178/16 2179/3
2180/14 2181/19
2182/3 2182/15
2188/18 2211/4

**did [36]**   2123/25
2124/20 2130/1
2132/23 2133/17
2134/12 2140/22
2191/6 2191/18
2196/25 2197/3
2198/11 2198/12
2199/1 2200/15
2202/16 2203/24
2204/1 2204/20
2204/21 2205/13
2205/17 2206/2
2211/13 2217/12
2221/9 2221/12
2223/14 2223/25
2224/2 2226/15
2230/11 2231/3
2231/10 2236/13
2239/11

**did you [6]**   2133/17
2140/22 2203/24
2223/25 2231/10
2236/13

**didn't [15]**   2167/5
2167/7 2200/7 2201/6
2202/19 2202/23
2203/21 2204/1
2204/14 2210/15
2218/21 2223/12
2224/6 2236/5 2239/8

**difference [4]**
2133/13 2134/6
2151/15 2231/4

**different [30]**
2130/11 2130/12
2133/10 2143/1
2144/19 2152/19
2152/19 2157/1
2158/12 2161/6
2165/6 2175/17
2182/3 2182/8
2190/23 2190/25
2192/17 2194/2
2207/5 2208/8
2208/24 2209/1
2209/5 2211/8
2214/23 2220/20
2222/7 2224/3 2226/6
2242/7

**differentiate [3]**
2167/8 2167/13
2186/20

**Digital [1]**   2205/14
**diminished [2]**

2133/15 2135/22

**direct [6]**   2121/4
2125/14 2160/15
2187/16 2198/24
2207/6

**direction [1]**
2190/16

**directional [1]**
2231/8

**directly [6]**   2146/1
2149/18 2160/4
2163/2 2176/18
2194/14

**disclose [3]**   2200/2
2200/7 2200/15

**disclosed [13]**
2124/9 2124/23
2198/21 2199/17
2201/12 2201/21
2205/23 2206/1
2206/7 2229/19
2230/13 2234/7
2235/7

**disclosing [1]**
2234/24

**disclosure [4]**
2124/11 2228/22
2234/18 2238/7

**disclosures [2]**
2235/24 2236/2

**discourage [1]**
2188/13

**discuss [6]**   2131/7
2138/15 2140/19
2164/2 2195/18
2242/11

**discussed [5]**
2159/16 2165/10
2193/15 2193/18
2235/3

**discussing [4]**
2148/14 2153/22
2155/1 2169/12

**discussion [2]**
2222/14 2243/20

**display [1]**   2237/7
**disrupt [1]**   2145/22
**distribute [2]**
2172/8 2172/9

**distributed [2]**
2154/6 2181/24

**distribution [69]**
2131/21 2132/16
2133/25 2135/8
2135/12 2135/13
2135/18 2137/5
2138/7 2138/10
2138/11 2139/5
2140/3 2140/16
2140/19 2142/5
2148/13 2154/3
2154/5 2156/22
2158/4 2158/25
2163/8 2163/11
2167/7 2167/20

2168/9 2168/13
2168/5 2168/13
2169/4 2171/4 2171/6
2180/2 2180/15
2181/14 2184/12
2194/7 2194/9
2194/16 2194/21
2203/22 2204/6
2204/20 2204/21
2208/1 2208/6
2208/13 2208/19
2209/7 2209/9
2209/15 2209/20
2210/24 2211/2
2212/6 2213/10
2214/10 2214/13
2214/19 2215/1
2216/7 2217/5 2218/1
2220/8 2220/25
2221/3 2225/2
2230/24 2239/23
2240/7

**distributor [7]**
2143/9 2184/13
2184/15 2189/3
2204/16 2211/20
2216/12

**distributors [33]**
2131/16 2132/4
2132/9 2136/8
2141/10 2143/13
2145/17 2145/21
2158/1 2160/8 2162/7
2167/20 2168/3
2168/6 2168/16
2169/6 2172/13
2175/24 2182/22
2184/10 2185/8
2185/12 2187/20
2187/21 2187/23
2188/17 2189/20
2208/2 2208/12
2211/3 2211/16
2218/5 2223/11

**distributors' [1]**
2182/25

**DISTRICT [3]**   2118/1
2118/1 2118/10

**dive [1]**   2132/11
**divested [1]**   2155/17
**divestiture [21]**
2129/9 2138/14
2142/21 2148/12
2151/2 2151/8 2151/9
2151/12 2153/22
2153/24 2154/2
2154/8 2154/13
2154/17 2159/2
2159/7 2159/9
2159/12 2178/21
2200/21 2201/3

**Division [2]**   2119/3
2119/9

**DMA [2]**   2205/17
2206/8

**do [55]**   2126/6

2134/24 2138/16
2142/22 2145/5
2147/1 2149/5
2149/21 2150/9
2152/4 2154/24
2160/23 2164/14
2168/10 2168/18
2169/5 2169/15
2170/19 2171/4
2171/12 2172/21
2173/13 2173/20
2175/4 2176/6
2176/16 2177/3
2177/5 2181/12
2182/17 2187/5
2194/3 2203/21
2204/19 2210/12
2212/20 2213/19
2214/7 2216/16
2217/16 2219/5
2223/12 2226/13
2226/15 2227/10
2228/21 2229/16
2229/17 2230/4
2230/16 2234/6
2234/12 2235/13
2238/7 2244/7

**do nothing [1]**
2216/16

**do you [11]**   2126/6
2134/24 2145/5
2147/1 2149/5 2152/4
2160/23 2168/10
2169/5 2169/15
2173/13

**do you have [5]**
2154/24 2214/7
2228/21 2234/6
2234/12

**do you know [1]**
2164/14

**Do you recognize [1]**
2212/20

**Do you see [2]**
2177/5 2229/16

**do you understand [1]**
2187/5

**Doctor [1]**   2196/13
**document [3]**   2231/25
2232/5 2232/7

**documents [1]**
2222/10

**does [24]**   2134/11
2136/14 2136/22
2140/14 2144/9
2144/10 2145/16
2146/13 2148/22
2149/5 2157/17
2159/6 2159/8
2161/20 2174/9
2175/20 2182/5
2183/10 2184/19
2185/7 2187/2 2230/5
2241/3 2243/7

**doesn't [13]**   2133/7

**D**

**doesn't... [12]**
2140/16 2167/12
2179/5 2179/6
2185/21 2214/13
2223/15 2233/14
2238/22 2241/4
2243/5 2243/7
**doing [3]** 2124/25
2146/23 2197/5
**DOJ [3]** 2119/2
2198/7 2198/16
**dollar [1]** 2215/16
**dollars [1]** 2137/4
**dominant [2]** 2133/7
2133/15
**don't [52]** 2125/1
2129/23 2133/12
2136/17 2137/1
2137/20 2148/4
2156/1 2157/12
2163/20 2176/18
2177/8 2177/21
2177/22 2183/13
2186/16 2188/6
2188/10 2193/8
2194/12 2194/18
2194/19 2194/23
2204/17 2204/22
2205/20 2206/9
2220/12 2222/6
2224/5 2228/6
2228/10 2228/24
2230/9 2230/12
2230/15 2231/1
2232/8 2233/8 2233/8
2233/9 2233/11
2233/24 2234/2
2235/6 2235/8
2237/23 2238/5
2238/20 2239/4
2242/2 2242/4
**done [18]** 2172/15
2205/22 2206/2
2208/16 2210/21
2211/6 2213/8
2213/13 2220/14
2225/7 2225/11
2226/4 2227/14
2227/22 2228/1
2229/18 2232/9
2233/21
**doors [1]** 2183/8
**down [6]** 2130/4
2131/8 2142/14
2164/12 2205/2
2205/6
**download [4]** 2152/13
2158/14 2159/23
2160/2
**downloaded [8]**
2144/7 2151/15
2152/3 2153/9
2154/18 2155/4
2156/12 2157/5

**dozen [1]** 2127/8
**Dr. [25]** 2125/2
2125/5 2125/10
2125/16 2128/6
2128/10 2128/13
2128/20 2152/23
2186/24 2193/3
2195/10 2195/13
2195/18 2196/11
2198/3 2199/4
2199/25 2203/4
2212/18 2217/23
2223/21 2229/4
2242/10 2242/16
**Dr. Baker [1]** 2198/3
**Dr. Chipty [20]**
2125/2 2125/10
2125/16 2128/6
2128/10 2128/13
2128/20 2152/23
2186/24 2193/3
2195/10 2195/18
2196/11 2199/4
2199/25 2212/18
2223/21 2229/4
2242/10 2242/16
**Dr. Chipty's [3]**
2195/13 2203/4
2217/23
**Dr. Tasneem [1]**
2125/5
**draw [1]** 2236/2
**drew [1]** 2129/15
**drilling [1]** 2131/8
**drop [2]** 2205/2
2205/6
**drop-down [2]** 2205/2
2205/6
**DuckDuckGo [6]**
2150/8 2174/8
2203/14 2211/7
2217/18 2219/11
**DuckDuckGo's [1]**
2165/5
**due [1]** 2197/16
**duopoly [1]** 2146/25
**duration [10]**
2132/18 2173/1
2173/17 2174/4
2174/10 2175/5
2175/21 2176/7
2180/19 2207/22
**during [3]** 2195/19
2218/20 2242/12
**dynamics [2]** 2220/19
2243/9

**E**

**each [5]** 2141/21
2167/9 2167/13
2174/2 2237/4
**earlier [10]** 2162/1
2169/11 2169/16
2202/20 2202/22
2213/4 2214/24

2217/24 2234/22
2239/7
**early [6]** 2163/22
2193/18 2197/12
2197/23 2198/15
2216/14
**early years [1]**
2216/14
**econometrics [1]**
2126/23
**economic [9]** 2129/2
2129/13 2129/16
2130/8 2130/11
2164/3 2196/22
2197/5 2225/7
**economics [12]**
2126/1 2126/4 2126/5
2126/8 2126/11
2126/14 2126/16
2127/21 2127/24
2128/7 2137/18
2166/12
**economist [5]**
2132/23 2183/3
2198/3 2206/18
2243/23
**economists [1]**
2190/22
**education [2]** 2202/2
2202/6
**educational [1]**
2125/23
**effect [7]** 2143/25
2164/17 2184/22
2190/18 2191/6
2205/18 2230/20
**effective [2]** 2179/7
2230/17
**effectively [2]**
2123/10 2227/13
**effectiveness [1]**
2189/10
**effects [6]** 2127/13
2166/20 2166/22
2167/18 2207/11
2207/15
**efficient [3]**
2137/25 2138/2
2154/4
**efforts [8]** 2132/9
2173/22 2174/23
2175/1 2175/4
2175/14 2175/15
2205/9
**egg [10]** 2136/3
2136/4 2136/12
2136/14 2136/22
2137/5 2137/15
2220/21 2220/24
2221/13
**either [6]** 2126/10
2188/13 2190/2
2198/6 2203/23
2215/15
**eligible [1]** 2162/18

**else [7]** 2123/25
2167/12 2203/24
2230/7 2241/4
2242/17 2244/12
**Email [4]** 2119/6
2119/11 2120/7
2120/11
**enable [3]** 2142/5
2163/22 2206/13
**enabled [1]** 2147/23
**encourage [8]**
2149/18 2159/18
2159/23 2160/2
2160/7 2160/8
2163/21 2180/7
**end [4]** 2166/18
2167/14 2238/23
2243/6
**ended [1]** 2232/19
**enforced [1]** 2135/17
**engaged [6]** 2128/1
2128/3 2133/10
2225/18 2225/22
2227/3
**engaging [2]** 2136/15
2136/24
**engine [15]** 2144/17
2144/19 2209/22
2210/11 2211/20
2212/8 2216/2
2220/25 2221/8
2224/22 2225/3
2225/9 2226/10
2227/13 2238/11
**engineer [10]**
2134/20 2236/6
2236/9 2236/10
2238/9 2238/17
2240/15 2241/11
2241/14 2241/19
**engineering [2]**
2241/18 2241/21
**engines [3]** 2210/2
2214/9 2228/4
**enhancing [1]**
2166/22
**enormous [1]** 2180/25
**enough [1]** 2238/5
**ensuring [1]** 2133/6
**enter [5]** 2179/14
2179/17 2184/12
2190/2 2239/17
**entered [4]** 2157/18
2157/20 2158/25
2174/20
**entire [2]** 2201/16
2233/7
**entrant [2]** 2239/16
2239/16
**entrants [5]** 2142/2
2163/20 2239/21
2239/25 2240/2
**entry [33]** 2135/2
2135/11 2135/23
2135/24 2141/14

**E**

**entry... [28]**
2141/23 2141/24
2142/2 2173/10
2173/20 2174/3
2174/6 2174/12
2174/14 2174/19
2180/7 2180/8
2188/13 2188/14
2190/2 2193/19
2193/24 2194/4
2195/3 2203/10
2203/13 2207/20
2224/17 2226/20
2226/22 2227/1
2229/10 2231/16
**envisioned [1]**
2176/13
**equivalent [2]**
2232/11 2234/1
**especially [9]**
2141/14 2147/20
2154/7 2181/4
2186/13 2216/13
2217/14 2217/21
2235/20
**essence [1]** 2168/9
**essentially [2]**
2130/4 2191/13
**established [1]**
2210/10
**estimates [1]** 2162/2
**et [2]** 2118/3 2122/7
**et al [1]** 2122/7
**Europe [13]** 2173/22
2174/23 2175/1
2175/6 2175/8
2175/12 2175/18
2187/13 2205/9
2205/12 2205/15
2205/18 2205/23
**Europeans [1]** 2206/8
**evaluate [1]** 2166/13
**evaluated [2]**
2130/10 2193/4
**evaluating [1]**
2132/24
**even [41]** 2132/6
2134/19 2136/15
2136/23 2137/14
2138/1 2143/17
2144/21 2146/3
2146/15 2152/6
2156/22 2157/7
2158/2 2158/19
2158/22 2159/1
2159/22 2160/8
2160/9 2160/13
2160/19 2161/3
2164/17 2164/25
2169/11 2170/1
2170/24 2172/18
2178/3 2182/25
2183/22 2185/10
2186/8 2188/16

2194/17 2210/15
2217/14 2219/7
2221/18 2236/8
**even in [1]** 2164/17
**every [7]** 2144/4
2231/25 2232/5
2232/5 2232/7
2234/14 2234/15
**everybody [1]**
2244/16
**everyone [4]** 2122/4
2122/10 2192/15
2196/4
**evidence [14]**
2130/18 2143/19
2143/21 2164/16
2166/19 2176/8
2190/3 2190/18
2204/14 2218/21
2223/17 2228/2
2228/12 2244/6
**evolved [1]** 2226/8
**exacerbated [2]**
2225/6 2225/14
**exact [2]** 2205/21
2215/10
**exactly [3]** 2134/19
2147/7 2205/20
**examination [3]**
2125/14 2193/18
2196/9
**examine [1]** 2200/3
**examined [1]** 2207/16
**example [28]** 2127/13
2129/8 2129/15
2129/19 2149/17
2150/1 2150/5 2150/6
2150/7 2160/18
2161/17 2161/21
2172/10 2172/12
2174/11 2174/13
2174/15 2174/16
2174/19 2181/16
2181/21 2182/10
2189/2 2190/6 2190/8
2213/15 2223/2
2230/3
**examples [1]** 2161/14
**except [3]** 2206/12
2207/18 2220/17
**exceptions [3]**
2174/7 2194/10
2194/12
**exclude [3]** 2171/8
2171/9 2181/13
**excluded [3]** 2123/5
2171/10 2239/22
**exclusionary [5]**
2180/12 2225/18
2225/22 2227/3
2229/15
**exclusive [11]**
2137/4 2151/8
2151/12 2179/18
2181/13 2183/12

2211/2 2216/19
2216/22 2217/6
2219/23
**exclusives [1]**
2180/9
**exclusivity [4]**
2182/5 2182/9
2183/11 2211/13
**excuse [3]** 2122/15
2126/2 2143/9
**executives [4]**
2222/10 2223/22
2223/25 2224/2
**exhibit [2]** 2244/3
2244/10
**exist [1]** 2123/8
**existed [3]** 2221/13
2224/19 2227/1
**existence [1]**
2222/22
**existent [1]** 2161/13
**existing [4]** 2177/13
2178/16 2180/14
2183/23
**exit [1]** 2204/3
**expand [1]** 2155/8
**expanded [1]** 2175/8
**expansion [3]**
2135/23 2173/10
2195/3
**expect [20]** 2137/10
2145/20 2161/9
2169/5 2169/7
2171/25 2172/1
2172/17 2173/12
2183/19 2187/6
2187/10 2187/20
2187/21 2209/19
2210/1 2210/3
2216/17 2216/21
2217/5
**expected [1]** 2208/18
**expeditiously [1]**
2124/24
**experience [4]**
2145/1 2145/23
2174/9 2190/9
**experienced [2]**
2174/17 2188/8
**experiment [1]**
2183/1
**expert [19]** 2127/20
2127/23 2128/2
2128/6 2128/11
2197/11 2197/15
2197/24 2198/1
2198/21 2200/2
2200/7 2200/15
2201/13 2201/22
2202/5 2202/16
2228/4 2241/20
**expertise [6]**
2233/14 2236/3
2236/12 2238/20
2238/22 2238/22

**experts [1]** 2167/19
**explain [14]** 2131/9
2132/3 2136/4
2137/17 2139/15
2142/13 2152/24
2155/14 2162/6
2167/23 2171/20
2179/1 2188/22
2193/3
**explained [10]**
2176/11 2180/18
2189/21 2193/22
2208/16 2211/1
2214/22 2216/11
2220/15 2236/8
**explaining [2]**
2228/11 2240/19
**explanation [1]**
2176/12
**expressed [1]**
2239/19
**extend [1]** 2171/7
**extending [1]**
2239/20
**extensive [1]**
2204/12
**extent [11]** 2123/18
2147/23 2154/19
2157/24 2185/10
2203/22 2204/12
2207/3 2207/10
2239/16 2243/20

**F**

**face [2]** 2162/3
2169/22
**facilitate [2]**
2199/7 2209/10
**facing [4]** 2130/11
2147/22 2164/12
2186/14
**fact [20]** 2124/23
2127/21 2134/21
2136/6 2137/13
2146/2 2147/4
2150/13 2160/24
2169/24 2176/2
2176/11 2182/23
2209/7 2209/15
2210/1 2219/13
2220/17 2229/19
2229/23
**factor [1]** 2143/23
**factored [1]** 2167/1
**factoring [1]**
2191/14
**factors [3]** 2167/16
2173/6 2204/2
**factual [1]** 2123/13
**faculty [1]** 2126/18
**fairly [1]** 2124/15
**familiar [7]** 2167/21
2199/9 2199/11
2204/9 2204/11
2204/13 2204/23

**F**

**far [6]** 2201/3 2204/7 2225/16 2225/20 2235/15 2235/24
**faster [4]** 2146/10 2169/8 2206/13 2230/19
**favor [1]** 2185/22
**fear [2]** 2185/8 2185/10
**feature [3]** 2222/18 2223/16 2223/17
**features [9]** 2179/24 2183/8 2190/5 2222/23 2228/8 2236/23 2237/14 2238/1 2239/13
**February [3]** 2197/12 2197/23 2198/15
**felt [1]** 2201/7
**few [3]** 2148/7 2154/14 2193/15
**Fifth [1]** 2119/9
**figure [1]** 2241/5
**filed [2]** 2198/9 2198/17
**final [5]** 2198/8 2198/16 2202/14 2202/18 2206/1
**finally [1]** 2124/20
**find [6]** 2140/2 2172/17 2182/21 2183/1 2183/2 2191/6
**finding [2]** 2207/13 2231/8
**findings [3]** 2123/6 2124/6 2128/25
**finds [1]** 2123/18
**Firefox [1]** 2226/10
**firm [11]** 2126/8 2126/11 2126/15 2127/14 2133/7 2133/10 2136/10 2143/10 2156/23 2157/14 2165/21
**firm's [2]** 2133/16 2165/22
**firms [7]** 2127/3 2136/6 2147/16 2160/18 2160/19 2170/24 2196/22
**first [37]** 2122/12 2122/12 2130/24 2131/9 2131/16 2132/3 2133/4 2133/24 2137/25 2141/5 2143/13 2145/10 2147/11 2151/13 2156/20 2168/12 2168/25 2169/1 2170/15 2171/4 2173/20 2180/1 2180/3 2180/22 2181/4

