IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      ) CIVIL NO.:
et al.,                        ) 20-3010-APM
            Plaintiff,         )
        vs.                    )
                               )
GOOGLE, LLC,                   )
                               ) April 29, 2025
            Defendant.         ) Washington, D.C.
_____  ) Day 7 - Afternoon Session


Transcript of Remedies Hearing Proceedings
Before the Honorable Amit P. Mehta
United States District Judge


APPEARANCES:

For DOJ PLAINTIFFS: David E. Dahlquist, Esquire
                    United States Department of Justice
                    Antitrust Division
                    209 South LaSalle Street
                    Suite 600
                    Chicago, IL 60604

                    Diana Arlen Aguilar Aldape, Esquire
                    U.S. Department of Justice
                    450 Golden Gate Avenue
                    Room 10-101
                    San Francisco, CA 94102

                    Sarah Bartels, Esquire
                    U.S. Department of Justice
                    Antitrust Division
                    450 Fifth Street, NW
                    Washington, DC 20530

                    Veronica N. Onyema, Esquire
                    DOJ-CIV
                    450 E Street NW
                    Suite 8714
                    Washington, DC 20530


Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

APPEARANCES: (Cont'd)


For Plaintiff
State of Colorado:    Adam T. Severt, Esquire
                      Sara Trent, Esquire
                      Travis R. Chapman, Esquire
                      Ryan T. Karr, Esquire
                      R. Cameron Gower, Esquire
                      DOJ-ATR
                      Liberty Square Building
                      450 Fifth Street, NW
                      Suite 7106
                      Washington, DC 20530

                      Jonathan B. Sallet, Esquire
                      Colorado Department of Law
                      Consumer Protection Section,
                      Antitrust Unit
                      Ralph L. Carr Colorado Judicial
                      Center
                      1300 Broadway
                      Suite 7th Floor
                      Denver, CO 80203

                      Austin Ostiguy, Esquire
                      Tennessee Attorney General's Office
                      Consumer Protection Division
                      P.O. Box 20207
                      Nashville, TN 37202

                      Michael Schwartz, Esquire
                      Office of the New York State
                      Attorney General
                      Antitrust Bureau
                      28 Liberty Street
                      20th Floor
                      New York, NY 10005

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

2283

APPEARANCES: (Cont'd)


For Defendant
Google:                John E. Schmidtlein, Esquire
                       Graham Safty, Esquire
                       Kenneth C. Smurzynski, Esquire
                       Colette Connor, Esquire
                       Gloria K. Maier, Esquire
                       Williams & Connolly LLP
                       680 Maine Avenue, S.W.
                       Washington, DC 20024

                       Matthew L. McGinnis, Esquire
                       Ropes & Gray LLP
                       Prudential Tower
                       800 Boylston Street
                       Boston, MA 02199












Reported by:    Christine T. Asif, RPR, FCRR
                Federal Official Court Reporter
                333 Constitution Avenue, NW
                Washington, D.C. 20001
                (202) 354-3247


Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription


Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

INDEX

Witness Name                                                        Page

Dr. Tasneem Chipty

    Cross-examination By Mr. Schmidtlien..................... 2285

    Redirect Examination By Mr. Gower........................ 2310

Heather Adkins

    Direct Examination By Ms. Maier.......................... 2319

    Cross-examination By Ms. Onyema.......................... 2353

    Redirect Examination By Ms. Maier........................ 2387

    Recross-examination By Ms. Onyema........................ 2390


Exhibit    Description                              Evidence

PXR 0302    Core Rigor Review                          2372

PXR 0306    Document titled                            2383
            "Cybersecurity Risks"

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

P R O C E E D I N G S

(1:30 p.m.)

THE COURT:  All right.  Welcome back, everybody.

Mr. Schmidtlien.

MR. SCHMIDTLIEN:  Thank you, Your Honor.

CROSS-EXAMINATION (Cont'd)

BY MR. SCHMIDTLIEN:

Q.  Dr. Chipty, if the Court in this case were to order a data sharing remedy, and put aside for a second what data because I understand you're not offering an opinion on that, but if the Court were to order a one-time sharing of some undefined amount of data, would you agree that that would help to address any potential issues of disincentivising Google to innovate going forward because they wouldn't have to continually make available new innovations on a forward-looking basis?

A.  So I think there are pros and cons.  If I understand what you're asking, a pro would be -- presumably, there would be no potential future innovations, or fewer of them, that might be potentially exposed to a free writer problem.  And I'm not offering an opinion as to whether they would or would not.  I don't understand the production technology well enough to understand that.  But there are pros and cons.

And if, in fact, you think that there -- that data sharing could potentially lead to free writing, then -- but

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

the con of doing that is -- again, it depends on the production technology, and I'm not offering an opinion on how that would actually play out.  But the con is that it may not be enough, especially if there are attributes of learning that Google has had that would then make their incremental innovations somehow necessarily better because they have had such a sufficient lead in the game.

So I think the -- there would have to be some balancing, and I am not able to give you that balancing.

Q.  You would agree that in this case, it's not necessary for remedy -- for a remedy to be considered successful for it to remove Google's monopoly power in either the general search engine or the search text advertising markets?

A.  So I don't -- I didn't look at that question.  What I really looked at is the question of whether the remedies -- how should one approach the remedies if the goal was to restore the competitive rivalry that was destroyed.  And I don't have a view as to whether there are other goals outside of the goal that I was evaluating the remedies for.

Q.  Right.  But from an economist's perspective, a remedy that does not remove Google's monopoly power doesn't mean that it hasn't been successful; correct?

A.  I think it's possible from the point of view of restoration, but I think there is sort of the secondary goal, or at least a second goal -- I don't mean to dimunize it -- of

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

deterrence.  But again, I have not offered an opinion on that.

Q.  Do you have an understanding as to whether the purpose of the plaintiff's remedy in this case is to remove any market power or monopoly power that Google may have had in any relevant market?

A.  So I can't speak to the purpose of the remedy.  I looked at it with an eye towards would it be able to restore competition in light of the competitive rivalry that was destroyed.

Q.  Now, as part of your work in this case, have you done anything to evaluate whether, in the remedial world, revenue share payments to browser developers or smart phone manufacturers or wireless carriers will be higher, lower, or the same as they were in a but-for world?

A.  I'm sorry, are you asking about the remedial world?

Q.  Correct.

A.  I think that the answer to that could change over time.  I think revenue share payments -- or whatever payments, however they're structured, will be a function of the strength of the second best competitor.  That's because the highest bidder has to beat the second highest bidder.

And I think that until rivals would have a chance to significantly improve their product quality, it is quite possible that in the remedial world, payments will be lower.

And in the initial years.

But then, again, as that changes, this is one of the reasons I do think some form of data sharing or ad syndication remedy is necessary, because it will -- to ease the transition pain, if you will.

Q.   You haven't done any calculations or modeling with regards to what the remedial world is going to look like in terms of payments to browsers or Android distributors; correct?

A.   No, I haven't done any modeling, but I have observed that the -- the choice screen payments that Google might be eligible to make depending on the ultimate remedy package certainly the plaintiffs have proposed, that Google be allowed to pay for choice screens on existing Android devices.  And if -- and the form of that payment would be based on their historical payments.

So I think that would give some sense that at least in year one, distributors would have continued payments from Google on existing Android devices.  But after that, I don't -- I can't predict what the path of payments will be, except to say that until rivals catch up, you know, it's reasonable to expect that there will be some hit to manufacturers.

Q.   And you would expect that lower payments in the remedial world will translate into potential harm to consumers; correct?

A.   So possibly in the short run, but even then I cannot say how distributors would sort of, you know, pass that or deal with that with respect to their consumers.  But the whole point is that in time, distributors and users would be better off because of greater competition.

Q.   Do you believe that in the long run, the payments would be high- -- rev share payments would be higher?

A.   I think it's possible, yes, because the whole point of this is to increase the strength of competitors generally.

Q.   But you -- again, you haven't done any modeling or calculations about where the rev share payments are going to ultimately land either in the remedial world or in the competitive world afterwards, right?

A.   No, I haven't done any calculations.  It's just directionally, it's just based on the principles of economics.

Q.   And if in the -- either in the remedial world or the competitive world that follows, rev share payments, let's say, to Apple were higher, that would actually result in even more disincentives for Apple to enter the search business; right?

A.   I guess the only -- it's possible Apple may not enter in that scenario.  But the point is that if, in fact, rev share payments go up, that would mean that the competition problem would have been resolved through other competitors.

So I'm not really sure -- this isn't about getting Apple

to do something, it's about creating competition through entry.  And Apple is one potential source of entering or sponsoring entry, but the point is that there is competition from non-Google rival general search firms, and that could result in greater payments to Apple.

Q.  As part of your analyses that you've disclosed in your expert reports, you've not made any assessment of whether plaintiff's remedies will harm competition amongst browser competitors; correct?

A.  Correct.  I've really focused on the relevant markets here, general search services and general search text advertising.

Q.  You haven't performed any assessment of whether plaintiff's remedies will harm competition amongst smart phone manufacturers; correct?

A.  I've not studied that.

Q.  All right.  I want to turn to Chrome divestiture just for a few moments.  You're not offering any opinion in this case as to whether a Chrome divestiture is technically feasible; right?

A.  That's correct.

Q.  And you're not offering an opinion in this case that any potential shift in search query share from Google to any rival search engine is more likely than not as a result of a Chrome divestiture; correct?

**A.** Could you repeat that question, please.

**Q.** Sure.

You're not offering an opinion in this case that any potential shift in search query share from Google to another rival is more likely than not as a result of a Chrome divestiture?

**A.** I'm just hesitating on the "more likely than not." I do think that if the Chrome -- I do think if Chrome is divested, a rival would become the new default on Chrome. I mean, it's possible the new Chrome owner puts Google on as the default, it is possible. But just thinking about the incentives from payments, I think it's more likely that the new owner of Chrome would want to go with another default, at least after there is a good replacement for -- an alternative to Google.

**Q.** How long would it take for a replacement to Google to come along?

**A.** I don't know. I can't answer that question. It depends on how technically feasible it is to ramp up.

**Q.** You've not offered an opinion about whether a divested Chrome would remain as popular with users as it is today; right?

**A.** No, I can't say that, but certainly a buyer who makes these kinds of investments will have every incentive to make the product successful.

**Q.** You haven't done any analysis of potential buyers for

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Chrome; correct?

A.   No, I have not.

Q.   You've not done any analysis of the extent to which Chrome would remain broadly distributed if it was divested; right?

A.   I guess I'm not sure what you mean by "broadly distributed" in this -- well.

Q.   Do you have an understanding as to one of the reasons why Chrome is popular is because it's broadly distributed?

A.   I think one of the reasons it's popular is that it's preinstalled on Android devices.  And I don't know whether it would or would not be, because the new owner of Chrome might be able to get a preinstallation deal.  I just don't know.

Q.   A new owner of Chrome would certainly be able and incentivized to pay for distribution of Chrome; correct?

A.   Yes.

Q.   Now, if you can go to slide 25 of Dr. Chipty's -- now, you list here a 7 percent user downloaded Chrome, a potential share shift; is that right?

A.   That's right.

Q.   And that includes both user downloaded Chrome on desktop and on mobile devices; right?

A.   That's correct.

Q.   And none of the conduct that was involved in this case involved user downloaded Chrome on desktop; right?

A.   I think that's right.

Q.   And at least half of your 7 percent there of potential share shift relates to desktop; right?

A.   That's right.  That's what I said earlier.  But I also said earlier a remedy doesn't have to target just the specific barriers.  It may be more efficient to chart -- to employ other tools as well.

Q.   Now, your 3 to 4 percent share shift on mobile is based on a variety of assumptions; correct?

A.   Well, the assumptions I laid out.

Q.   The new buyer of Chrome does not set Google as the default on Chrome on mobile; correct?

A.   That was the assumption.

Q.   You also assume that if the buyer sets somebody other than Google as the default on Chrome, Chrome remains or maintains the same popularity with users; right?

A.   That's correct.  That's the assumption in this calculation.

Q.   Your 7 percent potential share shift here assumes Chrome maintains its same market share position amongst other browsers; right?

A.   No, I don't think that's correct.  Because the calculation incorporates recovery of shares by Google, so query recovers the clawback rates.  And so that would diminish Chrome's relative importance.  I just don't know how much sitting here.

Q.  You assume for mobile that Google will only claw back 20 to 40 percent of queries if Chrome on mobile were set to a search engine other than Google; correct?

A.  That's correct.  That's the historic clawback rate for mobile devices that Google used to study and negotiate its -- you know, its agreements with Apple in the last few years.

Q.  The documents you're referring to have nothing to do with the clawback rates on Chrome; correct?

A.  That's correct.  They're not specifically about Chrome, they're about Apple.

Q.  The Chrome browser is a popular Google product that people associate with Google Search; correct?

A.  So Chrome is a Google browser.  I'm not -- I cannot tell you how much of Chrome usage is because of Chrome or Google.  So --

Q.  And you recognize, I think in your report, that there's a risk that a new buyer of Chrome won't be as successful at Chrome as Google has been; right?

A.  Yes, it's possible.  I try to lay out different risks and benefits, because the Court will have access to record that I don't, to assess sort of the potential for the different risks.

Q.  I'm sorry, say that again.  You think the Court is going to have access to a different record on the potential risks of a Chrome divestiture than you have?

A.   Well, there will be testimony in the case that might speak to that.

Q.   I see.

You've watched all the testimony.  I've seen you in the back of the courtroom for a good part of the plaintiff's case; right?

A.   Well, I've tried to attend as much as I can.

Q.   You're not offering any opinion as to whether a Chromium divestiture will be successful; correct?

A.   No, I don't -- I have not specifically given an analysis of the business merits of the Chrome divestiture and all of that.  I believe there's another expert who's speaking to that.  I'm really talking about the impact of a divestiture on rivals' ability to gain access to search access points.

Q.   I want to turn to some of your opinions about general AI applications.  And can we turn to slide 40.

Now, this was a slide that you went through with plaintiff's counsel; correct?

A.   Yes.

Q.   And can you describe exactly what is on this slide?

A.   Well, it's just -- it's an illustration to give an example of how a Google Gemini widget might replace a Google Search widget.  It's just an illustration to promote the idea that -- or to make clear the idea that if Google is able to distribute Google Search through a Gemini -- through its Gemini app,

without restrictions on payments for preinstallation, that it's possible that sort of Google is able to secure search access points like this, like it has in the actual world with the Google Search widget.

Q.   And this illustrate -- illustrative example that you've got here on the right side of this slide, just so we're clear, is this made up?

A.   So, yes.  It's to imagine what it would look like.  But as far as I'm aware, this does not exist today.

Q.   And if it did exist today, what are you imagining gets returned if somebody types something into a Gemini widget?

A.   Well, the point of this exercise was to look ahead and ask if the Gemini app, or future version of it, is a search access point, then Google could distribute its Search product through this search access point.

So the idea is that if users typed in a query here, then it would, in essence, in some way, shape, or form, return search results.

Q.   Are you offering the opinion that Google is going to turn the Gemini app into the Google app?

A.   I'm not offering an opinion on what Google will or will not actually do.  The point is GenAI apps are increasingly able to return search results today.  So if in the future a Gemini -- a GenAI app is able to serve as a, you know, useful, important search access point, this could, in principle,

provide a circumvention on the bans to preinstallation.

Q.   Is the Gemini app today a significant search access point, using your definition?

A.   So I have not specifically studied that.  But I know Google's expert, Dr. Hit, has.  And he has said it is, in his view, not a significant search access point today.

But the point isn't about today.  The point is about what might happen in the future if Google has, you know, fewer ways to secure users.  And so you could imagine that Google will look for alternative ways, ways that it doesn't utilize today.  And so the question is not what it's doing today but what it might do in the future if circumstances change.

Q.   Google's remedy covers the Gemini app; correct?

A.   Yes, in part, but not as comprehensively as plaintiff's remedies do.

Q.   By "comprehensively," you mean the plaintiffs ban outright Google's ability to pay for any form of distribution of the Gemini app; correct?

A.   I believe plaintiff's remedies would call for the Gemini app being treated on equal footing with other search access points.

Q.   And that would mean under plaintiff's remedy, Google could not pay for placement or distribution of the Gemini app under any circumstances; correct?

A.   I think that's correct.  But I can't be certain.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.   Have you studied any Google distribution agreements that involve the Gemini app?

A.   Yes, I have.  Again, Dr. Hit has described two of them in his expert report, and I went and I looked at them, I studied them.

Q.   You didn't study them in your opening report in this case; correct?

A.   No, that's correct, I wasn't aware of them, but then he brought it to my attention and then I did.

          THE COURT:  I'm sorry, then studied what?

          MR. SCHMIDTLIEN:  Google distribution agreements involving the Gemini app.

          THE COURT:  Gotcha.

Q.   (BY MR. SCHMIDTLIEN)  And to date, Google has entered into nonexclusive distribution agreements involving the Gemini app; correct?

A.   So the two that I saw, as I recall, they are nonexclusive. But again, the question isn't today, the question is where might Google pivot if it's, you know, forced to find other ways to search access points.

Q.   Google's proposed remedy in this case would prevent Google from entering into exclusive distribution agreements involving the Gemini app.  You're aware of that; right?

A.   Right.  I talked about my understanding, which involves Google still being able to pay for distribution.  And as I

explained, the -- really the significant point is that Google could still outpay anyone else because it's got the better product today, and it's got better ability to monetize today. So it stands to reason that it would win those competitions.

Q.   It's your testimony that Google's Gemini app is the best GenAI product today?

A.   No, that's not the point.  The point is the use of the Gemini app as a search access point to distribute Google search.

Q.   I see.  So you're imagining something in the future that isn't happening today?

A.   Well, I'm not going to take a position on exactly the state of this today, but I understand there's evidence in the record that Google Search is being used to -- within the Gemini app to allow users access to the kinds of information Google provides through, say, the Google Search app.  But beyond that, I cannot say.

Q.   Have you studied the extent to which rival generative AI applications have successfully obtained distribution?

A.   So, I am aware that ChatGPT has been successful, at least in the infancy of these apps, to generate user downloads and create a relationship with Apple.

Q.   ChatGPT was able to get distribution as part of Apple Intelligence; correct?

A.   That's my understanding.

Q.   And are you aware of any other devices where generative AI applications have been able to obtain distribution?

A.   I'm not aware of any, but there might be.  Just because I'm not aware of any doesn't mean it --

MR. SCHMIDTLIEN:  May I approach, Your Honor?

Q.   (BY MR. SCHMIDTLIEN)  Dr. Chipty, I've handed you what we've marked as RDX 0179.  And I will represent to you that this is a blog post that was issued by Perplexity on April the 24th, 2025.

Have you reviewed the testimony from Mr. Shevelenko in this case?

A.   Only in part.

Q.   You're aware Mr. Shevelenko has expressed concerns about Perplexity's ability to get distribution for the Perplexity app; is that right?

A.   That's right.

Q.   And Mr. Shevelenko appeared in this court the day before this announcement was made; correct?

A.   So I -- I don't -- I can't recall the dates specifically enough.

Q.   Were you aware that Perplexity was able to get preload distribution on Motorola's most advanced new devices?

A.   No, I wasn't aware of this.  I just said I wasn't aware of others.

But the point isn't today.  But actually, you know, I

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

will say this, that if Google could pay for distribution in the future, and it would be motivated to do so if, in fact, the Gemini app remains its principal way to pay for Search distribution, you know, it's possible that deals like this would be jeopardized because today, Google's got the monetization advantage.

Q.   Google has the monetization advantage in general -- generative AI?

A.   No, Google Search.

Q.   I see.  So you're back to we're going to convert the Gemini app into a search engine?

A.   I think it's important for forward-looking remedies to anticipate circumvention.

Q.   Let me ask you about -- just a few questions about choice screens.  Have you done any analysis in this case about whether to forcing Google to offer choice screens on Pixel devices will make Pixel devices less attractive to users as compared to iPhones?

A.   No, I have not looked at that.

Q.   Have you done any analysis --

        MR. SCHMIDTLIEN:  Can we go back to slide 25.

Q.   (BY MR. SCHMIDTLIEN)  In this remedial world estimated shares demonstrative here, have you done any analysis or made any estimate of how much share shift you think will occur as a result of forcing Google to put choice screens on Pixel

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

devices?

A.   So I have not factored that in here.  Pixel devices using the 2020 data would be a very small share.  And so I did not incorporate that change in here.

Q.   Do you have a estimate and even an order of magnitude?

A.   Well, using the historical data, it would be relatively small, but I don't have an estimate specifically.

Q.   But "relatively small," you mean less than 1 percent?

A.   I can't -- I can't really do that off the top of my head I'd.  Have to look at the data.

     But the point about the Pixels, again, is forward-looking.  If that becomes one of the key ways that Google can gain distribution, then I think that that -- the historical share may not be reflective of the future share.

Q.   None of the conduct involved in this case related to Pixel devices; correct?

A.   That's correct.

          THE COURT:  Mr. Schmidtlien, when you say 1 percent, you mean --

          MR. SCHMIDTLIEN:  Share shift.

          THE COURT:  Were you talking about 1 percent share shift?

          MR. SCHMIDTLIEN:  Right.  In other words, on this, what Dr. Chipty has done --

          THE COURT:  Sorry, I know what she's done, but when

you use 1 percent, you mean 1 percent of all Search traffic currently goes through Pixel search access points, that would fully shift in theory?

MR. SCHMIDTLIEN:  I'm talking about the estimated share shift would be 1 percent or less.

THE COURT:  Okay.

Q.  (BY MR. SCHMIDTLIEN)  Do you have an estimate of what Pixel's market share is in smart phones in the United States?

A.  I don't have a precise number.  I think it's under 5 percent, but that's my sense.

Q.  Okay.

A.  Yeah.

Q.  Just quickly back to generative AI, you've not offered any opinion in this case that the Gemini app has market power in any market; correct?

A.  That's correct.

Q.  You've not -- also you've not offered any opinion in this case that the Android operating system has market power in any market; correct?

A.  I've not studied that, no.

Q.  You've not offered any opinion in this case that Google has designed the Android operating system to favor Google Search?

A.  Not that I'm aware, at least not yet.

Q.   You've not offered any opinion in this case that Google's designed the Android operating system to harm non-Google Search engines; correct?

A.   Again, if you're talking about the engineering or the software design, not to my knowledge.  At least not yet.

Q.   You've seen no evidence in this case that Google's designed the Android operating system in any way to favor the Gemini app over any other generative AI; correct?

A.   Same answer; not to my knowledge and at least not yet.

Q.   If we can turn to slide 45.

     Now, this is a slide that you put together that sets forth your understanding of Google's proposed remedy in this case; is that right?

A.   That's right.

Q.   And the third sub-bullet below the first one is they permit some exclusives; is that right?

A.   That's correct, with respect to the browsers, the one-year exclusives.

Q.   And would you just explain again to the Court, what type of exclusive agreement are you claiming that Google's remedy would still permit with regards to browsers?

A.   So as I understand it, under this -- under Google's proposed browser agreements that they propose they be allowed to continue entering, Google would be -- for example, be able to be the default on a browser like Safari, on all of the

Apple iPhones and standard mode in the U.S. for a period of one year.  So that means they could pay for that, and they could pay for that for the whole, without giving Apple flexibility.

And I pick Apple, but you could pick any other third-party browser.  Give Apple -- without giving the browser flexibility on, you know, different versions of it, for example, or something like that.

Q.   When you -- what do you mean by "different versions of it"?  Do you mean like iPhone 16, iPhone 17, those types of things?

A.   That would be one dimension of flexibility.

Q.   Is there another dimension of flexibility that you have in mind?

A.   It's -- so I guess I -- that's the obvious one.  I don't -- there could be others.  I just don't know how different variants of phone or phone access points through software could be pushed out.

Q.   Okay.  Aside from that, are you -- is there another type of exclusivity that you have in mind that you believe is permitted under Google's proposed remedy?

A.   In terms of -- in terms of contractual exclusivity, I don't think so, but I'm not -- yeah, I'll leave it there.  In terms of contractual.

But I have -- I do have an opinion that the -- that the

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

types of agreements that Google would propose it still be allowed to enter with distributors and carriers would have the effect of excluding rivals from the significant defaults.

Q.   What do you mean by that?

A.   Well, as I said, as long as Google can pay for those defaults, Google having the quality advantage today and also Google having the monetization advantage today, it's reasonable to expect that the significant defaults would be won by Google.

Q.   You -- you're not offering an opinion in this case that that the types of remedies that Google has offered would have been deemed anticompetitive in a but-for world; correct?

A.   I think that's right, but we're in the aftermath.  I think that what will restore competition is different from what would have been okay had Google not had the benefit of its exclusionary conduct for more than ten years.

Q.   You're not sitting here offering an opinion that the types of agreements that are permitted by Google's remedy would have been deemed exclusive in the but-for world; right?

A.   I think that's right.

Q.   With respect to the iPhone 16, iPhone 17 example you just gave, how often do phone manufacturers like Apple issue new versions of their phones?

A.   I'm not certain.

Q.   You're not aware that Apple or Samsung typically bring out

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

one new version of the iPhone or of the Samsung Galaxy every year?

A.   So the reason I said I'm not certain is I think for some years it was a two-year cadence for some of the phones, so I'm not sure.

Q.   If under Google's remedy Apple could get out of the agreement every year, they could set a new default on every new version they offer; correct?

A.   Yes, in theory.  But -- and that's, I think, the difference between thinking about whether a contract is sort of actually an exclusive, like as a matter of the contract, or whether it creates incentives for exclusivity.

     And here, as I said, especially over the short-term, what will happen -- well, one year, going from year one, when Google wins the defaults, will that give enough room and opportunity for rivals to get the data they need to invest so that they could win the contract, the default, the following year.  And I'm suggesting that's a pretty high hurdle and unlikely to turn out that way.

Q.   So the only way to rectify that is to force Apple not to choose Google as the default for some period of years in the hopes that rivals catch up; correct?

A.   I think that's the point of a remedial period.  It -- unfortunately, we're in the world of the second best, and the transition will take time.

Q.   Let me take you back to slide 36.

Just so I want to -- I want to understand what you're depicting here.  What you're depicting here is plaintiff's remedial world; right?

A.   That's correct.

Q.   And plaintiff's remedial world says:  Google, first you can't compete for distribution at all; correct?

A.   No, I don't think that's correct.

Q.   For two decade -- or for certainly the last 15 years, since smart phones were introduced, all sorts of different search engines have paid for distribution; correct?

A.   I think that's right.

Q.   So you're saying, step one, Google, you can't pay for the type of distribution that has historically occurred in the market.  Correct, that's step one?

A.   That is a feature of the remedial world.

Q.   And step two is, during this period that you can't compete for distribution, we're going to force you to give all of your user data, your search index, and we're going to force you to syndicate all of your search results to rivals so they can then go ahead and compete in the market where you can't compete for distribution.  That's how plaintiff's remedies work together, is your understanding?

A.   Well, I --

Q.   Is that how plaintiff's remedies work together?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.   I'm sorry, but I don't agree that Google can't compete for distribution.  It can compete through innovation.  And it can compete in -- it can compete direct with users, to encourage users to download the general -- Google general search app.

Q.   Just like Microsoft has been able to compete for the last 15 years; correct?

A.   Well, look, there's evidence in the record that the ability to compete without defaults is -- that Google is better positioned to compete without defaults than anyone else, because it has the quality and brand advantage that no one else does.

Q.   It has the best product; right?

A.   It does today.

Q.   It has for the last 20 years; correct?

A.   The question is not --

Q.   Yes or no, ma'am?

A.   I do think Google has a good product, and it had a good product back then.  But that's --

Q.   That's all.  That's the only question I asked you.  For the last 20 years, Google has had the best search engine; correct?

A.   Yes.

          MR. SCHMIDTLIEN:  No further questions.

          THE COURT:  All right.  Thank you, Mr. Schmidtlien.

          Any redirect, Counsel?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

MR. GOWER:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. GOWER:

Q.  Dr. Chipty, you were asked questions about when you were retained for the remedies portion of this case.  Do you recall those?

A.  Yes, I do.

Q.  And when were you first retained for the liability portion of this case?

A.  Sometime circa -- at least the conversations began sometime circa June 2020.  And then I was retained soon thereafter.

Q.  So you've been thinking about the issues in this case for roughly five years?

A.  Yes, I have.

Q.  And you were asked questions about what distributors would have done absent Google's conduct.  Do you recall that?

A.  I do.

Q.  Now, I didn't hear any questions about what rivals would have done after Google's conduct -- absent Google's conduct, so I wanted to give you a chance to explain.  What incentives would rivals have had absent Google's anticompetitive contracts?

A.  Well, let me -- if you play back to, I don't know, circa 2014, that would be ten years or more ago, if rivals could

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

have competed for defaults, even in small ways, they -- I would expect they would have secured minor defaults, niche defaults, and slowly chipped away.  And as I testified to earlier, I think that that -- the fact -- that it's reasonable to expect that would have been possible given that Google paid billions of dollars for exclusive distribution.

So I think that's what would have happened.  Rivals would have slowly amassed scale that would have let them innovate in ways that would have then further contributed to their success and over the course of 10-plus years, I think that would have been a more competitive environment.  It would have created greater rivalry among the smaller general search firms, and it would have created more competitive pressure on Google.

Q.  And would distributors' decisions in that scenario have been different than the decisions they had to make over the course of the last ten years in this world?

A.  Certainly, if distributors had better choices, we might have seen greater variety of decisions in terms of the different types of selections they might have given consumers.  And perhaps they might have even gone across their entire portfolio with a different general search firm.

Q.  All right.  Now, you've spoken about the remedial world a lot.  I just want to be clear, can you give us a definition of the remedial world as you understand it?

