4149

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, ET AL.,  )
                                   )
          Plaintiffs,              )
                                   )    CV No. 20-3010
      vs.                          )    Washington, D.C.
                                   )    May 8, 2025
GOOGLE LLC,                        )    9:35 a.m.
                                   )
          Defendant.               )    Day 13
_____)    Morning Session


TRANSCRIPT OF REMEDIES HEARING PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

4150

APPEARANCES:

For DOJ Plaintiffs:             David E. Dahlquist
                                UNITED STATES
                                DEPARTMENT OF JUSTICE
                                Antitrust Division
                                209 South LaSalle Street
                                Suite 600
                                Chicago, IL 60604
                                (202) 805-8563
                                Email:
                                david.dahlquist@usdoj.gov

                                Adam T. Severt
                                DOJ-ATR
                                Antitrust Division
                                450 Fifth Street, NW
                                Suite 7100
                                Washington, D.C. 20530
                                (202) 307-6158
                                Email: adam.severt@usdoj.gov

For Plaintiff
State Colorado:                 Jonathan Bruce Sallet
                                COLORADO DEPARTMENT OF LAW
                                Consumer Protection Section,
                                Antitrust Unit
                                Ralph L. Carr Colorado
                                Judicial Center
                                1300 Broadway
                                Suite 7th Floor
                                Denver, CO 80203
                                (720) 508-6000
                                Email: jon.sallet@coag.gov

4151

APPEARANCES CONTINUED:

For Defendant Google:            John E. Schmidtlein
                                 Kenneth C. Smurzynski
                                 WILLIAMS & CONNOLLY LLP
                                 680 Maine Avenue SW
                                 Washington, D.C. 20024
                                 (202) 434-5000
                                 Email: jschmidtlein@wc.com
                                 Email: ksmurzynski@wc.com

                                 Mark S. Popofsky
                                 ROPES & GRAY LLP
                                 2099 Pennsylvania Avenue NW
                                 Washington, D.C. 20006
                                 (202) 508-4624
                                 Email:
                                 mark.popofsky@ropesgray.com

Court Reporter:                  William P. Zaremba
                                 Registered Merit Reporter
                                 Certified Realtime Reporter
                                 Official Court Reporter
                                 E. Barrett Prettyman CH
                                 333 Constitution Avenue, NW
                                 Washington, D.C. 20001
                                 (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

4152

- - -

WITNESS INDEX

- - -

WITNESSES          DIRECT CROSS REDIRECT

DEFENDANT'S:

DR. LORIN M. HITT          4154     4191
KEVIN MURPHY          4195

4153

P R O C E E D I N G S

THE COURT:  Good morning.  Please be seated, everyone.

COURTROOM DEPUTY:  Your Honor, we're now calling for the record Civil Action 20-3010, United States of America, et al., versus Google LLC.

Present for the government is Jonathan Sallet and David Dahlquist.

And John Schmidtlein for the defendants.

THE COURT:  All right.  Good morning, everyone.

Anything we need to discuss before we continue?

MR. DAHLQUIST:  We're ready to go with the witness, Your Honor, unless you have any questions about the filings last night.

THE COURT:  No.

I've reviewed them.  I just need to do a little bit more work over the lunch break and then we'll have an answer for you later on this afternoon.

MR. DAHLQUIST:  We're ready for the professor.

THE COURT:  Professor Hitt.

All right, Professor Hitt, welcome back.

Have a seat.

THE WITNESS:  Good morning, Your Honor.

4154

- - -

DR. LORIN M. HITT, WITNESS FOR THE DEFENDANT, HAVING BEEN PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED FURTHER AS FOLLOWS:

CROSS-EXAMINATION (CONTINUED)

BY MR. DAHLQUIST:

Q    Professor Hitt, good morning again.

A    Good morning.

Q    Welcome back.

A    Thank you.

Q    Professor Hitt, yesterday, we left off talking about data and how data is used to train foundational models and finely tuned models.

That's where we left off, right?

A    Yes.

Q    I'd like to pick up a bit about data, but more so data in the reference of grounding.

You're familiar with grounding, correct?

A    That is correct.

Q    And you're aware that grounding refers to the use of Search data to validate a response from a GenAI product, correct?

A    So Search data could be one input to a grounding process.  It could be other data feeds and other sources of data, but it's one thing you could ground on, yes.

4155

Q    Okay.

And grounding helps to ensure that an answer from a GenAI product is accurate, correct?

A    That's one of the applications of grounding.

The other is to bring in facts, for example, that are real time and could not have been, for example, in the training dataset.

Q    Okay.

And your opinion, and I just want make sure I'm clear of your opinion in this matter, is that Google does not have a competitive advantage arising from data needed to ground GenAI models.  Does that sound accurate?

A    Yes.

The marketplace evidence suggests that they do not have a competitive advantage, regardless of any advantage they may or may not have in the acquisition of data.

Q    Okay.

And so that's what I want to talk about, that opinion that, in your view, Google doesn't have this competitive advantage in grounding, okay.

So let's take that.

First of all, you're aware that Google incorporates elements of Google Search to ground the Gemini app, correct?

A   Yes, I understand that there's an API that they use for Gemini grounding.

MR. DAHLQUIST:  And let's put on the screen a demonstrative that I made of --

BY MR. DAHLQUIST:

Q   Did you happen to attend the testimony of Ms. Elizabeth Reid or did you read the testimony?

A   No, I didn't have an opportunity to either attend or read.

Q   Okay.  Great.

Well, then let me show you what Ms. Reid said in court this week.

When she was asked -- she was asked if the Gemini app incorporates elements of the Google Search web index, and -- through Fast Search, and her answer was "yes."

Also asked her if the Gemini app relies on a subset of Google Search ranking through Fast Search.

You weren't aware of this testimony prior to now; is that right?

A   I didn't hear this testimony.

Q   Okay.

A   But --

Q   So would you agree that other competitors do not have access to both the web index and Google Search ranking that the Gemini app does?

4157

A    I think that's correct.

I think as I discussed in my direct, that, for instance, I've been able to ground on other things, including their own index or license indices or so forth, but they don't have access to the Google index.

Q    Okay.

A    Or at least not the Fast Search API that is referenced here in the slide.

Q    But your testimony was --

MR. DAHLQUIST:  I have copies of the demonstrative here.  Apologies.  I will hand them up now.

May I approach, Your Honor?

And just for the record, Your Honor, this demonstrative is marked PXR26.

THE COURT:  Professor, I'll just remind you:  Try and slow your cadence down for the benefit of our court reporter.

THE WITNESS:  Yes.

THE COURT:  Thank you.

MR. DAHLQUIST:  We'll both do our best.

THE WITNESS:  We'll try.

BY MR. DAHLQUIST:

Q    Okay.

So on your direct examination, you talked about many of the other GenAI companies and how they can access

the same amount of information that Google does, correct?

A    That was largely in the context of pre-training, but there was a separate discussion on grounding that focused mostly on the marketplace outcomes related to grounding.

Q    But that's -- and that's what I want to focus on.

Your opinion is that Google does not have a competitive advantage based on the information that Google Search has.

That's your opinion, right?

A    Yes, that's consistent with market outcomes.

You have to be very careful about what "competitive advantage" means.

Competitive advantage means a sustainable difference in performance of you relative to your competitors in the actual marketplace.

So you can have -- many things in the world can be valuable, but whether or not it translate into a sustainable difference in performance in outcomes is very important, and that's what my opinion focuses on.

Q    And your opinion is based on market outcomes as you've observed them based on your reading of analyst reports and analysis of available market data, correct?

A    Yes.

It's largely public data, as well as the internal

4159

data in this case --

Q    Okay.

A    -- regarding benchmarks and user acceptance of these technologies.

Q    But do you consider what the actual competitors have said in this trial?

And let's go to the next slide, which is testimony from OpenAI.

Do you see that in front of you from Mr. Nick Turley?

Did you review the testimony of Mr. Nick Turley in preparing your testimony today?

A    So the answer to that question is "yes."

I was going to quickly read this quote.

Q    Oh, sure.  Please.

A    Okay.

Q    And are you familiar with this quote?

A    Yes, I've seen this quote.

Q    Okay.

So then you're aware that ChatGPT, OpenAI, today, they cannot serve this final 20 percent, which represents the long-tail queries, correct?

A    That's what he's discussing in here.

He believes that being able to have access -- have information about the long tail could be potentially

valuable.

Q    But Google, through the Gemini app, doesn't have the 20 percent problem that ChatGPT has, correct?

A    I think Google Search is a -- has more data in it, I will agree with that.

Again, to the extent to which this relies on things that, for example, a Perplexity or an OpenAI in this case couldn't otherwise get access to, I think that's a separate issue.

But certainly you can say that the Google Search Index is better.

Whether OpenAI could also build the capabilities to do the extended search using public domain data, that seems plausible, at least in many cases.

Q    But that's not what he said.

He said he cannot get that 20 percent, and it will take him years to get there; isn't that right?

A    I don't think he specifically says a time frame for it, but certainly I think it's reasonable to interpret his quote as saying that this is -- you know, there's some engineering to be done in order to get there.  So that's one point, which is that a lot of the data that would be there is publicly available; it's a matter of doing the engineering to do so.

And then second, you can -- again, I don't think

4161

there's good benchmarks that I think are in the public domain that I can use here for Chat -- for SearchGPT, but SearchGPT appears to be doing pretty well and that others have been able to perform on grounded models on par with Gemini.

Q    Today, the Google Gemini app benefits from Google's data advantage, correct?

A    Yes.

Like OpenAI benefits from the OpenAI engineering and efforts that they've put forward and their ability to have an effective user presence, like Perplexity has benefited from their technology that they started from a grounded perspective in the first place.

So, yes, there's many different ways you can benefit from technologies that you have, and Google does benefit from their index.

Q    Let's look at the next slide, which is the testimony from Mr. Michael Schechter who is the VP of growth at Bing.

Are you familiar with his testimony?

A    Yes, I believe I've seen this.

Q    Okay.

And would you agree that today, Bing's GenAI app, called CoPilot, has trouble serving local queries, correct?

4162

A     That's not something I specifically investigated, but that seems to be consistent with what he's describing here.

Q     And this, similar to the ChatGPT, is -- some of that could be in the long tail, correct?

A     I don't know if I have an opinion on that.

It could be, but, again, you know, it depends on -- yeah, you know, so what he's describing are local queries.  I don't know to the extent to which that's long tail or not.

Q     Today, Google does not have an issue with serving local queries, correct?

A     I don't know one way or another where they rank relative to, for example, the vertical search engines that also focus on that kind of technology.  That's -- I think that's just something I don't know.

Q     Let's talk about -- so we just talked about how Google grounds itself through the Gemini app with some Search components.

I'd like to talk about -- and we can take that slide down.  Thank you.

BY MR. DAHLQUIST:

Q     I'd like to talk about how Google also grounds to third parties, non-Google entities.

Are you aware that Google contracts with third

parties for grounding services?

A    Yes.

I understand that's a normal business practice for grounding, that some data has to come from something other than the Internet in some cases, weather, for instance.

Q    And your opinion with regard to this third-party access is that Google cannot restrict the ability of competitors to access data that's necessary for grounding, correct, that's your opinion?

A    Yes.

It's my understanding, at least from the agreements I was able to see, that these agreements are available to other firms and they tend to be nonexclusive, and that would lead to the conclusion that I made.

BY MR. DAHLQUIST:

Q    Okay.

So let's look at a document, and I'm going to ask if you've seen it before and it was with Ms. Reid.

Ms. Cassidy, if you could put up PXR153.

And the document, this document is titled "Anthropic Grounding Proposal."

And let's turn to page 6.  It's 481.  It's on your screen in front of you.

MR. SMURZYNSKI:  Your Honor, could I ask that we be provided with exhibits contemporaneously with the

4164

witness.

MR. DAHLQUIST:  Yes.

THE COURT:  Yes, you may.  Fair request.

MR. SMURZYNSKI:  Thank you, Your Honor.

MR. DAHLQUIST:  May I approach?

THE COURT:  Yes, you may.

BY MR. DAHLQUIST:

Q    And, Professor Hitt, I've handed you a document that's Bates stamped PXR153.  And if you turn to page 6, it's on the screen.  It's also on the paper in front of you, whichever is easier.

If we can look at the heading, the heading says, Gemini App Mitigations In Place.

The web results quality offered to Vertex, that's the third-party grounding service.

You're aware of that, correct?

A    I believe that's included in the capabilities Vertex is grounding.  I think there's other things other than grounding.

Q    Fair.

And it says, the web results quality offered to Vertex is lower than what's offered to the Gemini app.

You see that statement, correct?

A    Yes.

4165

Q    Do you have any reason to think that that statement is not true?

A    No.

Q    And this is a Google document.

Had you reviewed this Google document prior to your testimony today?

A    I may have seen this, but I don't specifically recall it.

Q    But this document shows that Google restricts the quality of the results that are offered to third parties as compared to the results that it provides to Google's own Gemini app, correct?

A    So I don't know if I -- I don't know one way or the other whether they're restricted or that this is due to some other constraint that they're operating under.  So I can't speak to that.

But the plain language says that, at least in this presentation, that the -- what is available to Gemini may be less than what is available through Vertex through third-party applications.

Q    Let's just look at one other line.

Under mitigations, under 1, the Gemini app will continue to get much richer search results with Knowledge boxes -- with Knowledge Graph oneboxes and related questions than what's offered to Vertex, web results only.

4166

Do you see that?

A    Yes, that's what it says in this document.

Q    Okay.

And despite seeing this, it's still your opinion that Google does not have a competitive advantage in grounding, correct?

A    Right.  It's in terms of providing grounded models, yes.

So as I've said, Google might have many advantages in Search because they have a high-quality search product.

But then you can look to see whether or not other firms have been able to build successful grounded models. And at least at the current state of play, that has been the case.

So when we're talking about competitive advantage in the marketplace, absolutely; but certainly it's undeniable that Google has a very capable Search product.

Q    I asked you a little bit yesterday about how you reconcile your opinions with some of the Court's findings.

Do you remember some of that discussion?

A    Yes.

Q    So are you aware that the Court found, and this is at page 226 of the opinion, that Google has, "access to scale that its rivals cannot match."

Do you recall that statement?

4167

A     I don't believe I recall it verbatim, but yes, I understand that is part of the argument that was made.

Q     And the Court's opinion also says, Google has used that scale to improve its search product.

Do you recall that piece of the opinion?

A     Yes.

I mean, again, not verbatim, but yes, I understand that that is part of the reasoning.

Q     But despite those holdings, you still believe that Google has no competitive advantage with respect to grounding, correct?

A     Right.

In the sense that, if you look at marketplace outcomes, what you see is that other firms have been able to build successful grounded products using the resources that they have available.

And I don't deny that Google has a high-quality search product that has certain advantages for that, but the interesting thing, as we were discussing in my direct, is that there's many different ways to build a successful product, including a successful grounded product, and other people have been able to do so.

Q     Okay.

Next topic.  We can take down that.

Next topic, still sort of on the idea of data,

because that's surrounding us all.

But I'd like to talk about the idea of input foreclosure, which is one of the economic theories you have in your testimony and that's underlying your expert report here, correct?

A    Yes, that's one thing we mentioned along the way.

Q    Okay.

I'm not an economist, so let's set a very basic level.

At a basic level, the concept of input foreclosure is that if a single firm controls the inputs, that they can raise the costs for rivals to compete, correct?

A    That's one conceptualization.

Yes, that's the raising rivals' costs framework.

But generally, the idea is that's broadly correct, which is, if a firm that uses an input also controls or owns an input, that gives them additional, you know, competitive leverage over others who might want to use the same input.

Q    And that's the framework you used here. You looked at three inputs into foundational models to see if Google had the ability to foreclose rivals' access to it, correct?

A    I would say what I did is -- you know, is consistent with the spirit of that framework.

I was thinking of it in the value chain framework

because I think that's easier to understand and more akin to industry analysis.

But the import foreclosure framework also is of the same spirit.

Q    Just to remind us all, you looked at three potential input foreclosure elements, computational resources data, and talent, correct?  Those are the three you looked at?

A    Yeah.

I don't think I framed it specifically as input foreclosure of those.

Again, it's this theory that is the same, you know, type of prediction that comes out of it.

But, yes, those are the three inputs that I considered.

Q    And you would agree that for input foreclosure, there's two elements.  There's one, the ability to actually foreclose an input, and two, the incentive to foreclose that input, correct?

A    Yes, some of the literature has framed it exactly that way.

Q    And your opinion is that Google does not have the ability to foreclose any of those foreclosure elements that you analyzed in this case, correct?

4170

A    I think that would be very consistent with my opinion.

Q    But in this case and in your work in this case, you did not analyze the incentive prong of the foreclosure analysis. You did not look at if Google has the incentive to foreclose rivals from the input components, correct?

A    I don't think I -- so I may have considered in passing, but I did not have a specific section in my report devoted to the incentives to foreclose.

I did focus on the -- focus principally on the availability, because, again, I consider that theory sort of another way of thinking about the same problem, but it wasn't a theory that says, you know, this is the fundamental theory I'm relying on, it's one of many that I'm using.

But, yes, that's right, I did not do anything on the incentive to foreclose.

Q    Because once you found that Google lacked the ability to foreclose either data, computational resources, or talent, you stopped. You felt there was no need to look at incentives, correct?

A    I think that -- well, I don't know if I used that reasoning process, but my focus was on the ability principally because I thought that was the most important thing to consider.

Q    Okay.

But I think we're agreed, you did not perform an incentive analysis on any of your inputs, correct?

A    I think that's reasonable.

Certainly something I would be aware of, but it's not something I deliberately set out to do.

Q    Okay.

I'd like to ask you about the idea of distribution.  You talked about distribution a fair amount on direct.

Would you agree that in addition to the three inputs you identified, distribution can be an input into a foreclosure analysis?

A    So from the perspective -- so you could consider that -- well, you could consider that, especially when you're talking about not so much the foundation models which is where the three inputs were focused, but on the downstream, you know, when you go further and you start talking about applications, especially consumer applications, the ability to get that into consumers' hands is an important part.

Q    And, in fact, in an antitrust analysis, distribution is an important input into foreclosure analysis, correct?

4172

A       When you -- it can be, yes, depending on the context you're in when you're thinking about especially, you know, consumer applications, the ability -- again, the easy way to think of that is, do firms have the ability to get these products into the hands of potential buyers.

Q       But you did not --

A       And that is something I did consider.

Q       I'm sorry, I didn't mean to cut you off.

A       I'm sorry.

Q       I want to make sure you finish you answer.

A       That is something I did consider, because there's a portion of my report that specifically focuses on access to distribution.

Q       And I agree you considered it.

And we'll talk about one of your slides that talks about it.

But I think we talked at your deposition.  You did not focus on distribution as part of your foreclosure analysis; are we agreed on that?

A       So what I would say is, is that I examined the ability of firms to achieve distribution.

I didn't frame it in a foreclosure framework, but I did look and certainly consider the idea that, you know, whether or not, for example, a firm that was able to produce a successful foundation model would be able to then produce

4173

a successful product.

We see that to be the case from the market, so I did consider that, but I didn't attempt to frame that in an input foreclosure framework.

Q    But with respect to distribution, you did not analyze the -- either the ability or the incentive of Google to foreclose distribution in the GenAI industry, correct?

A    So I think that's right on incentive.

I think the ability would be wrapped up in some of the other analysis that I did regarding the fact that if you -- what you observe, I think there's a -- there was a slide in my direct that shows the different ways in which firms can actually get distribution --

Q    Yeah.

A    -- either through their own products or through simply showing up on The App Store or for being on the web.

So there's a whole section of my report devoted to that that would relate to ability, but, again, I didn't frame it as an input foreclosure framework.

Q    Let's look at that slide.  I'm glad you brought that up.

Let's go to Slide 34 of your direct demonstrative.

Ms. Cassidy, if you could put up Slide 34 from RDXD32.034.

And it should be -- do you still have a copy of

4174

your demonstratives in front of you?

A    No.

MR. DAHLQUIST:  May I approach, Your Honor?

BY MR. DAHLQUIST:

Q    Was this the slide you were referencing, Slide 34?

A    That's one of them.

The other one I would also -- let's see, find the other one.

So that's one that was on my mind and --

Q    Well, let's start here.

A    Yeah.

That's one.

And the other one is the listing of all the GenAI products and how they've achieved distribution.

Q    Okay.

So let's start here.

Your opinion that you offered yesterday is that -- I'll just focus on the bold in the heading:  "Google does not control distribution in any meaningful way."

That's your opinion, correct?

A    That's correct.

Q    And this is solely focused on the GenAI industry. That's your -- that's the focal point of your opinions here, correct?

A    Yes.

It's focused on the downstream -- this particular section is focused on downstream distribution of either to consumers or embedded in commercial products.

Q    And, sir, you're aware that the Court found that Google used distribution in Search to foreclose competitor access to the marketplace, correct?

A    Yes.

I understand there's issues related to distribution related to Search.

Again, that wasn't the focus of my report, but, yes, I understand that was one of the issues.

Q    And let's look at your elements here.

You have, let's look at Apple.  Just take in the middle.

You said that, "Google does not control distribution through Apple."

You see that prong?

A    Yes.

Q    You're aware that Google paid billions of dollars to Apple to keep Search as an exclusive default on Apple devices, correct?

A    Yes, I'm aware of those agreements.

Q    And do you think Google could do the same thing for the GenAI marketplace?

4176

A     So there's nothing in the way this market is evolving that suggests that is a likely outcome, at least the way things are now.

At least my understanding is, number one, there was a competition for distribution direct through Apple, and Google wasn't the winner this time around.

And then, second, the general idea that it does not appear that any of the folks who, you know, control these access points like the OEMs -- Apple, Samsung, Motorola -- are really contemplating exclusive agreements at this stage because of the pace at which this technology changes, and that seems consistent with their behavior and rationale in that sense.

Q     Let's look at Android.

You're aware that Google paid billions of dollars to Android distributors to gain Search as a default on Android devices, correct?

A     Yes.

Q     Okay.

And you're also aware that Google paid billions of dollars to be an exclusive default on web browsers, correct?

A     Yes.

Q     Okay.

So let's take a hypothetical.

Let's assume for a moment -- I know your opinion

4177

is that Google does not have the ability to foreclose distribution.  Assume with me for minute they do, okay?

If Google does have the ability to foreclose distribution in the GenAI industry, would you agree they also have the incentive to do so?

A    I'd have to think really carefully the extent to which they would have the incentive to do so.

You can envision a world where there are incentives to do so, and you can also envision reasons why they might not.

So it's not an analysis I've done, and so I'm reluctant to offer real-time economic conclusions on something of that import.

Q    Okay. Next topic.  Let's talk about investments.

One of the topics you talked about on direct was that the plaintiffs' proposal to require Google -- well, let me start at a higher level.

You're aware that the proposed final judgment by plaintiffs has a restriction on future investments, correct?

A    Yes, in the sense of a waiting period, evaluation period, yes.

Q    Correct, correct.

There's -- the way the PFJ is written -- and, actually, I should have asked this question -- I'm not sure.

Are you aware that there was an initial proposed

4178

final judgment that was revised into a revised final --
proposed final judgment?

You're aware of that, right?

A    Yes.

I reviewed both because my report was largely prepared with the other one in place, and then the additional one arrived a couple weeks before.

Q    Okay.

And so you're aware that these investment provisions changed from, perhaps, a more restrictive investment proposal to, in the revised one, a waiting period, correct, a notification and waiting period, correct?

A    Yes.

I believe the previous version was much more restrictive.

Q    Okay.

And are you familiar with the Hart-Scott-Rodino Act, HSR Act?

A    Vaguely.

Yeah, vaguely.

I understand the general principle of it.  I don't know the details.

Q    HSR Act has a similar 30-day waiting period and a notice period for all companies that meet a threshold?

4179

A       Yeah.

Yeah, there's a threshold in which certain types of activities, once you exceed a threshold, are subject to additional scrutiny.  That's my understanding.

Q       And so you're aware that under the revised PFJ, Google can still make investments in the GenAI industry, correct?

A       Yes, they can.

Whether they are -- whether Google as an investor continues to be attractive under those constraints that's -- attractive under those constraints, that's something that I explicitly consider, and there's suggestions that that certainly might make it less so.

Q       And that's what I want to talk about.

So it's your opinion that the restrictions that are in the revised PFJ still limit -- limit investments in the GenAI industry, correct?

A       So I think they limit the attractiveness of those kinds of investments.

And I think we were talking about, for example, small firm, you know, who does not have the ability to participate in that kind of process, and also the time delay would be two reasons why that you may expect Google to be a less-attractive investor to the folks on the other side than, say, some of the other participants.

4180

Q   But is it your opinion that the mere requirement to notify the Department of Justice of a proposed acquisition or investment is itself going to dampen investments in the GenAI industry?

A   Yes, because it introduces uncertainty.

Under that notification provision, you know, you notify, and then something can happen 30 days on.

And to the extent that that would -- that firms would pause their activities or believe they may be acting under constraints over that period in an industry that has a very, very fast cycle time, that might make Google somewhat less attractive as a potential investor and limit the number of deals that can -- that would occur.

Q   You're aware that the HSR Act has been in place since 1976, correct?

A   It's been in place a long time.  I do not know the details.

Q   A long time.

And is it your opinion that since 1976, investment in the U.S. economy has been dampened by the Hart-Scott-Rodino Act?

A   I don't think that's an analysis I've done.

But certainly we're talking about deals that are often vastly larger than some of the ones that I've been talking about here.

And that actually the same deal -- if the deals exceeded the HSR threshold, they would be evaluated anyway and subject to those rules.

Q    And are you presuming that any of the notifications that Google might give will be either challenged by the Department of Justice as presumptively illegal or anticompetitive?

A    So I'm not a lawyer, I don't know what they actually might do.

But if you were talking about an early-stage firm, say, a small company or even a medium-sized company, you know, I can contemplate the people who would give me investments; one, I have this large notification requirement with an uncertain outcome, I don't know what's going to happen; another I can go do the deal today.  You know, I think that sort of takes Google out, which makes the market for that type of investment a little less competitive, and that's the kind of thinking that's in my mind.

I don't know how it's going to be implemented, but to the extent it has additional effort and introduces additional uncertainty, I think the issues I raise are relevant.

Q    Well, let's go to the slide you talked about, Slide 41 of your demonstrative.

4182

This is just one of the slides where you identified lots of other competitors, lots of other participants in the GenAI space, right?

A    Yes.

Q    So you would agree that just plaintiffs' provision on investment alone does not eliminate all competition for investments, right?

A    I don't think it would limit it.

It does put a potential constraint.  I mean, constraints generally make -- you know, don't make you better off.

But it wouldn't eliminate it, but it certainly would put a constraint on Google that would not be present, for example, for these other firms.

Q    Let's take a hypothetical.

Let's assume I have a GenAI firm that's out on the market for investment.  You have 100 bidders, okay?

A    Okay.

Q    Google's one of them.

Does the elimination of one bidder really restrain investment in that marketplace?

You're left with 99 bidders after that.

Does that constrain investment?

A    So it depends on who it is that you're constraining.

4183

So, you know, staying within the world of your hypothetical, if it's the second highest, it's either the first or second highest bidder that's going to infect the transaction price that actually occurs; if they're not, that won't.

But we're not necessarily in a world where that's actually the case where you have 100 bidders.  You have a limited number of bidders here, and I think that changes the dynamic a little bit.

Q    But, Professor, isn't that the point?

If removing Google actually changes the competitive current constraint to such a dynamic, isn't it possible that Google, therefore, has had some market power that's impacting that competitive element?

A    I would say that, that in these differentiated product worlds, every firm who's in here has some degree of market power.  We're not in a world where price is marginal cost in any of this, yeah, so we're not in that world.

So what we're in a world is of differentiated product competition.  And when you're in that world, taking out competitors who might be, for example, the attractive partner, decreases value.  They may very well be for some set of these deals where people are approaching Google, they may be the first or second choice, and that would have an influence.

4184

Q   You would agree that putting investments in others aside, the proposed remedy by the plaintiffs still allows Google to invest in its own product and its own services in the GenAI industry, correct?

A   I think on the investment side, yes, the constraints -- there's some lack of clarity on what constraints it might impose and their ability to integrate GenAI products into other products.

So that would be a different aspect of the remedy, but they can continue to invest in their products, their own products, subject to not tripping over the -- some of those constraints, to the extent they apply.

Q   Okay.

Last topic.

And we can take that slide down.

Actually, let's turn to another one of your slides before we do that.

BY MR. DAHLQUIST:

Q   Search access points, you talked a little bit about that on direct examination with your counsel.

It's your opinion that today, the Gemini app does not qualify as a search access point.

That's your opinion, right?

A   Yes.

As a practical matter, the Gemini app is not a way

4185

in which people get to Google Search.  That's a casual way of saying it but, yes.

Q    Let's go to slide 32 of your deck that you walked through with your counsel.

I might have the wrong number.  Apologies.

A    You're likely to be right.

And I've shuffled the pages.  It's makes it more difficult than it should be.

Q    This is what happens when you do things late at night.

THE COURT:  It's 30.

MR. DAHLQUIST:  30.

Thank you very much, Your Honor.

30.

BY MR. DAHLQUIST:

Q    Slide 30 was the slide you talked about with your counsel related to search access points, correct?

A    That's one of them, yes.

Q    And I think your -- here it says your view is it's not a search access point because a tiny fraction of users engage with it, engage with Search through the GenAI app, correct?

A    Right.

The number of people who wind up -- who are on Gemini who wind up in Google Search in this, at least in

4186

this analysis, is very, very small.

Q   And this is the first time you've ever been asked to opine on what a search access point is, correct?

A   I think that's fair.

I think it's a term that seems to be a part of this particular litigation.

Q   And I think when we talked about this at your deposition, you defined a search access point as, does it move a material number of people into another product, I think was the definition you used, correct?

A   Yeah.

Was it intended to and does it succeed in doing so, I think is closer to the way I articulated it there.

But the way you said it is consistent, yes.

Q   Do you know, does Google agree with your definition?

You never asked them if they agreed with your definition, correct?

A   So I reviewed testimony or I think that Google personnel were asked about this.

I actually in my interviews, I think I also asked that at least of Ms. Robeson.

I may have asked it of some of the other interviewees, too.  I think maybe others as well.

MR. DAHLQUIST:  Your Honor, may I approach?

4187

BY MR. DAHLQUIST:

    Q    Professor, if you could turn to your deposition, page 399, line 11.

          Just if you could just review that for a minute and I'll ask you.

    A    399, 11?

    Q    399, 11.

    A    Okay.

    Q    I'm sorry, I have the wrong page.

          Can we look at page 401.

          My apologies, sir.

          401, line 10.

          And can you just review from line 10 to line 22 and then I'll ask you the same question again.

    A    Okay.

          Yeah.

    Q    Okay.

          So now after reviewing your deposition -- you can close that now.

    A    Oh, is there a question?

    Q    Yes.

          My question is going to be:  Do you recall now after reviewing that, that you did not specifically ask anyone at Google if they agreed with your definition?

4188

A    So I think that's right.

I did ask them, do you consider -- I did ask -- and certainly Ms. Robeson, maybe Mr. Kapur, do you consider this to be a search access point.

And I believe those questions were put to others, but I don't think I ran my definition by them.  I think that's right, as it says here.

Q    Just for clarity's sake, let's look at the -- I'll read this in and just make sure you agree with it.

Looking at your deposition, page 401, line 10.

Question:  Does Google agree with your definition of search access point?

Answer begins at line 14:  So I think it would be consistent with my conversations with other Google people, in the sense that I think, under this definition, for example, a Search box would be and the Gemini app would not be, but I didn't put that question to Google specifically.

Were you asked that question, did you give that answer.

A    Yes, that's exactly right, consistent with what I just indicated.

I don't think I asked that question, but I did ask about search access points.

And I've reviewed testimony on that same point.

4189

But I didn't ask them to check my definition.

Q    Okay.  You can close the deposition now.

Are you aware that today, Google is working to identify new GenAI access points?

A    I don't think I have firsthand knowledge of that, but I can believe that anybody making a GenAI app is looking for ways to get it into the hands of users.

MR. DAHLQUIST:  Let's -- if we can put up a document, PXR113.

And, again, this was in the testimony of Ms. Reid. I don't know if you saw it in reviewing that.

PXR113 at page 3, 846.

And I'll put it up on the screen here.

I have a copy as well.

May I approach, Your Honor?

THE COURT:  You may.

BY MR. DAHLQUIST:

Q    So it's just page 3 of the document.  It's in front of you.  I just want to ask you real quick about the heading.

At the very top of page 3, Bates stamp 846, it says the introduction of AI is creating new access points, allowing other providers to reach users rapidly; Google should meet users where they are or risk ceding the new ecosystem.

4190

Do you see that heading?

A    Yes.

Q    Okay.

And so today, you report that only a small percentage of Gemini app users are making that link from the GenAI -- from the Gemini app over to Search, correct?

A    Yes.

In the data that I had available, the number of people who go from Gemini into actual Google Search is very limited.

Q    Okay.

But here you see that Google is working on creating new access points for GenAI users, correct?

A    That's what it says on the slide.

I'd have to review as to exactly what they were talking about, but that's what it says, is that they're considering finding new ways to get users to use Gemini.

Q    Well, let's go back to your demonstrative, page 30 of your demonstrative which has your analysis.

You would agree that if the number of users increases that make the connection from Gemini to Search, that you might have to reconsider your definition of a search access point, correct?

A    Well, certainly to the -- if the numbers were different on this slide, I would have to reconsider it,

because of -- my opinion is based on what I know now.

Q    And I think we talked, that if this number got to around 25 percent, that that might change your opinion, correct?

A    Yeah.

I'd have to think about what the context was that was driving the change, but certainly if the data changed, you'd have to reconsider what the conclusion is.

MR. DAHLQUIST:  No further questions, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Smurzynski, any redirect?

MR. SMURZYNSKI:  Very briefly, Your Honor.

- - -

REDIRECT EXAMINATION

BY MR. SMURZYNSKI:

Q    Professor Hitt, you were asked some questions today about distribution of Google's Gemini assistant app.

Does Google's proposed remedy put any limitations on Google's ability to exclusively enter into a deal that's exclusive with respect to that app?

A    Yeah, my understanding is that Google has explicitly suggested that in their proposed remedy, that those arrangements would not be exclusive.

And that's consistent with the way the industry seems to be moving is, I think the OEMs and other folks who

4192

control consumer access are also not contemplating exclusivity, but Google has explicitly said they won't be exclusive.

Q    You were also shown a document, PXR0153, that refers to grounding via the Vertex AI or the Vertex -- the Vertex AI.  Is your opinion -- strike that.

Is that the only way in which a competitor of Google can ground their own product?

A    No.

Vertex AI is a tool that could be used to build a product, but competitors can indicate this -- there's a slide that indicates this -- they can build their own grounding capability, including Search or other data feeds, they can license data feeds through APIs and have that incorporated into grounded responses.

They can license Search capabilities from others as well, and we've seen all of those things happening.

Q    Last question or questions.

Yesterday, late in the day, you were asked some questions about Search data.

When you use that term, what do you mean?

A    So Search data is somewhat vague.

And so I think in my answers yesterday, I partitioned it into when we were talking about Search data.

Search data used for Search, I don't have to make any distinctions between what that data is.  If it's a search, if it's related to Search, it's going to go into the Search product.

When you move over to the world of these GenAI apps, then it starts mattering what the boundaries of that are.  And so I would consider certainly worldwide web data that is openly available worldwide data that would be available in that realm.  There could be other things that relate to it that are used to train these models.

The one thing I'm explicitly -- since I don't know the precise boundaries of the definition, there are certain things that I know have been identified that are important that I've explicitly excluded, things like click and query data where I've had explicit conversations to exclude that from the realm.

So it's unclear what the boundaries of that are, but I would certainly consider open web search data the relevant search data for the trainings of those things.

I would say click and query data is on the other side of that.  There may be other things that are used that could go in that could be viewed as Search data.  Whether those are specifically available to Google, that's not clear.

Q    So you made reference to open web data and including that within Search data.  Is that open web data that you've included there something that's exclusively available to Google or available to others?

A    In principle, that should be available to anyone willing to invest in engineering resources to collect and to compute resources to go out and get it.  But to build the collection capability and then to go out and get it.

In fact, I understand that Google might actually be under some additional constraints that others might not either be under or operate under that might actually give them some slight incremental amount of data that Google doesn't use for their AI.

MR. SMURZYNSKI:  Thank you, Professor Hitt.

I have no further questions.

THE COURT:  Okay, Professor Hitt, thank you very much for your time and testimony.

THE WITNESS:  Thank you.  Nice meeting you, Your Honor.

THE COURT:  Nice meeting you as well.  Safe travels home.

MR. POPOFSKY:  May it please the Court.  Mark Popofsky, Ropes & Gray, Your Honor, on behalf of Google.

Google calls Kevin Murphy from the University of

Chicago.

THE COURT:  Mr. Popofsky, it's nice to see you.

MR. POPOFSKY:  Good to see you, Your Honor.

COURTROOM DEPUTY:  Please remain standing and raise your right hand.

(Witness is placed under oath.)

COURTROOM DEPUTY:  Thank you, sir.  Please be seated.

THE COURT:  All right.  Dr. Murphy, welcome back.

THE WITNESS:  Thank you.  Good to see you again.

THE COURT:  Good to see you as well.

MR. POPOFSKY:  May I proceed, Your Honor?

THE COURT:  You may.

- - -

KEVIN MURPHY, WITNESS FOR THE DEFENDANT, SWORN

DIRECT EXAMINATION

BY MR. POPOFSKY:

    Q    Good morning, Professor Murphy.

    A    Good morning.

    Q    Can you please state and spell your name for the record.

    A    Yes.

         My name is Kevin M. Murphy.

         That's K-e-v-i-n, the initial M, and then M-u-r-p-h-y.

4196

Q    And can you please remind the Court of your current position.

A    Yes.

I'm the George J. Stigler distinguished service professor of economics in the department of economics, in the Booth School of Business, Emeritus.

MR. POPOFSKY:  Your Honor, at the liability stage, Professor Murphy was qualified as an expert in economics and industrial organization.  We understand that plaintiffs have no objection to his recognition as an expert in those same fields, economics and industrial organization, in this proceeding as well.

THE COURT:  Mr. Severt?

MR. SEVERT:  No objection.

THE COURT:  So we'll once more recognize Dr. Murphy as an expert in economics and industrial organization.

BY MR. POPOFSKY:

Q    Now, Professor Murphy, did you prepare a slide presentation to assist the Court with your testimony here today?

A    I did.

MR. POPOFSKY:  Your Honor, may I approach?

THE COURT:  You may.

MR. POPOFSKY:  For the record, Your Honor, the slide presentation is RDXD33.

May I have permission to publish?

BY MR. POPOFSKY:

Q    Now, as with prior presentations, Professor Murphy, there's a red box or two in this presentation.  Please remember not to say what's in the red boxes.

A    I will do my best.

Q    Let's go to Slide 2, Professor Murphy.

Can you please tell the Court what your assignment was for this phase in the matter.

A    Yeah, there's really three main components.

I was asked to describe the economic principles of sound antitrust remedies.  I was then asked to apply those same principles to plaintiffs' proposed remedies.

The six areas I was specifically asked to address but I also addressed some other things, was the payment ban for preinstallation, the prohibition against self-preferencing, the divestiture of Chrome, conditional divestiture of Android, mandating of choice screens, and the public education fund.

After going through plaintiffs' remedies, I was asked to go through Google's remedies and apply those same economic principles to evaluate those using the same tools.

And along the way, I'll have some -- respond to some of the opinions put forward by Dr. Chipty, Dr. Luca, and Dr. Rangel.

Q    And have you formed any opinions in connection with your assignment?

A    Yes.

Not surprisingly, corresponding to those same three areas, I found opinions about the sound economic remedies, that is, the principles of remedies in this case.

I've applied those principles to plaintiffs' remedies, and I also applied them to Google's remedies. I'm not going to talk more here about that since we're going to cover it in a minute.

Q    And can you describe the methodology you employed as you approached your assignment.

A    Yes.

Well, I'm an economist, so I started thinking about the underlying economics of remedies, and, you know, that helped me devise the principles.

I also looked at and studied the findings of the Court, because if we're going to construct remedies, we have to understand the findings as well as the other factual evidence for the case that will help us craft remedies consistent with those principles.

I also looked at plaintiffs' proposals, as well as

the proposed remedies of both sides; put all those pieces together to come to my conclusions.

Q    Now, let's turn to your first opinion, what you describe here as the economic principles of remedies.

Do you have opinions concerning the economic principles applicable to injunctive relief in a monopoly maintenance case, Professor Murphy?

A    I do.

And really the core of the principles is really expressed in that blue text in that top box, and I'll just read it because I think it captures most of the key elements really.

It's, "Protect the competitive process from harm caused by the conduct found anticompetitive to promote consumer welfare."

So the two key things we want to think about is the competitive process, because the competitive processes are the best method we've ever found to promote consumer welfare.  So consumer welfare is always there, but the competitive process is a key part of that.

But also, the remedies should be tethered to the conduct found anticompetitive, because the findings of the Court provide us a guideline as to what we might want to do to eliminate the harm caused by the conduct found anticompetitive; that is, by understanding the conduct,

4200

we can then move in a more competitive direction that allows the competitive process to work to promote consumer welfare.

So those are the three things that I always would try to keep in my mind; competitive process, tethered to the conduct found anticompetitive, because that tells us directionally and in some sense what things could help improve the competitive process and to promote consumer welfare.

Q    Now, are there things that remedy proposals do that do not align with sound economic analysis?

A    Yes.

I really divide them into two groups here.

First one is some cautions, is about ways that, in the process of generating remedies, you might interfere with, and rather than improve the competitive process, actually detract from the competitive process.

First one I talk about here is artificially propping up rivals or hampering Google, and that's, you know, trying to alter the competitive process one way or the other often and typically will get in the way of the competitor process, so you want to try to avoid that if you can.

Secondly, and particularly in a dynamic industry like this, you don't want to diminish the incentives to innovate and to invest in improved products, because

4201

ultimately consumer welfare, and really the economy as a whole, benefits from that kind of improvement in technology and, really, improvement in how we do things.

So the second one is the things that remedies should not do.  This is more along the lines of staying tethered to the conduct found anticompetitive.

Remember I talked about competitive process.  What I just talked about first had more to do with the competitive process.  This is more closely related to staying tethered.  So we shouldn't try to reshape the market features unrelated to the conduct or harm.

The idea here is, we no longer have that guidepost as to how we would intervene in a way that would improve outcomes.  We're now really in some sense in a regulatory rather than remedial mode.

Finally, we should be careful to focus on consumer welfare.  And when we're talking about remedies that affect how people compete, we should not be trying to achieve other policy goals that in turn distort the competitive process and thereby harm consumers.

Q    And can you give the Court an example of a market feature unrelated to the conduct or harm that applies in this case.

A    Yes.

So, for example, let's say something like an entry

barrier that would be there anyway.  So that's an entry barrier that's not -- not created by the conduct, would have been there anyway, intervening to overcome that is, therefore, something that's really not related to the conduct found anticompetitive, it's a feature of the market that would be there anyway, and now such an intervention would be more akin to regulation than it would be a remedy per se.

Q    You mentioned regulation.

As you think, Professor Murphy, about the principles you just described for crafting antitrust remedies in a monopoly maintenance case, are there particular ways you categorize potential remedies?

A    You know, I think it's helpful to think of remedies into three groups.  And with any group, you know, there's never a super bright line, but I think it's useful to think in three modes.  What I call corrective remedies. Those are things that work to stop harm from the conduct found anticompetitive.

So we found -- for example, you know, the Court found that the exclusive nature of Google's conduct contracting was anticompetitive.  That was the finding of the Court.  A logical corrective remedy to that would be to take away the ability to have that exclusive contracting going forward.

4203

And why is that good from an economics point of view is, the Court's findings tell us that moving in that direction and getting rid of that conduct should make things more competitive.  That's why it was found to be anticompetitive in the first place.  It's sort of like, if this was something you shouldn't have done, you shouldn't do it going forward, and that's the nature of a corrective remedy.

Importantly to me, that's improving, according to -- you know, under the Court's findings, that's improving the competitive process, which will restore competition using the competitive process.  That is, we don't have to direct how that new opportunity for people to compete shows up.  The market will decide, is it going to be this way, is it going to be that way.

And like the testimony we heard from Eddy Cue and really heard throughout the trial so far, we're at that point now where lots of opportunities are out there for where this market might go.  And that environment is probably the most difficult environment to direct where things are going to end up; that is, markets -- if markets do anything well, that's what they do the best, which is help figure out which of the many paths that things could go along end up.  And if you unburden the process from the conduct found anticompetitive, it will allow that process to

4204

work.

And what's nice about that is we don't have to have a guide as to, okay, what's going to happen, you know, how -- what's the magnitude of what's going to change?  We just -- we're just guided by the Court to say, this moves us in the right direction, it unburdens the process from where it would have been.

Q   Can you tell the Court what you meant by that final bullet under "Corrective remedies can sufficiently restore competition without measuring harm from conduct"?

A   Yeah, it's basically the idea I just said.

We don't have to say, you know, this is going to have a huge effect or the effect going forward is going to be the same as the effect we see in the past.

It really is, by unburdening the process, by getting rid of what the Court found anticompetitive on a going-forward basis, that will allow competition to overcome whatever that impediment would have been.  That's why I see it's working with rather than in opposition to the competitive process.

Q   And how does that concept you just described, working with rather than in opposition to the competitive process relate, if at all, to your second column?

A   Well, my second point is about restorative remedies.

And so the corrective remedies say, look, let's get rid of the conduct and let the competitive process work to get us where we want to be.

And that's a good place to start and it's very -- to me, it fits very well with the kind of standard the Court found, which is, you know, reasonably capable of having a problem.  Well, just get rid of it if it's reasonably capable of having a problem.  So let's -- let's have corrective remedies to get rid of the conduct.

Restorative remedy says the following.  Look, we have this past conduct, and it's possible that past conduct changed the competitive landscape to such an extent that removing the anticompetitive form of conduct won't restore competition in sufficient -- a timely manner.

But now we recognize that in order to do that, we're going beyond just having the competitive process, we're going to intervene in the competitive process, we're going to override the competitive process in some way.

So we better make sure, first off, we know what kind of change is different and the extent to which it's different so we can calibrate any restorative remedies.

That first question is what I call the causal connection which is, we need to establish a causal connection between past conduct and the prospects for consumer welfare going forward; that is, it changed the

4206

landscape to such an extent that the corrective remedies alone wouldn't do it.

And we're going to go through that causal connection question in a bit.

Q   One of your responses, Professor Murphy, was to the effect that when you have a restorative remedy, it doesn't sufficiently restore competition.

Restore competition relative to what?

A   You always want to think about where you would have been, that is, the but-for world, because once you've targeted -- once we thought about the but-for world, if we go beyond that, we're now into basically regulation, right.

You're saying, this is a world that would have existed anyway; this is back to where it would have been. And once you go beyond that, now we're basically saying, no, we think we can -- we'll do better, we're going to somehow alter the competitive process.

But that's really a regulatory approach, because you're no longer remedying what happened in the past or remedying the conduct, you're actually affirmatively overriding what the marketplace would generate.

Q   And in that connection, why do you underscore the words "only" and "extent" in that restorative remedies column?

A    Well, the "only" is going to get to that causal connection.  I'm going to talk more about that in a minute, so I don't want to do too much more.

But there's an important point here, that when you have a causal connection, it tells you not only that something might need to be restored, but it tells you the extent to which it needs to be restored.  And if you know the extent, you should tailor any restorative remedies to correspond to that extent, because once you've gone beyond that, you're back into the regulatory intervention category.

Q    And can you tell the Court about that regulatory intervention category?

A    Yeah.

The easy way to think about regulatory interventions are things that are not attempting to get rid of the conduct found anticompetitive or trying to get us back to where we would have been, but trying to alter the marketplace in some other way.  That's what I would mean by a regulatory intervention.

And I think that's exactly how you should think about it, because this is not about ongoing conduct of the type found anticompetitive and it's not about correcting for the impact going forward on the prospects for competition of past conduct.  It's kind of -- we're out there in kind of freelancing at that point.

4208

Q    And is that why you put Xs in that column?

A    I did.

I think -- that's a lot of caution.

Maybe -- I don't know what's a caution symbol you have, you know, like on the road?  I would put a caution symbol there.  You know, maybe put the -- I think it looks like that, you know, caution like you have on the highway.

THE COURT:  Professor Murphy -- if I could ask a question of the professor.

So how do you view the fruits of anticompetitive conduct?

This may not be strictly an economic principle, but sort of the case law certainly talks about the fruits and remedying or at least having the fruits being considered -- the remedies addressing the fruits.

And if I could, and I think at least the plaintiffs' position in this case, is that there are -- at least two identifiable; one is data; and the other is capital, revenues that give Google an ongoing advantage that the kind of corrective remedies that you've just described would still ensure -- would still maintain a non-competitive marketplace.

THE WITNESS:  Well, I think there are two separate sides to it.

So I think if you think about that, you know, we

want to deny Google -- I think usually the way the plaintiffs would put it, you want to deny Google the fruits of anti-competitive conduct.

And the first thing I would say, you know, that is -- that, you know, at least certainly legally, but, you know, economics talks also about the deterrence.

But the important thing is, to the extent possible, you'd want that deterrence not to come at the expense of future competition, because if you say, I'm going to deny Google the fruits but by reducing competition in the future, then you're not just harming Google, you're also harming consumers.

So I think we should -- you know, to the extent possible, economics would say, punish Google in some other way.  Fine, whatever else it is.  But don't use rules about how you compete to accomplish that goal of denying them the fruits, because that's not just denying Google the fruits, it's harming consumers and competition in the process, which is counterproductive, that is, that would be the big point I would make as an economist.

And then the literature on crime and punishment, which is very much related to that, tries to make expressly that point.  You want to sort of deter deterrence or disgorgement or whatever it is, but do it in a way that mitigates the overall harm you cause in the process.  Do it

in a way -- and so doing that through rules that reduce competition has the very big downside of harming consumers and competition, and that to me is the big downside of trying to do that through these kinds of remedies, that is, remedies that are related to competition.

THE COURT:  So no one -- the plaintiffs haven't proposed a strict denial.

Let's just talk about data.  I mean, nobody has suggested that Google can't use the data it's accumulated, rather, what the remedy is proposed is access by competitors, and I think maybe you're going to talk about that in a little bit.

But how do you view that kind of remedy within this framework in terms of the ultimate goal.  Everybody agrees it's not about picking winners and losers, it's ensuring the competitive marketplace can flourish.

THE WITNESS:  Yeah, I think there are two things.

One is, and as you point out, you know, harm -- you know, reducing what Google can do for consumers is a very difficult way to make the world better, right, because the whole goal of competition is to improve things for consumers.

So operating on that side, saying I'm going to make it harder for Google to satisfy customers' needs, that's particularly pernicious because it's just digging a

4211

hole that's going to be very difficult to ever get out.

What's harder to see but still problematic is like, take a sharing type remedy like it came up yesterday in Eddy Cue's testimony, talked about what about sharing the index, you know, what's the harm, you give it to them, Google has it, they can have it too.

Now, first off, my reaction as an economist would be, that's interfering in the competitive process. And you say, well, who cares about mere competitive process, I care about the world.

But here's the thing. When it comes to, for example, saying, somebody is going to develop their own index as opposed to use Google's index, what's the benefit? You might think it's just duplication of effort. Why do we want to duplicate effort?

But the answer is, no; that is, progress happens through the competitive process. In the process of developing your own, you're going to do something different than Google. You're going to do something that fits better with what you do. You're going to do something that maybe does it in a more efficient, different way. In the market economy, that kind of, some people call duplication, is, in fact, a very important part of the competitive process.

So if I wanted to get in the car industry, you could say, okay, let me give you Toyota's plans, let me give

you Toyota's factory plans, let me tell you how they do everything.

But consumers are going to be more benefited in the long run if Kevin comes up with his own car, done in his own way, designs his factory maybe a different way than Google designs their factories.  And AI is on that trajectory already.

I'm just saying, that's the -- that kind of differentiated way of doing things is an important part of the competitive process.  And it's tempting to say, well, let's shortcut that, let's speed things up.  But in speeding them up, we're actually leaving out an important part of the competitive process.  So that's what I tell you.

You know, I teach this all the time in class.  And it's really interesting because that kind of disorganized, in some sense, way in which we make progress shows up in industry after industry in terms of how we get from here to there.

And I actually teach my class about progress in milk cows, because it's exactly that kind of every little farmer out there trying to do something different.

And, you know, the amount of milk we get from a cow has gone up fivefold since the '50s, not by some grand plan that some dude had, it was by every little guy doing his little thing, maybe different than the guy down the

street, and that's the kind of thing that's lost when you shortcut the competitive process.

BY MR. POPOFSKY:

Q   One follow-up to Your Honor's question.

As an economist, if you were considering the fruits of the violation concept, would you want to determine the extent to which fruits were obtained through the conduct?

A   Yeah.

I think there's no question, either for crafting remedies of this type or remedy -- or things trying to address the fruits, you need to say what was the impact of the conduct.  You need to measure impact.

And that's an inherent part of any type of remedy, whether it's the competitive-type remedies we're talking here or like you said, denying the monopolist the fruits of his conduct.  Either one would require a measurement.

Q   Let's turn to that question of measurement.

This slide is entitled Restorative Remedies May Be Justified Only When.

Are there circumstances, Professor Murphy, when you would assess the merit of restorative remedies?

A   Well, I think you, in all circumstances, you restore [sic] whether you should think about restorative remedies.  Are they needed.  And the first question you ask

in that inquiry, is there evidence of the strong causal connection.

And what that means is, if we look at the competition and the prospect from consumer welfare going forward and compare that to what it would have been absent the conduct found anticompetitive, inherently that's a but-for world comparison; that is, what is the marketplace structure and prospects for consumer welfare now, what would it have been but for the conduct found anti-competitive. The causal connection looks for that difference, not just the existence of the difference, the nature of the difference and the extent, the magnitude of any difference.

And in cases where that is large enough to say it's worth intervening and interfering in the competitive process or overriding the competitive process, whatever term you want to use so that the benefits of that restoration exceed the costs of that restoration, you might want to have restorative remedies.  But you start with that causal connection question.

THE COURT:  Mr. Murphy, can I ask you -- I'm sorry, Popofsky, I'm sorry for interrupting.

But, you know, we've talked a lot about but-for world during these proceedings, and it hasn't been made clear to me how anybody establishes what that but-for world is.

4215

What data inputs, how can the judge, let alone -- an economist, let alone a judge figure out what the world would have looked like but-for certain competitive conduct or anticompetitive conduct?

THE WITNESS:  Understand exactly where you're coming from.

And fortunately for us, we don't have to construct a fully constructive but-for world.

The idea that I could tell you, and the world will look just like this, nobody is going to do that.  And nobody is going to do that in this case, nobody is going to do it in most cases.

There's a rare case where you could say, you know, a very narrow form of conduct and but-for the merger, these firms would have been separate like they were six months ago, maybe that's an easy but-for world.  But in a case like this, you're not going to be able to precisely specify a but-for world.

Fortunately for us, we don't have to.  What we need to do is assess where that but-for world would have likely been, like, not in all its dimensions but in terms of the dimensions that would affect competition going forward in this industry.

And in terms of the theories laid out in this case, that centers around rivals' scale, because the

theories of why past impacts the present, in this case really are centered on in the but-for world rivals would have had more scale than they do in the actual world, and that would then translate into a different competitive environment going forward.

And remember, in that comparison, our but-for world is not an arbitrary but-for world, it's but-for the conduct found anticompetitive.  So all the other features of the market we can take from the actual world, but what we need is to get rid of the conduct.  In this case, let's get rid of the exclusivity of Google's contract.

So Google can still pay for distribution, they still own Chrome, all those things are still there as far as I can tell.  And you would be more of an expert at that than me, but I think about it as a world in which we get rid of exclusivity and what evidence do we have that will help us understand how that but-for world would deviate from the actual world in terms of the kind of scale that rivals would have achieved.  If we can do that, we can answer the causal connection in my mind.

MR. POPOFSKY:  And, Michelle, if we can go to Slide 11 just for a minute while we're here.

BY MR. POPOFSKY:

Q    I'd like to ask you as a follow-up to the Court's question, Mr. Murphy, what would be Google's conduct in that

4217

but-for world, the world without the exclusive element?

A    Well, I think I just answered that, so I'll go ahead and answer it again.

But it really is, Google would be able to still contract for distribution, they'd still have Chrome and all those things, but we got to get rid of the exclusive aspects because that was what was found anticompetitive and, therefore, wouldn't have been there in a but-for world.

Q    And would Google still likely make large payments to distributors in that but-for world?

A    Oh, yes, sir.

Google would have an incentive to pay and compete for distribution of its products, just like it did in the actual world, but they wouldn't be able to do it on an exclusive basis.  They'd be willing -- they'd be able to, in this but-for world, to contract for distribution but not on an exclusive basis.

Q    And in response to the Court's questions, I believe you testified to the effect that one doesn't have to fully construct the but-for world but you have to assess the nature and extent of the but-for world; is that correct?

A    The nature and extent of the but-for world insofar as it would affect competition going forward, because that's the crux of the causal connection; is there something we need to restore in order to get competition to where it

4218

would have been but for the anticompetitive conduct?

Q    And is it common in antitrust economics to conduct this sort of but-for inquiry?

A    It is.

It sort of underlies most damage analyses and analyzes basically any notion of impact.

And, again, as I teach my students all the time, but-for is the essential idea behind impact generally.  The impact of anything is the difference between what happened when it was present and it wouldn't happen -- that would have happened when it wasn't.

That's sort of a mechanical definition of impact. It's sort of -- it happened, you're here, where we would have been had it not happened that's inherently a but-for world question.

Q    And one final question along these lines.

Dr. Chipty testified when she was here, Professor Murphy, that it is not possible for anyone to predict how the world would have played out with nonexclusive Google distribution.

Do you agree?

A    I would agree to the extent that you can't fully specify what would have happened.

But for purposes of what we need to do for the causal connection and the appropriate scope of remedies,

4219

we don't need to do all of that.  We need to assess in terms of how it would affect the future, in this case, scale, the impact of that conduct on the rest -- on the but -- on the world, and, therefore, that aspect of the but-for difference.

MR. POPOFSKY:  And we'll come back to your analysis of that.

Michelle, if we could return to Slide 7, please, where we are.

BY MR. POPOFSKY:

Q    Now, can you tell the Court why you have this bullet here, "Collective Remedies are Insufficient to Rectify the Harm"?

A    Yes, because -- just because there's some work to be done to get us to where competition would have been, don't think we need to always in that case go beyond the corrective remedies, because corrective remedies in and of themselves will allow the marketplace to overcome where we are, right.

That's the whole idea.  The whole idea of the competitive process is you unburden it from the things that were holding it back, and we should move forward.

And the restorative remedies are only justified when that isn't going to be sufficient to get us back to where we would have been.

And it's important to remember, to get us back to where we would have been, not to get us to where somebody wants us to be or some other world, it's really to get us back to where we would have been.

Q    Well, let's talk about where we've been and where we want to go.

What are you depicting on this slide, Professor Murphy?

A    It's just kind of a simple way to look at the -- as I see what the question is.

MR. POPOFSKY:  Slide 8, Your Honor.

THE WITNESS:  So Slide 8.

So this -- is, we have the actual world here in gray.

We have the but-for world, which is the world that would have existed absent the conduct.  So that we --

And then the idea is, in the future, our desire is to get to where we would have been.

We want to get rid of not just the conduct and what it will do going forward, but any lingering effect of the past conduct.

So the idea of the competitive world is it's more competitive than the actual world.

And corrective remedies, say, okay, by getting rid of the conduct, we will then allow the world to proceed as a

4221

more competitive environment that'll get us back to the competitive world.

The idea, I think, of plaintiffs' remedies, is go the other way, which is, let's actually restrict competition in the short term, and that's why I show this going down.

We're not making the world more competitive, we're actually reducing competition by not allowing Google, for example, to bid, by taking Chrome away, by many of the data-sharing remedies, as I'll point out in a minute, that all those kinds of things are pushing us down in terms of the competition.

And Dr. Chipty admits that in this remedial period, there will be -- we're preventing many aspects of competition, and so the downward slope is intended to affect that many of the plaintiffs' remedies, at least in my mind are pretty extreme in terms of how they interfere in the competitive process.

So that in and of itself is bad, right, because you want to improve competition but you're actually reducing it in the remedial period.

And remember, the remedial period is not just a year or two years.  In their world, it's five years, ten years.  That is less competition overriding the competitive process for a substantial period of time.

And then at the end of that what I still don't

understand completely is how you're supposed to get from there to where you would have been, because you kind of push the world way away from where you would have been and somehow magically you get back to where you would have been, which is why I got the guy with hands on his head.  He's not quite sure how he's supposed to get back up there.  He's flying off the end of the roller coaster but somehow he's supposed to get back up there, and it's not so clear how he gets there.

Maybe it's too cute by half, but I thought it was kind of fun.

You guys need some fun, right.  You can't always be unfun.

THE COURT:  There's always a lot of curves in economics; usually they end somewhere.

BY MR. POPOFSKY:

Q    Well, let's turn to your analysis of that causal connection, Professor Murphy, because we have covered these concepts in the Court's questions.

How did you go about assessing the but-for world and its impact in this case?

A    Yeah.

So the first thing -- and I think we skipped it, you've got to go back a slide -- is that at the bottom there, there's a couple of what we call more -- the first

4223

one is a more qualitative assessment, that is, you know, if you look through what the testimony has been, and I think what the evidence is, there's -- there's really not much evidence that rivals -- I'm sorry, partners would have promoted Google Search rivals more absent these exclusive aspects of Google agreements.

It's a possibility they might have but really not much evidence that they would have done additional promotion of rivals absent the exclusive aspects and/or early evidence of a material impact on market outcomes, and I'm going to address that on the next slide so we can get to the next slide.

Q    Let's turn to Slide 11.

Just orient the Court.

A    Okay.

Q    What are you depicting here?

A    Well, first off, why am I depicting it? That's really the question.

So remember we talked about we don't need to construct a but-for world, we need to assess the but-for world.

And so what I'm going to do, what you always have to do, right, because we never see the but-for world.

That's the complication you were talking about before.  Nobody is going to see the but-for world.  We have

4224

got to construct it or think about it.  We need things from the actual world that are informative about the but-for world, okay.

So I'm going to use the evidence from choice screens, not because choice screens are the but-for world. I'm not at all saying choice scenes are what the world would look like.  In fact, choice screens wouldn't be what the world would look like.  It would be a world in which Google and others compete for nonexclusive distribution.

But choice screens have a virtue in that they eliminate the exclusive nature of distribution, because you've got the other guys right next to Google.

And then in terms of the dimension of exclusivity, in some sense they're farther than probably where you think the but-for world is, because in a but-for world, Google is probably still going to have preferred distribution even if rivals have some distribution.  Choice screens puts them right there next to Google.

The key evidence from the choice screen, and it's true of the European choice screen that I show here, it's true of the DMA choice screens on Mac that showed up later, and it's true in the Allcott, et al., study, which is not really a choice screen but kind of analogous, is that the impact of getting rid of exclusivity by introducing a choice screen is very small, it's on the order of 1 percent, and

that is telling us that exclusivity per se would have had a small effect, quite small effect on rival shares.

Q    And how does that relate to your inquiry into the causal connection?

A    Well, to the extent we think the casual connection -- the impact on future competition comes through rivals' shares, this is telling us that any impact on rivals' shares would be -- would have been quite small of eliminating exclusivity.

So that we're not using choice screens as the but-for world but a proxy for what would happen if you got rid of exclusivity.

Q    And how does the choice screen results relate to His Honor's questions about fruits of the violation?

A    Well, it would apply there, too, that if the major way in which they benefited was keeping rivals from getting scale, then this would address that issue as well.

Q    Do you regard the choice screen proxy, as you put it, as conservative, not conservative, something else?

A    I think in terms of the degree of exclusivity, it would be conservative, because it's not just getting rid of exclusivity, it's actually getting rid of preferential promotion by, really, the neutrality inherent in the choice screen approach.

Now --

Q    Go ahead.

A    And a couple things.

I mean -- and Dr. Rangel talked about a lot of other things that might explain why Google would do well even on a choice screen, like they have better well-known brand.  Google has got a history, and people have a habit of using Google.

The reason why that's actually not a bad thing from the point of view of a but-for world analysis is those same things would have been present in the but-for world; that is, Google, if you go back to 2010 or 2014, already had the highest-quality search engine, it was already widely used in the environment, right.  Those things are part of, and correctly part of, the but-for world.

You wouldn't want to take those out.  Taking those out would be not just eliminating exclusivity, it would be eliminating important aspects of what the but-for world would have been.

Q    Now, did Dr. Chipty in her testimony before the Court undertake the kind of assessment of the but-for world in the relevant dimensions that you have undertaken?

A    Not -- she didn't do any -- she didn't try to infer from the actual world what a but-for world might look like.  She actually relied on the Court's findings as establishing what a -- that there's a substantial difference

for the but-for world.

And, you know, my understanding is the Court applied a different standard, did not apply a but-for world standard, implied a reasonable, capable of -- you guys know all the legal terms, but it goes on from there.  That's the standard, and, therefore, I don't think it really allows you to do the kind of but-for comparison that we need to do here.

Q    Now, are the size of the payments indicative of a strong causal connection as Dr. Chipty testified, Professor Murphy?

A    No, because there would be -- as she even testified, there would be substantial payments in the but-for world, because even nonexclusive distribution is quite valuable from a point of view of Google and others, and they would have paid for nonexclusive distribution.

The magnitude of the payments doesn't isolate what was paid for the exclusive component of that.  So the magnitude of the payments don't tell us that there's a substantial effect of exclusivity.  It says the contracts were valuable but not necessarily the exclusive elements of those contracts.

Q    And one final question for you, Professor Murphy, on this Slide 12.

Do you regard the opinions you are offering to the

4228

Court today as consistent with the Court's liability decision as you understand it?

A    I do.

In fact, I've tried to explain how they dovetail into that in a pretty direct way, I think, but that's for the Court to decide.

Q    Now, Dr. Chipty, when she was here, asserted for the first time on the stand that in the but-for world, rivals would have slowly chipped away.

Did you have a reaction to that testimony?

A    I did.

And I think I understand what she was saying.  And the idea is, okay, they would have gotten some distribution.  And if they had gotten some distribution and gotten some more share, that would have allowed them to progressively move further on, chipping away at Google's position.

Once again, how do we address that?  We look at evidence from the real world that can inform that chipping-away hypothesis, and that's what I do on this slide.

Q    This is Slide 13, to orient the Court?

A    Yes.

Q    What did you find in undertaking that inquiry?

A    I looked at two episodes.

One was the 2010 syndication deal between

Microsoft and Yahoo!.

And that's an example where in that case, Microsoft got additional scale, actually much more scale than I estimate off the choice screen they would have gotten from eliminating exclusivity. So basically their scale doubled because Yahoo! was rightfully the same size as them.

And so you do see that, you know, if you follow Microsoft, it's going to go from the red line Bing up to the combined Bing and Yahoo!, the orange line.

But what you'll notice is, that's a one-time event. When they get the extra scale, they get the extra scale. That does not lead to a snowball that further increases their scale from there, the chipping away that Dr. Chipty is talking about.

Q   Why does slowly chipping away require a snowball and not just increasing scale, Dr. Murphy?

A   Well, because if you're trying to apply it to, say, what I just did in terms of nonexclusive distribution, it says they would have gotten nonexclusive distribution, but then they would have gotten scale out of that, but that scale wouldn't have fed back to give them additional scale. And remember, our question here is really about scale. Would they have gotten more scale in terms of the world today, substantially more scale than they actually have.

Then the second one I looked at was the Yahoo!

deal, and the Yahoo! deal was with Mozilla in 2014.  And in 2014, as has been discussed endlessly, Yahoo! won the default away from Google on Firefox, and so they got additional scale and additional distribution, right, they got both.  They got more distribution through Yahoo! and they got additional scale.

And then the question is, did that then lead to a further increase in Yahoo!'s market position.  If you look at the data, I don't have a graph for it, but the data clearly show, rather than grow from there, they actually shrunk from there as both Yahoo! lost some of the users they gained initially, and Mozilla lost users because people were less satisfied with the Mozilla product.  So you really had not a snowball but actually a melting snow, you know, kind of going in the other direction.

Q    And one final question on this slide, Professor Murphy.

How does your 1 percent choice screen result relate to this concept of slowly chipping away?

A    Well, they're sort of separate, but my point here is, you know, if it had been a 1 percent shift, it probably would be hard to tell whether there was chipping away, because you'd be looking for, did this little thing turn into a bigger little thing.  But by looking at the Bing Yahoo! experiments, that's not a trivial move.  That's a

4231

pretty big move.  And if there's a follow-on effect, a chipping away that results from that, we think we would be able to see it.

Similarly with the 2014 deal, that was a pretty big increase for Yahoo!, and over the period that they held the default on Firefox, they were losing now, not gaining further, right.  It wasn't like the springboard to doing better down the road, it was actually pushing them back.  We don't have the chart for that, but all these charts are back in the liability report, as was extensively discussed.

THE COURT:  We'll take our morning break at this point.

So it's a little bit -- we're approaching ten after 11:00.  We'll resume at 11:25.

And, Dr. Murphy, I'll just ask you not to discuss your testimony during the break, sir.  Thank you.

COURTROOM DEPUTY:  All rise.  This Court is now in recess.

(Recess from 11:07 a.m. to 11:28 a.m.)

THE COURT:  Thank you, everyone.

Mr. Popofsky, whenever you're ready.

MR. POPOFSKY:  Thank you, Your Honor.

4232

BY MR. POPOFSKY:

Q    Professor Murphy, welcome back.

Now, Professor Murphy, in forming your opinion that you saw no evidence of the strong causal connection required to for restorative remedies, did you consider, and we'll look at it on the next slide, Slide 14, Dr. Chipty's testimony that she saw exacerbation of pre-existing entry barriers from the unlawful conduct?

A    I did.

And I think there's a fairly simple way to think about this.  And she'd identified four entry barriers, one was distribution itself, the second was scale, the third was brand, and the fourth was capital cost.

The distribution barrier, I think, is directly addressed through the kind of corrective remedies or things that directly address distribution going forward, because the distribution barrier, you can think of as it's a flow, what we call in economics.  It's -- distribution is a flow. It's not yesterday's distribution, it's distribution day by day, whatever, and that's addressed by the kind of corrective remedies going forward.

So the other three barriers are, in my mind, basically derivative of the scale question, that is, had rivals been more successful and gotten more scale or more business.  In the past, that would have lowered -- gotten

4233

them a better brand, would have gotten them more willingness of investors to invest in capital.

And those things, I think, largely derivative of scale. So my discussion so far of the causal connection in terms of working through scale, I think is a pretty good way to address the entry barriers. And essentially it's the same story but an indirect version of the scale story largely in my mind.

Q    And did you find evidence that Google's conduct exacerbated the scale brand or capital entry barriers?

A    No, because we've just looked at the scale story. And we say that, you know, rivals could have gotten some scale in the but-for world, but there's no evidence that they would have gotten substantially more scale in the but-for world.

Using the choice screen as a proxy for eliminating exclusivity, you know, it's on that 1 percent slight increase in scale, which I don't think would change the resulting entry barriers as she calls them, to the extent that we would say, boy, that's really going to affect competition going forward in a way that corrective remedies can't deal with.

The other part that ties into that, though, is, again, if you think back to the testimony we've heard throughout this trial and really came to a point, I think,

yesterday in Eddy Cue's testimony, which is that the most important area of competition coming today seems to be coming from the AI side of the world, and, therefore, additional scale for other rivals in the past would be further -- the importance of that for competition going forward.

I think Eddy Cue said, you know, it's not really about Google and Microsoft anymore, it's about Perplexity, OpenAI.  It's about all those other options, and their ability to compete is essentially where it would have been in the but-for world.

They would not have had scale in the past because they really weren't even here.  They weren't ready.  That's a new technology.  And, frankly, I'm amazed as how much that perspective has changed since last summer, right.  That is just between less than a year later, the discussion of AI is has gone through the roof, as has our stocks.  I wish I had put more money into AI, but it definitely has gone forward.

Q    And very briefly just to round this out, did you find evidence of an exacerbation of brand or capital entry barriers from the product?

A    I don't think there's evidence that -- of any elevation of those barriers in a way that would significantly impact the prospects for competition going forward.

So, for example, the AI competitors seem to be doing pretty well at raising capital, that is, there's a lot of capital coming in, which from an economics standpoint is not surprising.  AI is going to be successful.  Exactly where it's going to be successful and how quickly is not in fully known.  But I mean, they're differentiated in a way that Yahoo! and Microsoft never were.

And that also fits in with the corrective remedies that get rid of exclusivity, because, as I've said numerous times, when you're differentiated, that's the best chance to take advantage of distribution alongside somebody else, because it's not -- you provide independent value. So somebody like an OEM or somebody else would say, I want to do maybe Google Search and something else because it's different; it adds to the piece.

It was much less rationale to say I'm going to do Google Search and then I'm going to do Bing Search, right? The value add proposition wasn't there the way it would be certainly with a GenAI product but even with a Perplexity that says, hey, they do something different.  People are going to use them to do different kinds of queries than they do on Google, and that's, again, Eddy Cue talked about that yesterday.

So remedies that get rid of exclusivity make it even easier for people to get promotion alongside a

4236

conventional search engine fit well with the AI revolution that we're seeing.

Q    So that leads to a follow-up question, Professor Murphy.

You found a small effect from exclusivity in the past.  Does that imply a small effect going forward from lifting exclusivity with a corrective remedy?

A    It doesn't.

I mean, because these competitors are different, and they're different in a particular way that fits well with co-distribution or co-promotion, whatever you want to call it, because they're differentiated.

Now, some of that would have happened anyway but the remedies are going to allow that to occur even more so.

Q    Let's turn -- now we're moving to Slides 15 and 16, your second opinion.  We've gone through the principles.

THE COURT:  Sorry to interrupt.  If I could just follow-up on a question.

You've mentioned Mr. Cue's testimony from yesterday.

One of the things he also said yesterday was that, let's leave the AI aside, and that's an important -- let's leave it aside.

He said effectively, Judge, I don't know what you could rule or what you could order to restore competition.

What's your reaction to that?

THE WITNESS:  I think he's -- I think he's -- I think the kind of things like plaintiffs have put on the table, I don't think they restore competition.  They may tilt competition one way or the other, they may lead rivals to be more successful, but I think, and maybe I misheard what he said, he was saying competition is coming, that it's coming from AI.

THE COURT:  From AI, that's why I'm asking you to put that aside.

THE WITNESS:  Yeah.

And I think given it's coming from AI, it makes even less sense to diminish competition now to enhance the opportunities for Bing or a Yahoo! or somebody like that, because you're still incurring the cost of diminishing competition today.  But given, if you think AI is the likely path, the benefit of anything you're doing is greatly diminished.

And I think that's where I go.  That's how I think about it, is that the evolution in the market has made a backward-looking view of the world even less important than a forward-looking view.  And, you know, my whole approach on remedies is always about, let's think about the future, where are we going, what's going to really work best for consumers going forward.

4238

And we're at a point where it's -- some people call them inflection points, whatever you want to call, we're at a point where things are going to change, that things are changing.  We don't know how much, how fast, whatever.

And to think about we're going to navigate that by trying to steer competition in one direction or another, that's a task I don't want to -- I don't want to drive that bus.  Somebody else want to drive that bus, I don't want to drive that bus, because I have no -- I know enough to know I don't know what to do.

And I think fortunately, we have the option of unfettering competition, open -- you know, like I say, through corrective remedies, make it so that if people want to do Perplexity and Google or Perplexity instead of Google or Perplexity, Google Gemini, and Open AI, that's the options they got, because that's our best option for making things moving forward.

But I also would say, as I said a bit ago, don't -- we don't want to forget about the competitive process.  There's value in the process of people competing to make their products better, because that helps make us different, and different is the source of progress.  The fact that we can do something different today than we could ten years ago, is really the key engine of keeping the world

4239

going, and that's true -- it's true in computers, it's true in Search, and it's true in cows, it's true all over the place, okay.

MR. POPOFSKY:  Ready to proceed, Your Honor?

BY MR. POPOFSKY:

Q    You mentioned plaintiffs' proposals, Professor Murphy.  Let's turn to your analysis of them. Can you give the Court your high-level conclusions concerning them.

A    Yeah.

I think as I tried to show with the roller coaster, I think there's a couple of major problems.

One is, given the lack of a causal connection, the idea that I want to override or tilt competition as a way to restore competition, I think, has -- doesn't have a basis in trying to get us back to where we would have been.

Those are extreme reductions in competition and I'll talk about why in a minute without really tethering it to a goal to getting us back to where we would have been.

It's like the roller coaster.  We're moving way away from a competitive outcome to somehow try to create competition, and that's dangerous.  And that's particularly, like I said, doesn't fit well in a world where AI is on the horizon.

4240

Q   You have a bullet at the -- or the statement at the bottom here, "No basis that speculative long-term benefits outweigh certain harm to competition and consumers."

Can you elaborate for that on Slide 18.

A   Yeah.

I think there's no question that many of the harms, and I'll talk about it in a minute because I don't want to go through it in detail now, are going to happen, that is, the harms from payment bans, the harms from the Chrome divestiture, those are going to happen, and so that's -- you know, that's almost -- I would say certain. And it's not short term, it's something that's going to happen over a period of years, and in many ways might extend past the remedial period.

And as I tried to illustrate with the roller coaster, is there's no clear reason that is going to get us anywhere different than we would have been.  Whether that means AI comes in quickly or slowly or whatever, there's no reason to believe this is going to get us to a but-for world that's better than where we would end up by letting competition, unfettered from the type of conduct we have, so if some -- those remedies are followed from the findings -- so, you know, the corrective remedies should be there, but there's no evidence that this distortion of

competition that we're going to incur, it's worth that to improve upon what we would get from allowing competition to work unfettered.

Q    And I put up the roller coaster because that's where you were, but one last question on that sort of summary slide.

From an economic perspective, given your assessment of this case, is it a valid remedial goal to terminate Google's monopoly given the Court found one?

A    I mean, you know, I don't want to get into debates over what's monopoly, what's not monopoly.  We could be here forever.

What the important thing is, for remedies point of view, your goal should be to get you back to where you would have been.  That's the guidepost you have.  Because the fact that you would have been there tells us that would have been the outcome of competition.

Your goal is not to get us to some place that the competitive process would not have generated.  That's a regulatory solution, and at least from this economist's perspective, in a dynamic world, those kinds of solutions are likely to do more harm than good.

Q    You mentioned that plaintiffs' remedies do not work through the competitive process.

I'd move to Slide 20.

Can you elaborate on that for the Court.

A    Yeah.

I mean, if you think about the history of Search and one key aspect of Search competition on the user's side, it really is -- doesn't have price competition.  These are free products from the point of view of consumers.

But just because you don't have price doesn't mean you don't have competition.  The competition happens on other dimensions.  And the dimensions that would have been important historically are improving quality, that is, how do I get more users?  I get more users by making a better product.  And one of the reasons Google was successful at getting more users is because it did produce a better product.  I think everybody agrees on that.

The other thing you do is, you supply complements; that is, you supply a browser.  And a browser that promotes Search generally promotes your search engine as well.

That's a way to say, hey, Mr. Consumer, here's a great browser to use, and that will come along and that will help me grow my search business so that you compete through the complements.

And in Google's case, not just browsers but even the Android OS, which was, again, a way to compete for users in a world where you can't compete directly on price on the user's side in Search.

And, finally, you compete for -- on price for promotion.

And the discussion of Dr. Chipty and plaintiffs more generally emphasize that competition for defaults, nonexclusive defaults in the case of Google, but competition for defaults through payments is part of the competitive process.  It's what people will do, because getting users is valuable.

And one of the ways you get users is promotion through partners, a competitive marketplace is going to have that, and that's true absent exclusivity.  That is preinstallation, defaults, those are valuable, part of the competitive process, and, indeed, price competition, because that's how you can compete on price.  You can compete on quality, you can compete through complements, and you can compete through price on promotion through partners.

Q    Is that why you have red Xs next to each of those?

A    Because if you think about plaintiffs' remedies, they go after each of those, they prevent Google from competing through innovation by saying, you have to share innovations with others.

And remember, the economics of innovation is, why do I innovate?  Because I'm able to get the benefits of that innovate -- appropriate the benefits of that innovation.  And when I have to share that innovation with

rivals, that diminishes my incentive to do it, because I'm not getting the leg up that I would get if I could keep it just for myself.

So having to share, particularly having to share on a marginal cost basis where you don't really profit at all from that sharing, would mean I'd have less incentive to improve my product.  So it's hard to compete through users through innovation if you have to share innovations with others.

Secondly, by divesting Chrome, you're losing the ability to compete through the complement Chrome, and by the conditional divestiture of Android, you have some of the same problem.

And, finally, by payment bans on Google, you would have reduced the ability or almost eliminated the ability to compete through price.  And that competition would not just be against traditional rivals, it would be against AI competitors as well, right.  It would be cutting off Google's ability and partners' ability to benefit from that competition even against new entrants.

Q   Now, Professor Murphy, have you evaluated Dr. Chipty's view that under plaintiffs' proposed remedies, Google still have avenues to compete?

A   I have.

There's really two that she points to that are

most significant.

One is paying rewards.  That's been discussed at various points throughout the trial.

The big problem with paying people is fraud; that is, if you go out on a broad basis to pay people, people line up to get paid.  That's just how the world works.  Whether or not they do what you want them to do, they still want to get paid.  And, you know.

And I think Dr. Whinston recognized that in his testimony.  And I recognized it in my testimony.  And the marketplace evidence says, yes, we do see some things like Bing rewards, but they tend to be quite small because making them big would tend to attract the kind of fraud problems that are there.

The other one is, you know, going through The App Store and advertising through The App Store, for example, that is a way to compete, but it -- you've -- that's there now.  It doesn't really offset all of the things that are lost by getting rid of the three most effective and empirically valid ways of competing, which are the three I mentioned before.

But even plaintiffs' remedies don't even allow for unfettered competition through The App Store.  They have restrictions on the types of promotion that Google can get through The App Store in terms of what rivals have to get

4246

and things like that.

Q   Now, Dr. Chipty added a third.  She said Google still could innovate under their proposal.

What was your response to that?

A   Well, the question in economics is not whether you could, the question is whether you would.

And the diminished incentives, I think, cuts against that pretty strongly.

THE COURT:  Let me ask you.

You know, look, any remedy is going to diminish some degree of innovation or the incentive to innovate, I should say.

So even, for example, limiting -- removing the exclusivity, in some sense, would presumably reduce the incentive to innovate.

Is there some level of tolerable reduction in the incentive of innovation that you could identify or quantify, if you will --

THE WITNESS:  Well --

THE COURT:  -- that would -- in exchange for the promotion of competition, at least in the short term --

THE WITNESS:  Yes.

THE COURT:  -- in the short term?

I recognize this is not a long-term tradeoff.

THE WITNESS:  Yeah, I would say two things.

One is, I would look to how directly a remedy reduces incentives to innovate.

So, for example, the lack of exclusivity, you still can pay for promotion, you can still get more promotion at a better price by improving your product. So I would think that is a pretty marginal change.  I think sharing the fruits of your innovation with somebody else is much more direct.

Another one, if you're thinking along the sharing dimension, is that since you're between sharing things from the past and sharing things from the future; that is, things from the past would tend have less of that negative impact.

Sharing things on an ongoing basis and syndication on an ongoing basis and those things, they're going to tend to have a greater effect, because innovation is about the future, not so much about the past.  So I would really focus on that.

To what extent is a remedy going, kind of hitting innovation incentives directly, versus to what extent is it -- is it maybe tangentially affecting innovation incentives.

Now, so that's I think how I would approach it. It's really a matter of degree.  And I think, as you talked about earlier in the trial, this gets to sort of the

4248

spectrum concept that, you know, okay, it's going to have some adverse effect, but can we calibrate that relative to what we get out of it.

And here, I would again stress something, and my view on this has evolved over the last year, which is, again, the arrival of the AI alternatives means that a lot is going to happen if we just unfetter things. As long as we make sure competition can work, we don't have to do a whole lot of, like, directing where it goes or helping it along. The process itself will make it work, and that to me at a big evolution in the marketplace.

BY MR. POPOFSKY:

Q     Let's move on to Slide 21, Professor Murphy.

Does this slide relate to your roller coaster?

A     It does.

It's just -- it's simple.

It's really an illustration of the extent to which we're deviating very far from what the but-for world would have looked like.

Remember, our goal, even according to Dr. Chipty, is to get back to competition to where it would have been but for.

And two things comes to mind.

One is, she talks about, well, how long do we have to keep these remedies in place? Well, to the point where

rivals have overcome the barriers to entry and expansion. But there's no evidence that they would have reached that in the but-for world, and, therefore, that wouldn't be a valid metric for asking whether we restore things to where they would have been.

And, secondly, what we're going in the interim, according to her Table 1 analysis, is illustrated in the piechart on the right; that is, in the actual share she starts with is 11 percent for rivals, that's across mobile and desktop.

And according to her Table 1, if rivals win extensive preinstallation because of the payment ban and other things, we would add another 38 percent for rivals, which would be 49 percent.

So it basically goes from 11 to 49, which, of course, is not at all what we think the but-for world would look like. Again, we're going way away from what a but-for world would look like.

BY MR. POPOFSKY:

Q    You mentioned this set of piecharts, which is from Dr. Chipty's slides, includes desktop and mobile.

How would it look if you just considered mobile?

A    Mobile, it would start lower, like 4 percent or something like that, and it would end higher, about 55. So it would be an even more dramatic shift on mobile than on

4250

desktop.

Q   Let's turn to -- you mentioned the payment bans.

Looking at the specific types of remedies plaintiffs have proposed and starting with the payment bans, and let's go to Slide 23.

What was your analysis overall of the payment bans?

A   I think the Court is well aware of, and I'll do it quickly, Eddy Cue talked about it yesterday, this is the Hobson's choice that kept Eddy Cue up at night, right?

And it's a Hobson's choice, because, you have two bad options:  1, you could continue to promote Google and not get paid, or you could promote a lower quality browser with a possibility of getting paid.  Sort of neither one is as good as what you have now, which is, I could promote Google and get paid and -- as opposed to one of these two options.

Q   And let's look at the next slide, Slide 24, what you call here bad choice 1, promoting Google without payment.

Can you please explain what you're depicting here.

A   Yeah.

Well, this would be a world in which the partner continues to promote Google but simply the payments go away.

But as I think economics would inform us,

4251

the payments going away doesn't -- that's not the extent of it; that is, with lower payments, there's going to be less incentive to expand your sales, uses of Search, all those things, and that's going to translate into less investment in doing those kind of things; whether it's innovation or higher prices or whatever, there's going to be a downstream economic impact of removing payments.

Q    And did Mr. Cue talk about that yesterday?

A    He did.

Again, he talked about -- he didn't use the word "Hobson's choice," but I think when he talked about being kept up at night, that's what he had in mind.

Q    And you have a blue bar at the bottom of this slide.  No share shifts to offset these costs if partner promotes Google without payments.  What were you communicating there?

A    Well, according to the plaintiffs' view of the world, the reason we're doing this is to shift share to rivals.  I don't agree that's the right goal, but that's their goal.

Under their goal of shifting share to rivals, this outcome where the AI takes payments from Google -- I'm sorry, loses payments from Google but still promotes Google doesn't go very far in the direction of what they're looking for, doesn't get her her Table 1, for example.

4252

Q    Now, you mentioned this bad choice 1 promoting Google without payment has an impact on partners and users. Did you look for evidence of that?

A    We do.

You know, this is from the testimonies that's been in the court, so I'm not going to spend -- the Court knows the testimony.

What I'm just going to say is, there's testimony from carriers that talks about the kind of harms that would happen to them and their customers.  There's testimony from the OEMs about the similar types of harm.  And there's testimony from the browser makers who would be most direct affected really because this is their major source of revenue by the kind of, if this were -- these kind of outcomes happen.  They'd either have to have a worse browser or they would have to get reduced payments, and reduced payments, of course, would be particularly problematic for the independent browser makers.

Q    And that's slides 25 to 27 for the Court.

A    That correct.

Q    Let's turn to what you call bad choice 2, promoting a lower quality, less preferred search engine.

A    Yes.

And this would be -- and I think Dr. Chipty seems to say she thinks this is certainly one possible, maybe a

4253

like likely outcome.  I can't remember exactly the word she used, but she seemed to think this would be a likely outcome.

And in that case, there would be harm to partners, because they would get lower payments, I think has been acknowledged.  They would also get a less preferred search engine, which makes their products less attractive.

But probably most importantly, consumers themselves would get less attractive search engines, and if we use the Allcott et al. study to quantify that, and you just use their number, which, remember, came from desktop, where switching to rivals has a smaller effect on -- because of quality differences aren't as great for Bing, they would say their $70 to supply to mobile is about 20 billion a year.  So the harm to users from switching all this preinstallation over to inferior search engines is very substantial, on the order of 20 billion a year.

Q    And with bad choice 2, would you expect to see lower payments to partners than in the current world?

A    There would be, because, I mean, you're taking them -- the highest valued customer for your promotion off the table.  So Google is no longer able to bid.  Those willing to be bid less would take over.

Q    And would you expect those lower payments to partners to translate into inferior devices?

4254

A    I think it would reduce the incentives to expand your device usage, which would mean less incentive to cut price to expand usage and less incentive to innovate to expand usage.  So economics tells us it would -- that's the direction it would go.

Q    You quote Dr. Chipty as saying, we're in the world of the second best, and the transition will take time.

Why did you pull out that quote to place here?

A    It was just to remind ourselves that this isn't a very short-term situation; that is, even, according to all the people, it's going to take rivals time to get up to speed, it's going to take time for this remedial period to play out, and, you know, five, 10 years, in that area.  So this is not a short-term -- you know, quick, short-term loss in exchange for a long-term benefit.  This is an extended -- even according to the plaintiffs' estimates, an extended period of diminished competition and consumer welfare.

Q    Now, moving to the next slide, Slide 29, did you evaluate Dr. Chipty's testimony that the plaintiffs' syndication data-sharing remedies might ameliorate some of this harm you just identified from the two bad choices?

A    I don't want to take too much time.

There's two real points.

One is even under that analysis, it mitigates it.  It doesn't eliminate it.  It reduces it.

However, I think thinking of it and reducing it actually overstates it, because instead of -- yeah, maybe if you do all these sharing things, there would be less direct harm from an inferior search engine.  But, remember, in the sharing process, you're actually harming things on a different dimension, which is the innovation and other incentives.  So the ongoing obligations that underlie her mitigation exacerbate other problems.  So it's not even clear it overall reduces the problems.  It shifts the nature of the costs.

And as a point I made in my report that, you know, you're trying to say the -- you know, people with inferior products have to overcome the fact that consumers don't want to use their products, well, that's a real cost in the world.  You have to overcome it by giving it to -- forcing that cost on to somebody else.

And unfortunately the way these remedies are structured, a significant part of that cost is going to be pushed on to consumers.  You're going to say, you have to deal with lower quality products than you would otherwise want so that rivals can get better, and that bothers me.

THE COURT:  So how do you square that with the reality of what we've talked about, which is the emergence of AI, and that is, the innovation, at least the remedies, go to Search, and, of course, Search, as we've talked about,

4256

has some application in terms of grounding from AI.

But if the future is AI, then why would Google's incentives to continue to try and innovate and push AI forward be diminished by some of these remedies that are more targeted toward Search?

And we've heard a lot of folks come in and say, look, the AI technology is much broader based than just for Search functionality.

THE WITNESS:  Yeah.

THE COURT:  It has lots of functions.

So it's not clear to me that why something that's a relative -- a remedy that's targeted to one application of AI would reduce Google's incentive to innovate with respect to the broad swath of applications.

THE WITNESS:  It's good you asked the question because I think I maybe wasn't clear in what I was saying.

My emphasis was on innovation in the Search part of the universe.

I agree with you, AI is going to be used for all kinds of things.  Google recognizes that.

So the cost here is going to be much more focused on the Search side of the house; that is, innovation to improve the Search results, because those Search results, you're going to give them to everybody else.  So whatever you get, everybody else gets.  That diminishes my incentive

on the Search side of the house.

The AI side, and this is really why it's hard to discourage the investments in AI by Google and others, they're looking at a broad spectrum of, you know, we can use this to run all kinds of stuff.  So it's not so much they would diminish the AI dimension.

Now, what I do think would happen is think about that intersection between Search and AI; that by giving, for example, AI competitors access to Google's existing way of doing things, you're tilting your investment in the Search side of the world toward being more Google-like as opposed to more like their own like, and that's the thing I was talking about before.

I actually think from a progress point of view, having the AI people there trying to do their own thing, which is -- and, again, I don't -- you know, as we've heard throughout the trial, really, AI, its strength, it's not Search in a different -- it's different than Search, and them trying to do it that way is where the real value is going to come from.

THE COURT:  I can't remember who, which expert it was that testified, but, look, if you were to grant the kind of remedies of sharing data access, the market incentives would be such -- maybe it was Dr. Chipty, but the market incentives would be such that the rivals wouldn't try and

4258

duplicate Google, they'd take this raw data as an opportunity to figure out product differentiation that they might not otherwise have been able to achieve because they lacked access to the raw data.

What's your response to that?

THE WITNESS:  Well, I think rivals always have an incentive to differentiate their product.

And making it easier to be like Google, I don't think enhances the incentive to be different from Google, because, you know, the more you make it easy to be like Google, the more people are going to tend to be like Google. The more you make it so that the way to succeed is to be different, the more they're going to be different. So I would say I disagree that this tilts you towards doing something different.

Now, you can argue that, well, but aren't they complementary?  Being able to do what Google does is complementary with being able to do other things.  But that runs into the problem that I was talking about before in my mind which is, it's always temping to think, well, geez, if you just gave people stuff, wouldn't that be great?

And, you know, it doesn't tend to work out that way, that it creates disincentives for both the giver and the receiver; that, I think, are better handled in a competitive environment, because, you know, if you think

about where private property regimes have tended to do extremely well, it's in innovation.  It's because people are able to not share everything with other people.  And it's in my mind -- look, I'm a hopeless economist.  That's where I am and I'm always going to be that.

THE COURT:  I'm sorry, you said you're a what?

THE WITNESS:  A hopeless economist.

THE COURT:  Hopeless.

THE WITNESS:  I'm an economist to the end, right.  It's like, you know, people who know just always accuse me of being like a -- you're just a hopeless economist.

But that idea that competitive process is important for getting you where you want to be, it's not -- short-cutting to get to the end doesn't usually work out as easily as it did as you think, because you think about all the good things that happen if you did that, hard to know the unintended consequences.  And the rule of unintended consequences is they almost always turn out in the negative direction, not the positive.  That's the economics that I was taught.

BY MR. POPOFSKY:

Q   And just to round out this slide, Professor Murphy, you know, there was an old nursery tale, you swallow the spider to catch the fly?

A   Yeah, that's --

4260

Q    Does that relate to this?

A    That's one I've used before.

That refers to solving one problem by creating another one.

That's the old -- and, you know, it all ends up with the horse, I think.

So that's the old nursery rhyme, yes.

Q    Now, turning to another topic, are plaintiffs' payment bans justified on the ground that it will increase partners' incentives to enter Search?

A    I don't think so.

And I'm going to tell you what I think as an economist, which is, first, to recognize that any time I can get something in the marketplace that reduces my incentive to do it for myself, I can go down to the baker and buy a cake, that makes me less likely to bake my own cake.  The cheaper that cake is, the more likely I'm going to buy it from the baker rather than bake it.  The better his cake is, the more likely it is I'm going to buy the cake from the baker rather than bake it myself.  So the make-buy always has a disincentive problem, and so that's no different here.

Now, the question is, do we want to make the market alternatives worse to induce somebody to make for themselves?  And the answer I think pretty rarely, do you want to do that, because by definition, why are they going

to market, because they can get something better than they can do for themselves.

And here, we're -- again, this is where the AI thing comes in.  You know, it's like, why at this juncture, when there's these emerging other outside opportunities would we push Apple to bring in their own search engine, it just seems -- doesn't make a whole lot of sense to me, because this is a marketplace that's emerging a bunch of other alternatives that they could take advantage of, rather than doing it themselves.  Of all the times you would try to push them to enter, this seems like a poor one.

Q    And have you considered whether Apple would have less incentive to enter Search if Microsoft or another non-Google Search competitor made Apple a large payment for promoting their search service?

A    No.

The incentive to enter is always a comparison of what can I do for myself versus what can I get in the market; and if what can I get in the market is good or better than what I can do for myself, I won't enter.

And that would be true whether that option is from Google, Microsoft, Perplexity, some combination of a bunch of them, whatever.

And I just don't see the goal here of getting Apple to provide for themselves.  It seems like it's really

4262

forcing Apple to do something that they've revealed for themselves that they don't want to do in exchange for, given the future we're looking at, I don't see why that would be a good idea.

Q    Let's turn to Slides 31 and then 32, your analysis of plaintiffs' prohibitions on self-referencing and commingling.

Can you please tell the Court your evaluation of those proposed remedies.

A    Really, this is one is simple.  I actually did work on this years ago.

In product integrations and product -- integrations both within a product and integration features into a product and increasing the ability of products to work with one another has been an important part of progress in the software business forever; that is, how do we make it easier and cheaper for consumers.

You do it by putting more and more features that become part of the product, and it gets sold to a wider base of people, and, therefore, you can sell there for less per unit and you can given a wider base of people the advantage. And when you give a wider base of people the advantage, then complementary services to those things are more likely to get developed because they can use more services.  So the work I did in this area sort of pushes you exactly in that

4263

direction; that is, integration in everything is something that's very much value-adding.

And then so that's about, you know, you wouldn't want to stop that. That's tying back to our first principle of using the competitive process. Integration is very much part of the competitive process.

Secondly, as far as I remember, integrations haven't really been the thrust of the case of what was found to be anticompetitive; and, therefore, it's not tethered to the conduct or tethered to something that would be different in the but-for world. So I think it kind of fails both of those two key guideposts.

Q   Now, Professor Murphy, does the theoretical possibility, which Dr. Chipty talked about, that Google might "circumvent" a prohibition against exclusivity under Google's proposed remedies justify these prohibitions against self-preferencing and commingling?

A   Again, if you adopt remedies of the corrective type along the lines of what Google has proposed, I don't -- I'm not aware of what she's argued that would promote -- allow Google to circumvent the exclusivity aspects, right.

You want to think about, would this kind of service -- and certainly not to an extent that would warrant giving up the benefits that come from the kind of integration we're talking about here.

4264

Q    Let's turn to Slide 33 and then 34 and turn to your analysis of plaintiffs' proposed divestures of Chrome and Chromium.

A    Yes.

Q    What is your analysis of them?

A    Well, it really is, we talked about this earlier.

You know, Chrome and Chromium is one of the ways that Google has competed through complements to Search.

Chrome, as an improved search engine, a better search engine, that will -- I mean, sorry, a better browser that will lead to more search and more use of the web, was in the long-term interest of Google; that is, promoting Chrome as a vehicle to expand usage of the web, which is highly complementary to Search.  Chromium goes beyond that and says, not only should we produce our own better browser, let's make browsers better generally.

And the evidence from the marketplace -- again, it's always important to think about market evidence -- is that Google has been the most successful at doing that, in a sense of developing a browser that gets wide usage on other platforms, not just your own platforms, that -- over time; that is, Chrome's, you know, has a big share of usage on Windows, it's used a lot on Mac, it's used not as much but still significantly on iOS, it's really been the most successful browser.

4265

Chromium, as a browser engine, has really, you know, been very successful, and the graph I put here tries to illustrate that, in the context of Microsoft's browsers, Edge and IE, the red line is where Microsoft's browsers were going in terms of their share of Windows browser usage from 2011 to 2020.  So over nine years, it was just like in steady decay.

In January of 2020, Microsoft switches to Chromium, and, I don't know, maybe it's a coincidence, whatever, it turned around right then; and instead of going down, it's now been going up over time.

In contrast, Firefox, which didn't switch to Chromium, has continued to go down.

And so what do you take away from this?

It's just a simple way of thinking about plaintiffs' remedies.

From the point of view of Chrome and Chromium, Google has done as well or better -- better than anybody else in the marketplace at an independent browser and a browser engine in Chromium.

And the idea that, okay, we'll take it away from Chrome -- from Google and make -- give it to somebody else, seems not very wise.  If you're focused on competition and consumer welfare, why would you take something away from somebody who's been the most successful with it and give it

to somebody else, it's just odd to me.

Now, the reason I think they're thinking about it is, well, that will allow rival browsers to be in -- I mean, rival search engines to be installed. That's the logic.

But think about what that means; that just focusing Chrome and Chrome users into the Hobson's choice that we just talked about, right. It's sort of saying, I want to extend the Hobson's choice that kept Eddy Cue up at night to Chrome because you're going to give it to somebody else who's either going to install an inferior browser or get less compensation and still use Google. So it's like a loss in terms of the taking it away from the person who's the most valuable owner and giving it for, I think, of another cost, not a benefit.

Q   Now, turning to Slide 35, have you considered the incentives of potential buyers of Chrome and Chromium that have been mentioned in this proceeding?

A   Yeah, I mean, these have been discussed.

I think Yahoo! said pretty clearly that they would use it to switch to a distribution vehicle for Yahoo!, which is just Prong 2 of the Hobson's choice, right. From the point of view of consumers, let's have a lower-quality search engine installed. I'm not sure why that's a great idea.

Perplexity says they would -- I don't remember

4267

exactly what Perplexity said about what they would do. I know one thing they said is, Don't give it OpenAI because we would rather Google have it than OpenAI have it.

And the basic idea there is, I think they were thinking, Google's incentives to promote Chrome and Chromium are broader than OpenAI's would be, and, therefore, giving it to them narrowly would be worse than Google having it, which is consistent with my chart I just put up. I see that as fitting in well with that.

Q   Now, have you also considered Dr. Chipty's testimony of what share shift they would create, the plaintiffs, under their proposed remedy objective given the harms of transferring Chrome that you described?

A   Right.

So if you go back to Dr. Chipty's analysis, you got the same 11 percent you start with. 31 percent is the amount you get by switching Apple devices and Android devices according to her estimates of how much Google would clawback. And 7 percent of overall search comes from user downloaded Chrome of which 3 percent is on mobile and 4 percent is on desktop.

And the point I would make is, if you think about how many people you're shifting, in this case 3 percent on mobile or 4 percent on desktop, is small compared to how many people are suffering from getting a worse default,

4268

right; that is, you're sort of harming the world from the point of view of a big population, to move a small fraction of that population over to Yahoo!.

The economics of that isn't very good, right. It's like thinking about it from the point of view of the Allcott study. They estimate putting an inferior default on it's like $70 a customer. But you only move maybe 20 percent of those customers. So per customer moved, it's not $70, it's $70 times 5, because you're incurring the cost on five guys to move one. So that's $350 per guy moved. That's even worse economics. That's what I'm saying here. It's incurring a widespread reduction in value for customers in exchange for a relatively narrow shift in volume.

Q   And one last question on Chrome, Professor Murphy. What assumption did Dr. Chipty make about the quality of Chrome post-divestiture that underlay this pie chart drawn from her slides?

A   She assumed that the quality of Chrome would stay constant. And as I talked about before, that ignores the fact that you're taking Chrome from somebody who's able to do the most in developing an independent browser and browser engine and giving it to somebody else, and that's, I would expect, to reduce the innovation there.

Q   Have you considered plaintiffs' proposed conditional divestiture of Android, Professor Murphy?

A    I have.

Q    And let's go to Slide 38.

A    Yeah.

Again, there's two substantial issues I see with conditional divestiture.

One is, it would reduce Google's investment incentives because it's no longer clear that they will continue to have Android in the future, right?  Its potential divestment of Android would reduce their incentives to invest, both just because it's creating the uncertainty and a lower probability of retention, but also because those investments would not necessarily be as valuable to whoever gets Android as they would be to Google because they're going to have a different plan.

And, secondly, and this has been pointed out by a number of authors who've looked at conditional remedies, it creates rather poor incentives, because it says, if rivals don't do better, we're going to think about having you divest Android, which, you might say, well, isn't that good, it helps rivals do better, but it also says, well, Google, if you do better, you're more likely to get Android developed.  So if you improve a lot and the rivals don't gain much share, we might come back and divest Android, and that's an adverse incentive that's been recognized by many people who've thought about conditional remedies.

Q    And let's move on, just to round out this set of remedies, to Slide 40, and plaintiffs' proposals for choice screens on Google devices and for a period of time on the Android installed base.

What was your assessment of that proposed set of remedies?

A    Well, I think, first off, choice screens are relatively ineffective at moving share; we know that.

But secondly, they fail the market test; that is, we have not seen parties negotiating deals privately that involve choice screens, and that pre -- for search engines. That pre-dates Google success.  It pre-dates this case.

It's just widely seen that choice screens are not what the market tends to produce, for reasons I think we do understand, that there's value to having a default and particularly value to having a good default, that people want to have a default for the people who don't want to choose what they use.

So having a default is valuable directly.  Doesn't mean you have to have an exclusive default, but you need a default because defaults have value.  And choice screens get away from that, let alone choice screens that have an inferior -- I mean, cases where you have an inferior default followed by a choice screen.  That's like, I don't know, combining the worst of both, in some sense.

4271

So they're going to impose costs on users. And some of these choice screens have much more costs than even the ones we've seen in the past, because these are choice scenes that would show up every year.

So you're going to have, like, national choice screen day in which when you get up in the morning, you open your phone, now you choose, then you open your computer, now you choose, come home at night, open your tablet and you choose again. It's not just when I sit at my computer, I've got to choose.

And one thing about setting up your computer and having a choice screen, at least you're involved in probably a series of choices you have to make. Having a choice screen fall out of the sky on a very busy day for me might not be a very good idea at all, right; it's even more disruptive than it otherwise would have.

Q   And what share shifts would you expect these harms you just described to generate?

A   Quite small, because, remember, the choice screen itself moves a very small percentage.

And in the case of Google devices, like Pixel accounts for 2.5 percent of Google queries. So if you moved 1 percent of 2.5 percent, that's like, right, that's .025 percent. That's a very small fraction of Google queries, yet you'd be putting choice screens on all those

devices.

Q   And if His Honor has the indulgence for one more slide before lunch, we'll then be at an appropriate breaking point.

Let's turn ahead to the public education fund proposed by the Colorado Plaintiffs, Slide 43.

Did you read Professor Luca's testimony, Professor Murphy?

A   I did.

Q   What was your reaction to it?

A   Well, first, I think there's really two points.

Somehow, you're supposed to end up with 3, they always told me, but I always end up with 2 for some reason. I guess I'm just a little slow.  But anyway, we end up with two.

The two big points are number one.

It's not really an education campaign as I would see it.  It's a campaign that's designed to encourage people to shift to rivals, and that's more promotion.

And given that it's promotion, rivals would have an incentive to do it if it's cost effective; that is, if telling people, hey, you should use Google, you should use Bing, there are other options out there, that's something rivals have an incentive to do.

So given what we're talking about here is

4273

promotion, largely, and the objective is promotion, I'm not sure why you'd have a public fund to do it as opposed to leaving it up to rivals who would internalize, is it worth the effort, what's the most effective way to do it.  I just see that as a superior alternative.

Q    And where's the figure on the slide drawn from, Professor Murphy?

A    This is the Allcott study.  This is one figure out of the Allcott study.  And you heard so much about it, and I don't remember whether people have shown this figure.

But this is the usage of Bing for two groups of customers that were paid to use Bing.  The blue line are people that were paid to use Bing but only required to use it for a couple of days; that is, very short term.

And so you see, a lot of people like getting paid, so a bunch of people tried Bing.

And then you sort of see the attrition that happens gradually over time, and that's the blue line.

What's interesting is the orange group is a different group.  They were paid to use Bing too, but they had to use it for 14 days.  So you can see not as many people are willing to use it for 14 or willing to use it for 2.

And then after 14 days when they no longer would be getting paid to use Bing, they were offered the

opportunity to go back to Google.  And so a lot of people did.  That's that big drop at day 14.

Now, you might say well, jeez, we got them to try Bing; some people actually liked Bing.  But it would be a mistake, in my mind, to think that that number you have there at day 14, or telling me how many people really like Bing, because what you'll see is about a third over the next two months of those people end up going back away from Bing; that is, the orange line, just like the blue line, keeps going down.  So it says even after the choice screen or the opportunity to choose back to Google, you still have a lot of people who are using Bing who nonetheless later reveal they prefer Google.

And, for example, when Dr. Rangel talked about choice screens, he talked about three different groups of users, but he never talked about the fourth group of users who people, after they have the choice screen, have chosen Bing or some other search engine but later find that's not what they like.  So you've got to take that as an account too.  They've lost the recommendation, really, that came from the default.

Q    And how does your analysis of Figure 3 relate to your critique of Dr. Luca?

A    I think it just really -- because he talks about these kinds of remedies and things like that, and his goal

4275

is to push people to use Bing or alternatives.  And my only point is, that's costly for users.  And that's really the point of the Allcott et al., study, that there's a cost associating with pushing people to do that, because some people get stuck.

MR. POPOFSKY:  Your Honor, this is an appropriate time to take the luncheon break.

THE COURT:  Sure.

All right.  Let's go ahead and take our break for lunch.  We'll resume at 1:30.

We'll see everybody after lunch.  Thank you.

COURTROOM DEPUTY:  All rise.  This Court is now in recess.

(Recess from 12:29 p.m. to 1:30 p.m.)

4276

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__May 8, 2025_____          _____

                                    William P. Zaremba, RMR, CRR

BY MR. DAHLQUIST:
[11] 4154/6 4156/5
4157/22 4162/22
4163/15 4164/7
4174/4 4184/18
4185/15 4187/1
4189/17
BY MR. POPOFSKY:
[12] 4195/17
4196/18 4197/4
4213/3 4216/23
4219/10 4222/16
4231/23 4239/5
4248/12 4249/19
4259/21
BY MR. SMURZYNSKI:
[1] 4191/15
COURTROOM DEPUTY:
[5] 4153/4 4195/4
4195/7 4231/17
4275/12
MR. DAHLQUIST: [12]
4153/12 4153/19
4156/3 4157/10
4157/20 4164/2
4164/5 4174/3
4185/12 4186/25
4189/8 4191/9
MR. POPOFSKY: [12]
4194/22 4195/3
4195/12 4196/7
4196/23 4196/25
4216/21 4219/6
4220/11 4231/22
4239/4 4275/6
MR. SEVERT: [1]
4196/14
MR. SMURZYNSKI: [4]
4163/24 4164/4
4191/12 4194/14
THE COURT: [37]
4153/2 4153/10
4153/15 4153/20
4157/15 4157/19
4164/3 4164/6
4185/11 4189/16
4191/10 4194/16
4194/20 4195/2
4195/9 4195/11
4195/13 4196/13
4196/15 4196/24
4208/8 4210/6
4214/20 4222/14
4231/11 4231/20
4236/17 4237/9
4246/9 4246/20
4246/23 4255/22
4256/10 4257/21
4259/6 4259/8 4275/8
THE WITNESS: [19]
4153/23 4157/18
4157/21 4194/18
4195/10 4208/23
4210/17 4215/5

4220/12 4237/2
4237/11 4246/19
4246/22 4246/25
4256/9 4256/15
4258/6 4259/7 4259/9

$

$350 [1] 4268/10
$70 [4] 4253/14
4268/7 4268/9 4268/9

'

'50s [1] 4212/23
's [1] 4230/8

.

.025 [1] 4271/24
.025 percent [1]
4271/24

1

1 percent [5]
4224/25 4230/18
4230/21 4233/17
4271/23
10 [3] 4187/12
4187/13 4188/10
10 years [1] 4254/13
100 [2] 4182/17
4183/7
11 [6] 4187/3 4187/6
4187/7 4216/22
4223/13 4249/15
11 percent [2]
4249/9 4267/16
11:00 [1] 4231/14
11:07 [1] 4231/19
11:25 [1] 4231/14
11:28 [1] 4231/19
12 [1] 4227/24
12:29 [1] 4275/14
13 [2] 4149/7
4228/21
1300 [1] 4150/15
14 [5] 4188/13
4232/6 4273/22
4274/2 4274/6
14 days [2] 4273/21
4273/24
15 [1] 4236/15
16 [1] 4236/16
18 [1] 4240/5
1976 [2] 4180/15
4180/19
1:30 [2] 4275/10
4275/14

2

2.5 percent [2]
4271/22 4271/23
20 [3] 4241/25
4253/14 4253/17
20 percent [4]
4159/21 4160/3
4160/16 4268/8
20-3010 [2] 4149/4

4153/5
20001 [1] 4151/13
20006 [1] 4151/8
20024 [1] 4151/4
2010 [2] 4226/11
4228/25
2011 [1] 4265/6
2014 [4] 4226/11
4230/1 4230/2 4231/4
202 [5] 4150/5
4150/10 4151/4
4151/8 4151/14
2020 [2] 4265/6
4265/8
2025 [2] 4149/5
4276/7
20530 [1] 4150/10
209 [1] 4150/4
2099 [1] 4151/7
21 [1] 4248/13
22 [1] 4187/13
226 [1] 4166/23
23 [1] 4250/5
24 [1] 4250/18
25 [1] 4252/19
25 percent [1]
4191/3
27 [1] 4252/19
29 [1] 4254/18

3

3 percent [2]
4267/20 4267/23
30 [5] 4185/11
4185/12 4185/14
4185/16 4190/18
30 days [1] 4180/7
30-day [1] 4178/23
3010 [2] 4149/4
4153/5
307-6158 [1] 4150/10
31 [1] 4262/5
31 percent [1]
4267/16
32 [2] 4185/3 4262/5
3249 [1] 4151/14
33 [1] 4264/1
333 [1] 4151/13
34 [4] 4173/22
4173/23 4174/5
4264/1
35 [1] 4266/15
354-3249 [1] 4151/14
38 [2] 4249/13
4269/2
399 [3] 4187/3
4187/6 4187/7

4

4 percent [2]
4267/21 4267/24
40 [1] 4270/2
401 [3] 4187/10
4187/12 4188/10
41 [1] 4181/25

43 [1] 4272/6
434-5000 [1] 4151/4
450 [1] 4150/9
4624 [1] 4151/8
481 [1] 4163/22
49 [2] 4249/14
4249/15

5

5000 [1] 4151/4
508-4624 [1] 4151/8
508-6000 [1] 4150/17
55 [1] 4249/24

6

600 [1] 4150/4
6000 [1] 4150/17
60604 [1] 4150/5
6158 [1] 4150/10
680 [1] 4151/3

7

7 percent [1]
4267/19
7100 [1] 4150/9
720 [1] 4150/17
7th [1] 4150/16

8

80203 [1] 4150/16
805-8563 [1] 4150/5
846 [2] 4189/12
4189/21
8563 [1] 4150/5

9

99 [1] 4182/22
9:35 [1] 4149/6

A

a.m [3] 4149/6
4231/19 4231/19
ability [27] 4161/10
4163/7 4168/21
4169/17 4169/23
4170/18 4170/22
4171/20 4172/3
4172/4 4172/21
4173/6 4173/9
4173/18 4177/1
4177/3 4179/21
4184/7 4191/19
4202/24 4234/10
4244/11 4244/15
4244/15 4244/19
4244/19 4262/14
able [21] 4157/3
4159/24 4161/4
4163/12 4166/12
4167/14 4167/22
4172/24 4172/25
4215/17 4217/4
4217/14 4217/15
4231/3 4243/23
4253/22 4258/3
4258/17 4258/18

**A**

**able... [2]** 4259/3
 4268/20
**about [144]**
**above [1]** 4276/4
**above-titled [1]**
 4276/4
**absent [5]** 4214/5
 4220/16 4223/5
 4223/9 4243/11
**absolutely [1]**
 4166/16
**acceptance [1]**
 4159/3
**access [30]** 4156/24
 4157/5 4157/25
 4159/24 4160/8
 4163/7 4163/8
 4166/23 4168/21
 4172/12 4175/7
 4176/9 4184/19
 4184/22 4185/17
 4185/20 4186/3
 4186/8 4188/4
 4188/12 4188/24
 4189/4 4189/22
 4190/13 4190/23
 4192/1 4210/10
 4257/9 4257/23
 4258/4
**accomplish [1]**
 4209/16
**according [8]** 4203/9
 4248/20 4249/7
 4249/11 4251/17
 4254/10 4254/16
 4267/18
**account [1]** 4274/19
**accounts [1]** 4271/22
**accumulated [1]**
 4210/9
**accurate [2]** 4155/3
 4155/12
**accuse [1]** 4259/10
**achieve [3]** 4172/21
 4201/18 4258/3
**achieved [2]** 4174/14
 4216/19
**acknowledged [1]**
 4253/6
**acquisition [2]**
 4155/16 4180/3
**across [1]** 4249/9
**Act [5]** 4178/18
 4178/18 4178/23
 4180/14 4180/21
**acting [1]** 4180/9
**Action [1]** 4153/5
**activities [2]**
 4179/3 4180/9
**actual [12]** 4158/16
 4159/5 4190/9 4216/3
 4216/9 4216/18
 4217/14 4220/13
 4220/23 4224/2

4226/23 4249/8
**actually [32]**
 4169/17 4173/13
 4177/24 4181/1
 4181/9 4183/4 4183/7
 4183/11 4184/16
 4186/21 4194/9
 4194/11 4200/16
 4206/20 4212/12
 4212/19 4221/4
 4221/7 4221/19
 4225/22 4226/8
 4226/24 4229/3
 4229/24 4230/10
 4230/14 4231/8
 4255/2 4255/5
 4257/14 4262/10
 4274/4
**Adam [1]** 4150/7
**adam.severt [1]**
 4150/11
**add [2]** 4235/18
 4249/13
**added [1]** 4246/2
**adding [1]** 4263/2
**addition [1]** 4171/11
**additional [13]**
 4168/17 4178/7
 4179/4 4181/21
 4181/22 4194/10
 4223/8 4229/3
 4229/21 4230/4
 4230/4 4230/6 4234/4
**address [7]** 4197/17
 4213/12 4223/11
 4225/17 4228/17
 4232/16 4233/6
**addressed [3]**
 4197/18 4232/15
 4232/20
**addressing [1]**
 4208/15
**adds [1]** 4235/15
**admits [1]** 4221/12
**adopt [1]** 4263/18
**advantage [16]**
 4155/11 4155/15
 4155/15 4155/20
 4158/8 4158/13
 4158/14 4161/7
 4166/5 4166/15
 4167/10 4208/19
 4235/11 4261/9
 4262/21 4262/22
**advantages [2]**
 4166/9 4167/18
**adverse [2]** 4248/2
 4269/24
**advertising [1]**
 4245/16
**affect [6]** 4201/17
 4215/22 4217/23
 4219/2 4221/14
 4233/20
**affected [1]** 4252/13

**affecting [1]**
 4247/21
**affirmatively [1]**
 4206/20
**after [11]** 4182/22
 4187/18 4187/23
 4197/23 4212/17
 4231/14 4243/19
 4273/24 4274/10
 4274/17 4275/11
**afternoon [1]**
 4153/18
**again [29]** 4154/7
 4160/6 4160/25
 4162/7 4167/7
 4169/12 4170/11
 4172/3 4173/18
 4175/11 4187/14
 4189/10 4195/10
 4217/3 4218/7
 4228/17 4233/24
 4235/22 4242/23
 4248/4 4248/6
 4249/17 4251/10
 4257/16 4261/3
 4263/18 4264/17
 4269/4 4271/9
**against [7]** 4197/19
 4244/17 4244/17
 4244/20 4246/8
 4263/15 4263/17
**ago [4]** 4215/16
 4238/19 4238/25
 4262/11
**agree [17]** 4156/23
 4160/5 4161/23
 4169/16 4171/11
 4172/14 4177/4
 4182/5 4184/1
 4186/15 4188/9
 4188/11 4190/20
 4218/21 4218/22
 4251/19 4256/19
**agreed [4]** 4171/2
 4172/19 4186/17
 4187/24
**agreements [5]**
 4163/12 4163/12
 4175/23 4176/10
 4223/6
**agrees [2]** 4210/15
 4242/14
**ahead [4]** 4217/3
 4226/1 4272/5 4275/9
**AI [38]** 4189/22
 4192/5 4192/6
 4192/10 4194/13
 4212/6 4234/3
 4234/16 4234/18
 4235/1 4235/4 4236/1
 4236/22 4237/8
 4237/9 4237/12
 4237/16 4238/16
 4239/23 4240/19
 4244/17 4248/6

4251/22 4255/24
 4256/1 4256/2 4256/3
 4256/7 4256/13
 4256/19 4257/2
 4257/3 4257/6 4257/8
 4257/9 4257/15
 4257/17 4261/3
**aided [1]** 4151/15
**akin [2]** 4169/1
 4202/7
**al [5]** 4149/3 4153/6
 4224/22 4253/10
 4275/3
**align [1]** 4200/10
**all [44]** 4153/10
 4153/21 4155/22
 4168/1 4169/5
 4174/13 4178/24
 4182/6 4191/10
 4192/17 4195/9
 4199/1 4204/23
 4212/14 4213/23
 4215/21 4216/8
 4216/13 4217/5
 4218/7 4219/1
 4221/10 4224/6
 4227/5 4231/9
 4231/17 4234/9
 4239/2 4244/6
 4245/18 4249/16
 4251/3 4253/15
 4254/10 4255/3
 4256/19 4257/5
 4259/15 4260/5
 4261/10 4271/15
 4271/25 4275/9
 4275/12
**All right [3]**
 4153/10 4153/21
 4195/9
**Allcott [6]** 4224/22
 4253/10 4268/6
 4273/8 4273/9 4275/3
**allow [8]** 4203/25
 4204/17 4219/18
 4220/25 4236/14
 4245/22 4263/21
 4266/3
**allowed [1]** 4228/15
**allowing [3]** 4189/23
 4221/7 4241/2
**allows [3]** 4184/2
 4200/1 4227/6
**almost [3]** 4240/12
 4244/15 4259/18
**alone [5]** 4182/6
 4206/2 4215/1 4215/2
 4270/22
**along [9]** 4168/6
 4198/1 4201/5
 4203/24 4218/16
 4242/19 4247/10
 4248/10 4263/19
**alongside [2]**
 4235/11 4235/25

**A**

**already [3]** 4212/7 4226/11 4226/12
**also [30]** 4156/16 4160/12 4162/15 4162/23 4164/10 4167/3 4168/16 4169/3 4174/7 4176/20 4177/5 4177/9 4179/22 4186/21 4192/1 4192/4 4197/18 4198/11 4198/20 4198/25 4199/21 4209/6 4209/11 4235/8 4236/21 4238/19 4253/6 4267/10 4269/11 4269/20
**alter [3]** 4200/19 4206/17 4207/17
**alternative [1]** 4273/5
**alternatives [4]** 4248/6 4260/23 4261/9 4275/1
**always [18]** 4199/19 4200/3 4206/9 4219/16 4222/12 4222/14 4223/22 4237/23 4258/6 4258/20 4259/5 4259/10 4259/18 4260/20 4261/17 4264/18 4272/13 4272/13
**am [2]** 4223/17 4259/5
**amazed [1]** 4234/14
**ameliorate [1]** 4254/20
**AMERICA [2]** 4149/3 4153/6
**AMIT [1]** 4149/9
**amount [5]** 4158/1 4171/9 4194/12 4212/22 4267/17
**analogous [1]** 4224/23
**analyses [1]** 4218/5
**analysis [26]** 4158/23 4169/2 4170/5 4171/3 4171/13 4171/22 4171/24 4172/19 4173/10 4177/11 4180/22 4186/1 4190/19 4200/10 4219/7 4222/17 4226/9 4239/7 4249/7 4250/6 4254/24 4262/5 4264/2 4264/5 4267/15 4274/22
**analyst [1]** 4158/22
**analyze [2]** 4170/4

**analyzed [1]** 4169/24
**analyzes [1]** 4218/6
**Android [15]** 4176/14 4176/16 4176/17 4197/21 4242/23 4244/12 4267/17 4268/25 4269/8 4269/9 4269/13 4269/19 4269/21 4269/23 4270/4
**another [13]** 4162/13 4170/12 4181/15 4184/16 4186/9 4238/7 4247/10 4249/13 4260/4 4260/8 4261/13 4262/15 4266/14
**answer [11]** 4153/18 4155/2 4156/15 4159/13 4172/10 4188/13 4188/20 4211/16 4216/19 4217/3 4260/24
**answered [1]** 4217/2
**answers [1]** 4192/23
**Anthropic [1]** 4163/21
**anti [2]** 4209/3 4214/9
**anti-competitive [2]** 4209/3 4214/9
**anticompetitive [22]** 4181/7 4199/14 4199/22 4199/25 4200/5 4201/6 4202/5 4202/19 4202/22 4203/5 4203/25 4204/16 4205/13 4207/16 4207/22 4208/10 4214/6 4215/4 4216/8 4217/7 4218/1 4263/9
**antitrust [7]** 4150/3 4150/8 4150/14 4171/22 4197/15 4202/11 4218/2
**any [25]** 4153/13 4155/15 4165/1 4169/23 4171/3 4174/19 4176/8 4181/4 4183/18 4191/11 4191/18 4193/2 4198/4 4202/15 4205/21 4207/8 4213/14 4214/12 4218/6 4220/20 4225/7 4226/22 4234/22 4246/10 4260/13
**anybody [3]** 4189/6 4214/24 4265/18
**anymore [1]** 4234/8
**anyone [3]** 4187/24 4194/5 4218/18

**anything [5]** 4153/21 4170/15 4203/22 4218/9 4237/17
**anyway [7]** 4181/2 4202/1 4202/3 4202/6 4206/14 4236/13 4272/14
**anywhere [1]** 4240/18
**API [2]** 4156/1 4157/7
**APIs [1]** 4192/14
**apologies [3]** 4157/11 4185/5 4187/11
**app [26]** 4155/24 4156/14 4156/16 4156/25 4160/2 4161/6 4161/23 4162/18 4164/13 4164/22 4165/12 4165/22 4173/16 4184/21 4184/25 4185/21 4188/16 4189/6 4190/5 4190/6 4191/17 4191/20 4245/15 4245/16 4245/23 4245/25
**appear [1]** 4176/8
**APPEARANCES [2]** 4149/11 4150/18
**appears [1]** 4161/3
**Apple [12]** 4175/14 4175/17 4175/21 4175/21 4176/5 4176/9 4261/6 4261/12 4261/14 4261/25 4262/1 4267/17
**applicable [1]** 4199/6
**application [2]** 4256/1 4256/12
**applications [6]** 4155/4 4165/20 4171/19 4171/20 4172/3 4256/14
**applied [3]** 4198/10 4198/11 4227/3
**applies [1]** 4201/22
**apply [6]** 4184/12 4197/15 4197/24 4225/15 4227/3 4229/17
**approach [10]** 4157/12 4164/5 4174/3 4186/25 4189/15 4196/23 4206/18 4225/24 4237/22 4247/23
**approached [1]** 4198/15
**approaching [2]** 4183/23 4231/13
**appropriate [4]** 4218/25 4243/24

**apps [1]** 4193/6
**arbitrary [1]** 4216/7
**are [106]** 4155/6 4159/17 4161/1 4161/20 4162/8 4162/25 4163/12 4165/10 4166/22 4169/7 4169/14 4172/19 4176/3 4176/10 4177/8 4177/25 4178/17 4179/3 4179/9 4179/16 4180/23 4181/4 4181/22 4183/23 4185/24 4189/3 4189/24 4190/5 4192/1 4193/7 4193/10 4193/12 4193/13 4193/17 4193/21 4193/23 4199/18 4200/3 4200/9 4202/12 4202/18 4203/18 4203/21 4207/15 4207/15 4208/17 4208/23 4210/5 4210/17 4212/3 4213/21 4213/25 4216/2 4216/13 4219/9 4219/12 4219/19 4219/23 4220/7 4221/10 4221/16 4223/16 4224/2 4224/5 4224/6 4226/13 4227/9 4227/25 4231/9 4232/22 4235/20 4236/9 4236/14 4237/24 4238/3 4238/4 4239/17 4240/9 4240/11 4240/23 4241/22 4242/5 4242/10 4243/12 4244/25 4245/14 4245/18 4245/20 4255/17 4256/4 4258/11 4258/24 4259/2 4260/8 4260/25 4262/23 4267/6 4267/25 4270/7 4270/13 4271/3 4272/16 4272/23 4273/12 4273/22 4274/12
**area [3]** 4234/2 4254/13 4262/25
**areas [2]** 4197/17 4198/8
**aren't [2]** 4253/13 4258/16
**argue [1]** 4258/16
**argued [1]** 4263/20
**argument [1]** 4167/2

**A**

**arising [1]**   4155/11
**around [4]**   4176/6
 4191/3 4215/25
 4265/10
**arrangements [1]**
 4191/23
**arrival [1]**   4248/6
**arrived [1]**   4178/7
**articulated [1]**
 4186/13
**artificially [1]**
 4200/17
**as [118]**   4154/3
 4157/2 4158/21
 4158/25 4158/25
 4160/20 4165/10
 4166/9 4167/19
 4169/10 4172/18
 4173/19 4175/21
 4176/16 4179/9
 4180/12 4181/6
 4184/22 4184/25
 4186/8 4186/24
 4188/7 4189/14
 4190/15 4192/17
 4193/22 4194/20
 4195/11 4196/8
 4196/10 4196/12
 4196/16 4197/5
 4198/15 4198/22
 4198/22 4198/25
 4198/25 4199/4
 4199/23 4201/1
 4201/13 4202/10
 4204/3 4204/14
 4209/20 4210/18
 4211/7 4211/13
 4213/5 4216/13
 4216/13 4216/15
 4216/24 4217/23
 4218/7 4220/10
 4220/25 4221/9
 4225/10 4225/17
 4225/18 4225/19
 4226/24 4227/10
 4227/12 4228/1
 4228/2 4229/6 4230/2
 4230/11 4231/10
 4232/17 4233/16
 4233/19 4234/14
 4234/17 4235/9
 4238/19 4239/11
 4239/14 4240/16
 4242/17 4244/18
 4247/24 4248/7
 4248/7 4250/15
 4250/15 4250/16
 4250/25 4253/13
 4254/6 4255/11
 4255/25 4257/11
 4257/16 4258/1
 4259/14 4259/15
 4259/15 4260/12
 4263/7 4263/7 4264/9

4264/13 4264/23
 4265/1 4265/18
 4267/9 4268/19
 4269/12 4269/13
 4272/17 4273/3
 4273/5 4273/21
 4274/19
**as opposed [2]**
 4211/13 4273/3
**aside [4]**   4184/2
 4236/22 4236/23
 4237/10
**ask [17]**   4163/17
 4163/24 4171/8
 4187/5 4187/14
 4187/23 4188/2
 4188/2 4188/23
 4189/1 4189/19
 4208/8 4213/25
 4214/20 4216/24
 4231/15 4246/9
**asked [19]**   4156/13
 4156/13 4156/16
 4166/18 4177/24
 4186/2 4186/17
 4186/20 4186/21
 4186/23 4188/19
 4188/23 4191/16
 4192/19 4197/14
 4197/15 4197/17
 4197/24 4256/15
**asking [2]**   4237/9
 4249/4
**aspect [3]**   4184/9
 4219/4 4242/4
**aspects [6]**   4217/6
 4221/13 4223/6
 4223/9 4226/17
 4263/21
**asserted [1]**   4228/7
**assess [5]**   4213/22
 4215/20 4217/20
 4219/1 4223/20
**assessing [1]**
 4222/20
**assessment [4]**
 4223/1 4226/20
 4241/8 4270/5
**assignment [3]**
 4197/11 4198/5
 4198/15
**assist [1]**   4196/20
**assistant [1]**
 4191/17
**associating [1]**
 4275/4
**assume [3]**   4176/25
 4177/2 4182/16
**assumed [1]**   4268/18
**assumption [1]**
 4268/15
**ATR [1]**   4150/8
**attempt [1]**   4173/3
**attempting [1]**
 4207/15

**attend [2]**   4156/6
 4156/8
**attract [1]**   4245/13
**attractive [7]**
 4179/10 4179/11
 4179/24 4180/12
 4183/21 4253/7
 4253/9
**attractiveness [1]**
 4179/18
**attrition [1]**
 4273/17
**authors [1]**   4269/16
**availability [1]**
 4170/11
**available [13]**
 4158/23 4160/23
 4163/13 4165/18
 4165/19 4167/16
 4190/8 4193/8 4193/9
 4193/23 4194/4
 4194/4 4194/5
**Avenue [3]**   4151/3
 4151/7 4151/13
**avenues [1]**   4244/23
**avoid [1]**   4200/21
**aware [22]**   4154/20
 4155/22 4156/18
 4159/20 4162/25
 4164/16 4166/22
 4171/5 4175/5
 4175/20 4175/23
 4176/15 4176/20
 4177/18 4177/25
 4178/3 4178/9 4179/5
 4180/14 4189/3
 4250/8 4263/20
**away [22]**   4202/24
 4221/8 4222/3 4228/9
 4228/16 4228/19
 4229/13 4229/15
 4230/3 4230/19
 4230/22 4231/2
 4239/21 4249/17
 4250/24 4251/1
 4265/14 4265/21
 4265/24 4266/12
 4270/22 4274/8

**B**

**back [33]**   4153/21
 4154/9 4190/18
 4195/9 4206/14
 4207/10 4207/17
 4219/6 4219/22
 4219/24 4220/1
 4220/4 4221/1 4222/4
 4222/6 4222/8
 4222/24 4226/11
 4229/21 4231/8
 4231/9 4232/2
 4233/24 4239/16
 4239/19 4241/14
 4248/21 4263/4
 4267/15 4269/23

4274/1 4274/8
 4274/11
**backward [1]**   4237/21
**backward-looking [1]**
 4237/21
**bad [8]**   4221/18
 4226/8 4250/12
 4250/19 4252/1
 4252/21 4253/18
 4254/21
**bake [3]**   4260/16
 4260/18 4260/20
**baker [3]**   4260/15
 4260/18 4260/20
**ban [2]**   4197/18
 4249/12
**bans [6]**   4240/10
 4244/14 4250/2
 4250/4 4250/7 4260/9
**bar [1]**   4251/13
**Barrett [1]**   4151/12
**barrier [4]**   4202/1
 4202/2 4232/14
 4232/17
**barriers [9]**   4232/8
 4232/11 4232/22
 4233/6 4233/10
 4233/19 4234/21
 4234/23 4249/1
**base [4]**   4262/19
 4262/21 4262/22
 4270/4
**based [5]**   4158/8
 4158/21 4158/22
 4191/1 4256/7
**basic [3]**   4168/8
 4168/10 4267/4
**basically [7]**
 4204/11 4206/12
 4206/15 4218/6
 4229/5 4232/23
 4249/15
**basis [9]**   4204/17
 4217/15 4217/17
 4239/16 4240/2
 4244/5 4245/5
 4247/14 4247/15
**Bates [2]**   4164/9
 4189/21
**be [158]**
**because [104]**
 4166/10 4168/1
 4169/1 4170/11
 4170/17 4170/23
 4172/11 4176/11
 4178/5 4180/5
 4185/20 4191/1
 4198/21 4199/11
 4199/17 4199/22
 4200/5 4200/25
 4206/10 4206/18
 4207/9 4207/21
 4209/9 4209/17
 4210/20 4210/25
 4212/15 4212/20

**B**

**because... [76]**
4215/25 4217/7
4217/23 4219/14
4219/14 4219/17
4221/18 4222/2
4222/18 4223/23
4224/5 4224/11
4224/15 4225/21
4227/12 4227/14
4229/6 4229/17
4230/12 4230/23
4232/16 4233/11
4234/12 4235/9
4235/12 4235/14
4236/9 4236/12
4237/15 4238/10
4238/17 4238/22
4240/8 4241/4
4241/15 4242/7
4242/13 4243/7
4243/13 4243/18
4243/23 4244/1
4245/12 4247/16
4249/12 4250/11
4252/13 4253/5
4253/12 4253/20
4255/2 4256/16
4256/23 4258/3
4258/10 4258/25
4259/2 4259/15
4260/25 4261/1
4261/8 4262/24
4266/9 4267/2 4268/9
4269/7 4269/10
4269/12 4269/14
4269/17 4270/21
4271/3 4271/19
4274/7 4274/24
4275/4
**become [1]** 4262/19
**been [69]** 4154/2
4155/6 4157/3 4161/4
4166/12 4166/13
4167/14 4167/22
4180/14 4180/16
4180/20 4180/24
4186/2 4193/13
4202/3 4204/7
4204/18 4206/10
4206/14 4207/17
4214/5 4214/9
4214/23 4215/15
4215/21 4217/8
4218/1 4218/14
4219/15 4219/25
4220/2 4220/4 4220/5
4220/18 4222/2
4222/3 4222/4 4223/2
4225/8 4226/10
4226/18 4230/2
4230/21 4232/24
4234/10 4239/16
4239/19 4240/18
4241/15 4241/16

4241/16 4242/9
4245/2 4248/21
4249/5 4252/5 4253/5
4258/3 4262/15
4263/8 4264/19
4264/24 4265/2
4265/11 4265/25
4266/17 4266/18
4269/15 4269/24
**before [13]** 4149/9
4153/11 4163/18
4178/7 4184/17
4223/25 4226/19
4245/21 4257/13
4258/19 4260/2
4268/19 4272/3
**begins [1]** 4188/13
**behalf [1]** 4194/23
**behavior [1]** 4176/12
**behind [1]** 4218/8
**being [8]** 4159/24
4173/16 4208/14
4251/11 4257/11
4258/17 4258/18
4259/11
**believe [10]** 4161/21
4164/17 4167/1
4167/9 4178/14
4180/9 4188/5 4189/6
4217/19 4240/20
**believes [1]** 4159/24
**benchmarks [2]**
4159/3 4161/1
**benefit [8]** 4157/16
4161/15 4161/16
4211/13 4237/17
4244/19 4254/15
4266/14
**benefited [3]**
4161/12 4212/3
4225/16
**benefits [8]** 4161/6
4161/9 4201/2
4214/16 4240/3
4243/23 4243/24
4263/24
**best [8]** 4157/20
4197/9 4199/18
4203/22 4235/10
4237/24 4238/17
4254/7
**better [28]** 4160/11
4182/11 4205/19
4206/16 4210/20
4211/19 4226/5
4231/8 4233/1
4238/22 4240/21
4242/11 4242/13
4247/6 4255/21
4258/24 4260/18
4261/1 4261/20
4264/9 4264/10
4264/15 4264/16
4265/18 4265/18
4269/18 4269/20

4269/21
**between [7]** 4193/2
4205/24 4218/9
4228/25 4234/16
4247/11 4257/8
**beyond [6]** 4205/16
4206/12 4206/15
4207/9 4219/16
4264/14
**bid [3]** 4221/8
4253/22 4253/23
**bidder [2]** 4182/20
4183/3
**bidders [4]** 4182/17
4182/22 4183/7
4183/8
**big [12]** 4209/19
4210/2 4210/3 4231/1
4231/5 4245/4
4245/13 4248/11
4264/22 4268/2
4272/16 4274/2
**bigger [1]** 4230/24
**billion [2]** 4253/14
4253/17
**billions [3]** 4175/20
4176/15 4176/20
**Bing [22]** 4161/19
4229/8 4229/9
4230/24 4235/17
4237/14 4245/12
4253/13 4272/23
4273/11 4273/12
4273/13 4273/16
4273/20 4273/25
4274/4 4274/4 4274/7
4274/8 4274/12
4274/18 4275/1
**Bing's [1]** 4161/23
**bit [9]** 4153/17
4154/16 4166/18
4183/9 4184/19
4206/4 4210/12
4231/13 4238/19
**blue [5]** 4199/10
4251/13 4273/12
4273/18 4274/9
**bold [1]** 4174/18
**Booth [1]** 4196/6
**both [11]** 4156/24
4157/20 4178/5
4199/1 4230/5
4230/11 4258/23
4262/13 4263/11
4269/10 4270/25
**bothers [1]** 4255/21
**bottom [3]** 4222/24
4240/2 4251/13
**boundaries [3]**
4193/6 4193/12
4193/17
**box [3]** 4188/16
4197/6 4199/10
**boxes [2]** 4165/24
4197/8

**boy [1]** 4233/20
**brand [5]** 4226/6
4232/13 4233/1
4233/10 4234/20
**break [5]** 4153/17
4231/11 4231/16
4275/7 4275/9
**breaking [1]** 4272/3
**briefly [2]** 4191/12
4234/19
**bright [1]** 4202/16
**bring [2]** 4155/5
4261/6
**broad [3]** 4245/5
4256/14 4257/4
**broader [2]** 4256/7
4267/6
**broadly [1]** 4168/15
**Broadway [1]** 4150/15
**brought [1]** 4173/20
**browser [18]** 4242/16
4242/16 4242/19
4250/13 4252/12
4252/15 4252/18
4264/10 4264/15
4264/20 4264/25
4265/1 4265/6
4265/19 4265/20
4266/11 4268/21
4268/21
**browsers [6]** 4176/21
4242/22 4264/16
4265/4 4265/5 4266/3
**Bruce [1]** 4150/12
**build [7]** 4160/12
4166/12 4167/15
4167/20 4192/10
4192/12 4194/7
**bullet [3]** 4204/9
4219/12 4240/1
**bunch [3]** 4261/8
4261/22 4273/16
**bus [3]** 4238/9
4238/9 4238/10
**business [5]** 4163/3
4196/6 4232/25
4242/20 4262/16
**busy [1]** 4271/14
**buy [4]** 4260/15
4260/17 4260/19
4260/20
**buyers [2]** 4172/5
4266/16

---

**C**

**cadence [1]** 4157/16
**cake [5]** 4260/16
4260/16 4260/17
4260/18 4260/19
**calibrate [2]**
4205/21 4248/2
**call [10]** 4202/17
4205/22 4211/22
4222/25 4232/18
4236/12 4238/2

**C**

call... [3]  4238/2
4250/19 4252/21
called [1]  4161/24
calling [1]  4153/4
calls [2]  4194/25
4233/19
came [4]  4211/3
4233/25 4253/11
4274/20
campaign [2]  4272/17
4272/18
can [93]  4157/25
4158/17 4158/17
4160/10 4160/25
4161/2 4161/14
4162/20 4164/12
4166/11 4167/24
4168/11 4171/12
4172/1 4173/13
4177/8 4177/9 4179/6
4179/8 4180/7
4180/13 4181/12
4181/15 4184/10
4184/15 4187/10
4187/13 4187/18
4189/2 4189/6 4189/8
4192/8 4192/11
4192/12 4192/14
4192/16 4195/20
4196/1 4197/11
4198/14 4200/1
4200/22 4201/21
4204/8 4204/9
4205/21 4206/16
4207/11 4210/16
4210/19 4211/6
4214/20 4215/1
4216/9 4216/12
4216/14 4216/19
4216/19 4216/21
4219/11 4223/11
4228/18 4232/17
4238/24 4239/8
4240/5 4242/1
4243/14 4243/14
4243/15 4243/15
4245/24 4247/5
4247/5 4248/2 4248/8
4250/21 4255/21
4257/4 4258/16
4260/13 4260/15
4261/1 4261/2
4261/18 4261/18
4261/19 4261/20
4262/8 4262/20
4262/21 4262/24
4273/21
Can you [1]  4239/8
can't [8]  4165/16
4210/9 4218/22
4222/12 4233/22
4242/24 4253/1
4257/21
cannot [4]  4159/21

4160/16 4165/7
4166/24
capabilities [3]
4160/12 4164/17
4192/16
capability [2]
4192/13 4194/8
capable [4]  4166/17
4205/6 4205/8 4227/4
capital [7]  4208/19
4232/13 4233/2
4233/10 4234/20
4235/2 4235/3
captures [1]  4199/11
car [2]  4211/24
4212/4
care [1]  4211/9
careful [2]  4158/12
4201/16
carefully [1]  4177/6
cares [1]  4211/9
Carr [1]  4150/14
carriers [1]  4252/9
case [33]  4159/1
4160/8 4166/14
4169/24 4170/3
4170/3 4173/2 4183/7
4198/9 4198/23
4199/7 4201/23
4202/12 4208/13
4208/17 4215/11
4215/13 4215/16
4215/25 4216/1
4216/10 4219/2
4219/16 4222/21
4229/2 4241/8
4242/22 4243/5
4253/4 4263/8
4267/23 4270/12
4271/21
cases [5]  4160/14
4163/5 4214/13
4215/12 4270/23
Cassidy [2]  4163/19
4173/23
casual [2]  4185/1
4225/5
catch [1]  4259/24
categorize [1]
4202/13
category [2]  4207/10
4207/12
causal [17]  4205/22
4205/23 4206/3
4207/1 4207/5 4214/1
4214/10 4214/18
4216/19 4217/24
4218/25 4222/17
4225/4 4227/10
4232/4 4233/4
4239/13
cause [1]  4209/25
caused [2]  4199/14
4199/24
caution [4]  4208/3

4208/4 4208/23 4208/9
cautions [1]  4200/13
ceding [1]  4189/24
Center [1]  4150/15
centered [1]  4216/2
centers [1]  4215/25
certain [6]  4167/18
4179/2 4193/12
4215/3 4240/3
4240/12
certainly [18]
4160/10 4160/19
4166/16 4171/5
4172/23 4179/13
4180/23 4182/12
4188/3 4190/24
4191/7 4193/7
4193/18 4208/13
4209/5 4235/19
4252/25 4263/23
Certified [1]
4151/11
certify [1]  4276/2
CH [1]  4151/12
chain [1]  4168/25
challenged [1]
4181/6
chance [1]  4235/10
change [7]  4191/3
4191/7 4204/4
4205/20 4233/18
4238/3 4247/7
changed [5]  4178/10
4191/7 4205/12
4205/25 4234/15
changes [3]  4176/12
4183/8 4183/11
changing [1]  4238/4
chart [3]  4231/9
4267/8 4268/17
charts [1]  4231/9
Chat [1]  4161/2
ChatGPT [3]  4159/20
4160/3 4162/4
cheaper [2]  4260/17
4262/17
check [1]  4189/1
Chicago [2]  4150/5
4195/1
chipped [1]  4228/9
chipping [7]  4228/16
4228/19 4229/13
4229/15 4230/19
4230/22 4231/2
chipping-away [1]
4228/19
Chipty [15]  4198/2
4218/17 4221/12
4226/19 4227/10
4228/7 4229/14
4243/3 4246/2
4248/20 4252/24
4254/6 4257/24
4263/14 4268/15
Chipty's [6]  4232/7

4242/22 4249/21
4254/19 4267/10
4267/15
choice [48]  4183/24
4197/21 4224/4
4224/5 4224/6 4224/7
4224/10 4224/17
4224/19 4224/20
4224/21 4224/23
4224/24 4225/10
4225/13 4225/18
4225/23 4226/5
4229/4 4230/18
4233/16 4250/10
4250/11 4250/19
4251/11 4252/1
4252/21 4253/18
4266/6 4266/8
4266/21 4270/2
4270/7 4270/11
4270/13 4270/21
4270/22 4270/24
4271/2 4271/4 4271/5
4271/12 4271/13
4271/19 4271/25
4274/10 4274/15
4274/17
choices [2]  4254/21
4271/13
choose [6]  4270/18
4271/7 4271/8 4271/9
4271/10 4274/11
chosen [1]  4274/17
Chrome [24]  4197/20
4216/13 4217/5
4221/8 4240/11
4244/10 4244/11
4264/2 4264/7 4264/9
4264/13 4265/17
4265/22 4266/6
4266/6 4266/9
4266/16 4267/5
4267/13 4267/20
4268/14 4268/16
4268/18 4268/20
Chrome's [1]  4264/22
Chromium [10]  4264/3
4264/7 4264/14
4265/1 4265/9
4265/13 4265/17
4265/20 4266/16
4267/5
circumstances [2]
4213/21 4213/23
circumvent [2]
4263/15 4263/21
Civil [1]  4153/5
clarity [1]  4184/6
clarity's [1]  4188/8
class [2]  4212/14
4212/19
clawback [1]  4267/19
clear [9]  4155/10
4193/24 4214/24
4222/8 4240/17

**C**

clear... [4]   4255/9
 4256/11 4256/16
 4269/7
clearly [2]   4230/10
 4266/19
click [2]   4193/14
 4193/20
close [2]   4187/19
 4189/2
closely [1]   4201/9
closer [1]   4186/13
co [3]   4150/16
 4236/11 4236/11
co-distribution [1]
 4236/11
co-promotion [1]
 4236/11
coag.gov [1]   4150/17
coaster [6]   4222/7
 4239/12 4239/20
 4240/17 4241/4
 4248/14
coincidence [1]
 4265/9
collect [1]   4194/6
collection [1]
 4194/8
Collective [1]
 4219/12
Colorado [4]   4150/12
 4150/13 4150/14
 4272/6
COLUMBIA [1]   4149/1
column [3]   4204/23
 4206/24 4208/1
combination [1]
 4261/22
combined [1]   4229/9
combining [1]
 4270/25
come [10]   4163/4
 4199/2 4209/8 4219/6
 4242/19 4256/6
 4257/20 4263/24
 4269/23 4271/8
comes [8]   4169/13
 4211/11 4212/4
 4225/6 4240/19
 4248/23 4261/4
 4267/19
coming [7]   4215/6
 4234/2 4234/3 4235/3
 4237/7 4237/8
 4237/12
commercial [1]
 4175/4
commingling [2]
 4262/7 4263/17
common [1]   4218/2
communicating [1]
 4251/16
companies [2]
 4157/25 4178/24
company [2]   4181/11

4181/11
compare [1]   4214/5
compared [2]   4165/11
 4267/24
comparison [4]
 4214/7 4216/6 4227/7
 4261/17
compensation [1]
 4266/11
compete [20]   4168/12
 4201/18 4203/13
 4209/16 4217/12
 4224/9 4234/10
 4242/20 4242/23
 4242/24 4243/1
 4243/14 4243/14
 4243/15 4243/16
 4244/7 4244/11
 4244/16 4244/23
 4245/17
competed [1]   4264/8
competing [3]
 4238/21 4243/20
 4245/20
competition [65]
 4176/5 4182/6
 4183/20 4203/11
 4204/10 4204/17
 4205/14 4206/7
 4206/8 4207/23
 4209/9 4209/10
 4209/18 4210/2
 4210/3 4210/5
 4210/21 4214/4
 4215/22 4217/23
 4217/25 4219/15
 4221/4 4221/7
 4221/11 4221/14
 4221/19 4221/23
 4225/6 4233/21
 4234/2 4234/5
 4234/24 4236/25
 4237/4 4237/5 4237/7
 4237/13 4237/16
 4238/7 4238/13
 4239/14 4239/15
 4239/17 4239/22
 4240/3 4240/22
 4241/1 4241/2
 4241/17 4242/4
 4242/5 4242/8 4242/8
 4243/4 4243/5
 4243/13 4244/16
 4244/20 4245/23
 4246/21 4248/8
 4248/21 4254/17
 4265/23
competitive [73]
 4155/11 4155/15
 4155/20 4158/8
 4158/13 4158/14
 4166/5 4166/15
 4167/10 4168/17
 4181/18 4183/12
 4183/14 4199/13

4199/17 4199/17
4199/20 4200/1
4200/2 4200/4 4200/7
4200/15 4200/16
4200/19 4201/7
4201/9 4201/19
4203/4 4203/11
4203/12 4204/20
4204/22 4205/2
4205/12 4205/16
4205/17 4205/18
4206/17 4208/21
4209/3 4210/16
4211/8 4211/9
4211/17 4211/23
4212/10 4212/13
4213/2 4213/15
4214/9 4214/14
4214/15 4215/3
4216/4 4219/21
4220/22 4220/23
4221/1 4221/2 4221/6
4221/17 4221/24
4238/20 4239/21
4241/19 4241/24
4243/6 4243/10
4243/13 4258/25
4259/12 4263/5
4263/6
competitive-type [1]
 4213/15
competitor [4]
 4175/6 4192/7
 4200/21 4261/14
competitors [12]
 4156/23 4158/16
 4159/5 4163/8 4182/2
 4183/21 4192/11
 4210/11 4235/1
 4236/9 4244/18
 4257/9
complement [1]
 4244/11
complementary [4]
 4258/17 4258/18
 4262/23 4264/14
complements [4]
 4242/15 4242/21
 4243/15 4264/8
completely [1]
 4222/1
complication [1]
 4223/24
component [1]
 4227/18
components [3]
 4162/19 4170/6
 4197/13
computational [2]
 4169/6 4170/18
compute [1]   4194/7
computer [4]   4151/15
 4271/7 4271/9
 4271/11
computer-aided [1]

4151/15
computers [1]   4239/1
concept [5]   4168/10
 4204/21 4213/6
 4230/19 4248/1
concepts [1]   4222/19
conceptualization [1]
 4168/13
concerning [2]
 4199/5 4239/9
conclusion [2]
 4163/14 4191/8
conclusions [3]
 4177/12 4199/2
 4239/8
conditional [6]
 4197/20 4244/12
 4268/25 4269/5
 4269/16 4269/25
conduct [49]   4199/14
 4199/22 4199/24
 4199/25 4200/5
 4201/6 4201/11
 4201/22 4202/2
 4202/5 4202/18
 4202/21 4203/3
 4203/25 4204/10
 4205/2 4205/9
 4205/11 4205/11
 4205/13 4205/24
 4206/20 4207/16
 4207/21 4207/24
 4208/11 4209/3
 4213/8 4213/13
 4213/17 4214/6
 4214/9 4215/3 4215/4
 4215/14 4216/8
 4216/10 4216/25
 4218/1 4218/2 4219/3
 4220/16 4220/19
 4220/21 4220/25
 4232/8 4233/9
 4240/22 4263/10
connection [21]
 4190/21 4198/4
 4205/23 4205/24
 4206/4 4206/22
 4207/2 4207/5 4214/2
 4214/10 4214/19
 4216/20 4217/24
 4218/25 4222/18
 4225/4 4225/6
 4227/10 4232/4
 4233/4 4239/13
CONNOLLY [1]   4151/3
consequences [2]
 4259/17 4259/18
conservative [3]
 4225/19 4225/19
 4225/21
consider [15]   4159/5
 4170/11 4170/24
 4171/14 4171/15
 4172/7 4172/11
 4172/23 4173/3

**C**

**consider... [6]**
4179/12 4188/2
4188/3 4193/7
4193/18 4232/5
**considered [9]**
4169/15 4170/7
4172/14 4208/15
4249/22 4261/12
4266/15 4267/10
4268/24
**considering [2]**
4190/17 4213/5
**consistent [12]**
4158/11 4162/2
4168/24 4170/1
4176/12 4186/14
4188/14 4188/21
4191/24 4198/24
4228/1 4267/8
**constant [1]**   4268/19
**Constitution [1]**
4151/13
**constrain [1]**
4182/23
**constraining [1]**
4182/25
**constraint [4]**
4165/15 4182/9
4182/13 4183/12
**constraints [8]**
4179/10 4179/11
4180/10 4182/10
4184/6 4184/7
4184/12 4194/10
**construct [5]**
4198/21 4215/7
4217/20 4223/20
4224/1
**constructive [1]**
4215/8
**consumer [17]**
4150/13 4171/19
4172/3 4192/1
4199/15 4199/18
4199/19 4200/2
4200/7 4201/1
4201/16 4205/25
4214/4 4214/8
4242/18 4254/17
4265/24
**consumers [16]**
4175/4 4201/20
4209/12 4209/18
4210/2 4210/19
4210/22 4212/3
4237/25 4240/4
4242/6 4253/8
4255/13 4255/19
4262/17 4266/22
**consumers' [1]**
4171/20
**contemplate [1]**
4181/12
**contemplating [2]**

4176/10 4192/1
**contemporaneously [1]**
4163/25
**context [4]**   4158/2
4172/2 4191/6 4265/3
**continue [6]**   4153/11
4165/23 4184/10
4250/12 4256/3
4269/8
**continued [3]**   4151/1
4154/5 4265/13
**continues [2]**
4179/10 4250/24
**contract [3]**   4216/11
4217/5 4217/16
**contracting [2]**
4202/22 4202/24
**contracts [3]**
4162/25 4227/20
4227/22
**contrast [1]**   4265/12
**control [4]**   4174/19
4175/16 4176/8
4192/1
**controls [2]**   4168/11
4168/16
**conventional [1]**
4236/1
**conversations [2]**
4188/14 4193/15
**copies [1]**   4157/10
**CoPilot [1]**   4161/24
**copy [2]**   4173/25
4189/14
**core [1]**   4199/9
**correct [60]**   4154/18
4154/19 4154/22
4155/3 4155/24
4157/1 4158/1
4158/23 4159/22
4160/3 4161/7
4161/24 4162/5
4162/12 4163/9
4164/16 4164/23
4165/12 4166/6
4167/11 4168/5
4168/12 4168/15
4168/22 4169/7
4169/19 4169/24
4170/6 4170/20
4171/3 4171/24
4173/7 4174/20
4174/21 4174/24
4175/7 4175/22
4176/17 4176/21
4177/19 4177/22
4177/22 4178/12
4178/12 4179/7
4179/17 4180/15
4184/4 4185/17
4185/22 4186/3
4186/10 4186/18
4190/6 4190/13
4190/23 4191/4
4217/21 4252/20

4276/3
**correcting [1]**
4207/22
**corrective [19]**
4202/17 4202/23
4203/7 4204/9 4205/1
4205/9 4206/1
4208/20 4219/17
4219/17 4220/24
4232/15 4232/21
4233/21 4235/8
4236/7 4238/14
4240/24 4263/18
**correctly [1]**
4226/14
**correspond [1]**
4207/9
**corresponding [1]**
4198/7
**cost [12]**   4183/18
4232/13 4237/15
4244/5 4255/14
4255/16 4255/18
4256/21 4266/14
4268/9 4272/21
4275/3
**costly [1]**   4275/2
**costs [7]**   4168/12
4168/14 4214/17
4251/14 4255/10
4271/1 4271/2
**could [42]**   4154/23
4154/24 4154/25
4155/6 4159/25
4160/12 4162/5
4162/7 4163/19
4163/24 4171/14
4171/15 4173/23
4175/24 4187/2
4187/4 4192/10
4193/9 4193/22
4193/22 4200/6
4203/23 4208/8
4208/16 4211/25
4215/9 4215/13
4219/8 4233/12
4236/17 4236/25
4236/25 4238/24
4241/11 4244/2
4246/3 4246/6
4246/17 4250/12
4250/13 4250/15
4261/9
**couldn't [1]**   4160/8
**counsel [3]**   4184/20
4185/4 4185/17
**counterproductive [1]**
4209/19
**couple [5]**   4178/7
4222/25 4226/2
4239/12 4273/14
**course [3]**   4249/16
4252/17 4255/25
**court [38]**   4149/1
4151/10 4151/12

4150/12 4157/16
4166/22 4175/5
4194/22 4196/1
4196/20 4197/11
4198/21 4199/23
4201/21 4202/20
4202/23 4204/5
4204/8 4204/16
4205/5 4207/11
4219/11 4223/14
4226/20 4227/2
4228/1 4228/6
4228/21 4231/17
4239/8 4241/9 4242/1
4250/8 4252/6 4252/6
4252/19 4262/8
4275/12
**Court's [9]**   4166/19
4167/3 4203/2
4203/10 4216/24
4217/18 4222/19
4226/24 4228/1
**cover [1]**   4198/13
**covered [1]**   4222/18
**cow [1]**   4212/23
**cows [2]**   4212/20
4239/2
**craft [1]**   4198/23
**crafting [2]**   4202/11
4213/10
**create [2]**   4239/21
4267/11
**created [1]**   4202/2
**creates [2]**   4258/23
4269/17
**creating [4]**   4189/22
4190/13 4260/3
4269/10
**crime [1]**   4209/21
**critique [1]**   4274/23
**CROSS [2]**   4152/4
4154/5
**CROSS-EXAMINATION [1]**
4154/5
**CRR [2]**   4276/2
4276/8
**crux [1]**   4217/24
**Cue [7]**   4203/16
4234/7 4235/22
4250/9 4250/10
4251/8 4266/8
**Cue's [3]**   4211/4
4234/1 4236/19
**current [4]**   4166/13
4183/12 4196/2
4253/19
**curves [1]**   4222/14
**customer [3]**   4253/21
4268/7 4268/8
**customers [4]**
4252/10 4268/8
4268/12 4273/12
**customers' [1]**
4210/24
**cut [2]**   4172/8

**C**

cut... [1]   4254/2
cute [1]   4222/10
cuts [1]   4246/8
cuts against [1]
 4246/8
cutting [2]   4244/18
 4259/14
CV [1]   4149/4
cycle [1]   4180/11

**D**

D.C [5]   4149/5
 4150/10 4151/4
 4151/8 4151/13
Dahlquist [2]   4150/2
 4153/8
damage [1]   4218/5
dampen [1]   4180/3
dampened [1]   4180/20
dangerous [1]
 4239/22
data [53]   4154/12
 4154/12 4154/16
 4154/17 4154/21
 4154/23 4154/24
 4154/25 4155/11
 4155/16 4158/23
 4158/25 4159/1
 4160/4 4160/13
 4160/22 4161/7
 4163/4 4163/8
 4167/25 4169/7
 4170/18 4190/8
 4191/7 4192/13
 4192/14 4192/20
 4192/22 4192/25
 4193/1 4193/2 4193/7
 4193/8 4193/15
 4193/18 4193/19
 4193/20 4193/22
 4194/1 4194/2 4194/2
 4194/12 4208/18
 4210/8 4210/9 4215/1
 4221/9 4230/9 4230/9
 4254/20 4257/23
 4258/1 4258/4
data-sharing [2]
 4221/9 4254/20
dataset [1]   4155/7
Date [1]   4276/7
dates [2]   4270/12
 4270/12
David [2]   4150/2
 4153/8
david.dahlquist [1]
 4150/6
day [9]   4149/7
 4178/23 4192/19
 4232/19 4232/20
 4271/6 4271/14
 4274/2 4274/6
days [4]   4180/7
 4273/14 4273/21
 4273/24

deal [9]   4181/11
 4181/15 4191/19
 4228/25 4230/1
 4230/1 4231/4
 4233/22 4255/20
deals [5]   4180/13
 4180/23 4181/1
 4183/23 4270/10
debates [1]   4241/10
decay [1]   4265/7
decide [2]   4203/14
 4228/6
decision [1]   4228/2
deck [1]   4185/3
decreases [1]
 4183/22
default [15]   4175/21
 4176/16 4176/21
 4230/3 4231/6
 4267/25 4268/6
 4270/15 4270/16
 4270/17 4270/19
 4270/20 4270/21
 4270/23 4274/21
defaults [5]   4243/4
 4243/5 4243/6
 4243/12 4270/21
Defendant [4]   4149/7
 4151/2 4154/2
 4195/15
DEFENDANT'S [1]
 4152/5
defendants [1]
 4153/9
defined [1]   4186/8
definitely [1]
 4234/18
definition [12]
 4186/10 4186/16
 4186/18 4187/24
 4188/6 4188/11
 4188/15 4189/1
 4190/22 4193/12
 4218/12 4260/25
degree [4]   4183/16
 4225/20 4246/11
 4247/24
delay [1]   4179/22
deliberately [1]
 4171/6
demonstrative [7]
 4156/4 4157/10
 4157/14 4173/22
 4181/25 4190/18
 4190/19
demonstratives [1]
 4174/1
denial [1]   4210/7
Denver [1]   4150/16
deny [4]   4167/17
 4209/1 4209/2
 4209/10
denying [3]   4209/16
 4209/17 4213/16
department [5]

4150/3 4150/13
 4180/2 4181/6 4196/5
depending [1]   4172/1
depends [2]   4162/7
 4182/24
depicting [4]   4220/7
 4223/16 4223/17
 4250/21
deposition [6]
 4172/17 4186/8
 4187/2 4187/18
 4188/10 4189/2
derivative [2]
 4232/23 4233/3
describe [3]   4197/14
 4198/14 4199/4
described [5]
 4202/11 4204/21
 4208/20 4267/13
 4271/18
describing [2]
 4162/2 4162/8
designed [1]   4272/18
designs [2]   4212/5
 4212/6
desire [1]   4220/17
desktop [6]   4249/10
 4249/21 4250/1
 4253/11 4267/21
 4267/24
despite [2]   4166/4
 4167/9
detail [1]   4240/9
details [2]   4178/22
 4180/17
deter [1]   4209/23
determine [1]   4213/6
deterrence [3]
 4209/6 4209/8
 4209/23
detract [1]   4200/16
develop [1]   4211/12
developed [2]
 4262/24 4269/22
developing [3]
 4211/18 4264/20
 4268/21
deviate [1]   4216/17
deviating [1]
 4248/18
device [1]   4254/2
devices [8]   4175/22
 4176/17 4253/25
 4267/17 4267/18
 4270/3 4271/21
 4272/1
devise [1]   4198/19
devoted [2]   4170/9
 4173/17
did [54]   4156/6
 4156/7 4159/11
 4168/23 4170/4
 4170/5 4170/8
 4170/10 4170/15
 4171/2 4172/6 4172/7

4172/11 4172/17
 4172/23 4173/3
 4173/5 4173/10
 4187/23 4188/2
 4188/2 4188/19
 4188/23 4196/19
 4196/22 4208/2
 4217/13 4222/20
 4226/19 4227/3
 4228/10 4228/11
 4228/23 4229/18
 4230/7 4230/23
 4232/5 4232/9 4233/9
 4234/19 4242/13
 4251/8 4251/9 4252/3
 4254/8 4254/18
 4259/15 4259/16
 4262/10 4262/25
 4268/15 4272/7
 4272/9 4274/2
did you [10]   4156/6
 4156/7 4159/11
 4188/19 4196/19
 4232/5 4252/3 4254/8
 4254/18 4272/7
didn't [12]   4156/8
 4156/20 4172/8
 4172/22 4173/3
 4173/18 4188/17
 4189/1 4226/22
 4226/22 4251/10
 4265/12
difference [9]
 4158/15 4158/19
 4214/10 4214/11
 4214/12 4214/12
 4218/9 4219/5
 4226/25
differences [1]
 4253/13
different [35]
 4161/14 4167/20
 4173/12 4184/9
 4190/25 4205/20
 4205/21 4211/18
 4211/21 4212/5
 4212/21 4212/25
 4216/4 4227/3
 4235/15 4235/20
 4235/21 4236/9
 4236/10 4238/23
 4238/23 4238/24
 4240/18 4255/6
 4257/18 4257/18
 4258/9 4258/13
 4258/13 4258/15
 4260/21 4263/10
 4269/14 4273/20
 4274/15
differentiate [1]
 4258/7
differentiated [6]
 4183/15 4183/19
 4212/9 4235/6
 4235/10 4236/12

**differentiation [1]**
 4258/2
**difficult [4]**   4185/8
 4203/20 4210/20
 4211/1
**digging [1]**   4210/25
**dimension [4]**
 4224/13 4247/11
 4255/6 4257/6
**dimensions [5]**
 4215/21 4215/22
 4226/21 4242/9
 4242/9
**diminish [4]**   4200/24
 4237/13 4246/10
 4257/6
**diminished [4]**
 4237/18 4246/7
 4254/17 4256/4
**diminishes [2]**
 4244/1 4256/25
**diminishing [1]**
 4237/15
**direct [17]**   4152/4
 4157/2 4157/24
 4167/19 4171/10
 4173/12 4173/22
 4176/5 4177/15
 4184/20 4195/16
 4203/13 4203/20
 4228/5 4247/9
 4252/12 4255/3
**directing [1]**   4248/9
**direction [9]**   4200/1
 4203/3 4204/6
 4230/15 4238/7
 4251/24 4254/5
 4259/19 4263/1
**directionally [1]**
 4200/6
**directly [6]**   4232/14
 4232/16 4242/24
 4247/2 4247/20
 4270/19
**disagree [1]**   4258/14
**discourage [1]**
 4257/3
**discuss [2]**   4153/11
 4231/15
**discussed [5]**   4157/2
 4230/2 4231/10
 4245/2 4266/18
**discussing [2]**
 4159/23 4167/19
**discussion [5]**
 4158/3 4166/20
 4233/4 4234/16
 4243/3
**disgorgement [1]**
 4209/24
**disincentive [1]**
 4260/21
**disincentives [1]**
 4258/23

**disorganized [1]**
 4212/15
**disruptive [1]**
 4271/16
**distinctions [1]**
 4193/2
**distinguished [1]**
 4196/4
**distort [1]**   4201/19
**distortion [1]**
 4240/25
**distribution [47]**
 4171/9 4171/9
 4171/12 4171/23
 4172/13 4172/18
 4172/21 4173/5
 4173/7 4173/13
 4174/14 4174/19
 4175/3 4175/6
 4175/10 4175/17
 4176/5 4177/2 4177/4
 4191/17 4216/12
 4217/5 4217/13
 4217/16 4218/20
 4224/9 4224/11
 4224/16 4224/17
 4227/14 4227/16
 4228/13 4228/14
 4229/18 4229/19
 4230/4 4230/5
 4232/12 4232/14
 4232/16 4232/17
 4232/18 4232/19
 4232/19 4235/11
 4236/11 4266/20
**distributors [2]**
 4176/16 4217/10
**DISTRICT [3]**   4149/1
 4149/1 4149/10
**divest [2]**   4269/19
 4269/23
**divesting [1]**
 4244/10
**divestiture [7]**
 4197/20 4197/21
 4240/11 4244/12
 4268/16 4268/25
 4269/5
**divestment [1]**
 4269/9
**divestures [1]**
 4264/2
**divide [1]**   4200/12
**Division [2]**   4150/3
 4150/8
**DMA [1]**   4224/21
**do [143]**
**do you [15]**   4159/5
 4166/25 4167/5
 4173/25 4187/22
 4188/2 4188/3
 4206/22 4208/10
 4210/13 4218/21
 4225/18 4227/25
 4255/22 4265/14

**Do you have [2]**
 4164/25 4199/5
**Do you remember [1]**
 4166/20
**Do you see [3]**
 4159/9 4166/1 4190/1
**document [11]**
 4163/17 4163/20
 4163/20 4164/8
 4165/4 4165/5 4165/9
 4166/2 4189/9
 4189/18 4192/4
**does [39]**   4155/10
 4155/12 4156/25
 4158/1 4158/7
 4161/15 4162/11
 4166/5 4169/22
 4174/18 4175/16
 4176/7 4177/1 4177/3
 4179/21 4182/6
 4182/9 4182/20
 4182/23 4184/21
 4186/8 4186/12
 4186/15 4188/11
 4191/18 4204/21
 4211/21 4225/3
 4225/13 4229/12
 4229/15 4230/18
 4236/6 4248/14
 4248/15 4258/17
 4260/1 4263/13
 4274/22
**doesn't [20]**   4155/19
 4160/2 4194/13
 4206/7 4217/19
 4227/17 4236/8
 4239/15 4239/23
 4242/5 4242/7
 4245/18 4251/1
 4251/24 4251/25
 4254/25 4258/22
 4259/14 4261/7
 4270/19
**doing [15]**   4160/23
 4161/3 4186/12
 4210/1 4212/9
 4212/24 4231/7
 4235/2 4237/17
 4251/5 4251/18
 4257/10 4258/14
 4261/10 4264/19
**DOJ [2]**   4150/2
 4150/8
**DOJ-ATR [1]**   4150/8
**dollars [3]**   4175/20
 4176/15 4176/21
**domain [2]**   4160/13
 4161/2
**don't [81]**   4157/5
 4160/18 4160/25
 4162/6 4162/9
 4162/13 4162/16
 4165/7 4165/13
 4165/13 4167/1
 4167/17 4169/10

4170/7 4170/21
 4178/21 4180/22
 4181/8 4181/14
 4181/20 4182/8
 4182/10 4188/6
 4188/23 4189/5
 4189/11 4193/1
 4193/11 4200/24
 4203/12 4204/2
 4204/12 4207/3
 4208/4 4209/15
 4215/7 4215/19
 4219/1 4219/16
 4221/25 4223/19
 4227/6 4227/19
 4230/9 4231/9
 4233/18 4234/22
 4236/24 4237/4
 4238/4 4238/8 4238/8
 4238/9 4238/11
 4238/20 4238/20
 4240/8 4241/10
 4242/7 4242/8 4244/5
 4245/22 4248/8
 4251/19 4254/22
 4255/13 4257/16
 4258/8 4260/11
 4261/24 4262/2
 4262/3 4263/19
 4265/9 4266/25
 4267/2 4269/18
 4269/22 4270/17
 4270/24 4273/10
**done [8]**   4160/21
 4177/11 4180/22
 4203/6 4212/4
 4219/15 4223/8
 4265/18
**doubled [1]**   4229/6
**dovetail [1]**   4228/4
**down [12]**   4157/16
 4162/21 4167/24
 4184/15 4212/25
 4221/5 4221/10
 4231/8 4260/15
 4265/11 4265/13
 4274/10
**downloaded [1]**
 4267/20
**downside [2]**   4210/2
 4210/3
**downstream [4]**
 4171/18 4175/2
 4175/3 4251/6
**downward [1]**   4221/14
**DR [1]**   4154/2
**Dr. [31]**   4195/9
 4196/16 4198/2
 4198/2 4198/3
 4218/17 4221/12
 4226/3 4226/19
 4227/10 4228/7
 4229/14 4229/16
 4231/15 4232/7
 4243/3 4244/22

**D**

Dr.... [14]  4245/9
 4246/2 4248/20
 4249/21 4252/24
 4254/6 4254/19
 4257/24 4263/14
 4267/10 4267/15
 4268/15 4274/14
 4274/23
Dr. Chipty [15]
 4198/2 4218/17
 4221/12 4226/19
 4227/10 4228/7
 4229/14 4243/3
 4246/2 4248/20
 4252/24 4254/6
 4257/24 4263/14
 4268/15
Dr. Chipty's [6]
 4232/7 4244/22
 4249/21 4254/19
 4267/10 4267/15
Dr. Luca [2]  4198/2
 4274/23
Dr. Murphy [4]
 4195/9 4196/16
 4229/16 4231/15
Dr. Rangel [3]
 4198/3 4226/3
 4274/14
Dr. Whinston [1]
 4245/9
dramatic [1]  4249/25
drawn [2]  4268/17
 4273/6
drive [3]  4238/8
 4238/9 4238/10
driving [1]  4191/7
drop [1]  4274/2
dude [1]  4212/24
due [1]  4165/14
duplicate [2]
 4211/15 4258/1
duplication [2]
 4211/14 4211/22
during [2]  4214/23
 4231/16
dynamic [4]  4183/9
 4183/12 4200/23
 4241/21

**E**

each [2]  4243/17
 4243/19
earlier [2]  4247/25
 4264/6
early [2]  4181/10
 4223/9
early-stage [1]
 4181/10
easier [5]  4164/11
 4169/1 4235/25
 4258/8 4262/17
easily [1]  4259/15
easy [4]  4172/4

4207/14 4215/16
4258/10
economic [11]  4168/3
 4177/12 4197/14
 4197/25 4198/8
 4199/4 4199/5
 4200/10 4208/12
 4241/7 4251/7
economics [20]
 4196/5 4196/5 4196/8
 4196/11 4196/16
 4198/18 4203/1
 4209/6 4209/14
 4218/2 4222/15
 4232/18 4235/3
 4243/22 4246/5
 4250/25 4254/4
 4259/19 4268/4
 4268/11
economist [11]
 4168/8 4198/17
 4209/20 4211/7
 4213/5 4215/2 4259/4
 4259/7 4259/9
 4259/11 4260/13
economist's [1]
 4241/20
economy [3]  4180/20
 4201/1 4211/22
ecosystem [1]
 4189/25
Eddy [8]  4203/16
 4211/4 4234/1 4234/7
 4235/22 4250/9
 4250/10 4266/8
Eddy Cue [5]  4203/16
 4234/7 4235/22
 4250/9 4250/10
Eddy Cue's [2]
 4211/4 4234/1
Edge [1]  4265/4
education [3]
 4197/22 4272/5
 4272/17
effect [15]  4204/13
 4204/13 4204/14
 4206/6 4217/19
 4220/20 4225/2
 4225/2 4227/20
 4231/1 4236/5 4236/6
 4247/16 4248/2
 4253/12
effective [4]
 4161/11 4245/19
 4272/21 4273/4
effectively [1]
 4236/24
efficient [1]
 4211/21
effort [4]  4181/21
 4211/14 4211/15
 4273/4
efforts [1]  4161/10
either [12]  4156/8
 4170/18 4173/6

4173/15 4173/23
4181/5 4183/2
4194/11 4213/10
4213/17 4252/15
4266/10
elaborate [2]  4240/5
 4242/1
element [2]  4183/14
 4217/1
elements [8]  4155/23
 4156/14 4169/6
 4169/17 4169/23
 4175/13 4199/11
 4227/21
elevation [1]
 4234/23
eliminate [5]  4182/6
 4182/12 4199/24
 4224/11 4254/25
eliminated [1]
 4244/15
eliminating [5]
 4225/9 4226/16
 4226/17 4229/5
 4233/16
elimination [1]
 4182/20
Elizabeth [1]  4156/7
else [15]  4209/15
 4225/19 4235/11
 4235/13 4235/14
 4238/9 4247/8
 4255/16 4256/24
 4256/25 4265/19
 4265/22 4266/1
 4266/10 4268/22
Email [6]  4150/6
 4150/11 4150/17
 4151/5 4151/5 4151/9
embedded [1]  4175/4
emergence [1]
 4255/23
emerging [2]  4261/5
 4261/8
Emeritus [1]  4196/6
emphasis [1]  4256/17
emphasize [1]  4243/4
empirically [1]
 4245/20
employed [1]  4198/14
encourage [1]
 4272/18
end [13]  4203/21
 4203/24 4221/25
 4222/7 4222/15
 4240/21 4249/24
 4259/9 4259/14
 4272/12 4272/13
 4272/14 4274/8
endlessly [1]  4230/2
ends [1]  4260/5
engage [2]  4185/21
 4185/21
engine [15]  4226/12
 4236/1 4238/25

4242/17 4252/22
4253/7 4255/4 4261/6
4264/9 4264/10
4265/1 4265/20
4266/23 4268/22
4274/18
engineering [4]
 4160/21 4160/24
 4161/9 4194/6
engines [5]  4162/14
 4253/9 4253/16
 4266/4 4270/11
enhance [1]  4237/13
enhances [1]  4258/9
enough [2]  4214/13
 4238/10
ensure [2]  4155/2
 4208/21
ensuring [1]  4210/16
enter [6]  4191/19
 4260/10 4261/11
 4261/13 4261/17
 4261/20
entities [1]  4162/24
entitled [1]  4213/19
entrants [1]  4244/20
entry [9]  4201/25
 4202/1 4232/8
 4232/11 4233/6
 4233/10 4233/19
 4234/20 4249/1
environment [6]
 4203/19 4203/20
 4216/5 4221/1
 4226/13 4258/25
envision [2]  4177/8
 4177/9
episodes [1]  4228/24
especially [3]
 4171/15 4171/19
 4172/2
essential [1]  4218/8
essentially [2]
 4233/6 4234/10
establish [1]
 4205/23
establishes [1]
 4214/24
establishing [1]
 4226/25
estimate [2]  4229/4
 4268/6
estimates [2]
 4254/16 4267/18
et [5]  4149/3 4153/6
 4224/22 4253/10
 4275/3
European [1]  4224/20
evaluate [2]  4197/25
 4254/19
evaluated [2]  4181/2
 4244/21
evaluation [2]
 4177/20 4262/8
even [26]  4181/11

**E**

even... **[25]**  4224/16 4226/5 4227/12 4227/14 4234/13 4235/19 4235/25 4236/14 4237/13 4237/21 4242/22 4244/20 4245/22 4245/22 4246/13 4248/20 4249/25 4254/10 4254/16 4254/24 4255/8 4268/11 4271/3 4271/15 4274/10
event **[1]**  4229/11
ever **[3]**  4186/2 4199/18 4211/1
every **[4]**  4183/16 4212/20 4212/24 4271/4
everybody **[5]** 4210/14 4242/14 4256/24 4256/25 4275/11
everyone **[3]**  4153/3 4153/10 4231/20
everything **[3]** 4212/2 4259/3 4263/1
evidence **[22]** 4155/14 4198/23 4214/1 4216/16 4223/3 4223/4 4223/8 4223/9 4224/4 4224/19 4228/18 4232/4 4233/9 4233/13 4234/20 4234/22 4240/25 4245/11 4249/2 4252/3 4264/17 4264/18
evolution **[2]** 4237/20 4248/11
evolved **[1]**  4248/5
evolving **[1]**  4176/2
exacerbate **[1]** 4255/8
exacerbated **[1]** 4233/10
exacerbation **[2]** 4232/7 4234/20
exactly **[10]**  4169/20 4188/21 4190/15 4207/20 4212/20 4215/5 4235/4 4253/1 4262/25 4267/1
examination **[5]** 4154/5 4157/24 4184/20 4191/14 4195/16
examined **[1]**  4172/20
example **[22]**  4155/5 4155/6 4160/7 4162/14 4172/24 4179/20 4182/14 4183/21 4188/16

4201/21 4201/25 4202/20 4211/12 4221/8 4229/2 4235/1 4245/16 4246/13 4247/4 4251/25 4257/9 4274/14
exceed **[2]**  4179/3 4214/17
exceeded **[1]**  4181/2
exchange **[4]**  4246/20 4254/15 4262/2 4268/13
exclude **[1]**  4193/15
excluded **[1]**  4193/14
exclusive **[18]** 4175/21 4176/10 4176/21 4191/20 4191/23 4192/3 4202/21 4202/24 4217/1 4217/6 4217/15 4217/17 4223/5 4223/9 4224/11 4227/18 4227/21 4270/20
exclusively **[2]** 4191/19 4194/3
exclusivity **[23]** 4192/2 4216/11 4216/16 4224/13 4224/24 4225/1 4225/9 4225/12 4225/20 4225/22 4226/16 4227/20 4229/5 4233/17 4235/9 4235/24 4236/5 4236/7 4243/11 4246/14 4247/4 4263/15 4263/21
exhibits **[1]**  4163/25
existed **[2]**  4206/14 4220/16
existence **[1]** 4214/11
existing **[2]**  4232/8 4257/9
expand **[5]**  4251/3 4254/1 4254/3 4254/4 4264/13
expansion **[1]**  4249/1
expect **[5]**  4179/23 4253/18 4253/24 4268/23 4271/17
expense **[1]**  4209/9
experiments **[1]** 4230/25
expert **[6]**  4168/4 4196/8 4196/10 4196/16 4216/14 4257/21
explain **[3]**  4226/4 4228/4 4250/21
explicit **[1]**  4193/15
explicitly **[5]** 4179/12 4191/22

4192/2 4193/11 4193/14
expressed **[1]** 4199/10
expressly **[1]** 4209/22
extend **[2]**  4240/14 4266/8
extended **[3]**  4160/13 4254/15 4254/16
extensive **[1]** 4249/12
extensively **[1]** 4231/10
extent **[27]**  4160/6 4162/9 4177/6 4180/8 4181/21 4184/12 4205/12 4205/20 4206/1 4206/23 4207/7 4207/8 4207/9 4209/7 4209/13 4213/7 4214/12 4217/21 4217/22 4218/22 4225/5 4233/19 4247/19 4247/20 4248/17 4251/1 4263/23
extra **[2]**  4229/11 4229/11
extreme **[2]**  4221/16 4239/17
extremely **[1]**  4259/2

**F**

fact **[10]**  4171/22 4173/10 4194/9 4211/23 4224/7 4228/4 4238/24 4241/15 4255/13 4268/20
factories **[1]**  4212/6
factory **[2]**  4212/1 4212/5
facts **[1]**  4155/5
factual **[1]**  4198/22
fail **[1]**  4270/9
fails **[1]**  4263/11
fair **[4]**  4164/3 4164/20 4171/9 4186/4
fairly **[1]**  4232/10
fall **[1]**  4271/14
familiar **[4]**  4154/18 4159/17 4161/20 4178/17
far **[6]**  4203/17 4216/13 4233/4 4248/18 4251/24 4263/7
farmer **[1]**  4212/21
farther **[1]**  4224/14
fast **[5]**  4156/15 4156/17 4157/7 4180/11 4238/4
feature **[2]**  4201/22

4202/5
features **[4]**  4201/11 4216/8 4262/13 4262/18
fed **[1]**  4229/21
feeds **[3]**  4154/24 4192/13 4192/14
felt **[1]**  4170/19
fields **[1]**  4196/11
Fifth **[1]**  4150/9
figure **[7]**  4203/23 4215/2 4258/2 4273/6 4273/8 4273/10 4274/22
filings **[1]**  4153/14
final **[9]**  4159/21 4177/18 4178/1 4178/1 4178/2 4204/9 4218/16 4227/23 4230/16
finally **[3]**  4201/16 4243/1 4244/14
find **[5]**  4174/7 4228/23 4233/9 4234/20 4274/18
finding **[2]**  4190/17 4202/22
findings **[8]**  4166/19 4198/20 4198/22 4199/22 4203/2 4203/10 4226/24 4240/24
Fine **[1]**  4209/15
finely **[1]**  4154/13
finish **[1]**  4172/10
Firefox **[3]**  4230/3 4231/6 4265/12
firm **[7]**  4168/11 4168/16 4172/24 4179/21 4181/10 4182/16 4183/16
firms **[9]**  4163/13 4166/12 4167/14 4172/4 4172/21 4173/13 4180/8 4182/14 4215/15
first **[23]**  4155/22 4161/13 4183/3 4183/24 4186/2 4199/3 4200/13 4200/17 4201/8 4203/5 4205/19 4205/22 4209/4 4211/7 4213/25 4222/23 4222/25 4223/17 4228/8 4260/13 4263/4 4270/7 4272/11
firsthand **[1]**  4189/5
fit **[2]**  4236/1 4239/23
fits **[4]**  4205/5 4211/19 4235/8 4236/10
fitting **[1]**  4267/9

**F**

**five [3]**  4221/22
4254/13 4268/10
**five years [1]**
4221/22
**fivefold [1]**  4212/23
**Floor [1]**  4150/16
**flourish [1]**  4210/16
**flow [2]**  4232/17
4232/18
**fly [1]**  4259/24
**flying [1]**  4222/7
**focal [1]**  4174/23
**focus [10]**  4158/6
4162/15 4170/10
4170/10 4170/22
4172/18 4174/18
4175/11 4201/16
4247/17
**focused [7]**  4158/4
4171/17 4174/22
4175/2 4175/3
4256/21 4265/23
**focuses [2]**  4158/20
4172/12
**focusing [1]**  4266/6
**folks [4]**  4176/8
4179/24 4191/25
4256/6
**follow [6]**  4213/4
4216/24 4229/7
4231/1 4236/3
4236/18
**follow-on [1]**  4231/1
**follow-up [4]**  4213/4
4216/24 4236/3
4236/18
**followed [2]**  4240/23
4270/24
**following [1]**
4205/10
**FOLLOWS [1]**  4154/4
**forcing [2]**  4255/15
4262/1
**foreclose [12]**
4168/21 4169/18
4169/18 4169/23
4170/6 4170/9
4170/16 4170/18
4173/7 4175/6 4177/1
4177/3
**foreclosure [14]**
4168/3 4168/10
4169/3 4169/6
4169/11 4169/16
4169/23 4170/4
4171/13 4171/23
4172/18 4172/22
4173/4 4173/19
**foregoing [1]**  4276/3
**forever [2]**  4241/12
4262/16
**forget [1]**  4238/20
**form [2]**  4205/13
4215/14

**formed [1]**  4196/4
**forming [1]**  4232/3
**forth [1]**  4157/4
**fortunately [3]**
4215/7 4215/19
4238/12
**forward [25]**  4161/10
4198/2 4202/25
4203/7 4204/13
4204/17 4205/25
4207/23 4214/5
4215/22 4216/5
4217/23 4219/22
4220/20 4232/16
4232/21 4233/21
4234/6 4234/18
4234/25 4236/6
4237/22 4237/25
4238/18 4256/4
**forward-looking [1]**
4237/22
**found [27]**  4166/22
4170/17 4175/5
4198/8 4199/14
4199/18 4199/22
4199/24 4200/5
4201/6 4202/5
4202/19 4202/20
4202/21 4203/4
4203/25 4204/16
4205/6 4207/16
4207/22 4214/6
4214/9 4216/8 4217/7
4236/5 4241/9 4263/8
**foundation [2]**
4171/16 4172/25
**foundational [2]**
4154/12 4168/20
**four [1]**  4232/11
**fourth [2]**  4232/13
4274/16
**fraction [3]**  4185/20
4268/2 4271/24
**frame [4]**  4160/18
4172/22 4173/3
4173/19
**framed [2]**  4169/10
4169/20
**framework [9]**
4168/14 4168/19
4168/24 4168/25
4169/3 4172/22
4173/4 4173/19
4210/14
**frankly [1]**  4234/14
**fraud [2]**  4245/4
4245/13
**free [1]**  4242/6
**freelancing [1]**
4207/25
**front [5]**  4159/9
4163/23 4164/10
4174/1 4189/19
**fruits [14]**  4208/10
4208/13 4208/14

4208/15 4209/2
4209/10 4209/17
4209/17 4213/6
4213/7 4213/12
4213/16 4225/14
4247/8
**fully [4]**  4215/8
4217/20 4218/22
4235/6
**fun [2]**  4222/11
4222/12
**functionality [1]**
4256/8
**functions [1]**
4256/10
**fund [3]**  4197/22
4272/5 4273/2
**fundamental [1]**
4170/13
**further [9]**  4154/3
4171/18 4191/9
4194/15 4228/16
4229/12 4230/8
4231/7 4234/5
**future [12]**  4177/19
4209/9 4209/11
4219/2 4220/17
4225/6 4237/23
4247/12 4247/17
4256/2 4262/3 4269/8

**G**

**gain [2]**  4176/16
4269/23
**gained [1]**  4230/12
**gaining [1]**  4231/6
**gave [1]**  4258/21
**geez [1]**  4258/20
**Gemini [25]**  4155/23
4156/2 4156/13
4156/16 4156/25
4160/2 4161/5 4161/6
4162/18 4164/13
4164/22 4165/12
4165/18 4165/22
4184/21 4184/25
4185/25 4188/16
4190/5 4190/6 4190/9
4190/17 4190/21
4191/17 4238/16
**GenAI [24]**  4154/21
4155/3 4155/12
4157/25 4161/23
4173/7 4174/13
4174/22 4175/25
4177/4 4179/6
4179/17 4180/4
4182/3 4182/16
4184/4 4184/8
4185/21 4189/4
4189/6 4190/6
4190/13 4193/5
4235/19
**general [2]**  4176/7
4178/21

**generally [6]**
4168/15 4182/10
4218/8 4242/17
4243/4 4264/16
**generate [2]**  4206/21
4271/18
**generated [1]**
4241/19
**generating [1]**
4200/14
**George [1]**  4196/4
**get [89]**  4160/8
4160/16 4160/17
4160/21 4165/23
4171/20 4172/5
4173/13 4185/1
4189/7 4190/17
4194/7 4194/8
4200/20 4205/2
4205/3 4205/7 4205/9
4207/1 4207/15
4207/16 4211/1
4211/24 4212/17
4212/22 4216/10
4216/10 4216/15
4217/6 4217/25
4219/15 4219/24
4220/1 4220/2 4220/3
4220/18 4220/19
4221/1 4222/1 4222/4
4222/6 4222/8
4223/11 4229/11
4229/11 4235/9
4235/24 4235/25
4239/16 4240/17
4240/20 4241/2
4241/10 4241/14
4241/18 4242/11
4242/11 4243/9
4243/23 4244/2
4245/6 4245/8
4245/24 4245/25
4247/5 4248/3
4248/21 4250/13
4250/16 4251/25
4252/16 4253/5
4253/6 4253/9
4254/11 4255/21
4256/25 4259/14
4260/14 4261/1
4261/18 4261/19
4262/24 4266/11
4267/17 4269/21
4270/21 4271/6
4275/5
**gets [6]**  4222/9
4247/25 4256/25
4262/19 4264/20
4269/13
**getting [18]**  4203/3
4204/16 4220/24
4224/24 4225/16
4225/21 4225/22
4239/19 4242/13
4243/7 4244/2

**G**

**getting... [7]**
4245/19 4250/14
4259/13 4261/24
4267/25 4273/15
4273/25
**give [17]** 4181/5
4181/12 4188/19
4194/11 4201/21
4208/19 4211/5
4211/25 4211/25
4229/21 4239/8
4256/24 4262/22
4265/22 4265/25
4266/9 4267/2
**given [10]** 4237/12
4237/16 4239/13
4241/7 4241/9 4262/2
4262/21 4267/12
4272/20 4272/25
**giver [1]** 4258/23
**gives [1]** 4168/17
**giving [6]** 4255/15
4257/8 4263/24
4266/13 4267/6
4268/22
**glad [1]** 4173/20
**go [45]** 4153/12
4159/7 4171/18
4173/22 4181/15
4181/24 4185/3
4190/9 4190/18
4193/3 4193/22
4194/7 4194/8
4197/10 4197/24
4203/19 4203/23
4206/3 4206/12
4206/15 4216/21
4217/3 4219/16
4220/6 4221/3
4222/20 4222/24
4226/1 4226/11
4229/8 4237/19
4240/9 4243/19
4245/5 4250/5
4250/24 4251/24
4254/5 4255/25
4260/15 4265/13
4267/15 4269/2
4274/1 4275/9
**go ahead [2]** 4217/3
4275/9
**goal [13]** 4209/16
4210/14 4210/21
4239/19 4241/8
4241/14 4241/18
4248/20 4251/19
4251/20 4251/21
4261/24 4274/25
**goals [1]** 4201/19
**goes [4]** 4227/5
4248/9 4249/15
4264/14
**going [125]** 4159/14
4163/17 4180/3

4181/14 4181/20
4183/3 4187/22
4193/3 4197/23
4198/12 4198/12
4198/21 4202/25
4203/7 4203/14
4203/15 4203/21
4204/3 4204/4
4204/12 4204/13
4204/13 4204/17
4205/16 4205/17
4205/18 4205/25
4206/3 4206/16
4207/1 4207/2
4207/23 4209/9
4210/11 4210/23
4211/1 4211/12
4211/18 4211/19
4211/20 4212/3
4214/4 4215/10
4215/11 4215/11
4215/17 4215/22
4216/5 4217/23
4219/24 4220/20
4221/5 4223/10
4223/22 4223/25
4224/4 4224/16
4229/8 4230/15
4232/16 4232/21
4233/20 4233/21
4234/5 4234/24
4235/4 4235/5
4235/16 4235/17
4235/21 4236/6
4236/14 4237/24
4237/24 4237/25
4238/3 4238/6 4239/1
4240/9 4240/11
4240/13 4240/17
4240/20 4241/1
4243/10 4245/15
4246/10 4247/15
4247/19 4248/1
4248/7 4249/6
4249/17 4251/1
4251/2 4251/4 4251/6
4252/6 4252/8
4254/11 4254/12
4255/18 4255/19
4256/19 4256/21
4256/24 4257/20
4258/11 4258/13
4259/5 4260/12
4260/17 4260/19
4260/25 4265/5
4265/10 4265/11
4266/9 4266/10
4269/14 4269/18
4271/1 4271/5 4274/8
4274/10
**going-forward [1]**
4204/17
**gone [5]** 4207/9
4212/23 4234/17
4234/18 4236/16

**good [24]** 4153/2
4153/10 4153/23
4154/7 4154/8 4161/1
4195/3 4195/10
4195/11 4195/18
4195/19 4203/1
4205/4 4233/5
4241/22 4250/15
4256/15 4259/16
4261/19 4262/4
4268/4 4269/20
4270/16 4271/15
**GOOGLE [173]**
**Google's [23]** 4161/7
4165/11 4182/19
4191/17 4191/18
4191/19 4197/24
4198/11 4202/21
4211/13 4216/11
4216/25 4228/16
4233/9 4241/9
4242/22 4244/19
4256/2 4256/13
4257/9 4263/16
4267/5 4269/6
**Google-like [1]**
4257/11
**got [18]** 4191/2
4217/6 4222/5
4222/24 4224/1
4224/12 4225/11
4226/6 4229/3 4230/3
4230/5 4230/5 4230/6
4238/17 4267/16
4271/10 4274/3
4274/19
**gotten [12]** 4228/13
4228/14 4228/14
4229/4 4229/19
4229/20 4229/23
4232/24 4232/25
4233/1 4233/12
4233/14
**government [1]**
4153/7
**gradually [1]**
4273/18
**grand [1]** 4212/23
**grant [1]** 4257/22
**graph [3]** 4165/24
4230/9 4265/2
**gray [3]** 4151/7
4194/23 4220/14
**great [5]** 4156/10
4242/19 4253/13
4258/21 4266/23
**greater [1]** 4247/16
**greatly [1]** 4237/17
**ground [6]** 4154/25
4155/12 4155/23
4157/3 4192/8 4260/9
**grounded [7]** 4161/4
4161/13 4166/7
4166/12 4167/15
4167/21 4192/15

**grounding [22]**
4154/17 4154/18
4154/20 4154/23
4155/2 4155/4
4155/20 4156/2
4158/3 4158/5 4163/1
4163/4 4163/8
4163/21 4164/15
4164/18 4164/19
4166/6 4167/11
4192/5 4192/13
4256/1
**grounds [2]** 4162/18
4162/23
**group [4]** 4202/15
4273/19 4273/20
4274/16
**groups [4]** 4200/12
4202/15 4273/11
4274/15
**grow [2]** 4230/10
4242/20
**growth [1]** 4161/18
**guess [1]** 4272/14
**guide [1]** 4204/3
**guided [1]** 4204/5
**guideline [1]**
4199/23
**guidepost [2]**
4201/12 4241/15
**guideposts [1]**
4263/12
**guy [4]** 4212/24
4212/25 4222/5
4268/10
**guys [4]** 4222/12
4224/12 4227/4
4268/10

---

**H**

**habit [1]** 4226/6
**had [19]** 4165/5
4168/21 4183/13
4190/8 4193/15
4201/8 4212/24
4216/3 4218/14
4225/1 4226/11
4228/14 4230/13
4230/21 4232/23
4234/12 4234/17
4251/12 4273/21
**half [1]** 4222/10
**hampering [1]**
4200/18
**hand [2]** 4157/11
4195/5
**handed [1]** 4164/8
**handled [1]** 4258/24
**hands [4]** 4171/20
4172/5 4189/7 4222/5
**happen [14]** 4156/6
4180/7 4181/15
4204/3 4218/10
4225/11 4240/9
4240/11 4240/14

**H**

**happen... [5]**  4248/7
4252/10 4252/15
4257/7 4259/16
**happened [7]**  4206/19
4218/9 4218/11
4218/13 4218/14
4218/23 4236/13
**happening [1]**
4192/17
**happens [4]**  4185/9
4211/16 4242/8
4273/18
**hard [4]**  4230/22
4244/7 4257/2
4259/16
**harder [2]**  4210/24
4211/2
**harm [18]**  4199/13
4199/24 4201/11
4201/20 4201/22
4202/18 4204/10
4209/25 4210/18
4211/5 4219/13
4240/3 4241/22
4252/11 4253/4
4253/15 4254/21
4255/4
**harming [6]**  4209/11
4209/12 4209/18
4210/2 4255/5 4268/1
**harms [6]**  4240/8
4240/10 4240/10
4252/9 4267/13
4271/17
**Hart [2]**  4178/17
4180/21
**Hart-Scott-Rodino [2]**
4178/17 4180/21
**has [56]**  4158/9
4160/3 4160/4
4161/11 4161/24
4163/4 4166/13
4166/17 4166/23
4167/3 4167/10
4167/17 4167/18
4169/20 4170/5
4177/19 4178/23
4180/10 4180/14
4180/20 4181/21
4183/13 4183/16
4190/19 4191/21
4192/2 4210/2 4210/8
4211/6 4212/23
4223/2 4226/6 4230/2
4234/15 4234/17
4234/17 4234/18
4237/20 4239/15
4248/5 4252/2 4253/5
4253/12 4256/1
4256/10 4260/21
4262/15 4263/19
4264/8 4264/19
4264/22 4265/1
4265/13 4265/18

**hasn't [1]**  4214/23
**have [250]**
**have information [1]**
4159/25
**haven't [2]**  4210/6
4263/8
**having [15]**  4154/2
4205/6 4205/8
4205/16 4208/14
4244/4 4244/4
4257/15 4267/7
4269/18 4270/15
4270/16 4270/19
4271/12 4271/13
**he [18]**  4159/24
4160/15 4160/16
4160/16 4160/18
4222/8 4236/21
4236/24 4237/7
4237/7 4251/9
4251/10 4251/10
4251/11 4251/12
4274/15 4274/16
4274/24
**he didn't [1]**
4251/10
**he said [3]**  4160/15
4160/16 4237/7
**he was [1]**  4237/7
**he's [9]**  4159/23
4162/2 4162/8 4222/5
4222/6 4222/6 4222/7
4237/2 4237/2
**head [1]**  4222/5
**heading [5]**  4164/12
4164/12 4174/18
4189/20 4190/1
**hear [1]**  4156/20
**heard [6]**  4203/16
4203/17 4233/24
4256/6 4257/16
4273/9
**HEARING [1]**  4149/9
**held [1]**  4231/5
**help [5]**  4198/23
4200/6 4203/23
4216/16 4242/20
**helped [1]**  4198/19
**helpful [1]**  4202/14
**helping [1]**  4248/9
**helps [3]**  4155/2
4238/22 4269/20
**her [10]**  4156/15
4156/16 4226/19
4249/7 4249/11
4251/25 4251/25
4255/7 4267/18
4268/17
**here [53]**  4157/8
4157/11 4159/23
4161/2 4162/3 4168/5
4168/19 4174/10
4174/16 4174/23
4175/13 4180/25

4269/15 4272/2
4183/8 4185/16
4185/19 4188/7
4189/13 4190/12
4196/20 4198/12
4199/4 4200/12
4200/17 4201/12
4207/4 4212/17
4213/16 4216/22
4218/13 4218/17
4219/12 4220/13
4223/16 4224/20
4227/8 4228/7
4229/22 4230/20
4234/13 4240/2
4241/11 4248/4
4250/19 4250/21
4254/8 4256/21
4260/21 4261/3
4261/24 4263/25
4265/2 4268/11
4272/25
**here's [2]**  4211/11
4242/18
**hey [3]**  4235/20
4242/18 4272/22
**high [3]**  4166/10
4167/17 4239/8
**high-level [1]**
4239/8
**high-quality [2]**
4166/10 4167/17
**higher [3]**  4177/17
4249/24 4251/6
**highest [4]**  4183/2
4183/3 4226/12
4253/21
**highest-quality [1]**
4226/12
**highly [1]**  4264/14
**highway [1]**  4208/7
**him [1]**  4160/17
**him years [1]**
4160/17
**his [14]**  4160/20
4161/20 4196/10
4212/4 4212/4 4212/5
4212/25 4213/17
4222/5 4225/14
4245/9 4260/18
4272/2 4274/25
**historically [1]**
4242/10
**history [2]**  4226/6
4242/3
**Hitt [9]**  4153/20
4153/21 4154/2
4154/7 4154/11
4164/8 4191/16
4194/14 4194/16
**hitting [1]**  4247/19
**Hobson's [6]**  4250/10
4250/11 4251/11
4266/6 4266/8
4266/21
**holding [1]**  4219/22

**holdings [1]**  4167/9
**hole [1]**  4211/1
**home [2]**  4194/21
4271/8
**Honor [25]**  4153/4
4153/13 4153/23
4157/12 4157/13
4163/24 4164/4
4174/3 4185/13
4186/25 4189/15
4191/9 4191/12
4194/19 4194/23
4195/3 4195/12
4196/7 4196/23
4197/1 4220/11
4231/22 4239/4
4272/2 4275/6
**Honor's [2]**  4213/4
4225/14
**HONORABLE [1]**  4149/9
**hopeless [4]**  4259/4
4259/7 4259/8
4259/11
**horizon [1]**  4239/24
**horse [1]**  4260/6
**house [2]**  4256/22
4257/1
**how [53]**  4154/12
4157/25 4162/17
4162/23 4166/18
4174/14 4181/20
4201/3 4201/13
4201/18 4203/13
4204/4 4204/21
4207/20 4208/10
4209/16 4210/13
4212/1 4212/17
4214/24 4215/1
4216/17 4218/19
4219/2 4221/16
4222/1 4222/6 4222/8
4222/20 4225/3
4225/13 4228/4
4228/17 4230/18
4234/14 4235/5
4237/19 4238/4
4238/4 4242/10
4243/14 4245/6
4247/2 4247/23
4248/24 4249/22
4255/22 4262/16
4267/18 4267/23
4267/24 4274/6
4274/22
**However [1]**  4255/1
**HSR [4]**  4178/18
4178/23 4180/14
4181/2
**huge [1]**  4204/13
**hypothesis [1]**
4228/19
**hypothetical [3]**
4176/24 4182/15
4183/2

I

**I also [6]**   4186/21
 4197/18 4198/11
 4198/20 4198/25
 4238/19
**I articulated [1]**
 4186/13
**I believe [5]**
 4161/21 4164/17
 4178/14 4188/5
 4217/19
**I can [7]**   4161/2
 4181/12 4181/15
 4189/6 4216/14
 4260/13 4260/15
**I can't [1]**   4165/16
**I did [14]**   4168/23
 4170/8 4170/10
 4172/7 4172/11
 4172/23 4173/3
 4173/10 4188/2
 4196/22 4208/2
 4232/9 4262/25
 4272/9
**I didn't [5]**   4156/20
 4173/3 4173/18
 4188/17 4189/1
**I don't [36]**   4160/18
 4160/25 4162/6
 4162/9 4162/13
 4162/16 4165/7
 4165/13 4167/1
 4167/17 4169/10
 4170/21 4178/21
 4180/22 4181/8
 4181/14 4181/20
 4182/8 4188/23
 4189/5 4189/11
 4193/11 4208/4
 4227/6 4233/18
 4234/22 4236/24
 4237/4 4251/19
 4257/16 4258/8
 4263/19 4265/9
 4266/25 4270/24
 4273/10
**I don't have [2]**
 4193/1 4230/9
**I had [2]**   4190/8
 4234/17
**I have [11]**   4157/10
 4181/13 4182/16
 4187/9 4189/5
 4189/14 4194/15
 4197/3 4238/10
 4244/24 4269/1
**I just [9]**   4153/16
 4188/22 4201/8
 4204/11 4217/2
 4229/18 4261/24
 4267/8 4273/5
**I know [5]**   4176/25
 4191/1 4193/13
 4238/10 4267/2
**I mean [10]**   4167/7

 4182/9 4210/8 4235/6
 4236/9 4241/10
 4242/3 4264/10
 4266/18 4270/23
**I might [1]**   4185/5
**I partitioned [1]**
 4192/24
**I recall [1]**   4167/1
**I say [1]**   4238/13
**I should [2]**   4177/24
 4246/12
**I think [98]**   4157/1
 4157/2 4160/4 4160/8
 4160/19 4161/1
 4162/15 4164/18
 4169/1 4169/25
 4170/21 4171/2
 4171/4 4172/17
 4173/9 4173/11
 4179/20 4181/16
 4181/22 4183/8
 4184/5 4185/19
 4186/4 4186/7
 4186/10 4186/13
 4186/19 4186/21
 4186/24 4188/6
 4188/15 4191/2
 4191/25 4199/11
 4202/14 4202/16
 4207/20 4208/3
 4208/6 4208/16
 4208/23 4209/1
 4210/11 4210/17
 4213/10 4213/23
 4216/15 4217/2
 4221/3 4222/23
 4223/2 4228/5
 4228/12 4232/10
 4232/14 4233/3
 4233/5 4233/25
 4234/7 4237/2 4237/2
 4237/3 4237/6
 4237/12 4237/19
 4237/19 4238/12
 4239/11 4239/12
 4239/15 4240/7
 4242/14 4245/9
 4246/7 4247/7
 4247/23 4247/24
 4250/8 4250/25
 4251/11 4252/24
 4253/5 4254/1 4255/1
 4256/16 4258/6
 4258/24 4260/6
 4260/12 4260/24
 4266/2 4266/14
 4266/19 4267/4
 4270/7 4270/14
 4272/11 4274/24
**I thought [2]**
 4170/23 4222/10
**I understand [6]**
 4163/3 4167/2
 4175/12 4178/21
 4194/9 4228/12

**I want [7]**   4155/18
 4158/6 4172/10
 4179/14 4235/13
 4239/14 4266/8
**I was [9]**   4159/14
 4163/12 4168/25
 4197/14 4197/15
 4197/17 4197/23
 4256/16 4258/19
**I will [2]**   4160/5
 4197/9
**I would [24]**   4168/23
 4171/5 4172/20
 4174/7 4183/15
 4190/25 4193/7
 4193/18 4193/20
 4207/18 4208/5
 4209/4 4209/20
 4218/22 4240/12
 4244/2 4247/1 4247/2
 4247/17 4247/23
 4248/4 4267/22
 4268/22 4272/17
**I'd [11]**   4154/16
 4162/20 4162/23
 4168/2 4171/8 4177/6
 4190/15 4191/6
 4216/24 4241/25
 4244/6
**I'll [14]**   4157/15
 4174/18 4187/5
 4187/14 4188/9
 4189/13 4198/1
 4199/10 4217/2
 4221/9 4231/15
 4239/18 4240/8
 4250/8
**I'll read [1]**   4188/9
**I'm [49]**   4155/9
 4163/17 4168/8
 4170/14 4170/14
 4172/8 4172/9
 4173/20 4175/23
 4177/11 4177/24
 4181/8 4187/9
 4193/11 4196/4
 4198/12 4198/17
 4207/2 4209/9
 4210/23 4212/8
 4214/21 4214/21
 4223/4 4223/10
 4223/22 4224/4
 4224/6 4234/14
 4235/16 4235/17
 4237/9 4243/23
 4244/2 4251/23
 4252/6 4252/8 4259/4
 4259/5 4259/6 4259/9
 4260/12 4260/17
 4260/19 4263/20
 4266/23 4268/11
 4272/14 4273/2
**I'm going [9]**
 4163/17 4207/2
 4210/23 4223/10

 4223/22 4224/4
 4260/12 4260/17
 4260/19
**I'm just [2]**   4212/8
 4252/8
**I'm not [7]**   4168/8
 4181/8 4198/12
 4224/6 4244/2 4252/6
 4263/20
**I'm not sure [2]**
 4177/24 4273/2
**I'm sorry [4]**   4187/9
 4214/21 4251/23
 4259/6
**I've [18]**   4153/16
 4157/3 4159/18
 4161/21 4164/8
 4166/9 4177/11
 4180/22 4180/24
 4185/7 4188/25
 4193/14 4193/15
 4198/10 4228/4
 4235/9 4260/2
 4271/10
**I've got [1]**   4271/10
**idea [23]**   4167/25
 4168/2 4168/15
 4171/8 4172/23
 4176/7 4201/12
 4204/11 4215/9
 4218/8 4219/20
 4219/20 4220/17
 4220/22 4221/3
 4228/13 4239/14
 4259/12 4262/4
 4265/21 4266/24
 4267/4 4271/15
**identifiable [1]**
 4208/18
**identified [5]**
 4171/12 4182/2
 4193/13 4232/11
 4254/21
**identify [2]**   4189/4
 4246/17
**IE [1]**   4265/4
**ignores [1]**   4268/19
**IL [1]**   4150/5
**illegal [1]**   4181/7
**illustrate [2]**
 4240/16 4265/3
**illustrated [1]**
 4249/7
**illustration [1]**
 4248/17
**impact [17]**   4207/23
 4213/12 4213/13
 4218/6 4218/8 4218/9
 4218/12 4219/3
 4222/21 4223/10
 4224/24 4225/6
 4225/7 4234/24
 4247/13 4251/7
 4252/2
**impacting [1]**

**I**

impacting... [1] 4183/14
impacts [1] 4216/1
impediment [1] 4204/18
implemented [1] 4181/20
implied [1] 4227/4
imply [1] 4236/6
import [2] 4169/3 4177/13
importance [1] 4234/5
important [20] 4158/19 4170/23 4171/21 4171/23 4193/13 4207/4 4209/7 4211/23 4212/9 4212/12 4220/1 4226/17 4234/2 4236/22 4237/21 4241/13 4242/10 4259/13 4262/15 4264/18
importantly [2] 4203/9 4253/8
impose [2] 4184/7 4271/1
improve [10] 4167/4 4200/7 4200/15 4201/13 4210/21 4221/19 4241/2 4244/7 4256/23 4269/22
improved [2] 4200/25 4264/9
improvement [2] 4201/2 4201/3
improving [4] 4203/9 4203/10 4242/10 4247/6
incentive [28] 4169/18 4170/4 4170/5 4170/16 4171/3 4173/6 4173/8 4177/5 4177/7 4217/12 4244/1 4244/6 4246/11 4246/15 4246/17 4251/3 4254/2 4254/3 4256/13 4256/25 4258/7 4258/9 4260/14 4261/13 4261/17 4269/24 4272/21 4272/24
incentives [19] 4170/9 4170/20 4177/9 4200/24 4246/7 4247/3 4247/20 4247/22 4254/1 4255/7 4256/3 4257/23 4257/25 4260/10 4266/16 4267/5 4269/7

included [2] 4164/17 4194/3
includes [1] 4249/21
including [4] 4157/4 4167/21 4192/13 4194/2
incorporated [1] 4192/15
incorporates [2] 4155/23 4156/14
increase [4] 4230/8 4231/5 4233/18 4260/9
increases [2] 4190/21 4229/13
increasing [2] 4229/16 4262/14
incremental [1] 4194/12
incur [1] 4241/1
incurring [3] 4237/15 4268/9 4268/12
indeed [1] 4243/13
independent [4] 4235/12 4252/18 4265/19 4268/21
index [10] 4152/2 4156/14 4156/24 4157/4 4157/5 4160/11 4161/16 4211/5 4211/13 4211/13
indicate [1] 4192/11
indicated [1] 4188/22
indicates [1] 4192/12
indicative [1] 4227/9
indices [1] 4157/4
indirect [1] 4233/7
induce [1] 4260/23
indulgence [1] 4272/2
industrial [3] 4196/9 4196/11 4196/16
industry [15] 4169/2 4173/7 4174/22 4177/4 4179/6 4179/17 4180/4 4180/10 4184/4 4191/24 4200/23 4211/24 4212/17 4212/17 4215/23
ineffective [1] 4270/8
infect [1] 4183/3
infer [1] 4226/23
inferior [8] 4253/16 4253/25 4255/4 4255/12 4266/10 4268/6 4270/23

inflection [1] 4238/2
influence [1] 4183/25
inform [2] 4228/18 4250/25
information [3] 4158/1 4158/8 4159/25
informative [1] 4224/2
inherent [2] 4213/14 4225/23
inherently [2] 4214/6 4218/14
initial [2] 4177/25 4195/24
initially [1] 4230/12
injunctive [1] 4199/6
innovate [10] 4200/25 4243/23 4243/24 4246/3 4246/11 4246/15 4247/3 4254/3 4256/3 4256/13
innovation [18] 4243/20 4243/22 4243/25 4243/25 4244/8 4246/11 4246/17 4247/8 4247/16 4247/20 4247/21 4251/5 4255/6 4255/24 4256/17 4256/22 4259/2 4268/23
innovations [2] 4243/21 4244/8
input [16] 4154/23 4168/2 4168/10 4168/16 4168/17 4168/18 4169/6 4169/10 4169/16 4169/18 4169/19 4170/6 4171/12 4171/23 4173/4 4173/19
inputs [7] 4168/11 4168/20 4169/14 4171/3 4171/12 4171/17 4215/1
inquiry [4] 4214/1 4218/3 4225/3 4228/23
insofar [1] 4217/22
install [1] 4266/10
installed [3] 4266/4 4266/23 4270/4
instance [2] 4157/3 4163/5
instead [3] 4238/15 4255/2 4265/10
Insufficient [1]

integrate [1] 4184/7
integration [4] 4262/13 4263/1 4263/5 4263/25
integrations [3] 4262/12 4262/13 4263/7
intended [2] 4186/12 4221/14
interest [1] 4264/12
interesting [3] 4167/19 4212/15 4273/19
interfere [2] 4200/14 4221/16
interfering [2] 4211/8 4214/14
interim [1] 4249/6
internal [1] 4158/25
internalize [1] 4273/3
Internet [1] 4163/5
interpret [1] 4160/19
interrupt [1] 4236/17
interrupting [1] 4214/21
intersection [1] 4257/8
intervene [2] 4201/13 4205/17
intervening [2] 4202/3 4214/14
intervention [4] 4202/6 4207/10 4207/12 4207/19
interventions [1] 4207/15
interviewees [1] 4186/24
interviews [1] 4186/21
introduces [2] 4180/5 4181/21
introducing [1] 4224/24
introduction [1] 4189/22
invest [6] 4184/3 4184/10 4194/6 4200/25 4233/2 4269/10
investigated [1] 4162/1
investment [13] 4178/9 4178/11 4180/3 4180/19 4181/17 4182/6 4182/17 4182/21 4182/23 4184/5 4251/4 4257/10 4269/6
investments [11]

## I

**investments... [11]**
4177/14 4177/19
4179/6 4179/16
4179/19 4180/4
4181/13 4182/7
4184/1 4257/3
4269/12
**investor [3]**   4179/9
4179/24 4180/12
**investors [1]**   4233/2
**involve [1]**   4270/11
**involved [1]**   4271/12
**iOS [1]**   4264/24
**is [384]**
**is consistent [1]**
4168/24
**is that [1]**   4264/19
**is that correct [1]**
4217/21
**is that right [1]**
4156/19
**is there [3]**   4214/1
4217/24 4246/16
**isn't [7]**   4160/17
4183/10 4183/12
4219/24 4254/9
4268/4 4269/19
**isolate [1]**   4227/17
**issue [3]**   4160/9
4162/11 4225/17
**issues [4]**   4175/9
4175/12 4181/22
4269/4
**it [280]**
**it creates [1]**
4269/17
**it doesn't [1]**
4206/7
**it happened [1]**
4218/13
**it just [1]**   4261/7
**it would be [8]**
4188/13 4224/8
4225/21 4226/16
4235/18 4244/17
4244/18 4274/4
**it's [150]**
**it's like [2]**
4259/10 4268/7
**its [9]**   4166/24
4167/4 4184/3 4184/3
4215/21 4217/13
4222/21 4257/17
4269/8
**itself [6]**   4162/18
4180/3 4221/18
4232/12 4248/10
4271/20

## J

**January [1]**   4265/8
**jeez [1]**   4274/3
**John [2]**   4151/2
4153/9

**John Schmidtlein [1]**
4153/9
**jon.sallet [1]**
4150/17
**Jonathan [2]**   4150/12
4153/7
**jschmidtlein [1]**
4151/5
**judge [4]**   4149/10
4215/1 4215/2
4236/24
**judgment [3]**   4177/18
4178/1 4178/2
**Judicial [1]**   4150/15
**juncture [1]**   4261/4
**just [91]**   4153/16
4155/9 4157/13
4157/15 4162/16
4162/17 4165/21
4169/5 4174/18
4175/14 4182/1
4182/5 4187/4 4187/4
4187/13 4188/8
4188/9 4188/22
4189/18 4189/19
4199/10 4201/8
4202/11 4204/5
4204/5 4204/11
4204/21 4205/7
4205/16 4208/20
4209/11 4209/17
4210/8 4210/25
4211/14 4212/8
4214/10 4215/10
4216/22 4217/2
4217/13 4219/14
4220/9 4220/19
4221/21 4223/14
4225/21 4226/16
4229/16 4229/18
4231/15 4233/11
4234/16 4234/19
4236/17 4242/7
4242/22 4244/3
4244/16 4245/6
4248/7 4248/16
4249/22 4252/8
4253/11 4254/9
4254/21 4256/7
4258/21 4259/10
4259/11 4259/22
4261/7 4261/24
4264/21 4265/7
4265/15 4266/1
4266/5 4266/7
4266/21 4267/8
4269/10 4270/1
4270/13 4271/9
4271/18 4272/14
4273/5 4274/9
4274/24
**JUSTICE [3]**   4150/3
4180/2 4181/6
**justified [3]**
4213/20 4219/23

4260/9
**justify [1]**   4263/16

## K

**K-e-v-i-n [1]**
4195/24
**Kapur [1]**   4188/3
**keep [4]**   4175/21
4200/4 4244/2
4248/25
**keeping [2]**   4225/16
4238/25
**keeps [1]**   4274/9
**Kenneth [1]**   4151/2
**kept [3]**   4250/10
4251/12 4266/8
**Kevin [4]**   4194/25
4195/15 4195/23
4212/4
**key [7]**   4199/11
4199/16 4199/20
4224/19 4238/25
4242/4 4263/12
**kind [36]**   4162/15
4179/22 4181/18
4201/2 4205/5
4205/20 4207/24
4207/24 4208/20
4210/13 4211/22
4212/8 4212/15
4212/20 4213/1
4216/18 4220/9
4222/2 4222/11
4224/23 4226/20
4227/7 4230/14
4232/15 4232/20
4237/3 4245/13
4247/19 4251/5
4252/9 4252/14
4252/14 4257/22
4263/11 4263/22
4263/24
**kinds [8]**   4179/19
4210/4 4221/10
4235/21 4241/21
4256/20 4257/5
4274/25
**know [109]**   4160/20
4162/6 4162/7 4162/8
4162/9 4162/13
4162/16 4165/13
4165/13 4168/17
4168/23 4169/13
4170/13 4170/21
4171/18 4172/3
4172/23 4176/8
4176/25 4178/22
4179/21 4180/6
4180/16 4181/8
4181/12 4181/14
4181/15 4181/20
4182/10 4183/1
4186/15 4189/11
4191/1 4193/11
4193/13 4198/18

4200/19 4202/14
4202/15 4202/20
4203/10 4204/3
4204/12 4205/6
4205/19 4207/7
4208/4 4208/5 4208/6
4208/7 4208/25
4209/4 4209/5 4209/6
4209/13 4210/18
4210/19 4211/5
4212/14 4212/22
4214/22 4215/13
4223/1 4227/2 4227/4
4229/7 4230/14
4230/21 4233/12
4233/17 4234/7
4236/24 4237/22
4238/4 4238/10
4238/10 4238/11
4238/13 4240/12
4240/24 4241/10
4245/8 4245/15
4246/10 4248/1
4252/5 4254/13
4254/14 4255/11
4255/12 4257/4
4257/16 4258/10
4258/22 4258/25
4259/10 4259/10
4259/16 4259/23
4260/5 4261/4 4263/3
4264/7 4264/22
4265/2 4265/9 4267/2
4270/8 4270/24
**knowledge [3]**
4165/23 4165/24
4189/5
**known [2]**   4226/5
4235/6
**knows [1]**   4252/6
**ksmurzynski [1]**
4151/5

## L

**lack [3]**   4184/6
4239/13 4247/4
**lacked [2]**   4170/17
4258/4
**laid [1]**   4215/24
**landscape [2]**
4205/12 4206/1
**language [1]**   4165/17
**large [4]**   4181/13
4214/13 4217/9
4261/14
**largely [6]**   4158/2
4158/25 4178/5
4233/3 4233/8 4273/1
**larger [1]**   4180/24
**LaSalle [1]**   4150/4
**last [7]**   4153/14
4184/14 4192/18
4234/15 4241/5
4248/5 4268/14
**late [2]**   4185/9

**L**

**late... [1]**  4192/19
**later [5]**  4153/18
 4224/21 4234/16
 4274/12 4274/18
**law [2]**  4150/13
 4208/13
**lawyer [1]**  4181/8
**lead [5]**  4163/14
 4229/12 4230/7
 4237/5 4264/11
**leads [1]**  4236/3
**least [18]**  4157/7
 4160/14 4163/11
 4165/17 4166/13
 4176/2 4176/4
 4185/25 4186/22
 4208/14 4208/16
 4208/18 4209/5
 4221/15 4241/20
 4246/21 4255/24
 4271/12
**leave [2]**  4236/22
 4236/23
**leaving [2]**  4212/12
 4273/3
**left [3]**  4154/11
 4154/14 4182/22
**leg [1]**  4244/2
**legal [1]**  4227/5
**legally [1]**  4209/5
**less [27]**  4165/19
 4179/13 4179/24
 4180/12 4181/17
 4221/23 4230/13
 4234/16 4235/16
 4237/13 4237/21
 4244/6 4247/13
 4251/2 4251/4
 4252/22 4253/6
 4253/7 4253/9
 4253/23 4254/2
 4254/3 4255/3
 4260/16 4261/13
 4262/20 4266/11
**less-attractive [1]**
 4179/24
**let [10]**  4156/11
 4177/17 4205/2
 4211/25 4211/25
 4212/1 4215/1 4215/2
 4246/9 4270/22
**let me [1]**  4177/17
**let's [61]**  4155/21
 4156/3 4159/7
 4161/17 4162/17
 4163/17 4163/22
 4165/21 4168/8
 4173/20 4173/22
 4174/7 4174/10
 4174/16 4175/13
 4175/14 4176/14
 4176/24 4176/25
 4177/14 4181/24
 4182/15 4182/16

 4184/16 4185/3
 4188/8 4189/8
 4190/18 4197/10
 4199/3 4201/25
 4205/1 4205/8 4205/8
 4210/8 4212/11
 4212/11 4213/18
 4216/10 4220/5
 4221/4 4222/17
 4223/13 4236/15
 4236/22 4236/23
 4237/23 4239/7
 4248/13 4250/2
 4250/5 4250/18
 4252/21 4262/5
 4264/1 4264/16
 4266/22 4269/2
 4270/1 4272/5 4275/9
**let's leave [1]**
 4236/23
**let's see [1]**  4174/7
**letting [1]**  4240/21
**level [5]**  4168/9
 4168/10 4177/17
 4239/8 4246/16
**leverage [1]**  4168/18
**liability [3]**  4196/7
 4228/1 4231/10
**license [3]**  4157/4
 4192/14 4192/16
**lifting [1]**  4236/7
**like [70]**  4154/16
 4161/9 4161/11
 4162/20 4162/23
 4168/2 4171/8 4176/9
 4193/14 4200/24
 4201/25 4203/5
 4203/16 4208/5
 4208/7 4208/7 4211/3
 4211/3 4213/16
 4215/3 4215/10
 4215/15 4215/16
 4215/21 4216/24
 4217/13 4224/7
 4224/8 4226/5
 4226/24 4231/7
 4235/13 4237/3
 4237/14 4238/13
 4239/20 4239/23
 4245/11 4246/1
 4248/9 4248/19
 4249/17 4249/18
 4249/23 4249/24
 4253/1 4257/11
 4257/12 4257/12
 4258/8 4258/10
 4258/11 4259/10
 4259/11 4261/4
 4261/11 4261/25
 4265/7 4266/12
 4268/5 4268/7
 4270/24 4271/5
 4271/21 4271/23
 4273/15 4274/6
 4274/9 4274/19

**liked [1]**  4274/4
**likely [13]**  4176/2
 4185/6 4215/21
 4217/9 4237/16
 4241/22 4253/1
 4253/2 4260/16
 4260/17 4260/19
 4262/23 4269/21
**limit [5]**  4179/16
 4179/16 4179/18
 4180/12 4182/8
**limitations [1]**
 4191/18
**limited [2]**  4183/8
 4190/10
**limiting [1]**  4246/13
**line [16]**  4165/21
 4187/3 4187/12
 4187/13 4187/13
 4188/10 4188/13
 4202/16 4229/8
 4229/9 4245/6 4265/4
 4273/12 4273/18
 4274/9 4274/9
**lines [3]**  4201/5
 4218/16 4263/19
**lingering [1]**
 4220/20
**link [1]**  4190/5
**listing [1]**  4174/13
**literature [2]**
 4169/20 4209/21
**litigation [1]**
 4186/6
**little [13]**  4153/16
 4166/18 4181/17
 4183/9 4184/19
 4210/12 4212/20
 4212/24 4212/25
 4230/23 4230/24
 4231/13 4272/14
**LLC [2]**  4149/6
 4153/6
**LLP [2]**  4151/3
 4151/7
**local [3]**  4161/24
 4162/8 4162/12
**logic [1]**  4266/4
**logical [1]**  4202/23
**long [13]**  4159/22
 4159/25 4162/5
 4162/9 4180/16
 4180/18 4212/4
 4240/2 4246/24
 4248/7 4248/24
 4254/15 4264/12
**long-tail [1]**
 4159/22
**long-term [4]**  4240/2
 4246/24 4254/15
 4264/12
**longer [5]**  4201/12
 4206/19 4253/22
 4269/7 4273/24

**look [37]**  4161/17
 4163/17 4164/12
 4165/21 4166/11
 4167/13 4170/5
 4170/19 4172/23
 4173/20 4175/13
 4175/14 4176/14
 4187/10 4188/8
 4205/1 4205/10
 4214/3 4215/10
 4220/9 4223/2 4224/7
 4224/8 4226/23
 4228/17 4230/8
 4232/6 4246/10
 4247/2 4249/17
 4249/18 4249/22
 4250/18 4252/3
 4256/7 4257/22
 4259/4
**looked [11]**  4168/20
 4169/5 4169/8
 4198/20 4198/25
 4215/3 4228/24
 4229/25 4233/11
 4248/19 4269/16
**looking [10]**  4188/10
 4189/6 4230/23
 4230/24 4237/21
 4237/22 4250/3
 4251/25 4257/4
 4262/3
**looks [2]**  4208/6
 4214/10
**LORIN [1]**  4154/2
**losers [1]**  4210/15
**loses [1]**  4251/23
**losing [2]**  4231/6
 4244/10
**loss [2]**  4254/14
 4266/12
**lost [5]**  4213/1
 4230/11 4230/12
 4245/19 4274/20
**lot [15]**  4160/22
 4208/3 4214/22
 4222/14 4226/3
 4235/2 4248/6 4248/9
 4256/6 4261/7
 4264/23 4269/22
 4273/15 4274/1
 4274/11
**lots [4]**  4182/2
 4182/2 4203/18
 4256/10
**lower [11]**  4164/22
 4249/23 4250/13
 4251/2 4252/22
 4253/5 4253/19
 4253/24 4255/20
 4266/22 4269/11
**lower-quality [1]**
 4266/22
**lowered [1]**  4232/25
**Luca [2]**  4198/2
 4274/23

**L**

**Luca's [1]**   4272/7
**lunch [4]**   4153/17
 4272/3 4275/10
 4275/11
**luncheon [1]**   4275/7

**M**

**M-u-r-p-h-y [1]**
 4195/25
**Mac [2]**   4224/21
 4264/23
**made [8]**   4156/4
 4163/14 4167/2
 4194/1 4214/23
 4237/20 4255/11
 4261/14
**magically [1]**   4222/4
**magnitude [4]**   4204/4
 4214/12 4227/17
 4227/19
**main [1]**   4197/13
**Maine [1]**   4151/3
**maintain [1]**   4208/21
**maintenance [2]**
 4199/7 4202/12
**major [3]**   4225/15
 4239/12 4252/13
**make [36]**   4155/9
 4172/10 4179/6
 4179/13 4180/11
 4182/10 4182/10
 4188/9 4190/21
 4193/1 4203/3
 4205/19 4209/20
 4209/22 4210/20
 4210/24 4212/16
 4217/9 4235/24
 4238/14 4238/22
 4238/22 4248/8
 4248/10 4258/10
 4258/12 4260/20
 4260/22 4260/23
 4261/7 4262/16
 4264/16 4265/22
 4267/22 4268/15
 4271/13
**make-buy [1]**   4260/20
**makers [2]**   4252/12
 4252/18
**makes [5]**   4181/16
 4185/7 4237/12
 4253/7 4260/16
**making [7]**   4189/6
 4190/5 4221/6
 4238/17 4242/11
 4245/12 4258/8
**mandating [1]**
 4197/21
**manner [1]**   4205/14
**many [18]**   4157/25
 4158/17 4160/14
 4161/14 4166/9
 4167/20 4170/14
 4203/23 4221/8

4221/13 4221/15
4240/7 4240/14
4267/23 4267/25
4269/24 4273/21
4274/6
**marginal [3]**   4183/17
4244/5 4247/7
**Mark [2]**   4151/6
 4194/23
**Mark Popofsky [1]**
 4194/23
**mark.popofsky [1]**
 4151/9
**marked [1]**   4157/14
**market [28]**   4158/11
 4158/21 4158/23
 4173/2 4176/1
 4181/17 4182/17
 4183/13 4183/17
 4201/10 4201/21
 4202/5 4203/14
 4203/19 4211/21
 4216/9 4223/10
 4230/8 4237/20
 4257/23 4257/24
 4260/23 4261/1
 4261/19 4261/19
 4264/18 4270/9
 4270/14
**marketplace [21]**
 4155/14 4158/4
 4158/16 4166/16
 4167/13 4175/7
 4175/25 4182/21
 4206/21 4207/18
 4208/22 4210/16
 4214/7 4219/18
 4243/10 4245/11
 4248/11 4260/14
 4261/8 4264/17
 4265/19
**markets [2]**   4203/21
 4203/21
**match [1]**   4166/24
**material [2]**   4186/9
 4223/10
**matter [6]**   4155/10
 4160/23 4184/25
 4197/12 4247/24
 4276/4
**mattering [1]**   4193/6
**may [31]**   4149/5
 4155/16 4155/16
 4157/12 4164/3
 4164/5 4164/6 4165/7
 4165/18 4170/7
 4174/3 4179/23
 4180/9 4183/22
 4183/24 4186/23
 4186/25 4189/15
 4189/16 4193/21
 4194/22 4195/12
 4195/13 4196/23
 4196/24 4197/3
 4208/12 4213/19

4237/4 4237/23 4276/9?
**maybe [19]**   4186/24
 4188/3 4208/4 4208/6
 4210/11 4211/20
 4212/5 4212/25
 4215/16 4222/10
 4235/14 4237/6
 4247/21 4252/25
 4255/2 4256/16
 4257/24 4265/9
 4268/7
**me [25]**   4156/11
 4177/2 4177/17
 4181/12 4198/19
 4203/9 4205/5 4210/3
 4211/25 4211/25
 4212/1 4214/24
 4216/15 4242/20
 4246/9 4248/10
 4255/21 4256/11
 4259/10 4260/16
 4261/7 4266/1
 4271/14 4272/13
 4274/6
**mean [20]**   4167/7
 4172/8 4182/9
 4192/21 4207/18
 4210/8 4226/3 4235/6
 4236/9 4241/10
 4242/3 4242/7 4244/6
 4253/20 4254/2
 4264/10 4266/3
 4266/18 4270/20
 4270/23
**meaningful [1]**
 4174/19
**means [6]**   4158/13
 4158/14 4214/3
 4240/19 4248/6
 4266/5
**meant [1]**   4204/8
**measure [1]**   4213/13
**measurement [2]**
 4213/17 4213/18
**measuring [1]**
 4204/10
**mechanical [2]**
 4151/15 4218/12
**medium [1]**   4181/11
**medium-sized [1]**
 4181/11
**meet [2]**   4178/24
 4189/24
**meeting [2]**   4194/18
 4194/20
**MEHTA [1]**   4149/9
**melting [1]**   4230/14
**mentioned [10]**
 4168/6 4202/9
 4236/19 4239/6
 4241/23 4245/21
 4249/20 4250/2
 4252/1 4266/17
**mere [2]**   4180/1
 4211/9

**merger [1]**   4215/14
**maybe merger [1]**   4215/14
**merit [2]**   4151/11
 4213/22
**method [1]**   4199/18
**methodology [1]**
 4198/14
**metric [1]**   4249/4
**Michael [1]**   4161/18
**Michelle [2]**   4216/21
 4219/8
**Microsoft [8]**   4229/1
 4229/3 4229/8 4234/8
 4235/7 4261/13
 4261/22 4265/8
**Microsoft's [2]**
 4265/3 4265/4
**middle [1]**   4175/15
**might [32]**   4166/9
 4168/18 4177/10
 4179/13 4180/11
 4181/5 4181/9
 4183/21 4184/7
 4185/5 4190/22
 4191/3 4194/9
 4194/10 4194/11
 4199/23 4200/14
 4203/19 4207/6
 4211/14 4214/17
 4223/7 4226/4
 4226/23 4240/14
 4254/20 4258/3
 4263/15 4269/19
 4269/23 4271/14
 4274/3
**milk [2]**   4212/20
 4212/22
**mind [12]**   4174/9
 4181/19 4200/4
 4216/20 4221/15
 4232/22 4233/8
 4248/23 4251/12
 4258/20 4259/4
 4274/5
**minute [8]**   4177/2
 4187/4 4198/13
 4207/2 4216/22
 4221/9 4239/18
 4240/8
**misheard [1]**   4237/6
**mistake [1]**   4274/5
**mitigates [2]**
 4209/25 4254/24
**mitigation [1]**
 4255/8
**mitigations [2]**
 4164/13 4165/22
**mobile [8]**   4249/9
 4249/21 4249/22
 4249/23 4249/25
 4253/14 4267/20
 4267/24
**mode [1]**   4201/15
**model [1]**   4172/25
**models [9]**   4154/12
 4154/13 4155/12

**M**

**models... [6]** 4161/4
 4166/8 4166/12
 4168/20 4171/16
 4193/10
**modes [1]** 4202/17
**moment [1]** 4176/25
**money [1]** 4234/18
**monopolist [1]**
 4213/16
**monopoly [5]** 4199/6
 4202/12 4241/9
 4241/11 4241/11
**months [2]** 4215/15
 4274/8
**more [69]** 4153/17
 4154/16 4160/4
 4169/1 4178/10
 4178/14 4185/7
 4196/15 4198/12
 4200/1 4201/5 4201/8
 4201/9 4202/7 4203/4
 4207/2 4207/3
 4211/21 4212/3
 4216/3 4216/14
 4220/22 4221/1
 4221/6 4222/25
 4223/1 4223/5
 4228/15 4229/3
 4229/23 4229/24
 4230/5 4232/24
 4232/24 4232/24
 4233/1 4233/14
 4234/18 4236/14
 4237/6 4241/22
 4242/11 4242/11
 4242/13 4243/4
 4247/5 4247/9
 4249/25 4256/5
 4256/21 4257/11
 4257/12 4258/10
 4258/11 4258/12
 4258/13 4260/17
 4260/19 4262/18
 4262/18 4262/23
 4262/24 4264/11
 4264/11 4269/21
 4271/2 4271/15
 4272/2 4272/19
**morning [10]** 4149/7
 4153/2 4153/10
 4153/23 4154/7
 4154/8 4195/18
 4195/19 4231/11
 4271/6
**most [16]** 4170/23
 4199/11 4203/20
 4215/12 4218/5
 4234/1 4245/1
 4245/19 4252/12
 4253/8 4264/19
 4264/24 4265/25
 4266/13 4268/21
 4273/4
**mostly [1]** 4158/4

**Motorola [1]** 4170/10
**move [13]** 4186/9
 4193/5 4200/1
 4219/22 4228/16
 4230/25 4231/1
 4241/25 4248/13
 4268/2 4268/7
 4268/10 4270/1
**moved [3]** 4268/8
 4268/10 4271/22
**moves [2]** 4204/5
 4271/20
**moving [7]** 4191/25
 4203/2 4236/15
 4238/18 4239/20
 4254/18 4270/8
**Mozilla [3]** 4230/1
 4230/12 4230/13
**Mr. [13]** 4159/9
 4159/11 4161/18
 4188/3 4191/11
 4195/2 4196/13
 4214/20 4216/25
 4231/21 4236/19
 4242/18 4251/8
**Mr. Consumer [1]**
 4242/18
**Mr. Cue [1]** 4251/8
**Mr. Cue's [1]**
 4236/19
**Mr. Kapur [1]** 4188/3
**Mr. Michael [1]**
 4161/18
**Mr. Murphy [2]**
 4214/20 4216/25
**Mr. Nick [2]** 4159/9
 4159/11
**Mr. Popofsky [2]**
 4195/2 4231/21
**Mr. Severt [1]**
 4196/13
**Mr. Smurzynski [1]**
 4191/11
**Ms. [8]** 4156/7
 4156/11 4163/18
 4163/19 4173/23
 4186/22 4188/3
 4189/10
**Ms. Cassidy [2]**
 4163/19 4173/23
**Ms. Elizabeth [1]**
 4156/7
**Ms. Reid [3]** 4156/11
 4163/18 4189/10
**Ms. Robeson [2]**
 4186/22 4188/3
**much [26]** 4165/23
 4171/16 4178/14
 4185/13 4194/17
 4207/3 4209/22
 4223/3 4223/8 4229/3
 4234/14 4235/16
 4238/4 4247/9
 4247/17 4254/22
 4256/7 4256/21

 4257/5 4263/2 4263/25
 4264/23 4267/18
 4269/23 4271/2
 4273/9
**Murphy [37]** 4194/25
 4195/9 4195/15
 4195/18 4195/23
 4196/8 4196/16
 4196/19 4197/6
 4197/10 4199/7
 4202/10 4206/5
 4208/8 4213/21
 4214/20 4216/25
 4218/18 4220/8
 4222/18 4227/11
 4227/23 4229/16
 4230/17 4231/15
 4232/2 4232/3 4236/4
 4239/7 4244/21
 4248/13 4259/23
 4263/13 4268/14
 4268/25 4272/8
 4273/7
**my [57]** 4157/2
 4158/20 4163/11
 4167/19 4170/1
 4170/8 4170/22
 4172/12 4173/12
 4173/17 4174/9
 4175/11 4176/4
 4178/5 4179/4
 4181/18 4186/21
 4187/11 4187/22
 4188/6 4188/14
 4189/1 4191/1
 4191/21 4192/23
 4195/23 4197/9
 4199/2 4200/4
 4204/24 4211/7
 4212/19 4216/20
 4218/7 4221/15
 4227/2 4230/20
 4232/22 4233/4
 4233/8 4237/22
 4242/20 4244/1
 4244/7 4245/10
 4248/4 4255/11
 4256/17 4256/25
 4258/19 4259/4
 4260/14 4260/16
 4267/8 4271/9 4274/5
 4275/1
**myself [5]** 4244/3
 4260/15 4260/20
 4261/18 4261/20

**N**

**name [2]** 4195/20
 4195/23
**narrow [2]** 4215/14
 4268/13
**narrowly [1]** 4267/7
**national [1]** 4271/5
**nature [7]** 4202/21
 4203/7 4214/11

**navigate [1]** 4238/6
**necessarily [3]**
 4183/6 4227/21
 4269/12
**necessary [1]** 4163/8
**need [20]** 4153/11
 4153/16 4170/19
 4205/23 4207/6
 4213/12 4213/13
 4215/20 4216/10
 4217/25 4218/24
 4219/1 4219/1
 4219/16 4222/12
 4223/19 4223/20
 4224/1 4227/7
 4270/20
**needed [2]** 4155/11
 4213/25
**needs [2]** 4207/7
 4210/24
**negative [2]** 4247/13
 4259/18
**negotiating [1]**
 4270/10
**neither [1]** 4250/14
**neutrality [1]**
 4225/23
**never [5]** 4186/17
 4202/16 4223/23
 4235/7 4274/16
**new [8]** 4189/4
 4189/22 4189/24
 4190/13 4190/17
 4203/13 4234/14
 4244/20
**next [14]** 4159/7
 4161/17 4167/24
 4167/25 4177/14
 4223/11 4223/11
 4224/12 4224/18
 4232/6 4243/17
 4250/18 4254/18
 4274/7
**nice [4]** 4194/18
 4194/20 4195/2
 4204/2
**Nick [2]** 4159/9
 4159/11
**night [6]** 4153/14
 4185/10 4250/10
 4251/12 4266/9
 4271/8
**nine [1]** 4265/6
**nine years [1]**
 4265/6
**no [35]** 4149/4
 4153/15 4156/8
 4165/3 4167/10
 4170/19 4174/2
 4191/9 4192/9
 4194/15 4196/10
 4196/14 4201/12
 4206/15 4206/19

**N**

no... [20]   4210/6
4211/16 4213/10
4227/12 4232/4
4233/11 4233/13
4238/10 4240/2
4240/7 4240/17
4240/19 4240/25
4249/2 4251/14
4253/22 4260/21
4261/16 4269/7
4273/24
nobody [5]   4210/8
4215/10 4215/10
4215/11 4223/25
non [3]   4162/24
4208/21 4261/14
non-competitive [1]
4208/21
non-Google [2]
4162/24 4261/14
nonetheless [1]
4274/12
nonexclusive [8]
4163/13 4218/20
4224/9 4227/14
4227/16 4229/18
4229/19 4243/5
normal [1]   4163/3
not [157]
nothing [1]   4176/1
notice [2]   4178/24
4229/10
notification [3]
4178/12 4180/6
4181/13
notifications [1]
4181/5
notify [2]   4180/2
4180/7
notion [1]   4218/6
now [53]   4153/4
4156/18 4157/11
4176/3 4187/18
4187/19 4187/22
4189/2 4191/1
4196/19 4197/5
4199/3 4200/9
4201/14 4202/6
4203/18 4205/15
4206/12 4206/15
4211/7 4214/8
4219/11 4225/25
4226/19 4227/9
4228/7 4231/6
4231/17 4232/3
4236/13 4236/15
4237/13 4240/9
4244/21 4245/18
4246/2 4247/23
4250/15 4252/1
4254/18 4257/7
4258/16 4260/8
4260/22 4263/13
4265/11 4266/2

4266/15 4267/10
4271/7 4271/7 4274/3
4275/12
number [13]   4176/4
4180/12 4183/8
4185/5 4185/24
4186/9 4190/8
4190/20 4191/2
4253/11 4269/16
4272/16 4274/5
numbers [1]   4190/24
numerous [1]   4235/9
nursery [2]   4259/23
4260/7
NW [3]   4150/9 4151/7
4151/13

**O**

oath [1]   4195/6
objection [2]
4196/10 4196/14
objective [2]
4267/12 4273/1
obligations [1]
4255/7
observe [1]   4173/11
observed [1]   4158/22
obtained [1]   4213/7
occur [2]   4180/13
4236/14
occurs [1]   4183/4
odd [1]   4266/1
OEM [1]   4235/13
OEMs [3]   4176/9
4191/25 4252/11
off [12]   4154/11
4154/14 4172/8
4182/11 4205/19
4211/7 4222/7
4223/17 4229/4
4244/18 4253/21
4270/7
offer [1]   4177/12
offered [7]   4164/14
4164/21 4164/22
4165/10 4165/25
4174/17 4273/25
offering [1]   4227/25
Official [1]   4151/12
offset [2]   4245/18
4251/14
often [2]   4180/24
4200/20
Oh [3]   4159/15
4187/20 4217/11
okay [44]   4155/1
4155/8 4155/17
4155/20 4156/10
4156/21 4157/6
4157/23 4159/2
4159/16 4159/19
4161/22 4163/16
4166/3 4167/23
4168/7 4170/25
4171/7 4174/15

4176/19 4176/23
4177/2 4177/14
4178/8 4178/16
4182/17 4182/18
4184/13 4187/8
4187/15 4187/17
4189/2 4190/3
4190/11 4194/16
4204/3 4211/25
4220/24 4223/15
4224/3 4228/13
4239/3 4248/1
4265/21
old [3]   4259/23
4260/5 4260/7
once [8]   4170/17
4179/3 4196/15
4206/10 4206/11
4206/15 4207/9
4228/17
one [85]   4154/23
4154/25 4155/4
4160/21 4162/13
4165/13 4165/21
4168/3 4168/6
4168/13 4169/17
4170/14 4172/15
4174/6 4174/7 4174/8
4174/9 4174/12
4174/13 4175/12
4176/4 4177/15
4178/6 4178/7
4178/11 4181/13
4182/1 4182/19
4182/20 4184/16
4185/18 4193/11
4200/13 4200/17
4200/19 4201/4
4206/5 4208/18
4210/6 4210/18
4213/4 4213/17
4217/19 4218/16
4223/1 4227/23
4228/25 4229/10
4229/25 4230/16
4232/11 4236/21
4237/5 4238/7
4239/13 4241/5
4241/9 4242/4
4242/12 4243/9
4245/2 4245/15
4247/2 4247/10
4248/24 4250/14
4250/16 4252/25
4254/24 4256/12
4260/2 4260/3 4260/4
4261/11 4262/10
4262/15 4264/7
4267/2 4268/10
4268/14 4269/6
4271/11 4272/2
4272/16 4273/8
one-time [1]   4229/10
oneboxes [1]   4165/24
ones [2]   4180/24

4271/3
ongoing [5]   4207/21
4208/19 4247/14
4247/15 4255/7
only [12]   4165/25
4190/4 4192/7
4206/23 4207/1
4207/5 4213/20
4219/23 4264/15
4268/7 4273/13
4275/1
open [8]   4193/18
4194/1 4194/2
4238/13 4238/16
4271/6 4271/7 4271/8
OpenAI [9]   4159/8
4159/20 4160/7
4160/12 4161/9
4161/9 4234/9 4267/2
4267/3
OpenAI's [1]   4267/6
openly [1]   4193/8
operate [1]   4194/11
operating [2]
4165/15 4210/23
opine [1]   4186/3
opinion [30]   4155/9
4155/10 4155/19
4158/7 4158/10
4158/20 4158/21
4162/6 4163/6 4163/9
4166/4 4166/23
4167/3 4167/5
4169/22 4170/2
4174/17 4174/20
4176/25 4179/15
4180/1 4180/19
4184/21 4184/23
4191/1 4191/3 4192/6
4199/3 4232/3
4236/16
opinion -- strike [1]
4192/6
opinions [7]   4166/19
4174/23 4198/2
4198/4 4198/8 4199/5
4227/25
opportunities [3]
4203/18 4237/14
4261/5
opportunity [5]
4156/8 4203/13
4258/2 4274/1
4274/11
opposed [4]   4211/13
4250/16 4257/12
4273/3
opposition [2]
4204/19 4204/22
option [3]   4238/12
4238/17 4261/21
options [5]   4234/9
4238/17 4250/12
4250/17 4272/23
orange [3]   4229/9

**O**

**orange... [2]**
 4273/19 4274/9
**order [6]**  4160/21
 4205/15 4217/25
 4224/25 4236/25
 4253/17
**organization [3]**
 4196/9 4196/11
 4196/17
**orient [2]**  4223/14
 4228/21
**OS [1]**  4242/23
**other [66]**  4154/24
 4154/24 4155/5
 4156/23 4157/3
 4157/25 4163/4
 4163/13 4164/18
 4164/18 4165/14
 4165/15 4165/21
 4166/11 4167/14
 4167/21 4173/10
 4174/7 4174/8
 4174/13 4178/6
 4179/24 4179/25
 4182/2 4182/2
 4182/14 4184/8
 4186/23 4188/14
 4189/23 4191/25
 4192/13 4193/9
 4193/20 4193/21
 4197/18 4198/22
 4200/20 4201/18
 4207/18 4208/18
 4209/14 4216/8
 4220/3 4221/4
 4224/12 4226/4
 4230/15 4232/22
 4233/23 4234/4
 4234/9 4237/5 4242/9
 4242/15 4245/15
 4249/13 4255/6
 4255/8 4258/18
 4259/3 4261/5 4261/9
 4264/21 4272/23
 4274/18
**others [13]**  4161/3
 4168/18 4184/1
 4186/24 4188/5
 4192/16 4194/4
 4194/10 4224/9
 4227/15 4243/21
 4244/9 4257/3
**otherwise [4]**  4160/8
 4255/20 4258/3
 4271/16
**our [12]**  4157/16
 4157/20 4216/6
 4220/17 4229/22
 4231/11 4234/17
 4238/17 4248/20
 4263/4 4264/15
 4275/9
**ourselves [1]**  4254/9
**out [36]**  4169/13

 4171/6 4181/16
 4182/16 4183/21
 4194/7 4194/8
 4203/18 4203/23
 4207/24 4210/18
 4211/1 4212/12
 4212/21 4215/2
 4215/24 4218/19
 4221/9 4226/15
 4226/16 4229/20
 4234/19 4245/5
 4248/3 4254/8
 4254/13 4258/2
 4258/22 4259/14
 4259/18 4259/22
 4269/15 4270/1
 4271/14 4272/23
 4273/8
**outcome [7]**  4176/2
 4181/14 4239/21
 4241/17 4251/22
 4253/1 4253/3
**outcomes [8]**  4158/4
 4158/11 4158/19
 4158/21 4167/14
 4201/14 4223/10
 4252/15
**outside [1]**  4261/5
**outweigh [1]**  4240/3
**over [19]**  4153/17
 4168/18 4180/10
 4184/11 4190/6
 4193/5 4231/5 4239/2
 4240/14 4241/11
 4248/5 4253/16
 4253/23 4264/21
 4265/6 4265/11
 4268/3 4273/18
 4274/7
**overall [4]**  4209/25
 4250/6 4255/9
 4267/19
**overcome [6]**  4202/3
 4204/17 4219/18
 4249/1 4255/13
 4255/15
**override [2]**  4205/18
 4239/14
**overriding [3]**
 4206/21 4214/15
 4221/23
**overstates [1]**
 4255/2
**own [19]**  4157/4
 4165/11 4173/15
 4184/3 4184/3
 4184/10 4192/8
 4192/12 4211/12
 4211/18 4212/4
 4212/5 4216/13
 4257/12 4257/15
 4260/16 4261/6
 4264/15 4264/21
**owner [1]**  4266/13
**owns [1]**  4168/16

**P**

**p.m [2]**  4275/14
 4275/14
**pace [1]**  4176/11
**page [11]**  4163/22
 4164/9 4166/23
 4187/3 4187/9
 4187/10 4188/10
 4189/12 4189/18
 4189/21 4190/18
**page 226 [1]**  4166/23
**page 3 [3]**  4189/12
 4189/18 4189/21
**page 399 [1]**  4187/3
**page 401 [2]**  4187/10
 4188/10
**page 6 [1]**  4163/22
**pages [1]**  4185/7
**paid [15]**  4175/20
 4176/15 4176/20
 4227/16 4227/18
 4245/6 4245/8
 4250/13 4250/14
 4250/16 4273/12
 4273/13 4273/15
 4273/20 4273/25
**paper [1]**  4164/10
**par [1]**  4161/4
**part [20]**  4167/2
 4167/8 4171/21
 4172/18 4186/5
 4199/20 4211/23
 4212/9 4212/12
 4213/14 4226/13
 4226/14 4233/23
 4243/6 4243/12
 4255/18 4256/17
 4262/15 4262/19
 4263/6
**participants [2]**
 4179/25 4182/3
**participate [1]**
 4179/22
**particular [4]**
 4175/2 4186/6
 4202/13 4236/10
**particularly [6]**
 4200/23 4210/25
 4239/22 4244/4
 4252/17 4270/16
**parties [4]**  4162/24
 4163/1 4165/10
 4270/10
**partitioned [1]**
 4192/24
**partner [3]**  4183/22
 4250/23 4251/14
**partners [7]**  4223/4
 4243/10 4243/16
 4252/2 4253/4
 4253/19 4253/25
**partners' [2]**
 4244/19 4260/10
**party [3]**  4163/6
 4164/15 4165/20

**passing [1]**  4170/8
**past [17]**  4204/14
 4205/11 4205/11
 4205/24 4206/19
 4207/24 4216/1
 4220/21 4232/25
 4234/4 4234/12
 4236/6 4240/15
 4247/12 4247/13
 4247/17 4271/3
**path [1]**  4237/17
**paths [1]**  4203/23
**pause [1]**  4180/9
**pay [4]**  4216/12
 4217/12 4245/5
 4247/5
**paying [2]**  4245/2
 4245/4
**payment [11]**  4197/18
 4240/10 4244/14
 4249/12 4250/2
 4250/4 4250/6
 4250/20 4252/2
 4260/9 4261/14
**payments [18]**  4217/9
 4227/9 4227/13
 4227/17 4227/19
 4243/6 4250/24
 4251/1 4251/2 4251/7
 4251/15 4251/22
 4251/23 4252/16
 4252/17 4253/5
 4253/19 4253/24
**Pennsylvania [1]**
 4151/7
**people [54]**  4167/22
 4181/12 4183/23
 4185/1 4185/24
 4186/9 4188/14
 4190/9 4201/18
 4203/13 4211/22
 4226/6 4230/12
 4235/20 4235/25
 4238/1 4238/14
 4238/21 4243/7
 4245/4 4245/5 4245/6
 4254/11 4255/12
 4257/15 4258/11
 4258/21 4259/2
 4259/3 4259/10
 4262/20 4262/21
 4262/22 4267/23
 4267/25 4269/25
 4270/16 4270/17
 4272/18 4272/22
 4273/10 4273/13
 4273/15 4273/16
 4273/22 4274/1
 4274/4 4274/6 4274/8
 4274/12 4274/17
 4275/1 4275/4 4275/5
**per [5]**  4202/8
 4225/1 4262/20
 4268/8 4268/10
**percent [24]**  4159/21

## P

**percent... [23]**
4160/3 4160/16
4191/3 4224/25
4230/18 4230/21
4233/17 4249/9
4249/13 4249/14
4249/23 4267/16
4267/16 4267/19
4267/20 4267/21
4267/23 4267/24
4268/8 4271/22
4271/23 4271/23
4271/24
**percentage [2]**
4190/5 4271/20
**perform [2]**   4161/4
4171/2
**performance [2]**
4158/15 4158/19
**perhaps [1]**   4178/10
**period [17]**   4177/20
4177/21 4178/12
4178/12 4178/23
4178/24 4180/10
4221/13 4221/20
4221/21 4221/24
4231/5 4240/14
4240/15 4254/12
4254/17 4270/3
**permission [1]**
4197/3
**pernicious [1]**
4210/25
**Perplexity [10]**
4160/7 4161/11
4234/8 4235/19
4238/15 4238/15
4238/16 4261/22
4266/25 4267/1
**person [1]**   4266/13
**personnel [1]**
4186/20
**perspective [5]**
4161/13 4171/14
4234/15 4241/7
4241/21
**PFJ [3]**   4177/23
4179/5 4179/16
**phase [1]**   4197/12
**phone [1]**   4271/7
**pick [1]**   4154/16
**picking [1]**   4210/15
**pie [1]**   4268/16
**piece [2]**   4167/5
4235/15
**pieces [1]**   4199/1
**piechart [1]**   4249/8
**piecharts [1]**
4249/20
**Pixel [1]**   4271/21
**place [11]**   4161/13
4164/13 4178/6
4180/14 4180/16
4203/5 4205/4 4239/3

4241/18 4248/25
4254/8
**placed [1]**   4195/6
**plain [1]**   4165/17
**Plaintiff [1]**
4150/12
**plaintiffs [12]**
4149/4 4150/2
4177/19 4184/2
4196/9 4209/2 4210/6
4237/3 4243/3 4250/4
4267/12 4272/6
**plaintiffs' [23]**
4177/16 4182/5
4197/16 4197/23
4198/10 4198/25
4208/17 4221/3
4221/15 4239/6
4241/23 4243/18
4244/22 4245/22
4251/17 4254/16
4254/19 4260/8
4262/6 4264/2
4265/16 4268/24
4270/2
**plan [2]**   4212/24
4269/14
**plans [2]**   4211/25
4212/1
**platforms [2]**
4264/21 4264/21
**plausible [1]**
4160/14
**play [2]**   4166/13
4254/13
**played [1]**   4218/19
**please [12]**   4153/2
4159/15 4194/22
4195/4 4195/7
4195/20 4196/1
4197/7 4197/11
4219/8 4250/21
4262/8
**point [40]**   4160/22
4174/23 4183/10
4184/22 4185/20
4186/3 4186/8 4188/4
4188/12 4188/25
4190/23 4203/1
4203/18 4204/24
4207/4 4207/25
4209/19 4209/23
4210/18 4221/9
4226/9 4227/15
4230/20 4231/12
4233/25 4238/1
4238/3 4241/13
4242/6 4248/25
4255/11 4257/14
4265/17 4266/22
4267/22 4268/2
4268/5 4272/4 4275/2
4275/3
**pointed [1]**   4269/15
**points [13]**   4176/9

4184/19 4185/17
4188/24 4189/4
4189/22 4190/13
4238/2 4244/25
4245/3 4254/23
4272/11 4272/16
**policy [1]**   4201/19
**poor [2]**   4261/11
4269/17
**Popofsky [5]**   4151/6
4194/23 4195/2
4214/21 4231/21
**population [2]**
4268/2 4268/3
**portion [1]**   4172/12
**position [4]**   4196/2
4208/17 4228/16
4230/8
**positive [1]**   4259/19
**possibility [3]**
4223/7 4250/14
4263/14
**possible [6]**   4183/13
4205/11 4209/8
4209/14 4218/18
4252/25
**post [1]**   4268/16
**post-divestiture [1]**
4268/16
**potential [7]**   4169/6
4172/5 4180/12
4182/9 4202/13
4266/16 4269/9
**potentially [1]**
4159/25
**power [2]**   4183/13
4183/17
**practical [1]**
4184/25
**practice [1]**   4163/3
**pre [5]**   4158/2
4232/8 4270/11
4270/12 4270/12
**pre-dates [2]**
4270/12 4270/12
**pre-existing [1]**
4232/8
**pre-training [1]**
4158/2
**precise [1]**   4193/12
**precisely [1]**
4215/17
**predict [1]**   4218/19
**prediction [1]**
4169/13
**prefer [1]**   4274/13
**preferencing [2]**
4197/20 4263/17
**preferential [1]**
4225/22
**preferred [3]**
4224/16 4252/22
4253/6
**preinstallation [4]**
4197/19 4243/12

4249/12 4253/16
**prepare [1]**   4196/19
**prepared [1]**   4178/6
**preparing [1]**
4159/12
**presence [1]**   4161/11
**present [5]**   4153/7
4182/13 4216/1
4218/10 4226/10
**presentation [4]**
4165/18 4196/20
4197/2 4197/7
**presentations [1]**
4197/5
**presumably [1]**
4246/14
**presuming [1]**   4181/4
**presumptively [1]**
4181/6
**pretty [11]**   4161/3
4221/16 4228/5
4231/1 4231/4 4233/5
4235/2 4246/8 4247/7
4260/24 4266/19
**Prettyman [1]**
4151/12
**prevent [1]**   4243/19
**preventing [1]**
4221/13
**previous [1]**   4178/14
**PREVIOUSLY [1]**
4154/3
**price [12]**   4183/4
4183/17 4242/5
4242/7 4242/24
4243/1 4243/13
4243/14 4243/16
4244/16 4247/6
4254/3
**prices [1]**   4251/6
**principally [2]**
4170/10 4170/23
**principle [4]**
4178/21 4194/5
4208/12 4263/4
**principles [12]**
4197/14 4197/16
4197/25 4198/9
4198/10 4198/19
4198/24 4199/4
4199/6 4199/9
4202/11 4236/16
**prior [3]**   4156/18
4165/5 4197/5
**private [1]**   4259/1
**privately [1]**
4270/10
**probability [1]**
4269/11
**probably [6]**   4203/20
4224/14 4224/16
4230/21 4253/8
4271/12
**problem [9]**   4160/3
4170/12 4205/7

## P

**problem... [6]**
4205/8 4244/13
4245/4 4258/19
4260/3 4260/21
**problematic [2]**
4211/2 4252/17
**problems [4]** 4239/12
4245/13 4255/8
4255/9
**proceed [3]** 4195/12
4220/25 4239/4
**proceeding [2]**
4196/12 4266/17
**proceedings [4]**
4149/9 4151/15
4214/23 4276/4
**process [56]** 4154/24
4170/22 4179/22
4199/13 4199/17
4199/20 4200/2
4200/4 4200/7
4200/14 4200/15
4200/16 4200/19
4200/21 4201/7
4201/9 4201/19
4203/11 4203/12
4203/24 4203/25
4204/6 4204/15
4204/20 4204/23
4205/2 4205/16
4205/17 4205/18
4206/17 4209/18
4209/25 4211/8
4211/9 4211/17
4211/17 4211/23
4212/10 4212/13
4213/2 4214/15
4214/15 4219/21
4221/17 4221/24
4238/21 4238/21
4241/19 4241/24
4243/7 4243/13
4248/10 4255/5
4259/12 4263/5
4263/6
**processes [1]**
4199/17
**produce [5]** 4172/24
4172/25 4242/13
4264/15 4270/14
**produced [1]** 4151/15
**product [30]** 4154/21
4155/3 4166/10
4166/17 4167/4
4167/18 4167/21
4167/21 4173/1
4183/16 4183/20
4184/3 4186/9 4192/8
4192/11 4193/4
4230/13 4234/21
4235/19 4242/12
4242/14 4244/7
4247/6 4258/2 4258/7
4262/12 4262/12

4262/13 4262/14
4262/19
**products [18]**
4167/15 4172/5
4173/15 4174/14
4175/4 4184/8 4184/8
4184/10 4184/11
4200/25 4217/13
4238/22 4242/6
4253/7 4255/13
4255/14 4255/20
4262/14
**professor [43]**
4153/19 4153/20
4153/21 4154/7
4154/11 4157/15
4164/8 4183/10
4187/2 4191/16
4194/14 4194/16
4195/18 4196/5
4196/8 4196/19
4197/6 4197/10
4199/7 4202/10
4206/5 4208/8 4208/9
4213/21 4218/18
4220/8 4222/18
4227/11 4227/23
4230/17 4232/2
4232/3 4236/4 4239/7
4244/21 4248/13
4259/23 4263/13
4268/14 4268/25
4272/7 4272/8 4273/7
**Professor Hitt [6]**
4153/20 4153/21
4154/7 4154/11
4191/16 4194/14
**Professor Luca's [1]**
4272/7
**Professor Murphy [18]**
4195/18 4196/8
4196/19 4197/6
4218/18 4220/8
4227/11 4230/17
4232/2 4232/3 4236/4
4239/7 4244/21
4248/13 4259/23
4263/13 4272/8
4273/7
**profit [1]** 4244/5
**progress [6]** 4211/16
4212/16 4212/19
4238/23 4257/14
4262/15
**progressively [1]**
4228/15
**prohibition [2]**
4197/19 4263/15
**prohibitions [2]**
4262/6 4263/16
**promote [10]** 4199/14
4199/18 4200/2
4200/7 4250/12
4250/13 4250/15
4250/24 4263/20

**promoted [1]** 4223/5
**promotes [4]** 4242/16
4242/17 4251/15
4251/23
**promoting [5]**
4250/19 4252/1
4252/22 4261/15
4264/12
**promotion [16]**
4223/8 4225/23
4235/25 4236/11
4243/2 4243/9
4243/16 4245/24
4246/21 4247/5
4247/6 4253/21
4272/19 4272/20
4273/1 4273/1
**prong [3]** 4170/4
4175/18 4266/21
**property [1]** 4259/1
**proposal [4]** 4163/21
4177/16 4178/11
4246/3
**proposals [4]**
4198/25 4200/9
4239/6 4270/2
**proposed [21]**
4177/18 4177/25
4178/2 4180/2 4184/2
4191/18 4191/22
4197/16 4199/1
4210/7 4210/10
4244/22 4250/4
4262/9 4263/16
4263/19 4264/2
4267/12 4268/24
4270/5 4272/6
**proposition [1]**
4235/18
**propping [1]** 4200/18
**prospect [1]** 4214/4
**prospects [4]**
4205/24 4207/23
4214/8 4234/24
**Protect [1]** 4199/13
**Protection [1]**
4150/13
**provide [3]** 4199/23
4235/12 4261/25
**provided [1]** 4163/25
**providers [1]**
4189/23
**provides [1]** 4165/11
**providing [1]** 4166/7
**provision [2]** 4180/6
4182/5
**provisions [1]**
4178/10
**proxy [3]** 4225/11
4225/18 4233/16
**public [6]** 4158/25
4160/13 4161/1
4197/22 4272/5
4273/2

**publicly [1]** 4160/23
**publish [1]** 4197/3
**pull [1]** 4254/8
**punish [1]** 4209/14
**punishment [1]**
4209/21
**purposes [1]** 4218/24
**push [5]** 4222/2
4256/3 4261/6
4261/11 4275/1
**pushed [1]** 4255/19
**pushes [1]** 4262/25
**pushing [3]** 4221/10
4231/8 4275/4
**put [24]** 4156/3
4161/10 4163/19
4173/23 4182/9
4182/13 4188/5
4188/17 4189/8
4189/13 4191/18
4198/2 4199/1 4208/1
4208/5 4208/6 4209/2
4225/18 4234/18
4237/3 4237/10
4241/4 4265/2 4267/8
**puts [1]** 4224/17
**putting [4]** 4184/1
4262/18 4268/6
4271/25
**PXR0153 [1]** 4192/4
**PXR113 [2]** 4189/9
4189/12
**PXR153 [2]** 4163/19
4164/9
**PXR26 [1]** 4157/14

## Q

**qualified [1]** 4196/8
**qualify [1]** 4184/22
**qualitative [1]**
4223/1
**quality [15]** 4164/14
4164/21 4165/10
4166/10 4167/17
4226/12 4242/10
4243/15 4250/13
4252/22 4253/13
4255/20 4266/22
4268/16 4268/18
**quantify [2]** 4246/17
4253/10
**queries [7]** 4159/22
4161/24 4162/9
4162/12 4235/21
4271/22 4271/25
**query [2]** 4193/14
4193/20
**question [37]**
4159/13 4177/24
4187/14 4187/20
4187/22 4188/11
4188/17 4188/19
4188/23 4192/18
4205/22 4206/4
4208/9 4213/4

## Q

**question... [23]**
4213/10 4213/18
4213/25 4214/19
4216/25 4218/15
4218/16 4220/10
4223/18 4227/23
4229/22 4230/7
4230/16 4232/23
4236/3 4236/18
4240/7 4241/5 4246/5
4246/6 4256/15
4260/22 4268/14
**questions [11]**
4153/13 4165/24
4188/5 4191/9
4191/16 4192/18
4192/20 4194/15
4217/18 4222/19
4225/14
**quick [2]**  4189/19
4254/14
**quickly [4]**  4159/14
4235/5 4240/19
4250/9
**quite [6]**  4222/6
4225/2 4225/8
4227/15 4245/12
4271/19
**quote [6]**  4159/14
4159/17 4159/18
4160/20 4254/6
4254/8

## R

**raise [3]**  4168/12
4181/22 4195/5
**raising [2]**  4168/14
4235/2
**Ralph [1]**  4150/14
**ran [1]**  4188/6
**Rangel [3]**  4198/3
4226/3 4274/14
**rank [1]**  4162/13
**ranking [2]**  4156/17
4156/24
**rapidly [1]**  4189/23
**rare [1]**  4215/13
**rarely [1]**  4260/24
**rather [11]**  4200/15
4201/15 4204/19
4204/22 4210/10
4230/10 4260/18
4260/20 4261/9
4267/3 4269/17
**rationale [2]**
4176/13 4235/16
**raw [2]**  4258/1
4258/4
**RDXD32.034 [1]**
4173/24
**RDXD33 [1]**  4197/2
**reach [1]**  4189/23
**reached [1]**  4249/2
**reaction [4]**  4211/7

4228/10 4237/11
4272/10
**read [6]**  4156/7
4156/9 4159/14
4188/9 4199/11
4272/7
**reading [1]**  4158/22
**ready [5]**  4153/12
4153/19 4231/21
4234/13 4239/4
**real [7]**  4155/6
4177/12 4189/19
4228/18 4254/23
4255/14 4257/19
**real-time [1]**
4177/12
**reality [1]**  4255/23
**really [56]**  4176/10
4177/6 4182/20
4197/13 4199/9
4199/9 4199/12
4200/12 4201/1
4201/3 4201/14
4202/4 4203/17
4204/15 4206/18
4212/15 4216/2
4217/4 4220/3 4223/3
4223/7 4223/18
4224/23 4225/23
4227/6 4229/22
4230/13 4233/20
4233/25 4234/7
4234/13 4237/24
4238/25 4239/18
4242/5 4244/5
4244/25 4245/18
4247/17 4247/24
4248/17 4252/13
4257/2 4257/17
4261/25 4262/10
4263/8 4264/6
4264/24 4265/1
4272/11 4272/17
4274/6 4274/20
4274/24 4275/2
**realm [2]**  4193/9
4193/16
**Realtime [1]**  4151/11
**reason [7]**  4165/1
4226/8 4240/17
4240/20 4251/18
4266/2 4272/13
**reasonable [3]**
4160/19 4171/4
4227/4
**reasonably [2]**
4205/6 4205/7
**reasoning [2]**  4167/8
4170/22
**reasons [4]**  4177/9
4179/23 4242/12
4270/14
**recall [5]**  4165/8
4166/25 4167/1
4167/5 4187/22

**receiver [1]**  4258/24
**recess [4]**  4231/18
4231/19 4275/13
4275/14
**recognition [1]**
4196/10
**recognize [4]**
4196/15 4205/15
4246/24 4260/13
**recognized [3]**
4245/9 4245/10
4269/24
**recognizes [1]**
4256/20
**recommendation [1]**
4274/20
**reconcile [1]**
4166/19
**reconsider [3]**
4190/22 4190/25
4191/8
**record [5]**  4153/5
4157/13 4195/21
4197/1 4276/3
**recorded [1]**  4151/15
**Rectify [1]**  4219/13
**red [5]**  4197/6
4197/7 4229/8
4243/17 4265/4
**redirect [3]**  4152/4
4191/11 4191/14
**reduce [7]**  4210/1
4246/14 4254/1
4256/13 4268/23
4269/6 4269/9
**reduced [3]**  4244/15
4252/16 4252/16
**reduces [4]**  4247/3
4254/25 4255/9
4260/14
**reducing [5]**  4209/10
4210/19 4221/7
4221/19 4255/1
**reduction [2]**
4246/16 4268/12
**reductions [1]**
4239/17
**reference [2]**
4154/17 4194/1
**referenced [1]**
4157/8
**referencing [2]**
4174/5 4262/6
**refers [3]**  4154/20
4192/5 4260/3
**regard [3]**  4163/6
4225/18 4227/25
**regarding [2]**  4159/3
4173/10
**regardless [1]**
4155/15
**regimes [1]**  4259/1
**Registered [1]**
4151/11
**regulation [3]**

4202/7 4202/9
4206/12
**regulatory [7]**
4201/14 4206/18
4207/10 4207/11
4207/14 4207/19
4241/20
**Reid [4]**  4156/7
4156/11 4163/18
4189/10
**relate [9]**  4173/18
4193/10 4204/23
4225/3 4225/13
4230/19 4248/14
4260/1 4274/22
**related [10]**  4158/4
4165/24 4175/9
4175/10 4185/17
4193/3 4201/9 4202/4
4209/22 4210/5
**relative [5]**  4158/15
4162/14 4206/8
4248/2 4256/12
**relatively [2]**
4268/13 4270/8
**relevant [3]**  4181/23
4193/19 4226/21
**relied [1]**  4226/24
**relief [1]**  4199/6
**relies [2]**  4156/16
4160/6
**reluctant [1]**
4177/12
**relying [1]**  4170/14
**remain [1]**  4195/4
**remedial [7]**  4201/15
4221/12 4221/20
4221/21 4240/15
4241/8 4254/12
**remedies [81]**  4149/9
4197/15 4197/16
4197/23 4197/24
4198/9 4198/9
4198/11 4198/11
4198/18 4198/21
4198/23 4199/1
4199/4 4199/21
4200/14 4201/4
4201/17 4202/12
4202/13 4202/15
4202/17 4204/9
4204/25 4205/1
4205/9 4205/21
4206/1 4206/23
4207/8 4208/15
4208/20 4210/4
4210/5 4213/11
4213/15 4213/19
4213/22 4213/25
4214/18 4218/25
4219/12 4219/17
4219/17 4219/23
4220/24 4221/3
4221/9 4221/15
4232/5 4232/15

**R**

**remedies... [30]**
4232/21 4233/21
4235/8 4235/24
4236/14 4237/23
4238/14 4240/23
4240/24 4241/13
4241/23 4243/18
4244/22 4245/22
4248/25 4250/3
4254/20 4255/17
4255/24 4256/4
4257/23 4262/9
4263/16 4263/18
4265/16 4269/16
4269/25 4270/2
4270/6 4274/25
**remedy [21]**  4184/2
4184/9 4191/18
4191/22 4200/9
4202/7 4202/23
4203/8 4205/10
4206/6 4210/10
4210/13 4211/3
4213/11 4213/14
4236/7 4246/10
4247/2 4247/19
4256/12 4267/12
**remedying [3]**
4206/19 4206/20
4208/14
**remember [18]**
4166/20 4197/7
4201/7 4216/6 4220/1
4221/21 4223/19
4229/22 4243/22
4248/20 4253/1
4253/11 4255/4
4257/21 4263/7
4266/25 4271/19
4273/10
**remind [4]**  4157/15
4169/5 4196/1 4254/9
**removing [4]**  4183/11
4205/13 4246/13
4251/7
**report [9]**  4168/4
4170/8 4172/12
4173/17 4175/11
4178/5 4190/4
4231/10 4255/11
**reporter [5]**  4151/10
4151/11 4151/11
4151/12 4157/17
**reports [1]**  4158/23
**represents [1]**
4159/21
**request [1]**  4164/3
**require [3]**  4177/16
4213/17 4229/15
**required [2]**  4232/5
4273/13
**requirement [2]**
4180/1 4181/13
**reshape [1]**  4201/10

**resources [5]**
4167/15 4169/7
4170/18 4194/6
4194/7
**respect [4]**  4167/10
4173/5 4191/20
4256/13
**respond [1]**  4198/1
**response [4]**  4154/21
4217/18 4246/4
4258/5
**responses [2]**
4192/15 4206/5
**rest [1]**  4219/3
**restoration [2]**
4214/16 4214/17
**restorative [12]**
4204/24 4205/10
4205/21 4206/6
4206/23 4207/8
4213/19 4213/22
4213/24 4214/18
4219/23 4232/5
**restore [11]**  4203/11
4204/10 4205/13
4206/7 4206/8
4213/24 4217/25
4236/25 4237/4
4239/15 4249/4
**restored [2]**  4207/6
4207/7
**restrain [1]**  4182/20
**restrict [2]**  4163/7
4221/4
**restricted [1]**
4165/14
**restriction [1]**
4177/19
**restrictions [2]**
4179/15 4245/24
**restrictive [2]**
4178/10 4178/15
**restricts [1]**  4165/9
**result [1]**  4230/18
**resulting [1]**
4233/19
**results [10]**  4164/14
4164/21 4165/10
4165/11 4165/23
4165/25 4225/13
4231/2 4256/23
4256/23
**resume [2]**  4231/14
4275/10
**RESUMED [1]**  4154/3
**retention [1]**
4269/11
**return [1]**  4219/8
**reveal [1]**  4274/12
**revealed [1]**  4262/1
**revenue [1]**  4252/14
**revenues [1]**  4208/19
**review [4]**  4159/11
4187/4 4187/13
4190/15

**reviewed [5]**  4153/10
4165/5 4178/5
4186/19 4188/25
**reviewing [3]**
4187/18 4187/23
4189/11
**revised [5]**  4178/1
4178/1 4178/11
4179/5 4179/16
**revolution [1]**
4236/1
**rewards [2]**  4245/2
4245/12
**rhyme [1]**  4260/7
**richer [1]**  4165/23
**rid [19]**  4203/3
4204/16 4205/2
4205/7 4205/9
4207/15 4216/10
4216/11 4216/15
4217/6 4220/19
4220/24 4224/24
4225/12 4225/21
4225/22 4235/9
4235/24 4245/19
**right [52]**  4153/10
4153/21 4154/14
4156/19 4158/10
4160/17 4166/7
4167/12 4170/15
4173/8 4178/3 4182/3
4182/7 4184/23
4185/6 4185/23
4188/1 4188/7
4188/21 4191/10
4195/5 4195/9 4204/6
4206/12 4210/20
4219/19 4221/18
4222/12 4223/23
4224/12 4224/18
4226/13 4230/4
4231/7 4234/15
4235/17 4244/18
4249/8 4250/10
4251/19 4259/9
4263/21 4265/10
4266/7 4266/21
4267/14 4268/1
4268/4 4269/8
4271/15 4271/23
4275/9
**rightfully [1]**
4229/6
**rise [2]**  4231/17
4275/12
**risk [1]**  4189/24
**rival [3]**  4225/2
4266/3 4266/4
**rivals [37]**  4166/24
4168/12 4170/6
4200/18 4216/2
4216/18 4223/4
4223/5 4223/9
4224/17 4225/16
4228/9 4232/24

4239/12 4234/4
4237/5 4244/1
4244/17 4245/25
4249/1 4249/9
4249/11 4249/13
4251/19 4251/21
4253/12 4254/11
4255/21 4257/25
4258/6 4269/18
4269/20 4269/22
4272/19 4272/20
4272/24 4273/3
**rivals' [5]**  4168/14
4168/21 4215/25
4225/7 4225/8
**RMR [2]**  4276/2
4276/8
**road [2]**  4208/5
4231/8
**Robeson [2]**  4186/22
4188/3
**Rodino [2]**  4178/17
4180/21
**roller [6]**  4222/7
4239/11 4239/20
4240/16 4241/4
4248/14
**roof [1]**  4234/17
**ROPES [2]**  4151/7
4194/23
**ropesgray.com [1]**
4151/9
**round [3]**  4234/19
4259/22 4270/1
**rule [2]**  4236/25
4259/17
**rules [3]**  4181/3
4209/15 4210/1
**run [2]**  4212/4
4257/5
**runs [1]**  4258/19

**S**

**Safe [1]**  4194/21
**Safe travels [1]**
4194/21
**said [22]**  4156/11
4159/6 4160/15
4160/16 4166/9
4175/16 4186/14
4192/2 4204/11
4213/16 4234/7
4235/9 4236/21
4236/24 4237/7
4238/19 4239/23
4246/2 4259/6
4266/19 4267/1
4267/2
**sake [1]**  4188/8
**sales [1]**  4251/3
**Sallet [2]**  4150/12
4153/7
**same [20]**  4158/1
4168/18 4169/4
4169/12 4170/12

**S**

**same... [15]**   4175/24
4181/1 4187/14
4188/25 4196/10
4197/16 4197/24
4197/25 4198/7
4204/14 4226/10
4229/6 4233/7
4244/13 4267/16
**Samsung [1]**   4176/9
**satisfied [1]**
4230/13
**satisfy [1]**   4210/24
**saw [3]**   4189/11
4232/4 4232/7
**say [42]**   4160/10
4168/23 4172/20
4179/25 4181/11
4183/15 4193/20
4197/7 4201/25
4204/5 4204/12
4205/1 4209/4 4209/9
4209/14 4211/9
4211/25 4212/10
4213/12 4214/13
4215/13 4220/24
4229/18 4233/12
4233/20 4235/13
4235/16 4238/13
4238/19 4240/12
4242/18 4246/12
4247/1 4252/8
4252/25 4253/14
4255/12 4255/19
4256/6 4258/14
4269/19 4274/3
**saying [15]**   4160/20
4185/2 4206/13
4206/15 4210/23
4211/12 4212/8
4224/6 4228/12
4237/7 4243/20
4254/6 4256/16
4266/7 4268/11
**says [22]**   4160/18
4164/12 4164/21
4165/17 4166/2
4167/3 4170/13
4185/19 4188/7
4189/22 4190/14
4190/16 4205/10
4227/20 4229/19
4235/20 4245/11
4264/15 4266/25
4269/17 4269/20
4274/10
**scale [35]**   4166/24
4167/4 4215/25
4216/3 4216/18
4219/2 4225/17
4229/3 4229/3 4229/5
4229/11 4229/12
4229/13 4229/16
4229/20 4229/21
4229/21 4229/22

4229/23 4229/24
4230/4 4230/6
4232/12 4232/23
4232/24 4233/4
4233/5 4233/7
4233/10 4233/11
4233/13 4233/14
4233/18 4234/4
4234/12
**scenes [2]**   4224/6
4271/4
**Schechter [1]**
4161/18
**Schmidtlein [2]**
4151/2 4153/9
**School [1]**   4196/6
**scope [1]**   4218/25
**Scott [2]**   4178/17
4180/21
**screen [22]**   4156/3
4163/23 4164/10
4189/13 4224/19
4224/20 4224/23
4224/25 4225/13
4225/18 4225/24
4226/5 4229/4
4230/18 4233/16
4270/24 4271/6
4271/12 4271/14
4271/19 4274/10
4274/17
**screens [17]**   4197/21
4224/5 4224/5 4224/7
4224/10 4224/17
4224/21 4225/10
4270/3 4270/7
4270/11 4270/13
4270/21 4270/22
4271/2 4271/25
4274/15
**scrutiny [1]**   4179/4
**se [2]**   4202/8 4225/1
**search [103]**   4154/21
4154/23 4155/23
4156/14 4156/15
4156/17 4156/17
4156/24 4157/7
4158/9 4160/4
4160/10 4160/13
4162/14 4162/19
4165/23 4166/10
4166/10 4166/17
4167/4 4167/18
4175/6 4175/10
4175/21 4176/16
4184/19 4184/22
4185/1 4185/17
4185/20 4185/21
4185/25 4186/3
4186/8 4188/4
4188/12 4188/16
4188/24 4190/6
4190/9 4190/21
4190/23 4192/13
4192/16 4192/20

4192/22 4192/24
4193/1 4193/1 4193/3
4193/3 4193/4
4193/18 4193/19
4193/22 4194/2
4223/5 4226/12
4235/14 4235/17
4235/17 4236/1
4239/2 4242/3 4242/4
4242/17 4242/17
4242/20 4242/25
4251/3 4252/22
4253/6 4253/9
4253/16 4255/4
4255/25 4255/25
4256/5 4256/8
4256/17 4256/22
4256/23 4256/23
4257/1 4257/8
4257/11 4257/18
4257/18 4260/10
4261/6 4261/13
4261/14 4261/15
4264/8 4264/9
4264/10 4264/11
4264/14 4266/4
4266/23 4267/19
4270/11 4274/18
**SearchGPT [2]**   4161/2
4161/3
**seat [1]**   4153/22
**seated [2]**   4153/2
4195/8
**second [12]**   4160/25
4176/7 4183/2 4183/3
4183/24 4201/4
4204/23 4204/24
4229/25 4232/12
4236/16 4254/7
**secondly [6]**   4200/23
4244/10 4249/6
4263/7 4269/15
4270/9
**section [4]**   4150/13
4170/8 4173/17
4175/3
**see [37]**   4159/9
4163/12 4164/23
4166/1 4166/11
4167/14 4168/20
4173/2 4174/7
4175/18 4190/1
4190/12 4195/2
4195/3 4195/10
4195/11 4204/14
4204/18 4211/2
4220/10 4223/23
4223/25 4229/7
4231/3 4245/11
4253/18 4261/24
4262/3 4267/8 4269/4
4272/18 4273/5
4273/15 4273/17
4273/21 4274/7
4275/11

**seeing [2]**   4166/4
4236/2
**seem [1]**   4235/1
**seemed [1]**   4253/2
**seems [11]**   4160/14
4162/2 4176/12
4186/5 4191/25
4234/2 4252/24
4261/7 4261/11
4261/25 4265/23
**seen [8]**   4159/18
4161/21 4163/18
4165/7 4192/17
4270/10 4270/13
4271/3
**self [3]**   4197/20
4262/6 4263/17
**self-preferencing [2]**
4197/20 4263/17
**self-referencing [1]**
4262/6
**sell [1]**   4262/20
**sense [13]**   4167/13
4176/13 4177/20
4188/15 4200/6
4201/14 4212/16
4224/14 4237/13
4246/14 4261/7
4264/20 4270/25
**separate [5]**   4158/3
4160/9 4208/23
4215/15 4230/20
**series [1]**   4271/13
**serve [1]**   4159/21
**service [4]**   4164/15
4196/4 4261/15
4263/23
**services [4]**   4163/1
4184/3 4262/23
4262/24
**serving [2]**   4161/24
4162/11
**Session [1]**   4149/7
**set [6]**   4168/8
4171/6 4183/23
4249/20 4270/1
4270/5
**setting [1]**   4271/11
**Severt [2]**   4150/7
4196/13
**share [17]**   4228/15
4243/20 4243/25
4244/4 4244/4 4244/8
4249/8 4251/14
4251/18 4251/21
4259/3 4264/22
4265/5 4267/11
4269/23 4270/8
4271/17
**shares [3]**   4225/2
4225/7 4225/8
**sharing [13]**   4211/3
4211/4 4221/9 4244/6
4247/8 4247/10
4247/11 4247/12

**S**

**sharing... [5]**
4247/14 4254/20
4255/3 4255/5
4257/23
**she [19]**  4156/13
4156/13 4218/17
4226/22 4226/22
4226/24 4227/12
4228/7 4228/12
4232/7 4233/19
4244/25 4246/2
4248/24 4249/8
4252/25 4253/1
4253/2 4268/18
**she'd [1]**  4232/11
**she's [1]**  4263/20
**shift [6]**  4230/21
4249/25 4251/18
4267/11 4268/13
4272/19
**shifting [2]**  4251/21
4267/23
**shifts [3]**  4251/14
4255/9 4271/17
**short [9]**  4221/5
4240/13 4246/21
4246/23 4254/10
4254/14 4254/14
4259/14 4273/14
**short-cutting [1]**
4259/14
**short-term [3]**
4254/10 4254/14
4254/14
**shortcut [2]**  4212/11
4213/2
**should [21]**  4173/25
4177/24 4185/8
4189/24 4194/5
4199/21 4201/5
4201/16 4201/18
4203/3 4207/8
4207/20 4209/13
4213/24 4219/22
4240/24 4241/14
4246/12 4264/15
4272/22 4272/22
**shouldn't [3]**
4201/10 4203/6
4203/6
**show [6]**  4156/11
4221/5 4224/20
4230/10 4239/11
4271/4
**showed [1]**  4224/21
**showing [1]**  4173/16
**shown [2]**  4192/4
4273/10
**shows [4]**  4165/9
4173/12 4203/13
4212/16
**shrunk [1]**  4230/11
**shuffled [1]**  4185/7
**sic [1]**  4213/24

**side [11]**  4179/24
4184/5 4193/21
4210/23 4234/3
4242/4 4242/25
4256/22 4257/1
4257/2 4257/11
**sides [2]**  4199/1
4208/24
**significant [2]**
4245/1 4255/18
**significantly [2]**
4234/24 4264/24
**similar [3]**  4162/4
4178/23 4252/11
**Similarly [1]**  4231/4
**simple [5]**  4220/9
4232/10 4248/16
4262/10 4265/15
**simply [2]**  4173/16
4250/24
**since [7]**  4180/15
4180/19 4193/11
4198/12 4212/23
4234/15 4247/11
**single [1]**  4168/11
**sir [5]**  4175/5
4187/11 4195/7
4217/11 4231/16
**sit [1]**  4271/9
**situation [1]**
4254/10
**six [2]**  4197/17
4215/15
**size [2]**  4227/9
4229/6
**sized [1]**  4181/11
**skipped [1]**  4222/23
**sky [1]**  4271/14
**slide [57]**  4157/8
4159/7 4161/17
4162/21 4173/12
4173/20 4173/22
4173/23 4174/5
4174/5 4181/24
4181/25 4184/15
4185/3 4185/16
4185/16 4190/14
4190/25 4192/12
4196/19 4197/2
4197/10 4213/19
4216/22 4219/8
4220/7 4220/11
4220/12 4222/24
4223/11 4223/12
4223/13 4227/24
4228/20 4228/21
4230/16 4232/6
4232/6 4240/5 4241/6
4241/25 4248/13
4248/14 4250/5
4250/18 4250/18
4251/14 4254/18
4254/18 4259/22
4264/1 4266/15
4269/2 4270/2 4272/3

4272/6 4272/6
**Slide 14 [1]**  4232/6
**Slide 2 [1]**  4197/10
**Slide 29 [1]**  4254/18
**Slide 34 [2]**  4173/23
4174/5
**Slide 41 [1]**  4181/25
**Slide 7 [1]**  4219/8
**slides [8]**  4172/15
4182/1 4184/16
4236/15 4249/21
4252/19 4262/5
4268/17
**slight [2]**  4194/12
4233/17
**slope [1]**  4221/14
**slow [2]**  4157/16
4272/14
**slowly [4]**  4228/9
4229/15 4230/19
4240/19
**small [16]**  4179/21
4181/11 4186/1
4190/4 4224/25
4225/2 4225/2 4225/8
4236/5 4236/6
4245/12 4267/24
4268/2 4271/19
4271/20 4271/24
**smaller [1]**  4253/12
**Smurzynski [2]**
4151/2 4191/11
**snow [1]**  4230/14
**snowball [3]**  4229/12
4229/15 4230/14
**so [177]**
**so I think [8]**
4173/8 4179/18
4187/25 4188/13
4192/23 4208/25
4209/13 4263/11
**So I would [2]**
4247/7 4258/14
**so if [1]**  4240/23
**So it [2]**  4249/15
4249/25
**So it's [8]**  4177/11
4189/18 4231/13
4244/7 4255/8
4256/11 4257/5
4266/12
**So somebody [1]**
4235/13
**software [1]**  4262/16
**sold [1]**  4262/19
**solely [1]**  4174/22
**solution [1]**  4241/20
**solutions [1]**
4241/21
**solving [1]**  4260/3
**some [65]**  4160/20
4162/4 4162/18
4163/4 4163/5
4165/15 4166/19
4166/20 4169/20

4179/9 4179/25
4180/24 4183/13
4183/16 4183/22
4184/6 4184/11
4186/23 4191/16
4192/19 4194/10
4194/12 4197/18
4198/1 4198/2 4200/6
4200/13 4201/14
4205/18 4207/18
4209/14 4211/22
4212/16 4212/23
4212/24 4219/14
4220/3 4222/12
4224/14 4224/17
4228/13 4228/14
4228/14 4230/11
4233/12 4236/13
4238/1 4240/23
4241/18 4244/12
4245/11 4246/11
4246/14 4246/16
4248/2 4254/20
4256/1 4256/4
4261/22 4270/25
4271/2 4272/13
4274/4 4274/18
4275/4
**somebody [16]**
4211/12 4220/2
4235/11 4235/13
4235/13 4237/14
4238/9 4247/8
4255/16 4260/23
4265/22 4265/25
4266/1 4266/10
4268/20 4268/22
**somehow [5]**  4206/16
4222/4 4222/7
4239/21 4272/12
**something [36]**
4162/1 4162/16
4163/4 4171/5 4171/6
4172/7 4172/11
4177/13 4179/11
4180/7 4194/3
4201/25 4202/4
4203/6 4207/6
4211/18 4211/19
4211/20 4212/21
4217/24 4225/19
4235/14 4235/20
4238/24 4240/13
4248/4 4249/24
4256/11 4258/15
4260/14 4261/1
4262/1 4263/1
4263/10 4265/24
4272/23
**somewhat [2]**  4180/11
4192/22
**somewhere [1]**
4222/15
**sorry [10]**  4172/8
4172/9 4187/9

**S**

**sorry... [7]**   4214/21
 4214/21 4223/4
 4236/17 4251/23
 4259/6 4264/10
**sort [18]**   4167/25
 4170/11 4181/16
 4203/5 4208/13
 4209/23 4218/3
 4218/5 4218/12
 4218/13 4230/20
 4241/5 4247/25
 4250/14 4262/25
 4266/7 4268/1
 4273/17
**sound [4]**   4155/12
 4197/15 4198/8
 4200/10
**source [2]**   4238/23
 4252/13
**sources [1]**   4154/24
**South [1]**   4150/4
**space [1]**   4182/3
**speak [1]**   4165/16
**specific [2]**   4170/8
 4250/3
**specifically [9]**
 4160/18 4162/1
 4165/7 4169/10
 4172/12 4187/23
 4188/18 4193/23
 4197/17
**specify [2]**   4215/17
 4218/23
**spectrum [2]**   4248/1
 4257/4
**speculative [1]**
 4240/2
**speed [2]**   4212/11
 4254/12
**speeding [1]**   4212/11
**spell [1]**   4195/20
**spend [1]**   4252/6
**spider [1]**   4259/24
**spirit [2]**   4168/24
 4169/4
**springboard [1]**
 4231/7
**square [1]**   4255/22
**stage [3]**   4176/11
 4181/10 4196/7
**stamp [1]**   4189/21
**stamped [1]**   4164/9
**stand [2]**   4154/3
 4228/8
**standard [4]**   4205/5
 4227/3 4227/4 4227/6
**standing [1]**   4195/4
**standpoint [1]**
 4235/3
**start [8]**   4171/18
 4174/10 4174/16
 4177/17 4205/4
 4214/18 4249/23
 4267/16

**started [2]**   4161/12
 4198/17
**starting [1]**   4250/4
**starts [2]**   4193/6
 4249/9
**state [3]**   4150/12
 4166/13 4195/20
**statement [4]**
 4164/23 4165/2
 4166/25 4240/1
**STATES [5]**   4149/1
 4149/3 4149/10
 4150/2 4153/5
**stay [1]**   4268/18
**staying [3]**   4183/1
 4201/5 4201/10
**steady [1]**   4265/7
**steer [1]**   4238/7
**stenography [1]**
 4151/15
**Stigler [1]**   4196/4
**still [28]**   4166/4
 4167/9 4167/25
 4173/25 4179/6
 4179/16 4184/2
 4208/21 4208/21
 4211/2 4216/12
 4216/13 4216/13
 4217/4 4217/5 4217/9
 4221/25 4224/16
 4237/15 4244/23
 4245/8 4246/3 4247/5
 4247/5 4251/23
 4264/24 4266/11
 4274/11
**stocks [1]**   4234/17
**stop [2]**   4202/18
 4263/4
**stopped [1]**   4170/19
**Store [5]**   4173/16
 4245/16 4245/16
 4245/23 4245/25
**story [3]**   4233/7
 4233/7 4233/11
**street [3]**   4150/4
 4150/9 4213/1
**strength [1]**   4257/17
**stress [1]**   4248/4
**strict [1]**   4210/7
**strictly [1]**   4208/12
**strike [1]**   4192/6
**strong [3]**   4214/1
 4227/10 4232/4
**strongly [1]**   4246/8
**structure [1]**   4214/8
**structured [1]**
 4255/18
**stuck [1]**   4275/5
**students [1]**   4218/7
**studied [1]**   4198/20
**study [6]**   4224/22
 4253/10 4268/6
 4273/8 4273/9 4275/3
**stuff [2]**   4257/5
 4258/21

**subject [3]**   4179/3
 4181/3 4184/11
**subset [1]**   4156/17
**substantial [6]**
 4221/24 4226/25
 4227/13 4227/20
 4253/17 4269/4
**substantially [2]**
 4229/24 4233/14
**succeed [2]**   4186/12
 4258/12
**success [1]**   4270/12
**successful [15]**
 4166/12 4167/15
 4167/20 4167/21
 4172/25 4173/1
 4232/24 4235/4
 4235/5 4237/6
 4242/12 4264/19
 4264/25 4265/2
 4265/25
**such [6]**   4183/12
 4202/6 4205/12
 4206/1 4257/24
 4257/25
**suffering [1]**
 4267/25
**sufficient [2]**
 4205/14 4219/24
**sufficiently [2]**
 4204/9 4206/7
**suggested [2]**
 4191/22 4210/9
**suggestions [1]**
 4179/12
**suggests [2]**   4155/14
 4176/2
**Suite [3]**   4150/4
 4150/9 4150/16
**summary [1]**   4241/6
**summer [1]**   4234/15
**super [1]**   4202/16
**superior [1]**   4273/5
**supply [3]**   4242/15
 4242/16 4253/14
**supposed [4]**   4222/1
 4222/6 4222/8
 4272/12
**sure [11]**   4155/9
 4159/15 4172/10
 4177/24 4188/9
 4205/19 4222/6
 4248/8 4266/23
 4273/2 4275/8
**surprising [1]**
 4235/4
**surprisingly [1]**
 4198/7
**surrounding [1]**
 4168/1
**sustainable [2]**
 4158/14 4158/18
**SW [1]**   4151/3
**swallow [1]**   4259/24
**swath [1]**   4256/14

**switch [2]**   4265/12
 4266/20
**switches [1]**   4265/8
**switching [3]**
 4253/12 4253/15
 4267/17
**SWORN [2]**   4154/3
 4195/15
**symbol [2]**   4208/4
 4208/6
**syndication [3]**
 4228/25 4247/14
 4254/20

---

**T**

**table [5]**   4237/4
 4249/7 4249/11
 4251/25 4253/22
**tablet [1]**   4271/8
**tail [4]**   4159/22
 4159/25 4162/5
 4162/10
**tailor [1]**   4207/8
**take [27]**   4155/21
 4160/17 4162/20
 4167/24 4175/14
 4176/24 4182/15
 4184/15 4202/24
 4211/3 4216/9
 4226/15 4231/11
 4235/11 4253/23
 4254/7 4254/11
 4254/12 4254/22
 4258/1 4261/9
 4265/14 4265/21
 4265/24 4274/19
 4275/7 4275/9
**takes [2]**   4181/16
 4251/22
**taking [6]**   4183/20
 4221/8 4226/15
 4253/20 4266/12
 4268/20
**tale [1]**   4259/23
**talent [2]**   4169/7
 4170/19
**talk [17]**   4155/18
 4162/17 4162/20
 4162/23 4168/2
 4172/15 4177/14
 4179/14 4198/12
 4200/17 4207/2
 4210/8 4210/11
 4220/5 4239/18
 4240/8 4251/8
**talked [30]**   4157/24
 4162/17 4171/9
 4172/17 4177/15
 4181/24 4184/19
 4185/16 4186/7
 4191/2 4201/7 4201/8
 4211/4 4214/22
 4223/19 4226/3
 4235/22 4247/24
 4250/9 4251/10

**T**

**talked... [10]**
 4251/11 4255/23
 4255/25 4263/14
 4264/6 4266/7
 4268/19 4274/14
 4274/15 4274/16
**talking [18]**   4154/11
 4166/15 4171/16
 4171/19 4179/20
 4180/23 4180/25
 4181/10 4190/16
 4192/24 4201/17
 4213/15 4223/24
 4229/14 4257/13
 4258/19 4263/25
 4272/25
**talks [6]**   4172/15
 4208/13 4209/6
 4248/24 4252/9
 4274/24
**tangentially [1]**
 4247/21
**targeted [3]**   4206/11
 4256/5 4256/12
**task [1]**   4238/8
**taught [1]**   4259/20
**teach [3]**   4212/14
 4212/19 4218/7
**technologies [2]**
 4159/4 4161/15
**technology [6]**
 4161/12 4162/15
 4176/11 4201/2
 4234/14 4256/7
**tell [13]**   4197/11
 4203/2 4204/8
 4207/11 4212/1
 4212/13 4215/9
 4216/14 4219/11
 4227/19 4230/22
 4260/12 4262/8
**telling [4]**   4225/1
 4225/7 4272/22
 4274/6
**tells [5]**   4200/5
 4207/5 4207/6
 4241/16 4254/4
**temping [1]**   4258/20
**tempting [1]**   4212/10
**ten [3]**   4221/23
 4231/13 4238/25
**ten years [2]**
 4221/23 4238/25
**tend [7]**   4163/13
 4245/12 4245/13
 4247/13 4247/15
 4258/11 4258/22
**tended [1]**   4259/1
**tends [1]**   4270/14
**term [15]**   4186/5
 4192/21 4214/15
 4221/5 4240/2
 4240/13 4246/21
 4246/23 4246/24

4254/10 4254/14
4254/14 4254/15
4264/12 4273/14
**terminate [1]**   4241/9
**terms [19]**   4166/7
 4210/14 4212/17
 4215/21 4215/24
 4216/18 4219/1
 4221/10 4221/16
 4224/13 4225/20
 4227/5 4229/18
 4229/23 4233/5
 4245/25 4256/1
 4265/5 4266/12
**test [1]**   4270/9
**testified [6]**   4154/3
 4217/19 4218/17
 4227/10 4227/13
 4257/22
**testimonies [1]**
 4252/5
**testimony [36]**
 4156/6 4156/7
 4156/18 4156/20
 4157/9 4159/7
 4159/11 4159/12
 4161/18 4161/20
 4165/6 4168/4
 4186/19 4188/25
 4189/10 4194/17
 4196/20 4203/16
 4211/4 4223/2
 4226/19 4228/10
 4231/16 4232/7
 4233/24 4234/1
 4236/19 4245/10
 4245/10 4252/7
 4252/8 4252/10
 4252/12 4254/19
 4267/11 4272/7
**tethered [6]**   4199/21
 4200/4 4201/6
 4201/10 4263/9
 4263/10
**tethering [1]**
 4239/18
**text [1]**   4199/10
**than [46]**   4163/5
 4164/19 4164/22
 4165/19 4165/25
 4179/25 4180/24
 4185/8 4200/15
 4201/15 4202/7
 4204/19 4204/22
 4211/19 4212/5
 4212/25 4216/3
 4216/14 4220/23
 4224/14 4229/4
 4229/24 4230/10
 4234/16 4235/21
 4237/21 4238/24
 4240/18 4240/21
 4241/22 4249/25
 4253/19 4255/20
 4256/7 4257/18

4260/18 4260/20
4261/1 4261/10
4261/20 4265/18
4267/3 4267/6 4267/7
4271/2 4271/16
**thank [15]**   4154/10
 4157/19 4162/21
 4164/4 4185/13
 4191/10 4194/14
 4194/16 4194/18
 4195/7 4195/10
 4231/16 4231/20
 4231/22 4275/11
**thank you [13]**
 4154/10 4157/19
 4162/21 4164/4
 4191/10 4194/14
 4194/16 4194/18
 4195/7 4195/10
 4231/16 4231/22
 4275/11
**Thank you very much
 [1]**   4185/13
**that [730]**
**that is [1]**   4245/5
**that seems [1]**
 4160/14
**that won't [1]**
 4183/5
**that'll [1]**   4221/1
**that's [181]**
**That's really [1]**
 4223/18
**their [38]**   4157/4
 4161/10 4161/12
 4161/16 4173/15
 4176/12 4180/9
 4184/7 4184/10
 4184/10 4191/22
 4192/8 4192/12
 4194/13 4211/12
 4212/6 4221/22
 4229/5 4229/13
 4234/9 4238/22
 4246/3 4251/20
 4251/21 4252/10
 4252/13 4253/7
 4253/11 4253/14
 4255/14 4257/12
 4257/15 4258/7
 4261/6 4261/15
 4265/5 4267/12
 4269/9
**them [40]**   4153/16
 4157/11 4158/22
 4168/17 4174/6
 4182/19 4185/18
 4186/17 4188/2
 4188/6 4189/1
 4194/12 4198/11
 4200/12 4209/16
 4211/5 4212/12
 4224/17 4228/15
 4229/6 4229/21
 4231/8 4233/1 4233/1

4239/19 4235/21
4238/2 4239/7 4239/9
4245/7 4245/13
4252/10 4253/21
4256/24 4257/19
4261/11 4261/23
4264/5 4267/7 4274/3
**themselves [7]**
 4219/18 4253/9
 4260/24 4261/2
 4261/10 4261/25
 4262/2
**then [38]**   4153/17
 4156/11 4159/20
 4160/25 4166/11
 4172/25 4176/7
 4178/6 4180/7
 4187/14 4193/6
 4194/8 4195/24
 4197/15 4200/1
 4209/11 4209/21
 4216/4 4220/17
 4220/25 4221/25
 4224/13 4225/17
 4229/20 4229/25
 4230/7 4230/7
 4235/17 4256/2
 4262/5 4262/22
 4263/3 4264/1
 4265/10 4271/7
 4272/3 4273/17
 4273/24
**theoretical [1]**
 4263/13
**theories [3]**   4168/3
 4215/24 4216/1
**theory [4]**   4169/12
 4170/11 4170/13
 4170/14
**there [67]**   4158/3
 4160/17 4160/21
 4160/22 4170/19
 4173/11 4176/4
 4177/8 4177/25
 4186/13 4187/20
 4193/9 4193/12
 4193/21 4194/3
 4199/19 4200/9
 4202/1 4202/3 4202/6
 4202/12 4203/18
 4207/24 4208/6
 4208/17 4208/23
 4210/17 4212/18
 4212/21 4213/21
 4214/1 4216/13
 4217/8 4217/24
 4221/13 4222/2
 4222/6 4222/8 4222/9
 4222/25 4224/18
 4225/15 4227/5
 4227/12 4227/13
 4229/13 4230/10
 4230/11 4230/22
 4235/18 4240/25
 4241/16 4245/14

**T**

**there... [14]**
4245/17 4246/16
4251/16 4253/4
4253/20 4255/3
4257/15 4259/23
4262/20 4267/4
4268/23 4272/23
4272/23 4274/6
**there's [55]** 4156/1
4160/20 4161/1
4161/14 4164/18
4167/20 4169/17
4169/17 4172/11
4173/11 4173/17
4175/9 4176/1
4177/23 4179/2
4179/12 4184/6
4192/11 4197/6
4197/13 4202/16
4207/4 4213/10
4215/13 4219/14
4222/14 4222/25
4223/3 4223/3
4226/25 4227/19
4231/1 4232/10
4233/13 4234/22
4235/2 4238/21
4239/12 4240/7
4240/17 4240/19
4240/25 4244/25
4249/2 4251/2 4251/6
4252/8 4252/10
4252/11 4254/23
4261/5 4269/4
4270/15 4272/11
4275/3
**thereby [1]** 4201/20
**therefore [10]**
4183/13 4202/4
4217/8 4219/4 4227/6
4234/3 4249/3
4262/20 4263/9
4267/6
**these [33]** 4159/4
4163/12 4172/5
4176/9 4178/9
4182/14 4183/15
4183/23 4193/5
4193/10 4210/4
4214/23 4215/14
4218/16 4222/18
4223/5 4231/9 4236/9
4242/5 4248/25
4250/16 4251/14
4252/14 4255/3
4255/17 4256/4
4261/5 4263/16
4266/18 4271/2
4271/3 4271/17
4274/25
**they [120]** 4155/14
4155/16 4156/1
4157/5 4157/25
4159/21 4161/12

4162/13 4165/13
4166/10 4167/16
4168/11 4177/2
4177/4 4177/7
4177/10 4179/8
4179/9 4179/18
4180/9 4181/2 4181/8
4183/22 4183/23
4184/10 4184/12
4186/17 4187/24
4189/24 4190/15
4192/2 4192/12
4192/14 4192/16
4203/22 4211/6
4212/1 4213/25
4215/15 4216/3
4216/12 4217/14
4221/16 4222/15
4223/7 4223/8
4224/10 4225/16
4226/5 4227/16
4228/4 4228/13
4228/14 4229/4
4229/11 4229/11
4229/19 4229/20
4229/23 4229/24
4230/3 4230/4 4230/5
4230/6 4230/10
4230/11 4231/5
4231/6 4233/14
4234/12 4234/13
4234/13 4235/20
4235/21 4237/4
4237/4 4237/5
4238/17 4243/19
4243/19 4245/7
4245/8 4245/12
4245/23 4249/2
4249/4 4252/16
4253/5 4253/6
4253/13 4257/5
4258/2 4258/3
4258/16 4259/18
4260/25 4261/1
4261/1 4261/9 4262/2
4262/24 4266/19
4266/25 4267/1
4267/2 4267/4
4267/11 4268/6
4269/7 4269/13
4270/9 4270/18
4272/12 4273/20
4273/20 4273/24
4273/25 4274/13
4274/17 4274/19
**they'd [5]** 4217/5
4217/15 4217/15
4252/15 4258/1
**they're [16]** 4165/14
4165/15 4183/4
4190/16 4224/14
4230/20 4235/6
4236/10 4236/12
4247/15 4251/24
4257/4 4258/13

4266/2 4269/14
4271/1
**they've [4]** 4161/10
4174/14 4262/1
4274/20
**thing [22]** 4154/25
4167/19 4168/6
4170/24 4175/24
4193/11 4209/4
4209/7 4211/11
4212/25 4213/1
4222/23 4226/8
4230/23 4230/24
4241/13 4242/15
4257/12 4257/15
4261/4 4267/2
4271/11
**things [68]** 4157/3
4158/17 4160/7
4164/18 4176/3
4185/9 4192/17
4193/9 4193/13
4193/14 4193/19
4193/21 4197/18
4199/16 4200/3
4200/6 4200/9 4201/3
4201/4 4202/18
4203/3 4203/21
4203/23 4207/15
4210/17 4210/21
4212/9 4212/11
4213/11 4216/13
4217/6 4219/21
4221/10 4224/1
4226/2 4226/4
4226/10 4226/13
4232/15 4233/3
4236/21 4237/3
4238/3 4238/4
4238/18 4245/11
4245/18 4246/1
4247/1 4247/11
4247/12 4247/12
4247/14 4247/15
4248/7 4248/23
4249/4 4249/13
4251/4 4251/5 4255/3
4255/5 4256/20
4257/10 4258/18
4259/16 4262/23
4274/25
**think [168]**
**thinking [11]**
4168/25 4170/12
4172/2 4181/18
4198/17 4247/10
4255/1 4265/15
4266/2 4267/5 4268/5
**thinks [1]** 4252/25
**third [9]** 4162/24
4162/25 4163/6
4164/15 4165/10
4165/20 4232/12
4246/2 4274/7
**third-party [3]**

4169/6 4164/15
4165/20
**this [167]**
**this demonstrative
[1]** 4157/14
**those [57]** 4167/9
4169/7 4169/11
4169/14 4169/23
4175/23 4179/10
4179/11 4179/18
4181/3 4184/11
4188/5 4191/23
4192/17 4193/19
4193/23 4196/10
4197/15 4197/24
4197/25 4198/7
4198/10 4198/24
4199/1 4200/3
4202/18 4216/13
4217/6 4221/10
4226/9 4226/13
4226/15 4226/15
4227/22 4233/3
4234/9 4234/23
4239/17 4240/11
4240/23 4241/21
4243/12 4243/17
4243/19 4247/15
4251/3 4251/5
4253/22 4253/24
4256/23 4262/9
4262/23 4263/12
4268/8 4269/12
4271/25 4274/8
**though [1]** 4233/23
**thought [4]** 4170/23
4206/11 4222/10
4269/25
**three [15]** 4168/20
4169/5 4169/7
4169/14 4171/11
4171/17 4197/13
4198/8 4200/3
4202/15 4202/17
4232/22 4245/19
4245/20 4274/15
**threshold [4]**
4178/24 4179/2
4179/3 4181/2
**through [46]** 4156/15
4156/17 4160/2
4162/18 4165/19
4165/19 4173/15
4173/15 4175/17
4176/5 4185/4
4185/21 4192/14
4197/23 4197/24
4206/3 4210/1 4210/4
4211/17 4213/7
4223/2 4225/6 4230/5
4232/15 4233/5
4234/17 4236/16
4238/14 4240/9
4241/24 4242/20
4243/6 4243/10

**T**

**through... [13]**
4243/15 4243/16
4243/16 4243/20
4244/7 4244/8
4244/11 4244/16
4245/15 4245/16
4245/23 4245/25
4264/8
**throughout [4]**
4203/17 4233/25
4245/3 4257/17
**thrust [1]** 4263/8
**ties [1]** 4233/23
**tilt [2]** 4237/5
4239/14
**tilting [1]** 4257/10
**tilts [1]** 4258/14
**time [25]** 4155/6
4160/18 4176/6
4177/12 4179/22
4180/11 4180/16
4180/18 4186/2
4194/17 4212/14
4218/7 4221/24
4228/8 4229/10
4254/7 4254/11
4254/12 4254/22
4260/13 4264/22
4265/11 4270/3
4273/18 4275/7
**timely [1]** 4205/14
**times [3]** 4235/10
4261/10 4268/9
**tiny [1]** 4185/20
**titled [2]** 4163/20
4276/4
**today [17]** 4159/12
4159/20 4161/6
4161/23 4162/11
4165/6 4181/15
4184/21 4189/3
4190/4 4191/17
4196/21 4228/1
4229/24 4234/2
4237/16 4238/24
**together [1]** 4199/2
**told [1]** 4272/13
**tolerable [1]**
4246/16
**too [8]** 4186/24
4207/3 4211/6
4222/10 4225/15
4254/22 4273/20
4274/20
**tool [1]** 4192/10
**tools [1]** 4197/25
**top [2]** 4189/21
4199/10
**topic [5]** 4167/24
4167/25 4177/14
4184/14 4260/8
**topics [1]** 4177/15
**toward [2]** 4256/5
4257/11

**towards [1]** 4258/14
**Toyota's [2]** 4211/25
4212/1
**tradeoff [1]** 4246/24
**traditional [1]**
4244/17
**train [2]** 4154/12
4193/10
**training [2]** 4155/7
4158/2
**trainings [1]**
4193/19
**trajectory [1]**
4212/7
**transaction [1]**
4183/4
**transcript [3]**
4149/9 4151/15
4276/3
**transcription [1]**
4151/15
**transferring [1]**
4267/13
**transition [1]**
4254/7
**translate [4]**
4158/18 4216/4
4251/4 4253/25
**travels [1]** 4194/21
**trial [6]** 4159/6
4203/17 4233/25
4245/3 4247/25
4257/17
**tried [4]** 4228/4
4239/11 4240/16
4273/16
**tries [2]** 4209/22
4265/3
**tripping [1]** 4184/11
**trivial [1]** 4230/25
**trouble [1]** 4161/24
**true [11]** 4165/2
4224/20 4224/21
4224/22 4239/1
4239/1 4239/1 4239/2
4239/2 4243/11
4261/21
**try [11]** 4157/16
4157/21 4200/4
4200/21 4201/10
4226/22 4239/21
4256/3 4257/25
4261/10 4274/3
**Try and [1]** 4157/16
**trying [13]** 4200/19
4201/18 4207/16
4207/17 4210/4
4212/21 4213/11
4229/17 4238/7
4239/16 4255/12
4257/15 4257/19
**tuned [1]** 4154/13
**Turley [2]** 4159/10
4159/11
**turn [19]** 4163/22

4164/9 4184/16
4187/2 4199/3
4201/19 4213/18
4222/17 4223/13
4230/23 4236/15
4239/7 4250/2
4252/21 4259/18
4262/5 4264/1 4264/1
4272/5
**turned [1]** 4265/10
**turning [2]** 4260/8
4266/15
**two [25]** 4169/17
4169/18 4179/23
4197/6 4199/16
4200/12 4208/18
4208/23 4210/17
4221/22 4228/24
4244/25 4247/1
4248/23 4250/11
4250/16 4254/21
4254/23 4263/12
4269/4 4272/11
4272/15 4272/16
4273/11 4274/8
**two years [1]**
4221/22
**tying [1]** 4263/4
**type [9]** 4169/13
4181/17 4207/22
4211/3 4213/11
4213/14 4213/15
4240/22 4263/19
**types [4]** 4179/2
4245/24 4250/3
4252/11
**typically [1]**
4200/20

**U**

**U.S [1]** 4180/20
**ultimate [1]** 4210/14
**ultimately [1]**
4201/1
**unburden [2]** 4203/24
4219/21
**unburdening [1]**
4204/15
**unburdens [1]** 4204/6
**uncertain [1]**
4181/14
**uncertainty [3]**
4180/5 4181/22
4269/11
**unclear [1]** 4193/17
**undeniable [1]**
4166/17
**under [21]** 4165/15
4165/22 4165/22
4179/5 4179/10
4179/11 4180/6
4180/10 4188/15
4194/10 4194/11
4194/11 4195/6
4203/10 4204/9

4244/22 4246/3
4251/21 4254/24
4263/15 4267/12
**underlay [1]** 4268/16
**underlie [1]** 4255/7
**underlies [1]** 4218/5
**underlying [2]**
4168/4 4198/18
**underscore [1]**
4206/22
**understand [17]**
4156/1 4163/3 4167/2
4167/7 4169/1 4175/9
4175/12 4178/21
4194/9 4196/9
4198/22 4215/5
4216/17 4222/1
4228/2 4228/12
4270/15
**understanding [6]**
4163/11 4176/4
4179/4 4191/21
4199/25 4227/2
**undertake [1]**
4226/20
**undertaken [1]**
4226/21
**undertaking [1]**
4228/23
**unfetter [1]** 4248/7
**unfettered [3]**
4240/22 4241/3
4245/23
**unfettering [1]**
4238/13
**unfortunately [1]**
4255/17
**unfun [1]** 4222/13
**unintended [2]**
4259/17 4259/17
**unit [2]** 4150/14
4262/21
**UNITED [5]** 4149/1
4149/3 4149/10
4150/2 4153/5
**universe [1]** 4256/18
**University [1]**
4194/25
**unlawful [1]** 4232/8
**unless [1]** 4153/13
**unrelated [2]**
4201/11 4201/22
**up [49]** 4154/16
4157/11 4163/19
4173/9 4173/16
4173/21 4173/23
4185/24 4185/25
4189/8 4189/13
4200/18 4203/14
4203/21 4203/24
4211/3 4212/4
4212/11 4212/12
4212/16 4212/23
4213/4 4216/24
4222/6 4222/8

**U**

**up... [24]**   4224/21
4229/8 4236/3
4236/18 4240/21
4241/4 4244/2 4245/6
4250/10 4251/12
4254/11 4260/5
4263/24 4265/11
4266/8 4267/8 4271/4
4271/6 4271/11
4272/12 4272/13
4272/14 4273/3
4274/8
**upon [1]**   4241/2
**us [32]**   4168/1
4169/5 4198/23
4199/23 4200/5
4203/2 4204/5 4205/3
4207/16 4215/7
4215/19 4216/16
4219/15 4219/24
4220/1 4220/2 4220/3
4220/3 4221/1
4221/10 4225/1
4225/7 4227/19
4238/22 4239/16
4239/19 4240/17
4240/20 4241/16
4241/18 4250/25
4254/4
**usage [8]**   4254/2
4254/3 4254/4
4264/13 4264/20
4264/22 4265/6
4273/11
**usdoj.gov [2]**   4150/6
4150/11
**use [35]**   4154/20
4156/2 4161/2
4168/18 4190/17
4192/21 4194/13
4209/15 4210/9
4211/13 4214/16
4224/4 4235/21
4242/19 4251/10
4253/10 4253/11
4255/14 4257/4
4262/24 4264/11
4266/11 4266/20
4270/18 4272/22
4272/22 4273/12
4273/13 4273/13
4273/20 4273/21
4273/22 4273/22
4273/25 4275/1
**used [16]**   4154/12
4167/3 4168/19
4170/21 4175/6
4186/10 4192/10
4193/1 4193/10
4193/21 4226/13
4253/2 4256/19
4260/2 4264/23
4264/23
**useful [1]**   4202/16

**user [3]**   4159/3
4161/11 4267/19
**user's [2]**   4242/4
4242/25
**users [24]**   4185/20
4189/7 4189/23
4189/24 4190/5
4190/13 4190/17
4190/20 4230/11
4230/12 4242/11
4242/11 4242/13
4242/23 4243/7
4243/9 4244/7 4252/2
4253/15 4266/6
4271/1 4274/16
4274/16 4275/2
**uses [2]**   4168/16
4251/3
**using [10]**   4160/13
4167/15 4170/14
4197/25 4203/12
4225/10 4226/7
4233/16 4263/5
4274/12
**usually [3]**   4209/1
4222/15 4259/14

**V**

**vague [1]**   4192/22
**vaguely [2]**   4178/19
4178/20
**valid [3]**   4241/8
4245/20 4249/3
**validate [1]**   4154/21
**valuable [9]**   4158/18
4160/1 4227/15
4227/21 4243/8
4243/12 4266/13
4269/13 4270/19
**value [11]**   4168/25
4183/22 4235/12
4235/18 4238/21
4257/19 4263/2
4268/12 4270/15
4270/16 4270/21
**value-adding [1]**
4263/2
**valued [1]**   4253/21
**various [1]**   4245/3
**vastly [1]**   4180/24
**vehicle [2]**   4264/13
4266/20
**verbatim [2]**   4167/1
4167/7
**version [2]**   4178/14
4233/7
**versus [3]**   4153/6
4247/20 4261/18
**versus Google LLC [1]**
4153/6
**Vertex [9]**   4164/14
4164/18 4164/22
4165/19 4165/25
4192/5 4192/5 4192/6
4192/10

**vertical [1]**   4162/21
**very [39]**   4158/12
4158/19 4166/17
4168/8 4170/1
4180/11 4180/11
4183/22 4185/13
4186/1 4186/1
4189/21 4190/9
4191/12 4194/16
4205/4 4205/5
4209/22 4210/2
4210/20 4211/1
4211/23 4215/14
4224/25 4234/19
4248/18 4251/24
4253/16 4254/10
4263/2 4263/5 4265/2
4265/23 4268/4
4271/14 4271/15
4271/20 4271/24
4273/14
**via [1]**   4192/5
**view [19]**   4155/19
4185/19 4203/2
4208/10 4210/13
4226/9 4227/15
4237/21 4237/22
4241/14 4242/6
4244/22 4248/5
4251/17 4257/14
4265/17 4266/22
4268/2 4268/5
**viewed [1]**   4193/22
**violation [2]**   4213/6
4225/14
**virtue [1]**   4224/10
**volume [1]**   4268/13
**VP [1]**   4161/18
**vs [1]**   4149/5

**W**

**waiting [4]**   4177/20
4178/11 4178/12
4178/23
**walked [1]**   4185/3
**want [52]**   4155/9
4155/18 4158/6
4168/18 4172/10
4179/14 4189/19
4199/16 4199/23
4200/21 4200/24
4205/3 4206/9 4207/3
4209/1 4209/2 4209/8
4209/23 4211/15
4213/6 4214/16
4214/17 4220/6
4220/19 4221/19
4226/15 4235/13
4236/11 4238/2
4238/8 4238/8 4238/9
4238/9 4238/14
4238/20 4239/14
4240/9 4241/10
4245/7 4245/8
4254/22 4255/13

4255/21 4259/13
4260/22 4260/25
4262/2 4263/4
4263/22 4266/8
4270/17 4270/17
**wanted [1]**   4211/24
**wants [1]**   4220/3
**warrant [1]**   4263/23
**was [88]**   4156/13
4156/13 4156/15
4157/9 4158/2 4158/3
4159/14 4163/12
4163/18 4167/2
4168/25 4170/19
4170/22 4170/23
4172/24 4173/11
4174/5 4174/9
4175/12 4176/5
4177/15 4177/25
4178/1 4178/5
4178/14 4185/16
4186/10 4186/12
4189/10 4191/6
4191/7 4196/8
4197/12 4197/14
4197/15 4197/17
4197/18 4197/23
4202/22 4202/22
4203/4 4203/6 4206/5
4212/24 4213/12
4217/7 4217/7
4218/10 4218/17
4222/10 4225/16
4226/12 4227/18
4228/7 4228/12
4228/25 4229/6
4229/25 4230/1
4230/22 4231/4
4231/8 4231/10
4232/12 4232/12
4232/12 4232/13
4235/16 4236/21
4237/7 4242/12
4242/23 4246/4
4250/6 4254/9
4256/16 4256/17
4257/13 4257/22
4257/24 4258/19
4259/20 4259/23
4263/8 4264/11
4265/6 4270/5
4272/10
**Washington [5]**
4149/5 4150/10
4151/4 4151/8
4151/13
**wasn't [7]**   4170/13
4175/11 4176/6
4218/11 4231/7
4235/18 4256/16
**way [61]**   4162/13
4165/13 4168/6
4169/21 4170/12
4172/4 4174/19
4176/1 4176/3

**W**

**way... [52]** 4177/23
4184/25 4185/1
4186/13 4186/14
4191/24 4192/7
4198/1 4200/19
4200/20 4201/13
4203/14 4203/15
4205/18 4207/14
4207/18 4209/1
4209/15 4209/24
4210/1 4210/20
4211/21 4212/5
4212/5 4212/9
4212/16 4220/9
4221/4 4222/3
4225/16 4228/5
4232/10 4233/5
4233/21 4234/23
4235/6 4235/18
4236/10 4237/5
4239/15 4239/20
4242/18 4242/23
4245/17 4249/17
4255/17 4257/9
4257/19 4258/12
4258/23 4265/15
4273/4
**ways [11]** 4161/14
4167/20 4173/12
4189/7 4190/17
4200/13 4202/13
4240/14 4243/9
4245/20 4264/7
**wc.com [2]** 4151/5
4151/5
**we [149]**
**we can [1]** 4200/1
**we don't [1]** 4219/1
**we will [1]** 4220/25
**we would [1]** 4239/19
**we'll [14]** 4153/17
4157/20 4157/21
4172/15 4196/15
4206/16 4219/6
4231/11 4231/14
4232/6 4265/21
4272/3 4275/10
4275/11
**we're [49]** 4153/4
4153/12 4153/19
4166/15 4171/2
4180/23 4183/6
4183/17 4183/18
4183/19 4198/12
4198/21 4201/14
4201/17 4203/17
4204/5 4205/16
4205/17 4205/17
4206/3 4206/12
4206/15 4206/16
4207/24 4212/12
4213/15 4216/22
4221/6 4221/6
4221/13 4225/10

4231/15 4236/2
4236/15 4238/1
4238/3 4238/6
4239/20 4241/1
4248/18 4249/6
4249/17 4251/18
4254/6 4261/3 4262/3
4263/25 4269/18
4272/25
**we've [12]** 4192/17
4199/18 4214/22
4220/5 4233/11
4233/24 4236/16
4255/23 4255/25
4256/6 4257/16
4271/3
**weather [1]** 4163/5
**web [13]** 4156/14
4156/24 4164/14
4164/21 4165/25
4173/16 4176/21
4193/7 4193/18
4194/1 4194/2
4264/11 4264/13
**week [1]** 4156/12
**weeks [1]** 4178/7
**welcome [4]** 4153/21
4154/9 4195/9 4232/2
**welfare [12]** 4199/15
4199/19 4199/19
4200/2 4200/8 4201/1
4201/17 4205/25
4214/4 4214/8
4254/17 4265/24
**well [67]** 4156/11
4158/25 4161/3
4170/21 4171/15
4174/10 4177/16
4181/24 4183/22
4186/24 4189/14
4190/18 4190/24
4192/17 4194/20
4195/11 4196/12
4198/17 4198/22
4198/25 4203/22
4204/24 4205/5
4205/7 4206/25
4208/23 4211/9
4212/10 4213/23
4217/2 4220/5
4222/17 4223/17
4225/5 4225/15
4225/17 4226/4
4226/5 4229/17
4230/20 4235/2
4236/1 4236/10
4239/23 4242/17
4244/18 4246/5
4246/19 4248/24
4248/25 4250/8
4250/23 4251/17
4255/14 4258/6
4258/16 4258/20
4259/2 4264/6
4265/18 4266/3

4267/9 4269/19
4269/20 4270/7
4272/11 4274/3
**well-known [1]**
4226/5
**were [33]** 4167/19
4171/17 4174/5
4179/20 4181/10
4186/20 4188/5
4188/19 4190/15
4190/24 4191/16
4192/4 4192/19
4192/24 4213/5
4213/7 4215/15
4219/22 4223/24
4227/21 4230/12
4231/6 4235/7 4241/5
4251/15 4252/14
4257/22 4265/5
4267/4 4273/12
4273/13 4273/20
4273/25
**weren't [3]** 4156/18
4234/13 4234/13
**what [148]**
**what's [19]** 4164/22
4165/25 4181/14
4197/7 4204/2 4204/3
4204/4 4204/4 4208/4
4211/2 4211/5
4211/13 4237/1
4237/24 4241/11
4241/11 4258/5
4273/4 4273/19
**whatever [13]**
4204/18 4209/15
4209/24 4214/15
4232/20 4236/11
4238/2 4238/5
4240/19 4251/6
4256/24 4261/23
4265/10
**when [34]** 4156/13
4166/15 4171/15
4171/18 4171/25
4172/2 4183/20
4185/9 4186/7
4192/21 4192/24
4193/5 4201/17
4206/6 4207/4
4211/11 4213/1
4213/20 4213/21
4218/10 4218/11
4218/17 4219/24
4228/7 4229/11
4235/10 4243/25
4251/11 4261/5
4262/22 4271/6
4271/9 4273/24
4274/14
**whenever [1]** 4231/21
**where [67]** 4154/14
4162/13 4171/17
4177/8 4182/1 4183/6
4183/7 4183/17

4189/23 4189/24
4193/15 4203/18
4203/19 4203/20
4204/6 4205/3 4206/9
4206/14 4207/17
4214/13 4215/5
4215/13 4215/20
4217/25 4218/13
4219/9 4219/15
4219/18 4219/25
4220/2 4220/2 4220/4
4220/5 4220/5
4220/18 4222/2
4222/3 4222/4
4224/14 4229/2
4234/10 4235/5
4237/19 4237/24
4238/1 4238/3
4239/16 4239/19
4239/23 4240/21
4241/5 4241/14
4242/24 4244/5
4248/9 4248/21
4248/25 4249/4
4251/22 4253/12
4257/19 4259/1
4259/4 4259/13
4261/3 4265/4
4270/23
**where's [1]** 4273/6
**whether [20]** 4158/18
4160/12 4165/14
4166/11 4172/24
4179/9 4179/9
4193/22 4213/15
4213/24 4230/22
4240/18 4245/7
4246/5 4246/6 4249/4
4251/5 4261/12
4261/21 4273/10
**which [64]** 4159/7
4159/21 4160/6
4160/22 4161/17
4162/9 4168/3
4168/16 4171/16
4173/12 4176/11
4177/7 4179/2
4181/16 4185/1
4190/19 4192/7
4203/11 4203/22
4203/23 4205/6
4205/20 4205/23
4207/7 4209/18
4209/22 4212/16
4213/7 4216/15
4220/15 4221/4
4222/5 4224/8
4224/22 4225/16
4233/18 4234/1
4235/3 4242/23
4245/20 4248/5
4248/17 4249/14
4249/15 4249/20
4250/15 4250/23
4253/7 4253/11

**W**

**which... [15]**  4254/2
 4255/6 4255/23
 4257/16 4257/21
 4258/20 4260/13
 4263/14 4264/13
 4265/12 4266/20
 4267/8 4267/20
 4269/19 4271/6
**whichever [1]**
 4164/11
**while [1]**  4216/22
**Whinston [1]**  4245/9
**who [21]**  4161/18
 4168/18 4176/8
 4179/21 4181/12
 4182/24 4183/21
 4185/24 4185/24
 4185/25 4190/9
 4191/25 4211/9
 4252/12 4257/21
 4259/10 4270/17
 4273/3 4274/12
 4274/12 4274/17
**who's [5]**  4183/16
 4265/25 4266/10
 4266/13 4268/20
**who've [2]**  4269/16
 4269/25
**whoever [1]**  4269/13
**whole [8]**  4173/17
 4201/2 4210/21
 4219/20 4219/20
 4237/22 4248/9
 4261/7
**why [30]**  4177/9
 4179/23 4203/1
 4203/4 4204/18
 4206/22 4208/1
 4211/14 4216/1
 4219/11 4221/5
 4222/5 4223/17
 4226/4 4226/8
 4229/15 4237/9
 4239/18 4243/17
 4243/23 4254/8
 4256/2 4256/11
 4257/2 4260/25
 4261/4 4262/3
 4265/24 4266/23
 4273/2
**why do [1]**  4243/23
**wide [1]**  4264/20
**widely [2]**  4226/12
 4270/13
**wider [3]**  4262/19
 4262/21 4262/22
**widespread [1]**
 4268/12
**will [29]**  4157/11
 4160/5 4160/16
 4165/22 4181/5
 4197/9 4198/23
 4200/20 4203/11
 4203/14 4203/25

4204/17 4215/9
4216/16 4219/18
4220/20 4220/25
4221/13 4242/19
4242/19 4243/7
4246/18 4248/10
4254/7 4260/9
4264/10 4264/11
4266/3 4269/7
**William [3]**  4151/10
 4276/2 4276/8
**WILLIAMS [1]**  4151/3
**willing [5]**  4194/6
 4217/15 4253/23
 4273/22 4273/22
**willingness [1]**
 4233/1
**win [1]**  4249/11
**wind [2]**  4185/24
 4185/25
**Windows [2]**  4264/23
 4265/5
**winner [1]**  4176/6
**winners [1]**  4210/15
**wise [1]**  4265/23
**wish [1]**  4234/17
**within [4]**  4183/1
 4194/2 4210/13
 4262/13
**without [6]**  4204/10
 4217/1 4239/18
 4250/19 4251/15
 4252/2
**witness [6]**  4152/2
 4153/13 4154/2
 4164/1 4195/6
 4195/15
**WITNESSES [1]**  4152/4
**won [1]**  4230/2
**won't [4]**  4183/5
 4192/2 4205/13
 4261/20
**word [2]**  4251/10
 4253/1
**words [1]**  4206/23
**work [17]**  4153/17
 4170/3 4200/2
 4202/18 4204/1
 4205/2 4219/14
 4237/24 4241/3
 4241/24 4248/8
 4248/10 4258/22
 4259/14 4262/11
 4262/15 4262/25
**working [5]**  4189/3
 4190/12 4204/19
 4204/22 4233/5
**works [1]**  4245/7
**world [104]**  4158/17
 4177/8 4183/1 4183/6
 4183/17 4183/18
 4183/19 4183/20
 4193/5 4206/10
 4206/11 4206/13
 4210/20 4211/10

4214/17 4214/23
4214/24 4215/2
4215/8 4215/9
4215/16 4215/18
4215/20 4216/2
4216/3 4216/7 4216/7
4216/9 4216/15
4216/17 4216/18
4217/1 4217/1 4217/8
4217/10 4217/14
4217/16 4217/20
4217/21 4217/22
4218/15 4218/19
4219/4 4220/3
4220/13 4220/15
4220/15 4220/22
4220/23 4220/25
4221/2 4221/6
4221/22 4222/3
4222/20 4223/20
4223/21 4223/23
4223/25 4224/2
4224/3 4224/5 4224/6
4224/8 4224/8
4224/15 4224/15
4225/11 4226/9
4226/10 4226/14
4226/17 4226/20
4226/23 4226/23
4227/1 4227/3
4227/14 4228/8
4228/18 4229/23
4233/13 4233/15
4234/3 4234/11
4237/21 4238/25
4239/23 4240/20
4241/21 4242/24
4245/6 4248/18
4249/3 4249/16
4249/18 4250/23
4251/18 4253/19
4254/6 4255/15
4257/11 4263/11
4268/1
**worlds [1]**  4183/16
**worldwide [2]**  4193/7
 4193/8
**worse [5]**  4252/15
 4260/23 4267/7
 4267/25 4268/11
**worst [1]**  4270/25
**worth [3]**  4214/14
 4241/1 4273/4
**would [246]**
**would be [1]**  4249/25
**wouldn't [12]**
 4182/12 4206/2
 4217/8 4217/14
 4218/10 4224/7
 4226/15 4229/21
 4249/3 4257/25
 4258/21 4263/3
**wrapped [1]**  4173/9
**written [1]**  4177/23
**wrong [2]**  4185/5

4187/9

**X**

**Xs [2]**  4208/1
 4243/17

**Y**

**Yahoo [16]**  4229/1
 4229/6 4229/9
 4229/25 4230/1
 4230/2 4230/5 4230/8
 4230/11 4230/25
 4231/5 4235/7
 4237/14 4266/19
 4266/20 4268/3
**yeah [29]**  4162/8
 4169/9 4173/14
 4174/11 4178/20
 4178/25 4179/2
 4183/18 4186/11
 4187/16 4191/5
 4191/21 4197/13
 4204/11 4207/13
 4210/17 4213/9
 4222/22 4237/11
 4239/10 4240/6
 4242/2 4246/25
 4250/22 4255/2
 4256/9 4259/25
 4266/18 4269/3
**year [6]**  4221/22
 4234/16 4248/5
 4253/15 4253/17
 4271/4
**years [9]**  4160/17
 4221/22 4221/22
 4221/23 4238/25
 4240/14 4254/13
 4262/11 4265/6
**yes [68]**  4154/15
 4154/25 4155/13
 4155/25 4156/15
 4157/18 4158/11
 4158/24 4159/13
 4159/18 4161/8
 4161/14 4161/21
 4163/2 4163/10
 4164/2 4164/3 4164/6
 4164/24 4166/2
 4166/8 4166/21
 4167/1 4167/6 4167/7
 4168/6 4168/14
 4169/14 4169/20
 4170/15 4172/1
 4174/25 4175/8
 4175/12 4175/19
 4175/23 4176/18
 4176/22 4177/20
 4177/21 4178/4
 4178/13 4179/8
 4180/5 4182/4 4184/5
 4184/24 4185/2
 4185/18 4186/14
 4187/21 4188/21
 4190/2 4190/7

**Y**

**yes... [14]**  4195/22
 4196/3 4198/6
 4198/16 4200/11
 4201/24 4217/11
 4219/14 4228/22
 4245/11 4246/22
 4252/23 4260/7
 4264/4
**yesterday [12]**
 4154/11 4166/18
 4174/17 4192/19
 4192/23 4211/3
 4234/1 4235/23
 4236/20 4236/21
 4250/9 4251/8
**yesterday's [1]**
 4232/19
**yet [1]**  4271/25
**you [515]**
**you have [1]**  4208/5
**you know [60]**
 4160/20 4162/7
 4162/8 4168/17
 4168/23 4169/13
 4170/13 4172/3
 4176/8 4180/6
 4181/12 4181/15
 4183/1 4198/18
 4200/19 4202/15
 4202/20 4203/10
 4205/6 4208/6 4208/7
 4208/25 4209/4
 4209/5 4209/13
 4210/18 4211/5
 4212/14 4212/22
 4214/22 4215/13
 4223/1 4227/2 4229/7
 4230/14 4230/21
 4233/12 4233/17
 4237/22 4240/12
 4240/24 4241/10
 4245/8 4245/15
 4246/10 4248/1
 4252/5 4254/13
 4254/14 4255/12
 4257/4 4257/16
 4258/10 4258/22
 4258/25 4260/5
 4261/4 4264/7
 4264/22 4265/2
**You looked [1]**
 4168/20
**You never [1]**
 4186/17
**you notify [1]**
 4180/7
**you restore [1]**
 4213/24
**you should [1]**
 4207/20
**you still [1]**  4247/5
**you understand [1]**
 4228/2
**you'd [5]**  4191/8

4209/8 4230/23
 4271/25 4273/2
**you'll [2]**  4229/10
 4274/7
**you're [63]**  4154/18
 4154/20 4155/22
 4159/20 4164/16
 4171/16 4172/2
 4172/2 4175/5
 4175/20 4176/15
 4176/20 4177/18
 4178/3 4178/9 4179/5
 4180/14 4182/22
 4182/24 4183/20
 4185/6 4206/13
 4206/19 4206/20
 4207/10 4209/11
 4209/11 4210/11
 4211/18 4211/19
 4211/20 4215/5
 4215/17 4218/13
 4221/19 4222/1
 4229/17 4231/21
 4235/10 4237/15
 4237/17 4244/10
 4247/10 4247/11
 4250/21 4253/20
 4255/5 4255/12
 4255/19 4256/24
 4257/10 4259/6
 4259/11 4265/23
 4266/9 4267/23
 4268/1 4268/9
 4268/20 4269/21
 4271/5 4271/12
 4272/12
**you've [12]**  4158/22
 4163/18 4186/2
 4194/3 4206/10
 4207/9 4208/20
 4222/24 4224/12
 4236/19 4245/17
 4274/19
**your [136]**
**Your Honor [22]**
 4153/4 4157/12
 4157/13 4163/24
 4164/4 4174/3
 4185/13 4186/25
 4189/15 4191/9
 4191/12 4194/19
 4194/23 4195/3
 4195/12 4196/7
 4196/23 4197/1
 4220/11 4231/22
 4239/4 4275/6
**Your Honor's [1]**
 4213/4

**Z**

**Zaremba [3]**  4151/10
 4276/2 4276/8