# Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>    Plaintiffs,<br>    v.<br><br>GOOGLE LLC,<br><br>    Defendant. | No. 1:20-cv-03010-APM |
| STATE OF COLORADO, *et al.*,<br><br>    Plaintiffs,<br>    v.<br><br>GOOGLE LLC,<br><br>    Defendant. | No. 1:20-cv-03715-APM |

**BRIEF OF *AMICUS CURIAE* ADMARKETPLACE, INC.**

Lauren M. Weinstein
D.C. Bar # 1035184
Lois S. Ahn (*pro hac vice* forthcoming)
D.C. Bar # 90030717
Harry P. Larson
D.C. Bar # 90032001
MoloLamken LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2018
Fax: (202) 556-2001
lweinstein@mololamken.com

*Counsel for Proposed* Amicus Curiae
*adMarketplace, Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Local Rule 7(o)(5) and FRAP 29(a)(4) and 26.1, adMarketplace, Inc. states that it has no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

## STATEMENT OF *AMICUS CURIAE* INDEPENDENCE

Pursuant to Local Rule 7(o)(5) and FRAP 29(a)(4)(e), adMarketplace, Inc. states that:

(i) no party's counsel authored the brief in whole or in part;

(ii) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

(iii) no person—other than the *amicus curiae*, its members, or its counsel— contributed money that was intended to fund preparing or submitting the brief.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ........................................................ 1

ARGUMENT ..................................................................................................................... 2

I.    An Overly Narrow Definition of "Qualified Competitor" Would Undermine
      Efforts To Increase Competition in the Relevant Markets ................................... 2

II.   The Remedy Can Incentivize Ad Syndication Without Banning Distribution
      Payments to Publishers Altogether ...................................................................... 7

CONCLUSION ................................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Int'l Salt Co. v. United States*,
   332 U.S. 392 (1947)..............................................................................................15

*Massachusetts v. Microsoft Corp.*,
   373 F.3d 1199 (D.C. Cir. 2004)......................................................................6, 15

*Nat'l Collegiate Athletic Ass'n v. Alston*,
   594 U.S. 69 (2021)..............................................................................................15

*New York v. Microsoft Corp.*,
   224 F. Supp. 2d 76 (D.D.C. 2002)....................................................................15

*United States v. Glaxo Grp. Ltd.*,
   410 U.S. 52 (1973)..............................................................................................15

## <u>INTRODUCTION AND INTEREST OF *AMICUS CURIAE*</u>

adMarketplace is a privately held corporation that sells clicks to advertisers from users to whom it serves relevant text ads in response to their search queries on websites, browsers, and applications not controlled by Google.  adMarketplace has played an active role in the remedies phase of this case.  Shortly after this Court's ruling on liability, adMarketplace, through its counsel, sent the U.S. Department of Justice and certain Plaintiff States (collectively, "the government") a memorandum that proposed remedies aimed at restoring competition in the markets this Court found Google has monopolized.  Following that submission, adMarketplace's representatives met on over a dozen occasions with the government to discuss remedies.  Ultimately, the government disclosed adMarketplace's President and Co-CEO Adam Epstein as a witness for the remedies-phase hearing.  adMarketplace produced voluminous discovery in response to requests from Google, and Mr. Epstein testified at a deposition and at the remedies hearing.

adMarketplace did not submit an *amicus curiae* brief by May 9, 2025.  On May 30, the Court asked two questions during closing arguments that have compelled adMarketplace to seek leave to file this *amicus curiae* brief.  Specifically, this Court asked:

1.  "[I]s adMarketplace a qualified competitor?"  May 30, 2025 Hr'g Tr. 4770:10-11.

2.  "The question I have is as follows, which is, every single distribution partner, whether they've testified in a deposition or submitted an amicus brief, has said, this would harm us . . . .  Is that an acceptable outcome, to fix one market at the risk of harming others?  Because that's what these other folks are telling me, that payment bans will harm competition of the browser market, it's going to harm competition in the mobile phone market, and, ultimately, could just run some people out of business."  May 30, 2025 Hr'g Tr. 4901:15-4902:1.

