**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*,<br><br>　　　　　　　　　Plaintiffs,<br><br> v.<br><br>Google LLC,<br><br>　　　　　　　　　Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |

| | |
|---|---|
| State of Colorado, *et al.*,<br><br>　　　　　　　　　Plaintiffs,<br><br> v.<br><br>Google LLC,<br><br>　　　　　　　　　Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

**DEFENDANT'S RESPONSE TO THE COURT'S
<u>JULY 29, 2025 MINUTE ORDER</u>**

On July 29, 2025, the Court ordered Google to file a brief "explaining why it did not include a one-year term limitation for OEM and carrier agreements when such term is included for browser agreements, *see* Google's RPFJ § III.K." The variation is due to differences in how third parties design browsers, on the one hand, and configure mobile phones and tablets, on the other, as well as Google's understanding of why the Court concluded in its liability opinion that different types of agreements are exclusive.

Google included the referenced one-year term limitation in Section III.K of its Proposed Final Judgment (PFJ) to account for the Court's statement in its liability decision that "Google's browser agreements are exclusive insofar as they establish Google as the out-of-the-box default search engine." *United States v. Google LLC*, 747 F. Supp. 3d 1, 146-47 (D.D.C. 2024). Third parties all have historically designed their browsers with a single default search engine, and they often include only one search box in the browser where queries are submitted to the default search engine.[1] In view of these third-party designs and the liability opinion's statements about exclusivity, Google's PFJ sought to address the possibility that the Court would consider a default agreement to be exclusive in some sense even if it was subject to the other prohibitions in Section III.K of Google's PFJ (*i.e.*, no requirement to set Google as default across all operating system versions or privacy modes of browsers). If the Court held that view, then the term limitation would resolve any implications of that characterization because "'short-term' exclusive agreements 'present little threat to competition,'" *Google*, 747 F. Supp. 3d at 157 (cleaned up) (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012)), and the "one year" term matches what "courts have presumed reasonable under related antitrust

---

[1] Examples of this design are illustrated at DXD-37.047 (depicting Safari on iOS) and slide 21 of the presentation accompanying Google's September 12, 2023 opening statement (depicting Firefox on iOS).

provisions." *Id.* (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984)).[2]

The provisions of Google's PFJ applicable to smartphone and tablet manufacturers/sellers reflect the different designs of those devices relative to third-party browsers. As a matter of design, Android OEMs consistently have preloaded multiple search access points on mobile devices, including a search widget, a search application, and at least one browser.[3] Google's PFJ eliminates any semblance of search exclusivity on Android mobile phones and tablets sold in the U.S. by prohibiting agreements to promote Google Search or Chrome unless the agreements (1) allow the preloading of rival search engines and browsers, and (2) are the product of access-point-by-access-point competition. With respect to the first point, an agreement to preload the Google Search app or Chrome browser could not, for example, condition such a license on the partner refraining from preloading or promoting a rival general search engine or browser, thereby ensuring that contractual exclusivity does not exist. Google's PFJ §§ III.E, F. And with respect to the second point, a payment for preloading the Google Search app or Chrome app could not, for example, be conditioned on the partner also preloading any other Google application, thereby

---

[2] Google respectfully disagrees with the Court's determination that the agreements challenged by Plaintiffs are exclusive. In preparing the PFJ, however, Google proposed remedies that it submits are more than sufficient to address each of the violations identified by the Court based on the determinations made in its liability opinion.

[3] Third-party browser developers also include other "search access points" within their browser designs in addition to the default browser setting, such as Safari's "preset bookmarks" and Firefox's "this time, search with" functionality. *See Google*, 747 F. Supp. 3d at 44 (listing "preset bookmarks within the default browser" as among the "channels of distribution … known as search access points"). In addressing the browser agreements, the Court indicated these access points are "less efficient" than the search box in the browser where queries are submitted to the default search engine. *Id.* at 147 ("The fact that Google's browser partners can contract with its rivals for distribution through less efficient channels does not … immunize the challenged agreements from being deemed exclusive."). Google did not understand the Court to be drawing the same distinction between different access points on Android devices. *See id.* at 150; DXD-37.109 (indicating that approximately the same percentage of Google Search queries originated from the Google Search widget as from browsers on Android devices in the U.S. in 2019-21).

ensuring that each search access point is individually contestable and not contingent upon the outcome of competition for any other access point. *Id.* §§ III.H, I; *see also id.* §§ III.A, B (prohibiting any agreement requiring preinstallation of the Google Search app or Chrome as a condition of licensing any other Google app). The Court's opinion does not suggest that an agreement subject to these prohibitions would be exclusive in any sense. Accordingly, there is no need to limit the duration of any such agreement to one year.

