## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 1:20-cv-03010-APM <br><br> HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case No. 1:20-cv-03715-APM <br><br> HON. AMIT P. MEHTA |

## PLAINTIFFS' BRIEF IN SUPPORT OF
## PLAINTIFFS' FINAL PROPOSED FINAL JUDGMENT

The antitrust remedy in this case has profound implications for the day-to-day lives of every American. Following this Court's determination that "Google is a monopolist, and it has acted as one to maintain its monopoly" in multiple markets in a decade-long campaign of exclusion that violated the Sherman Act, Liab. Op. at 4, Plaintiffs proposed a comprehensive set of remedies to stop the unlawful conduct and restore competition to the "frozen" search market, *id.* at 202. In its opinion, the Court granted some but not all of the government's proposed remedies. *See, e.g.*, Rem. Op. at 132 ("The need for a data-sharing remedy is heightened by the court's decision not to adopt a payment ban."). This Court asked the parties to "submit a revised final judgment that is consistent with this Memorandum Opinion," *id.* at 222–23, and Plaintiffs'

proposed final judgment implements what the Court wrote. But Google construes the remedies opinion narrowly—and improperly—at every turn, seeking to maintain the status quo and its billions of dollars of monopoly profits. In the analysis below, Plaintiffs itemize the discrepancies between their proposal and Google's and explain why this Court should prefer Plaintiffs' proposed final judgment.

## I.    Section III: Prohibitory Injunctions

In line with the Court's observation that "Google's proposed prohibitory injunctive relief provides an appropriate starting point," Rem. Op. at 104, Plaintiffs have built Section III of their final judgment directly from Section III of Google's March 7, 2025 proposal. To those provisions, Plaintiffs added amendments requested by this Court. *Id.* at 110–11. But a series of meetings between the parties have revealed the need for clarifying amendments as well. Through these discussions, Plaintiffs have learned that Google now interprets provisions from its March 7 proposal more narrowly than this Court, and more narrowly than Google represented the provisions to be several months ago. Accordingly, Plaintiffs' proposal for Section III includes amendments meant to ensure the final judgment aligns with the Court's opinion. The following sections explain where Plaintiffs' and Google's Section III provisions diverge substantively and why the Court should prefer Plaintiffs' version.[1]

---

[1] In addition to the Section III discrepancies addressed explicitly here and in the definitions analysis below, *see infra* § V, Plaintiffs' and Google's Section III provisions contain minor wording differences. With respect to these differences, Plaintiffs do not see—and Google has not identified—any substantive implications. Accordingly, Plaintiffs have not individually addressed these stylistic differences and instead offer them collectively as cleaner and clearer than Google's parallel wordings.

### A.    Section III Generally: Repeated Differences on the Permissibility of Conditioning

One disagreement between the parties appears throughout the parties' proposals for Section III: Plaintiffs' remedies ban conditioning while Google's remedies only ban agreements that codify conditioning. More specifically, Google's provisions generally state, "Google shall not enter or maintain any agreement . . . that conditions" one thing on another. Def. FPFJ §§ III.A–J. Thus, Google's provisions bar "conditioning" not on its own but only to the extent the relevant conditioning appears in an agreement.

Google's narrow focus on agreements renders its proposed provisions ineffective. For example, Section III.A states, "Google shall not enter or maintain any agreement . . . that conditions the licensing of Google Play . . . on . . . distributing, preloading, placing, displaying, using, or licensing the Google Search Application . . . ." Because Section III.A restricts only "agreements," Google permits itself to unilaterally condition access to the Play Store on distribution of the Google Search Application. For example, Google could (in accordance with its remedies) deny any request for the Play Store brought by a manufacturer whose proposed device does not have the Google Search Application preinstalled on the home screen. In a meeting, Google confirmed that Plaintiffs have not misread its provisions—Google intends to reserve the right to conditionally refuse to license the Play Store based on whether the device manufacturers opt to distribute Google Search-related products.

Google's reservation runs counter to this Court's remedies opinion and to Google's own representations. For example, this Court characterized a variety of Google's remedies as prohibiting "conditioning" and "bundling" without regard for whether those practices appear in an agreement. Rem. Op. at 15, 104–05 (discussing Sections III.A–D and III.H–J). That understanding came from Google itself. For example, Google explained to this Court in post-trial

briefing that Google's remedies would ensure that "any OEM may license and preload the Play Store (or any other Google application) on any smartphone or tablet sold in the U.S. without having to place Google Search or Chrome anywhere on the device." Def. Rem. Post-trial Br. at 13. The Court took Google at its word. Rem. Op. at 105–06 ("OEMs would be able to license the Play Store or any other Google software application without having to place Google Search or Chrome on the device. . . . [A]n OEM could license the Google Play Store without any obligation to preload the Google Assistant or Gemini app."). To ensure Google's promises and this Court's opinion are fulfilled, the final judgment must prohibit conditioning itself, not just agreements that contain conditioning.

Google's proposal also flouts the law of exclusive dealing, which "treats 'conditional refusals to deal—i.e., one firm unilaterally refusing to deal with another firm unless some condition is met'—and exclusive dealing as synonymous." *OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1247 (11th Cir. 2022) (cleaned up); *accord BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 529 (5th Cir. 2022) (endorsing *OJ Com.* and explaining that "conditional refusals to deal are functionally equivalent to exclusive-dealing arrangements").

"The Court's role is to end the illegal conduct and to make every effort to protect against conduct of the same type or class . . . ." *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 189 (D.D.C. 2002). To satisfy this obligation, the Court must ban conditioning itself, not just agreements that contain conditioning.

### B.    Plaintiffs' and Google's Sections III.C–D

| Plaintiffs' Sections III.C–D | Google's Sections III.C–D |
| --- | --- |
| C. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google | C. Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search Application, the Chrome Browser Application, or Google Play, on the |

| | |
|---|---|
| Assistant Application on any device sold in the United States. | manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Assistant Application on Covered Devices sold in the United States. |
| D. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States. | D. Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search Application, the Chrome Browser Application, or Google Play, on the manufacturer also distributing, preloading, placing, displaying, using, or licensing a Google GenAI Assistant Application on Covered Devices sold in the United States. |

In Sections III.C–D, Plaintiffs' proposed remedies correct a subtle discrepancy in Google's own provisions that leaves room for behavior this Court said it would prohibit.

In both proposals to this Court, Sections III.C–D parallel earlier provisions, Sections III.A–B, which prohibit Google from conditioning access to "Google Play *or any other Google application*" (emphasis added) on exclusive distribution of the Google Search Application or Chrome. Sections III.C–D, in turn, concern exclusive distribution of the Google Assistant and Google GenAI. Plaintiffs' Sections III.C–D retain the same wording of Sections III.A–B. Google's provisions are narrower. Google's Section III.C–D do not restrict the conditioning of "any . . . Google software applications," as Sections III.A–B do. Instead, they restrict conditioning only if it involves "the Google Search Application, the Chrome Browser Application, or Google Play." In a meeting, Google confirmed the subtle shift in wording is intentional: Google wants to retain the right to condition, for example, the Google Maps and YouTube apps on the exclusive distribution of Google GenAI and the Google Assistant.

