**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████ |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | ███████████████ |
| Defendant. | |

**DEFENDANT GOOGLE LLC'S BRIEF IN SUPPORT OF ENTRY OF ITS**
**<u>PROPOSED FINAL JUDGMENT</u>**

# TABLE OF CONTENTS

I.  PLAINTIFFS' PROPOSALS REGARDING "GENAI PRODUCTS" ARE VASTLY OVERBROAD. .................................................................................2

II.  PLAINTIFFS' PROPOSED REWRITE OF THE GOOGLE PROPOSED PROHIBITORY INJUNCTION IS CONTRARY TO THE LAW, THE FACTS, AND THE COURT'S OPINION..........................................................................7

  A.  The Court Should Reject Plaintiffs' Attempt to Overhaul Google's Proposed Injunction. ..................................................................................7

    1.  Plaintiffs' PFJ extends to devices and agreements that were not the subject of any claims or findings.....................................................................7

    2.  Plaintiffs' PFJ encompasses hypothetical conduct that was not the subject of any claims or findings.....................................................................9

    3.  Plaintiffs' expansion of the "forward-looking" remedies is contrary to precedent and the Court's opinion. ........................................................ 10

    4.  Plaintiffs' proposed limits on the duration of agreements are unreasonable and impermissibly regulate third parties.................................................. 13

    5.  Plaintiffs' generalized prohibition on "exclusive" contracts is unenforceable. ...................................................................................... 14

  B.  Google's PFJ Implements the Court's Modifications to the Prohibitory Injunction. ..................................................................................................15

    1.  Google's PFJ requires annual terminability for OEM and carrier agreements. ...................................................................................... 16

    2.  Google's PFJ expressly authorizes promotion of Third-Party GenAI Products............................................................................................. 16

    3.  Google's PFJ expands the definition of "Gemini Assistant Application."18

III.  GOOGLE'S PROPOSED LANGUAGE FOR THE DATA DISCLOSURE AND SYNDICATION PROVISIONS TRACKS THE COURT'S OPINION, WHEREAS PLAINTIFFS' LANGUAGE WOULD STRETCH THE REMEDY BEYOND THE OPINION'S BOUNDS. .................................................................19

  A.  Plaintiffs' Definitions Would Expand "Qualified Competitor" Eligibility Far Beyond That Ever Previously Pursued by Plaintiffs. ......................................19

  B.  Restrictions Are Necessary to Ensure the Datasets and Syndicated Results and Ads Are Used Only for the Court's Intended Objectives. ..............................20

    1.  Permitting Qualified Competitors to sell or share Google's index data and user-side data would undermine the remedy's purpose and violate user privacy and security. .............................................................................. 20

    2.  Permitting Qualified Competitors to use syndicated search results and ads for other purposes would likewise undermine the remedy's purpose....... 21

C.      Plaintiffs' Rewritten User-Side Data Sharing Proposal Improperly Gives
        Plaintiffs Unilateral Decision-Making Control over the Privacy and
        Security Safeguards to Be Applied. .................................................................22

D.      The Court Should Reject Syndication Provisions that Would Require a
        Departure from Google's Ordinary Commercial Terms. .....................................25

E.      The Court Should Enter Google's Proposed Language for the Remaining
        Disputed Data-Sharing, Syndication, and Auction Provisions. ...........................29

IV.     PLAINTIFFS' TECHNICAL COMMITTEE AND COMPLIANCE
        PROPOSALS SHOULD BE REJECTED. ......................................................................30

A.      Plaintiffs' PFJ Impermissibly Delegates Substantive Powers to the TC and
        Plaintiffs to Define Affirmative Remedy Obligations. .........................................30

B.      Plaintiffs Seek to Expand the TC's Role Beyond the Court's Opinion. ................32

C.      Plaintiffs' Proposed "Senior Business Executive" Provision Is
        Unworkable. ..........................................................................................................34

D.      Plaintiffs' Document Retention Provisions Are Unnecessary and
        Overbroad. ............................................................................................................34

E.      Plaintiffs' Proposal for Unlimited Compliance Reports, Interrogatories,
        Interviews, and Document Requests Is Unreasonable. .........................................35

V.      PLAINTIFFS' PROPOSED ENFORCEMENT PROVISIONS ARE
        CONTRARY TO PRECEDENT. ....................................................................................36

VI.     CONCLUSION ................................................................................................................39

**ABBREVIATIONS**

| CITATION | CORRESPONDING FILING OR TRANSCRIPT |
|---|---|
| Google's PFJ | Google's Proposed Final Judgment Dated September 17, 2025. |
| Pls.' PFJ | Plaintiffs' Final Proposed Final Judgment Dated September 17, 2025. |
| Rem. Op. | Memorandum Opinion Regarding Remedies Dated September 2, 2025 (ECF 1435). |
| Tr. | Transcript of the Evidentiary Hearing on Remedies Conducted from April 21 to May 9, 2025 and May 30, 2025. |
| Google's Orig. PFJ | Google's Proposed Final Judgment Dated December 20, 2024 (ECF 1108-1). |
| Pls.' Orig. RPFJ | Plaintiffs' Revised Proposed Final Judgment Dated March 7, 2025 (ECF 1184-1). |
| Pls.' RPFOF | Plaintiffs' Remedies Responsive Proposed Findings of Fact Dated May 23, 2025 (ECF 1364). |
| Google's PFOF | Google's Proposed Findings of Fact Dated May 16, 2025 (ECF 1346). |

Google respectfully requests that the Court enter the attached Proposed Final Judgment (PFJ), which implements the findings and conclusions in the Court's September 2, 2025 opinion, and reject the alternative proposal filed today by Plaintiffs.

First, Google has adopted definitions relating to generative artificial intelligence that conform to the Court's remedies opinion. Plaintiffs' proposal, by contrast, would encompass Google products that have nothing to do with the relevant markets and are unrelated to the evidentiary record and contrary to the Court's findings. Their approach squarely contradicts *Microsoft*'s holdings regarding "forward-looking" remedies.

Second, Google made the specific modifications to the prohibitory injunction (Section III of its PFJ) that the Court directed. Plaintiffs disregarded the Court's conclusions and rewrote the proposed injunction, and their changes find no support in the law or the Court's findings.

Third, Google's PFJ implements the Court's determinations regarding compelled data disclosures and syndication. Plaintiffs' proposals run afoul of the Court's opinion, even on matters as fundamental as whether a Qualified Competitor may sell the data received from Google. And they have backtracked on their own prior representations, including with respect to the Court's ultimate authority to determine crucial issues surrounding user privacy.

Fourth, Google's provisions addressing the Technical Committee and final judgment compliance track the Court's description of the Technical Committee's role and its rejection of several remedies proposed by Plaintiffs. The PFJ submitted by Plaintiffs fails to account for these determinations and is fundamentally unworkable in several respects.

Fifth, Google proposes straightforward enforcement provisions that are consistent with the remedies opinion and precedent. Plaintiffs' additional proposals find no support in the record and reflect misstatements of law.

## I.    PLAINTIFFS' PROPOSALS REGARDING "GENAI PRODUCTS" ARE VASTLY OVERBROAD.

Unlike Google's PFJ, which is tethered to the products and issues addressed during the litigation and in the Court's remedies opinion, Plaintiffs' PFJ seeks to regulate countless Google products and services that are unconnected to the liability determination, the evidentiary record from both the liability and remedies trials, and the Court's remedies findings.  Plaintiffs seek to accomplish this improper objective primarily through their definition of "GenAI Product," which they define to mean "***any*** application, software, service, feature, tool, functionality, or product ***that involves or makes use of Generative AI capabilities or models***."  Pls.' PFJ § IX.J (emphasis added).  This definition is far too broad and would reach across Google products having nothing to do with general search services or general search text advertising (or even GenAI products like Google Gemini).

GenAI capabilities and models are "widely used across many industries," from "health care and life sciences" to "travel and hospitality."  Tr. 4055:17-4056:17 (Hitt).  Google has incorporated GenAI into every product of significance that it offers.  Tr. 3329:13-16 (Collins).  For instance, GenAI facilitates video and audio generation in YouTube, helps Google Photos users find old pictures, drafts emails in Gmail, and summarizes documents in Google Drive.  *Id.* 3321:12-3322:25, 3328:8-3329:12.  And these examples barely scratch the surface, as GenAI has played a role in everything from self-driving cars to predicting protein structures.  *E.g.*, Tr. 2449:18-2450:13 (Pichai).

Plaintiffs' proposed definition of "GenAI Product" would encompass these technologies and many more "that involve[] or make[] use of Generative AI capabilities or models" in some respect.  Pls.' PFJ § IX.J.  Because terms incorporating the definition of "GenAI Product" appear throughout Plaintiffs' proposed prohibitory injunction, Plaintiffs' proposal would regulate

Google's distribution of all manner of applications and services unrelated to this case, including but not limited to Google Photos, Messenger, Gmail, Google Drive (Google's cloud storage service), and Google Workspace (Google's suite of office productivity applications like Google Docs, Google Sheets, and Google Slides).  *Id.* §§ III.D, G-O.[1]  The term also affects the provisions requiring data disclosures and syndication because "GenAI Product" is part of the definition of "Competitor," which in turn appears in "Qualified Competitor."  *Id.* §§ IX.E, W; *see id.* §§ IV.A, IV.B, V.A, VI.B.  As the Court directed, a "Competitor" includes "any provider of, or potential entrant in the provision of, … a GenAI Product."  *Id.* § III.E.  But under Plaintiffs' overbroad definition of "GenAI Product," a "Competitor" purportedly could include countless enterprise software companies, e-commerce sites, and social media platforms.  All of this is contrary to the facts and the law that informed the Court's liability and remedies opinions.

