**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA, *et al.*,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

---

STATE OF COLORADO, *et al.*,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No. 1:20-cv-03715-APM

HON. AMIT P. MEHTA

---

## <u>DEFENDANT GOOGLE LLC'S PROPOSED FINAL JUDGMENT</u>

WHEREAS, Plaintiffs United States of America, and the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, by and through their respective Attorneys General, filed their Complaint on October 20, 2020, and their Amended Complaint on January 15, 2021;

AND WHEREAS, Plaintiffs Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico,

1

Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming filed their Complaint on December 17, 2020;

AND WHEREAS, the Court conducted a trial and entered Findings of Fact and Conclusions of Law in both actions on August 5, 2024 accepting certain claims and rejecting certain claims of Plaintiffs;

AND WHEREAS, the Court conducted an evidentiary hearing concerning proposed remedies and entered Findings of Fact and Conclusions of Law on September 2, 2025;

NOW THEREFORE, upon the record at trial and all prior and subsequent proceedings, it is hereby ORDERED, ADJUDGED, AND DECREED:

## I.     JURISDICTION

This Court has jurisdiction over the subject matter of this action and over Google LLC.

## II.    APPLICABILITY

This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns.

## III.   PROHIBITED CONDUCT

A.     Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Search Application on Covered Devices sold in the United States.

B.     Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Chrome Browser Application on Covered Devices sold in the United States.

C.       Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search Application, the Chrome Browser Application, or Google Play, on the manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Assistant Application on Covered Devices sold in the United States.

D.       Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search Application, the Chrome Browser Application, or Google Play, on the manufacturer also distributing, preloading, placing, displaying, using, or licensing a Google GenAI Assistant Application on Covered Devices sold in the United States.

E.       Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on Covered Devices sold in the United States.

F.       Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on Covered Devices sold in the United States.

G.       Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party GenAI Assistive Service on Covered Devices sold in the United States.

H.      Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Search Application on the preload, placement, or assignment of any other access point to any of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application on Covered Devices sold in the United States. For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis.

I.      Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Chrome Browser Application on the preload, placement, or assignment of any other access point to any of the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application on Covered Devices sold in the United States. For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis.

J.      Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Assistant Application or a Google GenAI Assistant Application on the preload, placement, or assignment of any other access point to any of the Google Search Application and/or the Chrome Browser Application on Covered Devices sold in the United States. For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis.

K.      Google shall not enter or maintain any agreement with a manufacturer or wireless carrier requiring the preload, placement, or assignment of an access point on Covered Devices in

4

the United States to any of the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application for a period of more than one year, unless the agreement allows the manufacturer or wireless carrier to terminate the agreement on an annual basis and does not charge a fee for terminating.

L.      Google shall not enter or maintain any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) permits the Browser Developer on an annual basis to set a different Default Search Engine in the United States for any Operating System Version and/or Privacy Mode offered by the Browser Developer without foregoing any payments attributable to an Operating System Version or Privacy Mode where Google Search remains set as the Default Search Engine; and (ii) expressly permits the Browser Developer to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States.

M.      Google shall not enter or maintain any agreement requiring Apple Inc. ("Apple") to set Google Search as the Default Search Engine in the United States with respect to any proprietary Apple feature or functionality, including Siri and Spotlight, unless the agreement complies with Section III.L above.

N.      Google shall not enter or maintain any agreement requiring Apple to distribute any Google GenAI Assistant Application in any Apple web browser or on any Apple mobile or desktop device in the United States unless the agreement expressly permits Apple to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States.

O.      Nothing in this Final Judgment shall otherwise prohibit Google from providing Consideration to a manufacturer or wireless carrier with respect to any Google product or service

in exchange for such entity's distribution, placement on any access point, promotion, or licensing of that Google product or service.

P.       Nothing in this Final Judgment shall prohibit Google from distributing the Google Search Application, the Google Assistant Application, and a Google GenAI Assistant Application through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license.

## IV.     REQUIRED DISCLOSURES OF DATA

A.       <u>Google's Web Search Index</u>: For the term of this Final Judgment, Google will make available, at Marginal Cost, to Qualified Competitors the following data related to Google's Web Search Index on a non-discriminatory basis while safeguarding personal privacy and security:

1.       for each document in the Google Web Search Index a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other;

2.       a DocID to URL map; and

3.       for each DocID the following set of associated data: (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag.

