**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                    Plaintiffs,<br><br>   v.<br><br>GOOGLE LLC,<br><br>                    Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |
| STATE OF COLORADO, *et al.*,<br><br>                    Plaintiffs,<br><br>   v.<br><br>GOOGLE LLC,<br><br>                    Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

**AMICUS CURIAE OPENAI'S BRIEF IN SUPPORT OF
<u>PLAINTIFFS' PROPOSED FINAL JUDGMENT</u>**

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to LCvR 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(A), amicus curiae OpenAI OpCo, LLC ("OpenAI") states it is a subsidiary of OpenAI Global, LLC and that Microsoft Corporation is a publicly held corporation that has a financial interest of 10% or more in OpenAI Global, LLC.

**STATEMENT OF INTEREST**

As set forth more fully in its motion for leave to file this brief, OpenAI has a strong interest in this litigation because, as a generative artificial intelligence ("GenAI") company, it is a prospective Qualified Competitor as defined by this Court. The remedies ordered by the Court will have a significant impact on OpenAI's ability to effectively compete against Google in the monopolized market of general search services.

**STATEMENT OF AMICUS CURIAE INDEPENDENCE**

Pursuant to LCvR 7(o)(5) and Federal Rule of Appellate Procedure (29)(a)(4)(E), OpenAI certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person—other than the amicus, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    THE FINAL JUDGMENT SHOULD ALLOW SYNDICATION USAGE BEYOND DISPLAY OF THE TEN BLUE LINKS ............................................... 2

    II.    THE FINAL JUDGMENT SHOULD ADOPT PLAINTIFFS' PROPOSED SYNDICATION TERMS ....................................................................................... 4

    III.    THE FINAL JUDGMENT SHOULD NOT ALLOW GOOGLE'S ARTIFICIAL AND AMBIGUOUS LIMITATIONS ON THE USE OF ITS DATA ................... 6

CONCLUSION .............................................................................................................................. 8

## ABBREVIATIONS

| CITATION | CORRESPONDING FILING OR TRANSCRIPT |
|---|---|
| Pls.' PFJ | Plaintiffs' proposed final judgment dated September 17, 2025 (ECF No. 1442-1) |
| Def.'s PFJ | Defendant's proposed final judgment dated September 17, 2025 (ECF No. 1443-2) |
| Rem. Op. | Court's Memorandum Opinion Regarding Remedies dated September 2, 2025 (ECF No. 1436) |
| Rem. Tr. | Transcript of the Evidentiary Hearing on Remedies, conducted from April 21 to May 9, 2025, and May 30, 2025 |
| PFJ Hr'g Tr. | Transcript of the Hearing on Final Judgment Proceedings, conducted on October 8, 2025 |

**PRELIMINARY STATEMENT**

The dispute before the Court concerns competing terms for a judgment to remediate Google's longstanding monopolistic behavior. Google's monopoly in general search services has given it significant scale advantages, preventing Qualified Competitors from "pry[ing] open" the "frozen" general search market and delivering innovation for the benefit of American consumers. Rem. Op. at 107. Plaintiffs' proposed final judgment squarely addresses this issue and advances the goals of the Court's remedial opinion, particularly as to syndication and data sharing. By contrast, Google's proposed restrictions on syndication and data sharing would effectively gut these remedies, entrenching Google's dominance and limiting innovation.

*First*, Google's proposed restrictions on Qualified Competitors' display of syndicated search results would force Qualified Competitors to adopt a single mode of displaying search results via ten blue links, and thus bar innovative uses of the results. Google's proposed cookie-cutter approach to displaying search results is simply not how GenAI products (like ChatGPT) use search syndication, and it is telling that Google itself does not use the ten blue links for Google's own AI search product named "AI Overviews." In comparison, Plaintiffs' proposal for the use of syndicated search results requiring "the least restrictive terms Google provides under any current search syndication agreements" gives Google an opportunity to use existing business terms while providing flexibility for Qualified Competitors to innovate for the benefit of American consumers. Pls.' PFJ § V.B.6.

