**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| United States of America, *et al.*, | | |
| | Plaintiffs, | Case No. 1:20-cv-03010 (APM) |
| v. | | HON. AMIT P. MEHTA |
| Google LLC, | | |
| | Defendant. | |

| | | |
|---|---|---|
| State of Colorado, *et al.*, | | |
| | Plaintiffs, | Case No. 1:20-cv-03715 (APM) |
| v. | | HON. AMIT P. MEHTA |
| Google LLC, | | |
| | Defendant. | |

**BRIEF OF *AMICUS CURIAE* MICROSOFT CORPORATION IN SUPPORT OF
PLAINTIFFS' FINAL PROPOSED FINAL JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................................ 1

ARGUMENT ................................................................................................................................... 3

I. THE FINAL JUDGMENT SHOULD INCLUDE GENERATIVE AI
PRODUCTS ....................................................................................................................... 3

II. THE FINAL JUDGMENT SHOULD PROHIBIT MULTI-YEAR
AGREEMENTS .................................................................................................................. 8

III. THE COURT SHOULD RETAIN JURISDICTION TO ENFORCE AND
MODIFY THE FINAL JUDGMENT. ................................................................................ 10

IV. THE TECHNICAL COMMITTEE SHOULD HAVE BROAD
DISCRETION TO RESOLVE DISPUTES. ....................................................................... 12

CONCLUSION ............................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Int'l Salt Co. v. United States,*
    332 U.S. 392 (1947)................................................................................................................10

*Massachusetts v. Microsoft Corp.,*
    373 F.3d 1199 (D.C. Cir. 2004).......................................................................................... *passim*

*New York v. Microsoft Corp.,*
    531 F. Supp. 2d 141 (D.D.C. 2008)..................................................................................16, 17

*United States v. Google LLC,*
    747 F. Supp. 3d 1 (D.D.C. 2024)............................................................................................11

*United States v. Int'l Salt Co. et al.,*
    Civ. No. 32-310 (S.D.N.Y. Dec. 27, 1946)............................................................................13

*United States v. Microsoft Corp.,*
    231 F. Supp. 2d 144 (D.D.C. 2002)..................................................................................4, 10

*United States v. Microsoft Corp.,*
    2009 WL 1348218 (D.D.C. Nov. 12, 2002) ..........................................................................13

**Other Authorities**

*Alphabet Announced Third Quarter 2025 Results*, ALPHABET (Oct. 29, 2025),
    https://s206.q4cdn.com/479360582/files/doc_financials/2025/q3/2025q3-
    alphabet-earnings-release.pdf ....................................................................................................8

Spencer Weber Waller, *Access and Information Remedies in High Tech Antitrust,*
    LOYOLA UNIV. CHI. SCH. OF L. (July 25, 2011),
    https://doi.org/10.2139/ssrn.1895018. ....................................................................................16

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(A), *amicus curiae* Microsoft Corporation certifies that Microsoft has no parent corporation and that no publicly held corporation owns 10% or more of Microsoft's stock.

## STATEMENT OF INTEREST

Microsoft is a global technology company that develops, licenses, and supports a wide range of software, services, and devices.  Among its diverse business lines, it operates Bing, a general search engine ("GSE") that competes across the general search and general search text advertising markets.  Microsoft also has developed Copilot, an advanced generative artificial intelligence ("GenAI") platform that integrates large language models into Bing, productivity tools, cloud services, and other enterprise applications.  Most recently, Microsoft launched Azure AI Agents, which combines Bing-grounded search with GenAI chatbots and deepens the integration between its general search services and GenAI offerings.

Microsoft has a significant interest in the issues before the Court.  These issues directly affect the competitive landscape for both general search and GenAI technologies—two sectors central to Microsoft's ongoing innovation and investment.  As one of Google's main competitors in general search, Microsoft has firsthand experience with the harmful effects of Google's exclusive and anticompetitive distribution agreements, as well as the broader challenges posed by data access barriers, restricted market opportunities, and Google's dominance.  Microsoft has observed similar issues arising in GenAI, including constraints related to distribution and platform control.

