UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
UNITED STATES OF AMERICA et al.,              )
                                              )
        Plaintiffs,                           )
                                              )
                v.                            )        Case No. 20-cv-3010 (APM)
                                              )
GOOGLE LLC,                                   )
                                              )
        Defendant.                            )
_____ )
_____
                                              )
STATE OF COLORADO et al.,                     )
                                              )
        Plaintiffs,                           )
                                              )
                v.                            )        Case No. 20-cv-3715 (APM)
                                              )
GOOGLE LLC,                                   )
                                              )
        Defendant.                            )
_____ )

## MEMORANDUM OPINION

I.      INTRODUCTION

        The age-old saying "the devil is in the details" may not have been devised with the drafting

of an antitrust remedies judgment in mind, but it sure does fit.

        On September 2, 2025, the court issued a Memorandum Opinion ("Remedies Opinion"),

ECF No. 1435 [hereinafter Rem. Op.], following its determination that Defendant Google LLC

had maintained monopolies in the general search services and general search text advertising

markets through exclusive distribution agreements in violation of Section 2 of the Sherman Act.

*See United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024).  The Remedies Opinion

recounted the case's procedural history; made new findings of fact, particularly with respect to emerging generative AI ("GenAI") products; discussed the legal principles animating the court's decision; and determined the scope of remedies sufficient to "pry open" the markets closed by Google's antitrust violations. The court agreed that Google's proposed prohibitory injunctions were a start. Rem. Op. at 107. But it also held that, to be effective, the remedies should include some of Plaintiffs' proposed behavioral remedies, including disclosure of information about Google's search index, compelled sharing of certain user data, and forced syndication of search results and search text ads, as well as a Technical Committee to assist Plaintiffs with their enforcement efforts. The court rejected more severe proposals, such as the divestiture of Chrome, mandated choice screens, and a complete payment ban, among others. *Id.* at 3–6.

The court then directed the parties to meet and confer and present a joint proposed final judgment consistent with the Remedies Opinion's findings and conclusions. *See id.* at 222–23.

That is when the devil reared its head. As has been true during much of this five-year-long litigation, the parties continued to see eye-to-eye on little, even with the benefit of the Remedies Opinion. They submitted two competing final proposed final judgments reflecting their respective interpretations of the Remedies Opinion with accompanying briefs explaining their positions. *See* Pls.' Br. in Supp. of Pls.' Final Proposed Final J., ECF No. 1442 [hereinafter Pls.' Br.]; Pls.' Br., Pls.' Final Proposed Final J., ECF No. 1442-1 [hereinafter Pls.' FPFJ]; Def. Google LLC's Br. in Supp. of Entry of its Proposed Final J., ECF No. 1441 [hereinafter Google's Br.]; Google's Br., App. to Google's Br., ECF No. 1441-1 [hereinafter Google's App'x]; Google's Br., Def. Google LLC's Proposed Final J., ECF No. 1441-2 [hereinafter Google's FPFJ].

The parties convened before the court on October 8, 2025, for a hearing on those proposed final judgments ("October 8th hearing"). *See* Tr. of Hr'g on Final J. Proceedings, ECF No. 1447

2

[hereinafter Hr'g Tr.]. A week later, Plaintiffs filed a Notice of Substitute Provisions offering modified versions of certain provisions in their proposed prohibitory injunctions that purported to reflect an updated understanding of the court's Remedies Opinion. *See* Pls.' Notice of Substitute Provisions, ECF No. 1449 [hereinafter Pls.' Suppl.]. Google responded a few days later. *See* Def. Google LLC's Resp. to Pls.' Suppl., ECF No. 1451 [hereinafter Google's Suppl.].

Having now heard hundreds of hours of testimony, reviewed thousands of pages of exhibits and briefing, and considered all the relevant law and authorities across both the liability and remedies phases, the court at long last enters the Final Judgment against Google. While the Remedies Opinion broadly established the court's remedy-specific conclusions of law, the court now explains with more granularity the reasons for adopting, rejecting, or modifying the specific provisions of the parties' most recent proposed final judgments. *See United States v. Microsoft Corp.* (*Microsoft III*), 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc) (holding that the district court must "provide an adequate explanation for the relief . . . ordered" and "explain[] how its remedies decree would accomplish [the] objectives" of antitrust remedies established by the Supreme Court); *cf. Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) ("No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." (citation omitted)).

Rather than regurgitate the whole of the Remedies Opinion or scrutinize every word of the parties' proposals, this opinion highlights the parties' major disagreements and explains how the court resolves them in the Final Judgment. For completeness, the court also includes an Appendix identifying the finer differences between the parties' proposals and the language the court ultimately adopts.

## II.    GENERAL PRINCIPLES

The court starts with three preliminary points.  *First*, in their briefs and at the October 8th hearing, the parties repeatedly offered as a basis for advancing their positions that, by deciding in the Remedies Opinion to impose or modify a certain remedy, the court had "adopted" text from the party's proposed final judgment, or that their proposed provisions "track" the Remedies Opinion while the other's depart.  *See, e.g.*, Hr'g Tr. at 21:13-17; *id.* at 41:18–42:10; Pls.' Br. at 11–12, 28–29; Google's Br. at 10, 13, 15.  Such arguments rest on an incorrect assumption.  As emphasized at the hearing, to the extent the court "adopted" anything offered by a party, it was a proposed remedy as a general concept, not the text offered to define it.  Hr'g Tr. at 21:18–22:3.  "It is a federal court's judgment, not its opinion, that remedies an injury."  *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).  The court exercises its remedial authority in this case through the Final Judgment; the Remedies Opinion and the one at hand merely explain the exercise of this authority.  *See Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring); *cf. Trump v. CASA, Inc.*, 606 U.S. 831, 930 n.3 (2025) (Jackson, J., dissenting).

*Second*, the court reiterates the scope of its remedial authority.  "The remedy in a Section 2 enforcement action 'must seek' to 'unfetter a market from anticompetitive conduct,' 'deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'"  Rem. Op. at 58 & n.3 (quoting *Microsoft III*, 253 F.3d at 103).  Supreme Court precedent "uphold[s] equity's authority to use drastic measures to achieve freedom from the influence of the unlawful restraint of trade," as long as such measures "reasonably tend[] to dissipate the restraint and prevent evasions."  *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 726 (1944).  But the "[m]ere existence of an exclusionary act

does not itself justify full feasible relief against the monopolist to create maximum competition." *Microsoft III*, 253 F.3d at 106 (citation omitted); *see also* Rem. Op. at 62–63.

Though these broad principles framed the court's task, the evidence (or lack of it) was the key to deciding whether to adopt or reject a proposed remedy. After all, "[t]here can be no remedy absent a factual basis to support it." Rem. Op. at 119. The court considered and rejected proposed remedies that could not be sufficiently justified by evidence. *See, e.g.*, *id.* at 119–28 (rejecting a payment ban because of anticipated harms to third parties); *id.* at 164–68 (declining to require Ads Data–sharing because Plaintiffs did not offer sufficient evidence as to how it would increase competition in the general search text ads market); *see also id.* at 128 n.14 (declining to consider a partial payment ban because of a lack of evidence). The court continues to be guided by the evidence in fashioning the specific terms of the Final Judgment.

*Finally*, "it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of [antitrust] law, all doubts as to the remedy are to be resolved in its favor." *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 & n.18 (1961) (first citing *Bausch & Lomb*, 321 U.S. at 726; then citing *Loc. 167 of Int'l Bhd. of Teamsters v. United States*, 291 U.S. 293, 299 (1934)). Plaintiffs in this case have successfully borne this burden. *See Google*, 747 F. Supp. 3d at 32. Where any doubts remained after considering the evidence and the parties' positions, the court has deferred to Plaintiffs as to the appropriate remedial terms. *See also* Rem. Op. at 60 (citing 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 653f (5th ed. & Supp. 2025) [hereinafter AREEDA & HOVENKAMP] ("[A]ny plausible doubts should be resolved against the monopolist.")); *id.* at 66 n.4 (citing 3 AREEDA & HOVENKAMP ¶ 650a(2)(B) ("[I]t is always appropriate to deprive the defendant of the continuing

benefits of past misbehavior.  In devising the 'tailored' remedies for this purpose, reasonable doubts will ordinarily be resolved against the defendant.")).

With this understanding, the court now turns to those terms.  The court begins by addressing several definitions that are fundamental to the reach and effect of the Final Judgment. It then turns to the prohibitory injunctions and required data-sharing and syndication remedies. The court concludes by explaining how the Final Judgment will be enforced, in particular the Technical Committee's operations and the court's retention of jurisdiction.  The provisions not addressed in this opinion can be found in the Appendix.

## III.    DEFINITIONS

### A.    GenAI-Related Terms

GenAI plays a significant role in these remedies.  As a refresher, between the liability and remedies phases, GenAI burst on to the scene as a formidable nascent threat to general search engines (GSEs).  Rem. Op. at 2; *see also id.* at 99 ("[T]here is ample evidence that GenAI chatbots grounded in general search perform an information-retrieval function that is similar to GSEs."). The remedies phase thus became "as much about promoting competition among GSEs as ensuring that Google's dominance in search does not carry over into the GenAI space."  *Id.* at 2; *see also id.* at 106–07 ("GenAI products have emerged as a competitive threat to the traditional GSE, and Google cannot be permitted to leverage its dominance in general search to the GenAI product space.").

The court determined that GenAI products and companies should be included in the remedies insofar as GenAI products and GSEs share the capacity to "fulfill a broad array of informational needs."  *Id.* at 99–101; *see also id.* at 45–46 ¶ 66.  The court rejected Google's insistence that GenAI products should be excluded because they were outside the relevant markets

or untethered to Plaintiffs' theory of liability. *See id.* at 101. Expanding the scope of the remedies to include GenAI, the court held, was both within the court's authority and appropriate to ensure that Google's illegal conduct could not reverberate into that emerging market. *Id.* at 101–02 (citing *New York v. Microsoft Corp.* (*New York I*), 244 F. Supp. 2d 76, 128–29, 193 (D.D.C. 2002)).

Despite this, the parties maintain drastically different understandings of how a GenAI product should be defined for purposes of the Final Judgment. Plaintiffs would have "GenAI Product" mean "any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models." Pls.' FPFJ § IX.J. Google offers no similar umbrella definition. Rather, in an effort to narrow the universe of GenAI products swept into the Final Judgment, it offers several different terms referring to discrete GenAI products or categories of products that have among their "principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information." *See* Google's FPFJ § IX.K, L, Y, Z.

The court adopts Plaintiffs' definition of "GenAI Product" with Google's specification that a GenAI Product, for purposes of this decree, have "among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information." *See* Final J., ECF No. 1462 [hereinafter FJ], § IX.J.

Google's discrete terms are too narrow. Taken together, they have the potential to exclude Google GenAI products beyond Google Gemini and Google Assistant or any product that is not strictly "a user-facing mobile software application . . . that makes use of generative AI capabilities or models." *See* Google's FPFJ § IX.K, L; *see also* Pls.' Br. at 28–29.

But Plaintiffs' proposed definition is exceedingly broad. The parties' shared definition of "GenAI" (as opposed to "GenAI Product") is "a type of artificial intelligence that creates new

content including but not limited to text, images, code, classifications, and other media using machine learning models." *See* Pls.' FPFJ § IX.I; Google's FPFJ § IX.H; *see also* Rem. Op. at 17 ¶ 2. Products that "involve[] or make[] use of [such] capabilities or models" encompass a near infinite swath of industries and products having nothing to do with GSEs or the illegal conduct at issue. *See* Google's Br. at 2–5.

GenAI products and companies were expressly included in the Final Judgment because of the growing integration of GenAI into search products. *See* Rem. Op. at 19 ¶ 6. But search and GenAI are not completely interchangeable. *See* Remedies Hr'g Tr., ECF Nos. 1393–1420 [hereinafter Rem. Tr.], at 21:2-5 (Opening Arg.) (Plaintiffs' counsel acknowledging that search and GenAI "are different but overlapping products" and that GenAI "is not a replacement for [s]earch today"); Rem. Op. at 43 ¶ 63. At least for now, GSEs and GenAI products have use cases not shared by the other. *See* Rem. Op. at 44 ¶ 65. Narrowing Plaintiffs' definition to products that have "among [their] principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information" better fits the purpose of including GenAI products within the remedial scheme.

Plaintiffs themselves acknowledge that the court "was clear that the final judgment shall extend to any GenAI Product with the 'capacity to fulfill a broad array of informational needs.'" Pls.' Br. at 28–29 (quoting Rem. Op. at 100). Yet in the same breath, they argue that "Google's attempt to restrict what GenAI Products are covered by the final judgment based on their form or 'principal function' . . . excludes relevant Google GenAI Products from the final judgment [and] ignores any possibility that nascent GenAI competitors may disrupt Google's market dominance through future innovations." *Id.* at 29. Although Plaintiffs stated later that it was "not [their] intention" to sweep in GenAI technologies such as those powering non-information-retrieval

functions in Google products like Photos, Gmail, or Drive, Hr'g Tr. at 114:5–115:9; *see* Google's Br. at 2–3, their proposal unequivocally does so.

For these reasons, the court has adopted the definition of "GenAI Product" described above.[1]  *See* FJ § IX.J.  The modification makes adopting Plaintiffs' definition of "Third-Party GenAI Product" appropriate.  *See* FJ § IX.CC; Pls.' FPFJ § IX.FF.  The court also adopts Plaintiffs' definition of "Google GenAI Product."  *See* FJ § IX.N; Pls.' § IX.N.  Finally, the court adopts Google's definition of "Google Assistant Application," as Plaintiffs' addition of "and . . . any Google GenAI Product" would have swallowed the rest of the definition into a nullity. *See* FJ § IX.M; Pls.' FPFJ § IX.M; Google's FPFJ § IX.K.

## B.    "Qualified Competitor" and "Competitor"

Because the data-sharing and syndication remedies are designed to directly benefit potential competitors in the relevant markets, it is necessary to define which emerging or extant competitors are eligible to enjoy them—that is, to determine who is a "Qualified Competitor."

To start, the court has adopted Plaintiffs' version of "Competitor."  *See* FJ § IX.E.  The parties' proposed definitions are not so far off, but Google's includes several qualifications. *Compare* Pls.' FPFJ § IX.E, *with* Google's FPFJ § IX.D.  Plaintiffs' version is simpler and reflects the court's directive to include GenAI; the court did not intend to broaden the definition of a Competitor to then narrow it again in unnecessary ways.  *See* Rem. Op. at 103–04 & n.8.

The parties agree that a Qualified Competitor should meet certain data security standards, agree to regular data security and privacy audits, not pose a risk to the national security of the United States, and make a sufficient showing of a plan to invest and compete in or with the GSE

---

[1] The court sees no material distinction between the definition of "GenAI Product" it has adopted and Plaintiffs' suggestion that their definition of "GenAI" should be left intact with their definitions of "Google GenAI Product" and "Third-Party GenAI Product" limited only to those products that can "fulfill a broad array of informational needs." Hr'g Tr. at 115:5-20.

and/or Search Text Ads markets.[2]  *See* Pls.' FPFJ § IX.W; Google's FPFJ § IX.T.  These criteria will ensure that the data-sharing and syndication remedies fulfill their intended purpose of increasing competition in the relevant markets.  *See* Rem. Op. at 129–36, 170–71.

The biggest disagreement among the parties concerns Google's proposal that a Qualified Competitor not only be initially certified as one but also annually recertified on those same criteria. *See* Google's FPFJ § IX.T.  Google points out that, because Qualified Competitors will be given an enormous quantity of valuable rights and data, "the incentives for mischief . . . will be enormous."  Hr'g Tr. at 26:13-18.  Google reasons that bad actors that are initially certified as Qualified Competitors could easily abandon a previously demonstrated "plan to invest and compete in or with" the relevant markets and potentially pose privacy and security risks or simply become a white label of Google.  *Id.* at 26:13–28:4.  In the absence of a recertification requirement, Google contends, the remedies could incentivize harmful or even anti-competitive behavior or allow it to escape detection.

Plaintiffs object to the recertification requirement as "unnecessary red tape."  *Id.* at 22:5-7.  Although they agree that a Competitor that abandons its plans to compete should be decertified, Plaintiffs argue that obvious, established contenders like Microsoft's Bing should not be subject to a yearly burden to continue to benefit from the remedy.  *Id.* at 22:5-8.  Putting up annual roadblocks burdening all Qualified Competitors rather than calling out Qualified Competitors on an individual basis "when there's suspicion" is, to Plaintiffs, an example of a "red-tape hoop" that Qualified Competitors must jump through that will delay getting "to a world where there's competition."  *Id.* at 25:4-11, 37:6-23.

---

[2] The court expressly revised the language "plan to invest and compete in" to "plan to invest and compete *in or with*" the relevant markets.  *See* Rem. Op. at 103–04 (emphasis added).  Google's FPFJ does not reflect this revision. *See* Google's FPFJ § IX.T ("plan to invest and compete with").  The court assumes this was error.

The court agrees with Google that an annual recertification requirement is prudent.  The court shares Google's concern about companies initially certified as Qualified Competitors who might abandon their professed intent to compete and improperly take advantage of data releases or other remedies.  *See id.* at 23:2–24:12.  Some companies that already compete or have maintained their intent to compete in the relevant markets, such as Microsoft, DuckDuckGo, and OpenAI, will face no "red tape" in getting recertified.  For new market participants, requiring them to make an annual showing of their continued intent to compete with Google should not prove to be overly burdensome.

Plaintiffs advance an audit procedure as an alternative to a recertification requirement.  *Id.* at 25:4-11.  But audits are conducted in hindsight, not with foresight.  By the time a reason to initiate an audit arises, the mischief has likely already occurred, potentially with enormous consequences not only for Google but for its users whose data may be shared with a Qualified Competitor gone rogue.  And Plaintiffs' suggestion that Qualified Competitors warranting decertification will be readily noticeable from their market activities (or lack thereof) suffers from the same infirmity.  *See id.* at 24:16-25.  By the time mischief's effects are felt in the market, it may be too late.  To arrive at a "world where there's competition," the remedies must ensure that their purpose is effected through the entirety of the judgment period.  An annual recertification requirement is a relatively simple prophylactic measure to keep bad actors from escaping detection.  The court trusts that the Technical Committee and Plaintiffs will establish a recertification process that is neither difficult nor burdensome.  *See id.* at 27:10-14.

