## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**UNITED STATES OF AMERICA et al.,**    )
                                        )
    **Plaintiffs,**  )
                                        )
      **v.**  )    **Case No. 20-cv-3010 (APM)**
                                        )
**GOOGLE LLC,**                         )
                                        )
    **Defendant.**   )
_____ )
_____
                                        )
**STATE OF COLORADO et al.,**           )
                                        )
    **Plaintiffs,**  )
                                        )
      **v.**  )    **Case No. 20-cv-3715 (APM)**
                                        )
**GOOGLE LLC,**                         )
                                        )
    **Defendant.**   )
_____ )

## FINAL JUDGMENT

WHEREAS, Plaintiffs United States of America, and the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, by and through their respective Attorneys General ("Co-Plaintiff States"), filed their Complaint on October 20, 2020, and their Amended Complaint on January 15, 2021;

AND WHEREAS, Plaintiffs Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire,

New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming ("Colorado Plaintiff States") filed their Complaint on December 17, 2020;

AND WHEREAS, the Court conducted a trial and entered Findings of Fact and Conclusions of Law in both actions on August 5, 2024;

AND WHEREAS, the Court entered judgment finding Google liable for violating Section 2 of the Sherman Act by unlawfully maintaining its monopolies in the general search services and general search text advertising markets;

AND WHEREAS, the Court conducted a further remedies trial and entered additional Findings of Fact and Conclusions of Law on September 2, 2025;

NOW THEREFORE, upon the record at trial and all prior and subsequent proceedings, it is hereby ORDERED, ADJUDGED, AND DECREED:

## I.      JURISDICTION

The Court has jurisdiction over the subject matter of this action and over Google LLC.

## II.     APPLICABILITY

The Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns; and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise.

## III.    PROHIBITORY INJUNCTIONS

A.      Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Search Application on any device sold in the United States.

B.    Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Chrome Browser Application on any device sold in the United States.

C.    Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of the Google Assistant Application on any device sold in the United States.

D.    Google shall not condition the licensing of Google Play or any other Google application on the distribution, preload, placement, display, use, or license of any Google GenAI Product on any device sold in the United States.

E.    Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on any device sold in the United States.

F.    Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on any device sold in the United States.

G.    Google shall not condition (i) Consideration or (ii) the license of Google Play or any Google software application on a device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party GenAI Product on any device sold in the United States.

H.    Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Search Application for one device on any other preload, placement,

or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States.

I.      Google shall not condition the payment for preload, placement, or assignment of an access point for the Chrome Browser Application for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States.

J.      Google shall not condition the payment for preload, placement, or assignment of an access point for the Google Assistant Application or any Google GenAI Product for one device on any other preload, placement, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product for that device or any other device sold in the United States.

K.      Google shall not enter or maintain any agreement requiring or conditioning Consideration on the distribution, preload, placement, display, use, license, or assignment of an access point for the Google Search Application, the Chrome Browser Application, the Google Assistant Application, or any Google GenAI Product in the United States unless the agreement terminates no more than one year after the date it is entered.

L.      Google shall not condition (1) Consideration for a Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any browser access point (including alternative modes such as Privacy Mode) on any Device on (2) the Browser Developer setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product on any other browser access point on that same

4

Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit the Browser Developer to promote any Third-Party General Search Service and Third-Party GenAI Product.

M.    Google shall not condition (1) Consideration for Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality, including Safari, Siri, Spotlight, and any Privacy Mode within those products, on one Device on (2) Apple setting Google Search or any Google GenAI Product as the Default Search Engine or default GenAI Product with respect to any proprietary Apple feature or functionality on that same Device or any other Device in the United States. Any agreement containing a default condition permitted by this provision must expire after one year and must expressly permit Apple to promote any Third-Party General Search Service and Third-Party GenAI Product.

N.    Nothing in this Final Judgment shall prohibit Google from distributing the Google Search Application, the Google Assistant Application, and any Google GenAI Product through a single Application Programming Kit (APK) as long as the licensee has the option to disable end-user access to any of those applications and services that the licensee declines to license.

## IV.    REQUIRED DISCLOSURES OF DATA

A.    <u>Google's Web Search Index</u>: Within thirty (30) days of a Qualified Competitor's certification pursuant to Section IX.V, unless granted additional time, Google shall make available, at marginal cost, to Qualified Competitors the following data related to Google's Web Search Index:

      1.      for each document in the Google Web Search Index, a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other;

      2.      a DocID to URL map; and

      3.      for each DocID, the (A) time that the URL was first seen, (B) time that the URL was last crawled, (C) spam score, and (D) device-type flag.

