# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT GOOGLE LLC'S MOTION FOR A PARTIAL STAY PENDING APPEAL**

## TABLE OF CONTENTS

LEGAL STANDARD............................................................................................5

ARGUMENT ......................................................................................................8

I.    GOOGLE IS LIKELY TO PREVAIL ON THE MERITS OF ITS APPEAL. ..................8

    A.    The Browser Default Agreements Are the Product of Competition, Not Anticompetitive Exclusion.........................................................................9

        1.    The Browser Default Agreements Reflect Competition on the Merits, Which Is Not Exclusionary as a Matter of Law. ............................9

        2.    The Browser Default Agreements Are Not Exclusive Deals....................11

    B.    The Browser Default Agreements Did Not Harm the Competitive Process. ........14

    C.    Reversal of the Determination Regarding the Browser Default Agreements Requires Reversal of the Judgment........................................................17

    D.    Google Does Not Have a Monopoly Over Search Queries. ...............................18

    E.    The Remedies Imposed by the Court Are Contrary to Law. ...............................21

II.    GOOGLE WILL BE IRREPARABLY HARMED ABSENT A STAY. ..........................26

    A.    Google Will Be Irreparably Harmed by the Compelled Disclosure of Its Trade Secrets and Other Proprietary Information..................................................26

    B.    Google Would Be Irreparably Harmed Through the Deprivation of Its Right to Appeal. ...............................................................................................30

    C.    Google Will Experience Irreparable Harm to Its Competitive Standing, Goodwill, and Reputation. ..............................................................................31

    D.    Google Would Be Irreparably Harmed Because It Would Undergo Fundamental Business Changes and Incur Substantial Unrecoverable Expenses for the Benefit of Competitors. ..............................................................33

III.    A STAY IS IN THE PUBLIC INTEREST AND WILL NOT HARM PLAINTIFFS. .............................................................................................35

    A.    The Public Will Benefit from a Stay................................................................36

    B.    The Targeted Stay Requested by Google Eliminates any Purported Concerns About Competitors........................................................................38

CONCLUSION.................................................................................................40

# **TABLE OF AUTHORITIES**

## **CASES**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ...................................13

*Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7 (D.D.C. 2014) ...........................................6, 36

*Am. President Lines, LLC v. Matson, Inc.*, 775 F. Supp. 3d 379 (D.D.C. 2025)...........................17

*Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir. 1983)....................................13

*Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018)...................................32

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102 (3d Cir. 2010) ........................................36

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................................................................19

*CBS Corp. v. FCC*, 785 F.3d 699 (D.C. Cir. 2015) ...........................................................3, 27, 28

*Ctr. for Int'l Env't Law v. Office of U.S. Trade Rep.*, 240 F. Supp. 2d 21 (D.D.C. 2003) .... *passim*

*Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018)................................. *passim*

*Cigna Corp. v. Bricker*, 103 F.4th 1336 (8th Cir. 2024).................................................................26

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .............................................................................23

*Concord Boat v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000).................................................23

*Confederated Tribes of Chehalis Reservation v. Mnuchin*, 2020 WL 3791874 (D.D.C. July 7, 2020)....................................................................................................................................36

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004) ............................................................................................................................................31

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013).........................32

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 390 F. Supp. 3d 128 (D.D.C. 2019) .................................................................................................................................36

*Eisai, Inc. v. Sanofi Aventis, U.S., LLC*, 821 F.3d 394 (3d Cir. 2016) .........................................14

*Epic Games, Inc. v. Apple, Inc.*, 2021 WL 6755197 (9th Cir. Dec. 8, 2021) ...............................34

*FTC v. Qualcomm Inc.*, 935 F.3d 752 (9th Cir. 2019)............................................................ *passim*

*Hospital Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192 (D.D.C. 2010)..........................27

*In re NTE Conn., LLC*, 26 F.4th 980 (D.C. Cir. 2022) .............................................................7, 35

*In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025).......................................30

*Jewish War Veterans of U.S., Inc. v. Gates*, 522 F. Supp. 2d 73 (D.D.C. 2007)............................6

*John Doe Agency v. John Doe Corp.*, 488 U.S. 1306 (1989) (Marshall, Circuit Justice) .............31

*Jubilant DraxImage, Inc. v. U.S. Int'l Trade Comm'n*, 396 F. Supp. 3d 113 (D.D.C. 2019)........28

*Marin Audubon Soc'y v. FAA*, 129 F.4th 869 (D.C. Cir. 2025) ...........................................1, 5, 26

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004) (en banc) .................... *passim*

ii

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27 (D.D.C. 2002) .......4, 36

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) ........................................27

*Mytinger v. FTC*, 301 F.2d 534 (D.C. Cir. 1962) .........................................................................18

*NCAA v. Alston*, 141 S. Ct. 2141 (2021)...............................................................................2, 24

*NCAA v. Bd. of Regents of Univ. of Okla.*, 463 U.S. 1311 (1983) (White, Circuit Justice) ...........8

*Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008) .................................20

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) (en banc) ...............................................11

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................8, 35

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) .........................................................................18

*Population Inst. v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986) ...................................................5

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)........................................................2, 15, 16

*Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312 (7th Cir. 2006)..............................................19

*Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419 (D.D.C. 2018) ........................7, 26, 28

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ............................32

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) .................19

*Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315 (1983) (Blackmun, Circuit Justice) .....................26

*Standard Oil Co. of Cal. v. United States*, 337 U.S. 293 (1949) .................................................18

*Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112 (1st Cir. 2011) ..............................................18

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) ................................................................20

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024)......................................... *passim*

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966).................................................................9

*United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000).........................................6, 15

*United States v. Microsoft Corp.*, No. 98-cv-1233, ECF 591 (D.D.C. June 20, 2000) .........6, 8, 38

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) ......................... *passim*

*United States v. Philip Morris USA Inc.*, 2006 WL 4608645 (D.C. Cir. Nov. 1, 2006)................8

*United States v. Visa U.S.A. Inc.*, 2002 WL 638537 (S.D.N.Y. Feb. 7, 2002)...................8, 34, 38

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).........10, 37

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977) ...............................................................................................................................6, 9

*Walker Process Equip., Inc. v. Food Mach. Corp.*, 382 U.S. 172 (1965) .....................................18

*ZF Meritor LLC v. Eaton Corp.*, No. 06-623, ECF 283 (D. Del. Aug. 19, 2011)....................8, 35

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)...................................................12

## STATUTES AND RULES

Clayton Act Section 3, 15 U.S.C. § 14 ...........................................................................18

Sherman Act Section 2, 15 U.S.C. § 2 .................................................................. *passim*

**ABBREVIATIONS**

| CITATION | CORRESPONDING FILING OR TRANSCRIPT |
|---|---|
| Final Judgment | Final Judgment Dated December 5, 2025 (ECF 1462). |
| Remedy Op. | Memorandum Opinion Regarding Remedies Dated September 2, 2025 (ECF 1435). |
| Reid Decl. | Declaration of Elizabeth Reid, Vice President and Head of Search, Dated January 15, 2026. |
| Adkins Decl. | Declaration of Jesse Adkins, Director of Product Management for Search Syndication and Search Ads Syndication, Dated January 15, 2026. |
| Liability Tr. | Transcript of the Trial Conducted on September 12 to November 16, 2023 and May 2 to 3, 2024. |
| Remedy Tr. | Transcript of the Evidentiary Hearing on Remedies Conducted from April 21 to May 9, 2025 and May 30, 2025. |
| Liability PFOF | Google's Proposed Findings of Fact Dated February 9, 2024 (ECF 828). |
| Remedy PFOF | Google's Proposed Findings of Fact Dated May 16, 2025 (ECF 1346). |

Google respectfully requests that the Court stay certain provisions of the Final Judgment pending Google's appeal of the Court's liability and remedies rulings.  Specifically, the Court should stay Google's obligations to disclose "data related to Google's Web Search index" and "User-side Data" to "Qualified Competitors," as well as the requirements to enter a "search syndication license" and "Search Text Ads syndication agreement" with "Qualified Competitors."  *See* Final Judgment §§ IV.A-B, V, VI.B-C.  In deciding whether a stay is warranted, the Court considers the likelihood that Google "will prevail on the merits of the appeal," the likelihood that Google "will be irreparably harmed absent a stay," and "the public interest in granting the stay," including "the prospect that others will be harmed" by a stay.  *Marin Audubon Soc'y v. FAA*, 129 F.4th 869, 871 (D.C. Cir. 2025) (quotation omitted).  These factors favor a stay in this case.

The likelihood of success on the merits.  Google is likely to prevail on the merits of its appeal because Google will demonstrate that its agreements to be the default search engine in third-party web browsers are the product of competition on the merits and are not exclusionary as a matter of law.  The determination that the browser agreements are "exclusive" marks an unprecedented expansion of antitrust liability.  No other court has found that comparable contracts involve exclusive dealing, and the agreements at issue more closely resemble conduct the D.C. Circuit held is lawful.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 68 (D.C. Cir. 2001) (en banc) (reversing finding that Microsoft violated Section 2 by providing "inducements" to distribute its browser and holding that "the antitrust laws do not condemn even a monopolist for offering its product at an attractive price" or for "developing an attractive product").

