## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

### <u>DECLARATION OF ELIZABETH REID</u>

I, Elizabeth Reid, declare as follows:

1.      I have been employed by Google LLC or its predecessors ("Google") in various roles since 2003.  I am currently employed by Google as a Vice President and Head of Search.  I submit this declaration in support of Google's Motion to Stay.  The facts set forth herein are within my personal knowledge and if called as a witness, I could and would competently testify to them.

2.      As the Head of Search, I am responsible for the entire Search product area.  Over

the past twenty-two years, I have also been involved in Google's Local and Geo product areas,

including serving as the Vice President of Engineering for Geo.

3.      I testified in the remedies hearing on May 6, 2025.

4.      I have reviewed the Court's Final Judgment ("FJ") issued on December 5, 2025,

and, in particular, Section IV titled "Required Disclosures of Data" and Section V titled

"Required Syndication of Search Results."  I have also reviewed the Court's September 2, 2025

opinion ("Sept. Rem. Op.") and the Court's December 5, 2025 opinion ("Dec. Rem. Op.").

**Compelled Disclosure of Google's Search Index Will Irreparably Harm Google**

5.      I understand that Google is required under the Final Judgment to make available

to Qualified Competitors,[1] for all websites in Google's Web Search Index:[2]

    a.  a unique identifier ("DocID") of each document (i.e., URL) in Google's Web

           Search Index and information sufficient to identify duplicates;

    b.  "a DocID to URL map"; and

    c.  "for each Doc ID, the (A) time that the URL was first seen, (B) time that the URL

           was last crawled, (C) spam score, and (D) device-type flag."  FJ §§ IV.A.1-3.

---

[1] "Qualified Competitor" is defined as "a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee; who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in or with the GSE and/or Search Text Ads markets; and who does not pose a risk to the national security of the United States."  FJ § IX.V.  "Competitor" is defined as "any provider of, or potential entrant in the provision of (i) a General Search Engine (GSE) in the United States, (ii) Search Text Ads in the United States, or (iii) a GenAI Product in the United States" (as those terms are defined in the Final Judgment).  FJ § IX.E.

[2] "Web Search Index" is defined as "databases that store and organize information about websites and their content that is crawled from the web. For the avoidance of doubt, it does not include Google's vertical indexes or its video, images, or other specialized indexes that contain information not crawled from the web."  FJ § IX.FF.

6.      I understand Google must make this disclosure on a one-time basis to each Qualified Competitor, "at marginal cost."  FJ § IV.A.

7.      Unless the Final Judgment is stayed, Google will suffer immediate and irreparable harm as a result of the transfer of this proprietary information to Google's competitors, and may additionally suffer irreparable financial and reputational harm should the data provided to competitors be leaked or hacked.

<u>Disclosure of Google's Intellectual Property and Proprietary Data</u>

8.      The selection of webpages in Google's search index is the result of more than twenty-five years of sustained investments and exhaustive engineering efforts.  As I explained at the remedies hearing, the indexing process occurs in three primary stages: crawling the web, analyzing webpages, and building a tiered index.  First, Google's crawling technology processes webpages on the open web, relying on proprietary page quality and freshness signals to focus on webpages most likely to serve users' information needs.  Second, Google marks up crawled webpages with proprietary page understanding annotations, including signals to identify spam and duplicate pages.  Finally, Google builds the index using the marked-up webpages generated in the annotation phase.  Google's index employs a proprietary tiering structure that organizes webpages based on how frequently Google expects the content will need to be accessed and how fresh the content needs to be (the fresher the content needs to be, the more frequently Google must crawl the webpage).  Each indexed webpage is assigned a unique identifier known as a "DocID."

9.      If the Final Judgment is not stayed, Qualified Competitors will receive the output of Google's best-in-class technologies, as well as valuable insight into the technologies themselves.  For example, the compelled disclosure of each URL in Google's web index will

furnish Qualified Competitors with the output of Google's efforts to efficiently crawl the open

web's trillions of pages, analyze billions of crawled pages, and, finally, identify the subset of

useful pages for users.  The image below from the demonstrative (RDXD-28.005) shows the

fraction of pages (in green) that make it into Google's web index, compared with the pages that

Google crawls (in red).  Under the Final Judgment, Google must disclose to Qualified

Competitors the curated subset reflected in green.



