IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*,<br><br>        Plaintiffs,<br><br>   v.<br><br>Google LLC,<br><br>        Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |
| State of Colorado, *et al.*,<br><br>        Plaintiffs,<br><br>   v.<br><br>Google LLC,<br><br>        Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

## DECLARATION OF JESSE ADKINS

I, Jesse Adkins, declare as follows:

1. I am currently employed by Google LLC (Google) as a Director of Product Management for Search Syndication and Search Ads Syndication. I have worked for Google since 2013. I submit this declaration in support of Google's Motion to Stay. The facts set forth herein are within my personal knowledge and if called as a witness, I could and would competently testify to them.

2. As Director of Product Management for Search Syndication and Search Ads Syndication, my responsibilities include overseeing the product areas in which Google

syndicates its web search results and search ads to partners for display on their sites. In particular, my responsibilities include overseeing Google's Web Search Syndication and Search Ads Syndication products, as well as Google's partnership with Yahoo Japan. I am familiar with Google's existing commercial terms for Google's search and search ads syndication agreements.

3. I testified in the evidentiary hearing on remedies on May 1 and May 2, 2025.

4. I have reviewed the Court's Final Judgment ("FJ") issued on December 5, 2025, and, in particular, Section V titled "Required Syndication of Search Results" and Section VI titled "Search Text Ad Auction Changes and Search Text Ads Syndication." I have also reviewed the Court's September 2, 2025 opinion ("Sept. Rem. Op.") and the Court's December 5, 2025 opinion ("Dec. Rem. Op.").

### Compelled Syndication of Google's Search Text Ads Will Irreparably Harm Google

5. I understand that the Court's Final Judgment provides that "Google shall take steps sufficient to make available to any Qualified Competitor a Search Text Ads Syndication License whose term will be five (5) years from the date the license is signed," and lists requirements for the licenses. FJ § VI.B. If the Final Judgment is not stayed, these compelled syndication provisions will cause immediate, significant, and irreparable harm to Google and its advertisers.

### Disclosure of Google's Proprietary Technologies and Intellectual Property

6. Google's search text ads auction is the cumulation of decades of research and work performed by thousands of engineers. When a user enters a query on a syndication partner's site, Google's algorithms consider potentially thousands of ad campaigns to determine whether an ad would be helpful to the user, and if so, which ad to show. Google's algorithms determine not only which ads are most relevant to the user's query, but also the appearance of

2

the ads. Because an ad campaign may be composed of multiple options for the ad's headline, copy, sitelinks, and associated images, Google's algorithms dynamically consider which ad components to include and which version of the ad is most relevant.

7.  Data on which ads Google shows in response to specific user queries and what content Google has chosen to show for that ad can reveal Google's proprietary ad targeting technology and expose Google's intellectual property. Third parties can acquire this data en masse by "scraping" the user query and Google's syndicated ads in an automated manner, and then use those outputs to train their own algorithms.

8.  In the ordinary course, Google is selective regarding which ad syndicators to partner with, including for reasons of protecting Google's intellectual property. But under the Final Judgment, Google is compelled to syndicate to any Qualified Competitor who requests a license. Although Qualified Competitors will be contractually restricted from scraping Google's syndicated ads,[1] the extent of monitoring by Plaintiffs and the Technical Committee for compliance is unknown, and even the most extensive monitoring cannot guarantee detection.

9.  Even those Qualified Competitors who do comply with these restrictions would need to defend against third parties seeking to scrape Google's ads and steal Google's intellectual property. While Google has technologies to prevent third-party scraping of Google.com, Qualified Competitors have no incentive to develop such tools, and Google's ability to detect such theft is diminished on third-party sites.

10. The harm to Google by virtue of exposure of its intellectual property will multiply exponentially given the Final Judgment's provision that Qualified Competitors are allowed to

---

[1] Section VI.B.6 of the Final Judgment allows Google "to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated ads[.]"

3

sub-syndicate Google's ads. FJ § VI.B.9; *see also* Dec. Rem. Op. at 47. Sub-syndication allows a Qualified Competitor to provide ads to a third party using Google's syndication service, meaning that the Qualified Competitor acts as a middleman to earn revenue while Google fulfills each ad request.

11. Additionally, even if all Qualified Competitors adhere to the terms of the syndication license, and third parties do not scrape or hack Qualified Competitors, Google will suffer irreparable harm to its competitive standing as a result of the Final Judgment. The Final Judgment irreparably harms Google by making its valuable ads available to its competitors, which significantly undermines Google's ability to create a differentiated search experience.

12. The disclosure of Google's intellectual property and proprietary technologies and harm to Google's competitive standing cannot be undone if the Final Judgment is overturned or modified on appeal, and there would be no way to remedy the harm to Google after appeal.

<u>Harms to Google's Advertisers</u>

13. If the Final Judgment is not stayed, Google's advertisers also risk irreparable harm. The harm to Google's advertisers in turn harms Google's relationship with its advertisers, and Google's competitive standing as a result.

14. As context for the misaligned incentives and resulting harm that will follow from the Court's Final Judgment, I begin with a brief overview of the different players involved in the ad syndication business. Currently, advertisers that sign up for Google Ads have the option to show ads on Google's search partner network. Google's search partner network includes various websites that syndicate ads from Google ("ad syndicators").

