## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | |
| | Case No. 1:20-cv-03010-APM |
| v. | |
| | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, *et al.* | |
| Plaintiffs, | |
| | Case No. 1:20-cv-03715-APM |
| v. | |
| | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANT GOOGLE LLC'S
## MOTION FOR A PARTIAL STAY PENDING APPEAL

## **TABLE OF CONTENTS**

LEGAL STANDARD ............................................................................................................3

ARGUMENT .......................................................................................................................3

    I. Google's Claims Of Irreparable Injury Are Premature And Speculative. ...................... 3

        A. Google Cannot Show It Faces Any Certain And Great Irreparable Injury From
           The Syndication Requirements. .......................................................................... 4

        B. Google Cannot Show It Faces Any Imminent, Certain, And Great Irreparable
           Injury From The Data-Sharing Requirements. .................................................... 9

           1. Google's Speculative Concerns Over Disclosure Of Confidential
              Information Are Premature. .................................................................. 10

           2. Google's Reputation Will Not Be Harmed. .......................................... 12

           3. Google's Theorized Loss Of Right To Appeal Is Not Imminent.......... 13

        C. The Court Can Accommodate Google By Affording It An Opportunity To
           Renew Its Motion At An Appropriate Time. ..................................................... 14

    II. Google Fails To Make A Strong Showing Of Likelihood Of Success On The Merits.15

        A. The Court Correctly Held That Google's Conduct Was Exclusionary And
           Anticompetitive. ................................................................................................ 16

           1. The Court Correctly Held That "Competition For The Contract" Is No
               Defense To Google's Unlawful Conduct. ............................................. 17

           2. The Court Correctly Found That Google's Distribution Agreements
               Were Exclusive. ................................................................................... 18

        B. The Court Correctly Followed *Microsoft* And Rejected Google's Misplaced
           Reliance On *Rambus*. ....................................................................................... 18

        C. Google Is A Monopolist In General Search. ..................................................... 20

        D. Google Has Not Shown An Abuse Of Discretion In The Syndication And
           Data-Sharing Remedies The Court Ordered. .................................................... 21

    III. The Public Interest Weighs Strongly Against A Stay. ................................................ 22

CONCLUSION .................................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ............................................................................ 16

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ............................................................................................. 20

*Cardinal Health, Inc. v. Holder,*
    846 F. Supp. 2d 203 (D.D.C. 2012) .................................................................. 9, 12

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ...................................................................... 3, 4, 11

*Cigar Ass'n of America v. FDA,*
    317 F. Supp. 3d 555 (D.D.C. 2018) ..................................................................... 16

*Citizens for Responsibility & Ethics in Washington v. FEC,*
    904 F.3d 1014 (D.C. Cir. 2018) .............................................................................. 3

*Connecticut v. Massachusetts,*
    282 U.S. 660 (1931) ............................................................................................... 4

*Cuomo v. U.S. Nuclear Regulatory Commission,*
    772 F.2d 972 (D.C. Cir. 1985) ............................................................................. 16

*Dallas Safari Club v. Bernhardt,*
    453 F. Supp. 3d 391 (D.D.C. 2020) ....................................................................... 9

*Douglas Dynamics, LLC v. Buyers Products Co.,*
    717 F.3d 1336 (Fed. Cir. 2013) .......................................................................... 6, 7

*FTC v. Elders Grain, Inc.,*
    868 F.2d 901 (7th Cir. 1989) ............................................................................... 24

*FTC v. Meta Platforms, Inc.,*
    775 F. Supp. 3d 16 (D.D.C. 2024) ....................................................................... 20

*FTC v. Qualcomm Inc.,*
    935 F.3d 752 (9th Cir. 2019) ................................................................................. 6

*FTC v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020) ................................................................................. 6

*In re Google Play Store Antitrust Litigation,*
    147 F.4th 917 (9th Cir. 2025) ......................................................................... 21, 22

*KalshiEX LLC v. Commodity Futures Trading Commission,*
  119 F.4th 58 (D.C. Cir. 2024)...................................................................................... 3, 15, 22

*MaineGeneral Medical Center v. Engels,*
  No. 25-5297, 2025 WL 2682148 (D.C. Cir. Sept. 17, 2025)........................................ 3, 4, 5, 14

*Massachusetts v. Microsoft Corp.,*
  373 F.3d 1199 (D.C. Cir. 2004)...................................................................................... 22

*McWane, Inc. v. FTC,*
  783 F.3d 814 (11th Cir. 2015) ........................................................................................ 20

*Mexichem Specialty Resins, Inc. v. EPA,*
  787 F.3d 544 (D.C. Cir. 2015)........................................................................................ 1, 2, 4

*Mylan Pharmaceuticals, Inc. v. Shalala,*
  81 F. Supp. 2d 30 (D.D.C. 2000).................................................................................... 9

*National Parks Conservation Ass'n v. U.S. Forest Service,*
  No. 15-CV-01582 (APM), 2016 WL 420470 (D.D.C. Jan. 22, 2016) ................................. 3, 4

*Nken v. Holder,*
  556 U.S. 418 (2009)........................................................................................................ 3, 16, 22

*Rambus Inc. v. FTC,*
  522 F.3d 456 (D.C. Cir. 2008) ........................................................................................ 19

*Robert Half International Inc. v. Billingham,*
  315 F. Supp. 3d 419 (D.D.C. 2018)................................................................................ 11

*Sandoz, Inc. v. FDA,*
  439 F. Supp. 2d 26 (D.D.C. 2006) .................................................................................. 9

*Todd v. Exxon Corp.,*
  275 F.3d 191 (2d Cir. 2001) ............................................................................................ 19

*United Shoe Machinery Corp. v. United States,*
  258 U.S. 451 (1922)........................................................................................................ 18

*United States v. Dentsply International, Inc.,*
  399 F.3d 181 (3d Cir. 2005) ........................................................................................... 17, 18

*United States v. Microsoft,*
  253 F.3d 34 (D.C. Cir. 2001)....................................................................... 16, 18, 19, 20, 22

*United States v. Visa U.S.A., Inc.,*
  No. 98 CIV 7076 BSJ, 2002 WL 638537 (S.D.N.Y. Feb. 7, 2002) ........................................ 8

*United States v. Western Electric Co., Inc.*,
  777 F.2d 23 (D.C. Cir. 1985) ................................................................ 10

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................ 4, 9

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ................................................................ 17

Statutes
15 U.S.C. § 4 ............................................................................................ 1

Other Authorities
Hon. Diane P. Wood, *The Necessary Revival of Sherman Act Section 2*,
  Competition Policy International, Feb. 8, 2021 ...................................... 24

