**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

United States of America, *et al.*,

                             Plaintiffs,

v.

Google LLC,

                             Defendant.

Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

███████████████████

---

State of Colorado, *et al.*,

                             Plaintiffs,

v.

Google LLC,

                             Defendant.

Case No. 1:20-cv-03715-APM

HON. AMIT P. MEHTA

███████████████████

---

## JOINT STATUS REPORT

Pursuant to the Court's Order, ECF No. 1482, the Parties submit the following Joint Status Report.

### I.    Joint Status Update

On January 21, 2026, the Court entered an order appointing the Parties' nominees to the Technical Committee ("TC"), those three individuals composing the Standing Committee Members. Under Section VII.A.6 of the Final Judgment, Plaintiffs are required to enter into a Technical Committee Services Agreement ("TC Services Agreement") with each Technical Committee Member ("TC Member") "[p]romptly after appointment." Under Section VII.A.8, each TC Member must also sign a confidentiality agreement.

The Parties provide the Court with the following joint update on the status of the TC Services Agreement and Confidentiality Agreement and request the Court's assistance with the disputes identified below in the Parties' Position Statements. The Parties respectfully request an expedited hearing on these disputes.

TC Services Agreement Status

Section VII.A.6.a directs the TC Services Agreement to include, among other provisions, that "[t]he TC members shall serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the parties agree, including payment of reasonable fees and expenses."

The Parties have engaged in ongoing meet and confers regarding potential compensation for TC members, beginning on December 16, 2025 and concluding on January 30, 2026, when the Parties reached impasse on the time commitment for TC Members and related points on which compensation would be based.

During and after this same period, the Parties engaged in ongoing negotiations regarding other provisions of the TC Services Agreement. Although the Parties remained at an impasse regarding compensation-related terms, they were able to reach agreement regarding the remainder of the TC Services Agreement.

The Parties respectfully request the Court's guidance on the compensation-related disputes. The Parties include their respective position statements regarding these disputes in Sections II–IV below.

Confidentiality Agreement Status

On January 20, 2026, Plaintiffs sent Google a draft of the Confidentiality Agreement at the same time Plaintiffs sent the draft TC Services Agreement. Google provided redlines to the

draft Confidentiality Agreement on February 4. On February 5, the Parties met and conferred

regarding the Confidentiality Agreement and—while an agreement has not been reached—

believe that Court intervention is not needed at this time.

## II.    United States and Co-Plaintiff States' Position Statement Regarding Compensation-Related Terms

This is a landmark antitrust case to which the Parties and the Court have dedicated a great

deal of time and effort. The Final Judgment is the culmination of years of litigation and thorough

analysis by the Court, and the remedies are intended to address over a decade's worth of harm

caused by Google's conduct in the markets for general search services and search text ads. The

TC will play a vital role in implementing those remedies.

To that end, Plaintiffs propose that, at least for each TC Member's initial term,[1] the TC

Member role should be (a) considered a full-time position, (b) compensated at a salary that

reflects the market and practical realities of similar positions and expectations, and

(c) compensated at the same rate for the entirety of the TC Member's initial term. Since the

Parties' first meet and confer on December 16, Plaintiffs have emphasized the full-time

commitment, which reflects the critical nature of the TC's role to assist in the enforcement of

and compliance with the Final Judgment. Plaintiffs' proposal is further informed by the technical

committee in the *Microsoft* case, which was compensated on a full-time basis and—as Google

has affirmatively argued—had a narrower remit compared to the more complex remedies that the

TC will address here.[2] By contrast, Google's proposal that the TC Member role be compensated

---

[1] Under Section VII.A. 4 of the Final Judgment, "[t]he Standing Committee Members shall serve for an initial term of thirty-six (36) months; the remaining members shall serve for an initial term of thirty (30) months."

[2] *See, e.g.*, Rem. Tr. 4829:1–4830:23 (J. Schmidtlein) ("In *Microsoft*, the details were, you're going to have to disclose those APIs, you're going to have to disclose a certain amount of

as a salary position based on a part-time commitment undermines the TC before its work can even begin, relegating TC Members to part-time, ignoring the vital role of the TC and the primary precedent that exists, and impairing the ability to recruit highly qualified individuals to serve on the TC.

