**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

**DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF ITS
MOTION FOR A PARTIAL STAY PENDING APPEAL**

## <u>TABLE OF CONTENTS</u>

I.    GOOGLE'S MOTION IS NOT PREMATURE........................................................2

II.   THE IRREPARABLE HARMS THAT GOOGLE WOULD EXPERIENCE
     WITHOUT A STAY ARE NOT SPECULATIVE. ..........................................5

     A.    Compelled Syndication Would Irreparably Harm Google Absent a Stay. ..............6

     B.    Index Disclosure Would Irreparably Harm Google Absent a Stay.......................11

     C.    User-side Data Disclosure Would Irreparably Harm Google Absent a Stay.........13

III.  GOOGLE HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE
     MERITS OF ITS APPEAL..........................................................................................15

IV.  GOOGLE HAS ESTABLISHED THAT A STAY IS IN THE PUBLIC
     INTEREST AND WILL NOT HARM PLAINTIFFS.......................................18

     CONCLUSION....................................................................................................................21

# **TABLE OF AUTHORITIES**

## CASES

*Acumed LLC v. Stryker Corp.*, 551 F.3d 1323 (Fed. Cir. 2008) ................................................8, 13

*Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7 (D.D.C. 2014) ...........................................20

*CBS Corp. v. FCC*, 785 F.3d 699 (D.C. Cir. 2015) .......................................................................6

*Ctr. for Int'l Env't Law v. Office of U.S. Trade Rep.*, 240 F. Supp. 2d 21 (D.D.C. 2003) ........5, 12

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006).......................11

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38
(2d Cir. 1986)................................................................................................................8, 13

*Cigna Corp. v. Bricker*, 103 F.4th 1336 (8th Cir. 2024).........................................................10, 12

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013)...........................7

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 390 F. Supp. 3d 128
(D.D.C. 2019) ......................................................................................................................21

*FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500 (5th Cir. 1982) ....................................................10

*FTC v. Qualcomm Inc.*, 411 F. Supp. 3d 658 (N.D. Cal. 2019) ....................................................9

*FTC v. Qualcomm Inc.*, 935 F.3d 752 (9th Cir. 2019)............................................................9, 16

*Hospital Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192 (D.D.C. 2010)....................11, 14

*Human Touch DC, Inc. v. Merriweather*, 2015 WL 12564166 (D.D.C. May 26, 2015) .............21

*In re Google Play Store Antitrust Litig.*, No. 20-cv-5671, ECF 702 (N.D. Cal. Oct. 7,
2024) ......................................................................................................................................3

*In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025)...................................3, 16

*Jubilant DraxImage, Inc. v. U.S. Int'l Trade Comm'n*, 396 F. Supp. 3d 113 (D.D.C. 2019)........15

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27 (D.D.C. 2002) .....14, 20

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) ......................................3

*NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1 (1st Cir. 2019)........14

*Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187 (3d Cir. 1990) ..............10

*Privitera v. Cal. Bd. of Med. Quality Assurance*, 926 F.2d 890 (9th Cir. 1991) ............................4

*Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008)............................................................17, 18

*Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419 (D.D.C. 2018) ................................3, 11

*Signal Peak Energy, LLC v. Haaland*, 2024 WL 3887386 (D.D.C. Aug. 21, 2024).......................3

*Tools Aviation, LLC v. Digital Pavillion Elecs. LLC*, 797 F. Supp. 3d 222 (E.D.N.Y.
2025) ......................................................................................................................................8

*United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024).................................................18

*United States v. Microsoft Corp.*, 97 F. Supp. 2d 59 (D.D.C. 2000) ..................................................3

*United States v. Microsoft Corp.*, No. 98-cv-1233, ECF 591 (D.D.C. June 20, 2000) .............3, 16

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) ......................16, 17, 18

*United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006) ...................................3

*United States v. Philip Morris USA Inc.*, 2006 WL 4608645 (D.C. Cir. Nov. 1, 2006) .................3

*United States v. Visa U.S.A. Inc.*, 2002 WL 638537 (S.D.N.Y. Feb. 7, 2002) ............................16

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977) ...............................................................................................................................................15

*ZF Meritor LLC v. Eaton Corp.*, No. 06-623, ECF 283 (D. Del. Aug. 19, 2011) ........................16

## STATUTES AND RULES

Sherman Act Section 2, 15 U.S.C. § 2 .....................................................................................16, 17

**ABBREVIATIONS**

| CITATION | CORRESPONDING FILING OR TRANSCRIPT |
|---|---|
| Final Judgment | Final Judgment Dated December 5, 2025 (ECF 1462). |
| Google's Br. | Memorandum of Points and Authorities in Support of Defendant's Motion for a Partial Stay Pending Appeal Dated January 16, 2026 (ECF 1471-1). |
| Pls.' Br. | Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion for a Partial Stay Pending Appeal Dated January 30, 2026 (ECF 1478). |
| Remedy Op. | Memorandum Opinion Regarding Remedies Dated September 2, 2025 (ECF 1435). |
| Reid Decl. | Declaration of Elizabeth Reid, Vice President and Head of Search, Dated January 15, 2026 (ECF 1471-2). |
| Adkins Decl. | Declaration of Jesse Adkins, Director of Product Management for Search Syndication and Search Ads Syndication, Dated January 15, 2026 (ECF 1471-3). |
| Remedy Tr. | Transcript of the Evidentiary Hearing on Remedies Conducted from April 21 to May 9, 2025 and May 30, 2025. |

