# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>Google LLC,<br><br>    *Defendant.* | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA |
| State of Colorado, *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>Google LLC,<br><br>    *Defendant.* | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA |

**BRIEF OF PUBLIC KNOWLEDGE AS AMICUS CURIAE
IN OPPOSITION TO DEFENDANT'S MOTION
FOR PARTIAL STAY PENDING APPEAL**

John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
john@publicknowledge.org

*Counsel for Amicus Curiae*
*Public Knowledge*

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ...................................................................................1

SUMMARY OF ARGUMENT...........................................................................................2

ARGUMENT ......................................................................................................................3

I.     GOOGLE WILL FAIL ON THE MERITS...............................................................3

    A.     Google's "competition on the merits" argument ignores the nature of the violation. ........................................................................................................4

    B.     This Court correctly found the agreements exclusive. .........................................5

    C.     Monopolists are subject to different rules than their competitors. ....................6

    D.     Google's *Microsoft* "inducements" argument misreads the precedent. ...........8

    E.     The remedies are tailored to the proven violation. ...............................................9

II.    IT DOES NOT HARM GOOGLE TO FOLLOW THE LAW. .................................10

    A.     The data at issue is not trade secret material.....................................................10

    B.     The Final Judgment contains robust safeguards................................................11

    C.     Google's right to appeal is preserved through ordinary mechanisms............12

    D.     Business disruption is not irreparable harm......................................................12

III.   A DELAY WOULD HARM FUTURE AND PRESENT COMPETITION, AND THE PUBLIC...........................................................................................................13

    A.     Delay compounds competitive harm while Google extends its dominance into AI.......................................................................................................................13

    B.     The competitive window may close during the appeal.....................................15

    C.     Google's burden is modest. ...................................................................................16

IV.    THE PUBLIC HAS WAITED LONG ENOUGH ..........................................................16

CONCLUSION ................................................................................................................20

**TABLE OF AUTHORITIES**

**CASES**

Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir. 1979) ...............................5, 7, 8

Ford Motor Co. v. United States, 405 U.S. 562 (1972)...................................................................9

FTC v. Qualcomm Inc., 935 F.3d 752 (9th Cir. 2019)...............................................................3, 13

In re Google Play Store Antitrust Litig., 147 F.4th 917 (9th Cir. 2025) ......................................11

International Salt Co. v. United States, 332 U.S. 392 (1947)..........................................................9

Massachusetts v. Microsoft Corp., 373 F.3d 1199 (D.C. Cir. 2004)......................................10, 11

Nat'l Soc'y of Pro. Eng'rs v. United States, 435 U.S. 679 (1978)................................................10

Nken v. Holder, 556 U.S. 418 (2009)..............................................................................................3

Rambus Inc. v. FTC, 522 F.3d 456 (D.C. Cir. 2008) ......................................................................9

United States v. Dentsply Int'l, Inc., 399 F.3d 181 (3d Cir. 2005) ..............................................5, 7

United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316 (1961)....................................2, 12

United States v. Google LLC, 747 F. Supp. 3d 1 (D.D.C. 2024)............................................passim

United States v. Grinnell Corp., 384 U.S. 563 (1966)....................................................................4

United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001) (en banc) ............................2, 5, 8

**OTHER AUTHORITIES**

Alphabet Hits $4 Trillion Market Capitalization, CNBC (Jan. 12, 2026),
    https://www.cnbc.com/2026/01/12/alphabet-4-trillion-market-cap.html.................................16

Apple Inc., Press Release, Apple Reports First Quarter Results (Jan. 29, 2026),
    https://www.apple.com/newsroom/2026/01/apple-reports-first-quarter-results .......................15

Google & Apple, Joint Statement (Jan. 12, 2026).............................................................................3

Google, Filing EU Complaint Against Microsoft Licensing (Sept. 25, 2024; updated Nov. 28,
    2025).........................................................................................................................................8

Maria Palmieri & Sebastian Hufnagel, Google's AI Advantage: Why Crawler Separation Is the
    Only Path to a Fair Internet, Cloudflare Blog (Jan. 30, 2026) ................................................14

Mark Gurman, Apple Plans to Use 1.2 Trillion Parameter Google Gemini Model to Power New
    Siri, Bloomberg (Nov. 5, 2025)...............................................................................................14

Restatement (Third) of Unfair Competition § 39 (1995) .............................................................11

## CORPORATE AND FINANCIAL DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5), amicus states as follows:

Public Knowledge is a nonprofit, non-stock corporation organized under the laws of the District of Columbia. It has no parent corporation, and no publicly held corporation has an ownership interest in it.

