**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>Defendant. | Case No. 1:20-cv-03010-APM<br><br>HON. AMIT P. MEHTA<br><br>[redacted] |
| State of Colorado, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Google LLC,<br><br>Defendant. | Case No. 1:20-cv-03715-APM<br><br>HON. AMIT P. MEHTA<br><br>[redacted] |

**JOINT STATUS REPORT**

Pursuant to the order of operations and timing for Category 2 Recommendations, ECF Nos. 1528-2, 1529, the Parties submit the following Joint Status Report.

## I. Joint Status Update

Pursuant to Sections V and VI.B of the Final Judgment in the above-captioned cases, Plaintiffs and the Technical Committee ("TC"), with input from Google, are required to create and submit to the Court templates for a search syndication license and a Search Text Ads syndication license. ECF No. 1462 at §§ V, VI.B [hereinafter Final J.].

The syndication template license is subject to the terms that the Court ordered the Parties to adopt for recommendations as set forth in Appendix A to the Parties' Joint Status Report filed on May 20, 2026 ("May 20 JSR Appendix"), ECF Nos. 1520-1, 1521, as well as to the order of

operations and timing for "Category 2 Recommendations," ECF Nos. 1528-2, 1529. The Parties engaged in the requisite exchanges pursuant to that order of operations, including multiple meet and confers.

As directed by the Court's Minute Order of October 6, 2026, on October 9, 2026, Plaintiffs submitted to the Court the syndication Recommendation and Recommended Template, which provides license terms for both search syndication and Search Text Ads syndication, *see* ECF Nos. 1559, 1559-1.[1] Also at that time, Plaintiffs identified the parts of the Recommended Template as to which Google had provided an objection and attached those objections. ECF No. 1559-2. Plaintiffs initially filed these materials under seal, ECF Nos. 1559, 1559-1, 1559-2, with redacted versions filed on October 9, 2026, and October 13, 2026, ECF Nos. 1560, 1560-1, 1560-2, 1561, 1561-1.[2]

The Parties' positions on Google's outstanding objections are presented below.

## II. Google's Position Statement

Plaintiffs' Proposed Template license includes remedies that previously were rejected by the Court, namely a compelled grounding remedy and marginal cost pricing, and eliminates Google's customary use restrictions that the Court previously approved. More broadly,

---

[1] The terms "Recommendation" and "Recommended Template" have the same meanings as provided in Plaintiffs' October 9 submission to the Court. *See* ECF Nos. 1559, 1559-1.

[2] As with the Recommendation, Google has requested that the entirety of this Joint Status Report and attached exhibits be redacted for purposes of this filing to permit Google additional time to determine what redactions it believes are necessary. Plaintiffs have agreed to do so, with the understanding that Google will provide reasonable, tailored proposed redactions to Plaintiffs next week. With respect to timing of Google providing those redactions, Plaintiffs have requested by 12:00 PM ET on Tuesday, October 20, 2026, and Google has proposed by 12:00 PM ET on Thursday, October 22, 2026, in either case with an aim towards filing an agreed-upon version within one day thereafter. The Parties will work to file the redacted version of this submission as quickly as they can after Plaintiffs receive Google's proposed redactions, or as ordered by the Court.

Plaintiffs' Proposed Template departs significantly from the Final Judgment and established commercial practice. Far from tracking Google's existing contracts, Plaintiffs rewrote them entirely, interjecting a web of exceptions to Google's standard intellectual property protections, introducing new technical requirements, and removing a number of terms altogether. None of these changes finds any basis in the Final Judgment. By including numerous and unjustified divergences from Google's existing commercial agreements, Plaintiffs' Proposed Template creates a host of ambiguities that would mire parties and the Court in the precise sorts of technical and administrative disputes that the Court attempted to avoid when it decided that any license should follow Google's existing commercial terms.

Google has explained to Plaintiffs and the Technical Committee each of the problems it identifies in this submission, including through a series of meetings between the Technical Committee and the Google executives and personnel who run the relevant services. Plaintiffs, however, have continued to decline to follow Google's existing terms, policies, and protocols, in favor of an untested and unprecedented approach that would treat Qualified Competitors substantially differently than any of Google's syndication partners. Google's Proposed Templates, on the other hand, faithfully adhere to the Court's instructions by applying most-favored-nation (MFN) terms and ordinary course IP protections. The Court should reject Plaintiffs' overreaching proposal and adopt Google's Proposed Templates. *See* Ex. 1, Google's Proposed Search Template; Ex. 2, Google's Proposed Ads Template; Ex. 3, Google's Cover Letter to Proposed Templates.

### A. The Use of Syndicated Search Results for GenAI Grounding Would Contravene Both the Final Judgment and Commercial Practice.

The Court should reject Plaintiffs' revisions to Google's standard syndication terms. As the evidence introduced in the remedies proceeding demonstrated, Google's syndicated search

results are designed to be served directly to the user, not for use in an LLM for any purpose, including grounding. Permitting Qualified Competitors to use Google's syndicated search results as an input for GenAI models would circumvent Google's intellectual property protections. It would also circumvent existing publisher controls, enabling Qualified Competitors to ground their models on content that they are ineligible to receive directly and that Google itself is not permitted to use for grounding.

In addition, to the extent that Plaintiffs' rewrite of Google's syndication contracts is intended to enable grounding through a backdoor,[3] this is nothing more than a second bite at the apple. The Court ***denied*** Plaintiffs' request to require Google to syndicate its FastSearch results, a request that was expressly intended to enable grounding. Sept. Op., ECF No. 1435, at 179. And the Court ***confirmed*** at the October 2025 hearing that, under the Court's September 2025 decision, Qualified Competitors are prohibited from taking syndicated search results and feeding them into an LLM—a predicate step that would be required for grounding. Oct. 8, 2025 Tr. 107:13–108:6. In sum, Plaintiffs' proposal violates the Court's prior decisions as well as the Final Judgment's mandate that the syndication terms adhere to Google's ordinary course IP protections and "least restrictive" use and display conditions.

---

[3] Plaintiffs refuse to give Google a straight answer to whether, under Plaintiffs' Proposed Template, a Qualified Competitor may use Google's syndicated search results for grounding. Plaintiffs' original August 31, 2026 Template expressly cited "grounding" as a permitted use. After the Technical Committee met with Google's syndication license executives, Plaintiffs' revised October 4, 2026 Template struck the word "grounding." *See* Ex. 4, Pls' Redline 8/31 v. 10/4 Templates, Exhibit C § 2.3. In a subsequent meet-and-confer, however, Plaintiffs stated that no substantive change was intended by removal of the express references to grounding. Google has sought clarification from Plaintiffs as to whether any form of grounding is permitted under their Template, and if so, what form, but Plaintiffs have refused to answer. *See* Ex. 5, Pls' 10/8 E-Mail.

### 1. The Court Already Rejected Plaintiffs' Proposals That Would Have Permitted Syndicated Results to be Used for Grounding.

Grounding (also commonly known as retrieval-augmented generation, or "RAG") is fundamentally different from the syndication of search results. Search syndication involves ***displaying*** a search engine's web search results directly to users; grounding involves using search results as a data input for generating and serving different search results. Rather than returning the results directly to the user for the user to engage with, grounding involves feeding search results into a large language model (LLM) for the purpose of supplementing the information known to the LLM. *See* Sept. Op., ECF No. 1435 ¶¶ 37–38. Google offers grounding services to select third parties separately from its web search syndication service. *See* Sept. Op., ECF No. 1435 ¶ 45.

While Plaintiffs' March 7, 2025 Proposed Final Judgment (ECF No. 1184-1) attempted to extend the remedy to include grounding, the Court's narrowing of Plaintiffs' proposal confirmed that grounding is out of scope:

***First***, the Court rejected Plaintiffs' proposal to require compelled syndication of Google's "FastSearch" results, which LLMs use for grounding:

> Google will not be required to syndicate FastSearch results. Recall, FastSearch is a technology that rapidly generates limited organic search results for certain use cases, such as grounding of LLMs, and is derived primarily from the RankEmbed model. . . . FastSearch results are delivered through Vertex, Google's cloud-based grounding product. Given FastSearch's function, forced syndication of its results is an ill-fitting remedy. . . . Its primary use case is grounding for GenAI products, but Plaintiffs have not asked the court for a remedy that would forbid Google from refusing a Qualified Competitor's request to receive services through Vertex. The court will not require Google to create a syndication service for FastSearch results, when it does not do so now.

Sept. Op., ECF No. 1435, at 179 (citations omitted).

***Second***, the Court also rejected the provision in Plaintiffs' Proposed Final Judgment that would have forbidden Google from imposing any restrictions on the use or display of Google's syndicated search results. Dec. Op., ECF No. 1461, at 37. The Court explained that a rationale in narrowing Plaintiffs' proposal was to eliminate terms that "strayed too far from terms found in licensing agreements in the existing search syndication market." *Id.*

***Finally***, and relatedly, the Court confirmed that the syndication remedy is to be consistent in scope and terms with Google's existing commercial arrangements. Sept. Op., ECF No. 1435, at 173 ("Google's syndication obligations under Section VII.A shall be consistent with its current syndication agreements.]."); Sept. Op., ECF No. 1435, at 180 ("[T]he narrowed remedy . . . addresses Google's concerns that the forced syndication contemplated by Plaintiffs exceeds ordinary commercial terms and places its intellectual property at risk."); Dec. Op., ECF No. 1461, at 43 ("[The] restrictions or limitations in a search syndication license pursuant to the Final Judgment shall be, for the most part, defined by Plaintiffs' language, on "least restrictive," "no less favorable," or "no worse" terms. The Final Judgment will retain the use of "ordinary commercial" terms to protect against Qualified Competitors using the syndication agreement in a manner that exceeds its intended purpose.").

When the specific issue of use of the syndicated results in an LLM came up at the October 2025 hearing, Google's counsel stated his understanding that "[w]hat we can't have . . . consistent with your opinion is, a search engine gets syndicated search results and they take those results and they feed them into their own LLM. And maybe the LLM spits out a slightly different collection of results that may or may not include some number of Google results . . . ." Oct. 8, 2025 Tr. 107:13–21. The Court confirmed that use in an LLM was not what the Court understood Plaintiffs to be requesting: "What you've just described strikes me as something

different than what they're discussing, which is, I understood them to say, look, a qualified competitor should be able to get the results and then literally display them as they wish." Oct. 8, 2025 Tr. 108:2–6.

The Final Judgment accordingly provides:

> Qualified Competitors may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose, except that Google may impose restrictions on the display or use of syndication components no less favorable than what it provides under any current search syndication agreements as of the date of entry of this Final Judgment. Google is also permitted to place its ordinary commercial restrictions on scraping, indexing, or crawling the syndicated results and content.

FJ § V.B.7; *see also id.* at § V.B.6 ("Google may impose no restrictions or conditions on how a Qualified Competitor uses, displays, or integrates information or services obtained under this Section V beyond the least restrictive terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment.").

Plaintiffs now attempt to revive their previously-rejected remedies, and create exemptions to Google's existing terms in violation of the Final Judgment.

### 2. Google's Search Syndication Service Is Designed Solely for Serving Ten Blue Link Search Results to Users, Not AI Grounding.

Plaintiffs' Proposed Template introduces various carve-outs and exceptions that nullify Google's standard IP protections and its MFN use-and-display limitations.

At trial, Google presented unrebutted evidence that both Google and Microsoft strictly prohibit search syndication licensees from using search results for any purpose other than serving the results to the end user.[4] Plaintiffs' Proposed Template eliminates these standard use

[4] Google's Proposed Findings of Fact, ECF No. 1346 ¶ 808 (Tr. 3478:24–79:17 (Reid) ("[O]ur syndication APIs have restrictions that allow you to display the results to the users. But you can't use them to build a competitive search engine, you can't store them, you can't analyze them, you

restrictions contained in all Google syndication licenses. While Plaintiffs claim to seek "flexibility" for GenAI companies, the Final Judgment strictly limits any flexibility to Google's "least restrictive" use and display terms and standard IP protections. FJ § V.B.6; *see also* FJ § V.B.7. Instead of respecting these limits, Plaintiffs' template would enable uses that have never been permitted in Google's commercial contracts.

That Plaintiffs' template departs from Google's ordinary most-favored terms is clear; unfortunately, little else is clear about how it would operate in practice. While Exhibit C § 5.1 contains (certain) use and display restrictions from Google's syndication agreements, it makes the applicability of those terms *contingent* on other provisions in the agreement. Exhibit C Section 5.1 applies except as otherwise permitted by Sections 4.4, 5.4, 6.6, and Exhibit C Section 2.3[5]; Exhibit C Section 2.3 ("Additional Terms Permitting Use Within GenAI Products") then applies "[n]otwithstanding Sections 4.4, 4.5, 5.4, and 5.5, as well as the terms of this Exhibit C." Pls' Proposed Template, EFC No. 1559-1, Exhibit C §§ 2.3, 5.1. Plaintiffs' template similarly makes Google's ability to impose its ordinary-course prohibitions on scraping, indexing, and crawling *contingent* on other provisions in the agreement, provisions which appear to override

---

can't learn from them. They're intended to be purely for the purpose of serving.")); *id.* ¶ 832 (citing 30(b)(6) deposition testimony from Microsoft confirming that Microsoft syndicates for the sole purpose of passing the syndicated search results on to users—not for the purpose of allowing other search engines to store or analyze the results); *id.* ¶ 837 (Microsoft imposes prohibitions on derivative usage of its data, or usage of the data for purposes other than for showing search results. Tr. 1071:9–72:1 (Schechter)); Schechter (Microsoft) (30(b)(6) Dep.) Tr. 29:7–30:17); *id.* ¶ 838 (Microsoft's syndication traffic quality policy provides that Microsoft's syndication partners may not: "edit, modify, reverse engineer, decompile, or otherwise alter the Bing Services, except where the foregoing is expressly permitted by law." RDX0317 at .012).

[5] "*Except as otherwise permitted by this Agreement, including actions permitted under Section 4.4, Section 5.4, Section 6.6, and Exhibit C Section 2.3*, Signatory and its Affiliate(s) will not, and will use commercially reasonable efforts to not permit any third party to . . . ."

those very prohibitions. *Id.* at § 4.5.[6] Even the ban on "LLM Training" is subject to an exception that is itself defined by reference back to the provision it overrides. Specifically, Section 4.4(c) applies "[n]otwithstanding 4.4.b"; the last sentence of Section 4.4(c) then permits any "actions permitted in Exhibit C Section 2.3," and Exhibit C Section 2.3 overrides Section 4.4.

In light of Plaintiffs' representations that their template is not intended to prohibit grounding, a plausible reading of the cross-referenced sections cited above is that they *exempt* GenAI Products from Google's use restrictions, and more broadly, render Google unable to impose its usual terms on any Qualified Competitor. Indeed, the other terms of the template *prohibit Google from imposing any restrictions of use and display* other than those permitted in Exhibit C Sections 2.2 and 2.3. Pls' Proposed Template, EFC No. 1559-1, § 4.4(a). But the only limitation permitted in the referenced sections, Exhibit C Sections 2.2 and 2.3, relates to the number of "Request[s] for Search Results or Search Results Set per Covered Query" a Qualified Competitor may issue. Far from permitting Google to impose the "least restrictive" use limitations found in its ordinary course agreements, those sections further ***limit*** Google's ability to enforce its existing restrictions on display and use. Plaintiffs' Exhibit C Section 2.3, "Additional Terms Permitting Use Within GenAI Products," further expands this unjustified loophole in Google's ordinary course terms. This provision provides an exemption from Google's prohibition on caching and thus allows a Qualified Competitor to "temporarily" cache Google's syndicated search results for use within a GenAI Product. The reason for this caching

[6] "Crawling Restrictions. Pursuant to terms set forth in Exhibit C Section 5 *and except as otherwise stated* in Section 4.4 and Exhibit C Section 2.3, Google may, at its discretion, place ordinary commercial restrictions on the ability of Signatory and its Affiliate(s) to scrape, index, or crawl any Search Results, Search Results Sets, or other information or data made available as part of the Search Service(s)."

allowance is to permit grounding, as expressly acknowledged in Plaintiffs' August 31, 2026 Template. *See* Ex. 6, Pls' 8/31 Template, Exhibit C § 2.3(a).[7] And Section 2.3(b) provides that a "single-call API retrieval" (meaning completing the API request through a single call rather than streaming requests) "for use within GenAI Products" does not constitute "scraping, indexing, or crawling prohibited under this Agreement." The original text of Plaintiffs' Proposed Template explicitly framed this provision as permitting grounding. *See* Ex. 6, Pls' 8/31 Proposed License, Exhibit C § 2.3(b).[8] Plaintiffs have now eliminated the explicit reference to grounding, but the remainder of this non-standard provision remains. As described in Section I.A.3, *infra*, any storage or use of Google's search results other than for direct display to the user is prohibited under Google's standard terms.

