# Exhibit 1

[redacted]

[redacted]

Google

**WEB SEARCH SERVICE AGREEMENT**
**FOR COMPANIES CERTIFIED AS QUALIFIED COMPETITORS**
**PURSUANT TO *U.S. v. GOOGLE* FINAL JUDGMENT**

## COMPANY INFORMATION

**COMPANY: [FILL IN THE COMPANY'S FULL LEGAL NAME HERE]**

| | Business Contact: | Legal Contact: | Technical Contact: |
|---|---|---|---|
| Name: | | | |
| Title: | | | |
| Address, City, State, Postal Code: | | | |
| Phone: | | | |
| Email: | | | |

## TERM

**TERM:** Starting on [INSERT DATE (MUST BE FIRST OF MONTH)] ("**Effective Date**") and continuing for five years through [INSERT DATE (MUST BE THE LAST DAY OF MONTH)] (inclusive).

## SERVICES

**WEB SEARCH SERVICE ("WSS")**
**IMAGE SEARCH SERVICE ("IS")**
**VIDEO SEARCH SERVICE ("VS")**
**KNOWLEDGE PANEL SERVICE ("KP")**

[redacted]

This Google Web Search Service Agreement for Companies Certified as Qualified Competitors Pursuant to the *U.S. v. Google* Final Judgment including any attached exhibit(s) ("**Agreement**") is entered into by Google LLC ("**Google**") and [Fill in Company's full legal name] ("**Company**") and is effective as of the Effective Date. This Agreement is entered pursuant to the Final Judgment and is subject to the terms of the Final Judgment and further order by the Court.

**1. Definitions.** In this Agreement:

1.1. "**Affiliate**" means any entity that directly or indirectly controls, is controlled by, or is under common control with, a party.

1.2. "**Approved Client Application**" means a Client Application that provides a General Search Engine or GenAI Product as defined in the Final Judgment and that is either listed in Exhibit A or approved by Google in writing from time to time under Section 6.3(a), in each case, for the purpose of accessing the Services.

1.3. "**Brand Elements**" means trade name(s), trademarks, logos, domain names, and other distinctive brand elements.

1.4. "**Client Application**" means any application, plug-in, helper, component, or other executable code that runs on a user's desktop computer or mobile device (or any subsequent version of such application).

1.5. "**Client Application Guidelines**" means the policy guidelines applicable to the Approved Client Application(s) as provided by Google to Company from time to time, including those located at the following URL: https://support.google.com/adsense/answer/10926790 (or any different URL(s) or additional URL(s) Google may provide to Company from time to time).

1.6. "**Company Content**" means any content served to End Users that is not provided by Google.

1.7. "**Confidential Information**" means information that one party (or a Delegate, as defined below) discloses to the other party (or its Delegate) under this Agreement, and that is marked as confidential or would normally be considered confidential information under the circumstances. It does not include information that is independently developed by the recipient, is rightfully given to the recipient by a third party without confidentiality obligations, or becomes public through no fault of the recipient.

1.8. "**Court**" means Judge Amit P. Mehta of the United States District Court of the District of Columbia.

1.9. "**End User**" means an individual human end user of a Site or Approved Client Application who is in the United States.

1.10. "**Fees**" [redacted]

1.11. "**Final Judgment**" means *United States, et al. v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C.), ECF No. 1462.

1.12. "**GenAI**" or "**Generative AI**" means a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models.

1.13. "**GenAI Product**" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information.

[redacted]

1.14. **"General Search Engine"** or **"GSE"** means software or a service that produces links to websites and other relevant information in response to a user query or prompt and that seeks to fulfill a broad array of informational needs.

1.15. **"Google Branding Guidelines"** means the brand treatment guidelines applicable to the Services and located at the following URL: [redacted] (or a different URL Google may provide to Company from time to time).

1.16. **"Google Technical Protocols"** means technical protocols and/or any other technical requirements and specifications applicable to the Services as provided, and updated, by Google to Company from time to time.

