# Exhibit 2

[redacted]

[redacted]

Google

# ADSENSE FOR SEARCH AGREEMENT
# FOR COMPANIES CERTIFIED AS QUALIFIED COMPETITORS
# PURSUANT TO *U.S. v. GOOGLE* FINAL JUDGMENT

## COMPANY INFORMATION

**COMPANY: [FILL IN THE COMPANY'S FULL LEGAL NAME HERE]**

| | Business Contact: | Legal Contact: | Technical Contact: |
|---|---|---|---|
| Name: | | | |
| Title: | | | |
| Address, City, State, Postal Code: | | | |
| Phone: | | | |
| Email: | | | |

## TERM

**TERM:** Starting on [INSERT DATE (MUST BE FIRST OF MONTH)] ("**Effective Date**") and continuing for five years through [INSERT DATE (MUST BE THE LAST DAY OF MONTH)].

## SERVICE

**ADSENSE FOR SEARCH ("AFS")**

[redacted]

This Google AdSense for Search Agreement for Companies Certified as Qualified Competitors Pursuant to the *U.S. v. Google* Final Judgment including any attached exhibit(s) ("**Agreement**") is entered into by Google LLC ("**Google**") and [Fill in Company's full legal name] ("**Company**") and is effective as of the Effective Date. This Agreement is entered pursuant to the Final Judgment and is subject to the terms of the Final Judgment and further order by the Court.

**1. Definitions.** In this Agreement:

1.1. "**Ad**" or "**Result**" means an individual Search Text Ad provided through the Service.

[redacted]

1.3. "**Ad Revenues**" [redacted]

1.4. "**AdSense for Search Restricted Access Features (RAFs) Policy**" or the "**RAF Policy**" means the policy located at https://support.google.com/adsense/answer/16262554?hl=en or such replacement URL, and additional URLs, as notified by Google to Company, each as updated from time to time.

1.5. "**Ad Set**" means a set of one or more Ads.

1.6. "**Affiliate**" means any entity that directly or indirectly controls, is controlled by, or is under common control with, a party.

1.7. "**Approved Client Application**" means a Client Application that runs on an End User's desktop computer, that provides a General Search Engine or GenAI Product as defined in the Final Judgment, and that is either listed in Exhibit A or approved by Google in writing from time to time under Section 10.3(a), in each case, for the purpose of accessing the Service.

1.8. "**Brand Elements**" means trade name(s), trademarks, logos, domain names, and other distinctive brand elements.

1.9. "**Click Tracking**" means click tracking or other click monitoring of Ads or Ad Sets on the Sites by Company.

1.10. "**Client Application**" means any application, plug-in, helper, component, or other executable code that runs on a user's desktop computer or mobile device (or any subsequent version of such application).

1.11. "**Client Application Guidelines**" means the policy guidelines applicable to the Approved Client Application(s) as provided by Google to Company from time to time, including those located at the following URL: https://support.google.com/adsense/answer/10926790 (or any different URL(s) or additional URL(s) Google may provide to Company from time to time).

1.12. "**Company Content**" means any content served to End Users that is not provided by Google.

1.13. "**Confidential Information**" means information that one party (or a Delegate, as defined below) discloses to the other party (or its Delegate) under this Agreement, and that is marked as confidential or would normally be considered confidential information under the circumstances. It does not include information that is independently developed by the recipient, is rightfully given to the recipient by a third party without confidentiality obligations, or becomes public through no fault of the recipient.

1.14. "**Court**" means Judge Amit P. Mehta of the United States District Court of the District of Columbia.

1.15. "**Desktop Ads**" means Ads that are displayed in response to Queries submitted by End Users not using Mobile Devices or Tablet Devices.

[redacted]

1.16. **"End User"** means an individual human end user of a Site or Approved Client Application who is in the United States.

1.17. **"Final Judgment"** means *United States, et al. v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C.), ECF No. 1462.

1.18. **"GenAI Product"** means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models and has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information.

1.19. **"GenAI" or "Generative AI"** means a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models.

1.20. **"General Search Engine"** or **"GSE"** means software or a service that produces links to websites and other relevant information in response to a user query or prompt and that seeks to fulfill a broad array of informational needs.

