# Exhibit 4

[redacted]

[redacted]

**[TEMPLATE] QUALIFIED COMPETITOR SYNDICATION LICENSE AGREEMENT**

This Qualified Competitor Syndication License Agreement ("**Agreement**") is entered into this ___ day of ____, [2026] by and between _____________ ("**Signatory**") and Google LLC ("**Google**") (collectively, "**Parties**"). The effective date of this Agreement shall be the date on which Signatory executes this Agreement (the "**Effective Date**").

RECITALS

A. WHEREAS, the United States District Court for the District of Columbia (the "**Court**"), Judge Amit P. Mehta, has entered a Final Judgment (ECF No. 1462, "**Final Judgment**") in *United States of America et al. v. Google LLC* (Civil Action No. 20-3010 (APM)) and *State of Colorado et al. v. Google LLC* (Civil Action No. 20-3715 (APM)) (collectively, "**Underlying Consolidated Cases**"), which, among other things, requires Defendant Google to take or refrain from taking certain actions and further provides for the appointment of five members of a Technical Committee ("**TC**") to assist the Plaintiffs in the Underlying Consolidated Cases (collectively, "**Plaintiffs**") in the enforcement of Google's compliance with the Final Judgment;

B. WHEREAS, Section IX.V of the Final Judgment provides for the certification of Qualified Competitors, as defined below;

C. WHEREAS, Signatory has been certified as a Qualified Competitor pursuant to Section IX.V of the Final Judgment for the period [CERTIFICATION EFFECTIVE DATE] through [CERTIFICATION EXPIRATION DATE], subject to periodic recertification;

D. WHEREAS, Sections V.A–B of the Final Judgment require that Google shall make available to Qualified Competitors certain information and data related to its web and mobile search services via syndication through real-time APIs and subject to a license governing the terms of syndication;

E. WHEREAS, Section VI.B of the Final Judgment requires that Google shall make available to Qualified Competitors its syndication services for Search Text Ads—as defined in the Final Judgment—subject to a license governing the terms of syndication; and

F. WHEREAS, the Parties to this Qualified Competitor Syndication License Agreement intend to be legally bound.

NOW, THEREFORE, in consideration of the mutual promises contained herein and pursuant to the Court's Final Judgment, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

[redacted]

AGREEMENT

1. Definitions. As used in this Agreement, the following terms shall have the following meanings:

1.1. "**Ad Revenues**" means, for any period during the Agreement Term, revenues ~~generated~~that are recognized by Google in connection with ~~the~~Signatory's or its Affiliate(s)' use of ~~any~~the Search Text Advertising Service(s) ~~by Signatory or its Affiliate(s) which are~~ and attributed to Search Text Ads ~~provided through such~~ in that period. For avoidance of doubt, this Definition extends to all revenues generated in connection with Signatory's or its Affiliate(s)' use of the Search Text Advertising Service(s) ~~in that period. Notwithstanding the foregoing, if advertisers buy~~and attributed to Search Text Ads ~~at~~for a ~~fixed or aggregated price, then~~given period, except that Google may withhold or claw back Ad Revenues ~~for those Search Text Ads~~generated from spam, bot traffic, or other fraudulent activity, and only if Google first (a) notifies Plaintiffs and the TC of its intent to withhold or claw back such Ad Revenues at least thirty (30) days in advance of taking such action and (b) provides Plaintiffs with an opportunity to audit and object to Google's withholding or clawing back of Ad Revenues. In the event Google receives an objection from Plaintiffs under this Definition, Google will ~~be calculated~~not withhold or claw back any Ad Revenues subject to objection until such objection is resolved between Google and Plaintiffs or as ~~if such advertisers had paid the final price for the provision of~~ otherwise ordered by the ~~Search Text Ad in accordance with the definition above~~Court.

1.2. "**Affiliate**" means, as applied to Signatory, any entity, other than Signatory, that has been expressly included within the scope of Signatory's certification or recertification as a Qualified Competitor pursuant to Section IX.V of the Final Judgment; provided, however, that the Parties to this Agreement will include or exclude any entity from the scope of this definition if the TC so instructs after receiving Signatory's change of control notice under Section 15. As applied to Google, this Definition means any entity that directly or indirectly controls, is controlled by, or is under common control with, Google.

1.3. "**Click Tracking**" means click tracking or other click monitoring of Search Text Ads or Search Text Ad Sets on the Sites and Client Applications by Signatory or its Affiliate(s).

~~1.3.~~1.4. "**Client Application**" means any application, plug-in, helper, Search Access Point, component, or other executable code that runs on an End User's desktop computer, mobile device, or other device incorporating a Search Access Point (or any subsequent version of such application) listed in Exhibit A of this Agreement.

[redacted]

~~1.4.~~1.5. "**Covered Query**" means a Query that originated from an End User in the United States and was submitted through a Site or Client Application.

~~1.5.~~1.6. "**Disclosed Remedies Information**" means any information or data listed in Exhibit B or provided pursuant to a Service listed in Exhibit B that must be provided to Signatory and its Affiliate(s) by Google pursuant to this Agreement, and over which Signatory or its Affiliate(s) have possession, custody, or control.

~~1.6.~~1.7. "**End User**" means an individual human end user ~~whom Signatory or its Affiliate(s) (as appropriate) permit to use the Services,~~of a Site, or a Client Application.

1.8. "**GenAI**" or "**Generative AI**" shall have the meaning assigned to it in Section IX.I of the Final Judgment.

~~1.7.~~1.9. **"GenAI Product"** shall have the meaning assigned to it in Section IX.J of the Final Judgment.

1.10. ~~"**Google Program Guidelines**" means the policy and implementation guidelines applicable to the Services and as located at the following URL(s): https://support.google.com/adsense/answer/6068943 (or any different URL(s) or additional URL(s) Google may provide to Signatory and its Affiliate(s) from time to time, provided that Googly also notify Plaintiffs and TC of any different URL(s) or additional URL(s) under this definition prior to providing such URL(s) to Signatory or its Affiliate(s)).~~"**General Search Engine**" or "**GSE**" shall have the meaning assigned to it in Section IX.K of the Final Judgment.

~~1.8.~~

~~1.9.~~1.11. "**Include**" and "**including**" shall be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided.

1.12. "**Monthly Forecast**" means the projected volume of Covered Queries that Signatory, together with its Affiliate(s), expects to send to Google through Requests each month.

1.13. "**Peak QPS**" means the maximum number of Requests a system handles during its busiest single second of traffic during a month.

~~1.10.~~1.14. "**Qualified Competitor**" shall have the meaning assigned to it in Section IX.V of the Final Judgment.

~~1.11.~~1.15. "**Query**" means (a) a text query or prompt entered and submitted by an End User (whether by typing or voice input) into a Search Access Point on any Site, Client

[redacted]

Application, Syndicated Site, or Syndicated Application, including, without limitation, a browser address bar that is configured with a Site as its default search engine (so long as such configuration is in compliance with this Agreement).), or (b) if applicable, a text query from Google's query rewriting features (e.g., "did you mean," "people also ask," and autocomplete) that the End User selects.

1.12.1.16. "**Request**" means a request originating from Signatory, an Affiliate of Signatory, or an End User (as applicable) and sent to Google for a Search Results Set and/or a Search Text Ad Set (as applicable) under any Service(s) described in Exhibit B.

1.13.1.17. "**Search Access Point**" shall have the meaning assigned to it in Section IX.W of the Final Judgment.

1.14.1.18. "**Search Feature**" shall have the meaning assigned to it in Section IX.X of the Final Judgment.

1.15.1.19. "**Search Result**" means an individual search result provided by Google through any Search Service(s) described in Exhibit B in response to a Query or Request.

1.16.1.20. "**Search Results Set**" means a set of one or more Search Results.

1.17.1.21. "**Search Service(s)**" means the information, data, and Search Features that Google must make available to Qualified Competitors via syndication through real-time API(s) under Section V.A of the Final Judgment, as further described in Exhibit B.

1.18.1.22. "**Search Text Ad**" shall have the meaning assigned to it in Section IX.Y of the Final Judgment.

1.19.1.23. "**Search Text Ad Platform**" means any product, service, or platform that displays, serves, issues, syndicates, or otherwise provides Search Text Ads to a General Search Engine or a GenAI Product.

1.20.1.24. "**Search Text Ad Set**" means a set of one or more Search Text Ads provided through any Search Text Advertising Service described in Exhibit B.

1.21.1.25. "**Search Text Advertising Service(s)**" means the Search Text Ads syndication and related services, including any assets, extensions, or similar Search Text Ad variations, that Google must make available to Qualified Competitors under Section VI.B of the Final Judgment, as further described in Exhibit B.

[redacted]

~~1.22.~~1.26. “**SERP**” or “**Search Engine Results Page**” ~~shall have the meaning assigned to it in Section IX.Z of the Final Judgment~~means any Site page or Client Application screen that contains any Search Results.

~~1.23.~~1.27. “**Service(s)**” means the Search Service(s) and/or Search Text Advertising Service(s) (as applicable) that Google shall provide to Signatory and its Affiliate(s) under this Agreement, as further described in Exhibit B.

1.28. “**Signatory Content**” means any content served to End Users that is not provided by Google.

~~1.24.~~1.29. “**Site(s)**” means the website(s) located at the URL(s) listed in Exhibit A of this Agreement, together with any additional URL(s) added under Exhibit A Section 3 (which shall be deemed to be included in Exhibit A as of such addition).

~~1.25.~~1.30. “**Subsyndicate**” means any entity besides Google, Signatory, or an Affiliate of Signatory that owns or operates any website, application, plug-in, helper, Search Access Point, component, or other executable code that runs on an End User’s desktop computer, mobile device, or other device incorporating a Search Access Point (or any subsequent version of such application). For clarity, any sub-syndication provided to Subsyndicate under this Agreement will be limited to the Subsyndicate’s Syndicated Site(s) and Syndicated Application(s).

~~1.26.~~1.31. “**Suspend**” or “**suspension**” means disabling or limiting access to or use of the Services or components of the Services.

~~1.27.~~1.32. “**Syndicated Site(s)**” means any website(s) not owned or operated by Signatory or its Affiliate(s) for which Signatory or its Affiliate(s) may provide sub-syndication under this Agreement, as listed in Exhibit A. For the avoidance of doubt, Sites and Client Applications are not Syndicated Sites.

~~1.28.~~1.33. “**Syndicated Application(s)**” means any application, plug-in, helper, component, or other executable code that runs on an End User’s desktop computer or mobile device (or any subsequent version of such application) that is not owned or operated by Signatory or its Affiliate(s), but for which Signatory or its Affiliate(s) may provide sub-syndication under this Agreement, as listed in Exhibit A. For the avoidance of doubt, Sites and Client Applications are not Syndicated Applications.

~~1.29.~~1.34. “**TC Members**” means the members of the TC who have been appointed to the TC by the Court pursuant to Sections VII.A.1–3 of the Final Judgment.

[redacted]

1.35. "**Unacceptable Content**" means content on a Site, Client Application, Syndicated Site, or Syndicated Application, besides content provided by Google, that violates or encourages conduct that would violate the Google Guidelines and Protocols permitted under Exhibit C Section 5.4.

