# Exhibit 7

[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America, *et al.*,<br>Plaintiffs,<br>v.<br>Google LLC,<br>Defendant. | Case No. 1:20-cv-03010-APM<br>HON. AMIT P. MEHTA |

| | |
|---|---|
| State of Colorado, *et al.*,<br>Plaintiffs,<br>v.<br>Google LLC,<br>Defendant. | Case No. 1:20-cv-03715-APM<br>HON. AMIT P. MEHTA |

**DECLARATION OF JESSE ADKINS**

I, Jesse Adkins, declare as follows:

1. I am currently employed by Google LLC ("Google") as a Director of Product Management for Search Ads. I served as the Director of Product Management for Search Syndication and Search Ads Syndication from 2013 until September 2026. I submit this declaration in support of Google's objections to Plaintiffs' Proposed Syndication Template. The facts set forth herein are within my personal knowledge and if called as a witness, I could and would competently testify to them.

2. As Director of Product Management for Search Syndication and Search Ads Syndication, my responsibilities included overseeing the product areas in which Google syndicates its web search results and search ads to partners for display on their sites. In particular, my responsibilities included overseeing Google's search and ads syndication products. I have served as one of the product approvers for Google's search and search ads syndication contracts, and I am familiar with Google's existing commercial terms for Google's search and search ads syndication agreements.

3. I testified in the remedies evidentiary hearing on May 1 and May 2, 2025. I also submitted a declaration in support of Google's Motion to Stay on January 16, 2026. ECF No. 1471-3.

4. I have reviewed the Court's Final Judgment ("FJ") issued on December 5, 2025, and, in particular, Section V titled "Required Syndication of Search Results" and Section VI titled "Search Text Ad Auction Changes and Search Text Ads Syndication." I have also reviewed the syndication license agreement template proposed by the Technical Committee ("TC") and Plaintiffs, as revised on October 4, 2026 ("Plaintiffs' Proposed Template"), and the two template syndication agreements that Google submitted to the TC on August 10, 2026: a search syndication license ("Google's Proposed Search Template") and an AdSense for Search license ("Google's Proposed Ads Template"). On September 25, 2026 and September 29, 2026, I met with the TC and Plaintiffs to discuss the Proposed Template.

**Google's Search and Search Ads Syndication Products**

5. Search syndication is when Google's web search results are syndicated for display to users on a third-party website. Google offers two search syndication products: Programmable

Search Engine ("ProSE"), which is available to anyone who signs up for it, and Web Search Syndication ("WSS"), which is available to directly negotiated partners.

6. Search ad syndication is when a partner requests Google's search text ads for its search results page and Google displays those ads on the partner's site. This service is called AdSense for Search ("AFS"): AFS Online is the off-the-shelf product governed by click-to-accept terms; AFS Direct is only available to directly negotiated partners.

7. When an AFS search text ad receives a click, the advertiser pays Google, and Google pays a revenue share to the syndication partner. Google, not the partner, has the relationship with the advertiser. If an advertiser has a problem with the traffic it receives from a syndication partner, the advertiser comes to Google for support, and Google may offer the advertiser a refund.

8. Google's syndicated ads are shown on what Google calls its Search Partner Network. The Search Partner Network is selected by default when an advertiser purchases search ads on Google, although advertisers may opt out of the network or exclude individual sites. Because the network operates as a single opt-out, poor-quality traffic on one partner's site can lead advertisers to opt out of the network as a whole, which reduces revenue for every partner in the network, including any Qualified Competitor who syndicates Google's ads. For this reason, Google devotes substantial time and effort to maintaining the quality of the Search Partner Network.

9. Providing Google's search and ads syndication services requires coordination among at least six different teams, including Product Management, Engineering, Trust and Safety, Policy and Enforcement, Tech Support, and Finance. However, the Plaintiffs' Proposed Template makes a number of changes to Google's MFN contractual terms that would upend the

systems and processes that these teams rely on today, which would not only burden Google but also delay provision of services to the Qualified Competitors.

**Web Search Syndication Services Versus Grounding Services**

10. Google offers grounding services separately from search syndication, and the two products differ significantly in a number of respects. At a baseline level the products serve different purposes—while search syndication provides Google's organic search results for *display* on third-party websites, grounding uses organic search data to provide a machine learning model with additional information used to improve the model's output. Grounding with Google Search ("GwGS"), which is available on Google Cloud's Vertex AI platform, does not provide customers with ranked raw search results—instead, it provides a grounded large language model response accompanied by unranked corroborating sources.

