# Exhibit 8

[redacted]

**U.S. Department of Justice**

Antitrust Division

*Liberty Square Building*

*450 5th Street, N.W.*
*Washington, DC 20530*

September 15, 2026

Colette Connor, Esq.
Williams & Connolly LLP
680 Maine Ave SW
Washington, DC 20024

Re: *United States et al. v. Google LLC*, 1:20-cv-03010-APM (D.D.C.)

Dear Colette:

Pursuant to the order of operations and timing for Category 2 Recommendations, ECF Nos. 1528-2, 1529, Plaintiffs together with the Technical Committee ("TC") hereby respond to your letter and Attachment A thereto of September 8, 2026 ("Requests"), seeking additional information regarding the recommended template search syndication and Search Text Ads syndication license, provided to Google on August 31, 2026 ("Recommended Template").

As stated in the Cover Recommendation, in developing the Recommended Template, Plaintiffs and the TC affirmatively sought input from Google, reviewed documents and information provided by Google, engaged with third parties, and brought to bear the cumulative experience of Plaintiffs in the underlying litigation and of TC Members and TC Staff as professionals working extensively in the industry for over 20 years. Where the Final Judgment sets explicit requirements, those requirements are reflected within the main body of the Recommended Template. Where the Final Judgment demands terms no less favorable than Google's commercial agreements—or explicitly pins terms to Google's commercial agreements—the Recommended Template was supplemented with appropriate language in exhibits derived from the TC's analysis of Google's commercial syndication agreements.

Pursuant to the order of operations and timing for Category 2 Recommendations, ECF Nos. 1582-2, 1529, Google had the opportunity to request additional information regarding the Recommended Template if it had a good faith belief that such information was necessary to comply with or exercise its right to object under the Final Judgment. By your September 8 letter, Google has submitted approximately 100 Requests for additional information. To facilitate providing responses, Plaintiffs have annotated your September 8 letter and Attachment A to add numbers to the Requests. Copies of the annotated letter and attachment are being provided contemporaneously with these responses. As you will

see below, we have identified by number the Request(s) to which a given response is being provided.[1]

Plaintiffs have in good faith considered each of these Requests and provided any appropriate responses thereto. In responding to any given Request, Plaintiffs and the TC do not concede, nor should any response be construed as conceding, that the Request itself is appropriate or that the information sought by the Request is relevant to Google's ability to exercise its right to object under the Final Judgment.

Before addressing Google's specific Requests below, Plaintiffs more broadly note that Google appears to take issue with Plaintiffs and the TC's treatment of Google's August 10, 2026, submission to the TC, which Google describes as "includ[ing] complete template licenses for search syndication and search ads syndication and explain[ing] why [those] licenses would be consistent with the Court's Final Judgment." Plaintiffs and the TC reviewed all of Google's input, including its August 10 submission. They were not, however, required to follow or rely on Google's proposed template licenses in developing the Recommended Template. And indeed, it would make little sense if Google were able to dictate the terms of its own syndication remedies.

Google also appears to take issue with various departures from and omissions of its "standard" terms. The Court was clear, however, that remedial syndication licenses need not mirror Google's standards terms exactly—and in fact, the Court anticipated that there may be variations from Google's "ordinary commercial terms" within remedial syndication licenses in order to promote the "innovation this [syndication] remedy attempts to encourage," and preserve availability of syndication remedies to Qualified Competitors even where they "hop[e] to compete by offering unique services or features." Final J. Op. at 37-39. Google itself "recognize[s] there are adjustments needed to Google's standard terms given the procedural circumstances." Google Req. No. 38.

Subject to the foregoing, Plaintiffs together with the TC further respond to Google's Requests as follows:

**<u>Re Google Request Nos. 1, 11–12:</u>** Plaintiffs and the TC drafted the Recommended Template to comply with the Court's instruction that providers of GenAI Products be included within the Final Judgment's definition of Qualified Competitor to "leave no doubt that the remedies extend to [GenAI Product] companies." Final J. §§ IX.E, IX.V; Rem. Op. at 103–04. Plaintiffs and the TC further took into account that the "purpose of this [syndication] remedy is to provide a short-term measure for Qualified Competitors to compete as they improve their own search capabilities, not an additional means to facilitate that development." Rem. Op. at 178.

Further as to Request No. 1, the Court understood that, "as to the data-sharing and syndication remedies," GenAI Products "grounded in general search perform an

[1] Please note that the number "94" was inadvertently skipped and therefore is not referenced in the responses below.

information-retrieval function that is similar to GSEs," such that GenAI Products are a "potential threat to Google's dominance in the market for general search services." *Id.* at 99–100. For clarity, Plaintiffs and the TC have drafted the Recommended Template with the intent to ensure that search syndication and Search Text Ads syndication remedies can extend to GenAI Product providers. The Recommended Template does not, however, reference Google's FastSearch results or other services available through Google's Vertex platform, nor do we intend for the syndication remedies to encompass these services. *See id.* at 179.

Further as to Request No. 11, Plaintiffs and the TC also drafted the Recommended Template to comply with the Court's instruction that syndication remedies should extend to Qualified Competitors "hoping to compete by offering unique services or features," including in circumstances where such a Qualified Competitor requires license terms that are "not 'ordinary' or typical to Google's existing syndication agreements." Final J. Op. at 39. Accordingly, Plaintiffs do not interpret the Final Judgment or the Recommended Template as prohibiting purely transitory processing of syndicated content by Qualified Competitors with GenAI Products to permissibly implement the syndication remedies or display search results and Search Text Ads to End Users. Plaintiffs do not intend for the Recommended Template to permit Qualified Competitors to use syndicated data to train their GenAI Products. *See* Final J. Op. at 43 n.10.

