# Exhibit 18

***United States of America et al. v. Google LLC* (Civil Action No. 20-3010 (APM))**
***State of Colorado et al. v. Google LLC* (Civil Action No. 20-3715 (APM))**

## STATEMENT OF THE TECHNICAL COMMITTEE

Pursuant to the Final Judgment in the above-referenced cases, the Court has appointed a technical committee ("TC") to assist in the enforcement of and compliance with the Final Judgment. ECF No. 1462 § VII.A.1. The TC consists of five members ("TC Members") who have each been appointed by the Court and who together perform the TC's duties and responsibilities under and pursuant to the Final Judgment. ECF No. 1462 § VII.A; *see also* ECF Nos. 1474, 1517. The TC Members have also hired and engaged individuals to provide professional services in furtherance of the TC's duties under the Final Judgment ("TC Staff"). ECF No. 1462 § VII.A.7.i.

As Chair of the TC, I present the following Statement on behalf of the TC regarding certain issues relating to the use of syndication within GenAI Products, which were raised during the Status Conference held on October 30, 2026. This statement represents the collective understanding of the five TC Members. The facts set forth herein are within the TC's knowledge and expertise. ECF No. 1462 § VII.A.2.

## INTRODUCTION

1. The TC has reviewed the transcript of the October 30, 2026 Status Conference in the above-referenced cases, specifically the Court's questions at Hearing Tr. 62:23–63:12, 81:8–19, 99:2–13, and the proposed Joint Status Report on Syndication that was the subject of that conference. The Court's questions regarding GenAI Products were stated as follows:

> I think the proposal of GenAI companies being able to receive syndicated terms and use those links to formulate narrative responses is, generally speaking,

> consistent with the terms of the judgment. But—and this is a big but—it has to be confined to the very narrow use that we have discussed here today and—two things, one, whether there's a technological way to ensure that it's not used for greater purposes; and, two, whether there will be some audit function to ensure that it's not being misused in a way that's prohibited.

(Hearing Tr. 99:4–13.)

2. The answer to both questions is yes. The mechanisms described below are examples drawn from current industry practice, not a required design. Qualified Competitor ("QC") systems may differ, and implementations will likely be specific to the QC's own infrastructure. What matters is the outcome: syndicated search results are used only to answer the query at hand, and are not retained, used for training, or used for product development.

**QUESTION 1:** ***Is there a technological way to ensure that syndicated results are not used for greater purposes?***

3. Yes. Technical mechanisms exist to ensure that a GenAI Product provider does not use syndicated search results beyond the narrow, permitted purpose discussed at the October 30, 2026 Status Conference. For example, an isolated, ephemeral Retrieval-Augmented Generation ("RAG") pipeline can be configured to: (i) hold syndicated content only in volatile memory (RAM) during the inference window; (ii) never write syndicated content to any disk, database, or log store; and (iii) automatically clear all syndicated content at the end of each inference turn, before any subsequent user interaction. This architecture enforces the receive-generate-discard sequence at the infrastructure level, not merely at the policy level.

4. Inference and training are separate operations. When a deployed language model answers a query, its parameters do not change, and the model itself retains nothing from the content supplied for that answer. Training is a distinct, deliberate process that runs separately

from the systems serving users.[1] The practical risk therefore lies not in the model "learning" while it answers, but in the data systems around it—logs, caches, and datasets—where syndicated results could be kept and later used for training or analysis. Keeping all forms of data, which would include syndicated search results, out of those systems is a familiar engineering problem with established solutions. This approach is technically feasible and operationally consistent with current enterprise AI practice.

5. Leading providers already separate inference from training as a routine commercial matter. Two examples:

a. **Amazon Web Services.** Through Amazon Bedrock, AWS serves third-party AI models to enterprise customers. AWS states that neither it nor the model providers use Bedrock inputs or outputs to train any model. Customers can select a zero-data-retention mode, under which no request or response data is written to durable storage, and can enforce that setting across their organization through access policies.[2]

---

[1] The Court explained in the Remedies Opinion:

> Even with high-quality filtered data, there are still limitations as to how accurately an LLM can respond to prompts. [ Rem. Tr.] at 167:6–168:11, 172:23–173:21 (Durrett) (discussing limitations of LLMs); *id.* at 382:18–383:14 (Turley) (discussing limitations with ChatGPT's functionality). The capabilities of an LLM are limited by the content of its training data and when that training occurs, and their accuracy is similarly circumscribed by content and timing. Importantly, (1) if information is not in an LLM's training data, it will not be able to produce a factual response to a query that seeks such information; (2) LLMs can provide reasonably accurate responses for frequently seen data but struggle to do so for lesser-known information; and (3) LLMs can forget the content of data they have previously been exposed to and thus cannot store information in a "lossless way." *See id.* at 158:24–159:19, 161:5–162:6, 171:13–172:21 (Durrett) (discussing these issues).