2183/14 2183/15 2183/21 2188/6 2189/17 2191/2 2191/24 2194/7 2199/18 2207/24 2214/2 2218/12
**fit [2]** 2151/21 2224/14
**five [7]** 2175/7 2175/8 2175/13 2176/14 2176/21 2202/23 2203/2
**five years [7]** 2175/7 2175/8 2175/13 2176/14 2176/21 2202/23 2203/2
**fixed [1]** 2130/7
**flexibility [9]** 2179/16 2181/3 2184/10 2185/2 2186/7 2186/7 2189/20 2194/11 2223/12
**flexible [2]** 2188/17 2189/19
**flights [1]** 2238/4
**Floor [1]** 2120/6
**focus [6]** 2134/22 2134/24 2180/20 2193/22 2207/20 2240/3
**focused [7]** 2138/5 2158/4 2179/11 2179/13 2180/2 2193/8 2215/11
**focuses [4]** 2129/13 2133/22 2140/16 2149/10
**focusing [7]** 2132/3 2135/1 2155/4 2155/22 2160/10 2160/22 2175/20
**folks [1]** 2244/12
**followed [3]** 2190/19 2191/2 2191/7
**following [2]** 2130/5 2237/3
**forced [1]** 2168/6
**foreclose [1]** 2221/20
**foreclosed [1]** 2133/24
**foregoing [1]** 2245/3
**forget [1]** 2232/18
**form [3]** 2154/5 2192/9 2206/12
**formal [1]** 2193/9
**formally [1]** 2192/9
**forming [2]** 2236/4 2236/13
**formulate [1]** 2148/2
**forth [4]** 2144/2 2221/22 2229/9 2243/10

**forward [4]** 2125/2 2224/15 2235/17 2239/24
**forward-looking [1]** 2239/24
**found [12]** 2133/21 2137/19 2146/13 2156/18 2157/13 2161/19 2161/20 2175/25 2191/3 2191/10 2191/11 2191/13
**four [3]** 2135/8 2174/21 2203/17
**fourth [2]** 2160/22 2173/24
**fragmented [1]** 2156/25
**frame [1]** 2197/13
**frankly [1]** 2159/1
**free [8]** 2138/19 2165/16 2165/17 2165/20 2165/23 2166/13 2166/16 2166/17
**free-rider [4]** 2165/16 2165/17 2165/23 2166/13
**free-riding [3]** 2165/20 2166/16 2166/17
**front [2]** 2186/3 2226/3
**frontier [1]** 2161/5
**fruits [1]** 2229/12
**full [1]** 2145/13
**fullest [1]** 2143/3
**fully [1]** 2216/21
**function [1]** 2127/2
**functionality [1]** 2238/17
**fund [2]** 2202/2 2202/6
**funded [1]** 2174/17
**further [5]** 2135/16 2154/2 2160/6 2195/12 2201/6
**future [15]** 2133/6 2165/19 2165/22 2166/5 2166/9 2170/23 2171/8 2171/14 2171/24 2171/25 2172/7 2182/14 2182/21 2191/14 2191/17

**G**

**Gabriel [1]** 2165/5
**gain [1]** 2236/14
**game [2]** 2147/16 2200/1
**gap [1]** 2165/7
**gateway [2]** 2135/3 2193/24
**gave [2]** 2202/11

2202/19
**Gemini [4]** 2171/23 2172/4 2172/7 2172/13
**GenAI [15]** 2132/17 2170/9 2170/10 2170/13 2170/15 2170/16 2170/22 2171/1 2171/5 2171/7 2171/9 2171/13 2171/15 2171/18 2172/22
**GenAI's [1]** 2170/19
**GenAI-based [1]** 2171/9
**general [35]** 2129/5 2129/5 2135/3 2135/6 2136/6 2136/9 2136/10 2139/21 2141/14 2144/19 2151/1 2154/11 2156/23 2157/14 2157/18 2157/20 2157/25 2160/12 2160/13 2166/16 2170/22 2170/24 2171/9 2171/10 2172/3 2173/21 2174/6 2174/14 2174/18 2175/2 2179/16 2182/12 2182/13 2190/24 2216/4
**generally [4]** 2148/15 2179/4 2186/3 2236/7
**generation [1]** 2240/1
**Generative [1]** 2161/22
**get [35]** 2124/22 2131/18 2136/11 2138/16 2140/8 2145/18 2146/10 2148/8 2150/25 2154/8 2154/22 2155/17 2155/19 2169/1 2176/12 2199/14 2199/16 2204/15 2204/20 2204/21 2205/2 2214/13 2218/25 2220/25 2221/3 2221/4 2224/12 2226/3 2227/9 2234/23 2234/23 2239/12 2240/14 2240/23 2242/20
**get-go [1]** 2131/18
**gets [2]** 2150/16 2216/7
**getting [4]** 2166/15 2180/4 2224/9 2238/20
**gist [1]** 2165/6

**G**

**give [21]** 2129/15
2146/13 2147/15
2153/4 2164/11
2165/15 2173/18
2174/13 2175/16
2177/17 2179/15
2187/15 2190/8
2190/9 2190/11
2191/22 2194/25
2229/5 2233/6 2236/1
2243/17
**given [18]** 2123/20
2128/25 2130/11
2136/13 2136/21
2137/8 2163/8
2170/13 2173/8
2173/11 2183/18
2185/2 2187/13
2195/4 2207/22
2210/9 2214/23
2217/16
**gives [5]** 2141/7
2160/14 2216/11
2227/15 2236/17
**giving [2]** 2125/22
2194/22
**global [1]** 2126/13
**Gmail [1]** 2160/1
**go [50]** 2128/23
2130/1 2130/3
2130/22 2131/13
2131/18 2132/14
2133/1 2133/19
2135/7 2138/6
2138/13 2138/25
2139/18 2139/24
2141/4 2142/8 2148/6
2148/19 2153/12
2153/16 2154/1
2155/2 2158/11
2159/20 2162/16
2163/1 2164/22
2165/4 2166/23
2169/23 2170/12
2171/22 2173/15
2179/12 2179/22
2188/4 2189/11
2194/5 2194/14
2194/22 2201/3
2206/7 2213/8 2218/8
2220/3 2222/7
2231/17 2235/24
2242/8
**go ahead [1]** 2242/8
**goal [5]** 2133/9
2133/14 2206/16
2206/24 2233/4
**goals [5]** 2132/15
2132/22 2132/23
2133/3 2137/17
**goes [6]** 2124/18
2163/7 2170/25
2190/16 2235/15
2237/14

**going [24]** 2136/15
2144/24 2144/25
2146/6 2148/4 2149/8
2151/5 2163/16
2176/4 2176/5
2176/10 2199/12
2215/14 2219/9
2219/18 2219/23
2220/4 2221/17
2235/17 2238/21
2242/6 2243/6
2243/17 2243/19
**gone [3]** 2157/22
2158/19 2175/10
**good [17]** 2122/3
2122/10 2122/11
2122/22 2122/25
2123/1 2125/3
2125/16 2125/19
2147/24 2174/11
2174/13 2174/19
2176/15 2196/11
2196/12 2242/7
**Good morning [6]**
2122/10 2122/22
2122/25 2123/1
2196/11 2196/12
**GOOGLE [247]**
**Google's [104]**
2124/6 2129/3 2131/2
2131/5 2132/19
2133/24 2134/4
2134/10 2134/13
2134/16 2135/4
2135/10 2135/12
2137/3 2137/11
2137/12 2137/15
2139/20 2147/8
2153/5 2153/8
2157/13 2158/5
2163/6 2166/3 2166/4
2166/9 2167/19
2169/17 2175/18
2177/2 2179/10
2179/11 2179/14
2179/19 2179/22
2180/6 2180/6
2180/16 2181/4
2181/12 2181/15
2182/1 2182/11
2183/10 2183/15
2183/18 2184/7
2184/9 2185/24
2186/1 2187/21
2188/10 2193/17
2193/25 2194/3
2194/10 2194/18
2194/23 2195/3
2195/5 2195/8 2195/9
2205/5 2207/19
2208/17 2211/1
2211/12 2219/3
2221/19 2222/13
2222/22 2222/24
2222/24 2223/4

2223/18 2224/2
2224/19 2225/1
2225/10 2226/5
2226/17 2227/23
2230/20 2230/24
2231/22 2231/25
2232/10 2232/11
2232/19 2233/7
2233/19 2233/25
2234/1 2234/25
2235/16 2237/11
2238/10 2239/22
2240/6 2240/13
2240/15 2240/24
2244/7
**Google-operated [1]**
2178/8
**Google-owned [2]**
2178/7 2179/3
**google.com [2]**
2149/19 2158/16
**Googles [1]** 2234/20
**got [6]** 2180/25
2203/17 2211/11
2226/7 2242/24
2244/10
**government [1]**
2128/4
**Gower [2]** 2119/8
2125/4
**graduate [1]** 2126/22
**granular [2]** 2165/3
2213/3
**graph [7]** 2142/4
2150/23 2151/21
2157/17 2233/19
2233/22 2234/1
**graphics [1]** 2172/11
**great [5]** 2145/6
2147/3 2151/10
2182/19 2234/16
**greater [15]** 2131/16
2132/2 2132/4
2141/20 2157/10
2161/10 2167/4
2167/15 2168/16
2179/16 2181/3
2185/22 2186/6
2194/11 2209/5
**ground [3]** 2149/3
2153/4 2169/2
**group [1]** 2190/22
**guess [1]** 2192/9
**guidance [1]** 2173/19
**guiding [1]** 2130/8

**H**

**habituate [1]**
2135/20
**habituated [1]**
2188/9
**had [35]** 2122/12
2135/21 2137/2
2139/22 2139/22
2151/14 2157/18

2159/20 2166/5
2174/16 2175/23
2176/1 2180/11
2183/22 2191/1
2201/2 2208/16
2208/17 2208/22
2210/15 2210/15
2220/17 2221/7
2221/10 2223/21
2225/2 2225/16
2225/20 2225/23
2225/25 2226/2
2226/9 2227/5
2230/25 2231/11
**half [6]** 2156/11
2174/21 2196/17
2203/17 2218/14
2242/24
**half years [2]**
2174/21 2203/17
**halves [1]** 2166/10
**hand [2]** 2125/7
2145/24
**handed [2]** 2199/4
2212/18
**Hang [1]** 2242/19
**happen [6]** 2159/25
2165/21 2183/14
2183/25 2184/3
2184/3
**happened [7]** 2134/7
2134/7 2134/19
2139/19 2157/18
2208/23 2226/2
**happens [2]** 2143/10
2156/11
**happy [1]** 2229/4
**hard [5]** 2203/1
2207/21 2211/10
2212/10 2229/5
**harder [3]** 2221/4
2225/6 2225/13
**harm [4]** 2167/20
2173/8 2180/22
2231/9
**harmed [1]** 2231/15
**harming [1]** 2207/14
**harms [4]** 2133/17
2133/21 2133/22
2134/3
**has [30]** 2123/11
2133/10 2135/10
2139/10 2153/12
2153/17 2160/24
2161/2 2161/17
2167/1 2171/4 2171/9
2171/11 2173/20
2175/8 2175/12
2175/23 2176/3
2176/8 2177/15
2178/24 2182/1
2186/10 2213/16
2217/17 2222/19
2231/24 2238/20
2240/6 2241/4

2260

Case 1:20-cv-03010-APM   Document 1405   Filed 07/09/25   Page 143 of 163

**H**

have [240]
haven't [10]   2129/8
 2151/25 2200/25
 2206/2 2220/2 2220/8
 2226/12 2227/14
 2227/22 2227/25
having [7]   2132/4
 2164/18 2164/18
 2227/8 2227/9
 2227/20 2238/15
he [10]   2164/24
 2165/1 2165/5 2205/1
 2205/2 2239/17
 2240/14 2240/17
 2240/23 2241/3
He said [1]   2164/24
He's [2]   2240/14
 2240/24
head [1]   2126/13
healthy [1]   2147/25
hear [5]   2144/24
 2174/2 2184/8
 2230/11 2238/21
heard [2]   2122/20
 2169/11
HEARING [1]   2118/9
heart [1]   2163/7
heightened [1]
 2123/20
held [1]   2126/9
help [11]   2142/23
 2144/12 2153/24
 2164/12 2165/7
 2166/12 2186/3
 2186/14 2190/24
 2198/7 2243/5
helpful [4]   2164/24
 2189/18 2240/10
 2243/22
helps [1]   2137/23
her [4]   2241/1
 2243/5 2243/8
 2243/21
here [40]   2124/1
 2131/14 2132/18
 2141/23 2146/23
 2149/8 2151/11
 2151/22 2153/19
 2162/9 2171/18
 2171/23 2173/8
 2175/1 2175/15
 2179/25 2189/12
 2198/5 2199/7 2204/7
 2206/11 2207/25
 2213/13 2213/23
 2214/10 2215/11
 2216/7 2217/2 2220/4
 2221/7 2222/7
 2224/13 2229/19
 2231/13 2232/3
 2233/17 2234/10
 2240/9 2242/21
 2243/21
hesitating [1]

high [15]   2129/21
 2130/20 2130/23
 2135/22 2136/7
 2136/9 2147/6 2170/7
 2195/2 2220/25
 2224/19 2224/23
 2227/5 2235/22
 2236/16
high-quality [2]
 2136/7 2170/7
higher [1]   2143/22
highest [3]   2127/1
 2153/20 2221/7
highlighted [1]
 2151/11
highlights [1]
 2137/6
highly [1]   2174/17
him [1]   2240/19
hired [1]   2198/6
his [7]   2164/25
 2176/11 2176/12
 2176/14 2240/9
 2241/1 2244/3
historic [1]   2161/14
historical [5]
 2139/9 2143/18
 2173/16 2180/11
 2203/6
historically [5]
 2131/20 2154/10
 2158/18 2171/10
 2218/17
history [6]   2173/20
 2173/23 2174/3
 2175/21 2203/10
 2203/13
hold [2]   2135/17
 2219/6
home [1]   2172/14
honest [1]   2243/4
Honor [18]   2122/5
 2122/17 2122/22
 2123/18 2123/21
 2125/3 2128/5
 2128/16 2128/18
 2195/12 2196/6
 2199/2 2212/15
 2242/6 2242/14
 2243/12 2244/1
 2244/5
HONORABLE [1]   2118/9
hopefully [1]   2199/7
horizontal [1]
 2127/14
hotel [1]   2238/3
hour [2]   2195/16
 2242/24
housekeeping [1]
 2242/15
how [86]   2127/2
 2127/20 2129/1
 2130/1 2130/10
 2131/10 2132/4

2132/17 2133/9
2133/17 2134/3
2134/17 2134/24
2135/10 2136/10
2138/18 2140/8
2140/12 2140/14
2141/2 2141/16
2142/13 2143/4
2144/8 2145/5
2146/14 2147/1
2147/1 2148/16
2151/20 2152/14
2152/24 2153/4
2153/10 2153/24
2154/11 2157/7
2158/7 2158/21
2159/2 2159/16
2159/18 2160/23
2162/23 2164/14
2165/24 2168/18
2169/12 2170/10
2172/6 2172/19
2173/3 2173/6 2173/9
2173/11 2173/13
2173/13 2174/9
2174/12 2174/13
2174/24 2175/16
2175/20 2176/6
2179/19 2182/16
2183/5 2187/20
2194/3 2200/1 2207/2
2208/7 2214/11
2220/16 2224/14
2226/7 2226/16
2227/16 2227/22
2228/6 2231/4 2231/5
2232/2 2236/2
2236/14 2242/2
however [1]   2170/6
Hunt [1]   2192/1
hypothetical [3]
 2187/2 2187/6
 2193/15

**I**

I agree [1]   2186/14
I also [3]   2139/8
 2141/9 2188/12
I am [1]   2204/12
I assume [3]   2143/12
 2143/21 2150/17
I believe [13]
 2151/2 2155/13
 2176/14 2179/22
 2180/1 2192/12
 2195/7 2201/1
 2202/22 2205/19
 2211/15 2220/19
 2221/12
I can [3]   2124/5
 2191/22 2235/18
I can't [13]   2209/3
 2217/9 2217/19
 2217/21 2222/6
 2232/8 2233/23

2234/16 2235/12
2237/24 2238/1
2241/21 2242/5
I cannot [4]   2134/14
 2166/16 2206/5
 2236/1
I did [9]   2196/25
 2198/11 2198/12
 2199/1 2204/1
 2205/13 2206/2
 2231/3 2239/11
I don't [19]   2176/18
 2183/13 2186/16
 2193/8 2204/17
 2204/22 2206/9
 2220/12 2222/6
 2230/9 2231/1 2232/8
 2233/8 2233/8 2233/9
 2237/23 2238/5
 2238/20 2242/2
I don't have [5]
 2228/10 2228/24
 2230/15 2234/2
 2242/4
I don't recall [2]
 2205/20 2224/5
I don't think [1]
 2137/20
I gave [1]   2202/19
I guess [1]   2192/9
I have [23]   2123/2
 2125/25 2126/4
 2128/15 2129/21
 2132/14 2134/5
 2145/7 2146/18
 2147/4 2175/1
 2190/21 2199/24
 2201/20 2202/8
 2224/1 2225/11
 2227/15 2231/1
 2232/13 2232/21
 2236/11 2243/15
I haven't [6]   2129/8
 2151/25 2220/2
 2226/12 2227/14
 2227/25
I just [3]   2139/25
 2199/15 2216/25
I know [1]   2243/13
I mean [7]   2156/20
 2168/2 2178/2 2185/9
 2198/11 2241/17
 2243/23
I said [2]   2155/16
 2201/7
I say [1]   2145/12
I should [1]   2186/6
I think [114]   2124/5
 2131/14 2134/11
 2135/1 2136/1 2137/5
 2137/9 2137/13
 2145/24 2146/8
 2147/6 2147/16
 2147/24 2149/1
 2149/15 2150/8

I

**I think... [98]**
2153/2 2156/2
2156/18 2156/24
2158/1 2164/5
2164/16 2165/6
2166/1 2166/10
2166/18 2166/23
2166/24 2168/2
2168/11 2169/10
2169/20 2170/13
2171/3 2171/11
2173/8 2173/16
2173/17 2174/7
2174/11 2174/12
2176/4 2176/8
2176/20 2176/23
2177/19 2178/4
2178/13 2179/8
2180/4 2181/5 2182/8
2182/23 2183/7
2183/13 2185/4
2186/2 2186/4 2186/6
2186/7 2187/10
2187/23 2188/14
2188/15 2188/20
2189/25 2190/3
2190/15 2192/15
2193/6 2193/11
2194/13 2194/18
2194/20 2194/25
2195/8 2197/17
2198/10 2199/22
2202/25 2203/14
2205/4 2205/8
2206/12 2208/7
2208/22 2209/9
2209/18 2210/14
2211/10 2215/9
2215/21 2216/3
2216/5 2216/20
2218/7 2218/19
2219/13 2223/3
2224/9 2225/5 2229/7
2230/22 2231/8
2231/13 2231/14
2235/18 2237/22
2239/15 2240/2
2241/13 2241/15
2242/3
**I thought [2]**
2189/13 2214/22
**I understand [16]**
2147/20 2152/8
2162/17 2169/16
2170/21 2177/12
2178/23 2181/15
2187/3 2188/24
2192/21 2218/9
2238/19 2238/25
2243/2 2243/17
**I want [10]** 2148/14
2180/20 2184/7
2186/24 2193/16
2202/9 2212/13

**I wanted [1]** 2148/21
**I was [5]** 2126/10
2128/24 2129/1
2152/23 2164/22
**I will [1]** 2124/19
**I work [1]** 2126/7
**I would [19]** 2127/1
2144/14 2161/9
2167/3 2169/7
2171/15 2171/25
2172/1 2173/12
2189/18 2195/13
2199/12 2207/18
2207/18 2209/4
2209/25 2210/3
2210/7 2236/24
**I'd [3]** 2123/2
2138/16 2215/9
**I'll [10]** 2132/15
2148/4 2193/13
2195/18 2224/15
2241/3 2242/10
2242/12 2242/22
2243/4
**I'm [55]** 2136/19
2142/22 2148/2
2148/20 2149/8
2149/10 2151/5
2155/11 2159/4
2160/10 2185/9
2188/22 2188/24
2191/19 2199/11
2200/5 2204/7
2204/11 2204/13
2204/23 2204/23
2205/20 2206/11
2209/12 2210/19
2211/22 2212/5
2215/15 2217/10
2224/8 2224/12
2226/1 2228/5
2228/11 2228/16
2228/20 2229/4
2230/1 2230/2 2230/4
2232/3 2232/15
2233/5 2236/8 2236/8
2236/19 2236/24
2237/22 2237/24
2238/12 2238/21
2240/17 2241/20
2242/6 2243/2
**I'm familiar [1]**
2204/13
**I'm going [1]** 2149/8
**I'm just [3]** 2148/2
2228/11 2232/15
**I'm not [15]** 2185/9
2204/7 2205/20
2206/11 2210/19
2226/1 2230/1 2230/4
2232/3 2236/8 2236/8
2236/24 2240/17
2241/20 2243/2