A.  So for me there are essentially -- I think of like three

different time periods.  There would be sort of where we are today.  I call that sort of the actual world.  This is the -- this is sort of where we are after competition has been harmed, and we're trying to figure out how to restore to a place that would have been absent the conduct.

The remedial world is sort of where the remedies are in place.  I don't view the remedial world as the competitive world.  This is really the time when the benefits to Google from its past anticompetitive conduct persist.  So when we talk about competition on the merits, you can't really have competition on the merits when you've got the largest firm in the market benefiting, continuing to benefit from its past anticompetitive conduct.  So this remedial world is really, I think of it as an incubation period, a time when, you know, we give competition a chance to play out.

It's at the end of this period, the firms that have made the investments would be then positioned to compete without the support of the remedies.  And in that world, the competitive world, we would have essentially sort of unconstrained, Google would be able to compete, rivals would be able to compete.  And then who ultimately wins and loses would be the outcome of that process that would reflect sort of the erosion of the unfair advantage Google has amassed over ten or more years.

Q.  So when you spoke about the goal of restoration, did you

mean that the goal is to make the remedial world look as if it would have absent Google's conduct, or was it to make the post-remedial world look as if it would have absent Google's conduct?

A.   It's the post-remedial world.  That's why I try to sort of interject a few times that these share shift calculations are really about the remedial world.  They're not a depiction of the but-for world.

Q.   All right.  Now, you were asked a lot of questions about whether plaintiff's remedies permit Google to pay for distribution.  Some of that was in the context of Gemini, and some of that was just in generic context.  So allow me to turn you to slide 27 of your presentation.

A.   Okay.

Q.   Dr. Chipty, are these elements here -- in particular, let me point to the first one.  Are apps in app stores a form of distribution?

A.   Yes, they are.

Q.   Are promotional reminders on Gmail and YouTube a form of distribution?

A.   Yes, they are.

Q.   And is paying users directly for search activity a form of distribution?

A.   Yes.

Q.   And do these -- how do these forms of distribution

relate -- I think you've been speaking to them in terms of Google Search. Can you address how they might relate to the Gemini app?

A. Well, I think all of these -- all four, not just those three, all four also apply to the Gemini app.

Q. Now, you were asked about revenue share payments and how they might change over time. Do you recall those questions?

A. I do.

Q. And you said something about the second best competitor. Can you elaborate on that?

A. Sure. I said in the first instance that the way competitions sort of play out is that the highest value bidder wins, the bidder who values that deal the most wins. And given sort of the strategic interaction across bidders, the highest value bidder will end up sort of just outbidding the second highest valuation bidder.

So today, Google has to beat Microsoft, because Microsoft's, presumably, the second highest value bidder in different competitions. But if the remedies are successful -- first of all, Microsoft might get better. And so even if it's Google and Microsoft, you would expect rev share payments to go up once Google is able to compete again through that method of competition.

And then if the remedies are really successful, other rivals will get better also. So even Microsoft will have to

up its game to compete against, you know, its second best, even in the remedial world.

Q.   Okay.  So you've spoken about the second best competitor today.  You've spoken about what it might look like under plaintiff's remedies.  Can you explain for a moment what the second best competitor -- how strong that competitor might be under Google's remedies?

A.   Well, if you go back to what I said, that Google's remedies are likely to preserve the status quo, because Google's remedies, and all the variations with the greater flexibility or with the one-year exclusives, would allow Google to pay, which means that with its quality advantage and its monetization advantage, especially over a three-year remedy period, it's hard to imagine that there would be an improvement in the ability of the second best to do anything more than it's doing already.  Which would mean Google would still be able to just outbid, say, Microsoft as it is today.  So I would expect really no improvement in revenue share payments for distributors.

Q.   You were asked about the risks of doing too much in a remedy.  Can you opine for a moment about what the risks of doing too little might be?

A.   I think that's obvious.  Risks of doing too little would preserve the status quo and allow a dominant firm to continue to benefit from its past conduct and potentially further that

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

into the future.

MR. GOWER:  Thank you, Dr. Chipty.

No more questions.

THE COURT:  Thank you, Counsel.

Dr. Chipty, thank you very much for your time and testimony.  Safe travels.

THE WITNESS:  Thank you very much.

MR. DAHLQUIST:  Your Honor, two brief administrative matters.  One regarding dep exhibits.

Mr. Grant.

MR. FERGUSON:  Good afternoon, Your Honor, Grant Ferguson for the United States.  As Mr. Dahlquist previewed, I have with us a thumb drive containing all deposition designations and objections for witnesses whose --

THE COURT:  I'm sorry, keep your voice up.  You have a thumb drive containing what?

MR. FERGUSON:  All designations and objections for witnesses whose deposition testimony was affirmatively designated by the plaintiffs, as well as video files and a crosswalk between deposition exhibit numbers and trial exhibit numbers.

THE COURT:  Okay.

MR. FERGUSON:  My understanding is that the parties had agreed for us submitting this today.  May I approach?

THE COURT:  Sure, just hand that to Mr. Burton.

Are there any confidentiality issues with respect to the designated testimonies or deposition designations?

MR. DAHLQUIST:  Go ahead.

MR. SCHMIDTLIEN:  Because we are not at the post-trial, you know, submissions phase, confidentiality has not been done either with parties or third parties for purposes of this, so this has not been reviewed for confidentiality.

THE COURT:  Okay.

MR. DAHLQUIST:  I think that's agreed.  We can do that in the post-trial briefing process.  To the extent we cite or rely on those designations, we can connect with defense counsel and resolve that in advance of our briefing.  But, so the short answer to the question is no, there's not been -- those have not gone through the confidentiality review process.

MR. SCHMIDTLIEN:  This is the way we did it at the liability phase, and so we were following the Court's protocol.

THE COURT:  That's fine.  I think, you know, look, I think we've discussed sort of channeling this in a way that gets the priority out first.

MR. SCHMIDTLIEN:  Right.

THE COURT:  And getting that taken care of and, you know, for reasons that the parties have made or decisions

parties have made, these folks have not been called live.  And so I think just from the standpoint of efficiency and the way we get this done, is we'll just put a pin on getting this available through a confidentiality review afterwards.

MR. DAHLQUIST:  Understood.  That works for us, Your Honor.

THE COURT:  Okay.

MR. DAHLQUIST:  We had been working hard to try to have a final document submission.  We didn't get that done quite today.  We're still negotiating.  So we reserve the opportunity to present you with some additional documents, as many agreed as possible.

THE COURT:  Okay.

MR. DAHLQUIST:  We might have a few -- an argument on some few narrow disputes again, but we can advise you as we approach.

THE COURT:  Okay.  So otherwise --

MR. DAHLQUIST:  Subject to those exhibits and subject to our rebuttal case, the plaintiffs rest our case in chief.

THE COURT:  Very good.

And that's true for states as well?

MR. SCHWARTZ:  Yes, it is, Your Honor.

THE COURT:  Okay, very good.

All right.  Good, we reached that milestone, so why

don't we turn to Google.

Ready for your first witness, Mr. Schmidtlien?

MR. SCHMIDTLIEN:  I'm assuming I don't get to move for judgment at the close of the government's case.

MR. DAHLQUIST:  I'm happy to argue against it.

MR. SCHMIDTLIEN:  But I surely would if I could. Your Honor, Google calls Heather Adkins.

THE CLERK:  Please remain standing and raise your right hand.

HEATHER ADKINS, called as a witness, being first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Thank you.  Please be seated.

THE COURT:  All right.  Ms. Adkins, welcome.

THE WITNESS:  Thank you.

DIRECT EXAMINATION

BY MS. MAIER:

Q.  Good afternoon, Ms. Adkins.  Could you please state and spell your name for the record?

A.  Heather Lynn Adkins, H-e-a-t-h-e-r, L-y-n-n, A-d-k-i-n-s.

Q.  Ms. Adkins, are you a Google employee?

A.  Yes.

Q.  And when did you begin working at Google?

**A.**   May 13th, 2002.

**Q.**   Can you briefly describe your first job at Google in 2002?

**A.**   I was technically what we called a systems administrator, but it was really a kind of jack of all trades kind of job. We did everything.  I think my first week I cabled a data center.  But my primary responsibilities were really the security administration work, so setting up firewalls, managing accounts, that kind of thing.  But we really did everything in those days.

**Q.**   And today, what is your role at Google?

**A.**   I am vice president of security engineering, and I oversee our office of cybersecurity resilience.

THE COURT:  Cybersecurity what?

THE WITNESS:  Resilience.

**Q.**   (BY MS. MAIER)  Could you explain to the Court, what is Google's office of cybersecurity resilience?

**A.**   Cybersecurity teams spread throughout its business units, and we maintain this office to provide a harmonizing layer over the business so that we can centralize secure strategy and risk management.  But it is also the place where we provide centralized security solutions for the business.

**Q.**   And, Ms. Adkins, how many employees at Google have a security role?

**A.**   Well, we like to think that everyone has a security role.

But there are approximately seven to eight thousand -- that's a rough estimate -- who would consider it part of their majority time or dedicated time role.

Q.   And what product area within Google do you sit in?

A.   I sit in what we call the core product area.

Q.   And can you briefly describe what the functions are of the core product area?

A.   Core provides the centralized services and infrastructure upon which we run the company, including on our major products.

Q.   And what security responsibilities does the core product area have at Google?

A.   So because core runs the kind of central services and infrastructure for the company, we layer into that security within the privacy, safety, and security team, which I'm a part of.  And that provides that infrastructure upon which Google runs, a high degree of security assurance, so that the product areas don't have to build all of that infrastructure for themselves.

Q.   Ms. Adkins, so you are not a member of the Google Search team; correct?

A.   No, I am not.

Q.   Do you use search logs, sometimes referred to as click-and-query logs, on a daily basis?

A.   No, I don't.

THE COURT:  Slow down, Counsel.

Could you just explain to me what you mean by the central infrastructure of the company, what does that sort of look like, so I can visualize in my mind?

THE WITNESS:  So starting at the hardware, it's the data centers.

THE COURT:  Okay.

THE WITNESS:  And all of our machines more or less have the same operating system on them.  This is what we call our core infrastructure.  It's the place where we have a technology called Borg running.  So this is what instruments all of the tasks and jobs and the infrastructure.  It's also where we have all of the databases that Gmail uses, that Search uses, and the rest of our product sets.

So we did it this way because if we made every product build their own infrastructure, it would be very expensive and it would be difficult to manage.  So by centralizing this, we've been able to scale solutions, including security.

THE COURT:  Thank you.

Q.  (BY MS. MAIER:)  So, Ms. Adkins, do you have responsibilities relating to securing Google Search user data, including click-and-query data?

A.  Yes, I do.

Q.  And can you briefly describe that responsibility?

**A.**   So the Search user data gets put into that core infrastructure, stored in our centralized databases.  And we oversee the security controls that need to be applied to that based on the sensitivity of the data.  That includes the kind of infrastructure that allows us to grant access to people, but also encrypting the data at rest and all of the detection and threat monitoring around it to make sure that the data stays inside this kind of core protected area.

**Q.**   In your 23 years at Google, has your role always been focused on security?

**A.**   Yes.

MS. MAIER:  Could we pull up the slides, please.

**Q.**   (BY MS. MAIER)  Ms. Adkins, so I will note for the record that this is a page from PXR 0306.  Ms. Adkins, is this a demonstrative that you are familiar with?

**A.**   Yes.

**Q.**   And what is this slide?

**A.**   So this slide describes our high-level approach to cybersecurity, starting with culture.  We think it's really important to set the tone at the top, all the way from our founders to our board and our executive teams, all the way through -- you know, all the way down to the engineers.  And we spend a lot of time really focused on that culture.

Secondly, on cybersecurity talent.  These are incredibly niche fields, a bit like neurosurgery and cardiology are in

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

medicine.  You have to have the right experts for the right kinds of problems.  And, you know, given the breadth of what we are doing at Google, especially the sensitivity of the information we hold, we spend a lot of time investing in talent.

And then also our technology story, starting with our secure architecture principles and driving innovation to create the right baseline of security, as well as five- to ten-year strategy road maps that really keep us ahead of what threat actors are doing.

Q.  Could you provide an example of how Google has used innovation to address cybersecurity?

A.  So one of the things we realized pretty early on back in kind of 2009, 2010, is that the security solutions available to us in enterprise solutions, like in the vendor market, just simply were not sufficient.  And so we had to go back to the drawing board and really start to innovate on things that would help us defend better.

A good example of this are security keys.  These are hardware keys that plug into a USB port on your machine and provide two-factor authentication, so a secondary log in. That can't be stolen by a threat actor.  They didn't exist when we needed them.  We had to kind of work to invent those. And they're now available on the market as well.  But it's an example of one of many things that we've had to do.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.   And this slide refers to secure architecture principles. What are those and why are they important?

A.   This is something that we felt passionately about almost from the beginning.  But we've known that when you build a complex system, you have to design the security in at the beginning of the design process.  It's a bit like a car.  If you let a car go off the lot without a seat belt and made the consumer put the seat belt in later, maybe they never would or it would be the wrong kind of seat belt.  You have to actually design the car with the seat belt in mind and put it in at the beginning.

So we have done this with our technology.  It's, in the industry, what's called secure by design.  And we've been focused on that for over 20 years.  It's allowed us to really solve some of the basic fundamental classes of problems that exist in the field.

Q.   And one more foundational question.  In the context of cybersecurity, can you explain to the Court the difference between a security vulnerability and a security breach?

A.   So we would consider a vulnerability to be a weakness. This might be a configuration error, or it might be a mistake that a software engineer made.  But it makes the system fundamentally weak in some way.

Now, that doesn't become an actual problem until the vulnerability is exploited.  And it leads to a breach if the

threat actor who exploited it causes harm to the system in some way.  So these are often used interchangeably, but they actually mean very different things.  You can have a vulnerability without a breach.

Q.   And, Ms. Adkins, this slide reflects something called the defender's dilemma.  Is this an image that you're familiar with in your work?

A.   Yes.

Q.   And what is the defender's dilemma?

A.   The defender's dilemma, it represents the asymmetrical nature that we find ourselves in as defenders.  The systems that -- and I'm going to speak very generally here about the industry.  If you are in a defense position, you are managing a very complex system.  And only one weakness in the system is all the attacker needs to get in.  They have infinite amounts of time, resources, capabilities, energy.  They don't have other competing priorities.  And so they only have to get it right once.  We have to get it right every time.  This is called kind of the defender's dilemma, this asymmetrical situation.

Q.   And, Ms. Adkins, I want to turn to the threat outlook.  And this is another page from PXR 0306.  Is this a slide that you are familiar with?

A.   Yes, it is.

Q.   And is it one that you've spoken to in the past?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.   Yes.

Q.   So can you tell us what is reflected on this slide?

A.   This slide is a time line between 2009 and 2024, and it represents some points in time where there have been major cybersecurity incidents.  It is representing the growth of that threat over time.

Q.   And on -- it refers to here state-sponsored activity. What are state-sponsored threat actors?

A.   So state-sponsored, or what we'd call government-backed actors, I think James Bond in a uniform, a hacker who is working on behalf of a nation state with nation state goals in mind, maybe espionage or sabotage, who is user cyber techniques to carry that out.  The big actors in this venue are typically China, Russia, Iran, North Korea.

Q.   And what is the commercial surveillance industry?

A.   For as little as $20, you can go and buy a hacking platform.  And without a lot of technical knowledge, you can hack other people.  We see a variety of commercial surveillance vendors providing this kind of capability, either to spy on spouses but also much more serious, to spy on journalists.  And some nations, even without their own cyber capability, will contract with one of these vendors to provide that capability for them.

Q.   Can you describe the other types of threat actors that Google monitors?

A.   So we have seen an uptick in organized crime getting into the cyber game.  For example, the ransomware pandemic at the moment is largely orchestrated by organized crime, the idea that you can hack into somebody, encrypt their data and then hold it for ransome.  A really famous case recently is the British library.

We also see hackers who are teenagers hacking for fun, hacking for profit, hacking because they don't know why.  But it goes to show there's kind of a wide variety of threat actors out there who are doing this for different purposes.

Q.   And this time line at the beginning in 2009 refers to Operation Aurora?

A.   Uh-huh.

Q.   And it says, "China hacks Google."  What was Operation Aurora in 2009?

A.   Operation Aurora was a two-year campaign to hack into companies.  There were at least 20 victims, of which Google was the last and -- at least of that period of time.  It was an attack on our corporate infrastructure that led to the theft of our intellectual property.  And again, affected at least 20 other companies over that period of time.

Q.   And how did the attack happen?

A.   The attack on Google began with the threat actor sending chat messages to our employees.  And those chat messages contained a link with the intent of getting the employees to

click on the link.  43 of our employees opened that link in Chrome.  One of them opened it in Microsoft Internet Explorer 6.  And that vulnerability that was hosted on the attacker's infrastructure was exploited against the browser and led to compromise of the system underneath it.  And from there, then the threat actor was able to spread their attack through the network.

Q.   So was there a bug at the time in the Microsoft software?

A.   It was in Microsoft Internet Explorer 6.

Q.   And had that bug been known at the time to Microsoft?

A.   Yes.  Microsoft had learned about that bug in September of 2009, and we were compromised in December of 2009.

Q.   So how did that 2009 incident impact Google's approach to cybersecurity?

A.   Well, we had there for the first time the opportunity to study a threat actor of this kind.  And we have high confidence now it was the People's Republic of China, it was a state-sponsored attack.  And it gave us insights into what these very sophisticated adversaries were able to do and then compare how we were doing with our defenses.

     That's the moment at which we realized the standard way of doing security didn't work against these kinds of threat actors.  And over a period of about a decade later, you know, we did these innovations.  I mentioned security keys is one of

them.  We probably did about a hundred different projects over a period of a decade to really raise the bar above and beyond what the standard security advice is, what the compliance regimes require, to make sure that we were better defended in the future.

Q.  And how did -- how does Google's response that you just described compare to what you know about other technology companies?

A.  The kind of work we did is very difficult.  It takes a lot of talent, it takes a lot of time and energy, and you have to really be dedicated for a long time.

As we see in this slide, you can see many of our peers sort of continuously have issues.  Microsoft is a good example.  Going back to the late 90s, they had lots of issues with kind of internet catastrophes, like code red and slammer. They're very famous attacks that took down large parts of the infrastructure.

But even as late as 2023, they continue to struggle to defend against these kinds of nation states.  And they had a very prominent compromise by an attacker affiliated -- it's Aurora affiliated, so the same actor that was in Google in 2009.  And a long kind of string of things in between with the product security as well.

So I -- it's difficult to compare, because we don't have sort of insider view of their controls, but we do get hints

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

that we're doing pretty well compared to how some of our peers are doing.

Q.   And is there something called the Secure by Design Pledge?

A.   Yes.  So a lot of those innovations that we pushed for beginning in 2009, 2010, we have pushed out of Google into either open-source projects or products that we offer or are done through coalitions that are now available.  A lot of those things we did are now considered the recommended advanced practice.  And CISA, the Cybersecurity Infrastructure Security Agency out of DHS, in 2024, put together this kind of Secure by Design Pledge to try to get more and more companies to sign up to do these things.  It's not mandated through any compliance regime.  But their hope was by getting people to volunteer and sign up to the pledge that we would see more and more of this end up in the industry as best practice.

Q.   And are you aware of some of the signatories of that pledge?

A.   Yes, I am.

Q.   Do you know, has Meta signed that pledge?

A.   No, Meta has not signed that pledge.

Q.   Has OpenAI signed the Secure by Design Pledge?

A.   No.

Q.   Has Yahoo signed the Secure by Design Pledge?

A.   No.

Q.   Has Perplexity signed the Secure by Design Pledge?

A.   No.

Q.   Has DuckDuckGo signed the Secure by Design Pledge?

A.   No.

Q.   And in the course of your work, have you had the occasion to observe the security of any technology start-ups?

A.   So in the course of our business, we do acquire start-ups, and have done so, you know, over several decades.  And so I have been able to see -- as we onboard these acquisitions, I've been able to see their kind of security posture, yes.

Q.   And do you have any observations about what you've observed over time?

A.   When you're in a start-up, you have a limited amount of capital, and you have a limited amount of time to use that capital to bring your product to market.  And in security, we talk about this trade-off between velocity of the business and security.  What I see start-ups doing often is trying to maximize their time that they have to get product to market.  And so you often see them swinging towards the velocity and away from safety.  And this is a pattern that we see pretty consistently in the start-ups that we acquire.

Q.   And you mentioned Microsoft.  When it comes to Yahoo, are you aware of their record of cybersecurity incidents over time?

A.   Yeah, I think the earliest I can remember is 1997, was

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

their first -- somebody hacked in and changed their web page. But we have awareness of breaches in 2012, I think where they lost hundreds of millions of usernames and passwords, a breach in 2013, where they lost, again, I think 3 billion accounts. Then between 2014 and 2016, they were compromised by the Russian FSB.  And that went undetected for two years.

Q.   Ms. Adkins, turning to Google Chrome.  Is Google Chrome a target of cyber attacks?

A.   Yes.

Q.   And can you explain why that is, from your perspective?

A.   I have a good example.  In 2021, we observed threat actors working for the North Korean government set up a fake company with fake personnel, fake LinkedIn profiles.  And this company was a security research company.  And they began to make contacts with prominent security people in the industry, contacting them on social media, emailing them.

     And then over a period of months, they got a level of trust built with people.  And then they carried out their attack.  And the way they did this is they posted on their fake company website a blog post that was also hosting a Chrome vulnerability partnered with a Windows vulnerability. And then they sent a link to their new friends that they had made.

     Google Chrome developers were some of those people.  And because there was this bond of trust, the developers were

willing to visit the website, which then exploited the browser, exploited Windows underneath it as well. This is what we call a zero-day attack. This was a vulnerability we did not know about before. And they were able to compromise the systems of two Chrome -- two people in the Chrome organization.

And we think the intent there was, first and foremost, maybe to steal their security research, so an espionage campaign, but we've seen the North Koreans, in other instances, leverage that access to tamper with software as well.

Q. Did that attack that you're describing on Chrome result in a widespread breach at Google?

A. No, it didn't. The systems that they gained access to participate in our beyond corp infrastructure. This is another innovation we made after Operation Aurora, which is designed to kind of detrust the laptop. So once they were on, you know, the workstation, the laptop of the employees, they were stuck there. And it is difficult for them to spread an attack.

The other thing that we innovated after Operation Aurora was a high throughput data pipeline that allows us to detect these kinds of things very quickly. So they got a couple hours of access, we got to watch them try to break out of this containment barrier we had created, and we were able to

contain the attack before they caused any harm.

Q.   Why is it that a browser like Chrome is an attractive target of attack?

A.   Well, if you think about it, it's installed on a few billion devices.  If you can take control of the Chrome software, you have control of a few billion devices on the planet.

Q.   How does Google keep Chrome's 4 billion users secure?

A.   So it starts with hiring.  I mean, there's a whole layered approach.  I could go on for a very long time so I'll be brief.  But it starts with hiring.  We validate who we hire. And even though we've done that, we don't trust them.  We have a zero trust kind of policy around everything.

Same thing with hardware.  We validate the hardware, we have secure boot technology.

And then we have this core infrastructure that I've mentioned before with all the layers of security in it.  And that is where the developers operate.  Their laptops are part of that system, where we put search query logs are a part of that system, where we build the Chrome browser is a part of that system.

So it gets the benefit of all of those security innovations that we've made over the years.  And so the -- you know, both the Chrome browser and the users get the benefit of all of that layered security.

Q.   And, Ms. Adkins, I want to ask a quick question or two about Google's safe browsing.  And the Court has heard a bit about safe browsing, but could you say, does Chrome's enhanced safe browsing promote Google's ability to keep users secure?

A.   It does.  It's actually one of the very first things that we built as a security kind of focused product.  We have visibility into what's happening on the web through search and crawl and all of that.

What you see here is a very high-level description of enhanced safe browsing.  But the idea here is that if we can identify a malicious website, when the user browses to it, they'll get a warning.  And the idea is to keep the user from browsing there and being harmed.

And the way this works is that, you know, we will look at, let's say, you go to a URL, a new web browser, we can see, via hashed version of that, that you are doing that, and we can match it with our database of whether or not that's a malicious website.  And then you get the warning.

Q.   And the enhanced protection, is that a layer above the --

A.   It is.

Q.   -- basic safe browsing you're describing?

A.   Yeah, so this is a opt-in version of safe browsing where we can see even more data than just the URL.  We might see a little bit of a snippet of the web page which allows us to better, with greater accuracy, know whether or not that's a

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

good web page or a bad web page.

Q.   And is that enhanced version only available in Chrome?

A.   Yes.

Q.   And then when it comes to Chromium open-source project, does Google also do work to secure that open-source project?

A.   Yes.  We run the infrastructure for Chromium, the open-source product as well, again, on top of that secure core infrastructure that we have.

THE COURT:  If I could interrupt you, we're probably at a point to take our afternoon break, if that works.

MS. MAIER:  Okay.

THE COURT:  So we're about five after, about, approaching.  Let's resume at 3:20.

Ms. Adkins, I ask you not to discuss your testimony with any bad actors or otherwise during the break.

THE WITNESS:  Okay, thanks.

(A recess was taken.)

MS. MAIER:  Your Honor, before I pick back up, I forgot to pass out the hard copy.  Do you mind if I approach?

THE COURT:  Thank you.

Q.   (BY MS. MAIER)  Ms. Adkins, you meant that your responsibilities involve some of the core storage systems?

A.   That's correct, yes.

Q.   And so can you describe, does Google store its Google search logs in a secure environment?

**A.**   Yes.   We store the kind of search user query logs in that core infrastructure that I described that has all the layers of security around it.

**Q.**   And are you familiar with the plaintiff's proposed remedies relating to data sharing?

**A.**   Yes.

**Q.**   Do you have security-related concerns with the proposal that Google share data about user search clicks and queries, search log data?

**A.**   Yes, I do.

**Q.**   Do you have any security-related concerns relating to the security practices of the recipient of that data?

**A.**   Yes.   In my view, the search query data is of a very high sensitivity in terms of its content.   And that would mandate that you protect it relative to the kinds of threats it might face.

What we've learned is that the choice we made to store it in that kind of core infrastructure that we've been protecting to a high level is really the bar you have to set.   The compliance regimes don't go far enough.   The basic security advice we get generally as an industry doesn't go far enough.   It really needs to be protected in that core storage system.

So my concern with the proposed remedy of data sharing is that in a third-party system, the security practices that would be necessary for the third party to implement aren't

specified.  So we don't know if it's going to be something that the third party can defend against the kinds of threat actors that they're going to face.

Q.   And when it comes to -- and again, setting aside privacy and focusing on security aspect.  Do you have any security-related concerns about the data transfer methodology that could take place between Google and the recipient of this data?

A.   Yeah.  So anytime you move data between two locations, you have to think very carefully about the architecture and what security choices you're going to make.  You need that secure by design philosophy.

I'll just pick one architecture example.  A connection between two data points has to be authenticated so that you know the two parties are the right parties to receive and transmit the data, but also that they're authorized at that time.  Typically, we would implement this with some kind of cryptographic methodology which would give both sides, for example, a piece of data, cryptographically assured piece of data that, during the authentication, would validate the connection.

The trick here is that on the other parties' system, they have to protect that.  If it's stolen, that piece of authentication information is stolen, it can be used by the thief to also authenticate that connection, and therefore,

they could carry out the same kinds of transmission.

Now, there are ways to secure that.  But this is where the details get really important.  You have to make sure that the architecture, top to bottom, is really designed to defend against these kinds of scenarios and that you understand the threats that might be facing the system at the time.

Q.  And do you have any other security-related concerns relating to those data sharing provisions?

A.  Yeah, so one of the things we've seen happen in, say, the last decade or so, as all of these major breaches have happened at different companies, is that data ends up on the dark web.  Now, take the scenario where this kind of user data is shared with a third party.  If the third party cannot properly secure it and it's stolen, the thieves can take that data and actually combine it with other data on the dark web to further perpetuate harm.

I'll give you an example, relatively recent.  There has been a map of Tesla owners in the United States that was posted online.  And the idea there was to activate people to go and physically harm the Tesla or the Tesla owners.  We think this map was created through a combination of data from two different data breaches.  And this is a hypothesis still.  But we -- there's a parking app that you can sign up for to pay for your parking.  You give it your name, maybe your make and model of car, your license plate, and that allows you to

pay for parking in, say, a city.  That data doesn't have enough about you to know where you live.  But that data was breached, put online on the dark web.  But you can combine the name and kind of the rough area where the person lives with another data breach that does have their address.  And we think this is how the map was created.

So it gets to the importance of kind of how the data is protected, what kind of data is there, and really thinking through what's the worst-case scenario that could happen if this data was stolen.

Q.   Ms. Adkins, turning to the plaintiff's proposal to divest Chrome and Chromium, are you aware of that proposal?

A.   Yes.

Q.   How would divesting Chrome from Google affect the security of the Google Chrome and Chromium software?

A.   Well, again, I'll maybe lean back on an example.  The scenario I'm most worried about is the Solar Winds scenario.  Solar Winds is an American company, they're about 2000 people.  They make network monitoring software, and they give that software to their customers to install on their own systems.  Similar to people installing Chrome.

In September of 2019, they were compromised by Russian intelligence, and they were compromised for about two years, undetected.  The Russians came in and, during the build process for the software, inserted a back door that would give

the Russians access to whoever ran the software.  That back door was then pushed out.  And if you, as a customer, did the update, you got the back door.  That led to the compromise of companies in the United States and several U.S. Government agencies.