The Court's questions raise issues critically important to adMarketplace.  As Mr. Epstein testified, adMarketplace "[a]bsolutely" "intend[s] to apply to be a qualified competitor."  Apr. 28, 2025 Hr'g Tr. 1864:19-21.  It thus has an interest in ensuring that the Court defines "Qualified

Competitor" as the government suggested in the afternoon session of closing arguments, *i.e.*, to include entities with "a plan to invest and compete [with]" the search text ads market—a definition adMarketplace undoubtedly satisfies.  May 30, 2025 Hr'g Tr. 4898:14-4899:16.  adMarketplace also has an interest in assisting the Court in fashioning remedies that would allow the continued survival of its supply partners—publishers, and potential publishers, of native search ads.[1] adMarketplace thus respectfully submits this *amicus curiae* brief to assist the Court as it considers remedies in this action.

## ARGUMENT

### I.    AN OVERLY NARROW DEFINITION OF "QUALIFIED COMPETITOR" WOULD UNDERMINE EFFORTS TO INCREASE COMPETITION IN THE RELEVANT MARKETS

During closing arguments, the Court asked:  "[I]s adMarketplace a qualified competitor?" May 30, 2025 Hr'g Tr. 4770:10-11.  The government responded:  "[T]o the extent adMarketplace was able to build technology and had a plan to build technology . . . that they could use to partner with an entrant or another general search engine to sort of plug into their search engine and serve the text ads, then I think they would [be]."  *Id.* at 4770:13-18.  The government incorrectly represented that adMarketplace's products do not "do that today."  *Id.* at 4770:21-22.  Based on that statement, the Court "understood" adMarketplace "was not delivering search text ads," and noted that, based on the government's representation at closing, adMarketplace would not "get access to ads data, absent a plan that they would like to become a syndicator of text ads."  *Id.* at 4770:25-4771:12.  Respectfully, the government incorrectly suggested that adMarketplace would

_____

[1] "Publisher" as used in this brief refers to a "property that is not a general search engine where users are expressing intent [by] entering queries" into "search input boxes."  Apr. 28, 2025 Hr'g Tr. 1781:5-11.  Examples include, but are not limited to, websites; browsers like Safari, Mozilla, and Opera; and Buy Now Pay Later sites like Klarna, Zip, and Afterpay.  *See id.* at 1781:12-21.

not meet the Revised Proposed Final Judgment (the "RPFJ") definition of Qualified Competitor and offered a new definition that threatens the effectiveness of the very remedies it proposes.

    A.    The government defined "Qualified Competitor" in the RPFJ as "a Competitor who . . . makes a sufficient showing . . . of a plan to invest and compete in the GSE and/or Search Text Ads markets, and who does not pose a risk to the national security of the United States." Dkt. 1184-1 ("RPFJ") § III.U. The government's Remedies Proposed Findings of Fact (the "RPFF") stated: "***adMarketplace sells search text ads***. adMarketplace offers search text ads through its AMP Results product, which returns ads on a search engine results page in response to a query. adMarketplace also offers search text ads through its AMP Suggest[ ] product, which appears below a search box as a user is typing a query." Dkt. 1370 ("RPFF") ¶¶ 2-3 (emphasis added) (citations omitted). By the government's own definition and proposed factual findings, adMarketplace currently competes in the "Search Text Ads" market and is a Qualified Competitor.

Contrary to its written RPFF, in the morning session of closing arguments, the government responded that adMarketplace would not be a "Qualified Competitor" because, as the government represented, adMarketplace does not syndicate search text ads on behalf of general search engines. *See* May 30, 2025 Hr'g Tr. 4770:10-4771:12. But the RPFJ requires no such thing. All the RPFJ requires is "a sufficient showing . . . of a plan to invest and compete in the GSE and/***or Search Text Ads markets***" by serving text ads in response to general search queries. RPFJ § III.U (emphasis added). Paragraphs 2-3 of the government's RPFF, which Mr. Epstein's testimony amply supports, make clear that adMarketplace has plans to compete in the "Search Text Ads" market—indeed, adMarketplace ***already*** competes in that market.[2]