Google's PFJ therefore addresses the reasons provided in the Court's liability opinion for characterizing MADAs and RSAs as exclusive. The Court stated that the "exclusivity" of the MADA "arises from" the "contractual requirements" that "that all MADA signatories must … feature the Google Search Widget in the center of the home screen" and "place Chrome on the home screen" (pursuant to provisions of RSAs) combined with the "market realities" that "the Google Play Store is a must-have on all Android devices" and "the industry-wide practice is to avoid excessive preloading of applications." *Google*, 747 F. Supp. 3d at 150. Google's PFJ eliminates these terms that were characterized as exclusive. For example, the PFJ prohibits any agreement that conditions the licensing of Google Play (or any other Google app) on the partner distributing or preloading Google Search or Chrome on mobile phones or tablets sold in the U.S. Google's PFJ §§ III.A, B. Under this provision, an OEM could license the Play Store for a given device while exclusively preinstalling a rival's search widget, search application, and browser on the same device. Furthermore, an OEM could enter an agreement to preload Chrome without also having to preload the Google Search widget (or vice versa). *Id.* Because Google's PFJ eliminates all of the conceivable factors the Court identified in "conclud[ing] that the MADA is exclusive in practice," *Google*, 747 F. Supp. 3d at 150, Google did not propose

3

limiting the duration of contestable, access-point-by-access-point, non-exclusive agreements that could be entered consistent with the PFJ.

In addressing the RSAs with Android OEMs and wireless carriers, the Court's liability opinion stated that "the RSAs contain an 'alternative search services' clause," which "prohibits Google's Android partners from preloading rival search engines" and "also greatly restricts a partner's ability to promote other GSEs." *Id.* at 151. Google's PFJ eliminates the provisions of RSAs deemed exclusive by prohibiting any agreement with an OEM or carrier that conditions payments (or the license of any Google app) on the counterparty refraining from preloading or distributing rival general search engines or browsers on mobile phones or tablets sold in the U.S. Google's PFJ §§ III.E, F. For the reasons discussed above, Google's PFJ also addresses what the liability opinion characterized as an "all-or-nothing choice." *Google*, 747 F. Supp. 3d at 151 (stating that "[n]o rational market actor would sell a MADA-compliant device without ensuring that it earned search revenue through the RSA"). Under Google's PFJ, an OEM or carrier could exclusively preinstall a rival search engine while still preloading the Play Store or other Google apps, or it could earn revenue from Google on some search access points without foregoing the opportunity to earn revenue from rival search engines on other access points. Google's PFJ §§ III.A, B, H, I. Again, there is no semblance of exclusivity, and therefore no arguable need to impose a maximum one-year term.[4]

---

[4] Google did not propose a one-year term limitation on agreements to distribute the Gemini Assistant app or Google Assistant app for the additional reason that they were not part of the Court's liability determination and were excluded at Plaintiffs' urging from the relevant markets identified by the Court. *See* Def.'s Proposed Conclusions of Law, ECF No. 1347 at 14-15, 58-63 (May 16, 2025). Although Plaintiffs should be limited to "an injunction against continuation of [the unlawful] conduct" identified in the liability opinion, *United States v. Microsoft Corp.*, 253 F.3d 34, 106 (D.C. Cir. 2001) (en banc), Google's PFJ goes further than that by proposing "forward-looking" restrictions on distribution of the Gemini Assistant app and Google Assistant app. Adding a one-year limit on the term of agreements to promote these apps would be unwarranted, particularly given that "when the district court … adopt[s] a forward-looking provision, its discretion is necessarily less broad because, without

Dated: August 1, 2025                     Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: */s/ John E. Schmidtlein*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice*)
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*

---

liability findings to mark the way, it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1223-24 (D.C. Cir. 2004) (en banc).

5