The Court's opinion reflects a broader understanding for Sections III.C–D. *E.g.*, Rem. Op. at 3 (explaining that Google will be barred from "condition[ing] the licensing of the Play Store *or any other Google application* on the distribution, preloading, or placement of Google

Search, Chrome, *Google Assistant*, or *the Gemini app*" (emphasis added)); *id.* at 15 ("Google would have the court enter an order that . . . prohibits Google from bundling Google Search, Chrome, *Google Assistant*, or *the Gemini app* with Google Play or *other Google apps* in their OEM agreements" (emphasis added)). Accordingly, Plaintiffs' remedies properly align the words of Sections III.C–D with the words of Sections III.A–B.

### C.    Plaintiffs' and Google's Section III.K

| Plaintiffs' Section III.K | Google's Section III.K |
|---|---|
| K. Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution of, preload of, placement of, display of, use of, license of, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered. | K. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier requiring the preload, placement, or assignment of an access point on Covered Devices in the United States to any of the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application for a period of more than one year, unless the agreement allows the manufacturer or wireless carrier to terminate the agreement on an annual basis and does not charge a fee for terminating. |

Section III.K of Plaintiffs' and Google's proposed remedies contain only one substantive discrepancy. Plaintiffs' Section III.K limits the duration of the specified contracts Google can enter to one year, while Google allows the agreements to have any duration as long as the agreement permits Google's partner to "terminate the agreement on an annual basis and does not charge a fee for terminating." Plaintiffs' version of Section III.K has two advantages over Google's.

*First*, Plaintiffs' Section III.K aligns best with this Court's instructions. As this Court explained, Section III.K should require a "one-year term" for Google's distribution agreements. Rem. Op. at 110–11; *see also* Minute Order (July 29, 2025) (referring to a similar provision as requiring a "one-year term").

6

*Second*, Plaintiffs' Section III.K avoids the difficult task of monitoring and specifying limits on the conditions and consequences Google's contracts can attach to a partner's choice to terminate an agreement after one year. As this Court recognized, the ability to terminate an agreement does not prevent substantial foreclosure when the right of termination is not easy to exercise. Liab. Op. at 225–26 (finding that Google's distribution contracts lacked "ease of terminability" and explaining that "[t]he lack of flexibility for partners to exit the distribution agreements reinforces their foreclosure effect").

Partially acknowledging this point, Google's version of Section III.K prohibits Google's agreements from "charg[ing] a fee for terminating." But that prohibition is too narrow: it still allows Google to discourage termination by more creative means. For example, Google's remedies seemingly permit an agreement that (1) requires 12 months' notice for any termination, (2) delays payments for the remainder of the agreement when notice of termination is given, or (3) contains annual revenue-share increases rendering the right of termination entirely irrational.[2]

Expanding Google's provision to itemize and prohibit every conceivable method of rendering termination painful is an impossible task. Accordingly, Plaintiffs have proposed simple one-year limitations that avoid this unnecessary complication.[3]

---

[2] One agreement in the third category is a two-year agreement with a right of termination after one year where Google pays Apple a rate of 1% for the first year and 71% for the second year. The competitive effect of that agreement is indistinguishable from a two-year agreement at a rate of 36% with no right of termination.

[3] If the Court is inclined to accept Google's one-year approach, Plaintiffs request that the Court impose a broader limit on Google's ability to discourage termination, such as a remedy clause requiring that Google's contracts "permit partners to terminate annually at will, without more than 30 days' notice, and without triggering any unfavorable consequences other than the loss of the agreement's continued benefits at termination."

### D.    Plaintiffs' and Google's Section III.L

| Plaintiffs' Section III.L | Google's Section III.L |
|---|---|
| L. Google shall not enter or maintain any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) applies to no more than one Operating System Version and no more than one Privacy Mode, (ii) terminates no more than one year after the date it is entered, and (iii) expressly permits the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product. For clarity, this provision does not prohibit Google from negotiating multiple such agreements with a Browser Developer as long as no agreement is conditioned on another. | L. Google shall not enter or maintain any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) permits the Browser Developer on an annual basis to set a different Default Search Engine in the United States for any Operating System Version and/or Privacy Mode offered by the Browser Developer without foregoing any payments attributable to an Operating System Version or Privacy Mode where Google Search remains set as the Default Search Engine; and (ii) expressly permits the Browser Developer to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States. |

In Section III.L, Plaintiffs have corrected a subtle flaw in Google's proposed remedy that renders the provision virtually ineffectual.[4]

Google's proposal for Section III.L permits Google to enter a default agreement with any browser developer as long as, in relevant part, the agreement "permits the Browser Developer on an annual basis to set a different Default Search Engine . . . for any Operating System Version and/or Privacy Mode offered." In a meeting, Google explained that its proposal permits Google to negotiate an all-or-nothing one-year deal where Apple, for example, must set Google as the default search engine on every instance of Safari (both standard mode and privacy mode) on every Apple device (i.e., all iPhones, iPads, and Macs).

---

[4] The parties' proposals for Section III.L also reflect a difference of opinion on whether browser agreements can last more than one year and, if so, what conditions and consequences can apply to an annual termination right. For the reasons discussed as to Section III.K, Plaintiffs have proposed an easily administrable one-year limitation.

Google's reading of its proposal for Section III.L renders the provision almost useless. As this Court explained, the remedies in this action must ensure that any browser partner is permitted to both "set a different GSE on different operating system versions or in a privacy mode *and* make[] changes, if desired, on an annual basis." Rem. Op. at 105 (emphasis added). Google's proposal all but eliminates the required operating-system and privacy-mode flexibility: as long as Google re-negotiates its browser contracts each year, those contracts (and the negotiations for them) can continue requiring a universal Google default.[5] That is not what Google promised its remedies would deliver. *See* Def. Rem. Post-trial Br. at 15–16 (promising that "Apple could, for example, set Google as the default in Safari on iPhones while setting a different search engine as the default in Safari on Mac computers" and that "[a] browser developer could also set a different default search engine in standard browsing mode and private browsing mode"); RDXD-33.047 ("Google's proposed remedies . . . allow Google and rivals to compete for browser defaults by OS version and by mode . . . .").

By contrast, Plaintiffs' remedies ensure that Google's rivals can compete for a particular mode on a particular operating system by ensuring that Google negotiates default agreements for modes and operating systems separately.