*First*, the myriad "GenAI Products" that Plaintiffs seek to regulate formed no part of the Court's liability determination, which was limited to the relevant markets for general search services and general search text advertising.  "Ordinarily," a court may "conclude rather swiftly that products which fall outside of the relevant market ***are inappropriate for discussion and consideration*** by the Court in conjunction with the crafting of a remedy for illegal monopoly maintenance."  *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 104 (D.D.C. 2002) (emphasis added).  Nearly all of the "GenAI Products" encompassed by Plaintiffs' definition did not come up at trial because there is no credible argument (then or now) that they are even related to the

---

[1] The term "GenAI Product" appears in several other defined terms in Plaintiffs' PFJ, including "Google GenAI Product," "Third-Party GenAI Product," and "Google Assistant Application."  Pls.' PFJ §§ IX.M, N, FF.  These terms are part of Plaintiffs' proposed prohibitory injunction in Section III.

relevant markets or Plaintiffs' theory of liability.  The liability opinion thus offers no basis for regulating development or distribution of these applications and services.

*Second*, Plaintiffs did not present any evidence at the remedies hearing that could support regulating "GenAI Products" as they have defined the term.  Indeed, most of the products encompassed by that term were ***not even deemed relevant for discovery purposes*** during the remedies phase.  For example, Plaintiffs argued that even in the context of their overbroad requests for production, they were "focused on discovery" regarding "generative AI as it relates to Search, Search access points and Search features."  Oct. 24, 2024 Hr'g Tr. 13:7-10; *see id.* 14:25-15:1 ("If it doesn't relate to Search, we're not interested in that.").  After limiting discovery in this way, Plaintiffs unsurprisingly did not present evidence at the hearing regarding competition among messaging apps, email services, or the plethora of other products that may "involve[] or make[] use of Generative AI capabilities or models."  Pls.' PFJ § IX.J.  In *Microsoft*, the court rejected the plaintiffs' argument that the remedy should extend to products outside the relevant market—such as web services and handheld devices—***even though*** the plaintiffs offered a "wide array of testimony" to support inclusion of those products in the remedy.  *New York*, 224 F. Supp. 2d at 134.  It is inconceivable, then, that the judgment could regulate all "GenAI Products" despite Plaintiffs having offered ***no evidence*** regarding the vast majority of products encompassed by the term.  *See id.* at 136.

*Third*, the Court made no findings that could support Plaintiffs' definition of "GenAI Products" and the related terms in their PFJ.  Although the remedies opinion addresses certain specific applications of GenAI, there are no findings applicable to photo apps, email, videoconferencing tools, or countless other products that may be ensnared by Plaintiffs' proposal.  To the limited extent that the opinion alluded to some of these products, it made clear

that they should **not** be subject to the final judgment.  For instance, the Court observed that "[s]urely, Plaintiffs do not intend for the compliance officer's duties to reach such Alphabet subsidiaries like YouTube, Nest, or Waymo."  Rem. Op. at 222.  By the same token, the final judgment's prohibitions surely cannot encompass the products offered by YouTube, Nest, and Waymo, even if they "involve[] or make[] use of Generative AI capabilities or models."  Pls.' PFJ § IX.J.  Yet that is precisely what Plaintiffs seek.

In contrast to Plaintiffs' overbroad proposal, Google's PFJ conforms to the remedies opinion by providing that a product may fall within an applicable definition pertaining to GenAI if, among other things, it "has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information."  Google's PFJ §§ IX.L, Y, Z.  These definitions implement the Court's conclusion that **certain kinds of products** that include GenAI capabilities or models "perform an information-retrieval function that is similar to GSEs" and pose "a potential threat … in the market for general search services."  Rem. Op. at 99-100; *see id.* at 22-26 (describing "AI Chatbots" that "perform an information-retrieval function like that performed by GSEs" and "AI Assistants" with "voice- assistant capabilities built into … chatbots").  Consistent with the Court's opinion, Google's proposed definitions encompass "GenAI chatbots, like ChatGPT, Perplexity, and Claude," which the Court found are used by "tens of millions of people … to gather information that they previously sought through internet search."  Rem. Op. at 1; *see id.* at 103.  And Google's proposals do not include Photos, Gmail, Drive, or the myriad other Google and third-party services that incorporate GenAI functionality but have not been shown to "perform an information-retrieval function that is similar to GSEs," let alone the "potential to become a viable platform substitute for" GSEs.  Rem. Op. at 99, 103.

*Fourth*, *Microsoft* precludes Plaintiffs' broader definition of "GenAI Product."  In addressing GenAI, this Court relied upon the *Microsoft* court's decision to extend a remedy to aspects of "server/network computing," which posed a "platform threat" to "Microsoft's dominance" in the monopolized market that was "both real and similar" to the platform "threats posed by Navigator and the Java technologies."  *New York*, 224 F. Supp. 2d at 128; *see* Rem. Op. at 101-02.  Despite affording certain protections to "server/network computing," however, the *Microsoft* court ***rejected*** the plaintiffs' proposal to extend the decree to all "middleware" because "the vast majority of the software technologies identified in Plaintiffs' definitions" of "middleware" were not shown to "have the potential to evolve into platforms … akin or equivalent to … Navigator and Java."  *New York*, 224 F. Supp. 2d at 136.  Plaintiffs' definition of "GenAI Product" and related terms should be rejected for the same reason: While the Court found that a particular subset of products pose "a potential threat … in the market for general search services" because they "perform an information-retrieval function that is similar to GSEs," Rem. Op. at 99-100, there are no such findings for the vast majority of applications of GenAI potentially encompassed by Plaintiffs' definitions.

As with the remedy directed to server/network computing in *Microsoft*, this Court's rulings regarding GenAI are the "most forward-looking" elements of its decision, and the Court's "discretion [wa]s necessarily less broad."  *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1222-24 (D.C. Cir. 2004).  Even where the facts and law establish the "appropriateness of a forward-looking remedy, the Court treats every expansion of protection with great caution and makes every attempt to craft a remedy which is no more expansive than necessary."  *New York*, 224 F. Supp. 2d at 135; *see Massachusetts*, 373 F.3d at 1224-26.  The Court should reject Plaintiffs' attempt to regulate disparate "GenAI Products" that were not even the subject of

remedies findings, let alone liability determinations, and it should instead adopt Google's proposed definitions and corresponding provisions.

## II.    PLAINTIFFS' PROPOSED REWRITE OF THE GOOGLE PROPOSED PROHIBITORY INJUNCTION IS CONTRARY TO THE LAW, THE FACTS, AND THE COURT'S OPINION.

The Court "accept[ed], with its modifications, Google's proposed remedies in full." Rem. Op. at 222.  But Plaintiffs have ignored the Court's ruling, adding provisions that were never litigated, reintroducing concepts that were rejected, and seeking to inject ambiguity through terms that Plaintiffs cannot explain.

### A.    The Court Should Reject Plaintiffs' Attempt to Overhaul Google's Proposed Injunction.

#### 1.    Plaintiffs' PFJ extends to devices and agreements that were not the subject of any claims or findings.

Plaintiffs propose a flawed definition of the term "device," which impermissibly expands many of the provisions in Google's proposed final judgment that the Court accepted.  *See* Pls.' PFJ § IX.H.  Google's PFJ provisions pertaining to Third-Party Browsers have always applied to all applicable form factors (*i.e.*, mobile phones, tablets, laptops, and desktops) because the agreements at issue in this case pertained to browsers available on all such surfaces, while the remaining provisions were expressly directed to agreements with "a mobile device manufacturer or wireless carrier" involving "mobile phones and tablets," as that addressed the at issue Android distribution agreements.  *See* Google's Orig. PFJ § III.  This approach tracked Plaintiffs' theory of liability and the Court's findings.

Plaintiffs' proposal, by contrast, reaches distribution involving devices never at issue in this litigation.  For example, Plaintiffs' proposed decree covers devices running Google's ChromeOS operating system even though Plaintiffs never challenged agreements with companies that manufacture Chromebooks, let alone established that those agreements harm

competition.  To paraphrase part of the Court's rationale for rejecting the "self-preferencing" remedy, the Court "made no finding in the liability phase" that agreements pertaining to Chromebooks were "unlawful" even though Plaintiffs could have challenged those agreements because they were "hiding in plain sight."  Rem. Op. at 216-17.