4.       This information must be provided for all websites in the Web Search Index Google uses for searches on Google.com, the Google Search App, or future Google general search products.

5.       Google must make this information available to Qualified Competitors on a one-time basis at or around the time they are so certified as a Qualified Competitor.

6.      Nothing in this Section IV is intended to transfer intellectual property rights of third parties to index users.

B.      <u>User-Side Data</u>: For the term of this Final Judgment, Google will make available, at Marginal Cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:

1.      User-side Data used to build, create, or operate the GLUE statistical model(s); and

2.      User-side Data used to train, build, or operate the RankEmbed model(s).

3.      For the avoidance of doubt, "User-side Data" for purposes of Section IV includes only the underlying data, not the model itself or any ranking signal or score, spam score, information retrieval score, information satisfaction score, query interpretation information, query suggestion information, query-based salient term, or document salient term.

4.      The number of times a Qualified Competitor may receive a dataset will be capped by the Court after consultation with the Technical Committee. The cap on the number of such disclosures will be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied.

C.      <u>User-Side Data Sharing Administration</u>: These remedies are intended to make this data available in a way that provides suitable security and privacy safeguards for the data that Google must share.

1.      Before this data specified in Paragraph IV.B is shared with Qualified Competitors, Google shall apply adequate anonymization and privacy-enhancing techniques to ensure the data is anonymized and secured, while attempting to optimize its usefulness.

2.      Google must provide sufficient information about each dataset such that Qualified

Competitors can reasonably understand what it contains, including but not limited

to a description of what the dataset contains, any sampling methodology used to

create the dataset, and any anonymization or privacy-enhancing technique that

was applied. Plaintiffs, in consultation with the Technical Committee, may

recommend restrictions on what information Google shares under this Paragraph

IV.C.2 for the purposes of (i) promoting data privacy and security and (ii)

ensuring privacy and security safeguards are effectively applied.

3.      Google will have up to six (6) months from the date that security and privacy

safeguards are finally determined to implement the technology and provide any

notice necessary to comply with this Section IV.C.2.

4.      The data specified in Paragraph IV.A and B will be shared pursuant to a license

governing use. The terms of the license shall include a requirement that the

Qualified Competitor commit not to share or sell the datasets, and shall use the

datasets for the exclusive purpose of serving users located in the United States

through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI

Product.

## V.      REQUIRED SYNDICATION OF SEARCH RESULTS

A.      <u>Search Syndication</u>: Google must take steps sufficient to make available to any

Qualified Competitor a syndication agreement whose term will be five (5) years from the date

Google's search syndication service, as set forth in this Final Judgment, is made available to the

Qualified Competitor, unless there are fewer than five (5) years remaining before expiration of

the term of the Final Judgment, in which case the term will be the remainder of the term of the

8

Final Judgment. Google must make available under the syndication agreement the following information and data in response to each query submitted by a Qualified Competitor:

1.   Both desktop and mobile versions of the ranked organic web search results obtained from crawling the web (i.e., the ten blue links) that Google provides under current standard search syndication agreements;

2.   the user-facing query-rewriting features that Google provides under current standard search syndication agreements, including user-facing features that enable query correction, modification, or expansion; and

3.   the Local, Maps, Video, Images, and Knowledge Panel search feature content that Google provides under current standard search syndication agreements. For the avoidance of doubt, Google is not required to syndicate content in a manner inconsistent with its third-party content license agreements.

B.   <u>Search Syndication Agreement Terms</u>: The search syndication agreement must have the following additional features:

1.   Google will make syndicated content available via an API.

2.   Google will provide Qualified Competitors with latency and reliability functionally equivalent to what Google ordinarily provides to other users of Google's search syndication products with respect to queries originating in the United States. For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.

3.   Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms

agreed to by other users of Google's search syndication products with respect to queries originating in the United States.

4.   Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google.

5.   Qualified Competitors may elect, in their sole discretion, the queries (of those that are eligible for syndication pursuant to paragraph V.B.4) for which they will request syndicated results and which syndication components to call for.

6.   Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors must submit to the Technical Committee audits of syndication frequency and scope. The Technical Committee will make recommendations regarding the frequency and content of these audits, and the Court will have final authority over their frequency and scope.

7.   The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section V is to display the search results to the end user who submitted the associated query, for the exclusive purpose of

serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product.