*Second*, Plaintiffs' proposal properly imposes only a floor (in terms of favorability to Qualified Competitors) on syndication terms, whereas Google's proposal would allow Google to offer only (relatively unfavorable) terms that it previously extracted by exercising its monopoly power. Although OpenAI is not privy to Google's redacted objections, it makes no sense for an

1

antitrust remedy to allow a monopolist to treat its competitors as (or more) unfavorably than it did in the unfettered exercise of its monopoly power.

*Third*, Plaintiffs' proposed data-sharing remedy allows Qualified Competitors to develop innovative, new search-oriented products that could compete against Google's dominance. As drafted, Google's proposal would not permit OpenAI to use Google's data to build its own index—and thus would undermine the goals of this Court's remedial order.

Further, the ambiguity in Google's proposal for syndication terms and data sharing invites disputes, delaying the implementation of these remedies and their pro-consumer results.

## ARGUMENT

**I.  THE FINAL JUDGMENT SHOULD ALLOW SYNDICATION USAGE BEYOND DISPLAY OF THE TEN BLUE LINKS**

Google's proposed constraints on syndication contravene the ability of Qualified Competitors to create better search products for consumers through innovation. Google would prohibit a Qualified Competitor from using syndicated search results for anything other than "***display[ing] the search results*** to the end user who submitted the associated query." Def.'s PFJ § V.B.7 (emphasis added). But not all search products display "blue links" in response to a user query. Google ignores that—as this Court has recognized—GenAI search products already diverge from this format and that variation benefits consumers. *See* Rem. Op. at 25 (explaining that OpenAI's ChatGPT, like GenAI search products, "already provides answers without 10 blue links, in a simple experience, with natural contextual conversational follows ups" (quoting PXR0176 at -125)).

OpenAI's Head of ChatGPT, Nick Turley, explained to the Court how ChatGPT's search product is different from Google's during the remedies evidentiary hearing. Mr. Turley explained that "what we're hoping to build is a new type of product. It's not your classic search-engine

2

experience with links. It's this useful AI that over time does more and more for you." Rem. Tr. at 418:6-419:9 (Turley). OpenAI is "not trying to recreate the type of experience that [a consumer] would find on Google.com where you see ten blue links." *Id.* at 389:17-390:2 (Turley). Rather, OpenAI would use syndicated search results to improve ChatGPT's responses to a higher quality and with access to realtime information. *See* Rem. Op. at 171 (quoting Rem. Tr. at 425:1-10 (Turley) ("The syndicated search results would be helpful now. . . because it allows us to immediately improve quality of the product on . . . the dimension of realtime information and currency, and allows us to focus on building out the parts on which we can most differentiate . . . .")).

Prospective Qualified Competitors like OpenAI require a remedy flexible enough to support these innovations, which only Plaintiffs' proposal provides. Specifically, Plaintiffs' proposal prevents Google from imposing restrictions or conditions on how a Qualified Competitor can use, display, or integrate syndication results beyond "the least restrictive terms Google provides under any current search syndication agreements." Pls.' PFJ § V.B.6. This provision conforms to the Court's requirement that "Google's syndication obligations . . . shall be consistent with its current syndication agreements." Rem. Op. at 173.

Google's syndication-display restriction would stifle innovation by requiring Qualified Competitors to adopt a single prescribed approach to invoking the remedy. This Court revised the definition of Qualified Competitor "[t]o leave no doubt that the remedies extend" to a firm like OpenAI, whose "GenAI product like ChatGPT is not limited to the GSE market." Rem. Op. at 103-04. Given the structure of the remedy, a Qualified Competitor's "advantage will have to come from innovation and differentiating their search services from Google's." Rem. Op. at 132. Consistent with the Court's opinion, the remedy extended to companies like OpenAI that are

3

developing GenAI products should therefore provide leeway to experiment, innovate, and deliver differentiation.

All while Google itself has already moved onto different formats: it is telling that Google *itself* will not be subject to any restrictions or incentives to return only "blue links." Rather, as Google's "AI Overviews" currently operates, Google responds to user queries with narrative responses. *See* Rem. Op. at 19-20 (describing the display of Google's "AI Overviews"). The final judgment should not inadvertently create a disparity between Qualified Competitors and how Google is able to display search results in Google's own products which include search and GenAI. *See id*. at 102 (describing Google's integration of GenAI into search as "show[ing] no signs of slowing"). Privileging Google's "AI Overviews" and Gemini at the expense of its GenAI competitors would turn the Court's liability finding on its head, allowing ***Google*** to secure a competitive advantage for its own GenAI products.