Microsoft also brings a unique, historical perspective as the defendant in *United States v. Microsoft*, which also involved allegations of monopolization in fast-evolving technology markets and a technical committee designed to implement the court's final judgment.  That experience

gives Microsoft a distinct understanding of how antitrust enforcement can balance the twin goals of preserving competition and fostering innovation, particularly as it relates to the enforcement of a final judgment and the operation of a technical committee.

Accordingly, Microsoft submits this brief to assist the Court in evaluating the parties' competing final proposed final judgments and implementing the directives set forth in the Court's September 2, 2025, Memorandum Opinion.

## STATEMENT OF *AMICUS CURIAE* INDEPENDENCE

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure (29)(a)(4)(E), Microsoft certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person— other than the *amicus,* its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION

Microsoft respectfully submits this *amicus curiae* brief to assist the Court in evaluating the parties' competing proposals regarding four topics in the parties' respective final proposed final judgments ("FPFJs").  The Court should adopt Plaintiffs' proposals, which will best effectuate the Court's remedies decision and foster increased competition in general search.

*First,* the Court should adopt Plaintiffs' proposed definition of GenAI Products.  Plaintiffs' FPFJ includes a flexible, forward-looking definition of "GenAI Products," while Google's FPFJ seeks to limit the scope of GenAI Products covered by the final judgment.  *Compare* Pls. FPFJ § IX.J (as modified by Rem. Hr'g Tr. 115:14-20) *and* Def. FPFJ §§ IX.L, IX.Y, IX.Z.  Plaintiffs' proposed definition properly captures certain GenAI products alongside traditional search defaults in browsers, operating systems, and mobile environments and accounts for the ever-evolving technology landscape.  As the Court has already recognized, there is significant overlap in GenAI and general search, and any remedies that attempt to "pry open" the general search market will be ineffective if they do not also apply to GenAI products that incorporate general search technologies.

*Second,* the Court should reject Google's attempt to continue its anticompetitive multi-year distribution agreements.  Plaintiffs' FPFJ includes a one-year term on distribution agreements, whereas Google's FPFJ permits multi-year agreements with annual opt-out provisions.  *Compare* Pls. FPFJ § III.K *and* Def. FPFJ § III.K.  As the Court has recognized, these multi-year contracts are precisely what "contributed to [Google] stifling competition."  *See* Memorandum Opinion, 1:20-cv-03010-APM (Dkt. No. 1436), at 110 (Sept. 2, 2025) (hereinafter "Remedies Opinion").  The Court should adopt Plaintiffs' proposal because Google's contracting practices already make it difficult for distribution partners to work with competing search and GenAI providers and

1

allowing multi-year contracts to continue—even with annual opt-out provisions—risks further entrenching Google's unlawful scale advantage and perpetuating the status quo.

*Third,* the Court should retain jurisdiction to revisit its decree. Plaintiffs' FPFJ includes express language enabling the Court to retain jurisdiction to enforce and—if necessary—modify its judgment, which is standard in antitrust decrees, whereas Google's FPFJ seeks weaker language that would limit the Court's ability to revisit its decision. *Compare* Pls. FPFJ § XI.A *and* Def. FPFJ § XI. The Court should adopt Plaintiffs' FPFJ, which allows the Court to monitor and evaluate whether its remedies have been effective. As the Court has observed, there is a substantial likelihood that the final remedies may not fully address one of the main fruits of Google's anticompetitive conduct: the massive scale advantage it enjoys over existing competitors. Remedies Opinion at 89 (discussing the "importance of scale as a fruit of Google's exclusive distribution arrangements."). Additionally, the Court has acknowledged that it may need to "revisit a payment ban (or a lesser remedy) if competition is not substantially restored through the remedies the court does impose." *Id.* at 128. Explicitly retaining jurisdiction and reserving the right to enforce and modify the final judgment (e.g., by barring Google from making payments for default placement) preserves the Court's ability to "clarify[] and reconsider[] its decree in light of changing . . . market realities." *Id.* It will also allow the Court to act swiftly, if needed, to ensure that the general search and general search text advertising markets are not forever distorted due to Google's adjudicated anticompetitive conduct.