Finally, Google would put the burden on the court to determine, sometimes in consultation with the Technical Committee, whether a Competitor meets the required data security standards, poses a national security risk to the United States, and has made a sufficient showing of a plan to

compete in or with the relevant markets. *See* Google's FPFJ § IX.T. Though Plaintiffs have hedged on this point, *see infra* Section VIII, the Final Judgment is enforced by Plaintiffs. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1243 (D.C. Cir. 2004) ("[U]ltimately the power to enforce the terms of the decree rests with the government." (quoting *United States v. Microsoft Corp.* (*Microsoft IV*), 231 F. Supp. 2d 144, 198 (D.D.C. 2002))); *see also* Pls.' Br. at 21–24. And the Technical Committee exists to serve Plaintiffs in that effort. *See Massachusetts*, 373 F.3d at 1244; *see also In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 954 (9th Cir. 2025) (establishing a Technical Committee to "provide[] a process to review and resolve inevitable disputes between the parties—ideally without further need for judicial intervention").

As Google often emphasized in its remedies-phase briefs, "courts should never aspire to the role of central planners and must be sensitive to the possibility that the continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition." Def.'s Proposed Conclusions of L., ECF No. 1347, at 10 (internal quotation marks omitted) (quoting *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 102–03 (2021)). The court therefore adopts Plaintiffs' version, whereby those determinations are made by Plaintiffs, in consultation with the Technical Committee. *See* FJ § IX.V; *see also infra* Section VIII.

### C.    "Device"

Google proposes that a "Device" covered by the Final Judgment exclude devices running on the ChromeOS operating system.[3] Google's FPFJ § IX.F. It points out that "Plaintiffs never challenged agreements with companies that manufacture Chromebooks, let alone established that those agreements harm competition" and that the court rejected Plaintiffs' proposed self-preferencing ban. Google's Br. at 7–8 (citing Rem. Op. at 216–17). Google also contends that

---

[3] Google adopted the term "Covered Device" while Plaintiffs use "Device." *Compare* Pls.' FPFJ § IX.H, *with* Google's FPFJ § IX.F. The court opts to use "Device." *See* FJ § IX.H.

placing conditions on the distribution of Chrome could not be achieved with respect to devices running on ChromeOS because "the Chrome browser is the UI [user interface] for . . . a ChromeOS device or Chromebook." *Id.* at 8 (quoting Rem. Tr. at 3892:17-20 (Samat) (alteration in original)). In fact, Chrome and ChromeOS are so integrated that Google has not yet been able to separate them. *Id.* (citing Rem. Tr. at 2611:6-23 (Nieh)).

The court finds this reasonable. Plaintiffs insist that allowing Google to exclude ChromeOS-based devices would permit it to enter "nakedly exclusive" agreements with manufacturers of ChromeOS devices. *See* Pls.' Br. at 26–27; Hr'g Tr. at 117:24–118:8. The court does not share Plaintiffs' concern. Exclusive distribution of Chrome by a manufacturer of a ChromeOS device is not the kind of anticompetitive agreement that has been at issue in this case. Unlike distribution on Android or Apple devices or on a third-party browser, Chrome is a necessary component of a ChromeOS device. And although Google Search is the default search engine on Chrome, the court previously rejected a self-preferencing ban in part because Plaintiffs never pursued a theory of liability based on this fact. Rem. Op. at 216–17. Without a factual basis to support restricting exclusive distribution of Chrome on ChromeOS devices, the court cannot order Google be enjoined from entering into such agreements. *Cf. Google*, 747 F. Supp. 3d at 152 ("[E]xclusive agreements are not condemned per se by the antitrust laws, even if they involve a dominant firm."). The court also finds it reasonable to exclude ChromeOS-based devices from the remedies altogether, rather than, as Plaintiffs suggest, identifying individual provisions from which they are carved out. Hr'g Tr. at 117:19–118:8.

"Device" will thus expressly exclude "any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed." *See* FJ § IX.H. Plaintiffs' definition is otherwise consistent with the court's interpretation of the part of Google's remedies

that proposed optionality as to the default GSE on a given access point on a device-by-device basis. *See* Pls.' FPFJ § IX.H ("'Device' or 'device' means any single smartphone, tablet, laptop, or desktop.  For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices)."); Rem. Op. at 105.  This definition ensures that optionality will exist at the level of the individual device.  *See* Pls.' Br. at 27.

### D.    "Google"

Finally, a few words on the definition of "Google."  The parties have addressed the court's previous concern about the breadth of Plaintiffs' originally proposed definition, *see* Rem. Op. at 221–22, by cabining it to those people or entities "controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product."  *See* Pls' FPFJ § IX.L; Google's FPFJ § IX.J.

The court adopts Plaintiffs' final proposed definition, which includes Google's "affiliates, partnerships, and joint ventures" and is written with an eye towards preventing Google from simply moving its anticompetitive conduct to a sister company.  *See* Pls' FPFJ § IX.L.  To this, the court also adds: "For clarity, the term 'affiliates' includes any Alphabet, Inc.–related entity that controls or oversees the aforementioned products."  *See* FJ § IX.L.  This definition will capture Alphabet subsidiaries like DeepMind that are separate from Google but work with it to develop Google products relevant for purposes of these remedies.  *See* Hr'g Tr. at 123:5-23; *see also* Rem. Tr. at 625:1–626:3 (Hsiao); *id.* at 3341:8-21, 3348:7-22 (Collins).  Google should not be able to avoid the terms of the Final Judgment by how Alphabet chooses to organize itself.

## IV.    PROHIBITORY INJUNCTIONS

The court previously acknowledged that Google's proposed prohibitory injunctions were a good starting place to remedy its illegal conduct. Rem. Op. at 104. But they did not alone go far enough, either as a class of remedies or as injunctive relief itself.

As injunctive relief, Google's proposals addressed the core of its anticompetitive conduct—its exclusive distribution agreements. *See Google*, 747 F. Supp. 3d at 32–33. The proposed provisions broadly would have offered Google's distribution partners more flexibility to contract with companies other than Google for search and search-related products. Rem. Op. at 105–06. The court agreed that Google should indeed be barred from entering into those exclusive agreements, but also added that (1) like Browser Developers, original equipment manufacturers (OEMs) and wireless carriers should be given the opportunity to set a different GSE at various search access points across different devices on an annual basis; (2) Browser Developers should expressly be permitted to promote any Third-Party General Search Service or Third-Party GenAI Product; and (3) Google should not be permitted to contract with Apple to exclusively distribute any Google GenAI product either in any Safari mode or on any Apple mobile or desktop device. *Id.* at 110–11.

In their final proposed final judgments, the parties presented slightly different versions of Google's originally proposed provisions reflecting different understandings of the court's instructions and holdings. The major disagreements here are whether (1) Google GenAI Products should be subject to lesser restrictions; (2) prohibited conditioning of one Google product on a partner's acceptance of another product is limited to actual agreements; (3) distribution contracts must terminate after one year; and (4) provisions applicable to Browser Developers and Apple should be different from those applicable to Android devices.

A.       **Effect of Inclusion of GenAI**

Google appears for the most part to have heeded the court's ruling that GenAI be incorporated into the remedies generally, *see id.* at 99–104, and that it be written into certain provisions specifically, *see, e.g.*, *id.* at 111. *See generally* Google's FPFJ § III.  But its proposed text includes a semantic head fake to afford greater flexibility for distributing its GenAI products. For example, Google broadly proposes being barred from conditioning the licensing of "Google Play or *any other Google software application*" on the distributing, preloading, placing, displaying, using, or licensing of the Google Search or Chrome applications.  *Id.* § III.A–B (emphasis added).  This prohibition would prevent Google from, say, tying distribution of Google Maps to a partner's acceptance of Search or Chrome.  But Google proposes dropping the "any other Google software application" language when it comes to distributing its GenAI products. Google would bar itself from conditioning the licensing of only "the Google Search Application, the Chrome Browser Application, or Google Play" on the distributing, preloading, placing, displaying, using, or licensing of its GenAI products, including Gemini and Google Assistant.  *Id.* § III.C–D.  In other words, under Google's proposal, it could say to a partner, "We'll license Google Maps but only if you also distribute Gemini."  Google employs similar methods of relaxing restrictions that would otherwise prevent it from entering exclusive agreements in other provisions about GenAI.  *Compare, e.g.*, Google's FPFJ § III.H–I, *with id.* § III.J; *id.* § III.L–M, *with id.* § III.N.

Google defends this subtle yet material distinction by arguing that GenAI was "not part of Plaintiffs' theory of liability or the Court's liability determination" either with respect to Google's conduct or its products.  *See* Google's Br. at 11.  Provisions that regulate the licensing of Google GenAI products or revenue-share agreements (RSAs) pertaining to such products should be

16

narrower than parallel provisions for Search or Chrome, Google insists, because the former are "forward-looking provisions" where the court's "discretion is necessarily less broad," and a broader remedy creates the "danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Id.* at 10–12. Accordingly, Google believes it should be able "to retain the right to condition, for example, the Google Maps and YouTube apps on the exclusive distribution of Google GenAI and Google Assistant," because none of these products are "monopoly products." Hr'g Tr. at 59:4–62:18; *see also* Pls.' Br. at 5.

Adopting Google's proposal would be self-defeating. *See* Rem. Op. at 62 ("Antitrust actions would be 'futile exercise[s]' indeed 'if the Government prove[d] a violation but fail[ed] to secure a remedy adequate to redress it." (alterations in original) (quoting *E. I. du Pont*, 366 U.S. at 323)). To repeat once more, Google cannot be permitted to replay its illegal conduct with its GenAI products. Google's arguments have for the most part already been considered and rejected by the court. *See id.* at 99–104.

It is simply not true that the injunctive relief must be so tightly shrink-wrapped around the exact contours of liability. *See Nat'l Soc'y of Pro. Eng'rs v. United States* (*NSPE*), 435 U.S. 679, 698 (1978) (affirming injunctive relief that went "beyond a simple proscription against the precise conduct previously pursued"); *accord* 3 AREEDA & HOVENKAMP ¶ 653f ("[I]njunctive relief must be tailored with sufficient breadth to ensure that a certain 'class' of acts, or acts of a certain type or having a certain effect, not be repeated."). As Google recognizes, *see* Google's Br. at 11, the court can also enjoin "'practices connected with acts actually found to be illegal,' including practices 'which are of the same type or class as unlawful acts,'" Rem. Op. at 60 (first citing *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 89 (1950); then citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969)). Employing "the same anticompetitive playbook for its

GenAI products that it used for Search," *id.* at 99, would surely be within the same type or class as Google's unlawful exclusionary acts with respect to Search.

At the October 8th hearing, Google contended that it should be permitted to condition its GenAI products in the same way that, for example, Microsoft has been conditioning distribution of its GenAI product, Copilot, on other applications "given the nascent nature of the market and given the level and the degree of competition" and because "Google doesn't have market power in Gemini." Hr'g Tr. at 61:5–64:5; *see also* Google's Br. at 13. The court is unpersuaded.

Besides the representation made by counsel at the hearing, no evidence has been presented that Microsoft in fact conditions distribution of Copilot on other applications, or that any other company does so with their respective GenAI products. *See* Rem. Op. at 217 (finding that Microsoft has integrated Copilot into Edge and Bing, but not that Microsoft bundles Copilot with other applications). Even if they did, the point of these remedies is not to ensure that Google maintains parity with competitors—it is to ensure that others can effectively compete in these markets. *Cf. Massachusetts*, 373 F.3d at 1231 (Section 2 remedies must "restor[e] conditions in which the competitive process is revived."); 3 AREEDA & HOVENKAMP ¶ 650a(2)(D).

Moreover, Google's argument that it should not be prevented from pursuing creative licensing regimes with its GenAI products because of its relative lack of power in that market is unconvincing. Remedies need not be strictly limited to "monopoly products" or even products for which the monopolist has any leverage in the market. The *New York I* court recognized this when it approved the inclusion of new technologies that "ha[d] the capacity to function in a manner similar to that of" the middleware that was the focus of liability in the remedies decree. 224 F. Supp. 2d at 129. And the D.C. Circuit affirmed that decision. *See Massachusetts*, 373 F.3d at 1204. Even Google's own proposed provisions, by their own terms and by Google's

characterization, include products not at issue in liability or for which findings of fact about market power were never established.  *See* Google's FPFJ § III.A–B (referring to "Google Play *or any other Google software application*" (emphasis added)); Google's Br. at 11.  Google acknowledges that even those products would fall within the court's authority to enjoin other conduct "of the 'same type or class' as the violations."  Google's Br. at 11 (citation omitted).

To be certain, the D.C. Circuit has cautioned that when "adopting a forward-looking provision," the court's "discretion is necessarily less broad because . . . it is in danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Massachusetts*, 373 F.3d at 1224.  But that discretion is not so constricted that it prohibits the court from imposing remedies to prevent the same unlawful conduct from occurring again in a meaningfully overlapping context.  *See id.* at 1233 ("The district court certainly did not abuse its discretion by adopting a remedy that denies Microsoft the ability to take the same or similar actions to limit competition in the future rather than a remedy aimed narrowly at redressing the harm suffered by specific competitors in the past.").

In sum, the court declines to accept the relaxed injunctive relief Google proposes with respect to GenAI products.  Those provisions related to such products shall be parallel to the provisions related to non-GenAI Google products in the way that Plaintiffs propose.[4]  *See* FJ § III.A–D, H–J, M.

---

[4] Google also characterizes the court's description of its recent Gemini Commercial Agreement with Samsung as "recogniz[ing] this distinction" between GenAI and non-GenAI products with respect to access-point optionality. *See* Google's Br. at 12–13 (discussing Rem. Op. at 50–56).  The court simply described these agreements to demonstrate that the liability decision was already influencing the way Google was contracting with its partners, *see* Rem. Op. at 107, not to define the scope of the Final Judgment when it comes to the distribution of GenAI products.

**B.    Scope of Prohibited Conditioning**

The parties appeared to agree throughout the remedies phase about the constraints on Google's ability to condition the distribution of one piece of software on another.  *See* Rem. Op. at 106.  Apparently, not so.

Google's proposed injunctive relief prevents it from entering or maintaining agreements that contain an express conditioning term.  But Plaintiffs' proposals ban conditioning altogether, regardless of whether it has been memorialized in an agreement.  *Compare* Google's FPFJ § III.A–J ("Google shall not enter or maintain any agreement . . . that conditions . . . ."), *with* Pls.' FPFJ § III.A–J ("Google shall not condition . . . .").

Plaintiffs urge acceptance of their version to prevent Google from not only entering into agreements that contain an express conditioning term, but also declining to enter agreements that would not.  Pls.' Br. at 3.  They allege that "[i]n a meeting, Google confirmed that . . . Google intends to reserve the right to conditionally refuse to license the Play Store based on whether the device manufacturers opt to distribute Google Search–related products."  *Id.*  Google emphatically denies having made this representation, Hr'g Tr. at 54:1–56:10, but still defends its proposed language on the basis that "Plaintiffs did not establish, and the Court did not find, that Google engaged in any 'conditioning' that did not involve an agreement," *see* Google's Br. at 9–10, and that Plaintiffs' proposed language invites potential misinterpretation by partners, *see* Hr'g Tr. at 56:11-16.

The court has already explained that injunctive relief need not be surgically drawn around the exact contours of liability.  *See supra* Section IV.A.  But more to the point, conditional refusals to deal are as pernicious as conditional deals committed to writing.  *Cf. OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1247 (11th Cir. 2022) ("Conditional refusals to deal—i.e., one firm unilaterally

refusing to deal with another firm unless some condition is met—and exclusive dealing [are] synonymous." (cleaned up)); *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022) ("[C]onditional refusals to deal are functionally equivalent to exclusive-dealing arrangements." (citing *OJ Com.*, 34 F.4th at 1247)); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) (analyzing exclusionary business practices as if they were exclusive agreements because such practices were "as effective as those in written contracts"). A prohibition on Google's anticompetitive conduct would be fundamentally flawed if, for example, Google were prohibited from entering into an agreement that expressly conditions the licensing of the Play Store on the distribution of Search but were permitted to decline a request to license Google Play because the partner would not preinstall Search on its devices. *See* Pls.' Br. at 3. After all, this court must "end the illegal conduct and . . . make every effort to protect against conduct of the same type or class." *New York I*, 224 F. Supp. 2d at 189.

Plaintiffs' language is not impermissibly vague, as Google suggests. Google's Br. at 10. It is straightforward: Google shall not condition. Google protests that "Plaintiffs have not explained whether the act of 'condition[ing]' purportedly could reach even a trivial statement by a single Google employee that does not result in an actual agreement," Google's Br. at 10, and that it is at risk of being brought into a contempt proceeding over a potential misunderstanding during negotiations, Hr'g Tr. at 56:9-16. These concerns are overstated. The court is confident that "trivial" statements will not result in contempt proceedings and that if there is a non-trivial allegation of breach, the Final Judgment's enforcement procedures will provide an adequate path to resolution. *See generally* FJ § VII.

Google swears that "there's not going to be any conditioning of the type" and that it is "100 percent certain that [the court] would find that to be a violation of the decree, and that [it]

will not take place."  Hr'g Tr. at 57:1-4.  Then it should have no problem with a decree that expressly prohibits "any conditioning of the type."  The court therefore adopts Plaintiffs' language that "Google shall not condition."  *See generally* FJ § III.

C.    **Annual Termination**

At the liability phase, the court determined that "[t]he lack of flexibility for partners to exit the distribution agreements reinforces their foreclosure effect."  *Google*, 747 F. Supp. 3d at 158. This lack of flexibility came from both the agreements' durations and the fact that they were not easily terminable.  *Id.*  The court thus approved of provisions giving Browser Developers, OEMs, and wireless carriers an annual opportunity to reset the search product at different access points across different devices.  Rem. Op. at 110–11.

Google believes that multi-year agreements with a right to opt out annually without termination fees offer sufficient flexibility.  In fact, it argues, a multi-year agreement with annual opt-outs would *increase* the contracting options for partners, including opting out of their agreements after one year, if they wish.  Google's Br. at 14; Hr'g Tr. at 74:19–75:5.  Google insists that partners want these choices and that providing them will foster greater competition.  Hr'g Tr. at 75:6-13.

Plaintiffs see it differently.  They urge that an applicable agreement must "terminate[] no more than one year after the date it is entered."  Pls.' FPFJ § III.K.  Stressing that Google's prior agreements were hard to terminate, Plaintiffs argue that Google's proposal would still permit it to find creative ways to make termination difficult or to discourage opting out, such as by annually increasing RSA payments or imposing other burdens.  Pls.' Br. at 7 & n.2.