This information shall be provided for all websites in the full Web Search Index Google uses for searches on Google.com, the Google Search Application, or any future Google general search products.  Nothing in Section IV is intended to transfer intellectual property rights of third parties to index users.

      B.    <u>User-Side Data</u>: For the term of this Final Judgment, Google shall make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security:

      1.      User-side Data used to build, create, or operate the GLUE statistical model(s); and

      2.      User-side Data used to train, build, or operate the RankEmbed model(s).

Google shall make this data available to Qualified Competitors at least twice, with the exact number and frequency of such disclosures to be determined by the Court after consultation with Plaintiffs and the Technical Committee (TC).  Any cap on the number of such disclosures shall be informed, in part, by the utility of the datasets disclosed after appropriate privacy-enhancing techniques have been applied.  For clarity, this Section IV.B shall not require disclosure of intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs.

C.    <u>User-Side Data Sharing Administration</u>:

1.    Plaintiffs, in consultation with the TC, shall promptly determine the appropriate User-side Data privacy and security safeguards to be applied before Google shares the data specified in Section IV.B with Qualified Competitors.  Google shall have up to six (6) months from the date that the Plaintiffs, in consultation with the TC, determine such privacy and security safeguards to implement the technology and provide any notice necessary to comply with this Section IV, and Google shall be deemed to have implemented the technology once Plaintiffs, in consultation with the TC, determine that the technology, including privacy and security safeguards, is fully functional.

2.    Google shall provide sufficient information about each dataset such that Qualified Competitors can reasonably understand what it contains, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Plaintiffs, in consultation with the TC, may impose restrictions on what information Google shares under this Section IV.C.2 for the purposes of (i) promoting data privacy and security and (ii) ensuring privacy and security safeguards are effectively applied.

3.    The data specified in Sections IV.A and B will be shared pursuant to a license governing use.  The terms of the license shall include a requirement that the Qualified Competitor commit not to share or sell the datasets unless authorized by the Technical Committee or the Court and shall use the datasets for the exclusive purpose of serving users through a General Search Engine, Search Text Ads, and/or a Third-Party GenAI Product.  Within six (6) months of the Effective Date of this Final Judgment,

Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.

## V.    REQUIRED SYNDICATION OF SEARCH RESULTS

A.    <u>Search Syndication License</u>: Google shall take steps sufficient to make available to any Qualified Competitor, on financial terms no worse than those offered to any other user of Google's search syndication products, a syndication license whose term will be five (5) years from the date the license is signed, and which shall require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:

1.    both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;

2.    the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion; and

3.    the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment.

B.    <u>Search Syndication License Terms</u>: The search syndication license in Section V.A shall have the following additional features:

1.    Google shall make syndicated content available via an API.

2.    Google shall provide Qualified Competitors with latency and reliability functionally equivalent to what any other user of Google's search syndication products

would receive as of the date of entry of this Final Judgment. For the avoidance of doubt, Google's obligations do not extend to latency and reliability differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.

3. Google shall provide the license on a non-discriminatory basis to any Qualified Competitor on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment.

4. Qualified Competitors' use of Google's syndication services in the first year will be capped at 40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year period with an expectation that Qualified Competitors will become independent of Google over time through investment in their own search capabilities. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with Plaintiffs and the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google.

5. Google may not consent to Qualified Competitors exceeding syndication limits, and Qualified Competitors shall submit to the TC audits of syndication frequency and scope. The frequency and content of these audits shall be determined by the Plaintiffs in consultation with the TC.

6. Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this

Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment.

7.      Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment.  Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated results and content.

8.      It shall be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end user except that Google may require a Qualified Competitor to share information with Google regarding the end user, on terms no less favorable than what any other user of Google's search syndication products would receive as of the date of entry of this Final Judgment, as is necessary for the purposes of (1) basic search syndication functionality; (2) spam and abuse detection; and (3) legal or regulatory compliance.

9.      Google may not retain or use (in any way) syndicated queries or other information it obtains under Section V.A for its own products and services beyond the most limited retention and use permitted under any of Google's current search syndication agreements as of the date of entry of this Final Judgment.