Furthermore, even if the browser agreements could be characterized as exclusive, Google is likely to prevail on appeal because they did not "harm the competitive *process* and thereby

harm consumers." *Id.* at 58. Plaintiffs did not prove that any of the contracts at issue in this case had "the requisite anticompetitive effect," *id.* at 58-59, and the liability opinion excused the absence of evidence on this crucial point by relying on inference. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 152-53 (D.D.C. 2024). But the "toothless" standard applied in this case has never been used by the D.C. Circuit for determining the liability question of whether conduct has an anticompetitive effect. The *Microsoft* court relied on inference for a different purpose, *see* 253 F.3d at 79, and the approach taken here conflicts with subsequent binding precedent. *See Rambus Inc. v. FTC*, 522 F.3d 456, 464-67 (D.C. Cir. 2008).

Although any one of these points is sufficient to justify a stay, there are other reasons why Google is likely to establish on appeal that it did not violate the Sherman Act. For example, Plaintiffs failed to prove that Google possesses monopoly power because they did not prove their alleged relevant antitrust markets. The Court should have concluded that Plaintiffs' qualitative account of the purportedly distinctive characteristics of general search engines was legally insufficient to define a market that excluded other reasonably interchangeable search services for the most monetizable search queries, including "specialized" search providers like Amazon and Booking. *See Google*, 747 F. Supp. 3d at 108-16.

Google is also likely to prevail on appeal because the remedies are contrary to law. For example, the compelled syndication of search results and ads will require an unprecedented degree of judicially imposed forced dealing among competitors overseen by a "central planner"—a role that courts "should never aspire to" when imposing an antitrust remedy. *NCAA v. Alston*, 594 U.S. 69, 102-03 (2021). While such a sweeping regulatory decree would be troubling in any case, it is especially unsupported here because it is untethered to Plaintiffs' theory of liability and the Court's liability findings, both of which were limited to the claim that

certain terms of certain Google distribution agreements were "exclusive."  Plaintiffs never established, and the Court never found, that any party to these purportedly exclusive agreements wanted to set another search engine as the default in a browser or exclusively preinstall it on a device but declined to do so because of an agreement with Google.  And Plaintiffs adduced no evidence that the "fruits" the Court decided to pluck from Google and hand to competitors "were actually the products of the unlawful [exclusive dealing] practices," *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1232 (D.C. Cir. 2004) (en banc) (cleaned up), as opposed to the fruits of the "lawful reasons for [Google's] market success" and the inherent "features of the general search market."  *See* Remedy Op. at 77, 88.  On these facts, the law precludes a remedy compelling Google to provide its valuable assets to Qualified Competitors, including firms that do not even compete in the markets identified in the liability opinion and were never impacted by the purportedly exclusive agreements.  *See Massachusetts*, 373 F.3d at 1232-33; *Microsoft*, 253 F.3d at 104-06.

The likelihood of irreparable harm.  A stay pending appeal often applies to the entirety of a judgment, and that approach would be warranted here.  Nevertheless, Google's motion is more limited.  Google seeks to stay only the aspects of the Final Judgment that indisputably will cause irreparable harm to Google, namely the transfer of its index and user-side data to Qualified Competitors and the provision of syndicated search results and ads to Qualified Competitors.

Absent a stay, the data-disclosure provisions would irreparably harm Google because competitors will gain access to vast amounts of Google's proprietary information.  *See* Reid Decl. ¶¶ 5-35.  It is axiomatic that appellate "review can be effective only if it occurs before confidential information is disclosed to third parties."  *CBS Corp. v. FCC*, 785 F.3d 699, 708 (D.C. Cir. 2015).  "Disclosure followed by appeal … is obviously not adequate" because then

"the cat is out of the bag," and Google's confidential data can never "be made secret again if the judgment … ultimately is reversed." *Id.* (cleaned up).  Google would effectively be deprived of its right to appeal these remedies if it were required to turn over the data sets before its appeal is resolved.

The compelled syndication provisions, like the data-disclosure requirements, would inflict irreparable harm by giving competitors valuable insights into Google's confidential algorithms and other proprietary techniques—information that could never be "unlearned" if Google prevails on appeal.  *See* Reid Decl. ¶¶ 36-47; Adkins Decl. ¶¶ 6-12.  And even if that were not the case, forcing Google to make "licenses available to its competitors" that it would not have offered in the absence of the Final Judgment would irreparably harm Google by allowing those competitors to use Google's world-class search results and text ads.  *See FTC v. Qualcomm Inc.*, 935 F.3d 752, 755, 757 (9th Cir. 2019) (staying injunction pending appeal in Section 2 case).  As detailed below, Google would also experience numerous other forms of irreparable harm without a stay of these provisions, including damage to its reputation and competitive standing as well as significant unrecoverable expenses.

The prospect that others will be harmed and the public interest.  "[T]he public interest is served by protecting confidential business information and trade secrets," not by handing them to competitors before appellate review can occur.  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002).  That is especially true in this case because full implementation of the remedies would jeopardize user privacy for hundreds of millions of Americans.  *See* Reid Decl. ¶¶ 26-35.  The public interest dictates that appellate review should occur before the private search queries of Google users are shared without their consent and

before innovation and investment are permanently warped by compelled data disclosures and syndication.

Google does not seek to stay any preparatory work related to the data-disclosure and syndication remedies, even though those remedies never should have been imposed. The stay will not impede appointing the Technical Committee, determining "privacy and security safeguards" applicable to user-side data, and developing licenses for the provision of user-side data and syndication services. Moreover, the stay will not affect the prohibitory injunction, even though it never should have been imposed either. To be clear, the prohibitory injunction, like the other provisions of the Final Judgment, will undermine the competitive process and harm consumers, including by dismantling a procompetitive business model for licensing applications to Android device manufacturers. If the public interest were dispositive, then the Final Judgment should be stayed in its entirety. But in light of the standard for a stay pending appeal, Google has limited its motion to the provision of data sets and syndication services to Qualified Competitors. Any purported effect of a delay in full implementation of these remedies pales in comparison to the harm that will occur absent a stay.

## LEGAL STANDARD

Under "long-standing principles governing stays pending appeal," the court "consider[s] (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Marin Audubon Soc'y*, 129 F.4th at 871 (quotation omitted). "The test is a flexible one," and a stay "may be granted with either a high likelihood of success and some injury, or *vice versa*." *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986); *see Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) ("Courts in this Circuit traditionally have

analyzed these four factors on a sliding scale, whereby a strong showing on one factor could make up for a weaker showing on another." (cleaned up)).

    <u>The likelihood of success on the merits</u>.  When applying the first factor, "[t]he court is not required to find that ultimate success by the movant is a mathematical probability," and it "may grant a stay even though its own approach may be contrary to movant's view of the merits." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).  In particular, a movant may "remedy a lesser showing of likelihood of success on the merits with a strong showing as to the other three factors, provided that the issue on appeal presents a 'serious legal question' on the merits." *Cigar Ass'n*, 317 F. Supp. 3d at 560 (quoting *Holiday Tours*, 559 F.2d at 844).  Courts accordingly have entered stays pending appeal where "the case presented difficult and substantial legal questions," despite "disagree[ing] with [the movant's] position, and find[ing] there to be a low likelihood of success on the merits." *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 13 (D.D.C. 2014).

    In the same vein, courts have stayed their judgments where the movant has "raise[d] a serious legal question" about the "application" of circuit precedent, despite finding that it "may be true" that the movant is "unlikely to prevail on appeal" in view of an argument that the precedent "is directly on point and controls the outcome." *Jewish War Veterans of U.S., Inc. v. Gates*, 522 F. Supp. 2d 73, 79 (D.D.C. 2007).  For example, in *United States v. Microsoft Corp.*, the district court stayed the final judgment in its entirety pending appeal, No. 98-cv-1233-TPJ, ECF 591 at 2 (D.D.C. June 20, 2000) ("*Microsoft* Stay Order"), even though it had concluded that Microsoft violated Sections 1 and 2 of the Sherman Act and a host of state laws.  *See generally* 87 F. Supp. 2d 30 (D.D.C. 2000).

The likelihood of irreparable harm.  With respect to the second factor, courts have identified numerous forms of irreparable harm that justify staying a final judgment pending appeal.  For instance, the compelled disclosure of a party's trade secrets or other proprietary information causes irreparable harm because once that information has been "surrendered pursuant to the … court's order, confidentiality will be lost for all time," and "[t]he status quo could never be restored."  *Ctr. for Int'l Env't Law v. Office of U.S. Trade Rep.*, 240 F. Supp. 2d 21, 23 (D.D.C. 2003) (staying order requiring defendant to release confidential records pending appeal despite acknowledging that "plaintiffs will suffer harm if a stay is granted" and "the public has a strong interest in the prompt release of the[] documents"); *see, e.g.*, *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018) ("[T]he disclosure of confidential information is, by its very nature, irreparable because such information, once disclosed, loses its confidential nature." (quotation omitted)).

Irreparable harm also arises from compelled licensing to competitors, including because such "fundamental business changes … cannot be easily undone."  *Qualcomm*, 935 F.3d at 755-56 (staying injunction "requiring that Qualcomm make [certain] licenses available to its competitors" after the district court found its refusal to license violated Section 2 of the Sherman Act).  Furthermore, courts have concluded that an "irrecoverable financial loss" is a form of "irreparable harm," including when the "expenditures would be unrecoverable" if the appellate court reverses, thereby "leaving [the movant] with no remedy to restore [itself] to the status quo ante."  *Cigar Ass'n*, 317 F. Supp. 3d at 563 (quotation omitted); *see, e.g.*, *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (explaining that "financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation" (cleaned up)).