        10.      Receiving the list of URLs in Google's index will enable Qualified Competitors to

forgo crawling and analyzing the larger web, and to instead focus their efforts on crawling only

the fraction of pages Google has included in its index.  This identification of the webpages that

Google has selected for inclusion in its web crawl index is a core search asset that Qualified

Competitors would receive at marginal cost.  This information additionally will allow Qualified

Competitors to deduce proprietary trade secrets about how Google selects webpages for

inclusion in its search index.

11.     The disclosure of Google's time-first-seen and time-last-crawled metadata (FJ §

IV.A.3) for each indexed webpage will additionally provide Qualified Competitors insight into

Google's freshness and tiering signals.  As I explain above, Google determines how frequently to

crawl a particular webpage based on its proprietary assessment of how "fresh" the information

needs to be to serve users and how frequently it expects to return the webpage in its results.

With the data Google is required to provide, Qualified Competitors can infer how frequently

Google crawls each webpage in its index from the "time that the URL was last crawled"

metadata.  Information regarding Google's crawl schedule will provide rivals with insight into

Google's proprietary freshness signals and index tiering structure.  For example, webpages that

have been crawled most recently are likely to be those for which freshness is most important;

conversely those crawled least frequently are likely to be those for which freshness is least

important or which Google stores in its less-used tiers.

12.     The disclosure of Google's spam signal values for each stored webpage (FJ §

IV.A.3) will provide Qualified Competitors with Google's proprietary information.  As I testified

at the remedies hearing, Google's process for developing and improving these and other

proprietary ranking signals is expensive and iterative, involving the continuous work of hundreds

of engineers, as well as millions of dollars spent on human raters who evaluate signal

performance each year.  Qualified Competitors could incorporate Google's spam scores into their

own systems and additionally reverse engineer further proprietary insights.

13.     In sum, the compelled disclosures of Google's proprietary search index data will

bestow core search assets upon Qualified Competitors, eroding Google's competitive advantage

and undermining its ability to differentiate itself from its competitors with its superior indexing,

spam-fighting, freshness, and tiering technologies.

<u>Harm to Google's Users and Google's Reputation</u>

14.    If spammers or other bad actors were to gain access to Google's spam scores from Qualified Competitors via data leaks or breaches—a realistic outcome given the tremendous value of the data—Google's search quality would be degraded and its users exposed to increased spam, thereby weakening Google's reputation as a trustworthy search engine.

15.    The disclosure of the spam signal values for Google's indexed webpages via a data leak or breach would degrade Google's search quality and diminish Google's ability to detect spam.  As I testified at the remedies hearing, the open web is filled with spam.  Google has developed extensive spam-fighting technologies to attempt to keep spam out of the index. Fighting spam depends on obscurity, as external knowledge of spam-fighting mechanisms or signals eliminates the value of those mechanisms and signals.

16.    If spammers or other bad actors gained access to Google's spam scores, they could bypass Google's spam detection technologies and hamstring Google in its efforts to combat spam.  For example, spammers commonly buy or hack legitimate websites and replace the content with spam, an attack made easier if spammers can use Google's spam scores to target webpages Google has assessed as low spam risk.  In this way, the compelled disclosures are likely to cause more spam and misleading content to surface in response to user queries, compromising user safety and undermining Google's reputation as a trustworthy search engine.

17.    In summary, Google will be unable to recover the immense value of the proprietary data and intellectual property disclosed to rivals under the search index provisions if the Final Judgment is overturned or modified on appeal.  Google's users and Google's reputation will also irreparably suffer in the event the index data is leaked by Qualified Competitors or their systems are breached.

**Compelled Disclosure of Google User Data Will Irreparably Harm Google and Its Users**

18.    I understand that Google is also required to make periodic disclosures to Qualified Competitors of (i) "User-side Data used to build, create, or operate the GLUE statistical model(s)" and (ii) "User-side Data used to train, build, or operate the RankEmbed model(s)," "at marginal cost."  FJ § IV.B.

19.    The "User-side Data" encompassed by Section IV.B of the Final Judgment includes highly sensitive user data, including but not limited to the user's query, location, time of search, and how the user interacted with what was displayed to them, for example hovers and clicks.

20.    In addition to data about the user's query and their interaction with Google's search results, the "User-side Data" encompassed by Section IV.B also includes detailed information about the results themselves.  For instance, the data used to build Google's "Glue" model also includes all web results returned and their order, as well as all search features[3] returned and their order.  The Glue model captures this data for the preceding thirteen months of search logs.

21.    Unless the Final Judgment is stayed, these user data disclosures will cause Google to suffer irreparable intellectual property loss, compromised user privacy, and substantial reputational and financial harms, harm that cannot be undone if the Final Judgment is overturned or modified on appeal.