15. When an ad from one of Google's advertisers shows on an ad syndicator's website and that ad receives a click, the advertiser will pay a cost-per-click determined by

4

Google's ad auction, and both the ad syndicator and Google will receive some portion of that cost-per-click subject to Google's revenue share agreement. The more clicks an advertiser receives, the more the advertiser must pay in total.

16. Ad syndicators are often eager to make greater revenue in the short term by using "trick to click" tactics that artificially inflate clicks on ads so the advertisers must pay more, resulting in greater revenues to the ad syndicator. These tactics do not provide corresponding value to the advertiser because the user was tricked into clicking on the ad (rather than being genuinely interested in the advertiser's product or service). Through these methods, an ad syndicator can earn tens of millions of dollars collectively across many advertisers in a matter of weeks, before any individual advertiser is able to detect fraudulent clicks.

17. In my experience, bad-actor ad syndicators have little or no incentive to maintain a positive relationship with advertisers, particularly since the short-term profits they can make from employing "trick to click" tactics are incredibly lucrative. Companies in the ad syndicator space are constantly creating new schemes to increase their revenue at the expense of advertisers, and Google is engaged in a game of whack-a-mole to detect and end these practices.

18. Currently, Google takes extensive measures to attempt to ensure that advertisers only pay for high-value clicks from actual users who are interested in the advertisements, rather than paying for clicks that result from deceiving users into clicking on ads or are generated from bot nets. While the Final Judgment allows Google to retain "ordinary-course restrictions on the use or display of syndicated ad content," FJ § VI.B.6, it will be much more challenging for Google to enforce these restrictions given that Google has no discretion over who is eligible to request syndication from Google and the volume of queries for which they request syndication.

19.     The Final Judgment also permits Qualified Competitors to sub-syndicate Google's ads.  FJ § VI.B.9.  This ad sub-syndication provision exacerbates this problem further, creating many more parties for Google to monitor, while simultaneously removing some of the tools Google has historically used to fight fraud.  For instance, some sites will purposefully design webpages that induce users to click on ads, by adding misleading labels or adding movement to the page such that users click the ads accidentally.  In the ordinary course of business, Google would not voluntarily work with these parties.  Under the Final Judgment, Google will have to closely monitor an ever-growing list of sub-syndication sites for such changes that defraud advertisers.

20.     To provide another example, and as I explained in my testimony, the ad syndicator could append information to the query to return an ad with a higher cost-per-click, thereby increasing the payment it receives as part of its revenue share.  In the past year, my team encountered a variation on this scheme where an ad syndicator appended the name of a high-income country to its queries, then purchased cheap traffic from a different country to click on those ads, resulting in tens of millions of dollars in click fraud over the course of only two months.

21.     Under the Final Judgment, Qualified Competitors (or their sub-syndicators) may perpetrate such schemes and send Google modified search queries.  Without the user's true search query, the ads served would be lower quality.  If the user still clicked on the ad—perhaps due to some misleading user interface—Google's advertisers would pay for that click even though the user is far less likely to purchase the advertiser's products or services.  This renders Google unable to protect its advertisers and deliver a valuable advertising experience.  Again,

these harms will multiply given the sub-syndication provision of the Final Judgment (FJ § VI.B.9).

22. Because syndicating ads can offer a significant source of revenue, Google has exercised careful and measured discretion when evaluating who to partner with, and whether certain practices may come at the expense of Google or its advertisers. The Final Judgment restricts Google's ability to operate its syndication business in the ordinary course, hindering Google from effectively protecting its intellectual property and its business model, thus resulting in irreparable harm absent a stay.

23. The harm to Google's advertisers and Google's competitive standing cannot be undone if the Final Judgment is overturned or modified on appeal, and there would be no way to remedy the harm to Google or its advertisers after appeal.

**Compelled Syndication "on Financial Terms No Worse Than Those Offered to Any Other User" of the Syndication Services Will Irreparably Harm Google**

24. I understand that the Court's Final Judgment requires Google to provide both its syndicated search results and features and its syndicated search text ads to Qualified Competitors on financial terms "no worse than those offered to any other user of Google's search syndication products." FJ §§ V.A, VI.B.2. At this time, the precise contours of the compelled pricing terms are unknown. The Plaintiffs and the Technical Committee, with input from Google, are to prepare a license template. FJ §§ V.B, VI.B. Google has the right to object to licensing terms, but may not "dictate pricing with Qualified Competitors based on existing commercial terms[.]" Dec. Rem. Op. at 41.

25. The existing rates were offered in the context of specific customers with whom Google has long-established partnerships, and for whom Google has a strong understanding of the partner's unique traffic mix, capacity requirements, and technical needs in order to price the

service.  Extending these rates to Qualified Competitors forces Google to price its services well below how it would choose to price these services in the market.  The Court recognized that "[t]he Final Judgment's pricing provisions may result in syndication agreements that depart from the way Google has historically contracted or made its revenue."  Dec. Rem. Op. at 41.

26. Google will suffer financial harm to the extent that the Final Judgment results in the compelled syndication of search results and features and search text ads at rates that do not make economic sense for Google.  The financial impact cannot be quantified at this time because it will depend on both the compelled licensing terms and the volume of queries Qualified Competitors choose to syndicate to Google.

27. If the Final Judgment is overturned or modified on appeal, these harms to Google cannot be undone.

\*   \*   \*   \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __15__ day of January 2026, in ___Pittsburgh PA___.

Signed by:
*Jesse Adkins*
851A9A333316462...
Jesse Adkins

8