**ABBREVIATIONS**

| CITATION | CORRESPONDING FILING OR TRANSCRIPT |
|---|---|
| Final Judgment | Final Judgment<br>Dated December 5, 2025 (ECF No. 1462) |
| FJ Op. | Memorandum Opinion Regarding Final Judgment<br>Dated December 5, 2025 (ECF No. 1461) |
| Remedies Op. | Memorandum Opinion Regarding Remedies<br>Dated September 2, 2025 (ECF No. 1435) |
| Liability Op. | Memorandum Opinion Regarding Liability<br>Dated August 5, 2024 (ECF No. 1032) |
| Remedies Tr. | Transcript of the Evidentiary Hearing on Remedies<br>Conducted from April 21 to May 9, 2025 and May 30, 2025 |

Monopolization undermines the dynamism and innovation on which American economic progress depends, stifling the competitive incentives of third parties and monopolists alike. In online search and search text advertising—some of our country's most important markets—this Court found that "Google is a monopolist, and it has acted as one to maintain its monopoly." Liability Op. 4. Congress has imposed on the United States in these circumstances the "duty. . . to prevent and restrain" these violations and directed this Court to proceed "as soon as may be" to the disposition of these cases. 15 U.S.C. § 4. Following thorough liability and remedies proceedings, the time has come to restore competition to internet search.

Google implicitly recognizes all this—and the strength of the Court's liability opinion— by declining to seek a stay as to the many aspects of the Final Judgment now underway or due to imminently take effect. Its breathless claims of legal error notwithstanding, Google has not sought to stay the Final Judgment's prohibitions relating to its exclusionary contracting practices or the work of the Technical Committee (TC) to, among other things, help establish the parameters and requirements attendant to the data-sharing and syndication remedies. Google instead seeks only to stay four aspects of the remedy that will not take effect for months to come—the actual sharing of data and execution of syndication licenses. The Plaintiffs, the United States and its co-plaintiff states as well as the Colorado States, offered to work with Google on ways to allow it to raise its stay arguments as to these remedies when they are ripe, *see* Exhibit A, Declaration of T. Chapman Jan. 30, 2026, but Google instead filed this motion without even mentioning the Plaintiffs' openness to doing so. *See* Dkt. 1471 at 2.

Two problems with Google's timing doom its current motion.  First, a stay requires irreparable harm, which must be "of such *imminence* that there is a clear and present need for equitable relief." *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir.

1

2015) (citation modified). The harms Google projects might occur when the sharing and syndication aspects of the Final Judgment come into force are not imminent—they are distant.

Second, Google's timing forces the parties and the Court into unnecessary conjecture. Irreparable injury must be "actual and not theoretical." *Id.* (citation modified). In the coming months, Google's theoretical injuries will give way to actual understanding of how sharing and syndication will play out following the robust processes put in place by this Court to ensure they are in the public interest. Long before, and indeed in order for, data sharing and syndication remedies to take effect, the final parameters of the challenged remedies must be determined by the TC, the parties, and the Court. With the help of the TC, Plaintiffs will propose specific terms for syndication licenses, FJ §§ V.B, VI.B, determine security and privacy safeguards for data sharing, *id.* § IV.C, and identify and vet Qualified Competitors, § IX.V. Arguments Google now raises as to how irreparable harm will arise from sharing or syndicating certain content with certain third parties rest on hyperbole and speculation; in the future, they could be assessed based on the actual remedies approved by the Court. Objections Google now offers as reasons for a stay can all be raised before these remedies go into effect through Google's exercise of its "broad right to object." FJ Op. 49.[1]

There is simply no need to hazard a guess at this juncture. The Court should deny Google's motion without prejudice to its being renewed later, when the actual contours of syndication, sharing, and certification of Qualified Competitors are clear and Google's irreparable injury arguments can be assessed based on facts rather than a speculative (and unrealistic) parade of horribles. As discussed in greater detail below, the Plaintiffs have no

---

[1] Google's arguments on the merits fare no better and, for the reasons stated below, its failure to demonstrate a likelihood of success on the merits is an independent basis to deny its motion.

objection to ensuring Google has sufficient time to brief and appeal a motion to stay the four remedies once they are finalized and ready to be implemented, and there are several reasonable procedural means of assuring that opportunity.

## LEGAL STANDARD

A stay pending appeal provides "extraordinary relief." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). It is an "intrusion into the ordinary processes of administration and judicial review" and thus "is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation modified). To obtain a stay pending appeal, the movant bears the burden of (1) "ma[king] a strong showing that [it] is likely to succeed on the merits," (2) showing that it "will be irreparably injured absent a stay," (3) showing that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding," and (4) demonstrating that the public interest favors a stay. *Id.* at 434.

## ARGUMENT

### I. Google's Claims Of Irreparable Injury Are Premature And Speculative.

Although Google has no likelihood of success on the merits of its appeal, this Court's analysis can begin and end with irreparable injury, since "a showing of irreparable harm is a necessary prerequisite for a stay, [and the] failure to demonstrate such harm is fatal to [a movant's] request." *MaineGeneral Med. Ctr. v. Engels*, No. 25-5297, 2025 WL 2682148, at *1 (D.C. Cir. Sept. 17, 2025) (citation modified); *accord KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024) (explaining how failure to show irreparable injury "is fatal to the Commission's stay request because a showing of irreparable harm is a necessary prerequisite for a stay"). The D.C. Circuit "has set a high standard for irreparable injury," *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, No. 15-CV-01582 (APM), 2016 WL 420470, at *7 (D.D.C. Jan. 22, 2016)

(quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006));
the alleged harm must be "both certain and great, actual and not theoretical . . . and of such
*imminence* that there is a clear and present need for equitable relief to prevent [it]."
*MaineGeneral*, 2025 WL 2682148, at *1 (quoting *Mexichem*, 787 F.3d at 555). Relief "will not
be granted against something merely feared as liable to occur at some indefinite time." *Wis. Gas
Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Connecticut. v. Massachusetts*, 282
U.S. 660, 674 (1931)). Mere fear about requirements taking effect at an indefinite time in the
future is all that Google can offer the Court now, which precludes a stay at this stage. Google's
equitable position is weakened further by its past endorsement of remedies along these same
lines that include sharing its index, Remedies Tr. at 4744; syndicating results, Remedies Tr. at
4743-44; and including Gen AI. FJ § V.B.7.