**A.      The TC Member Role Is A Full-Time Commitment**

Considering the TC Member role as a full-time commitment reflects the importance of the role and that it deserves the TC Members' full attention. As this Court has recognized, the TC "will carry out important functions" and will help Plaintiffs "establish standards and processes[] . . . [t]hat will be part of the 'practical workings' of the final judgment." Rem. Op. 211–12 (citation omitted).  Recognizing the significant work that the TC Members will undertake, the Court extended the remedies period by one year based on the "expectation that it will take one year to establish the [TC] and the processes necessary for execution." Rem. Op. 219. Even once those processes are established, however, the TC will continue to have substantial ongoing obligations, including but not limited to evaluating (potential) Qualified Competitors, auditing Qualified Competitors' data security and privacy practices, auditing Qualified Competitors' use of search syndication, receiving disclosures from Google about Search Text Ads auction changes, monitoring Google's implementation of and compliance with its obligations under the Final Judgment, handling complaints received pursuant to the Final Judgment, and submitting regular written reports to Plaintiffs on the TC's activities and recommendations. Rem. Op. 211–12; Final Judg. §§ V.B.5, VI.A, VII.A.7, VII.C.3, VII.E, IX.V.

---

protocols. . . . That's what the technical committee was brought in [*Microsoft*] for, a bunch of computer science and engineering. It was a very narrow remit and a very narrow set of expertise."); Def.'s Prop. Findings of Fact ¶ 1226, ECF No. 1346 ("[Plaintiffs' proposed TC] is different from the role of the Technical Committee in *United States v. Microsoft*, where the Technical Committee was established to assist the plaintiffs with compliance. Here, the TC has substantive input into what the actual proposals require of Google." (internal citation omitted)).

The actual remedies, moreover, are technologically complex—not only in and of themselves, but also when implemented "in these fast-moving times, where GenAI technologies are breaking barriers seemingly at light speed." Rem. Op. 220. For the TC to provide the "technical competence" needed to assist in the enforcement of and compliance with the Final Judgment, TC Members must be able to dedicate their full attention to the remedies. Rem. Op. 212; Final Judg. § VII.A. Google's contention that the TC need only work on a part-time basis conflicts with the fact that the TC will have a much broader role and wider scope of issues to work through than the *Microsoft* technical committee, as Google's own arguments have recognized. *See* Final Judg. Mem. Op. 50 (rejecting Google's argument that the TC's role in this case is improperly broad); Rem. Tr. 4829:1–4830:23 (J. Schmidtlein) (describing the *Microsoft* technical committee as having a "very narrow remit and a very narrow set of expertise").

Plaintiffs expect the Standing Committee Members to be deeply involved in the analyses and decision-making processes of the TC. To be effective and drive the process forward, TC Members need to have a strong executive skillset, including leadership and organizational skills, in addition to a high level of expertise and experience. In making the nominations, Plaintiffs recognized the serious and substantial work to be done. At least two Standing Committee Members have extensive experience in creating and managing the types of organizational structures and cross-technical teams that will be needed to implement the remedies, and given the complexity of the numerous areas of their remit, Plaintiffs anticipate that a high level of commitment will be required by the TC Members to carry out their duties efficiently and effectively, especially in a fast-moving industry. The work of establishing the TC and the required processes will be significant, *see* Rem. Op. 219, especially during the initial term, and even if there is a possibility that the committee *may* at some point be able to transition into more

of a "maintenance" posture, that point would be much further down the line (and indeed never came in *Microsoft*, where the technical committee remained full-time).

Treating the TC Member role as a full-time position is also consistent with *Microsoft*. Plaintiffs understand that the *Microsoft* technical committee member role was at no point part-time and was compensated as a salaried position throughout each member's time on the committee. And as the *Microsoft* court emphasized, the committee's significant work played a critical role in the final judgment's success:

> [T]he TC has truly become one of the most successful aspects of the Final Judgments, because it has been invaluable in facilitating the Plaintiffs' enforcement efforts. . . . [T]he instant case is an 'unusually complex' one, and the TC has provided the Plaintiffs with crucial technical expertise by providing advice and evaluating Microsoft's compliance with the Final Judgments. . . . [The TC] provid[ed] testing, feedback, and critiques that have proved critical to the Plaintiffs' efforts to maximize the full potential of the Final Judgments' remedies.

*New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 157 (D.D.C. 2008) (internal footnote and citation omitted). The court went on to recognize that "based largely upon the TC's ability to evaluate the technical significance of issues and advise the Plaintiffs and Microsoft as to potential solutions," the parties were able to resolve compliance-related concerns "through cooperation rather than litigation." *Id.* at 158. The court later called the committee "the lynchpin in the successful effort" to implement the remedies and expressing that "without their assistance we would not have been successful." Hr'g Tr. 29:21–30:05, *United States v. Microsoft Corp.*, Case No. 1:98-cv-01232-CKK (D.D.C. June 19, 2012), ECF No. 930.