Google seeks to pause the final implementation of four specific provisions of the Final Judgment that would require Google to irreversibly disclose and share valuable assets and user data with its competitors while its appeal is pending. Each provision would cause textbook forms of irreparable harm to Google and the public unless a stay is entered. Plaintiffs do not explain how the consequences of these provisions could be undone if this Court's judgment is reversed. Plaintiffs thus have no sound basis to oppose Google's targeted request, which is supported by the evidence (including declarations and live testimony from last year's evidentiary hearing) and the law (including stay rulings in other major antitrust cases and numerous precedents addressing the irreparable harm of compelled licensing and the forced disclosure of confidential data). Plaintiffs have neither stipulated to a partial stay nor acknowledged that the Court should simply decide Google's motion in the usual manner. Instead, Plaintiffs ask the Court to "deny Google's motion without prejudice" and to direct Google to file separate stay motions when each of the four provisions is days or weeks away from being fully implemented. *See* Pls.' Br. at 2, 14-15, 24.

Plaintiffs do not cite a single case where a Court required such a piecemeal approach to a stay pending appeal, and there is no reason to adopt Plaintiffs' novel approach here. It is true that certain implementation details—including the specific terms of the syndication licenses and the privacy and security safeguards applied to user-side data—have not yet been determined. But that does not alter the fact that requiring Google to disclose data and license its search results and ads to its competitors would result in significant irreparable harm. The provisions Google seeks to stay *expressly require* Google to provide its valuable assets and confidential data to competitors so that they can use those assets and data in their general search engines in competition with Google. Disclosing confidential business information to competitors and

1

supplying them with valuable assets that Plaintiffs contend will help them compete with Google are paradigmatic forms of irreparable harm.  Such irreparable harm to Google is neither "speculative" nor "unrealistic"—indeed, aiding Google's competitors was Plaintiffs' express purpose in seeking these remedies.  *See* Pls.' Br. at 2.  It is therefore clear that such harms will be the direct and intended consequence of fully implementing certain provisions of the Final Judgment.

Plaintiffs' alternative arguments regarding the other stay factors are equally unconvincing.  Google has described numerous reasons why it has established a likelihood of success on the merits of its appeal of the liability and remedies decisions.  Plaintiffs' cursory response ignores some of Google's arguments altogether and mischaracterizes others in an attempt to create the misimpression that they are factual disputes subject to a deferential standard of review.  At a minimum, Google has advanced a serious legal question on the merits.  Finally, Plaintiffs offer no reason to doubt that a stay is in the public interest.  Their unexplained claim that entering a partial stay now would lead to delay is illogical and ignores that Plaintiffs' proposal for piecemeal litigation of Google's stay request would consume far more time and judicial resources and force a rushed judicial review.

## I.    GOOGLE'S MOTION IS NOT PREMATURE.

Plaintiffs' lead argument is that the irreparable harms detailed in Google's brief "are not imminent—they are distant."  Pls.' Br. at 2.  Yet Plaintiffs cite no case where a court refused to stay aspects of a final judgment because the requirements at issue were not scheduled to take effect for several more months.  And there is no real dispute that Plaintiffs expect these remedies to be implemented before the merits appeal is concluded in this action.  Even when injunctions contain a series of preparatory steps or distinct deadlines for certain provisions, courts do not require the party requesting a stay to file a separate motion each time a requirement is about to

take effect.  In *Microsoft*, for example, the district court stayed its final judgment even though it contained some provisions that would not take effect for several months.  *See United States v. Microsoft Corp.*, No. 98-cv-1233-TPJ, ECF 591 (D.D.C. June 20, 2000) ("*Microsoft* Stay Order").  And Plaintiffs themselves cite a more recent case where many provisions of the final judgment "were stayed pending appeal" pursuant to a single order even though some of those provisions required up to eight months of preparatory work before they would take effect.  *See In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 945 n.11 (9th Cir. 2025).  Courts have taken the same approach in other cases involving injunctions issued following government enforcement actions.  *See, e.g.*, *United States v. Philip Morris USA Inc.*, 2006 WL 4608645, at *1 (D.C. Cir. Nov. 1, 2006) (staying final judgment shortly after it was issued even though the judgment imposed a process for negotiating and approving implementation details in the months ahead).[1]

Plaintiffs' argument rests primarily on the use of the word "imminence" in cases that neither described what qualifies as "imminent" nor resolved a motion on that ground.  *See, e.g.*, Pls.' Br. at 1-2 (quoting *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)).  This superficial assertion ignores that irreparable harm is often considered "imminent" even when it is months away.  *See, e.g.*, *Signal Peak Energy, LLC v. Haaland*, 2024 WL 3887386, at *8 (D.D.C. Aug. 21, 2024) (rejecting the government's argument that "injury is not imminent because the potential procedural violation 'is months away'"); *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 434 (D.D.C. 2018) (finding irreparable harm, including that the need for "relief is immediate," where an agreement "lasts for only another eight months" and the

---

[1] For the final judgments referenced in this paragraph, *see United States v. Microsoft Corp.*, 97 F. Supp. 2d 59, 64, 68 (D.D.C. 2000); *In re Google Play Store Antitrust Litig.*, No. 20-cv-5671, ECF 702 at 2-3 (N.D. Cal. Oct. 7, 2024); *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1, 938-39 (D.D.C. 2006).

case "is not likely to conclude on the merits within that time"); *Privitera v. Cal. Bd. of Med. Quality Assurance*, 926 F.2d 890, 897 (9th Cir. 1991) (reversing determination that there was no "irreparable injury" from an event "three months away" and where denying the motion was "delaying resolution of a question which could just as easily have been resolved at the time").