## INTEREST OF AMICUS CURIAE

Public Knowledge is a nonprofit organization that promotes freedom of expression, an open internet, and access to affordable communications tools and creative works. For over two decades, Public Knowledge has participated in proceedings before Congress, the Federal Communications Commission, the Federal Trade Commission, and the federal courts on competition policy in technology markets.

Public Knowledge files this brief to respond to the specific arguments Google raises in its Memorandum of Points and Authorities in Support of Defendant Google LLC's Motion for a Partial Stay Pending Appeal, ECF No. 1471-1 ("Mem."), and to stress to the Court the importance of the remedies it imposed to the public, to the future of competition in search, and to developing areas such as artificial intelligence.

## CERTIFICATION OF COUNSEL

In accordance with Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), amicus certifies that (1) this brief was authored entirely by its counsel and not by counsel for any party in the above-captioned actions, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from amicus curiae and its counsel, no other person contributed money to fund preparing or submitting this brief.

1

**SUMMARY OF ARGUMENT**

Google seeks a partial stay of the Final Judgment entered December 5, 2025. It asks the Court to stay the data-sharing and syndication provisions, claiming it will likely succeed on the merits, will suffer irreparable harm absent a stay, and that the public interest favors delay. Each claim fails, and a stay would cause serious harm to competition and to the hundreds of millions of Americans who depend on search to find information, products, and services.

On likelihood of success, Google rehashes arguments this Court rejected after years of litigation. It insists its browser agreements reflect "competition on the merits," but this Court found otherwise based on record evidence that it paid billions of dollars annually to be the exclusive default on browsers covering over 90 percent of the U.S. search market. Google's reliance on *Microsoft's* "inducements" holding misreads the precedent: *Microsoft* addressed promotional payments, not agreements that foreclose rivals. *United States v. Microsoft Corp.*, 253 F.3d 34, 67-71 (D.C. Cir. 2001) (en banc).

On irreparable harm, Google claims the data-sharing provisions will disclose trade secrets. Even assuming the index data qualifies, the Final Judgment contains sufficient safeguards. Courts routinely order monopolists to share proprietary information as part of antitrust remedies. Regardless, antitrust defendants cannot avoid compliance by pleading hardship. *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326-27 (1961).

On the balance of hardships, a stay would extend competitive harms this Court found have persisted for over a decade. Google is already using its search dominance to establish dominance in AI. Days before filing its appeal, Google announced a multi-year partnership with Apple to provide the foundational AI models for Siri and Apple Intelligence,[1] a variation on the

---

[1] Google & Apple, Joint Statement (Jan. 12, 2026), https://blog.google/company-news/inside-google/company-announcements/joint-statement-google-apple.

relationship that gave rise to this litigation. The competitive window that generative AI has opened may close during an appeal. Competitors need data and open distribution channels now, not years from now when Google has cemented its position in AI as thoroughly as it did in search.

On the public interest, this case has been pending since October 2020. The Court found that hundreds of millions of Americans use a search engine they were steered to, not one they chose, and that Google used its monopoly to raise prices on ads: costs that are ultimately borne by consumers. A stay extends these harms. The public interest lies in prompt enforcement.

**ARGUMENT**

A party seeking a stay of judgment pending appeal must demonstrate (1) a likelihood of success on the merits, (2) that it will suffer irreparable injury absent a stay, (3) that the stay will not substantially harm other parties, and (4) that the public interest favors a stay. *Nken v. Holder*, 556 U.S. 418, 425-26 (2009). In antitrust cases, courts have granted stays where the movant raised serious questions about the merits and demonstrated clear irreparable harm, *see FTC v. Qualcomm Inc.*, 935 F.3d 752, 755-56 (9th Cir. 2019), but Google can make neither showing here.

## I.      GOOGLE WILL FAIL ON THE MERITS.

Google advances four principal arguments on the merits: that the browser agreements reflect "competition on the merits" and are not exclusionary as a matter of law, that the agreements are not "exclusive," that the agreements did not harm the competitive process, and that the remedies are not tailored to the violation. Each argument fails because it asks this Court to relitigate factual findings this Court made based on extensive record evidence, or to misread binding precedent.