In Plaintiffs' formulation, the sole limitation on how a GenAI Product may use Google's syndicated search results is contained in Section 4.4(c), which prohibits the use of results to "(i) pre-train, train, fine-tune, or otherwise develop the weights of any large language model or other machine learning model such that syndicated content becomes permanently embedded in model parameters ("LLM Training"), or (ii) conduct bulk re-indexing or re-syndication of Search Results as a substitute for independent web crawling or web index development." But as noted *supra*, the prohibition is subject to an exception that swallows the prohibition. In any event, as

[7] "Additional Terms Permitting GenAI Product Grounding: Notwithstanding Sections 4.4, 4.5, 5.4, and 5.5, as well as the terms of this Exhibit C, Google shall not: (a) prohibit Signatory and its Affiliate(s) from temporarily caching Search Results solely ***for the purpose of grounding any single response*** to a Covered Query generated by a GenAI Product owned and operated by Signatory and its Affiliate(s), provided that any such cached content is not stored beyond the duration necessary to complete such response." (emphasis added).

[8] "Additional Terms Permitting GenAI Product Grounding: Notwithstanding Sections 4.4, 4.5, 5.4, and 5.5, as well as the terms of this Exhibit C, Google shall not: . . . (b) treat single-call API retrieval under this Agreement ***for use in GenAI Product grounding*** described in Exhibit C Section 2.3.a as bulk scraping, indexing, or crawling prohibited under this Agreement." (emphasis added).

further described below, the "LLM Training" and "bulk re-indexing or re-syndication" prohibition is substantially narrower than Google's ordinary course terms and those of Microsoft, and would be impossible to implement or enforce.

### 3. Permitting Use of Syndicated Results for Grounding Would Divulge Google's Intellectual Property and Enable Reverse Engineering.

Plaintiffs' position on what grounding rights their template is intended to convey is shifting and often self-contradictory. However, allowing Qualified Competitors to ingest syndicated search results to ground their LLM outputs in ***any*** manner infringes on Google's intellectual property rights. As explained at the remedies hearing, Google's search syndication service relies on contractual restrictions to protect Google's IP, including the requirement that syndication partners may not "'crawl', 'spider', index or in any non-transitory manner store or cache information obtained from the services, including results, beyond what is necessary to present results in response to a search query." Tr. 2988:19–2990:2 (Adkins) (explaining that under Google's syndication terms, customers may not "keep a copy of the result . . . for a temporary amount of time . . . ").

Because grounding on search results necessarily requires ingestion and caching of the results, Google's search grounding product includes additional IP protections through its product implementation. Grounding with Google Search (part of the Vertex AI offering) does not provide customers with the ranked raw search results; instead, it ingests those results internally to provide only the grounded LLM response. Sept. Op., ECF No. 1435 ¶¶ 44–46 ("Vertex customers do not, however, receive the FastSearch-ranked web results themselves, only the information from those results. Google limits Vertex in this manner to protect its intellectual property." (citation omitted); *see also* Tr. 3340:19–41:7 (Collins) ("[I]f we provided direct access [to Google's search results] then -- through an API then developers could reverse engineer

Search or any other grounding service we expose them to, potentially train on, train AI models on the output and so on."). Google's grounding product additionally protects its sources from scraping by inserting a temporary "redirect" that routes traffic through Google's search attribution layer—rather than to the weblink directly—thereby allowing Google to monitor potential abuse of the services. Ex. 7, Adkins Decl. ¶ 12.

The Court explicitly recognized the need to protect Google's intellectual property by maintaining ordinary commercial restrictions on scraping, indexing, crawling, and caching. *See* Dec. Op., ECF No. 1461, at 43 ("The Final Judgment will retain the use of 'ordinary commercial' terms to protect against Qualified Competitors using the syndication agreement in a manner that exceeds its intended purpose."). Allowing GenAI Products to process and ground on syndicated results directly conflicts with these established protections against IP leakage and reverse engineering. Plaintiffs' proposed Section 4.4(c) on "LLM Training" is impractical, unenforceable, and flatly inconsistent with Google's existing terms. Those terms bar all forms of indexing—not merely "bulk re-indexing"—and any use in an LLM or other machine learning model. Plaintiffs identify no technical or contractual mechanism capable of preventing syndicated data, once ingested by a Qualified Competitor's LLM, from becoming "permanently" incorporated into the model's parameters. And the trial record demonstrates that providing direct or programmatic access to search results for AI models allows competitors to train machine learning models to predict or replicate Google's proprietary ranking systems, query understanding mechanisms, and search stack architecture. The Court should not countenance this circumvention of the protections Google imposes in its grounding products.

**4. Permitting Use of Syndicated Results For Grounding Would Violate Express Use Limitations Imposed by Publishers on Google.**

Separately from all of the above concerns, permitting Qualified Competitors to use syndicated search results for AI grounding would directly violate Google's representations to publishers about how their content will be used. Search syndication products and AI grounding tools utilize fundamentally distinct technical architectures and make use of web publishers' content in different ways, and the opt-out options that Google offers to publishers reflect this economic and technical reality. Allowing Qualified Competitors to process Google's syndicated search results for AI grounding would enable AI companies whose crawlers have been blocked by publishers to bypass those restrictions and utilize the restricted content for the exact AI use cases the publishers prohibited—ingesting and re-synthesizing content from website owners who explicitly chose not to participate in AI grounding.

In meetings with the Technical Committee, Google executives detailed why publisher controls make grounding on syndicated results unworkable. Yet neither Plaintiffs nor the Technical Committee has offered any explanation of how Google could reconcile those controls with the use contemplated by Plaintiffs' Proposed Template.

Under Google's publisher controls, website owners can permit Google's primary web crawler (Googlebot) to index their web pages for display in Google's search results, while simultaneously using separate management tools like Google-Extended and the Search Generative AI Control to opt out of having their content processed by Google's AI services. Ex. 7, Adkins Decl. ¶¶ 13–14.[9] This is not hypothetical: many publishers expressly prohibit their

[9] Google Extended allows publishers to opt-out from being used for grounding in Google Vertex and Gemini Apps and for training future generations of Gemini models that power Gemini Apps and Vertex AI API for Gemini; Search Generative AI Control allows publishers to opt out of Gen-AI features in Google Search including AI Overviews and AI Mode.

content from being used in Google's AI services while continuing to allow search indexing for display in Google's search results. Ex. 7, Adkins Decl. ¶ 14. And outside of Google's controls, many major publishers also configure site-level permissions (such as robots.txt rules) specifically to block web crawlers dedicated to AI search and grounding models (*e.g.*, OAI-SearchBot, PerplexityBot, or Claude-SearchBot) while continuing to allow indexing for general organic web search. Ex. 7, Adkins Decl. ¶ 14. Permitting Qualified Competitors to feed Google's syndicated web search results into generative AI models would invalidate these distinct controls and violate the explicit choices of millions of website publishers.

For all of these reasons, the Court should adopt Google's Proposed Template and confirm that grounding is outside the scope of permissible use for the syndicated search results.[10]

### B. Plaintiffs' Proposed Financial Terms Have Never Been Offered to Any Potential Licensor of Google's Syndication Products.

The Court rejected Plaintiffs' request for "marginal cost" organic search syndication pricing, in part to avoid creating perverse incentives that "encourage market entry" by "'white label' GSEs in the short term [that] seek simply to present Google search results under a different brand name" with no incentive to differentiate or innovate. Sept. Op., ECF No. 1435, at 174. And yet, contrary to the Court's directive, Plaintiffs now propose that all of the compelled search

[10] Given the MFN display and use provisions in the Final Judgment, Google's Proposed Search Template adopts a provision [redacted] Ex. 1, Google's Proposed Search Template § 2.3(d). For the avoidance of doubt, Google's syndication agreements have never permitted the modification of individual search results, Ex. 7, Adkins Decl. ¶ 11, and this clarification is included in Google's Proposed Search Template. Ex. 1, Google's Proposed Search Template § 2.3(d). The Technical Committee and Plaintiffs confirmed agreement on this particular issue in their September 15 responses to Google's questions. *See* Ex. 8, Pls' 9/15 Letter, Response 10 ("Plaintiffs and the TC do not anticipate permitted use cases where a Qualified Competitor performs individual, result-level modifications to search results received by Google under the syndication remedies.")

syndication services, save for Image Search, be provided [redacted]. Requiring Google to syndicate its search results [redacted] obviously would exacerbate the harms the Court already warned against.[11] Plaintiffs' pricing proposal for search text ads syndication is similarly unprecedented and unworkable: it improperly combines terms across multiple different deals and applies them in entirely novel ways that have no basis in commercial practice (Google's or otherwise). The Court should adopt Google's proposed pricing, which conforms to the Court's MFN instructions.

#### 1. Plaintiffs' Proposal [redacted] Search Services Contradicts the Court's Rejection of Marginal Cost Pricing and Has No Basis in Any Google Agreement.

The Court ordered that the search syndication license be made available "on financial terms no worse than those offered to any other user of Google's search syndication products," adding that the terms must be "no less favorable than the most favorable terms Google provides under any current search syndication agreements as of the date of entry of this Final Judgment." FJ §§ V.A, V.B.3. Plaintiffs originally requested marginal-cost pricing during the remedy proceedings, but the Court rejected Plaintiffs' proposal in its Final Judgment because it would create perverse incentives for licensees not to innovate or compete on the merits and it would completely destroy the offerings of other search syndication providers such as Brave. *See* Sept. Op., ECF No. 1435, at 172, 174. Plaintiffs' proposed licensing terms of $[redacted] per 1,000 requests for Web Search, Video Search, Knowledge Panel, and Local/Maps, and $[redacted] per 1,000 requests for Image Search, should be rejected for these same reasons.

[11] For all of these reasons, Plaintiffs' proposed pricing is impermissibly confiscatory. *See Hartford-Empire Co. v. U.S.*, 323 U.S. 386, 414-17 (1945).

[redacted] is not "MFN" pricing—Google has never offered these services [redacted]. To arrive at the $[redacted] price, Plaintiffs adopted a pricing term from Google's 2016 contract with [redacted], but that pricing term expired in [redacted]. Ex. 7, Adkins Decl. ¶ 19. By the date of the Final Judgment, [redacted] paid $[redacted] per 1,000 queries for web search results. Ex. 7, Adkins Decl. ¶ 19. Plaintiffs' proposal also ignores the other terms that went hand-in-hand with the [redacted] price (whether $[redacted] or $[redacted]). Specifically, the [redacted] contract bundled syndicated web search results together with Google's syndicated search text ads (AdSense for Search, or "AFS"): Google [redacted] charged an ads revenue share, and required that [redacted] use Google's AFS ads for any search text ads it displayed. Ex. 7, Adkins Decl. ¶ 19. The contractual terms ensured that Google ads would show prominently, and that Google would receive a significant portion of any search ads revenue earned by [redacted]. Plaintiffs' proposal omits the AFS search ads component of the deal, allowing Qualified Competitors to secure [redacted] search results without any commitment to show Google ads, and thus [redacted] This proposal amounts to a search syndication license that has never existed with any licensee and directly contravenes this Court's rulings.

Moreover, the [redacted] contract did not include Video, Knowledge Panel, or Local/Maps content. Ex. 7, Adkins Decl. ¶ 19. Plaintiffs nonetheless seek to impose a $[redacted] price on all of those services as well. Again, Plaintiffs' proposal has no precedent in anything that Google has ever agreed to, and it flies in the face of the Court's rejection of marginal-cost pricing.

Finally, Plaintiffs' proposed Image Search fees present the same flaw as the $[redacted] from the [redacted] deal. Here, Plaintiffs point to [redacted]'s $[redacted] per 1,000 Image Search requests rate, which (like [redacted] is part of a bundled AFS relationship. The [redacted] agreement requires

[redacted] to call Google's AFS for an ad each time it calls for a third party search text ad, and requires [redacted] to provide the AFS ad with premium placement. Ex. 7, Adkins Decl. ¶ 19.

In contrast to Plaintiffs' reliance on cherry-picked, non-comparable benchmarks in a manner incompatible with the terms of the Final Judgment, Google's proposed terms seek to identify the best *a la carte* price for each element of the Court's required syndication package. Google's ads-free web search syndication product was priced at $5 per 1,000 requests as of the date of entry of the Final Judgment. Ex. 7, Adkins Decl. ¶ 16. While this service is ordinarily capped at 10,000 queries per day, Google's proposal generously contemplates removing this cap and offering the rate to Qualified Competitors up to the separate query cap that will be imposed under the Final Judgment. Google further proposes that the same pricing govern Image Search and Video Search, neither of which Google has offered as stand-alone services.

Because Google has never included Knowledge Panel in its Web Search Syndication ("WSS"), no established MFN price exists for it. Ex. 7, Adkins Decl. ¶ 22. Microsoft's Bing previously offered Bing Entity—a comparable product—as part of a bundled package. Ex. 7, Adkins Decl. ¶ 23. To establish a Knowledge Panel benchmark in the absence of direct WSS pricing, Google analyzed Bing's other bundled offerings at the time to calculate a standalone value of $[redacted] per 1,000 requests for Bing Entity, which it now proposes adopting for Knowledge Panel.[12] Google addresses the proposed pricing for Local/Maps in Section I.D, below.

12 [redacted]

**2. Plaintiffs' Proposed Search Ads Pricing Is Significantly More Favorable to Qualified Competitors Than Any Deal Google Offers to Any Syndication Partner.**

Plaintiffs' proposed search ads syndication pricing is far more favorable to Qualified Competitors than any deal Google offers (or has ever offered) to its AFS partners. Plaintiffs claim that their proposed [redacted]% revenue share is based on the rate from Google's 2024 agreement with [redacted] *See* Ex. 8, Pls' 9/15 Letter, Response 30. However, the proposed rate deviates from [redacted]'s agreement in a number of respects. By applying desktop search result rates to mobile search result rates, discarding critical [redacted] and materially different tiered revenue share provisions, and adopting ad hoc terms without justification, Plaintiffs cherry pick isolated commercial terms to construct an unprecedented pricing structure. The resulting proposed license bears no resemblance to the "most-favored-nation" pricing required by the Final Judgment. The Court should adopt Google's proposal, which straightforwardly applies Google's MFN terms.

***First***, Plaintiffs erroneously apply Google's *desktop* pricing terms to *mobile* site ad results. Google historically has offered a different revenue share rate for its syndicated results for display on desktop and its syndicated results for display on mobile sites. Ex. 7, Adkins Decl. ¶¶ 24–26. Desktop follows a tiered schedule of revenue share percentages tied to total accrued revenue, with current MFN rates ranging from [redacted]% (for total revenue of $[redacted] or less) to [redacted]% (for more than $[redacted] of revenue). Ex. 7, Adkins Decl. ¶ 25.[13] On mobile sites, the revenue share is a consistent [redacted]% with no tiers. Ex. 7, Adkins Decl. ¶ 26.[14] Yet Plaintiffs' proposal ignores Google's mobile revenue share rate and instead applies Google's desktop rate

---

[13] These are the effective revenue share rates, inclusive of Google's customary [redacted].

[14] This rate likewise includes Google's [redacted].

to both desktop and mobile sites. Plaintiffs thereby invent a price term that Google does not offer to any customer, in contravention of the Final Judgment. *See* FJ § VI.B. (Plaintiffs' proposal further departs from Google's contracts in dropping many of the restrictions and policies Google applies to its mobile AFS offering, as further described in Section I.C, *infra*.).