1.17. **"Intellectual Property Rights"** means all patent rights, copyrights, trademark rights, rights in trade secrets, database rights, moral rights, domain names, rights in or relating to Confidential Information, and any other intellectual property rights (registered or unregistered) throughout the world.

1.18. **"Monthly Forecast"** means the projected volume of United States Queries from Sites and Approved Client Applications that Company expects to send to Google through Requests each month.

1.19. **"Peak QPS"** means the maximum number of Requests a system handles during its busiest single second of traffic during a month.

1.20. **"Plaintiffs"** means the plaintiffs as defined in the Final Judgment.

1.21. **"QPS"** means Queries per second.

1.22. **"Query"** means (a) a text query entered and submitted into a Search Box on a Site or on an Approved Client Application by an End User (whether by typing or voice input); or (b) a text query from Google's query re-writing features ("did you mean," "people also ask," and autocomplete) that the End User selects.

1.23. **"Request"** means a request that is sent by Company to Google for a Results Set. For the avoidance of doubt, synthetic queries are not Requests.

1.24. **"Result"** means an individual search result from the web provided through the applicable Service.

1.25. **"Results Page"** means any Site page or Approved Client Application screen that contains any Results.

1.26. **"Results Set"** means a set of one or more Results.

1.27. **"Search Box"** means a search box (or other means approved by Google) into which End Users enter search queries.

1.28. **"Services"** means the Services listed on the front page(s) of this Agreement.

1.29. **"Site(s)"** means a Web site(s) that provides a General Search Engine or GenAI Product as defined in the Final Judgment, and that is located at the URL(s) listed in Exhibit A or approved by Google in writing from time to time under Section 6.3(a).

1.30. [redacted]

1.31. **"Technical Committee"** means the five-person committee of experts appointed by the Court pursuant to Final Judgment Section VII.A.

[redacted]

1.32. In this Agreement, (i) "**including**" means "including but not limited to," (ii) examples are illustrative and not the sole examples of a particular concept, (iii) unless expressly stated otherwise, "**days**" means calendar days.

**2. Launch, Permitted Use, and Implementation and Maintenance of the Services.**

2.1. **Launch**. The parties will each use reasonable efforts to launch the Services into live use within 30 days from the Effective Date. Company will not launch any implementation of the Services into live use, including without limitation any implementation on or through an Approved Client Application, until Google has approved such implementations in writing (email to suffice), which approval will not be unreasonably withheld or delayed. [redacted]

2.2. **Permitted Use.** Company agrees that the only permitted use of the Services (or any part thereof) is for Company to, subject to the terms of this Agreement, send a Request to Google for a Results Set that Company then displays on the applicable Site or Approved Client Application to the End User who entered the associated Query (as applicable) (the "**Permitted Use**"). Company will not, and will not knowingly or negligently allow any third party to, use the Services, Results (or part thereof), or other information obtained through use of the Services for any purpose other than the Permitted Use. For the avoidance of doubt, Company may not issue Requests to Google that contain synthetic queries.

2.3. **Implementation and Maintenance.**

(a) For the remainder of the Term, Google will make the Services available for use by Company and Company will implement and maintain the Services on the Sites and Approved Client Applications. For clarity, Company may not implement the Services on a property that is not a Site or Approved Client Application. [redacted]

(b) Company will ensure, with respect to every Site and Approved Client Application, Company:

(i) is the technical and editorial decision maker in relation to each page and Approved Client Application, including Results Pages, on which the Services are implemented; and

(ii) has control over the way in which the Services are implemented on each of those pages and Approved Client Applications.

(c) Company will ensure that the Services are implemented and maintained in accordance with the following:

(i) [redacted]

(ii) the Google Branding Guidelines; and

(iii) the Google Technical Protocols.

[redacted]

(d) Google will, upon receiving a Request sent in compliance with this Agreement, provide a Results Set when available. Company will then display the Results Set on the applicable Site or Approved Client Application.