1.21. **"Google Branding Guidelines"** means the brand treatment guidelines applicable to the Services and located at the following URL: [redacted] (or a different URL Google may provide to Company from time to time).

1.22. **"Google Program Guidelines"** means the policy and implementation guidelines applicable to the Services and as located at the following URLs: [redacted] (or any different URL(s) or additional URL(s) as Google may provide to Company from time to time).

1.23. **"Google Technical Protocols"** means technical protocols and/or any other technical requirements and specifications applicable to the Service as provided, and updated, by Google to Company from time to time.

1.24. **"Intellectual Property Rights"** means all patent rights, copyrights, trademark rights, rights in trade secrets, database rights, moral rights, domain names, rights in or relating to Confidential Information, and any other intellectual property rights (registered or unregistered) throughout the world.

1.25. **"Mobile Ads"** means Ads displayed in response to Queries submitted by End Users using Mobile Devices.

1.26. **"Mobile Device"** means a mobile device, as determined by Google in its sole discretion consistent with the mobile device definitions used by Google for advertiser reporting, pricing, and feature serving.

1.27. **"Mobile & Tablet Queries"** means Queries from Mobile Devices or Tablet Devices.

1.28. **"Monthly Forecast"** means the projected volume of U.S. Queries from Sites, Approved Client Applications, and Syndicated Properties that Company expects to send to Google through Requests each month.

1.29. **"Net Ad Revenues"** [redacted]

1.30. **"Peak QPS"** means the maximum number of Requests a system handles during its busiest single second of traffic during a month.

1.31. **"Plaintiffs"** means the plaintiffs as defined in the Final Judgment.

1.32. **"QPS"** means Queries per second.

[redacted]

1.33. "**Query**" means (a) a text query entered and submitted into a Search Box on a Site or on an Approved Client Application by an End User (whether by typing or voice input) or (b) if applicable, a text query from Google's query re-writing features ("did you mean," "people also ask," and autocomplete) that the End User selects.

1.34. "**Request**" means a request that is sent by Company to Google for an Ad Set. For the avoidance of doubt, synthetic queries are not Requests.

1.35. "**Restricted Access Feature**" or "**RAF**" means a feature of the Service that is listed in the RAF Policy and that Google has made available to Company.

1.36. "**Results Page**" means any Site page that contains any Results.

1.37. "**Search Box**" means a search box into which End Users enter search queries.

1.38. "**Search Text Ad**" means a general search text advertisement, which is an ad that resembles an organic link on a search engine results page. Search Text Ads can include images and often appear at the top of the search engine results page with a designation indicating that they are paid advertisements. If, during the Term, Google makes a syndication service generally available that provides publishers with Search Text Ads for AI Overviews that appear on the publishers' properties, then, subject to any additional or different terms that the Court or Technical Committee may agree to apply, "Search Text Ad" will also include those Search Text Ads.

1.39. "**Service**" means the provision of Search Text Ads through Google's AdSense for Search service.

1.40. "**Site(s)**" means a Web site(s) that provides a General Search Engine or GenAI Product as defined in the Final Judgment, and that is located at the URL(s) listed in Exhibit A or approved by Google in writing from time to time under Section 10.3(a).

1.41. "**Subsyndicate**" means the owner of a Syndicated Property, as reported to Google.

1.42. "**Syndicated Approved Client Application**" means an Approved Client Application that: (i) is not owned and operated by Company, and (ii) either is listed in Attachment 1 to Exhibit D (Terms for Syndicated Properties), or is approved by Google from time to time under Section 10.3(a), in each case, for the purpose of accessing a Service on a Syndicated Site.

1.43. "**Syndicated Property**" means a Syndicated Approved Client Application or a Syndicated Site.

1.44. "**Syndicated Site**" means a Site that: (i) is not owned and operated by Company, and (ii) is either listed in Attachment 1 to Exhibit D (Terms for Syndicated Properties), or is approved by Google from time to time under Section 10.3(a).

1.45. "**Tablet Ads**" means Ads displayed in response to Queries submitted by End Users using Tablet Devices.

1.46. "**Tablet Device**" means a tablet device, as determined by Google in its sole discretion consistent with the tablet device definitions used by Google for advertiser reporting, pricing, and feature serving.