~~1.30.~~1.36. "**URL**" means a uniform resource locator address to a site on the internet.

2. Agreement Term. The term of this Agreement is five (5) years, starting on the Effective Date, unless terminated earlier in accordance with the terms of this License or extended by Court order ("**Agreement Term**"). For avoidance of doubt, the Agreement Term will not be shortened by the expiration or termination of the Final Judgment unless otherwise ordered by the Court.

3. Syndication to be Provided, Schedule, and Method. Exhibit B describes the Search Service(s) and/or Search Text Advertising Service(s) that Google shall provide to Signatory and its Affiliate(s) under this Agreement, as well as the method, means, and financial terms by which Google shall provide these Services. For the avoidance of doubt, any Search Service(s) made available to Signatory under this Agreement must provide, via real-time API(s), the information and data described in Section V.A of the Final Judgment.

4. Search Services Launch, Implementation, and Maintenance. For any Search Service(s) that Google shall provide to Signatory and its Affiliate(s) under this Agreement, the Parties agree as follows:

4.1. Launch. The Parties to this Agreement will launch the Search Service(s) into live use within thirty (30) days from the Effective Date~~.~~, except that this timeline may be extended (a) as needed to accommodate the Implementation Review Period permitted under Exhibit A Section 3.2, (b) due to reasonable delays caused by Signatory or its Affiliate(s), or (c) as otherwise permitted by Plaintiffs, in consultation with the TC, or by the Court. Google shall provide all Search Service(s) to Signatory and its Affiliate(s) for implementation across all Sites and Client Applications, and Signatory's payment obligations for such implementations described in Exhibit B shall not run until all such Search Service(s) have been implemented across all such Sites and Client Applications. Signatory and its Affiliate(s) will not launch, use, or implement any Search Service(s) provided under this Agreement anywhere other than on a Site or Client Application.

4.2. Implementation.

a. Choice of Requests to Syndicate. Except as otherwise stated in Sections 4.6 and 4.7, Signatory may elect, in its sole discretion, the Queries for which it will issue

[redacted]

Requests to Google for Search Results or Search Results Sets under this Agreement~~.~~, so long as the Requests comply with the terms of this Agreement.

b. Latency; Reliability. Google will provide the Search Service(s) to Signatory and its Affiliates on a non-discriminatory basis, with required latency and reliability according to the terms set forth in Exhibit C Section 2.1; provided, however, that Google's obligations under this Section 4.2.b do not extend to variations in Search Service latency and reliability that result from differences in Service implementation, users, or other such factors outside of Google's control.

c. Required Information Disclosures. Signatory and its Affiliate(s) may determine, in their sole discretion, what and how much information to share with Google regarding their End Users when using any Search Service(s); provided, however, that Google may impose certain disclosure requirements, as set forth in Exhibit C Sections 8 and 9, only as necessary for the purposes of ensuring basic functionality of any Search Service(s), detecting spam and abuse, or as otherwise required for legal or regulatory compliance. For avoidance of doubt, nothing in this Section 4.2.c is intended to limit the availability or implementation of the [redacted] ~~or Non-Personalized Ads~~ described in Exhibit B Section 3.

4.3. Search Service Maintenance.

a. For the remainder of the Agreement Term, Google will make available and Signatory and its Affiliate(s) (as appropriate) will implement and maintain each of the Search Services on each of the applicable Sites and Client Applications in Exhibit A. For clarity, Signatory and its Affiliate(s) may not implement the Services on a property that is not a Site or Client Application. For technical support from Google, Signatory and its Affiliate(s) may contact Google at [redacted] or such other email address or URL ~~as~~ Google may ~~provide~~make available to Signatory ~~from time to time,~~and its Affiliate(s), provided that Google notifies Plaintiffs and the TC in parallel of any alternative email address or URL provided under this Section 4.3.a.

b. Signatory will ensure that, with respect to every Site and Client Application, Signatory or its Affiliate(s) (as appropriate):

i. is the technical and editorial decision maker in relation to each page, including SERPs and each Client Application on which the Search Services are implemented; and

ii. has control over the way in which the Search Services are implemented on each of those SERPs and Client Applications.

[redacted]

c. Signatory will ensure that the Search Services are implemented and maintained by Signatory and its Affiliate(s) in accordance with the ~~applicable Google Program Guidelines, Google technical protocols (if any), and any other technical requirements Google may require; provided, however, that Google shall not impose any requirements under the Google Program Guidelines, Google technical protocols, or any other technical requirements except as permitted under Section VI.B.11 of the Final Judgment. In the event of a conflict between the Google Program Guidelines or Google technical protocols and the terms of this Agreement, the terms of this Agreement will control~~Google Guidelines and Protocols permitted under Exhibit C Section 5.4.

d. Signatory will ensure that, at all times during the Agreement Term, Signatory and its Affiliate(s):

i. Have a clearly labeled and easily accessible privacy policy in place relating to the Site(s) and Approved Client Application(s); and

ii. Provide the End User with clear and comprehensive information about ~~cookies and other~~any information stored or accessed on the End User's device in connection with the Search Services~~, including information about End Users' options for cookie management~~.

e. Signatory and its Affiliate(s) (as appropriate) will use commercially reasonable efforts to ensure that an End User gives consent to the storing and accessing of ~~cookies and other~~ information on the End User's device in connection with the Search Services where such consent is required by law.

4.4. Display and Use Restrictions.

a. Restrictions Generally. Except as otherwise set forth in Exhibit C Sections 2.2 and 2.3, Google will not impose any restrictions or conditions on how Signatory or its Affiliate(s) use, display, or otherwise integrate the Search Service(s), including any information or data made available under such Services. For clarity, except as set forth in Exhibit C Sections 2.2 and 2.3, Signatory and its Affiliate(s) may elect, in their sole discretion, which Search Service components, assets, information, and data to display or use in their own products or services, and they may do so in any manner they choose, including, without limitation, reordering Search Results or Search Service components, assets, information, or data.

b. Display and Use in GenAI Products. Notwithstanding Section 4.4.a, Signatory and its Affiliate(s) may display and use ~~the~~ Search ~~Services to ground~~Results received

[redacted]

under this Agreement within their responses to Covered Queries issued by End Users to GenAI Products owned and operated by Signatory or its Affiliate(s).

c. GenAI Product Training Prohibited. Notwithstanding Section 4.4.b, Signatory and its Affiliate(s) shall not use syndicated Search Results to (i) pre-train, train, fine-tune, or otherwise develop the weights of any large language model or other machine learning model such that syndicated content becomes permanently embedded in model parameters ("**LLM Training**"), or (ii) conduct bulk re-indexing or re-syndication of Search Results as a substitute for independent web crawling or web index development. For avoidance of doubt, single-use retrieval and incorporation of Search Results into a specific response generated by a GenAI Product owned and operated by Signatory or its Affiliate(s) in response to a Covered Query or other actions permitted in Exhibit C Section 2.3 will not constitute LLM Training and are permitted under this Agreement.

4.5. Crawling Restrictions. Pursuant to terms set forth in Exhibit C Section 5 and except as otherwise stated in Section 4.4 and Exhibit C Section 2.3, Google may, at its discretion, place ordinary commercial restrictions on the ability of Signatory and its Affiliate(s) to scrape, index, or crawl any Search Results, Search Results Sets, or other information or data made available as part of the Search Service(s).

4.6. No Sub-Syndication. Signatory and its Affiliate(s) will not sell, license, or otherwise make available to any Subsyndicate any Search Service(s) provided by Google under this Agreement. For clarity, no Affiliate of Signatory will be deemed to be a Subsyndicate under this Agreement.

4.7. Covered Queries. Google shall only be required to provide Search Services in response to Request(s) sent in response to a Covered Query except as otherwise provided herein.

4.8. Signatory Monitoring and Audit Obligations; Tapering Schedule.

a. Monitoring Obligations. For the Agreement Term, Signatory agrees to monitor the frequency and scope of Requests issued by Signatory or its Affiliate(s) to Google for Search Results or Search Results Sets under this Agreement, including (a) the number of total annual Covered Queries, and (b) the number of such Covered Queries for which Signatory or its Affiliate(s) issues a Request or Requests to Google for Search Results or Search Results Sets under this Agreement. On reasonable written notice from the TC pursuant to Section 4.8.b below, Signatory and its Affiliate(s) (as appropriate) will permit the TC to access any information or data collected or monitored under this Section 4.8.a and to independently track, monitor, assess, or evaluate the frequency and scope of Requests issued by Signatory or its Affiliate(s) to Google

[redacted]

under this Agreement. For avoidance of doubt, nothing in this Section 4.8.a is intended to limit or supersede the information sharing obligations set forth in Section 6.~~5~~4.

b. Audit Obligations. For the Agreement Term, Signatory and its Affiliate(s) (as appropriate) agree to undergo periodic audits by the TC of the frequency and scope of Requests described in Section 4.8.a, which may include audits of, without limitation, the frequency and volume of Requests submitted to Google, the total annual Covered Queries received by Signatory and its Affiliate(s), and the percentage of Requests for Search Results or Search Results Sets sent to Google in response to Covered Queries. On reasonable written notice from the TC, Signatory, its Affiliate(s) (as appropriate), and Google will promptly comply with any and all requests made by the TC in relation to such audits, including requests for documents, data, information, or interviews.

c. Tapering Schedule. For a one (1)-year term beginning on the Effective Date, Signatory and its Affiliate(s) will only issue Requests to Google for Search Results or Search Results Sets under this Section 4 in response to a maximum of forty percent (40%) of total annual Covered Queries ("**Initial Tapering Rate**"). For the remainder of the Agreement Term, Signatory and Google agree that the scope and frequency of Requests that Signatory and its Affiliate(s) may issue to Google under this Section 4 will be set according to a schedule to be determined by the Court, Plaintiffs, and the TC in the Underlying Consolidated Cases pursuant to Section V.B.4 of the Final Judgment ("**Tapering Schedule**"); provided, however, that if such Tapering Schedule has not been determined by the end of the one (1)-year term beginning on the Effective Date, Signatory and its Affiliate(s) may continue to issue Requests to Google under this Section 4 in response to a maximum of forty percent (40%) of total annual Covered Queries until such Tapering Schedule is in place or as otherwise ordered by the Court.

d. Incorporation of Tapering Schedule. The Parties to this Agreement agree to incorporate by reference the Tapering Schedule in its entirety. Within five (5) business days of the date on which the Tapering Schedule is approved by the Court in the Underlying Consolidated Cases, Google shall deliver a copy of such Tapering Schedule to Signatory according to the notice procedures set forth in Section 25. Upon receipt by Signatory, the Tapering Schedule shall automatically become a binding part of this Agreement as if fully set forth herein. For clarity, in the event of a conflict between the terms of this Agreement and the Tapering Schedule, once incorporated, the terms of the Tapering Schedule will control.