11. The products also use different methods to protect their intellectual property. Because the search syndication product only provides for the display of search results, Google relies on contractual restrictions to protect its intellectual property, rather than technological constraints. For instance, Google's syndication agreements include terms that prohibit syndication partners from crawling, spidering, indexing or in any non-transitory manner storing or caching Google's results, as well as prohibitions on modifying individual results and modifying the user queries. By contrast, Section 4.4(a)-(b) of the Plaintiffs' Proposed Template would permit Qualified Competitors to use Google's search results within their GenAI products, and Exhibit C, Section 2.3 would bar Google from prohibiting temporary caching of results for that purpose. Google has been offering search syndication for decades, and the product was designed long before the proliferation of GenAI products.

12. By contrast, Google's grounding product employs both contractual restrictions and product design choices to protect Google's IP. To prevent scraping, traffic is typically routed through a temporary "redirect" via Google's search attribution layer instead of navigating directly to the web link, enabling Google to track potential service misuse. The temporary nature of these redirect links—in contrast to standard, static web links—creates technical barriers to scraping and caching the underlying source content. Additionally, the data flows for the grounding product run on Google's platform, allowing Google to monitor compliance and immediately suspend customers that violate its terms.

13. Google provides publishers with distinct controls over how their content is used in Google's search and grounding products. Under Google's publisher controls, website owners and publishers can permit Google's primary web crawler (Googlebot) to index their pages for display in Google's search results—which also governs whether their content appears in Google's syndicated search results. A separate management tool, Google-Extended, allows publishers to opt out of having their content processed by Google's AI grounding services, including Grounding with Google Search, and for training future generations of Gemini models that power Gemini Apps and Vertex AI API for Gemini.[1] Google also offers a separate Search Generative AI Control that allows publishers to appear in traditional search results without having their content used for Google's Gen-AI features, such as AI Overviews and AI Mode.[2]

---

[1] *See List of Google's Common Crawlers*, Google, https://developers.google.com/crawling/docs/crawlers-fetchers/google-common-crawlers#google-extended (last visited Oct. 13, 2026).

[2] *See, e.g., Search Generative AI Control*, *Google Search Console Help*, Google, https://support.google.com/webmasters/answer/16908024?hl=en (last visited Oct. 13, 2026); *New Opportunities, control and insights for website owners*, Google, https://blog.google/products-and-platforms/products/search/new-controls-website-owners/ (last visited Oct. 13, 2026).

14. Many website owners and publishers have chosen to disallow use of their content in Google's AI grounding services while allowing Google's web crawler to index their pages for display in Google's search results. When Google last measured this extent of publisher opt-outs, at the end of the second quarter of 2026, approximately [redacted]% of publishers that allow Googlebot for web search had opted out of Google's grounding product through Google-Extended. Publishers that have opted out through Google-Extended include large companies such as [redacted]. Outside of Google's controls, many major publishers configure site-level permissions (such as robots.txt rules) specifically to block web crawlers dedicated to AI search and grounding models (*e.g.*, OAI-SearchBot, PerplexityBot, or Claude-SearchBot) while continuing to allow indexing for general organic web search. Examples include [redacted]. Google estimates that approximately [redacted]% of domains allow Googlebot but disallow OAI-SearchBot.[3] Other publishers, such as [redacted], have permitted use of their content in Google's grounding product but have blocked crawlers operated by OpenAI.

15. Google's syndicated search results are drawn from content that publishers have permitted Googlebot to index. If Qualified Competitors were permitted to use Google's syndicated search results for grounding, publishers' content could be used to ground Qualified Competitors' AI products even where those publishers have expressly disallowed such use,

[3] Google's Proposed Search and Ads Templates includes a provision from an existing syndication contract that requires each customer to [redacted]

whether through Google-Extended or through robots.txt instructions directed at the Qualified Competitors' own crawlers.

**Pricing of the Syndicated Search Services**

16. Google's off-the-shelf online search syndication service, ProSE, includes an ads-free version, which was offered as of the date of entry of the Final Judgment for $5 per 1,000 requests. That product reflects Google's only stand-alone web search syndication pricing. ProSE is ordinarily subject to a cap of 10,000 queries per day. [redacted].

17. Unlike ProSE, Google's directly negotiated WSS partners all have combined WSS and AFS agreements. WSS and AFS terms are negotiated together and evaluated as a whole.

18. Because the ads portion of a bundled syndication deal is often worth a multiple of the search syndication fees, Google has historically accepted lower per-query fees for search syndication in the context of a bundled search and ads syndication relationship, in which AFS revenue offsets the lower search fees. Google would not agree to those search syndication fees on a stand-alone basis.