Further as to Request No. 12, Section 4.4.c of the Recommended Template is not intended to permit improper use by Qualified Competitors of syndicated content or other information received from Google under the syndication remedies as a substitute for independent web crawling or web index development, nor is it intended to limit the ability of Qualified Competitors, including those offering GenAI Products or 'unique services or features," to receive and implement the syndication remedies. *See* Final J. Op. at 39.

**<u>Re Google Req. No. 2:</u>** Plaintiffs and the TC have drafted this language with the intent to preserve a Qualified Competitor's ability to ensure search results and Search Text Ads are properly retrieved and displayed for their End Users, including for Qualified Competitors who may need, *inter alia*, to correct typos or reformat Covered Queries received through GenAI Products (including as needed to ensure syndicated content is properly displayed in GenAI Products). For clarity, Plaintiffs and the TC do not intend for the Recommended Template to permit the issuance of synthetic queries, as prohibited by the Final Judgment. *See* Final J. §§ V.B.10, VI.B.9; Rem. Op. at 170, 178.

**<u>Re Google Req. Nos. 3, 95:</u>** Plaintiffs and the TC do not intend to permit Qualified Competitors to issue synthetic queries under the syndication remedies. The Final Judgment is clear on this prohibition. Final J. §§ V.B.10, VI.B.9. As the Court describes them, synthetic queries are "made-up queries, by a human or machine, that a Qualified Competitor could ask Google to run to test towards developing its own GSE." Rem. Op. at 170. Plaintiffs and the TC have drafted the Recommended Template with this definition and these prohibitions in mind.

Google's questionining appears to assume that any difference between a Covered Query and a Request issued to Google in response to such Covered Query would constitute a synthetic query under the Final Judgment, but such differences could also result from normal and permissible technical processes undertaken by Qualified Competitors to ensure search results and Search Text Ads are properly retrieved and displayed for their End Users. For example, query processing by a Qualified Competitor—including, e.g., to correct typos or reformat Covered Queries issued to GenAI Products—would facilitate the display of search results and Search Text Ads for End Users, not create "made-up queries" issued to Google to "test towards developing [a Qualified Competitor's] GSE." *See id.*

Further as to Request No. 95, on the other hand, processing of Covered Queries as needed for the purpose of permissibly implementing the syndication remedies and displaying results and Search Text Ads to the End User is covered, even if it does so through agentic or non-human mechanisms.

**Re Google Req. No. 4:** Plaintiffs and the TC drafted Section 6.3 of the Recommended Template after evaluating input from Google, including responses to Technical Committee demand letters, commercial agreements, and Google's own syndication proposals, and in compliance with the Final Judgment. *See, e.g.*, Final J. §§ V.B.3, V.B.7, VI.B.6. For example, the language of [redacted] is derived from Google commercial agreements (e.g., GOOG-DOJ-FJ-00000142) with the intent to preserve a Qualified Competitor's ability [redacted] on terms "no less favorable than what [Google] provides under any current search syndication agreements as of the date of entry of th[e] Final Judgment." *See* Final J. § V.B.7. The intent of this provision is not to improperly manipulate search results or Search Text Ads, but to ensure Qualified Competitors, including those intending to compete using GenAI Products, can properly and effectively implement the syndication remedies and display results and Search Text Ads to End Users.

**Re Google Req. No. 5:** Google's understanding of the relationship between Section 6.3 and Exhibit C Section 2.2 of the Recommended Template is generally correct. Plaintiffs and the TC drafted these sections after evaluating input from Google and with the intent to preserve a Qualified Competitor's ability [redacted] on terms "no less favorable than what [Google] provides under any current search syndication agreements as of the date of entry of th[e] Final Judgment." *See* Final J. § V.B.7. The Exhibit C cross-reference in Section 6.3 is intended to encompass the limiting language in Exhibit C Section 2.2.

**Re Google Req. Nos. 6, 8, 10, 21:** Plaintiffs and the TC drafted the Recommended Template to conform to the Final Judgment's requirement that Google must make remedial syndication licenses available to Qualified Competitors on terms "no less favorable" to those offered to any user of Google's search syndication products or Search Text Ads syndication products, with certain exceptions where Google may impose its ordinary commercial terms (e.g., on scraping, indexing, or crawling syndicated results, content, and Search Text Ads). Final J. §§ V.B, VI.B; Final J. Op. at 37–43. As

reitereated *supra*, where the Final Judgment demands terms no less favorable than Google's commercial agreements—or where such terms must align to Google's ordinary commercial restrictions—the Recommended Template is supplemented with appropriate language derived from Google's commercial syndication agreements, as set forth in Exhibit C.

Further as to Request No. 6, as to the inclusion of "Search Results" alongside "Search Results Sets," Plaintiffs and the TC do not intend for this language to change Google's products or the rights of the parties. Rather, this language was included for clarity given the Final Judgment's language and use of "results" rather than "Results Sets." *See, e.g.*, Final J. § V.A, V.B.7.

Further as to Request No. 8, Plaintiffs and the TC drafted the quoted language in Section 4.4.a of the Recommended Template to reflect language used in the Final Judgment to describe the full scope of syndication information and materials covered by the syndication remedies. *See* Final J. §§ V.A, V.B.6–7. The quoted language is not intended to conflict with language in Exhibit C Section 2.