ECF No. 1436 at 30–31.

[2] Amazon Bedrock FAQs, https://aws.amazon.com/bedrock/faqs/ ("Will AWS and third-party model providers use customer inputs to or outputs from Amazon Bedrock to train . . . any third-party models? No . . . .") (last visited Nov. 13, 2026); Amazon Bedrock User Guide, "Data protection," https://docs.aws.amazon.com/bedrock/latest/userguide/data-protection.html (Model

b. **Brave.** Brave licenses results from its independent search index through an API marketed to AI developers for grounding generated answers. Its standard terms permit use of search results in the customer's application but prohibit storing or caching them "other than transient storage required for operation of Customer Applications," and prohibit using them "to create, evaluate, train, re-train, fine-tune, benchmark or otherwise improve artificial intelligence models." Storage and training rights are available only under separate plans. A search syndicator thus already licenses results for AI inference while excluding training—the same line the Court has drawn.[3]

6. The turn-level discard is the operative mechanism for multi-turn conversations. A single inference turn occurs when syndicated links are received, content is fetched, and a response is generated. At this point the syndicated material is discarded. What persists in the context window across turns within a session is only the LLM's own generated response, not the underlying syndicated links. The compliance boundary for syndicated content is the turn, not the session. The conversation history that carries forward contains only the qualifying company's own output; Google's syndicated links are not present in it and cannot be recovered from it.

**QUESTION 2:** ***Is there an audit mechanism that can ensure syndicated results are not misused?***

---

Deployment Accounts) (last visited Nov. 13, 2026); Amazon Bedrock User Guide, "Data retention" https://docs.aws.amazon.com/bedrock/latest/userguide/data-retention.html (zero-data-retention mode) (last visited Nov. 13, 2026).

[3] Brave Search API Terms of Use § 3(b)(i), (xiii), https://api-dashboard.search.brave.com/documentation/resources/terms-of-service (last updated Sept. 1, 2026); Brave Search API, https://brave.com/search/api/ ("Can I store results or use them to train models? Yes, with a plan that includes storage rights.") (last visited Nov. 13, 2026).

7. Yes. A three-layer audit mechanism is technically feasible if the Court believes it is appropriate to include such a mechanism in the syndication template. Each layer is described below.

8. **Logging of events, not content.** Rather than logging the content of syndicated results, the system logs data lifecycle events. A Qualified Competitor's system can record that syndicated results were received, used, and discarded—keyed to query identifiers and timestamps—without recording the results themselves. This compliance mechanism is already defined in the Recommended Template: QCs are required to maintain and log information about their use of syndication (Section 6.4) and are subject to periodic audits by the TC for compliance with the syndication cap and tapering rate (Section 4.7).

9. **Architecture Review.** The second layer is periodic architecture review—such as inclusion in the Qualified Competitor re-certification process—to verify that the qualifying company's system is structurally designed to prevent prohibited use. This review is analogous to a SOC 2 Type II assessment and provides structural assurance that transaction-level logging alone cannot provide.

10. **Google's own systems.** As the syndicating party, Google can observe query volumes, timing, and distributions at its API and flag patterns inconsistent with genuine user traffic, without access to the Qualified Competitor's internal systems.

**CONCLUSION**

11. Based on our review and technical analysis, it is our professional opinion that both questions the Court posed at the October 30, 2026 Status Conference are answerable in the affirmative. The narrow permitted use—receive syndicated search results, generate a narrative response, discard—can be enforced at the infrastructure level and independently audited through

the three mechanisms described above. The syndication template need not prescribe a particular architecture to enforce this narrow permitted use. Neither the technical confinement mechanism nor the audit function requires reliance on policy assurances alone; both can be contractually required, technically implemented, and independently verified.

Signed by:
Tammy Savage
A94B2793B05D4EA...

11/13/2026

Tammy Savage
Technical Committee Chairperson

Date