**I'm not sure [2]**
2188/24 2217/10
**I'm sorry [9]**
2136/19 2142/22
2148/20 2149/10
2155/11 2159/4
2188/22 2191/19
2238/12
**I'm sure [1]** 2238/21
**I've [20]** 2124/17
2124/18 2126/19
2127/8 2127/13
2127/16 2127/18
2128/3 2129/13
2151/16 2180/18
2199/4 2199/6 2204/7
2220/15 2226/7
2228/11 2229/21
2236/7 2242/23
**icon [2]** 2215/7
2215/17
**idea [3]** 2189/2
2190/1 2190/4
**ideally [1]** 2207/16
**ideas [1]** 2183/8
**identified [9]**
2130/13 2133/23
2135/2 2135/7 2163/9
2188/2 2203/14
2215/25 2241/5
**identify [9]** 2130/8
2130/17 2133/17
2133/21 2134/11
2156/17 2183/3
2191/19 2231/24
**identifying [2]**
2139/1 2232/4
**IL [1]** 2119/5
**images [1]** 2237/15
**imagine [5]** 2172/12
2174/12 2183/14
2189/9 2189/18
**immediate [4]**
2164/10 2186/14
2186/22 2191/5
**immediately [1]**
2236/18
**impact [3]** 2146/11
2225/1 2230/24
**impacted [1]** 2225/10
**impacts [2]** 2234/19
2243/9
**implementation [4]**
2129/11 2129/17
2165/14 2242/4
**implemented [1]**
2242/3
**implication [1]**
2171/11
**implications [2]**
2171/2 2171/3
**implicit [1]** 2137/12
**imply [2]** 2136/14
2136/22
**import [1]** 2152/17

**importance [3]**
2127/14 2127/17
2193/19
**important [19]**
2130/19 2136/2
2146/2 2146/9
2148/16 2148/18
2152/24 2153/3
2153/5 2171/6
2173/11 2189/25
2190/16 2194/9
2195/1 2206/15
2208/7 2235/11
2235/20
**impose [1]** 2178/3
**impression [1]**
2123/14
**impressions [1]**
2198/12
**improve [4]** 2141/20
2168/14 2168/24
2240/10
**incentive [10]**
2127/19 2131/17
2132/4 2144/23
2145/4 2166/20
2167/6 2183/7
2187/15 2192/18
**incentives [29]**
2129/2 2129/14
2129/16 2130/11
2130/25 2134/2
2135/22 2140/22
2144/14 2144/20
2144/21 2160/14
2160/15 2165/18
2166/4 2166/8 2167/2
2182/25 2183/24
2184/6 2190/2
2194/24 2195/2
2210/9 2214/23
2234/19 2234/25
2235/1 2235/16
**incentivize [1]**
2150/1
**include [3]** 2159/6
2185/23 2198/8
**including [6]** 2127/2
2128/4 2158/25
2160/17 2233/19
2237/8
**inclusive [1]** 2151/8
**inconsistency [1]**
2161/1
**increase [7]** 2141/13
2142/1 2156/6 2175/2
2185/11 2191/13
2195/2
**increases [2]** 2161/4
2161/7
**increasing [1]**
2189/9
**incremental [1]**
2140/7
**incur [3]** 2135/22

**I**

**incur... [2]**   2184/6
2195/2
**independent [2]**
2126/7 2228/10
**index [10]**   2121/2
2231/22 2232/1
2232/5 2232/7
2232/11 2232/11
2232/20 2233/7
2237/11
**indicated [1]**
2122/12
**individually [3]**
2135/24 2138/15
2140/20
**industrial [6]**
2126/23 2126/24
2127/11 2127/24
2128/6 2128/11
**industry [1]**   2147/21
**ineffective [1]**
2180/2
**infer [1]**   2176/24
**inferior [1]**   2210/11
**influence [3]**   2174/4
2174/24 2175/21
**inform [4]**   2173/17
2174/9 2175/4 2176/7
**information [14]**
2124/12 2233/18
2233/20 2236/18
2237/3 2238/4 2238/8
2238/15 2240/12
2240/20 2240/21
2241/16 2241/25
2243/18
**informed [1]**   2123/11
**inherent [1]**   2173/24
**initial [1]**   2198/8
**initially [1]**   2188/1
**innovate [20]**   2160/6
2160/23 2161/3
2161/9 2165/18
2166/5 2166/8
2166/25 2167/2
2167/4 2167/6
2167/14 2182/25
2183/24 2194/24
2227/9 2234/20
2234/25 2235/1
2235/17
**innovated [2]**   2161/2
2161/18
**innovating [1]**
2161/15
**innovation [6]**
2127/19 2145/25
2165/22 2166/10
2166/21 2183/6
**innovations [4]**
2166/6 2228/8
2238/10 2240/15
**innovator [1]**
2160/25

**input [3]**   2230/5
2230/7 2230/10
**inputs [3]**   2228/23
2229/13 2229/20
**inputs both [1]**
2229/13
**inserts [1]**   2244/5
**insights [2]**   2166/12
2173/18
**install [1]**   2172/13
**installation [5]**
2154/21 2155/24
2157/9 2158/8
2158/23
**installed [2]**
2154/20 2155/18
**instance [2]**   2167/3
2191/2
**instances [2]**   2179/6
2179/9
**instead [2]**   2137/5
2189/14
**insulation [1]**
2227/19
**integration [2]**
2127/14 2127/16
**interaction [3]**
2127/3 2136/2
2234/14
**interest [3]**   2123/8
2123/10 2123/20
**internal [1]**   2222/10
**Internet [1]**   2237/12
**interpret [2]**   2241/1
2243/5
**interrupt [1]**   2151/5
**intervention [1]**
2191/10
**interventions [3]**
2190/23 2190/25
2191/4
**introduce [4]**
2130/25 2131/10
2131/15 2132/5
**introduced [2]**
2222/17 2222/21
**invest [8]**   2131/23
2134/2 2135/15
2169/2 2183/24
2194/24 2223/11
2227/9
**investing [1]**
2161/15
**investment [2]**
2166/22 2167/17
**investment-enhancing
[1]**   2166/22
**investments [7]**
2132/8 2141/20
2163/22 2171/17
2176/3 2184/6
2200/14
**involve [1]**   2228/22
**involved [2]**   2207/25
2208/11

**iPhone [1]**   2182/13
**iPhones [1]**   2181/22
**irrespective [1]**
2209/6
**is [229]**
**is that [2]**   2203/11
2203/18
**is that right [15]**
2196/16 2196/20
2197/12 2197/24
2199/21 2202/3
2203/8 2203/14
2205/15 2206/19
2214/3 2226/23
2231/7 2239/10
2239/14
**is there [4]**   2122/19
2160/11 2163/10
2244/12
**isn't [9]**   2146/19
2166/17 2201/3
2201/10 2205/3
2221/16 2240/16
2243/21 2243/22
**isn't that [1]**
2205/3
**issue [6]**   2147/17
2171/23 2204/5
2210/8 2213/9
2225/12
**issued [1]**   2237/4
**issues [1]**   2237/21
**it [187]**
**it doesn't [1]**
2243/5
**it even [1]**   2194/17
**it would be [9]**
2142/18 2151/21
2157/5 2171/6
2189/18 2214/22
2220/10 2238/2
2241/8
**it's [88]**   2122/11
2124/8 2124/9
2124/16 2125/21
2127/1 2137/9
2137/21 2138/1
2146/6 2147/12
2147/17 2147/18
2153/20 2156/20
2157/12 2161/11
2161/12 2164/6
2164/7 2164/17
2164/18 2165/14
2165/18 2168/3
2172/15 2172/16
2174/14 2174/16
2174/18 2175/10
2175/13 2175/15
2180/25 2181/5
2183/19 2185/2
2186/16 2186/21
2187/10 2188/19
2189/21 2189/25
2191/24 2192/5

2192/5 2192/13
2192/15 2192/20
2192/24 2193/11
2193/11 2194/5
2195/16 2197/13
2197/18 2199/23
2203/1 2204/12
2207/21 2208/7
2209/19 2210/9
2211/10 2212/10
2216/12 2216/20
2216/24 2217/8
2218/4 2218/13
2218/15 2219/9
2219/13 2221/3
2222/24 2227/4
2227/8 2227/9
2227/18 2227/18
2231/2 2232/23
2234/21 2235/2
2236/12 2243/16
2243/17
**It's good [1]**
2122/11
**item [3]**   2141/23
2174/23 2232/2
**items [1]**   2237/7
**its [37]**   2122/14
2129/11 2133/7
2135/14 2135/17
2135/19 2136/15
2136/23 2139/5
2143/12 2157/8
2157/15 2157/21
2157/24 2159/14
2159/15 2161/22
2166/6 2166/6 2172/2
2175/9 2175/24
2179/17 2180/11
2180/24 2183/6
2191/20 2192/9
2209/11 2215/7
2229/12 2229/15
2231/7 2232/5
2236/22 2236/22
2237/20
**itself [5]**   2173/23
2175/21 2209/8
2209/23 2219/7
**IV.C [2]**   2199/18
2200/9
**IV.H [1]**   2200/13
**IV.I [1]**   2200/13
**IX.E [1]**   2201/25

**J**

**January [3]**   2197/12
2197/22 2198/14
**job [1]**   2183/7
**John [3]**   2120/8
2122/9 2196/7
**John Schmidtlein [2]**
2122/9 2196/7
**Jon [1]**   2122/8
**jon.sallet [1]**

**J**

**jon.sallet... [1]**
 2120/7
**Jonathan [1]**  2120/2
**journal [1]**  2192/12
**jschmidtlein [1]**
 2120/11
**Juan [1]**  2192/2
**JUDGE [1]**  2118/10
**judgment [6]**  2198/8
 2198/17 2202/14
 2202/18 2206/1
 2232/17
**judicial [2]**  2120/5
 2123/5
**just [66]**  2124/1
 2124/25 2131/8
 2139/25 2142/1
 2142/9 2145/10
 2146/24 2148/2
 2150/14 2152/3
 2153/4 2154/14
 2155/4 2155/14
 2155/22 2158/21
 2162/5 2164/18
 2165/8 2166/15
 2168/25 2169/1
 2175/9 2178/10
 2180/13 2181/8
 2181/20 2184/2
 2185/11 2186/17
 2189/21 2192/12
 2193/3 2194/5 2194/5
 2195/18 2196/14
 2199/6 2199/15
 2199/23 2200/5
 2216/25 2218/9
 2219/18 2219/23
 2223/6 2225/6 2227/8
 2227/18 2228/7
 2228/11 2230/2
 2230/6 2232/15
 2232/15 2236/19
 2240/12 2242/10
 2242/12 2243/4
 2243/9 2243/16
 2244/1 2244/9
 2244/15
**justice [4]**  2119/3
 2119/8 2123/14
 2128/4

**K**

**keep [4]**  2124/15
 2145/21 2148/4
 2189/19
**keeping [1]**  2185/24
**kept [1]**  2123/19
**Khushita [3]**  2120/12
 2122/23 2124/2
**kind [13]**  2124/13
 2146/10 2146/15
 2152/18 2164/7
 2166/19 2172/14
 2172/24 2173/25

2176/4 2180/5
 2242/23 2243/10
**kinds [3]**  2149/9
 2176/13 2184/22
**knew [1]**  2134/19
**know [73]**  2128/24
 2135/21 2137/21
 2139/1 2139/25
 2142/25 2143/4
 2145/11 2146/22
 2147/6 2150/6 2150/7
 2151/1 2155/16
 2163/24 2164/9
 2164/14 2164/22
 2166/16 2166/24
 2169/24 2171/23
 2172/7 2172/21
 2174/5 2174/16
 2179/3 2181/3 2181/6
 2182/24 2183/6
 2183/18 2183/23
 2184/3 2186/4
 2186/21 2187/13
 2188/1 2188/9
 2189/12 2190/11
 2191/1 2194/7
 2194/11 2194/16
 2200/1 2204/17
 2204/19 2204/22
 2207/21 2211/10
 2220/12 2223/19
 2226/13 2227/15
 2227/19 2228/6
 2230/9 2230/20
 2232/8 2233/8
 2233/11 2235/6
 2235/8 2235/13
 2237/23 2237/25
 2238/3 2238/5 2238/7
 2238/20 2240/1
 2243/13
**knowing [1]**  2134/15
**knowledge [4]**
 2233/19 2233/22
 2234/1 2237/15
**known [1]**  2226/9
**Koenig [3]**  2120/12
 2122/24 2123/25

**L**

**labeled [1]**  2151/25
**lack [1]**  2144/20
**language [3]**  2165/6
 2215/10 2232/3
**large [2]**  2150/25
 2210/12
**largely [3]**  2161/12
 2173/9 2197/9
**largest [3]**  2156/22
 2157/4 2169/17
**LaSalle [1]**  2119/4
**last [8]**  2153/13
 2173/3 2173/14
 2174/6 2174/24
 2190/14 2197/4

2218/20
**lastly [1]**  2176/6
**late [3]**  2197/11
 2197/22 2198/14
**later [1]**  2174/21
**LAW [1]**  2120/3
**Law360 [3]**  2120/12
 2122/24 2123/16
**layer [1]**  2190/14
**layout [1]**  2237/7
**lead [3]**  2132/8
 2176/4 2192/1
**leading [2]**  2225/16
 2225/20
**learn [1]**  2240/15
**learning [2]**  2163/16
 2241/17
**least [19]**  2146/13
 2146/23 2147/24
 2148/25 2150/4
 2151/15 2175/25
 2176/21 2177/8
 2178/15 2182/11
 2186/12 2188/1
 2189/25 2202/23
 2203/2 2206/17
 2226/2 2227/16
**leave [4]**  2137/17
 2149/15 2196/25
 2197/2
**left [1]**  2135/21
**legal [1]**  2191/23
**length [1]**  2176/17
**less [2]**  2142/19
 2168/8
**let [4]**  2126/3
 2145/8 2158/24
 2212/11
**let's [31]**  2132/11
 2132/22 2138/3
 2139/19 2140/19
 2142/20 2145/12
 2148/12 2153/22
 2158/5 2161/24
 2162/11 2162/22
 2164/2 2170/9
 2170/18 2173/1
 2173/15 2174/2
 2177/2 2179/10
 2184/9 2218/12
 2233/12 2233/13
 2234/4 2241/1 2241/4
 2242/8 2242/16
 2244/15
**level [8]**  2127/1
 2129/21 2130/20
 2130/23 2147/6
 2234/9 2235/22
 2236/16
**liability [8]**
 2124/20 2128/25
 2164/17 2197/19
 2204/10 2213/10
 2224/11 2228/11
**license [1]**  2236/22

**lies [1]**  2136/11
**light [3]**  2130/18
 2153/20 2194/2
**like [36]**  2122/20
 2123/2 2138/16
 2144/4 2145/15
 2147/12 2150/10
 2152/18 2156/2
 2156/17 2160/1
 2160/16 2160/18
 2171/9 2172/15
 2172/16 2172/22
 2188/7 2189/4 2191/1
 2191/10 2192/11
 2196/23 2208/5
 2213/24 2215/18
 2217/12 2227/6
 2227/6 2229/5 2231/3
 2234/18 2239/16
 2241/18 2243/9
 2244/6
**likelihood [1]**
 2185/22
**likely [13]**  2130/10
 2130/24 2131/2
 2131/5 2139/12
 2140/25 2141/10
 2163/9 2179/23
 2195/5 2217/17
 2218/4 2235/20
**limit [1]**  2211/16
**limited [1]**  2229/20
**limiting [1]**  2183/10
**line [12]**  2129/16
 2153/15 2153/15
 2153/19 2153/20
 2153/20 2153/20
 2163/23 2171/18
 2214/2 2230/10
 2236/2
**link [1]**  2163/5
**links [1]**  2237/9
**lion's [1]**  2157/2
**list [2]**  2205/2
 2205/6
**listed [2]**  2171/18
 2238/1
**litigate [1]**  2224/10
**litigation [1]**
 2197/8
**little [10]**  2131/9
 2132/17 2169/11
 2174/2 2175/7
 2186/21 2194/6
 2196/13 2202/9
 2224/11
**lived [1]**  2177/19
**LLC [2]**  2118/6
 2122/7
**LLP [1]**  2120/9
**local [2]**  2233/19
 2237/14
**Locala [2]**  2244/2
 2244/11
**logic [1]**  2179/8

**L**

**long [20]**  2164/9
2168/15 2173/3
2173/4 2173/6 2173/9
2173/13 2174/12
2174/13 2174/24
2175/16 2178/23
2185/4 2185/25
2194/22 2225/17
2225/21 2227/2
2243/6 2243/19
**long-term [2]**  2164/9
2168/15
**longer [6]**  2124/18
2142/2 2169/1
2177/20 2181/8
2227/10
**look [19]**  2124/5
2138/7 2142/9
2163/13 2168/21
2172/2 2175/23
2180/24 2193/23
2207/24 2215/9
2217/23 2234/4
2236/24 2236/25
2237/1 2237/25
2242/23 2243/2
**looked [8]**  2129/8
2143/3 2193/6 2194/1
2202/8 2204/9 2208/5
2238/14
**looking [9]**  2140/7
2141/23 2174/23
2180/22 2181/11
2239/24 2240/13
2240/14 2240/24
**lose [4]**  2139/5
2157/8 2214/16
2216/16
**losing [1]**  2184/17
**lost [2]**  2139/9
2143/17
**lot [3]**  2146/20
2220/10 2221/3
**lower [6]**  2137/23
2143/20 2154/2
2163/2 2168/7
2220/10
**loyalty [1]**  2160/16
**lucrative [1]**  2172/3
**lunch [1]**  2242/8

**M**

**made [18]**  2123/13
2143/13 2144/25
2157/24 2175/14
2205/12 2226/10
2226/13 2229/21
2230/23 2231/6
2231/8 2231/11
2231/14 2232/13
2232/17 2240/5
2240/8
**main [1]**  2150/11
**Maine [1]**  2120/9

**mainline [1]**  2237/8
**maintain [5]**  2140/6
2144/23 2152/16
2179/23 2189/20
**maintained [2]**
2136/15 2136/23
**maintaining [1]**
2227/21
**maintenance [3]**
2133/11 2136/13
2136/22
**majority [3]**  2156/13
2184/25 2210/12
**make [30]**  2124/5
2127/3 2130/14
2141/19 2145/16
2146/16 2149/6
2159/25 2163/22
2165/3 2168/10
2169/15 2171/17
2172/21 2176/3
2176/15 2182/17
2183/7 2184/19
2187/2 2209/3 2215/3
2216/25 2217/19
2218/9 2237/3 2241/3
2241/16 2243/15
2244/9
**makes [3]**  2123/6
2153/2 2164/5
**making [8]**  2144/21
2145/25 2148/24
2164/14 2214/19
2219/7 2226/1
2243/16
**manifest [1]**  2165/25
**manufacturers [2]**
2179/15 2208/21
**many [11]**  2127/20
2141/10 2143/4
2145/8 2188/18
2191/25 2192/3
2210/5 2218/5
2224/23 2224/23
**many years [1]**
2224/23
**many-authored [1]**
2191/25
**maps [1]**  2237/14
**March [1]**  2198/17
**marked [3]**  2199/5
2212/18 2244/2
**market [38]**  2130/12
2135/21 2138/18
2140/9 2142/6
2142/14 2146/24
2151/11 2154/12
2155/9 2155/12
2155/25 2157/10
2157/15 2157/19
2159/25 2161/19
2163/10 2169/3
2195/1 2203/16
2203/17 2205/14
2207/16 2211/24