So for me, the scenario I worry about with a divestiture of Chrome is would the receiving party be able to protect it. You're not just buying software.  And you're not just buying the users.  You are buying the responsibility to protect the installs in 4 billion machines.  And if you think about the things we've had to do to defend Chrome and some of the practices that we see generally in the industry, I worry whether they stand a chance in that defender's dilemma if they don't have the resources, the talent, the culture and the technology to really defend that at scale.

Q.   And what are some of the security capabilities that Chrome would not be able to take advantage of if divested?

A.   Well, there's that whole infrastructure stack, which we spent a decade innovating and building.  Some of it's available on the market.  Much of it's difficult to do for yourself.  It's, you know, increasingly becoming recommended standards but it's not mandated.

So the company that buys Chrome wouldn't get the default infrastructure that protects the developers, the build, the release, the user data that comes in via safe browsing or

through Chrome sync.  And also they wouldn't be able to leverage all of the security capabilities we've built.

So, for example, we have a security testing infrastructure that we call fuzzing that Chrome uses to test all the versions of software that it gets.  You wouldn't have access to Google's red teams and penetration testing to test the software manually and through the lens of an attacker. And, you know, there are many more things that we do as part of our software life cycle in securing the software that you wouldn't get.

Q.   And can you just clarify, what is a red team?

A.   Oh, sorry, yes, so this is military terminology, red team, blue team.  Blue team are the defenders, red team are the attackers.  We hire very talented hackers, the good kind, to test ourselves and test our software as a proxy for real attackers.

Q.   And, Ms. Adkins, are you aware that plaintiffs have proposed potentially divesting Android and Play in the future?

A.   Yes.

Q.   And how would divesting Android and Play from Google impact the security of those systems?

A.   I would say it's much the same situation.  Android is built on top of that secure infrastructure, and all of the work that we have done for layered security over the years.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

And I might just also say, you know, in the aftermath of the Solar Winds incident, the president asked NIST, which is the National Institute of Standards and Technology, to provide a definition of critical software.

And the reason for this is we might begin to think a little bit about what are the most important pieces to protect. Solar Winds' software is one of them, no surprise, designated critical software. But browsers now as well, and operating systems. And Android is an operating system. And this suggests that, you know, going forward, we really should be thinking about browsers, operating systems, et cetera, as needing to have these very high bars of security set for them.

Q.   And, Ms. Adkins, recognizing that we are in an open courtroom, does Google conduct analysis of the cybersecurity threat landscape on an ongoing basis?

A.   Yes, we do.

Q.   Can you describe that at a high level?

A.   So one of the things we realized during Operation Aurora, which is all the way back in 2009, is that we needed to have a better understanding of who the threat actors are and we're -- more proactively understand what they might do and what they are doing at the moment. We also realized they use our products. And through that, we can gain a visibility into how they operate, when they operate, and why they operate.

And so we are able to build profiles of the threat actors. We have them in the database. And as we have ongoing operations on the platform, we can connect in malicious activity to it and be able to say, you know, we've been tracking this threat actor for five years, here's some new behavior we want to get in front of. We might then push out something to safe browsing. We might start filtering malicious messages in Gmail, for example. We might remove an application from the Android Play store that's malicious. But it gives us this kind of reference database, this kind of flywheel of updates gives us this reference database that we can continuously come back to.

Q. And then at a high level, recognizing the public setting, does Google assist the U.S. Government with cybersecurity?

A. Yes, we do. Yeah, I'll say a few words, I guess.

So one of the important things that we think is, as we are beginning to see what these threat actors are doing, in some cases, we might report these as a crime if they seem of criminal intent. We will report them to the victims as much as we can. And also sharing information within some of the sharing tables that are created in the government.

So, for example, CISA has the JCDC, which they stood up to bring industry to table to info share about some of the things we're seeing. And we might also share, through some of our government contracts, information that we're seeing as

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

well.

MS. MAIER:  And, Your Honor, that completes my questioning for open court.  I have a handful of additional questions for our closed session.

THE COURT:  Okay.

All right.  Folks, we're going to close the courtroom for a brief period of time, as we discussed earlier today.  I promised at the outset this would be short.  And then once that portion of the examination is concluded, we will reopen the courtroom and open it back up for public session.

So if you are not affiliated with either party, I'm going to ask you to please step outside for a few moments.  Thank you very much.

(Sealed session of court.)



A. ██████████████████████████████████████
████████████████████████████████████████
██████████████████████████
  ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████.

Q. ████████████████████████████████████████
████████████████████████████████████████
████████████████?

A. ██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████.

Q. ██████████████████████████████████████?

A. ██████████████████████████████████████
██████████.

Q. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████?

A. ████████████████████████████████████
████████████████████████████████████████
██████████████████████████





Q.

███████████████████████ ?

A.    ██████████████████████ .

Q.    ███████████████████████████████████████████████

███████████████████████████████ ?

A.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ .

Q.    ██████████████████████████████████████████

███████████████████████████████████████████

████████████████ ?

A.    ██ .

Q.    ████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ ?

A.    ███████████████████████████████████████████████

███████████████████████████████████████████

Direct Examination - Adkins

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████.

Q.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████?

A.    ████████████████████.

Q.    ████████████████████████████████████
████████████?

A.    █████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████
      ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
██████.

Q. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮.
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮.
▮▮▮▮▮▮▮▮▮▮.
▮▮▮▮▮▮
▮▮▮▮▮

Q. ▮▮▮▮▮▮▮▮▮

A. ▮▮

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮?

A. ▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮?

A. ▮▮▮▮▮.

Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮.

Q.

(The following proceedings were had in open court.)

MR. SCHMIDTLIEN:  Ms. Adkins, if you think that a question comes up that might be sensitive, obviously flag it for His Honor.

THE WITNESS:  Will do.

THE COURT:  Thank you.

We're a couple seconds behind here.  That's fine.

MS. ONYEMA:  I'll get started.

Q.  (BY MS. ONYEMA)  Now, Ms. Adkins, earlier today during your direct examination, your counsel showed you a threat outlook slide, if you recall, that had different breaches and also that referenced state-sponsored activity from China and Russian.  Do you recall that?

A.  Yes, I do.

Q.  Now, I want to talk to you about national security.  Now, you've never held a full-time position with the United States Government; correct?

A.  Correct.

Q.  Since 2002, your only full-time position has been at Google?

A.  Correct.

Q.  And Google is a publicly traded company?

A.  It is now, yes.

**Q.** Google owes a duty to its shareholders to maximize value; correct?

**A.** Um -- I'm not entirely sure how to answer that. It sounds like the kind of thing that is in a public statement somewhere, but sure, yeah.

THE COURT: Let's move on.

**Q.** (BY MS. ONYEMA) Well, Ms. Adkins, you're here to speak for Google today on security issues; correct?

**A.** Correct.

**Q.** You do not speak for the United States Government on issues of national security; correct?

**A.** Correct.

**Q.** As VP of security engineering at Google, you don't know what intelligence the U.S. Government receives from other sources; correct?

**A.** No, I do not, other than these sources that then become public.

**Q.** You would agree that the United States Government has unique capabilities to assess national security threats that private companies such as Google do not?

**A.** I wouldn't know what capabilities the U.S. Government has. I have a general sense of how investigations work and how methods and sources work. I have a pretty good imagination. So I could, you know, probably have a mental picture for it, but as you say, I've never worked there.

**Q.** But it is your view that the government has unique capabilities as it relates to assessing national security issues?

**A.** Well, in some cases; and in some cases, we have unique capabilities as well.

**Q.** Now, Ms. Adkins, you were deposed in this case; correct?

**A.** Correct.

**Q.** I took your deposition about two weeks ago?

**A.** Yes.

MS. ONYEMA: Permission to approach, Your Honor, with deposition binders.

**Q.** (BY MS. ONYEMA) Now, Ms. Adkins, I'd like you to turn in your deposition binder to page 93 of your deposition transcript and let me know when you're there.

**A.** I am there.

**Q.** Thank you.

I want to refer you to lines 6 through 17 of your deposition transcript where I asked you the following question and you provided the following answer.

"QUESTION: And you would agree that the United States Government has tools available to it that Google does not as it relates to addressing national security issues; correct?

"ANSWER: I would agree that the United States Government has unique capabilities. For example, it's allowed to do hacking back operations against threat actors. That's not a

capability available to us.  I would agree they probably have capabilities they're authorized otherwise under law to do that we're not authorized to do."

Q.  Was that your testimony?

A.  Yes.

(Discussion sotto voce.)

MS. ONYEMA:  I will read lines, yes, 18 through 20 state:

Q.  (BY MS. ONYEMA)  "Again, everybody has a different piece of the puzzle when it comes to understanding what's going on."

Do you see that language?

A.  Yes, I do.

Q.  Okay.  Now, the United States Government, for example, has access to classified information; correct?

A.  I would assume so.

Q.  The United States Government also has subpoena power?

A.  I think that's true, yes.

Q.  But Google does not?

A.  Correct.

Q.  And you understand that under plaintiff's proposed remedies, the United States will assess whether any qualified competitor who receives data poses a national security risk; correct?

A.  I'm not aware of that piece of the remedies, but if you say so.  It sounds reasonable, yeah.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.   So have you reviewed the specific remedies that plaintiffs have proposed?

A.   I've reviewed parts of it.  I don't recall whether or not I've seen that piece.

Q.   Do you understand that plaintiff's proposed remedies also specify that the United States will evaluate any potential risks to national security stemming from a Chrome divestiture?

A.   Again, I would say same answer.  I'm not sure I read that specific part.  I don't recall.

Q.   Understand.

Now, on your direct, you discussed Google's process as it relates to cybersecurity; correct?

A.   Our culture, talent, architecture, and innovation, yes.

Q.   Well, let's talk briefly about the cybersecurity of other companies.

A.   Uh-huh.

Q.   In your role as VP of security engineering at Google, it is nearly impossible for you to verify the people, processes, and technologies of another company.  Is that fair to say?

A.   I think it's fair so say.  And I don't have an insider access to look at all their controls and see, you know, bit by bit have they done everything right.  I do think we get a fair amount of information.  Like it's a really small community of people who do this work.  And there are information sharing

relationships.  We get public information.  We see stuff through the kind of incident-sharing working groups that getting put together.

So I do have a sense of how things are going.  But again, I don't have the ability to go in and run scanners and look at their control settings and things like that.  But again, you can get a general sense of that.

Q.  But you can't get a direct sense of another company's security, correct, because you can't go in and measure their security directly?

A.  I would say we can't measure whether everything's happening right, but we can certainly see when things are going wrong.

Q.  You can see when other things are going wrong in other companies?

A.  There are certain circumstances, especially now that more and more regulations are going into place that are mandating data breach notification, whether it's at the state level or the federal level or through SEC obligations.  So increasingly, we do have more and more insight into incidents that are happening.

Q.  Well, let's turn and discuss vulnerabilities and breaches. Now, Ms. Adkins, you mentioned during your direct testimony the concept of zero day.  Do you recall providing testimony about zero day?

A.   I do.

Q.   A zero day is a colloquial term for a vulnerability that is not discovered by the victim until after it is exploited. Is that a fair characterization?

A.   No, I would say it's a vulnerability that we did not know about until the moment it's discovered.

     And so the nuance here is that the weakness, the vulnerability, can be in the software, a threat actor can figure out a way to exploit that, and they may actually exploit that for a long time before somebody notices.  It's only the point at which somebody notices and then, you know, the vendor can actively call it the zero day.

Q.   Now, you mentioned on your direct testimony that Google has experienced -- you referenced a zero day in Chrome.  Do you recall that?

A.   Correct.

Q.   Google's experienced multiple zero days in Chrome; correct?

A.   You know, like all software manufacturers, we have vulnerability in our software.

Q.   Uh-huh.  Would your answer be the same for Android?

A.   Yes.

Q.   And, Ms. Adkins, Google has also had multiple data breaches in the past; correct?

A.   The only ones that I recall -- so again, important that we

understand what breach means here, and here, I would refer to NIST, who has a very clear definition that it is an incident that leads to the loss or unauthorized access of important information.  There's a very detailed definition there.

So something like the North Korea incident that I mentioned, where we were able to contain it before any harm was caused, depending on whether you're using the term "breach" in a casual way or in a legal way, really matters. So we might call it a breach, we might not call it a breach, depending on the regulation that would kick in and where we are in the world, the jurisdiction.

Q.   Let's  --

A.   So we have kind of Operation Aurora is one that I mentioned, but whether or not the North Korea situation was a breach depends on the context in which you're interpreting that.

Q.   In 2016, 5 million Google passwords were leaked; is that correct?

A.   I would need a reference to that, but that doesn't sound familiar, no.

Q.   In March of 2018, Google discovered a bug in its Google Plus social network that gave outside developers access to private user data.  Do you recall that incident?

A.   Again, I would need a reference to give you an understanding of what happened there.

Q.   It's publicly available on the internet as well --

A.   Yeah, I've been Google 23 years and --

         THE COURT:   Let's not talk over each other.   Was there a follow-up question?

         MS. ONYEMA:   Yes, there's a follow-up question, Your Honor.

Q.   (BY MS. ONYEMA)   So you're not familiar with a Google Plus social network data breach regarding private user data?

A.   I'm not aware of a breach.   Again, the definition of that is really important.   But again, it's been some time, and I would need a reference to that to sort of go through what happened with you.

Q.   So putting aside the terminology, "vulnerability" or "breach," you are not aware of a bug in Google Plus social network that provided outside developers user data?

A.   Again, I would want to look at the details before trying to answer that.

     Now, keep in mind that, just coming back to your question about the 5 million passwords, there are kind of two phenomenon that we see happen.   Number one, people often share passwords between websites.   So they might use the same password for their Gmail account that they use to log into the *New York Times*.   If that other account is compromised, it's associated with your Gmail account, and they might try it.   So we see them kind of compromise these password databases of

other companies and then try them against the Gmail account. So sometimes you'll see reports of a Gmail data breach, but actually what's happened is the user has shared passwords across sites.

The other phenomenon we see is something called the info stealer market. This is malware that ends up on people's computers, and it steals the usernames and passwords as people are typing them in. They go back to the threat actor. And there are these database where you can buy Gmail accounts. Now, this is the result of malware on the end user's computer, not on Google.

So when I hear things -- like I'm not sure exactly which 5 million account data breach you're talking about, but it sounds to me like one of these two cases. We have not had a breach where someone hacked into Google and took out of our systems 5 million users.

Q. But you may have had a breach where there was access to this information?

A. No, that's not what I'm saying. I'm saying that it could be that these 5 million accounts were compromised as a result of these other two phenomenon that I've described.

Q. But you mentioned a moment ago that you're not familiar necessarily with the incident, and so --

A. I'm not familiar -- sorry, I overlapped. I'm not familiar with any incident where we were hacked and someone took them

off of our systems.

Q.   So you're making assumptions as to a moment ago you were just discussing what could have happened.  Those are assumptions because you aren't recalling sitting here today that particular incident?

A.   Well, I can tell you there was not an incident where someone hacked into Google and stole 5 million accounts.  So I would assume, based on my experience, that is one of these other two things.  And we have had reports of that throughout the years where it gets reported as a data breach in Gmail but actually it's one of these other two things that are happening.

Q.   But it's still an outside party getting access to information; correct?

A.   Information from the user, yes.

Q.   Correct.

     Now, on direct, you testified, and I believe your precise words was that Google is "doing pretty well compared to peers."  Do you recall that, providing that language?

A.   Yes.

Q.   And so you would agree that Google has had data breaches in the past?

A.   We have had a few, but not as many as others.

Q.   Other companies have had data breaches in the past?

A.   Yes, sorry, was that the question?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

**Q.**  It was.

**A.**  Yes.

**Q.**  No problem.

**A.**  Again, I would say the frequency there is concerning.  If we look at Yahoo, you know, in 2012, 2013, 2014 to '16, Microsoft very consistently, over several decades, I think the frequency there is important.

I think also the way they're handled is very important.  And, you know, when I look at Aurora, we detected that quite early, and we were able to get ahead of it quite early.  With the North Korea incident I mentioned, they only got a few hours of access in a contained environment.  So when we look at the impact of these and the frequency, it is less.

**Q.**  We'll talk about Microsoft in a few minutes.  I did want to ask a follow-up question about Project Aurora.  Now, when Google was attacked in 2009, Google at that time was investing heavily in security; right?

**A.**  We were doing all the basics that we were advised to do through compliance regimes.  You know, we were making people rotate their passwords on a regular basis.  We were applying security updates from our vendors.  There's a whole host of things back in those days would have been considered best practice.  We were doing those.

**Q.**  And those best practices didn't prevent the breach from happening; correct?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.   That's correct.  These threat actors are very sophisticated and know how to work around those best practices.

Q.   To that end, Google, like any other company, could have data breaches in the future; correct?

A.   Well, as I testified earlier, we went through a decades-long transformation innovating in many areas and going above and beyond the practices that are considered the best practices.  And since 2009, we only know of the North Korea situation which was contained after a couple of hours.

Q.   I'd like to turn and talk about third-party vendors for cybersecurity Now, Google uses outside vendors for cybersecurity; is that correct?

A.   We use a few.

Q.   Would you estimate that it's roughly 30 to 40 external vendors?  Does that number sound about right?

A.   So there are different kinds of vendors.  There are software vendors, where we might use them to provide a unique capability on our systems, and then there are vendors who come in the form of the work force.  So I'm not sure which one of these you're referring to.

Q.   Just in terms of outside vendors in its totality, would it be your educated guess that Google uses about 30 to 40?  Does that sound about right?

A.   Again, I don't have a precise number.  But if I was to

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

make an educated guess, on the work force side, it's probably 30 to 40, yeah.

Q.   For example, Google has a partnership with CrowdStrike Falcon to provide support; correct?

A.   This is a software and services company, yes.

Q.   Now, you agree that the use of external vendors for cybersecurity introduces vulnerability into Google's cybersecurity; correct?

A.   Yes.  So this is one of the reasons why we evaluate these vendors.  So with CrowdStrike, you end up installing that on your systems, and it has a high level of privilege.  And so if anything goes wrong, there's a lot of risk.

And so one of the things we did with CrowdStrike is we actually invested in them when they were a start-up.  So we got a lot of say into the road map, how the software was built, and how they orchestrated it.  And for a long time, we didn't use it.  And it was only after a certain period of time where we started evaluating it.

And then on top of that, CrowdStrike has two environments.  They will run in a cloud environment, or they will run in a gov cloud environment.  Gov cloud is where the classified systems get run.  We run our stuff in the gov cloud.  So we asked them for an even higher level of security, even above and beyond what a normal company would ask.  And then on top of that, I mandated they only keep our data for

seven days.

So we've put restrictions like this in place as we assess the risk and as we look at how we want to use them.  I also will remove them if the risk becomes too high.  So we're very careful when you're sort of allowing these very privileged third parties to have insight there.

Q.  Now --

MS. MAIER:  I'm sorry to interrupt, but the name of that vendor is something we redacted in the deposition.

MS. ONYEMA:  It was unredacted later.

MS. MAIER:  Okay.

MS. ONYEMA:  Yeah.  We discussed that with your colleagues maybe yesterday.

Q.  (BY ONYEMA)  Now, in terms of CrowdStrike Falcon, you mentioned that Google has say into its system or its software; correct?  Is that what you just testified?

A.  I would say that as a customer, we have input into the road map, and we have input into, you know, our views into how they should be running things.  And of course, we would always have the choice to not run them if we're not comfortable with that.

Q.  You would agree, though, that Google has input but not control in terms of how CrowdStrike Falcon designs its software?

A.  I would agree with that.  I mean, I don't have

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

architectural control over it.  But I would say the incentives here between customer and vendor are pretty tight.  I think they want the business.  So to some extent, if we insert something into our requirements that's very important, they're going to listen to that.

Q.   Well, any third-party software provider makes the ultimate decision as to what changes to make to its software; correct?

A.   Into what changes they make, yes, and it's our decision whether or not to run it.

Q.   Now, in terms of software products, Google relies on third-party open-source software products?

A.   Correct.

Q.   In fact, today, Google uses upwards of 15,000 third-party open-source software projects?  Does that number sound about right?

A.   I think it's actually closer to 19,000, yeah.

Q.   Google uses open-source packages in Chrome, for example?

A.   Yes, we do.

Q.   And you would agree that how one designs a software system is very important to the ultimate security of that system; correct?

A.   Absolutely.  And when it comes to open source, this is incredibly important.  As -- so open-source software is often developed in the open, so we can see the code.  So we can

assess the quality of code.  And again, we make risk-based calls on how we use that code.

So, for example, a popular open-source package does video processing.  But they're not written very well.  But it would be very difficult to rewrite it because they're so intricately written.  So if we were going to run that, our security standard would mandate that we run that in what we call a sandbox.  That protects the system around it as it's running.

So, you know, we make these risk assessments based on the quality of the software, and that's how we determine whether or not it's safe to run.

MS. ONYEMA:  Your Honor, permission to approach.  I have some binders for the Court and the witness.

Q.   (BY MS. ONYEMA)  Now, Ms. Adkins, I've just handed you a binder with several documents, and I'd like you to open the binder and turn to what has been labeled as PXR 0302 and let me know when you are there.

A.   I am there.

Q.   The title is "Core Rigor Review."

Do you see that?

A.   I do.

Q.   And your name is at the bottom of the page?

A.   Yes, it is.

MS. ONYEMA:  Your Honor, plaintiffs move to admit PXR 0302 into evidence.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

MS. MAIER:  No objection.

THE COURT:  It will be admitted, PXR 0302.

(Exhibit PXR 0302 was received.)

Q.  (BY MS. ONYEMA)  Now, Ms. Adkins, this is a core risk government review update that you prepared in January of this year; correct?

A.  Government's update, yes.

Q.  Yes.

I'd like to turn to page 8 of this particular document. You'll see that it says "Top cybersecurity risk overview" at the top.  Just let me know when you're there.

A.  I am there.

Q.  Now, there's a section labeled "Third-party risks," and under that it says, "Third party SAAS."

Do you see that?

A.  I do.

Q.  And SAAS is software as a service?

A.  That's correct.

Q.  Now, Google has internally determined that the use of third-party software as a service creates a high security risk; correct?

A.  That's correct.

Q.  I'd like you to turn to page 22 of this document.  And just let me know when you're there.

MS. ONYEMA:  Ms. Cassidy, you can pull that down.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Thank you.

A.   Is it -- what's the page number on the bottom?  I don't have the --

Q.   (BY MS. ONYEMA)  It's a little hard to read.  It says 22 at the very bottom and then under that, there's a Bates number that ends in 327.

A.   327.

Q.   Yes.

A.   Okay.

Q.   Do you see the page?

A.   I hope we're on the right one.

Q.   Now, on this page --

         MS. ONYEMA:  And, Ms. Cassidy, you can pull this page up.  You can't pull this up?

Q.   (BY MS. ONYEMA)  Never mind.  We're not going to pull it up.  We're just going to talk about it.

     On this particular page, you discuss the risks associated with third-party-produced software and both open source and commercial in more detail; correct?

A.   Correct.

Q.   And you note that Google's use of third-party software creates a high risk, which we discussed earlier; correct?

A.   So actually, this slide we are looking at now is software supply chain, not software as a service.

Q.   Okay.  One moment.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

In terms of this particular slide, software supply chain, you note in the document that Google relies on thousands of third-party-produced software, both open source and commercial; correct?

A.  Correct.

Q.  And we were discussing that a few moments ago?

A.  Correct.

Q.  And you also note that the use of third-party software, while it increases developer velocity, it also introduces risk by incorporating unverifiable components; correct?

A.  That's correct.  And this is what I meant by, you know, when we start to use a video encoder or, say, a cryptographic library, we have to assess the risk that it assesses and then choose to use it in the right way.

Q.  And at the time that this document was prepared, you also noted in this particular slide that Google had not yet developed all the solutions needed to scale control enforcement?

A.  That's true.  And the reason for that is there's 19,000 packages.  And so what we'd focused on for a long time were really these very critical ones that would focus on a critical risk.  I mentioned the video encoder.  We'd sandboxed that for a very long time.

And another example is a package called open SSL which provides cryptographic service.  We had so little faith in

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

that that we forked the code and kind of rewrote it and built our own.

So that gives you an idea of kind of how we're thinking a little bit about some of this code, but we do want to deal with kind of a long tail of 19,000, and you can imagine that requires unique solutions to scale.

Q.   But to answer my specific question, at the time of this presentation that you prepared, you noted that Google had not yet developed all the solutions needed to scale controlled environment.

A.   Correct.   We were continuing to burn down the residual risk.

Q.   Thank you.

Now, I want to turn and talk about plaintiff's proposed data sharing remedies.   I know you provided some testimony during your direct.   Do you recall that?

A.   I do.

Q.   And I believe you testified that you had concerns that plaintiff's proposed data sharing remedies might create some security risks.   Do you recall providing that testimony?

A.   Yes, I do.

Q.   Now, you're not suggesting that other tech companies should be prohibited from collecting data simply because that data could be used in nefarious ways; correct?

A.   I do think you have to do a very careful risk assessment

and a threat model to understand sort of how that data might be shared and protect it.  And keeping in mind that we're not just talking about a single point in time.  We're talking about the full duration of sort of that situation as it might persist.  There's security on day one, there's security on year five, year ten, however long it lasts.

And what we know is that the life cycle of business is such that, you know, business choices get made and things go up and down.  That's really the history of cybersecurity that we looked at in that threat picture.  You know, that it's important then when that first decision is made, you consider everything that comes after it.  And that's my concern.

Q.   Again, Ms. Adkins, my question was a little bit more precise than that.  Is it your view that other tech companies should be prohibited from collecting data?

A.   That's a pretty broad question.  I mean, I'm not in a position to tell companies what they can and can't do.  But I think when we think about search user query data, when you think about the ad click data, we need to be incredibly thoughtful about the impact of that decision.  That data is of high sensitivity.  You can do a lot with that data if you are malicious.  And I think it is very important that we consider all of the factors here.

Q.   Now, Ms. Adkins, you're not testifying that no other tech company that collects data from internet users is capable of

protecting data, are you?

A.   I would say there's a very, very high bar that you have to set for click-query data and for ad click data.

Q.   Ms. Adkins, that was not my question.  My precise question was whether you were suggesting that other tech companies that collect data from internet users are not capable of protecting that data.

A.   If you want my professional opinion, I'm very picky about who I put my data with.  I think there are good choices and bad choices, and I'm a Google user, for a reason.

Q.   And you've been with Google your entire professional career since 2002; correct?

A.   That's correct.  So I have a front row seat on how we do that protection.

Q.   But you don't have a front row seat in terms of how other companies handle their cybersecurity correct, because you can't --

A.   No, but I do have a pretty good understanding of the history of their failures.

Q.   But to go back to some of your testimony earlier today, you do agree that you are not able to see directly into the systems of other companies; correct?

A.   Again, I don't have an insider's view of being able to check all of their controls, but we certainly get a sense, through our information sharing, through, you know, people

rotating through companies, through public reports, kind of how things are going, yes.

999.

Q.   Now, let's talk about Chrome and Android.  Now, on your direct examination, you raised concerns that a divestiture could create security risks.  Do you recall providing that testimony?

A.   I do.

Q.   Now, should the Court order a divestiture in this case, you don't know the identity of the buyer sitting here today; correct?

A.   No, I don't.

Q.   And you certainly are not providing testimony about the cybersecurity systems that a future divestiture buyer has in place?

A.   No, I'm only assessing what I think would be necessary to put in place and what I know of how hard that is to do.

Q.   Now, I want to talk a little bit about your relationship to Chrome as an organizational matter.  There is a Chrome security team at Google; correct?

A.   Correct.  They cover the product security for Chrome.

Q.   And you are not a member of the Chrome security team?

A.   No, I'm not.

Q.   You're also not directly responsible for maintaining the Chrome browser in any way; correct?

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

A.   So I'm not responsible for the code changes, the builds, the kind of release.  But we are responsible in core for overseeing the infrastructure that makes all of that happen, the core infrastructure that I mentioned.  And kind of with that -- without that, Chrome doesn't exist.

Q.   You do not have any responsibilities as it relates to the technical day-to-day of operating Chrome?

A.   Again, I think the -- you know, the technical operating of changing code and pushing code and sort of building new product features, no.  But operations of Chrome also includes how the developers work on their workstations, how they come into the office every day, who they are, and also kind of where the data sits as it interacts with Google's core infrastructure.  So those are also part of the operations, and we do have oversight of that.

Q.   But again, Ms. Adkins, you are not directly responsible for maintaining the Chrome browser?

A.   I'm not responsible for maintaining the code.

Q.   Now, you talked a little bit earlier about collaboration in the industry.  So I'd like to talk about that --

A.   Sure.

Q.   -- in more detail.  Now, you would agree that Google sees a value in industry collaboration on issues of cybersecurity; correct?

A.   Yes.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.  Google participates in cybersecurity coalitions?

A.  Yes, we do.

Q.  For example, Google is a member of the coalition for security artificial intelligence?

A.  That's true.

Q.  Alongside companies such as Anthropic, OpenAI, and Meta?

A.  I do believe they're part of COSI, yes.

Q.  And earlier today, you mentioned incentives; correct?

A.  Correct.

Q.  And NIST is a part of the Department of Commerce?

A.  That's correct.

Q.  Google conforms to cybersecurity standards set by NIST; correct?

A.  I would say we use the cybersecurity standards as a baseline and actually as part of things like the Fed Rep Program.  We get audited against NIST standards, the standard 853s used for Fed Rep.  But in many cases, we go above and beyond even where the standards needs us to be.

Q.  You do look to NIST guidance for your baseline?

A.  We do.  We think it's a valuable framework for looking at cyber.

Q.  And you would agree that most of the advancements in cybersecurity are places where Google has built industry coalitions and standards?

A.  I'm sorry, ask that again?

Q.   Absolutely.

You would agree that most of the advancements in cybersecurity are places where Google has built industry coalitions and standards?