_____

[2] Even if a partnership with a GSE were required to be a "Qualified Competitor," adMarketplace would satisfy that definition. In the post-remedies world, adMarketplace would partner with, and

B.     "Qualified Competitor" should be defined to increase competition in the relevant markets.  The narrow definition the government offered during the morning of closing arguments would not be sufficient to achieve that goal.  That definition would exclude any entity that is not a GSE or has not partnered with a GSE, including, for example, OpenAI, Perplexity, and other GenAI service providers.  And it could exclude publishers like Mozilla and Apple, whose access to Google's syndication assets is critical to facilitating greater competition.  *See* Apr. 28, 2025 Hr'g Tr. 1810:18-1811:22 (explaining that in the post-remedies world, "competition . . . takes place on the page of the publishers because they're syndicating the[ ] ads").

Maximizing opportunities for competition is key to prying open the markets Google has monopolized.  As Mr. Epstein testified, adMarketplace has been competing with Google by innovatively utilizing publishers' search access points to deliver relevant search text ads to users outside of Google's SERP.  *See* Apr. 28, 2025 Hr'g Tr. 1786:16-18, 1787:22-1789:18. adMarketplace and other Google rivals must overcome three cold start problems created by Google's "data moat" to compete more effectively.  *Id.* at 1792:15-1793:1 (spelling corrected). Specifically, (1) "knowing what relevant search term to . . . recommend" in response to a "partial query"; (2) sufficient "advertiser liquidity"; and (3) access to "search results."  *Id.* at 1794:12-1797:3.  With ads syndication, adMarketplace and other potential rivals would be able to overcome those cold-start challenges and improve the quality of their products.  *See* Apr. 29, 2025 Hr'g Tr.

---

syndicate ads for, existing GSEs like Ecosia and new GSE entrants.  *See* RPFF ¶ 3 ("adMarketplace could syndicate search ads, including search text ads, to a new general search engine entrant."); Apr. 28, 2025 Hr'g Tr. 1813:13-1814:9 (testimony that adMarketplace could "build a custom solution for [new GSE entrants] that would include not only [adMarketplace] ads but Google-sold ads"); *id.* at 1841:9-14 (testimony that "Ecosia" "would be interested in obtaining Google's search text ads from adMarketplace").

2146:4-16 (T. Chipty) ("[S]yndication remedies really play an important role to allow rivals a better chance to get better faster, to really have that kind of impact.").[3]

More specifically, publishers could provide curated search experiences that pull search results and text ads from Google and competitors. *See* Apr. 28, 2025 Hr'g Tr. 1799:8-14, 1810:18-1811:22. Different providers would compete to have publishers display their search results or text ads (or both). But such competition will not be possible if "Qualified Competitor" is defined to exclude entities that do not currently—or do not plan to—syndicate search text ads for GSEs. To inject competition into the markets, syndication assets must be given to entities that are able to run an effective and competitive search monetization platform. Running such a platform requires (1) search advertiser liquidity, (2) relevant search ad selection technology, and (3) expertise in search media value measurement. Given the difficulty of building a search ads platform, *see id.* at 1821:20-1822:7, publishers may wish to sub-syndicate Google ads from rival ads platforms like adMarketplace.

As the Court has found, and the overwhelming evidence shows, Google has an enormous query advantage due to its anticompetitive practices. *See* Dkt. 1033 (Aug. 5, 2025 Mem. Op.) at 226-27. Restoring competition requires eliminating Google's anticompetitive default distribution agreements and closing the query gap between Google and its rivals by granting critical market participants access to Google's syndication assets. *See* RPFJ § IV.C (prohibiting "[e]xclusionary [a]greements [w]ith [p]ublishers"); Apr. 29, 2025 Hr'g Tr. 2208:4-17 (T. Chipty) ("rivals would have had a chance to chip away at Google's monopoly" had Google paid for non-exclusive distri-

---

[3] The government and Google agree the syndication remedy has merit. *See* May 30, 2025 Hr'g Tr. 4760:2-4 ("The data and syndication remedies are needed to help restore competition more quickly; they're a necessary ingredient to complement the other remedies."); *id.* at 4835:19-4836:8 (Google describing syndication as an "elegant solution").