E.    **Plaintiffs' Section III.M and Google's Sections III.M–N**

| **Plaintiffs' Section III.M** | **Google's Sections III.M–N** |
|---|---|
| M. Google shall not enter or maintain any agreement requiring Apple to set Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product in the United States with respect to any proprietary Apple feature or functionality, | M. Google shall not enter or maintain any agreement requiring Apple Inc. ("Apple") to set Google Search as the Default Search Engine in the United States with respect to any proprietary Apple feature or functionality, |

---

[5] Under Google's remedies, if Google enters multi-year contracts with its browser partners, the browser partners need only have operating-system and privacy-mode flexibility after the first year.

| | |
|---|---|
| including Safari, Siri, and Spotlight, unless the agreement (i) applies to no more than one Operating System Version and no more than one Privacy Mode, (ii) terminates no more than one year after the date it is entered, and (iii) expressly permits Apple to promote any Third-Party General Search Service and Third-Party GenAI Product. For clarity, this provision does not prohibit Google from negotiating multiple such agreements with Apple as long as no agreement is conditioned on another. | including Siri and Spotlight, unless the agreement complies with Section III.L above.<br><br>N. Google shall not enter or maintain any agreement requiring Apple to distribute any Google GenAI Assistant Application in any Apple web browser or on any Apple mobile or desktop device in the United States unless the agreement expressly permits Apple to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States. |

Sections III.M–N of Google's remedies contain several problems.

*First*, Google's Section III.M errs by incorporating the flawed terms in Google's Section III.L. For the reasons explained in analyzing Section III.L, Plaintiffs' Section III.M uses the superior words of their version of Section III.L.

*Second*, Google's Sections III.M–N err by collectively contravening this Court's instructions. In its remedy opinion, this Court explained that "Section III.L of Google's RPFJ shall be modified to make clear that Google is prohibited from entering into an exclusive agreement with Apple to distribute any Google GenAI product either in any Safari mode or on any Apple mobile or desktop device." Rem. Op. at 111. Plaintiffs followed these instructions. Section III.M of Plaintiffs' current proposal began with a reprint of Section III.L of Google's RFPJ. Then as the Court instructed, Plaintiffs expanded the provision to apply to "any Google GenAI Product" and "Safari." Plaintiffs' only other change to the provision addresses a concern that Google raised in a meeting—Plaintiffs added a clarification at Google's request to the end of the provision to confirm Google can enter multiple agreements with Apple as long as those agreements are not conditioned on each other (i.e., as long as Google does not engage in all-or-nothing negotiations).

10

Rather than "modif[y]" Section III.L of Google's RPFJ—as this Court instructed—Google has offered the provision again (now in Section III.M) without any amendment. Google claims that a new provision, Section III.N, implements the spirit of the Court's request for a modification. But Section III.N fails to incorporate all the limitations the Court required. Section III.L of Google's RPFJ contained (via cross-reference) three relevant limiters on Google's contracts with Apple: provisions limiting Google's ability to contract with Apple (i) for more than one operating-system default at a time, (ii) for more than one year, and (iii) without a provision expressly permitting rival promotion. By directing the parties to expand a provision with those limiters to cover GenAI, the Court instructed the parties to also apply those limiters to GenAI. Section III.N of Google's latest remedies, however, arbitrarily includes only one of those three limiters—the requirement for expressly permitting rival promotion. Thus, Google's remedies permit Google to negotiate an all-or-nothing GenAI distribution agreement with Apple covering all Apple operating systems and devices and lasting years on end with no right of termination. Plaintiffs see no basis in the record, the law, or this Court's remedies opinion for such a trivial GenAI remedy.

### F.    Plaintiffs' Section III.N

| Plaintiffs' Section III.N | Google's Parallel Section |
|---|---|
| N. Google shall not enter or maintain any exclusive contract relating to the distribution of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and any Google GenAI Product in the United States. | *Not Applicable* |

Section III.N of Plaintiffs' remedies tracks the Court's statements in its remedies opinion that the final judgment will prohibit Google "from entering or maintaining any exclusive contract relating to the distribution of Google Search, Chrome, Google Assistant, and the Gemini app."

Rem. Op. at 3; *accord id.* at 74 (findings sufficient to "enjoin Google's continued use of exclusive agreements to distribute its GSE"); *id.* at 111 ("Google cannot secure on browsers exclusivity for its GSE"). "[T]he central feature" of Google's proposed remedies was "an injunction against those provisions of the MADAs, the RSAs, and the browser agreements that the court deemed exclusive." *Id.* at 104. But Google's proposed remedies do not accomplish that objective, even as modified by this Court. *Id.* at 110–11. At liability, the Court found that "Google's browser agreements are exclusive insofar as they establish Google as the out-of-the-box default search engine." Liab. Op. at 204. Yet Google's remedies allow Google to continue entering into browser agreements that make it the out-of-the-box default, as long as it does so one year at a time. Likewise, the liability opinion explains that the Court found that Google's MADAs were exclusive because they required Android OEMs and carriers to preload the Google Search Widget and Google Chrome, *id.* at 210, but Google's remedies allow it to continue entering into agreements with the same requirements (as long as it does so one year and one access point at a time). To the extent that the Court believed that Plaintiffs agreed that Google's proposed remedies eliminated all exclusive contracts, *see* Rem. Op. at 16, that is not the case. *See, e.g.*, Pls. Rem. Post-trial Br. at 74 (explaining that Google's remedies allowed some "exclusive default" contracts).

By implementing the Court's directive that that the final judgment bar "any exclusive contract," Rem. Op. at 3, Plaintiffs' Section III.N prevents any inadvertent gap between the remedies opinion and the final judgment regarding the treatment of exclusive contracts relating to the distribution of Google Search, Chrome, Google Assistant, and the Gemini app. The provision also helps prevent a recurrence of the unlawful conduct by ensuring that Google cannot adopt novel forms of the exclusive distribution the Court condemned. *See, e.g.*, *United States v.*

*Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (a remedies decree "must seek" to "unfetter the market from anticompetitive conduct" and "ensure that there remain no practices likely to result in monopolization in the future" (internal quotation marks omitted)); *cf. Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 698 (1978) ("[I]t is not necessary that all of the untraveled roads to [a similar] end be left open and that only the worn one be closed.").

### G.    Google's Section III.O

| Plaintiffs' Parallel Section | Google's Section III.O |
|---|---|
| *Not Applicable* | O. Nothing in this Final Judgment shall otherwise prohibit Google from providing Consideration to a manufacturer or wireless carrier with respect to any Google product or service in exchange for such entity's distribution, placement on any access point, promotion, or licensing of that Google product or service. |

In Section III.O, Google's proposed remedies contain a meaningless truism declaring that the final judgment does not prohibit something it does not "otherwise prohibit." In a meeting, Google explained that it drafted this provision long ago to counter Plaintiffs' proposed payment ban. Given the absence of any payment ban in the parties' latest proposals and the meaninglessness of Google's Section III.O, Plaintiffs' proposal has no provision paralleling Google's Section III.O. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012) ("[L]egal drafters should not include words that have no effect.").