If Plaintiffs had challenged agreements pertaining to Google's licensing and distribution of Chromebooks and the Google apps that are included therein, Google would have presented extensive evidence of how the design and distribution of ChromeOS differs from the agreements at issue in this case.  For example, the PFJ's restrictions on distributing the Chrome browser cannot reasonably be applied to Chromebooks because "the Chrome browser *is* the UI [user interface] for … a ChromeOS device or Chromebook."  Tr. 3892:17-20 (Samat) (emphasis added).  "In other words, without Chrome, you don't have the user interface, and … you can't even see the [w]indows on your screen" on a Chromebook.  Tr. 2611:6-10 (Nieh).  In fact, Google employees conducted a years-long project where they "tried to take apart ChromeOS and Chrome and separate them," but they "failed" and "gave up," which is "further evidence that ChromeOS today is deeply integrated with Chrome."  *Id.* 2611:11-23.  "[R]emedies must be of the 'same type or class' as the violations," *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995), and an overhaul of the design and licensing of ChromeOS does not meet that standard given that Plaintiffs challenged altogether different agreements in this case.  Finally, Chromebooks generate only a small fraction of U.S. general search queries, but they are important to schools and students who depend on low-cost devices, and there is no evidence that expanding the prohibitory injunction would benefit these groups or any other consumers.  *See, e.g.*, DXD-37.033 (Murphy); Tr. 2555:15-22 (Nieh).

8

Plaintiffs' revisions to the PFJ would also extend the provisions currently limited to "mobile phones and tablets" to other types of laptops and desktops, including those that run on the Microsoft Windows operating system.  In an effort to compromise this disputed aspect of the competing proposed final judgments, Google offered to extend the applicable prohibitions to laptops and desktops if Plaintiffs would agree to carve out devices that run on ChromeOS and any successor to ChromeOS.  Plaintiffs rejected this proposal.  Nevertheless, Google has revised its PFJ to conform to its compromise proposal.  Among other things, Google has replaced the phrase "mobile phones and tablets" in its PFJ with the defined term "Covered Device," which "means a smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed."  Google's PFJ § IX.F.

### 2. Plaintiffs' PFJ encompasses hypothetical conduct that was not the subject of any claims or findings.

Plaintiffs also seek to rewrite numerous provisions of Google's PFJ in contravention of the Court's opinion by replacing the straightforward prohibitions on "agreements" with vague prohibitions on "conditions."  These changes should be rejected for several reasons.

First, only Google's language corresponds to Plaintiffs' claims and the Court's liability determination.  As indicated above, Plaintiffs did not base their theory of liability at issue here on anything other than certain agreements.  *See United States v. Google LLC*, 747 F. Supp. 3d 1, 88, 146-52 (D.D.C. 2024); Rem. Op. at 9-10.

Second, the remedies proceedings do not support Plaintiffs' reformulation.  Plaintiffs did not establish, and the Court did not find, that Google engaged in any "conditioning" that did not involve an agreement.  The findings of fact from the remedies phase, like those from the liability phase, describe **contracts** between Google and several sophisticated companies.  This is not a

9

coincidence, as the only conduct at issue involves a commonplace value exchange (such as licensing software or promoting a service) that is the subject of an agreement as a matter of ordinary commercial practice.

Third, Plaintiffs' original RPFJ included a prohibition on "conditional access" that the Court did not adopt or instruct the parties to reconcile with Google's PFJ. Pls.' Orig. RPFJ § IV.D. And for good reason, as Plaintiffs' rehashed proposal presents the same vagueness issues as the "anti-circumvention" proposals that the Court expressly rejected. *E.g.*, Rem. Op. at 208-09. For example, Plaintiffs have not explained whether the act of "condition[ing]" purportedly could reach even a trivial statement by a single Google employee that does not result in an actual agreement. Plaintiffs' proposal creates the kind of needless ambiguity that suppresses rather than enhances competition and has no place in a judicial decree.

### 3. Plaintiffs' expansion of the "forward-looking" remedies is contrary to precedent and the Court's opinion.

Plaintiffs' proposal disregards the evidence and the Court's opinion by removing distinctions between the restrictions applicable to the Google Search Application (GSA) and Chrome, on the one hand, and the "forward-looking" restrictions applicable to products outside the relevant markets (such as the Google Gemini app), on the other hand. These distinctions—which have been part of Google's PFJ since it filed the document—were described by Google in its briefs and arguments and were summarized in the Court's opinion. *See* Rem. Op. at 104-05 (describing provisions applicable to Search and Chrome); *id.* at 106 (describing separate provisions applicable to the Gemini app and Assistant). The Court accepted these provisions, subject to specific modifications, and Plaintiffs' attempt to alter them conflicts with the law and the Court's findings.

10

For example, the first two sections of Google's prohibitory injunction bar "any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Search Application" or "the Chrome Browser Application" on "Covered Devices sold in the United States."  Google's PFJ §§ III.A, B.  These provisions not only eliminate the aspects of MADAs deemed exclusive by the Court, but also enjoin other conduct "of the 'same type or class' as the violations."  *Microsoft*, 56 F.3d at 1460.  In particular, Sections III.A and B extend to the licensing of "Google Play *or any other Google software application*," Google's PFJ §§ III.A, B (emphasis added), including numerous applications that are not the subject of any findings by the Court and were never shown to be "a must-have" on Android devices or otherwise deemed analogous to Google Play.  *See, e.g.*, *Google*, 747 F. Supp. 3d at 150.

Sections III.C and D of Google's PFJ are narrower prohibitions that do not include the bolded phrase because they are "forward-looking" provisions that regulate the licensing of the Google Assistant Application, the Gemini app, and any future Google GenAI Assistant Application.  *See, e.g.*, Rem. Op. at 106.  Unlike GSA and Chrome, these services were not part of Plaintiffs' theory of liability or the Court's liability determination.  *See, e.g.*, *Google*, 747 F. Supp. 3d at 34, 150-52.  The Court's remedies findings confirm that applying the broader restrictions applicable to GSA and Chrome (in Sections III.A and B) to this emerging area would only hinder vigorous competition.  For instance, "ChatGPT has proven to be an immensely popular and fast-growing product, with over 100 million daily active users as of the end of 2024."  Rem Op. at 39.  "OpenAI calculated its share of the U.S. market as of December 2024 to be approximately 85%," with Google's "Gemini at 7%."  *Id.* at 42.  Under these circumstances,

the Court should not revisit its adoption of Google's PFJ by imposing a six-year prohibition on Google licensing the Gemini app together with "any other Google application," as Plaintiffs propose.  Pls.' PFJ § III.D; *see Massachusetts*, 373 F.3d at 1224 (holding that when "adopting a forward-looking provision," the Court's "discretion is necessarily less broad because … it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers").

        The same considerations apply to the provisions governing RSAs, where Plaintiffs likewise seek to erase a distinction with respect to access-point-by-access-point licensing that was present in Google's PFJ since December 2024 and both recognized by and not modified by the Court.  As the Court observed in paraphrasing recent RSA amendments that conform to Google's PFJ, the salient features of agreements pertaining to GSA and Chrome include "revenue share payments on an access-point-by-access-point and device-by-device basis" and "no restrictions on promoting alternative search services."  Rem. Op. at 55-56 (summarizing December 2024 AT&T amendment); *see also id.* at 50 (summarizing April 2025 Samsung RSA); Google's PFJ §§ III.E-I.  Under Section III.J of Google's original and current PFJ, agreements pertaining to the Google Assistant and Gemini differ in that they need not be access-point-by-access-point with respect to Assistant or Gemini.  The Court's summary of the Gemini Commercial Agreement with Samsung recognizes this distinction in describing the multiple Gemini access points configured pursuant to the agreement.  Rem. Op. at 51 (stating that "a new Samsung device must be preinstalled with the Gemini app placed in the App Tray" and "Samsung must set the long-press side key and the 'hot word' to invoke the Gemini app by default"); *see id.* at 53 (explaining that the agreement "does not limit Samsung's ability to work with GenAI services other than Gemini" and "other device entry points remain available to other

GenAI services, including additional side-key buttons, hot words, or placement in the hot seat or on the default home screen"). This agreement complies in all respects with Google's PFJ because, among other things, it is non-exclusive, annually terminable, includes device-by-device optionality, and includes no requirements regarding GSA or Chrome. *See, e.g.*, Rem. Op. at 53, 106; Tr. 254:3-256:4 (Fitzgerald); Google's PFJ §§ III.G, J, K.

Plaintiffs seek to modify the PFJ by porting the access-point-by-access-point requirement applicable to GSA and Chrome to the "forward-looking" provision pertaining to Assistant and the Gemini app. *See* Pls.' PFJ § III.J. Such heavy-handed regulation is unwarranted in a remedy that extends outside the relevant markets and beyond the liability findings. That is all the more apparent here, given the evidence in the remedies trial record that dispels any notion that Google has market power in GenAI products, as well as the Court's findings that "[t]he GenAI space is highly competitive" and "[r]ival GenAI products have had some success in obtaining distribution with OEMs and other companies" even though only a few years ago those GenAI firms were largely unknown or did not even exist. Rem. Op. at 40, 42.

### 4. Plaintiffs' proposed limits on the duration of agreements are unreasonable and impermissibly regulate third parties.