8.  Google may impose its ordinary commercial terms and policies. For the avoidance of doubt, Google is permitted to place its ordinary commercial restrictions on the use and display of its syndicated results and content. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, crawling, or otherwise storing or analyzing the syndicated results and content.

9.  It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may impose its ordinary commercial terms as is necessary for the purposes of (1) search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance.

10. Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section V for Google's own products and services to the same extent Google retains or uses data in the ordinary course from other users of its search syndication service.

11. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor.  Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment.

12. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also

provide simultaneous notice to the Technical Committee of the breach and the

actions Google is taking in light of the breach.

C.    <u>Existing Syndication Agreements</u>: The provisions of this Section V will have no

effect on any existing Google search syndication agreements with third parties or on Google's

ability to enter into search syndication contracts with third parties other than Qualified

Competitors, except that Google must permit any entity with an existing search syndication

agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to

terminate its existing agreement in favor of the remedies in this Section V.

## VI.    SEARCH TEXT AD AUCTION CHANGES AND SEARCH TEXT ADS SYNDICATION

A.    <u>Search Text Ads Auction Changes</u>: Within a reasonable period of time after the

Technical Committee's appointment, Plaintiffs and the Technical Committee shall submit a

proposal to the Court, by which Google shall periodically provide the Technical Committee and

Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters

and, for each such change, (1) Google's public disclosure of that change or (2) a statement why

no public disclosure is necessary. The proposal shall detail the types of changes that must be

disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the

steps to ensure any public disclosure of an ad auction change (if not already made by Google)

avoids revealing Google's trade secrets, in accord with the Court's instructions in its September

2, 2025, Memorandum Opinion. For the avoidance of doubt, Google need not report on auction

experiments, which are generally tested on some fraction of Google's Search Text Ads traffic.

Should any of these auction experiments result in ad auction launches that fall within the types of

changes that must be disclosed under this Section, Google shall disclose such changes to

Plaintiffs and the Technical Committee.

B.    <u>Search Text Ads Syndication</u>: Google must take steps sufficient to make available to any Qualified Competitor a Search Text Ads syndication agreement whose term will be five (5) years from the date Google's Search Text Ads syndication service, as set forth in this Final Judgment, is made available to the Qualified Competitor, unless there are fewer than five (5) years remaining before expiration of the term of the Final Judgment, in which case the term will be the remainder of the term of the Final Judgment. The Search Text Ads syndication agreement must have the following additional features:

1.    Google will provide latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, with respect to queries originating in the United States. For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.

2.    Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, with respect to queries originating in the United States.

3.    Google will make available to Qualified Competitors all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) that are available through its Search Text Ads syndication products.

4.    Google will make the purchase of ads syndicated under this Section VI available to advertisers on a nondiscriminatory basis comparable to, and no more

burdensome than, the availability of Google's other Search Text Ads, and must offer advertisers the choice to opt into showing ads on Qualified Competitors' websites, consistent with Google's ordinary commercial terms, policies, and functionality offered to other users of Google's Search Text Ads syndication products.

5. Qualified Competitors shall have the same formatting flexibility with respect to the Search Text Ads syndicated pursuant to this Judgment as Google makes available to other users of Google's Search Text Ads syndication products.

6. Qualified Competitors shall be free to use other providers of syndicated search ads or display their own ads, and Qualified Competitors shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources.

7. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product.

8. Google may impose its ordinary commercial terms and policies. For the avoidance of doubt, Google is permitted to place its ordinary commercial restrictions on the use and display of its syndicated ads. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, crawling, or otherwise storing or analyzing the syndicated ads.

9.     Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure and shared ads systems. Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products.

10.     Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads.

11.     It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may impose its ordinary commercial terms for the purposes of (1) ad syndication functionality; (2) spam and abuse detection; and/or (3) legal or regulatory compliance.

12.     For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment.

13.     If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach.

14.     Google will be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse.

15.     Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results.

C.     <u>Existing Syndication Agreements</u>: The provisions of this Section VI will have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter into Search Text Ad syndication contracts with third parties other than Qualified Competitors, except that Google must permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI.

## VII.   COMPLIANCE AND ENFORCEMENT PROCEDURES

A.     <u>Technical Committee</u>:

1.     Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to assist in enforcement of and compliance with this Final Judgment.