The proposed limitation of displaying search results is problematic because it is already obsolete or outdated, frustrating Qualified Competitors' ability to compete against Google's "AI Overviews" and offer consumers variation in search. American consumers will benefit if they can choose between products that tackle "search" in different ways.

## II. THE FINAL JUDGMENT SHOULD ADOPT PLAINTIFFS' PROPOSED SYNDICATION TERMS

Only Plaintiffs' proposal that Google must provide syndication on terms "no less favorable than the most favorable terms" that Google already provides, Pls.' PFJ § V.B.3, fits the remedial scheme. *See* Rem. Op. at 173 (requiring syndication "on terms no less favorable than a current licensee as of the date the judgment is entered"); *id.* at 174 (requiring syndication pricing "on 'financial terms no worse than those offered to any other user of Google's search syndication products'"). OpenAI is concerned that Google's proposal would impose terms from a handful of

4

outdated agreements negotiated and executed by Google with the benefit of its monopoly power, and inadvertently create disputes between the parties about what is or is not an "ordinary" commercial term. Def.'s PFJ § V.B.

The purpose of the syndication remedy is to introduce independent search competition, allowing Qualified Competitors to "deliver high-quality search results." Rem. Op. at 170. Plaintiffs' proposal properly imposes only a floor (in terms of favorability to Qualified Competitors) on syndication terms, and provides clear guidelines that Qualified Competitors are entitled to a "Most Favored Nation" clause for Google's syndication agreements. In contrast, Google's proposal would allow Google to offer only (relatively unfavorable) terms that it previously extracted by exercising its monopoly power. Google entered its current syndication agreements with counterparties facing Google as a monopolist, and Google's dominant position is reflected in its so-called "ordinary" commercial terms. *See* Rem. Op. at 1 ("Google is a monopolist, and it has acted as one to maintain its monopoly."). Syndication consistent with "ordinary" commercial terms would allow Google to maintain its grip on the search market.

Moreover, Google's proposal injects unnecessary and undesirable complexity into the remedy's implementation. As Mr. Turley testified, Google in the past shut out certain Qualified Competitors, such as OpenAI, from syndication agreements. *See id.* at 38-39 (citing Rem. Tr. at 413:1-416:3 (Turley)). As a result, there are no so-called "ordinary" commercial terms for syndication with many Qualified Competitors, including OpenAI. Disputes over which terms are "ordinary" risks delaying the implementation of the remedy—and as Mr. Turley explained at the hearing, the speed with which any remedy is available is as important as the remedy itself. *See* Rem. Tr. at 409:11-410:22 (Turley) (explaining that access to Google's index "faster would allow [OpenAI] to build a better product faster").

Google complains that Plaintiffs' proposal would allow Qualified Competitors to pick, from a menu of favorable terms, a combination of terms that would not reflect "ordinary commercial terms." *See generally* ECF No. 1443 at 25-29. But, again, Google's position that terms it imposed as a monopolist should ***constrain*** this Court's antitrust remedies is entirely inappropriate. It is entirely plausible that a sound antitrust remedy would require a monopolist to treat its competitors less unfavorably than it did in the unfettered exercise of its monopoly power, so as to help restore lost competitive balance and innovation beneficial to American consumers. The Court should not allow Google to leverage its outdated terms moving forward.