*Fourth,* the Court should empower the Technical Committee to resolve disputes. Plaintiffs' FPFJ provides for a robust and independent Technical Committee, while Google's FPFJ wants the Court to arbitrate nearly every dispute itself. *Compare* Pls. FPFJ § VII.A.7 *and* Def. FPFJ § VII.A.7.a. Once again, the Court should adopt Plaintiffs' FPFJ, which provides for a Technical

Committee similar to the one established in *United States v. Microsoft*.  The Technical Committee in *Microsoft* proved an efficient, trusted, and technically capable resource.  It resolved many implementation issues at the committee level—without burdening the Court—and provided transparency and accountability through its regular reporting requirements.  The Court should adopt the language in Plaintiffs' FPFJ to ensure that the Technical Committee is not restricted from applying its expertise outside of the narrow issues enumerated in Google's FPFJ, and to alleviate the burden on the Court.

**ARGUMENT**

## I.    THE FINAL JUDGMENT SHOULD INCLUDE GENERATIVE AI PRODUCTS.

The Court has made clear that "Google cannot use the same anticompetitive playbook for its GenAI Products that it used for Search" and that "the final judgment will reach GenAI technologies and companies."  Remedies Opinion at 99, 103.  That was because there is "ample evidence that GenAI chatbots grounded in general search perform an information-retrieval function that is similar to GSEs."  *Id.*

The record is full of examples of how GenAI is already being integrated across general search and related search invocation surfaces.  Google, for example, has incorporated AI Overviews into its search engine results page, and it has launched an AI Mode in its Chrome browser.  *See* Remedies Opinion at 19-22.  Microsoft has similarly incorporated GenAI-powered Copilot Answers into its search engine results page and launched new Copilot search features.  *See* Schechter Rem. Dep. 30(b)(6) 103:21-25; 104:17-20; Schechter Rem. Dep. 30(b)(1) 240:23-242:8 (describing Google's "extensive use of AI overviews" and how Microsoft has incorporated GenAI technologies into Bing).  And, as the Court has acknowledged, many competitors in the market, including Perplexity and others, are now embedding GenAI into traditional search products such

3

as web browsers.  *See* Rem. Hr'g Tr. 63:6-9 (Oct. 8, 2025).  Because both GenAI and GSEs "fulfill a broad array of informational needs," the Court recognized that GenAI is "a potential threat to Google's dominance in the market for general search services." Remedies Opinion at 100.

The inverse is also true; GenAI products ground the output of the model based on information from an external database or GSE.  *Id.* at 32.  To perform this role effectively, GenAI products must integrate high-quality search technology.  *See id.* at 39.  For example, when a GenAI chatbot is asked a detailed question, "the LLM may not actually have the information to accurately respond to the user unassisted."  Cromwell Rem. Dep. 30(b)(1) 71:3-4.  In that scenario, GenAI products use grounding, which calls on a search index, to provide "the LLM[,] in real-time[,] additional context to pick through in order to reply with an accurate response to the user," and includes citations for the response.  *Id.* 71:5-17.  This combination of search and GenAI allows a GenAI chatbot both to perform a function similar to a GSE (i.e., providing links to URLs where a user can find more information on a topic) and improves the quality of the GenAI product more generally by "reduc[ing] an LLM's hallucinations and improv[ing] factuality" as well as addressing the recency problem caused by LLMs relying on dated training data.  Remedies Opinion at 37-38.  Moreover, the importance of grounding GenAI in search is likely only to deepen.  *Id.* at 135 ("In this moment of all moments, Google cannot afford to abandon or scale back its investment in search technologies, given the importance of grounding to GenAI products . . . which is likely only to deepen.").

To implement the Court's directive that "the final judgment will reach GenAI technologies and companies," *see* Remedies Opinion at 99, Plaintiffs initially proposed a functionality-based definition of "GenAI Product."  That definition covers "any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models."