The court holds that a hard-and-fast termination requirement after one year would best carry out the purpose of the injunctive relief.

Recall, the liability phase "record reflects no meaningful competitive rebidding of the agreements. The more common story is Google's partners renewing the agreements without genuine consideration of an alternative." *Google*, 747 F. Supp. 3d at 158. Requiring contracting parties to reevaluate their positions and renegotiate their agreements each year would create regular opportunities for competitive rebidding. Competitors in the industry would be on regular notice as to when an agreement between a Browser Developer, OEM, or wireless carrier and Google is coming to an end and be able to prepare accordingly to enter a competitive bid when that time comes. *See* Hr'g Tr. at 73:19–74:8. A bright-line, one-year term also will simplify enforcement. *See* Pls.' Br. at 7; Hr'g Tr. at 73:11-18 (Plaintiffs' counsel suggesting that adopting Google's language would in fact be less efficient than Google represents because it may require "mini economic trial[s]" on potential multi-year contracts "to see whether or not the incentives overwhelm what should be the right of termination"); *see also id.* at 67:24–69:6 (Plaintiffs' counsel approving of an omnibus agreement for the required separate agreements for different Operating System versions and privacy modes across different devices as long as each agreement must be renegotiated each year). *But see* Google's Br. at 14 & n.2 (describing Plaintiffs' proposal as increasing administrative burden because the optionality Plaintiffs seek could be achieved in a single agreement).

The court is skeptical of Google's contention that its proposal would give partners *more* flexibility. In theory, partners have always had a choice. But in practice, Google has held all the cards. *Google*, 747 F. Supp. 3d at 158; Hr'g Tr. at 80:1-5. Knowing that contracts will come to

an end annually gives them a bit of the leverage they previously lacked and, importantly, will create frequent opportunities for genuine competition.[5]

Courts have presumed under related antitrust provisions that exclusive contracts ending within a year are reasonable. *Google*, 747 F. Supp. 3d at 157. Given the aggregation of factors contributing to the exclusive agreements' substantial foreclosure of the market, the hard-and-fast yearly termination requirement will help to "pry open" that market. *See* FJ § III.K–M.

### D.    Browser Developers and Apple

The parties' proposals with respect to Browser Developers and Apple differed from the start, and they have only diverged further. Plaintiffs originally proposed that Google could "enter or maintain any agreement requiring" either a Browser Developer or Apple to set Google Search (and for Apple, also any Google GenAI Product) as the default search engine or product only if that agreement applies to just one Operating System Version and one Privacy Mode at a time. Pls.' FPFJ § III.L–M. They also clarified that "this provision does not prohibit Google from negotiating multiple such agreements with" a Browser Developer or Apple "as long as no agreement is conditioned on another." *Id.* Google, on the other hand, proposed that it could enter such an agreement as long as the Browser Developer or Apple is permitted "on an annual basis to set a different Default Search Engine in the United States for any Operating System Version and/or Privacy Mode offered by the Browser Developer [or Apple] without foregoing any payments attributable to an Operating System Version or Privacy Mode where Google Search remains set as

---

[5] Google takes issue with a yearly termination requirement as "impermissibly regulat[ing] third parties." Google's Br. at 13. But antitrust remedies directed at agreements that unlawfully foreclose markets will necessarily affect relevant third parties to some degree. That is unavoidable. *See, e.g.*, *New York I*, 224 F. Supp. 2d at 152–56 (approving restrictions on Microsoft's ability to enter certain agreements with third party OEMs); *cf. E. I. du Pont*, 366 U.S. at 326 ("[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests.").

the Default Search Engine."[6]   Google's FPFJ § III.L; *id.* § III.M–N.   Plaintiffs maintain that Google's provision would allow it to require Apple to set Google as the default search engine on every instance of Safari on every Apple device at every access point as long as it did so one year at a time.   Pls.' Br. at 8–9; Hr'g Tr. at 72:3-15.   But Google is adamant that its provision would allow a Browser Developer or Apple on an annual basis to "mix and match" across Operating Systems or Privacy Modes without any impact on their revenue share.   Hr'g Tr. at 77:14–78:10. It insists that the only difference between its provisions and Plaintiffs' is the issue of yearly termination and administration.   *Id.* at 78:11–79:8.

At the October 8th hearing, Plaintiffs justified their proposal in part by stating that they understood the court "to permit some more exclusive dealing on browsers and Apple."   *Id.* at 70:4– 16.   More specifically, they said, "We read Your Honor's opinion to suggest that you would be okay with more all-or-nothing type agreements, where Google would buy, for example, all iPhones in the United States, the standard Safari mode default, where Apple can't change a single device to a different default.   We find that troubling, but if they were going to do that, we want it to be limited to the mode and the operating system."   *Id.* at 69:7-13.   In response, the court clarified it did not intend for there to be daylight between restrictions on Google's ability to contract with respect to Android devices and those with respect to Browser Developers and Apple.   *Id.* at 70:25– 71:15.   Plaintiffs told the court that this was "welcome news," *id.* at 71:16, and that they would "love to rewrite" those provisions, *id.* at 87:23–88:22.[7]

---

[6] Because the court has already found that applicable restrictions should not be relaxed with respect to GenAI products and that agreements permitted under the prohibitory injunctions must terminate after one year, *see supra* Sections IV.A, C, the court discusses these provisions without addressing those differing elements of the parties' proposals. The court also does not discuss the one element of these provisions that is undisputed—that Browser Developers and Apple are expressly permitted to promote any Third-Party General Search Service and Third-Party GenAI Product. *See* Pls.' FPFJ § III.L–M; Google's FPFJ § III.L–N.

[7] As far as the court can tell, Plaintiffs appear to have understood the court to "permit some more exclusive dealing" with respect to Browser Developers and Apple because it read the court's description of Google's original revised

Following this exchange, Plaintiffs submitted new proposals for its provisions regarding Browser Developers and Apple. *See* Pls.' Suppl. These revised provisions tightened the restrictions to mirror those imposed on Android partners. They would prevent Google from conditioning consideration for (1) setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes) or any proprietary Apple feature or functionality (such as Safari, Siri, Spotlight, and any Privacy Mode) on a device on (2) setting the same product on any other browser access point or proprietary Apple feature or functionality on that same device or any other device in the United States. *See* Pls.' Suppl. § III.L–M. In other words, Plaintiffs propose that the same access-point-by-access-point and device-by-device optionality it proposes for Android devices apply also to browsers and Apple devices.

The Final Judgment will include, over Google's objection, Plaintiffs' revised provisions regarding Browser Developers and Apple. *See* FJ § III.L–M.

As a threshold matter, the court rejects Google's contention that it cannot consider Plaintiffs' updated provisions because they were presented "after the evidentiary record is closed and after briefing and argument on the parties' [proposed final judgments]." *See* Google's Suppl. at 5. Plaintiffs have not relied on new evidence. And Google has had a fulsome opportunity to respond at both the October 8th hearing and in writing. Furthermore, in crafting the Final Judgment, the court is not beholden to the exact language the parties have proposed at any stage.

---

proposed final judgment and its acknowledgment that "[a]ll of this is a good start" as adopting that description for purposes of the Final Judgment. *See* Rem. Op. at 105–07 ("Under its proposal . . . Google also would be permitted to pay Browser Developers, including Apple, to set Search as the default GSE, so long as the Browser Developer (1) can promote other GSEs and (2) is permitted to set a different GSE on different operating system versions or in a privacy mode and make[] changes, if desired, on an annual basis. . . . And Apple could preload GSEs on a device-by-device basis (i.e., Safari for Mac versus Safari for Windows), and install different GSEs for different search modes, like private browsing."). As previously explained, *see supra* Section II, any "approvals" of a proposed remedy did not signal the court's embrace of the proposal's specific text.

The court makes this determination with the evidentiary record already before it, as well as the benefit of the parties' arguments and submissions.

Google's merits objections to Plaintiffs' updated proposals are largely a reprise of its position that the prohibitory injunctions must be limited to the narrowest reading of the court's liability findings. For example, Google stresses multiple times that Plaintiffs only established that the "purported 'exclusivity' arose from Apple having agreed for the term of the contract not to 'pre-select a different default search engine in Safari's private browsing mode' or 'offer a different default search engine on different Apple devices (e.g., *different defaults on mobile versus desktop devices*).'" *Id.* at 1 (quoting Pls.' Post-Trial Br., ECF No. 896, at 36); *see also id.* at 2–3 (referring to the court's representation at the October 8th hearing that it had understood Plaintiffs' reference to device-level optionality as being relevant to the device type). Maybe so, but the court can fashion a remedy that goes "beyond a simple proscription against the precise conduct previously pursued." *NSPE*, 435 U.S. at 698; *see supra* Section IV.A.

Google also argues that device-by-device and access-point-by-access-point optionality is unnecessary to include in the provision applicable to Apple. Because Apple, too, is an OEM, Google states, all the other provisions in the prohibitory injunction will also apply to Apple. Google's Suppl. at 3. This is only partly true.

The court held at the liability phase that "(1) agreements between Google and browser developers, such as Apple and Mozilla, were exclusive insofar as they established Google as the out-of-the box default search engine; (2) mobile application distribution agreements ("MADAs") between Google and Android [OEMs] were exclusive in practice; and (3) [RSAs] between Google and Android device distributors—both OEMs and wireless carriers—formalized the practical exclusivity of the MADAs." Rem. Op. at 9–10 (citing *Google*, 747 F. Supp. 3d at 146–52).

In doing so, it evaluated separately the Apple Internet Services Agreement (ISA) and Browser Developer agreements on one hand and the Android agreements on the other, because the way Google Search was distributed across those agreements differed.  For Apple and Browser Developers, Search is integrated into specific search access points, such as Safari, Siri, and Spotlight on Apple devices, and the search box, navigation or location bar, and search box displayed on the Startpage on Mozilla's Firefox browser. *See Google*, 747 F. Supp. 3d at 44 ¶ 59; *id.* 96 ¶ 334.  For Android devices, on the other hand, Search is primarily distributed through individual applications, such as the Google Search Widget and Chrome, and bundled with others like YouTube and Google Maps as part of the MADAs.  *Id.* at 97–100 ¶¶ 348–361.  Apple does not contract for Google services through applications the way Android partners do.  So, while Apple is indeed an OEM, those provisions that prevent Google from conditioning payment or licensing of *applications* on the distribution of one another do not apply to Apple.  This objection therefore falls flat.

Finally, Google maintains that "[t]he additional provision applicable to agreements setting Google Search as the Default Search Engine in a Third-Party Browser has always differed in some respects from the provisions directed to certain devices because a browser default is only one search access point on a device.  There is no logical basis for distinguishing between individual devices or access points in the context of a browser default, which is why no one even suggested such a concept until Plaintiffs raised it this month."  Google's Suppl. at 4 (emphasis omitted). Google overlooks the fact that Browser Developers can also be OEMs—notably, for instance, Samsung. *Google*, 747 F. Supp. 3d at 35–37 ¶¶ 9, 16.  Others may emerge in the future.  Plaintiffs' proposal ensures that a device manufacturer that also has a proprietary browser could contract for browser placement with different competitors.  The court acknowledges that at present firms that

are only Browser Developers (e.g., Mozilla) may not have the ability to select a default search engine on a device-by-device basis. But because express recognition of such optionality would deny Google "the ability to take the same or similar actions to limit competition in the future," *Massachusetts*, 373 F.3d at 1233, the court thinks deference to Plaintiffs is warranted here. *See E. I. du Pont*, 366 U.S. at 334; *supra* Section II.

### E.    Other Provisions

The court addresses two final provisions of the proposed prohibitory injunctive relief, each proposed by Plaintiffs or Google alone. The court adopts neither.

*First*, Plaintiffs propose a provision that reads: "Google shall not enter or maintain any exclusive contract relating to the distribution of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and any Google GenAI Product in the United States." Pls.' FPFJ § III.N. This is far too broad and vague a term.

Federal Rule of Civil Procedure 65(d) requires that every order granting an injunction "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). Plaintiffs defend the provision essentially as being designed to catch what is "not allowed." Hr'g Tr. at 87:12–88:3; *see also* Pls.' Br. at 12 ("Section III.N prevents any inadvertent gap between the remedies opinion and the final judgment regarding the treatment of exclusive contracts relating to the distribution of Google Search, Chrome, Google Assistant, and the Gemini app."). But that is exactly the kind of ban on unspecified conduct that Rule 65(d) is designed to prevent. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[Rule 65(d)] requires that those enjoined receive explicit notice of precisely what conduct is outlawed."); *cf. Gulf Oil Corp. v. Brock*, 778 F.2d 834, 843 (D.C. Cir. 1985) (rejecting order that enjoined "substantially similar" conduct without explaining what would be similar). The provision tracks what Plaintiffs describe as "the

Court's directive that . . . the final judgment bar 'any exclusive contract,'" Pls.' Br. at 12 (quoting Rem. Op. at 3), but again, the Final Judgment is what restrains Google, not an opinion. Rule 65(d) requires specificity, not vague language that might fill undefined "gaps." *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) ("[W]e have held injunctions to be too vague when they enjoin all violations of a statute in the abstract without any further specification . . . ." (citing *SEC v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007))).

The court can understand Plaintiffs' desire to include a provision that "helps prevent a recurrence of the unlawful conduct by ensuring that Google cannot adopt novel forms of the exclusive distribution the Court condemned." Pls.' Br. at 12 (citing *Microsoft II*, 253 F.3d at 103). But the court cannot enjoin "all future violations of the antitrust laws." *Zenith Radio*, 395 U.S. at 133. The Final Judgment's enforcement provisions, including the court's retention of jurisdiction, should provide an avenue for addressing any allegation of noncompliance or circumvention.[8]

*Second*, Google proposes a provision that reads: "Nothing in this Final Judgment shall otherwise prohibit Google from providing Consideration to a manufacturer or wireless carrier with respect to any Google product or service in exchange for such entity's distribution, placement on any access point, promotion, or licensing of that Google product or service." Google's FPFJ § III.O. Apparently, Google drafted this provision in response to Plaintiffs' previously proposed payment ban. Pls.' Br. at 13. The court has rejected for now that proposed remedy. Rem. Op. at 119–28. Because this provision otherwise adds nothing of value to the Final Judgment, the court declines to adopt it.

---

[8] Plaintiffs' counsel also stated that "[i]f those provisions [enjoining Google from locking up device or access-point flexibility] were also changed to where everyone, including Apple and browsers, had device-by-device and access-point-by-access-point flexibility, I don't know if I could name a type of exclusive agreement right now that would be captured by III.N." Hr'g Tr. at 88:4-12. Because the court adopts Plaintiffs' modified §§ III.L and III.M, *see supra* Section IV.D, Plaintiffs' concern should be placated.

V.      DATA-SHARING

The chief conflict regarding the data-sharing remedy has to do with Google's proposal that the data be shared subject to a license governing use.  *See* Google's FPFJ § IV.C.4.

Required sharing of certain data is justified to "narrow the scale gap created by Google's exclusive distribution agreements and, in turn, the quality gap that followed."  Rem. Op. at 130. Google has acquired a massive scale advantage in part because its exclusive distribution agreements have enabled Google to see far more queries than any of its rivals.  *Google*, 747 F. Supp. 3d at 49–50 ¶¶ 86–90.  Those queries gave Google data that helped improve the quality of Search, which in turn attracted more users and improved monetization, reinforcing the flywheel of network effects that entrenched Google's monopoly.  *Id.* at 161–62.  Because antitrust remedies must "deny to the defendant the fruits of its statutory violation," *Microsoft III*, 253 F.3d at 103 (citations omitted), and because scale is a significant fruit of Google's exclusive distribution agreements, *see* Rem. Op. at 89, the court held that sharing data—specifically, of Web Search Index[9] Data and User-side Data—"represents a reasonable method of eliminating the consequences of [Google's] illegal conduct," Rem Op. at 130 (quoting *NSPE*, 435 U.S. at 698). The data would give competitors the opportunity to boost quality while they continue to innovate to set themselves apart competitively from Google.  *See id.* at 145–46; *see also id.* at 130 (citing *In re Google Play Store*, 147 F.4th at 947 (affirming an information-sharing remedy that would "overcome [Google's] illegally amplified network effects by giving rival stores a fair opportunity to establish themselves" (cleaned up))).

---

[9] The Final Judgment adopts Google's "Web Search Index" rather than Plaintiffs' "Search Index."  *See* FJ § IX.FF; Appendix; Google's App'x at 1.  Google's term and definition more closely aligns with the court's prior directive that this definition should exclude data from Google's various other indexes not crawled from the web.  *See* Rem. Op. at 141.

Google proposes that any data required to be shared under the Final Judgment be subject to a license governing use. That license would "include a requirement that the Qualified Competitor commit not to share or sell the datasets, and shall use the datasets for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product." Google's FPFJ § IV.C.4. The Final Judgment should forbid Qualified Competitors from selling the data they receive to unknown third parties, Google argues, because the data-sharing remedy is meant to furnish Qualified Competitors tools to compete in the relevant markets, not to give them an easy way to "turn a quick profit in a manner that violates user privacy (including Google's own terms of service)." Google's Br. at 20.

In general, the court agrees that data should be shared subject to a license, but with modifications that incorporate some of Plaintiffs' objections.

### A.    Restriction on Sharing or Selling Data

Plaintiffs' main concern raised at the October 8th hearing about the licensing proposal was that restricting Qualified Competitors from selling or sharing data from the jump would "artificially constrain them right now before we even know who they are, what their new product might be, [or] how they might innovate on that." Hr'g Tr. at 47:3–48:1.

As to the restriction on selling data, Plaintiffs argue that any Competitor whose intention is only to sell data rather than earnestly use it to compete would be screened out from the start, as such a firm would not be certified as a Qualified Competitor. *Id.* at 47:3-11. When pressed to offer a scenario in which it would be appropriate for a Qualified Competitor to simply sell the data to a third party, regardless of whether that third party has an interest in developing a GSE, counsel for Plaintiffs could only relay that those specific scenarios are as of now unknown. They noted only that it is possible, for example, that a Qualified Competitor would want to sell a product that

includes the data, and the Final Judgment should not preemptively preclude them from doing so without letting that scenario unfold. *See id.* at 49:5-17.