10.      For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users

10

of the Qualified Competitor. Queries from a syndicator of the Qualified Competitor and synthetic queries are not eligible for syndication under the Final Judgment.

11.    If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement, it may exercise its rights under the agreement. Google must also provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach.

Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.

C.    Existing Syndication Agreements: The provisions of this Section V shall have no effect on any existing Google search syndication agreements with third parties or on Google's ability to enter into search syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing search syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section V.

## VI.    SEARCH TEXT AD AUCTION CHANGES AND SEARCH TEXT ADS SYNDICATION

A.    Search Text Ads Auction Changes: Within a reasonable period of time after the Technical Committee's appointment, Plaintiffs shall submit a proposal to the Court, informed by the Technical Committee's views, by which Google shall periodically provide the Technical Committee and Plaintiffs a report outlining all changes to its Search Text Ads auction meeting certain parameters and, for each change, (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary. Plaintiffs' proposal shall detail the types of changes that must be disclosed, the frequency of disclosure, the steps to mitigate undue burden on

Google, and the steps to ensure any public disclosure of an ad auction change (if not already made by Google) avoids revealing Google's trade secrets, in accord with the Court's instructions in its September 2, 2025, Memorandum Opinion.  Plaintiffs have the right to challenge any disclosure they deem inadequate.  For the avoidance of doubt, Google need not report on auction experiments, which are generally tested on some fraction of Google's Search Text Ads traffic, but Google shall disclose changes to the Search Text Ads auction that result from any such auction experiments.

   B. <u>Search Text Ads Syndication</u>: Google shall take steps sufficient to make available to any Qualified Competitor a Search Text Ads Syndication License whose term will be five (5) years from the date the license is signed.  The Search Text Ads syndication agreement shall have the following additional features:

   1. Google shall provide Qualified Competitors latency, reliability, and performance functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products, e.g., AdSense for Search, or any other current or future products offering syndicated Search Text Ads.  Search Text Ads syndication licenses to Qualified Competitors shall include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products.  For the avoidance of doubt, Google's obligations do not extend to latency, reliability, and performance differences that result from differences in product implementation, users, or are otherwise outside of Google's syndication products.

   2. Google shall provide the Search Text Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products.

3.     Google shall not require Qualified Competitors to share more information with Google regarding the end user than it requires from any other user of Google's Search Text Ads syndication products.

4.     The only permitted use of the information and data that Qualified Competitors obtain from Google pursuant to this Section VI is to display the ad results to the end user who submitted the associated query, as further detailed in this section, except as permitted by Section VI.B.9.

5.     Google shall (i) make the purchase of ads syndicated under this Section VI.B available to advertisers on a non-discriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads and (ii) include Qualified Competitors in its Search Partner Network.

6.     Qualified Competitors shall have the same formatting flexibility available to any other user of Google's Search Text Ads syndication products, shall be free to use other providers of syndicated search ads or display their own ads, and shall not be required to provide Google ads with preferential placement over equivalent ads requested from other sources.  Google may place only ordinary-course restrictions on the use or display of syndicated ad content, but such restrictions shall be no more restrictive than those applied to any other user of Google's Search Text Ads syndication products.  Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated ads.

7.     Google is permitted to retain or use data collected from Qualified Competitors in provisioning of the service under Section VI for Google's own products and services for the purpose of building, improving, and maintaining its ads infrastructure

13

and shared ads systems.  Google's use of Qualified Competitors' data for these purposes will be the same as Google's use of data from other users of its Search Text Ads syndication products.

8.      Google need not grant Qualified Competitors the right to set a minimum cost per click for syndicated ads unless failing to do so would violate Section VI.B.1.

9.      For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States, from human end users. Synthetic queries are not eligible for syndication under the Final Judgment.  Queries from a syndicator of the Qualified Competitor are not eligible for syndication under the Final Judgment, unless such Qualified Competitor has been certified as a Competitor to a Google ads platform (e.g., Google Ads).

10.     If Google in good faith believes a Qualified Competitor is in breach of the terms of its agreement under this Section VI, Google may exercise its rights under the agreement.  Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach.  Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections.  If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes.  Google may seek expedited consideration from the Court if the circumstances warrant such treatment.