The prospect that others will be harmed and the public interest. Although the "first two factors of the traditional standard are the most critical" in determining whether to issue a stay pending appeal, the court also considers "whether issuance of the stay will substantially injure the other parties interested in the proceeding" and "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The final two "factors merge when the Government is the opposing party," *id.* at 435, but that does not mean these factors favor the government over a private party, even when the government purports to be discharging its statutory duties in the public interest. *See, e.g.*, *United States v. Philip Morris USA Inc.*, 2006 WL 4608645, at *1 (D.C. Cir. Nov. 1, 2006) (staying permanent injunction pending appeal after government prevailed in a lengthy bench trial); *Cigar Ass'n*, 317 F. Supp. 3d at 563 (staying judgment in FDA's favor pending appeal even though "the public has an interest in ensuring that the FDA can exercise its authority and scientific expertise"). Specifically, courts have stayed the imposition of antitrust remedies even where "the Government successfully demonstrated that the exclusionary rules and practices of the Defendant[] have had a significant adverse effect on competition and consumer welfare." *United States v. Visa U.S.A. Inc.*, 2002 WL 638537, at *1 (S.D.N.Y. Feb. 7, 2002); *see also Qualcomm*, 935 F.3d at 756-57; *Microsoft* Stay Order at 2.[1]

## ARGUMENT

## I.    GOOGLE IS LIKELY TO PREVAIL ON THE MERITS OF ITS APPEAL.

Google is likely to demonstrate on appeal that it has not violated the Sherman Act, and, at a minimum, it will present "a 'serious legal question' on the merits" that warrants a stay in the

---

[1] Stays pending appeal are commonplace not only in antitrust cases brought by the government, but also in private antitrust actions where the court enters a permanent injunction. *See, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 463 U.S. 1311, 1313 (1983) (White, Circuit Justice); *ZF Meritor LLC v. Eaton Corp.*, No. 06-623, ECF 283 at 2 (D. Del. Aug. 19, 2011) (staying injunction pending appeal in exclusive dealing case).

interim given the irreparable harm that will befall Google and non-parties absent a stay.  *Cigar*

*Ass'n*, 317 F. Supp. 3d at 560 (quoting *Holiday Tours*, 559 F.2d at 844).

> **A.    The Browser Default Agreements Are the Product of Competition, Not Anticompetitive Exclusion.**

> > **1.    The Browser Default Agreements Reflect Competition on the Merits, Which Is Not Exclusionary as a Matter of Law.**

Google will show on appeal that its agreements to be the default search engine in

browsers such as Apple Safari and Mozilla Firefox reflect "competition on the merits" that

cannot be condemned under Section 2.  *Microsoft*, 253 F.3d at 62.  The Court found that Google

"has long been the best search engine, particularly on mobile devices" and that "Google's

partners value its quality."  *Google*, 747 F. Supp. 3d at 144.  And it determined that those

partners "continue to select Google as the default because its search engine provides the best bet

for monetizing queries."  *Id.*  This is the essence of competition on the merits: "offering a

customer an attractive deal is the hallmark of competition," and "the antitrust laws do not

condemn even a monopolist for offering its product at an attractive price."  *Microsoft*, 253 F.3d

at 68 (concluding Microsoft did not violate the Sherman Act by offering distributors

"inducements" to promote its software "free of charge or even at a negative price").

The Court nevertheless determined the browser default agreements violated Section 2

because "these largely undisputed facts are not inconsistent with possessing and exercising

monopoly power."  *Google*, 747 F. Supp. 3d at 144.  Irrespective of whether Google possesses

monopoly power, "having a monopoly does not by itself violate § 2," *Microsoft*, 253 F.3d at 58,

and it is lawful for a firm to maintain monopoly power through "a superior product, business

acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

Google "has hired thousands of highly skilled engineers, innovated consistently, and made

shrewd business decisions" to create "the industry's highest quality search engine" that browser

developers such as Apple and Mozilla unequivocally believe provides the best search experience as the default for their users. *Google*, 747 F. Supp. 3d at 31; *see, e.g.*, *id.* at 95 (quoting testimony from an Apple executive that it was a "no brainer" for Apple "to stay with Google" rather than switching the Safari default to Bing because Google has "the best search engine … and they're monetizing really well"). As Microsoft's CEO acknowledged, Google is "competing every day to improve search," and "on search, I think the competition is pretty intense." Liability Tr. 3532:22-3533:2 (Nadella).

The Court underweighted these dispositive facts because of its determination that "Google has no true competitor." *Google*, 747 F. Supp. 3d at 144 (stating that Google's share of Plaintiffs' alleged relevant market "has been remarkably durable" and "[o]nly once in the last 22 years has a rival dislodged Google as the default GSE"). As indicated, however, neither the relative strength of competitors in a market nor the prevalence of certain outcomes of competition on the merits is sufficient to establish liability under Section 2. *See Microsoft*, 253 F.3d at 58. A monopolist's conduct comprising competition on the merits is lawful even when that monopolist lacks substantial rivals. After all, "[t]he successful competitor, having been urged to compete, should not be turned upon when he wins." *Id.* at 58. Unlike regulatory schemes designed "to eliminate the monopolies enjoyed" by specific firms, the Sherman Act does "not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415-16 (2004) (cleaned up). Yet that is what happened here: the Court ruled against agreements that are indistinguishable from those entered by Google before it was alleged to have unlawfully maintained a monopoly (and are the very type of agreement that rival search engines have sought for years) even though browser

developers want to continue setting Google as the default because it offers the best service at the best price. *See Google*, 747 F. Supp. 3d at 145. Google did not engage in exclusionary conduct because it repeatedly succeeded in defeating rivals on the merits—with partners and consumers overwhelmingly choosing Google over inferior search engines.

### 2.    The Browser Default Agreements Are Not Exclusive Deals.

Despite unrebutted evidence that Google's browser default agreements are the product of competition on the merits, the Court concluded that the agreements are anticompetitive because they are "exclusive." *Id.* at 146-49. This conclusion also is contrary to law. The agreements are not exclusive because Google is buying one promotional opportunity created by the browser developers' choice to design their product with a single default search engine. After the production of millions of documents, more than 100 depositions, and a 10-week trial on liability, Plaintiffs adduced no evidence that these firms wanted a different product design, such as a search engine choice screen or a separate default setting for different devices or device types. Liability PFOF ¶¶ 803, 807-812, 860-68; *see also* Remedy PFOF ¶¶ 944-46, 954-55. Browser developers testified unanimously that they prefer to set a single default search engine, and the design is ubiquitous. Liability PFOF ¶¶ 860-68, 1227-33, 1348-53, 1356-57. For example, Bing is the default in browsers such as Microsoft Edge and Amazon Silk, while DuckDuckGo is the default search engine in its browser. *Id.* ¶ 864. Mozilla likewise did not change the design of its Firefox browser in 2014 when it switched the default to Yahoo, or in 2017 when it switched back to Google. *Id.* ¶¶ 1365, 1376. Nor did Mozilla seek browser-by-browser optionality. "If the buyers in a market demand one thing, the antitrust laws do not prohibit an [alleged monopolist] from offering that same thing on slightly different terms." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 453 (6th Cir. 2007) (en banc). Given that an alleged monopolist is permitted by law to compete in the market by offering "slightly different terms" to customers who demand their

11

product, Google did not engage in exclusionary conduct by offering what consumers

demanded—a default for all their browsers.

Google's agreements with browser developers also are not exclusive because they do not

prevent the counterparties from dealing with rivals. "An exclusive dealing arrangement is an

agreement in which a buyer agrees to purchase certain goods or services only from a particular

seller for a certain period of time." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir.

2012). Yet for years Apple has agreed with Microsoft to "provide a readily available and easily

discoverable option for the user to change the user's default search services to Bing through

Apple's search selection facility." Liability PFOF ¶ 1289 (quoting DX0963). And for years

Apple has prominently displayed default "bookmarks" for Bing and Yahoo alongside Google in

the browser. *Id.* ¶¶ 1230-34, 1404-06; *see Google*, 747 F. Supp. 3d at 94 (describing an "Apple-

Microsoft promotional agreement" for "preloading [Bing] as a default bookmark on Safari").

Apple and other browser developers not only have agreed to promote rival search engines, they

also have negotiated revenue share payments in exchange for doing so. Liability PFOF ¶¶ 1280-

91, 1351-55, 1401-11. No other court has held that an agreement is exclusive under comparable

circumstances.

Mozilla's 2014 agreement to set Yahoo as the default in Firefox—which was an

exclusive deal under the Court's novel definition—illustrates the significance of the opinion's

departure from precedent. After Yahoo entered that agreement with Mozilla, "Yahoo's share …

increased from around 10% to 30% of the Firefox queries." *Google*, 747 F. Supp. 3d at 96. No

other court has suggested that contracting for a promotional opportunity that appeals to a

minority of users is exclusive dealing, yet that is what the Court has done here by conflating a

user-changeable default setting with exclusivity. The approach is contrary to an unbroken line of

12

authority requiring a plaintiff to establish that the challenged agreements are "exclusive rather than run-of-the-mill contracts, which inevitably 'foreclose' or 'exclude' alternative sellers from some portion of the market, namely the portion consisting of what was bought."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016) (cleaned up) (quoting *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.)).[2]

The opinion's expansion of exclusive dealing would have the result of condemning competition on the merits.  For example, the Court distinguished the Yahoo-Mozilla deal referenced above on the ground that "Google's brand recognition and Yahoo's poor quality were major factors that dampened the default effect on Firefox."  *Google*, 747 F. Supp. 3d at 148.  But this observation further supports the notion that an agreement to set a user-changeable default is not exclusive because users can and do access their preferred search engine when confronted with an inferior option as the default.  Moreover, the opinion acknowledges that "[u]sers are free to navigate to Google's rivals through non-default search access points," *id.* at 149, and on Apple iPhones—which are the source of the majority of mobile queries in the U.S.—users' invocation of "non-default search access points" confirms that Google winning the Safari default does not comprise exclusive dealing.  More than 38% of general search queries on iPhones occur ***outside*** the Safari default.  *Google*, 747 F. Supp. 3d at 147, 149.  This is dispositive because "if customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted—even if a competitor remains unable to increase its market

---

[2] Mozilla's experience with Yahoo is far from the only example of users accessing their preferred search engine notwithstanding a default setting.  For many years virtually every Windows PC sold in the U.S. has shipped with Bing as the default on all search access points, but Google receives approximately 80% of queries entered on those computers.  Liability PFOF ¶¶ 47-52, 770, 777-82, 830-31.  Google likewise received a substantial majority of queries on mobile devices where Bing was the default, including Windows phones and certain Blackberries.  *Id.* ¶¶ 496-500, 781-82, 847-59, 1425.

share." *Eisai, Inc. v. Sanofi Aventis, U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016).  Browser

developers' and users' persistent preference for Google—which has "has long been the best

search engine," *Google*, 747 F. Supp. 3d at 144—does not render the default agreements

exclusive or otherwise anticompetitive.