---

[3] Google's search features are the units displayed on the SERP that provide information to users beyond the "ten blue links," for example images, weather information, sports scores, or stock quotes.

<u>Disclosure of Google's Intellectual Property</u>

22.    The disclosure of user data required by the Final Judgment will directly reveal Google's intellectual property and enable significant reverse engineering.

23.    As I testified at the remedies hearing, the disclosure of Glue training data amounts to the disclosure of Google's intellectual property, because it reveals the output of Google's Search technologies in response to every query issued by a user located in the United States over a 13-month period.  More specifically, disclosure of each element Google surfaced to the user in response to a particular query will provide Qualified Competitors with tremendous insight into Google's ranking technologies.  The disclosure of RankEmbed data likewise directly hands over Google's intellectual property to Qualified Competitors.

24.    Qualified Competitors could also readily use the disclosed Glue and RankEmbed data as training data for a large language model, allowing them to reproduce or otherwise learn from significant Google intellectual property.

25.    Ultimately, the disclosure of Google's proprietary Glue and RankEmbed datasets will enable Qualified Competitors to improve their own search capabilities on the back of Google's exhaustive and expensive engineering efforts.  This will harm Google's competitive standing and limit its ability to differentiate itself with best-in-class ranking technologies.

<u>Additional Harms to Google and Its Users</u>

26.    Users provide Google with sensitive information in their queries, and trust Google to protect this information.  The rise of large language model technologies has led to users providing even more sensitive information, as users familiar with generative AI tools are entering longer and more detailed queries into Google Search.

27.     Accordingly, Google enforces a suite of policies designed to strictly limit access to user data.

28.     Google has never voluntarily shared with third parties user data as defined under the Final Judgment.  FJ § IX.EE.

29.     Google will not have final decision-making authority over the anonymization and privacy-enhancing techniques to be applied to the user data before it is shared with Qualified Competitors.  FJ § IV.C.1.  With respect to the selection of security and privacy measures to be applied, the Final Judgment affords Google only the right to object; the measures ultimately chosen are outside of Google's control.  FJ §§ IV.C.1., VII.A.7.k.

30.     The extent of harm to user privacy and erosion of user trust will depend on the anonymization and privacy-enhancing techniques that Google is permitted to apply, and the data privacy and data security standards that Qualified Competitors are held to.[4]  Based on my experience, disclosure of the data risks harming user privacy and eroding user trust in Google in a number of ways.

31.     The Final Judgment's requirement that Google share user data risks immediately and irreparably compromising Google's reputation as a trustworthy search engine capable of protecting users' sensitive data.  The extent of harm will depend on the anonymization and privacy-enhancing techniques that Google is permitted to apply.  While Google does not have control over the ultimate decision, Google users are nonetheless likely to fault Google for any privacy or security issues that arise from the data disclosures.

---

[4] "Qualified Competitors" must "meet[] the Plaintiffs' approved data security standards as recommended by the Technical Committee[.]"  FJ § IX.V.  The Final Judgment affords Google only the right to object to those standards; the standards ultimately chosen are beyond Google's control.  FJ § VII.A.7.k.

32.     To the extent consumers use Google Search less for certain sensitive categories of queries or forgo using Google Search altogether, Google's business will be directly harmed.

33.     In addition, I expect competitors may use the Final Judgment to raise questions about whether Google can be trusted with user data, further undermining Google's reputation.

34.     Given the tremendous value of Google's user data, Qualified Competitors will likely become key targets for hackers or other attackers upon receiving Google's data.  Qualified Competitors, especially new or recent entrants, likely do not have security infrastructure on par with Google's.  The Final Judgment does not specify which security practices Qualified Competitors must implement or guarantee that those measures will be on par with Google's, a necessary and comprehensive level of protection for such sensitive data.  FJ § IX.V.  If bad actors hack or otherwise access user data disclosed to Qualified Competitors, that breach would severely undermine user trust in Google, as many users would likely misattribute blame to Google for Qualified Competitors' data security failures.

35.     In summary, if the Final Judgment is overturned or modified on appeal, Google will be unable to recover the value of the intellectual property lost due to the direct disclosure and reverse engineering of its proprietary technology enabled under the Final Judgment's user data provision.  Nor could Google recover the potential reputational and financial damage suffered due to the disclosures of user data and the resulting loss of user trust.