### A. Google Cannot Show It Faces Any Certain And Great Irreparable Injury From The Syndication Requirements.

Google fails to demonstrate any "certain and great" irreparable harm from the Final
Judgment's syndication requirements. Google already syndicates both search results and ads to
third parties and has done so for years. Remedies Op. 173, 182. In response to Google's
objections, the Court pared down Plaintiffs' proposed syndication remedies to track the
"ordinary commercial terms" of those preexisting syndication relationships. *Id.* at 4. Google
itself represented to the Court that this "cabin[ed]" approach to syndication would be
"proportional" and an acceptable alternative to Plaintiffs' proposals. Remedies Tr. 4742:7-
4744:11. And Plaintiffs estimate that the terms of the syndication licenses that Qualified
Competitors will receive will not be determined and approved until the second half of 2026 at the
earliest. Google's claims that the syndication requirements nonetheless threaten it with
irreparable harm now are speculative.

Google first claims that the syndication requirements will disclose its intellectual property. Def.'s Mem. Supp. Mot. 29. But the Court already "addresse[d] Google's concerns" that syndication "places its intellectual property at risk" by providing that syndication under the Final Judgment would track the commercial terms Google already uses. Remedies Op. 180. Google complains that it will not be choosing the Qualified Competitors who receive syndication licenses, but that complaint is premature given that no Qualified Competitors have been identified yet—and given that Google fought for and obtained the right to object to any Qualified Competitor it thinks problematic.[2] Equally premature is Google's speculative claim that the terms of Qualified Competitors' syndication licenses will be ineffective to protect whatever intellectual property interest it has. As Google grudgingly acknowledges, the licenses, which will be drafted "with input from Google," FJ § V.B.11, will *include* the sort of "use restrictions" for search results and "query-volume limits" that Google believes are necessary. Def.'s Mem. Supp. Mot. 29-30. And if Google disagrees with the specifics of the proposed license, it will be able to object to the Court. The Court is in no position now to evaluate Google's claims that the undecided details of the license will cause it irreparable harm.

That leaves Google's apparent claim that *any* "compelled licensing" of intellectual property "to competitors causes irreparable harm," no matter the terms and no matter the

---

[2]    Because the identity of Qualified Competitors is speculative at this point, Google's suggestion that Qualified Competitors will permit "an untold number of third parties" to "scrape Google's results" from their sites is speculation on top of speculation. Mot. 30. The Court has also addressed it: The Final Judgment demands that any Qualified Competitor gaining access to syndication be subject to "security standards" and agree to regular "security and privacy audits" by members of the TC, who themselves have expertise in data security. FJ at IX.V, VII.A.2, VII.A.7.b; ECF No. 1475-1 (Exhibit A to Plaintiffs' Unopposed Motion to Appoint Technical Committee Members). Google's professed security concerns are hypothetical and not sufficient to demonstrate irreparable harm. *MaineGeneral*, 2025 WL 2682148, at *1 (concluding that concerns about "*potential* disclosure of privileged, confidential, or protected information is insufficient to demonstrate irreparable harm") (emphasis added).

competitors. Def.'s Mem. Supp. Mot. 29. Google's lone authority for that proposition, *FTC v. Qualcomm Inc.*, 935 F.3d 752, 755-56 (9th Cir. 2019), says no such thing. *Qualcomm* involved (among other things) a requirement that the defendant exhaustively license patents to other modem chip suppliers, which it had not done before, *FTC v. Qualcomm Inc.*, 969 F.3d 974, 984 (9th Cir. 2020); by contrast, Google has long syndicated search results to other search providers, Remedies Op. 173. And in any event, *Qualcomm* found irreparable injury for stay purposes because the remedy overall would change the defendant's business in ways that could not "be easily undone." 935 F.3d at 755. But, of course, the supply of syndicated results could be halted in an instant, were Google to prevail.

Google next argues it will suffer irreparable harm to its "competitive standing" if it syndicates search results and ads to rivals. Def.'s Mem. Supp. Mot. 31. This claim, too, is premature and speculative. For one thing, the Court has permitted Google to continue paying distributors for default placement, which the Court acknowledged will "leav[e] in place the very forces" that have frozen the ecosystem and *reinforced* Google's dominant competitive standing. Remedies Op. 127. For another, Google does not yet know who the Qualified Competitors will be, how many there will be, which ones will want syndication licenses, what threat they may pose to Google's "competitive standing" in the near term, or what specific syndication license terms will be offered, and thus cannot show that syndication poses a certain and great threat.

Indeed, Google has voluntarily syndicated search results and ads for years without suffering "erosion in reputation and brand distinction." Def.'s Mem. Supp. Mot. 32. Google offers no reason, beyond its say-so, for the Court to think it will suffer such an injury now.[3] And

---

[3]     Google's analogy to *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013), falls flat. That case held that a patentee was irreparably injured by having to compete with infringing products—i.e., products that copied the patentee's inventions without

the fact that Qualified Competitors will not be able to license all of the content available on Google Search suggests the opposite—by virtue of that content, Google should remain a distinctive product notwithstanding syndication. In any event, the Court found that "[f]or Qualified Competitors to compete" and actually take business from Google, "they must innovate and differentiate their product from Google's rather than simply feeding off Google's work." Remedies Op. 146-47. That remains true, and it belies Google's claim that syndication will erode its market position.

Google's claims that it will lose "goodwill and competitive standing" among advertisers are likewise incurably speculative and premature now. Def.'s Mem. Supp. Mot. 32. Before the TC determines security standards for Qualified Competitors, the Qualified Competitors are identified and approved, and the terms of their syndication licenses are determined, Google's fears that Qualified Competitors will fail to stop "tactics used by licensees and third parties to defraud advertisers," *id.*, are nothing more than fantasy.

Google lastly claims that the syndication requirements will force it to make "fundamental business changes." Like all of Google's other claims, this argument requires ignoring what this Court has decided about the syndication remedy—and speculating about what has yet to be decided.

Google asserts, for example, that the terms of the syndication licenses will be ones that "never would have resulted from a commercial negotiation." Def.'s Mem. Supp. Mot. 33; *see id.* at 34. There cannot be any basis for that claim before the actual terms of those licenses—which the Court has held will *not* "exceed[] ordinary commercial terms" in Google's existing

---

its consent. *Douglas* offers no support to Google's claim that it will be injured by a future syndication license that will track the terms of existing licenses that Google voluntarily granted third parties.

syndication agreements, Remedies Op. 180—are determined. For the same reason, there is no basis for Google's suggestion that it will need to "overhaul significant aspects of its syndication business." Def.'s Mem. Supp. Mot. 34. Until the actual syndication licenses are determined, Google has no reason not to take this Court at its word that the licenses will track Google's *current* "syndication business." Rem. Op. 8.