Google's proposal to treat the TC Member role as a part-time position from the start risks the success of the TC and the Court's Final Judgment. Setting up the TC as part-time would unnecessarily disrupt the TC's ability to perform their obligations and impede implementation of the Court-ordered remedies. The wiser course would be for TC Members to commence their terms prepared for full-time work.

Google's proposal also has significant financial consequences that would also impair the ability to attract and retain talented TC Members. The TC Members are private citizens who have agreed to serve the public by assisting Plaintiffs and the Court in the enforcement of and compliance with the Final Judgment. Two of these individuals are in the process of leaving their current employment and/or foregoing industry opportunities to work on the TC. Although Google has insisted that TC Members can engage in "other opportunities" like consulting if they want a full-time income while serving on the TC, that position falls flat for at least two reasons.

*First*, Google assumes that TC Members who are not already engaged in consulting work can readily do so. That, however, would: (a) effectively require such members to set up a side business that does not already exist; (b) require such members to actively grow a side business while also trying to do the work of the TC; and (c) distract from such members' work on the TC, which must take priority.

*Second*, Google assumes that "other opportunities" would be sufficient to make up for the shortfall in income from the TC Member role being a part-time position. This assumption, however, ignores that TC Members would be locked out of doing a substantial portion of possible consulting work due to the conflict provisions of the Final Judgment, including the one-year cooling-off period at the end of their service on the committee. Final Judg. § VII.A.2.c. These provisions—which Plaintiffs view as important to maintaining the integrity of the committee—would make it difficult for the TC members to easily find other professional opportunities that align with their expertise.

Accordingly, Plaintiffs believe that the TC Member role should be considered a full-time position, at least for each TC Member's initial term, and all TC Members, including the remaining two members to be selected, should be compensated accordingly.[3]

**B.    The TC Member Salary Should Reflect The Market And Practical Realities Of Similar Positions And Expectations**

In addition, the TC Member salary should reflect the market and practical realities of positions that are similar to and have similar expectations as the TC Member role. Given their duties and obligations, the TC Member role is most akin to a senior Product Manager role in the technology industry. To meet the Court's remedial goals, the role requires a TC Member to work strategically and cross-functionally to apply leading-edge technical expertise, at a minimum. Moreover, TC Members need to have the experience and expertise to engage with senior executives at Google on highly complex issues. Plaintiffs' proposal therefore aims to compensate TC Members accordingly, to enhance the TC's ability to attract and retain top talent.

Plaintiffs' proposal recognizes that the type of role a TC member would inhabit is akin to, at a minimum, a senior full-time product manager positions in the technology industry and should be paid a salary that reflects the expertise brought to the role, the work to be done, and the expectation that the individual will prioritize that work over other potential professional endeavors.[4]

---

[3] Plaintiffs have advised Google that if a TC Member is unwilling or unable to commit to being full-time, and if both (a) the other TC Members believe that the resulting workload distribution among the TC Members would still be workable, and (b) the TC Members agree that different terms reflecting the reduced commitment is appropriate, then the TC Members may jointly make such a proposal to Plaintiffs for that specific member for Plaintiffs to consider.

[4] How Google compensates its own Product Managers may reflect a competitive salary in the marketplace. During the parties' December 16 meet and confer, Plaintiffs requested that Google provide information on its salary ladders for Plaintiffs to consider. Google declined. Therefore, Plaintiffs looked at publicly available information for Google Product Managers in San

Further, Plaintiffs recognize that serving on the TC represents a significant opportunity cost for TC Members. As noted above, two of the Standing Committee Members are in the process of leaving their current employment and/or foregoing industry opportunities in recognition of the need to focus on the TC on a full-time basis. Moreover, many senior leaders and executives in the technology industry now—particularly more senior employees with experiences comparable to the TC Members' experiences—are compensated at least partially in stock options,[5] the value of which can grow over time, potentially very significantly. Here, however, TC Members will not have the opportunity for stock options and thus will be forgoing such potential future growth.[6]

The opportunity costs that the TC members bear are not limited to their time serving on the TC. Section VII.A.2.c of the Final Judgment prohibits TC Members from "perform[ing] any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC." This provision effectively locks each TC Member out of any number of well-paid employment opportunities after their time on the TC ends, and similar restrictions in the private sector typically require additional compensation to account for the lost employment potential.