Notably, Plaintiffs do not argue that intervening events are likely to render Google's request for a stay unnecessary. They do not contend that Google's appeal is likely to be resolved before the provisions are fully implemented, and they have not agreed to stipulate to a stay of any of the provisions at issue when the provisions are poised to take effect. Plaintiffs simply seek to impose an arbitrary and unjustified postponement of a motion that everyone agrees will need to be decided in the coming months.

What Plaintiffs propose is not only novel, but would also create a procedural morass. Instead of allowing for an orderly resolution of Google's motion, Plaintiffs contend that Google should file motions on the eve of implementation of each of the four remedies at issue. For example, the index-disclosure provision generally requires Google to make the specified data available to a Qualified Competitor within 30 days after a Qualified Competitor is certified. *See* Final Judgment § IV.A. Although Google *could have* waited until it received notice of a certification before filing a motion to stay implementation of the remedy (along with a motion for an administrative stay given the 30-day deadline), Google assumed that the Court prefers not to receive emergency motions addressing issues that have been apparent to the parties for months. Moreover, this approach potentially would have led to additional emergency motions, as Google would need to seek expedited consideration from the D.C. Circuit if this Court did not enter an administrative stay on the timeline Plaintiffs propose. Plaintiffs' argument that Google's motion is premature is baseless.

## II.    THE IRREPARABLE HARMS THAT GOOGLE WOULD EXPERIENCE WITHOUT A STAY ARE NOT SPECULATIVE.

Plaintiffs' second argument is that the timing of Google's motion "forces the parties and the Court into unnecessary conjecture," and the Court should wait until Google's irreparable harm arguments "could be assessed based on the actual remedies approved by the Court."  Pls.' Br. at 2.  This argument is also meritless.  The harms from the compelled disclosure of Google's intellectual property and other proprietary information are not speculative, and the Court should grant Google's motion now rather than denying it without prejudice as Plaintiffs propose.

The four specific requirements Google seeks to stay each compel Google to turn over its proprietary assets and information to Qualified Competitors under circumstances where "[t]he status quo could never be restored" if Google prevails on appeal.  *Ctr. for Int'l Env't Law v. Office of U.S. Trade Rep.*, 240 F. Supp. 2d 21, 23 (D.D.C. 2003) (citation omitted).  Nothing in Plaintiffs' brief calls into question the fundamental point that the consequences of requiring Google to disclose information and share assets with competitors, regardless of implementation details, could not be undone if this Court's judgment is reversed.  And as discussed in Google's opening brief and further below, courts have repeatedly recognized that such effects plainly could not be undone.  Google could never recover the value of the search results, ads, and other intellectual property that it would be compelled to license to any Qualified Competitor who seeks a license, even if it were to immediately terminate the syndication services following a successful appeal.  Likewise, a Qualified Competitor would not unlearn the information it would glean from Google's web index and user-side data.  In this case, as in so many others involving the forced licensing of intellectual property or disclosure of confidential information, "[d]isclosure followed by appeal … is obviously not adequate" because "the cat is out of the

bag" once the disclosure has occurred. *CBS Corp. v. FCC*, 785 F.3d 699, 708 (D.C. Cir. 2015) (citation omitted).

It is true that numerous details about these remedies remain unresolved—in large part due to Plaintiffs' failure to develop concrete proposals or supporting evidence despite months of remedies discovery and a three-week evidentiary hearing. And it is true that the Court can and should adopt provisions that mitigate some of the harms Google has described. But the specific remedies Google seeks to stay would irreparably harm Google under any circumstance, and so the Court need not delay granting Google's motion. Google has already presented significant, unrebutted evidence—including extensive trial testimony and detailed declarations—describing how and why it would be irreparably harmed by compelled syndication and data disclosures. Courts routinely make irreparable harm determinations in the face of far greater uncertainty, including when granting or staying preliminary injunctions based on a limited record. Google has met its burden of establishing the likelihood of irreparable harm absent a stay, and the Court need not wait for more information before granting Google's motion.

## A.    Compelled Syndication Would Irreparably Harm Google Absent a Stay.

Plaintiffs' arguments regarding the compelled syndication of search results and ads focus on the fact that some implementation details remain unresolved, including the specific "terms of the syndication licenses that Qualified Competitors will receive" and which Qualified Competitors will be certified. *See* Pls.' Br. at 4-5. But this is no obstacle to granting Google's motion because the compelled syndication provisions in the Final Judgment would irreparably harm Google irrespective of how they are implemented. The unresolved details Plaintiffs reference will affect *the magnitude* of the harm to Google, consumers, and advertisers, but *the existence* of the significant irreparable harms Google has described is inherent in the forced aid to competitors that the Final Judgment would impose.