3

### A.    Google's "competition on the merits" argument ignores the nature of the violation.

Google argues that its browser default agreements are the "product of competition on the merits" and "not exclusionary as a matter of law." Mem. at 9. Because Google "has long been the best search engine" and browser developers "value its quality," Google reasons, its payments for default placement must be lawful. *Id.* This argument ignores how monopoly maintenance works.

A monopolist may have achieved its position through superior products, and it may continue to offer a superior product, but that does not immunize exclusionary conduct designed to prevent rivals from reaching scale. The Supreme Court long ago distinguished between monopoly power achieved through "a superior product, business acumen, or historic accident" and monopoly power maintained through exclusionary conduct. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The former is lawful; the latter violates Section 2. This Court found that Google engaged in the latter.

This Court did not find that Google violated Section 2 because it built a good search engine. It found that Google violated Section 2 because it paid billions of dollars annually to foreclose rivals from the distribution channels they needed to compete. *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) ("Liability Opinion") at 201-213.[2] The agreements covered over 90 percent of the U.S. search market, prevented rivals from reaching the scale needed to improve their products, and deterred investment in competing search engines. *Id.* at 206-213. Google's argument conflates product quality with distribution foreclosure, but a firm may have a superior product and still violate Section 2 by foreclosing rivals from distribution.

---

[2] All page references to the Liability Opinion cite to the pagination of the Court's Memorandum Opinion, ECF No. 1033.

4

*See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274–75 (2d Cir. 1979). Google's status as "the best search engine" did not license it to pay billions to block competitors from the primary channels of search distribution.

**B.      This Court correctly found the agreements exclusive.**

Google argues the browser agreements "are not exclusive deals" because Google is merely "buying one promotional opportunity" created by browser developers' choice to design their products with a single default. Mem. at 11-13. But being set as the default search engine in a browser is enough to make its agreements "exclusive" under Section 2.[3] In *Microsoft*, the D.C. Circuit upheld a finding that distribution agreements with Internet Access Providers were exclusive even though browser distribution could be achieved through "more costly and less effective" alternative means. *Microsoft*, 253 F.3d at 70. The court explained that *Microsoft* had "kept usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat" by foreclosing the major distribution channels. *Id.* at 67.

The same logic applies here. Google is the exclusive default on Safari, which generates about 65 percent of queries on Apple devices. Liability Opinion at 203. Google is the exclusive default on Firefox, and its payments to Mozilla generate 80 percent of Mozilla's operating revenue. *Id.* at 204. The agreements foreclose rivals from the most efficient distribution

---

[3] Google's agreements require that Google be set as the default search engine. Liability Opinion at 204 (citing Liability Opinion at 103, ¶ 298). But even if the agreements lacked express exclusivity clauses, they would still be "exclusive" for purposes of Section 2. What matters is not the label on the contract but the competitive effect. When a monopolist's payments are structured so that distribution partners have overwhelming financial incentives to make the monopolist the sole default—and the monopolist is in fact the sole default—the arrangement is exclusive regardless of how the contract is drafted. *See Microsoft*, 253 F.3d at 70 (de facto exclusivity suffices); *Dentsply*, 399 F.3d at 191 ("The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals."). A monopolist cannot escape Section 2 liability by structuring its foreclosure through financial incentives rather than express contractual terms.

channels. The fact that rivals can theoretically reach users through bookmarks, URL typing, or other means does not make the agreements non-exclusive, any more than the availability of "more costly and less effective" browser distribution saved *Microsoft's* agreements. If that were the rule, no distribution agreement would ever qualify as exclusive. A contract for the exclusive on-airport car rental counter would not be exclusive because rivals could reach travelers through off-site lots and shuttle buses, or because travelers can take a taxi, instead. An exclusive deal for sports broadcasting would not be exclusive because fans can attend the game in person. People are unlikely to seek alternatives if the cost is high enough or the friction great enough. That is precisely why Google pays for exclusivity in the first place.

Google argues that browser developers "want" a single default design, so buying that default cannot be exclusionary. Mem. at 11-12. But the question is not what browser developers want in the abstract; the question is whether Google's payments foreclose rivals from distribution. They do. Browser developers have no incentive to design choice screens or allow multiple defaults (or to enter the search market themselves) when Google pays billions for exclusivity. As this Court found, the revenue share payments "discourage partners from making changes that would hurt Google." Liability Opinion at 206. The preferences of distribution partners cannot immunize a monopolist's foreclosure strategy, or monopolists could always point to the willingness of counterparties to accept their payments as evidence that no foreclosure occurred.