***Second***, Plaintiffs fail to apply the [redacted] that Google applies to account for Google's operating costs and other baseline technical expenses. Ex. 7, Adkins Decl. ¶ 29. Taken together, the revenue share term and [redacted] give an effective revenue share rate. In Google's agreements that lack a [redacted], the revenue share term is commensurately modified to account for Google's costs. Ex. 7, Adkins Decl. ¶ 29. Yet Plaintiffs disregard this fact, importing the revenue share figures from a deal that has a [redacted] while omitting [redacted]. Pls' Proposed Template, EFC No. 1559-1, Exhibit B § 1; GOOG-DOJ-FJ-00000348 (RDX0420) at 372-73 (revenue share without [redacted] *id.* at 372 ([redacted]). Plaintiffs contend that because some of Google's agreements lack a [redacted], the Qualified Competitor template need not include one. Ex. 8, Pls' 9/15 Letter, Response 91. But Plaintiffs fail to recognize that each agreement that lacks a [redacted] includes a *lower* revenue share—thereby negating any impact on the effective rate. By excising the [redacted] Plaintiffs give Qualified Competitors a more favorable effective rate than Google gives to any customer. Ex. 7, Adkins Decl. ¶ 29.

***Third***, Plaintiffs ignore the tiered structure of Google's desktop revenue share deals, taking the revenue share rate applicable only to the top tier ([redacted]) and applying it across all revenue bands. Although Plaintiffs rely on the rate from Google's 2024 agreement with [redacted] for their proposed [redacted]% revenue share term (Ex. 8, Pls' 9/15 Letter, Response 30), that ([redacted]) rate applied only to AFS revenues in excess of

$[redacted]. Ex. 7, Adkins Decl. ¶ 30. For revenues below that threshold, the revenue share follows a graduated ([redacted]) scale between [redacted]% and [redacted]%. *See* GOOG-DOJ-FJ-00000348 (RDX0420), Exhibit B.

***Fourth***, the [redacted]% revenue share rate used in Plaintiffs' proposal expired on [redacted], prior to the date of the Final Judgment. The [redacted] contract (effective date of [redacted]) contained a step-down for desktop revenue rates, moving from [redacted]% ([redacted]) for the highest tier until [redacted] to [redacted]% ([redacted]) for the highest tier until [redacted], to [redacted]% ([redacted]) for the highest tier through expiration of the deal on [redacted]. Ex. 7, Adkins Decl. ¶ 30. Specifically, as of the date of the Final Judgment, [redacted] was receiving a desktop revenue share between [redacted]% and [redacted]%, [redacted] (or, an effective rate of [redacted]% to [redacted]%). Ex. 7, Adkins Decl. ¶ 30. At present, [redacted] is receiving a desktop revenue share between [redacted]% and [redacted]%, [redacted] (or, an effective rate of [redacted]% to [redacted]%). Ex. 7, Adkins Decl. ¶ 31.[15] Plaintiffs' inclusion of an expired revenue share rate violates the Final Judgment's instruction that search ads syndication follow MFN terms. FJ § VI.B.2 ("Google shall provide the Search Text Ads Syndication License to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products.").

***Finally***, Plaintiffs' Proposed Template includes a provision requiring Google to provide [redacted] to each Qualified Competitor. Pls' Proposed Template, EFC No. 1559-1, Exhibit C § 10. This was taken from a one-off term with [redacted] that dates to [redacted] Ex. 7, Adkins Decl. ¶ 32. Google's provision of [redacted] to [redacted] was part of a confidential

[15] The [redacted] agreement includes a [redacted]% revenue share (or an effective rate of [redacted]%) for mobile ads consistently, for the length of the term and regardless of total revenue accrued.

negotiation between the parties; Google has not provided [redacted] since [redacted], years before the effective date of the Final Judgment and far outside its scope. Ex. 7, Adkins Decl. ¶ 32. Just as the Final Judgment does not require Google to create new products out of whole cloth, it likewise does not require Google to resurrect legacy terms that date to almost ten years before the effective date of the Final Judgment. FJ § V.A. Requiring Google to give every Qualified Competitor [redacted] would create perverse incentives for Qualified Competitors to sign up for the service but not use it.

The fix to all of these errors is straightforward: the Court should adopt Google's proposed pricing, which follows MFN terms and reflects actual commercial realities as of the date of the Final Judgment. More specifically, Google's proposed pricing tracks the currently in-effect [redacted] pricing through the expiration of that deal on [redacted], and from there tracks Google's "rate card" pricing. *See* Ex. 2, Google's Proposed Ads Template, Exhibit B.

| *Google's Proposed Revenue Share to* [redacted] | *Google's Proposed Revenue Share* [redacted] *to to End of Term* |
| --- | --- |
| <u>Owned & Operated</u><br><br>Desktop: Tiered between [redacted]% (≤[redacted] USD) and [redacted]% (>[redacted] USD) ([redacted])<br><br>Mobile: [redacted]% ([redacted]) | <u>Owned & Operated</u><br><br>Desktop: Tiered between [redacted]% (≤[redacted] USD) and [redacted]% (>[redacted] USD) ([redacted])<br><br>Mobile: [redacted]% ([redacted]) |
| <u>Subsyndicates</u><br><br>Desktop: Tiered between [redacted]% (≤[redacted] USD) and [redacted]% (>[redacted] USD) ([redacted])<br><br>Mobile: [redacted]% ([redacted]) | <u>Subsyndicates</u><br><br>Desktop: Tiered between [redacted]% (≤[redacted] USD) and [redacted]% (>[redacted] USD) ([redacted])<br><br>Mobile: [redacted]% ([redacted]) |

No existing partner has terms applicable to the period [redacted] forward that are more favorable than Google's rate card pricing; were Google to enter a new deal that is more favorable

than the rate card pricing, Google would (consistent with the Final Judgment) be required to extend that pricing to Qualified Competitors. This pricing structure comports with the Court's instruction that "the Search Text Ads License shall be based on 'financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products,'" thereby "prevent[ing] Google from charging an inflated price to Qualified Competitors, and . . . provid[ing] Qualified Competitors certainty about their costs for a five-year term and facilitate building search capacity in a predictable way." Sept. Op., ECF No. 1435, at 185.

### C. Plaintiffs' Rewrite of Google's WSS and AFS Contracts Violates the Final Judgment and Presents a Host of Technical, Operational, and Legal Challenges.

The Final Judgment does not authorize Plaintiffs to draft a new syndication agreement from scratch—it requires that the search and search text ads syndication licenses be provided on terms "no less favorable than the most favorable terms Google provides under any current search syndication agreements," subject to Google's "least restrictive" use and display conditions and its "ordinary commercial restrictions on scraping, indexing, or crawling the syndicated results and content." FJ §§ V.A, V.B.3, V.B.6–7, VI.B.2. The Court's intent was to avoid becoming "a 'central planner,' as syndication agreements with Qualified Competitors generally will have to follow ordinary commercial terms and therefore will not need to be customized." Sept. Op., ECF No. 1435, at 180. Google's Proposed Templates follow that instruction. But Plaintiffs' Proposed Template does not. Beyond the grounding and pricing terms addressed above, Plaintiffs' template fundamentally restructures Google's existing syndication agreements, while removing a number of provisions and rewriting others in a manner that goes far beyond the

Court's directive. The result is a new agreement that bears little relation to Google's existing agreements—and one that is riddled with ambiguities and unclear obligations.[16]

Consistent with the Court's instructions, Google started from its existing, ordinary-course syndication contracts and modified them in two respects: (1) to incorporate the MFN terms the Final Judgment requires, and (2) to remove terms the Final Judgment does not permit.[17] On August 10, 2026, Google submitted two templates to the Technical Committee and Plaintiffs: a search syndication license ("Google's Proposed Search Template") and an AdSense for Search license ("Google's Proposed Ads Template"). *See* Ex. 1, Google's Proposed Search Template; Ex. 2, Google's Proposed Ads Template; Ex. 3, Google's Cover Letter to Proposed Templates. Google's approach anchors the Qualified Competitor license to terms that have been negotiated, successfully implemented, and enforced across Google's existing syndication business, and it confines the Court's and the Technical Committee's role to verifying MFN compliance rather than inventing a bespoke contract with terms never agreed to by Google.

Plaintiffs, however, took a fundamentally different approach. Their August 31, 2026 template and their revised October 4, 2026 template do not start from any Google agreement. While certain provisions are taken piecemeal from Google's contracts, many provisions are not, imposing obligations that have never appeared in any Google syndication contract. And the provisions that did originate in Google's contracts have been heavily revised, with key

[16] In this brief, Google has included selected examples of the substantive drafting issues with Plaintiffs' Proposed Template. The complete list of Google's objections, a truncated version of which was filed with the Court as ECF No. 1559-2, is attached to this JSR as Exhibit 10. Google is also including as Exhibit 9 the cover letter that accompanied its objections, which explains the meaning for each category of objection.

[17] For instance, Google removed its contractual provisions requiring that [redacted]

accompanying terms omitted and entirely new obligations added. The result is not an MFN license, but a new product, governed by unprecedented terms, which Google would have to administer separately from the rest of its syndication business. While striking a clause requires only a key stroke, effectuating that change will upend the work of each team that makes Google's syndication services possible. Ex. 7, Adkins Decl. ¶ 9. Plaintiffs' rewrite creates technical requirements untethered from the realities of how the services function; upends Google's existing operational processes in a manner that will harm Google's advertisers and delay provisioning of the services to Qualified Competitors; and creates novel legal obligations that appear in no Google agreement and fail to adhere to this Court's requirements. On top of this, Plaintiffs' template introduces a number of (needless) ambiguities that will force the parties to return to the Court time and time again to seek clarity.[18]

#### 1. Plaintiffs' Template Disregards Google's Existing Technical Protocols and Capabilities.

Plaintiffs' proposal contains multiple provisions that are technologically infeasible or would require substantial re-engineering of Google's existing products and systems to design and implement. These deviations from Google's practices find no basis in the Final Judgment and should be rejected in favor of Google's existing implementations.

[18] After Plaintiffs transmitted their October 4 Proposed Template, the parties continued to meet and confer. On October 8, Plaintiffs responded to a number of the questions Google posed in its objections and during the meetings, and Plaintiffs proposed certain changes to their template. Ex. 11. On October 16, Plaintiffs sent a letter responding to an additional question from Google, and again proposed certain changes to their template. Ex. 17. Plaintiffs have not shared a revised version of their October 4 Proposed Template incorporating the proposed changes from Plaintiffs' correspondence. Google's submission is based on the understanding that Plaintiffs will incorporate their proposed changes into their template. Should Plaintiffs refuse to adopt any of the revisions proposed in their October 8 and 16 letters, Google reserves all rights to raise additional objections.

***First,*** Plaintiffs' proposed [redacted] materially deviates from Google's [redacted] Plaintiffs' Proposed Template defines a [redacted], and it prohibits Google from [redacted] Pls' Proposed Template, EFC No. 1559-1, Exhibit B § 3(b). That description does not align with [redacted] Ex. 7, Adkins Decl. ¶54-56.[19] To begin with, [redacted] Ex. 7, Adkins Decl. ¶ 54-56. [redacted]. Ex. 7, Adkins Decl. ¶ 57. [redacted]. Ex. 7, Adkins Decl. ¶ 57. [redacted]. Ex. 7, Adkins Decl. ¶ 57. Google's Proposed Ads Template, by contrast, [redacted]

[19] For the avoidance of doubt, [redacted] *See* GOOG-DOJ-FJ-00000348 (RDX0420), Exhibit E ([redacted]).

[redacted]. Ex. 2, Google's Proposed Ads Template, Exhibit E §§ 1, 2.4; GOOG-DOJ-FJ-00000348 (RDX0420), Exhibit E.

***Second***, Plaintiffs' Proposed Template's service availability and latency requirements exceed anything Google has ever offered. Pls' Proposed Template, EFC No. 1559-1, Exhibit C.

a. Plaintiffs' Proposed Template adopts the search and ads availability and latency metrics from the web search service-level agreement ("SLA") in Google's agreement with [redacted], while stripping key accompanying limitations. Specifically, Google's commitment to meet certain latency and availability requirements set forth in that agreement was capped at [redacted] Ex. 7, Adkins Decl. ¶ 46.[20] Plaintiffs' Proposed Template omits both [redacted]; indeed, Section 6.6(d) of the template provides that Google's latency and availability obligations persist even if a Qualified Competitor's actual query volume exceeds its own forecasts. Pls' Proposed Template, EFC No. 1559-1, § 6.6(d). This unbounded guarantee on latency and reliability is unprecedented in both Google's contracts and broader industry practice. Ex. 7, Adkins Decl. ¶ 46. Extending uncapped SLAs to an open-ended class of Qualified Competitors is not possible with Google's current infrastructure and resources. [redacted]

---

[20] In [redacted]. GOOG-DOJ-FJ-00000142 (PXR0516), Exhibit G § 1.5.

[redacted]. Ex. 7, Adkins Decl. ¶ 46.[21] [redacted]. Ex. 7, Adkins Decl. ¶ 53. And the unbounded requirement that "Google shall not take any actions that have the effect of slowing Search Service Network Latency" is unreasonable—some product improvements will have the side effect of slowing latency. Pls' Proposed Template, EFC No. 1559-1, Exhibit C § 2.1(b); Ex. 7, Adkins Decl. ¶ 50.

b. Plaintiffs' SLA additionally imposes severity classifications and resolution deadlines that have no precedent in any Google syndication agreement. *See* Ex. 7, Adkins Decl. ¶ 52 (explaining that Exhibit C, Sections 4.1–4.2 of Plaintiffs' Proposed Template are not taken from any of Google's syndication agreements).[22] In their October 8 correspondence, Plaintiffs proposed revising the mandatory resolution time periods to require that Google restore service within four hours for Severity 1 Errors and within twenty-four hours for Severity 2 Errors. Ex. 11 at 3. However, none of Google's syndication agreements guarantee resolution times for any latency or reliability issues, because it may be highly variable how long it takes to restore service during extraordinary events. Ex. 7, Adkins Decl. ¶ 52. Furthermore, Plaintiffs' Proposed Template requires that Google will provide, over a rolling 30-day period, [redacted]% "Search Text

---

[21] For similar reasons, Google proposes to utilize static volume based thresholds rather than percentage based thresholds. *See* Ex. 10, Google's Objections, Row 121. Given that different Qualified Competitors may have vastly different query volumes, a 10% increase in peak queries per second for one Qualified Competitor may require months of notice, while a 10% increase for another Qualified Competitor may require just one week of notice. Ex. 7, Adkins Decl. ¶ 53.

[22] For ads syndication, the Final Judgment requires "latency, reliability, and performance functionally equivalent to what Google *ordinarily provides*" (emphasis added), which is why Google seeks to remove the [redacted]% Search Text Advertising Service Availability requirement and the [redacted] provisions. FJ § VI.B.1; *see also* Ex. 10, Google's Objections, Row 310.

Advertising Service Availability," which is defined as the percentage of Requests for Search Text Ads sent to Google and processed by Google's system within one second. [redacted] Ex. 7, Adkins Decl. ¶ 51. Today, approximately [redacted]% of U.S. AFS ad requests take longer than one second on the server. Ex. 7, Adkins Decl. ¶ 51. Google instead proposed to offer Qualified Competitors latency and reliability "functionally equivalent to what Google ordinarily provides to other users of Google's Search Text Ads syndication products," which is consistent with the Final Judgment. *See*, *e.g.*, FJ VI.B.1; Ex. 10, Google's Objections, Row 109.

c. Plaintiffs' Proposed Template additionally [redacted]. [redacted]. Ex. 7, Adkins Decl. ¶ 46, n.10. While Google will provide Qualified Competitors with search latency and reliability functionally equivalent to what [redacted]

d. Finally, Plaintiffs' Proposed Template would impose a [redacted]% availability SLA and a [redacted]-millisecond network latency threshold across all selected search services—including Image Search, Video Search, Knowledge Panel, and Local/Maps content—again with no traffic caps. Pls' Proposed Template, EFC No. 1559-1, Exhibit C § 2.1(a)–(b); Ex. 7, Adkins Decl. ¶

45. These requirements are unprecedented because [redacted]. Ex. 7, Adkins Decl. ¶ 45.

***Third***, Plaintiffs' Template omits Google's requirement that syndicated ads be displayed in a single continuous block and not be interspersed with other advertisements or content. Ex. 2, Google's Proposed Ads Template § 2.3(e); Ex. 7, Adkins Decl. ¶ 72. That requirement—universally imposed in all of Google's AFS agreements—is not an arbitrary display preference but rather reflects the architecture of the product and protects the integrity of the ads auction. Google renders syndicated ads in an iframe—a Google-controlled window within the partner's page—so that ads render as intended without modification. Ex. 7, Adkins Decl. ¶ 72; Tr. 2959:25–60:14 (Adkins) ("That request is sent directly from the user's web browser to our server. We create what is called an iframe. Think of that as a sandbox. It's like a small web page within a web page. That is Google's web page. So the communication is directly between the user's computer and Google's server."). This allows Google to directly collect the signals it needs to detect invalid traffic, and prevents Google's proprietary ads data from being passed to third parties. Tr. 2960:17–62:1 (Adkins). Because the ads are rendered in an iframe, they are necessarily displayed in a continuous block and cannot be interspersed with other advertisements. Ex. 7, Adkins Decl. ¶ 72. Plaintiffs' omission invites implementations that would break the iframe model, require Google to build a new rendering architecture, and expose advertisers to misleading interleaved displays.[23]

[23] In their October 8 correspondence, Plaintiffs stated they "are willing to require that Qualified Competitors display Search Text Ads in the order that they were received. . . . [but] do not believe other restrictions on this point, including Google's proposed language, are required by the Final Judgment." Ex. 11, Pls' 10/8 Letter, Response 5. Google understands this response to mean that Plaintiffs intend to allow Qualified Competitors to insert third-party ads between Google's ads, in violation of Google's terms and inconsistent with Google's technology. *See* Adkins Dec. ¶ 72.