(i) **Web Search Service Results:** [redacted] For the avoidance of doubt, Company will not modify any individual WSS Result in a WSS Results Set before displaying it to the End User.

(e) Company will ensure that: (i) each Request is sent in compliance with this Agreement; (ii) each Request is generated by a Query; and (iii) each Request contains the Query that generated that Request. For the avoidance of doubt, Company will not make more than one Request per Query per Results Page and Company will not send synthetic queries to Google.

(f) [redacted]

(g) Company will ensure that at all times during the applicable Term, Company:

(i) has a clearly labeled and easily accessible privacy policy in place relating to the Site(s) and Approved Client Application(s); and

(ii) provides the End User with clear and comprehensive information about any information stored or accessed on the End User's computer or device in connection with the Services.

(h) Company will take reasonable steps to ensure that an End User gives consent to the storing and accessing of information on the End User's computer or device where such activity occurs in connection with the Services and obtaining such consent is required by law.

(i) Google and Company agree to the Google Ads controller-controller data protection terms available at: https://privacy.google.com/businesses/controllerterms/ (or any different or additional URL Google may provide to Company from time to time).

**3. Syndication Limits, Restrictions, and Compliance.**

3.1. **Syndication Limits.**

(a) Company must comply with the syndication limits enumerated in the Final Judgment, which states that Company's use of the Services will be capped to 40% of the Company's annual United States Queries from Company's General Search Engine or GenAI Product and decline over the course of the Term. The pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with Plaintiffs and the Technical Committee. For the avoidance of doubt, the Company must comply with these syndication limits and tapering requirements as determined by the Court, and may not circumvent them, including by directly, or through any third party, using automated means to access content from any Google services in violation of the machine-readable instructions on Google's web pages (for example, robots.txt files that disallow crawling, training, or other activities).

(b) Within the first 45 days when Google and the Company are preparing to launch the Services, Company must provide Google and the Technical Committee with twelve months of Monthly Forecasts and Peak QPS, for review. If the Technical Committee approves Company's Monthly Forecasts and Peak QPS, Google will use them to accommodate Peak QPS for the Services. For each subsequent year the Company receives the Services, Company will provide an updated set of twelve months of Monthly Forecasts and Peak QPS, for the Technical Committee to review and approve. Google will work with the Technical Committee to develop reasonable protocols that safeguard the Monthly Forecasts' commercially sensitive information.

[redacted]

(c) If Company consistently falls below its Monthly Forecasts or Peak QPS for a period of three months or longer, Google may request that the Technical Committee revise the Monthly Forecasts or Peak QPS for the remainder of any given year.

(d) Any increase to the Company's Monthly Forecasts or Peak QPS must be approved by the Technical Committee. Company will provide to Google and the Technical Committee: at least three months notice if Company expects to increase any Monthly Forecast by less than 5% of its forecasted Peak QPS; and at least six months notice if Company expects to increase any Monthly Forecast by more than 5% of its forecasted Peak QPS.

(e) Company warrants that the Monthly Forecasts and Peak QPS provided to Google and the Technical Committee are accurate estimates made in good faith.

(f) Google will not be obligated to make the Services available in excess of the Peak QPS limits in the Monthly Forecasts approved by the Technical Committee.

3.2. **Restrictions.** Company will not, and will not knowingly or negligently allow any third party to:

(a) modify, obscure or prevent the display of all, or any part of, any Results, [redacted]

(b) edit, filter, truncate, append terms to or otherwise modify any Query;

(c) implement any click tracking or other click monitoring of Results;

(d) enter into any type of arrangement with a third party where either party receives a financial benefit in connection with the Results (including any co-branding, white labeling or sub-syndication arrangement). For the avoidance of doubt, nothing in this Section 3.2(d) is intended to prevent Company from displaying advertisements on a Results Page.