1.47. "**Technical Committee**" means the five-person committee of experts appointed by the Court pursuant to Final Judgment Section VII.A.

1.48. In this Agreement, (i) "**including**" means "including but not limited to," (ii) examples are illustrative and not the sole examples of a particular concept, (iii) unless expressly stated otherwise, "**days**" means calendar days.

**2. Launch, Permitted Use, and Implementation and Maintenance of the Service.**

2.1. **Launch**. The parties will each use reasonable efforts to launch the Service into live use within 30 days from the Effective Date. Company will not launch any implementation of the Service into live use,

[redacted]

including without limitation any implementation on or through an Approved Client Application, and such implementations will not be payable by Google, until Google has approved such implementations in writing (email to suffice), which approval will not be unreasonably withheld or delayed. [redacted]

2.2. **Permitted Use.** Company agrees that the only permitted use of the Service (or any part thereof) is for Company to, subject to the terms of this Agreement, send a Request to the Service for an Ad Set that Company then displays on the applicable Site or Syndicated Site to the End User who entered the associated Query (as applicable) (the "**Permitted Use**"). Company will not, and will not knowingly or negligently allow any third party to, use the Service, Ads (or part thereof), or other information obtained through use of the Service for any purpose other than the Permitted Use. For the avoidance of doubt, Company may not issue Requests to Google that contain synthetic queries.

2.3. **Implementation and Maintenance.**

(a) For the remainder of the Term, Google will make available and Company will implement and maintain the Service on the Sites and Approved Client Applications. For clarity, Company may not implement the Service on a property that is not a Site, Approved Client Application, or Syndicated Property. [redacted]

(b) Company will ensure that with respect to every Site and Approved Client Application, except for Syndicated Properties, Company:

(i) is the technical and editorial decision maker in relation to each page, including Results Pages, and each Approved Client Application, on which the Service is implemented; and

(ii) has control over the way in which the Service is implemented on each of those pages and Approved Client Applications.

(c) Company will provide the name of the Subsyndicate that owns and operates each Syndicated Property. For the period during which the Service is used on a Syndicated Property, Company will ensure that with respect to every such Syndicated Property, the named Subsyndicate owns and operates such Syndicated Property and all corresponding Results Pages, where "operate" means that the Subsyndicate maintains and has final administrative authority over the Syndicated Property and all corresponding Results Pages.

(d) Company will ensure that the Service is implemented and maintained in accordance with the following:

(i) the Google Program Guidelines;

(ii) the Google Branding Guidelines; and

(iii) the Google Technical Protocols.

[redacted]

(e) Company will ensure that Ads are displayed in a single continuous block and are not interspersed with any other advertisements or content.

(f) Company will ensure that: (i) each Request is sent in compliance with this Agreement; (ii) each Request is generated by a Query; and (iii) each Request contains the Query that generated that Request. For the avoidance of doubt, Company will not send synthetic queries to Google.

(g) Google will, upon receiving a Request sent in compliance with this Agreement, provide an Ad Set when available. Company will then display the Ad Set (as applicable) on the applicable Site.

(h) Company will ensure that at all times during the applicable Term, Company:

(i) has a clearly labeled and easily accessible privacy policy in place relating to the Site(s) and Approved Client Application(s); and

(ii) provides the End User with clear and comprehensive information about cookies and other information stored or accessed on the End User's computer or device in connection with the Service, including information about End Users' options for cookie management.

(i) Company will use commercially reasonable efforts to ensure that an End User gives consent to the storing and accessing of cookies and other information on the End User's computer or device in connection with the Service where such consent is required by law.

(j) Google and Company agree to the Google Ads controller-controller data protection terms available at: https://privacy.google.com/businesses/controllerterms/ (or any different or additional URL Google may provide to Company from time to time).