5. Search Text Advertising Services Launch, Implementation, and Maintenance. For any Search Text Advertising Service(s) that Google shall provide to Signatory and its Affiliate(s) under this Agreement, the parties agree as follows:

5.1. Launch. The parties to this Agreement will launch the Search Text Advertising Service(s) into live use within thirty (30) days from the Effective Date, except that this timeline may be extended (a) as needed to accommodate the Implementation Review Period permitted under Exhibit A Section 3.2, (b) due to reasonable delays caused by Signatory or its Affiliate(s), or (c) as otherwise permitted by Plaintiffs, in consultation with the TC, or by the Court. Google shall provide all Search Text Advertising Service(s) to Signatory and its Affiliate(s) for implementation across all Sites and Client Applications, and Signatory's payment obligations for such implementations described in Exhibit B shall not run until all such Search Text Advertising Service(s) have been implemented across all such Sites and Client Applications. Signatory and its Affiliate(s) will not launch, use, or implement any Search Text Advertising Service(s) provided under this Agreement anywhere other than on a Site or Client Application.

5.2. Implementation.

a. Choice of Requests to Syndicate. Except as otherwise stated in Sections 5.7 and 5.8, Signatory and its Affiliate(s) may elect, in their sole discretion, which Requests to issue to Google for Search Text Ads or Search Text Ad Sets under this Agreement~~.~~, so long as the Requests comply with the terms of this Agreement.

b. Latency; Reliability; Performance. Google will provide the Search Text Advertising Service(s) to Signatory and its Affiliate(s) on a non-discriminatory basis, with required latency, reliability, and performance according to the terms set forth in Exhibit C Section 3; provided, however, that Google's obligations under this Section 5.2.b do not extend to variations in Search Text Advertising Service latency, reliability, or performance that result from differences in Service implementation, users, or other such factors outside of Google's control.

c. Required Information Disclosures. Except as set forth in Exhibit C Sections 8 and 9, Signatory and its Affiliate(s) may determine, in their sole discretion, what and how much information to share with Google regarding their End Users when using any Search Text Advertising Service(s), including what information about an End User to provide when submitting a Request to Google for Search Text Ads or Search Text Ad Sets. For avoidance of doubt, nothing in this Section 5.2.c is intended to limit the availability or implementation of the [redacted] ~~or Non-Personalized Ads~~ described in Exhibit B Section 3.

5.3. Search Text Advertising Service Maintenance.

a. For the remainder of the Agreement Term, Google will make available and Signatory and its Affiliate(s) (as appropriate) will implement and maintain each of the Search Text Advertising Services on each of the applicable Sites and Client Applications in Exhibit A. For clarity, Signatory and its Affiliate(s) may not implement the Search Text Advertising

[redacted]

Services on a property that is not a Site or Client Application. For technical support from Google, Signatory and its Affiliate(s) may contact Google at

[redacted]

or such other email address or URL as Google may may providemake available to Signatory from time to time,and its Affiliate(s), provided that Google notifies Plaintiffs and TC in parallel of any alternative email address or URL provided under this Section 5.3.a).

b. Signatory will ensure that, with respect to every Site and Client Application, Signatory or its Affiliate(s) (as appropriate):

i. is the technical and editorial decision maker in relation to each page, including SERPs and each Client Application on which the Search Text Advertising Services are implemented; and

ii. has control over the way in which the Search Text Advertising Services are implemented on each of those SERPs and Client Applications.

c. Signatory will ensure that the Search Text Advertising Services are implemented and maintained by Signatory and its Affiliate(s) in accordance with the applicable Google Program Guidelines, Google technical protocols (if any), and any other technical requirements Google may require; provided, however, that Google shall not impose any requirements under the Google Program Guidelines, Google technical protocols, or any other technical requirements except as permitted under Section VI.B.11 of the Final Judgment. In the event of a conflict between the Google Program Guidelines or Google technical protocols and the terms of this Agreement, the terms of this Agreement will controlGoogle Guidelines and Protocols permitted under Exhibit C Section 5.4.

d. Signatory will ensure that, at all times during the Agreement Term, Signatory and its Affiliate(s):

i. Have a clearly labeled and easily accessible privacy policy in place relating to the Site(s) and Approved Client Application(s); and

ii. Provide the End User with clear and comprehensive information about cookies and other information stored or accessed on the End User's device in connection with the Search Text Advertising Services, including information about End Users' options for cookie management.

e. Signatory and its Affiliate(s) (as appropriate) will use commercially reasonable efforts to ensure that an End User gives consent to the storing and accessing of

[redacted]

cookies and other information on the End User's device in connection with the Search Text Advertising Services where such consent is required by law.

5.4. Display and Use Restrictions. Except as set forth in Section 5.7 and Exhibit C Section 3.2, Signatory and its Affiliate(s) may only use Search Text Ads and related information provided as part of the Search Text Advertising Service(s) for the purpose of displaying Search Text Ads or Search Text Ad Sets to an End User in response to a Query~~; provided, however, that Google will not impose any restrictions or conditions on how Signatory or its Affiliate(s) use, display, format, or otherwise integrate the Search Text Advertising Service(s), including any Search Text Ads made available under such Services, except as set forth in Exhibit C~~, as further described in the Google Guidelines and Protocols permitted under Exhibit C Section 5.4.

5.5. Crawling Restrictions. Pursuant to terms set forth in Exhibit C Section 5 and except as otherwise stated in Section 45.4 and Exhibit C Section 2.3, Google may, at its discretion, restrict the ability of Signatory and its Affiliate(s) to scrape, index, or crawl any Search Text Ads or Search Text Ad Sets made available as part of the Search Text Advertising Service(s).

5.6. No Preferential Placement. Google will not require, as a condition of providing any Service(s) or otherwise, that Signatory provide any preferential placement or similar treatment to any Search Text Ad or Search Text Ad Set made available under this Agreement as compared to Search Text Ads or Search Text Ad Sets provided by Signatory, its Affiliate(s), or any third party.

5.7. Sub-Syndication. Signatory and its Affiliate(s) may not sell, license, or otherwise make available any Search Text Advertising Service(s) provided by Google under this Agreement to any Subsyndicate unless and until Signatory has been specifically certified as a Qualified Competitor to a Google Search Text Ad Platform under the Final Judgment. The parties will launch any such sub-syndication into live use according the same procedures set forth in Section 5.1; provided, however, that if Signatory is certified as a Qualified Competitor to a Google Search Text Ad Platform after the Effective Date, the time period for launching any sub-syndication into live use will run from the date on which Google receives notice of Signatory's certification as a Qualified Competitor to a Google Search Text Ad Platform. For clarity, no Affiliate of Signatory will be deemed to be a Subsyndicate under this Agreement.

5.8. Covered Queries. Google shall only be required to provide Search Text Advertising Services in response to Requests sent in response to a Covered Query except as otherwise provided herein.

[redacted]

5.9. Advertiser Availability. As of the Effective Date and continuing for the Agreement Term, Google will make the purchase of Search Text Ads syndicated under this Agreement available to advertisers on a non-discriminatory basis comparable to, and no more burdensome than, the availability of any other Google Search Text Ad, including, without limitation, Google Search Text Ads incorporated into AI Overviews and GenAI Products. For avoidance of doubt, Google shall not take any action during the Agreement Term that is intended to decrease the availability of Search Text Ads syndicated under this Agreement to advertisers compared to the availability of any other Google Search Text Ad, including opting advertisers out of the Search Text Advertising Services by default.

5.10. Search Partner Network. As of the Effective Date and continuing for the Agreement Term, Google will promptly include Signatory and any Affiliate of Signatory (as appropriate) in Google's Search Partner Network. Google shall not condition the inclusion of Signatory or any Affiliate of Signatory (as appropriate) in Google's Search Partner Network on any prior, contemporaneous, or future payments, promises, or other such consideration or terms beyond those included in this Agreement.

6. Additional Provisions.

6.1. No Exclusivity. The Parties to this Agreement acknowledge that this Agreement is non-exclusive and that either Party and its Affiliate(s) will be free, during and after the Agreement Term, to engage or contract with third parties for the provision of services similar to the Services.

6.2. Competitive Products and Services Permitted. Except as set forth in Section 4, Section 5, and Exhibit C Sections 2.2, 3.2, 5, 6, and 8, nothing in this Agreement shall be interpreted to prevent, preclude, or otherwise restrict Signatory or its Affiliates from developing, distributing, marketing, displaying, using, licensing, or selling a product or service that competes with any Services. For clarity, Signatory and/or its Affiliates shall be free to use and/or display their own Search Results, Search Result Sets, Search Text Ads, and Search Text Ad Sets, or those of a third party, without limitation, throughout the Agreement Term.

~~6.3. Multiple Requests per Covered Query Permitted. Except as set forth in Exhibit C, Signatory, an Affiliate of Signatory, or an End User (as applicable) may send multiple Requests to Google for any given Covered Query for the purposes of Covered Query refinement, correction, or progressive Search Result or Search Text Ad enhancement.~~

~~6.4.~~6.3. Search Text Ads Auction Change Notice. For any public disclosure of a Search Text Ads auction change that Google makes under Section VI.A of the Final Judgment in the Underlying Consolidated Cases, Google shall, within five (5) business days of the date on which such disclosure is made, deliver a copy of such disclosure to Signatory.

[redacted]

~~6.5.~~6.4. Service Information Logs. Throughout the Agreement Term, Signatory will maintain and log information relevant to the use and implementation of Services by Signatory and its Affiliate(s) in a reasonably accessible format ("**Service Information Logs**"), which Signatory will provide to the TC at least monthly following the launch of the Service(s) under this Agreement. These Service Information Logs must include, at minimum, (a) measurements of Service availability and latency (including measurements collected pursuant to Exhibit C Sections 2.1 and 3.1; (b) logs of Requests sent to Google and Search Results and/or Search Text Ads received in response (including, if applicable, Publisher IDs, Client IDs, Channel IDs, event-level Request IDs, and any response or error code(s) received); and (c) measurements of the Service(s) performance (including, if applicable, network traffic logs, cost-per-click, number of clicks, and conversion metrics). Notwithstanding the foregoing, in the event Signatory receives a request from Plaintiffs or the TC to provide information not included within its Service Information Logs, Signatory will use commercially reasonable efforts to promptly provide such information to Plaintiffs and the TC.