19. I understand that the price of $[redacted] per 1,000 requests for the Remedial Web Search Service in Exhibit B, Section 1 of the Proposed Template is drawn from Google's agreement with [redacted]. Pls' 9/15 Letter, Response 30; GOOG-DOJ-FJ-00000142. That pricing term expired in [redacted]. GOOG-DOJ-FJ-00000240. As of December 5, 2025, the date of entry of the Final Judgment, [redacted] paid $[redacted] per 1,000 queries for web search results. *Id.* For all relevant time periods, the [redacted] contract bundled syndicated web search results together with AFS. Google [redacted] charged an AFS

revenue share, and required that [redacted] for search text ads, thereby guaranteeing substantial search text ads revenue. GOOG-DOJ-FJ-00000142, § 4. The [redacted] contract covered only Google's web search results and Image Search, and did not include Video, Knowledge Panel, or Local/Maps content. For image search results, the price of $[redacted] per 1,000 requests for the Remedial Image Search Service in Exhibit B, Section 1 of the Proposed Template is drawn from Google's agreement with [redacted]. [redacted]'s $[redacted] per 1,000 requests rate, like [redacted]'s rate, is explicitly tied to a bundled AFS relationship. The contract requires [redacted]. Section 5.6 of Plaintiffs' Proposed Template, by contrast, would provide that rate while prohibiting Google from requiring any preferential placement for its ads.

20. [redacted]

21. Google has never offered Video Search through its WSS agreements,[4] and therefore there is no WSS pricing precedent for that product. Google proposed charging [redacted]

[4] Because Google has never offered Video Search through its WSS agreements, the WSS agreements include language specifying that syndication partners may not [redacted]

22. Google has also never offered Knowledge Panel as part of WSS, and therefore has no established MFN price. As I testified at the remedies hearing, Google syndicates a limited subset of Knowledge Panel information only to Yahoo Japan. That arrangement is unique to the Japanese market, is not part of the WSS service, and is a bundled deal in which an ads revenue share offsets the cost of the search services. In addition, [redacted].

23. Microsoft's Bing previously offered Bing Entity, a product similar to Google's Knowledge Panel.[5] After 2023, Microsoft offered Bing Entity only as part of a bundled package.[6] Google attempted to derive the stand-alone price for Bing Entity based on the bundled price, using the following logic: [redacted].[7] Accordingly, Google's proposed price for Knowledge Panel is also $[redacted] per 1,000 requests.

[5] Microsoft Azure Team, *Microsoft Cognitive Services Updates – Bing Entity Search API and Project Prague*, Microsoft (July 12, 2017), https://azure.microsoft.com/en-us/blog/microsoft-cognitive-services-updates-bing-entity-search-api-and-project-prague/.

[6] *See* Barry Schwartz, *Microsoft Bing Search APIs Price Going Up 10x*, Search Engine Roundtable (Feb. 20, 2023, 7:31 AM), https://www.seroundtable.com/microsoft-bing-search-apis-cost-34929.html.

[7] An alternative method for calculating the stand-alone price of Bing Entity is [redacted]

**Pricing of the Syndicated Search Text Ads Services**

24. For its ads syndication product, Google imposes a different revenue share rate for display on desktop versus mobile devices.

25. Desktop follows a tiered schedule of revenue share percentages tied to total accrued revenue, with current most-favored-nation rates ranging from [redacted]% (total revenue of $[redacted] or less) to [redacted]% (more than $[redacted] of revenue). Google Proposed Ads Template, Exhibit B. Each percentage applies to the portion of monthly desktop ad revenue that falls within the corresponding tier, and each is subject to [redacted] described below.

26. Across all current AFS direct contracts, the mobile revenue share [redacted]%.[8] [redacted]. Google announced in December 2024 that it would deprecate that program [redacted].[9]

27. Approximately twenty years ago, Google began investing in mobile ads, and it approached mobile as a different product given the different user experience, site optimization, and measurement technology. For example, Cross Device conversions and In Store conversions are proprietary technologies built for measuring mobile traffic.

[8] In the [redacted] agreement, this rate is reflected as a [redacted]% mobile and tablet revenue share [redacted], which yields an effective rate of approximately [redacted]%.

[9] Google applies a flat revenue share across desktop and mobile only for AFS Online, a self-service product intended for smaller customers that is subject to an annual cap of five billion queries. Google uses a flat rate for that product for the sake of simplicity.

28. Exhibit B, Section 1 of Plaintiffs' Proposed Template would apply the same revenue share percentage to desktop and mobile ad revenues. No current AFS direct agreement uses a flat rate across desktop and mobile.

29. The Plaintiffs' Proposed Template also does not apply the [redacted] that Google applies to account for Google's operating costs and other baseline technical expenses. In Google's agreements that [redacted]. In failing to apply the [redacted], Plaintiffs propose a revenue share that is a more favorable effective rate than what Google provides to any customer.