Further as to Request No. 10, Section 4.4.a was drafted to conform to the Final Judgment's inclusion of explicit language regarding a Qualified Competitor's display, use, and integration of information or services obtained under a remedial syndication license. *See* Final J. § V.B.6–7. For clarity, Plaintiffs and the TC do not intend for the Recommended Template to permit Qualified Competitors to use syndicated content in ways that conflict with the Final Judgment or the Court's instructions. *See, e.g.*, Rem. Op. at 178.

Further as to Request No. 21, the Court was clear that remedial syndication licenses need not mirror Google's standard terms exactly. Final J. Op. at 37–39. As to latency, reliability, and performance requirements, Plaintiffs and the TC reviewed and, where appropriate, incorporated language derived from Google's input based on the Final Judgment's requirement that Google provide Qualified Competitors with latency, reliability, and performance "functionally equivalent" to what any other user of Google's syndication services would receive as of the date of entry of the Final Judgment. Final J. §§ V.B.2, VI.B.1.

**<u>Re Google Req. No. 7:</u>** Plaintiffs and the TC do not anticipate permitted use cases where a Qualified Competitor performs individual, result-level modifications to search results received by Google under the syndication remedies.

**<u>Re Google Req. No. 9:</u>** Plaintiffs and the TC drafted the Recommended Template to conform to the Final Judgment's requirements, including the required scope of syndication and limitations on how Google may restrict a Qualified Competitor's ability to use, display, or integrate information or services obtained under the syndication remedies. *See* Final J. §§ V.A, V.B.6–7. Accordingly, the Recommended Template's treatment of [redacted] the ten blue links is intended to be the same as for any other search results provided under the syndication remedies. If

Google has concerns around this approach, Plaintiffs invite Google to identify or provide language from its commercial syndication agreements relating to this point. Absent such commercial language that Plaintiffs and the TC can independently verify, Plaintiffs and the TC must follow the Final Judgment's requirements set forth in, e.g., Sections V.B.6–7.

**<u>Re Google Req. No. 13:</u>** The click tracking language included in Exhibit C Section 6 is informed by Google's commercial syndication agreements (e.g., GOOG-DOJ-FJ-00000348) and is intended to cover only click tracking for Search Text Ads. Regarding the second question, Plaintiffs and the TC do not intend for the Recommend Template to permit use of syndicated content and other information received from Google in ways that contradict the Final Judgement and the Court's instruction. *See, e.g.*, Rem. Op. at 178.

**<u>Re Google Req. No. 14:</u>** Under Section V.A of the Final Judgment, Google is required to make available to Qualified Competitors a search syndication license under which Google must provide, "via real-time API(s)," the following information and data: (1) "both desktop and mobile versions of the ranked organic web search results obtained from crawling the web"; (2) "the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion"; and (3) "the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment." The Final Judgment provides these requirements explicitly, rather than pinning the search syndication Google must provide only to what Google ordinarily provides within its Web Search syndication services. Given the Final Judgment's language and upon consideration of Google's input, including Google's commercial syndication agreements, Plaintiffs and the TC have drafted the Remedial Web Search Service in Exhibit B to encompass Google's commercial Web Search syndication product and the Search Feature content required under Section V.A, including Video Search Feature content and any related beta programs or Product-Integrated Features (PIFs). Image Search syndication is offered separately given evidence of such service separation in Google's commercial syndication agreements.

**<u>Re Google Req. No. 15:</u>** Plaintiffs and the TC appreciate the added context provided by Google regarding the technical feasibility of terms covering Search Text Ad formatting flexibility, display, and use. *See* Final J. § VI.B.6. Without the Source Code Agreement in effect, Plaintiffs and the TC remain unable to independently confirm Google's assertions regarding this point.

As a general matter, Plaintiffs and the TC drafted the Recommended Template to conform to the Court's view that Google may not reject variations from terms that are "'ordinary' or typical to Google's existing syndication agreements" where such variations would "ensur[e] a certain degree of user-data protections" or ensure the syndication remedies can extend to "Qualified Competitors hoping to compete by offering unique

services or features." Final J. Op. at 39. Plaintiffs and the TC understand that Google's implementation of Search Text Ads via JavaScript and iFrames permits Google to track or receive granular data from syndication partners, which could require privacy-focused Qualified Competitors to forego the Search Text Ads syndication remedies. If this understanding is incorrect, please let Plaintiffs know.

**Re Google Req. No. 16:** Google has previously approved Search Text Ads for display and revenue share in [redacted] The TC has requested information related to all protocols for delivering syndication, but Google has not provided it. The Recommended Template has therefore been drafted based on available information.

In addition, Plaintiffs and the TC drafted the Recommended Template to minimize reliance on external Google policies and guidelines, which Google appears to be able to unilaterally change under commercial agreements, to conform the Recommended Template to the Court's view that Google should not have an "effective veto" over remedial syndication terms or over which Qualified Competitors may receive syndication remedies. See Final J. Op. at 37-39.

**Re Google Req. No. 17:** Plaintiffs and the TC understand that Google's various external policies and guidelines, including Google's Program Guidelines, impose terms unilaterally on Google's syndication partners and may be changed at any time by Google without prior agreement by Google's syndication partners. The Final Judgment does not permit Google to unilaterally alter the terms of remedial syndication agreements in any way; Google is only permitted to propose additional Search Text Ad syndication terms under Section VI.B.11 of the Final Judgment. Moreover, the Final Judgment does not permit Google to impose terms on Qualified Competitors that conflict with express requirements of the Final Judgment, so Plaintiffs and the TC have drafted the Recommended Template with the intent of incorporating, where approrpiate under the Final Judgment, as many technical implementation requirements and policies as possible within the Recommended Template itself.