2212/3 2212/6
2213/23 2214/2
2214/8 2220/5 2222/5
2222/8 2223/14
2226/1 2227/5
2227/13 2243/9
**marketplace [3]**
2161/13 2170/2
2173/25
**markets [13]**  2127/2
2129/4 2131/6
2131/23 2141/25
2153/25 2160/18
2161/7 2161/15
2163/4 2163/6 2193/9
2229/11
**materially [1]**
2225/9
**math [3]**  2125/25
2126/4 2193/13
**Matrix [1]**  2126/15
**matter [11]**  2133/17
2137/18 2166/14
2166/16 2173/14
2174/24 2176/17
2183/13 2218/19
2242/15 2245/4
**matters [2]**  2127/24
2239/25
**maximally [1]**
2188/17
**maximum [1]**  2184/10
**may [11]**  2122/13
2122/13 2123/5
2128/16 2128/17
2128/18 2145/22
2190/4 2190/6 2199/2
2212/15
**maybe [7]**  2147/24
2150/8 2175/7
2176/21 2177/22
2190/5 2224/10
**me [20]**  2122/15
2126/2 2126/3
2142/23 2143/9
2144/12 2145/8
2146/13 2148/21
2158/24 2176/20
2180/13 2201/2
2221/24 2224/6
2230/1 2243/5
2243/17
**mean [24]**  2132/1
2132/6 2134/6
2143/25 2149/23
2156/20 2157/4
2168/2 2170/19
2178/2 2181/21
2185/9 2188/23
2192/8 2198/11
2206/21 2207/14
2223/15 2230/4
2230/5 2230/7 2231/3
2241/17 2243/23

**meaningful [1]**
2174/6
**means [9]**  2145/24
2156/13 2183/21
2184/24 2236/9
2237/13 2241/6
2241/13 2241/18
**meant [4]**  2146/12
2159/1 2192/11
2240/17
**measure [1]**  2173/13
**measures [1]**  2162/21
**mechanical [2]**
2120/18 2145/10
**mechanism [1]**  2173/8
**media [2]**  2123/3
2123/17
**medium [2]**  2164/9
2165/2
**medium-term [1]**
2165/2
**MEHTA [1]**  2118/9
**memory [1]**  2227/7
**mentioned [2]**
2155/12 2220/22
**mentioning [1]**
2155/10
**Merit [1]**  2120/14
**metadata [1]**  2232/6
**methodology [3]**
2138/22 2139/16
2139/25
**microeconomics [1]**
2126/22
**Microsoft [19]**
2146/21 2147/8
2147/12 2147/19
2150/6 2160/13
2161/23 2169/13
2169/17 2169/22
2170/7 2216/22
2217/6 2217/14
2217/15 2217/16
2217/20 2218/22
2218/25
**Microsoft's [1]**
2170/4
**middle [1]**  2149/3
**might [48]**  2130/14
2130/15 2130/18
2132/5 2137/22
2137/24 2137/25
2138/19 2139/6
2145/21 2146/16
2147/2 2147/19
2151/20 2154/12
2154/22 2160/8
2169/12 2170/23
2170/24 2171/8
2171/24 2172/1
2172/6 2172/13
2173/9 2173/18
2174/14 2175/16
2181/6 2182/21
2182/22 2183/2

**M**

**might... [15]**  2183/4
 2185/8 2187/18
 2189/15 2189/22
 2190/19 2190/23
 2208/15 2208/23
 2209/1 2211/17
 2222/8 2227/16
 2230/6 2230/7
**mimmick [2]**  2238/9
 2238/17
**mind [3]**  2132/23
 2164/8 2175/1
**minimize [1]**  2124/17
**minimum [1]**  2227/12
**minor [3]**  2181/6
 2221/22 2221/24
**minute [1]**  2124/19
**minutes [2]**  2154/14
 2242/24
**misses [4]**  2168/11
 2168/12 2168/15
 2168/15
**missing [2]**  2238/3
 2238/4
**misunderstood [1]**
 2177/22
**MIT [2]**  2126/5
 2126/20
**mix [3]**  2190/25
 2191/3 2191/10
**MLex [3]**  2120/12
 2122/23 2123/16
**mobile [12]**  2143/19
 2143/20 2144/5
 2153/17 2154/7
 2156/8 2156/9
 2156/10 2156/12
 2156/14 2181/24
 2217/14
**mode [4]**  2182/4
 2182/16 2182/18
 2222/15
**model [1]**  2191/18
**models [2]**  2182/15
 2222/4
**modes [3]**  2182/21
 2183/1 2183/4
**modify [1]**  2184/7
**modules [1]**  2237/8
**moment [11]**  2131/9
 2140/15 2140/18
 2142/4 2148/5
 2151/22 2155/6
 2155/10 2155/12
 2161/24 2178/19
**monetization [3]**
 2135/16 2181/1
 2186/10
**monetize [1]**  2187/17
**money [1]**  2146/21
**monopolies [1]**
 2161/3
**monopolized [1]**
 2229/11

**monopoly [15]**  2152/18
 2133/10 2133/11
 2136/13 2136/15
 2136/21 2136/23
 2137/3 2137/11
 2161/7 2161/20
 2169/13 2169/14
 2172/3 2195/9
 2208/17
**months [1]**  2197/19
**more [55]**  2127/18
 2130/15 2130/16
 2131/4 2131/7
 2131/10 2132/11
 2135/15 2137/8
 2137/10 2137/14
 2137/25 2138/1
 2148/7 2151/6 2158/2
 2160/23 2161/9
 2161/15 2162/20
 2163/25 2164/10
 2164/11 2165/3
 2165/7 2165/8
 2166/25 2168/4
 2175/7 2175/13
 2176/22 2178/10
 2179/4 2180/25
 2183/19 2185/1
 2186/10 2187/24
 2188/10 2188/15
 2191/4 2195/1 2195/5
 2203/3 2206/14
 2208/23 2213/3
 2219/8 2219/10
 2220/17 2220/19
 2221/18 2226/3
 2236/18 2240/22
**more years [2]**
 2208/23 2220/19
**morning [17]**  2118/7
 2122/3 2122/10
 2122/22 2122/25
 2123/1 2125/16
 2125/19 2196/11
 2196/12 2198/25
 2202/11 2206/16
 2220/22 2230/12
 2239/8 2242/23
**most [6]**  2126/10
 2126/13 2147/9
 2153/13 2169/18
 2181/23
**mostly [1]**  2198/10
**motivation [1]**
 2161/11
**move [15]**  2125/1
 2128/6 2132/15
 2142/20 2144/1
 2148/12 2153/22
 2155/24 2155/25
 2163/24 2195/13
 2224/15 2233/12
 2242/6 2244/6
**moved [1]**  2217/2
**movements [1]**

**Mr. [17]**  2122/15
 2122/16 2123/25
 2164/23 2176/11
 2196/5 2204/24
 2204/25 2206/9
 2238/19 2239/10
 2240/9 2240/13
 2242/20 2243/25
 2244/2 2244/11
**Mr. Koenig [1]**
 2123/25
**Mr. Locala [2]**
 2244/2 2244/11
**Mr. Ramaswamy [2]**
 2204/24 2204/25
**Mr. Sallet [2]**
 2122/15 2243/25
**Mr. Schmidtlein [5]**
 2122/16 2196/5
 2206/9 2238/19
 2242/20
**Mr. Turley [5]**
 2164/23 2176/11
 2239/10 2240/9
 2240/13
**Ms. [3]**  2122/14
 2151/3 2161/25
**Ms. Adkins [1]**
 2122/14
**Ms. Young [2]**  2151/3
 2161/25
**much [12]**  2125/11
 2138/18 2140/12
 2154/11 2165/8
 2168/25 2181/8
 2194/25 2227/16
 2227/23 2228/6
 2234/24
**multi [1]**  2235/19
**multi-prong [1]**
 2235/19
**multipronged [1]**
 2162/20
**my [37]**  2122/23
 2125/20 2126/7
 2126/10 2126/15
 2126/18 2129/13
 2133/2 2133/12
 2133/22 2149/8
 2149/9 2150/4
 2150/14 2162/9
 2177/24 2179/21
 2180/18 2194/8
 2199/23 2200/6
 2203/2 2203/20
 2207/6 2215/5
 2215/11 2220/1
 2220/1 2224/24
 2225/13 2228/1
 2232/15 2235/9
 2236/2 2236/12
 2236/17 2242/23
**my understanding [1]**
 2203/20

**N**

**name [3]**  2122/23
 2125/17 2125/20
**narrow [2]**  2178/14
 2182/24
**narrowly [1]**  2123/9
**nascent [6]**  2170/15
 2170/19 2171/1
 2171/5 2171/13
 2171/13
**natural [1]**  2226/22
**nature [6]**  2124/8
 2152/2 2207/22
 2210/9 2230/16
 2230/18
**NBER [1]**  2192/5
**near [1]**  2147/19
**necessary [5]**
 2123/18 2124/5
 2137/24 2171/17
 2227/16
**need [15]**  2122/13
 2122/13 2124/11
 2136/7 2137/18
 2163/10 2185/6
 2207/2 2207/9
 2207/24 2208/4
 2210/3 2219/15
 2220/24 2233/6
**needed [1]**  2227/12
**needs [1]**  2130/7
**Neeva [11]**  2174/8
 2174/11 2203/14
 2203/16 2203/22
 2204/5 2204/14
 2204/20 2204/21
 2204/24 2205/6
**Neeva's [3]**  2174/9
 2174/13 2204/3
**net [1]**  2143/25
**never [2]**  2211/11
 2222/5
**new [9]**  2123/16
 2154/20 2154/21
 2155/18 2177/23
 2178/5 2178/16
 2192/13 2219/23
**New York [1]**  2123/16
**next [23]**  2125/5
 2130/3 2138/6
 2138/13 2139/24
 2141/4 2142/8
 2148/19 2153/16
 2159/20 2162/16
 2165/4 2166/23
 2172/25 2173/15
 2179/12 2179/22
 2188/4 2194/5 2218/8
 2231/17 2240/1
 2240/1
**niche [5]**  2181/6
 2210/15 2221/21
 2222/11 2223/3
**no [60]**  2118/4
 2123/8 2124/1 2128/8

**N**

**no... [56]**   2129/7
2129/12 2135/21
2136/17 2137/2
2137/20 2142/2
2144/22 2147/3
2149/1 2149/6 2161/1
2161/6 2174/6 2177/8
2177/20 2180/10
2180/16 2182/7
2182/20 2183/5
2185/9 2186/7
2191/12 2191/13
2200/11 2200/23
2200/25 2202/19
2203/25 2206/2
2209/17 2211/10
2211/22 2212/5
2212/10 2214/11
2216/9 2216/10
2218/24 2219/25
2220/6 2224/8 2225/4
2226/18 2227/4
2227/14 2228/5
2228/10 2228/16
2228/20 2229/21
2235/8 2240/8
2241/23 2244/13
**non [8]**   2132/7
2132/10 2149/23
2149/24 2150/3
2161/13 2181/4
2219/16
**non-browser [1]**
2181/4
**non-default [3]**
2149/23 2149/24
2150/3
**non-existent [1]**
2161/13
**non-Google [3]**
2132/7 2132/10
2219/16
**none [1]**   2173/17
**nonexclusive [4]**
2208/13 2208/19
2215/18 2220/8
**not [151]**
**not that [1]**   2225/14
**notable [2]**   2156/16
2156/24
**notes [1]**   2242/23
**nothing [5]**   2189/21
2205/5 2216/16
2217/5 2222/3
**notice [1]**   2206/3
**notification [1]**
2200/14
**noting [1]**   2156/19
**notwithstanding [2]**
2222/21 2223/4
**November [1]**   2198/9
**novo [3]**   2174/12
2174/14 2174/19
**now [52]**   2122/5

2137/8 2137/24
2139/19 2140/7
2145/18 2148/20
2150/6 2154/19
2155/3 2155/4
2155/22 2157/7
2158/18 2160/10
2160/22 2163/8
2164/24 2167/19
2169/10 2170/9
2171/1 2175/8
2181/25 2195/17
2195/20 2196/13
2196/23 2197/22
2198/20 2202/9
2203/6 2205/9
2206/16 2206/25
2209/13 2212/13
2213/8 2214/7 2215/3
2215/23 2217/24
2218/8 2220/3
2221/18 2222/19
2223/19 2227/10
2240/10 2242/7
2242/9 2244/17
**number [11]**   2142/7
2151/14 2154/14
2154/22 2157/22
2198/20 2202/19
2203/2 2214/3
2237/10 2237/25
**numbers [8]**   2142/23
2151/7 2153/4
2154/25 2155/3
2205/20 2213/23
2213/24
**NW [2]**   2119/9
2120/16

**O**

**oath [1]**   2125/8
**object [1]**   2123/17
**objection [2]**
2122/19 2128/8
**observing [2]**   2161/6
2168/2
**obtain [1]**   2203/22
**obtained [2]**   2237/10
2237/12
**obtaining [1]**
2181/13
**obvious [2]**   2147/9
2156/20
**obviously [2]**
2124/11 2243/8
**occur [1]**   2134/12
**occurred [4]**   2134/10
2134/12 2134/16
2148/21
**OEM [3]**   2144/13
2209/22 2215/14
**OEMs [3]**   2144/18
2150/5 2203/23
**off [7]**   2124/19
2169/2 2169/6 2169/7

2169/8 2210/13
2210/14
**offer [5]**   2172/5
2187/21 2197/11
2218/22 2235/14
**offered [8]**   2200/23
2202/1 2202/5
2210/21 2211/23
2212/2 2235/22
2239/7
**offering [8]**   2199/20
2210/16 2212/5
2212/7 2228/16
2228/17 2228/20
2230/1
**Official [1]**   2120/15
**offset [2]**   2137/22
2166/21
**Oh [2]**   2178/4 2228/5
**Ohio [1]**   2126/19
**okay [35]**   2122/10
2122/12 2122/18
2124/3 2124/25
2128/9 2144/11
2146/17 2148/10
2149/12 2149/13
2150/19 2151/18
2152/21 2174/1
2178/17 2189/5
2192/23 2193/1
2193/7 2195/16
2196/18 2197/14
2201/8 2204/18
2212/22 2214/6
2215/2 2231/19
2232/16 2234/11
2242/25 2243/25
2244/8 2244/14
**once [2]**   2143/23
2242/22
**one [52]**   2123/6
2134/17 2137/10
2137/22 2137/24
2144/14 2144/16
2145/2 2145/21
2145/24 2146/4
2146/12 2146/16
2146/19 2147/25
2151/5 2154/24
2155/3 2156/4
2156/25 2165/21
2166/3 2166/17
2169/13 2170/18
2172/21 2177/16
2179/18 2183/11
2184/4 2189/14
2189/15 2189/24
2190/25 2192/22
2193/4 2193/8
2196/23 2197/2
2205/10 2207/20
2208/14 2208/22
2210/4 2214/12
2217/24 2224/9
2226/20 2230/3

2230/5 2233/14
2242/14
**one-year [2]**   2179/18
2197/2
**ongoing [1]**   2229/15
**online [1]**   2192/15
**only [19]**   2140/16
2148/24 2149/7
2149/20 2152/10
2157/14 2174/7
2174/7 2178/2
2178/15 2182/3
2184/12 2192/21
2193/4 2197/9 2202/1
2211/20 2234/9
2235/13
**only or [1]**   2148/24
**open [5]**   2146/24
2149/15 2183/8
2194/8 2229/10
**OpenAI [5]**   2239/12
2239/22 2240/6
2240/14 2240/16
**OpenAI's [2]**   2164/23
2176/11
**opening [2]**   2179/7
2194/17
**operated [1]**   2178/8
**operating [3]**
2200/21 2225/3
2225/8
**operative [1]**
2177/20
**opined [2]**   2129/10
2148/13
**opinion [43]**   2129/21
2129/23 2130/6
2133/20 2134/6
2184/8 2185/7 2194/8
2197/20 2199/20
2202/17 2202/20
2202/24 2203/2
2204/2 2204/4
2210/16 2210/22
2211/16 2211/23
2212/2 2212/5 2212/7
2218/11 2219/1
2219/17 2219/22
2220/1 2220/2 2220/9
2228/17 2228/20
2230/2 2230/12
2231/3 2231/7
2231/10 2232/18
2233/24 2235/14
2235/22 2236/1
2239/19
**opinions [16]**
2132/13 2138/3
2198/21 2199/17
2199/23 2200/2
2200/8 2200/15
2200/23 2201/12
2201/21 2202/5
2215/23 2235/5
2236/4 2236/13

**O**

**opportunities [1]**
 2220/18
**opportunity [2]**
 2168/14 2221/20
**opposed [5]**  2133/11
 2134/25 2185/24
 2207/20 2228/23
**opt [1]**  2201/10
**opt-outs [1]**  2201/10
**optimal [2]**  2176/17
 2176/19
**order [12]**  2123/17
 2140/4 2140/6
 2142/10 2156/5
 2175/24 2176/14
 2207/1 2207/23
 2218/22 2233/6
 2243/9
**ordered [3]**  2123/9
 2159/9 2159/12
**organic [1]**  2237/10
**organically [1]**
 2164/6
**organization [5]**
 2126/23 2126/24
 2127/24 2128/7
 2128/11
**organizations [3]**
 2123/3 2123/17
 2127/12
**other [44]**  2123/3
 2123/17 2124/13
 2126/9 2132/9
 2141/22 2143/15
 2144/22 2145/15
 2146/18 2147/15
 2148/1 2148/25
 2149/9 2152/10
 2153/7 2153/10
 2156/16 2156/18
 2156/24 2158/1
 2160/1 2162/3 2167/9
 2167/13 2172/22
 2182/13 2182/20
 2182/20 2183/1
 2183/17 2184/17
 2185/18 2188/8
 2189/24 2190/5
 2190/9 2190/9 2211/5
 2214/9 2219/19
 2222/11 2228/8
 2237/12
**others [2]**  2225/6
 2227/20
**otherwise [3]**
 2168/17 2200/8
 2229/14
**ought [2]**  2146/22
 2146/23
**our [3]**  2195/17
 2240/11 2242/8
**ourselves [1]**
 2172/17
**out [27]**  2123/3

 2124/22 2142/17
 2150/15 2160/8
 2161/4 2170/6 2172/6
 2175/6 2182/16
 2182/17 2182/18
 2182/23 2184/11
 2185/25 2189/4
 2203/17 2211/4
 2211/11 2212/12
 2218/15 2220/16
 2231/5 2231/5 2241/5
 2244/4 2244/9
**outcome [1]**  2140/12
**outcomes [12]**  2134/9
 2134/12 2134/15
 2134/21 2134/23
 2134/25 2204/8
 2207/21 2209/4
 2209/6 2212/12
 2234/2
**output [4]**  2161/6
 2230/5 2230/8
 2230/10
**outputs [2]**  2228/23
 2229/24
**outs [2]**  2182/20
 2201/10
**outside [5]**  2150/16
 2150/22 2160/19
 2242/13 2242/16
**over [23]**  2126/19
 2132/9 2135/15
 2137/9 2138/19
 2141/19 2161/13
 2175/18 2181/7
 2183/21 2184/4
 2186/12 2193/13
 2208/23 2218/13
 2220/18 2227/23
 2229/24 2231/17
 2233/13 2233/18
 2234/13 2241/4
**overall [5]**  2149/14
 2167/1 2194/4
 2213/23 2214/2
**overcome [6]**  2142/3
 2173/10 2175/17
 2176/5 2225/6
 2225/13
**Overviews [1]**  2238/3
**overwhelmingly [1]**
 2187/14
**own [10]**  2126/15
 2135/14 2157/21
 2159/14 2159/15
 2163/18 2163/20
 2228/1 2240/11
 2240/11
**owned [2]**  2178/7
 2179/3
**owner [3]**  2154/20
 2154/21 2155/18

**P**

**p.m [2]**  2244/19

 2244/19

**package [1]**  2149/15
**page [4]**  2229/6
 2231/17 2237/1
 2244/5
**paid [6]**  2137/4
 2177/15 2208/19
 2209/7 2209/15
 2220/7
**painlessly [1]**
 2134/20
**panel [1]**  2237/15
**paper [7]**  2190/22
 2191/25 2192/4
 2192/5 2192/13
 2192/24 2193/5
**par [1]**  2185/21
**parse [1]**  2232/3
**part [7]**  2162/20
 2201/7 2230/3
 2231/24 2239/13
 2241/9 2242/1
**participants [1]**
 2130/12
**particular [3]**
 2188/13 2208/22
 2212/8
**parties [3]**  2123/13
 2128/3 2210/2
**partner [2]**  2126/11
 2240/12
**Partners [1]**  2126/14
**party [4]**  2142/19
 2144/6 2157/25
 2210/22
**past [2]**  2133/8
 2209/11
**path [10]**  2135/21
 2159/13 2164/13
 2169/3 2172/5 2183/7
 2187/16 2195/1
 2208/22 2225/25
**pay [58]**  2139/6
 2141/11 2143/7
 2144/18 2146/19
 2146/20 2149/2
 2149/3 2149/7
 2149/11 2149/16
 2149/17 2149/18
 2149/21 2149/22
 2150/1 2154/21
 2158/7 2158/22
 2160/4 2162/4 2162/7
 2172/13 2177/7
 2179/5 2179/7 2180/3
 2180/7 2180/23
 2180/25 2181/1
 2181/10 2182/2
 2183/19 2184/13
 2185/1 2185/24
 2186/12 2187/1
 2187/1 2187/7 2187/7
 2187/11 2187/11
 2187/12 2187/15
 2187/18 2187/24