A.   I would say that, you know, there are a number of them.  I couldn't say that the only advancements we've made are with coalitions, but there are some very notable ones, yes.

Q.   And there's other advancements you've made with other types of, for example, partnerships that you mentioned earlier today; correct?

A.   Correct.

Q.   Google participates in an information sharing forum known as the Joint Cyber Defense Collaboration --

A.   Yes.

Q.   -- or Collaborative?

A.   Yes.

Q.   And the Joint Cyber Defense Collaborative is an information sharing forum created by CISA that you referenced earlier?

A.   Correct.

Q.   Now, these partnerships allow companies to share information on potential cybersecurity threats?

A.   It creates a table to share information.  It doesn't guarantee that information is shared.

Q.   Google does provide cybersecurity information to industry

peers; correct?

A.   Sometimes.

Q.   And Google also receives information as it relates to --

A.   Sometimes.

Q.   Just let me finish my question.  Thank you.

Google also receives information from peers as it relates to cybersecurity?

A.   Yes.

Q.   You also mentioned the Secure by Design Pledge during your direct examination; correct?

A.   Correct.

Q.   You mentioned that Google has signed that pledge?

A.   Correct.

Q.   You would estimate that more than a hundred other companies have joined Google in signing it; correct?

A.   I checked recently, and I think it's actually more than 300.

Q.   More than 300?

A.   Correct.

Q.   Thank you.

Now, earlier today you were talking about Microsoft and some of the breaches that it had experienced in the past.  And I would like you to turn to PXR 0306 in your binder.  It's a document that's titled "Cybersecurity Risks," and it has your name at the bottom?

A.   Yes.

Q.   Just let me know when you're there.

A.   I'm there.

MS. ONYEMA:   Your Honor, plaintiffs move to admit PXR 0306 into evidence.

MS. MAIER:   No objection.

THE COURT:   It will be admitted.

(Exhibit PXR 0306 was received.)

Q.   (BY MS. ONYEMA)   Now, I want to look at the first page of this document.  It identifies your name and the names of Royal Hansen and Vickie Eckert; correct?

A.   Correct.

Q.   And Royal Hansen is the VP of privacy, safety, and security?

A.   He was at the time of writing this, yes.

Q.   And within privacy, safety, and security, that's a pillar within core; right?

A.   Correct.

Q.   And you are employed in the security pillar within that framework?

A.   Correct.

Q.   So there's a separate privacy pillar?

A.   Correct.

Q.   I'd like for -- and you prepared this slide deck for Google's board of directors; correct?

A.   Let me double-check which one this is.

     Yes, I believe that is what this is.

Q.   Thank you.

     Now, Ms. Adkins, I'd like you to turn to the page Bates ending 352.  It's page 8 of the document, but the numbers are a little small, so I'll give you the Bates number as well. Just let me know when you're there, Ms. Adkins.

A.   I am there.  Yes.

Q.   Now, this slide is entitled "Benchmarking Cybersecurity Posture"; correct?

A.   Correct.

Q.   And in this slide, you are showing the board of directors cybersecurity posture scores for a number of companies, including Google; correct?

A.   So what this slide shows is data from a third-party company called SecurityScorecard, and they use external signals, so not internal signals but external ones, to benchmark companies.  And companies like Google will use this to get a signal as to how good their vendors might be.

     But it is kind of external signals only.  It would be a bit like walking through the parking lot and assessing how safe the cars are by what kind of tires they have.  Right. You don't get a sense of their crash ratings, you don't get a sense of how the seat belts perform.  So it's sort of an outside view.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.   Now, you would agree that SecurityScorecard, who's providing this data, this data is a useful barometer as to what's going on in cybersecurity; correct?

A.   It's useful, but as I mentioned, it's limited.  And we also know that people who serve on boards often see this data in other venues.  So we thought it would be useful to just put kind of our board of directors -- give them a context for how SecurityScorecard views us at the time.

Q.   You did think it was important enough to put this slide in front of the board of directors; correct?

A.   I think context for the board's important.

Q.   Now, I want to talk about the specific bands and scores on this document.  You'll see a number of scores in the 90s, and they all have an A in the green next to them?

A.   Correct.

Q.   And most of those are financial institutions like Bank of America, Wells Fargo; correct?

A.   And Google cloud platform.

Q.   And the cloud platform, but not Google overall; correct?

A.   And again, this is a difference in how they're doing the external assessment.  I think they make this distinction here based off of our IP addresses.  So they'll look at one set of IP addresses that belong to the Google cloud platform and another that belonged to Google, but it's all running on the same infrastructure.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Q.  Ms. Adkins, you just said a moment ago that you think they're using certain metrics.  Do you know for sure, or this is your assumption?

A.  So they do publish on their website some very high-level information about how they do that.  What makes me think that this is based on IP address is that it's sort of an area where we've got a different set of IPs for cloud than we do for Google.

Q.  But you don't know for sure; correct, Ms. Adkins?

A.  I don't know for sure, but I don't know how else they'd make the distinction.

Q.  But you don't work at SecurityScorecard; correct?

A.  No, I do not.

Q.  Now, a moment ago we talked about the scores for some of the bank institutions, like Bank of America has a 96; correct?

A.  Yes, it does.

Q.  And Bank of America needs to secure its customers' money; right?

A.  Yes.

Q.  There's also a band in orange for B, and there's a variety of scores there.  You'll see that Apple has a score of 89; correct?

A.  Correct.

Q.  Google and Meta both received a score of 86?

A.   At the time of this, yes.  I think when I checked the Google score recently, we were back up in the A category.

Q.   But at the time of this slide it was 86?

A.   Correct.

Q.   Amazon's at 84?

A.   Correct.

Q.   And then Microsoft is at 83; correct?

A.   Correct.

Q.   So at the time of this slide, Google was within three points of Microsoft; correct?

A.   Yes, according to these external signals.

MS. ONYEMA:  No further questions, Your Honor.

THE COURT:  Okay.  Thank you.

Redirect?

REDIRECT EXAMINATION

BY MS. MAIER:

Q.   Ms. Adkins, you mentioned that you worked on a review with the government.  Could you just state what role it was that you held in connection with that review you referred to?

A.   So I served on CISA's Cyber Safety Review Board, which was set up at the behest of the president under executive order, and the purpose of this board was to review incidents impacting national security.

Now, I did this in my personal capacity after being appointed to the board.  And the board's purpose really is to

identify, you know, key things that -- after big incidents, key things that we could do differently to prevent them from happening to the nation the next time.

Q. And counsel for the plaintiffs asked you some questions about risk management at Google. Is managing security risks at Google part of its ongoing security operations?

A. Yes, it is.

Q. Does it take time to manage particular security risks?

A. It does. And what we have found is that, you know, once we had put in kind of our basic security posture, as we had had during Aurora, and then as we evolved the security program over a decade, we started getting into the challenges that really take a very long time to solve. You're sort of reinventing almost the way computers work.

So, for example, one of the big risks we're managing at the moment the shift to post-quantum cryptography.

THE COURT: Shift to what?

THE WITNESS: Post-quantum cryptography.

This is a full upgrade of cryptography that's going to have to happen on the planet. That kind of transition takes five, ten years. So those are the kinds of challenges we're now at the point we are tackling.

Q. (BY MS. MAIER) And counsel asked you about zero day vulnerabilities. Is Google's management of vulnerabilities like that one something that you view as one of Google's

cybersecurity's weaknesses or strengths?

A.   I would view it as a strength.  And the reason for that is that, you know, we've not had -- you know, outside of the Chrome zero day that was very targeted at our users, we've not had an incident as a result of a vulnerability.

And I will also note that if you were to buy that exploit on the underground, it's about a million dollars.  So that's how far -- high we've raised the bar at Google.  We're forcing or adversaries to spend millions and millions of dollars to essentially waste their bugs, right, because once we see them, we fix them.  And that just gives you a sense of, you know, how hard they have to try.

Q.   And when you last -- so you were asked some questions about the SecurityScorecard from 2024.  When you most recently checked, do you recall what Google's score was?

A.   I think one week it was 90, another week it was 91.  It fluctuates quite a bit, because these external signals are fairly dynamic.  It could be a news report, it could be an IP address of one of our customers that, you know, is going through a fluctuation.  So the data is not particularly stable.

Q.   And counsel for plaintiff asked about whether it's your opinion that no other tech company could keep data safe, I believe.  To your mind, is there a difference between another company collecting data and what they do with it and Google

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

sharing the data of its own users?

A.   Sorry, I'm not sure I understand the question.

Q.   Yeah, when it comes to Google's own user data, does Google take care with that data?

A.   Yes.

Q.   And then when it comes to Google's overall security record during the time that we've looked at since Aurora, are you proud of that security record?

A.   Yes.

Q.   And why is that?

A.   Because we've been able to keep the user data stored with us, protected, and, you know, we've been able to take the daily shots that are fired at us.  It's a constant onslaught. I think, you know, we're probably one of the most targeted entities on the planet, and we've built the kind of processes with our culture, tech, and our people that allow us to defend every single day for long periods of time.

        MS. MAIER:  Thank you.  I have no further questions.

        MS. ONYEMA:  Your Honor, just two brief questions as counsel brought up the cybersecurity, if the Court will allow me?

        THE COURT:  Sure.  Two quick questions.

        MS. ONYEMA:  Yes, Your Honor.

                RECROSS-EXAMINATION

BY MS. ONYEMA:

Q.   Now, your attorney asked you questions about your time at the cybersecurity review board; correct?

A.   The Cyber Safety Review Board.

Q.   Cyber Safety Review Board; correct?

A.   Correct.

Q.   During your time on that board, for the reviews you completed, you did not have access to classified information; correct?

A.   For the two reviews I completed, I did not.

Q.   And the board does not also have subpoena power; correct?

A.   My understanding is no.

Q.   Okay.  Thank you.

        MS. ONYEMA:  Thank you, Your Honor.

        THE COURT:  Ms. Adkins, thank you very much for your time and testimony.  Safe travels home.

        Okay.  Mr. Schmidtlien, what do we have on tap here?

        MR. SCHMIDTLIEN:  I have a couple of alternatives for you at this -- at this hour.  The next witness on our list is Mr. Pichai.  He will be testifying tomorrow.  If Your Honor wants, I do have an expert witness who can begin testifying right now.  He will obviously -- he will not complete -- this is Professor Nieh, who I believe you've got a summary for.

        THE COURT:  So, look, we can wrap up for the day and

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

just start with Mr. Pichai tomorrow.  I think the question is just in terms of timing, do you expect Mr. Pichai to be how long?

MR. SCHMIDTLIEN:  I do not anticipate his direct to be longer than an hour.

THE COURT:  All right.  So we'll get to Professor Nieh.

MR. SCHMIDTLIEN:  Correct, and Mr. Zenner, who's another expert, we expect to get to both of them tomorrow.

THE COURT:  Okay.  And I take it, Mr. Pichai will be entirely an open session?

MR. SCHMIDTLIEN:  That is correct, Your Honor.

THE COURT:  Okay.  Very good.

All right.  So let's just do that.  We'll begin tomorrow then -- all right.  So we've got a quick criminal matter here in court at 9:15.  So just be mindful of whatever you leave on the tables overnight and then we'll begin at 9:30 tomorrow.

Anything before we adjourn for the evening?

MR. DAHLQUIST:  No, Your Honor.

MR. SCHWARTZ:  Nothing from the states.

THE COURT:  Okay, very good.  We'll see everybody tomorrow.  Please don't wait for me.

(The proceedings were concluded at 4:43 p.m.)

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

        I, Christine Asif, RPR, FCRR, do hereby certify that
the foregoing is a correct transcript from the stenographic
record of proceedings in the above-entitled matter.

                    _____/s/_____
                    Christine T. Asif
                    Official Court Reporter

    Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

| < Dates >. | < 1 >. | 2009 2324:14, | 25 2292:16, |
|---|---|---|---|
| April | 1 2285:2, | 2327:3, | 2301:21. |
| 2300:8. | 2302:8, | 2328:11, | 27 2313:13. |
| April 29, | 2302:18, | 2328:15, | 28 2282:37. |
| 2281:11. | 2302:21, | 2329:14, | . |
| December of | 2303:1, | 2330:22, | . |
| 2009 | 2303:5. | 2331:6, | < 3 >. |
| 2329:13. | 10-101 | 2344:20, | 3 2293:7, |
| first decision | 2281:33. | 2366:16, | 2333:4, |
| 2376:11. | 10-plus | 2367:9. | 2337:13. |
| January of | 2311:10. | 2010 2324:14, | 30 2285:2, |
| 2372:5. | 10005 | 2331:6. | 2367:15, |
| June 2020. | 2282:39. | 2012 2333:2, | 2367:23, |
| 2310:11. | 1300 2282:23. | 2366:5. | 2368:2, |
| March of 2018, | 15 2308:9, | 2013 2333:4, | 2392:17. |
| 2362:21. | 2309:6, | 2366:5. | 300 2382:17, |
| May  2300:5, | 2370:14, | 2014 2310:25, | 2382:18. |
| 2316:24. | 2392:16. | 2333:5, | 327 2373:6, |
| May 13th, 2002 | 16 2305:10, | 2366:5. | 2373:7. |
| 2320:1. | 2306:21, | 2016 2333:5, | 333 2283:42. |
| September of | 2366:5. | 2362:17. | 352 2384:5. |
| 2009, | 17 2305:10, | 202 2283:44. | 354-3247 |
| 2329:12. | 2306:21, | 2020 2302:3. | 2283:44. |
| September of | 2357:17. | 20207 | 36 2308:1. |
| 2019, | 18 2358:7. | 2282:30. | 37202 |
| 2341:22. | 19 2370:17, | 2021 2333:11. | 2282:31. |
| $20 2327:16. | 2374:19, | 2023 2330:18. | . |
| . | 2375:5. | 2024 2327:3, | . |
| . | 1997 2332:25. | 2331:11, | < 4 >. |
| < 0 >. | . | 2389:14. | 4 2293:7, |
| 000 2370:14, | . | 2025 2281:11, | 2335:8, |
| 2370:17, | < 2 >. | 2300:9. | 2342:10, |
| 2374:19, | 20 2294:1, | 20530 2281:40, | 2392:24. |
| 2375:5. | 2309:14, | 2281:46, | 40 2294:2, |
| 0179 2300:7. | 2309:20, | 2282:15. | 2295:16, |
| 02199 | 2325:14, | 209 2281:26. | 2367:15, |
| 2283:19. | 2328:17, | 20th 2282:38. | 2367:23, |
| 0302 2284:24, | 2328:21, | 22 2372:23, | 2368:2. |
| 2371:16, | 2337:13, | 2373:4. | 43 2329:1, |
| 2371:25, | 2358:7. | 2285 2284:7. | 2392:24. |
| 2372:2, | 20-3010-APM | 23 2323:9, | 45 2304:10. |
| 2372:3. | 2281:6. | 2363:2. | 450 2281:32, |
| 0306 2284:26, | 2000 2341:18. | 2310 2284:9. | 2281:39, |
| 2323:14, | 20001 | 2319 2284:13. | 2281:44, |
| 2326:22, | 2283:43. | 2353 2284:15. | 2282:13. |
| 2382:23, | 2002 2320:3, | 2372 2284:24. | . |
| 2383:5, | 2355:21, | 2383 2284:26. | . |
| 2383:8. | 2377:12. | 2387 2284:17. | < 5 >. |
| . | 20024 | 2390 2284:19. | 5 2303:11, |
| . | 2283:13. | 24th 2300:9. | 2362:17, |

2363:19,
2364:13,
2364:16,
2364:20,
2365:7.
.
.
< 6 >.
6 2329:3,
2329:10,
2357:17.
600 2281:27.
60604
2281:28.
680 2283:12.
.
.
< 7 >.
7 2281:13,
2292:17,
2293:1,
2293:18.
7106 2282:14.
7th 2282:24.
.
.
< 8 >.
8 2372:9,
2384:5.
800 2283:18.
80203
2282:25.
83 2387:7.
84 2387:5.
853s 2380:17.
86 2386:25,
2387:3.
8714 2281:45.
89 2386:22.
.
.
< 9 >.
9 2392:16,
2392:17.
90 2389:16.
90s 2330:14,
2385:13.
91 2389:16.
93 2357:13.
94102

2281:34.
96 2386:15.
999 2378:3.
_____/s/___
_____
2393:5.
.
.
< A >.
A-d-k-i-n-s
2319:22.
ability
2295:14,
2297:17,
2299:3,
2300:14,
2309:8,
2315:15,
2336:4,
2360:5.
able 2286:9,
2287:8,
2292:12,
2292:13,
2295:24,
2296:2,
2296:23,
2296:24,
2298:25,
2299:23,
2300:2,
2300:21,
2304:24,
2309:5,
2312:20,
2312:21,
2314:22,
2315:17,
2322:18,
2329:6,
2329:20,
2332:9,
2332:10,
2334:4,
2334:25,
2342:7,
2342:17,
2343:1,
2345:1,
2345:4,

2362:6,
2366:10,
2377:21,
2377:23,
2390:11,
2390:12.
above 2330:2,
2336:19,
2367:8,
2368:24,
2380:17.
above-entitled
2393:3.
absent 2310:17,
2310:20,
2310:22,
2312:5,
2313:2,
2313:3.
Absolutely
2370:23,
2381:1.
access 2294:20,
2294:24,
2295:14,
2296:3,
2296:13,
2296:15,
2296:25,
2297:2,
2297:6,
2297:20,
2298:20,
2299:8,
2299:15,
2303:2,
2305:17,
2323:5,
2334:10,
2334:14,
2334:24,
2342:1,
2343:6,
2358:14,
2359:22,
2362:3,
2362:22,
2364:17,
2365:13,
2366:12,

2391:8.
according
2387:11.
account
2363:22,
2363:23,
2363:24,
2364:1,
2364:13.
accounts
2320:9,
2333:4,
2364:9,
2364:20,
2365:7.
accuracy
2336:25.
acquire 2332:7,
2332:21.
acquisitions
2332:9.
across 2311:20,
2314:14,
2364:4.
activate
2340:19.
actively
2361:12.
activity
2313:22,
2327:7,
2345:4,
2355:14.
actor 2324:22,
2326:1,
2328:23,
2329:6,
2329:17,
2330:21,
2345:5,
2361:8,
2364:8.
actors 2324:10,
2327:8,
2327:10,
2327:13,
2327:24,
2328:10,
2329:24,
2333:11,

2337:15,
2339:3,
2344:21,
2345:2,
2345:17,
2357:25,
2367:1.
actual 2296:3,
2312:2,
2325:24.
actually
2286:3,
2289:19,
2296:22,
2300:25,
2307:11,
2325:9,
2326:3,
2336:5,
2340:15,
2361:9,
2364:3,
2365:11,
2368:14,
2370:17,
2373:23,
2380:15,
2382:16.
ad 2288:3,
2376:19,
2377:3.
Adam 2282:6.
additional
2318:11,
2346:3.
address
2285:13,
2314:2,
2324:12,
2341:5,
2386:6,
2389:19.
addresses
2385:22,
2385:23.
addressing
2357:22.
adjourn
2392:19.
Adkins 2284:11,

2319:7,
2319:10,
2319:15,
2319:19,
2319:21,
2319:23,
2320:23,
2321:20,
2322:21,
2323:13,
2323:14,
2326:5,
2326:21,
2333:7,
2336:1,
2337:14,
2337:21,
2341:11,
2343:17,
2344:14,
2355:4,
2355:11,
2356:7,
2357:6,
2357:12,
2360:23,
2361:23,
2371:14,
2372:4,
2376:13,
2376:24,
2377:4,
2379:16,
2384:4,
2384:7,
2386:1,
2386:9,
2387:17,
2391:16.
administration
2320:8.
administrative
2316:8.
administrator
2320:4.
admit 2371:24,
2383:4.
admitted
2372:2,
2383:7.

advance
2317:13.
advanced
2300:22,
2331:10.
advancements
2380:22,
2381:2,
2381:6,
2381:8.
advantage
2301:6,
2301:7,
2306:6,
2306:7,
2309:10,
2312:23,
2315:12,
2315:13,
2342:17.
adversaries
2329:20,
2389:9.
advertising
2286:13,
2290:12.
advice 2330:3,
2338:21.
advise
2318:15.
advised
2366:18.
affect
2341:14.
affected
2328:20.
affiliated
2330:20,
2330:21,
2346:12.
affirmatively
2316:18.
aftermath
2306:13,
2344:1.
Afternoon
2281:13,
2316:11,
2319:19,
2337:10.

afterwards
2289:13,
2318:4.
agencies
2342:5.
Agency
2331:11.
ago 2310:25,
2357:8,
2364:22,
2365:2,
2374:6,
2386:1,
2386:14.
agree 2285:12,
2286:10,
2309:1,
2356:18,
2357:20,
2357:23,
2358:1,
2365:21,
2368:6,
2369:22,
2369:25,
2370:20,
2377:21,
2379:22,
2380:22,
2381:2,
2385:1.
agreed 2316:24,
2317:10,
2318:12.
agreement
2304:20,
2307:7.
agreements
2294:6,
2298:1,
2298:11,
2298:15,
2298:22,
2304:23,
2306:1,
2306:18.
Aguilar
2281:30.
ahead 2296:12,
2308:21,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

2317:3,
2324:9,
2366:10.
AI 2295:15,
2299:18,
2300:1,
2301:8,
2303:14,
2304:8.
al 2281:6.
Aldape
2281:30.
allow 2299:15,
2313:12,
2315:11,
2315:24,
2381:21,
2390:16,
2390:21.
allowed
2288:12,
2304:23,
2306:2,
2325:14,
2357:24.
allowing
2369:5.
allows 2323:5,
2334:22,
2336:24,
2340:25.
almost 2325:3,
2388:14.
Alongside
2380:6.
already
2315:16.
alternative
2291:14,
2297:10.
alternatives
2391:19.
amassed 2311:8,
2312:23.
Amazon
2387:5.
America
2385:17,
2386:15,
2386:18.

American
2341:18.
Amit P. Mehta
2281:17.
among
2311:12.
amongst 2290:8,
2290:14,
2293:19.
amount 2285:12,
2332:13,
2332:14,
2359:24.
amounts
2326:15.
analyses
2290:6.
analysis
2291:25,
2292:3,
2295:10,
2301:15,
2301:20,
2301:23,
2344:15.
Android 2288:8,
2288:13,
2288:18,
2292:10,
2303:19,
2303:23,
2304:2,
2304:7,
2343:18,
2343:21,
2343:23,
2344:9,
2345:9,
2361:21,
2378:4.
announcement
2300:18.
ANSWER 2287:18,
2291:17,
2304:9,
2317:14,
2356:3,
2357:19,
2357:23,
2359:9,

2361:21,
2363:17,
2375:7.
Anthropic
2380:6.
anticipate
2301:13,
2392:4.
anticompetitive
2306:12,
2310:22,
2312:9,
2312:13.
Antitrust
2281:25,
2281:38,
2282:20,
2282:36.
anytime
2339:9.
app 2295:25,
2296:13,
2296:20,
2296:24,
2297:2,
2297:13,
2297:18,
2297:20,
2297:23,
2298:2,
2298:12,
2298:15,
2298:23,
2299:5,
2299:8,
2299:15,
2299:16,
2300:15,
2301:3,
2301:11,
2303:15,
2304:8,
2309:4,
2313:16,
2314:3,
2314:5,
2340:23.
APPEARANCES
2281:21,
2282:1,

2283:1.
appeared
2300:17.
Apple 2289:19,
2289:20,
2289:21,
2289:25,
2290:2,
2290:5,
2294:6,
2294:10,
2299:22,
2299:23,
2305:1,
2305:3,
2305:5,
2305:6,
2306:22,
2306:25,
2307:6,
2307:20,
2386:22.
application
2345:9.
applications
2295:16,
2299:19,
2300:2.
applied
2323:3.
apply 2314:5.
applying
2366:20.
appointed
2387:25.
approach
2286:16,
2300:5,
2316:24,
2318:16,
2323:18,
2329:14,
2335:10,
2337:19,
2357:10,
2371:12.
approaching
2337:13.
approximately
2321:1.

apps 2296:22, 2299:21, 2313:16.

architectural 2370:1.

architecture 2324:7, 2325:1, 2339:10, 2339:13, 2340:4, 2359:14.

area 2321:4, 2321:5, 2321:7, 2321:12, 2323:8, 2341:4, 2386:6.

areas 2321:18, 2367:7.

argue 2319:5.

argument 2318:14.

Arlen 2281:30.

around 2323:7, 2335:13, 2338:3, 2367:2, 2371:8.

artificial 2380:4.

Aside 2285:9, 2305:19, 2339:4, 2363:13.

Asif 2283:40, 2393:1, 2393:6.

aspect 2339:5.

assess 2294:21, 2356:19, 2358:21, 2369:2, 2371:1, 2374:13.

assesses 2374:13.

assessing 2357:2, 2378:16, 2384:21.

assessment 2290:7, 2290:13, 2375:25, 2385:21.

assessments 2371:9.

assist 2345:14.

associate 2294:12.

associated 2363:24, 2373:17.

assume 2293:13, 2294:1, 2358:15, 2365:8.

assumes 2293:18.

assuming 2319:3.

assumption 2293:12, 2293:16, 2386:3.

assumptions 2293:8, 2293:9, 2365:2, 2365:4.

assurance 2321:17.

assured 2339:19.

asymmetrical 2326:10, 2326:19.

attack 2328:19, 2328:22, 2328:23, 2329:6, 2329:19, 2333:19, 2334:3, 2334:12, 2334:20, 2335:1, 2335:3.

attacked 2366:16.

attacker 2326:15, 2329:4, 2330:20, 2343:7.

attackers 2343:14, 2343:16.

attacks 2330:16, 2333:8.

attend 2295:7.

attention 2298:9.

Attorney 2282:28, 2282:35, 2391:2.

attractive 2301:17, 2335:2.

attributes 2286:4.

audited 2380:16.

Aurora 2328:12, 2328:15, 2328:16, 2330:21, 2334:16, 2334:21, 2344:19, 2362:13, 2366:9, 2366:15, 2388:11, 2390:7.

Austin 2282:27.

authenticate 2339:25.

authenticated 2339:14.

authentication

2324:21, 2339:20, 2339:24.

authorized 2339:16, 2358:2, 2358:3.

available 2285:15, 2318:4, 2324:14, 2324:24, 2331:8, 2337:2, 2342:20, 2357:21, 2358:1, 2363:1.

Avenue 2281:32, 2283:12, 2283:42.

aware 2296:9, 2298:8, 2298:23, 2299:20, 2300:1, 2300:3, 2300:4, 2300:13, 2300:21, 2300:23, 2303:25, 2306:25, 2331:17, 2332:23, 2341:12, 2343:17, 2358:24, 2363:9, 2363:14.

awareness 2333:2.

away 2311:3, 2332:20.

.

.

< B >.

B. 2282:17.

back 2285:3, 2294:1,

2399

2295:5,
2301:10,
2301:21,
2303:14,
2308:1,
2309:18,
2310:24,
2315:8,
2324:13,
2324:16,
2330:14,
2337:18,
2341:16,
2341:25,
2342:1,
2342:3,
2344:20,
2345:12,
2346:10,
2357:25,
2363:18,
2364:8,
2366:22,
2377:20,
2387:2.
bad 2337:1,
2337:15,
2377:10.
balancing
2286:8,
2286:9.
ban 2297:16.
band 2386:21.
bands
2385:12.
Bank 2385:16,
2386:15,
2386:18.
bans 2297:1.
bar 2330:2,
2338:19,
2377:2,
2389:8.
barometer
2385:2.
barrier
2334:25.
barriers
2293:5.
bars 2344:12.

Bartels
2281:36.
based 2288:14,
2289:15,
2293:7,
2323:4,
2365:8,
2371:9,
2385:22,
2386:6.
baseline
2324:8,
2380:15,
2380:19.
basic 2325:15,
2336:21,
2338:20,
2388:10.
basics
2366:18.
basis 2285:16,
2321:24,
2344:16,
2366:20.
Bates 2373:5,
2384:4,
2384:6.
beat 2287:22,
2314:17.
become 2291:9,
2325:24,
2356:16.
becomes
2302:12,
2369:4.
becoming
2342:21.
began 2310:10,
2328:23,
2333:14.
begin 2319:25,
2344:5,
2391:22,
2392:14,
2392:17.
beginning
2325:4,
2325:6,
2325:11,
2328:11,

2331:6,
2345:17.
behalf
2327:11.
behavior
2345:6.
behest
2387:21.
behind
2355:9.
believe 2289:6,
2295:12,
2297:19,
2305:20,
2365:17,
2375:18,
2380:7,
2384:2,
2389:24,
2391:24.
belong
2385:23.
belonged
2385:24.
below
2304:15.
belt 2325:7,
2325:8,
2325:9,
2325:10.
belts
2384:24.
benchmark
2384:18.
Benchmarking
2384:9.
benefit
2306:15,
2312:12,
2315:25,
2335:22,
2335:24.
benefiting
2312:12.
benefits
2294:20,
2312:8.
best 2287:21,
2299:5,
2307:24,

2309:12,
2309:20,
2314:9,
2315:1,
2315:3,
2315:6,
2315:15,
2331:16,
2366:22,
2366:24,
2367:2,
2367:8.
better 2286:6,
2289:4,
2299:2,
2299:3,
2309:9,
2311:17,
2314:20,
2314:25,
2324:18,
2330:4,
2336:25,
2344:21.
beyond 2299:17,
2330:2,
2334:15,
2367:8,
2368:24,
2380:18.
bidder 2287:21,
2287:22,
2314:12,
2314:13,
2314:15,
2314:16,
2314:18.
bidders
2314:14.
big 2327:13,
2388:1,
2388:15.
billion 2333:4,
2335:5,
2335:6,
2335:8,
2342:10.
billions
2311:6.
binder 2357:13,

2371:15,
2371:16,
2382:23.
binders
2357:11,
2371:13.
bit 2323:25,
2325:6,
2336:2,
2336:24,
2344:6,
2359:22,
2359:23,
2375:4,
2376:13,
2378:18,
2379:19,
2384:21,
2389:17.
blog 2300:8,
2333:20.
Blue 2343:13.
Board 2323:21,
2324:17,
2383:25,
2384:12,
2385:7,
2385:10,
2385:11,
2387:20,
2387:22,
2387:25,
2391:3,
2391:4,
2391:5,
2391:7,
2391:11.
boards
2385:5.
Bond 2327:10,
2333:25.
boot 2335:15.
Borg 2322:11.
Boston
2283:19.
bottom 2340:4,
2371:22,
2373:2,
2373:5,
2382:25.