bution); *id.* at 2194:13-15 (T. Chipty) ("[P]laintiffs' data and ad syndication remedies directly go to the scale barrier.").[4]

As closing arguments continued, the government recognized that the narrow reading of the term "Qualified Competitor" it had offered earlier in the day would be problematic.  The government clarified that its proposed definition is "inten[ded]" to include "GenAI products, like Perplexity, like OpenAI."  May 30, 2025 Hr'g Tr. 4898:25-4899:11.  Recognizing the Court's authority to modify the definition of "Qualified Competitor," the government suggested the Court "change the word 'in' to 'with,'" *id.* at 4898:14-4899:16, so "Qualified Competitor" would include entities with "a plan to invest and compete [*with*] the GSE and/or Search Text Ads markets," RPFJ § III.U (emphasis added).  Under that revised language, adMarketplace, publishers, and GenAI products would all be Qualified Competitors.

adMarketplace respectfully urges the Court to adopt the government's revised definition of "Qualified Competitor":  A Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee, who makes a sufficient showing to the Plaintiffs, in

---

[4] Those assets should include, at a minimum, Google's search text ads feed, post-click-conversion data, and Suggest API.  *See* Apr. 28, 2025 Hr'g Tr. 1794:6-1797:3, 1814:20-1816:7 (testimony regarding how access to "ads data-sharing remedies" would help would-be competitors overcome "cold start problems").  The assets should also include the product listing ads ("PLAs") feed. Providing access to PLAs would create the conditions for publishers' curated search results pages to compete with the monetization and relevancy of ads on Google.com.  Users have come to expect PLAs as part of the search experience, and PLAs remain a significant source of advertising dollars. *See* Dkt. 1033 ¶ 181 (finding that, in 2020, 46.9% of ad dollars spent on Google derived from a mix of PLAs and search text ads).  That PLAs are not part of the monopolized markets under this Court's liability opinion (Dkt. 1033) poses no obstacle to the Court ordering their syndication in a remedy.  *See, e.g., Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1215 (D.C. Cir. 2004) (courts may order "'forward-looking' provisions," addressing issues that "played no role" in finding a violation of the antitrust laws); Dkt. 1369 (Pls' Remedies Post-Trial Br.) at 7 (collecting cases).

consultation with the Technical Committee, of a plan to invest in and compete with the GSE and/or

Search Text Ads markets, and who does not pose a risk to the national security of the United States.

## II.    THE REMEDY CAN INCENTIVIZE AD SYNDICATION WITHOUT BANNING DISTRIBUTION PAYMENTS TO PUBLISHERS ALTOGETHER

Under the RPFJ, "Google must not offer or provide to any Distributor any payment that is

determined or calculated based on the usage of or revenue generated by—or any similar factor

for—any particular GSE or Search Access Point." RPFJ § IV.E.  During closing arguments, the

Court expressed concern that the government's proposed ban on revenue share payments would

"harm competition [in] the browser market," and "in the mobile phone market, and, ultimately,

could just run some people out of business." May 30, 2025 Hr'g Tr. 4901:15-4902:1.  The Court

suggested potential alternatives to a blanket ban on distribution payments, such as granting excep-

tions to independent browsers and mobile phone manufacturers, and a contingent payment ban.

*See id.* at 4907:19-4909:10, 4911:9-4914:11.  While the government acknowledged the possibility

of harm to publishers, *see id.* at 4902:2-22, it did not provide any alternatives to its proposed ban.

adMarketplace's business turns on pairing advertisers with publishers to display relevant

ads to users in response to search queries (or partial search queries).  *See* Apr. 28, 2025 Hr'g Tr.

1780:12-22.  Based on its partnerships with publishers, adMarketplace shares the concerns the

Court expressed during closing arguments that the government's proposed ban might put

publishers out of business before they can transition to non-Google-hosted search results pages.

The government's search text ads syndication remedy (RPFJ § VIII.E) can avoid that outcome

subject to minor modifications described below.