## II.    Sections IV (Required Disclosures of Data) and V (Required Syndication of Search Results)

The Court instructed the parties to modify Plaintiffs' data-sharing proposals in Section VI and syndication proposals in Section VII of Plaintiffs' RPFJ (ECF No. 1184-1) consistent with the enumerated changes listed by the Court. Plaintiffs have generally done so. Google, in

contrast, has significantly revised Plaintiffs' proposal, wordsmithing Plaintiffs' remedy that was accepted by the Court and incorporating new language not instructed by the Court throughout.

Plaintiffs respectfully request that the Court reject Google's modifications and start any drafting of the final judgment with Plaintiffs' submission, as Google's revisions (1) were proposed by Google well after Plaintiffs have had any opportunity to litigate such revisions; and (2) serve no purpose other than to limit the effectiveness of the remedies carefully considered and accepted by the Court. In the interest of efficiency, Plaintiffs will not address each of the numerous minor changes proposed by Google, but will instead focus on the larger disputes, new restrictions that Google proposes that limit the utility of the Court's user-side data disclosure and search syndication remedies. Google's justifications are unsupported by any record, as Google did not propose these changes until after the Court issued its opinion, and the Court should reject Google's attempt to re-litigate an issue it could have raised in the months-long proceedings. Finally, these provisions are flawed conceptually and in how they are drafted. Plaintiffs list these ill-suited modifications below along with additional bases to reject them:

### A.   Google's Proposed Data Usage License in Section IV.C.4 of Google's Proposal

Google seeks to introduce a new license for data usage:

> 4.  The data specified in Paragraph IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets, and shall use the datasets for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product.

Plaintiffs oppose this language in its entirety. In addition to the reasons stated above, this provision dramatically narrows the utility of this data to Qualified Competitors with no concomitant benefit.

Google's proposal does not allow a Qualified Competitor to use this data on the same terms that Google may use this data by restricting how it may be used, whether it can be shared, whether it can be sold, and where it may be used. These restrictions will increase costs for Qualified Competitors. First, Google's use restriction is perhaps the most pernicious, as Qualified Competitors may not use the datasets purely to improve their algorithms or products, but rather, only for "serving" users results. Second, Qualified Competitors could not share any data, for example, in a joint venture with an AI company to improve search results or innovate new search-oriented products. Third, Qualified Competitors who currently sell data or search results (for example to GenAI companies) would also be forced, at significant expense, to make the choice of either maintaining a second copy of their data or systems untouched by the data at issue or shut down that business. Fourth, a Qualified Competitor who currently serves results worldwide from one system would be forced to either maintain a second copy of its user data and systems untouched by the data at issue or cease providing search results outside of queries from the United States.

Each of Google's restrictions limits the power of the free market and innovation to make effective use of the data disclosed, and for no benefit. Limiting the already anonymized data further serves no remedial goal. The Court made clear it had "narrowed Plaintiffs' proposals [] to fit the wrong." Rem. Op. at 133. Indeed, the Court concluded that Google's scale advantage was a "fruit" of Google's monopolization that should be denied to Google through the disclosure of data. Rem. Op. at 133. Severely limiting how Qualified Competitors may use this data fails to dislodge the fruit from Google's grasp, leaving rivals holding nothing but dust. Especially as GenAI technologies "may yet prove to be game changers," limiting now how this data may be

used without consideration of new search-oriented applications of this technology risks

undermining the purpose of these remedies. Rem. Op. at 1.

**B.    Google's Proposed Syndication Usage Limitation under Google's V.B.7**

In enumerating the specific changes to Plaintiff's syndication proposal, the Court rejected

Plaintiffs' initial syndication provision that provided no restrictions to how licensees could use

syndicated content, finding that "[o]rdinary commercial restrictions" in Google's syndication

agreements were "consistent with the objective of the search syndication remedy." Rem. Op. at

178. Plaintiffs have implemented this in Section V.B.6. Google did not, and instead proposed

new language:

> V.B.7. The only permitted use of the information and data that Qualified
> Competitors obtain from Google pursuant to this Section V is to display the
> search results to the end user who submitted the associated query, for the
> exclusive purpose of serving users located in the United States through a
> General Search Engine, Search Text Ads, and/or a Third-Party GenAI
> Product.

This formulation goes far beyond the Court's minor revision to Plaintiffs' proposal despite the

Court's clear instruction. And again, Google aims to reduce the effectiveness of the Court's

remedies with unnecessary, untested, and unwise revisions.[6]

**C.    Google's Reduction of Its Syndication Latency and Reliability Obligations in Section V.B.2**

Section V.B.2 requires Google to provide syndication "with latency and reliability

functionally equivalent to what any other user of Google's search syndication products would

receive as of the date of entry of this Final Judgment." Google proposes additional language that

---

[6] Google additionally seeks to impose limitations on Qualified Competitor's ability to service their own syndication clients. *See* Def. FPFJ § V.B.11 ("Queries from a syndicator of the Qualified Competitor . . . are not eligible for syndication under the Final Judgement."). The Court should reject this limitation for the same reasons described here, as well as for the reasons discussed in § III.3, *infra.*

"[f]or the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products." Def. FPFJ § V.B.2. Plaintiffs oppose this language as the language drafted by Plaintiffs and explicitly accepted by the Court already makes clear Google's obligation. Rem. Op. at 169. Google's new language invites Google to challenge the Qualified Competitors' syndication usage and to litigate the cause of any latency or reliability issues.

### D.    Google's Proposed Privacy Regime in Section IV.C.1

Google proposes new language states that "Google shall apply adequate anonymization and privacy-enhancing techniques to ensure the data is anonymized and secured, while attempting to optimize its usefulness." Def. FPFJ § IV.C.1. As drafted, this appears to provide Google with the ability to select anonymization and privacy-enhancing techniques, as well as the optimization of utility with those techniques. Plaintiffs disagree. Plaintiffs' formulation makes clear that it is appropriate for the "Court (and Plaintiffs) to rely on the Technical Committee" to facilitate the resolution of the proper privacy-enhancing techniques to be resolved in this remedy. Rem. Op. at 164.

## III.    Section VI: Search Text Ad Remedies

Effective search text ads syndication is crucial for "'pry[ing] open'" the search text ads market and restarting the flywheel that made Google's monopolies "so durable." Rem. Op. at 183 (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)). Plaintiffs and Google disagree on the implementation of this remedy in three principal ways.

1. Term of the Text Ads and Search Syndication License. The appropriate length of these licenses is five years, a duration intentionally greater than Google's existing syndication agreements to "afford a Qualified Competitor greater certainty to develop its capacity to

compete." Rem. Op. at 175, 185. Google proposes a term of *the lesser of* five years or the FPFJ's remaining duration. Def. FPFJ §§ V.A, VI.B. This restriction reads out of existence the core of the Court's reasoning for setting the term. The Court determined a five-year term for organic syndication was necessary for "Qualified Competitors to offer high-quality results" while developing their own capabilities. Rem. Op. at 175; *id.* at 180 (Qualified Competitors "will be able to deliver high-quality web results for five years while they build their own search index and search stack."). The Search Text Ads term, in turn, is intended to provide a monetization stream during that development process, recognizing that a Qualified Competitor needs certainty to bring products to market and while "develop[ing] its capacity to compete." Rem. Op. at 185. Under Google's formulation, that is only effectively available for the first year of the six-year judgment. Afterwards, the term of the Syndication Licenses stops abruptly after five years, regardless of when the Qualified Competitor began using the service. Google's proposal runs contrary to the plain reading and underlying logic of the Court's opinion, needlessly penalizes new entrants that raise capital to enter after the six-years has already begun to run, and should be rejected.