Plaintiffs also rewrote the provisions in Section III of Google's PFJ applicable to Browsers Developers, even where the Court accepted them without modification. Google's PFJ requires that applicable agreements must, among other things, "permit[] the Browser Developer on an annual basis to set a different Default Search Engine in the United States." Google's PFJ § III.L. The Court did not modify this aspect of the PFJ. *See, e.g.*, Rem. Op. at 110 (explaining that "as drafted" Google's PFJ requires applicable agreements to "allow the Browser Developer to annually set a different GSE"). Plaintiffs' proposal, however, provides that an applicable agreement must "terminate[] no more than one year after the date it is entered." Pls.' PFJ § III.L.

13

The Court should reject Plaintiffs' attempt to prohibit multi-year agreements that the third party can elect to terminate annually, both with respect to Browser Developers in Section III.L and the duration of licenses of applicable Google apps to manufacturers and wireless carriers in Section III.K.

Plaintiffs presented no evidence that an agreement providing annual termination options consistent with Google's PFJ is somehow different from a one-year agreement with no options. Any such evidence would have been unpersuasive because allowing a Browser Developer to enter a multi-year deal with annual options only ***increases*** the number of contracting options available to the Browser Developer (the same Browser Developers could also insist upon one-year agreements if they preferred). Courts have referred interchangeably and without distinction to agreements with annual terminability and one-year agreements. *See, e.g.*, *Google*, 747 F. Supp. 3d at 157 (indicating that "[e]xclusive-dealing contracts terminable in less than a year are presumptively lawful under section 3" (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984)).[2]

### 5.    Plaintiffs' generalized prohibition on "exclusive" contracts is unenforceable.

Plaintiffs propose a new provision that would prohibit "any exclusive contract relating to the distribution of" various products, including "any Google GenAI Product." Pls.' PFJ § III.N. Section III of Google's PFJ already eliminates the terms deemed exclusive by the Court—a point

---

[2] Plaintiffs' revisions also introduce a new requirement for separate agreements for different Operating System Versions and Privacy Modes. Pls.' PFJ § III.L. For example, under Plaintiffs' proposal, Apple could decide to set Google Search as the default in Safari across all devices, but it would need to enter several separate agreements to accomplish this (*i.e.*, one for iOS, one for iPad OS, and one for mac OS). Plaintiffs' proposal increases administrative burdens for no substantive gains, because the same optionality could be provided in a single agreement rather than several separate instruments.

that Google explained in its Proposed Conclusions of Law and other filings and that Plaintiffs

had ample opportunity to address.  As the Court stated in adopting Google's PFJ in full,

"[s]tripping away the exclusivity of those contracts is a good start to unwind those advantages, so

the court will accept those terms."  Rem. Op. at 110; *see id.* at 222.

Plaintiffs, however, cannot supplement the descriptions of prohibited conduct in Google's

PFJ with a generalized ban on "exclusive" contracts because the law "requires that those

enjoined receive explicit notice of precisely what conduct is outlawed."  *Schmidt v. Lessard*, 414

U.S. 473, 476 (1974).  Plaintiffs have not explained to Google what other type of contract would

be deemed "exclusive" if it complies with all provisions of Google's PFJ, and they cannot be

allowed to make that determination on an *ad hoc* basis for the duration of the judgment.  *See,*

*e.g.*, *id.* at 476 & n.2.  Insofar as Plaintiffs envision imposing an obligation to comply with an

undefined body of case law concerning exclusive contracting, their proposal is no different than

"[b]road, non-specific language that merely enjoins a party to obey the law or comply with an

agreement," which "does not give the restrained party fair notice" and therefore cannot be

imposed.  *Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994).  And

if Plaintiffs view their new proposal as encompassing agreements that they might consider

somehow "similar" to the prohibitions in Google's PFJ, then the provision is indistinguishable

from the anti-circumvention proposals the Court already rejected.  Rem. Op. at 208-09.

### B.    Google's PFJ Implements the Court's Modifications to the Prohibitory Injunction.

After "accept[ing]" Google's proposed remedies, the Court "modifie[d] a few aspects of

Google's prohibitory injunction."  Rem. Op. at 110; *see id.* at 222-23.  Google has incorporated

each modification.

     **1.**     **Google's PFJ requires annual terminability for OEM and carrier agreements.**

First, the Court required a "one-year option as a condition of payments to OEMs and wireless carriers."  Rem. Op. at 111.  Google incorporated this change in a new provision, which is Section III.K of its revised PFJ.  Google's proposal applies not only to GSA and Chrome, but also to the Google Assistant Application and any Google GenAI Assistant Application.  And for avoidance of doubt, the provision makes clear that Google cannot charge a termination fee if a partner decides to terminate an agreement after a year.

Plaintiffs' version of Section III.K is flawed in almost every respect described above. For example, it includes Plaintiffs' overbroad definitions of "Google Assistant Application" and "Google GenAI Product"; it sweeps in Chromebooks and other devices beyond the scope of this case; and it limits applicable agreements to one year rather than requiring annual options to terminate.

     **2.**     **Google's PFJ expressly authorizes promotion of Third-Party GenAI Products.**

Second, the Court stated that the portion of Google's PFJ "provid[ing] that agreements with Browser Developers shall expressly permit them to 'promote any Third-Party General Search Service' … is underinclusive" because "it excludes GenAI products."  Rem. Op. at 111. Google has implemented this change by specifying in Section III.L that an applicable agreement must, among other things, "expressly permit[] the Browser Developer to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States."  Google's PFJ § III.L.  Google's definition of "Third-Party GenAI Product" encompasses "any application, software, service, feature, tool, functionality, or product not owned by Google or its affiliates that involves or makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad

range of publicly available information." *Id.* § IX.Z.[3]  This provision corresponds to the Court's conclusion that certain kinds of products incorporating GenAI should be subject to aspects of the final judgment even though they are outside the relevant markets.  *See, e.g.*, Rem. Op. at 100 (concluding that "GenAI chatbots have not eliminated the need for GSEs," but "the capacity 'to fulfill a broad array of informational needs' constitutes a defining feature of both products"); *see also id.* at 22-26, 99-103.

The opinion further provides that "Google's RPFJ shall be modified to make clear that Google is prohibited from entering into an exclusive agreement with Apple to distribute any Google GenAI product either in any Safari mode or on any Apple mobile or desktop device." *Id.* at 111.  Google has implemented this requirement in Section III.N of its PFJ, which provides that "Google shall not enter or maintain any agreement requiring Apple to distribute any Google GenAI Assistant Application in any Apple web browser or on any Apple mobile or desktop device in the United States unless the agreement expressly permits Apple to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States."[4]

Plaintiffs' corresponding provision, which is in Section III.M of their PFJ, should be rejected for a host of reasons.  To begin, it incorporates an overbroad definition of "GenAI Product."  Furthermore, the other restrictions added by Plaintiffs that would apply to their overbroad category of "GenAI Products"—such as annual terminability and optionality based on Operating System Version and Privacy Mode—are not necessary here "to make clear that Google is prohibited from entering into an exclusive agreement."  Rem. Op. at 111.  This aspect of the decree is purely "forward-looking" in that it applies only to products outside the relevant

---

[3] Consistent with Plaintiffs' characterization of SVPs throughout this case, the definition "does not include specialized vertical search services."  Google's PFJ § IX.Z.

[4] The next section addresses the definition of "Google GenAI Assistant Application."

markets. Under the present circumstances, Plaintiffs have not shown that the same restrictions applicable to Google Search are warranted in a "forward-looking remedy," where "the Court treats every expansion of protection with great caution and makes every attempt to craft a remedy which is no more expansive than necessary." *New York*, 224 F. Supp. 2d at 135.

### 3. Google's PFJ expands the definition of "Gemini Assistant Application."

The final modification to Google's prohibitory injunction involves "Google's definition of 'Gemini Assistant Application,'" which the Court found to be "too narrow" because it "does not contemplate the possibility that Google may launch a new GenAI product during the judgment period, whose distribution could raise exclusivity concerns." Rem. Op. at 111. Google has addressed this issue by replacing "Gemini Assistant Application" with the broader term "Google GenAI Assistant Application," which means:

> [T]he stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors) and any future user-facing software application owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information, provided, however, that this term shall not include Google Search, the Google Search Application, the Chrome Browser Application, or the Google Assistant Application.

Google's PFJ § IX.L; *see* Google's Orig. PFJ § IX.E.

This new definition uses the language described in Part I above to encompass future apps not already addressed by the PFJ that "could raise exclusivity concerns," Rem. Op. at 111, because they "perform an information-retrieval function that is similar to GSEs" and are "a potential threat … in the market for general search services." *Id.* at 100-01. Plaintiffs do not propose an alternative definition of this term, but instead use the same overbroad definition of "Google GenAI Product" addressed in Part I above. In addition to all of its other flaws, Plaintiffs' definition is not directed in any sense to products "whose distribution could raise

18

exclusivity concerns."  Rem. Op. at 111.  Plaintiffs' proposal would prohibit, among many other things, an agreement that conditioned a license to Google Meet on a license to Google Drive because they both "involve[] or make[] use of Generative AI capabilities or models."  *See* Pls.' PFJ §§ III.C, D; *id.* §§ IX.J, M, N.  That is not an "exclusive" contract, and even if someone tried to characterize it as one, it could not possibly be an appropriate subject for the remedy imposed in this case.