2.     The TC members must be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless the Court approves, no TC member:

a.     may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC;

16

b.    may have been retained as a consulting or testifying expert by any party in this action; or

c.    may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC.

3.    Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google will each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee will serve as chair. The selection and approval process will be as follows:

a.    As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group will identify to Google the individuals they propose to select as their designees to the TC, and Google will identify to Plaintiffs the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Paragraph VII.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of selection.

b.    The Plaintiffs will apply to the Court for appointment of the persons selected pursuant to Paragraph VII.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Paragraph VII.A.2 above.

c.    As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") will identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google must not object

17

to these selections on any grounds other than failure to satisfy the requirements of Paragraph VII.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of the selection and must be served on the other party as well as on the Standing Committee Members.

d.    The Plaintiffs will apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members will be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by the Standing Committee Members which the parties have failed to resolve among themselves will also be decided by the Court based solely on the requirements stated in Paragraph VII.A.2 above.

4.    The Standing Committee Members will serve for an initial term of thirty-six (36) months; the remaining members will serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Paragraph VII.A.3 above. In the case of the fourth and fifth members of the TC, those members will be re-appointed or replaced in the manner provided in Paragraph VII.A.3 above.

5.    If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally

selected the TC member will select a replacement member in the same manner as provided for in Paragraph VII.A.3 above.

6.      Promptly after appointment of the TC by the Court, the Plaintiffs will enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google must indemnify each TC member and hold them harmless against any losses, claims, damages, liabilities or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements must include the following:

        a.      The TC members will serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the parties agree, including the payment of reasonable fees and expenses. To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution.

        b.      The TC Services Agreement will provide that each member of the TC must comply with the limitations provided for in Paragraph VII.A.2 above.

7.      The TC has the following powers and duties:

        a.      For the avoidance of doubt, neither the TC nor Plaintiffs will have the right to make final decisions as to the requirements of this Final Judgment. Google will have the right to object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations of or substantive requirements of this Final Judgment.

19

b.      The TC will have the power to advise and make recommendations about the standards to be applied for assessing, and the ultimate determination of whether a third party should qualify as a Qualified Competitor for purposes of this Final Judgment, *see* Paragraph IX.T.

c.      The TC will have the power to recommend reasonable data security standards applicable to Qualified Competitors, which will be submitted to the Court for review and determination, *see* Paragraph IX.T.

d.      The TC will have the power to advise Plaintiffs and the Court about an appropriate cap on User-side Data disclosures to be made to Qualified Competitors, *see* Paragraph IV.B.4;

e.      The TC will have the power to advise Plaintiffs and the Court about appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C.

f.      The TC will have the power to audit Qualified Competitors' use of search and search text ads syndication services, *see* Paragraph IX.T.

g.      The TC will have the power to conduct data security and privacy safeguard audits of Qualified Competitors, *see* Paragraph IX.T.

h.      The TC will have the power to advise Plaintiffs and the Court about an appropriate tapering rate for search syndication, *see* Paragraph V.B.4.

i.      The TC will have the power to develop and propose parameters that inform Google what types of Search Text Ads auction changes must be brought to the attention of Plaintiffs and the Technical Committee, and receive disclosures from Google about Search Text Ads auctions changes, *see* Paragraph VI.A.

j.      The TC may make reasonable and proportional requests necessary to perform its duties, on reasonable notice to Google, to:

(1)      interview any Google personnel, who may have counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google;

(2)      provide non-privileged documents and records in its possession, custody, or control;

(3)      obtain reasonable access to systems or equipment to the extent necessary to perform testing regarding appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C; and

(4)      obtain reasonable access to any physical facility, building or other premises to the extent necessary to perform testing regarding appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C.

(5)      To the extent that Google and the TC cannot agree on the reasonable scope of any such request, the parties may submit such disagreement to the Court for resolution.

k.      The TC must report in writing to the parties, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment.

l.      The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the parties, such staff or consultants (all of whom must meet the qualifications of Paragraphs VII.A.2.a-c) as are reasonably necessary for the TC

to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC will be based on reasonable and customary terms commensurate with the individual's experience and responsibilities, and subject to approval by the parties. To the extent that the parties cannot agree on such a request, the parties will submit such disagreement to the Court for resolution.

m.    The TC must account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the parties. To the extent that the parties cannot agree on the reasonableness of such expenses, the parties will submit such disagreement to the Court for resolution.