### III.   THE FINAL JUDGMENT SHOULD NOT ALLOW GOOGLE'S ARTIFICIAL AND AMBIGUOUS LIMITATIONS ON THE USE OF ITS DATA

As Mr. Turley testified, OpenAI has started building its own search index and ranking infrastructure, where user-side data from third parties is a necessary ingredient for success. *See* Rem. Tr. at 392:24-393:5, 399:21-401:11 (Turley). Like many other potential competitors to Google in this space, OpenAI does not have sufficient scale of click-and-query data on its own to build a search technology that can effectively compete against Google. *Id.* at 402:24-403:10 (Turley). Only Plaintiffs' proposal allows a prospective Qualified Competitor, like OpenAI, to leverage the data-sharing remedy to innovate new search-oriented products. The artificial and ambiguous limitations in Google's proposal would not. *Compare* Def.'s PFJ § IV.C.4 (requiring that datasets be used "for the exclusive purpose of serving users located in the United States"), *with* Pls.' PFJ § IV.C (imposing no comparable restraint). As drafted, Google's limitations are incompatible with the purpose of the remedial scheme and should not be adopted.

Access to user-side data should enable Qualified Competitors to "improve their GSE, particularly in responding to long-tail queries." Rem. Op. at 155. The data-sharing provision in Plaintiffs' proposal would sufficiently allow a Qualified Competitor to "accelerate the

6

development of [its] own index." *Id*. at 140 (quoting Rem. Tr. at 409:11-410:22 (Turley)). To improve responses to long-tail queries, for example, Qualified Competitors should be permitted to develop their products using this data. Rem. Tr. at 402:24-403:10 (Turley) (explaining that OpenAI "do[es] need ideally more data for the less common queries"); *see also* Rem. Op. at 160 (explaining that "it will be up to Qualified Competitors to engineer the technology and develop the infrastructure to make use of [Google's data]").

OpenAI (and Plaintiffs) interpret Google's proposal to prohibit Qualified Competitors from building an index using the user-side data-sharing remedy. *See* PFJ Hr'g Tr. at 43:8-18 ("[R]ight now, as drafted, . . . the data specified in [Def.'s PFJ §§] IV.A and B . . . '[shall be used] for the exclusive purpose of serving users,' which [Plaintiffs have] interpreted to mean just displaying results . . . ."). Under a plain reading of this provision, Google proposes an artificial limitation that would neuter the remedy, permitting it to maintain its long-held monopoly in search. Plaintiffs' proposal intentionally omits any such limitation. Google has needed to clarify that this strict limitation was not its "intention," which evinces the tremendous ambiguity in its provision. *Id*. at 43:8-19; 44:7-11. That ambiguity sets the stage for potential disagreements between Google and Qualified Competitors about what data usage "serves users" —and, indeed, differences about that very question are what drives innovative, differentiated competition. Should Google object to the Technical Committee's interpretation of this language, this ambiguous provision risks delaying or derailing a Qualified Competitor from bringing innovation to market.

It is similarly unclear whether Google intends to prevent analytics usage of these datasets under Google's proposal. Qualified Competitors may wish to analyze user feedback to understand categories of query intent (i.e., whether the intent of a query is to navigate to a

7

specific site, make a transaction, find an answer, etc.). For OpenAI, this is but one step in the process of "improv[ing] Search" for end users. *See* PFJ Hr'g Tr. at 44:7-11 (Google acknowledging that the datasets can be used to "improve Search"). But Google may disagree and challenge a hypothetical Technical Committee's recommendation that analytics qualifies as "serving users," stalling OpenAI's ability to progress. The ambiguity in Google's proposal is problematic for any Qualified Competitor hoping to quickly leverage this remedy to develop a competitive GSE or search-related product.

## CONCLUSION

While Plaintiffs' proposals on syndication and data-sharing are consistent with the remedial scheme, if enacted, Google's proposed restrictions would gut these remedies considerably, allowing a dominant firm to hold on to its monopoly and obstruct innovation. That would be an ironic and unwelcome coda to these proceedings. For these reasons, OpenAI respectfully submits that the syndication and data-sharing terms of Plaintiffs' proposed final judgment should be adopted in full by this Court.

Date: October 31, 2025

Respectfully submitted,

*/s/ Ashok Ramani*
DAVIS POLK & WARDWELL LLP
Ashok Ramani
ashok.ramani@davispolk.com
Serge A. Voronov
serge.voronov@davispolk.com
900 Middlefield Road, Suite 200
Redwood City, CA 94063
Tel:   (650) 752-2000

*Counsel for Amicus Curiae OpenAI OpCo, LLC*

8