Pls. FPFJ § IX.J.  Plaintiffs' approach was to propose a forward-looking definition that captured current GenAI offerings (e.g., Gemini; Copilot; ChatGPT; Perplexity) and emerging AI agents—task-oriented tools that plan and execute actions on a user's behalf and routinely invoke web search.  To ensure the Court's distribution remedies reach GenAI technologies connected to general search without sweeping in unrelated products (e.g., Google Photos), Plaintiffs propose further limiting distribution remedies to only GenAI Products "that fulfill a broad array of information needs."  *See* Rem. Hr'g Tr. 115:14-20.[1]  With this modification, the definition and related provisions are grounded in the Court's liability findings while remaining broad enough to encompass nascent GenAI technologies.  Plaintiffs' approach also addresses the Court's observation that GenAI is "a potential threat to Google's dominance in the market for general search services," and the Court's concern that Google may "use the same anticompetitive playbook for its GenAI products that it used for Search" to unlawfully retain monopoly power and foreclose GenAI rivals.  Remedies Opinion at 99-100.

By contrast, Google's FPFJ would narrowly cabin the GenAI products covered by the Court's distribution remedies.  Google would limit distribution remedies to only GenAI products whose "***principal function[]***" is "answering information-seeking prompts."  Def. FPFJ § IX.L (emphasis added).  This principal function test is unworkable and inconsistent with the Court's findings and the Remedies Phase record.  Modern GenAI is multifunctional and increasingly embedded across different products—including general search, browsers, assistants, AI agents, and operating system/UI invocation points—where it competes by fulfilling broad informational

---

[1]     As modified, the definition of "Google GenAI Product" means "any GenAI Product offered by Google ***that can fulfill a broad array of information needs***, including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the 'Google Gemini' application (and that application's functionally equivalent successors."  Pls. FPFJ § IX.N; Rem. Hr'g Tr. 115:14-20 (emphasis added).  Similarly, as modified, the term "Third-Party GenAI Product" means "any GenAI Product that is not owned by Google ***that can fulfill a broad array of information needs***."  Pls. FPFJ § IX.FF; Rem. Hr'g Tr. 115:14-20 (emphasis added).

needs.  A principal function requirement would exclude competitive substitutes that involve or use GenAI capabilities or models.  *See, e.g.*, Pls. Br. at 29.  For instance, it would exclude AI agents whose principal function may include task execution (e.g., drafting emails or booking travel) even though such agents routinely invoke web search and present ranked recommendations in response to user queries.  It would also spur endless disputes on what a product's "principal function" is.  Worse, this limitation would allow Google to reprise the same playbook of anticompetitive agreements to eliminate Third-Party GenAI Products that incorporate general search functionality, simply because answering information-seeking prompts is not their principal function ***today***— even though those products could principally function as general search ***tomorrow***.

Google's proposal also seeks to categorically exclude "Google Search, the Google Search Application, the Chrome Browser Application, or the Google Assistant Application," from remedies that would apply to "Google GenAI Assistant Application" (i.e., Google Gemini) regardless of whether those products integrate GenAI capabilities.  That carve-out conflicts with the Court's finding that Google has deeply integrated GenAI into its general search products, including by incorporating AI Overviews into its Google Search entry results page, the Google Search Application, and the Chrome Browser Application.  *See* Remedies Opinion at 102.  A definition that excludes non-Gemini products from GenAI will create a massive loophole ripe for exploitation.  The Court did not limit its analysis to "assistant" applications or GenAI whose principal function is answering prompts.  *See* Remedies Opinion at 99–102; Pls. Br. at 29.  It should reject Google's attempt to do so now.