As to the restriction on sharing data, Plaintiffs worry that such a license would prevent Qualified Competitors from sharing data with a partner in a joint venture, for example "with an AI company to improve search results or innovate new search-oriented products." Pls.' Br. at 15; *see also* Hr'g Tr. at 48:18–49:19. Google does not flatly oppose the possibility of such a joint venture, but it points out that it "would need to understand whether the joint venture partner is actually doing something that is related to the purposes of this remedy." Hr'g Tr. at 53:10-24.

With all this in mind, the court agrees that it is appropriate to subject Qualified Competitors to a license that prohibits them from sharing or selling the data received under the Final Judgment. But those Qualified Competitors will be able to petition the Technical Committee (or the court, if necessary) for relief from that constraint.

The court has serious concerns about allowing Qualified Competitors unbridled use of this valuable data. Even with appropriate privacy safeguards in place, User-side Data is still likely to contain highly sensitive information about individual users. *See* Rem. Op. at 163. And allowing a Qualified Competitor simply to sell the data to make a profit would be inconsistent with the purpose of this remedy. But at the same time, the court also agrees that Qualified Competitors should not be prevented from entering joint ventures or otherwise innovating with this data. After all, data-sharing is meant to give competitors a hand in setting themselves apart from Google. *See id.* at 145–46. Because the real-world effects of the data-sharing remedy have not yet been borne out, there is value in leaving slightly ajar the door to the possibility that some form of sharing or selling the data would be reasonable. *See also* Hr'g Tr. at 52:22–53:3 (Plaintiffs' counsel stating that they are more concerned about the hurdles put up for sharing and would be willing to write

out the sale provision); *id.* at 53:21-24 (Google's counsel stating that a Qualified Competitor and its potential partner getting approval and providing Google with notice and some transparency would be "something that makes sense").

### B. "Exclusive Purpose"

Next, Plaintiffs take issue with Google's proposed limitation that Qualified Competitors use the data "for the exclusive purpose of serving users . . . through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product." *See* Google's FPFJ § IV.C.4. They read this language as permitting Qualified Competitors to use the data "only for 'serving' users results," but not to improve algorithms or products. Pls.' Br. at 15.

The court does not read the proposed text so narrowly. That provision does not require a Qualified Competitor to only serve users "results." It does not limit how the data is used, whether directly to serve query results or to improve algorithms or products, as long as the *end* purpose of such use is to develop a product in the relevant markets that is competitive in quality.

Google itself maintains that "these terms are intended to require Qualified Competitors to use the disclosed data solely to compete in the appropriate markets rather than turn a quick profit." Google's Br. at 20; *see also* Hr'g Tr. at 42:25–43:20 (Google's counsel agreeing with the court that the intention behind this phrase is not how Plaintiffs characterized it). If it becomes evident during the judgment period that Google does in fact intend to use this language to essentially neutralize the remedy, the court will reconsider it. But for now, the court finds this limitation reasonable.

### C. Burden on Qualified Competitors

Plaintiffs worry that "Qualified Competitors who currently sell data or search results (for example to GenAI companies) would also be forced, at significant expense, to make the choice of

either maintaining a second copy of their data or systems untouched by the data at issue or shut down that business."  Pls.' Br. at 15.

The court is unsure of Plaintiff's concern.  Nothing in the Final Judgment would prevent a Qualified Competitor from selling its *own* search results and its *own* search results data, even if such products used Google's proprietary data as an input in some way.  And companies like the GenAI companies Plaintiffs refer to that could benefit from the data in a way that is consistent with the purpose of the remedy can themselves seek to be certified as Qualified Competitors. Lastly, if there is some compelling reason a Qualified Competitor must sell the data that is consistent with the purpose of this remedy, it may petition the Technical Committee (or the court) to do so.  *See supra* Section V.A.

### D.    Location of Users Served

Google would specify that the consumers served by use of the data be "located in the United States."  Google's FPFJ § IV.C.4.  Plaintiffs argue that, under Google's provision, a Qualified Competitor that currently serves search results worldwide using one system would be forced to exert considerable effort into building anew or maintaining separate infrastructure to use Google's data for the purpose of only serving users "located in the United States."  Pls.' Br. at 15.  At the hearing, the court asked counsel for Google how this would be feasible as a practical matter.  Hr'g Tr. at 44:3-45:21.  Counsel for Google responded that "that may be a [T]echnical [C]ommittee issue that . . . depending on how these competitors operate . . . [the Technical Committee] can resolve," *id.* at 45:14-17, but that ultimately what that phrase attempts to prevent is data getting into the hands of competitors who would use the data to develop products, whether search or unrelated to search, outside of the United States or that do not include the United States because "[t]hat's outside the scope of what this case was about," *id.* 45:2-8.  Though the court understands

Google's concern, given the practical difficulties the language may produce, the court believes that excising the phrase would avoid confusion. The court is willing to revisit this issue if necessary, with input from the Technical Committee.

*      *      *

The provision imposing a license for shared data will thus be as follows: "The data specified in Sections IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets unless authorized by the Technical Committee or the Court and shall use the datasets for the exclusive purpose of serving users through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product." FJ § IV.C.3. To be clear, the license requirement is not meant to allow Google to impose further burdens on Qualified Competitors. Nor is it meant to be an "artificial hurdle[]" to Qualified Competitors' ability to innovate. *See* Hr'g Tr. at 52:20-21. As drafted by the court, this provision will simply ensure that execution of this remedy remains moored to its purpose. To facilitate execution of this remedy, the court has also included in the Final Judgment a provision requiring that Plaintiffs and the Technical Committee, with input from Google, create a template for such a license within six months of the effective date of the Final Judgment. *See* FJ § IV.C.3.

## VI.    SEARCH SYNDICATION

Because it will take time for Qualified Competitors to develop high-quality competitive GSEs even with the data-sharing remedy, the court found that requiring Google to syndicate its search results would provide a much-needed "bridge" for Qualified Competitors to deliver quality search results that will foster short-term competition with Google. Rem. Op. at 170–71 (quoting Rem. Tr. at 3023:16–3024:14 (J. Adkins) (agreeing that "search syndication can provide a bridge

until a new search engine can become a fully independent search engine")).  But it also determined that the information syndicated would be narrower than what Plaintiffs proposed and that syndication would be subject to a license restricting use, as "the purpose of this remedy is to provide a short-term measure for Qualified Competitors to compete as they improve their own search capabilities, not an additional means to facilitate that development.  Other remedies serve that latter purpose."  *Id.* at 178.

Consistent with the Remedies Opinion, the parties' proposals include some version of a search syndication license.  *See* Pls.' FPFJ § V.A–B; Google's FPFJ § V.A–B.  They differ in substantial ways, however.  Mainly, the parties disagree on whether the terms of the search syndication license should (1) be restricted to those "no less favorable" than those in existing licenses or to "ordinary commercial" terms; (2) permit Google to restrict display of search results; (3) permit sub-syndication; and (4) last for a term of five years regardless of whether such term might extend beyond the six-year judgment period.

## A.   "No Less Favorable" versus "Ordinary Commercial" Terms

### 1.   *License Terms Generally*

Originally, Plaintiffs had proposed an exceedingly broad search syndication remedy.  They proposed, among other things, that Google would be required to provide search syndication services only at marginal cost and could not place any conditions or restrictions on how a Qualified Competitor could use or display the syndicated content.  Rem. Op. at 168–70.  The court narrowed many of these provisions largely because they strayed too far from terms found in licensing agreements in the existing search syndication market.  *Id.* at 173–74 (quoting *Bausch & Lomb*, 321 U.S. at 728 ("Congress has been liberal in enacting remedies to enforce the antimonopoly

statues.  But in no instance has it indicated an intention to interfere with ordinary commercial practices.")).

In making this determination, the court used phrases like the following: that a "Qualified Competitor who opts into the syndication remedies shall receive organic results and features on terms *no less favorable than* a current licensee"; "when it comes to a remedy like syndication for which there is an established market and which requires Google to deal with a Qualified Competitor, it is best to hew closely to *ordinary commercial terms*"; and "[p]ricing shall be based on 'financial terms *no worse than* those offered to any other users of Google's search syndication products.'"  *Id.* at 173–74 (emphases added) (citation omitted).  The court's overarching point was that the terms of a syndication license should not be unmoored from commercial realities already in place.

The parties have picked from this section of the Remedies Opinion the phrases that, they believe, best fit their purposes.  Phrases like "no less favorable than," "no worse than," and "least restrictive" appear throughout Plaintiffs' proposal.  *See* Pls.' FPFJ § V.A–B.  Google's, on the other hand, consistently refers to "ordinary commercial" terms.  *See* Google's FPFJ § V.B. The parties have sparred over what these terms mean and whether they track the court's opinion. *See* Pls.' Br. at 18–20; Google's Br. at 25–29.

For the most part, the court is wary of Google's blanket reliance on "ordinary commercial" terms.  First, Google's use of "ordinary commercial" terms is ambiguous.  As Plaintiffs point out, it is unclear what an "ordinary commercial" term with respect to any limitation currently is or how it may change over time.  Pls.' Br. at 19.  To be fair, the court used "ordinary commercial terms" in the Remedies Opinion, so Google cannot be faulted for grasping onto that language.  But it did

not intend for that phrase to convey an effective veto to Google over the search syndication terms merely because a term or some combination of terms is not deemed "ordinary."

But that is precisely how Google would have the court apply it. If a Qualified Competitor proposes a term that is not "ordinary" or typical to Google's existing syndication agreements, Google wants to be able to reject it. Such an ability would inhibit the innovation this remedy attempts to encourage. For example, potential Qualified Competitor DuckDuckGo operates a GSE that seeks to set itself apart by focusing on user privacy. Br. of Amicus Curiae Duck Duck Go, Inc. in Supp. of Pls.' FPFJ, ECF No. 1446-1 [hereinafter DuckDuckGo Br.], at 4; *Google*, 747 F. Supp. 3d at 36 ¶ 12. In an amicus brief, DuckDuckGo worries that, under Google's proposed provisions, Google would be able to refuse to syndicate search results to privacy-focused GSEs like DuckDuckGo's by saying that a provision ensuring a certain degree of user-data protections is not "ordinary" to Google's existing syndication agreements. DuckDuckGo Br. at 5. Qualified Competitors hoping to compete by offering unique services or features may therefore be forced to either forego the syndication remedy or abandon developing what sets them apart. *Id.* at 5–6.

Save one exception, the court will adopt Plaintiffs' language over Google's use of "ordinary commercial" terms. Because these provisions are many, the court will discuss two areas where these differences were particularly contentious: pricing and display restrictions.

### 2. Pricing

The court held that Google would not be required to provide syndication services at "no more than . . . marginal cost." Rem. Op. at 174. Because the availability of marginal-cost syndication from Google would disincentivize new syndication market entrants and potentially harm current providers of search syndication services, the court wrote that "[p]ricing shall be based

on 'financial terms no worse than those offered to any other user of Google's search syndication products.'" *Id.* at 173–74 (citation omitted).

And yet Google took a different tack. It now proposes that "Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's search syndication products." Google's FPFJ § V.B.3.

Its main objection to the court's language, which Plaintiffs have adopted, is that it would create the same problems the court contemplated would arise from a "marginal cost" provision. A most-favored-nation pricing term, Google protests, would result in syndication licenses with pricing terms cherry-picked from, for instance, discounted organic search syndication pricing offered to partners who also syndicate search text ads, sometimes at prices below marginal cost. Google's Br. at 26. Ordinarily, Google says, such discounted pricing is offered because the discount is offset by the revenue Google expects from the ad syndication. *Id.* Google argues that being required to offer the discounted rate to a Qualified Competitor where Google cannot expect the same revenue to offset it would "'interfere with' and 'reduce, if not eliminate, competition in the market for syndicated search results'" for the same reasons the court determined marginal-cost pricing would. *Id.* (quoting Rem. Op. at 175).

Google's concern is overstated. The court thinks it is unlikely that a Qualified Competitor will syndicate search results from Google but not search text ads. After all, it is through search text ads (and other forms of advertising) that GSEs generate revenue. While it may be possible that a Qualified Competitor will syndicate search results from Google but search text ads from elsewhere or not at all, until such arrangements come to fruition, the court is disinclined to alter

the Final Judgment in a way that permits Google to dictate pricing with Qualified Competitors based on existing commercial terms reached with Google's profit motive in mind.

Similarly, that most-favored-nation pricing would "substantially impact[] Google's monetization expectation," Google's Br. at 26, is of no moment. Google's "monetization expectation" is a fruit of its illegal conduct. *See* Rem. Op. at 95–97. "Those who violate the [Sherman] Act may not reap the benefits of their violations and avoid an undoing of their unlawful project on the plea of hardship or inconvenience." *E. I. du Pont*, 366 U.S. at 326–27. The Final Judgment's pricing provisions may result in syndication agreements that depart from the way Google has historically contracted or made its revenue. *See* Google's Br. at 26–27. But that is an acceptable consequence of remedying Google's illegal conduct. *Microsoft III*, 253 F.3d at 103 (holding that Section 2 remedies must "deny to the defendant the fruits of its statutory violation" (internal citation and quotation marks omitted)).

### 3.     Restriction on Display of Search Results

Originally, it was Plaintiffs who sought to enable Qualified Competitors to "effectively replicate how Google delivers its [search engine results pages ("SERPs")]." Rem. Op. at 172 ("How else to explain Plaintiffs' insistence that Google must provide information that is 'the same as if the Qualified Competitor's query had been submitted through Google.com'?" (citation omitted)). Now, Plaintiffs accuse Google of attempting such a result. Hr'g Tr. at 98:15–99:1. And they are right. Google now proposes that it be "permitted to place its ordinary commercial restrictions on the use and display of its syndicated results and content." Google's FPFJ § V.B.8. At the October 8th hearing, Google's counsel explained that its typical syndication-display restrictions include requiring a "Powered by Google" branding insignia, preventing the licensee from changing the order of the syndicated search results, or simply preventing the licensee from

"using the syndicated results in manners other than the way Google . . . presents them." Hr'g Tr. at 106:19–107:10. Google believes it should be able to continue to impose these restrictions under the Final Judgment.

Plaintiffs aver that if Google can limit Qualified Competitors' display of the syndicated search results to, for example, the "10 blue links" in the way they are displayed on Google's own SERPs, a GenAI company like OpenAI would not be able to "repackag[e] it" as they or their consumers would see fit. *Id.* at 98:15–99:1; *see also* Rem. Tr. at 389:17–390:2 (Turley) (OpenAI is "not trying to recreate the type of experience that [a consumer] would find on Google.com where you see ten blue links."); Hr'g Tr. at 98:18-21 ("[Google's] provision says they can put ordinary commercial restrictions on the use and display of syndicated Search results. That is what we worry about would create a world of Google clones."). Because of these concerns, Plaintiffs propose that Google may not impose such restrictions "beyond the least restrictive terms Google provides under any current search syndication agreements." Pls.' FPFJ § V.B.6.

The court agrees with Plaintiffs. Google frames its proposal in part by arguing that oftentimes a Qualified Competitor *wants* to be able to adopt Google's branding "as part of the reason why they're syndicating from Google." Hr'g Tr. at 109:9-18. That may be true for some current licensees. But for a Qualified Competitor—who, to reiterate, can only be certified if it can demonstrate a plan to invest and compete in or with the GSE and/or Search Text Ads markets— becoming a Google clone or marketing itself as one seems an unlikely desire. The syndication remedy is meant to give Qualified Competitors a boost in quality while they develop competitive products, not to pose as Google in the meantime. And at least one potential Qualified Competitor in the GenAI space has explicitly expressed a desire to depart from Google's familiar ten blue

links format.  At bottom, allowing Google to require licensees to display results to replicate Google's SERPs would be at odds with what this remedy is designed to achieve.[10]

\*    \*    \*

In sum, both pricing and non-pricing restrictions or limitations in a search syndication license pursuant to the Final Judgment shall be, for the most part, defined by Plaintiffs' language, on "least restrictive," "no less favorable," or "no worse" terms.   The Final Judgment will retain the use of "ordinary commercial" terms to protect against Qualified Competitors using the syndication agreement in a manner than exceeds its intended purpose.  *See* Rem. Op. at 184 (citing Rem. Tr. at 2988:9–2989:3, 2990:22–2992:10 (J. Adkins) (discussing Google's ordinary restrictions on scraping, indexing, and crawling in its current syndication agreements)).

A final word on Google's objections:  Google contends that Plaintiffs' proposed license restrictions contradict the court's previous assurance that "Qualified Competitors generally will have to follow ordinary commercial terms and therefore will not need to be customized."  Google's Br. at 28–29 (quoting Rem. Op. at 180).  Google takes this quote out of context.  The court made this assurance in response to Google's concern that the syndication remedy would put the court in the role of a "central planner."  Rem. Op. at 180 (citation omitted).  Google should take the court at its word that it has no intention of becoming a "central planner."  Indeed, adopting Plaintiffs' terms will avoid this.  Google appears to believe that, unless it alone gets to say what terms are ordinary, each license will be a custom-made patchwork of terms causing Google insurmountable challenges.[11]  But there is more certainty in the universe of terms that are the "least restrictive" or

---

[10] As to use, Google explains Qualified Competitors should not be permitted to use syndicated data to feed into their LLMs for training.  Hr'g Tr. at 107:11–108:1.  The court agrees the Final Judgment should not permit this.  *See id.* at 108:19–109:2.  But the court does not believe that is what Plaintiffs seek or that the Final Judgment in fact permits it.
[11] In response to the court's note in the Remedies Opinion that "[i]f there are technical feasibility issues with syndicating only crawled web results, Google shall so advise the court," Rem. Op. at 173 n.24, Google now lists a

that are "no less favorable."  In any event, Google cannot "avoid an undoing of [its] unlawful project on the plea of hardship or inconvenience."  *See E. I. du Pont*, 366 U.S. at 326–27.

Lastly, for both the search and search text ads syndication remedies, the court will also require that Plaintiffs and the Technical Committee, with input from Google, create a template for such syndication licenses within 60 days of the effective date of the Final Judgment.  *See* FJ §§ V.B, VI.B.

### B.    Sub-Syndication

The court agrees with Google that Qualified Competitors should not be able to sub-syndicate the search results they syndicate from Google under the Final Judgment.  *See* Google's FPFJ § V.B.11.  Plaintiffs object, arguing that sub-syndication is a standard permission in the existing syndication market and that, because it is not apparent yet whether a Qualified Competitor would "need" to sub-syndicate, the Final Judgment should not foreclose them from doing so upfront.  Hr'g Tr. at 93:3-16.