11.     Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality,

protect advertisers, and prevent ad misuse.  Qualified Competitors are free to reject these proposed additional terms.  Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such term and allow Plaintiffs a reasonable period of time to raise objections.  If Plaintiffs object and seek a resolution by the Court, Google may not modify its Search Text Ad syndication agreements under this Section VI until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes.  Google may seek expedited consideration from the Court if the circumstances warrant such treatment.

12.     Qualified Competitors may elect, in their sole discretion, the queries for which they will request syndicated ad results.

Within sixty (60) days of the Effective Date of this Final Judgment, Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.

C.     <u>Existing Syndication Agreements</u>: The provisions of this Section VI shall have no effect on any existing Google Search Text Ad syndication agreements with third parties or on Google's ability to enter in Search Text Ad syndication agreements with third parties other than Qualified Competitors, except that Google shall permit any entity with an existing Search Text Ad syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VI.

## VII.   COMPLIANCE, ADMINISTRATION, AND ENFORCEMENT PROCEDURES

A.   <u>Technical Committee</u>:

1.      Within sixty (60) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee to assist in enforcement of and compliance with this Final Judgment.

2.      The TC members shall be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, behavioral science, and data privacy and data security.  No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner.  In addition, unless the Court so approves, no TC member:

a.      may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC;

b.      may have been retained by any party as a consulting or testifying expert in this action; or

c.      may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC.

3.      Within thirty (30) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google shall each select one member of the TC, and a majority of those three members will then select the remaining two members.  Plaintiff United States' appointee shall serve as chair.  The selection and approval process shall be as follows:

16

a. As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group shall identify to Google the individuals they propose to select as their designees to the TC, and Google shall identify to Plaintiffs the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection.

b. The Plaintiffs shall apply to the Court for appointment of the persons selected pursuant to Section VII.A.3.a above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Section VII.A.2 above.

c. As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") shall identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google shall not object to these selections on any grounds other than failure to satisfy the requirements of Section VII.A.2 above. Any such objection shall be made within ten (10) business days of receipt of notification of selection and shall be served on the other party as well as on the Standing Committee Members.

d. The Plaintiffs shall apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or

17

members shall be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by the Standing Committee Members which the parties have failed to resolve among themselves shall also be decided by the Court based solely on the requirements stated in Section VII.A.2 above.

4.    The Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Section VII.A.3 above. In the case of the fourth and fifth members of the TC, those members shall be re-appointed or replaced in the manner provided in Section VII.A.3 above.

5.    If any party determines that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, they may petition the Court for removal of that member. If a member of the TC is removed by the Court, resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member shall select a replacement member in the same manner as provided for in Section VII.A.3 above.

6.    Promptly after appointment of the TC by the Court, the Plaintiffs shall enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google shall indemnify each TC member and hold them harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that

18

such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements shall include the following:

      a.      The TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the parties agree, including payment of reasonable fees and expenses. To the extent that the parties cannot agree on the terms of a TC Services Agreement, the parties will submit such disagreement to the Court for resolution.

      b.      The TC Services Agreement shall provide that each member of the TC must comply with the limitations provided for in Section VII.A.2 above.

7.      The TC shall have the following powers and duties:

      a.      The TC shall have the power and authority to monitor Google's implementation of and compliance with its obligations under this Final Judgment, in the manner described further herein.

      b.      The TC shall have the power to recommend reasonable data security standards applicable to Qualified Competitors, which shall be approved by the Plaintiffs.

      c.      The TC may, on reasonable notice to Google:

         i.      interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google;

ii.    inspect and copy any document in the possession, custody, or control of Google personnel;

iii.    obtain reasonable access to any system or equipment to which Google personnel have access;

iv.    obtain reasonable access to, and inspect, any physical facility, building, or other premises to which Google personnel have access; and

v.    require Google personnel to provide documents, data, and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct.

d.    The TC shall have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Section VII.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate, and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties.

e.    The TC shall receive complaints from Google's Compliance Officer (as described in Section VII.B below), third parties, or the Plaintiffs and handle them in the manner specified in Section VII.C below.

f.    The TC shall report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its

duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC.

g.      Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC shall immediately notify the Plaintiffs in writing setting forth the relevant details.

h.      TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained.

i.      The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Sections VII.A.2.a–c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgment.  The compensation of any person retained by the TC shall be based on reasonable and customary terms commensurate with the individual's experience and responsibilities.