      **B.**      **The Browser Default Agreements Did Not Harm the Competitive Process.**

      Even assuming that the browser agreements could be regarded as exclusive deals, Google

is likely to prevail on appeal because Plaintiffs did not establish that the agreements had "the

requisite anticompetitive effect." *Microsoft*, 253 F.3d at 58-59.  As the Court acknowledged,

"categorizing Google's distribution agreements as 'exclusive' does not answer the question of

whether those deals violate Section 2." *Google*, 747 F. Supp. 3d at 152.  Exclusive dealing is "a

presumptively legitimate business practice," *Microsoft*, 253 F.3d at 69, and liability potentially

attaches only if it "harm[s] the competitive *process* and thereby harm[s] consumers." *Id.* at 58.

Plaintiffs did not meet their burden in this respect, and the Court excused their failure because,

among other things, it applied an erroneous legal standard.

      The Court held that the "key question" in ascertaining an anticompetitive effect is

whether "Google's exclusive distribution contracts reasonably appear capable of significantly

contributing to maintaining Google's monopoly power in the general search services market."

*Google*, 747 F. Supp. 3d at 153.  Although this test is derived from language that appears in

*Microsoft*, the D.C. Circuit used it only ***after*** finding that Microsoft's conduct was independently

anticompetitive to evaluate the altogether different question of whether the plaintiffs had to show

that the "defendant's continued monopoly power is precisely attributable to its anticompetitive

conduct." *Microsoft*, 253 F.3d at 79.  The Court's application of this test to identify harm to

competition in the first instance conflicts with precedent and sweeps too broadly because there

are countless things a monopolist can do that are not exclusionary but "reasonably appear

capable of significantly contributing to maintaining" its monopoly power, including hiring the most talented employees, building and improving the best product, foreseeing a market paradigm shift that its rivals do not, and paying for unmatched distribution opportunities.

In *Microsoft*, for example, the district court condemned Microsoft's practice of paying "a bounty for each customer the [distributor] signs up for service using [Microsoft's] IE browser" on the ground that Microsoft was "acting to preserve its monopoly."  *Microsoft*, 253 F.3d at 67-68.  The district court even found that "it is fair to conclude that these inducements and restrictions contributed significantly to the drastic changes that have in fact occurred in Internet Explorer's and Navigator's respective usage shares" and "thereby contributed significantly to preserving the applications barrier to entry" that protected Microsoft's operating system monopoly.  *Microsoft*, 87 F. Supp. 2d at 41.  The D.C. Circuit did not dispute these conclusions about how Microsoft's inducements contributed to Microsoft's monopoly power and harmed its competitor, but it *reversed* the imposition of liability because "the antitrust laws do not condemn even a monopolist for offering its product at an attractive price."  *Microsoft*, 253 F.3d at 68.  This Court's use of the "reasonably capable" test to find anticompetitive harm led to the same error because it did not distinguish conduct that "harm[s] the competitive *process* and thereby harm[s] consumers" from lawful "conduct which is competitive, even severely so."  *Id.* at 58.

The D.C. Circuit's decision in *Rambus* required holding in this case that Google's browser agreements were not exclusionary.  In that case, the D.C. Circuit held that the FTC "failed to demonstrate that Rambus's conduct was exclusionary" where the evidence suggested that Rambus's counterparty, JEDEC, would have chosen Rambus regardless of its allegedly unlawful conduct.  522 F.3d at 467.  "Rambus's alleged deception cannot be said to have had an effect on competition in violation of the antitrust laws" where JEDEC "would have standardized

the very same technologies," *i.e.*, where JEDEC would have had the same preference for Rambus's product, "in the world that world have existed but for Rambus's deception." *Id.* at 466-67. This Court declined to apply *Rambus* because, according to the Court, *Rambus* is limited to deceptive conduct, and it was only in those "circumstances" that "the D.C. Circuit deemed it appropriate to demand proof that Rambus's deception in fact resulted in competitive harm." *Google*, 747 F. Supp. 3d at 155. The D.C. Circuit, however, did not limit its holding to deceptive conduct. Rather, the court explained that "[d]eceptive conduct—*like any other kind*—must have an anticompetitive effect in order to form the basis of a monopolization claim." *Rambus*, 522 F.3d at 464 (emphasis added). Determining whether the allegedly exclusionary conduct "had an effect on competition in violation of the antitrust laws" requires an evaluation of whether consumers would have preferred the defendant's product in "the world that would have existed but for" that conduct, the D.C. Circuit explained, because otherwise there is no way to ascertain whether the conduct at issue had the requisite substantial effect on competition. *Id.* at 466-67.

Under the correct legal standard, the evidence compels the conclusion that the challenged conduct—browser developers selecting Google as the default for Safari, Firefox, and a handful of other browsers—produced no harm to the competitive process, as it was the result of competition on the merits. The evidence indisputably showed that browser developers such as Apple and Mozilla ***wanted*** to set Google as the default on their browsers, and the supposedly anticompetitive contracts simply reflected their selection. *See* Liability PFOF ¶¶ 1277-79, 1292, 1360-79, 1386-1400, 1456-59; Remedy PFOF ¶¶ 162, 168. The opinion cites two instances when Apple purportedly "sought greater flexibility," *Google*, 747 F. Supp. 3d at 93, but they are irrelevant because the negotiations predate the period evaluated by Plaintiffs' experts for anti-

competitive effects, were not addressed with any Apple witness, and are squarely refuted by the only Apple witness who testified about that period.  Liability PFOF ¶¶ 1255-61, 1304-07. Moreover, analyses conducted by Plaintiffs' economist—who agreed "that the likely competitive effects of Google's behavior … is ideally examined relative to a but-for world," Liability Tr. 6085:15-19 (Whinston)—showed that rival search engines would not have received any appreciable increase in query volumes even if users had been forced to choose a search engine rather than presented with a default.  Liability PFOF ¶¶ 793-823, 1426-32.  These are not irrelevant "thought experiments," *Google*, 747 F. Supp. 3d at 155; they confirm that Plaintiffs failed to meet their burden of showing that the purportedly exclusive provisions "harm[ed] the competitive *process* and thereby harm[ed] consumers."  *Microsoft*, 253 F.3d at 58.

### C.    Reversal of the Determination Regarding the Browser Default Agreements Requires Reversal of the Judgment.

Plaintiffs also failed to carry their burden to demonstrate that Google's agreements with Android device manufacturers and wireless carriers had the requisite anticompetitive effect. Among other things, the conclusion that Google's agreements with browser developers reflect competition on the merits also compels reversal of the judgment with respect to the Android agreements because the Android agreements do not "foreclose competition in a substantial share of the line of commerce affected."  *Microsoft*, 253 F.3d at 69 (explaining that "in all cases" alleging exclusive dealing "the plaintiff must both define the relevant market and prove the degree of foreclosure").  The Court found that no more than 19.4% of general search queries in the U.S. were "covered by" the "agreements with Android OEMs and carriers."  *Google*, 747 F. Supp. 3d at 44.  While that "coverage" measure vastly overstates any foreclosure attributable to those agreements, even the 19.4% figure is insufficient to support liability because "[c]ourts presume foreclosure of less than 30% of the market to be insubstantial."  *Am. President Lines,*

17

*LLC v. Matson, Inc.*, 775 F. Supp. 3d 379, 402 n.4 (D.D.C. 2025) (entering summary judgment on Section 2 claims); *see, e.g.*, *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123-24 (1st Cir. 2011) ("[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent, and while high numbers do not guarantee success for an antitrust claim, low numbers make dismissal easy.").

Where, as here, a majority of search engine queries occur on Windows computers (where Microsoft's Bing is exclusively preloaded) and non-Google browsers (where competing search engines have the same ability to compete for the default as Google), the Android agreements alone cannot as a matter of law substantially foreclose competition in the alleged relevant markets. Any reliance on anarchic pre-*Microsoft* decisions involving Section 3 of the Clayton Act, such as *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293 (1949), and *Mytinger v. FTC*, 301 F.2d 534 (D.C. Cir. 1962)—cases predating and contrary to modern economic-focused antitrust analysis—is legal error.