**Compelled Syndication of Google's Search Results and Features Will Irreparably Harm Google**

36.     Under the terms of the Final Judgment, I understand that Google will be required to make available to any Qualified Competitor a syndication license whose term will be up to five (5) years from the date the license is signed, and which will require Google to syndicate

certain search results and search features in response to queries submitted by a Qualified
Competitor.  FJ § V.A.

37.      Google must provide a syndication license "on a non-discriminatory basis to any
Qualified Competitor on terms no less favorable than the most favorable terms Google provides
under any current search syndication agreements" as of the date of entry of the Final Judgment.
FJ § V.B.3.

38.      In terms of the results and features required to be provided to Qualified
Competitors, I understand that Google is required to syndicate:

    a.   "Both desktop and mobile versions of the ranked organic web search results
obtained from crawling the web" (i.e., the ten blue links), as of the date of entry of
the Final Judgment;

    b.   "the user-facing query-rewriting features that Google provides under any of its
current standard search syndication agreements," as of the date of entry of the
Final Judgment; and

    c.   "the Local, Maps, Video, Images, and Knowledge Panel Search Feature content
that Google provides under any of its current standard search syndication
agreements" as of the date of entry of the Final Judgment.  FJ §§ V.A.1-3.

39.      Google must syndicate these features and information to Qualified Competitors
"with latency and reliability functionally equivalent to what any other user of Google's search
syndication products would receive" as of the date of entry of the Final Judgment.  FJ § V.B.2.
"Qualified Competitors' use of Google's syndication services in the first year will be capped at
40% of Qualified Competitors' annual U.S. queries and decline over the course of a 5-year

period," with the pace of the tapering to be determined by the Court upon consultation with

Plaintiffs and the Technical Committee.  FJ § V.B.4.

40.     If the Final Judgment is not stayed, these compelled syndication provisions will

cause immediate, significant, and irreparable harm to Google.

41.     As I testified at the remedies hearing, the search results and features required to

be syndicated to Qualified Competitors are the product of decades of sustained engineering effort

and innovation and many billions of dollars of investment.  The Final Judgment compels Google

to syndicate to Qualified Competitors the output of these proprietary technologies.

42.     Ordinarily, to protect its intellectual property, Google syndicates to only trusted

syndication partners and places a number of contractual restrictions on how syndication partners

may use the syndicated search results and features.  While the Final Judgment permits Google to

"place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated

results and content," FJ § V.B.7, Google does not have the ability (as it does in the ordinary

course) to decline to syndicate to a Qualified Competitor.  This arrangement leaves Google

vulnerable to Qualified Competitors who may violate the licensing terms and store and analyze

syndicated content in order to use Google's results and features for future user queries, and/or to

gain insights into Google's proprietary technologies and intellectual property.

43.     In addition, any third party could "scrape" the syndicated results and features

from Qualified Competitors' sites and thereby also avail themselves of Google's results and

features, and gain insights into Google's proprietary technologies and intellectual property.[5]

---

[5] In the search industry, web scraping is the automated process of extracting data from webpages to retrieve and save information from the underlying code.  For instance, I am aware that third parties attempt to scrape data from Google's search results pages to display those results as their own and to gain insight into Google's search algorithms.  Google invests in and employs technological means to block such efforts.

Google today invests in measures to defend against third parties scraping data from Google.com, but Qualified Competitors have no such incentive to protect Google's intellectual property.

44.     Qualified Competitors will be obvious targets for any third party that desires Google's data, including third parties whose efforts to scrape Google.com were previously stymied.  Among the third parties that would be able to scrape Google's results in this manner are foreign state actors.

45.     The loss of these proprietary insights and information cannot be altered if the Final Judgment is overturned or modified on appeal.  The disclosure of Google's intellectual property and proprietary technology cannot be undone, and there would be no way to remedy the harm to Google after appeal.

46.     Additionally, even if all Qualified Competitors adhere to the terms of the syndication license, and third parties do not scrape or hack Qualified Competitors, Google will suffer irreparable harm to its competitive standing as a result of the Final Judgment.  For example, Google's organic search results are the highest quality available.  The Final Judgment irreparably harms Google by making this uniquely valuable content available to its competitors, which significantly undermines Google's ability to create differentiated search results pages.

47.     If the Final Judgment is overturned or modified on appeal, these harms to Google cannot be undone.

*       *       *       *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ____15th____ day of January 2026, in ____Los Altos,  CA_____.

Signed by:

*Elizabeth Hamon Reid*

4CBEEE12C16E4F0...

Elizabeth Reid