Google complains that *if* any of its current syndication partners become Qualified Competitors, those firms will be able to avail themselves of the syndication remedy and Google will "lose the benefit" of its current agreements with them. Def.'s Mem. Supp. Mot. 34. That argument again requires impermissible and premature speculation about who will become a Qualified Competitor. Google also offers no explanation why there would be "potentially irreversible consequences" from its current syndication partners' obtaining syndication on a set of terms all of which Google has previously accepted. *Id.* Thus, this case is nothing like *Visa*, where allowing banks to terminate their "dedication agreements" with Visa and Mastercard— thereby becoming free to issue American Express or Discover cards—was arguably irreversible. *United States v. Visa U.S.A., Inc.*, No. 98 CIV 7076 BSJ, 2002 WL 638537, at *1 (S.D.N.Y. Feb. 7, 2002).

Google yet again indulges in premature speculation when it claims that the syndication requirements will "compel[] [it] to provide [syndication] on uneconomical terms." Def.'s Mem. Supp. Mot. 35. Google ignores that, at Google's insistence, this Court rejected Plaintiffs' proposal that Google syndicate results and ads at marginal cost and instead ordered syndication at "a market rate." Remedies Op. 174. Its own declarant admits this rate is currently "unknown." Adkins Decl. ¶ 24. Given that holding and absent *any* information about what the specific terms of syndication will be, Google cannot show a certain and great threat that syndication under the

Final Judgment would be "uneconomical" for it. In any event, Google misstates the law in arguing that "unrecoverable" expenses are always irreparable harm. Def.'s Mem. Supp. Mot. 35. "[T]he general rule" in this Circuit is "that economic harm does not constitute irreparable injury." *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012); *Wis. Gas*, 758 F.2d at 674 ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."). Economic harm "must be more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 401 (D.D.C. 2020) (Mehta, J.) (quoting *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000)). Google makes no attempt to show that whatever "unrecoverable" expenses it would incur by providing syndication would have a serious financial effect on the company—nor could it, given its colossal resources. *See, e.g.*, *Cardinal Health*, 846 F. Supp. 2d at 212 (concluding that $1 billion loss compared to $102 billion in annual revenues did not constitute irreparable injury); *Sandoz, Inc. v. Food and Drug Admin.*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (concluding that a loss of $31 million in sales compared to $32 billion in annual sales did not constitute irreparable injury).

### B. Google Cannot Show It Faces Any Imminent, Certain, And Great Irreparable Injury From The Data-Sharing Requirements.

The data-sharing requirements here are even farther on the horizon than the syndication requirements, making Google's claims of harm from those requirements even more premature. By the Court's estimate, it will take "one year to put the infrastructure and processes in place to implement" the data-sharing remedies. Remedies Op. 221. As with syndication, any company seeking data sharing would have to convince Plaintiffs and the TC (and potentially the Court) that it is a Qualified Competitor. FJ § IX.V. Google will have up to six months from the date that security and privacy safeguards are established for user-side data before it must share that data.

9

FJ § IV.C.1. The process of developing sustainable, independent rivals will be measured in years, not months. *See, e.g.*, Remedies Op. 220 ("And then there is the expected time, measured in years, it will take for a competitor to develop the capacity to compete with Google."); FJ Op. 36 ("[I]t will take time for Qualified Competitors to develop high-quality competitive GSEs" using shared data.). In short, Google fails to show that "the alleged harm is certain to occur in the near future and will directly result from the injunctive order." *United States v. W. Elec. Co., Inc.*, 777 F.2d 23, 30 (D.C. Cir. 1985). And as with syndication, Google's claims of harm are also speculative given that the terms of the data-sharing license will not be determined for many months, much less what Qualified Competitors will be able to access such data.

### 1. Google's Speculative Concerns Over Disclosure Of Confidential Information Are Premature.

Google first argues that data from its search index contains trade secrets whose disclosure would constitute irreparable harm. The record demonstrates otherwise. This Court significantly narrowed the search-index data-sharing remedy from Plaintiffs' proposal, and the Court found that as a result of this narrowing, Google "will not be required to produce data that is largely a product of engineering and innovation." Remedies Op. 145. Google itself represented to the Court that a "one-shot index" disclosure, as the Court ultimately ordered, would pose less risk of "getting into learning Google's IP." Remedies Tr. 4744:12-16. Google selectively quotes the Court's statement that the remedy would reveal "some proprietary information," Def.'s Mem. Supp. Mot. 27, but Google omits that in the same breath, the Court found that "the encroachment will be minimal," Remedies Op. 145.[4] Given the Court's findings about the narrowness of the

---

[4]    To reach that conclusion, the Court relied on the testimony of Elizabeth Reid, Remedies Op. 145—the same witness who now claims that even the modest disclosure the Court crafted will give away the product of Google's "exhaustive engineering efforts," Reid Decl. ¶ 8. The

search-index data sharing, Google's purported irreparable injury from the data sharing falls well

short of the requirement that irreparable injury be "great." *Chaplaincy*, 454 F.3d at 297.

Google's claims about the search-index remedy also conspicuously ignore the Court's

factual finding that the data disclosed will be "comparable to what [Google] once shared under

an agreement with an existing partner, Yahoo Japan." Remedies Op. 145. The fact that Google

has *already* voluntarily shared comparable data with a rival makes Google's predictions of harm

from the remedy here speculative at best. And since Google has already disclosed similar types

of information, the cases Google cites for the proposition that disclosing trade secrets to

"competitors in the market" is automatically irreparable, *see, e.g.*, *Robert Half Int'l Inc. v.*

*Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018), are inapposite.

Google likewise ignores that the search-index data "will be shared pursuant to a license

governing use," which will be created "with input from Google." FJ § IV.C.3. The license may

mitigate some or all of Google's concerns—surely Google will argue that the license terms

*should* do so—but there is no way to reasonably assess that now, because the license has not

been created and submitted to the Court, nor have specific terms even been proposed.

With respect to the sharing of user-side data, Google's claim of harm to trade secrets is

even more speculative and premature. Google cannot describe what data will be shared until

privacy-enhancing techniques are applied to the data to safeguard user privacy, FJ § IV.C.1; it

does not know when the data will be shared or how many times it will be shared, FJ § IV.B.2;

and the user-side data, like the search-index data, is to be shared pursuant to a license yet to be

determined and approved by the Court, FJ § IV.C.3.

---

Court should disregard Google's attempt, in a post-hoc declaration, to revise Ms. Reid's
testimony and undo the Court's factual findings.