---

Francisco at Google's "L10" level, which roughly equates to a Vice President Role, and used that to inform the compensation proposal. Although the Parties disagree as to whether the TC Member role reflects a higher level on Google's ladder, Plaintiffs do not believe that needs to be resolved for purposes of the present dispute.

[5] For example, between 2022 and 2024, the compensation of Google's six executive officers was structured to be less than 3% coming from salary and well over 90% coming from stock awards. Alphabet, Notice of 2025 Annual Meeting of Stockholders and Proxy Statement 49 (Apr. 25, 2025), https://abc.xyz/investor/annual-meeting/.

[6] TC members would also forego typical employment benefits such as health insurance, life insurance, and 401(k) plans.

Based on the factors and information above, Plaintiffs have proposed that the total compensation for each TC Member per year should be ▉▉▉▉▉. This total amount reflects the market and practical realities of the TC Member position and will ensure that the TC is comprised of serious, experienced, and talented members in an industry that is widely known for being highly competitive, particularly at more senior levels.

By contrast, Google appears to propose that the TC Member salary be based in large part on the reported hourly rates of experts in this case, for a total annual compensation of ▉▉▉ ▉▉▉ per TC Member—an annual salary assuming part-time hours. Google's approach, however, is neither realistic nor appropriate in this context. Moreover, the TC's work is inherently different than what an expert typically does in the litigation context. The TC Members are not merely looking at a discrete set of issues and offering an opinion. Instead, the TC Members will be building an entire organization from scratch, serving as operators and managers, creating cross-functional teams, developing a range of processes, and undertaking ongoing auditing and compliance responsibilities over the full term of the Final Judgment. Such work is far more akin to a typical salaried executive than to a consulting or testifying expert. Further, for the reasons discussed above, the TC Member role is a full-time position, and tying salary for this type of position to a specific number of hours worked does not reflect market or practical realities.

Even accepting, *arguendo*, Google's starting point of the hourly rates of experts in this litigation, such an approach fails to account for the actual compensation those experts received. An expert's hourly rate, as stated in an expert report on a given matter, does not necessarily reflect that expert's actual compensation related to that matter. Many experts, whether working with a firm or independently, also receive other forms of compensation in addition to their hourly

rate on a matter, such as a percentage of the billings for staff working on that matter or a bonus to reward the expert for bringing that work to firm. Google's proposal does not appear to account for any such additional forms of compensation.

Finally, to the extent Google suggests that its proposal is based on the *Microsoft* technical committee, that assertion ignores that the remedies in this case are more complex than in *Microsoft*. Further, the technology industry has grown exponentially since the *Microsoft* technical committee concluded its work, and competitive salaries in the market today are significantly higher.

### C.    TC Member Compensation Should Be Set For The Initial Term

Finally, compensation for TC Members should be set for the initial term. As referenced above, Standing Committee Members and remaining members are to serve for an initial term of 36 months and 30 months, respectively. Final Judg. § VII.A. 4. The TC Services Agreement therefore binds Plaintiffs and TC Members for the same periods.

As a practical matter, the TC Members should have a degree of certainty as to what their compensation will be across their terms. Plaintiffs thus propose that the TC Member total compensation be set at a sum certain for the entire initial term. This balances income certainty with the opportunity to reassess in the event circumstances change and to make an adjustment if the parties agree that is appropriate.

Google's proposal, by contrast, would create an untenable position for the TC and TC Members. Google proposes that total compensation be set at a sum certain for only the first year of each TC Member's term, with compensation for the remainder of the term to be decided at a later, undefined time. Such a structure essentially asks TC Members to decide now to forego other professional opportunities and commit to a three-year term plus a one-year non-compete

provision, with no knowledge of what their compensation would be after just one year.[7] Google's proposal thus prevents the TC Member from having important details needed to make an informed decision on whether to join the TC in the first instance. And the proposal is further inconsistent with the approach used for the *Microsoft* technical committee and with how compensation in professional arrangements is typically structured.

### D. Conclusion

For these reasons, Plaintiffs respectfully request the Court to order that, at least for each TC Member's initial term, the TC Member position be (a) considered a full-time position, (b) compensated at a salary that reflects the market and practical realities of similar full-time positions and expectations, and (c) compensated at a consistent salary for its initial term.