Absent a stay Google would be irreparably harmed by being forced to license its proprietary content—*i.e.*, the search results, search features, and search text ads referenced in the Final Judgment—to its direct competitors. Plaintiffs are incorrect that it is "premature" to conclude that the "syndication licenses will be ineffective to protect whatever intellectual property interest it has." Pls.' Br. at 5. Although the terms will be important for many reasons, they will not alter the fact that the Final Judgment *compels* Google to provide its valuable content to Qualified Competitors so that they can use the content to serve their own users. *See* Reid Decl. ¶ 41 (explaining that "the search results and features required to be syndicated to Qualified Competitors are the product of decades of sustained engineering effort and innovation and many billions of dollars of investment" and are the "output of" Google's "proprietary technologies"); Remedies Tr. 3507:1-18, 3515:24-3517:8 (Reid) (explaining why the content Google displays in response to search queries "itself is intellectual property"). Today prospective Qualified Competitors have no legal entitlement to take Google's search results, features, and ads and display them as their own. Because the Final Judgment changes the legal foundation protecting some of Google's most valuable assets, it would irreparably harm Google absent a stay.

Plaintiffs fail to rebut Google's arguments and authorities explaining why compelled licensing is a textbook form of irreparable harm. Plaintiffs try to distinguish one such authority by stating that the movant "was irreparably injured by having to compete with … products that copied [its] inventions without its consent." Pls.' Br. at 6 n.3 (characterizing *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013)). But that is *exactly* what the Final Judgement would require Google to do. Absent a stay, Google would be compelled to give its proprietary content to Qualified Competitors so that they can use Google's content to compete

with Google for general search users.  The irreparable harm to Google in this case is even more clear cut than in other cases involving compelled licensing.  For instance, courts have found that an intellectual property owner is irreparably harmed where the "Court would, in effect, grant to [the competitor] a compulsory license."  *Tools Aviation, LLC v. Digital Pavillion Elecs. LLC*, 797 F. Supp. 3d 222, 235 (E.D.N.Y. 2025).  Here, the Court is *intentionally and explicitly* giving Qualified Competitors a five-year compulsory license to Google's intellectual property.  Although the terms of the compulsory license will be important in a number of respects, they will not alter the Court's determination that "Google will not be able to refuse a Qualified Competitor's syndication request."  Remedies Op. at 180.  Tellingly, Plaintiffs do not cite a single case where a court allowed this kind of "forced-dealing remedy" to take effect while the defendant's appeal was pending.

Plaintiffs contend that "Google has long syndicated search results to other search providers" on voluntary terms, Pls.' Br. at 6, as if that somehow eliminates the irreparable harm from being *required* to enter a five-year license with *every* Qualified Competitor that requests one.  Google has never syndicated search results or ads to the kinds of companies that the Court intended to capture with its expanded definition of "Qualified Competitors."  *See* Rem. Op. at 103-04.  And Plaintiffs' argument ignores that "loss of control … is the very thing that constitutes irreparable harm in the licensing context."  *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) (finding irreparable harm from continued use of trademark without movant's consent even though movant had licensed the trademark); *see Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1327-29 (Fed. Cir. 2008) (affirming determination that compelled licensing of a patent would cause irreparable harm even though movant had licensed the patent).

Plaintiffs also contend that one of the cases cited by Google is distinguishable because the movant there was required "to exhaustively license patents to other modem chip suppliers, which it had not done before." Pls.' Br. at 6 (characterizing *FTC v. Qualcomm Inc.*, 935 F.3d 752 (9th Cir. 2019)). But nothing in the opinion, which *granted* Qualcomm's stay request, indicates that the decision turned on this purported distinction. And when the stay was granted, the district court had found that "Qualcomm has previously licensed its modem chip [patents] to rivals," but it "stopped licensing rival modem chip suppliers" and decided "to license only OEMs." *FTC v. Qualcomm Inc.*, 411 F. Supp. 3d 658, 752-54 (N.D. Cal. 2019). The fact that Google syndicates search results and ads to some third parties on negotiated terms does not diminish the irreparable harm from being *compelled* to license to *any* Qualified Competitor.

Plaintiffs are also off base in asserting that the harms of compelled syndication would be fleeting because "the supply of syndicated results could be halted in an instant, were Google to prevail." Pls.' Br. at 6. Halting the syndication service following a successful appeal does nothing to mitigate the irreparable harm to Google in the meantime from having to provide its search results, features, and ads to Qualified Competitors—with whom Google has no existing relationship and no reason to trust they will comply with the license terms—and to compete against search experiences built on Google's own results. Plaintiffs cannot credibly discount the interim effects on Google after having argued repeatedly that syndication is not "a long-term remedy," but rather a "short-term bridge" that purportedly would have near-term consequences. Remedies Tr. 4804:11-16 (closing argument); *see* Remedies Op. at 171 (stating that syndication "would enable Qualified Competitors to compete in the short term").