###### C.    Monopolists are subject to different rules than their competitors.

Google points to exclusive distribution agreements by other firms, including the Firefox default arrangement that Microsoft and Yahoo have also sought, as evidence that such agreements must be lawful. Mem. at 13-14. This is fallacious.

A monopolist is not permitted to do everything its competitors can do. This is foundational to monopolization law. Conduct that is perfectly lawful when undertaken by a firm without market power may violate Section 2 when undertaken by a monopolist, because the same conduct has different competitive effects depending on the market position of the firm that engages in it. The Third Circuit stated the rule directly: "Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). A monopolist faces legal constraints that do not apply to smaller firms, which face market constraints.

The Second Circuit explained this in *Berkey Photo*: conduct that "tends to destroy competition" is "illegal when taken by a monopolist," even though "in the hands of a smaller market participant it might be considered harmless, or even 'honestly industrial.'" 603 F.2d 263, 274-75 (2d Cir. 1979). The court gave an example directly relevant here: "A classic illustration is an insistence that those who wish to secure a firm's services cease dealing with its competitors." *Id.* at 274. Such insistence may be unremarkable when demanded by a small supplier; it becomes exclusionary when demanded by a monopolist.

Google controls over 90 percent of general search queries in the United States. When Google enters into exclusive default agreements with Apple and Mozilla, it forecloses rivals from distribution channels covering the vast majority of the market. When Microsoft or DuckDuckGo seeks the same agreements, the competitive effect is categorically different. A rival's exclusive deal with a browser might shift a few percentage points of market share; Google's exclusive deals lock up distribution and prevent any rival from achieving the scale necessary to compete. That is why Section 2 applies to Google's conduct and not to theirs.

The point is not that Google is being punished for its success. The point is that Google's success imposes legal obligations that do not apply to smaller firms. A monopolist that has achieved its position through lawful means is "permitted, and indeed encouraged" to "compete aggressively on the merits." *Berkey Photo*, 603 F.2d at 281. But it may not use exclusionary conduct to foreclose rivals from the distribution channels they need to challenge its dominance. This asymmetry is not unfair to Google. It is a premise of competition law, a body of law Google itself at times invokes.[4]

**D.      Google's *Microsoft* "inducements" argument misreads the precedent.**

Google relies on *Microsoft's* statement that "the antitrust laws do not condemn even a monopolist for offering its product at an attractive price," arguing that its revenue share payments are equivalent to the "inducements" the D.C. Circuit held lawful. Mem. at 9-10, 15 (quoting *Microsoft*, 253 F.3d at 68). This misreads the case.

The inducements the D.C. Circuit approved were payments to Internet Access Providers to promote Internet Explorer over Navigator. The court held that offering "a product at an attractive price" or "developing an attractive product" does not violate Section 2. *Microsoft*, 253 F.3d at 68. But the same opinion held that *Microsoft* violated Section 2 through exclusive dealing with those same providers. *Id.* at 67-71. Google's agreements are not payments for promotion. They are payments for exclusive default placement that foreclose rivals from the most efficient distribution channels. This Court found that the agreements were "exclusive *in practice*." Liability Opinion at 204.

---

[4] *See* Google, Filing EU complaint against Microsoft licensing (Sept. 25, 2024; updated Nov. 28, 2025), https://cloud.google.com/blog/topics/inside-google-cloud/filing-eu-complaint-against-microsoft-licensing (urging European regulators to "move quickly and decisively to protect competition" against Microsoft's allegedly anticompetitive cloud licensing practices; complaint withdrawn when EU launched its own investigation).

Google also cites Rambus for the proposition that liability requires evidence that counterparties would have made different choices absent the challenged conduct. Mem. at 15-16. But Rambus addressed a deception claim, not exclusive dealing. 522 F.3d 456, 464-67 (D.C. Cir. 2008). The D.C. Circuit found insufficient evidence that a counterparty would have adopted different technology absent Rambus's alleged misrepresentations. That holding has no application to exclusive distribution agreements that by their terms foreclose rivals from primary distribution channels. The foreclosure itself is the competitive harm, not a result of other conduct.