***Fourth***, Plaintiffs indicated for the first time in their October 4 template that Qualified Competitors should be permitted to implement their own query rewriting features that enable "query correction, modification, or expansion." Pls' Proposed Template, EFC No. 1559-1, § 6.7. Google, however, does not permit its syndication partners to use their own query rewriting features for search text ads requests, because Google is unable to verify the extent to which the query is being modified. Ex. 7, Adkins Decl. ¶ 59. Google's advertisers select keyword match types that dictate how similar the advertisers' keywords must be to the user's query for the ad to show on the results page. *See* Sept. Op., ECF No. 1435, at 196–97. When a third-party query correction feature modifies the user query before sending it to Google, Google cannot guarantee that an advertiser who opted into exact keyword match is receiving the treatment they expect. Ex. 7, Adkins Decl. ¶ 60. Google also cannot assess whether the Qualified Competitor appended terms to artificially inflate the value of the user query, such as changing the query from "broker" to "broker for high income," which returns an ad with a higher cost-per-click, and thus a larger payment to the partner at the expense of the advertiser. Ex. 7, Adkins Decl. ¶ 61.[24] Moreover, Qualified Competitors could also use unrestricted query correction rights to send synthetic queries to Google, in violation of the Final Judgment. *See* FJ §§ V.B.10, VI.B.9.

Each of these departures is without basis under the Final Judgment, and should be rejected.

---

[24] While Google does allow certain syndication partners to issue alternative search queries, that is subject to strict policies—[redacted] Ex. 7, Adkins Decl. ¶ 61, n.12. These strict guidelines define the boundaries of acceptable query modification and therefore ensure that Google can maintain its guarantees to advertisers. Plaintiffs' proposal to allow Qualified Competitors to use their own query correction technology is seemingly unbounded, however, which risks harm to Google's advertisers.

### 2. Plaintiffs' Template Discards Google's Existing Policies Designed to Protect Google's Advertisers and Sustain Google's Search Partner Network.

Under the Final Judgment, Qualified Competitors will become part of Google's "Search Partner Network." *See* FJ § VI.B.5. Google's Search Partner Network includes third-party websites that partner with Google to display Google's AFS ads. These websites depend on the overall health of Google's Search Partner Network. Poor-quality traffic from one website (including subsyndicate sites) can lead advertisers to decide to opt out of participation in the Search Partner Network entirely, reducing revenue for every participant, including Qualified Competitors. Ex. 7, Adkins Decl. ¶ 7. Google devotes substantial effort to maintaining Search Partner Network quality for that reason. Ex. 7, Adkins Decl. ¶ 7. Plaintiffs' Proposed Template strips out or encumbers the very tools Google uses to do so.

#### a) Google Should Be Permitted to Enforce Its Policies, Guidelines, and Technical Protocols.

Plaintiffs' Proposed Template removes all references to Google's policies, guidelines, and technical protocols. Ex. 7, Adkins Decl. ¶ 65. In their place, Exhibit C § 5.4 sets out a new process whereby Google must seek Plaintiffs' permission to propose "Google Guidelines and Protocols" through the amendment procedures in Section 20. Pls' Proposed Template, EFC No. 1559-1, § 20 & Exhibit C § 5.4; Ex. 7, Adkins Decl. ¶ 65. Even assuming Plaintiffs allow Google to apply its standard policies, guidelines, and technical protocols, they would take effect only after the Court has ruled on the proposed template and agreements with Qualified Competitors are already in place. Pls' Proposed Template, EFC No. 1559-1, § 20 & Exhibit C § 5.4; Ex. 7, Adkins Decl. ¶ 65. This is an unprecedented (and dangerous) proposition, particularly because Qualified Competitors who offer a Search Text Ads platform will have the ability to subsyndicate Google's ads to a potentially expansive network of third-party sites. FJ § VI.B.9.

While Qualified Competitors may be appropriately vetted through other mechanisms mandated by the Final Judgment, the subsyndicate network carries far greater risks and Google requires the use of its ordinary course policies and practices to protect its advertisers.

As the Court heard during the remedies trial, these policies—applicable to every AFS and WSS partner—are not formalities. Google's Branding Guidelines require that ads be labeled and differentiated from organic results and prohibit modification of individual search results. Ex. 7, Adkins Decl. ¶ 66.[25] And the Client Application Guidelines ensure that applications do not mislead users or defraud advertisers through, for example, unwanted software installations. Ex. 7, Adkins Decl. ¶ 66. The Acceptable Use Policy prohibits illegal or objectionable content such as child sexual abuse material and computer viruses. Ex. 7, Adkins Decl. ¶ 66. Notably, because "Unacceptable Content" is defined solely by reference to whatever guidelines emerge from that process, Plaintiffs' Proposed Template would launch with no operative content standard at all. Pls' Proposed Template, EFC No. 1559-1, § 1.35 & Exhibit C § 5.1(h). Google must also be able to update these policies as abuse evolves—for instance, in 2025 Google tightened its ad styling restrictions after a partner's hard-to-read display generated 20% more revenue than a compliant display while producing poor outcomes for advertisers. Ex. 7, Adkins Decl. ¶ 67; Tr. 2977:9–20, 2978:9–13 (Adkins). Nowhere does the Final Judgment contemplate that Google cannot impose any of its current policies, guidelines, and technical protocols, nor does the Final Judgment grant Plaintiffs the power to review and approve these existing policies.[26]

---

[25] As explained above, Plaintiffs provided a written response confirming that Qualified Competitors should not be permitted to conduct individual, result-level modifications on Google's search syndication results. *See supra* n.8.

[26] Section VI.B.11 of the Final Judgment states that "Google shall be entitled to propose additional terms to the Search Text Ad syndication agreements with Qualified Competitors as necessary to guarantee ad quality, protect advertisers, and prevent ad misuse," and details a

Plaintiffs also seek to insert themselves into Google's ordinary-course practice of reviewing, approving, and monitoring the sites and client applications on which a partner seeks to use Google's syndication services. Pls' Proposed Template, EFC No. 1559-1, §§ 4.1, 5.1. Google uses these review and approval rights to monitor for invalid traffic, misleading ad displays, and illegal content such as child sexual abuse material, and it will apply these same standards to Qualified Competitors exactly as it does to every other partner. Ex. 7, Adkins Decl. ¶ 63. Google's Proposed Ads Template preserves those rights (requiring that Google's approval determinations must be reasonable and without intent to discriminate), and through the meet-and-confer process Google has agreed to provide its review criteria to the Technical Committee and Plaintiffs, and to give prior notice if it intends to modify the criteria in a manner that would affect Qualified Competitors. Ex. 10, Google's Objections, Rows 80–81.

Plaintiffs' Proposed Template bars Google from modifying its review criteria until Plaintiffs are afforded thirty days to object, creating an unnecessary administrative burden that would impact all syndication partners. Pls' Proposed Template, EFC No. 1559-1, Exhibit A §§ 3.1–3.3; Ex. 7, Adkins Decl. ¶ 68. In addition, Plaintiffs' Proposed Template introduces waiting periods that depart from Google's practices: specifically, Exhibit C § 5.3 gives the Qualified Competitor and its subsyndicates five days to remove unacceptable content and bars any suspension without three business days' advance notice to Plaintiffs and the Technical

---

notice and objection procedure. This provision applies to the terms of the syndication agreements, but cannot be read to implicate all of Google's policies, guidelines, and technical protocols, some of which link out to policies that apply to syndication partners but are not owned by the syndication team. Ex. 7, Adkins Decl. ¶ 69. Allowing Qualified Competitors to reject any modifications to these policies, and preventing Google from implementing policy changes potentially until the Court intervenes, would force Google to fork its policies. *Id.* Assuming *arguendo* that this Final Judgment provision does apply to the policies, guidelines, and technical protocols incorporated into the agreements, Plaintiffs still have no basis to remove the policies that are currently present in all of Google's syndication agreements.

Committee; Section 16.2 requires fifteen business days' notice before Google may act on a material breach, with further delay in the event Plaintiffs object. Pls' Proposed Template, EFC No. 1559-1, Exhibit C §§ 5.2–5.3, 16.2; Ex. 7, Adkins Decl. ¶ 64. But the timing is critical—each day that the services remain active on a fraudulent site, millions of dollars in bot traffic can be imposed on advertisers, and ads may continue to run alongside illegal content. Ex. 7, Adkins Decl. ¶ 64. Google must immediately pull ads from pages that display child sexual abuse material, promote terrorism, or otherwise attempt to monetize egregious content. Ex. 7, Adkins Decl. ¶ 64. For these reasons, Google's [redacted]. Ex. 7, Adkins Decl. ¶ 64. To accommodate Plaintiffs' waiting periods, [redacted]. Ex. 7, Adkins Decl. ¶ 64. Google has offered a workable alternative: it can notify Plaintiffs and the Technical Committee of site-level enforcement, and Qualified Competitors will retain Google's ordinary appeal process, under which Google responds within ten business days and after compliance is confirmed, reinstatement is immediate. Ex. 10, Google's Objections, Row 140.

**b) Google Should Be Permitted to Apply Its Subsyndication Terms.**

Plaintiffs' Proposed Template lacks necessary subsyndication safeguards and imposes unworkable confidentiality requirements, leaving Google vulnerable to ad fraud and operational risks. To begin with, Plaintiffs' Proposed Template is internally inconsistent about subsyndication, leaving it unclear which terms bind subsyndicates.[27] Most of the agreement's

[27] To list just one example, Plaintiffs' Proposed Template defines "End Users" only as users of a Site or Client Application, without mention of Syndicated Sites or Syndicated Applications. Because Queries may only be submitted by End Users, the template is drafted as though queries

terms do not mention subsyndicates at all. Google's Proposed Ads Template avoids this ambiguity through a dedicated subsyndication exhibit that (1) requires the partner to identify the subsyndicate that owns and operates each property (for "know-your-customer" purposes) and (2) passes Google's material terms through to subsyndicates (to ensure subsyndicates do not jeopardize ecosystem health). Ex. 2, Google's Proposed Ads Template § 2.3(c) & Exhibit D; Ex. 7, Adkins Decl. ¶ 44. Section 5.7 of the Plaintiffs' Proposed Template contains none of these protections. Ex. 7, Adkins Decl. ¶ 44. Without them, a subsyndicate suspended for policy violations could regain access to the same ads by reapplying with a different name—a known tactic of bad actors removed from AFS for ad fraud. Ex. 7, Adkins Decl. ¶ 44.

Plaintiffs' Proposed Template compounds the problem with confidentiality obligations that Google cannot implement. Exhibit A § 3.4 would require Google to treat all information about a Qualified Competitor's syndicated sites and applications as "Highly Confidential" under the Protective Order, restrict access on a need-to-know basis, and certify to the Qualified Competitor, Plaintiffs, and the Technical Committee that it has implemented confidentiality procedures before receiving any such information. Pls' Proposed Template, EFC No. 1559-1, Exhibit A § 3.4; Ex. 7, Adkins Decl. ¶ 43. Plaintiffs have represented that the subsyndicate sites themselves could constitute Qualified Competitors' confidential business information; Google, however, obviously requires access to these sites to provision the services, and the sub-syndicate sites will be publicly displaying Google's ads. [redacted]. Ex. 7, Adkins Decl. ¶ 44. Isolating

from subsyndicates are ineligible. This is one of many examples where using Plaintiffs' template, rather than adopting the structure of Google's ordinary course agreements (which have been negotiated and tested over many years), will lead to an agreement so unclear that it is effectively unenforceable.

subsyndicate data in the manner contemplated in Plaintiffs' Template would require building [redacted]—an engineering project requiring years of work. Ex. 7, Adkins Decl. ¶ 44. Google's existing safeguards already address the concern: employees may access AFS data only as necessary for their roles and must agree to Google's [redacted], which prohibits competitive use of that data. Ex. 7, Adkins Decl. ¶ 43.

#### c) Google Should Be Permitted to Retain Its Prohibitions for Ads on Mobile Applications.

Several provisions of the Plaintiffs' Proposed Template presume that syndicated ads will be displayed in native mobile applications. Those terms contradict Google's contractual restrictions and policies. Ex. 7, Adkins Decl. ¶ 37.[28] Google deprecated support for syndicated ads in mobile native applications in December 2024 and does not offer a mobile software development kit. Instead, syndicated ads on mobile devices can be served only via mobile sites. Ex. 7, Adkins Decl. ¶ 37. Google discontinued syndicated ads on mobile applications because of significant challenges in ensuring the safety and integrity of its ads—mobile applications can make covert changes to a user's device or download malware, and Google lacks effective tools to

[28] Google sought the basis for Plaintiffs' requirement that Google allow Qualified Competitors to show syndicated ads on mobile applications, and Plaintiffs claimed that "Google has previously approved Search Text Ads for display and revenue share in Permitted Client Applications in multiple agreements (*see, e.g.*, GOOG-DOJ-FJ-00000142 [PXR0516], GOOG-DOJ-FJ-00000348 [RDX0420])." Ex. 8, Pls' 9/15 Letter, Response 16. Plaintiffs are mistaken: the mobile revenue share in the agreements refer to ads shown on mobile sites, not ads on mobile devices. Indeed, Plaintiffs cite to the [redacted] agreement (GOOG-DOJ-FJ-00000142 (PXR0516)) which states in Section 2.7 that "direct and indirect access to the Services is still prohibited from or as a result of any versions of the Approved Client Applications that run on End Users' Mobile Devices or Tablet Devices," and the [redacted] agreement (GOOG-DOJ-FJ-00000348 (RDX0420)) includes a similar restriction in Section 2.3. And the Approved Client Applications listed in Exhibit A of those agreements are limited to desktop applications.

monitor and enforce against such conduct in mobile applications at scale. Ex. 7, Adkins Decl. ¶ 38.

While Plaintiffs' Proposed Template does not require Google to provide a mobile software development kit, it still requires Google to "collaborate in good faith to implement the Search Text Advertising Service(s) on the Client Application(s) and Syndication Application(s)," including "providing commercially reasonable technical support and cooperation necessary to enable such implementation." Exhibit C § 3.3. This provision compels Google to support an integration that its own contractual terms expressly prohibit, and regardless of the implementation mechanism, forcing Google to allow the display of ads on mobile applications would degrade Google's spam signals and put Google's intellectual property at risk. Ex. 7, Adkins Decl. ¶¶ 39–40.