(e) directly or indirectly, (i) offer incentives to End Users to generate impressions, Requests or clicks on Results, (ii) fraudulently generate impressions, Requests or clicks on Results or (iii) modify impressions, Requests or clicks on Results;

(f) "crawl", "spider", index or in any non-transitory manner store or cache, or use in any manner Results (or part thereof) or other information obtained by Company through use of the Services beyond what is necessary to present Results to the End User who submitted the associated Query. For the avoidance of doubt, this provision prohibits reverse engineering or using the Services (including any Results) to ground or train any model;

(g) except for content provided by Google, display on any Site or Approved Client Application, any content that violates or encourages conduct that would violate [redacted], the Google Branding Guidelines, the Google Technical Protocols, or the Client Application Guidelines;

(h) monetize IS Results or VS Results, including by serving or displaying advertisements on or in connection with, any IS Results or VS Results;

(i) Without limiting the scope of its other obligations under the Agreement, Company shall ensure that it has obtained or observed relevant rights to any third party content provided on any search results page, including, but not limited to, any applicable terms of service, or observing the industry practice known as the robots exclusion protocol, as further described at http://www.robottxt.org. Company shall obtain or observe such rights in good faith use of user agents, source addresses, crawl rates and so forth. This clause shall be without prejudice to the other provisions in this Section 3.2.

3.3. **Compliance.**

(a) Company will not knowingly or negligently allow any use of or access to the Services through any Site or Approved Client Application that is not in compliance with the terms of this Agreement. Company will use commercially reasonable efforts to monitor for any such access or use and will, if any such access or use is detected, take all reasonable steps requested by Google to disable this access or use.

[redacted]

(b) If Company is not in compliance with this Agreement at any time, Google may with notice to Company (such notice setting forth such noncompliance in reasonable detail), suspend provision of all (or any part of) the Services [redacted] until Company implements adequate corrective modifications as reasonably required and determined by Google; [redacted]

4. **Client Applications**. Company will, and will ensure that any Approved Client Application(s) will, comply with the Client Application Guidelines, as provided by Google to Company from time to time.

5. **No Exclusivity.** This Agreement is non-exclusive. Provided Company complies with this Agreement, including [redacted] and the Google Branding Guidelines, Company may display results from other search result providers on the Sites or Approved Client Applications.

6. **Changes and Modifications.**

6.1. **By Google.** If Google modifies [redacted], the Google Branding Guidelines, the Google Technical Protocols, or the Client Application Guidelines and the modification requires action by Company, Company will take the necessary action no later than 30 days from receipt of notice from Google (or such longer period as required by applicable law or permitted by Google in writing). [redacted]

6.2. **By Company.** Company will use commercially reasonable efforts to provide Google with at least 15 days prior notice of any change in code or serving technology that could reasonably be expected to affect the delivery or display of any Results, [redacted]

6.3. **Site and Approved Client Application List Changes.**

(a) Company may notify Google from time to time that it wishes to add URL(s) to the Site(s) or Client Application(s) to the Approved Client Application(s), in each such case, by sending notice to Google at least 45 days before Company wishes the addition to take effect. Google may approve or disapprove the request in its reasonable discretion, this approval or disapproval to be in writing. Regardless of whether Google approves a URL or Client Application, Google will not be obligated to provide any Services to that URL or Client Application until the Technical Committee determines that the URL or Client Application is entitled to use the Services under the Final Judgment.

(b) If there is a change in control of any Site or Approved Client Application (such that the conditions set out in Section 2.3(b)(i) or 2.3(b)(ii) are not met):

(i) Company will provide notice to Google at least 30 days before the change; and

(ii) from the date of that change in control of the Site or Approved Client Application, that Site or Approved Client Application will be treated as removed from this Agreement. Company will ensure that from that date, the Services are no longer implemented on that Site or Approved Client Application.

7. **Data.**

7.1. **Definition of Company Data.** As between Company and Google, any data or information sent by Company to Google during the Term, including, without limitation, data or information submitted as a Request to Google ("Company Data"), will remain the property of Company.