2.4. **Mobile & Tablet Queries.** Notwithstanding anything to the contrary in this Agreement, Company, based on its good faith determination of an End User's device type, will not, and will not allow any third party to (a) directly or indirectly access the Service through any application, plug-in, helper, component or other executable code that runs on an End User's Mobile Device or Tablet Device; (b) access the Service for Mobile & Tablet Queries obtained as a result of such End Users downloading any application, plug-in, helper, component or other executable code; (c) allow any third party sites or applications, except for explicitly approved mobile Syndicated Sites listed in Exhibit D, to access the Service for Mobile & Tablet Queries; or (d) except for explicitly approved mobile Syndicated Sites listed in Exhibit D, enter into any type of arrangement with a third party where either party receives a financial benefit in connection with the Results or Ad revenue for Mobile & Tablet Queries. Upon notice from Google, Company will immediately cease accessing, and cease allowing any third party to access, the Service, in violation of Section 2.4(a)-(d) above, on or through any End User device identified by Google as a Mobile Device or Tablet Device. For the avoidance of doubt, nothing in this Section 2.4 is intended to prevent Company from displaying third party ads on a Results Page. [redacted]

**3. Syndication Limits, Restrictions, and Compliance.**

3.1. Syndication Limits.

(a) Within the first 45 days when Google and the Company are preparing to launch the Service, Company must provide Google and the Technical Committee with twelve months of Monthly Forecasts and Peak QPS, for review. If the Technical Committee approves Company's Monthly Forecasts and Peak QPS, Google will use them to accommodate Peak QPS for the Service. For each subsequent year the Company

[redacted]

receives the Service, Company will provide an updated set of twelve months of Monthly Forecasts and Peak QPS for the Technical Committee to review and approve. Google will work with the Technical Committee to develop reasonable protocols that safeguard the Monthly Forecasts' commercially sensitive information.

(b) If Company consistently falls below its Monthly Forecasts or Peak QPS for a period of three months or longer, Google may request that the Technical Committee revise the Monthly Forecasts or Peak QPS for the remainder of any given year.

(c) Any increase to the Company's Monthly Forecasts or Peak QPS must be approved by the Technical Committee. Google requires the Company to provide at least three months notice should the Company seek to increase any Monthly Forecast by less than 5% of its forecasted Peak QPS. Google requires the Company to provide at least six months notice should the Company seek to increase any Monthly Forecast by more than 5% of its forecasted Peak QPS.

(d) Company warrants that the Monthly Forecasts and Peak QPS provided to Google and the Technical Committee are accurate estimates made in good faith.

(e) Google will not be obligated to make the Service available in excess of the Peak QPS limits in the Monthly Forecasts approved by the Technical Committee.

3.2. **Restrictions.** Company will not, and will not knowingly or negligently allow any third party to:

(a) modify, obscure, or prevent the display of all, or any part of, any Results;

(b) edit, filter, truncate, append terms to, or otherwise modify any Query;

(c) implement any click tracking or other click monitoring of Results except as provided in Section 5 (Click Tracking) below;

(d) display any Results in pop-ups, pop-unders, exit windows, expanding buttons, animation, or other similar methods;

(e) interfere with the display of, or frame, any Results Page or any page accessed by clicking on any Results;

(f) display any content between any Results and any page accessed by clicking on those Results or place any interstitial content immediately before any Results Page containing any Results;

(g) enter into any type of arrangement under which a third party and Company [redacted] (including any co-branding, white labeling or sub-syndication arrangement), [redacted] For the avoidance of doubt, nothing in this Section 3.2(g) is intended to prevent Company from displaying third party ads on a Results Page;

(h) directly or indirectly, (i) offer incentives to End Users to generate impressions, Requests, or clicks on Results, (ii) deceptively generate impressions, Requests, or clicks on Results or (iii) modify impressions, Requests, or clicks on Results;

(i) "crawl", "spider", index or in any non-transitory manner store or cache, or use in any manner Results (or part thereof) or other information obtained by Company through use of the Service beyond what is necessary to present Results to the End User who submitted the associated Query. For the avoidance of doubt, this provision prohibits reverse engineering or using the Service (including any Results) to ground or train any model;

(j) except for content provided by Google, display on any Site or Approved Client Application, any content that violates or encourages conduct that would violate the Google Program Guidelines, the Google Branding Guidelines, the Google Technical Protocols, or the Client Application Guidelines, ("**Unacceptable Content**"), [redacted]

[redacted]

(l) use the Service to directly or indirectly monetize error pages. Indirect monetization of error pages includes, but is not limited to, having a search box or text links on error pages that resolve to pages containing Ads. Errors include, but are not limited to, DNS errors or HTTP response codes of types 3xx, 4xx, or 5xx;

(m) Without limiting the scope of its other obligations under the Agreement, Company shall ensure that it has obtained or observed relevant rights to any third party content provided on any search results page, including, but not limited to, any applicable terms of service, or observing the industry practice known as the robots exclusion protocol, as further described at http://www.robottxt.org. Company shall obtain or observe such rights in good faith use of user agents, source addresses, crawl rates and so forth. This clause shall be without prejudice to the other provisions in this Section 3.2.