6.5. Syndication Forecasting.

a. Baseline Query Volume Threshold. On or promptly after the Effective Date, Google will notify Signatory of the maximum monthly query volume and Peak QPS that Google can accommodate during the Agreement Term without Signatory providing any Monthly Forecasts or projected Peak QPS under this Section 6.5 ("**Baseline Query Volume Threshold**"); provided, however, that such Baseline Query Volume Threshold must be determined by Google in agreement with Plaintiffs and the TC, or as otherwise ordered by the Court. Google may update or modify the Baseline Query Volume Threshold only in agreement with Plaintiffs, in consultation with the TC, or as otherwise ordered by the Court. If Google updates or modifies the Baseline Query Volume Threshold, Google will notify Signatory in writing of such updated or modified Baseline Query Volume Threshold at least three (3) months in advance of such update or modification taking effect.

b. Forecasting Required. Within the first forty-five (45) days when Google and Signatory, together with its Affiliate(s), are preparing to launch the Services, Signatory will provide Google and the TC with twelve (12) months of Monthly Forecasts and Peak QPS, for review; provided, however, that Signatory is only required to provide Monthly Forecasts and Peak QPS above the Baseline Query Volume Threshold. Signatory warrants that the Monthly Forecasts and Peak QPS provided to Google and the TC are reasonably accurate estimates made in good faith. If the TC approves Signatory's Monthly Forecasts and Peak QPS, Google will use them to accommodate Peak QPS for the Services. Thereafter, on the last business day of each month, and for as long as Signatory receives the Services, Signatory will provide an updated set of twelve (12) months of Monthly Forecasts and Peak QPS (except where such information falls below the

[redacted]

Baseline Query Volume Threshold) for the TC to review and approve. Google will work with Plaintiffs and the TC to develop reasonable protocols that safeguard any commercially sensitive information within the Monthly Forecasts or Peak QPS provided by Signatory, and Google will certify its compliance with any such protocols to Signatory by providing written notice of such certification.

c. Signatory Requests to Update Forecasts. Any increase to Signatory's Monthly Forecasts or Peak QPS provided to Google must be approved by the TC. Google requires Signatory to provide at least three (3) months notice, via the process set forth in Section 6.5.b, should Signatory seek to increase any Monthly Forecast by 10% or less of its forecasted Peak QPS. Google requires Signatory to provide at least six (6) months notice should Signatory seek to increase any Monthly Forecast by more than 10% of its forecasted Peak QPS.

d. No Service Degradation For Exceeding Peak QPS. Signatory's Monthly Forecasts and Peak QPS are provided for capacity planning purposes only. Google's obligations under this Agreement, including its latency and availability obligations under Exhibit C Sections 2.1 and 3.1, shall not be diminished, excused, or otherwise affected by Signatory's or its Affiliate(s)' actual query volume exceeding the Monthly Forecasts or Peak QPS provided under this Section 6.5. Nothing in this Section 6.5 shall be deemed to create any penalty, liability, or adverse consequence for Signatory or its Affiliate(s) in connection with the exceedance of any Monthly Forecast or Peak QPS.

6.6. Query Rewriting Features Permitted. Subject to Exhibit C Section 2.2 and the Google Guidelines and Protocols, Signatory and its Affiliate(s) may implement their own query rewriting features, including features that enable query correction, modification, or expansion, instead of or in addition to using any query rewriting features provided by Google under this Agreement. For avoidance of doubt, Signatory and its Affiliate(s) may implement any query rewriting features permitted under this Agreement within their GSE(s) and/or GenAI Products, and any Requests issued by Signatory or its Affiliate(s) following use of such query rewriting features shall not be deemed to be synthetic queries under this Agreement.

7. Retention of Information and Data by Google.

7.1. Retention for Search Services. Except as set forth in Exhibit C Sections 3.2, 7.1, and 8.3, Google may not, in any way, retain or use for its own products and/or services any Queries, Requests, or other information it obtains from Signatory or Signatory's Affiliate(s) in connection with the Search Service(s). For clarity, nothing in this Section 7.1 shall be interpreted to limit the provision of any Search Service(s) to Signatory or its Affiliate(s) as otherwise set forth herein.

[redacted]

7.2. Retention for Search Text Advertising Services. Google may only retain or use data collected from Signatory or its Affiliate(s) in connection with the Search Text Advertising Service(s) for the purpose of building, improving, and maintaining its Search Text Ad infrastructure and shared ad systems, as further set forth in Exhibit C~~.~~ 3.2, 7.1, and 8.3. For clarity, nothing in this Section 7.2 shall be interpreted to limit the provision of any Search Text Advertising Service(s) to Signatory or its Affiliate(s) as otherwise set forth herein.

8. Effect of Requests by Plaintiffs, TC Members, or Court Upon Google. Google shall promptly stop providing the Service(s) (as applicable) to Signatory and its Affiliate(s) upon a request from the Plaintiffs, TC Members, or the Court. Google shall, within ten (10) business days, resume providing the Service(s) upon a request from the Plaintiffs, TC Members, or the Court to resume providing such Services.

9. Effect of Requests by Plaintiffs, TC Members, or Court Upon Signatory. Signatory shall use best efforts to return or destroy Disclosed Remedies Information within fifteen (15) business days as directed by the Plaintiffs, TC Members, or the Court upon request.

10. Incorporation of Final Judgment. The Parties to this Agreement agree to incorporate by reference the Final Judgment in its entirety. If the Final Judgment is modified, amended, or otherwise altered by the Court or as a result of any appeal of the Underlying Consolidated Cases, Google shall, within five (5) business days of the date on which such modification, amendment, or other alteration occurs, deliver a copy of such modified, amended, or altered Final Judgment to Signatory according to the notice procedures set forth in Section 25. Upon receipt by Signatory, any modifications, amendments, or alterations of the Final Judgment shall automatically become a binding part of this Agreement as if fully set forth herein. For clarity, in the event of a conflict between the terms of this Agreement and the Final Judgment, including any modification, amendment, or other alteration to the Final Judgment, the terms of the Final Judgment will control.

11. Assignment. Neither Party to this Agreement may assign any part of this Agreement without prior written authorization of the Plaintiffs.

12. Capitalized Terms. Capitalized terms used in this Agreement and not specifically defined herein shall have the respective definitions given to them in the Final Judgment.

13. Computing Time. When computing any time period specified in this Agreement: (a) exclude the day of the event that triggers the period; (b) count every day, including intermediate Saturdays, Sundays, and legal holidays; and (c) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday; provided, however, that (1) when

[redacted]

computing any time period listed in terms of business days, exclude intermediate Saturdays, Sundays, and legal holidays; and (2) in the event of a conflict in deadlines between this Agreement and the Final Judgment or related Court order, the deadline in the Final Judgment or related Court order controls.

14. Affiliate Liability. Signatory will be liable for the acts and omissions of each of its Affiliates in connection with any Services provided under this Agreement to the extent any such acts or omissions, if performed by Signatory, would constitute a ~~material~~ breach of, or otherwise give rise to liability under, this Agreement.

15. Change of Control. If Signatory experiences a change of control (including through a stock purchase or sale, merger, or other form of corporate transaction), then the following provisions shall apply:

a. Signatory shall provide written notice of the change of control to the TC, including any changes to Signatory's list of Affiliates, within ten (10) business days after the change of control takes effect. In the event that, following receipt of such notice, the TC so instructs, Signatory and Google shall terminate this Agreement.

b. Signatory and its Affiliate(s) shall immediately cease accepting any Services that are provided by Google under this Agreement, unless the TC expressly authorizes otherwise in writing.

c. Upon receiving notice of Signatory's change of control, Google may request permission from the TC to terminate this Agreement. If the TC grants Google's request, Google may, at its discretion, terminate this Agreement by providing ten (10) business days' notice, in writing, to the TC and Signatory.

16. Termination of this Agreement.

16.1. Signatory Right of Termination. Signatory may terminate this Agreement for any reason by providing fifteen (15) business days' written notice to the TC and Google.

16.2. Google Right of Termination. If Google, in good faith, believes Signatory or its Affiliate(s) have materially breached this Agreement, Google may terminate this Agreement pursuant to the following:

a. Notice Required. At least fifteen (15) business days prior to exercising its rights under this Section 16.2, Google must provide written notice to Signatory, Plaintiffs, and

the TC detailing (i) the provisions of this Agreement that Google believes Signatory and/or its Affiliate(s) have materially breached, and (ii) the actions Google intends to take in response.

b. Effect of Notice. After providing the notice required under Section 16.2.a, Google will not exercise any termination rights or take any related action under this Agreement until the earlier of (i) the date on which Google receives written notice from Plaintiffs that Plaintiffs do not object to termination, or (ii) fifteen (15) business days following Google's provision of notice under Section 16.2.a; provided, however, that if, within fifteen (15) business days of Google providing the notice required under Section 16.2.a, Google receives written notice from Plaintiffs that Plaintiffs intend to object to Google's termination, Google will not exercise any termination rights or take any related action under this Agreement until the later of (i) fourteen (14) days after Plaintiffs seek Court intervention concerning Google's intent to terminate this Agreement, if the Court does not act; or (ii) until further order by the Court, if the Court intervenes.

16.3. Pre-Termination Remediation Permitted. Before either Party exercises its termination rights under this Section 16, such Party may notify the other Party of its intent to exercise its termination rights and request remediation of any alleged breach or noncompliance serving as the basis for terminating this Agreement. Upon receiving such notice, the receiving Party will, within fifteen (15) business days, use commercially reasonable efforts to respond to such notice and either (a) attempt to remedy any alleged breach or noncompliance or (b) reject remediation under this Section 16.3. For avoidance of doubt, nothing in this Agreement, including Section 16.3, is intended to limit or prevent the ability of Signatory or its Affiliate(s) to submit complaints to Plaintiffs and the TC under the Final Judgment.

16.4. Effect of Termination. ~~Upon termination of this Agreement, Google shall promptly cease providing any Services~~Upon expiration or termination of this Agreement, (a) Google shall promptly cease providing any Services, (b) all rights and licenses granted by each Party will cease immediately, (c) if requested, and except as otherwise expressly permitted elsewhere herein, each Party will use commercially reasonable efforts to promptly return to the other Party, or destroy and certify destruction of, all Disclosed Remedies Information; and (d) Google will have no further obligation to provide the Services (including Search Results) to Signatory or its Affiliate(s) or to make any payments with respect to any continued use of the Services by Signatory or its Affiliate(s) following expiration or termination.

16.5. Survival. Upon termination of this Agreement for any reason, including any termination pursuant to a Court order, Sections 1 (Definitions), 9 (Effect of Requests by Plaintiffs, TC Members, or Court Upon Signatory), 11 (Assignment), 12 (Capitalized Terms), 13 (Computing Time), 17 (No Waiver), 18 (No Agency), 19 (No Third-Party Beneficiaries), 23 (Severability), 24 (Governing Law and Forum), 26 (Intellectual Property), 27 (Confidentiality;

[redacted]

Publicity), 28 (Warranties; Disclaimers); 29 (Limitation of Liability), and ~~30~~31 (Indemnification) will survive unless otherwise specifically ordered by Court order.

17. No Waiver. Neither party to this Agreement will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

18. No Agency. This Agreement does not create any agency, partnership, or joint venture between the parties.

19. No Third-Party Beneficiaries. This Agreement does not confer any benefits on any third party unless this Agreement expressly states that it does.

20. Amendment. This Agreement may not be amended absent written permission from Plaintiffs, in consultation with the TC, or from the Court, with such permission identifying with specificity the manner in which this Agreement may be amended. Such permission is valid only with respect to this specific Agreement between Signatory and Google. Any amendment must be in writing, be signed by both ~~parties~~Parties, and expressly state that it is amending this Agreement. Any amendment shall be null and void to the extent it exceeds the scope of the written permission provided by Plaintiffs pursuant to this Section 20.

21. Entire Agreement. This Agreement (together with the Exhibits hereto) constitutes the entire agreement and understanding between the parties hereto with respect to its subject matter and supersedes any and all other prior or contemporaneous agreements, written or oral, between the parties relating to the subject matter herein.

22. Suspension of the Agreement for Decertification.

22.1. Notice Required. Signatory will notify Google, in writing, within five (5) business days of Signatory losing its certification as a Qualified Competitor pursuant to Section IX.V. of the Final Judgment; provided, however, that this notice period will not run until Signatory receives a specific determination, in writing, from the Court, Plaintiffs, or the TC that it is no longer certified as a Qualified Competitor under the Final Judgment.