30. Plaintiffs' Proposed Template would also provide a revenue share of [redacted]% for all AFS ad revenues for desktop and mobile ads in a given month for a Qualified Competitor's own sites and client applications, and [redacted]% for syndicated sites and applications. First, no Google agreement has provided a [redacted]% revenue share on both desktop and mobile. Second, in the [redacted] agreement, the [redacted]% rate applied only to the top tier of a progressive desktop schedule—the portion of monthly AFS revenue above $[redacted]—and was subject to the [redacted], resulting in an effective rate of [redacted]% on that portion of revenue. Effective [redacted], the [redacted] agreement incorporated a tiered step-down structure for desktop revenue share rates. Under this schedule, the top tier rate was set at [redacted]% ([redacted]) through [redacted], decreasing to [redacted]% ([redacted]) through [redacted], and ultimately stepping down to [redacted]% ([redacted]) for the remainder of the term ending [redacted]. As a result, the initial [redacted]% rate had already lapsed prior to the entry of the Final Judgment.

31. Currently [redacted] is receiving a desktop revenue share between [redacted]% and [redacted]%, [redacted] (or, an effective rate of [redacted]% to [redacted]%).

32. Exhibit C, Section 10 of Plaintiffs' Proposed Template would further require Google to provide each Qualified Competitor with [redacted] within thirty days of the agreement's effective date, [redacted], and [redacted]—to be spent on advertising on Google.com. This was taken from a one-off term with [redacted] that dates to [redacted]. Google has not provided [redacted] in syndication agreements since [redacted], years before the effective date of the Final Judgment. Because the [redacted] regardless of whether a Qualified Competitor implements the syndication services, they would also create a perverse incentive for entities to seek Qualified Competitor status in order to obtain [redacted].

**Technical Constraints Implicated by Plaintiffs' Proposed Template**

*Ad Revenue Accounting*

33. Google's syndication agreements define ad revenues as revenues that are [redacted]. *See* Google Ads Template § 1.3. [redacted] Google's agreements also provide that Google's payments are based on [redacted] *See id.* § 14.1(b). These are important terms that are present in all of Google's syndication agreements—without them, a syndication partner's noncompliance could cause an ad to appear alongside illegal content, and Google could not recover that ad revenue from the partner even if Google refunded the amount to the advertiser.

34. When Google confirms that ad clicks were invalid, Google fully refunds advertisers and then debits the invalid or unrecognized revenue from syndication partners. However, Section 1.1 of Plaintiffs' Proposed Template, which defines "Ad Revenues," would permit Google to withhold or claw back ad revenues generated from spam, bot traffic, or other fraudulent activity only if Google first notifies Plaintiffs and the TC at least thirty days in advance and provides Plaintiffs with an opportunity to audit and object, and would bar Google from withholding or clawing back any amount subject to an objection until the objection is resolved. As I explained in my January 16, 2026 declaration, my team encountered a scheme that resulted in tens of millions of dollars in click fraud over the course of only two months. ECF No. 1471-3 ¶ 20. Requiring Google to delay its typical debit processes would be harmful to Google's advertisers and create significant administrative burden.

35. Google's payment pipelines run on automated, shared infrastructure that does not support treating Qualified Competitors differently from other partners. All AFS customers flow through the same payment pipelines and processes, and there is no way to segregate Qualified Competitors so that they are subject to different accounting practices. Accommodating Plaintiffs' Proposed Template's process would require Google to engineer new systems, requiring work across three to four different teams and affecting multiple workflows in the payment process. Forcing a 30-day pause or pre-approval before executing debits is technically unfeasible and disruptive to Google's financial workflows.

36. Section 5.1 of Plaintiffs' Proposed Template (and, for search services, Section 4.1) would also provide that a Qualified Competitor's payment obligations do not run until Google's services have been implemented across all of the Qualified Competitor's sites and client applications. This term is not included in any of Google's syndication agreements. For

ads syndication, Google collects payment from advertisers and then pays the partner a revenue share. Withholding Google's payment rights until all Qualified Competitor properties are live penalizes Google for delays caused by the Qualified Competitor. Section 2.1 of Google's Ads Template instead provides that implementations are not launched, and are not payable, until Google has approved them in writing, with approval not to be unreasonably withheld or delayed—these are the MFN terms in Google's syndication agreements.