**Re Google Req. No. 18:** Plaintiffs and the TC drafted the Recommended Template to conform to the Final Judgment and the Court's instructions, including the Court's view that that there may be variations from Google's "ordinary commercial terms" within remedial syndication licenses in order to, e.g., increase clarity for Qualified Competitors, promote the "innovation this [syndication] remedy attempts to encourage," and preserve availability of syndication remedies to Qualified Competitors even where they "hop[e] to compete by offering unique services or features." Final J. Op. at 37–39. The Recommended Template's broad treatment of Client Applications, including the additional reference to Search Access Points, as defined by the Final Judgment, is intended to encompass the full set of applications, plug-ins, interfaces, browsers, GenAI Products, etc., through which a Qualified Competitor may display syndicated content and compete under the Final Judgment. This treatment conforms to the Final Judgment and the Court's interest in (1) promoting innovation through syndication remedies and (2)

preserving the availability of syndication remedies to "Qualified Competitors hoping to compete by offering unique services or features." Final J. Op. at 37–39.

**Re Google Req. No. 19:** In drafting the Recommended Template, Plaintiffs and the TC considered and, where appropriate, incorporated input from Google to comply with and facilitate the efficient implementation of the Final Judgment. The Recommended Template's definition of URL is taken from Google's Maps license proposal and included out of an abundance of caution. If Google has specific concerns regarding the language of this definition, please let Plaintiffs know.

**Re Google Req. No. 20:** Thank you for this context and your offer to discuss provisions requiring forecasts of projected syndication volume from Qualified Competitors. Plaintiffs and the TC drafted the Recommended Template to conform to the Final Judgment, including Sections V.B.6–9, and the purpose of the syndication remedies, which is to provide a short-term measure for Qualified Competitors to compete. Rem. Op. at 178. For example, Plaintiffs and the TC have some concerns that requiring Qualified Competitors to provide forecasts of syndication volume to Google may inhibit the innovation and competition the syndication remedies were meant to encourage. *See* Final J. Op. at 39. Plaintiffs will confer with the TC regarding Google's request to discuss this provision.

**Re Google Req. Nos. 22, 46–66:** As noted *supra*, where the Final Judgment demands terms no less favorable than Google's commercial agreements—or where such terms must align to Google's ordinary commercial restrictions—the Recommended Template is supplemented with appropriate language derived from Google's commercial syndication agreements. The Court, however, was clear that remedial syndication licenses need not mirror Google's standards terms exactly; in fact, the Court anticipated that there may be variations from Google's "ordinary commercial terms" within remedial syndication licenses in order to, e.g., increase clarity for Qualified Competitors, promote the "innovation this [syndication] remedy attempts to encourage," and preserve availability of syndication remedies to Qualified Competitors even where they "hop[e] to compete by offering unique services or features." Final J. Op. at 37–39.

In the Recommendation Statement and Basis Statement, Plaintiffs have already provided (1) an explanation of the process Plaintiffs and the TC undertook to evaluate input from Google and third parties, as well as to determine the recommended terms present in the Recommended Template, and (2) an account of the materials relied upon to inform the Recommendation, including the Recommended Template. Plaintiffs understand from Google's phrasing that at this time, it does not have any specific questions regarding the provisions referenced in the respective Requests, apart from what is apparent in the parentheticals at Request Nos. 57 and 62.

Further as to Request No. 22, Exhibit B Section 3 of the Recommended Template was drafted with the understanding that the Court explicitly contemplated extending the syndication remedies to privacy-focused Qualified Competitors and other Qualified Competitors "hoping to compete by offering unique services or features," including in

circumstances where such a Qualified Competitor requires license terms that are "not 'ordinary' or typical to Google's existing syndication agreements." *Id.* at 39. In addition, Request No. 22 suggests that [redacted] differs from [redacted] in the Recommended Template. Please provide information or documentation on Google's [redacted] so that Plaintiffs and the TC may consider it.

Further as to Request Nos. 57 and 66, regarding Google's Branding Guidelines, the Court was clear in its Memorandum Opinion Supporting the Final Judgment that "the syndication remedy is meant to give Qualified Competitors a boost in quality while they develop competitive products, not to pose as Google in the meantime." Final J. Op. at 42. Requiring Qualified Competitors to adopt Google Branding Guidelines is at odds with the Court's language and the remedial goals of the syndication remedies. More generally, Plaintiffs and the TC drafted the Recommended Template to minimize reliance on external Google policies and guidelines, which Google appears to be able to unilaterally change under commercial agreements, to conform the Recommended Template to the Court's view that Google should not have an "effective veto" over remedial syndication terms or over which Qualified Competitors may receive syndication remedies. *See* Final J. Op. at 37–39.

Further as to Request No. 62, regarding the parenthetical, the language of Section 27.1 is derived from a Google syndication agreement (GOOG-DOJ-FJ-00000142) and does not "remove industry-standard exclusions." Rather, Plaintiffs and the TC intend for references to Google to align with the Final Judgment's definition, which includes affiliates. Final J. § IX.L.

Further as to Request No. 65, regarding the parenthetical, Plaintiffs and the TC drafted Exhibit C Section 8.3 of the Recommended Template to comply with the Final Judgment requirements regarding limitations on what information Google can require Qualified Competitors to share under the syndication remedies and how Google may retain or use that information language, Final J. §§ V.B.8–9, VI.B.3–4, with language derived from Google commercial agreements (e.g., GOOG-DOJ-FJ-00000142).