 2187/25 2188/10
 2189/3 2189/8
 2208/12 2209/20
 2215/6 2215/15
 2217/4 2217/25
**pay a [1]**  2189/3
**paying [5]**  2148/23
 2160/11 2162/3
 2188/23 2209/9
**payment [23]**  2138/14
 2140/21 2140/23
 2140/24 2141/2
 2141/5 2141/9
 2141/13 2141/24
 2142/7 2142/10
 2142/11 2168/18
 2168/22 2179/2
 2179/6 2188/23
 2189/15 2190/7
 2190/19 2192/18
 2215/3 2218/10
**payments [18]**  2142/3
 2144/22 2144/25
 2148/24 2149/1
 2149/7 2149/9 2152/6
 2160/16 2188/12
 2189/18 2189/19
 2189/22 2192/18
 2214/19 2215/1
 2215/22 2220/6
**pays [3]**  2150/6
 2168/4 2168/7
**people [1]**  2238/21
**percent [50]**  2139/22
 2139/23 2140/4
 2140/6 2140/7
 2142/11 2142/18
 2142/18 2142/19
 2144/1 2145/14
 2145/14 2150/24
 2151/11 2151/14
 2151/14 2153/5
 2153/6 2153/6 2153/7
 2153/7 2153/8
 2153/17 2154/17
 2154/22 2155/7
 2155/13 2155/19
 2155/22 2155/24
 2156/4 2156/5 2156/7
 2156/9 2156/10
 2156/12 2156/14
 2156/23 2157/3
 2157/22 2158/18
 2175/19 2213/15
 2213/15 2213/25
 2214/1 2218/13
 2220/4 2220/10
 2227/6
**percentage [6]**
 2142/6 2142/13
 2156/5 2213/14
 2214/5 2220/9
**percentages [1]**
 2213/24
**perfect [1]**  2173/17

**P**

**perfectly [1]**
 2134/20
**perhaps [5]**  2138/1
 2158/1 2169/19
 2183/16 2188/17
**period [12]**  2131/18
 2132/6 2137/9
 2138/20 2149/1
 2183/11 2185/25
 2186/12 2221/6
 2225/24 2226/16
 2227/2
**perjured [1]**  2224/7
**permissible [1]**
 2172/16
**permit [3]**  2180/9
 2181/12 2184/9
**permitted [3]**  2162/7
 2181/19 2215/2
**permitting [1]**
 2184/22
**persistent [1]**
 2230/20
**person [2]**  2236/8
 2243/24
**perspective [9]**
 2133/2 2133/12
 2138/16 2158/5
 2158/6 2166/3 2166/7
 2206/18 2225/13
**persuade [1]**  2218/22
**Ph.D [1]**  2126/5
**phase [5]**  2124/21
 2164/20 2197/11
 2213/10 2224/11
**phone [1]**  2177/20
**pick [1]**  2202/19
**pie [11]**  2140/18
 2142/4 2150/13
 2150/23 2151/21
 2154/25 2155/14
 2156/16 2157/17
 2163/9 2213/3
**Pixel [2]**  2178/5
 2178/11
**place [7]**  2124/25
 2154/24 2184/5
 2185/15 2185/16
 2233/1 2241/9
**placed [1]**  2125/8
**placement [7]**  2149/4
 2150/7 2150/17
 2150/23 2154/9
 2215/7 2215/12
**Plaintiff [1]**  2120/2
**plaintiffs [24]**
 2118/4 2119/2 2122/8
 2125/5 2125/13
 2128/5 2161/8 2164/8
 2178/4 2185/15
 2197/10 2197/24
 2198/2 2198/6 2198/7
 2201/2 2202/2
 2205/25 2206/6

2215/22 2217/12
 2225/17 2225/21
 2229/7
**plaintiffs' [76]**
 2121/5 2129/3
 2129/11 2129/19
 2130/24 2131/4
 2131/10 2131/15
 2131/22 2132/16
 2132/16 2138/3
 2138/5 2139/5 2139/7
 2140/2 2142/20
 2143/8 2149/14
 2152/7 2152/11
 2152/20 2156/22
 2157/9 2158/24
 2158/25 2159/22
 2160/24 2162/11
 2162/17 2167/19
 2168/5 2169/4
 2169/12 2169/21
 2169/25 2177/9
 2177/12 2179/20
 2193/16 2194/3
 2194/8 2194/13
 2194/22 2194/25
 2195/5 2195/7
 2198/16 2198/16
 2199/9 2200/16
 2201/9 2201/13
 2201/22 2202/18
 2212/25 2213/4
 2214/8 2214/19
 2215/2 2215/4 2215/6
 2215/13 2215/19
 2216/18 2228/22
 2229/2 2229/23
 2234/7 2234/13
 2235/15 2235/23
 2236/5 2236/14
 2239/14 2241/24
**plan [2]**  2239/17
 2244/15
**play [8]**  2129/22
 2146/9 2172/6
 2184/11 2206/14
 2211/11 2212/12
 2235/10
**played [3]**  2220/16
 2231/5 2231/5
**player [1]**  2170/2
**plays [1]**  2170/6
**please [12]**  2122/3
 2125/7 2125/9
 2125/17 2128/20
 2132/14 2133/1
 2139/24 2148/19
 2196/3 2242/11
 2242/14
**point [32]**  2144/5
 2147/10 2148/17
 2148/22 2152/25
 2153/3 2153/11
 2168/11 2168/12
 2171/24 2172/4

2172/8 2180/13
 2183/6 2183/18
 2184/14 2184/16
 2184/17 2209/23
 2212/9 2212/11
 2213/17 2221/16
 2221/17 2221/19
 2222/2 2223/3
 2223/10 2225/25
 2235/9 2239/24
 2241/15
**points [36]**  2135/17
 2139/2 2139/3 2140/1
 2140/9 2142/6
 2142/13 2142/17
 2143/1 2150/11
 2150/11 2156/5
 2168/22 2172/23
 2177/14 2179/4
 2179/8 2180/10
 2188/18 2189/23
 2189/24 2202/12
 2205/10 2211/5
 2213/9 2213/16
 2214/5 2214/10
 2214/13 2215/25
 2219/6 2221/22
 2221/24 2222/11
 2223/24 2224/3
**portion [4]**  2124/15
 2142/7 2150/16
 2156/7
**portions [1]**  2124/23
**position [6]**  2206/9
 2217/20 2239/2
 2241/21 2243/11
 2243/23
**positioned [1]**
 2169/18
**positions [2]**
 2123/12 2126/9
**posits [1]**  2143/6
**possibilities [1]**
 2149/1
**possibility [4]**
 2147/2 2149/15
 2193/4 2222/4
**possible [22]**
 2123/19 2130/17
 2131/20 2137/21
 2146/15 2154/10
 2165/14 2172/16
 2181/5 2185/2
 2188/19 2189/19
 2197/18 2199/23
 2216/12 2216/20
 2216/24 2217/8
 2220/15 2231/2
 2234/21 2235/2
**possibly [5]**  2146/5
 2203/3 2208/14
 2217/11 2241/19
**post [1]**  2140/8
**post-remedy [1]**
 2140/8

**potential [19]**
 2130/13 2142/2
 2155/9 2163/20
 2166/2 2166/13
 2170/16 2171/14
 2171/19 2182/21
 2190/23 2212/24
 2213/20 2220/5
 2239/15 2239/16
 2239/20 2239/25
 2240/2
**potentially [1]**
 2182/25
**power [2]**  2127/15
 2161/20
**practical [2]**
 2183/13 2218/19
**practice [1]**  2126/14
**pre [9]**  2154/20
 2154/21 2155/18
 2155/24 2157/9
 2158/8 2158/23
 2172/13 2177/13
**pre-existing [1]**
 2177/13
**pre-install [1]**
 2172/13
**pre-installation [5]**
 2154/21 2155/24
 2157/9 2158/8
 2158/23
**pre-installed [2]**
 2154/20 2155/18
**preamble [1]**  2229/8
**precedent [1]**
 2160/11
**precise [1]**  2134/18
**precluded [2]**  2152/9
 2222/3
**predict [2]**  2204/8
 2220/16
**prediction [5]**
 2146/12 2209/3
 2217/19 2226/1
 2226/7
**predominantly [1]**
 2197/5
**prefer [2]**  2210/5
 2210/12
**preferencing [1]**
 2127/17
**preload [6]**  2152/5
 2179/16 2204/15
 2210/24 2211/17
 2216/7
**preloaded [2]**
 2152/13 2211/20
**prepared [3]**  2128/13
 2132/12 2244/3
**present [3]**  2120/12
 2122/19 2197/4
**presentation [1]**
 2203/5
**preserve [4]**  2123/7
 2131/2 2195/9

**P**

**preserve... [1]**
2235/21
**preset [1]** 2181/22
**press [1]** 2123/4
**presumably [2]**
2157/20 2187/24
**pretty [1]** 2163/3
**Prettyman [1]**
2120/15
**prevent [2]** 2172/24
2215/14
**prevented [2]**
2148/23 2205/6
**previewed [1]**
2140/15
**previewing [1]**
2168/20
**previous [1]** 2154/23
**previously [1]**
2128/1
**primarily [1]** 2156/9
**primary [2]** 2133/22
2198/2
**principal [1]** 2173/4
**principle [2]** 2173/3
2235/2
**principles [1]**
2130/9
**prior [3]** 2127/24
2197/22 2221/10
**privacy [5]** 2182/4
2182/16 2182/18
2222/15 2222/24
**private [2]** 2128/3
2222/17
**proactively [1]**
2160/7
**probably [4]** 2157/13
2182/9 2187/23
2242/24
**problem [16]** 2130/4
2130/7 2136/3 2136/4
2136/12 2136/14
2136/22 2137/5
2137/15 2165/16
2165/17 2165/23
2180/4 2220/22
2220/24 2221/13
**problems [3]** 2186/9
2188/2 2188/5
**proceeding [1]**
2128/21
**proceedings [6]**
2118/9 2120/18
2123/5 2130/19
2198/5 2245/4
**process [16]** 2124/24
2134/23 2134/23
2134/24 2140/13
2147/23 2161/12
2165/9 2192/14
2193/23 2204/8
2208/8 2208/11
2209/4 2211/11

2212/10
**produce [2]** 2185/19
2185/20
**produced [1]** 2120/18
**product [15]** 2136/7
2136/9 2146/1
2157/25 2160/7
2168/7 2168/14
2170/5 2174/18
2182/13 2182/14
2190/12 2216/4
2222/24 2240/11
**products [8]** 2143/16
2147/22 2164/12
2170/8 2188/9 2190/9
2190/10 2222/8
**professor [1]**
2126/11
**programs [2]** 2160/16
2160/17
**prohibited [3]**
2162/2 2199/19
2200/9
**prohibiting [1]**
2190/1
**projected [1]** 2151/7
**promote [4]** 2159/24
2181/7 2190/1
2209/10
**promotion [5]**
2149/17 2149/22
2149/23 2149/24
2150/3
**promotional [1]**
2159/25
**prong [1]** 2235/19
**proper [6]** 2171/2
2174/4 2174/9 2175/5
2175/21 2176/7
**properties [1]**
2160/1
**proposal [12]**
2129/11 2142/20
2177/6 2177/10
2177/13 2178/13
2179/2 2179/14
2179/17 2181/15
2182/1 2182/11
**proposals [4]**
2130/15 2180/6
2180/16 2194/2
**proposed [27]** 2129/2
2129/6 2132/24
2140/23 2152/8
2152/20 2162/17
2169/25 2177/2
2178/20 2179/10
2185/15 2198/8
2198/13 2198/16
2199/9 2202/18
2206/1 2212/25
2215/2 2215/13
2216/18 2229/23
2234/13 2235/15
2235/23 2241/24

**proposition [1]**
2167/12
**prospect [2]** 2145/5
2147/1
**prospects [1]**
2141/24
**protect [2]** 2123/10
2172/2
**protected [1]**
2135/11
**Protection [1]**
2120/3
**provide [6]** 2167/11
2180/10 2202/16
2229/14 2237/20
2238/15
**provided [2]** 2231/1
2242/1
**provider [1]** 2167/10
**provides [1]** 2233/11
**providing [1]**
2229/12
**provision [16]**
2129/22 2182/5
2182/10 2183/10
2184/7 2199/18
2199/21 2200/20
2201/19 2201/22
2202/1 2202/6
2233/17 2234/12
2235/10 2238/8
**provisions [17]**
2129/9 2129/20
2164/7 2175/3
2175/12 2180/10
2180/17 2194/19
2199/8 2200/13
2200/16 2205/17
2206/4 2211/14
2238/16 2241/23
2242/3
**pry [1]** 2229/10
**prying [1]** 2146/24
**public [7]** 2123/4
2123/11 2123/20
2124/12 2124/23
2202/2 2202/6
**publication [1]**
2192/13
**publicly [1]** 2124/9
**publish [1]** 2128/18
**published [7]** 2127/4
2127/8 2127/10
2192/5 2192/8
2192/11 2192/12
**publisher [1]**
2201/10
**publishers [2]**
2199/19 2200/10
**pull [2]** 2203/4
2229/1
**pulling [1]** 2185/21
**pulls [1]** 2235/3
**purpose [4]** 2214/7
2214/23 2232/14

2243/3
**purposes [6]** 2214/17
2215/23 2216/10
2229/9 2231/10
2235/5
**pursued [1]** 2208/15
**pushes [1]** 2235/3
**put [9]** 2185/15
2199/6 2205/2
2212/13 2215/16
2215/18 2232/25
2239/4 2240/13
**PXRD011 [1]** 2244/3
**PXRD012 [1]** 2195/14

**Q**

**qualified [6]**
2127/23 2162/18
2231/25 2237/4
2241/10 2241/25
**qualify [2]** 2128/6
2171/15
**quality [24]** 2131/23
2135/19 2136/7
2136/9 2136/11
2141/20 2146/7
2157/16 2160/7
2163/5 2168/7
2168/14 2168/24
2170/7 2185/17
2219/4 2219/5
2220/25 2221/7
2227/23 2228/3
2228/6 2232/12
2240/10
**quantification [3]**
2225/11 2228/16
2231/1
**quantified [2]**
2134/3 2134/5
**quantify [3]** 2225/1
2225/8 2228/15
**queries [16]** 2139/1
2139/9 2139/12
2142/25 2143/4
2143/5 2143/17
2150/16 2150/17
2150/22 2150/25
2153/5 2153/8 2156/8
2158/19 2160/12
**query [9]** 2206/3
2206/4 2227/24
2228/7 2228/19
2234/14 2234/15
2237/4 2237/21
**question [21]**
2136/20 2145/6
2145/9 2146/18
2147/3 2148/3
2151/10 2159/3
2159/4 2166/3 2166/8
2177/4 2185/13
2200/5 2212/1
2214/25 2232/16
2233/23 2236/11

**Q**

**question... [2]**
2237/17 2242/4
**questions [5]**
2130/19 2148/7
2195/12 2223/23
2243/3
**quickly [3]**   2124/22
2165/7 2206/14
**quite [3]**   2148/18
2160/17 2188/24
**quits [1]**   2174/20
**quo [3]**   2131/3
2179/23 2235/21

**R**

**raise [2]**   2125/7
2242/18
**raised [1]**   2169/10
**Ralph [1]**   2120/4
**Ramaswamy [2]**
2204/24 2204/25
**ran [1]**   2126/15
**range [1]**   2145/19
**ranked [1]**   2237/10
**ranking [1]**   2237/7
**rapidly [1]**   2164/11
**rates [6]**   2139/10
2139/11 2140/2
2143/18 2143/20
2143/22
**rationale [1]**   2164/3
**raw [1]**   2230/6
**RDXD15.002 [1]**
2199/5
**RDXD15.010 [1]**
2212/19
**re [1]**   2224/10
**re-litigate [1]**
2224/10
**reach [3]**   2152/5
2152/12 2181/16
**reached [4]**   2130/21
2204/4 2219/17
2229/22
**read [6]**   2123/3
2193/11 2201/19
2232/2 2233/8 2233/9
**readily [1]**   2192/16
**reading [1]**   2234/10
**real [2]**   2188/11
2240/12
**real-time [1]**
2240/12
**realistic [1]**
2186/19
**really [25]**   2130/23
2131/14 2133/2
2137/2 2138/14
2146/9 2146/10
2147/18 2147/21
2152/17 2165/3
2176/15 2188/6
2193/23 2206/11
2206/14 2219/2

2219/3 2230/9
2230/10 2232/3
2233/14 2233/14
2241/21 2243/11
**Realtime [1]**   2120/14
**reason [4]**   2124/15
2182/9 2214/18
2230/3
**reasonable [6]**
2137/10 2183/19
2187/10 2209/19
2214/22 2241/8
**reasonably [1]**
2173/9
**reasons [5]**   2166/24
2169/20 2182/8
2215/21 2243/3
**rebuttal [1]**   2212/13
**recall [2]**   2205/20
2224/5
**received [1]**   2139/2
**recent [2]**   2174/15
2190/22
**recently [3]**   2126/13
2127/18 2223/6
**recess [4]**   2195/21
2195/22 2244/18
2244/19
**recognition [5]**
2225/15 2225/17
2225/21 2226/5
2226/16
**recognize [4]**
2128/10 2143/15
2191/16 2212/20
**recognized [3]**
2174/5 2211/16
2219/1
**record [27]**   2122/6
2123/6 2125/18
2130/18 2139/10
2143/2 2143/20
2143/22 2145/13
2153/2 2161/17
2161/21 2163/3
2164/5 2164/16
2164/17 2170/14
2170/21 2173/18
2203/20 2204/10
2222/15 2228/2
2228/11 2243/15
2243/16 2245/3
**recorded [1]**   2120/18
**recover [2]**   2139/8
2143/16
**recovery [2]**   2139/9
2140/2
**recreate [2]**   2233/19
2238/17
**RECROSS [1]**   2121/4
**REDIRECT [1]**   2121/4
**reduced [1]**   2134/1
**reducing [1]**   2235/16
**reduction [1]**
2201/17

**refer [1]**   2229/8
**reference [1]**
2205/12
**referred [2]**   2181/20
2223/3
**referring [1]**
2205/14
**regarding [1]**
2200/14
**regardless [2]**
2144/25 2237/11
**regards [7]**   2198/5
2200/9 2200/16
2201/22 2207/7
2210/22 2211/7
**Registered [1]**
2120/14
**reinforce [1]**
2135/19
**reinforced [3]**
2135/10 2137/22
2193/25
**relate [1]**   2132/18
**related [5]**   2135/15
2200/8 2228/9 2234/5
2234/15
**relates [1]**   2180/13
**relating [1]**   2199/17
**relationship [3]**
2228/3 2228/12
2228/14
**relative [8]**   2153/10
2157/6 2207/16
2226/6 2226/12
2230/25 2235/20
2240/20
**relatively [6]**
2156/25 2174/15
2177/19 2178/14
2190/22 2192/13
**releasing [1]**
2161/22
**relevant [9]**   2130/17
2131/5 2131/23
2141/25 2153/25
2163/4 2163/5
2170/10 2170/13
**relief [1]**   2200/20
**rely [1]**   2204/1
**relying [1]**   2204/23
**remain [3]**   2145/3
2150/17 2156/21
**remains [3]**   2144/16
2175/18 2184/18
**remedial [23]**
2131/17 2132/6
2138/20 2141/6
2143/7 2144/15
2145/2 2146/14
2147/10 2169/21
2170/6 2186/11
2213/1 2213/2
2213/21 2215/25
2216/17 2217/3
2217/4 2219/17