Box 2282:30.
Boylston
2283:18.
brand
2309:10.
breach 2325:19,
2325:25,
2326:4,
2333:3,
2334:13,
2341:5,
2360:18,
2362:1,
2362:8,
2362:9,
2362:15,
2363:8,
2363:9,
2363:14,
2364:2,
2364:13,
2364:15,
2364:17,
2365:10,
2366:24.
breached
2341:3.
breaches
2333:2,
2340:10,
2340:22,
2355:13,
2360:22,
2361:24,
2365:21,
2365:24,
2367:5,
2382:22.
breadth
2324:2.
break 2334:24,
2337:10,
2337:15.
brief 2316:8,
2335:11,
2346:7,
2390:20.
briefing
2317:11,
2317:13.

briefly 2320:2,
2321:6,
2322:25,
2359:15.
bring 2306:25,
2332:15,
2345:23.
British
2328:6.
broad
2376:16.
broadly 2292:4,
2292:5,
2292:8.
Broadway
2282:23.
brought 2298:9,
2390:21.
browser
2287:13,
2290:8,
2294:11,
2294:13,
2304:23,
2304:25,
2305:6,
2329:4,
2334:2,
2335:2,
2335:20,
2335:24,
2336:15,
2378:25,
2379:17.
browsers
2288:8,
2293:20,
2304:17,
2304:21,
2344:8,
2344:11.
browses
2336:11.
browsing
2336:2,
2336:3,
2336:4,
2336:10,
2336:13,
2336:21,

2336:22,
2342:25,
2345:7.
bug 2329:8,
2329:11,
2329:12,
2362:21,
2363:14.
bugs 2389:10.
build 2321:18,
2322:16,
2325:4,
2335:20,
2341:24,
2342:24,
2345:1.
Building
2282:12,
2342:19,
2379:9.
builds
2379:1.
built 2333:18,
2336:6,
2343:2,
2343:24,
2368:16,
2375:1,
2380:23,
2381:3,
2390:15.
Bureau
2282:36.
burn 2375:11.
Burton
2316:25.
business
2289:20,
2295:11,
2320:18,
2320:20,
2320:22,
2332:7,
2332:16,
2370:3,
2376:7,
2376:8.
but-for
2287:15,
2306:12,

2306:19,
2313:8.
buy 2327:16,
2364:9,
2389:6.
buyer 2291:22,
2293:10,
2293:13,
2294:17,
2378:10,
2378:14.
buyers
2291:25.
buying 2342:8,
2342:9.
buys 2342:23.
.
.
< C >.
C. 2281:12,
2283:8,
2283:43.
CA 2281:34.
cabled
2320:6.
cadence
2307:4.
calculation
2293:17,
2293:21.
calculations
2288:6,
2289:11,
2289:14,
2313:6.
call 2297:19,
2312:2,
2321:5,
2322:9,
2327:9,
2334:3,
2343:4,
2361:12,
2362:9,
2371:7.
called 2318:1,
2319:11,
2320:4,
2322:11,
2325:13,

2326:5,
2326:19,
2331:3,
2364:5,
2374:24,
2384:16.
calls 2319:7,
2371:2.
Cameron
2282:10.
campaign
2328:16,
2334:9.
capabilities
2326:16,
2342:16,
2343:2,
2356:19,
2356:21,
2357:2,
2357:5,
2357:24,
2358:2.
capability
2327:19,
2327:22,
2327:23,
2358:1,
2367:19.
capable
2376:25,
2377:6.
capacity
2387:24.
capital
2332:14,
2332:15.
car 2325:6,
2325:7,
2325:10,
2340:25.
cardiology
2323:25.
care 2317:24,
2390:4.
career
2377:12.
careful 2369:5,
2375:25.
carefully

2339:10.
Carr 2282:21.
carried
2333:18.
carriers
2287:14,
2306:2.
carry 2327:13,
2340:1.
cars 2384:22.
case 2285:8,
2286:10,
2287:4,
2287:11,
2290:18,
2290:22,
2291:3,
2292:23,
2295:1,
2295:5,
2298:6,
2298:21,
2300:11,
2301:15,
2302:15,
2303:15,
2303:19,
2303:22,
2304:1,
2304:6,
2304:13,
2306:10,
2310:5,
2310:9,
2310:13,
2318:19,
2319:4,
2328:5,
2357:6,
2378:9.
cases 2345:18,
2357:4,
2364:14,
2380:17.
Cassidy
2372:25,
2373:13.
casual
2362:8.
catastrophes

2330:15.
catch 2288:20,
2307:22.
category
2387:2.
caused 2335:1,
2362:7.
causes
2326:1.
Center 2282:22,
2320:7.
centers
2322:6.
central
2321:13,
2322:3.
centralize
2320:20.
centralized
2320:22,
2321:8,
2323:2.
centralizing
2322:18.
certain
2297:25,
2306:24,
2307:3,
2360:16,
2368:17,
2386:2.
Certainly
2288:12,
2291:22,
2292:13,
2308:9,
2311:17,
2360:12,
2377:24,
2378:13.
certify
2393:1.
cetera
2344:11.
chain 2373:24,
2374:1.
challenges
2388:12,
2388:21.
chance 2287:23,

2310:21,
2312:15,
2342:13.
change 2287:18,
2297:12,
2302:4,
2314:7.
changed
2333:1.
changes 2288:2,
2370:7,
2370:9,
2379:1.
changing
2379:9.
channeling
2317:21.
Chapman
2282:8.
characterizatio
n 2361:4.
chart 2293:5.
chat 2328:24.
Chatgpt
2299:20,
2299:23.
check
2377:24.
checked
2382:16,
2387:1,
2389:15.
Chicago
2281:28.
chief
2318:20.
China 2327:14,
2328:14,
2329:18,
2355:14.
chipped
2311:3.
Chipty 2284:5,
2285:8,
2292:16,
2300:6,
2302:24,
2310:4,
2313:15,
2316:2,

2316:5.
choice 2288:10,
2288:13,
2301:14,
2301:16,
2301:25,
2338:17,
2369:20.
choices
2311:17,
2339:11,
2376:8,
2377:9,
2377:10.
choose 2307:21,
2374:14.
Christine
2283:40,
2393:1,
2393:6.
Chromium
2295:8,
2337:4,
2337:6,
2341:12,
2341:15.
circa 2310:10,
2310:11,
2310:24.
circumstances
2297:12,
2297:24,
2360:16.
circumvention
2297:1,
2301:13.
CISA 2331:10,
2345:22,
2381:18,
2387:20.
cite 2317:12.
city 2341:1.
CIVIL 2281:5.
claiming
2304:20.
clarify
2343:11.
classes
2325:15.
classified

2358:14,
2368:22,
2391:8.
claw 2294:1.
clawback
2293:23,
2294:4,
2294:8.
clear 2295:24,
2296:6,
2311:23,
2362:2.
CLERK 2319:8,
2319:14.
click 2329:1,
2376:19,
2377:3.
click-and-query
2321:24,
2322:23.
click-query
2377:3.
clicks
2338:8.
close 2319:4,
2346:6.
closed
2346:4.
closer
2370:17.
cloud 2368:20,
2368:21,
2368:23,
2385:18,
2385:19,
2385:23,
2386:7.
CO 2282:25.
coalition
2380:3.
coalitions
2331:8,
2380:1,
2380:24,
2381:4,
2381:7.
code 2330:15,
2370:25,
2371:1,
2371:2,

2375:1,
2375:4,
2379:1,
2379:9,
2379:18.
Colette
2283:9.
Collaboration
2379:19,
2379:23,
2381:13.
Collaborative
2381:15,
2381:17.
colleagues
2369:13.
collect
2377:6.
collecting
2375:23,
2376:15,
2389:25.
collects
2376:25.
colloquial
2361:2.
Colorado
2282:6,
2282:18,
2282:21.
COLUMBIA
2281:2.
combination
2340:21.
combine
2340:15,
2341:3.
comes 2332:22,
2337:4,
2339:4,
2342:25,
2355:5,
2358:10,
2370:23,
2376:12,
2390:3,
2390:6.
comfortable
2369:20.
coming

2363:18.
Commerce
  2380:10.
commercial
  2327:15,
  2327:18,
  2373:19,
  2374:4.
community
  2359:24.
companies
  2328:17,
  2328:21,
  2330:8,
  2331:12,
  2340:11,
  2342:4,
  2356:20,
  2359:16,
  2360:15,
  2364:1,
  2365:24,
  2375:22,
  2376:14,
  2376:17,
  2377:5,
  2377:16,
  2377:22,
  2378:1,
  2380:6,
  2381:21,
  2382:15,
  2384:13,
  2384:18.
company 2321:9,
  2321:14,
  2322:3,
  2333:12,
  2333:13,
  2333:14,
  2333:20,
  2341:18,
  2342:23,
  2355:24,
  2359:20,
  2360:8,
  2367:4,
  2368:5,
  2368:24,
  2376:25,

2384:16,
2389:23,
2389:25.
compare
  2329:21,
  2330:7,
  2330:24.
compared
  2301:18,
  2331:1,
  2365:18.
compete 2308:7,
  2308:17,
  2308:21,
  2308:22,
  2309:1,
  2309:2,
  2309:3,
  2309:5,
  2309:8,
  2309:9,
  2312:17,
  2312:20,
  2312:21,
  2314:22,
  2315:1.
competed
  2311:1.
competing
  2326:17.
competition
  2287:9,
  2289:5,
  2289:23,
  2290:1,
  2290:3,
  2290:8,
  2290:14,
  2306:14,
  2312:3,
  2312:10,
  2312:11,
  2312:15,
  2314:23.
competitions
  2299:4,
  2314:12,
  2314:19.
competitive
  2286:17,

2287:9,
2289:13,
2289:18,
2311:11,
2311:13,
2312:7,
2312:19.
competitor
  2287:21,
  2314:9,
  2315:3,
  2315:6,
  2358:22.
competitors
  2289:9,
  2289:24,
  2290:9.
complete
  2391:23.
completed
  2391:8,
  2391:10.
completes
  2346:2.
complex 2325:5,
  2326:14.
compliance
  2330:3,
  2331:14,
  2338:20,
  2366:19.
components
  2374:10.
comprehensively
  2297:14,
  2297:16.
compromise
  2329:5,
  2330:20,
  2334:4,
  2342:3,
  2363:25.
compromised
  2329:13,
  2333:5,
  2341:22,
  2341:23,
  2363:23,
  2364:20.
computer

2364:10.
computer-aided
  2283:49.
computers
  2364:7,
  2388:14.
con 2286:1,
  2286:3.
concept
  2360:24.
concern
  2338:23,
  2376:12.
concerning
  2366:4.
concerns
  2300:13,
  2338:7,
  2338:11,
  2339:6,
  2340:7,
  2375:18,
  2378:5.
concluded
  2346:9,
  2392:24.
conduct
  2292:23,
  2302:15,
  2306:16,
  2310:17,
  2310:20,
  2312:5,
  2312:9,
  2312:13,
  2313:2,
  2313:4,
  2315:25,
  2344:15.
confidence
  2329:18.
confidentiality
  2317:1,
  2317:5,
  2317:8,
  2317:15,
  2318:4.
configuration
  2325:21.
conforms

2380:12.
connect
  2317:12,
  2345:3.
connection
  2339:13,
  2339:21,
  2339:25,
  2387:19.
Connolly
  2283:11.
Connor
  2283:9.
cons 2285:17,
  2285:23.
consider
  2321:2,
  2325:20,
  2376:11,
  2376:22.
considered
  2286:11,
  2331:9,
  2366:22,
  2367:8.
consistently
  2332:21,
  2366:6.
constant
  2390:13.
Constitution
  2283:42.
Consumer
  2282:19,
  2282:29,
  2325:8.
consumers
  2288:24,
  2289:3,
  2311:19.
Cont'd 2282:1,
  2283:1,
  2285:6.
contacting
  2333:16.
contacts
  2333:15.
contain 2335:1,
  2362:6.
contained

2328:25,
  2366:12,
  2367:10.
containing
  2316:13,
  2316:16.
containment
  2334:25.
content
  2338:14.
context
  2313:11,
  2313:12,
  2325:17,
  2362:15,
  2385:7,
  2385:11.
continually
  2285:15.
continue
  2304:24,
  2315:24,
  2330:18.
continued
  2288:17.
continuing
  2312:12,
  2375:11.
continuously
  2330:13,
  2345:12.
contract
  2307:10,
  2307:11,
  2307:17,
  2327:22.
contracts
  2310:23,
  2345:25.
contractual
  2305:22,
  2305:24.
contributed
  2311:9.
control 2335:5,
  2335:6,
  2360:6,
  2369:23,
  2370:1,
  2374:17.

controlled
  2375:9.
controls
  2323:3,
  2330:25,
  2359:22,
  2377:24.
conversations
  2310:10.
convert
  2301:10.
copy 2337:19.
Core 2284:24,
  2321:5,
  2321:7,
  2321:8,
  2321:11,
  2321:13,
  2322:10,
  2323:1,
  2323:8,
  2335:16,
  2337:7,
  2337:22,
  2338:2,
  2338:18,
  2338:22,
  2371:19,
  2372:4,
  2379:2,
  2379:4,
  2379:13,
  2383:17.
corp 2334:15.
corporate
  2328:19.
COSI 2380:7.
Counsel
  2295:18,
  2309:25,
  2316:4,
  2317:13,
  2322:1,
  2355:12,
  2388:4,
  2388:23,
  2389:22,
  2390:21.
couple 2334:23,
  2355:9,

2367:10,
  2391:19.
course 2311:10,
  2311:16,
  2332:5,
  2332:7,
  2369:19.
court. 2346:15,
  2355:3.
courtroom
  2295:5,
  2344:15,
  2346:7,
  2346:10.
cover
  2378:21.
covers
  2297:13.
crash
  2384:23.
crawl 2336:8.
create 2299:22,
  2324:8,
  2375:19,
  2378:6.
created
  2311:11,
  2311:13,
  2334:25,
  2340:21,
  2341:6,
  2345:21,
  2381:18.
creates
  2307:12,
  2372:20,
  2373:22,
  2381:23.
creating
  2290:1.
crime 2328:1,
  2328:3,
  2345:18.
criminal
  2345:19,
  2392:15.
critical
  2344:4,
  2344:8,
  2374:21.

CROSS-EXAMINATION 2284:7, 2284:15, 2285:6.
crosswalk 2316:20.
Crowdstrike 2368:3, 2368:10, 2368:13, 2368:19, 2369:14, 2369:23.
cryptographic 2339:18, 2374:12, 2374:25.
cryptographically 2339:19.
cryptography 2388:16, 2388:18, 2388:19.
culture 2323:19, 2323:23, 2342:14, 2359:14, 2390:16.
currently 2303:2.
customer 2342:2, 2369:17, 2370:2.
customers 2341:20, 2386:18, 2389:19.
Cyber 2327:12, 2327:21, 2328:2, 2333:8, 2380:21, 2381:13, 2381:17, 2387:20, 2391:4, 2391:5.
Cybersecurity

2284:27, 2320:13, 2320:14, 2320:17, 2320:18, 2323:19, 2323:24, 2324:12, 2325:18, 2327:5, 2329:15, 2331:10, 2332:23, 2344:15, 2345:14, 2359:13, 2359:15, 2367:12, 2367:13, 2368:7, 2368:8, 2372:10, 2376:9, 2377:16, 2378:14, 2379:23, 2380:1, 2380:12, 2380:14, 2380:23, 2381:3, 2381:22, 2381:25, 2382:7, 2382:24, 2384:9, 2384:13, 2385:3, 2389:1, 2390:21, 2391:3.
cycle 2343:9, 2376:7.
.
.
< D >.
DAHLQUIST 2281:23, 2316:8, 2316:12,

2317:3, 2317:10, 2318:5, 2318:8, 2318:14, 2318:18, 2319:5, 2392:20.
daily 2321:24, 2390:13.
dark 2340:12, 2340:15, 2341:3.
database 2336:17, 2345:2, 2345:10, 2345:11, 2364:9.
databases 2322:13, 2323:2, 2363:25.
date 2298:14.
dates 2300:19.
David 2281:23.
Day 2281:13, 2300:17, 2360:24, 2360:25, 2361:2, 2361:12, 2361:14, 2376:5, 2379:12, 2388:23, 2389:4, 2390:17, 2391:25.
day-to-day 2379:7.
days 2320:10, 2361:17, 2366:22, 2369:1.
DC 2281:40, 2281:46, 2282:15,

2283:13.
deal 2289:2, 2292:12, 2314:13, 2375:4.
deals 2301:4.
decade 2308:9, 2329:24, 2330:2, 2340:10, 2342:19, 2388:12.
decades 2332:8, 2366:6.
decades-long 2367:7.
decision 2370:7, 2370:9, 2376:20.
decisions 2311:14, 2311:15, 2311:18, 2317:25.
deck 2383:24.
dedicated 2321:3, 2330:11.
deemed 2306:12, 2306:19.
default 2291:9, 2291:10, 2291:13, 2293:10, 2293:14, 2304:25, 2307:7, 2307:17, 2307:21, 2342:23.
defaults 2306:3, 2306:6, 2306:8, 2307:15, 2309:8, 2309:9, 2311:1, 2311:2,

2311:3.
defend 2324:18,
  2330:19,
  2339:2,
  2340:4,
  2342:11,
  2342:15,
  2390:16.
Defendant
  2281:12,
  2283:5.
defended
  2330:4.
defender
  2326:6,
  2326:9,
  2326:10,
  2326:19,
  2342:13.
defenders
  2326:11,
  2343:13.
Defense
  2317:13,
  2326:13,
  2381:13,
  2381:17.
defenses
  2329:21.
definition
  2297:3,
  2311:23,
  2344:4,
  2362:2,
  2362:4,
  2363:9.
degree
  2321:17.
demonstrative
  2301:23,
  2323:15.
Denver
  2282:25.
dep 2316:9.
Department
  2281:24,
  2281:31,
  2281:37,
  2282:18,
  2380:10.

depending
  2288:11,
  2362:7,
  2362:10.
depends 2286:1,
  2291:17,
  2362:15.
depicting
  2308:3.
depiction
  2313:7.
deposed
  2357:6.
deposition
  2316:13,
  2316:18,
  2316:20,
  2317:2,
  2357:8,
  2357:11,
  2357:13,
  2357:18,
  2369:9.
describe
  2295:20,
  2320:2,
  2321:6,
  2322:25,
  2327:24,
  2337:24,
  2344:18.
described
  2298:3,
  2330:7,
  2338:2,
  2364:21.
describes
  2323:18.
describing
  2334:12,
  2336:21.
Description
  2284:22,
  2336:9.
Design 2304:5,
  2325:5,
  2325:6,
  2325:10,
  2325:13,
  2331:3,

2331:12,
  2331:22,
  2331:24,
  2332:1,
  2332:3,
  2339:12,
  2382:9.
designated
  2316:19,
  2317:2,
  2344:8.
designations
  2316:14,
  2316:17,
  2317:2,
  2317:12.
designed
  2303:23,
  2304:2,
  2304:7,
  2334:17,
  2340:4.
designs
  2369:23,
  2370:20.
desktop
  2292:20,
  2292:24,
  2293:2.
destroyed
  2286:17,
  2287:10.
detail 2373:19,
  2379:22.
detailed
  2362:4.
details 2340:3,
  2363:16.
detect
  2334:22.
detected
  2366:9.
detection
  2323:6.
determine
  2371:10.
determined
  2372:19.
deterrence
  2287:1.

detrust
  2334:17.
developed
  2370:25,
  2374:17,
  2375:9.
developer
  2374:9.
developers
  2287:13,
  2333:24,
  2333:25,
  2335:18,
  2342:24,
  2362:22,
  2363:15,
  2379:11.
devices
  2288:13,
  2288:18,
  2292:10,
  2292:21,
  2294:5,
  2300:1,
  2300:22,
  2301:17,
  2302:1,
  2302:2,
  2302:16,
  2335:5,
  2335:6.
DHS 2331:11.
Diana
  2281:30.
difference
  2307:10,
  2325:18,
  2385:20,
  2389:24.
different
  2294:19,
  2294:21,
  2294:24,
  2305:7,
  2305:9,
  2305:17,
  2306:14,
  2308:10,
  2311:15,
  2311:19,

2311:21,
2312:1,
2314:19,
2326:3,
2328:10,
2330:1,
2340:11,
2340:22,
2355:13,
2358:9,
2367:17,
2386:7.
differently
2388:2.
difficult
2322:17,
2330:9,
2330:24,
2334:19,
2342:20,
2371:5.
dilemma 2326:6,
2326:9,
2326:10,
2326:19,
2342:13.
dimension
2305:12,
2305:13.
diminish
2293:23.
dimunize
2286:25.
DIRECT 2284:13,
2309:3,
2319:17,
2355:12,
2359:12,
2360:8,
2360:23,
2361:13,
2365:17,
2375:16,
2378:5,
2382:10,
2392:4.
directionally
2289:15.
directly
2313:22,

2360:10,
2377:21,
2378:24,
2379:16.
directors
2383:25,
2384:12,
2385:7,
2385:10.
disclosed
2290:6.
discovered
2361:3,
2361:6,
2362:21.
discuss
2337:14,
2360:22,
2373:17.
discussed
2317:21,
2346:7,
2359:12,
2369:12,
2373:22.
discussing
2365:3,
2374:6.
Discussion
2358:6.
disincentives
2289:20.
disincentivisin
g 2285:13.
disputes
2318:15.
distinction
2385:21,
2386:11.
distribute
2295:24,
2296:14,
2299:8.
distributed
2292:4,
2292:6,
2292:8.
distribution
2292:14,
2297:17,

2297:23,
2298:1,
2298:11,
2298:15,
2298:22,
2298:25,
2299:19,
2299:23,
2300:2,
2300:14,
2300:22,
2301:1,
2301:4,
2302:13,
2308:7,
2308:11,
2308:14,
2308:18,
2308:22,
2309:2,
2311:6,
2313:11,
2313:17,
2313:20,
2313:23,
2313:25.
distributors
2288:8,
2288:17,
2289:2,
2289:4,
2306:2,
2310:16,
2311:14,
2311:17,
2315:19.
District
2281:1,
2281:2,
2281:18.
divest
2341:11.
divested
2291:8,
2291:19,
2292:4,
2342:17.
divesting
2341:14,
2343:18,

2343:21.
divestiture
2290:17,
2290:19,
2290:25,
2291:6,
2294:25,
2295:9,
2295:11,
2295:13,
2342:6,
2359:8,
2378:5,
2378:9,
2378:14.
Division
2281:25,
2281:38,
2282:29.
do. 2358:3.
Document
2284:26,
2318:9,
2372:9,
2372:23,
2374:2,
2374:15,
2382:24,
2383:10,
2384:5,
2385:13.
documents
2294:7,
2318:11,
2371:15.
doing 2286:1,
2297:11,
2315:16,
2315:20,
2315:22,
2315:23,
2324:3,
2324:10,
2328:10,
2329:21,
2329:23,
2331:1,
2331:2,
2332:17,
2336:16,

2344:23,
2345:17,
2365:18,
2366:18,
2366:23,
2385:20.
DOJ 2281:23.
DOJ-ATR
  2282:11.
DOJ-CIV
  2281:43.
dollars 2311:6,
  2389:7,
  2389:9.
dominant
  2315:24.
done 2287:11,
  2288:6,
  2288:9,
  2289:10,
  2289:14,
  2291:25,
  2292:3,
  2301:15,
  2301:20,
  2301:23,
  2302:24,
  2302:25,
  2310:17,
  2310:20,
  2317:6,
  2318:3,
  2318:9,
  2325:12,
  2331:8,
  2332:8,
  2335:12,
  2343:25,
  2359:23.
door 2341:25,
  2342:2,
  2342:3.
double-check
  2384:1.
down 2322:1,
  2323:22,
  2330:16,
  2372:25,
  2375:11,
  2376:9.

download
  2309:4.
downloaded
  2292:17,
  2292:20,
  2292:24.
downloads
  2299:21.
drawing
  2324:17.
drive 2316:13,
  2316:16.
driving
  2324:7.
Duckduckgo
  2332:3.
duly 2319:11.
duration
  2376:4.
During 2308:17,
  2337:15,
  2339:20,
  2341:24,
  2344:19,
  2355:11,
  2360:23,
  2375:16,
  2382:9,
  2388:11,
  2390:7,
  2391:7.
duty 2356:1.
dynamic
  2389:18.
.
.
< E >.
E. 2281:23,
  2283:6.
earlier 2293:3,
  2293:4,
  2311:4,
  2346:7,
  2355:11,
  2367:6,
  2373:22,
  2377:20,
  2379:19,
  2380:8,
  2381:9,

2381:19,
2382:21.
earliest
  2332:25.
early 2324:13,
  2366:10.
ease 2288:4.
Eckert
  2383:11.
economics
  2289:16.
economist
  2286:20.
educated
  2367:23,
  2368:1.
effect
  2306:3.
efficiency
  2318:2.
efficient
  2293:5.
eight 2321:1.
either 2286:12,
  2289:12,
  2289:17,
  2317:6,
  2327:19,
  2331:7,
  2346:12.
elaborate
  2314:10.
elements
  2313:15.
eligible
  2288:11.
emailing
  2333:16.
employ
  2293:5.
employed
  2383:19.
employee
  2319:23.
employees
  2320:23,
  2328:24,
  2328:25,
  2329:1,
  2334:18.

encoder
  2374:12,
  2374:22.
encourage
  2309:3.
encrypt
  2328:4.
encrypting
  2323:6.
end 2312:16,
  2314:15,
  2331:16,
  2364:10,
  2367:4,
  2368:10.
ending
  2384:5.
ends 2340:11,
  2364:6,
  2373:6.
energy 2326:16,
  2330:10.
enforcement
  2374:18.
engine 2286:13,
  2290:24,
  2294:3,
  2301:11,
  2309:20.
engineer
  2325:22.
engineering
  2304:4,
  2320:12,
  2356:13,
  2359:18.
engineers
  2323:22.
engines 2304:3,
  2308:11.
enhanced
  2336:3,
  2336:10,
  2336:19,
  2337:2.
enough 2285:22,
  2286:4,
  2300:20,
  2307:15,
  2338:20,

2338:21,
2341:2,
2385:9.
enter 2289:20,
2289:21,
2306:2.
entered
2298:14.
entering
2290:2,
2298:22,
2304:24.
enterprise
2324:15.
entire 2311:20,
2377:11.
entirely
2356:3,
2392:11.
entities
2390:15.
entitled
2384:9.
entry 2290:2,
2290:3.
environment
2311:11,
2337:25,
2366:12,
2368:20,
2368:21,
2375:10.
environments
2368:20.
equal
2297:20.
erosion
2312:23.
error
2325:21.
especially
2286:4,
2307:13,
2315:13,
2324:3,
2360:16.
espionage
2327:12,
2334:8.
Esquire

2281:23,
2281:30,
2281:36,
2281:42,
2282:6,
2282:7,
2282:8,
2282:9,
2282:10,
2282:17,
2282:27,
2282:33,
2283:6,
2283:7,
2283:8,
2283:9,
2283:10,
2283:15.
essence
2296:17.
essentially
2311:25,
2312:19,
2389:10.
estimate
2301:24,
2302:5,
2302:7,
2303:7,
2321:2,
2367:15,
2382:14.
estimated
2301:22,
2303:4.
et 2281:6,
2344:11.
evaluate
2287:12,
2359:6,
2368:9.
evaluating
2286:19,
2368:18.
evening
2392:19.
everybody
2285:3,
2358:9,
2392:22.

everyone
2320:25.
everything
2320:6,
2320:10,
2335:13,
2359:23,
2360:11,
2376:12.
Evidence
2284:22,
2299:13,
2304:6,
2309:7,
2371:25,
2383:5.
evolved
2388:11.
exactly
2295:20,
2299:12,
2364:12.
EXAMINATION
2284:9,
2284:13,
2284:17,
2310:2,
2319:17,
2346:9,
2355:12,
2378:5,
2382:10,
2387:15.
examined
2319:11.
example
2295:21,
2296:5,
2304:24,
2305:8,
2306:21,
2324:11,
2324:19,
2324:25,
2328:2,
2330:14,
2333:11,
2339:13,
2339:19,
2340:17,

2341:16,
2343:3,
2345:8,
2345:22,
2357:24,
2358:13,
2368:3,
2370:18,
2371:3,
2374:24,
2380:3,
2381:9,
2388:15.
except
2288:20.
excluding
2306:3.
exclusionary
2306:16.
exclusive
2298:22,
2304:20,
2306:19,
2307:11,
2311:6.
exclusives
2304:16,
2304:18,
2315:11.
exclusivity
2305:20,
2305:22,
2307:12.
executive
2323:21,
2387:21.
exercise
2296:12.
Exhibit
2284:22,
2316:20,
2372:3,
2383:8.
exhibits
2316:9,
2318:18.
exist 2296:9,
2296:10,
2324:22,
2325:16,