Currently, if publishers want to display Google search results in response to user queries,

they must funnel users to Google's SERP, where only Google ads are displayed.  Dkt. 1033 ¶¶ 298,

334; Apr. 28, 2025 Hr'g Tr. 1798:21-1799:7.  If a user clicks one of those Google ads, the adver-

tiser pays Google a price-per-click set by Google, and Google pays the publisher a percentage of the revenue it earns from those clicks.  Dkt. 1033 ¶¶ 186, 298, 334.  The RPFJ proposes to ban those payments from Google to publishers altogether.

Such a blanket ban might make sense if all the Court was trying to achieve was replacing Google with some other GSE (*e.g.*, Bing) as the default search engine in browsers and on mobile devices.  *See* May 30, 2025 Hr'g Tr. 4914:15-4915:16  (Court noting that, with a complete ban on Google's distribution remedies, once "somebody . . . succeeds to Google as the default search engine," Apple may have to "live in a world where [it] can't get paid anything" and has "no choice").  But the post-remedies world need not be so limited.  Nor should it be.  *See id.* at 4914:7-11 (government's "goal [is] to really change and restore competition and pry these [markets] open," by "the stopping of defaults").

To allow innovative search experiences to emerge, publishers need time to transition and access to monetization to survive in the interim.  Dkt. 1341 at 12 (Mozilla Br.) (government's proposed distribution remedies "could force Mozilla to exit the browser market"); May 30, 2025 Hr'g Tr. 4902:13-19 (Court noting "[t]here may not be a Mozilla tomorrow").  That does not mean Google should be permitted to make whatever payments it wants to maintain its stranglehold on the market and control over search access points.  To the contrary, the Court could compel Google to continue making distribution payments so long as the amount publishers receive for serving syndicated Google ads (the "syndication revenue share") significantly exceeds the revenue share they receive for funneling users to Google's SERP.

The Court can create incentives that would inject competition into the markets Google has monopolized by permitting Google to continue making payments to publishers within certain parameters that incentivize publishers to use syndication assets to transition to non-Google-hosted

SERPs.  In such a world, publishers could monetize under the existing search distribution model while they build, test, and iterate ways to syndicate ads and results from Google and any number of sources, including GenAI products.

For example, in the post-remedies world, Mozilla could accept a revenue share payment of X% of the cost-per-click on the Google ad when it monetizes through the distribution model.  And, as Mozilla transitions to a syndication model, it could accept a syndication revenue share of 2X% the cost-per-click when a user clicks a syndicated Google ad—or an even higher cost-per-click offered by a Google competitor like adMarketplace.  Of course, if the user clicks a competitor's ad, Google would pay nothing.  Competitors like adMarketplace would have the opportunity to beat Google on price by paying publishers a higher cost-per-click and could further "compress" Google's "$50 to $70 billion" in monopoly profits by "lowering their pricing to the advertiser to sell the click."  Apr. 28, 2025 Hr'g Tr. 1803:7-22, 1808:16-1809:1, 1816:11-1817:14 (cleaned up). The greater the delta between Google's distribution revenue share percentages and the syndication revenue share percentages, the greater the incentive publishers would have to choose syndication over distribution.[5]

The image below demonstrates how search distribution operates from a user perspective. An iPhone user who wants to access ChatGPT and Google results must query both ChatGPT and

---

[5] Google's syndication revenue share, however, must not be so high as to preclude competitors like adMarketplace from making a profit while offering publishers payouts that are competitive to Google's.  *See* Apr. 29, 2025 Hr'g Tr. 2166:23-2167:18 (T. Chipty).

Safari.  The user's query on Safari is **pushed** to Google's SERP with all advertiser dollars flowing to Google when a user clicks an ad:



The user interface in search distribution looks familiar:



By contrast, the following image demonstrates how syndication—*i.e.*, the higher-revenue-share option in adMarketplace's proposal—could operate.  Specifically, a user enters a query on Safari that returns **both** ChatGPT and Google search results because Safari **pulls** results from multiple sources, and returns ads from both adMarketplace and Google for the same reason.