2. Pricing and Commercial Practice Benchmarking in Text Ads and Search Syndication Licenses. As with the auction disclosure remedy, Google rejects the MFN language ordered by this Court and proposes a rewrite. In its opinion, this Court ordered that: "[T]he Search Text Ads License shall be based on 'financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products.'" Rem. Op. at 185; *see also* Rem. Op. at 174 (ordering that search syndication "[p]ricing shall be based on 'financial terms no worse than those offered to any other user of Google's search syndication products.'"). While the Court ordered that this provision "shall remain unchanged" from Plaintiffs' Revised Proposed Final

Judgment, Rem. Op. at 185, Google seeks to change, and weaken, it. Google's rewrite proposes permitting Google to charge Qualified Competitors "market rates consistent with ordinary commercial terms agreed to by the users of" the syndication product. Def. FPFJ §§ VI.B.2 (text ads), V.B.3 (search). Google's proposed language permits it flexibility inconsistent with the Remedies Opinion: "consistent with ordinary commercial terms" is undefined and vague, and it would permit Google to charge Qualified Competitors prices in excess of those charged at least some existing syndicators. In contrast, Plaintiffs' proposal ensures that Qualified Competitors receive "most-favored-nation pricing" and prevents Google from engaging in any gamesmanship that would, in effect, "charge[] an inflated price to Qualified Competitors." Rem. Op. at 185. Google attempted to justify its rewrite during meetings by claiming that its GSE syndication contracts jointly syndicate both organic search and ads. Google's head of syndication made this same point at trial. Rem. Tr. 3021:3–3022:5 (Jesse Adkins). In its proposed findings of fact, Google opposed Plaintiffs' proposed language on precisely the same grounds. Google PFOF (ECF #1346) at ¶ 913. The Court, presented with this evidence, adopted Plaintiffs' language.

In addition, throughout Section VI, Google seeks blanket rights to apply its "ordinary commercial terms" to various aspects of the text ad syndication agreements. *See, e.g.*, Def. FPFJ §§ VI.B.2, VI.B.4, VI.B.8, VI.B.11. Google makes no effort to define either what the terms are or how they will be determined over time. Plaintiffs propose that these terms are limited to Google's practices as of the Court's Remedies Opinion to eliminate any incentive for Google to engage in future gamesmanship. Preempting such incentives is critical here, as the record already establishes that Google has subtly degraded the quality of its search text ads in ways that harmed consumers. Liab. Op. at 263. Plaintiffs also propose that Qualified Competitors receive features, services, and terms "no less favorable" than Google provides under any current search

syndication agreements," which is a definitive standard as opposed to Google's vague "ordinary commercial terms" standard. Plaintiffs' language is also consistent with the Court's language regarding organic syndication. Rem. Op. at 173 ("A Qualified Competitor who opts into the syndication remedies shall receive organic results and features on terms no less favorable than a current licensee as of the date the judgment is entered.").

3. Scope of Permissible Uses of Text Ads Syndication[7]. Google seeks to add a provision barring Qualified Competitors from using syndicated results to serve "[q]ueries from a syndicator of the Qualified Competitor." Def. FPFJ § VI.B.12. This Court recognized that, using the syndication remedy, "an independent ad platform could emerge to compete with Google." Rem. Op. at 183. Any independent ad platform would, by definition, serve "[q]ueries from a syndicator of the Qualified Competitor," and Google's addition would bar such platforms from relying on the syndication remedy. Google's proposed addition is also more restrictive than its ordinary-course search text ad syndication contracts, which generally permit at least some level of sub-syndication by Google's syndicators for both organic[8] and ads results. *See* RDX0420 at -469, -1488–1491; RDX0401 at -228, -247–51. The Court should reject Google's proposed limitations.

## IV.    Section VII: Compliance, Administration, and Enforcement

Two disagreements explain most discrepancies between Plaintiffs' and Google's Section VII proposals. *First*, Plaintiffs' remedies retain Plaintiffs' enforcement authority under the final judgment while Google's provisions attempt to transfer Plaintiffs' enforcement

---

[7] Plaintiffs separately address Google's newly proposed "permitted use" section for search syndication in § II.B, *supra*.

[8] For this reason, this Court should also reject the limitations on sub-syndication Google proposes in its FPFJ V.B.7. *See supra* § II.B.

authority to this Court alone, requiring it to resolve every procedural dispute between the parties during the term of the final judgment. *Second*, Plaintiffs' remedies reflect the Court's language that the Technical Committee shall "inform and assist the Government in its enforcement efforts," Rem. Op. at 212 (quoting *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1244 (D.C. Cir. 2004)), while Google continues to seek an "equal seat at the table" in the enforcement of the final judgment by adding language that would empower Google to delay or stymie enforcement at every turn simply by objecting, *see* Rem. Op. at 212.

1. Plaintiffs' Enforcement Authority. Plaintiffs' remedies maintain language that empowers the Technical Committee to advise Plaintiffs in their enforcement of the final judgment, while Google's provisions remove the Plaintiffs' enforcement authority in favor of the Court resolving every procedural dispute during the term of the final judgment. For example, Google's newly added Section VII.7.A states that "neither the TC nor Plaintiffs will have the right to make final decisions as to the requirements of this Final Judgment" and "Google will have the right to object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations of or substantive requirements of this Final Judgment." In many other instances, Google simply removes references to the Plaintiffs or replaces them with references to the Court. Def. FPFJ §§ VII.A.2, VII.A.7.c; *see also* Def. FPFJ §§ IV.B.4, IV.C.1, V.B.4, V.B.6, V.B.12, VI.B.12 (examples from other sections).

Google's proposed language contradicts both this Court's rulings and prior case law. In *Massachusetts*, the D.C. Circuit made clear, when endorsing similar compliance and enforcement provisions, that "ultimately the power to enforce the terms of the decree rests with the government." 373 F.3d at 1243 (quoting *United States v. Microsoft*, 231 F. Supp. 2d 144, 198 (D.D.C. 2002) [hereinafter *Microsoft IV*]). Therefore, "the Government's ability to enforce the

decree is clearly strengthened, not diminished, by the existence and composition of the Technical Committee." *Massachusetts*, 373 F.3d at 1244. When this Court approved the Plaintiffs' Technical Committee proposal, it ruled similarly, stating that the Technical Committee is designed to "inform and assist the Government in its enforcement efforts" by "providing technical competence to the [Plaintiffs] in [their] enforcement of the decree." Rem. Op. at 212 (quoting *Massachusetts*, 373 F.3d at 1244). As a result, "*Plaintiffs* and the Technical Committee will have to establish standards and processes" as part of the "practical workings" of the final judgment. *Id.* (emphasis added). Rather than implement the Court's instructions, Google seeks to impose its own standards and processes while using the Technical Committee as a substitute for Plaintiffs' longstanding enforcement authority. But the Technical Committee is "not intended as a substitute for the enforcement authority of the United States." *Microsoft IV*, 231 F. Supp. 2d at 199. By attempting to refashion the compliance and enforcement remedies approved by this Court, Rem. Op. at 212, Google improperly seeks to control the enforcement of remedies imposed due to its own illegal acts.