## III.    GOOGLE'S PROPOSED LANGUAGE FOR THE DATA DISCLOSURE AND SYNDICATION PROVISIONS TRACKS THE COURT'S OPINION, WHEREAS PLAINTIFFS' LANGUAGE WOULD STRETCH THE REMEDY BEYOND THE OPINION'S BOUNDS.

The parties have reached agreement on certain provisions of Sections IV, V, and VI of the Proposed Final Judgment.  Important differences remain, however, and Google addresses the disputed provisions below.

### A.    Plaintiffs' Definitions Would Expand "Qualified Competitor" Eligibility Far Beyond That Ever Previously Pursued by Plaintiffs.

Google's definitions of "Competitor" and "General Search Engine" exclude specialized vertical providers ("SVPs"), consistent with the Court's liability opinion.  *See* Google's PFJ §§ IX.D, I.  Google's "Competitor" definition also includes the more appropriately scoped term "Third-Party GenAI Product," *id.* § IX.D, as opposed to Plaintiffs' term "GenAI Product" that, as discussed above, encompasses a wide array of products that have nothing to do with the relevant markets at issue in this case.  *See* Pls.' PFJ § IX.J.

Google's "Qualified Competitor" definition additionally requires that the Qualified Competitors remain in compliance with the applicable criteria, consistent with the purpose of the remedy.[5]  *See* Google's PFJ § IX.T.  Under Plaintiffs' proposal, a Qualified Competitor could

---

[5] Google's proposal also includes an express right by Google to report data security or other license violations by Qualified Competitors.  Google's PFJ § IX.T.  Finally, Google's proposal

make an initial showing of a plan to compete, become qualified, and immediately discontinue all investment while nonetheless receiving years of syndicated search results and ads and multiple user-side data disclosures.  Pls.' PFJ § IX.W.  Such a result cannot be squared with the purpose of the remedy, *i.e.*, to enable competitors to invest and build their own search engine.

### B. Restrictions Are Necessary to Ensure the Datasets and Syndicated Results and Ads Are Used Only for the Court's Intended Objectives.

#### 1. Permitting Qualified Competitors to sell or share Google's index data and user-side data would undermine the remedy's purpose and violate user privacy and security.

The Court should adopt Google's permitted use provision (Google's PFJ § IV.C.4) to ensure Google's search index and user-side data are only used as intended per the Court's opinion.  The proposed license would require that Qualified Competitors agree not to share or sell the datasets, and to use the datasets for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product.  Consistent with the Court's opinion, these terms are intended to require Qualified Competitors to use the disclosed data solely to compete in the appropriate markets rather than turn a quick profit in a manner that violates user privacy (including Google's own terms of service).

Without a provision like that proposed by Google, nothing would bar a Qualified Competitor from selling disclosed index and user data to other unknown third parties (or otherwise sharing the data).  There is no dispute that these datasets are tremendously valuable and are the product of years of Google hard work and ingenuity.  The search index remedy furnishes Qualified Competitors with a proprietary dataset to "quickly build a competitive search

---

makes clear that the determination as to whether an entity meets the criteria to be a Qualified Competitor is to be made by the Court, not Plaintiffs.  *Id.*

index." Rem. Op. at 144. And the user-side datasets will include queries and other user-interaction data, as well as Google's search results. *Id.* at 153-54. Beyond allowing Qualified Competitors to profit from reselling the data, Plaintiffs' proposal vitiates the protective measures intended to secure the disclosed data, including "reasonable data security standards applicable to Qualified Competitors," "data security and privacy audits," and a sufficient showing that recipients "[do] not pose a risk to the national security of the United States." *Id.* at 103, 211. The proposal would also vitiate the limits on who qualifies as a "Qualified Competitor." For instance, under Plaintiffs' proposal, a company that fails to make a sufficient showing "of a plan to invest and compete in or with the GSE and/or Search Text Ads markets," Pls.' PFJ § IX.W, would still be able to acquire the same data by purchasing it from any company that did qualify. Similarly, a company that does not meet the definition of a "Competitor," *id.* § IX.E, and therefore is ineligible to become a "Qualified Competitor," could bypass the process altogether by purchasing the data from any company that did qualify.

> **2.      Permitting Qualified Competitors to use syndicated search results and ads for other purposes would likewise undermine the remedy's purpose.**

In addition to Google's ordinary course use and display restrictions (*see* Google's PFJ §§ V.B.8 & VI.B.8), Google's PFJ §§ V.B.7 and VI.B.7 implement the Court's direction that the syndication remedy be only a short-term "bridge" for the Qualified Competitor. Rem. Op. at 170-71, 183. Specifically, the sole purpose of the syndication remedy is to enable a Qualified Competitor to display syndicated search results or ads to the end user who submitted the query to the Qualified Competitor, through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product—the Qualified Competitor cannot use syndicated results or ads for any other purpose. *See* Rem. Op. at 178 ("[T]he purpose of this remedy is to provide a short-term

measure for Qualified Competitors to compete as they improve their own search capabilities, not an additional means to facilitate that development.").

 For those same reasons, Google's PFJ § V.B.11 (search) and § VI.B.12 (search text ads) further clarify that only queries from human end users are eligible for syndication; Google is under no obligation to serve results in response to machine-generated queries or queries from a syndicator of the Qualified Competitor (*i.e.*, a sub-syndicator).  Plaintiffs' rejection of a bar on sub-syndication to other third parties will result in entities that do not meet the requirements of a Qualified Competitor nonetheless getting access to Google data simply by entering into sub-syndication agreements with Qualified Competitors.  Allowing Qualified Competitors to sub-syndicate Google's results and ads is entirely divorced from the Court's reasoning that new general search engine entrants should receive syndication from Google for the purpose of improving, and monetizing, ***their own*** SERPs.  Rem. Op. at 183; *see also* Tr. 4805:4-6 (Severt) ("[T]hat's our view that the syndication remedy should not be available to people who just want to syndicate.").  And because sub-syndication prevents Google from having a direct relationship with the sites that show Google's syndicated content, Google would be unable to monitor compliance and enforce its policies—putting Google's intellectual property at risk and causing harm to Google's advertisers.

### C.    Plaintiffs' Rewritten User-Side Data Sharing Proposal Improperly Gives Plaintiffs Unilateral Decision-Making Control over the Privacy and Security Safeguards to Be Applied.

The Court should adopt Google's proposed language regarding the administration of the user-side data sharing provisions.  Google's PFJ §§ IV.C.1, VII.A.7.  It implements the Court's directive that Google's datasets are to be "anonymiz[ed] and secur[ed]," "while attempting to optimize their usefulness."  Rem. Op. at 164; *see* Google's PFJ § IV.C.1.  Consistent with the Court's opinion, Google's PFJ further provides that "[t]he TC will have the power to advise

Plaintiffs and the Court about appropriate User-side Data security and privacy safeguards,"
Google's PFJ § VII.A.7.e, while clarifying that "neither the TC nor Plaintiffs will have the right
to make final decisions as to the requirements of this Final Judgment," *id.* § VII.A.7.a.
Plaintiffs' proposal, on the other hand, reserves for Plaintiffs the determination of the privacy
and security safeguards to be applied.  Their proposal is both an improper delegation of authority
to Plaintiffs and inconsistent with the representations of DOJ counsel at closing arguments—"in
each case, the ultimate authority would rest with the Court, and Google, of course, would be able
to object, if we weren't able to reach resolution."  Tr. 4772:19-24.

        The evidence from the remedies trial made clear that the privacy standard in Plaintiffs'
March 7, 2025 RPFJ—which focused exclusively on protecting Personally Identifiable
Information (Pls.' Orig. RPFJ § VI.D)—was insufficient to protect user privacy.  As the Court
found, "[b]oth sides presented privacy experts who agreed that the disclosure of User-side Data
without applying adequate anonymization and privacy-enhancing techniques would reveal
sensitive user information."  Rem. Op. at 163.  The Court further found that "anonymizing and
securing" the datasets, "while attempting to optimize their usefulness," "no doubt will be
challenging."  *Id.* at 164.  The Court made clear that it would review the recommendations of the
Technical Committee in addressing any disputes over Google's proposed data-sharing disclosure
process.  *Id.*

        Plaintiffs' new PFJ fails to recognize the Court's directives regarding the protection of
user privacy and the Court's role in that process, instead reserving for themselves the
determination of the "privacy and security" safeguards to be applied.  Specifically, Plaintiffs'
new provision provides:  "Plaintiffs, in consultation with the TC, shall promptly determine the
appropriate User-side Data privacy and security safeguards to be applied before Google shares

                                                    23

the data specified in Section IV.B with Qualified Competitors."  Pls.' PFJ § IV.C.1.  Plaintiffs'

PFJ cannot be reconciled with the Court's conclusion that it is appropriate for the Court (and the

Plaintiffs) to "rely on the Technical Committee to '*facilitate the resolution* of potentially

complex and technologically nuanced disputes between [Google] and others over the practical

workings of' the final judgment."  Rem. Op. at 164 (emphasis added) (quoting *Massachusetts*,

373 F.3d at 1244).

Google's proposed language, on the other hand, straightforwardly implements the Court's

opinion.  Google retains the original framework of Plaintiffs' user-side data sharing

administration provision and updates the first sentence to reference Google applying

"anonymization and privacy-enhancing techniques to ensure the data is anonymized and secured,

while attempting to optimize its usefulness," consistent with the Court's opinion.  *See* Google's

PFJ § IV.C.1.  Google maintains the original second sentence (Google's PFJ § IV.C.2) and

additionally maintains the third sentence (Google's PFJ § IV.C.3) regarding timing with a

correction to resolve what could be read to be circular:  "Google will have up to six (6) months

from the date that security and privacy safeguards are finally determined to implement the

technology and provide any notice necessary to comply with this Section IV.C.2."  *Id.* § IV.C.3.