8.    Each TC member, and any consultants or staff hired by the TC, must sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC must be treated as Highly Confidential under the Protective Order in this case, and must not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities.

B.    <u>Annual Compliance Report and Compliance Inspection</u>:

1.    Without limiting the sovereign enforcement authority of each of the Plaintiff States, the Plaintiff States will form a committee to coordinate their enforcement of this Final Judgment ("Plaintiff States' Committee"). No Plaintiff State shall take any

action to enforce this Final Judgment without first consulting with the United States and with the Plaintiff States' Committee.

2.      Google will prepare and submit, on an annual basis, a written report describing its compliance with this Final Judgment ("Annual Compliance Report").

3.      To determine and enforce compliance with this Final Judgment, upon written request and on reasonable notice to Google and subject to any lawful privilege, a duly authorized representative of the United States (after consultation with the Plaintiff States' Committee) or of the Attorney General of a Plaintiff State (after consultation with the United States and the Plaintiff States' Committee), may:

a.      request from Google no more than one interim written report per year ("Interim Report"), under oath if requested, regarding Google's compliance with this Final Judgment;

b.      make reasonable requests to Google for production of non-privileged documents and records in its possession, custody, or control sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report; and

c.      subject to the reasonable convenience of Google and without restraint or interference from it, interview officers, employees, or agents of Google, who may have counsel present, sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report.

4.      No information or documents obtained by the means provided in this section shall be divulged by the United States or the Plaintiff States to any person, except in the course of legal proceedings to which the United States is a party, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

5.      If, at the time information or documents are furnished by Google to the United States or the Plaintiff States, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)" then the United States shall give 10 business days' notice prior to divulging such material in any legal proceeding.

6.      Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the United States or the Plaintiff States under this Final Judgment. After appropriate consideration of such claim of protection, the United States or the Plaintiff States, as the case may be, will either assert that the material is protected from disclosure under law or give Google 10 business days' notice of its intent to disclose the material.

C.      <u>Internal Compliance Officer</u>:

1.      Google shall designate, within 30 days of entry of this Final Judgment, an internal Compliance Officer who shall be an employee of Google with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment.

2.      Within seven (7) days of the Compliance Officer's appointment, Google must identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the Compliance Officer position, Google must appoint a replacement and identify to the

24

Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address.

3.     The Compliance Officer shall supervise the review of Google's activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google.

4.     The Compliance Officer shall be responsible for performing the following activities:

a.     within 45 days after entry of this Final Judgment, distributing a copy of this Final Judgment to all officers and directors of Google;

b.     promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Paragraph VII.C.4.a;

c.     ensuring that those persons designated in Paragraph VII.C.4.a are annually briefed on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or U.S. antitrust law;

d.     obtaining from each person designated in Paragraph VII.C.4.a an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has been advised and understands that his or her failure to comply with this Final Judgment may result in a finding of contempt of court;

e.     maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Paragraph VII.C.4.d has been obtained;

f.      establishing and maintaining the website provided for in Paragraph VII.D.2.b;

g.      preparing the Annual Compliance Report described in Paragraph VII.B.2 and any Interim Report requested as described in Paragraph VII.B.3.a;

h.      receiving complaints from third parties or the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Paragraph VII.D;

i.      maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and

j.      ensuring employees retain all relevant documents and electronically stored information, regardless of medium or form, regarding all complaints received pursuant to Paragraph VII.D.1 and action taken by Google with respect to any such complaint.

D.      <u>Voluntary Dispute Resolution</u>:

1.      Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs or the Compliance Officer.

2.      Submissions to the Compliance Officer.

a.      Third parties or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment. Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints related to Google's compliance with this Final Judgment to the Compliance Officer whenever doing so would be consistent with the public interest.

b.      To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's corporate website, in a manner reasonably acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website must provide a mechanism for communicating complaints and inquiries to the Compliance Officer.

c.      Google shall have 30 days after receiving a complaint to attempt to resolve or to reject it.

## VIII.   EFFECTIVE DATE; TERMINATION

A.      Subject to the outcome of any motion to stay this Final Judgment pending appeal, this Final Judgment shall take effect 60 days after the date on which it is entered, except that the portions of Section VII.A that require the parties to take steps toward forming the Technical Committee and that address the start of its work shall take effect immediately.