In support of its overly narrow definition, Google argues that restricting the distribution of Google's GenAI products would disadvantage Google relative to competitors noting that "other products out there . . . are getting plenty of distribution."  Rem. Hr'g Tr. 61:13-19.  Yet, in Google's

most recent quarterly earnings release, CEO of Alphabet and Google Sundar Pichai praised Gemini for "topping leaderboards" and having "over 650 million monthly active users." *Alphabet Announced Third Quarter 2025 Results*, ALPHABET (Oct. 29, 2025), https://s206.q4cdn.com/ 479360582/files/doc_financials/2025/q3/2025q3-alphabet-earnings-release.pdf.    Moreover, the Court has expressed concern that Google could use "Google products that have some degree of leverage in the market . . . as a way of better positioning Gemini relative to other chat GenAI products."  Rem. Hr'g Tr. 63:10-16.  This concern is precisely why Google's narrow definition— which carves non-Gemini AI features out of "GenAI" and thereby out of the distribution remedies—is problematic: it would permit Google to continue leveraging its general search dominance to advantage its GenAI products and foreclose rivals.

Adopting a broader, forward-looking definition of GenAI Product is especially important in this case because the record shows that Google has already deployed its search playbook to constrain GenAI distribution through MADAs, RSAs, and related agreements—one of the Court's principal concerns.  For example, Microsoft's Director of Customer Engagement, Charlie Beard, testified about the challenges Microsoft has experienced with installing Copilot on a leading OEM's devices because that OEM has a "complicated RSA agreement with Google" that covers some GenAI products.  *See* Ex. A, Feb. 20, 2025, Deposition Transcript of Charlie Beard ("Beard Dep.") 33:4-13.  Similarly, Google's RSA with another leading OEM has posed a challenge to Copilot distribution.  *Id.* 83:15-24 ("Google was telling their partners that Copilot . . . qualified as an assistive app and therefore [distributing it] would violate the RSAs.").  U.S. phone carriers have reported the same constraints.  One major mobile distributor considered the preinstallation of ***any*** Microsoft asset (including Copilot) to be a violation of its RSA with Google.  *Id.*  120:5-121:17 (discussing mobile distributor's outreach to Microsoft about "testing Bing and Copilot on an

Android device" and stating that it "identified that . . . anything that required a Microsoft – some of the Microsoft assets that we'd want, including Edge and Bing, would violate their RSA"). Another major mobile distributor also considered preinstalling Copilot on its Android devices but conveyed that these devices were covered by Google's MADA and RSA agreements. *Id.* 134:13-21. So too with a third major mobile distributor, which expressed interest in distributing Copilot but needed to "check their RSA about any restrictions about having Copilot preinstalled on their devices." *Id.* 139:15-20. As Microsoft's own recent experiences illustrate, Google's anticompetitive search agreements are already being used to limit GenAI distribution and stifle competition.

Plaintiffs' forward-looking, functionality-based relief is also firmly supported by precedent. It is well-established that courts have broad discretion to "fashion appropriate relief by adopting . . . 'forward-looking' provisions . . . both to avoid a recurrence of the violation and to eliminate its consequences." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1215 (D.C. Cir. 2004) (citation omitted). Furthermore, it is consistent with the Final Judgment in *Microsoft*, which defined the concept of "middleware" broadly to capture both "present and future middleware technologies." *See United States v. Microsoft*, 231 F. Supp. 2d 144, 187 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004), Dkt. No. 740, at 69. The same approach is warranted here to "effectively pry open to competition a market that has been closed by [Google's] illegal restraints." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947).

## II. THE FINAL JUDGMENT SHOULD PROHIBIT MULTI-YEAR AGREEMENTS.

The Court should adopt Plaintiffs' proposed language limiting the duration of distribution contracts to "no more than one year." Pls. FPFJ §§ III.K-M. Plaintiffs' proposed language is consistent with the Court's directive to impose a "one-year term" on Google's OEM and wireless

carrier agreements.    Remedies Opinion at 110.   By contrast, Google's proposal would permit multi-year contracts as long as Google agrees to "terminate the agreement on an annual basis and does not charge a fee for terminating."  Defs. FPFJ § III.K.   Contrary to Google's assertion, this is not the functional equivalent of a one-year term.  Defs. Br. at 14.  As Plaintiffs explained, opt-outs in multi-year contracts are "difficult to exercise or even impossible to exercise" and there are an "unlimited number of ways that Google could make the option to exercise the right to termination difficult or impossible."  Rem. Hr'g Tr. 66:15-67:3.