But Google has it right: "Allowing Qualified Competitors to sub-syndicate Google's results . . . is entirely divorced from the Court's reasoning that new general search engine entrants should receive syndication from Google for the purpose of improving . . . *their own* SERPs." Google's Br. at 22 (citing Rem. Tr. at 4805:4-6 (Closing Arg.) (Plaintiffs' counsel stating that it's their "view that the syndication remedy should not be available to people who just want to syndicate")).  Given that search syndication is meant to provide a Qualified Competitor a way to serve high-quality results while it develops its own products, the court does not see why a Qualified Competitor would "need" to sub-syndicate to accomplish that purpose.  *See* Rem. Op. at 170–71.

---

host of "technical feasibility issues."  *See* Google's Br. at 29.  The court is not at this time convinced that these issues are so burdensome the features subject to syndication must be limited to those that Google "provides under current standard search syndication agreements."  *See id.*  As explained above, Google overstates how "bespoke" the syndication agreements with Qualified Competitors will be.  *See id.*

And that some syndication agreements today, including Google's, permit some level of sub-syndication does not warrant expanding the purpose of the syndication remedy. *See* Pls.' Br. at 20; Hr'g Tr. at 93:19–94:8; *see also id.* at 105:6–106:6 (Google's counsel stating that sub-syndication is not a widespread practice and usually limited to the licensee's affiliate, and that in those agreements where Google does permit sub-syndication, it retains an absolute right to reject it).

### C.    Duration

A syndication license pursuant to the Final Judgment will be for a term of five years, regardless of when Google's syndication service is made available to the Qualified Competitor, for both search and search text ads syndication.

Despite the court's holding to that effect, *see* Rem. Op. at 175–76, Google has added that a syndication license will be for a term of five years, *unless* there are fewer than five years remaining before the end of the judgment period. Googe's FPFJ § V.A. In that case, Google proposes, the license will be for a term lasting the remainder of the judgment period. *Id.* In practice, what that means is that only a Qualified Competitor that comes onto the scene during the first year of the Final Judgment will enjoy a full five-year syndication term.

The court does not dwell on this long. It held that the syndication license would be for five years based on testimony from potential Qualified Competitors that five years would be enough time in which to become independent of Google. Rem. Op. at 175–76 (citing Rem. Tr. at 426:16–25 (Turley)); *id.* at 176 n.25 (citing to article detailing that Brave began delivering search results exclusively from its own search index within about two years). And as DuckDuckGo points out, allowing these syndication licenses to terminate at the end of the judgment period could permit Google to simply run out the clock on license negotiations, especially as the judgment period draws

to a close.  DuckDuckGo Br. at 6–7.  The syndication remedy as Google would have it would not fulfill its purpose for a Qualified Competitor that becomes certified in year five of the six-year judgment period; the Qualified Competitor would simply not have enough time with the syndicated data to develop a competitive GSE in the meantime.  *See* Rem. Op. at 175–76; Hr'g Tr. at 110:10–111:8.  What's more, were the court to adopt Google's proposal, the incentive for Qualified Competitors to come forward would diminish over the period remaining on the Final Judgment.  Such an outcome would benefit only Google, not competition.

## VII.    SEARCH TEXT ADS SYNDICATION

"Because Google has more users, it has more advertisers, and with more advertisers, it has more dollars to improve its GSE and pay for distribution."  Rem. Op. at 183.  And because Qualified Competitors would be attempting to compete "[i]n the face of such formidable headwinds," the court held that Qualified Competitors should also be able to syndicate search text ads from Google as a "short-term measure designed to 'pry open' the relevant markets."  *Id.*

For the same reasons search syndication licenses will be restricted on "no less favorable terms" and other similar language used by Plaintiffs rather than Google's "ordinary commercial" terms, the same will be true, for the most part, for search text ads syndication.  *See generally* FJ § VI.  The restriction on scraping, indexing, and crawling will remain on ordinary commercial terms.  *Id.* § VI.B.6.  The provision regarding the duration of such licenses will also be the same.[12] *Id.* § VI.B.

---

[12] The restriction on display will be slightly different.  *See* FJ § VI.B.6.  The court previously held that "Google may place ordinary-course restrictions on the use or display of syndicated content."  Rem. Op. at 184.  Unlike in search syndication, Google presented evidence of the specific ways search text ads syndication without ordinary-course restrictions on display or use could harm advertisers and ad quality.  *See id.* (citing Rem. Tr. at 2972:4–2976:3, 2979:5–2984:10 (J. Adkins)).  That said, the court does not adopt Plaintiffs' narrow enumeration of permissible justifications for imposing such restrictions.  *See* Pls.' FPFJ § VI.B.6.

The search text ads syndication remedy differs in one important way from the search syndication remedy. The court previously contemplated the possibility of new entrants into the ad platform market. *See* Rem. Op. at 183 ("It is also possible that an independent ad platform could emerge to compete with Google and Microsoft, which are the only current suppliers of general search text ads in the United States."). Becoming an independent ad platform in the search text ads market takes a near-insurmountable effort in part due to Google's monopoly. *See* Rem. Tr. at 1794:12–1797:3 (Epstein) (describing "cold start" problems). To be competitive, a potential new entrant would need to be able to offer publishers syndication of high-quality ads. *See id.* at 1798:16–1799:16 (Epstein); *see also* Pls.' Br. at 20. So, while sub-syndication of search results would be inappropriate for Qualified Competitors looking to compete in search for the reasons explained above, *see supra* Section VI.B, sub-syndication of search text ads would be a useful bridge for a Qualified Competitor looking to compete with Google's ad platform. Sub-syndication will thus be permitted for search text ads only if "such Qualified Competitor has been certified as a Competitor to a Google ads platform (e.g., Google Ads)." FJ § VI.B.9.

## VIII.  ENFORCEMENT

From the beginning, the provisions related to the Technical Committee have been contentious. The court will not rehash the parties' arguments or go over their final proposals with a fine-tooth comb here. Rather, the court will explain at a high level its approach to the relevant provisions.

The court has been clear that a Technical Committee is an appropriate instrument to assist Plaintiffs in their enforcement efforts, as it "comports with federal courts' long history of utilizing appointed experts and provides a process to review and resolve inevitable disputes between the parties—ideally without further need for judicial intervention." Rem. Op. at 211 (quoting *In re*

*Google Play Store*, 147 F.4th at 954). A Technical Committee that is the "enforcement arm of the government," *Microsoft IV*, 231 F. Supp. 2d at 197, embodies the principle that with the government's broad authority to enforce the antitrust laws comes discretion with how violations should be redressed, *see F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170–71 (2004) ("A Government plaintiff . . . must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm. And a Government plaintiff has legal authority broad enough to allow it to carry out this mission. . . . '[I]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor.'" (quoting *E. I. DuPont*, 366 U.S. at 334)); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 575 (1972).

Throughout the remedies phase, Plaintiffs have vigorously insisted that the court's rulings and the case law make clear that "ultimately the power to enforce the terms of the decree rests with the government." Pls.' Br. at 21 (quoting *Massachusetts*, 373 F.3d at 1243). In their most recent brief, they took issue with Google's attempts at squeezing Plaintiffs out of various enforcement activities and roping the court into resolving disputes instead. *Id.* at 20–21. They also accused Google of attempting to "empower Google to delay or stymie enforcement at every turn simply by objecting." *Id.* at 21. Plaintiffs' FPFJ reflects these objections. *See generally* Pls.' FPFJ § VII.

Yet at the hearing, Plaintiffs appeared to surrender their position. From the jump, they conceded that Google should have full opportunity to object to any detail of the Final Judgment's execution. *See* Hr'g Tr. at 18:24–19:10. And despite the clear textual differences in the parties' FPFJs and briefs, Plaintiffs' counsel effectively agreed that "there is substantively no difference between the language that [Plaintiffs have] proposed, at least with respect to Google's ability to

object and bring things to the Court's attention, and what [Google has] proposed." *Id.* at 20:11–21:2.

Plaintiffs' counsel tried to assure the court that it is "free to delegate any of those elements [of enforcement] entirely to the [T]echnical [C]ommittee, entirely to [P]laintiffs." *Id.* at 34:7-14. But the court is frankly at a loss for how it can square this with their simultaneous position that "there is no such decision that ends with [Plaintiffs] and the [T]echnical [C]ommittee" and that "Google can object to everything and almost anything that would then require [the court's] resolution." *Id.* at 19:20–20:5.

The court is wary of being called in as a referee to the minutiae of the Final Judgment's execution and enforcement. Nevertheless, because the parties agree that Google should have a broad right to object, the court will grant it. *See* FJ § VII.A.7.k. This should put to rest Google's blanket objections to Plaintiffs' alleged attempts at taking decision-making authority from the court. Google's Br. at 30–32. The parties offer the assurance that they will elevate for judicial consideration only the most important conflicts. *See* Hr'g Tr. at 19:24–20:5; 26:7-12. The court is skeptical. Still, it adopts Google's express right to object with cautious optimism that the parties will keep their word.

Although Google will have an express right to object, the court affords some deference to Plaintiffs' provisions in this section of the Final Judgment. *See generally* FJ § VII; *see also* Appendix. Google appears to protest any function carried out by the Technical Committee that goes beyond mere "technical competence," characterizing the broad oversight and investigative functions Plaintiffs propose as "an end-run around the Court's rejection of the Plaintiffs' anticircumvention and anti-retaliation proposals." *See* Google's Br. at 32–33. Yet, the Technical Committee established in *New York I* and affirmed by *Massachusetts* had much of these same

broad functions.  *See* Second Modified Final J., *United States v. Microsoft Corp.*, No. 98-cv-1232, ECF No. 889 (D.D.C. Mar. 22, 2009).  None of these responsibilities are a "substitute for the enforcement authority of [Plaintiffs]" or the court.  Rem. Op. at 212 (citing *Massachusetts*, 373 F.3d at 1244).

Finally, to keep the court updated on the progress of executing the Final Judgment, Plaintiffs, with input from the Technical Committee, shall submit a status report within 90 days of the effective date of the Final Judgment and then on future dates as set by the Court.  FJ § VII.E.1.

## IX.    RETENTION OF JURISDICTION

Last but not least, the court addresses its retention of jurisdiction.  The Supreme Court was explicit in *United States v. United Shoe Machinery Corp.* that, where the government is entitled to relief in a Section 2 case, the "court's power" to order additional relief to remedy an earlier antitrust violation "is clear," even after the judgment period has passed.  391 U.S. 244, 251 (1968); *accord* 2A AREEDA & HOVENKAMP ¶ 325a ("[A] court's involvement is not necessarily ended once its decree is issued."); *id.* ¶ 325c2 ("Antitrust decrees may reserve the court's jurisdiction to order additional or modified relief." (citing *United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295 (D. Mass. 1953), *aff'd per curiam*, 347 U.S. 521 (1954))).  Both parties' proposals would preserve this court's jurisdiction accordingly.

Plaintiffs' proposal that it be permitted to file suit against Google for a period of four years after the expiration of the Final Judgment for any violations of the Final Judgment committed during the judgment period is not, as Google argues, the impermissible creation of a cause of action.  *See* Google's Br. at 38–39.  It is simply a part of the court's retention of its jurisdiction to enable Plaintiffs to enforce the Final Judgment.

That said, the court will not determine now, as Plaintiffs propose, what Plaintiffs must show to alter the judgment and to what standard Google will be held in response. *Compare* FJ § XI.A, *with* Pls.' FPFJ § XI.A. The court will address those specifics if and when the time comes.

## X.    CONCLUSION

It bears repeating that "Google is a monopolist, and it has acted as one to maintain its monopoly." *Google*, 747 F. Supp. 3d at 32. In crafting the Final Judgment, the task of this court was to "unfetter a market from anticompetitive conduct, . . . deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future," *Microsoft III*, 253 F.3d at 103 (internal quotation marks and citations omitted), even if the remedies ordered would "entail harsh consequences," *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1033 (D.C. Cir. 2008) (quoting *E. I. du Pont*, 366 U.S. at 327). The terms of the Final Judgment have been designed to do just that consistent with established Section 2 legal principles.

The Final Judgment accompanies this Memorandum Opinion.

Dated:  December 5, 2025

_____
Amit P. Mehta
United States District Judge

51

# APPENDIX

## I.  JURISDICTION

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| The Court has jurisdiction over the subject matter of this action and over Google. | This Court has jurisdiction over the subject matter of this action and over Google LLC. | This Court has jurisdiction over the subject matter of this action and over Google LLC. |

## II.  APPLICABILITY

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors and assigns; and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise. | This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns. | This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns; and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise. |

## III.  PROHIBITORY INJUNCTIONS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.  Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Search Application on any device sold in the United States. | A.  Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Search Application on Covered Devices sold in the United States. | A.  Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Search Application on any device sold in the United States. |
| B.  Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Chrome Browser Application on any device sold in the United States. | B.  Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of Google Play or any other Google software application on that manufacturer also distributing, preloading, placing, displaying, using, or licensing the Chrome Browser Application on Covered Devices sold in the United States. | B.  Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use or license of the Chrome Browser Application on any device sold in the United States. |
| C.  Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or | C.  Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search | C.  Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or |

| | | |
|---|---|---|
| license of the Google Assistant Application on any device sold in the United States. | Application, the Chrome Browser Application, or Google Play, on the manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Assistant Application on Covered Devices sold in the United States. | license of the Google Assistant Application on any device sold in the United States. |
| D. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States. | D. Google shall not enter or maintain any agreement with a manufacturer that conditions the licensing of the Google Search Application, the Chrome Browser Application, or Google Play, on the manufacturer also distributing, preloading, placing, displaying, using, or licensing Google GenAI Assistant Application on Covered Devices sold in the United States. | D. Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States. |
| E. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on any device sold in the United States. | E. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on Covered Devices sold in the United States. | E. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on any device sold in the United States. |
| F. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on any device sold in the United States. | F. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on Covered Devices sold in the United States. | F. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on any device sold in the United States. |
| G. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or | G. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that manufacturer or wireless carrier | G. Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or |

| | | |
|---|---|---|
| licensing any Third-Party GenAI Product on any device sold in the United States. | refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party GenAI Assistive Service on Covered Devices sold in the United States. | licensing any Third-Party GenAI Product on any device sold in the United States. |
| H.  Google shall not condition the payment for preload of, placement of, or assignment of an access point for the Google Search Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. | H.  Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Search Application on the preload, placement, or assignment of any other access point to any of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application on Covered Devices sold in the United States.  For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis. | H.  Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Search Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. |
| I.  Google shall not condition the payment for preload of, placement of, or assignment of an access point for the Chrome Browser Application for one device on any other preload of, placement of, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. | I.  Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Chrome Browser Application on the preload, placement, or assignment of any other access point to any of the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application on Covered Devices sold in the United States.  For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis. | I.  Google shall not condition the payment for preload, placement, or assignment of an access point for the Chrome Browser Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. |
| J.  Google shall not condition the payment for preload of, placement of, or assignment of an access point for the Google Assistant Application or any Google GenAI Product for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser | J.  Google shall not enter or maintain any agreement with a manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Assistant Application or a Google GenAI Assistant Application on the preload, placement, or assignment of any other | J.  Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Assistant Application or any Google GenAI Product for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the |

| | | |
|---|---|---|
| Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. | access point to any of the Google Search Application and/or the Chrome Browser Application on Covered Devices sold in the United States. For the avoidance of doubt, Google shall only contract with such partners with respect to such access points on a device by device basis. | Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States. |
| K. Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution of, preload of, placement of, display of, use of, license of, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered. | K. Google shall not enter or maintain any agreement with a manufacturer or wireless carrier requiring the preload, placement, or assignment of an access point on Covered Devices in the United States to any of the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and/or a Google GenAI Assistant Application for a period of more than one year, unless the agreement allows the manufacturer or wireless carrier to terminate the agreement on an annual basis and does not charge a fee for terminating. | K. Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution, preload, placement, display, use, license, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered. |
| L. Google shall not condition (1) Consideration for a Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes such as Privacy Mode) on any Device on (2) the Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any other browser access point on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product.[1] | L. Google shall not enter or maintain any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) permits the Browser Developer on an annual basis to set a different Default Search Engine in the United States for any Operating System Version and/or Privacy Mode offered by the Browser Developer without foregoing any payments attributable to an Operating System Version or Privacy Mode where Google Search remains set as the Default Search Engine; and (ii) expressly permits the Browser Developer to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States. | L. Google shall not condition (1) Consideration for a Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes such as Privacy Mode) on any Device on (2) the Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any other browser access point on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product. |

[1] Originally: "Google shall not enter or maintain any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) applies to no more than one Operating System Version and no more than one Privacy Mode, (ii) terminates no more than one year after the date it is entered, and (iii) expressly

| | | |
|---|---|---|
| M. Google shall not condition (1) Consideration for Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality, including Safari, Siri, Spotlight, and any Privacy Mode within those products, on one Device on (2) Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit Apple to promote any Third-Party General Search Service and Third-Party GenAI Product.[2] | M. Google shall not enter or maintain any agreement requiring Apple, Inc. ("Apple") to set Google Search as the Default Search Engine in the United States with respect to any proprietary Apple feature or functionality, including Siri and Spotlight, unless the agreement complies with Section III.L above.<br><br>N. Google shall not enter or maintain any agreement requiring Apple to distribute any Google GenAI Assistant Application in any Apple web browser or on any Apple mobile or desktop device in the United States unless the agreement expressly permits Apple to promote any Third-Party General Search Service or Third-Party GenAI Product in the United States. | M. Google shall not condition (1) Consideration for Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality, including Safari, Siri, Spotlight, and any Privacy Mode within those products, on one Device on (2) Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit Apple to promote any Third-Party General Search Service and Third-Party GenAI Product. |
| N. Google shall not enter or maintain any exclusive contract relating to the distribution of Google Search, the Google Search Application, the Chrome Browser Application, the Google Assistant Application, and any Google GenAI Product in the United States. | [No similar provision.] | [No similar provision.] |
| [No similar provision.] | O. Nothing in this Final Judgment shall otherwise prohibit Google from providing Consideration to a manufacturer or wireless carrier with respect to any Google product or service in exchange for such entity's distribution, placement on any access point, promotion, or licensing of that Google product or service. | [No similar provision.] |
| O. Nothing in this Final Judgment shall prohibit Google from | P. Nothing in this Final Judgment shall prohibit Google from | N. Nothing in this Final Judgment shall prohibit Google from |

permits the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product. For clarity, this provision does not prohibit Google from negotiating multiple such agreements with a Browser Developer as long as no agreement is conditioned on another."