j.      The TC shall account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs.  Google's failure to promptly pay the TC's accounted-for costs and expenses, including for agents and consultants, shall constitute a violation of this Final Judgment and may result in sanctions imposed by the Court.  Google may, on application to the Court, object to the reasonableness of any such fees or other

expenses only if Google has conveyed such objections to the Plaintiffs and the TC within ten (10) calendar days of receiving the invoice for such fees or other expenses. On any such application, (a) Google shall bear the burden to demonstrate unreasonableness; (b) Google shall establish an escrow account into which it deposits the disputed costs and expenses until the dispute is resolved; and (c) the TC members shall be entitled to recover all costs incurred on such application (including reasonable attorneys' fees and costs), regardless of the Court's disposition of such application, unless the Court expressly finds that the TC's opposition to the application was without substantial justification.

k.      Google may object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations or substantive requirements of this Final Judgment.

8.      Each TC member, and any consultants or staff hired by the TC, shall sign a confidentiality agreement prohibiting disclosure of any information obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC shall be treated as Highly Confidential under the Protective Order in this case, and shall not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities.

B.    <u>Internal Compliance Officer</u>:

1.    Google shall designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment.

2.    Within seven (7) days of the Compliance Officer's appointment, Google shall identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address.  Within fifteen (15) days of a vacancy in the Compliance Officer position, Google shall appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address.  Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs.

3.    The Compliance Officer shall supervise the review of Google activities to ensure that they comply with this Final Judgment.  The Compliance Officer may be assisted by other employees of Google.

4.    The Compliance Officer shall be responsible for performing the following activities:

a.    within forty-five (45) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and directors of Google;

b.    promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Section VII.B.4.a above;

c.    ensuring that those persons designated in Section VII.B.4.a above are annually briefed on the meaning and requirements of this Final Judgment and

the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws;

        d.      obtaining from each person designated in Section VII.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment and (ii) has been advised and understands that his or her failure to comply with this Final Judgment may result in a finding of contempt of court;

        e.      maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Section VII.B.4.d above has been obtained;

        f.      establishing and maintaining the website provided for in Section VII.C.2.a below;

        g.      receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section VII.C below;

        h.      maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and

        i.      ensuring Google retains all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgment and all complaints received and/or action taken by Google with respect to any complaint.

5.      Google shall within thirty (30) days further appoint a senior business executive, who has visibility into any Google entity with obligations under this Final Judgment, whom Google shall make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered.

C.      <u>Voluntary Dispute Resolution</u>:

1.      Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer.

2.      Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment.  Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest.

a.      To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints.   To encourage whenever possible the informal resolution of complaints and inquiries, the website shall provide a mechanism for communicating complaints and inquiries to the Compliance Officer.

b.      Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it.

c.      Within thirty (30) days of receiving a complaint, the Compliance Officer shall advise the TC and the Plaintiffs of the nature of the complaint and its disposition.  The TC may then propose to the Plaintiffs further actions consistent

with this Final Judgment, including consulting with Plaintiffs regarding the complaint.

3.      The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment.

   a.      The TC shall investigate the complaints it receives and shall consult with the Plaintiffs regarding its investigation.  At least once during its investigation, and more often when it may help resolve the complaints informally, the TC shall meet with the Compliance Officer to allow Google to respond to the substance of the complaints and to determine whether the complaints can be resolved without further proceedings.

   b.      Following its investigation, the TC shall advise Google and the Plaintiffs of its conclusion and its proposal for cure.

   c.      Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but shall not be otherwise made available in any other court or tribunal related to any other matter.  No member of the TC shall be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment.

   d.      The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion.

26

D.    Compliance Inspection:

1.    Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States shall form a committee to coordinate their enforcement of this Final Judgment.  Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee.

2.    For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google shall permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff:

a.    to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and

b.    to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to

any matters contained in this Final Judgment.  The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Google.

3.     Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), Google shall submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

4.     If, at the time information or documents are furnished by Google to the Plaintiffs, Google identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)," then the Plaintiffs shall give five (5) business days' notice prior to divulging such material in any legal proceeding, unless good cause is shown for a shorter notice period.

5.     Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the Plaintiffs under this Final Judgment.  After appropriate consideration of such claim of protection, Plaintiffs, as the case may be, will either assert that the material is protected from disclosure under law or give Google ten (10) business days' notice of its intent to disclose the material.