### D.    Google Does Not Have a Monopoly Over Search Queries.

The points above would require reversing (or at a minimum, revisiting) the liability determination because Google's conduct was not exclusionary as a matter of law, irrespective of the definition of the market affected by that conduct. But Google will also demonstrate on appeal that the liability determination must be reversed because Google lacks monopoly power, which "is a necessary element of a monopolization charge." *Microsoft*, 253 F.3d at 51. Among other things, Plaintiffs did not adduce evidence sufficient to support the existence of an antitrust market for general search services, and "[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (cleaned up); *see also Walker Process Equip., Inc. v. Food Mach. Corp.*, 382 U.S. 172, 177 (1965). The evidence instead showed that any relevant market must include

other places online where users enter queries, including specialized vertical providers (SVPs) such as Amazon and Booking.  Google indisputably does not possess monopoly power in any market that includes these significant competitors.

The Court found "that an SVP can serve the same purpose as a GSE for an individual query on a particular subject matter" because "[a] user can, for example, use either Google or OpenTable to find a nearby Japanese restaurant, or turn to Google or Amazon to shop for a blender." *Google*, 747 F. Supp. 3d at 114.  And it acknowledged that "Google does perceive and respond to competitive pressure from other platforms, particularly SVPs," including by "develop[ing] verticals like shopping, flights, and hotels in part to provide users with topic-specific results much like SVPs." *Id.* at 113-14.  Despite these significant findings, the Court excluded SVPs from its relevant market because "no SVP can fulfill a user's varied needs in the same manner as a GSE." *Id.* at 114 ("[A]n SVP may be reasonably interchangeable with a GSE for a discrete purpose but for not the 'same purposes.'").

The Court reached this conclusion based on a subset of the "practical indicia" described in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), but these "evidentiary proxies" led the Court astray.  *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986).  By performing only a qualitative assessment of the "practical indicia," the Court excused Plaintiffs' failure to provide "quantitative evidence from expert economists," *Google*, 747 F. Supp. 3d at 108, and relevant evidence of how users actually interact with GSEs and SVPs. "While the 'practical indicia' may be … important considerations in defining a market, they were never intended to exclude economic analysis altogether." *Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006).  Yet the only attempt by Plaintiffs' experts to marshal the vast array of data produced in this case to support their market definition fell flat, as the

Court correctly rejected their quantitative analysis purporting to show that GSEs are a distinctive "'one-stop shop' for all manner of queries."  *Google*, 747 F. Supp. 3d at 111.

Although that should have led the Court to reject Plaintiffs' proposed market definition, the Court nevertheless adopted Plaintiffs' proposed relevant market based on qualitative observations about GSEs' ability "to fulfill a broad array of informational needs," including by "provid[ing] answers to noncommercial queries or tak[ing] a user to a desired location on the web through a navigational query."  *Google*, 747 F. Supp. 3d at 111, 114.  This is not a dispositive distinction between GSEs and SVPs, but rather the way that Google "competes with [SVPs] by using a different business model."  *Am. Express*, 585 U.S. at 538.  Google earns no revenue from "noncommercial queries" where it displays no ads, yet it strives to provide the best results in response to all of those queries so that its satisfied users will return to Google with commercial queries, *i.e.*, the only revenue-generating Google Search queries, which are the subject of fierce competition from SVPs that likewise seek to monetize those searches.  What matters is not the varied infrastructure that a GSE such as Google and an SVP like Amazon have each built to appeal to users looking "to shop for a blender," *Google*, 747 F. Supp. 3d at 114, but whether these sites are "reasonably interchangeable" for a consumer looking to perform that task. *Microsoft*, 253 F.3d at 51-52 (citation omitted); *see, e.g.*, *United States v. Cont'l Can Co.*, 378 U.S. 441, 450 (1964) (holding products were in the same antitrust market even though they "have different characteristics which may disqualify one or the other, at least in their present form, from this or that particular use"); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("[T]he relevant market must include 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'").  The Court's own findings regarding how GSEs and SVPs are used renders

Plaintiffs' proposed market for general search services legally deficient. For that reason and others, Google will prevail on the merits of its appeal.

### E.    The Remedies Imposed by the Court Are Contrary to Law.

For any or all of the reasons set forth above, the Court should grant Google's request for a stay because of the likelihood that Google will prevail on its appeal of the liability determination. Additionally (or alternatively), the Court should grant Google's motion because of the likelihood that it will prevail in vacating the remedies it seeks to stay, *i.e.*, the data disclosure and compelled syndication requirements in Sections IV, V, and VI of the Final Judgment.

These regulatory interventions are contrary to law and unsupported by the evidence because Plaintiffs failed repeatedly to distinguish any purported consequence of the conduct that gave rise to liability from lawfully obtained advantages that predated the alleged conduct and would have existed in its absence. As a result, the data disclosure and compelled syndication remedies were not (and could not have been) "tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107. This fundamental shortcoming in Plaintiffs' case pervades every lens through which the Court evaluated these remedies, including its consideration of causation and the so-called "fruits" of the violation.

The Court held that "[c]ausation plays an important role in calibrating the scope of a remedial decree" and "'[t]he relief granted should not exceed evidence of a causal connection' between the defendant's anticompetitive behavior and its dominant position in the relevant market." Remedy Op. at 63 (brackets omitted) (quoting *Massachusetts*, 373 F.3d at 1234). But Plaintiffs never established a "causal connection" between the purportedly exclusive contractual provisions that gave rise to liability (*i.e.*, "the defendant's anticompetitive behavior") and Google's position in the market. Rather, Plaintiffs' own evidence showed that Google received a

substantial majority of general search queries before it allegedly violated Section 2 and that Google would have maintained those lawful advantages—including by continuing to receive significant default distribution—in the absence of any purportedly exclusive agreements. Remedy PFOF ¶¶ 14-25.  Plaintiffs never even showed that any third party refrained from setting a rival search engine as a default or exclusively preloading a rival search engine because of a purportedly exclusive agreement with Google.  *Id.* ¶¶ 26-31.  Accordingly, there was no basis to conclude that "anticompetitive behavior"—as opposed to lawful competition, natural barriers to entry, and other market dynamics—caused Google to maintain or extend its "position in the relevant market."  *See* Remedy Op. at 63.

The remedies opinion erred in excusing Plaintiffs' failure of proof on these crucial points. For example, the Court stated that "Google's data advantage is so great that it would blink reality to characterize the agreements' contribution to that disparity as only marginally impactful." Remedy Op. at 79.  But Google had a significant and lawful "data advantage" long before the monopoly maintenance alleged in this case.  *Google*, 747 F. Supp. 3d at 31 ("In 2009, 80% of all search queries in the United States already went through Google.").  And Google has long held a significant and lawful "data advantage" on devices where another search engine is exclusively preloaded and set as the default.  *Id.* at 48 ("Google's search share on Windows devices is 80%.").  Even with respect to devices where Google has won distribution opportunities, Plaintiffs never proved that any portion of Google's "advantage" was attributable to ***the exclusivity provisions*** at issue in this case as opposed to numerous other factors, including the indisputably lawful practice of paying for default or preload distribution.  *See* Remedy PFOF ¶¶ 15-18; *Google*, 747 F. Supp. 3d at 172 (distinguishing "exclusive defaults" from "a non-exclusive default" and confirming that "Plaintiffs are not challenging the concept of a search

default or that distributors may recommend a search engine, set a search default, or preinstall search access points").  It is as if Plaintiffs were given the full benefit of a theory of liability they never pursued or proved while also being relieved of the fundamental obligation to "segregate any lawful acts and unrelated market events that might have contributed to [the defendant's] market share from any anticompetitive conduct."  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000); *see Microsoft*, 253 F.3d at 105 (explaining that *Concord Boat*'s "reasoning is instructive" even though it "involved the award of money damages rather than equitable relief"); *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A]ny model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." (quotation omitted)).

The Court's consideration of the "fruits" of the "violation" further illustrates the point. For example, the Court stated that "Google's unlawful agreements allowed it to capitalize on … default bias and network effects."  Remedy Op. at 83.  But "default bias and network effects are features of the general search market; they did not arise because of Google's exclusive dealing." *Id.* at 88.  Google indisputably would have received significant default placements in the absence of the alleged exclusivity provisions deemed unlawful, and any supposed "network effects"— like every other natural barrier to entry identified by Plaintiffs in this case—existed before any alleged violation and would have persisted without the conduct at issue.  Remedy PFOF ¶¶ 15-18, 61-79.  The Court did not (and could not) "go into the record far enough to be confident that what had been identified as fruits were actually the products ***of the unlawful practices***." *Massachusetts*, 373 F.3d at 1232 (cleaned up) (emphasis added).

Under these circumstances, Section 2 violations "should be remedied by an injunction against continuation of th[e] conduct" deemed unlawful.  *Microsoft*, 253 F.3d at 106 (cleaned

up).  But the Court went much further by adopting remedies that force Google to share its

lawfully acquired intellectual property and other valuable assets with Qualified Competitors,

despite the complete absence of evidence that any competitor would have built anything

resembling Google's web index, search results, or search text ads if not for the exclusive-dealing

conduct.  These remedies do not even find support in the "goal" articulated by Plaintiffs' own

economist of "allow[ing] competition to resume where it would have been without the conduct"

deemed unlawful.  Remedy Tr. 2206:16-2207:6 (Chipty).  Instead of remedying the purportedly

"unlawful foreclosure of distribution channels for rival" general search engines, the data

disclosure and compelled syndication remedies impermissibly require "propping up" Qualified

Competitors for years to come by allowing them to use Google's search results, ads, and other

intellectual property on terms that never would have arisen through competition.  *See*

*Massachusetts*, 373 F.3d at 1231-32 (rejecting a proposed remedy that contemplated "market

engineering" for the benefit of "a specific competitor" despite evidence that it "would reduce the

applications barrier to entry" (cleaned up)).  And throughout the term of the Final Judgment, this

experiment in forced parity will require the Court to dictate the "terms of dealing" between

Google and its competitors by acting as the "central planner" for search syndication services,

even though courts "should never aspire to the role" when imposing an antitrust remedy.  *Alston*,

594 U.S. at 102-03.

While these remedies should not have been imposed at all, the decision to expand the

definition of "Qualified Competitor" to extend the remedies to certain "GenAI Products"

highlights the disconnect between the applicable legal standards and the relief imposed.  There is

zero evidence that the exclusive-dealing conduct identified in the liability opinion had any effect

on the competitiveness of any chatbot or other GenAI Product.  To offer one example, ChatGPT

is the fastest growing consumer product in history, with an estimated 85% "share of the U.S. market as of December 2024" and distribution on iPhones and other popular devices.  Remedy Op. at 41-42.  The Court found that "[t]he evidence did not show … that Google's GenAI product responses are superior to other GenAI offerings due to Google's access to more user-interaction data," and "[i]f anything, the evidence established otherwise."  *Id.* at 156.  Furthermore, as the Court observed, "[t]he money flowing into this space, and how quickly it has arrived, is astonishing."  *Id.* at 128.