What the Court has already found about the user-side data-sharing remedy cuts against Google's claims. The Court found that the user-side remedy "poses no threat to reveal the 'blueprints' to Google's search infrastructure and technology." Remedies Op. 162. It found that the user-side data sharing here "involves no compelled disclosure of intellectual property or trade secrets," but only "raw user data." *Id.* at 162–63. It found that "[t]he sharing of raw user data does not pose . . . risks of 'cloning'" Google Search. *Id.* at 163. The Court found that "the limited [user-side data] disclosure ordered here will not dampen Google's incentive to innovate." *Id.* And if all that were not enough, the Final Judgment provides that the user-side data remedy "shall not require disclosure of intellectual property or trade secrets." FJ § IV.B.2. Google does not acknowledge any of the Court's findings, instead stating in a footnote that (contrary to the Court's findings) "the [user-side] data sets themselves are Google confidential information and its trade secrets are embedded in them." Def.'s Mem. Supp. Mot. 28 n.3 (citing Reid Decl. ¶¶ 20–25). Once again, the Court should disregard Google's attempt to rewrite the record by declaration.

### 2. Google's Reputation Will Not Be Harmed.

Google makes a reputational-harm argument as to the data-sharing requirements as well, arguing that the privacy risks of disclosing user-side data will cause it to lose its users' trust. Def.'s Mem. Supp. Mot. 32–33. But a "showing of reputational harm must be concrete and corroborated, not merely speculative," *Cardinal Health*, 846 F. Supp. 2d at 213, and Google's showing is purely the latter. Indeed, the Court does not have anywhere near the information it would need to evaluate Google's reputational-harm claim. The process of identifying privacy safeguards under the Final Judgment has not even begun. Google cannot credibly complain about the shortcomings of privacy protections that do not exist yet—and that it acknowledges it will have a say in. Def.'s Mem. Supp. Mot. 33. Likewise, Google's suggestion that "malicious

actors" may steal the data from Qualified Competitors is pure speculation. Qualified Competitors will have to meet "data security standards" before being certified and will be subject to "regular data security and privacy audits." FJ § IX.V. Those security standards and audit procedures have yet to be determined, and Qualified Competitors have yet to be selected. Any privacy and security risks now are only in Google's imagination and nowhere near the certain and great harms that justify a stay.

Google argues that "even if every appropriate safeguard is implemented," there will still be harm to user privacy. Def.'s Mem. Supp. Mot. 33. That contradicts Google's prior representations and the Court's findings. Google's own expert agreed with Plaintiffs' privacy expert that user privacy could be preserved by properly applying privacy-enhancing techniques, and the Court so found. Remedies Op. at 163–64 (citing Rem. Tr. at 3730:2–12 (Culnane) and 1133:5–15, 1163:20–1165:8 (Evans)). Google offers no persuasive explanation why it will suffer reputational harm from sharing data in a carefully designed and carefully monitored framework. If Google suffers reputational damage as a result of this case, it will likely be from Google's decade-long illegal campaign of monopolization, not from the secured transfer of anonymized raw user data.

### 3.   Google's Theorized Loss Of Right To Appeal Is Not Imminent

Google lastly argues that, absent a stay, it will lose its right to appeal the data-sharing remedies because the data will be disclosed, making the appeal of those remedies moot.[5] But that

---

[5]      As Google tacitly acknowledges, this argument applies only (if at all) to the search-index sharing, which will occur a single time; the user-side data must be refreshed at least once, Remedies Op. 158, meaning that Google's appeal of the user-side data sharing is highly unlikely to become moot during appeal. But it is doubtful that an appeal of the search-index remedy would be mooted, either. Even assuming the search-index data were shared with some Qualified Competitors during Google's appeal—itself an uncertain and distant prospect—it would be

injury, assuming it is cognizable, is hardly "clear and present." *MaineGeneral*, 2025 WL
2682148, at *1. As noted above, no data sharing will take place for many months. The mere
possibility that the time for sharing search-index data will come before Google's appeal
concludes is no basis for granting Google the extraordinary relief of a stay pending appeal now;
rather, it is a reason to wait and, if needed, adjudicate the issue later when the actual safeguards
have been determined, real facts are at hand, and the data sharing is actually close to
commencing.

### C. The Court Can Accommodate Google By Affording It An Opportunity To Renew Its Motion At An Appropriate Time.

In sum, given how much work remains to be done to operationalize the syndication and
data-sharing remedies and how long that work will take, there is no basis for granting Google a
stay now. Nor is there any pressing need for the Court to use its resources to decide Google's
claims at this juncture. As Plaintiffs told Google before it filed this premature stay motion,
Plaintiffs are willing to work with Google so that it can seek a stay at a later date when more
specifics are known and its alleged irreparable injuries are at least arguably imminent. *See*
Exhibit B. There are several possible means of allowing the issues to be fully resolved in a more
concrete and efficient manner, depending on the circumstances of how the TC's work and
licensing processes develop.

In particular, the Court could grant an administrative stay at an appropriate time in the
future so that a motion could be resolved before any of Google's alleged irreparable injuries can
occur. For example, the Court could state that it will grant an administrative stay of the two
syndication requirements at issue after the Court has approved templates for the search and ad

---

possible for later entrants to become Qualified Competitors after Google's appeal concludes and
receive the search-index data then, keeping the issue live.

syndication licenses, assuming Google chooses to renew its motion[6] and that the stay will last until 30 days after the Court resolves that renewed motion. Similarly, the Court could state that it will grant an administrative stay of the challenged data-sharing requirements once Google files such a renewed motion (when there actually is an imminent requirement for Google to share data), and that that stay will terminate 30 days after a motion to stay those requirements is resolved.

Alternatively, the Court could state now that it need not rule on Google's motion given the significant work and factual development that must occur before the remedies are even ready to go into effect, *see, e.g.*, Remedies Op. at 164,[7] but that it will make determinations on the template syndication licenses and data-sharing parameters 30–45 days in advance of formally approving each, in order to allow time for Google to file renewed stay motions and the Court to adjudicate them. Either approach is preferable to entertaining Google's shot-in-the-dark claims of irreparable injury now.

## II.    Google Fails To Make A Strong Showing Of Likelihood Of Success On The Merits.

Google's lack of clear and present irreparable injury is enough to doom its stay motion, *KalshiEX*, 119 F.4th at 64, and counsels in favor of denying the motion without prejudice and without reaching any other stay factors. But Google's stay request also fails because Google cannot make a strong showing of likelihood of success on the merits of its appeal.

---

[6]    The Court could permit later stay motions to incorporate by reference the merits arguments in Google's current motion.

[7]    "The court does not accept that the lack of particulars is fatal to the User-side Data–sharing remedy. It is entirely appropriate for the court (and Plaintiffs) to rely on the Technical Committee to 'facilitate the resolution of potentially complex and technologically nuanced disputes between [Google] and others over the practical workings of' the final judgment." Remedies Op. at 164.