## III. Colorado States' Position Statement Compensation-Related Terms

The Colorado States join in the separate statement of the United States and offer these additional views. The Colorado States' position on compensation reflects our expectation of the extensive commitment that will be required of its members in order for the TC to achieve its goals effectively, both in developing, launching, and maintaining the TC's processes and, especially, in implementing the remedies.

Although the phrasing of "full-time" versus "part-time" can be a helpful shorthand, the fundamental point is this: The work of the TC cannot be calculated merely by counting hours.

In the interview process, the Colorado States consistently emphasized to prospective TC Members that the work of the TC must always come first. And that means, perforce, that the

---

[7] Google's proposal would also disrupt the TC's ability to carry out its duties under the Final Judgment. Under Google's timeline, the TC Members would need to enter salary negotiations less than a year from now, while still doing significant work both to stand up the TC's operations and to assist in the enforcement of and compliance with the Final Judgment. Such a disruption is not necessary and could readily be avoided with Plaintiffs' proposal.

members must be available to ensure the rapid and thoughtful implementation of remedies and that they must be prepared to assume the opportunity costs that this commitment may involve. In other words, achieving remedial goals is not just a matter of the total hours that the members work; it must also recognize the dedicated focus that TC Members will need to devote to these tasks. And that, of course, requires that they not work some defined set of hours but that they be available whenever they are needed and that the work of the TC must take precedence in their professional lives.

The varied and complex tasks assigned to the TC support the need for a full-time commitment. Not only must the TC stand up—and then manage—a new organization comprised of dedicated professionals, it must also help solve critical technical issues needed to implement the Court's remedies and conduct ongoing monitoring and other duties. Some of these tasks include:

- Determining what companies are Qualified Competitors, a task that itself includes determining whether a Competitor under the Final Judgment meets approved data security standards and then whether that company has presented a sufficient plan to invest and compete in or with the GSE and/or Search Text Ads markets. Final Judg. § IX.V.

- Determining the appropriate general Qualified Competitor, and User-side Data-specific, privacy and security safeguards to be applied before Google shares data with Qualified Competitors, as well as helping to determine that the technology for user data-sharing including privacy and security safeguards is fully functional and considering restrictions on the data that Google shares. Final Judg. §§ IV.C., IX.V.

- Continuing to administer data security and privacy audits to Qualified Competitors. Final Judg. § IX.V.

- Consulting with Plaintiffs and the Court regarding the exact number of and frequency of disclosures of User-side Data to Qualified Competitors Final Judg. § IV.B.2.

- Consulting with Plaintiffs regarding the frequency and content of search syndication audits and continuing to administer such audits. Final Judg. § V.B.5.

- Continuing to receive and investigate complaints from Plaintiffs, Google's Compliance Officer, and third parties. Final Judg. §§ VII.A.7e., VII.C.3.

Against this, Google's objections ring hollow.

First, the role of a TC Member is not that of an expert witness, and Google's apparent notion that the Court look to the payment of experts as a guide to the compensation issue is wholly inapt. An expert offers an opinion. A TC Member runs an organization. An expert suggests how facts can be understood. A TC Member's task is to "assist the plaintiffs and the court in enforcing equitable antitrust remedies," Rem. Op. 211–a task that requires analyzing facts and applying multiple disciplines to actionable outcomes. An expert witness would never be described as a decision-maker. But the very first task of the TC is to make a critical decision: whom to propose for the final two slots on the TC.

The importance of experience and knowledge among TC Members cannot be over-emphasized. Google has plentiful knowledge about the operations of general search and general search text ads – software engineering, information retrieval, artificial intelligence, economics, behavioral science and data privacy and data security. Rem. Op. 213. A good bet is that there is no entity in the world more knowledgeable.

Against this, the Plaintiffs must work to enforce the Final Judgment effectively. A huge barrier to success is the vast information asymmetry that exists between the Plaintiffs and Google. In some real sense, a critical task of the TC, with the help of expert staff, is to close that asymmetry just enough to render remedies effective. And to do so in the face of Google's superior knowledge and obvious economic incentives – the same economic incentives that led, after all, to the monopoly maintenance conduct itself. This daunting task demands a TC with sophisticated expertise and laser-like focus.

Second, Google fails (or declines) to recognize what is at stake. This Court has emphasized the importance of speedily implementing the Final Judgement. Hr'g Tr. 32:7–15

(Oct. 08, 2025). Even just considering the two compensation numbers on their face sets up an obvious choice: Risk under-implementation or risk over-compensation. In these circumstances that is no choice at all. Under-implementation would risk the failure of the remedies. Over-compensation, given the specific numbers filed under seal in the separate statement of the United States, would be a rounding error, even less than a rounding error, for Google.