Plaintiffs are incorrect that imposing appropriate license terms and vetting Qualified Competitors can adequately protect Google from the irreparable consequences of forced

licensing.  While these contractual measures would unquestionably be important, they are no substitute for Google being able to decide who it will deal with and on which terms in order to guard against trade-secret theft and schemes that damage its relationship with advertisers.  *See* Reid Decl. ¶¶ 42-45 ("[T]o protect its intellectual property, Google syndicates to only trusted syndication partners."); Adkins Decl. ¶¶ 8-10 ("Google is selective regarding which ad syndicators to partner with, including for reasons of protecting Google's intellectual property."); *id.* ¶¶ 21-22 (describing how "Google has exercised careful and measured discretion when evaluating who to partner with" given the risk that Google will be "unable to protect its advertisers and deliver a valuable advertising experience").

By arguing that Google's concerns are "premature given that no Qualified Competitors have been identified yet," Pls.' Br. at 5, Plaintiffs demand an unprecedented degree of precision and omniscience.  Google does not need to wait until its trade secrets are taken and its advertisers harmed to obtain relief; rather, a stay is warranted precisely because full relief would not be feasible after the fact.  *See, e.g.*, *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024) (finding irreparable harm where "a substantial danger exists that [a party] would advertently or inadvertently disclose" a trade secret); *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990) (finding irreparable harm from circumstances that "inhibited the [movant's] ability to control its own [trademarks], which in turn creates the *potential* for damage to its reputation"); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982) (finding irreparable harm where "it appears very possible that a trade secret will be revealed").  As discussed in Google's opening brief and Section I *supra*, courts stay entire final judgments or significant portions of them in response to a single motion based on a preexisting record.  No authority requires Google to pick out individual Qualified Competitors that it deems

10

untrustworthy or potentially subject to exploitation by malicious third parties.  And Plaintiffs are simply wrong that "Google's fears that Qualified Competitors will fail to stop" fraudulent tactics "are nothing more than fantasy."  Pls.' Br. at 7.  Google has described multiple instances where precisely such tactics were recently used and explained why they will be more prevalent and more difficult to stop if a stay is not entered, particularly given that Qualified Competitors may sub-syndicate Google's ads under the Final Judgment.  *See* Adkins Decl. ¶¶ 14-23; *see also* Remedies Tr. 2976:13-2979:4; 2985:7-2987:14 (Adkins).

**B.    Index Disclosure Would Irreparably Harm Google Absent a Stay.**

Google seeks to stay the obligation to disclose certain "data related to Google's Web Search Index," including "a DocID to URL map," the "time that the URL was last crawled," and the "spam score."  Final Judgment § IV.A.  Plaintiffs contend that this disclosure of billions of crawled webpages and certain proprietary annotations would not cause "great" harm because the Court found that "the remedy would reveal 'some proprietary information'" but "'the encroachment will be minimal.'"  Pls.' Br. at 10-11 (quoting Remedies Op. at 145).  This argument misstates the law.  The case cited by Plaintiffs uses the word "great," but it neither addressed what constitutes "great" harm nor involved the disclosure of confidential or proprietary information.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Time and again, courts have determined that an "injury is great, actual, and imminent" where "proprietary business information is disclosed to … competitors in the market," *i.e.*, the exact outcome that index disclosure is intended to bring about.  *Hospital Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 199-200 (D.D.C. 2010) (citation and quotation omitted); *see Robert Half Int'l*, 315 F. Supp. 3d at 433 (finding irreparable harm due to the "use and disclosure of … confidential business information").  The index-disclosure requirement involves an especially large volume of confidential information in the form of

11

billions of crawled webpages and certain annotations for each page.  But even if that were not the

case, the harm to Google would be "great" for purposes of establishing irreparable harm.  *See*

*Cigna*, 103 F.4th at 1346-47 (finding "harm that is certain and great" where there is "a

substantial danger" that "one or more" trade secrets would be disclosed to a competitor because

"the fact that a single trade secret may be disclosed is enough" (cleaned up)); *Ctr. for Int'l Env't*

*Law*, 240 F. Supp. 2d at 22-23 (granting stay pending appeal based on "a strong showing of

irreparable harm" where movant was ordered to produce documents describing negotiations).

Not only is it clear that Google would be irreparably harmed if the index disclosure

provision were not stayed, but Plaintiffs' arguments are also factually inaccurate.  To begin,

Google never indicated that the Final Judgment requires only a "modest disclosure" or suggested

that it would not reveal Google's valuable intellectual property.  *See* Pls.' Br. at 10 & n.4.  The

index data in question inherently reflects Google's proprietary determination of which webpages

(out of the trillions available on the open web) are potentially relevant to its users' queries.  Reid

Decl. ¶¶ 8-10.  The data also inevitably reveals Google's proprietary determination of how

frequently to crawl each page and its proprietary spam score.  *Id.* ¶¶ 11-13.  Plaintiffs are also

incorrect in suggesting that there is some inconsistency between the observations made about

these points in Ms. Reid's declaration and her testimony at the remedies hearing.  *See* Pls.' Br. at

10 n.4.  Among other things, Ms. Reid explained at the remedies hearing that Google has "to be

really thoughtful about" which webpages to crawl and how frequently to do so, and she

described the significant work required to develop spam scores, including testifying that they are

part of the "huge amount of proprietary data" in Google's index.  Remedies Tr. 3436:8-3438:25,

3442:21-3444:6, 3462:1-3463:3 (Reid).  The disclosure ordered by the Court would reveal less

intellectual property than would have been encompassed by Plaintiffs' radical proposal that Ms.