**E.      The remedies are tailored to the proven violation.**

Google argues that the data-sharing and syndication remedies are "contrary to law" because plaintiffs failed to show a causal connection between the challenged conduct and Google's market advantages. Mem. at 21-26. The remedies strip away "fruits" that Google obtained through lawful conduct, Google claims, not fruits of the violation. *Id.* This argument misunderstands the standard for antitrust remedies.

District courts have broad discretion to fashion relief that terminates the illegal monopoly, denies the defendant the fruits of its violation, and prevents recurrence. *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972). The relief need not be limited to undoing the precise competitive harms attributable to specific contract terms; it must address the monopoly power the defendant accumulated and maintained through years of illegal conduct. Courts should "pry open to competition a market that has been closed by defendants' illegal restraints." *International Salt Co. v. United States*, 332 U.S. 392, 401 (1947).

This Court applied this standard correctly. It found that Google's exclusive agreements foreclosed rivals from distribution for over a decade, prevented them from reaching competitive

9

scale, and allowed Google to accumulate data advantages and network effects. Memorandum Opinion, ECF No. 1436 ("Remedy Op."), at 63-90. Each remedy connects to a proven violation.

Google argues that plaintiffs never proved its index advantages resulted from the specific agreements found unlawful. Mem. at 21-25. But antitrust remedies need only "represent a reasonable method of eliminating the consequences of the illegal conduct." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978); *see Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1216 (D.C. Cir. 2004) (applying this standard to forward-looking behavioral provisions). The law does not require tracing each byte of index data to a specific foreclosed query. Google's exclusive agreements foreclosed rivals for over a decade, and the remedies are a reasonable method of restoring conditions that make competition possible. That is all the law requires.

## II.     IT DOES NOT HARM GOOGLE TO FOLLOW THE LAW.

Google claims four categories of irreparable harm: disclosure of trade secrets, deprivation of the right to appeal, harm to competitive standing and reputation, and unrecoverable business expenses. Mem. at 26-35. None of these claims establishes irreparable harm because Google has either mischaracterized the nature of the data subject to disclosure or exaggerated the consequences of compliance.

### A.     The data at issue is not trade secret material.

Google frames its search index data as "trade secrets" whose disclosure would cause irreparable harm that could never be undone. Mem. at 26-30. Google's Vice President and Head of Search submitted a declaration describing the index data as the product of "more than twenty-five years of sustained investments and exhaustive engineering efforts." Declaration of Elizabeth Reid, ECF No. 1471-2 ("Reid Decl."), ¶ 8. Google argues that once this data is disclosed to Qualified Competitors, "confidentiality will be lost for all time." Mem. at 28.

Google must disclose (1) a unique identifier for each URL in its index, (2) a map connecting those identifiers to URLs, and (3) for each URL, the time first seen, time last crawled, spam score, and device-type flag. Final Judgment, ECF No. 1462, at 5-6. Even if Google has a proprietary interest in its selection and evaluation of public URLs, antitrust remedies routinely require monopolists to disclose proprietary information. *See In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025) (app catalog data); *Massachusetts*, 373 F.3d at 1215-1218 (APIs and documentation). The disclosures are appropriate because they remedy the harm caused by years of unlawful monopolization.

Google also argues that disclosure of spam scores will allow spammers to "bypass Google's spam detection technologies." Reid Decl. ¶¶ 14-16. But spam scores are snapshots reflecting Google's assessment at a point in time. Google updates these scores continuously as spammers develop new techniques and Google improves its detection methods. A one-time disclosure of historical scores does not give spammers a permanent roadmap to evade future detection. And even if Google's spam-fighting depends entirely on obscurity rather than the quality of its detection methods, that does not make it a trade secret. Trade secret protection requires information that affords "an actual or potential economic advantage over others"—not merely information a company prefers to keep private. *Restatement (Third) of Unfair Competition* § 39 (1995).

### B.    The Final Judgment contains robust safeguards.

Google claims that disclosure will jeopardize user privacy. Mem. at 36-37. This argument overstates the privacy risk and ignores the safeguards the Final Judgment provides.

The user-side data subject to disclosure consists of anonymized and aggregated information about queries and user interactions. Final Judgment at 6. The Final Judgment requires that privacy and security safeguards be applied before any disclosure. The Technical

11

Committee will consult with plaintiffs and recommend appropriate measures. *Id.* at 7. Qualified Competitors must meet data security standards approved by plaintiffs and the Technical Committee, and they must agree to regular audits. *Id.* at 32-33.