#### d) Google Should Be Permitted to Follow Its Usual Accounting and Payment Processes.

Plaintiffs' Proposed Template would also require substantial changes to Google's payment processes, again without any basis in the Final Judgment. In Plaintiffs' Proposed Template, for example, "Ad Revenues" are defined in a manner that imposes new obligations on Google to delay its clawback of revenue for fraudulent or low-value ad clicks.[29] Pls' Proposed

[29] Plaintiffs' Proposed Template additionally removes Google's MFN provision that [redacted] After meeting and conferring, Plaintiffs offered the following compromise in their October 8 letter: "Plaintiffs and the TC are willing to permit Google to [redacted] However, Plaintiffs and the TC oppose Google's proposed language insofar as [redacted] may be determined by Google without validation or oversight." These changes are not currently reflected in Plaintiffs' Proposed Template, and as written, Exhibit B Section 2.2(b) would [redacted] Ex. 7, Adkins Decl. ¶ 32.

Template, EFC No. 1559-1, § 1.1. The definition requires Google to provide notice to the Technical Committee and Plaintiffs 30 days before taking any action, pausing the clawback process entirely until Plaintiffs resolve their objections. *Id.* In Google's systems, however, all AFS customers flow through the same automated payment pipelines, which cannot segregate Qualified Competitors for different accounting treatment. Ex. 7, Adkins Decl. ¶ 35. Implementing Plaintiffs' pre-clearance process would require new systems built across multiple teams.[30] By contrast, Google's Proposed Templates implement the Court's instructions by applying Google's usual payment and accounting processes. Should Plaintiffs or the Technical Committee object after Google completes its ordinary course clawback process, they may object, but they have no basis to preemptively disrupt these systems.

### 3. Plaintiffs' Template Exposes Google, Advertisers, Publishers, and Users to New Legal Risks.

Google's syndication agreements allocate legal risk in ways refined over years of commercial practice. By discarding that framework, Plaintiffs' Proposed Template exposes Google—and advertisers, publishers, and users—to risks that Google's tested contracts were designed to prevent.

***First***, Google's agreements expressly [redacted] Ex. 1, Google's Proposed Search Template § 12.2(b)(iii). Plaintiffs' proposal, however, drops this provision. Combined with Plaintiffs' provisions permitting Qualified Competitors to display and use syndicated content "in any manner they choose," Pls' Proposed Template, EFC No. 1559-1, §

---

[30] Section 1.1 would permit Google to withhold or claw back fraudulent ad revenues only after notifying Plaintiffs and the Technical Committee thirty days in advance and giving Plaintiffs an opportunity to audit and object—and it would bar any clawback while an objection is pending. Pls' Proposed Template, EFC No. 1559-1, § 1.1; Ex. 7, Adkins Decl. ¶ 36.

4.4(a), Plaintiffs' Proposed Template would [redacted] which Google has never permitted. Pls' Proposed Template, EFC No. 1559-1, § 31.1(a).

***Second***, [redacted]

***Third***, Google's Proposed Search and Ads Templates define Unacceptable Content by reference to the Program Guidelines, Branding Guidelines, Technical Protocols, and Client Application Guidelines, and ties each restriction to Google's right to suspend service in as targeted a fashion as is commercially reasonable. Ex. 2, Google's Proposed Ads Template §§ 3.2(j), 3.2(m), 3.2(n), 3.3(b); Ex. 7, Adkins Decl. ¶¶ 63–64. The Plaintiffs' Proposed Template consolidates these restrictions into a single provision that prohibits only content violating "the Google Guidelines and Protocols permitted under Exhibit C Section 5.4"—guidelines that do not yet exist and can be adopted only by amendment with Plaintiffs' permission. Pls' Proposed Template, EFC No. 1559-1, § 1.35, Exhibit C §§ 5.1(h), 5.4. Because Plaintiffs' Proposed

---

[31] In a similar vein, Plaintiffs refuse to include Google's proposed provision prohibiting Qualified Competitors from [redacted], although they agree that the prohibition [redacted] *Compare* Ex. 1, Google's Proposed Search Template § 3.2(h) *with* Plaintiffs Proposed Template Exhibit C § 5.1(k).

Template does not separately enumerate each restriction, it leaves gaps in legal protection from the first day of the agreement: nothing in the Plaintiffs' Proposed Template, as drafted, expressly prohibits a Qualified Competitor from displaying Google's ads alongside child sexual abuse material, malware, or other illegal content. And even where such content is identified, Plaintiffs' Proposed Template bars Google from suspending service until the Qualified Competitor or its subsyndicate has had five days to remove the content and Plaintiffs and the Technical Committee have received three business days' notice—notice requirements that do not exist in any syndication agreement. Pls' Proposed Template, EFC No. 1559-1, Exhibit C § 5.3; Ex. 7, Adkins Decl. ¶ 64.

***Fourth***, as set out in Section I.A above, Google's syndication agreements do not permit grounding, and Google's grounding products are governed by different terms reflecting their different liability profile, including the risk of hallucinated outputs. Plaintiffs' Proposed Template nonetheless expressly permits Qualified Competitors to "display and use Search Results . . . within their responses to Covered Queries issued by End Users to GenAI Products," Pls' Proposed Template, EFC No. 1559-1, § 4.4(b), and then requires Google to indemnify Qualified Competitors against third-party infringement claims arising from the "authorized use of Google's technology used to provide the Services," *id.* § 30.2(a)(i)—[redacted] Read together, these provisions could require Google to indemnify a Qualified Competitor for the outputs of the Qualified Competitor's own LLM, generated from Google's syndicated results—including claims by publishers who expressly opted out of grounding. Google has never accepted such an obligation in any syndication or grounding agreement, and the Final Judgment does not require it to do so now.

***Finally,*** Plaintiffs' Proposed Template departs from Google's MFN syndication terms in a number of other respects, each without basis in the Final Judgment. Google's Objections (Ex. 10) contain a comparison of Plaintiffs' language to Google's MFN language, *see* columns A, B, C, and D, and explain the divergences, *see* columns E, F, and G.

**4. Plaintiffs' Departure from Google's Forms Introduces Needless Uncertainty and Ambiguity.**

Apart from the many substantive departures from Google's standard terms, Plaintiffs' Proposed Template is drafted in a manner that renders the parties' obligations uncertain. Its core restrictions are made subject to a web of cross-referenced exceptions—Exhibit C § 5.1 applies "[e]xcept as otherwise permitted by this Agreement, including actions permitted under Section 4.4, Section 5.4, Section 6.6, and Exhibit C Section 2.3," while Section 4.5 permits crawling restrictions only "[p]ursuant to terms set forth in Exhibit C Section 5 and except as otherwise stated in Section 4.4 and Exhibit C Section 2.3," and Exhibit C § 2.3 in turn applies "[n]otwithstanding Sections 4.4, 4.5, 5.4, and 5.5, as well as the terms of this Exhibit C." Pls' Proposed Template, EFC No. 1559-1, § 4.5 & Exhibit C §§ 2.3, 5.1. The result is that no provision can be read on its own, and it is frequently impossible to determine which provision controls.[32]

[32] Plaintiffs' template even makes it ambiguous which services are covered under the agreement. Exhibit B, Section 4 requires Google to provide the Technical Committee and the Plaintiffs notice whenever Google launches "a new, commercially available product, service, or integrated feature that alters, augments, replaces, *or otherwise relates* to any Service(s) provided under this Agreement." Pls' Proposed Template, EFC No. 1559-1, Exhibit B § 4 (emphasis added). Plaintiffs may then compel Google to amend the agreement to make any service related to the syndication products available to the Qualified Competitors under the template's terms. This provision is not only overly broad, but it is plainly not required under the Final Judgment, which only requires that Google provide search syndication services listed in Section V.A, and "all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through its syndication products" pursuant to Section VI.B.1.

To name just one example: Plaintiffs' definitions of "Query," "Request," and "End User" overlap and conflict. A "Covered Query" is a query that "originated from an End User in the United States," *id.* § 1.5—language that, as Google has explained in its objections, could be read to permit the query to be modified before it is sent to Google. Moreover, Plaintiffs refused to adopt Google's definition that an "End User" means an individual human end user of a Site or Approved Client Application who is *in the United States*." Ex. 2, Google's Proposed Ads Template, § 1.16 (emphasis added). Because Plaintiffs' definition of End User expressly removes that geographical restriction, and Plaintiffs define "Request" as "a request originating from Signatory, an Affiliate of Signatory, or an End User (as applicable)[,]" Plaintiffs' template appears to allow Qualified Competitors to send Google queries from outside of the United States. Pls' Proposed Template, EFC No. 1559-1, § 1.16.[33]

Google's templates define these terms clearly and consistently. An "End User" is "an individual human end user of a Site or Approved Client Application who is in the United States"; a "Query" is a text query entered into a search box on a Site or Approved Client Application by an End User (or a Google query-rewriting suggestion the End User selects); and a "Request" is "a request that is sent by Company to Google," with the express clarification that "synthetic queries are not Requests." Ex. 2, Google's Proposed Ads Template §§ 1.16, 1.33, 1.34; Ex. 1, Google's Proposed Search Template §§ 1.9, 1.22, 1.23. Each Request must be generated by, and contain, the Query that generated it. Ex. 2, Google's Proposed Ads Template § 2.3(f); Ex. 1,

[33] This may be unintentional on Plaintiffs' part, given that their template elsewhere states that "Google shall only be required to provide Search Services in response to Request(s) sent in response to a Covered Query[,]" which is defined as "a Query that originated from an End User in the United States and was submitted through a Site or Client Application." Pls' Proposed Template, EFC No. 1559-1, §§ 4.7, 1.5. But this example highlights the uncertainties and ambiguities created by drafting new terms rather than using existing terms.

Google's Proposed Search Template § 2.3(e); Ex. 7, Adkins Decl. ¶ 59. These definitions track Google's ordinary-course agreements and protect the exact-match keyword guarantees on which advertisers rely. Ex. 7, Adkins Decl. ¶¶ 59-60.

### D. Google's Maps Products Have Different Terms and Pricing That Must Be Applied to the Maps Services Offered to Qualified Competitors.

As the Court heard during the remedies proceedings, Google's web search syndication service does not syndicate the local places content and map displayed in Google's Local Unit. Tr. 3498:18–23 (Reid). For developers seeking to access Google Maps content, Google's separate Maps organization offers developer products that make available local places content and maps. Tr. 3492:1-12 (Reid). Plaintiffs' proposed terms are directed at Google's search and search text ads syndication services and do not specify what, if any, Local/Maps content Google is required to provide beyond the local content made available through the ten blue links.

To the extent that the Final Judgment requires Google to offer one or more separate Google Maps services to Qualified Competitors as the "Local/Maps" component of the required search syndication services, then those services must be accompanied by the separate "most favorable" and "least restrictive" terms that govern them.[34] To that end, Google prepared a template agreement—which it provided to Plaintiffs and the Technical Committee on August 19, 2026—containing the Google Maps Platform MFN terms, adapted to conform to the Final

[34] The Final Judgment requires Google to syndicate "the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment." FJ § V.A.3. As noted above—and as Google advised the Technical Committee in its first correspondence regarding syndication, on May 1, 2026—Google does not syndicate the local places content and map displayed in Google's Local Unit through WSS. The Technical Committee offered no feedback or other clarification. However, in order to engage in good faith with the Plaintiffs and the Technical Committee, Google prepared MFN templates for the Maps products that provide functionality most similar to Google's Local SERP unit (specifically, Places UI Kit Query, Places UI Kit Pro, Dynamic Maps, and Maps SDK, hereinafter the "Maps Products").

Judgment. Plaintiffs and the Technical Committee did not engage with the substance of these proposed licenses, and they are not reflected in Plaintiffs' recommended template. Despite Google's good faith proposal of a template for the Google Maps Products, in conformance with the MFN requirement, Plaintiffs have provided no explanation as to why the Maps terms should not govern, and Plaintiffs have otherwise provided no solution to resolve the fundamental incompatibilities between the terms that govern Google's search syndication services and those that govern the Google Maps Products.

Google's search syndication terms have never been used to offer the Maps Products and are inappropriate for the Maps Products for a number of reasons, all of which are an outgrowth of the fact that the Maps Products are an entirely separate product offering. The terms that accompany the Maps Products are inseparable from the product itself, as explained in detail in the accompanying declaration submitted by Google's Vice President and General Manager of the Google Maps Platform and Google Earth, Dr. Yael Maguire. *See* Ex. 12, Maguire Decl. Among the most salient differences: ***First***, the Maps Products are built on separate technology stacks and have different technical constraints. Ex. 12, Maguire Decl. ¶¶ 7, 31. As a result, the latency and service availability levels that Google is able to meet with respect to its web search syndication service have no applicability to the Maps Products. Ex. 12, Maguire Decl. ¶¶ 32, 34–35. ***Second***, unlike Google's syndicated web results, the Maps Products include Google user-generated content [redacted] that can only be used in connection with Google's products and services. For that reason, Google's Maps product agreements contain attribution and other content protections. Ex. 12, Maguire Decl. ¶¶ 12–15. ***Third***, the Maps Products are provisioned by customers via the Google Cloud Console, and require that customers sign or accept a Google Maps agreement. Ex. 12, Maguire Decl. ¶¶ 9–10. The billing and

support infrastructure is separate from that utilized by Google's search and search ads syndication and accompanied by separate terms. Ex. 12, Maguire Decl. ¶ 16. ***Finally***, the Maps Products are offered at different prices than WSS services, on different graduated scales, in agreements negotiated with different concerns in mind. Ex. 12, Maguire Decl. ¶¶ 17, 20. As with WSS, Plaintiffs' proposed $[redacted] price finds no basis in past or current commercial practice. With the exception of preview and experimental phases and the Maps SDK, Google has never offered the Maps Products [redacted]. Ex. 12, Maguire Decl. ¶ 18.

At bottom, either the Google Maps products should be excluded from the compelled syndication services, or the terms for this separate product must be subject to the Maps template license. As noted above, Google prepared and provided to Plaintiffs and the Technical Committee a template agreement for use, should the Google Maps Products be included in the Qualified Competitor offering. *See* Exhibits 13, 14, 15, and 16. Google additionally made Dr. Maguire available to the Technical Committee, and he explained the product differences and provided the Technical Committee with a demonstration of how the relevant Google Maps products (Places UI Kit Query, Places UI Kit Pro, Maps SDK, and Dynamic Maps) could be used by a Qualified Competitor. Google received no feedback regarding those terms.

* * *

For all of the foregoing reasons, the Court should adopt Google's Proposed Templates.

## III. Plaintiffs' Position Statement Regarding the Recommended Template

The Final Judgment's remedies are intended to address over a decade's worth of harm that Google caused in the markets for general search services and search text ads. As discussed in the Recommendation, search syndication is critical to the success of the Court's remedies: Because "[i]t will take time for a Qualified Competitor to build its own search index and the

capacity to deliver high-quality search results," Qualified Competitors need remedial search syndication to compete in the short term, particularly when answering long-tail, local, and fresh queries. ECF No. 1435 at 170–71 [hereinafter Rem. Op.]. Search Text Ads syndication is similarly important, as it enables Qualified Competitors to monetize high-quality ads from the start. *Id.* at 183.

Reflecting the remedies enforcement posture, the Final Judgment charges Plaintiffs and the TC with "creat[ing] . . . a template for such a license." Final J. §§ V.B, VI.B. The Recommendation details the efforts undertaken by Plaintiffs and the TC to develop and refine the Recommended Template. *See generally* ECF No. 1559 at 1–4, 7–9 (redacted versions available at ECF Nos. 1560, 1561). Notably, the Final Judgment also expressly limits Google's role in creating the template: It is simply to provide "input." Final J. §§ V.B, VI.B. Indeed, it would make little sense for Google—i.e., the adjudicated monopolist—to assert influence over the very implementation designed to remedy its unlawful conduct. Although "Google may object to and be heard by the Court on any recommendation from the TC or Plaintiffs as to the interpretations or substantive requirements of [the] Final Judgment," *id.* § VII.A.7.k, the case law is clear that at this stage, "all doubts as to the remedy are to be resolved in [the Government's] favor," ECF No. 1461 at 5 [hereinafter Final J. Op.] (quoting *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 & n.18 (1961) (additional citations omitted)).