[redacted]

7.2. **Definition of Google Data.** As between Company and Google, any data or information collected by Google ("Google Data") will remain the property of Google.

7.3. **Permitted and Prohibited Uses.**

(a) **Company Data.** [redacted]

(b) **Google Data.** [redacted]

(c) **Legally Required Uses.** Notwithstanding the foregoing or anything to the contrary herein, Google may use the Google Data, and either party may use the Company Data to the extent required by law, in order to comply with legal process, preventing fraud or imminent harm, and ensuring the security of its network and Services.

**8. Intellectual Property.** Except to the extent expressly stated otherwise in this Agreement, neither party will acquire any right, title, or interest in any Intellectual Property Rights belonging to the other party, or to the other party's licensors.

**9. Brand Elements.**

9.1. [redacted]

9.2. [redacted]

**10. Payment.**

10.1. **Payments.** [redacted]

10.2. **Payee.** In accordance with applicable laws and regulations, Google operates multiple local Google Affiliates to process transactions, and payments from Company to Google may be made to one or more of these Google Affiliates as specified by Google, which will satisfy Company's payment obligations under this Agreement.

10.3. **Offset.** [redacted]

[redacted]

10.4. **Invoices.** [redacted]

10.5. **Taxes.** [redacted]

10.6. **Currency & Bank Charges.** [redacted]

**11. Warranties; Disclaimers.**

11.1. **Warranties.**

(a) [redacted]

11.2. **Company Warranties.** Company warrants that:

(a) [redacted]

(b) [redacted]

11.3. **Disclaimers.** [redacted]

**12. Indemnification.**

12.1. **By Company.** [redacted]

12.2. **By Google.**

(a) [redacted]

(b) [redacted]

[redacted]

12.3. **General.** [redacted]

## 13. Limitation Of Liability.

13.1. **Limitation.**

(a) [redacted]

(b) (a) [redacted]

13.2. [redacted]

13.3. [redacted].

[redacted]

13.4. [redacted]

**14. Confidentiality; Publicity.**

14.1. **Confidentiality**. The recipient will not disclose the other party's Confidential Information, except to Affiliates, employees, agents, professional advisors, or third-party contractors ("**Delegates**") who need to know it and who have a legal obligation to keep it confidential. The recipient will use the other party's Confidential Information only to exercise rights and fulfill obligations under this Agreement while using reasonable care to protect the Confidential Information. The recipient will ensure that its Delegates are also subject to the same non-disclosure and use obligations. The recipient may disclose Confidential Information when required by law after giving reasonable notice to the other party, and the opportunity to seek confidential treatment, a protective order or similar remedies or relief prior to disclosure, if permitted by law.

14.2. In the event that Company is required to file a copy of this Agreement or a summary of this Agreement with the Securities and Exchange Commission, Company will seek confidential treatment for any such filing, will give Google reasonable prior notice and opportunity to review any such filing so that Google may provide Company with specific redaction requests, and will use its reasonable efforts to redact the Agreement (including as to all Google redaction requests) or alternatively provide an agreement summary, in each case if and to the extent permitted by applicable laws and regulations.

14.3. **Publicity**. Neither party may make any public statement regarding this Agreement without the other's written approval.

**15. Term and Termination.**

15.1. **Term**. The term of this Agreement is the Term stated on the front pages of this Agreement, unless earlier terminated as provided in this Agreement.

15.2. **Termination**.

(a) **Termination for Convenience.** Company may terminate this Agreement for convenience at any time with notice to Google.

(b) Google may terminate this Agreement immediately if Company is no longer entitled to receive the Services under the Final Judgment, including if Google is no longer required to offer the Services under the Final Judgment.

(c) **Termination for Cause.** [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

(d) Google may terminate this Agreement, or the provision of any Service, immediately with notice if pornographic content that is illegal under U.S. law is displayed on any Site or Approved Client Application.

(e) If Google in good faith believes a Qualified Competitor is in breach of the terms of its Agreement, it may exercise its rights under the Agreement. Before exercising such rights, Google must provide simultaneous notice to the Technical Committee of the breach and the actions Google is taking in light of the breach.