(n) **Customer Content.** [redacted]

3.3. **Compliance.**

(a) Company will not knowingly or negligently allow any use of or access to the Service through any Site, Approved Client Application, or Syndicated Property that is not in compliance with the terms of this Agreement. Company will use commercially reasonable efforts to monitor for any such access or use and will, if any such access or use is detected, take all reasonable steps requested by Google to disable this access or use.

(b) If Company is not in compliance with this Agreement at any time, Google may with notice to Company (such notice setting forth such noncompliance in reasonable detail), suspend provision of all (or any part of) the Service [redacted] until Company implements adequate corrective modifications as reasonably required and reasonably determined by Google; [redacted]

(c) Google may restrict, suspend, or terminate Company's right to use any RAF in accordance with the RAF Policy, even if Company implements adequate corrective modifications in response to any finding of non-compliance in accordance with Section 3.3(b).

**4. Client Applications.** Company will, and will ensure that all Approved Client Application(s) and all Syndicated Approved Client Applications will, comply with the Google Program Guidelines and the Client Application Guidelines, as provided by Google to Company from time to time. When evaluating the rights and obligations of Syndicated Approved Client Applications, any reference in the Guidelines listed in the immediately preceding sentence to "Approved Client Applications" will be deemed to apply equally to Syndicated Approved Client Applications. For the avoidance of doubt, all Queries originating from an Approved Client Application must resolve to a Results Page on a Site and all Queries originating from a Syndicated Approved Client Application must resolve to a Results Page on the applicable Syndicated Site.

**5. Click Tracking.** To the extent permitted under the RAF Policy, Company may implement Click Tracking in accordance with the Google Technical Protocols, Google Program Guidelines, and this Agreement. Company is responsible for the implementation and operation of any Click Tracking.

[redacted]

**6. No Exclusivity.** This Agreement is non-exclusive. Provided Company complies with this Agreement, including the Google Program Guidelines and the Google Branding Guidelines, Company may display ads from other ad providers on the Sites or Syndicated Sites.

[redacted]

**8. Client IDs.** Google will provide Company with client IDs and channel IDs, as reasonably requested by Company from time to time. In addition, Company will deploy such number of client IDs as Google may reasonably request. In the event Google provides Company with notice of its election to substitute an existing client ID associated with a Site, Approved Client Application, or Syndicated Property for a new or different client ID, Company will deploy such new or different client ID to the applicable Site, Approved Client Application, or Syndicated Property within five (5) business days of receiving Google's notice, provided that any such change does not materially affect Company's ability to monitor or obtain applicable reports for any such Site, Approved Client Application, or Syndicated Property (or section or page thereof). The Company will use client IDs as reasonably instructed by Google, and will provide such information to Google as Google may reasonably request with respect to the use and application of any client IDs.

**9. Third Party Distribution.**

9.1. **Syndicated Properties.** If the Technical Committee determines that a Syndicated Site or Syndicated Approved Client Application is entitled to use the Service under the Final Judgment, and the Syndicated Properties are approved by Google pursuant to Section 10.3(a), Company may sub-syndicate the Service in accordance with Exhibit D (Sub-Syndication Terms) and, in connection with such sub-syndication, Company may share revenue received hereunder with Subsyndicates.