22.2. Effect of Notice. Thirty (30) days from the date on which Google receives the notice required under Section 22.1, or thirty (30) days from the date on which Google otherwise learns of Signatory losing certification as a Qualified Competitor under the Final Judgment and providing written notice to Signatory of such fact, Signatory and Google agree to suspend all benefits and obligations imposed on either Party relating to the Service(s) provided under this Agreement, subject to Reinstatement under Section 22.3 herein, unless otherwise ordered by the Court. For clarity, and subject to agreement by Signatory and Google, Google may continue to

[redacted]

provide the Services to Signatory or its Affiliate(s) during a period of Suspension under this Section 22, subject to Google's then standard terms and conditions; provided, however, that Google will not be obligated to provide the Services (including Search Results and Search Text Ads) to Signatory or its Affiliate(s) or make any payments with respect to the continued use of the Services by Signatory or its Affiliate(s) during a period of Suspension.

22.3. Reinstatement. If Signatory is recertified as a Qualified Competitor pursuant to Section IX.V of the Final Judgment following a period of suspension, the parties agree to reinstate this Agreement in its entirety within ten (10) business days of Google learning of such recertification or Google receiving written notice by Signatory of such recertification, whichever comes earlier. For clarity, Google will reinstate provision of the Services under this Section 22.3 using the most recent Monthly Forecasts and Peak QPS provided by Signatory and approved by the TC under Section 6.5.b.

23. Severability. If any part of this Agreement is found to be illegal or unenforceable, the Agreement may be terminated upon notice from Plaintiffs or TC Members to the Parties. Absent a notice of termination from Plaintiffs or TC Members, the rest of the Agreement (i.e., any part not found to be illegal or unenforceable), will remain in full effect.

24. Governing Law and Forum. This Agreement is governed in all respects by the federal common law of the United States of America or, to the extent that the Court deems it necessary to resort to the laws of another jurisdiction, the law of the District of Columbia. Pursuant to Section XI.A of the Final Judgment, all disputes arising under this Agreement shall be brought in the Court, which shall have exclusive jurisdiction over disputes under this Agreement. As to all such disputes, the Parties to this Agreement consent to the personal jurisdiction of such Court.

25. Notices. Any notices or other communications required to be given under this Agreement will be deemed to have been properly given if sent by mail ~~and~~or email to the applicable party or entity at its addresses below (or to such other address as to which such party or entity shall hereafter notify the other party or parties~~):~~), provided that such notice references this Agreement's title and Effective Date:

*If to Google, to:* [redacted]

~~[Name]~~
~~[Address]~~
~~[City, ST ZIP]~~
~~[Phone]~~
~~[Email]~~

[redacted]

*If to Signatory or its Affiliate(s), to:*

[Name]
[Address]
[City, ST ZIP]
[Phone]
[Email]

*If to the TC, to:*

[Name]
[Address]
[City, ST ZIP]
[Phone]
[Email]

*If to Plaintiffs, collectively to:*

Danielle Hauck
Travis Chapman
Claire M. Maddox
Grant Fergusson
Emma Waitzman
Ryan Karr
U.S. Department of Justice
Antitrust Division
Technology & Digital Platforms Section
450 5th St NW
Washington, D.C. 20530
(202) 307-3954
Danielle.Hauck@usdoj.gov
Travis.Chapman@usdoj.gov
Claire.Maddox@usdoj.gov
Grant.Fergusson@usdoj.gov
Emma.Waitzman@usdoj.gov
Ryan.Karr@usdoj.gov

Jonathan B. Sallet
Colorado Office of the Attorney General
1300 Broadway, 7th Floor

[redacted]

Denver, CO 80203
Telephone: (720) 508-6000
E-Mail: Jon.Sallet@coag.gov

Jayme Weber
Arizona Office of the Attorney General
400 West Congress, Ste. S-215
Tucson, Arizona 85701
Telephone: (520) 628-6609
E-Mail: Jayme.Weber@azag.gov

Sarah Mader
Office of the Attorney General of Ohio
30 E Broad Street, 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
E-Mail: Sarah.Mader@ohioago.gov

Tyler Corcoran
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-8722
E-Mail: Tyler.Corcoran@ag.tn.gov

26. Intellectual Property. [redacted]

[redacted]

27. Confidentiality; Publicity.

27.1. Confidentiality. Except with the prior written consent of the disclosing Party, the recipient of any information pursuant to this Agreement that is marked as confidential or would reasonably be considered confidential information under the circumstances (“**Confidential Information**”) will not disclose that Confidential Information, except to Affiliates, employees, agents, or professional advisors who need to know it and who have agreed in writing (or in the case of professional advisors are otherwise bound) to keep it confidential. The recipient will ensure that those people and entities use Confidential Information only to exercise rights and fulfill obligations under this Agreement, while using reasonable care to keep the Confidential Information confidential. The recipient may also disclose Confidential Information when required by law or Court order after giving reasonable notice to the discloser, if permitted by law. ~~For avoidance of doubt,~~

27.2. Exceptions.

a. Notwithstanding Section 27.1, Google may (i) inform advertisers of the participation of Signatory and its Affiliate(s) (as applicable) in the Services; and (ii) share with advertisers Site-specific and Client Application-specific statistics, the Site URL(s), the name(s) and platform(s) of the Client Application(s), and related information collected by Google through its provision of the Search Text Advertising Services to Signatory and its Affiliate(s). Disclosure of information by Google under this Section 27.2.a will also be subject to the terms of the Google Privacy Policy located at the following URL: http://www.google.com/privacypolicy.html (or a different URL Google may provide to Signatory from time to time), unless otherwise ordered by the Court. Google shall notify Plaintiffs and the TC upon changing the URL of the Google Privacy Policy described herein.

b. Each Party agrees that the terms of this Agreement, once fully executed, shall be deemed Confidential Information of the other Party; provided that, in addition to the permitted disclosures under Section 27.1, the Parties must disclose the terms of this Agreement to Plaintiffs and the TC, and either Party may disclose the terms of this Agreement (i) if required to do so by law, Court order, or generally accepted accounting principles, (ii) as required to assert its rights hereunder, and (iii) to its own directors, employees, attorneys, accountants, and other advisors on a “need to know” basis and under an obligation of confidentiality no less stringent than set forth herein. Each Party agrees that the disclosing Party will be given prompt notice of any disclosure made pursuant to clause (i) or (ii) above, and that any such disclosure shall be limited to the extent reasonably possible and as permitted by applicable law and/or Court order. Notwithstanding the foregoing, in the event that Signatory or its Affiliate(s) is required to file a copy of this Agreement or a summary of this Agreement with the Securities and Exchange Commission, Signatory will seek confidential treatment for any such filing, will give Google

[redacted]

reasonable prior notice and opportunity to review any such filing so that Google may provide Signatory with specific redaction requests, and will use its reasonable efforts to redact he Agreement (including as to all Google redaction requests) or alternatively provide an agreement summary, in each case if and to the extent permitted by applicable laws and regulations.

27.3. Publicity. Neither Party may issue any press release or make any public statement regarding this Agreement without the other's written approval, except that either Party may make public disclosure as required by applicable law and/or Court order. For avoidance of doubt, statements or disclosures of information to Plaintiffs or the TC shall not be deemed to be public statements under this Section 27.3.

27.4. Subsyndicate Disclosures. Notwithstanding Section 27.1, Signatory may provide Subsyndicate(s) with the following information about their Syndicated Site(s) and Syndicated Application(s): (a) total number of impressions; (b) total number of clicks; (c) revenue share payment made to such Syndicated Site(s) or Syndicated Application(s); and (d) such other information and metrics specific to the Syndicated Site(s) or Syndicated Application(s) as Signatory reasonably believes is necessary for Signatory to comply with its obligations hereunder and Google approves in writing, such approval not to be unreasonably withheld or delayed.

28. Warranties; Disclaimers.

28.1. Warranties Generally. Each Party warrants that (a) it has full power and authority to enter into this Agreement; and (b) entering into or performing under this Agreement will not violate any agreement it has with a third party.

28.2. Signatory Warranties. Signatory warrants that:

a. Signatory, together with its Affiliate(s), will meet all requirements set by the Court or Plaintiffs, in consultation with the TC, to access the Services at all times during the Agreement Term and will promptly inform Google, Plaintiffs, and the TC of any changes to its business that may affect its eligibility to access the Services; and

b. all information provided by or on behalf of Signatory or its Affiliate(s) to Google, Plaintiffs, or the TC in connection with this Agreement, including information Signatory or its Affiliate(s) provide to gain or maintain access to the Service, is complete, correct, and current.

~~28.2.~~28.3. Disclaimers. Except as expressly provided for in this Agreement and to the maximum extent permitted by applicable law, neither Party makes any warranty of any kind,

[redacted]

whether implied, statutory, or otherwise, and disclaims, without limitation, warranties of merchantability, fitness for a particular use, and noninfringement.

29. Limitation of Liability.

29.1. Limitations.

a. [redacted]

b. [redacted]

29.2. Exceptions to Limitations. [redacted]

30. Force Majeure. Neither Party to this Agreement will be liable for failure or delay in performance to the extent caused by circumstances beyond its reasonable control.

~~30.~~31. Indemnification.

30.1. By Signatory.

a. [redacted]

[redacted]

[redacted]

[redacted] [redacted]

30.2. By Google.

a. [redacted]

b. [redacted]

[redacted]

[redacted]

30.3. General. [redacted]

~~31.~~32. Counterparts. The Parties to this Agreement may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument. The Parties may also sign this Agreement electronically if permitted by applicable law.

[redacted]

Signed by the Parties' authorized representatives on the dates below.