*Ads on Mobile Applications*

37. In December 2024, Google stopped allowing for the display of its search ads integrated into mobile applications and Google no longer offers a mobile software development kit for syndicated ads. The current allowance for ads on mobile is limited to ads displayed on mobile sites. Google's contracts and policies state that customers may not access AFS through, or as a result of, any application, plug-in, or other executable code running on a mobile device. *See, e.g.*, [redacted] Syndication Agreement, GOOG-DOJ-FJ-00000142 § 2.7; [redacted] Syndication Agreement GOOG-DOJ-FJ-00000348 § 2.3.

38. Google's ad spam teams can monitor sites on desktop and mobile web sites by navigating to them, but it is far more difficult to monitor whether mobile applications comply with Google's policies. Inspecting compiled software for malicious behavior requires substantially more effort and specialized skills compared to inspecting websites, which have all of their code open to the public. When users download mobile applications, an application can make covert changes to the user's device or download malware. Google's experience with downloadable desktop applications included deceptive user acquisition, deceptive installation tactics, and deceptive settings changes, and Google lacks effective tools to monitor and enforce against similar conduct in mobile applications at scale. Google no longer monetizes mobile

applications through syndicated search ads because of these enforcement difficulties, and offering such monetization would make these deceptive schemes more profitable.

39. I understand the Plaintiffs' Proposed Template does not require Google to offer a mobile application software development kit to Qualified Competitors, though Exhibit C Section 3.3 does require that Google will "collaborate in good faith to implement the Search Text Advertising Service(s) on the Client Application(s) and Syndication Application(s)," including "providing commercially reasonable technical support and cooperation necessary to enable such implementation." This provision would force Google to enable a mobile app implementation that is forbidden by its contractual terms.

40. And whether implemented via a mobile application software development kit, or through some other method, allowing mobile app developers to integrate AFS ads onto their apps will weaken Google's spam protections and potentially expose the contents of Google's iframe, exposing Google's intellectual property. When ads show on websites, the browser provides a layer of security such that a website owner could not effectively scrape the contents of Google's iframe. But in a mobile application, the app will have additional operating system privileges that would allow it to inspect the content of Google's ads without the ability for Google to detect this behavior.

*Subsyndication*

41. Exhibit A, Section 3.4 of Plaintiffs' Proposed Template would require Google to treat any information about a Qualified Competitor's syndicated sites and applications as "Highly Confidential" under the Protective Order, to restrict access to that information on a need-to-know basis, and to certify to the Qualified Competitor, Plaintiffs, and the TC that it has implemented confidentiality procedures before receiving any such information.

42. Google's data stack cannot support that requirement. Publisher data for AFS is maintained horizontally throughout shared infrastructure, not segregated by individual owner. For that reason, partitioning subsyndicate data into distinct tables and permission tiers would necessitate the development of parallel logging and database architectures—a major engineering undertaking that would take years to complete.

43. Google's existing policies, which state that employees may access data only as necessary to perform their roles, are designed to protect commercially sensitive information regarding subsyndicates. All Google personnel who access AFS data must agree to Google's [redacted], which prohibits competitive use of business platform data. Google employees complete annual compliance training on this policy.

44. At the most fundamental level, Google needs to know the identity of each subsyndicate in order to provide the services. Section 2.3(c) of Google's Ads Template requires the partner to name the subsyndicate that owns and operates each syndicated property, and Exhibit D of that template passes through Google's material terms to subsyndicates, requires that [redacted] Section 5.7 of Plaintiffs' Proposed Template contains none of these protections. To protect advertisers, Google confirms that the named subsyndicate has editorial control over each site receiving the services, monitors whether the site is receiving bot traffic, and confirms that the subsyndicate is not an entity previously terminated from the service for policy violations. Bad actors removed from AFS for ad fraud sometimes attempt to regain access to the services through subsyndication. Without pass-through of Google's terms, a subsyndicate that is suspended for violating Google's policies could

regain access to the same ads by simply becoming a subsyndicate of a different Qualified Competitor. Without the inclusion of Google's existing terms for subsyndication, these schemes would proliferate and harm the health of the Search Partner Network, causing advertisers to opt out.

*Latency, Reliability, and Query Volume Forecasts*

45. Exhibit C, Section 2.1(a)–(b) of Plaintiffs' Proposed Template would impose a [redacted]% availability service level agreement ("SLA") and a [redacted]-millisecond network latency threshold across all selected search services, including Image Search, Video Search, Knowledge Panel, and Local and Maps content, without traffic caps. To my knowledge, [redacted]

46. The web search SLA in Google's agreement with [redacted] guarantees particular latency and availability only for [redacted] web search requests per day over a rolling thirty-day period, and it includes exceptions for extraordinary load events.[10] Plaintiffs' Proposed Template contains neither protection, and Section 6.5(d) expressly provides that Google's latency and availability obligations are not diminished or excused if a Qualified Competitor's actual query volume exceeds its forecasts. From a technical perspective, it is not possible to guarantee any particular level of latency or reliability for an unlimited volume of queries. Higher query volume requires additional machine capacity, and not only is data center capacity in short supply across the industry, but on a fundamental level, it is not technically possible for Google to provision an unlimited amount of machine capacity.