<u>**Re Google Req. Nos. 23, 25:**</u> Thank you for this context regarding Google's review of implementations as well as Sites and Client Applications. Plaintiffs and the TC have drafted the Recommended Template with the understanding that Qualified Competitors must abide by the Recommended Template's requirements for implementations of Sites and Client Applications, such as those set forth in Sections 4.2 and 5.2 of the Recommended Template. While, as a general matter, Plaintiffs and the TC do not interpret the Final Judgment as granting Google a unilateral approval right over the availability of syndication remedies to Qualified Competitors, Plaintiffs and the TC have drafted Exhibit A Section 3 with the intent to permit Google to reject Sites and Client Applications, including implementations thereof, with prior notice to Plaintiffs, the TC, and the relevant Qualified Competitor if extending the Services to such Sites, Client Applications, Syndicated Sites, or Syndicated Application would violate the terms of the Recommended Template.

**Re Google Req. No. 24:** Plaintiffs and the TC have drafted the Recommended Template to conform to the Final Judgment's requirements, which include the explicit requirement that Google include Qualified Competitors in its Search Partner Network. Final J. § VI.B.5. This requirement is not paired with any terms permitting Google to limit inclusion based on verification or other procedures, and the Court does not contemplate such limitations in either its Remedies Opinion (ECF No. 1436) or Final Judgment Opinion (ECF No. 1461). If Google has specific concerns underlying its request to impose verification or other requirements on Qualified Competitors before complying with this Final Judgment provision, please let Plaintiffs know.

**Re Google Req. No. 26:** The references to "content flags" and "contextual features" in Exhibit B Section 1 are intended to capture signals and protocols leveraged to surface Search Feature content within the remedial Web Search Service. *Cf.* Ltr. from C. Connor to Technical Committee (Aug. 14, 2026) (describing [redacted]). The TC has requested information related to how the signals or protocols for such features work and how they are delivered, but Google has not provided it. The Recommended Template has therefore been drafted based on available information..

**Re Google Req. No. 27:** As described in Exhibit B Section 1, Plaintiffs and the TC have drafted the Recommended Template to include a remedial Search Text Ads syndication service that encompass the full scope of Search Text Ads syndication covered by the Final Judgment. This includes "all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) available through [Google's] syndication products," including AdSense for Search and "any other current or future products offering syndicated Search Text Ads." Final J. § VI.B.1. In drafting the Recommended Template, Plaintiffs and the TC reviewed and, where appropriate, incorporated input from Google, such as responses to Technical Committee demand letters, commercial agreements, and Google's own syndication proposals. The resulting Recommended Template includes language intended to cover not only AdSense for Search but also services and features covered by other Google Search Text Ads syndication products, such as the AdSense Direct Program, [redacted], and other related beta programs and PIFs. *See, e.g.*, Ltr. from C. Connor to Technical Committee (Aug. 14, 2026). The Recommended Template does not encompass the deprecated AdSense for Domains program or the AdMob Program.

**Re Google Req. No. 28:** Plaintiffs and the TC drafted the Recommended Template in conformity with the Final Judgment's requirement that Google must make remedial syndication licenses available to Qualified Competitors on terms "no less favorable" to those offered to any user of Google's search syndication products or Search Text Ads syndication products, rather than on Google's "ordinary commercial terms"—except that Google may impose its ordinary commercial restrictions on scraping, indexing, or crawling syndicated results, content, and Search Text Ads. Final J. §§ V.B, VI.B; Final J. Op. at 37–43. Plaintiffs' and the TC's treatment of subsyndication within the Recommended Template is intended to reflect the limited scope of subsyndication permitted under the Final Judgment: sub-syndication is only permitted for Search Text

Ads syndication and only where a Qualified Competitor has been certified as a Competitor to a Google ads platform. *Compare* Final J. § V.B.10 *with id.* § VI.B.9. Under these circumstances, Google's proposed subsyndication terms may require improper information sharing among Competitors. For example, Google's proposed requirement that, e.g., Qualified Competitors identify all subsyndicates to Google amounts to a requirement that Competitors to Google's ads platform must share their own ads platform client list—which is competitively sensitive information—with Google in order to benefit from the remedy. Such a requirement would undermine the purpose of this syndication remedy. *See* Final J. Op. at 37–39.

**Re Google Req. No. 29:** To clarify, by "personalization is not available for AFS," does Google mean that only non-personalized Ads are available through AdSense for Search, or that AdSense for Search does not currently support non-personalized Ads? In either case, please confirm whether personalization was ever available for AdSense for Search, and if so, when personalization became unavailable for AdSense for Search.

**Re Google Req. Nos. 30–32, 43:** Plaintiffs and the TC drafted the Recommended Template to conform to the Final Judgment's requirement that Google must make remedial syndication licenses available to Qualified Competitors on "financial terms no worse than those offered to any other user" of Google's search syndication products or Search Text Ads syndication products. Final J. §§ V.A, VI.B.2. As described in the Recommendation Statement, where the Final Judgment demands terms no less favorable than Google's commercial agreements, Plaintiffs and the TC included language in the Recommended Template derived, where appropriate, from the TC's analysis of the most favorable financial terms in Google's commercial syndication agreements (including, e.g., GOOG-DOJ-FJ-00000142 and GOOG-DOJ-FJ-00000348).

In its Memorandum Opinion Supporting the Final Judgment (ECF No. 1461), the Court made clear that the remedial syndication licenses need not include pricing terms that exactly mirror Google's "ordinary commercial terms," nor must they reflect market rates without the context of Google's discounted pricing practices, including discounts offered due to the bundled provision of search syndication and Search Text Ads syndication services, "sometimes at prices below marginal cost." Final J. Op. at 37–41. The result, per the Court, is that the "Final Judgment's pricing provisions may result in syndication agreements that depart from the way Google has historically contracted or made its revenue." *Id.* at 41. "[T]hat is an acceptable consequence of remedying Google's illegal conduct." *Id.* Pinning remedial pricing terms to Google's "ordinary commercial terms" would run counter to the Court's instructions, improperly "convey an effective veto to Google" over terms if Google does not deem them "ordinary," *id.* at 38–39, and impose remedial terms on Qualified Competitors "with Google's profit motive in mind," rather than the remedial goals of the remedies, *id.* at 41.