2219/22 2232/14
2232/23
**remedies [161]**
**remedy [54]**   2129/11
2130/15 2132/15
2132/18 2132/22
2137/17 2137/22
2140/8 2147/23
2148/13 2164/10
2172/18 2183/10
2186/24 2187/2
2187/6 2188/3 2193/4
2194/2 2198/5 2199/8
2199/10 2199/20
2200/24 2201/13
2201/23 2206/17
2212/25 2214/8
2215/2 2215/4 2215/6
2215/13 2215/19
2216/18 2229/2
2229/5 2229/6 2229/9
2230/13 2231/18
2231/21 2232/4
2234/8 2234/13
2235/15 2236/15
2236/21 2236/21
2237/19 2239/14
2239/24 2241/9
2241/24
**remedying [1]**
2236/19
**remember [1]**   2193/8
**remind [3]**   2151/4
2155/5 2193/20
**reminders [1]**   2160/1
**remove [2]**   2229/10
2230/20
**repeat [6]**   2136/19
2159/4 2184/4 2212/1
2225/19 2237/16
**replace [1]**   2170/25
**report [3]**   2150/14
2202/16 2212/14
**Reporter [4]**   2120/13
2120/14 2120/14
2120/15
**reports [9]**   2197/15
2198/21 2200/2
2200/3 2200/7
2200/16 2201/13
2201/22 2202/6
**represented [2]**
2124/8 2124/16
**reproduce [1]**
2240/24
**request [3]**   2122/13
2123/19 2206/12
**require [3]**   2177/6
2229/24 2236/21
**required [7]**   2123/7
2124/17 2205/23
2206/3 2229/19
2234/7 2235/6
**requirement [1]**
2178/3

**R**

**requirements [1]**
2205/15
**requires [6]** 2135/1
2232/4 2233/17
2234/13 2237/20
2237/22
**requiring [1]** 2206/8
**reset [3]** 2143/12
2143/14 2145/17
**resources [1]**
2217/16
**respect [6]** 2150/5
2181/15 2194/13
2194/20 2194/24
2202/2
**respectfully [1]**
2123/19
**respects [1]** 2212/23
**respond [1]** 2187/21
**response [6]** 2159/3
2161/3 2161/22
2167/15 2237/4
2237/20
**restore [14]** 2131/5
2133/4 2133/14
2133/18 2134/17
2153/24 2173/4
2173/7 2190/24
2195/5 2206/18
2206/21 2207/2
2233/6
**restoring [12]**
2129/4 2129/22
2133/9 2162/24
2170/10 2176/21
2179/20 2195/8
2206/15 2207/8
2232/24 2235/11
**restrict [1]** 2241/24
**restricted [1]**
2207/4
**restrictions [1]**
2162/4
**result [3]** 2142/11
2154/12 2240/6
**resulted [1]** 2207/10
**results [14]** 2139/15
2185/19 2185/20
2186/1 2236/6
2236/20 2236/22
2237/10 2237/20
2239/13 2240/14
2240/25 2241/11
2241/12
**resume [4]** 2195/17
2206/22 2242/10
2244/15
**retain [3]** 2152/9
2157/10 2157/14
**retained [4]** 2197/10
2197/16 2197/23
2198/14
**retaliation [3]**
2185/8 2185/9

2185/10
**retention [1]**
2197/22
**return [3]** 2140/18
2179/10 2193/16
**revenue [5]** 2142/3
2146/19 2149/3
2184/17 2215/15
**reverse [11]** 2236/6
2236/9 2236/10
2238/9 2238/16
2240/15 2241/11
2241/14 2241/18
2241/19 2241/21
**review [3]** 2124/21
2223/25 2242/23
**reviewed [1]** 2222/9
**reviewing [1]** 2213/4
**rewards [1]** 2160/16
**Richard [1]** 2119/8
**richard.gower [1]**
2119/11
**ride [1]** 2165/21
**rider [4]** 2165/16
2165/17 2165/23
2166/13
**riding [3]** 2165/20
2166/16 2166/17
**right [144]**
**rise [6]** 2122/2
2141/7 2165/15
2195/20 2196/1
2244/17
**risk [1]** 2185/7
**risking [1]** 2189/22
**risks [3]** 2130/13
2165/12 2172/20
**risky [1]** 2184/6
**rival [14]** 2136/10
2143/11 2145/12
2154/12 2179/16
2182/14 2185/18
2189/4 2191/7 2212/8
2219/19 2228/18
2232/18 2232/19
**rival's [1]** 2234/24
**rivalry [9]** 2131/1
2131/11 2131/15
2132/5 2133/15
2141/21 2161/10
2167/15 2209/6
**rivals [110]** 2131/17
2131/19 2131/22
2132/4 2132/7
2132/10 2133/25
2134/1 2135/13
2135/21 2137/2
2137/6 2137/10
2137/14 2138/19
2139/7 2139/13
2139/22 2140/5
2140/8 2140/10
2141/6 2141/11
2141/16 2141/18
2142/5 2142/11

2143/24 2144/1
2144/17 2145/16
2146/6 2146/9 2154/5
2154/8 2154/18
2155/25 2156/3
2156/6 2156/15
2157/11 2163/7
2163/10 2163/13
2163/19 2164/11
2166/6 2166/8
2166/25 2167/3
2167/8 2167/12
2168/13 2169/2
2170/4 2171/9
2171/10 2173/10
2173/12 2177/7
2177/18 2180/5
2180/24 2181/5
2181/9 2181/13
2183/21 2184/5
2184/5 2185/3 2185/4
2185/25 2186/16
2186/19 2187/25
2188/7 2188/19
2189/23 2194/22
2194/25 2194/25
2206/13 2208/16
2212/25 2216/18
2217/13 2217/21
2218/2 2218/11
2219/16 2219/24
2220/17 2221/20
2221/25 2225/25
2226/2 2226/6
2227/10 2227/23
2230/18 2232/10
2232/25 2233/25
2234/19 2236/5
2236/23 2238/9
2238/16 2239/20
2241/16
**rivals' [9]** 2134/1
2139/20 2147/22
2158/5 2166/7
2168/23 2211/24
2212/3 2235/16
**RMR [2]** 2245/2
2245/8
**roadmap [1]** 2132/12
**role [6]** 2129/21
2146/9 2190/17
2198/1 2206/15
2235/11
**rolled [1]** 2175/6
**rough [1]** 2205/20
**roughly [4]** 2196/15
2196/19 2197/4
2197/15
**RPFJ [2]** 2201/9
2202/10
**RSA [1]** 2211/12
**rulings [1]** 2123/13
**run [4]** 2160/12
2199/7 2199/15
2240/21

**run-through [1]**
2199/7

**S**

**Safari [11]** 2153/21
2181/18 2181/23
2182/4 2183/17
2205/7 2218/23
2219/11 2221/25
2222/18 2223/24
**safeguard [1]**
2172/19
**said [25]** 2124/18
2129/13 2130/6
2133/20 2136/21
2152/3 2155/13
2155/16 2164/24
2167/19 2169/16
2188/8 2201/7
2203/16 2204/7
2206/9 2214/16
2217/12 2225/5
2225/12 2227/15
2239/15 2241/5
2241/18 2244/5
**Sallet [4]** 2120/2
2122/8 2122/15
2243/25
**same [16]** 2131/24
2140/5 2165/6
2166/11 2172/17
2175/15 2183/24
2184/1 2184/5
2192/19 2192/20
2192/24 2202/20
2206/3 2215/21
2228/19
**Samsung [1]** 2210/23
**saw [1]** 2142/4
**say [33]** 2127/1
2134/14 2145/12
2145/12 2148/21
2149/22 2150/3
2161/6 2162/8
2165/21 2167/3
2172/13 2176/16
2176/18 2182/13
2182/14 2183/15
2183/17 2185/18
2186/6 2192/8
2198/12 2206/5
2207/19 2209/2
2209/4 2212/10
2224/2 2224/6
2233/14 2235/12
2235/23 2238/12
**saying [7]** 2123/23
2147/8 2211/19
2211/22 2215/15
2224/7 2224/8
**says [2]** 2229/9
2240/9
**scale [35]** 2134/1
2135/8 2135/13
2135/14 2135/15

**S**

**scale... [30]**
2135/18 2136/7
2136/11 2141/19
2163/2 2163/3 2163/5
2163/7 2167/5 2185/5
2194/13 2194/14
2194/17 2221/4
2221/10 2226/19
2226/22 2227/1
2227/12 2227/16
2227/18 2227/24
2228/3 2228/7 2228/9
2228/19 2228/23
2229/13 2229/20
2230/25
**scale-dependent [4]**
2167/5 2228/23
2229/13 2229/20
**scale-related [1]**
2135/15
**scenarios [1]** 2216/6
**Schmidtlein [8]**
2120/8 2122/9
2122/16 2196/5
2196/7 2206/9
2238/19 2242/20
**scope [4]** 2181/19
2205/24 2205/25
2206/11
**scratch [1]** 2174/18
**screen [15]** 2162/8
2172/14 2177/23
2178/24 2187/1
2187/7 2187/19
2187/22 2188/3
2188/12 2188/18
2189/3 2189/18
2190/19 2191/8
**screens [31]** 2175/3
2175/6 2175/9
2175/11 2177/6
2177/9 2177/13
2177/17 2178/5
2178/14 2178/15
2178/20 2179/9
2187/11 2187/12
2187/15 2187/25
2188/6 2188/16
2188/23 2189/8
2189/10 2189/14
2190/1 2190/4 2190/5
2190/7 2190/11
2191/2 2191/5
2210/17
**search [152]**
**search-query [1]**
2227/24
**searching [1]** 2160/4
**seat [1]** 2124/4
**seated [3]** 2122/3
2125/9 2196/3
**second [20]** 2131/2
2133/6 2133/25
2137/23 2138/1

2147/14 2148/13
2153/20 2166/7
2168/25 2169/1
2170/3 2170/16
2171/11 2171/18
2173/22 2174/23
2183/25 2186/13
2192/2
**secret [1]** 2123/15
**section [18]** 2120/3
2199/18 2200/9
2200/19 2201/9
2201/13 2201/16
2201/16 2201/25
2229/1 2229/4
2229/10 2231/20
2231/21 2233/11
2234/5 2234/7 2237/1
**Section IV.C [2]**
2199/18 2200/9
**Section IX.E [1]**
2201/25
**Section VI [3]**
2229/1 2229/4
2231/20
**Section VI.B [1]**
2201/9
**sections [3]** 2199/15
2199/17 2200/13
**secured [1]** 2180/11
**security [1]** 2124/10
**see [16]** 2122/11
2154/24 2177/5
2186/4 2186/9 2188/5
2189/5 2199/16
2204/14 2211/18
2218/21 2219/23
2222/10 2229/16
2240/4 2244/16
**seek [1]** 2160/8
**seeking [2]** 2205/25
2206/7
**seemed [1]** 2201/3
**seen [3]** 2190/18
2223/17 2228/12
**select [1]** 2211/5
**selected [3]** 2168/3
2217/10 2217/20
**self [1]** 2127/17
**self-preferencing [1]**
2127/17
**send [1]** 2159/25
**senior [1]** 2223/21
**sense [13]** 2144/24
2146/13 2174/13
2175/16 2184/19
2187/2 2189/21
2192/11 2227/16
2230/6 2239/3
2242/20 2242/22
**sensitive [1]**
2124/11
**September [1]** 2223/8
**series [1]** 2132/8
**SERP [2]** 2185/20

2235/8

**served [1]** 2157/21
**serves [1]** 2227/7
**services [4]** 2129/5
2135/6 2139/21
2179/17
**session [6]** 2118/7
2122/14 2124/6
2124/18 2124/22
2196/2
**set [23]** 2131/17
2132/4 2139/4
2140/10 2143/8
2150/2 2159/14
2160/9 2162/20
2181/17 2182/3
2182/12 2185/12
2188/16 2189/3
2189/23 2195/4
2210/2 2210/11
2218/23 2219/23
2229/9 2232/6
**sets [2]** 2184/14
2184/14
**setting [3]** 2155/22
2204/15 2209/22
**settings [1]** 2210/24
**seven [1]** 2196/17
**seven years [1]**
2196/17
**several [5]** 2190/25
2193/5 2193/6
2193/10 2199/15
**share [65]** 2138/18
2139/22 2139/23
2140/3 2140/4 2140/6
2140/8 2140/9 2141/7
2142/3 2142/6
2142/10 2142/14
2143/5 2143/11
2143/17 2143/23
2143/24 2144/1
2144/3 2146/15
2146/15 2146/19
2149/3 2149/10
2151/12 2151/16
2154/12 2154/17
2154/25 2155/9
2155/13 2155/23
2155/25 2156/4
2156/7 2156/14
2156/14 2156/23
2156/25 2157/2
2157/2 2157/6
2157/10 2157/15
2162/1 2162/6 2166/5
2175/18 2191/4
2191/17 2211/24
2212/6 2212/24
2213/14 2213/16
2213/23 2213/24
2214/2 2215/15
2217/1 2220/5 2220/5
2220/12 2227/6
**share-shift [1]**

2162/1

**shared [7]** 2129/24
2163/17 2163/21
2205/23 2230/16
2235/12 2235/14
**shares [7]** 2139/21
2145/12 2145/14
2163/10 2212/3
2213/20 2214/8
**sharing [25]** 2129/19
2131/22 2138/7
2162/11 2162/19
2162/22 2162/23
2163/1 2163/11
2163/23 2164/7
2165/1 2165/11
2165/12 2165/24
2171/16 2175/3
2175/12 2176/13
2205/12 2205/17
2206/13 2230/17
2235/10 2242/2
**she [6]** 2233/14
2238/20 2238/22
2239/2 2239/2 2243/8
**She doesn't [1]**
2233/14
**she's [6]** 2239/1
2241/5 2243/11
2243/23 2243/23
2243/24
**shed [1]** 2130/18
**shelved [1]** 2222/12
**shift [26]** 2139/12
2140/3 2140/4 2141/8
2141/10 2142/10
2143/24 2144/3
2146/15 2146/15
2151/16 2154/12
2154/18 2154/25
2156/14 2156/25
2157/2 2157/6 2161/4
2162/1 2163/9
2191/17 2212/24
2214/8 2218/5 2220/5
**shifted [1]** 2216/1
**shifting [2]** 2156/14
2191/4
**shifts [3]** 2149/10
2162/6 2217/2
**short [9]** 2123/2
2123/19 2176/24
2177/19 2180/4
2180/19 2190/19
2191/11 2240/21
**short-term [2]**
2180/4 2190/19
**should [23]** 2123/14
2129/23 2133/18
2167/16 2171/15
2173/3 2173/13
2174/24 2175/16
2185/23 2186/6
2202/13 2202/17
2202/23 2203/2

**S**

**should... [8]** 2203/7 2230/13 2230/13 2230/16 2235/12 2239/12 2239/19 2240/2
**show [5]** 2151/21 2172/11 2178/24 2188/17 2189/3
**showed [4]** 2151/13 2154/23 2169/25 2181/23
**showing [3]** 2142/4 2154/25 2179/8
**shown [1]** 2142/16
**shows [6]** 2139/20 2142/9 2153/16 2158/12 2161/17 2163/3
**shut [1]** 2185/24
**side [4]** 2226/19 2226/22 2227/1 2234/5
**sidebar [1]** 2237/9
**sidebar content [1]** 2237/9
**sides [1]** 2166/10
**signals [2]** 2232/6 2240/24
**significance [3]** 2138/17 2166/13 2240/20
**significant [13]** 2134/6 2137/8 2153/10 2157/8 2157/14 2163/4 2170/1 2195/1 2207/14 2231/4 2231/9 2238/10 2238/17
**similar [1]** 2165/4
**similarly [1]** 2160/19
**simplification [1]** 2150/14
**since [2]** 2175/8 2175/13
**single [4]** 2211/20 2231/25 2232/5 2232/7
**sir [1]** 2124/1
**sit [1]** 2243/21
**site [1]** 2237/9
**sitting [2]** 2222/7 2223/22
**situated [1]** 2160/19
**situation [5]** 2163/25 2164/1 2172/17 2208/24 2209/1
**six [5]** 2196/15 2196/17 2197/15 2197/18 2197/19
**six years [1]** 2196/15

**size [2]** 2127/14 2232/12
**skim [1]** 2193/11
**skip [1]** 2193/13
**slice [1]** 2155/7
**slide [64]** 2128/13 2128/23 2130/3 2130/3 2130/22 2131/13 2132/14 2133/1 2133/19 2135/7 2138/6 2138/13 2138/25 2139/18 2139/20 2139/24 2141/4 2142/8 2142/9 2147/5 2148/19 2150/23 2151/3 2151/7 2151/23 2151/25 2152/23 2153/12 2153/16 2154/1 2155/2 2156/7 2158/11 2158/12 2159/20 2160/10 2160/22 2161/24 2162/2 2162/16 2163/1 2164/22 2165/5 2166/23 2168/21 2169/23 2170/12 2171/22 2172/10 2173/15 2179/12 2179/22 2188/4 2189/11 2194/5 2195/13 2203/4 2205/10 2217/1 2217/23 2218/8 2239/4 2239/5 2244/4
**slide 10 [1]** 2135/7
**Slide 14 [1]** 2138/25
**Slide 19 [4]** 2150/23 2151/7 2151/23 2151/25
**Slide 2 [1]** 2128/23
**Slide 3 [1]** 2130/3
**Slide 4 [1]** 2130/22
**Slide 42 [2]** 2203/4 2205/10
**slotting [1]** 2237/7
**slowly [2]** 2137/11 2185/5
**small [4]** 2136/10 2191/13 2194/10 2194/11
**snippets [1]** 2237/9
**so [186]**
**so I think [10]** 2124/14 2146/2 2168/9 2178/13 2184/24 2186/19 2189/24 2207/18 2216/15 2229/25
**so it's [2]** 2147/12 2195/16
**so this 18 percent [1]** 2157/22

**so this divestiture [1]** 2154/8
**So this is [1]** 2146/12
**So this slide [3]** 2139/20 2142/9 2158/12
**solution [3]** 2164/11 2165/2 2186/22
**solutions [1]** 2164/10
**solve [1]** 2182/5
**some [51]** 2130/14 2130/18 2131/14 2132/19 2134/11 2139/9 2143/16 2144/23 2147/14 2147/25 2153/4 2154/22 2155/19 2166/19 2167/24 2169/19 2173/12 2173/16 2173/18 2175/3 2180/9 2180/20 2182/13 2183/17 2183/22 2185/3 2186/12 2188/19 2189/12 2189/22 2190/7 2191/1 2199/7 2199/23 2202/11 2202/11 2202/12 2202/12 2206/12 2209/20 2212/23 2212/24 2213/9 2213/19 2214/24 2219/19 2222/4 2225/5 2228/14 2230/6 2239/7
**somebody [1]** 2241/4
**someone [1]** 2167/12
**something [12]** 2131/20 2145/15 2150/10 2154/9 2165/15 2165/20 2172/16 2193/12 2201/10 2208/14 2227/6 2230/4
**sometimes [1]** 2137/24
**somewhere [2]** 2216/12 2242/24
**soon [2]** 2147/25 2244/16
**sooner [3]** 2223/15 2223/18 2224/4
**sorry [15]** 2123/23 2136/19 2142/22 2148/20 2149/10 2151/5 2152/1 2155/11 2159/4 2188/22 2191/19 2219/20 2225/19 2233/12 2238/12
**sort [20]** 2122/13 2127/11 2144/2

2149/14 2144/14 2149/14 2157/1 2172/10 2190/12 2191/14 2207/5 2209/10 2210/24 2212/24 2217/1 2221/21 2224/9 2230/19 2240/1 2240/19
**sorts [1]** 2228/8
**sought [1]** 2203/22
**source [3]** 2157/1 2169/16 2191/20
**South [1]** 2119/4
**speak [1]** 2178/19
**specific [19]** 2129/23 2134/9 2134/12 2134/15 2137/19 2202/17 2202/19 2203/1 2207/21 2208/6 2209/3 2212/5 2230/15 2230/24 2231/15 2234/2 2235/6 2235/8 2235/12
**specifically [13]** 2153/23 2161/22 2182/17 2199/22 2200/8 2204/1 2204/17 2204/22 2224/5 2226/2 2226/12 2234/9 2238/1
**specifics [1]** 2166/15
**spell [1]** 2125/17
**spirit [2]** 2199/24 2200/8
**splits [1]** 2153/6
**sponsor [1]** 2190/2
**sponsoring [2]** 2180/8 2188/14
**square [1]** 2160/23
**standard [1]** 2181/18
**start [12]** 2125/22 2126/3 2128/24 2132/15 2132/22 2139/19 2148/14 2151/13 2162/22 2183/25 2221/21 2227/20
**started [6]** 2126/18 2130/6 2133/20 2139/1 2175/9 2196/22
**starting [3]** 2138/10 2140/21 2143/2
**starts [4]** 2135/12 2136/6 2142/25 2168/2
**StatCounter [1]** 2153/14
**state [3]** 2120/2 2125/17 2126/19