2379:5.
existing
2288:13,
2288:18.
expect 2288:21,
2288:23,
2306:8,
2311:2,
2311:5,
2314:21,
2315:18,
2392:2,
2392:9.
expensive
2322:17.
experience
2365:8.
experienced
2361:14,
2361:17,
2382:22.
expert 2290:7,
2295:12,
2297:5,
2298:4,
2391:22,
2392:9.
experts
2324:1.
explain
2304:19,
2310:21,
2315:5,
2320:16,
2322:2,
2325:18,
2333:10.
explained
2299:1.
exploit 2361:9,
2361:10,
2389:6.
exploited
2325:25,
2326:1,
2329:4,
2334:1,
2334:2,
2361:3.
Explorer

2329:3,
2329:10.
exposed
2285:20.
expressed
2300:13.
extent 2292:3,
2299:18,
2317:11,
2370:3.
external
2367:15,
2368:6,
2384:16,
2384:17,
2384:20,
2385:21,
2387:11,
2389:17.
eye 2287:8.
.
.
< F >.
face 2338:16,
2339:3.
facing
2340:6.
fact 2285:24,
2289:22,
2301:2,
2311:4,
2370:14.
factored
2302:2.
factors
2376:23.
failures
2377:19.
fair 2359:20,
2359:21,
2359:23,
2361:4.
fairly
2389:18.
faith
2374:25.
fake 2333:12,
2333:13,
2333:20.
Falcon 2368:4,

2369:14,
2369:23.
familiar
2323:15,
2326:6,
2326:23,
2338:4,
2362:20,
2363:7,
2364:22,
2364:24.
famous 2328:5,
2330:16.
far 2296:9,
2338:20,
2338:21,
2389:8.
Fargo
2385:17.
favor 2303:23,
2304:7.
FCRR 2283:40,
2393:1.
feasible
2290:19,
2291:18.
feature
2308:16.
features
2379:10.
Fed 2380:15,
2380:17.
Federal
2283:41,
2360:19.
felt 2325:3.
FERGUSON
2316:11,
2316:12,
2316:17,
2316:23.
few 2290:18,
2294:6,
2301:14,
2313:6,
2318:14,
2318:15,
2335:4,
2335:6,
2345:15,

2346:13,
2365:23,
2366:11,
2366:14,
2367:14,
2374:6.
fewer 2285:19,
2297:8.
field
2325:16.
fields
2323:25.
Fifth 2281:39,
2282:13.
figure 2312:4,
2361:9.
files
2316:19.
filtering
2345:7.
final 2318:9.
financial
2385:16.
find 2298:19,
2326:11.
fine 2317:20,
2355:9.
finish
2382:5.
fired
2390:13.
firewalls
2320:8.
firm 2311:21,
2312:11,
2315:24.
firms 2290:4,
2311:12,
2312:16.
first 2304:15,
2308:6,
2310:8,
2313:16,
2314:11,
2314:20,
2317:22,
2319:2,
2319:11,
2320:2,
2320:6,

2329:16,
2333:1,
2334:7,
2336:5,
2383:9.
five 2310:14,
2337:12,
2345:5,
2376:6,
2388:21.
five- 2324:8.
fix 2389:11.
flag 2355:5.
flexibility
2305:4,
2305:7,
2305:12,
2305:13,
2315:11.
Floor 2282:24,
2282:38.
fluctuates
2389:17.
fluctuation
2389:20.
flywheel
2345:11.
focus
2374:21.
focused
2290:10,
2323:10,
2323:23,
2325:14,
2336:6,
2374:20.
focusing
2339:5.
Folks 2318:1,
2346:6.
follow-up
2363:4,
2363:5,
2366:15.
following
2307:17,
2317:18,
2355:3,
2357:18,
2357:19.

follows
2289:18,
2319:12.
footing
2297:20.
force 2307:20,
2308:18,
2308:19,
2367:20,
2368:1.
forced
2298:19.
forcing
2301:16,
2301:25,
2389:8.
foregoing
2393:2.
foremost
2334:7.
forgot
2337:19.
forked
2375:1.
form 2288:3,
2288:14,
2296:17,
2297:17,
2313:16,
2313:19,
2313:22,
2367:20.
forms
2313:25.
forth
2304:12.
forum 2381:12,
2381:18.
forward
2285:14,
2344:10.
forward-looking
2285:16,
2301:12,
2302:12.
found 2388:9.
foundational
2325:17.
founders
2323:21.

four 2314:4,
2314:5.
framework
2380:20,
2383:20.
Francisco
2281:34.
free 2285:20,
2285:25.
frequency
2366:4,
2366:7,
2366:13.
friends
2333:22.
front 2345:6,
2377:13,
2377:15,
2385:10.
FSB 2333:6.
full 2376:4,
2388:19.
full-time
2355:18,
2355:21.
fully 2303:3.
fun 2328:7.
function
2287:20.
functions
2321:6.
fundamental
2325:15.
fundamentally
2325:23.
future 2285:19,
2296:13,
2296:23,
2297:8,
2297:12,
2299:10,
2301:2,
2302:14,
2316:1,
2330:5,
2343:19,
2367:5,
2378:14.
fuzzing
2343:4.

.
.
< G >.
gain 2295:14,
2302:13,
2344:24.
gained
2334:14.
Galaxy
2307:1.
game 2286:7,
2315:1,
2328:2.
Gate 2281:32.
gave 2306:22,
2329:19,
2362:22.
Gemini 2295:22,
2295:25,
2296:11,
2296:13,
2296:20,
2296:24,
2297:2,
2297:13,
2297:18,
2297:19,
2297:23,
2298:2,
2298:12,
2298:15,
2298:23,
2299:5,
2299:8,
2299:15,
2301:3,
2301:11,
2303:15,
2304:8,
2313:11,
2314:3,
2314:5.
Genai 2296:22,
2296:24,
2299:6.
General
2282:28,
2282:35,
2286:12,
2290:4,

2290:11,
2295:15,
2301:7,
2309:4,
2311:12,
2311:21,
2356:22,
2360:7.
generally
2289:9,
2326:12,
2338:21,
2342:12.
generate
2299:21.
generative
2299:18,
2300:1,
2301:8,
2303:14,
2304:8.
generic
2313:12.
gets 2296:10,
2317:22,
2323:1,
2335:22,
2341:7,
2343:5,
2365:10.
getting
2289:25,
2317:24,
2318:3,
2328:1,
2328:25,
2331:14,
2360:3,
2365:13,
2388:12.
Give 2286:9,
2288:16,
2295:21,
2305:6,
2307:15,
2308:18,
2310:21,
2311:23,
2312:15,
2339:18,

2340:17,
2340:24,
2341:19,
2341:25,
2362:24,
2384:6,
2385:7.
given 2295:10,
2311:5,
2311:19,
2314:14,
2324:2.
gives 2345:10,
2345:11,
2375:3,
2389:11.
giving 2305:3,
2305:6.
Gloria
2283:10.
Gmail 2313:19,
2322:13,
2345:8,
2363:22,
2363:24,
2364:1,
2364:2,
2364:9,
2365:10.
goal 2286:16,
2286:19,
2286:24,
2286:25,
2312:25,
2313:1.
goals 2286:18,
2327:11.
Golden
2281:32.
GOOGLE, LLC
2281:10.
Google.
2328:14.
Gotcha
2298:13.
Gov 2368:21,
2368:22.
Government
2319:4,
2333:12,

2342:4,
2345:14,
2345:21,
2345:25,
2355:19,
2356:10,
2356:14,
2356:18,
2356:21,
2357:1,
2357:21,
2357:23,
2358:13,
2358:16,
2372:5,
2372:7,
2387:18.
government-back
ed 2327:9.
GOWER 2282:10,
2284:9,
2310:1,
2310:3,
2316:2.
Graham
2283:7.
Grant 2316:10,
2316:11,
2323:5.
Gray 2283:16.
greater 2289:5,
2290:5,
2311:12,
2311:18,
2315:10,
2336:25.
green
2385:14.
groups
2360:2.
growth
2327:5.
guarantee
2381:24.
guess 2289:21,
2292:5,
2305:15,
2345:15,
2367:23,
2368:1.

guidance
2380:19.
.
.
< H >.
H-e-a-t-h-e-r
2319:21.
hack 2327:18,
2328:4,
2328:16.
hacked 2333:1,
2364:15,
2364:25,
2365:7.
hacker
2327:10.
hackers 2328:7,
2343:14.
hacking
2327:16,
2328:7,
2328:8,
2357:25.
hacks
2328:14.
half 2293:1.
hand 2316:25,
2319:9.
handed 2300:6,
2371:14.
handful
2346:3.
handle
2377:16.
handled
2366:8.
Hansen 2383:11,
2383:13.
happen 2297:8,
2307:14,
2328:22,
2340:9,
2341:9,
2363:20,
2379:3,
2388:20.
happened
2311:7,
2340:11,
2362:25,

2363:12,
2364:3,
2365:3.
happening
2299:11,
2336:7,
2360:12,
2360:21,
2365:12,
2366:25,
2388:3.
happy 2319:5.
hard 2315:14,
2318:8,
2337:19,
2373:4,
2378:17,
2389:12.
hardware
2322:5,
2324:20,
2335:14.
harm 2288:24,
2290:8,
2290:14,
2304:2,
2326:1,
2335:1,
2340:16,
2340:20,
2362:6.
harmed 2312:4,
2336:13.
harmonizing
2320:19.
hashed
2336:16.
head 2302:9.
hear 2310:19,
2364:12.
heard 2336:2.
Heather
2284:11,
2319:7,
2319:10,
2319:21.
heavily
2366:17.
held 2355:18,
2387:19.

help 2285:12,
2324:18.
hereby
2393:1.
hesitating
2291:7.
high 2307:18,
2321:17,
2329:17,
2334:22,
2338:13,
2338:19,
2344:12,
2344:18,
2345:13,
2368:11,
2369:4,
2372:20,
2373:22,
2376:21,
2377:2,
2389:8.
high- 2289:7.
high-level
2323:18,
2336:9,
2386:4.
higher 2287:14,
2289:7,
2289:19,
2368:23.
highest
2287:21,
2287:22,
2314:12,
2314:15,
2314:16,
2314:18.
hints
2330:25.
hire 2335:11,
2343:14.
hiring 2335:9,
2335:11.
historic
2294:4.
historical
2288:15,
2302:6,
2302:14.

historically
2308:14.
history 2376:9,
2377:19.
Hit 2288:21,
2297:5,
2298:3.
hold 2324:4,
2328:5.
home 2391:17.
Honor 2285:5,
2300:5,
2310:1,
2316:8,
2316:11,
2318:6,
2318:23,
2319:7,
2337:18,
2346:2,
2355:6,
2357:10,
2363:6,
2371:12,
2371:24,
2383:4,
2387:12,
2390:20,
2390:24,
2391:15,
2391:21,
2392:12,
2392:20.
Honorable
2281:17.
hope 2331:14,
2373:11.
hopes
2307:22.
host 2366:21.
hosted
2329:3.
hosting
2333:20.
hour 2391:20,
2392:5.
hours 2334:24,
2366:12,
2367:10.
hundred 2330:1,

2382:14.
hundreds
2333:3.
hurdle
2307:18.
hypothesis
2340:22.
.
.
< I >.
idea 2295:23,
2295:24,
2296:16,
2328:3,
2336:10,
2336:12,
2340:19,
2375:3.
identifies
2383:10.
identify
2336:11,
2388:1.
identity
2378:10.
IL 2281:28.
illustrate
2296:5.
illustration
2295:21,
2295:23.
illustrative
2296:5.
image 2326:6.
imagination
2356:23.
imagine 2296:8,
2297:9,
2315:14,
2375:5.
imagining
2296:10,
2299:10.
impact 2295:13,
2329:14,
2343:22,
2366:13,
2376:20.
impacting
2387:23.

2414

implement
2338:25,
2339:17.
importance
2293:24,
2341:7.
important
2296:25,
2301:12,
2323:20,
2325:2,
2340:3,
2344:6,
2345:16,
2361:25,
2362:3,
2363:10,
2366:7,
2366:8,
2370:4,
2370:21,
2370:24,
2376:11,
2376:22,
2385:9,
2385:11.
impossible
2359:19.
improve
2287:24.
improvement
2315:15,
2315:18.
in. 2324:21,
2326:15,
2364:8.
incentive
2291:23.
incentives
2291:11,
2307:12,
2310:21,
2370:1,
2380:8.
incentivized
2292:14.
incident
2329:14,
2344:2,
2362:2,

2362:5,
2362:23,
2364:23,
2364:25,
2365:5,
2365:6,
2366:11,
2389:5.
incident-sharin
g 2360:2.
incidents
2327:5,
2332:23,
2360:20,
2387:22,
2388:1.
includes
2292:20,
2323:4,
2379:10.
including
2321:9,
2322:19,
2322:23,
2384:14.
incorporate
2302:4.
incorporates
2293:22.
incorporating
2374:10.
increase
2289:9.
increases
2374:9.
increasingly
2296:22,
2342:21,
2360:20.
incredibly
2323:24,
2370:24,
2376:19.
incremental
2286:5.
incubation
2312:14.
INDEX 2284:1,
2308:19.
industry

2325:13,
2326:13,
2327:15,
2331:16,
2333:15,
2338:21,
2342:12,
2345:23,
2379:20,
2379:23,
2380:23,
2381:3,
2381:25.
infancy
2299:21.
infinite
2326:15.
info 2345:23,
2364:5.
Information
2299:15,
2324:4,
2339:24,
2345:20,
2345:25,
2358:14,
2359:24,
2359:25,
2360:1,
2362:4,
2364:18,
2365:14,
2365:15,
2377:25,
2381:12,
2381:18,
2381:22,
2381:23,
2381:24,
2381:25,
2382:3,
2382:6,
2386:5,
2391:8.
Infrastructure
2321:8,
2321:14,
2321:16,
2321:18,
2322:3,

2322:10,
2322:12,
2322:16,
2323:2,
2323:5,
2328:19,
2329:4,
2330:17,
2331:10,
2334:15,
2335:16,
2337:6,
2337:8,
2338:2,
2338:18,
2342:18,
2342:24,
2343:4,
2343:24,
2379:3,
2379:4,
2379:14,
2385:25.
initial
2288:1.
innovate
2285:14,
2311:8,
2324:17.
innovated
2334:21.
innovating
2342:19,
2367:7.
innovation
2309:2,
2324:7,
2324:12,
2334:16,
2359:14.
innovations
2285:15,
2285:19,
2286:6,
2329:25,
2331:5,
2335:23.
input 2369:17,
2369:18,
2369:22.

insert 2370:3.
inserted 2341:25.
inside 2323:8.
insider 2330:25, 2359:21, 2377:23.
insight 2360:20, 2369:6.
insights 2329:19.
install 2341:20.
installed 2335:4.
installing 2341:21, 2368:10.
installs 2342:10.
instance 2314:11.
instances 2334:10.
Institute 2344:3.
institutions 2385:16, 2386:15.
instruments 2322:11.
intellectual 2328:20.
Intelligence 2299:24, 2341:23, 2356:14, 2380:4.
intent 2328:25, 2334:7, 2345:19.
interaction 2314:14.
interacts 2379:13.
interchangeably

2326:2.
interject 2313:6.
internal 2384:17.
internally 2372:19.
Internet 2329:2, 2329:10, 2330:15, 2363:1, 2376:25, 2377:6.
interpreting 2362:15.
interrupt 2337:9, 2369:8.
intricately 2371:5.
introduced 2308:10.
introduces 2368:7, 2374:9.
invent 2324:23.
invest 2307:16.
invested 2368:14.
investigations 2356:22.
investing 2324:4, 2366:16.
investments 2291:23, 2312:17.
involve 2298:2, 2337:22.
involved 2292:23, 2292:24, 2302:15.
involves 2298:24.
involving 2298:12,

2298:15, 2298:22.
IP 2385:22, 2385:23, 2386:6, 2389:18.
iphone 2305:10, 2306:21, 2307:1.
iphones 2301:18, 2305:1.
Ips 2386:7.
Iran 2327:14.
issue 2306:22.
issued 2300:8.
issues 2285:13, 2310:13, 2317:1, 2330:13, 2330:14, 2356:8, 2356:11, 2357:3, 2357:22, 2379:23.
.
.
< J >.
jack 2320:5.
James 2327:10.
JCDC 2345:22.
jeopardized 2301:5.
job 2320:2, 2320:5.
jobs 2322:12.
John 2283:6.
joined 2382:15.
Joint 2381:13, 2381:17.
Jonathan 2282:17.
journalists 2327:21.
Judge

2281:18.
judgment 2319:4.
Judicial 2282:21.
jurisdiction 2362:11.
Justice 2281:24, 2281:31, 2281:37.
.
.
< K >.
K. 2283:10.
Karr 2282:9.
keep 2316:15, 2324:9, 2335:8, 2336:4, 2336:12, 2363:18, 2368:25, 2389:23, 2390:11.
keeping 2376:2.
Kenneth 2283:8.
key 2302:12, 2388:1, 2388:2.
keys 2324:19, 2324:20, 2329:25.
kick 2362:10.
kind 2320:5, 2320:9, 2321:13, 2323:4, 2323:8, 2324:14, 2324:23, 2325:9, 2326:19, 2327:19, 2328:9, 2329:17, 2330:9, 2330:15,

2330:22,
2331:11,
2332:10,
2334:17,
2335:13,
2336:6,
2338:1,
2338:18,
2339:17,
2340:12,
2341:4,
2341:7,
2341:8,
2343:14,
2345:10,
2356:4,
2360:2,
2362:13,
2363:19,
2363:25,
2375:1,
2375:3,
2375:5,
2378:1,
2379:2,
2379:4,
2379:12,
2384:20,
2384:22,
2385:7,
2388:10,
2388:20,
2390:15.
kinds 2291:23,
2299:15,
2324:2,
2329:23,
2330:19,
2334:23,
2338:15,
2339:2,
2340:1,
2340:5,
2367:17,
2388:21.
knowledge
2304:5,
2304:9,
2327:17.
known 2325:4,

2329:11,
2381:12.
Korea 2327:14,
2362:5,
2362:14,
2366:11,
2367:9.
Korean
2333:12.
Koreans
2334:9.
.
.
< L >.
L-y-n-n
2319:21.
L. 2282:21,
2283:15.
labeled
2371:16,
2372:13.
laid 2293:9.
land 2289:12.
landscape
2344:16.
language
2358:11,
2365:19.
laptop 2334:17,
2334:18.
laptops
2335:18.
large
2330:16.
largely
2328:3.
largest
2312:11.
Lasalle
2281:26.
last 2294:6,
2308:9,
2309:5,
2309:14,
2309:20,
2311:16,
2328:18,
2340:10,
2389:13.
lasts 2376:6.

late 2330:14,
2330:18.
later 2325:8,
2329:24,
2369:10.
Law 2282:18,
2358:2.
lay 2294:19.
layer 2320:19,
2321:14,
2336:19.
layered 2335:9,
2335:25,
2343:25.
layers 2335:17,
2338:2.
lead 2285:25,
2286:7.
leads 2325:25,
2362:3.
leaked
2362:17.
lean 2341:16.
learned
2329:12,
2338:17.
learning
2286:4.
least 2286:25,
2288:16,
2291:13,
2293:1,
2299:20,
2303:25,
2304:5,
2304:9,
2310:10,
2328:17,
2328:18,
2328:21.
leave 2305:23,
2392:17.
led 2328:19,
2329:5,
2342:3.
legal 2362:8.
lens 2343:7.
less 2301:17,
2302:8,
2303:5,

2322:8,
2366:13.
level 2333:17,
2338:19,
2344:18,
2345:13,
2360:18,
2360:19,
2368:11,
2368:23.
leverage
2334:10,
2343:2.
liability
2310:8,
2317:18.
Liberty
2282:12,
2282:37.
library 2328:6,
2374:13.
license
2340:25.
life 2343:9,
2376:7.
light 2287:9.
likely 2290:24,
2291:5,
2291:7,
2291:12,
2315:9.
limited
2332:13,
2332:14,
2385:4.
line 2327:3,
2328:11.
lines 2357:17,
2358:7.
link 2328:25,
2329:1,
2333:22.
Linkedin
2333:13.
list 2292:17,
2391:20.
listen
2370:5.
little 2315:22,
2315:23,

2327:16,
2336:24,
2344:6,
2373:4,
2374:25,
2375:4,
2376:13,
2378:18,
2379:19,
2384:6.
live 2318:1,
2341:2.
lives 2341:4.
LLP 2283:11,
2283:16.
locations
2339:9.
log 2324:21,
2338:9,
2363:22.
logs 2321:23,
2321:24,
2335:19,
2337:25,
2338:1.
long 2289:6,
2291:15,
2306:5,
2330:11,
2330:22,
2335:10,
2361:10,
2368:16,
2374:20,
2374:23,
2375:5,
2376:6,
2388:13,
2390:17,
2392:3.
longer
2392:5.
look 2286:14,
2288:7,
2296:8,
2296:12,
2297:10,
2302:10,
2309:7,
2313:1,

2313:3,
2315:4,
2317:20,
2322:4,
2336:14,
2359:22,
2360:5,
2363:16,
2366:5,
2366:9,
2366:12,
2369:3,
2380:19,
2383:9,
2385:22,
2391:25.
looked 2286:15,
2287:7,
2298:4,
2301:19,
2376:10,
2390:7.
looking
2373:23,
2380:20.
loses
2312:21.
loss 2362:3.
lost 2333:3,
2333:4.
lot 2311:23,
2313:9,
2323:23,
2324:4,
2325:7,
2327:17,
2330:9,
2330:10,
2331:5,
2331:8,
2368:12,
2368:15,
2376:21,
2384:21.
lots 2330:14.
lower 2287:14,
2287:25,
2288:23.
Lynn 2319:21.
.

.
< M >.
MA 2283:19.
ma'am
2309:16.
machine
2283:48,
2324:20.
machines
2322:8,
2342:10.
magnitude
2302:5.
MAIER 2283:10,
2284:13,
2284:17,
2319:18,
2320:16,
2322:21,
2323:12,
2323:13,
2337:11,
2337:18,
2337:21,
2346:2,
2369:8,
2369:11,
2372:1,
2383:6,
2387:16,
2388:23,
2390:18.
Maine
2283:12.
maintain
2320:19.
maintaining
2378:24,
2379:17,
2379:18.
maintains
2293:14,
2293:19.
major 2321:9,
2327:4,
2340:10.
majority
2321:3.
malicious
2336:11,

2336:18,
2345:3,
2345:8,
2345:9,
2376:22.
malware 2364:6,
2364:10.
manage 2322:17,
2388:8.
management
2320:21,
2388:5,
2388:24.
managing
2320:9,
2326:13,
2388:5,
2388:15.
mandate
2338:14,
2371:7.
mandated
2331:13,
2342:22,
2368:25.
mandating
2360:17.
manually
2343:7.
manufacturers
2287:14,
2288:22,
2290:15,
2306:22,
2361:19.
map 2340:18,
2340:21,
2341:6,
2368:15,
2369:18.
maps 2324:9.
marked
2300:7.
market 2287:4,
2287:6,
2293:19,
2303:8,
2303:15,
2303:16,
2303:19,

2303:20,
2308:15,
2308:21,
2312:12,
2324:15,
2324:24,
2332:15,
2332:18,
2342:20,
2364:6.
markets
2286:13,
2290:10.
match
2336:17.
matter 2307:11,
2378:19,
2392:16,
2393:3.
matters 2316:9,
2362:8.
Matthew
2283:15.
maximize
2332:18,
2356:1.
Mcginnis
2283:15.
mean 2286:21,
2286:25,
2289:23,
2291:9,
2292:5,
2297:16,
2297:22,
2300:4,
2302:8,
2302:19,
2303:1,
2305:9,
2305:10,
2306:4,
2313:1,
2315:16,
2322:2,
2326:3,
2335:9,
2369:25,
2376:16.
means 2305:2,

2315:12,
2362:1.
meant 2337:21,
2374:11.
measure 2360:9,
2360:11.
media
2333:16.
medicine
2324:1.
member 2321:20,
2378:22,
2380:3.
mental
2356:24.
mentioned
2329:25,
2332:22,
2335:17,
2360:23,
2361:13,
2362:6,
2362:14,
2364:22,
2366:11,
2369:15,
2374:22,
2379:4,
2380:8,
2381:9,
2382:9,
2382:12,
2385:4,
2387:17.
merits 2295:11,
2312:10,
2312:11.
messages
2328:24,
2345:8.
Meta 2331:20,
2331:21,
2380:6,
2386:25.
method
2314:22.
methodology
2339:6,
2339:18.
methods

2356:23.
metrics
2386:2.
Michael
2282:33.
Microsoft
2309:5,
2314:17,
2314:18,
2314:20,
2314:21,
2314:25,
2315:17,
2329:2,
2329:8,
2329:10,
2329:11,
2329:12,
2330:13,
2332:22,
2366:6,
2366:14,
2382:21,
2387:7,
2387:10.
milestone
2318:25.
military
2343:12.
million
2362:17,
2363:19,
2364:13,
2364:16,
2364:20,
2365:7,
2389:7.
millions
2333:3,
2389:9.
mind 2305:14,
2305:20,
2322:4,
2325:10,
2327:12,
2337:19,
2363:18,
2373:15,
2376:2,
2389:24.

mindful
2392:16.
minor 2311:2.
minutes
2366:14.
mistake
2325:21.
mobile 2292:21,
2293:7,
2293:11,
2294:1,
2294:2,
2294:5.
mode 2305:1.
model 2340:25,
2376:1.
modeling
2288:6,
2288:9,
2289:10.
moment 2315:5,
2315:21,
2328:3,
2329:22,
2344:23,
2361:6,
2364:22,
2365:2,
2373:25,
2386:1,
2386:14,
2388:16.
moments
2290:18,
2346:13,
2374:6.
monetization
2301:6,
2301:7,
2306:7,
2315:13.
monetize
2299:3.
money
2386:18.
monitoring
2323:7,
2341:19.
monitors
2327:25.

monopoly
2286:12,
2286:21,
2287:5.
months
2333:17.
motivated
2301:2.
Motorola
2300:22.
move 2319:3,
2339:9,
2356:6,
2371:24,
2383:4.
multiple
2361:17,
2361:23.
.
.
< N >.
N. 2281:42.
Name 2284:3,
2319:20,
2340:24,
2341:4,
2369:8,
2371:22,
2382:25,
2383:10.
names
2383:10.
narrow
2318:15.
Nashville
2282:31.
nation 2327:11,
2330:19,
2388:3.
National
2344:3,
2355:17,
2356:11,
2356:19,
2357:2,
2357:22,
2358:22,
2359:7,
2387:23.
nations

2327:21.
nature
2326:11.
nearly
2359:19.
necessarily
2286:6,
2364:23.
necessary
2286:10,
2288:4,
2338:25,
2378:16.
need 2307:16,
2323:3,
2339:11,
2362:19,
2362:24,
2363:11,
2376:19.
needed 2324:23,
2344:20,
2374:17,
2375:9.
needing
2344:12.
needs 2326:15,
2338:22,
2380:18,
2386:18.
nefarious
2375:24.
negotiate
2294:5.
negotiating
2318:10.
network 2329:7,
2341:19,
2362:22,
2363:8,
2363:15.
neurosurgery
2323:25.
New 2282:34,
2282:39,
2285:15,
2291:9,
2291:10,
2291:12,
2292:11,

2292:13,
2293:10,
2294:17,
2300:22,
2306:22,
2307:1,
2307:7,
2307:8,
2333:22,
2336:15,
2345:5,
2363:23,
2379:9.
news 2389:18.
next 2385:14,
2388:3,
2391:20.
niche 2311:2,
2323:25.
Nieh 2391:24,
2392:7.
NIST 2344:2,
2362:2,
2380:10,
2380:12,
2380:16,
2380:19.
NO. 2281:5,
2379:10,
2391:13.
non-google
2290:4,
2304:2.
None 2292:23,
2302:15.
nonexclusive
2298:15,
2298:17.
normal
2368:24.
North 2327:14,
2333:12,
2334:9,
2362:5,
2362:14,
2366:11,
2367:9.
not. 2291:7.
notable
2381:7.

note 2323:13,
2373:21,
2374:2,
2374:8,
2389:6.
noted 2374:16,
2375:8.
Nothing 2294:7,
2392:21.
notices
2361:10,
2361:11.
notification
2360:18.
nuance
2361:7.
Number 2303:10,
2363:20,
2367:16,
2367:25,
2370:15,
2373:2,
2373:5,
2381:5,
2384:6,
2384:13,
2385:13.
numbers
2316:20,
2316:21,
2384:5.
NW 2281:39,
2281:44,
2282:13,
2283:42.
NY 2282:39.
.
.
< O >.
O. 2282:30.
objection
2372:1,
2383:6.
objections
2316:14,
2316:17.
obligations
2360:19.
observations
2332:11.

observe 2332:6.
observed 2288:9, 2332:12, 2333:11.
obtain 2300:2.
obtained 2299:19.
obvious 2305:15, 2315:23.
obviously 2355:5, 2391:23.
occasion 2332:5.
occur 2301:24.
occurred 2308:14.
offer 2301:16, 2307:8, 2331:7.
offered 2287:1, 2291:19, 2303:14, 2303:18, 2303:22, 2304:1, 2306:11.
offering 2285:10, 2285:21, 2286:2, 2290:18, 2290:22, 2291:3, 2295:8, 2296:19, 2296:21, 2306:10, 2306:17.
Office 2282:28, 2282:34, 2320:13, 2320:17, 2320:19, 2379:12.