Advertiser dollars flow either to Google (if the user clicks a Google ad) or to adMarketplace (if the user clicks an adMarketplace ad):



The user interface is differentiated as depicted below—and can exist in a variety of ways not pictured here—because search publishers like Apple or Mozilla would curate search results and search text ads from multiple providers:



adMarketplace's proposal thus avoids potentially catastrophic damage to Google's distribution partners like Mozilla, while also incentivizing search publishers to build curated, differentiated search experiences. *See* Apr. 28, 2025 Hr'g Tr. 1845:13-15. As depicted above,

new search experiences could still include Google ads (and Google results, if publishers take advantage of the search results syndication remedy, *see* RPFJ § VII), without requiring publishers to push users to Google's SERP on an all-or-nothing basis.

adMarketplace's proposal, moreover, would not require the Court to price regulate. Rather, the Court would set parameters that would determine Google's margin for publisher payments.[6] **Market forces** would determine how much advertisers pay Google and competitors like adMarketplace on a cost-per-click basis. The Court would decide what portion of the cost-per-click Google pays to publishers. For example, Google could pay 25% of cost-per-click revenue it receives to publishers who opt for distribution, and a 50% of cost-per-click revenue share for publishers who opt for syndication instead. So long as the syndication revenue share does not exceed 60% of cost-per-click revenue, competitors will be able to offer more competitive pricing to publishers and incentivize them to choose relevant non-Google ads over Google ads. With an upper limit of 60% of the cost-per-click and a requirement that Google pay 2X the percentage for clicks on syndicated ads, the lower limit of Google's distribution revenue share would be anywhere between 20-30% of the cost-per-click. Those parameters are high enough to ensure that Google provides monetization to the search text ads syndication market during the transition but low enough to ensure that rivals like adMarketplace are able to compete against Google's payout to publishers.

---

[6] The Court could also delegate the setting of revenue share-payment parameters to the Technical Committee. The RPFJ empowers the Court to "act *sua sponte* to issue orders or directions for the . . . carrying out of [the] Final Judgment." RPFJ § XI.B. The Court would retain the authority to evaluate the market impact of the parameters on Google's revenue share payments and could—with the assistance of the Technical Committee—adjust them as needed to best improve competition.

The payment flows under adMarketplace's proposal are depicted here:



Google and adMarketplace would compete to charge a lower cost-per-click to advertisers. Google would pay a revenue share percentage of that cost-per-click to the publisher, and adMarketplace would compete to pay the publisher a higher cost-per-click than Google.

Only minimal tweaks to the government's RPFJ would be required to implement adMarketplace's proposal, which is amply supported by the record.[7] Instead of prohibiting Google from making distribution payments altogether, *see* RPFJ § IV.E, the Court could establish new

---

[7] *See, e.g.*, Dkt. 1374 (Google's Responsive Proposed Findings of Fact) ¶ 75 (publishers "benefited from" Google's competition with OpenAI and Perplexity, "as did their users"); Dkt. 1373 (Google's Proposed Findings of Fact) ¶ 107 (payment ban could result in billions in consumer harm); *id.* ¶¶ 86-87, 100 (describing harm to Google's partners from proposed payment ban); *id.* ¶ 171 ("Losing Firefox and Opera as competitors would have significant harms to competition, innovation, and stability in the browser market, as it would remove competitive pressure on large browsers and threaten the existence of Gecko, the only web engine not backed by a large technology company."); RPFF ¶ 426 ("If given the opportunity to continue payments, Google will leverage its dominant position and partners' limited negotiating strength to continue controlling defaults on search access points."); *id.* ¶ 434 ("Google's proposed remedy of merely removing exclusivity from distribution agreements does not fix the harm created by Google's conduct.").

financial terms as outlined above.  Further, while RPFJ § IV.D requires an unbundling of Google's offerings in the two separate markets (*i.e.*, ads and search results), that section could be clarified to establish that Google cannot require its distribution partners to funnel all queries to Google's SERP as a condition of receiving those payments.[8]  And, instead of requiring Google to offer a search text ads syndication license "on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products, e.g. AdSense for Search," RPFJ § VII.E, the Court could require financial terms significantly more favorable than the revenue share for distribution clicks.  *See* Apr. 28, 2025 Hr'g Tr. 1842:8-10.[9]