By contrast, Plaintiffs' remedies—which broadly mirror the provisions approved in *Microsoft IV*—are designed with the Court's instructions in mind. The Court approved Plaintiffs' Technical Committee proposal, Rem. Op. at 212, so Plaintiffs have left Section VII largely unchanged. Where the Court has requested changes—including changes to the functions of the Technical Committee and the addition of data privacy and data security expertise, Rem. Op. at 211–13—Plaintiffs have implemented them. As a result, Plaintiffs' remedies are intended to tailor the compliance provisions approved in *Microsoft IV* to this Court's Remedies Opinion without needless alterations.

Retaining Plaintiffs' enforcement authority also ensures that the final judgment is administrable without unduly burdening this Court. As this Court stated, the establishment of a Technical Committee "provides a process to review and resolve inevitable disputes between the parties—*ideally without further need for judicial intervention.*" *Id.* at 211 (quoting *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 954 (9th Cir. 2025) (emphasis added)). In *Massachusetts*, the D.C. Circuit viewed the value of administrability similarly when evaluating compliance and enforcement procedures nearly identical to those proposed by Plaintiffs, affirming the district court's view that such compliance provisions are "mechanisms established for the government's and ultimately the Court's benefit." 373 F.3d at 1244.

Plaintiffs' role in enforcing the final judgment is not just proper formally, but also pragmatically. Plaintiffs and the Technical Committee are tasked with establishing a wide array of standards and processes as part of their role in establishing the "practical workings" of the final judgment. Rem. Op. at 212 (quoting *Massachusetts*, 373 F.3d at 1244 (citation omitted)). To carry out their enforcement and advising functions, respectively, Plaintiffs and the Technical Committee will need processes not just to make one-time determinations, but also to manage frequent and ongoing (1) requests for documents, data, access to facilities, (2) complaints concerning Google's compliance with the final judgment, (3) Technical Committee requests to hire staff or consultants, and more. Consistent with the Court's language that compliance and enforcement procedures should enable the resolution of disputes "without further need for judicial intervention," Plaintiffs' remedies seek to minimize the administrative burden on this Court by establishing mechanisms to resolve most disputes without requiring the Court's involvement in the first instance. *Id.* at 211 (quoting *In re Google Play Store*, 147 F.4th at 954).

Google's Section VII provisions, by contrast, strip Plaintiffs of their ability to resolve such disputes without judicial intervention, forcing this Court to resolve, in the first instance, every procedural dispute during the term of the final judgment. For example, Google's proposal would require this Court to resolve such granular and ongoing disputes as what data the Technical Committee can request from a single Google manager, what Google buildings the Technical Committee can enter, and what staff the Technical Committee can hire. *See, e.g.*, Def. FPFJ §§ VII.A.7.j, VII.A.7.l. Such a proposal is both improper and unadministrable. As this Court found, compliance and enforcement procedures like those involving the Technical Committee provide "a process to review and resolve the inevitable disputes between the parties—ideally without further need for judicial intervention." Rem. Op. at 211 (quoting *In re Google Play* Store, 147 F.4th at 954). In *Microsoft IV*, the court was even more explicit, holding that such provisions "can only assist Plaintiffs' enforcement efforts and should not be viewed as a hindrance or a cause of delay." 231 F. Supp. 2d. at 199. By rewriting Section VII and stripping the Plaintiffs of their enforcement role, Google twists the proposal adopted by this Court, Rem. Op. at 212, into a morass of procedures where Google can delay or stymie enforcement at every turn simply by objecting.

2. Google's Role in Enforcement. A corollary to the parties' disagreement on the Plaintiffs' proper enforcement authority is their disagreement over what role Google should play in enforcing the final judgment. Whereas Plaintiffs' remedies retain references to the Plaintiffs throughout Section VII to reflect the belief that the Plaintiffs, not Google, retain enforcement authority, Google's proposal replaces "Plaintiffs" with "the parties" such that Google would wield enforcement powers over a final judgment meant to remedy its own illegal acts. For example, Google's provisions grant Google oversight and approval powers over the Technical

Committee, including (1) the ability to object to the terms of a Technical Committee member's appointment, Def. FPFJ § VII.A.6.a, (2) the ability to object to the Technical Committee's staff and consultant hiring decisions, Def. FPFJ § VII.A.7.l, (3) the ability to object to the Technical Committee's requests for documents, data, or access, Def. FPFJ § VII.A.7.j, (4) the ability to object to any expenses incurred by the Technical Committee, Def. FPFJ § VII.A.7.m, and (5) the affordance to receive regular reports from the Technical Committee regarding the actions it has taken, Def. FPFJ § VII.A.7.k.

Google's proposal is another improper attempt to acquire an "equal seat at the table." Rem. Op. at 212. As this Court explicitly stated, Google's attempts to exert co-equal control over the Technical Committee "misconstrues the Committee's purpose." *Id.* The Technical Committee is not a "neutral arbiter" assisting both parties, but rather a remedial mechanism designed to "inform and assist the Government in its enforcement efforts." *Id.* (quoting *Massachusetts*, 373 F.3d at 1244). Permitting Google to exert such control over provisions meant to remedy its own illegal acts flouts the Court's own explicit instructions and completely undermines the remedial purpose of the final judgment. It would allow Google to rebuff and delay remedial work at every step. For these reasons, the Plaintiffs' remedies have adopted language from the compliance provisions approved in *Microsoft IV* empowering the Plaintiffs, in consultation with the Technical Committee, to enforce the final judgment, rather than the parties.

## V.    Section IX: Definitions

Plaintiffs briefly explain key outstanding discrepancies in the definitions used by the parties below.

A.    **Device and Covered Device**

| Plaintiffs' Section IX.H | Google's Sections IX.F |
|---|---|
| "Device" or "device" means any single smartphone, tablet, laptop, or desktop. For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices). | "Covered Device" means a smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed. |

Plaintiffs' definition of "device" and Google's parallel definition of "Covered Device" contain one substantive difference and one notable stylistic difference.