Google's Technical Committee provisions further elaborate on the Technical Committee's (and

Plaintiffs') power and the Court's ultimate authority.  As explained further below, "the TC will

have the power to advise Plaintiffs and the Court about appropriate User-side Data security and

privacy safeguards," *id.* § VII.A.7.e, and "neither the TC nor Plaintiffs will have the right to

make final decisions as to the requirements of this Final Judgment," *id.* § VII.A.7.a.

**D.    The Court Should Reject Syndication Provisions that Would Require a Departure from Google's Ordinary Commercial Terms.**

Google's PFJ provides for syndication pricing "at market rates consistent with ordinary commercial terms agreed to by other users of Google's search syndication products with respect to queries originating in the United States."  Google's PFJ §§ V.B.3, VI.B.2.  And with respect to non-pricing terms, Google's PFJ provides for ordinary commercial terms.  *Id.* §§ V.B.2, V.B.8, V.B.9, V.B.10, VI.B.1, VI.B.4, VI.B.8, VI.B.9, VI.B.11.

Plaintiffs' PFJ, on the other hand, requires Google to make both search and search text ads syndication licenses available to Qualified Competitors on pricing terms "no worse than those offered to any other user of Google's . . . syndication products."  Pls.' PFJ §§ V.A, VI.B.2.  For non-pricing terms, Plaintiffs' search syndication provisions require the license be offered "on terms no less favorable than the most favorable terms Google provides" to any other syndication user "as of the date of entry of this Final Judgment."  *Id.* §§ V.A, V.B.3, V.B.6, V.B.7, V.B.8, V.B.9.  For search ads syndication, Plaintiffs require Google to provide licensing terms made available to "any other user of Google's Search Text Ads syndication products."  *Id.* §§ VI.B.1, VI.B.3, VI.B.6, VI.B.12.

Plaintiffs' language could be read to suggest that these requirements would be implemented on a ***term-by-term basis***, without regard to the broader deal terms contained in any given agreement, thereby allowing Qualified Competitors to demand a license with an amalgam of terms cherry-picked from existing contracts across Google's global partners.[6]  The result would be compelled syndication on terms that do not align with ***any*** commercial Google

---

[6] Counsel for Google inquired of counsel for Plaintiffs in a meet-and-confer session whether Plaintiffs intended the language to require the combination of terms from wholly separate agreements with different parties, and counsel for Plaintiffs declined to take a position.  Counsel further declined to provide their interpretation of their own PFJ provisions on these issues.

syndication deal, let alone "ordinary commercial terms." Rem. Op. at 173. This outcome is contrary to the Court's opinion in a number of respects.

*First*, permitting pricing terms to be cherry-picked across different global deals would result in pricing that runs headfirst into the same problems that the Court identified with respect to Plaintiffs' "marginal cost" pricing proposal. Rem. Op. at 174-75. For instance, Google offers ███████████████████████████████████████████████████████

███████████████████████████████████████████ Those ads syndication deals provide that ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ To the extent Plaintiffs' proposal requires Google to offer ███████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████, the resulting terms would differ dramatically from the standard commercial terms that syndication partners receives. In short, mandating pricing terms unmoored from the remaining terms of broader agreements in which they operate would "interfere with" and "reduce, if not eliminate, competition in the market for syndicated search results." Rem. Op. at 175.

*Second*, and relatedly, Google's search and search text ads syndication pricing terms cannot be considered in isolation from a deal's other terms. To name two examples (there are many more across Google's contracts): ████████████████████████████████████

███████████████████████████████. That term is part of the overall deal bargain and substantially impacts Google's monetization expectation. ██████████████████████████

███████████████████████████████████████████████████

███ ; Google's PFJ § V.B.5.  But then the pricing terms must take that into account, that is,

Google should not be required to offer the same revenue share as it would for a deal with

different rights and obligations.  As a second example, ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████  Accordingly, Google should not be required to offer ████████████████

██████████████████████████████████ .  In sum, considering pricing

terms in isolation from all other terms of a search or search ads syndication deal would be an

extraordinary departure from ordinary commercial terms and practices.

Google's proposal makes clear that Google may charge "market rates consistent with

ordinary commercial terms agreed to by other users of Google's search syndication products

with respect to queries originating in the United States."  Google's PFJ § V.B.3.  This provision

tethers pricing to Google's ordinary commercial terms.  With respect to search results

syndication, Google's proposal would promote continued competitive conditions in the U.S.

"market for syndicated search results" that the Court identified in its opinion.  Rem. Op. at 175.

And with respect to search text ads syndication, Google's proposal would address the Court's

directive to "prevent Google from charging an inflated price to Qualified Competitors," *id.* at

185, while avoiding the unintended consequences that would result were Qualified Competitors

permitted to pick and choose individual terms across different deals.  As set forth above, ███████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

     *Third*, Google should not be compelled to offer each term of its existing agreements with

partners to Qualified Competitors.  Pls.' PFJ §§ V.A, V.B.2, V.B.3, V.B.6, V.B.7, V.B.8, V.B.9,

VI.B.1, VI.B.3, VI.B.6, VI.B.12.  To do so would require exactly the customization that the

Court indicated would not be required.  Rem. Op. at 180.  For example, one of Google's current

U.S. partners has a bespoke technical implementation ████████████████████████████

████████████████████████████████████████████████.  Were

Google compelled to build those implementations for Qualified Competitors at their request, █

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████.  This would likely entail months of coordinated effort.  ████████████████

██████████████████████████████████████████████

██████████████████████████████████████.  Therefore,

Google's proposed language in Sections V.B.9 and VI.B.11, requiring that Google apply its

ordinary commercial terms, is a more sensible provision.  As another example (as above, there

are many more), certain partners receive ██████████████████████████████████████

████████████████████████████████████████.  Requiring

Google to revert to those historical implementations under Plaintiffs' PFJ Section VI.B.6 would

run afoul of ordinary commercial terms.

     Google's proposed language solves for each of these problems by specifying the

categories of terms that must be offered (in contrast with the "all term" provision of Plaintiffs'

PFJ, § V.B.3), and tethering Google's obligations to ordinary commercial terms, consistent with the Court's instruction that "Qualified Competitors generally will have to follow ordinary commercial terms and therefore will not need to be customized."  Rem. Op. at 180.

*Finally*, with respect to which search features are syndicated, implementing Plaintiffs' proposal as written presents technical feasibility issues.  Rem. Op. at 173 n.24 ("If there are technical feasibility issues with syndicating only crawled web results, Google shall so advise the Court.").  Specifically, extending syndication features currently provided only to Yahoo Japan would require Google to launch serving changes, perform quality assurance for the additional features, and train Google's customer service and tech support teams.  Syndicating the Knowledge Panels provided to Yahoo Japan would be particularly technically challenging: the existing implementation cannot be simply mirrored for other partners and would instead require Google to rebuild the underlying data sources to scope out third-party licensed data and other non-crawled data.  Additionally, Plaintiffs' proposal would require significant updates to Google's legacy code paths, as well as the untested expansion of highly bespoke, negotiated offerings at unprecedented scale.  Google's proposed language solves this problem by requiring Google to syndicate those features that it "provides under current standard search syndication agreements."  Google's PFJ § V.A.1-3.

### E.    The Court Should Enter Google's Proposed Language for the Remaining Disputed Data-Sharing, Syndication, and Auction Provisions.

For each remaining disputed provision in Sections IV, V, and VI of the parties' PFJs (and the relevant definitions from Section IX), Google attaches an appendix with the parties' respective provisions and a short explanation of why the Court should adopt Google's language.

## IV.    PLAINTIFFS' TECHNICAL COMMITTEE AND COMPLIANCE PROPOSALS SHOULD BE REJECTED.

Plaintiffs' revised Technical Committee (TC) and compliance provisions fail to follow the Court's remedies opinion and otherwise add several unworkable requirements.  The Court should therefore adopt Google's provisions as they pertain to the TC and compliance in the final judgment in this action.

### A.    Plaintiffs' PFJ Impermissibly Delegates Substantive Powers to the TC and Plaintiffs to Define Affirmative Remedy Obligations.