B.      Pursuant to Local Rule 54.2, the deadline for any motion under Federal Rule of Civil Procedure 54(d)(2)(B) and the proceedings as to any such motion shall be held in abeyance pending the conclusion of any appeals from this Final Judgment.

C.      Unless this Court grants an extension, this Final Judgment will expire on the sixth anniversary of the date on which it takes effect.

## IX.    DEFINITIONS

A.      "API" or "application programming interface" means a mechanism that allows different software components to communicate with each other.

B.      "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd.

C.      "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors.

D.      "Competitor" means any provider of, or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States or (iii) a Third-Party GenAI Product in the United States.  For the avoidance of doubt, "Competitor" does not include specialized vertical search providers, whether or not they offer a GenAI product.

E.      "Consideration" means any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval.

F.      "Covered Device" means a smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed.

G.      "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine.

H.      "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models.

I.      "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt, and that attempts to answer all queries (rather than only regarding particular topics). "General Search Engine" or "GSE" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032.

J.      "Google" means Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, and groups controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any Google GenAI Assistant Application; and (3) the directors, officers, managers, agents, and employees of such entities specified in this Paragraph IX.J who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any Google GenAI Assistant Application.

K.      "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors.

L.      "Google GenAI Assistant Application" means the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors) and any future user-facing software application owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information, provided, however, that this term shall not include Google Search, the Google Search Application, the Chrome Browser Application, or the Google Assistant Application.

M.      "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors.

N.      "Google Search" means the web search and search advertising services offered by Google at Google.com.

O.      "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors).

P.      "Marginal Cost" means the direct total production cost of producing an additional unit of a good or service, as determined by calculating the change in direct total production cost resulting from providing the additional unit(s) of data or services.

Q.      "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android.

R.      "Plaintiff States" means the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming.

S.      "Privacy Mode" means a mode within a web browser that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet.

T.      "Qualified Competitor" means a Competitor who applies to be so designated and: (i) meets the data security standards as determined by the Court in consultation with the Technical Committee; (ii) agrees to and satisfactorily passes regular data security and privacy audits by the Technical Committee; (iii) does not pose a risk to the national security of the United States, as determined by the Court; and (iv) makes a sufficient showing of a plan to invest and compete with General Search Engines and/or Search Text Ads providers, as determined by the Court in consultation with the Technical Committee. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis and establish that it continues to meet the criteria set forth in (i) – (iv). To continue to be in compliance with (iv) for purposes of re-certification, the Qualified Competitor must show that it is making sufficient efforts to invest and compete with General Search Engines and/or Search Text Ads providers. Google will have the right to object to and be heard by the Court on the qualification of, and continuing eligibility of, any proposed Qualified Competitor, including on the basis of noncompliance with data security, privacy, or contractual access or use restrictions.

U.      "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic text link on a search engine results page. "Search Text Ad" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 60, and includes Search Text Ads appearing in or in connection with Google AI Overviews.

V.      "Specialized Vertical Provider" means a platform that responds to queries with information centered on a particular subject matter.

W.      "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Paragraph VII.A.

X.    "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet.

Y.    "Third-Party GenAI Assistive Service" means a user-facing software application not owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information.

Z.    "Third-Party GenAI Product" means any application, software, service, feature, tool, functionality, or product not owned by Google or its affiliates that involves or makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information.  For clarity, "Third-Party GenAI Product" does not include specialized vertical search services, whether or not they offer a GenAI product.

AA.    "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search, and is not owned by Google or its affiliates.

BB.    "User-side Data" means all data obtained from users in the United States, directly through a search engine's interaction with the user's device, including software running on that device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries.

CC.    "Web Search Index" means databases that store and organize information about websites and their content that is crawled from the web.  For the avoidance of doubt, it does not

include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web.

## X.    THIRD-PARTY RIGHTS

Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature.

## XI.    RETENTION OF JURISDICTION

This Court retains jurisdiction for the purpose of enabling any of the parties to this Final Judgment to apply for such further orders or directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify or terminate any of its provisions, and to enforce compliance.

Dated: _____    _____
                                                Amit P. Mehta
                                    United States District Court Judge