In Microsoft's experience, Google's contracting practices have made it difficult for distribution partners to work with competing general search and GenAI providers.  Multi-year frameworks with automatic renewals, narrow notice windows, and deep technical integrations impose substantial administrative, technical, and operational burdens on distribution partners seeking to exercise opt-out provisions.  Under this framework, Google will have a greater ability to leverage its defaults in favor of renewal, deter genuine competitive rebidding, and hinder rivals' ability to gain traction distributing general search and GenAI products.  *See, e.g.*, *United States v. Google LLC*, 747 F. Supp. 3d 1, 158 (D.D.C. 2024) ("the record reflects no meaningful competitive rebidding of the agreements.  The more common story is Google's partners renewing the agreements without genuine consideration of an alternative.").  The Court has already recognized this concern and noted that Google's proposal may "disincentivize [OEMs] from opting out if they're guaranteed a higher revenue share year over year until the end of the term . . . [which] could allow Google to run out the clock on the judgment itself."  Rem. Hr'g Tr. 76:6-12.  The Court has further acknowledged that it was precisely these multi-year contracts that "contributed to stifling competition."  Remedies Opinion at 110.

Permitting extended multi-year contracts will preserve and protect Google's default status and reinforce its ill-gotten scale advantage, further entrenching its search dominance and constraining the ability of rivals to compete. The Court should adopt Plaintiffs' proposed language and limit distribution agreements to a "one-year term" so distribution partners can reassess and set different GSEs annually across search access points and devices, curbing the "network effects that Google [has] enjoyed as a monopolist." Remedies Opinion at 109-110.

### III.    THE COURT SHOULD RETAIN JURISDICTION TO ENFORCE AND MODIFY THE FINAL JUDGMENT.

Although the Court tried to carefully balance its remedies against potential effects to third parties, Google's continued ability to crowd out competition using its ill-gotten monopoly profits raises questions about whether it will ever face meaningful competition for general search distribution. As the Court explicitly recognized, judges must be "open to clarifying and reconsidering their decrees in light of changing . . . market realities" and the "court is thus prepared to revisit a payment ban (or a lesser remedy) if competition is not substantially restored through the remedies the court does impose." Remedies Opinion at 128. It is, therefore, critical that the Court retain authority to revisit its decision related to RSAs if it becomes evident that existing prohibitions "will not alone restore competition to a market that has not had any in more than a decade." *Id.* at 114.

To preserve that authority, the Court should adopt Plaintiffs' proposed language and make clear that it will: (1) retain jurisdiction to enforce the final judgment; and (2) intervene swiftly and, if necessary, modify the final judgment if competition does not improve, which includes preserving its ability to revisit remedies it originally chose not to impose. *See* Pls. FPFJ § XI.A ("Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or

10

appropriate . . .").  These two features are standard in antitrust decrees and are essential in this case given the risk that the remedies may not "pry open" competition.

*First*, the Court should explicitly retain jurisdiction to enforce, clarify, and modify the final judgment as market conditions and technologies evolve.  *See* Pls. FPFJ § XI.A.  As explained in Areeda & Hovenkamp, a court's involvement "is not necessarily ended once its decree is issued," particularly where a decree "restrain[s] the monopolist's acts without destroying its monopoly power or restoring competitive conditions," which may require ongoing supervision.  *See Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 325a.  Courts have long retained jurisdiction to respond to market conditions.  In *International Salt*, the final judgment stated that: "Jurisdiction of this case is retained for the purpose of enabling any of the parties to this judgment to apply to the court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this judgment, for the amendment, modifications or termination of any of the provisions thereof, for the enforcement of compliance . . ."  Final Judgment, *United States v. Int'l Salt Co., et al.*, No. 32-310 (S.D.N.Y. Dec. 27, 1946), at VIII, available at https://www.justice.gov/atr/page/file/1176211/dl?inline.  Likewise, in *Microsoft*, the district court retained jurisdiction "such that the Court may act *sua sponte* to issue further orders or directions, including but not limited to orders or directions relating to the construction or carrying out of this Final Judgment, the enforcement of compliance therewith, the modification thereof, and the punishment of any violation thereof."  Final Judgment, *United States v. Microsoft Corp.*, No. 98-1232, 2009 WL 1348218 (D.D.C. Apr. 22, 2009), at VII (hereinafter "*Microsoft* Final Judgment").