[2] Originally: "Google shall not enter or maintain any agreement requiring Apple to set Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product in the United States with respect to any proprietary Apple feature or functionality, including Safari, Siri, and Spotlight, unless the agreement (i) applies to no more than one Operating System Version and no more than one Privacy Mode, (ii) terminates no more than one year after the date it is entered, and (iii) expressly permits Apple to promote any Third-Party General Search Service and Third-Party GenAI Product. For clarity, this provision does not prohibit Google from negotiating multiple such agreements with Apple as long as no agreement is conditioned on another."

| | | |
|---|---|---|
| distributing the Google Search Application, the Google Assistant Application, and any Google GenAI Product through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license. | distributing the Google Search Application, the Google Assistant Application, and a Google GenAI Assistant Application through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license. | distributing the Google Search Application, the Google Assistant Application, and any Google GenAI Product through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license. |

## IV.    REQUIRED DISCLOSURES OF DATA

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A. Google's Search Index: Within thirty (30) days of a Qualified Competitor's certification pursuant to Section IX.W, Google shall make available to such Qualified Competitor, at marginal cost, to Qualified Competitors the following data related to Google's Search Index: | A. Google's Web Search Index: For the term of this Final Judgment, Google will make available, at Marginal Cost, to Qualified Competitors the following data related to Google's Web Search Index on a non-discriminatory basis while safeguarding personal privacy and security: | A. Google's Web Search Index: Within thirty (30) days of a Qualified Competitor's certification pursuant to Section IX.V, unless granted additional time, Google shall make available, at marginal cost, to Qualified Competitors the following data related to Google's Web Search Index: |
| 1. for each document in the Google Search Index, a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other; | 1. for each document in the Google Web Search Index a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other; | 1. for each document in the Google Web Search Index, a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other; |
| 2. a DocID to URL map; and | 2. a DocID to URL map; and | 2. a DocID to URL map; and |
| 3. for each DocID, the (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag. | 3. for each DocID the following set of associated data: (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag. | 3. for each DocID, the (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag. |
| This information shall be provided for all websites in the full Search Index Google uses for searches on Google.com, the Google Search Application, or any other current or future Google general search products. Nothing in Section IV is intended to transfer intellectual property rights of third parties to index users. | 4. This information must be provided for all websites in the Web Search Index Google uses for searches on Google.com, the Google Search App, or future Google general search products. | The information shall be provided for all websites in the full Web Search Index Google uses for searches on Google.com, the Google Search Application, or any future Google general search products. Nothing in Section IV is intended to transfer intellectual property rights of third parties to index users. |
| | 5. Google must make this information available to Qualified Competitors on a one-time basis at or around the time they are so certified as a Qualified Competitor. | |
| | 6. Nothing in this Section IV is intended to transfer intellectual property rights of third parties to index users. | |

| | | |
|---|---|---|
| B. <u>User-Side Data</u>: For the term of this Final Judgment, Google shall make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:<br><br>1. User-side Data used to build, create, or operate the GLUE statistical model(s); and<br><br>2. User-side Data used to train, build, or operate the RankEmbed model(s).<br><br>Google shall make this data available to Qualified Competitors at least twice, with the exact number and frequency of such disclosures to be determined by the Court after consultation with Plaintiffs and the Technical Committee (TC). Any cap on the number of such disclosures shall be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. For clarity, this Section IV.B shall not require disclosure of intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs. | B. <u>User-Side Data</u>: For the term of this Final Judgment, Google will make available, at Marginal Cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:<br><br>1. User-side Data used to build, create, or operate the GLUE statistical model(s); and<br><br>2. User-side Data used to train, build, or operate the RankEmbed model(s).<br><br>3. For the avoidance of doubt, "User-side Data" for purposes of Section IV includes only the underlying data, not the model itself or any ranking signal or score, spam score, information retrieval score, information satisfaction score, query interpretation information, query suggestion information, query-based salient term, or document salient term.<br><br>4. The number of times a Qualified Competitor may receive a dataset will be capped by the Court after consultation with the Technical Committee. The cap on the number of such disclosures will be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. | B. <u>User-Side Data</u>: For the term of this Final Judgment, Google shall make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:<br><br>1. User-side Data used to build, create, or operate the GLUE statistical model(s); and<br><br>2. User-side Data used to train, build, or operate the RankEmbed model(s).<br><br>Google shall make this data available to Qualified Competitors at least twice, with the exact number and frequency of such disclosures to be determined by the Court after consultation with Plaintiffs and the Technical Committee (TC). Any cap on the number of such disclosures shall be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied. For clarity, this Section IV.B shall not require disclosure of intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs. |
| C. <u>User-Side Data Sharing Administration</u>: | C. <u>User-Side Data Sharing Administration</u>: These remedies are intended to make this data available in a way that provides suitable security and privacy safeguards for the data the Google must share. | C. <u>User-Side Data Sharing Administration</u>: |
| 1. Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors. Google shall have up to six (6) months from the date that the Plaintiffs, in | 1. Before this data specified in Paragraph IV.B is shared with Qualified Competitors, Google shall apply adequate anonymization and privacy-enhancing techniques to ensure the data is anonymized and secured, while attempting to optimize its usefulness. | 1. Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors. Google shall have up to six (6) months from the date that the Plaintiffs, in |

| | | |
|---|---|---|
| consultation with the TC, determine such privacy and security safeguards to implement the technology and provide any notice necessary to comply with this Section IV, and Google shall be deemed to have implemented the technology once Plaintiffs, in consultation with the TC, determine that the technology, including privacy and security safeguards, is fully functional. | 3.   Google will have up to six (6) months from the date that security and privacy safeguards are finally determined to implement the technology and provide any notice necessary to comply with this Section IV.C.2. | consultation with the TC, determine such privacy and security safeguards to implement the technology and provide any notice necessary to comply with this Section IV, and Google shall be deemed to have implemented the technology once Plaintiffs, in consultation with the TC, determine that the technology, including privacy and security safeguards, is fully functional. |
| 2.   Google shall provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the TC, may impose restrictions on what information Google shares under this Section IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied. | 2.   Google must provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the Technical Committee, may recommend restrictions on what information Google shares under this Paragraph IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied. | 2.   Google shall provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the TC, may impose restrictions on what information Google shares under this Section IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied. |
| [No similar provision.] | 3.   The data specified in Paragraph IV.A and B will be shared pursuant to a license governing use. The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets, and shall use the datasets for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. | 3.   The data specified in Sections IV.A and B will be shared pursuant to a license governing use.   The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets unless authorized by the Technical Committee or the Court and shall use the datasets for the exclusive purpose of serving users through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product.  Within six (6) months of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license. |

## V.     REQUIRED SYNDICATION OF SEARCH RESULTS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.  <u>Search Syndication License</u>: Google shall take steps sufficient to make available to any Qualified Competitor, on financial terms no worse than those offered to any other user of Google's search syndication products, a syndication license whose term will be five (5) years from the date the license is signed, and which shall require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:<br>1.  both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;<br>2.  the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion; and<br>3.  the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of the entry of this Final Judgment. | A.  <u>Search Syndication</u>: Google must take steps sufficient to make available to any Qualified Competitor a syndication agreement whose term will be five (5) years from the date Google's search syndication service, as set forth in this Final Judgment, is made available to any Qualified Competitor, unless there are fewer than five (5) years remaining before expiration of the term of the Final Judgment, in which case the term will be the remainder of the term of the Final Judgment.  Google must make available under the syndication agreement the following information and data in response to each query submitted by a Qualified Competitor:<br>1.  Both desktop and mobile versions of the ranked organic web search results obtained from crawling the web (i.e., the ten blue links) that Google provides under current standard search syndication agreements;<br>2.  the user-facing query-rewriting features that Google provides under current standard search syndication agreements, including user-facing features that enable query correction, modification, or expansion; and<br>3.  the Local, Maps, Video, Images, and Knowledge Panel search feature content that Google provides under current standard search syndication agreements.  For the avoidance of doubt, Google is not required to syndicate content in a manner inconsistent with its third-party content license agreements. | A.  <u>Search Syndication License</u>: Google shall take steps sufficient to make available to any Qualified Competitor, on financial terms no worse than those offered to any other user of Google's search syndication products, a syndication license whose term will be five (5) years from the date the license is signed, and which shall require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:<br>1.  both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;<br>2.  the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion; and<br>3.  the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment. |
| B.  <u>Search Syndication License Terms</u>: The search syndication license specified in Section V.A shall have the following additional features: | B.  <u>Search Syndication Agreement Terms</u>: The search syndication agreement must have the following additional features: | B.  <u>Search Syndication License Terms</u>: The search syndication license in Section V.A shall have the following additional features: |

| | | |
|---|---|---|
| 1. Google shall make syndicated content available via an API. | 1. Google will make syndicated content available via an API. | 1. Google shall make syndicated content available via an API. |
| 2. Google shall provide responses with latency and reliability functionally equivalent to what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment. | 2. Google will provide Qualified Competitors with latency and reliability functionally equivalent to what Google ordinarily provides to other users of Google's search syndication products with respect to queries originating in the United States. For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products. | 2. Google shall provide Qualified Competitors with latency and reliability functionally equivalent to what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment. For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products. |
| 3. Google shall provide the license on a non-discriminatory basis to any Qualified Competitor on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. | 3. Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's search syndication products with respect to queries originating in the United States. | 3. Google shall provide the license on a non-discriminatory basis to any Qualified Competitor on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. |
| 4. Syndication shall start with significant access to the data required by Section V.A above and decline over the course of five (5) years with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. Qualified Competitors' use of Google's search syndication services in the first year of a syndication license available under Section V.A shall be capped at 40% of the Qualified Competitors' annual queries. The scope of allowable syndication beyond the first year of a syndication license available under Section V.A shall be determined by the Plaintiffs in consultation with the TC. | 4. Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google. | 4. Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with Plaintiffs and the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google. |
| 5. Google may not consent to Qualified Competitors exceeding syndication limits set by Plaintiffs, and Qualified Competitors shall | 6. Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors must submit to the | 5. Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors shall submit to the TC |

| | | |
|---|---|---|
| submit to their TC audits of syndication frequency and scope. The frequency and content of these audits shall be determined by the Plaintiffs in consultation with the TC. | Technical Committee audits of syndication frequency and scope. The Technical Committee will make recommendations regarding the frequency and content of these audits, and the Court will have final authority over their frequency and scope. | audits of syndication frequency and scope. The frequency and content of these audits shall be determined by the Plaintiffs in consultation with the TC. |
| 6.  Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. | 7.  The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section V is to display the search results to the end user who submitted the associated query, for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. | 6.  Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment. |
| 7.  Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment. | 5.  Qualified Competitors may elect, in their sole discretion, the queries (of those that are eligible for syndication pursuant to paragraph V.B.4) for which they will request syndicated results and which syndication components to call for.<br><br>8.  Google may impose its ordinary commercial terms and policies. For the avoidance of doubt, Google is permitted to place its ordinary commercial restrictions on the use and display of its syndicated results and content.  Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, crawling, or otherwise storing or analyzing the syndicated results and content. | 7.  Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment.  Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated results and content. |
| 8.  It shall be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may require a Qualified Competitor to share information with Google regarding the end-user, on terms no less favorable than what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment, as is | 9.  It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may impose its ordinary commercial terms as is necessary for the purposes of (1) search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance. | 8.  It shall be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end user except that Google may require a Qualified Competitor to share information with Google regarding the end user, on terms no less favorable than what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment, as is |

| | | |
|---|---|---|
| necessary for the purposes of (1) basic search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance. | | necessary for the purposes of (1) basic search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance. |
| 9. Google may not retain or use (in any way) syndicated queries or other information it obtains under Section V.A for its own products and services beyond the most limited retention and use permitted under any of Google's current search syndication agreements as of the date of entry of this Final Judgment. | 10. Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section V for Google's own products and services to the same extent Google retains or uses data in the ordinary course from other users of its search syndication service. | 9. Google may not retain or use (in any way) syndicated queries or other information it obtains under Section V.A for its own products and services beyond the most limited retention and use permitted under any of Google's current search syndication agreements as of the date of entry of this Final Judgment. |
| 10. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States. Synthetic queries are not eligible for syndication under this Final Judgment. | 11. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment. | 10. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment. |
| [No similar provision.] | 12. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach. | 11. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach. |
| [No similar provision.] | [No similar provision.] | Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license. |
| C. Existing Syndication Agreements: The provisions of this Section V shall have no effect on any existing Google syndication agreements with third parties or on its ability to enter into syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing syndication agreement who becomes a Qualified Competitor, | C. Existing Syndication Agreements: The provisions of this Section V will have no effect on any existing Google search syndication agreements with third parties or on Google's ability to enter into search syndication contracts with third parties other than Qualified Competitors, except that Google must permit any entity with an existing search syndication agreement who becomes a | C. Existing Syndication Agreements: The provisions of this Section V will have no effect on any existing Google search syndication agreements with third parties or on Google's ability to enter into search syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing search syndication agreement who |

| | | |
|---|---|---|
| at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V. | Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V. | becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V. |

## VI.    SEARCH TEXT AD AUCTION CHANGES AND SEARCH TEXT ADS SYNDICATION

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A. <u>Search Text Ads Auction Changes</u>: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs shall submit a proposal to the Court, informed by the Technical Committee's views, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each such change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. Plaintiffs' proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. Plaintiffs have the right to challenge any disclosure they deem inadequate. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic, but Google shall disclose changes to the Search Text Ads auction that result from any such auction experiments. | A. <u>Search Text Ads Auction Changes</u>: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs and the Technical Committee shall submit a proposal to the Court, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each such change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. The proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic. Should any of these auction experiments result in ad auction launches that fall within the types of changes that must be disclosed under this Section, Google shall disclose such changes to Plaintiffs and the Technical Committee. | A. <u>Search Text Ads Auction Changes</u>: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs shall submit a proposal to the Court, informed by the Technical Committee's views, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. Plaintiffs' proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion. Plaintiffs have the right to challenge any disclosure they deem inadequate. For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic, but Google shall disclose changes to the Search Text Ads auction that result from any such auction experiments. |
| B. <u>Search Text Ads Syndication</u>: Google shall take steps sufficient to make available to any Qualified Competitor a Search Ads Syndication License whose term will be five (5) years from the date the license is | B. <u>Search Text Ads Syndication</u>: Google must take steps sufficient to make available to any Qualified Competitor a Search Text Ads syndication agreement whose term will be five (5) years from the date | B. <u>Search Text Ads Syndication</u>: Google shall take steps sufficient to make available to any Qualified Competitor a Search Text Ads Syndication License whose term will be five (5) years from the date the |

| | | |
|---|---|---|
| signed. The Search Text Ads syndication agreement shall have the following additional features: | Google's Search Text Ads syndication service, as set forth in this Final Judgment, is made available to the Qualified Competitor, unless there are fewer than five (5) years remaining before expiration of the term of the Final Judgment, in which case the term will be the remainder of the term of the Final Judgment. The Search Text Ads syndication agreement must have the following additional features: | license is signed. The Search Text Ads syndication agreement shall have the following additional features: |
| 1. Google shall provide latency, reliability, and performance functionally equivalent to what Google provides any other user of Google's Search Text Ads syndication products, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads. Search Text Ads syndication licenses to Qualified Competitors shall include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products. For the avoidance of doubt, Google shall only provide syndication for queries that originate in the United States. | 1. Google will provide latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, with respect to queries originating in the United States. For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.<br><br>3. Google will make available to Qualified Competitors all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) that are available through its Search Text Ads syndication products. | 1. Google shall provide latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads. Search Text Ads syndication licenses to Qualified Competitors shall include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products. For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products. |
| 2. Google shall provide the Search Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products. | 2. Google will offer these syndication services on a non-discriminatory basis to Qualified Competitors at market rates consistent with ordinary commercial terms agreed to by other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, with respect to queries originating in the United States. | 2. Google shall provide the Search Text Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products. |
| 3. Google shall not require Qualified Competitors to share more information with Google regarding the end-user than it requires from any other user of Google's Search Text Ads syndication products. | 11. It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user, except that Google may impose its ordinary commercial terms for the | 3. Google shall not require Qualified Competitors to share more information with Google regarding the end user than it requires from any other user of Google's Search Text Ads syndication products. |

| | | |
|---|---|---|
| | purposes of (1) ad syndication functionality; (2) spam and abuse detection; and/or (3) legal or regulatory compliance. | |
| 4. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, as further detailed in this section. | 7. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, for the exclusive purpose of serving users located in the United States through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product. | 4. The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, as further detailed in this section, except as permitted by Section VI.B.9. |
| 5. Google shall (i) make the purchase of ads syndicated under this Section VI.B available to advertisers on a nondiscriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads; (ii) include Qualified Competitors in its Search Partner Network; and (iii) provide advertisers the option to appear on each individual Qualified Competitor's sites on a site-by-site basis (i.e., an advertiser can choose to appear as a syndicated result on a Qualified Competitor's site regardless of whether it opts into the Search Partner Network or chooses to appear on any other site, including Google.com) to the same extent advertisers have such choice for any Google Search Text Ads Syndicator as of the date of entry of this Final Judgment. | 4. Google will make the purchase of ads syndicated under this Section VI available to advertisers on a nondiscriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads, and must offer advertisers the choice to opt into showing ads on Qualified Competitors' websites, consistent with Google's ordinary commercial terms, policies, and functionality offered to other users of Google's Search Text Ads syndication products. | 5. Google shall (i) make the purchase of ads syndicated under this Section VI.B available to advertisers on a non-discriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads and (ii) include Qualified Competitors in its Search Partner Network. |
| 6. Qualified Competitors shall have the same formatting flexibility available to any other user of Google's Search Text Ads syndication products, shall be free to use other providers of syndicated search ads or display their own ads, | 5. Qualified Competitors shall have the same formatting flexibility with respect to the Search Text Ads syndicated pursuant to this Judgment as Google makes available to other users of Google's Search Text Ads syndication products. | 6. Qualified Competitors shall have the same formatting flexibility available to any other user of Google's Search Text Ads syndication products, shall be free to use other providers of syndicated search ads or display their own ads, |