E.    <u>Status Reports to the Court</u>:

    1.    Plaintiffs, with input from the Technical Committee, shall file a status report within ninety (90) days of the Effective Date of this Final Judgment, and then on future dates as set by the Court, updating the Court as to the enforcement of and Google's compliance with this Final Judgment.

## VIII.  EFFECTIVE DATE AND EXPIRATION

This Final Judgment will take effect sixty (60) days after the date on which it is entered (the "Effective Date"), and Plaintiffs shall report the date on which Google has substantially implemented all provisions of this Final Judgment, except for Section VII.A, which shall take effect immediately upon entry.  Unless the Court grants an extension or early termination is granted, this Final Judgment will expire six (6) years from the Effective Date.  This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets.

## IX.  DEFINITIONS

A.    "API" or "application programming interface" means a mechanism that allows different software components to communicate with each other.

B.    "Apple" means Apple Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.     "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd.

D.     "Chrome Browser Application" means the browser software application currently marketed by Google as "Google Chrome" and its successors.

E.     "Competitor" means any provider of or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States.

F.     "Consideration" means anything of value, including any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval.

G.     "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine.

H.     "Device" or "device" means any single smartphone, tablet, laptop, or desktop, excluding any device on which the ChromeOS operating system or a successor to the ChromeOS operating system is installed.  For clarity, any two devices are different devices, even if they are the same make and model (e.g., two Samsung Galaxy S25s are two devices; two Apple iPhone 16 Pros are two devices).

I.     "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models.

J.     "GenAI Product" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models and

has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information.

K.    "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt and that seeks to fulfill a broad array of informational needs.

L.    "Google" means (1) Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California; (2) its successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures controlling or overseeing Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product; and (3) the directors, officers, managers, agents, and employees of such entities specified in this Section IX.L who oversee Google Search (including syndicated products), Search Text Ads (including syndicated products), the Chrome Browser Application, the Google Search Application, the Google Assistant Application, and any related Google GenAI Product.  For clarity, the term "affiliates" includes any Alphabet Inc.–related entity that controls or oversees the aforementioned products.

M.    "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors.

N.    "Google GenAI Product" means any GenAI Product offered by Google, including by way of example, the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors).

O.      "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors.

P.      "Google Search" means the web search and search advertising services offered by Google at Google.com.

Q.      "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors).

R.      The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided.

S.      "Marginal Cost" or "marginal cost" means the direct total production cost of producing an additional unit of a good or service, which is determined by calculating the change in direct total production cost resulting from Google providing the additional unit(s) of data or services required under this Final Judgment.

T.      "Operating System Version" means a web browser version or a version of any proprietary Apple feature or functionality, including Siri and Spotlight, designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android.

U.      "Privacy Mode" means a mode within a web browser or an Apple product or service such as Siri or Spotlight that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet.

V.      "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data

security and privacy audits by the Technical Committee; who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets; and who does not pose a risk to the national security of the United States.  To remain eligible as a Qualified Competitor, the Competitor must apply for re-certification on an annual basis starting from the date of original certification as a Qualified Competitor and establish that it continues to meet the definition of a Qualified Competitor.  The Technical Committee shall establish appropriate procedures for the re-certification process.

      W.     "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites.  Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites.

      X.     "Search Feature" in Google Search means any user-facing content on a SERP that is not an organic link.  Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches.

      Y.     "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP.  Search Text Ads can include images and often appear at the top of the SERP with a designation indicating that they are paid advertisements.  "Search Text Ad" also includes Search Text Ads appearing in or in connection with Google AI Overviews.

Z.     "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, drawn from a broad index of the web.

AA.     "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Section VII.A.

BB.     "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet.

CC.     "Third-Party GenAI Product" means any GenAI Product that is not owned by Google.

DD.     "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search and is not owned by Google or its affiliates.

EE.     "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means.  User-side Data includes information Google collects when answering commercial, tail, and local queries.

FF.     "Web Search Index" means databases that store and organize information about websites and their content that is crawled from the web.  For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web.

## X.    THIRD-PARTY RIGHTS

Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC.

## XI.    RETENTION OF JURISDICTION AND ENFORCEMENT OF FINAL JUDGMENT

A.    Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions, for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment.

B.    For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four (4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment.


Dated:  December 5, 2025

_____
Amit P. Mehta
United States District Judge