Against this backdrop, it is not in line with the goals of antitrust law that a company such as OpenAI would receive Google's web index or the right to syndicate Google's search results and ads for five years **even if** it is not competing in either of the relevant markets identified in the liability opinion.  *See* Remedy Op. at 103-04 (expanding Plaintiffs' proposed final judgment "[t]o leave no doubt that the remedies extend" to "OpenAI and similar firms, like Anthropic and Perplexity" because they "arguably would not" have qualified under Plaintiffs' own proposal).  Extending the data disclosure and compelled syndication remedies beyond general search engines involves unprecedented judicial regulation of a highly dynamic segment of the economy "without liability findings to mark the way."  *Massachusetts*, 373 F.3d at 1224.  And it even requires rejecting a core premise of Plaintiffs' liability case, which rested on convincing the Court to exclude GenAI Products from the relevant markets—along with every other service that competes with Google Search through a differentiated offering.  *Compare Google*, 747 F. Supp. 3d at 113-14 (excluding SVPs from the relevant market even though "Google does perceive and respond to competitive pressure from" them because "no SVP can fulfill a user's varied needs in the same manner as a GSE") *with* Remedy Op. at 99-100 (extending "the data-sharing and

syndication remedies" to certain GenAI Products even though "their functionality only partially overlaps" with GSEs and they approach "similar" tasks "in different ways").

The data disclosure and compelled syndication remedies would be extraordinary under any circumstance, and they are legally impermissible in this case. For this reason and others, Google has established a sufficient likelihood that it will prevail on the merits of its appeal to warrant a stay of these remedies.

## II.    GOOGLE WILL BE IRREPARABLY HARMED ABSENT A STAY.

The second stay factor is "the likelihood that [Google] will be irreparably harmed absent a stay." *Marin Audubon Soc'y*, 129 F.4th at 871. If the Final Judgment were not stayed, Google would be required to divulge its trade secrets and proprietary data, license its valuable assets to competitors, jeopardize its goodwill and competitive standing, and incur unrecoverable expenses for the benefit of competitors. Each of those injuries is irreparable, and any one of them would be sufficient to justify a stay pending appeal. A stay is imperative in a case like this one that features all of those irreparable harms and more.

### A.    Google Will Be Irreparably Harmed by the Compelled Disclosure of Its Trade Secrets and Other Proprietary Information.

Absent a stay, the Final Judgment would cause a paradigmatic form of irreparable harm by compelling Google to provide its trade secrets and other confidential proprietary information to Qualified Competitors. "[T]he disclosure of confidential information is, by its very nature, irreparable because such information, once disclosed, loses its confidential nature." *Robert Half Int'l*, 315 F. Supp. 3d at 433 (cleaned up). Indeed, "[t]he fact that a single trade secret may be disclosed is enough" to support a finding of irreparable harm because "once a trade secret is disclosed, its secrecy is lost forever." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024); *see Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, Circuit

Justice) (finding irreparable harm where the EPA "would be free to use Monsanto's trade secrets for the benefit of its competitors" because they "could not be made secret again" after disclosure).  Under these circumstances, appellate "review can be effective only if it occurs *before* confidential information is disclosed to third parties."  *CBS Corp.*, 785 F.3d at 708 (emphasis added).

      The Court should stay Section IV.A of the Final Judgment because it requires Google to disclose certain trade-secret "data related to Google's Web Search index."  As the Court acknowledged, the compelled disclosure of this data unquestionably "will reveal some proprietary information" to competitors.  Remedy Op. at 145.  For example, disclosure of the "DocID to URL map" referenced in Section IV.A would reveal extensive trade-secret information because there are trillions of pages on the open web, and Google has "done a lot of work to understand which of those trillions of webpages are the most valuable" and therefore should be included in its index.  Remedy Tr. 3446:15-22 (Reid); *see* Reid Decl. ¶¶ 8-17 (summarizing trade secrets encompassed by Section IV.A, including Google's proprietary spam scores).  Courts have found irreparable harm when the evidence merely "suggest[s]" that the movant's "confidential and proprietary information" has been or will be "disclosed to its competitors in the market" because such disclosures undermine a source of "competitive advantage."  *Hospital Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010); *see, e.g.*, *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77-78 (D.D.C. 2001).  The irreparable harm in this case is even more clear cut, as the Court imposed this remedy precisely because it concluded that "Google's index gives it a key competitive advantage" that the Court decided should be shared with Qualified Competitors.  Remedy Op. at 139.  It is beyond dispute that the harm to Google from relinquishing this source of its competitive advantage would be

irreversible.  As soon as the disclosure occured, Qualified Competitors could incorporate

Google's data into their own indexing efforts before the D.C. Circuit decides Google's appeal.

"[C]onfidentiality will be lost for all time," and "[t]he status quo could never be restored" if

Google prevails.  *Ctr. for Int'l Env't Law*, 240 F. Supp. 2d at 23.

   For much the same reason, Google would be irreparably harmed by the disclosures

required by Section IV.B of the Final Judgment, which encompass "User-side Data used to build,

create, or operate the GLUE statistical model(s)" and "RankEmbed model(s)."   The moment

Qualified Competitors receive these data sets "the cat is out of the bag" because Google would

not be able to claw back copies of the data or compel competitors to disentangle it from their

own systems.  *CBS Corp.*, 785 F.3d at 708; *see, e.g.*, *Jubilant DraxImage, Inc. v. U.S. Int'l Trade

Comm'n*, 396 F. Supp. 3d 113, 125 (D.D.C. 2019) (concluding the injury caused by disclosure of

confidential business information "would be irreparable" because "once … putatively protected

material is disclosed, the very right sought to be protected has been destroyed").  As with the

data related to Google's index, the Court found that the confidential user-side data in question is

a source of Google's "advantage" and that "[h]elping competitors improve their search engines is

precisely what this remedy is designed to accomplish."  Remedy Op. at 157, 160.  Nothing more

needs to be said to conclude that Google would be irreparably harmed by disclosure.  *See, e.g.*,

*Robert Half Int'l*, 315 F. Supp. 3d at 433-34 (finding "irreparable harm by virtue of [the] use and

disclosure of … confidential business information" because once that "information is disclosed

to competitors in the market," the movant "to some extent will lose a competitive advantage over

competitors" (cleaned up)).[3]

---

[3] Although the Final Judgment provides that "Section IV.B shall not require disclosure of
intellectual property or trade secrets, such as algorithms, ranking signals, or post-trained LLMs,"
Final Judgment § IV.B.2, the data sets themselves are Google confidential information and its
trade secrets are embedded in them.  Reid Decl. ¶¶ 20-25.  For example, the compelled

The "Search Syndication" and "Search Text Ads Syndication" requirements in Sections V and VI of the Final Judgment likewise would irreparably harm Google if they are not stayed. Although the Final Judgment provides that Google may impose certain restrictions on the use of the syndication services to protect its underlying trade secrets, these provisions unquestionably compel Google to license vast amounts of intellectual property, including its industry-leading "ranked organic web search results" and significant portions of its "Search Feature content." Final Judgment § V.A; *see, e.g.*, Remedy Tr. 3507:1-18 (Reid) (explaining why information that appears in a search feature "is intellectual property"); Reid Decl. ¶¶ 40-46.  Courts have found that compelled licensing to competitors causes irreparable harm even when the refusal to license was itself the basis for liability, which certainly is not the case here.  *See, e.g., Qualcomm*, 935 F.3d at 755-56 (staying injunction "requiring that Qualcomm make exhaustive SEP [standard essential patent] licenses available to its competitors" after the trial court concluded Qualcomm violated the antitrust laws by "refus[ing] to license SEPs to rival chip suppliers").

Furthermore, in a commercial setting Google prevents the unauthorized use of its trade secrets not only with the use restrictions permitted by the Final Judgment, but also through measures such as imposing query-volume limits and licensing additional content only to trusted partners.  *See* Remedy Tr. 2996:1-25 (Adkins) (explaining how a "10,000 query-per-day" cap helps "limit the amount of exposure of our trade secrets"); *id.* 2998:15-24 (describing Google's

---

disclosure of GLUE data will reveal "a huge amount of IP" because "it's not just what the user queried and what the user clicked but everything the user saw" on the search results page. Remedy Tr. 3517:21-3518:21 (Reid); *see id.* 3529:18-3532:8 (describing the "big difference between" disclosing "the user's query and click versus … all the things the user rejected" and explaining how disclosure of the latter will enable competitors "to essentially reverse engineer" and "reproduce" the "whole search-results page"); Reid Decl. ¶¶ 20-25.  For present purposes, however, the consequences of disclosure are irreparable regardless of whether the data sets reveal trade secrets or are characterized as some other form of confidential record.  *See, e.g.*, *Ctr. for Int'l Env't Law*, 240 F. Supp. 2d at 23 (staying judgment pending appeal where release of documents relating to trade negotiations would cause irreparable injury).