A movant's showing on the merits must be "strong"; "simply showing some 'possibility of irreparable injury,'" is insufficient. *Nken*, 556 U.S. at 434 (cleaned up). It "remains an open question whether the 'likelihood of success' factor is an 'independent, free-standing requirement,' or whether, in cases where the three other factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits." *Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) (Mehta, J.) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014)). But even under the sliding-scale framework, "'a serious legal question' on the merits" is required and suffices only if the movant has made "a strong showing as to the other three factors." *Id.*; *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985) ("A stay may be granted with either a high probability of success and some injury, or *vice versa*.").

Given Google's weak showing on the other three factors, the Court should not apply the lower "serious legal question" standard. But under any standard, Google's motion fails to make the requisite merits showing. The Court's liability decision hewed closely to the legal framework from *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) (en banc), under which the Court's factual findings established clear Section 2 violations in two relevant markets. And the four remedies Google now seeks to stay are all strongly supported by *Microsoft* and other binding precedent. Google has no likelihood of demonstrating error in any part of these well-reasoned conclusions.

### A. The Court Correctly Held That Google's Conduct Was Exclusionary And Anticompetitive.

This Court correctly held that Google's distribution agreements were exclusionary under Section 2. The Court found that Google's distribution agreements foreclosed 45-50% of the relevant markets—a finding Google quibbles with only in passing—and caused multiple

anticompetitive effects in each. Liability Op. 214–47. Google's arguments do not come close to a strong showing that the Court erred in that conclusion.

> **1. The Court Correctly Held That "Competition For The Contract" Is No Defense To Google's Unlawful Conduct.**

Google's principal argument is that its browser agreements were not anticompetitive because Google obtained defaults by outbidding rivals in "competition on the merits." Def.'s Mem. Supp. Mot. 9. But that argument cannot survive this Court's findings that "there is no genuine 'competition for the contract'" because Google is "the only real choice" for distributors. Liability Op. 200–01. Google's massive revenue-share payments make it "financially infeasible [for distributors] to switch." *Id.* at 201. And rivals' scale and quality disadvantages—both maintained and entrenched by Google's unlawful conduct—ensure that "Google does not face true market competition*." Id.* Google has not challenged these findings as clearly erroneous, and they are fatal to Google's argument: Courts have rejected arguments that rivals can compete for contracts where, as here, rivals' ability to compete "simply has not proven to be realistic." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284–85 (3d Cir. 2012) (citation omitted); *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189 (3d Cir. 2005) ("Although its rivals could theoretically convince a dealer to buy their products and drop Dentsply's line, that has not occurred."). Google claims that "the relative strength of competitors" is irrelevant to liability under Section 2, Def.'s Mem. Supp. Mot. 10, but the Court did not merely find that Google's rivals were weaker—it found that rivals' competitive disadvantage was Google's doing. *See, e.g.*, Liability Op. 202 (finding that Google "maintain[ed] [its] position through means other than competition on the merits") (citation modified). Google does not even try to challenge that finding and thus has not made a strong showing of likelihood of success on this issue.

### 2. The Court Correctly Found That Google's Distribution Agreements Were Exclusive.

Google next argues that its browser agreements were not "exclusive" because browser developers could still make rival search engines available as long as they were not the default. In Google's telling, browser search defaults were merely "one promotional opportunity" that Google chose to pay for. Def.'s Mem. Supp. Mot. 11. But this Court found otherwise. It found that the preloaded default on a device is a distribution channel for search, and not just any distribution channel: given defaults' power to shape user behavior, defaults are the *most efficient* distribution channel for search "by far," Liability Op. 24, and Google's agreements gave it exclusivity over that uniquely valuable mode of distribution. *Id.* at 204–14. Those unchallenged factual findings are dispositive: Under *Microsoft*, an agreement foreclosing the most efficient distribution channel in the relevant market is exclusive. *See Microsoft*, 253 F.3d at 70 ("[Microsoft] severely restricted Netscape's access to those distribution channels leading most efficiently to the acquisition of browser usage share."); *Dentsply*, 399 F.3d at 193 (finding the exclusivity policy foreclosed rivals from "dealers[,] the preferred distribution channels" for artificial teeth).

Moreover, an agreement need not completely preclude third parties from "dealing with rivals," Def.'s Mem. Supp. Mot. 12, if its "practical effect" is to limit or prevent rivals from accessing the market, *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 457 (1922) (leases required lessee to get all of its machinery from lessor or risk having leases canceled); *see also Microsoft*, 253 F.3d at 76 (finding that Microsoft's default clause made the agreement exclusive as a "practical matter"). This Court found that "practical effect" of limiting rivals' access to the market here. Google's significant foreclosure of defaults effectively ensures that "new entrants cannot hope to achieve a scale that would allow them to compete with Google."

Liability Op. 226. Again, Google simply ignores both precedent and this Court's findings, which is no recipe for a strong showing of likelihood of success on the merits.

### B. The Court Correctly Followed *Microsoft* And Rejected Google's Misplaced Reliance On *Rambus.*

Google next argues that the Court's liability opinion erred in asking whether "Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market." Liability Op. 216 (discussing *Microsoft*, 253 F.3d at 79). Instead, Google argues, the D.C. Circuit's decision in *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008), required the Court to determine "whether consumers would have preferred [Google's] product" in the but-for world absent Google's conduct. Def.'s Mem. Supp. Mot. 16.

Google is wrong. *Microsoft* could hardly have been clearer on this point: an anticompetitive-effects analysis under Section 2 does *not* require a but-for analysis. Liability Op. 218 (citing *Microsoft*, 253 F.3d at 79). *Rambus* "nowhere questioned" *Microsoft*, and for good reason: unlike in *Microsoft*, where the government's theory of harm was that Microsoft maintained its monopoly by erecting barriers to rivals' entry and competition, the theory of harm in *Rambus* was that the defendant acquired a monopoly by deceiving a standard-setting organization—"a form of exclusionary conduct particularly susceptible to a finding of materiality." *Id.* at 219. *Rambus*' holding in that unique context "does not require" proof of anticompetitive effects "against a but-for world" in *every* Section 2 case, as Google believes it does, *id.*, and, of course, the panel decision in *Rambus* could not overrule the *en banc* decision in *Microsoft.*

### C. Google Is A Monopolist In General Search.

Google next challenges one of the two relevant markets found by the Court: the market for general search services. Def.'s Mem. Supp. Mot. 18. But Google does not come close to demonstrating a likelihood of success on this issue.

"[M]arket definition is a deeply fact-intensive inquiry," *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001), and this Court's factual findings on the existence of a general search services market were clear and unequivocal. The Court found in detail that the general search market was supported by the "practical indicia" identified in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Liability Op. 140-46. That was the right approach in this case, since "a zero-price market" like general search "does not readily lend itself to [quantitative] price-based analyses." *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 46 (D.D.C. 2024); *see also* Liability Op. 139.