This Court has recognized before the different positions in which the Plaintiffs and Google stand. In rejecting Google's request that it have the right to nominate as many TC Members as the Plaintiffs, the Court said:

> Google seems to believe it deserves an equal seat at the table. Google's Br. at 73. But that misconstrues the Committee's purpose. Its role is "to inform and assist the Government in its enforcement efforts," Massachusetts, 373 F.3d at 1244, not to act as a "neutral arbiter," Google's Br. at 73.

Rem. Op. 212.

Finally, "it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of [antitrust] law, all doubts as to the remedy are to be resolved in its favor." Final Judg. Op. 5. That is why "[w]here any doubts remained after considering the evidence and the parties' positions, the court has deferred to Plaintiffs as to the appropriate remedial terms." *Id.* Given the importance of the work of the Technical Committee, any doubt should be resolved in favor of the Plaintiffs' position, but as demonstrated herein, the Colorado States believe there is no doubt at all.

## IV.  Google's Position Statement Regarding Compensation-Related Terms

Google and Plaintiffs are in agreement that Technical Committee Members ("TC Members") should be fairly compensated for the important role that they will serve in administering the Final Judgment.  Plaintiffs' unprecedented compensation proposal, however, assumes unrealistically full-time work (███████████████) for the first three years, and sets

a fixed ███████ salary that is to be paid regardless of time actually worked. Google's proposal, by contrast, will more than fairly compensate TC Members based on a more realistic projection of the amount of work they will perform, consistent with the Final Judgment. FJ § VII.A.6.a ("The TC members shall serve . . . at the cost and expense of Google on such terms and conditions as the parties agree including payment of *reasonable* fees and expenses."). Consistent with the Court's "expectation that it will take one year to establish the Technical Committee and the processes necessary for execution," Sept. 2 Op. at 219, Google's proposal also accounts for the Technical Committee's changing duties over time. Google's proposed compensation for the first year ███████ is based on the assumption that TC Members each devote very substantial time—approximately ███████ hours—to Technical Committee work over the first year of service. Compensation would then be re-assessed to reflect that the ongoing duties after the first year are significantly less time-intensive than the duties in the first year.

Plaintiffs' principal arguments in support of their proposal are (i) that the Microsoft TC was ultimately paid on a full-time basis, and (ii) that the TC Members should be compensated at a level commensurate with a VP-level role at a major technology company. Neither withstands scrutiny.

First, Plaintiffs' proposal is at odds with the Technical Committee's duties under the Final Judgment. Those duties are most time-intensive at the outset, as the Technical Committee develops standards and processes before reverting to primarily compliance work. Aided by as many staff "as are reasonably necessary" to perform its duties (FJ § VII.A.7.i), the TC Members' immediate tasks entail: (1) recommending Qualified Competitor ("QC") data security standards, advising on certification, and establishing re-certification procedures; (2) advising on the license template for the index and user-side data disclosures; (3) advising on privacy and security

safeguards to be applied to the user-side data and the number and frequency of the user-side data disclosures; (4) advising on the search and ads syndication license templates and search syndication caps; and (5) advising on the search text ads reporting requirement.  The timelines provided by the Final Judgment contemplate that all of that work will occur within the first year, and much of it within the first six months.[8]  Once these "processes necessary for execution" of the Judgment are in place, Sept. 2 Op. at 219, the TC Members' responsibilities will transition to less time-consuming work, including assessing prospective QCs, auditing and re-certifying QCs, reviewing ads auction disclosures, handling any complaints, and reporting on Google's compliance.[9]  Google's proposal accounts for this reduced workload by reassessing compensation after the first year, rather than a fixed salary that does not account for any change in actual hours worked.[10]

Second, Plaintiffs' proposal to presumptively compensate TC Members on a full-time basis—without any requirement that TC Members record their time— is inconsistent with both the Final Judgment ("payment of reasonable fees") and common practice in the context of the consulting and testifying experts retained for litigation, as well as monitors and special masters. Federal courts routinely establish compliance monitors and special masters with hourly compensation frameworks, typically charging their "standard hourly rate" plus costs and expenses. Thomas E. Willging et al., *Special Masters' Incidence and Activity*, Federal Judicial Center, 41-44 (2000); *see also Trout v. Ball*, 705 F. Supp. 705, 708 (D.D.C. 1989) ("The rule in this Circuit is that [special master's] fees are to be determined based upon the prevailing market rate for similar

---

[8] FJ §§ IV.C.1, 3; FJ § V.B; FJ §§ VI.A, B; FJ §§ VII.A.1, 3.c.