Reid also addressed in her testimony, but it is beyond dispute that the remedy still requires Google to disclose its valuable and confidential data to competitors. *See id.*; Reid Decl. ¶¶ 8-13.

As discussed above in connection with compelled syndication, the harm Google would experience without a stay is not undercut by Plaintiffs' claim that "the data disclosed will be 'comparable to what Google once shared under an agreement with an existing partner, Yahoo Japan.'" Pls.' Br. at 11 (cleaned up) (quoting Remedies Op. at 145).[2]  Companies and individuals develop intellectual property and other assets precisely so that they can decide how to deploy them—whether for their personal enjoyment, to benefit their customers, or to deliver value to a specific business partner as part of a commercial arrangement supported by non-disclosure agreements.  The voluntary licensing of purportedly analogous data to a trusted partner (who is not even a participant in the relevant market in this case) does not eliminate the irreparable harm that would result from *compelling* Google to license to Qualified Competitors that it does not deal with at all or does not want to deal with on the imposed terms. *See, e.g.*, *Acumed*, 551 F.3d at 1327-29; *Church of Scientology Int'l*, 794 F.2d at 44.

## C.    User-side Data Disclosure Would Irreparably Harm Google Absent a Stay.

For many of the same reasons, Plaintiffs' opposition to Google's request to stay the user-side data disclosure requirement is both legally inapt and factually inaccurate.  Google would be irreparably harmed by *any* implementation of this remedy, including one that does "not require disclosure of intellectual property or trade secrets," Pls.' Br. at 12 (quoting Final Judgment § IV.B.2), and that is subject to all appropriate "privacy-enhancing techniques," *id.* at 11.

---

[2] Moreover, the spam scores provided to Yahoo! Japan were limited in ways that distinguish them from the Final Judgment.  *See* Rem. Tr. 3092:18-3093:6 (Adkins) (testifying that the agreement was limited to "Japanese crawled websites" and did not encompass Google's "global index"); *id.* 3117:3-19 (explaining that Google provides the scores so that Yahoo Japan! can "evaluate the results in the Japanese language" for "their own independent evaluation and to give Google feedback").

Although the *magnitude* of many forms of harm to Google (and non-parties) will be affected by the scope of the disclosure and the applicable terms, the *fact* that significant irreparable harm would occur absent a stay is inevitable.  There is no question that the data Google would be required to disclose absent a stay is maintained confidentially and used by Google "to train, build, or operate" proprietary models for Google Search.  *See* Final Judgment § IV.B; Reid Decl. ¶¶ 19-20.  And the Court stated that "[h]elping competitors improve their search engines is precisely what this remedy is designed to accomplish."  Rem. Op. at 160.  If Google prevails on appeal, it would be impossible to undo any unearned advantage competitors gained from using the data in the meantime, including by using it to train their own systems or by analyzing it to acquire new insights.

It is immaterial for present purposes whether the data is characterized as "raw user data" acquired through Google's proprietary efforts or as data that would reveal "trade secrets."  *See* Pls.' Br. at 11-12.  Courts have repeatedly found irreparable harm in the disclosure of confidential data and information without first determining whether it meets the legal definition of a trade secret.  *See, e.g.*, *Hospital Staffing Solutions*, 736 F. Supp. 2d at 200 (finding irreparable harm from potential disclosure to competitors of "client information, prospective client information, pricing information, and billing rates" (citation omitted)); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002) (finding irreparable harm through "the loss of confidential customer information"); *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 6 (1st Cir. 2019) (finding irreparable harm from disclosure of a "membership list to a direct competitor").  Regardless of how Plaintiffs seek to characterize the user-side data or how much of it ultimately must be turned over to Qualified Competitors, the "injury would be irreparable" because once the "putatively protected material is

disclosed, the very right sought to be protected has been destroyed." *Jubilant DraxImage, Inc. v. U.S. Int'l Trade Comm'n*, 396 F. Supp. 3d 113, 125 (D.D.C. 2019) (cleaned up).

Last, Plaintiffs suggest that Google conceded during the remedies hearing that the disclosure of certain more limited data than that set forth in Plaintiffs' extraordinary proposed final judgment would not implicate any Google intellectual property issues. *See* Pls.' Br. at 10-12 & n.4. Plaintiffs are wrong. By explaining to the Court that the volume of intellectual property that would be revealed varied depending on which categories of data would be disclosed, Google never agreed that the disclosures required by the Final Judgment would not reveal any Google trade secrets or otherwise not irreparably harm Google. In fact, Google's witnesses explained at the remedies hearing that disclosing data "used to build, create, or operate the GLUE statistical model(s)" would divulge Google's valuable intellectual property. Final Judgment § IV.B; *see, e.g.*, Remedies Tr. 2808:16-2810:13 (Allan); *id.* 3517:20-3518:21 (Reid). This is exactly what Ms. Reid described in her declaration in support of Google' motion for a stay. *See* Reid. Decl. ¶¶ 19-25.