Google claims that users trust their search activity will remain private. Reid Decl. ¶ 26. But this claim sits uneasily with Google's existing data practices. Google shares detailed user information with advertisers to power its core business model. It uses query data to train machine learning models. It syncs data across devices and services. The Final Judgment's privacy safeguards are at least as protective as Google's commercial data sharing with advertisers.

### C.    Google's right to appeal is preserved through ordinary mechanisms.

Google argues that implementation of the remedies will cause a "de facto deprivation of [its] basic right to appeal." Mem. at 30. Once data is disclosed, Google reasons, it cannot be "made secret again," and appellate review will be meaningless. *Id.* This argument proves too much.

By Google's logic, any remedy requiring disclosure of information would deprive the defendant of its appellate rights, and stays would be automatic in all cases involving information sharing. Courts have not adopted this rule. The right to appeal does not encompass a right to avoid implementing an adverse judgment while the appeal proceeds.

### D.    Business disruption is not irreparable harm.

Google claims it will suffer irreparable harm from "fundamental business changes" and "unrecoverable expenses." Mem. at 33-35. But these are ordinary compliance costs, not irreparable harm. Every antitrust defendant faces business disruption when found liable; the remedy by definition requires the defendant to change its conduct. The Supreme Court has held that antitrust violators cannot avoid remedies by pleading hardship or inconvenience. *E.I. du Pont*, 366 U.S. at 326-27.

Google cites *Qualcomm* for the proposition that "fundamental business changes" constitute irreparable harm. Mem. at 33-34. But in *Qualcomm*, the Ninth Circuit stayed the injunction because it concluded the district court likely erred on the merits. 935 F.3d at 756. The Ninth Circuit did not hold that business changes constitute irreparable harm in all cases; it weighed the likely merits error against the compliance burden. Here, Google has shown no comparable likelihood of reversal.

## III. A DELAY WOULD HARM FUTURE AND PRESENT COMPETITION, AND THE PUBLIC

Even if Google could show some harm from implementing the Final Judgment, the balance of hardships tilts sharply against a stay. The competitive harm from continued delay far exceeds any burden Google will bear from complying, and consumers would continue to be denied the benefits of competition as long as the stay persists.

### A. Delay compounds competitive harm while Google extends its dominance into AI.

This Court found that Google's unlawful conduct has persisted for more than a decade. During those years, Google paid billions annually to foreclose rivals from distribution, prevented them from achieving the scale needed to compete, and deterred investment in search technology. The result is a market frozen in place, with Google processing more than 90 percent of general search queries in the United States and facing no meaningful competitive threat. A stay would extend these dynamics yet longer. Appeals in complex antitrust cases take years to resolve. If Google obtains a stay, it will continue to enjoy the fruits of its unlawful conduct throughout the appellate process while rivals remain foreclosed from distribution and the gap between Google and potential competitors widens.

The urgency is heightened by Google's ongoing efforts to leverage its search dominance into artificial intelligence. On January 12, 2026, four days before filing its notice of appeal,

13

Google announced a multi-year partnership with Apple to provide the foundational AI models for Siri and Apple Intelligence. Under the deal, Apple will pay Google approximately $1 billion annually for access to Google's Gemini models and cloud technology.[5] This extends one of the relationships that gave rise to this litigation. For years, Google paid Apple billions annually for default search placement on Apple devices—payments that this Court found helped Google maintain its search monopoly. Now Apple is paying Google, giving Google a major distribution win inside one of the largest device ecosystems in the world while generating revenue rather than incurring costs. The balance of payments still favors Apple and amounts, in practice, to Apple giving Google a discount on its existing payments. No other AI company is able to leverage its existing financial relationships to achieve distribution in this way.

The pattern should be familiar. Google used exclusive distribution agreements to foreclose search rivals from reaching users. It is now positioned to use its AI capabilities, built in part on the data advantages it accumulated during years of unlawful foreclosure, to establish the same kind of dominance in generative AI.[6] This Court recognized this risk, devoting many pages of its remedies opinion to discussing the relationship between search and AI, and crafted remedies designed to prevent Google from using "the same anticompetitive playbook for its GenAI products that it used for Search." Remedy Op. at 100. A stay would undermine that objective at the moment it matters most.