Google's objections fail to appreciate the realities of the remedies enforcement posture and further reflect the mistaken belief—already expressly rejected by the Court—that Google "deserves an equal seat at the table." Rem. Op. at 212. Indeed, rather than present tailored and targeted objections, Google has taken a scattershot approach that appears calculated, at best, to neutralize the Recommended Template as a remedy and, at worst, to mold the Recommended

Template to further entrench Google's monopoly power. Google's September 29 submission to Plaintiffs asserted more than ***240*** objections, and even its updated submission on October 9 continued to assert more than ***220*** objections. Google mistakes the Parties' process as a negotiation where it has equal say, when that is far from the case.[35]

Rather than respond individually to each of Google's roughly 220 objections—many of which Plaintiffs believe are either spurious or in plain conflict with the Final Judgment—Plaintiffs have organized the following subsections to focus on key terms of the Recommended Template and common objections made by Google. In the event this Court would like the Parties to submit additional briefing on any of Google's objections or Plaintiffs' responses thereto, Plaintiffs are prepared to do so. In addition, Plaintiffs request that, in the event this Court is inclined to reject any provision in the Recommended Template, Plaintiffs and the TC be given the opportunity to propose an amended version of that provision, rather than the Court adopting Google's proposal.

### A. The Recommended Template Properly Incorporates Google's Most Favorable Commercial Terms

With few exceptions, the Final Judgment requires Google to provide syndication on terms "no less favorable" than the most favorable terms Google provides under *any* current syndication agreement, rather than on Google's "ordinary commercial terms." *See* Final J. §§ V.B, VI.B; Final J. Op. at 37–44. It also tasks Plaintiffs and the TC—not Google—with analyzing Google's current syndication agreements and creating a template syndication license

[35] The Parties have continued to discuss potential clarifications to the Recommended Template to resolve Google's objections. Although Plaintiffs anticipate that the Parties may be able to resolve some of those objections before any hearing or resolution of the disputes discussed in this Joint Status Report, Plaintiffs do not believe that any such clarifications would materially impact the disputes presented herein. Accordingly, Plaintiffs believe the disputes presented herein are ripe for the Court regardless of any continued discussions.

representing those most favorable terms. *See* Final J. §§ V.B, VI.B. To create the syndication Recommendation and Recommended Template, Plaintiffs and the TC carefully analyzed Google's current syndication agreements, as well as substantial input provided by Google. The result is a Recommended Template that properly incorporates Google's most favorable syndication terms—or, in limited circumstances, Google's ordinary commercial terms, *see* Final J. §§ V.B.7, VI.B.6—as required by the Final Judgment. *See* Final J. §§ V.B, VI.B.

Google now objects—over 140 times—that Plaintiffs and the TC have failed to reflect Google's most favorable terms. But Google's objections are not targeted at explaining which of its relevant commercial terms are actually more favorable than those within the Recommended Template. Instead, Google attempts to leverage its objections to muddy the Final Judgment's requirement and improperly impose its own preferred terms on Qualified Competitors, as further described in the subparts below. Google's strategy with these objections seems clear: delay and deny the implementation of this Court's remedies by forcing this Court to adjudicate the Recommended Template clause by clause. But this Court specifically adopted Plaintiffs' "no less favorable" approach to syndication terms to avoid "becoming a central planner" for these remedies. Final J. Op. at 43–44. It need not become a central planner at Google's behest now.

#### 1. Google Improperly Suggests That Any Deviation From Its Ordinary Commercial Terms "Conflicts With MFN Terms"

In 140 instances, Google objects that the Recommended Template "Conflicts with MFN Terms." *See generally* ECF No. 1559-2. For many of those instances, however, that objection signals not a conflict, but instead an attempt by Google to refashion the Final Judgment's "no less favorable" language into a prohibition on the Recommended Template containing *any deviation whatsoever* from Google's ordinary commercial terms. Such an interpretation of the Final Judgment is untenable.

The Final Judgment is clear that Google's ordinary commercial terms are not the default. In fact, this Court explicitly contemplated the remedial syndication licenses differing from Google's existing syndication agreements: "If a Qualified Competitor proposes a term that is not 'ordinary' or typical to Google's existing syndication agreements, Google wants to be able to reject it. Such an ability would inhibit the innovation this remedy attempts to encourage." Final J. Op. at 39. Similarly, several terms of the Final Judgment impose explicit syndication requirements not tied to Google's ordinary commercial language. *See, e.g.*, Final J. §§ V.B.4–5 (syndication cap), V.B.8 (limited purposes for requiring information about end users), VI.B.5 (Search Text Ads parity and Search Partner Network inclusion), VI.B.10 (restrictions on Google's ability to terminate remedial licenses). When considering the terms of the Final Judgment, this Court further articulated that the syndication remedies are intentionally crafted to avoid simply duplicating what Google has always done. *See, e.g.*, Final J. Op. at 42–43 (syndication remedies intended to provide a short-term "boost in quality," not require Qualified Competitors to "adopt Google's branding" or mirror "Google's familiar ten blue links format").

Moreover, Google's claim that deviating from its ordinary commercial terms and procedures for syndication would impose undue hardship on Google has already been rejected. As this Court previously wrote, "Google appears to believe that, unless it alone gets to say what terms are ordinary, each license will be a custom-made patchwork of terms causing Google insurmountable challenges." Final J. Op. at 43. The Court was clear, however, that "Google cannot 'avoid an undoing of [its] unlawful project on the plea of hardship or inconvenience.'" *Id.* at 44 (quoting *E. I. du Pont*, 366 U.S. at 326–27); *see also id.* at 43–44 n.11. In fact, the Final Judgment's requirements may necessarily "result in syndication agreements that depart from the way Google has historically contracted or made its revenue . . . . [T]hat is an acceptable

consequence of remedying Google's illegal conduct." *Id.* at 41 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc)).

The only ways in which the Recommended Template differs from Google's commercial syndication agreements are where change is necessary to *effectuate* the Final Judgment, not to violate it. For example, the Recommended Template includes terms to (1) reflect explicit requirements in the Final Judgment, (2) preserve the Court's articulated purposes of the remedies, and (3) implement necessary standards and processes to facilitate the enforcement of and Google's compliance with the Final Judgment. *See* Rem. Op. at 212 ("Plaintiffs and the [TC] will have to establish standards and processes… [as] part of the 'practical workings' of the [F]inal [J]udgment." (quoting *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1244 (D.C. Cir 2004)). Further, the Recommended Template properly excludes Google's commercial terms that conflict with the Final Judgment or the Court's directives.

A prime example of where deviating from Google's commercial syndication agreements is necessary concerns Google's branding guidelines. Google objects that the Recommended Template conflicts with its most favorable terms because the template does not incorporate Google's branding guidelines that apply to Google's commercial syndication licensees. Those guidelines, however, directly conflict with the Final Judgment and the Court's instructions. Google's current syndication agreements incorporate its branding guidelines (and several other external policies) by reference to a URL; Google's syndication licensees are bound to the terms of these guidelines even while Google retains the ability to unilaterally modify the terms of such guidelines. To incorporate such guidelines into the Recommended Template would improperly permit Google to impose new terms on Qualified Competitors that the Final Judgment does not

countenance.[36] *See* Final J. § VI.B.11. Moreover, allowing Google to impose its branding guidelines would hinder the "innovation" that the Final Judgment is meant to incentivize by, e.g., forcing Qualified Competitors to serve as Google clones or market themselves as "Powered by Google." *See* Final J. Op. at 39.

Here and across several similarly tenuous objections, Google's attempts to mischaracterize the Recommended Template's terms as improper deviations from its own commercial terms—even where such terms align with the Final Judgment—are without merit and should be disregarded.

**2. Google Improperly Attempts To Impose Its Own Preferred Syndication Terms On Qualified Competitors Through The Guise of Objections**

Although this Court has been clear that the Final Judgment does not permit Google to dictate the terms of its own syndication remedies or veto terms that it does not deem "ordinary," *see* Final J. Op. at 37–39, Google nevertheless attempts to use its objections to situate itself as the sole arbiter of what terms are appropriate to include within the Recommended Template. Indeed, rather than engage meaningfully with the Recommended Template and consider what reasonable adjustments may resolve its concerns, Google regularly asserts that Plaintiffs and the TC should simply scrap the Recommended Template in favor of Google's own preferred terms to resolve its objections, claiming the Recommended Template would be unworkable or impose undue burden on Google if it is not rewritten to favor Google's own proposed terms. To that apparent end, for ***140*** of its objections—98 of which include "Conflicts with MFN Terms"—Google's proposed resolution is to simply adopt a competing template syndication license

[36] To the extent this Court may determine that any terms within Google's external guidelines are appropriate to include in the Recommended Template, the template includes a procedure by which Google may propose additional terms derived from those external documents. ECF No. 1559-1 at 45–46.

Google authored, even though Google has no role under the Final Judgment to propose such a competing template. *See* ECF No. 1559-2; Final J. §§ V.B, VI.B.

For the reasons discussed in Part III.A.1 above, such objections are a bare attempt by Google to relitigate its ability to impose ordinary commercial restrictions on Qualified Competitors, which this Court has already rejected. Even further, such objections also reflect Google's attempt to leverage the objection process to impose preferred syndication terms that are neither ordinary nor favorable to Qualified Competitors, as well as to impose undue burden and delay on the agreed-upon order of operations for submitting Recommendations to this Court. *See generally* ECF Nos. 1520-1, 1521, 1528-2, 1529 (collectively, the order of operations). For example, Google asked Plaintiffs for extensions multiple times during this process despite Google having already agreed to the timeline for submitting the syndication Recommendation and Recommended Template. *See* ECF Nos. 1528-2, 1529 (reflecting agreed-upon timeline from Parties' meet and confers on the matter). After Plaintiffs attempted to resolve various Google objections through updates that resulted in the Recommended Template, Plaintiffs agreed to request a short extension so Google could update its objections. ECF No. 1558. Google still maintains roughly 220 objections. The sheer number of Google's objections—including spurious or otherwise improper objections—suggests Google is abusing this process to impede the timely implementation of this Court's remedies.

Google's objections related to the Recommended Template's treatment of user privacy exemplify Google's attempt to shoehorn in its preferred terms. Google provided Plaintiffs and the TC with [redacted] including such a privacy-preserving implementation [redacted]. The Recommended Template's language is derived from that agreement. *See* ECF No. 1559-1 at 37. Yet, rather than

engage meaningfully with the Recommended Template's language, Google objects on grounds that the language "do[es] not align" with Google's agreement terms—without identifying the specific conflict—and proposes that the Recommended Template include instead different privacy terms derived from technical claims a Google employee made in a recent conversation with the TC.

Although Plaintiffs and the TC considered these technical discussions with Google in good faith, such discussions—divorced from the text of Google's current syndication agreements—cannot replace the general requirement that Google provide remedial syndication on terms "no less favorable" than those offered to any other user. Final J. § V.B.3; Final J. Op. at 43–44. Further, this Court has previously recognized that Qualified Competitors may elect to compete with Google by offering "unique services or features," including privacy-focused services. Final J. Op. at 39. To permit Google to impose its preferred privacy restrictions on Qualified Competitors beyond the most favorable terms included in the Recommended Template would be tantamount to allowing Google to "refuse to syndicate search results to privacy-focused GSEs," such that privacy-focused Qualified Competitors would be required to "either forego the syndication remedy or abandon developing what sets them apart." *Id.* Plaintiffs and the TC understand that, under Google's agreement with [redacted]. Such an affordance is the most favorable privacy term within Google's syndication agreements and is properly included within the Recommended Template. *See* Final J. §§ V.B.8, VI.B.3.

Another example of Google's misguided objections relates to the Recommended Template's syndication forecasting provisions. ECF No. 1559-1 at 14–15. At Google's behest, Plaintiffs and the TC broadly adopted Google's proposal for Qualified Competitors to provide

monthly forecasts of their syndication query volume. *See id*. Although these terms are not included in any of Google's current syndication agreements or explicitly required by the Final Judgment, Plaintiffs and the TC determined that such terms provide a reasonable process to facilitate implementation of the syndication remedies, including Google's ability to devote sufficient data center capacity to service Qualified Competitors. *Cf.* Rem. Op. at 164 ("It is entirely appropriate for the court (and Plaintiffs) to rely on the Technical Committee to 'facilitate the resolution of potentially complex and technologically nuanced disputes between [Google] and others over the practical workings of' the final judgment" (quoting *Massachusetts*, 373 F.3d at 1244)). In reaching this conclusion, Plaintiffs and the TC also determined that, without Final Judgment language on point, such terms should remain procedural in nature, rather than impose affirmative obligations or restrictions on Qualified Competitors.

Now, however, Google is attempting to use the objection process to add further terms that would materially restrict Qualified Competitors' use of the remedies. Indeed, Google now objects to the inclusion of *its own requested proposal* within the Recommended Template under the guise that it conflicts with Google's most favorable syndication terms. ECF No. 1559-2 at 28. Apparently, Google has now decided that it also wants to include the ability for Google to throttle or pause the remedial syndication services if Qualified Competitors' peak query volume exceeds the estimates required under this new, procedural provision. Such an objection abuses the process in an improper effort to impose Google's preferred terms. And in fact, the Recommended Template already includes terms to limit Qualified Competitors' volume of queries and address Google's service interruptions. *See, e.g.*, ECF No. 1559-1 at 9–10 (incorporating 40% syndication cap required by Sections V.B.4 and V.B.5 of the Final

Judgment); *id.* at 41–43 (setting out procedures for how Google and Qualified Competitors can remedy service interruptions without every interruption requiring resolution by this Court).

In short, in crafting the Recommended Template, Plaintiffs and the TC spent months analyzing Google's contracts and input. The terms chosen for the Recommended Template are the culmination of this work, and both Plaintiffs and the TC believe the Recommended Template accurately reflects the "most favorable terms Google provides" under any current syndication agreement. Final J. §§ V.B.3. Additionally, Plaintiffs and the TC have incorporated standards and processes into the Recommended Template to effectively implement and enforce the syndication remedies without imposing unnecessary hardship on Google. Beyond the syndication forecasting provisions described above, these procedural terms include, among other things, notice and reporting requirements for both Google and Qualified Competitors, *see, e.g.*, ECF No. 1559-1 at 9–10, 14, 31–32, 44–45, and a process whereby Google may propose additional terms derived from its external policies and technical protocols, *id.* at 45–46.

The Recommended Template thus reflects the Final Judgment's requirements and should be implemented to further this Court's syndication remedies.

### B. The Recommended Template Properly Includes Financial Terms No Worse Than Those Offered to Any Other User of Google's Syndication Products

The Final Judgment is clear: Google shall make the syndication remedies available to Qualified Competitors "on financial terms no worse than those offered to any other user" of Google's syndication products. Final J. §§ V.A, VI.B.2. The Final Judgment does not peg this requirement to the Final Judgment's date of entry, nor is this requirement pinned to "market rates consistent with [Google's] ordinary commercial terms." *See id.* (omitting such terms); Final J. Op. at 39–41 (rejecting Google's pricing proposal). Instead, the Final Judgment's approach to syndication pricing is effectively "most-favored-nation pricing" intended to "prevent Google

from charging an inflated price to Qualified Competitors, . . . provide Qualified Competitors certainty about their costs for a five-year term[,] and facilitate building search capacity in a predictable way." Rem. Op. at 185. In short, Qualified Competitors who opt into the syndication remedies should receive the best financial terms offered to any user of Google's syndication products, even if individual pricing terms are individually derived from discounted rates or collectively "result in syndication agreements that depart from the way Google has historically contracted or made its revenue." Final J. Op. at 40–41.

The pricing terms included in the Recommended Template are taken directly from Google's active commercial syndication agreements. For example, the single best search syndication price Google has offered is [redacted] for search results, made to [redacted].[37] The single best Search Text Ads syndication revenue share rate Google has offered is [redacted]. Both agreements include search syndication alongside Search Text Ads syndication, indicating that Google generates revenues even with the discounts. *Cf.* Final J. Op. at 40–41 (rejecting Google's pricing proposal and explaining Google's view that "discounted pricing is . . . offset by the revenue Google expects from the ad syndication").