[redacted]

(f) [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

**16. Miscellaneous.**

16.1. **Compliance with Laws**. Each party will comply with all applicable laws, rules, ordinances, judicial and administrative orders, and regulations in exercising its rights and fulfilling its obligations under this Agreement.

16.2. **Notices**. All notices must be in English and in writing. Notices of termination or breach must (a) be addressed to the other party's primary point of contact and to the other party's Legal Department, which for Google is [redacted]; and (b) reference this Agreement's title and Effective Date. All other notices must be addressed to the other party's primary contact. Emails are written notices. Notice will be treated as given on receipt, as confirmed by written or electronic records.

16.3. **Approval Standards; Application of Requirements.** [redacted]

16.4. **Assignment**. Neither party may assign any part of this Agreement.

16.5. **Change of Control**. Upon the earlier of (a) entering into an agreement providing for a change of control (for example, through a stock purchase or sale, merger, asset sale, liquidation or other similar form of corporate transaction), (b) the board of directors of Company recommending its shareholders approve a change of control, or (c) the occurrence of a change of control (each, a "Change of Control Event"), the Company will notify the Technical Committee and Google. Google will suspend the Services until the Technical Committee conducts the certification process required by the Final Judgment and certifies that Company is still certified as such after the Change in Control Event.

16.6. **Governing Law.** [redacted]

16.7. **Equitable Relief**. Nothing in this Agreement will limit either party's ability to seek equitable relief.

[redacted]

16.8. **Entire Agreement; Amendments.**

(a) [redacted]

16.9. **No Waiver.** Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

16.10. **Severability.** If any term (or part of a term) of this Agreement is invalid, illegal or unenforceable, the rest of the Agreement will remain in effect.

16.11. **Survival.** The following sections of this Agreement will survive any expiration or termination of this Agreement: 7 (Data), 8 (Intellectual Property), [redacted] 14 (Confidentiality; Publicity), [redacted], and 16 (Miscellaneous).

16.12. **No Agency.** This Agreement does not create an agency, partnership, or joint venture between the parties.

16.13. **No Third Party Beneficiaries.** This Agreement does not confer any benefits on any third party unless it expressly states that it does.

16.14. **Force Majeure.** Neither party will be liable for failure or delay in performance to the extent caused by circumstances beyond its reasonable control.

16.15. **Signatures.** The parties may sign this Agreement using counterparts and electronic copies as originals. The parties may also sign this Agreement electronically if permitted by applicable law.

Signed:

| **Google** | **Company** |
|---|---|
| By: | By: |
| Print Name: | Print Name: |
| Title: | Title: |
| Date: | Date: |

[redacted]

**EXHIBIT A**

**Sites and Approved Client Applications:**

For clarity, all Sites and Approved Client Applications deemed approved under this Exhibit A remain subject to compliance with this Agreement, and nothing in this Agreement is intended to approve any implementation that is not compliant with this Agreement (including any applicable policies and guidelines) or to relieve Company of the obligation to correct any non-compliant Sites or Approved Client Applications.

Nothing in this Agreement restricts Google's right to, at any time, cease provision of Services to non-compliant Sites or Approved Client Applications, including those listed as approved under this Exhibit A.

[redacted]

## EXHIBIT B

**FEES**

**Web Search Service ("WSS") Fees**
[redacted] USD / 1000 Requests for Results Sets

**Image Search Service ("IS") Fees**
[redacted] USD / 1000 Requests for Results Sets

**Video Search Service ("VS") Fees**
[redacted] USD / 1000 Requests for Results Sets

**Knowledge Panel Service ("KP") Fees**
[redacted] USD / 1000 Requests for Results Sets ([redacted])

**Note that all fees are additive.**

**CURRENCY: USD**

[redacted]

**EXHIBIT C**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

3. [redacted]

[redacted]

[redacted]

[redacted]