[redacted]

**10. Changes and Modifications.**

10.1. **By Google**. If Google modifies the Google Program Guidelines, the Google Branding Guidelines, the Google Technical Protocols, the RAF Policy, or the Client Application Guidelines and the modification requires action by Company, Company will take the necessary action no later than 30 days from

[redacted]

receipt of notice from Google (or such longer period as required by applicable law or permitted by Google in writing). [redacted]

10.2. **By Company**. Company will use commercially reasonable efforts to provide Google with at least 15 days prior notice of any change in code or serving technology that could reasonably be expected to affect the delivery or display of any Results, [redacted]

10.3. **Site and Approved Client Application List Changes.**

(a) Company may notify Google from time to time that it wishes to add or remove URL(s) to the Site(s) or add or remove Client Application(s) to the Approved Client Application(s), in each such case, by sending notice to Google at least 45 days before Company wishes the addition or deletion to take effect. Google may approve or disapprove a request to add a URL or Client Application in its reasonable discretion, this approval or disapproval to be in writing. Regardless of whether Google approves a URL or Client Application, Google will not be obligated to provide the Service to that URL or Client Application until the Technical Committee determines that the URL or Client Application is entitled to use the Service under the Final Judgment.

(b) If there is a change in control of any Site or Approved Client Application (such that the conditions set out in Section 2.3(b)(i) or 2.3(b)(ii) are not met) or of any Syndicated Property (such that the conditions set out in Section 2.3(c) are not met):

(i) Company will provide notice to Google at least 30 days before the change; and

(ii) from the date of that change in control of the Site, Approved Client Application, or Syndicated Property, that Site, Approved Client Application, or Syndicated Property will be treated as removed from this Agreement. Company will ensure that from that date, the Service is no longer implemented on that Site, Approved Client Application, or Syndicated Property.

**11. Data.**

11.1. **Definition of Company Data.** As between Company and Google, any data or information sent by Company to Google during the Term, including, without limitation, data or information submitted as a Request to Google ("Company Data"), will remain the property of Company.

11.2. **Definition of Google Data.** As between Company and Google, any data or information collected by Google, including, without limitation, data or information from clicks on the Ads displayed on the Site or a Syndicated Site ("Google Data"), will remain the property of Google.

11.3. **Permitted and Prohibited Uses.**

(a) **Company Data.** [redacted]

[redacted]

(b) **Google Data.** [redacted]

(c) **Data Shared with Advertisers.** [redacted]

[redacted]

[redacted]

(d) **Legally Required Uses.** Notwithstanding the foregoing or anything to the contrary herein, Google may use the Google Data, and either party may use the Company Data to the extent required by law, in order to comply with legal process, preventing fraud or imminent harm, and ensuring the security of its network and Services.

**12. Intellectual Property.** Except to the extent expressly stated otherwise in this Agreement, neither party will acquire any right, title, or interest in any Intellectual Property Rights belonging to the other party, or to the other party's licensors.

**13. Brand Elements.**

[redacted]

[redacted]

**14. Payment.**

14.1. Payments.

[redacted]

[redacted]

[redacted]

(c) **Payor.** In accordance with applicable laws and regulations, Google operates multiple local Google Affiliates to process transactions, and payments from Google to Company may be made by one or more of these Google Affiliates, which will satisfy Google's payment obligations under this Agreement.

14.2. **Taxes.** [redacted]

14.3. **Currency & Bank Charges.** [redacted]

14.4. **Offsets & Withholding.** [redacted]

**15. Warranties; Disclaimers.**

[redacted]

**16. Indemnification.**

[redacted]

[redacted]

**17. Limitation of Liability.**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**18. Confidentiality; Publicity.**

18.1. **Confidentiality**. The recipient will not disclose the other party's Confidential Information, except to Affiliates, employees, agents, professional advisors, or third-party contractors ("**Delegates**") who need to know it and who have a legal obligation to keep it confidential. The recipient will use the other party's Confidential Information only to exercise rights and fulfill obligations under this Agreement while using reasonable care to protect the Confidential Information. The recipient will ensure that its Delegates are also subject to the same non-disclosure and use obligations. The recipient may disclose Confidential

[redacted]

Information when required by law after giving reasonable notice to the other party, and the opportunity to seek confidential treatment, a protective order or similar remedies or relief prior to disclosure, if permitted by law.