**GOOGLE LLC**

By:

Print Name:

Title:

Date:

**SIGNATORY**

By:

Print Name:

Title:

Date:

[redacted]

## EXHIBIT A: SITES AND CLIENT APPLICATIONS

The parties to this Agreement hereby acknowledge and agree to the following:

1. Sites and Client Applications. For the Agreement Term, Google will make available, and Signatory and its Affiliate(s), as appropriate, will implement and maintain, each of the Service(s) listed in Exhibit B on each of the Site(s) and Client Application(s) listed below:

**REMEDIAL WEB SEARCH SERVICE SITES & CLIENT APPLICATIONS**

**[Signatory] Properties**

*Sites:*
[List of Sites]

*Client Applications:*
[List of Client Applications]

**Properties of [Signatory]'s Affiliate(s)**

*Sites:*
[List of Sites]

*Client Applications:*
[List of Client Applications]

**REMEDIAL IMAGE SEARCH SERVICE SITES & CLIENT APPLICATIONS**

**[Signatory] Properties**

*Sites:*
[List of Sites]

*Client Applications:*
[List of Client Applications]

[redacted]

**Properties of [Signatory]'s Affiliate(s)**

*Sites:*
[List of Sites]

*Client Applications:*
[List of Client Applications]

**REMEDIAL ADSENSE FOR SEARCH SITES & CLIENT APPLICATIONS**

**[Signatory] Properties**

*Sites:*
[List of Sites]

*Client Applications:*
[List of Client Applications]

**Properties of [Signatory]'s Affiliate(s)**

*Sites:*
[List of Sites]

*Client Applications:*
[List of Client Applications]

2. Syndicated Sites and Syndicated Applications. For the Agreement Term and pursuant to Section 5.7 of this Agreement, Signatory and its Affiliate(s), as appropriate, may make available the Search Text Advertising Service(s) listed in Exhibit B on each of the Syndicated Site(s) and Syndicated Application(s) listed below:

**REMEDIAL ADSENSE FOR SEARCH SYNDICATED SITES & APPLICATIONS**

**Syndicated Sites**

[List of Syndicated Sites]

[redacted]

**Syndicated Applications**

[List of Client Applications]

3. Implementation Review; Modifications Permitted. ~~Signatory may, at its discretion, add or remove~~

3.1. Implementation Review Criteria. Prior to any implementation of the Services on a Site~~(s),~~, Client Application~~(s),~~, Syndicated Site~~(s),~~, or Syndicated Application~~(s) listed in~~ going into live use, Google is permitted to review such implementation for purposes of ensuring (a) basic search syndication functionality; (b) maintaining the quality of Search Text Ads; (c) spam and abuse detection, including prevention of spam, bot traffic, or other fraudulent activity; or (d) legal or regulatory compliance; provided, however, that prior to the Effective Date, Google will notify Plaintiffs and the TC of all criteria it intends to use to review implementations under this Exhibit ~~A by~~ C Section 3.a ("**Implementation Review Criteria**"). If Google wishes to modify the Implementation Review Criteria during the Agreement Term, Google will notify Plaintiffs and the TC at least thirty (30) days prior to the date on which Google wishes the modification to become effective (such notice setting out the proposed modification and the basis for modification in reasonable detail). If, within thirty (30) days of Google notifying Plaintiffs and the TC of its proposed modification(s) to the Implementation Review Criteria, Google receives notice from Plaintiffs that Plaintiffs object to such modification(s), Google agrees not to implement the proposed modification(s) unless and until Plaintiffs confirm the objections have been addressed, or as otherwise ordered by the Court.

3.2. Implementation Review Period. Upon receiving notice under Exhibit A Section 3.3 of an implementation of the Services going into live use, Google will have thirty (30) days to review and, if appropriate, object to any such implementation of the Services on a Site, Client Application, Syndicated Site, or Syndicated Application going into live use ("**Implementation Review Period**"), and Signatory, together with its Affiliate(s), will not bring any implementation into live use during the Implementation Review Period. To exercise its objection rights under this Exhibit A Section 3.2, Google must simultaneously notify Signatory, Plaintiffs, and the TC of its intent to object, the basis for its objection, and what steps Google believes would be required before such implementation goes into live use. If Google objects to an implementation under this Exhibit A Section 3.2, the implementation shall not go into live until (i) Signatory, together with its Affiliate(s), resolves any noncompliance with the Implementation Review Criteria, (ii) Google agrees to withdraw its objection(s), or (iii) as otherwise instructed by the Court, whichever occurs sooner. During any Implementation Review Period or objection period under this Exhibit A Section 3.2, Google shall provide such reasonable assistance and cooperation to Signatory and

[redacted]

its Affiliate(s) (without being required to disclose any sensitive or proprietary information) as Signatory may request to aid in remedying any noncompliance with the Implementation Review Criteria. For avoidance of doubt, Google will not object to any such implementation except on reasonable belief that such implementation violates the Implementation Review Criteria, and if Google does not object to an implementation during the Implementation Review Period, Signatory and its Affiliate(s) (as appropriate) may bring such implementation into live use. Nothing in this Exhibit A Section 3.b is intended to limit or supersede the ability of Signatory or its Affiliate(s) to issue complaints under the Final Judgment.

3.3. Notice of Implementations and Modifications. Signatory may, from time to time, simultaneously notify Google, Plaintiffs, and the TC that it wishes to add or remove URL(s) to the Site(s) or Syndicated Site(s), or add or remove Client Applications or Syndicated Applications, from Exhibit A Section 1; provided, however, that Signatory notifies Google, in writing, of such modification at least thirty (30) days before Signatory wishes the addition or deletion to take effect. Any such modification to the list of Site(s), Client Application(s), Syndicated Site(s), and Syndicated Application(s) in this Exhibit A shall not be treated as an Amendment to this Agreement under Section 20. Google may not ~~reject~~object to any modification to the list of Site(s), Client Application(s), Syndicated Site(s), and Syndicated Application(s) in this Exhibit A Section 1, except as permitted under Exhibit A Sections 3.2 and 3.3.

3.4. Confidentiality Screening for Syndicated Sites and Syndicated Applications. Google agrees to treat any information about Syndicated Sites or Syndicated Applications received under this Agreement as Highly Confidential under the ~~extent~~Protective Order in the Underlying Consolidated Cases, except that Google employees may be provided access to such ~~modification would otherwise violate the terms~~information on a need-to-know basis for the sole purpose and use of ~~this Agreement. At least ten (10) days prior to issuing any such rejection, Google shall provide written notice~~complying with this Agreement, including reviewing and, if appropriate, objecting to implementations under this Exhibit A Section 3. Prior to receiving any information about Syndicated Sites or Syndicated Applications under this Agreement, Google will certify to Signatory, Plaintiffs, and the TC ~~detailing the basis for~~ in writing that it has implemented appropriate confidentiality procedures or mechanisms under this Exhibit A Section 3.4, with such certification including a description of the procedure(s) or mechanism(s) implemented. Google will undertake such ~~rejection.~~reasonable additional steps to comply with this Exhibit A Section 3.4 as may be agreed upon by the Parties or as instructed by Plaintiffs, the TC, or the Court. For avoidance of doubt, Google is not required to disclose any sensitive or proprietary information to Signatory or its Affiliate(s) under this Exhibit A Section 3.4.

[redacted]

## EXHIBIT B: SERVICES TO BE PROVIDED

The Parties to this Agreement hereby acknowledge and agree to the following:

1. Selected Service(s). Signatory may elect, in its sole discretion, which Service(s) listed below to receive under this Agreement, and Google will provide such selected Service(s) to Signatory and its Affiliate(s) according to the methods and financial terms listed below:

**SEARCH SERVICES**

| ☐ **Remedial Web Search ("WS") Service** | **Search Fees** |
|---|---|
| All syndicated web search results and related information, data, and Search Feature content required under Section V.A of the Final Judgment, including user-facing query-rewriting features and Local, Maps, Video, and Knowledge Panel Search Feature content (whether provided via content flags, contextual features, or otherwise).<br><br>The Remedial WS Service will be made available on all Sites and Client Applications via one or more real-time APIs. | $[redacted] per 1,000 Requests for WS Search Results Sets |

| ☐ **Remedial Image Search ("IS") Service** | **Search Fees** |
|---|---|
| All syndicated information, data, and Search Feature content relating to Google's provision of its Images Search Feature(s) under Section V.A of the Final Judgment.<br><br>The Remedial IS Service will be made available on all Sites and Client Applications via one or more real-time APIs. | $[redacted] per 1,000 Requests for IS Search Results Sets. |

[redacted]

## SEARCH TEXT ADVERTISING SERVICES

| ☐ **Remedial AdSense for Search ("AFS")** | **Revenue Share Percentage** |
|---|---|
| All Search Text Ads and related information, data, or content, including assets, extensions, or Search Text Ad variations, made available through Google's commercial ads syndication product(s).<br><br>The Remedial AFS Service will be made available to Signatory and its Affiliate(s) according to Google's standard method(s) for providing ads syndication; provided, however, that at Signatory's sole discretion, Google will alternatively make the Remedial AFS Service available to Signatory and its Affiliate(s) according to the [redacted] described in Exhibit B Section 3. | For Sites and Client Applications: [redacted]% of AFS Ad Revenues in a given month.<br><br>For Syndicated Sites and Syndicated Applications: [redacted]% of AFS Ad Revenues in a given month. |

2. Payment Terms.

2.1. Company Payments.

a. Search Services. The Search Fees owed to Google under this Agreement are additive and will be calculated using the number of Requests for Search Results Sets as reported by Google.

b. Offset. Google may offset the Search Fees payable to Signatory and its Affiliate(s) (as appropriate) under this Agreement against Google's payment obligations to Signatory and its Affiliate(s) (as appropriate) under this Agreement.

c. Invoices. Even if the Search Fees are offset under Exhibit B Section 2.1.b, Google will invoice (or send a statement of financial activity to) Signatory or its Affiliate(s) (as appropriate) for Search Fees in the month after the Search Fees are incurred. Signatory or its Affiliate(s) (as appropriate) will pay the invoice amount, if any, to Google within thirty (30) days

[redacted]

of the date of invoice. For avoidance of doubt, in each invoice or statement of financial activity issued under this Exhibit B Section 2.1.c, Google will list all Search Fees payable to Signatory and its Affiliate(s) (as appropriate), all payments owed by Google to Signatory and its Affiliate(s) (as appropriate), and any offsets calculated for such Search Fees and payment obligations.

d. Invoice Disputes. Signatory and its Affiliate(s) (as appropriate) may dispute invoiced Search Fees if Signatory and its Affiliate(s) (as appropriate) believe in good faith that such Search Fees were inaccurately invoiced (an "**Invoice Dispute**"). Invoice Disputes must be submitted to [redacted] and identify all disputed amounts and the reason for dispute. Google will review in good faith all Invoice Disputes and will provide Signatory and its Affiliate(s) (as appropriate) an explanation of Search Fees due following such review (an "**Invoice Dispute Report**"). If an Invoice Dispute is submitted within thirty (30) days of Signatory and its Affiliate(s) (as appropriate) receiving an invoice under this Agreement (the "**Payment Due Date**"), then (i) Signatory and its Affiliate(s) (as appropriate) must only pay the amounts not subject to the Invoice Dispute by the Payment Due Date, and (ii) unpaid Search Fees stated in an Invoice Dispute Report to be accurately invoiced are due within thirty (30) days after delivery of such report to Signatory and its Affiliate(s) (as appropriate). If an Invoice Dispute is submitted after the Payment Due Date and the Invoice Dispute Report states that Search Fees paid were incorrectly invoiced, then Google will issue a credit equal to the agreed amount. For avoidance of doubt, nothing in this Exhibit B Section 2.1.d is intended to limit or supersede the ability of Signatory and its Affiliate(s) (as appropriate) to submit complaints to Plaintiffs, the TC, or Google under the Final Judgment.

2.2. Google Payments.

a. For each applicable Search Text Advertising Service, Google will pay Signatory and its Affiliate(s) (as appropriate) an amount equal to the Revenue Share Percentage of Ad Revenues attributable to a calendar month. This payment will be made in the month following the calendar month in which the applicable Search Text Ads were displayed.

b. Google's payments for Search Text Advertising Services under this Agreement will be based on Google's accounting, which may be filtered to exclude invalid queries, impressions, conversions, or clicks in each case provided Google does not receive and retain payment from the applicable advertiser for such activity. On reasonable written notice from Signatory, Plaintiffs, or the TC, Google will promptly produce to Signatory, Plaintiffs, or the TC (as appropriate) its accounting for payments under this Agreement, including any filters or exclusions applied.