---

[10] *See* GOOG-DOJ-FJ-00000142, Exhibit G §§ 1.4, 1.5. Furthermore, [redacted] *Id.*, Exhibit G §§ 1, 2.6.

47. Plaintiffs' Proposed Template further requires that, "Google shall not take any actions that have the effect of slowing Search Service Network Latency, including, without limitation, in circumstances where Search Service Network Latency is below the Search Service Network Latency Threshold, with the intent of approaching or reaching the Search Service Network Latency Threshold, even if doing so would decrease costs for Google." Plaintiffs' Proposed Template, Exhibit C § 2.1(b). Google has never included any such term in any of its syndication agreements because it is industry standard to use load shedding, the practice of dropping requests during extraordinary traffic spikes to prevent system-wide overload.

48. Google's syndication services share common servers with Google.com search services, and these servers will automatically perform load shedding on a system-wide basis, including on requests to Google.com. But under Plaintiffs' template, Google would be prevented from using this ordinary course traffic management practice because it could in some instances slow the Search Service Network Latency for Qualified Competitors.

49. To guarantee that Qualified Competitors' traffic is not impacted by system-wide load shedding, Google would need to isolate syndication services for the Qualified Competitors onto isolated servers, which would require significant time and engineering work to accomplish.

50. And because Exhibit C, Section 2.1(b) is very broad ("Google shall not take any actions that have the effect of slowing Search Service Network Latency") it could be interpreted to mean that Google cannot even launch product improvements that have a side effect of slowing latency, which is fairly common for launches that increase ad candidates to improve relevancy in the auction.

51. Furthermore, Plaintiffs' Proposed Template requires [redacted]% of AFS ads to be under 1 second, which is currently not being met. Because Google runs an ad auction each time

a syndicated ad is requested, a portion of requests take longer to process: approximately [redacted]% of U.S. AFS ad requests take longer than one second on the server because U.S. traffic has denser ad auctions on average.

52. The severity-error classifications and the associated resolution deadlines and service credits in Exhibit C, Sections 4.2 and 4.3 do not appear in any of Google's syndication SLAs, and Google does not guarantee resolution times in any of its syndication agreements because doing so may not be technically possible during extraordinary events.

53. The Syndication Forecasting portion of the Plaintiffs' Proposed Template, which proposes to use a 10% increase in peak QPS to determine how much advanced notice Google will receive, presents additional technical and operational issues. There may be significant variance in the query volumes and peak QPS of the Qualified Competitors. A 10% increase could encompass an enormous amount of machine capacity, [redacted]

*Proxy Architecture*

54. Exhibit B, Section 3 of the Proposed Template defines a [redacted] However, that description does not reflect how [redacted]

[redacted].[11] In a typical AFS implementation, the user's browser requests the search results page from the partner's server, and that page instructs the browser to load Google-owned AFS JavaScript from a Google server. The AFS JavaScript then sends the ad request—including the publisher's identity and the user's query—to a Google server. Google runs an ad auction and serves ads relevant to the query. When the user clicks an ad, the browser sends a request to a Google server reporting the click, and Google directs the browser to the advertiser's website. The end user's IP address is visible to Google at each of these steps.

55. [redacted]

56. [redacted]

57. [redacted]

[11] Google has never [redacted].

[redacted] As I testified at the remedies hearing, Google must collect signals directly from the user's device in order to detect bots and invalid activity and to verify the integrity of each click. [redacted]

*Query Rewriting and Keyword Match*

58. Section 6.7 of the Proposed Template would allow Qualified Competitors to apply their own query rewriting technology—including query correction, modification, or expansion—without limitation, and provides that requests issued after such rewriting will not be deemed synthetic queries. The provision places no limit on how far a rewritten query may depart from the query the end user entered.

59. Google does not permit its current syndication partners to use their own query correction technology. Google's agreements require that each query be entered by a human end user, that each request contain that query, and that partners not edit, truncate, append terms to, or otherwise modify the query. *See* Google Ads Template §§ 2.2, 2.3(f), 3.2(b); Google Search Template § 2.3(e).

60. Third-party query alteration breaks Google's exact-match keyword guarantees to advertisers (who bid on specific query terms) and risks serving irrelevant ads that damage advertiser return on investment. For example, if an advertiser opts into exact match, Google must ensure that the advertiser's ads show only on queries that are nearly an exact match to the

advertiser's keywords. Google cannot make that guarantee if a Qualified Competitor alters queries with its own technology before sending them to Google.