Further as to Request No. 43, Plaintiffs understand that, unlike certain other requirements in the Final Judgment, the requirement of "financial terms no worse than those offered to any other user" is not pinned to the Final Judgment's date of entry. Accordingly, as described in the Recommendation Statement, where the Final Judgment

demands terms no less favorable than Google's commercial agreements, Plaintiffs and the TC included language in the Recommended Template derived, where appropriate, from the TC's analysis of the most favorable financial terms in Google's commercial syndication agreements. This includes the [redacted] provision added to the Recommended Template.

**Re Google Req. No. 33:** Plaintiffs and the TC drafted the Recommended Template to conform to the Final Judgment's requirement that Google provide syndication licenses to Qualified Competitors, encompassing not only providers of or potenital entrants in the provision of a General Search Engine or GenAI Product, but also providers of or potential entrants in the provision of Search Text Ads in the United States. Final J. §§ V.A, VI.B, IX.E, IX.V. For example, the Final Judgment contemplates the provision of syndication remedies to Qualified Competitors who have been certified as a Competitor to a Google ads platform. Final J. § VI.B.9.

The extension of syndication remedies to providers of competing ads platforms and Search Access Points aligns with the Final Judgment and the Court's adoption of "no less favorable" language over "ordinary commercial terms" language, including to ensure that Google cannot refuse to syndicate search results or Search Text Ads to a Qualified Competitor "hoping to compete by offering unique services or features" simply because the terms of remedial syndication are not "ordinary." Final J. Op. at 37–39.

**Re Google Req. No. 34:** Plaintiffs view the Final Judgment as clear regarding the scope and implementation of the syndication remedies, as well as the rights and obligations of Google and Qualified Competitors under the Final Judgment. Where the Final Judgment refers to terms "no less favorable" than what Google offers other users of its search syndication or Search Text Ads syndication services—or "ordinary commercial restrictions on scraping, indexing, or crawling" the syndicated content—Plaintiffs and the TC have drafted the Recommended Template to reflect those requirements. *See* Final J. § V.B, VI.B. However, the Court was clear that Qualified Competitors retain the right to submit complaints based on remedial syndication agreements, Final J. § X, and the Court retains jurisdiction over the Final Judgment if further orders or directions are needed "for the construction or carrying out of th[e] Final Judgment, for the modification of any of its provisions, for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of th[e] Final Judgment." Final J. § XI.A. Plaintiffs and the TC do not believe it is appropriate for Google to use remedial syndication agreements as a way to delay its compliance with the Final Judgment, including possible modifications thereof, and Plaintiffs and the TC believe incorporation of the Final Judgment by reference is a proper and effective method to ensure such compliance within the Recommended Template. For clarity, Google and Qualified Competitors will remain empowered to seek amendment under Recommended Template Section 20 as needed following any potential modification to the Final Judgment, and nothing in the Recommended Template is intended to suggest that the Court cannot set a schedule for implementing any such modification to the Final Judgment.

**Re Google Req. No. 35:** Limiting the referenced provision to "material breach" as the primary grounds for termination is consistent with standard commercial practice. Incorporating a non-material breach standard would introduce broad, unilateral and immediate termination rights. Providing Google with such a unilateral control mechanism is not appropriate given the current remedial posture and would further leave Qualified Competitors, the TC, Plaintiffs, and the Court without a reasonable cure period or other means of intervention.

**Re Google Req. No. 36:** Plaintiffs oppose the inclusion of Google's proposed Company Warranties provision in the Recommended Template. The proposed provision would make the warranties mutual as between Google and the TC, effectively expanding the grounds for termination and giving Google greater control over Qualified Competitors. Such a result is not appropriate in this context, given the current remedial posture, and Qualified Competitors will be subject to processes and procedures overseen and enforced by Plaintiffs and the TC.

**Re Google Req. No. 37:** Plaintiffs and the TC do not intend for the Recommended Template to require Google to provide syndication services to Qualified Competitors whose certification under Section IX.V of the Final Judgment has lapsed. Instead, the Suspension provision in the Recommended Template is intended to permit Google to suspend all remedial syndication services once a Qualified Competitor loses certification under the Final Judgment. In the event that a lapsed Qualified Competitor is later recertified under Section IX.V of the Final Judgement, the Suspension provision is intended to expedite the reinstatement of the remedial syndication services to the Qualified Competitor given that the "purpose of this [syndication] remedy is to provide a short-term measure for Qualified Competitors to compete as they improve their own search capabilities." Rem. Op. at 178.

**Re Google Req. No. 38:** Plaintiffs and the TC drafted the Amendment and Termination provisions in compliance with the Final Judgment, including express requirements governing termination, *See* Final J. §§ V.B.11, VI.B.10, and in alignment with Plaintiffs' and the TC's roles regarding the enforcement of and compliance with the Final Judgment. Section 16.3 of the Recommended Template is intended only to provide a voluntary remediation process for Google and Qualified Competitors available prior to initiating termination proceedings. This process is not mandatory but is intended as a voluntary preliminary step before initiating termination proceedings. If a Qualified Competitor wishes to seek voluntary remediation under a remedial syndication agreement, for example, Google would have fifteen (15) business days to respond to the Qualified Competitor's notice and either attempt or reject remediation. Upon receipt of Google's response, the Qualified Competitor may pursue termination or choose to continue under the remedial syndication agreement.