**S**

statement [2] 2123/2 2123/24
STATES [7] 2118/1 2118/3 2118/10 2119/2 2122/6 2125/4 2181/22
status [5] 2131/3 2179/23 2211/8 2215/4 2235/21
stem [1] 2147/7
stenography [1] 2120/18
step [2] 2242/12 2242/16
steps [1] 2130/5
stick [1] 2232/15
sticking [1] 2220/3
still [25] 2122/15 2131/24 2144/16 2145/25 2146/2 2146/5 2147/11 2149/3 2149/16 2150/9 2156/21 2157/10 2158/9 2158/13 2169/24 2175/15 2175/18 2180/7 2180/9 2181/9 2184/24 2186/10 2189/23 2217/15 2222/23
stimulate [3] 2140/25 2141/3 2141/16
stopped [1] 2196/19
Store [1] 2158/15
stores [1] 2159/24
strategic [1] 2127/3
strategies [1] 2160/20
strategy [2] 2235/19 2235/20
Street [2] 2119/4 2119/9
strength [1] 2226/13
strong [3] 2166/24 2217/20 2225/23
structural [1] 2200/19
structure [4] 2189/17 2189/19 2211/3 2221/19
studied [3] 2129/6 2154/11 2226/12
study [6] 2127/2 2191/6 2191/11 2191/19 2192/18 2192/19
sub [2] 2180/22 2181/11
sub-bullet [2] 2180/22 2181/11
subjects [2] 2126/21 2127/10
submit [1] 2200/2

submitted [1] 2237/4
Subsection [1] 2234/4
substantially [1] 2220/20
successful [4] 2130/15 2130/16 2161/8 2191/4
such [3] 2124/9 2160/25 2188/3
suffered [1] 2240/6
sufficient [2] 2233/18 2237/6
suggest [4] 2157/17 2176/20 2176/23 2190/3
suggesting [1] 2210/19
suggests [3] 2182/24 2211/2 2211/3
Suite [3] 2119/4 2119/10 2120/6
superior [1] 2219/4
support [1] 2202/6
suppose [1] 2186/25
supposed [2] 2136/11 2235/13
sure [29] 2125/24 2128/22 2129/18 2131/12 2136/5 2138/24 2139/17 2142/15 2142/24 2142/24 2145/25 2153/1 2155/15 2162/15 2167/25 2171/21 2172/22 2183/8 2188/24 2217/10 2218/9 2219/21 2230/4 2233/8 2236/8 2237/18 2238/13 2238/21 2244/9
surfaces [1] 2216/23
surprise [1] 2224/6
surprising [2] 2157/7 2157/12
suspect [1] 2144/24
SW [1] 2120/9
switch [9] 2143/11 2144/19 2144/21 2184/15 2216/4 2219/1 2219/18 2226/19 2244/9
switched [1] 2216/3
switching [1] 2201/17
SWORN [1] 2125/13
syndicated [1] 2241/11
syndication [51] 2132/17 2138/8 2140/15 2146/8 2147/15 2147/20 2148/8 2162/12 2162/14 2162/19

2164/2 2164/3 2164/7 2164/10 2164/24 2165/7 2165/11 2165/13 2165/24 2168/13 2168/19 2168/23 2169/5 2169/8 2170/3 2171/12 2171/16 2180/17 2185/14 2185/19 2186/3 2186/8 2186/13 2190/15 2194/14 2194/19 2194/21 2217/13 2219/14 2230/17 2235/10 2236/15 2236/17 2236/19 2236/21 2237/19 2238/8 2238/16 2239/8 2239/14 2241/9 2242/1
system [1] 2200/21

**T**

T-a-s-n-e-e-m [1] 2125/21
tab [1] 2150/7
table [7] 2150/14 2212/13 2212/21 2213/8 2214/12 2216/1 2216/7
tailored [1] 2123/9
take [53] 2124/18 2129/19 2132/12 2134/5 2137/6 2137/13 2146/6 2159/18 2159/22 2163/16 2163/24 2164/8 2164/15 2165/2 2166/9 2168/25 2169/19 2170/18 2173/9 2173/12 2174/12 2174/14 2175/16 2176/3 2176/5 2176/5 2176/10 2176/14 2176/21 2181/8 2182/10 2183/6 2185/4 2186/10 2186/21 2187/23 2188/15 2195/17 2196/25 2203/7 2206/9 2207/13 2221/17 2221/18 2227/10 2231/3 2234/4 2236/25 2240/22 2241/21 2242/2 2242/8 2242/17
take years [1] 2165/2
taken [1] 2220/2
takes [3] 2173/4 2173/6 2244/4
taking [1] 2128/24

talk [14] 2132/17 2151/20 2158/5 2162/11 2170/9 2173/1 2199/13 2201/6 2202/9 2218/10 2218/12 2219/8 2220/4 2224/17
talked [10] 2187/18 2203/10 2203/13 2205/9 2206/16 2207/5 2220/21 2230/22 2232/24 2234/22
talking [7] 2178/10 2185/9 2214/1 2216/25 2217/2 2219/9 2236/20
talks [4] 2200/20 2231/21 2237/2 2237/6
target [4] 2137/18 2137/25 2138/1 2138/2
Tasneem [3] 2125/5 2125/13 2125/20
taught [5] 2126/17 2126/20 2126/21 2127/6 2196/15
teaching [1] 2196/19
team [1] 2174/17
technical [4] 2129/10 2129/16 2230/2 2243/24
technological [2] 2137/9 2161/5
technology [4] 2152/1 2170/25 2236/8 2241/20
tell [7] 2217/9 2217/21 2221/24 2237/24 2238/5 2240/17 2243/22
ten [11] 2127/22 2135/15 2137/8 2153/13 2161/13 2175/25 2176/2 2176/25 2208/23 2218/20 2220/18
ten years [7] 2135/15 2137/8 2153/13 2161/13 2175/25 2176/25 2218/20
tend [1] 2195/9
tension [1] 2177/5
tentative [1] 2192/9
term [11] 2136/2 2147/19 2164/9 2165/2 2168/15 2180/4 2190/19 2191/12 2202/9 2202/13 2202/17
terms [11] 2145/10 2146/7 2157/6

**T**

**terms... [8]**   2186/14
 2189/17 2232/12
 2233/13 2234/23
 2235/16 2235/18
 2235/24
**terribly [1]**   2243/22
**Terrific [1]**   2195/15
**testified [12]**
 2127/20 2164/23
 2202/20 2202/22
 2205/1 2217/24
 2218/4 2221/16
 2224/18 2226/20
 2239/17 2244/2
**testify [6]**   2138/11
 2206/11 2239/2
 2239/2 2243/8
 2243/11
**testimony [24]**
 2124/9 2124/16
 2128/14 2131/8
 2147/21 2164/20
 2165/4 2176/15
 2195/11 2195/19
 2197/11 2198/25
 2202/11 2204/19
 2204/23 2207/6
 2214/24 2218/16
 2222/9 2223/25
 2239/7 2240/9 2241/2
 2242/11
**text [2]**   2129/5
 2201/17
**than [18]**   2124/19
 2131/5 2135/15
 2137/8 2142/19
 2143/15 2157/11
 2175/7 2175/13
 2176/25 2180/24
 2186/7 2186/11
 2187/25 2191/4
 2192/17 2219/11
 2220/10
**thank [17]**   2123/21
 2123/22 2123/23
 2123/24 2124/3
 2125/9 2125/11
 2150/20 2151/18
 2152/21 2178/17
 2187/4 2195/10
 2195/19 2196/3
 2196/6 2244/16
**thank you [12]**
 2123/22 2123/23
 2123/24 2124/3
 2125/9 2150/20
 2151/18 2152/21
 2178/17 2195/19
 2196/6 2244/16
**Thank you very much**
 **[1]**   2125/11
**that [546]**
**that a [1]**   2152/12
**that's [110]**   2124/15

2131/18 2131/20
2134/22 2136/9
2137/11 2141/7
2142/16 2143/3
2144/8 2144/8 2145/6
2145/13 2145/24
2146/2 2146/8
2146/21 2147/3
2150/12 2151/11
2152/14 2152/16
2154/9 2155/7 2161/6
2168/9 2169/18
2172/10 2174/18
2176/13 2177/24
2178/9 2178/12
2178/12 2178/13
2179/8 2179/23
2180/4 2180/15
2182/19 2187/5
2188/14 2189/24
2194/1 2196/24
2197/7 2197/17
2197/21 2198/4
2198/10 2198/19
2198/23 2199/22
2200/11 2200/18
2201/4 2201/5
2201/11 2201/15
2202/4 2202/15
2203/9 2203/15
2203/19 2203/20
2205/4 2205/8
2205/10 2205/11
2205/16 2206/20
2206/24 2208/22
2210/19 2211/22
2213/6 2213/12
2213/15 2213/22
2214/4 2214/11
2214/15 2214/21
2215/5 2215/9
2215/21 2218/3
2218/13 2220/1
2220/1 2220/23
2221/2 2222/2
2223/10 2224/24
2225/24 2226/19
2232/2 2233/4 2233/9
2235/3 2235/20
2236/2 2236/7
2237/23 2237/24
2239/9 2240/2
2240/17 2242/3
**their [26]**   2125/5
 2141/10 2143/14
 2145/2 2145/23
 2146/1 2146/7 2150/2
 2152/14 2163/17
 2163/18 2163/20
 2168/14 2177/10
 2180/18 2183/23
 2189/20 2190/13
 2191/11 2195/2
 2198/8 2206/1 2206/4
 2206/14 2218/5

2250/23
**them [25]**   2132/9
 2134/5 2135/4
 2149/18 2152/17
 2152/18 2154/24
 2163/22 2163/22
 2164/12 2170/25
 2171/7 2171/8
 2173/17 2176/14
 2177/22 2185/21
 2189/20 2193/25
 2198/7 2198/11
 2198/24 2199/24
 2232/19 2240/16
**themselves [3]**
 2167/8 2190/4 2224/7
**then [45]**   2124/20
 2126/19 2129/1
 2130/8 2130/10
 2132/15 2132/16
 2132/18 2135/16
 2137/3 2139/3 2139/8
 2139/12 2140/19
 2143/14 2143/21
 2143/24 2149/2
 2151/13 2152/4
 2157/4 2157/5 2158/1
 2159/12 2160/6
 2163/19 2167/14
 2170/16 2171/5
 2171/14 2175/8
 2187/16 2188/15
 2190/7 2190/11
 2190/12 2190/14
 2196/25 2208/4
 2208/4 2213/19
 2213/20 2236/10
 2242/17 2244/15
**theoretically [2]**
 2146/22 2178/3
**there [61]**   2122/19
 2133/2 2144/22
 2145/8 2145/20
 2147/25 2150/15
 2150/16 2153/15
 2156/16 2158/9
 2160/11 2161/14
 2163/10 2163/19
 2165/4 2165/12
 2166/1 2166/10
 2166/17 2166/24
 2168/20 2169/12
 2169/20 2171/3
 2173/16 2176/8
 2177/5 2182/18
 2182/20 2183/15
 2185/7 2185/10
 2185/22 2189/9
 2190/21 2191/12
 2191/16 2191/16
 2191/22 2192/3
 2193/4 2198/20
 2199/14 2207/14
 2209/5 2210/17
 2214/2 2218/17

2218/19 2219/2
 2219/3 2219/15
 2220/5 2222/11
 2228/12 2231/4
 2235/9 2237/2
 2241/23 2244/12
**there'll [2]**   2163/20
 2166/19
**there's [29]**   2124/24
 2133/12 2134/6
 2136/2 2145/20
 2146/20 2147/24
 2148/25 2149/1
 2149/2 2156/25
 2161/1 2161/21
 2163/4 2164/16
 2164/20 2174/5
 2190/3 2190/21
 2192/21 2193/10
 2204/19 2211/16
 2220/4 2222/14
 2228/2 2228/2
 2228/14 2233/17
**thereafter [1]**
 2147/25
**therefore [1]**
 2235/14
**Therein [1]**   2136/11
**these [58]**   2131/7
 2135/2 2138/15
 2138/17 2138/18
 2139/9 2139/13
 2142/23 2145/18
 2146/14 2149/10
 2149/20 2151/16
 2154/16 2154/25
 2155/3 2157/1
 2158/19 2159/21
 2160/19 2164/25
 2165/15 2167/16
 2170/23 2172/19
 2173/17 2174/2
 2175/12 2175/25
 2176/9 2176/16
 2176/20 2176/23
 2177/14 2179/13
 2180/20 2188/4
 2188/16 2190/16
 2199/17 2200/16
 2203/6 2214/9
 2214/13 2214/17
 2215/25 2216/6
 2216/15 2216/22
 2217/7 2219/18
 2222/3 2222/11
 2230/23 2234/19
 2237/22 2239/20
 2243/20
**These were [1]**
 2164/25
**they [82]**   2130/15
 2132/17 2137/20
 2141/19 2142/1
 2144/21 2144/23
 2145/1 2145/22

**T**

**they... [73]** 2149/15
2149/17 2149/18
2150/1 2152/9
2158/14 2158/15
2158/16 2162/9
2167/5 2167/6 2167/7
2169/7 2170/24
2171/16 2172/1
2174/20 2174/20
2176/12 2176/18
2177/13 2178/15
2178/24 2180/3
2180/6 2180/9 2180/9
2183/22 2183/23
2185/5 2186/18
2186/20 2187/14
2187/16 2188/10
2189/22 2189/23
2190/13 2190/24
2191/1 2191/3
2191/10 2191/11
2191/12 2191/12
2191/16 2191/18
2193/6 2194/18
2203/17 2205/19
2206/3 2206/3
2208/16 2210/14
2210/15 2217/9
2217/10 2217/12
2217/21 2223/12
2223/13 2223/14
2223/15 2223/23
2224/6 2224/7
2225/13 2225/14
2233/1 2239/17
2239/18 2239/23
**they'd [5]** 2141/18
2167/4 2167/6 2169/7
2240/9
**they'll [1]** 2167/9
**they're [6]** 2136/1
2148/18 2179/21
2185/19 2185/21
2213/24
**thing [4]** 2149/20
2184/1 2223/19
2243/5
**things [6]** 2122/12
2156/18 2160/16
2189/15 2196/14
2223/12
**think [155]**
**thinking [3]** 2146/23
2202/13 2207/6
**third [13]** 2131/4
2134/1 2141/23
2142/19 2144/6
2157/25 2160/10
2173/23 2175/20
2181/11 2181/11
2210/2 2210/22
**third-party [2]**
2142/19 2144/6
**thirdly [1]** 2141/13

**this [175]**
**those [46]** 2124/2
2134/20 2140/1
2143/10 2144/2
2150/17 2150/22
2150/24 2150/24
2152/16 2159/19
2164/9 2165/3
2170/18 2173/11
2175/4 2177/17
2177/19 2177/20
2178/7 2179/5 2179/9
2181/2 2183/4 2183/8
2183/8 2183/20
2184/22 2187/17
2189/10 2189/19
2191/18 2194/2
2198/13 2200/3
2200/3 2208/5 2208/8
2211/3 2211/15
2217/17 2219/2
2223/25 2224/2
2224/19 2227/21
**though [1]** 2186/5
**thought [4]** 2147/4
2189/13 2202/23
2214/22
**thoughts [1]** 2202/12
**threat [5]** 2170/15
2170/19 2171/1
2171/5 2171/13
**threatened [1]**
2123/10
**threats [1]** 2171/14
**three [11]** 2123/9
2130/23 2133/22
2146/5 2149/1
2176/23 2176/25
2183/15 2184/2
2184/3 2184/5
**three years [3]**
2176/23 2183/15
2184/5
**through [21]** 2126/7
2127/18 2132/12
2139/2 2139/16
2145/25 2147/23
2148/8 2152/12
2157/1 2159/14
2160/1 2160/16
2164/7 2165/1
2180/11 2185/19
2192/13 2199/7
2199/15 2213/8
**throughout [2]**
2131/8 2190/17
**tied [1]** 2231/15
**time [43]** 2124/17
2128/5 2131/24
2135/18 2137/6
2137/14 2141/19
2146/6 2151/6
2160/20 2163/16
2163/24 2164/8
2164/15 2164/18

2169/9 2170/18
2173/12 2176/5
2176/10 2181/7
2184/15 2185/4
2185/25 2186/10
2186/11 2186/12
2186/21 2186/25
2188/16 2190/7
2197/13 2219/15
2221/17 2221/18
2226/14 2226/16
2227/2 2227/9
2227/19 2240/12
2240/22 2242/7
**time-consuming [1]**
2165/9
**timeline [2]** 2175/20
2176/19
**timelines [6]**
2173/16 2174/3
2176/16 2176/20
2176/23 2203/6
**times [3]** 2123/16
2127/20 2127/22
**timing [2]** 2147/17
2242/21
**titled [1]** 2245/4
**today [20]** 2128/14
2137/13 2143/16
2147/8 2160/13
2168/3 2169/17
2172/15 2172/18
2180/25 2183/4
2185/1 2187/14
2188/8 2188/9
2208/24 2209/1
2213/5 2214/25
2234/22
**together [3]** 2168/19
2169/5 2199/6
**told [2]** 2201/2
2201/2
**too [6]** 2176/24
2180/19 2201/3
2234/24 2235/15
2235/24
**took [2]** 2197/2
2201/1
**tool [3]** 2134/18
2170/17 2171/19
**top [3]** 2153/15
2175/24 2232/4
**topic [2]** 2148/8
2242/7
**topics [1]** 2127/11
**touch [1]** 2196/14
**touched [1]** 2198/24
**towards [1]** 2194/22
**trace [3]** 2142/17
2144/4 2150/15
**tracing [1]** 2140/1
**trade [1]** 2169/13
**traditional [3]**
2170/24 2171/10
2239/16

**traffic [1]** 2153/18
**transcript [5]**
2118/9 2120/18
2124/21 2124/22
2245/3
**transcription [1]**
2120/18
**translate [1]**
2213/20
**transparency [2]**
2129/9 2201/17
**transpires [1]**
2123/12
**treated [1]** 2172/22
**tried [5]** 2130/17
2205/2 2218/22
2218/25 2225/1
**trier [1]** 2127/21
**tries [1]** 2172/11
**trivial [1]** 2155/25
**true [1]** 2225/24
**try [5]** 2145/8
2186/24 2204/20
2204/21 2232/15
**trying [7]** 2148/2
2169/21 2174/17
2224/10 2224/12
2232/25 2233/5
**Turley [5]** 2164/23
2176/11 2239/10
2240/9 2240/13
**turn [7]** 2132/18
2138/3 2161/24
2177/2 2229/24
2233/18 2234/13
**two [21]** 2123/8
2133/2 2146/5
2156/18 2166/1
2166/10 2166/10
2170/13 2171/3
2175/13 2181/4
2184/4 2186/4 2186/9
2191/24 2205/19
2223/21 2223/23
2224/10 2228/13
2228/14
**two years [3]**
2175/13 2205/19
2223/23
**type [2]** 2129/22
2143/19
**types [9]** 2159/21
2160/20 2180/1
2181/5 2189/15
2215/1 2222/7
2222/11 2239/20

**U**

**U.S [7]** 2119/8
2143/5 2153/5 2153/8
2153/13 2153/17
2158/18
**ubiquitous [1]**
2210/9
**ubiquitously [1]**

**U**

**ubiquitously... [1]**
2210/4
**ultimate [4]**   2134/23
2140/11 2209/6
2233/4
**ultimately [6]**
2140/11 2188/15
2198/12 2223/12
2243/4 2243/19
**under [45]**   2125/8
2130/15 2131/21
2139/5 2139/7
2139/13 2140/5
2141/2 2143/7
2145/18 2146/16
2147/20 2149/14
2151/16 2152/11
2154/16 2156/22
2157/1 2157/9
2159/22 2160/24
2162/17 2168/5
2168/12 2169/25
2172/18 2180/6
2181/3 2181/19
2182/9 2184/4 2206/1
2206/8 2212/25
2214/9 2215/2 2215/4
2215/6 2215/7 2215/7
2216/17 2230/13
2234/7 2238/8
2238/15
**undergraduate [3]**
2125/25 2126/4
2126/22
**understand [33]**
2130/7 2142/23
2144/13 2147/7
2147/20 2152/7
2152/8 2152/14
2152/17 2162/13
2162/17 2169/16
2170/21 2177/12
2178/23 2181/15
2182/11 2187/3
2187/5 2188/24
2192/4 2192/21
2207/9 2207/23
2215/13 2218/9
2218/25 2222/23
2237/6 2238/19
2238/25 2243/2
2243/17
**understanding [14]**
2152/11 2177/24
2203/20 2207/3
2214/7 2215/5
2224/13 2224/24
2228/21 2234/6
2234/12 2236/14
2236/17 2240/23
**understood [3]**
2150/4 2240/19
2243/12
**undertaken [1]**