Official 2283:41, 2393:7.
often 2306:22, 2326:2, 2332:17, 2332:19, 2363:20, 2370:24, 2385:5.
Okay 2303:6, 2303:12, 2305:19, 2306:15, 2313:14, 2315:3, 2316:22, 2317:9, 2318:7, 2318:13, 2318:17, 2318:24, 2322:7, 2337:11, 2337:16, 2346:5, 2358:13, 2369:11, 2373:9, 2373:25, 2387:13, 2391:14, 2391:18, 2392:10, 2392:13, 2392:22.
on. 2358:10.
onboard 2332:9.
once 2314:22, 2326:18, 2334:17, 2346:9, 2388:9, 2389:10.
one-time 2285:11.
one-year 2304:17, 2315:11.

ones 2361:25, 2374:21, 2381:7, 2384:17.
ongoing 2344:16, 2345:2, 2388:6.
online 2340:19, 2341:3.
onslaught 2390:13.
ONYEMA 2281:42, 2284:15, 2284:19, 2355:10, 2355:11, 2356:7, 2357:10, 2357:12, 2358:7, 2358:9, 2363:5, 2363:7, 2369:10, 2369:12, 2369:14, 2371:12, 2371:14, 2371:24, 2372:4, 2372:25, 2373:4, 2373:13, 2373:15, 2383:4, 2383:9, 2387:12, 2390:20, 2390:24, 2391:1, 2391:15.
open 2344:14, 2346:3, 2346:10, 2355:3, 2370:23, 2370:25, 2371:15, 2373:18,

2374:3, 2374:24, 2392:11.
open-source 2331:7, 2337:4, 2337:5, 2337:7, 2370:12, 2370:15, 2370:18, 2370:24, 2371:3.
Openai 2331:22, 2380:6.
opened 2329:1, 2329:2.
opening 2298:6.
operate 2335:18, 2344:25.
operating 2303:19, 2303:23, 2304:2, 2304:7, 2322:9, 2344:9, 2344:11, 2379:7, 2379:8.
Operation 2328:12, 2328:14, 2328:16, 2334:16, 2334:21, 2344:19, 2362:13.
operations 2345:3, 2357:25, 2379:10, 2379:14, 2388:6.
opine 2315:21.
opinion 2285:10,

2285:21,
2286:2,
2287:1,
2290:18,
2290:22,
2291:3,
2291:19,
2295:8,
2296:19,
2296:21,
2303:15,
2303:18,
2303:22,
2304:1,
2305:25,
2306:10,
2306:17,
2377:8,
2389:23.
opinions
  2295:15.
opportunity
  2307:16,
  2318:11,
  2329:16.
opt-in
  2336:22.
orange
  2386:21.
orchestrated
  2328:3,
  2368:16.
order 2285:8,
  2285:11,
  2302:5,
  2378:9,
  2387:21.
organization
  2334:6.
organizational
  2378:19.
organized
  2328:1,
  2328:3.
Ostiguy
  2282:27.
others 2300:24,
  2305:16,
  2365:23.
otherwise

2318:17,
2337:15,
2358:2.
ourselves
  2326:11,
  2343:15.
outbid
  2315:17.
outbidding
  2314:15.
outcome
  2312:22.
outlook
  2326:21,
  2355:13.
outpay
  2299:2.
outright
  2297:16.
outset
  2346:8.
outside
  2286:18,
  2346:13,
  2362:22,
  2363:15,
  2365:13,
  2367:12,
  2367:22,
  2384:25,
  2389:3.
overall
  2385:19,
  2390:6.
overlapped
  2364:24.
overnight
  2392:17.
oversee
  2320:12,
  2323:3.
overseeing
  2379:3.
oversight
  2379:15.
overview
  2372:10.
owes 2356:1.
own 2322:16,
  2327:21,

2341:20,
2375:2,
2390:1,
2390:3.
owner 2291:10,
  2291:12,
  2292:11,
  2292:13.
owners 2340:18,
  2340:20.
.
.
< P >.
p.m. 2285:2,
  2392:24.
package
  2288:11,
  2371:3,
  2374:24.
packages
  2370:18,
  2374:20.
Page 2284:3,
  2323:14,
  2326:22,
  2333:1,
  2336:24,
  2337:1,
  2357:13,
  2371:22,
  2372:9,
  2372:23,
  2373:2,
  2373:10,
  2373:12,
  2373:14,
  2373:17,
  2383:9,
  2384:4,
  2384:5.
paid 2308:11,
  2311:5.
pain 2288:5.
pandemic
  2328:2.
parking
  2340:23,
  2340:24,
  2341:1,
  2384:21.

part 2287:11,
  2290:6,
  2295:5,
  2297:14,
  2299:23,
  2300:12,
  2321:2,
  2321:16,
  2335:18,
  2335:19,
  2335:20,
  2343:8,
  2359:10,
  2379:14,
  2380:7,
  2380:10,
  2380:15,
  2388:6.
participate
  2334:15.
participates
  2380:1,
  2381:12.
particular
  2313:15,
  2365:5,
  2372:9,
  2373:17,
  2374:1,
  2374:16,
  2388:8.
particularly
  2389:20.
parties
  2316:23,
  2317:6,
  2317:25,
  2318:1,
  2339:15,
  2339:22,
  2369:6.
partnered
  2333:21.
partnership
  2368:3.
partnerships
  2381:9,
  2381:21.
parts 2330:16,
  2359:3.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

party 2338:25,
  2339:2,
  2340:13,
  2342:7,
  2346:12,
  2365:13,
  2372:14.
pass 2289:2,
  2337:19.
passionately
  2325:3.
password
  2363:22,
  2363:25.
passwords
  2333:3,
  2362:17,
  2363:19,
  2363:21,
  2364:3,
  2364:7,
  2366:20.
past 2312:9,
  2312:12,
  2315:25,
  2326:25,
  2361:24,
  2365:22,
  2365:24,
  2382:22.
path 2288:19.
pattern
  2332:20.
pay 2288:13,
  2292:14,
  2297:17,
  2297:23,
  2298:25,
  2301:1,
  2301:3,
  2305:2,
  2305:3,
  2306:5,
  2308:13,
  2313:10,
  2315:12,
  2340:24,
  2341:1.
paying
  2313:22.

payment
  2288:14.
payments
  2287:13,
  2287:19,
  2287:25,
  2288:8,
  2288:10,
  2288:15,
  2288:17,
  2288:19,
  2288:23,
  2289:6,
  2289:7,
  2289:11,
  2289:18,
  2289:23,
  2290:5,
  2291:12,
  2296:1,
  2314:6,
  2314:21,
  2315:19.
peers 2330:12,
  2331:1,
  2382:1,
  2382:6.
peers.
  2365:19.
penetration
  2343:6.
People 2294:11,
  2323:5,
  2327:18,
  2329:18,
  2331:14,
  2333:15,
  2333:18,
  2333:24,
  2334:5,
  2340:19,
  2341:18,
  2341:21,
  2359:19,
  2359:25,
  2363:20,
  2364:6,
  2364:7,
  2366:19,
  2377:25,

2385:5,
  2390:16.
percent
  2292:17,
  2293:1,
  2293:7,
  2293:18,
  2294:2,
  2302:8,
  2302:18,
  2302:21,
  2303:1,
  2303:5,
  2303:11.
perform
  2384:24.
performed
  2290:13.
perhaps
  2311:20.
period 2305:1,
  2307:21,
  2307:23,
  2308:17,
  2312:14,
  2312:16,
  2315:14,
  2328:18,
  2328:21,
  2329:24,
  2330:2,
  2333:17,
  2346:7,
  2368:17.
periods 2312:1,
  2390:17.
Permission
  2357:10,
  2371:12.
permit 2304:16,
  2304:21,
  2313:10.
permitted
  2305:21,
  2306:18.
perpetuate
  2340:16.
Perplexity
  2300:8,
  2300:14,

2300:21,
  2332:1.
persist 2312:9,
  2376:5.
person
  2341:4.
personal
  2387:24.
personnel
  2333:13.
perspective
  2286:20,
  2333:10.
phase 2317:5,
  2317:18.
phenomenon
  2363:20,
  2364:5,
  2364:21.
philosophy
  2339:12.
phone 2287:13,
  2290:14,
  2305:17,
  2306:22.
phones 2303:8,
  2306:23,
  2307:4,
  2308:10.
physically
  2340:20.
Pichai 2391:21,
  2392:1,
  2392:2,
  2392:10.
pick 2305:5,
  2337:18,
  2339:13.
picky 2377:8.
picture
  2356:24,
  2376:10.
piece 2339:19,
  2339:23,
  2358:9,
  2358:24,
  2359:4.
pieces
  2344:6.
pillar 2383:16,

| | | | |
|---|---|---|---|
| 2383:19, 2383:22. | 2375:14, 2375:19, 2389:22. | 2382:12. | 2311:21. |
| pin 2318:3. | PLAINTIFFS | plug 2324:20. | portion 2310:5, |
| pipeline 2334:22. | 2281:23, 2288:12, | Plus 2362:22, 2363:7, | 2310:8, 2346:9. |
| pivot 2298:19. | 2297:16, 2316:19, | 2363:14. | poses 2358:22. |
| Pixel 2301:16, | 2318:19, | point 2286:23, | position |
| 2301:17, | 2343:17, | 2289:4, | 2293:19, |
| 2301:25, | 2359:1, | 2289:8, | 2299:12, |
| 2302:2, | 2371:24, | 2289:22, | 2326:13, |
| 2302:15, | 2383:4, | 2290:3, | 2355:18, |
| 2303:2, | 2388:4. | 2296:12, | 2355:21, |
| 2303:8. | planet 2335:7, | 2296:14, | 2376:17. |
| Pixels | 2388:20, | 2296:15, | positioned |
| 2302:11. | 2390:15. | 2296:22, | 2309:9, |
| place 2312:5, | plate | 2296:25, | 2312:17. |
| 2312:7, | 2340:25. | 2297:2, | possible |
| 2320:21, | platform | 2297:6, | 2286:23, |
| 2322:10, | 2327:17, | 2297:7, | 2287:25, |
| 2339:7, | 2345:3, | 2299:1, | 2289:8, |
| 2360:17, | 2385:18, | 2299:7, | 2289:21, |
| 2369:2, | 2385:19, | 2299:8, | 2291:10, |
| 2378:15, | 2385:23. | 2300:25, | 2291:11, |
| 2378:17. | Play 2286:3, | 2302:11, | 2294:19, |
| placement | 2310:24, | 2307:23, | 2296:2, |
| 2297:23. | 2312:15, | 2313:16, | 2301:4, |
| places 2380:23, | 2314:12, | 2337:10, | 2311:5, |
| 2381:3. | 2343:18, | 2361:11, | 2318:12. |
| Plaintiff | 2343:21, | 2376:3, | possibly |
| 2281:7, | 2345:9. | 2388:22. | 2289:1. |
| 2282:5, | Please 2291:1, | points 2295:14, | post 2300:8, |
| 2287:4, | 2319:8, | 2296:3, | 2333:20. |
| 2290:8, | 2319:14, | 2297:21, | Post-quantum |
| 2290:14, | 2319:19, | 2298:20, | 2388:16, |
| 2295:5, | 2323:12, | 2303:2, | 2388:18. |
| 2295:18, | 2346:13, | 2305:17, | post-remedial |
| 2297:14, | 2392:23. | 2327:4, | 2313:3, |
| 2297:19, | Pledge 2331:4, | 2339:14, | 2313:5. |
| 2297:22, | 2331:12, | 2387:10. | post-trial |
| 2308:3, | 2331:15, | policy | 2317:5, |
| 2308:6, | 2331:18, | 2335:13. | 2317:11. |
| 2308:22, | 2331:20, | popular | posted 2333:19, |
| 2308:25, | 2331:21, | 2291:20, | 2340:19. |
| 2313:10, | 2331:22, | 2292:8, | Posture |
| 2315:5, | 2331:24, | 2292:9, | 2332:10, |
| 2338:4, | 2332:1, | 2294:11, | 2384:10, |
| 2341:11, | 2332:3, | 2371:3. | 2384:13, |
| 2358:20, | 2382:9, | popularity | 2388:10. |
| 2359:5, | | 2293:15. | potential |
| | | port 2324:20. | 2285:13, |
| | | portfolio | |

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

2285:19,
2288:24,
2290:2,
2290:23,
2291:4,
2291:25,
2292:17,
2293:1,
2293:18,
2294:21,
2294:24,
2359:6,
2381:22.
potentially
 2285:20,
 2285:25,
 2315:25,
 2343:18.
power 2286:12,
 2286:21,
 2287:5,
 2303:15,
 2303:19,
 2358:16,
 2391:11.
practice
 2331:10,
 2331:16,
 2366:23.
practices
 2338:12,
 2338:24,
 2342:12,
 2366:24,
 2367:3,
 2367:8,
 2367:9.
precise
 2303:10,
 2365:17,
 2367:25,
 2376:14,
 2377:4.
predict
 2288:19.
preinstallation
 2292:12,
 2296:1,
 2297:1.
preinstalled

2292:10.
preload
 2300:21.
prepared
 2372:5,
 2374:15,
 2375:8,
 2383:24.
present
 2318:11.
presentation
 2313:13,
 2375:8.
preserve
 2315:9,
 2315:24.
president
 2320:12,
 2344:2,
 2387:21.
pressure
 2311:13.
presumably
 2285:18,
 2314:18.
pretty 2307:18,
 2324:13,
 2331:1,
 2332:20,
 2356:23,
 2365:18,
 2370:2,
 2376:16,
 2377:18.
prevent
 2298:21,
 2366:24,
 2388:2.
previewed
 2316:12.
primary
 2320:7.
principal
 2301:3.
principle
 2296:25.
principles
 2289:15,
 2324:7,
 2325:1.

priorities
 2326:17.
priority
 2317:22.
privacy
 2321:15,
 2339:4,
 2383:13,
 2383:16,
 2383:22.
private
 2356:20,
 2362:23,
 2363:8.
privilege
 2368:11.
privileged
 2369:5.
pro 2285:18.
proactively
 2344:22.
probably
 2330:1,
 2337:9,
 2356:24,
 2358:1,
 2368:1,
 2390:14.
problem
 2285:20,
 2289:23,
 2325:24,
 2366:3.
problems
 2324:2,
 2325:15.
Proceedings
 2283:48,
 2355:3,
 2392:24,
 2393:3.
process
 2312:22,
 2317:11,
 2317:16,
 2325:6,
 2341:25,
 2359:12.
processes
 2359:19,

2390:15.
processing
 2371:4.
produced
 2283:48.
product
 2287:24,
 2291:24,
 2294:11,
 2296:14,
 2299:3,
 2299:6,
 2309:12,
 2309:17,
 2309:18,
 2321:4,
 2321:5,
 2321:7,
 2321:11,
 2321:18,
 2322:14,
 2322:16,
 2330:23,
 2332:15,
 2332:18,
 2336:6,
 2337:7,
 2378:21,
 2379:10.
production
 2285:22,
 2286:2.
products
 2321:10,
 2331:7,
 2344:24,
 2370:11,
 2370:12.
professional
 2377:8,
 2377:11.
Professor
 2391:24,
 2392:6.
profiles
 2333:13,
 2345:1.
profit
 2328:8.
Program

2380:16,
2388:11.
prohibited
2375:23,
2376:15.
Project 2337:4,
2337:5,
2366:15.
projects
2330:1,
2331:7,
2370:15.
prominent
2330:20,
2333:15.
promised
2346:8.
promote
2295:23,
2336:4.
promotional
2313:19.
properly
2340:14.
property
2328:20.
proposal
2338:7,
2341:11,
2341:12.
propose
2304:23,
2306:1.
proposed
2288:12,
2298:21,
2304:12,
2304:23,
2305:21,
2338:4,
2338:23,
2343:18,
2358:20,
2359:2,
2359:5,
2375:14,
2375:19.
pros 2285:17,
2285:23.
protect

2338:15,
2339:23,
2342:7,
2342:9,
2344:7,
2376:2.
protected
2323:8,
2338:22,
2341:8,
2390:12.
protecting
2338:18,
2377:1,
2377:6.
Protection
2282:19,
2282:29,
2336:19,
2377:14.
protects
2342:24,
2371:8.
protocol
2317:19.
proud 2390:8.
provide 2297:1,
2320:19,
2320:22,
2324:11,
2324:21,
2327:22,
2344:3,
2367:18,
2368:4,
2381:25.
provided
2357:19,
2363:15,
2375:15.
provider
2370:6.
provides
2299:16,
2321:8,
2321:16,
2374:25.
providing
2327:19,
2360:24,

2365:19,
2375:20,
2378:6,
2378:13,
2385:2.
provisions
2340:8.
proxy
2343:15.
Prudential
2283:17.
public 2345:13,
2346:10,
2356:4,
2356:17,
2360:1,
2378:1.
publicly
2355:24,
2363:1.
publish
2386:4.
pull 2323:12,
2372:25,
2373:13,
2373:14,
2373:15.
purpose 2287:3,
2287:7,
2387:22,
2387:25.
purposes
2317:7,
2328:10.
push 2345:6.
pushed 2305:18,
2331:5,
2331:6,
2342:2.
pushing
2379:9.
put 2285:9,
2301:25,
2304:11,
2318:3,
2323:1,
2325:8,
2325:10,
2331:11,
2335:19,

2341:3,
2360:3,
2369:2,
2377:9,
2378:17,
2385:6,
2385:9,
2388:10.
puts 2291:10.
putting
2363:13.
puzzle
2358:10.
PXR 2284:24,
2284:26,
2323:14,
2326:22,
2371:16,
2371:25,
2372:2,
2372:3,
2382:23,
2383:5,
2383:8.
.
.
< Q >.
qualified
2358:21.
quality
2287:24,
2306:6,
2309:10,
2315:12,
2371:1,
2371:10.
queries 2294:2,
2338:8.
query 2290:23,
2291:4,
2293:22,
2296:16,
2335:19,
2338:1,
2338:13,
2376:18.
QUESTION
2286:14,
2286:15,
2291:1,

2291:17,
2297:11,
2298:18,
2309:15,
2309:19,
2317:14,
2325:17,
2336:1,
2355:5,
2357:18,
2357:20,
2363:4,
2363:5,
2363:18,
2365:25,
2366:15,
2375:7,
2376:13,
2376:16,
2377:4,
2382:5,
2390:2,
2392:1.
questioning
  2346:3.
questions
  2301:14,
  2309:23,
  2310:4,
  2310:16,
  2310:19,
  2313:9,
  2314:7,
  2316:3,
  2346:4,
  2387:12,
  2388:4,
  2389:13,
  2390:19,
  2390:20,
  2390:23,
  2391:2.
quick 2336:1,
  2390:23,
  2392:15.
quickly
  2303:14,
  2334:23.
quite 2287:24,
  2318:10,

2366:9,
2366:10,
2389:17.
quo 2315:9,
  2315:24.
.
.
< R >.
R. 2282:8,
  2282:10.
raise 2319:8,
  2330:2.
raised 2378:5,
  2389:8.
Ralph
  2282:21.
ramp 2291:18.
ran 2342:1.
ransome
  2328:5.
ransomware
  2328:2.
rate 2294:4.
rates 2293:23,
  2294:8.
ratings
  2384:23.
RDX 2300:7.
reached
  2318:25.
read 2358:7,
  2359:9,
  2373:4.
Ready 2319:2.
real 2343:15.
realized
  2324:13,
  2329:22,
  2344:19,
  2344:23.
really 2286:15,
  2289:25,
  2290:10,
  2295:13,
  2299:1,
  2302:9,
  2312:8,
  2312:10,
  2312:13,
  2313:7,

2314:24,
2315:18,
2320:5,
2320:7,
2320:9,
2323:19,
2323:23,
2324:9,
2324:17,
2325:14,
2328:5,
2330:2,
2330:11,
2338:19,
2338:22,
2340:3,
2340:4,
2341:8,
2342:15,
2344:10,
2359:24,
2362:8,
2363:10,
2374:21,
2376:9,
2387:25,
2388:13.
reason 2299:4,
  2307:3,
  2344:5,
  2374:19,
  2377:10,
  2389:2.
reasonable
  2288:21,
  2306:8,
  2311:4,
  2358:25.
reasons 2288:3,
  2292:7,
  2292:9,
  2317:25,
  2368:9.
rebuttal
  2318:19.
recall 2298:17,
  2300:19,
  2310:5,
  2310:17,
  2314:7,

2355:13,
2355:15,
2359:3,
2359:10,
2360:24,
2361:15,
2361:25,
2362:23,
2365:19,
2375:16,
2375:20,
2378:6,
2389:15.
recalling
  2365:4.
receive
  2339:15.
received
  2386:25.
received.
  2372:3,
  2383:8.
receives
  2356:14,
  2358:22,
  2382:3,
  2382:6.
receiving
  2342:7.
recent
  2340:17.
recently
  2328:5,
  2382:16,
  2387:2,
  2389:14.
recess
  2337:17.
recipient
  2338:12,
  2339:7.
recognize
  2294:16.
recognizing
  2344:14,
  2345:13.
recommended
  2331:9,
  2342:21.
record 2294:20,

2294:24,
2299:14,
2309:7,
2319:20,
2323:13,
2332:23,
2390:6,
2390:8,
2393:3.
recorded
2283:48.
recovers
2293:22.
recovery
2293:22.
RECROSS-EXAMINA
TION 2284:19,
2390:25.
rectify
2307:20.
red 2330:15,
2343:6,
2343:11,
2343:12,
2343:13.
redacted
2369:9.
REDIRECT
2284:9,
2284:17,
2309:25,
2310:2,
2387:14,
2387:15.
refer 2357:17,
2362:1.
reference
2345:10,
2345:11,
2362:19,
2362:24,
2363:11.
referenced
2355:14,
2361:14,
2381:18.
referred
2321:23,
2387:19.
referring

2294:7,
2367:21.
refers 2325:1,
2327:7,
2328:11.
reflect
2312:22.
reflected
2327:2.
reflective
2302:14.
reflects
2326:5.
regarding
2316:9,
2363:8.
regards 2288:6,
2304:21.
regime
2331:14.
regimes 2330:4,
2338:20,
2366:19.
regular
2366:20.
regulation
2362:10.
regulations
2360:17.
reinventing
2388:14.
relate 2314:1,
2314:2.
related
2302:15.
relates 2293:2,
2357:2,
2357:22,
2359:13,
2379:6,
2382:3,
2382:6.
relating
2322:22,
2338:5,
2338:11,
2340:8.
relationship
2299:22,
2378:18.

relationships
2360:1.
relative
2293:24,
2338:15.
relatively
2302:6,
2302:8,
2340:17.
release
2342:25,
2379:2.
relevant
2287:6,
2290:10.
relies 2370:11,
2374:2.
rely 2317:12.
remain 2291:20,
2292:4,
2319:8.
remains
2293:14,
2301:3.
remedial
2287:12,
2287:16,
2287:25,
2288:7,
2288:23,
2289:12,
2289:17,
2301:22,
2307:23,
2308:4,
2308:6,
2308:16,
2311:22,
2311:24,
2312:6,
2312:7,
2312:13,
2313:1,
2313:7,
2315:2.
remedies
2286:15,
2286:16,
2286:19,
2290:8,

2290:14,
2297:15,
2297:19,
2301:12,
2306:11,
2308:22,
2308:25,
2310:5,
2312:6,
2312:18,
2313:10,
2314:19,
2314:24,
2315:5,
2315:7,
2315:9,
2315:10,
2338:5,
2358:21,
2358:24,
2359:1,
2359:5,
2375:15,
2375:19.
Remedies
Hearing
Proceedings
2281:16.
remedy 2285:9,
2286:11,
2286:20,
2287:4,
2287:7,
2288:4,
2288:11,
2293:4,
2297:13,
2297:22,
2298:21,
2304:12,
2304:20,
2305:21,
2306:18,
2307:6,
2315:14,
2315:21,
2338:23.
remember
2332:25.
reminders

2313:19.
remove 2286:12,
  2286:21,
  2287:4,
  2345:8,
  2369:4.
reopen
  2346:10.
Rep 2380:15.
Rep. 2380:17.
repeat
  2291:1.
replace
  2295:22.
replacement
  2291:14,
  2291:15.
report 2294:16,
  2298:4,
  2298:6,
  2345:18,
  2345:19,
  2389:18.
Reported
  2283:40,
  2365:10.
Reporter
  2283:41,
  2393:7.
reports 2290:7,
  2364:2,
  2365:9,
  2378:1.
represent
  2300:7.
representing
  2327:5.
represents
  2326:10,
  2327:4.
Republic
  2329:18.
require
  2330:4.
requirements
  2370:4.
requires
  2375:6.
research
  2333:14,

2334:8.
reserve
  2318:10.
residual
  2375:11.
Resilience
  2320:13,
  2320:15,
  2320:17.
resolve
  2317:13.
resolved
  2289:24.
resources
  2326:16,
  2342:14.
respect 2289:3,
  2304:17,
  2306:21,
  2317:1.
response
  2330:6.
responsibilitie
  s 2320:7,
  2321:11,
  2322:22,
  2337:22,
  2379:6.
responsibility
  2322:25,
  2342:9.
responsible
  2378:24,
  2379:1,
  2379:2,
  2379:16,
  2379:18.
rest 2318:19,
  2322:14,
  2323:6.
restoration
  2286:24,
  2312:25.
restore
  2286:17,
  2287:8,
  2306:14,
  2312:4.
restrictions
  2296:1,

2369:2.
result 2289:19,
  2290:5,
  2290:24,
  2291:5,
  2301:25,
  2334:12,
  2364:10,
  2364:20,
  2389:5.
results
  2296:18,
  2296:23,
  2308:20.
resume
  2337:13.
retained
  2310:5,
  2310:8,
  2310:11.
return 2296:17,
  2296:23.
returned
  2296:11.
rev 2289:7,
  2289:11,
  2289:18,
  2289:22,
  2314:21.
revenue
  2287:12,
  2287:19,
  2314:6,
  2315:18.
Review 2284:24,
  2317:15,
  2318:4,
  2372:5,
  2387:17,
  2387:19,
  2387:20,
  2387:22,
  2391:3,
  2391:4,
  2391:5.
Review.
  2371:19.
reviewed
  2300:10,
  2317:7,

2359:1,
  2359:3.
reviews 2391:7,
  2391:10.
rewrite
  2371:5.
rewrote
  2375:1.
Rigor 2284:24,
  2371:19.
risk 2294:17,
  2320:21,
  2358:22,
  2368:12,
  2369:3,
  2369:4,
  2371:9,
  2372:4,
  2372:10,
  2372:21,
  2373:22,
  2374:9,
  2374:13,
  2374:22,
  2375:12,
  2375:25,
  2388:5.
risk-based
  2371:1.
Risks 2284:27,
  2294:19,
  2294:22,
  2294:24,
  2315:20,
  2315:21,
  2315:23,
  2359:7,
  2372:13,
  2373:17,
  2375:20,
  2378:6,
  2382:24,
  2388:5,
  2388:8,
  2388:15.
rival 2290:4,
  2290:23,
  2291:5,
  2291:9,
  2299:18.

rivalry
  2286:17,
  2287:9,
  2311:12.
Rivals 2287:23,
  2288:20,
  2295:14,
  2306:3,
  2307:16,
  2307:22,
  2308:20,
  2310:19,
  2310:22,
  2310:25,
  2311:7,
  2312:20,
  2314:25.
road 2324:9,
  2368:15,
  2369:18.
role 2320:11,
  2320:24,
  2320:25,
  2321:3,
  2323:9,
  2359:18,
  2387:18.
Room 2281:33,
  2307:15.
Ropes
  2283:16.
rotate
  2366:20.
rotating
  2378:1.
rough 2321:2,
  2341:4.
roughly
  2310:14,
  2367:15.
row 2377:13,
  2377:15.
Royal 2383:10,
  2383:13.
RPR 2283:40,
  2393:1.
run 2289:1,
  2289:6,
  2321:9,
  2337:6,

  2360:5,
  2368:20,
  2368:21,
  2368:22,
  2369:20,
  2370:10,
  2371:6,
  2371:7,
  2371:11.
running
  2322:11,
  2369:19,
  2371:8,
  2385:24.
runs 2321:13,
  2321:17.
Russia
  2327:14.
Russian 2333:6,
  2341:22,
  2355:15.
Russians
  2341:24,
  2342:1.
Ryan 2282:9.
.
.
< S >.
S. 2281:31,
  2281:37,
  2305:1,
  2342:4,
  2345:14,
  2356:14,
  2356:21.
SAAS 2372:17.
SAAS.
  2372:14.
sabotage
  2327:12.
Safari
  2304:25.
Safe 2316:6,
  2336:2,
  2336:3,
  2336:4,
  2336:10,
  2336:21,
  2336:22,
  2342:25,

  2345:7,
  2371:11,
  2384:22,
  2389:23,
  2391:17.
Safety 2321:15,
  2332:20,
  2383:13,
  2383:16,
  2387:20,
  2391:4,
  2391:5.
Safty 2283:7.
Sallet
  2282:17.
Samsung
  2306:25,
  2307:1.
San 2281:34.
sandbox
  2371:8.
sandboxed
  2374:22.
Sara 2282:7.
Sarah
  2281:36.
saw 2298:17.
saying 2308:13,
  2364:19.
says 2308:6,
  2328:14,
  2372:10,
  2372:14,
  2373:4.
scale 2311:8,
  2322:18,
  2342:15,
  2374:17,
  2375:6,
  2375:9.
scanners
  2360:5.
scenario
  2289:22,
  2311:14,
  2340:12,
  2341:9,
  2341:17,
  2342:6.
scenarios