Because adMarketplace's proposal does not risk putting publishers out of business, it can be implemented immediately.  And because the proposal would facilitate the markets' transition to a competitive state, it need only be implemented for a limited period of five to ten years.  *See* Apr. 28, 2025 Hr'g Tr. 1820:14-1821:12 (testimony that syndication remedies for five years would allow rivals to catch up to Google); RPFJ § VII.E (proposing 10 years).  adMarketplace's proposal ensures the viability of publishers while incentivizing their transition to non-Google-hosted search results pages via the ads syndication model.

This Court has "large discretion" to adopt proposals like adMarketplace's that "fit the exigencies of the particular case" to "effectively pry open to competition a market that has been

---

[8] The RPFJ arguably already contains this in its ban on offering payments or other things of value in exchange "for undermining, frustrating, interfering with, or in any way discouraging the use of any GSE Competitor."  RPFJ § IV.A-B.

[9] Google's distribution revenue share payments provide a better benchmark than its AdSense for Search ("AFS") payments for at least two reasons.  First, Google withholds advertiser information from its AFS syndicators to prevent competition on price.  RPFF ¶ 793. The goal here is the exact opposite—to generate competition on price.  Second, the quality of the AFS feed is not high enough to pry open competition.  *See* Apr. 28, 2025 Hr'g Tr. 1810:10-1813:11.  The Court-ordered feed would be of higher quality, which the financial terms should reflect.

closed by defendant['s] illegal restraints." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). Courts routinely set business terms where necessary to remedy anticompetitive conduct. In *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004), for example, the D.C. Circuit affirmed a remedy that imposed certain parameters on Microsoft's licenses of its Windows operating system to OEMs, requiring that the licenses contain uniform terms and conditions and allow OEMs flexibility to distribute or promote non-Microsoft middleware. *Id.* at 1204; *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 267-68 (D.D.C. 2002). The Supreme Court has also approved remedies that change business terms. *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 84-85, 107 (2021) (affirming remedies that limit NCAA's ability to cap grants-in-aid below full cost of college attendance and eliminate caps on education-related benefits for college athletes); *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973) ("Mandatory selling on specified terms and compulsory patent licensing at reasonable charges are recognized antitrust remedies.").

adMarketplace's proposal, coupled with the ads syndication provisions of the RPFJ, can pry open competition. Distribution-payment and syndication remedies go hand in hand. *See* RPFF ¶ 1008 ("Plaintiffs' remedies in this case are designed to work together to make consumers better off, and to do so in a timely manner."). With an incentive to choose syndication over distribution, publishers will innovate search experiences that pull search results and ads from various sources—including Google, other GSEs, adMarketplace, and GenAI products—onto non-Google-controlled search results pages. That, in turn, will increase the number of opportunities for search text ad providers to compete based on price and relevance. That is the vibrant, competitive search ecosystem that should result from this landmark case.

## **CONCLUSION**

For the foregoing reasons, adMarketplace respectfully requests that the Court adopt the government's Revised Proposed Final Judgment sections IV.E, VII, and VIII.E subject to the modifications described above.  adMarketplace also requests that the Court adopt the government's revised definition of "Qualified Competitor" (*see* May 30, 2025 Hr'g Tr. 4898:25-4899:11), defining the term as:  A Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee, who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete with the GSE and/or Search Text Ads markets, and who does not pose a risk to the national security of the United States.


Dated:    July 11, 2025
          Washington, D.C.

  /s/ Lauren M. Weinstein
Lauren M. Weinstein
D.C. Bar # 1035184
Lois S. Ahn (*pro hac vice* forthcoming)
D.C. Bar # 90030717
Harry P. Larson
D.C. Bar # 90032001
MoloLamken LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2018
Fax: (202) 556-2001
lweinstein@mololamken.com

*Counsel for Proposed* Amicus Curiae
*adMarketplace, Inc.*