As to substance, Plaintiffs' and Google's definitions differ on whether "device" or "Covered Device" includes devices (namely, laptops) running on the ChromeOS operating system. The effect of this discrepancy manifests primarily in Sections III.A–K of the final judgment, which ban various forms of exclusive dealing with device manufacturers. In the two days before the filing of this brief, Google explained for the first time that these provisions should apply to third-party manufacturers of devices running on any operating system—including Google's own Android operating system and personal-computer operating systems such as Windows—except ChromeOS. The only rationale Google could offer in its defense is that ChromeOS devices will not work without Chrome.

The time for Google to defend the need for exclusive dealing with device manufacturers has passed. In any case, if Google's assertion is correct, then manufacturers of ChromeOS devices will want Chrome and, like an Android or Windows device manufacturer, can receive Chrome under agreements permitted by Plaintiffs' remedies. More broadly, Google's argument has no relevance to most of Section III's provisions. Section III.E, for example, prohibits Google from paying a partner to refrain from distributing a rival general search service. Google has

offered no reason why it needs to enter such a nakedly exclusive and anticompetitive agreement with a manufacturer of ChromeOS devices.

As to style, Google's definition contains unnecessary ambiguity on whether "device" refers to a model of device (e.g., all Apple iPhone 16 Pros) or each individual device. When evaluating the adequacy of Google's proposed prohibitory injunctive relief, this Court interpreted Google's proposed remedies as permitting "OEMs and carriers . . . to preload different GSEs on a device-by-device, access-point-by-access-point basis," such that an OEM or carrier "could make different GSEs the search widget default on different devices without putting at risk revenue share from Google." Rem. Op. at 105. Accordingly, Plaintiffs have added clarifying language to the definition of "device" to ensure OEMs and carriers retain the ability to preload or make default different GSEs on a device-by-device basis. Preserving this flexibility for OEMs and carriers is not only in line with the Court's language but also enables GSEs to more actively compete across devices. For example, Plaintiffs' "device" definition would ensure that an OEM like Motorola could contract with a Competitor to Google for preloading or default status on a percentage of its Motorola Edge 2025 devices, rather than bundle all Motorola Edge 2025 devices with Google. Plaintiffs do not understand Google to object to Plaintiffs' view that "device" should be defined to include only one device. Accordingly, this definitional difference is purely stylistic, and Plaintiffs' definition is preferable to reduce ambiguity.

### B.  GenAI Product and Related Definitions

Plaintiffs and Google differ in their structural approach to defining GenAI products. Plaintiffs adopt a universal definition for "GenAI Product," Pls. FPFJ § IX.J, while Google employs three competing definitions: (1) "Google GenAI Assistant Application," Def. FPFJ § IX.L, (2) "Third-Party GenAI Assistive Service," Def. FPFJ § IX.Y, and (3) "Third-Party GenAI Product," Def. FPFJ § IX.Z. As an initial matter, Plaintiffs believe Google's separation of

"GenAI Product" into three competing definitions—and omission of any Google GenAI Product definition—unnecessarily complicates the final judgment's treatment of GenAI Products. This Court was clear in holding that "the final judgment will reach GenAI technologies and companies." Rem. Op. at 103. In so holding, this Court explicitly adopted the Plaintiffs' definition of GenAI Product. Rem. Op. at 103, 103 n.8. Google's decision to restructure the final judgment's treatment of GenAI Products is thus unsupported by the Court's opinion.

The core disagreement between the parties involves Google's attempt to limit the scope of GenAI Products covered by the final judgment. Whereas Plaintiffs' definition extends to "any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models," Pls. FPFJ § IX.J, Google's definitions further narrow what GenAI Products are covered in two ways. In eight instances, Google applies definitions involving a "GenAI Assistant Application," defined as a "stand-alone user-facing mobile software application . . . that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information." *See* Def. FPFJ §§ IX.L, IX.Y. In six, Google applies its definition of "Third-Party GenAI Product," which limits Plaintiffs' definition to only third-party GenAI Products that have "among [their] principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information." Def. FPFJ § IX.Z.

Google improperly limits the scope of GenAI Products subject to the final judgment. In holding that the "final judgment will reach GenAI technologies and companies," Rem. Op. at 103, this Court was clear that the final judgment shall extend to any GenAI Product with the "capacity to fulfill a broad array of informational needs," Rem. Op. at 100 (quoting *United States*

28

*v. Google LLC*, 747 F. Supp. 3d 1, 110–11 (D.D.C. 2024)) (internal quotations omitted). The Court did not limit its analysis to assistant applications or third-party GenAI Products, as Google proposes. Rather, this Court explicitly considered "Google's own product development" and "integration between Search and GenAI" as reasons to include GenAI Products under the final judgment. Rem. Op. at 102. Nor did the Court limit its analysis to GenAI Products that have a "principal function" of "answering information-seeking prompts." *See* Def. FPFJ §§ IX.L, IX.Y–Z. Instead, this Court clarified that it is the mere "*capacity* to fulfill a broad array of information needs" that "renders GenAI a potential threat to Google's dominance in the market for general search services." Rem. Op. at 100 (emphasis added) (internal quotations omitted). The Court's reasoning reflects market realities: GenAI Products are emerging technologies with rapidly developing features, functionalities, and modes of interaction that may continue to evolve during the term of the final judgment. Google's attempt to restrict what GenAI Products are covered by the final judgment based on their form or "principal function" thus not only excludes relevant Google GenAI Products from the final judgment today but also ignores any possibility that nascent GenAI competitors may disrupt Google's market dominance through future innovations. Such restrictions only enable Google to "use the same anticompetitive playbook for its GenAI products that it used for Search." Rem. Op. at 99. Therefore, Plaintiffs have retained the simple GenAI Product definition adopted by the Court. Rem. Op. at 103, 103 n.8.

### C.    General Search Engine

| Plaintiffs' Section IX.K | Google's Sections IX.I |
|---|---|
| "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt. | "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt, and that attempts to answer all queries (rather than only regarding particular topics). "General Search Engine" or "GSE" also has the |

| | meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032. |
|---|---|

The parties' definitions of "General Search Engine" differ in two respects: (1) Plaintiffs' removal of the cross-reference to the Court's liability opinion and (2) Google's inclusion of a clause limiting its definition to only a software or service that "attempts to answer all queries (rather than only regarding particular topics)." Plaintiffs view the first difference as mainly stylistic; the definition adopted by Plaintiffs here is functionally equivalent to the definition defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, so Plaintiffs' decision not to include the cross-reference is intended to promote clarity, reduce redundancies, and ensure that all relevant aspects of the final judgment are included within it rather than cross-referenced with other documents.

Google's inclusion of new language limiting the definition of "General Search Engine" to only software or a service that "attempts to answer *all queries*" (emphasis added), however, is substantive. In a meeting, Google described its intent for this phrase to exclude specialized vertical providers from the definition of "General Search Engine." Plaintiffs do not object to that outcome, which is entirely consistent with the Court's liability opinion. However, Google's proposed language sweeps far more broadly. Under Google's definition, any choice by a GSE not to attempt to answer a user query would exclude that GSE under the final judgment, no matter the reason. Taken to the extreme, a GSE's content moderation decisions, language limitations, or even legal restrictions would exclude that GSE from Google's definition. Plaintiffs do not understand Google to contend that such an outcome is proper, so Plaintiffs have opted to use the definition adopted by the Court.

### D.    Qualified Competitor and Competitor

The Court accepted Plaintiffs' definitions of "Qualified Competitor" and "Competitor," with two instructions to modify the terms to make clear that "OpenAI and similar firms, like Anthropic and Perplexity" meet the definition. Rem. Op. at 103, 103 n.8. Plaintiffs executed this change. Pls. FPFJ §§ IX.E, IX.W. The Court also accepted Plaintiffs' proposal that the Technical Committee bear responsibility for "advis[ing] Plaintiffs about potential Qualified Competitors." Rem. Op. at 211 (citing Pls. RPFJ § III.U). The Court did not require Court involvement in the certification process nor require any re-certification, instead explicitly stating that "[o]f course, for a 'Competitor' to become a 'Qualified Competitor,' it would have to demonstrate to Plaintiffs and the Technical Committee that it has 'a plan to invest and compete in [or with] the GSE and/or Search Text Ads markets . . . .'"  Rem. Op. at 103 n.8 (quoting Pls. RPFJ § III.U).

Google did not accept the Court's definitions and proposed substantial additions. These changes (1) burden Qualified Competitors with additional re-certification procedures and (2) burden the Court by asking it to be directly involved with the certification, and proposed annual re-certification, of every Qualified Competitor. *See* Def. FPFJ § IX.T. Specifically, Google demands that the Court, and not Plaintiff United States, determine that each Qualified Competitor "does not pose a risk to the national security of the United States." Def. FPFJ § IX.T. National security concerns are the purview of the Executive Branch of the United States. *Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 926–27 (D.C. Cir. 2003) ("It is . . . well-established that the judiciary owes some measure of deference to the executive in cases implicating national security, a uniquely executive purview.").

Dated: September 17, 2025

Respectfully submitted,

*/s/ Karl E. Herrmann*
David E. Dahlquist
Travis R. Chapman (D.C. Bar #90031151)
Grant M. Fergusson (D.C. Bar #90004882)
R. Cameron Gower
Karl E. Herrmann (D.C. Bar #1022464)
Ryan T. Karr
Michael G. McLellan (D.C. Bar #489217)

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 805-8563
David.Dahlquist@usdoj.gov
Travis.Chapman@usdoj.gov
Karl.Herrmann@usdoj.gov

*Counsel for Plaintiff*
*United States of America*

By:    /s/ Lee Istrail
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of
Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By:    /s/ Diamante Smith
Ken Paxton, Attorney General
Brent Webster, First Assistant
Attorney General
Ralph Molina, Deputy First Assistant
Attorney General
Austin Kinghorn, Deputy Attorney
General for Civil Litigation
Thomas York, Division Chief,
Antitrust Division
Diamante Smith, Assistant Attorney
General, Antitrust Division
Office of the Attorney General, State
of Texas
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1162
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By:    /s/ Carolyn D. Jeffries
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney
General
Michael Jorgenson, Supervising Deputy
Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney
General (DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice

455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

Amanda J. Wentz
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
Phone: (501) 682-1178
Fax: (501) 682-8118
Amanda.Wentz@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney General
Ronald J. Stay, Jr., Senior Assistant
Attorney General
Charles Thimmesch, Senior Assistant
Attorney General
Office of the Attorney General, State of
Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and
Director, Consumer Protection Division
Jesse Moore, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of
Indiana
Indiana Government Center South, Fifth
Floor
302 West Washington Street
Indianapolis, Indiana 46204
Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the
Office of Consumer Protection
Philip R. Heleringer, Executive Director of
the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive
Director of the Office of Consumer
Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of
Kentucky*

Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General, State of
Louisiana
Public Protection Division
1885 North Third St.
Baton Rouge, Louisiana 70802
nachabea@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

Alison Esbeck
Missouri Bar No. 58501
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
Alison.esbeck@ago.mo.gov

Phone: 314-340-4977
Fax: 314-340-7981
*Counsel for Plaintiff State of
Missouri*

Lynn Fitch, Attorney General
Crystal Utley Secoy, Assistant Attorney
General
Lee Morris, Special Assistant Attorney
General
Office of the Attorney General, State of
Mississippi
P.O. Box 220
Jackson, Mississippi 39205
Crystal.Utley@ago.ms.gov
Lee.Morris@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

Anna Schneider
Special Assistant Attorney General, Senior
Counsel
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT. 59602-0150
Phone: (406) 444-4500
Fax: 406-442-1894
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant
Deputy Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Office of the Attorney General, State of
South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

Joshua L. Kaul, Attorney General
Caitlin M. Madden, Assistant Attorney
General
Wisconsin Department of Justice
17 W. Main St.
Madison, Wisconsin 53701
caitlin.madden@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*

PHILIP WEISER
Attorney General of Colorado

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney
General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Matthew Michaloski, Assistant Attorney General
Marie W.L. Martin, Deputy Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mmichaloski@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

STEPHEN COX
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Fred Nishihira
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-3324
E-Mail: fnishihira@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawai'i

Rodney I. Kimura
Department of the Attorney General, State
of Hawai'i
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549

E-Mail: John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Christopher Teters
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: chris.teters@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Melissa English
Office of the Attorney General of
Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
menglish@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of
Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of
Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker

Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New
Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New
Hampshire*

MATTHEW PLATKIN
Attorney General of New Jersey

Yale A. Leber
Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (609) 376-2383
E-Mail: Yale.Leber@law.njoag.gov
Abiola.Miles@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.

Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust
Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North
Dakota*

DAVID YOST
Attorney General of Ohio

Beth Ann Finnerty, Section Chief,
Antitrust
Sarah Mader, Assistant Attorney General,
Antitrust
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Beth.Finnerty@ohioago.gov
Sarah.Mader@ohioago.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Malisa McPherson
Office of the Oklahoma Attorney General
313 NE 21st Street

Oklahoma City, OK 73105
Telephone: (405) 522-2297
E-Mail: Malisa.Mcpherson@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Cheryl Hiemstra, Special Assistant
Attorney General
Gina Ko, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 934-4400
E-Mail: Cheryl.Hiemstra@doj.oregon.gov
Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of
Pennsylvania*

LOURDES L. GÓMEZ TORRES
Secretary of Justice

TANIA L. FERNÁNDEZ-MEDERO
Assistant Secretary of Justice

SAMUEL WISCOVITCH-CORALI
Deputy Undersecretary

Pablo Tufiño-Soto
Senior Attorney

Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, Ext. 1205
E-Mail: ptufino@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto
Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney
General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South
Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South
Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney
General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov

*Counsel for Plaintiff State of Vermont*

JASON S. MIYARES
Attorney General of Virginia

Tyler T. Henry
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of
West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

KEITH KAUTZ
Attorney General of Wyoming

William T. Young

Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*