Prior to the remedies trial, Plaintiffs submitted a PFJ that included numerous provisions that would have improperly vested Plaintiffs and the TC with authority to determine affirmative substantive requirements of the final judgment, without court involvement, violating Google's Due Process rights and Article III.  Google objected to these provisions in its pre-trial and post-trial briefing.  *E.g.*, ECF 1215 at 14-15, ECF 1347 at 72-74.  During closing arguments, Plaintiffs assured the Court that they intended that all substantive authority to determine the requirements of the final judgment would remain with the Court:

> [T]he technical committee will help make recommendations, assess, it will help narrow, ripen, and resolve issues before they ever get to the Court. ***But in each case, the ultimate authority would rest with the Court, and Google, of course, would be able to object, if we weren't able to reach resolution.***

Tr. 4772:19-24 (Severt) (emphasis added).  The Court's remedies opinion acknowledged Google's concerns, but stated that they were "largely mooted by the court's narrowing of some proposed remedies and its rejection of others."  Rem. Op. at 211.  The Court further explained that the TC would have only "process responsibilities" and would not substitute for the authority of the Court.  *Id.* at 211-12.

Given Plaintiffs' concessions and the Court's opinion, Google's PFJ ensures that Google has the opportunity to be heard on, and that the Court would remain the ultimate decision-maker

for, any substantive disputes on which the parties and the TC cannot reach resolution. Plaintiffs'

proposal, by contrast, takes decision-making authority away from the Court. For example, under

Plaintiffs' proposal:

- Plaintiffs, in consultation with the TC, unilaterally "determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors." Pls.' PFJ § IV.C.1. Plaintiffs' proposal provides no right for Google to object that such safeguards are not sufficient or are otherwise objectionable, and no role for the Court to review the privacy safeguards if the parties disagree. Indeed, under Plaintiffs' proposal, Plaintiffs could reject the recommendation of the TC and make their own determination on privacy with no oversight by the Court.

- Plaintiffs, in consultation with the TC, determine reasonable data security standards applicable to Qualified Competitors. *Id.* § VII.A.7.b. Plaintiffs' proposal provides no right for Google to object to such standards and no role for the Court to review the standards if the parties disagree.

- Plaintiffs, in consultation with the TC, unilaterally decide who is a "Qualified Competitor," including "who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets." *Id.* § IX.W. Plaintiffs' proposal provides no right for Google to object to such determination and no role for the Court to review who is a "Qualified Competitor" if the parties disagree.

- Plaintiffs unilaterally can decide that their TC appointee need not meet several of the criteria otherwise required for appointment to the TC. Under Plaintiffs' proposal, Plaintiffs could appoint an individual recently employed by a competitor or even a "consulting or testifying expert" retained by Plaintiffs in this case. *See id.* § VII.A.2 ("unless Plaintiffs specifically consent, no TC member….").

- Plaintiffs unilaterally can remove any TC member (even Google's appointee) that they determine, in their sole judgment, "has failed to act diligently and consistently with the purposes of this Final Judgment." *Id.* § VII.A.5. Under Plaintiffs' proposal, Google has no right to object and the Court has no review of such removal.

- Plaintiffs' proposal grants the TC the power to require Google to provide access to documents, systems, its buildings and its source code and algorithms, to submit reports to the TC, and to conduct employee interviews with no stated limitations. *Id.* § VII.A.7.c, d. Under Plaintiffs' proposal, the Court (and even Plaintiffs) appear to have no role whatsoever in policing such requests, and Google does not appear to have any ability to challenge such requests as unreasonable, unnecessary, or not relevant or proportional to the needs of the TC's duties.

These are just some of the powers reserved to the TC and/or Plaintiffs. For the reasons discussed in Google's post-trial briefing, these proposals would violate Google's Due Process rights and Article III. *E.g.*, ECF 1215 at 14-15, ECF 1347 at 72-74. Google's proposal, on the other hand, includes various provisions that make clear that neither the TC nor Plaintiffs have the right to make final decisions as to the substantive requirements of the final judgment, and that Google will have the right to object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations or substantive requirements of the final judgment. Google's PFJ §§ VII.A.2, VII.A.5, VII.A.6.a, VII.A.7.a, VII.A.7.j, VII.A.7.l, VII.A.7.m. Google respectfully requests that the Court enter these provisions.

### B.    Plaintiffs Seek to Expand the TC's Role Beyond the Court's Opinion.

In Plaintiffs' March 7, 2025 RPFJ, they proposed giving the TC wide-ranging authority, including providing the TC broad oversight authority over Google's business to address complaints related to Google's compliance with each aspect of the final judgment and with Plaintiffs' proposed (but rejected) anti-circumvention and anti-retaliation provisions. While the Court's opinion adopted a TC, it significantly narrowed the responsibilities from what Plaintiffs requested:

> [The TC] will (1) advise Plaintiffs about potential Qualified Competitors, *id.* § III.U; (2) recommend reasonable data security standards applicable to Qualified Competitors, *id.* § X.A.7.b; (3) advise about an appropriate cap on User-side Data disclosure, *id.* § VI.C; (4) consult with Plaintiffs about appropriate User-side Data security and privacy safeguards, *id.* § VI.D; (5) help formulate a tapering rate for search syndication, *id.* § VII.C.2; (6) audit Qualified Competitors' use of search syndication services, *id.* § VII.C.3; and (7) receive disclosures from Google about Search Text Ads auction changes, *id.* § VIII.D.

Rem. Op. at 211-12. The Court stated that the TC's "proper role" was limited to providing "technical competence." *Id.* at 212.

32

Google's proposal explicitly enumerates the TC's responsibilities as stated in the Court's ruling. *See* Google's PFJ § VII.A.7. By contrast, Plaintiffs' proposal seeks to grant the TC broad oversight and investigation responsibilities over the entire final judgment. In particular, Plaintiffs seek to include in the TC's powers the ability to receive complaints regarding Google's compliance with ***all aspects*** of the final judgment, including provisions where it otherwise has no role, and for which it has no "technical competence." *See* Pls.' PFJ §§ VII.A.7.e-h, VII.C. For instance, under Plaintiffs' proposal, technical experts chosen based on their expertise in the roles that the Court enumerated (such as data security and privacy) would be charged with investigating and making a recommendation regarding complaints about whether Google's contracts violate the provisions of Section III. Such a role is unnecessary and does not align with the Court's ruling. And it would be particularly improper to grant the TC broad oversight and investigative authority as an end-run around the Court's rejection of the Plaintiffs' anticircumvention and anti-retaliation proposals.[7]

Google's compliance proposal properly places the responsibility for reviewing and investigating complaints with the appointed Compliance Officer. And it grants the TC the ability to make "reasonable and proportional requests" for documents, employee interviews, and other information "necessary to perform its duties."[8] The Court should adopt Google's proposal.

---

[7] Tellingly, despite the Court's anticircumvention ruling, Plaintiffs' PFJ requires the TC to notify the Plaintiffs "when the TC has reason to believe . . . that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment." Pls.' PFJ § VII.A.7.g. During the meet and confer, Google raised this language with Plaintiffs, but Plaintiffs have refused to remove it.

[8] Unlike Google's proposal, Plaintiffs in no way limit the scope of the TC's power to seek documents and other information, and provide no ability for Google to challenge unreasonable requests. For instance, Plaintiffs seek a provision to grant the TC "access to . . . any physical facility, building or other premises" and "access to any system or equipment" without limitation. Pls.' PFJ § VII.A.7.c. During meet and confers, Google asked Plaintiffs why such proposals were necessary, and Plaintiffs explained it may be necessary to perform testing regarding

C.      **Plaintiffs' Proposed "Senior Business Executive" Provision Is Unworkable.**

Plaintiffs seek a provision appointing "a senior business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered."  Pls.' PFJ § VII.B.5.  This provision is overbroad and unworkable. Plaintiffs' proposal appears to be based on a much narrower provision in *Microsoft*.  In an amendment to the Microsoft final judgment, the parties agreed that Microsoft would maintain an "executive with direct responsibility for managing the project to rewrite the technical documentation for the Microsoft Communications Protocol Program . . . and shall make [the executive] available to update the Court on the project at Status Conferences or as otherwise ordered."  Second Modified Final Judgment, *United States v. Microsoft Corp.*, No. 98-1232, ECF No. 889 (D.D.C. Mar. 22, 2009) at IV.E.  This was a much narrower and more workable provision, focused on one aspect of the final judgment.  Plaintiffs' provision, by contrast, seeks a senior business executive with an understanding of Google's compliance with the entire final judgment.  The Court should reject this unnecessary and unworkable provision.

D.      **Plaintiffs' Document Retention Provisions Are Unnecessary and Overbroad.**

Plaintiffs seek to have Google retain an attorney to "collect documents and interview employees and generally review Google's document retention practices and Google's

---

appropriate User-side Data security and privacy safeguards.  Google therefore added a provision that limited the powers in this way.  Plaintiffs also seek to grant the TC "access to Google's source code and algorithms," in part to address third-party complaints.  *Id.* § VII.A.7.d.  During the meet and confer on this provision, Plaintiffs were not able to identify any specific reason why such access would be necessary to the duties the Court delineated for the TC, but stated generally that the TC is tasked with various technical responsibilities that could implicate Google's algorithms.

compliance with its legal discovery obligations under this case and final judgment."  Pls.' PFJ § VII.B.6.  This provision is unnecessary and overbroad for several reasons.

*First*, Plaintiffs' proposal appears to be another bite at seeking sanctions related to Google's discovery practices in this case.  But the Court's liability opinion declined to impose sanctions on Google.  Simply put, there is no connection whatsoever between this proposed remedy and the conduct at issue in this case or any valid remedial objective, and no other justification for a remedy related to Google's discovery practices.

*Second*, Google's proposal already requires that Google's Compliance Officer "ensur[e] employees retain all relevant documents and electronically stored information . . . regarding all complaints received . . . and action taken by Google with respect to any such complaint." Google's PFJ § VII.C.4.j.  Plaintiffs' proposal similarly places this duty on the Compliance Officer.  Pls.' PFJ § VII.B.4.j.  There is therefore no need to add an additional person with overlapping responsibilities.

*Third*, Plaintiffs' proposal is vague and overbroad.  For one, it is unclear whether Plaintiffs' proposal is limited to document retention practices related to this case or seeks something broader. *See id.* § VII.B.6 (attorney would "generally review Google's document retention practices").  Plaintiffs would also require the Compliance Officer and the retained attorney to ensure Google retains all documents "related to this Final Judgment."  *Id.* § VII.B.4.j. That is so vague and overbroad as to be unworkable.  The Court should enter Google's provisions, which reasonably limit the scope of document retention to a workable set.

### E.    Plaintiffs' Proposal for Unlimited Compliance Reports, Interrogatories, Interviews, and Document Requests Is Unreasonable.

Under Google's proposal, Google would be required to provide an annual compliance report describing its compliance with the final judgment.  Plaintiffs would also be able to request

one interim written report per year, and would be able to seek documents and employee interviews sufficient to verify the matters in Google's compliance reports. Google's PFJ § VII.B.2-3. Plaintiffs' proposal goes much further. It would require Google to respond to an unlimited number of requests by Plaintiffs for written reports, interrogatories, employee interviews, and document requests "relating to any matters contained in this Final Judgment." Pls.' PFJ § VII.D.2-3. Such a requirement is overbroad and unnecessary, especially given the Court's rejection of Plaintiffs' anticircumvention provisions and given that the TC will already have the ability to seek documents and interviews for matters within its purview. The Court should enter Google's proposal, which places reasonable limits on the compliance reporting Google must submit.

## V. PLAINTIFFS' PROPOSED ENFORCEMENT PROVISIONS ARE CONTRARY TO PRECEDENT.

Both PFJs propose preserving this Court's jurisdiction to issue further orders as may be necessary or appropriate to carry out or construe the final judgment, to modify or terminate its provisions, and to enforce compliance. Google's PFJ § XI; *see* Pls.' PFJ § XI. The relevant section of Plaintiffs' PFJ, however, would also alter substantive and procedural law in ways that are both unjustified and contrary to precedent.

First, Plaintiffs propose that in a motion to modify the final judgment, they "need not show any change in circumstances, but need only demonstrate that modification is necessary to achieve the intended purposes of this Final Judgment to restore competition in the monopolized markets." Pls.' PFJ § XI.A. The apparent purpose of this provision is to absolve Plaintiffs of the need to comply with Federal Rule of Civil Procedure 60(b)(5), which limits when a court may alter a final judgment. Supreme Court precedent dictates that relief under Rule 60(b)(5) requires the movant to "establish[] that changed circumstances warrant relief." *Horne v. Flores*, 557 U.S.

433, 447 (2009); *see Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992).  The Court should reject Plaintiffs' request to rewrite Rule 60(b)(5) because "federal courts have no more discretion to disregard the mandate of a Federal Rule than they do to disregard constitutional or statutory provisions."  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506 (D.C. Cir. 2016) (cleaned up); *see BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612, 1621 (2025) ("It is Rule 60(b)'s standard—and *only* Rule 60(b)'s standard—that applies when a party seeks relief from final judgment.").[9]

Furthermore, there is also no sound basis for the final judgment to recite various forms of relief Plaintiffs purportedly might pursue, such as "an order to divest [a] Google business" or "a ban on default payments."  Pls.' PFJ § XI.A.  The Court addressed and rejected those proposed remedies in its opinion, and it should not incorporate language contemplating a second bite at the apple.  To the extent the Court indicated that it may revisit those decisions (or an "unconditional" revenue share remedy), there is no ground for departing from Rule 60(b)(5).

Plaintiffs also propose that "[i]n any action to enforce this Final Judgment, Google must show by a preponderance of the evidence that its actions are in compliance with this Final Judgment."  Pls.' PFJ § XI.A.  The question of who bears the burden of proof and persuasion

_____

[9] Google acknowledges that dicta in a D.C. Circuit case suggests that the *Rufo* standard described above—which requires the movant to show "changed circumstances"—does not apply to "request[s] of the party who sought the equitable relief."  *United States v. W. Elec. Co.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995).  If that is the basis for Plaintiffs' proposal, it is untenable.  In the years since *Western Electric*, ample authority confirms that the *Rufo* standard applies to requests by the party that sought equitable relief.  *See, e.g., Am. Council of Blind v. Mnuchin*, 977 F.3d 1, 7 (D.C. Cir. 2020) (applying *Horne*); *Pigford v. Veneman*, 292 F.3d 918, 925 (D.C. Cir. 2002) (applying *Rufo* to a request made by the beneficiary of equitable relief).  At a minimum, the Court should not resolve this "thorny issue" in the abstract by incorporating a flawed legal principle into a final judgment when it can instead decide the appropriate standard in the future if Plaintiffs request a modification.  *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 169 (D.D.C. 2008) (describing cases where the D.C. Circuit and "courts in other circuits have … applied *Rufo* to cases in which the beneficiary of a consent decree sought to" modify the decree).

should depend on the issue that arises, not the provision of a final judgment.  Plaintiffs' proposal

would violate precedent and statutory law by shifting the burden of proof on at least some issues

from Plaintiffs to Google.  For example, one mechanism to enforce a judgement is a motion for

civil contempt.  *See* Fed. R. Civ. P. 70(e).  But the burden of proof in such a proceeding rests

with the party seeking relief, not the party accused of contempt.  *See, e.g.*, *U.S. Bank N.A. v.*

*Poblete*, 2017 WL 4736712, at *2 (D.D.C. Oct. 19, 2017).  Plaintiffs have neither provided a

justification for reallocating the burden of proof to Google nor established that the Court even

has the power to enter such an order.  *See Winston & Strawn*, 843 F.3d at 506 (holding that a

district court may not shift the burden of proof on a summary judgment motion, even where a

nonmovant fails to file an opposition).

Similar problems afflict Plaintiffs' proposal that the final judgment "be interpreted to

give full effect to the procompetitive purposes of the U.S. antitrust laws and to restore the

competition the Court found was harmed by Google's illegal conduct."  Pls.' PFJ § XI.C.

Plaintiffs have not offered any authority for the proposition that their preferred interpretive

principle can or should displace any substantive or procedural law.  The provision is also too

vague to be enforced.  If this principle can be used to interpret the injunction to mean something

other than what it actually says, then the judgment does not "describe in reasonable detail … the

act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).

Plaintiffs next propose that for four years after expiration of the final judgment, they may

bring an "action" against Google for additional relief "if any Plaintiff has evidence that Google

violated this Final Judgment before it expired."  Pls.' PFJ § XI.D.  Again, Plaintiffs have cited no

authority authorizing such a provision, which deviates from the background principle that

"creating a cause of action is a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022),

38

not a judicial one.  Moreover, Plaintiffs' proposal lacks foundation, as there is no reason to think that Google will violate the final judgment and therefore no need for a process and remedy directed to such an unfounded hypothetical.

Finally, Plaintiffs seek an order providing for the recovery of attorneys' fees and expert fees "[i]n connection with a successful effort by any Plaintiff to enforce this Final Judgment against Google."  Pls.' PFJ § XI.E.  The Court should also reject this proposal.  "[T]he prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser," and "[f]ederal courts may depart from this rule only when there is express statutory authorization to do so."  *Lackey v. Stinnie*, 145 S. Ct. 659, 666 (2025) (cleaned up).  Plaintiffs have not provided a statutory authority for one-way fee shifting in this context, and in all events there is no sound basis for including such a provision in the final judgment here.

## VI.    CONCLUSION

The Court should adopt Google's PFJ instead of Plaintiffs' PFJ.

Dated: September 17, 2025                Respectfully submitted,

                                        WILLIAMS & CONNOLLY LLP

                                        By: */s/ John E. Schmidtlein*
                                        John E. Schmidtlein (D.C. Bar No. 441261)
                                        Benjamin M. Greenblum (D.C. Bar No. 979786)
                                        Colette T. Connor (D.C. Bar No. 991533)
                                        680 Maine Avenue, SW
                                        Washington, DC 20024
                                        Tel: 202-434-5000
                                        jschmidtlein@wc.com
                                        bgreenblum@wc.com
                                        cconnor@wc.com

                                        WILSON SONSINI GOODRICH & ROSATI P.C.
                                        Michael Sommer (admitted *pro hac vice*)
                                        Franklin M. Rubinstein (D.C. Bar No. 476674)
                                        1700 K Street, NW
                                        Washington, DC 20006

39

Tel: 202-973-8800
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*