*Second*, the Court should include a mechanism that will allow it to monitor real-world outcomes and intervene quickly if competition does not improve.  One provision likely to require

review is the Court's decision not to ban RSA payments. The Court has recognized that it may need to revisit its decision not to impose a payment ban because distributors may be "incentivized to stick with Google" due to "Google's massive financial advantage." *See* Remedies Opinion at 127-128. Privacy constraints may also blunt the effectiveness of certain data sharing remedies, potentially increasing the need to reconsider an RSA payment ban if evidence shows that the data-sharing remedies are not adequately decreasing Google's scale advantage. *See* April 24, 2025 Rem. Tr. 126:15–20 (Michael Schechter) ("Any amount of filtering . . . reduces the functionality of that dataset.").

The Court has already recognized that "[m]erely excising the exclusive provisions from Google's distribution agreements will not unleash competition." Remedies Opinion at 108. It is, therefore, possible—if not likely—that the final remedies may not be enough to strip Google of the fruits of its illegal conduct. The decree should, accordingly, include ongoing monitoring and expedited intervention authority to identify and remedy shortfalls promptly. This mechanism is also supported by precedent, including in *Microsoft*, in which the district court retained jurisdiction "to modify or terminate any of its provisions, to enforce compliance, and to punish violations of its provisions." *See Microsoft* Final Judgment, at VII.

Together, retaining jurisdiction and preserving the ability to rapidly intervene and modify the final judgment will enable the Court to monitor outcomes, deter and address noncompliance, and calibrate the decree as needed so that the remedial regime achieves its goal of restoring competition in the markets where Google has maintained an unlawful monopoly.

## IV.    THE TECHNICAL COMMITTEE SHOULD HAVE BROAD DISCRETION TO RESOLVE DISPUTES.

Lastly, the Court should adopt Plaintiffs' FPFJ that includes language allowing the Technical Committee to monitor Google's implementation of and compliance with the Court's

Final Judgment.  *See* Pls. FPFJ § VII.A.7 ("The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgement."). This language largely mirrors the Technical Committee provisions in *Microsoft*, which similarly provided that the Technical Committee "shall have the power and authority to monitor Microsoft's compliance with its obligations under this final judgment."  *See Microsoft* Final Judgment, at IV(B)(8).

By contrast, Google's FPFJ provisions state that "neither the TC nor Plaintiffs will have the right to make final decisions as to the requirements of this Final Judgment.  Google will have the right to object to and be heard by the Court on ***any*** recommendation from the TC or Plaintiffs as to the interpretations of or substantive requirements of this Final Judgment."  *See* Def. FPFJ § VII.A.7.a (emphasis added).  This proposal defeats the purpose of establishing a Technical Committee and will, as a practical matter, force the Court to resolve every possible dispute that may arise.  And, as this Court noted, "Google's objections that the Technical Committee will wield too much authority is largely mooted by the court's narrowing of some proposed remedies and its rejection of others."  Remedies Opinion at 211.  Additionally, Google's proposal would mire the Technical Committee and the Court in motions practice and delay implementation of the Court's remedies.  Every month of delay further entrenches Google's unlawful scale advantage and postpones the restoration of competition.  The Court should reject Google's attempt to create procedural bottlenecks and instead allow the Technical Committee to do what it is designed to do: advise on complex technical issues that will help loosen Google's anticompetitive grip on general search.

Microsoft has experience working with a Technical Committee in *Microsoft*.  In that case, the court-approved Technical Committee served as an expert, independent resource that translated

complex technical obligations into practical, verifiable compliance. As Microsoft's 30(b)(6) witness testified, it was Microsoft's experience that "having a technical committee can be useful in ensuring compliance with any remedies that are imposed, and . . . not having one can create challenges." Smutny Rem. Dep. Tr. 65:1-5. The Technical Committee worked directly with Microsoft personnel and furnished regular reports that allowed the court and the parties to identify issues early and resolve them efficiently.

A core strength of the Technical Committee in *Microsoft* was its capacity to triage and resolve technical disputes without formal motion practice. It helped ensure that the Court was not tasked with having to "be a referee . . . on every detail and the terms of the execution." Rem. Hr'g Tr. 14:19-25. As the district court later commented, the Technical Committee "has truly become one of the most successful aspects of the Final Judgments, because it [was] invaluable in facilitating the Plaintiffs' enforcement efforts." *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 152-53 (D.D.C. 2008).

Many issues were resolved by the Technical Committee without having to raise the issue with the court. For example, the Technical Committee resolved disputes related to the "adequacy of the disclosure of millions of lines and pages of software code and technical information made available by Microsoft to application developers."[2] The Technical Committee also reviewed and tested new versions of Windows, Internet Explorer, and other default middleware programs before they were released to consumers, which "proved critical to the Plaintiffs' efforts to maximize the full potential of the Final Judgments' remedies." *Microsoft*, 531 F. Supp. 2d at 157.

---

[2]      *See* Spencer Weber Waller, *Access and Information Remedies in High Tech Antitrust*, Loyola Univ. Chi. Sch. of L. (July 25, 2011), at 17, https://doi.org/10.2139/ssrn.1895018.

Additionally, when compliance-related concerns arose, the Technical Committee helped evaluate the technical significance of the issues and could advise Plaintiffs and Microsoft as to potential solutions, which meant the parties were "able to resolve [disputes] through cooperation rather than litigation." *Id.* While compliance-related issues arose "regarding virtually every aspect of Section III,"[3] the parties, "with the assistance of the TC" were able to negotiate solutions, which "obviated the need for compliance-related litigation" and helped reduce the burden on the court. *Id.* The same can be achieved in this case with Plaintiffs' proposed language, which is similar to what was imposed in *Microsoft*.

By empowering a neutral Technical Committee to handle technical execution while reserving legal determinations to the Court, the Court can minimize unnecessary motions practice and maximize compliance outcomes in complex, fast-evolving technical environments. The Court should therefore adopt Plaintiffs' Technical Committee provisions and reject Google's attempt to create procedural bottlenecks.

## <u>CONCLUSION</u>

For the foregoing reasons, Microsoft respectfully submits that the Court's Final Judgment should incorporate Sections IX.J (as modified by Rem. Hr'g Tr. 115:14-20), III.K-M, XI.A, and VII.A.7 of Plaintiffs' Final Proposed Final Judgment.

---

[3]    Analogous compliance-related issues may arise in this case related to Section III of the FPFJs (the prohibitory injunction), including disputes over whether certain contract provisions require or condition conduct prohibited by that section. *See* Pls. FPFJ § III; Def. FPFJ § III. A robust and empowered Technical Committee, as Plaintiffs propose, can assess the significance of such provisions and facilitate resolution without Court intervention similar to its role resolving disputes in *Microsoft*.

Dated: November 4, 2025    Respectfully submitted,

*/s/ John Jurata*
John (Jay) Jurata, Jr. (*pro hac vice*)
**DECHERT LLP**
1900 K Street, NW
Washington, DC 20006
Tel.: (202) 261-3300
Fax: (202) 261-3333
jay.jurata@dechert.com

Julia Chapman *(pro hac vice)*
**DECHERT LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Tel.: (215) 994-2060
Fax: (215) 994-2222
julia.chapman@dechert.com

Russell P. Cohen (*pro hac vice*)
**DECHERT LLP**
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Tel.: (415) 262-4506
Fax: (415) 262-4555
Russ.Cohen@dechert.com

*Counsel for Microsoft Corporation*