| | | |
|---|---|---|
| and shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources. Google may place only ordinary-course restrictions on the use or display of syndicated ad content intended to guard against "trick or click" schemes, ensure the proper ordering of ads, guarantee ad quality, protect the advertiser, or prevent ad misuse, and may place restrictions on scraping, indexing, or crawling syndicated results, but such restrictions shall be no more restrictive than those applied to any other user of Google's Search Text Ads syndication products. | 6.  Qualified Competitors shall be free to use other providers of syndicated search ads or display their own ads, and Qualified Competitors shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources.<br><br>8.  Google may impose its ordinary commercial terms and policies. For the avoidance of doubt, Google is permitted to place its ordinary commercial restrictions on the use and display of its syndicated ads.  Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, crawling, or otherwise storing or analyzing the syndicated ads. | and shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources. Google may place only ordinary-course restrictions on the use or display of syndicated ad content, but such restrictions shall be no more restrictive than those applied to any other user of Google's Search Text Ads syndication products.  Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated ads. |
| 7.  Google may only retain or use (in any way) syndicated queries or other information it obtains under this Section VI.B to "build, improve, and maintain" its ad infrastructure in the same manner it used such information as of the date of entry of this Final Judgment. | 9.  Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure and shared ads systems.  Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products. | 7.  Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure and shared ads systems.  Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products. |
| 8.  Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads unless failing to do so would violate Section VI.B.1. | 10. Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads. | 8.  Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads unless failing to do so would violate Section VI.B.1. |
| 9.  For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users. Synthetic queries are not eligible for syndication under the Final Judgment. | 12. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment. | 9.  For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users. Synthetic queries are not eligible for syndication under the Final Judgment.  Queries from a syndicator of the Qualified Competitor are not eligible for syndication under the Final Judgment, unless such Qualified Competitor has been certified as a |

| | | Competitor to a Google ads platform (e.g., Google Ads). |
|---|---|---|
| 10. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement under this Section VI, Google may exercise its rights under the agreement.  Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach.  Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections.  If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. | 13. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement.   Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach. | 10. If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement under this Section VI, Google may exercise its rights under the agreement.  Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach.  Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections.  If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes.  Google may seek expedited consideration from the Court if the circumstances warrant such treatment. |
| 11. Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse.  Qualified Competitors are free to reject these proposed additional terms.   Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such term and allow Plaintiffs a reasonable period of time to raise objections.  If Plaintiffs object and seek a resolution by the Court, Google may not modify its Search Text Ad syndication agreements under this Section VI until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. | 14. Google will be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse. | 11. Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse.  Qualified Competitors are free to reject these proposed additional terms.   Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such term and allow Plaintiffs a reasonable period of time to raise objections.  If Plaintiffs object and seek a resolution by the Court, Google may not modify its Search Text Ad syndication agreements under this Section VI until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes.  Google may seek expedited |

| | | consideration from the Court if the circumstances warrant such treatment. |
|---|---|---|
| 12. Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated search text ad results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under current search text ad syndication agreements as of the date of entry of this Final Judgment. | 15. Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results. | 12. Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results. |
| [No similar provision.] | [No similar provision.] | Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license. |
| C.  Existing  Syndication Agreements: The provisions of this Section VI shall have no effect on any existing Google search text ad syndication agreements with third parties or on its ability to enter into search text ad syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing search text ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI. | C.  Existing  Syndication Agreements: The provisions of this Section VI will have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter into Search Text Ad syndication contracts with third parties other than Qualified Competitors, except that Google must permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI. | C.  Existing  Syndication Agreements: The provisions of this Section VI shall have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter in Search Text Ad syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI. |

## VII.    COMPLIANCE, ADMINISTRATION, AND ENFORCEMENT PROCEDURES

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.  Technical Committee: | A.  Technical Committee: | A.  Technical Committee: |
| 1.    Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to assist in | 1.    Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to | 1.    Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee to assist in |

| | | |
|---|---|---|
| enforcement of and compliance with this Final Judgment. | assist in enforcement of and compliance with this Final Judgment. | enforcement of and compliance with this Final Judgment. |
| 2. The TC members shall be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, as well as data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless Plaintiffs specifically consent, no TC member: | 2. The TC members must be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless the Court approves, no TC member: | 2. The TC members shall be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless the Court so approves, no TC member: |
| a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC; | a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC; | a. may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC; |
| b. may have been retained by any party as a consulting or testifying expert in this action; or | b. may have been retained as a consulting or testifying expert by any part in this action; or | b. may have been retained by any party as a consulting or testifying expert in this action; or |
| c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC. | c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC. | c. may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC. |
| 3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google shall each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee shall serve as chair. The selection and approval process shall be as follows: | 3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google will each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee will serve as chair. The selection and approval process will be as follows: | 3. Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google shall each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee shall serve as chair. The selection and approval process shall be as follows: |
| a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group shall identify to Google the individuals they propose to select as their designees to the TC, and Google shall identify to Plaintiffs | a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group will identify to Google the individuals they propose to select as their designees to the TC, and Google will identify to Plaintiffs | a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group shall identify to Google the individuals they propose to select as their designees to the TC, and Google shall identify to Plaintiffs |

| | | |
|---|---|---|
| the individual it proposes to select as its designees. No party may object to a selection on any ground other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection. | the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Paragraph VII.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of selection. | the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection. |
| b. The Plaintiffs shall apply to the Court for appointment of the persons selected pursuant to Section VII.A.3.a) above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Section VII.A.2 above. | b. The Plaintiffs will apply to the Court for appointment of the persons selected pursuant to Paragraph VII.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Paragraph VII.A.2 above. | b. The Plaintiffs shall apply to the Court for appointment of the persons selected pursuant to Section VII.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Section VII.A.2 above. |
| c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") shall identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google shall not object to these selections on any grounds other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of the selection and shall be served on the other party as well as on the Standing Committee Members. | c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") will identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google must not object to these selections on any grounds other than failure to satisfy the requirements of Paragraph VII.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of the selection and must be served on the other party as well as on the Standing Committee Members. | c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") shall identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google shall not object to these selections on any grounds other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection and shall be served on the other party as well as on the Standing Committee Members. |
| d. The Plaintiffs shall apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members shall be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by | d. The Plaintiffs will apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members will be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by | d. The Plaintiffs shall apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members shall be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by |

| | | |
|---|---|---|
| the Standing Committee Members which the parties have failed to resolve among themselves shall also be decided by the Court based solely on the requirements stated in Section VII.A.2 above. | the Standing Committee Members which the parties have failed to resolve among themselves will also be decided by the Court based solely on the requirements stated in Paragraph VII.A.2 above. | the Standing Committee Members which the parties have failed to resolve among themselves shall also be decided by the Court based solely on the requirements stated in Section VII.A.2 above. |
| 4. The Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Section VII.A.3 above. In the case of the fourth and fifth members of the TC, those members shall be re-appointed or replaced in the manner provided in Section VII.A.3 above. | 4. The Standing Committee Members will serve for an initial term of thirty-six (36) months; the remaining members will serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Paragraph VII.A.3 above. In the case of the fourth and fifth members of the TC, those members will be re-appointed or replaced in the manner provided in Paragraph VII.A.3 above. | 4. The Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Section VII.A.3 above. In the case of the fourth and fifth members of the TC, those members shall be re-appointed or replaced in the manner provided in Section VII.A.3 above. |
| 5. If Plaintiffs determine that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, or if a member of the TC resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member shall select a replacement member in the same manner as provided for in Section VII.A.3 above. | 5. If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member will select a replacement member in the same manner as provided for in Paragraph VII.A.3 above. | 5. If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member shall select a replacement member in the same manner as provided for in Section VII.A.3 above. |
| 6. Promptly after appointment of the TC by the Court, the Plaintiffs shall enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google shall indemnify each TC member and hold them harmless against any losses, claims, | 6. Promptly after appointment of the TC by the Court, the Plaintiffs will enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google must indemnify each TC member and hold them harmless against any losses, claims, | 6. Promptly after appointment of the TC by the Court, the Plaintiffs shall enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google shall indemnify each TC member and hold them harmless against any losses, claims, |

| | | |
|---|---|---|
| damages, liabilities or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements shall include the following: | damages, liabilities or expenses arising out of, in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreement must include the following: | damages, liabilities, or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements shall include the following: |
| a. The TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the Plaintiffs approve, including the payment of reasonable fees and expenses. | a. The TC members will serve, without bond or security, at the cost and expense of Google on such terms and conditions as the parties agree, including the payment of reasonable fees and expenses. To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution. | a. The TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the parties agree, including payment of reasonable fees and expenses. To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution. |
| b. The TC Services Agreement shall provide that each member of the TC must comply with the limitations provided for in Section VII.A.2 above. | b. The TC Services Agreement will provide that each member of the TC must comply with the limitations provided for in Paragraph VII.A.2 above. | b. The TC Services Agreement shall provide that each member of the TC must comply with the limitations provided for in Section VII.A.2 above. |
| 7. The TC shall have the following powers and duties: | 7. The TC has the following powers and duties: | 7. The TC shall have the following powers and duties: |
| a. The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgment, in the manner describe further herein. | b. The TC will have the power to advise and make recommendations about the standards to be applied for assessing, and the ultimate determination of whether a third party should qualify as a Qualified Competitor for purposes of this Final Judgment, *see* Paragraph IX.T. | a. The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgment, in the manner described further herein. |
| | d. The TC will have the power to advise Plaintiffs and the Court about an appropriate cap on User-side Data disclosures to be made to Qualified Competitors, *see* Paragraph IV.B.4. | |
| | e. The TC will have the power to advise Plaintiffs and the Court about appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C. | |

| | | |
|---|---|---|
| | f. The TC will have the power to audit Qualified Competitors' use of search and search text ads syndication services, *see* Paragraph IX.T. | |
| | g. The TC will have the power to conduct data security and privacy safeguard audits of Qualified Competitors, *see* Paragraph IX.T. | |
| | h. The TC will have the power to advise Plaintiffs and the Court about an appropriate tapering rate for search syndication, *see* Paragraph V.B.4. | |
| | i. The TC will have the power to develop and propose parameters that inform Google what types of Search Text Ads auction changes must be brought to the attention of Plaintiffs and the Technical Committee, and receive disclosures from Google about Search Text Ads auctions changes, *see* Paragraph VI.A. | |
| b. The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which shall be approved by the Plaintiffs. | c. The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which will be submitted to the Court for review and determination, *see* Paragraph IX.T. | b. The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which shall be approved by the Plaintiffs. |
| c. The TC may, on reasonable notice to Google: | j. The TC may make reasonable and proportional requests necessary to perform its duties, on reasonable notice to Google, to: | c. The TC may, on reasonable notice to Google: |
| 1. interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; | 1. interview any Google personnel, who may have counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; | i. interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google; |
| 2. inspect and copy any document in the possession, custody, or control of Google personnel; | 2. provide non-privileged documents and records in its possession, custody, or control; | ii. inspect and copy any document in the possession, custody, or control of Google personnel; |

| | | |
|---|---|---|
| 3. obtain reasonable access to any system or equipment to which Google personnel have access; | 3. obtain reasonable access to systems or equipment to the extent necessary to perform testing regarding appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C; and | iii. obtain reasonable access to any system or equipment to which Google personnel have access; |
| 4. obtain reasonable access to, and inspect, any physical facility, building or other premises to which Google personnel have access; and | 4. obtain reasonable access to any physical facilities, building or other premises to the extent necessary to perform testing regarding appropriate User-side Data security and privacy safeguards, *see* Paragraph IV.C. | iv. obtain reasonable access to, and inspect, any physical facility, building, or other premises to which Google personnel have access; and |
| 5. require Google personnel to provide documents, data and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct. | [No similar provision. | v. require Google personnel to provide documents, data, and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct. |
| [No similar provision.] | 5. To the extent that Google and the TC cannot agree on the reasonable scope of any such request, the parties may submit such disagreement to the Court for resolution. | [No similar provision.] |
| d. The TC shall have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Section VII.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties. | [No similar provision.] | d. The TC shall have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Section VII.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate, and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties. |
| e. The TC shall receive complaints from Google's | [No similar provision.] | e. The TC shall receive complaints from Google's |

75

| | | |
|---|---|---|
| Compliance Officer (as described in Section VII.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section VII.C below. | | Compliance Officer (as described in Section VII.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section VII.C below. |
| f. The TC shall report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC. | k. The TC must report in writing to the parties, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment. | f. The TC shall report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC. |
| g. Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC shall immediately notify the Plaintiffs in writing setting forth the relevant details. | [No similar provision.] | g. Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC shall immediately notify the Plaintiffs in writing setting forth the relevant details. |
| h. TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained. | [No similar provision.] | h. TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained. |
| i. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Sections VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC shall be based on reasonable and | l. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the parties, such staff or consultants (all of whom must meet the qualifications of Paragraphs VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC will be based on reasonable and | i. The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Sections VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment. The compensation of any person retained by the TC shall be based on reasonable and |

| | | |
|---|---|---|
| customary terms commensurate with the individual's experience and responsibilities. | customary terms commensurate with the individual's experience and responsibilities, and subject to approval by the parties. To the extent that the parties cannot agree on such a request, the parties will submit such disagreement to the Court for resolution. | customary terms commensurate with the individual's experience and responsibilities. |
| j. The TC shall account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs. Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, shall constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. Google may, on application to the Court, object to the reasonableness of any such fees or other expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses. On any such application, (a) Google shall bear the burden to demonstrate unreasonableness; (b) Google shall establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members shall be entitled to recover all costs incurred on such application (including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification. | m. The TC must account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the parties. To the extent that the parties cannot agree on the reasonableness of such expenses, the parties will submit such disagreement to the Court for resolution. | j. The TC shall account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs. Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, shall constitute a violation of this Final Judgment and may result in sanctions imposed by the Court. Google may, on application to the Court, object to the reasonableness of any such fees or other expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses. On any such application, (a) Google shall bear the burden to demonstrate unreasonableness; (b) Google shall establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members shall be entitled to recover all costs incurred on such application (including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification. |
| [No similar provision.] | a. For the avoidance of doubt, neither the TC nor Plaintiffs will have the right to make final decisions as to the requirements of this Final Judgment. Google will have the right to object to and be | k. Google may object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations or substantive requirements of this Final Judgment. |

| | heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations of or substantive requirements of this Final Judgment. | |
|---|---|---|
| 8.    Each TC member, and any consultants or staff hired by the TC, shall    sign    a    confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court.  No member of the TC may make any public statements relating to the TC's activities. | 8.    Each TC member, and any consultants or staff hired by the TC, must    sign    a    confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC must be treated as Highly Confidential under the Protective Order in this case, and must not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court.  No member of the TC may make any public statements relating to the TC's activities. | 8.    Each TC member, and any consultants or staff hired by the TC, shall    sign    a    confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court.  No member of the TC may make any public statements relating to the TC's activities. |
| B.    Internal Compliance Officer: | C.    Internal Compliance Officer: | B.    Internal Compliance Officer: |
| 1.    Google shall designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's    antitrust    compliance program and helping to ensure compliance    with    this    Final Judgment. | 1.    Google shall designate, within 30 days of entry of this Final Judgment, an internal Compliance Officer who shall be an employee of Google with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment. | 1.    Google shall designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's    antitrust    compliance program and helping to ensure compliance    with    this    Final Judgment. |
| 2.    Within seven (7) days of the Compliance Officer's appointment, Google shall identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address.  Within fifteen (15) days of a vacancy in the | 2.    Within seven (7) days of the Compliance Officer's appointment, Google must identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address.  Within fifteen (15) days of a vacancy in the | 2.    Within seven (7) days of the Compliance Officer's appointment, Google shall identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address.  Within fifteen (15) days of a vacancy in the |

| | | |
|---|---|---|
| Compliance Officer position, Google shall appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs. | Compliance Officer position, Google must appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. | Compliance Officer position, Google shall appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs. |
| 3.  The Compliance Officer shall supervise the review of Google activities to ensure that they comply with this Final Judgment.  The Compliance Officer shall be assisted by other employees of Google. | 3.  The Compliance Officer shall supervise the review of Google's activities to ensure that they comply with this Final Judgment.  The Compliance Officer may be assisted by other employees of Google. | 3.  The Compliance Officer shall supervise the review of Google activities to ensure that they comply with this Final Judgment.  The Compliance Officer shall be assisted by other employees of Google. |
| 4.  The Compliance Officer shall be responsible for performing the following activities: | 4.  The Compliance Officer shall be responsible for performing the following activities: | 4.  The Compliance Officer shall be responsible for performing the following activities: |
| a. within thirty (30) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google; | a. within 45 days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google; | a. within forty-five (45) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google; |
| b. distributing a copy of this Final Judgment to any person who succeeds to a position described in Section VII.B.4.a above within thirty (30) days of the date the person starts that position. | b. promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Paragraph VII.C.4.a; | b. promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Section VII.B.4.a above; |
| c. ensuring that those persons designated by Section VII.B.4.a above are annually trained on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws; | c. ensuring that those persons designated in Paragraph VII.C.4.a are annually briefed on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust law; | c. ensuring that those persons designated by Section VII.B.4.a above are annually briefed on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws; |
| d. obtaining from each person designated in Section VII.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has been advised and understands that his or her failure | d. obtaining from each person designated in Paragraph VII.C.4.a an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has been advised and understands that his or her failure to comply with this | d. obtaining from each person designated in Section VII.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment and (ii) has been advised and understands that his or her failure |

| | | |
|---|---|---|
| to comply with this Final Judgment may result in a finding of contempt of court; | Final Judgment may result in a finding of contempt of court; | to comply with this Final Judgment may result in a finding of contempt of court; |
| e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII.B.4.d above has been obtained; | e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Paragraph VII.C.4.d has been obtained; | e. maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII.B.4.d above has been obtained; |
| f. annually communicating to all employees that they may disclose to the Compliance Officer, without reprisal for such disclosure, information concerning any violation or potential violation of this Final Judgment or the U.S. antitrust laws by Google, and establishing a confidential avenue for any employee to report potential violations. | [No similar provision.] | [No similar provision.] |
| g. establishing and maintaining the website provided for in Section VII.C.2.a below; | f. establishing and maintaining the website provided for in Paragraph VII.D.2.b; | f. establishing and maintaining the website provided for in Section VII.C.2.a below; |
| [No similar provision.] | g. preparing the Annual Compliance Report described in Paragraph VII.B.2 and any Interim Report requested as described in Paragraph VII.B.3.a; | [No similar provision.] |
| h. receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section VII.C below; | h. receiving complaints from third parties or the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Paragraph VII.C; | g. receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section VII.C below; |
| i. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and | i. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and | h. maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and |
| j. ensuring Google retains all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment and all complaints received and or action taken by Google with respect to any complaint. | j. ensuring employees retain all relevant documents and electronically stored information, regardless of medium or form, regarding all complaints received pursuant to Paragraph VII.D.1 and action taken by Google with respect to any such complaint. | i. ensuring Google retains all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment and all complaints received and/or action taken by Google with respect to any complaint. |
| 5.  Google shall within thirty (30) days further appoint a senior | [No similar provision.] | 5.  Google shall within thirty (30) days further appoint a senior |

| | | |
|---|---|---|
| business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered. | | business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered. |
| 6.  Google shall retain (if it has not already) a licensed attorney in good standing in California to collect documents and interview employees and generally review Google's document retention practices and Google's compliance with its legal discovery obligations under this case and final judgment.  This attorney shall be retained for a term no shorter than eighteen (18) months.  This attorney (and any team this attorney assembles) shall present to the Audit and Compliance Committee (or any successor Board Committee) on the retention of documents and Google's compliance with its discovery obligations. | [No similar provision.] | [No similar provision.] |
| C.  Voluntary Dispute Resolution: | D.  Voluntary Dispute Resolution: | C.  Voluntary Dispute Resolution: |
| 1.  Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer. | 1.  Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs or the Compliance Officer. | 1.  Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer. |
| 2.  Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment.  Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest. | 2.  Submissions to the Compliance Officer.<br><br>a. Third parties or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment.  Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints related to Google's compliance with this Final Judgment to the Compliance Officer whenever doing so would be consistent with the public interest. | 2.  Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment.  Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest. |

| | | |
|---|---|---|
| a. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website shall provide a mechanism for communicating complaints and inquiries to the Compliance Officer. | b. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's corporate website, in a manner reasonably acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website must provide a mechanism for communicating complaints and inquiries to the Compliance Officer. | a. To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website shall provide a mechanism for communicating complaints and inquiries to the Compliance Officer. |
| b. Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it. | c. Google shall have 30 days after receiving a complaint to attempt to resolve or to reject it. | b. Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it. |
| c. Within thirty (30) days of receiving a complaint, the Compliance Officer shall advise the TC and Plaintiffs of the nature of the complaint and its disposition. The TC may then propose to the Plaintiffs further actions consistent with this Final Judgment, including consulting with Plaintiffs regarding the complaint. | [No similar provision.] | c. Within thirty (30) days of receiving a complaint, the Compliance Officer shall advise the TC and Plaintiffs of the nature of the complaint and its disposition. The TC may then propose to the Plaintiffs further actions consistent with this Final Judgment, including consulting with Plaintiffs regarding the complaint. |
| 3. The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment. | [No similar provisions.] | 3. The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment. |
| a. The TC shall investigate the complaints it receives and shall consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve the complaints informally, the TC shall meet with the Compliance Officer to allow Google to respond to the substance of the complaints and to determine whether the complaints can be resolved without further proceedings. | | a. The TC shall investigate the complaints it receives and shall consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve the complaints informally, the TC shall meet with the Compliance Officer to allow Google to respond to the substance of the complaints and to determine whether the complaints can be resolved without further proceedings. |

| | | |
|---|---|---|
| b. Following its investigation, the TC shall advise Google and the Plaintiffs of its conclusion and its proposal for cure. | | b. Following its investigation, the TC shall advise Google and the Plaintiffs of its conclusion and its proposal for cure. |
| c. Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but shall not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC shall be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment. | | c. Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but shall not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC shall be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment. |
| d. The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion. | | d. The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion. |
| D. Compliance Inspection: | B. Annual Compliance Report and Compliance Inspection: | D. Compliance Inspection: |
| 1. Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States shall form a committee to coordinate their enforcement of this Final Judgment. Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee. | 1. Without limiting the sovereign enforcement authority of each of the Plaintiff States, the Plaintiff States will form a committee to coordinate their enforcement of this Final Judgment ("Plaintiff States' Committee"). No Plaintiff State shall take any action to enforce this Final Judgment without first consulting with the United States and with the Plaintiff States' Committee. | 1. Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States shall form a committee to coordinate their enforcement of this Final Judgment. Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee. |
| [No similar provision.] | 2. Google will prepare and submit, on an annual basis, a written report describing its compliance with this Final Judgment ("Annual Compliance Report"). | [No similar provision.] |
| 2. For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an | 3. To determine and enforce compliance with this Final Judgment, upon written request and on reasonable notice to Google and subject to any lawful privilege, a duly authorized representative of the | 2. For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an |

| | | |
|---|---|---|
| authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google shall permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff: | United States (after consultation with the Plaintiff States' Committee) or of the Attorney General of a Plaintiff State (after consultation with the United States and the Plaintiff States' Committee), may: | authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google shall permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff: |
| [No similar provision.] | a. request from Google no more than one interim written report per year ("Interim Report"), under oath if requested, regarding Google's compliance with this Final Judgment; | [No similar provision.] |
| a. to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and | b. make reasonable requests to Google for production of non-privileged documents and records in its possession, custody, or control sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report; and | a. to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and |
| b. to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Google. | c. subject to the reasonable convenience of Google and without restraint or interference from it, interview officers, employees, or agents of Google, who may have counsel present, sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report. | b. to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Google. |
| 3.   Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the | [No similar provision.] | 3.   Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the |

| | | |
|---|---|---|
| Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Co-Plaintiff States' enforcement committee), Google shall submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment. | | Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), Google shall submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment. |
| [No similar provision.] | 4.   No information or documents obtained by the means provided in this section shall be divulged by the United States or the Plaintiff States to any person, except in the course of legal proceedings to which the United States is a party, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law. | [No similar provision.] |
| [No similar provision.] | 5.   If, at the time information or documents are furnished by Google to the United States or the Plaintiff States, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)" then the United States shall give 10 business days' notice prior to divulging such material in any legal proceeding. | 4.   If, at the time information or documents are furnished by Google to the Plaintiffs, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)," then the Plaintiffs shall give five (5) business days' notice prior to divulging such material in any legal proceeding, unless good cause is shown for a shorter notice period. |
| [No similar provision.] | 6.   Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the United States or the Plaintiff States under this Final Judgment.    After appropriate consideration of such claim of | 5.   Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the Plaintiffs under this Final Judgment.    After appropriate consideration of such claim of protection, Plaintiffs, as the case may |

| | | |
|---|---|---|
| | protection, the United States or the Plaintiff States, as the case may be, will either assert that the material is protected from disclosure under law or give Google 10 business days' notice of its intent to disclose the material. | be, will either assert that the material is protected from disclosure under law or give Google ten (10) business days' notice of its intent to disclose the material. |
| [No similar provision.] | [No similar provision.] | E.  Status Reports to the Court: 1.  Plaintiffs, with input from the Technical Committee, shall file a status report within ninety (90) days of the Effective Date of this Final Judgment, and then on future dates as set by the Court, updating the Court as to the enforcement of and Google's compliance with this Final Judgment. |

## VIII.  EFFECTIVE DATE AND EXPIRATION

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| The Final Judgment will take effect sixty (60) days after the date on which it is entered (the "Effective Date"), and Plaintiffs shall report the date on which Google has substantially implemented all provisions of this Final Judgment, except for Section VII.A, which shall take effect immediately upon entry.  Unless the Court grants an extension or early termination is granted, this Final Judgment will expire six (6) years from the Effective Date.  This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets. | A.  Subject to the outcome of any motion to stay this Final Judgment pending appeal, this Final Judgment shall take effect 60 days after the date on which it is entered, except that the portions of Section VII.A that require the parties to take steps toward forming the Technical Committee and that address the start of its work shall take effect immediately. B.  Pursuant to Local Rule 54.2, the deadline for any motion under Federal Rule of Civil Procedure 54(d)(2)(B) and the proceedings as to any such motion shall be held in abeyance pending the conclusion of any appeals from this Final Judgment. C.  Unless this Court grants an extension, this Final Judgment will expire on the sixth anniversary of the date on which it takes effect. | The Final Judgment will take effect sixty (60) days after the date on which it is entered (the "Effective Date"), and Plaintiffs shall report the date on which Google has substantially implemented all provisions of this Final Judgment, except for Section VII.A, which shall take effect immediately upon entry.  Unless the Court grants an extension or early termination is granted, this Final Judgment will expire six (6) years from the Effective Date.  This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets. |

## IX.  DEFINITIONS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.  "API" or "application programming interface" means a mechanism that allows different | A.  "API" or "application programming interface" means a mechanism that allows different | A.  "API" or "application programming interface" means a mechanism that allows different |

| | | |
|---|---|---|
| software components to communicate with each other. | software components to communicate with each other. | software components to communicate with each other. |
| B.  "Apple" means Apple, Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees. | [No similar provision.] | B.  "Apple" means Apple Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees. |
| C.  "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd. | B.  "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd. | C.  "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd. |
| D.  "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors. | C.  "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors. | D.  "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors. |
| E.  "Competitor" means any provider of, or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States. | D.  "Competitor" means any provider of, or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States or (iii) a Third-Party GenAI Product in the United States. For the avoidance of doubt, "Competitor" does not include specialized vertical search providers, whether or not they offer a GenAI product. | E.  "Competitor" means any provider of or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States. |
| F.  "Consideration" means anything of value, including monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval. | E.  "Consideration" means any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval. | F.  "Consideration" means anything of value, including any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval. |
| G.  "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine. | G.  "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine. | G.  "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine. |
| H.  "Device" or "device" means any single smartphone, tablet, laptop, or desktop.  For clarity, any two devices are different devices, even if they are the same make and model | F.  "Covered Device" means a smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a | H.  "Device" or "device" means any single smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the |

| | | |
|---|---|---|
| (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices). | successor to the ChromeOS operating system is installed. | ChromeOS operating system is installed. For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices). |
| I.   "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models. | H.  "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models. | I.   "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models. |
| J.   "GenAI Product" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models.   It can include GenAI Search Access Points. | [No similar provision.] | J.   "GenAI Product" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information. |
| K.   "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt. | I.   "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt, and that attempts to answer all queries (rather than only regarding particular topics). "General Search Engine" or "GSE" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032. | K.   "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt and that seeks to fulfill a broad array of informational needs. |
| L.   "Google" means (1) Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products) the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product; and | J.   "Google" means Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, and groups controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any Google GenAI Assistant Application; and (3) the directors, officers, managers, | L.   "Google" means (1) Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product; and |

| | | |
|---|---|---|
| (3) the directors, officers, managers, agents, and employees of such entities specified in this Section IX.L who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products) the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product. | agents, and employees of such entities specified in this Paragraph IX.J who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any Google GenAI Assistant Application. | (3) the directors, officers, managers, agents, and employees of such entities specified in this Section IX.L who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product. For clarity, the term "affiliates" includes any Alphabet Inc.–related entity that controls or oversees the aforementioned products. |
| M. "Google Assistant Application" means (1) the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors and (2) any Google GenAI Product. | K. "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors. | M. "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors. |
| N. "Google GenAI Product" means any GenAI Product offered by Google including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors). | L. "Google GenAI Assistant Application" means the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors) and any future user-facing software application owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety or topics using a broad range of publicly available information, provided, however, that this term shall not include Google Search, the Google Search Application, the Chrome Browser Application, or the Google Assistant Application. | N. "Google GenAI Product" means any GenAI Product offered by Google, including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors). |
| O. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors. | M. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors. | O. "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors. |
| P. "Google Search" means the web search and search advertising services offered by Google at Google.com. | N. "Google Search" means the web search and search advertising services offered by Google at Google.com. | P. "Google Search" means the web search and search advertising services offered by Google at Google.com. |

| | | |
|---|---|---|
| Q. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors). | O. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors). | Q. "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors). |
| R. The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided. | [No similar provision.] | R. The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided. |
| S. "Marginal Cost" or "marginal cost" means the direct total production cost of producing an additional unit of a good or service, which is determined by calculating the change in direct total production cost resulting from Google providing the additional unit(s) of data or services required under this Final Judgment. | P. "Marginal Cost" means the direct total production cost of producing an additional unit of a good or service, as determined by calculating the change in direct total production cost resulting from providing the additional unit(s) of data or services. | S. "Marginal Cost" or "marginal cost" means the direct total production cost of producing an additional unit of a good or service, which is determined by calculating the change in direct total production cost resulting from Google providing the additional unit(s) of data or services required under this Final Judgment. |
| T. "Operating System Version" means a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android. | Q. "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android. | T. "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android. |
| U. "Person" or "person" means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust. | [No similar provision.] | [No similar provision.] |
| [No similar provision.] | R. "Plaintiff States" means the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, | [No similar provision.] |

| | Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming. | |
|---|---|---|
| V. "Privacy Mode" means a mode within a web browser or an Apple product or service such as Siri or Spotlight that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet. | S. "Privacy Mode" means a mode within a web browser that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet. | U. "Privacy Mode" means a mode within a web browser or an Apple product or service such as Siri or Spotlight that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet. |
| W. "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee, who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets, and who does not pose a risk to the national security of the United States. | T. "Qualified Competitor" means a Competitor who applies to be so designated and: (i) meets the data security standards as determined by the Court in consultation with the Technical Committee; (ii) agrees to and satisfactorily passes regular data security and privacy audits by the Technical Committee; (iii) does not pose a risk to the national security of the United States, as determined by the Court; and (iv) makes a sufficient showing of a plan to invest and compete with General Search Engines and/or Search Text Ads providers, as determined by the Court in consultation with the Technical Committee. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis and establish that it continues to meet the criteria set forth in (i) – (iv). To continue to be in compliance with (iv) for purposes of re-certification, the Qualified Competitor must show that it is making sufficient efforts to invest and compete with General Search Engines and/or Search Text Ads providers. Google will have the right to object to and be heard by the Court on the qualification of, and continuing eligibility of, any proposed Qualified Competitor, including on the basis of noncompliance with data security, privacy, or contractual access or use restrictions. | V. "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee; who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets; and who does not pose a risk to the national security of the United States. To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis starting from the date of original certification as a Qualified Competitor and establish that it continues to meet the definition of a Qualified Competitor. The Technical Committee shall establish appropriate procedures for the re-certification process. |

| | | |
|---|---|---|
| X. "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites. Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites. | [No similar provision.] | W. "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites. Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites. |
| Y. "Search Feature" in Google Search means any user-facing content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches. | [No similar provision.] | X. "Search Feature" in Google Search means any user-facing content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches. |
| AA. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. Search Text Ads can include images and often appear at the top of the SERP with a designation indicating that they are paid advertisements. "Search Text Ad" also includes Search Text Ads appearing in or in connection with Google AI Overviews. | U. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic text link on a search engine results page. "Search Text Ad" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 60, and includes Search Text Ads appearing in or in connection with Google AI Overviews. | Y. "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. Search Text Ads can include images and often appear at the top of the SERP with a designation indicating that they are paid advertisements. "Search Text Ad" also includes Search Text Ads appearing in or in connection with Google AI Overviews. |
| BB. "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, including from a broad index of the web. | [No similar provision.] | Z. "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, drawn from a broad index of the web. |
| [No similar provision.] | V. "Specialized Vertical Provider" means a platform that responds to queries with information centered on a particular subject matter. | [No similar provision.] |
| CC. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Section VII.A. | W. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Paragraph VII.A. | AA. "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Section VII.A. |

| DD.“Third-Party Browser” means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet. | X. “Third-Party Browser” means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet. | BB.“Third-Party Browser” means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet. |
|---|---|---|
| [No similar provision.] | Y. “Third-Party GenAI Assistive Service” means a user-facing software application not owned by Google or its affiliates that makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information. | [No similar provision.] |
| FF. “Third-Party GenAI Product” means any GenAI Product that is not owned by Google. | Z. “Third-Party GenAI Product” means any application, software, service, feature, tool, functionality, or product not owned by Google or its affiliates that involves or makes use of generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information. For clarity, “Third-Party GenAI Product” does not include specialized vertical search services, whether or not they offer a GenAI Product. | CC.“Third-Party GenAI Product” means any GenAI Product that is not owned by Google. |
| EE. “Third-Party General Search Service” means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search, and is not owned by Google or its affiliates. | AA.“Third-Party General Search Service” means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search, and is not owned by Google or its affiliates. | DD.“Third-Party General Search Service” means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search and is not owned by Google or its affiliates. |
| GG.“User-side Data” means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. | BB.“User-side Data” means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's device, including software running on that device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. | EE. “User-side Data” means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. |
| Z. “Search Index” means any databases that store and organize | CC.“Web Search Index” means databases that store and organize | FF. “Web Search Index” means databases that store and organize |

| | | |
|---|---|---|
| information about websites and their content that is crawled from the web. | information about websites and their content that is crawled from the web. For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web. | information about websites and their content that is crawled from the web. For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web. |

## X.    THIRD-PARTY RIGHTS

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC. | Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature. | Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC. |

## XI.    RETENTION OF JURISDICTION AND ENFORCEMENT OF FINAL JUDGMENT

| Plaintiffs' Proposal | Google's Proposal | Final Judgment |
|---|---|---|
| A.  Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions (including an order to divest any relevant Google business), for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment.  For example, Plaintiffs may request that the Court revisit its decision on a payment ban, including but not limited to a ban on default payments, if competition is not substantially restored by this Order.  In any motion to modify this Final Judgment, Plaintiffs need not show any change in circumstances, but need only demonstrate that modification is necessary to achieve the intended purposes of this Final Judgment to restore competition in the monopolized markets.  In any action to | This Court retains jurisdiction for the purpose of enabling any of the parties to this Final Judgment to apply for such further orders or directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify or terminate any of its provisions, and to enforce compliance. | A.  Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions, for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment. |

| | | |
|---|---|---|
| enforce this Final Judgment, Google must show by a preponderance of the evidence that its actions are in compliance with this Final Judgment. | | |
| B. The Court may act *sua sponte* to issue orders or directions for the construction or carrying out of this Final Judgment, for the enforcement of compliance, and for the punishment of any violation. | [No similar provision.] | [No similar provision.] |
| C. This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the U.S. antitrust laws and to restore the competition the Court found was harmed by Google's illegal conduct. | [No similar provision.] | [No similar provision.] |
| D. For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment. | [No similar provision.] | B. For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment. |
| E. In connection with a successful effort by any Plaintiff to enforce this Final Judgment against Google, whether litigated or resolved before litigation, Plaintiff may request that the Court order Google to reimburse that Plaintiff for the fees and expenses of its attorneys, as well as all other costs, including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation. | [No similar provision.] | [No similar provision.] |