"know your customer" approach to negotiated syndication arrangements).  The Final Judgment eliminates these established practices for protecting trade secrets by, among other things, preventing Google from deciding who it will license to and displacing Google's standard query-volume caps with percentages established "by the Court upon consultation with Plaintiffs and the Technical Committee."  *E.g.*, Final Judgment § V.B.3-4; *see* Adkins Decl. ¶¶ 6-12; Reid Decl. ¶¶ 42-46.  Without a stay, Google's intellectual property would be disclosed directly to Qualified Competitors and secondarily to an untold number of third parties who would attempt to "scrape" Google's results from Qualified Competitors' sites in order to gain unauthorized access to Google's intellectual property and proprietary ranking techniques.  *See* Reid Decl. ¶¶ 43-44.  The potential disclosure of "a single trade secret" to a competitor supports a finding of irreparable harm, *Cigna*, 103 F.4th at 1346, and the harm to Google from the extensive transfer of intellectual property required by Sections V and VI easily qualifies as irreparable.[4]

**B.**     **Google Would Be Irreparably Harmed Through the Deprivation of Its Right to Appeal.**

Absent a stay, Google would experience a "*de facto* deprivation of [its] basic right to appeal," which is another form of irreparable harm that "further strengthens [Google's] argument for a stay."  *Ctr. for Int'l Env't Law*, 240 F. Supp. 2d at 23.  For example, the Final Judgment provides that Qualified Competitors may receive the specified "data related to Google's Web Search Index" on a one-time basis "[w]ithin thirty (30) days of a Qualified Competitor's certification."  Final Judgment § IV.A.  If the disclosure occurs before Google's appeal is

---

[4] As support for its "forced sharing" regime, the Court cited *In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025).  *See* Remedy Op. at 180 n.26.  While Google disagrees with the analogy, that is yet another case where virtually all provisions of the final judgment "were stayed pending appeal."  *Google Play Store*, 147 F.4th at 945 n.11.  The only portion of the judgment not stayed was a single provision "prohibiting Google from paying smartphone manufacturers not to preinstall Play Store competitors on their devices" that had already been implemented pursuant to a separate settlement agreement with other parties.  *See id.*

decided, then Google would lose its opportunity to obtain effective appellate review because at least some Qualified Competitors will have already received their "one-time disclosure" of Google's proprietary data to "enable [them] to build their own search indexes" based on Google's investments and innovation.  Remedy Op. at 146.  Allowing the disclosure to occur would be tantamount to deciding on behalf of the D.C. Circuit that the liability determination should be upheld and the remedy imposed.  This deprivation of appellate review is another paradigmatic form of irreparable harm.  *See, e.g.*, *John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309 (1989) (Marshall, Circuit Justice) ("The fact that disclosure would moot that part of the [lower court's] decision requiring disclosure of [a confidential record] would also create an irreparable injury.").

### C.    Google Will Experience Irreparable Harm to Its Competitive Standing, Goodwill, and Reputation.

The syndication and data-disclosure provisions of the Final Judgment would also irreparably injure Google through the "diminishment of competitive positions in [the] marketplace" and "lost opportunities to distribute unique products," which are among the "factors supporting irreparable harm determinations."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004).  For example, Google must make its "ranked organic web search results" and "Search Text Ads" available to all Qualified Competitors to use in competition with Google.  Final Judgment §§ V.A, VI.B.  It is undisputed that the unparalleled quality of those results and ads is an important element of competition in the relevant markets identified by the Court.  *See* Remedy Op. at 77 (reaffirming that Google has "innovated consistently," and "[t]he result is the industry's highest quality search engine, which has earned Google the trust of hundreds of millions of daily users").  Absent a stay, the Final

Judgment would irreparably harm Google by making its distinctive content available to competitors that Google would not license to in the absence of a Court order.

The harm to Google's competitive standing would be irreparable even though the Final Judgment does not require Google to syndicate *all* of the content it displays to Google Search users.  To borrow an analogy: car buyers could point to numerous differences between "a Mercedes Benz S550" and "a Ford Taurus," but if "the Ford made its place in the market" by using "the intellectual property of the Mercedes and capitalized on its similarity," then "Mercedes would lose some of its distinctiveness and market lure because competitors could contend that they had 'similar features.'"  *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013).  This is a classic form of "irreparable injury" due to "erosion in reputation and brand distinction," *id.*, and it is what would happen here as soon as Google is compelled to begin providing syndication services unless the Final Judgment is stayed.  *See* Reid Decl. ¶¶ 38-41, 46.  Moreover, the compelled syndication remedies would affect Google's goodwill and competitive standing in relation to advertisers as well as users, including because of the diminished ability to identify tactics used by licensees and third parties to defraud advertisers if Google is required to license to any Qualified Competitor.  *See* Adkins Decl. ¶¶ 13-23.

The data-disclosure requirements in Section IV likewise would cause "reputational harm," which is a well-recognized form of "irreparable injury."  *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018); *see, e.g.*, *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("[I]njury to goodwill and reputation … is often held to be irreparable.").  The Court recognized that Google raised "a valid concern" regarding the "release of any User-side Data because of the associated risks to user privacy."  Remedy Op.

at 163.  And Google remains committed to doing everything it can to protect user privacy consistent with the Final Judgment, even though it will not have "an equal seat at the table" when the Technical Committee "consult[s] with Plaintiffs about appropriate User-side Data security and privacy safeguards."  *Id.* at 211-12; *see* Final Judgment § IV.C.  But even if every appropriate safeguard is implemented, Google would be irreparably harmed by not being able to make the same commitments to users about "not sharing their data with others" and the "deletion of data."  Remedy Tr. 3526:14-3527:7 (Reid).  Today users "trust that if they come to Google, no one learns about it."  *Id.* 3525:2-3526:13.  If the Final Judgment were not stayed, however, users would be "worried that that data might go somewhere else," and they might "decide they're not going to search for certain categories on Google" or "decide not to use Google altogether."  *Id.*; *see* Reid Decl. ¶¶ 31-33; *Morgan Stanley DW*, 150 F. Supp. 2d at 78 (finding irreparable harm because "[i]f clients begin to feel that their personal information is not safe … this development might well lead to a loss of trust and goodwill").  Moreover, if the index data or user-side data were disclosed to Qualified Competitors, then the data sets would be a target for malicious actors seeking to access Google's trade secrets and users' personal data from companies with less robust security systems or fewer incentives to protect this valuable information.  *See* Reid Decl. ¶¶ 14-17, 31-35.  Such irreparable harm should not be inflicted while Google's appeal is pending.

> **D.    Google Would Be Irreparably Harmed Because It Would Undergo Fundamental Business Changes and Incur Substantial Unrecoverable Expenses for the Benefit of Competitors.**

If Google's stay motion were not granted, Google will experience significant and irreparable harm from providing syndicated search results and ads to Qualified Competitors on terms that never would have resulted from a commercial negotiation.  By requiring Google "to enter new contractual relationships and renegotiate existing ones on a large scale," the Final

33

Judgment imposes "fundamental business changes" that should not be implemented while its

appeal is pending.  *Qualcomm*, 935 F.3d at 756.

With respect to existing syndication relationships, Sections V.C and VI.C of the Final

Judgment provide that any company currently syndicating search results or search text ads from

Google that "becomes a Qualified Competitor" may "terminate its existing agreement" with

Google "in favor of the remedies" imposed by the Final Judgment.  Absent a stay, Google would

lose the benefit of the bespoke terms it has negotiated with specific syndication partners—a clear

example of an irreparable harm.  *See Visa*, 2002 WL 638537, at *1 (staying a final judgment

after the government established Section 2 liability because of the "potentially irreversible

consequences" of allowing non-parties "to rescind" agreements with the defendants).

The irreparable harm from terminating Google's negotiated syndication agreements is

especially unwarranted because Plaintiffs never even argued, let alone established, that any of

those terms are anticompetitive.  Yet the Final Judgment requires Google to overhaul significant

aspects of its syndication business by providing a combination of product features and

commercial terms that it has never offered to any particular licensee, let alone all of them.

Courts have found irreparable harm from antitrust remedies that are far narrower and less

disruptive than the compelled syndication provisions at issue here.  For example, a circuit court

found that Apple "made a sufficient showing of irreparable harm" from an injunction that

allowed app developers to include external links or other calls to action directing customers to

purchasing mechanisms outside Apple's App Store.  *Epic Games, Inc. v. Apple, Inc.*, 2021 WL

6755197, at *1 (9th Cir. Dec. 8, 2021) (staying injunction entered at 559 F. Supp. 3d at 1058).

And a trial court stayed an injunction prohibiting the defendant from "linking discounts and other

benefits to market penetration targets." *ZF Meritor*, ECF 283 at 2.  The harms at stake here are both more extensive and more clearly irreparable.

Finally, Google would experience additional irreparable harm if it were compelled to enter syndication agreements with any of the large or rapidly growing companies that the Court has indicated should fall within the definition of a Qualified Competitor.  Dramatically expanding Google's syndication business presents significant challenges.  In a commercial setting, Google would have tools for addressing these issues, including declining to enter agreements with new licensees it cannot reasonably support and adjusting the price of the service to account for increased demand.  But the Final Judgment replaces commercial negotiation with judicially imposed terms, and absent a stay Google would be compelled to provide valuable services to its competitors on uneconomical terms.  *See* Adkins Decl. ¶¶ 24-27.  If Google prevails on appeal, all of these "expenditures would be unrecoverable, leaving [Google] with no remedy to restore [itself] to the status quo ante." *Cigar Ass'n*, 317 F. Supp. 3d at 563 (cleaned up); *see, e.g., NTE Conn.*, 26 F.4th at 990 (granting stay request because "financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation" (cleaned up)).[5]

## III.    A STAY IS IN THE PUBLIC INTEREST AND WILL NOT HARM PLAINTIFFS.

The "stay inquiry calls for assessing the harm to the opposing party and weighing the public interest"—two factors that "merge when the Government is the opposing party." *Nken*,

---

[5] As indicated above, Google does not seek a stay to avoid the costs of preparing to provide the syndication services (or the data described in Section IV of the Judgment), even though those expenses will also be unrecoverable if Google prevails on appeal and comparable obligations have been stayed in other cases.  Google asks only that the Court stay its obligation to incur the substantial additional expense associated with providing its valuable search results, ads, and data directly to competitors.

556 U.S. at 435.  As with both factors discussed above, these final two factors favor staying the

Final Judgment while Google's appeal is pending.

> **A.**    **The Public Will Benefit from a Stay.**

To begin, the final factors support a stay because the Final Judgment unquestionably

requires disclosure of trade secrets and other significant proprietary information to Qualified

Competitors.  *See* Reid Decl. ¶¶ 8-13, 18-25, 41-46; Adkins Decl. ¶¶ 6-12.  Even if a few

companies purportedly will benefit from access to Google's proprietary data and search results,

"***the public interest*** is served by protecting confidential business information and trade secrets."

*Merrill Lynch,* 298 F. Supp. 2d at 34-35 (emphasis added); *see, e.g.*, *Bimbo Bakeries USA, Inc. v.*

*Botticella*, 613 F.3d 102, 119 (3d Cir. 2010) (explaining that "there is a generalized public

interest in upholding the inviolability of trade secrets" (cleaned up)).

Moreover, "[t]he public interest is best served when established contract and property

rights are enforced."  *Akiachak Native Cmty.*, 995 F. Supp. 2d at 18.  Without a stay, Google

would be forced to license some of its most valuable assets, including its industry-leading web

index, syndicated search results, and syndicated text ads.  Although the Court concluded that

these drastic remedies should be imposed, "the public interest rests with the D.C. Circuit

deciding whether this [C]ourt got it right" before Google is compelled to turn over its assets to

non-parties.  *Confederated Tribes of Chehalis Reservation v. Mnuchin*, 2020 WL 3791874, at *2

(D.D.C. July 7, 2020).

The public interest further favors a stay because hundreds of millions of Americans

potentially "have a privacy interest that would be affected by disclosure" of their confidential

information to Qualified Competitors.  *Dunlap v. Presidential Advisory Comm'n on Election*

*Integrity*, 390 F. Supp. 3d 128, 134 (D.D.C. 2019).  Indeed, the Court acknowledged that the risk

to user privacy from the forced disclosure of user-side data "is a valid concern."  Remedy Op. at

163 (providing the example "of a search query from a user in a small town regarding a rare health condition"). Absent a stay, Google Search users around the country would have no say over whether Qualified Competitors can obtain access to their search queries and other sensitive data. Reid Decl. ¶¶ 26-35. And Google's advertiser customers would face significant harm as well due to Google's diminished ability to detect fraudulent schemes perpetrated on syndication and sub-syndication sites if Google is compelled to license ads to any Qualified Competitor. Adkins Decl. ¶¶ 13-23.

A stay is also in the public interest because it ensures that consumers will receive the benefits of innovation, including through the continuous improvements that make Google "the industry's highest quality search engine," Remedy Op. at 77, and the development of GenAI products that have enjoyed incredible user growth and quality improvements without any Court-imposed remedies. *See, e.g.*, *id.* at 40-43. The evidentiary record in this case and precedent establish that compelling "firms to share the source of their advantage … may lessen the incentive for the [defendant], the rival, or both to invest in those economically beneficial facilities." *Trinko*, 540 U.S. at 407-08. The specific remedies that Google seeks to stay would require forced sharing on a vast scale. If these remedies were not stayed, there is a significant risk that they would skew the incentives of Google and non-parties to invest in building web indices, improving the ranking of search results, and developing unforeseen future technologies. And there is a significant risk that these remedies would degrade the quality of Google's products for users and advertisers, including by exposing the proprietary spam scores that Google uses to deliver high quality results and inhibiting Google's ability to protect advertisers from fraudulent schemes. *See* Reid Decl. ¶¶ 14-17; Adkins Decl. ¶¶ 16-23. Whatever private benefit a Qualified Competitor purportedly may receive from unprecedented access to Google's

assets would come at the expense of the public's interest in obtaining the benefits of investment and innovation by both Google and Qualified Competitors.

## B. The Targeted Stay Requested by Google Eliminates any Purported Concerns About Competitors.

Finally, any argument that full implementation of the remedies would purportedly benefit the public by promoting competition fails on multiple levels.

First, it ignores that numerous trial and appellate courts have stayed remedial decrees in antitrust cases, including where the Government has established violations of Section 2 at trial. *See Qualcomm*, 935 F.3d at 755, 757; *Visa*, 2002 WL 638537, at *1; *Microsoft* Stay Order at 2. In each case the district court found that the remedies were an appropriate means to restore competition, but those findings plainly did not preclude a determination that a stay was in the public interest. Indeed, a stay is necessary precisely because of the wide-ranging and unpredictable consequences of regulating complex industries and technologies through a judicial decree.

Second, the stay Google seeks here is far more limited than the stays entered in many other cases and is structured to preempt any purported concerns about delay. Among other things, Google has not sought to stay any of the preparatory work associated with the remedies at issue, such as appointing the Technical Committee, submitting proposed licenses for the provision of user-side data and syndication services, or determining "privacy and security safeguards" for user-side data. Although Google believes that these remedies are unwarranted and should never have been imposed, it is prepared to do everything short of turning over its data or providing syndicated results and ads while its appeal is pending.

Third, Plaintiffs and third parties will not be harmed by a stay because Google seeks only to pause implementation of novel legal entitlements that no Qualified Competitor would have

obtained under any other circumstance.  Plaintiffs never even argued, let alone established, that

any Qualified Competitor would have been able to access or replicate Google's proprietary

search index or use its syndicated search results or ads on the terms specified in the Final

Judgment if not for the conduct at issue in this case.  Although Plaintiffs have argued that

Qualified Competitors purportedly will benefit from the newly created data disclosure and

syndication requirements, that is patently insufficient to justify denying a stay because some

party or non-party always stands to benefit from immediate implementation of a judgment.  The

interest of competitors is not equivalent to the public interest.

   Fourth, any purported benefits of implementing these remedies while Google's appeal is

pending are speculative at best and are offset by the countervailing harms.  For example,

Plaintiffs did not establish that companies are currently unable to obtain syndicated search results

and ads on commercially negotiated terms.  Thus, any benefit to Qualified Competitors from

compelling Google to provide syndication services while its appeal is pending would be highly

speculative relative to the status quo.  And even if compelled syndication somehow could

provide an immediate boon to Qualified Competitors before Google's appeal is resolved, that

would simultaneously harm other third parties and stifle innovation.  Among other things, if

Qualified Competitors flocked to the compelled syndication services while the appeal is pending,

then they would be flocking away from the services currently offered by non-parties such as

Microsoft and Brave, which would imperil their ability or willingness to invest in search.  *See*

Remedy Op. at 175 (observing that "with little prospect of profiting from syndication,

independent GSEs like Brave will cease or decrease investment in maintaining (let alone

improving) their search indices" (cleaned up)).

Any purported benefits of implementing the data-disclosure remedies before Google's appeal is resolved are equally speculative.  If Plaintiffs believed that the data disclosures should happen at the earliest opportunity, then they could have presented a plan at the remedies evidentiary hearing for disclosing user-side data without compromising user privacy and security.  It is telling that they did not do so, despite having the benefit of extensive fact and expert discovery.  Conversely, the harms of premature disclosure would be widespread and irreparable.  To borrow an idiom, there is no way to put the toothpaste back in the tube once Google's proprietary data or users' private search queries are delivered to Qualified Competitors. This is a paradigmatic case where a stay will benefit the public interest.

## CONCLUSION

Google respectfully requests that the Court grant its motion to stay the above-described portions of the Final Judgment.

Dated: January 16, 2026                      Respectfully submitted,

                                             WILLIAMS & CONNOLLY LLP

                                             By: */s/ John E. Schmidtlein*
                                             John E. Schmidtlein (D.C. Bar No. 441261)
                                             Benjamin M. Greenblum (D.C. Bar No. 979786)
                                             Colette T. Connor (D.C. Bar No. 991533)
                                             680 Maine Avenue, SW
                                             Washington, DC 20024
                                             Tel: 202-434-5000
                                             jschmidtlein@wc.com
                                             bgreenblum@wc.com
                                             cconnor@wc.com

                                             WILSON SONSINI GOODRICH & ROSATI P.C.
                                             Michael Sommer (admitted *pro hac vice*)
                                             Franklin M. Rubinstein (D.C. Bar No. 476674)
                                             1700 K Street, NW
                                             Washington, DC 20006
                                             Tel: 202-973-8800
                                             msommer@wsgr.com

frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*