Google argues that this market definition fails for lack of quantitative support. Def.'s Mem. Supp. Mot. 19–20. Its argument is wrong on both the facts and the law. Factually, there was strong quantitative evidence in the record: This Court found that Google experimented with degrading its search quality and learned that "a significant quality depreciation by Google would not result in a significant loss of revenues." Liability Op. 48. And legally, "[t]here is no legal requirement that a plaintiff supply quantitative proof to define a relevant market." *Id.* at 139 (citing *McWane, Inc. v. FTC*, 783 F.3d 814, 829–30 (11th Cir. 2015)).

Google also claims that specialized vertical providers must be in the relevant market because they can answer some search queries. Def.'s Mem. Supp. Mot. 18–19. But the relevant question is whether alternatives are "reasonably interchangeable by consumers *for the same purposes*." *Microsoft*, 253 F.3d at 52 (emphasis added). In *Microsoft*, the D.C. Circuit affirmed the district court's finding that handheld devices were outside the relevant market for PC

operating systems because they "f[e]ll far short of performing all of the functions of a PC." *Id.*
The same logic applied here: Specialized vertical providers may answer some queries, but this
Court found they cannot "fulfill a user's varied needs in the same manner as a [general search
engine]." Liability Op. 147–48. Google does not even mention *Microsoft*'s holding on this point,
but that holding precludes Google from showing a likelihood of success on market definition.

### D. Google Has Not Shown An Abuse Of Discretion In The Syndication And Data-Sharing Remedies The Court Ordered.

Google's final argument—that the syndication and data-sharing remedies are "contrary to
law and unsupported by the evidence," Def.'s Mem. Supp. Mot. 21—again ignores both the
Court's findings and governing precedent.

As a factual matter, Google's claim that "Plaintiffs never established a causal connection
between" its unlawful conduct "and Google's position in the market," Def.'s Mem. Supp. Mot.
21 (internal quotations omitted), is wrong. This Court's remedies opinion devoted nineteen pages
to the issue of causation, Remedies Op. 63–82, finding that Google's unlawful conduct
"significantly contributed to the maintenance of its monopoly power," *id.* at 77. Google's
agreements "allowed Google to persistently widen the data moat" between itself and rivals—
giving Google a scale advantage that "played an important role in entrenching Google's
dominance." *Id.* at 79.

Google's complaints of Plaintiffs' purported "failure of proof," Def.'s Mem. Supp. Mot.
22, assume the correctness of arguments that this Court rightly rejected. Google assumes that
Plaintiffs were required to establish anticompetitive effects by reconstructing a hypothetical but-
for marketplace—an argument that this Court rightly held "stretches *Microsoft* . . . beyond
recognition." Remedies Op. 67. Google likewise assumes that Plaintiffs were required to
quantify what "portion of Google's 'advantage' was attributable to" its unlawful conduct, Def.'s

21

Mem. Supp. Mot. 22—an argument for which Google has never offered authority and which this Court correctly rejected, Remedies Op. 97.

Google also gets nowhere with its cursory claim that the data-sharing and syndication remedies improperly require "propping up" rivals and make this Court a "central planner." Def.'s Mem. Supp. Mot. 24. It is well recognized that "after establishing liability, [a] district court ha[s] within its basket of remedial powers the authority to require [the defendant] to deal with parties harmed by its anticompetitive conduct, including its competitors." *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 948 (9th Cir. 2025); *see also Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1222 (D.C. Cir. 2004) (affirming requirement that Microsoft disclose APIs to competitors). Given that the remedies will likely apply to a number of Qualified Competitors, Google's attempted analogy to the remedy *Massachusetts* rejected for solely and specifically benefiting Java—"a specific competitor"—falls flat. Def.'s Mem. Supp. Mot. 24 (citing *Massachusetts*, 373 F.3d at 1231–32). And the Court did not make itself a "central planner"; on the contrary, by deferring to the ordinary commercial terms of Google's existing contracts wherever possible, the Court expressly "la[id] to rest Google's contention" on that score. Remedies Op. 180.[8]

## III. The Public Interest Weighs Strongly Against A Stay.

The third and fourth stay factors—which require a movant to "(3) show that issuing a stay will not substantially injure the other parties interested in the proceeding; and (4) establish

---

[8]    Google's complaint that the remedy extends to GenAI products is curious given its earlier concession before this Court that the remedy should extend to GenAI. Remedies Op. 99. It is also misplaced. As this Court recognized, the *Microsoft* remedy extended to products that were not in the relevant markets found at liability because of their potential to promote competition in those markets. *Id.* at 101–04. So too here.

that the public interest favors a stay"[9]—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors weigh strongly against granting Google a stay pending appeal now.

Google's arguments that the public will benefit from a stay hinge on its irreparable harm arguments, which are (as explained above) speculative and, in many instances, contrary to the Court's factual findings. For example, Google's claim that the public interest would be harmed by disclosing its trade secrets, Def.'s Mem. Supp. Mot. 36, fails because it has no basis for thinking its trade secrets *will* be disclosed. So too does Google's claim that "hundreds of millions of Americans[']" privacy is at risk. *Id.* Google previously conceded that remedies in this case can protect privacy, this Court found that privacy will be protected in the remedies, and before the privacy safeguards for the data sharing remedies are actually identified and approved under the Final Judgment, Google's privacy concerns are at best pure speculation. *See* Remedies Op. 163–64; Final Judgment § IV.C. And Google's claim that the remedies at issue will deprive the public of "the benefits of innovation," Def.'s Mem. Supp. Mot. 37, is likewise speculative in the absence of any evidence that the Court, Plaintiffs, and Technical Committee will implement such remedies in a way that harms innovation. Rather, Google's claim contradicts the Court's finding that Google will not be disclosing information that is "a product of engineering and innovation." Remedies Op. 145; *see also id.* at 136 (noting that the Court had modified the data-sharing remedies "to mitigate their impact on Google's and competitors' innovation incentives"). Google has failed to grasp that, in a competitive marketplace, innovation comes from new sources, which press the incumbent to improve its own quality, lower prices, and speed innovation.

---

[9]    *KalshiEX LLC*, 119 F.4th at 63 (internal quotations omitted) (citing *Nken*, 556 U.S. at 434).

On the other side of the ledger, there are strong reasons why the public interest will benefit from denying a stay now. Staying the requirements now would inevitably delay the remedy by deterring would-be Qualified Competitors from coming forward and reducing Google's incentives to complete its preparatory work on schedule. Those diminished incentives would inevitably slow down the many steps that must be taken before remedies are ready to be implemented. Google dismisses this prospect on the ground that the remedies are "entitlements that no Qualified Competitor would have obtained" in ordinary circumstances, Def.'s Mem. Supp. Mot. 38–39, but these are not ordinary circumstances. This Court has adjudicated Google liable for violating Section 2 through a decade-long campaign of monopolization in two markets comprising billions of dollars in commerce (to say nothing of the *two* additional Sherman Act verdicts that judges and juries have rendered against Google in the last several years). The paramount public interest at this point is in keeping the remedy on a path to implementation as soon as possible, not "depriv[ing] consumers . . . of the benefits of competition pendente lite" for Google's sole benefit. *FTC v. Elders Grain, Inc*., 868 F.2d 901, 904 (7th Cir. 1989).[10] At the very least, that public interest counsels strongly in favor of denying Google a stay *now*, when its claims of irreparable harm rest on nothing more than speculation and surmise.

## CONCLUSION

For the foregoing reasons, the Court should deny Google's motion without prejudice.

---

[10]    Google acknowledges that competitors may benefit from the remedies but argues that "[t]he interest of competitors is not equivalent to the public interest." Def.'s Mem. Supp. Mot. 39. Google misses the entire point of this case and the remedy: the public has a vital interest in competition, and "it is impossible to *have* competition without competitors." Hon. Diane P. Wood, *The Necessary Revival of Sherman Act Section 2*, Competition Pol'y Int'l (Feb. 8, 2021), https://perma.cc/GA8M-LAAD.

Dated: January 30, 2026

Respectfully submitted,

<u>/s/ Karl E. Herrmann</u>
David E. Dahlquist
Travis R. Chapman (D.C. Bar #90031151)
Danielle Hauck
Karl E. Herrmann (D.C. Bar #1022464)

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-6158
David.Dahlquist@usdoj.gov
Travis.Chapman@usdoj.gov

*Counsel for Plaintiff*
*United States of America*

By:      /s/ Lee Istrail
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex
Enforcement Chief, Antitrust Division
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of
Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By:      /s/ Diamante Smith
Ken Paxton, Attorney General
Brent Webster, First Assistant
Attorney General
Ralph Molina, Deputy First Assistant
Attorney General
Austin Kinghorn, Deputy Attorney
General for Civil Litigation
Thomas York, Division Chief,
Antitrust Division
Diamante Smith, Assistant
Attorney General, Antitrust
Division
Office of the Attorney General,
State of Texas

P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1162
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By:      /s/ Carolyn D. Jeffries
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney
General
Michael Jorgenson, Supervising Deputy
Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney
General (DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

Amanda J. Wentz
Ark. Bar No. 2021066
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
Phone: (501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney
General
Ronald J. Stay, Jr., Senior Assistant
Attorney General
Charles Thimmesch, Senior Assistant
Attorney General
Office of the Attorney General, State of
Georgia
40 Capitol Square, SW Atlanta, Georgia
30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and
Director, Consumer Protection Division
Jesse Moore, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of
Indiana
Indiana Government Center South, Fifth
Floor
302 West Washington
Street Indianapolis,
Indiana 46204
Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the
Office of Consumer Protection
Philip R. Heleringer, Executive
Director of the Office of Consumer
Protection Jonathan E. Farmer, Deputy
Executive Director of the Office of
Consumer Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff*
*Commonwealth of Kentucky*

Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General, State of
Louisiana
Public Protection Division
909 Poydras St. Suite 1850
New Orleans, LA 70112
(225) 326-6435
NachabeA@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736, Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

Alison Esbeck
Missouri Bar No. 58501 Assistant
Attorney General Consumer
Protection Section
Missouri Attorney General's Office 815
Olive Street | Suite 200
Saint Louis, Missouri 63101
Alison.esbeck@ago.mo.gov
Phone: 314-340-4977

*Counsel for Plaintiff State of Missouri*

Lynn Fitch, Attorney General
Crystal Utley Secoy, Assistant Attorney
General
Lee Morris, Special Assistant Attorney
General
Office of the Attorney General, State of
Mississippi
P.O. Box 220, Jackson, Mississippi 39205
Crystal.Utley@ago.ms.gov
Lee.Morris@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

Anna Schneider
Special Assistant Attorney General,
Senior Counsel,
Montana Office of Consumer Protection
P.O. Box 200151,
Helena, MT 59602-0150
Phone: (406) 444-4500
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney
General
C. Havird Jones, Jr., Senior Assistant Deputy
Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Office of the Attorney General,
State of South Carolina
1000 Assembly Street
Rembert C. Dennis
Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

Joshua L. Kaul, Attorney General
Caitlin M. Madden, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Post Office Box 7857
Madison, Wisconsin 53707-7857
caitlin.madden@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

PHILIP WEISER
Attorney General of Colorado

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney
General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North
Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and
Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Matthew Michaloski, Assistant Attorney
General
Marie W.L. Martin, Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mmichaloski@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

STEPHEN J. COX
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of
Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of
Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Norman Lee Miller, Jr.
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-2710
E-Mail: nmillerjr@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawaiʻi

Rodney I. Kimura
Department of the Attorney General, State
of Hawaiʻi
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawaiʻi*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail: John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Christopher Teters
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: chris.teters@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Melissa English
Office of the Attorney General of
Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
menglish@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of
Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of
Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General

100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New
Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New
Hampshire*

JENNIFER DAVENPORT
Acting Attorney General of New Jersey

Yale A. Leber
Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (609) 376-2383
E-Mail: Yale.Leber@law.njoag.gov
Abiola.Miles@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87504

Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust
Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North
Dakota*

DAVID YOST
Attorney General of Ohio

Beth Ann Finnerty, Section Chief,
Antitrust
Sarah Mader, Assistant Attorney General,
Antitrust
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Beth.Finnerty@ohioago.gov
Sarah.Mader@ohioago.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Cameron R. Capps
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Telephone: (405) 522-0858
E-Mail: Cameron.capps@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Gina Ko, Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (503) 934-4400
E-Mail: Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of
Pennsylvania*

LOURDES L. GÓMEZ TORRES
Secretary of Justice

TANIA L. FERNÁNDEZ-MEDERO
Assistant Secretary of Justice

SAMUEL WISCOVITCH-CORALI
Deputy Undersecretary

Pablo Tufiño-Soto
Senior Attorney
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192

San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, Ext. 1205
E-Mail: ptufino@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov
*Counsel for Plaintiff State of Vermont*

JAY JONES
Attorney General of Virginia

Tyler T. Henry
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

KEITH KAUTZ
Attorney General of Wyoming

William T. Young
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*