[9] FJ § V.B.5; FJ § VI.A; FJ §§ VII.A.7.a, c-h; FJ §§ VII.C, E; FJ § IX.W.

[10]  Notably, nothing in the Final Judgment requires that TC Members exclusively work on the Technical Committee.  As reflected in Section VII.A.2 of the Final Judgment, TC Members may perform other work throughout their service, subject to the conflict limitations.

work."). While Google's own proposal provides for a fixed salary for the first year (as opposed to an hourly-pay structure) in recognition of the TC Members' commitment to set aside substantial time for their initial work on the Technical Committee, it bears emphasis that a salaried position is itself a departure from the norm.

Third, Plaintiffs point to the *Microsoft* Technical Committee in support of their full-time, fixed salary proposal. But the *Microsoft* Technical Committee prepared original, highly technical documentation required to be usable by licensees across a broad range of implementations—an extraordinarily complex effort that ultimately took more than five years. *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 158-64 (D.D.C. 2008); *see also* Joint Status Report, *United States v. Microsoft Corp.*, 2011 WL 2681926 (Apr. 22, 2011 D.D.C.) (Microsoft will be "publishing the documentation prepared by the TC without any substantive changes."). The Microsoft Technical Committee also expanded its involvement over time across multiple implementation plans, taking on work that Microsoft had committed to completing and resolving technical issues itself using Windows source code. *See New York*, 531 F. Supp 2d at 144, 158-64 (recounting the protocol disclosure remedy's "extreme and unforeseen" delays and "tortured history"). Here, there is no reason to believe—and Plaintiffs have not suggested—that the Technical Committee's responsibilities entail a similar, years-long technical endeavor. Nonetheless, Plaintiffs have proposed ███████ TC Member annual salaries that far exceed those of the *Microsoft* TC members.[11] The Court should instead adopt Google's proposal, which is more than reasonable in both the form and amount of compensation.

---

[11] ████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Finally, based on the parties' meet-and-confer discussions, Plaintiffs appear to be contemplating a role for the Technical Committee that is very different from Google's understanding. Google's understanding was that the Technical Committee would be composed of technical experts whose principal role would be to bring their technical expertise to bear on the unresolved issues in the Final Judgment. To that end, Google's compensation proposal is based on the blended average hourly rate of testifying experts retained by either side in the liability and remedies phases of this litigation (28 experts total; average rate just under ███████, as well as Dr. Abowd's customary hourly rate ███████ Plaintiffs, by contrast, envision the Technical Committee as principally executive-level product managers, who Plaintiffs believe should be compensated akin to the total compensation package (including stock options) that Vice Presidents at major technology companies receive. Plaintiffs have not explained how the TC Member's role is comparable to that of a VP-level executive, whether in terms of day-to-day responsibilities, time commitment, or otherwise.

The Court should adopt Google's proposal: ███████ compensation for year 1, with year 2 and thereafter to be reassessed based on anticipated time commitment (among other variables). The Court should further require that TC Members track the number of hours spent per week on Technical Committee-related responsibilities.

_____

████████████████████████████████████████████

Dated: February 6, 2026                    Respectfully submitted,

                                           /s/ Karl E. Herrmann
                                           David E. Dahlquist
                                           Travis R. Chapman (D.C. Bar #90031151)
                                           Danielle Hauck
                                           Claire M. Maddox (D.C. Bar #498356)
                                           Grant M. Fergusson (D.C. Bar #90004882)
                                           Karl E. Herrmann (D.C. Bar #1022464)

                                           U.S. Department of Justice
                                           Antitrust Division
                                           Technology & Digital Platforms Section
                                           450 Fifth Street NW, Suite 7100
                                           Washington, DC 20530
                                           Telephone: (202) 307-6158
                                           David.Dahlquist@usdoj.gov
                                           Travis.Chapman@usdoj.gov

                                           *Counsel for Plaintiff United States of America*

By: /s/ Amanda Wentz
Amanda J. Wentz
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
Phone: (501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

By: /s/ Carolyn D. Jeffries
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney General
Michael Jorgenson, Supervising Deputy Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General (DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

By: /s/ Lee Istrail
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex Enforcement Chief, Antitrust Division
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: /s/ Charles Thimmesch
Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney General
Ronald J. Stay, Jr., Senior Assistant Attorney General
Charles Thimmesch, Senior Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By: /s/ Jesse Moore
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director, Consumer Protection Division
Jesse Moore, Deputy Attorney General
Christi Foust, Deputy Attorney General
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

By: /s/ Jonathan E. Farmer
Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the
Office of Consumer Protection
Philip R. Heleringer, Executive
Director of the Office of Consumer
Protection
Jonathan E. Farmer, Deputy Executive
Director of the Office of Consumer
Protection
Office of the Attorney General,
Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff*
*Commonwealth of Kentucky*

By: /s/ Asyl Nachabe
Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General, State of
Louisiana
Public Protection Division
909 Poydras St. Suite 1850
New Orleans, LA 70112
(225) 326-6435
NachabeA@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By: /s/ Scott Mertens
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By: /s/ Alison Esbeck
Alison Esbeck
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
Alison.esbeck@ago.mo.gov
Phone: 314-340-4977

*Counsel for Plaintiff State of Missouri*

By: /s/ Anna Schneider
Anna Schneider
Special Assistant Attorney General,
Senior Counsel,
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT 59602-0150
Phone: (406) 444-4500
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

By: /s/ Mary Frances Jowers
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy
Attorney General
C. Havird Jones, Jr., Senior Assistant
Deputy Attorney General
Mary Frances Jowers, Assistant Deputy
Attorney General
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Rembert C. Dennis
Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

2

By: /s/ Diamante Smith
Ken Paxton, Attorney General
Brent Webster, First Assistant Attorney
General
Ralph Molina, Deputy First Assistant
Attorney General
Austin Kinghorn, Deputy Attorney General
for Civil Litigation
Thomas York, Division Chief, Antitrust
Division
Diamante Smith, Assistant Attorney
General, Antitrust Division
Office of the Attorney General,
State of Texas
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1162
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: /s/ Caitlin M. Madden
Joshua L. Kaul, Attorney General
Caitlin M. Madden, Assistant
Attorney General
Wisconsin Department of Justice
17 W. Main St.
Post Office Box 7857
Madison, Wisconsin 53707-7857
caitlin.madden@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

PHILIP WEISER
Attorney General of Colorado

*/s/ Jonathan B. Sallet*
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney
General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

William F. Cavanaugh, Jr.
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2793
E-Mail: wfcavanaugh@pbwt.com

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI
Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Matthew Michaloski, Assistant Attorney General
Marie W.L. Martin, Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail: mmichaloski@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

STEPHEN J. COX
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Norman Lee Miller, Jr.
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-2710
E-Mail: nmillerjr@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawaiʻi

Rodney I. Kimura
Department of the Attorney General, State
of Hawaiʻi
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawaiʻi*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail: John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Christopher Teters
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: chris.teters@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Melissa English
Office of the Attorney General of
Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
menglish@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of
Massachusetts
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of
Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General

100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New
Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New
Hampshire*

JENNIFER DAVENPORT
Acting Attorney General of New Jersey

Yale A. Leber
Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (609) 376-2383
E-Mail: Yale.Leber@law.njoag.gov
Abiola.Miles@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87504

4

Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust
Division
Office of the Attorney General of North
Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570
E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North
Dakota*

DAVID YOST
Attorney General of Ohio

Beth Ann Finnerty, Section Chief,
Antitrust
Sarah Mader, Assistant Attorney General,
Antitrust
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Beth.Finnerty@ohioago.gov
Sarah.Mader@ohioago.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Cameron R. Capps
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Telephone: (405) 522-0858
E-Mail: Cameron.capps@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Gina Ko, Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (503) 934-4400
E-Mail: Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of
Pennsylvania*

LOURDES L. GÓMEZ TORRES
Secretary of Justice

TANIA L. FERNÁNDEZ-MEDERO
Assistant Secretary of Justice

SAMUEL WISCOVITCH-CORALI
Deputy Undersecretary

Pablo Tufiño-Soto
Senior Attorney
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192

San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, Ext. 1205
E-Mail: ptufino@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov
*Counsel for Plaintiff State of Vermont*

JAY JONES
Attorney General of Virginia

Tyler T. Henry
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

KEITH KAUTZ
Attorney General of Wyoming

William T. Young
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*

WILLIAMS & CONNOLLY LLP

By: _/s/ John E. Schmidtlein_____
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice*)
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-880
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*

8