## III.    GOOGLE HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS APPEAL.

Google's brief describes numerous reasons why it is likely to prevail on the merits of its appeal, and any one of them is sufficient to justify the partial stay that Google has requested. Plaintiffs' response treats these issues as an afterthought—offering only cursory replies, relegating them to the back half of the brief, and urging the Court to deny Google's motion "without prejudice and without reaching" this factor. *See* Pls.' Br. at 15. Plaintiffs' approach is a tacit acknowledgement that this case presents the kinds of highly consequential and deeply contested legal issues that warrant a stay, even if this Court's "own approach may be contrary to [Google's] view of the merits." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559

F.2d 841, 843 (D.C. Cir. 1977).  Indeed, Plaintiffs' own brief cites five antitrust cases from the last twenty-five years where the defendant sought a stay pending appeal from a district or circuit court, and in every one of them a court stayed all or part of the final judgment.  *See Google Play Store Antitrust Litig.*, 147 F.4th at 945 n.11; *Qualcomm*, 935 F.3d at 754-55; *ZF Meritor LLC v. Eaton Corp.*, No. 06-623, ECF 283 at 2 (D. Del. Aug. 19, 2011); *United States v. Visa U.S.A. Inc.*, 2002 WL 638537, at *1 (S.D.N.Y. Feb. 7, 2002); *Microsoft* Stay Order at 2.

In response to Google's arguments on the merits, Plaintiffs engage in a sleight of hand by reframing the legal issues Google has identified to give the misimpression that they are subject to a deferential standard of review.  For instance, Google's brief explained why it is likely to demonstrate that its agreements to be the default search engine in third-party browsers are the product of competition on the merits and therefore are not exclusionary as a matter of law.  *See* Google's Br. at 9-11.  Plaintiffs assert that Google "has not challenged" "as clearly erroneous" a finding that Google purportedly "does not face true market competition."  Pls.' Br. at 17 (quotation omitted).  As Google explained, however, a finding that Google is far ahead of its rivals does not resolve whether Google maintained that advantage through exclusionary conduct rather than competition on the merits, and thus is insufficient as a matter of law to establish Section 2 liability.  *See* Google's Br. at 10.  Plaintiffs also assert that "the Court did not merely find that Google's rivals were weaker" but "found that rivals' competitive disadvantage was Google's doing."  Pls.' Br. at 17.  But as Google's brief explained, there are countless examples of competitive acts that strengthen one company and weaken its rivals but that do not give rise to Section 2 liability.  *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 68 (D.C. Cir. 2001) (en banc); Google's Br. at 9-11, 15 (describing *Microsoft*'s holding that certain distribution-

related conduct relating to IEAK did not violate Section 2 even though the trial court found it "contributed significantly to the drastic changes" in a competitor's "usage shares").

In much the same vein, Plaintiffs attempt to recast Google's arguments regarding "exclusivity" as resting on "unchallenged factual findings" about whether default placement "is the most efficient distribution channel in the relevant market." Pls.' Br. at 18 (citing *Microsoft*, 253 F.3d at 70). But a finding that default placement is the most efficient distribution channel cannot legally establish whether Google's agreements for default placement were exclusive. Unlike the agreement in *Microsoft* that prohibited AOL from supplying output of rivals' products to its customers beyond a *de minimis* level, *see* 253 F.3d at 68, Google's agreements with Apple and Mozilla did not prohibit them from delivering any other search engine to every user who wanted to use it for any query or to set it as their default search engine. Plaintiffs do not and cannot explain how such agreements could be legally exclusive.

Plaintiffs engage in further misdirection by asserting that "an anticompetitive effects analysis under Section 2 does *not* require a but-for analysis." Pls.' Br. at 19. Plaintiffs do not argue that *Microsoft* (or any other precedent) distinguished exclusionary conduct from competition on the merits based on whether the "exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining … monopoly power," which was the standard applied here. *See* Google's Br. at 14-15. As Google's brief explained, *Microsoft* applied this principle only when answering a different question that arose after it had already found an anticompetitive effect. *See id.*

Instead of addressing Google's arguments on this issue, Plaintiffs mischaracterize the "but for" world in *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008). *Rambus* held that Rambus's conduct was not exclusionary when the FTC failed to show that a standards body

17

would not have had the same preference for Rambus's product "in the world that would have existed but for Rambus's deception." *Id.* at 466-67. Plaintiffs suggest this holding was limited to its purportedly "unique context," Pls.' Br. at 19, but they ignore that *Rambus* reflects the underlying proposition that conduct cannot be exclusionary when evidence fails to show that the challenged conduct affected trading partners' (there, the standards body) selection of one rival over another. Plaintiffs avoid that issue because they never established in this case that Apple, Mozilla, or any other browser developer wanted to adopt a different browser design or to set a different default search engine but didn't do so because of an agreement with Google. *See* Google's Br. at 16-17. The evidence instead established that browser developers *preferred* to set Google as the default on all their browsers because they "value its quality" and believe it "provides the best bet for monetizing queries." *United States v. Google LLC*, 747 F. Supp. 3d 1, 144 (D.D.C. 2024). Those facts and others made clear that any purportedly exclusive provisions of the browser agreements did not "harm the competitive *process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58.

## IV.    GOOGLE HAS ESTABLISHED THAT A STAY IS IN THE PUBLIC INTEREST AND WILL NOT HARM PLAINTIFFS.

The public-interest factors also favor a stay in this case. Plaintiffs' only argument for "why the public interest will benefit from denying a stay now" is that entering a stay sooner rather than later purportedly would "delay the remedy by deterring would-be Qualified Competitors from coming forward and reducing Google's incentives to complete its preparatory work on schedule." Pls.' Br. at 24. This makes no sense. If anything, Plaintiffs' proposed approach would cause additional delay because the parties and the Court would need to deal with multiple rounds of stay motions at the same time they are focused on completing the preparatory

steps. It is difficult to envision how dividing one round of briefing (that is now complete) into multiple future rounds would expedite the process.

There is no reason to believe that prospective Qualified Competitors will be less likely to seek certification promptly if Google's motion is granted, especially given that every step short of delivering data and providing syndication services will proceed as scheduled while Google's appeal is pending. Again, Plaintiffs' novel approach seems more likely to discourage early movers than Google's straightforward stay motion. For example, Plaintiffs contend that Google's "complaint is premature given that no Qualified Competitors have been identified yet." Pls.' Br. at 5. The implication of this claim is that Google would strengthen its case for a stay by highlighting any vulnerabilities in whichever Qualified Competitors are poised to be certified first, including reasons why their systems may not be secure or they cannot be expected to comply with license terms. While individualized considerations are part of the certification process, prospective Qualified Competitors would not benefit from requiring the parties to litigate these company-specific issues in future stay motions when a stay is already warranted on the current record.

Plaintiffs further incorrectly argue that entering a stay now would diminish "Google's incentives to complete its preparatory work on schedule." Pls.' Br. at 24. The proposed order ensures that the parties' incentives are unaffected because it preserves the existing deadlines in the Final Judgment and the total duration of each individual provision subject to the stay. For example, Google has proposed that the parties jointly notify the Court when all prerequisites to index disclosure have been met, and the expiration date of the index-disclosure obligation will then automatically be extended by the number of days that elapse before the stay is lifted. The same process will apply to the other provisions Google seeks to stay.

Plaintiffs also have not refuted any of the reasons why a targeted stay will serve the public interest.  They claim that Google "has no basis for thinking its trade secrets *will* be disclosed,"  Pls.' Br. at 23, but as discussed in Section II *supra*, Google need not establish that the compelled syndication and data disclosure provisions would reveal "trade secrets."  Courts have made clear that "[t]he public interest is best served when established contract and property rights are enforced," *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 18 (D.D.C. 2014) (citation omitted), and compelled syndication is a major departure from the usually inviolable principle that a company may decide to refrain from delivering its valuable content and other assets to competitors.  Furthermore, there is no dispute that the index data and user-side data are confidential information used by Google for business purposes, and "the public interest is served by protecting confidential business information."  *Merrill Lynch*, 298 F. Supp. 2d at 34-35.

Finally, Plaintiffs give the public interest short shrift by dismissing "Google's privacy concerns" as "pure speculation."  Pls.' Br. at 23.  Google's concerns are substantiated by extensive evidence, including the testimony of Google's Head of Search (who has worked on Google Search for more than two decades) and a computer scientist recognized by the Court as an expert in data privacy.  *See* Rem. Tr. 3521:13-3527:7 (Reid); 3667:11-3729:6 (Culnane).  Those concerns are further corroborated by specific risks inherent in providing the user-side data at issue to third parties.  *See, e.g.*, Reid Decl. ¶¶ 19-21, 26-29, 34.  Plaintiffs' assertions that the "remedies in this case can protect privacy" and "the Court found that privacy will be protected" are reductive.  *See* Pls.' Br. at 23.  There is an inherent tension between disclosure and privacy, and Plaintiffs have never articulated how they actually *would* protect privacy despite ample opportunity to do so and the Court's acknowledgement that user privacy "is a valid concern" that "no doubt will be challenging."  Remedies Op. at 163-64.  The public interest favors a stay

because non-parties have an interest in what happens to their search queries and because of the numerous and significant risks to user privacy that are inherent in the disclosure of user-side data. Google does not need to peer into the future and predict precisely what *will* happen to establish that hundreds of millions of Google Search users have an interest in waiting until Google's appeal is resolved before they are exposed to those risks. *See, e.g.*, *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 390 F. Supp. 3d 128, 134 (D.D.C. 2019) (concluding that the public interest favors a stay where third parties "*may* have a privacy interest that would be affected by disclosure of these communications" (emphasis added)); *Human Touch DC, Inc. v. Merriweather*, 2015 WL 12564166, at *5 (D.D.C. May 26, 2015) (concluding that "[t]he public, which includes the patients whose confidential health information *may* be disseminated …, has a powerful interest in maintaining the privacy of such information" (emphasis added)).

## CONCLUSION

Google respectfully requests that the Court enter its proposed order granting its motion for a partial stay of the Final Judgment.

Dated: February 6, 2026                    Respectfully submitted,

                                           WILLIAMS & CONNOLLY LLP

                                           By: */s/ John E. Schmidtlein*
                                           John E. Schmidtlein (D.C. Bar No. 441261)
                                           Benjamin M. Greenblum (D.C. Bar No. 979786)
                                           Colette T. Connor (D.C. Bar No. 991533)
                                           680 Maine Avenue, SW
                                           Washington, DC 20024
                                           Tel: 202-434-5000
                                           jschmidtlein@wc.com
                                           bgreenblum@wc.com
                                           cconnor@wc.com

21

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice)*
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-8800
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*