---

[5] Mark Gurman, *Apple Plans to Use 1.2 Trillion Parameter Google Gemini Model to Power New Siri*, Bloomberg (Nov. 5, 2025), https://www.bloomberg.com/news/articles/2025-11-05/apple-plans-to-use-1-2-trillion-parameter-google-gemini-model-to-power-new-siri.
[6] Maria Palmieri & Sebastian Hufnagel, *Google's AI Advantage: Why Crawler Separation Is the Only Path to a Fair Internet*, Cloudflare Blog (Jan. 30, 2026), https://blog.cloudflare.com/uk-google-ai-crawler-policy (explaining that publishers cannot block Google's AI data collection without losing search visibility, giving Google an AI training data advantage rivals cannot replicate).

### B.      The competitive window may close during the appeal.

The timing of implementation matters because generative AI presents the first genuine opportunity in years to challenge Google's dominance in search. Companies like Perplexity, OpenAI, and others are developing AI-powered search products that offer new approaches to information retrieval. These products need data and distribution to succeed.

The GenAI market is dynamic in ways the search market has not been for over a decade. The Court found that as of December 2024, OpenAI held approximately 85 percent of the U.S. GenAI chatbot market, with Gemini at 7 percent, Claude at 3 percent, and Perplexity and Copilot making up the remainder. Remedy Op. at 42, ¶ 60. Google's Gemini app had roughly 140 million daily queries, compared to ChatGPT at 1.2 billion, MetaAI at over 200 million, and a cluster of emerging competitors including Grok, DeepSeek, and Perplexity. *Id.* These numbers describe a market in motion, where positions have not yet solidified. The right intervention now can shape competitive dynamics for years. The wrong delay can allow those dynamics to calcify.

The Court found that the volume of Google Search queries in Apple's Safari browser declined for the first time in 22 years, perhaps due to the emergence of GenAI chatbots. Remedy Op. at 44, ¶ 63. At the same time, Google's own AI Overviews feature has increased Google Search queries in the United States by 1.5 to 2 percent since its introduction. Remedy Op. at 44, ¶ 64. Generative AI can draw users away from traditional search, but Google is already recapturing that interest by folding AI into its own search product. The window for competitors to gain a foothold is narrowing.

Google is moving aggressively to make sure that outcome holds. The Apple deal gives Gemini distribution across as many as 2.5 billion active Apple devices.[7] The Court found that

---

[7] Apple Inc., Press Release, Apple Reports First Quarter Results (Jan. 29, 2026), https://www.apple.com/newsroom/2026/01/apple-reports-first-quarter-results.

Google has entered into Gemini distribution and promotion agreements with Samsung, Motorola, and Lenovo. Remedy Op. at 43, ¶ 62.  Google is not standing still while this appeal proceeds. It is actively extending its reach. If a stay is granted, by the time remedies take effect, Google may have locked up AI distribution as thoroughly as it locked up search distribution, and the opportunity for competitive entry will have passed.

### C.    Google's burden is modest.

Google's burden from implementation is modest compared to the harm from delay. Google must modify some contracts to remove exclusivity provisions, develop infrastructure to share index data, make syndication available on fair terms, and cooperate with a Technical Committee. These are not crushing obligations for a company valued at more than four trillion dollars with vast engineering resources.[8]

## IV.    THE PUBLIC HAS WAITED LONG ENOUGH

This case has been pending since October 2020. The liability trial concluded in November 2023. The remedies trial concluded in May 2025. The Final Judgment was entered in December 2025. The Department of Justice and state attorneys general devoted enormous resources to proving Google's violations, prevailing in the most significant antitrust enforcement action in the technology sector in a generation.

Hundreds of millions of Americans use search every day to find information, buy products, get directions, and answer questions. The Court found that Google's exclusive agreements locked up the default search position on the devices those people use. Default placement drives the vast majority of queries to Google: 65 percent of searches on Apple devices flow through the Safari default, and Google receives nearly 95 percent of all search queries on

---

[8] *Alphabet Hits $4 Trillion Market Capitalization*, CNBC (Jan. 12, 2026), https://www.cnbc.com/2026/01/12/alphabet-4-trillion-market-cap.html.

iPhones. Liability Opinion at 102-03, ¶ 296. Google's agreements covered over 90 percent of the U.S. search market, preventing meaningful competition. Liability Opinion at 227. Users did not choose Google through informed comparison. The Court credited evidence that many users are not even aware a default search engine exists, much less how to change it. Liability Opinion at 27, ¶ 68. Those who tried to switch faced "choice friction," obstacles like multiple screens and app downloads, that discouraged them from following through. Liability Opinion at 27-29, ¶¶ 69-73.

The result is that people have been denied experience with alternatives they might actually prefer. The Court considered a peer-reviewed study in which users were offered a small payment to switch their default from Google to Bing for two weeks. One-third of those users opted to keep Bing after the test ended. Remedy Op. at 84–85. Nearly two-thirds reported that Bing was better than they had expected. *Id.* A behavioral economics expert testified that search engines are "experience goods," meaning consumers need to use a product to understand its quality. Remedy Op. at 85. Google's stranglehold on defaults has kept users from gaining that experience with any rival. The Court found that users' lack of exposure to Bing was "a significant driver of Google's large share." Remedy Op. at 85.

As a result, people are using a product they were steered to, not one they chose. They have been denied the chance to discover whether they would prefer something else. And the market that could develop those alternatives was starved. The Court found that Silicon Valley venture capital treated search as a "no fly zone." Liability Opinion at 237. Apple, which had the capacity to build its own search engine, was disincentivized from doing so by the tens of billions Google paid for default placement. Remedy Op. at 80. Investment and innovation that would have benefited users never materialized. This may now happen in AI.

The harms extend beyond lack of choice. Google's monopoly position has affected the quality of the search experience that hundreds of millions of people receive each day. The Court credited Google's own 2020 internal study in which Google degraded major ranking components for approximately three months. The quality reduction was massive, equivalent to removing twice the information contained in all of Wikipedia. Revenue declined by less than one percent. Liability Opinion at 48-49, ¶ 134. That finding implies that Google can let the quality of its product slip without meaningful business consequences, precisely because its exclusive agreements have ensured that users have no realistic alternative. A firm facing real competitive pressure could not afford that tradeoff.

The record reflects how Google has used that insulation from market forces. The Court found that Google is "a monopolist unconcerned about product changes that have decreased advertisers' autonomy over the auctions they enter and the ads they purchase," and that it "has suffered no consequences because it does not operate in a competitive text ads market." Liability Opinion at 263-64. Google cut the data it provided advertisers in search query reports, hiding information about which queries triggered their ads, and expanded keyword matching to force advertisers into broader and more expensive auctions. Liability Opinion at 94-97, ¶¶ 269-278. Text ads on Google "resemble the organic links" on the results page, appearing at the top with only the word "Sponsored" to distinguish them. Liability Opinion at 60, ¶ 176. The Court found that Google's AI Overviews and other first-party features have reduced user interactions with organic web results. Remedy Op. at 21-22, ¶ 10. The practical result is a search experience increasingly shaped by Google's revenue priorities and decreasingly shaped by the open web.

This matters all the more because alternatives with different design priorities cannot reach users through the channels that matter. DuckDuckGo offers a privacy-focused search

18

experience: it does not track user sessions, does not log IP addresses, and anonymizes click data. Liability Opinion at 44-46, ¶¶ 121-124. But Google's exclusive default agreements keep DuckDuckGo and similar products out of the distribution channels where most users encounter search. The Court found that Google's revenue-share payments "discourage partners from making changes that would hurt Google." Liability Opinion at 206. Users who want to try a different search engine confront the same "choice friction" the Court identified: multiple screens, additional steps, and a default that resets. Liability Opinion at 27-29, ¶¶ 69-73. A stay would preserve this dynamic.

The financial harms are just as concrete. The Court found that Google used its monopoly to raise ad prices without any meaningful competitive constraint. Liability Opinion at 259. Google used "pricing knobs" to inflate the cost of text ads, raising prices in 5 to 15 percent increments timed to hit revenue targets. Remedy Op. at 95-96. Google designed these increases to be imperceptible, so advertisers would attribute rising costs to normal auction fluctuations rather than to Google's deliberate choices. *Id.* Of course, higher advertising costs do not stay with advertisers. Businesses pass those costs on to the public.

A stay extends all these harms.  The public interest lies in prompt enforcement, and the remedies should take effect as scheduled.

19

**CONCLUSION**

Google cannot satisfy any factor required for a stay pending appeal. For these reasons,

Public Knowledge respectfully urges the Court to deny Google's motion for a partial stay

pending appeal.

*Respectfully submitted,*

/s/ John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
john@publicknowledge.org

February 5, 2026