When crafting the Recommended Template, Plaintiffs and the TC undertook significant efforts to strictly adhere to the Final Judgment's language, methodically identifying the single most favorable financial terms across Google's commercial agreements. Where Google imposed variable prices or revenue share rates within a single agreement, Plaintiffs and the TC identified

---

[37] Plaintiffs note that Google prices Image Search syndication separately from search syndication. The most favorable price for Image Search syndication, reflected in the Recommended Template, is [redacted]—taken from Google's syndication agreement with [redacted].

the single most favorable price or rate for that agreement. The result is a Recommended Template with clear, flat financial terms "no worse than those offered to any other user" of Google's syndication products. *See* Final J. §§ V.A, VI.B.2. Plaintiffs and the TC believe such an approach is both required by the Final Judgment and appropriate to "provide Qualified Competitors certainty about their costs for a five-year term," Rem. Op. at 185, and to remedy Google's illegal conduct, *see* Final J. Op. at 41 ("[T]hat most-favored-nation pricing would substantially impact Google's monetization expectation . . . is of no moment. Google's monetization expectation is a fruit of its illegal conduct." (citations and quotations omitted)).

Google's objections to the Recommended Template's pricing terms are improper and without merit for at least two reasons. *First*, Google argues that Plaintiffs and the TC must ignore favorable financial terms within Google's current commercial syndication agreements, including discounts, simply because those terms of current licenses were time limited. But the Final Judgment does not impose such a restrictive time-based limitation on the applicable financial terms. *See* Final J. §§ V.A, VI.B.2. Rather, it requires Plaintiffs and the TC to craft a Recommended Template based on the most favorable financial terms offered to "any other user of Google's [syndication products]." *Id.* That is what Plaintiffs and the TC have done: the financial terms in the Recommended Template are the most favorable financial terms made available to a current licensee of Google's syndication products. In rejecting this fact, Google attempts to relitigate the language of the Final Judgment in favor of worse financial terms for Qualified Competitors than what Google has offered to other current licensees—terms, in fact, that Google appears to have made *worse* over the past year. *See, e.g.*, Letter from Ecosia GmbH to This Court (June 22, 2026). Such an outcome is untenable.

*Second*, contrary to Google's claims, the Final Judgment does not require that syndication services be priced at Google's proposed market rates of between [redacted] and [redacted] for stand-alone services. The Final Judgment is clear that the Recommended Template must include "financial terms no worse than those offered to any other user" of Google's syndication products, rather than Google's market rates. Final J. §§ V.A, VI.B.2; *see also* Final J. Op. at 40, 61, 65 (rejecting Google's previous attempt to impose market rates). Not only does the Recommended Template already include the most favorable financial terms within Google's syndication agreements, but also [redacted] Google's commercial syndication agreements price syndication above [redacted]. Google's objections on this point are thus a blatant attempt by Google to reconstruct its own syndication remedies into a vehicle for even greater monetization. *See* Final J. Op. at 41 ("Google's 'monetization expectation' is a fruit of its illegal conduct."). As this Court has plainly stated, "[t]hose who violate the [Sherman] Act may not reap the benefits of their violations." Final J. Op. at 41 (quoting *E. I. du Pont*, 366 U.S. at 326–27). Google's objections on this point should therefore be disregarded.

Plaintiffs and the TC understand that, because Google has offered search syndication commercially at [redacted] Yet Google previously objected to the Court's adoption of most-favored-nation pricing for this reason, and this Court has already dismissed Google's concerns. *See* Final J. Op. at 40. In doing so, this Court stated that "it is unlikely that a Qualified Competitor will syndicate search results from Google but not search text ads. . . . [so] the court is disinclined to alter the Final Judgment in a way that permits Google to dictate pricing with Qualified

Competitors based on existing commercial terms reached with Google's profit motive in mind." *Id.* at 40–41.

Plaintiffs and the TC believe the financial terms included within the Recommended Template properly adhere to the language of the Final Judgment, Final J. §§ V.A, VI.B.2. [redacted]

- [redacted]
- [redacted]
- [redacted]

---

[redacted]

[redacted]

[redacted]

### C. The Recommended Template Preserves Necessary Flexibility for Qualified Competitors Offering GenAI Products

This Court has made clear that the remedies, including the syndication remedies, must extend to GenAI firms planning to invest and compete in or with the GSE and/or Search Text Ads markets. Final J. §§ IX.E, IX.V; Rem. Op. at 99–104. This Court was clear as to the need to "ensure that the ill effects of [a monopolist's] conduct [are] not felt in [a] related area of the industry"—particularly given Google's own increasing integration of search and GenAI. *Id.* at 102 (quoting *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 129 (D.D.C. 2002)). This intention is woven directly into the Final Judgment. When this Court considered the Parties' proposed final judgment terms regarding the display and use of syndicated search results, for example, it rejected Google's plea to place "ordinary commercial restrictions on the use and display of its syndicated results and content." Final J. Op. at 41–42. It did so to avoid Qualified Competitors from "becoming a Google clone" under Google's ordinary commercial restrictions, as that outcome "would be at odds with what this remedy is designed to achieve." *Id.* at 41–43. Instead, this Court was careful to craft remedies that would empower Qualified Competitors—including Qualified Competitors offering GenAI Products—to "depart from Google's familiar ten blue links format" in order to compete with Google in the short-term while independently developing competitive products. *Id.* at 42–43; *see also id.* at 36 ("Nor is [the license requirement] meant to be an artificial hurdle to Qualified Competitors' ability to innovate.") (internal citation omitted).

In crafting the Recommended Template, Plaintiffs and the TC were careful to ensure its terms could apply seamlessly to all Qualified Competitors, including those offering GenAI Products as well as those offering GenAI Search Features like AI Overviews on SERPs. For

example, Plaintiffs and the TC incorporated certain terms into the Recommended Template to effectuate the Court's extension of syndication remedies to GenAI firms, such as:

- Section 4.4.b, which makes clear that Qualified Competitors may display and use syndicated search results within GenAI Products;
- Section 4.4.c, which incorporates this Court's prohibition on training GenAI Products on syndicated content, Final J. Op. at 43 n.10; and
- Exhibit C Section 2.3, which clarifies that Google's ordinary commercial term permitting temporary caching of syndicated search results extends to display and use within GenAI Products.

ECF No. 1559-1. Taken together, these terms are intended to ensure Qualified Competitors offering GenAI Products can benefit from the syndication remedies by, e.g., temporarily caching the content of syndicated search results received in response to a query for the purpose of responding to that query with either a list of URLs or a text summary (or both).

Plaintiffs and the TC believe that these terms are not only consistent with the Final Judgment and necessary to effectuate it and the Court's treatment of GenAI Products, but also necessary to ensure that Qualified Competitors offering GenAI Products can compete with Google in the short-term "as they improve their own search capabilities." Rem. Op. at 177–78; Final J. Op. at 36–37. As this Court heard, potential Qualified Competitors like OpenAI intend to compete with Google without recreating Google's "ten blue links." Final J. Op. at 42–43 (citing Rem. Tr. at 389:17–390:2 (Turley)). Such Qualified Competitors may, for example, seek to compete by generating text summaries in response to a query rather than displaying a standard list of URLs. Rem. Op. at 20 (describing how AI Overviews "will take the search results that come back and use a[n] [LLM] to produce a summary of those results") (citing Rem. Tr. at 149:21–150:4 (Durrett)). When this Court rejected Google's plea to impose on Qualified Competitors its "ordinary commercial restrictions on the use and display of its syndicated results

and content," it "agree[d] with Plaintiffs" that such restrictions—much like those Google seeks to impose now—would unduly restrict potential Qualified Competitors' ability to repackage or reformat syndicated search results to effectively compete with Google in the short-term, rather than serve as a "Google clone." Final J. Op. at 42. As this Court wrote:

> "The syndication remedy is meant to give Qualified Competitors a boost in quality while they develop competitive products, not to pose as Google in the meantime. And at least one potential Qualified Competitor in the GenAI space has explicitly expressed a desire to depart from Google's familiar ten blue links format."

*Id.* at 42–43. Without the flexibility to repackage or reformat syndicated search results, Qualified Competitors with GenAI Products (or GSEs with GenAI Search Features) may be required to "either forego the syndication remedy or abandon developing what sets them apart." Final J. Op. at 39.

Additionally, Plaintiffs and the TC do not believe the proposed terms extending syndication remedies to GenAI Products are prohibited under Google's most favorable display and use restrictions nor by any restrictions in the Court's opinions. *See* Final J. § V.B.7. Under the Recommended Template, Google is not required to syndicate its FastSearch results or any services from its Vertex platform. *See* Rem. Op. at 179. Nor must Google permit a Qualified Competitor to "crawl, spider, index, or in any non-transitory manner store or cache information obtained from the [syndication services] . . . beyond what is necessary to present [s]earch results and/or Search Text Ads in response to a Query." ECF No. 1559-1 at 44 (describing standard Google commercial term) (internal quotations omitted). Google need only provide syndication to Qualified Competitors offering GenAI Products on a "non-discriminatory basis," including permitting such Qualified Competitors to temporarily cache information obtained under the Recommended Template. Final J. § V.B.3.

### D. The Recommended Template Imposes Appropriate Terms Covering Both Organic Web Search Results and Search Feature Content

Contrary to Google's objections, the Recommended Template imposes appropriate terms for the remedial syndication of Search Feature content, including Maps content.[41] This Court adopted explicit terms dictating the scope of remedial search syndication, requiring under Section V.A that Google provide its (1) "ranked organic web search results obtained from crawling the web," (2) "user-facing query-rewriting features," and (3) "Local, Maps, Video, Images, and Knowledge Panel Search Feature content." Final J. § V.A. The result is a remedial syndication license where terms are generally no less favorable than the most favorable terms Google provides in its existing web search syndication agreements, *see* Final J. Op. at 37–44, but where the scope of search syndication is explicitly defined by the Court's order.

The Recommended Template's remedial web search service is defined explicitly to mirror the language of Section V.A. *See* ECF No. 1559-1 at 33. Where the Recommended Template adds language to the description of remedial search syndication, i.e., "whether provided via content flags, contextual features, or otherwise," such language is intended to preserve the full scope of Search Feature content Google must provide under the Final Judgment. *Id.*[42] And where the Final Judgment requires terms no less favorable than those offered to other users of Google's search syndication products, such as financial terms, the Recommended

---

[41] Under the Final Judgment, a "Search Feature" in Google Search means "any user-facing content on a SERP that is not an organic link." Final J. § IX.X. "Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, 'did you mean' prompts, spelling corrections, and related searches." *Id.*

[42] This quoted phrase from the Recommended Template is derived from Google's own correspondence to the TC regarding its syndication products and the TC's understanding of the protocols available to Google to surface Search Feature content within syndicated search results.

Template properly applies those terms to the remedial search syndication Google must provide under Section V.A of the Final Judgment.

To be clear, Google has not provided Plaintiffs with any objections stating that it will not or cannot syndicate all Search Feature content listed in Section V.A of the Final Judgment to Qualified Competitors, including Maps content.[43] Google only objects that it should be able to dictate the terms on which it is required to syndicate such Search Feature content—even where those terms differ from the most favorable terms in Google's commercial syndication agreements. *Cf.* Final J. Op. at 38–39 (rejecting Google's attempt to impose "ordinary" terms because it would "convey an effective veto to Google"); *id.* at 40–41 (not permitting Google to "dictate pricing with Qualified Competitors based on existing commercial terms reached with Google's profit motive in mind.").

Google's objections are improper for at least three reasons. *First*, Google attempts yet again to acquire an "equal seat at the table," *see* Rem. Op. at 212, seeking to negotiate bespoke terms of its own making where the Final Judgment permits no such process. *See* Part III.A, *supra*. Google's role in this process, however, is to provide input, not propose competing terms or negotiate its own remedies. *See* Final J. §§ V.B, VI.B ("Plaintiffs and the Technical Committee, with input from Google, shall create and submit to the Court a template for such license.").

*Second*, Google's objections mischaracterize this Court's syndication remedies. The Final Judgment recognizes that the goals of the syndication remedies require a syndication product that may, at times, differ from what Google offers today, but that is offered on terms based on

[43] In fact, Google has indicated to Plaintiffs and the TC that it has already begun preparations to syndicate the Search Feature content listed in Section V.A of the Final Judgment together with organic search results.

Google's existing search syndication agreements. Final J. Op. at 39 (discussing reasons why Qualified Competitors may want terms that are not "ordinary" or typical to Google's existing syndication agreements). For example, the Final Judgment explicitly scopes remedial search syndication to include ranked organic web search results, user-facing query-rewriting features, and Search Feature content together, rather than simply requiring Google to syndicate its commercial search syndication products as-is. Final J. § V.A; *see also* Final J. Op. at 60–63 (*both* parties' proposed final judgments taking this same approach); *id.* at 42–43 (discussing desire to avoid "Google clones" and permit Qualified Competitors to "depart from Google's familiar ten blue links format"). The Final Judgment then requires Google to provide this explicitly scoped remedial search syndication "on terms no less favorable than the most favorable terms Google provides under any current search syndication agreements." Final J. § V.B.3. The Recommended Template accordingly scopes its remedial search syndication to include the search results, query-rewriting features, and Search Feature content listed in Section V.A of the Final Judgment while using the most favorable terms in Google's existing search syndication agreements. *See* ECF No. 1559-1 at 33.

By contrast, Google now objects that Qualified Competitors should be required to syndicate Search Feature content like Maps separately from organic search results—and on terms worse than the most favorable terms Google provides under any current search syndication agreements. For example, none of Google's current syndication agreements price search syndication above $[redacted] per 1,000 requests, but Google now claims that the Recommended Template's search syndication pricing should be between $[redacted] per 1,000 requests. Google does so on the basis that it should be able to pin the pricing of remedial search syndication on its own assertions of what other competitors, like Microsoft's Bing, offered for content similar to

Google's Knowledge Panel ($[redacted] per 1,000 requests)—or on even worse terms, tying the price to its own market rates for stand-alone syndication ($5.00 per 1,000 requests). But the Final Judgment is clear that Google must provide remedial search syndication on "financial terms no worse than those offered to any other user of Google's search syndication products," not on terms derived from Google's market rates or competitors' purported pricing. Final J. § V.A; *see also* Final J. Op. at 39–41 (rejecting Google's attempt to impose market rates). The Recommended Template reflects "financial terms no worse than those offered to any other user of Google's search syndication products," Final J. § V.A; *see* Part III.B. Additionally, Google attempts to impose terms more favorable to Google derived from its stand-alone syndication products by arguing that any more favorable terms within its syndication agreements were the result of discounts provided to licensees receiving both search syndication and ads syndication. But this Court has already dismissed Google's argument that its commercial discounts should be ignored for the purposes of the syndication remedies:

> "The court thinks it is unlikely that a Qualified Competitor will syndicate search results from Google but not search text ads. After all, it is through search text ads (and other forms of advertising) that GSEs generate revenue…. [T]he court is disinclined to alter the Final Judgment in a way that permits Google to dictate pricing with Qualified Competitors based on existing commercial terms reached with Google's profit motive in mind."

Final J. Op. at 40–41. Despite what Google claims, the Recommended Template—incorporating both search syndication and Search Text Ads syndication—reflects both the reality of Google's commercial syndication agreements and this Court's understanding of Qualified Competitors' incentives to make use of both search syndication and Search Text Ads syndication.

*Third*, Google's demand to impose its own variable terms for syndicating Search Feature content like Maps unnecessarily impedes the implementation of the syndication remedies by creating the very "custom-made patchwork of terms" that Google warned would result if the

Court did not permit Google to impose its ordinary commercial restrictions on Qualified Competitors. *See* Final J. Op. at 43–44. Under the Recommended Template, Qualified Competitors have "certainty about their costs for a five-year term" so they can "build[] search capacity in a predictable way." Rem. Op. at 185. The Recommended Template's search syndication terms and pricing apply to remedial search syndication, and the Recommended Template's Search Text Ads syndication terms apply to remedial Search Text Ads syndication. Rather than engage with the Recommended Template, Google objects that it must be able to dictate its own preferred, variable terms if Qualified Competitors want Search Feature content like Maps: terms that must be additionally negotiated, evaluated by Plaintiffs and the TC for compliance with the Final Judgment, and implemented before Qualified Competitors can begin to receive syndication. Such an outcome is neither necessary nor appropriate under the Final Judgment. And it ignores procedures that Plaintiffs and the TC have already included in the Recommended Template to appropriately facilitate Google's technical implementation of remedial search syndication. *See, e.g.*, ECF No. 1559-1 at 45–46 (permitting Google to propose additional terms on an ongoing basis where needed for, *inter alia*, search syndication functionality).

For the reasons set forth in Plaintiffs' Position Statement, Plaintiffs respectfully request that the Court overrule Google's objections and enter the syndication Recommendation and Recommended Template to effectuate the syndication remedies.

Dated: October 16, 2026

Respectfully submitted,

/s/ Grant M. Fergusson
Claire M. Maddox (D.C. Bar #498356)

Travis R. Chapman (D.C. Bar #90031151)
Danielle Hauck
Grant M. Fergusson (D.C. Bar #90004882)
Emma Waitzman (D.C. Bar #1738427)

U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 549-7155
Claire.Maddox@usdoj.gov

*Counsel for Plaintiff United States of America*

By: /s/ Amanda Wentz
Amanda J. Wentz
Assistant Attorney General
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, Arkansas 72201
Phone: (501) 682-1178
Amanda.Wentz@ArkansasAG.gov

*Counsel for Plaintiff State of Arkansas*

By: /s/ Carolyn D. Jeffries
Rob Bonta, Attorney General
Paula Blizzard, Senior Assistant Attorney General
Michael Jorgenson, Supervising Deputy Attorney General
Brian Wang, Deputy Attorney General
Carolyn D. Jeffries, Deputy Attorney General (DC Bar No. 1600843)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Cari.Jeffries@doj.ca.gov

*Counsel for Plaintiff State of California*

By: /s/ Lee Istrail
James Uthmeier, Attorney General
R. Scott Palmer, Special Counsel, Complex Enforcement Chief, Antitrust Division
Lee Istrail, Assistant Attorney General
Office of the Attorney General, State of Florida
PL-01 The Capitol
Tallahassee, Florida 32399
Lee.Istrail@myfloridalegal.com
Scott.Palmer@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

By: /s/ Charles Thimmesch
Christopher Carr, Attorney General
Logan B. Winkles, Deputy Attorney General
Ronald J. Stay, Jr., Senior Assistant Attorney General
Charles Thimmesch, Senior Assistant Attorney General
Office of the Attorney General, State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
cthimmesch@law.georgia.gov

*Counsel for Plaintiff State of Georgia*

By:
/s/ Scott L. Barnhart
Theodore Edward Rokita, Attorney General
Scott L. Barnhart, Chief Counsel and Director, Consumer Protection Division
Office of the Attorney General, State of Indiana
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Scott.Barnhart@atg.in.gov

*Counsel for Plaintiff State of Indiana*

By: /s/ Jonathan E. Farmer
Russell Coleman, Attorney General
J. Christian Lewis, Commissioner of the Office of Consumer Protection
Philip R. Heleringer, Executive Director of the Office of Consumer Protection
Jonathan E. Farmer, Deputy Executive Director of the Office of Consumer Protection
Office of the Attorney General, Commonwealth of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
Philip.Heleringer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

By: /s/ Asyl Nachabe
Liz Murrill, Attorney General
Asyl Nachabe, Assistant Attorney General
Office of the Attorney General, State of Louisiana
Public Protection Division
909 Poydras St. Suite 1850
New Orleans, LA 70112
(225) 326-6435
NachabeA@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

By: /s/ Scott Mertens
Dana Nessel, Attorney General
Scott Mertens, Assistant Attorney General
Michigan Department of Attorney General
P.O. Box 30736
Lansing, Michigan 48909
MertensS@michigan.gov

*Counsel for Plaintiff State of Michigan*

By: /s/ Alison Esbeck
Alison Esbeck
Assistant Attorney General
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
Alison.esbeck@ago.mo.gov
Phone: 314-340-4977

*Counsel for Plaintiff State of Missouri*

By: /s/ Anna Schneider
Anna Schneider
Special Assistant Attorney General, Senior Counsel,
Montana Office of Consumer Protection
P.O. Box 200151
Helena, MT 59602-0150
Phone: (406) 444-4500
Anna.schneider@mt.gov

*Counsel for Plaintiff State of Montana*

By: /s/ Mary Frances Jowers
Alan Wilson, Attorney General
W. Jeffrey Young, Chief Deputy Attorney General
C. Havird Jones, Jr., Senior Assistant Deputy Attorney General
Mary Frances Jowers, Assistant Deputy Attorney General
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Rembert C. Dennis Building
P.O. Box 11549
Columbia, South Carolina 29211-1549
mfjowers@scag.gov

*Counsel for Plaintiff State of South Carolina*

By: /s/ Diamante Smith
Ken Paxton, Attorney General
Brent Webster, First Assistant Attorney General
Ralph Molina, Deputy First Assistant Attorney General
William D. Wassdorf, Deputy Attorney General for Civil Litigation
Thomas York, Division Chief, Antitrust Division
Diamante Smith, Assistant Attorney General, Antitrust Division
Office of the Attorney General,
State of Texas
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1162
Diamante.Smith@oag.texas.gov

*Counsel for Plaintiff State of Texas*

By: /s/ Caitlin M. Madden
Joshua L. Kaul, Attorney General
Caitlin M. Madden, Assistant Attorney General
Wisconsin Department of Justice
17 W. Main St.
Post Office Box 7857
Madison, Wisconsin 53707-7857
caitlin.madden@Wisconsin.gov

*Counsel for Plaintiff State of Wisconsin*

PHILIP WEISER
Attorney General of Colorado

/s/ Jonathan B. Sallet
Jonathan B. Sallet, DC Bar No. 336198
Steven M. Kaufmann
Elizabeth W. Hereford
Conor J. May
Colorado Office of the Attorney General
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov
Steve.Kaufmann@coag.gov
Elizabeth.Hereford@coag.gov
Conor.May@coag.gov

*Counsel for Plaintiff State of Colorado*

MIKE HILGERS
Attorney General of Nebraska

Justin C. McCully, Assistant Attorney General
Nebraska Department of Justice
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-9305
E-Mail: Justin.mccully@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

KRISTIN K. MAYES
Attorney General of Arizona

Robert A. Bernheim, Unit Chief Counsel
Jayme Weber, Senior Litigation Counsel
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6507
E-Mail: Robert.Bernheim@azag.gov
Jayme.Weber@azag.gov

*Counsel for Plaintiff State of Arizona*

BRENNA BIRD
Attorney General of Iowa

Noah Goerlitz, Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St., 2nd Floor
Des Moines, IA 50319
Telephone: (515) 725-1018
E-Mail: Noah.goerlitz@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

LETITIA JAMES
Attorney General of New York

Elinor R. Hoffmann
Morgan J. Feder
Michael D. Schwartz
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8513
E-Mail: Elinor.hoffmann@ag.ny.gov
Morgan.feder@ag.ny.gov
Michael.schwartz@ag.ny.gov

*Counsel for Plaintiff State of New York*

JEFF JACKSON
Attorney General of North Carolina

Kunal Janak Choksi
Joshua Daniel Abram
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6000
E-Mail: kchoksi@ncdoj.gov
jabram@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

JONATHAN SKRMETTI

Attorney General of Tennessee

J. David McDowell
Austin Ostiguy
Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: David.McDowell@ag.tn.gov
austin.ostiguy@ag.tn.gov
Tyler.Corcoran@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

DEREK E. BROWN
Attorney General of Utah

Marie W.L. Martin, Division Director
Utah Office of Attorney General
160 E 300 S, 5th Floor
P.O. Box 140811
Salt Lake City, Utah 84114
Telephone: (801) 440-9825
E-Mail:
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

STEPHEN J. COX
Attorney General of Alaska

Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
Office of the Attorney General
1031 W. Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5275
E-Mail: Jeff.pickett@alaska.gov

*Counsel for Plaintiff State of Alaska*

WILLIAM TONG
Attorney General of Connecticut

Nicole Demers
Office of the Attorney General of Connecticut
165 Capitol Avenue, Suite 5000
Hartford, CT 06106
Telephone: (860) 808-5202
E-Mail: Nicole.demers@ct.gov

*Counsel for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

Michael Andrew Undorf
Delaware Department of Justice
Fraud and Consumer Protection Division
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
E-Mail: Michael.undorf@delaware.gov

*Counsel for Plaintiff State of Delaware*

BRIAN SCHWALB
Attorney General of the District of Columbia

Elizabeth Gentry Arthur
Office of the Attorney General for the District of Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 724-6514
E-Mail: Elizabeth.arthur@dc.gov

*Counsel for Plaintiff District of Columbia*

DOUGLAS MOYLAN
Attorney General of Guam

Norman Lee Miller, Jr.
Office of the Attorney General of Guam
590 S. Marine Corps Drive, Suite 901
Tamuning, Guam 96913
Telephone: (671) 475-2710

E-Mail: nmillerjr@oagguam.org

*Counsel for Plaintiff Territory Guam*

ANNE E. LOPEZ
Attorney General of Hawai'i

Rodney I. Kimura
Department of the Attorney General, State of Hawai'i
425 Queen Street
Honolulu, HI 96813
Telephone (808) 586-1180
E-Mail: Rodney.i.kimura@hawaii.gov

*Counsel for Plaintiff State of Hawai'i*

RAÚL LABRADOR
Attorney General of Idaho

John K. Olson
Office of the Idaho Attorney General
Consumer Protection Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 332-3549
E-Mail: John.olson@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

KWAME RAOUL
Attorney General of Illinois

Elizabeth Maxeiner
Brian Yost
Jennifer Coronel
Office of the Attorney General of Illinois
115 S. LaSalle St.
Chicago, IL 60603
Telephone: (773) 590-7935
E-Mail: Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov
Jennifer.coronel@ilag.gov

*Counsel for Plaintiff State of Illinois*

KRIS W. KOBACH
Attorney General of Kansas

Christopher Teters
Kansas Office of the Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612
Telephone: (785) 296-3751
E-Mail: chris.teters@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AARON M. FREY
Attorney General of Maine

Christina M. Moylan
Office of the Attorney General of Maine
6 State House Station
August, ME 04333
Telephone: (207) 626-8800
E-Mail: Christina.moylan@maine.gov

*Counsel for Plaintiff State of Maine*

ANTHONY G. BROWN
Attorney General of Maryland

Schonette J. Walker
Melissa English
Office of the Attorney General of Maryland
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6480
E-Mail: swalker@oag.state.md.us
menglish@oag.state.md.us

*Counsel for Plaintiff State of Maryland*

ANDREA CAMPBELL
Attorney General of Massachusetts

Jennifer E. Greaney
Office of the Attorney General of Massachusetts

One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 963-2981
E-Mail: Jennifer, greaney@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

Zach Biesanz
Senior Enforcement Counsel
Office of the Minnesota Attorney General
Antitrust Division
445 Minnesota Street, Suite 600
St. Paul, MN 55101
Telephone: (651) 757-1257
E-Mail: Zach.biesanz@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

Michelle C. Badorine
Lucas J. Tucker
Nevada Office of the Attorney General
100 N. Carson Street
Carson City, NV 89701
Telephone: (775) 684-1164
E-Mail: mbadorine@ag.nv.gov
ltucker@ag.nv.gov

*Counsel for Plaintiff State of Nevada*

JOHN FORMELLA
Attorney General of New Hampshire

Brandon Garod
Office of Attorney General of New Hampshire
1 Granite Place South
Concord, NH 03301
Telephone: (603) 271-1217
E-Mail: Brandon.h.garod@doj.nh.gov

*Counsel for Plaintiff State of New Hampshire*

JENNIFER DAVENPORT
Acting Attorney General of New Jersey

Yale A. Leber
Abiola G. Miles
Deputy Attorneys General
New Jersey Attorney General's Office
25 Market Street, P.O. Box 106
Trenton, NJ 08625
Telephone: (609) 376-2383
E-Mail: Yale.Leber@law.njoag.gov
Abiola.Miles@law.njoag.gov

*Counsel for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

Judith E. Paquin Cholla Khoury
Assistant Attorney General
New Mexico Office of the Attorney General
408 Galisteo St.
Santa Fe, NM 87504
Telephone: (505) 490-4885
E-Mail: jpaquin@nmag.gov
ckhoury@nmag.gov

*Counsel for Plaintiff State of New Mexico*

DREW WRIGLEY
Attorney General of North Dakota

Elin S. Alm
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of the Attorney General of North Dakota
1720 Burlington Drive, Suite C
Bismarck, ND 58504
Telephone: (701) 328-5570

E-Mail: ealm@nd.gov

*Counsel for Plaintiff State of North Dakota*

D. ANDREW WILSON
Attorney General of Ohio

Beth Ann Finnerty, Section Chief, Antitrust
Sarah Mader, Assistant Attorney General, Antitrust
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Beth.Finnerty@ohioago.gov
Sarah.Mader@ohioago.gov

*Counsel for Plaintiff State of Ohio*

GENTNER DRUMMOND
Attorney General of Oklahoma

Cameron R. Capps
Office of the Oklahoma Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
Telephone: (405) 522-0858
E-Mail: Cameron.capps@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

DAN RAYFIELD
Attorney General of Oregon

Gina Ko, Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (503) 934-4400
E-Mail: Gina.Ko@doj.oregon.gov

*Counsel for Plaintiff State of Oregon*

DAVID W. SUNDAY, JR.
Attorney General of Pennsylvania

Tracy W. Wertz
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
E-Mail: jbetsko@attorneygeneral.gov
twertz@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

LOURDES L. GÓMEZ TORRES
Secretary of Justice

TANIA L. FERNÁNDEZ-MEDERO
Assistant Secretary of Justice

SAMUEL WISCOVITCH-CORALI
Deputy Undersecretary

Pablo Tufiño-Soto
Senior Attorney
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, Ext. 1205
E-Mail: ptufino@justicia.pr.gov

*Counsel for Plaintiff Territory Puerto Rico*

PETER NERONHA
Attorney General of Rhode Island

Stephen Provazza
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
E-Mail: SProvazza@riag.ri.gov

*Counsel for Plaintiff State of Rhode Island*

MARTIN J. JACKLEY
Attorney General of South Dakota

Yvette K. Lafrentz
Office of the Attorney General of South Dakota
1302 E. Hwy 14, Suite 1
Pierre, SD 57501
Telephone: (605) 773-3215
E-Mail: Yvette.lafrentz@state.sd.us

*Counsel for Plaintiff State of South Dakota*

CHARITY R. CLARK
Attorney General of Vermont

Christopher J. Curtis, Assistant Attorney General
Office of the Attorney General of Vermont
109 State St.
Montpelier, VT 05609
Telephone: (802) 828-3170
E-Mail: christopher.curtis@vermont.gov
*Counsel for Plaintiff State of Vermont*

JAY JONES
Attorney General of Virginia

Tyler T. Henry
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
Telephone: (804) 692-0485
E-Mail: thenry@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

NICHOLAS W. BROWN
Attorney General of Washington

Amy N.L. Hanson
Senior Managing Assistant Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-5419
E-Mail: Amy.hanson@atg.wa.gov

*Counsel for Plaintiff State of Washington*

JOHN B. McCUSKEY
Attorney General of West Virginia

Douglas Lee Davis
Office of the Attorney General, State of West Virginia
1900 Kanawha Boulevard East
Building 6, Suite 401
P.O. Box 1789
Charleston, WV 25305
Telephone: (304) 558-8986
E-Mail: Douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

KEITH KAUTZ
Attorney General of Wyoming

William T. Young
Wyoming Attorney General's Office
2320 Capitol Avenue
Kendrick Building
Cheyenne, WY 82002
Telephone: (307) 777-7847
E-Mail: William.young@wyo.gov

*Counsel for Plaintiff State of Wyoming*

WILLIAMS & CONNOLLY LLP

By: *<u>/s/ John E. Schmidtlein</u>*
John E. Schmidtlein (D.C. Bar No. 441261)
Benjamin M. Greenblum (D.C. Bar No. 979786)
Colette T. Connor (D.C. Bar No. 991533)
680 Maine Avenue, SW
Washington, DC 20024
Tel: 202-434-5000
jschmidtlein@wc.com
bgreenblum@wc.com
cconnor@wc.com

WILSON SONSINI GOODRICH & ROSATI P.C.
Michael Sommer (admitted *pro hac vice)*
Franklin M. Rubinstein (D.C. Bar No. 476674)
1700 K Street, NW
Washington, DC 20006
Tel: 202-973-880
msommer@wsgr.com
frubinstein@wsgr.com

ROPES & GRAY LLP
Mark S. Popofsky (D.C. Bar No. 454213)
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: 202-508-4624
Mark.Popofsky@ropesgray.com

Matthew McGinnis (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: 617-951-7703
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant Google LLC*