18.2. **Exceptions.** Notwithstanding Section 18.1 (Confidentiality), Google may (a) inform advertisers of Company's participation in the Service; and (b) share with advertisers Site-specific and Approved Client Application-specific statistics, the Site URL, the name and platform of the Approved Client Applications, and related information collected by Google through its provision of the Service to Company. Disclosure of information by Google under this Section 18.2 will be subject to the terms of the Google Privacy Policy located at the following URL: http://www.google.com/privacypolicy.html (or a different URL Google may provide to Company from time to time).

18.3. **Subsyndicates.** [redacted]

18.4. In the event that Company is required to file a copy of this Agreement or a summary of this Agreement with the Securities and Exchange Commission, Company will seek confidential treatment for any such filing, will give Google reasonable prior notice and opportunity to review any such filing so that Google may provide Company with specific redaction requests, and will use its reasonable efforts to redact the Agreement (including as to all Google redaction requests) or alternatively provide an agreement summary, in each case if and to the extent permitted by applicable laws and regulations.

18.5. **Publicity.** Neither party may make any public statement regarding this Agreement without the other's written approval.

**19. Term and Termination.**

19.1. **Term.** The term of this Agreement is the Term stated on the front pages of this Agreement, unless earlier terminated as provided in this Agreement.

19.2. **Termination.**

(a) **Termination for Convenience.** Company may terminate this Agreement for convenience at any time with notice to Google.

(b) Google may terminate this Agreement immediately if Company is no longer entitled to receive the Services under the Final Judgment, including if Google is no longer required to offer the Service under the Final Judgment.

(c) **Termination for Cause.** [redacted]

[redacted]

[redacted]

[redacted]

(d) Breach of terms and conditions of this Agreement by a Subsyndicate or Syndicated Property will be handled under Exhibit D (Terms for Syndicated Properties).

(e) Google may terminate this Agreement, or the provision of the Service, immediately with notice if pornographic content that is illegal under U.S. law is displayed on any Site, Approved Client Application, or Syndicated Property.

[redacted]

(f) If Google in good faith believes Company is in breach of the terms of this Agreement, Google may exercise its rights under the Agreement. Before exercising such rights, Google shall first provide simultaneous notice to the Technical Committee and the Plaintiffs of the breach and the actions Google is taking in light of the breach. Google shall provide this notice in time such that Plaintiffs have a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, Google may not take any action until the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. Google may seek expedited consideration from the Court if the circumstances warrant such treatment.

[redacted]

**20. Miscellaneous.**

20.1. **Compliance with Laws**. Each party will comply with all applicable laws, rules, ordinances, judicial and administrative orders, and regulations in exercising its rights and fulfilling its obligations under this Agreement.

20.2. **Notices**. All notices must be in English and in writing. Notices of termination or breach must (a) be addressed to the other party's primary point of contact and to the other party's Legal Department, which for Google is [redacted]; and (b) reference this Agreement's title and Effective Date. All other notices must be addressed to the other party's primary contact. Emails are written notices. Notice will be treated as given on receipt, as confirmed by written or electronic records.

20.3. **Approval Standards; Application of Requirements.** [redacted]

20.4. **Assignment**. Neither party may assign any part of this Agreement.

20.5. **Change of Control**. Upon the earlier of (a) entering into an agreement providing for a change of control (for example, through a stock purchase or sale, merger, asset sale, liquidation or other similar form of corporate transaction), (b) the board of directors of Company recommending its shareholders approve a change of control, or (c) the occurrence of a change of control (each, a "Change of Control Event"), the Company will notify the Technical Committee and Google. Google will suspend the Service until the Technical Committee conducts the certification process required by the Final Judgment and certifies that the Company is still certified as such after the Change in Control Event.

[redacted]

20.7. **Equitable Relief**. Nothing in this Agreement will limit either party's ability to seek equitable relief.

20.8. **Entire Agreement; Amendments.**

[redacted]

(i) Google shall provide simultaneous notice to the Technical Committee and the Plaintiffs of any such amendment and allow Plaintiffs a reasonable period of time to raise objections. If Plaintiffs object and seek a resolution by the Court, the amendment will not be effective until a date after the later of (i) two weeks after Plaintiffs seek Court intervention, if the Court does not act, or (ii) until further order of the Court, if the Court intervenes. Google may seek expedited consideration from the Court if the circumstances warrant such treatment, in which case the amendment will not be effective until a date after the expedited proceedings are completed.

20.9. **No Waiver**. Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

20.10. **Severability**. If any term (or part of a term) of this Agreement is invalid, illegal or unenforceable, the rest of the Agreement will remain in effect.

20.11. **Survival**. The following sections of this Agreement will survive any expiration or termination of this Agreement: 11 (Data), 12 (Intellectual Property), [redacted] 18 (Confidentiality; Publicity), [redacted], and 20 (Miscellaneous).

20.12. **No Agency**. This Agreement does not create an agency, partnership, or joint venture between the parties.

20.13. **No Third Party Beneficiaries**. This Agreement does not confer any benefits on any third party unless it expressly states that it does.

20.14. **Force Majeure**. Neither party will be liable for failure or delay in performance to the extent caused by circumstances beyond its reasonable control.

20.15. **Signatures**. The parties may sign this Agreement using counterparts and electronic copies as originals. The parties may also sign this Agreement electronically if permitted by applicable law.

[redacted]

Signed:

| **Google** | **Company** |
|---|---|
| By: | By: |
| Print Name: | Print Name: |
| Title: | Title: |
| Date: | Date: |

[redacted]

**EXHIBIT A**

**Sites and Approved Client Applications:**

For clarity, all Sites and Approved Client Applications deemed approved under this Exhibit A remain subject to compliance with this Agreement, and nothing in this Agreement is intended to approve any implementation that is not compliant with this Agreement (including any applicable policies and guidelines) or to relieve Company of the obligation to correct any non-compliant Sites or Approved Client Applications.

Nothing in this Agreement restricts Google's right to, at any time, cease provision of Service to non-compliant Sites or Approved Client Applications, including those listed as approved under this Exhibit A.

[redacted]

**EXHIBIT B**

**CURRENCY: USD**

[redacted]

**REVENUE SHARE PERCENTAGE:**

**<u>Company-owned Sites: Effective Date - September 30, 2027</u>**

**Desktop**

[redacted]

**Mobile and Tablet**

[redacted]

**<u>Company-owned Sites: October 1, 2027 - Expiry of Term</u>**

**Desktop**

[redacted]

[redacted]

**Mobile and Tablet**

[redacted]

**<u>Syndicated Properties - Effective Date - September 30, 2027</u>**

**Desktop**

[redacted]

**Mobile and Tablet**

[redacted]

**<u>Syndicated Properties - October 1, 2027 - Expiry of Term</u>**

**Desktop**

[redacted]

[redacted]

**Mobile and Tablet**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**[OPTIONAL] EXHIBIT D**

**Sub-Syndication Terms**

**1. Conditions to Permitted Distribution.** [redacted]

[redacted]

2. **Syndication Agreement Requirements.** [redacted]

3. **Reports.**

[redacted]

[redacted]

**4. Notice of Syndicated Agreement Termination.** [redacted]

**5. Suspension and Termination.** [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**6. Policy Updates.** [redacted]

**7. Payment; Fees.** [redacted]

**8. No Rights Under this Agreement.** [redacted]

**9. Order of Precedence.** [redacted]

[redacted]

**Attachment 1 to Exhibit D**

**Syndicated Properties**

| **Syndicated Site and Syndicated Approved Client Application Owner(s)** | **Search Results Page/Site URL** | **Client Application** |
| --- | --- | --- |
| | | |
| | | |

Any URLs or Client Applications listed in this Attachment 1 to Exhibit D are subject to the terms that apply to Syndicated Sites or Syndicated Approved Client Applications.

For clarity, all Syndicated Sites and Syndicated Approved Client Applications deemed approved under this Exhibit D remain subject to compliance with this Agreement, and nothing in this Agreement is intended to approve any implementation that is not compliant with this Agreement (including any applicable policies and guidelines) or to relieve Company of the obligation to correct any non-compliant Syndicated Sites or Syndicated Approved Client Applications. Nothing in this Agreement restricts Google's right to, at any time, cease provision of the Service to non-compliant Syndicated Sites or Syndicated Approved Client Applications, including those listed as approved under this Exhibit D.

[redacted]

# [OPTIONAL] EXHIBIT E
## Additional Provisions for Permitted Sites

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]