[redacted]

2.3. All Payments.

a. As between Google and Signatory and its Affiliate(s), Google is responsible for all taxes (if any) associated with the transactions between Google and advertisers in connection with Search Text Ads displayed on the Sites, Client Applications, Syndicated Sites, and Syndicated Applications. Signatory and its Affiliate(s) (as appropriate) are responsible for all taxes (if any) associated with the Services, other than taxes based on Google's net income, net worth, asset value, property value, or employment. All payments to Signatory and its Affiliate(s) (as appropriate) from Google in relation to the Services will be treated as inclusive of tax (if applicable) and will not be adjusted. If Google is obligated to withhold any taxes from its payments to Signatory and its Affiliate(s), Google will notify Signatory of this and will make the payments net of the withheld amounts. Google will provide Signatory with original or certified copies of tax payments (or other sufficient evidence of tax payments) if any of these payments are made by Google.

b. All payments due to Google or to Signatory and its Affiliate(s) (as appropriate) will be in the currency described in the associated invoice, such currency to be determined upon mutual agreement by the Parties. and made by electronic transfer to the account notified to the paying Party by the other Party for that purpose, and the Party receiving payment will be responsible for any bank charges assessed by the recipient's bank. Any charges for converting foreign currency shall be the responsibility of Signatory and its Affiliate(s) (as appropriate) and will be invoiced accordingly. In accordance with applicable laws and regulations, Google operates multiple local Google-affiliated entities to process transactions, and payments from Signatory or its Affiliate(s) to Google may be made to one or more of these Google-affiliated entities as specified by Google, which will satisfy the payment obligations of Signatory and its Affiliate(s) (as appropriate) under this Agreement.

c. In addition to other rights and remedies Google may have, Google may offset any payment obligations to Signatory and its Affiliate(s) (as appropriate) that Google may incur under this Agreement against any undisputed, past due product or service fees owed to Google by Signatory and its Affiliate(s) (as appropriate) under this Agreement. Google may also withhold and offset against its payment obligations under this Agreement, or require Signatory and its Affiliate(s) (as appropriate) to pay Google within thirty (30) days of any invoice, any amounts Google may have overpaid to Signatory and its Affiliate(s) in prior periods.

2.4. SOC 1 Report. Upon written request by Signatory or its Affiliate(s) (as appropriate), and no more than once per calendar year during the Agreement Term, Google will make available to Company a SOC 1, Type 2 report (or similar report with comparable data) from a reputable, independent certified public accounting firm covering the key controls and validation mechanisms in place to meet the revenue reporting obligations under this Agreement.

[redacted]

Such report will be considered Confidential Information of Google under this Agreement, except that Google will, upon reasonable, written notice from Plaintiffs or the TC, provide a copy of any such report made available under this Exhibit B Section 2.4 to Plaintiffs and the TC.

~~3.~~ Privacy-Preserving Alternative Implementation.

[redacted]

[redacted]

[redacted]

~~3.2. Non-Personalized Ads Permitted. In addition to the methods of implementing the Search Text Advertising Service(s) described in Exhibit B Sections 1 and 3.1, Google shall make available to Signatory and its Affiliate(s), at Signatory's sole discretion, the option of receiving non-personalized Search Text Ads under the Search Text Advertising Services ("**Non-Personalized Ads**" or "**NPAs**"). Non-Personalized Ads provided under this Agreement shall conform to the NPA specifications at https://support.google.com/adsense/answer/7670312 (or such URL as Google may may provide to Signatory from time to time, provided that Google notifies Plaintiffs and TC in parallel of any alternative URL provided under this Exhibit B Section 3.2).~~

4. Related Products, Services, and Integrated Features. Within five (5) business days of launching a new, commercially available product, service, or integrated feature that alters, augments, replaces, or otherwise relates to any Service(s) provided under this Agreement, Google shall provide written notice of such new product(s), service(s), or integrated feature(s) to Plaintiffs and the TC. In the event that, following receipt of such notice, Plaintiffs so instruct, Signatory and Google will amend this Agreement according to Section 20 solely to make such

new product(s), service(s), or integrated feature(s) available to Signatory and its Affiliate(s) pursuant to the terms set forth in Sections V and VI of the Final Judgment.

[redacted]

## EXHIBIT C: ADDITIONAL CLAUSES FOR SERVICES TO BE PROVIDED

The Parties to this Agreement hereby acknowledge and agree to the following additional provisions, which are intended to supplement, and not replace or conflict with, Sections 4, 5, 6, and 7 of this Agreement:

1. Additional Definitions. For the purposes of this Exhibit C, the following terms shall have the following meanings:

1.1. "**Duplicate Advertisements**" means URLs (and not advertisers, categories or keywords) that promote Search Text Ads that include the same website, display URL, or advertiser that is promoted in an advertisement displayed or sold by or on behalf of Signatory or its Affiliate(s) as permitted under this Agreement.

1.2. "**Network Issues**" means any outage(s) or latency caused by any third party network connectivity or software that is outside of Google's control.

1.3. "**Search Service Availability**" means the percentage of Requests for Search Results or Search Results Sets sent to Google in response to a Covered Query that are processed by Google under this Agreement.

1.4. "**Search Service Network Latency**" means the round-trip time of a TCP/IP ping packet between a peering address owned or operated by Signatory or its Affiliate(s) and Google's peering address.

1.5. "**Search Text Advertising Service Availability**" means the percentage of Requests for Search Text Ads or Search Text Ad Sets sent to Google under this Agreement that are processed by Google's system within one (1) second.

1.6. "**Server Latency**" means the time period between when Google's system receives a Request for Search Text Ads or Search Text Ad Sets under this Agreement and when Google's system has processed such Request. For clarity, Server Latency does not include any time associated with transmission of the Request for Search Text Ads or Search Text Ad Sets from Signatory or its Affiliate(s) to Google's system or transmission of the applicable Search Text Ads or Search Text Ad Sets from Google's system to Signatory or its Affiliate(s).

[redacted]

2. Additional Clauses for Search Services.

2.1. Required Search Service Latency and Reliability.

a. Required Search Service Availability. For all selected Search Service(s) in Exhibit B, Google will provide Signatory and its Affiliate(s) with [redacted] Search Service Availability over a rolling thirty (30) day period (excluding any Network Issues), as measured and monitored from Google's facilities in the United States.

b. Search Service Network Latency Threshold. Throughout the Agreement Term, Search Service Network Latency will not exceed an average of [redacted] milliseconds over any 10-hour period (excluding any Network Issues) ("**Search Service Network Latency Threshold**"). To measure Search Service Network Latency, Signatory ~~will~~may either (i) install private interconnects at Google's United States-based network meeting places as mutually agreed by the Parties~~.~~, or (ii) implement such other processes and mechanisms agreed upon by the Parties. Upon reasonable notice by the TC, Signatory and Google agree to submit information or data concerning measurements of the Search Service Network Latency, or to grant the TC access to the private interconnects installed under this Exhibit C Section 2.1, and will, if the TC so instructs, modify, update, or otherwise change the method(s) for measuring Search Service Network Latency under this Agreement. Throughout the Agreement Term, Google shall not take any actions that have the effect of slowing Search Service Network Latency, including, without limitation, in circumstances where Search Service Network Latency is below the Search Service Network Latency Threshold, with the intent of approaching or reaching the Search Service Network Latency Threshold, even if doing so would decrease costs for Google.

2.2. Display or Use Restrictions for Search Services. Signatory and its Affiliate(s) (as appropriate~~),~~) may [redacted] Except as expressly approved by Google or the Court in writing, Signatory and its Affiliate(s) will not make more than one (1) Request for Search Results or Search Results Set per Covered Query. Notwithstanding the foregoing, [redacted]

[redacted]

2.3. Additional Terms Permitting Use Within GenAI ~~Product Grounding~~Products. Notwithstanding Sections 4.4, 4.5, 5.4, and 5.5, as well as the terms of this Exhibit C, Google shall not:

a. prohibit Signatory ~~and~~or its Affiliate(s) from temporarily caching Search Results solely for the purpose of ~~grounding any single~~ displaying or using those Search Results as part of a response to a Covered Query ~~generated~~issued by an End User of a GenAI Product owned and operated by Signatory and its Affiliate(s), provided that any such cached content is not stored beyond the duration necessary to complete such response; or

b. treat single-call API retrieval under this Agreement for use ~~in~~within GenAI ~~Product grounding~~Products described in Exhibit C Section 2.3.a as ~~bulk~~ scraping, indexing, or crawling prohibited under this Agreement.

3. Additional Clauses for Search Text Advertising Services.

3.1. Required Search Text Advertising Service Latency, Reliability, and Performance.

a. Search Text Advertising Service Availability. For all selected Search Text Advertising Service(s) in Exhibit B, Google will provide Signatory and its Affiliate(s) with [redacted] Search Text Advertising Availability over a rolling thirty (30) day period (excluding any Network Issues), as measured and monitored from Google's facilities in the United States.

b. Search Text Ad Server Latency Threshold. For all selected Search Text Advertising Service(s) in Exhibit B, Server Latency will not exceed an average of [redacted] milliseconds over any ~~10~~24-hour period ("**Server Latency Threshold**"). Google will work in good faith to find ways to continuously improve Server Latency during the Agreement Term. For avoidance of doubt, Google shall not take any actions throughout the Agreement Term that have the effect of slowing Server Latency, including, without limitation, in circumstances where Server Latency is below the Server Latency Threshold, with the intent of approaching or reaching the Server Latency Threshold, even if doing so would decrease costs for Google.

3.2. Search Text Ads Display or Use Restrictions. [redacted]

[redacted]

3.3. No Dedicated Search Text Ads Software Development Kit (SDK) for Client Applications and Syndicated Applications. Notwithstanding any other terms in this Agreement, Google and Signatory acknowledge and agree that Google does not offer a dedicated mobile application software development kit for the provision of Search Text Ads. Unless otherwise ordered by the Court, Google will not be required to make Search Text Ads available on any Client Applications or Syndicated Applications through any dedicated mobile application software development kit during the Agreement Term. The Parties to this Agreement will collaborate in good faith to implement the Search Text Advertising Service(s) on the Client Application(s) and Syndication Application(s) without the use of a dedicated mobile application software development kit. Google shall provide Signatory and its Affiliate(s) with commercially reasonable technical support and cooperation necessary to enable such implementation, subject to any Google Guidelines and Protocols implemented pursuant to Exhibit C Section 5.4.

4. Escalation of Service Availability and Latency Noncompliance.

4.1. Severity Classifications. For the purposes of this Exhibit C Section 4, the Parties agree to classify any Google noncompliance with Exhibit C Sections 2.1.a, 2.1.b, 3.1.a, or 3.1.b by severity (together, "**Severity Errors**") as follows:

a. A "**Severity 2 Error**" shall mean (i) any Search Service Availability or Search Text Advertising Availability provided by Google under this Agreement that is more than ninety-nine and five-tenths percent (99.5%) but less than the required ninety-nine and nine-tenths percent (99.9%) over a rolling thirty (30) day period (excluding any Network Issues), as

[redacted]

measured and monitored from Google's facilities in the United States, and (ii) any Search Service Network Latency or Server Latency that exceeds an average of 75 milliseconds over any 10-hour period but is less than 99 milliseconds over any 10-hour period.

b. A "**Severity 1 Error**" shall mean (i) any Search Service Availability or Search Text Advertising Availability provided by Google under this Agreement that is ninety-nine and five-tenths percent (99.5%) or less over a rolling thirty (30) day period (excluding any Network Issues), as measured and monitored from Google's facilities in the United States, and (ii) any Search Service Network Latency or Server Latency that exceeds 99 milliseconds over any 10-hour period.

4.2. Responding to Severity Errors. If either Party becomes aware of a suspected Severity 2 Error or Severity 1 Error under this Agreement, such Party will promptly notify the other Party of such Severity Error(s). Upon becoming aware of such Severity Error(s), Google will use commercially reasonable efforts to (a) respond to any such notice provided by Signatory or its Affiliate(s) within thirty (30) minutes (for Severity 2 Errors) or fifteen (15) minutes (for Severy 1 Errors), and (b) resolve such Severity Error within one (1) day (for Severity 2 Errors) or thirty (30) minutes (for Severity 1 Errors).

4.3. Remedy for Noncompliance.

a. If Google fails to resolve a Severity Error within the applicable time period set forth in Exhibit C Section 4.2 such that, during any given thirty (30) day period, Search Text Ads or Search Text Ad Sets are not sent back to Signatory or its Affiliate(s) in response to a Request for Search Text Ads or Search Text Ad Set under this Agreement, then [redacted]

[redacted]

b. [redacted]

5. Policy and Compliance Obligations.

5.1. Policy Obligations. Except as otherwise permitted by this Agreement, including actions permitted under Section 4.4, Section 5.4, Section 6.6, and Exhibit C Section 2.3, Signatory and its Affiliate(s) will not, and will use commercially reasonable efforts to not permit any third party to:

a. modify, obscure, or prevent the display of all, or any part of, any Search Results or Search Text Ads;

b. edit, filter, truncate, append terms to, or otherwise modify any Covered Query;

c. implement any ~~click tracking or other click monitoring of Search Results or Search Text Ads~~Click Tracking, except as provided in Exhibit C Section 6 below;

d. display any Search Results or Search Text Ads in pop-ups, pop-unders, exit windows, expanding buttons, animation, or other similar methods;

[redacted]

e. enter into any type of arrangement with a third party where either party receives a financial benefit in connection with (i) the Search Results or Search Text Ads provided under this Agreement or (ii) any Ad Revenues (including any co-branding, white labeling or sub-syndication arrangement). For the avoidance of doubt, nothing in this Exhibit C Section 5.1.e is intended to prevent Signatory or its Affiliate(s) from displaying, using, or sub-syndicating Search Text Ads under ~~Section 5~~Sections 5.4, 5.6, 5.7, and Exhibit C Section 3 of this Agreement;

f. directly or indirectly, (i) offer incentives to End Users to generate impressions, Requests, or clicks on Search Results and/or Search Text Ads; (ii) fraudulently generate impressions, Requests, or clicks on Search Results and/or Search Text Ads; or (iii) modify impressions, Requests, or clicks on Search Results and/or Search Text Ads;

g. "crawl," "spider," index or in any non-transitory manner store or cache information obtained from the Services (including Search Results and Search Text Ads), beyond what is necessary to present Search Results and/or Search Text Ads in response to a Query;

h. except for content provided by Google, display on any Site or Client Application any content that violates or encourages conduct that would violate the Google ~~Program Guidelines, Google technical protocols, or any other technical requirements; provided, however, that Google shall not impose any requirements under the Google Program Guidelines, Google technical protocols, or any other technical requirements except as permitted under Section VI.B.11 of the Final Judgment. In the event of a conflict between the Google Program Guidelines, Google's technical protocols, or any other technical requirements and this Agreement, the terms of this Agreement will control~~Guidelines and Protocols permitted under Exhibit C Section 5.4;

i. enter into any type of arrangement where a third party other than Subsyndicate receives a payment in connection with Search Text Ads provided under this Agreement (for example, a Subsyndicate's partner). For the avoidance of doubt, Affiliates are not treated as third parties for the purposes of this Exhibit C Section 5.1.i;

j. use the Services to directly or indirectly monetize error pages~~, unless expressly permitted by Google or as otherwise ordered by the Court.~~. Indirect monetization of error pages includes, but is not limited to, having a search box or text links on error pages that resolve to pages containing Search Text Ads. Errors include, but are not limited to, DNS errors or HTTP response codes of types 3xx, 4xx, or 5xx; or

[redacted]

k. serve or display advertisements on or in connection with, or otherwise monetize, SERPs that have Search Results from the Remedial Image Search Service listed in Exhibit B.

5.2. Compliance Obligations. Signatory and its Affiliate(s) will not knowingly or negligently allow any use of or access to the Services through any Site or Client Application that is not in compliance with the terms of this Agreement. Signatory and its Affiliate(s) (as appropriate) will use commercially reasonable efforts to monitor for any such access or use and will, if any such access or use is detected, take all reasonable steps requested by Google to disable this access or use. If Signatory and its Affiliate(s) are not in compliance with this Agreement at any time, Google may with notice to Signatory (such notice setting forth such noncompliance in reasonable detail) suspend provision of all (or any part of) the applicable Services (in as targeted and narrow a fashion as is commercially reasonable to eliminate the problem) until Signatory and its Affiliate(s) (as appropriate) implement adequate corrective modifications as reasonably required and determined by Google or as otherwise ordered by the Court; provided, however, that at least fifteen (15) business days prior to exercising its rightsduring any suspension period, Google shall provide such reasonable assistance and cooperation to Signatory and its Affiliate(s) (without being required to disclose any sensitive or proprietary information) as Signatory may request to aid in remedying the noncompliance. For any notice Google provides to Signatory under this Exhibit C Section 5.2, Google mustshall also provide simultaneous written notice to Signatory, Plaintiffs, and the TC detailing (i) the alleged noncompliance by Signatory and/or its Affiliate(s) and, (ii) the actions Google intends to takeis taking in response. After providing this notice, Google will not exercise any suspension rights, and (iii) the anticipated length of the suspension period. For avoidance of doubt, once Signatory and its Affiliate(s) (as appropriate) implement adequate corrective modifications under this Exhibit C Section 5.2, Google agrees to reinstate any Services suspended under this Exhibit C Section 5.2 or take any related action under this Agreement until the earlier of (i) the date on which Google receives written notice from Plaintiffs that Plaintiffs do not object to suspension, or (ii) fifteen (15) business days following Google's provision of notice under this Exhibit C Section 5.2; provided, however, that if, within fifteen (15) business days of Google providing the notice required under this Exhibit C Section 5.2, Google receives written notice from Plaintiffs that Plaintiffs intend to object to Google's termination, Google will not exercise any termination rights or take any related action under this Agreement until the as soon as possible and no later of (i) fourteen (14)than ten (10) business days after Plaintiffs seek Court intervention concerning Google's intent to suspend this Agreement, if the Court does not act; or (ii) until further order by the Court, if the Court intervenes.such corrective modifications are implemented.

5.3. Signatory Content. For Site, Client Application, Syndicated Site, or Syndicated Application content not controlled by Signatory or its Affiliate(s), Signatory and its Affiliate(s) (as appropriate) will use commercially reasonable efforts to ensure that such content is not

[redacted]

Unacceptable Content. If Signatory or its Affiliate(s) becomes aware that any Site, Client Application, Syndicated Site, or Syndicated Application contains Unacceptable Content, Signatory will have such Unacceptable Content removed as soon as reasonably practicable (not to exceed five (5) days). If Signatory, together with its Affiliate(s), fails to remove Unacceptable Content not controlled by Signatory or its Affiliate(s) within five (5) days of becoming aware of such Unacceptable Content, Google may, with notice to Signatory (such notice setting forth the noncompliance with this Exhibit C Section 5.3 in reasonable detail) suspend provision of all (or any part of) the Services (in as targeted and narrow a fashion as is commercially reasonable to eliminate the problem) until Signatory or its Affiliate(s) (as appropriate) removes the Unacceptable Content; provided, that, during any suspension period, Google shall provide such reasonable assistance and cooperation to Signatory and its Affiliate(s) (without being required to disclose any sensitive or proprietary information) as Signatory shall request to aid in remedying the noncompliance. For avoidance of doubt, once Signatory and its Affiliate(s) (as appropriate) removes the Unacceptable Content, Google agrees to reinstate any Services suspended under this Exhibit C Section 5.2 as soon as possible and no later than ten (10) business days after such Unacceptable Content is removed. Google will not exercise any suspension rights under this Exhibit C Section 5.3 without first notifying Plaintiffs and the TC of Google's intent to exercise such rights (such notice setting forth the noncompliance with this Exhibit C Section 5.3 in reasonable detail) at least three (3) business days in advance.

5.4. Additional Obligations Permitted by Amendment. During the Agreement Term and only pursuant to the Amendment procedures set forth in Section 20 of this Agreement, Google may, at its discretion, propose additional terms to this Agreement for the purposes of (a) basic search syndication functionality; (b) maintaining the quality of Search Text Ads; (c) spam and abuse detection, including reasonable terms to prevent or eliminate spam, bot traffic, or other fraudulent activity; or (d) legal or regulatory compliance ("**Google Guidelines and Protocols**"). For avoidance of doubt, Google shall not propose additional terms to this Agreement that conflict with the Final Judgment.

5.5. Compliance with Laws. Each Party to this Agreement will comply with all applicable laws, rules, ordinances, judicial and administrative orders, and regulations in exercising its rights and fulfilling its obligations under this Agreement.

6. Click Tracking. Signatory and its Affiliate(s) (as appropriate) may implement ~~click tracking~~Click Tracking in accordance with ~~Google's~~ applicable Google technical protocols, ~~the Google Program Guidelines, and this Agreement~~policies, or guidelines; provided, however, that ~~that~~ Google shall not impose any terms or requirements under ~~the Google Program Guidelines, Google technical protocols, or any other technical requirements~~this Exhibit C Section 6 except as permitted under ~~Section VI.B.11 of the Final Judgment. In the event of a conflict between Google's technical protocols or the Google Program Guidelines and this Agreement, the terms of~~

[redacted]

this Agreement will controlExhibit C Section 5.4 herein. Signatory and its Affiliate(s) (as appropriate) are responsible for the implementation and operation of any click trackingClick Tracking.

7. [redacted]

7.1. [redacted]

7.2. [redacted].

7.3. [redacted]

[redacted]

7.4. [redacted]

8. Permitted and Prohibited Uses of Data.

8.1. Definition of Signatory Data. [redacted]

8.2. Definitions of Google Data. [redacted]

8.3. Permitted and Prohibited Uses.

a. Signatory Data. [redacted]

[redacted]

b. Google Data. [redacted]

c. Signatory Click Data. [redacted]

d. Data Shared with Advertisers. [redacted]

e. Legally Required Uses. Notwithstanding the foregoing or anything to the contrary within this Agreement, Google may use Google Data, and either Party may use Signatory Data and Signatory Click Data to the extent required by law, in order to comply with legal process, preventing fraud or imminent harm, and ensuring the security of its network and services.

f. Exceptions for Privacy-Preserving Alternatives. Nothing in this Exhibit C Section 8 shall limit or supersede any rights that Signatory and its Affiliate(s) may have to

[redacted]

withhold, anonymize, alter, or otherwise protect the privacy of End User data under Exhibit B Section 3.

9. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]