61. Query modification is also a known vector for advertiser harm. As I testified at the remedies hearing, Google permits partners to append keywords only under specific conditions—for example, appending a destination that the user typed into a separate box on a travel site—because unrestricted appending would allow a partner to add terms the user never typed, such as "high net worth" on a financial services query, to artificially increase the cost per click.[12] And as I explained in my January 16, 2026 declaration, my team encountered a scheme in which an ad syndicator appended the name of a high-income country to its queries and purchased cheap traffic to click on the resulting ads, resulting in tens of millions of dollars in click fraud over two months. ECF No. 1471-3 ¶ 20.

62. Because it is unclear how a Qualified Competitor's query rewriting technology would function, Section 6.6 could also operate as a means of sending Google the synthetic queries that are prohibited both by the Final Judgment and by the terms of Google's agreements. FJ §§ V.B.10, VI.B.9.

**Advertiser Harm**

*Site, Application, and Implementation Approvals*

63. In the ordinary course, Google first reviews and approves the sites and client applications on which a partner seeks to use the services, and then, after the partner has

[12] Google maintains additional conditions on the use of alternative search queries, [redacted]

implemented the services, reviews the implementations. Google also reviews subsequent changes to approved sites, client applications, and implementations to ensure ongoing compliance with its policies. Google's templates reflect this process: Section 2.1 of the Google Ads Template and the Google Search Template requires Google's written approval before an implementation goes live; Section 10.3(a) of the Google Ads Template permits Google to approve or disapprove, in its reasonable discretion, new sites and client applications on [redacted] days' notice; and Exhibit A of that template confirms that approved sites remain subject to the agreement and that Google may cease providing the service to non-compliant sites. [redacted] Google uses these approval rights to monitor for invalid traffic, misleading display of advertisements, and illegal or objectionable content such as Child Sexual Abuse Material. Google applies these approvals to Qualified Competitors in the same manner it does for all other syndication partners and does not intend to use them as a veto over Qualified Competitors.

64. The timing of enforcement matters to advertisers. Each day that syndication services remain active on a site engaged in fraud, millions of dollars in fraudulent bot traffic can be imposed on Google's advertisers, and advertisers' ads may continue to show alongside illegal or objectionable content. However Section 5.3 of Plaintiffs' Proposed Template gives the Qualified Competitor and their subsyndicates five days to remove unacceptable content and bars Google from suspending service for such content without three business days' advance notice to Plaintiffs and the TC; and Section 16.2 requires fifteen business days' notice before Google may act on a material breach, with further delay if Plaintiffs object. By contrast, Sections 3.2(n) and

3.3(b) of the Google Ads Template permit Google to suspend service, in as targeted a fashion as is commercially reasonable, when unacceptable content appears or the partner is out of compliance. For many content violations, Google must act immediately to remove its ads from the site, such as when bad actors are trying to use AFS to monetize sites containing Child Sexual Abuse Material or promoting terrorism. [redacted] To accommodate the Proposed Template's periods, [redacted], which would be burdensome from an engineering perspective and would delay provision of the services.

*Google's Policies and the Advertiser Ecosystem*

65. Every AFS and WSS partner is subject to Google's policies, guidelines, and technical protocols, including the Google Program Guidelines, the Google Branding Guidelines, the Client Application Guidelines, the Google Technical Protocols, the Acceptable Use Policy, and the AdSense for Search Restricted Access Features ("RAF") Policy. The Proposed Template omits these policies. Instead, Exhibit C, Section 5.4 provides that Google may propose "Google Guidelines and Protocols" only through the amendment procedures in Section 20, after the agreement's effective date and with no defined end date, and Section 1.35 and Exhibit C, Section 5.1(h) define unacceptable content solely by reference to whatever guidelines are adopted through that process.

66. These policies serve to safeguard advertisers, users, and Google's intellectual property. For instance, the Google Branding Guidelines do not only apply to results that include Google's branding, but also include broader requirements that advertisements must be clearly labeled and distinguished from organic search results, and alterations to the content of individual

search results are strictly prohibited—a measure that further protects Google's intellectual property. To prevent applications from deceiving users or defrauding advertisers, such as through unwanted software installations, compliance with the Client Application Guidelines is also required. Additionally, the Acceptable Use Policy prohibits sites from hosting unlawful or harmful content, including computer viruses or Child Sexual Abuse Material. Prohibited practices like deceptive ad presentation are governed by the Google Program Guidelines, which also regulate alternative search mechanisms such as keyword appending and related search units. Finally, the RAF Policy establishes rules regarding special AFS features, such as click tracking and alternative search queries, which carry greater risk to advertisers and to Google and requires additional restrictions

67. Google must be able to update its policies, guidelines, and technical protocols as methods of abuse and click fraud evolve. Companies in the ad syndication space are constantly creating new schemes to increase their revenue at the expense of advertisers, and Google is engaged in a continual effort to detect and end those practices. As I testified at the remedies hearing, Google tightened its ad styling restrictions after receiving advertiser escalations about a partner whose ad display—which used hard-to-read text, a barely visible ad attribution, and an oversized call-to-action button—generated 20% more revenue than a compliant display while leaving advertisers with low value clicks.

68. My understanding is that Exhibit C, Section 5.4 of Plaintiffs' Proposed Template would only permit Google to update its policies, guidelines, and technical protocols through a formal contract amendment that must be approved by Plaintiffs and the Technical Committee. This would cause a significant bottleneck for Google's Trust and Safety, Enforcement, and Spam teams, who together own the network of policies that govern the syndication services. If

Google's policies cannot keep pace with changing ad fraud schemes, Google will be unable to maintain the quality of ad clicks on its search partner network, and I expect that advertisers will opt out of the network, limiting the monetization opportunity available to all partners, including Qualified Competitors. Google has instead proposed to provide notice to the Technical Committee and Plaintiffs should it intend to change the syndication policies in a manner that will impact Qualified Competitors.

69. Moreover, Google's policies, guidelines, and technical protocols may link to other Google policies that affect products other than the syndication services. For instance, Google's Program Guidelines may reference unwanted software policies, which also apply to products in the Chrome Web Store. As written, Exhibit C, Section 5.4 of Plaintiffs' Proposed Template may implicate even these policies, slowing down the work of many other Google teams.

70. And if Qualified Competitors are not bound to Google's ad policies, it is unclear whether they will be eligible for the [redacted] in Exhibit C, Section 7 of Plaintiffs' Proposed Template. [redacted].

**Additional Concerns Presented by Plaintiffs' Template**

71. Plaintiffs' Proposed Template also makes a number of unnecessary changes to Google's typical contractual language, which essentially break many of Google's policies and would result in various unintended consequences.

72. For instance, section 2.3(e) of the Google Ads Template requires that ads be displayed in a single continuous block; because syndicated ads are rendered in an iframe, they

are necessarily displayed in a single continuous block and cannot be interspersed with other advertisements.[13] Sections 3.2(e) and (f) of the Google Ads Template also prohibit partners from framing or interfering with results pages and from inserting interstitial content between an ad and the page the user reaches by clicking it. These provisions appear in all of Google's syndication agreements, and the Proposed Template omits them from its list of restrictions in Exhibit C, Section 5.1. As written, it is not technologically possible for Google to comply with Plaintiffs' provision.

73. Additionally, Plaintiffs define a SERP as any page or screen containing "Search Results," a term limited to Google's organic results. As a result of this definition, webpages that only show Google's ad results are not SERPs, and any obligations tied to SERPs will not apply to pages that only contain Google's ads. This creates an improper loophole to the restrictions in Google's ordinary course agreements.

74. Google's syndication agreements define an "Ad" as an individual search text ad provided through Google's service, so that the agreements' restrictions apply only to the ads Google provides. *See* Google Ads Template § 1.1. Section 1.22 of the Plaintiffs' Proposed Template omits that definition and instead provides that "Search Text Ad" has the meaning assigned to it in Section IX.Y of the Final Judgment—a generic definition that is not limited to ads provided by Google. The term therefore covers a Qualified Competitor's own ads and ads provided by third parties, as other provisions of the Proposed Template confirm: Section 5.6 compares Search Text Ads made available under the agreement to "Search Text Ads or Search Text Ad Sets provided by Signatory, its Affiliate(s), or any third party," and Section 6.2 provides that a Qualified Competitor is free to use and display "their own . . . Search Text Ads . . . or

---

[13] However, third party advertisements can be shown above or below the block of AFS ads.

those of a third party." Because the Proposed Template uses the generic term throughout, it produces results that appear unintended. For example, the restrictions in Exhibit C, Section 5.1—including the prohibitions on modifying or obscuring the display of "any Search Text Ads" and on caching information obtained from the services, "including . . . Search Text Ads"—would by their terms apply to every search text ad a Qualified Competitor displays, not only to Google's ads. The Google Ads Template avoids this problem by limiting its restrictions to the ads Google provides, consistent with Google's ordinary-course terms.

* * * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of October 2026, in Pittsburgh, Pennsylvania.

Signed by:
Jesse Adkins
851A9A333316462...

Jesse Adkins