**Re Google Req. No. 39:** As a general matter, Plaintiffs and the TC have drafted the Severability provision of the Recommended Template with the intent of conforming to the Final Judgment's requirement that Google make syndication services available to Qualified Competitors pursuant to a license whose term will be five (5) years from the

date the license is signed. Final J. §§ V.A, VI.B. While Plaintiffs and the TC do not intend for any terms of the Recommended Template to be illegal or unenforceable, should any terms of a remedial syndication agreement entered into between Google and a Qualified Competitor be found to be illegal or unenforceable, the Severability provision is intended to operate as severing the illegal or unenforceable provisions such that the relevant Qualified Competitor may continue to receive syndication remedies as required under the Final Judgment. In such circumstances, Plaintiffs and the TC may review the surviving remedial syndication license to ensure it complies with all Final Judgment requirements.

**Re Google Req. No. 40:** Plaintiffs and the TC drafted the Assignment provision of the Recommended Template with the understanding that neither party to the agreement would be generally permitted to assign the agreement to a different entity. The permission structure included in the Assignment section is intended only to capture edge cases, such as where a Qualified Competitor pursues internal corporate restructuring during the Agreement Term to better compete, where restructuring does not conflict with the scope of the Qualified Competitor's certification under Section IX.V of the Final Judgment.

**Re Google Req. No. 41:** Plaintiffs and the TC drafted the Change of Control provision of the Recommended Template with the understanding that only Qualified Competitors would be able to receive search syndication and Search Text Ads syndication services under the Final Judgment. The notice structure included in the Change of Control section is intended only to capture edge cases involving Qualified Competitor certification or recertification under Section IX.V of the Final Judgment, such as where a a change of control does not conflict with the scope of the Qualified Competitor's current certification under the Final Judgment.

**Re Google Req. Nos. 42, 67–89:** Plaintiffs and the TC have carried out their obligations under the Final Judgment to create and submit to the Court a template for search syndication and Search Text Ads syndication. Final J. §§ V.B, VI.B. In so doing, Plaintiffs and the TC reviewed and, where appropriate, incorporated input from Google, such as responses to Technical Committee demand letters, commercial agreements, and Google's own syndication proposals. *Id.* Google's role under the Final Judgment is not to dictate the terms of its own syndication remedies or demand inclusion of omitted terms, but to comply with the remedies.

Further as to Request No. 42, Plaintiffs and the TC do not understand Google's question to relate to the syndication remedies, of which the present Recommendation is a part, nor do Plaintiffs believe it is appropriate to incorporate restrictions unrelated to the syndication remedies within the Recommended Template.

**Re Google Req. No. 44:** Plaintiffs and the TC drafted the Recommended Template to conform to the Final Judgment's language, with the Exhibits generally housing language intended to cover terms "no less favorable" than what Google provides to other users of its syndication services. *See* Final J. Op. at 37–39. Plaintiffs and the TC

do not intend for any cross-references within the Recommended Template to be ambiguous or circular. As an example, the cross-references in Exhibit C, Section 5.1.e is included only to clarify that the prohibition in Exhibit C, Section 5.1.e, covering financial arrangements with third parties, is not intended to restrict a Qualified Competitor's ability to (1) sub-syndicate Search Text Ads as permitted under the Final Judgment or (2) display or use the Search Text Ads syndication remedies as permitted under the Final Judgment. As to Google's reference to Exhibit C, Sections 4.5 and 5.5, because no such Sections exist, Plaintiffs understand Google's request to be referring to Sections 4.5 and 5.5 of the core Recommended Template, rather than Exhibit C. Plaintiffs and the TC have drafted these sections to conform to the Final Judgment's requirements permitting Google to impose ordinary commercial restrictions on scraping, indexing, or crawling syndicated search results and Search Text Ads. Final J. §§ V.B.7, VI.B.6. The cross-references in these sections are included only to clarify that permissible display and use of the syndication remedies by providers of GenAI Products, which the Court explicitly included within the Final Judgment's definition of Qualified Competitor to "leave no doubt that the remedies extend to [GenAI Product] companies," Final J. §§ IX.E, IX.V; Rem. Op. at 103–04, do not consitute scraping, indexing, or crawling prohibited under the Final Judgment.

**Re Google Req. No. 45:** Plaintiffs and the TC drafted the language in Recommended Template Sections 1.5 and 9 with the intent of ensuring that Qualified Competitors do not improperly retain or use syndicated content or information received from Google under the syndication remedies. This approach aligns with the Court's view that "the purpose of this [syndication] remedy is to provide a short-term measure for Qualified Competitors to compete as they improve their own search capabilities, not an additional means to facilitate that development." Rem. Op. at 178.

**Re Google Request No. 90:** Plaintiffs and the TC drafted the Recommended Template, including the descriptions of remedial syndication services in Exhibit B that include syndication of Maps Search Feature content, to conform to the Final Judgment. Under Section V.A of the Final Judgment, Google is required to make available to Qualified Competitors a search syndication license under which Google must provide, "via real-time API(s)," the following information and data: (1) "both desktop and mobile versions of the ranked organic web search results obtained from crawling the web;" (2) "the user-facing query-rewriting features that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment, including user-facing Search Features that enable query correction, modification, or expansion;" and (3) "the Local, Maps, Video, Images, and Knowledge Panel Search Feature content that Google provides under any of its current search syndication agreements as of the date of entry of this Final Judgment." The Final Judgment provides these requirements explicitly, rather than pinning the search syndication Google must provide only to what Google ordinarily provides within its Web Search syndication services. Given the Final Judgment's language and upon consideration of Google's input, including Google's own proposed Maps license, Plaintiffs and the TC have drafted the Remedial Web Search Service in Exhibit B to encompass Google's commercial Web Search syndication product

and the Search Feature content required under Section V.A, including Maps Search Feature content and any related beta programs or PIFs.

Moreover, the Court was clear that remedial syndication licenses need not mirror Google's standards terms exactly. In fact, the Court anticipated that there may be variations from Google's "ordinary commercial terms" within remedial syndication licenses in order to, e.g., increase clarity for Qualified Competitors, promote the "innovation this [syndication] remedy attempts to encourage," and preserve availability of syndication remedies to Qualified Competitors even where they "hop[e] to compete by offering unique services or features." Final J. Op. at 37–39.

**Re Google Req. Nos. 91, 93, 98–99, 104–05, 107:** Google misunderstands the process. Plaintiffs and the TC are not required to identify materials relied upon on a provision-by-provision basis. Moreover, requests for additional information must include, inter alia, "the relevance of each piece of information sought to . . . Google's ability to . . . exercise its right to object under the Final Judgment." May 20 JSR App. ¶ 6(b)(i). Google's blanket request is not sufficient.

In addition, Google turns the process on its head, by broadly asking for additional information without specifying any particular provision as to which Google is seeking information and potentially taking issue. Google thus appears to be targeting provisions based on the information relied upon, rather than on the merits of the provisions themselves.

Further as to Request No. 93, Plaintiffs and the TC drafted the Recommended Template after reviewing a wide range of input from Google, including Google's commercial syndication agreements, and in conformity with the Final Judgment's requirement that syndication licenses be offered to Qualified Competitors "on financial terms no worse than those offered to any other user" of Google's search syndication products and Search Text Ads syndication products. Final J. §§ V.A, VI.B. The [redacted] AdSense for Domain contract provides only secondary support, after other Google commercial syndication agreements (e.g., GOOG-DOJ-FJ-00000311), for including a [redacted] on AFS revenue share.

**Re Google Req. No. 92:** In drafting the Recommended Template, Plaintiffs and the TC considered and, where appropriate, incorporated input from Google (including language from all commercial syndication agreements Google provided) not only where expressly required by the Final Judgment, but also where incorporating such input could facilitate the efficient implementation of the syndication remedies. As part of this process, Plaintiffs and the TC reviewed the [redacted] agreement and other Google syndication agreements for standard contractual terms, such as the definition of "Request," and implementation provisions, such as the Launch provision in Recommended Template Section 4.1.

**Re Google Req. No. 96:** The proposed pricing set forth in the Recommended Template is dictated by Section V.A of the Final Judgment, which orders that the search

syndication license be offered "on financial terms no worse than those offered to any other user of Google's search syndication products." Accordingly, Plaintiffs and the TC relied on Google's own syndication agreements for the pricing terms, and information from third parties was neither was relied upon nor "is necessary [for Google] to. . . exercise its right to object under the Final Judgment." *See* May 20 JSR App. ¶ 6(b).

**Re Google Req. No. 97:** Section V.B.4 of the Final Judgment provides that "[t]he pace of this tapering, the methods for measuring and determining the percentage, and the application of the percentage will be determined by the Court upon consultation with Plaintiffs and the Technical Committee in a manner that facilitates competition while incentivizing Qualified Competitors to move promptly to become independent of Google." The template is clear that the tapering schedule is still being determined. If Google believes that the tapering schedule should be included in the submission to the Court on October 6, 2026, please provide Google's position and rationale.

**Re Google Req. Nos. 100–102:** Google misunderstands Plaintiffs' and the TC's reliance on the TC's interview with [redacted]. As reflected by the description of that interview in the Basis Statement, the material information relied upon related to [redacted]. When considering monitoring provisions within the Recommended Template, Plaintiffs and the TC relied on Google's own agreements, including for any values for relevant parameters.

Further as to Request No. 102, Plaintiffs and the TC do not have any—and did not rely upon any—contracts or other documentation from [redacted] related to the Recommended Template's provisions regarding violation severity classification levels.

**Re Google Req. Nos. 103, 108:** Plaintiffs refer Google to Section II.B of the Recommendation, which identifies the material information relied upon to support the Recommendation Statement, pursuant to Paragraphs 1 and 2 of the May 20 JSR Appendix.

Further as to Request No. 103, the TC's [redacted] interview with [redacted] was not relied upon for Section 4 of the Recommended Template.

**Re Google Req. No. 106:** As discussed supra, Request No. 22 suggests that the [redacted] Google currently makes commercially available differs from the [redacted] in the Recommended Template. Such information is relevant for assessing a response to this question. Please provide information or documentation on Google's commercially available [redacted] so that Plaintiffs and the TC may consider it.

* * * * *

Finally, Google has requested a "live discussion between Google and members of the Technical Committee in order to narrow areas of disagreement and improve [Google's] shared factual understanding." Plaintiffs and the TC are amenable to such a call prior to the deadline for Google's objections on September 29, 2026, to the extent

Google seeks information that is necessary to exercise its right to object under the Final Judgment, and provided that Google identifies, at least 48 hours in advance, the specific Requests that it would like to discuss on the call. Once Google has had the opportunity to review the responses above, please send us available dates and times, and we will promptly respond to schedule the call.

To the extent Googel has any objections to the Recommended Template, we look forward to receiving Google's submission to Plaintiffs by 3p ET on September 29, 2026. ECF No. 1528-2 at 3.

Sincerely,

*/s/ Grant M. Fergusson*
Grant M. Fergusson