2227/10
**undisciplined [1]**
2147/12
**unilateral [1]**
2184/13
**Unit [1]**   2120/4
**UNITED [7]**   2118/1
2118/3 2118/10
2119/2 2122/6 2125/4
2181/22
**United States [2]**
2125/4 2181/22
**United States of [1]**
2122/6
**University [2]**
2126/19 2126/20
**unlawful [3]**   2207/9
2221/6 2221/14
**unless [3]**   2123/6
2195/12 2217/2
**unlock [2]**   2168/22
2180/10
**until [2]**   2140/19
2197/4
**up [20]**   2122/21
2124/1 2138/19
2146/7 2179/7 2186/6
2188/16 2194/8
2194/17 2203/1
2203/4 2212/13
2214/24 2217/22
2220/8 2224/3 2229/1
2232/19 2239/4
2240/15
**URL [1]**   2232/5
**us [12]**   2129/15
2132/12 2144/4
2155/5 2173/18
2174/13 2193/20
2224/3 2227/16
2240/10 2240/11
2243/22
**usable [1]**   2240/21
**usdoj.gov [2]**   2119/6
2119/11
**use [22]**   2149/18
2160/15 2160/19
2164/14 2165/3
2172/9 2175/2 2175/8
2176/15 2177/9
2178/14 2181/12
2185/25 2189/14
2210/19 2211/1
2240/16 2240/22
2241/10 2241/16
2241/25 2244/5
**useable [1]**   2236/18
**used [7]**   2123/23
2138/22 2143/19
2153/13 2165/5
2191/11 2244/10
**useful [4]**   2146/13
2183/1 2183/2 2190/6
**user [25]**   2144/7
2145/23 2151/15

2152/3 2152/12
2153/9 2154/18
2155/4 2156/11
2157/5 2163/14
2163/21 2164/6
2164/14 2165/8
2183/22 2226/19
2226/22 2227/1
2227/8 2230/6
2233/22 2234/5
2234/14 2234/14
**user-downloaded [3]**
2144/7 2151/15
2152/3
**user-side [4]**
2226/19 2226/22
2227/1 2234/5
**users [36]**   2131/25
2132/1 2135/20
2136/8 2149/18
2150/2 2158/7 2158/9
2158/12 2159/2
2159/11 2159/13
2159/16 2159/18
2159/23 2160/2
2160/4 2160/7
2160/11 2160/14
2167/13 2167/21
2168/16 2169/6
2180/5 2186/15
2186/17 2187/13
2187/16 2187/17
2188/8 2188/9 2190/8
2190/12 2210/12
2226/3
**using [5]**   2135/20
2143/21 2173/24
2176/6 2176/9

**V**

**V.C [1]**   2200/19
**vague [1]**   2234/9
**valuable [1]**   2182/22
**value [1]**   2167/11
**valued [1]**   2146/1
**variation [1]**
2186/25
**various [6]**   2127/11
2139/2 2176/16
2213/9 2213/20
2214/9
**Vasant [2]**   2120/12
2122/23
**vast [1]**   2156/13
**Verizon [1]**   2211/13
**version [4]**   2147/14
2171/24 2172/7
2244/4
**versus [4]**   2122/7
2228/7 2230/5
2240/21
**versus Google LLC [1]**
2122/7
**vertical [2]**   2127/16
2161/18

**very [7]**   2124/22
2125/11 2152/1
2199/9 2204/8 2223/6
2235/22
**VI [3]**   2229/1 2229/4
2231/20
**VI.A [1]**   2231/21
**VI.B [1]**   2201/9
**videos [1]**   2237/14
**view [15]**   2144/13
2145/5 2147/1 2149/5
2155/3 2160/23
2179/21 2180/18
2226/23 2228/10
2228/24 2230/15
2234/2 2242/2 2242/4
**viewed [3]**   2135/24
2136/1 2169/5
**views [2]**   2229/22
2243/8
**VIII [1]**   2201/16
**violations [1]**
2229/12
**vs [1]**   2118/5
**vulnerabilities [2]**
2124/13 2124/14
**vulnerable [1]**
2124/13

**W**

**want [28]**   2123/25
2136/8 2145/1
2145/22 2148/14
2167/8 2180/20
2182/22 2184/7
2184/11 2186/17
2186/24 2186/25
2189/15 2190/13
2193/16 2196/14
2199/15 2202/9
2212/13 2214/24
2215/17 2215/19
2216/25 2218/9
2224/17 2226/19
2241/4
**wanted [2]**   2148/21
2223/13
**wants [3]**   2149/2
2240/23 2242/17
**was [43]**   2126/10
2126/13 2128/24
2129/1 2133/15
2135/14 2135/19
2137/2 2139/4
2152/23 2159/3
2162/2 2164/22
2165/4 2165/6
2176/14 2181/23
2187/5 2191/4
2191/11 2193/3
2193/23 2197/19
2198/8 2198/17
2201/6 2202/22
2203/2 2203/16
2207/3 2207/14

**W**

**was... [12]**   2210/23
 2219/4 2221/17
 2223/4 2223/6 2223/8
 2226/10 2226/13
 2231/15 2237/12
 2237/16 2244/10
**Washington [4]**
 2118/5 2119/10
 2120/10 2120/16
**wasn't [6]**   2143/17
 2218/17 2218/19
 2219/2 2219/3
 2239/22
**way [16]**   2130/13
 2149/16 2152/10
 2167/11 2168/19
 2172/21 2188/19
 2193/22 2194/22
 2206/7 2210/19
 2212/23 2233/9
 2233/14 2239/2
 2241/24
**ways [18]**   2130/25
 2131/14 2140/25
 2158/9 2158/12
 2158/19 2159/10
 2170/13 2172/2
 2175/4 2181/12
 2189/9 2194/9 2207/5
 2221/22 2222/5
 2227/10 2231/15
**wc.com [1]**   2120/11
**we [94]**   2123/19
 2124/20 2124/21
 2124/24 2125/1
 2128/18 2128/23
 2130/3 2130/22
 2131/13 2133/1
 2133/19 2134/19
 2134/19 2135/7
 2137/17 2138/6
 2138/13 2138/16
 2138/25 2139/18
 2139/24 2140/15
 2141/4 2142/4 2142/8
 2142/9 2143/4
 2145/11 2145/11
 2145/13 2145/14
 2145/17 2145/18
 2146/22 2147/5
 2148/7 2148/8 2151/2
 2152/23 2153/12
 2153/16 2154/1
 2155/2 2158/4
 2158/11 2159/20
 2162/16 2163/1
 2164/22 2166/23
 2167/24 2168/21
 2169/11 2169/11
 2169/23 2170/12
 2171/22 2172/17
 2173/25 2174/16
 2174/16 2179/12
 2179/22 2187/13

 2187/18 2188/4
 2189/11 2193/18
 2194/5 2195/17
 2195/17 2199/12
 2200/3 2201/6 2203/4
 2208/23 2208/25
 2217/23 2220/3
 2223/19 2223/20
 2223/21 2224/13
 2229/1 2230/22
 2231/17 2233/6
 2236/25 2239/4
 2242/17 2244/2
 2244/3 2244/5
**we respectfully [1]**
 2123/19
**we will [3]**   2124/21
 2195/17 2195/17
**we'd [3]**   2184/5
 2236/24 2244/6
**we'll [8]**   2125/2
 2131/7 2140/18
 2199/14 2241/5
 2242/10 2244/9
 2244/16
**we're [14]**   2122/5
 2138/15 2144/24
 2151/20 2178/10
 2209/12 2216/3
 2217/2 2219/23
 2224/9 2238/21
 2238/23 2243/6
 2243/19
**we's [1]**   2244/7
**we've [10]**   2154/25
 2159/16 2165/10
 2180/20 2193/8
 2193/15 2199/5
 2199/6 2212/18
 2244/9
**web [1]**   2153/18
**weeks [2]**   2197/15
 2197/18
**weighed [1]**   2167/17
**Weinberg [1]**   2165/5
**welcome [1]**   2125/10
**welfare [2]**   2191/7
 2191/14
**well [93]**   2126/10
 2126/18 2126/25
 2127/9 2127/11
 2127/19 2128/3
 2130/14 2130/22
 2131/21 2132/6
 2132/19 2132/25
 2133/19 2134/11
 2134/18 2135/1
 2135/7 2135/12
 2136/1 2140/10
 2141/4 2141/5
 2141/18 2142/1
 2144/6 2147/11
 2148/4 2150/8
 2153/12 2156/1
 2156/9 2156/18

 2157/12 2157/20
 2158/9 2160/13
 2161/1 2162/19
 2162/25 2163/13
 2164/5 2164/16
 2165/18 2166/1
 2168/11 2168/21
 2169/16 2170/21
 2171/3 2172/7
 2172/21 2173/4
 2173/8 2173/15
 2174/5 2174/17
 2175/3 2175/6
 2175/18 2175/23
 2178/7 2178/25
 2180/24 2181/21
 2187/3 2188/4
 2191/22 2193/22
 2194/5 2195/7
 2199/11 2209/9
 2216/24 2218/13
 2220/3 2220/15
 2222/2 2222/14
 2222/23 2223/6
 2223/19 2226/9
 2227/4 2231/13
 2232/2 2232/9
 2232/24 2236/7
 2237/22 2238/23
 2239/21 2239/21
**well-funded [1]**
 2174/17
**well-known [1]**
 2226/9
**Wellesley [1]**   2126/5
**went [4]**   2130/8
 2143/1 2143/5 2205/1
**were [47]**   2133/23
 2141/18 2144/22
 2151/3 2152/9
 2152/17 2152/23
 2155/9 2156/18
 2157/7 2158/24
 2159/9 2159/12
 2164/25 2165/23
 2169/11 2172/23
 2175/6 2176/12
 2185/15 2185/18
 2188/16 2189/8
 2189/14 2197/10
 2197/16 2197/16
 2198/2 2198/6
 2198/14 2198/15
 2199/12 2205/19
 2210/9 2211/12
 2213/4 2213/9
 2215/11 2222/11
 2222/12 2222/12
 2223/23 2225/5
 2225/9 2225/14
 2231/15 2239/23
**what [130]**
**what sort [1]**
 2210/24
**what's [3]**   2217/1

 2234/10 2243/20
**whatever [4]**   2172/1
 2190/15 2230/16
 2242/17
**when [27]**   2132/24
 2133/10 2143/2
 2143/10 2147/5
 2149/22 2150/3
 2150/13 2150/15
 2164/23 2169/4
 2171/25 2183/8
 2185/25 2186/18
 2187/13 2192/8
 2201/1 2202/13
 2203/13 2204/9
 2205/17 2218/10
 2219/8 2220/17
 2226/10 2244/2
**whenever [1]**   2184/13
**where [32]**   2126/6
 2126/17 2129/15
 2130/17 2133/4
 2139/3 2142/23
 2143/3 2146/8 2149/3
 2150/22 2151/21
 2155/5 2155/8
 2155/17 2161/19
 2170/25 2174/16
 2179/6 2184/18
 2190/22 2191/1
 2206/22 2207/8
 2207/20 2217/4
 2217/15 2219/9
 2220/5 2220/7 2230/9
 2237/24
**whether [33]**   2129/3
 2137/18 2144/25
 2147/18 2162/3
 2162/7 2164/6 2164/7
 2166/8 2166/20
 2199/16 2210/23
 2211/7 2215/24
 2217/9 2217/21
 2222/10 2225/8
 2226/5 2228/21
 2229/18 2229/23
 2232/10 2233/5
 2233/6 2233/22
 2235/15 2235/23
 2236/5 2237/11
 2238/7 2238/14
 2240/5
**which [31]**   2127/5
 2130/15 2132/8
 2135/16 2138/5
 2140/24 2143/2
 2145/16 2147/20
 2156/5 2157/1
 2159/14 2166/16
 2168/7 2179/11
 2181/23 2186/12
 2186/21 2195/4
 2195/14 2203/22
 2207/3 2207/10
 2207/25 2210/15

**W**

which... [6]   2212/24
 2213/9 2217/1 2230/7
 2234/4 2239/17
while [1]   2192/6
who [9]   2140/11
 2145/21 2154/21
 2157/14 2183/16
 2198/3 2204/21
 2238/21 2239/25
who's [1]   2243/17
whoever [1]   2209/20
whole [4]   2146/4
 2222/2 2223/10
 2232/5
whose [1]   2128/1
why [14]   2125/1
 2134/22 2141/24
 2148/4 2152/16
 2169/2 2174/18
 2178/13 2186/17
 2194/1 2219/15
 2223/11 2235/3
 2239/4
widely [3]   2153/13
 2154/6 2181/24
widget [3]   2172/14
 2172/15 2215/17
will [38]   2124/18
 2124/19 2124/21
 2128/10 2144/6
 2145/3 2146/5
 2147/11 2147/15
 2161/3 2163/13
 2164/8 2164/15
 2173/12 2176/21
 2179/7 2180/2 2181/2
 2182/24 2183/6
 2183/19 2186/10
 2186/20 2186/21
 2187/14 2192/12
 2195/1 2195/7 2195/9
 2195/17 2195/17
 2214/5 2216/1
 2216/18 2216/22
 2221/18 2235/10
 2236/5
William [3]   2120/13
 2245/2 2245/8
WILLIAMS [1]   2120/9
willing [2]   2211/17
 2215/15
win [14]   2140/11
 2141/18 2163/13
 2163/19 2167/11
 2167/13 2181/2
 2181/6 2183/16
 2183/19 2184/24
 2185/3 2188/19
 2217/17
winning [1]   2141/16
wireless [3]   2208/21
 2209/22 2210/23
without [22]   2134/15
 2136/15 2136/23

2146/3 2152/6 2156/3
2157/15 2160/9
2166/15 2168/25
2169/1 2169/2 2170/1
2171/7 2184/17
2186/11 2189/22
2191/14 2206/22
2207/8 2216/13
2227/19
witness [5]   2121/2
 2122/14 2125/6
 2125/8 2125/13
WITNESSES [1]   2121/4
won [1]   2212/8
won't [2]   2163/19
 2195/3
word [1]   2210/20
words [5]   2144/23
 2148/25 2152/10
 2164/25 2185/18
work [10]   2126/6
 2126/7 2130/11
 2163/2 2164/19
 2168/19 2176/9
 2196/23 2197/6
 2197/8
working [8]   2163/15
 2164/5 2164/25
 2165/8 2184/2 2192/5
 2192/13 2196/22
works [2]   2200/1
 2236/15
world [54]   2141/7
 2143/7 2144/15
 2145/2 2146/14
 2146/19 2147/10
 2155/17 2163/25
 2169/21 2170/6
 2186/11 2207/16
 2207/19 2208/5
 2208/18 2209/13
 2209/14 2209/18
 2210/1 2210/17
 2210/25 2211/9
 2211/19 2212/9
 2213/1 2213/2
 2213/14 2213/16
 2213/21 2215/25
 2216/17 2216/21
 2217/3 2217/4 2219/9
 2219/17 2219/22
 2220/5 2220/7
 2220/16 2224/13
 2224/14 2226/6
 2226/7 2228/18
 2231/4 2231/11
 2232/10 2232/18
 2232/22 2232/23
 2233/25 2234/3
worry [1]   2227/20
worse [2]   2169/6
 2210/13
worth [2]   2156/19
 2193/11
would [317]

wouldn't [13]
 2134/20 2137/3
 2169/1 2182/10
 2182/12 2183/22
 2183/24 2184/6
 2185/16 2217/9
 2220/11 2223/15
 2224/5
wouldn't it [1]
 2220/11
write [1]   2122/23
written [4]   2127/4
 2127/13 2127/16
 2127/18
wrong [1]   2234/23
wrongdoing [1]
 2221/11

**Y**

Yahoo [4]   2211/7
 2217/18 2226/9
 2226/13
yeah [15]   2147/3
 2151/24 2155/7
 2159/5 2178/9
 2188/25 2189/11
 2190/20 2193/12
 2197/9 2197/17
 2197/18 2212/21
 2214/5 2223/21
year [11]   2179/18
 2183/11 2183/14
 2183/15 2183/21
 2184/1 2184/2 2184/3
 2184/4 2184/4 2197/2
years [35]   2126/19
 2135/15 2137/8
 2153/13 2161/13
 2163/6 2165/2 2174/7
 2174/21 2175/7
 2175/8 2175/13
 2175/13 2175/24
 2175/25 2176/3
 2176/14 2176/21
 2176/23 2176/25
 2183/15 2184/5
 2196/15 2196/17
 2197/5 2202/23
 2203/2 2203/17
 2205/19 2208/23
 2216/14 2218/20
 2220/19 2223/23
 2224/23
Yep [1]   2189/6
yes [45]   2122/17
 2127/7 2138/21
 2145/7 2147/7
 2154/14 2155/2
 2159/8 2161/16
 2167/22 2186/2
 2187/9 2191/21
 2192/10 2192/10
 2192/25 2193/21
 2194/1 2197/1
 2197/25 2201/7

2209/12 2204/11
2207/5 2207/12
2211/15 2216/5
2218/7 2218/15
2221/5 2221/9
2221/12 2221/15
2223/9 2223/14
2224/21 2227/4
2230/15 2231/23
2234/21 2235/2
2236/7 2236/16
2241/19 2242/4
yesterday [3]
 2122/13 2244/2
 2244/11
yet [2]   2151/25
 2192/4
York [1]   2123/16
you [359]
you -- just [1]
 2232/15
you know [36]
 2128/24 2135/21
 2137/21 2139/25
 2142/25 2146/22
 2147/6 2151/1
 2163/24 2164/22
 2169/24 2172/7
 2172/21 2174/16
 2179/3 2181/3 2181/6
 2182/24 2183/6
 2183/18 2183/23
 2184/3 2186/21
 2188/1 2188/9
 2190/11 2191/1
 2194/11 2194/16
 2200/1 2227/15
 2227/19 2230/20
 2237/25 2238/3
 2240/1
You submit [1]
 2200/2
You understand [1]
 2215/13
you'd [3]   2156/17
 2197/23 2229/5
you're [18]   2145/16
 2145/20 2147/7
 2150/9 2168/19
 2177/9 2199/9
 2199/20 2204/9
 2205/14 2210/16
 2212/7 2214/1
 2216/25 2217/2
 2228/4 2228/17
 2238/20
you've [31]   2127/5
 2138/11 2144/15
 2144/17 2151/7
 2152/3 2163/9
 2171/18 2200/23
 2201/12 2202/5
 2203/10 2206/16
 2210/21 2211/6
 2211/23 2212/2

**Y**

**you've... [14]**
2213/8 2213/13
2214/18 2218/4
2220/14 2220/21
2224/18 2224/25
2225/7 2226/4
2227/11 2232/17
2232/24 2235/22
**Young [2]** 2151/3
2161/25
**your [79]** 2122/5
2122/17 2122/22
2123/18 2123/21
2123/24 2125/3
2125/7 2125/17
2125/22 2128/5
2128/14 2128/16
2128/18 2128/20
2130/1 2131/8 2132/3
2132/11 2132/13
2138/3 2139/16
2144/13 2148/22
2149/5 2152/11
2159/3 2159/4
2160/22 2160/23
2184/8 2185/7
2193/19 2195/10
2195/12 2195/18
2196/6 2196/13
2197/22 2198/1
2198/21 2198/24
2199/2 2200/2 2200/5
2200/7 2200/15
2201/1 2201/12
2201/21 2202/5
2202/12 2202/12
2202/16 2205/10
2212/1 2212/13
2212/15 2215/23
2216/7 2218/11
2218/13 2218/16
2219/22 2226/23
2231/10 2235/5
2236/4 2236/13
2237/16 2237/16
2239/5 2242/6
2242/11 2242/14
2243/3 2243/12
2244/1 2244/5
**Your Honor [17]**
2122/5 2122/17
2122/22 2123/18
2125/3 2128/5
2128/16 2128/18
2195/12 2196/6
2199/2 2212/15
2242/6 2242/14
2243/12 2244/1
2244/5
**yourself [1]** 2229/18
**YouTube [1]** 2160/2

**Z**

**Zaremba [3]** 2120/13
2245/2 2245/8
**zero [1]** 2166/17