  2340:5.
Schmidtlein
  2283:6.
SCHMIDTLIEN
  2284:7,
  2285:4,
  2285:5,
  2285:7,
  2298:11,
  2298:14,
  2300:5,
  2300:6,
  2301:21,
  2301:22,
  2302:18,
  2302:20,
  2302:23,
  2303:4,
  2303:7,
  2309:23,
  2309:24,
  2317:4,
  2317:17,
  2317:23,
  2319:2,
  2319:3,
  2319:6,
  2355:4,
  2391:18,
  2391:19,
  2392:4,
  2392:8,
  2392:12.
SCHWARTZ
  2282:33,
  2318:23,
  2392:21.
score 2386:22,
  2386:25,
  2387:2,
  2389:15.
scores 2384:13,
  2385:12,
  2385:13,
  2386:14,
  2386:22.
screen
  2288:10.
screens
  2288:13,

2301:15,
2301:16,
2301:25.
Sealed
  2346:15.
seat 2325:7,
  2325:8,
  2325:9,
  2325:10,
  2377:13,
  2377:15,
  2384:24.
seated
  2319:14.
SEC 2360:19.
second 2285:9,
  2286:25,
  2287:21,
  2287:22,
  2307:24,
  2314:9,
  2314:16,
  2314:18,
  2315:1,
  2315:3,
  2315:6,
  2315:15.
secondary
  2286:24,
  2324:21.
Secondly
  2323:24.
seconds
  2355:9.
Section
  2282:19,
  2372:13.
Secure 2296:2,
  2297:9,
  2320:20,
  2324:7,
  2325:1,
  2325:13,
  2331:3,
  2331:12,
  2331:22,
  2331:24,
  2332:1,
  2332:3,
  2335:8,

2335:15,
2336:4,
2337:5,
2337:7,
2337:25,
2339:11,
2340:2,
2340:14,
2343:24,
2382:9,
2386:18.
secured
  2311:2.
securing
  2322:22,
  2343:9.
security-relate
  d 2338:7,
  2338:11,
  2339:6,
  2340:7.
Securityscoreca
  rd 2384:16,
  2385:1,
  2385:8,
  2386:12,
  2389:14.
seeing 2345:24,
  2345:25.
seem 2345:18.
seen 2295:4,
  2304:6,
  2311:18,
  2328:1,
  2334:9,
  2340:9,
  2359:4.
sees 2379:22.
selections
  2311:19.
sending
  2328:23.
sense 2288:16,
  2303:11,
  2356:22,
  2360:4,
  2360:7,
  2360:8,
  2377:24,
  2384:23,

2384:24,
2389:11.
sensitive
  2355:5.
sensitivity
  2323:4,
  2324:3,
  2338:14,
  2376:21.
sent 2333:22.
separate
  2383:22.
serious
  2327:20.
serve 2296:24,
  2385:5.
served
  2387:20.
service
  2372:17,
  2372:20,
  2373:24,
  2374:25.
services
  2290:11,
  2321:8,
  2321:13,
  2368:5.
Session
  2281:13,
  2346:4,
  2346:11,
  2346:15,
  2392:11.
set 2293:10,
  2294:2,
  2307:7,
  2323:20,
  2333:12,
  2338:19,
  2344:12,
  2377:3,
  2380:12,
  2385:22,
  2386:7,
  2387:21.
sets 2293:13,
  2304:11,
  2322:14.
setting 2320:8,

2339:4,
2345:13.
settings
  2360:6.
seven 2321:1,
  2369:1.
several 2332:8,
  2342:4,
  2366:6,
  2371:15.
Severt
  2282:6.
shape
  2296:17.
Share 2287:13,
  2287:19,
  2289:7,
  2289:11,
  2289:18,
  2289:22,
  2290:23,
  2291:4,
  2292:18,
  2293:2,
  2293:7,
  2293:18,
  2293:19,
  2301:24,
  2302:3,
  2302:14,
  2302:20,
  2302:21,
  2303:5,
  2303:8,
  2313:6,
  2314:6,
  2314:21,
  2315:18,
  2338:8,
  2345:23,
  2345:24,
  2363:20,
  2381:21,
  2381:23.
shared 2340:13,
  2364:3,
  2376:2,
  2381:24.
shareholders
  2356:1.

shares 2293:22, 2301:23.
sharing 2285:9, 2285:11, 2285:25, 2288:3, 2338:5, 2338:23, 2340:8, 2345:20, 2345:21, 2359:25, 2375:15, 2375:19, 2377:25, 2381:12, 2381:18, 2390:1.
Shevelenko 2300:10, 2300:13, 2300:17.
Shift 2290:23, 2291:4, 2292:18, 2293:2, 2293:7, 2293:18, 2301:24, 2302:20, 2302:22, 2303:3, 2303:5, 2313:6, 2388:16, 2388:17.
short 2289:1, 2317:14, 2346:8.
short-term 2307:13.
shorthand 2283:48.
shots 2390:13.
show 2328:9.
showed 2355:12.
showing 2384:12.

shows 2384:15.
side 2296:6, 2368:1.
sides 2339:18.
sign 2331:13, 2331:15, 2340:23.
signal 2384:19.
signals 2384:17, 2384:20, 2387:11, 2389:17.
signatories 2331:17.
signed 2331:20, 2331:21, 2331:22, 2331:24, 2332:1, 2332:3, 2382:12.
significant 2297:2, 2297:6, 2299:1, 2306:3, 2306:8.
significantly 2287:24.
signing 2382:15.
Similar 2341:21.
simply 2324:16, 2375:23.
single 2376:3, 2390:17.
sit 2321:4, 2321:5.
sites 2364:4.
sits 2379:13.
sitting 2293:24, 2306:17, 2365:4, 2378:10.

situation 2326:20, 2343:23, 2362:14, 2367:10, 2376:4.
slammer 2330:15.
slide 2292:16, 2295:16, 2295:17, 2295:20, 2296:6, 2301:21, 2304:10, 2304:11, 2308:1, 2313:13, 2323:17, 2323:18, 2325:1, 2326:5, 2326:22, 2327:2, 2327:3, 2330:12, 2355:13, 2373:23, 2374:1, 2374:16, 2383:24, 2384:9, 2384:12, 2384:15, 2385:9, 2387:3, 2387:9.
slides 2323:12.
Slow 2322:1.
slowly 2311:3, 2311:8.
small 2302:3, 2302:7, 2302:8, 2311:1, 2359:24, 2384:6.
smaller 2311:12.

smart 2287:13, 2290:14, 2303:8, 2308:10.
Smurzynski 2283:8.
snippet 2336:24.
social 2333:16, 2362:22, 2363:8, 2363:14.
software 2304:5, 2305:18, 2325:22, 2329:9, 2334:10, 2335:6, 2341:15, 2341:19, 2341:20, 2341:25, 2342:1, 2342:8, 2343:5, 2343:7, 2343:9, 2343:15, 2344:4, 2344:7, 2344:8, 2361:8, 2361:19, 2361:20, 2367:18, 2368:5, 2368:15, 2369:15, 2369:24, 2370:6, 2370:7, 2370:11, 2370:12, 2370:15, 2370:20, 2370:24, 2371:10, 2372:17, 2372:20,

2373:18,
2373:21,
2373:23,
2373:24,
2374:1,
2374:3,
2374:8.
Solar 2341:17,
2341:18,
2344:2,
2344:7.
solutions
2320:22,
2322:18,
2324:14,
2324:15,
2374:17,
2375:6,
2375:9.
solve 2325:15,
2388:13.
somebody
2293:13,
2296:11,
2328:4,
2333:1,
2361:10,
2361:11.
somehow
2286:6.
someone
2364:15,
2364:25,
2365:7.
Sometime
2310:10,
2310:11.
Sometimes
2321:23,
2364:2,
2382:2,
2382:4.
somewhere
2356:5.
soon 2310:11.
sophisticated
2329:20,
2367:2.
Sorry 2287:16,
2294:23,

2298:10,
2302:25,
2309:1,
2316:15,
2343:12,
2364:24,
2365:25,
2369:8,
2380:25,
2390:2.
sort 2286:24,
2289:2,
2294:21,
2296:2,
2307:10,
2312:1,
2312:2,
2312:3,
2312:6,
2312:19,
2312:22,
2313:5,
2314:12,
2314:14,
2314:15,
2317:21,
2322:3,
2330:13,
2330:25,
2363:11,
2369:5,
2376:1,
2376:4,
2379:9,
2384:24,
2386:6,
2388:13.
sorts
2308:10.
sotto 2358:6.
sound 2362:19,
2367:16,
2367:24,
2370:15.
sounds 2356:3,
2358:25,
2364:14.
source 2290:2,
2370:23,
2373:18,

2374:3.
sources
2356:15,
2356:16,
2356:23.
South
2281:26.
speaking
2295:12,
2314:1.
specific
2293:4,
2359:1,
2359:10,
2375:7,
2385:12.
specifically
2294:9,
2295:10,
2297:4,
2300:19,
2302:7.
specified
2339:1.
specify
2359:6.
spell
2319:20.
spend 2323:23,
2324:4,
2389:9.
spent
2342:19.
spoke
2312:25.
spoken 2311:22,
2315:3,
2315:4,
2326:25.
sponsoring
2290:3.
spouses
2327:20.
spread 2320:18,
2329:6,
2334:19.
spy 2327:20.
Square
2282:12.
SSL 2374:24.

stable
2389:21.
stack
2342:18.
stand
2342:13.
standard
2305:1,
2329:22,
2330:3,
2371:7,
2380:16.
Standards
2342:22,
2344:3,
2380:12,
2380:14,
2380:16,
2380:18,
2380:24,
2381:4.
standing
2319:8.
standpoint
2318:2.
stands
2299:4.
start 2324:17,
2345:7,
2374:12,
2392:1.
start-up
2332:13,
2368:14.
start-ups
2332:6,
2332:7,
2332:17,
2332:21.
started
2355:10,
2368:18,
2388:12.
starting
2322:5,
2323:19,
2324:6.
starts 2335:9,
2335:11.
State 2282:6,

2282:34,
2299:13,
2319:19,
2327:11,
2358:8,
2360:18,
2387:18.
state-sponsored
2327:7,
2327:8,
2327:9,
2329:19,
2355:14.
statement
2356:4.
States 2281:1,
2281:18,
2281:24,
2303:9,
2316:12,
2318:22,
2330:19,
2340:18,
2342:4,
2355:18,
2356:10,
2356:18,
2357:20,
2357:23,
2358:13,
2358:16,
2358:21,
2359:6,
2392:21.
status 2315:9,
2315:24.
stays 2323:8.
steal 2334:8.
stealer
2364:6.
steals
2364:7.
stemming
2359:7.
stenographic
2393:2.
step 2308:13,
2308:15,
2308:17,
2346:13.

stole 2365:7.
stolen 2324:22,
2339:23,
2339:24,
2340:14,
2341:10.
stood
2345:22.
storage
2337:22,
2338:22.
store 2337:24,
2338:1,
2338:17,
2345:9.
stored 2323:2,
2390:11.
stores
2313:16.
story 2324:6.
strategic
2314:14.
strategy
2320:20,
2324:9.
Street 2281:26,
2281:39,
2281:44,
2282:13,
2282:37,
2283:18.
strength
2287:20,
2289:9,
2389:2.
strengths
2389:1.
string
2330:22.
strong
2315:6.
structured
2287:20.
struggle
2330:18.
stuck
2334:19.
studied
2290:16,
2297:4,

2298:1,
2298:4,
2298:10,
2299:18,
2303:21.
study 2294:5,
2298:6,
2329:17.
stuff 2360:1,
2368:22.
sub-bullet
2304:15.
Subject
2318:18,
2318:19.
submission
2318:9.
submissions
2317:5.
submitting
2316:24.
subpoena
2358:16,
2391:11.
success
2311:9.
successful
2286:11,
2286:22,
2291:24,
2294:17,
2295:9,
2299:20,
2314:19,
2314:24.
successfully
2299:19.
sufficient
2286:7,
2324:16.
suggesting
2307:18,
2375:22,
2377:5.
suggests
2344:10.
Suite 2281:27,
2281:45,
2282:14,
2282:24.

summary
2391:24.
supply 2373:24,
2374:1.
support
2312:18,
2368:4.
surely
2319:6.
surprise
2344:7.
surveillance
2327:15,
2327:19.
swinging
2332:19.
sworn
2319:11.
sync 2343:1.
syndicate
2308:20.
syndication
2288:3.
system 2303:19,
2303:23,
2304:2,
2304:7,
2322:9,
2325:5,
2325:22,
2326:1,
2326:14,
2329:5,
2335:19,
2335:20,
2335:21,
2338:22,
2338:24,
2339:22,
2340:6,
2344:9,
2369:15,
2370:20,
2370:21,
2371:8.
systems 2320:4,
2326:11,
2334:5,
2334:14,
2337:22,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

2341:20,
2343:22,
2344:9,
2344:11,
2364:16,
2365:1,
2367:19,
2368:11,
2368:22,
2377:22,
2378:14.
.
.
< T >.
T. 2282:6,
2282:9,
2283:40,
2393:6.
table 2345:23,
2381:23.
tables 2345:21,
2392:17.
tackling
2388:22.
tail 2375:5.
taken.
2337:17.
talent 2323:24,
2324:5,
2330:10,
2342:14,
2359:14.
talented
2343:14.
talked 2298:24,
2379:19,
2386:14.
tamper
2334:10.
tap 2391:18.
target 2293:4,
2333:8,
2335:3.
targeted
2389:4,
2390:14.
tasks
2322:12.
Tasneem
2284:5.

team 2321:15,
2321:21,
2343:11,
2343:12,
2343:13,
2378:20,
2378:22.
teams 2320:18,
2323:21,
2343:6.
tech 2375:22,
2376:14,
2376:24,
2377:5,
2389:23,
2390:16.
technical
2327:17,
2379:7,
2379:8.
technically
2290:19,
2291:18,
2320:4.
techniques
2327:13.
technologies
2359:20.
Technology
2285:22,
2286:2,
2322:11,
2324:6,
2325:12,
2330:7,
2332:6,
2335:15,
2342:15,
2344:3.
teenagers
2328:7.
ten 2306:16,
2310:25,
2311:16,
2312:24,
2376:6,
2388:21.
ten-year
2324:9.
Tennessee

2282:28.
term 2361:2,
2362:7.
terminology
2343:12,
2363:13.
terms 2288:7,
2305:22,
2305:24,
2311:18,
2314:1,
2338:14,
2367:22,
2369:14,
2369:23,
2370:11,
2374:1,
2377:15,
2392:2.
Tesla 2340:18,
2340:20.
test 2343:4,
2343:6,
2343:15.
testified
2311:3,
2319:12,
2365:17,
2367:6,
2369:16,
2375:18.
testifying
2376:24,
2391:21,
2391:22.
testimonies
2317:2.
testimony
2295:1,
2295:4,
2299:5,
2300:10,
2316:6,
2316:18,
2337:14,
2358:4,
2360:23,
2360:24,
2361:13,
2375:15,

2375:20,
2377:20,
2378:7,
2378:13,
2391:17.
testing 2343:3,
2343:6.
text 2286:13,
2290:11.
thanks
2337:16.
THE WITNESS
2316:7,
2319:16,
2320:15,
2322:8,
2355:7,
2388:18.
theft
2328:20.
themselves
2321:19.
theory 2303:3,
2307:9.
thereafter
2310:12.
they'll
2336:12,
2385:22.
thief
2339:25.
thieves
2340:14.
thinking
2291:11,
2307:10,
2310:13,
2341:8,
2344:11,
2375:3.
Third 2304:15,
2317:6,
2338:25,
2339:2,
2340:13,
2369:6,
2372:14.
Third-party
2305:6,
2338:24,

2367:11,
2370:6,
2370:12,
2370:14,
2372:13,
2372:20,
2373:21,
2374:8,
2384:15.
third-party-pro
  duced
  2373:18,
  2374:3.
though 2335:12,
  2369:22.
thoughtful
  2376:20.
thousand
  2321:1.
thousands
  2374:2.
threat 2323:7,
  2324:10,
  2324:22,
  2326:1,
  2326:21,
  2327:6,
  2327:8,
  2327:24,
  2328:9,
  2328:23,
  2329:6,
  2329:17,
  2329:23,
  2333:11,
  2339:2,
  2344:16,
  2344:21,
  2345:1,
  2345:5,
  2345:17,
  2355:12,
  2357:25,
  2361:8,
  2364:8,
  2367:1,
  2376:1,
  2376:10.
threats
  2338:15,

2340:6,
2356:19,
2381:22.
three 2311:25,
  2314:5,
  2387:9.
three-year
  2315:13.
throughout
  2320:18,
  2365:9.
throughput
  2334:22.
thumb 2316:13,
  2316:16.
tight 2370:2.
timing
  2392:2.
tires
  2384:22.
title
  2371:19.
titled 2284:26,
  2382:24.
TN 2282:31.
today 2291:20,
  2296:9,
  2296:10,
  2296:23,
  2297:2,
  2297:6,
  2297:7,
  2297:10,
  2297:11,
  2298:18,
  2299:3,
  2299:6,
  2299:11,
  2299:13,
  2300:25,
  2301:5,
  2306:6,
  2306:7,
  2309:13,
  2312:2,
  2314:17,
  2315:4,
  2315:17,
  2316:24,
  2318:10,

2320:11,
2346:8,
2355:11,
2356:8,
2365:4,
2370:14,
2377:20,
2378:10,
2380:8,
2381:10,
2382:21.
together
  2304:11,
  2308:23,
  2308:25,
  2331:11,
  2360:3.
tomorrow
  2391:21,
  2392:1,
  2392:9,
  2392:15,
  2392:18,
  2392:23.
tone 2323:20.
took 2330:16,
  2357:8,
  2364:15,
  2364:25.
tools 2293:6,
  2357:21.
Top 2302:9,
  2323:20,
  2337:7,
  2340:4,
  2343:24,
  2368:19,
  2368:25,
  2372:10,
  2372:11.
totality
  2367:22.
towards 2287:8,
  2332:19.
Tower
  2283:17.
tracking
  2345:5.
trade-off
  2332:16.

traded
  2355:24.
trades
  2320:5.
traffic
  2303:1.
Transcript
  2281:16,
  2283:48,
  2357:14,
  2357:18,
  2393:2.
transcription
  2283:49.
transfer
  2339:6.
transformation
  2367:7.
transition
  2288:4,
  2307:25,
  2388:20.
translate
  2288:24.
transmission
  2340:1.
transmit
  2339:16.
travels 2316:6,
  2391:17.
Travis
  2282:8.
treated
  2297:20.
Trent 2282:7.
trial
  2316:20.
trick
  2339:22.
tried 2295:7.
true 2318:22,
  2358:17,
  2374:19,
  2380:5.
trust 2333:18,
  2333:25,
  2335:12,
  2335:13.
try 2294:19,
  2313:5,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

2318:8,
2331:12,
2334:24,
2363:24,
2364:1,
2389:12.
trying 2312:4,
2332:17,
2363:16.
turn 2290:17,
2295:15,
2295:16,
2296:19,
2304:10,
2307:19,
2313:12,
2319:1,
2326:21,
2357:12,
2360:22,
2367:11,
2371:16,
2372:9,
2372:23,
2375:14,
2382:23,
2384:4.
turning 2333:7,
2341:11.
Two 2298:3,
2298:17,
2308:9,
2308:17,
2316:8,
2333:6,
2334:5,
2336:1,
2339:9,
2339:14,
2339:15,
2340:22,
2341:23,
2357:8,
2363:19,
2364:14,
2364:21,
2365:9,
2365:11,
2368:19,
2390:20,

2390:23,
2391:10.
two-factor
2324:21.
two-year
2307:4,
2328:16.
type 2304:19,
2305:19,
2308:14.
typed
2296:16.
types 2296:11,
2305:10,
2306:1,
2306:11,
2306:17,
2311:19,
2327:24,
2381:9.
Typically
2306:25,
2327:14,
2339:17.
typing
2364:8.
.
.
< U >.
ultimate
2288:11,
2370:6,
2370:21.
ultimately
2289:12,
2312:21.
unauthorized
2362:3.
unconstrained
2312:20.
undefined
2285:11.
underground
2389:7.
underneath
2329:5,
2334:2.
Understand
2285:10,
2285:17,

2285:22,
2285:23,
2299:13,
2304:22,
2308:2,
2311:24,
2340:5,
2344:22,
2358:20,
2359:5,
2359:11,
2362:1,
2376:1,
2390:2.
understanding
2287:3,
2292:7,
2298:24,
2299:25,
2304:12,
2308:23,
2316:23,
2344:21,
2358:10,
2362:25,
2377:18,
2391:13.
Understood
2318:5.
undetected
2333:6,
2341:24.
unfair
2312:23.
unfortunately
2307:24.
uniform
2327:10.
unique 2356:19,
2357:1,
2357:4,
2357:24,
2367:18,
2375:6.
Unit 2282:20.
United 2281:1,
2281:18,
2281:24,
2303:8,
2316:12,

2340:18,
2342:4,
2355:18,
2356:10,
2356:18,
2357:20,
2357:23,
2358:13,
2358:16,
2358:21,
2359:6.
UNITED STATES
OF AMERICA
2281:5.
units
2320:18.
unlikely
2307:19.
unredacted
2369:10.
until 2287:23,
2288:20,
2325:24,
2361:3,
2361:6.
unverifiable
2374:10.
update 2342:3,
2372:5,
2372:7.
updates
2345:11,
2366:21.
upgrade
2388:19.
uptick
2328:1.
upwards
2370:14.
URL 2336:15,
2336:23.
usage
2294:14.
USB 2324:20.
useful 2296:24,
2385:2,
2385:4,
2385:6.
user 2292:17,
2292:20,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

2292:24,
2299:21,
2308:19,
2322:22,
2323:1,
2327:12,
2336:11,
2336:12,
2338:1,
2338:8,
2340:12,
2342:25,
2362:23,
2363:8,
2363:15,
2364:3,
2364:10,
2365:15,
2376:18,
2377:10,
2390:3,
2390:11.
usernames
  2333:3,
  2364:7.
users 2289:4,
  2291:20,
  2293:15,
  2296:16,
  2297:9,
  2299:15,
  2301:17,
  2309:3,
  2309:4,
  2313:22,
  2335:8,
  2335:24,
  2336:4,
  2342:9,
  2364:16,
  2376:25,
  2377:6,
  2389:4,
  2390:1.
uses 2322:13,
  2322:14,
  2343:4,
  2367:12,
  2367:23,
  2370:14,

    2370:18.
using 2297:3,
  2302:2,
  2302:6,
  2362:7,
  2386:2.
utilize
  2297:10.
.
.
< V >.
validate
  2335:11,
  2335:14,
  2339:20.
valuable
  2380:20.
valuation
  2314:16.
value 2314:12,
  2314:15,
  2314:18,
  2356:1,
  2379:23.
values
  2314:13.
variants
  2305:17.
variations
  2315:10.
variety 2293:8,
  2311:18,
  2327:18,
  2328:9,
  2386:21.
velocity
  2332:16,
  2332:19,
  2374:9.
vendor 2324:15,
  2361:12,
  2369:9,
  2370:2.
vendors
  2327:19,
  2327:22,
  2366:21,
  2367:11,
  2367:12,
  2367:16,

2367:17,
2367:18,
2367:19,
2367:22,
2368:6,
2368:10,
2384:19.
venue
  2327:13.
venues
  2385:6.
verify
  2359:19.
Veronica
  2281:42.
version
  2296:13,
  2307:1,
  2307:8,
  2336:16,
  2336:22,
  2337:2.
versions
  2305:7,
  2305:9,
  2306:23,
  2343:5.
via 2336:16,
  2342:25.
vice 2320:12.
Vickie
  2383:11.
victim
  2361:3.
victims
  2328:17,
  2345:19.
video 2316:19,
  2371:3,
  2374:12,
  2374:22.
view 2286:18,
  2286:23,
  2297:6,
  2312:7,
  2330:25,
  2338:13,
  2357:1,
  2376:14,
  2377:23,

2384:25,
2388:25,
2389:2.
views 2369:18,
  2385:8.
visibility
  2336:7,
  2344:24.
visit 2334:1.
visualize
  2322:4.
voce. 2358:6.
voice
  2316:15.
volunteer
  2331:15.
VP 2356:13,
  2359:18,
  2383:13.
vs 2281:8.
vulnerabilities
  2360:22,
  2388:24.
vulnerability
  2325:19,
  2325:20,
  2325:25,
  2326:4,
  2329:3,
  2333:21,
  2334:3,
  2361:2,
  2361:5,
  2361:8,
  2361:20,
  2363:13,
  2368:7,
  2389:5.
.
.
< W >.
W. 2283:12.
wait 2392:23.
walking
  2384:21.
wanted
  2310:21.
wants
  2391:22.
warning

2438

2336:12,
2336:18.
Washington
2281:12,
2281:40,
2281:46,
2282:15,
2283:13,
2283:43.
waste
2389:10.
watch
2334:24.
watched
2295:4.
ways 2297:8,
2297:10,
2298:20,
2302:12,
2311:1,
2311:9,
2340:2,
2375:24.
weak 2325:23.
weakness
2325:20,
2326:14,
2361:7.
weaknesses
2389:1.
web 2333:1,
2336:7,
2336:15,
2336:24,
2337:1,
2340:12,
2340:15,
2341:3.
website
2333:20,
2334:1,
2336:11,
2336:18,
2386:4.
websites
2363:21.
week 2320:6,
2389:16.
weeks 2357:8.
Welcome 2285:3,

2319:15.
Wells
2385:17.
whatever
2287:19,
2392:16.
whether
2285:21,
2286:15,
2286:18,
2287:3,
2287:12,
2290:7,
2290:13,
2290:19,
2291:19,
2292:10,
2295:8,
2301:16,
2307:10,
2307:12,
2313:10,
2336:17,
2336:25,
2342:13,
2358:21,
2359:3,
2360:11,
2360:18,
2362:7,
2362:14,
2370:10,
2371:10,
2377:5,
2389:22.
whoever
2342:1.
whole 2289:3,
2289:8,
2305:3,
2335:9,
2342:18,
2366:21.
wide 2328:9.
widespread
2334:13.
widget 2295:22,
2295:23,
2296:4,
2296:11.

Will 2287:14,
2287:20,
2287:25,
2288:4,
2288:5,
2288:19,
2288:21,
2288:24,
2290:8,
2290:14,
2291:23,
2294:1,
2294:20,
2295:1,
2295:9,
2296:21,
2297:9,
2300:7,
2301:1,
2301:17,
2301:24,
2306:14,
2307:14,
2307:15,
2307:25,
2314:15,
2314:25,
2323:13,
2327:22,
2336:14,
2345:19,
2346:10,
2355:7,
2358:7,
2358:21,
2359:6,
2368:20,
2368:21,
2369:4,
2372:2,
2383:7,
2384:18,
2389:6,
2390:21,
2391:21,
2391:23,
2392:10.
Williams
2283:11.
willing

2334:1.
win 2299:4,
2307:17.
Windows
2333:21,
2334:2.
Winds 2341:17,
2341:18,
2344:2,
2344:7.
wins 2307:15,
2312:21,
2314:13.
wireless
2287:14.
within 2299:14,
2321:4,
2321:15,
2345:20,
2383:16,
2383:17,
2383:19,
2387:9.
without 2296:1,
2305:3,
2305:6,
2309:8,
2309:9,
2312:17,
2325:7,
2326:4,
2327:17,
2327:21,
2379:5.
WITNESS 2284:3,
2319:2,
2319:11,
2319:13,
2322:5,
2337:16,
2371:13,
2391:20,
2391:22.
witnesses
2316:14,
2316:18.
won 2306:9.
words 2302:23,
2345:15,
2365:18.

work 2287:11,
2308:23,
2308:25,
2320:8,
2324:23,
2326:7,
2329:23,
2330:9,
2332:5,
2337:5,
2343:25,
2356:22,
2356:23,
2359:25,
2367:2,
2367:20,
2368:1,
2379:11,
2386:12,
2388:14.
worked 2356:25,
2387:17.
working 2318:8,
2319:25,
2327:11,
2333:12,
2360:2.
works 2318:5,
2336:14,
2337:10.
workstation
2334:18.
workstations
2379:11.
world 2287:12,
2287:15,
2287:16,
2287:25,
2288:7,
2288:24,
2289:12,
2289:13,
2289:17,
2289:18,
2296:3,
2301:22,
2306:12,
2306:19,
2307:24,
2308:4,

2308:6,
2308:16,
2311:16,
2311:22,
2311:24,
2312:2,
2312:6,
2312:7,
2312:8,
2312:13,
2312:18,
2312:19,
2313:1,
2313:3,
2313:5,
2313:7,
2313:8,
2315:2,
2362:11.
worried
2341:17.
worry 2342:6,
2342:12.
worst-case
2341:9.
wrap 2391:25.
writer
2285:20.
writing
2285:25,
2383:15.
written 2371:4,
2371:6.
.
.
< Y >.
Yahoo 2331:24,
2332:22,
2366:5.
year 2288:17,
2305:2,
2307:2,
2307:7,
2307:14,
2307:18,
2372:6,
2376:6.
years 2288:1,
2294:6,
2306:16,

2307:4,
2307:21,
2308:9,
2309:6,
2309:14,
2309:20,
2310:14,
2310:25,
2311:10,
2311:16,
2312:24,
2323:9,
2325:14,
2333:6,
2335:23,
2341:23,
2343:25,
2345:5,
2363:2,
2365:10,
2388:21.
yesterday
2369:13.
York 2282:34,
2282:39,
2363:23.
yourself
2342:21.
Youtube
2313:19.
.
.
< Z >.
Zenner
2392:8.
zero 2335:13,
2360:24,
2360:25,
2361:2,
2361:12,
2361:14,
2361:17,
2388:23,
2389:4.
zero-day
2334:3.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter